# In the United States Court of Federal Claims

No. 95-829C

(Filed: August 30, 2006)

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, Plaintiff, | * | Winstar case; Assumption of Risk of Regulatory Changes; Motion for Reconsideration; Summary Judgment on Liability. |
| v. | * | |
| THE UNITED STATES, Defendant. | * | |

*William D. Symmes,* with whom were *Leslie R. Weatherhead* and *William M. Symmes,* Witherspoon, Kelley, Davenport & Toole, P.S., Spokane, WA, for Plaintiff.

*Elizabeth M. Hosford,* with whom were *Stuart E. Schiffer,* Deputy Assistant Attorney General, *David M. Cohen,* Director, and *Jeanne E. Davidson,* Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.[1]

This Winstar-related case[2] is before the Court on Defendant's March 3, 2005 Motion For Reconsideration of the Court's September 12, 2002 liability decision issued by Chief Judge Edward J. Damich. Sterling Sav., et al. v United States, 53 Fed. Cl. 599 (2002). The case involves the acquisition by Plaintiff Sterling Savings Association ("Sterling") of three

---

[1] This case was transferred to Judge Thomas C. Wheeler on June 1, 2006, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

[2] See United States v. Winstar Corp., 518 U.S. 839 (1996).

failing or insolvent thrifts in the State of Washington: (1) Lewis Federal Savings & Loan Association of Chehalis, WA ("Lewis") in 1985; (2) Tri-Cities Savings & Loan Association of Kennewick, WA ("Tri-Cities") in 1988; and (3) Central Evergreen Federal Savings & Loan Association of Chehalis, WA ("Central Evergreen") in 1988. The Lewis and Tri-Cities acquisitions involved cash assistance to Sterling from the Federal Savings and Loan Insurance Corporation ("FSLIC"), and Government forbearance letters allowing Sterling to count supervisory goodwill toward regulatory capital. The Central Evergreen transaction was structured differently, without any cash assistance from FSLIC, or any Government forbearance letters. Sterling, 53 Fed. Cl. at 606.

For all three acquisitions, Chief Judge Damich found that the Government breached its contractual obligation to allow Sterling to use supervisory goodwill to satisfy regulatory capital requirements, and to amortize the goodwill over an agreed time period. For the Lewis and Tri-Cities transactions, the Court also found that the Government "breached its contractual obligation . . . to forbear from exercising its regulatory authority against Plaintiff for failing to meet its regulatory ratio requirements[.]" Id. at 615.

Defendant requests reconsideration of the Court's liability decision only as to the Central Evergreen acquisition. Defendant relies upon the decision of the United States Court of Appeals for the Federal Circuit in Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004), and contract language in the Central Evergreen agreement identical to a clause that the Admiral Court found shifted the risk of regulatory change to the plaintiff in that case. Because of this risk-shifting clause, the Government contends that the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in August 1989 and its implementing regulations did not constitute a breach of contract.[3] For the reasons explained below, Defendant's Motion for Reconsideration is GRANTED. The Court will enter summary judgment on liability for the Government regarding the Central Evergreen transaction. Summary judgment on liability for Plaintiff regarding the Lewis and Tri-Cities transactions will stand.

## Background

A limited summary of the Central Evergreen transaction will suffice for the purposes of this decision. A fuller description of the Lewis, Tri-Cities and Central Evergreen transactions is found in Chief Judge Damich's September 12, 2002 liability decision, cited

---

[3] Other decisions are in line with Admiral and support Defendant's position. See Franklin Fed. Sav. Bank et al. v. United States, 431 F.3d 1360 (Fed. Cir. 2005); First Commerce Corp. v. United States, 63 Fed. Cl. 627 (2005); Bayside Fed. Sav. & Loan Assoc. v. United States, 64 Fed. Cl. 15 (2004); Coast-to-Coast Fin. Corp. v. United States, 62 Fed. Cl. 469 (2004).

herein where necessary.

Sterling acquired Central Evergreen in late 1988. The Central Evergreen transaction is memorialized in the following documents, all contained in a March 17, 2005 Appendix that Plaintiff provided to the Court ("Pltf's App."):[4] (1) An Acquisition Agreement between Sterling and Central Evergreen, dated July 20, 1988 (Pltf's App. at 1-23); (2) Federal Home Loan Bank Board ("FHLBB") Resolution No. 88-1273, dated December 8, 1988 (Id. at 24-29); (3) A reciprocal resolution by Sterling's Board of Directors, dated December 22, 1988 (Id. at 30-31); (4) An Agreement between Sterling and the FSLIC, dated December 28, 1988 (Id. at 32-37) (the "Agreement"); and (5) Sterling's Business Plan for operating the merged institutions, dated August 15, 1988 (Id. at 38-46).

In Section V of the Agreement, "Miscellaneous Provisions," paragraph D stated:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

(Pltf's App. at 35).[5] This provision is identical to risk-shifting clauses addressed in Admiral, 378 F.3d at 1339, Franklin Fed. Sav. Bank et al. v. United States, 431 F.3d 1360, 1363 (Fed. Cir. 2005), and Guaranty Fin. Serv., Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991).

The Agreement also contained a "Definitions" section where each of the following terms was defined: Fully Phased-In Capital Requirement, Minimum Capital Requirement, Regulatory Capital, Regulatory Capital Requirement, and Regulatory Capital Deficiency. (Pltf's App. at 33). Each of these terms referred to a specific banking regulation found in 12 C.F.R. § 561 or § 563, "or any successor regulation." Id.

In Section III of the Agreement, "Obligations of the Acquirer," paragraphs A and B stated:

---

[4] Defendant also furnished an Appendix with its motion, but for convenience, the Court's record citations are to Plaintiff's Appendix where nearly all of the relevant documents are contained. Defendant's Appendix ("Deft's App.") is cited only where a document does not appear in Plaintiff's Appendix.

[5] The term "Board" in this Agreement refers to the Federal Home Loan Bank Board. The Agreement states that FSLIC "is under the operating direction" of the Board. (Pltf's App. at 32).

> A. The Acquirer will cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan. The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised prior to December 31, 1990.
>
> B. The Acquirer agrees that if the ratio of regulatory capital to total assets is less than the ratio projected in the attached Business Plan by 90 basis points until the earlier of (I) December 31, 1990, or (ii) the raising of the additional capital provided for in the attached Business Plan, or subsequently 30 basis points, it will comply with the directives that are imposed under 12 C.F.R. Section 563.13(d) and will comply with the time period specified.

(Pltf's App. at 34).

An integration clause in Section V, paragraph K of the Agreement provided that "[t]his Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof." Id. at 36.

Finally, Section V, paragraph M of the Agreement provided that "[t]his Agreement is not a waiver of or forbearance from any applicable regulation." (Pltf's App. at 36).

The Business Plan contained Sterling's projections covering a three-year period for fiscal years ending June 30, 1989, 1990, and 1991, and was appended to the Agreement as Attachment A. (Pltf's App. at 38-46). For each fiscal year, the Business Plan contained a line item for "Intangible Assets" including the "Supervisory Goodwill" associated with Sterling's acquisition of Central Evergreen. Id. at 41, 43, 45. In a series of quarterly proformas, the Business Plan shows a projected increase of $20.9 million in Intangible Assets as of December 1988, reflecting the addition of the negative net worth for Central Evergreen. Sterling, 53 Fed. Cl. at 607.

In a January 27, 1989 letter, the accounting firm of Coopers & Lybrand stated that Plaintiff allocated approximately $23.8 million to supervisory goodwill resulting from

Sterling's acquisition of Central Evergreen. The letter also stated that Plaintiff would amortize the goodwill for 12 years in accordance with the Statement of Financial Accounting Standards No. 72. Id.[6]

On August 9, 1989, Congress enacted FIRREA, Pub. L. No. 101-73, 103 Stat. 183, codified throughout 12 U.S.C. Among other things, FIRREA abolished the FSLIC and transferred its functions to other agencies, created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation ("FDIC"), eliminated the FHLBB and replaced it with the Office of Thrift Supervision ("OTS") within the Department of Treasury, and established the Resolution Trust Corporation ("RTC") to be charged with closing certain thrifts. 12 U.S.C. §§ 1437 note, 1441a, 1821. FIRREA also restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements. Under the new law, Congress established three new capital standards: core capital, tangible capital and risk-based capital. 12 U.S.C. § 1464(t). Under these new standards, supervisory goodwill could not be included in satisfying tangible capital, and had to be amortized on a 20-year basis for purposes of calculating risk-based and core capital. Id. See also Sterling at 601-02.

Following the enactment of FIRREA, Sterling failed to meet the minimum capital requirements. Sterling filed an amended "Capital Restoration Plan" with OTS on February 28, 1990, and proposed that it should be acquired by another financial institution by May 31, 1990. Id. at 608. OTS approved this plan on the condition that Sterling's board of directors execute an operating agreement that consented to the appointment of a receiver or conservator if a merger could not be consummated. On May 10, 1990, Sterling elected not to execute an operating agreement with this condition. As a result, OTS denied Sterling's Capital Restoration Plan on May 22, 1990, and imposed operating restrictions on Sterling. Id.

Based upon affidavit and deposition testimony from Sterling's Senior Vice President and Chief Financial Officer, furnished to the Court by Plaintiff's counsel, it is apparent that Sterling, FHLBB and FSLIC were well aware in 1988, before the Central Evergreen acquisition was completed, that existing regulatory capital standards might be increased. (Pltf's App. at 75-76, Affidavit of Daniel G. Byrne, Feb. 2, 1993, ¶¶ 10, 11). Mr. Byrne acknowledged that, in the negotiation of the Central Evergreen transaction, Sterling wanted to mitigate the risk that "the existing regulatory capital standards might be increased." Id. at ¶ 11. In his deposition on July 11, 2000, Mr. Byrne testified regarding the risk-shifting clause in Section V, paragraph D. According to Mr. Byrne, Sterling "had heartburn with it,

---

[6] At the time of Sterling's acquisition of Central Evergreen, there was no prohibition against including goodwill in regulatory capital. A thrift could include goodwill in calculating regulatory capital without obtaining any governmental approval.

but we thought we protected ourselves by adding the language that we were discussing" in Sections III, A and B, and in the last paragraph of Section II. (Pltf's App. at 83, Deposition of Daniel G. Byrne, July 11, 2000, at 321). When asked why Sterling did not simply ask for Section V, D to be taken out of the Agreement, Mr. Byrne testified "[w]e made that recommendation one time, maybe several times," but "the people . . . at FSLIC and the bank board did not want that [clause] to come out." Id.

In May 1990, Sterling filed suit against OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order and a preliminary injunction. The district court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. The preliminary injunction restricted OTC and FDIC from regulating Sterling, and held that some of the forbearances were contracts. See Sterling, 53 Fed. Cl. at 608 (citing Sterling Sav. Assoc. v. Ryan, 751 F. Supp. 871, 881-83 (E.D.Wash. 1990)). The U.S. Court of Appeals for the Ninth Circuit reversed, vacated the injunction, and held that "[a] thrift's remedy against the government, if any, is not an injunction against the enforcement of FIRREA but damages for breach of contract or for taking of property." Id. (citing Sterling Sav. Assoc. v. Ryan, 959 F.2d 241 (Table), 1992 WL at *1 (9th Cir. April 14, 1992)). On September 13, 1995, the district court transferred the case to the United States Court of Federal Claims. Id.

The issue before the Court is whether the Government through the enactment of FIRREA breached the Central Evergreen Agreement with Sterling, or whether Sterling assumed the risk of regulatory changes by means of the risk-shifting "successor regulation" provisions in Section V, paragraph D of the Agreement.

## Discussion

### A. Standard for Reconsideration and Summary Judgment

Under Rule 59 of the Rules of the Court of Federal Claims ("RCFC"), the Court may grant a motion for reconsideration when the moving party satisfies its burden to show "either that: (a) an intervening change in the controlling law has occurred, (b) evidence not previously available has become available, or (c) that the motion is necessary to prevent manifest injustice." Citizens Fed. Bank, FSB v. United States, 53 Fed. Cl. 793, 794 (2002) (quoting Bishop v. United States, 26 Cl. Ct. 281, 286 (1992)). Defendant cites the Federal Circuit's Admiral decision, 378 F.3d 1336, as an intervening change in the controlling law. (Deft's Motion at 4). The Federal Circuit's decision in Franklin Fed. Sav. Bank et al. v. United States, 431 F.3d 1360 (Fed. Cir. 2005) is to the same effect. The Court finds that Defendant has satisfied its burden, and that grounds for reconsideration of the Court's earlier opinion exist.

The Court's September 12, 2002 liability decision granted summary judgment for Plaintiff. By Defendant's motion for reconsideration, the Court again is being asked to enter summary judgment. The standard of review applicable to the 2002 decision applies again now. Accordingly, the Court will not grant summary judgment unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact, and the Court must resolve doubts about any factual issues in favor of the non-moving party. Id. (citing Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307 (Fed. Cir. 1998).

B. Analysis of the Risk-Shifting Clause and Related Case Law

Answering the question of which party, Sterling or the Government, bore the risk of regulatory change must begin with the Supreme Court's decision in Winstar itself. In Winstar, the plurality decision noted that, "in the world of regulated industries . . . the risk that legal change will prevent bargained-for performance is always lurking in the shadows." United States v. Winstar Corp., 518 U.S. 839, 869 (1996) (quoting Restatement (Second) of Contracts § 264, Comment a). The Court held that the contracts at issue in Winstar promised long-term forbearance protecting the thrifts from regulatory change, but observed that "each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language." Id. at 869 n.15 (citing Guaranty Fin. Serv., Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift.)). The risk-shifting clause in Guaranty, cited with approval by the Supreme Court, is identical to Section V, paragraph D of the December 28, 1988 Agreement in this case. (Deft's App. at 11).

In Admiral, 378 F.3d 1336, another Winstar-related case appealed from our Court, the Federal Circuit interpreted a "Regulatory Capital Maintenance Agreement" containing the same risk-shifting provision found in Guaranty, and in Section V, paragraph D in the Sterling Agreement. (Deft's App. at 18). After a thorough review of Winstar, Guaranty, and other cases, the Admiral Court held that:

> . . . Admiral assumed the risk of a regulatory change such as that brought about by FIRREA. For that reason, Admiral cannot recover damages based upon the enactment of FIRREA and the promulgation of regulations pursuant to that statute that altered Admiral's obligations under the contract.

Admiral, 378 F.3d at 1343. The Federal Circuit acknowledged that Guaranty was a decision from a different circuit, but explained "we accord great weight to the decisions of our sister circuits when the same or similar issues come before us, and we 'do not create conflicts among the circuits without strong cause.'" Id. at 1340 (citing Wash. Energy Co. v. United States, 94 F.3d 1557, 1561 (Fed. Cir. 1996)).

In the course of its analysis, the Federal Circuit mentioned this Court's September 12, 2002 Sterling decision, which the Admiral trial court relied upon for the proposition that the risk-shifting clause should not shift the risk of regulatory change to the private party. Admiral, 378 F.3d at 1341. After describing the reasoning in Sterling,[7] the Federal Circuit noted its disagreement:

> We do not believe Guaranty can be distinguished in that manner. The court in Guaranty found that the language in question altered the government's obligations with respect to the regulatory capital and amortization issues and shifted to Guaranty the risk of FIRREA's regulatory change with respect to those issues. The Guaranty court "interpret[ed] the contract to mean that Guaranty had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed." Guaranty, 928 F.2d at 1001.

Id. (citation omitted)(emphasis added). Although Plaintiff correctly observes that the Federal Circuit did not have the Sterling record before it, and that its comments on Sterling are non-binding dicta, the Court nevertheless finds the Federal Circuit's observations in line with the

---

[7] The Federal Circuit in Admiral described the Sterling rationale as follows:

> The Sterling court read Guaranty as not holding that the purported risk-shifting clause mandated that the risk of regulatory change was shifted to the plaintiffs. Instead, the court in Sterling ruled that the risk-shifting clause meant that the acquirer could be required to comply with regulations regarding maintenance of capital levels, payment of dividends, and reporting of deviations from the business plan, but that the clause did not alter the government's obligation to allow the plaintiff to treat supervisory goodwill as an asset and amortize it over the period set forth in the contract. 53 Fed. Cl. at 614.

Admiral, 378 F.3d at 1341.

reasoning in Winstar, Guaranty, and Admiral.

More recently, in Franklin Fed. Sav. Bank et al. v. United States, 431 F.3d 1360 (Fed. Cir. 2005), the Federal Circuit again reviewed the import of the risk-shifting clause, observing "[t]he key question on appeal is whether the 'successor regulation' language in section VIII(D) placed the risk of regulatory change on Franklin." Id. at 1363. Following another extensive review of the legal landscape, the Federal Circuit held: "We conclude that here as in Admiral the 'successor regulations' clause of the [Agreement] placed the risk of regulatory change on the thrift entities." Id. at 1371.

Since Admiral, our Court in at least three other cases has given legal effect to this identical clause shifting the risk of regulatory changes to the thrifts. In each case, the Court has found that the enactment of FIRREA did not constitute a breach of contract. See First Commerce Corp. v. United States, 63 Fed. Cl. 627 (2005); Bayside Fed. Sav. & Loan Assoc. v. United States, 64 Fed. Cl. 15 (2004); Coast-to-Coast Fin. Corp. v. United States, 62 Fed. Cl. 469 (2004).

Plaintiff argues that this case is more like Hometown Fin. Inc. v. United States, 409 F.3d 1360 (Fed. Cir. 2005), where the Federal Circuit distinguished Admiral and found that a dividend agreement in that thrift acquisition did not shift the risk of regulatory change to the acquiring thrift. Hometown, 409 F.3d at 1367-68. Although the agreement in Hometown contained the identical risk-shifting language at issue in Guaranty, Admiral, Franklin, and the present case, the Hometown agreement contained express forbearance language absent in the other cases. Section I(E) of the regulatory maintenance agreement in Hometown provided:

> "Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. § 561.13(b), or any successor regulation thereto, <u>except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.</u>

Hometown, at 1367 (emphasis added). The underscored language describing how the parties would treat forbearances even if there were regulatory changes makes Hometown a starkly different case. The Sterling Agreement does not include any forbearances that would modify the risk-shifting language in Section V, paragraph D.

Plaintiff also contends that Section III, paragraphs A and B of the Sterling Agreement should take precedence over the risk-shifting clause in Section V, paragraph D, but the Court does not accept this proposition. Section III, "Obligations of Acquirer," refers to the Business Plan attached to the Agreement, and specifies what Sterling must do if its Regulatory Capital falls below its Minimum Capital Requirement. (Pltf's App. at 34). Section III, paragraph A states that Sterling's obligation will be to restore capital to "the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan." Id. As acknowledged in the deposition of Sterling's Chief Financial Officer (Id. at 83), Sterling saw this provision as affording it some protection if new laws or regulations were to increase the Minimum Capital Requirement. However, Section III of the Agreement makes no mention of goodwill, the inclusion of goodwill in regulatory capital, or of any governmental forbearances from the effects of regulatory changes. The clause in Section V, paragraph M underscores this conclusion. That clause explicitly states that "[t]his Agreement is not a waiver of or forbearance from any applicable regulation." Id. at 36.

Plaintiff further argues that its "bargained-for" and "negotiated" Business Plan is a contract itself, reflecting the Government's agreement that Sterling could count supervisory goodwill toward capital requirements. (Pltf's Response, at 5-6). While the Business Plan contains Sterling's quarterly projections, and serves as a benchmark by which to apply Section III of the Agreement, it does not in any way limit the risk of regulatory changes that Sterling assumed in Section V, paragraph D. (Pltf's App. at 38-46). There is no evidence that the Business Plan was in any sense "bargained-for" or "negotiated," and it has no signatures. The Business Plan contains only two pages of text, and does not make any reference to goodwill, or of any governmental forbearance or understanding regarding goodwill. Id. The mere inclusion of supervisory goodwill in the line item for "Intangible Assets" on the Business Plan does not mean that Sterling could continue counting goodwill as regulatory capital after the enactment of FIRREA. The conclusion is inescapable from the affidavit and deposition of Sterling's Chief Financial Officer (Pltf's App. at 75-76, 82-83) that Sterling, and representatives of the FSLIC and FHLBB, anticipated regulatory changes in capital requirements, and negotiated the terms of their Agreement with a mutual awareness that the regulatory environment was likely to change. As Mr. Byrne testified, Sterling had "heartburn" about assuming the risks of regulatory changes (id. at 83), but the clause remained in the Agreement and Sterling accepted it with open eyes.

Plaintiff also identifies the integration clause, Section V, paragraph K of the Agreement, as aiding its position. That clause provides:

> This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

(Pltf's App. at 36). Reading this language together with Section V, paragraph D, Plaintiff argues that the integration clause recognizes the discrete components of the Central Evergreen transaction (i.e., the Acquisition Agreement, the reciprocal resolutions, the Agreement, and the Business Plan), but that the risk-shifting language in Section V, paragraph D applies only to the December 28, 1988 Agreement.[8] Therefore, according to Plaintiff, the Government's "obligation" in the Business Plan to allow Sterling to count goodwill toward its capital requirements falls outside the scope of Section V, paragraph D. As Plaintiff's counsel describes this argument, Section V, paragraph D "is restrictive in the scope of its application to this agreement by Sterling to maintain capital. It doesn't apply to the other agreements pursuant to which the Government recorded its promises to Sterling." (Aug. 7, 2006 Conference, Tr. at 9).

The Court has serious reservations regarding Plaintiff's creative argument. Section V, paragraph K refers to "any understanding agreed to in writing by the parties." (Pltf's App. at 36). Thus, if the documents Plaintiff wants the Court to deem "integrated" were not signed by both parties, as the reciprocal resolutions and the Business Plan were not, the documents may not be covered by the integration clause. See Franklin Fed. Sav. Bank, 431 F.3d at 1366 (integration clause did not incorporate approval and forbearance letters that "were not 'written' agreements signed by the parties"). However, even with all doubts concerning the integration clause resolved in Plaintiff's favor, Plaintiff still would not prevail. Amassing all of these documents together as one transaction, including the reciprocal resolutions and the Business Plan, there is simply nothing in them creating an obligation for the Government to regard supervisory goodwill as regulatory capital after FIRREA.

Finally, the defined terms in the Agreement which refer to 12 C.F.R. §§ 561 and 563 "or any successor regulation" (Id. at 33), also favor Defendant. Viewing these terms together with the risk-shifting clause in Section V, paragraph D, the Court must find that Sterling assumed the risk of all regulatory changes, such as FIRREA, when it agreed to acquire Central Evergreen. While the Court has little doubt that Sterling expected to count supervisory goodwill toward regulatory capital as long as it could, the Agreement that Sterling knowingly entered into is its contract, and Sterling is bound by those terms.

---

[8] Plaintiff made this argument for the first time at an August 7, 2006 conference with the Court. See Tr. at 9.

## Conclusion

Based upon the foregoing, the Court concludes that Section V, paragraph D of the Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA. Defendant's Motion for Reconsideration is GRANTED. There being no genuine issues of material fact, summary judgment on liability is entered for Defendant regarding the Central Evergreen transaction. That portion of the Court's September 12, 2002 liability decision inconsistent with the foregoing is hereby vacated. The Court will promptly schedule a status conference with counsel for the parties to arrange for further proceedings in this matter.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge