**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **Court No. 95-829-C**<br><br>**(Judge Wheeler)** |

---

**MOTION AND BRIEF FOR RECONSIDERATION**

---

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**
**1100 US BANK BUILDING**
**422 W. RIVERSIDE**
**SPOKANE, WA 99201**
**Tele: (509) 624-5265**

**WILLIAM D. SYMMES**
**LESLIE R. WEATHERHEAD**
**WILLIAM M. SYMMES**
**Attorneys for Plaintiffs**

**September 14, 2006**

# TABLE OF CONTENTS


I. STATEMENT OF CASE AND QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. REHEARING IS APPROPRIATE WHERE THE COURT HAS MISAPPREHENDED CRITICAL ISSUES OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. THE COURT'S ENTRY OF SUMMARY JUDGMENT IN FAVOR OF THE GOVERNMENT ON ITS MOTION FOR RECONSIDERATION WAS BASED UPON STATEMENTS OF FACT THAT WERE MISTAKEN OR, IN CERTAIN INSTANCES, DISPUTED, UPON WHICH A TRIAL SHOULD BE HAD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*1. Summary Of Facts Relied Upon By The Court* . . . . . . . . . . . . . . . . . . . . . . . 2

*2. The Absence Of References To Goodwill And Its Use As Capital In Section III Of The Agreement Supports Sterling's Position, Not The Government's* . 3

*3. The Evidence Is Undisputed That The Business Plan Was "Bargained For" And "Negotiated"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*4. The Business Plan Explicitly References Governmental Understandings Regarding Goodwill* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*5. Sterling Has Consistently Construed Its Contracts With The Government* . 8

*6. The Court's Ruling Fundamentally Altered The Interpretation Of The Central Evergreen Documents In A Way Not Anticipated In The Government's Motion For Reconsideration. Sterling Had No Fair Opportunity To Demonstrate The Issues Of Fact Nor To Raise Additional Arguments Implicated By The New Interpretation* . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*7. Assuming All Contracts Are Read As A Single Instrument, They Are Replete With Evidence Of Intent That Capital Promises Should Survive A Change In Regulation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Admiral Financial Inc. v. United States*, 378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . 12

*Guaranty Fin. Serv., Inc. v. Ryan*, 928 F.2d 984 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hometown Fin. Inc. vs. United States*, 409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 12

*Sterling Savings Assoc. v. Ryan*, 751 F. Supp. 871, 879-881 (E.D. Wash. 1990) . . . . . . . . . . . . 13

*Savings Association v. United States*, No. 95-829C, *slip op.* (Fed. Cl. Nov. 15, 2002) . . . . . 3, 4, 5

*Savings Association v. United States*, No. 95-829C, ___ Fed. Cl. ___, 2006 WL 2513059 (Fed. Cl. Aug. 30, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

## RULES

Rules of the Court of Federal Claims - Rule 59(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**MOTION AND BRIEF FOR RECONSIDERATION**

## I. STATEMENT OF CASE AND QUESTION PRESENTED

Sterling Savings Association ("Sterling") brought suit against the United States in May 1990, seeking to remedy breaches of contracts for the acquisition of three thrifts. In January 1997, Sterling moved for partial summary judgment on liability for breach. That motion was granted in September 2002. On March 3, 2005, the Government moved for reconsideration as to the Central Evergreen transaction. That motion was granted on August 30, 2006 (hereafter the "*Aug. 30 Order*"). *Sterling Savings Association v. United States*, No. 95-829C, ___ Fed. Cl. ___, 2006 WL 2513059 (Fed. Cl. Aug. 30, 2006) [Doc. 204].

Sterling now respectfully moves for reconsideration of that portion of the Court's order of August 30, 2006, that directs entry of judgment in favor of the Government. While Sterling respectfully disagrees with the Court's vacation of the prior order of summary judgment in Sterling's favor, it does

not seek by this motion to relitigate that aspect of the Court's decision. Rather, in the respectful[1] belief that the Court overlooked certain issues of material fact, Sterling requests that the issue of liability on the Central Evergreen transaction should be decided at trial.

## II. ARGUMENT

### A. REHEARING IS APPROPRIATE WHERE THE COURT HAS MISAPPREHENDED CRITICAL ISSUES OF FACT.

Under Rule 59(c) of the Rules of the Court of Federal Claims, reconsideration is available to prevent "manifest injustice."

Manifest injustice is not defined in the rules, but Sterling respectfully submits that a grant of adverse judgment on reconsideration of a motion for summary judgment based upon either a misapprehension of the facts or where triable issues of fact remain would be a manifest injustice.

### B. THE COURT'S ENTRY OF SUMMARY JUDGMENT IN FAVOR OF THE GOVERNMENT ON ITS MOTION FOR RECONSIDERATION WAS BASED UPON STATEMENTS OF FACT THAT WERE MISTAKEN OR, IN CERTAIN INSTANCES, DISPUTED, UPON WHICH A TRIAL SHOULD BE HAD.

#### *1. Summary Of Facts Relied Upon By The Court.*

This Court's order on reconsideration granting partial summary judgment in favor of the Government was expressly predicated on five key propositions of fact: (a) "Section III of the Agreement makes no mention of goodwill, the inclusion of goodwill in regulatory capital, or of any governmental forbearances"; (b) "There is no evidence that the Business Plan was in any sense 'bargained-for' or 'negotiated'"; (c) The Business Plan "does not make any reference to goodwill, or of any governmental

---

[1] Sterling is particularly mindful that this Court was obliged to assume responsibility for deciding a pending motion to reconsider a summary judgment motion that has itself been *sub judice* for nine years, and which was the subject of some four shelf feet of briefing materials, three or four previous orders, and two lengthy hearings. Sterling respectfully submits that, though it is certainly of no fault of this Court, the lack of judicial continuity is prejudicial to the extent that it is simply not humanly possible for a judicial officer coming new to the matter to master the entire record, and this may be an additional reason to grant reconsideration.

. . . understanding regarding goodwill"; (d) Sterling only recently took the position that the language in the Agreement's "integration clause" limits the application of paragraph V(D) of the Agreement to the Agreement itself; and (e) assuming all the documents are a single transaction, "nothing in them" creates an obligation in the Government to regard supervisory goodwill as capital after FIRREA. *Aug. 30 Order*, [Doc. 204] pp. 10-11. As discussed below, some of these propositions are disputed, and a trial is therefore required.

### *2. The Absence Of References To Goodwill And Its Use As Capital In Section III Of The Agreement Supports Sterling's Position, Not The Government's.*

The Court's order is correct that Section III of the Agreement does not contain the words "goodwill" or that such was to be "included in regulatory capital." Goodwill and its treatment were negotiated and agreed to in the Business Plan, which Sterling has always contended is a distinct instrument evidencing the contract.[2] The Agreement, and its component Section III, refer to Sterling's duty to raise additional capital as necessary in the future. The absence of a direct reference to the Government's promises to Sterling regarding supervisory goodwill actually supports Sterling's position because the Government's promise concerning regulatory capital and its treatment under Regulatory Accounting Practices ("RAP") were agreed to in the Business Plan. In other words, the power the Government reserved in section V(D) of the Agreement operates, as Chief Judge Damich found, on Sterling's obligations to raise more capital as described in the Agreement, but did not operate (as Chief Judge Damich also found) on the Government's promise regarding the use of supervisory goodwill as capital. *Sterling Savings v. United States*, 53 Fed. Cl. 599, 612-14 (2002) [Doc. 103, pp. 18, 20-21]; *Sterling Savings v. United States*, No. 95-829C, *slip op.* at 4-5 & n.3 (Fed. Cl. Nov. 15, 2002) [Doc.

---

[2] Sterling herein demonstrates, at pp. 7-8, *infra*, that this has consistently been Sterling's position, that Chief Judge Damich found it supported by undisputed evidence, that the Government's challenge to it on a previous reconsideration motion was rejected, and that the Government's instant motion for reconsideration never raises the issue.

117] (hereinafter the "*Nov. 15 slip op.*").

### *3. The Evidence Is Undisputed That The Business Plan Was "Bargained For" And "Negotiated".*

Chief Judge Damich ruled that it was a matter of undisputed fact that the Business Plan was one of the instruments evidencing the bargained-for exchange between Sterling and the Government in which Sterling acquired Central Evergreen at the behest of the Government in exchange for a promise that it could use supervisory goodwill as capital. 53 Fed. Cl. at 612-14 [Doc. 103, pp. 18, 21]; *Nov. 15 slip op.* at 4-5 & n.3 [Doc. 117]. When Sterling moved for clarification of a certain aspect of Chief Judge Damich's order, the Government argued in response that the Business Plan had no proper status as a contract instrument. Chief Judge Damich rejected that argument, once again ruling in his order on reconsideration that

> First, it is clear that the Court's opinion finds that the business plan (Pl.'s Mot. at *App.* C-3, A-1 to A-8) is part of the bargained-for-exchange between the parties to the Central Evergreen transaction, along with Resolution of the Bank Board approving the merger, and the reciprocal resolution by Plaintiff's board of directors.

*Nov. 15 slip op.* at 4 [Doc. 117].

When the Government made its instant motion for reconsideration, it did not seek reconsideration of these two rulings. Accordingly, Sterling was not in a position to understand that it would be required to reproduce to either Judge Wolski or this Court those parts of the record that support Chief Judge Damich's rulings. Sterling believes that the evidence is undisputed that the Business Plan *was* "agreed upon" and "negotiated", but, at a minimum, this question should be tried if this Court sees evidence to the contrary.

The evidence that the parties "agreed upon" the Business Plan comes first in the forms of the two resolutions. In its own resolution, the FHLBB provided that (1) Sterling and the FSLIC should agree that Sterling "will operate within the scope of the business plan provided in this application" and

(2) that Sterling should "ratify the terms and conditions of this approval resolution and . . . submit a . . . resolution" to that effect. Sterling furnished a resolution so committing itself. Chief Judge Damich ruled on uncontested evidence, and the Government does not seek reconsideration, that these two reciprocal resolutions formed a contract. 53 Fed. Cl. at 612-14 [Doc. 103, pp. 18, 20-21]; *Nov. 15 slip op.* at 4-5 & n.3 [Doc. 117]. It was plainly a material provision of that contract (the FHLBB included it as an essential "condition") that the parties agree that Sterling operate according to the Business Plan. *Id.*

As for negotiation of the Business Plan itself, in the evidence already of record, Dan Byrne, Sterling's Chief Financial Officer, testified that the specifics of the Business Plan were carefully negotiated with officers of the FSLIC. (See *Appendix to Pl's Resp. re: Def's Mot. for Recon. of the Court's Sept. 12, 2002, Liab. Dec.* ("*Reconsider. App.*") [Doc. 180], pp. 75-76, 82:14-25.) Ed Hedlund, who negotiated the Central Evergreen transaction on the FSLIC's behalf, agreed that the Business Plan was negotiated. (*Id.* at p. 224:6-10; *Reconsid. App.*, p. 56, ¶ 37; p. 76, ¶ 13.)

There is, in short, no evidence that the Business Plan was *not* negotiated. Sterling, therefore, believes at a minimum a triable issue exists, and that at such trial Sterling shoul dbe permitted additional evidence of negotiation that is not yet of record.[3]

### *4. The Business Plan Explicitly References Governmental Understandings Regarding Goodwill.*

The Business Plan must be read in its proper context; there is no dispute that it, and the parties' agreement that Sterling could and would operate in conformity with it, was an essential part of the bargain between the Government and Sterling for the takeover of Central Evergreen. Thus, the entire Business Plan (including the aspects relating to regulatory capital and goodwill) constitutes the parties' mutual understanding. Furthermore, the Business Plan doesn't merely mention goodwill. It recites (in the text portion) how much goodwill would be created by the Central Evergreen acquisition. More significantly, in the numerical schedules, it contains quarterly calculations of the amount of goodwill Sterling would carry on its books as a result of the acquisitions. And, most important of all, the

---

[3] For example, by way of an offer of proof, Sterling represents that at the June 7, 2000 deposition of Harold Gilkey, Mr. Gilkey testified "Yes, I did have discussions with Hilton Hewitt. It involved the business plan, which involved the net operating loss carryforwards, the injection of capital and the way we were going to get that capital." Transcript of June 7, 2000 Deposition of Harold Gilkey, 288:3-7. Mr. Gilkey further testified:

Q: ...Sterling had the right to count the Central Evergreen goodwill as capital, contractually?
A: Yes.
Q: Where is that?
A: It is in the - page 0338 in the assets section, intangible assets.
Q: And that line -
A: Increases from 18 million to 39 million as a reflection of the acquisition of Central Evergreen, to take place in December.
Q: And it is your position that this line on page 0338 gives Sterling the contractual right to count the Central Evergreen goodwill as capital?
A: Yes.
Q: If you look at the bottom of that same page where it says RAP leverage, what is meant by RAP?
A: Regulatory accounting practices.

Transcript of June 7, 2000 Deposition of Harold Gilkey, 303:2-19.

schedules contain a quarterly calculation of figures that are denominated "GAAP leverage" and "RAP leverage." (*Reconsid. App*., pp. 41-46.)

"Leverage" is a term to describe the ratio of capital to total assets. The GAAP version of this number is that produced using "Generally Accepted Accounting Principles" employed in standard business accounting. The "RAP" version, however, is relevant solely to compliance with governmental capital requirements. "RAP" stands for "Regulatory Accounting Practices". (*Sterlings' Reply Re Mot. for Part. Summ. Jdgmt. re: Liability, and Resp. to Cross-Motion to Dismiss and Supp. Aff. of Weatherhead re Sterling's Motion for Part. Summ. Jdgmt re: Liability, Vol. I,* [Doc. 27] Ex. K, pp.5-6) In other words, the entries in the Business Plan relating to "RAP leverage" had only one function: to specify exactly how Sterling's capital would be calculated *for purposes of its compliance with regulatory requirements*. The undisputed evidence is that the Government negotiated and agreed to the figures recited in the Business Plan. The figures clearly show how the supervisory goodwill created by the acquisition of Central Evergreen was to be employed in determining the makeup of capital for purposes of capital regulations. Supervisory goodwill was specifically and expressly included among the assets of the plan that make up "RAP leverage".

Finally, the undisputed evidence is that the transaction could not have worked any other way, and Sterling would not have proceeded without solemn promises. It is undisputed that Sterling twice rebuffed the Government's entreaties that it take over the ailing Central Evergreen, for a single specific reason – Sterling "did not have sufficient capital on its own to acquire a large insolvent thrift." (*Reconsid. App.*, [Doc. 180] pp. 55.) The Government offered promises designed to cure that problem. *Id.* At the last minute, however, when it looked as if the Government would not follow through with its capital promises, Sterling threatened to withdraw from the transaction altogether. (*Reconsid. App.*, [Doc. 180] 243.)

The Government has never produced any evidence to the contrary. At a minimum, sufficient evidence in favor of Sterling's contentions concerning this contract exists to require a trial.

### *5. Sterling Has Consistently Construed Its Contracts With The Government.*

Perhaps based upon an erroneous representation made by the Government during the August 7, 2006 telephone hearing (which Sterling had no chance to rebut), the Court concluded in its order that Sterling's argument that the Government's promise regarding the use of supervisory goodwill from the Central Evergreen acquisition is not within the ambit of section V(D) of the Agreement regarding maintenance of capital was of very recent origin. The Court may, on that belief, have accorded Sterling's position less weight.

In fact, Sterling wrote in its brief filed June 15, 1997, that:

> In any event, the facts in *Guaranty* are different. Here, Sterling and the FHLBB agreed, in their complementary resolutions, that Sterling would operate consistently with the Business Plan. While the separate Agreement concerning Sterling's duty to raise additional capital states that a change in regulations might increase Sterling's obligations (i.e., to raise capital), neither the complementary resolutions nor the Business Plan contain any language suggesting that the specific computation methods painstakingly laid out in the Business Plan would change. There is no basis for exporting language concerning a change in regulations from the Agreement concerning capital into the mutual resolutions and Business Plan so as to undercut the agreement to count goodwill as an asset in determining regulatory capital. The integration clause for the Agreement to raise capital certainly does not furnish any such basis. [The Agreement] is of equal dignity with, but did not supersede, any other 'understanding agreed to in writing by the parties.'

(*Reply re Motion for Partial Summary Judgment re Liability and Response to Cross-Motion to Dismiss* ("*1997 Reply*"), [Doc. 27] p. 54.)

Sterling has been consistent in its representations, and has not changed its construction of the agreements (unlike the Government, which at the beginning of this litigation agreed that it made promises to Sterling for specific treatment but denied that they were enforceable contractual promises, and, after losing that argument, now concedes that contracts were entered into, but denies that specific treatment was promised).

***6. The Court's Ruling Fundamentally Altered The Interpretation Of The Central Evergreen Documents In A Way Not Anticipated In The Government's Motion For Reconsideration. Sterling Had No Fair Opportunity To Demonstrate The Issues Of Fact Nor To Raise Additional Arguments Implicated By The New Interpretation.***

The Court supposed in its order that the resolutions, the accountant letters, the Business Plan and the Agreement should arguably be read together as a single contract instrument. And the Court concluded that, so construed, the contract contained "nothing" creating any obligation in the Government "to regard supervisory goodwill as regulatory capital after FIRREA."

This ruling causes unfair prejudice to Sterling in two ways. First, it changes the fundamental understanding of the nature of the Central Evergreen agreement on which Sterling has proceeded for many years in a way not fairly noticed in the Government's motion for reconsideration. The Government did not ask the Court to change Chief Judge Damich's two prior rulings that the resolutions, accountant letters and Business Plan were independent writings that have stature as separate contracts.

Although the Government has frequently argued that the resolutions and Business Plan are not part of any contract, it has never argued (so far as undersigned counsel can recall) that the resolutions, accountant letters, Business Plan and Agreement should be understood as a combined and unitary whole. No court so far has construed the Central Evergreen transaction in this way. Accordingly, Sterling had no opportunity to present evidence and argument on that score to this Court. Second, had Sterling believed, or been instructed by a court, that the Central Evergreen transaction must be understood to involve a single contract, the Agreement, into which the other writings must be combined, Sterling would *not* have affirmatively stated (as undersigned counsel did during the August 7, 2006 hearing) that it complains of no breach of the Agreement. On the contrary, Sterling should have been afforded a fair opportunity to show how the Government's conduct breached its promises, even if these are considered to have been made in a unitary contract (addressed in detail in point 7 below).

Sterling has plainly set out its understanding that the Cental Evergreen transaction involved three distinct, yet related contract instruments. Sterling, in its June 1997 Reply, explicitly set out its view that the resolutions, the Business Plan and the Agreement were interrelated but distinct and "of equal dignity." (*1997 Reply,* [Doc. 27], pp. 13-16, 24-28, 42, 51-56.) Sterling pointed out that the so-called "integration clause" was really no such thing. It does not by its terms integrate the resolution and Business Plan into the Agreement. (*Id.* at 54.) Rather section V(K) (which would be better described as a "parole evidence" or "supersession" clause) provides that other writings are *not* superseded by the Agreement (and thus, are also not subject to section V(D)). (*Id.*) The Government denied, on the face of the documents but without producing a single witness to support its denial, that the Central Evergreen acquisition involved any promise whatsoever for the use of goodwill as capital. It did not argue that the Central Evergreen documents should be considered as a unitary contract. (*Def's Mot. to Dismiss Pl's Sterling Financial Corp.; Cross-Motion of Summary Judgment; and Opp. to Pl's Mot. for Partial Summary Judgment* [Doc. 24], pp. 23-24.)

### *7. Assuming All Contracts Are Read As A Single Instrument, They Are Replete With Evidence Of Intent That Capital Promises Should Survive A Change In Regulation.*

#### (a) Context Evidence

Sterling has produced the *unrebutted* evidence of its own officers that: (1) the Government had *twice* asked it to acquire Central Evergreen but Sterling refused, specifically because it did not have sufficient capital to support the acquisition; (2) the Government tried a third time, specifically stating that sufficient capital would exist with capital from a related acquisition (Tri-Cities) and goodwill from Central Evergreen; (3) Sterling agreed, given the capital promises, to make the acquisition. (*Reconsid. App.*, [Doc. 180] pp. 55-56; *1997 Reply,* [Doc. 27] pp. 12-13.)

In later discovery, conducted in 2001, Sterling uncovered further undisputed evidence that: (4) when a doubt arose about whether the relevant officials in Washington, D.C., would approve FSLIC's

capital promise, Sterling refused to close the Central Evergreen transaction. The Seattle office of FSLIC urged the D.C. office to give its approval, lest Sterling withdraw, which would cost the Government an estimated $10 million in resolution costs. (*Reconsid. App.*, [Doc. 180], p. 243.) (5) As this Court observed in its order, Sterling negotiated changes to Section III of the Agreement, which it (and, presumably, its counterpart, the Government) believed would mitigate the effect of section V(D) of the Agreement.

The Government's current litigation position is that within days after telling the Government that it contemplated withdrawing from the Central Evergreen acquisition without adequate capital promises, and after negotiating language that the parties specifically understood would protect Sterling in the event of a change in capital regulations, Sterling willing entered into a contract that empowered the Government unilaterally to withdraw all the promised capital and attempt to take over Sterling (or, failing that, impose severe operating limitations upon it). Sterling respectfully submits that the context evidence alone makes the suggestion absurd, and requires a trial to establish the meaning of the contract.

**(b) Provisions Within The Agreement Itself**

As Sterling told the Court during the August 7, 2006 conference, Sterling has never contended that the Government breached the Agreement. Sterling has always believed (and Chief Judge Damich has twice validated its belief in prior rulings) that the Agreement was Sterling's promise to raise capital, and that the promise to raise capital was distinct from the Government's promise to include supervisory goodwill in capital. If Chief Judge Damich's prior rulings concerning the structure of the deal are now to be vacated, however, and the contract is to be viewed as a singular whole subject to the overarching terms of the "Agreement", Sterling ought in fairness be given an opportunity to demonstrate to the Court that the Government has breached this different contract.

First, as this Court has itself pointed out, Sterling negotiated section III of the Agreement in direct response to, and to mitigate, the Government's insistence on Section V(D). The clear principle discernible in *Guaranty Fin. Serv., Inc. v. Ryan*, 928 F.2d 984 (11th Cir. 1991) and *Admiral Financial, Inc. v. United States*, 378 F.3d 1336 (Fed. Cir. 2004) is that all contract provisions must be given effect; thus, the language in section III of the Agreement that Sterling need only meet the "lesser of" future capital regulations or the Business Plan must mean *something*. But the Court's ruling renders this language nugatory, meaningless, and ineffective, in direct contravention of that principle.

Second, it is true that the Agreement didn't contain a forbearance. That fact is of no significance, since (as the Court noted) no forbearance was needed; the Government had promised that supervisory goodwill would be included in Sterling's capital calculation, and such inclusion violated no regulation at the time. More noteworthy is that, in language clearly designed as part of the effort to mitigate any change of law, the Government expressly contracted in section III of the Agreement that Sterling need only meet the "lesser of" future capital regulations or the Business Plan. In that sense, Sterling's contract is very similar to the contract in *Hometown Fin. Inc. v. United States*, 409 F.3d 1360 (Fed. Cir. 2003). In *Hometown* the parties agreed that Hometown would meet future regulations, but agreed to change the definition of what future regulations Hometown would have to follow. Here, the same result was achieved in effect by doing the converse; specifically, the contract defined regulations as including future regulations but only required Sterling to adhere to the lesser of future regulations or its Business Plan.

Third, the Government promised to consider in good faith possible future accommodations as made necessary by the very changes in future law about which Sterling was worried. Section II of the Agreement provided that the Government "will give reasonable consideration to any revision to the Business Plan . . . necessitated by actions taken by any governmental body having jurisdiction that

caused [Sterling] to materially deviate from its Business Plan."

The disappearance, caused by FIRREA, of a huge portion of the capital used to calculate Sterling's compliance with regulations as prescribed in the Business Plan is clearly an event calling for such consideration. And the undisputed facts are that, soon after the adoption of FIRREA, Sterling proposed that the Government either accept rescission of the Central Evergreen acquisition or grant Sterling an "exception" or "exemption" under FIRREA consistent with the promises in the three acquisition contracts. (*Appendix to Sterling's Supp. Resp. on Whether it Contracted for Permanent Regulatory Capital, Vol. IV,* [Doc. 126] pp. 988-1007.) The Government summarily rejected Sterling's proposal.[4] If it be now understood that there was a single, unitary contract for the acquisition of Central Evergreen, Sterling would wish to present evidence and argument that the Government breached its duty of good faith and fair dealing under Section II.

Fourth, Sterling's obligation under the Agreement was to raise "Additional Capital" to meet future regulatory requirements. This was a defined term that meant capital the Government required Sterling to raise "or *otherwise deems to have been raised,* in satisfaction of the provisions of this Agreement." Where the Agreement was predicated on compliance with the Business Plan, which in turn deemed certain capital to have been raised, Sterling should, if all the documents constitute a unitary contract, be free to argue that the Government breached that portion of the contract under which capital (supervisory goodwill) had been "deem[ed] to have been raised."

---

[4] Judge Quackenbush, who originally granted an injunction in Sterling's favor, had relied on the Government's power to grant exceptions or exemptions – which the Government categorically refused to exercise in every case – in rejecting the Government's claim that FIRREA required it to abrogate contracts like Sterling's. *Sterling Savings Assoc. v. Ryan*, 751 F. Supp. 871, 879-881 (E.D. Wash. 1990).

## III. CONCLUSION

Sterling respectfully requests that the Court reconsider that portion of its order for summary judgment directing entry of partial summary judgment for the Government. The Court's misapprehension of certain facts has resulted in a manifest injustice to Sterling. Specifically, the absence of references to goodwill in the Agreement demonstrates that the Government's promise concerning regulatory capital and its treatment were negotiated through the Business Plan, which explicitly references the Government's understanding regarding goodwill. At a minimum, there remain triable issues on this point. Moreover, the Government never sought reconsideration of Chief Judge Damich's ruling that the Business Plan was negotiated. In fact, the evidence is undisputed that the Business Plan was "bargained for" and "negotiated." At the very least, the evidence creates a genuine issue of material fact necessitating a trial. Finally, the Court's ruling fundamentally altered the interpretation of the Central Evergreen Agreement, and Sterling had no fair opportunity to demonstrate the undisputed facts showing that, if the contracts are read as a single instrument, they evidence an intent that capital promises survived a change in regulation. In sum, the matter ought to be set down for trial simultaneously on the question of the meaning, scope and terms of the Central Evergreen contract(s) and damages.

Respectfully submitted this 14th day of September, 2006.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member Of the Bar of the United States Court of Federal Claims

1100 U.S. Bank Building,
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

G:\S\Sterling Savings Bank 81316\USA 977\Pleadings\M4 Reconsideration 08.wpd