**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**

**Respectfully submitted,**

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Acting Director**

**KENNETH M. DINTZER**
**Assistant Director**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**TIMOTHY ABRAHAM**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**February 26, 2007**

**Attorneys for Defendant**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... iii

INDEX TO APPENDIX ..... viii

INTRODUCTION ..... 1

STATEMENT OF ISSUES ..... 5

STATEMENT OF FACTS ..... 5

I. STERLING'S ACQUISITIONS ..... 5

II. STERLING'S POST-FIRREA INJUNCTION AND CAPITAL RAISING ..... 8

ARGUMENT ..... 11

I. THE LEGAL STANDARD FOR SUMMARY JUDGMENT ..... 11

II. STERLING'S LOST PROFITS MODEL SHOULD BE REJECTED ON THE GROUNDS THAT IT IS SPECULATIVE AND HAS NO BASIS IN FACT ..... 12

A. Dr. Horvitz's Lost Profits Calculation Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling's Failure To Meet FIRREA's Minimum Capital Requirements ..... 15

B. The Lost Profits Damages In Dr. Horvitz's Model Fail To Meet The Causation Standard And Are Invalid As A Matter Of Law Because His Calculations Ignore Sterling's Mitigation Of Damages Through Recapitalization In 1991 ..... 16

C. Dr. Horvitz's Model Invalidly Assumes That Sterling Was Unable To Grow Its Assets From 1989 To 1992, When The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions ..... 19

D. Dr. Horvitz's Model Is Speculative As A Matter Of Law Because He Fails To Identify The Assets That Would Have Been Acquired Absent The Breach Or The Liabilities That Would Have Funded Those Assets ..... 22

III. PLAINTIFFS' "MITIGATION" DAMAGES SHOULD BE REJECTED AS A MATTER OF LAW BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL ............................ 24

A. Professor James's Mitigation Theory, Which Is Based Upon The Payment of Preferred Stock Dividends, Should Be Rejected Because The Only Costs Associated With Raising Capital Are Transactions Costs ............................................................... 26

B. Professor James's Mitigation Damages Theory Should Be Rejected Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost Theory, Rather Than Actual Costs ............................ 28

IV. PLAINTIFFS' ALLEGED WOUNDED BANK CLAIMS FAIL AS A MATTER OF LAW ........................................................................................ 31

A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank .................................. 32

B. Losses Incurred In Connection With The CJ-4 Loan Are Not Attributable To The Breach ...................................................................... 34

C. Excess Supervision Costs Are Not Attributable To The Breach ......................... 36

D. Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Units Offering Is Unrelated To A Breach ......................................................................... 37

E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That Other Legal And Accounting Fees Are Attributable To A Breach ........................................................................... 38

CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 12

Bank United of Texas, FSB v. United States,
50 Fed. Cl. 645 (2001),
aff'd in relevant part, 80 Fed. Appx. 663 (Fed. Cir. 2003),
cert. denied, 543 U.S. 916 (2004) .......... *passim*

California Fed. Bank, FSB v. United States,
43 Fed. Cl. 445 (1999),
aff'd in part, 245 F.3d 1342 (Fed. Cir. 2001),
cert. denied, 534 U.S. 1113 (2002) .......... *passim*

California Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir.),
cert. denied, 126 S. Ct. 344 (2005) .......... 14

Castle v. United States,
48 Fed.Cl. 187 (2000),
aff'd, 301 F.3d 1328 (Fed. Cir. 2002),
cert. denied, 539 U.S. 925 (2003) .......... 15

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .......... 11

Chain Belt Co. v. United States,
115 F. Supp. 701 (Ct. Cl. 1953) .......... 17

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed. Cir. Jan. 24, 2007) .......... 14

Citizens Fin. Servs. v. United States,
64 Fed. Cl. 498 (2005),
aff'd, 170 Fed. Appx. 129 (Fed. Cir.),
petition for cert. denied, 127 S. Ct. 662 (Nov. 27, 2006) .......... 24

Citizens Fin. Servs. v. United States,
57 Fed. Cl. 64 (2003) .......... 28

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000),
rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002) .......................................................... 4, 31

Columbia First Bank, FSB v. United States,
54 Fed. Cl. 693 (2002) .......................................................................................................... 3, 29

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) ............................................................................................................. 24

Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,
773 F.2d 1506 (9th Cir. 1985) ............................................................................................... 12

Estate of Berg v. United States,
213 Ct. Cl. 466, 687 F.2d 377 (1982) ................................................................................... 33

Far West Federal Bank v. OTS,
951 F.2d 1093 (9th Cir. 1991) ............................................................................................... 10

Fawick Corp. v. United States ,
149 Ct. Cl. 623 (1960) ........................................................................................................... 19

Fifth Third Bank of Western Ohio v. United States,
55 Fed. Cl. 223 (2003) ........................................................................................................... 23

Franklin Fed. Savings Bank v. United States,
55 Fed. Cl. 108 (2003) ....................................................................................................... *passim*

General Electric Co. v. Joiner,
522 U.S. 136 (1997) ............................................................................................................... 23

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999),
aff'd in part, vac. in part, 239 F.3d 1374 (Fed. Cir. 2001) .................................................. 26, 27

Granite Management Corp. v. United States,
58 Fed. Cl. 766 (2003),
aff'd in part, remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005) ................ 4, 28

Hadley v. Baxendale,
156 Eng. Rep. 145, 9 Ex. 341, (Ex. Ch. 1854) ...................................................................... 33

Hoffman Constr. Co. of Oregon v. United States,
40 Fed. Cl. 184 (1998),
aff'd in relevant part, 178 F.3d 1313 (Fed. Cir. 1999) .......................................................... 12

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) .......................................................... 14
Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......................................................... 23

LaSalle Talman Bank, FSB v. United States,
45 Fed. Cl. 64 (1999),
aff'd in part, vac. in part, 317 F.3d 1363 (Fed. Cir. 2003) .......................................... *passim*

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) .......................................................... 12

Midwest Indus. Painting of Florida v. United States,
4 Cl. Ct. 124 (1983) .......................................................... 17

Myerle v. United States,
33 Ct. Cl. 1 (1897) .......................................................... 31

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975) .......................................................... 17, 33

Piggly Wiggly Corp. v. United States,
112 Ct. Cl. 391, 81 F. Supp. 819 (1949) .......................................................... 39

Prudential Ins. Co. of America v. United States,
801 F.2d 1295 (Fed. Cir. 1986) .......................................................... 32

R.S.E., Inc. v. Pennsy Supply, Inc.,
523 F.Supp. 954 (M.D. Pa. 1981) .......................................................... 13

Ramsey v. United States,
121 Ct. Cl. 426, 101 F.Supp. 353 (1951) .......................................................... 31

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) .......................................................... 17

Seal-Flex, Inc. v. Athletic Track & Court Constr.,
98 F.3d 1318 (Fed. Cir. 1996) .......................................................... 12

Shyface v. Secretary of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) .......................................................... 14

Southern California Federal Sav. & Loan v. United States,
57 Fed. Cl. 598 (2003),
aff'd in part, rev'd in part, and remanded on other grounds,
422 F.3d 1319 (Fed. Cir. 2005) .......... 24

Southern National Corp. v. United States,
57 Fed. Cl. 294 (2003) .......... 21, 24

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004) .......... 24

Sterling Savings Ass'n v. Ryan,
751 F. Supp. 871 (E.D. Wash. 1990) .......... *passim*

Sterling Savings Ass'n v. Ryan,
959 F.2d 241 (9th Cir. 1992) .......... 10, 20

Sterling Savings v. United States,
53 Fed. Cl. 599 (2002) .......... *passim*

Sterling Savings v. United States,
57 Fed. Cl. 234 (2003) .......... 21

Sterling Savings v. United States,
57 Fed. Cl. 445 (2003) .......... 13

Sterling Savings v. United States,
72 Fed. Cl. 404 (2006) .......... 11, 13

Suess v. United States,
52 Fed. Cl. 221 (2002) .......... 3, 29

Toledo Peoria & W. Ry. v. Metro Waste Sys. Inc.,
59 F.3d 637 (7th Cir. 1995) .......... 17

Wells Fargo Bank, N.A. v. United States,,
88 F.3d 1012 (Fed. Cir. 1996) .......... 31

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002) .......... 14

## STATUTES AND RULES

12 C.F.R. §563.13 .......... 7

12 C.F.R. § 567.1 (1990) .......... 7

12 C.F.R. § 567.2 (1990) .......... 7

12 C.F.R. § 567.5 (1990) .......... 7

12 C.F.R. § 567.8 (1989) .......... 15

12 C.F.R. § 567.10(a)(4) .......... 8

12 U.S.C. §1464(t) (1989) .......... 7

54 Fed. Reg. 49,411 (Nov. 30, 1989) .......... 7

12 U.S.C.A. § 1464(s)(4) .......... 8

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA") .......... *passim*

RCFC 56 .......... *passim*

## ADDITIONAL SOURCES

22 Am. Jur. 2d Damages § 514 (1988) .......... 18

Restatement of Contracts §335 .......... 17

Restatement (Second) of Contracts § 347 .......... 17

Restatement (Second) of Contracts § 350 .......... 17, 18

Restatement (Second) of Contracts § 351 .......... 33

# INDEX TO APPENDIX


**DOCUMENT** **PAGE**

**Volume I**

Acquisition Agreement, dated November 5, 1985 . . . . . . . . . . . . 1

Assistance Agreement, dated November 5, 1985 . . . . . . . . . . . . 15

Assistance Agreement, dated April 8, 1988 . . . . . . . . . . . . 23

FHLBB No. 88-1273, dated December 8, 1988 . . . . . . . . . . . . 25

Agreement, dated December 28, 1988 . . . . . . . . . . . . 31

Offering Circular, dated November 14, 1989 . . . . . . . . . . . . 33

Sterling Savings Association Capital Restoration Plan,
dated February 19, 1990 . . . . . . . . . . . . 35

Letter from William J. Durbin to Board of Directors (OTS No. 7918),
dated May 22, 1990 . . . . . . . . . . . . 45

OTS Letter from Carol Friend to Daniel G. Byrne,
dated June 18, 1990 . . . . . . . . . . . . 46

FDIC Letter from John W. Stone to Board of Directors,
dated July 31, 1990 . . . . . . . . . . . . 48

FDIC Letter from John W. Stone to Daniel G. Byrne,
dated September 7, 1990 . . . . . . . . . . . . 49

Report of Examination, dated September 17, 1990 . . . . . . . . . . . . 50

Report of Examination, dated September 16, 1991 . . . . . . . . . . . . 141

Offering Circular, dated November 20, 1991 . . . . . . . . . . . . 206

1992 Annual Report, Sterling Savings . . . . . . . . . . . . 326

Deposition of Harold Gilkey, dated June 8, 2000 . . . . . . . . . . . . 372

Deposition of Daniel G. Byrne, dated December 4, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 374

**Volume II**

Deposition of Paul Horvitz, dated December 6, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

Deposition of Paul Horvitz, dated December 7, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

Deposition of Daniel G. Bryne, dated December 3, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

PAGES INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393 - 405

Expert Report of Joe A. Hargett, dated April 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

CJ-4 Business Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415

Corrected Expert Report of Christopher James, dated September 10, 2001 . . . . . . . . . . . . . . . 416

Report of Christopher James, dated January 9, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 561

Corrected Expert Report of Paul Horvitz, dated September 6, 2001 . . . . . . . . . . . . . . . . . . . . . 583

Update to the Expert Report of Paul Horvitz, dated December 10, 2003 . . . . . . . . . . . . . . . . . 589

FHLBB Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings
and Loan Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 593

Prospectus - 1993 Sterling Financial Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 597

Report of Christopher James, Updated December 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683

Deposition of Christopher James, dated March 8, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702

Deposition of Paul Horvitz, dated February 25, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 705

FDIC Report of Examination, dated September 17, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Additional Materials Relied Upon by Paul Horvitz (tab 10) -
Sterling Savings Bank Calculation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 747

Memo - From Wayne Allert to Rod Barnett, Monthly Update
on Internal Audit Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749
OTS Letter from William Durbin to Board of Directors, dated April 11, 1990 . . . . . . . . . . . . 753

Letter from Harold Gilkey and William Zuppe to William Durbin,
dated May 10, 1990 . . . . . 754

Temporary Restraining Order (TRO), US District Court for The Eastern
District of Washington, dated May 28, 1990 . . . . . 774

Updated Amended Expert Report Of Mukesh Bajaj, Ph.D.,
dated February 15, 2007 . . . . . 776

Update to the Expert Report of Paul Horvitz, dated December 11, 2006 . . . . . 786

Updated Expert Report of Professor Christopher M. James,
dated December 11, 2006 . . . . . 794

Expert Report W. Barefoot Bankhead, dated February 15, 2007 . . . . . 805

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**

**INTRODUCTION**

Pursuant to Rule 56 of the United States Court of Federal Claims and this Court's Order dated September 27, 2006, defendant, the United States, respectfully submits this revised motion for summary judgment regarding damages.[1] Plaintiffs assert lost profits,"mitigation," and wounded bank damages[2] that were purportedly incurred by Sterling Savings Association

---

[1] We originally filed this motion on July 20, 2004. Prior to the filing of Sterling's response, the motion was stayed, and the stay was not lifted until this Court issued an order, dated September 27, 2006, permitting refiling of the motion. Consequently, we were effectively precluded from pursuing our motion for over two years after it was initially filed. We now refile the motion in light of Sterling's decision to drop certain claims (see footnote 2), Sterling's filing of amended expert reports on December 11, 2006, and completion of our responsive expert reports on February 16, 2007.

[2] Prior to December 2007, Sterling also maintained claims for restitution, reliance, and hypothetical replacement cost of capital damages. Sterling has acknowledged, however, that these theories are barred by precedent of the United States Court of Appeals for the Federal Circuit, and, therefore, will not be presented at trial. As such, those theories are not addressed in this motion.

("Sterling") as a result of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA").

Sterling has retained five experts: Professor Christopher James, Dr. Paul Horvitz, Mr. John W. Mitchell, Mr. William Conerly, and Mr. David Welch. Professor James opines upon the “mitigation” claim. Dr. Horvitz opines upon the lost profits claim. Mr. Mitchell and Mr. Conerly address the economy of the Pacific Northwest. Since neither Mr. Mitchell nor Mr. Conerly attempts to quantify damages, and their opinions are not relied upon by Professor James and Dr. Horvitz, their opinions are irrelevant and not expressly addressed in this motion for summary judgment. Similarly, Mr. Welch's work, addressing the yields on preferred stock offerings in 1989 and 2000, was not utilized to calculate damages in this case or to support any of the theories of damages advanced by Sterling. Therefore, his report is also irrelevant, and not addressed in this motion.[3]

Sterling's damages claims suffer from many infirmities and errors. We request summary judgment, however, only upon those points that are readily amenable to summary disposition in light of now-established precedent and based upon the undisputed facts in the record. Based upon that precedent and the undisputed facts, Sterling's lost profits model should be rejected on the grounds that it is speculative and has no basis in fact. As a preliminary matter, the model, which assumes that, absent the elimination of goodwill from regulatory capital, the "but for" bank would have earned profits at the same rate as Sterling actually did, fails to identify the assets that would have been acquired to pursue such a strategy. Further, the model fails to

[3] We reserve the right to file motions in limine to exclude these irrelevant witnesses from testifying.

account for, or even acknowledge, that there would have been competition in the market for the assets Sterling assumes it would acquire.

The speculative nature of Sterling's model is further demonstrated by the fact that the model ignores two key facts. First, the model fails to take into account that Sterling recapitalized in 1991, achieving full compliance with FIRREA's regulatory capital requirements and fully replacing all of the goodwill attributable to its acquisitions of Lewis Federal Savings and Loan Association ("Lewis Federal") and Tri-Cities Savings and Loan Association ("Tri-Cities"). Thus, the model projects damages through 2000 on the plainly incorrect assumption that Sterling never replaced the regulatory capital eliminated by FIRREA. In addition, the model depends upon the incorrect assumption that Sterling was prevented by FIRREA from pursuing its investment strategy. It is undisputed that, in 1990, Sterling obtained an injunction prohibiting OTS from imposing any restrictions arising from Sterling's noncompliance with FIRREA's regulatory capital requirements. Therefore, Sterling's lost profits model is counter-factual to the extent that it assumes that FIRREA prevented Sterling from achieving the thrift's growth projections. Consequently, Sterling's lost profits model should be rejected as a matter of law.

Sterling's "mitigation" damages theory, which purports to calculate the actual costs of replacing regulatory capital eliminated by FIRREA (although Sterling steadfastly maintains that it never replaced the goodwill), should be rejected because its hypothetical premise has been rejected by the Federal Circuit and this Court. LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003); Cal Fed, 43 Fed. Cl. 445, 460-61 (1999), aff'd in part, 245 F.3d 1342, 1350 (Fed. Cir. 2001); Franklin Fed. Savings Bank v. United States, 55 Fed. Cl. 108, 115-16 (2003); Columbia First Bank v. United States, 54 Fed. Cl. 693, 697-98 (2002); Suess v.

United States, 52 Fed. Cl. 221, 229 (2002); Bank United v. United States, 50 Fed. Cl. 645, 650 (2001), aff'd, 80 Fed. Appx. 663 (Fed. Cir. Sept. 22, 2003).

In 1991, Sterling achieved compliance with the new capital standards mandated by FIRREA, and replaced all of the goodwill attributable to its acquisition of Lewis Federal and Tri-Cities, through a common stock offering and a conversion of preferred stock to common stock. Sterling's expert, however, does not attempt to quantify the actual costs of issuing those securities in 1991. Instead, he assumes that, in 1991, Sterling sold preferred stock, and uses the dividend rate for that hypothetical preferred stock offering to calculate damages, contrary to the Federal Circuit ruling in LaSalle, 317 F.3d 1363 at 1375, and this Court in Granite Management Corp. v. United States, 58 Fed. Cl. 766, 778-79, aff'd in part and remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005).

Sterling also has offered an assortment of so-called wounded bank claims, based upon the following allegations: 1) it incurred increased costs to acquire a branch of another thrift known as Great American Savings and Loan; 2) it incurred losses on a loan, known as the CJ-4 Loan, due to FIRREA's requirements; 3) it incurred excess supervision costs based upon its status as a "troubled thrift," 4) it incurred transactions costs in an unsuccessful 1989 public offering; and 5) it incurred legal, accounting, and insurance costs in defending against regulatory interference. Plaintiffs offer no proof that the alleged breach caused these increased costs. In Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 434-41 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), the trial court rejected plaintiffs' wounded bank claim upon summary judgment where plaintiff failed to demonstrate a causal link between the alleged damage and FIRREA. Further, the claims suffer from other infirmities. For example, Sterling claims that the increased

costs allegedly incurred in connection with the 1989 public offering resulted from its inability to pay preferred stock dividends. This claim is foreclosed because the Court has previously ruled that Sterling was not contractually entitled to pay dividends. Sterling Savings v. United States, 53 Fed. Cl. 599, 614 (2002). In addition, Sterling's claim for legal fees encompasses fees incurred in litigation that are foreclosed by statute. Given plaintiffs' failure of proof on its wounded bank claims, the Court should grant our motion for summary judgment.

## STATEMENT OF ISSUES

1. Whether plaintiffs can prove causation and reasonable certainty with respect to their lost profits damages.

2. Whether plaintiffs' purported "mitigation" damages reflect actual costs to replace regulatory capital eliminated by FIRREA.

3. Whether plaintiffs may recover wounded bank damages when they are unable to establish that the alleged damages were caused by a breach.

## STATEMENT OF FACTS

### I. STERLING'S ACQUISITIONS

Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. Id. This case arises out of Sterling's acquisition of three failing savings and loan institutions in the 1980s: Lewis Federal Savings & Loan Association ("Lewis Federal"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen").

In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). App. 1. Sterling did not invest any of its own money. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration. App. 15-22.

In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Federal Home Loan Bank Board ("FHLBB"), pursuant to Resolution No. 88-250, approved the acquisition, authorized an Assistance Agreement, and authorized and directed that a forbearance letter be sent to Sterling. App. 593-96. The Assistance Agreement required a FSLIC cash contribution of $11,730,128.00. Sterling did not invest any of its own money. App. 24.

In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and FSLIC did not provide cash assistance. App. 25-32.

Sterling considered each of its acquisitions to be a success. In a Securities and Exchange Commission filing submitted in 1989, subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits. . . . Through consolidation, the Association has reduced the cost of

> performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to [Sterling.]

App. 34. The fifteen branches acquired by Sterling through the acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen are an integral part of Sterling's branch network; at the time of the alleged breach, the deposit base from the acquired branches represented approximately 57 percent of Sterling's deposit base. App. 407. Through 1994, the deposits in the acquired branches represented over 50 percent of Sterling's deposits, and, as recently as 2001, deposits in the acquired branches accounted for twenty percent of the deposit base. App. 407-08. Further, subsequent to the alleged breach, Sterling earned over $50 million in income from the acquired branches. App. 409.

On August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA established new capital requirements. In particular, FIRREA, and the regulations promulgated to implement it, required thrifts to comply with three separate regulatory capital standards: a leverage (or "core capital") standard, a tangible capital standard, and a risk-based capital standard. 12 U.S.C. §1464(t) (1989); 12 C.F.R. §§ 567.1, 567.2, 567.5 (1990); 54 Fed. reg. 49,411 (Nov. 30, 1989). "Qualifying supervisory goodwill" was to be phased-out gradually between 1990 and 1995. 12 U.S.C. §1464(t); 12 C.F.R. §563.13. In the intervening years, eligible savings associations were permitted to include qualifying supervisory goodwill to satisfy core and risk-based capital standards established under FIRREA. Id.

## II. STERLING'S POST-FIRREA INJUNCTION AND CAPITAL RAISING

As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. App. 37. Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. App. 5. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. App. 37. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. App. 37-38.

In April 1990, OTS approved Sterling's capital restoration plan on the condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. App. 753. On May 10, 1990, Sterling declined to execute the operating agreement. App. 754.

On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards, refused to consent to the operating agreement, and did not propose an acceptable remedy for its capital deficiency, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound operation, pursuant to 12 C.F.R. § 567.10(a)(4). App. 45.

In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a

temporary restraining order in May 1990 and a preliminary injunction in August 1990. In its opinion granting the preliminary injunction, the court severely restricted OTS's and FDIC's authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash. 1990). OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83.

OTS complied with the terms of the injunction, and notified Sterling that the agency intended to "strictly obey" the district court's order prohibiting it from enforcing any restrictions contrary to the agreements Sterling entered into in connection with its acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. App. 46, 48-49. During the pendency of the injunction, which ultimately was dissolved in 1992, Sterling never needed to initiate an action to compel enforcement of the injunction or complain of Government noncompliance with the injunction. Indeed, Sterling's internal audit department, in a memorandum dated September 20, 1991, referred to restrictions imposed prior to the issuance of the injunction as "OTS operational concerns stayed by preliminary injunction." App. 750. Moreover, in exam reports issued during the pendency of the injunction, examiners expressly acknowledged that OTS was enjoined from enforcing FIRREA's capital requirements. App. 59, 71, 144.

In November 1991, Sterling raised approximately $21 million through a public offering of common stock. App. 329. The public offering brought Sterling into compliance with all of FIRREA's minimum capital ratios. Id. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

App. 209. In addition, Sterling's 1992 Annual Report indicated that completion of the equity offering brought Sterling into compliance with FIRREA's capital standards:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

App. 329 (emphasis added).

According to Harold Gilkey, Sterling's Chief Executive Officer, the 1991 capital raising would not have occurred if Sterling had already been in capital compliance at the time, because Sterling would have had substantial excess capital. App. 373.

On April 14, 1002, the Ninth Circuit Court of Appeals reversed the district court decision. Sterling Savings Assoc. v. Ryan, 959 F.2d 241 (9th Cir. 1992). Relying upon Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991), the Ninth Circuit concluded that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling, 959 F.2d at 241. On that basis, the Ninth Circuit vacated the district court's judgment and remanded the case to the district

court. Id. By the time the Ninth Circuit issued its decision, however, Sterling had already completed its public offering and achieved compliance with FIRREA's capital requirements.

In 1993, Sterling's holding company, Sterling Financial Corporation, raised approximately $17 million through a preferred stock offering, and downstreamed approximately $12 million to Sterling. In the prospectus, Sterling Financial Corporation noted increased capital requirements would be phased-in as of December 31, 1994. App. 603. As of September 30, 1992 (prior to the offering), however, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." Id. at 606. Further, it was anticipated that Sterling would continue to meet all regulatory requirements in the future, although "there can be no assurance in this regard." Id. at 603.

The Court, in Sterling Savings v. United States, 72 Fed. Cl. 404 (2006), recently held that, with respect to the Central Evergreen acquisition, the Government did not breach a contract with Sterling because the risk of regulatory change had been contractually allocated to Sterling.[4]

## ARGUMENT

### I. THE LEGAL STANDARD FOR SUMMARY JUDGMENT

When there exists "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). The movant has the burden initially of pointing out the absence of any genuine disputes of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant discharges this burden, the non-movant must

[4] For purposes of this motion, the goodwill associated with the Lewis Federal and Tri-Cities acquisitions will be referred to as the "contractual goodwill," while the goodwill associated with the Central Evergreen acquisition will be referred to as the "noncontractual goodwill."

demonstrate specific facts showing a genuine dispute of fact for trial. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

A dispute of fact is "genuine" only if it "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of fact, reasonable inferences are to be drawn in favor of the non-movant; however, unreasonable or speculative inferences are insufficient to defeat summary judgment. See, e.g., Hoffman Constr. Co. v. United States, 40 Fed. Cl. 184, 198 (1998), aff'd in relevant part, 178 F.3d 1313 (1999) (rejecting plaintiffs' unsupported, speculative inferences). The Court is not, however, to weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

A fact is material if it might affect the outcome of the case, and its materiality is determined by the substantive law applicable to the case. Id. at 248. The substantive law also must be applied to the undisputed facts to determine whether the "moving party is entitled to a judgment as a matter of law." RCFC 56(c); accord Seal-Flex, Inc. v. Athletic Track & Court Constr., 98 F.3d 1318, 1321 (Fed. Cir. 1996).

## II. STERLING'S LOST PROFITS MODEL SHOULD BE REJECTED ON THE GROUNDS THAT IT IS SPECULATIVE AND HAS NO BASIS IN FACT

Sterling's lost profits claim is presented by Dr. Paul Horvitz. Dr. Horvitz estimates damages by creating a hypothetical "but for" bank in which supervisory goodwill counts as capital post-FIRREA.[5] The hypothetical but for bank is based in its entirety upon a series of

[5] The model assumes Sterling would be free from FIRREA's breaching provisions while other institutions with alleged goodwill contracts would be subject to the same provisions. However, under the case law, all similarly situated institutions must be treated the same way in a "but for" world. See, e.g. Dolphin Tours, Inc. v. Pacifico Creative Service Inc., 773 F.2d 1506, 1510-12 (9th Cir. 1985) (a valid damage model must account for the fact that if one market participant becomes free of anti-competitive behavior, other similarly situated market

unrealistic assumptions. For instance, Dr. Horvitz simply assumes that, but for the alleged breach, Sterling would have had a much larger balance sheet and would have earned profits on the balance sheet at the same rate as the actual Sterling. App. 587. Dr. Horvitz also assumes that Sterling suffered damage during the pendency of the temporary injunction, notwithstanding the fact that the issuance of the injunction prohibited the Government from enforcing any breach-related restrictions upon Sterling's growth. Using this invalid methodology, he incorrectly opines that Sterling incurred $58.164 million in lost profits damages between 1990 and September 30, 2006. App. 789. Moreover, Dr. Horvitz ignores the fact that, according to Sterling's own witness, Sterling replaced its goodwill in 1991. App. 329, 373. Thus, after that date, Sterling was free to pursue all the profit opportunities it now describes as foregone.

According to Dr. Horvitz's latest model,[6] at September 30, 2006, the "but for" bank would have had $248,631,000 more in assets than those of the actual bank. App. 792. According to the model, these incremental assets would have earned the same average return as Sterling's actual

---

participants become free as well); R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966 (M.D. Pa. 1981) (same). Putting aside other issues discussed in this motion, therefore, the incorrect assumption concerning other market participants, in and of itself, renders the model invalid.

[6] In an initial expert report, dated September 6, 2001, Dr. Horvitz calculated lost profits through 2000 of $75.777 million, plus future damages of $21.264 million. Dr. Horvitz based this calculation on his belief that goodwill associated with FSLIC assistance should not be amortized. In a supplemental report issued in December 2003, Dr. Horvitz adjusted his damages calculation to acknowledge that goodwill associated with FSLIC assistance provided in connection with the Lewis Federal and Tri-Cities acquisitions was required to be amortized. Sterling, 57 Fed. Cl. 445, 455 (2003). App. 589. The 2003 adjustment, however, resulted in greater lost profits, in the amount of $77.405 million, because Dr. Horvitz extended the lost profits calculation through 2003. App. 591. The damages alleged in Dr. Horvitz's current report, dated December 11, 2006, reflect this Court's recent ruling that the Government did not breach a contract in connection with Sterling's acquisition of Central Evergreen. Sterling, 72 Fed. Cl. 404.

assets. App. 586. Dr. Horvitz calculates that the return on these "foregone assets" would have been approximately $58.164 million as of September 30, 2006. App. 792. He also claims that the value of the goodwill remaining at that date would have been approximately $641,000, based upon Professor James's replacement model (which is addressed in section III below). App. 789.

Lost profits are recoverable only where the damage proximately resulted from the breach, was foreseeable, and can be proved with reasonable certainty. California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001). With respect to causation, a plaintiff must prove that its damages "'inevitably and naturally, not possibly or probably' flow from the defendant's breach." CalFed, 395 F.3d at 1267. The appellate court in CalFed specifically considered the proposed "less exacting standard . . . that the breach need only be a 'substantial factor' contributing to the loss," CalFed, 395 F.3d at 1267, and it held that the trial court "correctly rejected the 'substantial factor' test." Id. at 1268.[7]

As demonstrated below, Dr. Horvitz's model does not meet the causation test because plaintiffs cannot prove that, absent the breach, Sterling would have met FIRREA's capital requirements. Moreover, Sterling's lost profits damages cannot meet the causation test because

---

[7] Recently, in Citizens Federal Bank v. United States, No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007), which is not yet final, the Federal Circuit purported to modify that long-standing rule, finding that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion" and permitting the trial court to utilize the "substantial factor" causation test rather than the "but for" test. Id. at *3. Yet, even if the "substantial factor" test applies, a position with which we disagree, the plaintiff cannot avoid its obligation to establish that, absent the breach, it would not have incurred the costs that it is seeking. A plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999).

Dr. Horvitz's model assumes that Sterling never mitigated its damages notwithstanding its replacement of every dollar of contractual goodwill eliminated by FIRREA.

"In order for [a but for profits] claim to satisfy the reasonable certainty standard, the proof relied upon must be rooted in fact." Castle v. United States, 48 Fed.Cl. 187, 205 (2000), aff'd, 301 F.3d 1328, 1338 (Fed. Cir. 2002). In this case, two major assumptions of Dr. Horvitz's "but for" profits model are not "rooted in fact" and render Sterling unable to meet the reasonable certainty standard as a matter of law.

### A. Dr. Horvitz's Lost Profits Calculation Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling's Failure To Meet FIRREA's Minimum Capital Requirements

In his 2006 expert report, Dr. Horvitz apparently assumes that, absent the breach, Sterling would have been in compliance with FIRREA's minimum capital requirements, and would not have been subject to any restrictions or limitations upon growth of assets. Consequently, he assumes that, absent the breach, Sterling would have been in a position to leverage the goodwill attributable to the Lewis Federal and Tri-Cities acquisitions.[8] That assumption is invalid as a matter of law. Even assuming, absent the breach, that the Lewis Federal and Tri-Cities goodwill counted as regulatory capital, the elimination of the noncontractual, Central Evergreen goodwill would have rendered Sterling non-compliant with the minimum "core capital" requirement of three percent set forth in FIRREA's implementing regulations. 12 C.F.R. § 567.8 (1989). Sterling's core capital ratio, at 2.21 percent, would not have met the minimum requirement.

[8] As we demonstrate below, the district court for the Eastern District of Washington permanently enjoined enforcement of any restrictions upon Sterling's growth resulting from the breach, thereby precluding damages for lost profits. Absent the breach, however, Sterling would not have complied with the minimum capital requirements imposed by FIRREA for the reasons set forth above.

App. 812 (Bankhead Report).[9] Therefore, Dr. Horvitz's assumption that the breach rendered Sterling incapable of leveraging its contractual goodwill is invalid, rendering his model invalid as a matter of law.

### B. The Lost Profits Damages In Dr. Horvitz's Model Fail To Meet The Causation Standard And Are Invalid As A Matter Of Law Because His Calculations Ignore Sterling's Mitigation Of Damages Through Recapitalization In 1991

Dr. Horvitz's lost profits model incorrectly assumes that, between 1989 and 2006, Sterling never replaced the regulatory capital eliminated by FIRREA. This incorrect assumption renders the entire model invalid.

In 1991, Sterling raised approximately $23 million in regulatory capital for purposes of achieving compliance with FIRREA's capital requirements. App. 329. Sterling's Chief Executive Officer, Harold Gilkey, acknowledged at deposition that, absent the breach, Sterling would not have raised capital in 1991. App. 373. Consequently, Sterling mitigated its damages.[10] Nonetheless, in his model, Dr. Horvitz assumes that, between 1989 and 2006, Sterling never replaced a penny of the goodwill associated with the Lewis Federal and Tri-Cities acquisitions. Based on this assumption, he calculates damages through September 30, 2006.[11]

---

[9] This calculation assumes that, absent the breach, Sterling would have raised approximately $10 million in capital in December 1989. While we disagree with that assumption for reasons not addressed in this motion, we assume that it is valid in the core capital calculation set forth above only to demonstrate that, even adopting such an assumption, Sterling fails to meet FIRREA's minimum capital requirements.

[10] Thus, at most, Sterling would be entitled to the transaction costs incurred in connection with the recapitalization.

[11] Professor James's calculations of future lost profits and lost profits incurred prior to mitigation are invalid for the same reasons.

The Court of Appeals for the Federal Circuit requires the Court to account for mitigation a plaintiff undertakes as a result of a breach. LaSalle, 317 F.3d at 1371-72 (citing Restatement (Second) of Contracts §347(c) cmt. e). In LaSalle, the Federal Circuit held that a sale of the thrift that resulted in replacement of the lost goodwill constituted a substitute transaction that mitigated damages. Id. Here, Sterling's 1991 recapitalization, which it admits was for purposes of reaching capital compliance and would not have occurred but for the breach, is also a form of mitigation. Indeed, Sterling possessed a duty to mitigate. Bank United, 50 Fed. Cl. at 662. A plaintiff must mitigate "at the least cost to the defendant," Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975), is "under an obligation to avoid by a reasonable effort any damages which it should have foreseen," Chain Belt Co. v. United States, 115 F. Supp. 701, 714 (Ct. Cl. 1953) (citing Restatement of Contracts § 335), and "cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b).

If a nonbreaching party fails to make any attempt to mitigate its damages, but instead merely attempts to impose all loss, even if it could have been avoided, upon the breaching party, the nonbreaching party will be precluded from recovering the amount of loss that could have been avoided. See, e.g., Midwest Indus., 4 Cl. Ct. at 133 ("nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part"); Toledo P. & W. Ry. v. Metro Waste Sys., 59 F.3d 637, 640 (7th Cir. 1995) ("[i]n the event [the injured party] fails to take reasonable steps to avoid additional harm, [the injured party] bears the risk of any increased damages which could have been avoided"); Restatement

(Second) of Contracts § 350(1), at 126 (1981). The rationale of this rule is to provide an incentive to the nonbreaching party to reduce any damages resulting from the breach:

> Rationale. The rules stated in this Section reflect the policy of encouraging the injured party to attempt to avoid loss. The rule stated in Subsection (1) encourages him to make such efforts as he can to avoid loss by barring him from recovery for loss that he could have avoided if he had done so. The exception stated in Subsection (2) protects him if he has made actual efforts by allowing him to recover, regardless of the rule stated in Subsection (1), if his efforts prove unsuccessful.

Restatement (Second) of Contracts § 350 cmt. a, at 127 (1981) (citation omitted).

With regard to the nonbreaching party's obligation to incur additional expenses in attempting to mitigate his damages, he need not do so to the extent that they involve an "undue risk, burden, or humiliation." Although a nonbreaching party is not generally required to spend substantial sums of additional money to avoid further damage,

> a party may be required to make expenditures to mitigate damages caused by a breach of contract if (1) the expenditures are small in comparison to the possible losses, and (2) it is virtually certain that the expenses incurred will avoid at least a part of the loss.

22 Am. Jur. 2d Damages § 514, at 596 (1988) (emphasis added). In fact, this Court's predecessor, the Court of Claims, has held that, if a contractor's damage is a direct result of the Government's breach of contract, and the contractor could have reduced its loss by expending money and subsequently seeking recovery of that money from the Government (in lieu of the entire claimed amount of the loss absent mitigation), the contractor's failure to do so precludes recovery:

> Plaintiff's only explanation is that it preferred to accept the larger loss rather than to pay any sum whatsoever to GSA when it was convinced GSA was in error. This explanation is hardly consistent

> with traditional legal principles pertaining to proximate cause or the duty to minimize damages. If there was in fact such a direct causal connection between the release and plaintiff's suit against Winslow, and plaintiff could have won its suit simply by paying the Government $20,000, it should have paid it under protest, thereby not suffering any losses from Winslow, and then sued in this court to recover the $20,000.

Fawick, 149 Ct. Cl. at 637.

In ignoring Sterling's 1991 capital raising,[12] which, at $23 million, was more than enough to replace the $13 million in contractual goodwill that it would have possessed at that date, and assuming that Sterling never mitigated during the period of his damages calculation, Dr. Horvitz commits an error that invalidates his model as a matter of law.[13]

### C. Dr. Horvitz's Model Invalidly Assumes That Sterling Was Unable To Grow Its Assets From 1989 To 1992, When The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions

The speculative nature of Dr. Horvitz's lost profits model is amply demonstrated by the fact that he did not account for the issuance of a temporary restraining order, issued in May 1990, that prevented the Government from enforcing any of the provisions of FIRREA related to Sterling's alleged contracts. App. 773-74. The temporary restraining order was followed by a preliminary injunction; in an opinion dated August 8, 1990, the United States District Court for the Eastern District of Washington enjoined and restrained the Government from:

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the [Lewis Federal, Tri-Cities and Central Evergreen] supervisory acquisition agreements between Sterling and the

[12] Dr. Horvitz also ignores several other subsequent capital raisings. See, e.g., App. 793.

[13] As we explain below, the lost profits that allegedly arose before the 1991 recapitalization are not recoverable for other reasons.

> FHLBB and the FSLIC; b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift; c. placing Sterling in a receivership or conservatorship; and d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

Sterling, 751 F. Supp. at 881-82. In response to a motion for reconsideration, the district court determined that the restriction on placement of Sterling in receivership or conservatorship was overly broad, and amended its ruling to provide that "[t]he Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect." Id. at 884. Consequently, the district court amended subsection "a" of its order to prevent "any attempt by the defendants to appoint a receiver or conservator based on a reason that, either directly or indirectly, is inconsistent with the contracts." Id. Thereafter, the Government was precluded from enforcing any provision of FIRREA that was contrary to the contracts found by the district court, including the Central Evergreen contract, which the Court has ruled was not breached. Sterling, 53 Fed. Cl. at 614.

The injunction remained effective until April 14, 1992, when the Ninth Circuit dissolved it. At that point, however, Sterling had replaced the goodwill eliminated by FIRREA and was in full capital compliance. Sterling, 959 F.2d 241.

Therefore, during the period that the injunction was in place, Sterling was free to implement any plans for growth that were in place pre-breach, and the Government was prohibited from restricting Sterling's ability to implement the plans. Notwithstanding this prohibition, Dr. Horvitz, in his lost profits damages model, assumes that Sterling suffered damage between July 1, 1990, after the temporary restraining order had been issued, and 1992,

the year that the injunction was lifted. That alleged damage is in the form of lost earnings on assets that Sterling allegedly would have acquired in the absence of a breach. App. 591. That assumption is without basis because, during the period that the injunction was in place, the Government was prohibited from enforcing any of FIRREA's restrictions against Sterling to the extent that the restrictions were inconsistent with any contract provisions. Sterling, 751 F. Supp. at 881-82. Nonetheless, based upon his incorrect assumption that Sterling was unable to grow its assets while the injunction was in place, Dr. Horvitz incorrectly assumes that Sterling earned less than it would have otherwise earned in 1990 and 1991 due to a breach. App. 792.[14] The error is then compounded because Dr. Horvitz assumes that there are fewer earnings available for acquiring assets in the years 1992 through 2006 than would have been available absent the breach. Id. The result of these incorrect assumptions is that Dr. Horvitz's lost profits model is inherently speculative.

[14] In a 2003 opinion in this case, the Court held that Sterling possesses standing to assert a claim for damages during the period that the injunction was in place. Sterling Savings v. United States, 57 Fed. Cl. 234, 240 (2003). In a motion for summary judgment, we had argued that Sterling had no cause of action for the period that the injunction was in place because the Government was prevented from enforcing any provision of FIRREA that was inconsistent with the terms of the acquisitions. Id. at 234-35. While the Court decided that Sterling possessed standing to sue for the period that the injunction was in place, it also expressly recognized that our argument "may be relevant to the calculation of damages." Id. at 240. For the reasons set forth above, the injunction is not only relevant to damages, but renders Dr. Horvitz's lost profits model inherently speculative.

### D. Dr. Horvitz's Model Is Speculative As A Matter Of Law Because He Fails To Identify The Assets That Would Have Been Acquired Absent The Breach Or The Liabilities That Would Have Funded Those Assets

In his model, Dr. Horvitz assumes that, but for the breach, Sterling's asset base would be over $284 million larger than in the actual world, and that the return on these additional assets would have been the same as the actual thrift. App. 792. There is no basis for these assumptions.

First, Dr. Horvitz's conclusion that Sterling's asset base would be $284 million larger absent the breach is speculative as a matter of law because he does not identify the assets that would have been acquired absent the breach or the liabilities that would have funded those claimed incremental costs. When asked, at deposition, the composition of the assets in the but-for thrift, Dr. Horvitz admitted that he did not even attempt to determine the specific asset mix. App. 380. In fact, he stated that he had not attempted to construct the assets or liabilities of the but-for thrift, and acknowledged that the composition of the foregone assets was not an essential part of his analysis. App. 380-81, 385. In other words, Dr. Horvitz merely assumes, without analyzing what the assets would have been or whether they would have been available, that Sterling would have acquired $284 million in additional assets absent the breach. Further compounding the invalidity of this model is Dr. Horvitz's incorrect assumption that, in the but-for world, Sterling would have operated unfettered by the breaching provisions of FIRREA, while all of its competitors would have been constrained. In other words, Dr. Horvitz assumes that, in the but-for world, Sterling would have had more regulatory capital, while its competitors would not, since FIRREA's provisions would have applied to them. App. 382. Further, Dr.

Horvitz made no effort to determine whether the presence of Sterling's competitors in the market would have affected its ability to expand its asset base, although he admitted that Sterling operates in a competitive market. App. 383, 384.

In addition, Dr. Horvitz merely assumes, without analysis or supporting data, that the but-for thrift would have earned the same rate of return on the but-for assets that it earned on its actual assets. App. 586. Again, however, this assumption cannot be supported, or even tested, because Dr. Horvitz does not identify the assets that would have been acquired. At deposition, Dr. Horvitz was forced to admit that, in 1993, if Sterling had replicated its actual experience, by growing assets through the purchase of mortgage-backed securities, the incremental assets would not have earned the same rate as the actual assets. App. 387, 777-79. Therefore, his model is inherently speculative and should be rejected as a matter of law.

As the Supreme Court has observed, "nothing . . . . requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999), (quoting General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997)). Here, Dr. Horvitz simply assumes that Sterling would have achieved nearly $284 million in additional growth absent the breach, and earned the identical return on the additional assets that the actual bank earned, with absolutely no determination, or even an attempt to determine, how that growth would have been achieved. While Dr. Horvitz's candor about the absence of analysis of the composition of the but for thrift is commendable, it also renders his model invalid as a matter of law because he merely assumes that the but-for thrift would have replicated what Sterling did in the real world, with no evidence or basis upon which to support this assumption. See Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl.

223, 241 (2003) (rejecting, upon summary judgment, a model nearly identical to Dr. Horvitz's because the expert failed to identify the investments or opportunities foregone by the thrift); Southern National Corp. v. United States, 57 Fed. Cl. 294, 304-06 (2003) (same); see also Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 115 (2004) (rejecting lost-profits claim because plaintiff could not prove that it would have acquired more assets absent the breach); Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 279-80, 285. In fact, Dr. Horvitz's lost-profits models have been rejected in every Winstar-related case in which they have been presented. See, e.g., Citizens Fin'l Servs. v. United States, 64 Fed. Cl. 498, 514 (2005), aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006); Southern California Federal Sav. & Loan v. United States, 57 Fed. Cl. 598, 625-27 (2003), aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir. 2005). Indeed, Sterling, when provided the opportunity to pursue its growth plan in the wake of the issuance of an injunction against enforcement of FIRREA, failed to achieve the growth assumed by Dr. Horvitz in his model. Moreover, Dr. Horvitz fails to take into account Sterling's 1991 replacement of the capital eliminated by FIRREA. For these reasons, Sterling's lost profits model must be rejected as a matter of law.

## III. PLAINTIFFS' "MITIGATION" DAMAGES SHOULD BE REJECTED AS A MATTER OF LAW BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL

In an expert report initially issued on January 9, 2004, Professor James offered a "new" theory for measuring damages that merely recycles a hypothetical model of damages that Sterling has chosen not to pursue at trial because it is barred by precedent of the United States Court of Appeals for the Federal Circuit and this Court. This "new" theory should be rejected for the

same reasons. The theory, which he refers to as "mitigation" damages, assumes that plaintiffs actually replaced the contractual goodwill eliminated by FIRREA, although plaintiffs continue to maintain steadfastly that, to date, they have never replaced the goodwill. Plaintiffs offer the theory as an alternative in the event that the Court rejects Dr. Horvitz's lost profits theory, which assumes that Sterling never replaced the regulatory capital eliminated by FIRREA. App. 565.

Under this new theory, plaintiffs acknowledge that Sterling successfully raised approximately $21 million of regulatory capital in the form of common stock, and converted $2.1 million of Series B preferred stock to common stock, in November of 1991. App. 568-69. Further, it is undisputed that, after the 1991 capital raising, Sterling achieved compliance with all of the required capital ratios under FIRREA. App. 329. In fact, Professor James quotes the offering circular for the 1991 common stock offering, which states that the primary purpose of the offering was "'to increase Sterling's regulatory capital levels." App. 568.

In calculating damages, however, Professor James does not attempt to calculate the actual costs associated with the common stock offering that occurred in 1991. Further, he does not acknowledge that Sterling achieved regulatory compliance, in part, merely by converting $2.1 million of existing preferred stock to common stock at no cost. Instead, he assumes that Sterling issued preferred stock with a set coupon rate in 1991, and calculates damages based upon the assumed preferred stock offering, using a methodology nearly identical to the hypothetical replacement cost theory that Sterling has abandoned. Further, Sterling achieved capital compliance with the 1991 offering, and, in raising $23 million, raised far in excess of the $13.3 million of contractual goodwill remaining at that time. App. 804A. Nonetheless, Professor James assumes, for purposes of calculating damages, that $12 million of the $21 million raised

through the common stock offering should be ignored because Sterling had unsuccessfully attempted to raise that amount of capital in 1989. He also allocates a portion of the 1991 proceeds to replacement of the noncontractual Central Evergreen goodwill. Based upon these faulty assumptions, he then assumes that a portion of a preferred stock issuance by Sterling's holding company, Sterling Financial Corporation, in 1993 was also an act of mitigation, and attributes damage to that capital raising. App. 799-800.

This theory does not fare any better than the hypothetical replacement cost of capital theory that plaintiffs have abandoned. First, basic financial economics recognizes that investment in securities has zero net present value. App. 386, 402. This principle has been affirmed by the Federal Circuit in both Glendale, 43 Fed. Cl. at 401-02, and CalFed, 245 F.3d at 1350. Therefore, assuming Sterling actually replaced the regulatory capital eliminated by FIRREA, the only damages it is entitled to are the transaction, or flotation, costs associated with the capital raising, as acknowledged by the Government's expert. App. 785. Second, Professor James's theory is entirely hypothetical, rather than reflecting actual costs, and should be rejected upon that basis.

**A. Professor James's Mitigation Theory, Which Is Based Upon The Payment of Preferred Stock Dividends, Should Be Rejected Because The Only Costs Associated With Raising Capital Are Transactions Costs**

Professor James admits that, in general, capital raising does not involve any cost to the issuer except transaction costs. App. 703-04. He makes an exception, however, for capital that is raised to replace goodwill, purportedly because the goodwill did not require dividend payments. Id. This exception is baseless as a matter of both law and economics. Sterling's hypothetical model conflicts with bedrock corporate finance principles, affirmed by the Federal

Circuit, establishing that the value of expected dividend or interest payments on capital raised as a cost, and the value of having cash in place of goodwill as a benefit, offset one another on the date of issuance, save transactions costs. CalFed, 43 Fed. Cl. at 460-61 ("[o]n the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs."), aff'd in part, 245 F.3d at 1350 ("the value of the cash proceeds of Cal Fed's newly-raised capital equaled the cost of future dividends"); Glendale, 43 Fed. Cl. at 401-02.

In other words, basic financial economics recognizes that investment in risky as well as risk-free securities has zero net present value. App. 782-84. To the extent that Dr. James ignores this principle, he is at odds with Dr. Horvitz, who acknowledges that capital market transactions occur at zero net present value, and there is no money to be made or lost by financing market rate assets with market rate liabilities. App. 386.

Like the cost of raising capital models rejected by this Court in other Winstar-related decisions, Sterling's cost of substitute capital model generates estimates that suggest damages are nearly equal to the total amount of contractual goodwill excluded from Sterling's regulatory capital. Professor James's model estimates the hypothetical cost of raising $13.3 million in capital as approximately $10 million. App. 800, 804A. In other words, a dollar of goodwill is worth nearly a dollar in cash. In Bank United, this Court recognized that a model generating estimated costs of substitute capital at even 50 cents on the dollar was "absurd on its face." Bank United, 50 Fed. Cl. at 655-56. Thus, the only damages related to capital raisings are transaction costs associated with raising the replacement capital. Consequently, Sterling should be entitled to no more than the transaction costs associated with replacement of its contractual goodwill.

**B. Professor James's Mitigation Damages Theory Should Be Rejected Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost Theory, Rather Than Actual Costs**

Even assuming that, under certain circumstances, the actual cost of raising replacement capital can exceed transaction costs, LaSalle, 317 F.3d at 1374-75, plaintiffs cannot meet the standard established by the Federal Circuit in LaSalle because the costs asserted here are not "actual."

This Court has rejected upon summary judgment alleged "actual" cost of replacement theories where the plaintiffs calculated "actual" damages by assuming a strategy that was not the one chosen by the thrift to replace regulatory capital lost due to FIRREA. For instance, in Granite, 58 Fed. Cl. at 777, the Court rejected a purported "actual" cost of replacement model that was "inconsistent with the manner in which plaintiff allegedly replaced its supervisory capital. . ." In that case, the thrift replaced regulatory capital through a cash infusion from its parent company, while its cost of replacement model was based upon a hypothetical preferred stock issuance. Id.

Similarly, in Citizens Fin'l Servs. v. United States, 57 Fed. Cl. 64, 71 (2003), the Court rejected a "hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy." In that case, the plaintiff mitigated damages and achieved regulatory capital compliance by shrinking, but plaintiffs constructed a hypothetical replacement cost of capital theory for achieving regulatory capital compliance. Id. at 71-72. The Federal Circuit's recent decision in Lasalle further supports summary dismissal of Sterling's hypothetical model. While rejecting the trial court's conclusion that dividend payments could not be a "cost of capital" merely because they are not legally obligatory, the Federal Circuit expressly agreed with the trial

court's rejection of plaintiff's replacement capital calculations that were not based on actual payments:

> We too do not adopt this calculation, for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

LaSalle, 317 F.3d at 1375 (emphasis added); see also Franklin Federal, 55 Fed. Cl. at 134-39 (dismissing hypothetical cost of replacement theory upon summary judgment after recognizing Winstar authority rejecting these models as "absurd on their face," "not credible," and "inherently odd"); Columbia First , 54 Fed. Cl. at 697-98 (rejecting cost of replacement theory at summary judgment because it was hypothetical and not based on costs actually incurred); see also Bank United, 50 Fed Cl. at 655-56; Suess, 52 Fed. Cl. at 229.

Here, plaintiffs achieved regulatory compliance in 1991 by raising approximately $21 million in common stock and converting $2.1 million of preferred stock to common stock. In his expert report, Professor James concedes that "Sterling has not paid cash dividends on any of its common stock, including the common stock issued in 1991." App. 574. He then asks the Court to "consider if instead Sterling had issued preferred stock in 1991 with a stated dividend rate (just like it did in 1993)." Id. This hypothetical model, which assumes a preferred stock issuance that involved dividends, when Professor James admits that Sterling has never paid cash dividends on the $21 million of common stock it actually raised, does not present the actual costs of mitigation, and must be rejected. If, in fact, there were costs, over and above transaction costs, associated with the 1991 common stock offering, then a "hypothetical" preferred stock model would have been unnecessary.

Professor James's reliance upon nonexistent preferred stock dividend payments as a basis for damage is equally inapplicable to Sterling's conversion of $2.1 million of preferred stock to common stock. Sterling raised the $2.1 million in preferred stock prior to the enactment of FIRREA, and, in 1991, converted the preferred stock, which paid dividends, to common stock, which did not. Therefore, Professor James's assumption that this conversion of capital that Sterling already possessed resulted in damage is groundless.

Finally, Professor James's attempt to create damages by assuming that part of Sterling's 1993 preferred stock offering constitutes mitigation, when Sterling had already achieved capital compliance in 1991 through its common stock offering and conversion of preferred stock to common stock, is incorrect. Id. at 5-6. As a preliminary matter, the Court should reject as baseless Professor James's claim that $12 million of the $21 million in capital raised in 1991 should be disregarded because it was intended to replace a capital offering that would have occurred in 1989 absent a breach. There is absolutely no evidence that the purpose of the 1991 common stock offering was intended to replace a capital raising that Sterling abandoned in 1989. Further, Sterling has maintained that the 1989 offering failed because the Government breached a contractual obligation to permit it to pay preferred stock dividends. That argument is now foreclosed, as the Court determined that Sterling never received a contractual promise that it would be permitted to pay such dividends. Sterling Savings Association v. United States, 53 Fed. Cl. 599, 615 (2002).

Similarly, it is clear that the purpose of the 1993 preferred stock offering was not to replace contractual goodwill eliminated by FIRREA. The prospectus for the offering stated that, as of September 30, 1992, Sterling "exceeded all regulatory capital requirements, including

requirements . . . scheduled to be phased in through December 31, 1994." App. 606. Consequently, Professor James's attempt to create "actual" damages by assuming that part of the 1993 offering was a mitigation effort is meritless. Consequently, the Court should reject Professor James's mitigation model as a matter of law.

## IV. PLAINTIFFS' ALLEGED WOUNDED BANK CLAIMS FAIL AS A MATTER OF LAW

To recover wounded bank damages, plaintiffs must meet the requirements of reasonable certainty, foreseeability, causation, and mitigation. Wells Fargo Bank v. United States,, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951)). In Coast, 48 Fed. Cl. at 434-41, the trial court rejected plaintiffs' wounded bank claim upon summary judgment where plaintiff failed to demonstrate a causal link between the alleged damage and FIRREA. Here, the plaintiffs cannot establish that the alleged wounded bank costs "resulted 'inevitably and naturally, not possibly nor even probably [from] the breach.'" CalFed, 43 Fed. Cl. at 455 (quoting Myerle, 33 Ct. Cl. at 27). Further, the wounded bank claims in this case suffer from other legal infirmities that are detailed below.

As a preliminary matter, each of the wounded bank claims purports to be endorsed by one of Sterling's experts, Dr. Horvitz. Dr. Horvitz, however, devotes only one page of his expert report to the five wounded bank claims, and acknowledges that all of the calculations were performed by Mr. Byrne, Sterling's CFO. App. 588. Further, Dr. Horvitz does not attest to the validity or correctness of any of the calculations of wounded bank damages. App. 389. While Dr. Horvitz reviewed summaries of the claims, he did not review the underlying documentation, and he relied upon conversations with Mr. Byrne for his understanding of the nature of the

claims. See, e.g., App. 389, 706. Consequently, Sterling's wounded bank damages claims, while reviewed by Dr. Horvitz, are, in fact, the result of work performed solely by Mr. Byrne, who has been proffered by Sterling as a fact, rather than expert, witness. As demonstrated below, Mr. Byrne's "analysis" of these claims suffers from his own failure to apply proper legal principles.

### A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank

Sterling alleges that the Government's alleged breach of a contractual obligation to permit goodwill to count as regulatory capital prevented it from purchasing a branch of Great American Savings Bank in 1989 for $61,000, and caused it to purchase the branch in 1994 or 1995 at a cost of $1.892 million, resulting in damages of $1.835 million. App. 592, 781. This claim is meritless. First, as a matter of causation, Sterling has provided no documentary evidence establishing that the branch of Great American Savings Bank was available for a purchase price of $61,000 in 1989, or that the Government had any role in Sterling's decision not to purchase the branch. On that basis alone, the Court should reject this claim.

Second, even if the causation hurdle could be overcome, Sterling could not establish that damages resulting from an inability to purchase a branch of Great American was foreseeable by the Government at the time of Sterling's acquisitions of Lewis Federal and Tri-Cities. "[F]oreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made." Prudential Ins. Co. of America v. The United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986). In other words, foreseeability is measured by determining the intent of the nonbreaching party at the time the contract is executed, rather than at the time of breach.

The foreseeability limitation on contract damages originated in Hadley v. Baxendale, 156 Eng. Rep. 145, 9 Ex. 341, 354 (Ex. Ch. 1854), where the court held that "damages should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things . . . or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract." The United States Court of Appeals for the Federal Circuit applies the Hadley test for foreseeability. Estate of Berg v. United States, 213 Ct. Cl. 466, 687 F.2d 377, 383 (1982). Pursuant to the Federal Circuit's application of Hadley, the foreseeability limitation bars recovery where the breaching party cannot reasonably be deemed to have contemplated the damages sought, at the time of contracting." Northern Helex, 207 Ct. Cl. at 878, 524 F.2d at 714-15; see also Restatement (Second) Contracts § 351, cmt. a ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.").

Sterling does not claim that it was required to purchase branches as a condition of its acquisitions in this case, or that the Government was on notice that it intended to buy branches. Consequently, neither Sterling's alleged inability to buy a branch after the enactment of FIRREA, nor its decision to buy the branch five years later at a price allegedly 6,203 percent higher than the original purchase price, App. 781-82, could have been foreseen by the Government, and this claim for damages must fail as a matter of law.

Third, Sterling's claim that it incurred a 6,203 percent increase in the purchase price of the Great American branch must fail because it does not meet the test for reasonable certainty. As a matter of simple economics, it is absurd to claim that an increase in the purchase price of the

branch is damage when we have no information about the relative values of the branch during the two periods at issue. For instance, even if the branch ultimately acquired was, in fact, worth $61,000 in 1989, Sterling has provided no information supporting its apparent assumption that the increase in value was attributable to pure appreciation, rather than substantial investment in the branches by the previous owner. In fact, Dr. Horvitz admitted that he did not know whether the branch ultimately acquired would have been operated in the same way, and whether the same value would have accrued if Sterling had purchased it in 1989. App. 389. Further, Sterling has provided no evidence establishing that any thrift, much less the Great American branch, appreciated by six thousand percent between 1989 and 1994 or 1995.

Moreover, Sterling's simplistic claim ignores the fact, as noted above, that Sterling was not required to buy the branches; consequently, when it decided to purchase one of them in the 1994-95 time period for $1.892 million, the branch must have been worth that amount to Sterling.[15] Therefore, Sterling incurred no damage, and its wounded bank claim raised in connection with the Great American branch must be rejected as a matter of law.

### B. Losses Incurred In Connection With The CJ-4 Loan Are Not Attributable To The Breach

Sterling's claim with respect to the CJ-4 Loan also fails to meet the causation and reasonable certainty tests. Sterling claims that its inability to advance additional funds to a borrower on a loan known as the "CJ-4 Loan" forced the loan into foreclosure, resulting in a loss

[15] Moreover, Mr. Byrne, who calculated the alleged damages incurred by Sterling in connection with the branch purchase, when asked the basis for the difference in deposit premium between 1989 and 1994, responded that it was due to "a great job on my part to negotiate the first transaction in '89." App. 378. Clearly, this damage claim was not the subject of objective, empirical financial or economic analysis.

of $1.241 million. App. 592; Compl. ¶7.8(g). Sterling claims that it was unable to advance additional funds due to certain loan-to-one-borrower limitations App. 392.

With respect to causation, it is undisputed that Sterling's Loan Committee approved the initiation of foreclosure in November 1989, prior to the date that the regulations implementing FIRREA went into effect. App. 413, 415. Further, between the date the loan was first advanced, March 15, 1988, and September 1990, the property decreased in value from $3.45 million to $1.6 million, and Sterling has not produced a single piece of evidence demonstrating that the losses it incurred would have been avoided absent a breach. Id. Thus, the property securing the CJ-4 loan experienced massive losses completely unrelated to any Government action.

Further, Sterling's claim that it was prevented by OTS from advancing additional funds to the borrower is without basis. Sterling has provided no evidence that it requested, and was denied, the right to advance such additional funds, and ignores the fact that the injunction obtained in May 1990 prohibited the Government from enforcing any restrictions inconsistent with Sterling's acquisition agreements. In fact, the undisputed evidence demonstrates that Sterling's examiners were aware that Sterling was considering the advance of additional funds to the borrower, and did not object. App. 100, 413. Consequently, Sterling cannot prove that any loss on the loan was attributable to Government action.

From a reasonable certainty standpoint, Mr. Byrne, and, consequently, Dr. Horvitz, assume that additional incremental funding of the CJ-4 Loan would have resulted in greater returns on the investment. App. 780. This assumption is directly contrary to Dr. Horvitz's assertion, in calculating alleged lost profits, that, as a matter of economics, incremental returns earned on foregone assets are equal to average returns. Id. Consequently, even if Sterling were

correct that the Government prevented it from advancing additional monies on the CJ-4 Loan, the assumption that the incremental investment would result in a greater return is contradicted by its own expert, Dr. Horvitz. Therefore, the wounded bank damages attributable to the CJ-4 Loan should be rejected as a matter of law.

### C. <u>Excess Supervision Costs Are Not Attributable To The Breach</u>

Sterling also claims $172,000 in "excess supervision costs" as wounded bank damages. App. 592. As was the case with the Great American Bank and CJ-4 Loan wounded bank damages, Sterling's sole support for these damages is the testimony of its chief financial officer, Mr. Byrne. Sterling's expert in economics, Dr. Horvitz, devotes one paragraph of his eighteen-page report to wounded bank damages, and performs no analysis of his own. He merely endorses Mr. Byrne's work based solely upon a review of Mr. Byrne's calculations and discussion with him.

Further, as was the case with the Great American Bank and CJ-4 Loan damages, Sterling cannot establish that the alleged excess supervision costs were caused by a breach of any of the acquisition agreements. The costs cited are all apparently attributable to examinations of Sterling, yet neither Mr. Byrne nor Dr. Horvitz attempt to determine whether the so-called excess supervision costs would have been assessed in the absence of a breach. App. 782. For instance, the excess supervision cost damages alleged by Sterling include costs incurred during 1995 and 1996, when it is undisputed that Sterling was categorized as a "well capitalized" thrift. App. 414. Further, Sterling appears to have included all of the costs associated with certain regulatory

examinations performed by OTS and the State of Washington, when such examinations are routinely performed regardless of a thrift's financial condition. Id.[16]

Therefore, Sterling cannot establish that the "excess supervision costs" alleged as wounded bank damages were caused by the breach of the acquisition agreements, and we are entitled to summary judgment with respect to the claim.

**D. Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Units Offering Is Unrelated To A Breach**

Sterling claims that a 1989 public offering was terminated because OTS would not preapprove the payment of dividends upon preferred stock. Compl. ¶ 7.8(b). This claim is based upon Sterling's assumption that it obtained a contractual right to pay dividends on a public offering of preferred stock when it entered into an agreement in connection with its acquisition of Central Evergreen. Sterling, 53 Fed. Cl. at 615. This damage claim is now foreclosed. As noted above, the Court has determined that Sterling was not accorded a contractual right to pay dividends on preferred stock when it acquired Central Evergreen because it "cannot point to any language in the [Central Evergreen] Agreement that stated or implied that Defendant was obliged to permit Plaintiff to do anything with respect to any stock dividends, common or preferred." Id. Indeed, plaintiffs, in requesting clarification of the Court's ruling on this issue, admitted that the absence of a contractual obligation would require a reduction in the amount of damages claimed.

---

[16] In his 2003 Report, Dr. Horvitz reduces the wounded bank damages attributable to excess supervision costs to $172,000, a reduction from the $303,000 claimed in his original report. When asked to explain this change at his deposition, he reported only that Mr. Byrne had reduced the number by including only "excess deposit insurance premiums paid for being a problem bank." App. 706. Dr. Horvitz, however, provided no documentation of these costs or the process through which the adjustment occurred, and, as was the case with the $303,000 number in his 2001 Report, did not verify the numbers reported by Mr. Byrne. Id.

Sterling Savings, et al. v. United States, No. 95-829C, slip op., pp. 3-4 (Nov. 15, 2002). Nonetheless, the Court declined to alter its holding on the issue. Id. Consequently, we are entitled to summary judgment on this damage claim.

Further, as a practical matter, the costs allegedly incurred in connection with the 1989 public offering may not be recovered because they do not meet the standard for expectancy damages. wounded bank damages may be awarded only if they are directly caused by the breach, Franklin Federal, 55 Fed. Cl. at 124, and if they would not have been incurred by Sterling but for the breach. LaSalle, 45 Fed. Cl. at 97. In this case, Sterling's expert, Dr. Horvitz, admitted that the costs incurred in connection with the 1989 public offering would have been incurred absent the breach. App. 389A. He attempted to justify inclusion of these costs within wounded bank damages nonetheless by observing that he was advised by Mr. Byrne that the costs were charged off rather than included in the proceeds of the offering. Id. This is a distinction without meaning. Regardless of how the costs would have been treated for accounting purposes, it is undisputed that they would have been incurred in Sterling's "but-for" world. Therefore, the costs cannot be recovered as a matter of law.

**E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That Other Legal And Accounting Fees Are Attributable To A Breach**

Sterling's final wounded bank damages claim is based upon its allegation that it should be awarded attorneys and accounting fees it incurred in defending against OTS's enforcement of FIRREA. Compl. ¶ 7.8(d). Sterling, however admits that a portion of these fees are attributable to fees incurred in litigating against the Government in connection with the application of FIRREA to Sterling. App. 377, 390. The recovery of such fees is barred as a matter of law.

Attorneys fees "incurred in litigating against the Government are not . . . recoverable absent an express statutory provision allowing them." Franklin Federal, 55 Fed. Cl. at 123 (citing Piggly Wiggly Corp. v. United States, 112 Ct. Cl. 391, 432, 81 F. Supp. 819 (1949)); LaSalle, 45 Fed. Cl. at 97. In Franklin Federal, the Court granted the Government summary judgment with respect to a wounded bank damages claim for attorney fees incurred in obtaining an injunction against enforcement of FIRREA. Franklin Federal, 55 Fed. Cl. at 123. Here, Sterling seeks, as wounded bank damages, legal fees incurred in obtaining an injunction and handling an appeal of the injunction. App. 375-77. As was the case in Franklin Federal, there is no statutory provision allowing the award of such fees, and summary judgment should be granted in favor of the Government.

With respect to legal fees allegedly incurred for activities other than litigation, Sterling has not met its burden of establishing that such fees were, in fact, not related to litigation, and it has not established that they were caused by the breach in this case. App. 747-48. Sterling's litigation counsel, Witherspoon, Kelley, Davenport and Toole, apparently rolled all of its fees, for litigation and regulatory matters, into one billing category known as "Alpha." App. 376. Further, Mr. Byrne has acknowledged that much of the work categorized as "Alpha" related either to litigation over the injunction or post-injunction legal advice. All of these fees are barred. App. 376-77. To the extent that any other regulatory matters were encompassed in the "Alpha" category, Sterling's records do not provide an adequate explanation as to whether the fees were incurred as a result of the alleged breach in this case, or for other reasons.

Moreover, Sterling's claim includes other attorneys fees that are litigation-related. Sterling has included invoices from the law firm of Arnold and Porter for legal advice related to

the injunction. App. 375. In addition, Sterling's claim includes invoices from Hogan and Hartson, a well-known law firm. Id. Mr. Byrne, however, mistakenly believes that Hogan and Hartson is a consulting firm. Id. To the extent that Hogan and Hartson actually provided legal advice, the fees cannot be claimed as wounded bank damages.

Further, Sterling's claim includes fees for regulatory advice provided after it replaced all of its goodwill in 1991, notwithstanding Mr. Byrne's acknowledgment that any alleged "regulatory interference" ended in 1992. App. 377. Finally, with respect to the vast majority of the fees allegedly incurred for accounting matters, Sterling has not provided a basis for the Court to conclude that the fees were incurred as a result of the alleged breaches. App. 376. In addition, the fees attributable to Coopers and Lybrand include a $15,000 "increased audit fee" that is not based upon separate billings by Coopers and Lybrand, but upon a conversation between Mr. Byrne and a partner at the accounting firm. This claim does not meet the requirement for reasonable certainty, and cannot be sustained.

For all of these reasons, Sterling has not met its burden with respect to its wounded bank damages claim for legal, accounting and insurance costs,[17] and the Government is entitled to summary judgment.

**CONCLUSION**

For the reasons set forth above, the Government's motion for summary judgment regarding plaintiffs' damages claims should be granted, and those claims should be dismissed.

---

[17] Although Sterling's one-page summary of legal and accounting fees includes "insurance" in the heading, the itemized list of fees that Sterling seeks to recover appears not to include any insurance costs. App. 747-48.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH HOLT

February 26, 2007

CERTIFICATE OF FILING

I hereby certify that on February 26, 2007, a copy of foregoing "DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford