**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

---

**APPENDIX TO DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES - VOL. I**

---

**Respectfully submitted,**

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Acting Director**

**KENNETH M. DINTZER**
**Assistant Director**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**Attorneys for Defendant**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**TIMOTHY ABRAHAM**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**February 26, 2007**

# INDEX TO APPENDIX


**DOCUMENT** **PAGE**

**Volume I**

Acquisition Agreement, dated November 5, 1985 . . . . . 1

Assistance Agreement, dated November 5, 1985 . . . . . 15

Assistance Agreement, dated April 8, 1988 . . . . . 23

FHLBB No. 88-1273, dated December 8, 1988 . . . . . 25

Agreement, dated December 28, 1988 . . . . . 31

Offering Circular, dated November 14, 1989 . . . . . 33

Sterling Savings Association Capital Restoration Plan, dated February 19, 1990 . . . . . 35

Letter from William J. Durbin to Board of Directors (OTS No. 7918), dated May 22, 1990 . . . . . 45

OTS Letter from Carol Friend to Daniel G. Byrne, dated June 18, 1990 . . . . . 46

FDIC Letter from John W. Stone to Board of Directors, dated July 31, 1990 . . . . . 48

FDIC Letter from John W. Stone to Daniel G. Byrne, dated September 7, 1990 . . . . . 49

Report of Examination, dated September 17, 1990 . . . . . 50

Report of Examination, dated September 16, 1991 . . . . . 141

Offering Circular, dated November 20, 1991 . . . . . 206

1992 Annual Report, Sterling Savings . . . . . 326

Deposition of Harold Gilkey, dated June 8, 2000 . . . . . 372

Deposition of Daniel G. Byrne, dated December 4, 2001 . . . . . 374

**Volume II**

Deposition of Paul Horvitz, dated December 6, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

Deposition of Paul Horvitz, dated December 7, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

Deposition of Daniel G. Bryne, dated December 3, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

PAGES INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393 - 405

Expert Report of Joe A. Hargett, dated April 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

CJ-4 Business Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415

Corrected Expert Report of Christopher James, dated September 10, 2001 . . . . . . . . . . . . . . . 416

Report of Christopher James, dated January 9, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 561

Corrected Expert Report of Paul Horvitz, dated September 6, 2001 . . . . . . . . . . . . . . . . . . . . . 583

Update to the Expert Report of Paul Horvitz, dated December 10, 2003 . . . . . . . . . . . . . . . . . 589

FHLBB Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings
and Loan Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 593

Prospectus - 1993 Sterling Financial Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 597

Report of Christopher James, Updated December 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683

Deposition of Christopher James, dated March 8, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702

Deposition of Paul Horvitz, dated February 25, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 705

FDIC Report of Examination, dated September 17, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Additional Materials Relied Upon by Paul Horvitz (tab 10) -
Sterling Savings Bank Calculation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 747

Memo - From Wayne Allert to Rod Barnett, Monthly Update
on Internal Audit Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749
OTS Letter from William Durbin to Board of Directors, dated April 11, 1990 . . . . . . . . . . . . 753

Letter from Harold Gilkey and William Zuppe to William Durbin,
dated May 10, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 754

Temporary Restraining Order (TRO), US District Court for The Eastern

District of Washington, dated May 28, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

Updated Amended Expert Report Of Mukesh Bajaj, Ph.D.,
dated February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 776

Update to the Expert Report of Paul Horvitz, dated December 11, 2006 . . . . . . . . . . . . . . . . . 786

Updated Expert Report of Professor Christopher M. James,
dated December 11, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 794

Expert Report W. Barefoot Bankhead, dated February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . 805

# ACQUISITION AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AS RECEIVER FOR LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION,
Chehalis, Washington

AND

STERLING SAVINGS ASSOCIATION
Spokane, Washington

Dated November 5, 1985

## TABLE OF CONTENTS

### ACQUISITION AGREEMENT BETWEEN THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION AS RECEIVER FOR LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION AND STERLING SAVINGS ASSOCIATION


| | Page |
|---|---|
| Recitals | 1 |
| § 1 Purchase of Assets | 2 |
| § 2 Assumption of Liabilities | 3 |
| § 3 Records | 4 |
| § 4 Tax Reports | 5 |
| § 5 Inventory and Audit | 5 |
| § 6 Purchase Price | 5 |
| § 7 Duties with Respect to Savers | 5 |
| § 8 Office Space for the RECEIVER | 7 |
| § 9 Litigation; Power of Attorney | 7 |
| § 10 Rights and Forbearance | 8 |
| § 11 Sole Benefit | 8 |
| § 12 Successors and Assigns | 8 |
| § 13 Notices | 9 |
| § 14 Accounting Principles | 9 |
| § 15 Governing Law | 10 |
| § 16 Effective Date | 10 |
| § 17 Entire Agreement, Severability | 10 |
| § 18 Counterparts, Modification, Headings | 11 |
| § 19 Warranties | 11 |
| § 20 Continuing Cooperation | 12 |
| Signature Page | 13 |

# ACQUISITION AGREEMENT

THIS AGREEMENT is made and entered into this 5th day of November, 1985, by and between the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, in its capacity as RECEIVER for Lewis Federal Savings and Loan Association, Chehalis, Washington (respectively, "RECEIVER" and "CLOSED ASSOCIATION"), and Sterling Savings Association, Spokane, Washington ("ACQUIRING ASSOCIATION").

## RECITALS

A. The CLOSED ASSOCIATION is a mutual savings and loan association organized under the laws of the United States, the accounts of which are insured by the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION in its capacity as a corporate instrumentality of the United States ("CORPORATION").

B. The FEDERAL HOME LOAN BANK BOARD ("BANK BOARD"), by its Resolution No. 85-994, dated November 4th, 1985, duly appointed the CORPORATION as RECEIVER for the CLOSED ASSOCIATION pursuant to § 5(d)(6)(A) of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1464(d)(6)(A) (1982), and the RECEIVER's appointment has become effective.

C. The RECEIVER has taken possession of the CLOSED ASSOCIATION and by operation of law has succeeded to all the rights, titles, powers, and privileges of the CLOSED ASSOCIATION.

( (

D. The ACQUIRING ASSOCIATION is a state savings and loan association organized under the laws of the State of Washington, the accounts of which are insured by the CORPORATION.

E. It has been mutually agreed between the ACQUIRING ASSOCIATION and the RECEIVER and the BANK BOARD has determined that it is in the best interests of the CLOSED ASSOCIATION, its savers, and the CORPORATION that substantially all of the CLOSED ASSOCIATION's assets, all of its deposits or withdrawable accounts, and substantially all of its other liabilities be immediately transferred to and assumed by the ACQUIRING ASSOCIATION as provided in this Agreement.

F. In consideration of the foregoing and of the mutual covenants and agreements contained in this Agreement, the RECEIVER and the ACQUIRING ASSOCIATION enter into the following agreement.

AGREEMENT

§ 1 Purchase of Assets. The RECEIVER hereby sells to the ACQUIRING ASSOCIATION, and the ACQUIRING ASSOCIATION hereby purchases from the RECEIVER, all of the RECEIVER's right, title, and interest in and to all of the CLOSED ASSOCIATION's assets that the RECEIVER owns or holds and any of the CLOSED ASSOCIATION's assets hereafter acquired by the RECEIVER, excluding, however: (i) any known or unknown claim, demand, cause of action, or judgment against the present or former controlling persons, directors, officers, or other persons directly or indirectly exercising a controlling influence over the

management or policies of the CLOSED ASSOCIATION or any of its subsidiaries, or their sureties, including any administrator, executor, personal representative, heir, or assign of any such person, arising out of any act(s) or omission(s) of such person prior to the effective date of this Agreement ("Effective Date") with respect to the CLOSED ASSOCIATION or its property, or its subsidiary or the subsidiary's property; (ii) any claim against counsel for the CLOSED ASSOCIATION for recovery of sums paid by the CLOSED ASSOCIATION to challenge the receivership or contemporary or subsequent actions of the BANK BOARD or the CORPORATION; and (iii) such limited items, parts, or portions of the CLOSED ASSOCIATION's books and records as are specifically identified by the RECEIVER, provided the ACQUIRING ASSOCIATION consents to the RECEIVER's retention of such records (the "excluded papers").

§ 2 Assumption of Liabilities. The ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform, and discharge all of the CLOSED ASSOCIATION's liabilities, including, but not limited to, those shown on the CLOSED ASSOCIATION's books and records at such time as the RECEIVER takes possession of the CLOSED ASSOCIATION, but excluding, however, obligations under any compensation or employment contract between the CLOSED ASSOCIATION and any of its employees, officers, or directors, other than obligations to honor or satisfy any rights already vested under such contracts. The term "liability" as used in this section does not refer to any obligation to indemnify controlling persons, directors, officers, or other persons as a result of suits arising from claims described in § 1, and the ob-

QUIRING ASSOCIATION specifically does not assume by virtue of this Agreement any such obligations for indemnification of the directors, officers, or employees of the CLOSED ASSOCIATION.

§ 3 Records.

(a) The ACQUIRING ASSOCIATION acknowledges that the RECEIVER is delivering to it, as among the assets sold and purchased under § 1 of this Agreement, all of the CLOSED ASSOCIATION's books and records, except the excluded papers, if any.

(b) The ACQUIRING ASSOCIATION agrees to preserve and keep safe all of the CLOSED ASSOCIATION's books and records that it acquires pursuant to this Agreement, to permit the RECEIVER at any reasonable time to inspect, make extracts from or copies of any of such books and records, and to cooperate fully with the RECEIVER in the preparation of the inventory described below.

(c) As a condition of this Agreement, the ACQUIRING ASSOCIATION agrees at its own expense either to segregate and keep separate or, in the alternative and at the option of the ACQUIRING ASSOCIATION, to reconstruct as of the date of this Agreement, the CLOSED ASSOCIATION's books and records transferred to it until the period in which the CLOSED ASSOCIATION may file an action for removal of the RECEIVER pursuant to law has expired, or, if such action is filed, until the dismissal of such action or the issuance of an order determining an appeal from any order of a court directing the removal of the RECEIVER.

( (

§ 4 Tax Reports.

The RECEIVER shall prepare and file or cause to be prepared and filed any and all federal and state tax reports otherwise required to be filed by the CLOSED ASSOCIATION through the Effective Date, as soon as it is practicable. The RECEIVER shall furnish a copy of all federal and state tax reports filed by RECEIVER on behalf of the CLOSED ASSOCIATION to ACQUIRING ASSOCIATION upon their completion. The ACQUIRING ASSOCIATION agrees to cooperate fully with the RECEIVER in preparing such tax reports.

§ 5 Inventory.

As soon as is practicable after the effective date of this Agreement, the RECEIVER shall make or cause to be made an inventory of the CLOSED ASSOCIATION's assets and a record of its liabilities, as directed by the BANK BOARD. The RECEIVER shall furnish a copy of the inventory of the CLOSED ASSOCIATION's assets and the record of its liabilities to the ACQUIRING ASSOCIATION upon their completion.

§ 6 Purchase Price. The purchase price of all assets sold to the ACQUIRING ASSOCIATION pursuant to § 1 shall be the assumption of liabilities provided for in § 2.

§ 7 Duties with Respect to Savers.

(a) The ACQUIRING ASSOCIATION agrees to pay, in accordance with the provisions of applicable law and the individual contracts governing the CLOSED ASSOCIATION's deposits or withdrawable accounts, all properly drawn and presented withdrawal requests by the CLOSED ASSOCIATION's depositors or withdrawable accountholders whose depos-

its or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement, to the extent that such deposits or withdrawable account balances are sufficient to permit such payments and in compliance with the contractual terms of such deposits and accounts, and in all other respects to discharge, in the usual course of business, the CLOSED ASSOCIATION's duties and obligations with respect to its depositors or accountholders whose deposits and accounts are assumed by the ACQUIRING ASSOCIATION; provided, however, that the ACQUIRING ASSOCIATION does not assume any special or unusual duties of the CLOSED ASSOCIATION to such depositors or accountholders unless the terms of such duties are disclosed in the CLOSED ASSOCIATION's records. Further, in accordance with applicable law and the individual contracts governing such deposits or accounts, the ACQUIRING ASSOCIATION agrees to pay interest on all of the CLOSED ASSOCIATION's deposits and withdrawable accounts that are assumed pursuant to § 2 of this Agreement.

(b) If any of such depositors or withdrawable accountholders declines to accept the obligation of the ACQUIRING ASSOCIATION to pay the CLOSED ASSOCIATION's deposit or account liabilities assumed pursuant to § 2 of this Agreement and asserts a claim against the RECEIVER for any part of such assumed deposit liabilities, the ACQUIRING ASSOCIATION shall provide the RECEIVER, upon demand, with an amount of money sufficient to enable it to pay the claim of such depositors or accountholders, less any applicable early withdrawal penalties, not exceeding the amount credited to such persons on the

ACQUIRING ASSOCIATION's records at the time such demand is made, and, upon paying the RECEIVER as so demanded, the ACQUIRING ASSOCIATION shall be discharged from any further liability for such claim under this Agreement.

(c) The ACQUIRING ASSOCIATION shall give written notice, in a form approved by the RECEIVER or its counsel, to the CLOSED ASSOCIATION's depositors and withdrawable accountholders whose deposits or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement of its assumption of liability for such deposits or accounts.

§ 8 Office Space for the RECEIVER. The ACQUIRING ASSOCIATION agrees to provide the RECEIVER, without charge and, if its duties so require, for a period of one (1) year from the date of this Agreement, adequate space on the premises, including vault space and furnishings, for the RECEIVER's use in connection with the transfer and transactions required by this Agreement and with the exercise and discharge of its powers and duties as receiver of the CLOSED ASSOCIATION. After such period, the ACQUIRING ASSOCIATION shall continue to provide to the RECEIVER, at a reasonable rental to be agreed upon by the parties, such space and furnishings for such period as the RECEIVER may request.

§ 9 Litigation; Power of Attorney. In the event that any action at law or in equity in which the RECEIVER has an interest is instituted by any person against the CLOSED ASSOCIATION, the ACQUIRING ASSOCIATION, or both of them, or against the RECEIVER and either or

both of the foregoing as co-defendants, or in whi action the RECEIVER joins or is joined as co-defendant, the ACQUIRING ASSOCIATION agrees to file, or to join with the RECEIVER in filing, a petition to remove the action to an appropriate court, and hereby authorizes and appoints, as its attorney for the purpose of effecting such removal, any attorney designated or approved by the RECEIVER to act in that capacity.

§ 10 Rights and Forbearance. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by either party in exercising or partially exercising any right, power, or remedy shall not preclude the further exercise of such right, power, or remedy.

§ 11 Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all conditions and provisions of it, are for sole benefit of the RECEIVER and the ACQUIRING ASSOCIATION and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give any person other than RECEIVER or the ACQUIRING ASSOCIATION any legal or equitable right, remedy, or claim under or with respect to this Agreement or any of its provisions.

§ 12 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, their respective transferees, successors, and assigns, but

this Agreement may not be assigned nor may any rights under it be transferred to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 13 Notices. Any notice, request, demand, or other communication to either of the parties shall be deemed given when received and shall be given in writing and delivered in person or sent by first class mail in a prepaid envelope to such party at its address set forth below or at such other address as such party shall hereafter furnish in writing:

Sterling Savings Association
Attn: Daniel G. Byrne, Chief Financial Officer
North 120 Wall Street
Spokane, Washington 99201-0696
Attn: President

Federal Savings and Loan Insurance Corporation
Attn: Special Representative, Receiver for
Lewis Federal Savings and Loan Association
1700 G Street, N.W.
Washington, D.C. 20552

§ 14 Accounting Principles. Except as otherwise provided in this Agreement, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, any assistance agreement or agreements to which the ACQUIRING ASSOCIATION and the CORPORATION are parties, including, but not limited to, an agreement to make a contribution or loan, an agreement to purchase subordinated debt, or an agreement to issue and purchase Income Capital Certifi-

cates, applicable regulations of the BANK BOARD the CORPORATION, or any resolution or action of the BANK BOARD or CORPORATION approving, or adopted concurrently with, this Agreement, then this Agreement, such assistance agreement, such regulations, and such resolutions or actions shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with an assistance agreement, such regulations, and the BANK BOARD's or the CORPORATION's resolutions or actions. If there is a conflict between this Agreement and an assistance agreement or such regulations or such resolutions or action, then the assistance agreement or such regulations or such resolutions or actions shall govern.

§ 15 Governing Law. To the extent that federal law does not control, this Agreement and the rights and obligations under it shall be governed by the law of the State of Washington. Nothing in this Agreement shall require any unlawful action or inaction by either party.

§ 16 Effective Date. This Agreement and the transfer of the CLOSED ASSOCIATION's assets and liabilities provided for by this Agreement shall become effective upon its execution by the parties.

§ 17 Entire Agreement, Severability.

(a) This Agreement, together with any interpretation of it or any understanding agreed to in writing by the parties, constitutes the entire agreement between the ACQUIRING ASSOCIATION and the CORPORATION as RECEIVER, but not in its corporate capacity in connection

with transactions contemplated by this Agreement and supersedes all prior agreements and understandings of the parties, excepting only any resolutions or letters approved or adopted contemporaneously with this Agreement by the BANK BOARD or the CORPORATION.

(b) If any provision of this Agreement is invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties.

§ 18 Counterparts, Modification, Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall together constitute one and the same instrument, and either party may execute this Agreement by signing any such counterpart.

(b) No modification of this Agreement shall be binding unless executed in writing and signed by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 19 Warranties.

(a) The RECEIVER warrants and represents that it has authority to enter into this Agreement and that as RECEIVER it has full power and authority to transfer the CLOSED ASSOCIATION's assets and liabilities as provided by this Agreement.

(b) The ACQUIRING ASSOCIATION warrants and represents that all of the transactions contemplated by this Agreement have been or will be authorized by all necessary corporate actions and that it, by its proper officers, has executed this Agreement and shall execute and deliver all instruments, certificates, and other documents that may be necessary or incidental to the performance of this Agreement.

(c) These warranties shall survive the execution, performance, and termination of this Agreement.

§ 20 Continuing Cooperation. The RECEIVER agrees, upon the request of the ACQUIRING ASSOCIATION, to execute and deliver such further instruments and documents of conveyance as shall be necessary or proper to vest in the ACQUIRING ASSOCIATION the RECEIVER's full legal or equitable title to the property transferred to the ACQUIRING ASSOCIATION pursuant to this Agreement.

IN WITNESS WHEREOF, The parties hereto have executed this Agreement by their duly authorized officers or agents.

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION AS RECEIVER FOR LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION

Date: March 5 1985

Attest: [signature]

By: [signature]

Its: Special Representative

STERLING SAVINGS ASSOCIATION

Date: November 5 1985

Attest: [signature]

By: [signature]

Its: Chairman

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AND

STERLING SAVINGS ASSOCIATION
Spokane, Washington

Dated: November 5, 1985



EXHIBIT 2

(b) The CORPORATION's receipt of a certified copy of the corporate resolutions of the ACQUIRING ASSOCIATION authorizing execution and delivery of the Acquisition Agreement and this Agreement;

(c) The CORPORATION's receipt of a memorandum from the Office of the Attorney General of the State of Washington indicating that the Acquisition is in compliance with Washington law;

(d) The ACQUIRING ASSOCIATION and any of its Affiliates and Subsidiaries, within the time periods specified by the terms of this Agreement or by the Bank Board, (1) having executed and delivered to the CORPORATION all other agreements, instruments, and documents required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Acquisition and related transactions, and (2) having taken all other actions imposed as conditions to the CORPORATION's obligation to provide assistance in any action by the Bank Board in approving the Acquisition and related transactions.

Section 3. <u>Contributions by the CORPORATION</u>.

(a) <u>Cash Contributions</u>.

(1) Within five business days after the Effective Date, <u>provided</u> that the conditions set forth in § 2(a)-(c) of this Agreement have been satisfied, and the conditions set forth in § 2(d) have been satisfied to the extent specified by the Bank Board as a condition to the CORPORATION's initial cash contribution, the CORPORATION shall wire transfer to the account of the ACQUIRING ASSOCIA-

TION at the Federal Home Loan Bank of Seattle, Account No. 7918-16, a cash contribution in the amount of One Million, Seven Hundred Fifty Thousand Dollars ($1,750,000).

(2) For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, all cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the CORPORATION that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

(b) Indemnification Contributions. Within 30 days after receipt of the ACQUIRING ASSOCIATION's quarterly reports required pursuant to § 7(a) or within 90 days of the final accounting required pursuant to § 7(b) of this Agreement, the CORPORATION shall contribute to the ACQUIRING ASSOCIATION, in its account at the Federal Home Loan Bank of Seattle, Account No. 7918-16, the reported amounts that are owed pursuant to § 4 of this Agreement.

(c) Adjustments. Any contribution or payment by the CORPORATION or any accounting or report furnished by the ACQUIRING ASSOCIATION under this Agreement shall be subject to adjustment if it subsequently appears that such contribution, payment, accounting, or

report was based upon error or was not computed in accordance with the accounting principles prescribed by this Agreement.

Section 4. Indemnification for the Undisclosed Liabilities and Litigation Challenging the Acquisition.

(a) Indemnifications. To the extent not otherwise reimbursed or reimbursable, except as provided in § 4(a)(1), the CORPORATION will indemnify the ACQUIRING ASSOCIATION for, and pay as provided in § 3(b), the amounts actually paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of the following liabilities and the reasonable costs and expenses of litigation related to such liabilities and to the defense of Claims described in § 4(a)(2), including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in connection with such satisfaction, settlement, or compromise, provided that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 8, and provided further that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 4(a), and the reports required by § 7(a) and (e) of this Agreement, in a form satisfactory to the CORPORATION, shall be submitted to the CORPORATION before such costs and expenses shall be paid by the CORPORATION pursuant to § 3(b):

(1) Undisclosed Liabilities. Except as provided in this § 4(a)(1), any liabilities of the ACQUIRING ASSOCIATION that were not disclosed or reflected on the Books or records of LEWIS immediately prior to the Effective Date and which, under generally accepted accounting principles as of the Effective Date consistently applied, are of the type that are disclosed or reflected as liabilities, but excluding any inadequacy in or lack of a valuation allowance or specific reserve, provided that, in the event that the satisfaction, settlement, or compromise of any liability or liabilities described in this § 4(a)(1) results in the acquisition by the ACQUIRING ASSOCIATION of an asset or assets, then at the CORPORATION's election:

(A) The ACQUIRING ASSOCIATION shall assign such asset or assets to the CORPORATION without cost to the CORPORATION; or

(B) The amount paid by the CORPORATION pursuant to § 4(a) shall be limited to the amount, if any, by which the amounts paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of such liability or liabilities exceed the fair market value of the asset or assets, if any, acquired as a consequence of the satisfaction, settlement, or compromise of such liability or liabilities as determined (i) by agreement between the ACQUIRING ASSOCIATION and the CORPORATION, or (ii) by an

appraisal performed by an independent appraiser approved by the CORPORATION, the cost of which appraisal shall be paid by the CORPORATION.

The CORPORATION's obligation to provide indemnification under this § 4(a)(1) shall not extend to any Subsidiaries of LEWIS or to liabilities of LEWIS incurred, prior to the Effective Date, with respect to any month or months for which the Books have not yet been completed or closed, (1) which normally recur in LEWIS' ordinary course of business and operations, (2) which are ordinarily posted on the Books on a periodic basis, and (3) which are in amounts that are materially the same as and can reasonably be predicted from prior postings on the Books, including, but not limited to, items such as (A) accrued employee salaries, (B) utility bills, (C) accrued interest due to depositors and accountholders, and (D) accrued interest payable to the Federal Home Loan Bank of Seattle, or any other lender to LEWIS, provided that, with respect to accrued interest payable to a lender, the underlying obligation to pay principal is reflected on the Books.

(2) Challenges to the Acquisition. Any action brought by other than the ACQUIRING ASSOCIATION, any of its Subsidiaries, creditors, or stockholders within a period of one year following the Effective Date to challenge or set aside the Acquisition or this Agreement that is grounded upon a Claim that an action or failure to act by the Bank Board or the CORPORATION was not in accordance with the Bank Board's or the CORPORATION's enabling legislation, and, in

the event that a court of competent jurisdiction directs the ACQUIRING ASSOCIATION to divest assets or liabilities of LEWIS on such ground, the reasonable costs and expenses of such divestiture, provided that such damages are directly attributable to such action or failure to act by the Bank Board or the CORPORATION.

(b) Pursuit of Related Claims. The ACQUIRING ASSOCIATION shall use its best efforts to reduce or minimize the CORPORATION's indemnity payments under this § 4 by the pursuit of Related Claims, and the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for reasonable and related costs and expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in complying with this § 4(b), provided that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 8, and provided further that the pursuit of Related Claims shall be subject to approval by the CORPORATION and the reports required by § 7(a) and (e) of this Agreement, in a form satisfactory to the CORPORATION, shall be submitted to the CORPORATION before costs and expenses related to the pursuit of Related Claims shall be paid by the CORPORATION pursuant to § 3(b). All sums recovered from each such Related Claim shall be paid over to the CORPORATION to the extent that the CORPORATION has made contributions pursuant to this Agreement.

(c) Payments as Contributions. All payments made by the CORPORATION to the ACQUIRING ASSOCIATION under this § 4 shall be considered contributions under this Agreement.

(d) Limitation on Indemnification. Subject to the provisions of § 11(b), the CORPORATION's obligations to provide indemnification under § 4(a)(1) shall not extend beyond three years after the Effective Date, and the CORPORATION's obligations to provide indemnification under § 4(a)(2) shall not extend beyond one year after the Effective Date. Notwithstanding anything contained in this Agreement to the contrary, the aggregate contributions made by the CORPORATION pursuant to § 4(a) shall not be in excess of One Million Dollars ($1,000,000).

(e) Tax Benefits. The ACQUIRING ASSOCIATION shall pay to the CORPORATION an amount equal to the net tax benefits, if any, realized by the ACQUIRING ASSOCIATION in any year ("Net Tax Benefits"), calculated as provided in this § 4(e). For purposes of this Agreement, the Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 4(e)(1) and (2) below ("Tax Benefit Items") that are utilized by the ACQUIRING ASSOCIATION to reduce its federal income tax liability in a given tax year as calculated in § 4(e)(3) below.

(1) The total amount of any net operating and capital loss carryovers, and any other carryovers resulting in a tax deduction from the ACQUIRING ASSOCIATION's gross income, arising from a taxable year or taxable period of LEWIS which ends on or prior to the Effective Date.

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION,

AND

STERLING SAVINGS ASSOCIATION
SPOKANE, WASHINGTON

DATED April 8, 1988

EXHIBIT 4

§ 3 Contributions.

(a) Initial Contribution by the CORPORATION.

(1) If the conditions set forth in § 2 have been satisfied, within five business days after the Effective Date the CORPORATION shall wire transfer to the account of the ACQUIRING ASSOCIATION at the Bank immediately available funds in the amount of $11,730,128.

(2) For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by GAAP, the cash contribution made under § 3(a)(1), shall be credited to the ACQUIRING ASSOCIATION'S regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the CORPORATION that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

(b) Debit Balances. Within 30 days after receipt of each Quarterly Report required pursuant to § 9(a) or within 90 days of the final accounting required pursuant to § 9(g), the CORPORATION shall contribute to the ACQUIRING ASSOCIATION, by

FEDERAL HOME LOAN BANK BOARD

No.: 88-1273

Date: December 8, 1[illegible]

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterlin Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December 5, 1988, a memorandum from the Office of District Banks, dated December 5, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

SUPERVISORY CASE FINDING

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

## COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

## WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

## VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

## TAX CERTIFICATION

RESOLVED FURTHER, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

RESOLVED FURTHER, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

## CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS

RESOLVED FURTHER, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

## EFFECTIVE DATE

RESOLVED FURTHER, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

## MISCELLANEOUS

RESOLVED FURTHER, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the FSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

## EXTENSION OF TIME

RESOLVED FURTHER, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and

MAINTENANCE OF BRANCH OFFICES

RESOLVED FURTHER, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

FAILURE TO MEET CONDITIONS

RESOLVED FURTHER, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board

John P. Ghizzoni
Assistant Secretary

AGREEMENT

This Agreement is made this 28th day of December, 1988, by and between Sterling Savings Association (the "Acquirer"), hereto and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), a corporate instrumentality and agency of the United States, which is under the operating direction of the Federal Home Loan Bank Board (the "Board").

WHEREAS, the Acquirer has filed with the FSLIC the appropriate application ("Application") for approval of its proposed acquisition of control of Central Evergreen Federal Savings and Loan Association (the "Institution"); and

WHEREAS, in order to make a determination to approve the subject Application, pursuant to the applicable standards, the FSLIC requires that the Acquirer enter into this Agreement; and

WHEREAS, the Acquirer is willing to enter into this Agreement in order that the FSLIC will act favorably upon the Acquirer's Application;

NOW THEREFORE, in consideration of the FSLIC acting favorably on the Application, the Acquirer agrees as follows:

I. DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

A. "Additional Capital" means capital that the Supervisory Agent directs the Acquirer to raise, or otherwise deems to have been raised, in satisfaction of the provisions of this Agreement.

B. "Business Plan" means the Acquirer's financial projections for the period through June 1991, a copy of which is attached hereto, as such plan may be amended from time to time with the prior written non-objection of the Supervisory Agent as provided below.

C. "Date of Acquisition" means the effective date on which the Acquirer acquires control of the Institution.

D. "Default" means the failure of the Acquirer to comply with its obligations under this Agreement.

E. "Dividend" means (a) any dividend paid or other distribution (including, but not limited to, a liquidating distribution) made on or with respect to any shares of common stock of the Acquirer, but not including a stock dividend of stock of the

Acquirer, or (b) any payment on account of the purchase, redemption or other acquisition or retirement of any such shares or any warrants or option thereon, whether made by the Acquirer or any direct or indirect subsidiary thereof.

F. "Fully Phased-In Capital Requirement" means the Acquirer's fully phased-in regulatory capital requirement as defined in 12 C.F.R. Section 563.13, or any successor regulation.

G. "Minimum Capital Requirement" means the amount computed quarterly according to Section 563.13(b) and as adjusted by the "April Calculation" specified in Section 563.13(b)(2)(iv), or any successor regulation thereto.

H. "Regulatory Capital" means regulatory capital defined in accordance with 12 C.F.R. Section 561.13, or any successor regulation hereto.

I. "Regulatory Capital Requirement" means the Acquirer's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto.

J. "Regulatory Capital Deficiency" means the amount by which the Regulatory Capital of the Acquirer, computed by the Supervisory Agent in accordance with 12 C.F.R. Section 561.13, or any successor regulation thereto, is less than the Minimum Capital Requirement.

K. "Supervisory Agent" means the Principal Supervisory Agent or any Supervisory Agent of the FHLBB and FSLIC at the Federal Home Loan Bank of Seattle.

All technical words or terms used in this Agreement for which meanings are not specified or otherwise provided by the provisions of this Agreement shall, insofar as applicable, have meanings as defined in the rules and regulations of the FHLBB. Any such technical words or terms used in the Agreement and undefined in said rules and regulations shall have meanings that accord with the best custom and usage in the thrift industry.

## II. <u>BUSINESS PLAN</u>

The Acquirer shall use its best efforts to comply with its Business Plan, and the Acquirer shall not, without receiving the prior written non-objection of the Supervisory Agent, take any action (i) not provided for in or contemplated by its Business Plan or (ii) which would create a significant possibility of material deviation therefrom; provided, however, that the failure to raise additional capital as provided in the Business Plan shall not be deemed to be a deviation if it is raised prior to December 31, 1990 and if a revised Business Plan has been submitted to the

**App. 31 A**

Supervisory Agent by June 30, 1989. The Acquirer shall not revise its Business Plan or adopt a new Business Plan unless the Acquirer has received from the Supervisory Agent prior written notice of non-objection to such revision or adoption. At least 30 days before the end of any period for which projections are included in the Business Plan, the Acquirer shall submit to the Supervisory Agent, in form and substance acceptable to the Supervisory Agent, new projections for the next successive twelve-month period.

The Supervisory Agent will give reasonable consideration to any revision to the Business Plan submitted, that was necessitated by actions taken by any governmental body having jurisdiction that caused the Acquirer to materially deviate from its Business Plan. Such material deviation shall not be a violation of the obligations.

III. OBLIGATIONS OF ACQUIRER

A. The Acquirer will cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan. The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised prior to December 31, 1990.

B. The Acquirer agrees that if the ratio of regulatory capital to total assets is less than the ratio projected in the attached Business Plan by 90 basis points until the earlier of (i) December 31, 1990 or (ii) the raising of the additional capital provided for in the attached Business Plan, or subsequently 30 basis points, it will comply with the directives that are imposed under 12 C.F.R. Section 563.13(d) and will comply with the time period specified.

C. The Acquirer may not pay any common stock Dividend without the prior written approval of the Supervisory Agent.

D. The Acquirer shall submit to the Supervisory Agent quarterly variance reports in the format of the Business Plan explaining any material deviation from the approved Business Plan.

IV. DEFAULTS

A. If the FSLIC shall determine that a Default has occurred, it shall give notice of such Default to the Acquirer and

This Offering Circular has been filed with the Office of Thrift Supervision but has not been authorized for use in final form. Information contained herein is subject to completion or amendment. The Units covered hereby may not be sold nor may offers to buy be accepted prior to the time the Offering Circular is declared effective by the Office of Thrift Supervision. These securities may not be sold nor may offers to buy be accepted prior to the time the Offering Circular is declared effective. This Offering Circular will not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any state in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of any such state.

SUBJECT TO COMPLETION, DATED NOVEMBER 14, 1989

OFFERING CIRCULAR

## 525,000 Units

# Sterling Savings Association

### Each Unit Consisting of One Share of Common Stock and One Share of $ Noncumulative Convertible Preferred Stock—Series A

The common stock and preferred stock are offered only in Units, each Unit consisting of one share of Common Stock, par value $1.00 per share (the "Common Stock"), and one share of $ Noncumulative Convertible Preferred Stock—Series A, par value $1.00 per share (the "Series A Preferred Stock"), of Sterling Savings Association ("Sterling" or the "Association"), a Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington.

The Series A Preferred Stock is convertible by the holder into Common Stock at any time and from time to time, unless previously redeemed, at a conversion price of $ per share of Common Stock (equivalent to a conversion ratio of shares of Common Stock for each share of Series A Preferred Stock), subject to adjustment under certain conditions. See "Description of Capital Stock—Preferred Stock—Series A Preferred Stock."

Prior to this offering, there has been only a limited public market for the Common Stock of the Association. See "Market for Capital Stock." The final Price to the Public will be determined by negotiations between the Association and the representative of the Underwriters (the "Representative"). For a discussion of the factors considered in determining the public offering price of the Units, see "Underwriting." It is currently estimated that the Price to the Public will be between $20.00 and $22.00 per Unit. The Association has applied to have the Common Stock, the Series A Preferred Stock, and the Units approved for quotation on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") under the symbols "STSA," "STSAP," and "STSAU," respectively. The Common Stock and the Series A Preferred Stock may not be separately transferred until 30 days after issuance of the Units.

The Series A Preferred Stock is redeemable, in whole or in part, on any dividend payment date on or after December 15, 1992 at the option of the Association, at the declining redemption prices set forth herein. Dividends on the Series A Preferred Stock are not cumulative and are payable quarterly in arrears on March 15, June 15, September 15, and December 15 of each year (other than the initial dividend period) when, as, and if declared by the Board of Directors, commencing March 15, 1990. The liquidation preference of the Series A Preferred Stock is $12.00 per share. See "Description of Capital Stock—Preferred Stock—Series A Preferred Stock."

Generally, no person, entity, or group is permitted to own 10% or more of the Association's outstanding stock without the approval of the Office of Thrift Supervision (the "OTS") and the Washington Department of Savings and Loan Associations.

The Association and the Underwriters have agreed that approximately 150,000 Units (the "Directed Units") will be reserved for sale to certain current shareholders of the Association including directors, executive officers, and senior managers of the Association, and other persons involved in the Association's business. See "Shares Reserved for Sale to Current Shareholders."

DIVIDENDS ON THE SERIES A PREFERRED STOCK ARE NOT CUMULATIVE. THEREFORE, IF A DIVIDEND ON THE SERIES A PREFERRED STOCK IS NOT DECLARED WITH RESPECT TO ANY DIVIDEND PERIOD, THE ASSOCIATION SHALL HAVE NO OBLIGATION AT ANY TIME TO PAY A DIVIDEND IN RESPECT OF SUCH DIVIDEND PERIOD AND MAY PAY DIVIDENDS ON JUNIOR STOCK IN ANY SUBSEQUENT DIVIDEND PERIOD AS LONG AS FULL DIVIDENDS ARE PAID WITH RESPECT TO THE SERIES A PREFERRED STOCK IN SUCH SUBSEQUENT DIVIDEND PERIOD. UPON THE EFFECTIVENESS OF REGULATIONS PROMULGATED UNDER THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT OF 1989, THE ASSOCIATION WILL NOT BE IN COMPLIANCE WITH REGULATORY CAPITAL REQUIREMENTS. ACCORDINGLY, THE ASSOCIATION MAY BECOME SUBJECT TO REGULATORY RESTRICTIONS WHICH COULD LIMIT ITS ABILITY TO PAY DIVIDENDS ON THE SERIES A PREFERRED STOCK. FOR A DISCUSSION OF THIS AND OTHER FACTORS THAT SHOULD BE CONSIDERED BY EACH PROSPECTIVE INVESTOR, SEE "SPECIAL CONSIDERATIONS."

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, THE OTS, OR THE FEDERAL DEPOSIT INSURANCE CORPORATION (THE "FDIC"), NOR HAS SUCH COMMISSION, OFFICE, OR CORPORATION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

| | Price to the Public | Underwriting Discount(1) | Proceeds to the Association(2) |
|---|---|---|---|
| Per Unit | $ | $ | $ |
| Total(3) | $ | $ | $ |

(1) The Association has agreed to indemnify the Underwriters against certain liabilities under the Securities Act of 1933, as amended. See "Underwriting." The Association has also agreed to pay the Representative an advisory fee of $200,000 and to reimburse the Representative for all direct out-of-pocket expenses incurred by the Representative in connection with this offering to the extent such expenses exceed 20% of the aggregate Underwriting Discount.

(2) Before deducting offering expenses payable by the Association estimated at $491,250.

(3) The Association has granted to the Underwriters an option, exercisable within 30 days of the date hereof, to purchase up to an additional 78,750 Units solely to cover over-allotments, if any. If such option is exercised in full, the total Price to the Public, the total Underwriting Discount, and the total Proceeds to the Association will be $ , $ , and $ , respectively. See "Underwriting."

**The Units are offered by the several Underwriters named herein when, as, and if delivered to and accepted by them subject to prior sale and subject to approval of certain legal matters by counsel to the Underwriters. The Underwriters reserve the right to withdraw, cancel, or modify such offer, and to reject orders in whole or in part. It is expected that delivery of the shares of Common Stock and Series A Preferred Stock will be made against payment therefor in , on or about , 1989.**

## DAIN BOSWORTH
INCORPORATED

The date of this Offering Circular is , 1989.

DRI08677

App. 33

**Analysis of Classified Assets, by Institution**

*Lewis Federal*. Classified assets at November 5, 1985 consisted primarily of three out-of-state participation loans and one loan on a hotel property located in Chehalis, Washington. As part of the acquisition, loss reserves of $750,000 were established with respect to the loan participations. Each of these participations has been fully resolved, resulting in an actual total loss of only $450,000, which represents a favorable recovery of $300,000 when compared to the $750,000 loss allowance previously established. The loan on the hotel property, which represents a substantial portion of remaining classified assets, was restructured and has been performing as agreed.

*Tri-Cities*. Classified assets at April 8, 1988 included four participation loans and ten commercial real estate properties owned, totalling $9.2 million, net of loss allowances. Pursuant to an Assistance Agreement, the FSLIC agreed to indemnify the Association against capital losses in excess of 25% with respect to certain assets. In addition, the FSLIC agreed to limit the Association's total capital loss exposure with respect to its 25% share to $900,000, after which amount the FSLIC agreed to indemnify 100% of any further losses. At September 30, 1989, Sterling had absorbed approximately $194,000 in capital losses on the assets covered by the FSLIC Assistance Agreement and had established loss allowances covering substantially all of the balance of the Association's exposure. The FSLIC also guaranteed the Association a minimum yield equal to the average six-month Treasury bill rate plus 150 basis points on this same group of assets. During the three months ended September 30, 1989 and the fiscal year ended June 30, 1989, the Association received $150,000 and $600,000, respectively, from the FSLIC under this yield subsidy arrangement. Nonindemnified classified assets totalled $2.4 million (net of specific loss allowances) as of the date of acquisition and consisted primarily of single family residential properties. At September 30, 1989, the Association had resolved $7.5 million in aggregate value of the indemnified assets and $1.8 million in aggregate value of the nonindemnified assets. See "Business—Lending Activities—Classified Loans, Real Estate Owned, and Delinquent Loans—Loans and REO Acquired From Tri-Cities."

*Central Evergreen*. Classified assets at December 31, 1988 totalled $17.5 million (net of loss allowances of $7.5 million) and consisted primarily of 34 loans on commercial real estate properties with an aggregate net balance of $10.2 million, 26 income-producing properties included in REO with an aggregate net balance of $4.9 million, and $2.4 million of residential loans and REO. The Association has made progress in resolving these assets during the nine-month period following the acquisition of Central Evergreen and expects continued improvement in reducing the level of classified assets. At September 30, 1989, remaining classified assets acquired from Central Evergreen were $16.2 million (net of loss allowances of $2.2 million). See "Business—Lending Activities—Classified Loans, Real Estate Owned, and Delinquent Loans."

These acquisitions have enabled the Association to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits. See "Taxation—Effect of Offering on Net Operating Loss Carryforwards." Through consolidation, the Association has reduced the cost of performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to the Association.







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5006 1776

# STERLING SAVINGS ASSOCIATION

## CAPITAL RESTORATION PLAN

FEBRUARY 19, 1990

Amended February 28, 1990



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 0149 F

STERLING SAVINGS ASSOCIATION
CAPITAL RESTORATION PLAN
INDEX

Plan Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Strategic Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pro forma financial information of contemplated transactions . . . . . . . . . . . 4
Pro forma consolidated and unconsolidated financial statements . . . . . . . . . . 4
Previous consolidated financial information . . . . . . . . . . . . . . . . . . . . 4
Compliance with limitations and restrictions under FIRREA . . . . . . . . . . . . 4
Loans-to-One-Borrower Limitations . . . . . . . . . . . . . . . . . . . . . . . 5
Growth Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Commercial Lending Limitations . . . . . . . . . . . . . . . . . . . . . . . . . 5
Consumer Lending Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Nonresidential Loan Limitations . . . . . . . . . . . . . . . . . . . . . . . . 6
Brokered Deposit Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . 6
Increase in assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Interest rate risk management . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Major changes in assets and liabilities and capital distribution . . . . . . . . . 7

Exhibits

1. Projected Financial Statements
2. Quarterly Projected Capital Calculations
3. Interest Rate Forecast
4. Projected Intangible Assets and Related Amortization
5. Agreement with Dain Bosworth
6. Key Management
7. Prospect List
8. Historical Consolidated Financial Information
9. Projected Unconsolidated Financial Information

STERLING SAVINGS ASSOCIATION

CAPITAL RESTORATION PLAN

February 19, 1990

Plan Summary

This document represents Sterling Savings Association's capital restoration plan as required by Thrift Bulletin 36. As of December 31, 1989, Sterling had regulatory capital, as documented on Exhibit 2, as follows:

| | Tangible Capital | Core Capital | Risk-based Capital |
|---|---|---|---|
| Total capital (deficiency) under FIRREA at 12/31/89 | $(12,553) | $ (2,273) | $ (2,273) |
| Minimum requirement | 10,280 | 20,738 | 30,012 |
| Capital surplus (deficiency) | $(22,833) | $(23,011) | $(32,285) |
| Ratio of Capital to Adjusted Assets | (1.89%) | (0.3%) | (0.3%) |

The principal reason for the capital deficiencies is a direct result of a change in the regulations by Congress in August 1989. The FIRREA legislation eliminated $13 million in FSLIC-contributed "permanent" capital which Sterling contractually obtained in its acquisitions of Tri-Cities Savings and Loan Association and Lewis Federal Savings and Loan Association. Additionally, as a result of the supervisory acquisition of Central Evergreen Federal Savings and Loan Association, completed without FSLIC assistance, Sterling increased its intangible assets by $22 million to approximately $25 million, for which the FIRREA legislation now penalizes Sterling by causing a reduction from GAAP capital in determining regulatory capital.

Sterling has developed a strategy to resolve its capital deficiency by being acquired by another financial institution. Sterling has retained Dain Bosworth Incorporated in an agreement dated January 10, 1990, to represent the Association to prospective acquirers. In the three weeks following the initiation of this arrangement, Sterling and Dain Bosworth Incorporated have prepared a prospect list of approximately 25 potential acquirers. At the same time, Sterling has been in the process of preparing



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 0151

financial information which would be needed by these potential acquirers to determine the suitability of acquiring the Association. Through the third week of February, Dain Bosworth Incorporated will be contacting these potential acquirers, soliciting their interest, and determining institutions that would pursue the acquisition of the Association.

Beginning the last week of February 1990, it is expected that the field will be narrowed to between four and five potential acquirers. The next step would be to schedule on-site due diligence reviews. These due diligence reviews, which will begin on February 26, 1990, and are expected to last between two and four days each, should be completed by the middle of March 1990. Dain Bosworth will contact these institutions to solicit their levels of interest and present the findings to Sterling's Board of Directors at the March meeting.

Following the March Board meeting, Sterling's Board sub-committee will review bids and make recommendations at the April Board meeting. By the May Board meeting, a definitive agreement should be negotiated and presented for approval by Sterling's Board of Directors. Following the May Board meeting, it is anticipated that proxy material would be prepared and disseminated to shareholders in preparation for a special shareholders' meeting which would be held in July 1990. Additionally, the merger application will be prepared and filed following the selection of the acquisition candidate. The Association anticipates a closing date between July 1 and September 30, 1990. It should be noted that the schedule is subject to the discretion of the purchasers and to regulatory approval. The Association would work diligently to accomplish an expeditious closing. A closing date of July 1 or later would allow certain balance sheet structurings to occur and to take advantage of expiring tax benefits. The potential acquirer may also have a desire to base the final purchase price of the Association on audited financial information as of the end of Sterling's fiscal year end, June 30, 1990. Ultimately, even though the Association cannot control the purchasers timing, we would expect to have a commitment letter by September 30, 1990.

As part of this Capital Restoration Plan, management and the Board of Directors of Sterling have a strong desire to maintain the franchise value at the highest level. Accordingly, the Association intends to continue to operate profitably as is reflected in the financial projections of Exhibit 1. Furthermore, the Association is

dedicated to operating in a safe and sound manner as is contemplated by the FIRREA legislation. The projected financial information incorporates various operating limitations affecting the Association. These restrictions are further discussed elsewhere in this Capital Restoration Plan.

Form of Sale

The Association has received interest from a variety of acquirers. Depending on the acquirer, the sale could take a variety of forms. The various forms all have the result of bringing the Association into compliance by converting the Association into part of a capital compliant institution. The alternative forms may include:

1. Sale of the Association to one financial institution. This is the most likely transaction and is advantageous by being easy to coordinate and potentially less costly to complete.

2. Sale of the Association in two or more components rather than as a single transaction. The Association has received considerable interest in portions of the Association's delivery system rather than as a complete unit. With its financial advisor, Dain Bosworth, the Association will evaluate whether the sale of the institution to multiple purchasers has more merit than the sale to a single acquirer. In essence, this strategy will evaluate whether the sum of the parts provides greater value than the whole unit.

3. Mutual conversion: Sterling and its financial advisor, Dain Bosworth, have been approached by a consultant representing a mutual institution with the proposition of converting the mutual and simultaneously acquiring Sterling. Due to the longer time frame anticipated to consummate this transaction, the Association feels this is less likely to occur. However, should this alternative develop greater interest, Sterling would work diligently with OTS to complete the transaction.

The sale for cash is considered the most likely alternative due to relative value of one sale transaction and the timeliness of completing the transaction. Presently there is much interest in the other alternatives and the Association will consider any offers received in terms of both value received and timeliness of completing the transaction. The Association considers all of the above forms of acquisition to be part of the sale of the company strategy.

Strategic Alternatives

While the Association's primary strategy to become compliant with the new capital standards is to seek a merger candidate, it has also evaluated alternative secondary strategies to become compliant as required by Thrift Bulletin 36. If acceptable bids are not received, the Association will consider the following alternative.

1. Remaining independent but downsizing the institution. Due to the disruption caused in the marketplace currently as a result of Resolution Trust Corp. activities, the Association is concerned with the nature of bids it will receive. As an alternative, the Association had evaluated the means to remain independent and comply with the new capital standards. This strategy entailed reduction in total assets of between $200 and $400 million. This strategy further resulted in the sale of branch facilities, portions of the Association's loan portfolio, and the sale of the Association's servicing portfolio. The premiums received on the sale of branch deposits and servicing portfolios were to be used to enhance regulatory capital, either as an increase to earnings or as a reduction to intangible assets. A marketing program designed to sell these branches and to liquidate assets to fund the transfer of deposit liabilities perhaps would have a longer time frame than the Association's primary strategy of selling the Company. It is expected, however, that this strategy could be completed by the end of 1990.

   Additionally as part of this strategy, the Association explored the ability to negotiate a private placement of the Association's common or preferred stock as a means to increase the capital ratios under the new capital standards. The Association had received interest in such a transaction.

The Association does not consider this alternative feasible under current conditions and is not currently pursuing it. This alternative strategy would be considered in the event no acquirers could be arranged.

Pro forma financial information of contemplated transactions (TB 36,#5):

The only contemplated transaction by the Association at this time is the sale of the company to another financial institution. Should an alternative strategy become a feasibility, Sterling would work closely with OTS to develop this strategy while preserving Sterling's capital position and franchise value.

Pro forma consolidated and unconsolidated financial statements (TB 36, #6)

Included in Exhibits 1 (consolidated financial information) and 9 (unconsolidated financial information) are the Association's computed projected balance sheet and income statements for each quarter through September 30, 1990.

Previous consolidated financial information (TB 36, #7):

As Exhibit 8, we have included Sterling's financial statements for the immediately preceding four quarters.

Compliance with the limitations and restrictions under FIRREA (TB 36, #8):

Although the Association has not been significantly limited or restricted to activities or investments in the past, FIRREA legislation and regulatory bulletins impose a variety of limitations on the Association. The Association intends to comply with all such limitations and restrictions. Specifically, the Association is now limited in loans to one borrower, asset growth, commercial lending, consumer lending, nonresidential lending, solicitation of brokered deposits, and capital distributions.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 0155

Based on the Association's negative regulatory capital level as of December 31, 1989, the following limitations and restrictions apply to the Association:

A. Loans-to-One-Borrower Limitations:

| | | 12/31/89 |
|---|---|---|
| Unsecured loans limit | - 15% | $500,000 |
| Secured loans limit | - 25% | 500,000 |
| Sale of REO limit | - 50% | 500,000 |

The Association intends to comply with the established loans-to-one-borrower ("LTOB") limitations as outlined above and will make a concentrated effort to reduce the current levels of loans to one borrower which may exceed these new limits. The Association has suspended all income property lending and is redirecting the resources of its subsidiary toward updating its credit file documentation and marketing its non-residential loan portfolio. The limitations on the sale of REO loans should not be a major factor for the Association, as the majority of REO sales are based on cash sales.

B. Growth Limitations

With FIRREA legislation, the Association's asset growth is limited to interest credited to deposits per quarter. It is the Association's intent to comply with the growth limitations by continuing the mortgage banking activities and selling loans into the secondary market. Principal and interest payments on loans and the liquidation of other assets are expected to be invested in liquidity-qualifying instruments in order to enhance liquidity levels.

C. Commercial Lending Limitations

Commercial lending is currently 3.86% of assets, substantially below the 10% limit. Future activity is dependent upon the Association's application for investment authority.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 0156

D. Consumer Lending Limitations:

| | | |
|---|---|---|
| Consumer loan portfolio limit | - 30% of assets | $210 million |
| Current consumer loan portfolio | | $ 19 million |

The Association is in compliance with the limits established for consumer lending activity. It is the Association's intent to continue current volume of consumer lending for home improvement, automobile, and personal line of credit purposes.

E. Nonresidential Loan Limitations:

| | |
|---|---|
| Nonresidential loan limitations 400% of core and supplemental capital | -0- |
| Current nonresidential loan portfolio | $149,061,000 |

The FIRREA legislation limits the level of the nonresidential lending portfolio. Currently, the Association is not in compliance with the limitations. It is the Association's intent to curtail this type of lending activity and reduce the current portfolio through marketing efforts.

F. Brokered Deposit Restrictions:

Per the FIRREA legislation, the Association is restricted from accepting deposits involving third parties. The Association's only brokered deposits consist solely of Washington State public funds obtained through one broker. In anticipation of the FIRREA limitations, the Association has been reducing its level of these brokered deposits. The Association expects to curtail solicitation of deposits using this one broker and anticipates it will be able to replace these funds with local deposits as the brokered deposits mature. The Association anticipates no problems with maintaining its liquidity as a result of the outflow of these brokered deposits.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 0157