Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

May 22, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Members of the Board:

The capital plan filed on January 8, 1990, and subsequently amended on February 28, 1990 was approved conditioned on the execution of an Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver. As specified in the April 11, 1990 approval letter, the executed agreement was to be returned to this office within 20 days of receipt (May 6, 1990).

In light of the Board of Director's unwillingness to comply with the conditions of approval, and the absence of an acceptable alternative capital plan, the capital plan is denied. The success of the capital plan was dependent upon the execution of a definite merger agreement or sales agreement, that the plan projected would be accomplished by "the May Board Meeting" (Board of Directors' meeting of May 22, 1990). Absence the execution of such a sales or merger agreement, the plan does not contain an acceptable remedy to the capital deficiency. As such, in accordance with 12 CFR 567.10, the attached Capital Directive is hereby issued for execution by the Board of Directors.

Sincerely,

ECH

for William J. Durbin
District Director
Seattle District

CF/kh

pc: Betty Reed - Washington State Supervisor

EXHIBIT 7

Office of Thrift Supervision
Department of the Treasury
Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

June 18, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201
OTS No. 7918

Dear Mr. Byrne:

As a follow up to our recent conversations regarding required reporting by Sterling Savings. My June 5, 1990 letter requesting you to make reports absolutely is not a restriction, nor does the wording of this letter imply that we view it as a restriction.

We fully recognize that, until the Temporary Restraining Order is dissolved or the court orders otherwise, we may not enforce the restrictions set forth in our letters of January 26th, March 9th and May 11th. We intend strictly to obey the court's order. However, as our earlier letters indicated, we have significant Supervisory concerns about the condition of Sterling and the soundness of some aspects of its operations.

In order that we may be fully informed, to our satisfaction, of those aspects of Sterling's operations that cause us concern, we are requiring that you make the reports described in our letter of June 5th. In this way we hope to have early and adequate warning of any significant risk to Sterling's condition resulting from such activities. See 12 C.F.R. 563.180(a) (1990) ("Each savings association . . . shall make such . . . reports of its affairs in such manner . . . as the Office may prescribe.")

If you have any questions regarding this matter, please contact me. Given that you have failed to file the June 12, 1990 report, tomorrow's report should cover the timeframe from May 29, 1990 thru June 15, 1990.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed
State Supervisor

Harold Gilkey
Chief Executive Officer
Sterling Savings Association

App. 46

bc: Docket Section
Ed Hedlund, Deputy District Director
John Bisset, Field Manager
Pat Stimac, Supervisory Analyst
Gregg Golden, DC
File 1-II
KHChron, Chron File, Routing, FDIC

**FDIC**
**Federal Deposit Insurance Corporation**
Washington, DC 20429

Division of Supervision

July 31, 1990

Board of Directors
Sterling Savings Association
N. 120 Wall Street
Spokane, Washington 99201-0696

Members of the Board:

Pursuant to authority delegated by the Board of Directors of the Federal Deposit Insurance Corporation, you are advised that your application for brokered deposit waiver dated January 26, 1990 is denied. Upon the August 2, 1990 expiration of the current temporary waiver, the institution may no longer accept, renew or rollover any brokered deposits.

The condition of your association has deteriorated to the degree where additional capital is urgently needed. The use of alternative funding sources should be continued [we acknowledge that brokered funds have been reduced from $18 million at yearend 1989 to $4 million at June 30, 1990] since the utilization of brokered deposits without realistic prospects for capital augmentation is believed inappropriate. If capital is raised, the FDIC would be willing to reconsider your request.

If you have questions, emergency liquidity needs, or would like to further discuss your application, please contact the San Francisco Regional Office at (415) 546-0160.

Sincerely,

John W. Stone
Associate Director

**FDIC**
**Federal Deposit Insurance Corporation**
Washington, DC 20429

Division of Supervision

1-11
7918

September 7, 1990

JKB

Mr. Daniel G. Byrne
Senior Vice President
Sterling Savings Association
N. 120 Wall
Spokane, Washington 99201-0696

Dear Mr. Byrne:

We have concluded our review of the concerns expressed in your August 17, 1990 letter. In your communication you inquired as to the basis for the Corporation's July 31, 1990 denial of your institution's application for a brokered deposit waiver. Our considerations of the merits of your application was based, in large part, on the FDIC's Report of Examination dated November 13, 1989, since that report provided a means of comprehensively assessing the condition of your association. The examination report indicated that the association's capital, even after full credit for all Goodwill, was inadequate given the quality of the non-covered assets. Further, the association apparently failed to provide the Office of Thrift Supervision ("OTS") with a viable plan to augment capital to an acceptable level. This factor raised serious concerns as to whether the association would be adequately capitalized in a reasonably prompt manner. In the absence of such a recapitalization plan, the use of brokered deposits was deemed inappropriate.

Subsequent to our denial, however, verbal communication was received on September 6, 1990 from the OTS in Seattle. OTS informed this office that your institution has approximately $13.5 million in off-balance sheet items qualifiable as capital pursuant to the Court's Preliminary Injunction dated August 8, 1990. A recalculation of the institution's capital requirements, after including these off-balance sheet items, reflects that the institution currently meets its applicable minimum capital levels, but only given the constraints of the Court's Injunction. In light of these circumstances, your institution does not fall within the definition of an undercapitalized insured depository institution pursuant to Section 337.6(a)(5) of the FDIC Rules and Regulations and a brokered deposit waiver would not be required.

We hope the above adequately addresses your concerns. We will also consider your application for a brokered deposit waiver withdrawn and our July 31, 1990 denial moot.

Sincerely,

John W. Stone

John W. Stone
Associate Director

9/17/90

# REPORT OF EXAMINATION

Office of Thrift Supervision
Seattle District

SG 0052593

App. 50 "Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER F PSG039 0068

**Office of Thrift Supervision**
Department of the Treasury Seattle District
2201 Sixth Avenue, Suite 1500, Seattle, WA 98121-1889

January 14, 1991

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201-0696

OTS No. 7918

Members of the Board:

The September 17, 1990 Report of Examination is attached. The examination was conducted by Office of Thrift Supervision examiner Scott Bradley and was performed concurrently with the examination conducted by the Federal Deposit Insurance Corporation. Their report has previously been forwarded, as has the separate OTS Report of Compliance Examination.

This letter should be considered part of the attached examination report and as such should be held in the same confidence.

Despite notable improvements in several areas of the association, the examination disclosed the continued unsatisfactory condition of Sterling Savings. Numerous weaknesses were noted in the area of board and management supervision; asset quality continues to be poor, as evidenced by high levels of classified assets and underwriting weaknesses; weak operating results continue to be experienced and the association lacks an adequate interest rate risk monitoring system, despite high levels of risk exposure. Additionally, even after giving full consideration to the provisions of the November 1985, April 1988, and December 1988, acquisition related agreements, capital continues to be inadequate given the association's high levels of risk and the weaknesses noted.

The Report provides detailed comments relating to the deficiencies noted during the examination. It should be reviewed in its entirety by each individual director, with specific corrective actions implemented where necessary. Items of primary concern are noted below, as well as within the body of the Report.

·Numerous violations of internal policy were noted regarding the systems in place to ensure the proper disbursement of officer expense claims. Inappropriate expenses were detected with regards to expenses claimed by Mr. Gilkey which require reimbursement to the association. In addition, policies and procedures addressing officer expense accounts are in need of revision. Documentation of Mr. Gilkey's reimbursement of



Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0069

inappropriately claimed expenses and the revised, board approved policies should be forwarded for our review. As recommended by the examination staff, expense requests for Mr. Gilkey and Mr. Zuppe must be subject to the prior review and approval of the Board of Directors, or its audit committee. This procedure should be included within the revised policy, as should other recommendations detailed in the Report.

•Deficiencies relating to the association's internal audit function are detailed in the examination report. As noted, the current internal audit system is grossly inadequate and lacks the essentials of a sound audit program. Similarly, the individual recently appointed to the position of internal auditor lacks essential experience and has not been provided adequate staffing necessary to establish an appropriate program. As indicated in the Report, the audit program must be revised to address all functions of the institution. Similarly, the Board must address the staffing of this department and determine its adequacy. The revised audit program, as well as a schedule of 1991 audits should be forwarded for our review in conjunction with your response to the Report of Examination and this letter.

•Underwriting concerns were noted in both the consumer and commercial lending portfolios. Newly originated credits were generally poorly underwritten and of marginal to low quality, with a number of regulatory violations noted. Although the policy covering commercial lending was found to be sound, the absence of a quality control review subsequent to origination, resulted in numerous exceptions. It is essential that such a program be implemented immediately. Given the already limited resources of the internal auditor (who also serves as compliance officer), another qualified individual should be appointed by the board to perform this review function.

Given the deficiencies noted and the absence of an appropriate review function, the planned growth in consumer loans should not be pursued until such time that underwriting policies and procedures are reviewed and found to be appropriate, and that a review program is implemented. Both the policies and the specifics of the review program should be forwarded for our review prior to the association proceeding with any growth of the consumer loan portfolio.

With regards to the commercial lending portfolio, procedures should be implemented to provide for the proper identification and monitoring of problem credits. These procedures as well as specifics of the internal review program for commercial lending should be forwarded for our review as well.

•Significant deficiencies relating to the level, management and monitoring of the association interest rate risk position were detected in the examination and are detailed within the Report. Of primary concern is the absence of expertise within the association necessary to adequately manage, analyze and monitor the risk exposure of the association. Also

Board of Directors
Sterling Savings Association
January 14, 1991
Page 3

evident is the lack of an adequate system to measure and evaluate interest rate sensitivity exposure in accordance with Thrift Bulletin No. 13. The lack of such a system is in direct violation of regulatory requirements and must be addressed immediately. Until such time that such a system is in place, and the necessary resources are assigned to this critical function, the restrictions contained within Mr. Durbin's October 1, 1990, letter to the Board will continue to be in effect.

The Report and this letter should be reviewed at your next regularly scheduled meeting. Please provide to the undersigned a certified copy of your board minutes verifying that each director has read the report. Also, a written response should be forwarded to this office addressing the areas of concern outlined in this letter, as well as all other deficiencies and regulatory violations discussed in the report, and detailing the corrective action initiated. This response should be received by February 15, 1991.

Sincerely,

Carol Friend

Carol Friend
Assistant Director

CF/lb

Attachment

pc: Betty Reed



"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0071

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

| Name and Address of Association | District | Docket No. |
|---|---|---|
| Sterling Savings Association<br>North 120 Wall Street<br>Spokane, Washington 99201 | Seattle<br><br>Type of Examination<br>Joint Regular | 07918 |

Examination Commenced: September 17, 1990
Examination Concluded: November 2, 1990

Service Corporations and Other Affiliates Which Are a Part of This Report:

INTERVEST Mortgage Investment Company
Action Mortgage Company
Evergreen Environmental Development Corporation
Evergreen First Service Corporation
Fidelity Service Corporation
Tri-Cities Mortgage Corporation
Tri-West Mortgage Incorporated

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the association for its confidential use. Under no circumstances shall the association, or any of its directors, officers, or employees disclose in any manner the report or any portion thereof to any person or organization not officially connected with the association as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the District Director should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued the process, should be advised of the above prohibition and referred to in 12 CFR 510.5 of the Office of Thrift Supervision's regulations.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

| Name and Address of Institution | District | Docket No. |
|---|---|---|
| Sterling Savings Association<br>North 120 Wall Street<br>Spokane, Washington 99201 | Seattle<br><br>Type of Examination<br>Joint Regular | 07918 |

Examination Commenced: September 17, 1990

Members of the Board:

In accordance with the Home Owners' Loan Act and Office of Thrift Supervision regulations, and in compliance with the laws and regulations of the State of Washington, we have conducted an examination of the above-named association on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the association's books and records. The examiners' comments and conclusions are based on an analysis of information obtained from the association's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the association's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate.

/s/ Gene Fitzpatrick
Examiner-in-Charge
State of Washington

/s/ Scott A. Bradley
Examiner-in-Charge
Office of Thrift Supervision
Seattle District

SG 0052598

App. 55

"Confidential Material - Subject to Protective Order"

Date: September 17, 1990 Docket No.: 07918

## INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary | 1 - 1.2 |
| Management, Asset Quality, Capital Adequacy, Risk Management, Operating Results, and Miscellaneous | 2 - 7.1 |
| **APPENDIX** | |
| Outstanding Enforcement Actions (Omitted) | A - 1.1 |
| Directors, Principal Officers, and Attorneys | A - 2.1 - 2.3 |
| Principal Operating Committees | A - 2a.1 |
| Summary of Stock Ownership | A - 3.1 - 3.4 |
| Statement of Condition | A - 4.1 - 4.2 |
| Statement of Operations | A - 5.1 - 5.2 |
| Key Ratios | A - 6.1 - 6.3 |
| Deposit/Liability Schedule (Omitted) | A - 7.1 |
| Deposits from Other Financial Institutions (Omitted) | A - 8.1 |
| Summary of Criticized Assets | A - 9.1 |
| Summary of Action Required by Criticized Assets | A - 11.1 |
| Classified Assets | A - 12.1 - 12.17 |
| Assets Subject to Special Mention | A - 13.1 - 13.2 |
| Loans in Process and Commitments (Omitted) | A - 14.1 |
| Concentrations (Omitted) | A - 15.1 |
| Gap Report Assumptions (Omitted) | A - 16.1 |
| Gap Analysis - Hedged Gap (Graphic) (Omitted) | A - 17.1 |
| Service Corporations | A - 23.1 - 23.20 |
| Other Affiliates (Omitted) | A - 24.1 |
| Financial Reporting Errors | A - 25.1 - 25.2 |
| Violations of Laws, Regulations, or Memoranda | A - 26.1 |
| Uniform Composite Rating System | A - 27.1 - 27.2 |




SG 0052599

"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0074

Date: September 17, 1990 Docket No.: 07918

ABBREVIATIONS WHICH MAY APPEAR IN THIS REPORT

A - Attorney
AD - Advisory Director
AVP - Assistant Vice President
CC - Contingent Classification
C - Controller
CB - Chairman of the Board
CEBA - Competitive Equality Banking Act
CEO - Chief Executive Officer
COO - Chief Operations Officer
D - Director
DE - Director Emeritus
EVP - Executive Vice President
FHA - Federal Housing Administration
FSLIC - Federal Savings and Loan Insurance Corporation
GAAP - Generally Accepted Accounting Principles
GVR - General Valuation Reserves
LIP - Loans in Process
MMDA - Money Market Deposit Account
MO - Managing Officer
NOW - Negotiable Order of Withdrawal
OTS - Office of Thrift Supervision
P - President
RAP - Regulatory Accounting Practices
REO - Real Estate Owned
S - Secretary
SVP - Senior Vice President
T - Treasurer
VA - Veterans Administration
VP - Vice President



SG0052600



dential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0075

Date: September 17, 1990 Docket No.: 07918

REPORT SUMMARY

A joint regular examination of Sterling Savings Association was performed using financial data primarily as of June 30, 1990. Emphasis was placed on asset quality, capital adequacy, asset/liability management, and operating results. The review also included the association's compliance with applicable laws and regulations. A concurrent Consumer Compliance Report, including a review of the Community Reinvestment Act and the Currency and Foreign Transaction Reporting Act, was prepared and was included under separate cover.

The scope of this examination focused primarily on a review of the association's asset quality with respect to real estate owned (REO), real estate investments (REI), delinquent loans, modified loans and a detailed review of the association's commercial lending operations. The review also included an analysis of consumer loans, income property loans, and the accuracy of net realizable value (NRV) calculations. The scope also included a review of Sterling Savings Association's (Sterling) operations, its consolidated capital calculation, management expense accounts (travel, entertainment, auto, and club dues, etc.), interest rate risk exposure, the adequacy of general and specific loss allowances, subsidiary operations, and the capabilities of management and the Board of Directors to effectively direct the operations of the association.

The overall condition of the association continues to be unsatisfactory. The level of classified assets, while improved, continues at a high level; interest rate risk exposure is also high and operating results have been poor. Since the prior examination, Sterling's operations have remained relatively stable overall; neither improving nor deteriorating significantly. Some improvement was noted, however, in several areas: the quality of information maintained in problem asset files; the preparation of NRV calculations (although the findings were not always implemented); correcting deficiencies noted in the previous examination; the decline in the levels of REO and REI as well as delinquent and nonaccrual loans; and the overall reduction in classified assets. The association has also experienced declines in some aspects of its operations. The increase in classified commercial credits is of concern, as is the marginal quality of a significant portion of new consumer loans granted; the noncompliance with Thrift Bulletin No. 13 (TB-13); an increased level of IRR; and a significant amount of additional specific loss allowances.

Management has implemented, or begun implementing, corrective action for some deficiencies noted in the prior reports of examination by reducing REO and REI and other classified assets; improving NRV analysis; improving the quality of information available in credit files; and taking the initiative to establish internal review functions in the form of an internal audit department. However, the association's existing internal audit department does not function in an internal audit capacity. The person charged with implementing the internal audit function lacks an internal audit background and will need additional qualified staff for the department to be considered adequate. Management's activities and actions in other aspects are also of concern. Certain travel and entertainment expenses of senior management are not in compliance with the association's internal policy for reimbursement or with safe and sound

Date: September 17, 1990 Docket No.: 07918

REPORT SUMMARY (continued)

practices. Certain expenses were not satisfactorily explained and must be reimbursed to the association. In addition, management refused to divulge financial information (other than stale information in credit files) pertaining to the association's directors and officers when examiners requested it.

Classified assets decreased by approximately $4.5 million to $35.6 million, or 5.4 percent of assets as compared to 5.7 percent of total assets at the previous examination. The decline in classified assets was primarily due to an upgrade in classifications, payoffs of credits, and the change of some classifications to loss classifications. However, classified assets are in excess of three times the association's equity capital and continue to be high. Loss classifications are up from the previous examination. Approximately 24.0 percent of new consumer credits reviewed exhibited the characteristics of marginal quality assets; which is of significant concern given management's plans to increase this type of lending. Commercial lending activities were also evidenced by numerous regulatory and internal policy exceptions because of a lack of quality control after origination.

As of June 30, 1990, Sterling maintained GAAP capital in the amount of $10.7 million and goodwill totaling $19.7 million. The overall capital position is considered poor even after giving full consideration and effect to the provisions of the November 1985, April 1988 and December 1988 acquisition related agreements. Management maintains that the capital standards mandated by the FIRREA do not apply to Sterling because of the association's prior "agreements" with the FSLIC/FHLBB. The Board and management have filed a lawsuit against OTS and the FDIC in an effort to enforce their position and a preliminary injunction has been issued by the United States District Court enjoining the OTS from taking actions inconsistent with its order. Were OTS permitted to apply the FIRREA mandated capital requirements, the association would not be in a compliant capital position.

The association's exposure to rising interest rates is considered high and is higher than the IRR of a typical savings and loan. Sterling's IRR exposure was slightly increased through entering into a large MBS transaction. Of concern is the failure of management to adequately analyze the impact of the transaction on the association's IRR position.

Operating results for fiscal year 1990 were poor. Sterling managed nominal profits of $266,000 during the 12 months ended June 30, 1990; largely because of two transactions which allowed the association to record gains totaling $392,000. Net income would have been negative for the year if not for the non-recurring gains. The net interest margin (NIM) remains low, yet stable at 1.5 percent of average assets and should show signs of improvement as goodwill is amortized and the nonearning assets are disposed of. For the first quarter of fiscal year 1991 ended September 30, 1990, the association is essentially on target to meet its budget expectations of $1.3 million in profits for the year; to be achieved primarily through an increased NIM.





"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0077

Date: September 17, 1990 Docket No.: 07918

REPORT SUMMARY (continued)

In addition, an examination of the association's compliance with consumer protection laws and regulations, conducted concurrently with this examination, disclosed numerous violations and an overall unsatisfactory compliance performance. The findings of the compliance examination were presented in a separate report of examination.

As a result of this examination and in accordance with the Uniform Composite Rating System, a composite rating of "5" has been assigned to the association. Refer to pages A-27.1 and A-27.2 of this report for an explanation of the rating system.



SG 0052603

Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0078

Date: September 17, 1990 Docket No.: 07918

## MANAGEMENT

An assessment of the level of oversight provided by the Board of Directors and management over significant functions of the association was performed. The Board of Directors was evaluated to determine its ability to act independently, meet its fiduciary duties to the association, and exercise reasonable care and due diligence in supervising the management of the association.

The findings of the review of the Board of Directors and management indicate that certain activities engaged in by management were not in compliance with internal policies, or with safe and sound internal control practices. The activities reflect poorly on the Board of Directors and management. Sterling has not had an internal audit department that functions as such. The implementation of a plan to remedy that deficiency has been undertaken by management; however, the department as it exists is grossly inadequate. Management has moved the asset classification function in a positive direction by improved identification of problem assets and performing NRV analyses. Management failed however, to identify additional problems in the commercial lending portfolio, and does not always implement NRV calculations when the calculations indicate a loss reserve is warranted. The IRR of the association is considered high. Management recently increased the association's IRR exposure through a MBS transaction without adequate analysis of its impact on IRR prior to completion of the transaction. The MBS transaction also violated an agreement dated December 28, 1988 which required the association to obtain, the prior non-objection of the Assistant District Director for any addition or revision to its business plan. Management failed to obtain the prior non-objection before entering into the transaction.

Despite the deficiencies noted, the Board or Directors and management have taken several positive steps to benefit the association. Management has indicated that the association is undergoing a reorganization in efforts to streamline its procedures to increase efficiency and reduce expenses. The Board of Directors and management have also effectively corrected, or begun correcting, some deficiencies noted in previous reports of examination. Classified assets have been decreased as has REO and REI. An improved format of NRV calculations is in place, and the quality of information available in credit files has also been improved.

### Officers Expense Reports

Senior management's expense reports for the previous 15 months were reviewed for reasonableness and compliance with the association's policies governing automobile usage, travel and entertainment expenses. The review disclosed instances of expenses claimed for which the business purpose and/or benefit to Sterling could not be determined from the information provided on the reports. This is contrary to internal policy and not in the best interests of the association. Internal controls for approving some of the reports and the subsequent issuing of checks were also poor. Policies and procedures need to be updated and expanded upon.





"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0079

Date: September 17, 1990 Docket No.: 07918

MANAGEMENT (continued)

Expenses where a business purpose and/or benefit to Sterling could not be ascertained were found in Chairman Gilkey's expense reports. Those expenses include, but were not limited to: $552 related to trips to Montana for the University of Montana Foundation; two days at the Salish Lodge with no other business expenses claimed; the purchase of $478 in books, with one reason given as "reimbursement for business books for University of Montana"; and $1,344 incurred to "express appreciation for efforts concerning Sterling's corporate insurance". Mr. Gilkey explained that he was acting in a business capacity on each of the occasions in question. However, the explanations given were vague, inconsistent with other known facts, and did not correlate into direct benefits for Sterling. The expenses seemed to be mostly for keeping in touch with individuals or keeping a personal profile in the community. Mr. Gilkey noted that many shareholders and deposit relationships have come from his University of Montana activities; however, only three shareholders (holding 1,643 shares, including preferred stock) are Montana residents and one is an immediate family member of Mr. Gilkey.

With respect to Sterling's auto policy, Mr. Gilkey stated that insurance is intended to be covered as the policy indicates; however, no reference to insurance coverage was found in the policy. In addition, certain instances were noted where Sterling paid for an employee's auto registration; an area also not covered by the policy. The policy also does not indicate what the monthly auto allowance is to be used for; however, the normal usage would be to offset the business usage portions of automobile costs such as loan payments, insurance, maintenance, registration fees, etc. The policy does indicate that no restrictions are in place on personal use; however, employees may be required to keep a mileage log or other records to differentiate between business and personal use. The employees should be required to maintain such a log (as the IRS requires) and based on that log, should limit payment of automobile expenses to the business percentage use only.

The expenses where a benefit to Sterling was not adequately established must be repaid to the association. Sterling's internal policy (and likely IRS regulations) dictate that the business purpose and the relationship of business guests be well documented. Sterling's management has not been providing adequate documentation. Mr. Gilkey also indicated that the policy governing travel and entertainment states that management has "discretion" in expensing items; however, that term could not be located and is totally contrary to the existing policy.



"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0080

Date: September 17, 1990 Docket No.: 07918

MANAGEMENT (continued)

In addition, Mr. Gilkey and Mr. Zuppe were approving each others expense reports which is a very poor practice with respect to internal controls and safe and sound operating practices. Also, Vice President Heidi Stanley was requesting and approving her own reimbursement checks; in one instance even signing Mr. Gilkey's name as approving the request. One of Ms. Stanley's expense reports was not approved by anyone, yet was paid. The practice of senior officers approving each others expense reports, and another officer approving her own check requests, including filling in Mr. Gilkey's name as requester, must cease immediately. Mr. Gilkey and Mr. Zuppe should be reviewing and approving other officers' expense reports and actually approving the reimbursement requests. The audit committee of the Board should be reviewing and approving the expense reports of Mr. Gilkey and Mr. Zuppe. Where funds are involved, dual control is critical for internal control purposes. Mr. Gilkey indicated that for the Board to review the reports would be unduly time consuming and cumbersome. The examiner considers this not to be the case. The audit committee would have two reports to review from the prior month at a regularly scheduled meeting each month.

Mr. Gilkey stated that the association's advertising budget is small since Sterling cannot compete with newspaper advertising against the larger associations. Management has chosen a strategy to be more conservative in its advertising budget and supplement that with management's community involvement. Mr. Gilkey's preference is, when possible, to make direct contact with people he knows have the means to qualify for credits.

Directors' and Officers' Financial Information

A request for either financial statements, or a statement of business and financial interests, including a range of net worth of the officers and directors of Sterling, was denied by Chairman Gilkey. Mr. Gilkey offered to discuss the financial status of the directors verbally with the examiners and indicated we were welcome to financial statements which were a part of existing credit files at Sterling.

OTS examiners declined Mr. Gilkey's offer of a verbal assessment of the directors' financial situations. In all but one case officers' and directors' financial statements in existing credit files were in excess of one year old. The purpose of having either the financial statements or statement of financial and business interests on file is to preclude actual or perceived conflicts of interest.

OTS recommends that Sterling include as part of its conflict of interest policy, the requirement to maintain personal financial statements or a statement of business and financial interests, along with a reasonable range of net worth, for the directors and officers of the association. Such a statement of related interests is required to be obtained annually per 12 CFR 215.7. Savings Associations are subject to this regulatory requirement, per the terms of the FIRREA legislation.







"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0081

Date: September 17, 1990 Docket No.: 07918

MANAGEMENT (continued)

Management indicated that the association has always adhered to a policy whereby any director having a potential conflict of interest in a transaction involving the association must disclose the nature and extent of such potential conflict of interest and excuse themselves from any vote regarding the proposed transaction. Management and the Board of Directors also requested that OTS refer them to a law or regulation which requires them to produce the financial statements.

Board Meetings

As part of the examination process, the examiners attended a regularly scheduled Board of Directors meeting as observers to the process. The meeting attended was the September 25, 1990 Board meeting. The meeting appeared to be somewhat "scripted", as certain portions of the meeting seemed to be read verbatim from prepared statements and the secretary did not appear to be taking many notes. No other method for recording the meeting was noted.

The meeting content and procedures were similar to meetings at other associations the examiners had attended with one exception; management did the majority of the talking and the comments raised very little in the way of questions or discussion from the directors. Even when questions were raised, there were only a few directors that participated. The meeting was, for the most part, a management discussion on what had been done the past month and what they planned to do going forward. The Board approved whatever action was recommended by management. Possibly, the Board was less willing to be outgoing with outside observers in attendance. Chairman Gilkey noted afterward that the Board members were not usually as quiet as they had been for that meeting. The only topic of discussion where everyone participated was the ongoing litigation with OTS and FDIC.





"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0082

Date: September 17, 1990 Docket No.: 07918

## ASSET QUALITY

A review was conducted of Sterling's internally classified assets, as well as a sample of nonclassified mortgage and nonmortgage loans and other assets. The scope of the review encompassed 66 percent of commercial banking loans, 25 percent of income property loans for Sterling and 28 percent of the income property loans in the subsidiary, Intervest Mortgage Investment Company. In addition, all parcels of REO and REI were reviewed, as were a sample of seasoned consumer loans and 46 new consumer credits.

Overall, the asset quality at Sterling continues to be poor as evidenced by the high level of classifications and approximately $1.6 million in newly classified commercial credits not identified by management. Some improvement was noted in the levels of REO and delinquent and nonaccrual loans. The trend in asset quality is slightly better than was reported at the previous examination and some other positive aspects were noted; particularly, the association's preparation of conservative NRV calculations, (although not always used), and improvement in maintaining updated information in the problem asset files.

### Criticized Assets

Although still poor, overall asset quality has shown improvement since the November 13, 1989, examination. Classified assets total $35.6 million, or 5.4 percent of total assets compared to $40.0 million, or 5.7 percent of assets at the prior examination. The decline in classified assets is primarily attributable to upgrading previous classifications, payoffs and paydowns of assets and the actual write down of certain assets. Additional specific valuation allowances identified since the prior examination totaled $1.6 million. All loan and REO losses in the $1.6 million figure were identified by management; however, were not recognized until the examination (see Net Realizable Value Calculations for details). In addition, a request by management to review 19 credits for possible upgrades or removal from classification resulted in 11 removals and one upgrade in the classification status. Additionally, assets totaling $4.6 million have been classified as Special Mention as compared to $3.7 million at the last examination.

### Net Realizable Value Calculations

NRV calculations are prepared by the association on a quarterly basis for all assets handled by Sterling's Special Assets Group. However, the calculations are not always used when a loss is indicated. Management stated that the NRV's were generally used to determine the worst case scenario for an asset and that certain qualitative factors were also considered which may temper the possibility of loss. Management was informed that the NRV's should be used for identifying the most likely resolution of an asset, with all known factors considered; and if the result indicated a loss, the loss must be recognized. Management also needs to document what the other factors and assumptions are that go into the decision. This documentation should be maintained in each asset's credit file. The NRV's can still be used as an internal tool to determine a worst case outcome, but should be noted as such in the file.



SG 0052608



"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0083

Date: September 17, 1990 Docket No.: 07918

ASSET QUALITY (continued)

Commercial Lending

An extensive review of Sterling's commercial lending activities was undertaken during the current examination. The review encompassed 66 percent of the association's outstanding credits in this area. The quality of the commercial portfolio is mixed. Real estate based credits are of acceptable quality; however, the "traditional" commercial business loans are of marginal to low quality. Asset classifications in this area have increased since the previous examination, mainly due to an increased review of the credits by OTS and FDIC examiners, and a lack of proper identification internally rather than a significant deterioration of the portfolio. Management needs to be aware of the problems noted with these credits and the potential for problems in the commercial portfolio if the loans are not closely monitored.

The level of outstanding commercial loans declined approximately 16 percent during the 12 months ended June 30, 1990. The primary reason for the decline was the departure of two of the association's commercial lending officers to work for competing financial institutions and taking several of Sterling's commercial customers with them. Management indicated that the association has granted no loans to new customers in this area and has no immediate plans to do so.

Numerous regulatory violations were also noted in the commercial credits; however, the violations were not considered serious enough to indicate a probability of loss and/or an adverse classification. A summary of the violations is as follows:

| Regulation | Description | Number of Violations |
|---|---|---|
| 12 CFR 563.170(c)(1)(iii) | No deed of trust in file | 1 |
| 12 CFR 563.170(c)(1)(iv) | No appraisal in file | 2 |
| 12 CFR 563.170(c)(1)(ix) | No title policy in file | 3 |
| 12 CFR 563.170(c)(2) | No financial statements in file | 2 |

Sterling's commercial lending policy is considered to be sound; however, it lacks a provision for quality control as evidenced by the preceding exceptions. The exceptions are primarily attributable to there being no formalized review process after origination.





Confidential Material - Subject to Protective Order*



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0084

Date: September 17, 1990 Docket No.: 07918

ASSET QUALITY (continued)

Consumer Lending

A review of 46 new consumer loans granted since the prior examination disclosed that approximately 24 percent of the loans (11 out of 46) were of marginal credit quality and not up to normal underwriting standards. The loans were characterized by low net worths, limited income, and high debt/income ratios. The accounts are all paying as agreed but there is little margin for error in the event of difficulties on the part of the borrower. The problems were not of a magnitude to classify the credits at this time. Personal lines of credit reviewed were found to be of acceptable credit quality.

Consumer loans outstanding as of the examination date totaled approximately $21.0 million. Management's budget for consumer lending indicated an increase to $34.0 million by June 30, 1991. The consumer lending department manager, Ms. Kellie deRoetth, believes that it will experience some difficulty even meeting her recommendation of increasing consumer loans to $26.0 million.

The proposed increase in consumer lending is of concern because of the high level of marginal credits noted, the limited number of trained staff, and concerns raised by Ms. deRoetth regarding attempting to attain a significant increase in the level of consumer credit granted. Ms. deRoetth's concerns consisted of battling a negative image of S&L's in general, Sterling's lawsuit with OTS, and a small marketing budget. If the factors indicated are not addressed, the overall quality of the consumer credits being granted could suffer just to meet budget expectations. Management needs to address the issues noted and provide this office with an explanation of how the concerns will be alleviated. Management has indicated that the $34.0 million level determined through the budget process is unrealistic at this time and the target level will be lowered to a yet undetermined amount.

Subsidiary Operations

Sterling is 100 percent owner of seven subsidiaries, of which three are active. The review of subsidiary operations disclosed that three subsidiaries suffered substantial operating losses for fiscal year 1990; the same three subsidiaries also were in a deficit capital position; and billing invoices from the parent company, lacked sufficient detail to substantiate the fees billed.

The subsidiaries generated an aggregate before tax net income of $373,000 for the fiscal year ended June 30, 1990. Three subsidiary operations, however, suffered significant losses for the same period. Tri-Cities Mortgage Corporation (Tri-Cities), Evergreen Environmental Development Corporation (Evergreen), and Fidelity Service Corporation (Fidelity) lost $355,000, $213,000, and $156,000 respectively before taxes. Currently, Tri-Cities, Evergreen, and Fidelity have deficit net worths of $891,000, $13,000, and $273,000 respectively.



SG 0052610

"Confidential Material - Subject to Protective Order"

App. 67

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0085

Date: September 17, 1990 Docket No.: 07918

ASSET QUALITY (continued)

The operating results of Tri-Cities were adversely impacted by its investment in two office buildings, Renton Plaza Investment Group and Interstate 291. Loans and investments in these two projects are classified Substandard due to negative cash flows, low rates of return and actions required to manage and protect the investments. (For details concerning these two investments see pages A-12.10 and A-12.11.)

The operating results of Fidelity were adversely impacted by its investment in a land development project (Grapetree Investment) and its investment in a community development partnership (Spokane Capital Partners.) The land development project is classified Substandard due to the speculative nature of the investment and lack of timely liquidation. The community development partnership is classified Loss due to no evidence of value. (The classifications are also included on page A-12.17.)

The loss in Evergreen Environmental is primarily due to the write-off of its loan to Ventura Equities. The loan represented a second lien position.

As a result of the June 19, 1989, examination Sterling now bills the subsidiaries for various items (shared personnel time, shared space, equipment rental, management services, etc.). A review of several invoices disclosed that the billing invoices fail to adequately detail the services being billed. Many transactions appear to be unsupported, with no methodology for determining what should be billed and at what rate. In the interests of maintaining a separate corporate identity for the subsidiaries, management needs to provide additional information on subsequent invoices which indicates exactly what the bill is for and how the charge was computed.

General Valuation Allowances

A review of the association's general valuation allowances (GVAs) was performed to determine the adequacy of the allowances and to ensure that all appropriate factors had been taken into consideration in determining the level of GVAs. The review disclosed that the level of GVAs was not excessive or in an "overreserved" status as indicated by management. The level is considered adequate at the current time, but must be re-evaluated at least quarterly and adjusted as necessary to take into consideration changes in trends and the status of assets.



"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0086

Date: September 17, 1990 Docket No.: 07918

ASSET QUALITY (continued)

Management must also take into consideration, certain factors that were omitted from the GVA analysis presented on October 30, 1990, for GVAs as of July 31, 1990. Substandard REO was given no factor in the analysis. Despite the association's history of selling REO at an overall gain, that may not continue to be true in the future. Assets criticized as Special Mention were given no additional risk weighting in determining GVAs. Assets criticized as Special Mention should carry a higher risk weighting than the nonclassified credits in the portfolio. The association's GVA methodology indicates that the factors used will be within an identified range, but "never below the 3-year average". The October 30th analysis disclosed two groups of assets where the factors used were in fact below the 3-year average. The two groups of assets were Substandard residential construction loans and Substandard commercial loans. Management needs to correct its methodology and ensure that internal policy is followed as well as the factors noted by the examiners.

Management continues to maintain that the association is overreserved, but accepts the findings of the current examination. GVAs must be evaluated on a quarterly basis and all pertinent factors need to be considered in the analysis. In response to this examination, management needs to provide this office with a corrected GVA methodology, as well as provide assurances that all pertinent factors are considered in the GVA analysis.

Loans to One Borrower

A review of Sterling's compliance with the loans-to-one-borrower limitations disclosed two violations; one of which was a conscious violation by the association. Sterling's loans-to-one-borrower limit was determined to be $500,000 as established by 12 CFR 563.93.

The first violation involved a series of loans granted to DeVries Enterprises and Jim's Transfer which were renewed November 30, 1989. The loan in question, which caused the violation, was granted at the renewal date in the amount of $75,000 to Jim's Transfer. All the notes were guaranteed by Michael DeVries, Pat DeVries and Bill DeVries in the total amount of $521,612.

The other violation involved a loan granted on November 3, 1989 to Patrick Sullivan in the amount of $11,000. This was in addition to a prior loan of $777,265 to Ritzville Hospitality Associates which was guaranteed by Mr. Sullivan.

Management indicated that with respect to the DeVries Enterprises credit, Washington Trust Bank in Spokane (WTB) has agreed to take the bulk of the credit, including the subject loan granted on November 30, 1989. A commitment letter has been issued by WTB to DeVries Enterprises and the transaction was expected to close by November 5, 1990. With respect to the Patrick Sullivan loan, Inland Northwest Bank in Spokane has agreed to take the credit and the line should be paid off on or before November 10, 1990.



SG 0052612



Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0087

Date: September 17, 1990 Docket No.: 07918

ASSET QUALITY (continued)

Management also stated that extenuating circumstances were involved with respect to the loans and additional advance to DeVries Enterprises and Jim's Transfer. The IRS had intended to file a levy on the company's assets and seizure of the assets was imminent unless certain past due taxes were paid immediately. The association granted the additional $75,000 loan to protect its collateral and to prevent the write-off of the loans. The violation with respect to the loan to Mr. Sullivan was caused through a clerical error and the circumstances causing the mistake have been corrected.

Subsequent discussions with management disclosed that the loans have been paid off as previously indicated.



"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0088

Date: September 17, 1990 Docket No.: 07918

## CAPITAL ADEQUACY

A review of Sterling's capital adequacy was performed giving full consideration to the conditions of the August 8, 1990 Preliminary Injunction. This review determined that even after giving full consideration to the November 1985, April 1988 and December 1988 acquisition related agreements, Sterling's capital position is considered poor by any assessment method.

As of June 30, 1990, Sterling reported GAAP capital in the amount of $10.7 million, equal to 1.6 percent of total assets. The amount is considered to be inadequate given the high level of risk evident in the association. The association also would fall significantly short of meeting any of the capital requirements mandated by FIRREA were these requirements to be applied. A comparison of the association's actual versus required levels of capital under FIRREA are as follows:

| | Tangible | Core | Risk-based |
|---|---|---|---|
| Required Capital | $10,036,000 | $20,072,000 | $24,885,000 |
| Actual Capital | (11,390,000) | ( 1,354,000) | ( 1,729,000) |
| Shortfall under FIRREA | (21,426,000) | (21,426,000) | (26,614,000) |

Management contends that the capital requirements of FIRREA do not apply to the association because of "governmental contractual obligations" which would allow the association until the end of 1993 to be in compliance with capital standards. Sterling has filed a lawsuit against the OTS and FDIC to enforce its position. As a result of this law suit, OTS has been enjoined from enforcing the capital requirements mandated by FIRREA.

### Risk-Based Capital Calculation

A considerable number of adjustments were made as a result of a review of the association's consolidated capital calculation; however, the net effect of the adjustments was in Sterling's favor. The association had calculated its risk-based capital requirement at $28.4 million, while the examiners calculated it at $24.9 million. The changes included reducing SBA guaranteed loans to their uninsured portion; reporting one subsidiary (Fidelity) as a non-includable subsidiary because of real estate development activities; and delineating various similar items which had been grouped together.



S G 0052614
"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0089

Date: September 17, 1990 Docket No.: 07918

## RISK MANAGEMENT

An analysis of Sterling's IRR management practices disclosed several significant weaknesses. The association's IRR measurement system is considered inadequate; the limits set by the Board are unacceptably high; and the association is not in compliance with the Board's IRR policy. In addition, the association entered into a transaction whereby it purchased $35.0 million in MBSs without prior documented analysis by management and the Board of Directors. The effect of the transaction was to increase the association's exposure to rising interest rates. Overall, Sterling is considered to be more highly exposed to rising interest rates than the typical thrift.

### Thrift Bulletin No. 13 Measurement System

A requirement of Thrift Bulletin No. 13 (TB-13) is that associations with total assets in excess of $500 million were to have the capability to calculate accurate and reliable interest rate sensitivity by December 31, 1989. Those associations could not rely solely on the market value of portfolio equity (MVPE) and net interest income (NII) exposure estimates produced by OTS.

The association's current model used to calculate NII and MVPE is grossly inadequate. The model does not allow for accurate estimates of cash flows and market values of various asset and liability accounts. The model assumes cash flows for all instruments are the same as the base case at each rate shock level; adjustable rate loans do not reprice; and prepayments remain constant under all rate scenarios. By ignoring those factors, estimates of how the market value of mortgages change due to changing interest rates are dramatically misstated.

Prepayment characteristics of various loan types are ignored. Specifically, periodic and lifetime caps on ARM's and balloon payments on certain types of loans are disregarded. In addition, all instruments are assumed to generate monthly cash flows regardless of the timing of the actual cash flows.

The market discount rate on ARM's used to calculate the weighted average discount rate on loans is based on teaser rates. The result is an overstatement of the market value of mortgages.

### Unacceptable Limits on IRR Exposure

The Board has established limits on IRR exposure which permit an exposure that has the potential to deplete net worth. In addition, the established limits could eliminate the association's MVPE under plausible changes in interest rates. The Board's exposure limit allows that the association's MVPE could be reduced to zero by a one-percent increase in interest rates. Such a high IRR exposure limit is not a safe and sound position for the Board to take. The Board should establish and ensure compliance with prudent limits on IRR exposure.





"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0090

Date: September 17, 1990 Docket No.: 07918

RISK MANAGEMENT (continued)

Noncompliance with Board IRR Policy

The association's IRR exposure did not exceed the limits established by the Board; however, corrective action needs to be taken because the limits established are unacceptable. When new limits are approved, the association will likely be noncompliant with those limits and the Board should direct that corrective measures be taken to bring the association into compliance.

The Board has a fiduciary responsibility to ensure that the association operates in a safe and sound manner. At the August 1990, board meeting management presented the Board with what appeared to be Board approved MVPE limits; however, the limits had not been approved. Management is cautioned that changing and/or presenting Board limits that have not been approved is not a prudent practice and impedes the Board in carrying out its fiduciary responsibilities.

Sterling needs to acquire a considerably more sophisticated NII/MVPE measurement system than the system currently in use. The Board should thoroughly review again, the requirements and recommendations outlined in TB-13. The Board also needs to revise, as soon as possible, the MVPE Board limits to comply with TB-13 and to ensure safe and sound operations. After revising the exposure limits, the Board needs to intensify its oversight of the IRR area, and establish a plan and timetable for management to comply with the approved limits.

Mortgage-Backed Securities Transaction

In September 1990, Sterling entered into a transaction whereby it purchased $35.0 million in MBSs funded with three-year FHLB advances. Management indicated that through its analysis, the transaction was "interest rate neutral". However, management was unable to provide that analysis to the examiners when requested to do so. No accurate determination could be made regarding the extent the transaction was discussed with the association's Board prior to management entering into the transaction. A significant amount of the information presented to the examiners was prepared after the transaction was completed.

As previously indicated, Sterling's current system for measuring MVPE and NII is considered to be inadequate. No investment decision should be based upon the current system. In fact, management indicated that no analysis of the MBS transaction was performed using the MVPE approach. During the examination, an analysis of the MBS transaction was performed by the OTS Capital Markets group in Washington, D.C. using its MVPE model. Discussions held with management by the capital markets analysts disclosed that management lacked the expertise and understanding of MVPE and NII to accurately measure Sterling's IRR and to comply with TB-13. Findings produced by that group indicated that Sterling is more highly exposed to IRR than the typical thrift. The industry median MVPE loss at a 200 basis point increase in interest rates is 2.1 percent. Sterling's MVPE loss at that same rate increase is equal to 2.6 percent of the market value of assets, or $17.4 million; not inclusive of the $35.0 million MBS transaction. When the transaction is included in the model, Sterling's MVPE loss is increased to 2.8 percent, or $19.6 million.





'onfidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0091

Date: September 17, 1990 Docket No.: 07918

RISK MANAGEMENT (continued)

Although the transaction did not significantly increase the association's interest rate risk exposure, any transaction that increases the interest rate risk exposure of an already highly exposed institution is of concern.

Management indicated that they had projected the impact of the transaction on the June 1990, GAP report and had deemed the transaction not to be risky. Sterling's management also stated that their analysis of the association's IRR exposure was calculated using GAP and TB-13 measurement standards which indicated that the transaction improved the position over that which was contemplated in the budget submitted to OTS for fiscal year 1991. Management indicates they are committed to complying with TB-13 by implementing reliable MVPE and NII measurement and reporting systems. TB-13 reports have been developed internally while assessing different independent programs. Management has found little standardization in the programs and the cost has, until very recently, been prohibitive. In addition, management indicated that they remain committed to operating conservatively and avoiding large, extraordinary expenditures. Consequently, management has avoided purchasing any program that has not gained widespread respect in the industry. The association believed that developing a model internally with simplified assumptions was a more prudent use of Sterling's resources.

The concern over the use of Sterling's resources and a desire to not rush into purchasing a model which is inadequate for the association's needs is understandable; however, the association has been assessing models for quite some time and remains undecided. A decision must be made in a timely manner which will bring the association into compliance with the requirements of TB-13.







"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0092

Date: September 17, 1990 Docket No.: 07918

## OPERATING RESULTS

An analysis of Sterling's operating results was performed for the fiscal year ended June 30, 1990. The analysis was conducted to determine the level, trend, and stability of earnings. Overall operating performance has historically been weak and erratic. Operating results for the fiscal year ended June 30, 1990, were also weak. Two significant adjustments adversely impacted the results but the association is on track to meet budget expectations for fiscal year 1991. Expectations for 1991 indicate an improvement over prior years, but are still considered to be low given the asset size and low capital position of the association.

Sterling's return on assets (ROE) was 0.04 for the fiscal year ended June 30, 1990, compared to a ROA of 0.21 for the previous fiscal year. The two major adjustments which contributed to the association's poor operating performance for fiscal year 1990 were the establishment of $1.4 million in additional general valuation allowances as a result of the previous examination and an audit adjustment which expensed capitalized stock offering expenses totaling $995,000. The establishment of GVAs is considered a normal part of business operations and not an extraordinary expense.

Sterling also experienced two significant non-operating gains which allowed the association to record net income of $266,000 for the fiscal year ended June 30, 1990. Those items were a gain of $95,000 on the sale of a closed branch building, and a gain totaling $297,000 on sale of 64 percent of the association's loan servicing portfolio. Without these extraordinary gains, the association would have reported a loss for the year. Historically, the association has not relied on non-operating income for profitability. Management has indicated that the servicing sale was an opportunity that they elected to take advantage of and have no current plans for any future sale of servicing.

Net income for the first three months of fiscal year 1991 ended September 30, 1990, totaled approximately $288,000. This is essentially on target with the budget estimation of $1.3 million in net income for the year; provided that no extraordinary items surface to impair income. The primary reason for the projected increase in profits is an increase of the NIM to in excess of 2 percent and a significant reduction in REO. One expense item which continues to negatively impact Sterling's net income is the amortization of goodwill at the rate of approximately $800,000 per quarter. Net income from subsidiary operations has been nominal since December 31, 1988, as well. For the six months ended June 30, 1990, net income from subsidiary operations totaled $174,000. That figure does not include various fees paid by the subsidiaries to the parent at the rate of approximately $1.6 million per year. Overall, the level of earnings is still considered to be low, but Sterling's composition of earnings is considered to be good.



nfidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0093

Date: September 17, 1990 Docket No.: 07918

OPERATING RESULTS (continued)

The net interest margin (NIM) over the two and a half years through June 30, 1990, has remained relatively stable at approximately 1.5 percent of average assets. That level of NIM is considered low, particularly when compared to the peer group average of 2.24 percent of average assets. The NIM has been low because of a high level of non-earning assets (REO, fixed assets, and intangible assets). The NIM does cover the association's general and administrative expenses and should continue to do so as management has indicated a concerted effort is underway to reduce operating expenses. The NIM should begin to show signs of improvement as the association amortizes the goodwill and REO continues to be disposed of. The level of REO and REI has been reduced approximately 50.0 percent between July 1, 1989 and June 30, 1990. Delinquent and non-accrual loans continue at a high level; however, the total of $14.8 million is a $3.3 million decrease from June 30, 1989. Budget estimates for fiscal year 1991 project a reduction in REO by approximately $2.4 million and a total reduction of non-earning assets by $6.6 million. Sterling's ratio of interest earning assets to interest bearing liabilities has improved slightly during the 12 months ended June 30, 1990; however, it remains below the peer group average of 99.78 percent.



Confidential Material - Subject to Protective Order

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0094

Date: September 17, 1990 Docket No.: 07918

MISCELLANEOUS

Internal Audit Department

A review of Sterling's internal audit department disclosed that the department lacks sufficient staff and depth in the audit programs to properly maintain an adequate internal audit function. Sterling reported assets of approximately $654 million as of July 31, 1990, as well as several subsidiaries with diverse business interests. Sterling's internal audit department consists of one person responsible for implementing the association's audit plan.

Internal audit schedules given to the examiners disclosed a schedule which consisted primarily of branch audit activities, assisting the independent auditors, monthly review of the association's policies and monitoring of operating restrictions. The schedule indicated that several other aspects of Sterling's operations were scheduled for review; however, a conversation with Ms. Colliton revealed that delays constantly occurred to put off the reviews indefinitely. Some of the areas Ms. Colliton indicated that she has never audited in her one and a half years at Sterling include: accounting transactions, finance transactions, subsidiary operations, investor reporting, loan originations, and loan servicing.

The existing internal audit function does an adequate job for what is actually audited; however, the process is narrow in scope and limited in depth. The department's current procedures provide a sound foundation on which to build. For an association the size and complexity of Sterling, the process must go further to be of significant benefit to the association. The audit work programs should be expanded to cover internal policy requirements as well as OTS regulatory requirements. Currently, according to Ms. Colliton, the work programs are written just prior to auditing an area. Sources for information to guide the creation of work programs are the OTS Regulatory Handbooks (Thrift Activities, Compliance, etc.) which are maintained at the association.

In a meeting with Chairman of the Board Gilkey and President Zuppe, Mr. Gilkey indicated that a significant change was planned for the internal audit department. Mr. Gilkey stated that the internal audit position was to be redefined as internal audit/compliance/quality control with Steve Churchill in the position. The current internal auditor is being reassigned. A conversation was held with Mr. Churchill regarding his qualifications for the position and his plans for the department. Mr. Churchill indicated that he had no prior internal audit experience; however, his background in banking consists primarily of experience in lending and problem assets. Mr. Churchill envisioned the restructured internal audit function to operate along the lines of a traditional internal audit department.



SG0052620
Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0095

Date: September 17, 1990 Docket No.: 07918

MISCELLANEOUS (continued)

The position as it exists needs to be expanded to include more than one person to ensure that all aspects of Sterlings' operations can be covered. In addition, the internal audit department must be given the ability to perform its duties by means of a definitive audit schedule as well as the development of detailed work programs. The Board and management must take the internal audit function seriously and not allow it to operate essentially as a branch audit department and as a liaison for the independent auditors and OTS with management. The internal audit function should provide the mechanism by which the Board receives unbiased information regarding the association's operations.



"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0096

# APPENDIX



"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0097

Date: September 17, 1990 Docket No.: 07918

## DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS

Number of Directors' Meetings Held During Past 12 Months: 13
Number of Directors Authorized: 12
Number of Vacancies: 0

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 Mos. | Tenure as Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| Gilkey, Harold B.<br>South 3924 Eastgate Court<br>Spokane, WA 99203 | CB/CEO<br>07-18-39 | 13 | 1981<br>1992 | $123,966 a/<br>10,000 b/<br>2,000 c/<br>500 d/<br>100 e/<br>100 f/<br>450 h/ |
| Zuppe, William W.<br>South 5306 Muirfield Lane<br>Spokane, WA 99203 | D/P/COO<br>09-10-41 | 13 | 1981<br>1992 | 90,000 a/<br>25,000 b/<br>2,000 c/<br>500 d/<br>100 e/<br>100 f/ |
| Barnes, Ned M.<br>710 East 12th<br>Spokane, WA 99202<br>Attorney | D/S<br>10-28-36 | 13 | 1983<br>1991 | 2,000 c/<br>500 d/<br>100 e/<br>100 f/ |
| Alverson, Raymond R.<br>2624 Boulevard Road S.E.<br>Olympia, WA 98501<br>Retired - Airline Pilot | D<br>10-29-31 | 13 | 1989<br>1991 | 2,000 c/<br>500 d/ |
| Barnett, Rodney W.<br>South 1312 Garfield St.<br>Spokane, WA 99202<br>President - Electrical Supply Company | D<br>11-14-43 | 13 | 1983<br>1991 | 2,000 c/<br>500 d/ |
| Clark, T. Richard<br>25308 S.E. 35th Street<br>Issaquah, WA 98027<br>Consultant - Farm Management Company | D<br>05-02-37 | 13 | 1981<br>1992 | 2,000 c/<br>500 d/<br>100 e/ |

(See page A-2.3 for Footnotes and Comments.)



SG 0052623
"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0098

Date: September 17, 1990 Docket No.: 07918

DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS (continued)

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 Mos. | Tenure as Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| Fugate, James P.<br>29715 111th Avenue S.E.<br>Auburn, WA 98002<br>School District Superintendent-Auburn | D<br>01-02-33 | 13 | 1989<br>1990 | 2,000 c/<br>500 d/ |
| Kroetch, Charles L.<br>1218 East 30th, #12<br>Spokane, WA 99203<br>President - Printing & Publishing Company | D<br>11-27-31 | 13 | 1981<br>1990 | 2,000 c/<br>500 d/<br>100 f/ |
| Larrabee, Robert<br>2323 Third Avenue<br>Clarkston, WA 99403<br>Owner - Funeral Home | D<br>03-02-35 | 13 | 1983<br>1992 | 2,000 c/<br>500 d/<br>100 f/ |
| Meyers,Robert E.<br>2222 Riverside Drive<br>Clarkston, WA 99403<br>Dentist | D<br>07-26-25 | 12 | 1983<br>1990 | 2,000 c/<br>500 d/ |
| Vander Stoep, James A.<br>727 S.W. 16th<br>Chehalis, WA 98532<br>Attorney | D<br>05-14-25 | 3 i/ | 1989<br>1991 | 2,000 c/<br>500 d/<br>3,622 k/ |
| Wallace, David O.<br>West 448-25th Avenue<br>Spokane, WA 99203<br>Owner - Supermarket | D<br>03-19-38 | 13 | 1981<br>1990 | 2,000 c/<br>500 d/ |
| Byrne, Daniel G.<br>East 709 Vicksburg<br>Spokane, WA 99208 | SVP/CFO<br>04-22-54 | | | 63,000 a/<br>5,000 b/<br>1,260 g/ |
| Page, Stephen L.<br>East 1212-35th Avenue<br>Spokane, WA 99203 | SVP<br>05-16-48 | | | 57,600 a/<br>2,000 b/<br>432 g/<br>350 h/ |

(See page A-2.3 for Footnotes and Comments.)







"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0099

Date: September 17, 1990 Docket No.: 07918

DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS (continued)

| Name<br>Mailing Address<br>Occupation | Title<br>Date of<br>Birth | Meetings<br>Attended<br>12 Mos. | Tenure as<br>Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration<br>From Association<br>(Annual Amount) |
|---|---|---|---|---|
| Parrish, Stanton C.<br>South 6506 Medelia Street<br>Spokane, WA 99223 | SVP<br>06-15-50 | | | 53,400 a/<br>801 g/<br>350 h/ |
| Harlow, John M.<br>5022 F Foothills Drive<br>Lake Oswego, OR 97034<br>President-Intervest | VP<br>08-06-42 | | | 96,000 a/<br>16,000 b/<br>1,200 g/<br>100 f/<br>350 h/ |
| Moore, S. Midge<br>E. 22801 Clearwater Lane<br>Liberty Lake, WA 99019 | VP<br>04-23-48 | | | 45,000 a/<br>4,000 b/<br>1,125 g/<br>350 h/ |
| Sackmann, Thomas<br>East 4522 Lane Park Road<br>Mead, WA 99021<br>President-Action Mortgage | VP<br>05-04-52 | | | 84,000 a/<br>22,000 b/<br>100 e/<br>450 h/ |
| Stanley, Heidi B.<br>West 609 Bradford Court<br>Spokane, WA 99203 | VP<br>09-15-56 | | | 42,000 a/<br>4,000 b/<br>665 g/<br>350 h/ |
| Witherspoon, Kelley<br>Davenport & Toole, P.S. | Legal Counsel | | | 715,289 j/ |

Footnotes and Comments:
a/ - Annual salary.
b/ - Bonus for fiscal year ended June 30, 1989.
c/ - Annual retainer for Board of Directors.
d/ - Directors' fee per meeting attended-Sterling
e/ - Directors' fee per meeting attended-Action Mortgage
f/ - Directors' fee per meeting attended-Intervest
g/ - 401K benefits
h/ - Auto Allowance
i/ - Director Vander Stoep is on a leave of absence from the Board. The leave has been extended an additional 6 months starting November 1990.
j/ - Total legal fees billed from April 1, 1989 through July 31, 1990. Director Barnes is a partner in this law firm.
k/ - Total legal fees billed from the firm of Armstrong, Vander Stoep, Redmond & Kelly during the period April 1, 1989 through July 31, 1990. Director Vander Stoep is a partner in this law firm.



Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0100

Date: September 17, 1990 Docket No.: 07918

## PRINCIPAL OPERATING COMMITTEES

| Name of Committee and Description of Functions | Frequency of Meetings | Members of Committee | Amounts of Fees Received |
|---|---|---|---|
| AUDIT COMMITTEE<br>Review important items with respect to accounting and control procedures, review all financial information prior to public release, recommend to the board a company auditor, and review all state and federal examinations and management responses to same. | Quarterly | Barnett, R. (1)<br>Barnes, N.<br>Gilkey, H.<br>Meyers, R.<br>Wallace, D. | None |
| PERSONNEL COMMITTEE<br>Review salaries and compensation and determine levels of compensation for the following year, as well as stock options to be granted. | May and June | Clark, T.R. (1)<br>Gilkey, H.<br>Kroetch, C.<br>Larrabee, R.<br>Meyers, R. | None |
| PLANNING COMMITTEE<br>Review goal establishment and review corporate statements of a policy nature, approve schedule for the budgeting process as well as review same for recommendation to the full board of directors, and develop an understanding of the strategic opportunities which are available to the association and give counsel and advice as to the nature of each. | January or February | Gilkey, H (1)<br>Barnes, N.<br>Barnett, R.<br>Clark, T. R.<br>Kroetch, C.<br>Larrabee, R.<br>Wallace, D.<br>Zuppe, W. | None |

Footnotes:
(1) Chairman of Committee

SG 0052626



"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0101

Date: September 17, 1990 Docket No.: 07918

## SUMMARY OF STOCK OWNERSHIP

| Title | Number of Shares | Percent to Total Outstanding |
|---|---|---|
| **Directors, Officers, Employees, and Affiliated Entities:** | | |
| Gilkey, Harold B. | 28,105 | 5.4 |
| Zuppe, William W. | 3,413 | 0.7 |
| Barnes, Ned M. | 5,355 | 1.0 |
| Alverson, Raymond R. | 1,000 | 0.2 |
| Barnett, Rodney W. | 8,051 1/ | 1.6 |
| Clark, T. Richard | 12,795 | 2.5 |
| Kroetch, Charles L. | 6,881 | 1.3 |
| Larrabee, Robert L. | 8,289 | 1.6 |
| Meyers, Robert E. | 15,494 | 3.0 |
| Wallace, David O. | 3,165 | 0.6 |
| Fugate, James P. | 1,000 | 0.2 |
| Vander Stoep, James A. | 1,231 | 0.2 |
| | | |
| Byrne, D.G. | 1,273 | 0.2 |
| Churchill, S.D. | 133 | - |
| Crithfield, G.D. | 792 | 0.1 |
| Hiatt, D.A. | 163 | - |
| Moore, S.M. | 525 | 0.1 |
| Page, S.L. | 1,926 | 0.4 |
| Parrish, S.C. | 1,513 | 0.3 |
| Rasmusson, D.C. | 146 | - |
| Sackman, T.F. | 100 | - |
| Stanley, H.B. | 160 | - |
| | | |
| Beil, T.L. | 25 | - |
| Bott, M.E. | 85 | - |
| Broemeling, C.L. | 29 | - |
| Clay, D.M. | 50 | - |
| DeRoetth, K.F. | 10 | - |
| Heath, L.H. | 200 | - |
| Judd, N.L. | 25 | - |
| Libby, H.M. | 152 | - |
| MacEnulty, K.M. | 100 | - |
| Nelsen, D.E. | 160 | - |
| Peterson, D.A. | 60 | - |
| Piper, B. | 100 | - |
| Tinsley, M.L. | 26 | - |
| Van Dijk, J.G. | 200 | - |
| Subtotal | 104,062 | 20.1 |



SG 0052627
"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0102

Date: September 17, 1990 Docket No.: 07918

SUMMARY OF STOCK OWNERSHIP (continued)

| | | |
|---|---|---|
| **Others Owning 1 Percent or More of Outstanding Shares:** | | |
| CEDE & Company | 60,374 | |
| Busch, J.A. | 6,439 | |
| Flock, R.V. | 7,202 | |
| Gustin, J. | 5,386 | |
| Gwinn, J.W. | 10,617 | |
| Seibly, W.W. | 21,695 | |
| Sterling Savings Association-Employee Savings and Investment Plan Trust | 16,071 | |
| Thomas, C. | 5,386 | |
| Wabanc & Co. | 9,095 | |
| White, K. Sr. | 6,191 | |
| Subtotal | 148,456 | 28.6 |
| **Others Owning Less Than 1 Percent of Outstanding Shares:** | | |
| Number of Shareholders: 530 | 265,861 | 51.3 |
| Subtotal | 518,379 | 100.0 |
| Total Outstanding Shares | 518,379 | 100.0 |

Total Shares Authorized : 8,000,000
Total Shares Outstanding: 518,379
Par Value : $1.00
Market Value : $ N/A

1/ Includes 3,220 shares owned by Carr Sales Profit-Sharing Plan, of which Mr. Barnett is the principal administrator.



SG 0052628
"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0103

Date: September 17, 1990 Docket No.: 07918

SUMMARY OF STOCK OWNERSHIP (continued)

Preferred Stock

Directors, Officers, Employees, and Affiliated Entities:

| | | Number of Shares 1/ | Percent to Total Outstanding |
|---|---|---|---|
| **Directors** | | | |
| Gilkey, Harold B. | CB/CEO | 9,720 | 10.8 |
| Zuppe, William W. | D/P/COO | 1,460 | 1.6 |
| Barnes Ned M. | D/S/A | 1,100 | 1.2 |
| Meyers, Robert E. | D | 1,000 | 1.1 |
| Kroetch, Charles L. | D | 960 | 1.1 |
| **Officers** | | | |
| Byrne, Daniel G. | SVP/CFO | 520 | 0.6 |
| Stanley, Heidi B. | VP | 400 | 0.4 |
| Churchill, Stephen D. | VP | 200 | 0.2 |
| Harlow, John M. | VP | 200 | 0.2 |
| Hiatt, Dean A. | VP | 200 | 0.2 |
| Moore, S. Midge | VP | 160 | 0.2 |
| Rasmusson, Diane C. | VP | 100 | 0.1 |
| **Employees** | | | |
| Bott, Muriel E. | | 100 | 0.1 |
| Cotton, James J. | | 100 | 0.1 |
| Quist, Edith J. | | 100 | 0.1 |
| Rainey, Katherine | | 100 | 0.1 |
| Subtotal | | 16,420 | 18.2 |



S G 0052629



"Confidential Material - Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0104

Date: September 17, 1990 Docket No.: 07918

SUMMARY OF STOCK OWNERSHIP (continued)

Others Owning 1 Percent or More of Outstanding Shares:

| | | |
|---|---|---|
| Porter, Hammitt E. | 2,500 | 2.8 |
| Pathology Associates Inc., P.S. | 2,000 | 2.2 |
| Pearson, Alma | 2,000 | 2.2 |
| Blain, Charles W. | 1,600 | 1.8 |
| Dean Witter Reynolds Inc. | 1,590 | 1.8 |
| Seibly, Walter W. | 1,440 | 1.5 |
| Walker, Bruce M. | 1,200 | 1.3 |
| Allied Safe & Vault | 1,000 | 1.1 |
| Andreasen, Ruby | 1,000 | 1.1 |
| Brown, Paul R. | 1,000 | 1.1 |
| Grollmus, John M. | 1,000 | 1.1 |
| Krumbholz, Walter O. | 1,000 | 1.1 |
| Pearson, Donald C. | 1,000 | 1.1 |
| Shearson Lehman Hutton, Inc. | 1,000 | 1.1 |
| Wallace, Helen M. | 1,000 | 1.1 |
| Waden, Clifford V. | 1,000 | 1.1 |
| Subtotal | 21,330 | 23.7 |

Others Owning Less Than 1 Percent of Outstanding Shares:

Number of Shareholders: 275

| | | |
|---|---|---|
| Subtotal | 52,418 | 58.1 |
| Total Outstanding Shares | 90,168 | 100.0 |

Total Shares Authorized : 1,000,000
Total Shares Outstanding: 90,168
Par Value : Not Applicable
Market Value : Unknown

Footnotes:

1/ Includes shares held directly, in joint tenant and in trust.



SG 0052630

"Confidential Material - Subject to Protective Order



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0105

Date: September 17, 1990 Docket No.: 07918

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (1)

| (In Thousands) | As of 30-JUN-1990 | As of 31-DEC-1989 | As of 31-DEC-1988 | As of 31-DEC-1987 |
|---|---|---|---|---|
| ASSETS | | | | |
| Mortgage Loans, Contracts, and Mortgage-Pool Securities | $551,194 | $578,849 | $371,903 | $223,559 |
| Memo: | | | | |
| Mortgage-Pool Securities | 115,395 | 118,488 | 84,112 | 41,663 |
| Less: | | | | |
| Loans in Process | 6,025 | 9,306 | 7,995 | 14,109 |
| Other Contra Accounts | 8,386 | 8,782 | 5,203 | 1,354 |
| Non-Mortgage Loans | 43,134 | 47,665 | 37,812 | 25,161 |
| Memo: | | | | |
| Commercial Loans and Leases | 22,967 | 27,412 | 26,000 | 16,852 |
| Consumer Loans and Leases | 19,723 | 19,645 | 11,277 | 7,973 |
| Accrued Interest | 444 | 608 | 535 | 336 |
| Less: | | | | |
| Contra Accounts | 501 | 196 | 0 | 0 |
| Repossessed Property | 5,983 | 8,483 | 5,790 | 1,519 |
| Real Estate Investments | 708 | 774 | 0 | 0 |
| Less: | | | | |
| Contra Accounts | 813 | 575 | 212 | 103 |
| Cash and Investment Securities | 58,591 | 41,402 | 38,882 | 26,661 |
| Investment in Subsidiaries Service Corporations | 3,566 | 5,239 | 4,994 | 13,235 |
| Fixed Assets - Net | 9,545 | 9,708 | 5,828 | 3,089 |
| Goodwill and Other Intangibles | 21,108 | 25,113 | 19,254 | 4,860 |
| Other Assets | 10,886 | 9,839 | 5,310 | 3,123 |
| TOTAL ASSETS | $688,990 | $708,213 | $476,363 | $285,641 |
| LIABILITIES AND MODIFIED EQUITY CAPITAL | | | | |
| Liabilities: | | | | |
| Deposits | $483,581 | $522,749 | $316,638 | $186,116 |
| Advances from FHLB | 112,976 | 83,628 | 55,300 | 51,650 |
| Other Borrowed Money | 76,581 | 84,050 | 74,316 | 32,955 |
| Unamortized Yield Adjustments on Purchased Deposits and Borrowings | 543 | (272) | 0 | 0 |
| Other Liabilities | 4,579 | 7,024 | 6,872 | 4,028 |
| TOTAL LIABILITIES | $678,260 | $697,179 | $453,126 | $274,749 |



0052631

"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0106

Date: September 17, 1990 Docket No.: 07918

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (1) (continued)

| (In Thousands) | As of 30-JUN-1990 | As of 31-DEC-1989 | As of 31-DEC-1988 | As of 31-DEC-1987 |
|---|---|---|---|---|
| MODIFIED EQUITY CAPITAL: | | | | |
| Perpetual Preferred Stock | $ 2,126 | $ 2,126 | $ 90 | $ 90 |
| Common Stock - Par Value | 518 | 518 | 517 | 469 |
| Paid in Excess of Par | 5,678 | 5,678 | 21,188 | 8,986 |
| Retained Earnings | 2,408 | 2,712 | 1,442 | 1,347 |
| TOTAL MODIFIED EQUITY CAPITAL | $ 10,730 | $ 11,034 | $ 23,237 | $ 10,892 |
| TOTAL LIABILITIES AND MODIFIED EQUITY CAPITAL | $688,990 | $708,213 | $476,363 | $285,641 |
| TOTAL REGULATORY CAPITAL | $ N/A | $ N/A | $ 26,805 | $ 10,997 |
| MEMO: General Valuation Allowances | $ 4,184 | $ 4,529 | $ N/A | $ N/A |

(See page A - 6.3 for footnotes.)



SG 0052632

"Confidential Material - Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG039 0107