# REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

---

**Name and Address of Institution**
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

**Region**: West
**Docket No.**: 07918

**Type of Examination**
Joint Regular

---

Examination Commenced: September 16, 1991
Examination Concluded: October 18, 1991

---

Service Corporations and Other Affiliates Which Are a Part of This Report:

Action Mortgage Company
Evergreen First Service Corporation
Fidelity Service Corporation
Intervest Mortgage Investment Company
Tri-Cities Mortgage Corporation

---

## Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstance shall the institution, or any of its directors, officers, or employees disclose in any manner the report, or any portion thereof, to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor. Independent auditors may be provided access to this report only after providing a written statement that they will not disclose the Report of Examination or any part thereof.

If a subpoena or other legal process is received calling for production of this document, the Regional Director should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued the process, should be advised of the above prohibition and, referred to Part 510.5 of the General Regulations of the Office of Thrift Supervision.

---

Directors, in keeping with their responsibilities, must review this report thoroughly and provide a response to the Regional Office, signed by each member of the Board of Directors, within 30 days of receipt of this report. This report should not be considered an audit report.

---

# REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| Sterling Savings Association<br>North 120 Wall Street<br>Spokane, Washington 99201 | West | 07918 |
| | **Type of Examination**<br>Joint Regular | |

Examination Commenced: September 16, 1991

Members of the Board:

As required by Section 563.170 of the Rules and Regulations, and in compliance with the laws and regulations of the State of Washington, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiners' comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate. All matters of criticism, violations of laws or regulations, and other matters of concern identified within this Report of Examination require the Board of Directors and management's prompt corrective action.

/s/ Eugene P. Fitzpartick
Examiner-in-Charge
State of Washington

John W. Potthast, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

Date: September 16, 1991 Docket No.: 07918

## INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary | 1 - 2 |
| Management, Asset Quality, Capital Adequacy, Risk Management, Operating Results | 3 - 17 |
| APPENDIX | |
| Violations of Laws or Regulations | A - 1.1 |
| Directors, Principal Officers, and Attorneys | A - 2.1 - 2.3 |
| Summary of Criticized Assets | A - 3.1 |
| Summary of Action Required by Criticized Assets | A - 4.1 - 4.2 |
| Classified Assets and Assets Designated Special Mention | A - 5.1 - 5.20 |
| Service Corporations | A - 6.1 - 6.17 |


## ABBREVIATIONS WHICH MAY APPEAR IN THIS REPORT

A = Attorney
AVP = Assistant Vice President
C = Controller
CB = Chairman of the Board
CDP = Core Deposit Premium
CEBA = Competitive Equality Banking Act
CEO = Chief Executive Officer
COO = Chief Operations Officer
D = Director
FDIC = Federal Deposit Insurance Corporation
FIRREA = Financial Institutions Reform, Recovery, and Enforcement Act of 1989
GAAP = Generally Accepted Accounting Principles
GVA = General Valuation Allowances
MVPE = Market Value of Portfolio Equity
OTS = Office of Thrift Supervision
P = President
RAP = Regulatory Accounting Practices
REO = Real Estate Owned
S = Secretary
SVP = Senior Vice President
T = Treasurer
VP = Vice President

Date: September 16, 1991 Docket No.: 07918

## REPORT SUMMARY

A joint regular examination of Sterling Savings Association (Sterling) was performed using financial data primarily as of July 31, 1991. This full-scope examination included an assessment of management, asset quality, capital, risk management, and operating results.

Although the association's financial condition has improved since the previous examination, the inadequate level and inferior quality of earnings, above-average level of classified assets, and excessive interest rate risk results in a financial condition which is still considered unsatisfactory. Management and the Board acknowledged the need for additional capital and have filed for a public common stock offering which management estimates will raise approximately $18.5 million in net proceeds and is expected to be completed during the last quarter of 1991. The long-term viability of Sterling is largely dependent on the success of this stock offering.

The association's GAAP capital as of June 30, 1991, was $12.6 million and includes $14.6 million of intangible assets. The association currently fails all three of the minimum capital requirements; however, management maintains that the capital standards mandated by the FIRREA do not apply to Sterling because of the association's prior "agreements" with the FSLIC/FHLBB. The association has filed a lawsuit against OTS and the FDIC in an effort to enforce their position and a preliminary injunction has been issued by the United States District Court enjoining the OTS from taking actions inconsistent with the "agreements".

Operating results improved over the previous fiscal year primarily because of the success of the association's mortgage banking operations. Net income totaled $1.7 million for the fiscal year ended June 30, 1991, or an ROAA of .26 percent. The earnings were dependent on non-recurring or fluctuating sources which included gains on the sale of assets totaling $2.0 million. The net interest margin of 1.8 percent continues to be inadequate to generate core earnings. Management projects net income to increase to $3.4 million for fiscal 1992 based on the successful completion of the stock offering.

The association's exposure to interest rates is considered excessive based on an estimated decrease in the Market Value of Portfolio Equity (MVPE) in excess of 100 percent for a two percent increase in interest rates. Management acquired a more sophisticated modeling system in response to the previous examination criticism; however, the exposure remains high primarily because of the large amount of short-term deposits and the level of tangible capital.

Classified assets decreased from $35.6 million to $26.2 million since the previous examination resulting in a decline of 26.4 percent; however, the current level continues to pose a significant risk to the association. Classified assets represent 4.3 percent of total assets or 206.3 percent of GAAP capital. This level compares unfavorably to the peer group classified assets to total assets ratio of 1.7 percent. Asset quality was also adversely affected by the $1.1 million increase in doubtful classifications.

Date: September 16, 1991 Docket No.: 07918

REPORT SUMMARY (continued)

Management's and the directorate's performance are considered unsatisfactory because of the association's poor financial condition. Although management has implemented corrective action to the concerns noted at the previous examination, the inadequate level and inferior quality of earnings, unsatisfactory asset quality, and excessive interest rate risk reflects unfavorably on management. The current examination also disclosed weaknesses in the area of internal audit and officers' expenses which were considered inappropriate and subject to reimbursement.

Corrective Actions Required

The Board of Directors and management need to take the actions outlined in this Report to correct the weaknesses that have been identified. The following list summarizes the most significant actions required. Refer to the body of the Report for additional corrective actions.

- o Correct all policy and procedure deficiencies noted in this Report;
- o Classify assets and report classifications, including those classified "loss," in accordance with this Report; and,
- o Establish a plan which will reduce the association's exposure to rising interest rates.

Based on findings of this examination, we have assigned the institution a composite rating of "5." This rating is assigned in accordance with the following definition contained in the Thrift Activities Handbook of the Office of Thrift Supervision:

> This category is reserved for institutions with an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources (such as merger partners or acquirers). Such institutions require immediate corrective action and constant supervisory attention. Obviously, formal administrative action is presumed necessary. Institutions with negative regulatory capital and those with negative GAAP capital and experiencing operating losses should be assigned this rating.

Date: September 16, 1991 Docket No.: 07918

## MANAGEMENT

The assessment of management included a review of the effectiveness of the Board of Directors, the capability of executive management and the Internal Audit Department, and the adequacy of policies, procedures, and internal controls.

Management's and the directorate's performance are considered unsatisfactory because of the association's poor financial condition. Although management has implemented corrective action to address the concerns noted at the previous examination, the inadequate level and inferior quality of earnings, unsatisfactory asset quality, and excessive interest rate risk reflects unfavorably on management.

### Effectiveness of Management and Directorate

The association's management and directorate are accountable for the current financial condition of the association. As a result of previous acquisitions, the association has a higher level of classified assets, earnings which are below peer group levels and dependent on fluctuating sources, and an above-average amount of intangible assets. Management has recognized the need for additional capital and the association is in the process of a public common stock offering.

The association's earnings improved since the previous examination and management was also able to reduce the level of classified assets. However, a large factor contributing to the improvement in earnings can be attributed to a favorable interest rate environment. Management responded promptly to all the examiner's recommendations and concerns. The success of the proposed stock offering would enhance the assessment of management and the directorate. However, the association will realize additional expenses and suffer substantial damage to its reputation in the local market in the event that the offering fails.

Chairman Gilkey and President Zuppe both expressed disagreement with the examiner's conclusion that management's performance and effectiveness has been unsatisfactory. Chairman Gilkey agreed that the current condition of the association was unsatisfactory but stated that significant progress has been made in addressing previous problems and that the pending stock offering, if successful, would further mitigate the areas of concern.

### Officer's Travel and Entertainment Expenses

A review of officers' travel, entertainment, and club membership expenses disclosed some expenses which had no apparent business benefit to the association. Management provided acceptable documentation and support for the majority of these expenses; however, President Zuppe's trip to San Diego is not considered an appropriate business expense, therefore, these expenses should be reimbursed to the association.

Date: September 16, 1991 Docket No.: 07918

MANAGEMENT (continued)

The subject of officers' expenses was an area of criticism at the previous examination. Management and the directorate responded by stating that since employees are asked to take a leadership role within the community, they must be supported financially due to the business benefit derived by the association. It is noted that documentation and internal controls have been improved since the previous examination; however, some expenses were not considered appropriate for officers of an insured institution.

The review of President Zuppe's expense account disclosed that he and his wife attended a Boy Scouts of America conference in San Diego, California during May 1991. The association paid $676 for round-trip airfare from Spokane to San Diego for both individuals. The association also paid for 6 nights lodging at the Hotel del Coronado totaling $1,218 and for a rental car for one week totaling $378. It is noted that Mr. Zuppe had received prior approval from Chairman Gilkey; however, this trip was not considered to provide a direct or measurable benefit to the association.

President Zuppe stated that the association's Audit Committee will address the examiner's request for reimbursement regarding the expenses incurred for the San Diego trip.

Internal Audit Department

The prior examination indicated concern for the absence of an internal audit system which extends beyond the function of completing branch reviews. Given the association's asset size and complexity of operation, the examiners recommend management's continuing attention for developing an internal audit system that reviews all areas of operation. As of the current examination, the internal audit function is just beginning to get under way for audit review in operational areas outside of branch reviews. However, during this review period, management and the audit committee have made substantial progress for the development of a fully functional audit department.

The review of the association's internal electronic data processing (EDP) also disclosed several areas which are in need of improvement. There is no record that the association's internal or external auditors have reviewed EDP computer-related controls since 1983. The EDP Committee does not appear to provide adequate oversight of EDP activities. No minutes were made available for review and meetings are not held on a regularly scheduled basis. With the exception of the board minutes making references to a third-party audit of FISERV - Spokane testing of a "Hot Site", nothing could be found regarding oversight and awareness of EDP activities. There are no policies and procedures in place to control the acquisition and use of micro-computers at the association. Thrift Bulletin 29 contains items that should be included in a thrift's micro-computer policies.

Audit manager, Wayne Allert indicated that management and the Audit Committee continue to recognize the need for a fully-functional audit department and will monitor its progress in the coming months. Additional resources will be allocated to this area as they are warranted.

Date: September 16, 1991 Docket No.: 07918

MANAGEMENT (continued)

Corrective Action Required

- o Provide reimbursement to the association for the inappropriate travel expenses detailed in this Report.

- o We recommend that the association's Internal Audit Department develop a plan to include the timely audits of all significant EDP-related activity.

- o We recommend that management request the EDP Committee to meet regularly and to maintain minutes of their assessments and decisions pertaining to EDP activities. Those include: adequacy of computer support, resolution of major problems incurred, and follow-up of EDP issues raised by management.

- o We recommend that the association develop policies and procedures, using Thrift Bulletin 29 as a guide, to provide guidance and control over micro-computer use.

Date: September 16, 1991 Docket No.: 07918

## ASSET QUALITY

An assessment of asset quality included a review of all internally classified assets, delinquent loans, real estate owned, and a sample of non-delinquent mortgage, non-mortgage and consumer loans. Our review sample totaled $106.2 million in loans representing 26.8 percent of the total loan portfolio. The assessment also included a review of the institution's loan underwriting, quality control, and loans to affiliated persons.

The association's asset quality continues to be a concern because of an above-average level of classified assets. Although total classified assets have decreased from the previous examination, the overall level remains high. Losses associated with high-risk income property loans continue to impair operating results. The major classifications are due to underwriting weaknesses stemming from previous examination periods and assets acquired from the association's merger with other financial institutions. New loans originated during the current examination period were primarily one-family to four-family mortgage loans and consumer loans which exhibited no material underwriting weaknesses.

### Classified Assets

The level of classified assets continues to pose a significant risk to the association with classified assets comprising 4.3 percent of total assets and 206.3 percent of GAAP capital. This level compares unfavorably to the peer group classified assets to total assets ratio of 1.7 percent. Asset quality is also adversely affected by the $1.1 million increase in doubtful classifications, which is primarily comprised of the Arch MacDonald credits. See Appendix A - 5.7 for additional details.

Criticized assets decreased from $40.2 million as reported in the previous examination report to $27.7 million as of July 31, 1991, which represents a reduction of 31.1 percent. More importantly, classified assets decreased from $35.6 million to $26.2 million, representing a decline of 26.4 percent.

The association's internal asset classification system is considered adequate since the only significant difference between the examiner's and management's classifications were the loans to Arch MacDonald. Management concurred with the remainder of the assets classified during the examination.

Chairman Gilkey stated that the association has made substantial progress in reducing the level of classified assets since the acquisition of Central Evergreen and that the delinquency rate has dropped from 4.5 percent to 1.76 percent since this acquisition. He also stated that management's efforts to resolve the Beitz loan has been frustrated because of difficulties in its dealings with other regulatory agencies, primarily FDIC.

Date: September 16, 1991 Docket No.: 07918

ASSET QUALITY (continued)

General Valuation Allowances

The examiners recommended an increase in general valuation allowances (GVA's) of $500,000 during the examination. Management concurred with the examiners recommendation and recorded an increase of $500,000 in GVA's as of September 30, 1991. Although there was a notable decrease in criticized assets from the previous exam, the examiners determined that the association's estimation of GVA's was inadequate based on the current level of classified loans, the $1.1 million increase in assets classified doubtful, historical loss experience, and the potential for adverse economic changes. An adequate level of GVA's was estimated to be approximately $3.1 million. This level would represent 11.9 percent of assets classified substandard and doubtful compared to a Western Region ratio of 13.7 percent. Refer to Appendix A - 4.1 for additional details.

The association's methodology for estimating GVA's was primarily based on one-year and three-year actual loss experience; however, there were some weaknesses in the implementation of the association's reserve policy. The association's calculation of the loss experience factors appeared to be flawed resulting in an understatement of loss experience. Also, the time periods which the association used to derive historical loss factors represented a period of favorable regional economic conditions and stable real estate markets. As a result, the reserve factors applied by the association were considered unrealistically low.

Chairman Gilkey stated that the association will review its existing methodology for calculating GVA's.

Appraisal Policy

The association's current appraisal policy does not meet the minimum requirements of 12 CFR 564. A substantial change to previous appraisal requirements was created as a result of FIRREA. These regulations were published in final form and became effective on August 23, 1990. The existing appraisal policy has not been fully updated since March 1989.

Date: September 16, 1991 Docket No.: 07918

ASSET QUALITY (continued)

Management responded during the examination by providing a preliminary draft of a new "Appraisal Policy and Procedures for Non-Complex Residential Real Estate Loans". The Policy was approved by the Senior Loan Committee on October 11, 1991. After review by the District Appraiser, the updated policy is not considered fully compliant. A listing of the deficiencies has been submitted to management for further review. Included in the deficiencies is the lack of a clear separation between the loan origination and appraisal functions. Specifically, it is inappropriate to have oversight of the appraisal approval process rest with the management of Action Mortgage Company or the Loan Committee. Additionally, there remains no apparent internal expertise for the ordering and review of appraisals. The examiners recommended that management contact the District Appraiser for guidance in drafting and implementing a fully compliant appraisal policy.

Chairman Gilkey stated that the appraisal policy will be amended to comply with existing regulatory requirements.

10th Avenue Appraisal

The association failed to obtain an appraisal on property which was acquired by deed in lieu of foreclosure in June 1991. This is a violation of 12 CFR 563.172(a). The property is a commercial office building located in Portland, Oregon known as the 10th Avenue building. The property was classified substandard during the examination. Refer to Appendix A - 5.16 for additional details.

Chairman Gilkey stated that the association has already requested bids for the appraisal of this property and that the carrying value of this asset will be appropriately adjusted based on the results of the appraisal.

Corrective Action

- Record specific valuation allowances for all assets classified "loss" upon receipt of this Report;

- Classify assets and report classifications in accordance with the findings contained in this Report;

- Review and revise management's methodology for establishing general valuation reserves addressing the concerns noted by the examiners;

- Submit a revised copy of the association's appraisal policy to this office by December 31, 1991; and,

- Order a current appraisal for the 10th Avenue real estate owned and adjust the carrying amount of this asset to fair value.

Date: September 16, 1991 Docket No.: 07918

## CAPITAL ADEQUACY

The review of capital included an analysis of the association's capital levels and trends, compliance considering the preliminary injunction and FIRREA, and a review of the anticipated stock offering in order to estimate future capital levels.

The current capital position is substantially below the requirements established by FIRREA; however, a preliminary injunction was previously issued which declared that the association was bound by the requirements contained in prior acquisition agreements. The current tangible, core, and risk-based capital are (0.8), 0.7, and 2.4 percent, respectively. Management is in the process of executing an additional public stock offering which management projects if successful will generate sufficient funds to meet the current capital requirements as mandated by FIRREA. Management estimates that the stock offering will be completed by year-end 1991.

### Acquisition Agreements

The association entered into various agreements with the FSLIC in 1985 and 1988, including an agreement to acquire Central Evergreen Federal Savings and Loan Association on an unassisted basis. Subsequent to the passage of FIRREA, the association was considered in violation of the minimum capital requirements. However, the association's initiated litigation which resulted in the issuance of a preliminary injunction, dated July 3, 1990 by the United States District Court for the Eastern District of Washington which prohibits the OTS from imposing any regulatory restrictions which would be inconsistent with the agreements. This injunction is currently being appealed by the OTS; however, no hearing date has been set.

The association's calculation for meeting the Agreement is considered misleading as the numerator (net worth) of the ratios is increased for the FSLIC Assistance, but the denominator (total assets) is kept constant and because the goodwill associated with the FSLIC assistance is not amortized.

### Capital Compliance

The association's tangible, core, and risk-based capital improved since the previous examination, however, it substantially fails all three of the FIRREA minimum capital requirements as of June 30, 1991, as shown in the following table:

| | Balance | Percent of Adj. Assets | Excess/(Deficiency) |
|---|---|---|---|
| Tangible Capital | $(4,713,933) | (0.8%) | $(13,614,661) |
| Core Capital | 4,186,794 | 0.7% | (13,614,661) |
| Risk-Based Capital | 8,281,826 | 2.4% | (17,040,015) |

App. 152

Date: September 16, 1991 Docket No.: 07918

CAPITAL ADEQUACY (continued)

The association's tangible capital improved from a negative $11.4 million as of June 30, 1990, to a negative $4.7 million as of June 30, 1991. This improvement was attributed to net earnings, amortization of goodwill and the utilization of net operating loss carry-forwards which reduced goodwill. The association's GAAP capital also increased from $11.0 million to $12.6 million for the same period and now represents 2.1 percent of total assets. The planned stock issuance anticipates 2.5 million shares of common stock to be offered at an approximate sales price of $8.25 per share. (the actual price will be established later and the range is expected to be between $7.50 and $9.00 per share.) In addition, 89,968 shares of cumulative convertible preferred stock currently outstanding will be simultaneously converted into common stock at a rate of 2.2 shares of common stock for each share of preferred stock.

The association anticipates net proceeds of approximately $18.5 million from this offering. Sales are expected to be completed by year-end 1991. If the sales materialize as anticipated, the projected capital levels (excluding core deposit intangibles) will be as follows:

| | 6/30/91 Pro Forma Balance | Percent of Adj. Assets | Excess/(Deficiency) |
|---|---|---|---|
| Tangible Capital | $15,912,503 | 2.6% | $6,734,276 |
| Core Capital | 24,813,230 | 4.1% | 6,456,776 |
| Risk-Based Capital | 28,908,262 | 8.2% | 772,884 |

The pro forma calculations assume that proceeds will be invested in zero percent risk-weighted government securities and does not take into consideration the full phase out of supervisory goodwill and/or nonincludable subsidiaries.

Qualifying Core Deposit Intangibles

The association claims approximately $4.6 million of other qualifying intangible assets or core deposit premiums (CDP) as of June 30, 1991 and is including approximately $1 million of other qualifying intangibles as core capital in its calculation of capital compliance. The CDP resulted from the acquisition of Central Evergreen and certain branches from Great American. The methodology and assumptions utilized to support the current carrying amount are not reflective of industry practice and are inadequate to support inclusion in core capital. The areas of concern are related to run-off methodology, retention assumptions, useful life, and discount rate.

At this examination the inclusion is not a significant issue given that capital falls short of all three FIRREA minimum requirements with or without the inclusion of these intangible assets. However, the inclusion is important in meeting the capital requirements assuming the proposed stock offering is successful.

Date: September 16, 1991 Docket No.: 07918

## RISK MANAGEMENT

The review of risk management included an analysis of interest rate risk (IRR), restructuring activities, liquidity levels, funding sources and savings solicitations.

Since the previous examination management has taken actions to improve its IRR measurement system and to reduce the reported asset and liability mismatch. Nevertheless, largely due to the projected adverse impact on the institution's Market Value of Portfolio Equity (MVPE) under increasing interest rate scenarios, the current mismatch reflects an excessive level of IRR.

### Interest Rate Risk

The current level of IRR exposes the association's net interest income and MVPE to a large decrease if there is an increase in market interest rates. For a 200 basis point instantaneous rise in interest rates, the examiner estimates that the net interest income would decline by about 9 percent. This means that a net interest margin of 1.8 percent at June 30, 1991 would be reduced to 1.6 percent. Also, for a 200 basis point instantaneous rise in interest rates the OTS IRR model projects that the MVPE would decrease by 106 percent. A decline in MVPE of 35 percent or more is considered to represent an excessive exposure to IRR.

Within the West Region it is projected that about 20 percent of the institutions would suffer an MVPE decline of 35 percent or more for a 200 basis point rise in interest rates. More importantly, projections show that about 10 percent of the institutions within the region would suffer an MVPE decline of 50 percent or more. The projected decline of 106 percent indicates that Sterling has one of the highest MVPE exposure ratios within the region relative to IRR.

As a result of the previous examination, management acquired a new IRR modeling program from the Sendero Corporation. Based on this model, management internally reports a one-year maturity gap of 14.8 percent. The ratio is lower than the OTS calculation primarily due to the assumption of lower decay rates (repricing intervals) for deposits. In addition, for a 200 basis point rise in interest rates, management projects that the institution's MVPE would decrease by only 26.8 percent. The projection is much lower than the OTS calculation primarily due to the manual addition of $13.5 million of "regulatory capital" obtained pursuant to supervisory acquisitions. The examiner notes that this is a misleading addition. The institution received cash assistance at the time of the acquisitions; therefore, the benefits are already included in the MVPE calculations.

The association had a one-year cumulative maturity gap equal to a negative 17.4 percent of total assets as of June 30, 1991, which reflects a reduction from the negative 24.9 percent one-year gap reported at the previous examination. However, the current ratio continues to reflect an excessive level of risk, as there are no offsetting factors, such as high level of capital, liquidity, or earnings, that provides adequate protection for this level of IRR.

Date: September 16, 1991 Docket No.: 07918

RISK MANAGEMENT (continued)

A new stock offering is currently being marketed which management estimates will raise net proceeds of $18.5 million. If the projected net proceeds were added to the institution's MVPE, the examiners estimated that the decline in MVPE for a 200 basis point rise in interest rates would be reduced to approximately 46 percent. This indicates that even with a successful stock offering the institution will continue to have a high level of IRR.

Restructuring Activities

The improvement in the maturity gap was accomplished largely by an 11.6 percent decrease in total assets which were funded by short-term borrowings. There was both an overall decrease in borrowings and a shift to longer term borrowings. Both factors helped to reduce the maturity gap.

Other restructuring activities included the sale of $12 million of 30-year FHLMC PCs and the subsequent purchase of $5 million of 7-year FHLMC PCs. The purpose of the transaction was to offset the increase in IRR related to a restructuring of the liquidity portfolio. In order to improve the overall yield of the liquidity portfolio, certain short-term government securities were replaced with 5-year FHLMC PCs.

Management is also discussing additional restructuring activities which include the sale of approximately $36 million of FHLMC 10 percent PCs, and approximately $1.4 million of investment securities. The funds may be reinvested over a period of time in shorter term PCs and mutual funds which would further reduce the institution's IRR exposure. The gains recorded would be partially offset by selling investment securities which currently have a market loss. As of July 31, 1991, the institution's investment and mortgage-backed securities portfolios had total unrecognized gains of $2.3 million and total unrecognized losses of $0.6 million.

Funding Sources and Savings Solicitation

Due primarily to a reduction in total assets and borrowed money, deposits have increased to 80.8 percent of total assets, compared to 70.2 percent at the time of the previous examination. However, there was an increase in total deposits of $8.8 million, equal to an annual increase of 1.8 percent.

A new account which was used to maintain deposits was the "no-strings" certificate of deposit. The account gives depositors the option of adding to the account at the original rate of interest even if there has been a subsequent decrease in market rates. Also there is no early withdrawal penalty other than the loss of a bonus interest of 0.25 percent at maturity. If there has been an increase in market rates, a depositor could close out the account and open a new account at a higher rate with little loss of interest. The result is that the features of the account could increase the decay factor (repricing interval) applied to the accounts for IRR modeling purposes. The options available to the

Date: September 16, 1991 Docket No.: 07918

RISK MANAGEMENT (continued)

depositors would effectively increase the IRR of these accounts within their one year maturity. As of June 30, 1991, the accounts total $123 million, equal to 25.0 percent of total deposits. This indicates that the accounts could still have a significant negative impact on IRR within the one-year time period.

Chairman Gilkey concurred with the examiner's findings and stated that the association's gap has continued to improve since the Central Evergreen acquisition. He also stated that the "no strings" certificate was initiated to stabilize deposit flows which was adversely effected by the decline in public confidence. He further stated that the association continues to replace wholesale funds and will try to convert maturing "no strings" certificates to more traditional certificates of deposit.

Corrective Actions Required

Actions needed to be taken by the Board of Directors and management include the following:

- o Continue to evaluate and implement strategies to decrease IRR;
- o Establish a goal for the estimated decline in MVPE for a 200 basis point rise in interest rates, together with a feasible time period when it can be achieved;
- o Refine and document support for the decay rates and prepayment assumptions used in the internal IRR calculation; and,
- o Evaluate the impact of the "no-strings" accounts in view of overall strategies to decrease IRR.

Date: September 16, 1991 Docket No.: 07918

## OPERATING RESULTS

An analysis of operating results was performed to determine the level, trend, and stability of earnings. The analysis included a review of financial records, management reports, accounting practices, comparative financial statements, and financial plans. Comparative financial statements for the calendar years 1989 and 1990 and the six-month period ended June 30, 1991 were utilized. We compared the budget for the fiscal year ended June 30, 1991 to the actual operating results for the same period, and we also determined the reasonableness of the budget for fiscal year ending June 30, 1992.

The stability of the association's earnings is considered unsatisfactory because of the significant reliance on non-recurring and/or fluctuating sources of earnings. The absence of core earnings continues to be the result of an insufficient net interest margin. Although there has been an improvement in earnings since the previous examination, the current level of net interest income is insufficient to cover operating expenses. The inadequate interest margin is primarily attributed to the poor net interest position created by the goodwill associated with the previous mergers. Management is projecting net income of approximately $3.4 million for fiscal 1992 with the assumption that the common stock offering is completed in the last quarter of 1991.

### Earnings Stability

The association reported net income of $1,721,000 for the fiscal year ended June 30, 1991, for a ROAA of 0.26 percent. However, these earnings included a net gain on the sale of mortgage loans and mortgage loan servicing rights of $1,668,000 and gains on the sale of other assets of $304,000. These non-recurring items represented approximately 85 percent of pretax operating income which totaled $2,311,000. Exclusive of these earnings, the association would have realized net income of approximately $250,000 assuming the same tax rate.

Operating results have shown some improvement since the previous examination. The return on average assets (ROAA) for the 1991, 1990, and 1989 fiscal years was 0.26, 0.09, and 0.25 percent, respectively. The improvement in earnings has been primarily accomplished through mortgage banking profits and gains on the sale of assets. The annualized ROAA improved to 0.44 for the six-month period ended June 30, 1991; however, this level was still below the peer group ROAA of 0.72 percent. Management is in the process of a new capital stock offering which could net approximately $18.5 million to the institution. This additional capital is expected to improve the ROAA to .54 percent for fiscal 1992; however, the projected level will still be below that currently reported by the peer group.

App. 157

Date: September 16, 1991 Docket No.: 07918

OPERATING RESULTS (continued)

A comparison of the association's consolidated earnings ratios to peer group averages indicates various areas of weakness. Key operating ratios for the six-month period ended June 30, 1991 are shown below:

| | Association | Peer Group | Variance Favorable/ (Unfavorable) |
|---|---|---|---|
| Interest Spread(**) | 2.57% | 2.88% | (0.31%) |
| Net Interest Margin(*) | 1.84% | 2.75% | (0.91%) |
| Net Interest Expense(**) | 7.05% | 6.41% | (0.64%) |
| Noninterest Expense(**) | 2.97% | 2.41% | (0.56%) |
| Return on Average Assets | 0.44% | 0.67% | (0.23%) |
| Net Interest Position(***) | 92.5% | 101.3% | (8.80%) |

(*) Net Interest Income/Average Assets
(**) As a percent of Average Assets
(***)Interest Earning Assets/Interest Costing Liabilities

The primary reason for the unfavorable net interest margin is attributed to the negative net interest position which is the ratio of interest earning assets to interest costing liabilities. The net interest margin has remained essentially unchanged since the previous examination; however, the peer group ratio improved from 2.46 percent to 2.75 percent. As illustrated in the previous table, the association's net interest margin is 91 basis points lower than the peer group. Approximately 25 basis points is the result of a lower yield on earning assets and a higher cost of funds than the peer group. The remaining variance of 66 basis points is attributed to the current negative net interest position.

The reason for the improvement in the peer group net interest margin was a decrease in the cost of funds which exceeded the decrease in the yield on earning assets. The association was unable to take full advantage of the decline in interest rates because of deposit outflows and the desire to reduce interest rate risk by repaying other borrowings. In addition, the association currently has $79 million in FHLB advances at the same cost shown for the prior calendar year while the cost of advances for the peer group declined 76 basis points during the same period.

Operating results continue to be adversely affected by the amortization of intangibles which totaled $2,710,000 for the fiscal year ended June 30, 1991. The amount of intangible amortization has been reduced as a result of the utilization of net operating loss carry-forwards acquired from previous mergers. The association restated net income for the 1990 and 1989 fiscal years which resulted in an increase in equity capital by $564,000. This amount is reflected as a prior period adjustment on the Thrift Financial Reports and did not impact the net income reported for fiscal 1991.

Date: September 16, 1991 Docket No.: 07918

OPERATING RESULTS (continued)

Negligible progress has been made in controlling non-interest expense which has declined from 2.5 percent for 1990 to an annualized rate of 2.4 percent for the first half of 1991, which equals the peer group average. Although the non-interest expense equals the peer group average on an unconsolidated basis, on a consolidated basis it is 3.0 percent which exceeds the consolidated peer group average of 2.4 percent. This is primarily caused by the expenses related to the association's mortgage banking subsidiary, Action Mortgage Company.

Budget Projections

Management's budget projection for the fiscal year ending June 30, 1992, estimates net income of $1.9 million for a ROAA of 0.3 percent. Another projection was prepared based on the completion of a $18.5 million stock sale in the second quarter. This projection estimates net income of $3.4 million for a ROAA of .5 percent. The following chart compares actual earnings with budgeted earnings for fiscal 1991 and the projected earnings for 1992 assuming the successful completion of the common stock sale.

| | Projected Fiscal 1992 | Actual Fiscal 1991 | Budgeted Fiscal 1991 |
|---|---|---|---|
| Interest Income | $56,323 | $60,110 | $60,999 |
| Interest Expense | 40,080 | 47,886 | 47,977 |
| Net Interest Income | 16,243 | 12,224 | 13,022 |
| Other Income | 6,839 | 5,197 | 3,674 |
| Operating Expenses | 18,398 | 15,110 | 14,677 |
| Income Before Taxes | 4,684 | 2,311 | 2,019 |
| Income Taxes | 1,312 | 590 | 686 |
| Net Income | $ 3,373 | $ 1,721 | $ 1,333 |

The association's budget for the fiscal year ending June 30, 1992, which includes the proposed stock offering, is based on a slight increase in interest rates from current levels and a 4 percent increase in assets. Management intends to increase the level of income property originations by $20 million per year, split evenly between permanent and construction loans, and increase commercial banking originations by 10 percent per year. Loan originations for Action Mortgage are projected to increase from $381 million to approximately $478 million. Management also projects an increase of $9 million in no cost deposits. The accuracy of the association's projection is dependent on management's ability to reduce the cost of maturing deposits, primarily "no strings" certificates of deposits, and the ability of Action Mortgage to generate an even higher level of originations for 1992. In addition, the projection did not reflect the $500,000 addition to general valuation reserves that was recorded during the quarter ended September 30, 1991.

Date: September 16, 1991 Docket No.: 07918

OPERATING RESULTS (continued)

Chairman Gilkey concurs with the examiner's conclusion that net income for 1991 was enhanced by the mortgage banking profits. He stated that this was necessary since the association could not grow in order to leverage existing capital thereby minimizing the effect of goodwill amortization. He also stated that an improvement in the net interest margin is anticipated with the successful sale of common stock and a reduction in the cost of deposits from the repricing of certificates of deposits at a lower cost.

# APPENDIX

Date: September 16, 1991 Docket No.: 07918

## VIOLATIONS OF LAWS OR REGULATIONS

| Law or Regulation Violated | # of Violations/ Amount of Loss Incurred, If Any | Description of Circumstances Surrounding Violation |
|---|---|---|
| 12 CFR 563.172(a) | 1/None | No appraisal was obtained at acquisition. |
| 12 CFR 563.172(c) | 1/$12,807 | No adjustment made to reflect lower of fair value or book value. |
| 12 CFR 564 | 1/None | Appraisal policies not compliant with FIRREA. |

Date: September 16, 1991 Docket No.: 07918

## DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS

Number of Directors' Meetings Held During Past 12 Months: 12
Number of Directors Authorized: 10 a/
Number of Vacancies: 0

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 Mos. | Tenure as Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| Gilkey, Harold B.<br>S. 3924 Eastgate Ct.<br>Spokane, WA 99203 | CB, CEO<br>07-18-39 | 12 | 1981<br>1992 | $123,966<br>49,600 b/<br>8,000 c/<br>1,100 d/<br>1,000 e/<br>400 f/<br>500 g/<br>1,995 h/<br>650 i/ |
| Zuppe, William W.<br>S. 5306 Muirfield Ln.<br>Spokane, WA 99223 | D, P, COO<br>09-10-41 | 12 | 1981<br>1992 | 90,000<br>36,000 b/<br>8,000 c/<br>1,100 d/<br>1,000 e/<br>400 f/<br>500 g/<br>1,800 h/<br>650 i/ |
| Alverson, Raymond R.<br>2624 Blvd. Rd. SE<br>Olympia, WA 98501<br>Retired | D<br>10-29-31 | 11 | 1989<br>1991 | 7,000 c/ |
| Barnes, Ned M.<br>710 E. 12th<br>Spokane, WA 99202<br>Attorney | D, S<br>10-28-36 | 12 | 1983<br>1991 | 8,000 c/<br>1,100 d/<br>1,000 e/<br>400 f/<br>500 g/ |
| Barnett, Rodney W.<br>S. 1312 Garfield St.<br>Spokane, WA 99202<br>Business Owner | D<br>11-14-43 | 12 | 1983<br>1991 | 8,000 c/ |

Date: September 16, 1991 Docket No.: 07918

DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS (continued)

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 Mos. | Tenure as Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| Fugate, Dr. James P.<br>29715 111th Ave S.E.<br>Auburn, WA 98002<br>School District Superintendent-Auburn | D<br>01-02-33 | 12 | 1989<br>1993 | 8,000 c/ |
| Kroetch, Charles L.<br>1218 E. 30th, #12<br>Spokane, WA 99203<br>Business Owner | D<br>11-27-31 | 12 | 1981<br>1993 | 8,000 c/<br>400 f/ |
| Larrabee, Robert<br>2323 Third Avenue<br>Clarkston, WA 99403<br>Business Owner | D<br>03-02-35 | 11 | 1983<br>1992 | 7,000 c/<br>100 f/ |
| Meyers, Robert E. D.D.S.<br>2222 Riverside Dr.<br>Clarkston, WA 99403<br>Dentist | D<br>07-26-25 | 12 | 1983<br>1993 | 8,000 c/ |
| Wallace, David O.<br>West 448-25th Avenue<br>Spokane, WA 99203<br>Business Owner | D<br>03-19-38 | 12 | 1981<br>1993 | 8,000 c/ |
| Byrne, Daniel G.<br>E. 709 Vicksburg<br>Spokane, WA 99208 | SVP, CFO<br>04-22-54 | | | 63,000<br>10,000 b/<br>1,260 h/<br>500 i/ |
| Stanley, Heidi B.<br>W. 609 Bradford Court<br>Spokane, WA 99203 | VP<br>09-15-56 | | | 48,000<br>10,000 b/<br>715 h/<br>500 i/ |
| Parrish, Stanton C.<br>S. 6506 Medelia St.<br>Spokane, WA 99223 | SVP<br>06-15-50 | | | 53,400<br>3,000 b/<br>801 h/<br>500 i/<br>100 f/ |

App. 164

Date: September 16, 1991 Docket No.: 07918

DIRECTORS, PRINCIPAL OFFICERS, AND ATTORNEYS (continued)

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 Mos. | Tenure as Director<br>Year Appt.<br>Year Expire | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| Page, Stephen L.<br>E. 1212-35th<br>Spokane, WA 99203 | SVP<br>05-16-48 | | | 57,600<br>3,000 b/<br>432 h/<br>500 i/ |
| Moore, S. Midge<br>E. 22801 Clearwater Ln.<br>Liberty Lake, WA 99019 | VP<br>04-23-48 | | | 45,000<br>3,000 b/<br>900 h/<br>500 i/ |
| Sackmann, Tom<br>E. 4522 Lane Park Rd.<br>Mead, WA 99021<br>President-Action Mortgage | VP<br>05-04-52 | | | 84,000<br>33,600 b/<br>500 i/<br>100 f/ |
| Harlow, John<br>5022 F Foothills Dr.<br>Lake Oswego, OR 97034<br>President-Intervest | VP<br>08-06-42 | | | 96,000<br>1,560 h/<br>500 i/<br>100 f/ |
| Witherspoon, Kelley<br>Davenport & Toole, P.S. | A | | | 456,847 j/ |

Footnotes and Comments:

a/ Directors Clark and Vander Stoep resigned. The board approved reduction in the number of directors from twelve to ten.
b/ Bonus for Fiscal Year 1991.
c/ Directors fee, $2,000 annual retainer and $500 per meeting attended.
d/ Directors fee per meeting attended - Action Mortgage.
e/ Directors fee per meeting attended - Harbor Financial Services.
f/ Directors fee per meeting attended - Intervest Mortgage.
g/ Directors fee per meeting attended - various service corporations.
h/ 401K benefits.
i/ Monthly Auto Allowance
j/ Total legal fees billed from June 1, 1990 through June 30, 1991. Director Barnes is a partner in this law firm.

Date: September 16, 1991 Docket No. 07918

## SUMMARY OF CRITICIZED ASSETS

| | |
|---|---|
| 1. Classified Assets | |
| Portion Classified "Substandard" | $24,878,533 |
| Portion Classified "Doubtful" | 1,159,478 |
| Portion Classified "Loss" | 141,092 |
| 1A. Total Classified Assets | $26,179,103 |
| (Memo--Portion Not Classified $-0-) | |
| 2. Assets Subject to Special Mention | 1,545,865 |
| 3. Consumer Credit Classified as Loss | 0 |
| 4. TOTAL CRITICIZED ASSETS (1A+2+3) | $27,724,968 |
| Total Criticized Assets to Total Assets | 4.6% |

Date: September 16, 1991 Docket No.: 07918

## SUMMARY OF ACTION REQUIRED BY CRITICIZED ASSETS

| | | |
|---|---|---|
| 1. | Total General Valuation Allowance prior to start date of exam | $1,932,171 |
| 2. | Any subsequent provisions made/losses charged to the General Valuation Allowance | $ 847,950 |
| 3. | Adjusted General Valuation Allowance (1 plus 2) | $2,780,121 |
| 4. | Adjustment required due to assets classified Loss for which no specific Allowance has been established | $ 141,092 |
| 5. | Remaining General Valuation Allowance (3 minus 4) | $2,639,029 |

A review of the adequacy of the general valuation allowance was completed as part of the examination process and it was determined that as of the date of the examination, the general valuation allowance was under-funded by approximately $500,000. Management concurred with the examiner's recommendation and recorded an increase of $500,000 in the general valuation allowance as of September 30, 1991.

The association's general valuation allowance was $3,991,000 as of June 30, 1990. During fiscal 1991, the association recorded net charge-offs of $1,777,000 to the reserve while only adding $150,000 through loan loss provisions. As a result, the general loan loss reserve declined to $2,172,000 as of June 30, 1991. It should be noted that the specific losses of $141,092 are net of the credit, in the amount of $94,547, given for unallocated specific reserves. This amount was applied toward REO loss classifications ($83,446) and other asset classifications ($11,101) recognized during this examination.

Although there was a notable decrease in criticized assets from the previous exam, the examiners determined that the association's estimation of GVA's was inadequate based on the current level of classified loans, the $1.1 million increase in assets classified doubtful, historical loss experience, and the potential for adverse economic changes. An adequate level of GVA's was estimated to be approximately $3.1 million. This level would represent 11.5 percent of assets classified substandard and doubtful compared to a Western Region ratio of 13.7 percent.

Date: September 16, 1991 Docket No.: 07918

SUMMARY OF ACTION REQUIRED BY CRITICIZED ASSETS (continued)

The association's methodology for estimating GVA's was primarily based on one-year and three-year actual loss experience. Although this methodology is generally considered sound, procedures for determining GVA's were flawed due to the following:

- A review of the actual loss experience for fiscal 1991 revealed an understatement of losses by $375,000. The result was an internal analysis which understated the minimum required reserve. This understatement was largely a result of a lack of consistency regarding the definition of charge-offs to be used for quantifying loan losses and incorrectly categorizing some of the charged-off loans. Debits to the general loan loss reserve were not considered as charge-offs in all instances.

- The reserve factors appear unrealistically low. Sterling uses 0.22 percent and 4.05 percent as factors for performing income property loans and substandard income property loans, respectively. More appropriate factors would generally range from 0.75 percent to 1.5 percent for performing income property loans and from 4.0 percent to 10.0 percent for substandard income property loans. For purposes of this examination, the factors of 0.8 percent and 6.0 percent were used.

- Although the GVA policy calls for an analysis to include current and anticipated economic trends, it appears that the final conclusion on GVA's is based strictly on historical loss experience. Anticipated economic trends and interest rate expectations should be incorporated and documented in the analysis due to the critical effect these items have on the association's ability to dispose of troubled assets.