Fees and service charges consist principally of service charges on deposit accounts as well as commissions on sales of annuity products by Harbor Financial, fees for certain customer services, and late charges on loans. The increase to $2.5 million for fiscal year 1991 compared to $2.0 million and $913,000 for fiscal years 1990 and 1989, respectively, was primarily due to an increase in the number of deposit accounts following the acquisition of Central Evergreen in fiscal year 1989 and to an increase in commissions on sales of annuity products to $624,000 from $403,000 and $99,000 in fiscal years 1990 and 1989, respectively.

Net gains (losses) on sale and operation of REO were ($532,000) during fiscal year 1991, compared to ($176,000) and $757,000 in fiscal years 1990 and 1989, respectively. The increased loss during fiscal year 1991 reflects a provision for losses on REO of $419,000 and a lower level of net gains on the sale of REO compared to the prior years. The provision in fiscal year 1991 primarily reflects an increase in a specific allowance on one property and the establishment of a general valuation allowance on REO. A $450,000 provision for loss on REO contributed to the net loss during fiscal year 1990. Favorable operating results and recoveries in excess of amounts expected on acquired REO contributed to the net gain during fiscal year 1989.

During fiscal year 1991, Sterling had a gain of $155,000 on FDIC indemnifications for loss on sale of REO compared to losses during fiscal years 1990 and 1989 of $97,000 and $66,000, respectively. Gains or losses on sales of FDIC covered assets are shared with the FDIC pursuant to a contract which expires in April 1993. The FDIC indemnification of capital losses represents the difference between the FDIC portion of gains and losses on sales of REO and the estimated amounts established at the date of acquisition.

Loan servicing fees were $651,000 during fiscal year 1991, a decrease from $864,000 and an increase from $471,000 during fiscal years 1990 and 1989, respectively. The amounts of loan servicing fees were proportionate to the average size of the loan servicing portfolios. Sterling's total servicing portfolio was approximately $121.7 million at June 30, 1991, compared to $174.1 million and $315.4 million at June 30, 1990 and 1989, respectively. During fiscal years 1991 and 1990, Sterling sold rights to service conventional loans for others in the amounts of $285.0 million and $312.1 million, respectively. These servicing sales were prompted primarily by the desire to increase Sterling's regulatory capital.

Net gains (losses) on sales of securities were $255,000, $241,000 and ($118,000) during fiscal years 1991, 1990 and 1989, respectively. The net gains in fiscal year 1991 include gains from a restructuring of Sterling's liquidity portfolio. The gain in fiscal year 1990 reflects the disposition of the portfolio of adjustable rate mortgage-backed securities for operational efficiencies. The net losses in fiscal year 1989 were primarily due to losses on the disposition of securities acquired from Central Evergreen and Tri-Cities.

Miscellaneous income generally includes net gains (losses) on disposition of office equipment, non-recurring fees and charges collected and other unclassified income. Miscellaneous income in fiscal year 1991 was $41,000. Miscellaneous income in fiscal year 1990 was $477,000 and included a gain on the sale of a former branch building. In fiscal year 1989, miscellaneous income of $550,000 included a gain on the settlement of a large acquired claim.

*Operating Expenses.* Operating expenses were $17.7 million, $18.6 million and $13.0 million during fiscal years 1991, 1990 and 1989, respectively. The decrease during fiscal year 1991, when compared to fiscal year 1990, reflects a reduction in employee compensation and benefits resulting, in part, from Sterling's corporate reorganization during fiscal year 1991. This corporate reorganization was intended to improve operating efficiency and increase employee productivity. The decrease during fiscal year 1991, when compared to fiscal year 1990, also reflects a reduction in intangible amortization expense and a reduction in the amount recognized as a current expense pursuant to SFAS No. 91 which requires the deferral of operating expenses based on the volume of loan activity. Other operating expenses for fiscal year 1990 include a charge for costs associated with a canceled public offering. Exclusive of nonrecurring items, other operating expenses during fiscal year 1991 increased by approximately 9%. This increase is primarily attributable to higher supervisory assessments, FDIC insurance premiums and legal expenses. Operating expenses during fiscal year 1990, compared to 1989, are higher primarily due to increased operations resulting from the acquisition of Central Evergreen in 1989, costs associated with a canceled public offering and legal expenses incurred to enforce the Acquisition Agreements with Sterling's regulators.

*Income Tax Provision (Benefit).* For fiscal years 1991, 1990 and 1989, the income tax provisions (benefit) were $590,000, ($164,000) and $225,000, respectively. The effective tax rates of 25.5%, (34.6)% and 13.2%, respectively, on income before income taxes are lower than the statutory rate of 34%. These lower effective tax rates are primarily due to the tax basis bad debt deduction, the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets), the premium or discount attributed to acquired assets sold and the receipt of nontaxable FDIC Yield Subsidy assistance payments pursuant to the Tri-Cities Acquisition Agreement. See "Taxation."

**Liquidity and Sources of Funds**

Sterling's primary sources of cash are customer deposits, principal and interest payments on, and sales of, loans and mortgage-backed securities, advances from the Federal Home Loan Bank of Seattle (the "FHLB Seattle") and borrowings under repurchase agreements. During the three months ended September 30, 1991, deposits increased $2.8 million to $491.3 million from $488.5 million at June 30, 1991 and from $479.2 million at June 30, 1990. These net increases in deposits reflect increases in retail deposits which more than offset a decrease in wholesale deposits. At September 30, 1991, Sterling had $4.5 million of fully collateralized public entity deposits. Principal repayments on loans and mortgage-backed securities were $22.8 million, $39.2 million, $147.1 million and $160.8 million during the three months ended September 30, 1991 and 1990 and fiscal years 1991 and 1990, respectively. The decrease in these repayments over the prior year is a reflection of the reduction in total loan and mortgage-backed securities portfolio balances.

OTS regulations require savings institutions to maintain an average daily balance of liquid assets greater than or equal to a specific percentage (currently 5%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At September 30, 1991, Sterling's liquidity ratio was 5.18% compared to 5.20% and 7.71% at June 30, 1991 and 1990, respectively. The regulatory liquidity ratio does not take into account certain other sources of liquidity, such as funds invested through Sterling's subsidiaries, potential borrowings against mortgage-backed securities or investment securities, and other potential financing alternatives. The required minimum liquidity ratio may vary from time to time, depending on economic conditions, savings flows and loan funding needs. It is Sterling's practice to maintain its liquidity level at or near the required minimum in order to maximize its yield on alternative investments.

At September 30, 1991, Sterling had advances outstanding from the FHLB Seattle totalling $78.2 million. Sterling must fully collateralize all borrowings from the FHLB Seattle. Accordingly, Sterling's credit line with the FHLB Seattle is based on the level of qualifying collateral. At September 30, 1991, Sterling had immediately available collateral to support additional advances of $47.5 million.

Sterling also borrows on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At September 30, 1991, Sterling had no outstanding borrowings under reverse repurchase agreements, with securities immediately available for secured borrowing of approximately $4.5 million and with unpledged securities available of $86.1 million for further borrowings.

**Capital Resources**

Sterling's total shareholders' equity was $13.1 million at September 30, 1991 and $12.6 million at June 30, 1991, compared to a restated $11.3 million at June 30, 1990. At September 30, 1991, shareholders' equity was 2.22% of total assets, compared to 2.07% and 1.64% of total assets at June 30, 1991 and 1990, respectively. The higher ratio at September 30, 1991 is a result of the earnings retained during the period and the decrease in total assets. As described in Note 3 of Notes to Consolidated Financial Statements, retained earnings for June 30, 1990 and 1989 and net income for the three months ended September 30, 1990 and fiscal years 1990 and 1989 have been restated to reflect a reduction in intangible amortization expense as a result of utilizing pre-acquisition tax operating loss carryforwards. Additionally, as described in Note 16 of Notes to Consolidated Financial Statements, there is currently $394,000 of cumulative dividends on the Series B Preferred Stock that has been declared and charged against retained earnings. An additional $56,000, or $0.63 per share, of dividends has accumulated through September 30, 1991, but has not been declared. Sterling does not intend to pay such dividends until such time as Sterling increases its capital to levels required

by FIRREA, without giving effect to the Acquisition Agreements. It is expected that if this Offering is completed Sterling's Board of Directors will declare dividends on the Series B Preferred Stock through the date of conversion into Common Stock and will direct that all accumulated dividends be paid on or before January 15, 1992, although Sterling may have to seek OTS approval before it pays such dividends. As a result of the planned conversion of Series B Preferred Stock, approximately 198,000 additional shares of Common Stock will be outstanding. This additional Common Stock will be includable in Sterling's regulatory tangible and core capital and will increase such capital by approximately $2.1 million. See "Conversion of Series B Preferred Stock."

Annualized return on average common shareholders' equity was 15.7% and 2.7% for the three months ended September 30, 1991 and 1990, respectively. Return on average common shareholders' equity was 15.5% in fiscal year 1991, 4.8% in fiscal year 1990 and 16.2% in fiscal year 1989. The lower return on equity for fiscal year 1990 compared to fiscal year 1989 is primarily attributable to expenses associated with a canceled public offering, legal costs incurred to enforce the Acquisition Agreements and provisions for loan and REO losses.

As a result of this Offering, Sterling expects to meet all current regulatory capital standards without giving effect to regulatory capital obtained through Sterling's past acquisitions. Sterling therefore intends to resume business banking, commercial real estate lending and construction lending activities at moderate levels, subject to applicable regulatory limitations. See "Risk Factors—Regulatory Capital Requirements," "Management's Discussion and Analysis," "Business—Legal Proceedings" and "Regulation—Recent Regulatory Developments."

**Effects of Inflation and Changing Prices**

A savings institution has an asset and liability structure that is interest rate sensitive. As a holder of monetary assets and liabilities, a savings institution's performance may be significantly influenced by changes in interest rates. Although changes in the prices of goods and services do not necessarily move in the same direction as interest rates, increases in inflation generally have resulted in increased interest rates, which may have an adverse effect on Sterling's business.

# BUSINESS

**Sterling Savings Association**

Sterling commenced operations in 1983 as a State of Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. Sterling, with $591.1 million in total assets at September 30, 1991, attracts FDIC-insured deposits from the general public through 27 retail branches located primarily in smaller, rural communities in Washington State. Sterling originates mortgage loans secured primarily by residential real estate in the metropolitan areas of the Pacific Northwest. At September 30, 1991, Sterling had loans receivable of $359.0 million, of which $189.4 million, or approximately 51.6%, was secured by one to four family residential real estate. To a lesser extent, Sterling also originates consumer, business banking, commercial real estate and construction loans.

**Operating Strategy**

Sterling provides personalized, quality financial services to its customers as exemplified by its "Hometown Helpful" philosophy. To further enhance Sterling's presence in its market area, it is working to:

- Increase its residential lending volume in metropolitan areas;
- Increase its market share of deposits in rural areas while efficiently managing its retail branch network;
- Increase fee income;
- Reduce its nonperforming assets, approximately 40% of which were obtained through acquisitions;
- Effectively manage its interest rate risk; and
- Enhance its regulatory capital position.

*Increased Residential Lending Volume in Metropolitan Areas.* Through its subsidiary Action Mortgage, Sterling operates fourteen residential loan production offices located in or near Pacific Northwest metropolitan areas, including Seattle, Spokane, Portland and Boise. Through experienced management of these loan production offices, Sterling has achieved substantial lending volumes while maintaining relatively low operating costs. Sterling believes it has positioned itself to take advantage of strong loan demand in these markets.

During the past three fiscal years, Sterling has increased its dollar amount of residential loan originations. These originations have increased from $167.1 million in fiscal 1989 to $380.8 million in fiscal 1991. Residential loan originations were $112.6 million during the three months ended September 30, 1991, as compared to $90.4 million for the three months ended September 30, 1990. Substantially all originations are sold into the secondary market, providing Sterling with significant mortgage banking revenue or swapped for FHLMC certificates.

*Increased Market Share of Deposits in Rural Areas and Efficient Management of the Retail Branch Network.* Sterling operates 27 full service retail branches primarily in rural communities throughout Washington. Sterling continuously seeks to increase its market share in the communities it serves by expanding deposit relationships, by improving product cross-selling and new business development programs, and by developing and implementing innovative savings services for target markets. Sterling's subsidiary, Harbor Financial, markets products such as tax-deferred annuities, mutual funds, and credit life and disability insurance through the branch network. Sterling's strategy of gathering deposits primarily in rural communities has enabled it to attract relatively low-cost, stable deposits. Sterling also earns higher rates on certain of the consumer products and services it sells in these communities relative to levels prevalent in urban markets.

*Increased Fee Income.* Management of Sterling is working to increase fee income by attracting a larger number of checking accounts and offering its customers a wider selection of fee-based services. Sterling believes that additional fee income increases will be generated through the active marketing of tax-deferred annuities, mutual funds, credit life and disability insurance and other financial products through Harbor Financial.

*Reduction of Nonperforming Assets.* Through the acquisition of three insolvent thrifts in fiscal years 1986, 1988 and 1989, Sterling acquired substantial amounts of nonperforming assets. At June 30, 1989, total

nonperforming assets were $33.6 million, of which $23.7 million were attributable to such acquisitions. By September 30, 1991, total nonperforming assets had decreased to $18.8 million, of which $7.7 million were attributable to such acquired institutions. Sterling seeks to further reduce the level of nonperforming assets by improving its methods of marketing real estate owned and curing delinquencies, primarily on commercial real estate loans. See "—Acquisitions."

*Effective Interest Rate Risk Management.* Sterling is committed to residential lending as its primary business and seeks to limit the interest rate risk inherent in such activity. Sterling emphasizes the retention in its portfolio of variable rate mortgage, consumer, business banking and construction loans while selling substantially all fixed rate loans into the secondary market in order to limit interest rate risk. See "Risk Factors—Impact of Interest Rates and Economic Conditions on the Savings and Loan Industry," "Management's Discussion and Analysis—Asset and Liability Management" and "—Results of Operations."

*Enhanced Regulatory Capital.* Sterling is committed to enhancing its capital base and regulatory capital ratios. An important part of this strategy is this Offering. In addition, management believes that the retention of future earnings and amortization of intangible assets will enhance Sterling's capital levels. Sterling actively manages the amount and mix of its assets in order to influence its capital ratios. See "Offering Circular Summary—Risk Factors," "Management's Discussion and Analysis—Asset and Liability Management," and "Regulation—Recent Regulatory Developments."

**Acquisitions**

Sterling commenced operations in April 1983 with $2.1 million in assets and capital. Through acquisitions, Sterling expanded its deposit and mortgage delivery systems considerably in a relatively short period and added a significant amount of assets and a more geographically diverse loan portfolio. Through consolidation of these acquired institutions, Sterling believes it has reduced the cost of administrative functions and increased its operating efficiency. In June 1983, Sterling added four branch offices and $44.2 million in assets through the acquisition of Lewis and Clark Savings & Loan Association ("Lewis and Clark") of Clarkston, Washington. In November 1985, Sterling added two branch offices and $53.5 million in assets through the acquisition of Lewis Federal Savings & Loan Association ("Lewis Federal") of Chehalis, Washington. In February 1988, Sterling acquired six branches and $47.5 million in assets, all located in Washington, from Great American First Savings Bank, FSB. In April 1988, Sterling added four branches and $81.2 million in assets through the acquisition of Tri-Cities Savings & Loan Association of Kennewick, Washington, and in December 1988, Sterling added eight branches and $248.9 million in assets through the acquisition of Central Evergreen Federal Savings & Loan Association of Chehalis, Washington.

The three largest of these institutions were insolvent and were acquired pursuant to Acquisition Agreements with regulatory authorities. The Lewis Federal and Tri-Cities Acquisition Agreements provided for various forms of regulatory assistance to induce Sterling to complete the acquisitions. Such assistance included indemnification against certain losses, regulatory cash assistance payments and regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Acquisition Agreements, Sterling was specifically allowed to (i) record regulatory cash assistance payments received as a part of regulatory capital; (ii) include intangible assets resulting from the acquisitions in the determination of regulatory capital; and (iii) extend intangible amortization periods beyond those allowed under GAAP for purposes of calculating regulatory capital.

The Central Evergreen Acquisition Agreement included an approved business plan under which Sterling would operate through December 31, 1993. The business plan established the required levels of regulatory capital as well as methodology of computing regulatory capital. The regulatory capital projections included in the business plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Acquisition Agreements.

Another significant economic aspect of the Tri-Cities and Central Evergreen acquisitions was that, because of the institutions' declared "insolvency," Sterling is allowed to utilize, for tax purposes, all of Central Evergreen's and 50% of Tri-Cities' accumulated NOL carryforwards to reduce future taxable income. Sterling has utilized a significant portion of these tax benefits. For a discussion of the NOL carryforwards

and limitations on their use in the future as a result of this Offering, see "Risk Factors—Federal Income Taxation of Sterling" and "Taxation."

The OTS has taken the position that FIRREA eliminated most of the capital-related provisions of the Acquisition Agreements and that Sterling is therefore not in compliance with current capital requirements. Sterling has challenged this position. See "—Legal Proceedings" and "Regulation—Recent Regulatory Developments."

In each of the insolvent thrift institution acquisitions, Sterling identified and carefully studied an opportunity to acquire and effectively manage distressed assets. Subsequent to the dates of the respective acquisitions, Sterling has endeavored to reduce the level of, and minimize losses on, the classified assets of each institution and thereby improve earnings on the acquired assets. Sterling has reduced the level of classified assets (net of FDIC indemnification) acquired from these institutions from $32.4 million at acquisition to $10.9 million at September 30, 1991. See "—Lending Activities—*Classified Assets, Real Estate Owned and Delinquent Loans.*"

**Lending Activities**

*General.* Sterling primarily originates mortgage loans secured by residential real estate. To a lesser extent, Sterling originates consumer, business banking, commercial real estate and construction loans. Sterling originated $117.2 million, $95.3 million and $399.8 million of loans during the three months ended September 30, 1991 and 1990, and fiscal year 1991, respectively, approximately 95% of which were secured by one to four family residential real estate. The following table sets forth information on loan origination, purchase, and sale activities for the periods indicated.

| | Three Months Ended September 30, 1991 | | Fiscal Year Ended June 30, 1991 | | 1990 | | 1989 | |
|---|---|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % | Amount | % |
| | (Dollars in thousands) | | | | | | | |
| Mortgage-construction: | | | | | | | | |
| One to four family residential | $ 247 | 0.2% | $ 3,603 | 0.9% | $ 20,614 | 5.2% | $ 18,483 | 7.3% |
| Multifamily | 0 | 0 | 0 | 0 | 9,340 | 2.3 | 22,987 | 9.0 |
| Commercial real estate | 0 | 0 | 0 | 0 | 3,950 | 1.0 | 20,810 | 8.2 |
| Mortgage-permanent: | | | | | | | | |
| One to four family residential | 112,368 | 95.9 | 377,197 | 94.3 | 334,469 | 83.9 | 148,664 | 58.4 |
| Multifamily | 0 | 0 | 0 | 0 | 2,850 | 0.7 | 3,755 | 1.5 |
| Commercial real estate | 0 | 0 | 0 | 0 | 2,047 | 0.5 | 7,350 | 2.9 |
| Nonmortgage: | | | | | | | | |
| Business banking | 566 | 0.5 | 4,617 | 1.2 | 9,513 | 2.4 | 19,889 | 7.8 |
| Consumer | 3,977 | 3.4 | 14,346 | 3.6 | 16,030 | 4.0 | 12,687 | 4.9 |
| Total loans originated | $117,158 | 100.0% | $399,763 | 100.0% | $398,813 | 100.0% | $254,625 | 100.0% |
| Loans purchased(1) | $ 0 | | $ 0 | | $ 0 | | $ 3,811 | |
| Loans sold(2) | $114,115 | | $366,105 | | $331,400 | | $102,281 | |
| Loans swapped for FHLMC certificates | $ 0 | | $ 0 | | $ 0 | | $ 54,430 | |

(1) Loans purchased do not include loans acquired as a result of acquisitions accounted for as purchases, or loans purchased and sold as part of mortgage banking operations.

(2) Loans sold in all periods include real estate loans which were secured into mortgage-backed securities and subsequently sold. During the three months ended September 30, 1991 and fiscal years 1991, 1990 and 1989, these amounts totalled $0, $0, $11.1 million and $32.5 million, respectively.

Substantially all loans originated during the three months ended September 30, 1991 and fiscal year 1991 were sold into the secondary market. Approximately 70% of these loans were sold with servicing rights retained by Sterling. The majority of these servicing rights were subsequently sold during fiscal 1991 or during the three months ended September 30, 1991.

Since the enactment of FIRREA and corresponding regulations, Sterling has implemented a strategy of emphasizing its residential mortgage lending while curtailing other lending activities. These actions have resulted in an increase in residential mortgage originations, loan sales into the secondary market and sales of servicing rights. Following this Offering, Sterling anticipates retaining a larger portion of these residential mortgage loans originated to the extent that Sterling's increased levels of capital will support this activity.

Under FIRREA, the permissible amount of loans-to-one-borrower by savings institutions is generally limited to 15% of unimpaired capital and surplus. Loans in an amount equal to an additional 10% of unimpaired capital and surplus also may be made to a borrower if the loans are fully secured by readily marketable collateral. FIRREA also provides special rules which permit loans to be made for any purpose up to $500,000, notwithstanding a savings institution's levels of unimpaired capital and surplus. Under the OTS's current interpretation of FIRREA, Sterling's maximum loans-to-one-borrower limit is $500,000. Commercial real estate lending restrictions, enacted in FIRREA, limit this type of lending to 400% of regulatory capital. The loans-to-one-borrower and the commercial real estate lending limitations have restricted Sterling's business banking and commercial real estate operations, but have not required the divestiture of any existing loans. Management believes these limitations have had a material adverse effect on the financial performance of Sterling. Sterling expects that its unimpaired capital and surplus, and therefore its permissible loans-to-one-borrower and commercial real estate lending limits, will increase following this Offering subject to applicable regulatory limitations. See "Regulation—Recent Regulatory Developments."

*Residential Lending.* The primary lending activity of Sterling is the granting of mortgage loans to enable borrowers to purchase single family homes on properties within its principal market area. Sterling also originates a limited amount of one to four family residential construction loans. During the three months ended September 30, 1991 and 1990, $112.6 million, or 96.1% and $90.4 million, or 94.8%, of Sterling's originations were one to four family residential mortgage loans. During fiscal year 1991, $380.8 million, or 95.2%, of Sterling's originations were one to four family residential mortgage loans.

Sterling originates primarily fixed rate mortgages. Sterling also originates ARMs, which have interest rates that adjust annually and are indexed to either the FHLB Eleventh District Cost of Funds Index or the weekly average yield on one-year Treasury securities. Borrower demand for ARMs versus fixed rate mortgage loans is a function of interest rate levels, the expectations for changes in the level of interest rates and the difference between interest rates and loan fees offered for fixed rate mortgage loans and the rates and loan fees for ARMs. Sterling's loan origination volume is subject to some seasonal variation, with the heaviest demand in the summer and the lightest in the winter. Loan demand is also affected by the interest rate environment and general economic conditions.

During the past several years, Sterling has increased its emphasis on residential mortgage banking as a source of income. Sterling originates conventional and government insured residential loans for sale into the secondary market. Within the secondary mortgage market for conventional loans, Sterling sells its originated loans primarily to the FHLMC and the FNMA. During the three months ended September 30, 1991 and fiscal year 1991, the FHLMC purchased approximately 49.9% and 41.3%, respectively, and the FNMA purchased approximately 22.9% and 28.5%, respectively, of the residential mortgage loans originated by Sterling. For the fiscal year ended June 30, 1990, the FHLMC purchased approximately 15.4% and the FNMA purchased approximately 52.3% of such loans. When it sells conventional residential loans to the secondary market, Sterling usually continues to service such loans for a period of time following the loan sale. FHA loans and loans partially guaranteed by the Veteran's Administration (the "VA") are almost always immediately sold into the secondary market on a loan-by-loan, servicing released basis, resulting in virtually no interest rate risk exposure to Sterling. See "Risk Factors—Mortgage Banking Operations."

Sterling maintains an internal loan-tracking system for residential loans which provides management with information regarding the composition, status, and volume of loans in process, as well as other information for secondary marketing purposes.

Conventional residential mortgage loans are originated for up to 95% of the appraised value or selling price of the mortgage property, whichever is less. All loans with loan-to-value ratios in excess of 80% require the customer to purchase private mortgage insurance from approved third parties so that Sterling's risk is no greater than a 75% loan-to-value ratio. Sterling's residential lending programs are intended to comply with all applicable regulatory requirements.

Residential mortgage loan applications must be approved for compliance with underwriting criteria, such as loan-to-value ratios against the appraised collateral, borrower income qualifications, credit history and the adequacy of insurance. After approval, Sterling issues a commitment to the prospective borrower specifying the amount of the loan and a date of expiration of the commitment. Depending on the type of loan and whether the prospective borrower has elected to lock in rates and fees, commitment information may also include rates, fees and, if the loan is an ARM, information concerning the index, convertibility and adjustment features. Sterling seeks to limit market risk (risk of fluctuating interest rates affecting the market value of an asset) on fixed rate commitments through the use of option transactions in conjunction with commitments to sell specific loans.

Credit authority with respect to conventional residential mortgage lending is currently limited to two individuals at Sterling, the senior vice president of loan administration and the president of Action Mortgage, Sterling's mortgage lending subsidiary. The maximum current individual loan limit applicable to any such individual is $250,000. The president of Action Mortgage has additional authority to approve pre-sold residential construction and portfolio loans meeting strict underwriting and pricing criteria, to an aggregate limit of $500,000 to one borrower. Residential loans that exceed these levels must be approved by Sterling's senior loan committee, which has credit authority for residential loans of up to $1 million.

Sterling traditionally made residential construction loans on custom homes (where the home buyer is the borrower), pre-sold homes and speculative residential construction. Construction financing is generally considered to involve a higher degree of risk than long-term financing on improved, occupied real estate. Sterling is presently limiting its construction lending to contractors who have pre-sold the subject properties under custom construction for the home owner. Sterling's risk of loss on construction loans is dependent largely upon the accuracy of the initial estimate of the property's value at completion of construction or development and the estimated cost (including interest) of construction. If the estimate of construction costs proves to be inaccurate, Sterling might have to advance funds beyond the amount originally committed to permit completion of the development and to protect its security position. Sterling might also be confronted, at or prior to the maturity of the loan, with a project with insufficient value to assure full repayment. Sterling's underwriting, monitoring and disbursement practices with respect to construction financing are intended to ensure that sufficient funds are available to complete construction projects. Sterling endeavors to limit its risk through its underwriting procedures, by using only approved, qualified appraisers and by dealing only with qualified builders and borrowers. Sterling expects following this Offering it will comply with applicable capital requirements without giving effect to regulatory capital obtained as a result of past acquisitions and will resume these lending activities at moderate levels.

*Commercial Real Estate Lending.* Due to the conflict with its regulators regarding compliance with applicable regulatory capital requirements, Sterling has limited certain of its traditional lending activities. Thus, during the three months ended September 30, 1991 and fiscal year 1991, Sterling originated $0 of commercial real estate loans. Sterling expects that following this Offering it will comply with applicable capital requirements without having to rely upon regulatory capital obtained as a result of past acquisitions and will resume these lending activities at moderate levels subject to applicable regulatory limitations. See "—Legal Proceedings" and "Regulation—Recent Regulatory Developments."



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 0991

Commercial real estate loans in prior years have been offered as both construction period and long-term loans secured by existing property. Sterling's commercial real estate construction loans typically have terms not longer than eighteen months, provide for variable interest rates, and are secured by projects within the Pacific Northwest. Loans on existing property typically have maturities of four to ten years and generally provide for variable rates. Commercial real estate loans generally involve a higher degree of risk than the financing of residential real estate because they typically involve large loan balances to single borrowers or groups of related borrowers. The payment experience on such loans is typically dependent on the successful operation of the real estate project and such loans present risks such as excessive collateral vacancy rates or inadequate rental income levels. Construction lending is subject to risks such as construction delays, cost overruns, insufficient collateral values and an inability to obtain permanent financing in a timely manner.

Credit authority with respect to commercial real estate is currently limited to two individuals. The maximum current loan limit applicable to one such individual is $100,000 and to both individuals acting jointly is $250,000. Commercial real estate loans that exceed one half of these limits are reported to Sterling's senior loan committee and those in excess of the individuals' limits must be approved by such committee. This committee has credit authority for commercial real estate loans of up to $2 million. Commercial real estate loans that exceed $1 million are reported to the Board of Directors on a monthly basis.

*Consumer Lending.* Sterling's consumer lending program provides loans for home improvement, automobiles, personal lines of credit and certain other purposes. Generally, consumer loans are originated for terms ranging from six months to five years. Interest rates are adjustable monthly, quarterly or semi-annually at a margin over an established external index. Sterling also makes loans secured by savings accounts and second mortgage loans secured by real estate. Limited fixed-rate secured financing is available for terms not to exceed five years. During the three months ended September 30, 1991 and 1990 and fiscal year 1991, Sterling's consumer loan originations totaled $4.0 million, $3.8 million and $14.3 million, or 3.4%, 4.0% and 3.6%, respectively, of total loan originations.

Consumer lending is delegated to branch or regional managers. The maximum current loan limit applicable to any such individual is $75,000. Additional credit authority, currently limited to $150,000, is delegated to two corporate officers. Consumer loans that exceed $150,000 must be approved by Sterling's senior loan committee, which has credit authority for consumer loans of up to $250,000.

*Business Banking Lending.* Generally, Sterling offers business banking loans secured by collateral other than real property. Such collateral is typically accounts receivable, inventory and equipment. Business banking lending is generally considered to involve a higher degree of risk than the financing of real estate principally because the collateral may be difficult to obtain or liquidate. Business banking loans offer relatively high yields, short maturities and variable interest rates. The availability of such loans enables potential depositors to establish a full-service banking relationship with Sterling. Sterling attempts to reduce the risk of loss associated with business banking lending by closely monitoring the financial condition and performance of its customers. Currently, Sterling's business banking lending is restricted because of the loans-to-one-borrower limitation and the fact that Sterling is currently making business banking loans only to existing business banking customers. During the three months ended September 30, 1991 and 1990 and fiscal year 1991, Sterling originated approximately $0.6 million, $1.1 million and $4.6 million of business banking loans, or 0.5%, 1.2% and 1.2%, respectively, of total loan originations. Following this Offering, Sterling intends to resume a moderate level of business banking lending.

Credit authority with respect to business banking lending is limited to three individuals. The maximum current loan limit applicable to any such individual is $150,000. Generally, business banking loans that exceed one half of each individual's respective limit are reported to Sterling's senior loan committee. Business banking loans in excess of these individual's respective limits must be approved by such committee, which has business banking credit authority of up to $500,000. Business banking loans that exceed $250,000 are reported to the Board of Directors on a monthly basis.

*Loan Portfolio Analysis.* The following table sets forth the composition of Sterling's loan portfolio by type of loan as of the dates indicated.

| | At September 30, 1991 | | At June 30, 1991 | | At June 30, 1990 | | At June 30, 1989 | |
|---|---|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % | Amount | % |
| Real estate: | | | | | | | | |
| One to four family residential ...... | $186,191 | 50.7% | $194,734 | 50.6% | $252,502 | 54.8% | $256,084 | 49.7% |
| Multifamily residential ...... | 33,267 | 9.0 | 33,442 | 8.7 | 24,651 | 5.3 | 28,250 | 5.5 |
| Commercial property ....... | 87,446 | 23.9 | 89,954 | 23.4 | 74,043 | 16.1 | 87,783 | 17.1 |
| Land and other ... | 7,406 | 2.0 | 7,582 | 2.0 | 16,393 | 3.5 | 19,721 | 3.8 |
| | 314,310 | 85.6 | 325,712 | 84.7 | 367,589 | 79.7 | 391,838 | 76.1 |
| Construction: | | | | | | | | |
| One to four family residential ...... | 3,176 | 0.9 | 6,865 | 1.8 | 13,652 | 3.0 | 15,863 | 3.1 |
| Multifamily residential ...... | 5,684 | 1.5 | 5,684 | 1.5 | 20,045 | 4.3 | 7,799 | 1.5 |
| Commercial property ....... | 6,043 | 1.6 | 7,579 | 1.9 | 17,105 | 3.7 | 53,838 | 10.4 |
| | 14,903 | 4.0 | 20,128 | 5.2 | 50,802 | 11.0 | 77,500 | 15.0 |
| Total real estate and construction loans ... | 329,213 | 89.6 | 345,840 | 89.9 | 418,391 | 90.7 | 469,338 | 91.1 |
| Consumer ............ | 22,857 | 6.2 | 22,482 | 5.9 | 20,717 | 4.5 | 18,639 | 3.6 |
| Business banking ...... | 15,556 | 4.2 | 16,288 | 4.2 | 21,972 | 4.8 | 27,209 | 5.3 |
| Total loans receivable .. | 367,626 | 100.0% | 384,610 | 100.0% | 461,080 | 100.0% | 515,186 | 100.0% |
| Undisbursed portion of loans in process ..... | (2,092) | | (2,987) | | (9,972) | | (26,467) | |
| Deferred loan fees, net of direct loan origination costs..... | (332) | | (705) | | (577) | | (1,243) | |
| Discount on loans acquired pursuant to purchase transactions ........ | (1,818) | | (1,905) | | (2,243) | | (2,586) | |
| Allowance for loan losses .............. | (4,355) | | (4,087) | | (6,649) | | (6,450) | |
| Loans receivable ...... | $359,029 | | $374,926 | | $441,639 | | $478,440 | |

*Contractual Principal Payments.* The following table sets forth the scheduled contractual principal repayments for Sterling's loan portfolio as of June 30, 1991. Demand loans, loans having no stated repayment schedule and no stated maturity, and overdrafts are reported as due in one year or less. Loan balances do not include undisbursed loan proceeds, unearned discounts, unearned income or allowances for loan losses.

| | Balance Outstanding at June 30, 1991 | Principal Payments Contractually Due in Fiscal Year | | | Principal Payments Contractually Due in Fiscal Years | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1992 | 1993 | 1994 | 1995-1996 | 1997-2001 | 2002-2006 | Thereafter |
| | (In thousands) | | | | | | | |
| Real estate: | | | | | | | | |
| Fixed ........ | $125,213 | $ 1,681 | $ 4,727 | $ 5,214 | $11,900 | $36,505 | $ 38,007 | $27,180 |
| Variable ..... | 200,499 | 8,324 | 1,437 | 4,933 | 11,513 | 41,349 | 63,343 | 69,600 |
| Construction...... | 20,128 | 20,128 | 0 | 0 | 0 | 0 | 0 | 0 |
| Business banking .. | 16,288 | 5,268 | 3,325 | 3,354 | 2,756 | 1,586 | 0 | 0 |
| Consumer ........ | 22,482 | 9,722 | 2,375 | 2,044 | 3,521 | 4,821 | 0 | 0 |
| | $384,610 | $45,123 | $11,864 | $15,545 | $29,690 | $84,261 | $101,350 | $96,780 |

*Loan Servicing.* Loan servicing includes collecting and remitting loan payments, accounting for principal and interest, holding escrow funds for the payment of real estate taxes and insurance premiums, contacting delinquent borrowers and supervising foreclosures in the event of unremedied defaults.

Sterling receives a fee, generally ranging from 0.25% to 0.375% of the unpaid principal balance of each loan serviced for others. Such fees serve to compensate Sterling for the costs of performing the servicing function. If such fee exceeds the standard for that type of loan, the net present value of the excess servicing fee is capitalized and, subsequently, amortized into servicing fee income, using an appropriate discount rate and certain prepayment assumptions. FHA and VA loans are almost always sold into the secondary market on a loan-by-loan, servicing released basis. Sterling receives a fee of approximately 1.0% to 2.0% for releasing the servicing upon the sale of such loans.

At September 30, 1991 and June 30, 1991, 1990 and 1989, Sterling was servicing $68.1 million, $86.6 million, $129.9 million and $262.9 million, respectively, of loans for the FHLMC and the FNMA. These amounts represented 67.0%, 71.2%, 74.6% and 83.4% of all loans serviced at these respective dates. Sterling's ability to continue servicing loans for the FNMA and the FHLMC is dependent upon Sterling's ability to meet the seller/servicer qualifications of these agencies, including the agencies' net worth requirements. See "Risk Factors—Mortgage Banking Operations."

Sterling has in the past, as part of its mortgage banking operations, sold servicing rights to assist in management of capital ratios. Following this Offering, Sterling anticipates retaining a larger portion of rights to service loans for others as the increased capital will support this activity while maintaining adequate regulatory capital ratios. Sterling may consider future servicing sales depending on market and regulatory conditions, although the extent and effect of such possible sales is presently uncertain.

*Secondary Market Activities.* Sterling has developed correspondent relationships with a number of independent brokers and financial institutions to facilitate the origination or purchase and sale of mortgage loans in the secondary market on either a participation or a whole loan basis. Substantially all of such purchased loans or participations are secured by real estate which is located in the Pacific Northwest. Those agents who present loans to Sterling for purchase are required to provide a processed loan package prior to commitment. Sterling then underwrites the loan in accordance with its established lending standards. The appropriate authority then reviews the loan and either approves or rejects its purchase. Although management of Sterling has the authority to purchase loans secured by real estate located outside of its general lending areas, it generally has not purchased such loans. Sterling's policy is to underwrite purchased loans in compliance with Sterling's own origination guidelines, which are intended to conform to the FHLMC and the FNMA underwriting standards.

In originating residential mortgage loans for sale in the secondary market, Sterling incurs market risk from the time of the loan commitment until such time as the loan (or resulting mortgage-backed security received in exchange for a pool of loans) is sold. To help minimize this risk, Sterling obtains commitments from investors to purchase loans or mortgage-backed securities at specified yields or utilizes hedging techniques such as purchasing options to sell mortgage-backed securities at a fixed price with respect to a portion of its loan commitments. These actions are based upon estimated closings of loans. There can be no assurance that such funding and hedging techniques will always be successful.

*Loan Commitments*. Sterling issues commitments to individual borrowers and mortgage brokers for the purposes of originating and purchasing loans. These commitments establish the terms and conditions under which Sterling will fund the loans. Closing must occur within a specified period of time. Sterling had outstanding commitments to originate or purchase mortgage loans aggregating $44.2 million at September 30, 1991. These commitments were issued for both adjustable and fixed rate mortgages. See Note 14 of Notes to Consolidated Financial Statements.

*Classified Assets, Real Estate Owned and Delinquent Loans*. To measure the quality of assets, including loans and REO, Sterling has established guidelines for classifying assets and determining provisions for anticipated loan and REO losses. Under these guidelines, an allowance for anticipated loan and REO losses is established. This system for classifying and reserving for loans and REO is administered by Sterling's Special Assets Department, which is responsible for minimizing loan deficiencies and losses therefrom. An oversight committee comprised of senior management monitors the activities and progress of the Special Assets Department and reports results to Sterling's Board of Directors.

Sterling's system requires the classification of loans and other assets that are considered to be of questionable quality and is intended to be consistent with regulations adopted by Sterling's regulators on December 31, 1987 under the directive of the Competitive Equality Banking Act. These regulations require each insured institution to classify its assets on a regular basis. In addition, in connection with the examination of insured institutions, regulatory examiners have authority to identify problem assets and, if appropriate, require them to be classified. Sterling's system employs the classification categories of "substandard," "doubtful" and "loss." Substandard assets have deficiencies which give rise to the distinct possibility that Sterling will sustain some loss if the deficiencies are not corrected. Doubtful assets have the weaknesses of substandard assets with the additional characteristic that the weaknesses make collection or liquidation in full on the basis of currently existing facts, conditions, and values questionable, and there is a high probability of loss. An asset classified as loss is considered uncollectible and of such little value that it should not be included as an asset of Sterling.

Assets classified as substandard or doubtful require the establishment of general valuation allowances in amounts adequate under GAAP. Under GAAP, assets classified as loss require either a specific valuation allowance of 100% of the amount classified or a write-off of such amount. Judgments regarding the adequacy of a general valuation allowance are based on continual evaluation of the nature, volume and quality of the loan portfolio, REO and other assets, specific problem assets and current economic conditions that may affect the recoverability of recorded amounts.

Generally, Sterling establishes specific allowances for the difference between the anticipated net realizable value (market value less selling costs, foreclosure costs and projected holding costs), adjusted for other possible sources of repayment and the book balance (loan principal or carrying value of REO, both net of specific allowances) of its classified loans and REO. Each classified loan and REO property is reviewed at least monthly. Allowances are established or periodically increased, if necessary, based on the review of information obtained through on-site inspections, market analysis, appraisals and purchase offers.

The following table sets forth information at September 30, 1991 relating to Sterling's classified assets and valuation allowances established in accordance with the classification system.

| | At September 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| Classification | Balance | Loss Allowance | FDIC Indemnification | Net Balance | % of Total Assets | Attributable to Supervisory Acquisitions(1) |
| | | | (Dollars in thousands) | | | |
| Substandard | $24,317 | $ 0 | $(1,039) | $23,278 | 3.9% | $10,303 |
| Doubtful | 1,212 | (606) | 0 | 606 | 0 | 584 |
| Loss | 2,131 | (2,131) | 0 | 0 | 0 | 0 |
| | $27,660 | $(2,737) | $(1,039) | $23,884 | 3.9% | $10,887 |

(1) Consists of $105,000, $203,000 and $10.0 million in substandard assets, net of loss allowances and FDIC indemnifications, and $0, $0 and $584,000 in doubtful assets, net of loss allowances and FDIC indemnifications, attributable to the acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen, respectively. See "—Acquisitions."

In addition to the above classified assets, $5.8 million of certain other loans at September 30, 1991 are referred to as "special mention" and possess certain credit deficiencies or potential weaknesses deserving management's close attention although they do not currently expose Sterling to a sufficient degree of risk to warrant classification.

REO is recorded at the lower of estimated fair value based on the appraisal of such properties or the principal balance of the defaulted loan (net of any loss reserves already established). Development, improvement and direct holding costs relating to the property are capitalized. The carrying value of acquired property is continuously evaluated and, if necessary, an allowance is established to reduce the carrying value to net realizable value (which considers, among other things, estimated direct holding costs and selling expenses).

The following table sets forth the activity in Sterling's REO for the periods indicated.

| | Three Months Ended September 30, 1991 | Fiscal Year Ended June 30, 1991 | 1990 | 1989 |
|---|---|---|---|---|
| | | (In thousands) | | |
| Balance at beginning of period | $ 8,358 | $10,172 | $16,336 | $ 6,804 |
| Loan foreclosures and other additions | 2,663 | 4,211 | 4,073 | 3,953 |
| Additions due to supervisory acquisitions | 0 | 0 | 0 | 9,362 |
| Capitalized expenses | 108 | 59 | 87 | 1,209 |
| Sales and other reductions | (811) | (5,665) | (9,874) | (4,926) |
| Provisions for loss | (16) | (419) | (450) | (66) |
| Balance at end of period | $10,302 | $ 8,358 | $10,172 | $16,336 |

*Major Classified Loans.* Each of Sterling's classified loans with a net book balance at September 30, 1991 of more than $400,000 is described below.

Central Evergreen originated a loan secured by a deed of trust on an 81-unit retirement apartment facility located in Modesto, California. The book balance at September 30, 1991 was $1.8 million, net of a specific loss allowance of $212,300. Sterling has initiated foreclosure proceedings.

Central Evergreen made four loans to finance the development of a condominium project, a portion of which has been converted to apartments, in Tumwater, Washington. The aggregate book balance of the loans at September 30, 1991 was $1.3 million, net of a specific loss allowance of $518,000 established at the acquisition date. These loans have been performing as agreed.

Central Evergreen originated a loan secured by a deed of trust on a pyrolysis (tire recycling) plant located in Chehalis, Washington and by deeds of trust and assignments of real estate contracts. Payments on the loan have occasionally been delinquent, but the borrower has generally made additional payments to cure the delinquency prior to foreclosure of the lien. The book balance on the loan at September 30, 1991 was $1.2 million. No specific loss allowance has been established for this loan.

Sterling originated a construction loan in July 1988 for the construction of a 45-unit residential care facility in Salem, Oregon. Although leasing of the units was initially slower than expected, occupancy is improving and all payments on this loan are current. The book balance on the loan at September 30, 1991 was $1.1 million. No specific loss allowance has been established for this loan.

Sterling acquired a 50% participation interest in a loan secured by a 79-unit motel in Sierra Vista, Arizona as a result of the Tri-Cities acquisition. The borrower has sought protection from creditors under Chapter 11 of the Bankruptcy Code. A Plan of Reorganization was approved by the Bankruptcy Court. The plan calls for weekly payments of $2,125, at 10% interest, amortized over 30 years, with the remaining balance due in ten years. The book balance at September 30, 1991 was $1.0 million, net of specific loss allowance of $85,000. Sterling has been advised that the borrower is current on its payments, although the Resolution Trust Corporation, as successor to the lead lender, has not released such payments since August 5, 1991. Pursuant to an assistance agreement between the FDIC and Sterling, entered into in connection with Sterling's acquisition of Tri-Cities, the FDIC has agreed to indemnify Sterling against 75% of the first $3.6 million of capital losses with respect to certain assets acquired in the transaction, including the Sierra Vista motel, and has agreed to limit Sterling's total loss exposure with respect to its 25% share to $900,000, after which the FDIC will indemnify 100% of any further losses. This assistance agreement will expire on April 8, 1993. At September 30, 1991, Sterling had absorbed approximately $480,000 in losses on the indemnified assets. In the event this asset is not fully liquidated prior to April 1993, no further indemnification for loss will be available. The loan is not scheduled to mature until November 2000. See "Management's Discussion and Analysis—Effects of Federal Financial Assistance."

Two loans acquired in the Central Evergreen acquisition are secured by 161 and 80 acre parcels of land located north of Marysville, Washington and the deceased borrower's guaranty. The loan on the 161 acre parcel is delinquent; the loan on the 80 acre parcel is performing as agreed. Sterling has instituted a claim against the guarantor's estate and judicial foreclosure against the delinquent loan. The properties do not fully secure the balance of the loans, so Sterling is relying on the assets of the estate for repayment. If the estate cannot pay the anticipated deficiency, Sterling may incur a loss. The aggregate book balance on both loans at September 30, 1991 was $943,000, with no specific loss allowance established.

Central Evergreen originated a loan on a single story 6,000 square foot commercial building utilized as a child care facility located in Olympia, Washington. Although the property is currently generating a negative cash flow, the borrower has remained current on the loan payments. The book balance on the loan at September 30, 1991 was $456,000 with no specific loss allowance established.

Central Evergreen originated a loan on two industrial buildings and an attached office building located on 9.9 acres in Brush Prairie, Washington. A judicial foreclosure is currently in process. The book balance on this loan at September 30, 1991 is $454,000. No specific loss allowance has been established for the loan.

Central Evergreen originated a loan secured by a three-story office building located in Tacoma, Washington. Judicial foreclosure was initiated by Sterling with judgment rendered in its favor on April 26, 1991. The borrower is attempting a sale of this property with possible financing from Sterling. The book balance on the loan at September 30, 1991 was $445,000. No specific loss allowance has been established for this loan.

*Major Real Estate Owned.* Each of Sterling's REO properties with a net book balance at September 30, 1991 of more than $400,000 is described below.

Sterling is a 99.5% partner in a commercial office building in Renton, Washington acquired through an assignment of interest from a bankrupt borrower. The book balance at September 30, 1991 was $3.0 million, net of a specific loss allowance of $608,000. The project consists of a five-story office building with 30,232 square feet of rentable area and adjoining undeveloped property. The office building is 100% leased, primarily to a single tenant on an intermediate-term basis. An effort is being made to sell the entire project. If this property is not sold prior to July 1992, there may be additional capital requirements for this investment. See "—Subsidiaries."

Sterling has acquired by deed in lieu of foreclosure two adjacent office/warehouse buildings in Bellevue, Washington. Sterling has negotiated a sale of one of these buildings for $1.0 million. The second building is proceeding with lease-up and marketing. Presently this building is approximately two-thirds leased. The book balance at September 30, 1991 was $2.0 million, net of a specific loss allowance of $64,000.

Sterling accepted deeds in lieu of foreclosure in July 1991, resulting in the acquisition of a six-story office building located in Portland, Oregon. The relatively high vacancy factor for office space in this market has held occupancy on the subject property at approximately 80% for the past year. Sterling's book balance at September 30, 1991 was $1.5 million, net of a specific loss allowance of $49,000. Sterling is currently entertaining a preliminary proposal for the purchase of this property by an adjacent property owner.

Central Evergreen acquired a 4.4 acre parcel of commercial land in Olympia, Washington. The book balance at September 30, 1991 was $852,000, net of specific loss allowance of $21,000. This property is being actively marketed.

Central Evergreen originated a loan secured by a two-story office/retail building located in Olympia, Washington. Title to this property reverted to Sterling through foreclosure action on August 12, 1991. Attempts are currently underway to lease the restaurant space previously vacated by the anchor tenant. The book balance at September 30, 1991 was $780,000. No specific loss allowance has been established for this asset.

Sterling acquired a 40% participation interest in a commercial complex located in the Spokane Valley as the result of default of the managing partner. This asset consists of 2 two-story office buildings with total net rentable area of 8,393 square feet. The book balance of the partnership interest was $37,300 at September 30, 1991. Sterling also has a first mortgage loan to the other partners with a book balance at September 30, 1991 of $477,000. This loan has never been delinquent. Attempts to market the subject property are ongoing. No specific loss allowance has been established for this asset.

Sterling acquired a former Central Evergreen branch building in Longview, Washington as part of the Central Evergreen acquisition. This property has been leased to a restaurant since 1985, and the lessee exercised the first of two five-year extension options in June 1990. The book balance at September 30, 1991 was $494,000. Sterling is currently marketing this property for sale subject to the existing lease. No specific loss allowance has been established for this asset.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 0998

**Allowance for Loan Losses**

The following tables set forth information regarding changes in Sterling's allowance for loan losses for the periods indicated.

| | Three Months Ended September 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| | Real Estate | Real Estate Construction | Business Banking | Consumer | Unallocated | Total |
| | | | (Dollars in thousands) | | | |
| Balance at beginning of period | $2,317 | $ 776 | $287 | $114 | $ 593 | $4,087 |
| Provision for period | 0 | 100 | 30 | 20 | 500 | 650 |
| Amounts written off | 0 | (357) | (19) | (7) | 0 | (383) |
| Recoveries | 0 | 0 | 1 | 0 | 0 | 1 |
| Balance at end of period | $2,317 | $ 519 | $299 | $127 | $1,093 | $4,355 |
| Ratio of allowance for loan losses to total loans | 0.73% | 3.48% | 1.92% | 0.56% | 0.30% | 1.18% |
| Annualized ratio of net writeoffs to average loans outstanding during the period | | | | | | 0.39% |

| | Fiscal Year Ended June 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| | Real Estate | Real Estate Construction | Business Banking | Consumer | Unallocated | Total |
| | | | (Dollars in thousands) | | | |
| Balance at beginning of period | $2,812 | $ 2,631 | $309 | $ 304 | $593 | $ 6,649 |
| Provision for period | 50 | 50 | 25 | 25 | 0 | 150 |
| Amounts written off | (545) | (1,907) | (47) | (223) | 0 | (2,722) |
| Recoveries | 0 | 2 | 0 | 8 | 0 | 10 |
| Balance at end of period | $2,317 | $ 776 | $287 | $ 114 | $593 | $ 4,087 |
| Ratio of allowance for loan losses to total loans | 0.71% | 3.86% | 1.76% | 0.50% | 0.15% | 1.06% |
| Ratio of net writeoffs to average loans outstanding during the period | | | | | | 0.64% |

| | Fiscal Year Ended June 30, 1990 | | | | | |
|---|---|---|---|---|---|---|
| | Real Estate | Real Estate Construction | Business Banking | Consumer | Unallocated | Total |
| | | | (Dollars in thousands) | | | |
| Balance at beginning of period | $2,602 | $2,400 | $ 484 | $371 | $593 | $6,450 |
| Provision for period | 446 | 350 | 285 | 19 | 0 | 1,100 |
| Amounts written off | (238) | (120) | (461) | (91) | 0 | (910) |
| Recoveries | 2 | 1 | 1 | 5 | 0 | 9 |
| Balance at end of period | $2,812 | $2,631 | $ 309 | $304 | $593 | $6,649 |
| Ratio of allowance for loan losses to total loans | 0.76% | 5.18% | 1.41% | 1.47% | 0.13% | 1.44% |
| Ratio of net writeoffs to average loans outstanding during the period | | | | | | 0.18% |







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 0999

| | Fiscal Year Ended June 30, 1989 | | | | | |
|---|---|---|---|---|---|---|
| | Real Estate | Real Estate Construction | Business Banking | Consumer | Unallocated | Total |
| | (Dollars in thousands) | | | | | |
| Balance at beginning of period | $2,500 | $ 82 | $310 | $285 | $593 | $ 3,770 |
| Provision for period | 110 | 150 | 0 | 0 | 0 | 260 |
| Amounts written off | (590) | (882) | (27) | (91) | 0 | (1,590) |
| Recoveries | 47 | 0 | 1 | 2 | 0 | 50 |
| Allowances for losses on assets acquired | 535 | 3,050 | 200 | 175 | 0 | 3,960 |
| Balance at end of period | $2,602 | $2,400 | $484 | $371 | $593 | $ 6,450 |
| Ratio of allowance for loan losses to total loans | 0.66% | 3.10% | 1.78% | 1.99% | 0.12% | 1.25% |
| Ratio of net writeoffs to average loans outstanding during the period | | | | | | 0.38% |

**Allowance for Real Estate Owned Losses**

The following tables set forth information regarding changes in Sterling's allowance for REO losses for the periods indicated.

| | Three Months Ended September 30, 1991 | Fiscal Year Ended June 30, 1991 | 1990 | 1989 |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| Balance at beginning of period | $1,011 | $ 980 | $ 819 | $ 347 |
| Provision for period | 16 | 419 | 450 | 66 |
| Amounts written off | (63) | (388) | (458) | (268) |
| Recoveries | 0 | 0 | 169 | 304 |
| Allowances for losses on assets acquired | 0 | 0 | 0 | 370 |
| Balance at end of period | $ 964 | $1,011 | $ 980 | $ 819 |
| Ratio of allowance to total REO | 9.4% | 12.1% | 9.6% | 5.0% |

During the three months ended September 30, 1991, Sterling reevaluated its loan loss allowance, placing greater emphasis on the recent loan loss experience of other savings institutions. While Sterling's levels of delinquent and nonperforming loans continue to decrease, the levels of such loans have increased in California and other regions of the country. Accordingly, Sterling recorded a $650,000 provision for loan losses, compared to no provision for the prior comparable period. The significant increase in the provision for loan and REO losses in the third quarter of fiscal year 1990 includes $950,000 for loan losses and $450,000 for REO losses recorded at the conclusion of a regulatory examination performed by the OTS, the Washington Supervisor and the FDIC. A substantial portion of the increase in allowances relates to commercial real estate loans and the construction loan portfolio. Since that time through September 30, 1991, Sterling originated $0 of commercial real estate loans and $6.8 million of construction loans. See "Risk Factors—Allowances for Losses on Loans and Real Estate Owned" and "Management's Discussion and Analysis—Results of Operations."

Delinquent and problem loans are a part of any lending business. If a borrower fails to make a required payment when due, Sterling institutes internal collection procedures. Sterling's collection procedures generally provide the following. An initial mailing requesting payment is made to the borrower when the loan is ten days past due. At 25 days past due, the borrower is contacted by telephone and payment is requested orally. In most cases, deficiencies are cured promptly. At 30 days past due, Sterling classifies a loan as delinquent. At 45 days past due, a notice of intent to foreclose is mailed. If the loan is still delinquent 30 days following the mailing of the notice of intent to foreclose, Sterling generally initiates foreclosure

proceedings. In certain instances, Sterling may modify the loan or grant a limited moratorium on loan payments to enable the borrower to reorganize his or her financial affairs.

The following table summarizes loans that are not performing in accordance with their original contractual terms:

| | At September 30, 1991 | | At June 30, 1991 | | At June 30, 1990 | |
|---|---|---|---|---|---|---|
| | Principal Balance | % of Total Loans(1) | Principal Balance | % of Total Loans(1) | Principal Balance | % of Total Loans(1) |
| | (Dollars in thousands) | | | | | |
| Nonaccrual loans | $6,080 | 1.63% | $ 8,280 | 2.15% | $10,771 | 2.34% |
| Accruing loans which are past due 90 days or more | 0 | 0 | 50 | 0.01 | 1,104 | 0.24 |
| Restructured loans | 2,443 | 0.66 | 2,452 | 0.63 | 1,299 | 0.28 |
| Total nonperforming loans | $8,523 | 2.29% | $10,782 | 2.80% | $13,174 | 2.86% |

| | At June 30, 1989 | | At June 30, 1988 | | At June 30, 1987 | |
|---|---|---|---|---|---|---|
| | Principal Balance | % of Total Loans(1) | Principal Balance | % of Total Loans(1) | Principal Balance | % of Total Loans(1) |
| | (Dollars in thousands) | | | | | |
| Nonaccrual loans | $15,619 | 3.03% | $6,098 | 1.75% | $4,574 | 2.47% |
| Accruing loans which are past due 90 days or more | 125 | 0.02 | 2,357 | 0.68 | 1,759 | 0.95 |
| Restructured loans | 1,516 | 0.30 | 672 | 0.19 | 1,197 | 0.65 |
| Total nonperforming loans | $17,260 | 3.35% | $9,127 | 2.62% | $7,530 | 4.07% |

(1) Percentages are based upon total loans receivable.

Sterling regularly reviews the collectibility of accrued interest income and generally ceases to accrue interest on a loan when either principal or interest is past due by 90 days or more. Any accrued and uncollected interest is eliminated from income at that time. Loans may be placed in nonaccrual status earlier if, in management's judgment, the loan may be uncollectible. Interest on such a loan is then recognized as income only if collected or if the loan is restored to performing status. At September 30, 1991 and June 30, 1991 and 1990, nonaccrual loans included $4.5 million, $5.2 million and $6.0 million, respectively, of loans attributable to supervisory acquisitions. Additional interest income of $173,000, $763,000 and $1.1 million would have been recorded during the three months ended September 30, 1991 and fiscal years 1991 and 1990, respectively, if nonaccrual and restructured loans had been current in accordance with their original contractual terms.

Sterling's quality control function reviews various aspects of residential real estate loans originated and acquired by Sterling to ensure compliance with appropriate underwriting criteria. The results of these reviews assist Sterling in monitoring the performance of its personnel and independent appraisers. Sterling's mortgage loan quality control function is intended to conform to guidelines and standards established by the FNMA and the FHLMC.

Sterling's quality control function reviews other types of loans (consumer, business banking and commercial real estate) and reports its results to the senior vice president of loan administration and senior loan committee. The quality control functions check for appropriate documentation as well as compliance with Sterling's underwriting criteria.

**Mortgage-Backed Securities**

Sterling invests in mortgage-backed securities issued by the FHLMC and the Government National Mortgage Association. These securities are purchased in the secondary market or acquired in swaps for loan pools from Sterling's portfolio. In the past, Sterling has exchanged loans for mortgage-backed securities to increase marketability and to provide collateral for borrowings. During fiscal year 1989, mortgage-backed securities increased as Sterling securitized a significant portion of loans receivable. During fiscal year 1990, Sterling sold its portfolio of adjustable rate mortgage-backed securities for operational efficiencies. In lieu thereof, Sterling generally purchased fixed rate securities. In September 1990, Sterling purchased $35 million of mortgage-backed securities to counter the decrease in net interest income resulting from the decline in Sterling's fixed rate mortgage portfolio. Sterling pledged such securities to the FHLB Seattle to secure a three-year borrowing in that approximate amount. Sterling is considering the sale of approximately $36 million of its higher yielding mortgage-backed securities portfolio in order to reduce exposure to accelerating prepayments. While this sale would result in a significant gain during the current fiscal year, total interest income and net interest income would be adversely affected in future periods, as a result of reinvesting the proceeds in lower yielding investments.

**Investment Portfolio**

Sterling maintains an investment portfolio comprised primarily of U.S. government and agency obligations and stock in the FHLB Seattle. Such investments provide Sterling with liquidity, a source of interest income and collateral which can be used to secure borrowings. Sterling has since its inception invested in investment grade securities and does not invest in below investment grade securities.

The following table sets forth the carrying values of Sterling's investment portfolio at the dates indicated.

| | At September 30, 1991 | At June 30, 1991 | At June 30, 1990 | At June 30, 1989 |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| U.S. government and agency obligations, at amortized cost | $ 6,599 | $ 8,344 | $21,363 | $23,305 |
| FHLB Seattle stock, at cost | 7,053 | 6,896 | 5,878 | 7,563 |
| Corporate notes, at amortized cost | 0 | 0 | 0 | 642 |
| Other | 30 | 30 | 30 | 129 |
| | $13,682 | $15,270 | $27,271 | $31,639 |
| Weighted average yield | 8.24% | 8.54% | 8.60% | 8.88% |

**Sources of Funds**

*General*. Sterling's primary sources of funds for use in lending and for other general business purposes are proceeds from deposit accounts, loan repayments, sales of loans, mortgage-backed securities and investment securities, FHLB Seattle advances, secured lines of credit and other borrowings. Scheduled loan repayments are a relatively stable source of funds, while deposit inflows and outflows and unscheduled loan "prepayments" are influenced significantly by general interest rates, interest rates available on other investments and other economic conditions. Borrowings may be used on a short-term basis to compensate for reductions in other sources of funds (such as deposit inflows at less than projected levels). Borrowings may also be used on a longer term basis to support expanded lending activities and to match repricing intervals of assets.

*Deposit Activities*. Sterling offers a variety of accounts for depositors designed to attract both short-term and long-term deposits from the general public. These accounts include money market accounts, regular savings accounts, checking and negotiable order of withdrawal ("NOW") accounts and certificates of deposits ("CDs"). These accounts earn interest at rates established by management and are based on a competitive







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1002

market analysis. The method of compounding varies from simple interest credited at maturity to daily compounding, depending on the type of account.

With the exception of certain promotional CDs and variable rate 18-month Individual Retirement Account ("IRA") certificates, all CDs carry a fixed rate of interest for a defined term from the opening date of the account. Substantial penalties are imposed if principal is withdrawn from most CDs prior to maturity.

The following are descriptions of the more significant accounts offered by Sterling:

*Regular Savings.* Sterling offers passbook and statement accounts which allow deposits and withdrawals without restriction. Interest is paid from the date of deposit to the date of withdrawal at a rate set by management. Interest is compounded and credited monthly.

*Checking and NOW Accounts.* Sterling emphasizes its checking and NOW account offerings. NOW accounts that maintain a minimum balance earn interest at a rate set by management. Interest is compounded and credited monthly. NOW accounts are offered under a variety of options with varying service charges and features. Commercial checking accounts are utilized primarily by businesses with related loan relationships.

*Money Market Demand Accounts.* Sterling offers a money market demand account ("MMDA"), which requires a $2,500 minimum initial deposit. The interest is variable and rates are subject to change by management. If the balance of the account falls below $2,500, the account earns the passbook rate of interest. There are no restrictions on the number of additions to the account. Regulations prohibit more than six preauthorized withdrawal transactions a month, however, and of these, a maximum of three withdrawals can be in the form of checks drawn against the account.

*Certificates of Deposit.* Sterling offers fixed rate, fixed term CDs for terms ranging from three months to ten years. Regular CDs have a minimum balance requirement of $500 and are issued at simple interest rates established by management.

*Promotional CDs.* Sterling offers two promotional CDs, the nine-month "Hands-on CD" and the one-year "No Strings CD." The "Hands-on CD" allows the customer to increase the rate of interest once during the term to Sterling's current rate on new nine-month CDs. The "No Strings CD" has no penalty for early withdrawal and a one-year guaranteed rate. The customer can make additions of $500 or more at any time during the term of either CD. The minimum opening balance for both promotional CDs is $5,000.

*Zero Coupon CDs.* Sterling offers a zero coupon CD requiring a minimum initial deposit of $500, with terms ranging from three to 20 years. Interest is computed on a simple interest, annual compound basis and is deferred until maturity.

*IRAs.* Sterling offers two accounts specifically for retirement accounts. The 18-month variable rate IRA certificate requires a minimum balance of $100 and the interest rate is adjusted monthly based upon the discount rate of 182-day U.S. Treasury bills at the latest auction. The 18-month fixed rate IRA certificate requires a minimum balance of $500 and the interest rate is fixed at the opening of the account for the full term. All of Sterling's CDs, except its two promotional CDs, qualify as IRA investments.

Sterling offers jumbo CDs (CDs with minimum balances of $100,000) for terms ranging from seven days to one year. Such deposits are priced to compare favorably with alternative borrowing sources. At September 30, 1991, jumbo deposits represented $21.3 million, or 4.3% of total deposits, compared with $22.4 million, or 4.6%, $43.9 million, or 9.2%, and $98.2 million, or 18.9% of all deposits, at June 30, 1991, 1990 and 1989, respectively.

In the past, Sterling supplemented its retail deposit gathering by soliciting Washington State Public Funds. Sterling has reduced its level of such wholesale deposits from 2.3% of deposits at June 30, 1990 to 0.9% of deposits at September 30, 1991. Public funds are generally obtained by competitive bid between qualifying financial institutions. Sterling believes that the current level of public funds does not significantly affect its interest rate risk.

The primary retail deposit vehicles being utilized by Sterling's customers are one-year and three-year certificates and one-year "No Strings CDs." The "No Strings CD" is being offered as a promotional account and will be replaced with other promotions from time to time.

At September 30, 1991, Sterling offered deposit accounts as set forth in the following table. Interest rates shown are those offered as of September 30, 1991. The minimum terms of the certificate accounts are as of the date of issuance:

| | At September 30, 1991 | | | | |
|---|---|---|---|---|---|
| Minimum Term | Category | Minimum Amount | Balances | % of Total Deposits | Interest Rate Offered September 30, 1991 |
| | (Dollars in thousands, except minimum amounts) | | | | |
| Transaction Accounts: | | | | | |
| None | Commercial Checking | $ 100 | $ 3,670 | 0.75% | 0.00% |
| None | NOW Accounts | 100 | 38,355 | 7.81 | 4.50 |
| None | Regular Savings | 100 | 42,008 | 8.55 | 5.00 |
| None | Money Market Accounts | 2,500 | 27,975 | 5.69 | 5.15 |
| | | | 112,008 | 22.80 | |
| Certificates of Deposit: | | | | | |
| 3 months | Fixed term, fixed rate | 500 | 1,873 | 0.38 | 5.25 |
| 6 months | Fixed term, fixed rate | 500 | 21,046 | 4.28 | 5.70 |
| 9 months | Fixed term, adjustable rate | 5,000 | 27,864 | 5.67 | 6.30 |
| 12 months | Fixed term, fixed rate | 500 | 79,581 | 16.20 | 6.30 |
| 12 months | Fixed term, fixed rate | 5,000 | 120,968 | 24.62 | 5.75 |
| 18 months | Fixed term, fixed rate | 500 | 238 | 0.05 | 6.60 |
| 30 months | Fixed term, fixed rate | 500 | 856 | 0.17 | 6.65 |
| 36 months | Fixed term, fixed rate | 500 | 79,269 | 16.13 | 6.70 |
| 36 months | Zero coupon, fixed term | 500 | 9,491 | 1.93 | 6.90 |
| 18 months | Variable Rate, IRA | 100 | 11,047 | 2.25 | 5.73 |
| 18 months | Fixed Rate, IRA | 500 | 5,433 | 1.12 | 6.60 |
| 30 days | Jumbos | 100,000 | 21,269 | 4.33 | 5.50 |
| | | | 378,935 | 77.13 | |
| | Deposit premium | | 345 | 0.07 | |
| | Total deposits | | $491,288 | 100.00% | |



DRI 02650

App. 257

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1004

The following table sets forth the composition of Sterling's deposit accounts at the dates indicated.

| | At September 30, 1991 | | At June 30, 1991 | | At June 30, 1990 | |
|---|---|---|---|---|---|---|
| | Amount | Percent of Total Deposits | Amount | Percent of Total Deposits | Amount | Percent of Total Deposits |
| NOW accounts | $ 38,355 | 7.8% | $ 36,119 | 7.4% | $ 33,642 | 7.0% |
| Commercial checking accounts | 3,670 | 0.7 | 3,973 | 0.8 | 7,385 | 1.5 |
| Regular savings | 42,008 | 8.5 | 40,993 | 8.4 | 43,051 | 9.0 |
| Money market demand accounts | 27,975 | 5.7 | 26,793 | 5.5 | 30,692 | 6.4 |
| Variable rate certificates: | | | | | | |
| 18 months | 11,047 | 2.3 | 11,807 | 2.4 | 14,685 | 3.1 |
| Fixed-rate certificates: | | | | | | |
| 1–11 months | 72,052 | 14.7 | 72,378 | 14.8 | 162,790 | 34.0 |
| 12–35 months | 207,076 | 42.2 | 213,175 | 43.6 | 100,984 | 21.1 |
| 36–240 months | 88,760 | 18.0 | 82,844 | 17.0 | 85,455 | 17.8 |
| | 490,943 | 99.9 | 488,082 | 99.9 | 478,684 | 99.9 |
| Deposit premium | 345 | 0.1 | 382 | 0.1 | 543 | 0.1 |
| Total deposits | $491,288 | 100.0% | $488,464 | 100.0% | $479,227 | 100.0% |

At June 30, 1991, the scheduled maturities of certificate accounts by interest rate were as follows:

| | Certificates of Deposit Maturing During Fiscal Year Ending June 30, | | | |
|---|---|---|---|---|
| | 1992 | 1993 | 1994 | 1995 and Thereafter |
| | (Dollars in thousands) | | | |
| 5.00 to 5.99% | $ 8,588 | $ 3 | $ 1 | $ 80 |
| 6.00 to 6.99% | 77,497 | 6,641 | 2,087 | 3,630 |
| 7.00 to 7.99% | 76,855 | 11,792 | 4,346 | 2,689 |
| 8.00 to 8.99% | 147,226 | 8,882 | 5,093 | 12,700 |
| 9.00 to 9.99% | 986 | 472 | 251 | 2,029 |
| 10.00 to 10.99% | 103 | 73 | 251 | 1,933 |
| 11.00 to 11.99% | 153 | 80 | 1,682 | 1,330 |
| 12.00 and over | 56 | 62 | 769 | 894 |
| | $311,464 | $28,005 | $14,480 | $25,285 |

At September 30, 1991 and June 30, 1991 and 1990, the amounts of certificate accounts by interest rate were as follows:

| | Certificates of Deposit at | | |
|---|---|---|---|
| | September 30, 1991 | June 30, 1991 | June 30, 1990 |
| | (Dollars in thousands) | | |
| 5.00 to 5.99% | $ 37,553 | $ 8,672 | $ 507 |
| 6.00 to 6.99% | 140,106 | 90,855 | 145 |
| 7.00 to 7.99% | 87,954 | 95,682 | 72,767 |
| 8.00 to 8.99% | 102,179 | 173,901 | 270,563 |
| 9.00 to 9.99% | 3,793 | 3,738 | 12,074 |
| 10.00 to 10.99% | 2,370 | 2,360 | 2,946 |
| 11.00 to 11.99% | 3,171 | 3,215 | 3,320 |
| 12.00 and over | 1,809 | 1,781 | 1,592 |
| | $378,935 | $380,204 | $363,914 |

The following table sets forth the deposit activities of Sterling for the periods indicated.

| | Three Months Ended September 30, 1991 | Fiscal Year Ended June 30, 1991 | 1990 | 1989 |
|---|---|---|---|---|
| | | (Dollars in thousands) | | |
| Beginning balance | $488,464 | $479,227 | $519,982 | $306,152 |
| New certificates of deposit | 47,985 | 184,856 | 360,265 | 488,596 |
| Matured certificates of deposit | (55,493) | (200,712) | (425,919) | (496,588) |
| Net change in transaction accounts | 2,817 | (6,892) | (9,440) | (25,252) |
| Deposits assumed as part of acquisitions | 0 | 0 | 0 | 215,992 |
| Other net changes | (37) | (161) | (153) | (161) |
| Net increase (decrease) before interest credited | (4,728) | (22,909) | (75,247) | 182,587 |
| Interest credited to accounts | 7,552 | 32,146 | 34,492 | 31,243 |
| Net increase (decrease) in deposits | 2,824 | 9,237 | (40,755) | 213,830 |
| Ending balance | $491,288 | $488,464 | $479,227 | $519,982 |

In the unlikely event Sterling is liquidated, depositors will be entitled to full payment of their deposit accounts prior to any payment to shareholders. Substantially all of Sterling's depositors are residents of the State of Washington. Sterling has no brokered deposits.

Sterling is a member of The Exchange, an automated teller system that allows participating customers to deposit or withdraw from NOW, MMDA or savings accounts at over 7,800 Exchange system machines located throughout the United States and Canada. Sterling has installed automated teller machines in six of its branches to better serve customers in those markets. Customers in other areas can access the system through automated teller machines operated by other financial institutions.

*Borrowings*. Deposit accounts are the primary source of funds for Sterling's lending and investment activities and for its general business purposes. Sterling does, however, rely upon advances from the FHLB Seattle to supplement its supply of lendable funds and to meet deposit withdrawal requirements.

The FHLB system, which consists of 12 regional Federal Home Loan Banks (the "FHL Banks") each subject to Federal Housing Finance Board (the "FHFB") supervision and regulation, functions as a central reserve bank providing credit to member institutions. As a member, Sterling is required to own stock of the FHLB Seattle in an amount determined by formula based upon Sterling's loans outstanding and advances from the FHLB Seattle. At September 30, 1991 Sterling exceeded its FHLB Seattle stock ownership requirement of $4.2 million by $2.9 million. The stock of the FHLB Seattle has always been redeemable at par value, but there can be no assurance that this will always be the case.

As a member of the FHLB Seattle, Sterling is authorized to apply for advances on the security of its FHLB Seattle stock and certain of its mortgage loans and other assets (principally securities which are obligations of, or guaranteed by, the United States), provided certain standards related to creditworthiness are met. Since the passage of FIRREA, the FHLB Seattle has required Sterling to pledge specific collateral to secure advances. Advances are made pursuant to several credit programs. Each credit program has its own interest rate and range of maturities. At September 30, 1991, Sterling had advances totalling $78.2 million from the FHLB Seattle which mature from 1991 through 1996 at interest rates ranging from 6.025% to 10.25%. See "Management's Discussion and Analysis—Liquidity and Sources of Funds."

Under FIRREA, the FHFB was created to oversee the FHL Banks in place of the Federal Home Loan Bank Board (the "FHLBB"). Membership in the FHLB system is expanded to include commercial banks and credit unions, assuming certain conditions are met. However, the requirements for access to FHL Bank advances are made more stringent. For example, FIRREA requires that long-term advances can be made to members, such as Sterling, only for the purpose of providing funds for housing. In addition, new collateral

requirements apply to such advances. FIRREA also requires that standards of community investment or service be established by the FHFB as a condition of continued access to advances. Members that are not qualified thrift lenders (as described by regulation) may only receive advances to provide funds for housing finance.

In addition to the borrowings described above, Sterling borrows funds under reverse repurchase agreements pursuant to which it sells securities (generally Treasury and mortgage-backed securities) under an agreement to buy them back at a specified price at a later date. These agreements to repurchase are treated as borrowings collateralized by the securities sold. Sterling uses these borrowings to supplement deposit gathering for funding the origination of mortgage loans. Sterling had no reverse repurchase agreements outstanding at September 30, 1991. For additional information regarding reverse repurchase agreements, see Note 11 of Notes to Consolidated Financial Statements.

The following table sets forth certain information regarding Sterling's short-term borrowings at the end of and during the periods indicated.

| | Three Months Ended September 30, 1991 | Fiscal Year Ended June 30, 1991 | Fiscal Year Ended June 30, 1990 |
|---|---|---|---|
| | (Dollars in thousands) | | |
| Maximum amount outstanding at any month end during the period: | | | |
| Reverse repurchase agreements | $19,250 | $71,997 | $92,128 |
| Short-term FHLB Seattle advances | 18,000 | 58,500 | 80,300 |
| Average amount outstanding during the period: | | | |
| Reverse repurchase agreements | 12,116 | 50,979 | 73,402 |
| Short-term FHLB Seattle advances | 17,200 | 35,708 | 54,146 |
| Weighted average rate paid during the period: | | | |
| Reverse repurchase agreements | 6.08% | 7.94% | 8.86% |
| Short-term FHLB Seattle advances | 8.70 | 9.13 | 9.69 |
| Weighted average rate paid at end of period: | | | |
| Reverse repurchase agreements | N/A | 6.15 | 8.50 |
| Short-term FHLB Seattle advances | 8.70 | 8.89 | 8.75 |

The following table sets forth certain information concerning Sterling's outstanding borrowings at the date indicated.

| | At September 30, 1991 | | At June 30, 1991 | | At June 30, 1990 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | (Dollars in thousands) | | | | | |
| FHLB Seattle advances: | | | | | | |
| Short-term | $13,000 | 16.63% | $16,800 | 17.11% | $ 85,900 | 45.48% |
| Long-term | 65,192 | 83.37 | 62,171 | 63.32 | 27,076 | 14.34 |
| Reverse repurchase agreements | 0 | 0.00 | 19,213 | 19.57 | 75,901 | 40.18 |
| Total borrowings | $78,192 | 100.00% | $98,184 | 100.00% | $188,877 | 100.00% |
| Weighted average interest rate | | 8.70% | | 8.60% | | 8.75% |







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1007

**Subsidiaries**

In addition to Action Mortgage, INTERVEST and Harbor Financial, the active subsidiaries described elsewhere in this Offering Circular, Sterling has five wholly owned subsidiaries that either are inactive or exist solely for the purpose of holding and owning specific assets or properties:

(1) Fidelity Service Corporation was organized in 1983 to acquire and sell real and personal property in eastern Washington and Idaho. The corporation's assets consist principally of office furniture and equipment used by Sterling.

(2) Tri-Cities Mortgage Corporation was obtained as part of Sterling's acquisition of Tri-Cities in April 1988. The corporation's principal assets are a 99.5% partnership interest in Renton Plaza Investors (a partnership which owns a five-story office building near Renton, Washington) and a 40% partnership interest in Interstate 291 (a partnership which owns two office buildings in Spokane County, Washington and adjacent undeveloped property).

Generally, under FIRREA, if a subsidiary was engaged in an activity not permissible for a national bank as of April 12, 1989, only a percentage of the association's investments in and loans to such subsidiary at April 12, 1989, or as of the date of calculation, whichever is less, may be included in capital. Such a percentage declines over a transition period as follows: July 1, 1991 to June 30, 1992—75%; July 1, 1992 to June 30, 1993—60%; July 1, 1993 to June 30, 1994—40%; thereafter—0%. To the extent the investment in these subsidiaries is not deducted from capital during the phase-in period, the assets of the subsidiaries must be consolidated with those of the savings association. The percentage may be further reduced by the FDIC during such five-year transition period with respect to a particular association on safety and soundness grounds.

Sterling's investment in Renton Plaza would be deemed an activity not permissible for a national bank, except that Sterling acquired this property through foreclosure and is grandfathered for five years from the date of foreclosure before its investment becomes subject to the non-permissible activity rules. Sterling is making every effort to liquidate its investment prior to the expiration date, July 1992. At September 30, 1991, tangible, core and risk-based capital would have been reduced by $49,000 if this rule were fully phased-in on that date.

(3) Tri-West Mortgage, Inc. was obtained in the acquisition of Tri-Cities and was originally engaged in mortgage banking. The corporation is now inactive.

(4) Evergreen Environmental Development Corporation was obtained in the acquisition of Central Evergreen in December 1988 and was organized to engage in real estate development. The corporation's principal asset is a 33% interest in the Grapetree Partnership, which owns a parcel of raw land in Spokane, Washington that it intends to develop as single-family residential lots. Sterling's investment in the Grapetree Partnership has been deemed to be an activity not permissible for a national bank. At September 30, 1991, tangible, core and risk-based capital had been reduced by $393,000 to reflect Sterling's investment in this subsidiary.

(5) Evergreen First Service Corporation was obtained in the acquisition of Central Evergreen and has as its principal asset all of the outstanding capital stock of Harbor Financial, through which Sterling offers tax deferred annuities, mutual funds and other financial products.

**Properties**

Sterling owns 19 offices and leases eight within Washington State. Action Mortgage leases 14 residential loan production offices (eleven in Washington, one in Oregon and two in Idaho). INTERVEST leases one office in Oregon and Harbor Financial leases one office in Washington. Such offices range in size from 600 to 7,500 square feet and have a total net book value, including leasehold improvements and furniture and fixtures, at September 30, 1991 of $7.7 million. See the map on the inside front cover of this Offering Circular for additional details concerning the location of these offices. Leases on these properties expire between September 30, 1992 and March 30, 2014. Sterling believes it will be able to renew the leases or obtain comparable leases.

**Competition**

Sterling faces strong competition, both in attracting deposits and in originating, purchasing and selling real estate and other loans, from other savings and loan associations, mutual savings banks, credit unions and commercial banks, many of which have greater resources than Sterling. Some or all of these competitive institutions operate in each of Sterling's market areas. Sterling competes in its market areas with these other institutions and financial intermediaries in all phases of its operations, including savings, lending, customer service and financial services. Management believes that a strong knowledge of, and presence in, the markets served by Sterling, a corporate focus on high-quality customer service, well-defined product lines and marketing programs responsive to the demands of the consumer enable Sterling to compete effectively in the delivery of its deposit and lending products.

Sterling competes for deposits in 16 counties throughout Washington. Based on the 1990 FHLB 12th District Survey of Market Share, which measured deposits of banks, thrifts and credit unions, Sterling was a market leader in Lewis (28.9% of total deposits), Garfield (30.4% of total deposits) and Asotin (25.0% of total deposits) counties. Sterling held 4% to 13% of total deposits in seven counties and 4% or less of total deposits in six other counties. The six branches located in Lewis, Garfield and Asotin counties accounted for 42.1% of Sterling's total deposits at September 30, 1991.

Sterling also competes with other institutions, many of which have greater financial resources than Sterling, in marketing financial products such as annuities, mutual funds and other financial products.

**Personnel**

As of September 30, 1991, Sterling, including its subsidiaries, had 292 full-time equivalent employees. Employees are not represented by a collective bargaining unit. Sterling believes its relationship with its employees is excellent.

**Legal Proceedings**

During fiscal years 1986, 1988 and 1989, Sterling, with the approval of its regulators, completed supervisory acquisitions of three insolvent institutions: Lewis Federal, Tri-Cities and Central Evergreen, respectively. Each of these institutions was insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on Sterling's financial statements. Each of the supervisory acquisitions was subject to supervisory Acquisition Agreements with then-existing regulatory authorities.

The Lewis Federal and Tri-Cities Acquisition Agreements provided for various forms of regulatory assistance to induce Sterling to undertake the acquisitions. Such assistance included indemnification against certain losses, regulatory cash assistance payments and regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Acquisition Agreements, Sterling was specifically allowed to (i) record regulatory cash assistance payments received as a part of regulatory capital; (ii) include intangible assets resulting from the acquisitions in the determination of regulatory capital; and (iii) extend intangible amortization periods beyond those allowed under generally accepted accounting principles, for purposes of calculating regulatory capital.

The Central Evergreen Acquisition Agreement included an approved business plan under which Sterling would operate through December 31, 1993. The business plan established the required levels of regulatory capital as well as methodology of computing regulatory capital. The regulatory capital projections included in the business plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Acquisition Agreements.

Beginning in October 1989, Sterling received several communications from the OTS advising it that the OTS was taking the position that the new minimum capital requirements of FIRREA were applicable to Sterling notwithstanding contrary provisions of Sterling's supervisory Acquisition Agreements. Thrift

Bulletin 38-2 was released by the OTS in January 1990 and stated that the new capital standards applied to all savings associations, including associations that had been operating under previously granted capital and accounting forbearances. Further, Thrift Bulletin 38-2 stated the OTS's position that FIRREA had eliminated such capital and accounting forbearances. Communications from the OTS indicated that the OTS had concluded that Sterling would fail to meet the new FIRREA capital standards. As an integral part of its primary capital plan, Sterling undertook a public offering of common and preferred stock which would have raised approximately $10.5 million of new capital. The offering was ultimately canceled in January 1990.

Notwithstanding Sterling's belief that its regulatory capital requirements are governed by the Acquisition Agreements, Sterling submitted several capital restoration plans to the OTS. Each plan ultimately was rejected by the OTS.

In May 1990, Sterling notified the OTS that it believed the position the OTS was taking was unlawful and, moreover, was specifically contrary to FIRREA. Following the OTS's subsequent refusal to honor the Acquisition Agreements, Sterling attempted to negotiate a mutually acceptable alternative solution so that it would not be regulated as a troubled thrift.

It is management's belief that the OTS was unwilling to negotiate any such alternative solution, and therefore on May 15, 1990, Sterling initiated a civil action against the OTS and the FDIC, seeking to have the OTS's construction of FIRREA in derogation of the Acquisition Agreements declared unlawful. The United States District Court for the Eastern District of Washington (the "Court") granted Sterling a temporary restraining order on May 28, 1990 and issued a preliminary injunction on July 3, 1990. The preliminary injunction, among other things, prohibits the regulators from imposing any regulatory restrictions on Sterling which would be inconsistent with the provisions of the Acquisition Agreements. On November 2, 1990, the Court narrowed the scope of the preliminary injunction but reaffirmed the injunction insofar as it prohibits the regulators from imposing or enforcing any regulatory restrictions on Sterling that would be inconsistent with the Acquisition Agreements. The Court stated "FIRREA does not eviscerate the contractual forbearances at issue in this case . . . Thus, at this point, only additional action by Congress can cause their demise or give the OTS authority to effect such a result."

A trial date for this civil action has not yet been set. On December 27, 1990, the federal regulators filed an appeal of the Court's order granting the preliminary injunction. The appeal has been fully briefed in the United States Court of Appeals for the Ninth Circuit. No hearing has been set. Should the Court of Appeals uphold the Court's order regarding the preliminary injunction, the federal regulators may seek review in the Supreme Court of the United States. Alternatively, the federal regulators may choose instead to proceed to trial on the merits or might seek to settle the dispute out of court. Should the Court of Appeals reverse the District Court's decision, Sterling will take advantage of all further remedies available to it under the circumstances. These remedies may include, without limitation, further appellate review, further proceedings before the Court or administrative remedies before the OTS. Sterling would consider all possibilities at such time, but no specific contingency plan would be settled upon before any hypothetical adverse court action were to occur and the surrounding facts and circumstances were known. There can be no assurance as to the ultimate outcome of Sterling's lawsuit or as to the consequences of that outcome on Sterling's operations.

Management believes that Sterling is in compliance with the minimum regulatory capital requirement under the Acquisition Agreements and the Central Evergreen business plan. Sterling has calculated its regulatory capital, giving effect to the regulatory capital provisions of the Acquisition Agreements, to be approximately $24.7 million, or 4.06% of assets at June 30, 1991, exceeding the minimum level pursuant to the Acquisition Agreements by approximately $754,000, or 0.12% of assets. Although management believes that Sterling is in compliance with applicable minimum capital standards after giving effect to the Acquisition Agreements, no assurance can be given that Sterling will continue to meet the regulatory capital levels required by the Acquisition Agreements.

According to Sterling's calculations as of September 30, 1991, if the OTS's interpretation of the FIRREA requirements were applicable to Sterling and if, as the OTS contends, the regulatory capital provisions of the Acquisition Agreements were not binding on the regulators, Sterling would not be in compliance with the OTS's minimum capital requirements. Sterling would have a shortfall of tangible capital of approximately $12.0 million, or 2.1% of total adjusted assets, a shortfall of core capital of approximately $10.7 million, or

1.8% of total adjusted assets, and a shortfall of risk-based capital of approximately $12.9 million, or 3.7% of risk-weighted assets. See "Offering Circular Summary—Risk Factors" and "Regulation—Recent Regulatory Developments."

Like the existing preliminary injunction, the permanent injunction sought by Sterling would, among other things, prevent the regulators from imposing or enforcing any regulatory restrictions against Sterling that would be inconsistent with the provisions of the Acquisition Agreements. There can be no assurance that Sterling will prevail in its lawsuit against the OTS and the FDIC or that, if it does prevail, it will then be in compliance with all capital requirements and other regulations or agreements to which it is subject. There can be no assurance that the permanent injunction sought by Sterling will be granted or that, if granted, it will be broad enough to prevent the imposition of penalties and sanctions which might be imposed for a failure to meet regulatory capital standards. The OTS has vigorously defended each similar case in which it has been a defendant and can be expected to do the same with respect to Sterling's lawsuit. During the pendency of the lawsuit, the OTS or the FDIC might attempt to impose significant penalties and sanctions against Sterling, although Sterling has had no indication as to whether the OTS or the FDIC might do so. For a discussion of such possible enforcement actions, see "Risk Factors—Regulatory Capital Requirements."

Periodically, various claims and lawsuits are brought against Sterling and its subsidiaries, such as claims to enforce liens, condemnation proceedings involving properties on which Sterling holds security interests, claims involving the making and servicing of real property loans, and other issues incident to Sterling's business. In addition, Sterling succeeded to several claims as a result of its acquisition of Tri-Cities, all of which are fully indemnified by the OTS. No material loss is expected from any of such pending claims or lawsuits.

## REGULATION

### Introduction

Sterling is chartered by the Washington Supervisor. Its savings deposits are insured by the FDIC. Sterling is subject to comprehensive regulation, examination and supervision by the OTS and these agencies. Furthermore, certain transactions and savings deposits are subject to regulations and controls promulgated by the Federal Reserve Board.

### Recent Regulatory Developments

FIRREA was enacted on August 9, 1989. The following is not intended to be a complete description of FIRREA, but is intended to describe certain of the most significant provisions applicable to Sterling. FIRREA authorized the creation of the OTS, headed by a single Director, as a bureau within the Department of the Treasury to charter federal savings associations and to serve as the primary regulator of all savings associations. FIRREA dissolved the FHLBB and the FSLIC. The insurance of deposits for institutions whose accounts were formerly insured by the FSLIC has been transferred to the FDIC, which now operates two funds: the Bank Insurance Fund for institutions formerly insured by the FDIC; and the Savings Association Insurance Fund (the "SAIF") for institutions, such as Sterling, formerly insured by the FSLIC. The FDIC will segregate assessments, premiums and administrative expenses between its two funds.

In addition, FIRREA gives the FDIC jurisdiction over savings associations in certain respects. Among other things, the FDIC, in consultation with the Director of the OTS, may adopt regulations or orders to prohibit thrift institutions' activities that pose a serious threat to the SAIF.

*Regulatory Capital Requirements.* Pursuant to FIRREA, the OTS adopted regulations implementing new capital standards applicable to all savings associations, including Sterling. Such capital standards, which became effective on December 7, 1989, include (i) a tangible capital requirement of not less than 1.5% of total adjusted assets, (ii) a leverage (or core) ratio requiring savings associations to maintain core capital in

an amount not less than 3.0% of their total adjusted assets, and (iii) a risk-based capital requirement equal to 7.2% of risk-weighted assets until December 31, 1992, and to 8% of such assets thereafter. Generally, intangible assets may not be included in capital; provided, however, that eligible savings associations, including Sterling, may include qualifying supervisory goodwill (stemming from acquisitions of insolvent institutions) as core capital in an amount up to 1.5% of total assets from the effective date of the new capital standards to January 1, 1992, declining thereafter to 0% after December 31, 1994; and provided, further, that mortgage servicing rights may be included in core and tangible capital, subject to certain limitations.

*Tangible Capital.* Tangible capital consists of common shareholders' equity, including retained earnings, non-cumulative perpetual preferred stock and related surplus and minority interests in equity accounts of fully consolidated subsidiaries. In calculating tangible capital certain items must be deducted. These items are goodwill and other intangible assets, nonqualifying purchased mortgage servicing rights and investments in subsidiaries engaged as principal in activities not permissible for national banks (except for a declining amount of grandfathered investments described below).

With respect to purchased mortgage servicing rights, the amount that qualifies to be included in tangible capital is the lowest of (a) 90% of fair market value if determinable, (b) 90% of original cost, or (c) the current amortized book value, provided that the amount included does not exceed 50% of the core capital nor 100% of tangible capital, except for amounts recorded prior to February 9, 1990.

With respect to investments in subsidiaries, if a subsidiary was engaged in an activity not permissible for a national bank as of April 12, 1989, a percentage of the association's investment in and loans to such subsidiary at April 12, 1989, or as of the date of calculation, whichever is less, may be included in tangible capital. Such percentage declines over a transition period as follows: July 1, 1991 to June 30, 1992—75%; July 1, 1992 to June 30, 1993—60%; July 1, 1993 to June 30, 1994—40%; thereafter—0%. Additional investments in such subsidiaries after April 12, 1989 are fully deducted from tangible capital. To the extent the investment in these subsidiaries is not deducted from tangible capital during the phase-in period, the assets of the subsidiaries must be consolidated with those of the savings association. The percentage may be further reduced by the FDIC during such five-year transition period with respect to a particular association on safety and soundness grounds. See "Business—Subsidiaries."

*Leverage (or Core) Capital.* "Core capital" is defined, essentially, as tangible capital plus supervisory goodwill subject to limits discussed below, FSLIC capital contributions and other qualifying intangible assets subject to a three-part test: separability, marketability and market valuation.

The amount of supervisory goodwill and FSLIC capital contributions that may be included in core capital is as follows: prior to January 1, 1992—1.5%; January 1, 1992 to December 31, 1992—1.0%; January 1, 1993 to December 31, 1993—0.75%; January 1, 1994 to December 31, 1994—0.375%; thereafter—0%. As of September 30, 1991, Sterling had $8.6 million of supervisory goodwill and approximately $13.5 million of FSLIC capital contributions arising from supervisory acquisitions which in the aggregate exceeded 1.5% of Sterling's total adjusted assets.

FIRREA requires the OTS to prescribe minimum capital requirements that are no less stringent than those which apply to national banks. The Office of the Comptroller of the Currency (the "OCC") published final leverage ratio regulations in September 1990. The OTS, on April 22, 1991, issued a proposed rule reflecting the requirements of the OCC leverage ratio regulation. The proposed OTS regulation continues the requirement that all savings associations must have and maintain core capital in an amount equal to at least 3% of adjusted total assets. In addition, the proposed rule provides that the minimum leverage ratio of 3% would apply only to savings associations in the strongest financial and managerial condition. All other savings associations would be required to maintain leverage ratios of at least 100 to 200 basis points higher than the 3% minimum. Due to the preliminary nature of the proposed rule, Sterling has not yet determined the impact, if any, that this proposed rule would have on the leverage ratio required to be maintained by Sterling. Sterling expects that as a result of this Offering and the planned conversion of the Series B Preferred Stock it will

meet the current 3% core capital requirement. Following this Offering, Sterling expects to further enhance its capital position and capital ratios through retention of earnings, amortization of intangible assets, and management of the level and mix of assets. There can be no assurance, however, that Sterling's capital levels will increase or that Sterling will meet the regulatory core capital requirement that may become applicable in the future under the proposed regulation.

*Risk-Based Capital.* FIRREA and OTS capital regulations also impose a risk-based capital requirement which is a percentage of capital to risk-adjusted assets. A risk weight is assigned to both the on-balance sheet assets and off-balance sheet commitments of a savings association. Representative risk weights include: 0% for assets that are backed by the full faith and credit of the United States; 20% for FHLB stock, agency securities not backed by the full faith and credit of the United States and certain high-quality mortgage-related securities; 50% for qualifying mortgage loans and certain non-high-quality mortgage-related securities; 100% for consumer, commercial and other loans; and 200% for delinquent or repossessed assets. The OTS has indicated it intends to propose a change to decrease the 200% risk weighting to 100% for repossessed assets and to reduce the 100% risk weighting to 50% for certain residential construction loans.

Both core capital and "supplementary capital," as defined below, may be used to meet the risk-based capital requirement, although supplementary capital cannot be used in an amount greater than 100% of core capital. For purposes of the risk-based capital requirement, supplementary capital includes permanent capital instruments such as cumulative perpetual preferred stock, perpetual or mandatorily convertible subordinated debt, maturing capital instruments such as subordinated debt, intermediate-term preferred stock, commitment notes and certain grandfathered mandatorily redeemable preferred stock (although the amount included declines as the instrument approaches maturity), and general valuation loan and lease loss allowances up to a maximum of 1.5% of risk-weighted assets until December 31, 1992 and up to 1.25% thereafter.

The risk-based capital requirement is equal to 7.2% of risk-weighted assets until December 31, 1992 and to 8% of such assets thereafter. Additionally, certain items currently includable in core capital and therefore in risk-based capital are scheduled to be phased out over a period ending December 31, 1994. Although Sterling will not meet the fully phased-in risk-based capital requirement as a result of this Offering and the planned conversion of the Series B Preferred Stock, Sterling expects to meet such requirement as it is phased in through the retention of earnings, amortization of intangible assets and management of the level and mix of assets. There can be no assurance, however, that Sterling's capital levels will increase or that Sterling will, in fact, meet the fully phased-in risk-based capital requirement in the future.

The following tables set forth Sterling's estimates of its tangible capital, core capital and risk-based capital at September 30, 1991, computed in accordance with the OTS capital regulations without giving effect to forbearance or capital provisions of the Acquisition Agreements, and compares these estimates with Sterling's tangible, core and risk-based capital requirements, as adjusted to give effect to the issuance and sale of 2,500,000 shares of Common Stock at a Price to Public of $8.25 per share and the conversion of $2.1 million of Series B Preferred Stock into Common Stock, under OTS capital regulations as currently in effect and as scheduled to be fully phased-in over a period ending December 31, 1994.

| | Tangible Capital at September 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| | | | As Adjusted(1) | | | |
| | Actual | | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio(2) | Amount | Ratio(2) | Amount | Ratio(2) |
| | (Dollars in thousands) | | | | | |
| Total shareholders' equity | $ 13,095 | 2.27% | $31,595 | 5.48% | $31,595 | 5.48% |
| Less: | | | | | | |
| Unidentified intangibles | (9,520) | (1.65) | (9,520) | (1.65) | (9,520) | (1.65) |
| Other intangibles | (4,399) | (0.76) | (4,399) | (0.76) | (4,399) | (0.76) |
| Nonqualifying capital(3) | (2,121) | (0.37) | 0 | 0 | 0 | 0 |
| Nonqualifying purchased mortgage servicing rights | 0 | 0 | 0 | 0 | 0 | 0 |
| Shares purchased by Deferred Compensation Plan, nonvested portion(4) | 0 | 0 | (33) | (0.01) | (33) | (0.01) |
| Investment in non-includable subsidiary | (393) | (0.07) | (393) | (0.07) | (393) | (0.07) |
| Total tangible capital | (3,338) | (0.58) | 17,250 | 2.99 | 17,250 | 2.99 |
| Tangible capital requirement | 8,652 | 1.50 | 8,652 | 1.50 | 8,652 | 1.50 |
| Tangible capital excess (deficiency) | $(11,990) | (2.08)% | $ 8,598 | 1.49% | $ 8,598 | 1.49% |

| | Core Capital at September 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| | | | As Adjusted(1) | | | |
| | Actual | | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio(2) | Amount | Ratio(2) | Amount | Ratio(2) |
| | (Dollars in thousands) | | | | | |
| Total tangible capital | $ (3,338) | (0.58)% | $17,250 | 2.97% | $17,250 | 2.97% |
| Add: | | | | | | |
| Includable Supervisory Goodwill | 8,652 | 1.50 | 8,652 | 1.50 | 0 | 0 |
| Qualifying identified intangibles up to 25% of other core capital(5) | 1,329 | 0.23 | 4,399 | 0.75 | 4,313 | 0.74 |
| Total core capital | 6,643 | 1.15 | 30,301 | 5.21 | 21,563 | 3.71 |
| Core capital requirement | 17,344 | 3.00 | 17,436 | 3.00 | 17,433 | 3.00 |
| Core capital excess (deficiency) | $(10,701) | (1.85)% | $12,865 | 2.21% | $ 4,130 | 0.71% |

| | Risk-Based Capital at September 30, 1991 | | | | | |
|---|---|---|---|---|---|---|
| | | | As Adjusted(1) | | | |
| | Actual | | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio(2) | Amount | Ratio(2) | Amount | Ratio(2) |
| | | | (Dollars in thousands) | | | |
| Total core capital(5) | $ 6,643 | 1.93% | $30,301 | 8.70% | $21,563 | 6.19% |
| Add: | | | | | | |
| Supplementary capital up to 100% of core capital: | | | | | | |
| Perpetual preferred stock(3) | 2,121 | 0.61 | 0 | 0 | 0 | 0 |
| General valuation allowances | 3,171 | 0.92 | 3,171 | 0.91 | 3,171 | 0.91 |
| Total risk-based capital | 11,935 | 3.46 | 33,472 | 9.61 | 24,734 | 7.10 |
| Risk-based capital requirement | 24,860 | 7.20 | 25,081 | 7.20 | 27,861 | 8.00 |
| Risk-based capital excess (deficiency) | $(12,925) | (3.74)% | $ 8,391 | 2.41% | $(3,127) | (0.90)%(6) |

(1) Based upon the sale of 2,500,000 shares of Common Stock at a Price to Public of $8.25 per share, resulting in net proceeds of $18.5 million (after deducting Underwriting Discounts and Commissions and estimated offering expenses). Also assumes the conversion of Series B Preferred Stock into Common Stock upon completion of this Offering. This conversion results in an additional $2.1 million of tangible capital and core capital. See "Offering Circular Summary—Conversion of Series B Preferred Stock," "Use of Proceeds" and "Conversion of Series B Preferred Stock."

(2) Ratio of capital to total adjusted assets for tangible and core capital and ratio of capital to risk-weighted assets for risk-based capital.

(3) As a result of the planned conversion of Series B Preferred Stock (see "Conversion of Series B Preferred Stock"), approximately 198,000 additional shares of Common Stock will be outstanding. This additional Common Stock will be includable in Sterling's regulatory core and tangible capital. Both the Series B Preferred Stock and the additional Common Stock outstanding as a result of conversion are includable under current regulations in risk-based capital.

(4) The assets of Sterling's Nonqualified Deferred Compensation Plan are subject to the claims of Sterling's creditors until vested in participants in the Plan and as such may not be included in regulatory capital.

(5) Includes qualifying identified intangible assets which are subject to defined criteria. Sterling believes it meets these established criteria, although no determination by the OTS has yet been made.

(6) Under existing regulations, Sterling's risk-based capital requirement is 7.2% until December 31, 1992, at which time the permanent requirement of 8% is scheduled to be phased in. Additionally, certain items currently includable in core capital and therefore in risk-based capital are scheduled to be phased out over a period ending December 31, 1994.

As a result of this Offering and the planned conversion of the Series B Preferred Stock, Sterling expects to exceed all current regulatory capital standards without giving effect to the Acquisition Agreements. Although Sterling will not meet the fully phased-in risk-based capital requirement as a result of this Offering and the planned conversion of the Series B Preferred Stock, Sterling expects to meet such capital requirement as it is phased in through the retention of earnings, amortization of intangible assets and management of the level and mix of assets. There can be no assurance, however, that Sterling's capital levels will increase or that Sterling will, in fact, meet the fully phased-in risk-based capital requirement in the future. There also can be no assurance that Sterling will meet the core capital requirement that may become applicable to it under the proposed regulations. In addition, new capital requirements may be imposed in the future.

FIRREA also authorizes the OTS to amend its risk-based capital requirement to reflect interest rate or other risks, provided that such amendments in the aggregate do not result in materially lower levels of capital being required than under the risk-based capital requirements applicable to national banks. Pursuant to this

provision, on December 31, 1990, the OTS issued a proposed rule which would add an interest rate risk component to the risk-based capital requirement. The OTS subsequently deferred this proposed rule until late 1992. Under the proposed rule, a savings association would be required to maintain capital in an amount equal to 50% of its interest rate risk exposure. Such exposure would be measured as the decline in the market value of the association's portfolio equity that would result from a 200 basis point increase or decrease in market interest rates (whichever results in a greater decline), as calculated according to certain models to be established by the OTS. The market value of an association's portfolio equity would be defined as the net present value of an association's assets, liabilities and off-balance sheet items. It is anticipated that the OTS would calculate the market value of an association's portfolio equity and such association's interest rate risk capital requirement, based upon information provided by the association to the OTS in the association's quarterly Thrift Financial Report. Under the proposed rule, such capital would be required to be maintained above the association's minimum risk-based capital requirement, as then determined by the OTS. In this connection, the OTS is considering (i) requiring the interest rate risk requirement to be in addition to the 8% risk-based capital requirement; (ii) reducing the risk-based capital requirement to 6% and adding the interest rate risk requirement to such reduced requirement; or (iii) adding the interest rate risk requirement to the minimum leverage ratio. Due to the preliminary nature of the proposed rule making and its deferred status, Sterling has not yet determined the impact, if any, that the rule would have on the risk-based or core capital required to be maintained by Sterling.

Other OTS regulations provide that the OTS may establish an individual minimum capital requirement for institutions on a case-by-case basis in light of the particular circumstances of each savings institution.

Savings associations which fail to meet the tangible, core or risk-based capital requirements are subject to a number of sanctions or restrictions. Under FIRREA, the OTS must prohibit any asset growth, except that the OTS may permit growth in an amount not in excess of net interest credited to the savings association's deposit liabilities if (i) the savings association obtains the prior approval of the OTS; (ii) any increase in assets is accompanied by an increase in tangible capital in an amount not less than 3% of the increase in assets; (iii) any increase in assets is accompanied by an increase in capital not less in percentage amount than required under the risk-based capital standards then applicable; (iv) any increase in assets is invested in low-risk assets (such as one to four family residential mortgage loans and fully secured consumer loans); and (v) the savings association's ratio of core capital to total assets is not less than the ratio existing on January 1, 1991.

The OTS must require any savings association not in compliance with capital standards (including any individual minimum capital requirement) to comply with a capital directive issued by the OTS. Such capital directive may require an association not in compliance with the capital requirements to (i) increase the amount of its regulatory capital to a specified level; (ii) convene a meeting with the OTS supervision staff for the purpose of accomplishing the objectives of the regulations; (iii) reduce or limit the rate of interest that may be paid on savings accounts; (iv) limit the receipt of deposits to those made to existing accounts; (v) cease or limit the issuance of new accounts of any or all classes or categories, except in exchange for existing accounts; (vi) cease or limit lending or the making of a particular loan or category of loan; (vii) cease or limit the purchase of loans or the making of specified other investments; (viii) limit operational expenditures to specific levels; (ix) increase liquid assets and maintain such increased liquidity at specified levels; or (x) take such other action or actions as the OTS may deem necessary or appropriate for the safety and soundness of the savings association or the protection of its depositors. The material failure of a savings association to comply with any plan, regulation, written agreement, order or directive issued will be treated as an unsafe or unsound practice which could result in the imposition of certain penalties or sanctions including, but not limited to, the assessment of civil monetary penalties, the issuance of a cease and desist order, or the appointment of a conservator or receiver.

Any savings association which does not meet its regulatory capital requirements may not accept brokered deposits if such deposits, together with any existing brokered deposits outstanding, would exceed 5% of the