association's total deposits, without a written waiver from the OTS. In addition, the FDIC prohibits, with certain exceptions, an "undercapitalized insured depository institution" from accepting any brokered deposits. An undercapitalized insured depository institution is defined as any insured depository institution which does not meet the minimum capital requirements applicable with respect to such institution. This prohibition includes any renewal of an account in any undercapitalized insured depository institution and any rollover of any amount on deposit. The FDIC may waive this restriction upon application by an insured depository institution and a finding that the acceptance of such deposits does not constitute an unsafe or unsound practice with respect to such institution. Sterling has no brokered deposits.

A savings association which is not in compliance with its capital requirements may apply to the OTS for an exemption from the sanctions and penalties imposed upon a savings association for failure to comply with its minimum capital standards. Pursuant to FIRREA, the OTS may approve an application for a capital exemption if such exemption would pose no significant risk to the affected insurance fund, the savings association's management is competent, the savings association is in compliance with all applicable statutes, regulations, orders and supervisory agreements and directives, and the savings association's management has not engaged in insider dealing, speculative practices or any other activities that could have jeopardized the association's safety and soundness or contributed to impairing the association's capital. Any application for a capital exemption must be accompanied by an acceptable capital plan. If a savings association receives approval of capital exemption and operates in accordance with an acceptable capital plan, it will be deemed to be in compliance with its capital standards for purposes of OTS capital regulation only. The savings association must request and receive approval of specific, express exemptions from the provisions of other rules, regulations and policy statements as part of the accepted capital plan to be deemed in capital compliance for purposes of such other rules, regulations and policy statements.

As part of the litigation discussed in "Business—Legal Proceedings," Sterling has maintained that it complies with the FIRREA capital plan requirement. First, Sterling's position is that if the Acquisition Agreements are given effect, Sterling complies with applicable capital standards and is not required to file a capital plan with the OTS. Second, even if Sterling were required to file a capital plan, such plan is embodied in the Business Plan approved by the OTS's predecessors as part of the Central Evergreen acquisition. See "Business—Acquisitions" and "—Legal Proceedings."

*Federal Deposit Insurance Corporation.* FIRREA increased the premiums paid by savings associations for federal deposit insurance. Pursuant to the SAIF assessment schedule, savings associations will be assessed insurance premiums (as a percentage of deposits) as follows: 0.23% from 1991 through 1993; 0.18% from 1994 through 1997; and 0.15% thereafter. These premium assessments may be higher if the FDIC determines that such an increase is necessary to restore the SAIF reserve within a reasonable period of time. Assessment levels in no event may be greater than 0.325%, nor may they increase by more than 0.075% in any one year.

The FDIC is empowered to initiate a termination of insurance proceeding in cases where the Board of Directors of the FDIC determines that an insured depository institution has engaged in unsafe or unsound practices, is in an unsafe or unsound condition to continue operations, or has violated an applicable law, regulation, order or condition imposed by the FDIC. The FDIC may deem failure to comply with applicable regulatory capital requirements an unsafe and unsound practice. If the FDIC terminates a savings association's deposit insurance, funds then on deposit continue to be insured for at least six months and up to two years and notice of such termination is provided to the account holders. Furthermore, if the FDIC initiates an insurance termination proceeding against a savings association that has no tangible capital the FDIC may issue a temporary order immediately suspending deposit insurance on all deposits received by such savings association.

*Resolution Funding Corporation.* FIRREA provides for substantial contributions by the FHL Banks to the Resolution Funding Corporation, which was created under FIRREA to raise funds to be used to resolve cases involving failed savings associations. The funding obligations that FIRREA imposes on the FHL Banks

may reduce the dividends paid by the FHL Banks to their shareholders, increase the cost to FHL Bank members of the services provided by the FHL Banks, or both. Each of these provisions may increase Sterling's cost of doing business.

*Loans to Affiliates.* FIRREA amends the statutory provisions governing transactions between a savings association and its affiliates. Such transactions are subject to the restrictions of Sections 23A and 23B of the Federal Reserve Act (the "FRA") in the same manner and to the same extent as if the savings association were a member bank as defined in the FRA, except that a savings association may not (i) extend credit to any affiliate engaged in activities that are impermissible for a bank holding company or (ii) purchase or invest in any securities of an affiliate other than shares of a subsidiary.

Section 23A of the FRA limits the aggregate amount of "covered transactions" with any one affiliate to 10% of the capital stock and surplus of the member bank. "Covered transactions" are defined in Section 23A to include extending credit to, purchasing the assets of, issuing a guarantee, acceptance or letter of credit on behalf of, or investing in the stock or securities of, any affiliate. Section 23A also requires a bank to obtain specified levels of collateral for any extension of credit to an affiliate.

Section 23B, in general, requires that any transaction with an affiliate be on terms and conditions no less favorable to the member bank than those applicable to transactions with unaffiliated entities. The OTS has recently adopted regulations further defining and clarifying the applicability of Sections 23A and 23B to savings associations. The Director of the OTS has the authority to impose any additional restrictions on any transaction between a savings association and an affiliate that he determines are necessary to protect the safety and soundness of the association.

In addition, FIRREA provides that extensions of credit to executive officers, directors and principal shareholders of a savings association are governed by Section 22(h) of the FRA. Section 22(h) requires prior approval by the board of directors of the bank before a loan can be made to an executive officer, director or 10% shareholder. In addition, such loan or extension of credit must be made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unaffiliated persons that do not involve more than the normal risk of repayment or present other unfavorable features. Section 22(h) also prohibits any loan or extension of credit to an executive officer or a controlling shareholder if such loan or extension of credit (when aggregated with the amount of all other loans or extensions of credit then outstanding to such individual) would exceed the limits on loans to a single borrower applicable to national banks. The Director of the OTS may impose additional restrictions for safety and soundness reasons.

*Loans-to-One-Borrower.* Under FIRREA, the permissible amount of loans-to-one-borrower follows the national bank standard for all loans made by savings associations (except that loans-to-one-borrower not in excess of $500,000 may be made in any event), as compared to the pre-FIRREA rule that applied that standard only to business banking loans made by federal associations. The OTS has promulgated a regulation establishing standards consistent with the FIRREA requirements. This standard generally does not permit loans-to-one-borrower to exceed 15% of unimpaired capital and surplus. Loans in an amount equal to an additional 10% of unimpaired capital and surplus also may be made to a borrower if the loans are fully secured by readily marketable collateral. It is the position of the OTS that Sterling's loans-to-one-borrower limit is $500,000 under FIRREA. Management believes these limitations have had a material adverse effect on Sterling's operations, but such limitations have not required divestiture of any existing loans. Sterling expects that its unimpaired and surplus capital, and therefore its permissible loans-to-one-borrower limit, will increase following this Offering.

Following the enactment of FIRREA, questions existed regarding the application of national bank loans-to-one-borrower standards to thrifts like Sterling, since the definition of capital and other matters needed to be resolved. These unresolved questions were under review by the OTS until December 1989 when the OTS issued interim compliance provisions. Prior to the issuance of the interim compliance provisions by the OTS,

Sterling made a small number of loans to nonaffiliated parties, which loans would have been in compliance with the pre-FIRREA loans-to-one-borrower regulations, but which may have violated the loans-to-one-borrower interim compliance provisions promulgated by the OTS in December 1989. Sterling has reduced the outstanding principal balances of such loans to a level where they are in compliance with existing loans-to-one-borrower regulations. Sterling does not believe that any of such possible violations was material. There can be no assurance, however, that the OTS will not take enforcement action, including the imposition of civil money penalties against Sterling, as a result of such potential violations.

*Nonresidential Real Estate Loans.* Under FIRREA, loans secured by nonresidential real estate are limited to 400% of regulatory capital. Management believes this limitation has had a material adverse effect on Sterling's operations, but such limitation has not required divestiture of any existing loans. Sterling expects that its regulatory capital will increase as a result of this Offering and that following this Offering it will resume nonresidential real estate lending at moderate levels subject to applicable regulatory limitations.

*Qualified Thrift Lender.* FIRREA's qualified thrift lender ("QTL") test became effective on July 1, 1991 and requires 70% of an institution's assets to consist of certain housing and consumer-related assets. Assets that will qualify without limit for inclusion as part of the 70% requirement are loans related to domestic residential housing and manufactured housing, home equity loans, mortgage-backed securities (where the mortgages are related to residential housing or manufactured housing), and direct or indirect obligations of the FSLIC or the FDIC. In addition, the following assets may be included in meeting the test subject to an overall limit of 15% of the savings association's portfolio: 50% of residential mortgage loans originated and sold within 90 days of origination; 100% of investments in service corporations that meet certain housing-related standards; 200% of loans related to the acquisition, development and construction of one to four family housing meeting certain low-income standards; 200% of certain loans in areas where credit needs of low and moderate income residents are not being adequately met; 100% of certain loans for the purchase, construction, improvement or upkeep of churches, schools, nursing homes and hospitals; and 100% of consumer and educational loans (limited to 5% of total portfolio assets). Sterling is in compliance with the QTL test at June 30, 1991.

*Community Reinvestment.* Under the Community Reinvestment Act (the "CRA"), as implemented by the OTS regulations, a savings institution has a continuing and affirmative obligation consistent with its safe and sound operation to help meet the credit needs of its entire community, including low and moderate income neighborhoods. The CRA does not establish specific lending requirements or programs for financial institutions nor does it limit an institution's discretion to develop the types of products and services that it believes are best suited to its particular community, consistent with the CRA. The CRA requires the OTS, in connection with its examination of a financial institution, to assess the institution's record of meeting the credit needs of its community and to take such record into account in its evaluation of certain applications by such institutions. FIRREA amended the CRA to require, effective July 1, 1990, public disclosure of an institution's CRA rating and to require that the OTS provide a written evaluation of an institution's CRA performance utilizing a four-tiered descriptive rating system in lieu of the existing five-tiered numerical rating system. The OTS has criticized Sterling's past compliance with the CRA and Sterling is taking steps designed to cure any deficiency.

*Change of Control.* Under applicable statutes and regulations, a person may not acquire control of a savings association without the prior approval of the OTS and the Washington Supervisor. Control is conclusively deemed to be acquired when, among other things, a person, either alone or acting in concert with others, acquires more than 25% of any class of voting stock of a savings association. Under federal statutes and regulations, a rebuttable presumption of control arises if a person acquires, either alone or acting in concert with others, more than 10% of any class of voting stock of a savings association and is subject to a "control factor," or acquires more than 25% of any class of non-voting stock, and is subject to a "control factor." A person is subject to a control factor as a result of specified ownership levels of the savings association's debt or equity or as a result of certain relationships with the savings association.

As indicated above, if a person's ownership of the savings association stock is below the threshold levels for control, such person may nevertheless be deemed to be "acting in concert" with one or more other persons that own stock in the savings association, in which case all of the stock ownership of each person acting in concert will be aggregated and attributed to each member of the group, thereby putting each one over the control threshold. Under certain circumstances, acquirors will be presumed to be acting in concert with other persons; however, such presumption may be rebutted by the acquiror. Applicable circumstances include (i) a company will be presumed to be acting in concert with a controlling shareholder or management official under certain circumstances; (ii) a company controlling or controlled by another company and companies under common control will be presumed to be acting in concert; and (iii) persons will be presumed to be acting in concert where they constitute a group under Section 13 or 14 of the Securities Exchange Act of 1934, as amended.

*Restrictions on Activities of State-Chartered Associations.* FIRREA prohibits a state-chartered savings association from engaging in any type of activity or any activity in an amount that is not permissible for a federal savings association unless (i) the FDIC has determined that such activity poses no threat to the insurance fund and (ii) the savings association continues to be in compliance with the fully phased-in capital standards imposed by FIRREA. If the FDIC determines that the amount of such activity does not pose a significant threat to the insurance fund, an association which is in compliance with FIRREA's fully phased-in capital requirements may engage in activities in an amount greater than that permissible for a federal savings association. FIRREA also prohibits a state-chartered savings association from acquiring or retaining any equity investment (other than shares in certain service corporations) of a type or in an amount not permissible for a federal savings association. A savings association must divest any such equity investment as quickly as can be prudently done, and in any event not later than July 1, 1994. For a discussion of such investments currently held by Sterling, see "Business—Subsidiaries."

*Restrictions on Capital Distributions by Thrift Institutions.* The OTS has adopted a capital distribution regulation which limits the ability of savings institutions to make capital distributions. Certain factors are considered by the OTS in determining whether to permit a savings institution to pay dividends, including, among other things, whether an institution meets fully phased-in capital requirements. Those savings institutions which meet the fully phased-in capital requirements have discretion in making capital distributions, while those with lower capitalization have less discretion in this regard and, in some cases, are required to seek the approval of the OTS.

**Proposed Legislation**

FISCCA was introduced in both houses of Congress in March 1991. The legislation is currently pending before Congress and still must be examined by various legislative committees. It is not possible to predict what provisions may be included in a bill which is enacted as law, or whether such a bill will be so enacted. In its present form, FISCCA provisions would, among other things, place severe restrictions on the operations of an insured institution with a capital ratio below a "critical capital level." Both the House of Representatives and Senate versions of the legislation generally define the "critical capital level" as tangible capital equal to 2% of total assets. Further, the proposed legislation requires the OTS to appoint a conservator or receiver for an insured institution within a specified time period following the date such institution's capital ratio falls below the critical capital level.

**Federal Reserve System**

Under the provisions of the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Deregulation Act"), depository institutions must maintain uniform reserves against their transaction accounts (interest-bearing checking or NOW accounts, automatic transfer accounts, accounts which by their terms allow certain third-party payments, pre-authorized or telephone transfers, and certain other short-term obligations) and nonpersonal time deposits (accounts in which a beneficial interest is held by other than a

natural person and certain other obligations). Regulation D of the Federal Reserve Board Rules and Regulations requires non-interest-bearing reserve maintenance in the form of either vault cash, funds on deposit at the Federal Reserve Bank or at another designated depository institution or funds in a pass-through account in an amount calculated by formula. The balances maintained to meet the reserve requirements imposed by the Federal Reserve System may be used to satisfy liquidity requirements.

The Deregulation Act also gives savings and loan associations authority to borrow from the Federal Reserve Bank "discount window," but Federal Reserve regulations require associations to exhaust all FHL Bank sources before borrowing from the Federal Reserve Bank.

**Washington Law and Regulations**

Sterling is a state-chartered institution and is subject to regulation by the Washington Supervisor, which conducts regular examinations to ensure that Sterling's operations and policies conform with sound industry practice. The Washington Supervisor requires Sterling to file annual statements and other reports.

State law regulates the amount of credit that can be extended to any one person, and the amount of money that can be invested in any one property. A State of Washington-chartered association may make a loan to any one borrower up to an amount which, taken together with all other outstanding loans and obligations to the same borrower, does not exceed the association's net worth or 10% of the association's withdrawable accounts, whichever is less. State law also regulates the types of loans Sterling can make. Generally, these regulations set by the Washington Supervisor are no stricter than the requirements set by the OTS. Without the Washington Supervisor's approval, Sterling cannot invest more than 10% of its total assets in other corporations. Presently, Sterling has less than 1% of its assets invested in other corporations.

## TAXATION

**General**

Sterling and its subsidiaries currently file a consolidated federal income tax return on a fiscal year basis ending June 30. Consolidated returns have the effect of eliminating intercompany distributions, including dividends, from the computation of consolidated taxable income for the taxable year in which the distributions occur.

Thrift institutions are subject to the provisions of the Code in the same general manner as other corporations. However, institutions such as Sterling which meet certain definitional tests and other conditions prescribed by the Code may benefit from certain favorable provisions regarding their bad debt reserve. Thrift institutions are allowed a deduction for a reasonable addition to their bad debt reserves as determined under various methods. For purposes of the bad debt reserve deduction, loans are separated into "qualifying real property loans," which generally are loans secured by interests in real property, and "nonqualifying real property loans," which are all other loans. The bad debt reserve deduction with respect to nonqualifying real property loans must be based on actual loss experience. The amount of the bad debt reserve deduction with respect to qualifying real property loans may be based upon actual loss experience (the "experience method") or a percentage of taxable income determined without regard to such deduction (the "percentage of taxable income method").

As permitted under the Code, Sterling has elected from year to year to use the method that represents a reasonable addition to the bad debt reserve for federal income tax purposes. In the past two years, Sterling has chosen to forego the maximum available amount of bad debt deductions with respect to qualifying real property loans until later years in an effort to utilize NOL carryforwards that may expire in the near future. Sterling has elected, based on the concurrence of Coopers & Lybrand with Sterling's position that such election is more likely than not permissible under the Code as presently in effect, to use the lesser of the





CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1021

experience method or the percentage of taxable income method to compute the minimum amount of bad debt deduction with respect to qualifying real property loans and thereby utilize NOL carryforwards that might otherwise expire. Should the Internal Revenue Service (the "IRS") require a larger bad debt deduction with respect to the qualifying real property loans for the 1990 and/or 1991 tax years, then NOL carryforwards previously claimed would not be used in those years and could expire and the amount of the bad debt deduction to be claimed for income tax purposes in future years would be reduced substantially, which could result in significantly higher taxes payable in the future. Sterling expects to utilize the maximum bad debt deduction in future tax years.

Under the experience method, the bad debt reserve deduction for qualifying real property loans is the amount which is necessary to bring the bad debt reserve up to the greater of the following: (A) the amount which bears the same ratio to loans outstanding at the close of the taxable year as the total bad debts sustained during the taxable year and the five preceding taxable years (or a shorter period with IRS approval), adjusted for recoveries of bad debts during such period, bear to the sum of the loans outstanding at the close of such six or fewer taxable years or (B) the lower of: (1) the balance of the reserve at the close of the base year (in Sterling's case, the tax year beginning July 1, 1987) or (2) if the amount of loans outstanding at the close of the taxable year is less than the amount of the loans outstanding at the close of the base year, the amount which bears the same ratio to loans outstanding at the close of the taxable year as the balance of the reserve at the close of the base year bears to the amount of loans outstanding at the close of the base year. Sterling has consistently used the full six years prescribed by the Code to determine its loss experience.

Under the percentage of taxable income method, the bad debt reserve deduction for qualifying real property loans is computed as a percentage of taxable income, which Congress has reduced from as much as 40% in recent years to 8% today, with certain adjustments, effective for taxable years beginning after 1986. The allowable deduction under the percentage of taxable income method for taxable years beginning before 1987 was scaled downward in the event that less than 82% of the total dollar amount of the assets of an institution qualified within certain designated categories. For all taxable years, there is no deduction in the event that less than 60% of the total dollar amount of the assets of an institution falls within such categories. Moreover, in such case, the thrift institution could be required to recapture, generally over a period of up to four years, its existing bad debt reserve.

The bad debt deduction under the percentage of taxable income method is subject to two limitations described as follows: (i) the amount accumulated in reserves for qualifying real property loans cannot exceed 6% of such loans outstanding at the end of the taxable year and (ii) the amount for qualifying real property loans when added to the bad debt reserve for losses on nonqualifying loans cannot exceed the amount by which 12% of total deposits or withdrawable accounts of depositors at year-end exceeds the sum of surplus, undivided profits and reserves at the beginning of the year. It is not expected that either limitation would restrict Sterling from making the maximum addition to its bad debt reserve if it chose to do so. The percentage bad debt deduction is reduced by the deduction for losses on nonqualifying loans. For taxable years beginning before 1987, such reduction was decreased in the event that less than 82% of the dollar amount of the assets of an institution qualified within certain designated categories.

The availability of the percentage of taxable income method has historically permitted qualifying thrifts to be taxed at a significantly lower effective maximum marginal federal income tax rate than that applicable to corporations generally. The amount of the percentage bad debt deduction was reduced after 1986 to 8% of taxable income, coupled with the reduction in the maximum corporate income tax rate to 34% (40% in 1987).

Qualifying thrift institutions, such as Sterling, that file federal income tax returns as part of a consolidated group are required by applicable Treasury Regulations to proportionately reduce their bad debt deduction for tax losses attributable to activities of nonthrift institution members of the consolidated group that are functionally related to the activities of the thrift institution member. These regulations historically have had no effect on Sterling and are not expected to reduce the amount of the bad debt deduction available

to it in the future. Sterling does not contemplate any action which would limit its ability to take as a bad debt deduction from its gross income for federal income tax purposes the maximum amount to which it is entitled under current law.

A corporate alternative minimum tax will be imposed to the extent it exceeds the corporation's regular income tax for the year. The alternative minimum tax will be imposed at the rate of 20% of a specially computed tax base. Included in this base will be a number of preference items, including the following: (i) 100% of the excess of a thrift institution's bad debt deduction over the amount that would have been allowable under the experience method; (ii) interest on certain tax-exempt bonds issued after August 7, 1986; and (iii) adjusted current earnings as specifically computed. In addition, for purposes of the alternative minimum tax, the amount of alternative minimum taxable income that may be offset by net operating loss is limited to 90% of alternative minimum taxable income. Since Sterling generally already uses the experience method to compute its bad debt deduction, the alternative minimum tax has not had a material effect on Sterling's income tax provision.

The portion of earnings appropriated to Sterling's bad debt reserve and claimed as a tax deduction will not be available for the payment of cash dividends or for distribution to shareholders (including distributions made on dissolution or liquidation), unless Sterling first includes the amount in taxable income and pays the resulting federal income tax. As of June 30, 1991, Sterling has a minor amount of accumulated earnings for which federal income tax has not been provided. If such amount is used for any purpose other than to absorb actual bad debt losses, including a dividend distribution or a distribution in liquidation, it will then become subject to federal income tax at the then current rate.

Generally, for taxable years beginning after 1986, the Tax Reform Act of 1986 (the "Tax Reform Act") also requires most corporations, including thrift institutions, to utilize the accrual method of accounting for tax purposes, and disallows 100% of a thrift institution's interest expense allocated to certain tax-exempt obligations. The Tax Reform Act also lowered the maximum tax rate from 46% to 34% for corporations, including thrift institutions.

Other aspects of the Tax Reform Act may have an indirect effect on the thrift industry. The Tax Reform Act generally limits the deductions allowable with respect to losses attributable to passive trade or business activities, such as real estate investment, to the amount of income earned from all such passive activities. This change could have an adverse effect on the market for rental and other real estate generally, and possibly on the ability of borrowers to repay loans secured by commercial real estate. The Tax Reform Act eliminates the deduction for contributions to IRAs by individuals who are covered by employer-sponsored retirement plans and whose income exceeds specified levels; however, the income contributions of these individuals will continue to be exempt from tax until withdrawn. This limitation on the deductibility of IRA contributions is expected to reduce the amount the individuals will elect to contribute to IRAs. The Tax Reform Act also eliminates the deduction for personal interest expense on loans other than those secured by mortgages on a principal or second residence with a five-year phase-out. As a result of further changes to the Code in 1987, mortgage interest on a principal or second residence will continue to be deductible to the extent that the amount of the mortgage loan indebtedness does not exceed $1 million acquisition indebtedness ($500,000 for a married individual filing a separate return) plus $100,000 home equity indebtedness ($50,000 for a married individual filing a separate return).

The foregoing examples are intended to be illustrative only and do not constitute a comprehensive review of all aspects of the Tax Reform Act and subsequent changes to the Code that could have an indirect effect on the business of thrift loan institutions, including Sterling.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1023

Sterling's federal income tax returns have been audited for the years 1984 and 1985 by the IRS. No interest or penalties were assessed in connection with the audit of Sterling's 1984 return. In connection with the audit of Sterling's 1985 return, Sterling was assessed a deficiency of $27,354, plus a minimal amount of interest. The assessment resulted from the manner in which an investment tax credit was calculated. No penalties were assessed against Sterling as a result of this assessment.

Sterling is subject to a business and occupation tax which is imposed under Washington law at the rate of 1.50% of gross receipts; however, interest received on loans secured by mortgages or deeds of trust on residential properties and interest on obligations issued or guaranteed by the United States are not subject to such tax. The State of Washington does not currently have an income tax.

Sterling and some of its subsidiaries carry on business activities in states other than Washington and, accordingly, are subject to such states' tax laws.

**Period of Net Operating Loss Carryforward**

There are unique NOL carryforward periods for thrift institutions, depending on the year the NOL was generated.

As a part of the acquisition of Lewis Federal, Sterling agreed to pay to the FDIC an amount equal to 100% of the tax benefit resulting from the utilization of Lewis Federal's acquired NOL carryforwards. All of these NOL carryforwards had been utilized and the amount due the FDIC has been paid as of June 30, 1988.

As a part of the acquisition of Tri-Cities, Sterling agreed to pay to the FDIC an amount equal to 50% of the tax benefit resulting from the utilization of the acquired NOL carryforwards. Sterling has available an additional $1.5 million of NOL carryforwards acquired with Tri-Cities. The payment due to the FDIC for these tax benefits must be made when the NOL carryforwards are utilized.

As part of the acquisition of Central Evergreen, Sterling acquired NOL carryforwards, of which approximately $3,225,000 remained available for utilization at June 30, 1991.

Based on the June 30, 1991 tax year-end, the acquired NOL carryforwards will expire as follows:

| Approximate NOL | | Expiration Period |
|---|---|---|
| Sterling's Portion | FDIC Portion | |
| $ 54,000 | $ 54,000 | 06/30/1993 |
| 1,450,000 | 1,450,000 | 06/30/2002 |
| 3,225,000 | 0 | 06/30/2003 |
| $4,729,000 | $1,504,000 | |

**Effect of Offering on Net Operating Loss Carryforwards**

The NOL carryforwards described above become subject to a limitation on their utilization if as a result of the sale of the shares of Common Stock in this Offering there is a change in ownership described in Section 382 of the Code. A change in ownership under Section 382 occurs if, during any three-year period, shareholders holding 5% or more of the stock of a corporation increase their ownership by more than fifty percentage points. In determining whether there has been a shift in ownership of more than fifty percentage points, the highest percentage of stock ownership by each 5% shareholder is compared to the lowest percentage of stock in Sterling owned by that shareholder over the three-year period preceding a particular test date. For this purpose, shareholders who acquire less than 5% of the stock in a public offering are considered a single 5% shareholder. A change in ownership is expected to occur as a result of this Offering. Thus, Sterling will be subject to the limitations described in Section 382 of the Code.

Section 382 provides a limitation on the use of deductions and NOL carryforwards by a taxpayer after an ownership change occurs. Generally NOL carryforwards and certain built-in losses are subject to an annual limitation on the taxable income against which those carryforwards may be deducted. The annual limitation is based on the application of the long-term tax-exempt rate published monthly by the Treasury Department to the value of the acquired institution at the time of the change in ownership. The current long-term tax-exempt rate is estimated to be 6.66%. Based on the value established by this Offering, the value of Sterling immediately prior to the anticipated ownership change is estimated to be $5.9 million. The annual limitation is estimated to be $392,940. This limitation applies for both regular and alternative minimum tax purposes. It is expected that the limitation upon Sterling's ability to utilize NOL carryforwards could result in significantly higher federal income taxes payable by Sterling in the future.

**Built-In Gains and Losses**

Section 382 deduction limitations are not confined to NOL carryforwards. Also included, unless within a de minimis rule which Sterling expects to meet, are "built-in losses," i.e., losses incurred by Sterling after the change in ownership but which reflect a decline in value of the disposed asset while it was in the hands of Sterling prior to the ownership change. These built-in losses would include any available bad debt deductions not taken prior to the ownership change. This amount is estimated to be $8.8 million.

Under the de minimis rule, a taxpayer may treat unrealized built-in gain or loss as zero and not subject to the deduction limitations of Section 382. The de minimis rule provides that if the net unrealized built-in loss is not greater than the lesser of $10 million or 15% of the "fair market value of the assets" (excluding cash, cash equivalents and marketable securities) immediately before the ownership change, then the net unrealized built-in gain or loss is zero and not subject to the limitations of Section 382. Sterling has not sought an appraisal of its assets. It is not totally clear as to whether the term "fair market value of assets" for purposes of a 15% test is determined with or without reduction for liabilities of the corporation. If the test is based on the fair market value of assets without reduction for liabilities, then the de minimis rule should apply. If not, the de minimis rule may not apply. Coopers & Lybrand has concurred with Sterling's position that under the Code as presently in effect it is more likely than not proper to determine the "fair market value of assets" without reduction for liabilities. Based on this position, Sterling has determined that the $8.8 million of non-deducted bad debt amounts and other built-in losses should not be subject to the deduction limitations of Section 382.

If the net unrealized built-in losses exceed the above de minimis threshold amount, the unused bad debt deduction and other built-in losses would be subject, together with the NOL carryforwards, to the annual Section 382 limitation, which could result in significantly higher taxes payable in the future.

**FDIC Assistance Payments**

In connection with the acquisition of Lewis Federal and Tri-Cities, the FDIC provided direct financial assistance and yield maintenance payments to Sterling. For acquisitions such as Lewis Federal and Tri-Cities occurring prior to January 1, 1989, the Code provides that gross income of a domestic savings and loan association shall not include any amount of money or other property received from the FDIC pursuant to Section 406(F) of the National Housing Act, regardless of whether any note or other instrument is issued in exchange therefor. As such, all FDIC assistance received by Sterling is tax free. For acquisitions occurring after December 31, 1989, FDIC assistance payments are included in gross income for tax purposes.

## MANAGEMENT

The Board of Directors of Sterling presently consists of ten members and is divided into three classes, with each class being as nearly equal in number as possible. Directors within each class are elected to three-year terms and serve until their successors are elected and qualified. Executive officers are elected annually by the Board of Directors at the organizational meeting of directors following the annual meeting of shareholders and serve at the Board's discretion.

Under Washington law, the director of a corporation owes a duty to that corporation and its shareholders to act in good faith, to act in a manner the director believes to be in the best interest of the corporation, and to act with the care an ordinarily prudent person in a like position would use under similar circumstances.

As allowed under Washington law, Sterling's Restated Articles of Incorporation, as amended, provide that a director of Sterling shall not be personally liable to Sterling or its shareholders for monetary damages for conduct as a director, except for liability of the director for (i) acts or omissions that involve intentional misconduct or a knowing violation of law by the director, (ii) conduct which violates RCW 23B.08.310 of the Washington Business Corporation Act pertaining to unpermitted distributions to shareholders or loans to directors or (iii) any transaction from which the director will personally receive a benefit in money, property or services to which the director is not legally entitled. If the Washington Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of Sterling shall be eliminated or limited to the fullest extent permitted by the Washington Business Corporation Act, as so amended. Any repeal or modification of the foregoing by Sterling's shareholders will not adversely affect any right or protection of a director of Sterling existing at the time of such repeal or modification.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1026

The following table sets forth information with respect to directors and executive officers of Sterling. There are no family relationships among these directors and executive officers, nor any arrangements or understandings between any director or executive officer and any other person pursuant to which such director or executive officer was elected.

| Name | Age | Position | Year Elected as a Director | Year of Expiration of Term |
|---|---|---|---|---|
| **Directors:** | | | | |
| Harold B. Gilkey ..... | 52 | Chairman of the Board and Chief Executive Officer | 1981 | 1992 |
| William W. Zuppe .... | 50 | President, Chief Operating Officer and Director | 1981 | 1992 |
| Ned M. Barnes ....... | 55 | Secretary and Director | 1983 | 1994 |
| Raymond R. Alverson . | 60 | Director | 1989 | 1994 |
| Rodney W. Barnett ... | 48 | Director | 1981 | 1994 |
| James P. Fugate ...... | 58 | Director | 1989 | 1993 |
| Charles L. Kroetch ... | 59 | Director | 1981 | 1993 |
| Robert D. Larrabee ... | 56 | Director | 1983 | 1992 |
| Robert E. Meyers ..... | 66 | Director | 1983 | 1993 |
| David O. Wallace ..... | 53 | Director | 1981 | 1993 |
| **Executive Officers Who Are Not Directors:** | | | | |
| Daniel G. Byrne ...... | 37 | Senior Vice President—Finance; Treasurer; Assistant Secretary | | |
| S. Midge Moore ...... | 43 | Senior Vice President—Branch Administration | | |
| Stephen L. Page ...... | 43 | Senior Vice President—Loan Administration | | |
| Heidi B. Stanley ...... | 35 | Senior Vice President—Administration/Operations | | |
| John M. Harlow ...... | 49 | Vice President of Sterling and President of INTERVEST | | |
| Stanton C. Parrish .... | 41 | Vice President of Sterling and President of Harbor Financial | | |
| Thomas F. Sackmann . | 39 | Vice President of Sterling and President of Action Mortgage | | |

The principal occupation of each director and executive officer of Sterling for the past five years is set forth below. All of the directors and executive officers have held their present position for the past five years unless otherwise stated.

HAROLD B. GILKEY co-founded Sterling and has served as Chairman of the Board and Chief Executive Officer since 1981. Mr. Gilkey brought to Sterling over 19 years of commercial and mortgage banking experience as Senior Vice President of Old National Bank of Spokane, Washington, a $1.6 billion commercial bank, and President of Bancshares Mortgage Company of Spokane, Washington, an institution servicing $500 million in mortgage loans. Prior to this, Mr. Gilkey was employed by Bank of America for twelve years, holding various management positions and was responsible for equipment finance and leasing, personnel and training and branch operations. Mr. Gilkey is a past Director of the Washington Savings League and a former member of the U.S. League of Savings Institutions Legislative Committee. Mr. Gilkey received his degree in business administration from the University of Montana in 1962 and his Master of Business Administration degree from the University of Southern California in 1970. Additionally, he is

Chairman of the Board of Action Mortgage, INVERVEST and Harbor Financial, which are subsidiaries of Sterling.

WILLIAM W. ZUPPE co-founded Sterling and has served as President and Chief Operating Officer, and Director, since 1981. He is also Vice President, and serves as a Director, of Action Mortgage, INTERVEST and Harbor Financial, which are subsidiaries of Sterling. Mr. Zuppe brought to Sterling 18 years of mortgage lending experience as Vice President of Bancshares Mortgage Company and Manager of Loan Administration of Sherwood & Roberts, Inc. of Walla Walla, Washington, a mortgage-banking company which serviced in excess of $500 million in mortgage loans. Mr. Zuppe is a member of the Washington Savings League Supervisory Liaison Committee.

NED M. BARNES, Secretary of Sterling since 1981 and Director since 1983, is a principal in the law firm of Witherspoon, Kelley, Davenport & Toole, P.S. of Spokane, Washington, which he joined in 1961. Mr. Barnes specializes in the areas of real estate and mortgage banking. He is also Secretary, and serves as a Director of Action Mortgage, INTERVEST and Harbor Financial, which are subsidiaries of Sterling. Mr. Barnes graduated from the University of Minnesota in 1958, earning a degree in business administration. He received his Juris Doctorate degree from the University of Washington in 1961.

RAYMOND R. ALVERSON, Director since 1989, is the Thurston County Fire Commissioner and a former captain of United Air Lines. Mr. Alverson is a former Director of Central Evergreen Federal Savings & Loan Association.

RODNEY W. BARNETT, Director since 1981, is President of Carr Sales Company, an electrical supply firm in Spokane, Washington. Mr. Barnett is also a past member of the Board of Directors of the National Association of Electrical Distributors and is Chairman of the Inland Empire Chapter of that association.

JAMES P. FUGATE, Director since 1989, is the Superintendent of Auburn School District No. 408 and a member of the Auburn Economic Development Council. Mr. Fugate is a former Director of Central Evergreen Federal Savings & Loan Association.

CHARLES L. KROETCH, Director since 1981, is owner and President of Kroma International Graphics Center, a printing and publishing company in Spokane, Washington. He is also a Director of INTERVEST, a subsidiary of Sterling. Mr. Kroetch also serves as a marketing consultant and was formerly President of the Advertising and Sales Association of Spokane, Washington.

ROBERT D. LARRABEE, Director since 1983, is the owner of Merchant Funeral Home in Clarkston, Washington. Mr. Larrabee is also a Director of Laurentian Capital Corporation, a former Director of Lewis and Clark Savings & Loan Association and a past President of the Board of Regents of the University of Washington.

ROBERT E. MEYERS, Director since 1983, is a self-employed dentist in Clarkston, Washington. Dr. Meyers is a former Director of Lewis and Clark Savings & Loan Association.

DAVID O. WALLACE, Director since 1981, is the owner of David O. Wallace & Associates, a consulting and food brokerage company, of Spokane, Washington. Mr. Wallace was also the owner and operator of Chet's Buy-Rite Market, a grocery store in Spokane, Washington.

DANIEL G. BYRNE, Senior Vice President Finance, Treasurer and Assistant Secretary, joined Sterling in 1983. Mr. Byrne is also the Assistant Secretary and Treasurer of INTERVEST and Secretary and Treasurer of Action Mortgage and Harbor Financial, which are subsidiaries of Sterling. Before joining Sterling, Mr. Byrne was on the staff of Coopers & Lybrand in Spokane, Washington. Mr. Byrne is a certified public accountant and graduated from Gonzaga University in 1977.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1028

S. MIDGE MOORE, Senior Vice President Branch Administration, joined Sterling in 1983. Prior to 1983, Ms. Moore was employed by Capital Savings Bank in Seattle and Spokane, Washington. Ms. Moore graduated from the University of Idaho in 1970.

STEPHEN L. PAGE, Senior Vice President Loan Administration, joined Sterling in 1983. Prior to 1983, Mr. Page was employed by Kiemle & Hagood Company of Spokane, Washington as a Property Management Leasing Officer. Mr. Page graduated from the University of Utah in 1970 and received a Master of Business Administration degree from the University of New Mexico in 1973.

HEIDI B. STANLEY, Senior Vice President Administration/Operations, joined Sterling in 1985. Ms. Stanley was formerly employed as a national college recruiter by IBM in San Francisco, California and Tucson, Arizona. Ms. Stanley graduated from Washington State University in 1979 with a degree in business administration.

JOHN M. HARLOW, Vice President of Sterling and President and Director of INTERVEST, a subsidiary of Sterling, joined Sterling in 1987. Mr. Harlow was formerly the President of the Mortgage Banking Division of Moore Financial Services of Portland, Oregon, a mortgage-banking subsidiary of West One Bancorp, and Senior Vice President of Income Property Lending of Bancshares Mortgage Company in Spokane, Washington. Mr. Harlow was also a Vice President/Regional Manager for I.D.S. Mortgage Company in Northern California. He graduated from the University of Illinois in 1965.

STANTON C. PARRISH, Vice President of Sterling and President and Director of Harbor Financial, a subsidiary of Sterling, joined Sterling in 1983. Prior to 1983, Mr. Parrish was employed by Western Savings Association of Portland, Oregon. Mr. Parrish is a 1972 graduate of Washington State University.

THOMAS F. SACKMANN, Vice President of Sterling and President and Director of Action Mortgage, which is a subsidiary of Sterling, joined Sterling in 1988. Mr. Sackmann was formerly Executive Vice President and Chief Operating Officer of Moore Financial Services of Boise, Idaho, a mortgage banking subsidiary of West One Bancorp, and was responsible for residential lending. Mr. Sackmann is a 1973 graduate of Linfield College and a 1976 graduate of the University of Washington School of Law.

**Committees of the Board of Directors**

The Audit Committee of the Board of Directors has certain duties relating to the work of the internal auditor, the annual independent certified public accountant audit, regulatory examinations, Sterling's internal accounting controls and Sterling's relationship with its independent auditors. The Committee currently consists of directors Barnett (Chairman), Barnes, Meyers and Wallace.

The Personnel Committee is composed of directors Larrabee (Chairman), Kroetch and Meyers. The Personnel Committee makes recommendations to the Board of Directors with respect to personnel policies which include, but are not limited to, officer and employee salaries and benefits.

The Planning Committee identifies and monitors broad political, social and environmental trends that may affect Sterling's activities and performance, advises management on long-range plans and programs, and assists the Board of Directors in policy-making functions. The Committee currently consists of directors Gilkey (Chairman), Barnes, Barnett, Kroetch, Larrabee, Wallace and Zuppe.

**Board of Director Compensation**

Directors of Sterling, including directors who are also executive officers, each receive an annual retainer of $2,000, plus a fee, which is currently $500, for each board meeting attended.

**Executive Compensation**

The following table sets forth information as to remuneration earned on an accrual basis for fiscal year 1991, by or on behalf of each of the five most highly compensated executive officers of Sterling whose total cash remuneration exceeded $60,000, as well as all executive officers of Sterling as a group.

| Name of Individual | Capacity Served | Cash Compensation(1) |
|---|---|---|
| Harold B. Gilkey ...................... | Chairman of the Board and Chief Executive Officer of Sterling | $184,600 |
| William W. Zuppe ...................... | President and Chief Operating Officer of Sterling | 137,000 |
| Thomas F. Sackmann.................... | Vice President of Sterling and President of Action Mortgage | 118,700 |
| John M. Harlow ........................ | Vice President of Sterling and President of INTERVEST | 96,400 |
| Daniel G. Byrne ....................... | Senior Vice President—Finance | 73,100 |
| All executive officers as a group (10 individuals) ...................... | | 844,100 |

(1) Includes salaries, cash bonuses and directors' fees. Does not include the value of medical and dental insurance, club memberships, automobiles and similar items which in the aggregate do not exceed 10% of the compensation to any such individual or 10% of the cash compensation paid to all executive officers as a group.

**Certain Employment Agreements and Arrangements**

Employment agreements between Sterling and Mr. Gilkey and Mr. Zuppe provide for annual basic compensation of not less than $54,000 to Mr. Gilkey and $42,000 to Mr. Zuppe. Additionally, such agreements provide for the payment of incentive bonuses, non-qualified deferred compensation (as described below), stock options and stock appreciation rights, the provision of term life insurance and rights to receive or participate in other benefit programs offered or maintained by Sterling. Incentive bonuses, which range in amount from 15% to 40% of Mr. Gilkey's and Mr. Zuppe's respective base salaries, are payable upon the attainment by Sterling of a return on equity of 10% or more. The maximum bonus would be paid if Sterling achieves a return on equity of 16% or more. Amounts payable as incentive bonuses are limited to 10% of Sterling's net income, calculated before deduction of incentive bonuses but after deduction for federal income taxes. Deferred compensation may be paid in an amount equal to 10% of the employee's annual base salary and additional contributions may be made up to 20% of the annual base salary. Stock options under the employment agreements are granted under the Incentive Stock Option Plan described below. Stock appreciation rights are granted in tandem with the stock options granted under the Incentive Stock Option Plan and must be exercised as a unit. A stock appreciation right entitles the holder to receive a payment equal to the difference between the fair market value of a share of Common Stock on the date of exercise over the opening or base value of the stock appreciation right on the date of grant. Sterling must purchase term life insurance for the duration of the agreements in the face amount of $500,000 on the life of each of Mr. Gilkey and Mr. Zuppe. The Association has the right to name the beneficiary with respect to one-half of the proceeds of each policy and Mr. Gilkey and Mr. Zuppe have the right to name the beneficiary with respect to the other half of the proceeds of each respective policy. Such agreements also provide for the payment of certain severance benefits to Mr. Gilkey and Mr. Zuppe upon termination of their employment by Sterling without good cause. Pursuant to these provisions, Mr. Gilkey and Mr. Zuppe are entitled to receive severance benefits of $300,000 and $250,000, respectively, payable either in a single installment or in equal installments over a period of five years, at the option of the employee. Mr. Gilkey's and Mr. Zuppe's employment agreements became effective July 23, 1985 and continue for the lesser of ten years or until terminated as

provided in the agreements. The agreements provide that they may be terminated by mutual consent, by the employee upon six months' notice, by Sterling without cause upon payment of the above-described benefits, by Sterling with cause, automatically upon the employee's death, insanity, disability, bankruptcy, by the FDIC or the OTS under certain conditions or upon certain other events involving the employee. The employee may, for consideration, waive limitations on compensation provisions of the employment agreements.

**Deferred Compensation Plan**

Since July 1, 1984, Sterling has maintained a nonqualified Deferred Compensation Plan covering Mr. Gilkey and Mr. Zuppe as provided by their respective employment agreements. The Personnel Committee may choose additional participants from a group of management employees. Contributions to the plan for each given year are determined by the Board as a percentage of net profits and allocated among individual participant accounts by the Personnel Committee. Contributions to the accounts maintained for Mr. Gilkey and Mr. Zuppe are allocated in accordance with their respective employment agreements, unless such contributions are waived. Accounts are credited with interest each year at the applicable rate for that year. Participants vest in an additional 10% of their benefit under the plan for each year of service with Sterling, with full vesting after ten years of service and upon retirement at or after age 60, death or disability. Payment of an account may be in a lump sum or in installments as determined by the Personnel Committee and installments may be accelerated by the Committee. Payment must be commenced within one year of the termination of the participant's employment with Sterling. No contributions were made for the three months ended September 30, 1991 or for the fiscal year ended June 30, 1991.

The vested amounts, accrued pursuant to the Deferred Compensation Plan as of June 30, 1991, are as follows:

| | |
|---|---|
| Harold B. Gilkey | $ 74,160 |
| William W. Zuppe | 46,520 |
| Thomas F. Sackmann | 4,000 |
| John M. Harlow | 4,000 |
| Daniel G. Byrne | 2,000 |
| All executive officers as a group (10 individuals) | 132,680 |

Sterling's Deferred Compensation Plan intends to purchase approximately 4,939 shares of Common Stock at the Price to Public in this Offering.

**Employee Savings Plan**

Effective July 1, 1985, Sterling adopted an employee savings plan under Section 401(k) of the Code. All of Sterling's salaried employees who have completed one year of service (including at least 1,000 hours of service) and who are at least 18 years old are eligible to participate in the plan and may elect to contribute on a tax-deferred basis up to 10% of their salary, which contributions vest immediately. Contributions to 401(k) plans are subject to nondiscrimination requirements. Therefore, highly compensated employees may have their contributions limited to less than 10% of their salary. Sterling makes a matching contribution equal to 25% of the employee's contribution up to a maximum of 2% of a participant's salary. Participants are 100% vested at all times in both employee and employer contributions. Employees have the option of directing their contribution to a fixed income security account or an equity security account. Prior to September 1, 1990, employer matching contributions were used to purchase Sterling's Common Stock and employees had the option of directing their contributions to the purchase of Sterling's Common Stock. During the three months ended September 30, 1991 and the fiscal year ended June 30, 1991, Sterling contributed $12,802 and $49,336, respectively, to the plan.

A participant's accrued benefit under the employee savings plan may be paid upon an employee's retirement, disability, termination of employment or death. If the value of the employee's account is $3,500

or less, the account will be distributed in a lump sum. If the value exceeds $3,500, participants may choose to leave their balance in the plan until age 70½, or they may elect monthly, quarterly or annual installments.

During the fiscal year ended June 30, 1991, allocations of Sterling's contribution under this plan to each of the most highly compensated executive officers and to all executive officers as a group (10 individuals) were as follows:

| | |
|---|---|
| Harold B. Gilkey | $1,995 |
| William W. Zuppe | 1,800 |
| Thomas F. Sackmann | -0- |
| John M. Harlow | 1,560 |
| Daniel G. Byrne | 1,260 |
| All executive officers as a group (10 individuals) | 9,463 |

**Incentive Stock Option Plan**

Sterling adopted an Incentive Stock Option Plan on January 25, 1984. Up to 100,000 shares of Sterling's Common Stock may be issued to officers and key employees of Sterling and subsidiary corporations pursuant to the exercise of incentive stock options or nonqualified stock options granted under the plan. The exercise price of options granted under the plan must at least equal the fair market value per share of Sterling's Common Stock on the date of grant. Options may be exercised in whole or in part after one year from the date of grant. In addition, the aggregate fair market value of the stock for which any employee may be granted options in any calendar year may not exceed $100,000 and the expiration date of the options may not exceed ten years from the date of grant. The Board of Directors is responsible under the plan for determining eligible participants, and the number of options, exercise prices and option termination dates with respect to each grant.

In accordance with certain employment agreements, Mr. Gilkey and Mr. Zuppe are entitled to receive incentive stock options under Sterling's Incentive Stock Option Plan together with an equal number of stock appreciation rights. Pursuant to these agreements, Mr. Gilkey and Mr. Zuppe are entitled to receive, provided Sterling attains a 0.40% return on average assets, incentive stock options and stock appreciation rights in a minimum annual amount of 1,000 shares, and a maximum annual amount of 2,500 shares. The stock appreciation rights are granted in tandem with the incentive stock options granted under the plan and must be exercised as a unit.

At September 30, 1991, options to purchase an aggregate of 82,500 shares of Common Stock with exercise prices ranging between $5.00 and $10.21 per share were outstanding, options for 6,250 shares of Common Stock had been exercised and options with respect to 11,250 shares of Common Stock remained available for grant. Such options are exercisable over periods expiring in fiscal years 1991 through 2001. Options to purchase 38,750 shares of Common Stock were granted during the fifteen month period ended September 30, 1991 at exercise prices of $5.00 to $8.25 per share. During fiscal year 1991, stock options for 9,000 shares expired unused at exercise prices of $9.72 to $10.21 per share.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1032

The following table sets forth information with respect to options granted and exercised during fiscal year 1991 and for the period from July 1, 1991 to September 30, 1991, to or by the executive officers of Sterling and to all executive officers as a group.

| | Harold B. Gilkey(1) | William W. Zuppe(1) | John M. Harlow | Thomas F. Sackmann | Daniel G. Byrne | All Executive Officers as a Group (10 Individuals) |
|---|---|---|---|---|---|---|
| Options outstanding at June 30, 1990 .... | 13,875 | 13,875 | 3,000 | 2,000 | 3,500 | 49,750 |
| Average exercise price per share .... | $8.67 | $8.67 | $9.59 | $9.33 | $9.56 | $9.05 |
| Options granted during fiscal 1991 ...... | 2,000 | 2,000 | 1,000 | 1,000 | 1,000 | 11,000 |
| Average exercise price per share .... | $5.00 | $5.00 | $5.00 | $5.00 | $5.00 | $5.00 |
| Options expired at June 30, 1991 ........ | 0 | 0 | (1,000) | 0 | (1,500) | (8,000) |
| Average exercise price per share .... | 0 | 0 | $10.13 | 0 | $9.88 | $9.89 |
| Options outstanding at June 30, 1991 .... | 15,875 | 15,875 | 3,000 | 3,000 | 3,000 | 52,750 |
| Average exercise price per share .... | $8.21 | $8.21 | $7.88 | $7.88 | $7.88 | $8.08 |
| Options granted July 1, 1991 through September 30, 1991 ................ | 3,250 | 3,250 | 1,000 | 2,500 | 2,500 | 18,000 |
| Average exercise price per share(2) .. | $8.25 | $8.25 | $8.25 | $8.25 | $8.25 | $8.25 |
| Options outstanding at September 30, 1991............................ | 19,125 | 19,125 | 4,000 | 5,500 | 5,500 | 70,750 |
| Average exercise price per share .... | $8.21 | $8.21 | $7.98 | $8.05 | $8.05 | $8.12 |

(1) Options to purchase a total of 17,453 shares of Common Stock have been granted to each individual in tandem with stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock above the option price at the date of exercise. Payment is to be made in cash, in the form of Common Stock, or in any combination thereof. The exercise of either rights or options serves to cancel the other.

(2) Options were granted on July 1, 1991 at a price of $5.25 per share but were subject to an adjustment to reflect the Price to Public for an offering of common shares during one year following the date of grant. Accordingly, the table is based upon the Price to Public of $8.25.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth as of September 30, 1991 information concerning the beneficial ownership of Sterling's Common Stock by persons who are known by Sterling to own beneficially more than 5% of Sterling's Common Stock, by directors of Sterling, and by all directors and executive officers as a group. At such date, no person who was not also a director of Sterling owned more than 5% of Sterling's Common Stock. For all persons listed, the address is the same as Sterling's.

| Name of Beneficial Owner | Before Offering: Amount and Nature of Beneficial Ownership | Before Offering: Approximate Percentage of Class(1) | Shares Reserved for Sale | Approximate Percentage of Class After Offering(2) |
|---|---|---|---|---|
| Raymond R. Alverson | 1,000 | * | 2,500 | * |
| Ned M. Barnes | 7,772(3) | 1.5% | 6,060 | * |
| Rodney W. Barnett | 8,051(4) | 1.5% | 1,212 | * |
| James P. Fugate | 1,000 | * | 1,818 | * |
| Harold B. Gilkey | 62,807(5) | 11.3% | 20,000 | 2.6% |
| Charles L. Kroetch | 14,813(6)(7) | 2.8% | 7,969(8) | * |
| Robert D. Larrabee | 14,109(7) | 2.7% | 10,999(8) | * |
| Robert E. Meyers | 23,514(7)(9) | 4.4% | 6,151(8) | * |
| David O. Wallace | 3,165 | * | 1,000 | * |
| William W. Zuppe | 20,741(10) | 3.9% | 3,000 | * |
| All directors and executive officers as a group (17 persons) (2 through 11) | 176,873 | 28.8% | 70,465(8) | 7.6% |

*Less than 1%

(1) Percentage of class is based upon the ratio of (i) the total number of shares of Common Stock set forth opposite each named individual (and all directors and executive officers as a group) to (ii) the sum of the number of issued and outstanding shares of Common Stock at September 30, 1991 and the number of shares issuable to each named individual, respectively, and to all directors and executive officers as a group upon (a) the exercise of stock options, (b) the conversion of shares of Series B Preferred Stock and/or (c) shares of Common Stock (either issued or issuable upon conversion of shares of Series B Preferred Stock) held in individual accounts under Sterling's employee savings plan. At September 30, 1991, there were 518,819 issued and outstanding shares of Common Stock, without giving effect to shares issuable upon the exercise of options or conversion of the Series B Preferred Stock.

(2) Percentage of class is based upon the ratio of (i) the total number of shares of Common Stock set forth opposite each named individual (and all directors and executive officers as a group) to (ii) the sum of the number of issued and outstanding shares of Common Stock upon completion of this Offering and the planned conversion of the Series B Preferred Stock and the number of shares issuable to each named individual, respectively, and to all directors and officers as a group upon (a) the exercise of stock options and/or (b) shares of Common Stock held in individual accounts under Sterling's employee savings plan. Upon completion of this Offering and the planned conversion of the Series B Preferred Stock, there will be 3,216,656 shares of Common Stock outstanding excluding shares issuable under Sterling's Incentive Stock Option Plan.

(3) Includes 523 shares of Common Stock owned by JBG Associates, a general partnership of which Mr. Barnes is a partner with shared voting and investment power and 4,828 shares of Common Stock owned for Mr. Barnes' account under a self-directed profit sharing plan maintained by the law firm of which Mr. Barnes is a partner. Also includes 220 and 2,200 shares of Common Stock issuable upon conversion of 100 and 1,100 shares of Series B Preferred Stock held by JBG Associates and said profit sharing plan, respectively. Does not include 1,000 shares of Common Stock owned by the law firm of which Mr. Barnes is a principal.





CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1034

(4) Includes 3,220 shares owned by Carr Sales Profit Sharing Plan, of which Mr. Barnett is the principal administrator.

(5) Excludes 1,100 shares of Common Stock and 1,400 shares of Series B Preferred Stock owned by Sterling's Deferred Compensation Plan, of which Mr. Gilkey disclaims beneficial ownership. Includes 15,875 and 18,304 shares of Common Stock issuable to Mr. Gilkey upon the exercise of stock options and the conversion of shares of Series B Preferred Stock, respectively, held by Mr. Gilkey. Also includes 523 shares of Common Stock issuable upon conversion of shares of Series B Preferred Stock held for Mr. Gilkey's individual account under Sterling's employee savings plan.

(6) Includes 2,112 shares of Common Stock issuable upon the conversion of shares of Series B Preferred Stock held by Mr. Kroetch.

(7) Includes 5,820 shares of Common Stock (either issued or issuable upon the planned conversion of shares of Series B Preferred Stock) held by Sterling's Deferred Compensation Plan at September 30, 1991 because power to vote and/or to dispose of such shares is vested in Sterling's Personnel Committee, of which this director is a member. This director disclaims beneficial ownership of these shares of Common Stock.

(8) Includes 4,939 shares of Common Stock reserved for sale to Sterling's Deferred Compensation Plan because power to vote and/or to dispose of such shares is vested in Sterling's Personnel Committee, of which three directors are members. These directors disclaim beneficial ownership of these shares of Common Stock.

(9) Includes 2,200 shares of Common Stock issuable upon the conversion of shares of Series B Preferred Stock held by Mr. Meyers.

(10) Excludes 1,200 shares of Series B Preferred Stock owned by Sterling's Deferred Compensation Plan, of which Mr. Zuppe disclaims beneficial ownership. Includes 15,875 and 572 shares of Common Stock issuable upon the exercise of stock options and the conversion of shares of Series B Preferred Stock, respectively, held by Mr. Zuppe. Also includes 881 shares of Common Stock held for Mr. Zuppe's individual account under Sterling's employee savings plan.

(11) In addition to the shares referenced in footnotes (2) through (7), includes 21,000 and 2,816 shares of Common Stock issuable to executive officers upon the exercise of stock options and the conversion of Series B Preferred Stock, respectively, held by such officers. Also includes an aggregate of 2,348 shares of Common Stock (either issued or issuable upon conversion of shares of Series B Preferred Stock) held in individual accounts under Sterling's employee savings plan.



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1035

## SHARES RESERVED FOR SALE TO DIRECTORS, EXECUTIVE OFFICERS AND DEFERRED COMPENSATION PLAN

The following table sets forth information concerning shares of Common Stock offered hereby which have been reserved by the Underwriters for sale at the Price to Public to certain of Sterling's directors and executive officers and its Deferred Compensation Plan. The information set forth in the following table is prospective and reflects only Sterling's understanding of the intentions of the persons named with respect to such purchases. The information set forth in the following table should be read in conjunction with the information set forth in the preceding beneficial ownership table.

| Name of Prospective Purchaser | Number of Shares Reserved for Sale |
|---|---|
| Raymond R. Alverson | 2,500 |
| Ned M. Barnes | 6,060 |
| Rodney W. Barnett | 1,212 |
| James P. Fugate | 1,818 |
| Harold B. Gilkey | 20,000 |
| Charles L. Kroetch | 3,030 |
| Robert D. Larrabee | 6,060 |
| Robert E. Meyers | 1,212 |
| David O. Wallace | 1,000 |
| William W. Zuppe | 3,000 |
| Daniel G. Byrne | 6,060 |
| John M. Harlow | 2,060 |
| S. Midge Moore | 2,060 |
| Stephen L. Page | 606 |
| Stanton C. Parrish | 1,212 |
| Thomas F. Sackmann | 2,970 |
| Heidi B. Stanley | 4,666 |
| Deferred Compensation Plan | 4,939 |
| Total shares reserved for sale | 70,465 |

## CERTAIN TRANSACTIONS

Certain of the directors and executive officers of Sterling were customers of, and had transactions with, Sterling in the ordinary course of business during the fiscal year ended June 30, 1991 and the three months ended September 30, 1991. In addition, certain of Sterling's directors and executive officers are officers, directors or shareholders of corporations or members of partnerships which were customers of Sterling and had transactions with Sterling in the ordinary course of business. All loans included in such transactions were on substantially the same terms, at substantially the same rates, and with substantially the same collateral requirements as those prevailing at the time for comparable transactions with other persons, and did not involve more than the normal risk of collectibility or present other unfavorable features. The following table sets forth certain information relating to loans made to directors and executive officers of Sterling whose total aggregate loan balances exceeded $60,000 at any time during the fifteen months ended September 30, 1991.

| Borrower | Type | Date of Loan | Highest Unpaid Balance | Balance Outstanding at September 30, 1991 | Current Rate |
|---|---|---|---|---|---|
| Robert E. Meyers | Mortgage | 7/31/80 | $103,064 | $101,021 | 10.000% |
| Robert D. Larrabee | Mortgage | 8/01/73 | 20,738 | 18,227 | 6.500 |
| | Consumer | 7/22/85 | 72,201 | 60,685 | 8.500 |
| William W. Zuppe | Mortgage | 6/03/85 | 137,229 | 132,466 | 8.750 |
| | Consumer | 5/31/91 | 35,005 | 0 | 9.375 |
| Heidi B. Stanley | Mortgage | 7/02/85 | 154,227 | 152,116 | 8.875 |
| | Consumer | 7/30/87 | 9,944 | 0 | 9.375 |
| Stanton C. Parrish | Mortgage | 12/8/83 | 91,202 | 89,554 | 8.125 |
| Stephen L. Page | Mortgage | 9/12/88 | 62,150 | 58,917 | 8.750 |
| | Consumer | 5/19/89 | 15,954 | 0 | 8.875 |

All future material loans to and transactions with Sterling's officers, directors, affiliates and/or controlling shareholders will be made for bona fide business purposes, will be on terms no less favorable than those available to unaffiliated parties and will be approved by a majority of the independent disinterested directors of Sterling.

The law firm of Witherspoon, Kelley, Davenport & Toole, P.S., of which Ned M. Barnes is a principal, billed $212,400 and $456,800 during the three months ended September 30, 1991 and the fiscal year ended June 30, 1991, respectively, for legal services rendered to Sterling and its subsidiaries, exclusive of amounts paid by customers.

During the three months ended September 30, 1991 and fiscal year ended June 30, 1991, Sterling purchased stationery supplies and incurred expenses for advertising and promotional services aggregating approximately $8,600 and $105,100, respectively, from Kroma International Graphics Center, which is owned by Charles L. Kroetch.

## DESCRIPTION OF CAPITAL STOCK

**Common Stock**

Sterling is authorized under its Restated Articles of Incorporation, as amended, to issue up to 8,000,000 shares of Common Stock, $1.00 par value, of which 518,819 shares were issued and outstanding at the close of business on September 30, 1991. In addition to the 2,500,000 shares of Common Stock offered hereby, the Underwriters may elect to purchase up to an additional 375,000 shares solely to cover over-allotments, if any.

Holders of Common Stock are entitled to one vote per share upon all matters upon which shareholders have the right to vote and are not entitled to cumulative voting rights. Shares of Common Stock do not have preemptive rights and are not subject to redemption. Holders of Common Stock are entitled to receive such dividends as may be declared by the Board of Directors of Sterling out of funds legally available. In the event of dissolution or winding up of the affairs of Sterling, holders of Common Stock are entitled to share ratably in all assets remaining after payment of all creditors and payment of all liquidation preferences of Sterling's Preferred Stock then outstanding. All outstanding shares of Common Stock are fully paid and nonassessable. The rights, preferences and privileges of holders of Common Stock are subject to those of holders of the Series B Preferred Stock and any other Preferred Stock that Sterling may issue in the future.

Manufacturers Hanover is the transfer agent and registrar for the Common Stock.

**Preferred Stock**

Sterling is authorized under its Restated Articles of Incorporation, as amended, to issue up to 1,000,000 shares of Preferred Stock, $1.00 par value. Preferred Stock is issuable in one or more series, each with such designations, preferences, rights, qualifications, limitations, and restrictions as the Board of Directors of Sterling may determine and set forth in supplemental resolutions at the time of issuance, generally without further shareholder action.

**Series B Preferred Stock**

On March 22, 1988, the Board of Directors of Sterling adopted a preferred stock resolution establishing and designating, and fixing and determining, the relative rights and preferences of the Series B Preferred Stock, of which 89,968 shares (issued in exchange for then-existing shares of $2.25 Cumulative Convertible Preferred Stock—Series A) are currently authorized and outstanding. Holders of the Series B Preferred Stock are entitled to receive, when, as and if declared by the Board of Directors, out of funds legally available therefor, annual cumulative cash dividends at the rate of $2.50 per share, payable quarterly in arrears on January 31, April 30, July 31 and October 31 of each year (each a "Dividend Payment Date"). The first Dividend Payment Date was October 31, 1988. There is no sinking fund with respect to the Series B Preferred Stock. Sterling intends to convert the Series B Preferred Stock into Common Stock upon, or within five days of, completion of this Offering and to pay accumulated dividends on or before January 15, 1992. See "Conversion of Series B Preferred Stock." Sterling's ability to pay dividends on the Series B Preferred Stock may be subject to prior approval by the OTS. See "Dividends."

*Cumulative Dividends.* Holders of Series B Preferred Stock are entitled to receive, when, as and if declared by the Board of Directors, out of funds legally available therefor, cumulative cash dividends, payable quarterly in arrears, at the rate of $2.50 per share per annum. Declared dividends on the Series B Preferred Stock accrue from the date of issuance and are payable quarterly on each Dividend Payment Date. Each declared dividend is payable to holders of record as they appear at the close of business on the stock books of Sterling on such record dates, not more than 30 nor less than three calendar days preceding the payment dates therefor as determined by the Board of Directors.

The right of holders of Series B Preferred Stock to receive dividends is cumulative. Accordingly, if the Board of Directors fails to declare a dividend payable on a Dividend Payment Date, then holders of the Series B Preferred Stock will have the right to receive a dividend in respect of the dividend period ending on such Dividend Payment Date, and Sterling will have the obligation to pay the dividend accrued for such period, whether or not dividends are declared payable on any future Dividend Payment Dates.

No full dividends shall be declared or paid or set apart for payment on any other preferred stock of Sterling of any series ranking, as to dividends, on a parity with or junior to the Series B Preferred Stock (the Common Stock and such other classes and series of equity securities being sometimes hereinafter referred to as the "Junior Stock") for any dividend period unless (i), except with respect to any series of preferred stock that at any time pays dividends on a periodic basis other than a quarterly basis, full dividends on the Series B Preferred Stock for the then-current dividend period have been or contemporaneously are declared and paid in full or declared and a sum sufficient for the payment thereof is set apart for such payment and (ii), with respect to any series of preferred stock that at any time pays dividends on a periodic basis other than a quarterly basis, full dividends on the Series B Preferred Stock for the immediately preceding dividend period have been declared and paid. When dividends are not so paid in full (or a sum sufficient for such full payment is not so set apart) upon the Series B Preferred Stock or any other preferred stock of Sterling ranking on a parity as to dividends with the Series B Preferred Stock, dividends upon shares of Series B Preferred Stock and dividends on such other preferred stock shall be declared by the Board of Directors pro rata so that the amount of dividends declared per share on the Series B Preferred Stock and on such other preferred stock shall in all cases bear to each other, except (a) with respect to any series of preferred stock that at any time pays dividends on a periodic basis other than a quarterly basis, the same ratio that accrued dividends on the Series B Preferred Stock for then-current dividend period (which shall include any accumulation in respect of unpaid dividends for prior dividend periods) and full dividends, including accumulations, if any, in respect of unpaid dividends for prior dividend periods, on shares of such other preferred stock, bear to each other and (b) with respect to any series of preferred stock that at any time pays dividends on a periodic basis other than a quarterly basis, the same ratio that dividends per share on the Series B Preferred Stock for the immediately preceding dividend period (which shall include any accumulation in respect of unpaid dividends for prior dividend periods) and full dividends, including accumulations, if any, in respect of unpaid dividends for prior dividend periods, on shares of such other preferred stock, bear to each other. Except as provided in the preceding sentence, full dividends on the Series B Preferred Stock must be declared and paid or set aside for payment for the most recent dividend period ending before (i) any dividends (other than in Common Stock or other Junior Stock) shall be declared and paid or set aside for payments, or any other distribution shall be made upon the Common Stock or other Junior Stock with respect to the payment of dividends or upon liquidation, or (ii) any Common Stock or any other Junior Stock is redeemed, purchased, or otherwise acquired by Sterling for any consideration (or any monies are paid to or made available for a sinking fund for the redemption of any shares of any such stock) except upon liquidation or by conversion into or exchange for stock of Sterling ranking junior to the Series B Preferred Stock as to dividends.

The amount of dividends payable for the initial period or any period shorter than a full dividend period are computed on the basis of a 360-day year of twelve 30-day months, and the actual number of days elapsed in the period. Dividends payable for each full quarterly period shall be computed by dividing the rate by four.

*Conversion Rights.* The Series B Preferred Stock is convertible at the option of the holder or Sterling into such number of shares of Common Stock as is determined by dividing the liquidation preference of such shares ($25.00) by a conversion price ($11.36 at September 30, 1991). The conversion price is subject to appropriate adjustment to prevent dilution of the conversion rights in certain events, including (i) the issuance of shares of Common Stock as a stock dividend, (ii) the subdivision, combination or reclassification of the Common Stock, (iii) the issuance to all holders of Common Stock of rights or warrants entitling them (within a 45-calendar-day period) to subscribe for or purchase shares of Common Stock at less than the current market price and (iv) the distribution to all holders of Common Stock of obligations, securities or property of

Sterling (other than cash dividends paid from retained earnings or consolidated net income) or rights to subscribe for or otherwise acquire securities of Sterling (other than those securities mentioned in this sentence). In addition to the foregoing adjustments, Sterling may, but shall not be required to, make such reductions in the conversion price as it considers to be advisable in order that any event treated for federal income tax purposes as a dividend of stock or stock rights will be taxable to the recipients to the minimum extent determined to be reasonable under the circumstances, as determined by the Board of Directors. No adjustment in the conversion price will be required unless such adjustment would require a change of at least 1% in the conversion price then in effect; provided, however, that any adjustment that would otherwise be required to be made shall be carried forward and taken into account in determining whether any subsequent adjustment is required. Except as set forth above, the conversion price will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, or carrying the right or option to purchase or otherwise acquire the foregoing, in exchange for cash, other property or services.

In the event of any consolidation or merger of Sterling with or into any other entity (other than a merger in which Sterling is the surviving entity), or in case of any sale or transfer of substantially all the assets of Sterling, or in the event of a reclassification, capital reorganization or change of outstanding shares of Common Stock, any holder of the Series B Preferred Stock will be entitled, after the occurrence of any such event, to receive on conversion the consideration which the holder would have received had such holder converted such holder's Series B Preferred Stock to Common Stock immediately prior to the occurrence of the event.

*Voting.* Holders of Series B Preferred Stock, voting as one class together with the holders of Common Stock, are entitled to one vote per share upon all matters upon which shareholders have the right to vote. Shares of Series B Preferred Stock do not have cumulative voting rights or preemptive rights, and are not subject to redemption.

*Liquidation Preference.* In the event of any voluntary or involuntary liquidation, dissolution or winding up of Sterling, the holders of Series B Preferred Stock are entitled, before any distribution or payment is made to holders of Common Stock or of any other Junior Stock upon liquidation, to a liquidation preference of $25.00 per share, plus accrued and unpaid dividends to the date of distribution. In the event of liquidation or dissolution, before payment may be made on any capital stock of Sterling, including the Series B Preferred Stock, Sterling must pay the amount reflected in the liquidation account, to the extent it is still in existence, to eligible account holders, in addition to payment of all liabilities of Sterling. If, upon the voluntary or involuntary liquidation, dissolution, or winding up of Sterling, the amounts payable with respect to the Series B Preferred Stock and any other shares of stock of Sterling ranking as to any such distribution on a parity with the Series B Preferred Stock are not paid in full, the holders of the Series B Preferred Stock and of such other shares will share ratably in any such distribution of assets of Sterling in proportion to the full respective distribution to which they are entitled, and the holders of shares of Series B Preferred Stock will not be entitled to any further participation in any distribution of assets by Sterling. Such liquidation rights are not triggered by (i) the sale, lease or exchange (for cash, shares of stock, securities, or other consideration) of all or substantially all the property and assets of Sterling, (ii) the merger or consolidation of Sterling into or with any other entity, or (iii) the merger or consolidation of any other entity with or into Sterling.

Manufacturers Hanover is the transfer agent and registrar for the Series B Preferred Stock.

**Anti-Takeover Provisions**

Sterling, through its articles of incorporation and bylaws, has in place certain provisions which may have an anti-takeover effect. Sterling's Restated Articles of Incorporation, as amended, provide, among other things, that Sterling may issue up to 1,000,000 shares of Preferred Stock, of which 89,968 shares are currently issued and outstanding, without prior shareholder approval, in one or more series, with such powers, preferences, rights, and limitations as the Board of Directors of Sterling may determine. Shares of preferred stock, if issued, could be given voting and conversion rights that could dilute the voting power and equity of the Common Stock. The issuance of preferred stock under certain circumstances could have the effect of delaying or preventing a change in control of Sterling. In addition, the Restated Articles of Incorporation provide for a classified Board of Directors, with Directors in each class being elected to three-year terms.

Sterling's Restated Articles of Incorporation, as amended, provide that a director of Sterling shall not be personally liable to Sterling or its shareholders for monetary damages for conduct as a director, except for liability of the director for (i) acts or omissions that involve intentional misconduct or a knowing violation of law by the director, (ii) conduct which violates RCW 23B.08.310 of the Washington Business Corporation Act pertaining to unpermitted distributions to shareholders or loans to directors or (iii) any transaction from which the director will personally receive a benefit in money, property or services to which the director is not legally entitled. If the Washington Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of Sterling shall be eliminated or limited to the fullest extent permitted by the Washington Business Corporation Act, as so amended. Any repeal or modification of the foregoing by Sterling's shareholders will not adversely affect any rights or protection of a director of Sterling existing at the time of such repeal or modification.

These and related provisions may discourage nonnegotiated takeover attempts which certain shareholders may deem to be in their interests. These and other provisions may also tend to perpetuate management.

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this Offering and the planned conversion of the 89,968 outstanding shares of the Series B Preferred Stock into 197,837 shares of Common Stock, Sterling will have outstanding 3,216,656 shares of Common Stock, excluding shares issuable under Sterling's Incentive Stock Option Plan. Of these shares, 3,022,068 shares of Common Stock will be freely transferable without restriction or further registration under the Regulations. The remaining 194,588 shares of Common Stock are restricted, as described below.

The Underwriters have reserved up to 70,465 shares of Common Stock offered hereby for sale at the Price to Public to certain of Sterling's directors and executive officers and its Deferred Compensation Plan. See "Shares Reserved for Sale to Directors, Executive Officers and Deferred Compensation Plan." Such shareholders presently own 92,179 shares of Common Stock which were acquired prior to this Offering (excluding shares issuable under Sterling's Incentive Stock Option Plan) and will hold an aggregate of 194,588 shares, or 6.0%, of the Common Stock outstanding upon completion of this Offering and the planned conversion of the Series B Preferred Stock. These shareholders have agreed with the Representatives that, for a period of 180 days from the effective date of this Offering, they will not, without written permission of the Representatives, sell, contract to sell, or otherwise dispose of, any such shares.

## UNDERWRITING

The Underwriters named below, for whom Dain Bosworth Incorporated, Sutro & Co. Incorporated and Wedbush Morgan Securities are acting as representatives (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement, to purchase from Sterling the respective numbers of shares of Common Stock set forth opposite their names below. The Underwriting Agreement provides that the obligations of the Underwriters to pay for and accept delivery of the shares of Common Stock are subject to certain conditions precedent and that the Underwriters will be obligated to purchase all of the shares if they purchase any of the shares.

| Underwriter | Number of shares of Common Stock |
|---|---|
| Dain Bosworth Incorporated | 834,000 |
| Sutro & Co. Incorporated | 833,000 |
| Wedbush Morgan Securities | 833,000 |
| TOTAL | 2,500,000 |

The Representatives have advised Sterling that the Underwriters propose to offer the shares of Common Stock to the public at the Price to Public set forth on the cover page of this Offering Circular and to certain dealers at such price less a concession not in excess of $0.37 per share and that the Underwriters and such dealers may reallow a discount not in excess of $0.10 per share to other dealers. The Price to Public, concession and discount to dealers may be changed by the Representatives after the initial public offering. The Underwriters do not intend to confirm sales to any accounts over which they exercise discretionary authority.

The Price to Public has been determined by negotiations between Sterling and the Representatives. Among the factors considered in such negotiations were the history of and prospects for the industry in which Sterling competes, the past and present operations of Sterling, its financial condition and future prospects and the general condition of the securities markets at the time of this Offering. There can be no assurance, however, that the prices at which the Common Stock will sell in the public market after this Offering will not be lower than the Price to Public.

Sterling has granted to the Underwriters an option, exercisable within 30 days after the date of this Offering Circular, to purchase up to an additional 375,000 shares of Common Stock at the Price to Public, less the Underwriting Discounts and Commissions set forth on the cover page of this Offering Circular solely to cover over-allotments in the sale of the shares of Common Stock, if any. To the extent the Underwriters exercise such option, each Underwriter will be committed, subject to certain conditions, to purchase the number of the additional shares of Common Stock which is proportional to such Underwriter's initial commitment.

At the request of Sterling, the Underwriters have reserved up to 70,465 shares of the Common Stock being sold in this Offering for sale at the Price to Public to certain of Sterling's directors and executive officers and its Deferred Compensation Plan. See "Shares Reserved for Sale to Directors, Executive Officers and Deferred Compensation Plan." The number of shares available for sale to the general public in this Offering will be reduced to the extent directors, executive officers and the Deferred Compensation Plan purchase such reserved shares. Any reserved shares not so purchased by the end of the first business day after the commencement of this Offering will be offered by the Underwriters to the general public in this Offering on the same terms as the other shares offered hereby.

Sterling has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended. Sterling has also agreed to pay the Representatives an advisory fee of $225,000 upon completion of this Offering and to reimburse the Underwriters for the difference, if any,

between the underwriting portion of the underwriting discounts and commissions and $300,000 for all direct underwriting costs incurred by the Underwriters in connection with this Offering. In connection with this Offering, Sterling is registering for sale to the Representatives, for $150, five-year warrants (the "Warrants") to purchase from Sterling 150,000 shares of Common Stock, and the Common Stock underlying such warrants. The Warrants are exercisable at $9.90 per share of Common Stock (the "Exercise Price"), a price equal to 120% of the Price to Public set forth on the cover page of this Offering Circular. The Warrants will be exercisable after the first anniversary and until the fifth anniversary of the date of this Offering Circular (the "Exercise Period"). The expiration of the Warrants, however, may be accelerated by Sterling under certain circumstances. Until the first anniversary of the date of this Offering Circular, the Warrants will be non-transferable except to the officers or partners of the Underwriters named above. The Warrants contain anti-dilution provisions which adjust the Exercise Price and the number of shares issuable thereunder upon the occurrence of certain events, including, with certain exceptions, any stock dividend, stock split, stock combination, reorganization, reclassification, consolidation, merger, sale or similar transaction. The holders of the Warrants will have no voting, cash dividend or other rights as shareholders of Sterling with respect to shares underlying the Warrants, unless the Warrants have been exercised. The Warrants grant to the holders thereof certain limited rights to participate as selling shareholders in any future public offerings of Common Stock by Sterling. The Warrants also grant to the holders thereof certain limited rights of registration of the Common Stock issuable upon exercise of the Warrants, but only in the event that such registration is required under the Regulations, as the same may be amended, or under any other applicable law.

## LEGAL MATTERS

The legality of the shares being offered hereby will be passed upon for Sterling by Witherspoon, Kelley, Davenport & Toole, P.S., Spokane, Washington and for the Underwriters by Perkins Coie, Seattle, Washington. Ned M. Barnes, the Secretary and a director of Sterling, is a principal of the firm of Witherspoon, Kelley, Davenport & Toole, P.S. Principals of the firm of Witherspoon, Kelley, Davenport & Toole, P.S. and members of their immediate families own in the aggregate approximately 10,500 shares of Sterling's Common Stock and 3,000 shares of Sterling's Series B Preferred Stock.

## EXPERTS

The consolidated balance sheets of Sterling as of June 30, 1991 and 1990 and the consolidated statements of income, changes in shareholders' equity and cash flows for each of the three years in the period ended June 30, 1991 included in this Offering Circular, have been included herein in reliance on the report, which includes an explanatory paragraph describing an uncertainty, of Coopers & Lybrand, independent certified public accountants, given on the authority of that firm as experts in accounting and auditing.

The tax positions set forth in the "Taxation" section of this document are included herein in reliance on the authority of Coopers & Lybrand, independent certified public accountants, as experts in taxation.

[THIS PAGE INTENTIONALLY LEFT BLANK]



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1044

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Independent Auditor's Report | F-2 |
| Sterling Savings Association and Subsidiaries | |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Income | F-4 |
| Consolidated Statement of Changes in Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |




CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1045

## INDEPENDENT AUDITOR'S REPORT

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries (the "Association") as of June 30, 1991 and 1990, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1991, 1990 and 1989. These consolidated financial statements are the responsibility of the Association's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1991 and 1990, and the consolidated results of their operations and their cash flows for the years ended June 30, 1991, 1990 and 1989 in conformity with generally accepted accounting principles.

The accompanying consolidated financial statements have been prepared assuming that the Association will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, there are uncertainties concerning (1) the ultimate outcome of a civil action against thrift industry regulatory authorities by the Association seeking to resolve the method of determining compliance with capital standards as promulgated pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and (2) the specific actions, if any, that regulatory authorities may later take if the Association does not prevail in its lawsuit. These matters raise substantial doubt as to the Association's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties.

The accompanying balance sheet and statement of retained earnings as of September 30, 1991, and the statements of income and cash flows for the three months ended September 30, 1991, and the statements of income and cash flows for the three months ended September 30, 1991 and 1990 were not audited by us and accordingly, we do not express an opinion on them.

We have previously audited, in accordance with generally accepted auditing standards, the consolidated balance sheets as of June 30, 1989, 1988 and 1987, and the related statements of income, retained earnings and cash flows for the years ended June 30, 1988 and 1987 (none of which are presented herein); we expressed unqualified opinions on those consolidated financial statements.

In our opinion, the information set forth in the selected financial data for each of the five years in the period ended June 30, 1991, appearing on pages 23-25, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.

COOPERS & LYBRAND

Spokane, Washington
August 15, 1991 except for Note 18, as to which the date is October 29, 1991

## STERLING SAVINGS ASSOCIATION

## CONSOLIDATED BALANCE SHEETS
**(Dollar Amounts in Thousands)**

**Information as of September 30, 1991 and for the three months then ended is unaudited**

| | September 30, 1991 (Unaudited) | June 30, 1991 | June 30, 1990 (Restated, Note 3) |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents: | | | |
| Interest bearing, including certificates of deposit | $ 469 | $ 1,087 | $ 27,689 |
| Non-interest bearing and vault | 7,467 | 5,821 | 8,795 |
| Restricted | 127 | 25 | 200 |
| Investments (market value $13,714, $15,311 and $27,050) | 13,682 | 15,270 | 27,271 |
| Loans receivable (net of allowance for losses of $4,355, $4,087 and $6,649) | 359,029 | 374,926 | 441,639 |
| Loans held for sale | 24,151 | 26,767 | 15,250 |
| Mortgage-backed securities (market value $144,763, $139,356 and $110,439) | 140,280 | 139,119 | 113,706 |
| Accrued interest receivable (including $138, $181 and $508 on investments) | 4,753 | 5,120 | 6,283 |
| Office properties and equipment | 10,473 | 10,602 | 11,133 |
| Real estate owned | 10,302 | 8,358 | 10,172 |
| Intangibles: | | | |
| Purchased mortgage servicing rights | 265 | 271 | 1,135 |
| Identified | 4,399 | 4,610 | 5,479 |
| Unidentified | 9,521 | 9,963 | 11,971 |
| Prepaid expenses and other assets | 6,177 | 6,381 | 8,217 |
| Total assets | $591,095 | $608 320 | $688,940 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Deposits | $491,288 | $488,464 | $479,227 |
| Advances from Federal Home Loan Bank | 78,192 | 78,971 | 112,976 |
| Securities sold subject to repurchase agreements | | 19,213 | 75,901 |
| Cashier's checks issued and payable | 3,877 | 4,139 | 4,668 |
| Borrowers' reserves for taxes and insurance | 1,841 | 1,209 | 1,495 |
| Accrued interest payable | 1,406 | 1,426 | 2,103 |
| Accrued expenses and other liabilities | 1,396 | 2,277 | 1,276 |
| Total liabilities | 578,000 | 595,699 | 677,646 |
| Commitments and contingent liabilities | | | |
| Preferred stock, $1 par value; 1,000,000 shares authorized; 89,968, 89,968 and 90,168 shares issued and outstanding ($2,249 liquidation preference value) | 90 | 90 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; 518,819, 518,819 and 518,387 shares issued and outstanding | 519 | 519 | 518 |
| Additional paid-in capital | 7,714 | 7,714 | 7,715 |
| Retained earnings | 4,772 | 4,298 | 2,971 |
| Total stockholders' equity | 13,095 | 12,621 | 11,294 |
| Total liabilities and stockholders' equity | $591,095 | $608,320 | $688,940 |

The accompanying notes are an integral part of the consolidated financial statements.







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1047