## STERLING SAVINGS ASSOCIATION

## CONSOLIDATED STATEMENTS OF INCOME

**(Dollar Amounts in Thousands, Except Per Share Amounts)**

**Information as of September 30, 1991 and 1990 and for the three months then ended is unaudited**

| | Three Months Ended September 30, | | Year Ended June 30, | | |
|---|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 | 1989 |
| | (Unaudited) | (Unaudited) (Restated) | | (Restated, Note 3) | (Restated, Note 3) |
| **Interest income:** | | | | | |
| Loans | $ 9,785 | $12,266 | $44,577 | $53,201 | $42,613 |
| Mortgage-backed securities | 3,192 | 2,607 | 12,472 | 10,483 | 7,786 |
| Investments and cash equivalents | 361 | 710 | 3,475 | 3,362 | 3,744 |
| FDIC yield subsidy | | 81 | 159 | 483 | 600 |
| | 13,338 | 15,664 | 60,683 | 67,529 | 54,743 |
| **Interest expense:** | | | | | |
| Deposits | 8,396 | 8,776 | 35,057 | 38,941 | 31,037 |
| Short-term borrowings | 385 | 2,907 | 7,891 | 11,692 | 10,755 |
| Long-term borrowings | 1,463 | 808 | 4,940 | 3,548 | 2,052 |
| | 10,244 | 12,491 | 47,888 | 54,181 | 43,844 |
| Net interest income | 3,094 | 3,173 | 12,795 | 13,348 | 10,899 |
| Provision for loan losses | 650 | | 150 | 1,100 | 260 |
| Net interest income after provision for loan losses | 2,444 | 3,173 | 12,645 | 12,248 | 10,639 |
| **Other income:** | | | | | |
| Mortgage banking operations | 1,748 | 567 | 4,372 | 3,425 | 1,028 |
| Fees and service charges | 677 | 574 | 2,466 | 2,011 | 913 |
| Loan commitment and origination fees | | | | 55 | 560 |
| Loan servicing fees | 81 | 215 | 651 | 864 | 471 |
| Net gain (loss) on sales of securities | | 33 | 255 | 241 | (118) |
| Net gain (loss) on sale and operation of real estate owned | (19) | 44 | (532) | (176) | 757 |
| FDIC indemnification for loss on sale of real estate owned | | 14 | 155 | (97) | (66) |
| Miscellaneous | | 8 | 41 | 477 | 550 |
| Total other income | 2,487 | 1,455 | 7,408 | 6,800 | 4,095 |
| **Operating expenses:** | | | | | |
| Employee compensation and benefits | 1,569 | 1,662 | 6,391 | 6,404 | 4,621 |
| Occupancy and equipment | 662 | 655 | 2,693 | 2,809 | 2,316 |
| Advertising and promotion | 38 | 34 | 261 | 296 | 275 |
| Data processing | 317 | 335 | 1,319 | 1,379 | 961 |
| Depreciation and amortization | 292 | 281 | 1,142 | 1,029 | 811 |
| Amortization of intangibles | 653 | 710 | 2,710 | 2,881 | 1,829 |
| Other | 742 | 794 | 3,226 | 3,776 | 2,219 |
| Total operating expenses | 4,273 | 4,471 | 17,742 | 18,574 | 13,032 |
| Income before income taxes | 658 | 157 | 2,311 | 474 | 1,702 |
| **Income tax provision (benefit):** | | | | | |
| Current | 184 | 40 | 1,899 | 1,424 | 309 |
| Deferred | | | (1,309) | (1,588) | (84) |
| | 184 | 40 | 590 | (164) | 225 |
| Net income | 474 | 117 | 1,721 | 638 | 1,477 |
| Less preferred stock dividends earned | 56 | 56 | 225 | 225 | 225 |
| Net income applicable to common shares | $ 418 | $ 61 | $ 1,496 | $ 413 | $ 1,252 |
| Net income per common share | $ .81 | $ .12 | $ 2.89 | $ .80 | $ 2.41 |
| Weighted average common shares outstanding | 518,819 | 518,387 | 518,453 | 518,298 | 520,468 |

The accompanying notes are an integral part of the consolidated financial statements.







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1048

## STERLING SAVINGS ASSOCIATION

### CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY
**(Dollar Amounts in Thousands, Except Per Share Amounts)**

**Information as of September 30, 1991 and for the three months then ended is unaudited**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Retained Earnings |
|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | |
| Balance, June 30, 1988 | 90,168 | $90 | 470,209 | $470 | $7,240 | $1,667 |
| Common shares issued for cash | | | 250 | | 3 | |
| Common stock dividend (10%) | | | 46,769 | 47 | 479 | (526) |
| Cash paid for fractional shares of common stock dividend | | | | | | (4) |
| Cash dividends on preferred stock ($2.50 per share) | | | | | | (225) |
| Costs to exchange Series B preferred stock for Series A | | | | | (14) | |
| Net income (Restated, Note 3) | | | | | | 1,477 |
| Balance, June 30, 1989 | 90,168 | 90 | 517,228 | 517 | 7,708 | 2,389 |
| Cash dividends on preferred stock ($.63 per share) | | | | | | (56) |
| Common shares issued upon exercise of stock options | | | 2,500 | 2 | 17 | |
| Common shares acquired and retired upon exercise of stock options | | | (1,341) | (1) | (10) | |
| Net income (Restated, Note 3) | | | | | | 638 |
| Balance, June 30, 1990 | 90,168 | 90 | 518,387 | 518 | 7,715 | 2,971 |
| Conversion of Series B preferred stock to common stock | (200) | | 432 | 1 | (1) | |
| Dividends declared on preferred stock ($4.38 per share) | | | | | | (394) |
| Net income | | | | | | 1,721 |
| Balance, June 30, 1991 | 89,968 | 90 | 518,819 | 519 | 7,714 | 4,298 |
| Unaudited: | | | | | | |
| Net income | | | | | | 474 |
| Balance, September 30, 1991 | 89,968 | $90 | 518,819 | $519 | $7,714 | $4,772 |

The accompanying notes are an integral part of the consolidated financial statements.







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1049

## STERLING SAVINGS ASSOCIATION

## CONSOLIDATED STATEMENTS OF CASH FLOWS

**(Dollar Amounts in Thousands)**

**Information as of September 30, 1991 and 1990 and for the three months then ended is unaudited**

| | Three Months Ended September 30, | | Year Ended June 30, | | |
|---|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 | 1989 |
| | (Unaudited) | (Unaudited) (Restated) | | (Restated, Note 3) | |
| Cash flows from operating activities: | | | | | |
| Net income | $ 474 | $ 117 | $ 1,721 | $ 638 | $ 1,477 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of effects of acquisitions: | | | | | |
| Provisions for loan and real estate owned losses | 666 | | 569 | 1,550 | 326 |
| Stock dividends on Federal Home Loan Bank stock | (157) | (165) | (651) | (633) | (756) |
| Net gain on sales of loans and securities | 10 | (890) | (2,642) | (3,328) | (154) |
| Depreciation and amortization | 849 | 969 | 3,466 | 3,514 | 2,640 |
| Deferred income taxes | | | (1,309) | (1,588) | (84) |
| Change in accrued interest receivable | 367 | (5) | 1,163 | 261 | (1,479) |
| Change in accrued interest payable | (20) | 322 | (677) | (920) | 889 |
| Change in cashier's checks issued and payable | (262) | (839) | (529) | (326) | (323) |
| Change in prepaid expenses and other assets | 204 | (495) | 1,802 | (2,712) | (560) |
| Change in accrued expenses and other liabilities | (881) | 656 | 1,001 | (4,773) | 179 |
| Change in loans held for sale | 2,616 | 422 | (11,517) | 3,091 | (16,822) |
| Change in purchased loan servicing rights | 6 | | 864 | 1,472 | (826) |
| Other, net | (5) | (34) | 1,455 | 1,352 | (142) |
| Net cash provided by (used in) operating activities | 3,867 | 58 | (5,284) | (2,402) | (15,635) |
| Cash flows from investing activities, net of effects of acquisitions: | | | | | |
| Loans disbursed | (6,588) | (24,358) | (71,760) | (116,464) | (173,034) |
| Loan principal payments | 19,064 | 36,265 | 137,049 | 151,663 | 110,264 |
| Purchase of mortgage-backed securities | (4,869) | (34,932) | (47,645) | (28,379) | (13,330) |
| Mortgage-backed securities principal payments | 3,698 | 2,906 | 10,009 | 9,127 | 5,459 |
| Proceeds from sales of mortgage-backed securities | | | 12,223 | 19,837 | 12,411 |
| Purchase of investments | | (373) | (367) | (313) | (8,238) |
| Proceeds from sales and maturities of investments | 1,750 | | 13,040 | 5,314 | 20,807 |
| Purchase of office properties and equipment | (83) | (192) | (611) | (1,435) | (926) |
| Proceeds from sales of real estate owned | 811 | 602 | 5,665 | 9,874 | 4,962 |
| Net cash provided by (used in) investing activities | 13,783 | (20,082) | 57,603 | 49,224 | (41,625) |
| Cash flows from financing activities, net of effects of acquisitions: | | | | | |
| Net change in NOW, passbook and money market deposits | 2,818 | (3,732) | (6,892) | (9,440) | (25,252) |
| Proceeds from sales of certificates of deposit | 47,985 | 59,497 | 184,856 | 360,265 | 488,596 |
| Payments for maturing certificates of deposit | (55,494) | (73,645) | (200,712) | (425,919) | (496,588) |
| Interest credited to deposits | 7,552 | 8,450 | 32,146 | 34,492 | 31,243 |
| Advances from the Federal Home Loan Bank | 3,000 | 57,000 | 62,000 | 97,000 | 101,000 |
| Repayment of Federal Home Loan Bank advances | | (35,000) | (85,600) | (96,000) | (88,800) |
| Net change in overnight Federal Home Loan Bank advances | (3,800) | (15,300) | (10,500) | 15,300 | |
| Net change in securities sold subject to repurchase agreements | (19,213) | (4,319) | (56,688) | (11,444) | 40,153 |
| Net change in borrowers' reserves | 632 | | (286) | | |
| Cash dividends on preferred stock | | | (394) | (56) | (225) |
| Net cash provided by (used in) financing activities | (16,520) | (7,049) | (82,070) | (35,802) | 50,127 |
| Cash and cash equivalents acquired as part of acquisitions | | | | | 13,640 |
| Net increase (decrease) in cash and cash equivalents | 1,130 | (27,073) | (29,751) | 11,020 | 6,507 |
| Cash and cash equivalents at beginning of the period | 6,933 | 36,684 | 36,684 | 25,664 | 19,157 |
| Cash and cash equivalents at end of the period | $ 8,063 | $ 9,611 | $ 6,933 | $ 36,684 | $ 25,664 |
| Supplemental disclosures: | | | | | |
| Cash paid during the period for: | | | | | |
| Interest | $10,264 | $20,619 | $ 37,730 | $ 55,155 | $ 42,563 |
| Income taxes | | | $ 7 | $ 52 | $ 120 |
| Loans swapped for mortgage-backed securities | | | | | $ 54,430 |
| Loans converted into real estate owned | $ 2,771 | $ 976 | $ 4,211 | $ 4,427 | $ 5,359 |
| Assets acquired and liabilities assumed as part of Central Evergreen acquisition | | | | | $248,883 |

The accompanying notes are an integral part of the consolidated financial statements.







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1050

## STERLING SAVINGS ASSOCIATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(All Dollar Amounts in Thousands, Except Per Share Amounts)**

**Information as of September 30, 1991 and 1990 and for the three months then ended is unaudited**

**1. Significant Accounting Policies:**

The accounting and financial reporting policies of Sterling Savings Association and its subsidiaries (the "Association") conform to generally accepted accounting principles and to general practice within the savings and loan industry. The following is a description of the Association's significant accounting policies.

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of the Association and all of its wholly and majority-owned subsidiaries.

The purchase price of acquired companies has been allocated to the assets and liabilities acquired based upon their estimated fair values at the date of acquisition. Results of operations of acquired companies are included in the accompanying financial statements only since the dates of acquisition. All significant intercompany accounts and transactions have been eliminated in consolidation.

*Investments and Mortgage-Backed Securities*

Investments are carried at cost, adjusted for amortization of premiums or accretion of discounts. Mortgage-backed securities are carried at their remaining unpaid principal balance, net of unamortized premium or unaccreted discount. Management has the ability and it is their intent to hold these securities until maturity. However, these securities are occasionally sold prior to their maturity in response to unforeseen market conditions in order to limit interest rate risk. If management determines to sell a security, it is classified as held for sale and carried at the lower of cost or market until it is sold. The Association does not currently have any securities held for sale. Premiums are amortized and discounts are accreted using the level interest yield method over the estimated remaining term of the underlying security. Gains and losses on sales of investments and mortgage-backed securities are recognized based on specific identification.

*Provision for Loan Losses*

A provision for possible loan losses, when determined necessary, is charged to income based on management's evaluation of the potential losses that may occur in its loan portfolio. Such evaluation, which includes a review of all loans which may not be fully collectible, considers, among other matters, the estimated net realizable value of the underlying collateral.

*Real Estate Owned*

Property acquired by foreclosure or deed in lieu of foreclosure is recorded at the lower of estimated fair value, based on appraisal of such property, or the principal balance of the defaulted loan. Development, improvement and direct holding costs relating to the property are capitalized. The carrying value of such property is continuously evaluated and, if necessary, allowances are established to reduce the carrying value to net realizable value (which considers, among other things, provisions for estimated direct holding costs and selling expenses).

*Office Properties and Equipment*

Office properties and equipment are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for new

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

properties and equipment and major renewals or betterments are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. When property or equipment is sold or retired, the cost and related accumulated depreciation are removed from the respective accounts, and the resulting gains or losses are reflected in income.

*Loan Origination and Commitment Fees*

Loan origination fees, net of certain specifically defined direct loan origination costs, are deferred and recognized as interest income using the level interest yield method over the contractual term of each loan adjusted for actual loan prepayment experience. If the related loan is sold, the remaining net amount deferred, which is part of the basis of the loan, is considered in determining the gain or loss on sale.

Loan commitment fees are deferred until the expiration of the commitment period unless management believes there is a remote likelihood that the underlying commitment will be exercised, in which case the fees are amortized to fee income using the straight-line method over the commitment period. If a loan commitment is exercised, the deferred commitment fee is accounted for in the same manner as a loan origination fee. Deferred commitment fees associated with expired commitments are recognized as fee income.

*Income Per Share*

Net income per share is equal to net income, reduced by dividends earned on preferred stock during the year, divided by the weighted average number of shares of common stock and common stock equivalents (stock options) outstanding during each year. All weighted average shares outstanding and per share amounts have been retroactively restated to reflect all stock dividends.

*Intangibles*

Identified intangibles, which represent separately identifiable intangible assets attributable to depositor relationships that existed at the date of an acquisition, are amortized on a straight-line basis over the estimated life of the depositor relationships acquired (eight years). Accumulated amortization of identified intangibles was $2,351, $2,464 and $1,595 at September 30, 1991 and June 30, 1991 and 1990, respectively.

Unidentified intangibles are amortized using the level interest yield method over the estimated remaining life (assuming prepayments) of the long-term interest-bearing assets (loans receivable and mortgage-backed securities) acquired (generally a total of twelve years, with the substantial majority of the unidentified intangible being amortized in the first four years). Accumulated amortization of unidentified intangibles was $6,864, $6,362 and $4,546 (restated, Note 3) at September 30, 1991 and June 30, 1991 and 1990, respectively.

*Mortgage Banking Operations*

The Association originates or purchases and sells loans and participating interests in loans, generally with the servicing rights retained, to provide additional funds for general corporate purposes and to generate servicing income. Loans and participating interests therein committed or held for sale are carried at the lower of cost or market value.

The Association recognizes a gain or loss on these loan sale transactions which includes a component reflecting the differential between the contractual interest rate of the loan and the interest rate which will be received by the investor. The present value of the estimated future profit for servicing the loans, together with the normal servicing fee rate ("deferred premium"), is taken into account in determining the amount of



 

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1052

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

gain or loss on the sale of loans. At September 30, 1991 and June 30, 1991 and 1990, net deferred premiums on loans sold of $355, $564 and $237, respectively, were included in prepaid expenses and other assets.

The portion of the purchase price of individual loans representing the cost of acquiring the right to service those loans is capitalized if there is a definitive plan to immediately sell the loans. The amount capitalized is subject to certain limitations based on the present value of the estimated future stream of net servicing income (assuming loan prepayments), and the recognition of a gain on the loan sale transaction.

Deferred premiums on loan sales and the capitalized costs of purchased servicing rights are both amortized to expense in proportion to the estimated future stream of net servicing income, assuming loan prepayments.

Premiums paid in connection with option transactions, entered into as an anticipatory hedge of movement in interest rates in connection with mortgage-banking operations, are deferred and amortized to expense over the option period. At September 30, 1991 and June 30, 1991 and 1990, net deferred premiums of $192, $173 and $96, respectively, associated with the purchase of put options on $39,000, $31,000 and $21,000 of unspecified mortgage-backed securities, were included in prepaid expenses and other assets.

*Cash Equivalents*

The Association considers a cash equivalent to be any highly liquid debt instrument purchased with an original maturity of three months or less.

*Reclassifications*

Certain prior year balances have been reclassified to conform with the 1991 presentation. These reclassifications had no effect on retained earnings or net income as previously reported.

**2. Regulatory Matters:**

During the years ended June 30, 1986, 1988 and 1989, the Association, with the approval of its regulators, completed supervisory acquisitions of three troubled institutions: Lewis Federal Savings and Loan Association ("Lewis Federal"), Tri-Cities Savings and Loan Association ("Tri-Cities") and Central Evergreen Federal Savings and Loan Association ("Central Evergreen"), respectively (see Note 15). Each of these institutions was insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on the Association's financial statements as part of accounting for the acquisition. Each of the supervisory acquisitions was subject to contractual acquisition agreements ("Agreements") with then-existing regulatory authorities.

The Lewis Federal and Tri-Cities Agreements provided for various forms of assistance to the Association to induce the Association to complete the acquisitions. Such assistance included cash payments, indemnification against certain losses, and regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreements, the Association was specifically allowed, for purposes of calculating regulatory capital, to: (1) record regulatory cash assistance payments received as a part of regulatory capital; (2) include intangible assets resulting from the acquisitions in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.

The Central Evergreen Agreement was based upon an approved Business Plan ("Business Plan") under which the Association would operate through December 31, 1993. The Central Evergreen Agreement and







CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1053

the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Agreements.

On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was enacted. FIRREA significantly revised the regulation and permissible activities of savings associations. Among other things, FIRREA virtually eliminates the solicitation of brokered deposits for "troubled thrift" institutions, and drastically reduces the aggregate amount of loans that can be made to any single borrower. FIRREA also prescribes new capital standards and consequences for non-compliance with capital standards. FIRREA further provides that, for purposes of calculating compliance with the new capital standards, savings associations will generally be required to exclude certain intangible assets and other previously allowable regulatory capital items.

FIRREA established the Office of Thrift Supervision ("OTS") as the primary federal regulator of both federal and state chartered savings associations. In response to FIRREA, the OTS promulgated new minimum capital regulations which became effective on December 7, 1989. These minimum capital regulations require savings associations to have tangible capital of at least 1.5% of adjusted total assets, core capital of at least 3.0% of adjusted total assets, and risk-based capital of at least 7.2% of risk-weighted assets as of June 30, 1991.

Beginning in October 1989, the Association received several communications from the OTS advising it that the OTS was taking the position that the new minimum capital requirements were applicable to the Association notwithstanding contrary provisions of Sterling's Agreements with the regulators. *Thrift Bulletin 38-2* was released by the OTS in January 1990 and stated that the new capital standards applied to all savings associations, including associations that had been operating under previously granted capital and accounting forbearances. Further, *Thrift Bulletin 38-2* purported to eliminate such capital and accounting forbearances. Communications from the OTS indicated that the OTS had concluded that the Association would fail to meet the new FIRREA capital standards. Therefore, the OTS indicated that it expected the Association to file a capital plan.

Notwithstanding the Association's belief that its regulatory capital adequacy requirements are governed by its contractual Agreements, the Association submitted several capital plans to the OTS, each of which was rejected.

In May 1990, the Association notified the OTS that it believed the position the OTS was taking was unlawful and, specifically, contrary to FIRREA. Following the OTS' subsequent refusal to honor the contractual Agreements, the Association attempted to negotiate a mutually acceptable alternative solution that would allow it to continue operating without undue interference by its regulators.

It is management's belief that the OTS was unwilling to negotiate any such alternative solution, and therefore, on May 15, 1990, the Association initiated a civil action against the OTS and the Federal Deposit Insurance Corporation ("FDIC"), seeking to have OTS' construction of FIRREA in degrogation of the Agreements declared unlawful. The United States District Court for the Eastern District of Washington ("Court") granted the Association a temporary restraining order on May 29, 1990, and issued a preliminary injunction on July 3, 1990. The preliminary injunction prohibits the regulators from imposing any regulatory restrictions on the Association that are inconsistent with the provisions of its contractual Agreements. On November 1, 1990, the Court narrowed the scope of the preliminary injunction but reaffirmed the injunction insofar as it prohibited the regulators from imposing or enforcing any regulatory restrictions on the Association that would be inconsistent with the contractual agreements.

A trial date for this civil action has not yet been set. On December 27, 1990, the federal agencies filed an appeal of the Court's orders regarding the preliminary injunction. The case has been fully briefed to the Ninth Circuit Court of Appeals. No hearing date has been set for the appeal.

The Association has calculated its regulatory capital, as provided in the Agreements, to be approximately $24,787 (4.06% of assets) at June 30, 1991, exceeding the minimum level required pursuant to the Agreements by approximately $754 (0.12% of assets) (see Note 18). Although the Association is in compliance with applicable minimum capital standards under the Agreements, no assurances can be given that the Association will continue to meet the regulatory capital levels required by the Agreements in future periods.

According to the Association's September 30, 1991 calculations, if the OTS' interpretation of the FIRREA requirements were applicable to the Association and if the Agreements were not binding on the regulators, the Association would not be in compliance with the OTS minimum capital requirements. The Association would have a shortfall of tangible capital of approximately $12.0 million, a shortfall of core capital of approximately $10.7 million and a shortfall of risk-based capital of approximately $12.9 million.

**Regulatory Capital Requirements and Balances as if the Supervisory Agreements were not Binding on the Regulators**

| | Requirements as of September 30, 1991 | | Balances as of September 30, 1991 | |
|---|---|---|---|---|
| | Dollars | % of Assets (1) | Dollars | % of Assets (1) |
| Tangible capital | $ 8,652 | 1.50% | $ (3,338) | (.60)% |
| Core capital | 17,344 | 3.00 | 6,643 | 1.20 |
| Risk-based capital | 24,860 | 7.20 | 11,935 | 3.50 |

(1) Percentages are based on adjusted total assets or risk-weighted assets.

The Association intends to vigorously defend itself from regulatory actions that are contrary to the Agreements, while alternatively seeking to negotiate with its Regulators mutually agreed upon levels of capital consistent with the intent of FIRREA and the Agreements. In addition, the Association will continue to explore opportunities to increase its capital. The Association plans to maintain operations at levels contemplated in its Business Plan.

The Association has been working with investment brokers to explore the feasibility of raising additional capital in the capital markets. If the Association is unable to (1) successfully raise sufficient capital to meet the proposed future minimum capital requirements or in the event that it is unsuccessful in the lawsuit with the OTS and FDIC, (2) otherwise comply with post-FIRREA capital standards independent of the Agreements and the Business Plan, or (3) remain in compliance with its supervisory Agreements, it may be subjected to severe sanctions that will materially adversely affect operations and may be unable to continue as a going concern. The consolidated financial statements do not include any adjustments that might be necessary related to the recoverability of recorded asset amounts, including the intangible assets, or the amount of liabilities, should the Association be unable to continue as a going concern.

**3. Restatement:**

The Association reduced taxes payable by a total of $2.8 million by utilizing $3.9 million and $4.9 million in pre-acquisition operating loss carryforwards of an acquired institution, Central Evergreen, for the years ended June 30, 1990 and 1991, respectively. The $2.8 million benefit from utilization of acquired net operating

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

loss carryforwards was accounted for as a reduction of the unidentified intangibles as of the date of acquisition, December 31, 1988, and a corresponding reduction of amortization expense since that date. The changes in amortization had no impact on income tax expense as previously reported. The impact of these benefits is as follows:

| | As Previously Reported | Restated |
|---|---|---|
| Net income, three months ended September 30, 1990 | $ 288 | $ 117 |
| Net income per common share, three months ended September 30, 1990 | $ .45 | $ .12 |
| Net income, year ended June 30, 1989 | $1,285 | $1,477 |
| Net income per common share, year ended June 30, 1989 | $ 2.04 | $ 2.41 |
| Net income, year ended June 30, 1990 | $ 266 | $ 638 |
| Net income per common share, year ended June 30, 1990 | $ 0.08 | $ 0.80 |

**4. Investments and Mortgage-Backed Securities:**

A summary of carrying and market values of investments follows:

| | September 30, 1991 | | June 30, 1991 | | June 30, 1990 | |
|---|---|---|---|---|---|---|
| | Carrying Value | Market Value | Carrying Value | Market Value | Carrying Value | Market Value |
| U.S. Government and agency obligations | $ 6,599 | $ 6,631 | $ 8,344 | $ 8,385 | $21,363 | $21,142 |
| Federal Home Loan Bank stock, at cost | 7,053 | 7,053 | 6,896 | 6,896 | 5,878 | 5,878 |
| Other | 30 | 30 | 30 | 30 | 30 | 30 |
| | $13,682 | $13,714 | $15,270 | $15,311 | $27,271 | $27,050 |

At September 30, 1991 and June 30, 1991 and 1990, the investment portfolio includes unrealized gains of $32, $41 and $12, respectively, and unrealized losses of $0, $0 and $233, respectively. The U.S. Government and agency obligations include maturities of $6,499 within one year and $100 in 1 to 5 years as of September 30, 1991, respectively. Proceeds from sales of investments were $0 and $8,958 for the three months ended September 30, 1991 and year ended June 30, 1991, respectively. Gross gains of $81 and gross losses of $0 were realized on those sales at June 30, 1991.

At September 30, 1991 and June 30, 1991 and 1990, the mortgage-backed securities portfolio, all of which are issued by U.S. Government agencies, includes unrealized gains of $4,540, $1,396 and $0, respectively, and unrealized losses of $57, $1,160 and $3,267, respectively. The maturity of mortgage-backed securities is dependent on the payments on the underlying mortgages. At September 30, 1991, $11,903 of the mortgage-backed securities have balloon maturities of 1 to 5 years, while the remainder amortize to the maturity of the security. Proceeds from sales of mortgage-backed securities during the year ended June 30, 1991 were $12,223. Gross gains of $174 and gross losses of $0 were realized on those sales. There were no sales of mortgage-backed securities for the three months ended September 30, 1991. At September 30, 1991, mortgage-backed securities with a carrying value of $7,130 were pledged as collateral for wholesale public funds deposits in accordance with Washington Public Deposit Protection Commission regulations. Additionally, the Association periodically utilizes MBS as security for other borrowing transactions (See Notes 10 and 11).



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1056

**5. Loans Receivable:**

The components of loans receivable are as follows:

| | September 30, 1991 | June 30, 1991 | June 30, 1990 |
|---|---|---|---|
| Real estate loans: | | | |
| Variable rate: | | | |
| 1-4 unit residential | $117,997 | $122,382 | $186,273 |
| 5 or more unit residential | 21,563 | 21,705 | 14,545 |
| Commercial | 64,651 | 68,876 | 41,737 |
| Land and other | 1,249 | 1,291 | 2,559 |
| Fixed rate: | | | |
| Conventional 1-4 unit residential | 55,272 | 59,280 | 52,190 |
| 1-4 unit issued by FHA/VA | 9,323 | 9,411 | 9,691 |
| 5 or more unit residential | 11,704 | 11,737 | 10,106 |
| Commercial | 22,795 | 21,078 | 32,306 |
| Land and other | 6,157 | 6,291 | 13,834 |
| Construction: | | | |
| 1-4 unit residential | 3,176 | 6,865 | 13,652 |
| 5 or more unit residential | 5,684 | 5,684 | 20,045 |
| Commercial | 6,043 | 7,579 | 17,105 |
| Other real estate loans and contracts | 3,599 | 3,661 | 4,348 |
| | 329,213 | 345,840 | 418,391 |
| Other loans: | | | |
| Commercial loans | 14,280 | 14,353 | 18,423 |
| Commercial and personal lines of credit | 6,576 | 7,320 | 8,331 |
| Consumer loans | 15,242 | 14,774 | 13,316 |
| Loans secured by deposits | 2,315 | 2,323 | 2,619 |
| | 38,413 | 38,770 | 42,689 |
| Total loans | 367,626 | 384,610 | 461,080 |
| Undisbursed portion of loans in process | (2,092) | (2,987) | (9,972) |
| Deferred loan fees, net of direct loan origination costs | (332) | (705) | (577) |
| Discount on loans acquired pursuant to purchase transactions | (1,818) | (1,905) | (2,243) |
| Allowance for losses | (4,355) | (4,087) | (6,649) |
| | $359,029 | $374,926 | $441,639 |

At September 30, 1991 and June 30, 1991, 1990 and 1989, the Association serviced loans for the benefit of others amounting to $101,683, $121,687, $174,095 and $315,377, respectively, which are not included in the loans receivable. During the quarter ended September 30, 1991 and 1990 and the years ended June 30, 1991 and 1990, the Association sold the rights to service $99,200, $0, $285,014 and $312,064, respectively, of loans serviced for others and the gain is included in mortgage banking operations.





CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1057

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Included in loans receivable are loans to directors and executive officers. Following is an analysis of the activity in loans to directors and executive officers:

| | Three Months Ended September 30, 1991 | Year Ended June 30, 1991 | 1990 | 1989 |
|---|---|---|---|---|
| Balance, beginning of year | $712 | $743 | $ 795 | $806 |
| Additions | 1 | 63 | 104 | 56 |
| Repayments | (56) | (94) | (156) | (67) |
| Balance, end of year | $657 | $712 | $ 743 | $795 |

The Association grants residential, commercial real estate, consumer and commercial loans throughout Washington and bordering areas, primarily northwestern Oregon. Loans originated outside this area are primarily for immediate sale into the secondary market. As of September 30, 1991 and June 30, 1991 and 1990, the Association had construction loans of $14,903, $20,128 and $56,190, respectively, which are concentrated in the Seattle and Spokane, Washington and Portland, Oregon metropolitan areas. Although these areas have diversified economies, they are still directly or indirectly dependent upon the aerospace industry to a large degree.

**6. Real Estate Owned:**

The components of real estate owned are as follows:

| | September 30, 1991 | June 30, 1991 | 1990 |
|---|---|---|---|
| Residential real estate, acquired through foreclosure (including $275, $234 and $541 from acquired institutions—see Note 15) | $ 360 | $ 513 | $ 1,158 |
| Commercial real estate, acquired through foreclosure (including $1,849, $1,469 and $2,650 from acquired institutions—see Note 15) | 9,568 | 7,529 | 7,732 |
| Former Association branch buildings held for sale (from acquired institution) | 567 | 569 | 580 |
| Other | 244 | 231 | 670 |
| | 10,739 | 8,842 | 10,140 |
| Allowance for losses | (964) | (1,011) | (980) |
| FDIC assistance | 527 | 527 | 1,012 |
| | $10,302 | $8,358 | $10,172 |

Costs incurred to acquire and improve real estate of $657, $404 and $108 had been capitalized as of September 30, 1991 and June 30, 1991 and 1990, respectively.

At September 30, 1991 and June 30, 1991 and 1990, commercial real estate included $91, $91 and $466, respectively, related to properties for which the FDIC has indemnified the Association for 75% of any capital losses and guaranteed the Association a minimum yield (see Note 15b). The FDIC assistance represents 75% of prior write-downs to net realizable value that will be paid by the FDIC upon disposition of the property.



DRI 02704

App. 311

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**7. Allowances for Loan and Real Estate Owned Losses:**

The following is an analysis of the changes in the allowances for loan and real estate owned losses:

| | Loan | Real Estate Owned | Total |
|---|---|---|---|
| Balance, June 30, 1988 | $3,770 | $ 347 | $4,117 |
| Provision for 1989 | 260 | 66 | 326 |
| Amounts written off | (1,590) | (268) | (1,858) |
| Recoveries | 50 | 304 | 354 |
| Allowance for losses on assets acquired | 3,960 | 370 | 4,330 |
| Balance, June 30, 1989 | 6,450 | 819 | 7,269 |
| Provision for 1990 | 1,100 | 450 | 1,550 |
| Amounts written off | (910) | (458) | (1,368) |
| Recoveries | 9 | 169 | 178 |
| Balance, June 30, 1990 | 6,649 | 980 | 7,629 |
| Provision for 1991 | 150 | 419 | 569 |
| Amounts written off | (2,722) | (388) | (3,110) |
| Recoveries | 10 | | 10 |
| Balance, June 30, 1991 | 4,087 | 1,011 | 5,098 |
| Provision for three months | 650 | 16 | 666 |
| Amounts written off | (383) | (63) | (446) |
| Recoveries | 1 | | 1 |
| Balance, September 30, 1991 | $4,355 | $ 964 | $5,319 |

The following is a summary of loans that are not performing in accordance with their original contractual terms:

| | September 30, 1991 | June 30, 1991 | June 30, 1990 | June 30, 1989 |
|---|---|---|---|---|
| Nonaccrual loans (1) | $6,080 | $ 8,280 | $10,771 | $15,619 |
| Accruing loans which are past due 90 days or more | 0 | 50 | 1,104 | 125 |
| Restructured loans (2) | 2,443 | 2,452 | 1,299 | 1,516 |
| Total nonperforming loans | $8,523 | $10,782 | $13,174 | $17,260 |

(1) The accrual of interest is stopped on any loan when either principal or interest becomes 90 days past due, unless it meets specific criteria. Any accrued and uncollected interest is eliminated from income at that time. A loan may be put in nonaccrual status sooner than this standard would dictate if, in management's judgment, that loan may be uncollectible. Such interest is then recognized as income only if it is ultimately collected.

At September 30, 1991 and June 30, 1991 and 1990, nonaccrual loans included $4,533, $5,214 and $6,040, respectively, relating to acquired institutions (see Note 15).

(2) Restructured loans occur when the Association has compromised the contractual loan terms to provide a reduction in the rate of interest and, in most instances, an extension of payments of principal or interest, or both, because of a deterioration in the financial position of the borrower. Restructured loans performing in accordance with their new terms are not included in nonaccrual loans unless concern exists as to the ultimate collection of principal or interest.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Additional gross interest income of $173 and $763 would have been recorded during the three months ended September 30, 1991 and the year ended June 30, 1991, if nonaccrual and restructured loans had been current in accordance with their original contractual terms. Interest income of $0 and $473 was recorded during the three months ended September 30, 1991 and the year ended June 30, 1991 in connection with these loans.

**8. Office Properties and Equipment:**

The components of office properties and equipment are as follows:

| | September 30, 1991 | June 30, 1991 | June 30, 1990 | Estimated Useful Life |
|---|---|---|---|---|
| Buildings and improvements | $ 7,356 | $ 7,329 | $ 7,553 | 20-40 years |
| Furniture, fixtures and equipment | 5,611 | 5,489 | 4,872 | 3-10 years |
| Automobiles | 55 | 55 | 170 | 3-5 years |
| Leasehold improvements | 1,047 | 1,040 | 985 | 5-10 years |
| Equipment under capital lease | 82 | 82 | 82 | 5 years |
| | 14,151 | 13,995 | 13,662 | |
| Less accumulated depreciation and amortization | 5,480 | 5,168 | 4,147 | |
| | 8,671 | 8,827 | 9,515 | |
| Land | 1,775 | 1,775 | 1,618 | |
| | $10,446 | $10,602 | $11,133 | |

**9. Deposits:**

The components of deposits are as follows:

| | September 30, 1991 | June 30, 1991 | June 30, 1990 |
|---|---|---|---|
| Commercial NOW accounts (non-interest bearing) | $ 38,355 | $ 3,973 | $ 7,385 |
| NOW accounts (4.50% to 5.00%) | 42,008 | 36,119 | 33,642 |
| Passbook accounts (5.00% to 5.25%) | 3,670 | 40,993 | 43,051 |
| Money market demand accounts (5.15% to 6.00%) | 27,975 | 26,793 | 30,692 |
| | 112,008 | 107,878 | 114,770 |
| Certificate accounts: | | | |
| 5.00 to 5.99% | 37,553 | 8,671 | 507 |
| 6.00 to 6.99% | 140,106 | 90,855 | 145 |
| 7.00 to 7.99% | 87,954 | 95,682 | 72,767 |
| 8.00 to 8.99% | 102,179 | 173,900 | 270,563 |
| 9.00 to 9.99% | 3,792 | 3,738 | 12,074 |
| 10.00 to 10.99% | 2,370 | 2,360 | 2,946 |
| 11.00 to 11.99% | 3,171 | 3,215 | 3,320 |
| 12.00% and over | 1,810 | 1,783 | 1,592 |
| | 378,935 | 380,204 | 363,914 |
| Net premium on deposits assumed pursuant to purchase transactions | 345 | 382 | 543 |
| | $491,288 | $488,464 | $479,227 |

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The amounts of scheduled maturities of certificate accounts were as follows at June 30, 1991:

| Year Ending June 30, | At June 30, 1991 Weighted Average Interest Rate | At June 30, 1991 Amount |
|---|---|---|
| 1992 | 7.50% | $312,465 |
| 1993 | 7.50 | 28,005 |
| 1994 | 8.36 | 14,450 |
| 1995 | 8.50 | 8,896 |
| Thereafter | 8.39 | 16,388 |
| | 7.60% | $380,204 |

At September 30, 1991 and June 30, 1991 and 1990, certificate accounts included accounts with a minimum balance of $100 ("Jumbos") of $21,269, $22,405 and $43,915, respectively. The weighted average rate paid on deposit accounts is 6.65%, 7.05% and 7.51% at September 30, 1991, June 30, 1991 and 1990, respectively.

The components of interest expense on deposits are as follows:

| | Three Months Ended September 30, | | Year Ended June 30, | | |
|---|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 | 1989 |
| NOW accounts | $ 402 | $ 425 | $ 1,527 | $ 1,633 | $ 1,233 |
| Passbook accounts | 548 | 586 | 2,190 | 2,471 | 2,082 |
| Money market demand accounts | 362 | 449 | 1,604 | 2,024 | 2,081 |
| Certificate accounts | 6,824 | 6,907 | 29,736 | 32,813 | 25,641 |
| | $8,136 | $8,367 | $35,057 | $38,941 | $31,037 |

**10. Advances From Federal Home Loan Bank:**

The advances from the Federal Home Loan Bank are repayable as follows:

| Year Ending June 30, | At September 30, 1991 Weighted Average Interest Rate | At September 30, 1991 Amount | At June 30, 1991 Weighted Average Interest Rate | At June 30, 1991 Amount |
|---|---|---|---|---|
| 1992 | 8.95% | $13,000 | 8.32% | $16,800 |
| 1993 | 8.98 | 12,000 | 8.98 | 12,000 |
| 1994 | 8.59 | 48,892 | 8.59 | 48,871 |
| 1995 | 8.40 | 1,300 | 8.40 | 1,300 |
| Thereafter | 8.20 | 3,000 | — | — |
| | 8.70% | $78,192 | 8.60% | $78,971 |

The weighted average interest rate at June 30, 1990 was 8.75%.

The advances are collateralized by eligible assets with a market value equal to a specified percentage of the amount outstanding. Assets eligible for collateral are qualifying real estate loans, mortgage-backed securities, Federal Home Loan Bank stock, and U.S. Government obligations. At September 30, 1991, the Association was part of a credit program under which it is required to specifically pledge collateral with a





CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1061

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

market value equal to a range between 110% and 120% of outstanding advances. At September 30, 1991, the Association had excess collateral available to support an additional $47.5 million of advances. Eligible assets that are pledged for collateral at September 30 and June 30, 1991 are as follows:

| | September 30, 1991 | June 30, 1991 |
|---|---|---|
| Qualifying real estate loans | $104,491 | $110,911 |
| Mortgage-backed securities | 40,065 | 41,338 |
| | $144,556 | $152,249 |

**11. Securities Sold Subject to Repurchase Agreements:**

The Association enters into sales of securities under agreements to repurchase (reverse repurchase agreements). Fixed-coupon reverse repurchase agreements are treated as financings, and the obligations to repurchase securities sold are reflected as a liability in the balance sheet. The dollar amount of securities underlying the agreements remains in the applicable asset accounts. At September 30, 1991 and June 30, 1991 and 1990, securities sold subject to repurchase agreements (all of which call for repurchasing the same security) included investments and mortgage-backed securities with an aggregate carrying value of $0, $20,874 and $83,038, respectively (aggregate market value of $0, $20,359 and $81,103, respectively). These agreements had a weighted average interest rate of 0%, 6.15% and 8.50%, respectively, and all mature within sixty days. Substantially all of the Association's reverse repurchase agreements at September 30, 1991 and June 30, 1991 were transacted with the Federal Home Loan Mortgage Corporation ("FHLMC"). The mortgage-backed securities underlying the agreements are being held by FHLMC. The average balance of securities sold subject to repurchase agreements was $12,116, $48,902, $73,402 and $70,502 during the three months ended September 30, 1991 and the years ended June 30, 1991, 1990 and 1989, respectively. The maximum amount outstanding at any month-end during the three months ended September 30, 1991 and the years ended June 30, 1991, 1990 and 1989 was $19,250, $71,997, $92,128 and $87,977, respectively.

**12. Income Taxes:**

The Association and its subsidiaries file a single consolidated income tax return. The Association is permitted under the Internal Revenue Code to deduct an annual addition to a reserve for bad debts ("bad debt deduction") in determining taxable income, subject to certain limitations. This addition differs from the provision for loan losses recorded for financial statement purposes. The Association's effective tax rate differs from the statutory income tax rate for the following reasons:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Income tax provision at federal statutory rate | $ 785 | $ 35 | $ 513 |
| Tax effect of: | | | |
| Bad debt deduction | (1,104) | (1,453) | (503) |
| Amortization of fair market value adjustments and intangibles arising from purchase acquisitions | 827 | 1,072 | 562 |
| Premium (discount) attributed to acquired assets sold | 117 | 340 | (148) |
| Tax-exempt yield subsidy payments received | (54) | (164) | (204) |
| Other, net | 19 | 6 | 5 |
| | $ 590 | $ (164) | $ 225 |

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

For the three months ended September 30, 1991 and 1990, income taxes were provided based on an estimated annual effective tax rate of 28.0% and 25.5%, respectively.

The components of the deferred income tax provision (benefit) are as follows:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Provision for losses | $(1,078) | $(1,728) | |
| Former use of cash basis accounting for tax purposes | | (50) | $(50) |
| Equity in losses of partnerships | 34 | 11 | 9 |
| Deferred loan fees recognized for tax purposes | (19) | 89 | (49) |
| Adjustment of prior year classifications of current and deferred tax liabilities | | 56 | (106) |
| Alternative minimum tax carryforward | (114) | (87) | |
| Other, net | (132) | 121 | 112 |
| | $(1,309) | $(1,588) | $(84) |

As a result of the acquisitions of Central Evergreen and Tri-Cities (see Note 15), the Association became entitled to utilize their tax basis net operating loss carryforwards to reduce consolidated taxable income earned subsequent to the dates of acquisition. Pursuant to an assistance agreement executed with the FDIC, the Association agreed to refund to the FDIC 50% of the tax benefit resulting from the utilization of the Tri-Cities net operating loss carryforwards. The Association further agreed to refund to the FDIC 100% of the tax benefit resulting from capital losses on certain Tri-Cities assets for which the Association is partially indemnified by the FDIC. The Association's share of the tax benefit resulting from the utilization of acquired net operating loss carryforwards, which was $1,689 for the year ended June 30, 1991, is recorded as a retroactive reduction of the unidentified intangible assets acquired.

The tax basis net operating loss carryforwards remaining at June 30, 1991 expire as follows:

| Year Ending June 30, | Association Portion | FSLIC Portion |
|---|---|---|
| 1993 | $ 54 | $ 54 |
| 2002 | 1,450 | 1,450 |
| 2003 | 3,225 | |
| | $4,729 | $1,504 |

In December 1987, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes" ("Statement"). Adoption of the Statement is mandatory by the first quarter of 1993. When adopted, the Statement will result in the restatement of all deferred tax balances to the statutory tax rates in effect at the time the balances are expected to be payable. Management is continuing to evaluate the impact of this Statement and the provisions for earlier adoption and restatement. The impact of this Statement on the financial statements of the Association is not known at this time.

**13. Employee Savings Plan:**

The Association maintains an employee savings plan under section 401(k) of the Internal Revenue Code. Substantially all employees are eligible to participate in the plan subject to certain requirements. Under the plan, employees may elect to contribute up to 8% of their salary and the Association will make a matching contribution equal to 25% of the employee's contribution. Each employee may make a supplemental

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

contribution of an additional 2% of their salary. All contributions vest immediately. Employees have the option of directing that their contributions be invested in a fixed income security account, an equity security account or, until September 1, 1990, the Association's common stock. During the three months ended September 30, 1991 and 1990, and the years ended June 30, 1991, 1990 and 1989, the Association contributed $14, $49, $53 and $37, respectively, to the employee savings plan.

**14. Commitments:**

At September 30, 1991 and June 30, 1991, the Association had loan commitments to borrowers and brokers totaling $44,204 and $41,251, respectively, including $40,580, $37,896 for fixed rate loans and $3,624 and $3,356, respectively, for variable rate loans. Substantially all loan commitments have interest rates that float with the market until closing or until committed for sale in the secondary market. Commitments, which are disbursed subject to certain limitations, extend over various periods of time, with the majority of funds being disbursed within a twelve-month period.

At September 30, 1991 and June 30, 1991, the Association had committed to purchase $0 and $5 million, respectively, of mortgage-backed securities. These securities are fixed rate and have a seven-year maturity.

The Association limits market risk (risk of fluctuating interest rates affecting the market value of an asset) on fixed rate commitments through the use of option transactions. At June 30, 1991, the Association had purchased options to deliver $31,000 of mortgage-backed securities (from underlying fixed rate residential mortgages) at set prices, which, in conjunction with commitments to sell specific loans, eliminates a majority of the market risk on fixed rate commitments. Substantially all of the commitments are for single family residential loans that have credit risk similar to the Association's existing portfolio.

At September 30, 1991 and June 30, 1991, the Association had made available various secured and unsecured commercial and personal lines of credit of approximately $10,373 and $11,168, respectively, of which the undisbursed portion is approximately $3,727 and $3,848. These lines of credit provide for periodic adjustment to market rates of interest, and have credit risk similar to the Association's existing portfolio.

Rental expense for office properties under operating leases was $186, $173, $865, $933 and $785 for the three months ended September 30, 1991 and 1990 and the years ended June 30, 1991, 1990 and 1989, respectively. Future minimum rental commitments as of June 30, 1991, under noncancelable operating leases with initial or remaining terms of more than one year, are as follows:

| Year Ending June 30, | |
|---|---|
| 1992 | $ 896 |
| 1993 | 806 |
| 1994 | 610 |
| 1995 | 373 |
| Thereafter | 2,513 |
| | $5,198 |

Future minimum rental payments receivable under noncancelable operating subleases with initial or remaining terms of more than one year are $508 at June 30, 1991.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**15. Acquisitions:**

a. *Central Evergreen Federal Savings and Loan Association*

On December 31, 1988, the Association acquired all of the outstanding stock of Central Evergreen of Chehalis, Washington, in exchange only for assuming its outstanding net liabilities. The acquisition was accounted for as a purchase, and resulted in the recording of $22,083 of intangible assets. This "supervisory" acquisition was conducted under an agreement executed with the Federal Home Loan Bank Board ("FHLBB"). As part of the acquisition, the FHLBB (now OTS) provided a "certification of insolvency" for Central Evergreen, which allows the Association to utilize Central Evergreen's tax basis net operating loss carryforwards.

The Central Evergreen acquisition did not involve cash assistance or indemnification from loss on troubled assets. The acquisition agreement was based upon an approved Business Plan under which the Association would operate through December 31, 1993. This agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities agreements (see below).

b. *Tri-Cities Savings and Loan Association*

On April 8, 1988, the Association acquired substantially all of the assets and assumed the liabilities of Tri-Cities of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("FSLIC"). FSLIC was succeeded by the FDIC pursuant to FIRREA (see Note 2). The acquisition was accounted for as a purchase, and resulted in the recording of $2,239 of intangible assets. Pursuant to an agreement executed with the FDIC, the Association received a cash assistance payment of $11,730 from the FDIC. As part of the acquisition Agreement, the FDIC agreed to indemnify the Association for 75% of any capital losses on certain assets until the Association's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. The FDIC further agreed to guarantee a minimum yield (equal to the average U.S. treasury bill rate plus 150 basis points) to the Association on this same group of assets. During the three months ended September 30, 1991 and 1990 and the years ended June 30, 1991 and 1990, the Association received $0, $0, $640 and $150, respectively, for loss indemnification and $0, $81, $159 and $483, respectively, for yield subsidies from the FDIC pursuant to the Tri-Cities acquisition Agreement. The FDIC also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years.

As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. The Association agreed to refund to the FDIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

The Tri-Cities acquisition Agreement provided the Association with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreement, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.

c. *Great American Bank Branches*

On February 5, 1988, the Association acquired six Washington branches of Great American Bank, F.S.B. The Association assumed deposit liabilities and accrued interest thereon of $47,548 and the lease obligations on two branch buildings. In consideration thereof, the Association received a net cash payment of $45,560 and other assets of $1,718. This transaction was accounted for as a purchase, and resulted in the creation of $270 of intangible assets.

d. *Lewis Federal Savings and Loan Association*

On November 5, 1985, the Association acquired the assets and assumed the liabilities of Lewis Federal from FSLIC. The acquisition was accounted for as a purchase, and resulted in the recording of $1,856 of intangible assets. Pursuant to an agreement executed with FSLIC, the Association received a cash assistance payment of $1,750 from FSLIC.

The Lewis Federal acquisition Agreement provided the Association with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreement, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.

e. *Effect of Acquisitions on Income*

The amortization of adjustments to fair market value and intangible assets relating to *all* purchase acquisitions reduced the Association's income before income taxes by $2,775, $3,111 and $1,652 for the years ended June 30, 1991, 1990 and 1989, respectively.

**16. Preferred Stock:**

Each share of preferred stock currently outstanding (Series B) entitles its holder to (a) an annual cash dividend of $2.50 per share, (b) receive up to $25.00 per share plus accumulated unpaid dividends in the event of involuntary or voluntary liquidation, and (c) beginning April 1, 1991, convert each preferred share into 2.2 shares of common stock. Each preferred share is also convertible into 2.2 shares of common stock at the option of the Association. Dividends on the preferred shares are cumulative and must be paid before any distributions to holders of common stock. The OTS has adopted regulations that control when and to what extent a savings association may pay dividends on both common and preferred stock. Because of the dispute over compliance with capital standards outlined in Note 2, it is uncertain whether the Association is eligible to pay dividends on its preferred stock.

At June 30, 1991, the Association has declared dividends of $4.38 per share, or $394, on its preferred stock. These dividends have been subtracted from retained earnings and accrued as a liability. An additional $56, or $0.63 per share, of dividends has accumulated through September 30, 1991, but has not been declared. The Association intends to pay these dividends at such time as the Association's capital levels are increased to minimum requirements established by the OTS notwithstanding its Agreements. These dividends have preference over any distributions to common shares and have been considered in calculating net income per common share.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**17. Incentive Stock Options:**

The Association has granted options to purchase shares of its common stock as summarized in the table below. All options granted become exercisable one year after the date of grant (all options outstanding are exercisable at June 30, 1991).

| | Number of Shares (A) | Option Price Per Share (B) | Expiration Date |
|---|---|---|---|
| Balance, June 30, 1988 | 35,000 | $7.68-$10.21 | 1989-1997 |
| Options granted | 9,500 | $9.90 | 1992 |
| Options granted | 4,000 | $9.90 | 1998 |
| Balance, June 30, 1989 | 48,500 | $7.68-$10.21 | 1989-1998 |
| Options granted | 10,750 | $8.75 | 1993 |
| Options granted | 2,000 | $8.75 | 1999 |
| Options exercised | (2,500) | $7.68 | 1989 |
| Options cancelled | (500) | $8.75 | 1993 |
| Balance, June 30, 1990 | 58,250 | $7.68-$10.21 | 1990-1999 |
| Options granted | 11,500 | $5.00 | 1994 |
| Options granted | 4,000 | $5.00 | 2000 |
| Options cancelled | (5,000) | $5.00-$10.21 | 1991-1994 |
| Options expired | (9,500) | $9.72-$10.21 | 1991 |
| Balance, June 30, 1991 | 59,250 | $5.00-$10.21 | 1991-2000 |
| Options granted | 23,250 | $8.25 | 1995-2001 |
| Balance, September 30, 1991 | 82,500 | $5.00-$10.21 | 1991-2001 |

(A) Stock options for a total of 28,406 shares have been granted in tandem with a corresponding number of stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock, above the option price, at the date of exercise. Payment is to be made in cash or in the form of newly issued common stock, or any combination thereof. The exercise of either rights or options serves to cancel the other. Since the exercise price exceeds current market value, no compensation expense is accrued at June 30, 1991 in connection with these stock appreciation rights.

(B) The exercise price associated with all options has been retroactively adjusted to recognize the effects of all stock dividends.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**18. Regulatory Capital:**

In connection with the insurance of its deposits by the FDIC and general regulatory oversight by the OTS, the Association is required to maintain minimum levels of regulatory capital.

The regulations governing the computation of regulatory capital changed significantly with the passage of FIRREA on August 9, 1989. As discussed in detail in Note 2, the Association's beliefs on how its regulatory capital should now be computed differ from the OTS' position. The Association believes that the Agreements for the acquisitions of three troubled institutions, and the various forbearances included therein, define the methodology for computing its regulatory capital requirements through December 31, 1993. Based on compliance with these Agreements, the Association's computation of its regulatory capital at June 30, 1991 and 1990 are as follows:

| | Amount | Percent of Assets |
|---|---|---|
| **June 30, 1991:** | | |
| Total stockholders' equity | $12,621 | 2.08% |
| Adjustment for amortization of goodwill under regulatory accounting | (1,374) | (0.23) |
| Contractual regulatory capital (FDIC cash assistance payments) | 13,480 | 2.21 |
| Computed regulatory capital | 24,727 | 4.06 |
| Minimum regulatory capital required under contractual acquisition agreements (specifically Central Evergreen Business Plan) | 23,973 | 3.94 |
| Regulatory capital surplus | $ 754 | 0.12% |
| **June 30, 1990:** | | |
| Total stockholders' equity, as previously reported | $10,730 | 1.56% |
| Adjustment for amortization of goodwill under regulatory accounting | (804) | (0.12) |
| Contractual regulatory capital (FDIC cash assistance payments) | 13,480 | 1.96 |
| Computed regulatory capital | 23,406 | 3.42 |
| Minimum regulatory capital required under contractual acquisition agreements (specifically Central Evergreen Business Plan) | 22,379 | 3.25 |
| Regulatory capital surplus | $ 1,027 | 0.15% |

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

According to the Association's calculations as of September 30, 1991, if the OTS' interpretation of the FIRREA requirements were applicable to the Association and if the Agreements were not binding on the regulators, the Association would not be in compliance with the OTS' minimum capital requirements. The Association would have a shortfall of tangible capital of approximately $12.0 million, a shortfall of core capital of approximately $10.7 million and a shortfall of risk-based capital of approximately $12.9 million.

**Regulatory Capital Requirements and Balances as if the Supervisory Agreements were not Binding on the Regulators**

| | Requirements as of September 30, 1991 | | Balances as of September 30, 1991 | |
|---|---|---|---|---|
| | Dollars | % of Assets (1) | Dollars | % of Assets (1) |
| Tangible capital | $ 8,652 | 1.50% | $ (3,338) | (0.60)% |
| Core capital | 17,344 | 3.00 | 6,643 | 1.20 |
| Risk-based capital | 24,860 | 7.20 | 11,935 | 3.50 |

(1) Percentages are based on adjusted total assets or risk-weighted assets.

According to the Association's calculations as of June 30, 1991, if the OTS' interpretation of the FIRREA requirements were applicable to the Association and if the Agreements were not binding on the regulators, the Association would not be in compliance with the OTS' minimum capital requirements. The Association would have a shortfall of tangible capital of approximately $13.6 million, a shortfall of core capital of approximately $12.6 million and a shortfall of risk-based capital of approximately $15.5 million.

**Regulatory Capital Requirements and Balances as if the Supervisory Agreements were not Binding on the Regulators**

| | Requirements as of June 30, 1991 | | Balances as of June 30, 1991 | |
|---|---|---|---|---|
| | Dollars | % of Assets (1) | Dollars | % of Assets (1) |
| Tangible capital | $ 8,903 | 1.5% | $ (4,688) | (0.8)% |
| Core capital | 17,838 | 3.0 | 5,269 | 0.9 |
| Risk-based capital | 25,505 | 7.2 | 10,006 | 2.8 |

(1) Percentages are based on adjusted total assets or risk-weighted assets.

FIRREA requires the OTS to prescribe minimum capital requirements that are no less stringent than those which apply to national banks. The Office of the Comptroller of the Currency (the "OCC") published final leverage ratio regulations in September 1990. The OTS, on December 12, 1990, issued a proposed rule which would reflect the requirements of the OCC leverage ratio regulation. The proposed OTS regulation continues the requirement that all savings associations must have and maintain core capital in an amount equal to at least 3% of adjusted total assets. In addition, the proposed rule provides that the minimum leverage ratio of 3% would apply only to savings association in the strongest condition. All other savings associations would be required to maintain leverage ratios of at least 100 to 200 basis points higher than the 3% minimum. Due to the preliminary nature of the proposed rule making, the Association has not yet determined the impact, if any, that this proposed rule would have on the leverage ratio required to be maintained by the Association.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**19. Quarterly Financial Data (Unaudited):**

Unaudited quarterly results of operations for the years ended June 30, 1991 and 1990 were restated to reflect the benefit from utilization of acquired tax net operating loss carryforwards (see Note 3) and sales of servicing rights. Unaudited, restated quarterly results and the effects of restatement are summarized below:

| | Year Ended June 30, 1991 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Interest income | $15,664 | $16,263 | $14,737 | $14,019 |
| Interest expense | 12,491 | 12,975 | 11,587 | 10,835 |
| Provision for loan losses | 0 | 50 | 50 | 50 |
| Net interest income after provision for loan losses | 3,173 | 3,238 | 3,100 | 3,134 |
| Other income | 1,455 | 1,582 | 2,058 | 2,313 |
| Operating expenses | 4,471 | 4,523 | 4,242 | 4,506 |
| Income before income taxes | 157 | 297 | 916 | 941 |
| Income tax provision | 40 | 76 | 234 | 240 |
| Net income | $ 117 | $ 221 | $ 682 | $ 701 |
| Net income applicable to common shares | $ 61 | $ 464 | $ 626 | $ 645 |
| Net income per common share | $ .12 | $ .32 | $ 1.21 | $ 1.24 |
| Effects of restatement: | | | | |
| Net income, as previously reported | $ 288 | $ 318 | $ 461 | $ 654 |
| Effect of restatement, net of tax | (171) | (97) | 221 | 47 |
| Net income, restated | $ 117 | $ 221 | $ 682 | $ 701 |

| | Year Ended June 30, 1990 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Interest income | $17,708 | $16,803 | $16,833 | $16,185 |
| Interest expense | 14,604 | 13,721 | 13,280 | 12,576 |
| Provision for loan losses | 60 | 90 | 950 | 0 |
| Net interest income after provision for loan losses | 3,044 | 2,992 | 2,603 | 3,609 |
| Other income | 1,265 | 1,520 | 806 | 3,209 |
| Operating expenses | 4,159 | 4,422 | 4,626 | 5,367 |
| Income (loss) before income taxes | 150 | 90 | (1,217) | 1,451 |
| Income tax provision (benefit) | 42 | 25 | (637) | 406 |
| Net income (loss) | $ 108 | $ 65 | $ (580) | $ 1,045 |
| Net income (loss) applicable to common shares | $ 52 | $ 9 | $ (637) | $ 989 |
| Net income (loss) per common share | $ .10 | $ .02 | $ (1.23) | $ 1.91 |
| Effects of restatement: | | | | |
| Net income (loss), as previously reported | $ 262 | $ 300 | $ (721) | $ 425 |
| Effect of restatement, net of tax | (154) | (235) | 141 | 620 |
| Net income (loss), restated | $ 108 | $ 65 | $ (580) | $ 1,045 |



DRI 02716



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER SG5003 1070




App. 324

DRI 02717

**No dealer, salesperson, or any other person has been authorized to give any information or to make any representation other than as contained in this Offering Circular in connection with the offering made hereby, and, if given or made, such information or representation must not be relied upon as having been authorized by Sterling. This Offering Circular does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby to any person or in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so, or to whom it is unlawful to make such offer or solicitation in such jurisdiction. Neither the delivery of this Offering Circular nor any sale hereunder shall under any circumstances create any implication that there has been no change in the affairs of Sterling since any of the dates as of which information is furnished herein or since the date hereof.**

TABLE OF CONTENTS


| | Page No. |
|---|---|
| Available Information | 2 |
| Offering Circular Summary | 3 |
| Risk Factors | 8 |
| Sterling Savings Association | 12 |
| Use of Proceeds | 13 |
| Market for Common Stock | 13 |
| Dividends | 14 |
| Conversion of Series B Preferred Stock | 14 |
| Dilution | 15 |
| Capitalization | 16 |
| Selected Consolidated Financial and Other Data | 16 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Business | 35 |
| Regulation | 59 |
| Taxation | 69 |
| Management | 74 |
| Security Ownership of Certain Beneficial Owners and Management | 82 |
| Shares Reserved for Sale to Directors, Executive Officers and Deferred Compensation Plan | 84 |
| Certain Transactions | 85 |
| Description of Capital Stock | 86 |
| Shares Eligible for Future Sale | 89 |
| Underwriting | 90 |
| Legal Matters | 91 |
| Experts | 91 |
| Index to Consolidated Financial Statements | F-1 |


# 2,500,000 Shares of Common Stock

STERLING SAVINGS Association

*Hometown Helpful!*

**OFFERING CIRCULAR**

**Dain Bosworth**
Incorporated

**Sutro & Co. Incorporated**

**Wedbush Morgan Securities**

November 20, 1991



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER L SG5003 1072