# Continued Deposition of

# Harold Gilkey

# June 8, 2000

# STERLING V USA

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY

STOREY & MILLER COURT REPORTERS

601 W. Riverside Avenue
Suite 1030
Spokane WA 99201-0910
Phone: (509) 456-0122
Fax: (509) 456-0169

Q. You did not?
A. (Shakes head negatively.)
Q. Would Sterling have pursued a public offering of this kind during this time frame had it not made the decision to achieve compliance with the current capital standards?
MR. SYMMES: Objection to form. Go ahead.
A. As I suggested to you--I didn't hear the first part of your--I don't recall the first part.
Q. (BY MS. HOSFORD) Would you like me to repeat the question?
A. I think you said did we consider--well, please repeat it.
Q. Okay. Would Sterling have pursued a public offering of this kind, the kind you completed in 1991, if you had not made the decision to achieve compliance with the capital--let me start over.
If Sterling had already been in capital compliance during this 1991 time frame, would you have pursued a public offering of this kind, to your knowledge?
MR. SYMMES: Object to form of the question, lacks foundation, assumes facts not in evidence, assumes facts not established, but go ahead.
A. If I understand your question correctly--you've

464

changed it from the first question to now.
Q. (BY MS. HOSFORD) Right.
A. If--it would have depended on what would have caused us to be in capital compliance. If the Federal Government would have confirmed our contracts, reestablishing it, it would have been my opinion we would not have gone to market.
Q. Why not?
A. We would have had substantial excess capital to support a company of $600 million. The only reason that I would have gone to the market if I--I would have gone to my regulators and asked for forbearance or asked for relief of the item in the contract to go to the marketplace for capital.
Q. Can you explain? I didn't understand that? Can you explain that?
A. One of the conditions of our contracts was to go to the market to get a certain amount of capital.
Q. Right.
A. The contracts were abrogated.
Q. Right.
A. We were a much different company in '91 than we were in 1989. If the contracts would have been reinstated, we would have had a substantial capital, substantial excess capital, to carry on our business.

465

I said that we would not have gone for additional capital at that time. Then I remembered that I had a contractual obligation. I would not have had the desire or the need to go for that capital at that time. I would have gone to my regulators and said, I've an obligation to do this. I don't see a good reason for us to do it. Would you waive that condition in your contract.
Q. Okay. Why do you assume that you would have had substantial excess capital?
A. Well, our net worth would have been approximately 50 to $60 million, which is about a 10 percent capital ratio, and that would have been above the capital requirement at that time.
Q. How do you know that your net worth would have been 50 to $60 million?
A. That was just my quick analysis of where I thought it would be.
Q. How would you have achieved that net worth during that time period?
MR. SYMMES: Object to the form of the question. I realize you are asking him, but your question lacks a tremendous amount of foundation. You are assuming a lot, but maybe you will get it out.
Q. (BY MS. HOSFORD) I'll restate my question.

466

Mr. Gilkey, you say, well, our net worth would have been approximately 50 to $60 million. I'm asking, how would you have achieved that net worth?
A. What I'm suggesting to you is if you would have reconfirmed your contracts, that would have been the number for the company, I believe. That was just my quick analysis in answer to the question.
Q. And would that be based upon the fact that you would still have the goodwill and the capital credits count as capital or something else?
A. We still had the goodwill. We didn't have the contracts.
Q. Okay, but would the 50 to $60 million of net worth have been dependent upon the government's recognition of that goodwill? That's what I've saying.
A. Would have been dependent upon the government's recognition of their contract.
Q. And does it assume that you would have engaged in some activities that would have brought you the 50 to $60 million of net worth?
A. No.
MR. SYMMES: That's my objection. I am not sure you two are communicating. That's my objection. Go ahead.
A. It assumes that the activity would have been that

467

# IN THE MATTER OF

*STERLING SAVINGS ASSOCIATION, A STATE CHARTER v. UNITED STATES*

---

*DANIEL G. BYRNE*

*December 4, 2001*

---

*HOUSTON REPORTING SERVICE*
*1010 LAMAR, SUITE 1400*
*HOUSTON, TX U.S.A. 77002*
*(713) 739-1400 FAX: (713) 739-1410*

*Original File BYRNE2.V1, 113 Pages*
*Min-U-Script® File ID: 1459143356*

**Word Index included with this Min-U-Script®**

App. 374

Page 119

in picking out just those items that I thought were in excess of the norm.

Q: So is it your opinion that but for the phaseout of Sterling's regulatory capital, the 9/25/89 and 1/31/90 examinations would not have taken place?

MR. W. D. SYMMES: Objection to the use of the word "phaseout" unless you describe it.

But go ahead.

A: I believe if Sterling had not been treated as a troubled thrift because of the Government's breach of the contract, we would not have been examined as frequently as we were during this period.

Q: (BY MR. MURPHY) And what is the basis of your inclusion of the State examinations in this calculation?

A: Generally the State joined with the OTS in performing examinations and basically on a piggyback, and from period to period, they may even alternate who was the lead examination. But in any case, they were scheduled simultaneously and in a joint fashion. And the fact that we had excessive examination by the OTS led to the State also coming in and joining in those examinations.

Q: Did the State regulators examine the institution's capital in the same manner that the federal regulators did?

Page 120

MR. W. D. SYMMES: At what time, may I ask?

MR. MURPHY: During this time frame.

MR. W. D. SYMMES: Go ahead.

A: Capital was calculated the same way for both State and OTS because of the mandate of FIRREA.

Q: (BY MR. MURPHY) And the next series of charges is for Washington general administrative.

Can you give me the basis for that — the inclusion of those charges?

A: My understanding is that those charges were included because the State of Washington implemented an assessment for troubled institutions and that had we not been deemed to be a troubled institution by the OTS, we wouldn't have been assessed.

Q: And the next section on this page is for FDIC general assessments. What is the basis for your inclusion of those amounts?

A: First off, I point out there is a typo. Where it says FDIC, that should be OTS —

Q: Oh, okay.

A: — general assessments. And the OTS had a policy of assessing troubled institutions at the rate of one and a half times a nontroubled institution.

So what this section does is to add up the total assessments and then divide by one and a half,

Page 121

identifying that extra half as the additional cost that Sterling was assessed because of the OTS's treatment of Sterling as a troubled thrift.

Q: And where is that one and a half time figure found? Is that in a regulation?

A: I know that there were supervisory memos that went out to all institutions. I'm not sure whether it was an actual regulation, but there were communications from the OTS stating that would be their policy for assessing institutions.

Q: Was — was Sterling in capital compliance by January 17th, 1992?

A: Sterling met the capital requirements of FIRREA, even excluding the capital from our contracts, in January of 1992; however, the OTS continued to bill us despite our protest letters for some period into 1992.

Q: Okay. One last question on this document: The examinations that you determined to be excessive, do you know if Professor Horvitz independently reviewed those or if he accepted your assessment that they were excessive?

A: I know that we provided examination reports to Dr. Horvitz, but you'd have to ask him that question.

Q: Okay. Now, if I could get you to turn to tab 10 of Exhibit 2. And the caption on this document is

Page 122

"Legal Accounting and Insurance," and then in parens, (Incurred Due to Treatment as a Troubled Bank and Regulatory Interference).

And at the bottom, it notes there is an analysis prepared by Daniel G. Byrne, CFO of Sterling Savings.

My first question is: What are you referring to by the legal accounting and insurance amounts included here?

A: Again, these are additional incremental costs that Sterling incurred in those categories because of the OTS' and the FDIC's treatment of Sterling as a troubled institution during this period of time by virtue of their breach of the contract.

Q: And how did these costs differ from those we just discussed in tab 8?

A: Well, generally, in tab 8 those were regulatory costs with the exception of one little category that had legal. This had more to do with other professional costs that were incurred because of the Government's actions and the continued treatment by Sterling's regulators at various times trying to overregulate Sterling.

Q: Okay. And just generally focusing on tab 10, what sort of matters were Arnold & Porter doing such

Page 123

that these charges weren't included in this analysis?
A: They were assisting Witherspoon, Kelley primarily on regulatory matters. And when the OTS would come through with restriction letters in contravention of the injunction that was in place, we would solicit Arnold & Porter's advice on how to deal with those various restriction orders.
Q: And how about Hogan & Hartson?
A: Hogan & Hartson was a consulting firm. And right offhand, I forgot exactly what their involvement was; but I know that there was an invoice provided that would refresh my memory.
Q: And XYZ partners, do you recall what their involvement was?
A: Again, they were a consulting company very early on, and I would have to look at the invoice again to refresh my memory.
Q: How about Coopers & Lybrand?
A: Coopers & Lybrand generally were assisting Sterling in, again, dealing with regulatory matters, particularly when restriction letters were being sent to Sterling by its regulators in dealing with regulatory matters. It also increased the cost of our audits during 1990 and 1991 because they had to do more work than would have been required had we not had the

Page 124

disagreements with our regulators.
Q: And what is your basis for inclusion of $15,000 for the increased audit fee?
A: That was based on a discussion I had with the partner of the audit engagement at the time as to how much incremental costs were incurred for procedures that the Coopers & Lybrand audit firm had to perform because of Sterling having a disagreement on capital and being treated as a troubled thrift by the OTS and the FDIC in terms of their performance of their audit and issuing an audit opinion on Sterling.
Q: And who was that partner?
A: That would have been Gordon Budke at the time.
Q: Did Coopers — sorry.
Did Coopers separately invoice the increase in audit fee, or was your discussion with the partner Coopers the sole basis for that $15,000.
A: There was not a separate billing for the incremental amount, and it was based on the conversation with Gordon.
Q: Did Coopers ever work on regulatory matters for Sterling prior to FIRREA?
A: Not in the context of the types of issues they dealt with in the '90-'91 period. They assisted Sterling on our acquisitions. And to the extent there

Page 125

were regulatory issues involved in those acquisitions, they would have been involved; but with specific restrictions and activities resulting from the breach, they had not been involved in those type of activities prior.
**MR. MURPHY:** Let's mark our next exhibit.
**THE WITNESS:** Am I done with this one here?
**MR. MURPHY:** For now, yeah.
(Exhibit No. 6 marked for identification)
**MR. MURPHY:** Let me have one of these, because this is too bulky.
Q: (BY MR. MURPHY) This is what I believe — what we've marked as Exhibit 6 is, I believe, the support for the material behind tab 10. I'm not going to spend a whole lot of time in here. I just want to ask you a couple of quick questions about this. It contains mostly invoices.
My first question, if I could get you to turn to SG 0803557. That's a Witherspoon, Kelley invoice dated June 26, 1990. And it notes that it's for professional services rendered, Alpha transaction.
Can you tell me what Alpha transaction was?
A: Alpha transaction was essentially costs associated with dealing with response to regulatory matters.

Page 126

Q: So is that just a general one type of account you have with Witherspoon, Kelley when they worked on regulatory matters it would get billed to Alpha?
A: That's correct.
Q: Okay.
A: On this particular account.
Q: Then for purposes of inclusion in your wounded bank analysis, would all items from the Alpha account be included, or would you go through Alpha matters to determine independently whether or not those should be subject to inclusion in your wounded bank analysis?
A: I think that we included anything that was in the Alpha matter. There may have been other matters that there were also costs incurred to deal with regulatory issues.
Q: Okay. Did Witherspoon, Kelley work on any regulatory matters for Sterling prior to FIRREA?
A: Again, they would have in the context of perhaps acquisitions, but nothing in terms of the scope that we incurred following FIRREA and breach of the contract.
Q: So Alpha would not have been related to the 1989 offering. Is that correct?
A: Costs incurred in the Alpha generally would not have been those that related to the offering. There may have been reference to the offering in the Alpha

Page 127

transaction only because it — we were not able to continue that offering because of the OTS' actions.

Q: And how about work on the injunction? Did Alpha have anything to do with that?

A: Yes, it did.

Q: Okay. So those matters would have been swept up into the Alpha account?

A: That, as well as other activities, including trying to get the OTS to agree to their agreements or to unscramble the egg or other activities. But there were a number of things we were trying to do. We were basically trying to work out with our regulators, get them to agree to the agreements they had already entered into; and so those were the kind of activities that our lawyers incurred time on.

Q: Okay. And how about the '91 offering? Would Alpha include any of those charges?

A: The costs incurred specifically with drafting the offering circular would have been captured in a different matter for the 1991 offering. There was an awful lot of dealing with regulators, trying to figure out how to proceed with the successful offering or, again, ways to resolve the difference between Sterling and its regulators from this period in 1990 through the completion of the offering in November of 1991.

Page 128

Q: Okay. Let's see. If I could just get you to flip to 803597, which is just another Witherspoon, Kelley invoice. This one is dated September 30, 1990.

And my only question here is: This one notes that it's for professional services rendered, corporate administration. If you could just tell me what sort of matters would appear in corporate administration.

A: Well, the first item we were working on litigation reports —

THE REPORTER: Litigation?

A: — litigation reports for examiners. So obviously, that had to do with examination-related function.

We have a reference here with respect to the servicing sale which was necessitated — the sale was necessitated because of the position we found ourselves with the regulators. Had it not been for the breach, we wouldn't have proceeded with that servicing sale at that time. It was a way of raising capital.

There's some discussion here about revising the annual report with one of the Coopers & Lybrand auditors, Dave Teague, and that had to do, in part, because of the additional disclosure requirements resulting from our disagreements with the regulators.

Page 129

There was some discussion about drafting and redrafting minutes as a result of Carol Friend's continued insistence that our secretary wasn't keeping detailed minutes to her satisfaction. And Carol Friend was our OTS supervisor at the time.

There are some discussions regarding the MDA, which stands for "management discussion and analysis" on our 10(k) between myself, Don Lukes and Norm Judd, again, necessitated because of the need to be more specific as a result of our dispute with our regulators and the treatment as a troubled thrift.

Q: (BY MR. MURPHY) Is it the case that all items in the corporate administration account would be swept into wounded bank analysis, or would you have to do an entry-by-entry assessment to determine whether they should be included?

A: I think in some invoices, it may have been item-by-item determination, and others it may have been a look at the preponderance of activity going on. And it may have been the entire invoice.

Q: Okay. Okay. I mentioned off the record that there were a couple of invoices I couldn't track to tab 10. Rather than have you spend a half hour flipping through, I'll just let you know what those are. And then if you guys can get back to me about that.

Page 130

A: Okay.

Q: The first one is a Witherspoon, Kelley entry on tab 10. It's listed as 9/30/90. It's in the amount of $13,717.

The second —

A: I'm sorry. On the summary page, again, it was how much?

Q: It's the $13,717 one.

A: Okay.

Q: And the second one is the January 10, 1991 payment of a bill for $7,300 — excuse me, $7,653.07. And that's it.

When did, for purposes of your inclusion in wounded bank damages, the regulatory interference end?

A: The restriction letters were withdrawn at the time that Sterling was increased from a MACRO rating of either 5 or 4 to a MACRO rating of 2 in late — as I recall, late 1992. However, we have had continue — continued friction with our regulators that has at times been borderline similar to what we incurred during the '89 through '92 period, in part because the same regulator that denied our ability to go to the marketplace came back as the supervisory agent of Sterling and today is still our supervisory agent and has taken a tighter view of regulating Sterling than we

Page 135

is the increased costs that we incurred to acquire that branch over what our costs would have been in 1989 had the Government not breached our contract.
Q: And how did you determine the value received by the RTC upon sale of the branches?
A: The $1,892,000 represents the value paid by Sterling for that branch, and it was referenced in documents that had been produced with respect to a news article put out by the RTC as to the total amount paid by Sterling and Sterling's internal bid worksheet which identified the Spokane branch with this dollar amount being paid or bid on by the RTC.
Q: And what is the item — the next item, costs described to deposit premium in Sterling's bid?
A: That essentially is the cost that Sterling would have paid to Great American in 1989 for this one branch. And actually there is a note at the bottom that the premium for both branches, Spokane and Richland, would have been $61,000, and that Sterling expected to incur an additional $54,000 relating to the closing of the transaction in winding down the operations at the Spokane branch. I think what this schedule was attempting to do was split the costs between the Spokane and Richland branch, but basically what it would have cost in 1989 versus what it cost in the 1994 or '5 time

Page 136

frame.
Q: And the transaction costs that are listed, what are those?
A: Those are the transaction costs that were incurred in 1989 by the various vendors to acquire the branches from Great American up until the time that the Government basically forced us to terminate that acquisition.
Q: So those are actual costs incurred?
A: Out-of-pocket expenses.
Q: The $1.892 million, is that cash that was paid by Sterling for the branch?
A: Essentially, yes. By virtue of the fact that Sterling assumed deposit liabilities, it was paid cash for those deposits; but then we deducted the amount of the premium from the amount of cash that Sterling received.
So effectively it was cash paid by Sterling back to the RTC to acquire those branches.
Q: So does the 1.892 represent the premium, or how is that related to the premium?
A: That is the premium and the cost —
Q: Okay.
A: — that Sterling paid to acquire those branch — that Spokane branch.

Page 137

Q: So how — just to make sure I understand this correctly. In 1989, Sterling ascribed the premium value to the premium branches of $61,000. Is that correct?
A: That's correct.
Q: And in 19 — when the branch was acquired from the RTC, Sterling effectively paid a $1.892 million premium. Is that correct?
A: That's correct.
Q: Okay. Do you have an opinion as to what the difference is a result of?
A: Difference of?
Q: The difference between the value that Sterling ascribed to the two branches in 1989 and the premium Sterling actually paid in — when it acquired the branch from the RTC.
A: That was a great job on my part to negotiate the first transaction in '89.
Q: So would it have been a bargain purchase in 1989?
A: I think it represented the market in 1989.
Q: Did you do any analysis of whether the deposit base changed between 1989 and the time the branch was actually acquired?
A: We did some analysis in terms of the level of deposits and the mix of deposits between CDs and

Page 138

transaction accounts. I don't recall what that analysis indicated.
Q: And is it your opinion that the franchise value of the Great American Savings branches or branch increased by 1.83 million between 1989 and 1994 or '95?
MR. W. D. SYMMES: Object to the form of that question.
You may answer.
A: I guess I'm having a little struggle with your term "franchise value" because we're talking one single branch that was primarily a depository, with very little in the way of loans. There just wasn't much franchise.
Q: (BY MR. MURPHY) So is it your opinion that the value of that branch increased by $1.83 million between 1989 and 1994/'95?
MR. W. D. SYMMES: Same objection.
A: I know that the market ascribed more value to it.
Q: (BY MR. MURPHY) Do you have an opinion as to whether or not the market for the value of deposit premiums generally increased between '89 and '94?
MR. W. D. SYMMES: Same objection.
Go ahead.
A: I really didn't study the market in terms of deposit premiums during the '90 through '93 period

CERTIFICATE OF FILING

I hereby certify that on February 26, 2007, a copy of foregoing "APPENDIX TO DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES - VOL. I" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford