**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**APPENDIX TO DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES - VOL. II**

**Respectfully submitted,**

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Acting Director**

**KENNETH M. DINTZER**
**Assistant Director**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**Attorneys for Defendant**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**TIMOTHY ABRAHAM**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**February 26, 2007**

# INDEX TO APPENDIX

**DOCUMENT** **PAGE**

**Volume I**


Acquisition Agreement, dated November 5, 1985 . . . . . . . . . . 1

Assistance Agreement, dated November 5, 1985 . . . . . . . . . . 15

Assistance Agreement, dated April 8, 1988 . . . . . . . . . . 23

FHLBB No. 88-1273, dated December 8, 1988 . . . . . . . . . . 25

Agreement, dated December 28, 1988 . . . . . . . . . . 31

Offering Circular, dated November 14, 1989 . . . . . . . . . . 33

Sterling Savings Association Capital Restoration Plan,
dated February 19, 1990 . . . . . . . . . . 35

Letter from William J. Durbin to Board of Directors (OTS No. 7918),
dated May 22, 1990 . . . . . . . . . . 45

OTS Letter from Carol Friend to Daniel G. Byrne,
dated June 18, 1990 . . . . . . . . . . 46

FDIC Letter from John W. Stone to Board of Directors,
dated July 31, 1990 . . . . . . . . . . 48

FDIC Letter from John W. Stone to Daniel G. Byrne,
dated September 7, 1990 . . . . . . . . . . 49

Report of Examination, dated September 17, 1990 . . . . . . . . . . 50

Report of Examination, dated September 16, 1991 . . . . . . . . . . 141

Offering Circular, dated November 20, 1991 . . . . . . . . . . 206

1992 Annual Report, Sterling Savings . . . . . . . . . . 326

Deposition of Harold Gilkey, dated June 8, 2000 . . . . . . . . . . 372

Deposition of Daniel G. Byrne, dated December 4, 2001 . . . . . . . . . . 374

**Volume II**


Deposition of Paul Horvitz, dated December 6, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

Deposition of Paul Horvitz, dated December 7, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

Deposition of Daniel G. Bryne, dated December 3, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

PAGES INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393 - 405

Expert Report of Joe A. Hargett, dated April 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

CJ-4 Business Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415

Corrected Expert Report of Christopher James, dated September 10, 2001 . . . . . . . . . . . . . . . 416

Report of Christopher James, dated January 9, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 561

Corrected Expert Report of Paul Horvitz, dated September 6, 2001 . . . . . . . . . . . . . . . . . . . . . 583

Update to the Expert Report of Paul Horvitz, dated December 10, 2003 . . . . . . . . . . . . . . . . . 589

FHLBB Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings
and Loan Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 593

Prospectus - 1993 Sterling Financial Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 597

Report of Christopher James, Updated December 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683

Deposition of Christopher James, dated March 8, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702

Deposition of Paul Horvitz, dated February 25, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 705

FDIC Report of Examination, dated September 17, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Additional Materials Relied Upon by Paul Horvitz (tab 10) -
Sterling Savings Bank Calculation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 747

Memo - From Wayne Allert to Rod Barnett, Monthly Update
on Internal Audit Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749
OTS Letter from William Durbin to Board of Directors, dated April 11, 1990 . . . . . . . . . . . . 753

Letter from Harold Gilkey and William Zuppe to William Durbin,
dated May 10, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 754

Temporary Restraining Order (TRO), US District Court for The Eastern

District of Washington, dated May 28, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

Updated Amended Expert Report Of Mukesh Bajaj, Ph.D.,
dated February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 776

Update to the Expert Report of Paul Horvitz, dated December 11, 2006 . . . . . . . . . . . . . . . . . . 786

Updated Expert Report of Professor Christopher M. James,
dated December 11, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 794

Expert Report W. Barefoot Bankhead, dated February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . 805

**IN THE MATTER OF**

*STERLING SAVINGS ASSOCIATION, A STATE CHARTER v. UNITED STATES*

---

*PAUL M. HORVITZ, PH.D.*

*December 6, 2001*

---

*HOUSTON REPORTING SERVICE*
*1010 LAMAR, SUITE 1400*
*HOUSTON, TX U.S.A. 77002*
*(713) 739-1400 FAX: (713) 739-1410*

*Original File HORVITZ2.V1, 231 Pages*
*Min-U-Script® File ID: 0141280946*

**Word Index included with this Min-U-Script®**

Page 337

breach.
As I understand reliance, it's an attempt to put the — the party in the position they would have been in absent the contract. And that's a different kind of — of consideration. But in general I guess in terms of reliance after the fact, what gain or loss made, I would take account — my view would be to tend to take account of the — of the subsequent events.
Q: Okay.
MR. W.D. SYMMES: Could we take a break at this point then, it being noon?
MS. HOSFORD: Okay.
THE VIDEOGRAPHER: We are now going off the record. The time is approximately 11:59.
(Lunch Recess).
THE VIDEOGRAPHER: We're now going back on the record. The approximate time is 1:16.
Q: (BY MS. HOSFORD) Professor Horvitz, it's your opinion that past damages can be determined with virtually complete certainty. Isn't that correct?
A: No. I think that's — that's somewhat of exaggeration. We know the factors that go into lost profits with — with certainty, but I think that probably is an exaggeration to say that we can determine the lost profits with — with close to perfect

Page 338

certainty.
Q: So are you saying it's not in your opinion that past damages can be calculated with virtually complete certainty?
A: I may have said that — that's, I think somewhat of an exaggeration. But certainly with — with reasonable certainty.
Q: Okay. So should we then assume that page 13 of your report has an exaggeration in it? Lines 4 to 5?
A: Well, I'm making a distinction that — that the past is more certain than the — than the future. But it — it's probably somewhat of exaggeration to say virtually complete certainty.
Q: So then line 5 of page 13 of your report contains somewhat of an exaggeration?
A: Yeah, I think so.
Q: Okay. How much of an exaggeration?
A: A little.
Q: Doesn't the fact that Sterling, in the real world, didn't have the incremental assets and never had the incremental assets, make it difficult to determine just what the but-for bank's earnings would have been?
A: That's because it's not virtually complete.
Q: So it is difficult to determine just what the bank — but-for bank's earnings would have been?

Page 339

A: No. I don't think it's — it's very difficult. I think it's — it's not completely certain.
Q: And there is some difficulty associated with making the calculation?
A: No. We know an awful lot about what those — those other assets would be in terms of the business plans and we know about the market. So one can be — can be pretty close in making that estimate.
Q: When you say pretty close, how do you measure pretty close?
A: I'd say with within a — within a few percent.
Q: How do you measure a few percent?
A: What do you mean, how do you measure?
Q: Plus or minus. What is a few percent?
A: I'd say if a — a — if a damage figure for a particular year is on average is $10 million, then it may be probably within the range of $950,000 to a million 50,000. That is within a five-percent range. Though of course, this is on an average basis. In any particular year things might be a little better or a little less. But things would average out to being fairly close.
Q: What would the assets be?
A: Well, I said the assets — you mean the assets of the but-for bank?

Page 340

Q: Uh-huh.
A: I think that was 3 billion 6.
Q: What percentage would be ARMS originated by Sterling, adjustable rate mortgages?
A: Oh, I did not — I did not attempt to determine the — the specific assets. The — my analysis is based on the fact that the portfolio would be roughly the same as the existing portfolio.
Q: So you don't know what percentage the fixed rate loans originated by Sterling would be among the assets?
A: It's based on the expectation that it would be about the same as the actual banks.
Q: And would that expectation be the same with respect to mortgage backed securities?
A: There is not an attempt in — in my modeling to — to construct the asset portfolio of the but-for bank. The analysis determines the amount of assets and then applies the earnings rate that Sterling had on its actual assets to the forgone assets.
Q: Why did you not attempt to construct the asset portfolio of the but-for bank?
A: Because I don't think it's necessary or that it is necessarily more accurate to do that.
Q: What do you mean not necessarily more accurate?

Page 341

A: The more detailed — the — the only reason for making a model more detailed is if one believes it would be more accurate and I don't think that would be more accurate in terms of predicting the earnings.
Q: Why wouldn't it be?
A: Because it is, in — in real life the institution would manage the incremental assets so as to get the — the greatest profit from them. And it might not be exactly the same structure as the existing assets.
Q: What would the liabilities be in a but-for world?
A: I have not attempted to — to construct the — the liability makeup of the — the but-for bank.
Q: So you don't know what percentage of the but-for bank would be comprised of retail CDs?
A: No.
Q: And you don't know what percentage of the but-for bank would be comprised of wholesale liabilities?
A: I have not attempted to — to create the — the liability structure of the — the but-for bank.
Q: So you wouldn't know what portion of the but-for bank would be comprised of — of Federal Home Loan Bank advances?

Page 342

A: No. That's — that's unnecessary to make the — the earnings analysis. And having that detail would not — would create a lot more numbers and more paper but not necessarily create any additional accuracy.
Q: And the same answer would apply to transaction accounts and reverse repos?
A: Yes.
Q: In your opinion, are there any necessary inputs for calculating past damages besides the economic environment and interest rates?
A: Well, plans and intentions of the — of the bank.
Q: How do those figure in?
A: Well, because we want to know what the — what the assets will be.
Q: Is there anything else that would be relevant? Any other necessary inputs?
A: In — in a sense everything affects everything, but it's all past. So — so those things exist. If there's anything that's — that's affecting the economy, we — we know about it. If there's something unusual like a — a special assessment on — on deposits, we know about that.
So there are all kinds of things that can come up and that can affect the profitability. What I'm

Page 343

saying is that as long as it's past profits we're talking about, we know about all those.
Q: To the extent that — that the thrifts' intention and plans are a necessary input — is it —
A: Yes. Because if their — if their plans were not to grow, if they didn't seek growth, then it would be poor modeling to build in a rapid rate of growth.
Q: What if — should you consider the fact that thrifts don't always achieve their plans?
A: Yes. But we have the past record. This is — this is not projecting into the future whether they will be able to accomplish that plan.
Q: Would the competitive environment in which the non-breaching operated be a necessary input?
A: Sure. But that's the necessary environment that I'm talking about.
Q: So the economic environment encompasses the competitive environment?
A: Sure.
Q: In your opinion is the competitive environment that would have prevailed in the but-for world known with certainty?
MR. W.D. SYMMES: Objection to the form of the question.
A: We know what —

Page 344

MR. W.D. SYMMES: I don't understand it, but you may go ahead and answer the question.
A: We know what the — what the competitive structure was.
Q: (BY MS. HOSFORD) So you're saying — are you saying that the competitive environment in the but-for world is exactly the same as the competitive environment in the real world?
A: Well, I know where you're — you're going. Is the — is the question whether who the breach applies to? Is that where we're going?
Q: I'm asking you a question, Professor Horvitz —
A: Well, okay —
Q: — and I can just ask you to —
A: What's the question? Is the but — yes, the competitive situation in the but-for world is — is — is what it is in the — in the actual world.
Q: It's the same exact situation?
A: I don't know what exact means.
Q: Well —
A: I mean, these things are pretty — pretty rough in terms of definitions of markets and structure. I'm saying the competitive structure is about the same.
Q: What's the basis for that opinion?
A: That if Sterling's contract was not breached,

Page 353

bank.
A: Yes.
Q: Okay. You said you took the internal growth rate and applied to the previous year's assets. Is that right?
A: Yes.
Q: Did you do that in each year?
A: Yes.
Q: Are you sure about that?
A: Yes. Well, not for the first couple of years where we used the business plan figures.
Q: Why — why — why did you use the business plan figures in those other years?
A: Because but for the breach, the business plans would have been achieved. Given the breach it — it — it wasn't. Because —
Q: Are we talking about the '89, '90 and '91 —
A: Yes.
Q: — time period?
A: Yes.
Q: But for every other year —
A: Every year after that, yes.
Q: Can you be more precise about every year after what?
A: For the years '90 and '91, I used the assets

Page 354

set in the business plan. I can't find it in here. Oh, okay. It's Table 5.
Q: In Tab 6?
A: In Tab 6.
Q: Okay.
A: This shows the — the growth constrained assets. In 1990 and '91 — in 1990 and '91, the bank shrank. The actual bank shrank.
Q: Are we looking at Column A?
A: Well, no, I'm looking at — when I say the actual bank shrank, I'm looking at Table 1.
Q: Okay. Table 1, Column A actual assets?
A: Yes. So the actual bank shrank from June of '89, '90 and '91, it shrank.
Q: I see that.
A: In — in my modeling I assumed that the bank didn't shrink but grew in accord with the growth in the business plan.
Q: So are you assuming that the projections made in '88 for '89 would have been realized but for the breach?
A: Yes.
Q: And you're assuming in the projections in '88 for '90 would have been realized, right?
A: Yes.

Page 355

Q: And what about projections for '91?
A: Yes. And from then on I did a model on that of the growth as I've described.
Q: After they stopped shrinking? I mean what made you — what was the — what was the triggering event or condition that made you decide to go with actual growth?
A: The actual bank was — was growing and the business plan no longer applied. So what I'm saying is that the but-for bank from 1991 to '92, would have grown at the same rate that the actual bank grew.
Q: Do you know if Sterling ever reduced its planned rate of growth for a year covered by a previous business plan?
A: I'm sorry. That it reduced its?
Q: Reduced its planned rate of growth for a year covered by a previous business plan. Do you understand my question?
A: They might have.
Q: Do you know?
A: I don't know.
Q: Okay. I think you testified a little bit — a little while ago that you assumed that the competitive environment in the but-for world was the same as the competitive environment in the real world?
A: Yes.

Page 356

Q: Is it your opinion that eliminating the alleged breaching provisions of FIRREA would have had no impact on the number of institutions competing with Sterling for retail loan and deposit customers?
A: What my analysis is based on, and this is what I've have been — been told to base it on, is that this case concerns a breach of contract for Sterling and that I should not assume as a legal matter that — that the — that everybody else was breached, that all other institutions that have lawsuits with the Government in effect win their lawsuits.
Q: So it's your opinion — I'm sorry. I shouldn't have interrupted.
A: No. Go ahead.
Q: So it's your opinion in the but-for world only Sterling would have had more regulatory capital?
A: That's what this analysis is based on.
Q: So are you saying in the but-for world FIRREA is enacted but only Sterling is — suffers breach?
A: Yes.
Q: Is it your opinion that eliminating the alleged breaching provisions from FIRREA would have had no impact on the appetite of Sterling's competitors for loans and deposits?
A: I'm not dealing with legislation. I'm dealing

Page 365

Q: So you can ignore the actions that would have been taken by competitors then?

A: I'm saying this would have been so small in the context of a competitive and efficient market that it would not have been perceptible to — to other participants in the market.

Q: And based upon that opinion, you didn't even attempt to study what the — what Sterling's competitors would have done?

A: No. But I've taken a conservative approach towards the — towards the earnings that Sterling would have achieved on their additional assets.

Q: But that conservative approach wasn't based upon some study of what their competitors would have done?

A: I have looked at their competitors and their market share. It's not that I have ignored that. I have concluded that the — that the effect on the market would have been insignificant. It's saying that it's insignificant or saying that it's zero, doesn't mean that I have ignored it.

Q: If the court rules that in the but-for world all thrifts with supervisory goodwill and capital credits can continue to count them towards regulatory capital, would that affect your damages calculation?

Page 366

A: Going forward or you mean — the — the courts can't decide that retroactively, can they?

Q: This court decides that it would have applied to all.

A: But that's going forward. So that would — so yes, that would have an affect on the market going forward.

Q: But it would not have an effect on the market going backwards. You would still assume that only Sterling?

A: My — what I've said is that my analysis assumes everything is the same except for the — the breach of Sterling's contract.

Q: What if the court says you should have assumed that the breach would also not be permissible with respect to all the other thrifts?

A: I could go — I could go back and recalculate this, if — if that's what a court so determines and it would reduce modestly the — the amount of the damages.

Q: How can you tell that it would be modest?

A: Because for all of the institutions that — that have goodwill claims, they are still a small part of the total market for financial assets and liabilities.

Q: Okay. Getting back to this necessary input

Page 367

statement in your report. Would the actions that would have been taken by Sterling's own management in the but-for world be a necessary input for calculating damages?

A: Are we at someplace — you referred to my statement in my report?

Q: Page 11, lines 28 through 30.

A: Yes. The actions and attitudes and — and skills of management are a part of the — of the input.

Q: And it's your opinion that these actions are known with certainty.

A: I don't have to know all of the actions of — of management. I have to — what my model takes into account is that management would have wanted to grow at least to the amounts indicated in my modeling.

Q: What actions would Sterling's management have taken in the but-for world in order to lure loan customers and deposit customers away from its competitors?

MR. W.D. SYMMES: Objection, form of the question.

A: Well, I think one thing to — to remember about it, some cases — to some extent it doesn't require any actions at all. There was a breach, and Sterling was viewed as a troubled, damaged institution. They had to,

Page 368

in effect, kick out some customers. They were subject to a — loans to one borrower limit. They were not allowed to take deposits over $100,000. They were — there was much adverse publicity that they received. So they were a damaged institution. And the size of the actual bank reflects the adverse publicity and adverse situation that — that they were in.

In the non-breach world, absent the breach, they wouldn't have gone through that. They would have maintained a reputation of being a — a growing progressive institution without taking any actions. They would have been larger than they would. Remember for the first couple of years the actual bank shrunk and that hadn't happened since their — their start in 1983, so it's — I think it's a mistake to focus actions they would have taken to be bigger. They would have been bigger absent the breach without doing anything.

Q: (BY MS. HOSFORD) So they would have been bigger with no action, without trying?.

A: Without trying. They had to try to shrink, in fact.

Q: Would the inputs that you believe are necessary to calculate damages have been known with certainty at the time the but-for Sterling's management would have had to make business decisions with respect to use of

Page 381

Q: During the 1990s was the extent of competition faced by Sterling more intense, less intense or about the same as in the 1980s.

A: I don't know how to measure that. They were in competitive markets. Those were pretty competitive markets in the '80s and in the '90s. I don't know what that means. Are you saying did they have more local competitors? I — I don't know what the question mean, I guess.

Q: Okay. Assume it's local.

A: I don't know the answer then as to whether they were more or less local competitors.

Q: So you have no opinion on that?

A: It's not a matter of opinion. I don't have knowledge. It's not a matter of opinion. It's a fact either they had more or less local competitors.

Q: So you haven't studied it?

A: I — no.

Q: Do you know if any other expert analyzed the amount of competition that Sterling faced in its efforts to attract savings and deposit customers?

A: I don't know.

Q: Do you consider the amount of competition in the market to be irrelevant to the question of damages?

A: No. It's not — it's not irrelevant. If this

Page 382

were not a competitive market, then the effect of Sterling seeking several hundred million dollars of additional assets and liabilities would affect conditions in the market. It's because it is a competitive market that I can say that Sterling's additional growth would not have affected the market.

Q: Have you analyzed the amount of competition that Sterling would have faced during the period relevant to your damages opinion, lost profits opinion, if FIRREA had been enacted without the alleged breaching provisions?

A: Is this different than the question you asked earlier?

Q: Did you answer this question earlier?

A: I — I — yes. I thought I answered it at great length.

Q: So do you assume that the competition is the same?

A: Well, repeat your question — the question you're asking now.

Q: Have you analyzed the amount of competition that Sterling would have faced during the period relevant to your lost profits damages opinion if FIRREA had been enacted without the alleged breaching provision?

Page 383

A: Well, this is the question you asked me before. And I said no, that I have analyzed the question of the but-for world in terms of everything being the same except for the breach of Sterling.

Q: So then the amount of competition would have been the same?

A: It would have been the same if what?

Q: If FIRREA had been enacted without the alleged breaching provisions?

A: If it had been enacted without the breaching provisions, there would have been other institutions seeking assets and liabilities to a greater extent than they were.

But as I indicated, that would have been relatively small considering the size of the markets so that — that prices would not have been significantly affected.

Q: And how do you know it would have been relatively small?

A: Because we're talking about very big markets. This is the same discussion we had 20 minutes ago. It's a very big market is what I said.

Q: Okay. In Table 5 of Exhibit — of Tab 6 to your report, you use the term growth constrained assets. What do you mean by that?

Page 384

A: This is Table 5 of Exhibit 6?

Q: Yes. We were just looking at it a little while ago.

A: Yes. I mean assets determined by the methodology that I described.

Q: Which methodology?

A: Internal growth of actual bank applied to the assets of the but-for bank plus the actual acquisitions made by the actual bank.

Q: And that's how you define growth constrained assets?

A: Yes.

Q: What is the source of this constraint on the but-for Sterling — on the but-for Sterling's total assets?

A: I'm sorry. What is the source?

Q: Yeah.

A: I don't know what that means. I told you how we got the numbers. What does — what.

Q: Is the constraint imposed on the thrift by its operating environment?

A: It's derived from what they actually did. That is, I am not modeling assets greater than those that are in accord with the growth of the actual bank.

Q: Is it possible that the but-for Sterling could

Page 401

Q: Okay. I'm going to hand you an exhibit. I'd like to mark this exhibit as Horvitz Exhibit No. 6.

(Exhibit No. 6 marked for identification)

Q: (BY MS. HOSFORD) It is Sterling's 1989 report to shareholders. To your knowledge, Mr. Horvitz, is it possible to figure out what Sterling's market capitalization or the value of all its outstanding stock was in 1989?

A: From this?

Q: Yeah.

A: If they have the stock price in here, they do. The...

Q: If you look at page 20, it appears to have some columns titled: Preferred Stock Shares and Common Stock Shares.

A: 20 has common shares, 250,000. It says 250. I assume that's 250,000. Oh, no. That's issued during — the balance comes to 517,000.

Q: Right. And what —

A: And the stock price in the fourth quarter of 1989 was a high of nine and a half and a low of eight. So 10 would be $5 million. So it's four and a half million, four million.

Q: It looks like they have 90,168 shares of preferred stock and 517,228 shares of common stock. Is

Page 402

that correct?

A: Yes.

Q: Okay. If you wouldn't mind turning to page 33, note 14. Do you see note 14 it indicates that the preferred stock has a liquidation value of $25 per share and that it's convertible to common at a ratio of 2.2 to 1.

A: Yes.

Q: Do you think it's reasonable then to state that this indicates a valuation of the preferred stock of $25 per share?

A: Well, not necessarily. The — the market value would not necessarily have been $25 per share.

Q: Why not?

A: Because investors may not have been willing to pay $25 for it under — in 1989. Maybe they would have. But I — I don't — I don't know. There is not information on the price of the — of the preferred.

Q: Okay. Well, on this annual report — moving on to preferred stock, if you would move to page 36. Would it be fair to say that preferred stock — I mean common stock was trading between $8 per share and $11 and five/eighths per share in fiscal 1989?

A: Yes.

Q: And would it be —

Page 403

A: That's during the fourth quarter, between eight and nine and a half.

Q: Would it be conservative to use the value of 11 and five/eighths per share for the common stock?

A: No. That wouldn't be conservative. That would be a high figure. It's conservative — in reverse. It's conservative in the sense that you want — want to figure that's — that's a maximum kind of valuation.

You're trying to show that the market value had very little and so it's conservative in that sense to use the $11 figure.

MS. HOSFORD: Okay. I need to go off the record for about two minutes.

THE VIDEOGRAPHER: Going off the record. The approximate time is 3:16.

(Brief Recess).

THE VIDEOGRAPHER: We're now going back on the record. The approximate time is 3:18.

MS. HOSFORD: I apologize Professor Horvitz, I wasted about 10 minutes with that. I'm going to have to come back to that later. But we will come back to it.

Q: (BY MS. HOSFORD) Okay. Just to confirm, it's your opinion that the type of assets that would comprise the — the foregone but-for world — or the type of

Page 404

assets that would be the foregone assets in the but-for world, would be comparable to the assets that Sterling actually held in the real world?

A: More or less. I don't — that's not an essential part of my — of my analysis.

Q: So would it be fair to say that if they — if Sterling held 50-percent loans that originated in the real world, then you would assume that it held approximately 50 percent loans that originated in the but-for world?

A: No.

Q: Why not?

A: Because I — that's not a necessary part of my analysis. I didn't — didn't do that. I assumed that the — the conclusion I have, my opinion is that the earnings on the foregone assets would be the same as the earnings on the actual portfolio. But I'm not saying that the portfolio would have been exactly the same.

Q: Okay. If you wouldn't mind looking at page 9 of your report. It states that: The new capital plan required a turn away from the growth and expansion strategy that had brought success to Sterling in the past. Since its capital ratios were low because of the breach, Sterling took action on both the numerator of the ratio (capital) and the denominator (assets).

Page 445

A: What year are we talking about?
Q: FY '93.
A: Sterling grew 380 million, the actual Sterling. And my model has the aggregate, but-for bank growing by 560 so it's an additional — the incremental assets are 180 million increase in that year.
MR. W.D. SYMMES: What year was that? I just didn't hear you?
MS. HOSFORD: FY '93.
MR. W.D. SYMMES: Thank you.
Q: (BY MS. HOSFORD) Why is the growth in the but-for world more than in the real world?
A: Because the but-for bank is bigger than the actual bank and the but-for bank grows at the same rate from internal — internal growth as the actual bank.
Q: Okay. If you wouldn't mind focusing on lines 23 to 26 of page 14. You state: The lost profits are based on the simple assumption that the non-breach Sterling earned profits on the foregone assets at the same rate that the actual Sterling did on its actual assets. This is a reasonable approximation, because the foregone assets are only a fraction of the actual assets.
Why — why does it matter whether the foregone assets are only a fraction of the actual

Page 446

assets?
A: Well, if we were talking about actual assets, say, of $100 million invested in a certain way earning a certain return and the incremental assets we're talking about were, say, $2 billion, I think it's — it would not be reasonable to simply assume that $2 billion could be invested at the same profitability, same return as the original $100 million. But here it's a year by year. It's a — a relatively small increase in assets.
Q: How big would the fraction have to be before earnings on the actual Sterling assets would not be a reasonable approximation?
A: Well, I think it is conservative to say that they will be — will be the same. So even if the assets were much larger than they are in the — in the but-for bank, I think it reasonable to believe that they could have been invested to generate the same return as the actual bank. After all, Sterling's returns were relatively mediocre. It was not a — a high earning bank. And the earnings that are projected for this are not particularly — particularly high.
Q: All right. So how big would the fraction have to be before earnings on the actual Sterling assets would be a reasonable approximation?
A: Would not be?

Page 447

Q: Would not be. Yeah.
A: I would think there would have to be a multiple of the actual assets.
Q: How big a multiple?
A: 1, 2, 3.
Q: Do all assets on a thrift's balance sheet produce the same return on assets?
A: No.
Q: Based upon your experience with the thrift industry, do wholesale assets on average produce a higher or lower return on assets than retail assets?
A: I guess I better be sure I know what you mean by wholesale and retail. You mean purchased versus originated or —
Q: Yes.
A: Okay. I think the — the return on purchased mortgage loans, for example, approximates the return on originated loans. In some cases it's — it's higher and in some cases it's lower. Because there are substantial expenses involved in origination of mortgages.
Q: So they're the same?
A: Well, it varies from year to year and from time to time. The — the thrift that I would have been a director of had several billion dollars of originated mortgages, purchased several billion dollars of — of

Page 448

whole loans in the — in the market from time to time, and we varied from year to year and time to time as to which was most — most profitable. We had a — a sizable mortgage banking operation that we eliminated because we concluded that — that purchasing mortgages was generat ing a better return for us than — than originating them. But other institutions might have a different experience.
Q: What does finance have to say about the value of a portfolio consisting of market priced assets financed with market priced liabilities?
A: Okay. Forgetting all about market constraints and — and imperfections in markets — in perfect markets in perfect competition, in that world banks would not exist and there's — because there is not a return to be made. If we are looking at a totally — a perfect world of perfect competition, perfect information, perfect markets, there is no money to be made by issuing market liabilities and acquiring market assets. And hence banks and thrifts don't exist.
Q: So is it your opinion that the principles of finance don't apply to thrifts?
A: No. It's my opinion that markets are not perfectly efficient, perfectly competitive and with perfect information.

Page 449

Q: So the principles of finance do apply to thrifts?
A: Yes. The principles of finance apply to thrifts. But I know that banks do exist. It's — someone once said that — that there is a large literature on — on why banks exist, and someone once remarked that economists are the only people that observe something that — that works in practice and wonder if it works in theory.
Q: Okay. If you wouldn't mind looking at Table 3-E of your Exhibit 6. Would it be fair to say that that table shows total assets increasing by 61 percent between June 30th, 1992 and June 30th, 1993?
A: Yes.
Q: Okay. I'm going to hand you what I'm marking as Horvitz Exhibit No. 8. It is Sterling — Sterling financial 1993 annual report, and — let me make sure I have the right document.
Okay. It's the Sterling financial annual report for 1993, and the Bates number is PSG 0270520.
(Exhibit No. 8 marked for identification)
Q: (BY MS. HOSFORD) Here is a rubber band to go around it. If you wouldn't mind looking at Roman Numeral page 19. And focusing on the paragraph that begins: Additionally during the second half of fiscal

Page 450

year 1993.
Do you see that?
A: Yes.
Q: And reading down through sentence that ends three percent to 3.25 percent from 3.43 percent for fiscal year 1993?
A: Yes.
Q: Okay. This report appears to reflect that the net — that the net interest margin will drop by between 18 and 43 basis points between 1993 and 1994. Is that correct?
A: Yes.
Q: Would you expect to see the return on average assets decline by an equivalent amount?
A: No.
Q: Why not?
A: Well, these are — this the decline in the — in the net interests margin is — is through a wholesale operation which would have a narrower spread but would have lower operating costs. So the — it might turn out to be that much of a decline or it might not because of the — of the low operating costs.
Q: So are you saying that the addition of assets would not decrease the net interest margin?
A: It — it would decrease net interest margin. I

Page 451

thought you asked about net income.
Q: Net interest margin.
A: Net interest margin, that's what it says. It was expected to reduce net interest margin.
Q: I asked would you expect to see the return on average assets declined by an equivalent amount?
A: Yes. And I said no to that because of the question of operating costs.
Q: All right. Why would the addition of assets decrease the net interest margin?
A: Because they're assets — wholesale assets being funded with wholesale liabilities at a narrower spread.
Q: Does that mean the incremental assets have a lower than average net interest margin?
A: These incremental assets, yes.
Q: You've already said that your model does not make any assumptions about the mix of assets in the foregone assets?
A: Yes.
Q: Did Sterling actually increase assets in 1993 with the mix of loans and mortgage backed securities?
A: Did they?
Q: Yeah.
A: Yes.

Page 452

Q: Would it change your model for 1993 if it could be shown that Sterling couldn't grow all assets proportionately in 1993.
A: I didn't assume they would grow all assets proportionately.
Q: So it wouldn't change your model?
A: No.
Q: Do you know of a way to calculate the marginal return on incremental assets for Sterling?
A: No. I don't think the data exists for that.
Q: If it could be done, would that lead to a more accurate model?
A: It might. It certainly would be an alternative that would be — would be worth considering if — if the data existed for that.
Q: Why — why are you not sure whether the data exists?
A: I'm quite sure the data don't exist.
Q: Why?
A: Because in — in any real life bank that's — that's going on operations there are assets coming in and paying off every day, liabilities coming in and coming out, so we don't really know what an incremental asset is.
Q: If we assume that the net interest margin on

**IN THE MATTER OF**

*STERLING SAVINGS ASSOCIATION, A STATE CHARTER v. UNITED STATES*

---

*PAUL M. HORVITZ, PH.D.*

*December 7, 2001*

---

*HOUSTON REPORTING SERVICE*
*1010 LAMAR, SUITE 1400*
*HOUSTON, TX U.S.A. 77002*
*(713) 739-1400 FAX: (713) 739-1410*

*Original File HORVITZ3.V1, 133 Pages*
*Min-U-Script® File ID: 0311344746*

**Word Index included with this Min-U-Script®**

Page 532

value in 1994 was the same as it was in '89?
A: The branch's value was not the same. It was worth more in 1994. It was worth much more. It was worth a million eight more.
Q: How do you know it would have been worth a million eight more if Sterling hadn't acquired it in '89?
A: We're talking about the same branches.
Q: How do you know it would have been operated in the same way and the same value would have accrued?
A: I don't know.
Q: So there is some doubt there?
MR. W.D. SYMMES: Object to the form of that question.
A: No. I don't think there is doubt there.
Q: (BY MS. HOSFORD) Is it your opinion that the phaseout of Sterling's supervisory goodwill and capital credit was the sole cause of — of Sterling's incurrence of the costs listed in Tab 8 — Tab 11? I'm sorry.
A: I'm always reluctant to — to say yes when — when there is a sole cause is in the — is in the question, but in this case I think yes. If they had the — the capital credit, if there hadn't been a breach, they — they would have done the deal.
Q: So you think — you do think it's the sole

Page 533

cause?
A: The — the sole cause of the deal not being done in 1989? Yes.
Q: How did you go about reviewing the factors that caused Sterling to incur these costs listed in Tab 11?
A: Those — those figures were prepared by Mr. Byrne, and I've — he's told me that's what they were and he has documentation for them. I have not reviewed that documentation.
Q: So you haven't reviewed the factors that caused Sterling to incur these costs other than relying upon what Mr. Byrne told you.
A: I'm relying on the fact that there was a deal that was done, an offer that was — was accepted and hence the deal would have been done had Sterling had the — the capital to be able to go ahead with it. But I'm relying on what — on what was represented to me. Yes. I have not independently verified any of that.
Q: So would it be fair to say that your reliance upon Mr. Byrne was the only consideration that caused you to conclude that the alleged breach and not other factors were responsible for the costs listed in Tab 11?
A: Oh, I gave some thought when — when we discussed this as to whether there could be other things that could have accounted for it, and I couldn't think

Page 534

of any.
Q: But you didn't do a study of any type?
A: I did not do an empirical study, no.
Q: You just sort of considered it in your own mind? I mean —
A: I don't accept that formulation of what I said. I think I've made clear what I did.
Q: Why didn't you do the calculations yourself and look at the documents yourself?
A: I didn't feel that was necessary. I don't verify most of the documents that are — that are involved here. If the — if the documents are wrong —
Q: You are opining that these damages were suffered, though, weren't you?
A: I'm opining that these — these are the damages providing the information provided to me is correct. If Sterling or Mr. Byrne or Mr. Symmes has falsified the information they've — they've given me — if the basic data here is wrong, clearly my figures would have to be redone. But I'm not attesting to the — the validity or the correctness of these numbers. Someone else will have to do that.
Q: It wouldn't take falsification though if there were other factors that —
A: Other factors is my judgment. I was told that

Page 535

it was a done deal that didn't go through. And I gave some thought, we had some discussion about whether there could be anything else that could account for this other than the lack of capital. I haven't been able to think of — of anything.
If you want to suggest something, I'll be glad to think about it.
Q: But you didn't do a formal study?
A: I don't know what you mean by a formal study. I gave it the study that — that in my opinion was appropriate for the — for the issue.
Q: You didn't ask to see all the documentation surrounding the Great American offer or bid or whatever it was in '89?
A: I just will repeat that I did not look at the original documents and I did not verify that the information Mr. Byrne gave me was correct.
Q: Did you review the size of the branches in '89 and '94?
A: I'm sorry. What?
Q: Did you review the size of the branches of the Great American branches in '89 and '94?
A: Yes. But I don't remember what it — what it is. What it was.
Q: How did you review it?

Page 568

did cover it.

MS. HOSFORD: Let's go off the record for a second.

THE VIDEOGRAPHER: We're now going off the record. The approximate time is 11:32.

(Brief Recess)

THE VIDEOGRAPHER: We're now going back on the record. The approximate time is 11:46.

Q: (BY MS. HOSFORD) Okay. If you wouldn't mind turning to Tab 9 of the additional relied upon materials relating to the cost of the 1989 unit offering.

Would it be fair to say that you reviewed these costs but did not verify them?

A: That's correct.

Q: And did you have any conversation with Mr. Byrne about these costs?

A: Yes. We discussed these and the appropriateness because in the — the — the issue we discussed had to do with the fact that in the but-for world the 1989 capital raising would have gone forward, and they would have incurred these costs even in the — in the but-for world.

However, what was explained to— to me as a matter of accounting, these had to be charged off when the transaction didn't go through. If the transaction

Page 569

had gone through, they would in effect have been capitalized. They would have been deducted from the — from the proceeds.

So there would not have been an expense of this amount in the — in the non-breach world and therefore, I deemed these to be appropriately due to the breach.

Q: Would it be fair to say that you reviewed this schedule but did not review the actual underlying documents that were the source for these costs?

A: That's correct.

Q: Was it your conversation — would it be fair to say that you have reached a conclusion that these costs were attributable to the alleged breach?

A: Not that the costs were due to the alleged breach. But they would have — these costs would have been incurred even absent the breach. But they would — they would not have been an expense to the bank. They would not have reduced earnings of the bank.

Q: So would it be fair to say that you concluded that these expenses would not have been incurred absent the breach, or these — these would not have been expensed absent the breach?

A: That's correct. Yes.

Q: And you relied upon — is it fair to say that

Page 570

you relied upon Mr. Byrne for determining that the breach was the sole factor in the expensing of these costs?

MR. W.D. SYMMES: Object to the form of that question. You may answer.

A: Well, there are — there are two steps. The — it was my conclusion that absent the breach, the '89 offering would have gone through, and hence absent the breach these would not have been expensed.

Q: But your conclusion that absent the breach the '89 offering would have gone through, is that based upon conversations you had — you had with Mr. Byrne or an independent study you did?

A: It's based on — on discussions with Mr. Byrne and Mr. Gilkey, Mr. Zuppe and — and review of — of various documents, the covering circular and information concerning the '89 transaction.

Q: As a matter of economics would these expenses have been considered costs if they had been capitalized?

A: I think the — as I understand the accounting, it would have been — been a reduction from the — the net proceeds of the transaction.

Q: What about —

A: From the sale of the securities.

Q: What about as a matter of economics?

Page 571

A: As a matter of economics the — the costs would have existed. And these — these would have existed absent the breach.

Q: In the but-for world you mean?

A: In the but-for world.

Q: Do you hold your opinion that these costs would not have been expensed absent the breach with a reasonable degree of certainty?

A: Well, relying on what I have been told, I — I don't have any independent knowledge of the — of the accounting.

Q: Okay. If you wouldn't mind turning to Tab 10 to the additional relied upon materials, which is — which is titled: Legal accounting and insurance incurred due to treatment as a troubled bank and regulatory interference.

Is it fair to say that you have not personally reviewed the source documents for the costs included in this — in this table?

A: Yes.

Q: Do you have any understanding as to what is meant by the term regulatory interference as used in this table?

A: I understand what's — what's meant by it and what's intended to be captured here are obviously not

Page 572

all the invoices paid from Coopers & Lybrand or — or Witherspoon, but these — this tabulation is supposed to be and is represented to me as being just those costs that were incurred because of Sterling's being treated as a — as a troubled bank and hence these were additional costs that were — that were breach related.

It's my opinion that any such costs are appropriately treated as wounded bank damages due to the — due to the breach. But I can't determine even if I had seen the Coopers & Lybrand invoice for a particular amount — I couldn't make the judgment as to whether that was something done in the normal course of business or something done because of the troubled status of — of Sterling. That was Mr. Byrne's determination.

Q: Are you saying you couldn't make the judgment or you didn't make the judgment?

A: I didn't, but I couldn't even if I tried.

Q: Why not?

A: Because I — I don't know what Coopers & Lybrand would normally have been doing and what a particular number of hours at a particular date represented. That was — that was Mr. Byrne's call.

Q: Do you — I assume that WKDT in here is Witherspoon, Kelley, Davenport & Toole?

A: Yes.

Page 573

Q: Do you have any sense as to whether these costs included any costs of, for instance, pursuing the injunction?

A: I would assume so.

Q: So you assume it includes all costs of pursuing the injunction?

A: Well, pursuing the injunction would — would not have been necessary absent the breach. So I would — would view any such costs as — as appropriate wounded bank damages.

Q: So you would view those legal costs as different from the legal costs incurred in this case? Why were those not also included?

A: Good point. Yes. Those should be included.

Q: So you assume that the legal costs of pursuing this case should also be included under the damages?

A: Oh, sure. I mean, I would — I would — I don't know —

Q: As a legal matter?

A: — whether that system works and whether that's the British system or what, but I would assume that — that the — if the — if Sterling is successful, that they — they have some claim for their costs of pursuing this. But that's a legal question.

Q: So it's based upon that assumption that you

Page 574

believe it's appropriate for the costs of — of pursuing the injunction?

MR. W.D. SYMMES: Objection form.

Q: (BY MS. HOSFORD) Are appropriately included?

A: No. No. Even if — even if our legal rules are such that the costs of the plaintiff in pursuing an action are not recoverable, these costs are directly due to the — to the breach. And so they are clearly part of the damages.

Q: But they are costs of pursuing an action?

A: Yes.

Q: So if we determine that the costs of pursuing an action are not recoverable, how are they recoverable — recoverable in this context?

A: Recoverable is something for a judge to say. I'm saying that these are costs that — that Sterling suffered because of the breach.

Q: So you've made no attempt to distinguish between any costs that were incurred in pursuing the injunction and any costs that were incurred by Witherspoon, Kelley in — in, for instance, meeting with regulators and that sort of thing?

A: Well, costs of meeting with — with — yeah. Those are the same in my view.

Q: Why are they the same in your view?

Page 575

A: If they're costs that they incurred because of the — of the breach, that's what I mean by — by wounded bank. If you're — you're telling me that the costs of pursuing a legal action are not properly includable for, if a judge determines that, then — then these should be deducted. That's — that's the matter of law, not the economics.

Q: Does the fact that the court ultimately ruled that Sterling was not entitled to an injunction affect your view that these are appropriate wounded bank costs?

A: No. I mean, they did what they thought was the — was the appropriate business thing to do with the — at the time, and I think we have to take that judgment. They did it in good faith, they pursued it. Whether they were successful or not successful, any costs would be due to the breach.

Q: Did you discuss with Mr. Byrne the fact that costs of pursuing the injunction are included in this table? Did he tell you that, or are you assuming that?

A: I assumed that. I don't know what specifically these bills from — from Witherspoon, Kelley are for, but I would assume that those costs would be included. It never occurred to me until — until you raised it that that was something, some different rule for that.

Q: And if those costs ultimately proved to be

# IN THE MATTER OF

*STERLING SAVINGS ASSOCIATION, A STATE CHARTER v. UNITED STATES*

---

*DANIEL G. BYRNE*

*December 3, 2001*

---

*HOUSTON REPORTING SERVICE*
*1010 LAMAR, SUITE 1400*
*HOUSTON, TX U.S.A. 77002*
*(713) 739-1400 FAX: (713) 739-1410*

*Original File BYRNE.V1, 107 Pages*
*Min-U-Script® File ID: 2286828132*

**Word Index included with this Min-U-Script®**



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER XX2629 0110 F

Page 69

have no objection if you continue to elaborate that in preparation of Professor Horvitz' deposition, but I would hope you would accommodate us in a like way.

In other words, we are now in the expert discovery phase, and you're back in the fact discovery. And she's already gone through this. But you may go through it again.

I'm not saying she had the schedule in front of her, but we went through all of these. But go ahead. I just want to make sure it's clear we're accommodating you. We would expect a like accommodation, if necessary, once we receive your expert reports.

**MR. MURPHY**: My review of Mr. Byrne's deposition index showed one reference to CJ-4, which was: Was the loan file produced? I don't want to get into —

**MR. W. D. SYMMES**: That's all right. Go ahead.

**MR. MURPHY**: — but we need to understand the basis for its inclusion in the wounded bank.

**MR. W. D. SYMMES**: That's fine. I don't object. I just want to make sure that it's understood we're being accommodating here, and I don't want to be penalized for it later.

Q: (BY MR. MURPHY) I'm sorry. You probably

Page 70

answered this, but I lost track.

The CJ-4 loan was originated by Sterling and not one of the acquired institutions?

A: That's correct.

Q: Okay. And were you involved in underwriting that loan?

A: I was not.

Q: How about approval of that loan?

A: I was not.

Q: Okay. What is the basis for the CJ-4 loss being included in a calculation of wounded bank damages?

A: The basis is that when the Government breached the contract, we were not permitted to make additional advances against the loan commitment that was already in effect when FIRREA was enacted. And the Government told us we could not make further advances; and as a consequence, this project fell behind in its construction process. And as a consequence, the borrowers sued Sterling for breaching its loan commitment. And in order to ultimately resolve the dispute with the borrowers and in order to get control of the property, because the Government was enforcing the limitation of loans to one borrower, we had to repossess the property — foreclose on the property, repossess it and make the improvements that the borrower

Page 71

would have made had we been able to advance the funds. And in the process, the market value of the property declined substantially. And when Sterling liquidated the property as part of trying to resolve this overall problem, we took a significant loss, which is summarized on this page at $1,734,267.70.

Q: And that's a — turning to the corrected one on the next page, is the amount of 1.615?

A: That's correct. I'm sorry. Yes:

Q: Let's just — let's just stick to this page and not doing any more referring back so —

A: Figures.

Q: Because I know I will confuse myself.

What happened to the suit that the borrowers initiated?

A: It was dropped as part of the agreement by Sterling to repossess the property, foreclose on the property, repossess it. The borrowers dropped their demands, and they were released from any commitments or financial loss in the property in order for Sterling to get control of it.

Q: And how — let me just ask a basic question: What is the loans to one borrower regulation that you referred to?

A: The loans to one borrower regulation came in

Page 72

with the FIRREA legislation that limited the size of the loan a financial institution could make to any one borrower, and it was based on the level of capital that an institution had, with a minimum of $500,000 generally.

And since the Government refused to acknowledge the contracts that existed on Central Evergreen, Tri-Cities and Lewis Federal, treated Sterling as if it had deficit capital as opposed to what our contracts said and limited us to $500,000.

This project was in excess of $500,000. The commitment was much larger, and we were unable to advance further funds following the passage of FIRREA.

Q: So is it your opinion that the loans to one borrower limitation is a breaching provision of FIRREA?

**MR. W. D. SYMMES**: Objection, form.

Go ahead and answer.

A: I don't know if it is a breaching form by itself. I do know the way this whole situation was handled by the Government, that we were told we could not advance any further funds by the OTS.

Q: (BY MR. MURPHY) Did the institution seek a waiver of the enforcement of the loans to one borrower provision?

A: I don't know if you would call it a waiver



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER XX2629 0128

# Pages App. 393 - App. 405

# Intentionally Omitted

# Sterling Savings Association, et al.
# v. United States

# Expert Report of
# Joe A. Hargett

**April 2002**

### B. Errors and Omissions in the Expert Report of Dr. Christopher James with Respect to Reliance Damages

Based upon my analysis to date, it is my opinion that certain assumptions that were used by Dr. James to calculate reliance damages are inaccurate, incomplete, and/or speculative. Shown below is a discussion of some of these errors and a description of the potential effect that such errors have on the overall damage model.

*1. Dr. James's Methodology Does Not Properly Measure Reliance Damages*

As illustrated above, Dr. James's calculations begin with the "net liabilities assumed by Sterling." This amount represents the amount by which the fair value of the *tangible* assets acquired exceeded the fair value of the liabilities assumed as of the date that each of the acquisitions in question were consummated. This calculation does not reflect a cash outlay by Sterling at that time. At the time of each of the three acquisitions in question, Sterling's cash investment was $0. Accordingly, in my opinion, Dr. James's approach is incorrect from the start and is not designed to capture Sterling's "actual" gains or losses from the supervisory acquisitions.

2. *Dr. James's Calculations* ***Exclude*** *the Post-Breach Operations and the Terminal Value of the Acquired Franchises*

Dr. James indicates that he believes that Sterling's deposit franchise was "valueless" after the alleged breach, and he alleges that the acquired branches' "post-breach earnings are not a benefit of the contracts."[74] In my opinion, these assertions are simply incorrect. The breach had no material effect on the operations of the individual branches that were acquired as part of the supervisory acquisitions in relationship to Sterling's other branches. To suggest that the branches had value to Sterling on the day before the breach but became valueless on the day after the breach is inaccurate.

The 15 branches that were acquired as part of the supervisory acquisitions represented an integral part of Sterling's branch network.[75] At the time of the breach, the combined deposit base from the acquired thrifts represented approximately 57% of Sterling's total deposit base.[76] In fact, up until 1994 (when Sterling began to acquire new branches), the branches acquired through the supervisory acquisitions represented over 50% of Sterling's total deposits on a consistent basis (see Exhibit P). Sterling has benefited both financially and operationally from the operations of the branches that were obtained as part of the supervisory acquisitions.[77]

[74] Expert Report of Dr. James – page 25, line 22 to page 26, line 13 and page 22, lines 31-32
[75] I have reviewed Sterling's annual reports for the post-breach period. Sterling routinely identifies its branch network as one of its key assets.
[76] Expert Report of Dr. James, Exhibit K, September 1989 data
[77] Even today, these branches represent a material portion of Sterling's business. As of June 30, 2001, only two of the 15 acquired branches have been closed, and the remaining 13 branches continue to maintain

Dr. James's incorrect approach fails to include the earnings and value attributable to the acquired thrifts that were part of the transactions during the post-breach period. This is a significant error that has a material impact on his estimate of reliance damages. In my opinion, from a financial perspective, any calculation of reliance damages must include all earnings attributable to the post-breach operations of the acquired thrifts that were part of the transactions to reflect the complete impact of the transactions involved.

*3. Dr. James Miscalculates the "Net Liabilities" Assumed*

As indicated above, Dr. James's analysis suggests that in entering into these supervisory transactions, Sterling incurred an initial "cost" that was equal to GAAP goodwill recorded as part of these transactions.[78] However, Dr. James's analysis does not account for the fact that the Tri-Cities and Central Evergreen goodwill balances were subsequently adjusted to reflect the financial benefits derived from the utilization of tax NOLs that were provided to Sterling as part of the acquisitions.[79] These adjustments are, in part, reflected on schedules contained within the expert reports produced by the plaintiffs, and they total, at a minimum, $3.272 million.[80] A summary of these adjustments is also included within Exhibit H. As such, Dr. James's estimate of reliance damages is overstated by at least this amount.

*4. Dr. James's Calculation of the Offsetting Gains is Speculative*

Dr. James provides an offset to the reliance damages in the form of the net income earned by Sterling that could be attributed to the three supervisory acquisitions. Dr. James's calculation is speculative for a variety of reasons. Shown below is a summary of two significant deficiencies:[81]

- *Dr. James's Attempt to "Directly" Identify Expenditures is Inconsistent.* Within Dr. James's methodology, any income/expense that cannot be "directly traced" to specific branches is allocated based upon branch deposits.[82] However, Dr. James's efforts to "directly trace" specific income/expense items are inconsistent. For example, Dr. James allocates approximately 94% of all 1986 income statement items to specific branches.

---

deposits of over $350 million (over 20% of Sterling's total deposit base.) A summary of the breakdown of deposit holdings by branch has been included as Exhibits O and P.

[78] Expert Report of Dr. Christopher James – page 20, lines 18-20

[79] The accounting regulations in effect at the time (and today) require that the goodwill balance for any purchase transaction be adjusted for the financial benefits derived from the utilization of NOLs obtained from the acquired entity.

[80] See Schedule entitled "But-for RAP Supervisory Goodwill for Lost Profits [Unused Tri-Cities NOL Balance used in FY 91]," a document prepared by Daniel G. Byrne, CFO of Sterling Savings, and provided by Dr. Horvitz in conjunction with his expert report.

[81] These criticisms are not intended to reflect an all-inclusive list of the errors or deficiencies within Dr. James's model.

[82] Expert Report of Dr. Christopher James – page 23, lines 14-15

However, in 1988, Dr. James is only able to trace approximately 16% of the income statement items to specific branches (see analysis at Exhibit Q). The lack of data results in an inconsistent methodology that, in my opinion, potentially misstates the benefits associated with the supervisory acquisitions.

- *Documents Supporting Dr. James's Calculations May Not Reflect the True Nature of the Branch Operations.* According to the branch operations reports, only two of Sterling's eight branches had positive net income during 1986.[83] In addition, the ratio of interest expense (i.e., interest paid upon deposits) to interest income (i.e., interest received from loans) fluctuates significantly from branch to branch during the 1986 and 1987 time periods. In my opinion, this suggests that these records used by Dr. James may not actually represent the true financial picture of Sterling's branch operations.

## C. Calculation of the Post-Breach Benefits That Were Excluded by Dr. James

As noted above, it is my opinion that many of the assumptions that were used by Dr. James to calculate reliance damages are inaccurate, incomplete, and/or speculative. Dr. James's failure to include the earnings and value attributable to the acquired branches during the post-breach period is a significant error that has a material impact on his estimate of reliance damages. I have quantified the income attributable to the acquired branches that were part of the supervisory acquisitions during the post-breach period using Dr. James's basic methodology. As summarized in Exhibit J, this income totals over $50 million between October 1, 1989 and June 30, 2001.[84]

Ignoring all other issues related to Dr. James's report, it is my opinion that, if Dr. James's reliance model were simply modified to include the post-breach earnings of the acquired thrifts, there would be no damages under Dr. James's theory of reliance damages. It is my opinion that the appropriate application of the plaintiffs' damage methodology results in no reliance damages.

As indicated above, there are flaws in Dr. James's incorrect methodology as described within the previous section of this report. Accordingly, I have performed three alternative calculations of the income attributable to the operations of the acquired thrifts after the breach. These three alternatives modify Dr. James's basic methodology in different ways. The key assumptions used in these three alternative calculations are as follows:

- Method 1: Same as Dr. James's model, with the exception that I remove the assumption that 50% of income from certain overhead branches is directly attributable to Central Evergreen. Instead, this income is allocated to all

[83] Sterling Savings Association Branch Statement of Profit and Loss dated 7/11/86 (PSG037 0704 – 0716)
[84] Dr. James's model stopped quantifying income attributable to the acquired branches as of September 30, 1989.

branches based on deposit balances. The results of this analysis are summarized in Exhibit L.

- Method 2: Same as Dr. James's model, with the exception that the only income directly attributable to Sterling or an acquired entity is limited to the activities of the various subsidiaries. The results of this analysis are summarized in Exhibit M.

- Method 3: Same as Dr. James's model, with the exception that I allocate all income to branches exclusively based on the deposit balances of Sterling's branches. The results of this analysis are summarized in Exhibit N.

The results of all of these alternative analyses indicate that post-breach income in excess of $50 million is attributable to the branches acquired as part of the supervisory acquisitions. These alternative approaches to Dr. James's model are compared to Dr. James's basic methodology in Exhibit K.

If the terminal value (as of June 30, 2001) of the branches acquired as part of the supervisory acquisitions were factored into the analysis, Dr. James's calculations would be reduced even further. The acquired branches had total deposits of approximately $356.3 million as of June 30, 2001. If I were to assume that the deposit premium for these deposits was 4.78%, the deposit premium associated with the acquired branches would be approximately $17.03 million.

A summary of the effects of these adjustments to Dr. James's reliance damage calculations is shown within Exhibit S. Based on all of my analysis, there are no damages owed to Sterling under a reliance theory of damages.

**App. 410**

special reserve account and have determined that the FSLIC made payments to Sterling totaling over $3.9 million during the 1988-1992 time period. A summary of the transactions involving this special reserve account have been included as Exhibit R.

5. *Dr. James's Calculation of the Government's "Earnings" is Flawed*

I have reviewed Dr. James's calculation of the Government's "earnings" on net avoided costs, and they are, in substance, interest calculations. They are calculated using the same basic method that I have used in other matters to calculate prejudgment interest. It is my understanding that interest should not be included in damage calculations in matters before the Court of Federal Claims unless specific contract provisions provide for the calculation of interest.

6. *Dr. James's Calculations <u>Exclude</u> the Post-Breach Operations and the Terminal Value of the Acquired Franchises*

Under Dr. James's methodology, the benefits received by Sterling in connection with the acquisitions must be considered.[94] Dr. James noted that the calculation of such benefits for the purposes of his restitution calculation is "in essence identical to the reliance calculation."[95] Dr. James's calculation of benefits received by Sterling does not include the post-breach earnings and value attributable to branches acquired in connection with the supervisory transactions.[96] From a financial perspective, these amounts should be included in any restitution claim to reflect the complete impact of the transactions involved. The failure to include the earnings and value attributable to these acquired branches during the post-breach period is a significant error that has a material impact on Dr. James's estimate of restitution.

### C. Calculation of Post-Breach Benefits That Were Excluded by Dr. James

As noted above, it is my opinion that many of the assumptions that were used by Dr. James to calculate restitution are inaccurate, incomplete, and/or speculative. However, as was the case with his estimate of reliance damages, Dr. James's failure to include the post-breach earnings and value attributable to the acquired branches is a significant error that has a material impact on his estimate of restitution.

As indicated previously, I have quantified the post-breach income attributable to the branches acquired as part of the supervisory acquisitions using Dr. James's basic methodology.[97] As summarized in Exhibit J, this income totals over $50 million between

---

[94] Expert Report of Dr. Christopher James – page 31, lines 19-20
[95] Expert Report of Dr. Christopher James – page 31, lines 26-27
[96] Dr. James's restitution calculation is "linked" to his reliance damages. For reliance damages, Dr James stopped quantifying these offsets as of September 30, 1989.
[97] The calculations of post-breach income after September 30, 1989 described above in my analysis of reliance damages can also be used for the restitution calculation.

October 1, 1989 and June 30, 2001.[98] Ignoring all other issues relating to Dr. James's report, it is my opinion that if Dr. James's restitution model were simply modified to include the post-breach earnings of the acquired thrifts, there would be no award under Dr. James's theory of restitution. Therefore, it is my opinion that the appropriate application of Dr. James's damage methodology results in no award under a theory of restitution. A summary of the effects of the adjustments described above to Dr. James's restitution calculations is shown within Exhibit T. Based on all of my analysis, there is no award owed to Sterling under a restitution theory.

[98] Dr. James's model stopped quantifying income attributable to the acquired branches as of September 30, 1989.

November 13, 1989 examination because of "nonperformance, financial weakness associated with the borrowers, untimely resolution and possible foreclosure."[107]

- Sterling's Loan Committee approved the initiation of foreclosure proceedings on November 17, 1989.[108] An additional internal memorandum dated November 24, 1989 indicates that a demand letter had already been sent and that the "game plan" for Sterling was to foreclose on the property.[109] Based upon these documents, Sterling had already decided to pursue a foreclosure prior to the effective date for the FIRREA capital regulations (i.e., December 7, 1989).

- According to the documents that I have reviewed, additional advances were approved by Sterling to improve the property for an amount up to $60,000.[110] This approval was made in a time period (April 1990) when the borrowers were still in possession of the property.[111] As such, it appears that Sterling was able to advance monies on the project during 1990.

- The original appraisal for the project dated March 15, 1988 indicated a value of $3.45 million. However, by November 1989, an estimate indicated that the value had dropped to $2.95 million.[112] A September 1990 discounted cash flow analysis of the project indicated a net present value of $1.6 million.[113] These appraisal amounts would suggest that the market for this property declined after the original loan was funded. As such, some type of loss on this loan was possible even before the alleged breach.

- Mr. Byrne suggests that Sterling had a desire to advance additional funds to these borrowers and was unable to due to the breach. However, the September 17, 1990 Report of Examination states that, "Management is considering advancing additional funds to complete tenant improvements although a final decision has not been reached."[114]

- Even if Sterling had been able to advance additional monies on the project, I have seen no persuasive evidence to suggest that Sterling believed that such an advance would have been prudent. The property had numerous liens

[107] November 13, 1989 Report of Examination (WON934 1810 – 1899), page A-12.10
[108] Summary of CJ-4 Business Park Loan (PSG063 1567)
[109] November 24, 1989 Memorandum from Steve Churchill to Bill Zuppe (PSG063 1967)
[110] Summary of CJ-4 Business Park Loan (PSG063 1567)
[111] Ibid.
[112] Ibid.
[113] September 17, 1990 Report of Examination (PSG039 0072 – 0158), page A-12.4
[114] Ibid.

against it relating to unpaid taxes and some type of advance from a different financial institution (i.e., Cascade Savings Bank).[115]

- It took Sterling an extended time period (almost three years) to complete the foreclosure process and sell the CJ-4 property.[116] During that period, the value of this property declined substantially.[117]

Despite these significant issues, Sterling contends that, but for alleged breach, this loan would have been repaid in full by the borrowers. The nature of the loan, the various problems incurred during construction and the reduction in appraised values all suggest that a loss on the resolution of the CJ-4 loan was a distinct possibility as of the date of the alleged breach. In fact, I have seen no persuasive evidence to support Sterling's claim that, absent the alleged breach, Sterling would have been able to avoid the CJ-4 losses that it actually incurred. As such, Sterling's allegations relating to this component of "wounded bank" damages are speculative and not supportable.

## B. Review of Other "Wounded Bank" Damages

In addition to reviewing plaintiffs' claims regarding the CJ-4 loan, I have also reviewed the support for the plaintiffs' claims for other types of "wounded bank" damages. I have noted several inconsistencies and/or documentation weaknesses that should be considered in reviewing such claims. These include:

- The plaintiffs' claims for regulatory supervision costs "incurred for being a troubled thrift" include costs that were incurred during the 1995-1996 time period.[118] Given that Sterling was categorized as a "well capitalized" thrift during the 1995-1996 time period, it is unlikely that these costs were incurred as a direct result of the alleged breach.

- Sterling appears to have included all of the costs associated with certain examinations performed by the State and the OTS.[119] The documentation presented by Sterling does not support a claim that all costs associated with these examinations are related to the alleged breach.

---

[115] Workout Meeting Analysis (PSG063 1518)
[116] Additional Materials Relied Upon by Paul Horvitz, Tab 7 – Corrected. As indicated above, the "plan" to begin foreclosure started in November 1989. The final sale of the project occurred on September 30, 1992.
[117] In fact, the majority of the losses alleged by Sterling relate to either a loss of interest or value during the foreclosure period.
[118] Additional Materials Relied Upon by Paul Horvitz, Tab 8
[119] Additional Materials Relied Upon by Paul Horvitz, Tab 8

CJ-4 BUSINESS PARK

Request is hereby made for authorization to pursue regulatory approval for the advancement of tenant improvement funds to complete the subject property. The advancement of tenant improvement funds is considered a matter of further protection of our collateral, as opposed to a request for an additional loan of funds to our borrower.

BACKGROUND

On or about June 27, 1988, the Senior Loan Committee approved a loan for the construction and permanent financing of two (2) concrete tilt-up office/warehouse buildings located at 1930/1950 116th Avenue, NE, Bellevue, Washington.

CJ-4 Associates, a General Partnership, was Borrower on the loan, with Jon C. Peterson, a single man, Charles W. and Judith Anderson, husband and wife, jointly and severally liable for the repayment. As of 1/31/88, financials from the Borrowers reflected the following: Anderson (TL/NW) $132M/$1,148M; Peterson $869M/$1,356M.

As reported to the Senior Loan Committee on August 28, and October 26, 1989, this project had begun to experience numerous problems related to cost overruns, construction delays and an ineffective marketing effort. A previous decision had been made in May of 1989 to apply a portion of the tenant improvement allowance to the completion of the building shell. Additional tenant improvement funding was to have been secured through tenant leases and/or additional collateral provided by Borrowers.

On November 17, 1989, the Senior Loan Committee approved the initiation of nonjudicial foreclosure on the subject property, with the direction that the CJ-4 file be transferred to Special Assets immediately. Although Sterling's most recent appraisal effective March 15, 1988, reflected a stabilized value of $3,450,000, an updated analysis provided by Intervest as of 11/15/89 reflected a stabilized value of $2,950,000 based upon market rental rates and conditions.

On December of 1989, Special Assets converted the nonjudicial foreclosure to a judicial foreclosure due to the apparent substantial deficiency to be realized upon the sale of the real estate and our indication that the Borrowers possessed additional assets. In response to this action, the Borrowers filed a counter claim against Sterling Savings alleging, among other things that Sterling was negligent in its failure to notify the defendants that the balance of funds available would not provide sufficient funding to allow the project to reach a tenant-ready, income producing status.

On April 4, 1990, the Senior Loan Committee of Sterling Savings approved an additional advance under the terms of our existing Deed of Trust in an amount not to exceed $60,000 to fund improvements required by the City of Bellevue in order to preserve our existing building permit, and therefore the value and integrity of our collateral. It was the opinion of our counsel that because this represented an advance under our existing Deed of Trust to preserve our collateral and not a new loan, the funding of said advance could be implemented immediately.



Confidential Material–Subject to Protective Order