*Sterling Savings Association, Sterling Financial Corporation v. United States*

# Corrected Expert Report of Christopher James

# WITHERSPOON, KELLEY, DAVENPORT & TOOLE

A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS

1100 U.S. BANK BUILDING
422 WEST RIVERSIDE
SPOKANE, WASHINGTON 99201-0300
Telephone: (509) 624-5265
Telecopier: (509) 458-2728

COEUR D'ALENE OFFICE
THE SPOKESMAN REVIEW BUILDING
608 NORTHWEST BOULEVARD, SUITE 401
COEUR D'ALENE, IDAHO 83814-2146
(208) 667-4000



ROBERT L. MAGNUSON
NED M. BARNES
WILLIAM D. SYMMES**
ROBERT H. LAMP
K. THOMAS CONNOLLY
THOMAS D. COCHRAN
DUANE M. SWINTON
JOSEPH H. WESSMAN
JEFFREY L. SUPINGER*
DONALD J. LUKES+‡
LESLIE R. WEATHERHEAD*
MICHAEL D. CURRIN
BRIAN T. REKOFKE*
EDWARD J. ANSON++
R. MAX ETTER, JR
STANLEY R. SCHULTZ
MICHAEL F. NIENSTEDT*
JOHN M. RILEY III
DENNIS M. DAVIS++
F.J. DULLANTY, JR
DANIEL E. FINNEY
MARY R. GIANNINI*‡
TIMOTHY M. LAWLOR
CLAUDE F. BAILEY
WILLIAM M. SYMMES
ROBERT S. MAGNUSON
MARK A. ELLINGSEN*+
DAVID M. KNUTSON
JODY M. McCORMICK
SHELLEY N. SWANSON
JOEL P. HAZEL*
CHRISTOPHER G. VARALLO*
STANLEY M. SCHWARTZ
KIMBERLY A. KAMEL
L. VICTORIA MEIER
MARY E. DePAOLO
RYANN M. BEAUDOIN

OF COUNSEL

WM. A. DAVENPORT
JOHN E. HEATH, JR
ALLAN H. TOOLE


September 10, 2001

**Via Federal Express**

Elizabeth Hosford, Esq.
Trial Attorney
United States Department of Justice
1100 L Street NW, Suite 12110
Washington, DC 20530

Re: Sterling v. USA

Dear Ms. Hosford:

Please find the corrected copy of the Christopher James expert witness report. I also enclose an errata list, indicating the changes made from the earlier version of the report.

Please also note that the "Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings", which was transmitted to you in the front sleeve of the notebook containing Paul Horvitz' corrected report is part of the documents relied upon for that report.

Please contact me if you have any questions or I can be of further assistance.

Thank you very much.

Very truly yours,

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE

By: William M. Symmes

Attachments (2)

Errata to Expert Witness Report of Christopher James

1. Footnote 15 should read:
Letter from Sterling's Board of Directors to William J. Durbin, May 10, 1990 (*not* 1989). The change is reflected on the corrected Exhibit A, p. 12.

2. Footnote 16 should read:
Letter from William Durbin, OTS, to Sterling's Board of Directors, May 11, 1990 (*not* 1989). The change is reflected on the corrected Exhibit A, p. 1.

3. The source for footnote 46 should change to "Analysis from Sterling Savings' CFO, Dan Byrne".

4. Footnote 47 should read:
Issue Memorandum, from James Faulstich to Federal Home Loan Bank Board, April 6, 1988 [WOF014 1091-WOF014 1095].

5. Footnote 68 should read:
Sterling Savings Association and Central Evergreen Federal S&L Association Combined Supervisory Stock Conversion and Merger (Acquisition) Application, 8/15/1988, pp. 1-3 [WON9442186-WON9442189] (*not* WON9442181-WON9442482). The change is reflected on the corrected Exhibit A, p. 1.

6. Footnote 69 should read:
FHLB-Seattle Memorandum from James R. Faulstich, Principal Supervisory Agent, to Julie L. Williams, Deputy General Counsel, and Linda Plye, Director of Corporate Activities, 11/7/88, pp. 2, 11, 17 [WOT9420424-0441] (p. 17 is added).

7. Footnote 77 should read:
Sterling Savings Association and Central Evergreen Federal S&L Association Combined Supervisory Stock Conversion and Merger (Acquisition) Application, 8/15/1988, pp. 3-4 [WON9442186-WON9442189] (*not* WON9442181-WON9442482). Exhibit A correctly identified the Bates numbers and does not need to be updated.

8. Footnote 82 should read:
SEC Staff Accounting Bulletin No. 42, attached as Exhibit III to FHLBB Memorandum SP-24, December 29, 1981, pp. 19-27 (*not* pp. 18-27).

9. Footnote 111 should read:
37% represents the approximate marginal Federal and State tax rate for Sterling (*not* Fidelity). The estimate is based on a conversation with Daniel G. Byrne, the CFO of Sterling.

10. The title on Exhibit DD, page 2 should read:
September 1988 - December 1990 (*not* September 1998 - December 1990).

11. Footnote 5 on Exhibit L should read:
Boxed deposit figures are based on analysis provided by Sterling Savings' CFO, Dan Byrne, *except the boxed figures for Mar-89 and Sep-89, where the sources are from Statement of Profit/Loss SG0706460 and SG0103129.*

12. Exhibit A should include the following documents:

Hard-copy Thrift Financial Reports, 3/98: SG0614446-468
Hard-copy Thrift Financial Reports, 6/98: SG0615575-597
Hard-copy Thrift Financial Reports, 9/98: SG0625662-683
Hard-copy Thrift Financial Reports, 12/98: SG0626816-844
Thrift Financial Report (FHLBB) 1983-1988 (on disc)
Thrift Financial Reports (Sheshunoff Information Services) 1989-2000 (on disc)

13. In the report on pages 2, 20, and 42 the reference to reliance damages should be $23,059 million (*not* $23.509 million). This is the figure that matches Exhibit E.

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C (Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## Report of Professor Christopher James - Corrected

### I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions as Visiting Scholar at the Federal Reserve Bank of San Francisco and Senior Economic Advisor to the Comptroller of Currency, Department of Treasury. I have also served as a consultant to the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve system and a number of financial institutions. While a consultant at the FDIC I

participated in a number of transactions involving failed banks. I also assisted in developing failure resolution policies for the FDIC.

I hold a B.A. from Michigan State University as well as an M.B.A in Finance and a Ph.D. in Economics from the University of Michigan. My academic work has been in the fields of financial institutions, corporate financial policy, and securities pricing. I have published numerous articles on economic and financial topics including a number of articles on the regulation of financial institutions, failure resolution policies and capital raising by depository institutions. I serve on the Board of Directors of SunTrust Bank North Central Florida.

## II. Assignment and Overall Conclusion

I have been asked by counsel for the plaintiffs to examine the harm to Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial") from three supervisory acquisitions the bank entered into from November 1985 to December 1988, and the subsequent breach of the acquisition contracts by the enactment and implementation of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA") in 1989. I have examined a cost of replacement theory, a restitution theory, and a reliance theory. I have also been asked to examine Sterling's performance relative to other financial institutions after the breach, in the context of evaluating the lost profits calculations performed by Dr. Horvitz.

My examination has led me to the conclusion that Sterling has experienced significant damages as a result of the government's breach. In my opinion, under a cost of replacement theory Sterling incurred damages of $60.018 million, under a restitution theory incurred damages of $37.565 million, and under a reliance theory incurred damages of $23.059 million. Although it would be economically correct to add interest to these amounts to the present, it is my understanding that prejudgment interest may not be allowed against the government. Accordingly, my analysis includes no interest on these amounts, despite the fact that the breach occurred over ten years ago.

In my opinion, Dr. Horvitz's calculations provide a reasonable estimate of Sterling's lost profits. In reaching the opinions explained below, I have relied upon the documents detailed in Exhibit A and conversations I have had with Sterling's management.

## III. Background

*Thrift industry problems and the role of Supervisory Capital*

Throughout the 1980s the thrift industry experienced a period of unprecedented financial difficulties. A sharp increase in interest rates in the early 1980s caused a majority of thrifts to lose money. As a result of massive industry-wide losses, the Federal Home Loan Bank Board ("FHLBB") was faced with a large problem. The capital of many thrifts had eroded to the point that they were insolvent in that the value of their assets was less than the value of their liabilities.

The cost of resolving these insolvencies represented an enormous liability to the insurance arm of FHLBB, the Federal Savings and Loan Insurance Corporation ("FSLIC"). For example, in 1982 there were 415 insolvent thrifts on a tangible net worth basis, with a total negative tangible net worth of $12.8 billion.[1] The mark-to-market insolvency of these institutions was, of course, even greater than their tangible net worth insolvency, and published estimates of the cost of resolving failing thrifts ranged from $1.6 billion in December 1985 to as much as $100 billion in January 1989.[2] The FHLBB itself estimated a cost of $1.6 billion in 1985, and by February 1989 had increased that estimate fifty-fold to $75-80 billion.[3] Unfortunately, the resources of the FSLIC were inadequate to deal with this enormous problem. For example, in 1980 FSLIC resources totaled only $6.5 billion,[4] far less than was needed to resolve these problems.

To conserve FSLIC's dwindling resources, the government resolved thrift failures, wherever possible, by using supervisory mergers. The primary benefit of a supervisory merger to the government was that it avoided costly liquidation. The liquidation costs avoided included cash outlays required by the FSLIC to pay off insured depositors, the administrative costs associated with a government receivership, and lost franchise value. Also very important to the government, it retained use of the funds not expended in liquidation, and thereby earned money on those funds.

---

[1] *The S&L Debacle*, Lawrence White, Oxford University Press, 1991, Table 6-11.
[2] *The Great Savings and Loan Debacle*, James Barth, The AEI Press, 1991, pp. 72 – 75, Figure 3-2.
[3] *Ibid.*
[4] *Ibid.*, Table 3-12.

In addition to the direct cost savings from resolving thrift failures through supervisory mergers rather than liquidation, there are other benefits to the government associated with supervisory mergers. In particular, through a supervisory merger FSLIC attracted additional capital and managerial talent into the troubled portion of the thrift industry. Acquirers were selected by FSLIC based on their ability to provide management expertise and generate synergies which would serve to strengthen acquired thrifts and improve the industry. Attracting these resources from healthy thrifts was an integral part of the government's strategy to restructure the industry. Furthermore, the acquisition of a troubled thrift by another institution reduces the FSLIC's risk because of a basic principal of portfolio theory -- diversification. The risk of two institutions that are combined is at most the average of the risk of the two institutions operating separately. Combining two institutions with earnings that are not perfectly correlated will reduce the risk of failure. The government was well aware of the tremendous benefits it received from these supervisory deals, and Richard Pratt, former chairman of the FHLBB from 1981 through early 1983, has testified that thrifts like Sterling, in acquiring failing thrifts were "absolutely" providing a service to the FSLIC and the FHLBB, and that this service was "indispensable."[5]

*Supervisory Capital Has Value for Thrifts*

The FSLIC utilized Supervisory Goodwill ("SGW") and Capital Credits (collectively "Supervisory Capital") as tools to entice a healthy thrift into acquiring an insolvent institution, thereby reducing the required expenditures of the insurance fund. Goodwill was determined according to Generally Accepted Accounting Principles, and supervisory goodwill was generally computed as the cash or other consideration paid for the institutions plus the net liabilities assumed (i.e., the fair market value of the liabilities assumed less the fair market value of the assets acquired). In other words, thrifts like Sterling acquired failing thrifts that had negative net value, a net liability, and in addition to the acquired assets and liabilities, also added to their balance sheet in the amount of that net liability. Pursuant to contracts entered into by thrifts and regulators, this

[5] Deposition of Richard Pratt in *Long Island Savings Bank, FSB, v. United States*, December 2, 1998, pp. 99-100.

supervisory goodwill was counted towards the regulatory capital of the acquiring institution.

In two of the supervisory acquisitions at dispute in this case, the FSLIC provided cash assistance to facilitate the transactions. In each of these, the assistance was accounted for by directly crediting Sterling's capital instead of being accounted for as a reduction to the supervisory goodwill Sterling acquired. By allowing the assistance to be accounted for as a capital credit, the FSLIC was effectively providing the acquiring institution with additional regulatory capital that could be used to support future growth or that could be used as additional regulatory capital reserves.

To understand the importance of supervisory capital, it is necessary to understand both how thrift institutions earn a profit, and the value of leverage. The asset side of the traditional thrift's balance sheet consists of interest-earning assets, such as home loans and investment securities. Those investments are largely funded by the thrift's liabilities (as opposed to equity capital) – primarily deposits, but also other liabilities such as Federal Home Loan Bank borrowings or subordinated debt. Since these assets and liabilities comprise the bulk of a thrift's balance sheet, thrift income is driven by the "spread" between the return of the thrift's earning assets and the cost of those interest-bearing liabilities. This spread is referred to as "net interest income" or "spread income".

By counting as regulatory capital, supervisory capital allowed a thrift to meet regulatory requirements, remain in business, and earn this spread income.[6] Government-regulated thrifts like Sterling are required to maintain a prescribed level of capital on their balance sheet. A bank cannot finance all of its assets with deposits and borrowings, but is instead required to have some capital on its balance sheet as well, which serves to reduce the risk to the deposit insurer, the FSLIC. After 1982 for example, the regulatory capital requirement was approximately 3% of total liabilities, meaning a thrift had to have capital of no less than 3% of its total liabilities to be in regulatory compliance. Thrifts which fell below that level of capital were subject to regulatory action. The inclusion of supervisory capital as regulatory capital therefore directly affected whether or not a thrift was in compliance, and hence its ability to remain in operation.

[6] Sterling also generated non-interest income such as loan servicing fees and gains on investment securities, and was able to continue earning this income as well through the ability to count supervisory capital as regulatory capital.

Consider for example two thrifts identical in every way, except that the first can count SGW as regulatory capital, while the second cannot. Suppose both have $100 million in assets, $2 million of which is SGW, $97 million in liabilities, and $3 million in net worth. The first bank has regulatory capital of the full $3 million, because it can include SGW as capital, and therefore meets all requirements. The second bank must deduct SGW in the calculation of regulatory capital, and therefore only has $1 million, which falls short of the capital requirement of $2.9 million (3% of $97 million). It will not be permitted to remain open under those circumstances, but must instead reduce its balance sheet to come into compliance, or face regulatory action. Counting the SGW as regulatory capital allows the first thrift to leverage that SGW, increase its balance sheet, and earn spread income on additional assets.

Empirical evidence on thrift capital ratios supports the assertion that leverage is valuable for thrifts. Instead of varying randomly from industry to industry and firm to firm as would be the case if capital structure were irrelevant and leverage wasn't valuable, capital ratios are consistently higher for banks and thrifts than for other types of firms. Berger, Herring, and Szego find that "...banks systematically have the highest leverage of firms in any industry, in sharp contrast to the implications of the Modigliani and Miller proposition, which predicts that capital structures should vary randomly across firms and industries."[7]

Because of the value of leverage, the supervisory deals had value to both parties. The government was able to avoid the problem and monetary costs of liquidating failing thrifts, and facing the depletion of the FSLIC insurance fund, and thrifts like Sterling were able to add regulatory capital, which they could then leverage, allowing them to earn spread income.[8]

## IV. History of Sterling and Its Supervisory Acquisitions

Sterling commenced operations in 1983 as a State of Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. In

[7] Berger, Herring, and Szego, "The Role of Capital in Financial Institutions," *Journal of Banking & Finance*, No. 19, 1995, p. 394.

[8] Indeed Sterling was relying on the ability to count supervisory capital as regulatory capital when it entered into its supervisory deals. Without this ability, Sterling would have been out of compliance as of the time of each of the deals in 1985 (Lewis Federal) and 1988 (Tri-Cities and Central Evergreen).

June 1983, shortly after beginning operations, Sterling acquired Lewis & Clark Savings and Loan Association.[9]

Sterling embarked on a strategy of çontrolled growth from its inception. Daniel Byrne, the CFO of Sterling, noted during his deposition that Sterling pursued a strategy of internal growth combined with strategically suited acquisitions:

> "...I think we always wanted to grow, and whether, we grew internally or through acquisitions, so we used both means from time to time.
>
> So to the extent that we were determined--we were determined to improve and enhance our franchise to originate loans internally, to gather deposits internally, to acquire franchise opportunities were another means of growth for us.
>
> ...We saw opportunities to acquire and pursued those opportunities, but we also pursued de novo branching activities in addition."[10]

In 1985 Sterling began a series of supervisory acquisitions. The supervisory acquisitions that are subject of this litigation are Lewis Federal (completed on November 5, 1985), Tri-Cities (completed on April 8, 1988), and Central Evergreen (completed on December 31, 1988). Exhibit B is a timeline of these acquisitions, as well as Sterling's other acquisitions.

The regulators represented to potential acquiring institutions, including Sterling, that such institutions would receive assistance for acquisitions of troubled thrifts, in the form, inter-alia, the right to use the purchase method of accounting and the right to include and other intangibles as regulatory capital for purposes of meeting applicable regulatory capital requirements. The FHLBB also represented that the government would provide other financial and regulatory assistance, including certain forbearances, for such acquisitions.

As I have noted above, the possible supervisory acquisitions presented to Sterling by the regulators fit well with Sterling's strategy of controlled growth:

---

[9] 1983 Sterling Savings Annual Report, p. 14.

[10] Deposition of Daniel G. Byrne, 7/10/00, p. 164.

> "...I can tell you that it was a philosophy at Sterling that we wanted to grow on a 50/50 basis, in the sense that we wanted to be able to grow through acquisition to bring on additional resources.
>
> We also wanted to grow internally so that you wouldn't outstrip our systems of control, and therefore, we tended to target for growth in part through acquisitions and in part through the internal growth to achieve that."[11]

By June 1989, Sterling had grown to $730 million in total assets and $23.7 million in regulatory capital. Its capital-to-asset ratio was approximately 3.25%.[12] Sterling was in compliance with the existing capital regulations throughout the 1980's until the passage of FIRREA in August 1989. Regulatory examinations conducted prior to FIRREA repeatedly awarded Sterling a composite rating of "2" with the exception of late 1989 when on the eve of FIRREA it was rated "3." A composite rating of "2" indicated that Sterling was a fundamentally sound institution with only modest weaknesses correctable in the normal course of business. Only with the passage of FIRREA did Sterling's examination ratings suffer. Exhibit C presents Sterling's examination ratings over time, which in addition to a composite rating reported ratings for Sterling's management, asset quality, capital, risk, and operating results (i.e. its MACRO ratings). Exhibit D presents the definitions of the composite ratings used by the regulators.

Provisions of FIRREA required that Sterling eliminate supervisory capital for the purposes of calculating regulatory capital. As a consequence, Sterling immediately failed each of the new measures of regulatory capital (i.e. tangible, core, and risk-based).

As part of the Central Evergreen business plan, Sterling was obligated to raise additional capital. In 1989 Sterling proposed selling a unit offering that would consist of one share of common stock and one share of preferred stock. The offering would have raised approximately $10.5 million of capital. Sterling had worked with its investment bankers and the offering was fully subscribed, but ultimately it had to be cancelled because the OTS would not provide approval for the payment of dividends on the preferred portion of the unit offering.[13]

---

[11] Deposition of Daniel G. Byrne, 7/10/00, p. 165.
[12] 1989 Sterling Savings Annual Report, pp. 18, 33.
[13] 1990 Sterling Savings Annual Report, p. 8.

As a consequence of failing the FIRREA mandated requirements, Sterling was required to file a capital restoration plan with the regulators. In January it filed its first capital plan, which it later amended in February 1990. In April the regulators approved the plan that required that Sterling make itself available for sale. The regulators approval was contingent on Sterling's Board executing an Operating Agreement which would have allowed for the possible appointment of a conservator for the institution.[14] Sterling's Board of Directors declined to execute the agreement.[15] In response the OTS imposed several restrictions on Sterling, including limiting its activities to those specified in the capital plan.[16]

On May 15, 1990 Sterling filed a complaint seeking injunctive relief or seeking rescission of the contracts.[17] On July 5, 1990 Sterling was awarded an injunction preventing the OTS and FDIC from enforcing regulatory restrictions inconsistent with the supervisory acquisitions; although regulatory scrutiny and limitations did not cease with the injunction.[18] Sterling continued to be subject to multiple restrictions which limited its operating activities.[19] Despite the restrictions, Sterling continued to comply with regulatory capital requirements incorporated in the acquisition documents of the Central Evergreen transaction.[20]

In fiscal 1992, Sterling completed a $21 million offering which increased its regulatory capital levels so that it was compliant with all of the capital standards imposed by FIRREA.[21] In October 1992 Sterling Financial was formed as a holding company. At that point Sterling Savings became an operating subsidiary of Sterling Financial.[22]

---

[14] Letter from William Durbin, OTS, to William Zuppe, Sterling's Board of Directors, April 11, 1990 [SG 0135709 – SG 0135740].

[15] Letter from Sterling's Board of Directors to William J. Durbin, May 10, 1990.

[16] Letter from William Durbin, OTS, to Sterling's Board of Directors, May 11, 1990.

[17] Sterling Savings Association vs. Timothy Ryan, et. al., Verified Complaint for Declaratory and Injunctive Relief, or in the Alternative, For Rescission and Damages, May 15, 1990.

[18] 1991 Sterling Savings Annual Report, p. 2.

[19] See for example, letter from Daniel Byrne to Carol Friend, OTS, June 21, 1990 [SG 0137928 – SG 0137931].

[20] 1991 Sterling Savings Annual Report, p. 18.

[21] 1992 Sterling Savings Annual Report, pp. 2, 39-40.

[22] 1993 Sterling Financial Corporation Annual Report, p. II.

*Sterling's Supervisory Acquisitions*[23]

Lewis Federal Acquisition

1. Timing and Background

   a. Sterling first met with the regulators regarding a potential acquisition of Lewis Federal on March 11, 1985.[24]

   b. On June 13, 1985, Sterling submitted a bid to FHLBB-Seattle to purchase Lewis Federal Savings and Loan Association, Chehalis, WA on an assisted basis. The bid involved FSLIC assistance in the form of $1,750,000 of up-front cash payment by FSLIC.[25]

   c. On October 23, 1985 FHLBB compared the possible resolutions of the insolvency of Lewis Federal. Along with Sterling, two other financial institutions submitted proposals to acquire Lewis Federal. Additionally, FHLBB considered the cost of liquidating Lewis Federal or its sale to a potential out-of-state bidder. Sterling's bid was recommended as the least expensive alternative.[26]

   d. On November 4, 1985, the FHLBB appointed FSLIC to be sole receiver for Lewis Federal and approved the sale of Lewis Federal to Sterling.[27] The acquisition and assistance agreements between FSLIC and Sterling were signed on November 5, 1985.[28]

   e. On November 12, 1985, Sterling's CEO, Harold Gilkey, received an official letter from the FHLBB detailing the forbearances granted to Sterling in conjunction with its approved supervisory acquisition of Lewis Federal. In particular, the FHLBB reiterated that "[t]he assets acquired by Sterling from Lewis will be deemed to have been acquired in a merger instituted for supervisory reasons" and confirmed that "[i]t is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assistance agreement ... is to be a credit to Sterling's net worth" and "[f]or purposes of reporting to

---

[23] Throughout this report, I collectively refer to the three acquisitions that are the subject of this lawsuit as "the supervisory acquisitions."

[24] Letter to William W. Zuppe from Donald W. Mochel, March 20, 1985 [Exhibit #7 Zuppe].

[25] Letter from William W. Zuppe to Hilton S. Hewitt accompanying the bid package for Lewis Federal, June 13, 1985 [WOF014 0415-WOF014 0420].

[26] Issues Memorandum, 10/23/1985, [WOF0140450-WOF0140454]; A Memorandum, 10/23/1985 [WOF0140468- WOF0140472]; S Memorandum, 10/23/1985 [WOF0140473- WOF0140481].

[27] Federal Home Loan Bank Board Resolution No. 85-985, 11/4/1985 [SG0600145-SG0600151]; and Federal Home Loan Bank Board Resolution No. 85-989, 11/4/1985 [SG0600223]

[28] Acquisition Agreement, 11/5/1985 [SG0600159-SG0600172]; and Assistance Agreement, 11/5/1985 [SG0600173-SG0600206].

the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method."[29]

2. Location of Branches

a. The branches Sterling acquired through the Lewis Federal acquisition were located in the Chehalis area of southwestern Washington. In a Board of Directors analysis of the "Lewis Federal Acquisition Opportunity" from February 1985, Sterling recognized both the risks – "[t]he marketplace currently served by Lewis is not a growth market" and "[t]he geographical distance involved presents a challenge to management, both in Spokane and the Chehalis area, in providing effective ongoing communications" – and the opportunities – an opportunity to accelerate their "plans to penetrate the Seattle and Portland marketplaces" – posed by the acquisition of branches in this area.[30]

b. However, Sterling ultimately felt that the acquisition of Lewis Federal was consistent with their desire to expand Sterling's marketplace. They also felt confident that "Sterling's mode of operation which [had] worked so successfully in serving small communities in eastern Washington [would] be accepted in southwestern Washington" and that "the products and services offered by Sterling will be beneficial to Chehalis, Centralia, Kelso and other contiguous towns."[31]

3. Condition of Lewis Federal

a. Lewis Federal had assets of $52.5 million and negative net worth of $0.05 million as of August 31, 1985. The institution had "consistently incurred operating losses since June of 1981" and was a participant in the Net Worth Capital Assistance Program. It reached insolvency at August 31, 1985.[32]

b. The FHLBB felt that Lewis Federal's financial problems were "attributable to depressed economic conditions in its home office lending market and a

---

[29] Letter to Harold B. Gilkey from Jeff Sconyers of the FHLBB, 11/12/1985 [SG0600207-SG0600209].
[30] "Lewis Federal Acquisition Opportunity" prepared for the Board of Directors' Meeting February 26, 1985, 2/26/85 [SG0040442-SG0040463].
[31] Letter to Hilton S. Hewitt of the FHLBB from William H. Zuppe, 6/13/1985 [WOF0140415-WOF0140420].
[32] FHLBB Issues Memorandum, 10/23/1985 [WOF0140450-WOF0140454].

negative yielding service corporation investment," as well as "a low yielding fixed rate mortgage portfolio" and "lack of managerial resources."[33]

c. Lewis Federal's regulatory ratings had fallen from a 3-C in October 1981 to a 4-D by May 1983 due to continual negative operating results, poor net worth and poor performance of wholly-owned service corporations. In fact, by May of 1983, Lewis Federal's board of directors had already begun "to discuss merger possibilities with other thrift institutions." After the supervisory exam ended March 23, 1984 in which Lewis Federal was again rated a 4-D, "the Supervisory Agent requested the board of directors [of Lewis Federal] to inform [the FHLBB] of the status of continuing efforts to attract a merger partner."[34]

<u>Tri-Cities Acquisition</u>

I. Timing and Background

a. Sterling was first approached to submit an acquisition proposal to acquire Tri-Cities Savings and Loan on May 21, 1986.[35] On June 3, 1986, Harold Gilkey, Sterling's CEO, sent a letter to Hilton Hewitt, a FHLBB Supervisory Agent, stating that "Sterling and Tri-Cities have entered into an agreement to agree" and that this agreement "indicates that it will require an appropriate audit of both companies with appropriate approvals of all participants, including shareholders of both companies, as well as the State of Washington and the Federal Home Loan Bank Board."[36] Additionally, Mr. Gilkey stated that "[Sterling is] not naive enough to believe that we understand all of the problems that Tri-Cities has exposed itself to."[37] The parties were unable to reach an agreement.[38]

b. Tri-Cities was marketed first on an in-state, unassisted basis to FSLIC-insured institutions in January 1987.[39] Four institutions indicated a preliminary

---

[33] FHLBB Issues Memorandum, 10/23/1985 [WOF0140450-WOF0140454]; and S Memorandum, 10/23/1985 [WOF0140473-WOF0140481].
[34] S Memorandum, 10/23/1985 [WOF0140473-WOF0140481].
[35] Counter Proposal to Sterling Savings Association from Tri-Cities Savings and Loan Association with notes from Ruth Rush, 5/21/1986 [SG0162153-SG0162154].
[36] Letter to Hilton S. Hewitt from Harold B. Gilkey, 6/3/1986 [SG0162092].
[37] *Ibid.*
[38] Closing Statement, April 8, 1988 [SG0148828 - SG0148829].
[39] S Memorandum from James Faulstich, Principal Supervisory Agent to John Buckley, Jr. Secretary to the Board, March 31, 1988 [WOF014 1079 – WOF014 1090].

interest, however, all four later stated that they were not interested without assistance.[40]

c. In August 1987, Tri-Cities has been marketed on an assisted basis.[41] A marketing package for Tri-Cities has been sent out, mentioning that "the FSLIC will consider any form of requested FSLIC assistance."[42] Tri-Cities was presented for bid at a conference in Seattle on October 15, 1987.[43]

d. On November 27, 1987, Sterling submitted a bid to FHLBB-Seattle to purchase Tri-Cities Savings and Loan Association on assisted basis. The bid requested FSLIC assistance in the form of a $9,871,000 up-front cash payment (subject to certain outlined adjustments) by FSLIC.[44]

e. On March 1, 1988, FHLBB compared the possible resolutions of the insolvency of Tri-Cities and recommended that Sterling be selected as the low bidder for the acquisition of Tri-Cities. Along with Sterling, two other financial institutions submitted proposals to acquire Tri-Cities, although one institution subsequently withdrew their bid. Additionally, FHLBB considered the cost of liquidating Tri-Cities or its sale to a potential out-of-state bidder.[45]

f. On April 6, 1988 FHLBB agreed with Sterling's proposed acquisition terms of:

1. Upfront cash contribution in the amount of $11,730,128 – this payment would count toward regulatory net worth.[46]
2. Capital loss and yield maintenance coverage on 13 assets with a net book value of $8.01 million and existing reserves of $1.8 million. Sterling will absorb 25% of the capital losses up to a pre-tax limit of $900,000.[47]
3. FSLIC will purchase three assets, two of which FSLIC as Receiver for Westside FS&LS is lead lender. These two assets have a net book value of $560,000. The third asset is Tri-Cities investment in Tri-West Construction, Inc., a wholly owned inactive subsidiary of Tri-Cities.[48]

---

[40] *Ibid.*
[41] S Memorandum from James Faulstich, Principal Supervisory Agent to John Buckley, Jr. Secretary to the Board, March 31, 1988 [WOF014 1079 – WOF014 1090].
[42] Marketing Package for Tri-Cities Savings and Loan Association, Kennewick, Washington.
[43] Memorandum to Herb Held from Patricia A. McJoynt, 3/1/1988 [WOB0051223-WOB0051226].
[44] Letter to Patricia McJoynt of FHLBB from Daniel L. Byrne, 11/27/1987 [WOB0051178-WOB0051194]
[45] Memorandum to Herb Held from Patricia A. McJoynt, 3/1/1988 [WOB0051223-WOB0051226]
[46] Analysis from Sterling Savings' CFO, Dan Byrne.
[47] Issue Memorandum, from James Faulstich to Federal Home Loan Bank Board, April 6, 1988 [WOF014 1091-WOF014 1095].
[48] *Ibid.*

4. Five year indemnification for undisclosed liabilities, claims not reserved for and asserted against the association, and litigation challenging the transaction. Standard forbearances regarding net worth forbearances, exclusion of scheduled items and liquidity deficiencies and service corporation.[49]
5. Tax benefits will be shared with the FSLIC on a 50/50.[50]

2. Location of Branches

a. The five branches with total assets of $69.5 million[51] acquired by Sterling through the acquisition of Tri-Cities were located in Kennewick (two branches), Pasco (two branches), and Richland (one branch). All five branches were located in the state of Washington.

b. While Sterling recognized the economic disruption caused "by the closing of the N-reactor," the acquisition fit well with Sterling's stated strategy of becoming "a leading financial institution in the Pacific Northwest."[52]

3. Condition of Tri-Cities

a. Tri-Cities had assets of $54.5 million, deficit regulatory capital of $6.1 million, and negative GAAP capital of $8.5 million as of December 1987.[53] Tri-Cities has suffered substantial dissipation of assets and earnings due to asset quality problems, underwriting and appraisal deficiencies, and management of the investment portfolio during 1984 and 1985.[54] Tri-Cities overall examination rating had been a 5 since 1985.[55]

b. In October 1985, the FHLBB executed a Consent Cease and Desist Order with the State of Washington.[56] In February 1986 the state examiner uncovered a violation of the Cease and Desist order.[57] Additionally, a supervisory letter was sent to Tri-Cities, noting "serious deficiencies in the areas of board oversight and effectiveness, executive management capabilities, major loan

[49] *Ibid.*
[50] *Ibid.*
[51] Sterling Savings Association, Annual Report 1988, p. 31.
[52] News release from Sterling Savings Association, April 11, 1988 [SG0501899 – SG0501900].
[53] S Memorandum from James Faulstich, Principal Supervisory Agent to John Buckley, Jr. Secretary to the Board, March 31, 1988 [WOF014 1079 – WOF014 1090].
[54] *Ibid.*
[55] *Ibid.*
[56] *Ibid.*
[57] *Ibid.*

underwriting policies and procedures, investment in subsidiary corporations, and asset quality problems."[58] Consequently, Supervisory Counsel recommended to the Office of Enforcement that a Consent Cease and Desist Order be pursued.[59]

c. In March 1986 the State Supervisor informed Tri-Cities that if Mr. Schmidtke, managing officer of Tri-Cities, was not replaced, "a court order would be sought and enforce the C&D."[60] Mr. Schmidtke resigned on March 11, 1986.[61]

d. In June 1986, a Consent Cease and Desist Order was executed between the FHLBB and Tri-Cities.[62] The Order covered: "net worth, loan documentation, accounting and financial reports, scheduled items, construction loan disbursements, service corporations and subsidiaries, limitations on lending, concentration of assets, business plan, and underwriting procedures…the institution was put on a monthly reporting requirement for compliance with the terms of the C&D Order."[63]

e. In December 1986 a report of examination of Tri-Cities was transmitted to the institution noting several areas of critical concern, such as, asset deterioration, inadequacy of management succession, poor operating results, and violations of outstanding enforcement actions.[64] The Board of Directors of Tri-Cities concluded in its response letter "that the most logical solution to [Tri-Cities'] problems appeared to be a merger or buy-out."[65] The institution began to actively seek an unassisted merger partner but no interest was found.[66]

Central Evergreen Acquisition

1. Timing and Background

a. Central Evergreen had been a troubled institution from the early 1980s. As a result, both bank management and the FHLB-Seattle began to seek a merger partner for the institution in 1987.

---

[58] *Ibid.*
[59] *Ibid.*
[60] *Ibid.*
[61] *Ibid.*
[62] *Ibid.*
[63] *Ibid.*
[64] *Ibid.*
[65] *Ibid.*
[66] *Ibid.*

b. From 1980 to 1983, Central Evergreen reported losses totaling $5.5 million. "These losses couple with losses on sales of fixed rate, low yielding assets during the same time period, resulted in a negative GAAP capital position of $14.2 million at December 31, 1984. As was permitted by the FHLBB, the association elected to defer approximately $15 million in losses for regulatory purposes." While Central Evergreen experienced positive earnings from 1984 to 1986, the institution again suffered losses in 1987 due to the default of several purchased loans and the institution entered into a Supervisory Agreement with the FHLBB in July 1987 that restricted its operations. Upon entering into this Supervisory Agreement, "both the association's management and the FHLB of Seattle ... actively sought a merger or acquisition partner. Contacts [were] made to individuals and financial institutions both in-state and outside the State of Washington. ... [T]wo parties other than Sterling Savings expressed interest. [However, b]oth verbal offers were declined due to the requirement to provide FSLIC assistance of $8 million to $10 million. Numerous forbearances were also requested."[67]

c. On August 15, 1988, Sterling submitted an application for a combined supervisory stock conversion and merger/acquisition of Central Evergreen to FHLB-Seattle requesting no FSLIC assistance. The application would "allow Central Evergreen to convert from a federal mutual association to a federal stock association and, simultaneously, allow Sterling to acquire the assets and assume the liabilities of Central Evergreen in a business combination." This transaction also would involve Sterling's ability to utilize approximately $15-22 million of Central Evergreen net operating loss carryforwards. Along with this application, Sterling submitted a revised business plan for fiscal 1989 to reflect the acquisition of Central Evergreen.[68]

d. In an internal memorandum dated November 7, 1988, FHLB-Seattle considered whether to approve Sterling's application. In this memorandum, FHLB-Seattle reviewed the proposed transaction – "Sterling proposes to acquire Central Evergreen, whereby simultaneously with conversion, Central

---

[67] FHLB-Seattle Memorandum from James R. Faulstich, Principal Supervisory Agent, to Julie L. Williams, Deputy General Counsel, and Linda Plye, Director of Corporate Activities, 11/7/88, p. 3-5 [WOT9420424-0441].

[68] Sterling Savings Association and Central Evergreen Federal S&L Association Combined Supervisory Stock Conversion and Merger (Acquisition) Application, 8/15/1988, p. 1-3 [WON9442186-WON9442189]; FHLB-Seattle Memorandum from James R. Faulstich, Principal Supervisory Agent, to Julie L. Williams, Deputy General Counsel, and Linda Plye, Director of Corporate Activities, 11/7/88 [WOT9420352-0365].

will merge into Sterling. ... Upon the conversion date Central Evergreen would issue the 100 shares to Sterling in exchange for assumption of Central Evergreen's liabilities. No cash or other remuneration is being paid for the stock by Sterling. After conversion and merger Central Evergreen's branches would become branches of Sterling. No liquidation account would be established for the former accountholders of Central Evergreen" – and the projected net operating loss carryforwards of approximately $22 million. With regard to the viability of the proposed business plan, they concluded that "Sterling's record of meeting its business plan objectives is evidenced by its continued profitability. We remain confident that Sterling's management will adhere to its plan and the institution will be closely monitored to ensure an increasing level of capital to required levels and safe and sound operation. We are also requiring the institution to meet certain pre-defined capital levels." Due to the "no-cost-to-FSLIC resolution of a GAAP-insolvent institution without presenting substantial injury or risk to the resulting institution, its depositors, shareholders or the FSLIC" nature of this transaction, the Principal Supervisory Agent recommended its approval noting that "any alternative resolution of the target institution would likely result in FSLIC-assistance of a minimum $8-10 million."[69] By November 21, 1988 the office of general counsel of FHLB-Seattle had approved the application.[70]

e. On December 5, 1988, the Principal Supervisory Agent of FHLB-Seattle recommended that the FHLBB approve this transaction, as well as an agreement between Sterling and the FSLIC requiring Sterling "to maintain and achieve certain specified levels of regulatory capital in accordance with scheduled increases as set forth in the Business Plan."[71] This application was directed to the Board for approval as it "present[ed] an issue of significant law or policy which require[ed] approval by the Board because the Resulting Institution [would] have a ratio of GAAP net worth to total liabilities of 1.43%."[72] On December 8, 1988 the FHLBB approved this transaction,[73]

---

[69] FHLB-Seattle Memorandum from James R. Faulstich, Principal Supervisory Agent, to Julie L. Williams, Deputy General Counsel, and Linda Plye, Director of Corporate Activities, 11/7/88, pp. 2, 11, 17 [WOT9420424-0441].

[70] Sterling Savings Association Minutes of the Meeting of the Board of Directors, 11/21/1988 [SG 0191766-782]

[71] FHLBB Memorandum to the Federal Home Loan Bank Board from Jordan Luke, General Counsel, 12/5/88 [WOT942 0329-0341].

[72] FHLBB Memorandum to Nadine Y. Washington, Board Operations, from Jordan Luke, General Counsel, 12/5/88 [WOT942 0326-0328].

although an agreement between the FHLBB and Sterling on the terms of the acquisition and associated requirements was not reached until December 28, 1988.[74] Sterling's acquisition of Central Evergreen was completed on December 31, 1988. Sterling recorded $13.603 million in unidentified intangibles and $8.480 million of identified intangibles ($2.0 million which was attributed to loan servicing rights) in association with this acquisition.[75]

2. Location of Branches

a. Central Evergreen was chartered in 1922 and headquartered in Chehalis, Washington. The nine branches Sterling acquired through the merger with Central Evergreen were located within western Washington,[76] an area of Washington that Sterling had first expanded into with the Lewis Federal acquisition in 1985. Sterling itself noted in its application for acquisition of Central Evergreen in August 1988 that "[t]his transaction will benefit Sterling through increasing and enhancing its retail delivery system, and adding vital branch locations in western Washington, consistent with its long-range plan to provide such facilities within the Pacific Northwest, in general, and the State of Washington, in particular." They also cited economies of scale in terms of branch management, administration and communication, as well as further geographic diversity of investments, as benefits that would result from this merger.[77]

3. Condition of Central Evergreen

a. Central Evergreen had assets of $254.9 million, regulatory capital of $4.6 million and negative GAAP capital of $12.7 million as of June 30, 1988. As discussed above, Central Evergreen had been a troubled institution since the early 1980s and was operated under a comprehensive Supervisory Agreement since July 1987. While the institution was experiencing "a positive earnings

[73] FHLBB Resolution No.: 88-1273, 12/8/1988 [WOT942 0010-0015].
[74] Sterling Savings Association Minutes of the Meeting of the Board of Directors, 12/20/1988 [SG 0192365-381]; Memorandum from Daniel G. Byrne, CFO of Sterling Savings, to File, 1/6/1989 [SG 0142067-068]; Agreement between Sterling Savings and FSLIC/FHLBB regarding the application for approval of the Central Evergreen acquisition, 12/28/88 [SG 0600390-404].
[75] 1989 Annual Report, Note 13.
[76] FHLB-Seattle Issues Memorandum, 11/7/1988, p. 3 [WOT942 0352-0365].
[77] Sterling Savings Association and Central Evergreen Federal S&L Association Combined Supervisory Stock Conversion and Merger (Acquisition) Application, 8/15/1988, p. 3-4 [WON9442186-WON9442189]

trend" in 1988, the FHLB-Seattle felt that "the likelihood of recapitalization or recovery through earnings retention [was] highly unlikely given the severely negative GAAP capital position" and deemed Central Evergreen's major weaknesses to be "its negative GAAP capital position; a weak, yet positive earning regulatory capital position; lower earnings and poor assets quality." Due to the institution's negative GAAP capital position, bank management and the FHLB-Seattle felt that acquisition was the most viable means of saving the institution.[78]

[78] FHLB-Seattle Memorandum from James R. Faulstich, Principal Supervisory Agent, to Julie L. Williams, Deputy General Counsel, and Linda Plye, Director of Corporate Activities, 11/7/88, p. 3 [WOT9420424-0441]; FHLBB Memorandum to the Federal Home Loan Bank Board from Jordan Luke, General Counsel, 12/5/88, pp. 2-3 [WOT942 0329-0341].

## VII. Reliance

My understanding of reliance damages is that it measures the net costs incurred by the non-breaching party – Sterling – in reliance on the contracts. I measure reliance damages as the costs that Sterling incurred in reliance on the contracts starting at the time of the acquisitions, less any benefits the bank received under the contracts. It is my opinion that Sterling is entitled to reliance damages of $23.059 million. The summary of my reliance damages calculation is presented in Exhibit E.

Sterling incurred significant costs in association with the supervisory mergers, and it only incurred these costs because it received as an offsetting benefit the contractual right to count supervisory capital as regulatory capital. I have already discussed the value of SGW, the capital credits, and leverage to a thrift, and it is that value Sterling was relying on in taking on the net liabilities of the acquired thrifts.

*Reliance - Measure of Sterling's Cost*

The net liabilities assumed by Sterling plus any other consideration paid is the measure of the initial costs incurred by Sterling in each of the acquisitions. This sum is the equivalent of the amount of goodwill. Many sources recognize the assumption of liabilities as a cost. Finance textbooks, regulatory pronouncements, and accounting literature all recognize the net liabilities acquired in a merger as a cost (or, alternatively, as a part of the purchase price of an acquisition).[79]

An example might be illustrative. If I have a $1000 mortgage on a house and the market value of the house drops so that it is worth only $800 then the overall value of my ownership in the house is negative $200. If a prospective buyer is willing to acquire my house and assume my mortgage then they are assuming my obligation which has an expected cost of $200. If I do not compensate the prospective buyer and they pay no compensation to me then the buyer has absorbed a cost of $200. On the other hand, I receive a benefit of $200 in the form of an obligation (i.e. liability) that I avoided. This is exactly the situation that existed for each of the three supervisory acquisitions made by

[79] As stated above, standard finance textbooks recognize the net liabilities assumed as the cost of a merger. Brealey and Myers define the cost of an acquisition as the cash paid minus the value of the acquired company as a separate entity. Since the value of the acquisitions was negative, the cost of the acquisitions to Sterling was the cash paid, if any, minus the negative value of the company (i.e., the net liabilities assumed.)

Sterling. Sterling absorbed balance sheets with a negative value, and the cost of the acquisition to the bank is that negative value (i.e. the net liabilities assumed).[80]

The FHLBB recognized the net liabilities assumed as a cost. FHLBB Supervisory Procedures memorandum SP-24, which was issued in December 29, 1981 and directed to the supervisory agents in the FHLB district banks, noted:

> "In a business combination involving the acquisition of a mutual institution, the price will often be determined by the assumption of liabilities in excess of the fair value of the assets acquired. This is a purchase in the same sense as if the consideration involved cash or a stock transfer."[81]

The Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin No. 42 ("SAB-42") on December 23, 1981. SAB-42 contained the SEC's interpretations "...concerning the application of existing financial accounting standards to business combinations accounted for by the purchase method involving financial institutions...". SAB-42 noted:

> "The cost of unidentifiable intangible assets purchased () is measured by the total cost of the purchase less the sum of the amounts assigned to the fair value of identifiable tangible and intangible assets and less the fair value of deposits and other liabilities assumed" (emphasis added).[82]

It is fully consistent with the views of the government's regulatory agencies to take these net liabilities as a cost, so the upfront cost of the contracts is therefore the total amount of goodwill recognized in the acquisitions, $38.2 million.

Recognizing these initial costs does not ignore the possibility that the value of the net liabilities might change over time. Any change in value is recognized in my calculation

---

[80] In this example, no one would assume liabilities of $1000 to obtain an asset of $800 unless there was some other expected benefit of home ownership. In the case of supervisory mergers, the benefit was the ability to use supervisory goodwill as part of regulatory capital.
[81] FHLBB memorandum SP-24, p. 6.
[82] SEC Staff Accounting Bulletin No. 42, attached as Exhibit III to FHLBB Memorandum SP-24, December 29, 1981, pp. 19-27.

in the offsetting gains recovered by Sterling. Alternatively, I could recognize the costs of the acquisitions to Sterling in the periods when goodwill is amortized (i.e. written off and booked as an expense) instead of at the date of acquisition when goodwill was initially booked. This would not change the damages. The presentation of damages would differ, but the amount of damages would be unchanged.

The cash assistance provided by the FSLIC in the Lewis Federal and Tri-Cities acquisitions reduces the initial costs that Sterling assumed in those transactions.[83] As presented on Exhibit E, the initial costs to Sterling of the three acquisitions were $24.735 million, which is the net liabilities assumed by Sterling, $38.215 million, less the cash assistance of $13.480 million.

*Reliance - Measure of Sterling's Benefit*

The offset to the upfront cost incurred by Sterling is any benefit the bank received under the contracts. The benefits that I have determined are any income earned by Sterling that can be attributed to the three supervisory acquisitions, plus any residual value of the branch franchises that it acquired.

It is important to note that any potential benefits from the contract ceased with the breach of the contract. The reason the benefit stops at the time of the breach is that the acquisition contracts permitted Sterling to count supervisory capital as regulatory capital, without this benefit, Sterling, as noted earlier, failed the FIRREA capital requirements. Prior to FIRREA, supervisory capital allowed Sterling to remain in capital compliance and to increase the leverage of the institution and thus to receive a benefit by generating earnings. Without the ability to count supervisory capital as regulatory capital, Sterling's ability to remain open was placed in jeopardy.

While it is true that Sterling survived, the earnings generated after the breach are not attributable to the ability to count supervisory capital as regulatory capital under the contracts. In other words, Sterling's post-breach earnings are not a benefit of the contract, but are attributable to other factors such as its restructuring efforts, capital Sterling raised, management effort and skill, or regulatory forbearance unrelated to the

[83] The results of my reliance damages calculation do not change if the cash assistance is considered a reduction in the cost incurred by Sterling or if it is considered as an additional benefit that Sterling received from the contracts.

contracts (and the injunction which prevented regulatory seizure but did not prevent regulatory constriction of Sterling's business activities.) My calculations of the measure of Sterling's benefit therefore end as of September 1989.

The income earned by Sterling that can be attributed to the three supervisory acquisitions requires estimation on my part. The operations of each of the three supervisory acquisitions, as well as its other acquisitions, were combined with Sterling's existing operations. It is my understanding that Sterling did not maintain separate financial statements for the supervisory acquisitions after they were acquired. It did collect and maintain branch-level information which I have used with the assistance of Sterling's Chief Financial Officer, Daniel G. Byrne, to determine what revenue and expenses can be directly traced to each acquisition.

Any revenues and expenses that cannot be directly traced are allocated based on the deposit size of the supervisory acquisitions relative to the rest of Sterling. I believe using relative deposit size is a reasonable assumption in this case for allocating the revenues and expenses that cannot be directly traced. In fact I believe it generously allocates the earnings of Sterling to the supervisory acquisitions which, when acquired, were troubled franchises with insufficient capital and earnings. Using deposits to allocate earnings implicitly assumes that the supervisory acquisitions began immediately contributing to the earnings of Sterling. Sterling was a financially stronger institution than any of the supervisory institutions, so much of the bank's subsequent earnings should be due to the assets that existed on Sterling's balance sheet prior to the supervisory acquisitions or due to other non-supervisory acquisitions.

A summary of the income that I have identified from the supervisory acquisitions can be found on Exhibit F. Exhibit F presents summary information for both the income that was directly related to the supervisory acquisitions, as well as income that has been allocated to the supervisory acquisitions based on deposits.

Exhibit G presents details on the income that can be directly identified. To determine these amounts I have relied on analysis performed by Sterling's CFO, Daniel G. Byrne. For fiscal years 1986 and 1987, Sterling's internal profit/loss statements identified revenue and expense items by branch. The information in the reports covered basic branch level activity such as interest income, fee income, interest expense, and operating expenses. For fiscal years 1988 and 1989, and the quarter ended September 1989 the

internal profit/loss statements provided less information, but still reported fee income and operating expenses.

In addition to the branches that Sterling acquired in the supervisory acquisitions, it acquired subsidiary corporations with each supervisory acquisition. Sterling maintained income statements for the subsidiaries so I am able to observe the profits of these corporations. Again, with the assistance of Daniel G. Byrne, I have reviewed Sterling's consolidating income statements that report the annual income for each of the subsidiaries. I have attributed the income from the subsidiaries to either Sterling or the supervisory acquisitions. For instance, Lewis Service Corporation was acquired in the acquisition of Lewis Federal, hence the income (or losses) from it are attributed to Lewis Federal.

An additional expense that can be traced to the Central Evergreen contract relates to the costs of the unit offering that was planned for in 1989, but ultimately failed because of the OTS's refusal to approve dividend payments on the preferred stock portion of the offering. The refusal of the OTS to allow dividends was a direct consequence of the breach and the capital deficiency the breach caused. The unit offering was required by the Central Evergreen Business Plan. Sterling had begun efforts to effect the offering in 1989 prior to the breach. Using information from Daniel G. Byrne, I have totaled the expenses that occurred prior to September 30, 1989 and attributed those costs to the Central Evergreen contract. Exhibit G also presents my summary of these costs.

To determine the overall benefits provided by the supervisory acquisitions, revenues and expenses that are not directly related to the supervisory acquisitions or to the other elements of Sterling need to be allocated. Exhibit H presents Sterling pre-tax, pre-amortization net income as reported on the Thrift Financial Reports that Sterling filed with the FHLBB.[84] Pre-tax, pre-amortization income is then adjusted for the revenues and expenses that were directly identified to determine the remaining net income that must be allocated.

Exhibit I presents the quarterly net income amounts that I need to allocate. The direct revenues and direct expenses for all of Sterling's branches as reported in Sterling's

[84] I begin with pre-amortization net income to avoid double counting the goodwill expense that I have presented as the initial costs of the supervisory acquisitions.

internal profit/loss statements are removed from the pool of income that must be allocated. The income from Sterling's subsidiaries is also removed. Pages 2 through 9 of Exhibit I present the details of Sterling's subsidiary income and of its branch income and expenses.

Lastly, Exhibit J presents the amounts allocated to each of the supervisory acquisitions and to the other elements of Sterling. To arrive at the figures in Exhibit J, the net income, presented in Exhibit I, is allocated based on the relative deposit size of the supervisory acquisitions.

The relative deposit size of the supervisory acquisitions is an important input into my calculations. Exhibits K and L show my calculation of both the relative size of the supervisory acquisitions, expressed as a percent of Sterling deposits, and the dollar amount of the deposit balances of the supervisory acquisitions. To determine the deposit size of the supervisory acquisitions and consequently their size relative to the rest of Sterling. I have reviewed analysis provided by Daniel G. Byrne, and I have reviewed the underlying supporting documents to determine the deposits at each of branches acquired in the supervisory acquisitions.

In addition to the income that the supervisory acquisitions generated, another offsetting gain from the supervisory acquisitions is any residual value of the deposit franchises acquired. My assessment is that the branch franchises from the supervisory acquisitions were valueless. My assessment is based on the following considerations.

First, as a consequence of the breach Sterling found itself deficient of all the FIRREA imposed capital standards. The value to Sterling of its deposits was contingent on the future operations of the bank. Sterling's tangible capital was *negative* $12.5 million relative to a requirement of $10.3 million - a $22.8 million deficit. Its ratio of tangible capital to assets was *negative* 1.89%.[85] Sterling's insolvency, in light of the new regulatory capital requirements, made any future value of its deposit franchise unrealizable, consequently it had no value.

---

[85] Sterling Savings Association Capital Restoration Plan, February 19, 1990, p. 1 [Gilkey deposition exhibit 35.]

Second, at the time of the breach, Sterling found itself facing significant supervisory scrutiny due to the capital deficiencies caused by the breach. Regulators required that Sterling make itself available for sale. As early as February 1990, Sterling was informing regulators that it had retained Dain Bosworth to assist it in identifying and finding an acquirer.[86] As part of the Capital Restoration Plan, Sterling also evaluated its ability to sell the bank in parts. Ultimately, Sterling was unable to find an acquirer.

Third, on May 10, 1990, in response to OTS pressure to have Sterling execute an operating agreement, Harold Gilkey and William Zuppe , the CEO and President of Sterling respectively, proposed that the OTS unwind the Central Evergreen transaction. They noted that it would be "operationally feasible" for the OTS to assume the remaining assets and liabilities of Central Evergreen on Sterling's books.[87] Had Central Evergreen any economic value Sterling would not likely have proposed returning it.

*Reliance – Additional Costs (Wounded Bank Costs)*

Sterling did not incur any wounded bank costs prior to the breach.[88] It may have after the breach, and it is my understanding that Dr. Paul Horvitz is addressing this issue.

---

[86] Sterling Savings Association Capital Restoration Plan, February 19,1990, pp. 2-3 [Gilkey deposition exhibit 35.]

[87] Letter from Harold B. Gilkey and William W. Zuppe to William J. Durbin, May 10, 1990, p. 17.

[88] As noted earlier, I have accounted for the costs stemming from the unit offering as costs attributable to the Central Evergreen contract. I have not included them as wounded bank costs to avoid double-counting.

## VI. Restitution

My understanding of restitution is that it measures the benefits the breaching party, the government, reaped under the contract, less any net benefits the non-breaching party, Sterling, received from the contract. My opinion is that Sterling be awarded $37.565 million under a restitutionary theory. Exhibit M presents the elements of my restitution calculation, as well as the amounts.

*Restitution - Measure of the Government's Benefit*

Sterling provided significant benefits to the government by acquiring three thrifts in 1985 and 1988. That benefit can be measured by the actions that government would have undertaken had Sterling not entered into the supervisory acquisitions with the government encouragement and approval. Furthermore, the options available to the government need to be options that do not include the use of supervisory goodwill as an incentive to facilitate the supervisory acquisition.

In supervisory acquisitions when the FSLIC was providing monetary assistance to the acquirer, the practice of the regulators was to evaluate the cost of resolving the troubled institution. The regulators determined the cost of providing monetary assistance versus the cost of alternative means of resolution. Typically, the regulators determined the cost of liquidating the troubled institution. The liquidation cost is the government's estimate of the costs that would have been incurred had it not been able to use supervisory goodwill to entice healthier institutions to acquire failing ones.

Prior to the acquisition of Lewis Federal, the FHLBB performed an analysis of the cost of liquidating Lewis Federal and concluded that the total liquidation cost to the FSLIC would have been $6 million.[89] The analysis was conducted on June 26, 1985.

On January 6, 1988 the FHLBB performed an analysis of the liquidation cost of Tri-Cities using figures from the September 30, 1987 Quarterly Financial Report, and

[89] FHLBB A Memorandum, October 23, 1985 (WOF014 0468-0472) and FHLBB Issues Memorandum, October 23, 1985 (WOF014 0450-0454).

concluded the total cost to the FSLIC would have been $20.75 million, with an initial cash outlay of $48.26 million.[90]

The liquidation estimates for these two thrifts were performed prior to the actual date of the deals and each thrift continued to lose money in the interim period. As a result, the estimates understate what the liquidation cost would have been to the FSLIC at the time of the mergers. A reasonable measure of the additional liquidation cost is the loss from operations between the time the liquidation estimate was done and the time of the deal. Exhibit M presents the additional adjustments that I have made for losses subsequent the FSLIC evaluations for Lewis Federal and Tri-Cities.

There was no liquidation analysis done for Central Evergreen, however, it was insolvent on a market value basis. The amount that the market value of liabilities exceeded the market value of assets in the acquisition of Central Evergreen was $20.1 million. This amount was endorsed by the FHLBB in approving the purchase accounting method of the transaction, and verified by independent accountants. Absent a liquidation analysis for Central Evergreen, in my opinion the $20.1 million is a conservative estimate of the liquidation costs, and I therefore use it as the benefit conferred upon the government by Sterling's acquisition of Central Evergreen.

By taking over these three thrifts, and assuming their net liabilities, Sterling saved the government these expenses which it otherwise would have incurred. The net liabilities that Sterling assumed would have been the obligations of the government. Furthermore, in the case of Central Evergreen using the net liabilities to proxy for liquidation costs should result in a conservative figure because the net liabilities do not include the administrative expense of liquidating the assets of a failing institution and paying off the insured depositors.

The government may argue that absent the Sterling deal it would have found another institution to acquire these thrifts, and therefore would have received this benefit regardless of Sterling. That argument is flawed, and without merit in this case. Had some institution other than Sterling entered into similar acquisitions for the supervisory institutions, then the government would now face this same damage claim from that

[90] FHLBB Memorandum from Alan R. Nilsen, January 6, 1988 (WOB005 1229-1251).

party. Another acquirer would have been similarly breached by the government, and would have a similar claim to these restitution damages.

In addition, in the case of Tri-Cities, it appears that the government did not have any viable alternatives to the Sterling deal. As I have already discussed the government opened the bidding for Tri-Cities to thrifts like Sterling after finding no interested parties to acquire Tri-Cities on an in-state, unassisted basis. In discussing the bidding history for Tri-Cities, the government lists three interested parties.[91] First, Old Stone Corporation of Providence, Rhode Island submitted the lowest-cost bid but later withdrew its proposal. World S&LA of Oakland, California was ruled out because of the level of assistance it required. The government also notes that World S&LA "only bid on this shop because it 'had' to. Not really interested."[92]

The government therefore received as a direct benefit of the contract with Sterling, the avoided costs of liquidating the three thrifts. This total is $46.8 million.

The benefit to the government is reduced by the direct cash contributions the government made at the time of the deals. The government contributed $13.48 million in cash assistance with the acquisition of Lewis Federal and Tri-Cities. This cash assistance to Sterling reduces the government's benefit. The government avoided a cost of $48.3 million, but it expended $13.48 million in the form of assistance to Sterling, so the net benefit the government received is $34.9 million.

The upfront costs of liquidation, which the government avoided due to Sterling's supervisory acquisitions, are not the only benefits received as a result of the contract. Not only did the government avoid these costs of $34.9 million, but also it was also able to continue earning investment income on the FSLIC fund. When the government avoided the cost of resolving the three failing thrifts, it preserved $34.9 million of the assets of the insurance fund. Had the government been forced to liquidate these thrifts, it would have expended these funds, and would have been unable to earn a return on these investments. The income it earned on the preserved assets is therefore part of the benefit to the government resulting from the contract.

---

[91] FHLBB Issues Memorandum from James R. Faulstich, April 6, 1988 (WOF014 1091-1095) and FHLBB S Memorandum, from James R. Faulstich, March 31, 1988 (WOF014 1079-1090).
[92] FHLBB Issues Memorandum from James R. Faulstich, April 6, 1988 (WOF014 1091-1095).

The benefit of maintaining the assets of the insurance fund was well known to the government. For example, James Croft, former head of the FHLBB Office of Examination and Supervision addressed this point in his testimony in two Winstar cases before this Court. In Glendale he stated that "preserving the insurance fund, both principal and its earning powers, was one of the primary charges that we as regulators had."[93] In CalFed, he testified:

> Q: And if money were paid out of the FSLIC insurance fund, how would that affect the earnings of that fund going forward?
> A: Well those funds would not be available to earn whatever they were invested in ... at that time.
> Q: Was that a consideration in approving supervisory mergers?
> A: Yes, it was.[94]

Government regulators therefore clearly saw the earnings on the insurance fund as a benefit of these supervisory deals, and Mr. Croft's testimony fully supports including these earnings as a benefit which the government received from the deals with Sterling. The benefit to the government is calculated as the return earned on the FSLIC Resolution Fund, on a balance of the cost avoided for each of the three thrifts, from the time of the respective deal until today. From the time of the deals until September 1989, the investment earnings were $2.7 million.[95] There can be no controversy that this measure is part of the government's benefit. Over the period 1985 – 1989, the government avoided liquidating the three acquired thrifts and expending these funds.

In total, the benefits to the government from the supervisory transactions with Sterling are costs that the FSLIC effectively avoided, plus the benefits of enhanced FSLIC investment earnings - a total of $37.6 million (see Exhibit M).

---

[93] Testimony of James Croft in *Glendale Federal v. U.S.*, March 28, 1997, p. 2772.
[94] Testimony of James Croft in *California Federal v. U.S.*, January 11, 1999, p. 218.
[95] The summary of this calculation is presented on Exhibit M. The details are presented in Exhibit N.

There are several other benefits to the government from the supervisory acquisitions that I have not tried to quantify, but that give me confidence that the amounts I have quantified conservatively estimate the overall benefit received by the government. First, another benefit that the government received from Sterling's supervisory acquisitions, and the many others that the government encouraged, was that it helped maintain depositor's confidence in the thrift industry. As one of its overarching concerns, the government and the thrift regulators were concerned about depositor confidence in the industry.[96] By acquiring the failed institutions and the branches of troubled institutions, Sterling assisted the government in maintaining confidence in the thrift industry.

A final benefit that the supervisory acquisitions conveyed on the government was that they allowed the government to consolidate management of the industry's assets in the hands of talented managers, and the supervisory acquisitions provided a means of attracting outside capital to the industry. This was an integral part of the industry's restructuring efforts that the regulators were encouraging.

*Restitution - Measure of Sterling's Benefit*

As an offset against the benefit to the government, I must take into account any benefit Sterling received under the contracts. In my opinion the benefits to Sterling of the supervisory transactions were very small. The benefits are any income generated from the acquisitions, plus a terminal value of the franchises acquired, less the costs of the acquisition. If the costs of the acquisition exceed the income and terminal value then in the restitution framework the benefits are zero.

My method of calculating the benefits to Sterling of the supervisory acquisitions is in essence identical to the reliance calculation I presented earlier. For all the supervisory acquisitions, I determined that the costs outweighed any gains and therefore the offsetting benefit in the restitution framework is zero.

---

[96] See e.g., deposition of Richard Pratt, December 2, 1998, pp. 29-30, 65; testimony of James Croft in *California Federal v. U.S.* (No. 92-138C), January 11, 1999, p. 138.

*Restitution – Additional Costs (Wounded Bank Costs)*

As noted above, Sterling did not incur any wounded bank costs prior to the breach. It may have after the breach, and it is my understanding that Dr. Paul Horvitz is addressing this issue.

## VI. Alternative Analysis of the Benefit to the Government for Restitution Recovery

I have also been asked to explore an alternative measure of the Government's benefit in the restitution framework. I believe the liquidation costs avoided by the FSLIC are a reasonable measure of the benefit the government received. In light of the *Glendale v. United States* appellate decision, which struggled with the notion that the liquidation costs avoided were the best estimate of the benefit received by the government, I have considered an alternative.

*Valuing the Benefit to the Government*

As mentioned in previous sections, the situation during the 1980s was difficult for the S&L industry. Many thrifts were insolvent or troubled and the FSLIC had a growing problem that needed to be addressed. Liquidation was clearly an expensive alternative. Therefore, a question arises: What did the government gain by utilizing supervisory capital instead of a more traditional resolution method?

Offering supervisory capital to financially stronger thrifts to induce them to acquire failing ones was a very inexpensive alternative for the government, as the cash expense for the FSLIC was minimal. Without the use of purchase accounting and allowing supervisory capital to count towards regulatory capital, the FSLIC would have been required to offer more cash to acquirers to accept the failing institutions.

Prior to its extensive use of supervisory capital to facilitate supervisory acquisitions, the costs to the FSLIC of resolving failing institutions required a larger cash outlay. Richard Pratt noted as much in his report to Congress in March 1983 while he served as Chairman of the FHLBB. He noted the alternative resolution tools that the Bank Board was employing, including "the use of purchase accounting," had "reduced the pre-1981 cost

of assistance from an average of 75 percent of the cost of liquidation to the current estimate of 12 percent."[97]

Similar statistics were reported elsewhere. The FHLBB, in its Annual Report for 1982, noted that "The FSLIC is required to resolve every failure at a cost no greater than that of liquidation. Historically, FSLIC assistance agreements have been about 70 percent of the cost of liquidation. However, by focusing on pairing problem cases with strong survivors, by tailoring assistance agreements to specific needs of the situation, and by using new procedures and approaches, the average present value cost of the FSLIC assistance agreements has fallen to 16.3 percent of the cost of liquidation..."[98]

In 1986, in an FHLBB research paper, James Barth, Dan Brumbaugh, and Daniel Sauerhaft (1986) examined the failure costs of savings and loan institutions. In their paper they present data that showed the historical cost of resolution relative to the estimated liquidation costs. For 1980, prior to the use of supervisory capital, the FSLIC's resolution costs were 60% of estimated liquidation costs.[99]

Given these alternative estimates of the FSLIC's *actual* historical costs, I believe that a reasonable estimate of the savings to the FSLIC of utilizing supervisory capital instead of a more traditional resolution method would be 70% of the cost of liquidation. To estimate the government's benefit, I have therefore applied a 30% discount to the estimates I am using of the liquidation costs in the three supervisory acquisitions. This methodology has led me to conclude that the FSLIC avoided resolution costs of $33.8 for the three acquisitions at issue in this matter.

The other elements of my restitution calculation are unchanged, except that the additional investment earnings on the funds retained by the FSLIC has decreased given the changes noted above. It is my opinion that the total restitution recovery is $21.842 million using this alternative methodology. A summary of my alternative restitution estimate is presented in Exhibit O. Exhibit P presents my calculation of the FSLIC's investment earnings given the FSLIC's cost savings presented in Exhibit O.

---

[97] FHLBB Agenda for Reform, March 1983, p. 16.
[98] 1982 FHLBB Annual Report, p. 13.
[99] *Failure Costs of Government-Regulated Financial Firms: The Case of Thrift Institutions*, James R. Barth, R. Dan Brumbaugh, Jr., and Daniel Sauerhaft, FHLBB Research Working Paper No. 123, October 1986, Table 2, p. 8.

## VIII. Cost of Replacement

Sterling was damaged when it lost its ability to fully count supervisory capital as regulatory capital. As I have already discussed, the supervisory capital allowed Sterling to increase its leverage, which has value to thrifts. The U.S. Court of Appeals for the Federal Circuit found in Glendale "...given the choice between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with it, a reasonable banker would surely take the latter."[100]

One method of determining the damages associated with the loss of supervisory capital is to measure the cost of replacing these forms of capital with a close substitute. While supervisory capital was a unique source of regulatory capital, I estimate the cost of replacing it with a close substitute – preferred stock – that would count as regulatory capital and give Sterling the same capital position and ability to leverage as the supervisory capital would have.

It is my opinion that Sterling is entitled to cost of replacement damages of $60.018 million. The calculation of this total is presented in Exhibit AA.

While preferred stock is similar to supervisory capital in that it counts as regulatory capital, it is different in significant ways. Sterling would incur transaction costs in issuing the preferred, and more importantly would face costs in the form of dividend payments.[101] This obligation did not exist with the supervisory capital because Sterling had already paid for it when it assumed the liabilities of the three acquired thrifts. Preferred stock also produces benefits that are not associated with supervisory capital. Goodwill is not a tangible asset, and the bank cannot invest the supervisory capital and earn a return as it could with the cash raised from preferred stock. The net of these incremental costs and benefits are the total costs of replacement.

---

[100] *Glendale Federal Bank, FSB v. U.S.*, 239 F.3d 1374 (Fed. Cir. 2001)

[101] For conceptual simplicity, I have assumed that the bank issues preferred stock. However, the analysis would not be materially different if I were to assume it had issued common stock. Despite the fact that the firm is not contractually committed to paying a stated dividend, common stock does involve a cost. Investors expect a future dividend stream that compensates them for risk as well as the time value of money. Further, the timing of those dividend payments is largely irrelevant. The cost of the dividends ultimately paid out is equivalent to a constant stream of dividends paid out at the rate of return required by the investors who are purchasing the common stock.

My analysis assumes that Sterling replaced all the contractual supervisory capital. Although there was a phase out period, during which a certain portion of supervisory capital continued to qualify as core and risk-based capital, all the supervisory capital was disallowed for the tangible capital measure. As previously mentioned, since Sterling met the capital requirement prior to FIRREA and fell short of all capital requirements immediately after FIRREA, it is my opinion that it is appropriate to replace all of the contractual supervisory capital. The contractual supervisory goodwill amortization schedule plus the amount of the capital credits is presented in Exhibit BB. For my calculation of the replacement costs, preferred stock replicates the annual balance of the supervisory capital (Columns [1], [2], and [4] of Exhibit AA, Page 2). I use the average level of preferred stock outstanding in each year (Column [5], Exhibit AA, Page 2) to compute the annual costs and benefits of maintaining preferred stock outstanding.

Issuing securities involves transaction costs – underwriting and other expenses. As seen in Column [6] of Exhibit AA, Page 2, I estimate transaction costs to be $2.366 million, or 6.9 % of the offering size of the total contractual supervisory capital outstanding at the breach, $34.134 million.[102] This cost is based upon empirical evidence presented in finance literature.[103] This is a conservative estimate since transaction costs are generally higher for firms in financial distress (and the breach left Sterling in financial distress).

The next step requires calculation of the required dividend payments to the investors who buy the preferred stock. A review of yield on Sterling's publicly traded securities, regulators' comments on Sterling's required rate of return, yields on new issues of preferred stock by thrifts, and yields on high-yield bond indices in 1989 suggest a required dividend of 13% to 35.5%. See Exhibit CC.

However, from the summer of 1989 onward, thrift institutions experienced extremely difficult times because of the taint and regulatory uncertainty associated with the industry. Simply put, FIRREA scared investors away from the thrift industry, and made capital raising unrealistic for institutions like Sterling. A front page Wall Street Journal article on the date FIRREA's capital requirements went into effect stated that "partly because of some of [FIRREA's] own provisions, it is increasingly obvious that thrifts will

[102] The calculation is as follows: $20.654 million of supervisory goodwill plus $13.480 million of the capital credits equals $34.134 million.
[103] Lee, Lochhead, Ritter and Zhao, "The Cost of Raising Capital," *The Journal of Financial Research*, Spring 1996. This article has been cited in other Winstar cases by government experts.