In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C (Judge Wolski) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# Report of Professor Christopher James

January 9, 2004

TABLE OF CONTENTS

**I. Qualifications** ........ **1**
**II. Assignment** ........ **2**
**III. Summary of Opinions** ........ **2**
**IV. Approach** ........ **3**
**V. Lost Profits from Un-Mitigated Supervisory Capital** ........ **4**
1. Capital Raises Subsequent to Breach ........ 5
2. Leverage Ratio on Supervisory Capital and Foregone Assets ........ 7
3. Dividends on Series B Preferred Stock ........ 7
**VI. Cost of Mitigation** ........ **8**
1. Cost of Mitigation – 1991 Through 2003 ........ 9
a. The Amounts of Mitigation Capital ........ 9
b. Dividend Costs on the Mitigation Capital ........ 11
c. Cash Benefit of Mitigation Capital ........ 13
2. Cost of Mitigation – 2004 Through 2025 ........ 14
**VII. Transaction Costs of Mitigation Capital** ........ **14**
**VIII. Wounded Bank Damages** ........ **15**
**IX. Summary - Total Damages** ........ **16**

App. 562

## TABLE OF EXHIBITS

**Exhibit A:** Curriculum Vitae

**Exhibit B:** Testimony in the Previous Four Years

**Exhibit C:** Additional Documents Considered

**Exhibit D:** Sterling Savings Association, Summary of Lost Profits and Actual Cost of Mitigation

**Exhibit E:** Calculation of Lost Earnings on Foregone Assets Through 1993

**Exhibit F:** Sterling Savings Association, Calculation of Mitigation Damages, 1991 - 2003

**Exhibit G:** Sterling Savings Association, Capital Raised Assumed to Replace Contractual Intangibles

**Exhibit H:** Sterling Savings Association, Calculation of Cash Benefit Yield

**Exhibit I:** Sterling Savings Association, Calculation of Future Mitigation Damages, 2004-2025

**Exhibit J:** Sterling Savings Association, Transaction Costs of Mitigation Capital

**Exhibit K:** Sterling Savings Association, Summary of Wounded Bank Damages

## I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions as Visiting Scholar at the Federal Reserve Bank of San Francisco and Senior Economic Advisor to the Comptroller of Currency, Department of Treasury.

I hold a B.A. from Michigan State University as well as an M.B.A. in Finance and a Ph.D. in Economics from the University of Michigan. My academic work has been in the fields of financial institutions, corporate financial policy, resolution of financial distress and securities pricing. I have published numerous articles on economic and financial topics including the regulation of financial institutions, failure resolution policies, and capital raising by depository institutions.

I currently serve on the editorial boards of four scholarly journals including the Journal of Financial Economics. I served as an associate editor of the Journal of Finance and as editor of the Journal of Financial Intermediation from 1988 through 1999. I also serve on the Board of Directors of SunTrust Bank North Central Florida and the academic board of the Turnaround Management Association. My resume, which includes a list of my publications, is attached as Exhibit A.

A list of my testimony over the last four years is included in Exhibit B. I am being compensated at my usual hourly rate of $550.

## II. Assignment

I have been retained in this matter by counsel for the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial"), to evaluate damages should the Court conclude, as the United States experts have suggested,[1] that Sterling, by issuing capital, mitigated the loss of supervisory capital acquired in the transactions ("supervisory capital") that are the subject of this litigation.[2] As part of my assignment I was asked to examine the capital raises that occurred subsequent to the breach and asked to evaluate the cost of those capital raises. Specifically I was asked to focus on capital that Sterling raised in calendar years 1991 and 1993.

As part of my analysis, I have reviewed various documents including reports issued by experts retained by the Department of Justice, deposition testimony, court opinions, legal filings, financial statements for Sterling, and other selected documents for Sterling. A list of the documents I have considered is contained in Exhibit C. This list supplements the document lists that I previously produced in reports I issued in September 2001 and December 2003.

## III. Summary of Opinions

Sterling suffered significant damages in the event that the Court determines that Sterling was able to mitigate the loss of its supervisory capital with capital raised subsequent to the breach ("mitigation capital").[3] The damages consist of several

[1] See Expert Report of Mukesh Bajaj, April 22, 2002, pp. 21-24.
[2] I use the terms "supervisory capital acquired in the transactions" and "contractual intangibles" interchangeably.
[3] I am not rendering an opinion that Sterling actually replaced the supervisory capital that was generated in the contracts with the government. I believe this is counterfactual, but I have been asked to assume it for purposes of these calculations. In fact I believe the testimony of Sterling's fact witnesses was that absent the breach Sterling would have raised capital in 1989 and all of the capital it did raise. Among other facts, I

components. First, the lost profits that Sterling suffered before the capital raises I was asked to assume mitigated the loss of the supervisory capital. As I will explain later, the methodology is based on Dr. Horvitz's lost profits model, but is based on a different time period. The second consists of the net costs of substituting the mitigation capital for the supervisory capital. This represents the ongoing costs of the mitigation capital net of any benefits from the mitigation capital. The third consists of the transaction costs associated with issuing mitigation capital. The last are the wounded bank damages calculated by Daniel Byrne, the Chief Financial Officer of Sterling. In total these damages are $24.601 million. Exhibit D presents a summary of the damages.

## IV. **Approach**

In the first part of my damages calculation I have estimated the lost earnings Sterling suffered from supervisory capital that was not mitigated by the capital raises. The value of the supervisory capital lay in the promise of the government to count the supervisory capital towards regulatory capital, and the leverage that this treatment of supervisory capital created. As the Federal Circuit found in both Glendale and CalFed: "...it is clear that the Government's promise that was breached had substantial value."[4] My lost profits calculation is based on the leverage model that Dr. Horvitz provided in a report in December 2003. His model utilizes the actual financial performance of Sterling to determine the profits that could have been made from the supervisory capital.

In the second part of my damages calculation, I address the net costs of mitigation. As indicated above, the capital raises counted towards regulatory capital effectively replacing a portion of the supervisory capital. The capital raises (i.e.

---

examined the intended purposes of the capital raises and Sterling's track record of consistent asset growth, both of which indicate that Sterling has had a continuing need for additional capital and would have had this need absent the breach.

[4] *Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1381-82 (Fed. Cir. 2001) and *California Federal Bank, F.S.B. v. United States*, 245 F.3d. 1350 (Fed. Cir. 2001).

mitigation capital) was different from supervisory capital in two fundamental respects. First, it entailed costs in the form of dividend payments that were paid to the providers of the capital and the costs of dividends that while unpaid have accrued. Supervisory capital did not entail a dividend cost. It is a basic principal of finance that all capital has a cost. The Federal Circuit noted that capital is not a gift and that it entails a cost. It further stated that the costs could take the form of dividends, capital appreciation, or a combination thereof.[5] Second, the mitigation capital was a tangible asset and had earning power not related to its ability to be leveraged. It could be invested to generate earnings that supervisory capital could not generate. I have termed this the cash benefit of the mitigation capital. The cost of the mitigation capital is therefore the capital costs less the cash benefits.

Lastly, I assess the transaction costs associated with the mitigation capital and incorporate other costs incurred by Sterling due to the breach (i.e. "wounded bank" damages.)

## V. Lost Profits from Un-Mitigated Supervisory Capital

Leverage is valuable to thrifts. Sterling's lost profits stem from the lost leverage opportunities that resulted from the breach. The supervisory capital that was not replaced could have been used to support additional assets and generate spread income. In addition to the shrinkage Sterling experienced, it also was unable to experience the growth that it would have experienced absent the breach. The lost profits from the loss of leverage ability can be measured with the model developed by Dr. Horvitz.

Exhibit E presents my calculation of lost profits from un-mitigated supervisory capital. Table 1 of Exhibit E is a summary of the lost profits and indicates that Sterling's

[5] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003).

lost income from foregone assets was $5.447 million. My calculation of lost profits starts at the time of the breach (as does Dr. Horvitz's) and continues through February 1993 - the time when the supervisory capital would have been fully-mitigated.

To determine the lost profits from unmitigated supervisory capital I have made several adjustments to the model created by Dr. Horvitz to account for the capital raises that I have been asked to assume mitigated the supervisory capital. The first adjustment is to the amount of capital that the but-for bank would have raised. The implication of a ruling by the Court that Sterling's capital raises subsequent to the breach were initiated to mitigate the loss of the supervisory capital is that the capital raises would not have occurred absent the breach. This is the primary adjustment I have made to the lost profits model. The second change is that in light of the changed capital structure I have reevaluated the leverage ratio of the but-for bank at the end of fiscal year 1992. The final change relates to dividend payments on preferred stock that was converted into common stock at the time of the 1991 offering.

**1. Capital Raises Subsequent to Breach**

Sterling raised capital in fiscal 1992 and fiscal 1993.[6] The capital raised took several different forms.

In November of 1991 (fiscal year 1992), Sterling completed a common stock offering. Sterling issued 2.875 million shares at a price of $8.25 that generated proceeds, net of transaction costs, of $21.0 million.[7] The offering circular indicated that the primary purpose of the offering was "...to increase Sterling's regulatory capital levels. Net proceeds will be used to support the growth of Sterling's business, including the

[6] At the time, Sterling's fiscal year ended June 30. Hence fiscal year 1992 was the twelve-month period ended June 30, 1992 and fiscal year 1993 was the twelve-month period ended June 30, 1993.
[7] Sterling Savings 1992 Annual Report, pp. 23, 27.

origination of loans. Pending such applications, the net proceeds will be invested in short-term investment grade fixed income securities."[8]

In conjunction with the common stock offering, Sterling also opted to convert existing outstanding preferred stock to common stock. The conversion of the Series B preferred stock raised no funds for investment, but it increased Sterling's tangible and core capital by $2.1 million.[9]

In fiscal 1993 Sterling Financial was formed as a holding company of Sterling Savings.[10] In February 1993, the holding company issued $17.25 million of 8.75% subordinated notes due in 2000.[11] Of the proceeds raised by the holding company, $12.9 million was contributed to Sterling. In exchange for the contribution, Sterling issued preferred stock to the holding company. The preferred stock carried a coupon rate of 10.75%.[12] The intended use of the funds contributed to Sterling was "... to support the growth of its business, including funding loans and investments and expanding its branch network."[13]

Again, assuming that the Court determines that these capital raises were initiated to replace the supervisory capital, the implication is that they would not have occurred had the supervisory capital continued to fully count toward the regulatory capital requirements (or in the case of the capital raised and contributed in fiscal 1993, the portion mitigating the supervisory capital would not have occurred.) The capital raised from these issuances is therefore capital raised by the but-for bank.[14]

---

[8] Sterling Savings Offering Circular, November 20, 1991, p. 13.
[9] Sterling Savings Offering Circular, November 20, 1991, pp. 4, 14.
[10] Sterling Financial 1993 Annual Report, p. II.
[11] Sterling Financial 1993 Annual Report, p. XXV.
[12] Sterling Savings Bank, Summary of Capital Raising, Analysis Prepared by Daniel G. Byrne.
[13] Sterling Financial Corporation Subordinated Notes Prospectus, February 4, 1993, pp. 4, 12.
[14] As I have noted previously, I have been asked to assume that these capital raises resulted in mitigation of the supervisory capital. The stated intended uses of the offerings to support the growth of Sterling belies the premise that capital raises were mitigation.

**2. Leverage Ratio on Supervisory Capital and Foregone Assets**

It is necessary to assess the degree to which the but-for capital would have been leveraged to determine the amount of foregone assets that Sterling would have had. As part of my assessment I have reviewed the leverage ratios determined by Dr. Horvitz for the but-for bank and the actual leverage ratios employed by Sterling.

For 1989 through the end of fiscal year 1991, June 30, 1991, the leverage ratios of the but-for bank are based on the leverage ratios incorporated in Sterling's 1989 business plan. This is the business plan submitted with the application to acquire Central Evergreen.

At the end of fiscal 1992, June 30, 1992, I have adjusted the leverage ratio employed by Dr. Horvitz for the but-for bank. The leverage rate I have chosen balances Sterling's demonstrated practice to grow while maintaining capital levels in excess of the regulatory requirements. In December 1991, the FDIC Improvement Act ("FDICIA") was enacted that put into place a core capital standard that indicated that to be "well-capitalized" a thrift needed to have 5% core capital. The 5% well-capitalized core capital standard became effective in December 1992.[15] Consequently, I have assumed a 5% leverage ratio (i.e. core capital ratio) for June 30, 1992. This leverage ratio results in modest asset growth for the but-for bank from $782 million at June 20, 1991 to $786 million at June 30, 1992 while allowing for the highest capital classification under the FDICIA standards.

**3. Dividends on Series B Preferred Stock**

[15] Sterling Financial 1993 Annual Report, p. XXXXIV-XXXXV.

If the 1991 common stock offering would not have occurred, I have assumed that the Series B preferred stock would not have converted either. As noted above, the conversion of the Series B occurred in conjunction with the 1991 offering. Had the Series B preferred stock remained outstanding it would have continued to pay dividends. The Series B preferred stock paid annual dividends of $2.50 per share. The dividends were cumulative and required payment before distributions to common equity holders.[16] Prior to the conversion there existed declared but unpaid dividends that were paid at the time of the conversion.[17] I have therefore incorporated in the lost profits model dividend payments on the Series B preferred stock from the time of the conversion forward.

## VI. Cost of Mitigation

As described above, the cost of mitigation is determined by the net effect of the cost of providing mitigation capital. The net effect is the cost of capital that mitigated the loss of the contractual supervisory capital less any benefits derived from the mitigation capital that could not be derived from supervisory capital. This approach to calculating mitigation costs is consistent with the direction of the Federal Circuit in the LaSalle Talman case:

> "In general, payment of a return on capital reflects the cost of capital. However, in determining damages the benefits of that capital must be credited, as mitigation due to the replacement of goodwill with cash."[18]

The costs of mitigation are measured over the planned length of the contracts, so I have measured the costs from November 1991 to 2025.

---

[16] Sterling Savings 1991 Annual Report, p. 35.
[17] Sterling Savings 1992 Annual Report, pp. 27, 39.
[18] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003).

### 1. Cost of Mitigation – 1991 Through 2003

The net cost of mitigation capital from 1991 through 2003 is presented on Exhibit F. This exhibit presents the cost of the mitigation capital, net of the cash benefit of the mitigation capital. The net cost is $9.457 million. The following portion of my report explains the calculations on the exhibit.

#### a. The Amounts of Mitigation Capital

I have been asked to assume that the November 1991 offering and the contemporaneous conversion of Series B preferred stock to common stock acted as a substitute for the contractual supervisory capital. These capital raises initially mitigated only a portion of the contractual supervisory capital. The subsequent capital raise that I was ask to assume as mitigation capital was downstreamed from the holding company to Sterling in February 1993 and mitigated the remaining balance of the contractual supervisory capital. When the balance of the mitigation capital exceeds the amount of the contractually promised supervisory capital, I measure the mitigation costs solely on the amount that mitigated the supervisory capital.

Exhibit G presents the amount of supervisory capital that needed to be replaced and the amounts that were replaced assuming that the capital raises in fiscal years 1992 and 1993 mitigated the lost supervisory capital. My calculation is based on the mitigation costs of all of Sterling's contractually promised supervisory capital.[19] This

[19] In my previous reports estimating the anticipated costs of issuing preferred stock at the time of the breach, the contractual supervisory capital schedule reflected the ex ante expected amounts of supervisory capital. The schedule I am using in this report reflects the impact of the utilization of NOLs in the quarter ended June 30, 1991 and adjustments made in the quarter ended June 30, 1992.

schedule includes the capital credits from the Lewis Federal and Tri-Cities acquisitions amortized per Judge Damich's opinion on August 4, 2003.

In calculating the amount of the November 1991 common stock offering used to replace the supervisory capital, I have made one adjustment. In January 1990 Sterling was forced to cancel a fully-subscribed stock offering when due to the breach regulators failed to approve the ability of Sterling to pay dividends on the new stock. The stock offering would have raised approximately $12.0 million.[20] Of the $23.7 million of gross proceeds (2.875 million shares at an offering price of $8.25) raised in the November 1991 common stock offering[21], I assume that $12.0 million replaced the unit offering cancelled in January 1990.[22] The remaining balance of the November 1991 offering, $11.7 million, has been considered as mitigation of the supervisory capital.

As noted previously, I only attribute dividend costs to the amount of capital raised to mitigate the supervisory capital. In 1991, the adjusted amount of the 1991 common stock offering and all of the common stock created in the conversion of the Series B preferred stock served to mitigate the loss of the supervisory capital due to the breach. In 1993, the preferred stock issued by Sterling fully-mitigated the remaining lost supervisory capital. In subsequent years, as the contractually-promised balance of supervisory capital declines, I calculate the costs solely on the amount of the mitigation capital that equates with the contractually-promised amounts.

As the final step on Exhibit F, I reduce the amount of mitigation capital on which I calculate costs. The conversion of the Series B preferred stock into common stock

---

[20] The $12.0 million amount reflects the estimated proceeds of the unit offering before consideration of any transaction costs. Source: Sterling Savings 1990 Annual Report, p. 3.

[21] Sterling Savings 1992 Annual Report, p. 23.

[22] The intended use of the proceeds of the unit offering was to "reduce higher cost borrowings under reverse repurchase agreements (which currently bear interest at an average rate of 9.0%) as they mature, and for general corporate purposes." (Sterling Savings Association, Offering Cicular for Unit Offering, November 14, 1989, p. 17) Had Sterling been able to complete the unit offering it have would resulted in decreased leverage and improved regulatory capital levels. If the Court were to conclude the that 1991 offering mitigated the supervisory capital, it would be consistent to considered a portion of the 1991 offering a substitution of the unit offering. For purposes of my damges calculations I have assessed no costs to portion of the 1991 offering that substituted for the unit offering.

resulted in the creation of regulatory capital, but it did not significantly change the equity claims on Sterling's earnings nor did the conversion result in any proceeds for Sterling. For these reasons I reduce the amounts of mitigation capital on which I calculate damages by the proportion of total mitigation capital represented by the converted Series B preferred stock.

**b. Dividend Costs on the Mitigation Capital**

The investors in Sterling, like any provider of capital, expected returns on their capital investment. The Federal Circuit in LaSalle Talman noted:

> "...capital is not "costless" to either the investor or the recipient. As explained by James Van Horne & John M. Wachowicz, Jr., Fundamentals of Financial Management 387 (10th ed. 1998), "the cost of capital is the required rate of return on various types of financing." A capital investment does not become a "gift," as the government characterizes the ABN AMRO investment, simply because the return on that investment is expected to be paid out of earnings."[23]

As noted earlier, Sterling has not paid cash dividends on any of its common stock, including the common stock issued in 1991. As recognized in the above quotation from the Federal Circuit's decision in LaSalle Talman that does not mean that the capital was costless to Sterling. Consider if instead Sterling had issued preferred stock in 1991 with a stated dividend rate (just as it did in 1993.) Dividend payments on the preferred stock would be at the stated rate and would represent the cost of mitigation. It would be

[23] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1374-1375 (Fed. Cir. 2003).

illogical to attribute no costs to the 1991 common stock issuance, whereas a preferred issuance would entail costs.

To estimate the cost of the 1991 common stock issuance I have considered the following factors: First, in February 1993 capital was downstreamed to Sterling from Sterling Financial. In return Sterling issued preferred stock with a dividend rate of 10.75% to its holding company. It is a basic principal of finance that common stock is more costly than preferred stock. Second, interest rates declined from November 1991, the time of the 1991 common stock issuance, to February 1993, the time when the 10.75% preferred was issued by Sterling to its holding company. Equity issued in November 1991 would therefore have a higher cost of capital than equivalent equity issued in February 1993. Additionally, the future operation of Sterling was more precarious in November 1991 than February 1993 due to the threat of regulatory seizure resulting from the breach. These factors indicate that the cost of capital for the 1991 common stock issuance would have exceeded the cost of the 1993 preferred issuance. To be conservative however, I impute a cost of 10.75% to the mitigation capital from the 1991 common stock offering.[24]

The preferred issued by Sterling in 1993 had an explicit 10.75% dividend rate. I therefore have used that rate as the cost of the mitigation capital raised in 1993.

I have measured the mitigation costs based on the *pre-tax* dividends costs that Sterling incurred on its mitigation capital. I have done so because it is my understanding should damages be awarded Sterling would be subject to taxes on the award. If the damages were calculated on an after-tax basis then Sterling would be subject to double taxation and it would not be put into the same position as it would have been had the

[24] This assumption is consistent with Judge Bruggink's damages opinion in Home Savings of America and H.F. Ahmanson & Co v. United States, September 3, 2003 that all capital which mitigates the supervisory capital has a cost.

breach not occurred. Another consideration is that the tax treatment of the dividend costs be similar to the cash benefits of the mitigation capital that are on a pre-tax basis.

**c. Cash Benefit of Mitigation Capital**

As noted earlier, the mitigation capital provided Sterling with a benefit that could not be provided by supervisory capital (i.e. the earnings generated from the investment of the cash from the proceeds of the mitigation capital.) For the period from 1991 and through 2003 I have calculated this benefit based on the returns of Sterling's actual assets. I have used this as the measure of the benefit for several reasons. First, the cash from the proceeds of the mitigation capital was fungible with other funds raised by the Sterling. Once the cash proceeds were incorporated into Sterling's accounts one cannot determine the specific uses of the proceeds from the mitigation capital. Second, the stated purposes of the 1991 and 1993 offerings were to support the growth of Sterling's business including making loans and investments. Consequently, I have taken the approach that the proceeds from the mitigation capital were invested in the same mix of assets as any other funds raised by Sterling.[25]

Exhibit H presents my calculation of the returns of Sterling's actual assets. The yield is calculated based on the interest income generated from assets, plus any gains (or less any losses) from the sale of assets, less any provisions for losses. This reflects the income that flows from Sterling's tangible assets.

At all times from 1991 through 2003, the returns of Sterling's actual assets are multiplied by the amount of mitigation capital to determine the benefit of the mitigation capital. Asset returns calculated from Sterling's financial results are on a pre-tax basis and hence are comparable to the dividends costs discussed earlier.

[25] An alternative would be to estimate the benefit of the cash based on risk-free Treasury rates. Had I done so, damages would be higher.

### 2. Cost of Mitigation – 2004 Through 2025

The net cost for the future cost of mitigation is $1.814 million (see Exhibit I.) I have followed the same methodology as described above with a few modifications to account for the costs that will be incurred by Sterling in the future. The modifications are:

- I have estimated the benefit of the mitigation based on the yield of Treasury securities. It is not known what yields Sterling will earn in the future, so instead I have used a safe rate. Using treasury rates to estimate the cash benefits of the mitigation capital has the important feature of mimicking the risk characteristics of supervisory capital because both supervisory capital and Treasury securities are government promises. I assume that the mitigation capital will earn a risk-free return of 5.07% based on Treasury rates at the end of 2003. To be conservative in my damages calculation, I have used the highest rate in the yield curve.
- Because the damages are in the future they need to be discounted into current dollars. The future net mitigation costs are discounted at the risk-free Treasury rate used to determine the benefits of mitigation capital.

## VII. Transaction Costs of Mitigation Capital

The transactions costs associated with issuing the assumed mitigation capital are properly considered as damages to Sterling. The transaction costs have two components. In total the costs are $3.327 (see Exhibit J). These costs would not have been incurred by

Sterling had the assumed mitigation capital not been raised. Both components are related to the 1991 common stock offering.[26]

The first component is the underwriting fee and other expenses related to issuing the common stock. These fees and expenses of the 1991 offering can be determined based on the difference between the amount of the common stock issued and the net proceeds available to Sterling. This amount is $2.767 million (see Exhibit J).

The second component, not included in the reported underwriting fees and other expenses, is the value of warrants provided to the underwriters as part of their compensation for their services. The value of the warrants is properly considered a cost of issuing the 1991 common stock and consequently is another component of the transaction costs of the mitigation capital. I have valued the warrants using a standard valuation technique. The value of the warrants was $0.560 million. The calculation is presented on page 2 of Exhibit J.

**VIII. Wounded Bank Damages**

Properly included in the damages I am presenting are "wounded bank" costs. These are costs that Sterling incurred, but would otherwise not have incurred had the government not breached the contracts. These figures have been provided by Daniel G. Bryne, the CFO of Sterling. In total the wounded bank damages are $4.556 million.

---

[26] Currently I am unaware of any transaction costs of converting the Series B preferred to common stock. Any such costs would appropriately be included in my calculation.

Also, as noted earlier, the capital downstreamed to Sterling in 1993 was raised via an offering by Sterling Financial of subordinated notes. The transaction costs of the offering were borne by Sterling Financial. My analysis addresses the costs to Sterling of the mitigation capital, so consequently I have not included any costs associated with the subordinated notes offering.

## IX. Summary - Total Damages

Total damages are the sum of lost profits on un-mitigated supervisory capital, the net cost of mitigation capital, transaction cost associated with the issuance costs of mitigation capital, and wounded bank damages. The total damages are $24.601 million (see Exhibit D).

I hold the opinions expressed herein to a reasonable degree of certainty, and declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. I reserve the right to modify my report and opinions in response to reports of the government's experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

Christopher M. James

Executed 11/9/04

# *Exhibit E*

## *Sterling Savings Association*

## Calculation of Lost Earnings on Foregone Assets

### *Table 1: Summary of Lost Earnings Calculation*

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | Incremental Bank | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/1989 | $730,933 | $730,933 | $0 | | |
| 12/31/1989 | 708,213 | 747,390 | 39,177 | 0.33% | 0 |
| 6/30/1990 | 688,990 | 748,524 | 59,534 | 0.25% | 97 |
| 6/30/1991 | 608,999 | 781,622 | 172,623 | 0.94% | 561 |
| 6/30/1992 | 640,887 | 785,718 | 144,831 | 1.78% | 3,066 |
| 6/30/1993 | | | | 1.78% | 1,723 |
| | | | | | **$5,447** |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90, which are for the six months ended as of each date.

A From table 2a, column A.

B From table 5, column C.

D From Table 3a, column G. For period ending 6/30/90, ROAA reflects the return for the six month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets. Figure for 6/30/93 is calculated as foregone assets at 6/30/92 times the pro-rated return for the eight month period ended 2/28/93.

# *Exhibit G*

## *Sterling Savings Association*

## Capital Raised Assumed to Mitigate Contractual Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

| Date | Amortizing Capital Credit | SGW & Intangibles | Contractual Intangibles | Assumed Mitigation Capital | | | Total | Contractual Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1991 | Conversion of Preferred 1991 | 1993 | | | | |
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h]=Min([c],[g]) | [i] | [j] |
| 12/31/1989 | 11,929 | 20,654 | 32,583 | | | | - | - | | |
| 12/31/1990 | 11,104 | 18,296 | 29,399 | | | | - | - | | |
| 11/21/1991 | 10,368 | 14,000 | 24,368 | 11,719 | 2,100 | | 13,819 | 13,819 | | |
| 12/31/1991 | 10,278 | 13,471 | 23,749 | 11,719 | 2,100 | | 13,819 | 13,819 | 1,514 | 1,284 |
| 12/31/1992 | 9,452 | 10,038 | 19,490 | 11,719 | 2,100 | | 13,819 | 13,819 | 13,819 | 11,719 |
| 2/28/1993 | 9,319 | 9,738 | 19,056 | 11,719 | 2,100 | 12,900 | 26,719 | 19,056 | | |
| 12/31/1993 | 8,626 | 8,179 | 16,806 | 11,719 | 2,100 | 12,900 | 26,719 | 16,806 | 17,246 | 15,890 |
| 12/31/1994 | 7,801 | 6,396 | 14,196 | 11,719 | 2,100 | 12,900 | 26,719 | 14,196 | 15,501 | 14,283 |
| 12/31/1995 | 6,975 | 4,707 | 11,682 | 11,719 | 2,100 | 12,900 | 26,719 | 11,682 | 12,939 | 11,922 |
| 12/31/1996 | 6,149 | 3,124 | 9,273 | 11,719 | 2,100 | 12,900 | 26,719 | 9,273 | 10,477 | 9,654 |
| 12/31/1997 | 5,323 | 2,468 | 7,792 | 11,719 | 2,100 | 12,900 | 26,719 | 7,792 | 8,532 | 7,862 |
| 12/31/1998 | 4,497 | 1,944 | 6,442 | 11,719 | 2,100 | 12,900 | 26,719 | 6,442 | 7,117 | 6,557 |
| 12/31/1999 | 3,672 | 1,567 | 5,238 | 11,719 | 2,100 | 12,900 | 26,719 | 5,238 | 5,840 | 5,381 |
| 12/31/2000 | 2,846 | 1,329 | 4,175 | 11,719 | 2,100 | 12,900 | 26,719 | 4,175 | 4,707 | 4,337 |
| 12/31/2001 | 2,020 | 1,207 | 3,227 | 11,719 | 2,100 | 12,900 | 26,719 | 3,227 | 3,701 | 3,410 |
| 12/31/2002 | 1,194 | 1,085 | 2,279 | 11,719 | 2,100 | 12,900 | 26,719 | 2,279 | 2,753 | 2,537 |
| 12/31/2003 | 955 | 1,019 | 1,974 | 11,719 | 2,100 | 12,900 | 26,719 | 1,974 | 2,127 | 1,960 |
| 12/31/2004 | 911 | 972 | 1,884 | 11,719 | 2,100 | 12,900 | 26,719 | 1,884 | 1,929 | 1,778 |
| 12/31/2005 | 868 | 926 | 1,794 | 11,719 | 2,100 | 12,900 | 26,719 | 1,794 | 1,839 | 1,694 |
| 12/31/2006 | 824 | 879 | 1,703 | 11,719 | 2,100 | 12,900 | 26,719 | 1,703 | 1,748 | 1,611 |
| 12/31/2007 | 780 | 832 | 1,613 | 11,719 | 2,100 | 12,900 | 26,719 | 1,613 | 1,658 | 1,528 |
| 12/31/2008 | 736 | 786 | 1,522 | 11,719 | 2,100 | 12,900 | 26,719 | 1,522 | 1,567 | 1,444 |
| 12/31/2009 | 693 | 739 | 1,432 | 11,719 | 2,100 | 12,900 | 26,719 | 1,432 | 1,477 | 1,361 |
| 12/31/2010 | 649 | 692 | 1,341 | 11,719 | 2,100 | 12,900 | 26,719 | 1,341 | 1,387 | 1,278 |
| 12/31/2011 | 605 | 646 | 1,251 | 11,719 | 2,100 | 12,900 | 26,719 | 1,251 | 1,296 | 1,194 |
| 12/31/2012 | 561 | 599 | 1,161 | 11,719 | 2,100 | 12,900 | 26,719 | 1,161 | 1,206 | 1,111 |
| 12/31/2013 | 518 | 552 | 1,070 | 11,719 | 2,100 | 12,900 | 26,719 | 1,070 | 1,115 | 1,028 |
| 12/31/2014 | 474 | 506 | 980 | 11,719 | 2,100 | 12,900 | 26,719 | 980 | 1,025 | 944 |
| 12/31/2015 | 430 | 459 | 889 | 11,719 | 2,100 | 12,900 | 26,719 | 889 | 934 | 861 |
| 12/31/2016 | 386 | 412 | 799 | 11,719 | 2,100 | 12,900 | 26,719 | 799 | 844 | 778 |
| 12/31/2017 | 343 | 366 | 708 | 11,719 | 2,100 | 12,900 | 26,719 | 708 | 754 | 694 |
| 12/31/2018 | 299 | 319 | 618 | 11,719 | 2,100 | 12,900 | 26,719 | 618 | 663 | 611 |
| 12/31/2019 | 255 | 272 | 528 | 11,719 | 2,100 | 12,900 | 26,719 | 528 | 573 | 528 |
| 12/31/2020 | 211 | 226 | 437 | 11,719 | 2,100 | 12,900 | 26,719 | 437 | 482 | 444 |
| 12/31/2021 | 168 | 179 | 347 | 11,719 | 2,100 | 12,900 | 26,719 | 347 | 392 | 361 |
| 12/31/2022 | 124 | 132 | 256 | 11,719 | 2,100 | 12,900 | 26,719 | 256 | 301 | 278 |

January 9, 2004

# *Exhibit G*

## *Sterling Savings Association*

## Capital Raised Assumed to Mitigate Contractual Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

| Date | Amortizing Capital Credit | SGW & Intangibles | Contractual Intangibles | Assumed Mitigation Capital 1991 | Assumed Mitigation Capital Conversion of Preferred 1991 | Assumed Mitigation Capital 1993 | Total | Contractual Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h]=Min([c],[g]) | [i] | [j] |
| 12/31/2023 | 80 | 86 | 166 | 11,719 | 2,100 | 12,900 | 26,719 | 166 | 211 | 194 |
| 12/31/2024 | 36 | 39 | 75 | 11,719 | 2,100 | 12,900 | 26,719 | 75 | 121 | 111 |
| 12/31/2025 | - | - | - | 11,719 | 2,100 | 12,900 | 26,719 | - | 38 | 35 |

Notes:

[a] Straight line amortization for Tri-Cities and Lewis Federal. Source: *But-For RAP Supervisory Goodwill (QUARTERLY recreation of "SUPERV GW") [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[b] Straight line amortization taking into account NOL adjustments for Tri-Cities, Lewis Federal and Central Evergreen. Source: *But-For RAP Supervisory Goodwill (QUARTERLY recreation of "SUPERV GW") [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[d] Based on data from 6/30/1992 Annual Reports, pp 18, 28. Figure for capital raised in 1991 is the gross proceeds for the issuance of 2.875M shares of common stock at $8.25 per share excluding the estimated gross proceeds from withdrawn 1989 Sterling unit offering of $12.0m (see Sterling Savings Association 1990 Annual Report, p.3).

[e] Based on 11/91 Offering Circular, p.14. This $2.1m in additional regulatory capital is from conversion of series B preferred to common stock. The $2.1m is taken to mitigate contractual intangibles at no cost.

[f] On 2/28/93, Sterling Financial Corporation downstreamed $12.9 million to Sterling Savings Association.

[i] For years 1991 and 1993, average amount of raised capital is calculated by weighting the newly raised capital using the timing of capital availability. For years 1992, 1994 through 2025, the average is a simple average of the column [h] for the years [t] and [t-1].

[j] = [i] * (1-([e] / [g])).

# WITHERSPOON, KELLEY, DAVENPORT & TOOLE

A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS

1100 U.S. BANK BUILDING
422 WEST RIVERSIDE
SPOKANE, WASHINGTON 99201-0300
Telephone: (509) 624-5265
Telecopier: (509) 458-2728

COEUR D'ALENE OFFICE
THE SPOKESMAN REVIEW BUILDING
608 NORTHWEST BOULEVARD, SUITE 401
COEUR D'ALENE, IDAHO 83814-2146
(208) 667-4000



ROBERT L. MAGNUSON
NED M. BARNES
WILLIAM D. SYMMES**
ROBERT H. LAMP
K. THOMAS CONNOLLY
THOMAS D. COCHRAN
DUANE M. SWINTON
JOSEPH H. WESSMAN
JEFFREY L. SUPINGER*
DONALD J. LUKES+‡
LESLIE R. WEATHERHEAD*
MICHAEL D. CURRIN
BRIAN T. REKOFKE*
EDWARD J. ANSON++
R. MAX ETTER, JR.
STANLEY R. SCHULTZ
MICHAEL F. NIENSTEDT*
JOHN M. RILEY III
DENNIS M. DAVIS++
F J. DULLANTY, JR.
DANIEL E. FINNEY
MARY R. GIANNINI*‡
TIMOTHY M. LAWLOR
CLAUDE F. BAILEY
WILLIAM M. SYMMES
ROBERT S. MAGNUSON
MARK A. ELLINGSEN*-
DAVID M. KNUTSON
JODY M. McCORMICK
SHELLEY N. SWANSON
JOEL P. HAZEL*
CHRISTOPHER G. VARALLO*
STANLEY M. SCHWARTZ
KIMBERLY A. KAMEL
VICTORIA MEIER
MARY E. DePAOLO
RYAN M. BEAUDOIN

OF COUNSEL

WM. A. DAVENPORT
JOHN E. HEATH, JR.
ALLAN H. TOOLE


September 7, 2001

**Via Federal Express**

Elizabeth Hosford, Esq.
Trial Attorney
United States Department of Justice
1100 L Street NW, Suite 12110
Washington, DC 20530

Re: Sterling v. USA

Dear Ms. Hosford:

Please find the corrected copy of the Paul Horvitz expert witness report. Please note that the corrections are clearly indicated in the text of the report. I also enclose the electronic data you have requested.

As we discussed on the phone today, the James report will be sent to you via Federal Express on Monday.

Please contact me if you have any questions or I can be of further assistance.

Thank you very much.

Very truly yours,

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE

By: William M. Symmes

Attachments

Horvitz
EXHIBIT NO. 1
M. BULFINCH

# STERLING SAVINGS BANK

## Damages Calculation - Corrected

## CJ-4 Loss Due to Improper Enforcement of Loans-to-One Borrower Regulation

| #8 CJ-4 ASSOCIATES | | DATE | INV # | CHECK # | AMOUNT |
|---|---|---|---|---|---|
| LEGAL COSTS: | | | | | |
| WKDT - CJ-4 ASSOCIATES | | 11/14/90 | 81315-285 | | 896.25 |
| WKDT - CJ-4 ASSOCIATES | | 10/23/90 | 81315-285 | | 3,557.33 |
| WKDT - CJ-4 ASSOCIATES | | 9/17/90 | 81315-285 | | 947.60 |
| WKDT - CJ-4 ASSOCIATES | | 6/12/90 | 81315-285 | | 712.45 |
| WKDT - CJ-4 ASSOCIATES | | 8/13/90 | 81315-285 | | 1,039.30 |
| WKDT - CJ-4 ASSOCIATES | | 5/11/90 | 81315-285 | | 717.90 |
| WKDT - CJ-4 ASSOCIATES | | 4/10/90 | 81315-285 | | 2,468.65 |
| WKDT - CJ-4 ASSOCIATES | | 2/5/90 | 81315-285 | | 1,652.71 |
| | | | | | 11,992.19 |
| CJ-4 RELATED COSTS: | | | | | |
| ESTABLISH LOSS AT FORECLOSURE | | | 2/26/91 | | 801,450.00 |
| LOSS ON SALE OF NORTH HALF OF PROJECT | | | 11/30/91 | | 9,417.43 |
| ADDITIONAL RESERVE ESTABLISHED | | | | | 128,133.00 |
| RECOVERY UPON SALE OF SOUTH HALF OF PROJECT | | | 9/30/92 | | (91,711.00) |
| | | | | | 847,289.43 |
| INTEREST ACCRUED AT 2/26/91 WRITTEN OFF | | | | | 457,394.78 |
| | months | | principal | int. rate | |
| INTEREST 2/26/91 - 11/30/91(1) | | 9 | 2384544 (2) | 0.095 | 169,898.76 |
| INTEREST 12/01/91 - 9/30/92(1) | | 10 | 1393629 (3) | 0.095 | 110,328.96 |
| | | | | 0.095 | 0.00 |
| TOTAL INTEREST | | 19 | | | 280,227.72 |
| LATE CHARGES | | | | | 18,240.00 |
| TOTAL COST | | | | | 1,615,144.12 |

(1)THE LOAN RATE WAS BARR+1.5%, FLOOR OF 9.5%
(2)REPRESENTS THE LOAN BALANCE OF 2,400,000, LESS UNDISBURSED LIP OF 15,456.
(3)REPRESENTS THE PRIOR MONTH'S BALANCE LESS THE SALE PROCEEDS FROM THE NORTH 1/2 OF PROJECT.

Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>Senior Judge Smith |

## EXPERT REPORT OF PAUL HORVITZ - CORRECTED

I. Identification, Qualifications, and Background for Opinions

My Name is Paul Horvitz and my business address is 150 Sugarberry Circle, Houston, Texas 77024. I am Professor Emeritus of Finance at the University of Houston.

The information required by paragraph V.A.1. of the *Winstar*-related case Discovery Plan concerning my qualifications, publications, compensation and prior testimony has previously been provided to the government. Another copy of my resume is attached as Exhibit 1.

I have been retained by counsel for Sterling Savings Association and Sterling Financial Corporation to testify as an expert in this case on matters relating to the expectation damages due to Sterling as a result of the government's breach of its three

under which Sterling was authorized (and, indeed, required) to operate, reflects that high-leverage policy.[35]

Of course, Sterling would have complied with the minimum capital requirements that prevailed after FIRREA, and would probably have maintained some cushion above the minimum requirements (as most thrifts have done). But it is conservative to assume that Sterling, in the absence of the breach, would have maintained capital ratios that exceeded the actual Sterling. After all, Sterling in the 1990s had just come through a near-death experience—an experience due to a lack of regulatory capital. It is likely that Sterling management preferred to keep an extra cushion of capital because of that experience, and it is likely that the market enforced a similar discipline. Absent the breach, a Sterling that had always been in capital compliance even after FIRREA would not have operated with the same amount of excess capital.

The foregone assets in the model can be simply derived as the arithmetic product of the non-breach regulatory capital and the estimated leverage ratio. I imposed an additional restriction on the calculation of foregone assets, by limiting the year-to-year internal growth rate of the non-breach thrift to the internal growth rate of the actual thrift. Growth through acquisition by the actual thrift is added to the internal growth. The result is that the growth rate of the non-breach thrift is never larger than that of the actual thrift. This calculation is shown in Exhibit 6 – Tables 3e and 5.

The lost profits are based on the simple assumption that the non-breach Sterling earned profits on the foregone assets at the same rate that the actual Sterling did on its actual assets. This is a reasonable approximation, because the foregone assets are only a fraction of the actual assets. It is clear that they would have been invested subject to the same strategy and policies as the actual assets. In some other Goodwill cases, government witnesses have questioned whether a sufficient volume of assets was available in the market to meet the non-breach demands of the plaintiffs. That may be a legitimate question for thrifts with foregone assets of many billions of dollars. It is not an issue for an institution the size of Sterling. There are some other factors that must be considered, however.

---

[35] Source: Sterling Savings Association, Fiscal 1989 Business Plan update to include the acquisition of Central Evergreen, August 15, 1988 [WON944 2309].

The earnings that Sterling derived from its assets were affected by the fact that these assets were financed, to some extent, with equity capital on which no explicit interest payments were required. The foregone earning assets, on the other hand had to be financed dollar-for-dollar with interest costing liabilities. This factor would tend to make the profitability of the foregone assets less than that of the actual assets. On the other hand, there are several factors that work in the opposite direction.

It is widely believed that there are significant economies of scale in the operation of thrift institutions. That is, a larger institution will spread its fixed overhead costs over a larger volume of assets. There are economies in the acquisition of processing equipment and services. There are many fixed costs in the operation of a branch system, such that a larger volume of deposits can often be handled with very little increase in operating costs. Further, there are economies in the management of cash. An institution that grows by 50% does not generally need to hold 50% additional cash (a non-earning asset).

More important, absent the breach, Sterling would have had the opportunity to acquire assets and/or deposits from the RTC. Because of its capital deficiency in 1990 and 1991, Sterling was not able to participate in this market at the time in which the opportunities were the greatest. It has turned out to be the case that thrift institutions that purchased assets, deposits, or whole institutions from the RTC in its early years obtained great bargains. A thrift of which I have been a director made a number of such acquisitions, and these assets turned out to be very profitable. The opportunities for a thrift in the Northwest would have been substantial, particularly since Sterling would have been interested in acquisitions in smaller communities that were not desired by the giant banks and thrifts that comprised the bulk of the RTC's customers.[36]

In view of these considerations, it is my opinion that using the earnings rate of the actual Sterling as the basis for calculation of earnings on the foregone assets is conservative, and tends to understate the amount of Sterling's damages. It should be noted that I have followed this approach consistently, including the loss that Sterling suffered in 1996. The actual Sterling incurred losses in connection with a restructuring of its balance sheet and a shift in strategy toward commercial banking.[37] Sterling had about

[36] See Exhibit 7.
[37] Source: 1996 Annual Report, p.3.

$1.5 billion of assets in 1996. It is not likely that if Sterling had an additional $300 million of assets, that there would have been losses on these incremental assets. Nevertheless, I have modeled the damages on the assumption that the incremental bank suffered losses in 1996 similar to the actual Sterling experience.

Based on these parameters, I have calculated that Sterling's pre-tax profits from 1990 to 2000 would have been $75.777 million higher if there had not been a breach.[38] It is appropriate to use pre-tax figures here, since it is my understanding that any damage award paid to Sterling by the government will be subject to taxes. The calculations that lie behind this conclusion are shown in Exhibit 6.

B. Wounded Bank Damages

In addition to these lost profits, the actual bank suffered a reduction in its profits because of additional costs it incurred as a result of its weakened capital position. These "wounded bank" damages amount to at least $5.158 million. Mr. Byrne will testify in detail about these additional costs, but I have reviewed his calculations and discussed them with him. It is my opinion that the types of costs he describes are attributable to the breach, and would not have been incurred absent the breach. To make Sterling whole requires that it be compensated for these costs.

C. Future Damages

As of the beginning of 2001, absent the breach Sterling would still have $1.329 million of unamortized goodwill and the $13.5 million capital credit.[39] To make Sterling whole, the institution must be compensated for the value of that regulatory capital going forward. This regulatory capital would have great value, since it can be leveraged and will generate profits in the future as in the past. I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credit. His determination of the value is $21.264 million.

---

[38] See Exhibit 6 – Table 1.

[39] Data as of December 31, 2000. Source: Data from Sterling Savings Association

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C<br>Judge Wolski |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ**
**DECEMBER 10, 2003**

## I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in December 2000. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings Judge Damich. In an opinion dated August 4, 2003, Judge Damich ruled that the capital credits created in the Lewis Federal and Tri-Cities acquisitions were required to be amortized on a basis consistent with the terms of the forbearance clause in the contracts. I have therefore assumed that the capital credit amortizes over 40 years in the case of Lewis Federal and 15 years in the case of Tri-

issuance is the appropriate input into my calculation, not the gross amount (i.e. the amount excluding the transaction costs.)[4] This change also had the effect of reducing damages. Also, as warranted, I have fixed several typographical errors in the exhibits.

### B. *Future Damages*

As in my previous report, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credit. His determination of the value is $1.258 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $86.185 million. Exhibit 8 presents a summary of the amounts. As noted above, the lost earnings from 1990 through 2003 are $79.769 million, the wounded bank damages are $5.158 million, and the future damages are $1.258 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 10, 2003
3. Sterling Savings Association, Key Financial Data, 1983 – 1989
4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2003
5. Sterling Savings Association, Asset Composition, 1990 – 2003
6. Calculation of Lost Earnings on Foregone Assets Through 2003
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

[4] See Exhibit 6 – Table 3a, column b.

# *Exhibit 6*

## *Sterling Savings Association*

### Calculation of Lost Earnings on Foregone Assets

### *Table 1: Summary of Lost Earnings Calculation*

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | *Incremental Bank* | | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/1988 | $730,933 | $730,933 | $0 | | |
| 12/31/1989 | 708,213 | 748,162 | 39,949 | 0.34% | 0 |
| 6/30/1990 | 688,990 | 749,740 | 60,750 | 0.25% | 100 |
| 6/30/1991 | 608,999 | 786,365 | 177,366 | 0.97% | 592 |
| 6/30/1992 | 640,887 | 854,901 | 214,014 | 1.79% | 3,172 |
| 6/30/1993 | 1,032,538 | 1,377,337 | 344,799 | 1.81% | 3,868 |
| 6/30/1994 | 1,367,978 | 1,820,852 | 452,874 | 1.39% | 4,795 |
| 6/30/1995 | 1,542,367 | 2,051,847 | 509,480 | 1.30% | 5,865 |
| 6/30/1996 | 1,481,893 | 1,971,397 | 489,504 | 1.06% | 5,395 |
| 12/31/1996 | 1,534,787 | 2,041,764 | 506,977 | -0.03% | (123) |
| 12/31/1997 | 1,870,776 | 2,488,738 | 617,962 | 1.36% | 6,902 |
| 12/31/1998 | 2,309,845 | 2,813,114 | 503,269 | 1.03% | 6,353 |
| 12/31/1999 | 2,535,753 | 3,088,243 | 552,490 | 1.48% | 7,463 |
| 12/31/2000 | 2,651,771 | 3,229,539 | 577,768 | 1.46% | 8,087 |
| 12/31/2001 | 3,038,538 | 3,690,942 | 652,404 | 1.43% | 8,266 |
| 12/31/2002 | 3,503,878 | 4,034,976 | 531,098 | 1.49% | 9,731 |
| 9/30/2003 | 4,074,342 | 4,659,319 | 584,977 | 1.28% | 6,806 |
| 12/31/2003 | | | | | 2,499 |
| | | | | | $79,759 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From table 2a, column A.

B ~~From table 5, column C.~~

D From Table 3a, column G. For periods ending 6/30/90, 12/31/96, and 9/30/03 ROAA reflects the return for the six or nine month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets. Figure for 12/31/03 is calculated as foregone assets at 9/30/03 times the pro-rated return for the nine month period ended 9/30/03.

Updated December 10, 2003

Exhibit 6
Table 1

# *Exhibit 8*

## *Sterling Savings Association*

## Summary of Expectation Damages

($ in Thousands)

| | | | |
|---|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | | **$77,405** |
| [2] | **+ Wounded Bank Damages** | | **$4,556** |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 | |
| | Loss on CJ-4 Loan | $1,241 | |
| | Excess Supervision Costs | $172 | |
| | Cost of 1989 Units Offering | $1,004 | |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $304 | |
| [3] | **+ Future Damages** | | **$1,258** |
| | **Total Expectation Damages** | | **$83,219** |

Notes:

[2] Source: Data from Sterling Savings Association.

[3] Present value of cash flows representing the cost of replacing supervisory goodwill and capital credits in 12/31/2000 dollars as calculated by Professor James.

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington



WHEREAS, The Bank Board has considered a proposed acquisition agreement between the Receiver and the Acquiring Association ("Acquisition Agreement"), pursuant to which agreement the Acquiring Association would purchase substantially all of the assets of the Association, or the rents, issues, profits, and proceeds therefrom, and assume substantially all of the liabilities of the Association from the Receiver, but would not assume any obligations to stockholders or holders of subordinated debt of the Association ("Acquisition") (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Bank Board has considered a proposed receiver's agreement ("Receiver's Agreement") between the Receiver and the FSLIC in its corporate capacity ("Corporation"), pursuant to which agreement the Corporation would purchase from the Receiver certain assets of the Association not purchased by the Acquiring Association, or the rents, issues, profits and proceeds therefrom, and assume certain liabilities and expenses of the Receiver (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Acquisition will be conditioned upon the execution of, and the Bank Board has considered, a proposed assistance agreement ("Assistance Agreement"), (a copy of which agreement is in the Minute Exhibit File), between the Acquiring Association and the Corporation, pursuant to which the Corporation will provide certain financial assistance and indemnifications to the Acquiring Association to facilitate the Acquisition; and

WHEREAS, the Supervisor, Division of Savings and Loans, State of Washington, has indicated orally her intent to grant at the time of closing the approvals necessary under state law to implement the Acquisition; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington, dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988,

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-350 P

Page 4

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the transfer of substantially all of the Association's assets and liabilities to the Acquiring Association in accordance with §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982), and pursuant to the Acquisition Agreement should be effected without delay, is in the public interest and is in the best interests of the Association, its savers and creditors, and the Corporation; and

Approval of Purchase and Assumption Transaction and Increase of Insurable Accounts

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby approves the transfer of substantially all of the Association's assets and the assumption of substantially all of the Association's liabilities to and by the Acquiring Association pursuant to the Acquisition Agreement, and further approves the resulting increase in the Acquiring Association's accounts of an insurable type, pursuant to § 563.22 of the Insurance Regulations, 12 C.F.R. § 563.22 (1987), provided that:

(1) The board of directors of the Acquiring Association shall authorize the execution of, and the Acquiring Association shall enter into, an agreement to purchase substantially all of the assets and assume substantially all of the liabilities of the Association, in the form, or substantially in the form, of the proposed Acquisition Agreement, provided that the final form of such Acquisition Agreement has been approved by the Office of the General Counsel ("OGC"), and the Acquiring Association shall execute such other documents as may be necessary to effect such transfer of assets and liabilities of the Association to the Acquiring Association promptly upon the Receiver taking possession of the Association;

(2) The Acquiring Association shall take such other actions as may be necessary to consummate the Acquisition, and the Acquisition shall be effected in accordance with applicable state law promptly upon the Receiver taking possession of the Association; and

B

FEDERAL HOME LOAN BANK BOARD

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-852P



RESOLVED FURTHER, That the Corporation is authorized to make advances and pay expenses to, or on behalf of, the Receiver in accordance with the Receiver's Agreement; and

RESOLVED FURTHER, That the Corporation is authorized to pay all necessary or appropriate expenses incurred by, or on behalf of, the Operations and Liquidations Division, Office of the FSLIC, in preparation for the appointment of the FSLIC as receiver for the Association, provided that no such expenditures to be made by the Corporation shall extend to services rendered or goods received after the date and time the Receiver takes possession of the Association; and

Grounds for Financial Assistance

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), that (1) financial assistance and indemnifications by the FSLIC are necessary to facilitate the Acquisition, and (2) the amount of such assistance and indemnifications, to be provided in accordance with the terms and conditions of the proposed Assistance Agreement, would not exceed that amount reasonably necessary to save the cost of liquidating the Association, including the payment of its insured accounts; and

RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director, or the Director, Financial Assistance Division, Office of the FSLIC, or his designee ("FAD Director"), is hereby authorized to execute, on behalf of the Corporation, an agreement in the form, or substantially in the form, of the proposed Assistance Agreement, provided that the final form of such Assistance Agreement has been approved by the OGC; and

RESOLVED FURTHER, That the Director or the FAD Director is authorized to take such further actions as may be necessary or appropriate to exercise the rights and fulfill the obligations of the FSLIC contained in the Assistance Agreement; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-352 P



## Prevention of Probable Failure

RESOLVED FURTHER, That the Bank Board hereby finds that approval of the Acquisition pursuant to this Resolution is necessary to prevent the probable failure of the Association; and

## Supervisory Acquisition

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the Acquisition is instituted for supervisory reasons; and

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, finds that the acquisition of the Association by the Acquiring Association is an acquisition under § 406(f) of the NHA, 12 U.S.C. 1729(f) (1982), as amended, and is deemed a supervisory case; and

## Forbearances

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is authorized and directed to send to the Acquiring Association a letter concerning supervisory forbearances by the Bank Board and the FSLIC with respect to certain regulatory requirements in the form, or substantially in the form, of the letter in the Minute Exhibit File ("Forbearance Letter"), provided that the final form of such letter shall be approved by the OGC; and

## Accounting

RESOLVED FURTHER, That the Acquisition shall be accounted for, and the Acquiring Association shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent authorized in the Forbearance Letter; and

RESOLVED FURTHER, That, no later than ninety (90) days following the Effective Date, the Acquiring Association shall furnish a-