The effective tax rates on income before income taxes of approximately 37.1% for the three months ended September 30, 1992 and approximately 39.6% for the three months ended September 30, 1991 are higher than the federal statutory rate of 34.0%, primarily due to the amortization of intangible assets and state income taxes.

*Extraordinary Charge.* In September 1992, Sterling repaid $9.0 million of advances from the FHLB Seattle prior to the scheduled maturity dates. In accordance with the debt agreement, Sterling paid $294,000 in prepayment penalties. A related tax benefit of $106,000 has been deducted from the charge for financial statement presentation, resulting in a net charge of $188,000. See "—Net Interest Income."

**Results of Operations for Fiscal Years 1992, 1991 and 1990**

*Overview.* Sterling reported net income of $4.7 million, or $2.01 per common share, for fiscal year 1992. This compares to net income of $1.7 million, or $2.89 per common share, and $638,000, or $0.80 per common share, for fiscal years 1991 and 1990, respectively. The decrease in earnings per common share for fiscal year 1992 resulted from an increase in the average number of shares outstanding following the public offering of common stock during the quarter ended December 31, 1991. The return on average assets was 0.77% for fiscal year 1992 compared to 0.26% for fiscal year 1991, and 0.09% for fiscal year 1990.

The increased earnings for fiscal year 1992, compared to fiscal year 1991, primarily reflect increased net interest income, net gain on the sales of mortgage-backed securities and income from mortgage banking operations. The increased earnings for fiscal year 1991, compared to fiscal year 1990, are primarily due to a reduction in the provision for loan losses, increased income from mortgage banking operations, increased fees and service charges and a reduction in operating expenses.

*Net Interest Income.* Net interest income was $16.7 million, $12.8 million and $13.3 million for fiscal years 1992, 1991 and 1990, respectively. During fiscal year 1992, a decrease in the volume of average interest-earning assets and average interest-bearing liabilities, coupled with a decrease in prevailing interest rates, resulted in a decrease in total interest income to $52.8 million from $60.7 million and in total interest expense to $36.1 million from $47.9 million. Net interest income increased to $16.7 million from $12.8 million during fiscal year 1992 due to an improvement in the net interest margin to 2.92% from 2.13% during fiscal year 1991. This increase in the net interest margin is a direct result of a public offering and the decline in prevailing interest rates, which lowered Sterling's cost of funds, as well as improved net interest spreads primarily resulting from the restructuring of assets and liabilities during the second half of fiscal year 1992 and improved net interest spreads due to the decline in prevailing interest rates.

During fiscal year 1991, a decrease in the volume of average interest-earning assets and average interest-bearing liabilities primarily resulted in a decrease in total interest income to $60.7 million from $67.5 million, in total interest expense to $47.9 million from $54.2 million and in net interest income to $12.8 million from $13.3 million during fiscal year 1991 compared to fiscal year 1990. These reductions primarily resulted from Sterling's use of principal payments and proceeds from the sale of loans to reduce borrowings. The decrease in the volume of average interest-earning assets and average interest-bearing liabilities was partially offset by an increase in the interest margin for fiscal year 1991 to 2.13% from 2.04% for fiscal year 1990. The increase in the interest margin is primarily due to an increase in spread as Sterling's yield on loans and investments remained stable and the cost of deposits and borrowings declined with the decline in prevailing interest rates.

*Provision for Loan Losses.* Management's policy is to establish valuation allowances for estimated losses on loans by charging income. The evaluation of the adequacy of specific and general valuation allowances is an ongoing process. During fiscal year 1992, a $1.65 million provision was made for loan losses compared to $150,000 and $1.1 million for fiscal years 1991 and 1990, respectively. During fiscal year 1992, Sterling re-evaluated its loan loss allowance, placing greater emphasis on the recent loan loss experience of other savings institutions. The fiscal year 1992 provision was partially influenced by concerns about the declining California real estate market and the impact of one loan currently in foreclosure. This loan represents Sterling's only loan in California.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0608

During fiscal year 1990, Sterling revised its asset classification system, estimation process and method of analyzing valuation allowances and recorded a substantial provision for loan losses following the implementation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and a joint regulatory examination by the OTS, the FDIC and the Washington Supervisor. These loan loss provisions were made primarily for the commercial property and construction loan portfolios. During fiscal year 1991, management reduced the size of the commercial property and construction loan portfolios, which primarily resulted in a lower provision. The aggregate balances of commercial property and construction loans were $94.9 million at June 30, 1992, compared to $110.1 million and $124.8 million at June 30, 1991 and 1990, respectively.

At June 30, 1992, Sterling's loan delinquency rate was 1.45%, down from 2.04% at June 30, 1991 and 2.71% at June 30, 1990. Total nonperforming loans were $7.1 million at June 30, 1992, down from $10.8 million at June 30, 1991 and $13.2 million at June 30, 1990. As a percentage of total assets, nonperforming assets declined to 2.17% at June 30, 1992 from 3.15% at June 30, 1991 and 3.39% at June 30, 1990. Sterling believes that the provision for fiscal year 1992 represents an adequate addition based upon its evaluation of the factors affecting the establishment of valuation allowances. Such factors include the changing risk profile of its loan portfolio, which reflects the reduced balances of its commercial property and construction portfolios.

Sterling's loan loss allowance was $4.7 million at June 30, 1992, compared to $4.1 million at June 30, 1991 and $6.6 million at June 30, 1990. The net increase from 1991 to 1992 reflects a larger provision than the amounts written off. The decrease from 1990 to 1991 primarily reflects charge-offs on two loans for which specific allowances had been previously established. As a percentage of nonperforming loans, the loan loss allowance represented an increase in loan loss coverage to 53.3% at June 30, 1992 compared to 24.7% at June 30, 1991 and 31.8% at June 30, 1990, respectively. Excluding loans classified as loss, as a percentage of total loans receivable, the loan loss allowance at June 30, 1992 was 0.72% compared to 0.65% and 0.79% at June 30, 1991 and June 30, 1990, respectively.

*Other Income.* Other income during fiscal years 1992, 1991 and 1990 totalled $11.7 million, $7.4 million and $6.3 million, respectively. The principal sources of other income are income from mortgage banking operations, net gain on the sales of securities, fees and service charges, and loan servicing fees. Additionally included in other income are the net gain (loss) on sale and operation of REO and FDIC indemnification for loss on sale of REO. The increase in other income during fiscal year 1992 primarily reflects increases in net gain on sales of securities, income from mortgage banking operations and fees and service charges. The increase in other income in fiscal year 1991 compared to fiscal year 1990 primarily reflects increases in income from mortgage banking operations and fees and service charges.

Income from mortgage banking operations for fiscal years 1992, 1991 and 1990 was $5.3 million, $4.4 million and $3.4 million, respectively. The increased income from mortgage banking operations during these years resulted from increased income from loan sales and sales of servicing rights. The following table summarizes loan originations and sales of loans and servicing rights for the periods indicated.

| | Fiscal year ended June 30, | | |
|---|---|---|---|
| | 1992 | 1991 | 1990 |
| | (In millions) | | |
| Origination of one-to-four family mortgage loans | $585.0 | $380.8 | $355.0 |
| Sales of conventional loans with servicing retained | 376.8 | 255.4 | 209.8 |
| Sales of FHA/VA insured loans with servicing released | 88.7 | 110.7 | 121.1 |
| Principal balances of servicing portfolios sold | 172.8 | 285.0 | 312.1 |

Loan sales and sales of servicing rights resulted in significant contributions to Sterling's income during fiscal years 1992, 1991 and 1990. There can be no assurance that sales of loans and servicing rights will continue to provide such contributions to Sterling's income.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0609

Net gain on sales of securities was $3.6 million, $255,000 and $241,000 during fiscal years 1992, 1991 and 1990, respectively. The net gain on sales of securities in fiscal year 1992 reflects a restructuring of Sterling's relatively high-coupon mortgage-backed securities portfolio. See "—Net Interest Income." The net gain in fiscal year 1991 reflects restructuring of Sterling's short-term investment portfolio. The net gain in fiscal year 1990 reflects the disposition of the portfolio of adjustable rate mortgage-backed securities to improve operating efficiencies.

Fees and service charges consist primarily of service charges on deposit accounts, as well as fees for certain customer services, commissions on sales of annuity products by Harbor Financial and late charges on loans. The increases to $2.9 million for fiscal year 1992 and to $2.5 million for fiscal year 1991 from $2.0 million for fiscal year 1990 are primarily due to an increase in commissions on sales of annuity products during these years.

Loan servicing fees were $381,000 for fiscal year 1992, a decrease from $651,000 and $864,000 for fiscal years 1991 and 1990, respectively. The fiscal year 1992 decrease primarily resulted from a reduction in the servicing spread while the fiscal year 1991 decrease primarily reflects a reduction in the average size of the loan servicing portfolio. Sterling's total loan servicing portfolio was $302.8 million at June 30, 1992, compared to $123.8 million and $176.0 million at June 30, 1991 and 1990, respectively. During fiscal years 1992, 1991 and 1990, Sterling sold rights to service conventional loans for others with principal balances of $172.8 million, $285.0 million and $312.1 million, respectively. Gains on these sales are included in income from mortgage banking operations. These servicing sales were prompted primarily by Sterling Savings' desire to increase its regulatory capital.

The net loss on sale and operation of REO was $476,000 for fiscal year 1992, compared to net losses of $532,000 and $176,000 for fiscal years 1991 and 1990, respectively. The losses for fiscal years 1992 and 1991 are due to provisions for losses on REO of $391,000 and $419,000, respectively, and a lower level of net gains on the sale of REO during these years. The provision for losses on REO during fiscal year 1992 primarily reflects write-downs on several properties liquidated during the year, whereas the provision in fiscal year 1991 was primarily due to an increase in a specific valuation allowance on one property and the establishment of a general valuation allowance on REO.

For fiscal year 1992, Sterling had a loss of $23,000 on FDIC indemnifications for loss on sale of REO compared to a gain of $155,000 and a loss of $97,000 for fiscal years 1991 and 1990, respectively. The FDIC indemnification of capital losses represents the differences between the FDIC portion of gains and losses on sales of REO and the estimated amount established at the date of acquisition. Gains or losses on sales of FDIC-covered assets are shared with the FDIC pursuant to a contractual formula.

*Operating Expenses.* Operating expenses were $18.2 million, $17.7 million and $18.1 million for fiscal years 1992, 1991 and 1990, respectively. The increase for fiscal year 1992 primarily reflects an increase in employee compensation and benefits and occupancy and equipment primarily due to the increase in residential lending volumes, offset in part by a reduction in intangible amortization expense. The decrease for fiscal year 1991 primarily reflects a reduction in employee compensation and benefits resulting, in part, from Sterling's corporate reorganization during that year. This corporate reorganization was intended to improve operating efficiency and increase employee productivity. The decrease for fiscal year 1991, compared to fiscal year 1990, also reflects a reduction in intangible amortization expense. For fiscal year 1990, other operating expenses include approximately $1.0 million for costs associated with a canceled public offering.

*Income Tax Provision (Benefit).* The income tax provisions (benefit) were $3.4 million, $590,000 and $(164,000) for fiscal years 1992, 1991 and 1990, respectively. The effective tax rates were 39.6%, 25.6% and (34.6)%, respectively, for these same fiscal years. The higher effective tax rate in fiscal year 1992 primarily reflects the adoption of SFAS No. 109. See Note 12 of Notes to Consolidated Financial Statements.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0610

The lower effective tax rates in fiscal years 1991 and 1990 are primarily due to the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets), the tax basis bad debt deduction and the receipt of nontaxable FDIC yield subsidy assistance pursuant to the acquisition agreements. See "Taxation."

*Extraordinary Charge.* In January 1992, Sterling repaid $25.0 million of advances from the FHLB Seattle prior to the scheduled maturity dates. In accordance with the debt agreement, Sterling paid $1.2 million in prepayment penalties. The related tax benefit of $423,000 has been deducted from the charge for financial statement presentation. See "—Net Interest Income."

**Effects of FDIC Assistance**

As part of Sterling's acquisition in 1988 of an insolvent savings institution, Tri-Cities Federal Savings and Loan Association ("Tri-Cities"), the FDIC, as successor to the Federal Savings and Loan Insurance Corporation, agreed to reimburse and indemnify Sterling against 75% of all capital losses with respect to certain assets (the "Covered Assets"). In addition, the FDIC agreed to limit Sterling's 25% share of total capital loss exposure to $900,000. At September 30, 1992, Sterling had absorbed approximately $650,000 in capital losses on the Covered Assets, and remaining Covered Assets totalled $1.0 million. In the event the Covered Assets are not fully liquidated prior to the expiration of FDIC assistance in April 1993, future operating results of Sterling may be adversely affected.

The FDIC also guaranteed Sterling a minimum yield (the "FDIC yield subsidy") on the Covered Assets equal to the average six-month Treasury bill rate plus 150 basis points. Sterling received no payments pursuant to the FDIC yield subsidy during the quarter ended September 30, 1992 or fiscal year 1992. Sterling received $159,000 and $483,000 pursuant to the FDIC yield subsidy during fiscal years 1991 and 1990, respectively, which amounts were reflected in interest income.

**Liquidity and Sources of Funds**

As a financial institution, Sterling's primary sources of funds are derived from financing and investing activities. Net income and other operating activities represent a relatively smaller source of cash flows. Financing activities consist primarily of customer deposits, advances from the FHLB Seattle and other borrowings. Deposits increased $2.8 million to $508.5 million at September 30, 1992 from $505.7 million at June 30, 1992. This net increase in deposits reflects an increase in balances of transaction accounts, public funds accounts and interest credited to deposit accounts, which is offset by a $31.2 million decrease in balances of retail CDs. This decrease reflects a shift away from retail CDs in favor of transaction accounts and alternative investments in response to a declining interest rate environment. The increase in transaction account balances primarily reflects management's emphasis on expanding account relationships and increased customer usage of existing accounts as a result of competitive yields relative to alternative investments. Advances from the FHLB Seattle increased to $98.8 million at September 30, 1992 from $86.2 million at June 30, 1992. This increase is primarily due to an $11.3 million increase in overnight advances that are used to fund periodic fluctuations in loans held for sale. Management plans to continue to rely upon FHLB Seattle advances to help fund its operations.

Cash provided from investing activities consists primarily of principal and interest payments on loans and mortgage-backed securities. The level of these payments increases and decreases depending on the size of the loan and mortgage-backed securities portfolios and the general trend and level of interest rates, which influences the level of refinancing and mortgage prepayments. During the three months ended September 30, 1992, Sterling received cash for prior quarters' sales of $14.0 million of mortgage-backed securities. During the three months ended September 30, 1992, net cash was used in investing activities, primarily to fund new loans.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0611

Cash provided or used by operating activities is determined largely by changes in the level of loans held for sale. The level of loans held for sale depends on the level of loan originations and the time until an investor funds the purchase of the loan from Sterling. A majority of conventional loans held for sale are sold within 10 days of the closing of the loan while certain Federal Housing Administration ("FHA") and Veteran's Administration ("VA") insured loans may take up to 60 days. During the three months ended September 30, 1992, high levels of loan originations primarily increased the balances of loans held for sale and loan commitments outstanding by $9.9 million and $57.8 million, respectively, at September 30, 1992. Sterling typically offsets fluctuations in the level of loans held for sale by changing the level of advances from the FHLB Seattle, reverse repurchase agreements or cash. Sterling believes that proceeds from loans sold and advances from the FHLB Seattle will be sufficient to fund loan commitments in the future.

OTS regulations require savings institutions such as Sterling Savings to maintain an average daily balance of liquid assets equal to or greater than a specific percentage (currently 5%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At September 30, 1992, Sterling's liquidity ratio was 8.51% compared to 8.37% at June 30, 1992. The regulatory liquidity ratio does not take into account certain other sources of liquidity, such as funds invested through Sterling's subsidiaries, potential borrowings against mortgage-backed securities or investment securities and other potential financing alternatives. The required minimum liquidity ratio may vary from time to time, depending on economic conditions, savings flows and loan funding needs. It is Sterling's practice to maintain its liquidity level at or near the required minimum in order to maximize its yield on alternative investments.

Sterling's credit line with the FHLB Seattle is 25% of total assets. At September 30, 1992, Sterling had the ability to borrow an additional $66.9 million from the FHLB Seattle. Sterling also borrows on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At September 30, 1992, Sterling had $3.3 million of outstanding borrowings under reverse repurchase agreements, with securities available for additional secured borrowings of approximately $43.2 million.

**Capital Resources**

During the quarter ended December 31, 1991, Sterling completed the sale of 2.875 million shares of Common Stock for $8.25 per share. In addition to raising $21.0 million in new capital, Sterling Savings converted all of its outstanding Series B Preferred Stock to Common Stock. All accumulated dividends on the Series B Preferred Stock were declared and deducted from retained earnings at December 31, 1991 and paid in January 1992.

Sterling's total shareholders' equity was $40.0 million at September 30, 1992 compared to $38.2 million and $13.5 million at June 30, 1992 and September 30, 1991, respectively. At September 30, 1992, shareholders' equity was 6.0% of total assets, compared to 6.0% and 2.3% of total assets at June 30, 1992 and September 30, 1991, respectively.

Since it commenced operations, Sterling has made a number of acquisitions to expand its deposit and mortgage delivery systems, to add earning assets and to diversify geographically its loan portfolio. As an inducement to acquire insolvent thrift institutions, Sterling Savings' regulators allowed it to include certain items in the calculation of its regulatory capital. The OTS has taken the position that the right to include such items in the calculation of regulatory capital was eliminated by FIRREA. Nonetheless, at September 30, 1992, Sterling Savings exceeded all regulatory capital requirements, including requirements currently scheduled to be phased in through December 31, 1994, without giving effect to regulatory capital obtained through Sterling's past acquisitions of insolvent thrift institutions.

The following tables set forth Sterling Savings' tangible, core and risk-based capital positions, capital requirements and excess capital amounts at September 30, 1992, under OTS regulations as currently in effect and as scheduled to be phased in through December 31, 1994:

| | Tangible Capital at September 30, 1992 | | | |
|---|---|---|---|---|
| | Current requirements | | Fully phased-in requirements | |
| | Amount | Ratio(1) | Amount | Ratio(1) |
| | (Dollars in thousands) | | | |
| Total shareholders' equity | $ 40,024 | 6.15% | $ 40,024 | 6.15% |
| Less: | | | | |
| Intangibles(2) | (10,088) | (1.55) | (10,088) | (1.55) |
| Nonqualifying capital(3) | (1,297) | (0.20) | (1,297) | (0.20) |
| Shares purchased by deferred compensation plan, nonvested portion(4) | (237) | (0.04) | (237) | (0.04) |
| Investment in nonincludable subsidiary | (374) | (0.06) | (374) | (0.06) |
| Nonqualifying purchased mortgage service rights | (16) | 0.00 | (16) | 0.00 |
| Total tangible capital | 28,012 | 4.30 | 28,012 | 4.30 |
| Tangible capital requirement | 9,768 | 1.50 | 9,768 | 1.50 |
| Tangible capital excess | $ 18,244 | 2.80% | $ 18,244 | 2.80% |

| | Core Capital at September 30, 1992 | | | |
|---|---|---|---|---|
| | Current requirements | | Fully phased-in requirements | |
| | Amount | Ratio(1) | Amount | Ratio(1) |
| | (Dollars in thousands) | | | |
| Total tangible capital | $ 28,012 | 4.30% | $ 28,012 | 4.30% |
| Add: | | | | |
| Includable supervisory goodwill(2) | 6,512 | 0.97 | 0 | 0.00 |
| Qualifying identified intangibles up to 25% of other core capital | 3,128 | 0.48 | 3,128 | 0.46 |
| Total core capital | 37,652 | 5.75 | 31,140 | 4.76 |
| Core capital requirement | 19,630 | 3.00 | 19,630 | 3.00 |
| Core capital excess | $ 18,022 | 2.75% | $ 11,510 | 1.76% |

| | Risk-Based Capital at September 30, 1992 | | | |
|---|---|---|---|---|
| | Current requirements | | Fully phased-in requirements | |
| | Amount | Ratio(1) | Amount | Ratio(1) |
| | (Dollars in thousands) | | | |
| Total core capital | $ 37,652 | 9.84% | $ 31,140(2) | 8.34% |
| Add: | | | | |
| Supplementary capital up to 100% of core capital: | | | | |
| General valuation allowances | 3,052 | 0.80 | 3,052 | 0.82 |
| Subtract: | | | | |
| Assets required to be deducted | (859) | (0.22) | (3,435) | (0.92) |
| Total risk-based capital | 39,845 | 10.42 | 30,757 | 8.24 |
| Risk-based capital requirement | 27,539 | 7.20 | 29,872 | 8.00 |
| Risk-based capital excess | $ 12,306 | 3.22% | $ 885 | 0.24% |



SG 0165731

App. 625

"Confidential Material – Subject to Protective Order"

---

(1) Ratio of capital to total adjusted assets for tangible and core capital and ratio of capital to risk-weighted assets for risk-based capital.

(2) Under existing regulations, Sterling Savings' risk-based capital requirement is 7.2% until December 31, 1992, at which time the permanent requirement of 8.0% is scheduled to be phased in. Additionally, certain items currently includable in core capital and, therefore, in risk-based capital are scheduled to be phased out over a period ending December 31, 1994.

(3) Represents deferred tax assets which are excludable pursuant to applicable regulations.

(4) The assets of Sterling's nonqualified deferred compensation plan are subject to the claims of Sterling's creditors until such assets are vested in participants in the plan and as such are not included in regulatory capital.

Approximately $12.0 million of the net proceeds of this Offering will initially be contributed to Sterling Savings to improve further Sterling Savings' capital ratios. Sterling Savings intends to use such additional capital to support the growth of Sterling's business, including funding loans and investments. Management anticipates that Sterling Savings will continue to enhance its capital resources and its regulatory capital ratios as a result of this Offering, the retention of earnings, the amortization of intangible assets and the management of the level and mix of assets, although there can be no assurance in this regard.

In December 1990, the FASB issued SFAS No. 106 "Employers' Accounting for Post-Retirement Benefits Other Than Pensions." Sterling must adopt this statement by the beginning of fiscal year 1994. Management believes that this statement will not have a material effect on Sterling's financial statements when it is adopted.

**Effects of Inflation and Changing Prices**

A savings institution has an asset and liability structure that is interest-rate sensitive. As a holder of monetary assets and liabilities, a savings institution's performance may be significantly influenced by changes in interest rates. Although changes in the prices of goods and services do not necessarily move in the same direction as interest rates, increases in inflation generally have resulted in increased interest rates, which may have an adverse effect on Sterling's business.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0614

## BUSINESS

### General

Sterling is a savings and loan holding company, the sole subsidiary of which is Sterling Savings. The significant operating subsidiaries of Sterling Savings are Action Mortgage, INTERVEST and Harbor Financial. See "Sterling." Sterling Savings commenced operations in 1983 as a State of Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. Sterling, with $662.9 million in total assets at September 30, 1992, attracts FDIC-insured deposits from the general public through 27 retail branches located primarily in smaller, rural communities in Washington and originates mortgage loans secured primarily by residential real estate in the major metropolitan areas of the Pacific Northwest. To a lesser extent, Sterling also originates consumer, business banking and commercial property loans. At September 30, 1992, Sterling had loans receivable of $469.2 million, of which $295.4 million, or approximately 61.3%, was secured by one-to-four family residential real estate. Since 1983, Sterling has made a number of acquisitions to expand its deposit and mortgage delivery systems, to add earning assets and to diversify geographically its loan portfolio.

Sterling provides personalized, quality financial services to its customers as exemplified by its "Hometown Helpful" philosophy. Sterling believes this dedication to personalized service has enabled it to maintain a stable and relatively low-cost retail deposit base in rural areas, while generating a substantial volume of residential lending activity primarily in the metropolitan areas of the Pacific Northwest. Sterling operates 14 residential loan production offices primarily in the Spokane and Seattle, Washington, Portland, Oregon and Boise, Idaho metropolitan areas through its subsidiary, Action Mortgage. Sterling's INTERVEST subsidiary maintains one commercial property lending office in Portland, Oregon. Sterling markets tax deferred annuities, mutual funds and other financial products through its subsidiary, Harbor Financial.

Sterling has benefitted from the Pacific Northwest economy, which in recent years has generally experienced relatively stronger growth than the national economy. The Washington, Oregon and Idaho economies, while primarily dependent upon aerospace and natural resources, including agriculture, timber and mining, have become more diversified over the past decade. An increase in international trade and tourism, together with growth in small manufacturing and high technology industries, has broadened the economic base of the Pacific Northwest. The residential real estate market in Sterling's trade areas also has been generally strong, although the Puget Sound market area has recently experienced moderate declines in its general economy as well as in the number and amounts of residential sales. The commercial property market in Sterling's trade areas has not been strong in recent years, although it has generally been stronger than other markets in the country. Although Sterling anticipates continued economic growth in the Pacific Northwest, there can be no assurance that this growth will continue.

To further enhance Sterling's presence in its market area, it is working to (i) increase its volume of residential, consumer, business banking and commercial property loans, (ii) increase its market share of deposits while efficiently managing its retail branch network, (iii) increase fee income, (iv) reduce its nonperforming assets, (v) manage effectively its interest rate risk and (vi) enhance its regulatory capital position. At September 30, 1992, Sterling Savings exceeded all regulatory capital requirements, including requirements currently scheduled to be phased in through December 31, 1994.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0615

**Lending Activities**

*General.* Sterling originates mortgage loans secured primarily by residential real estate. To a lesser extent, Sterling originates consumer, business banking and commercial property loans. The following table sets forth information on loan production and purchase and sale activities for the periods indicated.

| | Three months ended September 30, 1992 | | Fiscal year ended June 30, | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1992 | | 1991 | | 1990 | |
| | Amount | % | Amount | % | Amount | % | Amount | % |
| | (Dollars in thousands) | | | | | | | |
| Mortgage—permanent: | | | | | | | | |
| One-to-four family residential | $133,957 | 87.7% | $580,134 | 95.1% | $377,197 | 94.3% | $334,469 | 83.9% |
| Multifamily residential | 1,845 | 1.2 | 0 | 0.0 | 0 | 0.0 | 2,850 | 0.7 |
| Commercial property | 0 | 0 | 1,459 | 0.2 | 0 | 0.0 | 2,047 | 0.5 |
| Mortgage—construction: | | | | | | | | |
| One-to-four family residential | 3,793 | 2.5 | 4,901 | 0.8 | 3,603 | 0.9 | 20,614 | 5.2 |
| Multifamily residential | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 9,340 | 2.3 |
| Commercial property | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 3,950 | 1.0 |
| Nonmortgage: | | | | | | | | |
| Consumer | 8,037 | 5.3 | 20,460 | 3.4 | 14,346 | 3.6 | 16,030 | 4.0 |
| Business banking | 5,102 | 3.3 | 3,084 | 0.5 | 4,617 | 1.2 | 9,513 | 2.4 |
| Total loans originated | $152,734 | 100.0% | $610,038 | 100.0% | $399,763 | 100.0% | $398,813 | 100.0% |
| Loans purchased | $ 0 | | $ 6,841 | | $ 0 | | $ 0 | |
| Loans sold | $ 93,998 | | $469,744 | | $366,105 | | $331,400(1) | |

(1) Includes $11.1 million of real estate loans which were converted into mortgage-backed securities and subsequently sold.

During fiscal year 1992, the majority of all residential loans closed were immediately sold into the secondary mortgage market. Approximately 80.9% of these loans sold were with servicing rights retained by Sterling. A significant portion of these servicing rights were subsequently sold during fiscal year 1992.

*One-to-Four Family Residential Lending.* The primary lending activity of Sterling has been the granting of mortgage loans to enable borrowers to purchase one-to-four family homes on properties within Sterling's principal market area. Sterling also originates a limited amount of one-to-four family residential construction loans.

Sterling originates primarily fixed-rate mortgages. Sterling also originates ARMs, which have interest rates that adjust annually and are indexed to either the FHLB Seattle Eleventh District Cost of Funds Index or the weekly average yield on one-year U.S. Treasury securities.

During the past several years, Sterling has increased its emphasis on residential mortgage banking as a source of income. Sterling originates conventional and government-insured residential loans for sale into the secondary mortgage market. Within the secondary mortgage market for conventional loans, Sterling sells its originated residential loans primarily to the FHLMC and the Federal National Mortgage Association (the "FNMA"). During the three months ended September 30, 1992 and fiscal year 1992, Sterling sold approximately 79.8% and 80.9%, respectively, of its total residential loans sold to such agencies. Loans sold to the FHLMC and the FNMA, and FHA and VA loans sold into the secondary market, are all sold without recourse to Sterling, except that Sterling may be obligated to repurchase from the FHLMC and the FNMA

any loans which are not underwritten in accordance with FHLMC and FNMA guidelines. Sterling endeavors to underwrite residential loans in compliance with FHLMC and FNMA underwriting standards. During the three months ended September 30, 1992 and fiscal years ended June 30, 1992 and 1991, respectively, the number and amount of loans repurchased from the FHLMC and the FNMA were not significant in light of the number and amount of loans sold to the FHLMC and the FNMA during these periods.

When it sells conventional residential loans in the secondary market, Sterling usually continues to service such loans for a period of time following the loan sale. FHA/VA-insured loans are almost always immediately sold into the secondary market on a loan-by-loan, servicing-released basis, resulting in virtually no interest rate risk exposure to Sterling.

Conventional residential mortgage loans are originated for up to 95% of the appraised value or selling price of the mortgage property, whichever is less. All loans with loan-to-value ratios in excess of 80% carry a requirement that the customer purchase private mortgage insurance from approved third parties so that Sterling's risk is limited to approximately 80% of the appraised value. Sterling's residential lending programs are designed to comply with all applicable regulatory requirements. For a discussion of Sterling's management of interest rate risk on conventional loans, see "—Lending Activities—Secondary Market Activities."

Sterling makes residential construction loans on custom homes, pre-sold homes and homes that are not pre-sold. Construction financing is generally considered to involve a higher degree of risk than long-term financing on improved, occupied real estate. Sterling's risk of loss on construction loans depends largely upon the accuracy of the initial estimate of the property's value at completion of construction or development and the estimated cost (including interest) of construction. If the estimate of construction costs proves to be inaccurate, Sterling might have to advance funds beyond the amount originally committed to permit completion of the development and to protect its security position. Sterling might also be confronted, at or prior to maturity of the loan, with a project with insufficient value to ensure full repayment. Sterling's underwriting, monitoring and disbursement practices with respect to construction financing are intended to ensure that sufficient funds are available to complete construction projects. Sterling endeavors to limit its risk through its underwriting procedures, by using only approved, qualified appraisers and by dealing only with qualified builders/borrowers.

*Multifamily Residential and Commercial Property Lending.* Sterling offers multifamily residential and commercial property loans as both construction and permanent loans secured by existing real property. Construction loans on such properties typically have terms of 12 to 18 months, provide for variable interest rates and are secured by projects within the Pacific Northwest. Permanent loans on existing property typically have maturities of four to 10 years and generally provide for variable rates. Multifamily residential and commercial property loans generally involve a higher degree of risk than the financing of one-to-four family residential real estate because they typically involve large loan balances to single borrowers or groups of related borrowers. The payment experience on such loans is typically dependent on the successful operation of the real estate project, and is subject to certain risks not present in one-to-four family residential mortgage lending. These risks include excessive vacancy rates or inadequate rental income levels. Construction lending is subject to risks such as construction delays, cost overruns, insufficient values and an inability to obtain permanent financing in a timely manner. Sterling attempts to reduce its exposure to these risks by generally requiring financial statements (at least annually) from the borrowers and operating statements on the properties.

Sterling is currently concentrating on originating multifamily residential loans with balances of up to $2.5 million. Sterling anticipates originating moderate amounts of commercial property loans during fiscal year 1993 and thereafter.

*Consumer Lending.* Sterling's consumer lending program provides loans for home improvement, automobiles, personal lines of credit and certain other purposes. Generally, consumer loans are originated for terms ranging from six months to six years. Interest rates are either fixed or adjustable monthly, quarterly

or semiannually, based on a contractual formula at a margin over an established external index. Sterling also makes loans secured by savings accounts and second mortgage loans secured by real estate. Limited fixed-rate secured financing is available for terms not to exceed 15 years.

*Business Banking Lending.* Sterling offers business banking loans secured by collateral other than real property. Such collateral is typically comprised of accounts receivable, inventory and equipment. Business banking lending is generally considered to involve a higher degree of risk than the financing of real estate, primarily because security interests in the collateral are more difficult to perfect and the collateral may be difficult to obtain or liquidate following an uncured default. Business banking loans typically offer relatively high yields, short maturities and variable interest rates. The availability of such loans enables potential depositors to establish a full-service banking relationship with Sterling. Sterling attempts to reduce the risk of loss associated with business banking lending by closely monitoring the financial condition and performance of its customers.

In June 1992, Sterling established a Private Banking Group to service higher income and self-employed customers. This group originates a variety of consumer and business banking loans to meet the needs of these customers. Such loans generally meet the same underwriting requirements as similar loans of the same type but generally involve larger balances and may have nonstandard terms.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0618

*Loan Portfolio Analysis.* The following tables set forth the composition of Sterling's loan portfolio by type of loan at the dates indicated.

| | September 30, 1992 | | June 30, 1992 | | 1991 | | 1990 | | 1989 | | 1988 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % | Amount | % | Amount | % | Amount | % |
| | (Dollars in thousands) | | | | | | | | | | | |
| Mortgage—permanent: | | | | | | | | | | | | |
| One-to-four family residential | $295,425 | 61.3% | $277,078 | 60.4% | $194,734 | 50.6% | $252,502 | 54.8% | $256,084 | 49.7% | $175,949 | 50.5% |
| Multifamily residential | 33,513 | 7.0 | 37,191 | 8.1 | 33,442 | 8.7 | 24,651 | 5.3 | 28,250 | 5.5 | 17,093 | 4.9 |
| Commercial property | 78,356 | 16.3 | 81,086 | 17.7 | 89,954 | 23.4 | 74,043 | 16.1 | 87,783 | 17.1 | 66,654 | 19.2 |
| Land and other | 5,648 | 1.2 | 6,013 | 1.3 | 7,582 | 2.0 | 16,393 | 3.5 | 19,721 | 3.8 | 0 | 0.0 |
| | 412,942 | 85.8 | 401,368 | 87.5 | 325,712 | 84.7 | 367,589 | 79.7 | 391,838 | 76.1 | 259,696 | 74.6 |
| Mortgage—construction: | | | | | | | | | | | | |
| One-to-four family residential | 8,065 | 1.7 | 5,058 | 1.1 | 6,865 | 1.8 | 13,652 | 3.0 | 15,863 | 3.1 | 7,226 | 2.1 |
| Multifamily residential | 4,315 | 0.9 | 4,315 | 0.9 | 5,684 | 1.5 | 20,045 | 4.3 | 7,799 | 1.5 | 23,089 | 6.6 |
| Commercial property | 4,635 | 1.0 | 4,424 | 1.0 | 7,579 | 1.9 | 17,105 | 3.7 | 53,838 | 10.4 | 26,650 | 7.7 |
| | 17,015 | 3.6 | 13,797 | 3.0 | 20,128 | 5.2 | 50,802 | 11.0 | 77,500 | 15.0 | 56,965 | 16.4 |
| Total mortgage loans | 429,957 | 89.4 | 415,165 | 90.5 | 345,840 | 89.9 | 418,391 | 90.7 | 469,338 | 91.1 | 316,661 | 91.0 |
| Consumer | 30,587 | 6.4 | 27,308 | 6.0 | 22,482 | 5.9 | 20,717 | 4.5 | 18,639 | 3.6 | 11,041 | 3.2 |
| Business banking | 20,266 | 4.2 | 16,237 | 3.5 | 16,288 | 4.2 | 21,972 | 4.8 | 27,209 | 5.3 | 20,264 | 5.8 |
| Total loans receivable | 480,810 | 100.0% | 458,710 | 100.0% | 384,610 | 100.0% | 461,080 | 100.0% | 515,186 | 100.0% | 347,966 | 100.0% |
| Undisbursed portion of loans in process | (5,235) | | (3,699) | | (2,987) | | (9,972) | | (26,467) | | (38,306) | |
| Deferred loan fees, net of direct loan origination costs | (129) | | (288) | | (705) | | (577) | | (1,243) | | (493) | |
| Discount on loans acquired pursuant to purchase transactions | (2,306) | | (2,424) | | (1,905) | | (2,243) | | (2,586) | | (989) | |
| Allowance for loan losses | (3,891) | | (4,745) | | (4,087) | | (6,649) | | (6,450) | | (3,770) | |
| Loans receivable | $469,249 | | $447,554 | | $374,926 | | $441,639 | | $478,440 | | $304,408 | |



SG 0165737

App. 631

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0619

*Contractual Principal Payments.* The following table sets forth the scheduled contractual principal repayments for Sterling's loan portfolio at June 30, 1992. Demand loans, loans having no stated repayment schedule and no stated maturity, and overdrafts are reported as due in one year or less. Loan balances do not include undisbursed loan proceeds, unearned discounts, unearned income or allowances for loan losses.

| | Balance outstanding at June 30, 1992 | Principal payments contractually due in fiscal years 1993 | 1994-1997 | Thereafter |
|---|---|---|---|---|
| | | (In thousands) | | |
| Mortgage—permanent: | | | | |
| Fixed | $185,119 | $ 189 | $42,598 | $142,332 |
| Variable | 216,249 | 6,336 | 21,247 | 188,666 |
| Mortgage—construction | 13,797 | 13,797 | 0 | 0 |
| Consumer | 27,308 | 15,494 | 6,964 | 4,850 |
| Business banking | 16,237 | 5,058 | 9,469 | 1,710 |
| | $458,710 | $40,874 | $80,278 | $337,558 |

*Loan Servicing.* Loan servicing includes collecting and remitting loan payments, accounting for principal and interest, holding escrow funds for the payment of real estate taxes and insurance premiums, contacting delinquent borrowers and supervising foreclosures in the event of unremedied defaults.

Sterling receives a fee, generally ranging from 0.25% to 0.375% of the unpaid principal balance of each loan serviced for others, to compensate it for the costs of performing the servicing function. If such fee exceeds the standard for that type of loan, the net present value of the excess servicing fee is capitalized as an asset and, subsequently, amortized into servicing fee income, using an appropriate discount rate and certain prepayment assumptions. The majority of FHA- and VA-insured loans are sold into the secondary market on a loan-by-loan servicing-released basis. Sterling generally receives a fee of approximately 1.0% to 2.0% of the principal balance for releasing the servicing upon the sale of such loans.

At September 30, 1992 and June 30, 1992, 1991 and 1990, Sterling serviced $225.6 million, $277.2 million, $86.6 million and $129.9 million, respectively, of loans for the FHLMC and the FNMA. These amounts represented 89.5%, 91.6%, 70.0% and 73.8% of all loans serviced during the three months ended September 30, 1992 and fiscal years 1992, 1991 and 1990, respectively. Sterling's ability to continue as a seller/servicer for the FNMA and the FHLMC is dependent upon meeting the qualifications of these agencies. Sterling currently meets all applicable requirements and anticipates meeting such requirements in the future.

In the past, Sterling sold servicing rights primarily to increase its regulatory capital ratios. In the future, Sterling anticipates retaining a larger portion of rights to service loans for others primarily to increase loan service fee income, although it may consider making future servicing sales depending on market and regulatory conditions.

*Secondary Market Activities.* Sterling has developed correspondent relationships with a number of independent brokers and financial institutions to facilitate the origination or purchase and sale of mortgage loans in the secondary market on either a participation or whole loan basis. Substantially all of such purchased loans or participations are secured by real estate located in the Pacific Northwest. Those agents who present loans to Sterling for purchase are required to provide a processed loan package prior to commitment. Sterling then underwrites the loan in accordance with its established lending standards. Sterling endeavors to underwrite residential loans in compliance with FHLMC and FNMA underwriting standards. Although management of Sterling has the authority to purchase loans secured by real estate located outside of its general lending areas, it generally has not done so.

In originating one-to-four family residential mortgage loans for sale in the secondary market, Sterling incurs market risk from the time of the loan commitment until such time as the loan (or resulting mortgage-backed security received in exchange for a pool of loans) is sold. To help minimize this risk, Sterling obtains

commitments from investors to purchase loans or mortgage-backed securities at specified yields or utilizes hedging techniques such as purchasing options to sell mortgage-backed securities at a fixed price with respect to a portion of its loan commitments. These actions are based upon estimated closings of loans. There can be no assurance that such funding and hedging techniques will always be successful.

*Loan Commitments.* Sterling uses commitments to individual borrowers and mortgage brokers for the purposes of originating and purchasing loans. These commitments establish the terms and conditions under which Sterling will fund the loans and closing must occur within a specified period of time. Sterling had outstanding commitments to originate or purchase mortgage loans aggregating $102.6 million and $44.8 million at September 30, 1992 and June 30, 1992, respectively. See Note 14 of Notes to Consolidated Financial Statements.

*Classified Assets, Real Estate Owned and Delinquent Loans.* To measure the quality of assets, including loans and REO, Sterling has established guidelines for classifying assets and determining provisions for anticipated loan and REO losses. Under these guidelines, an allowance for anticipated loan and REO losses is established when certain conditions exist. This system for classifying and reserving for loans and REO is administered by Sterling's Special Assets Department, which is responsible for minimizing loan deficiencies and losses therefrom. An oversight committee comprised of senior management monitors the activities and progress of the Special Assets Department and reports results to Sterling's Board of Directors.

Under this system, Sterling classifies loans and other assets it considers of questionable quality. Sterling's system employs the classification categories of "substandard," "doubtful" and "loss." Substandard assets have deficiencies which give rise to the distinct possibility that Sterling will sustain some loss if the deficiencies are not corrected. Doubtful assets have the weaknesses of substandard assets with the additional characteristic that the weaknesses make collection or liquidation in full on the basis of currently existing facts, conditions and values questionable, and there is a high probability of loss. An asset classified as loss is considered uncollectible and of such little value that it should not be included as an asset of Sterling. Total classified assets were $22.1 million, $23.8 million and $28.9 million at September 30, 1992 and June 30, 1992 and 1991, respectively. As a percentage of total assets, classified assets were 3.3%, 3.7% and 4.7%, respectively, for these periods.

Assets classified as substandard or doubtful require the establishment of general valuation allowances in amounts considered by management to be adequate under GAAP. Assets classified as loss require either a specific valuation allowance of 100% of the amount classified or a write-off of such amount. At September 30, 1992, Sterling's assets classified as loss totalled $1.5 million. Judgments regarding the adequacy of a general valuation allowance are based on continual evaluation of the nature, volume and quality of the loan portfolio, REO and other assets, specific problem assets and current economic conditions that may affect the recoverability of recorded amounts.

REO is recorded at the lower of estimated fair value based on the appraisal of such properties or the principal balance of the defaulted loan (net of any loss reserves already established). Development and improvement costs relating to the property are capitalized. The carrying value of acquired property is continuously evaluated and, if necessary, an allowance is established to reduce the carrying value to net realizable value (which considers, among other things, estimated direct holding costs and selling expenses). Loans are treated as in-substance foreclosed if (i) the borrower has little or no equity in the collateral, (ii) proceeds for repayment of the loan can only be expected from the operation or sale of the collateral and (iii) the borrower has given up control of the collateral to Sterling or has retained control but does not appear to be able to rebuild equity in the collateral in the near future.

At September 30, 1992, REO was $7.3 million, compared to $6.9 million and $8.4 million at June 30, 1992 and 1991, respectively. As a percentage of total assets, REO was 1.1%, 1.1% and 1.4%, respectively, for these periods. At September 30, 1992, REO consisted of 11 properties, with two properties constituting two-thirds of the total book value of REO. The net increase in REO at September 30, 1992 was primarily due to the transfer of one asset into REO following the foreclosure on such property.







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0621

Delinquent and problem loans are part of any lending business. If a borrower fails to make a required payment when due, Sterling institutes internal collection procedures. Sterling's collection procedures generally provide that an initial mailing requesting payment be made to the borrower when the loan is 10 days past due. At 25 days past due, the borrower is contacted by telephone and payment is requested orally. In most cases, deficiencies are cured promptly. At 30 days past due, Sterling classifies a loan as delinquent. At 45 days past due, a notice of intent to foreclose is mailed. If the loan is still delinquent 30 days following the mailing of the notice of intent to foreclose, Sterling generally initiates foreclosure proceedings. In certain instances, Sterling may modify the loan or grant a limited moratorium on loan payments to enable the borrower to reorganize his or her financial affairs.

The following table summarizes the principal balance of loans that are not performing in accordance with their original contractual terms.

| | September 30, | June 30, | | |
|---|---|---|---|---|
| | 1992 | 1992 | 1991 | 1990 |
| | (Dollars in thousands) | | | |
| Nonaccrual loans | $ 3,988 | $ 6,703 | $ 8,280 | $10,771 |
| Accruing loans which are past due 90 days or more | 0 | 31 | 50 | 1,104 |
| Restructured loans | 333 | 337 | 2,452 | 1,299 |
| Total nonperforming loans | 4,321 | 7,071 | 10,782 | 13,174 |
| Real estate owned | 7,263 | 6,877 | 8,358 | 10,172 |
| Total nonperforming assets | $11,584 | $13,948 | $19,140 | $23,346 |
| Ratio of total nonperforming assets to total assets | 1.8% | 2.2% | 3.2% | 3.4% |
| Ratio of total nonperforming loans to total loans | 0.9% | 1.5% | 2.8% | 2.9% |
| Ratio of allowance for loan losses to total nonperforming loans (1) | 74.8% | 53.3% | 24.7% | 31.8% |

(1) Excludes loans classified as loss from allowance for loan losses and from total nonperforming loans.

Sterling regularly reviews the collectibility of accrued interest income and generally ceases to accrue interest on a loan when either principal or interest is past due by 90 days or more. Any accrued and uncollected interest is eliminated from income at that time. Loans may be placed in nonaccrual status earlier if, in management's judgment, the loan may be uncollectible. Interest on such a loan is then recognized as income only if collected or if the loan is restored to performing status. Additional interest income of $100,000, $640,000 and $763,000 would have been recorded during the three months ended September 30, 1992 and fiscal years 1992 and 1991, respectively, if nonaccrual and restructured loans had been current in accordance with their original contractual terms.

Sterling's quality control staff reviews various aspects of residential real estate loans originated and acquired by Sterling to ensure compliance with appropriate underwriting criteria. The results of these reviews assist Sterling in monitoring the performance of its personnel and independent appraisers. Sterling's mortgage loan quality control function is intended to conform to guidelines and standards established by the FNMA and the FHLMC.

Sterling's quality control staff reviews other types of loans (consumer, business banking and commercial property) and reports its results to Sterling Savings' Senior Loan Committee, which includes the Senior Vice President of Loan Administration. The quality control staff checks for appropriate documentation as well as conformance to Sterling's underwriting criteria.

Generally, Sterling establishes specific allowances for the difference between the anticipated fair value (market value less selling costs, foreclosure costs and projected holding costs), adjusted for other possible sources of repayment, and the book balance (loan principal or carrying value of REO) of its loans classified as loss and REO. Each classified loan and REO property is reviewed at least monthly. Allowances are established or periodically increased, if necessary, based on the review of information obtained through on-site inspections, market analysis, appraisals and purchase offers.

The following table sets forth information regarding changes in Sterling's allowance for estimated losses on loans for the periods indicated.

| | Three months ended September 30, 1992 | Fiscal year ended June 30, 1992 | 1991 | 1990 | 1989 | 1988 |
|---|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | | |
| Balance at beginning of period | $ 4,745 | $ 4,087 | $ 6,649 | $6,450 | $ 3,770 | $ 185 |
| Charge-offs: | | | | | | |
| Mortgage—permanent | (1,310) | (643) | (545) | (238) | (590) | (21) |
| Mortgage—construction | 0 | (357) | (1,907) | (120) | (882) | (38) |
| Consumer | 0 | (9) | (223) | (91) | (91) | (15) |
| Business banking | (7) | (19) | (47) | (461) | (27) | (54) |
| Total charge-offs | (1,317) | (1,028) | (2,722) | (910) | (1,590) | (128) |
| Recoveries: | | | | | | |
| Mortgage—permanent | 8 | 29 | 2 | 2 | 47 | 0 |
| Mortgage—construction | 0 | 0 | 0 | 1 | 0 | 0 |
| Consumer | 5 | 6 | 8 | 5 | 2 | 6 |
| Business banking | 0 | 1 | 0 | 1 | 1 | 13 |
| Total recoveries | 13 | 36 | 10 | 9 | 50 | 19 |
| Net charge-offs | (1,304) | (992) | (2,712) | (901) | (1,540) | (109) |
| Provisions for loan losses | 450 | 1,650 | 150 | 1,100 | 260 | 572 |
| Allowances for losses on assets acquired | 0 | 0 | 0 | 0 | 3,960 | 3,122 |
| Balance at end of period | $ 3,891 | $ 4,745 | $ 4,087 | $6,649 | $ 6,450 | $3,770 |
| Allowances allocated to loans classified as loss | $ 866 | $ 1,424 | $ 1,575 | $2,987 | $ 3,420 | $ 391 |
| Ratio of net charge-offs to average loans outstanding during the period | 0.27% | 0.24% | 0.64% | 0.18% | 0.38% | 0.05% |

Allowances are provided for individual loans where ultimate collection is considered questionable by management after reviewing the current status of loans that are contractually past due and considering the net realizable value of the security of the loan or guarantees, if applicable. The following tables set forth the allowance for estimated losses on loans by loan category, based upon management's assessment of the risk associated with such categories, at the dates indicated, and summarizes the percentage of gross loans in each category to total gross loans.

| | September 30, 1992 | | June 30, 1992 | | 1991 | |
|---|---|---|---|---|---|---|
| | Amount | Loans in category as a percentage of total gross loans | Amount | Loans in category as a percentage of total gross loans | Amount | Loans in category as a percentage of total gross loans |
| Mortgage—permanent | $2,326 | 85.8% | $3,203 | 87.5% | $2,317 | 84.7% |
| Mortgage—construction | 519 | 3.6 | 519 | 3.0 | 776 | 5.2 |
| Consumer | 161 | 4.2 | 161 | 3.5 | 114 | 4.2 |
| Business banking | 442 | 6.4 | 419 | 6.0 | 287 | 5.9 |
| Unallocated | 443 | N/A | 443 | N/A | 593 | N/A |
| | $3,891 | 100.0% | $4,745 | 100.0% | $4,087 | 100.0% |



SG 0165741

App. 635

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0623

| | June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 1990 | | 1989 | | 1988 | |
| | Amount | Loans in category as a percentage of total gross loans | Amount | Loans in category as a percentage of total gross loans | Amount | Loans in category as a percentage of total gross loans |
| Mortgage—permanent | $5,391 | 79.7% | $4,881 | 76.1% | $2,646 | 74.6% |
| Mortgage—construction | 32 | 11.0 | 101 | 15.0 | 51 | 16.4 |
| Consumer | 147 | 4.5 | 214 | 3.6 | 130 | 3.2 |
| Business banking | 327 | 4.8 | 502 | 5.3 | 328 | 5.8 |
| Unallocated | 752 | N/A | 752 | N/A | 615 | N/A |
| | $6,649 | 100.0% | $6,450 | 100.0% | $3,770 | 100.0% |

**Mortgage-Backed Securities**

Sterling invests in mortgage-backed securities issued by the FHLMC and the Government National Mortgage Association. At September 30, 1992 and June 30, 1992 and 1991, mortgage-backed securities were $48.8 million, $42.1 million and $139.1 million, respectively.

During fiscal year 1992, dramatic changes in the maturity structure of a portion of Sterling's long-term, mortgage-backed securities portfolio resulted in a reduction of the anticipated yield on this portfolio. In response to these previously unforeseen changes, Sterling, during fiscal year 1992, implemented a strategy to restructure its mortgage-backed securities portfolio. In such restructuring, Sterling sold approximately $72.6 million of long-term, relatively high-coupon mortgage-backed securities, resulting in pre-tax net gains of $3.6 million. See "Management's Discussion and Analysis—Net Interest Income."

The following table provides the carrying values, maturities and weighted average yield of Sterling's mortgage-backed securities portfolio at September 30, 1992.

| | Maturity | | | | |
|---|---|---|---|---|---|
| | Less than one year | One to five years | Five to 10 years | Over 10 years | Total |
| | (Dollars in thousands) | | | | |
| Mortgage-backed securities(1): | | | | | |
| Balance | $ 0 | $14,857 | $24,042 | $9,911 | $48,810 |
| Weighted average yield | 0.00% | 7.56% | 6.93% | 8.69% | 7.48% |

(1) Based on contractual maturities, excluding principal reductions.

**Investment Portfolio**

Sterling maintains an investment portfolio comprised primarily of U.S. government and agency obligations and stock in the FHLB Seattle. Such investments provide Sterling with liquidity, a source of interest income and collateral which can be used to secure borrowings. Sterling has, since its inception, invested in investment-grade securities; it does not invest in high-yield, below investment-grade securities.

The following table provides the carrying values, maturities and weighted average yield of Sterling's investment portfolio at September 30, 1992.

| | Maturity | | | | |
|---|---|---|---|---|---|
| | Less than one year | One to five years | Five to 10 years | Over 10 years | Total |
| | (Dollars in thousands) | | | | |
| U.S. government and agency obligations, at amortized cost(1) | | | | | |
| Balance | $100 | $11,308 | $ 0 | $ 0 | $11,408 |
| Weighted average yield | 7.95% | 6.41% | 0.00% | 0.00% | 6.43% |
| FHLB Seattle stock, at cost | | | | | |
| Balance | $ 0 | $ 0 | $ 0 | $7,819 | $ 7,819 |
| Weighted average yield(2) | 0.00% | 0.00% | 0.00% | 10.25% | 10.25% |
| Other | | | | | |
| Balance | $ 0 | $ 0 | $ 0 | $ 29 | $ 29 |
| Weighted average yield | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total | | | | | |
| Balance | $100 | $11,308 | $ 0 | $7,848 | $19,256 |
| Weighted average yield | 7.95% | 6.41% | 0.00% | 10.21% | 7.97% |

(1) Based on contractual maturities.

(2) The weighted average yield on FHLB Seattle stock is based upon the dividend yield for the three months ended September 30, 1992.

**Sources of Funds**

*General.* Sterling's primary sources of funds for use in lending and for other general business purposes are proceeds from deposit accounts, loan repayments, FHLB Seattle advances, sales of loans, mortgage-backed securities and investment securities and secured lines of credit and other borrowings. Scheduled loan repayments are a relatively stable source of funds, while deposit inflows and outflows and unscheduled loan prepayments are influenced significantly by general interest rates, interest rates available on other investments and other economic conditions. Borrowings may be used on a short-term basis to compensate for reductions in other sources of funds (such as deposit inflows at less than projected levels). Borrowings may also be used on a longer-term basis to support expanded lending activities and to match repricing intervals of assets.

*Deposit Activities.* Sterling offers a variety of accounts for depositors designed to attract both short-term and long-term deposits from the general public. These accounts include CDs, regular savings accounts, negotiable order of withdrawal ("NOW") accounts and checking accounts. These accounts earn interest at rates established by management and are based on a competitive market analysis. The method of compounding varies from simple interest credited at maturity to daily compounding, depending on the type of account.

With the exception of certain promotional CDs and variable-rate 18-month Individual Retirement Account certificates, all CDs carry a fixed rate of interest for a defined term from the opening date of the account. Substantial penalties are imposed if principal is withdrawn from most CDs prior to maturity.

Sterling supplements its retail deposit gathering by soliciting funds from State of Washington public entities. At September 30, 1992, public funds were 7.8% of deposits compared to 6.0% and 0.8% of deposits at June 30, 1992 and 1991. Public funds are generally obtained by competitive bidding among qualifying financial institutions. Sterling believes that the current level of public funds does not significantly affect its interest rate risk.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0625

The primary retail deposit vehicles being utilized by Sterling's customers are one-year and three-year CDs, regular savings accounts and NOW accounts. The following table presents the average balance outstanding and weighted average interest rate paid for each major category of deposits for the periods indicated.

| | Three months ended September 30, 1992 | | Fiscal year ended June 30, 1992 | | 1991 | | 1990 | |
|---|---|---|---|---|---|---|---|---|
| | Average balance | Weighted average interest rate | Average balance | Weighted average interest rate | Average balance | Weighted average interest rate | Average balance | Weighted average interest rate |
| | | | (Dollars in thousands) | | | | | |
| Certificates of deposit | $351,649 | 5.56% | $367,608 | 6.65% | $372,610 | 7.98% | $388,564 | 8.44% |
| Regular savings accounts and money market accounts | 98,183 | 3.67 | 75,714 | 4.56 | 69,356 | 5.47 | 80,196 | 5.61 |
| Checking accounts: | | | | | | | | |
| NOW accounts | 47,873 | 2.93 | 40,170 | 3.76 | 34,217 | 4.46 | 32,423 | 5.04 |
| Non-interest-bearing demand accounts | 9,002 | 0 | 4,497 | 0 | 4,305 | 0 | 6,868 | 0 |
| | $506,707 | 4.84% | $487,989 | 6.02% | $480,488 | 7.30% | $508,051 | 7.66% |

The following table shows the amount and maturity of CDs that had balances of $100,000 or more at September 30, 1992.

| | September 30, 1992 |
|---|---|
| | (In thousands) |
| Remaining maturity: | |
| Less than three months | $45,149 |
| Three to six months | 6,294 |
| Six to 12 months | 12,879 |
| Over 12 months | 6,008 |
| | $70,330 |

In the unlikely event Sterling were ever liquidated, depositors would be entitled to payment of their deposit accounts prior to any payment to holders of the Notes or shareholders. Substantially all of Sterling's depositors are residents of the State of Washington. Sterling has no brokered deposits.

Sterling is a member of The Exchange, an automated teller system that allows participating customers to deposit or withdraw from NOW accounts, money market demand accounts and savings accounts at over 10,600 Exchange system machines located throughout the United States and Canada. Sterling has installed automated teller machines in six of its branches to better serve customers in those markets. Customers in other areas can access the system through automated teller machines operated by other financial institutions.

*Borrowings.* Deposit accounts are the primary source of funds for Sterling's lending and investment activities and for its general business purposes. Sterling does, however, rely upon advances from the FHLB Seattle to supplement its supply of lendable funds and to meet deposit withdrawal requirements. See "Management's Discussion and Analysis—Liquidity and Sources of Funds."

The following table sets forth certain information regarding Sterling's short-term borrowings at the end of and during the periods indicated.

| | Three months ended September 30, 1992 | Fiscal year ended June 30, 1992 | 1991 | 1990 |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| Maximum amount outstanding at any month-end during the period: | | | | |
| Reverse repurchase agreements | $ 5,161 | $19,250 | $71,997 | $92,128 |
| Short-term advances | 28,250 | 63,600 | 58,500 | 80,300 |
| Average amount outstanding during the period: | | | | |
| Reverse repurchase agreements | 2,115 | 2,437 | 50,979 | 73,402 |
| Short-term advances | 15,549 | 29,390 | 35,708 | 54,146 |
| Weighted average rate paid during the period: | | | | |
| Reverse repurchase agreements | 0.00% | 4.87% | 7.94% | 8.86% |
| Short-term advances | 8.07 | 6.49 | 9.13 | 9.69 |
| Weighted average rate paid at end of period: | | | | |
| Reverse repurchase agreements | 4.00 | 0.00 | 6.15 | 8.50 |
| Short-term advances | 6.92 | 8.98 | 8.89 | 8.75 |

The following table sets forth certain information concerning Sterling's outstanding borrowings.

| | September 30, 1992 | | June 30, 1992 | | 1991 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| | (Dollars in thousands) | | | | | |
| FHLB Seattle advances: | | | | | | |
| Short-term | $ 28,250 | 27.7% | $12,000 | 13.9% | $16,800 | 17.1% |
| Long-term | 70,532 | 69.1 | 74,233 | 86.1 | 62,171 | 63.3 |
| Securities sold subject to reverse repurchase agreements | 3,300 | 3.2 | 0 | 0.0 | 19,213 | 19.6 |
| Total borrowings | $102,082 | 100.0% | $86,233 | 100.0% | $98,184 | 100.0% |
| Weighted average interest rate | | 5.96% | | 6.83% | | 8.60% |

**Competition**

Sterling faces strong competition, both in attracting deposits and in originating, purchasing and selling real estate and other loans, from other savings and loan associations, mutual savings banks, credit unions and commercial banks, many of which have greater resources than Sterling. Some or all of these competitive institutions operate in each of Sterling's market areas. Sterling aggressively competes in its market areas with these other institutions and financial intermediaries in all phases of its operations, including savings, lending, customer service and financial services. Management believes that a strong knowledge of, and presence in, the markets served by Sterling, a corporate focus on high-quality customer service, well-defined product lines and marketing programs responsive to the demands of the consumer enable Sterling to compete effectively in the delivery of its deposit and lending products. Sterling also competes with other institutions, many of which have greater financial resources than Sterling, in marketing financial products such an annuities and mutual funds.

**Personnel**

At September 30, 1992, Sterling and its subsidiaries had 345 full-time equivalent employees. Sterling's employees are not represented by any collective bargaining unit. Sterling believes its relationship with its employees is excellent.

**Legal Proceedings**

Periodically, various claims and lawsuits are brought against Sterling and its subsidiaries, such as claims to enforce liens, condemnation proceedings involving properties on which Sterling holds liens, claims involving the making and servicing of real property loans, and other issues incident to Sterling's business. In addition, Sterling succeeded to several claims as a result of its acquisition of Tri-Cities, all of which are fully indemnified by the FDIC. No material loss is expected from any of such pending claims or lawsuits.

## TAXATION

Sterling and its subsidiaries file a consolidated federal income tax return. As permitted under the Code, Sterling has elected from year to year to use the method that represents a reasonable addition to the bad debt reserve for federal income tax purposes. In fiscal years 1991 and 1990, Sterling, for federal tax purposes, chose to forego the maximum available bad debt deductions with respect to qualifying real property loans until later years in an effort to utilize NOL carryforwards that may expire in the near future. Sterling has elected, based on the concurrence of Coopers & Lybrand with Sterling's position that such election is more likely than not permissible under the Code as presently in effect, to use the lesser of the experience method or the percentage of taxable income method to compute the minimum amount of bad debt deduction with respect to qualifying real property loans and thereby utilize NOL carryforwards that might otherwise expire. The unused bad debt deductions of approximately $8.8 million from fiscal years 1991 and 1990 represent built-in losses that Sterling intends to deduct in future tax years. Should the IRS require a larger bad debt deduction with respect to the qualifying real property loans for the 1991 and/or 1990 tax years, then NOL carryforwards previously claimed would not be used in those years and could expire. Therefore, the bad debt deduction to be claimed for income tax purposes in future years would be reduced substantially, which could result in significantly higher taxes payable in the future.

## REGULATORY DEVELOPMENTS

**Introduction**

Sterling became a savings and loan holding company as of November 1, 1992 and as such is subject to OTS regulations, examinations and reporting requirements. Sterling Savings is chartered by the State of Washington, Division of Savings and Loan Associations and Credit Unions and its savings deposits are insured by the FDIC. Sterling Savings is subject to comprehensive regulation, examination and supervision by the OTS, the FDIC and the Washington Supervisor. Furthermore, certain transactions and savings deposits are subject to regulations and controls promulgated by the Federal Reserve Board (the "FRB").

**Home Owners' Loan Act**

Sterling is registered as a savings and loan holding company within the meaning of the Home Owners' Loan Act (the "HOLA"). The HOLA generally permits a savings and loan holding company to engage in activities which are unrelated to the operation of a savings and loan association, provided that the holding company controls only one savings and loan association and such savings and loan association meets the qualified thrift lender test (the "QTL Test"). Sterling presently controls only one savings and loan association, Sterling Savings, which at September 30, 1992 exceeded the QTL Test.

If Sterling Savings fails to meet the QTL Test in the future, Sterling will become subject to restrictions on the activities in which it may engage. Such activities would generally be limited to any activity that the FRB by regulation has determined is permissible for bank holding companies pursuant to Section 4(c) of the Bank Holding Company Act of 1956, as amended (unless limited or prohibited by the OTS by regulation), and certain other limited services and activities. Sterling currently has no plans to engage in any activity that would be restricted if Sterling Savings were to fail to meet the QTL Test in the future. Although Sterling Savings expects to remain in compliance with the QTL Test in the future, there can be no assurance in this regard.

Under the HOLA, no person may acquire control of a savings association or a savings and loan holding company without the prior approval of the OTS. In addition, as a savings and loan holding company, Sterling would be prohibited from acquiring (i) control of another savings association or a savings and loan holding company without the prior approval of the OTS, (ii) by merger, consolidation or purchase of assets another savings association, or savings and loan holding company, without the prior approval of the OTS, (iii) more than 5% of the voting shares of a savings association or a savings and loan holding company which is not a subsidiary of Sterling or (iv) control of a depository institution the accounts of which are not insured by the FDIC.

The HOLA authorizes the OTS to issue a directive to a savings and loan holding company and any of its subsidiaries if the OTS determines that there is reasonable cause to believe that the continuation by the holding company of any activity constitutes a serious risk to the financial safety, soundness or stability of the holding company's subsidiary savings association. The OTS may impose restrictions through such directive to limit such risk, including limiting (i) the payment of dividends by the savings association, (ii) transactions between the savings association, the holding company and the subsidiaries or affiliates of either and (iii) any activities of the savings association that might create a serious risk that the liabilities of the holding company and its other affiliates may be imposed on the savings association. Such a directive has the same effect as a final cease and desist order. The issuance of the directive can be appealed to the Director of the OTS.

**The Federal Deposit Insurance Corporation Improvement Act of 1991**

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") was signed into law on December 19, 1991. Among other things, FDICIA provides for expanded regulation of depository institutions and their affiliates, including parent holding companies. FDICIA further provides the OTS, effective one year from the date of enactment, with broad powers to take "prompt corrective action" to resolve problems of insured depository institutions. The extent of these powers depends upon whether the institutions in question are "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized" or "critically undercapitalized."

On September 29, 1992, the OTS adopted final regulations implementing the "prompt corrective action" provisions of FDICIA. The effective date of these regulations is December 19, 1992. The OTS has advised Sterling Savings that, if the final regulations had been applicable to Sterling Savings as of September 30, 1992, Sterling Savings would have qualified as a "well capitalized" institution, which is defined as an institution which significantly exceeds the required minimum level for each capital measure, and has no outstanding agreement, order or directive to meet and maintain a specific capital level for any capital measure.

The "prompt corrective action" regulations do not require specific regulatory action for "well capitalized" or "adequately capitalized" institutions. Institutions with lower capital levels are, however, subject to increased scrutiny and must submit a written capital restoration plan. Sterling anticipates that it will continue to enhance its capital resources and its regulatory capital ratios as a result of this Offering, the retention of earnings, the amortization of intangible assets and the management of the level and mix of assets, although there can be no assurance in this regard.

Depending on the level of capital, the agencies' corrective powers can include: requiring a capital restoration plan; placing limits on asset growth and restrictions on activities; requiring the institution to issue additional stock (including voting stock) or to be acquired; placing restrictions on transactions with affiliates; restricting the interest rate the institution may pay on deposits; ordering a new election for the institution's board of directors; requiring that certain senior executive officers or directors be dismissed; prohibiting the institution from accepting deposits from correspondent banks; requiring the institution to divest certain subsidiaries; prohibiting the payment of principal or interest on subordinated debt; prohibiting the holding company from making capital distributions without prior regulatory approval and, ultimately, appointing a receiver for the institution. The appropriate federal banking agency is required to appoint a receiver (or, with the concurrence of the FDIC, a conservator) within 90 days after an institution becomes critically undercapitalized unless certain specific findings are made by such agency and the FDIC.

If the insured depository institution is undercapitalized, the parent holding company is required to guarantee that the institution will comply with any capital restoration plan submitted to and approved by the appropriate federal banking agency in an amount equal to the lesser of (i) 5% of the institution's total assets at the time the institution became undercapitalized or (ii) the amount which is necessary (or would have been necessary) to bring the institution into compliance with all applicable capital standards as of the time the institution fails to comply with the capital restoration plan.

Under FDICIA, only a "well capitalized" depository institution may accept brokered deposits without prior regulatory approval. FDICIA also requires annual examinations of all insured depository institutions by the appropriate federal banking agency, with some exceptions for small, well-capitalized institutions and state-charted institutions examined by state regulators. The federal banking agencies are required to set compensation standards for insured depository institutions that prohibit excessive compensation, fees or benefits to officers, directors, employees and principal shareholders. FDICIA also contains a number of consumer banking provisions, including disclosure requirements and substantive contractual limitations with respect to deposit accounts. FDICIA has also greatly expanded the range of merger, purchase and assumption, and deposit transfer transactions involving banks and savings associations that are exempt from payment of exit and entry fees as transfers of deposits between the FDIC's Bank Insurance Fund and its Savings Association Insurance Fund. Many of the provisions of FDICIA will be implemented through the adoption of regulations by the federal banking agencies.