## MANAGEMENT

The following table sets forth information with respect to Directors and executive officers of Sterling. The Board of Directors of Sterling currently consists of nine members. The Directors hold office until the next annual meeting of the shareholders of Sterling and until their successors are elected and qualified. There are no family relationships among these Directors and executive officers, nor any arrangements or understandings between any Director or executive officer and any other person pursuant to which such Director or executive officer was elected.

| Name | Age | Position |
|---|---|---|
| Harold B. Gilkey | 53 | Chairman of the Board and Chief Executive Officer(1) |
| William W. Zuppe | 51 | President, Chief Operating Officer and Director(1) |
| Ned M. Barnes | 56 | Secretary and Director(1) |
| Rodney W. Barnett | 49 | Director(1) |
| James P. Fugate | 60 | Director(1) |
| Charles L. Kroetch | 61 | Director(1) |
| Robert D. Larrabee | 57 | Director(1) |
| Robert E. Meyers | 67 | Director(1) |
| David O. Wallace | 54 | Director(1) |
| Daniel G. Byrne | 38 | Senior Vice President—Finance, Treasurer and Assistant Secretary(1) |
| S. Midge Moore | 44 | Senior Vice President of Sterling Savings |
| Stephen L. Page | 44 | Senior Vice President—Loan Administration of Sterling Savings |
| Heidi B. Stanley | 36 | Senior Vice President—Administration/Operations of Sterling Savings |
| John M. Harlow | 50 | Vice President of Sterling Savings and President of INTERVEST |
| Stanton C. Parrish | 42 | Vice President of Sterling Savings and President of Harbor Financial |
| Thomas F. Sackmann | 40 | Vice President of Sterling Savings and President of Action Mortgage |

(1) Positions are with Sterling and Sterling Savings.

The principal occupations of each Director and executive officer of Sterling for the past five years are set forth below. All of the Directors and executive officers have held their present positions for the past five years unless otherwise stated.

HAROLD B. GILKEY has served as Chairman of the Board and Chief Executive Officer of Sterling since its inception and has served as Chairman of the Board and Chief Executive of Sterling Savings since 1981. Mr. Gilkey co-founded Sterling Savings in 1981. Additionally, Mr. Gilkey is Chairman of the Board of Action Mortgage, INTERVEST and Harbor Financial. Mr. Gilkey brought to Sterling over 19 years of commercial and mortgage banking experience as Senior Vice President of Old National Bank of Washington, Spokane, Washington, a $1.6 billion commercial bank, and President of Bancshares Mortgage Company, Spokane, Washington, an institution servicing $500 million in mortgage loans. Prior to this, Mr. Gilkey was employed by Bank of America for 12 years, holding various management positions and was responsible for equipment finance and leasing, personnel and training, and branch operations. Mr. Gilkey is past director of the Washington Savings League and a former member of the U.S. League of Savings Institutions Legislative Committee. Mr. Gilkey received his degree in business administration from the University of Montana in 1962 and his Master of Business Administration degree from the University of Southern California in 1970.

WILLIAM W. ZUPPE has served as Director, President and Chief Operating Officer of Sterling since its inception and has served as Director, President and Chief Operating Officer of Sterling Savings since 1981. Mr. Zuppe co-founded Sterling Savings in 1981. Mr. Zuppe is also Vice President, and serves as a Director, of Action Mortgage, INTERVEST and Harbor Financial. Mr. Zuppe brought to Sterling 18 years of mortgage lending experience as Vice President of Bancshares Mortgage Company and Manager of Loan Administration of Sherwood & Roberts, Inc. of Walla Walla, Washington, a mortgage-banking company which serviced in excess of $500 million in mortgage loans. Mr. Zuppe is a director of the Washington Savings League.

NED M. BARNES has served as Director and Secretary of Sterling since its inception, as Secretary of Sterling Savings since 1981 and as Director of Sterling Savings since 1985. He is also Secretary, and serves as a Director, of Action Mortgage, INTERVEST and Harbor Financial. Mr. Barnes is a principal in the law firm of Witherspoon, Kelley, Davenport & Toole, P.S. of Spokane, Washington, which Mr. Barnes joined in 1961. Mr. Barnes' law practice emphasizes the areas of real estate and mortgage banking. Mr. Barnes graduated from the University of Minnesota in 1958, earning a degree in business administration. Mr. Barnes received his Juris Doctorate degree from the University of Washington in 1961.

RODNEY W. BARNETT has served as Director of Sterling since its inception and as Director of Sterling Savings since 1981. Mr. Barnett is President of Carr Sales Company, an electrical supply firm in Spokane, Washington. Mr. Barnett is also a past member of the board of directors of the National Association of Electrical Distributors and is Chairman of the Inland Empire Chapter of that association.

JAMES P. FUGATE has served as Director of Sterling since its inception and as Director of Sterling Savings since 1989. Mr. Fugate is the Superintendent of Auburn School District No. 408 and a member of the Auburn Economic Development Council. Mr. Fugate is a former director of Central Evergreen Savings & Loan Association.

CHARLES L. KROETCH has served as Director of Sterling since its inception and as Director of Sterling Savings since 1981. Mr. Kroetch is also a Director of INTERVEST. Mr. Kroetch is owner and President of Kroma International Graphics Center, a printing and publishing company in Spokane, Washington. Mr. Kroetch also serves as a marketing consultant and was formerly President of the Advertising and Sales Association of Spokane, Washington.

ROBERT D. LARRABEE has served as Director of Sterling since its inception and as Director of Sterling Savings since 1983. Mr. Larrabee is also a Director of INTERVEST. Mr. Larrabee is the owner of Merchant Funeral Home in Clarkston, Washington. Mr. Larrabee is also a director of Laurentian Capital Corporation, a former director of Lewis and Clark Savings & Loan Association and a past President of the Board of Regents of the University of Washington.

ROBERT E. MEYERS has served as Director of Sterling since its inception and as Director of Sterling Savings since 1983. Dr. Meyers is a retired dentist residing in Clarkston, Washington. Dr. Meyers is a former director of Lewis and Clark Savings & Loan Association.

DAVID O. WALLACE has served as Director of Sterling since its inception and as Director of Sterling Savings since 1981. Mr. Wallace is the owner of David O. Wallace & Associates, a consulting and food brokerage company in Spokane, Washington. Mr. Wallace was also the owner and operator of Chet's Buy-Rite Market, a grocery store in Spokane, Washington.

During fiscal year 1992, Directors of Sterling were paid an annual fee of $2,000, plus $500 for each meeting attended. In addition, with the exception of Messrs. Gilkey and Zuppe, on October 27, 1992, each Director received nonstatutory stock options under Sterling's 1992 Incentive Stock Option Plan to purchase up to 5,000 shares of Common Stock at an exercise price of $10.125 per share.

In addition to Messrs. Gilkey, Zuppe and Barnes, the executive officers of Sterling and its subsidiaries are as follows:

DANIEL G. BYRNE has served as Senior Vice President—Finance, Treasurer and Assistant Secretary of Sterling since its inception and joined Sterling Savings in 1983. Mr. Byrne is also the Assistant Secretary and Treasurer of Action Mortgage, INTERVEST and Harbor Financial. Before joining Sterling, Mr. Byrne was on the staff of the accounting firm of Coopers & Lybrand in Spokane, Washington. Mr. Byrne is a certified public accountant and graduated from Gonzaga University in 1977.

S. MIDGE MOORE, Senior Vice President of Sterling Savings, joined Sterling Savings in 1983. Prior to 1983, Ms. Moore was employed by Capital Savings Bank in Seattle and Spokane, Washington. Ms. Moore graduated from the University of Idaho in 1970.

STEPHEN L. PAGE, Senior Vice President—Loan Administration of Sterling Savings, joined Sterling Savings in 1983. Prior to 1983, Mr. Page was employed by Kiemle & Hagood Company of Spokane, Washington as a Property Management Leasing Officer. Mr. Page graduated from the University of Utah in 1970 and received a Master of Business Administration degree from the University of New Mexico in 1973.

HEIDI B. STANLEY, Senior Vice President—Administration/Operations of Sterling Savings, joined Sterling Savings in 1985. Ms. Stanley was formerly employed as a national college recruiter by IBM in San Francisco, California and Tucson, Arizona. Ms. Stanley graduated from Washington State University in 1979 with a degree in business administration.

JOHN M. HARLOW, Vice President of Sterling Savings and President and Director of INTERVEST, joined Sterling Savings in 1987. Mr. Harlow was formerly the President of the Mortgage Banking Division of Moore Financial Services of Portland, Oregon, a mortgage-banking subsidiary of West One Bancorp, and Senior Vice President of Income Property Lending of Bancshares Mortgage Company of Spokane, Washington. Mr. Harlow was also a Vice President/Regional Manager for I.D.S. Mortgage Company in Northern California. Mr. Harlow graduated from the University of Illinois in 1965.

STANTON C. PARRISH, Vice President of Sterling Savings and President and Director of Harbor Financial, joined Sterling Savings in 1983. Prior to 1983, Mr. Parrish was employed by Western Savings Association of Portland, Oregon. Mr. Parrish is a 1972 graduate of Washington State University.

THOMAS F. SACKMANN, Vice President of Sterling Savings and President and Director of Action Mortgage, joined Sterling Savings in 1988. Mr. Sackmann was formerly Executive Vice President and Chief Operating Officer of Moore Financial Services of Boise, Idaho, a mortgage-banking subsidiary of West One Bancorp, and was responsible for residential lending. Mr. Sackmann is a 1973 graduate of Linfield College and a 1976 graduate of the University of Washington School of Law.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0633

**Executive Compensation**

The following table sets forth information as to remuneration earned on an accrual basis for fiscal year 1992, by or on behalf of each of the five most highly compensated executive officers of Sterling whose total cash remuneration exceeded $60,000, as well as all executive officers of Sterling as a group.

| Name of individual | Capacity served | Cash compensation(1) |
|---|---|---|
| Harold B. Gilkey .......... | Chairman of the Board and Chief Executive Officer | $218,996 |
| William W. Zuppe ......... | President and Chief Operating Officer | 160,000 |
| Thomas F. Sackmann....... | Vice President of Sterling Savings and President of Action Mortgage | 136,372 |
| John M. Harlow ........... | Vice President of Sterling Savings and President of INTERVEST | 101,400 |
| Daniel G. Byrne ........... | Senior Vice President—Finance | 88,300 |
| All executive officers as a group (10 persons) ............................................. | | 968,268 |

(1) Includes salaries, cash bonuses and Directors' fees. Does not include the value of medical and dental insurance, club memberships, automobile allowances and similar items which in the aggregate do not exceed 10% of the compensation paid to any such individual or 10% of the compensation paid to all executive officers as a group.

**Incentive Stock Option Plan**

Sterling Savings adopted an Incentive Stock Option Plan on January 25, 1984 and a second Incentive Stock Option Plan on August 25, 1992. Pursuant to the Restructuring, Sterling assumed all obligations of Sterling Savings under such plans. At November 1, 1992, options to purchase an aggregate of 120,000 shares of Common Stock with exercise prices ranging between $5.00 and $10.21 per share were outstanding under such plans, options for 6,250 shares of Common Stock had been exercised and options with respect to 473,750 shares of Common Stock remained available for grant. The outstanding options are exercisable over periods expiring in fiscal years 1992 through 2002. Options to purchase 69,500 shares of Common Stock were granted during the 16 months ended October 31, 1992 at exercise prices ranging between $8.25 and $10.125 per share.

The following table sets forth information with respect to options granted and exercised during fiscal year 1992 and during the period from July 1, 1992 to October 31, 1992, to or by the executive officers of Sterling and to all executive officers as a group. No options were exercised during these periods.

| | Harold B. Gilkey(1) | William W. Zuppe(1) | Thomas F. Sackmann | John M. Harlow | Daniel G. Byrne | All executive officers as a group (10 persons) |
|---|---|---|---|---|---|---|
| Options granted during fiscal year 1992... | 3,250 | 3,250 | 2,500 | 1,000 | 2,500 | 18,000 |
| Average exercise price per share.......... | $8.25 | $8.25 | $8.25 | $8.25 | $8.25 | $8.25 |
| Options granted July 1, 1992 through October 31, 1992 .................... | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 9,000 |
| Average exercise price per share.......... | $9.50 | $9.50 | $9.50 | $9.50 | $9.50 | $9.50 |

(1) Options were granted to each individual in tandem with stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock above the option price at the date of exercise. Payment is to be made in cash, in the form of Common Stock, or in any combination thereof. The exercise of either rights or options serves to cancel the other.

## DESCRIPTION OF NOTES

The Notes are to be issued under an Indenture (the "Indenture"), dated , 1993, between Sterling and Norwest Bank Minnesota, National Association as trustee (the "Trustee"). The Notes are not savings accounts or deposits of Sterling, are not insured by the FDIC, any other governmental agency or otherwise and are not secured by any collateral.

The following is a summary of all material provisions of the Indenture. The summary does not purport to be complete and is subject to, and is qualified in its entirety by, the provisions of the Indenture (including the definition of certain terms in the Indenture which are used herein), the form of which has been filed as an exhibit to the Registration Statement of which this Prospectus is a part. Wherever particular provisions and definitions of the Indenture are referred to, such provisions and definitions are incorporated by reference as a part of the statements made, and the statements are qualified in their entirety by such reference. For purposes of the following summary, the term "Sterling" excludes Sterling's subsidiaries unless otherwise provided.

### General

The Notes offered by this Prospectus will be limited to $15,000,000 in aggregate principal amount, plus up to an additional $2,250,000 aggregate principal amount if the Underwriter's over-allotment option is exercised in full. The Notes will be issued in registered form only, without coupons, in denominations of $1,000 and any integral multiple thereof. Interest on the Notes will accrue from the date of original issuance and will be payable on the first day of each month, commencing March 1, 1993, at the rate per annum stated on the cover page of this Prospectus. Interest will be payable to the Person in whose name the Note is registered at the close of business on the 25th day of the month prior to such Interest Payment Date. The Notes will mature on January 31, 2000 unless redeemed earlier at the option of Sterling or repaid earlier upon the death of a Holder as set forth below. See "—Redemption at Option of Sterling" and "—Repayment Option Upon Death."

Payment of interest on any Interest Payment Date other than at Maturity will be paid by check and mailed to the registered Holder. Payment of principal and interest at Maturity will be made by check delivered in person or by mail to the registered Holder upon presentment of the Notes for payment at the Corporate Trust Office. The Notes may be presented for registration of transfer or exchange at an office or agency to be maintained by Sterling in Spokane, Washington. The Notes will be exchangeable without service charge, but Sterling may require payment to cover taxes or other government charges. The Notes will not be secured by the assets of Sterling or any of its Subsidiaries or Affiliates or otherwise and will not have the benefit of a sinking fund for the retirement of principal. In addition, the rights of Sterling to participate in any distribution of assets of any Subsidiary, including Sterling Savings, upon its liquidation or reorganization or otherwise (and thus the ability of the Holders to benefit indirectly from such distribution) are subject to the prior claims of creditors of that Subsidiary. Claims on Sterling's Subsidiaries by creditors other than Sterling may include substantial obligations with respect to loans, deposit liabilities, FHLB Seattle advances, federal funds purchased and securities sold subject to repurchase agreements.

So long as Sterling is a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Sterling will furnish to Holders annual reports of Sterling containing audited financial statements and interim reports with unaudited financial data on a quarterly basis. If Sterling ceases to be a reporting company under the Exchange Act, Sterling will furnish to Holders annual audited financial statements and quarterly unaudited summary income statements and retained earnings data.

The Indenture does not contain provisions that would provide protection to Holders against a sudden and dramatic decline in credit quality resulting from takeovers, recapitalizations or similar restructurings.

**Redemption at Option of Sterling**

The Notes may not be redeemed prior to January 31, 1996. The Notes are subject to redemption at 100% of the principal amount thereof plus accrued interest, at the option of Sterling, in whole at any time or in part from time to time, commencing on January 31, 1996, upon not less than 30 nor more than 60 days' notice mailed to the registered Holders thereof. The Redemption Price will be paid with interest accrued to the date fixed for redemption (subject to the right of the registered Holder on the Record Date for an interest payment to receive such interest). If Sterling elects to redeem less than all the Notes, the Trustee will select which Notes to redeem using such method as it shall deem fair and appropriate, including the selection for redemption of a portion of the principal amount of any Note, but not less than $1,000. On and after the Redemption Date, interest will cease to accrue on the Notes or portions thereof called for redemption.

**Repayment Option Upon Death**

Upon the death of any Holder, Sterling will purchase such Holder's Notes on request, if (i) the Notes have been registered in the Holder's name since their date of issuance or for a period of six months prior to the date of such Holder's death, whichever is less, (ii) the redemption payments with respect to such Holder's Notes will not exceed $30,000 in principal amount in any calendar year, (iii) Sterling will not, after giving effect to such payment, have made redemption payments on Notes of deceased Holders in an aggregate amount exceeding $150,000 in principal amount in any calendar year (if such aggregate principal amount exceeds $150,000, the Trustee will repay such Notes up to $150,000 in principal amount in the order in which such requests for repayment were received), (iv) either Sterling or the Trustee has been notified in writing of the request for redemption within one year after the Holder's death and, if less than all of such Holder's Notes are redeemed pursuant to such initial request, either Sterling or the Trustee has been notified in writing of subsequent requests for redemption of additional Notes of such Holder within one year after any such preceding notice, (v) Sterling is not, after giving effect to such payment, in default under any Senior Indebtedness and (vi) Sterling is not subject to any law, regulation, agreement or administrative directive preventing such repayment. Notes for which such repayment is requested shall, subject to the limitations described above, be repaid at 100% of the principal amount thereof, together with interest accrued to the Repayment Date, within 30 days following receipt by Sterling of (i) a written request for repayment signed by a duly authorized representative of the Holder, which shall indicate the name of the deceased Holder, the date of death of the deceased Holder and the principal amount of Notes to be repaid, (ii) the certificates representing the Notes to be repaid and (iii) evidence satisfactory to Sterling and the Trustee of the death of the Holder and evidence of authority of the representative to the extent required by the Trustee. Authorized representatives of a Holder shall include executors, administrators or other legal representatives of an estate, trustees of a trust, joint owners of Notes owned in joint tenancy or tenancy by the entirety, custodians, conservators, guardians, attorneys-in-fact and other Persons generally recognized as having legal authority to act on behalf of others.

The death of a Person owning a Note in joint tenancy or tenancy by the entirety with another or others shall be deemed the death of the Holder, and the entire principal amount of the Note so held shall be subject to repayment, together with interest accrued thereon to the Repayment Date. The death of a Person owning a Note by tenancy in common shall be deemed the death of a Holder only with respect to the deceased Holder's interest in the Note so held by tenancy in common, except that in the event a Note is held by a husband and wife as tenants in common, the death of either shall be deemed the death of the Holder, and the entire principal amount so held shall be subject to repayment. The death of a Person who, during his or her lifetime, was entitled to substantially all of the beneficial interests of ownership of a Note will be deemed the death of the Holder thereof for purposes of this provision, regardless of the registered Holder, if such beneficial interest can be established to the satisfaction of the Trustee. Such beneficial interest will be deemed to exist in typical cases of nominee ownership, ownership under the Uniform Gifts to Minors Act, community property or other joint ownership arrangements between a husband and wife and trust arrangements where one Person has substantially all of the beneficial ownership interests in the Note during his or her lifetime.

**Subordination**

The Notes are subordinated, in the manner and to the extent hereinafter described, to the prior payment of all Senior Indebtedness of Sterling. "Senior Indebtedness" means generally any indebtedness of Sterling, whether outstanding on the date of execution of the Indenture or thereafter created or incurred, unless it is provided in the appropriate instrument that such indebtedness is not senior to the Notes. Sterling had no outstanding Senior Indebtedness at November 30, 1992. Senior Indebtedness may be issued or incurred in the future, subject only to certain limitations on Funded Debt. See "—Restrictions on Additional Indebtedness."

Upon a distribution of assets upon dissolution, winding up, total liquidation or reorganization of Sterling, if an event of default has occurred and is continuing with respect to any Senior Indebtedness or if the principal of the Notes has been declared due and payable and such declaration has not been rescinded or annulled, then in any such instance all Senior Indebtedness must be paid in full before any payment of principal of or interest on the Notes may be made. Any subordination will not prevent the occurrence of an Event of Default (as defined below) under the Indenture.

By reason of the subordination of the Notes, in the event of liquidation of Sterling, the Holders will not receive payment until the holders of Senior Indebtedness have been satisfied. Also, by reason of the subordination provisions, in the event of liquidation of Sterling, general creditors of Sterling may recover less ratably than holders of Senior Indebtedness.

**Restrictions on Additional Indebtedness**

The Indenture limits the amount of Funded Debt of Sterling or any "Non-Bank Subsidiary" (defined as any subsidiary of Sterling other than any Insured Institution (including Sterling Savings) or any subsidiary of an Insured Institution). "Funded Debt" includes any of the following obligations of Sterling with a maturity in excess of one year (including, for such purpose, obligations extendable or renewable at Sterling's option to a time in excess of one year) (i) any obligation, contingent or otherwise, for borrowed money or for deferred purchase price of property or services, (ii) all obligations (including the Notes) evidenced by bonds, notes, debentures or other similar instruments, (iii) all indebtedness created under conditional sale or similar arrangements with respect to property acquired to the extent such indebtedness would appear as a liability on a balance sheet prepared in accordance with GAAP, but excluding trade payables and other accrued liabilities arising in the ordinary course of business, (iv) capitalized lease obligations, (v) guarantees of the foregoing and (vi) certain other obligations specified in the Indenture. Sterling and any Non-Bank Subsidiary may not create, incur, assume, guarantee or otherwise be liable for any Funded Debt (other than "Junior Indebtedness") if, immediately after giving effect thereto, the aggregate amount of Funded Debt of Sterling and all Non-Bank Subsidiaries would be greater than 80% of Sterling's Consolidated Net Worth. At September 30, 1992, Sterling's Consolidated Net Worth was approximately $40.0 million and Sterling had no outstanding Funded Debt. Under the foregoing restriction, and after giving effect to the sale of $15,000,000 in aggregate principal amount of the Notes offered hereby, Sterling could have incurred approximately $17.0 million of additional Funded Debt at September 30, 1992, excluding Junior Indebtedness.

The Indenture does not limit Sterling's Subsidiaries which are Insured Institutions, including Sterling Savings, from incurring indebtedness, except indebtedness guaranteed or secured by property of Sterling, and the Indenture does not limit Sterling's ability to incur senior short-term indebtedness that is not Funded Debt.

**Restrictions on Dividends and Other Distributions**

The Indenture provides that Sterling cannot declare or pay any dividends on, or purchase, redeem or acquire, its capital stock, return any capital to holders of capital stock as such, or make any distribution of assets to capital shareholders as such, except that Sterling may (i) declare and pay a dividend in capital stock of Sterling and (ii) declare and pay a dividend or make another distribution in cash or property other than

capital stock of Sterling if the amount of such dividend or distribution, together with the amount of all previous such dividends and distributions after June 30, 1992, would not exceed in the aggregate the sum of (a) $500,000, plus (b) 75% of Sterling's Consolidated Net Income (Loss) for each fiscal year after June 30, 1992, plus (c) 75% of the net proceeds received by Sterling for any capital stock issued after June 30, 1992.

**Consolidation, Merger or Transfer**

Sterling may not consolidate with, merge with, or transfer all or substantially all its assets to another entity unless such other entity assumes Sterling's obligations under the Indenture and unless (i) after giving effect thereto, no event shall have occurred and be continuing which, after notice or lapse of time, would become an Event of Default, (ii) each insured institution controlled by the surviving corporation shall be in compliance with applicable minimum capital requirements or shall have filed a capital plan acceptable to its primary regulator and (iii) certain other conditions are met.

**Events of Default**

An "Event of Default" includes (i) failure to pay the principal of the Notes when due at Maturity, upon redemption or upon repayment, as provided in the Indenture, whether or not prohibited by the subordination provisions of the Indenture, (ii) failure to pay any interest on the Notes when such interest becomes due and payable and continuance of such default for a period of 10 days, whether or not prohibited by the subordination provisions of the Indenture, (iii) failure to perform any other covenant set forth in the Indenture for 30 days after receipt of written notice from the Trustee or Holders of at least 25% in principal amount of the Outstanding Notes specifying the default and requiring Sterling to remedy such default, (iv) default in the payment at stated maturity of indebtedness of Sterling or a Subsidiary for Money borrowed having an outstanding principal amount due at stated maturity greater than $1.0 million and such default having continued for a period of 60 days beyond the stated maturity or any applicable grace period, whichever is greater, (v) an event of default as defined in any mortgage, indenture or instrument of Sterling or any Subsidiary having happened and resulted in the acceleration of indebtedness, which, together with the principal amount of any other such indebtedness so accelerated, aggregates $1.0 million or more at any time, which default shall not have been cured or waived and which acceleration shall not have been rescinded or annulled within a period of time and under conditions specified in the Indenture, (vi) appointment of the FDIC or RTC as receiver or conservator of Sterling or Sterling Savings in certain circumstances, (vii) certain events of insolvency, receivership, or reorganization of Sterling or any of its Subsidiaries and (viii) entry of a final judgment, decree or order against Sterling or any Subsidiary for the payment of Money in excess of $1.0 million and such judgment, decree or order continues unsatisfied for 60 days.

The Indenture provides that the Trustee shall, within 90 days after the occurrence of a "default" (meaning, for this purpose, the event specified above without grace periods), give the Holders of the Notes notice of all defaults known to it which have occurred and remain uncured; provided, that, except in the case of a default in the payment of principal of or interest on any of the Notes, the Trustee shall be protected in withholding such notice if and so long as it in good faith determines that the withholding of such notice is in the interest of the Holders.

If an Event of Default shall occur and be continuing, the Trustee, in its discretion, may and, at the written request of Holders of a majority in aggregate principal amount of the Outstanding Notes, shall proceed to protect and enforce its rights and the rights of the Holders. If an Event of Default shall occur and be continuing, either the Trustee or the Holders of at least 25% in aggregate principal amount of Outstanding Notes may accelerate the maturity of all such Outstanding Notes. The Holders of a majority in aggregate principal amount of Outstanding Notes may waive a default, except a default in the payment of principal of or interest on any Note. If an Event of Default has occurred and a declaration of acceleration made before a judgment or decree for payment of Money due is obtained, Holders of a majority of the Outstanding Notes may rescind the acceleration of the Notes if all Events of Default have been remedied and all payments due, other than those due as a result of acceleration, have been made.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0638

Sterling must furnish annually to the Trustee an Officers' Certificate stating whether to the best of the knowledge of the signers Sterling is in default under any of the provisions of the Indenture, and specifying all such defaults, and the nature thereof, of which they have knowledge.

A Holder will not have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless (i) such Holder shall have previously given to the Trustee written notice of a continuing Event of Default, (ii) the Holders of at least 25% in aggregate principal amount of the Outstanding Notes shall have made a written request, and offered reasonable indemnity, to the Trustee to institute such proceeding as Trustee, (iii) the Trustee shall have failed to institute such proceeding within 60 days and (iv) the Trustee shall not have received from the Holders of a majority in aggregate principal amount of the Outstanding Notes a direction inconsistent with such request. However, the Holder of any Note will have an absolute right to receive payment of the principal of and interest on such Note on or after the respective due dates and to institute suit for the enforcement of any such payment.

**Modification and Waiver**

With certain limited exceptions which permit modification of the Indenture by Sterling and the Trustee only, the Indenture may only be modified by Sterling with the consent of the Holders of not less than a majority in aggregate principal amount of Outstanding Notes; provided, however, that no such changes shall, without the consent of the Holder of each Note affected thereby (i) change the maturity date of the principal of, or the due date of any installment of interest on, any Note, (ii) reduce the principal of, or the rate of interest on, any Note, (iii) change the currency in which any portion of the principal of, or interest on, any Note is payable, (iv) impair the right to institute suit for the enforcement of any such payment, (v) reduce the above-stated percentage of Holders of the Outstanding Notes necessary to modify the Indenture, (vi) modify the foregoing requirements or reduce the percentage of Outstanding Notes necessary to waive any past default or (vii) impair the optional right to repayment provided the Holders.

The Holders of a majority in aggregate principal amount of Outstanding Notes may waive compliance by Sterling with certain restrictive provisions of the Indenture.

**Satisfaction and Discharge of Indenture; Defeasance**

The Indenture provides that Sterling may terminate its obligations under the Indenture with respect to all Notes which have become due and payable, will become due and payable at their Stated Maturity within one year or are redeemable at the option of Sterling within one year, by delivering to the Trustee, in trust for such purpose, Money, Government Obligations or both which, through the payment of interest and principal in respect thereof in accordance with their terms, will provide on the due dates of any payment of principal and interest, or a combination thereof, Money in an amount sufficient to discharge the entire indebtedness of such Notes.

**The Trustee**

Norwest Bank Minnesota, National Association will serve as Trustee under the Indenture and is also the Note Registrar.

## UNDERWRITING

Subject to the terms and conditions of the Underwriting Agreement between Sterling and the Underwriter, the Underwriter has agreed to purchase from Sterling $15,000,000 in aggregate principal amount of the Notes.

The Underwriting Agreement provides that the Underwriter's obligation to pay for and accept delivery of the Notes is subject to certain conditions precedent and that the Underwriter will be obligated to purchase all of the Notes, if any are purchased.

The Underwriter has advised Sterling that it proposes to offer the Notes to the public initially at the Price to Public and on the terms set forth on the cover page of this Prospectus and to selected dealers at that price, less a concession of not more than % of the principal amount of the Notes of which not more than % may be reallowed to certain other dealers. After the initial public offering, the Price to Public and other selling terms may be changed by the Underwriter.

Sterling has granted the Underwriter an option, exercisable not later than 30 days after the date of this Prospectus, to purchase up to $2,250,000 in aggregate principal amount of the Notes at the Price to Public set forth on the cover page hereof less the Underwriting Discounts and Commissions, solely to cover over-allotments, if any, made in connection with the sale of the Notes offered hereby. In the Underwriting Agreement, Sterling has agreed to indemnify the Underwriter against certain liabilities that may be incurred in connection with the sale of the Notes, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"), and to continue to make payments that the Underwriter may be required to make in respect thereto.

The Underwriter has indicated an intention to make a market in the Notes as permitted by applicable laws and regulations. The Underwriter, however, is not obligated to make such a market and any such market making could be discontinued at any time at the sole discretion of the Underwriter.

From time to time, the Underwriter has provided, and expects to provide in the future, investment banking services to Sterling for which the Underwriter has received, and will receive, customary fees and commissions. For its services as an underwriter in connection with Sterling Savings' public offering in November 1991, the Underwriter received customary underwriting discounts and commissions. For its services as a representative of the underwriters in connection with such offering, the Underwriter also received warrants to purchase 72,580 shares of Common Stock at $9.90 per share.

## LEGAL MATTERS

The validity of the Notes to be offered hereby will be passed upon for Sterling by Witherspoon, Kelley, Davenport & Toole, P.S., Spokane, Washington. Certain legal matters will be passed upon for the Underwriter by Perkins Coie, Seattle, Washington. Ned M. Barnes, the Secretary and a Director of Sterling, is a principal of the firm of Witherspoon, Kelley, Davenport & Toole, P.S. Principals of the firm of Witherspoon, Kelley, Davenport & Toole, P.S. and members of their immediate families own in the aggregate approximately 22,207 shares of Sterling's Common Stock.

## EXPERTS

The consolidated balance sheets of Sterling Savings, Sterling's predecessor, at June 30, 1992 and 1991 and the consolidated statements of income, changes in stockholders' equity and cash flows for each of the three fiscal years in the period ended June 30, 1992, included in this Prospectus, have been included herein in reliance on the report of Coopers & Lybrand, independent certified public accountants, given on the authority of that firm as experts in auditing and accounting.

The tax position set forth in the "Taxation" section of this Prospectus is included herein in reliance on the authority of Coopers & Lybrand, independent certified public accountants, as experts in taxation.

## AVAILABLE INFORMATION

Sterling's predecessor, Sterling Savings, was subject to the information reporting requirements of the Exchange Act until November 2, 1992, and in accordance therewith filed reports and other information with the Director of the OTS. Such reports can be inspected and copied at the public reference facilities maintained by the OTS at 801 17th Street, N.W., Washington, D.C. 20552, and at the Seattle District Office of the OTS at 2201 Sixth Avenue, Suite 1500, Seattle, Washington 98121-1889.

As of November 1, 1992, Sterling became subject to the information reporting requirements of the Exchange Act, and in accordance therewith files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and other information may be inspected and copied at the public reference facilities maintained by the Commission at 450 Fifth Street, N.W., Room 1024, Washington, D.C. or at the regional offices of the Commission. Copies of such material can be obtained at prescribed rates from the public reference section of the Commission at 450 Fifth Street, N.W., Washington, D.C. 20549. Sterling will furnish to holders of the Notes annual reports of Sterling containing audited financial statements and interim reports of Sterling with unaudited summary financial data on a quarterly basis.

Sterling has filed with the Commission a registration statement, together with all amendments, schedules and exhibits thereto (the "Registration Statement"), under the Securities Act with respect to the Notes offered hereby. This Prospectus, which constitutes a part of the Registration Statement, does not contain all the information set forth in the Registration Statement. Statements contained in this Prospectus concerning the provisions of any agreement or other document are not necessarily complete and in each instance reference is made to the copy of such agreement or other document filed as an exhibit or schedule to the Registration Statement, each such statement being qualified in all respects by such reference. For further information, reference is made to the Registration Statement and to the exhibits and schedules filed therewith, which are available for inspection without charge at the principal office of the Commission in Washington, D.C. Copies of the material containing this information may be obtained from the Commission upon payment of the prescribed fee.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The following documents, all of which were previously filed with the Commission (or, if a Sterling Savings filing, with the OTS) pursuant to the Exchange Act, are hereby incorporated by reference in this Prospectus: Sterling Savings' Annual Report on Form 10-K, as amended on Form 8, for the fiscal year ended June 30, 1992; Sterling's Quarterly Report on Form 10-Q, as amended on Form 8, for the quarter ended September 30, 1992 and Sterling Savings' Current Report on Form 8-K dated August 28, 1992.

Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that such statement is modified or replaced by a statement contained in this Prospectus. Any such statement so modified or superseded shall not be deemed, except as so modified or replaced, to constitute a part of this Prospectus. Sterling undertakes to provide without charge to each person to whom a copy of this Prospectus has been delivered, upon the written request of any such person, a copy of any or all of the documents referred to above that have been incorporated in this Prospectus by reference, other than exhibits to such documents. Written requests for such copies should be directed to Heidi B. Stanley, Senior Vice President, Sterling Savings Association, at Sterling's executive offices located at 120 North Wall Street, Spokane, Washington 99201.



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0641

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Accountants | F-2 |
| Sterling Savings Association and Subsidiaries (Predecessor to Sterling Financial Corporation) | |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Income | F-4 |
| Consolidated Statements of Changes in Stockholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-8 |




SG 0165760

App. 654

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0642

# REPORT OF INDEPENDENT ACCOUNTANTS

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries ("Sterling") as of June 30, 1992 and 1991, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1992, 1991 and 1990. These consolidated financial statements are the responsibility of Sterling's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Our report, dated August 15, 1991, on Sterling's financial statements as of June 30, 1991, and for the two years in the period then ended, included an explanatory paragraph regarding uncertainties concerning the ultimate outcome of a civil action against thrift industry regulatory authorities by Sterling seeking to resolve the method of determining compliance with capital standards as promulgated pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and the specific actions, if any, that regulatory authorities might later take if Sterling does not prevail in its lawsuit. As described in Note 2, as a result of the successful public stock offering completed in the quarter ended December 31, 1991, Sterling is in compliance with all current and fully phased-in FIRREA capital requirements and, therefore, the pending legal proceedings described above are not expected to have a material adverse effect on Sterling, regardless of the ultimate outcome of the case. Accordingly, our present opinion on the 1991 and 1990 financial statements as presented herein is different from that expressed in our previous report.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1992 and 1991, and the consolidated results of their operations and their cash flows for the years ended June 30, 1992, 1991 and 1990 in conformity with generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, Sterling changed its method of accounting for income taxes in 1992.

We have previously audited in accordance with generally accepted auditing standards the consolidated balance sheets as of June 30, 1990, 1989 and 1988, and the related statements of income, retained earnings and cash flows for the years ended June 30, 1989 and 1988 (none of which are presented herein); we expressed unqualified opinions on those consolidated financial statements.

In our opinion, the information set forth in the selected financial data for each of the five years in the period ended June 30, 1992, appearing on pages 13–15, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.

COOPERS & LYBRAND

Spokane, Washington
August 5, 1992





SG 0165761
"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0643

STERLING SAVINGS ASSOCIATION

CONSOLIDATED BALANCE SHEETS

(Dollar Amounts in Thousands)

Information as of September 30, 1992 is unaudited.

| ASSETS | September 30, 1992 (Unaudited) | June 30, 1992 | June 30, 1991 |
|---|---|---|---|
| Cash and cash equivalents: | | | |
| Interest bearing | $ 6,162 | $ 12,998 | $ 1,087 |
| Non-interest bearing and vault | 8,403 | 8,018 | 5,821 |
| Restricted | 890 | 275 | 25 |
| Investments (market value $19,630, $19,092 and $15,311) | 19,256 | 19,096 | 15,270 |
| Loans receivable (net of allowance for losses of $3,891, $4,745 and $4,087) | 469,249 | 447,554 | 374,926 |
| Loans and mortgage-backed securities held for sale | 69,982 | 70,623 | 26,767 |
| Mortgage-backed securities (market value $50,429, $42,927 and $139,356) | 48,810 | 42,116 | 139,119 |
| Accrued interest receivable (including $230, $224 and $181 on investments) | 3,752 | 4,067 | 5,120 |
| Office properties and equipment | 9,863 | 9,795 | 10,602 |
| Real estate owned | 7,263 | 6,877 | 8,358 |
| Intangibles | 10,088 | 10,649 | 14,573 |
| Prepaid expenses and other assets | 9,209 | 8,029 | 6,652 |
| Total assets | $662,927 | $640,097 | $608,320 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Deposits | $508,511 | $505,730 | $488,464 |
| Advances from Federal Home Loan Bank of Seattle | 98,782 | 86,233 | 78,971 |
| Securities sold subject to repurchase agreements | 3,300 | 0 | 19,213 |
| Cashier's checks issued and payable | 4,904 | 4,550 | 4,139 |
| Borrowers' reserves for taxes and insurance | 3,095 | 1,922 | 1,209 |
| Accrued interest payable | 1,235 | 1,261 | 1,426 |
| Accrued expenses and other liabilities | 3,076 | 2,178 | 2,277 |
| Total liabilities | 622,903 | 601,874 | 595,699 |
| Commitments and contingent liabilities | | | |
| Preferred stock, $1 par value; 1,000,000 shares authorized; 0, 0 and 89,968 shares issued and outstanding | 0 | 0 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; 3,591,743, 3,591,743 and 518,819 shares issued and outstanding | 3,592 | 3,592 | 519 |
| Additional paid-in capital | 25,683 | 25,683 | 7,714 |
| Retained earnings | 10,749 | 8,948 | 4,298 |
| Total stockholders' equity | 40,024 | 38,223 | 12,621 |
| Total liabilities and stockholders' equity | $662,927 | $640,097 | $608,320 |

The accompanying notes are an integral part of the consolidated financial statements.



SG 0165762

App. 656

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0644

## STERLING SAVINGS ASSOCIATION

## CONSOLIDATED STATEMENTS OF INCOME

**(Dollar Amounts in Thousands, Except Per Share Amounts)**

**Information for the three-month periods ended September 30, 1992 and 1991 is unaudited.**

| | Three months ended September 30, | | Year ended June 30, | | |
|---|---|---|---|---|---|
| | 1992 | 1991 | 1992 | 1991 | 1990 |
| | (Unaudited) | | | | |
| **Interest income:** | | | | | |
| Loans | $ 10,550 | $ 9,841 | $ 40,271 | $44,577 | $53,201 |
| Mortgage-backed securities | 1,822 | 3,192 | 10,884 | 12,472 | 10,483 |
| Investments and cash equivalents | 517 | 361 | 1,666 | 3,475 | 3,362 |
| FDIC yield maintenance subsidy | 0 | 0 | 0 | 159 | 483 |
| Total interest income | 12,889 | 13,394 | 52,821 | 60,683 | 67,529 |
| **Interest expense:** | | | | | |
| Deposits | 6,188 | 8,396 | 29,396 | 35,057 | 38,941 |
| Short-term borrowings | 411 | 385 | 2,126 | 7,891 | 11,692 |
| Long-term borrowings | 1,110 | 1,463 | 4,551 | 4,940 | 3,548 |
| Total interest expense | 7,709 | 10,244 | 36,073 | 47,888 | 54,181 |
| Net interest income | 5,180 | 3,150 | 16,748 | 12,795 | 13,348 |
| Provision for loan losses | 450 | 650 | 1,650 | 150 | 1,100 |
| Net interest income after provision for loan losses | 4,730 | 2,500 | 15,098 | 12,645 | 12,248 |
| **Other income:** | | | | | |
| Mortgage banking operations | 2,421 | 1,748 | 5,310 | 4,372 | 3,425 |
| Fees and service charges | 862 | 677 | 2,916 | 2,466 | 2,011 |
| Loan commitment and origination fees | 0 | 0 | 0 | 0 | 55 |
| Loan servicing fees | 176 | 81 | 381 | 651 | 864 |
| Net gain on sales of securities | 20 | 0 | 3,625 | 255 | 241 |
| Net gain (loss) on sale and operation of real estate owned | 23 | (19) | (476) | (532) | (176) |
| FDIC indemnification for gain (loss) on sale of real estate owned | 0 | 0 | (23) | 155 | (97) |
| Total other income | 3,502 | 2,487 | 11,733 | 7,367 | 6,323 |
| **Operating expenses:** | | | | | |
| Employee compensation and benefits | 1,976 | 1,569 | 7,185 | 6,391 | 6,404 |
| Occupancy and equipment | 793 | 662 | 2,878 | 2,693 | 2,809 |
| Depreciation | 304 | 305 | 1,200 | 1,142 | 1,029 |
| Amortization of intangibles | 562 | 583 | 2,333 | 2,710 | 2,881 |
| Other | 1,435 | 1,097 | 4,650 | 4,765 | 4,974 |
| Total operating expenses | 5,070 | 4,216 | 18,246 | 17,701 | 18,097 |
| Income before income taxes and other items | 3,162 | 771 | 8,585 | 2,311 | 474 |
| **Income tax provision (benefit):** | | | | | |
| Current | 1,173 | 305 | 3,222 | 1,899 | 1,424 |
| Deferred | 0 | 0 | 173 | (1,309) | (1,588) |
| | 1,173 | 305 | 3,395 | 590 | (164) |
| Income before extraordinary item and cumulative effect of change in accounting principle | 1,989 | 466 | 5,190 | 1,721 | 638 |
| Extraordinary item, early extinguishment of FHLB Seattle advances, net of income taxes of $106 and $423 | (188) | 0 | (822) | 0 | 0 |
| Income before cumulative effect of change in accounting principle | 1,801 | 466 | 4,368 | 1,721 | 638 |
| Cumulative effect at July 1, 1991 of change in accounting principle | 0 | 375 | 375 | 0 | 0 |
| Net income | 1,801 | 841 | 4,743 | 1,721 | 638 |
| Less preferred stock dividends earned | 0 | 56 | 93 | 225 | 225 |
| Net income applicable to common shares | $ 1,801 | $ 785 | $ 4,650 | $ 1,496 | $ 413 |
| Earnings per common share before extraordinary item and cumulative effect of change in accounting principle | $ 0.55 | $ 0.79 | $ 2.20 | $ 2.89 | $ 0.80 |
| Extraordinary item, net of income taxes | (0.05) | 0.00 | (0.35) | 0.00 | 0.00 |
| Cumulative effect of change in accounting principle | 0.00 | 0.72 | 0.16 | 0.00 | 0.00 |
| Earnings per common share | $ 0.50 | $ 1.51 | $ 2.01 | $ 2.89 | $ 0.80 |
| Weighted average shares outstanding | 3,612,738 | 518,819 | 2,311,941 | 518,453 | 518,298 |

The accompanying notes are an integral part of the consolidated financial statements.



SG 0165763

App. 657

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0645

## STERLING SAVINGS ASSOCIATION

### CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

**(Dollar Amounts in Thousands, Except Per Share Amounts)**

**Information as of and for the three-month period ended September 30, 1992 is unaudited.**

| | Preferred stock | | Common stock | | Additional paid-in capital | Retained earnings |
|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | |
| Balance, June 30, 1989 | 90,168 | $90 | 517,228 | $ 517 | $ 7,708 | $ 2,389 |
| Cash dividends on preferred stock ($.63 per share) | | | | | | (56) |
| Common shares issued upon exercise of stock options | | | 2,500 | 2 | 17 | |
| Common shares acquired and retired upon exercise of stock options | | | (1,341) | (1) | (10) | |
| Net income | | | | | | 638 |
| Balance, June 30, 1990 | 90,168 | 90 | 518,387 | 518 | 7,715 | 2,971 |
| Conversion of Series B preferred stock to common stock | (200) | | 432 | 1 | (1) | |
| Dividends declared on preferred stock ($4.38 per share) | | | | | | (394) |
| Net income | | | | | | 1,721 |
| Balance, June 30, 1991 | 89,968 | 90 | 518,819 | 519 | 7,714 | 4,298 |
| Shares sold to public, net of offering costs | | | 2,875,000 | 2,875 | 18,077 | |
| Dividends declared on preferred stock ($1.04 per share) | | | | | | (93) |
| Conversion of Series B preferred stock into common stock | (89,968) | (90) | 197,924 | 198 | (108) | |
| Net income | | | | | | 4,743 |
| Balance, June 30, 1992 | 0 | 0 | 3,591,743 | 3,592 | 25,683 | 8,948 |
| Net income (unaudited) | | | | | | 1,801 |
| Balance, September 30, 1992 | 0 | $ 0 | 3,591,743 | $3,592 | $25,683 | $10,749 |

The accompanying notes are an integral part of the consolidated financial statements.

STERLING SAVINGS ASSOCIATION

CONSOLIDATED STATEMENTS OF CASH FLOWS

(Dollar Amounts in Thousands)

Information as of and for the three-month periods ended September 30, 1992 and 1991 is unaudited.

| | Three months ended September 30, 1992 (Unaudited) | Three months ended September 30, 1991 (Unaudited) | Year ended June 30, 1992 | Year ended June 30, 1991 | Year ended June 30, 1990 |
|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | |
| Net income | $ 1,801 | $ 841 | $ 4,743 | $ 1,721 | $ 638 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Provisions for loan and real estate owned losses | 453 | 666 | 2,041 | 569 | 1,550 |
| Stock dividends on FHLB Seattle stock | (196) | (157) | (726) | (651) | (633) |
| Net gain on sales of loans and securities | (1,084) | (1,096) | (6,331) | (2,642) | (3,328) |
| Net gain on sales of office properties and equipment | 0 | 0 | (23) | 0 | 0 |
| Depreciation and amortization | 886 | 746 | 3,513 | 3,466 | 3,514 |
| Deferred income taxes | 0 | 0 | (173) | (1,309) | (1,588) |
| Change in: | | | | | |
| Accrued interest receivable | 315 | 367 | 1,053 | 1,163 | 261 |
| Accrued interest payable | (26) | (20) | (165) | (677) | (920) |
| Cashier's checks issued and payable | 354 | (262) | 410 | (529) | (326) |
| Prepaid expenses and other assets | (1,180) | 210 | (835) | 1,802 | (2,712) |
| Accrued expenses and other liabilities | 898 | (760) | 297 | 1,001 | (5,797) |
| Loans held for sale | (9,892) | 2,616 | 11,088 | (11,517) | 3,091 |
| Purchased loan servicing rights | 0 | 0 | 38 | 864 | 1,472 |
| Cumulative effect of change in accounting principle | 0 | (375) | (375) | 0 | 0 |
| Other, net | 0 | (5) | (579) | 1,061 | 1,352 |
| Net cash provided by (used in) operating activities | (7,671) | 2,771 | 13,976 | (5,678) | (3,426) |
| Cash flows from investing activities: | | | | | |
| Loans disbursed | (143,151) | (120,703) | (629,798) | (437,865) | (447,864) |
| Loan principal payments | 26,451 | 20,160 | 90,111 | 137,049 | 151,663 |
| Purchase of loans receivable | 0 | 0 | (6,257) | 0 | 0 |
| Proceeds from sales of loans | 93,998 | 114,115 | 469,744 | 366,105 | 331,400 |
| Purchase of mortgage-backed securities | (15,230) | (4,869) | (45,343) | (47,645) | (28,379) |
| Mortgage-backed securities principal payments | 5,070 | 3,698 | 18,343 | 10,009 | 9,127 |
| Proceeds from sales of mortgage-backed securities | 14,010 | 0 | 72,630 | 12,223 | 19,837 |
| Purchase of investments | 0 | 0 | (22,324) | (367) | (313) |
| Proceeds from maturities of investments | 0 | 0 | 19,196 | 3,000 | 2,000 |
| Proceeds from sales of investments | 0 | 1,750 | 0 | 10,040 | 3,314 |
| Purchase of office properties and equipment | (372) | (83) | (392) | (611) | (1,435) |
| Proceeds from sale of office properties and equipment | 0 | 0 | 917 | 0 | 0 |
| Proceeds from sales of real estate owned | 1,232 | 811 | 4,692 | 5,665 | 9,874 |
| Effect on deferred taxes from adoption of SFAS 109 | 0 | 0 | 2,423 | 0 | 0 |
| Net cash provided by (used in) investing activities | (17,992) | 14,879 | (26,058) | 57,603 | 49,224 |

The accompanying notes are an integral part of the consolidated financial statements.







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0647

STERLING SAVINGS ASSOCIATION

CONSOLIDATED STATEMENTS OF CASH FLOWS—(Continued)

(Dollar Amounts in Thousands)

Information as of and for the three-month periods ended September 30, 1992 and 1991 is unaudited.

| | Three months ended September 30, 1992 (Unaudited) | Three months ended September 30, 1991 (Unaudited) | Year ended June 30, 1992 | Year ended June 30, 1991 | Year ended June 30, 1990 |
|---|---|---|---|---|---|
| Cash flows from financing activities: | | | | | |
| Net change in NOW, passbook and money market deposits | (26,148) | 2,818 | 10,949 | (6,892) | (9,440) |
| Proceeds from sales of certificates of deposit | 84,954 | 47,985 | 176,025 | 184,856 | 360,265 |
| Payments for maturing certificates of deposit | (61,582) | (55,494) | (196,233) | (200,712) | (425,919) |
| Interest credited to deposits | 5,600 | 7,552 | 26,535 | 32,146 | 34,492 |
| Advances from the FHLB Seattle | 15,232 | 3,000 | 88,000 | 62,000 | 97,000 |
| Repayment of FHLB Seattle advances | (13,952) | 0 | (76,000) | (85,600) | (96,000) |
| Net change in overnight FHLB Seattle advances | 11,250 | (3,800) | (4,800) | (10,500) | 15,300 |
| Net change in securities sold subject to repurchase agreements | 3,300 | (19,213) | (19,213) | (56,688) | (11,444) |
| Net change in borrowers' reserves | 1,173 | 632 | 713 | (286) | 1,024 |
| Proceeds from sale of common stock | 0 | 0 | 20,952 | 0 | 0 |
| Cash dividends on preferred stock | 0 | 0 | (488) | 0 | (56) |
| Net cash provided by (used in) financing activities | 19,827 | (16,520) | 26,440 | (81,676) | (34,778) |
| Net increase (decrease) in cash and cash equivalents | (5,836) | 1,130 | 14,358 | (29,751) | 11,020 |
| Cash and cash equivalents at beginning of year | 21,291 | 6,933 | 6,933 | 36,684 | 25,664 |
| Cash and cash equivalents at end of year | $ 15,455 | $ 8,063 | $ 21,291 | $ 6,933 | $ 36,684 |
| Supplemental disclosures: | | | | | |
| Cash paid during the year for: | | | | | |
| Interest | $ 7,735 | $ 10,264 | $ 36,238 | $ 48,565 | $ 55,155 |
| Income taxes | $ 364 | $ 26 | $ 2,033 | $ 7 | $ 52 |
| Noncash investing activities: | | | | | |
| Loans converted into real estate owned | $ 1,621 | $ 2,771 | $ 3,329 | $ 4,211 | $ 4,427 |
| Transfer of securities from mortgage-backed securities to mortgage-backed securities held for sale | $ 0 | $ 0 | $ (54,944) | $ 0 | $ 0 |

The accompanying notes are an integral part of the consolidated financial statements.



SG 0165766

App. 660

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0648

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollar Amounts in Thousands, Except Per Share Amounts)
Information as of and for the three-month periods ended
September 30, 1992 and 1991 is unaudited.

## 1. SIGNIFICANT ACCOUNTING POLICIES:

The accounting and financial reporting policies of Sterling Savings Association and its subsidiaries ("Sterling") conform to generally accepted accounting principles and to general practice within the savings and loan industry. The following is a description of Sterling's significant accounting policies.

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Sterling and all of its wholly and majority-owned subsidiaries.

The purchase price of acquired companies has been allocated to the assets and liabilities acquired based upon their estimated fair values at the date of acquisition. All significant intercompany accounts and transactions have been eliminated in consolidation.

### Cash and Cash Equivalents

Sterling considers a cash equivalent to be any highly liquid debt instrument purchased with an original maturity of three months or less.

At September 30, 1992 and June 30, 1992 and 1991, Sterling had approximately $5,826, $6,144 and $5,399 of uninsured non-interest bearing deposits.

Restricted cash consists of non-interest bearing deposits maintained as a reserve at the Federal Reserve Bank.

### Loans and Mortgage-Backed Securities Held for Sale

Loans and mortgage-backed securities that will be held for indefinite periods of time or which management intends to use as part of its asset and liability strategy are classified as held for sale. These assets are carried at the lower of amortized cost or market value as determined on an aggregate basis. Market value is determined for loan pools and mortgage-backed securities which have common interest rates using published quotes as of the close of business. Unrealized losses on loans and mortgage-backed securities held for sale are included in the consolidated statements of operations and retained earnings.

### Investments and Mortgage-Backed Securities

Investments and mortgage-backed securities are classified as held for investment when management has the ability and the intent to hold these securities until maturity. Investments are carried at cost, adjusted for amortization of premiums or accretion of discounts. Mortgage-backed securities are carried at their remaining unpaid principal balance, net of unamortized premium or unaccreted discount. Premiums are amortized and discounts are accreted using the level interest yield method over the estimated remaining term of the underlying security.







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0649

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Provision for Loan Losses**

A provision for loan losses, when determined necessary, is charged to income based on management's evaluation of the potential losses that may occur in its loan portfolio. Such evaluation, which includes a review of all loans which may not be fully collectible, considers, among other matters, the estimated net realizable value of the underlying collateral.

**Real Estate Owned**

Property acquired by foreclosure, deed in lieu of foreclosure or loans considered in-substance foreclosed in accordance with Practice Bulletins No. 7 and No. 10 are recorded at the lower of estimated fair value less estimated selling expenses, based on appraisal of such property, or the principal balance of the defaulted loan. Development and improvement relating to the property are capitalized. The carrying value of such property is continuously evaluated and, if necessary, allowances are established to reduce the carrying value to fair value less estimated direct holding costs and selling expenses.

**Office Properties and Equipment**

Office properties and equipment are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for new properties and equipment and major renewals or betterments are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. When property or equipment is sold or retired, the cost and related accumulated depreciation are removed from the respective accounts, and the resulting gains or losses are reflected in income.

**Loan Origination and Commitment Fees**

Loan origination fees, net of certain specifically defined direct loan origination costs, are deferred and recognized as interest income using the level interest yield method over the contractual term of each loan adjusted for actual loan prepayment experience. If the related loan is sold, the remaining net amount deferred, which is part of the basis of the loan, is considered in determining the gain or loss on sale.

Loan commitment fees are deferred until the expiration of the commitment period unless management believes there is a remote likelihood that the underlying commitment will be exercised, in which case the fees are amortized to fee income using the straight-line method over the commitment period. If a loan commitment is exercised, the deferred commitment fee is accounted for in the same manner as a loan origination fee. Deferred commitment fees associated with expired commitments are recognized as fee income.

**Intangibles**

Identified intangibles, which represent separately identifiable intangible assets attributable to depositor relationships that existed at the date of an acquisition, are amortized on a straight-line basis over the estimated life of the depositor relationships acquired (eight years). Accumulated amortization of identified intangibles was $3,195, $2,984 and $2,140 at September 30, 1992, June 30, 1992 and 1991, respectively.

Unidentified intangibles are amortized using the level interest yield method over the estimated remaining life (assuming prepayments) of the long-term interest-bearing assets (loans receivable and mortgage-backed securities) acquired (generally twelve years). Accumulated amortization of unidentified intangibles was $8,261, $7,911 and $6,362 at September 30, 1992, June 30, 1992 and 1991, respectively.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Mortgage Banking Operations**

Sterling originates or purchases and sells loans and participating interests in loans, generally with the servicing rights retained, to provide additional funds for general corporate purposes and to generate servicing income. Loans and participating interests therein committed or held for sale are carried at the lower of cost or market value.

Sterling recognizes a gain or loss on these loan sale transactions which includes a component reflecting the differential between the contractual interest rate of the loan and the interest rate which will be received by the investor. The present value of the estimated future profit for servicing the loans, together with the normal servicing fee rate ("deferred premium"), is taken into account in determining the amount of gain or loss on the sale of loans. At September 30, 1992 and June 30, 1992 and 1991, net deferred premiums on loans sold and purchased servicing of $376, $741 and $835, respectively, were included in prepaid expenses and other assets.

Deferred premiums on loan sales and the capitalized costs of purchased servicing rights are both amortized to expense in proportion to the estimated future stream of net servicing income, assuming loan prepayments.

Premiums paid in connection with option transactions, entered into as an anticipatory hedge of movement in interest rates in connection with mortgage banking operations, are deferred and amortized to expense over the option period. At September 30, 1992 and June 30, 1992 and 1991, net deferred premiums of $193, $193 and $173, respectively, associated with the purchase of put options on $70,000, $45,000 and $31,000 of unspecified mortgage-backed securities, were included in prepaid expenses and other assets.

**Income Taxes**

Sterling and its subsidiaries file a consolidated income tax return. In February 1992, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") 109 "Accounting for Income Taxes," which requires an asset and liability approach for financial accounting and reporting for income taxes. One requirement of SFAS 109 is that the tax benefit related to acquired deductible temporary differences and pre-acquisition net operating loss carryforwards shall first be applied to reduce goodwill related to that acquisition to zero. Accordingly, goodwill has been reduced as a result of the tax benefits related to these items.

Sterling elected to adopt SFAS 109 effective July 1, 1991. The effect of initially applying the new standard was reported as the effect of a change in accounting principle. The cumulative effect of this change is reported separately in the June 30, 1992 consolidated statement of income. As required, first, second and third quarters of fiscal 1992 were restated for the effect of this change. Restatement of prior fiscal years' financial statements is not required as a result of this change.

**Earnings Per Share**

Net earnings per share is equal to net income, reduced by dividends earned on preferred stock during the year, divided by the weighted average number of shares of common stock and common stock equivalents (stock options and warrants) outstanding during each year.

**SFAS 106**

In December 1990, the FASB issued SFAS 106 "Employers' Accounting for Post-Retirement Benefits Other Than Pensions." Sterling must adopt this statement by the beginning of fiscal year 1994. Management believes that this statement will not have a material effect on the financial statements when it is adopted.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0651

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Reclassifications**

Certain balances have been reclassified with the fiscal year 1992 presentation. These reclassifications had no effect on retained earnings or net income as previously reported.

## 2. REGULATORY MATTERS:

Sterling has previously reported on a legal proceeding against the Office of Thrift Supervision ("OTS") and the Federal Depository Insurance Corporation ("FDIC") regarding the treatment of capital and accounting forbearances granted as an inducement to acquire insolvent thrift institutions (Note 18). On April 14, 1992, the United States Court of Appeals for the Ninth Circuit vacated the preliminary injunction issued in May 1990 by the United States District Court and remanded the case to the District Court for further proceedings.

As a result of Sterling's capital enhancement measures during the quarter ended December 31, 1991, Sterling exceeds all FIRREA capital requirements (Note 17) and its primary regulator, the OTS, has rescinded all "troubled thrift" restrictions which were imposed in the past. Therefore, the pending legal proceeding against the OTS and the FDIC is not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case.

## 3. EXTRAORDINARY CHARGES:

In September 1992, Sterling repaid $9,000 of advances from the FHLB Seattle prior to the scheduled maturity dates. In accordance with the debt agreement, Sterling paid $294 in penalties on early extinguishment of the debt. The related tax benefit of $106 has been deducted from the charge for financial statement presentation.

In January 1992, Sterling repaid $25,000 of advances from the Federal Home Loan Bank of Seattle ("FHLB Seattle") prior to the scheduled maturity dates. The repayment was made using proceeds from new advances, at lower interest rates, from the FHLB Seattle. In accordance with the advance agreement, Sterling paid $1,200 in prepayment penalties. The related tax benefit of $423 has been deducted from the charge for financial statement presentation.

## 4. INVESTMENTS AND MORTGAGE-BACKED SECURITIES:

A summary of carrying and market values of investments follows:

| | September 30, 1992 | | June 30, 1992 | | June 30, 1991 | |
|---|---|---|---|---|---|---|
| | Carrying value | Market value | Carrying value | Market value | Carrying value | Market value |
| U.S. Government and agency obligations | $11,408 | $11,782 | $11,444 | $11,440 | $ 8,344 | $ 8,385 |
| FHLB Seattle stock, at cost | 7,819 | 7,819 | 7,622 | 7,622 | 6,896 | 6,896 |
| Other | 29 | 29 | 30 | 30 | 30 | 30 |
| | $19,256 | $19,630 | $19,096 | $19,092 | $15,270 | $15,311 |



SG 0165770

App. 664

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0652

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

At September 30, 1992 and June 30, 1992 and 1991, the investment portfolio includes unrealized gains of $374, $48 and $41, respectively, and unrealized losses of $0, $52 and $0, respectively. The U.S. Government and agency obligations mature in 1 to 5 years. FHLB Seattle stock can only be sold back at par to the FHLB Seattle or to another member institution. Proceeds from sales of investments for the three-month periods ended September 30, 1992 and 1991 and fiscal years 1992, 1991 and 1990 were $0, $1,750, $0, $10,040 and $3,314. Gross gains of $0, $81 and $0 and no losses were recognized on the sales during the three-month period ended September 30, 1991 and fiscal years 1991 and 1990. At September 30, 1992 and June 30, 1992, U.S. Government and agency obligations with an aggregate carrying value of $1,026 and $1,128, respectively. and market value of $1,077 and $1,137, respectively, were pledged as collateral for the treasury tax and loan account in accordance with Federal Reserve Board regulations.

At September 30, 1992 and June 30, 1992 and 1991, the mortgage-backed securities portfolio, all of which are issued by U.S. Government agencies, includes unrealized gains of $1,619, $990 and $1,396, respectively, and unrealized losses of $0, $179 and $1,159, respectively. The maturity of mortgage-backed securities is dependent on the payments on the underlying mortgages. At September 30, 1992, $14,857 of the mortgage-backed securities have balloon maturities of 1 to 5 years and $24,042 have balloon maturities of approximately 7 years. At June 30, 1992, $10,754 of mortgage-backed securities have balloon maturities of 1 to 5 years and $19,560 have balloon maturities of approximately 7 years. The remainder of the mortgage-backed securities amortize to the maturity of the security. Proceeds from sales of mortgage-backed securities for the three-month periods ended September 30, 1992 and 1991 and fiscal years 1992, 1991 and 1990 were $14,010, $0, $72,630, $12,223 and $19,837, respectively. Gross gains of $20, $0, $3,643, $174 and $241, respectively, and gross losses of $0, $0, $18, $0 and $0, respectively, were realized on those sales. At September 30, 1992 and June 30, 1992, mortgage-backed securities with an aggregate carrying value of $6,215 and $6,613, respectively, and market value of $6,647 and $6,954, respectively, were pledged as collateral for wholesale public funds deposits in accordance with Washington Public Deposit Protection Commission regulations. Additionally, Sterling periodically utilizes mortgage-backed securities as security for other borrowing transactions (see Notes 10 and 11).







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0653

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**5. LOANS RECEIVABLE:**

The components of loans receivable are as follows:

| | September 30, 1992 | June 30, 1992 | June 30, 1991 |
|---|---|---|---|
| **Real estate loans:** | | | |
| Variable rate: | | | |
| 1–4 unit residential | $142,773 | $134,131 | $122,382 |
| 5 or more unit residential | 19,147 | 24,193 | 21,705 |
| Commercial | 57,394 | 57,086 | 68,876 |
| Land and other | 789 | 839 | 1,291 |
| Fixed rate: | | | |
| Conventional 1–4 unit residential | 140,219 | 132,113 | 59,280 |
| 1–4 unit insured by FHA/VA | 10,254 | 10,246 | 9,411 |
| 5 or more unit residential | 14,366 | 12,998 | 11,737 |
| Commercial | 20,962 | 22,327 | 21,078 |
| Land and other | 4,859 | 5,174 | 6,291 |
| Construction: | | | |
| 1–4 unit residential | 8,065 | 5,058 | 6,865 |
| 5 or more unit residential | 4,315 | 4,315 | 5,684 |
| Commercial | 4,635 | 4,424 | 7,579 |
| Other real estate loans and contracts | 2,179 | 2,261 | 3,661 |
| | 429,957 | 415,165 | 345,840 |
| **Other loans:** | | | |
| Commercial loans | 17,372 | 14,485 | 14,353 |
| Commercial and personal lines of credit | 9,239 | 7,780 | 7,320 |
| Consumer loans | 22,339 | 19,273 | 14,774 |
| Loans secured by deposits | 1,903 | 2,007 | 2,323 |
| | 50,853 | 43,545 | 38,770 |
| Total loans receivable | 480,810 | 458,710 | 384,610 |
| Undisbursed portion of loans in process | (5,235) | (3,699) | (2,986) |
| Deferred loan fees, net of direct loan origination costs | (129) | (288) | (753) |
| Discount on loans acquired pursuant to purchase transactions (see Note 12) | (2,306) | (2,424) | (1,858) |
| Allowance for losses | (3,891) | (4,745) | (4,087) |
| Loans receivable | $469,249 | $447,554 | $374,926 |

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Included in loans receivable are loans to directors and executive officers. Following is an analysis of the activity in loans to directors and executive officers:

| | Three months ended September 30, 1992 | Year ended June 30, 1992 | 1991 | 1990 |
|---|---|---|---|---|
| Balance, beginning of period | $592 | $782 | $815 | $869 |
| Additions | 5 | 6 | 63 | 104 |
| Repayments | (7) | (196) | (96) | (158) |
| Balance, end of period | $590 | $592 | $782 | $815 |

Sterling grants residential, commercial real estate, consumer and commercial loans throughout Washington and bordering areas, primarily northwestern Oregon. Loans originated outside this area are primarily for immediate sale into the secondary market.

### 6. REAL ESTATE OWNED:

The components of real estate owned are as follows:

| | September 30, 1992 | June 30, 1992 | 1991 |
|---|---|---|---|
| Residential real estate, acquired through foreclosure | $ 73 | $ 73 | $ 513 |
| Commercial real estate, acquired through foreclosure | 7,328 | 6,858 | 7,529 |
| Former branch buildings held for sale | 658 | 739 | 569 |
| Other | 80 | 208 | 231 |
| | 8,139 | 7,878 | 8,842 |
| Allowance for losses | (876) | (1,001) | (1,011) |
| FDIC assistance | 0 | 0 | 527 |
| | $7,263 | $6,877 | $8,358 |

Costs incurred to acquire and improve real estate of $394, $587 and $404 had been capitalized as of September 30, 1992 and June 30, 1992 and 1991, respectively.



SG 0165773

App. 667

"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0655

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**7. ALLOWANCES FOR LOAN AND REAL ESTATE OWNED LOSSES:**

The following is an analysis of the changes in the allowances for loan and real estate owned losses:

| | Loan | Real estate owned | Total |
|---|---|---|---|
| Balance, June 30, 1989 | $6,450 | $ 819 | $7,269 |
| Provision for 1990 | 1,100 | 450 | 1,550 |
| Amounts written off | (910) | (458) | (1,368) |
| Recoveries | 9 | 169 | 178 |
| Balance, June 30, 1990 | 6,649 | 980 | 7,629 |
| Provision for 1991 | 150 | 419 | 569 |
| Amounts written off | (2,722) | (388) | (3,110) |
| Recoveries | 10 | 0 | 10 |
| Balance, June 30, 1991 | 4,087 | 1,011 | 5,098 |
| Provision for 1992 | 1,650 | 391 | 2,041 |
| Amounts written off | (1,028) | (401) | (1,429) |
| Recoveries | 36 | 0 | 36 |
| Balance, June 30, 1992 | 4,745 | 1,001 | 5,746 |
| Provision for three months | 450 | 3 | 453 |
| Amounts written off | (1,317) | (128) | (1,445) |
| Recoveries | 13 | 0 | 13 |
| Balance, September 30, 1992 | $3,891 | $ 876 | $4,767 |

The following is a summary of loans that are not performing in accordance with their original contractual terms:

| | September 30, 1992 | June 30, 1992 | June 30, 1991 | June 30, 1990 |
|---|---|---|---|---|
| Nonaccrual loans (1) | $3,988 | $6,703 | $ 8,280 | $10,771 |
| Accruing loans which are past due 90 days or more | 0 | 31 | 50 | 1,104 |
| Restructured loans (2) | 333 | 337 | 2,452 | 1,299 |
| Total nonperforming loans | $4,321 | $7,071 | $10,782 | $13,174 |

(1) The accrual of interest is stopped on any loan when either principal or interest becomes 90 days past due, unless it meets specific criteria. Any accrued and uncollected interest is eliminated from income at that time. A loan may be put in nonaccrual status sooner than this standard would dictate if, in management's judgment, that loan may be uncollectible. Such interest is then recognized as income only if it is ultimately collected.

At September 30, 1992 and June 30, 1992 and 1991, nonaccrual loans included $2,110, $4,499 and $5,214, respectively, relating to acquired institutions (see Note 18).

(2) Restructured loans occur when Sterling has compromised the contractual loan terms to provide a reduction in the rate of interest and, in most instances, an extension of payments of principal or interest, or both, because of a deterioration in the financial position of the borrower. Restructured loans performing in accordance with their new terms are not included in nonaccrual loans unless concern exists as to the ultimate collection of principal or interest.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0656

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Additional gross interest income of $100 and $640 would have been recorded during the three months ended September 30, 1992 and the year ended June 30, 1992, if nonaccrual and restructured loans had been current in accordance with their original contractual terms. Interest income of $11 and $271 was recorded during the three months ended September 30, 1992 and the year ended June 30, 1992 in connection with these loans.

**8. OFFICE PROPERTIES AND EQUIPMENT:**

The components of office properties and equipment are as follows:

| | September 30, 1992 | June 30, 1992 | June 30, 1991 | Estimated useful life |
|---|---|---|---|---|
| Buildings and improvements | $ 6,950 | $ 6,854 | $ 7,329 | 20–40 years |
| Furniture, fixtures and equipment | 6,104 | 5,846 | 5,489 | 3–10 years |
| Automobiles | 63 | 63 | 55 | 3–5 years |
| Leasehold improvements | 1,098 | 1,088 | 1,040 | 5–10 years |
| Equipment under capital lease | 0 | 0 | 82 | 5 years |
| | 14,215 | 13,851 | 13,995 | |
| Less accumulated depreciation and amortization | 5,979 | 5,683 | 5,168 | |
| | 8,236 | 8,168 | 8,827 | |
| Land | 1,627 | 1,627 | 1,775 | |
| | $ 9,863 | $ 9,795 | $10,602 | |

**9. DEPOSITS:**

The components of deposits are as follows:

| | September 30, 1992 | June 30, 1992 | June 30, 1991 |
|---|---|---|---|
| Commercial NOW accounts (non-interest bearing) | $ 9,874 | $ 7,936 | $ 3,973 |
| NOW accounts, 2.50%, 3.75% and 5.00%, respectively | 48,900 | 45,048 | 36,119 |
| Passbook accounts, 3.25%, 4.00% and 5.25%, respectively | 73,674 | 54,941 | 40,993 |
| Money market demand accounts, 2.50% to 3.35%; 3.50% to 3.80%; and 5.25% to 5.35%, respectively | 32,430 | 31,168 | 26,793 |
| | 164,878 | 139,093 | 107,878 |
| Certificate accounts: | | | |
| 3.00 to 5.99% | 230,200 | 193,302 | 8,671 |
| 6.00 to 6.99% | 45,784 | 101,112 | 90,855 |
| 7.00 to 7.99% | 32,168 | 31,736 | 95,682 |
| 8.00 to 8.99% | 24,784 | 29,439 | 173,900 |
| 9.00 to 9.99% | 2,684 | 2,977 | 3,738 |
| 10.00 to 10.99% | 2,521 | 2,515 | 2,360 |
| 11.00 to 11.99% | 3,215 | 3,229 | 3,215 |
| 12.00% and over | 1,950 | 1,956 | 1,783 |
| | 343,306 | 366,266 | 380,204 |
| Net premium on deposits assumed pursuant to purchase transactions (Note 12) | 327 | 371 | 382 |
| | $508,511 | $505,730 | $488,464 |







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0657

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The weighted average rate paid on deposit accounts is 4.55%, 5.28% and 7.05% at September 30, 1992 and June 30, 1992 and 1991, respectively.

At June 30, 1992, the amounts of scheduled maturities of certificate accounts were as follows:

| Year Ending June 30, | Weighted average interest rate | Amount |
|---|---|---|
| 1993 | 5.96% | $285,212 |
| 1994 | 6.96 | 34,550 |
| 1995 | 7.80 | 12,934 |
| 1996 | 8.28 | 9,421 |
| 1997 | 7.28 | 10,757 |
| Thereafter | 7.93 | 13,392 |
| | 6.29% | $366,266 |

At September 30, 1992 and June 30, 1992 and 1991, certificate accounts included $70,330, $36,417 and $22,405, respectively, of accounts with a minimum balance of $100 ("Jumbos").

The components of interest expense on deposits are as follows:

| | Three months ended September 30, | | Year ended June 30, | | |
|---|---|---|---|---|---|
| | 1992 | 1991 | 1992 | 1991 | 1990 |
| NOW accounts | $ 354 | $ 402 | $ 1,509 | $ 1,527 | $ 1,633 |
| Passbook accounts | 631 | 548 | 2,106 | 2,190 | 2,471 |
| Money market demand accounts | 278 | 362 | 1,345 | 1,604 | 2,024 |
| Certificate accounts | 4,925 | 7,084 | 24,436 | 29,736 | 32,813 |
| | $6,188 | $8,396 | $29,396 | $35,057 | $38,941 |

## 10. ADVANCES FROM FEDERAL HOME LOAN BANK OF SEATTLE:

The advances from FHLB Seattle are repayable as follows:

| | At September 30, 1992 | | At June 30, 1992 | |
|---|---|---|---|---|
| Year Ending June 30, | Weighted average interest rate | Amount | Weighted average interest rate | Amount |
| 1993 | 4.93% | $13,250 | 9.00% | $12,000 |
| 1994 | 6.15 | 50,000 | 6.52 | 48,933 |
| 1995 | 5.96 | 24,000 | 6.01 | 21,000 |
| 1996 | 7.38 | 5,000 | 8.20 | 3,000 |
| Thereafter | 6.54 | 6,532 | 8.40 | 1,300 |
| | 6.03% | $98,782 | 6.83% | $86,233 |

The weighted average interest rate at June 30, 1991 was 8.75%.

The advances are collateralized by eligible assets with a market value equal to a specified percentage of the amount outstanding. Assets eligible for collateral are qualifying real estate loans, mortgage-backed securities and U.S. Government obligations. At September 30, 1992, Sterling was part of a credit program

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

under which it is required to specifically pledge collateral with a market value equal to a range between 100% and 125% of outstanding advances. At September 30, 1992, Sterling had excess collateral available to support an additional $38 million of advances. Eligible assets that are pledged for collateral at September 30 and June 30, 1992 are as follows:

| | September 30, 1992 | June 30, 1992 |
|---|---|---|
| Qualifying real estate loans | $ 78,422 | $ 88,698 |
| Mortgage-backed securities (market value $49,236 and $59,510, respectively) | 47,481 | 58,084 |
| | $125,903 | $146,782 |

## 11. SECURITIES SOLD SUBJECT TO REPURCHASE AGREEMENTS:

Sterling enters into sales of securities under agreements to repurchase (reverse repurchase agreements). Fixed-coupon reverse repurchase agreements are treated as financings, and the obligations to repurchase securities sold are reflected as a liability in the balance sheet. The dollar amount of securities underlying the agreements remains in the applicable asset accounts. There were no outstanding reverse repurchase agreements at June 30, 1992. At September 30, 1992 and June 30, 1991, securities sold subject to repurchase agreements (all of which call for repurchasing the same security) included investments and mortgage-backed securities with an aggregate carrying value of $4,131 and $20,874 (aggregate market value of $20,359). These agreements had a weighted-average interest rate of 4.00% and 6.15%, respectively. Substantially all of Sterling's reverse repurchase agreements at September 30, 1992 and June 30, 1991 were transacted with the Federal Home Loan Mortgage Corporation ("FHLMC"). The mortgage-backed securities underlying these agreements were held by FHLMC. The average balance of securities sold subject to repurchase agreements was $2,115, $2,437, $48,902 and $73,402 during the three months ended September 30, 1992 and the years ended June 30, 1992, 1991 and 1990, respectively. The maximum amount outstanding at any month-end during the three months ended September 30, 1992 and the years ended June 30, 1992, 1991 and 1990 was $5,161, $19,250, $71,997 and $92,128, respectively.

## 12. INCOME TAXES:

As discussed in Note 1, Sterling adopted SFAS 109 as of July 1, 1991. SFAS 109 establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities during the current and preceding years. It requires an asset and liability approach for financial accounting and reporting for income taxes. Sterling has implemented SFAS 109 for the fiscal year ended June 30, 1992. In accordance with this implementation, Sterling has recorded $7,682 in deferred tax assets and $2,866 in deferred tax liabilities at June 30, 1992, as well as recording the cumulative effect of $375 in income for fiscal 1992. Sterling recorded an additional $514 in income during fiscal 1992 due to the implementation of SFAS 109. No valuation allowance has been established to reduce the deferred tax assets, since it is more likely than not these assets will be realized. Also in accordance with the implementation of SFAS 109, Sterling has applied $1,600, primarily from the tax benefit of acquired net operating loss carryforwards, to reduce the balance of its goodwill. The cumulative effect of this change is reported separately in the fiscal 1992 consolidated statement of income and prior years' financial statements have not been restated.

In accordance with SFAS 109, deferred income taxes for fiscal 1992 reflect the impact of temporary differences between values recorded as assets and liabilities for financial reporting purposes and values utilized for income tax reporting in accordance with tax laws. These temporary differences include purchase valuation

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

amounts and other items not previously utilized in the determination of deferred income taxes under previously applicable generally accepted accounting principles. Accordingly, certain purchase valuation amounts have been modified as a result of the implementation of SFAS 109.

A reconciliation of the statutory income tax rate to the consolidated effective income tax rate and a reconciliation of income tax expense and the amount of income taxes computed by applying the statutory federal corporate tax rate to income before income taxes and extraordinary items follows:

| | Year ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 1992 | | 1991 | | 1990 | |
| | Amount | % | Amount | % | Amount | % |
| Income tax provision at federal statutory rate | $2,919 | 34.0% | $ 785 | 34.0% | $ 161 | 34.0% |
| Tax effect of: | | | | | | |
| Bad debt deduction | 0 | 0.0 | (1,104) | (47.8) | (1,453) | (306.5) |
| Amortization of fair market value adjustments and intangibles arising from purchase acquisitions | 506 | 5.9 | 827 | 35.8 | 946 | 199.5 |
| Net premium (discount) attributed to acquired assets sold | 0 | 0.0 | 117 | 5.1 | 340 | 71.7 |
| Tax-exempt yield subsidy payments received | 0 | 0.0 | (54) | (2.3) | (164) | (34.6) |
| Other, net | (30) | (0.3) | 19 | 0.8 | 6 | 1.3 |
| | $3,395 | 39.6% | $ 590 | 25.6% | $ (164) | (34.6)% |

This tax effect of the primary temporary differences giving rise to Sterling's deferred tax assets and liabilities for 1992 is as follows:

| | Asset | Liability |
|---|---|---|
| Net operating loss carryforward | $ 408 | $ 0 |
| Allowance for loan losses | 5,657 | 0 |
| Office properties and equipment | 0 | 435 |
| Equity in losses of partnerships | 0 | 402 |
| Hedging premiums | 168 | 0 |
| Purchase accounting discount or premium | 941 | 1,993 |
| Deferred loan fees | 0 | 36 |
| Tax credit carryforwards | 304 | 0 |
| Other | 204 | 0 |
| Total deferred income taxes | $7,682 | $2,866 |

For tax return purposes, Sterling had available at June 30, 1992 acquired tax net operating loss carryforwards of approximately $1,200 which expire on June 30, 2003. Pursuant to Internal Revenue Code Section 382 limitations, Sterling's utilization of tax net operating loss and tax credit carryforwards are currently limited to an aggregate maximum of approximately $393 annually.

13. EMPLOYEE SAVINGS PLAN:

Sterling maintains an employee savings plan under section 401(k) of the Internal Revenue Code. Substantially all employees are eligible to participate in the plan subject to certain requirements. Under the plan, employees may elect to contribute up to 8% of their salary and Sterling will make a matching

contribution equal to 25% of the employee's contribution. Each employee may make a supplemental contribution of an additional 2% of their salary. All contributions vest immediately. Employees have the option of directing that their contributions be invested in a fixed income security account, an equity security account or Sterling's common stock. During the three months ended September 30, 1992 and the years ended June 30, 1992, 1991 and 1990, Sterling contributed $21, $54, $49 and $53, respectively, to the employee savings plan.

## 14. COMMITMENTS:

At September 30, 1992 and June 30, 1992, Sterling had loan commitments to borrowers and brokers totaling $102,593 and $44,828, respectively, including $85,998 and $32,999 for fixed rate loans and $16,595 and $11,829, respectively, for variable rate loans. Substantially all loan commitments have interest rates that float with the market until closing or until committed for sale in the secondary market. At September 30, 1992 and June 30, 1992, commitments to secondary market institutions to sell fixed rate loans totaled $34,760 and $23,350, respectively. Commitments, which are disbursed subject to certain limitations, extend over various periods of time, with the majority of funds being disbursed within a twelve-month period. Substantially all of the commitments are for single family residential loans that have credit risk similar to Sterling's existing portfolio.

At September 30, 1992, Sterling had committed to purchase $5,000 of mortgage-backed securities. These securities are fixed rate and have a seven-year maturity.

Sterling limits market risk (risk of fluctuating interest rates affecting the market value of an asset) on commitments to originate or buy fixed rate mortgage loans through the use of option transactions. At September 30, 1992 and June 30, 1992, Sterling had purchased options to deliver $70,000 and $45,000, respectively, of mortgage-backed securities (from underlying fixed rate residential mortgages) at set prices, which, in conjunction with commitments to sell specific loans, eliminates a majority of the market risk on fixed rate commitments.

At September 30, 1992 and June 30, 1992, Sterling had mandatory forward commitments from the FHLB Seattle for $20,000 and $5,000, respectively, of fixed rate advances. These commitments mature in fiscal year 1993. These advances have a weighted average rate of 5.5% and 5.9%, respectively, and mature in fiscal years 1994 through 1996.

At September 30, 1992 and June 30, 1992, Sterling had made available various secured and unsecured commercial and personal lines of credit of approximately $15,333 and $12,349, respectively, of which the undisbursed portion is approximately $5,895 and $4,571. These lines of credit provide for periodic adjustment to market rates of interest, and have credit risk similar to Sterling's existing portfolio. Sterling has not historically realized credit losses due to these off-balance sheet credits. Based on this fact and Sterling's analysis of the undisbursed portion of these lines of credit, no specific valuation allowances were recorded for these off-balance sheet credits at September 30, 1992 or June 30, 1992 and 1991.

At June 30, 1992, Sterling had sold approximately $9,045 of mortgage-backed securities to be delivered in July 1992 and had classified these as held for sale at June 30, 1992.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0661

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Rental expense for office properties under operating leases was $273 and $186, $920, $865 and $933 for the three months ended September 30, 1992 and 1991, and for the years ended June 30, 1992, 1991 and 1990, respectively. Future minimum rental commitments as of June 30, 1992, under noncancelable operating leases with initial or remaining terms of more than one year, are as follows:

| Year ending June 30, | |
|---|---|
| 1993 | $1,003 |
| 1994 | 805 |
| 1995 | 537 |
| 1996 | 441 |
| 1997 | 364 |
| Thereafter | 1,947 |
| | $5,097 |

15. INCENTIVE STOCK OPTIONS AND WARRANTS:

Sterling has granted options to purchase shares of its common stock as summarized in the table below. The exercise price of all such options was equal to the fair market value of Sterling's common stock at the date of grant and such options become exercisable one year after the date of grant (all options outstanding at June 30, 1992 are exercisable).

| | Number of shares (A) | Option price per share | Expiration date |
|---|---|---|---|
| Balance, June 30, 1989 | 48,500 | $7.68–$10.21 | 1989–1998 |
| Options granted | 10,750 | $8.75 | 1993 |
| Options granted | 2,000 | $8.75 | 1999 |
| Options exercised | (2,500) | $7.68 | 1989 |
| Options cancelled | (500) | $8.75 | 1993 |
| Balance, June 30, 1990 | 58,250 | $7.68–$10.21 | 1990–1999 |
| Options granted | 11,500 | $5.00 | 1994 |
| Options granted | 4,000 | $5.00 | 2000 |
| Options cancelled | (5,000) | $5.00–$10.21 | 1991–1994 |
| Options expired | (9,500) | $9.72–$10.21 | 1991 |
| Balance, June 30, 1991 | 59,250 | $5.00–$10.21 | 1991–2000 |
| Options granted | 16,750 | $8.25 | 1995 |
| Options granted | 6,500 | $8.25 | 2001 |
| Options expired | (8,250) | $9.90 | 1992 |
| Balance, June 30, 1992 | 74,250 | $5.00–$10.21 | 1993–2001 |
| Options granted | 11,750 | $9.50 | 1996–2002 |
| Options cancelled | (1,000) | $5.00–$8.75 | 1993–1995 |
| Balance, September 30, 1992 | 85,000 | $5.00–$10.21 | 1993–2002 |

(A) Stock options for a total of 40,250 shares have been granted in tandem with a corresponding number of stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock, above the option price, at the date of exercise. Payment is to be made in cash or in the form of newly issued common stock, or any combination thereof. The exercise of either rights or options serves to cancel the other. Since the current market value exceeds the exercise price, compensation expense of $33 and $76, respectively, had been accrued at September 30, 1992 and June 30, 1992 in connection with these stock appreciation rights.



SG 0165779 A



"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0662

In connection with the public common stock offering in November 1991, Sterling issued to underwriters warrants to purchase 150,000 shares of common stock at an exercise price of $9.90 per share. The warrants are exercisable between November 1992 and November 1996.

**16. PREFERRED STOCK:**

During the year ended June 30, 1992, Sterling exercised its option and converted each share of Series B cumulative, convertible preferred stock into 2.2 shares of common stock. All accumulated dividends as of the conversion date were declared and paid. Had this conversion occurred at the beginning of the fiscal year, there would have been no material effect on earnings or earnings per share as reported.

**17. REGULATORY CAPITAL:**

In connection with the insurance of its deposits by the FDIC and general regulatory oversight by the OTS, Sterling is required to maintain minimum levels of regulatory capital.

As an inducement to acquire insolvent thrift institutions in the past, Sterling's regulators allowed it to include certain items in the calculation of its regulatory capital (see Note 18). The OTS has taken the position that the right to include such items in the calculation of regulatory capital was eliminated by FIRREA. Sterling's beliefs on how its regulatory capital should now be computed differ from the OTS' position. Sterling believes that the Acquisition Agreements for the acquisitions of several troubled institutions, and the various forbearances included therein, define the methodology for computing its regulatory capital requirements through December 31, 1993. Based on compliance with these Acquisition Agreements, Sterling's computation of its regulatory capital at June 30, 1992 is as follows:

| | Amount | Percent of assets |
|---|---|---|
| Total stockholders' equity | $38,223 | 5.87% |
| Adjustment for amortization of goodwill under regulatory accounting | (1,980) | (.30) |
| Contractual regulatory capital (FDIC cash assistance payments) | 13,480 | 2.07 |
| Computed regulatory capital | 49,723 | 7.64 |
| Minimum regulatory capital required under contractual acquisition agreements (specifically Central Evergreen Business Plan) | 25,730 | 3.94 |
| Regulatory capital surplus | $23,993 | 3.70% |

Sterling exceeds all current and fully phased-in capital requirements even if the OTS interpretation of the FIRREA requirements were applicable to Sterling and if the agreements were not binding on the regulators.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table sets forth Sterling's tangible capital, core capital and risk-based capital at September 30, 1992 and June 30, 1992, computed in accordance with the OTS capital regulations without giving effect to forbearance or capital provisions of the Acquisition Agreements (Note 18), and compares these with Sterling's tangible, core and risk-based capital requirements, under OTS capital regulations as currently in effect and as scheduled to be fully phased-in through December 31, 1994.

| | September 30, 1992 | | | | June 30, 1992 | | | |
|---|---|---|---|---|---|---|---|---|
| | Current requirements | | Fully phased-in requirements | | Current requirements | | Fully phased-in requirements | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| Total tangible capital | $28,012 | 4.30% | $28,012 | 4.30% | $26,556 | 4.21% | $26,556 | 4.21% |
| Tangible capital requirement | 9,768 | 1.50 | 9,768 | 1.50 | 9,452 | 1.50 | 9,452 | 1.50 |
| Tangible capital excess | $18,244 | 2.80% | $18,244 | 2.80% | $17,104 | 2.71% | $17,104 | 2.71% |
| Total core capital | $37,652 | 5.75% | $31,140 | 4.76% | $36,185 | 5.71% | $29,883 | 4.72% |
| Core capital requirement | 19,630 | 3.00 | 19,630 | 3.00 | 19,004 | 3.00 | 19,004 | 3.00 |
| Core capital excess | $18,022 | 2.75% | $11,510 | 1.76% | $17,181 | 2.71% | $10,879 | 1.72% |
| Total risk-based capital(1) | $39,845 | 10.42% | $30,757 | 8.24% | $39,578 | 10.68% | $33,276 | 9.14% |
| Risk-based capital requirement | 27,539 | 7.20 | 29,872 | 8.00 | 26,679 | 7.20 | 29,140 | 8.00 |
| Risk-based capital excess | $12,306 | 3.22% | $ 885 | .24% | $12,899 | 3.48% | $ 4,136 | 1.14% |

(1) Under existing regulations, Sterling's risk-based capital requirement is 7.2% until December 31, 1992, at which time the permanent requirement of 8% is scheduled to be phased-in. Additionally, certain items currently includable in core capital and therefore in risk-based capital are scheduled to be phased out through December 31, 1994.

The OTS has proposed regulations which would likely increase capital requirements for certain thrift institutions, including Sterling, above current levels. Also, under certain conditions, the OTS could establish an individual minimum capital requirement which might exceed any or all of the current or proposed capital requirements otherwise applicable to Sterling. Management expects that Sterling will remain in compliance with applicable regulatory capital requirements although, due to the preliminary nature of the proposed rule making, there can be no assurance in this regard.

18. ACQUISITIONS:

During the years ended June 30, 1988 and 1989, Sterling, with the approval of its regulators, completed supervisory acquisitions of two troubled institutions, Tri-Cities Savings and Loan Association ("Tri-Cities") and Central Evergreen Federal Savings and Loan Association ("Central Evergreen"), respectively. Both of these institutions were insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on Sterling's financial statements as part of accounting for the acquisitions. Both of the supervisory acquisitions were subject to contractual acquisition agreements ("Acquisition Agreements") with then-existing regulatory authorities.





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0664

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

a. *Central Evergreen Federal Savings and Loan Association*

On December 31, 1988, Sterling acquired all of the outstanding stock of Central Evergreen of Chehalis, Washington, in exchange only for assuming its outstanding net liabilities. The acquisition was accounted for as a purchase, and resulted in the recording of $22,083 of intangible assets. This "supervisory" acquisition was conducted under an Acquisition Agreement executed with the Federal Home Loan Bank Board ("FHLBB"). As part of the acquisition, the FHLBB (now OTS) provided a "certification of insolvency" for Central Evergreen, which allows Sterling to utilize Central Evergreen's tax basis net operating loss carryforwards.

The Central Evergreen acquisition did not involve cash assistance or indemnification from loss on troubled assets. The Acquisition Agreement was based upon an approved Business Plan under which Sterling would operate through December 31, 1993. This Acquisition Agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital requirements included in the Business Plan incorporated the forbearances and other provisions of certain other supervisory Acquisition Agreements, including Tri-Cities Savings and Loan Association (see below).

b. *Tri-Cities Savings and Loan Association*

On April 8, 1988, Sterling acquired substantially all of the assets and assumed the liabilities of Tri-Cities of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("FSLIC"). FSLIC was succeeded by the FDIC pursuant to FIRREA. The acquisition was accounted for as a purchase, and resulted in the recording of $2,239 of intangible assets. Pursuant to an Acquisition Agreement executed with FDIC, Sterling received a cash assistance payment of $11,730 from FDIC. As part of the acquisition Agreement, FDIC agreed to indemnify Sterling for 75% of any capital losses on certain assets until Sterling's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. FDIC further agreed to guarantee a minimum yield to Sterling on this same group of assets. During the three months ended September 30, 1992 and 1991 and the years ended June 30, 1992 and 1991, Sterling received $0, $0, $504 and $640, respectively, for loss indemnification and $0, $0, $0 and $159, respectively, for yield subsidies from FDIC pursuant to the Tri-Cities Acquisition Agreement. FDIC also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending pre-existing litigation of Tri-Cities for a period of five years.

As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. Sterling agreed to refund to FDIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

The Tri-Cities Acquisition Agreement provided Sterling with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Acquisition Agreement, Sterling was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods used in calculating regulatory capital beyond those allowed under generally accepted accounting principles.





CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0665

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 19. QUARTERLY FINANCIAL DATA (UNAUDITED):

Unaudited quarterly results of operations for the year ended June 30, 1992 was restated to reflect a change in accounting principle (Note 1). Unaudited, restated quarterly results and the effects of restatement are summarized below:

| | Year ended June 30, 1992 | | | |
|---|---|---|---|---|
| | First quarter | Second quarter | Third quarter | Fourth quarter |
| Interest income | $13,394 | $13,052 | $13,025 | $13,350 |
| Interest expense | 10,244 | 9,398 | 8,301 | 8,130 |
| Provision for loan losses | 650 | 150 | 250 | 600 |
| Net interest income after provision for loan losses | 2,500 | 3,504 | 4,474 | 4,620 |
| Other income | 2,487 | 3,052 | 3,246 | 2,948 |
| Operating expenses | 4,216 | 4,712 | 4,535 | 4,783 |
| Income before income taxes | 771 | 1,844 | 3,185 | 2,785 |
| Income tax provision | 305 | 729 | 1,260 | 1,101 |
| Net income from operations | 466 | 1,115 | 1,925 | 1,684 |
| Cumulative effect of change in accounting principle | 375 | 0 | 0 | 0 |
| Extraordinary item, net of tax (see Note 3) | 0 | 0 | (822) | 0 |
| Net income | $ 841 | $ 1,115 | $ 1,103 | $ 1,684 |
| Net income applicable to common shares | $ 785 | $ 1,078 | $ 1,103 | $ 1,684 |
| Earnings per share: | | | | |
| From operations | $ 0.79 | $ 0.68 | $ 0.54 | $ 0.47 |
| Cumulative effect of change in accounting principle | 0.72 | 0.00 | 0.00 | 0.00 |
| Extraordinary item, net of tax (see Note 3) | 0.00 | 0.00 | (0.23) | 0.00 |
| Earnings per share after cumulative effect of change of accounting principle and extraordinary item | $ 1.51 | $ 0.68 | $ 0.31 | $ 0.47 |
| Effects of restatement: | | | | |
| Net income from operations, as previously reported | $ 474 | $ 1,244 | $ 2,214 | $ 1,684 |
| Effect of restatement, net of tax | (8) | (129) | (289) | 0 |
| Net income from operations, restated | 466 | 1,115 | 1,925 | 1,684 |
| Cumulative effect of change in accounting for income taxes | 375 | 0 | 0 | 0 |
| Extraordinary item, as previously reported (see Note 3) | 0 | 0 | (897) | 0 |
| Effect of restatement | 0 | 0 | 75 | 0 |
| Extraordinary item, as restated (see Note 3) | 0 | 0 | (822) | 0 |
| Net income, restated | $ 841 | $ 1,115 | $ 1,103 | $ 1,684 |





"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0666

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Year ended June 30, 1991 | | | |
|---|---|---|---|---|
| | First quarter | Second quarter | Third quarter | Fourth quarter |
| Interest income | $15,664 | $16,263 | $14,737 | $14,019 |
| Interest expense | 12,491 | 12,975 | 11,587 | 10,835 |
| Provision for loan losses | 0 | 50 | 50 | 50 |
| Net interest income after provision for loan losses | 3,173 | 3,238 | 3,100 | 3,134 |
| Other income | 1,455 | 1,582 | 2,058 | 2,313 |
| Operating expenses | 4,471 | 4,523 | 4,242 | 4,506 |
| Income before income taxes | 157 | 297 | 916 | 941 |
| Income tax provision | 40 | 76 | 234 | 240 |
| Net income | $ 117 | $ 221 | $ 682 | $ 701 |
| Net income applicable to common shares | $ 61 | $ 164 | $ 626 | $ 645 |
| Earnings per common share | $ 0.12 | $ 0.32 | $ 1.21 | $ 1.24 |

**20. OPERATING EXPENSES—OTHER:**

The components of other expense which exceed one percent of the aggregate of total interest income and other income are as follows:

| | Three months ended September 30, | | Year ended June 30, | | |
|---|---|---|---|---|---|
| | 1992 | 1991 | 1992 | 1991 | 1990 |
| Data processing | $333 | $317 | $1,304 | $1,319 | $1,484 |
| Insurance | 324 | 306 | 1,214 | 1,163 | 1,116 |
| Legal and accounting | 265 | 114 | 502 | 563 | 419 |

**21. LOAN SERVICING:**

Loans serviced for others are not included in the consolidated balance sheets. The unpaid principal balances of these loans for the periods indicated are summarized as follows:

| | September 30, | | June 30, | | |
|---|---|---|---|---|---|
| | 1992 | 1991 | 1992 | 1991 | 1990 |
| Loan portfolios serviced for: | | | | | |
| FHLMC | $161,276 | $ 59,071 | $203,623 | $ 66,828 | $ 69,913 |
| FNMA | 64,316 | 9,015 | 73,563 | 19,806 | 60,030 |
| Others | 28,296 | 35,723 | 25,534 | 37,158 | 46,030 |
| | $253,888 | $103,809 | $302,720 | $123,792 | $175,973 |

Custodial escrow balances maintained in connection with the foregoing loan servicing were approximately $2,168, $1,047, $1,923, $507 and $830 at September 30, 1992 and 1991, and June 30, 1992, 1991 and 1990, respectively.

STERLING SAVINGS ASSOCIATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Concluded)

Following is an analysis of the changes in loan servicing rights purchased and excess servicing fees retained asset balances for the three months ended September 30, 1992 and for the years ended June 30, 1992 and 1991:

| | Purchased | Retained |
|---|---|---|
| Balance, June 30, 1990 | $1,135 | $ 237 |
| Additions | 0 | 1,596 |
| Sales | (740) | (1,168) |
| Amortization | (124) | (101) |
| Balance, June 30, 1991 | 271 | 564 |
| Additions | 0 | 1,077 |
| Sales | 0 | (1,014) |
| Amortization | (38) | (119) |
| Balance, June 30, 1992 | 233 | 508 |
| Additions | 0 | 0 |
| Sales | 0 | (334) |
| Amortization | (10) | (21) |
| Balance, September 30, 1992 | $ 223 | $ 153 |







"Confidential Material – Subject to Protective Order"

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PSG062 0668




App. 681

SG 0165786

"Confidential Material – Subject to Protective Order"

**No dealer, salesperson or other person has been authorized to give any information or to make any representations other than those contained in this Prospectus in connection with the offer made by this Prospectus, and, if given or made, such information or representations must not be relied upon as having been authorized by Sterling or by the Underwriter. Neither the delivery of this Prospectus nor any sale made hereunder shall under any circumstances create an implication that the information herein or incorporated by reference herein is correct as of any time subsequent to its date. This Prospectus does not constitute an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to anyone to whom it is unlawful to make such offer or solicitation.**

TABLE OF CONTENTS


| | Page |
|---|---|
| Prospectus Summary | 3 |
| Risk Factors | 7 |
| Sterling | 10 |
| Recent Developments | 11 |
| Use of Proceeds | 12 |
| Capitalization | 12 |
| Selected Consolidated Financial and Other Data | 13 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Business | 30 |
| Taxation | 43 |
| Regulatory Developments | 43 |
| Management | 46 |
| Description of Notes | 50 |
| Underwriting | 55 |
| Legal Matters | 55 |
| Experts | 55 |
| Available Information | 56 |
| Incorporation of Certain Documents by Reference | 56 |
| Index to Consolidated Financial Statements | F-1 |


**$15,000,000**

# STERLING
**Financial Corporation**

**% Subordinated Notes Due 2000**

**PROSPECTUS**

**Dain Bosworth**
Incorporated

, 1993

App. 682

SG 0165787

"Confidential Material – Subject to Protective Order"