IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x

STERLING SAVINGS ASSOCIATION, :
A state-chartered savings association, :
STERLING FINANCIAL CORPORATION, :
A Washington corporation :
Plaintiff, : Court No. 95-829-C
v. : Judge Wolski)
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - - -x

Washington, D.C.
Monday, March 8, 2004

Videotape Deposition of DR. CHRISTOPHER JAMES, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:09:40 a.m., Monday, March 8, 2004, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

Page 138

BY MS. HOSFORD:
Q. So do you believe that Sterling would have used a 50 basis point cushion in 1992?
A. No. I'm saying that it, what cushion it would use would depend on the, the amount of capital that it had, and in an attempt to, I think it is appropriate to assume that Sterling would not have given us objective of being well capitalized would have operated with less than a 5 percent capital ratio. I think 5.5 capital ratio used by Dr. Horvitz is conservative in the context of the assumptions he is, he is making, and I'm just pointing out that my lost profits calculation is based on a different set of assumptions concerning the but-for world.
Q. Did you change the ratio so that the thrift could continue to grow?
A. That was one of the reasons. Yes.
Q. And did you already tell me any other reasons?
A. Yes, I did.
Q. Okay. I think you addressed this briefly before, but could you turn to Exhibit E, please.
A. Okay.
Q. To your knowledge, was Exhibit E derived from Professor Horvitz's Exhibit E?

Page 139

A. I think I addressed that before. And the answer is not entirely. No.
Q. But isn't it, would it be wrong to think that Cornerstone, who works for both you and Dr. Horvitz took Dr. Horvitz's and then just revised it to conform to your assumptions?
MR. SYMMES: Objection. Go ahead and answer.
THE WITNESS: I'm not sure what you mean by that.
BY MS. HOSFORD:
Q. Since Cornerstone is working for both you and Dr. Horvitz and is generating all the spreadsheets, is it wrong to assume that they might have taken his spreadsheet and just revised it to conform to your new assumptions?
A. I think it's safe to say that I directed them to use a format similar to the format that I saw in Dr. Horvitz's report so as to allow an easy comparison between the two reports.
Q. Did you talk to Dr. Horvitz at all about this report?
A. No.
Q. So whose idea was it to use the model that Dr. Horvitz used?

Page 140

MR. SYMMES: Objection. Asked and answered. Go ahead.
THE WITNESS: That was my idea.
BY MS. HOSFORD:
Q. Did you consider any other methodologies?
A. Yes. I considered other methodologies. I concluded that this methodology was, I believe, the most appropriate.
Q. What other methodologies did you consider?
A. I considered using a methodology where I just looked at the leverage, the amount of unmitigated supervisory goodwill for presentation purposes, it would have looked different. For purposes of calculating damages, I would have arrived at the same conclusion.
Q. So you would have done the same damage number?
A. Using the same assumptions, yes.
Q. What's the difference between this methodology and one where you look at the leveraged the amount of unmitigated supervisory goodwill?
A. Other than in exposition and description, nothing really.
Q. So are there any other methodologies you considered?

Page 141

A. No.
Q. Did you review Dr. Horvitz's report before you prepared this lost profits calculation?
A. You mean his first report?
Q. Or any of his reports.
A. I reviewed his first report.
Q. And how did you obtain that?
A. Again, at the risk of repeating myself, it was part of my task and my first expert report and --
Q. So in your first expert report, you used it as well?
A. Yes. Remember?
MR. SYMMES: Objection to the phrase using it. I think you are getting crossed with the term reviewed but go ahead and answer to the best of your ability.
BY MS. HOSFORD:
Q. Did you review his second report?
A. No.
Q. The one he prepared in December?
A. No.
Q. And you didn't look at changes he made in January, I assume?
A. No.
Q. February, I mean.

Page 142

Okay. The first adjustment you talked about was the adjustment of the capital the but-for bank would have raised and I think you mentioned that's shown on Exhibit E?
A. Yes.
Q. Okay. Where exactly on Exhibit E is that shown?
A. If you go to Exhibit E, table five.
Q. I'm there.
A. Okay. You see that there is a capital constraint assets, see Exhibit B, or I'm sorry, column B, do you see it?
Q. Yes.
A. And that B is calculated using a column I, which is the core capital, which reflects the additional capital raised in 1989, but does not reflect capital raised in 1991 and 1993.
Q. Where does it show the capital raised in 1989?
A. If you look at column K.
Q. Okay. And so when Dr. Horvitz's report, there would have been an additional capital raised adjustment in '91 and '93?
A. '91. Yes.
Q. Why not '93?

Page 143

A. Well, because my lost profits goes only through to the, I think it's February of 1993 when the second capital raise occurred.
Q. But would Dr. Horvitz's report have shown the capital raising in 1993?
MR. SYMMES: Objection. I think he testified he hasn't reviewed it but go ahead and answer.
THE WITNESS: I believe his original report showed capital raised in 1993. That's right.
BY MS. HOSFORD:
Q. Okay. Have you quantified the impact associated with the adjustment, this adjustment that you made?
A. Which adjustment?
Q. Taking out the 1991 capital raising.
A. That specifically?
Q. Yes.
A. No.
Q. So you don't know whether it increased damages or decreased damages or caused them to remain the same?
A. No. I don't think that would be a fair conclusion.
Q. So what, which is it?

Page 144

A. Which is what?
Q. Did this, did this change increase damages, decrease or cause them to remain the same?
A. You mean in terms of just looking at lost profits?
Q. Uh-huh.
A. Well, if the but-for bank is going to have in Dr. Horvitz's model, going to have additional capital in 1991, so to the extent that but-for bank here has less capital, there is a greater difference in terms of the but-for bank's asset size relative to the actual bank size, so that should result in that part of it would make the damage number larger. Offsetting that, of course, is, so I think it would make it larger.
Q. Okay. Okay. On page 21, I mean on page 5 of your report, line 21, you make reference to Sterling's common stock offering that took place in November 1981?
A. Uh-huh. I think you misspoke. '91.
Q. I'm sorry. '91. You made reference here, to an offering circular that indicated the primary purpose of the offering.
Do you have any basis or basis for understanding what the purpose of the offering was

Page 145

other than that statement in the offering circular?
A. Other than reading the offering circular, that's my basis for my understanding what the purpose was.
Q. You didn't talk to Sterling personnel or anything like that?
A. You know, not in preparation of this report. I believe I talked to them, had discussion with them in preparation of my prior report.
Q. So for purposes of this report, do you assume that the offering took place for the purposes set forth in the offering circular?
A. My, my understanding is that the, for the purposes of this report, I'm assuming that the offering was undertaken to increase regulatory capital levels and that a portion of the offering --
Q. Where are you reading from?
A. I'm not reading from anywhere.
Q. Oh. Sorry I interrupted. Go ahead.
A. That for the purposes of this report, I'm assuming that the but for the breach, the $21 million net of transactions cost offering would not have occurred.
Q. So is the offering circular not even relevant to this report then?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

STERLING SAVINGS ASSOCIATION, :
a state-chartered savings :
association, :
STERLING FINANCIAL CORPORATION, :
a Washington corporation, :
Plaintiffs, :
vs. : Court No. 95-829-C
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - - - x

Washington, D.C.
February 25, 2004

Deposition of PAUL M. HORVITZ, Ph.D., a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Robert M. Jakupciak, a Notary Public in and for the District of Columbia, taken at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., 20530, at 9:19 a.m., on Wednesday, February 25, 2004, and the proceedings being taken down by Stenotype by Robert M. Jakupciak, RPR.

App. 705

Page 30

A. Well, the problem is that in my report on damages I include wounded banks as a category of damage, and so it would be a simple matter just to change that number for the wounded bank damages.

However, the wounded bank damages affect the earnings and the capital of the bank and, hence, that runs through the model and affects the rest of the lost -- affects the lost profits calculation as well as the wounded bank damages.

So we had to run through the whole model and redo the calculations to take account of that.

Q. Did you verify the new numbers given to you by Mr. Byrne for accuracy?

A. No. There is no -- I didn't review the invoices on which those revisions were made. But I did review with him the basis why the figures were changed. And then we ran the model based on those figures. So I have some understanding of why the figures changed. But I did not verify the figures.

Q. And what did he tell you about why the figures changed?

A. Well, it differs for the different categories of wounded bank damages. The CJ4 loan, it appeared to him that there had been some double counting of the interest loss on the loan. And all of

Page 31

these changes were in the direction of reducing the amount of damages claimed. So there seemed to be some double counting, so that was reduced.

Some of the excess supervisory costs would, questionable as to whether they were additional supervisory costs or whether they were related to some other issues that might not have been related to the breach. And so he removed all those. And the only excess supervisory costs that remained is the excess deposit insurance premiums that were paid for being a problem bank.

And with respect to legal fees, at my previous deposition I was shown a list of expenses, and there were, I believe, two items that seemed potentially duplicative, that is, two invoices for legal services that were exactly the same down to the penny. And the question was raised as to whether those were duplicates or whether they were accurate.

And Mr. Byrne told me he could not find the original invoices, and so decided to drop those duplicates, or drop those on the assumption that they were a duplication of the same expense. I believe that's all of it. But I could look at the list and --

Q. Okay. Do you know what prompted Mr. Byrne to make these changes? I think you mentioned in one

Page 32

case it was because something was raised at your deposition, but what about the other changes?

A. I don't know.

Q. How confident are you in the accuracy of your December 2003/February 2004 report?

A. Accuracy in what -- I'm not sure just what you mean. The accuracy of the number of, being calculated for damages? Or the specific calculations?

Q. All of the calculations.

A. Well, in one sense I guess recent events have demonstrated that the lost profits calculation is significantly too low. But I'm confident in the accuracy of the individual calculations.

There were some judgments I made early on that turn out to be too conservative.

Q. When you say that recent events have shown that lost profits are probably too low, can you explain your basis for that?

A. Well, the simplest thing is we look at -- I have the -- we have figures on the actual bank and I have my calculation of what the size of the "but for" bank would be. Well, at the present time the, Sterling is larger than my "but for" calculation, which indicates that that calculation of growth of Sterling that's based, that's built into my modeling

Page 33

was too conservative.

Q. Do you mean the actual bank is bigger than the "but for" calculation you had back in your original report? I'm not sure -- I'm not following.

A. The "but for" calculation in this February report for December 2003, the bank, the actual bank is bigger than that now in early 2004.

Q. Was that the case in your 2001 report? Was the "but for" bank smaller than the actual bank then? Do you see what I'm saying?

A. In 2001 the actual bank was smaller than the "but for" bank.

Q. So how is it different now? Why is it that recent events have told you that your lost profits calculation is too small?

A. The bank has grown very rapidly.

Q. But -- if the "but for" bank was smaller than the actual bank in 2001 and the "but for" bank is smaller than the actual bank in 2004, what recent events changed your mind?

MR. SYMMES: Objection.

A. I think you misstated it.

MR. SYMMES: Objection. Mischaracterized his testimony. Go ahead and answer.

Q. If I have mischaracterized your testimony,