7709

FDIC

FEDERAL DEPOSIT INSURANCE CORPORATION

OTS

San Francisco Region Tier III Examination Certificate Number 32158

Sterling Savings Association

Spokane Spokane County Washington

Examiner-In-Charge John F. Tokarz Examined Close of Business September 17, 1990

# REPORT OF EXAMINATION

## THIS REPORT OF EXAMINATION IS STRICTLY CONFIDENTIAL

This report of examination has been made by an examiner appointed by the Board of Directors of the Federal Deposit Insurance Corporation for use in the supervision of the bank. The information contained in this report is based upon the books and records of the bank, upon statements made to the Examiner by directors, officers, and employees, and upon information obtained from other sources believed to be reliable.

It is recommended that each director, in accordance with his/her responsibilities both to depositors and to shareholders, thoroughly review the report. In making this review, it should be kept in mind that while an examination includes some audit tests, it is not to be construed as an audit, and this report should not be considered an audit report.

This copy of the report is the property of the Federal Deposit Insurance Corporation and is furnished to the bank examined for its confidential use. Under no circumstances shall the bank, or any of its directors, officers, or employees disclose or make public in any manner the report or any portion thereof. If a subpoena or other legal process is received calling for production of this report, the Regional Office of the Federal Deposit Insurance Corporation should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued it, should be advised of these restrictions and referred to Part 309 of the Federal Deposit Insurance Rules and Regulations.

FEDERAL DEPOSIT INSURANCE CORPORATION

FDIC 6300/01 (6-82)

App. 707

## ABBREVIATIONS

The following are the principal abbreviations used in this report of examination.

| | |
|---|---|
| AL | Acres of Land |
| AP | Accounts Payable |
| AR | Accounts Receivable |
| ATS | Automatic Transfer Savings |
| AV | Appraised Value |
| BV | Book Value |
| CA | Current Assets |
| CD | Certificate of Deposit |
| CL | Current Liabilities |
| CPA | Certified Public Accountant |
| CSV | Cash Surrender Value |
| CT | Certificate of Title |
| d/b/a | Doing Business As |
| DPC | Debts Previously Contracted |
| DT | Deed of Trust |
| End | Endorser or Endorsed |
| EV | Estimated Value |
| F & F | Furniture and Fixtures |
| FA | Fixed Assets |
| FHA | Federal Housing Administration |
| FS | Financing Statement |
| Gty | Guarantor and Guaranteed |
| JM | Joint Maker |
| LS | Livestock |
| M | Thousands |
| M & E | Machinery and Equipment |
| Mdse | Merchandise |
| Mtge | Mortgage |
| MV | Market Value |
| NOW | Negotiable Order of Withdrawal |
| NP | Notes Payable |
| NR | Notes Receivable |
| NW | Net Worth |
| OA | Other Assets |
| OD | Overdraft |
| OL | Other Liabilities |
| ORE | Other Real Estate |
| OS | Operating Statement |
| PL | Prior Lien |
| PORE | Potential Other Real Estate |
| PPD | Prepaid |
| PS | Property *(Financial)* Statement |
| PV | Par Value |
| RE | Real Estate |
| SA | Security Agreement |
| SBA | Small Business Administration |
| TA | Total Assets |
| TE | Tax Equivalent Basis |
| TL | Total Liabilities |
| UBPR | Uniform Bank Performance Report |

### NOTE

Amounts shown on this report are rounded to the nearest thousand dollars *(000* omitted).

Component ratios have been taken from the Uniform Bank Performance Report and other sources which are based on data derived from Reports of Condition and Income filed with FDIC. Examination ratios have been derived from the results of the current and prior examinations. Peer group ratios are derived from a group of banks similar to your bank in terms of asset size and the characteristics of the market in which they operate.

FDIC 6300/01 (6-82) Reverse



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2372

| EXAMINER'S COMMENTS AND CONCLUSIONS | NUMBER 32158 |
|---|---|

CONSOLIDATED FINANCIAL STATEMENTS

The Report of Examination includes the consolidated financial statements of Sterling Savings Association and its wholly-owned subsidiaries prepared in accordance with generally accepted principles of consolidation. Wholly-owned subsidiaries consist of Action Mortgage Company, Evergreen Environmental Development Corporation, Evergreen First Service Corporation consolidated with its wholly-owned subsidiary The Best Agency, Fidelity Service Corporation, Intervest Mortgage Investment Company, Tri Cities Mortgage Corporation, and Tri West Mortgage, Inc.

The Statement of Financial Position and Adequacy of Capital schedules, (pages 2 and 3) were prepared as of July 31, 1990 from internal management reports. The Analysis of Earnings, (page 4), was prepared as of June 30, 1990 from the external audit report of Coopers & Lybrand. June 30 represents the Association's fiscal year end.

CONCURRENT EXAMINATION

The examination of Sterling Savings Association by the Corporation was conducted concurrently with a Joint, Full Scope examination by the Office of Thrift Supervision and the State of Washington - Division of Savings and Loan. The Report of Examination by these agencies was conducted as of the close of business September 17, 1990 with financial information as of June 30, 1990. The Joint Report of Examination will be filed under separate cover.

The Office of Thrift Supervision conducted a Compliance examination as of the close of business October 1, 1990. The findings and conclusions of the Report of Examination will be filed under separate cover.

SCOPE OF THE EXAMINATION

The scope of the examination was predominantly directed at assessing risk within the association's asset portfolio. The depth of the review consisted of analyzing all extensions of credit classified at the November 13, 1989 examination and/or internally classified in excess of $200,000; all commercial bank loans in excess of $150,000; a sampling of commercial income property loans in excess of $1,000,000; and all parcels of real estate owned in excess of $200,000. Residential and consumer lending, parcels of real estate owned less than $200,000, and other asset categories were reviewed in detail by the Office of Thrift Supervision and the State of Washington Division of Savings and Loan. Assets subject to adverse classification as a result of the review by the Office of Thrift Supervision and State of Washington have been incorporated into this Report of Examination.

ASSET QUALITY ASSESSMENT

Assets subject to adverse classification total $35,623,000 representing 5.45 percent of total assets and 241.89 percent of total equity capital and reserves. Classified assets in this examination report have declined $4,648,000 from the November 13, 1989 Corporation examination. Classified assets in the previous report totaled $40,271,000 representing 5.70 percent of total assets and 263.67 percent of total equity capital and reserves. Adverse classifications are distributed among three asset categories with the $24,991,000 in loans classified accounting for a majority of total classifications.

Total loan classifications have decreased $2,560,000 since the previous examination. A substantial portion of the reduction has come from the sale of collateral in order to liquidate the debt. In a majority of the cases the borrower was forced to liquidate the collateral to halt foreclosure action by the association. Supplemental page 2-c, Analysis of Loans Subject to Adverse Classification, details the changes in classified loans between examinations. The schedule excludes the classified loans from the Residential and Consumer loan portfolios.

App. 709

| EXAMINER'S COMMENTS AND CONCLUSIONS | NUMBER 32158 |
| --- | --- |

The analysis on supplemental page 2-c reflects total reductions of $9,769,000 in classifications from the November 13, 1989 examination. Excluding those loans that remain classified, net reductions total $5,972,000. Eighty-four percent of the net reductions have come from either payments or loans which are no longer subject to adverse classification. As mentioned above a majority of the payments resulted from liquidation of collateral. This group totals $3,113,000, representing 78 percent of total payments, and includes John Baldwin, Vincent Dressel, Kingsbury of Tahoe, Thompson/Brumback, N.L.T. Partnership, and H. H. Gatlin. Loans no longer subject to adverse classification include Holland Building Partnership at $433,000 and Caelus, Inc. at $401,000. Removal of the adverse classification on both credits is due to the strength of guarantors added between examinations rather then on the capacity of the borrowers.

New loan classifications at this examination total $6,033,000. Of this total $4,358,000 had been previously identified by management. Unidentified loans classified totaling $1,675,000 are all loans within the commercial bank loan portfolio. This area is regarded as a concern since two commercial loan officers resigned. Only two loans officers remain to handle a $21,000,000 portfolio coupled with the work-out of noted problems.

The reduction in real estate owned classifications results from sale of five large parcels totaling $1,322,000. These parcels accounted for 55 percent of the $2,742,000 reduction in classified real estate owned.

Loss classification have increased from $1,342,000 at the previous examination to $1,420,000 currently. The increase is especially disturbing considering that $482,000 of the previous loss was regarded as an accounting adjustment on the Michael Beitz loan. Therefore, actual loss classifications at the previous examination totaled $861,000, resulting in an increase of $559,000 in this advanced classification category. A significant percentage of loss classifications are centered in two loans, Michael Beitz at $212,000 and CJ-4 Associates at $801,000.

It was noted during the examination that credit file documentation had been improved over that seen at the previous examination. Credit files contained updated financial information and calculation of net realizable values on collateral to determine loss exposure. The enhanced credit file support was most obvious in the movement of the $1,200,000 Conrad Industries loan which was previously classified Doubtful for lack of information to support the associations collateral position. The loan is presently classified Substandard.

ADEQUACY OF CAPITAL

At the November 13, 1989 Corporation examination the association was determined to be insolvent due to the significant negative capital position per the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. Subsequent to the examination the association brought suit against the Corporation, as successor to the Federal Savings and Loan Corporation, and the Office of Thrift Supervision, as successor to the Federal Home Loan Bank Board. In the suit the association claimed that the capital forbearance agreement negotiated as a result of the acquisition of Tri Cities Savings and Loan Association in April, 1988 between themselves and the Federal Home Bank Board was enforceable and that it was not Congress's intent in the passage of F.I.R.R.E.A. to dissolve existing agreements between regulatory authorities and thrift institutions. Thus, the association claimed that due to the existence of this agreement the capital requirements of F.I.R.R.E.A. did not apply to Sterling Savings Association.

July 3, 1990

On August 8, 1990 the Federal District Court for the Eastern district of Washington ruled in favor of the association and issued a Preliminary Injunction preventing the application of F.I.R.R.E.A. capital requirements to the association and preventing the Office of Thrift Supervision from enforcing any operating restrictions previously placed on the association. In the Court's opinion the capital forbearance agreement executed in April, 1988 is a valid contract not superseded by F.I.R.R.E.A. and that the association is in compliance with the regulatory capital requirements in-place prior to the passage of the above legislation. also FDIC

Included in this Report of Examination on page 3-a is a calculation of the association's capital position per the requirements of F.I.R.R.E.A. for informational purposes.

| EXAMINER'S COMMENTS AND CONCLUSIONS | NUMBER 32158 |
|---|---|

ANALYSIS OF EARNINGS

Fiscal year end June 30, 1990 resulted in a net profit of $266,000 which is substantially below the $1,235,000 shown in the previous year. The decline in net profit is primarily due to the $1,400,000 replenishment of the general valuation reserve required at the previous examination, $995,000 in expenses resulting from the failed stock offering, and approximately $3,300,000 in intangible asset amortization expense. Earnings were supplemented however by a $297,000 gain on sale of mortgage servicing rights and a $95,000 gain on the sale of a branch office. Nominal improvements, as reflected in the Component Ratios and Trends on page 4, were seen in operating ratios for the latest fiscal year however the association's margin is grossly inadequate to cover overhead and the gain on sale of assets were largely responsible for the net profit reflected.

The association projects a net profit of $1,300,000 for fiscal 1991 and it appears operations are on target to achieve this level. First quarter results show a net profit of $288,000 which is slightly above projections for the quarter. Senior management has initiated a program to reduce operating expenses.

It appears unlikely that significant improvement in earnings will result in the foreseeable future primarily due to the significant volume of problem assets.

REVIEW WITH SENIOR MANAGEMENT

A review of the findings from both regulatory examinations was held with senior management on November 1, 1990. In attendance from the association were Chairman and Chief Executive Officer Gilkey, President and Chief Operation Officer Zuppe, Senior Vice President and Loan Administrator Page, Senior Vice President and Chief Financial Officer Byrne, vice President Churchill, and Internal Auditor Colliton. Representing the Office of Thrift Supervision were Supervisory Analyst Stimac, Field Manager Hickok, and Examiner Bradley. Examiner Gene Fitzpatrick represent the State Authority. The Corporation was represented by Field Office Supervisor Kroeger and the undersigned examiner.

The discussion focused on the following topics: a review of asset quality, which included underwriting concerns in commercial bank and consumer lending, general valuation reserves, and the need for enhanced documentation in transactions between subsidiary companies; the discussion of capital adequacy was limited to enhancing the risk-based asset calculation as several errors were noted by the Office of Thrift Supervision and that Fidelity Service Corporation is considered a non includable subsidiary for capital purposes. No determination was made by examiners of capital adequacy due to the Preliminary Injunction previously discussed; the risk management discussion focused on the association's interest rate risk position and the effects of a $35,000,000 mortgage backed securities purchase; operating results centered on earnings performance and included those items discussed elsewhere on page 1; and the final topics dealt with the need to expand the scope of and depth of the internal audit department, the need for more enhanced controls of over the payment of management's expense vouchers, the need for more updated financial information on directors, and enhanced reporting and documentation of business transactions and activities.

Senior management appeared to accept and agree with most of the examiners conclusions and indicated corrective action would be implemented. However, management disagreed with examiner findings that loss classifications have tripled since the previous examination. They indicated that a significant portion of the current loss is centered in the CJ-4 Associates credit. It is true that the $800,000 reflected as loss on this credit is a majority of the $1,420,000 reflected in the report. However, whether the loss is shown in one or several credits, the fact is that a significant portion, dollar volume, of substandard assets at the last examination have deteriorated to the point of requiring a loss classification, and the association will incur the loss of $800,000 regardless of the number of loans comprising the total. Senior management also disagreed with examiner findings in the area of real estate owned. An analysis of this account indicated that properties considered "easy resolution" cases have been disposed of resulting in a portfolio which will require significant time and effort to liquidate. Management requested that the examiner re-analyze the finding as they believe the portfolio will not be difficult to dispose of.

App. 711

| EXAMINER'S COMMENTS AND CONCLUSIONS | NUMBER 32158 |
|---|---|

The item receiving the most discussion involved the interest rate risk area. Management indicated they were surprised at the attention given to the $35,000,000 mortgage backed securities transaction and the examiners opinion that the transaction increased Sterling's exposure which is already regarded as extremely highly liability sensitive. The discussion did not resolve any of the disagreements on this issue between the association and the regulatory agencies. The final item receiving the most attention involved the availability of financial information on directors. Both Chairman Gilkey and President Zuppe indicated that directors would not provide such information because of a lack of trust of the government.

UNIFORM FINANCIAL INSTITUTIONS COMPOSITE RATING

The Uniform Financial Institutions Composite Rating assigned to your institution is 5. This rating is defined in the Corporation's Statements of Policy, beginning on page 5079 of the Federal Deposit Insurance Corporation's Law, Regulations and Related Acts, as follows: "This category is reserved for institutions with an extremely high immediate or near term probability of failure. The volume and severity of weaknesses or unsafe and unsound conditions are so critical as to require urgent aid from stockholders or other public or private sources of financial assistance. In the absence of urgent and decisive corrective measures, these situations will likely require liquidation and the payoff of depositors, disbursement of insurance funds to insured depositors, or some form of emergency assistance, merger or acquisition."

App. 712

| Examiner (Signature) | Regional Director (Signature) |
|---|---|
| John F. Tokarz | John R. Sexton |

FDIC 6300/03 (6-82) 1-a-2

## STATEMENT OF FINANCIAL POSITION

NUMBER 32158

TYPE: Consolidated | DATE: 7-31-90

| ASSETS | AMOUNT | % | LIABILITIES AND CAPITAL | AMOUNT | % |
|---|---|---|---|---|---|
| Interest-bearing Balances | 1,825 | | Transaction Accounts | 45,712 | 7 |
| Fed Funds Sold and Repos | | | Money Market Deposit Accounts | 30,752 | 5 |
| Trading Account Assets | | | Other Savings Accounts | 43,874 | 7 |
| Securities (1 Yr. & less) | 2,995 | | Total Brokered Deposits | 4,184 | 1 |
| TEMPORARY INVESTMENTS | 4,820 | 1 | Other Time Deps. $100M & Over | 34,147 | 5 |
| | | | Other Time Deps. Under $100M | 316,539 | 48 |
| Total Loans and Leases | 453,031 | 69 | Deps. Held in Foreign Offices | | |
| Securities (Over 1 Yr.) | 137,068 | 21 | TOTAL DEPOSITS | 475,208 | 73 |
| TOTAL EARNING ASSETS | 594,919 | 91 | Fed Funds Purchased & Repos | 71,336 | 11 |
| Less: Allowance For Loan | | | Other Borrowings(1 Yr.& Less) | 57,000 | 9 |
| and Lease Losses | 3,902 | 1 | Other Borrowings (Over 1 Yr.) | 32,683 | 5 |
| | | | Acceptances Outstanding | | |
| Cash and Noninterest- | | | Mtges. and Capitalized Leases | 883 | |
| bearing Balances | 8,848 | 1 | Accrued Expenses | 3,057 | |
| Acceptances | | | Other Liabilities | 3,118 | |
| Premises & Fixed Assets | 11,113 | 2 | TOTAL LIABILITIES | 643,285 | 98 |
| Other Real Estate Owned | 10,437 | 2 | | | |
| Investment in Unc. Subs | -- | | Subordinated Notes and Debs. | | |
| Intangible Assets | 20,653 | 3 | Limited Life Preferred Stock | | |
| Other assets | 12,042 | 2 | Total Equity Capital | 10,825 | 2 |
| TOTAL ASSETS | 654,110 | 100 | TOTAL LIABILITIES & CAPITAL | 654,110 | 100 |

MEMORANDUM INFORMATION:

### SUMMARY OF ITEMS SUBJECT TO ADVERSE CLASSIFICATION OR SPECIAL MENTION

| ASSET CATEGORY | SPECIAL MENTION | SUBSTANDARD | DOUBTFUL | LOSS | TOTAL CLASSIFIED |
|---|---|---|---|---|---|
| Loans and Leases | 3,778 | 23,770 | 74 | 1,147 | 24,991 |
| Transfer Risk | | | | | |
| Securities | | | | | |
| Other Real Estate | | 9,739 | | 154 | 9,894 |
| Other Assets | | 620 | | 118 | 738 |
| SUBTOTAL - ADVERSELY CLASS. ASSETS | 3,778 | 34,129 | 74 | 1,420 | 35,623 |
| Contingent Liabilities | | | | | |
| TOTALS - CURRENT EXAMINATION | 3,778 | 34,129 | 74 | 1,420 | 35,623 |
| TOTALS AT EXAMINATION - 11-13-89 | 3,687 | 37,251 | 1,678 | 1,342 | 40,271 |
| TOTALS AT EXAMINATION - 6-19-89/OTS | 6,253 | 30,952 | 1,691 | | 32,643 |
| TOTALS AT EXAMINATION - 4-18-88/OTS | 3,510 | 6,896 | 663 | 59 | 7,618 |

### EXAMINATION RATIOS AND TRENDS

| RATIOS | CURRENT EXAMINATION | PRIOR EXAM 11-13-89 | PRIOR EXAM 6-19-89/OTS | PRIOR EXAM 4-18-88/OTS |
|---|---|---|---|---|
| Adversely Classified Assets/Total Assets * | 5.45 | 5.70 | 4.45 | 2.46 |
| Adversely Class. Loans&Leases/Tot. Loans&Leases | 5.52 | 5.53 | NA | NA |
| Overdue Loans and Leases/Gross Loans and Leases | 3.19 | 3.98 | NA | NA |

COMMENTS: (* Adversely Classified Assets/Total Assets excludes Adversely Classified Contingent Liabilities.)
Total classified assets have declined $4,649M since the 11-13-89 Corporation examination. Classified assets represent 5.45% of total assets and 241.89% of total (GAAP) capital and reserves. The decline in the volume of total classifications does not appear to indicate an overall improvement in asset qualtiy. Adversely classified loans remain equal to the level at the previous examination when measured as a percentage of the loan portfolio. The volume of classified loans remains significant, and an additional $1,420M classified loss indicates a further deterioration in credit quality of existing problem assets.

| ANALYSIS OF CAPITAL | NUMBER 32158 |
|---|---|

| CAPITAL STRUCTURE - (Consolidated) | AMOUNT |
|---|---|
| Perpetual Pfd Stock (Par 1.00 :Shares Outstanding 90,168 )........... | 90 |
| Common Stock (Par 1.00 :Shares Authorized 8,000,000 / | |
| :Shares Outstanding 518,387 )........... | 518 |
| Surplus.................... | 7,715 |
| Undivided Profits.................... | 2,502 |
| Contingency And Other Capital Reserves.................... | |
| SUBTOTAL: Total Equity Capital.................... | 10,825 |
| ADD: Valuation Reserves.................... | 3,902 |
| SUBTOTAL: Total Equity Capital and Reserves.................... | 14,727 |
| LESS: Disallowed Intangibles.................... | 19,124 |
| Items Classified Loss.................... | 1,420 |
| SUBTOTAL: Primary Capital Before Qualified Convertible Debt.................... | (5,817) |
| ADD: Qualified Mandatory Convertible Debt, Net.................... | |
| (Not to Exceed 20% of last Subtotal) | |
| PRIMARY CAPITAL........ | (5,817) |
| Limited Life Preferred Stock.................... | |
| Subordinated Notes And Debentures.................... | |
| Mandatory Convertible Debt Not Allowed In Primary Capital.................... | |
| SUBTOTAL: Secondary Capital (Not To Exceed 50% Of Primary Capital)................ | |
| TOTAL CAPITAL.......... | (5,817) |

| ADJUSTMENTS TO CAPITAL | AMOUNT | PART 325 TOTAL ASSETS | AMOUNT |
|---|---|---|---|
| Nonbook Sound Banking Values | | Average Assets From Latest Call | 706,030 |
| LESS: 50% of Items Class. Doubtful | 37 | ADD: Valuation Reserves | 3,902 |
| | | LESS: Disallowed Intangibles | 19,124 |
| | | Assets Classified Loss* | 1,420 |
| | | Part 325 Total Assets | 689,388 |
| NET ADJUSTMENTS | (37) | NET ADJUSTMENTS* | (37) |
| ADJUSTED PRIMARY CAPITAL | (5,854) | | |
| ADJUSTED TOTAL CAPITAL | (5,854) | ADJUSTED PART 325 TOTAL ASSETS | 689,351 |

Limited Life Prefered Stock, Notes, Debentures & Mandatory Convertible Debt (Specify Rates, Repayment Program, Maturity & Balance)
Average assets are based on a five quarter average (6/30/89 through 6/30/90) of total assets from the FHLB Quarterly Report.

Securities Appreciation(Depreciation) Not Reflected In Above Analysis $ (2,265)
Percent Of Book Value Of Securities Valued At Current Market 100 %
Contingent Liabilities: Amount $ 0 Potential Loss $ 0

| COMPONENT RATIOS AND TRENDS | PEER NA | BANK 3-31-90 | 12-31-89 | 9-30-89 |
|---|---|---|---|---|
| GAAP Capital/Total Assets | NA | 1.48 | 1.56 | 1.52 |
| Core Capital/Adj. Tangible Assets | NA | (0.34) | NA | NA |
| Tangible Capital/Tangible Assets | NA | (1.84) | NA | NA |
| Risk-Based Capital/Risk Weighted Assets | NA | (0.53) | NA | NA |
| Source: 3-31-90 W.C. Ferguson & Company | | | | |

| EXAMINATION RATIOS AND TRENDS | CURRENT EXAM | PRIOR EXAM 11-13-89 | PRIOR EXAM 6-19-89/OTS | PRIOR EXAM 4-18-88/OTS |
|---|---|---|---|---|
| Primary Capital to Part 325 Total Assets | (0.84) | (1.12) | NA | NA |
| Total Capital to Part 325 Total Assets | (0.84) | (1.12) | NA | NA |
| Adj. Primary Cap. to Adj. Part 325 Total Asset | (0.85) | (1.12) | NA | NA |
| Adj. Total Cap. to Adj. Part 325 Total Assets | (0.85) | (1.12) | NA | NA |
| Adversely Class. Items/Total Equity Cap.& Res. | 241.89 | 263.67 | NA | NA |

COMMENTS: (* Adjustments To Part-325 Total Assets Exclude Adversely Classified Contingent Liabilities.)
Calculated on page 3-a is the association's capital position as required by F.I.R.R.E.A. Tangible capital amounts to ($12,035M), and core and risk-based capital each total ($2,534M). Tangible and core capital equate to (1.90%) and (0.40%) of tangible assets, respectively, while risk-based capital equates to (0.65%) of risk weighted assets. The association's capital ratios, per F.I.R.R.E.A. requirements, have increased over those calculated at the 11-13-89 Corporation examination primarily through the amortization of goodwill and the sale of excess servicing.

| ANALYSIS OF CAPITAL | NUMBER 32158 |
|---|---|

**CAPITAL REQUIREMENTS PER F.I.R.R.E.A.**

should add for [illegible] purp.

| | TA | – | RISK-BASED |
|---|---|---|---|
| Total GAAP Capital - 7-31-90 | 1 | | 10,825 |
| **LESS:** | | | |
| Unidentified Intangibles | 19,124 | 4 | 19,124 |
| Mortgage Servicing Rights | 1,529 | 1,529 | 1,529 |
| Non-Allowable Preferred Stock | 2,126 | 2,126 | 2,126 |
| **ADDITIONS:** | | | |
| Allowable Mortgage Servicing Rights (90% of FMV) | 1,376 | 1,376 | 1,376 |
| Qualified Supervisory Goodwill (1.5% of Tangible Assets) | | 9,501 | 9,501 |
| Total Core Capital per F.I.R.R.E.A. | (10,578) | ( 1,077) | ( 1,077) |
| **SUPPLEMENTARY CAPITAL:** | | | |
| Preferred Stock | | | 2,126 |
| General Valuation Reserves | | | 3,902 |
| Total Supplementary Capital | | | 6,028 |
| Allowable Supplementary Capital (Limited to 100% of Core Capital) | | | 0 |
| Total Capital per F.I.R.R.E.A. | (10,578) | ( 1,077) | ( 1,077) |
| **LESS EXAMINATION ADJUSTMENTS:** | | | |
| Assets Classified Loss & One-Half of Doubtful | 1,457 | 1,457 | 1,457 |
| **Adjusted Capital per F.I.R.R.E.A.** | **(12,035)** | **( 2,534)** | **( 2,534)** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | | |
|---|---|---|---|
| **Total/Risk Weighted Assets - 7-31-90** | 654,110 | 654,110 | 388,834 |
| **LESS:** | | | |
| Unidentified Intangibles | 19,124 | 19,124 | |
| Mortgage Servicing Rights | 1,529 | 1,529 | |
| **ADDITIONS:** | | | |
| Allowable Mortgage Servicing Rights (90% of FMV) | 1,376 | 1,376 | |
| **LESS EXAMINATION ADJUSTMENTS:** | | | |
| Assets Classified Loss & One-Half of Doubtful | 1,457 | 1,457 | 1,457 |
| **Total Tangible/Risk Weighted Assets** | **633,376** | **633,376** | **387,377** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | | |
|---|---|---|---|
| **F.I.R.R.E.A. Requirements** | 1.5% | 3.0% | 6.4% |
| Capital Required by F.I.R.R.E.A. | 9,501 | 19,001 | 24,792 |
| Capital Position at 7-31-90 | (12,035) | ( 2,534) | ( 2,534) |
| **Deficit** | **(21,536)** | **(21,535)** | **(27,326)** |
| Tangible Capital/Tangible Assets | ( 1.90%) | | |
| Core Capital/Adjusted Tangible Assets | | ( 0.40%) | |
| Risk-Based Capital/Risk Weighted Assets | | | ( 0.65%) |

## ANALYSIS OF BANK EARNINGS

NUMBER 32158

| COMPARATIVE STATEMENT OF INCOME | INTERIM | | | | |
|---|---|---|---|---|---|
| TYPE: Consolidated | 6-30-90 | | 6-30-89 | 6-30-88 | 6-30-87 |
| Interest Income.................... | 67,529 | | 55,285 | 30,883 | 20,410 |
| Interest Expense.................. | 54,181 | | 43,774 | 20,861 | 13,990 |
| Net Interest Income............. | 13,348 | | 11,511 | 10,022 | 6,420 |
| Non-interest Income................ | 6,559 | | 3,715 | 666 | 385 |
| Overhead Expense................... | 18,946 | | 13,006 | 8,447 | 5,669 |
| Provision for Loan and Lease Losses | 1,100 | | 260 | 558 | 158 |
| Provision for Alloc. Transfer Risk. | | | | | |
| Securities Gains (Losses).......... | 241 | | (166) | 352 | 468 |
| Net Operating Income (Pre-Tax).. | 102 | | 1,794 | 2,035 | 1,446 |
| Applicable Taxes................... | (164) | | 559 | 814 | 506 |
| Net Operating Income (After Tax) | 266 | | 1,235 | 1,221 | 940 |
| Extraordinary Credits (Charges), Net of Tax Effect............... | | | | | |
| Net Income...................... | 266 | | 1,235 | 1,221 | 940 |
| Other Increases/Decreases.......... | (225) | | (190) | (223) | 2,140 |
| Cash Dividends..................... | | | | | |
| Net Change in Equity Accounts.... | 41 | | 1,045 | 998 | 3,080 |

### COMPONENT RATIOS AND TRENDS

| RATIOS | PEER | BANK | | |
|---|---|---|---|---|
| | NA | 3-31-90 | 12-31-89 | 9-30-89 |
| Net Operating Income (After Tax) to Avg. Assets | NA | (0.45) | 0.21 | 0.15 |
| Net Interest Income (TE) to Avg. Earning Assets | NA | 1.78 | 1.57 | 1.46 |
| Overhead Expense to Average Assets | NA | 3.18 | 2.19 | 2.29 |
| Net Income to Average Total Equity | NA | (30.55) | 13.23 | 9.77 |
| Yield on Assets/Cost of Liabilities (Spread) | NA | 2.60 | 2.37 | 2.28 |
| Net Gain on Sale of Assets | NA | 0.22 | 0.66 | 0.19 |

Source: 3-31-90 W.C. Ferguson & Company

COMMENTS:

Refer to pages 1, Examiners Comments and Conclusions.

## ANALYSIS OF LOAN AND LEASE RESERVES

| RECONCILEMENT | 6-30-90 | 6-30-89 | 6-30-88 | 6-30-87 |
|---|---|---|---|---|
| Beginning Balance | 4,093 | 2,757 | 248 | 746 |
| Gross Loan and Lease Losses | 910 | 1,482 | 82 | 245 |
| Recoveries | 9 | 73 | 25 | 31 |
| Net Loan and Lease Losses (Recoveries) | 901 | 1,409 | 57 | 214 |
| Provision for Loan and Lease Losses | 1,100 | 295 | 480 | 188 |
| Other Increases (Decreases) | | 2,450 | 2,086 | (472) |
| Ending Balance | 4,292 | 4,093 | 2,757 | 248 |

### COMPONENT RATIOS AND TRENDS

| RATIOS | PEER | BANK | | |
|---|---|---|---|---|
| | NA | 3-31-90 | 12-31-89 | 9-30-89 |
| Loss Reserve to Total Loans and Leases | NA | NA | NA | NA |
| Net Losses to Average Total Loans and Leases | NA | NA | NA | NA |
| Recoveries to Prior Period Losses | NA | NA | NA | NA |
| Earnings Coverage of Net Losses (X) | NA | NA | NA | NA |

COMMENTS:
The Office of Thrift Supervision undertook a thorough analysis of the general valuation reserves during the examination. As a result no additional provision was recommended, however the regulatory disagrees with management's assessment that the association is "overreserved" by approximately $1,000,000.

**CONFIDENTIAL - SUPERVISORY SECTION**

NUMBER 32158

| | |
|---|---|
| Region: San Francisco | Field Office: Seattle |
| Date Examination Commenced: 9-17-90 | Date Examination Completed: 10-19-90 |

| | | |
|---|---|---|
| Date of Last FDIC Examination: 11-13-89 | Date of Last OTS/State Examination: 11-13-89 | Type of Examination |
| Personnel Needed to Start Examination of Main Office Three | Personnel Needed to Start Examination of Branches None | Independent - <br> Concurrent - X <br> Joint - <br> State - <br> Divided - <br> National - |

| Basic Blanket Bond: Amount | Basic Blanket Bond: Expiration | Excess Dishonesty: Amount | Excess Dishonesty: Expiration | Is Coverage Adequate? |
|---|---|---|---|---|
| $3,000 | 3-28-91 | None | NA | Yes - X <br> No - |

| Uniform Bank Rating: | Trust Capacities: | Municipal Sec. Deal. | Subject Part 335 |
|---|---|---|---|
| 5-4-4-4-3/5 | Yes - <br> No - X | Yes - <br> No - X | Yes - <br> No - X |

| | |
|---|---|
| Reports of Condition and Reports of Income checked for accuracy for the period of NA through NA | If amended reports were requested, comment on page 1, Examiner's Comments and Conclusions <br> Not Applicable |

**WORKING HOURS**

| EXAMINERS/ ASSISTANTS | GG | Exam Plan | Review Loans | Review Sec/OA | Funds Mgt. | Audit & IRC | Report Prep. | Mgt. Review | Admin | Train. | Spec. Activ. | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARLSON, MARTY V. | 12 | | 125 | | | | | | | | | 125 |
| FLONO, TIMOTHY D. | 12 | | 89 | | | | | | | | | 89 |
| TOKARZ, JOHN F. (In-Charge) | 13 | 8 | 151 | | | | 16 | 20 | | | | 195 |
| TOTAL HOURS | /// | 8 | 365 | | | | 16 | 20 | | | | 409 |
| Total hours by grade level | 5 | | | | | | | | | | | |
| | 7 | | | | | | | | | | | |
| | 9 | | | | | | | | | | | |
| | 11 | | | | | | | | | | | |
| | 12 | | 214 | | | | | | | | | 214 |
| | 13 | 8 | 151 | | | | 16 | 20 | | | | 195 |
| | 14 | | | | | | | | | | | |
| | 15 | | | | | | | | | | | |
| Tot Outside Hours | /// | | 8 | | | | 16 | 20 | | | | 44 |

FOOTNOTES

631 = Office of Thrift Supervision
264 = Division of Savings & Loans - State of Washington

895 = Total Hours - Other Agencies

FDIC 6300/10 (6-82) A



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2381

| CONFIDENTIAL - EXAMINER'S COMMENTS AND CONCLUSIONS | NUMBER 32158 |
|---|---|

CAMEL RATING - 5-4-4-4-3/5

There have been no significant changes in the association's condition since the previous examination, therefore no changes in the assigned rating are warranted. The reduction in the amount of classified assets is not regarded as an improvement in asset quality. Management's ability to work-out the designated problems remains questionable. A significant majority of the income property credits previously classified remain and although credit file information has improved, the associations exposure has not. The increase in commercial bank loan classifications is also a concern.

There have been no changes in senior management or the board of directors. Management's belief that the hardships being suffered by Sterling is due solely to government interference in their operation. Management believes that the association has been irreversibly harmed by the lawsuit between themselves and the regulatory agencies over the enforceability of the capital forbearance agreements reached with the F.H.L.B.B. in 1988. The resulting publicity has had a negative impact on their image in the community. As seen on core page 2, total assets have declined approximately $50,000,000 since the previous examination. However, it is unknown how much of the decline is due to the lawsuit or due to restructure of the association. At the exit review management indicated that they have curtailed lending in both income property and commercial bank. The only noticeable activity in lending is that of Action Mortgage Company, the residential mortgage arm of the association. This company continues to lend approximately $30,000,000 per month and is primarily responsible for a vast majority of the income generated by operations.

During the examination two representatives of the Capital Markets Group of the Office of Thrift Supervision reviewed a $35,000,000 restructure of F.H.L.B. advances and the corresponding acquisition of mortgage backed securities. The association claimed that the acquisition had a positive affect on the interest rate spread since the mortgage backed securities were interest rate neutral. Analysis of this transaction indicated that it had an adverse impact on the association's interest rate exposure, but that the effects were nominal due to the already high liability sensitive position of Sterling. Management continues to disagree with this finding.

BOARD OF DIRECTORS REVIEW

A meeting with the Board of Directors to review the examination findings has not been scheduled as of this writing. The next regularly scheduled meeting is November 27, 1990 followed by December 11, 1990.

RECOMMENDATION FOR SUBSEQUENT EXAMINATION

It is recommended that the next examination of the Association by the Corporation be structured as a Tier I examination. The review of income property loans should be expanded from that shown below while maintaining the same depth of examination in the commercial bank portfolio.

PORTFOLIO REVIEW

Listed below are the dollar amount and percentages of the three lending areas reviewed during the examination. It is recommended that all three areas be thoroughly reviewed at subsequent examinations.

| | Amount Reviewed | Total Portfolio | % of Portfolio |
|---|---|---|---|
| Sterling Income Property | 42,431 | 167,646 | 25.31 |
| Intervest Income Property | 9,289 | 33,127 | 28.04 |
| Sterling Commercial Bank | 13,625 | 20,741 | 65.69 |
| Total | 65,345 | 221,514 | 29.50 |

SUPPLEMENTAL SECTION

ASSETS SUBJECT TO ADVERSE CLASSIFICATION

NUMBER 32158

Includes all assets or portions thereof which are subject to a Substandard, Doubtful or Loss classification. Substandard classification is accorded assets or portions thereof not classified Doubtful or Loss but which have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. These assets are inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged. If deficiencies in these assets are not corrected there is a distinct possibility that the bank will suffer some loss. Doubtful and Loss classifications are self-explanatory. Assets classified Loss are deducted from stockholders equity in computing primary and total capital. Fifty percent of assets classified doubtful is deducted from primary and total capital in analyzing the capital of the bank.

| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
|---|---|---|---|---|---|
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |
| **RECAPITULATION** | | | | | |
| **LOANS** | | | | | |
| Income Property Loans | 30-89<br>90 & Over | 3,719,485<br>7,416,064 | 17,720,142 | 33,665 | 1,103,183 |
| Commercial Bank Loans | 30-89<br>90 & Over | 69,500<br>969,952 | 3,752,608 | 12,856 | 19,212 |
| Residential Construction Loans | 30-89<br>90 & Over | 183,750<br>227,840 | 477,906 | | |
| Residential Loans | 30-89<br>90 & Over | 185,369<br>1,220,319 | 1,746,926 | 27,396 | |
| Consumer Loans | 30-89<br>90 & Over | 739<br>48,689 | 72,174 | | 24,628 |
| Total Adversely Classified Loans | | 4,158,843<br>9,882,864 | 23,769,756 | 73,917 | 1,147,023 |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | | | | |
|---|---|---|---|---|---|
| **REAL ESTATE OWNED** | | | 9,739,256 | | 154,405 |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | | | | |
|---|---|---|---|---|---|
| **OTHER ASSETS** | | | 620,340 | | 118,095 |

FDIC 6300/14 (6-86)



App. 720

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2384

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | | | NUMBER 3215B | |
|---|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss | |

LOANS

INCOME PROPERTY LOANS

| | | | | | | |
|---|---|---|---|---|---|---|
| 2,432,232 Nonaccrual | | | | | | |
| ( 481,885) Contra-account | | | | | | |
| 1,950,347 | 546 days | 1,950,347 | 1,738,014 | | 212,333 | |
| BEITZ, G. MICHAEL & NATALIE | | | | | | |

Previously Classified Substandard at $1,468,462 and Loss at $481,885
Internally Classified 7-31-90, Substandard at $1,950,347 and Loss at $481,885

Balance of a $2,200M note dated 1-26-84, scheduled to mature on 2-1-09 and past due as indicated. Loan was originated by North America Savings (NAS) and sold to Central Evergreen Federal Savings (CEFS) on 5-31-84, with NAS retaining servicing. Servicing was subsequently passed to the FSLIC when it was appointed receiver for NAS in January 1987. Proceeds were used to purchase, and the loan is secured by a 2nd DT on, an 81 bed retirement home in Modesto, Ca. which was appraised for $2,635M in January 1984. The debt is in the form of an all-inclusive purchase money promissory note which includes an underlying lien due to Gibralter Savings and Loan. It was noted at the last examination that management failed to set-up a contra-asset account to reflect the amount due to Gibralter. Accordingly, the outstanding balance of the first mortgage which totaled $481,885 was deducted from the balance of Mr. Beitz's loan to reflect the amount owed to Gibralter. Subsequently, management performed an analysis of the borrower's payment history and determined that the outstanding balance of the Beitz loan when CEFS purchased the loan on 5-29-84 was $2,211,967. The underlying loan held by Gibralter was $640,780, indicating a net balance of $1,571,187 owed to CEFS. The payment history of the borrower also revealed that the loan has negatively amortized since inception, with a total of $379,160 capitalized from 1984 to 1989.

The corporation, NFNGN, Inc., filed for Chapter 11 bankruptcy relief on July 2, 1990. The retirement facility is operated by the corporation. However, the obligation to Sterling is owed by Dr. G. Michael Beitz. Sterling's legal counsel feels that title to the real estate is held individually by Dr. Beitz, who in turn gave a management contract to his company. Therefore, although a foreclosure proceeding may be enjoined by the Bankruptcy Court, it may not be automatically stayed. Sterling's legal counsel has forwarded this case to a California legal firm and has requested this firm to file a motion for relief from the stay, if the facility is property of the estate, or proceed with the foreclosure if it is not. Sterling's legal counsel also stated, "It is our understanding that the debtor is currently operating numerous retirement homes, all of which are burdened with incredible debt service requirements and limited cash flow. Further, the debtor appears to be hopelessly undercapitalized. Thus, it is unlikely that any attempted reorganization will meet with success." The law firm from California is currently ordering a preliminary title report to reconstruct the "chain of title" regarding ownership of the note and deed of trust. The NFNGN, Inc. schedule of assets and liabilities filed with the bankruptcy court supports the attorney's conclusion of the debtor's financial condition. It reported total assets of $29,131M and total liabilities of $25,075M. The majority of the assets and liabilities are centered in six retirement facilities. The debtor values these properties at $25,434M along with mortgages totaling $23,422M. The property pledged to this debt is valued by the debtor at $3,500M. Federal Deposit Insurance Corporation is the largest secured creditor with loans extended to the corporation totaling $16,800M.

The appraisal, dated 1-25-90, values the property pledged to this debt at $2,823M if occupancy is stabilized and an as is value of $2,577M. The appraiser noted that the property is in average condition, needs to be upgraded, and is one of the reasons why the retirement center's occupancy level at the time of the appraisal was 69 percent. The borrower reported to management that over the past few months, $100,000 has been spent on new carpet, paint and other maintenance items. Reportedly, the borrower has used the monthly debt service payments to complete the deferred maintenance. Management's net realizable value calculation as of 9-15-90 equaled $2,219,899.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | Amount | CLASSIFICATIONS Substandard | Doubtful | Loss |

BEITZ, G. MICHAEL & NATALIE (Continued)

Assumptions included; foreclosure to take six months, monthly income and expense figures were taken from the appraisal which used market rent rates while operating expense was based on expense comparables of other facilities, stabilized occupancy will be reached in the 11th month, delinquent property taxes of $185,000 paid the 7th month, and sale of the property occurring on the 17th month. This appears to properly reflect the value of the property at this time, but the potential of additional exposure to loss is evident. Historically, the property has not achieved the appraiser's income and expense projections. Total revenues for 1987, 1988, and 1989 were $533M, $581M, and $628M, respectively. The appraiser estimated total gross income of $837M, while the effective gross income is $761M after deducting a 10 percent vacancy rate plus other income. Any deterioration noted or the occupancy is not improving even though maintenance is reportedly completed, would warrant a further write-down. The Loss classification is determined by deducting the first mortgage from the net realizable value calculation, with the remaining balance classified Substandard. (Servicing Officer: Greg Leland)mvc.

1,200,000
( 64,118) Loans in process
1,135,882 — Substandard: 1,135,882
BOWEN, LEROY & VIRGINIA

Previously Classified Substandard
Internally Classified Substandard

Unreduced balance of a loan originated 2-26-87 for the purpose of constructing a retail facility in Burien, Wa. The loan is secured by a 1st DT on the property which was appraised for $1,550M on 2-11-86 and re-appraised for $1,330M on 2-18-88 when construction was completed.

The note was supposed to be converted to a permanent, amortizing loan on 3-1-88, but the property never attracted enough tenants to generate sufficient cash flow to support debt service. The present loan has been extended to 3-1-91, with interest-only due monthly. This is the 5th extension. The institution is not committed to fund the remaining loans in process and in fact, required the borrower to fund approximately $63M of tenant improvements in 1989, due to the property's slow absorption rate. Currently, the project is now 100 percent leased, but just recently, one of the larger tenant's, Circle K which is a regional convenience store chain, declared bankruptcy under Chapter 11. This lessee rents 22 percent of the total square feet available for rent and pays the highest lease of all the tenants. Vice President John Harlow stated that Circle K is still paying their lease payments, but the effects of the bankruptcy is still unknown. The Circle K Corporation recently announced the closing of several stores; however, it did not include the store that is located at the debtor's retail facility. The manager of the subject store indicates a very satisfactory performance for this facility. One possibility is that the bankruptcy could require the debtor to renegotiate the lease rate.

The latest financial statement for the borrower is dated 1-10-90 and lists TA of $3,931M, primarily composed of illiquid RE investments; TL of $2,280M; and a NW of $1,651M. Thus far, the borrower has cooperated with management and has kept interest current in the past by making up the shortfall in cash flow out of pocket. Management approached a couple of financial institutions to see if they were willing to refinance this debt. The debtor offered a 2nd mtge on his residence, but each one declined to refinance the debt based on the tenant mix and Circle K's bankruptcy status. Management will offer permanent financing to the borrower at maturity, if the borrower reduces the above loan to $910,000. The borrower is attempting to sale personal assets to reduce the loan. Management's 9-17-90 net realizable value of the property is $1,140,952. The loan is classified Substandard due to the bankrupt tenant, a high loan-to-value, and the project's inadequate cash flow to properly amortize the loan at its present balance of $1,135,882.
(Originating Officer: Sid Paul/Servicing Officer: John Harlow)mvc.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER | 32158 | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |
| 2,400,000<br>35,132 (1)<br>2,435,132 | 396 days | 2,400,000 | 1,598,550 | | 801,450 |

CJ-4 ASSOCIATES, A GENERAL PARTNERSHIP
General Partners:
Jon C. Peterson
Charles W. Peterson
Guarantors:
Jon C. Peterson
Charles W. & Judith Anderson

Previously Classified Substandard
Internally Classified Substandard at $1,990,000 and Doubtful at $410,000

Loan (1) represents funds extended to complete improvements required by the Bellevue, Wa. city code. The city of Bellevue building permits require work to be ongoing and not be abandoned, suspended or discontinued for a period of 180 days. These permits would be declared invalid if work did not recommence prior to 4-1-90. On 4-4-90, the senior loan committee approved the funding of the remaining site and building improvements required by the City of Bellevue, in an amount not to exceed $60,000. This amount is classified Substandard under the category of Other Real Estate Owned and is considered by management as advances on foreclosures.

The remaining debt is the balance of a $2.4 million loan granted on June 27, 1988, proceeds of which were used to construct two office/warehouse buildings in Bellevue, Washington. Terms call for monthly interest with a maturity date of 1-1-90. The debtors had the option to extend the construction another six months. Collateral consists of a first DT on two office/warehouse buildings with a combined gross building area of 42,000 square feet. An appraisal report dated 3-15-88, values the subject at $3.45 million based on a blended lease rate of 0.73 cents per foot.

Cost overruns due to engineering errors, extensive excavation costs, and wet weather completely exhausted the total amount estimated by management to complete construction and tenant improvements plus an interest reserve to carry the project through its absorption phase. By February 1989, Intervest was informed of the construction budget shortfall and allowed the borrowers to use the tenant improvement allowance for completion of the buildings. Construction of the building was completed by November 1989, but still no leasing to possibly justify extending additional monies to complete tenant improvements. On November 17, 1989, the Senior Loan Committee approved the initiation of nonjudicial foreclosure on the subject property and later, in December of 1989, converted to a judicial action based upon updated analysis provided by Intervest. In response to the association's action, the borrowers filed a counterclaim against Sterling Savings alleging among other things that Sterling was negligent in its failure to notify the defendants that the balance of funds available would not provide sufficient funding to allow the project to reach a tenant ready, income producing status. Vice President Greg Leland stated that the debtors lawsuit does not specify the dollar amount of damages or any punitive damages. He stated the borrower is attempting to prove that the property is worth approximately $3 to $3.5 million.

In September of 1990, management decided to continue with the judicial foreclosure action after the borrowers rejected the conditions of a deed in lieu of foreclosure. The debtors would not accept the reconveyance of the existing 2nd DT in the approximate amount of $175M held by Cascade Savings, Everett, Wa. A net realizable value calculation by management determined the value of the property to be $1,633,682. Income and expense projections were based on the 3-15-88 appraisal, with the exception of lowering the blended lease rate to $.675 per square foot. The cash flow also included a 12 month tenant improvement completion which totaled $840,000. Estimated final sales will occur the 30th month since the trial date of the debtors lawsuit is not scheduled until 8-14-91 and a twelve month period to reach stabilized income. The Special Asset Committee recommended to establish a specific reserve for this credit based on their net realizable value calculation. The $1,633,682 net realizable value minus the foreclosure costs of $35,132, equals a Loss of $801,450. The remaining balance is classified Substandard.
(Originating Officer: Sid Paul/Servicing Loan Officer: Greg Leland)mvc.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | Amount | CLASSIFICATIONS Substandard | Doubtful | Loss |
| 1,200,541<br>CONRAD INDUSTRIES, INC.<br>By & Gty: William F. & Nancy R. Conrad | 30 | 1,200,541 | 1,200,541 | | |

Previously Classified Doubtful at $1,226,543
Internally Classified Substandard at $1,200,000 and Doubtful at $541

The above debt represents the remaining balance of a $1,500M note dated 7-19-85, with a maturity date of 2-1-96. The loan terms require monthly payments of $13,485 which is based on a thirty year amortization scheduled. The interest rate is adjusted annually. The borrower brought the debt current during the examination.

Conrad Industries is an industrial manufacturing company which owns the marketing and distribution rights for the "Kleenair Pyrolysis Systems". The art of pyrolysis is "the decomposition of carbonaceous materials into useful gas, oil and carbons". Loan proceeds were used to construct a pyrolysis plant in Chehalis, Wa. This plant was designed to be a model which could show potential customers how this system could convert common waste materials to useful carbon by-products through the application of intense heat. The company's original intent was to develop machines to carry out this process and to market it world-wide. However, the company has not sold one machine since it began operations. As a result of no sales, the company has not been able to generate sufficient income to service the above debt and the debt owed to other creditors which totaled approximately $1,495M, excluding $825M of notes payable to affiliates. The affiliate who provided the operating capital for the debtor consists of Hub City Transfer & Storage Co., owned by Mr. Conrad. The affiliate's 12-31-89 financial statement listed TA of $1,180, TL of $740M, and a NW of $440M. Assets consist mainly of loans receivable from affiliates totaling $1,022M. The operating statement reflected net operating income of $107M. Conrad Group, Inc. is a trucking/moving company which is owned by Mr. Conrad. Its 12-31-89 financial statement listed TA of $613M, TL of $576M, and a NW of $37M. The primary asset of the company is account receivables of $385M. Operations generated net operating income of $111M on total revenues of $2,403M for 12-31-89. It is estimated that the two companies generated a total cash flow of $271M for 12-31-89. Conrad Industries, Inc. 12-31-89 financial statement indicates a highly leveraged position. TA equal $545M, TL of $3,540, and a NW of ($2,995M). Operations generated a net operating loss of $606M on revenues of $344M. Adding back depreciation expense of $254M, reveals a negative cash flow of $352M. This limited analysis indicates that the companies combined cash flow is a negative $81M. The credit files lacked an analysis of the companies cash flow and it is recommended that management perform an annual review on all three companies.

Collateral consists of a 1st DT on the pyrolysis plant, a first lien position on all machinery and equipment, 1st and 2nd DT on parcels comprising the Eads Transfer Facility, and 34 1st and 2nd DT and assignments of contracts secured by single family residences. A majority of the single family residences are located in Centralia, Wa. All the collateral was recently appraised either by narrative appraisals or drive-by appraisals. Management estimates the net recovery of the pledged collateral to equal $1,290,935.

In July of 1990, the company sold an exclusive license agreement to the Republic of Taiwan. The company received approximately $350M from this contract and used the proceeds to payoff the $250M loan from Lewis County. This enabled the association to release its $250M letter of credit which was issued in favor of Lewis County. The credit file also indicated that the borrower may have potential contracts with fourteen other Pacific rim countries and a company out of Salem, Oregon. Management did not know the debtors progress in closing these deals. Vice President Leland stated that the borrower has also paid off all delinquent interest according to the trouble debt restructure agreement entered into on 8-23-89.

This credit was classified Doubtful at the last examination based on the 90 day delinquent status of the credit, lack of documentation and analysis concerning the pledged collateral, and no current financial information on the borrower, Mr. Conrad and his other companies. This credit appears to warrant a Substandard classification based on the new information obtained since the last examination and the debtors performance in regards to meeting their obligations. (Servicing Officer: Greg Leland)mvc

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | | | NUMBER 32158 |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |
| 1,115,000<br>COOPER, WILLIAM | 61 Days | 1,115,000 | 1,115,000 | | |

Previously Classified Substandard at $1,103,850
Internally Classified Substandard

Fully disbursed construction loan dated 7-8-88 for a 45 unit residential care facility in Salem, OR. The original source of repayment was to come from permanent financing by Liberty Savings and Loan Association of Eugene, OR. However, this source did not materialize due to the facility's inability to achieve adequate levels of occupancy and generate sufficient levels of cash flow. The loan has been extended twice and presently matures on 12-31-90. The loan is collateralized by a first lien on the three building facility which has a 5-11-88 AV of $1,757M upon completion and a stabilized occupancy value of $1,948M.

The borrower's background is as a builder/developer. His construction company, Qualico, Inc., built the subject facility. Mr. Cooper got into the adult foster care business five years ago. He previously owned a firm, Senior Estate, which managed various residential care facilities. Recently, Mr. Cooper sold his management firm to one of his employees, Ron Aronson. Currently, Mr. Cooper owns 12 adult foster care facilities, including the subject facility, which are or will be managed by Senior Estates. A PS dated 9-1-88 for Mr. Cooper lists RE of $7,391.5M, TA of $8,464.2M, TL of $4,381.2M, and NW of $4,083M. As reflected in the statement Mr. Cooper's net worth consists primarily of illiquid RE equities. Mr. Cooper's financial position does not offer support to the credit.

The latest extension was to allow the borrower time to arrange a capital injection into the project, and assumption of the loan by a partnership consisting of Mr. Cooper and other unidentified "credit worthy investors". The project is approximately 60% occupied and shows a net operating loss of $54M through 7-90. The borrower estimates an additional six months will be needed to reach stabilized occupancy of 91%. A continuation of the Substandard classification is warranted based on the delinquent status, low level of occupancy, inability of the borrower or the project to support the debt, and an unidentified source of repayment. (Originating Officer: John Harlow/Servicing Officer: Dave Clay)sb

| | | | | | |
|---|---|---|---|---|---|
| 1,421,460 (1)<br>333,803 (2)<br>1,755,263<br>DANT, ROBERT M. | | | 1,755,263 | | |

Previously Classified Substandard at $1,734,529
Internally Classified Substandard

(1) Amount represents remaining balance of a $1,440M note dated 5-27-88, due 6-1-98 with interest paid current. The loan requires monthly principal and interest payments at 9.75% based on a 30 year amortization

(2) Represents the remaining balance of a $400M loan dated 6-14-88, due 9-1-93 with interest paid current. The loan requires interest only payments at 11.75%. An equity kicker was built into this loan with the Association scheduled to participate in a share of the proceeds from the eventual sale of the property as follows:

| | |
|---|---|
| If repaid by 12-31-88 | No participation. |
| If repaid by 12-31-89 | 25% of sales proceeds over $1,840M up to $38,750. |
| If repaid by 12-31-90 | 37.5% of sales proceeds over $1,840M up to $76,875. |
| If repaid by 12-31-91 | 50% of sales proceeds over $1,840M up to $122,500. |
| Thereafter | $160,000. |

The proceeds of loan (1) went to provide "attractive financing" that would enable the partnership to sell the property. The proceeds of loan (2) went to provide funds necessary to pay construction bills, pay future tenant improvements, and "supplement the cost to carry".

App. 725



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2389

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |

DANT, ROBERT M. (Continued)

Originally, Dant was to form a limited partnership which would raise sufficient funds or equity that would allow a small enough loan to provide debt service coverage. Because of tax law changes in 1986 and poor timing, he was unable to put this partnership together as planned. The private placement offering memorandum for Tenth Avenue Limited Partnership was completed in mid-December, 1987. Dant was unable to finalize the offering before moving in the first building tenant on February 1, 1988. In order to benefit from rehabilitation tax credits, the new law requires you to be part of the ownership prior to putting the building back in use. Since the offering took so long the "proposed limited partners" would not have benefited from these rehabilitation tax credits so this partnership was not formed.

Collateral on both loans consist of a first DT on 15,000 square feet of land and improvements. The property consists of a rehabilitated, six story office building containing a gross area of 31,053 square feet located in the Central Business District of downtown Portland, OR. Within the Central Business District certain areas have been designated "historic Districts" and many of the buildings in these areas have been restored and/or rehabilitated. The subject property was originally built in 1908, substantially remodeled in 1977 and rehabilitated in 1987. The rehabilitation work was financed through First Interstate Bank. The renovation work on the building has been completed and the building is currently 80% occupied. A 1987 appraisal valued the property at $1,950M. Combined debt service on both loans is $194,462. Based on the current occupancy level the property is operating at approximately a ($10,000) cash flow after debt service. The loan has been kept current through outside debt primarily from Bank of California and U.S. National Bank of Oregon. A operating statement for Dant Development Corporation was not in file. Mr. Dant's personal FS dated 4-30-89 shows a substantial NW, however, it is centered primarily in illiquid RE equities. It lists CA of $10M, RE equities of $3,685M, OA of $355M, TA of $4,050M, TL of $1,205M, and NW of $2,845M.

Based on the inability of the property to fully service the debt, the extremely high combined loan to value ratio (88.95%), the tenuous cash flow position of the borrowers company along with the illiquidity of his personal financial position the Substandard classification previously assigned is continued.
(Originating & Servicing Officer: John Harlow)sb

| | | |
|---|---|---|
| 1,811,728 - Gross Book Balance | | |
| (543,126) - Specific Reserves | | |
| 1,268,602 - Net Book Balance | | 1,268,602 |
| INDIAN CREEK CONDOMINIUMS | | |
| By & Gty: William Childress | | |
| Sally Childress | | |

Previously Classified Substandard
Internally Classified Substandard

Amount extended represents the remaining balance of four loans granted beginning 3-28-85, the proceeds of which were used to fund land acquisition and development of 32 condominium units and an eight-plex located in Olympia, WA. Sterling Savings acquired the loans as the result of a merger with Central Evergreen Savings and Loan Association. Terms call for monthly principal and interest payments totaling approximately $13,608. The maturity date for the loans is 12-19-17. Collateral for the loans consist of a 1st DT on the condominium project and the eight-plex. AV of the collateral as of 5-15-87 was $1,540M. The association performed a net realizable value analysis on the collateral, dated 9-18-90, which indicated a value of $1,339,520.

Due to a slow rent-up period, the loans became delinquent. On 1-7-88 Central Evergreen restructured the loans extending the maturity to 30 years and lowering the interest rate to 7.5%. An operating statement for the seven month period ending 7-31-90 shows net operating income of $76,372 which equates to $130,923 annualized cash flow. With current debt service requirements approximating $13,000 per month the indicated annualized cash flow does not appear adequate to cover. Management indicated that the borrower was making up the deficiency from "other sources", however, they did not know what these other sources were. The loan files did not contain current financial statements on the guarantors, nor was there any current occupancy data on the complex.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | NUMBER 32158 | | | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |

INDIAN CREEK CONDOMINIUMS (Continued)

Management has petitioned to reduce the level of the specific reserves on this asset as they feel that the collateral value now supports such a reduction. However, due to the existing cash flow deficiency of the collateral even at the substantially below market rate, the history of delinquency status, and the lack of current financial statements on the guarantors, it is not felt that such a move would be prudent at this point. Therefore a Substandard classification is accorded to the existing net book balance.
(Servicing Officer: Greg Leland)tdf

| Amount | Days or No. of Payments | Amount | Substandard |
|---|---|---|---|
| 226,500 (1) | 30 days | 226,500 | |
| 260,167 (2) | | | |
| 683,180 (3) | 46 days | 683,180 | |
| 1,169,847 | | | 1,169,847 |

MACDONALD, ARCH

Previously Classified Substandard
Internally Classified Substandard

(1) Amount represents the unreduced balance of a loan dated 1-27-88, originally due 2-1-89 with the maturity extended to 7-1-90. Loan terms called for interest only payments monthly with a balloon payment due on the maturity date. Proceeds of the loan were used to pay delinquent interest totaling $86,920 on loans (2) and (3), pay delinquent real estate taxes of $11,384, cover $8,537 in loan and legal fees, and establish a bancontrol account in the amount of $119,659 to cover future payments on all three notes. Collateral consists of a 1st DT on 156 acres of raw land in Snohomish County. AV as of 9-17-90 was $312M. A net realizable value analysis performed by the association on 9-14-90 valued the property at $224,342.

(2) Amount represents the remaining balance of a REC dated 11-16-79, between Robert and Thelma Fankhauser (sellers) and Fankhauser and MacDonald, Inc. (purchasers), for the purchase of 80 AL in northwest Snohomish County. Purchase price was $360M. The REC was assigned on 6-1-84 to M. Morgan Leigh Co who in turn assigned to Central Evergreen Savings and Loan Association. Mr. Fankhauser had previously purchased the property on contract from Max Schoonik on 10-25-79 for $280M. Terms of the assigned REC call for annual principal and interest payments at payments at 10% ($40M due in November of each year until paid in full). The last payment on this note was made in January of 1990 in the amount of $26,016. Collateral consists of a seller's assignment of the real estate contract between Robert Fankhauser and Fankhauser and MacDonald Inc. There is a title policy in file dated 10-2-84 for the amount of $111M and issued in favor of Central Evergreen which shows Central Evergreen in a second lien position behind the previous seller of the property, Max Schoonik. AV of the property as of 9-17-90 was $200M. A net realizable value analysis performed by the association on 9-14-90 valued the property at $135,201.

(3) Remaining balance of a $860M note dated 9-17-82 which Arch MacDonald executed in favor of Robert and Thelma Fankhauser. The note was assigned on 6-1-84 to M. Morgan Leigh Co. which, in turn, assigned it to Central Evergreen Savings and Loan Association on 9-28-84. The promissory note states "the sum of $860,000, with interest on the unpaid principal balance at the rate of 10% per annum from 10-1-82. Principal and interest payable in lawful money of the United States of America in installments as follows:

On or before 9-15-83, the sum of $50,000;
On or before 12-15-83, the sum of $50,000;
On or before 6-15-84, the sum of $75,000;
On or before 12-15-84, the sum of $75,000;

and thereafter, said installments shall be payable in respective amounts and on the respective dates of each month of each year as set forth above until the unpaid principal and interest have been paid in full".

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | :NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |

MACDONALD, ARCH (Continued)

Management has interpreted this clause to mean that after the indicated payment schedule semi-annual payments (due 6-15 and 12-15 each year) of $75M are due. Therefore, since the borrower missed the 6-15-89 payment the loan is past due. These note terms appear to be extremely ambiguous as the borrower could interpret it to mean payments were due only through 12-15-84 and he has fulfilled the note obligation.

Collateral on (3) consists of an assignment of a DT between Arch MacDonald and Robert Fankhauser on 160 acres of unimproved land in rural northwest Snohomish County. A trustee's sale guarantee in file dated 7-23-90 shows this lien behind a RE contract dated 5-2-79 between Mr. Fankhauser (purchaser) and Leo W. June and Lloyd Andersen (sellers), the previous owner of the property. The trustee's sale guarantee says the Fankhauser/June,Andersen contract has been only partially satisfied. Management indicated that they believe this contract has been fully satisfied and they sent fulfillment deeds out to Mr. June and Mr. Andersen in September on 1990 for their signatures. AV of the property as of 9-17-90 was $368M. On a net realizable value basis the association values the property at $272,135.

As the AV's for the collateral indicates, each extension of credit is under collateralized. Arch MacDonald passed away on 3-30-88. It appears that Central Evergreen was not aware of this fact and failed to file a claim against his estate. When the association did learn of Mr. MacDonald's death an attorney was consulted regarding the filing of claims. In a letter dated 8-24-89 the association's attorney, Marc Wheeler, stated that it was his understanding that when a creditor's claim is not filed on a secured debt, the creditor may look only to the security. He further stated "If we file a claim in this estate I am certain that it will be rejected as untimely". It appears that in the ensuing months the association's attorney adopted a different viewpoint. Mr. Wheeler now cites a Supreme Court decision issued in May, 1988 which ruled that creditors be given "actual" notice of probate proceedings. The attorney has apparently interpreted this decision to mean that a newspaper listing of the death is insufficient and that creditors must be individually notified. Management indicated that they were not given "actual" notice of Mr. MacDonald's death and as such they can still go against Mr. MacDonald's estate for any deficiency.

The association has instituted judicial foreclosure on the properties listed as collateral on the two loans that are currently shown as past due. The executor for Arch MacDonald's estate, Doug MacDonald, has contacted the association and inquired as to what it would take to reinstate the past due loans. The association responded by indicating the missed payments constituted default and that according to the provisions of the loans they were now demanding payment in full. Management indicated that they would drop the foreclosure action if the borrower gave them additional collateral to adequately cover the loans and current financial statements on the estate of Arch MacDonald. The borrower did submit a current balance sheet on the estate dated 6-30-90 which indicates a NW of $11,132M centered primarily in RE equities. Details on the RE and income information was unavailable.

A Substandard classification is accorded at the present time due primarily to the borrower's apparent willingness to reinstate the debt. This line contains significant loss exposure due to the severe collateral deficiencies on the loans/contracts, the ambiguous terminology of the loans/contracts, and the significant uncertainties of the association's ability to obtain a deficiency judgement against the estate. Close supervision by loan administration will be required to avoid further deterioration and to minimize exposure. (Servicing Officer: Greg Leland)tdf

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| | DELINQUENCY | | CLASSIFICATIONS | | |
| AMOUNT, DESCRIPTION, AND COMMENTS | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |
| 1,059,000 Participation Purchased<br>( 93,825) Specific Reserve<br>965,175 | 1,307 | 965,175 | 965,175 | | |

SIERRA VISTA SUNWOOD INN, LIMITED PARTNERSHIP
d/b/a SUN CANYON INN
Sierra Vista, Arizona
By: James Landwehr, General Partner
Gty: James & Frances Landwehr
Frank & Marie Dawson

Previously Classified Substandard
Internally Classified Substandard

The outstanding balance represents a 50 percent loan participation with Statesman Savings Bank located in Des Moines, Iowa as lead lender. Loan proceeds were used to construct a 79-unit hotel in Sierra Vista, Arizona. Sterling acquired the loan as a result of a merger with Tri-Cities Savings and Loan Association. This asset is subject to a FSLIC indemnification agreement whereby the maximum exposure to Sterling Savings is 25% of actual loss. This indemnification agreement expires in April of 1993.

Collateral consists of a 1st DT on the hotel and a security agreement on the F&F and equipment. An appraisal report dated 7-1-88, valued the subject at $1.65 million while the most recent appraisal, dated 3-22-90, valued the property at $1.5 million. The debtor filed Chapter 11 bankruptcy over two years ago and is operating the hotel as a debtor in possession. On 7-25-90, management accepted the borrower's plan of reorganization after rejecting two other plans. The plan calls for reinstating the above loan at $2.1 million. The terms call for monthly installments of principal and interest beginning October of 1990. The interest rate is fixed at 10 percent and principal will be amortized over a thirty year period. No later than ten years from the date of the order confirming this plan, the property will be sold and the balance of the loan as modified herein will be paid in full. The guarantees will remain in place. The delinquent interest of $239,893 will take on the form of a note. It is considered an unsecured claim, although it will be guaranteed by the above guarantors, and shall bear no interest. Payments will not begin until 3-30-94 over a term of five years.

The hotel is showing increased revenues and profitability every year starting with 1986, but it does not support the above mention amortization schedule. 1989 operations generated net operating income before debt service and depreciation of $141M on total revenues of $761M. Total debt service on the mortgage will equal $221M. The debtor's 1990 projections indicate net operating income before debt service and depreciation of $287M on total revenues of $916M. The largest increase in annual sales growth for the hotel was 8 percent, 1990 projections are estimating a 20 percent sales growth. Frank Dawson has declared Chapter 7 bankruptcy and the Landwehrs have repeatedly stated that they will file Chapter 11 petition rather than face a trial on their guarantees. The only viable guarantee is Marie Dawson who reports a $1 million net worth. Vice President Greg Leland stated that a judgment has been entered against Ms. Dawson for any deficiency after the sale of the hotel. No documentation was in the credit file to substantiate this position.

A letter, dated 7-30-90, from the Federal Deposit Insurance Corporation, a division of FSLIC operations stated, "We do not authorize a write-down to the appraised value of $1,500,000...Ms. Dawson has provided a signed deposition attesting that she has a net worth of over $1 million Any shortfall received from the sale of the property could be made up by Ms. Dawson. With Ms. Dawson's guarantee it cannot presently be stated that upon liquidation of the asset, the net proceeds will be less than the book value. Therefore, we will not write-down the book value of this asset to the appraised value." The association's exposure is $75,000, if the association is allowed to write this asset up to $1,050,000 (50% of $2.1 million). However, if the debtor performs according to the loan terms and goes beyond the indemnification expiration date, the association's exposure increases to $300,000. The loan is classified Substandard because of nonperformance and lack of collateral protection. (Servicing Officer: Greg Leland)mvc.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | :NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |
| 1,589,197<br>1201 ASSOCIATES, a general partnership<br>By: Ronald D., and Christine D. Gregory<br>Larry W., and M. Audrey Ingraham | | | 1,589,197 | | |

Internally Classified Substandard

Amount represents the remaining balance of a participation loan purchased from United Bank, A Savings Bank, in Tacoma, WA. The gross original balance of the loan was $10,110M, of which the subject institution purchased a 16% share. The loan is dated 12-31-84 and due 6-30-97. Purpose of the loan was to provide financing on the Everett Mall Plaza, a retail shopping center located across from the regional Everett Mall in Everett, WA. The loan is collateralized by a 1st DT on the project, which consists of seven buildings of various sizes on 8.02 AL plus a Jack in the Box restaurant under a ground lease where the building is actually owned by the tenant. AV of the project as of 6-1-90 was $13,000M.

The borrowers have indicated that they are experiencing cash flow difficulties on this project. The most recent operating statement, for the six month period ending 6-30-90, shows total revenue of $755M and net operating income of $597M. "Non project related" cash expenditures totaling $218M are listed in this statement which would decrease net operating income to $379M. Debt service requirements total $92,238 monthly or $553M every six months which does indeed indicate a cash flow deficiency. Several other non-operational expense totaling $158M are also indicated in the operating statement. If those were deducted from the cash flow deficiency becomes even greater. It is not known if these other expenses are actual cash outlays as analysis of the operating statement by management was not noted in the file. The borrowers have indicated that the cash flow deficiency is the result of the failure of several smaller tenants who vacated their spaces. Some of the vacated space has been released, however, the project remains approximately 20% vacant. Management is of the opinion that the property does indeed cash flow and that the non project related expenditures shown in the operating statement indicate that the borrowers have been diverting funds from this project to pay obligation on other projects. While it appears that the borrowers have been late making several payments they have not let the loan fall too far behind. Current financial statements on the general partners was not noted in the file and it is unknown how the borrowers have managed to keep the loan current.

Due to the cash flow deficiency of the collateral, along with the lack of current financial information on the general partners, a Substandard classification is accorded.
(Servicing Officer: Greg Leland)tdf

| | | | | | |
|---|---|---|---|---|---|
| Nineteen Income Property Loans – List Provided to Management | 30-89<br>90 & Over | 494,264<br>2,100,542 | 4,184,071 | 33,665 | 89,400 |
| Total Adversely Classified – Income Property Loans | 30-89<br>90 & Over | 3,719,485<br>7,416,064 | 17,720,142 | 33,665 | 1,103,183 |

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| | DELINQUENCY | | CLASSIFICATIONS | | |
| AMOUNT, DESCRIPTION, AND COMMENTS | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |

COMMERCIAL BANK LOANS

| | | | | | |
|---|---|---|---|---|---|
| 468,768 (1) Nonaccrual | 272 Days | 468,768 | 468,768 | | |
| 119,992 (2) Nonaccrual | 127 Days | 119,992 | 11,999 | | |
| 588,760 | | | | | |

AMERICAN HOME BUILDERS, INC.
By & Gty: Rodney Sarkela, President
Martin Seppala

Internally Classified Substandard

The borrowing relationship originated on 3-8-84 when funds were advanced on both notes to acquire a manufacturing business from Mr. Sarkela's father's estate. The business was located in Brush Prairie, WA and manufactured closed panel modular homes. The business ceased operations in 1985. The manufacturing plant has had various tenants since 1985 but has been vacant since November 1989. The association has a first lien on the 16,313 square foot plant and an additional 6.9 AL of vacant land. The property carries a 5-2-90 AV of $592M. Additional collateral consists of a first lien on two SFR lots which are internally valued at $13.5M each, and a limited first lien of $10M on a SFR in Vancouver, WA. Total collateral amounts to $629M.

The association commenced foreclosure action against the manufacturing plant in April 1990. The foreclosure action was halted when a reinstatement plan was negotiated during the examination. The borrowers brought both loans current through payment of $41,447 of principal and interest. In addition, $557 per month is being applied to foreclosure expenses incurred by the association. Funds to bring the loan current came from sale of a SFR lot previously held as collateral and other unspecified sources. The principals are involved in Seppala Aho Construction located in New Ipswich, NH and Lantana, FL. No financial information is available on this entity, however a Dun and Bradstreet report in file indicates substantial losses for fiscal 1988 and 1989 with declining trends. A personal statement on Mr. Seppala dated 10-31-89, but signed 3-16-90, shows a $9,014.4M net worth which primarily consists of ownership of closely-held companies. It is uncertain what financial support Mr. Seppala or the construction firm actually offer. Credit files contain no financial information on Mr. Sarkela.

Management indicated the borrowers are attempting to sell the building and were informed to expect payoff within 90 days. However, the credit files did not offer any support to this information such as an earnest money agreement or commitment from a prospective purchaser. The line warrants the assigned classification given the delinquent history, uncertain financial support of the principals, and reliance on the liquidation of collateral as the only source of repayment. The amount extended for loan #2 reflects the unguaranteed portion of a 90% SBA loan. (Servicing Officer: Dan King)jft

| | | | | | |
|---|---|---|---|---|---|
| 150,500 Nonaccrual | 138 Days | 150,500 | 131,288 | | 19,212 |

BETTS, JOHN M.
d/b/a Jack Betts & Associates

Internally Classified Substandard at $128,900 and Doubtful at $21,600

Current balance of a $150,727 debt consolidation loan dated 9-15-89. Collateral consists of a one story and a 1 1/2 story SFR's converted to office space. An internal Net Realizable Value shows a value of $131,288 as of 9-25-90. Communication with the borrower ceased and it is unknown why he stopped pay the examination the association foreclosed on the property and transferred it to REO at the amount classified above. An appraisal of the property has been ordered however it was not been received during the examination (Servicing Officer: Jim Ross/Handling Officer: Wayne Allert)jft

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | Amount | CLASSIFICATIONS Substandard | Doubtful | Loss |

171,626
BURDEN, R.W.

171,626 (Substandard)

Previously Classified Substandard
Internally Classified Substandard

Current balance on a $202M renewal note dated 9/88 to purchase a mini mart and provide funds for real estate development. The loan was originated in 1985 by Tri Cities Savings and Loan. Repayment is from collection of a promissory note and mini mart cash flow. The note is secured by an assigned note, first lien on 41 acres, second lien on a commercial building and cash.

A 1/26/88 FS on the borrower lists TL $436M and NW $487M centered in the promissory note known as the Broadmore note valued at $417M and real estate. No tax return has been obtained since 1987.

The loan has been paying as agreed, however, the borrower's primary asset (The Broadmore note) which is unsecured is in default and the payor is in bankruptcy. Sterling's request for undated financial information has been denied and the borrower's current position is unknown. Without the Broadmore note the collateral position is weak and may insufficient in a liquidation situation. Due to the unknown financial position of the borrower, the default on the Broadmore note which is the borrowers largest asset and limited collateral protection a Substandard classification is assigned. (Servicing Officer: Jim Ross)gf

110,225 (1)
4,645 (2)
74,640 (3)
189,510
CRM OPTICAL, INC.
By: R. Patrick Spiger

189,510 (Substandard)

Internally Classified Substandard

Loan (1) is a term loan dated 9-30-88 to buy out interest of former partners with an original balance of $150M. Loan (2) was used to acquire a automobile and loan (3) is the present balance of a $75M operating line. Company is a wholesaler of soft contact lenses and solutions. In 1989 the business expanded in the manufacture of hard lens and spectacle lens products. The maturity date of loan (1) has been extended once to 1-1-92 and loan (3) maturity date has been extended twice to 1-1-91. The latest extension on loan (3) was granted to allow for a $100M capital injection from outside investors and completion of fiscal 9-30-90 financial statements. Association has taken liens on all business assets, a second mortgage on Mr. Spiger's personal residence, a second mortgage on property in Idaho, an assignment of 20% interest in a partnership, and a pledge of all corporate stock. The total estimated value of collateral amounts to $427M.

The borrower diversified due to stiff competition which was substantially decreasing profit margins. Professional outside consultants were brought in to assist in the restructure. Financials for the FYE 9-30-89 show sales of $1,365.2M resulting in a net loss of $73.4M. An in-house prepared interim statement for the eleven months ended 8-31-90 show sales of $1,281M and a net profit of $42M. However, the accuracy of the statements is not ascertainable. The statement does not appear to reflect the expense of the outside professional which is expected to have a significant impact on the company's financial position. Based solely on the interim statement cash flow is inadequate to service the present level of debt, therefore the inclusion of professional fees could have a further adverse impact on the company's financial position. The $100M capital injection will have a material affect on the company, however, the borrower is having difficulty in attracting investors. The association's time limit for the injection has been extended once from 6-1-90 to 1-1-91. Based on present circumstances it most likely will be extended a third time. (Originating Officer: Tom Beil/Servicing Officer: Jim Ross)jft

App. 732

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY: Days or No. of Payments | Amount | CLASSIFICATIONS: Substandard | Doubtful | Loss |

164,509 (1)
50,000 (2)
10,000 (3)
224,509 — 224,509
DESIGNER DECAL, INC.
Guarantor - Keith Smeltzer

(1) Balance remaining on a $170M note dated 8/87 to provide 50% of the funding for a commercial building purchase. Repayment is from cash flow. A first DT on the commercial building and a second on equipment secures the note.

(2) Amount outstanding on a $50M line note for working capital dated 11/89. Repayment is from collection of accounts and a first lien on accounts and inventory secures the loan.

(3) Outstanding balance on a $10M note dated 1/90 for operating expenses. Repayment is from collection of accounts. A lien on accounts, inventory and a second DT on the guarantor's home secure the note.

The collateral is valued at $440M per file information.

The FYE FS dated 9/30/89 lists TA $190M, TL $105M and NW $85M. Sales of $784M resulted in a net profit of $4M after depreciation expense of $22M. In the prior year, the firm posted a $2M profit on similar sales volume.

A nine month interim FS dated 6/30/90 lists TA $186M, TL $148M and NW $37M. Sales of $547M has resulted in a net loss of $(47M) after $12M in depreciation expense. The balance sheet shows a negative cash position and the owner lending the firm $19M.

The guarantor's FS dated 1/5/90 lists TL $366M and NW $277M centered in real estate valued at $480M.

The firm markets signs to commercial customers nationwide. The boating industry which is a major portion of his business slumped in 1990 and a large grocery chain order did not materialize after costs were incurred. As a result, a loss was posted for the most recent fiscal year per the loan officer. Cash flow is tight as evidenced by the nonrevolvement of the operating line and overline needs of the firm.

Due to the marginal profitability in 1988 and 1989, loss incurred in 1990, tight cash flow and limited guarantor support a Substandard classification is assigned.
(Originating Officer: Tom Beil/Servicing Officer: Dan King)

262,015 (1) — 262,015
DEVRIES ENTERPRISES
Guarantors - Jim's Transfer, Inc.
Pat DeVries
Bill DeVries
Mike DeVries

32,521 (2)
18,750 (3)
75,000 (4)
50,000 (5)
35,386 (6)
211,657 — 211,657
JIM'S TRANSFER, INC.
Guarantors - DeVries Enterprises
Pat DeVries
Bill DeVries
Mike DeVries

App. 733



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2397

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY: Days or No. of Payments | Amount | CLASSIFICATIONS: Substandard | Doubtful | Loss |

DEVRIES ENTERPRISES/JIM'S TRANSFER, INC. (Continued)

(1) Current balance on a $275M note dated 8/86 which refinanced the existing mortgage and provided $125M for a capital injection into Jim's Transfer, Inc. Repayment is from Jim's Transfer, Inc.'s cash flow. A first DT on a commercial building secures the loan. A 1986 appraisal values the building at $385M.

(2) Outstanding balance on a $100M line note dated 8/88 for operating expenses. Repayment is from conversion of receivables.

(3) Remaining balance on a $41M note dated 10/88 to purchase two trucks. Repayment is from cash flow.

(4) Balance outstanding on a $75M note dated 11/89 to pay delinquent taxes. Cash flow is the source of repayment.

(5) Amount outstanding on a $50M loan dated 2/89 for operating expenses. Repayment is from conversion of receivables.

(6) Current balance on a $125M note dated 4/87 for an unspecified purpose. Repayment source is not stated.

Collateral for loans #2-6 consists of accounts, inventory, equipment, stock, and junior liens on the commercial building and guarantor's personal residences. Total collateral value is estimated to be $675M per file data.

Jim's Transfer, Inc. YE 12/31/89 FS lists TA $1,013M, TL $858M and NW $155M. Sales of $3.5MM resulted in a $9M net profit after $133M in depreciation expense. A six month interim FS dated 6/30/90 shows a profit of $28M on sales of $1.6MM.

The 6/90 personal FS's of the guarantors list on a combined basis TL $510M and NW $1,551M centered in business investment at $900M. Their outside net worth is limited and illiquid.

No 1989 FS is on file for DeVries Enterprises. A 1988 tax return shows TL $334M and a negative NW $(115M). A $3M net profit was posted for the year.

DeVries Enterprises is a partnership which owns a building used for storage by Jim's Transfer, Inc. and partially leased out. The partnership has required assistance and Jim's Transfer, Inc. has lent the firm $77M through 12/89 without a repayment schedule. The building is an old service station and garage and needs to remove gasoline storage tanks and does not has the funds to do so. It is not known whether a pollution problem exists.

Jim's Transfer, Inc. is a moving and storage company that has expanded into business record storage and commercial furniture moving. The firm has expanded rapidly. Sales have increased from $1.5MM to $3.5MM or 132% in the last four years. This growth has strained cash flow and management chose not to pay taxes in order to fund operations. In addition, financial data was inaccurate and not timely. A $66M profit in 1988 was reduced significantly when FS errors discovered. In the last four years, the firm has posted a cumulative loss $(98M). Due to the FS errors the firms reported NW of $155M as of YE 1989 is only $47M after adjustments.

Due to the history of losses, poor financial data, strained cash flow and limited guarantor support a Substandard classification is assigned.
(Originating & Servicing Officer: Dan King)gf

App. 734

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | | | NUMBER 32158 |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY: Days or No. of Payments | DELINQUENCY: Amount | CLASSIFICATIONS: Substandard | CLASSIFICATIONS: Doubtful | CLASSIFICATIONS: Loss |
| 179,845 (1) | | | 179,845 | | |
| 58,115 (2) | | | 58,115 | | |
| 99,471 (3) | | | 14,921 | | |
| 163,238 (4) | | | 28,567 | | |
| 500,669 | | | | | |

EVERGREEN ENGINE EXCHANGE, LTD.
By & Gty: Patrick Charles, President
Frank Ascolese, Vice President

Internally Classified Substandard

Company is a wholesale distributor of automobile engines. Cash flow problems developed when a merger with was dissolved, non payment of receivables from American Engine Exchange and another merger partner, and a general nationwide slowdown in the industry. The dissolution of the merger with American Engine Exchange resulted in a loss of 20% of the company's business. The company is presently restructuring its business to focus more emphasis on direct sales to retailers rather than using distributors. However, management indicated this shift is proceeding slowly as only 5% of sales are made through direct method. In addition, a $500M capital sale is proceeding slowly as investors want to see a return to profitable operations before committing funds. FYE statements dated 3-31-90 show sales of $2,047.9M resulting in a loss of $95.5M. An interim statement for 7-31-90 shows sales of $756.8M and a net loss of $6.2M. However, interest expense on the statement appears significantly below the amount normally seen for over $500M in debt. Management indicated that they will investigate the financial statements to determine the company's actual condition. Loans (3 and 4) reflect the unguaranteed portions of a 85% and 82.5% SBA loans, respectively. (Originating Officer: Tom Beil/Servicing Officer: Dan King)jft

| | | | | | |
|---|---|---|---|---|---|
| 15,000 (1) | | | | | |
| 39,992 (2) | | | | | |
| 45,214 (3) | | | | | |
| 63,550 (4) | | | | | |
| 21,647 (5) | | | | | |
| 185,403 | | | 185,403 | | |

HEMPHILL, KIM

(1) Balance outstanding on a $15M note dated 10/88 to reduce debt at another bank (10M) with remaining to the borrower. Source of repayment is not stated.

(2-5) Current balances on loans granted in 1987/88 to purchase various properties. Repayment is from rents/sale of unit or personal income.

The loans are secured by eight houses throughout Spokane. The 1987/88 appraised values total $289M with $65M in prior liens on three homes.

The borrowers 6/1/90 FS lists TL $712M and NW $672M centered in real estate valued at $1.2MM. No 1989 tax return is on file. A 1988 tax return shows a net cash flow of $6M. In 1987, the net cash flow was $71M.

The borrower is an appraiser and real estate investor. He has accumulated 24 properties, mainly single family dwellings in lower economic neighborhoods via distressed sales. He has been unable to obtain long term financing for his properties financed by Sterling in 1989/90. An updated credit report shows late payments, collections, judgments and foreclosure action. In addition to the real estate ventures he began a restaurant which was a cash drain and was closed in the summer of 1990.

The loans have been on an interest only basis while the customer attempted to find financing. Sterling has committed to a restructure and term out, but this has been delayed due to delinquent tax liens which have been filed against various properties.

Due to the deterioration in income from 1987 to 1988, the lack of income data for 1989 and 1990, derogatory credit report and nonamortizing debt a Substandard classification is assigned. (Originating & Servicing Officer: Dan King)gf

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | Amount | CLASSIFICATIONS Substandard | Doubtful | Loss |

| | | | | | |
|---|---|---|---|---|---|
| 149,067 (1) | | | 149,067 | | |
| 147,008 (2) | | | 51,452 | | |
| 296,075 | | | | | |

INLAND AQUA TECH. CO., INC.
Guarantor - Richard Handley
Inland Aqua Tech Equipment Systems Inc. (Limited to loan #2)

(1) Current balance on a $150M line note dated 12/89 for operating expenses. Repayment is from collection of receivables.

(2) Remaining balance on a $155M note dated 12/89 to refinance debt, purchase equipment and provide working capital. Repayment is from business income. The loan is supported by an SBA guaranty of 65% and only the nonguaranteed portion is subject to classification.

The loans are collateralized by accounts, inventory, equipment and junior deeds on personal and commercial property. Total collateral value is estimated at $840M per the 9/90 loan report.

The borrower's FYE FS dated 3/31/90 lists TA $855M, TL $836M and NW $19M. Sales of $1,311M resulted in a net loss of $(85M) after $125M in depreciation expense. The accuracy of the financial data is questionable since the firm does not follow GAAP accounting for research and development costs and minority interests. This departure has resulted in overstatement of assets and capital and understatement of losses. The true financial position of the firm is not known.

Inland Aqua Tech Equipment Systems, Inc. is a subsidiary of the borrower. It lists TL $34M and NW $20M.

Guarantor Handley's FS dated 5/15/90 lists TL $317M and NW $783M centered in real estate valued at $607M. His 1989 tax return lists total income at $63M.

The firm began in 1981 as industrial water treatment specialists. In the last couple of years, the firm has branched in biogenetic mining. This has required significant cash outlays in the form of fixed assets and research and development costs. To date, the mining venture has not been profitable, but a cash drain. The quality of the internal financial reports is questionable since projections vary significantly from actual results and the loan officer noted that a $100M receivable was not run through the books.

Due to the poor quality and inaccurate FS data and the cash drain of the mining venture a Substandard classification is assigned.
(Originating Officer: Tom Beil/Servicing Officer: Dan King)gf

| | | | | | |
|---|---|---|---|---|---|
| 222,599 (1) | | | | | |
| 5,485 (2) | | | | | |
| 20,646 (3) | | | | | |
| 5,335 (4) | | | | | |
| 254,065 | | | 254,065 | | |

INLAND MATTRESS & FEATHER CO.
Guarantor - Scott Griffith

Internally Classified Substandard

(1) Current balance on a $230M note dated 11/87 to purchase a commercial building and equipment and fund remodeling expenses. Repayment is from cash flow.

(2 and 3) Remaining balances on termed out credit lines for equipment purchases and operating expenses. Repayment is from income.

(4) Balance outstanding on a $7M note to purchase a truck which secures the loan. Repayment is from income.

Loans #1 - 3 are secured by a first deed on the commercial building and first liens on accounts, inventory and equipment. The collateral is valued at $568M per the file data.

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss |

INLAND MATTRESS & FEATHER CO. (Continued)

The borrower's FYE 6/30/89 FS lists TA $547M, TL $486M and NW $61M. Sales of $681M resulted in a net loss of $(35M) after $33M in depreciation expense. The firm changed its FYE in 1989 and for the four month year ending 10/31/89 it posted a loss $(72M) in part due to a $45M inventory adjustment. The cumulative net loss for the period 6/85 through 10/89 is $(44M). Interim numbers for the current year show the losses continuing. Through 6/90 a $(2M) loss has been incurred. The net worth has become a negative $(36M) before intangibles of $30M are backed out.

The guarantor's 9/30/89 FS lists TL $93M and NW $96M centered in his home.

The firm lost a large commercial customer and replacing the volume with profitable work has not materialized to date. Cash flow tightened as evidence by increase trade reliance and nonrevolving bank lines. The firm has cut expenses and is exploring the sale of the business or real estate or both.

Due to the history of losses, tight cash flow, negative net worth and limited guarantor support a Substandard classification is assigned. (Originating Officer: Tom Beil/Servicing Officer: Dan King)gf

| | | | | | |
|---|---|---|---|---|---|
| 73,926 (1)<br>129,161 (2)<br>203,087 | | | 203,087 | | |

PIERONE'S INC.
Guarantor - Lee Nordstrom

(1) Current balance on a $75M note dated 3/90 which termed out a credit line used for operating expenses. Repayment is from cash flow.

(2) Remaining balance on a $232M renewal note dated 2/89 to assist with the purchase of the clothing store. Repayment is from profits. The loan originated at $250M in 7/88.

The notes are secure by a first lien on accounts, inventory and leasehold improvements. Total collateral value per the 5/90 FS is $402M.

The borrower's FYE FS dated 7/31/89 lists TA $608M, TL $558M and NW $50M. Sales of $909M resulted in a net loss of $(67M) after $5M in depreciation expense.

A 5/31/90 interim FS for a 10 month period shows a loss of $(34M) and a net worth of $6M. The positive net worth is achieved by an asset reevaluation due to the purchase of the firm in 1989. This nonstandard accounting procedure adds $200M to the asset base. Without this reevaluation, the firm would have a negative net worth.

The guarantor's FS dated 4/23/90 lists TL $52M and NW $38M centered in business investment at $50M. No financial support is provided by the guarantor.

The guarantor purchased an established clothing store for $500M in 7/88 with $50M down and the balance funded by Sterlings loan and seller financing. The guarantor's father in law who provided financial skills and a guaranty died in early 1989. The new owner has not been able to increase sales beyond its historic $1MM level and has experienced losses due to high costs and heavy debt. Loan delinquency and overdrafts have been constant throughout 1990. A negative $(45M) net cash flow was projected for FYE 7/90, however, through May, 1990 the firm was behind budget. The borrower has cut expenses and has deferred debt payments to other creditors.

Due to the poor financial condition of the borrower, losses, negative cash flow and no guarantor support a Substandard classification is assigned. (Originating Officer: Tom Beil/Servicing Officer: Jim Ross)gf

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | | | | NUMBER 32158 |
|---|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY | | CLASSIFICATIONS | | | |
| | Days or No. of Payments | Amount | Substandard | Doubtful | Loss | |

77,236 (1)
35,000 (2)
75,000 (3)
138,000 (4)
61,967 (5)
387,203 — Substandard: 387,203
TRI STATE MARKET SUPPLY, INC.
Guarantors - Bart Triesh
Bart Triesh dba Metropolitan Lease Co.
Star Label Company, Inc.
Prime Food Equipment Company, Inc.

Internally Classified Substandard

(1 - 4) These notes were working capital advances that were rewritten during the examination into a $340M note with interest monthly and due in 7/91. Repayment is from collection of receivables.

(5) Current balance on $100M 4/88 note for an unspecified purpose. Repayment is not detailed.

The loans are secured by accounts, equipment and real estate valued at $595M per a 7/90 loan report.

Financial information for the borrower and three guarantors as of year end 12/31/89 is as follows:

| | TA | TL | NW | NI | DEPR |
|---|---|---|---|---|---|
| Tri State | $1,135M | $877M | $258M | $(69M) | $16M |
| Metro Lease | $432M | $271M | $162M | $81M | $45M |
| Star Label | $236M | $221M | $15M | $(11M) | $19M |
| Prime Food | $191M | $510M | $(310M) | $(147M) | $14M |
| Total | | | $125M | $(146M) | $94M |

On a combined basis, the firms have a low net worth and a negative cash flow. Also, Tri State's primarily asset (47% of the $1,135M)is receivables from related firms. Further, Prime Food posted a loss of $(175M) in the prior year.

Bart Triesch's personal FS dated 5/31/90 lists TL $315M and NW $773M centered in real estate valued at $566M and business investments at $393M. His 1989 tax return shows profits and depreciation totaling $194M.

The firm's operate in various facets of the food industry (e.g. Prime is an equipment manufacturing entity). Bart expanded from his traditional base in Tri State by forming Star Label and Prime Food in 1987 and 1988. This expansion has been costly in terms of money and management time. Actual results have not met projections on a consistent basis and the borrower has instituted a new cost approach for more accurate data. Bart has listed real estate for sale to generate cash. The loan officer deems the account as a workout.

Due to the losses, low net worth, inaccurate FS data a Substandard classification is assigned. (Originating Officer: Tom Beil/Servicing Officer: Dan King)gf

App. 738

| ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) | | | NUMBER 32158 | | |
|---|---|---|---|---|---|
| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY: Days or No. of Payments | DELINQUENCY: Amount | CLASSIFICATIONS: Substandard | CLASSIFICATIONS: Doubtful | CLASSIFICATIONS: Loss |
| 195,333<br>TULLIS, T.G. | | | 195,333 | | |

Previously Classified Substandard at $153,081 and Doubtful at $45,000
Internally Classified Substandard at $152,187 and Doubtful at $443,146

Balance outstanding on a $200M note dated 7/89 which restructured existing debt. The loan was originated by Tri Cities Savings and Loan. Sterling obtained a judgement in 4/89 against the borrower. The scheduled payments of $2M/month have been made on a timely fashion to date. The loan is secured by two real estate contracts which have a zero value per the loan officer. No current financial data is available and the borrowers financial position is unknown.

Due to the necessity of a legal action to bring the account in a paying status and the lack of financial information on the customer, a Substandard classification is assigned. (Servicing Officer: Jim Ross)gf

| | | | | | |
|---|---|---|---|---|---|
| Sixteen Commercial Bank Loans - List Provided to Management | 30-89<br>90 & Over | 69,500<br>230,692 | 374,178 | 12,856 | |
| **Total Adversely Classified - Commercial Bank Loans** | 30-89<br>90 & Over | 69,500<br>969,952 | 3,752,608 | 12,856 | 19,212 |

App. 739

ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued) NUMBER 32158

| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | Amount | CLASSIFICATIONS Substandard | Doubtful | Loss |
|---|---|---|---|---|---|
| RESIDENTIAL CONSTRUCTION LOANS | | | | | |
| Eight Residential Construction Loans- | 30-89 | 183,750 | 477,906 | | |
| List Provided to Management | 90 & Over | 227,840 | | | |
| RESIDENTIAL LOANS | | | | | |
| Forty-Nine Residential Loans - | 30-89 | 185,369 | 1,746,926 | 27,396 | |
| List Provided to Management | 90 & Over | 1,223,319 | | | |
| CONSUMER LOANS | | | | | |
| Eleven Consumer Loans - | 30-89 | 739 | 72,174 | | 24,628 |
| List Provided to Management | 90 & Over | 48,689 | | | |

App. 740



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2404

ASSETS SUBJECT TO ADVERSE CLASSIFICATION (Continued)

NUMBER 32158

| AMOUNT, DESCRIPTION, AND COMMENTS | DELINQUENCY Days or No. of Payments | DELINQUENCY Amount | CLASSIFICATIONS Substandard | CLASSIFICATIONS Doubtful | CLASSIFICATIONS Loss |
|---|---|---|---|---|---|
| **REAL ESTATE OWNED** | | | | | |
| Seventeen Commercial Income Properties | | | 4,428,285 | | 81,412 |
| Twenty-Five Residential Properties | | | 887,705 | | 19,002 |
| Two Insubstance Foreclosures | | | 3,509,088 | | 18,882 |
| Two Former Bank Premises | | | 579,006 | | 164 |
| Advances on Foreclosures | | | 335,172 | | 34,945 |
| **Total Adversely Classified - Real Estate Owned List Provided to Management** | | | **9,739,256** | | **154,405** |
| **OTHER ASSETS** | | | | | |
| Judgements | | | 97,610 | | |
| Repossessions | | | 8,700 | | 2,511 |
| Accounts Receivable | | | 514,030 | | 115,584 |
| **Total Adversely Classified - Other Assets List Provided to Management** | | | **620,340** | | **118,095** |

**App. 741**



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2405

| ASSETS LISTED FOR SPECIAL MENTION | NUMBER 32158 |
|---|---|

Includes assets believed to require more than ordinary management attention for the reasons specified, but which are not classified Substandard, Doubtful, or Loss.

| DESCRIPTION | DETAIL | AMOUNT EXTENDED |
|---|---|---|

LOANS

INCOME PROPERTY LOANS

| | | |
|---|---|---|
| PETERSEN, GARY | 2,750,000 | 2,750,000 |

Previously Listed as Special Mention
Internally Listed as Other Mention

Amount extended represents balance of a note dated 8-22-88 for the construction and permanent financing for the first of two three-story buildings in downtown Puyallup, WA. Collateral consists of a first DT on the 65,037 square foot land and the 37,191 square foot building. The original appraisal dated 9-30-88 valued the property at $2,750M upon completion and $3,500M at stabilized occupancy, estimated to require three years. The association's income property manual states that the association will lend up to 90% of the value at completion. At inception the loan to value ratio was 100%. The appraiser also expressed significant reservations about the market justification of the proposed project. In his final reconciliation of value the appraiser stated, "It is our opinion that unless and until a tenant for substantial space makes a commitment to the building, heavy reliance must be placed on the low value indicated by the Income Approach of $2,750M. This is the value upon completion of the structure, with a modest amount of occupied space. Given current market conditions, gradual absorption can be expected, and the value indicated as of year 4 is projected at $3,500M. This value remains contingent upon stabilized occupancy to be achieved in uncertain market conditions as described in the appraisal."

The association had a new appraisal of the property conducted on 4-12-90. The AV was $4,400M "as is" and $4,800M at stabilized occupancy. The appraiser noted that the project is ambitious and no rental comparables exist in the marketplace. He further indicated that the neighborhood is experiencing transition and the project is speculative until achieving stabilized occupancy. As of August, 1990 the project is only 61% occupied.

The borrower is seeking permanent financing outside the association. The loan has remained current despite the low occupancy, however, financials on the project were not available for review to determine the source of funds. Given the speculative nature of the project and the uncertainties of achieving stabilized occupancy a continuation of a Special Mention appears warranted. (Originating Officer: Sid Paul/Servicing Officer: Dave Clay)sb

COMMERCIAL BANK LOANS

| | | |
|---|---|---|
| ALLEN, R.W. | 163,295 | 163,295 |

Balance outstanding on a 7/88 loan to refinance existing mortgage and business loans with $39M new funds for working capital. Source of repayment is not stated. The loan is secured by accounts, inventory and equipment with a 3/90 FS value of $272M.

A 12/31/89 personal FS lists TL $305M and NW $283M centered in real estate and pension. Credit card debt of $42M is listed. His 1989 tax return lists gross income of $93M. A 12/31/89 FS on the dental practice lists TA $273M, TL $410M and negative NW $(137M).

The borrower is a Clarkston area dentist. His draws have exceeded his income in the last two years. In 1987 the firm had a $85M net worth. Draws of $421M in 1988/89 have exceeded profits of $209M for the same period. The customer is reducing expenses, but has requested additional debt to fund a retirement plan which Sterling has denied. Though the loan is paying, the levered personal financial position, heavy withdrawals and negative net worth in the business require an Special Mention criticism.
(Originating & Servicing Officer: Dan King)gf





CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2406

| ASSETS LISTED FOR SPECIAL MENTION | NUMBER 32158 | |
|---|---|---|
| Includes assets believed to require more than ordinary management attention for the reasons specified, but which are not classified Substandard, Doubtful, or Loss. | | |
| DESCRIPTION | DETAIL | AMOUNT EXTENDED |
| HOFFMAN, C.H. | 179,316 | 179,316 |

Balance remaining on a $188M note dated 5/88 which refinanced a mortgage on farmland and advanced $75M for investment in a fruit packing venture. Repayment is from fruit packing cash flow and income. The loan is secured by a first lien on farmland near Sprague, WA valued at $636M in 1987.

A 11/1/89 FS lists TL $132M and NW $725M centered in the farmland. The debt/asset ratio is low at 15%.

The borrower is a retired farmer who has taken the farm out of production and placed it in the Conservation Reserve Program. He is under a ten year program and receives $47M annually which is the bulk of his income. The loan is paying, however, the current amortization is inadequate. The loan was modified in 1989 and calls for monthly payments of 1.2M and a annual payment of $16M which includes interest due in January. The monthly payment does not cover the interest and $10.1M in interest has been accrued to date. The annual payment will catch up this back interest, but only a small principal reduction will occur. This current payment program is in effect until 1993. Due to an inadequate amortization program to a customer with limited and illiquid resources a Special Mention criticism is assigned.
(Originating Officer: Cajer Neely/Servicing Officer: Jim Ross)gf

| | | |
|---|---|---|
| RICHARD'S PRINTING INC. | 242,262 | |
| By & Gty: Richard Hanks | 8,080 | |
| | 250,542 | 250,542 |

(1) Balance outstanding on a $250M note dated 10/88 to payoff another bank and provide $40M for working capital. Repayment is from cash flow. The loan is secured by a first lien on commercial real estate, accounts, inventory and equipment. An SBA guaranty of 81% supports the loan.

(2) Current balance on a $10M note dated 6/89 to purchase and auto which secures the note. Repayment is from cash flow.

The firm's FYE 6/30/89 FS lists TA $343M, TL $329M and NW $14M. Sales of $468M resulted in a net loss of $(24M) after $34M in depreciation expense. In the prior year the firm posted a $(37M) loss. A nine month interim FS dated 3/31/90 lists a negative net worth of $(61M). A loss of $(75M) on $329M in sales is listed. The guarantor's FS dated 7/1/88 lists TL $107M and NW $477M centered in real estate and business investment. Income of $60M is claimed with the bulk of it from the firm.

The firm has not been profitable for several years as reflected on the financial statement. The city of Spokane has offered to purchase the real estate for $300M which was accepted. A large pay down is expected on the debt which will improve the financial picture. Only a Special Mention criticism is assigned due to the pending reduction. The history of losses and negative net worth normally require a lower classification.
(Originating & Servicing Officer: Dan King)gf

| ASSETS LISTED FOR SPECIAL MENTION | NUMBER 32158 |
|---|---|

Includes assets believed to require more than ordinary management attention for the reasons specified, but which are not classified Substandard, Doubtful, or Loss.

| DESCRIPTION | DETAIL | AMOUNT EXTENDED |
|---|---|---|
| SCOTT'S FRUIT WAREHOUSE & RV PARK | 160,000 | |
| Partners: Scott Vermillion | 17,745 | |
| Jerry Vermillion | 177,745 | 177,745 |

(1) Remaining balance on a $171M loan dated 6/86 to purchase land and construct a fruit stand and RV park. Repayment is from income.

(2) Current balance on a $19M note dated 1/87 to cover cost overrun on the construction. Repayment is from income.

The loans are secured by a first lien on the stand and RV park with a 4/86 appraised value of $410M, accounts, inventory and equipment of an undetermined value and a second lien on orchard ground with $20M in estimated equity. Both loans are supported by a SBA guaranty of 85%.

A financial statement dated 12/31/89 on the firm lists TA $294M, TL $302M and negative NW (8M). A loss of $(23M) on sales of $781M was posted after $21M in depreciation expense. A loss of $(13M) was posted in the prior year.

The 1989 FS's on the partners list on a combined basis TL $521M and NW $1,126M centered in real estate and business investment.

Performance has not been timely since the loan originated. The loan was brought current in late 1989. However, it is not certain if the loans will remain current during the winter months when business drops off. The borrower requested funds for a mobile home park development which was denied. Sterling has suggested he seek financing with another institution. Due to the periodic delinquency and losses a Special Mention criticism is assigned. (Servicing Officer: Dan King)gf

| | | |
|---|---|---|
| WALLACE FAMILY TRUST | 256,835 | 256,835 |
| Guarantor - Gary Wallace | | |

Remaining balance on a $260M note dated 2/89 to purchase equipment, provide working capital and consolidate debt. Repayment is from cash flow from the Cove Bowl bowling alley. A first DT on the alley with a SSA value of $472M secures the loan.

No financial statement from the trust is on file. The guarantor's 5/16/90 FS lists TL $574M and NW $2,095M centered in real estate. No tax return obtained since 1987.

The Wallace's owned the bowling facility for many years which was leased out to a third party. They began operating the alley in late 1988. Cove Bowl experienced losses under the prior owner. For 1989, their first full year the alley posted a loss of $(37M) after $52M in depreciation expense. The Coeur D'Alene area has several alley's and competition is keen. A request for $300M for remodeling was denied by Sterling due to inadequate cash flow. The funds were subsequently obtained from another institution. Due to the losses experienced by the Cove Bowl which is the repayment source, no financial data on the trust and illiquid support by the guarantor a Special Mention criticism is assigned. (Servicing Officer: Dan King)gf

| | |
|---|---|
| Subtotal - Commercial Bank Loans | 1,027,733 |
| **Total Loans Listed For Special Mention** | 3,777,733 |

ANALYSIS OF LOANS SUBJECT TO ADVERSE CLASSIFICATION — NUMBER 32158

| DESCRIPTION | SUBSTANDARD | DOUBTFUL | LOSS | TOTAL |
|---|---|---|---|---|
| Book Value at Last Examination - 11-13-89 Does not include Residential or Consumer Loans | 22,133 | 1,357 | 932 | 24,422 |
| Reductions: | | | | |
| Payments | 3,999 | 36 | | 4,035 |
| Not Now Adversely Classified | 1,010 | | | 1,010 |
| Now Classified Substandard | | 1,244 | 270 | 1,514 |
| Now Classified Doubtful | 29 | | | 29 |
| Now Classified Loss | 891 | | | 891 |
| To Other Real Estate or Other Assets | 1,363 | | | 1,363 |
| Charged-Off | 418 | 59 | 450 | 927 |
| TOTAL REDUCTIONS | 7,710 | 1,339 | 720 | 9,769 |
| Additions: | | | | |
| Not Adversely Classified Previously | 5,203 | | 19 | 5,222 |
| Further Advances-Loans Not Adversely Classified Previously | 576 | | | 576 |
| Further Advances-Loans Adversely Classified Previously | 34 | | | 34 |
| Credits Newly Extended | 201 | | | 201 |
| Previously Classified Substandard | | 29 | 891 | 920 |
| Previously Classified Doubtful | 1,244 | | | 1,244 |
| Previously Classified Loss | 270 | | | 270 |
| TOTAL ADDITIONS | 7,528 | 29 | 910 | 8,467 |
| Book Value at This Examination - 9-17-90 | 21,951 | 47 | 1,122 | 23,120 |

FDIC 6300/18 (6-82) 2-c



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 2409

COMPARATIVE STATEMENT OF INCO. AND CHANGES IN EQUITY CAPITAL, JOUNTS ; NUMBER 32158

| ITEMS | 6-30-90 | 6-30-89 | 6-30-88 | 6-30-87 |
|---|---|---|---|---|
| INTEREST INCOME: | | | | |
| Interest and fees on loans | 63,684 | 43,822 | 24,443 | 17,043 |
| Income from lease financing | | | | |
| Int. on balances with depository institutions | | 488 | 663 | 216 |
| Income on Federal funds sold and repos | | 323 | 68 | 188 |
| Interest from assets held in trading accounts | | | | |
| Interest and dividends on: | | | | |
| U.S. Government securities | 3,362 | 10,604 | 5,702 | 2,957 |
| Obligations of states and political subdiv. | | | | |
| Other securities | 483 | 48 | 7 | 6 |
| TOTAL INTEREST INCOME | 67,529 | 55,285 | 30,883 | 20,410 |
| INTEREST EXPENSES: | | | | |
| Interest on deposits | 38,941 | 31,131 | 14,994 | 10,678 |
| Expense of Federal funds purchased and repos. | | 318 | 649 | 221 |
| Interest on other borrowed money | 15,240 | 12,325 | 5,218 | 3,091 |
| Interest on subordinated notes and debentures | | | | |
| Interest on mortgages and capitalized leases. | | | | |
| TOTAL INTEREST EXPENSE | 54,181 | 43,774 | 20,861 | 13,990 |
| NET INTEREST INCOME | 13,348 | 11,511 | 10,022 | 6,420 |
| NON-INTEREST INCOME: | | | | |
| Trust department income | | | | |
| Service charges on deposit accounts | 2,011 | 793 | 320 | 141 |
| Other service charges, commissions and fees | 919 | 767 | 319 | 70 |
| Other operating income | 3,629 | 2,155 | 27 | 174 |
| TOTAL NON-INTEREST INCOME | 6,559 | 3,715 | 666 | 385 |
| OVERHEAD EXPENSE: | | | | |
| Salaries and employee benefits | 6,404 | 4,669 | 3,824 | 2,529 |
| Net occupancy expense of bank premises | 3,838 | 1,632 | 746 | 430 |
| Equipment expense | | 226 | 157 | 127 |
| Other operating expenses | 8,704 | 6,479 | 3,720 | 2,583 |
| TOTAL OVERHEAD EXPENSE | 18,946 | 13,006 | 8,447 | 5,669 |
| Provision for loan and lease losses | 1,100 | 260 | 558 | 158 |
| Provision for allocated transfer risk | | | | |
| Securities Gains (Losses) | 241 | (166) | 352 | 468 |
| Net operating income before taxes | 102 | 1,794 | 2,035 | 1,446 |
| Applicable income taxes | (164) | 559 | 814 | 506 |
| Net operating income after taxes | 266 | 1,235 | 1,221 | 940 |
| Nonoperating credits and charges: | | | | |
| Other net extraordinary credits (charges) | | | | |
| Total net nonop. credits (charges) before taxes | | | | |
| Applicable taxes | | | | |
| NET INCOME | 266 | 1,235 | 1,221 | 940 |
| Other increases in equity capital accounts: | | | | |
| Stock issuance | | 3 | 38 | 2,147 |
| Other increases per CPA | | 50 | | |
| Other decreases in equity capital accounts: | | | | |
| Cash dividends declared on common stock | | | | |
| Cash dividends declared on preferred stock | 225 | 225 | 226 | |
| Other decreases per CPA | | 18 | 35 | 7 |
| Net change in equity cap. accounts for period | 41 | 1,045 | 998 | 3,080 |
| Equity capital accounts at beginning of period | 10,512 | 9,467 | 8,469 | 5,389 |
| Equity capital accounts at end of period | 10,553 | 10,512 | 9,467 | 8,469 |

COMPONENT RATIOS AND TRENDS

| RATIOS | PEER | BANK | | |
|---|---|---|---|---|
| | NA | 3-31-90 | 12-31-89 | 9-30-89 |
| Yield on Total Loans and Leases (TE) | NA | 10.72 | 10.70 | 10.79 |
| Yield on Total Investment Securities(TE) | NA | 9.58 | 11.48 | 9.95 |
| Interest Income(TE) to Average Assets | NA | 9.35 | 9.33 | 9.59 |
| Interest Expense to Average Assets | NA | 7.56 | 7.76 | 8.13 |
| Cost of Funds | NA | 7.76 | 7.99 | 8.39 |

FDIC 6300/21 (8-84) 4-a

App. 746