STERLING SAVINGS BANK
CALCULATION OF DAMAGES

## LEGAL, ACCOUNTING & INSURANCE

(incurred due to treatment as a troubled bank & regulatory interference)

| DESCRIPTION | DATE | CK # | INVOICE # | AMOUNT | applied to RETAINER | |
|---|---|---|---|---|---|---|
| ARNOLD & PORTER | 9/25/1991 | 56758 | 10823 | 1,821.21 | 2,405.49 | |
| | 8/12/1991 | | | | 518.30 | |
| | 6/21/1991 | | 9/16/91 | | 4,997.56 | |
| | 11/9/1990 | | 10823 | | 482.50 | |
| | 10/18/1990 | | 10823 | | 831.75 | |
| | 8/21/1990 | | 10823 | | 93.76 | |
| | 7/13/1990 | 41672 | 10823 | 3,651.75 | | |
| | 6/22/1990 | retainer | | 10,000.00 | | |
| | | | | 15,472.96 | 9,329.36 | 15,472.96 |
| SEDGWICK JAMES | 6/14/1990 | 41046 | 115188 | 200.00 | | |
| HOGAN & HARTSON | 10/24/1991 | 56985 | 61083-0001 | 5,235.84 | | |
| XYZ PARTNERS | 7/13/1990 | 37672 | 5/17/1990 | 1,350.00 | | 6,785.84 |
| COOPERS & LYBRAND | 3/27/1990 | | | 2,500.00 | | |
| COOPERS & LYBRAND | 4/29/1990 | | 119-2311 | 1,100.00 | | |
| COOPERS & LYBRAND | 5/23/1990 | | | 2,800.00 | | |
| COOPERS & LYBRAND | 6/27/1990 | | | 2,700.00 | | |
| COOPERS & LYBRAND | 7/31/1990 | 42172 | | 8,865.00 | | |
| COOPERS & LYBRAND | 9/7/1990 | 42990 | 2747/8/9 | 700.00 | | |
| COOPERS & LYBRAND | 9/21/1990 | 43323 | 2838/39/51 | 3,400.00 | | |
| COOPERS & LYBRAND | | | 53/54 | 13,475.00 | | |
| COOPERS & LYBRAND | 12/21/1990 | | 0119-3052/ | 2,850.00 | | |
| COOPERS & LYBRAND | INCREASED AUDIT FEE (1990 & 1991) | | | 15,000.00 | | 53,390.00 |

| DESCRIPTION | DATE | CHECK # | INVOICE # | AMOUNT |
|---|---|---|---|---|
| WKDT | 4/10/1990 | | | 7,472.90 |
| WKDT | 5/18/1990 | | | 100.78 |
| WKDT | 5/23/1990 | | 81316 | 4,141.25 |
| WKDT | 7/13/1990 | 37671 | | 44,732.93 |
| WKDT | 7/20/1990 | 37711 | | 49,365.03 |
| WKDT | 9/28/1990 | 54193 | | 7,593.47 |
| WKDT | 9/30/1990 | | | 13,717.00 |
| WKDT | 10/5/1990 | 54667 | | 15,824.71 |
| WKDT | 10/12/1990 | 43981 | | 1,198.50 |
| WKDT | 10/13/1990 | 43982 | | 16,528.51 |
| WKDT | 11/30/1990 | | | 9,792.67 |
| WKDT | 12/4/1990 | 5467 | | 12,467.24 |
| WKDT | 12/19/1990 | | | 4,147.16 |
| WKDT | 1/10/1991 | 54881 | | 7,653.07 |
| WKDT | 2/26/1991 | 55191 | | 5,527.80 |
| WKDT | 1/31/1996 | | | 3,830.29 |
| WKDT | 1/29/1991 | | | 2,639.50 |

App. 747

STERLING SAVINGS BANK
CALCULATION OF DAMAGES

**LEGAL, ACCOUNTING & INSURANCE**
(incurred due to treatment as a troubled bank & regulatory interference)

| DESCRIPTION | DATE | CK # | INVOICE # | AMOUNT | applied to RETAINER | |
|---|---|---|---|---|---|---|
| WKDT | | | | | | |
| WKDT | 3/29/1991 | 55425 | | 7,504.69 | | |
| WKDT | 5/1/1991 | 55714 | | 2,054.68 | | |
| WKDT | 6/21/1991 | 56078 | | 5,565.83 | | |
| WKDT | 7/18/1991 | 56254 | | 3,166.03 | | |
| WKDT | 8/20/1991 | 56468 | | 4,914.00 | | |
| WKDT | 11/21/1991 | 57203 | | 207.22 | | |
| WKDT | 12/31/1991 | 57514 | | 4,548.98 | | |
| WKDT | 1/27/1992 | 58042 | | 2,606.74 | | |
| WKDT | 2/25/1992 | 58260 | | 1,894.34 | | |
| WKDT | 3/9/1992 | 58403 | | 5,699.42 | | |
| WKDT | 4/23/1992 | 58772 | | 5,154.34 | | |
| WKDT | 5/27/1992 | 58997 | | 1,383.00 | | |
| WKDT | 6/29/1992 | 59277 | | 5,629.76 | | |
| WKDT | 7/23/1992 | 59444 | | 1,265.24 | | |
| WKDT | 8/24/1992 | 59707 | | 315.70 | | |
| WKDT | 9/28/1992 | 60014 | | 2,277.30 | | |
| WKDT | 11/17/1992 | 60462 | | 87.50 | | |
| WKDT | 1/12/1993 | 60952 | | 486.00 | | |
| WKDT | 2/5/1993 | 61183 | | 140.00 | | |
| WKDT | 3/16/1993 | 61548 | | 1,312.50 | | |
| WKDT | 5/13/1993 | 62167 | | 537.84 | | |
| WKDT | 7/9/1993 | 62704 | | 840.00 | | |
| WKDT | 8/24/1993 | 63182 | | 367.00 | | |
| WKDT | 9/29/1993 | 63503 | | 62.50 | | |
| WKDT | 11/27/1993 | 63952 | | 462.50 | | |
| WKDT | 12/17/1993 | 64199 | | 162.50 | | |
| WKDT | 6/20/1994 | 65828 | | 87.50 | | |
| WKDT | 1/20/1994 | 64458 | | 275.00 | | |
| WKDT | 2/24/1995 | 87526 | | 301.00 | | |
| WKDT | 4/21/1995 | 88143 | | 13,710.95 | | |
| WKDT | 5/19/1995 | 88434 | | 16,317.23 | | |
| WKDT | 6/30/1995 | | | 3,298.09 | | 299,368.19 |
| | | | | | | 375,016.99 |

**App. 748**

Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings
CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0801876

# MEMO

STERLING SAVINGS Association

DATE: September 20, 1991

FROM: Wayne Allert
Internal Auditor

TO: Rod Barnett
Chairman, Audit Committee

SUBJECT: Monthly Update on Internal Audit Activities

Following is a report on internal audit activities conducted during the report month of August, 1991:

BOARD POLICIES

Asset Classification Policy

Requirement: Quarterly meeting of the Asset Classification Committee.

Action: The Asset Classification Committee held a meeting on July 2, 1991. Nothing to report at this time. The next meeting is scheduled for October 4, 1991.

Requirement: Asset Classification Quarterly Report to the Board.

Action: The quarterly report was presented to the Board at the July meeting. The next report is scheduled for October.

Action: Changes in asset classifications drive changes in specific valuation allowances. Upgrades in OTS asset classifications (except Special Mention) require OTS approval. There were no upgrades during the month of August.

Interest Rate Risk Policy

Requirement: Monthly meeting of Asset and Liability Committee (ALCO) covering nine specified areas of review.

Action: The minutes of the August 26, 1991 meeting are not yet available for review.

1991 Income Property Permanent Loan Servicing Status Report

Requirement: Intervest staff has completed a one-time project involving the completion of asset worksheets and the reorganization of files. The staff is currently focusing on loan servicing procedures for all income property/real estate loans over $250,000 — specifically: 1) property inspections, and 2) requests from

customers on appropriate updating information. There are 145 loans that fall into the category of over $250,000. As of report month end the following progress has been made:

| | | Completed | | |
|---|---|---|---|---|
| | | Intervest | Special Assets | Total SSA |
| Action: | Property inspections | 95% | 83% | 94% |
| | Requests to customer | 91% | 72% | 89% |
| | Borrowers responses to requests | 31% | 61% | 34% |

OTS OPERATIONAL CONCERNS STAYED BY PRELIMINARY INJUNCTION

No capital distributions; engage only in activities specified in the February 28, 1990 Capital Plan; prior approval of OTS on sale of any asset or group of assets in excess of $500,000; increase in compensation of any Executive Officer or Director: No exceptions.

Limit in total asset growth: Report month end total assets were down $87.9 million from the established threshold level of May 31, 1990.

Investment authority limited to short-term liquidity investments: Investment Committee minutes for August 5 and August 26, 1991 were reviewed. No exceptions.

Uninsured deposits not to be accepted: It is the responsibility of the branch managers to prevent the acceptance of uninsured deposits. All branches have received detailed instruction as to the uninsured restrictions placed on balances exceeding $100,000. This training is reinforced on a periodic basis.

A computer-generated report has been developed to increase internal control in this area. The monthly report requires that the branch managers evaluate any account having the potential of being uninsured. These reports are reviewed and monitored by Senior Management and the Internal Auditor.

On August 30, 1991 a deposit of $1 million was accepted from the Lewis County Treasurer. This was done pursuant to a verbal clearance from the Washington State Supervisor based upon meeting the collateral requirements of the WPDPC.

Loans

Conforming residential loans and pre-sold construction:

1. New residential loan listing for the report month was reviewed for proper loan types and individual levels not to exceed agency limits (currently $191,250). No exceptions noted.

2. New pre-sold residential construction loans originated in the report month were tested for proper documentation of sales agreements/ ownership. No exceptions noted.

3. Residential construction portfolio at report month end was $4,306,146, well below the cap of $23.0 million set by OTS.

App. 750

Business banking

1. Loans to existing business banking customers: All business banking loans for this reporting month were made to existing banking customers. The first advance under the SBA/CRA Small Business Loan program was extended to J.C. Nowatchik DBA "Ain't Just Cakes" for $11,500. This represents a portion of a $50,000 funding commitment to the SBA which is 90% government guaranteed. The commitment was approved by the Senior Loan Committee and the Board of Directors in January 1991. The OTS will be advised of the loan in its next weekly letter.

2. The balance in the business banking portfolio at report month end, was $15,785,367, below the $23 million level set for June 30, 1990 by OTS.

3. Letters of credit: Report month activity review showed no exceptions.

**SPECIAL FIRREA ISSUES**

Loans-to-one-borrower: Audit of the report month new loan originations indicated no exceptions to Sterling's policy of a LTOB limit of $500,000. New activity on the loans-to-one-borrower report is a result of a recordkeeping project by Intervest to insure that acquired Central Evergreen loans appear on the report.

Non-real estate commercial lending limitations - 10% of assets: At report month end, Sterling's commercial banking portfolio was 2.64% of assets.

Consumer lending limitation - 30% of assets: At report month end, Sterling's consumer portfolio was 3.76% of assets.

Nonresidential real estate lending - 400% of core and supplemental capital: Sterling has curtailed this lending activity and has continued to reduce the portfolio level.

Brokered deposits: FDIC, in a letter dated September 7, 1990 had indicated that the restriction on brokered deposits is a moot issue in terms of the application for a brokered deposit waiver. Further, the Institution currently meets its applicable minimum capital levels based on contractual agreements between Sterling and the regulators.

lf

cc: Harold Gilkey
Bill Zuppe
Dan Byrne

App. 751

"Confidential Material – Subject to Protective Order" SG 0185872

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER FL PSG060 0075

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

April 11, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201
OTS No. 7918

STERLING SAVINGS ASSOC.
EXECUTIVE BR.
APR 16 1990

SUBJECT: Capital Plan

Members of the Board:

The capital plan filed on January 8, 1990, and subsequently amended on February 28, 1990 has been reviewed and is approved, provided that a majority of the Board of Directors executes and returns the enclosed Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver within 20 days of receipt of this letter. Once fully executed, a copy of the Agreement will be forwarded to your attention.

If you have any questions, please contact Assistant District Director Carol Friend at (206) 340-2437.

Sincerely,

William J. Durbin
District Director
Seattle District

CAF/kh
Enclosures

pc: Betty Reed
State Supervisor

App. 753



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON889 1950 FL

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696 • (509) 624-4114

May 10, 1990

HAND DELIVERED

Office of Thrift Supervision
Department of the Treasury
1501 - 4th Avenue, 19th Floor
Seattle, Washington 98101-1693

Attention: Mr. William J. Durbin
District Director
Seattle District

Re: Capital Plan

Dear Mr. Durbin:

On April 16, 1990 we received your correspondence of April 11, 1990, together with the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver (the "Operating Agreement"). Having reviewed the proposed Operating Agreement and considered its potential impact on Sterling Savings Association ("Sterling" or the "Association"), we must respectfully decline to execute the Operating Agreement in its present form.

We feel very strongly that executing the Operating Agreement would be tantamount to admitting that Sterling's capital deficiency was caused by its own fault or neglect, when this is not at all the case. Also, the proposed Operating Agreement implies emphatically but incorrectly that the Office of Thrift Supervision and its predecessors (collectively, the "OTS") had nothing to do with creating Sterling's capital deficiency.

As we will explain in greater detail herein, we believe that, unfortunately, Sterling's regulators have breached existing acquisition contracts with Sterling. They have done this by purporting to "eliminate" the various regulatory capital and accounting forbearances granted to induce Sterling to acquire



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2163 F

troubled thrift institutions. The breach of existing contracts has thrown Sterling out of compliance with regulatory capital standards. To add insult to injury, if you will, the OTS is now treating Sterling like a troubled thrift.

We can assure you that we have not decided hastily or easily to decline to execute the Operating Agreement. Since its inception, the Association has worked diligently to develop a constructive and cooperative relationship with each of its regulators. We sincerely wish to continue that tradition by conducting a positive dialogue concerning the Association's existing capital deficiency. We believe that under the present circumstances, however, executing the Agreement in its present form would constitute an abrogation of our fiduciary responsibility to manage the affairs of the Association and to safeguard the interests of our depositors and shareholders.

As the first step toward what we trust will be a positive dialogue regarding the resolution of our capital deficiency, we intend this letter to be: 1) a comprehensive statement of the reasons for Sterling's capital deficiency, 2) our suggested alternatives for curing the deficiency, and 3) a discussion of what we would consider to be a reasonable Operating Agreement under the circumstances.

## BACKGROUND

### The Association.

Sterling commenced operations in 1983 as a Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. The Association's primary business is attracting deposits from the general public and originating, purchasing, selling and servicing secured residential, commercial and consumer loans.

Sterling's retail delivery system attracts deposits through 28 branches located primarily in smaller, rural areas of Washington. Sterling has successfully maintained a stable retail deposit base in rural areas while promoting higher volume lending activity in major metropolitan areas. Thus, the Association has achieved substantial lending volume with relatively low operating costs.

Sterling has been consistently profitable in every year since its inception, earning a total of over $5.5 million through December 31, 1989. Sterling's return on average equity exceeded 15% from 1986 through 1988 and was just below 14% during fiscal 1989. As of December 31, 1989, Sterling's net



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2164

worth under Generally Accepted Accounting Principles totalled $10.9 million.

Our management team, which has not changed significantly since inception, has always operated according to the highest principles of integrity and professional competence. In fact, were it not for their desire to live in Spokane, Washington, most of these individuals would be managers at regional or money center banks at substantially higher salaries than those they currently earn at Sterling.

Sterling is a conservative, "no-frills" institution. It is not among those institutions which have been justifiably criticized for their acquisitions of lavish headquarters buildings, art work collections, corporate jets and the like. Nor has Sterling made speculative "investments" in high yield junk bonds, land acquisition and development schemes and the like. In short, Sterling has not been, and is not now part of the problem. Rather, at the request of its regulators and always with their encouragement, support and approval, Sterling has been a part of the solution to the thrift crisis through its acquisitions of troubled thrifts.

The Regulatory Background.

During the late 1970's and early 1980's, a substantial number of thrift institutions experienced serious financial losses precipitated by a combination of soaring inflation, volatile interest rates, recession, and disintermediation. The Federal Savings and Loan Insurance Corporation ("FSLIC") Insurance Fund was insufficient to recapitalize or liquidate the increasing number of failing thrifts. Accordingly, from the early 1980's onward, the Federal Home Loan Bank Board ("FHLBB") sought in many instances to induce healthy thrifts such as Sterling to merge with or acquire and recapitalize troubled institutions.

At first, a substantial portion of these supervisory transactions were assisted by the infusion of FSLIC capital. In nearly all of the transactions, the FHLBB granted regulatory forbearances, typically by granting the acquiring institutions relief from applicable capital and liquidity requirements. Such relief lasted for a period of time sufficient to allow the acquiring institutions to restore their capital to normally required levels.

As the crisis in the thrift industry continued to worsen, and more and more FSLIC-insured thrift institutions became insolvent or troubled, the FSLIC and the FHLBB recognized that continuing to facilitate supervisory mergers with cash

contributions and promissory notes would quickly and entirely exhaust the Insurance Fund. Accordingly, the FSLIC and the FHLBB were forced to revise their policies and practices in order to prevent, or at least forestall, the exhaustion of the FSLIC Insurance Fund. Instead of financial assistance, the FSLIC and the FHLBB began to rely increasingly on regulatory forbearances to induce healthy thrifts to acquire troubled institutions.

For one thing, the regulators encouraged acquiring institutions to record regulatory cash assistance payments as part of their regulatory capital. For another, the regulators allowed acquiring thrifts to extend goodwill amortization periods beyond those allowed under Generally Accepted Accounting Principles. Finally, the regulators granted a variety of forbearances, such as agreements not to enforce capital requirements if a breach thereof was caused by a particular acquisition. In the course of its regulatory-assisted acquisitions, Sterling received each of these types of forbearances.

By granting such regulatory and accounting forbearances, the FSLIC and the FHLBB were able to induce healthy thrifts like Sterling to acquire troubled thrifts with minimal cash contributions or other tangible financial assistance from the FSLIC. The FSLIC and the FHLBB thus saved many billions of dollars in financial assistance that the FSLIC would otherwise have had to pay in order to resolve scores of insolvent and troubled FSLIC-insured thrift institutions.

<u>Regulatory-Supervised Acquisitions by Sterling</u>.

Before it had even opened its doors for business, Sterling was asked by state regulators to consider merging with Lewis & Clark Savings and Loan Association ("Lewis & Clark") of Clarkston, Washington. Since that time, Sterling has been asked to consider acquiring many institutions including Home Savings (Burien, Washington), Guaranty Savings (Longview, Washington), Lynnwood Savings (Lynnwood, Washington), Great Falls Federal Savings (Great Falls, Montana), Home Savings (Boise, Idaho) First Federal (Longview, Washington), Northwest Federal (Boise, Idaho), Mountain West (Salt Lake City, Utah), Tri-Cities Savings (Kennewick, Washington), Central Evergreen Savings (Chehalis, Washington), and Lewis Federal (Chehalis, Washington).

In addition to the Lewis & Clark acquisition, Sterling has now completed three significant acquisitions -- all at the request and with the encouragement and support of state and federal regulatory authorities. The acquisitions that led to



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2166

Sterling's existing capital deficiency, together with the salient facts concerning each acquisition are summarized below.

Lewis & Clark Savings and Loan Association.

By early 1983, the regulators had determined that management at Lewis & Clark was deficient in several respects including its apparent inability to manage interest rate risk. The then State Supervisor of Savings and Loans approached Sterling to request that Sterling consider merging with Lewis & Clark by the summer of 1983.

Less than three months after it commenced business, Sterling consummated a stock-for-stock acquisition of Lewis & Clark on June 30, 1983. Sterling, motivated by its desire to expand its market share and distribution network, agreed to enter into this transaction without any assistance from the regulators. The regulators, for their part, were eager to approve of the transaction since it resolved what could easily have become a $2 million problem at Lewis & Clark.

Lewis Federal Savings & Loan Association.

In the spring of 1985, the FHLBB had judged Lewis Federal Savings and Loan Association ("Lewis Federal") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Lewis Federal. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Lewis Federal's negative net worth.

The FHLBB recognized that the absorption of the insolvent Lewis Federal would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Lewis Federal.

In June, 1985, Sterling offered to acquire Lewis Federal subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital

requirements, and regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.

On November 4, 1985, the FHLBB adopted a resolution containing formal findings of fact: that Lewis Federal was insolvent; that severe financial conditions existed which threatened Lewis Federal's stability; that the FSLIC should be made receiver for Lewis Federal; that the FSLIC had appropriately considered Sterling's qualifications and competence to acquire and manage Lewis Federal; that the acquisition of Lewis Federal by Sterling would reduce the risk to the FSLIC; that Sterling's offer "present[ed] the lowest expense and least risk to the FSLIC of any proposal submitted"; that transfer of Lewis Federal to Sterling was preferable to liquidation and would avoid the loss to Lewis Federal account holders and creditors which liquidation would entail; that acquisition by Sterling was in the best public interest; that acquisition by Sterling was necessary to prevent the probable failure of Lewis Federal ; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Lewis Federal, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On November 5, 1985, Sterling entered into a formal contract with the FSLIC as Receiver for Lewis Federal, under which Sterling agreed to take over Lewis Federal subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of goodwill.

On November 12, 1985, the FHLBB entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Permitted Sterling to exclude certain of Lewis Federal's liabilities in determining compliance with certain requirements;

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal, or by Sterling's assumption of Lewis Federal's negative net worth;

(3) Agreed that Sterling could carry the $1.8 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $1.8 million in supervisory goodwill created by the transaction would be recorded pursuant to the purchase

method of accounting and could be amortized over 40 years; and

(5) Agreed that the difference between the book and fair market values of Lewis Federal's loan portfolio could be amortized over a 15 year period.

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $1.8 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Lewis Federal, the FSLIC would have had to spend, in our estimate, approximately $5.2 million to liquidate Lewis Federal. In addition to saving this amount, the FSLIC retained the right to utilize Lewis Federal's accumulated net operating loss carryforwards of approximately $3.0 million.

Tri-Cities Savings and Loan Association.

In the summer of 1987, the FHLBB had judged the Tri-Cities Savings and Loan Association ("Tri-Cities") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Tri-Cities. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected thrift institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Tri-Cities' negative net worth.

The FHLBB recognized that the acquisition of the insolvent Tri-Cities would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Tri-Cities.

In November, 1987, Sterling offered to acquire Tri-Cities subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital requirements, and specific regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2169

On April 7, 1988, the FHLBB adopted a resolution containing formal findings of fact: that Tri-Cities was insolvent; that the FSLIC should be made receiver for Tri-Cities; that Tri-Cities could not continue as a going concern without financial assistance from the FSLIC; that Sterling was qualified and competent to acquire and manage Tri-Cities; that the acquisition has necessary to prevent the probable failure of Tri-Cities; that the acquisition by Sterling was the most desirable alternative to liquidation or transfer to another institution, and represented the least cost to the FSLIC of any alternative; that the acquisition by Sterling was in the best public interest, and in the best interests of the account holders and creditors of Tri-Cities; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Tri-Cities, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On April 8, 1988, Sterling entered into a formal contract with the FSLIC as receiver for Tri-Cities, under which Sterling agreed to take over Tri-Cities subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of supervisory goodwill.

The FHLBB had already, on April 6, 1988, entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Agreed to waive the assessment, for one year, of penalties occasioned by Sterling's inability to satisfy liquidity requirements.

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities, or by Sterling's assumption of Tri-Cities' negative net worth;

(3) Agreed that Sterling could carry the $11.7 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $11.7 million in supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized over an eight year period.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2170

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $11.7 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Tri-Cities, the FSLIC would have had to spend, in our estimate, approximately $13.7 million to liquidate Tri-Cities. In addition to saving this amount the FSLIC also retained the right to utilize 50% of Tri-Cities' net operating loss carryforwards; the right to any realized excess over the yield maintenance subsidy covering certain assets; and the right to a share of the gain-on-sale of certain assets. In fact, the FSLIC has already become entitled to proceeds resulting from the sale of such properties for amounts in excess of the covered asset value.

Central Evergreen Federal Savings and Loan Association.

In the summer of 1987, the FHLBB requested that Sterling consider acquiring Central Evergreen Federal Savings and Loan Association ("Central Evergreen") a troubled thrift in Chehalis, Washington. Sterling demurred, pointing out that such an acquisition would create a regulatory capital deficiency. The FHLBB asked that Sterling consider the acquisition anyway, pointing out that the "permanent" regulatory capital created by the Lewis Federal and Tri-Cities acquisitions could be used to leverage Sterling into technical compliance with the regulations.

Sterling studied Central Evergreen, and concluded that the acquisition could be done, if Sterling arranged for an equity offering of between $4 to $6 million soon after the acquisition. Sterling then contracted with Central Evergreen, contingent upon approval of the FHLBB, to acquire Central Evergreen's assets and liabilities.

On December 8, 1988, the FHLBB adopted a resolution approving the acquisition. The FHLBB entered formal findings of fact that Central Evergreen was insolvent; that Sterling would be a viable entity following the acquisition; that the acquisition was necessary to prevent the probable failure of Central Evergreen; that the purchase method accounting treatment of goodwill should be used; and that the FSLIC should enter an agreement pursuant to Sterling's proposal calling for an infusion of capital after the acquisition.

On December 28, 1988, Sterling contracted with the FSLIC to carry out a specific business plan. The plan contemplated the addition of between $4 million to $6 million in new equity within two years. Under the agreement, supervisory goodwill and

the excess of book over fair market value of loans acquired from Central Evergreen were to be amortized over a 12 year period. Sterling, concerned about the growing thrift crisis, requested that a clause be included terminating the contract if some change in the laws made it impossible for Sterling to acquire additional equity. After negotiation, the FSLIC agreed to insert a clause permitting Sterling to revise its business plan should events beyond Sterling's control prevent the contemplated equity offering. On December 31, 1988, Sterling consummated the acquisition and began to prepare for an equity offering.

But for Sterling's acquisition of Central Evergreen, the FSLIC would have had to spend, in our estimate, approximately $30.1 million to liquidate Central Evergreen.

* * *

To summarize, it is reasonable to conclude that, as a result of the acquisitions discussed above, the FHLBB and the FSLIC saved in excess of $51 million. They also retained important assets such as the operating loss carryforwards accumulated by the acquired institutions and a right to reap some of the financial rewards generated by Sterling's expert management of assets acquired from the troubled institutions.

For its part, Sterling completed the acquisitions believing that the regulators would honor their contracts to:

(1) Allow Sterling to count an additional $13.5 million ($1.8 million from Lewis Federal and $11.7 million from Tri-Cities) in supervisory goodwill toward its regulatory capital requirement;

(2) Forebear from enforcing any regulatory capital regulations until November 5, 1990 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal;

(3) Forebear from enforcing any regulatory capital regulations until April 8, 1993 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities;

(4) Forebear from enforcing any regulatory capital regulations until December 31, 1990 if Sterling's failure to comply therewith was caused by an inability through no fault of Sterling to raise additional capital following the Central Evergreen acquisition;

(5) Allow Sterling to revise its business plan if events beyond Sterling's control prevented the equity offering contemplated as part of the Central acquisition;

(6) Allow Sterling to pay dividends on preferred stock issued as part of Sterling's proposed equity offering.

Sterling's Proposed Stock Offering.

As contemplated by the Central Evergreen Acquisition Agreement with the FSLIC, and in response to FIRREA and its implementing regulations, Sterling was prepared, in the fall of 1989, to add approximately $10.5 million to its capital accounts through a public offering. The public offering contemplated the sale of up to 603,750 units, each consisting of one share of the Association's common stock and one share of the Association's noncumulative convertible preferred stock. Dain Bosworth, Inc., the underwriter on the proposed stock offering, assured Sterling in December, 1989 that even more than the 603,750 units had been subscribed for.

Dain Bosworth had also performed its due diligence and satisfied itself that Sterling's earnings would be sufficient to allow for the payment of dividends. On several occasions prior to December 19, 1989, Sterling had requested the OTS' approval of the proposed payment of dividends. The OTS responded that it was in the OTS' and Sterling's mutual best interests to attract additional public capital and that prohibiting the payment of dividends would be inconsistent with the goal.

Ultimately, Sterling was forced to cancel the proposed stock offering entirely because of the OTS' refusal to allow the payment of dividends because of the fact that Sterling was a "capital deficient" institution. Sterling incurred fees and costs in connection with the aborted stock offering of nearly $1 million.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was enacted on August 9, 1989. Through FIRREA, Congress sought to impose strict new regulatory capital requirements upon thrifts. At the same time, however, Congress recognized the validity and enforceability of the federal government's specific contractual obligations to institutions such as Sterling.

It is our considered view, therefore, that Sterling's rights to the capital and regulatory forbearances described

above survived the enactment of FIRREA, and remain enforceable today. We are not persuaded that Thrift Bulletin 38-2, issued on January 9, 1990, (one day after capital plans were due) legally eliminated such forbearances as it purported to do.

Although the stringent, new capital requirements set forth in Section 301 of FIRREA are generally applicable to thrifts, they are not intended to abrogate differing capital requirements set forth in binding agreements previously entered into by the FHLBB and/or the FSLIC. Quite to the contrary, Section 401(f) provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which --
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Section 401(g) of FIRREA provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which --
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Similarly, Section 401(h) provides that

> all orders, resolutions, determinations, and regulations, which --

> (1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and
>
> (2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law .... (Emphasis added.)

Recognizing the continued validity and enforceability of forbearances previously granted by the FSLIC and the FHLBB, FIRREA also directs the newly created Resolution Trust Corporation to "evaluate the costs under existing [FSLIC] agreements with regard to ... forbearance ...."

FIRREA not only grants the OTS broad authority to grant exemptions and exceptions from the new capital standards, but it expressly preserves forbearances granted prior to FIRREA by the FHLBB and the FSLIC. For example, Section 302 of FIRREA provides:

> Notwithstanding the amendment made by this title to section 10 of the Home Owners' Loan Act and the repeal of Section 416 of the National Housing Act -
>
> (1) any plan approved by the Federal Home Loan Bank Board ... for any federal savings association shall continue in effect ...; and
>
> (2) any plan approved by the Federal Savings and Loan Insurance Corporation ... shall continue in effect ....

Former Sections 10 and 416 dealt with granting forbearances to "troubled associations" with net worths of 0.5 percent. When forbearances were granted to Sterling, Sterling was not a "troubled association." Moreover, Sterling's net worth was three times the level set by the quoted statutes. How then, we ask, can FIRREA possibly be interpreted as eliminating, or directing the elimination of, forbearances granted to a healthy institution like Sterling while preserving forbearances granted to "troubled associations" having low net worths? This just doesn't make sense.

It is clear that in enacting FIRREA, Congress recognized the continued validity and enforceability of pre-FIRREA contractual agreements such as the agreements between the FSLIC and the FHLBB, on the one hand, and Sterling on the other.

The FIRREA Regulations.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA (the "Capital Regulations"), which became effective on December 7, 1989. The OTS indicated in a press briefing shortly after enactment of FIRREA that it was "uncertain" about the impact of FIRREA on past the FHLBB and the FSLIC forbearances.

* * *

It is extremely important to note that, notwithstanding FIRREA, Sterling would not be in violation of the post-FIRREA capital standards were it not for the breach of supervisory acquisition agreements by the regulators.

It is also extremely important to note that nothing in FIRREA eliminates, or requires the regulators to eliminate, pre-existing contractual regulatory and accounting forbearances. To the contrary, the above-quoted Sections of FIRREA and others recognize the continued validity and enforceability of such regulatory and capital forbearances.

PROPOSED ALTERNATIVE REMEDIES FOR
STERLING'S CAPITAL DEFICIENCY UNDER FIRREA

Sterling completed all of its acquisitions in an orderly and controlled manner as part of its comprehensive growth strategy. Each acquisition was carried out at the request, and always with the encouragement, support and approval of the regulators. If any of Sterling's acquisitions were imprudent, or if Sterling had reason to believe that the regulators would breach their contractual commitments to Sterling, Sterling



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2176

certainly never heard as much from any of the regulators. Moreover, if Sterling had known that its regulators would attempt to breach their contractual commitments to the Association, Sterling would never have agreed to acquire the troubled thrifts in question.

Arguably, Sterling has saved the FSLIC, its successors, and ultimately, the taxpayers over $51 million through its acquisitions and its stewardship of troubled institutions. Sterling has not asked for or received one dollar more in acquisition assistance than it contracted for. Sterling has sought, and seeks today, nothing more than the benefit of its bargain with the regulators.

To our surprise, however, Sterling is now being told that, pursuant to FIRREA, the OTS is "eliminating" the very capital and accounting forbearances which the regulators contractually granted to induce Sterling to acquire troubled thrifts in the first place. Frankly, this is outrageous. Not only is it unfair by any objective standard, but we believe it is illegal. The government of the United States does not have license to breach the sanctity of its contracts any more than any one else does.

* * *

As we stated at the beginning of this letter, notwithstanding all that has transpired, we remain committed to conducting a positive dialogue concerning the Association's existing capital deficiency. We believe there are several equitable and logical solutions to our differences of opinion regarding the continuing validity of capital and regulatory forbearances previously granted to Sterling.

The following summary of alternatives is not intended to be an exclusive or comprehensive list. Each of the following alternatives could stand on its own merits or be utilized in combination with other alternatives depending upon the operational feasibilities involved. In any event we would ask for your consideration and written evaluation of these alternatives at your earliest convenience.

Comply With Supervisory Acquisition Agreements.

There is no way to completely undo the damage done by the violation of existing supervisory acquisition agreements with Sterling. For example, Sterling's proposed equity offering was aborted in January, 1990 because of the OTS's refusal to allow the payment of dividends on the preferred stock to be issued.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2177

The window of opportunity for that proposed equity offering closed in January, 1990.

The OTS could, however, do much to resolve Sterling's capital deficiencies by honoring existing supervisory acquisition agreements between Sterling and the regulators. This would mean that Sterling would have until November 5, 1990, December 31, 1990, and April 8, 1993, to remedy capital deficiencies caused, respectively, by the Lewis Federal, Central Evergreen, and Tri-Cities acquisitions. During these periods of time, Sterling could, pursuant to its existing supervisory acquisition agreements, count the $13.5 million in regulatory cash assistance payments toward its post-FIRREA capital requirements. In addition, Sterling's capital requirements would be reduced by $.8 million until November 5, 1990, and $1.4 million until April 8, 1993 because of forbearances associated, respectively, with the Lewis Federal and Tri-Cities acquisitions.

<u>Separate Exemption</u>.

The OTS, rather than addressing the forbearances granted in the various supervisory assistance agreements with Sterling, could grant a separate exemption from the existing capital requirements. The OTS has clear authority to do this pursuant to Section 301 of FIRREA, and Sterling meets all of the Section 301 standards for approval of the exemption. This exemption would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

<u>Separate Exception</u>.

The OTS pursuant to authority set forth in Section 301 of FIRREA, could also grant Sterling an exception to the FIRREA capital standards. Again, Sterling meets all of the Section 301 standards for approval of the exception. This exception would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

<u>Payment of Dividends</u>.

The OTS could allow Sterling to pay dividends on preferred stock so that the Institution could consider reviving its equity offering.

<u>Central Evergreen - Cash Contribution</u>.

Obviously, if the OTS is warranted in eliminating the capital and regulatory forbearances contained in the Central



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2178

Evergreen contracts, two facts become apparent. First, the contracts have no value to Sterling. Second, the contracts, as vitiated deprive us of the very tools -- the forbearances -- which allowed us to counterbalance the negative aspects of the Central Evergreen acquisition. These negative aspects included Central Evergreen's capital deficit, market valuation adjustments in the loan and investment portfolios, and the intangible assets acquired in the Central Evergreen acquisition. In the Central Evergreen acquisition, if Sterling had not been granted the forbearances, it would have required a cash contribution to compensate for the reduction in capital caused by the acquisition. In other words, the forbearances had an economic value, and the if the forbearances are now being taken away, they should be replaced by an equivalent cash contribution.

Using the formula previously applied by the FHLBB in accepting Sterling's bid proposal on Tri-Cities, the contribution would consist of Central Evergreen's capital deficit at the time of the acquisition, the net market valuation adjustments in the loan and investment portfolios, and the totals of intangible assets. Applying this formula, the cash contribution would be in the amount of $24,056,000.

Obviously, the Tri-Cities formula contemplated not only a cash contribution, but capital and regulatory forbearances. To put the Central Evergreen acquisition on a par with the typical regulatory assisted acquisition, it would also be necessary for the government to provide us today with indemnification for capital losses on certain identified assets, as well as yield maintenance subsidies on non-performing loans and real estate owned.

In a conciliatory gesture, however, we would be willing to accept the cash assistance of $24 million without indemnification, yield maintenance subsidies, or other regulatory assistance.

Central Evergreen - Rescission.

If the OTS is unable or unwilling to consider a cash contribution in connection with the Central Evergreen acquisition, we would suggest that the entire transaction be unwound. We believe this is an operationally feasible alternative and would involve the assumption on your part of all of Central Evergreen's assets and liabilities remaining on our books. These assets and liabilities are readily identifiable and could be easily transferred.

This alternative would involve the payment of a management fee to Sterling of approximately 1% of Central Evergreen's assets as reasonable compensation for its past and future services in connection with the management of Central Evergreen's assets and liabilities. Such a management fee could be negotiated based upon prevailing market rates for similar services.

Tri-Cities - Increased Capital Contribution.

Again, it would have been unthinkable for Sterling to complete the Tri-Cities acquisition based on the cash contribution therein if it were not for the capital and regulatory forbearances granted to Sterling in that acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents in the approximate amount, as of March 31, 1990, of $10.5 million.

Lewis Federal - Cash Contribution.

Just as it did as part of the Central and Tri-Cities acquisitions, the regulators granted Sterling critical capital and regulatory forbearances as part of the Lewis Federal acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents, as of March 31, 1990, of $1.6 million.

Stock Purchase.

The OTS could purchase common or qualifying preferred stock of the Association so that Sterling could increase its regulatory capital accounts. Sterling would be willing to repurchase such stock, out of its earnings over time commensurate with the reduction of intangible assets recorded in connection with Sterling's acquisitions.

* * *

The foregoing alternatives are not meant to be exclusive. They are all based on the same equitable principle: if contractual forbearances previously granted to Sterling are now being eliminated, it is only right that such forbearances be replaced with qualifying capital of equivalent value.

If Sterling's capital is still considered to be deficient following the selection by the OTS from among the above alternatives, the Association will become compliant through a number of steps. First, Sterling will reduce its intangibles through amortization and the use of net operating carry-forwards. Second, the Association will increase its capital



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON924 2180

through the retention of earnings. Third, assuming OTS approves of the payment of dividends, Sterling will, if necessary, pursue another equity offering. Fourth, Sterling will consider filing an application with the Federal Deposit Insurance Corporation for open thrift assistance. Finally, the Association will reduce assets, as necessary, to reduce its capital requirement.

We reiterate that we are ready, willing and able to discuss any feasible alternative, including the foregoing alternatives, in an effort to mediate our differences over the elimination of the contractual forbearances.

THE OPERATING AGREEMENT

If the OTS had not eliminated the capital and regulatory forbearances previously granted to Sterling and refused to allow Sterling to pay dividends occasioned by its proposed equity offering in late 1989, the Association would be in compliance with the capital standards mandated by FIRREA. Under such circumstances, you would not have asked us, as you have, to execute the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver.

Quite frankly, we could take the position today that, because the OTS has breached existing contracts with Sterling and thereby thrown Sterling into noncompliance with the capital standards, the OTS has no right to insist on the execution of any supervisory agreement by Sterling. We believe that this position is amply supported by the facts and circumstances in our case.

Nonetheless, as we stated at the outset, we remain committed to continuing the constructive and cooperative relationship which we have always enjoyed with our regulators for so long as the regulators work with us constructively to mediate the differences that now exist between us. To that end, we are willing to enter into an operating agreement, provided, of course, certain of your proposed operating restrictions are modified and all of the proposed consent provisions are eliminated.

Basically, we are amenable to keeping you fully apprised of all significant developments at the Association while we continue to increase our capital to regulatory levels. We will agree to abide by our capital plan and provide you with quarterly or more frequent reports regarding out operations and condition. If we fail to do any of this, we will then abide by operating restrictions which are substantially the same as those

set forth on pages 13 through 17 of your proposed Operating Agreement.

As is the case with our proposed capital restoration alternatives, we are willing to negotiate the terms of an Operating Agreement. The most important message we wish to leave with you, however, is that we remain willing and anxious to work with you to resolve our mutual concerns.

In the meantime, we would appreciate receiving at your earliest convenience, a written response to the proposals herein for resolving Sterling's post-FIRREA capital deficiency.

Very truly yours,

STERLING SAVINGS ASSOCIATION

By ____________________
HAROLD B. GILKEY
Chief Executive Officer

By ____________________
WILLIAM W. ZUPPE
President and Chief Operating Officer

App. 773

06/04/90 11:30 FHLBB/ENFORCEM'T NO.001 002

1.

cc CAF
Faxed 6/14 to W. Thompson + B. Reed.

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

FILED IN THE U.S. DISTRICT COURT Eastern District of Washington
MAY 29 1990
JAMES H. LARSEN, Clerk
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS-90-0175-JLQ<br><br>~~PROPOSED~~ TEMPORARY RESTRAINING ORDER<br><br>26261 5500 |

The Court having reviewed the submissions of the parties and files in this case, and having heard the argument of counsel, finds that plaintiff has established facts ~~supporting~~ that warrant the maintenance of the status quo & that serious questions exist in this matter. ~~a factual finding of likelihood of succeeding on the merits and immediate irreparable harm which substantially outweighs any threat of harm or inconvenience to defendants.~~

Accordingly, IT IS HEREBY ORDERED that defendants ... enjoined from imposing or enforcing any regulatory restr...



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0300
(509) 624-5265

tions against plaintiff, Sterling Savings, that are inconsistent with the provisions of the three (3) supervisory acquisition agreements between the parties and that the restrictions imposed by the January 26, 1990, March 9, 1990, and May 11, 1990 letters from the Department of Thrift Supervision to Sterling shall not be enforced; and it is further

ORDERED that this Temporary Restraining Order shall remain in effect through June 21, 1990, at 1:30 p.m., subject to further order of the Court when plaintiff's Motion for Preliminary Injunction shall be heard; and it is further

ORDERED that defendants appear before this Court at 1:30 p.m. on the 21st day of June, 1990, then and there to show cause, if any they have, why ~~they should not be restrained and enjoined during the pendency of this cause.~~ a preliminary injunction should not be entered. Plaintiff shall post a $10,000 bond.

IT IS SO ORDERED.

The Clerk is directed to enter this Order and forward copies to counsel.

DATED this 28th of May, 1990, at 4:35 p.m.

JUSTIN L. QUACKENBUSH
United States District Judge

Presented by:

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By
WILLIAM D. SYMMES
WSBA No. 683

By
LESLIE R. WEATHERHEAD
WSBA No. 11207
Attorneys for Plaintiff



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0300
(509) 624-5265