**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION,** | ) | |
| **a state-chartered savings association,** | ) | |
| **STERLING FINANCIAL CORPORATION,** | ) | |
| **a Washington corporation** | ) | |
| | ) | |
| Plaintiffs, | ) | **No. 95-829-C** |
| **v.** | ) | **(Judge Wheeler)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendant. | ) | |

# UPDATED AMENDED EXPERT REPORT OF MUKESH BAJAJ, Ph.D.

**February 15, 2007**

Sterling would have offset the lower spread on its incremental assets and liabilities through RTC acquisitions is unverifiable and speculative.

6.4.7.2 Dr. Horvitz's Assumptions Regarding Sterling's Wholesale Growth Are Speculative

Apart from retail growth, a thrift, like any entity, can acquire wholesale assets such as mortgage-backed securities (MBS). Wholesale markets for financial assets are international markets and the prices for assets in those markets are set by worldwide competition. A thrift can also fund assets using market-priced wholesale liabilities like Federal Home Loan Bank (FHLB) advances or reverse repurchase agreements although the ability to use these sources is limited by the availability of sufficient acceptable collateral.[158] However, a thrift has no comparative advantage in tapping the wholesale markets for assets or liabilities, and a strategy of adding market priced assets funded with wholesale liabilities to its balance sheet is not a source of economic profit to a thrift.

In 1993, Sterling implemented a growth strategy predicated on buying wholesale assets funded with wholesale liabilities with the intention of replacing these assets over time with retail assets and liabilities.[159] As a result, Sterling's assets grew by $399 million, or 61%,[160] over the prior year. The bulk of Sterling's growth was attributable to an increase of 245% in mortgage-backed securities (MBS) and investments.[161] As a percent of total assets, MBS and investments grew from 17% in 1992 to 36% in 1993. The funds to purchase these additional assets came primarily from FHLB advances, which increased by 243% between 1992 and 1993.[162]

Dr. Horvitz readily admits that the foregone assets and liabilities would have a lower spread than average:

---

[158] I also note that as a member, Sterling was required to purchase stock in the FHLB of Seattle according to a formula based on the amount of its outstanding loans and advances. (Sterling Financial 1993 Form 10-K, p. 19 [VSG001 0458]).

[159] ALCO Minutes, December 14, 1992 [WON935 1493-1494].

[160] Revised Updated Horvitz Report, Exhibit 6, Table 3e.

[161] Sterling Financial 1994 Annual Report, p. 1 [WON8871543].

[162] *Ibid.*

> Q. All right. Why would the addition of assets decrease the net interest margin?
>
> A. Because they're assets -- wholesale assets being funded with wholesale liabilities at a narrower spread.
>
> Q. Does that mean the incremental assets have a lower than average net interest margin?
>
> A. These incremental assets, yes.[163]

Thus, in 1993, by Dr. Horvitz's own admission, Sterling's incremental assets earned a lower rate of return than the rest of Sterling's asset portfolio. As noted in its ALCO minutes, Sterling understood this as well:

> The wholesale nature of the growth strategy will pull down the interest margin in the future.[164]

To the extent that the growth in Dr. Horvitz's model is wholesale growth, his assumption that Sterling would be able to earn the equivalent of its actual ROAA on its incremental assets is also not credible.

Also, Sterling's growth strategy was implemented with the intention of replacing wholesale assets and liabilities with loans and deposits. However, at the time its growth strategy was implemented, Sterling expressed concerns that it would be unable to generate assets to replace the wholesale assets:

> Norm Judd presented a draft proposal to the Board of Directors for the growth strategy…Howard Gilkey emphasized that the important component of this plan is the ability to replace wholesale activity with retail activity over the next few years. *Norm Judd noted that the Equity/Assets ratio grows over the next five years as we are unable to generate earning assets as fast as the increase in equity.* As our existing portfolio of balloon mortgages and securities begins to mature over the next few years the need to generate earning assets will increase. While we have successfully emphasized consumer and commercial loans, we are adding about $2 million in total balances monthly…If we just double

[163] Horvitz Deposition, December 6, 2001, p. 451.

[164] ALCO Minutes February 8, 1993 [WON935 1487]; ALCO Minutes March 15, 1993 [WON935 1483].

Similarly, in fiscal 1993, Sterling sold its mortgage-backed securities portfolio, which resulted in a gain of $0.638 million.[180] Although Dr. Horvitz has adjusted the but-for Sterling's ROAA for the penalties from the one-time prepayment of FHLB advances, he has not adjusted it for this one-time sale of Sterling's fixed rate securities portfolio.

Dr. Horvitz has selectively adjusted Sterling's but-for ROAA for non-recurring items. This approach is not credible. Dr. Horvitz has also made adjustments to the but-for Sterling's ROAA for its claimed "wounded bank" costs. I discuss the flaws in some of those claimed costs in the next section.

### 6.5 Dr. Horvitz's Presentation Of "Wounded Bank" Damages Is An Uncritical Repetition Of Sterling Management's Views And Obviously Flawed

Since filing his initial report, Dr. Horvitz has reduced the claimed amount of the "Wounded Bank Damages" he includes in his damages estimate to $4.556 million from $5.278 million.[181] These damages consist of:

- Cost of Great American branch denied because of OTS Capital Standards ($1.835 million)
- Loss on CJ-4 loan ($1.241 million)
- Excess Supervision Costs ($172,000)
- Cost of 1989 Units Offering ($1.004 million)
- Increased Legal and Accounting [Costs] to Defend against Regulatory Interference ($304,000).[182]

For all of these categories, Dr. Horvitz relies upon conversations with, and calculations prepared by, Daniel Byrne, CFO of Sterling, without any independent review of underlying documents.[183]

---

[180] Sterling 1993 Annual Report, p. XIX [PSG027 0540].

[181] Horvitz 2006 Report, Exhibit 8.

[182] *Ibid.*

[183] Horvitz Deposition, December 6, 2001, pp. 252-253, December 7, 2001, pp. 553-554.

Dr. Horvitz does not even appear to have provided a conceptual framework for the wounded bank damages to Mr. Byrne. He simply accepted a damages calculation provided him by his client and included it in his expert report. He did not direct the analysis, he did not review any primary documents and he did not even discuss any part of the wounded bank damages, other than the CJ-4 loan, with anyone other than Mr. Byrne.[184] Thus, Dr. Horvitz has simply put forth the views of Sterling's management without any critical analysis or input to the process. These claims violate standard economic theory, and are speculative, as I discuss below.

*CJ-4 Loan Loss*:

According to Mr. Byrne, the CJ-4 loan resulted in a loss of $1.241 million to Sterling.[185] Mr. Byrne alleges these damages occurred because the "Government was enforcing the limitations of loans to one borrower…"[186] As a result, Mr. Byrne claims that Sterling could not advance additional funds to the borrower but had to instead foreclose and repossess the property and make improvements on it. The thrift then lost money in liquidating the property later since its market value had declined.[187] Mr. Byrne concludes that Sterling would have been better off had it not been forced into foreclosing the property and simply made an incremental loan. That is, Mr. Byrne assumes, and Dr. Horvitz accepts without any further analysis, that Sterling's incremental return on additional investments in the CJ-4 loan would have been greater than its average return. In the absence of solid evidence, this claim is purely speculative from an economics perspective. Moreover, by drawing such a distinction between incremental and average returns here, Dr. Horvitz contradicts the premise behind his lost profits analysis for the 1989-2006 period. As discussed earlier, in estimating Sterling's alleged lost profits during 1989-2006, Dr. Horvitz had claimed that Sterling's incremental returns earned on foregone assets would have equaled the thrifts' actual average rate of return.

---

[184] Horvitz Deposition, December 7, 2001, pp. 555-556.

[185] Analysis Prepared by Daniel G. Byrne, 1/9/04 [VSG034 0074]

[186] Byrne Deposition, December 3, 2001, p. 70.

[187] *Ibid*, pp. 70-71.

*Cost of Great American Branch denied*:

The damages estimate for the Great American branch should have led Dr. Horvitz to question the calculation. According to Mr. Byrne, Sterling would have paid $61,000 to acquire two branches in 1989.[188] According to Mr. Byrne, the thrift was prevented from acquiring these branches due to inadequate capital.[189] Later, Sterling did acquire the Spokane branch through a Resolution Trust Corporation ("RTC") sale in the 1994-1995 period,[190] paying a $1.892 million deposit premium.[191] Mr. Byrne alleges, and Dr. Horvitz proposes, without additional analysis,[192] that the difference between this deposit premium paid in 1994 and the 1989 charge of $61,000 (plus transaction costs) calculated by Mr. Byrne represents damages to Sterling.[193] While an increase in value of 6,203% in five years is not impossible, on the surface it is unlikely unless there are additional factors to explain the increase. One difference that could account for the increased value of the Spokane branch is that its deposits increased from $16.2 million as of June 30, 1989 to $26.2 million at the time Sterling acquired it from the RTC. I have not been able to determine if any capital improvements were made to the branch that could have also affected its value.[194] Paying a higher price for a more valuable asset is not necessarily a source of damages. Absent additional information, Dr. Horvitz's claim is not verifiable.

Dr. Horvitz's claim contradicts economic logic and once again reveals the fallacy of *ex post* analysis in damages calculations. Asset values change over time due to changes in the supply and demand conditions for the asset. By not investing in the branches in 1989, Sterling avoided the risk of the value of these branches declining in the future. Had the

---

[188] Byrne Deposition, December 4, 2001, p. 137.

[189] *Ibid*., p. 134.

[190] *Ibid*, p. 134. The purchase actually occurred in March 1994. See RTC New Release [VSG015 0565-0571].

[191] *Ibid*, p. 137.

[192] Horvitz Deposition, December 7, 2001, pp. 530-531.

[193] Analysis Prepared by Daniel G. Byrne, 1/9/04 [VSG034 0085].

[194] Sterling Savings Association Acquisition of Two Branches from Great American, June 30, 1989 [VSG014 0577]; Great American Bid Summary [VSG014 0564].

branches actually declined in value, it is unlikely that Dr. Horvitz would have included Sterling's benefit of having avoided such a poor investment due to FIRREA.

*Excess Supervision Costs:*

Sterling's claim for excess supervision costs include $33,711 for the cost of its January 31, 1990 OTS examination and $138,266 for the incremental amount of its FDIC general assessments attributable to its status as a "troubled bank" from March 1990 to September 1991.[195] By including such claims as wounded bank damages, Dr. Horvitz assumes that Sterling would not have faced such costs in the but-for world. Regulators supervise thrifts to ensure the preservation of the deposit insurance fund. Excess risk taking by thrifts adversely affects the deposit insurer's liability. Therefore, it is likely that even in the but-for world Sterling would have faced what Dr. Horvitz terms "regulatory interference." In analyzing his but-for world, Dr. Horvitz makes no attempt to disentangle such potential grounds for regulatory actions (and their associated costs to Sterling) that were related to the alleged breach, from those unrelated to the alleged breach.

*Cost of 1989 Units Offering:*

I understand that Dr. William Hamm will explain why such costs are not attributable to the breach.

In summary, Dr. Horvitz performs no formal economic analysis on his own to establish the legitimacy of Plaintiffs' wounded bank damages claims. As I discussed above, his wounded bank damages claims are speculative.

### 6.6 Dr. Horvitz's Expectation Damages From 2006 Onward Are Conceptually Flawed

According to Dr. James, Sterling would have had $1.726 million in supervisory capital remaining as of September 30, 2006, and he estimates that the "future damages" from

---

[195] Sterling Savings Bank Calculation of Damages, Regulatory Supervisory Costs, prepared by Daniel G. Byrne [VSG034 0076].

any time a corporation finances the purchase of a safe asset through the issuance of a risky security. The spread simply represents the cost of the resulting reduction of balance sheet risk. Such spread has nothing to do with FIRREA and nothing to do with damages in this case.

Consider the fact that corporations often finance risky investments by issuing securities of lower risk. They expect to earn a positive spread in this case. Clearly, if Sterling had issued securities of lower risk than its investments, Dr. James would not have concluded there were negative damages.

The apples-to-oranges comparison of yields on securities of different risk in Dr. James's model contradicts the central principle of financial economics, namely, the difference in expected returns between two assets must solely be attributed to the differences in systematic risk of these asset's returns for their investors.[215] This principle is the bedrock of the Nobel Prize winning Capital Asset Pricing Model ("CAPM") as well as alternative asset pricing models that have been developed in financial economics.[216] For example, the basic reasoning behind the Arbitrage Pricing Theory ("APT") is that if two assets with the same systematic risk have different expected returns, a well-diversified investor can make arbitrage profit by buying the asset with the higher expected return and selling short the other asset.

For instance, if the lower yield on Treasury securities were *not* accompanied by a concomitantly lower risk (which Dr. James ignores) then investors could sell Treasuries and buy preferred stock to take advantage of this "arbitrage" opportunity, i.e., to earn higher returns without any additional risk. However, such arbitrage would be impossible in competitive capital markets since the preferred stock's price would rise (or its return

---

[215] According to asset pricing models developed in finance, the expected return on an asset depends on its systematic risk or non-diversifiable risk. The main idea is that, in a competitive market, investors who hold diversified portfolios will not be concerned about the diversifiable risk of an investment and will only require a risk premium to compensate them for non-diversifiable risk. These investors will set market prices in equilibrium and asset returns will therefore depend only on systematic risk.

[216] William F. Sharpe and John Lintner independently derived the CAPM. William F. Sharpe received the Nobel Prize in Economics in 1990 for developing the CAPM. Sharpe, W. F., "Capital Asset Prices: A Theory of Market Equilibrium under Conditions of Risk," *Journal of Finance*, September 1964. Lintner, J., "Security Prices, Risk and Maximal Gains from Diversification," *Journal of Finance*, December 1965.

would decline) in response until any return differential between the two securities would be solely due to their different levels of risk. In equilibrium, all securities trade at their fair risk-adjusted prices. Financial economists describe this principle by saying that transactions in fairly priced securities have zero net present value (NPV). In well-functioning capital markets, investors in Sterling's risky preferred stock would pay a price that would be fair given the risk they would bear for holding such securities. Similarly, Sterling would also be able to retire its liabilities or invest the proceeds in buying risk-free Treasury bonds at a fair price. The sale of one fairly priced security to invest in another will not cost more than the transaction costs incurred.

Dr. James fails to note the implicit risk reduction benefit associated with his proposed capital replacement financing scheme. By issuing preferred stock and using the proceeds to pay off its liabilities as Dr. James hypothesizes, Sterling would have not only have replaced its supervisory capital but would have also lowered the risk of its balance sheet. The spread component of Dr. James's damages model is simply the cost of such risk reduction. Proper measure of the cost of replacement of supervisory capital should do just that, replace capital, without an expensive reduction in risk. The proper measure of replacement cost is simply the transaction costs. If Sterling were to raise capital and make investments that result in net increase in its balance sheet risk, the spread between its financing costs and incremental income would be negative. Clearly, Dr. James would not conclude that in such a case Sterling's damages should be negative as such a spread income is simply compensation for an investment decision to bear additional risk and it should not be mixed up with the cost of replacement capital.

Some examples unrelated to Sterling's replacement of supervisory capital will help to further illustrate the methodological error in Dr. James's report. Suppose a company such as GE had issued AAA-rated debt with a yield of 9% and invested the proceeds in junk bonds yielding 15%. GE would have earned a positive spread of 6% but it would not have added any value for its shareholders. This is because the increase in risk of GE's assets as a result of its investment in junk bonds would have raised GE's cost of capital by an amount sufficient to offset its additional income from the positive spread.

8.3.9.5 Dr. James's Adjustments To The But-For Sterling's ROAA For Sterling's Claimed "Wounded Bank" Costs Are Not Supportable

Dr. James has adjusted the but-for Sterling's earnings for Sterling's claimed "wounded bank" costs.[298] These costs include the loss on the CJ4 Loan, excess supervision costs and claimed damages relating to the price that Sterling paid for a branch in Spokane, Washington.[299] As I discussed Section 6.5 above, these claims are speculative. Thus, there is no basis for these "wounded bank" adjustments to pre-tax, pre-amortization earnings.

**8.4 Transaction Costs That Sterling Would Not Have Incurred Absent The Phase Out Of Supervisory Capital Are Reasonable Damages**

The third component in Dr. James's model is transaction costs. Dr. James includes in Sterling's damages the difference between the gross and net proceeds received from its 1991 common stock offering or $2.767 million. To this amount, he adds $0.560 million, his estimate of the value of the warrants issued to the underwriters as part of their compensation for their services. As noted above, he then makes a pro-rata adjustment to the total of these two amounts to account for the portions of the capital raised in the 1991 offering that he allocates to replacing the capital from Sterling's withdrawn 1989 offering and to replacing the Central Evergreen goodwill.

I agree that to the extent that the breach caused Sterling to incur transaction costs that it would not have otherwise incurred, these costs are appropriately viewed as damages. It is my understanding that Sterling asserts that it had an obligation to raise capital based upon the Central Evergreen agreements. As I discussed above, to the extent that the loss of its supervisory capital caused Sterling to have to raise a larger amount of capital than it otherwise would have, the incremental costs associated with raising that capital are a reasonable measurement of damages.

[298] Revised Second James Report, Exhibit E, Table 3d.

[299] Revised Second James Report, Exhibit E, Tables 3c, 3d and 3e.

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C Judge Wheeler |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ**
**DECEMBER 11, 2006**

## I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in February 2004. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings by Judge Wheeler and to account for the passage of time. In an opinion dated August 30, 2006, Judge Wheeler ruled that the "...Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA."[1] For purposes of my Report and damages calculation I have therefore assumed that the supervisory capital created in the Central Evergreen acquisition will be subject to any limitations imposed by FIRREA.

[1] Opinion of Judge Wheeler, *Sterling Savings Association v. The United States*, August 30, 2006, p. 12.

My updated determination of Sterling's expectation damages is that they total $63.361 million.

## II. Elements of Expectation Damages

### *A. Lost Earnings on Foregone Assets*

To update my calculations I have relied on additional documents and data provided to me by the attorneys and Sterling since the filing of my last Report. These are primarily financial statements from 2003 though 2006. I have created an addendum to Exhibit 2 of my previous Report listing the additional materials supplied to me. Exhibit 3 is unchanged from my previous Report. Exhibit 4 and Exhibit 5 present financial information for Sterling and have been extended through September 2006 – the latest period for which I have financial statements.

Exhibit 6 incorporates the ruling of Judge Wheeler. Tables 4a, 4b, and 4c of Exhibit 6 have been restructured or added to present the amount of supervisory intangibles that could have been included in Sterling's core capital but-for the breach. Table 4a is a summary of the goodwill and intangibles of Sterling but-for the breach of the Lewis Federal and Tri-Cities contracts. Table 4b presents the goodwill amounts related to the Central Evergreen acquisition.[2] Since the Central Evergreen acquisition was supervisory in nature, the goodwill from the acquisition is subject to the supervisory goodwill phase-out limitations of FIRREA. The phase-out provisions of FIRREA allowed supervisory goodwill to count to a limited degree toward core-capital until January 1, 1995. This table calculates how much of the supervisory goodwill from Central Evergreen could count in Sterling's core capital over time. Table 4c presents the identified intangibles related to the Central Evergreen acquisition. These intangibles were allowed under provisions of FIRREA to also count toward core capital to a limited degree.[3]

---

[2] In documents from Sterling upon which I have relied, in the context of the Central Evergreen acquisition the term "unidentified intangibles" is used synonymously with goodwill.

[3] In my previous report I noted that changes in the accounting rules related to goodwill no longer require that goodwill be amortized, rather it is subjeet to impairment tests. For the contractual goodwill associated with Lewis Federal and Tri-Cities I assume that for regulatory capital purposes it would amortize. The change in the accounting rules did not affect goodwill from the Central Evergreen transaction because it was fully-amortized in 2000 – before the new rules took effect. Table 7 in Exhibit 6 presents an estimate of the amounts of non-supervisory goodwill given the new accounting rules.

My estimate of expectation damages is based on a model that is similarly structured to that presented in previous versions of my Report. I believe it is appropriate at this time to reconsider some of the assumptions used in modeling the "but for" bank for two reasons: first, Judge Wheeler's recent ruling removes significant amounts of regulatory capital from Sterling Savings, and so the world is quite different from the one modeled in earlier versions of my Report; second, we know a great deal more about the capabilities and attitudes of Sterling's management and organization than we did at the time the model was originally developed. I have therefore revisited a number of assumptions used in the previous modeling, and have made modest adjustments to take account of the changes required by Judge Wheeler's ruling.

Under the belief that the "but for" bank could include all of the intangibles resulting from the Central Evergreen merger in core capital, my previous Report assumed that until June 1991 Sterling would maintain the capital ratios specified in the Business Plan developed in 1988 (before FIRREA). Obviously, this is a conservative assumption, but plausible because the Central Evergreen goodwill made that a feasible strategy. Without the ability to use the Central Evergreen intangibles as anticipated at the time of the contract, it is not reasonable to assume that Sterling would strictly adhere to the capital ratios specified in the Business Plan.[4]

We know from the business plans and testimony of bank management that Sterling desired to grow and would have been very reluctant to shrink in asset size. My modeling of the "but for" bank assumes that Sterling will remain in compliance with the core capital requirement imposed by FIRREA and will maintain its asset size. Consequently I have estimated that the but-for bank will operate with a core capital ratio of 4% from December 31, 1989 to June 30, 1991, which is only marginally less than the ratios in the Business Plan (4.15%-4.24%), and well above the 3% ratio specified by FIRREA.

[4] In my original modeling I assumed that Sterling had a permanent (nonamortizing) capital credit and all of the intangibles from Central Evergreen to include in capital. This provided enough capital for a very large increase in assets if the capital were leveraged fully. In view of the uncertainty about the ability of Sterling to manage such substantial growth, and whether profits could be maintained through a period of very rapid growth, I imposed a restrictive growth constraint on the "but for" bank. In the "but for" world resulting from Judge Wheeler's ruling (i.e., with less core capital for Sterling), and with the evidence that Sterling is capable of managing substantial growth with good profitability, it may well be more appropriate to model the "but for" bank on the basis of a leveraging of all regulatory capital to the capital ratio maintained by the actual bank.

Additionally, a few data errors in the previous calculations have been found and corrected.[5]

In addition to adapting my calculation of Sterling's lost earnings to Judge Wheeler's ruling, I have updated my calculations through the present based on Sterling's recent financial performance. For the fourth quarter of 2003 through 2006 I have followed the same approach to modeling the but-for bank's performance as I did for 1990 through 2003.[6] Since 2003 Sterling has continued to grow both by internal growth and by acquisition. It has remained profitable while achieving this growth. Additionally in 2005 Sterling converted to a bank charter.

*B. Future Damages*

As in my previous Reports, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions. His determination of the value is $0.641 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $63.361 million. Exhibit 8 presents a summary of the amounts. The lost earnings from 1990 through 2006 are $58.164 million, the wounded bank damages are $4.556 million, and the future damages are $0.641 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 11, 2006
3. Sterling Savings Association, Key Financial Data, 1983 – 1989

---

[5] The first involved the treatment of the tax benefits from net operating loss carryforwards ("NOLs"). A second involved a recalculation of the December 1989 core capital. The TFR form in use in 1989 did not include information on core capital as defined by FIRREA, and previous Reports have used a figure based on the June 1990 TFR. I have concluded that core capital in December 1989 was about $1 million lower than the figure used previously. A third involved the amount of intangibles and assets resulting from the acquisition of Empire Savings. Each of these corrections would, other things being equal, lower the expectations damage calculation.

[6] My methodology and rationale were described in my previous reports of September 2001 and February 2004.

4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2006
5. Sterling Savings Association, Asset Composition, 1990 – 2006
6. Calculation of Lost Earnings on Foregone Assets Through 2006
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

Paul Horvitz

Paul Horvitz

Dec 11, 2006

Date

# *Exhibit 6*

## *Sterling Savings Association*

### Calculation of Lost Earnings on Foregone Assets

### *Table 1: Summary of Lost Earnings Calculation*

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | Incremental Bank | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/89 | $730,933 | $730,933 | $0 | | |
| 12/31/89 | 708,213 | 719,644 | 11,431 | 0.33% | 0 |
| 6/30/90 | 688,990 | 737,187 | 48,197 | 0.25% | 28 |
| 6/30/91 | 608,999 | 725,600 | 116,601 | 0.94% | 454 |
| 6/30/92 | 640,887 | 788,840 | 147,953 | 1.78% | 2,071 |
| 6/30/93 | 1,032,538 | 1,270,906 | 238,368 | 1.78% | 2,640 |
| 6/30/94 | 1,367,978 | 1,681,060 | 313,082 | 1.39% | 3,314 |
| 6/30/95 | 1,542,367 | 1,894,583 | 352,216 | 1.29% | 4,048 |
| 6/30/96 | 1,481,893 | 1,820,299 | 338,406 | 1.06% | 3,725 |
| 12/31/96 | 1,534,787 | 1,885,272 | 350,485 | -0.03% | (85) |
| 12/31/97 | 1,870,776 | 2,297,987 | 427,211 | 1.36% | 4,772 |
| 12/31/98 | 2,309,845 | 2,610,221 | 300,376 | 1.03% | 4,392 |
| 12/31/99 | 2,535,753 | 2,865,507 | 329,754 | 1.48% | 4,454 |
| 12/31/00 | 2,651,771 | 2,996,612 | 344,841 | 1.46% | 4,827 |
| 12/31/01 | 3,038,538 | 3,427,925 | 389,387 | 1.43% | 4,933 |
| 12/31/02 | 3,503,878 | 3,761,920 | 258,042 | 1.49% | 5,808 |
| 12/31/03 | 4,274,390 | 4,439,914 | 165,524 | 1.67% | 4,310 |
| 12/31/04 | 6,938,049 | 7,146,741 | 208,692 | 1.76% | 2,906 |
| 12/31/05 | 7,556,598 | 7,783,896 | 227,298 | 1.44% | 3,000 |
| 9/30/06 | 8,624,536 | 8,873,167 | 248,631 | 1.13% | 2,568 |
| | | | | | $58,164 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 2a, column A.

B From Table 5, column C.

D From Table 3a, column G. For periods ending 6/30/90, 12/31/96, and 9/30/06 ROAA reflects the return for the six or nine month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets.

App. 792

# Exhibit 6

## Sterling Savings Association

### Table 2a: Actual Bank and Intervest Financial Data

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill | Qualifying SGW | Other Qualifying Intangibles |
| 6/30/89 | 730,933 | | | | | | | | | | | |
| 12/31/89 | 706,213 | 627 | 324 | 1,620 | 2,571 | 112 | (2,273) | -0.32% | 0 | 20,983 | 10,308 | 0 |
| 6/30/90 | 668,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 | 10,036 | 0 |
| 6/30/91 | 608,999 | 2,020 | 590 | 2,770 | 5,360 | 394 | 7,920 | 1.30% | 0 | 14,573 | 8,903 | 1,584 |
| 6/30/92 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 | 6,288 | 3,327 |
| 6/30/93 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 | 7,673 | 2,575 |
| 6/30/94 | 1,367,978 | 10,084 | 4,789 | 2,262 | 17,135 | 1,386 | 72,764 | 5.32% | 20,000 | 17,915 | 5,044 | 1,916 |
| 6/30/95 | 1,542,367 | 10,440 | 5,236 | 3,487 | 19,163 | 4,078 | 87,919 | 5.70% | 10,200 | 14,945 | 0 | 1,220 |
| 6/30/96 | 1,481,893 | 8,163 | 4,779 | 3,332 | 16,274 | 4,632 | 93,097 | 6.28% | 0 | 11,868 | | 440 |
| 12/31/96 | 1,534,787 | (1,234) | (621) | 1,586 | (269) | 2,487 | 101,602 | 6.62% | 13,100 | 10,147 | | 0 |
| 12/31/97 | 1,670,776 | 13,165 | 7,911 | 2,265 | 23,341 | 6,077 | 141,025 | 7.54% | 30,000 | 7,882 | | 0 |
| 12/31/98 | 2,309,845 | 11,185 | 6,420 | 3,980 | 21,585 | 8,088 | 143,669 | 6.22% | 52,743 | 61,180 | | 0 |
| 12/31/99 | 2,535,753 | 19,096 | 11,163 | 5,692 | 35,951 | 9,579 | 168,889 | 6.66% | 10,000 | 55,488 | | 0 |
| 12/31/00 | 2,651,771 | 20,444 | 12,008 | 5,490 | 37,942 | 10,004 | 184,828 | 6.97% | 0 | 49,998 | | 0 |
| 12/31/01 | 3,038,538 | 22,934 | 12,368 | 5,377 | 40,679 | 10,513 | 240,669 | 7.92% | 38,044 | 44,621 | | 0 |
| 12/31/02 | 3,503,878 | 31,862 | 16,260 | 644 | 48,766 | 11,616 | 261,585 | 7.47% | 0 | 43,977 | | 0 |
| 12/31/03 | 4,274,390 | 41,564 | 23,085 | 263 | 64,932 | 11,616 | 315,386 | 7.38% | 26,322 | 47,955 | | 0 |
| 12/31/04 | 6,938,049 | 63,246 | 32,927 | 2,224 | 98,397 | 11,616 | 450,918 | 6.50% | 162,076 | 132,246 | | 0 |
| 12/31/05 | 7,556,598 | 68,341 | 33,567 | 2,222 | 104,150 | 11,619 | 507,711 | 6.72% | 0 | 136,838 | | 0 |
| 9/30/06 | 8,624,536 | 60,316 | 29,388 | 1,685 | 91,389 | 16,666 | 669,065 | 7.76% | 117,188 | 137,090 | | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A - D & F & J: Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b). Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data is merger adjusted. Data for the bank for 2005 and later are from FDIC Call Reports, which are reported on a year-to-date basis.
Column D: Data from Call Reports include goodwill impairment losses and amortization expense and impairment losses for other intangible assets.
Column J: Data from Call Reports include goodwill and other intangible assets.

G: Actual data from Thrift Financial Reports (Sheshunoff) and Call Reports, except for figure for 12/31/89, which is from the Sterling Savings Association Capital Restoration Plan dated 2/19/90. Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data are merger adjusted. Data for the bank for 12/31/05 and 9/30/06 are Tier 1 Capital from Call Reports.

I: Based on data from Sterling Savings, except for data prior to 6/30/93 which are from annual reports and offering circulars, and data after 12/31/99 which are from Table 8, column D. Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

K - L: Actual data from Thrift Financial Reports (Sheshunoff).

Updated December 11, 2006

In the United States Court of Federal Claims

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br>(Judge Wheeler) |

# Updated Expert Report of Professor Christopher M. James

December 11, 2006

**TABLE OF EXHIBITS**

**Exhibit A:** Curriculum Vitae

**Exhibit B:** Prior Testimony of Dr. Christopher M. James in the Previous Four Years

**Exhibit C:** Additional Documents Considered

**Exhibit D:** Summary of Lost Profits and Actual Cost of Mitigation for Lewis Federal and Tri-Cities

**Exhibit E:** Calculation of Lost Earnings on Foregone Assets Through 1993

**Exhibit F:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 1991 through 2006

**Exhibit G:** Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

**Exhibit H:** Calculation of Cash Benefit Yield

**Exhibit I:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

**Exhibit J:** Transaction Costs of Mitigation Capital for Lewis Federal and Tri-Cities

**Exhibit K:** Summary of Wounded Bank Damages

**Exhibit L:** Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

## I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Before joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions at several Federal Reserve Banks, the Federal Deposit Insurance Corporation, and the Treasury Department. I currently serve on the Advisory Board of SunTrust Bank. My academic research has been in the areas of securities pricing, corporate finance, and financial institutions. I have published numerous articles on economic and financial topics including the regulation of financial institutions, failure resolution policies, and capital raising by depository institutions. I also serve on the editorial boards of four scholarly journals including the *Journal of Financial Economics*. I served as an associate editor of the *Journal of Finance* and as editor of the *Journal of Financial Intermediation* from 1988 through 1999. A copy of my curriculum vitae is attached as Exhibit A. A list of my testimony over the last four years is included in Exhibit B. I am being compensated at my usual hourly rate of $650.

## II. Assignment

I have been retained in this matter by counsel for the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial"). I have been asked by the counsel for the plaintiffs to update my February 2004 report taking into account the Court ruling dated August 30, 2006.[1] Specifically, I was asked to:

a. Assume that the contract related to the acquisition of Central Evergreen was not subsequently breached by the government, hence did not result in damages to the plaintiffs.

b. Update my calculations through September 30, 2006.

[1] Opinion and Order, Judge Wheeler, filed August 30, 2006.

As part of my analysis, I have reviewed various documents including reports issued by experts retained by the Department of Justice, deposition testimony, court opinions, legal filings, financial statements for Sterling, and other selected documents for Sterling. A list of the additional documents I have considered is contained in Exhibit C. This list supplements the document lists that I previously produced.

## III. Summary of Opinions

Based on the Court ruling dated August 30, 2006, I was asked to assume that the contract related to the acquisition of Central Evergreen was not breached by the government. Hence, damages stem from the breach related to the acquisitions of Lewis Federal and Tri-Cities ("LF & TC") only. When calculating total damages, I followed the same methodology as in my February 2004 Expert Report, however, the calculated damages relate only to the LF & TC acquisitions.

Following similar steps as in my February 2004 Expert Report, I summed the damages resulting from the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with the issuance of mitigation capital related to LF & TC, lost profits attributable to the breach of the LF & TC contracts, and wounded bank damages related to the breach. Under the assumption of no damages pertaining to the acquisition contract for Central Evergreen, total damages are $18.708 million (see Exhibit D).

## IV. Cost of Mitigation

The calculation of the cost of mitigation in my current report follows the same methodology as in my February 2004 Expert Report albeit with updated inputs to account for the

Court's August 30, 2006 ruling.[2] Furthermore, I have updated my calculations through September 30, 2006. In these calculations only the costs of mitigating the contractual supervisory capital promises for LF & TC are considered damages. To determine these costs, in the context of my model, it is first necessary to assess which capital was raised as a substitute for LF & TC's supervisory capital as opposed to being raised for other purposes. These other purposes include raising capital to substitute for the 1989 unit offering which had been planned prior to the breach and to substitute for the supervisory capital from the Central Evergreen acquisition that was lost after the passage of FIRREA. Only capital raised as a substitute for LF & TC's supervisory capital mitigates the effect of the breach ("mitigation capital") and results in mitigation damages.

Capital that Sterling raised in the 1991 and 1993 offerings was not traceable to any specific purpose, but was generally used to support the growth of the business. In the 1991 offering prospectus Sterling stated: "The primary purpose of this Offering is to increase Sterling's regulatory capital levels. Net proceeds will be used to support the growth of Sterling's business, including the origination of loans."[3] In the 1993 offering prospectus the intended purpose of the capital contributed to Sterling was to "...improve further the Sterling Savings' capital ratios. Sterling Savings intends to use such additional capital to support the growth of the business, including funding loans and investments and expanding its branch network."[4] Neither of the offerings indicated that the purpose was to mitigate the effects of the breach or other non-breach aspects of FIRREA.[5]

---

[2] As I noted in my February 2004 Expert Report, I am not rendering an opinion on whether Sterling actually replaced the supervisory capital that was generated in the contracts with the government. For purposes of these calculations I have been asked to assume that it did.

[3] Sterling Savings Offering Circular, November 20, 1991, p. 13.

[4] Sterling Financial Corporation Subordinated Notes Prospectus, February 4, 1993, pp. 4, 12.

[5] As I noted in my February 2004 report, I have been asked to assume for purposes of these calculations that the offerings were used to mitigate the breach of Lewis Federal and Tri-Cities' contracts. I believe this premise is counterfactual based on my review of the documents and the testimony of fact witnesses but I make the assumption as the necessary basis for calculating damages at or near the time of the breach, and on the belief that it is conservative in the sense that it minimizes damages awardable against the government.

Furthermore, once capital is raised, the proceeds from such an offering are fungible. Given that Sterling did not specify whether the raised capital was attributable to either substituting for the 1989 offering, mitigating the loss of the supervisory capital of LF & TC, or substituting for supervisory capital of Central Evergreen, it is therefore necessary to allocate the proceeds to Sterling's needs when calculating the cost of mitigation. In the next paragraphs I outline the assumptions that I made in order to assess which capital was raised as a substitute for LF & TC's supervisory capital.

Consistent with my February 2004 report, I assumed that $12 million of the capital raised in the 1991 offering served as a substitute for the proceeds which Sterling would have raised in the 1989 withdrawn offering, an offering that had been planned prior to the breach. The balance of the capital raised at the time of the 1991 offering was then allocated between capital needs that arose after the passage of FIRREA. I allocated the balance proportionally between the need to substitute for the supervisory capital from the Central Evergreen acquisition and the need to mitigate the breach of LF & TC's contracts. I have continued to allocate a portion of the offering to Central Evergreen because post-FIRREA Central Evergreen's supervisory capital could no longer be counted as tangible capital. As a consequence, Sterling would have needed to find a substitute for it. Therefore, the balance of capital raised at the time of the 1991 offering (both the proceeds from the 1991 offering and capital raised due to the Preferred Stock Series B conversion) is prorated based on the respective supervisory capital balances of LF & TC (54.8%) and Central Evergreen (45.2% = 100% - 54.8%).[6]

The sum of the allocated proceeds of the 1991 offering of $11.719 million and the capital resulting from the Preferred Stock Series B conversion of $2.1 million is less than the sum of the balances of supervisory capital of LF & TC and Central Evergreen (see Exhibit G). The capital

[6] The amount of LF & TC and Central Evergreen supervisory capital as of the time of the 1991 offering is $13.346 million and $11.022 million, respectively (see Exhibit G). $13.346 million / ($13.346 million + $11.022 million) = 54.8%.

raised in 1993 is therefore necessary to fully-mitigate the loss of LF & TC's supervisory capital. In 1993, the preferred stock issued by Sterling fully-mitigated the supervisory capital of LF & TC, as well as fully-replaced Central Evergreen's.

**1. Cost of Mitigation – 1991 Through 2006**

The net cost of mitigation capital for LF & TC from 1991 through September 2006 is $7.729 million (see Exhibit F). The following updates were implemented:

1. As discussed above, I did not include in the calculated mitigation damages any costs associated with the substitution of Central Evergreen's supervisory capital. This results in a smaller average amount of capital assumed to mitigate the breach (presented in Exhibit G) and in turn lowers the net cost of capital (presented in Exhibit F).
2. I updated the calculation of the past mitigation costs to include years 2004, 2005, through September 2006.

**2. Cost of Mitigation – 2006 Through 2025**

The net future cost of mitigation for LF & TC is $1.386 million (see Exhibit I). The following updates were implemented:

1. I updated the cash benefit rate of mitigation capital and the discount rate to reflect the current yield on 30-year U.S. Treasury bonds.
2. I updated the analysis to include only the period starting on September 30, 2006 through December 31, 2025.[7]

[7] I have also made one correction to the calculation of the Weighted Average Capital Raised Balance in Exhibit I.

## V. Transaction Costs of Mitigation Capital

I updated my calculation of the transaction costs of mitigation capital taking into account the Court's ruling dated August 30, 2006. As discussed above, only capital mitigating the breach related to LF & TC contracts leads to mitigation damages. Therefore, only the portion of the transaction costs related to the capital which mitigated LF & TC's supervisory capital is included in mitigation damages. The transaction costs attributed to mitigation capital for LF & TC are $0.900 million (see Exhibit J).

## VI. Lost Profits from Un-Mitigated Supervisory Capital

My approach to lost profits follows the approach I outlined in my February 2004 report. As a result of the Court's ruling dated August 30, 2006, I calculate lost profits damages on LF & TC's supervisory capital prior to its full mitigation. As I noted in my February 2004 report, leverage is valuable to thrifts. The lost profits from the un-mitigated LF & TC supervisory capital can be measured with the model developed by Dr. Horvitz which I have adopted.[8] My calculation of lost profits starts at the time of the breach (as does Dr. Horvitz's) and continues through February 1993 – the time when the LF & TC supervisory capital would have been fully-mitigated.

As before, I have made several adjustments to Dr. Horvitz' model to account for the capital raises that I have been asked to assume mitigated the breach. The first adjustment is to the amount of capital Sterling would have raised but-for the breach. The implication of a possible ruling by the Court that Sterling's capital raises subsequent to the breach were initiated to mitigate the breach would mean that the capital would not have been raised. However not all of the capital raised in 1991 and 1993 was needed to mitigate the loss of LF & TC's supervisory capital – clearly some of the capital was raised for other purposes. Capital raised for purposes other than to

[8] Updated Expert Report of Professor Paul Horvitz, December 11, 2006.

mitigate the breach would still have been raised but-for the breach. My lost profits calculation therefore includes capital raised in 1991 that was a substitute for Central Evergreen's supervisory capital. As Exhibit E, Table 3a shows, $5.678 million of the 1991 offering and conversion of Series B Preferred is a substitute for Central Evergreen's supervisory capital.

The second adjustment I made to Dr. Horvitz's model is that in light of the changed capital structure I reevaluated the leverage ratio of the but-for bank at the end of fiscal year 1992. I have made the same adjustment as in my February 2004 report. The final adjustment relates to dividend payments on the Series B Preferred Stock that was converted into common stock at the time of the 1991 offering. To the extent that the Series B Preferred Stock was not converted , Sterling would have continued to pay dividends on the portion that was not converted.

The updated lost profits damages resulting from the un-mitigated supervisory capital from LF & TC are $4.137 million (see Exhibit E).

## VII. Wounded Bank Damages

The wounded bank damages of $4.556 million have not changed since my February 2004 report (see Exhibit K).

## VIII. Summary - Total Mitigation Damages

Total damages are the sum of the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with issuing the mitigation capital related to LF & TC, lost profits on un-mitigated supervisory capital pertaining to LF & TC, and wounded bank damages. The total damages are $18.708 million (see Exhibit D).

**IX. Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles for Dr. Horvitz's Report**

I have also been asked to update the cost of replacement damages resulting from the inability to leverage the remaining supervisory capital pertaining to LF & TC from 2006 to 2025. I have performed this calculation, showing that the net cost of replicating the supervisory capital in the future is $0.641 million (see Exhibit L). Because Sterling's rating has improved since my February 2004 report, I have updated my estimate of the dividend yield on the preferred stock that could replicate the supervisory capital of LF & TC.[9] I have assumed a 6.30% dividend yield for the preferred stock as of September 29, 2006, which is the yield on a preferred stock index with rating Baa/BBB as of September 29, 2006.[10] I have also updated the cash benefit rate of capital and the discount rate to reflect the current yield on the 30-year U.S. Treasury bonds of 4.76%.[11]

[9] Fitch upgraded Sterling's Long Term Issuer Default Rating from BB+ to BBB- on 3/22/06. (Source: *Bloomberg*)
[10] Source: www.epreferreds.com.
[11] Source: *Bloomberg.*

I hold the opinions expressed herein to a reasonable degree of certainty, and declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. I reserve the right to modify my report and opinions in response to reports of the government's experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

Christopher M. James

Executed 12/11/06

# Exhibit G

## Sterling Savings Association

### Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

($ in Thousands)

| Date | Amortizing Capital Credit | Lewis Federal and Tri-Cities SGW & Intangibles | Lewis Federal and Tri-Cities Supervisory Intangibles | Assumed Mitigation Capital 1991 | Conversion of Preferred 1991 | 1993 | Total | Lewis Federal and Tri-Cities Supervisory Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h] | [i] | [j] |
| 12/31/1989 | 11,929 | 3,627 | 15,557 | | | | - | - | | |
| 12/31/1990 | 11,104 | 3,433 | 14,537 | | | | - | - | | |
| 11/21/1991 | 10,368 | 2,978 | 13,346 | 11,719 | 2,100 | | 13,819 | 7,568 | | |
| 12/31/1991 | 10,278 | 2,922 | 13,199 | 11,719 | 2,100 | | 13,819 | 7,568 | 829 | 703 |
| 12/31/1992 | 9,452 | 2,306 | 11,758 | 11,719 | 2,100 | | 13,819 | 7,568 | 7,568 | 6,418 |
| 2/28/1993 | 9,319 | 2,287 | 11,605 | 11,719 | 2,100 | 12,900 | 26,719 | 11,605 | | |
| 12/31/1993 | 8,626 | 2,184 | 10,811 | 11,719 | 2,100 | 12,900 | 26,719 | 10,811 | 10,601 | 9,768 |
| 12/31/1994 | 7,801 | 2,062 | 9,863 | 11,719 | 2,100 | 12,900 | 26,719 | 9,863 | 10,337 | 9,524 |
| 12/31/1995 | 6,975 | 1,940 | 8,915 | 11,719 | 2,100 | 12,900 | 26,719 | 8,915 | 9,389 | 8,651 |
| 12/31/1996 | 6,149 | 1,818 | 7,967 | 11,719 | 2,100 | 12,900 | 26,719 | 7,967 | 8,441 | 7,777 |
| 12/31/1997 | 5,323 | 1,696 | 7,019 | 11,719 | 2,100 | 12,900 | 26,719 | 7,019 | 7,493 | 6,904 |
| 12/31/1998 | 4,497 | 1,573 | 6,071 | 11,719 | 2,100 | 12,900 | 26,719 | 6,071 | 6,545 | 6,030 |
| 12/31/1999 | 3,672 | 1,451 | 5,123 | 11,719 | 2,100 | 12,900 | 26,719 | 5,123 | 5,597 | 5,157 |
| 12/31/2000 | 2,846 | 1,329 | 4,175 | 11,719 | 2,100 | 12,900 | 26,719 | 4,175 | 4,649 | 4,284 |
| 12/31/2001 | 2,020 | 1,207 | 3,227 | 11,719 | 2,100 | 12,900 | 26,719 | 3,227 | 3,701 | 3,410 |
| 12/31/2002 | 1,194 | 1,085 | 2,279 | 11,719 | 2,100 | 12,900 | 26,719 | 2,279 | 2,753 | 2,537 |
| 12/31/2003 | 955 | 1,019 | 1,974 | 11,719 | 2,100 | 12,900 | 26,719 | 1,974 | 2,127 | 1,960 |
| 12/31/2004 | 911 | 972 | 1,884 | 11,719 | 2,100 | 12,900 | 26,719 | 1,884 | 1,929 | 1,778 |
| 12/31/2005 | 868 | 926 | 1,794 | 11,719 | 2,100 | 12,900 | 26,719 | 1,794 | 1,839 | 1,694 |
| 9/30/2006 | 835 | 891 | 1,726 | 11,719 | 2,100 | 12,900 | 26,719 | 1,726 | 1,771 | 1,632 |
| 12/31/2006 | 824 | 879 | 1,703 | 11,719 | 2,100 | 12,900 | 26,719 | 1,703 | 1,748 | 1,611 |
| 12/31/2007 | 780 | 832 | 1,613 | 11,719 | 2,100 | 12,900 | 26,719 | 1,613 | 1,658 | 1,528 |
| 12/31/2008 | 736 | 786 | 1,522 | 11,719 | 2,100 | 12,900 | 26,719 | 1,522 | 1,567 | 1,444 |
| 12/31/2009 | 693 | 739 | 1,432 | 11,719 | 2,100 | 12,900 | 26,719 | 1,432 | 1,477 | 1,361 |
| 12/31/2010 | 649 | 692 | 1,341 | 11,719 | 2,100 | 12,900 | 26,719 | 1,341 | 1,387 | 1,278 |
| 12/31/2011 | 605 | 646 | 1,251 | 11,719 | 2,100 | 12,900 | 26,719 | 1,251 | 1,296 | 1,194 |
| 12/31/2012 | 561 | 599 | 1,161 | 11,719 | 2,100 | 12,900 | 26,719 | 1,161 | 1,206 | 1,111 |
| 12/31/2013 | 518 | 552 | 1,070 | 11,719 | 2,100 | 12,900 | 26,719 | 1,070 | 1,115 | 1,028 |
| 12/31/2014 | 474 | 506 | 980 | 11,719 | 2,100 | 12,900 | 26,719 | 980 | 1,025 | 944 |
| 12/31/2015 | 430 | 459 | 889 | 11,719 | 2,100 | 12,900 | 26,719 | 889 | 934 | 861 |
| 12/31/2016 | 386 | 412 | 799 | 11,719 | 2,100 | 12,900 | 26,719 | 799 | 844 | 778 |
| 12/31/2017 | 343 | 366 | 708 | 11,719 | 2,100 | 12,900 | 26,719 | 708 | 754 | 694 |
| 12/31/2018 | 299 | 319 | 618 | 11,719 | 2,100 | 12,900 | 26,719 | 618 | 663 | 611 |
| 12/31/2019 | 255 | 272 | 528 | 11,719 | 2,100 | 12,900 | 26,719 | 528 | 573 | 528 |

Updated December 11, 2006

# Expert Report of W. Barefoot Bankhead

*Sterling Savings Association, et al. v. United States of America*

Case No. 95-829 C

---

## I. Qualifications

1. My name is W. Barefoot Bankhead, and I am a Managing Director with Navigant Consulting, which provides professional services to its clients in various areas, including financial, accounting and economic analysis. I graduated from the University of Texas in December 1976 with a Bachelor of Business Administration degree and a major in accounting. I am a certified public accountant in the State of Texas. From 1977 through 1987, I worked in public accounting, the last several years of which were with a then "big eight" firm, primarily serving clients in the financial services and real estate industries.

2. In April 1987, I began a two-year accounting fellowship with the Federal Home Loan Bank Board, now the Office of Thrift Supervision, the primary regulatory body for the savings and loan industry. After my fellowship and prior to joining Navigant Consulting in August 1998, I worked for nine years in a variety of positions with financial institutions. During that time, I served as an audit director for one of the largest bank holding companies in the country and as chief financial officer and member of the board of directors for a savings bank. My current resume is provided as Exhibit A. My hourly billing rate is $468.

## II. Background

3. From November 1985 through December 31, 1988, Sterling Savings Association ("Sterling") acquired the assets and liabilities of three thrift institutions through a series of assisted acquisitions as reflected in Table 1.

**Table 1. Thrift Acquisitions by Sterling Savings Association**

| Date | Acquired Institution | Location |
|---|---|---|
| November 5, 1985 | Lewis Federal Savings and Loan Association | Chehalis, Washington |
| April 8, 1988 | Tri-Cities Savings and Loan Association | Kennewick, Washington |
| December 31, 1988 | Central Evergreen Savings and Loan Association | Chehalis, Washington |

Source:
Sterling Savings Association, Annual Report for the years ended June 30, 1986 (pp. 22-23), 1988 (pp. 30-31) and 1989 (pp. 31-32) [SG2005 2526-2527; 2459-2460; 2399-2400]

4. In conjunction with the Lewis Federal and Tri-Cities acquisitions, Sterling and the Government entered into agreements that, among other things, provided certain forbearances related to the accounting for the goodwill created in the acquisitions.[1] Sterling alleged that certain documents governing the Central Evergreen transaction provided a similar goodwill accounting forbearance.

5. The Financial Institutions Reform, Recovery and Enhancement Act ("FIRREA") was enacted on August 8, 1989. Capital regulations adopted as a result of FIRREA required, among other things, thrifts to deduct goodwill from regulatory capital.

[1] Forbearance letters from the Federal Home Loan Bank Board ("FHLBB") to Sterling dated November 12, 1985 and April 6, 1988 grant certain accounting forbearances in the Lewis Federal and Tri-Cities acquisitions, respectively.

6. On September 12, 2002, the Court of Federal Claims ("the Court") initially determined that various contractual documents associated with all three of Sterling's acquisitions gave it the right to include goodwill in regulatory capital and that the enforcement of the FIRREA capital regulations represented a breach of the Government's commitment under those contracts. In an effort to estimate the damages associated with those breaches, Sterling submitted expert reports authored by Dr. Paul Horvitz and Dr. Christopher James. Dr. Horvitz's report, which was dated February 20, 2004 ("the Horvitz 2004 Report"), calculated alleged lost profits that resulted from the breaches. Dr. James's report, which was also dated February 20, 2004, calculated alleged damages related to the hypothetical raising of mitigation capital as replacement for the goodwill.[2]

7. On August 30, 2006, the Court amended its previous ruling and determined that the enforcement of the FIRREA capital regulations did not result in a breach of the Central Evergreen contract as there was no forbearance related to the accounting for the Central Evergreen-related goodwill. Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz ("Horvitz 2006 Report") and Dr. James issued his Update to the Expert Report of Dr. Christopher James ("James 2006 Report") on December 11, 2006, to amend the plaintiffs' damages claim reflecting the Court's updated ruling.

8. The United States Department of Justice ("DOJ") has asked me to evaluate Dr. Horvitz's calculation of core capital in the Horvitz 2006 Report. Because Dr.

---

[2] Dr. Horvitz and Dr. James initially issued damages reports in 2001. However, during 2003, the Court issued an opinion related to the amortization of goodwill associated with certain Federal Savings and Loan Insurance Corporation ("FSLIC") assistance. The 2004 reports represent Dr. Horvitz's and Dr. James's efforts to amend their reports to reflect the impact of the Court's 2003 opinion related to the amortization of goodwill associated with FSLIC assistance.

James has adopted Dr. Horvitz's lost profits methodology, DOJ has also asked me to evaluate the lost profit calculations in the James 2006 report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiffs' experts.

**III. Summary of Opinions**

9. Based upon my review and analysis of the documents cited in Exhibit B and my relevant education and experience, I have formed the following opinions:

- Dr. Horvitz's calculation of but-for Sterling's core capital erroneously includes goodwill in excess of amounts permitted under the regulation governing the phase-out of goodwill. Correcting for this error eliminates any lost profits as calculated by Dr. Horvitz.

- Even calculating but-for Sterling's core capital by allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill, Dr. Horvitz's model produces no lost profits.

- Since Dr. James has adopted Dr. Horvitz's lost profits calculation during the period between the breach and the date of full mitigation, his analysis of lost profits suffers from the same flaws that I have identified with Dr. Horvitz's model. Once the error in Dr. James's core capital calculations is corrected, Dr. James's model produces no lost profits.

## IV. Dr. Horvitz's Failure to Correctly Calculate Core Capital in the But-For Bank

10. The FIRREA capital regulation established three capital requirements – tangible, core, and risk-based. Thrifts were required, among other things, to deduct all intangible assets, including goodwill, in the calculation of tangible capital; limit identified intangible assets included in core and risk-based capital; and phase out supervisory goodwill from core and risk-based capital over a five-year period ending December 31, 1994.[3] Through December 31, 1994, thrifts were not required to deduct qualifying supervisory goodwill in calculating core capital.[4] Qualifying supervisory goodwill was limited to 1.5 percent of assets (as defined in the regulation) through December 31, 1991, and the includable amount then declined as a percentage of assets until January 1, 1995, when all supervisory goodwill was required to be deducted in calculating core capital.

---

[3] 12 CFR 567.1(ee) defined supervisory goodwill as goodwill resulting from the acquisition, merger, consolidation, purchase of assets, or other business combination (if such transaction occurred on or before April 12, 1989) of (1) a savings association where the fair market value of assets was less than the fair market value of liabilities at the acquisition date; or (2) a problem institution.

[4] 12 CFR 567.1(w) defined qualifying supervisory goodwill as (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices less any amortization that would have occurred subsequent to April 12, 1989 through the current reporting period where the amortization is calculated on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for regulatory accounting practices; plus (2) the lesser of (i) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under generally accepted accounting principles ("GAAP"); or (ii)(A) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under GAAP; (B) plus any amortization of the goodwill in (ii)(A) that occurred subsequent to April 12, 1989 for GAAP reporting purposes; (C) minus the amortization of the goodwill in (ii)(A) through the current period that results when the goodwill is amortized subsequent to April 12, 1989 on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for GAAP reporting purposes.

11. Sterling's supervisory goodwill exceeded the amount that could be included as qualifying supervisory goodwill in core capital under the FIRREA capital regulation. Table 2 summarizes Dr. Horvitz's determination of Sterling's supervisory goodwill as of December 31, 1989.

**Table 2. Sterling's Supervisory Goodwill, December 31, 1989**

| Institution | Amount (000s) |
|---|---|
| Lewis Federal and Tri-Cities (determined to be contractual) | $15,557 |
| Central Evergreen (determined to be non-contractual) | 11,357 |
| Total Supervisory Goodwill | $26,914 |
| Qualifying Supervisory Goodwill (1.5% of but-for Sterling's assets) | $10,421 |

12. The Court has determined that the Government breached contracts allowing Sterling to include the Lewis Federal and Tri-Cities goodwill in regulatory capital. Consequently, in the but-for world constructed by Dr. Horvitz, Sterling can include all of the $15,557,000 of Lewis Federal and Tri-Cities supervisory goodwill in regulatory capital as of December 31, 1989.

13. In his 2006 Report, Dr. Horvitz assumes that Sterling's Lewis Federal and Tri-Cities contractual supervisory goodwill is exempt from the limitations on the amount of supervisory goodwill that qualifies for core capital. This assumption is inconsistent with his 2004 report. In the Horvitz 2004 Report, Dr. Horvitz included contractual supervisory goodwill in his calculation of qualifying supervisory goodwill for purposes of determining the amount of disallowed intangibles due to the breach. (See Horvitz 2004 Report, Exhibit 6, Table 4b.) As illustrated in Table 3 below, Dr. Horvitz's 2006 Report erroneously assumes that

an additional $10,421,000 of but-for Sterling's non-contractual supervisory goodwill was qualifying supervisory goodwill and includable in core capital.

**Table 3. Dr. Horvitz's Calculation of But-For Sterling's Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Contractual goodwill (Lewis Federal and Tri-Cities) | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen) | 10,421 |
| ***Other Adjustments*** | |
| Identified intangibles | 5,670 |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| **But-For Sterling's Core Capital** | **$28,786** |

14. But-for Sterling could consider all $15,557,000 of the Lewis Federal and Tri-Cities contractual supervisory goodwill as qualifying supervisory goodwill even though this amount exceeded the $10,421,000 of qualifying supervisory goodwill otherwise permissible under the FIRREA capital regulation. However, Dr. Horvitz has erroneously included $25,978,000, or 3.74 percent of but-for Sterling's assets, as qualifying supervisory goodwill even though the FIRREA capital regulation permits only 1.5 percent and the contractual supervisory goodwill totals only 2.24 percent.[5]

15. The FIRREA capital regulation does not distinguish between contractual and non-contractual supervisory goodwill. In addition, the regulation clearly limits the amount of supervisory goodwill that qualifies as core capital. It is

[5] See Exhibit C.

implausible to assume that but-for Sterling would have been permitted to include the non-contractual Central Evergreen supervisory goodwill as qualifying supervisory goodwill when the contractual supervisory goodwill already exceeded the 1.5 percent maximum amount of qualifying supervisory goodwill includable in core capital as of December 31, 1989. To illustrate the impact of Dr. Horvitz's error, I have recalculated but-for Sterling's core capital using the information contained in the Horvitz 2006 Report:

**Table 4. But-For Sterling's Adjusted Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[6] | 15,557 |
| ***Other Adjustments*** | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles [7] | 3,174 |
| **But-For Sterling's Core Capital** | **$15,869** |

16. Adjusting Dr. Horvitz's model for the one change to correct the calculation of qualifying supervisory goodwill includable in core capital as of

[6] Qualifying supervisory goodwill as calculated by Dr. Horvitz totals only $10,421. However, because of the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill for purposes of calculating regulatory capital.

[7] The FIRREA capital regulation permits certain identified intangibles to be included in core capital up to a limit of 25 percent of core capital (before inclusion of identified intangibles).

December 31, 1989, results in negative lost profits, thus eliminating Sterling's entire lost profits claim.[8]

17. As shown below in Table 5, the contractual supervisory goodwill included as qualifying supervisory goodwill as a result of the Court's decisions exceeds the amount permissible under the FIRREA regulation at all times through December 31, 1994. Consequently, but-for Sterling would have been required to deduct all non-contractual supervisory goodwill (*i.e.*, goodwill associated with the Central Evergreen transaction) when calculating core capital. However, by erroneously including non-contractual supervisory goodwill as qualifying supervisory goodwill, Dr. Horvitz's but-for Sterling includes supervisory goodwill from two to nearly three times the amount permitted by the FIRREA capital regulation through December 31, 1994.

**Table 5. But-For Sterling's Total Supervisory Goodwill**

| Year Ended | FIRREA Allowable % of Tangible Assets | Total But-For Contractual Goodwill | Total But-For Supervisory Goodwill |
|---|---|---|---|
| 12/31/1989 | 1.500% | 2.239% | 3.739% |
| 6/30/1990 | 1.500% | 2.194% | 3.694% |
| 6/30/1991 | 1.500% | 1.940% | 2.950% |
| 6/30/1992 | 1.000% | 1.750% | 2.461% |
| 6/30/1993 | 0.750% | 1.471% | 1.995% |
| 6/30/1994 | 0.375% | 0.826% | 1.075% |

Source: Exhibit C

[8] As a result of this correction, but-for Sterling's core capital would have been 2.21 percent, below the 3 percent core capital required by the FIRREA capital regulation, effective with the filing of the March 31, 1990 Thrift Financial Report.

18. Even if one were to assume that allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill would have been appropriate, which, based upon my experiences at the FHLBB and in the thrift industry, I do not believe to be a plausible assumption, Dr. Horvitz's model would still result in no lost profits damages. To illustrate, I have recalculated but-for Sterling's core capital under this proportional allocation methodology to determine the potential impact at December 31, 1989, as shown in Table 6.

**Table 6. But-For Sterling's Core Capital at December 31, 1989 (Proportional Allocation)**

| | **Amount (000s)** |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[9] | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen)[10] | 4,398 |
| ***Other Adjustments*** | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles[11] | 4,273 |
| **But-For Sterling's Core Capital** | **$21,366** |

[9] Qualifying supervisory goodwill under the FIRREA capital regulation totals $10,421. Sterling's total supervisory goodwill from both contractual and non-contractual acquisitions was $26,914 ($15,557 from Lewis Federal and Tri-Cities and $11,357 from Central Evergreen). Allocating the $10,421 qualifying supervisory goodwill proportionally between contractual and non-contractual results in $6,023 (57.8 percent) allocated to the Lewis Federal and Tri-Cities contractual supervisory goodwill. However, per the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill in calculating regulatory capital. Consequently, $15,557 of the Lewis and Tri-Cities contractual supervisory goodwill is considered to be qualifying supervisory goodwill for purposes of calculating core capital.

[10] Allocating the $10,421 qualifying supervisory goodwill proportionally results in $4,398 (42.2 percent) allocated to the Central Evergreen non-contractual supervisory goodwill.

[11] See Footnote 7.

19. I have adjusted Dr. Horvitz's model to reflect this lower level of core capital at December 31, 1989. After making this one change, the amount of lost profits generated under Dr. Horvitz's model is negative (*i.e.*, no lost profits).

## V. Dr. James's Adoption of Dr. Horvitz's Erroneous But-For Sterling Core Capital Calculations

20. DOJ has asked me to review certain portions of the James 2006 Report that purport to calculate lost profits during the period between the breach and the date of full mitigation (February 28, 1993). Dr. James effectively adopts Dr. Horvitz's lost profits model, thus Dr. James's analysis of lost profits in the James 2006 Report suffers from the same flaws that I have identified in the Horvitz 2006 Report. As I did with Dr. Horvitz's model, I have adjusted for the error in the calculation of qualifying supervisory goodwill and determined that Dr. James's model, like Dr. Horvitz's model, results in no lost profits.

21. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work is ongoing.

February 15, 2007

W. Barefoot Bankhead

W. Barefoot Bankhead

CERTIFICATE OF FILING

I hereby certify that on February 26, 2007, a copy of foregoing "APPENDIX TO DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES - VOL. II" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford