**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**

Pursuant to Rule 56(d)(2) of the Rules of this Court, defendant, the United States, submits the following proposed findings of uncontroverted fact upon which defendant bases its accompanying motion for summary judgment regarding damages ("Motion") and as to which there is no genuine dispute.

1. Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. Id. This case arises out of Sterling's acquisition of three failing savings and loan institutions in the 1980s: Lewis Federal Savings & Loan Association ("Lewis Federal"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen").

2. In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). App. 1.

Sterling did not invest any of its own money. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration. App. 15-22.

3. In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Federal Home Loan Bank Board ("FHLBB"), pursuant to Resolution No. 88-250, approved the acquisition, authorized an Assistance Agreement and authorized and directed that a forbearance letter be sent to Sterling. App. 593-96. The Assistance Agreement required a FSLIC cash contribution of $11,730,128.00, and, as was the case with the Lewis Federal acquisition, Sterling did not invest any of its own money. App. 24.

4. In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and no cash assistance was provided by FSLIC. App. 25-32.

5. Each of Sterling's acquisitions was accomplished in furtherance of its strategy to grow its asset base by acquiring other thrifts, rather than opening its own branches, and Sterling viewed its execution of this strategy as successful. In a Securities and Exchange Commission filing submitted in 1989, subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits. . . . Through consolidation, the Association has reduced the cost of

> performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to [Sterling.]

App. 34.

6. The fifteen branches acquired by Sterling through the acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen are an integral part of Sterling's branch network; at the time of the alleged breach, the deposit base from the acquired branches represented approximately 57 percent of Sterling's deposit base. App. 407. Through 1994, the deposits in the acquired branches represented over 50 percent of Sterling's deposits, and, as recently as 2001, deposits in the acquired branches accounted for twenty percent of the deposit base. App. 407-08. Further, subsequent to the alleged breach, Sterling earned over $50 million in income from the acquired branches. App. 409.

7. On August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA established new capital requirements. In particular, FIRREA, and the regulations promulgated to implement it, required thrifts to comply with three separate regulatory capital standards: a leverage (or "core capital") standard, a tangible capital standard, and a risk-based capital standard. 12 U.S.C. §1464(t) (1989); 12 C.F.R. §§ 567.1, 567.2, 567.5 (1990); 54 Fed. reg. 49,411 (Nov. 30, 1989). "Qualifying supervisory goodwill" was to be phased-out gradually between 1990 and 1995. 12 U.S.C. §1464(t); 12 C.F.R. §563.13. In the intervening years, eligible savings associations were permitted to include qualifying supervisory goodwill to satisfy core and risk-based capital standards established under FIRREA. Id.

8. As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. App. 37.

9. Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. App. 5. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. App. 37. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. App. 37-38.

10. In April 1990, OTS approved Sterling's capital restoration plan on the condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. App. 753. On May 10, 1990, Sterling declined to execute the operating agreement. App. 754.

11. On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards, refused to consent to the operating agreement, and did not propose an acceptable remedy for its capital deficiency, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound operation, pursuant to 12 C.F.R. § 567.10(a)(4). App. 45.

12. In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. In its

opinion granting the preliminary injunction, the court severely restricted OTS's and FDIC's authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash. 1990). OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83.

13. Upon issuance of the injunction, OTS complied with its terms, and expressly conveyed to Sterling that the agency intended to "strictly obey" the district court's order prohibiting it from enforcing any restrictions contrary to the agreements Sterling entered into in connection with its acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. App. 46, 48-49. Further, during the pendency of the injunction, which ultimately was dissolved in 1992, Sterling never needed to initiate an action to compel enforcement of the injunction or complain of Government noncompliance with the injunction. Indeed, Sterling's internal audit department, in a memorandum dated September 20, 1991, referred to restrictions imposed prior to the issuance of the injunction as "OTS operational concerns stayed by preliminary injunction." App. 750. Moreover, in exam reports issued during the pendency of the injunction, examiners expressly acknowledged that OTS was enjoined from enforcing FIRREA’s capital requirements. App. 59, 71, 144.

14. In November 1991, Sterling raised approximately $21 million through a public offering of common stock. App. 329. The public offering brought Sterling into compliance with all of the minimum capital ratios required by FIRREA. Id. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

App. 209.

15. In addition, Sterling's 1992 Annual Report indicated that completion of the equity offering brought Sterling into compliance with the capital standards imposed by FIRREA:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. <u>We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements</u>. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. <u>Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest</u>.

App. 329 (emphasis added).

16. According to Harold Gilkey, Sterling's Chief Executive Officer, the 1991 capital raising would not have occurred if Sterling had already been in capital compliance at the time, because Sterling would have had substantial excess capital. App. 373.

17. On April 14, 1992l, the Ninth Circuit Court of Appeals reversed the district court decision. <u>Sterling Savings Assoc. v. Ryan</u>, 959 F.2d 241 (9th Cir. 1992). The Ninth Circuit, relying upon <u>Far West Federal Bank v. OTS</u>, concluded that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." <u>Sterling</u>, 959 F.2d at 241. On that basis, the Ninth Circuit vacated and remanded the district court's judgment to the district court. <u>Id.</u> By the time the

Ninth Circuit issued its decision, however, Sterling had already completed its public offering and achieved compliance with all of FIRREA's capital requirements.

18. In 1993, Sterling's holding company, Sterling Financial Corporation, raised approximately $17 million through a preferred stock offering, and downstreamed approximately $12 million to Sterling. In the prospectus, Sterling Financial Corporation noted increased capital requirements would be phased-in as of December 31, 1994. App. 603. As of September 30, 1992 (prior to the offering), however, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." Id. at 606. Further, it was anticipated that Sterling would continue to meet all regulatory requirements in the future, although "there can be no assurance in this regard." Id. at 603.

19. With respect to the Central Evergreen acquisition, the Government did not breach a contract with Sterling because the risk of regulatory change had been contractually allocated to Sterling. Sterling Savings v. United States, 72 Fed. Cl. 404 (2006).

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH HOLT

February 26, 2007

CERTIFICATE OF FILING

I hereby certify that on February 26, 2007, a copy of foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford