IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

---

**APPENDIX TO**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE GOVERNMENT'S UNDISCLOSED WITNESSES**

---

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

March 2, 2007

**APPENDIX TO**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE GOVERNMENT'S UNDISCLOSED WITNESSES**

**TABLE OF CONTENTS**

Procedural Order No. 2: Discovery Plan, August 11, 1997 . . . . . . 1

Defendant's Initial Disclosure Pursuant to Paragraph IV(A)(1) of the Discovery Plan, September 20, 1999 . . . . . . . . 11

Defendant's Identification of Experts, October 10, 2001 . . . . . . 20

Order, February 26, 2002 . . . . . . . . . 24

Order, July 23, 2002 . . . . . . . . . . 25

Order, October 1, 2002 . . . . . . . . . 26

Order, December 17, 2003 . . . . . . . . . 27

Defendant's Identification of Expert, February 9, 2004. . . . . . . 29

Scheduling Order, September 27, 2006 . . . . . . . 31

Transcript of Hearing, September 14, 2006 . . . . . . . 33

Defendant's Amended Response to Sterling's First Set of Interrogatories, December 5, 2006 . . . . . . . . . 53

Expert Report of W. Barefoot Bankhead, February 15, 2007 . . . . 57

Supplemental Expert Report of Joe A. Hargett, February 15, 2007 . . . . 75

Supplemental Expert Report of William G. Hamm, Ph.D., February 15, 2007 . . 88

Excerpts of Deposition of Joe Hargett, October 16, 2002 . . . . . 156

Excerpts of Deposition of William G. Hamm, Ph.D., November 5, 2002 . . . 166

Defendant's Proposed Pre-Trial Schedule, September 25, 2006 . . . . 171

Sterling's First Set of Interrogatories Propounded to Defendant, June 1, 2000 . . 178

Defendant's Responses and Objections to Sterling's First Set of Interrogatories, July 20, 2000 . . . . . . . . . . 180

# In the United States Court of Federal Claims

(Filed: August 7, 1997)

11

RECEIVED
AUG 12 1997
WITHERSPOON, KELLEY, DAVENPORT & TOOLE

| | |
|---|---|
| PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT, Plaintiffs, v. THE UNITED STATES, Defendant. | No. 90-8 C, et al. |

## PROCEDURAL ORDER NO. 2: DISCOVERY PLAN

Pursuant to Rules 1, 16, 77 and 77.1 of the Rules of the United States Court of Federal Claims, and to the Omnibus Case Management Order entered by the Court on September 18, 1996, ("Case Management Order" or "CMO"), the Court ORDERS as follows:

I. SCOPE OF THIS ORDER AND GENERAL PROVISIONS

A. This Discovery Plan governs discovery in all *Winstar*-related cases before the court except for (a) the *Glendale* and *Statesman* cases, and (b) the Priority Cases identified in Appendix D to the CMO. In the event that a case is removed from the list of Priority Cases it shall thereafter be subject to the terms of this Order.

B. The Discovery Plan is subject to the CMO, Procedural Order Number One ("Procedural Order No. 1"), the Master Order Concerning De Bene Esse Depositions, the Master Protective Order ("MPO"), and other procedural orders of the Managing Judge. The Rules of the Court of Federal

APPENDIX 1

Claims ("RCFC") govern discovery, except where in conflict with the CMO, Procedural Order No. 1, the MPO, or this Discovery Plan.

C. No provision of the Discovery Plan shall be construed to permit any party any discovery not otherwise permitted by the CMO, Procedural Order No. 1, the MPO, other Orders of this Court, or the RCFC.

D. Except insofar as this plan expressly states that the parties may agree to modification of time limits, the parties may not stipulate to an extension or increase of any Discovery Plan deadline or limitation without approval of the Court.

II. DISCOVERY CONVENTIONS

The following conventions apply to all discovery, including the common discovery procedures set forth in Section III. Production of "Common Documents" shall be governed by the provisions of Paragraph II.B.2. of Procedural Order No. 1.

A. Conventions for Production of Documents

1. Document production shall take place in Washington, D.C. or where the documents are maintained in the ordinary course of business, at the option of the producing party. The parties shall confer prior to a document production to establish dates and procedures for selection, review, and duplication of documents. Where the documents subject to a production are indexed, the producing party may require the requesting party to select groups or boxes of documents for production and review using the most current available indices prior to the commencement of the production.

2. Document production pursuant to a document request shall commence within 30 days of receipt of such document request and be completed within 60 days of receipt of such

document request, absent agreement of the parties to extend the deadline for such production, with such agreement to extend not to be unreasonably withheld.

3. Within thirty days of the deadline for production of documents, the producing party shall provide the requesting party with a privilege log specifically identifying any documents that the producing party did not produce pursuant to an assertion of privilege, and the nature of the privilege claimed. Identification of privileged documents that were produced in accordance with the CMO, shall continue to be subject to the provisions of the MPO. A party need not produce or identify in the privilege log (a) any document prepared pursuant to the attorney-client or work-product privileges prepared in connection with the present litigation, excluding expert reports, which shall be produced in accordance with the provisions of Section V, or (b) any document prepared pursuant to the attorney-client or work-product privileges developed or generated in the context of an enforcement proceeding or investigation, including criminal investigations.

B. Conventions for Depositions

1. Absent agreement between the parties participating in a deposition and the deponent, a deposition shall take place within 75 miles of the deponent's residence or place of employment and ordinarily shall be conducted between 9:00 am. and 5:30 p.m. on successive weekdays, excluding holidays. Depositions may be attended only by a court reporter and persons authorized under the MPO to have access to confidential information absent agreement between the parties.

2. The deponent may be questioned by no more than one attorney for the defendant and one attorney for each plaintiff at a time. An objection by one counsel for a plaintiff shall be deemed an objection by all plaintiffs' counsel who are present at a deposition.

3. Where a deposition is recorded by videotape, the appearance or demeanor of attorneys and the deponent shall not be distorted through camera or sound-recording techniques. To the extent practicable, a videotaped deposition will be conducted in a neutral setting against a solid background, with only such lighting as is required for accurate video recording. Camera angle, lens setting, and field of view will be changed only as necessary to record the natural body movements of the deponent or to portray exhibits and materials used during the deposition. No part of a videotaped deposition shall be released or made available to any member of the press or general public unless authorized by the Court.

4. Where a party intends to examine a non-party witness pursuant to a subpoena duces tecum, the parties shall use their best efforts to arrange for inspection and/or copying of the documents at least one week before the scheduled deposition.

5. The deponent shall execute the original deposition transcript within 30 days after receiving it from the court reporter. The court reporter shall distribute an errata sheet to counsel for the noticing party and to all counsel who requested copies of the deposition transcript. If a deponent fails to execute the deposition transcript within thirty days of receipt, the parties may use the deposition transcript as if it had been executed. The parties may use a certified copy of a deposition transcript in lieu of the original for all purposes.

C. Other Conventions

When serving a discovery request or response, a party shall also provide a copy of the request or response, excluding any produced documents, in an electronic form suitable to the parties.

III. COMMON DISCOVERY

A. General Provisions

1. Common discovery from the Government is limited to the discovery of information and production of documents that are not solely specific to any case or institution. Defendant has no obligation to respond to common discovery requests which seek only case-specific information, and Defendant shall not withhold documents or information directly relevant to common discovery merely because such documents or information also reference specific institutions or specific transactions.

2. Case-specific discovery in individual *Winstar* cases may not duplicate discovery already provided by defendant to Plaintiffs Coordinating Committee ("Plaintiffs Committee") in connection with common discovery under Procedural Order No. 1 and this Discovery Plan.

3. The Plaintiffs Committee is responsible for preparing common discovery interrogatories and a list of individuals or organizations for common discovery depositions as provided in this Discovery Plan. The Plaintiffs Committee is responsible for serving defendant with common discovery requests and ensuring that all common discovery material produced by defendant is available to all *Winstar* plaintiffs.

4. Any disputes concerning discovery referenced in Section III.A., including disputes over whether a request calls for only case-specific information, shall be raised, in the first instance, with the Coordinating Committees and the FDIC. The Coordinating Committees and the FDIC will attempt to resolve any disputes. If they are unable to reach agreement, either Coordinating Committee or the FDIC may file a motion with the Discovery Judge.

B. <u>Common Discovery Interrogatories and Requests for Admissions</u>

The Plaintiffs Committee shall prepare common discovery interrogatories. The Plaintiffs Committee shall serve the common discovery interrogatories on or after September 8, 1997, and

defendant shall serve its responses on the Plaintiffs Committee and the FDIC within 45 days thereafter.

C. Common Discovery Depositions

1. The Plaintiffs Committee shall submit a list to identify individuals or organizations that it will depose for purposes of common discovery. The list may not include damages expert witnesses for the defendant except for, and only to the extent they are, fact witnesses. The Plaintiffs Committee shall serve defendant with its initial list of these individuals and organizations on or after September 8, 1997. For depositions of organizations pursuant to RCFC 30(b)(6), the Plaintiffs Committee also shall inform defendant of the topics on which examination is required.

2. Defendant shall submit a list to identify individuals that it will depose for purposes of common discovery. The list may not include damage witnesses for a plaintiff except for, and only to the extent they are, fact witnesses. Defendant shall serve the Plaintiffs Committee with its initial list of these individuals on or after September 8, 1997.

3. The Coordinating Committees shall attempt to agree on a schedule for all common discovery depositions, including an estimated length of time for each deposition. If the Coordinating Committees are unable to agree, notice of a common discovery deposition and an estimated length of time for that deposition must be served on the opposing party at least 14 days prior to the date of the deposition.

4. At least 7 days prior to the commencement of a common discovery deposition, the Plaintiffs Committee shall identify no more than three attorneys who shall conduct the initial questioning on behalf of all plaintiffs. Additional plaintiffs' counsel, including the FDIC, may question a deponent only after completion of the examination by counsel designated by the Plaintiffs

Committee and may not repeat any questions posed previously in that deposition except to the limited extent required to establish a predicate or framework for examination on a new topic or for more detailed examination of topics previously covered.

IV. CASE-SPECIFIC DISCOVERY IN INDIVIDUAL WINSTAR CASES

A. Initial Disclosures

1. Within 30 days after the commencement of Phase II case-specific discovery in a case, a party shall, without awaiting a discovery request, provide to the other parties, to the extent known, the name and title of any current or former employee, agent, or representative of a party likely to have discoverable information relevant to the allegations in the Complaint, and any Cross-Claim or Counterclaim, identifying the subject of the information.

2. The plaintiffs, including the FDIC, participating in each wave of discovery shall form a Plaintiffs Discovery Committee to attempt, to the extent practicable, to coordinate discovery from third parties and depositions of fact witnesses.

B. Requests For Production of Documents

1. Parties may submit case-specific requests for production of documents at any time after commencement of Phase II case-specific discovery in a case. Such document production requests shall be governed by the provisions of this Order, Procedural Order No. 1 and the MPO.

C. Interrogatories, Requests for Admissions and Depositions

1. In addition to the common discovery and case-specific document discovery discussed above, a party in an individual case may submit case-specific interrogatories and requests for admissions, and take case-specific depositions. Such interrogatories and requests for admission

may not be submitted, and such depositions may not be taken, until 90 days after commencement of Phase II case-specific discovery in a case.

2. A party shall respond to interrogatories and requests for admissions within 45 days of service.

3. Where a plaintiff seeks to depose an individual or organization already deposed during common discovery, the deposition will be focused on case-specific topics. The parties shall attempt to agree on a schedule for all case-specific depositions, including an estimated length of time for each deposition. If the parties are unable to agree, notice of a deposition and an estimated length of time for that deposition must be served on a party at least 14 days prior to the date of the deposition.

4. Disputes over scheduling the deposition of a witness for case-specific discovery shall be resolved by the Discovery Judge.

V. EXPERT WITNESSES

A. Discovery of Plaintiffs' Expert Witnesses

1. Thirty days after Phase II case-specific discovery is completed in a case under the provisions of Procedural Order No. 1, each plaintiff shall provide defendant with the identity of each witness that plaintiff intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, each plaintiff shall deliver to defendant a final written report prepared and signed by each witness identified pursuant to Paragraph V.A.1. within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, defendant shall depose each of plaintiff's expert witnesses within 90 days after receiving the expert's final written report. Each plaintiff shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of that plaintiff.

B. Discovery of Defendant's Expert Witnesses

1. Thirty days after defendant receives a plaintiffs' expert reports pursuant to Paragraph V.A.2. defendant shall provide such plaintiff with the identity of each witness whom defendant intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, defendant shall deliver to each plaintiff a final written report prepared and signed by each witness identified pursuant to Paragraph V.B.1. within

90 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, a plaintiff shall depose defendant's expert witnesses within 60 days after receiving the experts' final report. The defendant shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If defendant fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of defendant.

VI. DISCOVERY DISPUTES

A. All discovery motions shall hereafter be filed with and resolved by the Discovery Judge, unless otherwise directed by the Managing Judge, Issue Judge or the Motion Judge.

B. In the event that a discovery dispute (a) appears to raise generic issues that may be relevant to a significant number of *Winstar*-related cases, or (b) raises concerns regarding a risk of substantial and burdensome duplication of discovery among different cases, the parties shall bring (or the Discovery Judge may refer) the dispute to the attention of the Coordinating Committees and the FDIC to consider whether the dispute should be subject to "common issue" treatment.

Loren A. Smith

LOREN A. SMITH
CHIEF JUDGE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Chief Judge Smith) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

RECEIVED
SEP 27 1999
WITHERSPOON, KELLEY DAVENPORT, TOOLE, P.S.

DEFENDANT'S INITIAL DISCLOSURE PURSUANT TO PARAGRAPH IV(A)(1) OF THE DISCOVERY PLAN

Defendant, the United States (the "Government"), provides, pursuant to Paragraph IV(a)(1) of the Court's Procedural Order No. 2: Discovery Plan (filed August 7, 1997), the following initial disclosure to plaintiffs Sterling Savings Association and Sterling Financial Corporation ("plaintiff").

INTRODUCTION AND RESERVATION OF RIGHTS

This initial disclosure sets forth, to the extent known, the names and titles of current or former employees, agents, or representatives likely to have discoverable information relevant to the allegations in plaintiff's complaint. This list is based upon the limited information currently available to us. More information may become known to us in the future. We reserve the

right to supplement or modify this list, such as by adding or deleting individuals, or by amending the scope or subject of the individuals' likely areas of knowledge. We also reserve the right to assert privileges, if necessary, with respect to any information known to, or documents held by, these individuals.

**EX PARTE CONTACT WITH FORMER EMPLOYEES IS PROHIBITED**

Please take notice that plaintiff is prohibited by Court order from ex parte contact with any former employee, officer or agent of the Office of Thrift Supervision ("OTS"), the Federal Home Loan Bank Board (including, but not limited to, the Federal Home Loan Bank of Seattle) ("FHLBB" and "FHLB-Seattle") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). Order, Plaintiffs in All Winstar-Related Cases at the Court, Nos. 90-8, et al., (filed Feb. 20, 1998).

That Order specifically denied a request made on behalf of all private plaintiffs in the Winstar-related cases for permission to interview, outside the presence of Government counsel, former employees of the FHLBB (including the FSLIC) and expressly limited contact by any plaintiff with such employees to formal depositions or informal interviews approved by Government

counsel. Id., citing 12 C.F.R. § 510.5 (1997).[1]

Please further take notice that plaintiff also is prohibited by law from ex parte contact with any former officer, employee or agent of the Federal Deposit Insurance Corporation ("FDIC"). 12 C.F.R. Part 309 (1999).

EX PARTE CONTACT WITH CURRENT EMPLOYEES IS PROHIBITED

Please also take notice that plaintiff is barred from ex parte contact concerning this action with any current OTS or FDIC employee, officer, or agent because, as such, they are represented by Government counsel in connection with this action.

| NAME AND TITLE (IF KNOWN) | AFFILIATION | SUBJECT(S) OF TESTIMONY |
|---|---|---|
| Ann M. Barnes<br>Special Representative | FSLIC | Tri-Cities Transaction ("Tri-Cities") |
| Patricia McJoynt<br>Assistant Director of Supervision | FHLB - Seattle | Tri-Cities |
| Susan M. Swenson<br>Designee of Executive Director | FSLIC | Tri-Cities |

[1] See Mot. by Pltfs' Coordinating Committee for Order Permitting Informal Interviews of Former FHLBB and OTS Employees at 3 (seeking informal interviews to determine "who might have been responsible for actions taken under the auspices of the FHLBB or FSLIC") (filed on or about Dec. 31, 1997).

| | | |
|---|---|---|
| Walter H. Hodgen<br>Supervisory Agent and Examiner | FHLB - Seattle | Tri-Cities and post-acquisitions examinations |
| Linda Plye<br>Assistant Director | FHLBB - Office of Regulatory Activities | Tri-Cities |
| Darrel Dochow<br>Director | FHLBB - Office of Regulatory Activities; OTS - Seattle District | Tri-Cities and post-acquisitions examinations |
| John Crosley<br>Financial Analyst | OTS - West Region | Sterling Savings regulator |
| Leo Clarke<br>General Counsel | FHLB – Seattle | Tri-Cities |
| M. Danny Wall<br>Chairman | FHLBB | Tri-Cities<br>Central Evergreen Transaction ("Central Evergreen") |
| Roger Martin<br>Board Member | FHLBB | Tri-Cities<br>Central Evergreen |
| Lawrence White<br>Board Member | FHLBB | Tri-Cities<br>Central Evergreen |
| J. Richard Earle<br>Mergers and Acquisitions Division | FSLIC | Tri-Cities |
| Herb Held<br>Mergers and Acquisitions Division | FSLIC | Tri-Cities |
| Stuart Root<br>Executive Director | FSLIC | Tri-Cities<br>Central Evergreen |
| Joe Blalock<br>Analysis and Evaluation Division | FHLBB | Tri-Cities |

| | | |
|---|---|---|
| Ronald Sommers<br>Section Chief | FHLBB | Tri-Cities |
| Debbie Skoler<br>Office of Regulatory Activities | FHLBB | Tri-Cities |
| Steven Davidson<br>Regional Director | FSLIC | Tri-Cities |
| Alan R. Nilsen<br>Supervisory Analyst | FHLB - Seattle | Tri-Cities |
| Ed Hedlund<br>Senior Supervisory Agent | FHLB - Seattle | Central Evergreen |
| Carol Gamble<br>Senior Supervisory Analyst | FHLB - Seattle | Central Evergreen |
| Bernard McKee<br>Regional Director | FSLIC | Lewis Transaction ("Lewis") |
| Craig Nolte<br>Supervisory Analyst | FHLB - Seattle | Central Evergreen |
| Elaine A. Laye<br>Staff Attorney | FHLBB Office of General Counsel | Central Evergreen |
| J. Amanda Machen<br>Assistant Deputy Director | FHLBB - Corporate and Securities Division | Central Evergreen |
| J. Mark Rundle<br>Assistant Director for Regional Operations | FHLBB<br>OES | Lewis |
| Pat Goings<br>Office of Regulatory Activities | FHLBB | Central Evergreen |
| James R. Faulstich<br>Principal Supervisory Agent | FHLB - Seattle | Central Evergreen<br>Lewis |

| | | |
|---|---|---|
| Penny Marshall<br>Senior Supervisory Agent | FHLB - Seattle | Central Evergreen |
| Ronald C. Mims<br>Field Manager, Examinations | FHLB - Seattle | Central Evergreen |
| Hilton S. Hewitt<br>Senior Supervisory Agent | FHLB - Seattle | Central Evergreen<br>Lewis |
| Robert M. Schmid<br>Special Representative | FSLIC | Lewis |
| Charles Galindo<br>District Director - Examinations | FHLB - Seattle | Lewis |
| William J. Schilling<br>Director | FHLBB | Lewis |
| Peter O. Stearns<br>Director | FSLIC | Lewis |
| Kathie Dando<br>Analyst | FHLB - Seattle and OTS - Seattle District | Lewis and post-acquisitions examinations |
| Francis M. Passarelli<br>Acting Director | FHLBB - OES | Lewis |
| Edwin G. Gray<br>Chairman | FHLBB | Lewis |
| Donald I. Hovde | FHLBB | Lewis |
| Mary A. Grigsby | FHLBB | Lewis |
| Carol A. Friend<br>Assistant Director, Industry Supervision | OTS - West Region | Sterling Savings regulator |
| John W. Potthast | OTS - West Region | Sterling Savings examiner |

| | | |
|---|---|---|
| Steve Shroba | OTS - West Region | Sterling Savings Examiner |
| Bruce I. Hickok | OTS - West Region | Sterling Savings examiner |
| Jeff Crump | OTS - West Region | Sterling Savings examiner |
| Stephen J. Scott | OTS - West Region | Sterling Savings examiner |
| John E. Morris | OTS - West Region | Sterling Savings examiner |
| Karl Brunner | OTS - West Region | Sterling Savings examiner |
| Richard Renken | OTS - West Region | Sterling Savings examiner |
| Scott Bradley | OTS - West Region | Sterling Savings examiner |
| Patricia Stimac | OTS - West Region | Sterling Savings examiner |
| Dwight Haskins | OTS - West Region | Sterling Savings examiner |
| Lenny G. Thilberg | FHLB - Seattle | Sterling Savings examiner |
| Donald Baird | FHLB - Seattle | Sterling Savings examiner |

DAVID W. OGDEN
Acting Assistant Attorney General

DAVID M. COHEN
Director

Mark A. Melnick / by [signature]

MARK A. MELNICK
Assistant Director

Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300

Attorneys for Defendant

September 20, 1999

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on September 22, 1999, I caused to be served by hand delivery a copy of "DEFENDANT'S INITIAL DISCLOSURE" addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Toole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel: (509) 624-5265

Victoria [signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | |
| **Plaintiffs,** | |
| **v.** | **No. 95-829C** |
| | **(Senior Judge Smith)** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**DEFENDANT'S IDENTIFICATION OF EXPERTS**

Pursuant to paragraph V.B.1. of Procedural Order No. 2: Discovery Plan, defendant, the United States, hereby identifies the following witnesses we intend to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence:

1. Dr. William G. Hamm
   Managing Director
   LECG, Inc.
   2000 Powell Street, Suite 600
   Emeryville, CA 94608

   (a) A copy of Dr. Hamm's curriculum vitae is attached hereto at Tab A.

   (b) A list of publications authored by Dr. Hamm in the last ten years is included in his curriculum vitae at Tab A.

   (c) The compensation to be paid Dr. Hamm for his work on this case is $400 per hour.

   (d) A list of other cases in which Dr. Hamm has testified at trial or by deposition, declaration or affidavit within the preceding four years is included in his curriculum vitae at Tab A.

2. Dr. Mukesh Bajaj
Managing Director
LECG, Inc.
2000 Powell Street, Suite 600
Emeryville, CA 94608

(a) A copy of Dr. Bajaj's curriculum vitae is attached hereto at Tab B.

(b) A list of publications authored by Dr. Bajaj in the last ten years is included in his curriculum vitae at Tab B.

(c) The compensation to be paid Dr. Bajaj for his work on this case is $400 per hour.

(d) A list of other cases in which Dr. Bajaj has testified at trial or by deposition, declaration or affidavit within the preceding four years is included in his curriculum vitae at Tab B.

3. Joe A. Hargett, CPA
Director
Peterson Consulting, Inc.
1801 K Street, N.W.
Washington, D.C. 20006

(a) A copy of Mr. Hargett's curriculum vitae is attached hereto at Tab C.

(b) A publication list authored by Mr. Hargett in the last ten years is included in his curriculum vitae at Tab C.

(c) The compensation to be paid Mr. Hargett for his work on this case is $325 per hour.

(d) A list of other cases in which Mr. Hargett has testified at trial or by deposition, declaration or affidavit within the preceding four years is included in his curriculum vitae at Tab C.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L St.
Washington, D.C. 20530
Tele: (202) 514-7300

Of counsel:
JANE M. E. PETERSON
COLLEEN CONRY
Trial Attorneys

October 10, 2001

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on this 10th day of October, 2001, I caused to be served by first-class mail, postage prepaid, copies of "DEFENDANT'S IDENTIFICATION OF EXPERTS" addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

# In the United States Court of Federal Claims

No. 95-829 C
(Filed: February 26, 2002)

RECEIVED
MAR 04 2002
WITHERSPOON, KELLEY DAVENPORT TOOLE

| | |
|---|---|
| **STERLING SAVINGS, ET AL.,** | * |
| Plaintiffs, | * |
| v. | * |
| **THE UNITED STATES,** | * |
| Defendant. | * |

## ORDER

Pursuant to today's status conference, the Court ORDERS that:

(1) The Plaintiffs' motion for leave to file its motion to strike the declaration of Joe A. Hargett and its surreply regarding the permanency and non-amortization of the FSLIC assistance, filed on February 27, 2001, is GRANTED. The Clerk of the Court is directed to file the motion and all subsequent briefing on the motion. The Clerk of the Court is likewise directed to file the Defendant's motion for enlargement of time, received on March 2, 2001, and the Plaintiffs' motion for enlargement of time, received on April 13, 2001. For administrative purposes, both of these motions shall be deemed to be GRANTED.

(2) All outstanding fact and expert discovery shall be completed no later than July 22, 2002.

(3) The parties shall file a joint status report no later than July 29, 2002. The status report shall inform the Court of the remaining issues that need to be addressed as well as the parties' recommendations for conduct of further proceedings in this case.

Edward J. Damich
EDWARD J. DAMICH
Judge

7/23/02

RECEIVED
JUL 29 2002
WITHERSPOON, KELLEY, DAVENPORT, TOOLE, P.S.

# In the United States Court of Federal Claims

No. 95-829 C

(Filed: July 23, 2002)

| | |
|---|---|
| STERLING SAVINGS, ET AL., | * |
| Plaintiffs, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

## ORDER

On July 19, 2002, the parties filed a joint motion for enlargement of time to complete expert discovery and to file a status report in this case. Cause having been established, the parties' motion is GRANTED. Expert discovery shall be concluded no later than September 20, 2002, and the parties shall file a joint status report no later than September 27, 2002.

Edward J. Damich
EDWARD J. DAMICH
Chief Judge

# In the United States Court of Federal Claims

No. 95-829 C

(Filed: October 1, 2002)

*************************************

| | |
|---|---|
| | * |
| **STERLING SAVINGS, ET AL.,** | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| Defendant. | * |
| | * |

*************************************

## ORDER

On September 11, 2002, the parties filed a joint motion for enlargement of time to complete expert discovery and to file a status report in this case. Cause having been established, the parties' motion is GRANTED. Expert discovery shall be concluded no later than November 8, 2002, and the parties shall file a joint status report no later than November 22, 2002.

Edward J. Damich

EDWARD J. DAMICH
Chief Judge

12/17/03

# In the United States Court of Federal Claims

No. 95-829C
(Filed December 17, 2003)

* * * * * * * * * * * * * * * * * * * * *

STERLING SAVINGS, ET AL., *

Plaintiffs, *

v. *

THE UNITED STATES, *

Defendant. *

* * * * * * * * * * * * * * * * * * * * *

FILED
DEC 17 2003
U.S. COURT OF FEDERAL CLAIMS

## ORDER

The Court has reviewed the briefs submitted by the parties relating to plaintiffs' request to amend the expert reports of Dr. Chris James and Dr. Paul Horvitz. For good cause shown, **IT IS HEREBY ORDERED THAT:**

1) On or before **January 9, 2004,** plaintiffs shall deliver to defendant their supplemental expert reports, containing the changes described and proposed in Plaintiffs' Brief Re: Amending Damage Expert Reports Pursuant to the Court's November 10, 2003 Order ("Plaintiffs' Brief")(filed November 25, 2003) and in the Errata to Plaintiffs' Brief (filed December 2, 2003). These written reports shall contain the data or other information considered by the witnesses in forming the opinions, and all exhibits to be used as a summary of or in support for the opinions, of the witnesses;

2) On or before **February 9, 2004,** defendant shall identify any experts whose testimony will be used to rebut the opinions contained in the supplemental expert reports;

3) Defendant may conduct discovery related to the changes to plaintiffs' expert reports, including the depositions of Drs. James and Horvitz, through **March 9, 2004**;

4) On or before **April 23, 2004**, defendant shall deliver to plaintiffs its expert reports rebutting the supplemental expert reports described in paragraph 1, above. These written reports shall contain the data or other information considered by the witnesses in forming the opinions, and all exhibits to be used as a summary of or in support for the opinions, of the witnesses;

5) Plaintiffs' shall have until and including **June 7, 2004** to depose defendant's experts identified pursuant to paragraph 2, above; and

6) Defendant shall file its motion for summary judgment upon damages on or by **July 20, 2004**.

**SO ORDERED.**

**VICTOR J. WOLSKI**
Judge

BG 2/9/04

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 95-829C
(Judge Wolski)

RECEIVED
FEB 12 2004
WITHERSPOON, KELLEY
DAVENPORT, TOOLE, P.S.

DEFENDANT'S IDENTIFICATION OF EXPERT

Pursuant to the Court's Order, dated December 17, 2003, defendant, the United States, hereby identifies the following witness we intend to call at trial to offer opinion testimony in response to the opinions contained in supplemental expert reports filed by plaintiff Sterling Savings Association on December 19, 2003, and January 9, 2004:

Dr. Mukesh Bajaj
Managing Director
LECG, Inc.
2000 Powell Street, Suite 600
Emeryville, CA 94608

(a) A copy of Dr. Bajaj's curriculum vitae is attached hereto at Tab A.

(b) A list of publications authored by Dr. Bajaj in the last ten years is included in his curriculum vitae at Tab A.

(c) The compensation to be paid Dr. Bajaj for his work on this case is $450 per hour.

(d) A list of other cases in which Dr. Bajaj has testified at trial or by deposition, declaration or affidavit within the preceding four years is included in his curriculum vitae at Tab A.

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

WILLIAM F. RYAN
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L St.
Washington, D.C. 20530

Tele: (202) 305-7562

Of counsel:
JANE M. E. PETERSON
COLLEEN CONRY
TAREK SAWI
Trial Attorneys

February 9, 2004

# In the United States Court of Federal Claims

No. 95-829C

(Filed: September 27, 2006)

```
**************************************** *
                                         *
STERLING SAVINGS ASSOCIATION,            *
                                         *
                    Plaintiff,           *
                                         *
v.                                       *
                                         *
THE UNITED STATES,                       *
                                         *
                    Defendant.           *
                                         *
**************************************** *
```

**SCHEDULING ORDER**

The Court has reviewed the proposed pretrial schedules submitted by counsel for the parties on September 25, 2006. Based upon those submittals, the Court hereby establishes the following schedule:

1. Plaintiff shall submit to Defendant revised expert reports on damages on or before December 11, 2006. Any depositions of Plaintiff's experts shall be completed on or before February 10, 2007. The scope of the depositions shall be limited to any new material not addressed in prior depositions.

3. Defendant shall submit to Plaintiff its responsive expert reports on or before February 17, 2007. Any depositions of Defendant's experts shall be completed on or before March 17, 2007. The scope of the depositions shall be limited to any new material not addressed in prior depositions.

4. Trial in this case shall begin on June 25, 2007. The Court will conduct a telephonic Pretrial Conference, on the record, on December 15, 2006 at 2:00 PM (EST). At that time, the Court will address the location of trial, the time to be allocated for trial, as well as pretrial and trial procedures.

5. On December 13, 2006, counsel shall exchange and file with the Court proposed witness lists, indicating the name and address for each witness, a brief summary of the subjects on which the witness is expected to testify, and the estimated time of direct testimony. Counsel shall also indicate the names of any persons who would have been called to testify, but who are deceased, unable to testify, or unable to travel for reasons of health.

6. Any party desiring to file a pretrial motion, including a motion *in limine* or motion for partial summary judgment, shall do so sufficiently in advance of trial so that the motion may be fully briefed and considered by the Court. The existence of any pending motion will not under any circumstances serve to delay the start of trial.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

# UNITED STATES
# COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, )
et al., )
)
Plaintiffs, )
)
v. ) Docket No.: 95-829C
)
UNITED STATES, )
)
Defendant. )

RECEIVED
OCT 17 2006
WITHERSPOON, KELLEY
DAVENPORT, TOOLE, P.S.

Pages: 1 through 19

Place: Washington, D.C.

Date: September 14, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, et al., Plaintiffs, | ) |
| v. | ) Docket No.: 95-829C |
| UNITED STATES, Defendant. | ) |

Room 603
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday,
September 14, 2006

The parties met, pursuant to notice of the Court, at 4:00 p.m.

BEFORE: HONORABLE THOMAS C. WHEELER
Judge

APPEARANCES: (Via Telephone)

For the Plaintiffs:

WILLIAM D. SYMMES, SR., Esquire
LESLIE R. WEATHERHEAD, Esquire
Witherspoon, Kelley, Davenport & Toole, P.C.
422 West Riverside Avenue
1100 U.S. Bank Building
Spokane, Washington 99201-0300
(509) 624-5265

APPEARANCES: (Cont'd.)

For the Defendant:

ELIZABETH M. HOSFORD, Esquire
DELISA SANCHEZ, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0332/616-0337

P R O C E E D I N G S

(4:00 p.m.)

THE COURT: Hello. This is Judge Wheeler.

MS. HOSFORD: Good afternoon, Your Honor.

THE COURT: Yes. Is that Ms. Hosford?

MS. HOSFORD: Yes, it is, Your Honor.

THE COURT: Okay.

MR. SYMMES: Good afternoon. Bill Symmes and Les Weatherhead in Spokane.

MS. HOSFORD: Your Honor, I also have Delisa Sanchez in my office with me.

THE COURT: Okay. Welcome to you all. We're on the record this afternoon in the Sterling Savings Association case, Docket No. 95-829C. With me in chambers I have our court reporter and my law clerks, Christopher Kimball and Peggy O'Neil.

Now, the reason I wanted to get us all together today, following the issuance of our opinion and order on reconsideration dated August 30, 2006, I wanted to discuss with counsel now the best means of going forward.

I want to know, and I'll hear from each side, what you see as the best way to proceed now that we're past the decision on the motion for reconsideration. I do understand that there's going

to be a further motion from the Plaintiffs' side for reconsideration, which I haven't seen yet. I don't know if you've filed it yet, but I think we will press ahead in the meantime.

Why don't I hear from Plaintiff first.

MR. WEATHERHEAD: Your Honor, Les Weatherhead. Thank you.

We are filing a motion for reconsideration, and in a nutshell what it asks is not so much that the Court revisit the question whether Judge Damich's order should be vacated, but rather whether summary judgment on the question of the Central Evergreen contract should be entered in favor of the government.

In a nutshell what we're asking is that there be a trial on the Central Evergreen contract and its meaning. We thought, although the motion doesn't say this part of it, but we thought that a trial on the Central Evergreen contract could conveniently be heard concurrently with the question of damages on all three contracts if the Court wanted to go that way or at a minimum on the other two contracts.

THE COURT: Well, let me just ask you without getting too far afield. Why do you say a trial is necessary on that phase?

MR. WEATHERHEAD: Two things, Your Honor.

The Court's order had some I guess findings -- they aren't denominated as findings, but effectively they're findings of fact -- that seem to drive the Court's conclusion, which we thought were contested matters that the Court ought to hear.

The second point, and it's a little more difficult for me to articulate it, but what it boils down to is that in his original order granting summary judgment and in his order granting clarification Judge Damich had ruled that there were in effect different components to the Central Evergreen transaction, all of which were contractual in discrete ways.

The Court's order on reconsideration seems to be saying that, to the contrary, there was one contract into which that is to say the Agreement with a capital A into one must integrate somehow the business plan and the resolution.

We didn't think that that was fairly put forth by the government's motion for reconsideration and so we never put before this Court the evidence of which we're aware that supports our reading of the contract.

It looks as though Judge Damich's order got changed in a way that we didn't anticipate and so in effect we didn't have an opportunity to show why if

you read the contract that way, that is to say as a single unitary agreement, why there were aspects of it that we think were nonetheless breached if you read it that way. We never have, and Judge Damich never did.

THE COURT: Well, I will certainly carefully review the motion for reconsideration when it comes in, and of course I'll need to decide whether the government should respond because, as I understand the rules, the Defendant does not need to respond unless I ask them to. We'll take a look at your motion and decide whether a response is necessary.

I think I can safely say that we'll plan to move ahead. We're not going to stop everything to consider your motion. I want to talk about how we're going to go forward.

I take it from what you said that on behalf of the Plaintiff you feel that the next step is to move toward a trial on the remaining damages. Is that correct?

MR. WEATHERHEAD: Yes, Your Honor.

THE COURT: Okay. Let me hear from the Defendant in that regard.

MS. HOSFORD: Thank you, Your Honor. Setting aside the whole issue of the motion for reconsideration, I think that's what you're asking me

to do.

THE COURT: Yes.

MS. HOSFORD: I was not even aware that a motion for reconsideration was being considered, but, anyway, assuming that the motion for reconsideration is denied what we think is appropriate is for Plaintiffs to revise their damages estimates to reflect the fact that there was no breach of contract committed by the government in connection with the Central Evergreen goodwill and that their damages estimates need to be adjusted downward to reflect that.

Before I heard this whole notion of a motion for reconsideration I was going to suggest that they submit those reports to us or serve them upon us in 30 days and then thereafter we would have 60 days to depose their experts and then issue our own reports.

I was also going to suggest that if possible the Court make it clear that the only purpose of this exercise should be to revise the damages estimates that have already been put in and that this is not an opportunity for Plaintiffs to come up with new damages theories or alternative damages theories that it has not presented in the past because it has already had two full opportunities to do so.

That's what I was going to suggest, and then after we had a chance to file our expert reports then I would have an opportunity to revise the motion for summary judgment that I filed in 2004 to reflect any new arguments that we may have.

I anticipate that I will have new arguments because there's a substantial loss of goodwill in connection with the Central Evergreen acquisition in terms of the breach of contract case, and I think that we'll have new arguments.

THE COURT: All right. Let me just explain how we came to learn about the plan for the motion for reconsideration.

I believe Mr. Symmes made a courtesy call to chambers and spoke with my law clerk just to advise us in advance of today's call that they plan to file a motion for reconsideration, so that's how that came about.

MR. SYMMES: That is correct, Your Honor. We will be filing today, Your Honor.

THE COURT: Okay. Tell me about the extent of discovery that has occurred in the past. In other words, Ms. Hosford, have you had a chance previously to review and verify the damages calculations, or has that not been done yet?

MS. HOSFORD: Well, Your Honor, expert discovery in this case actually started I believe in 2002, and we went through the whole expert discovery process. Plaintiffs disclosed their experts. We disclosed our experts. They filed reports. We filed reports.

Then after that Judge Damich issued his opinion in which he ruled as a matter of law that Plaintiffs had to amortize the goodwill associated with the capital credit in connection with the Lewis and Tri-Cities acquisitions.

At that point Plaintiffs, in late 2003, went ahead and revised their expert reports and then at that time added a new damages theory that they call mitigation, so we went through the whole process again. Our side deposed their experts. We filed new reports from our experts. After that, about six months later I filed my motion for summary judgment.

We've been through exhaustive expert discovery. There have been five expert reports at least, two depositions each of Plaintiffs' major experts. I mean, Professor Horowitz alone has had 700 pages of deposition. Professor James has had over 1,100 pages of deposition. There's been exhaustive discovery.

At this point, the only thing that's left to do is to make the changes to the numbers to reflect the fact that the goodwill associated with Central Evergreen was not the subject of a breach of contract.

THE COURT: Yes. In fact, I'm wondering if you need further discovery even after the numbers are revised.

MS. HOSFORD: Well, it's hard to know until I actually see them, Your Honor.

THE COURT: Yes. All right. Any comment, Mr. Weatherhead?

MR. WEATHERHEAD: Briefly, Your Honor, that it was my impression, intending no disrespect to the government, that the second round of depositions conducted of our experts following the revisions to their reports was largely repetitive of matters covered in the first round.

I would be somewhat surprised if a third round of depositions were really necessary, so my submission to the Court would be I guess in the first instance that there ought not to be further delay for depositions unless the government shows some special need for taking their depositions again.

It is true that with the Court's leave we did add a theory of damages in the second round, and

the government has covered that. We don't anticipate changing any of the theoretical approaches to calculation of damages. We think that what would be involved, assuming that the status quo remains in effect, what it would involve would be a revision to the report to back out the effect of Central Evergreen.

That hasn't been done yet, so I have to reserve the possibility that there's some kink in there that I don't know about, but it's hard for me to picture one.

THE COURT: Well, I'm not prejudging anything, but I think to do things in the proper sequence it makes sense for me to look at your motion for reconsideration first and then go forward from there. That will not take too much time. Once we know where we stand on those issues, we can then go forward.

I guess Plaintiff agrees that we need revised reports if Central Evergreen is out of the case. Is that correct?

MR. WEATHERHEAD: Yes, Your Honor, because I do not believe that you could read the existing report and back out the effect of Central Evergreen without some adjustments.

THE COURT: Okay. So if it remains as is currently with Central Evergreen out of the case, you would have to revise reports, and then the government would need to determine whether it thinks it needs additional discovery. Is that right, Ms. Hosford?

MS. HOSFORD: Yes, Your Honor, that's correct. I mean, we've taken only a very cursory look at Plaintiffs' model to try to get a sense of what backing out the Central Evergreen goodwill would do to them.

I think it could end up being more complicated than we think, so we would like to reserve the right to ask for depositions if we need to know the basis for Plaintiffs' experts' damages numbers and the assumptions that they use to arrive at those numbers.

With all due respect to Mr. Weatherhead, I don't recall the depositions in 2003 and early 2004 being all that repetitive. We kept them as brief as possible, and we got the information we needed.

THE COURT: Well, I think it makes sense for me to receive from you all a proposed schedule of events that we can use. You'll probably do that separately, I would imagine. It seems like you still have different views of the world.

Let's say today is September 14. Within 10 days from today, and I'm just suggesting this right now, so let's say by Monday, September 25, if I could get a proposed schedule of events and dates that would lead up through trial? If you want to factor in certain motions of any kind that's fine.

I mean, it's hard for me to say how successful any motions might be at this point. I kind of see this case going to trial unless support is simply lacking for the damages side of the case, and I doubt that's going to be true, but we'll see.

Does that seem to make sense as a way to go forward?

MS. HOSFORD: Your Honor, just as a matter of clarification, are you suggesting that we include the Appendix A proceedings and pretrial meeting of counsel and that sort of thing as well?

THE COURT: Yes.

MS. HOSFORD: Okay.

THE COURT: Now, I think you know, Ms. Hosford, from participation in Astoria, but I'll repeat this for the benefit of Mr. Symmes.

It's been my practice to somewhat streamline the Appendix A procedures. You know, I just think that following Appendix A to the letter results in the

parties really trying the case before they ever get to trial. There's just so much paper that goes with it.

What I would generally look for as a tradeoff is some really well-prepared proposed findings of fact that would come in after trial along with whatever brief you may want to submit, so the Appendix A part of it can be a bit abbreviated, and there would be posttrial briefs.

You don't have to give me dates for posttrial briefs, but if you would consider the various steps that you see going up through trial and present that to me in a proposed schedule, I think that would be very useful.

MR. SYMMES: This is Bill Symmes. Including a proposed trial date or a timeframe for a proposed trial?

THE COURT: Yes. I think that would be appropriate.

MR. SYMMES: Okay. Thank you.

THE COURT: I can tell you for purposes of figuring out a trial date that I would be free beginning about -- let me just be sure -- mid June in 2007.

MR. WEATHERHEAD: Your Honor, one of the things that we had discussed over the years on our end

of this was the possibility that given the location of the witnesses that the Court might consider trial here in the northwest.

THE COURT: Is this Mr. Weatherhead?

MR. WEATHERHEAD: I'm sorry, Your Honor. Yes. Les Weatherhead for the Plaintiffs.

THE COURT: Okay.

MR. WEATHERHEAD: Should we factor a motion for that into this schedule that we're talking about, or is that something that the Court would even consider?

THE COURT: Well, certainly we would consider it. I would look at the typical factors that help us determine whether to hold trial, but certainly we can hold trial in the northwest if it makes sense to do that.

We have to see where the witnesses are located. The possibility exists also to have part of the trial in the northwest and part of it in Washington. You know, there are various options we can discuss.

MR. WEATHERHEAD: If it would help the Court prejudge the issue, I might mention that the trout water is in terrific condition here in June.

THE COURT: All right. Well, I've done a

little fishing, but it's not a particular avocation. In any event, we'll take a look at that.

MS. HOSFORD: Your Honor, can I just ask one more question to clarify? This is Liz Hosford again.

THE COURT: Yes.

MS. HOSFORD: In coming up with the schedule, should we factor in this motion for reconsideration?

I was going to suggest that Plaintiffs submit their revised expert reports within 30 days, but if there's a motion for reconsideration I don't know how that would work.

THE COURT: Well, that's a good question. I think that I'll be in a position to give you an initial reading on the motion for reconsideration in fairly short order. You may get a signal from whether I ask you to respond or not.

MS. HOSFORD: Okay.

THE COURT: Maybe you'll want to do an either/or possibly. You know, if motion for reconsideration and if not motion for reconsideration.

MS. HOSFORD: Okay, Your Honor.

THE COURT: You know, we're still at a point in this case where things could break in a lot of different directions, but yet we have to make a game

plan.

I mean, this case was filed in 1995, and I certainly don't want to see it go on for another decade. We've got to start moving ahead. We'll deal with various contingencies as we move along.

MS. HOSFORD: Okay. Thank you.

THE COURT: I think the safe advice to both sides is that it's time to clear the decks and get to work, so that's what we're going to do.

MR. WEATHERHEAD: Thank you, Your Honor.

MS. HOSFORD: Thank you.

THE COURT: Anything else today?

MS. HOSFORD: Not on our side, Your Honor. This is Liz Hosford.

THE COURT: Yes.

MR. WEATHERHEAD: This is Les Weatherhead. Not from the Plaintiffs, Your Honor.

THE COURT: All right. We'll look for a proposed schedule from each of you on September 25. As I say, I'll give you a reading on the motion for reconsideration a quickly as I can.

I will tell you I'll be in trial starting Monday for about an eight day trial, so don't be surprised if it's not forthcoming immediately. I'll get to it as soon as I can.

MR. WEATHERHEAD: Very well, Your Honor.

MS. HOSFORD: Okay. Thank you very much, Your Honor.

THE COURT: Okay. Thanks to both sides. We'll be in touch.

(Whereupon, at 4:19 p.m. the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 95-829C

CASE TITLE: Sterling Savings, et al. v. U.S.

HEARING DATE: September 14, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 14, 2006

Renee Katz
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-829C<br>(Judge Wheeler) | RECEIVED<br>DEC 14 2006<br>WITHERSPOON, KELLEY DAVENPORT, TOOLE, P.S. |

**DEFENDANT'S AMENDED RESPONSE TO STERLING'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26(e)(2) and 33 of the Rules of the United States Court of Federal Claims, defendant submits the following, amended response to the first set of interrogatories served by plaintiff, Sterling Savings Association, as follows:

**INTERROGATORY NO. 1**: Identify any person employed by the FDIC, FHLBB, FSLIC, OTS, or any other Federal Banking Agency between 1983 to the present (other than expert witnesses retained for the purpose of this litigation) who analyzed, discussed or commented on the regulatory restrictions placed upon SSA and/or SFC following the passage of FIRREA, including any analysis or discussion of the consequences of those restrictions for SSA and/or SFC, its business strategy, its operating performance, and its profitability. Include for each person their name, employer, and job position(s) during all relevant periods.

Response: Subject to our prior objection, Defendant hereby identifies the following, additional persons:

John W. Stone
Former Associate Director
FDIC
Washington, D.C.

**INTERROGATORY NO. 49:** Please identify and provide the name, current address, present occupation and current telephone number of all persons who have knowledge of the relevant facts concerning the subject matter of this case and summarize your understanding and other knowledge concerning the same. In answering this interrogatory, please specify the occupation and title of the person at the time he or she acquired relevant knowledge and the approximate time frame during which such knowledge was acquired.

**Response:** Subject to our prior objections, Defendant hereby identifies the following persons:

David Kroeger
Former Field Office Supervisor
FDIC
Seattle

John W. Stone
Former Associate Director
FDIC
Washington, D.C.

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

William F. Ryan / JG
Jeanne E Davidson

WILLIAM F. RYAN
Assistant Director

Elizabeth M. Hosford

Of counsel:

TAREK SAWI
DELISA SANCHEZ
MELINDA HART

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

December 5, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on December 5, 2006, I caused to be served by United States mail (first-class mail, postage prepaid), and facsimile, copies of "DEFENDANT'S AMENDED RESPONSE TO STERLING'S FIRST SET OF INTERROGATORIES," addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Toole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

[signature]

# Expert Report of W. Barefoot Bankhead

*Sterling Savings Association, et al. v. United States of America*

Case No. 95-829 C

---

## I. Qualifications

1. My name is W. Barefoot Bankhead, and I am a Managing Director with Navigant Consulting, which provides professional services to its clients in various areas, including financial, accounting and economic analysis. I graduated from the University of Texas in December 1976 with a Bachelor of Business Administration degree and a major in accounting. I am a certified public accountant in the State of Texas. From 1977 through 1987, I worked in public accounting, the last several years of which were with a then "big eight" firm, primarily serving clients in the financial services and real estate industries.

2. In April 1987, I began a two-year accounting fellowship with the Federal Home Loan Bank Board, now the Office of Thrift Supervision, the primary regulatory body for the savings and loan industry. After my fellowship and prior to joining Navigant Consulting in August 1998, I worked for nine years in a variety of positions with financial institutions. During that time, I served as an audit director for one of the largest bank holding companies in the country and as chief financial officer and member of the board of directors for a savings bank. My current resume is provided as Exhibit A. My hourly billing rate is $468.

## II. Background

3. From November 1985 through December 31, 1988, Sterling Savings Association ("Sterling") acquired the assets and liabilities of three thrift institutions through a series of assisted acquisitions as reflected in Table 1.

**Table 1. Thrift Acquisitions by Sterling Savings Association**

| Date | Acquired Institution | Location |
|---|---|---|
| November 5, 1985 | Lewis Federal Savings and Loan Association | Chehalis, Washington |
| April 8, 1988 | Tri-Cities Savings and Loan Association | Kennewick, Washington |
| December 31, 1988 | Central Evergreen Savings and Loan Association | Chehalis, Washington |

Source:
Sterling Savings Association, Annual Report for the years ended June 30, 1986 (pp. 22-23), 1988 (pp. 30-31) and 1989 (pp. 31-32) [SG2005 2526-2527; 2459-2460; 2399-2400]

4. In conjunction with the Lewis Federal and Tri-Cities acquisitions, Sterling and the Government entered into agreements that, among other things, provided certain forbearances related to the accounting for the goodwill created in the acquisitions.[1] Sterling alleged that certain documents governing the Central Evergreen transaction provided a similar goodwill accounting forbearance.

5. The Financial Institutions Reform, Recovery and Enhancement Act ("FIRREA") was enacted on August 8, 1989. Capital regulations adopted as a result of FIRREA required, among other things, thrifts to deduct goodwill from regulatory capital.

[1] Forbearance letters from the Federal Home Loan Bank Board ("FHLBB") to Sterling dated November 12, 1985 and April 6, 1988 grant certain accounting forbearances in the Lewis Federal and Tri-Cities acquisitions, respectively.

6. On September 12, 2002, the Court of Federal Claims ("the Court") initially determined that various contractual documents associated with all three of Sterling's acquisitions gave it the right to include goodwill in regulatory capital and that the enforcement of the FIRREA capital regulations represented a breach of the Government's commitment under those contracts. In an effort to estimate the damages associated with those breaches, Sterling submitted expert reports authored by Dr. Paul Horvitz and Dr. Christopher James. Dr. Horvitz's report, which was dated February 20, 2004 ("the Horvitz 2004 Report"), calculated alleged lost profits that resulted from the breaches. Dr. James's report, which was also dated February 20, 2004, calculated alleged damages related to the hypothetical raising of mitigation capital as replacement for the goodwill.[2]

7. On August 30, 2006, the Court amended its previous ruling and determined that the enforcement of the FIRREA capital regulations did not result in a breach of the Central Evergreen contract as there was no forbearance related to the accounting for the Central Evergreen-related goodwill. Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz ("Horvitz 2006 Report") and Dr. James issued his Update to the Expert Report of Dr. Christopher James ("James 2006 Report") on December 11, 2006, to amend the plaintiffs' damages claim reflecting the Court's updated ruling.

8. The United States Department of Justice ("DOJ") has asked me to evaluate Dr. Horvitz's calculation of core capital in the Horvitz 2006 Report. Because Dr.

---

[2] Dr. Horvitz and Dr. James initially issued damages reports in 2001. However, during 2003, the Court issued an opinion related to the amortization of goodwill associated with certain Federal Savings and Loan Insurance Corporation ("FSLIC") assistance. The 2004 reports represent Dr. Horvitz's and Dr. James's efforts to amend their reports to reflect the impact of the Court's 2003 opinion related to the amortization of goodwill associated with FSLIC assistance.

James has adopted Dr. Horvitz's lost profits methodology, DOJ has also asked me to evaluate the lost profit calculations in the James 2006 report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiffs' experts.

**III. Summary of Opinions**

9. Based upon my review and analysis of the documents cited in Exhibit B and my relevant education and experience, I have formed the following opinions:

- Dr. Horvitz's calculation of but-for Sterling's core capital erroneously includes goodwill in excess of amounts permitted under the regulation governing the phase-out of goodwill. Correcting for this error eliminates any lost profits as calculated by Dr. Horvitz.

- Even calculating but-for Sterling's core capital by allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill, Dr. Horvitz's model produces no lost profits.

- Since Dr. James has adopted Dr. Horvitz's lost profits calculation during the period between the breach and the date of full mitigation, his analysis of lost profits suffers from the same flaws that I have identified with Dr. Horvitz's model. Once the error in Dr. James's core capital calculations is corrected, Dr. James's model produces no lost profits.

## IV. Dr. Horvitz's Failure to Correctly Calculate Core Capital in the But-For Bank

10. The FIRREA capital regulation established three capital requirements – tangible, core, and risk-based. Thrifts were required, among other things, to deduct all intangible assets, including goodwill, in the calculation of tangible capital; limit identified intangible assets included in core and risk-based capital; and phase out supervisory goodwill from core and risk-based capital over a five-year period ending December 31, 1994.[3] Through December 31, 1994, thrifts were not required to deduct qualifying supervisory goodwill in calculating core capital.[4] Qualifying supervisory goodwill was limited to 1.5 percent of assets (as defined in the regulation) through December 31, 1991, and the includable amount then declined as a percentage of assets until January 1, 1995, when all supervisory goodwill was required to be deducted in calculating core capital.

---

[3] 12 CFR 567.1(ee) defined supervisory goodwill as goodwill resulting from the acquisition, merger, consolidation, purchase of assets, or other business combination (if such transaction occurred on or before April 12, 1989) of (1) a savings association where the fair market value of assets was less than the fair market value of liabilities at the acquisition date; or (2) a problem institution.

[4] 12 CFR 567.1(w) defined qualifying supervisory goodwill as (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices less any amortization that would have occurred subsequent to April 12, 1989 through the current reporting period where the amortization is calculated on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for regulatory accounting practices; plus (2) the lesser of (i) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under generally accepted accounting principles ("GAAP"); or (ii)(A) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under GAAP; (B) plus any amortization of the goodwill in (ii)(A) that occurred subsequent to April 12, 1989 for GAAP reporting purposes; (C) minus the amortization of the goodwill in (ii)(A) through the current period that results when the goodwill is amortized subsequent to April 12, 1989 on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for GAAP reporting purposes.

11. Sterling's supervisory goodwill exceeded the amount that could be included as qualifying supervisory goodwill in core capital under the FIRREA capital regulation. Table 2 summarizes Dr. Horvitz's determination of Sterling's supervisory goodwill as of December 31, 1989.

**Table 2. Sterling's Supervisory Goodwill, December 31, 1989**

| Institution | Amount (000s) |
|---|---|
| Lewis Federal and Tri-Cities (determined to be contractual) | $15,557 |
| Central Evergreen (determined to be non-contractual) | 11,357 |
| Total Supervisory Goodwill | $26,914 |
| Qualifying Supervisory Goodwill (1.5% of but-for Sterling's assets) | $10,421 |

12. The Court has determined that the Government breached contracts allowing Sterling to include the Lewis Federal and Tri-Cities goodwill in regulatory capital. Consequently, in the but-for world constructed by Dr. Horvitz, Sterling can include all of the $15,557,000 of Lewis Federal and Tri-Cities supervisory goodwill in regulatory capital as of December 31, 1989.

13. In his 2006 Report, Dr. Horvitz assumes that Sterling's Lewis Federal and Tri-Cities contractual supervisory goodwill is exempt from the limitations on the amount of supervisory goodwill that qualifies for core capital. This assumption is inconsistent with his 2004 report. In the Horvitz 2004 Report, Dr. Horvitz included contractual supervisory goodwill in his calculation of qualifying supervisory goodwill for purposes of determining the amount of disallowed intangibles due to the breach. (See Horvitz 2004 Report, Exhibit 6, Table 4b.) As illustrated in Table 3 below, Dr. Horvitz's 2006 Report erroneously assumes that

an additional $10,421,000 of but-for Sterling's non-contractual supervisory goodwill was qualifying supervisory goodwill and includable in core capital.

**Table 3. Dr. Horvitz's Calculation of But-For Sterling's Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Contractual goodwill (Lewis Federal and Tri-Cities) | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen) | 10,421 |
| ***Other Adjustments*** | |
| Identified intangibles | 5,670 |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| **But-For Sterling's Core Capital** | **$28,786** |

14. But-for Sterling could consider all $15,557,000 of the Lewis Federal and Tri-Cities contractual supervisory goodwill as qualifying supervisory goodwill even though this amount exceeded the $10,421,000 of qualifying supervisory goodwill otherwise permissible under the FIRREA capital regulation. However, Dr. Horvitz has erroneously included $25,978,000, or 3.74 percent of but-for Sterling's assets, as qualifying supervisory goodwill even though the FIRREA capital regulation permits only 1.5 percent and the contractual supervisory goodwill totals only 2.24 percent.[5]

15. The FIRREA capital regulation does not distinguish between contractual and non-contractual supervisory goodwill. In addition, the regulation clearly limits the amount of supervisory goodwill that qualifies as core capital. It is

[5] See Exhibit C.

implausible to assume that but-for Sterling would have been permitted to include the non-contractual Central Evergreen supervisory goodwill as qualifying supervisory goodwill when the contractual supervisory goodwill already exceeded the 1.5 percent maximum amount of qualifying supervisory goodwill includable in core capital as of December 31, 1989. To illustrate the impact of Dr. Horvitz's error, I have recalculated but-for Sterling's core capital using the information contained in the Horvitz 2006 Report:

**Table 4. But-For Sterling's Adjusted Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[6] | 15,557 |
| ***Other Adjustments*** | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles [7] | 3,174 |
| **But-For Sterling's Core Capital** | **$15,869** |

16. Adjusting Dr. Horvitz's model for the one change to correct the calculation of qualifying supervisory goodwill includable in core capital as of

---

[6] Qualifying supervisory goodwill as calculated by Dr. Horvitz totals only $10,421. However, because of the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill for purposes of calculating regulatory capital.

[7] The FIRREA capital regulation permits certain identified intangibles to be included in core capital up to a limit of 25 percent of core capital (before inclusion of identified intangibles).

December 31, 1989, results in negative lost profits, thus eliminating Sterling's entire lost profits claim.[8]

17. As shown below in Table 5, the contractual supervisory goodwill included as qualifying supervisory goodwill as a result of the Court's decisions exceeds the amount permissible under the FIRREA regulation at all times through December 31, 1994. Consequently, but-for Sterling would have been required to deduct all non-contractual supervisory goodwill (*i.e.*, goodwill associated with the Central Evergreen transaction) when calculating core capital. However, by erroneously including non-contractual supervisory goodwill as qualifying supervisory goodwill, Dr. Horvitz's but-for Sterling includes supervisory goodwill from two to nearly three times the amount permitted by the FIRREA capital regulation through December 31, 1994.

**Table 5. But-For Sterling's Total Supervisory Goodwill**

| Year Ended | FIRREA Allowable % of Tangible Assets | Total But-For Contractual Goodwill | Total But-For Supervisory Goodwill |
|---|---|---|---|
| 12/31/1989 | 1.500% | 2.239% | 3.739% |
| 6/30/1990 | 1.500% | 2.194% | 3.694% |
| 6/30/1991 | 1.500% | 1.940% | 2.950% |
| 6/30/1992 | 1.000% | 1.750% | 2.461% |
| 6/30/1993 | 0.750% | 1.471% | 1.995% |
| 6/30/1994 | 0.375% | 0.826% | 1.075% |

Source: Exhibit C

[8] As a result of this correction, but-for Sterling's core capital would have been 2.21 percent, below the 3 percent core capital required by the FIRREA capital regulation, effective with the filing of the March 31, 1990 Thrift Financial Report.

18. Even if one were to assume that allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill would have been appropriate, which, based upon my experiences at the FHLBB and in the thrift industry, I do not believe to be a plausible assumption, Dr. Horvitz's model would still result in no lost profits damages. To illustrate, I have recalculated but-for Sterling's core capital under this proportional allocation methodology to determine the potential impact at December 31, 1989, as shown in Table 6.

**Table 6. But-For Sterling's Core Capital at December 31, 1989 (Proportional Allocation)**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| *Adjustments Related to Unidentified Intangibles* | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[9] | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen)[10] | 4,398 |
| *Other Adjustments* | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles[11] | 4,273 |
| **But-For Sterling's Core Capital** | **$21,366** |

[9] Qualifying supervisory goodwill under the FIRREA capital regulation totals $10,421. Sterling's total supervisory goodwill from both contractual and non-contractual acquisitions was $26,914 ($15,557 from Lewis Federal and Tri-Cities and $11,357 from Central Evergreen). Allocating the $10,421 qualifying supervisory goodwill proportionally between contractual and non-contractual results in $6,023 (57.8 percent) allocated to the Lewis Federal and Tri-Cities contractual supervisory goodwill. However, per the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill in calculating regulatory capital. Consequently, $15,557 of the Lewis and Tri-Cities contractual supervisory goodwill is considered to be qualifying supervisory goodwill for purposes of calculating core capital.

[10] Allocating the $10,421 qualifying supervisory goodwill proportionally results in $4,398 (42.2 percent) allocated to the Central Evergreen non-contractual supervisory goodwill.

[11] See Footnote 7.

19. I have adjusted Dr. Horvitz's model to reflect this lower level of core capital at December 31, 1989. After making this one change, the amount of lost profits generated under Dr. Horvitz's model is negative (*i.e.*, no lost profits).

## V. Dr. James's Adoption of Dr. Horvitz's Erroneous But-For Sterling Core Capital Calculations

20. DOJ has asked me to review certain portions of the James 2006 Report that purport to calculate lost profits during the period between the breach and the date of full mitigation (February 28, 1993). Dr. James effectively adopts Dr. Horvitz's lost profits model, thus Dr. James's analysis of lost profits in the James 2006 Report suffers from the same flaws that I have identified in the Horvitz 2006 Report. As I did with Dr. Horvitz's model, I have adjusted for the error in the calculation of qualifying supervisory goodwill and determined that Dr. James's model, like Dr. Horvitz's model, results in no lost profits.

21. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work is ongoing.

February 15, 2007

W. Barefoot Bankhead

W. Barefoot Bankhead

**Exhibit A**

NAVIGANT CONSULTING

# W. Barefoot Bankhead, CPA*

**W. Barefoot Bankhead**
Managing Director

**Navigant Consulting**
2001 Ross Avenue, Suite 500
Dallas, Texas 75201
Tel 214.712.1514
Fax 214.765.6582

bbankhead@navigantconsulting.com

**Service Lines**

- Banking and Financial Institutions
- Fraud and Investigative Accounting
- Complex Commercial Litigation
- Accounting Malpractice

**Professional History**

- 1998 to Present: Navigant Consulting
- 1993 – 1998: Bank One Corporation (now J.P. Morgan Chase and Company) – Audit Director, Regional Audit Director, Sr. Risk Advisor
- 1990 – 1993: First Cook Community Bank, FSB (now Republic Bank)– Chief Financial Officer, Treasurer, Director
- 1989 – 1990: Superior Bank, FSB – Sr. VP and Managing Director of Mergers & Acquisitions
- 1987 – 1989: Federal Home Loan Bank Board (now OTS) – Professional Accounting Fellow
- 1982 – 1987: Coopers & Lybrand (now PricewaterhouseCoopers) – Audit Manager
- 1977 – 1981: Cheatham, Brady & Lafferty – Audit Staff

**Education and Certification**

- BBA – Accounting, December 1976
  The University of Texas at Austin
- Certified Public Accountant (CPA)*

**Professional Associations**

- American Institute of Certified Public Accountants

**Teaching/Lecturing**

- McCombs School of Business, The University of Texas - Guest Lecturer
- Richland College, Former Accounting Instructor

W. Barefoot Bankhead specializes in providing damage analysis and accounting and regulatory expertise to clients in the financial services and professional services industries. Additionally, Mr. Bankhead has led numerous fraud and accounting investigations. Before joining Navigant Consulting in 1998, Mr. Bankhead had over twenty years of experience in banking and public accounting, including a two-year accounting fellowship with a federal banking regulator.

## Litigation and Investigations

Since joining Navigant Consulting, Mr. Bankhead has led consulting engagements for a number of clients in the financial services industry. He has provided expert testimony in several cases, including a series of cases involving alleged breach of contract that include claims for lost profits, restitution and reliance damages. Additionally, Mr. Bankhead has testified on damages and causation in professional accounting malpractice engagements. His work has involved the assessment of the economic impact on the plaintiffs' business; the evaluation of costs and benefits to both parties in the dispute; valuations of financial assets and liabilities and the evaluation of operational, financial, accounting and regulatory issues.

Mr. Bankhead has provided expert witness testimony on various matters related to financial institutions including financial institution valuation, management and regulation; the valuation of certain assets such as loans, real estate, deposit intangibles, residuals and other securitization interests; and the evaluation of lending practices, regulatory capital and failed institutions.

In relation to various engagements, Mr. Bankhead has:

» Reviewed financial institutions' practices for valuing and accounting for loans and investments (including asset-backed securities). Analysis involved determining allowances for losses, accounting for impairment, amortizing/accreting deferred fees and premiums/discounts, and accounting for various types of financial instruments.

*Navigant Consulting is not a CPA firm.

- Analyzed loan underwriting practices on commercial real estate, commercial, mortgage, subprime mortgage, home equity and credit card loans to determine compliance with regulatory requirements, internal policies and procedures, securitization agreements, representations and warranties in contractual agreements, or industry standards.
- Valued financial institutions and various financial assets such as residual interests in securitizations, loans, mortgage derivatives and other investments and mortgage servicing rights.
- Reviewed the valuation of financial institution branches/deposit franchises that have been sold as a result of alleged breaches of contract.
- Reviewed the purchase accounting adjustments related to acquisitions of financial institutions, including allocations to core deposit intangibles, mortgage servicing rights and the resulting goodwill.
- Reviewed the adequacy of due diligence in the acquisition of financial institutions such as banks, thrifts, and subprime mortgage lenders.
- Evaluated wholesale banking strategies, including the use of high-risk mortgage derivatives and the impact of those strategies on interest rate risk and regulatory compliance.
- Assessed the lending, investing and operating practices of financial institutions to determine their viability. Also assessed the operations and strategies of failed institutions to determine causes of failure. Assessments often included an evaluation of losses on major assets such as large commercial real estate loans, real estate investments and mortgage derivatives.
- Analyzed causation and damage claims related to exiting lines of business or the sale of subsidiaries engaged in banking, lease finance and nonconforming mortgage securitization.
- Assisted clients with SEC investigations related to loan loss allowances and the accounting for impairment of debt securities and assisted with the development and implementation of lending, loss allowance and loan fee policies and procedures.
- Reviewed employee expense accounts for evidence of inappropriate charges.
- Evaluated causation and damages related to professional accounting malpractice claims.
- Analyzed potential fiduciary claims against an investment company managing pension funds under Department of Labor regulations.
- Analyzed the surplus/deficits of bank holding company subsidiaries to assess the impact of the cross-guarantee provisions of the Financial Institutions Reform, Recovery and Enhancement Act of 1989.

» Evaluated and calculated damages related to lender liability claims.

## Financial Services

Mr. Bankhead has extensive experience in the financial services industry, having held a variety of positions with financial institutions. Mr. Bankhead was an Audit Director for one of the largest bank holding companies in the country, served as Chief Financial Officer (CFO) and member of the Board of Directors of a savings bank, and was Managing Director of Mergers and Acquisitions for another savings bank.

As an Audit Director, Mr. Bankhead was responsible for the development and execution of the corporate audit plan for over 25 separately chartered banks with over $30 billion in assets. Mr. Bankhead then assumed corporate audit responsibility for the bank's National Commercial Banking Group, a $30-billion line of business that included commercial lending and credit administration, asset-based lending, commercial loan operations, syndications, derivative product sales and international trade finance.

As a CFO, Mr. Bankhead was responsible for all financial, accounting and investment activities of the institution and chaired the bank's asset/liability committee. He also managed the bank's mortgage banking, real estate and investment management divisions. As a member of the Board of Directors, Mr. Bankhead served on the lending committee, whose responsibilities included approval of all large lending credits.

As Managing Director of Mergers and Acquisitions, Mr. Bankhead was responsible for identifying acquisition candidates, conducting due diligence and managing the bid process. He performed due diligence on numerous financial institutions including reviews of problem loans and troubled real estate. He also advised the president and CFO on SEC reporting matters, asset securitizations and other capital market transactions.

## Regulatory

During his accounting fellowship with the Federal Home Loan Bank Board, Mr. Bankhead responded to questions from financial institutions and their constituents on accounting, financial reporting, regulatory and other matters; wrote issues papers and opinions on accounting matters; and provided accounting, auditing and litigation support to the federal banking agency. Additionally, he frequently spoke and lectured on current banking issues at various conferences and seminars throughout the country.

## Public Accounting

While in public accounting with an international accounting firm, Mr. Bankhead served primarily financial institution and real estate clients. In addition to audit engagement responsibilities, he

advised clients on a number of matters including mergers and acquisitions, branch sales, capital market transactions, real estate workouts and regulatory matters.

## Testimony

» Northeast Savings, F.A. v. United States, United States Court of Federal Claims, No. 92-550C (deposition and trial)

» Beverly Hills Bancorp Inc. fka Wilshire Financial Services Group, Inc., v. Merrill Lynch Mortgage Capital Inc., and Wilshire Credit Corporation, Superior Court of the State of California and for the County of Los Angeles (deposition)

» Chapman Industries, et al. v. United Insurance Company of America, Second Judicial District Court of the State of Nevada and for the County of Washoe, No. CV87-6780 (deposition and hearing)

» Reliance Insurance Company v. KeyBank USA National Association v. Swiss Reinsurance America Corporation, et al., United States District Court for the Northern District of Ohio, Eastern Division, No. 1:01CV0062 (deposition)

» Anchor Savings Bank, FSB v. United States, United States Court of Federal Claims, No. 95-39C (deposition and trial)

» The Long Island Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 92-517C (deposition, declaration and trial)

» The Globe Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 91-1550C (deposition and trial)

» Caroline Hunt Trust Estate v. United States, United States Court of Federal Claims, No. 95-531C (deposition and trial)

» Chase Manhattan Mortgage Corporation and Chase Manhattan Mortgage Company of the Southeast v. Advanta Corp., et al., U.S. District Court for the District of Delaware, No. 01-507, (deposition and trial)

» LaSalle Talman Bank, F.S.B. v. United States, United States Court of Federal Claims, No. 92-652C (deposition and trial)

» Blitz Holdings Corp. and GCM Corporation, LTD. v. Grant Thornton, L.L.P., et al., 280th Judicial District, Harris County, Texas, No. 2002-32582 (deposition)

- WestFed Holdings, Inc., et al. v. United States, United States Court of Federal Claims, No. 92-820C (deposition, affidavit and trial)
- Bank United, et al. v. United States, United States Court of Federal Claims, No. 95-473C (deposition and trial)
- Standard Federal Bank v. United States, United States Court of Federal Claims, No. 92-844C (deposition)
- Homer J. Holland and Howard R. Ross v. United States, United States Court of Federal Claims, No. 95-524C (deposition)
- H. C. Bailey, et al. v. United States, United States Court of Federal Claims, No. 92-577C (deposition)
- Transamerica Home Loan v. ITT Industries, Inc., U.S. District Court for the Southern District of New York, No. 98 Civ. (deposition)

EXHIBIT B

# STERLING SAVINGS ASSOCIATION ET AL. V. UNITED STATES OF AMERICA

## *DOCUMENTS CONSIDERED BY W. BAREFOOT BANKHEAD*

| Document | Date | Begins | Ends |
|---|---|---|---|
| | | | |
| **Plaintiff's Expert Reports** | | | |
| Expert Report of Paul Horvitz - Corrected | 09/06/01 | | |
| Revised Update to the Expert Report of Paul Horvitz | 02/20/04 | | |
| Update to the Expert Report of Paul Horvitz | 12/11/06 | | |
| Expert Report of Professor Christopher M. James - Corrected | 9/2001 | | |
| Revised Update to the Expert Report of Professor Christopher M. James | 02/20/04 | | |
| Update Expert Report of Professor Christopher M. James | 12/11/06 | | |
| **Deposition Transcripts** | | | |
| Deposition of Paul Horvitz | 01/25/07 | | |
| **Legal Documents** | | | |
| Chief Judge Damich's 2002 Opinion | 09/12/02 | | |
| Chief Judge Damich's 2003 Opinion | 08/04/03 | | |
| Judge Wheeler's 2006 Opinion | 08/30/06 | | |
| **Case Documents** | | | |
| Annual Report - Sterling Savings | 06/30/86 | SG2005 2502 | SG2005 2532 |
| Annual Report - Sterling Savings | 06/30/88 | SG2005 2429 | SG2005 2466 |
| Annual Report - Sterling Savings | 06/30/89 | SG2005 2367 | SG2005 2405 |
| Forbearance letter - Lewis Federal | 11/12/85 | WOF014 0599 | WOF014 0601 |
| Forbearance letter - Tri-Cities | 04/06/88 | WOF014 1397 | WOF014 1398 |
| **Miscellaneous** | | | |
| Dr. Horvitz Components of Core Capital @ December 31, 1989 (Horvitz 2007 Deposition Exhibit 3) | | | |
| Dr. Horvitz Components of Core Capital @ June 30, 1990 (Horvitz 2007 Deposition Exhibit 4) | | | |
| **Industry Material** | | | |
| 12 CFR Section 567 | 11/89 | | |
| Thrift Financial Report Instruction Manuals | 8/90 | | |

Exhibit C

## *"But-For" Sterling Supervisory Goodwill Includable in Core Capital*

(Dollars in Thousands)

| Year Ended | "But-For" Sterling Tangible Assets [1] (000s) | Non-Contractual SGW (Central Evergreen): "But-For" Qualifying Supervisory Goodwill [2] (000s) | Non-Contractual SGW (Central Evergreen): "But=For" Qualifying Supervisory Goodwill (%) | Contractual SGW (Lewis Federal & Tri-Cities): "But-For" Supervisory Goodwill [3] (000s) | Contractual SGW (Lewis Federal & Tri-Cities): "But-For" Supervisory Goodwill (%) | Total "But-For" Supervisory Goodwill (%) |
|---|---|---|---|---|---|---|
| | A | B | C = B / A | D | E = D / A | F = C + E |
| 12/31/1989 | $694,760 | $10,421 | 1.500% | $15,557 | 2.239% | 3.739% |
| 6/30/1990 | 685,708 | 10,286 | 1.500% | 15,047 | 2.194% | 3.694% |
| 6/30/1991 | 704,730 | 7,118 | 1.010% | 13,673 | 1.940% | 2.950% |
| 6/30/1992 | 699,163 | 4,971 | 0.711% | 12,232 | 1.750% | 2.461% |
| 6/30/1993 | 766,910 | 4,013 | 0.523% | 11,285 | 1.471% | 1.995% |
| 6/30/1994 | 1,251,799 | 3,117 | 0.249% | 10,337 | 0.826% | 1.075% |

Notes:

[1] See Horvitz 2006 Report, Exhibit 6, Table 4b, Column C.

[2] See Horvitz 2006 Report, Exhibit 6, Table 4b, Column F.

[3] See Horvitz 2006 Report, Exhibit 6, Table 4a, Column A.

# SUPPLEMENTAL EXPERT REPORT OF JOE A. HARGETT

***STERLING SAVINGS ASSOCIATION ET. AL. v. UNITED STATES OF AMERICA***
**Case No. 95-829-C**

---

## I. QUALIFICATIONS

1. My name is Joe A. Hargett. I graduated summa cum laude from the University of Alabama with a Bachelor of Science degree in Commerce and Business Administration with a major in accounting. From 1984 to early 1989, I worked in the audit department of KPMG Peat Marwick, an international accounting firm. While there, I was designated as an industry expert in financial institution matters and served as a national instructor for the firm on financial institutions.

2. In March 1989, I began a two-year fellowship with the Federal Home Loan Bank System / Office of Thrift Supervision (OTS), the primary regulatory body for the savings and loan industry. My assignments included, among other things, (1) writing issue papers and opinions on accounting matters, (2) drafting segments of regulations and other regulatory guidance for the savings and loan industry, and (3) developing training materials and teaching courses on capital standards, recent accounting issues and other areas.

3. From 1991 to October 2003, I worked as a financial consultant at Navigant Consulting, Inc. (Navigant Consulting) or one of its predecessor firms. From April 1999 to October 2003, I was a Director with Navigant Consulting. From October 2003 until September 2006, I remained as an employee of Navigant Consulting, working on a part-time basis. In September 2006, I retired from Navigant Consulting. I remain primarily retired, but have worked as a private, independent consultant/contractor since September 2006. While employed at Navigant, my assignments involved the financial services industry as well as the performance and/or evaluation of damage analyses. Additional information is provided in my resume at Exhibit A.

## II. Background and Assignment

4. During 2001, I was asked by the U.S. Department of Justice to review and analyze various accounting issues surrounding the acquisition of certain thrifts undertaken by Sterling Savings Bank, FSB (Sterling) during the 1985-1988 time period. In April 2002, I issued a report in which I responded to certain claims made in reports issued by Dr. Christopher James and Dr. Paul Horvitz during September 2001. I also responded to certain claims regarding wounded bank damages that were made by Mr. Daniel Byrne, the CFO of Sterling. While my opinions regarding wounded bank damages remain relevant to the ongoing litigation, my understanding is that the other issues I addressed have been resolved by the United States Court of Federal Claims (the Court) or will not be presented by Sterling at trial.

5. On August 30, 2006, the Court issued a ruling that determined that the enactment of FIRREA did not breach the terms of the Central Evergreen contract and that the supervisory goodwill that was recorded as part of that transaction was not contractually protected from the new capital regulations. In other words, the Central Evergreen acquisition was a non-contractual acquisition. In contrast, the Tri-Cities and Lewis Federal transactions are considered to be contractual acquisitions. As a result of this new ruling, Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz (the "Horvitz 2006 Report"), on December 11, 2006 to amend the plaintiff's damages claim.

6. During January 2007, I was asked by the U.S. Department of Justice to review and consider how core capital was calculated within the 2006 Horvitz report. More specifically, I have been asked to review the expert report prepared by W. Barefoot Bankhead (the Bankhead Report) in this matter and to opine on the methodologies

used to calculate core capital that are described within that report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiff's experts.

## III. ANALYSIS OF DR. HORVITZ'S CORE CAPITAL CALCULATIONS

7. As an accounting fellow for the Office of Thrift Supervision from 1989 to 1991, one of my responsibilities was to serve on the working group that was responsible for implementing the capital regulations that were issued to implement the new capital requirements of the FIRREA legislation. As part of that working group, I served as the initial drafter of certain parts of that regulation, including items relating to supervisory goodwill. As such, I was one of the regulators involved in the creation and implementation of guidelines for the calculation of core capital during the 1989-1991 time period. I also developed training materials for a course on the new capital regulation, and served as one of the primary instructors to train selected regulatory personnel from the field offices of OTS.

8. The capital regulations that were drafted during the post-FIRREA time period represented a new standard by which to analyze a thrift's capital levels. The new capital regulation allowed for the inclusion of a portion of supervisory goodwill in the calculation of core capital during the 1989-1994 time periods. This portion of allowable supervisory goodwill was known as Qualifying Supervisory Goodwill and was defined as follows:

> (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices…plus (2) the lesser of: (i) supervisory goodwill as defined in 567.1 (ee)… (12 CFR § 567.1 (w)).

---

9. Under a scenario in which OTS, during the 1989 to 1994 time period, was working to allow all contractual goodwill to be included in the new regulatory core capital requirements of FIRREA (including the 1.5% limit of supervisory goodwill in regulatory capital), it is my opinion that all contractual goodwill would have been first applied to the 1.5% limit. Under this scenario, had contractual goodwill exceeded the 1.5% limit, it would have been allowed to continue to count despite the 1.5% limit. To the extent that contractual goodwill was less than 1.5%, other non-contractual goodwill, if any, could have been used up to the 1.5% limit. My opinion under this scenario is based upon (1) my employment as an accounting fellow for OTS from 1989 to 1991 (including my responsibilities on the working group that was responsible for implementing the capital regulations that were issued to implement the new capital requirements of the FIRREA legislation), and (2) all my experiences as an accountant and consultant over the years. Even without my unique background at OTS in 1989-1991, it is my opinion that the treatment described earlier in this paragraph would be the correct, and only correct, answer. This would have been the most appropriate methodology as it would have given a priority to supervisory goodwill that had been generated from a contractual transaction. To not do so could have resulted in a scenario in which institutions that were involved in non-contractual acquisitions would have received equally favorable treatment to those with contractual goodwill despite the FIRREA legislation's 1.5% supervisory limit (as well as other limits, including requirements that standards be no less stringent that those applicable to national banks.)

10. I have reviewed the Bankhead Report and I concur with Mr. Bankhead's conclusions regarding the calculation of core capital. I see no support for the adoption of the core capital calculations created by Dr. Horvitz and believe that such calculations result in an overstatement of Sterling's "but-for" core capital position.

**SUPPLEMENTAL EXPERT REPORT OF JOE A. HARGETT**

***STERLING SAVINGS ASSOCIATION ET. AL. v. UNITED STATES OF AMERICA***
**Case No. 95-829-C**

---

11. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work in this matter is ongoing and, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiff's experts.

Joe A. Hargett

February 15, 2007

Date

**Exhibit A**

**JOE A. HARGETT**
6295 TIMARRON COVE LANE
BURKE, VA 22015

---

| | |
|---|---|
| **SEPTEMBER 2006-CURRENT** | **Retired/Part-time consultant/contractor** |
| **FEBRUARY 1991-SEPTEMBER 2006** | **Navigant Consulting, Inc./Peterson Consulting** |

***Positions Held:***

| | |
|---|---|
| October 2003 – September 2006 | Part-time Hourly Employee |
| April 1999 – October 2003 | Director |
| January 1993 – March 1999 | Vice President |
| February 1991 – December 1992 | Executive Consultant |

Responsible for numerous financial consulting assignments in a variety of industries including the financial services industry. Experience has included numerous damage analyses involving professional malpractice, fidelity bond and other matters. Responsibilities for management of engagements have included assessment of available information, overall planning of work to be performed, supervision of the execution of work, analyses and summarization of information.

Engagement experiences have included investigation and fact-finding related to loan and investment portfolios (including loss recognition), loan servicing portfolios, fraud investigation, reconstruction of the reasons for losses, collateral evaluation, analyses and evaluation of appraisals, as well as other valuation related work.

Instructor for over twenty national training courses involving accounting, financial and litigation matters primarily in the financial services industry. These courses have been presented to government agencies, accounting firm personnel as well as law firms.

---

**MARCH 1989 - FEBRUARY 1991**

**Federal Home Loan Bank System/Office of Thrift Supervision ("OTS")**

***Position Held:*** Professional Accounting Fellow

Received a fellowship appointment to work for the savings and loan industry's primary regulatory body. Assignments included, among other things, (1) writing issue papers and opinions on accounting matters; (2) drafting segments of regulations and other regulatory guidance for the savings and loan industry; (3) serving as a frequent speaker to various industry and accounting groups throughout the United States; (4) developing training material and teaching courses on capital standards, recent accounting issues and other areas for OTS; (5) answering questions from financial institutions, CPA's and others on technical accounting matters; and (6) briefing the Director of OTS and other senior policy personnel on accounting and regulatory matters.

Special projects while at OTS included matters involving regulatory capital standards, investment portfolio issues, as well as evaluating mortgage banking operations and their loan servicing operations.

**1984 - 1989**

**KPMG Peat Marwick**

***Positions Held:***

| | |
|---|---|
| 1984 - 1985 | Assistant Accountant |
| 1985 - 1986 | Senior Accountant |
| 1986 - 1987 | Supervising Senior Accountant |
| 1987 - 1989 | Manager |

Worked on both audit and consulting engagements including many engagements involving the financial services industry. Responsibilities included engagement planning and supervision, evaluation of internal controls, execution of engagements, supervision of staff, report preparation and client interface.

**JOE A. HARGETT**
*(Continued)*

---

**PUBLICATIONS**

In June 1990, an article written by Mr. Hargett entitled "Developing Strategies to Capitalize Subsidiaries" was published in the *Regulatory Report*, a publication of an organization known at the time as the U.S. League of Savings Institutions.

**EDUCATION**

University of Alabama, Bachelor of Science degree, graduated December 1983 summa cum laude with major in accounting.

**ORGANIZATIONS**

Member of the American Institute of Certified Public Accountants

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY**

| | |
|---|---|
| Case Name: | Frank P. Slattery, Jr. et al., v. United States of America (Case No. 93-280C) |
| Date: | June 2003 / July 2003 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Sterling Savings Association, a state chartered savings association, Sterling Financial Corporation, a Washington Corporation v. United States of America (Case No. 95-829C) |
| Date: | October 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Mid-Continent Federal Savings Bank v. The United States (Case No. 95-472C) |
| Date: | May 2002 / July 2003 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

**JOE A. HARGETT**
*(Continued)*

| | |
|---|---|
| Case Name: | Standard Federal Bank v. The United States (Case No. 95-478C) |
| Date: | April 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Granite Management Corporation v. United States (Case No. 95-515C) |
| Date: | March 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Standard Federal Bank (formerly known as Heritage Federal Savings Bank) v. United States (Case No. 92-844C) |
| Date: | July 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Barron Bancshares, et al. v. United States (Case No. 90-830C) |
| Date: | June 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Southern California Federal Savings and Loan Association, et al. v. United States (Case No. 93-52C) |
| Date: | May 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | April 2000 |

| | |
|---|---|
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | John K. Castle, et al. v. United States (Case No. 90-1291C) |
| Date: | 1998/1999/2000 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | FDIC v. Arthur Andersen LLP (JAG Case No. 97-1166) |
| Date: | 1998 |
| Type of Testimony: | Arbitration |
| Forum: | Arbitration |

| | |
|---|---|
| Case Name: | Shorewood Associates, Inc. v. Resolution Trust Corporation, as Receiver for Centrust Federal Savings Bank |
| Date: | 1998 |
| Type of Testimony: | Deposition and Arbitration |
| Forum: | USDC Southern District of Florida – Miami Division |

| | |
|---|---|
| Case Name: | Statesman Savings Holdings Corp., et al., Plaintiffs, vs. United States of America, Defendant. |
| Date: | 1997/1998 |
| Type of Testimony: | Deposition and Trial |
| Forum: | United States Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

| | |
|---|---|
| Case Name: | United Savings Association of Texas, et al. (OTS Order No. AP 95-40 Dated December 26, 1995) |
| Date: | 1997 |
| Type of Testimony: | Deposition and Hearing |
| Forum: | Enforcement Proceeding Before the OTS |

| | |
|---|---|
| Case Name: | Freidkin vs. Fidelity Investments |
| Date: | 1996 |
| Type of Testimony: | Arbitration |
| Forum: | NASD Arbitration |

| | |
|---|---|
| Case Name: | Computer Discounters, Inc. vs. CompUSA, Inc., et al. |
| Date: | 1996 |
| Type of Testimony: | Trial |
| Forum: | Circuit Court, Fairfax County, Virginia |

| | |
|---|---|
| Case Name: | RTC as Receiver for Charter Savings Bank, F.S.B. v. Ross, et al. |
| Date: | 1995 |
| Type of Testimony: | Deposition |
| Forum: | USDC Southern District of Mississippi |

| | |
|---|---|
| Case Name: | Lincoln Federal Savings and Loan Association, et al. v. E.F. Hutton & Company, Inc. |
| Date: | 1994 |
| Type of Testimony: | Deposition |
| Forum: | USDC Western District of Kentucky |

## SUMMARY OF DECLARATIONS AND AFFIDAVITS SINCE 2000

| | |
|---|---|
| Case Name: | Sterling Savings Association, a state chartered savings association, Sterling Financial Corporation, a Washington Corporation v. United States of America (Case No. 95-829C) |
| Date: | January 2001 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

**JOE A. HARGETT**
*(Continued)*

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | November 2000 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | October 2000 |
| Type of Testimony: | Affidavit |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Republic Savings Bank, et al. v. United States (Case No. 92-265C) |
| Date: | April 2000 |
| Type of Testimony: | Affidavit |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Columbia First Bank, FSB v. United States (Case No. 95-510C) |
| Date: | March 2000 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

Exhibit B

**Sterling Savings Association et al. v. The United States**
**Documents Considered by Joe A. Hargett**

| No. | Date | Document | ADIIS or Bates Range |
|---|---|---|---|
| | | **Audited Financials** | |
| 1 | 06/30/89 | Report on Audit of Consolidated Financial Statements | PSG039 1643 - PSG039 1680 |
| 2 | 06/30/90 | Report on Audit of Consolidated Financial Statements | PSG039 1602 - PSG039 1642 |
| | | **Thrift Financial Reports** | |
| 3 | 03/31/89 | Quarterly Thrift Financial Report | WON889 1730 - WON889 1742 |
| 4 | 03/31/89 | Quarterly Thrift Financial Report-Amended | WON933 1586 - WON933 1588 |
| 5 | 06/30/89 | Quarterly Thrift Financial Report | PSG044 2279 - PSG044 2294 |
| 6 | 06/30/89 | Quarterly Thrift Financial Report-Amended | PSG044 2242 - PSG044 2244 |
| 7 | 09/30/89 | Quarterly Thrift Financial Report | WON937 1603 - WON937 1604 |
| 8 | 09/30/89 | Quarterly Thrift Financial Report-Amended | WON933 2027 - WON933 2042 |
| 9 | 12/31/89 | Quarterly Thrift Financial Report | PSG009 1317 - PSG009 1333 |
| | | **Legal Documents** | |
| 10 | 09/12/02 | Opinion, Chief Judge Damich in the United States Court of Federal Claims | None |
| 11 | 08/04/03 | Opinion, Chief Judge Damich in the United States Court of Federal Claims | None |
| 12 | 08/30/06 | Opinion and Order, Judge Wheeler in the United States Court of Federal Claims | None |
| | | **Expert Reports / Deposition** | |
| 13 | 01/15/07 | Expert Report of W. Barefoot Bankhead | None |
| 14 | 12/11/06 | Update to the Expert Report of Paul Horvitz | None |
| 15 | 01/27/07 | Deposition of Paul Horvitz | |
| | | **Miscellaneous** | |
| 16 | xx/xx/xx | Dr. Horvitz Components of Core Capital @ December 31, 1989 (Horvitz 2007 deposition exhibit 3) | None |
| 17 | xx/xx/xx | Dr. Horvitz Components of Core Capital @ June 30, 1990 (Horvitz 2007 deposition exhibit 4) | None |
| | | **General Industry Documents** | |
| 18 | 11/08/89 | Federal Register Vol. 54, No. 215, pgs. 46845-46875 | None |
| 19 | 08/90 | Thrift Financial Report Instruction Manuals | None |

APPENDIX 87