**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION,<br>A state-chartered savings association,<br>STERLING FINANCIAL CORPORATION,<br>A Washington Corporation<br><br>*plaintiffs,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 95-829-C<br>Judge Wheeler |

# Supplemental Expert Report of

# William G. Hamm, Ph.D.

## February 15, 2007

1. My name is William G. Hamm, and I am a Managing Director of LECG, LLC. The Government has asked me to draw upon my economics expertise and my lengthy involvement with the savings and loan industry to prepare a report evaluating certain of the plaintiffs' claims in the above-captioned matter. This evaluation includes a review of the expert reports submitted by Professor Paul Horvitz and Dr. Christopher James on behalf of the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("SFC").[1]

2. It is my understanding that the plaintiffs' claims arise from the United States' breach of certain agreements related to two supervisory acquisitions made by Sterling. The plaintiffs maintain that the Congress breached these agreements when it enacted the provisions of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") phasing out supervisory goodwill and regulatory capital credits from the definition of regulatory capital during the 1990-1995 period ("the phase-out").

3. In 2002, I submitted an expert report that, among other topics, discussed various aspects of thrift economics, including the risks facing thrifts that want to increase their earnings by growing their assets. My report also addressed certain opinions offered by Professor Horvitz and Dr. James in their 2001 expert reports.[2] Subsequent to the submission of my report, the plaintiffs' experts issued several more reports.[3] The most recent of these reports are dated December 2006, and reflect the Court's recent order regarding the Central Evergreen transaction.[4] On August 30, 2006, the Court ruled:

---

[1] It is my understanding that in an order dated September 12, 2002, the Court dismissed any contractual claim by Sterling Financial, noting that Sterling Financial was not in privity of contract with the Defendant.

[2] Expert Report of Paul Horvitz, June 28, 2001 ("Horvitz 2001 Report"); Report of Professor Christopher James -Corrected ("James 2001 Report").

[3] Revised Update to the Expert Report of Paul Horvitz, February 20, 2004 ("Revised Updated Horvitz Report"); Update to the Expert Report of Paul Horvitz, December 10, 2003 ("Updated Horvitz Report"); Revised Expert Report of Professor Christopher James, February 20, 2004 ("Revised Second James Report"); Report of Professor Christopher James, January 9, 2004 ("Second James Report"); Report of Professor Christopher James Updated December 2003, December 5, 2003 ("Updated First James Report").

[4] Update to the Expert Report of Paul Horvitz, December 11, 2006 ("Horvitz 2006 Report"); Updated Expert Report of Professor Christopher M. James, dated December 11, 2006 ("James 2006 Report").

> [The] Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA.[5]

4. In this report, I apply my experience in the thrift industry and my expertise in thrift economics to certain revised assumptions underlying the lost profits model developed by Professor Horvitz and adopted by Professor James in 2006 after the recent decision by Judge Wheeler.[6] As I will show, these assumptions fail to take into account the realities of the thrift business and trivialize the challenges facing profit-seeking executives in the savings and loan industry.

5. This report summarizes the opinions and conclusions that I have reached in this matter, with the following provisos:

a. ***My analysis is ongoing.*** I may express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents or new facts and opinions become available.

b. ***Bases for my opinions.*** My opinions are not based upon legal expertise; rather, they are based on general economic and business principles and my knowledge of the savings and loan industry, together with a basic understanding of relevant legal principles.

c. ***No opinion on liability.*** I have no opinion regarding whether a contract existed between the plaintiffs and the Defendant, or if such a contract did exist, whether it was breached by any of the parties involved in this litigation.

d. ***Documents considered.*** I have identified in Appendix C the additional documents that I considered in forming the opinions in this

---

[5] Order of Judge Wheeler, *Sterling Savings Association v. The United States*, August 30, 2006, p. 12.

[6] Professor James has indicated that he used Professor Horvitz's lost profits model, with "several adjustments," for estimating lost profits damages in his report. Accordingly, my opinions regarding Professor Horvitz's lost profits model apply to Professor James's lost profits model, as well.

report. In addition to these documents, I may use other exhibits as a summary or to support my opinions in this case. I further reserve the right to rely on any exhibit introduced in connection with the testimony of any other expert or witness, or other document produced in this case.

6. My report is organized as follows:

- Part I summarizes my qualifications to offer opinions on the matters discussed in this report.
- Part II summarizes my opinions.
- Part III provides background information on the thrift industry and the plaintiffs' claims for damages.
- Part IV analyzes certain issues related to Professor Horvitz's lost-profits model.
- Part V summarizes my conclusions regarding those aspects of the plaintiffs' claims addressed in this report.

## II. QUALIFICATIONS

### *A. Work Experience*

7. I have approximately 35 years of experience dealing with the U.S. savings and loan industry and/or its regulators. This section summarizes my professional experience.

#### 1. 1972-1977: OMB

8. In 1972, I was appointed Assistant Division Director and Chief of the Housing Branch in the U.S. Office of Management and Budget ("OMB"). Although the OMB is part of the Executive Office of the President, I held non-partisan career positions throughout my tenure.

9. As the head of the Housing Branch, I was responsible for analyzing the programs and budgets of the Federal Home Loan Bank Board ("FHLBB"), the Federal Savings and Loan Insurance Corporation ("FSLIC"), the Government National Mortgage Association ("GNMA"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), as well as the Department of Housing and Urban Development. I retained these responsibilities when, in 1976, I was promoted to Director of the Housing, Veterans, and Labor Programs Division – one of eight program divisions that comprised the principal operating units in OMB.

10. In order to fulfill my responsibilities, I developed a thorough understanding of the savings and loan ("S&L") industry and how the economic environment, government regulations, and public policies affect thrift institutions.[7] Using this understanding, I analyzed all of the proposals that the FHLBB developed for assisting the S&L industry and promoting its interests. In addition, I became familiar with the FHLBB's regulatory program, and analyzed all legislation affecting the agency

---

[7] The term "thrift institutions" is commonly applied to both S&Ls (regulated by the FHLBB, and later by the Office of Thrift Supervision) and savings banks (regulated by the Federal Deposit Insurance Corporation).

and its clients. My work products frequently were forwarded to the White House, where they were considered by the President or his domestic policy advisers.

11. During the 1972-77 period, I played a key role in OMB's ongoing efforts to modernize and reform the regulatory framework for the financial services industry. I actively participated on several interagency task forces charged with developing proposals that would enable banks and thrift institutions to compete effectively in the free market without exposing the federal deposit insurance funds to undue risk. Among the issues that I worked on as a member of these task forces were asset diversification, interest rate ceilings, competitive equality between banks and thrifts, deposit insurance limits, and risk-based deposit insurance premiums.

**2. 1977-1986: Legislative Analyst's Office**

12. In 1977, after conducting a nationwide search, the California Legislature selected me to be the state's Legislative Analyst. I became the third person to hold this position since it was established in 1941. As the Legislative Analyst, I headed a 95-person office that provided the Legislature and the people of California with objective, non-partisan analysis of all issues affecting state government. The scope of my responsibilities included the programs and budgets of the California Department of Savings and Loans ("DSL") and the California Department of Banking ("CDB").

13. During my nine years as the Legislative Analyst, I prepared analyses and recommendations pertaining to both the DSL and the CDB, and I testified before the Legislature numerous times on issues related to the departments' regulatory programs. I also played a key role in temporarily halting the issuance of new thrift charters by the DSL – an action that was justified by the industry's mounting losses and the department's inadequate regulation and oversight.

**3. 1986-1991: World Savings and Loan Association**

14. In 1986, I accepted a position as Vice President with World Savings and Loan Association ("World"), a highly profitable S&L headquartered in Oakland, California. Initially, I headed the Operations Analysis Department – World's internal

consulting group. In this capacity, I analyzed – and made recommendations for improving – the operations of all entities within the company, including the savings branches, the loan centers, underwriting, appraisal, loan servicing, treasury, accounting, marketing, and corporate facilities. In addition, I coordinated budgeting for the company, managed its product profitability system, analyzed all proposed capital outlays, and monitored the performance of World's primary competitors. In performing my duties, I became intimately familiar with all aspects of the thrift business, and developed significant expertise in the economics of deposit gathering and lending.

15. In 1988, I was put in charge of customer service for 75,000 mortgage loan customers. Approximately seven months later, I was promoted to the position of Loan Service Manager and given responsibility for 12 departments and 200 employees serving 155,000 real estate loan customers. In this position, I greatly enhanced my understanding of the factors that determine the profitability of mortgage loans.

16. In 1990, I moved to World's Corporate Development Department, where I analyzed several strategic issues facing the company. One of these issues was whether the company should expand its deposit-gathering operations in the State of Washington by building or acquiring other savings branches. At the President's direction, I prepared a detailed analysis of the deposit market in the Puget Sound area, including an assessment of the area's economic trends, demographic characteristics, and competitive environment.

17. During my five years at World, I played a leading role in numerous strategic planning and strategy development projects. I developed and applied comprehensive business models; I planned for and implemented S&L consolidations; and I prepared business strategies and action plans. I also coordinated World's strategic planning process for 1988. In addition, I was one of seven officers assigned to a task force charged with making recommendations to the Chairman and President regarding the organizational and operational changes needed to enhance World's success in a changing market. And I created the quantitative model that the President relied on in securing the Board of Director's approval for World to enter the then-$1 trillion mutual fund industry.

18. Thrift institutions are among the most heavily regulated firms in the U.S. economy. As a manager in the thrift industry, it was essential that I have a solid understanding of thrift regulations and regulatory procedures. Without this understanding, I would not have been able to fulfill my assigned responsibilities and contribute to World's strategic and business planning processes.

**4. 1991-1995: Federal Home Loan Bank of San Francisco**

19. In 1991, I was recruited to become a Senior Vice President ("SVP") at the Federal Home Loan Bank of San Francisco ("FHLB-SF"). The FHLB-SF is a privately capitalized wholesale bank that is an important source of credit for thrifts and commercial banks headquartered in California, Arizona, and Nevada. Among the FHLB-SF's customers when I joined the organization were nine of the ten largest S&Ls in the United States. When I left the bank in 1995, it was supplying over $40 billion in credit to its customers, and had assets of nearly $50 billion.

20. During 1991, my management responsibilities at the bank included strategic planning, budgeting, accounting and financial reporting, insurance, information systems, facilities, and property development. Early in 1992, the President put me in charge of Marketing and Sales – a position I held until late in the year, when I was promoted to the newly created position of Executive Vice President and became the bank's Chief Operating Officer ("COO").

21. As SVP for Marketing and Sales, I was responsible for selling credit products to the bank's mostly-S&L customers. I introduced a new approach to sales, known as consultative selling. This approach required all of us engaged in the sales process to gain a thorough understanding of the customer's business, so that we could serve the customer as consultants, rather than merely as order-takers. In carrying-out my responsibilities, I met with numerous thrift CEOs and CFOs to discuss their institutions' business strategies. In the process, I became knowledgeable about our customers' corporate objectives, their target returns or "hurdle rates," their cost of funds, their investment opportunities, and their operating expense ratios. I also enhanced my understanding of the opportunities and obstacles that thrifts face in growing their

businesses, managing their operations, and achieving their profit targets in a highly competitive market.

22. As COO, I was the bank's number two officer – accountable to the President and the Board of Directors for all financial and business operations. My responsibilities included strategy development, business planning, investments (*e.g.*, mortgage-backed securities), borrowing, cash management, asset/liability (risk) management, sales, marketing, underwriting, collateral management, credit risk management, information systems, accounting, and financial reporting. I also was accountable for compiling and publishing the Eleventh District Cost of Funds Index ("COFI") – the basis for the adjustable interest rates on billions of dollars of mortgages and other debt instruments.

23. Throughout my tenure with the FHLB-SF, I attended the monthly meetings of the bank's Board of Directors and had extensive contact with the directors, most of whom were chief executive officers of large and successful S&Ls. In addition, I was an active member of the bank's Executive Committee, its Credit Committee and its Asset/Liability Committee ("ALCO"). The Executive Committee was the primary planning, policy setting, and oversight body within the Bank. The Credit Committee reviewed the financial condition, performance, and management of each member institution, and assessed the institution's creditworthiness and financial prospects. The ALCO monitored the Bank's exposure to changes in market interest rates, and ensured that the Bank complied with the interest rate risk exposure limits imposed by the regulators and adopted by the Board of Directors. This committee also oversaw the Bank's $9.2 billion investment portfolio.

24. As a member of the credit committee, I helped determine the credit ratings assigned to the thrifts that used the bank's products. These credit ratings reflected the committee's assessment of an institution's financial strength, asset quality, capital position, earnings (quantity and quality), liquidity, exposure to interest rate risk, management, and operating environment. I also closely followed the regulatory policies and procedures adopted by the Office of Thrift Supervision ("OTS") and the Federal

Deposit Insurance Corporation ("FDIC"), so that the bank could anticipate the regulators' actions when one of its borrowers showed signs of weakness.

**5. 1996-Present: LECG**

25. In 1996, I became a Principal (now called "Director") of the Law & Economics Consulting Group, Inc. (now LECG). During the past ten-plus years, I have been retained by numerous business organizations and government entities to analyze the economic and public policy consequences of existing or proposed law, in a variety of policy areas. In 1999, I was promoted to Managing Director and assigned the responsibility for managing LECG's flagship office in Emeryville, California. I performed these duties until 2005. Currently, I serve as the coordinator of LECG's public policy practice.

## *B. Education*

26. I have an A.B. degree from Dartmouth College, where I was the only member of my 750-member class to be admitted to both the government and economics honors programs. I graduated magna cum laude, with high distinction in my major (Government). I also was elected to the Dartmouth chapter of Phi Beta Kappa and shared the Colby Prize, which is given annually to the outstanding Government major in the graduating class.

27. In addition, I have an M.A. and a Ph.D. in Economics from the University of Michigan. While at Michigan, I received numerous fellowships, including a National Science Foundation fellowship, and was elected to Phi Kappa Phi – an honorary society for economists and other scholars. My doctoral dissertation is entitled "Wage Determination in Public Utilities." My curriculum vitae is attached as Appendix A.

## *C. Areas of Expertise*

28. I am an expert, and have been qualified as an expert by Courts, in the following areas: economics, economic valuation, thrift economics, thrift management, thrift regulation, interest rate risk management, asset liability management, cost of funds for thrift institutions, business planning in the thrift industry, product profitability

analysis, and financial simulation models. A listing of my expert testimony in the last four years appears in Appendix B.

### *D. Compensation*

29. I have no financial stake in the outcome of this litigation. I am being compensated for my work on this case at my normal hourly billing rate of $500.

## III. Summary Of Opinions

30. In my opinion, Professor Horvitz's estimate of Sterling's damages is based on assumptions (explicit and implicit) about the thrift business that do not reflect reality and contradict well-accepted principles of thrift economics. As a result, I believe his opinions regarding lost profits are entirely without merit and heavily biased in the plaintiffs' favor.

31. For the same reasons, it is my opinion that the lost profits component of Dr. James's estimate of Sterling's damages, which adopted Professor Horvitz's methodology, are without merit.

## IV. BACKGROUND

32. In this part, I provide background information on the economics of the thrift industry, capital and regulatory capital requirements, Sterling Savings Association, and the plaintiffs' claims for damages.

### *A. Thrift Economics*

33. In order to understand the issues raised by the plaintiffs' claims, it is necessary to understand the economic fundamentals of the thrift industry.

#### 1. Sources of income

34. Savings and loan associations earn money primarily from three businesses:

***a. Intermediation***. The traditional business of an S&L is gathering deposits from retail customers and investing these funds in higher-yielding assets – principally real estate mortgage loans.

***b. Mortgage services.*** Thrifts also earn income from non-intermediation activities, such as originating loans and servicing loans.

- "Origination" is the process of extending credit to individual borrowers, and includes the all-important functions of loan underwriting and property appraisal.[8]
- "Servicing" encompasses certain administrative functions involved in mortgage lending, such as payment processing, collection of delinquent accounts, and customer service.

---

[8] "Underwriting" is the name given to the function that determines the credit-worthiness of the prospective borrower. "Appraisal" involves determining the value of the collateral that the mortgagor pledges to the lender as security for his or her loan.

*c. Payment services.* In addition, thrifts generate income by offering their customers fee-based deposit and payment services, such as checking accounts, money orders, travelers' checks, and credit cards.

Of these three businesses, intermediation is usually the most important and, in fact, is the thrift industry's original *raison d'être*.

**2. Determinants of operating income**

35. For a thrift to prosper, its revenues must exceed its expenses. The primary revenue and expense categories that, together, determine a thrift's operating profitability are:

- Net interest income (*i.e.*, interest income minus interest expense)
- Non-interest revenue (*e.g.*, fees earned by providing mortgage and payment services)
- General and administrative ("G & A") expenses (*e.g.*, salaries and benefits, marketing expenditures, rent)
- Provisions for loan losses due to borrower default

**3. Determinants of net interest income**

36. Net interest income is the primary source of most thrifts' operating revenues. The key determinants of net interest income are the "spread" and the "IEA/IBL ratio":

*b. The interest rate spread* is the difference between the weighted average yield on the thrift's interest-earning assets ("IEAs") and the weighted average cost of its interest-bearing liabilities ("IBLs").

*c. The IEA/IBL ratio* shows the relationship between the dollar volume of a thrift's interest-earning assets and the dollar volume of its interest-bearing liabilities.

37. For a given interest rate environment, the spread and the IEA/IBL ratio jointly determine a thrift's net interest margin – that is, its net interest income as a percentage of its interest-earning assets.

**4. Risks**

38. The business of intermediation requires a thrift to take numerous risks. These risks include:

- ***Credit risk*** – the risk that borrowers will not fulfill their obligations to the lender and, instead, default on their loans.
- ***Interest rate risk*** – the risk that interest rates will move "against" the thrift, thereby eroding the positive spread on its investments and reducing the market value of its assets.
- ***Options risk*** – the risk that borrowers will exercise their option to prepay their loans at a time when interest rates are relatively low and the proceeds from repayment cannot be reinvested at a favorable spread.
- ***Liquidity risk*** – the risk that cash inflows will not be sufficient to meet cash outflows, forcing the thrift to raise cash by liquidating assets at an inopportune time.
- ***Operations risk*** – the risk that the thrift will not be successful in implementing its business plans or controlling its operating expenses.
- ***Economic risk*** – the risk that the economy will falter, thereby reducing demand for the thrift's products and services, and jeopardizing the collection of principal and interest on outstanding loans and investments.

- ***Examination risk*** – the risk that federal or state examiners will demand changes in asset valuations or loan loss reserves, thereby reducing the thrift's regulatory capital and increasing its risk of failure.
- ***Regulatory risk*** – the risk that the regulators will change the definition of regulatory capital, raise the amount of capital that the thrift must hold, or impose limitations on the thrift's operations.

39. If not properly managed, these risks can overwhelm the initial spread between the yield on assets and the cost of liabilities, and put the thrift in an unsafe and unsound condition. When a thrift is deemed by the regulators to be in an unsafe or unsound condition, it is subject to seizure. During the period relevant to this case, Sterling was subject to each of these risks.

## *B. Capital and Capital Requirements*

40. All businesses need capital to finance their operations. Thrifts need capital for an additional reason: to satisfy statutory and regulatory capital requirements.

### 1. Minimum capital requirements

41. Regulatory capital requirements serve two important purposes in the thrift industry. First, they provide incentives for thrift owners and managers to operate their institutions in a prudent manner. Without these incentives, the system of federal insurance for thrift deposits would be unworkable. Once a thrift's economic net worth has been depleted, the owners will have an economic incentive to take imprudent risks at the expense of the deposit insurer – a condition commonly referred to as "moral hazard." Second, capital requirements protect the deposit insurance fund from claims by absorbing unanticipated losses incurred by thrifts, much like an insurance policy deductible protects the insurer.

42. To serve these purposes, however, the required capital must be "real" – that is, attributable to the thrift's economic net worth and, therefore, capable of absorbing losses and deterring imprudent behavior.

**2. Types of capital**

43. In the 1980s, when the transactions that are the subject of this case occurred, a thrift's "capital" was measured using two different standards: GAAP and RAP.

***a. GAAP Capital.*** When a thrift prepares its balance sheet in accordance with generally accepted accounting principles ("GAAP"), all or most of its assets and liabilities are valued at historical cost. The difference between book assets and book liabilities – the thrift's "net worth" – is sometimes referred to as "GAAP capital."

***b. RAP Capital.*** Capital measured in accordance with regulatory accounting principles ("RAP") may reflect assets and liabilities that either are not recognized by GAAP (*e.g.*, regulatory capital credits) or are not considered to be part of a business' net worth (*e.g.*, subordinated debentures).

44. Neither measure of capital, however, necessarily reflects the economic or financial condition of a thrift institution. Some components of GAAP capital (*e.g.*, goodwill) have no intrinsic value, because they cannot be sold in the marketplace or converted into cash. For this reason, thrift executives, securities analysts, credit rating agencies, investors, and creditors closely monitor thrifts' *tangible* net worth, which recognizes only tangible assets in calculating net worth.

45. The difference between GAAP capital and tangible net worth can be very large. James Barth, a former chief economist at the FHLBB and the OTS, estimates that in 1982, the thrift industry's GAAP net worth totaled $20 billion, but its tangible net worth amounted to only $4 billion.[9]

46. A thrift's tangible net worth is not always a reliable measure of the institution's financial condition. Because it is calculated based on the historical cost of assets and liabilities, tangible net worth may over- or under-state the current market value

[9] James R. Barth, *The Great Savings and Loan Debacle*, The AEI Press, 1991, p. 25.

of the thrift's net worth. When interest rates are abnormally high, for example, the market value of fixed-rate assets typically is less than the assets' historical cost. In 1982, the market or economic value of the thrift industry's net worth was estimated to be *minus* $150 billion, versus GAAP net worth of *plus* $20 billion and tangible net worth of *plus* $4 billion.[10]

### 3. Changes in regulatory capital requirements

47. Both the definition of regulatory capital and the minimum amounts of regulatory capital that thrifts were required to hold changed often during the 1980s and early 1990s.

#### *a. Capital requirements during the 1980s*

48. Prior to 1980, thrifts were required to maintain net worth equal to at least 5 percent of their liabilities.[11]

> ***a. The requirements are eased.*** During the first half of the 1980s, regulators lowered capital requirements in two ways. First, they reduced the minimum requirement from 5 percent of liabilities to 4 percent, and then to 3 percent.[12] Second, the regulators broadened the definition of regulatory capital to reflect "assets" not recognized by GAAP, such as "Deferred Losses," "Appraised Equity Capital," and cash infusions counted twice (i.e., "regulatory capital credits").[13] By broadening the definition of regulatory capital in this manner, the regulators made it appear that thrifts were healthier than, in fact, they really were. These changes, of course, did not affect the true economic condition of thrifts.
>
> ***b. The regulators reverse course.*** In August 1986, the FHLBB announced its intention to raise net worth standards gradually to 6 percent of liabilities, with a reduction of up to 2 percent for thrifts that achieved certain interest rate risk

---

[10] *Origins and Causes of the S&L Debacle: A Blueprint for Reform,* Report of the National Commission in Financial Institution Reform, Recovery and Enforcement, July 1993, pp. 30-31.

[11] Lawrence J. White, *The S&L Debacle: Public Policy Lessons for Bank and Thrift Regulation*, Oxford University Press, 1991, p. 82.

("IRR") targets. The FHLBB, however, made little progress toward this objective, and the 6 percent target was superseded by FIRREA.

*c. Institution-specific capital requirements.* At least since 1987, the regulators have had the statutory authority to require an individual thrift to hold more capital than the statutory or regulatory minimum, if the thrift is deemed to pose an excessive threat to the deposit insurance fund. Such an obligation is called an Individual Minimum Capital Requirement ("IMCR").[14]

***b. FIRREA alters regulatory capital requirements***

49. In 1989, the Congress enacted FIRREA, imposing new capital requirements on the U.S. thrift industry. FIRREA changed the definition of regulatory capital by phasing-out or excluding certain intangible assets (*e.g.*, goodwill) and other regulatory forbearances (*e.g.*, capital credits). It also required thrifts to satisfy three new capital requirements:

- *Tangible capital requirement.* The Act required thrifts to maintain tangible capital equal to at least 1.5 percent of their tangible assets. This requirement was intended to improve thrifts' ability to absorb losses, and thereby provide more protection to the deposit insurance fund.

- *Risk-based capital requirement.* The Act also required thrifts to maintain capital equal to at least 8 percent of their "risk-weighted assets."[15] As a result, thrifts with relatively risky assets (*e.g.*, construction loans, commercial loans) were required to hold more capital than thrifts with less-risky assets (*e.g.*,

---

[12] *Ibid.*

[13] *Ibid.*, p. 83. Also see FDIC, *Saving and Loan Crisis and Its Relationship to Banking*, in History of the Eighties – Lessons for the Future, pp. 173-4. The regulator's definition of regulatory capital also included supervisory goodwill.

[14] Capital: Qualifying Mortgage Loan, Interest Rate Risk Component, and Miscellaneous Changes, 12 CFR §567 at 15052-3 (2001). Also see Memo from Jack D. Smith to Jonathan Fiechter Re History of Regulatory Capital Requirements, 1978-1988, dated May 12, 1988, pp. 2 and 15.

[15] The Act phased-in this requirement over a four-year period. The minimum requirement was 6.4 percent and 7.2 percent for 1990 and 1991-92, respectively, before reaching 8.0 percent in 1993. See, Thrift Financial Report Instructions, Consolidated Capital Requirement – Schedule CCR, September 1991, p. 39.

Treasury securities, single-family mortgage loans). This important change explicitly acknowledged that the composition of a thrift's assets affects the degree of risk that the thrift poses to the deposit insurance fund.[16]

- *Core or leverage capital requirement.* The Act also required thrifts to maintain regulatory capital equal to 3 percent of their adjusted tangible assets. (This requirement is similar to the one that applied to thrifts prior to FIRREA.)

For purposes of the risk-based and core capital requirements, thrifts were permitted to count certain intangible assets in determining their regulatory capital.

#### *c. FDICIA imposes stiffer effective capital requirements.*

50. In 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), which had the effect of increasing the minimum core capital requirement from 3 percent of assets to 4 percent. FDICIA also required the FDIC to impose risk-based deposit insurance premiums on banks and thrifts, beginning in 1993.

## *C. Sterling Savings Association*

51. In this section of my report, I review Sterling's operational history and the two supervisory mergers at issue in this case.

### 1. Sterling's acquisitions

52. Until 2005, Sterling Savings Association was a Washington-chartered stock savings and loan association headquartered in Spokane, Washington. In 2005, it converted to a bank charter.

---

[16] The move to impose risk-based capital requirements actually began prior to FIRREA when, in December 1988, the FHLBB published draft regulations setting forth such requirements.

*a. Early history*

53. Sterling began operations in April 1983 with a single office and total assets of $2.5 million.[17] Shortly after opening its doors, Sterling acquired Lewis and Clark Savings and Loan Association in a non-supervisory merger (June 1983), thereby adding three branches and $44 million in assets.[18]

54. During the course of the 1980s, Sterling grew primarily by acquiring other thrifts. In fact, of the thrift's 28 branches at June 30, 1989, all but 2 had been obtained through acquisitions.[19] In June 1989, Sterling had total assets of $730 million, of which approximately 60 percent had been obtained via acquisitions.[20] Its deposits totaled $520 million.[21]

*b. Lewis Federal Acquisition*

55. Sterling's first supervisory merger involved Lewis Federal Savings and Loan Association ("Lewis"). In the spring of 1985, Sterling sought to acquire Lewis on an unassisted basis. Sterling's Chief Executive Officer ("CEO"), Mr. Harold Gilkey, states that the thrift terminated its efforts when investment bankers advised management that issuing the subordinated debt needed to finance the acquisition would be more costly than planned.[22]

56. Subsequently, Lewis was declared insolvent, and the FHLBB solicited bids for the thrift from several organizations, including Sterling.[23] Three institutions

[17] Sterling Savings, 1989 Report to Shareholders (henceforth, "1989 Report to Shareholders"), p. 4 [WON933 2229].

[18] Sterling Savings Association, 1983 Annual Report, pp. 4-5 [PSG043 2306].

[19] 1989 Report to Shareholders, p. 13 [WON933 2238].

[20] 1989 Report to Shareholders, p. 4 [WON933 2229].

[21] 1989 Report to Shareholders, p. 7 [WON933 2232].

[22] Deposition of Harold Gilkey (henceforth, "Gilkey Deposition"), pp. 84-85.

[23] Gilkey Deposition, p. 85.

submitted bids for Lewis, and Sterling's bid was accepted.[24] The acquisition was completed in November 1985.

57. Sterling believed that the acquisition of Lewis would provide it with several valuable opportunities, including:

- Greater asset size
- More loan production capacity
- Increased market penetration
- Increased earnings
- A larger, more stable deposit base with below-average servicing costs
- More-rapid penetration of the Seattle and Portland markets.[25]

58. As of August 31, 1985, Lewis had assets of $52.5 million and negative net worth of $0.05 million (negative 0.10 percent of assets). When the thrift's Net Worth Certificates ("NWCs") of $150,000 and appraised equity capital of $736,456 are excluded from assets, Lewis' negative net worth on this date becomes $937,702 (negative 1.8 percent of assets).[26]

59. In connection with the Lewis acquisition, Sterling received $1.75 million in cash assistance from the FSLIC. The plaintiffs claim that the terms of their agreement with the FSLIC permitted Sterling to in effect, *double-count* the cash assistance in calculating its regulatory capital position ("capital credit").

60. In accounting for the acquisition, Sterling added an intangible asset – goodwill – to its balance sheet, in the amount of $1.86 million.[27] The goodwill was

---

[24] A Memorandum to FHLBB from James R. Faulstich Re: FSLIC Assisted Acquisition, dated October 23, 1985 [WOF014 0468-0471].

[25] Lewis Federal Acquisition Opportunity, Board of Directors' Meeting, February 26, 1985, p. 2 [PSG061 1987].

[26] Issues Memorandum to FHLBB from James R. Faulstich Re: FSLIC Assisted dated October 23, 1985, [WOF014 0450].

[27] Sterling Savings Association, 1986 Annual Report (henceforth, "1986 Annual Report"), p. 22 [WON922 0026].

created pursuant to GAAP. The capital credit, however, was not recognized by GAAP, and existed only under RAP.

*c. Tri-Cities*

61. In 1986, representatives of Tri-Cities Savings and Loan Association ("Tri-Cities") approached Sterling's management to explore the possibility of Sterling acquiring the thrift. Management responded positively and attempted to negotiate a merger with Tri-Cities. According to Mr. Gilkey, these efforts failed, due to a disagreement over the financial terms of the transaction.[28]

62. Mr. Gilkey recalls that about a year later, the FHLBB asked Sterling to submit a competitive bid for the thrift, and informally advised management that a fair bid would be accepted.[29]

63. After completing its due diligence, Sterling management concluded that the Tri-Cities acquisition involved "little downside risk,"[30] and would increase shareholder value.[31] Management believed that the acquisition of Tri-Cities would provide valuable opportunities for Sterling, including:

- Penetration of a significant market in eastern Washington
- New depository locations
- Immediate loan origination capacity
- Approximately $11 million in cash to fund new loans
- Reduced operating costs[32]

---

[28] Gilkey Deposition, pp. 165-6.

[29] *Ibid.*, pp. 180-3.

[30] Sterling Savings Association, Minutes of the Meeting of the Board of Directors, February 20, 1988, p. 7 [PSG052 0424].

[31] Sterling Savings Association, Fiscal 1988 Business Plan Update to Include the Acquisition of Tri-Cities Savings and Loan Association (Draft), dated February 26, 1988 (henceforth "1988 Business Plan (Tri-Cities)"), p. 5 [PSG056 2622].

[32] 1988 Business Plan (Tri-Cities), pp. 2-5 [PSG056 2619-2622].

64. Mr. Gilkey noted in his deposition that, initially, Sterling was told that it had not been selected as the low bidder for Tri-Cities. Subsequently, management was informed that the low bidder (Old Stone) had chosen to withdraw, and that Sterling's acquisition of Tri-Cities would be approved.[33]

65. In December 1987, Tri-Cities had assets of about $54.5 million, deficit regulatory capital of $6.1 million, and negative GAAP capital of $8.5 million.[34] To facilitate the acquisition, the FHLBB made a cash contribution of $11.73 million to Sterling. Sterling also booked supervisory goodwill of $2.24 million in connection with the acquisition.[35] The acquisition was completed in April 1988.[36]

*d. Central Evergreen*

66. After completing the Tri-Cities transaction, Sterling sought to acquire Central Evergreen Federal Savings and Loan Association ("Central Evergreen") on an unassisted basis. Sterling's management believed that Central Evergreen presented many attractive opportunities to the thrift, including:

- Enhancements to Sterling's retail delivery system[37]
- The addition of vital branch locations in western Washington
- Economies of scale
- Greater geographical diversification
- A stable source of deposits
- Enhanced loan origination capability.[38]

---

[33] Gilkey Deposition, pp. 186, 193.

[34] Memo to John M. Buckley, Jr. from James R. Faulstich Re: Recommendation for the Appointment of the FSLIC as Receiver for and the Subsequent Acquisition of Substantially all the Assets and Liabilities of Tri-Cities S&LA, March 31, 1988, p. 3 [WOF014 1081].

[35] Sterling Savings Association, 1988 Annual Report (henceforth, "1988 Annual Report"), pp. 30-1 [PSG027 0385-0386].

[36] Press Release from Sterling Savings Association, dated April 11, 1988 (Gilkey Deposition, Exhibit 16).

[37] "The first issue is to satisfy the Board that we have a good reason to acquire Central Evergreen. That reason is acquisition of the delivery system." Sterling Savings Association, Minutes of the Meeting of the Board of Directors, dated April 26, 1988 (Gilkey Deposition, Exhibit 21), p. 9 [PSG052 0342].

[38] Sterling Savings Association and Central Evergreen Federal S & L Assn., Combined Supervisory Stock Conversion and Merger (Acquisition) Application dated August 15, 1988, pp. 3-4 [WON94- 2188-

67. As of June 30, 1988, Central Evergreen had total assets of $254 million, regulatory capital of $4.6 million, and negative GAAP capital of $12.7 million.[39] Sterling's management noted that the acquisition of Central Evergreen would "place Sterling among the top ten Washington State thrift institutions based on asset size."[40]

68. In its application to the FHLBB seeking approval for the acquisition, Sterling did not request any financial assistance or special accounting concessions.[41] It "recorded $13.603 million in unidentified intangibles and $8.480 million of identified intangibles" on its books when it accounted for the acquisition.[42] Pursuant to FHLBB policy, the accounting for these intangible assets had to satisfy GAAP, including those provisions of GAAP pertaining to the amortization of intangibles. Sterling also acquired approximately $15-22 million in net operating losses ("NOLs") that it could use to reduce future federal income tax payments.[43]

69. Sterling recognized that the acquisition of a large institution such as Central Evergreen carried risks, but management believed that it could make the transaction a success.

**2. Sterling's Response to FIRREA**

70. As soon as FIRREA took effect, Sterling found itself out of compliance with all three regulatory capital requirements imposed by the statute. Its efforts to avoid sanctions for non-compliance took several forms.

---

2189]; Sterling Savings Association, Fiscal 1989 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association, dated August 15, 1988 (henceforth, "1989 Business Plan (Central Evergreen)"), p. 2 [WON944 2310].

[39] James 2001 Report, p. 18.

[40] 1988 Annual Report, p. 2 [PSG027 0357].

[41] According to Sterling's Chief Financial Officer ("CFO"), Daniel G. Byrne, Sterling did not request cash assistance because such a request would have extended the bid process beyond December 31, 1988, when certain valuable tax benefits available to acquirers of problem institutions, expired. Deposition of Daniel G. Byrne (henceforth, "Byrne Deposition"), pp. 262-63.

[42] James 2001 Report, p. 18.

[43] Letter from Harold B. Gilkey to Hilton Hewitt of the FHLB of Seattle Re: Request Approval of a Supervisory Merger between Sterling Savings Association and Central Evergreen Savings and Loan Association, dated February 12, 1988 (Gilkey Deposition, Exhibit 28) [PSG056 2659].

*a. The aborted stock offering*

71. Prior to FIRREA's passage, Sterling had announced plans for a $12 million offering of common and preferred stock. Preparations for the sale continued through the summer and fall, but in December the offering was postponed (later cancelled) when the OTS refused to approve in advance the payment of dividends on the preferred stock.[44]

*b. Capital Plan*

72. The OTS required all thrifts that were not in compliance with regulatory capital requirements to submit plans showing how they would achieve compliance. Sterling filed a Capital Restoration Plan dated January 5, 1990.[45] OTS rejected this plan because it provided for the payments of dividends, even though it showed Sterling out of capital compliance.[46] Sterling filed a second plan on February 19, 1990, which also was not approved.[47] A draft plan, dated July 23, 1991, was submitted to OTS on July 24, 1991.

*c. The 1990 Injunction*

73. In part to prevent the OTS from applying the new capital requirements to Sterling, the thrift sought an injunction from the U.S. District Court for the Eastern District of Washington in May 1990. In response, Judge Quackenbush issued a temporary restraining order on May 28, 1990, and a Preliminary Injunction on August 8, 1990. Pursuant to the injunction, the OTS was "...enjoined and restrained from:

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;

---

[44] Letter from the OTS to William J. Zuppe, dated December 19, 1989 (Byrne Deposition, Exhibit 72) [WON889 0259].

[45] Deposition of Daniel G. Byrne (Exhibit 74).

[46] *Ibid.*, (Exhibit 76).

[47] *Ibid.*, (Exhibit 75).

b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;

c. placing Sterling in a receivership or conservatorship; and

d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.[48]

74. A November 1, 1990 order later narrowed the scope of the preliminary injunction but "reaffirmed the injunction insofar as it prohibited the regulators from imposing or enforcing any regulatory restrictions on the Association that would be inconsistent with the contractual agreements."[49]

75. In 1992, the Court of Appeals dissolved the injunction.[50]

***d. 1991 public offering***

76. In November 1991, Sterling successfully raised about $21 million in equity capital through a common stock offering. The proceeds from the offering returned the thrift to full compliance with all regulatory capital requirements.[51] The proceeds exceeded the unamortized balance of Sterling's supervisory capital, which according to Professor Horvitz was approximately $12.952 million at December 31, 1991.[52]

---

[48] Memorandum Opinion and Order Granting Motion for Preliminary Injunction and Denying Motion to Dismiss, *Inter Alia*, August 8, 1990, pp. 27-8 [WON878 0998-0999].

[49] Sterling 1991 Annual Report, p. 26 [PSG043 0642].

[50] *Sterling Savings Ass'n v. Ryan*, 959 F.2d 241 (9th Cir. 1992).

[51] Sterling Savings, 1992 Annual Report, p. 18 [PSG027 0492].

[52] See Horvitz 2006 Report, Exhibit 6, Table 4a. According to Professor Horvitz, the unamortized balance of the Lewis Federal and Tri-Cities intangibles was $13.673 million and $12.232 million at June 30, 1991 and June 30, 1992, respectively. The average of these two amounts is $12.952 million. In my report, for convenience, I will refer to the supervisory intangibles from Sterling's Lewis Federal and Tri-Cities acquisitions that are the subject of the instant lawsuit as Sterling's "supervisory capital."

### *D. The Plaintiffs' Claim for Expectation Damages*

77. In his most-recent report, Professor Horvitz contends that at December 31, 1989, Sterling had $16.067 million in supervisory capital remaining from the Lewis Federal and Tri-Cities acquisitions. In his opinion, the phase-out of this $16.067 million caused Sterling to incur total expectancy damages of $63.361 million.[53] A summary of Professor Horvitz's damages estimate appears in Table 1.

**Table 1**
**Professor Horvitz's Estimate of Sterling's Expectation Damages**
($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | $58,164 |
| [2] | **+ Wounded Bank Damages** | $4,556 |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 |
| | Loss on CJ-4 Loan | $1,241 |
| | Excess Supervision Costs | $172 |
| | Cost of 1989 Units Offering | $1,004 |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $304 |
| [3] | **+ Future Damages** | $641 |
| | **Total Expectation Damages** | $63,361 |

*Source: Horvitz 2006 Report, Exhibit 8*

78. As I noted above, Professor Horvitz and Dr. James have employed the same methodology to estimate the lost profits components of their damages models.[54] In fact, for the first four years of the assumed damages period (1989-1992), their estimates of lost profits are identical.[55] Accordingly, my evaluation of Professor Horvitz's most-recent lost profits estimate applies equally to Dr. James's lost profits model.

---

[53] Horvitz 2006 Report, p. 4 and Exhibit 8.

[54] Dr. James estimated lost profits for Sterling at $4.137 million through February 1993. Dr. James's total damages estimate, including mitigation and wounded bank costs, is $13.708 million (James 2006 Report, pp. 4 and 8 and Exhibit D). Dr. James indicated, "The lost profits from the un-mitigated LF & TC supervisory capital can be measured with the model developed by Professor Horvitz *which I have adopted*" (James 2006 Report, p. 8, *emphasis supplied*).

[55] Horvitz 2006 Report, Exhibit 6, Table 1 and James 2006 Report, Exhibit E, Table 1.

## V. PROFESSOR HORVITZ'S LOST PROFITS MODEL

79. In this section, I evaluate certain assumptions underlying the lost profits models set forth in the expert reports submitted by Professor Horvitz and Professor James.

### *A. Professor Horvitz's Model*

80. The model underlying Professor Horvitz's opinion on Sterling's expectancy damages is typical of the lost-profits models that I have reviewed in other *Winstar* cases. It is built on the concept of "foregone assets." Professor Horvitz assumes that, with more regulatory capital, Sterling would have held more interest-earning assets. He further assumes that the incremental assets would have been as profitable, on average, as the actual assets held by the real-world Sterling. According to Professor Horvitz, the pre-tax profits on these hypothetical assets constitute the bulk of Sterling's expectancy damages.

#### 1. The recent change to the assumptions underlying Professor Horvitz's model

81. In his most-recent report, Professor Horvitz changes a key assumption that appeared in previous versions of his report. In his earlier reports, he assumed that the but-for Sterling's target regulatory capital ratio during the periods ending December 31, 1989, June 30, 1990 and June 30, 1991, would have been 4.16%, 4.15% and 4.24%, respectively. These are the regulatory capital ratio targets that Sterling established when it formulated and adopted its August 1989 Business Plan.

82. Professor Horvitz now contends that the but-for Sterling would have "operate[d] with a core capital ratio of 4% from December 31, 1989 to June 30, 1991."[56] He believes a lower capital ratio is appropriate given the Court's decision that the supervisory goodwill associated with Sterling's acquisition of Central Evergreen is non-contractual. He explains his revision as follows:

---

[56] Horvitz 2006 Report, p. 3.

> Without the ability to use the Central Evergreen intangibles as anticipated at the time of the contract, it is not reasonable to assume that Sterling would strictly adhere to the capital ratios specified in the Business Plan.

83. Thus, due to a *non*-breaching provision of FIRREA that reduced Sterling's regulatory capital,[57] Professor Horvitz believes the thrift would have opted to take more risk, in order to hold more assets.

84. This is not the first time in this litigation that a Court ruling has reduced the but-for Sterling's post-FIRREA regulatory capital. When Judge Damich ruled that the goodwill associated with Sterling's regulatory capital credits had to be amortized, it put the but-for Sterling in the same position that Judge Wheeler's August 30, 2006 ruling put it in: having to choose between taking more risk and holding more assets. In his 2004 report, filed after Judge Damich's ruling, Professor Horvitz apparently concluded that the but-for Sterling *would not* have opted to take-on more risk after FIRREA. Consequently, Professor Horvitz's opinion that Sterling *would* have taken more risk due to the regulatory consequences of Judge Wheeler's ruling is at odds with the opinion he expressed following Judge Damich's ruling.

**2. Consequences of the change in assumptions**

85. By reducing the but-for Sterling's target capital ratios, Professor Horvitz increases the volume of assets held by the thrift in his model. Because he assumes that, on average, new assets are always as profitable as old assets, the change in assumption has the effect of increasing his estimate of Sterling's lost profits by 70 percent. In fact, if Professor Horvitz had assumed that the but-for Sterling would have retained the 4.16 percent target it adopted in August 1989 for the period ending December 31, 1989, there would be no "foregone assets" in 1989.

**3. Defects in Professor Horvitz's revised model**

86. Professor Horvitz provides no factual justification to support his new four percent estimate of the but-for Sterling's target core capital ratio. In fact, at his

---

[57] The provision that phased-out supervisory goodwill from the definition of regulatory capital.

deposition he was not sure who decided that the but-for target capital ratio in his model should be four percent.

> Q Whose idea was it to use the four percent number?
>
> A I'm not -- I simply don't recall.
>
> Q So it was not your idea?
>
> A I'm not sure, it may have been. I -- I thought it was *(sic)* made sense not to tie the calculations tightly to the business plan, and the four percent figure seemed like an appropriate figure that would not change the results very much, it would – would somewhat decrease the amount of shrinkage that the but-for bank would have undergone in the world of the new decision.[58]

I note that in all of his previous reports, Professor Horvitz apparently concluded that it made sense to tie the calculations to the business plan.

87. In my opinion, Professor Horvitz's but-for Sterling reflects a fundamental misunderstanding of how thrifts operate in the real world. Specifically:

- He fails to adequately recognize the importance of capital in reducing a thrift's risk of failure.
- He fails to adequately recognize the contribution of capital to the operating success of thrift institutions.
- He erroneously assumes that an increase in thrift assets leads to an increase in thrift profitability.
- He erroneously assumes that participants in the deposit-gathering and mortgage lending markets are always willing to accommodate a growth-oriented thrift such as Sterling, even if doing so reduces their own profitability.
- By implication, he erroneously assumes that in 1989, $10 million of amortizing paper capital like supervisory goodwill was more valuable than $10 million of cash.

---

[58] Deposition of Paul Horvitz, Ph.D., January 25, 2007 ("Horvitz 2007 Deposition"), p. 22.

88. As a result of this misunderstanding, Professor Horvitz's opinion on the plaintiffs' damages is neither reliable nor credible.

### *B. After FIRREA, the But-For Sterling Was More Likely to Raise, Than Lower, Its Target Capital Ratio*

89. In Professor Horvitz's but-for world, Sterling's asset goals dictate the thrift's target capital ratio. Professor Horvitz observes that, by adhering to the capital ratios in its August 1989 business plan, Sterling would have had to shrink its assets more than it contemplated when it adopted the targets. Because Professor Horvitz believes Sterling did not want to shrink, he assumes that the thrift would have reduced its targets in order to accommodate more assets on its balance sheet.

90. Based on my experience working for and with thrifts in the real world, I believe Professor Horvitz has it backwards. Well-managed thrifts determine how much risk of failing capital requirements they are willing to assume, and then set their target capital ratios accordingly. It is these ratios that determine a thrift's target asset size, not the other way around.

#### 1. Sterling's Actual Capital and But-For Capital

91. Prior to FIRREA, Sterling was in capital compliance, but it was in a very weak tangible net worth position. Table 2 shows Sterling regulatory capital position as of June 30, 1989.

**Table 2**
**Real-World Sterling's Regulatory Capital Position**
**June 30, 1989**

| | |
|---|---|
| Total Stockholders' Equity | $10,512 |
| FSLIC Assistance Payments | $13,480 |
| Adjustment to the amortization of fair market value adjustments and intangibles, arising from acquisitions, under FHLBB regulations. | $(277) |
| Regulatory capital | $23,715 |
| Minimum regulatory capital required | $21,612 |
| Regulatory capital in excess of minimum required | $2,103 |

*Source: Sterling Savings 1989 Annual Report, p. 33 [WON933 2258]*

92. Table 2 does not give a meaningful picture of Sterling's financial condition. As of June 30, 1989, Sterling's balance sheet included intangible assets totaling $25.722 million.[59] When this amount is subtracted from stockholders' equity of $10.512 million, Sterling's tangible net worth becomes *negative* $15.210 million. Even in Professor Horvitz's but-for world, the $10.5 million raised by its hypothetical 1989 offering is not sufficient to give Sterling positive tangible net worth, as Table 3 illustrates.

[59] This amount is comprised of goodwill of $16.630 million, identified intangibles of $6.360 million and purchased mortgage servicing rights of $2.732 million. Sterling Savings 1990 Annual Report, p. 16 [WON952 2212].

**Table 3**
**But-For Sterling's Regulatory Capital & Tangible Net Worth Position**
**December 31, 1989**

| | |
|---|---|
| Actual Core Capital | ($2,273) |
| **Less:** | |
| Actual Reported Supervisory Goodwill | (10,308) |
| Actual Net Income | (627) |
| **Plus:** | |
| Actual Dividends | 112 |
| Hypothetical Proceeds of 1989 Offering | 10,385 |
| Lewis Federal & Tri-Cities Supervisory Capital | 15,557 |
| Central Evergreen Qualifying Supervisory Goodwill | 10,421 |
| Central Evergreen Other Qualifying Intangibles | 5,670 |
| But-For Net Income | 202 |
| **Less:** | |
| But-For Dividends | (353) |
| **But-For Core Capital** | $28,786 |
| **Less:** Total Intangibles | (31,648) |
| **But-For Tangible Net Worth** | ($2,862) |

*Sources: Horvitz 2006 Report, Exhibit 6, Table 5.*

**2. Would a well-managed thrift's appetite for risk have increased following FIRREA?**

93. In evaluating the plausibility of Professor Horvitz's but-for world, one must consider what price would a well-managed thrift have been willing to pay in 1989, 1990, and 1991, in order to avoid becoming smaller. While neither Professor Horvitz nor I can say with certainty what price Sterling's Board of Directors would have paid in the but-for world, there are sound business reasons for concluding that the but-for Sterling would have targeted *higher*, rather than lower, regulatory capital ratios following FIRREA.

***a. Thrift regulation after FIRREA was more rigorous***

94. Following the enactment of FIRREA, the regulatory environment for thrifts was more severe than it had been in previous years. One reason was the addition of a second S&L regulator – the FDIC, which thrift executives regarded as much stricter

than the FHLBB.[60] A second reason was that the FHLBB's successor, the OTS, conducted more rigorous examinations than its predecessor.[61] (Clearly, the regulators were too lenient prior to FIRREA, and more intensive examinations were needed if the thrift industry was going to survive and prosper.)

95. Because the regulatory environment was more severe following FIRREA, the regulatory risk faced by thrift institutions generally was higher than it had been in the pre-FIRREA days. As a result, thrifts needed a larger regulatory capital cushion to achieve the same level of protection against falling out of capital compliance.

***b. The consequences of failure after FIRREA were much greater***

96. The likelihood that the regulators would grant forbearance to a thrift that fell out of capital compliance was considerably less after FIRREA than it was before.[62]

---

[60] Professor Horvitz agrees.

Q. Okay. Do you have an opinion as to whether savings and loan managements regarded the FDIC examination process as stricter or more lenient than the Federal Home Loan Bank board exam process?

A. They viewed it as stricter. (Deposition of Paul Michael Horvitz, Ph.D., December 2001 (henceforth, "Horvitz 2001 Deposition"), p. 421)

[61] Professor Horvitz agrees.

Q. Do you know if S&Ls regarded the OTS as a tougher regulator than the Federal Home Loan Bank board had been?

A. Well, I don't think it's a -- it's a difference of -- between OTS and the -- and Home Loan Bank board. It's the same people and the same examiners. It's a difference in time. So -- so OTS examinations were tougher than Home Loan Bank examiners, but it's -- it's the same people. It's their attitudes were -- were different. (Horvitz 2001 Deposition, pp. 421-422)

[62] Professor Horvitz agrees.

Q. How would you compare the risks to a thrift that fell out of regulatory capital compliance prior to FIRREA with the risks to a thrift that fell out of regulatory capital compliance after FIRREA?

A. Well, the -- the risk of action being taken after FIRREA were -- were greater, and -- and particularly that's true after FDICIA, F-D-I-C-I-A.

Q. Do believe that a thrift was more or less likely to benefit of regulatory forbearance after FIRREA relative to before?

A. More likely to benefit from forbearance?

Q. Yeah.

A. I think there were -- they were less likely to get forbearance from -- from capital compliance after -- after FIRREA. If they got it, they would benefit more.

In 1987, Congress directed the regulators to grant forbearance for troubled thrifts. By 1990, however, Congress had done an about face, and expected regulators to be less forgiving of financial weakness on the part of thrifts. The move away from forbearance culminated in the 1991 enactment of the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"), which greatly limited the regulators' ability to grant leeway to troubled thrifts.

97. Thus, not only was the risk of falling out of capital compliance greater in the post-FIRREA period; the consequences of non-compliance were much more severe. Consequently, other things equal, a rational thrift would need a larger capital cushion to achieve the same degree of protection against risk than it needed prior to FIRREA.

*c. Thrifts expected further increases in minimum capital requirements*

98. During 1990, most thrifts anticipated that the minimum capital requirements established by FIRREA would be increased further, in order to reduce the deposit insurance funds' exposure to loss. The Office of the Comptroller of the Currency ("OCC") – the regulator for national banks – announced that it would raise the minimum core capital requirement from three percent to four or five percent. FIRREA requires the OTS to prescribe minimum capital requirements for S&Ls that are no less stringent than those which apply to national banks.

99. In December 1990, the OTS responded to the OCC's statement of intent by proposing regulations that would have required most thrifts to maintain leverage (*i.e.*, core capital) ratios 100 to 200 basis points higher than the 3 percent minimum. Sterling acknowledged the possibility of the higher minimums in its June 30, 1991 Form 10-K:

---

Q. Do you believe that the sanctions were falling out of -- of regulatory compliance following FIRREA were more severe or less severe than they were prior to FIRREA?

A. Certainly after FDICIA they were -- they were more severe.

Q. What about after FIRREA?

A. I don't know the -- the answer to that. Probably more severe. (Horvitz 2001 Deposition, pp. 420-421)

> The OTS, on December 12, 1990, issued a proposed ruling reflecting the requirements of the OCC leverage ratio regulation. The proposed regulation continues the requirement that all savings associations must have and maintain core capital in an amount equal to at least 3% of adjusted total assets. In addition, the proposed rule provides that the minimum leverage ratio of 3% would apply only to savings associations in the strongest condition. All other savings associations would be required to maintain leverage ratios of at least 100 to 200 basis points higher than the 3% minimum. Due to the preliminary nature of the proposed rule, Sterling has not yet determined the impact, if any, that this proposed rule would have on the leverage ratio required to be maintained by Sterling.[63]

100. In a May 1991 letter to Dain Bosworth regarding its pending 1991 stock offering, Sterling advised the bankers that if its minimum core capital requirement was raised to five percent, Sterling would comply with that requirement. The thrift also noted that

> . . . rather than increasing total assets following the proposed offering, Sterling could maintain it's [*sic*] total assets at approximately $600 million which would increase the level of compliance.[64]

101. Sterling was also aware in 1990 that the OTS was considering a proposed rule adding an interest rate risk component to the risk-based capital requirements. Under such a rule, thrifts with relatively risky assets would be required to hold still more capital in order to remain in regulatory compliance.

> Under the proposed rule, a savings association would be required to maintain capital in an amount equal to 50% of its interest rate risk exposure...Under the proposed rule, such capital would be required to be maintained above the association's minimum risk-based requirement, as then determined by the OTS...Due to the preliminary nature of the proposed rule-making, Sterling has not yet determined the impact, if any, that the rule would have on the risk-based or core capital required to be maintained by Sterling.[65]

102. Finally, Sterling was aware that a bill introduced in March 1991 would

---

[63] Sterling Savings Association, Form 10-K, June 30, 1991, p. 44 [VSG001 0349].

[64] Letter to Ike Isenhart and David Welch from Daniel Byrne, May 23, 1991 [PSG049 1833-1853].

[65] Sterling Savings Association, Form 10-K, June 30, 1991, pp. 46-47 [VSG001 0351-0352].

> . . . place severe restriction on the operations of an insured institution with a capital ratio below a critical capital level," which was defined as "tangible capital equal to 2% of total assets.[66]

This bill became FDICIA, and was enacted in late 1991.[67]

103. In my opinion, the threat of higher minimum capital requirements would have tended to cause well-managed thrifts to seek larger regulatory capital cushions than they had in the past.[68]

***d. In the but-for world, the regulators might have imposed an individual minimum capital requirement on Sterling***

104. While the absence of the breach would have given Sterling more regulatory capital, it would not have reduced the thrift's risk profile or the threat it posed to the deposit insurance fund. Even before FIRREA, the regulators had concerns about Sterling's exposure "to above average levels of risk as evidenced by the substantial growth in assets and increasing level of interest rate risk in relation to a declining capital position."[69] There would have been a sound regulatory basis for these concerns in the but-world, since even Professor Horvitz's hypothetical Sterling would have had negative tangible net worth on December 31, 1989.

---

[66] Sterling Savings Association, Form 10-K, June 30, 1991, p. 53 [VSG001 0358].

[67] In July 1992, OTS proposed regulations to implement FDICIA's "prompt corrective action" provisions. These proposed regulations, among other things, required a thrift to achieve at least a five percent leverage ratio to be considered "well-capitalized," and at least a four percent leverage ratio for a thrift to be considered "adequately capitalized." (Sterling Savings Association, Form 10-K, June 30, 1992, p. 45 [VSG001 0421].)

[68] This is the very reason Professor Horvitz gives for his opinion that it would have been unwise for the real-world Sterling to reduce its capital ratio and increase its leverage during the injunction period.

> Q. What would be the risk of going forward with the business plan?
>
> A. Well, the -- the primary aspect of the business plan, what I have in mind when I say go ahead with the business plan, is growth. Well, if they went ahead with growth, that is adding additional assets and liabilities, then it turns out that the court says everything -- the Government is right, they have the right to take away your capital and the courts aren't going to intervene, then they would have been stuck in a situation where they would have had a -- a huge necessity to shrink, to abandon loan commitments. It would have been a -- a hell of a mess. (Horvitz 2001 Deposition, pp. 302-03)

[69] FHLBB and State of Washington Division of Savings and Loans Report of Examination, June 19, 1989, p. 5 [VSG002 0768].

105. Consequently, Sterling could not have ruled out the possibility that the regulators would find Sterling's risk profile satisfied the statutory requirements for an individual minimum capital requirement. Other things equal, the possibility of such action also would have made a larger, rather than smaller, capital cushion more attractive to the thrift's shareholders and board.

*e. Conclusion*

106. In my opinion, it is most unlikely that a thrift which, prior to FIRREA, sought a regulatory capital cushion of 115-124 basis points over the minimum requirement,[70] would have reduced the size of its target cushion after FIRREA, when regulation was more rigorous, higher capital requirements appeared to be on the way, and the consequences of falling out of capital compliance were much more drastic. For this reason, I believe Professor Horvitz's assumption that the but-for Sterling would have targeted a lower capital cushion is completely implausible.

107. I also note that Sterling anticipated the need to shrink its asset base in order to bolster its regulatory capital position, if events following the Central Evergreen acquisition did not unfold as anticipated.

> Sterling has considered strategic alternatives to this plan which might be employed should certain events not occur as projected. For example, to enhance profitability and increase regulatory capital, a risk controlled arbitrage could be implemented and unwound within a three to five year period. This would add approximately $1.5 million per year based upon a $100 million arbitrage. Alternatively, the balance sheet could be reduced by a sale of branches. This would increase regulatory capital by approximately 2% of deposits (assets) sold. Additionally, other assets would be considered for sale, if necessary, to achieve the success of this conversion.[71]

108. Finally, I note that thrifts today typically hold far more regulatory capital than they are required to hold. Figure 2 compares the core capital (leverage) ratio for the

---

[70] A "basis point" is one one-hundredth of a percentage point, or .01%.

[71] Sterling Savings Association, Fiscal 1988 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association, dated March 3, 1988, p. 9 [WON944 1338].

average thrift with the statutory minimum requirement, as well as the requirement for a thrift to be deemed "well capitalized."

**Figure 2**
**Core Capital Ratios as of September 30, 2006**




Note: Sterling was no longer a thrift in 2006. The core capital ratio for the average thrift was only slightly less at December 31, 2004, prior to Sterling's conversion.

Source: FDIC, *Statistics on Depository Institutions*, (http://www2.fdic.gov/sdi/main.asp).

109. Presumably, the thrifts that comprise the industry do not believe they are foregoing billions of dollars in shareholder value by holding excess capital.

## *C. Increased Risk and Operating Performance*

110. The recent change to Professor Horvitz's assumption regarding the but-for Sterling's target regulatory capital ratio has the effect of lowering the hypothetical thrift's tangible net worth ratio and increasing its leverage, thereby causing it to become riskier. Professor Horvitz makes no corresponding allowance in his model for the economic and regulatory consequences of a riskier Sterling.

**1. The operating advantages derived from tangible net worth**

111. As an expert in economics, I know that a tangible net worth[72] provides a thrift with numerous *business* advantages, such as:

- *A wider "spread."* Tangible net worth provides a source of financing for interest-earning assets, thereby reducing the thrift's need for costly interest-bearing liabilities.

- *Lower borrowing costs.* A thrift with significant tangible net worth is likely to obtain a more-favorable credit rating for its debt, thereby lowering the interest rate that it must pay on borrowed funds.

- *Increased financial flexibility.* A sound tangible net worth position provides a thrift with valuable options that weaker thrifts do not enjoy, such as the ability to borrow on an unsecured basis, and the ability to execute swap contracts on favorable terms with a wider range of counterparties.

- *Obtain more-favorable ratings from securities analysts.* Analysts closely monitor not only the quantity of a thrift's net worth, but its *quality*, as well. Thrifts with a strong tangible net worth position are more likely than weakly capitalized thrifts to obtain positive recommendations for their common stock from these analysts.

- *Take advantage of opportunities for enhancing shareholder value.* A strong tangible net worth position enables a thrift to exploit opportunities for increasing the flow of value, such as by acquiring branches or enlarging the market for its products through acquisitions.

- *Increase its ability to absorb unexpected losses.* The thrift business exposes firms to numerous risks that can result in unexpected losses. When losses occur, they come at the expense of the institution's tangible net worth. Artificial capital, such as supervisory goodwill, has no loss-absorption capacity because it cannot be used to pay a thrift's liabilities. By increasing its tangible net worth, a thrift reduces the probability that unexpected losses will sufficiently weaken its financial condition to handicap the institution in its day-to-day operations (*e.g.*, require the thrift to post collateral for swap contracts).

112. Professor Horvitz implicitly assumes that the hypothetical Sterling could have reduced its tangible net worth ratio and increased its risk without in any way

---

[72] "Tangible net worth" or "tangible capital" means the difference between a thrift's tangible assets and its liabilities. To avoid confusion with FIRREA's tangible capital requirement, I use the term "tangible net worth" in discussing the relationship between tangible assets and liabilities.

affecting the return on the foregone assets. In my opinion, his assumption is entirely unfounded. Given the hypothetical thrift's negative tangible net worth on the eve of FIRREA's implementation, there are sound business reasons for believing that the but-for Sterling would have been chosen to strengthen its financial condition, rather than increase its assets.

**2. The regulatory benefits derived from tangible net worth**

113. Thrifts recognize that, to be successful, they must enjoy the regulators' confidence. Thrifts require the regulators' confidence in order to obtain approval for building new branches, making acquisitions, selling branches, paying dividends, and conducting other business activities. For example, the Resolution Trust Corporation ("RTC") did not allow capital-compliant, but financially weak, thrifts lacking their primary regulator's blessing to bid on thrifts or branch networks that it marketed during the early 1990s.

114. To win the regulators' confidence, it was not enough for a thrift merely to satisfy regulatory capital requirements. A thrift also had to convince the regulators that it was financially stable and well-managed. I know from my experience in the thrift industry that, even before FIRREA imposed a tangible capital requirement on thrifts, regulators considered the financial condition of individual thrifts before acting on their requests.

115. When Sterling sought the regulator's approval for its acquisition of Central Evergreen, it told the regulators that it would maintain the regulatory capital ratios in its 1989 Business Plan. According to Professor Horvitz's testimony at his 2001 Deposition, Sterling's commitment to the regulators that it would maintain these ratios took precedence over its desire to grow.

> Q. Were they bound by the -- the projection of foregone assets in the business plan? I mean of assets of growth in assets in the business plan?
>
> A. No. I think in the -- that -- that Sterling agreed to maintain the capital ratio set in the -- in the business plan. And if that did

> not allow much growth, then so be it. The -- the growth was constrained. But I think they agreed to maintain that capital ratio.[73]

116. In my opinion, if the but-for Sterling had reversed its priorities and made the capital ratio subordinate to its growth objectives, as Professor Horvitz now claims it would have done, it would have impaired its relationship with its regulators – something most well-managed thrifts are unwilling to do.

## *D. Increased Assets Do Not Ensure Better Results*

117. Professor Horvitz's model assumes that the increase in leverage resulting from his assumed reduction in the but-for Sterling's target capital ratio would not have eroded the thrift's return on assets. In other words, he assumes that the hypothetical new assets, on average, would have been as profitable as the assets that the thrift held in the real world. However, increased assets does not always mean increased profits.

118. The notion that troubled thrifts can solve their problems by adding assets and becoming more profitable has been thoroughly debunked. In fact, Professor Horvitz, himself, found that:

> Another strategy [employed by thrifts] was to attempt to grow out of the problem...Very few who adopted this approach were successful.[74]

119. It is not surprising that Professor Horvitz and others have found that leverage and growth are not reliable sources of profits. If they were, regulators would enforce *maximum*, not minimum, regulatory capital requirements, since maximum leverage would provide the greatest protection to the deposit insurance fund.

120. Thrift managements also recognize that increasing assets does not necessarily help a thrift become more profitable. Evidence of this recognition can be found in the decisions made by thrift institutions to voluntarily reduce their capital by buying-back their common stock. In fact, thrift institutions sometimes *voluntarily* choose to shrink their assets, in order to increase shareholder value. For example, H. F.

---

[73] Horvitz 2001 Deposition, pp. 435-36.

[74] Paul M. Horvitz, "The Collapse Of The Texas Thrift Industry" in Restructuring The American Financial System, p. 104

Ahmanson, parent of Home Savings of America, announced in 1996 that it was going to shrink its assets by $20 *billion* – 40 percent – in order to *increase* its profitability.

> The nation's largest thrift says it intends to shrink its assets by as much as 40% in the next five years in a bid to increase profitability.[75]

121. It is also apparent that shrinking assets does not necessarily lead to decreased profits. For example, in the period from 1989 to 1991, Sterling's total assets declined from $730 million to $608 million, while its profits increased.

## *E. The Market Would Not Have Allowed the But-For Sterling to Increase Its Share of the Market for Deposits and Loans at No Cost*

122. Of all the deficiencies in Professor Horvitz's view of the thrift business, the one that, as a former thrift executive, I find most troubling and perplexing is his failure to make allowances for the constraints that the competitive market imposes on thrifts – especially those thrifts that would like to grow more rapidly than their peers. I can assure the Court that real-world thrifts – large and small – do not disregard these constraints. In fact, coming to grips with these market-imposed constraints is the very essence of the thrift business.

### 1. Professor Horvitz's but-for Sterling

123. By reducing the but-for Sterling's assumed regulatory capital ratios in 1989, 1990, and 1991, Professor Horvitz has Sterling holding a larger volume of assets than it actually held in the real world. Where would these assets, and the liabilities needed to finance them, have come from?

124. Professor Horvitz does not claim, and I do not believe, that there would have been more profitable assets and liabilities available in the but-for world than were actually available in the real world. Thus, Professor Horvitz's hypothetical foregone assets would have had to come from Sterling's competitors that, in the real world, held

---

[75] Snigdha Prakash, "Home Savings To Slash Assets In A Push For Profitability," American Banker, January 18, 1996.

these assets on their balance sheets. Similarly, the additional liabilities needed to finance these assets also would have had to come from Sterling's competitors. Thus, for the hypothetical Sterling to have acted in accordance with Professor Horvitz's lost-profits model, Sterling would have had to increase its shares of the loan and deposit markets at the expense of its competitors.

125. I believe Professor Horvitz's model of the but-for Sterling can be fairly summarized as follows:

> With its contractual supervisory goodwill and regulatory capital credits intact, the hypothetical Sterling would have acquired $427 million in *unspecified* assets with *unknown* characteristics from *unidentified* competitors. It would have financed these assets using *unspecified* liabilities with *unknown* characteristics lured away from *unidentified* competitors. The but-for Sterling would have moderated any significant interest rate risk associated with the hypothetical portfolio by hedging the risks with *unspecified* instruments. Although nothing is known of the assets, liabilities, and hedges that comprise this hypothetical portfolio, it nevertheless would have yielded the thrift exactly the same rate of return produced by the Sterling's real-world balance sheet.

126. Such a model trivializes a business that saw 1,400 of its member firms – nearly one-third of the industry – fail during the 1980s and 1990s. In reality, the thrift business is a high-risk, highly competitive, low-margin, volatile business. It bears no resemblance to the thrift industry postulated by Professor Horvitz.

**2. Growth versus profitable growth**

127. I do not dispute that a thrift wishing to increase its balance sheet can always grow. To do so, it need only purchase wholesale assets, such as mortgage-backed securities ("MBS"), and finance them with wholesale liabilities, such as the advances and reverse repurchase agreements that I sold at the FHLB-SF. But as Professor Horvitz acknowledges, financing market-priced wholesale assets with market-priced wholesale liabilities is unlikely to yield a positive net present value.[76]

---

[76] Horvitz 2001 Deposition, pp. 468-69.

128. The thrift business is much more challenging when growth must be both profitable and a contributor to shareholder value.

129. The importance of market constraints on a thrift's ability to increase its market share with profitable assets becomes apparent when one considers the size of the firms that comprise the thrift industry. If profitable growth was as easy to achieve as Professor Horvitz suggests,[77] there would be nothing stopping thrifts from achieving their growth objectives. Yet, today, 88 percent of the firms in the thrift industry have less than $1 billion in assets.

### 3. Real-world limits on profitable growth

130. In the real world, Sterling (whether as a bank or a thrift) must compete for customers with many different types of firms, including:

- Thrifts
- Commercial banks
- Credit unions
- Money-market funds
- Other mutual funds
- Cash management accounts offered by stock brokers

---

Q. If Fannie Mae issued debt and used the proceeds to buy Freddie Mac issued mortgage backed securities, would the portfolio have a net present value greater than zero according to the principles of finance?

A. Probably not.

Q. Why?

A. Because both of those institutions are about the same credit quality and issue debt at about the same rate, so to issue debt to one and -- and buy assets, the other probably wouldn't generate profits, but we -- we get close to that.

There are people who believe that home loan banks operate a profit, and they issue their debt, and they buy equivalent instruments and seem to -- to make a profit or believe they make a profit. So I'm not sure of the answer to this, but I say essentially zero.

[77] Horvitz 2001 Deposition, p. 368

Q. (BY MS. HOSFORD) So they would have been bigger with no action, without trying?

A. Without trying. They had to try to shrink, in fact.

- Mortgage bankers
- Mortgage brokers
- Retirement systems

Because they seek to attract the same customers as Sterling. their actions limit what Sterling can achieve in the loan and deposit markets.

***a. Limits on a thrift's ability to increase its deposit share***

131. For Sterling to increase its share of the local retail deposit market at any point in time, it must offer its competitors' customers an incentive to end their current banking relationships and re-establish them at a Sterling branch. This normally requires Sterling to raise its rates on deposit products sufficiently high to break the bonds of loyalty that exist between customer and depository. Thus, other things being equal, the immediate effect of a thrift's effort to increase its market share is an increase in the cost of new deposits relative to existing deposits. Professor Horvitz's model makes no allowance for this increase.

132. The cost to a thrift of attempting to increase its share of the deposit market, however, does not end here. Some of the thrift's existing customers inevitably become aware of the higher rates being offered to new customers. and many of them will seek to take advantage of the new rates. Thus, not only do the new deposits become more costly; existing deposits become more costly, as well. Thrift executives refer to this outcome as "cannibalization of the deposit base." Professor Horvitz's model makes no allowance for this increase in costs, either.

133. This increase in the cost of the thrift's liabilities occurs regardless of the actions taken by the thrift's competitors. The size of the increase will multiply, however, if the competitors wish to avoid losing profitable customers and respond with higher deposit rates of their own. When this happens, the thrift that touched-off the rate war may find itself with the same – or an even smaller – share of the local deposit market, but with materially higher interest expense. Professor Horvitz's model makes no allowance for the consequences of a competitive response designed to prevent the but-for Sterling from capturing its profitable customers.

***b. Limits on a thrift's ability to increase its share of the loan market***

134. Similar market forces are at work in the local market for mortgage and consumer loans. Loans are a commodity sold primarily on the basis of price. In order to capture a larger share of the loan market at any point in time, a thrift generally must either lower its mortgage interest rates or relax its underwriting standards. Either way, the cost of the new business will exceed the average cost of the business that the thrift otherwise would have gained. The yield on the new business will suffer either because of the lower interest rate on the loans, or the higher default rate resulting from the lower underwriting standards. Moreover, the new loans that the thrift would have made even if it had not sought to increase its market share will now be less profitable, because the thrift cannot limit the lower interest rate to incremental business. Consequently, some customers will receive a windfall at the thrift's expense, since they would have borrowed at the higher rate. Professor Horvitz's model makes no allowance for this erosion in the hypothetical Sterling's margin.

135. Here again, the thrift's profits tend to suffer even if the thrift's competitors take no defensive action to prevent their market share from going down. If, however, competitors match the lower rates being quoted by the predator-thrift, the latter's market share may not increase, while the profitability of its business goes down. Professor Horvitz makes no allowance for this these competitive realities, either.

136. In short, Professor Horvitz's model makes no allowance for the market forces that thrifts must contend with on a daily basis.

**4. Evidence that competition limits growth**

137. There is abundant evidence that market forces often cause thrifts to run out of profitable investment opportunities even before they become "capital constrained." For instance:

- Sometimes thrifts fail to hit their asset targets;
- Even successful thrifts do not grow without limit;

- Thrifts frequently maintain more than the minimum amount of required capital plus a safety margin;
- Thrifts pay dividends (*i.e.*, they voluntarily reduce their capital); and
- Thrifts sometimes voluntarily shrink their capital base when they recognize that profitable opportunities have become limited.[78]

**5. Competition would have been more intense in Professor Horvitz's but-for world**

138. In the real world, Sterling conducted business in highly competitive local markets. If we adopt Professor Horvitz's and Dr. James's assumption that growth is profitable even when it is supported by paper capital, we must conclude that competition within Sterling's markets would have been even more intense in the but-for world. Absent FIRREA, many other thrifts with supervisory goodwill and operations in the Washington and Oregon markets (particularly Benj. Franklin, Far West, Great Western, and World) also would have had a greater appetite to increase their holdings of mortgage loans financed with retail deposits. Under these circumstances, Sterling's but-for world would not have offered more opportunities to acquire assets or gather deposits; it would have offered fewer opportunities.

**6. Professor Horvitz erroneously exempts Sterling from competitive forces because it is relatively small**

139. Professor Horvitz acknowledges that Sterling seeks to attract customers in a competitive market.[79] He maintains, however, that the but-for Sterling would not have faced significant market constraints on their lending and deposit-gathering activities because it was a smaller thrift. He contends that Sterling could have attracted more loan

---

[78] For example, see Home Savings of America as cited above.

[79] Horvitz 2001 Deposition, pp. 378-80.

and deposit customers without making its rates more attractive to customers.[80] In my opinion, his contention does not reflect the reality of the thrift business.

***a. Smaller thrifts cannot fly below the radar screen***

140. I know from my experience that market leaders can and do protect their market shares from threats posed by large and small players alike. They "shop" the competition on at least a weekly basis, in order to detect rate changes that might jeopardize their customer base. In addition, well-managed financial institutions like World Savings require their customer service representatives to probe for explanations when deposit customers close accounts, and report their findings to management. Management uses this intelligence to protect the thrift's customer base by responding to the competitor's higher rates with promotional rates of their own.

141. I also know that smaller competitors do not get a free pass from market leaders, just because they are small. Market leaders understand the threat to their profitability from a rate war, and they frequently seek to discourage aggressive pricing at their expense by responding vigorously to any institution, large or small, that seeks to upset the stability of the local market.

***b. Professor Horvitz's contention cannot be reconciled with the make-up of today's thrift industry***

142. If Professor Horvitz's view of loan and deposit markets is valid, the ability of large thrifts to expand might be checked by market forces,[81] but smaller thrifts could expand without raising their rates on deposits or reducing the rates they charge on their loan products. In my opinion, his view cannot be reconciled with the composition of the thrift industry today.

---

[80] Horvitz 2001 Deposition, p. 509.

Q. So you assume that an increase in retail deposits would not require a raise -- or increase in posted rates?

A. To the -- yes.

[81] Horvitz 2001 Deposition, p. 509.

143. As of September 30, 2006 (the most-recent date for which information is available), approximately 88 percent of all savings associations had less than $1 billion in assets, while 63 percent had less than $300 million.[82] Based on my experience, I believe the overwhelming majority of these thrifts are not "small" because they choose to be, but because there are not sufficient profitable investment opportunities available to them in the market.

***c. Sterling was not all that small in its markets***

144. Mortgage lenders and deposit-gatherers compete for customers primarily in local markets, even though they may have facilities throughout the region or throughout the United States. Consequently, the relevant measure of a thrift's size is not its share of the national or regional market, but its share of the local markets where it competes. To suggest, as Professor Horvitz does,[83] that Sterling in the early 1990s was not subject to competitive limitations because of its tiny share of the national loan and deposit markets overlooks the realities of the competitive process.

145. In sum, Professor Horvitz's assumption that the but-for Sterling could have added assets and liabilities to its balance sheet without compressing its margins is completely speculative and at odds with the realities of the lending and deposit-gathering business.

***d. Acquisitions would not have enabled Sterling to avoid paying more for assets and liabilities***

146. The plaintiffs may argue that even if competitive forces in the market prevented Sterling from increasing its market share without reducing its profit margins,

---

[82] FDIC, *Statistics on Depository Institutions*, (http://www2.fdic.gov/sdi/main.asp). I am aware that Sterling was no longer a thrift in 2006.

[83] Horvitz 2001 Deposition, p. 232

Q. What is the market that you're talking about?

A. The market for thrift assets and thrift liabilities, but the -- that's what Sterling is concerned with, but it's the kind of assets and liabilities which would include thrift institutions, banks, credit unions, mortgage companies.

Q. Is it geographically limited?

A. No.

the thrift could have acquired additional retail assets and retail liabilities by acquiring them from other thrifts or banks. Such an argument, however, would be flawed. Thrifts and banks do not give away valuable assets; acquirers must pay a premium for them. These premiums would have raised the effective cost of growth to Sterling, and undermine the reliability of Professor Horvitz's assumption that the profitability of the hypothetical foregone assets would have been equal to the profitability of Sterling's real-world assets.[84]

### *F. The Real-World Sterling's Experience Belies Professor Horvitz's Expectancy Damages Estimate*

147. Sterling's own real-world experience is inconsistent with the assumptions underlying Professor Horvitz's lost-profits model.

148. Since 1996, Sterling has maintained a core capital ratio at least 50 percent higher than the ratio necessary to satisfy the regulators' "adequately capitalized" standard, and at least 20 percent higher than needed to satisfy the "well capitalized" standard. This means that in each of the years beginning with 1996, the real-world Sterling could have held some or all of the assets that Professor Horvitz labels "Foregone Assets," and still maintained a regulatory capital cushion equal to at least one percent of assets. This is the same cushion that Professor Horvitz assumes the but-for Sterling would have targeted in 1989, 1990, and 1991. In fact, in eight of these 12 years, the real-world Sterling could have held *all* of Professor Horvitz's Foregone Assets.

149. By the logic of Professor Horvitz's model, this means that the real-world Sterling voluntarily chose to forego nearly $39 million in profits. Why would a well-managed thrift leave so much money on the table? In my opinion, the answer is that the money was never on the table to begin with. It is more logical to assume that the real-world Sterling did not have sufficient profitable investment opportunities to warrant the

---

[84] Professor Horvitz testified that, without the ability to count all of Central Evergreen's intangibles as regulatory capital, Sterling "would have been less -- less able to make acquisitions." (Horvitz 2007 Deposition, p. 44)

use of its excess capital. The but-for Sterling's investment opportunities would not have been more plentiful.

150. Thus, Sterling's failure in the real world to fully leverage its real-money capital refutes Professor Horvitz's opinion that Sterling could have and would have leveraged its paper capital in the but-for world.

## VI. PROFESSOR HORVITZ MAKES NO ALLOWANCE FOR STERLING'S CONVERSION TO A BANK CHARTER

151. On July 8, 2005, Sterling converted from a thrift charter to a bank charter.[85] In doing so, management and the board demonstrated that the institution expected to realize additional benefits as a bank that would not be available to Sterling if it continued to operate as a thrift. Presumably, these benefits are reflected in the returns realized by the real-world Sterling, as well as the in the returns that Professor Horvitz and Professor James credit to Sterling in the but-for world.

152. In the but-for world, conversion to a bank charter would have eliminated the remainder of Sterling's supervisory capital from its regulatory capital. Yet, Professor Horvitz estimates that, due to the 1989 breach, Sterling continued to incur millions of dollars in lost profits. Without the supervisory capital, however, there could be no lost profits, even if Professor Horvitz's lost profits model was otherwise sound.

[85] Sterling Financial's December 31, 2005, Form 10-K, pp. 1.

## VII. CONCLUSION

153. For the reasons set forth in this report, I believe Professor Horvitz's estimate of Sterling's damages, as set forth in his most-recent report, is deeply flawed and completely without merit. Even if I ignored the flaws in his model, however, I would still conclude that Professor Horvitz's opinion regarding Sterling's damages is unreliable.

154. To put his opinion on Sterling's damages in a better economic perspective, I compared the value of the alleged cash flow losses to the amount of supervisory goodwill ($16.067 million) remaining from the Lewis Federal and Tri-Cities acquisitions on that date. Rather than use the nominal value of the alleged losses, I discounted the losses shown in Exhibit 6, Table 1 of Professor Horvitz's expert report back to December 31, 1989, using a rate of 15 percent. (This rate exceeds the weighted average pre-tax return on average equity for the thrift industry during the early 1990s.) This approach results in a valuation of $19.39 million.

155. Thus, Professor Horvitz's opinion implies that on December 31, 1989, $16.067 million in amortizing paper capital was worth $19.39 million of real-money cash capital, or 121 cents on the dollar – an absurd result.

156. I believe the actions of my previous employer, World Savings, further undermine the credibility of Professor Horvitz's expectancy damages estimate. During 1989, when FIRREA was pending before the Congress, I was a Vice President of World Savings. At June 30, 1989, World reported $329.1 million of goodwill arising from acquisitions.[86] At least $300 million (and possibly all) of this amount was subsequently deemed to be supervisory goodwill.[87]

157. Using Professor Horvitz's valuation of Sterling's supervisory goodwill, World's goodwill at June 30, 1989 supposedly was worth approximately $400 million to the shareholder's of World's parent company, Golden West Financial Corporation ("Golden West"). I am virtually certain a proposal that threatened to reduce shareholder

[86] Golden West Financial Corporation, Form 10-Q for quarter ending June 30, 1989.

[87] TFR database. Nine months later, on March 31, 1990, World reported qualifying goodwill of $297.3 million.

value by even a fraction of this amount would have been a major concern to World's senior management and Golden West's Board of Directors.

158. It is clear, however, that World did not attribute any material value to its supervisory capital. In July, Golden West's management advised shareholders:

> The anticipated higher industry capital standards are expected to have no impact on Golden West's thrift subsidiaries . . . [88]

159. Furthermore, while FIRREA was pending before Congress, World ran a full-page ad in the *Washington Post* urging Congress to establish and enforce "strong, tangible capital requirements for the operation of thrift institutions." The ad also stated that "[g]oodwill is nothing but thin air."[89]

160. In my opinion, World's support for the elimination of goodwill from regulatory capital and its statement that goodwill is "nothing but thin air" cannot be reconciled with Professor Horvitz's opinion on supervisory capital's economic value.

---

[88] Golden West Financial Corporation, Form 10-Q for quarter ending June 30, 1989.

[89] Golden West Financial Corporation, From 10-Q for quarter ending June 30, 1989.

Executed February 15, 2007.

William G. Hamm

William G. Hamm

**Appendix A**

# WILLIAM G. HAMM

LECG, LLC
2000 Powell Street, Suite 600
Emeryville, CA 94608
Tel. (510) 985-6888
Fax (510) 653-9898
Email: whamm@lecg.com

Residence:
P.O. Box 1096
Lafayette, CA 94549
Tel. (925) 283-1745
Email: wmghamm@aol.com

## EDUCATION

Ph.D., Economics, UNIVERSITY OF MICHIGAN

Fields of Emphasis: Industrial Organization and Labor Economics

M.A., Economics, UNIVERSITY OF MICHIGAN

A.B., Government, DARTMOUTH COLLEGE

## PRESENT POSITION

Managing Director
LECG, LLC, Emeryville, CA

## PROFESSIONAL EXPERIENCE

Economics Consultant, 1995 - present

Business Executive, 1986 - 1995

Government Official, 1969 - 1986

## ACCOMPLISHMENTS

### Consulting

*Coalition to Protect California:* Analyzed the economic and fiscal impact of an initiative limiting the use of eminent domain and increasing the number of regulatory takings that are compensable.

*Californians Against Higher Taxes:* Analyzed the economic and fiscal impact of an initiative imposing a severance tax on California oil production.

*Pacific Gas and Electric:* Analyzed the likely impact on consumers if a municipal utility annexes a portion of PG&E's service area.

*Stop the Reiner Initiative Coalition:* Analyzed the fiscal impact of an initiative to create a preschool entitlement in California, and evaluated the program's design.

*Californians for Affordable Prescriptions:* Analyzed the fiscal and economic impact of two ballot propositions that would establish prescription drug discount programs for certain California residents.

*Californians Allied for Patient Protection:* Tested the claim that regulation of insurance rates (Proposition 103), rather than tort reform, is responsible for limiting the growth in medical malpractice insurance premiums.

*Californians for Public Safety and Education:* Analyzed the fiscal impact of a proposed citizen initiative that would increase revenue to the state and local governments from legalized gambling.

*A coalition of health care providers:* Analyzed the impact of proposed reforms to Nevada's medical malpractice tort system on the cost of, and access to, healthcare.

*Committee for Workers Compensation Reform and Accountability:* Analyzed the economic and fiscal consequences of proposed changes to California's Workers Compensation system.

*California Scholarship Opportunity Act:* Analyzed the fiscal impact of a proposed constitutional amendment that would authorize use of public funds for scholarships to students in underperforming schools.

*California Association of Marriage & Family Therapists:* Analyzed the cost effectiveness of expanding the list of providers eligible to offer counseling to Medi-Cal participants.

*Nutritional Grocers Association of California*: Analyzed the impact of a proposed methodology for limiting redemption prices under the Women, Infants and Children Program ("WIC").

*American Liver Foundation*: Analyzed the fiscal impact on California's General Fund of proposed legislation establishing a statewide inoculation program for Hepatitis A.

*Business for Economic Growth in California*: Analyzed the economic and revenue impact of adopting a single-factor (sales) income apportionment formula under the state's corporate income tax program.

*Association of California Insurance Companies*: Analyzed workers' compensation benefits paid in California, relative to the benefit levels in other states.

*Californians Against Fraud and Higher Insurance Costs*: Analyzed the impact of proposed legislation on automobile insurance premiums, incentives to combat fraud, and number of lawsuits.

*Consulting Engineers and Land Surveyors of California*: Analyzed the economic and public policy consequences of a proposed constitutional amendment that would prevent the State of California from contracting-out certain professional services.

*Coalition for Fair Liability Laws*: Analyzed the economic impact of replacing joint-and-several liability with proportional liability for professional service providers.

*Californians Allied for Patient Protection*: Analyzed the economic and public policy consequences of legislative proposals to weaken medical malpractice insurance reforms in California.

*Car and Truck Renting and Leasing Association*: Analyzed the economic rationale for state controls on the prices that rental car companies may charge.

*International Game Technology*: Analyzed the economic impact of legislation to regulate business relationships, and testified before a committee of the Nevada Legislature.

*Coalition of Investor-Owned Utilities*: Analyzed the effects of the proposed Utility Rate Reduction Act on rate-payers, the state and local governments, and consumers.

*Coalition Against Unregulated Gambling*: Analyzed the impact on state and local governments of a proposed ballot proposition expanding Indian casino gambling.

*Major commercial bank*: Analyzed the issues raised, and conditions imposed, by regulators in connection with bank merger applications in six countries.

*Yolo County, California*: Analyzed the impact on county revenues of a recent change in state law.

*Major technology corporation*: Helped client identify probable impact of network-centric computing on competition, products, and business organization within a key customer segment (insurance).

*GTECH Corporation*: Identified opportunities for improving the management, organization, and effectiveness of the California State Lottery.

**Expert Witness**

Banking/Financial Services

*Granite Management Corporation v. United States* (Court of Federal Claims: 95-515C): Provided expert testimony at trial re: plaintiff's $137 million damages claim.

*Bank of America, et al., v. United States* (Court of Federal Claims: 95-660C; 95-7971C): Provided expert testimony at trial re: plaintiffs' $89 million damages claim.

*American Capital Corporation, et al., v. United States* (United States Court of Federal Claims: 95-523C): provided expert testimony at trial re: plaintiffs' $216 million damages claim.

*Frank P. Slattery, Jr., et al. v. United States* (Court of Federal Claims: 93-280C): Provided expert testimony at trial re: plaintiff's $3 billion damages claim.

*WestFed Holdings, Inc., et al., v. United States* (Court of Federal Claims: 92-820C, 95-731C, 95-797C, 95-803C (Consolidated)): Provided expert testimony at trial re: plaintiffs' $480 million damages claim.

*California Federal Bank, FSB v. United States II* (Court of Federal Claims: 92-138C): Provided expert testimony at trial re: plaintiffs' $600 million damages claim.

*Southern California Federal Savings and Loan Association, et al., v. United States* (Court of Federal Claims: 93-52C): Provided expert testimony at trial re: plaintiffs' $400 million damages claim.

*John K. Castle, et al. v. United States* (Court of Federal Claims: 90-1291C): Provided expert testimony at trial re: plaintiffs' $250 million damages claim.

*C. Robert Suess, et al. v. United States* (Court of Federal Claims: 90-981C): Provided expert testimony at trial re: plaintiffs' $1.1 billion damages claim.

*California Federal Bank, FSB v. United States I* (Court of Federal Claims: 92-138C): Provided expert testimony at trial re: plaintiffs' $1.7 billion damages claim.

*Glendale Federal Bank v. United States* (Court of Federal Claims: 90-772C): Provided expert testimony at trial re: plaintiffs' $2 billion damages claim; eighteen days on the witness stand.

*American Savings Bank, FA, et al., v. United States* (Court of Federal Claims: 92-872C): Filed expert report re: plaintiffs' $800 million damages claim; deposed. (Trial pending.)

*Home Savings of America FSB, et al., v. United States* (Court of Federal Claims: 92-620C): Filed expert report re: plaintiffs' $940 million damages claim; deposed. (Plaintiff withdrew claims addressed in expert report.)

*Coast Federal Bank, FSB, v. United States* (Court of Federal Claims: 92-466C): Filed two expert reports re: plaintiff's $1.4 billion damages claim; deposed. (Court granted summary judgment.)

*Sterling Savings Association, et al., v. United States* (Court of Federal Claims: 95-829-C): Filed expert report re: plaintiffs' $102 million damages claim; deposed. (Trial pending.)

*Maco Bancorp, Inc. v. United States* (Court of Federal Claims: 94-625C): Filed expert report re: plaintiffs' $300 million damages claim; deposed. (Case settled prior to trial.)

Housing/Mortgage Lending

*Chancellor Manor, et. al., v. United States* (Court of Federal Claims: 98-39C): Provided expert testimony at trial re: plaintiffs' $25 million damages claim (combined with CFC 94-1C).

*Cienega Gardens, et al., v. United States* (Court of Federal Claims: 94-1C): Provided expert testimony at trial re: plaintiffs' $41 million damages claim (combined with CFC 98-39C).

*Carabetta Enterprises, et. al., v. United States* (Court of Federal Claims: 02-1134C): Provided expert testimony at trial re: plaintiffs' $53 million damages claim.

*Independence Park, et al., v. United States* (Court of Federal Claims: 94-1AC): Provided expert testimony at trial re: plaintiffs' $3.4 million damages claim.

*Franconia Associates, et al., v. United States* (Court of Federal Claims: 97-381C): Provided expert testimony at trial re: plaintiffs' claims for damages.

*Claremont village Commons, et al., v. United States* (Court of Federal Claims: 94-1): Filed expert report re: plaintiffs' $101 million damages claim.

*Grass Valley Terrace, et al. v. United States* (Court of Federal Claims: 98-726C): Filed expert report re: plaintiffs' $20 million damages claim; deposed. (Trial pending.)

*Piercsall v. Ameriquest Mortgage Company and Ameriquest Capital Corporation:* (Superior Court of California, County of San Mateo: 415620): Designated testifying expert re: economic damages experienced by members of a class of borrowers. (Case settled prior to trial; adopted my methodology for calculating losses.)

Public Finance/Government Policy

*County of San Diego & County of Orange v. State of California, et al.* (Superior Court of California, County of San Diego, GIC 825109): Provided expert testimony at trial re: the State's ability to honor claims for reimbursement totaling $155 million.

*US West Communications, Inc., et al. v. City of Coralville* (Iowa District Court for Johnson County: LA CV-058956): Provided expert testimony at trial re: the economic and public policy consequences of a municipal ordinance.

*United States v. Anne (Sandy) Batchelor-Robjohns, et al.* (United States District Court, Southern District of Florida, Miami Division, 03-20164). Filed expert report re: complex financial transaction between a multinational bank and a U.S. corporation; deposed. (Court granted summary judgment.)

*Qwest Corporation v. Central Puget Sound Regional Transit Authority, et al.* (United States District Court for the Western District of Washington at Seattle: CO2-0155P): Filed declaration re: cost of protecting and relocating Plaintiff's facilities.

*Alliance of American Insurers, et al. v. California Department of Motor Vehicles* (Superior Court of the State of California: 02CS00702): Filed declaration re: cost of responding to electronic requests for information on licensed drivers and registered vehicles.

*U.S. West Communications, Inc., v. City of Santa Fe, New Mexico* (United States District Court, New Mexico: CIV 00-795 LH): Submitted expert report re: the economic and public policy consequences of a municipal ordinance.

*County of Orange v. Merrill Lynch & Company, Inc.* (United States District Court, Central District of California: CV-95-0037 GLT): Filed expert report re: plaintiff's $2 billion damages claim. (Case settled prior to trial.)

*Irvine Ranch Water District v. Merrill Lynch & Company, Inc.* (United States District Court, Central District of California: SA CV-97-254 GLT): Filed expert report re: plaintiff's $100 million damages claim. (Case settled prior to trial.)

*Qwest Corporation v. City of Portland* (United States District Court, District of Oregon: 01-CV-1005-JE): Submitted expert declaration regarding information needed to assess the City's right-of-way management needs.

*Markieta Malory, et al., v. University of Maryland Medical System Corporation* (Circuit Court for Baltimore City: 24-C-98410624): Submitted expert affidavit re: economic impact of medical malpractice insurance reforms.

*The Arc of Washington State, Inc., et al., v. Lyle Quasim, et al.* (United States District Court, State of Washington: C99-5577FDB): Designated testifying expert re: economic and budgetary consequences of relief sought by plaintiff; deposed.

*Washington Federation of State Employees, et al., v. State of Washington* (Superior Court of the State of Washington: 98-2-02432-9): Designated testifying expert re: economics of public retirement systems. (Court granted summary judgment.)

*Washington Federation of State Employees, et al., v. State of Washington* (Superior Court of the State of Washington: 98-2-00100-1): Designated testifying expert re: economics of public retirement systems. (Court granted summary judgment.)

*Levi Townsend v. Lyle Quasim* (United States District Court, Western District of Washington at Seattle: C00-0944Z): Filed expert report re: economic and budgetary consequences of relief sought by Plaintiff.

**Business**

FEDERAL HOME LOAN BANK OF SAN FRANCISCO, 1991 - 1995.

Executive Vice President - Chief Operating Officer

Responsibilities: Accountable to the CEO for all business and financial operations of this $50 billion bank, including:

- Finance
- Sales/Marketing
- Strategic planning
- Customer service
- Information systems
- Accounting/Budgeting
- Corporate communications
- Corporate facilities
- Financial reporting
- Credit underwriting
- Affordable housing
- Administration

Accomplishments:

- Increased assets by $9 billion.
- Increased annual net income by $53 million.
- Implemented comprehensive risk management policies that increased income stability and reduced risk.
- Reduced operating expenses by 14%.
- Developed customer product/business unit profitability system.

- Won support for the bank's legislative priorities from key federal agencies.
- Led the shift to a customer- and market-oriented corporate culture.
- Supervised preparation of two award-winning reports on affordable housing.

Senior Vice President - Sales & Marketing

Responsibilities: Accountable to the CEO for strategic planning, marketing, and sales.

Accomplishments:

- Reversed the downward trend in business.
- Implemented a segmented pricing strategy that generated $3 billion in new business within 3 months.

Senior Vice President - Administration

Responsibilities: Accountable to the CEO for strategic planning, budgeting, information systems, and real estate.

- Reduced operating expenses by 42%.
- Initiated strategies that helped bring occupancy in the Bank's 320,000 square foot headquarters building from 28% to 90% within 2 years.

WORLD SAVINGS AND LOAN ASSOCIATION, Oakland, CA, 1986 - 1991.

Vice President - Loan Service

Responsibilities: Accountable to SVP for providing quality service to 155,000 real estate loan customers and collecting $1.5 billion in payments annually. Managed 12 departments.

Accomplishments:

- Raised customer satisfaction by reducing telephone wait times 80% and error rates 50%.
- Instrumental in developing a product that, at one time, accounted for 10% of World's new business.

Vice President - Operations Analysis

Responsibilities: Accountable to EVP for corporate budgeting ($200 million/year) and operations improvement programs. Also supported strategic planning and business analysis.

**Government**

STATE OF CALIFORNIA, OFFICE OF THE LEGISLATIVE ANALYST, Sacramento, CA, 1977 - 1986.

Director (Legislative Analyst)

Responsibilities: Led a 95-person office that provided the Legislature and the public with objective analyses and recommendations on all aspects of state government. Testified before legislative committees on hundreds of occasions, and delivered more than 100 speeches on complex policy issues to civic and other groups.

Accomplishments:

- Prepared objective analyses of all Constitutional amendments, bond measures, citizen initiatives and other ballot propositions submitted to the voters.
- Published annual analyses of the Governor's Budget that recommended spending reductions totaling more than $1 billion.
- Prepared analyses of all bills affecting state expenditures or revenues, prompting thousands of perfecting amendments.
- Published analyses of key public policy issues, such as Proposition 13, rapid transit, health care, tax incentives, the environment, education, and corrections.
- Conceived and published a highly acclaimed annual report on strategic issues facing the state of California.

EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF MANAGEMENT AND BUDGET, Washington, D.C., 1969 - 1977.

Division Director

Responsibilities: Analyzed and made recommendations to the President on the programs/budgets of 3 cabinet-level agencies with $60 billion in spending authority. Previously served as a budget analyst and Branch Chief.

Accomplishments:

- Spearheaded the most extensive revision of subsidized housing and urban development programs ever undertaken.
- Prepared the analyses that helped convince the President to suspend or terminate nearly two dozen ineffective federal programs.
- Devised and won approval for new scorekeeping techniques that significantly increased the President's ability to control spending.
- Earned two Presidential citations.

## ACADEMIC HONORS AND AWARDS

Phi Beta Kappa
Graduated magna cum laude, with high distinction
William A. Jump Memorial Foundation Meritorious Award for Exemplary Achievement in Public Administration

National Science Foundation Fellowship
Phi Kappa Psi (honorary fraternity for scholars)
Colby Prize (shared)
Institute for Labor and Industrial Relations Fellowship
Institute for Public Utilities Fellowship

**OTHER APPOINTMENTS/AFFILIATIONS**

Member, Board of Trustees, Freedom From Hunger, 2004-present
Fellow, National Academy of Public Administration, 1983-present
Founding Principal, Council on Excellence in Government, 1986-present
Member, American Economics Association, 1964-present
Member, American Law and Economics Association, 1996-present
Member, Commonwealth Club, 1990-present
Member, Governing Board of the California Institute for County Government, 1999-2005
Member, Advisory Panel of the California Earthquake Authority, 1998-2004
Member, California Citizens Budget Commission, 1993-2000
Member, Board of Directors - PrimeTech, Inc., 1997-2000
Member, Dean's Advisory Council, San Francisco State University, 1995-1998
Founding Member, Dean's Advisory Council, Graduate School of Management, University of California/Davis, 1984-1993
Member, Board of Visitors, Institute for Public Policy, Duke University, 1986-1989
President, Western Legislative Fiscal Officers Association, 1983-1985

December 2006

**Appendix B**

**William G. Hamm**
**Expert Testimony in the Past Four Years**

| CASE | COURT | YEAR |
|---|---|---|
| **Trial Testimony:** | | |
| *Granite Management Corporation v. United States* | Court of Federal Claims: 95-515C | 2006 |
| *County of San Diego and County of Orange v. State of California et al.* | Superior Court of the State of California (GIC 85109) | 2005 |
| *Chancellor Manor, et. al., v. United States* | Court of Federal Claims: 98-39C (Combined with CFC 94-1C) | 2005 |
| *Cienega Gardens, et al., v. United States* | Court of Federal Claims: 94 (Combined with CFC 98-39C) | 2005 |
| *Carabetta Enterprises, et al., v. United States* | Court of Federal Claims: 02-1134C | 2004 |
| *Bank of America, et al., v. United States* | Court of Federal Claims: 95-660C; 95-7971C | 2004 |
| *American Capital Corporation, et al., v. United States* | Court of Federal Claims: 95-523C | 2004 |
| *Independence Park, et al., v. United States* | Court of Federal Claims: 94-1AC | 2004 |
| *Frank P. Slattery, Jr., et al. v. United States* | Court of Federal Claims: 93-280C | 2003 |
| *Franconia Associates, et al., v. United States* | Court of Federal Claims: 97-381C | 2003 |

**Appendix C**

## Additional Documents Considered

Order, *Sterling Savings Association v. United States*, September 12, 2002
Order, *Sterling Savings Association v. United States*, July 9, 2003
Order, *Sterling Savings Association v. United States*, July 11, 2003
Order, *Sterling Savings Association v. United States*, August 4, 2003
Order, *Sterling Savings Association v. United States*, August 30, 2006

Update to the Expert Report of Paul Horvitz, December 10, 2003 and additional materials relied upon
Revised Update to the Expert Report of Paul Horvitz, February 20, 2004
Report of Professor Christopher James Updated December 5, 2003
Report of Professor Christopher James, January 9, 2004 and additional materials relied upon
Revised Expert Report of Professor Christopher James, February 20, 2004
Update to the Expert Report of Paul Horvitz, December 11, 2006 and additional documents considered by Professor Horvitz
Updated Expert Report of Professor Christopher M. James December 11, 2006 and additional documents considered by Professor James
Amended Expert Report of Mukesh Bajaj, April 23, 2004

Deposition of Paul M Horvitz, Ph. D., February 25, 2004
Deposition of Paul Horvitz, Ph.D., January 25, 2007
Deposition of Dr. Christopher James, March 8-9, 2004
Deposition of Christopher James, Ph.D., February 2, 2007

Lewis Federal Acquisition Opportunity, Board of Directors' Meeting, February 26, 1985 PSG061 1984-2005
Horvitz, Paul M., "The Collapse Of The Texas Thrift Industry" in *Restructuring The American Financial System*
Prakash, Snigdha, "Home Savings To Slash Assets In A Push For Profitability," American Banker January 18, 1996
"Saving and Loan Crisis and Its Relationship to Banking," in *History of the Eighties – Lessons for the Future*, FDIC
*Origins and Causes of the S&L Debacle: A Blueprint for Reform*, Report of the National Commission in Financial Institution Reform, Recovery and Enforcement, July 1993
*FDIC, Statistics on Depository Institutions, http://www2.fdic.gov/sdi/main.asp*
Golden West Financial Corporation, Form 10-Q for quarter ending June 30, 1989
TFR Database
Thrift Financial Report Instructions, Consolidated Capital Requirement – Schedule CCR, September

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

- - - - - - - - - - - - - - - - x
STERLING SAVINGS ASSOCIATION and:
STERLING FINANCIAL CORPORATION, :
Plaintiffs, : No. 95-892C
vs. :
THE UNITED STATES OF AMERICA, : VOLUME 1
Defendant. :
- - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, October 16, 2002

Deposition of:

JOE HARGETT

the witness, called for examination by counsel for the Plaintiff, pursuant to notice and agreement, commencing at 9:10 a.m., at Department of Justice, 1100 L Street Northwest, before Virlana Kardash, RPR, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

harm, that could be harm.

BY MR. SYMMES:

Q In light of counsel's objection, do you have an opinion as to whether or not the passage of FIRREA caused any harm to Sterling Savings?

MS. HOSFORD: Objection. He was not retained for that.

THE WITNESS: I haven't studied that issue.

BY MR. SYMMES:

Q But you are issuing an opinion as to whether or not Sterling suffered damages, are you not?

A In the context of the assertions made by Sterling and, in particular, by the expert reports retained by the plaintiffs, that's really been the scope of what I've done.

Q Okay. Fair enough. So you've been retained by the Government to render certain opinions about this matter at trial; correct?

A I've been retained, and I've formed certain opinions that I anticipate expressing at trial.

Q And you testified before that all

those opinions that you could possibly render at trial are contained within this report; correct?

A Yes, as I sit here today, that's accurate. There may be an update here or there depending on the passage of time or something, but I don't anticipate anything else right now.

Q These opinions in this report are final opinions; correct?

A Right. I just mention that issue like on a date; for example, if I calculate something through June of 2001, with the passage of time, I might need to update it.

Q Sure. Is it fair to say, in reviewing your report, which is tab -- it is the front part of Exhibit No. 1 to your deposition. Is it fair to say that, generally, you outlined your main opinions, one, within the executive summary, beginning A through F?

A That's an executive summary. That does not express all of my opinions, but that's simply an executive summary of other things that are discussed in my report.

Q Right. I guess what I was asking -- I'm not trying to suggest otherwise, but the executive summary, doesn't it summarize the

opinions that you later describe in more detail later in the report?

A In a summary fashion, yes, that's right.

Q Turning to page No. 2 of 37 of your report --

MS. HOSFORD: Sorry. Which one?

BY MR. SYMMES:

Q Well, beginning on page 1 of 37, part B, is this an accurate description of your assignment in this case?

A Yes.

Q In the very last paragraph on page 2 of 37, it reads, "I have identified within Exhibit B the documents that I considered in forming the opinions within the report." Do you see that?

A Yes.

Q I'm going to ask you, in your mind, is there a difference between documents considered and documents relied upon?

A Yes.

Q Explain to me the difference, to you.

A I'd say "considered" is anything that I looked at that may or may not have had some

relevance. And "relied upon" are the more subset of those documents that are the basis that you consider in forming your opinions.

Q Okay. And it's fair to say that, in Exhibit B to your report, those are all the documents that you considered, as you just defined?

A Yes.

Q Okay. Now, I know it's a very long list, but just roughly, of what appears to be 1,269 documents -- and I will ask this when we get to the particular opinions -- but do you have the ability today to identify those documents that you relied upon in formulating a particular opinion?

A If you'd care to pull them all out and we can walk through them one by one, we can accomplish that, I'm sure. In a general sense, I'd say most of them are documents I relied upon.

Q Okay. Within this report, sir, could you please identify for me the first opinion that you came to in this matter?

A I'm assuming you mean skipping the qualifications and assignments section?

Q Yes. In other words, my

understanding -- we're here today for me to take your deposition so I can learn about the opinions you're going to be offering at trial. And my understanding is that this report describes those opinions.

And I guess my understanding is that, moving through the executive summary, your first set of opinions, if you will, is set forth in Roman numeral 3 on page 7 of 37. And it's dealing with the issue of the offsetting goodwill in the amortization?

A I think that's a fair characterization. To the extent there's opinions in the executive summary, they're going to be somewhere else in the back sections, which begin on page 7.

Q Identify for me those opinions in the executive summary.

A I'm going to assume, by opinion, you mean probably in the broadest sense of the word. So I think the first sentence is an opinion. I think it's also a fact. I don't think it's a fact in dispute.

But I state that those three transactions were accounted for using the purchase method of

accounting. I hold that opinion. I think that's factual in nature. I'm not sure you want me to do that.

Q That's fine.

A I think we can probably start walking through this sentence by sentence. You can probably come to the conclusion it's, at least in the broadest sense, an opinion. It may be more factual in nature, but it's still a view or opinion that I hold.

Q Okay. How about this? Is it fair to say that you're definitely offering opinions with regard to Sterling's booking of the cash assistance, the offsetting goodwill, and amortization issues; correct?

A Yes.

Q And you're offering certain opinions with respect to plaintiff's claims for expectancy damages; correct?

A Yes.

Q And you're offering opinions with regard to plaintiff's claims for reliance damages; correct?

A Yes.

Q And both of those are more defined

within the report?
A Yes, after the executive summary.
Q And you're issuing an opinion with regard to plaintiff's claims for restitution?
A Yes.
Q Plaintiff's claims for replacement damages?
A Yes.
Q And certain claims regarding wounded bank damages?
A Yes.
Q And that is an exhaustive list of the general opinions you'll be rendering on behalf of the Government in this case?
A When you say "exhaustive list," that's what's in the executive summary. And I'm not trying to quibble with you, but much more detail is provided in the report on a more finite, specific basis in the back.
But in general, that sounds fair.
Q That's all I meant. In general, the more details of your opinions are, therefore, spelled out later on in the report under the Roman numeral sections; correct?
A Yes, and then as supported by the

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x
STERLING SAVINGS ASSOCIATION and:
STERLING FINANCIAL CORPORATION, :
Plaintiffs, : No. 95-892C
vs. :
THE UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - x

ACKNOWLEDGEMENT OF DEPONENT

I, JOE HARGETT, do hereby acknowledge that I have read and examined Pages 3 through 284, inclusive, of the transcript of my deposition taken on Wednesday, October 16, 2002, and that:

(Check appropriate box)

[ ] The same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

[ ] except for the changes noted in the attached Errata Sheet, the same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

---------- --------------------
Date Signature

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Virlana Kardash, Registered Professional Reporter and a Notary Public in and for the District of Columbia, before whom the foregoing proceedings were taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me stenographically at the time and place noted in the caption hereof and thereafter reduced to computer-aided transcription by me; that the foregoing transcript is a true and correct record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in the outcome of the action.

Virlana Kardash, RPR, CSR
Notary Public in and for
The District of Columbia

My commission expires:
June 30, 2006

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x

Certified Copy

RECEIVED
NOV 20 2002
WITHERSPOON, KELLEY, DAVENPORT, TOOLE, P.S.

STERLING SAVINGS ASSOCIATION, :
a state-chartered savings :
association, STERLING :
FINANCIAL CORPORATION, A : No. 95-829-C
Washington Corporation :
Plaintiffs, :
vs. :
THE UNITED STATES OF AMERICA, :
Defendants. :
- - - - - - - - - - - - - - - - - - - x

DEPOSITION OF WILLIAM G. HAMM, Ph.D.
VOLUME I
(Pages 1 through 240)
(Taken by Plaintiffs)
San Francisco, California
November 5, 2002

Reported by: Howard Schroeder, CSR #1123
#4856-4

expectation of these benefits may help explain why Sterling continued to believe, even after FIRREA was enacted and the supervisory capital began to be phased out, that the acquisitions would continue to benefit the shareholders -- the shareholders. The reasons would lie amongst these factors, because none of these factors was -- let me just make sure before I speak here.

The withdrawal or the phase out of the supervisory capital did not invalidate any of these factors. They would still have been available to -- to Sterling to the extent that Sterling perceived the acquisition to provide valuable opportunities.

Q. So to know whether Sterling was harmed by the withdrawal of the promise to use supervisory goodwill as capital, you would want to use some other measure?

A. Well, Mr. Weatherhead, I have only addressed restitution and reliance in my report. And I have not addressed expectancy damages. And certainly as an economist that would generally be the first place I would look for damages.

But I can't -- I have no opinion on expectancy damages. And I -- I -- I can't

formulate one now.
Q. All right. Fair enough. Is it significant to your opinion about costs and benefits whether -- to know whether Sterling would have made the acquisitions that it made in connection with Lewis Federal without the promise from the government to use supervisory goodwill as capital?
A. No.
Q. Is it right then that you assume that the transaction would have occurred with or without that promise from the government?
A. No.
Q. So you have no opinion as to whether Sterling would have refused to enter into the acquisition of the assets and liabilities of Lewis Federal without that promise from the government?
A. And that promise being?
Q. The promise to use supervisory goodwill as capital.
A. Ahh, I don't have any opinion as to whether or not Sterling would have proceeded with the acquisition if it was not permitted to do -- not permitted to do that. So I -- I -- I -- I really I have no opinion.

MR. WEATHERHEAD: Joe, things will be safe here?

MR. SCHERTLER: Yes.

(Whereupon, at 4:59 p.m., the taking of the instant deposition ceased.)

Signature of Witness

SUBSCRIBED and SWORN TO before me this _______ day of _____________, 2002.

_____________________________

CERTIFIED SHORTHAND REPORTER

CERTIFICATE OF REPORTER

I, HOWARD SCHROEDER, Certified Shorthand Reporter, License No. 1123, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter transcribed under my direction; that I am neither counsel for, related to nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

[signature]

CERTIFIED SHORTHAND REPORTER

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Judge Wheeler) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED PRE-TRIAL SCHEDULE**

Pursuant to order of the Court issued at the status conference held on September 14, 2006, and the Court's order dated September 22, 2005, defendant, the United States, respectfully submits the following proposal for pre-trial proceedings in this case, including a date for commencement of trial. Consistent with the Court's September 22, 2005 order, the schedule reflects that plaintiffs' recent motion for reconsideration was denied, and commences with issuance of revised expert reports. In addition, pursuant to the Court's direction at the status conference, the proposed schedule assumes that the Court will not be available for trial until mid-June in 2007.

In proposing a schedule, we have assumed that the trial will require four weeks. The length of the trial would be diminished, however, if the Court eliminates many (or all) of plaintiffs' ten claims for damages upon summary judgment or if plaintiffs voluntarily dismiss claims that have already been rejected as a matter of law by the United States Court of Appeals for the Federal Circuit. For instance, in a 2003 joint status report, plaintiffs have already identified their reliance and restitution claims as "fallback" theories, consistent with Glendale

Federal Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001), in which identical theories were rejected by the Federal Circuit as a matter of law. Joint Status Report, dated July 21, 2003, at 3. In the joint status report, plaintiffs referred to this case as a "lost profits case," and suggested bifurcation of the "fallback" theories but, based upon their admission that the Glendale decision governs, the theories should be withdrawn or dismissed. Id.

Further, assuming that plaintiffs will prepare new expert reports consistent with the Court's recent holding that the Government did not breach any contract with respect to the Central Evergreen transaction, we respectfully request that the Court preclude plaintiffs from increasing damages by adding new theories or bases for award. Plaintiffs have had ample opportunity over the last five years to identify any and all grounds for damages, and any attempt to add new theories or bases at this time would be inappropriate and should be precluded.

[proposed schedules follow]

**Defendant's Proposed Pre-Trial Schedule**

| **Event** | **Deadline** |
|---|---|
| Plaintiffs' Revised Expert Reports | October 23, 2006 |
| Defendant's deposition(s) of Plaintiffs' Expert(s) and issuance of responsive reports | December 21, 2006 |
| Defendant's Revised Motion for Summary Judgment Upon Damages | January 11, 2007 |
| Plaintiffs' Response to Defendant's Motion for Summary Judgment Upon Damages | February 1, 2007 |
| Defendant's Reply Brief In Support Of Motion for Summary Judgment | February 22, 2007 |
| Oral Argument Upon Motion For Summary Judgment Upon Damages | March 5, 2007 |
| Meeting of Counsel pursuant to Appendix A of the Rules of the United States Court of Federal Claims ("Appendix A") | March 27, 2007 |
| Plaintiffs' Memorandum of Contentions of Law and Fact, Exhibit List, and Witness List, pursuant to Appendix A | April 23, 2007 |
| Defendant's Memorandum of Contentions of Law and Fact, Exhibit List, and Witness List, pursuant to Appendix A | May 21, 2007 |
| Motions *in limine* filed | May 29, 2007 |
| Responses to Motions *in limine* | June 8, 2007 |
| Pre-trial conference pursuant to Appendix A | June 11, 2007 |
| Commencement of four-week trial | June 25, 2007 |

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

s/ William F. Ryan

WILLIAM F. RYAN
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

Of counsel:

TAREK SAWI
DELISA SANCHEZ
MELINDA HART

September 25, 2006

CERTIFICATE OF FILING

I hereby certify that on September 25, 2006, a copy of foregoing "DEFENDANT'S PROPOSED PRE-TRIAL SCHEDULE," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford

**uscfc_cmecf@ao.uscourts.gov**
09/25/2006 02:57 PM

To uscfc_cmecf@ao.uscourts.gov
cc
bcc
Subject Activity in Case 1:95-cv-00829-TCW STERLING SAVINGS, et al v. USA "Proposed Pretrial Order"

*****NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**US Court of Federal Claims**

**United States Court of Federal Claims**

Notice of Docketing
This notice indicates that activity has occurred in the case identified below. Please note that these notices are generated for all public entries in all cases with the court, paper and electronic, and is therefore NOT NECESSARILY INDICATIVE OF AN ELECTRONIC FILING.

The following transaction was received from Hosford, Elizabeth entered on 9/25/2006 at 5:57 PM EDT and filed on 9/25/2006

| | |
|---|---|
| **Case Name:** | STERLING SAVINGS, et al v. USA |
| **Case Number:** | 1:95-cv-829 |
| **Filer:** | USA |
| **Document Number:** | 208 |

**Docket Text:**
Proposed Pretrial Order *suggesting pretrial schedule of events* , filed by USA. (Hosford, Elizabeth)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1131461693 [Date=9/25/2006] [FileNumber=393905-0]
[34fd3e59d1bb11a74541f8dfd30258a063c2901a5586d6399e453595c44cf782dc6f
2f633cf58014ff99e8ccd129242db8433890193129fe8fa6a9fe1dd4f600]]

**1:95-cv-829 Notice will be electronically mailed to:**

Elizabeth Marie Hosford elizabeth.hosford@usdoj.gov

William D. Symmes , Sr wds@wkdtlaw.com, janetj@wkdtlaw.com; janetf@wkdtlaw.com;

lwlibertas@aol.com; wms@wkdtlaw.com

**1:95-cv-829 Notice will NOT be delivered to:**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-829c<br><br>(Chief Judge Smith)<br><br>STERLING'S FIRST SET OF INTERROGATORIES PROPOUNDED TO DEFENDANT |

**CONFIDENTIAL MATERIALS - SUBJECT TO PROTECTIVE ORDER**

**TO: UNITED STATES OF AMERICA**

Pursuant to RCFC 26 and 33, plaintiffs herewith submit the following interrogatories to be answered separately and fully under oath within thirty (30) days from the date of service of said interrogatories upon you. In answering the interrogatories you are required to furnish such information as is available to you, not merely the information which you know of your personal knowledge. This is intended to include any information in the possession of the agent or attorney or any investigator for the answering party.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE
A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS
1100 U.S. BANK BUILDING
422 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0302
(509) 624-5265

# I. INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any person employed by the FDIC, FHLBB, FSLIC, OTS, or any other Federal Banking Agency between 1983 to the present (other than expert witnesses retained for the purpose of this litigation) who analyzed, discussed or commented on the regulatory restrictions placed upon SSA and/or SFC following the passage of FIRREA, including any analysis or discussion of the consequences of those restrictions for SSA and/or SFC, its business strategy, its operating performance, and its profitability. Include for each person their name, employer, and job position(s) during all relevant periods.

**Response**:



WITHERSPOON, KELLEY, DAVENPORT & TOOLE
A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS
1100 U.S. BANK BUILDING
422 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201-0302
(509) 624-5265

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-829c<br><br>(Senior Judge Smith) |

RECEIVED
JUL 21 2000
WITHERSPOON, KELLEY, DAVENPORT & TOOLE

**DEFENDANT'S RESPONSES AND OBJECTIONS TO STERLING'S FIRST SET OF INTERROGATORIES**

Pursuant to R.C.F.C. 33 and the Orders of this Court, defendant submits the following objections and responses to Sterling's First Set of Interrogatories Propounded To Defendant. Defendant has made a good faith effort to respond fully to those interrogatories to which it has not objected. Discovery is continuing, however, and defendant reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information and documents that may be discovered subsequent to providing these responses.

Defendant objects and responds to plaintiff's interrogatories as follows:

I. **General Objections and Responses**

Defendant asserts and incorporates by reference the following objections to plaintiff's interrogatories as though they were set forth in full in each response to each interrogatory:

1. Defendant objects to each interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product immunity, the deliberative process privilege, the law enforcement privilege, the bank examination privilege

OBJECTION: Defendant should not be required to search for information in the possession of the RTC (whose successor in interest is the FDIC-R), the Federal Home Loan Banks, or other offices, agencies, bodies, institutions, or boards that were not and are not part of the Government.

18. "Person" shall include any natural person, corporation (private or governmental), syndicate, trust, partnership, proprietorship, firm, group, association, joint venture, governmental or other public entity or agency, or any other form of organization or legal entity, including the United States, and all their respective officials, directors, officers, employees, representatives, agencies or agents, whether or not still alive or in existence.

OBJECTION: Defendant objects to this instruction to the extent that it refers to any person who is not within the defendant's knowledge or to the extent that it refers to any person or entity other than the FDIC in its corporate capacity and the OTS.

## I. INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any person employed by the FDIC, FHLBB, FSLIC, OTS, or any other Federal Banking Agency between 1983 to the present (other than expert witnesses retained for the purpose of this litigation) who analyzed, discussed or commented on the regulatory restrictions placed upon SSA and/or SFC following the passage of FIRREA, including any analysis or discussion of the consequences of those restrictions for SSA and/or SFC, its business strategy, its operating performance, and its profitability. Include for each person their name, employer, and job position(s) during all relevant periods.

**Response**: Defendant objects upon the ground that the information plaintiff seeks to have defendant identify already has been made available to plaintiff through document

production and is thus as accessible to plaintiff as to defendant. Therefore, the burden of extracting the information is the same for plaintiff as defendant.

In addition, Defendant objects to this interrogatory upon the grounds that plaintiff's use of the term "regulatory restrictions" is vague and ambiguous. Further, Defendant objects to this interrogatory upon the grounds that it is unduly broad and burdensome, and the use of the phrase "regulatory restrictions placed upon SSA and/or SFC following the passage of FIRREA" requires the Government to provide information that is not relevant to the subject matter involved in this case.

The Government further objects to this interrogatory to the extent that it assumes the continuous application and enforcement of regulations promulgated after enactment of FIRREA to Sterling. Moreover, the Government objects to this interrogatory to the extent that it requests information protected by the attorney-client privilege.

Subject to, and without waiving these objections, and the general objections stated above, defendant responds as follows:

Carol A. Friend
Former Supervisory Agent
OTS - Seattle

Edward Hedlund
Former Assistant Regional Director
OTS - Seattle

William Durbin
Former Director
OTS - Seattle

**INTERROGATORY NO. 63:** Identify, by Bates number(s) assigned, those documents responsive to SSA's and SFC's First Request for Production of Documents No. 14, which were propounded on Defendant on October 26, 1999.

**Response:** See response to Interrogatory No. 50.

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

Mark A. Melnick / by Jamie E. Winstead

MARK A. MELNICK
Assistant Director

Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor, 1100 L St. N.W.
Washington, DC 20530
(202) 514-7300

July 20, 2000

Attorneys for Defendant