**IN THE U.S. COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STERLING SAVINGS ASS'N, a state chartered savings Ass'n, STERLING FINANCIAL CORPORATION, a Washington corporation.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**U.S. OF AMERICA,**<br><br>**Defendant.** | **Court No. 95-829-C**<br><br>**(Judge Wheeler)** |

**<u>DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND STERLING'S RESPONSES THERETO AND STERLING'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH ITS CROSS-MOTION FOR SUMMARY JUDGMENT AS TO DAMAGES</u>**

Pursuant to Rule 56(d)(2) of the Rules of this Court, defendant, the United States, submits the following proposed findings of uncontroverted fact upon which defendant bases its accompanying motion for summary judgment regarding damages ("Motion") and as to which there is no genuine dispute.

1. Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. <u>Id</u>. This case arises out of Sterling's acquisition of three failing savings and loan institutions in the 1980s: Lewis Federal Savings & Loan Association ("Lewis Federal"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen").

**STERLING'S RESPONSE:** Sterling agrees to Paragraph 1.

2. In November 1985, Sterling successfully bid for and acquired Lewis Federal, an

insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). App. 1. Sterling did not invest any of its own money. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration. App. 15-22.

**STERLING'S RESPONSE:** Sterling disagrees that Paragraph 2 fully describes the acquisition of Lewis Federal. At the request of its regulators, Sterling agreed to acquire the assets and liabilities of Lewis in exchange for a cash contribution and regulatory capital. App. 1353-54, ¶¶ 16-17.

3. In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Federal Home Loan Bank Board ("FHLBB"), pursuant to Resolution No. 88-250, approved the acquisition, authorized an Assistance Agreement and authorized and directed that a forbearance letter be sent to Sterling. App. 593-96. The Assistance Agreement required a FSLIC cash contribution of $11,730,128.00, and, as was the case with the Lewis Federal acquisition, Sterling did not invest any of its own money. App. 24.

**STERLING'S RESPONSE:** Sterling disagrees that Paragraph 3 fully describes the acquisition of Tri-Cities. At the request of its regulators, Sterling agreed to acquire the assets and liabilities of Tri-Cities in exchange for a cash contribution and regulatory capital. App. 1356, ¶ 25.

4. In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and no cash assistance was provided by FSLIC. App. 25-32.

**STERLING'S RESPONSE:** Sterling disagrees that Paragraph 4 fully describes the acquisition

of Central Evergreen. Sterling was asked three times by its regulators to acquire the failing Central Evergreen. App. 1358, ¶ 33. It refused for lack of sufficient capital, until the regulators proposed that Sterling would be the winning bidder on Tri-Cities, and could use that capital, together with the goodwill to be created in the Central Evergreen merger, to meet capital requirements. *Id.* It would have been madness for Sterling to undertake the Central Evergreen acquisition without these promises.[1] Sterling threatened to pull out of the Central Evergreen merger until the Government reaffirmed its capital promises. *Id.* The Government did not provide cash assistance for the merger, although Sterling and the Government contracted that Sterling would operate according to its business plan. *Id.*

5. Each of Sterling's acquisitions was accomplished in furtherance of its strategy to grow its asset base by acquiring other thrifts, rather than opening its own branches, and Sterling viewed its execution of this strategy as successful. In a Securities and Exchange Commission filing submitted in 1989, subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits . . . . Through consolidation, the Association has reduced the cost of performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to [Sterling.]

App. 34.

**STERLING'S RESPONSE:** Sterling disagrees. The SEC filing speaks for itself. The acquisitions were the result of a strategy by the Government to save failing thrifts with a

[1] Sterling understands that the Court has ruled that Sterling assumed the risk of regulatory change in the Central Evergreen contract. As discussed in response to Paragraph 19, *infra*, Sterling intends to file a proffer to preserve the record on this point.

minimum of cash outlay. Sterling pursued a growth strategy of growing internally while making strategic acquisitions. App. 1111:1-10. The acquisitions were consistent with Sterling's growth strategy of targeting deposit gathering in smaller communities. App. 10, ¶ 22; App. 59. However, the capital promises offered by the Government in exchange for the three acquisitions were absolutely the key factor that justified Sterling's assumption of liabilities in excess of total of assets acquired plus cash assistance. App. 1108:13-19, 1112:19-1113:5, 1114:12-1115:23; App. 1251:18-22. Sterling would not have done the deals without the capital promises made by the Government. *Id.*; App. 273:18-22, 292:1-9. The acquisitions were successful until the Government's breach of the agreements.

6. The fifteen branches acquired by Sterling through the acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen are an integral part of Sterling's branch network; at the time of the alleged breach, the deposit base from the acquired branches represented approximately 57 percent of Sterling's deposit base. App. 407. Through 1994, the deposits in the acquired branches represented over 50 percent of Sterling's deposits, and, as recently as 2001, deposits in the acquired branches accounted for twenty percent of the deposit base. App. 407-08. Further, subsequent to the alleged breach, Sterling earned over $50 million in income from the acquired branches. App. 409.

**STERLING'S RESPONSE:** Sterling disagrees with Paragraph 6, and notes that the breach caused Sterling to curtail its operations, shrink its asset base, and lose other potential acquisitions. App. 1165:8-25; App. 849-50; App. 1166:15-1167:12. Had the Government not breached its contracts with Sterling, Sterling would have been even more profitable and the acquired branches would have been a smaller part of Sterling's deposit base. At the time of the breach, Sterling had not absorbed Central Evergreen and asked the Government to take it back. App. 1358, ¶ 33. That fact, and the fact that the Government refused to take it back, confirms

that both sides saw no value whatsoever in Central Evergreen.

7. On August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA established new capital requirements. In particular, FIRREA, and the regulations promulgated to implement it, required thrifts to comply with three separate regulatory capital standards: a leverage (or "core capital") standard, a tangible capital standard, and a risk-based capital standard. 12 U.S.C. §1464(t) (1989); 12 C.F.R. §§ 567.1, 567.2, 567.5 (1990); 54 Fed. reg. 49,411 (Nov. 30, 1989). "Qualifying supervisory goodwill" was to be phased-out gradually between 1990 and 1995. 12 U.S.C. §1464(t); 12 C.F.R. §563.13. In the intervening years, eligible savings associations were permitted to include qualifying supervisory goodwill to satisfy core and risk-based capital standards established under FIRREA. Id.

**STERLING'S RESPONSE:** Sterling agrees with Paragraph 7.

8. As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. App. 37.

**STERLING'S RESPONSE:** Sterling agrees that, due to the Government's breach of the agreements to treat the goodwill granted to Sterling by the acquisitions as capital, Sterling did not meet the capital requirements of FIRREA.

9. Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. App. 5. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. App. 37. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. App. 37-38.

**STERLING'S RESPONSE:** Sterling agrees that it submitted a capital plan under threat from

the Government, which had breached its contracts. Def's App. 35.

10. In April 1990, OTS approved Sterling's capital restoration plan on the condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. App. 753. On May 10, 1990, Sterling declined to execute the operating agreement. App. 754.

**STERLING'S RESPONSE:** Sterling agrees with Paragraph 10.

11. On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards, refused to consent to the operating agreement, and did not propose an acceptable remedy for its capital deficiency, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound operation, pursuant to 12 C.F.R. § 567.10(a)(4). App. 45.

**STERLING'S RESPONSE:** Sterling disagrees with Paragraph 11. The Government refused to abide by its contracts with Sterling relating to the three acquisitions and eventually threatened to shut down Sterling. App. 23, ¶¶ 7-8.

12. In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. In its opinion granting the preliminary injunction, the court severely restricted OTS's and FDIC's authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash. 1990). OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83.

**STERLING'S RESPONSE:** Sterling disagrees. The U.S. District Court for the Eastern District of Washington consistently affirmed the Government's authority to regulate Sterling, but ruled that the Government could not breach its contracts. *Id.*

13. Upon issuance of the injunction, OTS complied with its terms, and expressly conveyed to Sterling that the agency intended to "strictly obey" the district court's order prohibiting it from enforcing any restrictions contrary to the agreements Sterling entered into in connection with its acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. App. 46, 48-49. Further, during the pendency of the injunction, which ultimately was dissolved in 1992, Sterling never needed to initiate an action to compel enforcement of the injunction or complain of Government noncompliance with the injunction. Indeed, Sterling's internal audit department, in a memorandum dated September 20, 1991, referred to restrictions imposed prior to the issuance of the injunction as "OTS operational concerns stayed by preliminary injunction." App. 750. Moreover, in exam reports issued during the pendency of the injunction, examiners expressly acknowledged that OTS was enjoined from enforcing FIRREA's capital requirements. App. 59, 71, 144.

**STERLING'S RESPONSE:** Sterling disagrees with Paragraph 13. Though the injunction did provide Sterling time to raise the capital necessary to meet FIRREA standards to avoid a receivership, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by the Government, which eliminated Sterling's most profitable opportunities. App. 2-3, ¶¶ 7-8; App. 1165:8-25. Moreover, the Government continued to treat Sterling as a troubled thrift, even under the injunction. App. 2-3, ¶¶ 7-8; App. 849-850. Specifically, on June 5, 1990 (five days after issuance of the injunction), the Government wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. App. 848. Subsequently, the

Government sent Sterling other correspondence manifesting its intent to regulate Sterling's operations. App. 824; App. 851; App. 856. On June 20, 1990, the Government sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**…The listing attached to your letter does not reflect **the asset growth restrictions that Sterling is subject to**. By virtue of the denied capital plan, **no growth is permitted**. In additional, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. **The institution's activities are limited to those specified in the capital plan**….

App. 852-53 (emphasis added). The preliminary injunction forbade the OTS to breach the contracts, but it did not forbid the Government to regulate Sterling. Notably, the injunction did not prevent the OTS from treating Sterling as a "troubled thrift" under so-called "safety and soundness" regulations. App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9. Under the guise of "safety and soundness" regulation, the Government indirectly threatened Sterling with poor performance ratings. App. 2-3, ¶¶ 7-8. The threatened use of this standard showed the Government's intent to regulate Sterling as a troubled thrift, in breach of its contracts, despite the contracts and injunction.

Finally, the Government successfully moved for a partial reconsideration and appealed to the Ninth Circuit, which eventually vacated the injunction. *Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992). Thus, Sterling knew all along that if Sterling made aggressive business decisions, Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. App. 2-3, ¶¶ 7-8. This caution was validated by the Ninth Circuit's ruling. It cannot reasonably be disputed that the injunction only had the effect of keeping the Government at bay while Sterling fought to reach capital compliance in accordance with the new, non-contractual capital standards of FIRREA. *Id.*; App. 1170:12-22.

14. In November 1991, Sterling raised approximately $21 million through a public

offering of common stock. App. 329. The public offering brought Sterling into compliance with all of the minimum capital ratios required by FIRREA. Id. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

App. 209.

**STERLING'S RESPONSE:** Sterling agrees that Sterling raised approximately $21 million through a public offering of common stock in November 1991 and that such offering brought Sterling into compliance with the capital ratios required under FIRREA.

15. In addition, Sterling's 1992 Annual Report indicated that completion of the equity offering brought Sterling into compliance with the capital standards imposed by FIRREA:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

App. 329 (emphasis added).

**STERLING'S RESPONSE:** Sterling agrees. The fact that Sterling successfully completed this offering demonstrates the validity of Sterling's business plan and strength of Sterling's management. App. 3, ¶ 9; App. 162-63.

16. According to Harold Gilkey, Sterling's Chief Executive Officer, the 1991 capital raising would not have occurred if Sterling had already been in capital compliance at the time,

because Sterling would have had substantial excess capital. App. 373.

**STERLING'S RESPONSE:** Sterling disagrees. Sterling Chief Executive Officer Harold Gilkey testified concerning the actual bank after it had already shrank by 17% to $600 million. App. 1, ¶ 3. The deposition testimony cited by the Government does not discuss whether the but for bank, at over $731 million, would have raised capital. App. 2, ¶ 5. It is undisputed that Sterling's policy during the 1990s was to raise as much capital as the market would allow. App. 2, ¶ 6.

17. On April 14, 19921, the Ninth Circuit Court of Appeals reversed the district court decision. Sterling Savings Assoc. v. Ryan, 959 F.2d 241 (9th Cir. 1992). The Ninth Circuit, relying upon Far West Federal Bank v. OTS, concluded that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling, 959 F.2d at 241. On that basis, the Ninth Circuit vacated and remanded the district court's judgment to the district court. Id. By the time the Ninth Circuit issued its decision, however, Sterling had already completed its public offering and achieved compliance with all of FIRREA'S capital requirements.

**STERLING'S RESPONSE:** Sterling agrees. Sterling notes that the Ninth Circuit also held that Sterling's proper remedy was an action for damages for breach of contract in the Court of Claims. The case was then transferred to this Court.

18. In 1993, Sterling's holding company, Sterling Financial Corporation, raised approximately $17 million through a preferred stock offering, and downstreamed approximately $12 million to Sterling. In the prospectus, Sterling Financial Corporation noted increased capital requirements would be phased-in as of December 31, 1994. App. 603. As of September 30, 1992 (prior to the offering), however, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." Id. at 606.

Further, it was anticipated that Sterling would continue to meet all regulatory requirements in the future, although "there can be no assurance in this regard." Id. at 603.

**STERLING'S RESPONSE:** Sterling disagrees with the characterization of the prospectus and states that the prospectus speaks for itself. Sterling agrees that Sterling Financial Corporation, raised approximately $17 million through a preferred stock offering in 1993, and downstreamed approximately $12 million to Sterling.

19. With respect to the Central Evergreen acquisition, the Government did not breach a contract with Sterling because the risk of regulatory change had been contractually allocated to Sterling. Sterling Savings v. United States, 72 Fed. Cl. 404 (2006).

**STERLING'S RESPONSE:** Sterling agrees that this Court has held that the risk of regulatory change had been contractually allocated to Sterling in the Central Evergreen contract. Sterling respectfully disagrees with that ruling; Sterling will shortly file a proffer related to Central Evergreen to preserve the record on this point.

## STERLING'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(d)(2) of the Rules of this Court, Sterling submits the following proposed findings of uncontroverted fact upon which Sterling bases its accompanying motion for summary judgment and as to which there is no genuine dispute.

1. Sterling began operations in 1983 as a State of Washington-chartered federally insured stock savings and loan association headquartered in Spokane, Washington. App. 1245:8-21.

2. In contrast to the vast majority of thrifts, Sterling was a profitable and sound financial institution all during the troubled period of the 1980s. App. 9, ¶ 18; App. 105.

3. During this time, Sterling's market area enjoyed more favorable growth than most states, and completely avoided the 1990-1991 recession. App. 3-4, ¶ 11; App. 1253:11-12:54:4.

4. Because Sterling opened in 1983, after peak interest rates, it did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s, but instead held all loans at current market rates, exceeding the rates it was paying on deposits. App. 1254:18-24; 2006 App. 131.

5. By the end of its first year of business, Sterling was profitable. App. 10, ¶ 19; App. 131.

6. Its deposits, assets and profits increased each year without interruption through fiscal year 1989. App. 10, ¶ 19; App. 105.

7. Sterling had a relatively small market share in the markets that it entered, so it had a substantial market available to it for growth. App. 1278:1-19.

8. The success of Sterling during the 1980s was due primarily to its good management. App. 10, ¶¶ 20-21; App. 61.

9. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. *Id.*

10. Sterling's plan was implemented with considerable skill, and success was achieved. *Id.*

11. Sterling had the same management team throughout this period (and still does), and the same management and business strategy would have been in place absent the breach. *Id.*

12. The supervisory acquisitions that are the focus of this litigation were consistent with the growth plan, which from the outset included goals to achieve steady and consistent growth. App. 10, ¶ 22; App. 59.

13. Sterling pursued a strategy of internal growth combined with strategically-suited

acquisitions. App. 1111:1-10.

14. Sterling's plan was to grow aggressively through a balanced combination of acquisitions and branch creation. *Id.*; App. 1243:4-25, 1244:1-6, 1240:11-1247:19.

15. By the late 1980s, the number of insolvent thrifts threatened to swamp the resources of the FSLIC. *Winstar*, 518 U.S. at 847 (noting that by 1988 the FSLIC was itself insolvent by over $50 billion).

16. The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). *Id.* at 848.

17. The Office of Thrift Supervision recognized Sterling's ability to meet its business plan, and on this basis recommended it as a thrift capable of acquiring troubled institutions. App. 1353-54, ¶¶ 16-17, 1356, ¶ 25, 1358, ¶ 33.

18. Sterling completed three of these acquisitions of troubled thrifts, Lewis, Tri-Cities and Central Evergreen. *E.g., id.*

19. These acquisitions were consistent with Sterling's growth strategy of targeting deposit gathering in smaller communities. App. 10, ¶ 22; App. 59.

20. The inducements offered by the Government in exchange for these three acquisitions were the key factor that justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance. App. 1108:13-19, 1112:19-1113:5, 1114:12-1115:23; App. 1251:18-22.

21. Sterling would not have done the deals without the Capital Inducements made by the Government. App. 1108:13-19, 1109:21-1110:1, 1112:19-1113:5; App. 273:18-22, 292:1-9.)

22. Sterling's growth and profitability were attained through sound and conservative

operating policies. App. 10, ¶¶ 20-21; App. 882.

23. As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. App. 958-996.

24. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large, unassisted absorption of Central Evergreen in December 1988. App. 978.

25. In 1989, then, prior to the breach, Sterling was well on its way towards its goal of becoming a major player in the Northwest market in accord with its original and consistently-maintained business strategy. App. 961-62.

26. However, this rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, each with liabilities in excess of its assets, left Sterling in an undercapitalized position, although it had regulatory capital modestly in excess of its requirements. App. 13, ¶ 28; App. 60.

27. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue. App. 1008.

28. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement. App. 779.

29. This offering did not take place due to the Government's breach. App. 14, ¶ 32.

30. After the enactment of FIRREA, the Government began to treat Sterling as an undercapitalized, troubled thrift, forcing Sterling to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. App. 1165:8-25;

App. 849-50.

31. These restrictions included: (1) a limit on asset growth; (2) a moratorium on capital distributions; (3) limits on residential loans to conforming loans; (4) consumer lending restrictions; (5) loans to one borrower limits of $500,000; (6) no authority to purchase or sell any asset or group of assets in excess of $500,000; (7) approval of OTS required to increase compensation of any executive officer or director; and (8) inability to accept uninsured deposits. *Id.*

32. Sterling was forced to curtail its operations significantly. App. 1166:15-1167:12.

33. From June 1989 to June 1991, Sterling shrunk its asset base, declining in size for the first time in its history. App. 10, ¶ 21; App. 161-163; App. 1271:13-1274:17.

34. Sterling's total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%. App. 161-63.

35. Because of the breach, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate lending crippled. App. 1116:2-1117:15; App. 1255:1-18, 1256:19-1257:1, 1257:15-23, 1284-85, 1286:22-1287:15, 1288:1-3; 1290-92.

36. Sterling lost valuable employees. App. 1118:15-1120:2; App. 1286:15-1287:15.

37. Sterling was forced to forgo investment opportunities, including acquisitions. App. 1121:17-24, 1131:22-1144:2; App. 1279:13-1281:8.

38. Moreover, Sterling suffered damage to its reputation because of the Government's restrictions on the type and amount of business in which Sterling could engage. App. 1213:7-1214:24; App. 1217; App. 1219:22-1233:24, 1234:3-1235:14; App. 1238-1239; App. 1255-57.

39. In addition, Sterling was forced to cancel the 1989 offering because the OTS refused to commit to allow Sterling to pay dividends on the preferred stock that was part of the

offering. App. 1008.

40. The Government's breach severely damaged Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage. App. 1290:5-9.

41. Residential construction lending was a high profit area. App. 1290:10-14.

42. Prior to the breach, Sterling intended to expand Action Mortgage into Seattle, Portland, Vancouver (WA), Lake Oswego (OR), Boise and Salt Lake City. App. 1290-91.

43. Action's business plan was to quadruple lending activity, to be achieved through opening these offices. App. 1292:9-13.

44. Sterling attempted to support an Action Mortgage office in Salt Lake City, but could not make a profit without the ability to engage in construction lending. App. 1290:21-25.

45. Sterling thus had to close that office. *Id.*

46. Sterling was able to keep open a Boise office to handle single family loans, but could not expand that office into residential construction lending, the more profitable side of Action Mortgage. App. 1291:1-4.

47. Utah subsequently underwent an economic upswing, which Sterling could not benefit from because the Action office had to be closed. App. 1283:15-25.

48. The restriction also stopped Sterling from opening Action Mortgage offices in Seattle, Portland and Lake Oswego until after January of 1992. App. 1291:12-25; App. 1292:4-6.

49. By that time, Sterling had lost contact with the persons it intended to hire to supervise those offices, thus leading to further cost to find appropriate staff. App. 1291:15-17.

50. Sterling eventually opened the Seattle and Lake Oswego offices, which have been highly profitable. App. 1291:19-21.

51. However, Sterling lost years of time in Lake Oswego and in Seattle due to the

breach. *Id.*

52. Two-thirds of the existing staff of Intervest, another Sterling subsidiary, left following the Government's breach, including all of the big producers of assets, and Intervest was forced by the breach to eliminate almost all of its lending. App. 1286:22-1287:15.

53. Had the larger producers stayed and the breach not occurred, Intervest would have been able to substantially increase the size of its staff and therefore the size of its assets and lending capacity. *Id.*

54. Specifically, Intervest's operations would have expanded to cover northern California, Oregon, Idaho, parts of Utah, Montana and Washington. 1287:9-15.

55. Sterling suffered a reduction in servicing income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans. App. 1116:2-1117:15.

56. Sterling was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. App. 1285:1-3.

57. The Government forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. App. 1285:4-9.

58. Sterling also was forced to stop gathering uninsured deposits. App. 1285:6-10.

59. Sterling lost many customers with deposits in excess of $100,000, including a priest in Salish who had deposits in excess of $ 1 million. App. 1255:1-11; App. 1256:19-15; App. 1257:1.

60. Condron Homes and Baker Construction left due to OTS limitations on Sterling. App. 1255:12-18.

61. Fred Burstad and Burstad Construction of Seattle left due to OTS limitations. App. 1257:15-23.

62. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions; "[Sterling was] not only turning them away, we were walking them across the street to our competitors to avoid the restrictions that we were placed under." App. 1282:20-23.

63. The following customers left Sterling as a result of uncertainty about the Bank: (1) Boyd, Bjockman & Frickle, an accounting firm with a term loan for equipment and leasehold improvements as well as a credit line; (2) CRM Optical, a contact lens manufacturer with multiple term equipment loans and a credit line; (3) DIVCO Energy Control Company, a heating and air conditioning company, and its principal, Robert Nelson, considered a $5 million customer, with several equipment loans and a large credit line; (4) Latah Creek Winery, which had a $1 million equipment loan and a credit line; (5) Miller-Jordan Travel, a travel agency, had a credit line and a few equipment term loans; (6) Northern Technologies, Inc., a technology company that manufactured surge protectors, had a rapidly increasing credit line designed to keep pace with the company's growth; and (7) Northwest Ski Exchange, a retail shop, had several term loans and inventory financing. App. 1184:8-1185:16, 1186:17-1193:7, 1193A:14-1193B:5, 1193B:24-1204:25, 1205:12-1210:18; App. 1211.

64. Sterling's inability to continue commercial activity and the uncertainty of when the issues with the Government would be resolved cost Sterling many valuable business customers, including the following: (1) Aslin-Finch; (2) Dane Armstrong; (3) Ted Beasley; (4) Larry Biggs; (5) Cedar Builders; (6) Empire Jewelry and Loan; (7) George Hansen; (8) Don Howell; (9) Craig Jacobs; (10) Bill Lawson of A & A Construction; (11) Michael Manz; (12) Metallic Arts; (13) Grant Person; (14) Randy Ramey of Ramey Construction and Ramey Development; (15) Red Barn, NSE Inc.; (16) Doug Romney; (17) Roy Mitchell, Inc.; (18) Kevin and Chris Rudeen, Rudeen Development; (19) John Schreinir; (20) Harry and Daryl Siria; (21)

G. Wesley Sodoroff; (22) Vandervert Development; (23) Mike Walker; and (24) Woodland Montessori School. App. 1213:7-1214:24; App. 1217.

65. Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them, including the following: (1) Bill Lawson, who sought approximately $1.5 million; (2) Dick Vandervert; (3) Dick Villelli, who sought approximately $2.0 million; (4) Harlan Douglas; (5) Richard Naccarato of Cedar Pines General Partnership; (6) Bob Spears; (7) Ted Gunning; (8) Dean Grafos of Opportunity Plaza; (9) Thompson and Brumback. App. 1219:22-1233:24, 1234:3-1235:14.

66. Sterling could not expand its subsidiaries or keep pace with its customers' needs; without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities. App. 1279:13-25; App. 1280:17-25; App. 1281:1-8.

67. The acquisition of two Great American branches was denied by the OTS. App. 1121:17-24.

68. Further, a number of other acquisitions failed in part or as a direct result of Sterling's post-FIRREA, weakened capital position. App. 1132-1144.

69. For example, Sterling entered into discussions to acquire Horizon Bank, but could not satisfy Horizon as to Sterling's level of capital. App. 1131-32.

70. Likewise, Intervest ended negotiations for an acquisition due to the capital structure and Sterling's problems with the Government. App. 1132-33.

71. Sterling started discussions with Great Northwest Savings and Vancouver Federal in 1991, but Sterling was unable to convince either institution to go forward because of the Government's treatment of Sterling and Sterling's resultant poor capital position. App. 1136-38.

72. Sterling attempted to acquire Summit Savings in the mid-1990s, but Summit chose to go with another institution due to Sterling's capital structure and the breach. App. 1134-35.

73. Sterling had similar experiences with Gibraltar Savings, Willamette Savings, Hamilton Financial Services, and Security Pacific. App. 1138-44.

74. All of these transactions may have been completed if Sterling had had sufficient capital to be a competitive candidate for acquisition. *E.g., id.*

75. The CJ-4 loan was a property in Bellevue, Washington, that Sterling committed to loan for construction prior to the enactment of FIRREA. App. 1089:12-14.

76. FIRREA limited the size of a loan a financial institution could make to any one borrower, based on the level of capital an institution possessed. App. 1092:25-1093:5.

77. When the Government breached and refused to acknowledge the contracts for the three acquisitions, Sterling was treated as if it had deficit capital and limited to a $500,000 ceiling for a loan to any one borrower. App. 1093:6-13.

78. Because the CJ-4 loan was in excess of $500,000, Sterling was not permitted to make additional advances against the loan commitment that was already in effect. *Id.*

79. Because the Government would not allow Sterling to make further advances, the project fell behind on construction. App. 1091:10-1092:9.

80. The borrowers then sued Sterling for breaching the loan commitment. *Id.*

81. To resolve the dispute with the borrowers, Sterling was forced to foreclose on the property, repossess it, and make the improvements which the borrowers would have made if Sterling had been able to advance the funds per the loan commitment. *Id.*

82. In the process of foreclosure, repossession and improvements, the market value of the property declined significantly. *Id.*

83. When Sterling liquidated the property, therefore, Sterling suffered a $1.615 million loss. App. 1094:6-1095:2; App. 1288:1-3.

84. The Government eventually threatened to shut Sterling down completely. App. 23, ¶¶ 7-8.

85. In May 1990, Sterling filed suit against the OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. App. 311-351.

86. The district court issued a temporary restraining order in May of 1990 and a preliminary injunction in August 1990. App. 352-381.

87. Though the injunction did provide Sterling time to raise the capital necessary to meet FIRREA standards to avoid a receivership, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by the Government, which eliminated Sterling's most profitable opportunities. App. 2-3, ¶¶ 7-8; App. 1165:8-25.

88. Moreover, the Government continued to treat Sterling as a troubled thrift, even under the injunction. App. 2-3, ¶¶ 7-8; App. 849-850.

89. Specifically, on June 5, 1990 (five days after issuance of the injunction), the Government wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. App. 848.

90. Subsequently, the Government sent Sterling other correspondence manifesting its intent to regulate Sterling's operations. App. 824; App. 851; App. 856.

91. On June 20, 1990, the Government sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**…The listing attached to your letter

> does not reflect **the asset growth restrictions that Sterling is subject to**. By virtue of the denied capital plan, **no growth is permitted**. In additional, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. **The institution's activities are limited to those specified in the capital plan**….

App. 852-53 (emphasis added).

92. Sterling's CEO was "scared to death" of what the regulators would do during this time, and highly concerned that the Government would shut down the Bank through another avenue. App. 1258:25-1270:17.

93. The preliminary injunction ostensibly restricted the ability of OTS and FDIC to regulate Sterling; however, the injunction did not prevent the OTS from treating Sterling as a "troubled thrift" under so-called "safety and soundness" regulations. App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9.

94. Under the guise of "safety and soundness" regulation, the Government indirectly threatened Sterling with poor performance ratings. App. 2-3, ¶¶ 7-8.

95. The Government successfully moved for a partial reconsideration and appealed to the Ninth Circuit, which eventually vacated the injunction. *Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992).

96. Thus, Sterling knew all along that if Sterling made aggressive business decisions, Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. App. 2-3, ¶¶ 7-8.

97. The injunction only had the effect of keeping the Government at bay while Sterling fought to reach capital compliance in accordance with the new, non-contractual capital standards of FIRREA. App. 2-3, ¶¶ 7-8; App. 1170:12-22.

98. Because Sterling's capital ratios were low after the breach, Sterling was forced to turn away from the growth and expansion strategy that had brought success to Sterling in the

past. App. 1165:8-25.

99. In contrast to most capital deficient thrifts, Sterling operated at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991. App. 18, ¶ 45; App. 163.

100. Sterling thus could go to the capital market in 1991, earlier than most other capital deficient thrifts. App. 62.

101. Sterling raised gross proceeds of $23.7 million in late 1991, which put Sterling back in full capital compliance. App. 1060.

102. Sterling's business strategy called for periodic offerings to raise capital in line with its growth-oriented strategy. App. 1111; App. 1243:4-25, 1244:1-6, 1246:11-1247:19.

103. Sterling would have raised capital in 1991 even if the breach had not occurred. App. 1-2, ¶¶ 3-6; App. 63.

104. Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy of growth through deposit-gathering. App. 162-167.

105. In the mid-1990s, Sterling modified its strategy to shift from the traditional savings institution focus on home mortgage lending toward becoming the full service community bank that had been part of its original strategic plan. *Id.*

106. Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits. *Id.*

107. Since 1990 and continuing through the present, Sterling operated successfully, with increasing assets and profits. App. 3, ¶ 9; App. 162-63.

Respectfully submitted this 29th day of March, 2007.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: /s/ William D. Symmes

William D. Symmes, Counsel of Record
And Member of the Bar of the United States Court of Federal Claims
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on March 29, 2007, a copy of the foregoing DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH DEFENDANT'S REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND STERLING'S RESPONSES THERETO AND STERLING'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH ITS CROSS-MOTION FOR SUMMARY JUDGMENT AS TO DAMAGES was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Court No. 95-829-C

(Judge Wheeler)

---

**APPENDIX TO**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**
**AND**
**PLAINTIFFS' BRIEF RE: MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

---

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

March 29, 2007

**APPENDIX TO**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**
**AND**
**PLAINTIFFS' BRIEF RE: MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

**TABLE OF CONTENTS**


| | |
|---|---|
| Declaration of Harold B. Gilkey | 1 |
| Declaration of Paul M. Horvitz | 5 |
| Corrected Expert Report of Paul Horvitz, Dated September 6, 2001 | 52 |
| Revised Update to the Expert Report of Paul Horvitz, February 20, 2004 | 123 |
| Update to the Expert Report of Paul Horvitz, December 11, 2006 | 152 |
| Revised Expert Report of Professor Christopher James, February 20, 2004 | 187 |
| Updated Expert Report of Professor Christopher M. James, December 11, 2006 | 251 |
| Verified Complaint for Declaratory and Injunctive Relief, or in the Alternative, for Rescission and Damages, dated May 15, 1990 | 311 |
| Temporary Restraining Order, dated May 29, 1990 | 352 |
| Memorandum Opinion and Order Granting Motion for Preliminary Injunction and Denying Motion to Dismiss, Inter Alia, dated August 8, 1990 | 354 |
| Defendants' Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment, dated October 10, 2000 | 382 |
| Plaintiffs' Reply to "Defendant's Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment.", dated December 15, 2000 | 432 |
| Defendant's Reply to Plaintiff's Supplemental Opposition to Defendant's Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment, dated January 16, 2001 | 480 |
| Letter from FHLBB to Harold Gilkey dated, August 14, 1985 | 510 |
| Resolution No. 85-985, dated November 4, 1985 | 514 |

| | |
|---|---|
| Resolution No. 85-990, dated November 4, 1985 | 522 |
| FHLBB's Appointment of Receiver no. 85-984, dated November 4, 1985 | 525 |
| Acquisition Agreement, dated November 5, 1985 | 543 |
| Assistance Agreement, dated November 5, 1985 | 557 |
| Letter from FHLBB to Harold Gilkey dated November 12, 1985 | 591 |
| FHLBB Resolution No. 85-984, dated November 4, 1985 | 594 |
| FHLBB Resolution No. 85-986 , dated November 4, 1985 | 599 |
| FHLBB Resolution No. 85-987, dated November 4, 1985 | 602 |
| FHLBB Resolution No. 85-988, dated November 4, 1985 | 604 |
| FHLBB Resolution No. 85- 989, dated November 4, 1985 | 606 |
| Letter dated April 6, 1988 from FHLBB | 608 |
| FHLBB Resolution No. 88-250, dated April 7, 1988 | 610 |
| FHLBB's Appointment of Receiver No. 88-249, dated April 7, 1988 | 622 |
| Acquisition Agreement dated April 6, 1988 | 647 |
| Assistance Agreement dated April 8, 1988 | 662 |
| Order No. 807, dated April 7, 1988 | 742 |
| FHLBB Resolution No. 88-249, dated April 7, 1988 | 743 |
| FHLBB Resolution No. 88-251, dated April 7, 1988 | 751 |
| FHLBB Resolution No. 88-252, dated April 7, 1988 | 754 |
| FHLBB Resolution No. 88-253, dated April 7, 1988 | 756 |
| FHLBB Resolution No. 88-254, dated April 7, 1988 | 760 |
| Letter from Coopers & Lybrand to Sterling dated July 28, 1988 | 762 |
| Letter from Coopers & Lybrand to Sterling dated January 30, 1989 | 764 |
| Letter from Coopers & Lybrand to Sterling's Board of Directors dated January 27, 1989 | 769 |
| Agreement dated December 28, 1988 | 772 |
| Certificate of Corporate Resolution dated December 22, 1988 | 787 |

| | |
|---|---|
| Memorandum from Graham & Dunn to Betty Reed dated December 8, 1988 | 789 |
| Federal Home Loan Bank Board Memo No. 88-1273, dated December 8, 1988 | 795 |
| Acquisition agreement dated July 20, 1988 | 801 |
| Friend letter to Gilkey, dated January 26, 1990 | 824 |
| Byrne letter to Judge Ryan, dated May 11, 1990 | 825 |
| Friend letter to Gilkey, dated June 5, 1990 | 848 |
| Byrne letter to Friend, dated June 19, 1990 | 849 |
| Friend letter to Board of Directors, dated July 20, 1990 | 851 |
| Friend letter to Byrne, dated June 20, 1990 | 852 |
| Friend letter to Byrne, dated June 25, 1990 | 854 |
| Friend letter to Byrne, dated August 20, 1990 | 856 |
| Memo to FHLBB from Faulstich, dated October 23, 1985 | 857 |
| S Memorandum to Buckley from Faulstich, dated March 31, 1988 | 862 |
| Issue Memorandum to FHLBB from Fraulstich, dated April 6, 1988 | 874 |
| Memo from Luke to FHLBB, dated December 5, 1988 | 879 |
| 1989 Annual Report | 958 |
| 1990 Annual Report | 997 |
| 1992 Annual Report | 1036 |
| Deposition of Daniel G. Byrne, commencing December 3, 2001 | 1082 |
| Deposition of Daniel G. Byrne, commencing July 10-13, 2000 | 1098 |
| Deposition of Joe Hargett | 1150 |
| Deposition of Mukesh Bajaj, commencing June 19, 2002 | 1156 |
| Deposition of Rodney W. Barnett | 1164 |
| Deposition of William W. Zuppe | 1177 |
| Deposition of Thomas M. Beil | 1183 |
| Deposition of Cajer Neely | 1212 |
| Deposition of Gary D. Crithfield | 1218 |

| | |
|---|---|
| Deposition of Harold Gilkey | 1242 |
| 1985 FHLBB Regulation | 1298 |
| 1987 FHLBB Regulation | 1307 |
| 1985 Thrift Financial Report (excerpts) | 1300 |
| 1987 Thrift Financial Report (excerpts) | 1300 |
| 1985 TRF Instructions (excerpts) | 1302 |
| 1989 Business Plan Update | 1310 |
| Affidavit of William W. Zuppe, dated May 28, 1990 | 1350 |
| Supplemental Affidavit of Daniel G. Byrne, dated June 25, 1990 | 1368 |

IN THE U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

## DECLARATION OF HAROLD B. GILKEY

1. I am Chairman of the Board and Chief Executive Officer of Sterling Financial Corporation, the holding company of Sterling Savings Association (now Sterling Savings Bank).

2. I make this Declaration of my own personal knowledge. I was deposed by the government's attorneys in this matter on June 6, June 7, and June 8, 2000.

3. I understand that the government suggests that I said in my 2000 deposition that absent the breach, Sterling would not have raised capital in 1991. When the questions were posed to me on pages 464, 465 and 466 of my deposition, I answered with regard to the already shrunken bank. In June 1989, Sterling had assets of $731 million. By June 1991, management had shrunk the bank to $600 million in order to minimize the impact of the government's action taking away Sterling's capital acquired as a result of the acquisition of insolvent thrifts in 1985 and 1988. By 1991 Sterling would have had assets, based on our growth plan and the success of the bank up to that date, measurably greater than $731 million approaching $1 billion, in which case Sterling would have needed substantially more capital.

4. That I was speaking of the shrunken bank is evident at page 465, lines 9 and 10, of my deposition where I pointed out that Sterling would not have needed more capital in 1991

"to support a company of $600 million." This was the size of the actual shrunken bank. If I had understood that the government's counsel was asking what Sterling would have needed to do had the government not breached its contracts in the first place and reduced Sterling's capital, as opposed to a hypothetical question about the already damaged bank, I would have answered that Sterling would have needed more capital. After all, Sterling raised capital in almost every year during this time frame. For example, Sterling raised or the holding company downstreamed capital in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. Given its aggressive growth strategy, Sterling has always needed more capital.

5. Significantly, the government did not ask me, "Absent the breach and assuming Sterling was not its actual size ($600 million), but was the size the but-for bank would have been in 1991, would Sterling have raised capital in 1991?" Had I been asked this question, which I was not, the answer would have been "most assuredly yes."

6. The capital raised in 1991, therefore, brought the actual Sterling into compliance with the new FIRREA capital standards. It did not replace the capital taken away from Sterling by the government. Sterling had to continue to raise capital in the market place to support its growth and always planned to. Had the government not breached, Sterling would have $31 million in additional capital then and now. But for the FIRREA legislation and the implementing regulations eliminating the capital Sterling acquired through the acquisition of the insolvent thrifts, Sterling would have been significantly larger in 1991 approaching $1 billion, than its size of $731 million in assets in June 1989 and would definitely have needed more capital.

7. I am told the government is arguing that Sterling could have grown in the period January, 1990 to November, 1991. The suggestion is not only laughable, but suicidal. Sterling was fighting for its survival in the face of regulators who, we believed, were intent on shutting it down.

8. As CEO of Sterling, I viewed the preliminary injunction Sterling obtained as useful to prevent the closure of Sterling. I was, and remain, acutely mindful of the government's continued insistence that Sterling observe government-imposed limits on its business activities, backed by threats that, the injunction notwithstanding, the government could declare Sterling's actions "unsafe or unsound." In that climate, it would have been madness for Sterling to attempt to grow. In any event, it lacked capital — because of the government's breach — necessary to support growth.

9. I am told the government argues that our damages model is unsound because Sterling has not identified specifically all assets Sterling would have, but could not obtain. That assertion is partly wrong --- I did tell the government at my deposition about branches and whole institutions we could not acquire --- but it is mostly just mistaken. Every year of its existence, Sterling has forecast and achieved growth. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth. Then Sterling has to go to the market to find those assets. It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. And this is how Sterling has grown to over $10 billion in assets at the present time. Sterling finds billions in new assets every year. If its contract capital were restored, Sterling could easily find the assets to be supported by that capital. Excluding renewals, Sterling originated $5 billion in new assets in 2006.

**HAROLD B. GILKEY** declares under penalty of perjury under the laws of the United States of America that he is over the age of 18, competent to be a witness herein and that he makes the foregoing declaration on personal knowledge and that the same is true and correct.

DATED this 29th day of March, 2007.

[signature]
HAROLD B. GILKEY

IN THE U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

<u>**DECLARATION OF PAUL M. HORVITZ**</u>

## I. QUALIFICATIONS.

1. I make this Declaration of my own personal knowledge after many hours of research and investigation of the facts and circumstances surrounding the government's breach of certain contracts with Sterling Savings and following my modeling of the damages resulting from the breach.

2. I am an economist who has specialized in the economics of the banking and financial markets over the course of my entire career.

3. After graduating with a Ph.D in Economics from Massachusetts Institute of Technology in 1958, I spent approximately 18 years with the federal banking regulatory agencies, first as a Financial Economist with the Federal Reserve Bank, later as a Senior Economist and Associate Director of the Department of Banking in the Office of the Comptroller of the Currency, and then as Director of Research and Deputy to the Chairman of the Federal Deposit Insurance Corporation.

4. In 1977, I joined the faculty of the University of Houston as a Professor of Finance and served as the Judge James A. Elkins Professor of Banking and Finance from 1981

until 2000 when I retired from full time teaching. I am now Professor Emeritus of Finance at the University of Houston.

5. I have published extensively in the field of banking, finance and monetary policy: more than 10 books and monographs, over 50 articles in professional journals, approximately 20 papers published in books, as well as other articles in business publications. Most of my research has been concerned with regulation of financial institutions, and a number of my publications have dealt specifically with the thrift crises in the 1980's, the threat to the FSLIC fund, and the resulting legislation enacted by Congress in 1989.

6. I am a consultant in banking, thrift, and financial fields and have consulted over the years with the U.S. Treasury Department, Federal Deposit Insurance Corporation, Federal Home Loan Bank Board, Commission on Money and Credit, and other governmental agencies. I have testified at Hearings conducted by the U.S. Senate Banking Committee, the U.S. House Banking Committee, the U.S. House Small Business Committee, the U.S. Office of Thrift Supervision, as well as before other governmental agencies. Much of my Congressional testimony during the 1980s and 1990s related directly to the thrift crisis and public policy to deal with it. Attached as Exhibit A is a copy of my curriculum vitae.

7. I have served as a member of the Board of Directors of the Federal Home Loan Bank Board of Dallas (1983-1989) as a Director of Three Savings and Loans in the FSLIC Management Consignment Program (1986-1998) and was on the Board of Bank United of Texas, the largest thrift institution in Texas, as well as other financial entities.

8. I have been retained as an expert witness in approximately 25 cases in behalf of private litigants as well as in behalf of the federal government. I have testified in deposition and at trial in behalf of the thrift institutions in a number of *Winstar* cases.

## II. RETENTION

9. I was retained by Sterling Savings Association (hereafter "Sterling" or "Sterling Savings") in the spring of 2000 to assess and calculate damages caused by the federal government's breach of contracts between Sterling and the government over Sterling's acquisition of three insolvent thrifts located in the Pacific Northwest.

10. I issued my first Report in December 2000 followed by a corrected Report on September 6, 2001 in which I estimated Sterling's damages as a result of the breach. On February 20, 2004 I issued a Revised Updated Report in which I updated my calculation of expectation damages to incorporate the ruling made by Chief Judge Damich dated August 4, 2003 that the capital credits created in the Lewis Federal and Tri-Cities acquisition were not permanent but were required to be amortized pursuant to the forbearance provisions of those contracts; namely, over 40 years in the case of Lewis Federal and 15 years in the case of Tri-Cities. Finally, I updated my Report on December 11, 2006 to incorporate this Court's ruling on August 30, 2006 that the government did not breach the Agreement with Sterling relating to the acquisition of Central Evergreen. These Reports, incorporated herein by reference, are included in the Appendix submitted in conjunction with my Declaration and references to tables and graphs are to those attached to my Reports. The purpose of this Declaration is not to supplant my Reports but to expand on them and to comment on opinions and statements of the government's expert witnesses proffered in conjunction with the government's Motion for Summary Judgment Regarding Damages.

## III. THRIFT CRISIS

11. Understanding the magnitude and severity of the damages incurred by Sterling as a result of the government's breach of its Agreements involving Sterling's acquisition of insolvent thrifts requires some background on the economic role of the savings and loan

industry, the thrift crisis of the 1980's, the growing threat on the safety of the FSLIC insurance fund, the history and growth strategy of Sterling, and the relatively strong economy in the Pacific Northwest (where Sterling was located) compared to most of the rest of the country where the economy was troubled and the thrift crisis loomed.

12. Traditionally, the savings and loan industry used deposits from the public to make mortgage loans to homeowners. Starting in the early 1980's, many thrift institutions experienced serious financial difficulties when, because of economic conditions and Federal Reserve monetary policy, they were forced to pay interest on their deposits at substantially higher rates than they were earning on their mortgage loan and other assets. For example, a 30 year mortgage loan at a fixed rate of 6 percent was still on the thrift's books in 1981 when it was paying interest on deposits of 12 percent.

13. Nearly all thrifts suffered operating losses which reduced their book net worth. In turn, many of these thrifts became technically insolvent as their liabilities exceeded the value of their assets.

14. During the 1980s, many thrift institutions were unable to meet their capital requirements; many failed and many more were in danger of failing. This put pressure on the FSLIC insurance fund and the magnitude of the problem was greater than the resources of FSLIC to deal with it.

15. Against this background, the FSLIC sought out healthy, capital compliant, and well managed, institutions willing to absorb thrifts which had negative net worth. The well managed institutions were encouraged and provided with incentives to undertake these acquisitions of troubled institutions. Some of the incentives used by the FHLBB and FSLIC included the regulatory treatment of the goodwill resulting from the acquisition, FSLIC cash assistance, a capital credit provision in the contract allowing the acquiring thrift to double count

the amount of cash assistance in computing regulatory capital, and certain forbearances. Handling thrift failures in this manner represented a substantial savings to FSLIC as the regulatory credits and forbearances were of no real cost to FSLIC and allowed FSLIC to resolve a failed thrift without having to devote all its resources covering the negative net worth, thus preserving the insurance fund. In turn, the acquiring thrift received regulatory capital which it could leverage and grow, thus in part justifying the absorption of the negative net worth of the failing thrift, since these acquisitions came with the further assurance that under purchase accounting the resulting goodwill is included as an asset in the calculation of regulatory capital. This enabled the healthy thrift to absorb the negative net worth it had assumed as part of the acquisition over time through the amortization of the goodwill.

16. In short, virtually the entire thrift industry was in dire financial straits. The resulting threat to the insurance fund was real.

## IV. STERLING SAVINGS

17. Sterling was chartered by the State of Washington in 1983. It began operations in the same year as a federally insured stock savings and loan association headquartered in Spokane.

18. It is absolutely crucial, in appreciating the nature and extent of the damages sustained by Sterling by virtue of the government's breach, to recognize that the plight of the thrift industry in the 1980s as described above did not and does not apply to Sterling Savings. When Sterling opened its doors in 1983, this was well after the peak in interest rates. It did not have any loans made at low interest rates in the 1960s and 1970s. Sterling loans made at market rates in the 1980's generated returns in excess of the cost of deposits. Its service area was in the Pacific Northwest where the economy was strong.

19. Thus, Sterling was a profitable and sound financial institution throughout the troubled period of the 1980s. Sterling was profitable every year. (Indeed, Sterling remained profitable even after the breach up to the present day but not without serious financial harm following the breach.) Its deposits, assets and profits grew each year without interruption through the 1989 fiscal year.

20. Sterling's management had a business plan from the outset of gathering deposits in the small towns of rural Washington and lending in the bigger cities of Spokane, Western Washington, and the Portland, Oregon metropolitan area where loan demand was stronger. The plan worked to success and still does. From the standpoint of modeling and calculation of expectancy damages from the breach with reasonable certainty, it is also important to note that Sterling has the same management philosophy, the same growth-oriented strategic plan, and the same top executive management that it has had from its very beginning.

21. Although Sterling suffered a very significant setback and shrinkage due to the government's breach, which are described below, Sterling has grown from $730 million in assets at fiscal year 1989 to over $10 billion in assets as of February 28, 2007. This is largely because of the aggressive growth strategy of senior management, which strategy and team have remained consistent since Sterling's inception. The continuity of the senior management team and the success of the growth strategy also add credibility and certainty to an expectancy damage calculation in my opinion as an economist.

## V. ACQUISITION OF TROUBLED THRIFTS

22. During the mid to late 1980s, Sterling acquired three troubled thrifts. Each thrift was located in smaller communities and thus consistent with Sterling's growth strategy of targeting deposit generation in smaller communities.

23. The first insolvent thrift acquired by Sterling was Lewis Federal Savings and Loan Association ("Lewis Federal"), on November 15, 1985. Lewis Federal had been placed into receivership and FSLIC estimated the liquidation of Lewis Federal would cost it $6 million. Sterling agreed to take over the assets, liabilities and negative net worth of Lewis Federal in exchange for cash contributions from FSLIC of $1.75 million. It was agreed as part of the contract between the government and Sterling that the resulting goodwill of $2.044 million would be amortized in a straight line basis over 40 years and that the capital credit of $1.75 million would be made directly to net worth so that on its calculations of compliance with regulatory capital requirements, that $1.75 million would be added to the capital on its financial statements.

24. Sterling acquired Tri-Cities Savings and Loan Association ("Tri-Cities") on April 8, 1988. Tri-Cities had been placed into receivership, and FSLIC estimated the cost of liquidation to be $20.7 million. Sterling assumed the negative net worth of Tri-Cities and in exchange received $11.7 million in cash assistance, and the resulting $2.608 million in goodwill was to be amortized over 15 years on a straight-line basis. (The Court has since ruled that the cash assistance credit also amortizes.)

25. Sterling's acquisition of Central Evergreen Federal Savings and Loan ("Central Evergreen") was completed on December 31, 1998. Sterling had previously been requested by the government on two separate occasions to acquire Central Evergreen, but turned down the request each time because Central Evergreen's negative net worth was too large, and would adversely impact Sterling's capital position. On the third occasion, the government explained how with the regulatory capital acquired from the Tri-Cities acquisition, Sterling could take on the troubled thrift, thus linking the Tri-Cities and Central Evergreen transactions. Central Evergreen had a negative net worth of $12.4 million. The government had estimated that it

would take cash assistance of $8 to 10 million to induce a buyer to take on Central Evergreen, and there were few eligible buyers. No financial assistance was paid to Sterling. Because no cash assistance was paid, no formal liquidation cost study was done, but liquidation costs in my experience normally exceed the negative net worth of the failing institution (here, $12.4 million). However, Sterling recorded $8.4 million in identified intangibles and $13.6 million in unidentified intangibles which it agreed to amortize on the GAAP level-yield basis over 8 and 12 years, respectively. Parenthetically, even though it has been ruled that the government had the contractual right to avoid its agreement to include the Central Evergreen goodwill as regulatory capital, Sterling nevertheless had to record the amortization expense against retained earnings over the lifetime of the agreements, thus depressing Sterling's earnings and reducing its net worth.

26. In short, the government resolved a serious threat to its insurance fund when Sterling, a healthy thrift, stepped up and assumed the combined negative net worth of three failing thrifts totaling about $30 million. The total amount of cash assistance ($14 million) was far less than the negative net worth assumed by Sterling, and the liquidation costs avoided by the government was even greater --- Lewis Federal ($6 million), Tri-Cities ($20.7 million), and Central Evergreen (more than $10 million). Because of the ruling of the Court, no damages from the Central Evergreen transaction are included in my calculations, but the entire background is helpful in understanding my modeling and calculation of damages for the government's breach of the Lewis Federal and Tri-Cities agreements.

27. As of fiscal year end 1989, Sterling had total assets of $731 million and deposits of $519 million. It earned net income of $1.3 million for fiscal 1989, an increase over 1988 despite the absorption of Central Evergreen in December 1988. In 1989, prior to the breach,

Sterling was growing rapidly, was profitable, and was fulfilling its business strategy of becoming a major financial institution in the Pacific Northwest.

28. Rapid growth in the 1980s, but primarily the acquisition of troubled thrifts with liabilities in excess of their assets, left Sterling in a somewhat weakened capital position. As of June 30, 1989, Sterling had equity equal to 1.4 percent of total assets, as compared to an equity ratio of 2.2 percent a year earlier (before the unassisted acquisition of Central Evergreen). Though Sterling's capital was modestly in excess of its regulatory requirements, it needed additional capital, beyond that which it acquired from the troubled thrift transactions, to continue its growth strategy. So in 1988, Sterling planned an equity offering in 1989 to raise $10.5 million, sufficient to keep it in capital compliance and leave it with a comfortable margin, allowing the thrift to grow and expand in accord with its plan. The proposed equity offering was included in Sterling's Business Plan that became part of the Central Evergreen transaction.

29. In negotiating the agreements, the government and Sterling recognized the importance of capital that Sterling acquired from the agreements. For Sterling could not otherwise take on the assets and liabilities of the failing institution without resolution of the capital shortfalls created thereby. Sterling calculated that as of June 30, 1990, under its agreements with the government, its regulatory capital exceeded its required capital by $1.8 million. Yet, under the regulations in effect under FIRREA and after the breach, Sterling had a capital shortfall of over $20 million.

30. Sterling successfully integrated the three acquisitions. Sterling continued to receive high marks from its federal and state examiners during this period.

## VI. <u>EFFECTS OF BREACH ON STERLING</u>

31. FIRREA imposed new and higher capital requirements on all thrift institutions. Meeting those new requirements did not pose a problem to Sterling if the government's

contractual commitments in the acquisition of the troubled thrifts had remained in effect. However, soon after FIRREA's enactment, the Office of Thrift Supervision issued regulations gutting the amount of capital credits and supervisory goodwill that could count toward the increased capital requirements. This had an enormous negative impact on Sterling. Instead of its regulatory capital exceeding its required capital by $1.8 million on June 30, 1990, as described above, under OTS regulations Sterling had a capital shortfall of over $20 million ($21.4 million in tangible and core and $26.6 million in risk based).

32. The above figures do not include the $10.5 million equity offering planned for the fall of 1989. The offering was fully subscribed, in fact oversubscribed, but was cancelled at the last minute when the OTS refused to agree to permit payment of dividends on the preferred stock that was part of the offering. Naturally, investors are reluctant to purchase preferred stock on which no dividends are forthcoming. The inability of Sterling to obtain use of the $10.5 million in already subscribed capital is part of the damage suffered by the breach. As I stated in my original corrected Report dated September 6, 2001, by wiping out a large part of Sterling's capital and by preventing it from completing the 1989 equity offering, the breach had a devastating effect on Sterling that was nearly fatal to the institution's survival when the government threatened to close Sterling's doors.

33. Instead of treating Sterling as part of the solution in helping to preserve the FSLIC insurance fund, after FIRREA the government immediately began to regard Sterling as a troubled thrift. The government imposed operating restrictions on Sterling which included, among others: limiting the amount of loans to any one borrower; restricting business lending to existing customers; preventing Sterling from accepting deposits over $100,000; and limiting asset growth and precluding payment of dividends. Sterling was thus forced to curtail operations dramatically (literally walking good customers across the street to competitor banks) and to

abandon its growth strategy. Because of the breach, Sterling's commercial lending ability was virtually destroyed and its residential construction and real estate lending capacity severely curtailed. Key personnel abandoned Sterling, and its reputation in the banking and business communities was injured. Sterling contracted its asset base, reducing in size for the first time in history. It shrank total assets from $731 million in June of 1989 to $609 million in June 1991, a decrease of over 17 percent, to better come into FIRREA capital compliance.

34. In sum, the loss of capital due to the breaching provisions of FIRREA and the regulations issued thereunder forced Sterling to forego growth and shrink for the first time in its history. In my opinion, the shrinkage and resulting loss of profits was caused by the breach. I cannot find or think of any reason for the shrinkage other than the breach.

## VII. TEMPORARY RELIEF FROM THE DISTRICT COURT DID NOT PREVENT CONTINUED DAMAGE TO STERLING

35. After the government threatened to close Sterling approximately one year after it acquired Central Evergreen, in May 1990 Sterling sought temporary injunctive relief in the Federal District Court for the Eastern District of Washington. It is my understanding that the District Court issued a temporary restraining order in May 1990 and a preliminary injunction on July 3, 1990.

36. The temporary injunction prevented the Office of Thrift Supervision from seizing Sterling because of capital deficiency. It was not a permanent injunction. The government's experts now suggest that Sterling could have and should have ignored the regulators and FIRREA and carried through with its growth-oriented business plan. That is, they argue that the temporary injunction somehow defeats Sterling's lost profits claim.

37. Once it is understood that a temporary injunction will not be in place forever, and once the government appealed the injunction, it was and is obvious how any reasonably prudent

thrift must respond. As long as there is some risk that Sterling might lose on appeal its legal effort to prevent the government from breaching its contracts, as a business matter it would be foolish for Sterling to expand and grow. The fact that the evidence and the law seemed to support Sterling's position could provide no assurance that Sterling would prevail in its lawsuit. Any eventual loss on appeal, even if that appeared very unlikely, would require drastic shrinkage. Shrinkage is very difficult for, and costly to, a thrift institution.

38. Preventing seizure by a temporary injunction was a good move. It gave Sterling time to raise the capital necessary to meet FIRREA standards to avoid receivership. It gave Sterling time to choose what assets to liquidate and when. It also reduced the amount of damage owed by the government. For the damages incurred by a closed institution would be far greater than those where the institution was forced to shrink but remained in business.

39. Moreover, the government's argument in this regard overlooks the fact that substantial supervisory restrictions were imposed on Sterling during the period of the injunction that would not have been imposed on the capital-compliant institution that Sterling would have been absent the breach. For example, on June 5, 1990, five days after the temporary restraining order was issued, the government notified Sterling to report all actions inconsistent with the many restrictions imposed on Sterling before the order. On June 20, 1990, the government wrote another letter to the same effect. Later that fall, the government wrote Sterling and indirectly threatened Sterling with poor performance ratings under the safety and soundness regulations. The temporary injunction was eventually vacated by the Appellate Court; thus, Sterling was proved correct in not growing until it raised sufficient equity capital.

## VIII. MEASURING STERLING'S DAMAGES WITH REASONABLE CERTAINTY

40. Appreciating the impact of a loss of capital and the resulting forced shrinkage has on a thrift institution, in my opinion there is no question but that Sterling has been damaged. The

remaining question is how can the damage best be determined to a reasonable certainty. From the perspective of an economist, the best measure of damages is the difference between the earnings of the breached entity and the earnings it would have had absent the breach. The reason this is so is that in economic theory, the objective of a business firm is to maximize profits. Therefore, the difference in profits between the breached and non-breached firm is the logical measure of the extent of damage.

41. The calculation of lost profits is the sort of problem that economists are trained for and it comprises the major part of the work of economists --- in government, private, firms, and academia. Analyzing "what if" questions of this type is a traditional role for economists. Economists also develop forecasts of economic variables, both for the economy as a whole (GNP, inflation, employment, trade deficit, etc.) and for individual firms (sales, profits, etc.). The securities industry employs hundreds and hundreds of analysts exclusively devoted to forecasting earnings per share of publicly-traded stocks.

42. The specific question I have analyzed in my Reports is "How would the earnings of Sterling Savings differ from its actual earnings in the absence of breach?" Government's experts suggest that Sterling's lost profits are not susceptible to measurement and/or that such measurement is speculative. The suggestion is simply wrong. The discipline of economics has an established and accepted methodology for dealing with such questions, and I have performed the exercise many times over the years in my capacity as an economist. The specific task of assessing the "absence of breach earnings" or lost profits of Sterling is much easier than other assignments typically undertaken by economists (such as, what would be the effect on employment if there were an increase in the minimum wage; what would be the effect on gas prices if there were an increase or reduction in the oil supply, etc.).

43. Economic forecasting is a legitimate scientific activity that is not without some difficulty in a given case. I have had a great deal of experience in forecasting thrift earnings in my position first as an economist for the Federal Reserve Bank in the late 1950s, again in my position as Director of Research for the FDIC in the 1960s and 1970s, and again in my capacity as a Director of the Federal Home Loan Bank Board of Dallas.

44. However, it is important to recognize that my analysis and measurement of Sterling's "but for the breach" earnings do <u>not</u> involve any forecasting. This is simply because the key determinant of a thrift's earnings is interest rates --- interest rates on loans, and interest rates on deposits. Though interest rate forecasting is indeed difficult, here I am calculating Sterling's lost earnings only for the period of 1990 through 2006. As such, I need not forecast interest rates to calculate Sterling's earnings for that period. I can merely look them up. Nor do I have to project the economy in general or home sales in particular for this period. I can look them up. This lends markedly greater certainty and safety to a lost profits calculation.

45. Moreover, as I will make clear below, calculation of lost profits for Sterling was a much easier task than for other plaintiffs in this goodwill litigation. The vast majority of plaintiffs asserting lost profits in the *Winstar* cases had been weak financial institutions in the 1980s, before the breach and were weak in the 1990s. While Sterling was profitable throughout its history, many of the plaintiffs had a history of operating losses. Some of the plaintiffs therefore were closed. Because Sterling was always profitable, I assumed for purposes of my lost profits calculations that the "but for" Sterling would earn profits <u>at the same rate as the actual Sterling</u> for the past years 1990 through 2006 without having to forecast the future at all. In doing so, I ended up with a conservative approach because the "but for" bank would have been more profitable than the shrunken actual bank, at least in the early years. In sum, my opinion of Sterling's lost profits is based on a high degree of reasonable certainty.

## IX. HORVITZ LOST PROFITS METHODOLOGY

46. My lost profits methodology is simple and straightforward. It involves the type of financial modeling that has been widely accepted in the thrift and banking business (and by the federal thrift and bank regulators) for many years. First, I calculated the amount of regulatory capital that Sterling would have had if its Lewis Federal and Tri-Cities contracts with the government been honored. That is, I calculated the amount of disallowed capital. For the newly imposed tangible capital requirement, all the intangibles from Lewis Federal, Tri-Cities and Central Evergreen were disallowed from capital. For the core capital requirement, a portion of the intangibles counted as qualifying supervisory goodwill, but the majority was disallowed. This results in $15.557 million in disallowed capital from the Lewis Federal and Tri-Cities transactions as of December 31, 1989, and $11.357 million of other qualifying supervisory goodwill from the Central Evergreen transaction that was subject to the phase out limitations of FIRREA, plus $5.67 million in identified intangibles from the Central Evergreen acquisition that were subject to a separate qualifying test. Only $10.3 million of these intangibles were allowed to be included in Sterling's core capital at December 31, 1989. Had the Lewis Federal and Tri-Cities contracts been honored, all of the $15.557 million from Lewis Federal and Tri-Cities would have been included in core capital, $10.4 million of Central Evergreen's supervisory goodwill would count toward core capital, and all of the $5.67 million in identified intangibles from Central Evergreen would have counted. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 4a, 4b, and 4c, App. 177-179.) Additionally, Sterling would have been able to complete its capital offering in 1989 that would have raised an additional $10.5 million. Including other small adjustments to core capital that would have flowed from these very significant effects of the breach, Sterling would have had core capital of $28.8 million, whereas it actually reported

*negative* $2.2 million. The net effect of the breach was to disallow approximately $31.0 million of core capital at December 31, 1989.

47. Second, the additional capital would have been used to support additional assets or "foregone assets." Next, Sterling would have earned a return on those foregone assets. Then, these earnings would have been added to capital, allowing the acquisition of additional foregone assets that would yield additional profits. These lost profits, calculated on a year by year basis from the time of breach until today, represent the past lost profits of Sterling. I have summarized the lost profits calculation in Exhibit 6, Table 1 of my December 11, 2006 Report. The lost earnings from 1990 through September 2006 are $58.164 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In addition, there are wounded bank damages of $4.556 million (Horvitz Report, December 11, 2006, Exhibit 6, Table 3d, App. 175), future damages of $0.641 million based on Professor James' Report, for total expectation damages of $63.361 million --- all of which is then summarized in Exhibit 8 to my 2006 Report.

## X. <u>RETURN ON ASSETS</u>

48. The elimination of regulatory capital resulting directly from the breach forced Sterling to be smaller and less profitable than it otherwise would have been. There are only two inputs needed to make the calculation of lost profits: (1) the amount of foregone assets year by year and (2) the rate of profit that would be earned on the foregone assets.

49. With regard to the second input above, I assumed that the but-for Sterling would have earned profits at the same rate as the actual Sterling. This is a conservative assumption for two reasons. First, it is widely accepted that there are significant economies of scale in the operation of a thrift institution because a larger institution will spread its fixed overhead costs over a larger volume of assets, thereby reducing the unit cost. I prepared one of the earliest empirical studies on this subject in the early 1960s and subsequent research has been consistent

with my findings. Second, and more important, absent the breach, Sterling would have had the opportunity to acquire assets and deposits from the Resolution Trust Corporation ("RTC"), the governmental agency designated to liquidate failed thrifts. In the depressed markets of the early 1990s, there were great opportunities to purchase either whole institutions, branches, or asset portfolios from the RTC. There were many more institutions and assets for sale than there were eligible bidders. Such acquisitions fit with Sterling's growth strategy. However, under RTC policy, only institutions that were in full capital compliance were eligible to bid, and because of the breach, Sterling was deemed by the government to not be in capital compliance when the best opportunities were available. Based on my experience with a thrift institution that made a number of RTC acquisitions, it is my opinion that the rate of profitability on RTC assets would have significantly exceeded Sterling's rate of return on its actual assets. Attached as Exhibit 7 to my December 11, 2006 Report is a list of the RTC Resolutions of failed thrifts in Washington and Oregon, states where Sterling operated at the time. (App. 185.)

50. For the above reasons, in my opinion the but-for bank would likely have been more profitable than the actual Sterling. I have a high degree of confidence that the foregone assets would have been at least as profitable as the actual assets, and in my calculation of lost profits I have used the actual historical return-on-assets figure of Sterling to estimate the profitability of the foregone assets. In addition to my analytical calculations, there is a substantial body of actual experience that supports the reliability and credibility of the conclusions derived from my lost profits model. The evidence is contained within the repeated experiences of Sterling in response to its several injections of capital during the 1990s. In nearly every year of the 1990s, Sterling or its holding company raised capital and injected it into the thrift. In every case, Sterling successfully and profitably leveraged that capital. For example, in 1991 Sterling had a return on average assets (ROAA) before amortization and taxes of .87

percent. Sterling's actual assets at that time were $609 million. I estimated the but-for bank would have total assets of $725 million. The actual bank achieved that size during fiscal 1993, and in that year its ROAA was 1.71 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 and 3b, App. 169, 173.)

51. The largest increase in foregone assets occurred in fiscal 1994, when actual assets were $1.368 million and the but-for bank in my calculations had assets of $1.681 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180.) The actual bank had ROAA of 1.37 percent. With regard to whether it was reasonable to believe that Sterling could have maintained that ROAA on the additional $313 million in assets, there is no speculation involved. We can look it up. In 1997, the actual Sterling did reach the asset size of the 1994 but-for bank, and the ROAA was 1.36 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Table 3b, App. 173.) There is nothing speculative about these figures --- my calculations are supported by real data. Attached as Exhibit B is a chart showing that Sterling's Return on Average Assets, though it fluctuates from year-to-year, shows no tendency to decline as Sterling's asset size increases. Put another way, to reject my lost profits estimate, as the Government's experts do, they have to believe that although Sterling was able to profitably use the capital it raised (at significant expense) in 1991 and nearly every year since, but it would not have been able to make profitable use of additional (free) capital in 1989 and 1990, even though that was the time when Sterling's need for capital was the greatest and the opportunities for profitable acquisitions were the most abundant. But the Government's experts have provided absolutely no evidence to support such an extreme position.

52. The government's expert suggests, instead, that my calculation of lost profits is speculative because I do not identify the specific assets (or liabilities) that would be acquired by the but-for bank. While I do not identify specific assets, I cannot think of a single economic

reason why one would. My calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held the usual and ordinary type assets --- no exotic financial instruments or collector's items. There is no reason to doubt that additional assets of the type held by Sterling were readily available. Unlike some other goodwill cases in which the foregone assets represented a multiple of the actual assets and a large absolute volume, the foregone assets reach a peak of $427 million, but are considerably less for most of the damage period. This is not only a miniscule figure as measured by the total market, but is a small fraction of the actual Sterling assets. In fact, the bulk of lost profits are accounted for in years in which the foregone assets total less than 15 percent of the actual bank assets. Attached as Exhibit C is a graph depicting the comparison year by year of Sterling's foregone assets to actual total assets.

## XI. FOREGONE ASSETS

53. The other variable that determines lost profits is the amount of foregone assets. If Sterling had the additional capital taken away by the breach, it could have expanded to a greater extent than the actual bank.

54. Accepted economic methodology suggests that there are several alternative approaches to determine the amount of foregone assets. One approach is to consider the leveraging capacity that the additional capital provides. With a 4 percent capital requirement, an additional $1 million of capital will support an additional $25 million of assets. Similarly, with a 5 percent requirement, $20 million of additional assets can be supported. This approach is embedded in OTS guidelines for the preparation of Appraisals in connection with the conversion of mutual thrift institutions to stockholder-owned corporations.

55. Using this approach to estimating asset size requires an assumption as to the appropriate capital ratio to use. I chose to estimate the assets of the but-for bank on the

assumption that its capital-asset ratio each year (with only one exception) is at least as high as the actual Sterling capital-asset ratio for that year. While this is a reasonable approach, it results in an overly conservative capital ratio because it is likely that the breach had a long-lasting effect on Sterling's policy with respect to capital. While I can be very confident that the capital ratio of the but-for bank would not generally be higher than that maintained by the actual (breached) Sterling, in fact my calculations are based on the but-for bank maintaining a more conservative capital position than the actual bank.

56. Using this approach can result in periods of rapid growth in calculated foregone assets. So, to be sure that I err on the conservative side, I added a growth constraint which limits the growth of the but-for bank in any given year to a rate no faster than the growth of the actual bank. This means that in my calculations there are two constraints on the asset size of the but-for bank --- a capital constraint and a growth constraint. My calculations of lost profit damages are based in each year on whichever constraint results in the smaller foregone assets (and, hence, the smaller lost profits). (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180).

57. Substantial support for my foregone assets analysis is provided in the actual experience of Sterling. In my December 11, 2006 Report, I provide an estimate of the total assets of the but-for bank in Exhibit 6, Table 5, App. 180. In every case, the actual Sterling grew to a larger size than the but-for bank within a short period of time (usually within one year). In fact, the longest time that it took Sterling to exceed the but-for estimate was three years --- my 1994 estimate of $1.681 million was not exceeded until 1997. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In words, the basic reason why the but-for bank grew as rapidly as it did is because the actual bank (with the same management and business strategy operating in the identical economic environment) grew rapidly. If the government truly believes my estimates are aggressive or unreasonable, its experts should have provided some actual data

to suggest a lower growth rate, or at least provided some reason to believe that a lower growth rate would be appropriate. The government and its experts have elected not to do so.

## XII. 1991 CAPITAL RAISING DID NOT REPAIR DAMAGE TO STERLING CAUSED BY THE BREACH

58. Sterling raised $23 million in capital in 1991. The government implies that the damage caused by its breach was thereupon repaired, and Sterling in 1991 was back in the position it would have been absent the breach. This is hardly the case. Sterling lost $31.0 million in core capital because of the breach, including its attempt to raise $10.5 million in capital which failed because of the breach. Sterling had a pre-breach strategy calling for growth. That growth plan required that substantial additional capital be raised. Sterling did raise $23 million in capital in 1991, but it would have needed the capital in the absence of the breach. Nor did the 1991 offering replace the aborted 1989 offering, but it was another offering based on similar planning for growth, but now one step behind due to the breach. Analysis of the capital needs of the but-for bank must recognize the size and growth of the but-for bank. If the 1989 offering had gone through, the actual bank might not have needed the 1991 capital-raising to remain in capital compliance, but the but-for bank clearly did to pursue its objectives. Table 3a to Exhibit 6 of my December 11, 2006 Report shows that Sterling had acquired or been down-streamed capital in almost every year since 1991. (App. 172.)

59. Sterling has raised millions of dollars in capital over the past 15 years, amounts many times the amount of capital lost due to the breach. Since capital raising is costly, it is obvious that Sterling believed it could use all the capital it raised and, in fact, it has, done so. Sterling has grown to $10 billion in assets as of February 28, 2007. This picture is consistent with my interviews of management and the deposition testimony of Sterling's Chief Financial

Officer, Daniel Byrne, who has testified that Sterling's policy in the 1990s was to raise as much capital as possible.

60. I recognize the government cites deposition testimony by Harold B. Gilkey claiming that he said absent the breach, Sterling would not have raised capital in 1991, but it is clear that Mr. Gilkey was answering at pages 465 and 466 of his deposition as to an already shrunken bank with assets of "$600 million." He was not asked the question relevant for a damages inquiry --- "What would Sterling have done but-for the breach?". His response is therefore not determinative of what the but-for bank with assets of $726 million by June 1991 would have done. In my opinion, but-for the breach, Sterling demonstrably needed more capital by 1991.

61. Sterling did take two crucial (but costly) steps to minimize the government's damages. First, it filed suit to stop the government from seizing the bank. Second, it stopped growing and shrunk the size of the bank. The first step avoided the much greater losses that would have resulted from the closing of the bank. The second step reduced the extent of Sterling's capital deficiency. These efforts were important efforts to minimize damages, but they did not replace capital lost due to the breach.

## XIII. WOUNDED BANK DAMAGES

62. In addition to lost profits, the actual bank incurred costs and lost opportunities as a result of its weakened capital position caused by the breach. To make Sterling whole requires that it be compensated for these costs. These costs and lost opportunities, which are called wounded bank damages, are itemized in Exhibit 6, Table 3d and in Exhibit 8 to my December 11, 2006 Report. (App. 175, 186.)

63. Based on my definition of wounded bank damages, I requested that Sterling management compile a list of expenses that met my definition or criteria of this type of damage.

I have reviewed carefully the list compiled by Sterling. Although I cannot attest of my own personal knowledge as to the accuracy of the cost tabulation prepared by Sterling, assuming these costs are as they have been described to me, they meet my economic definition of wounded bank damages. In my opinion, these costs were a direct result of the breach and would not have been incurred but for the breach.

64. Based on personal experience with several financial institutions and on review of financial conditions of others, the most significant wounded bank damage Sterling suffered was the loss of opportunity to make acquisitions from the RTC at the time when the best economic opportunities existed. I have not included an estimate of this damage in my lost profits calculations, though as noted above the existence of this consideration adds to my confidence that the ROAA ratio I applied to foregone assets was conservative. Thus, there is no duplication between the lost profits calculation and the wounded bank damage figure.

65. Wounded bank damages may be best illustrated by the example of the Great American Savings Bank branch. Sterling attempted to acquire the branch for $61,000, but its request was rejected by the regulators because it was not in capital compliance following the breach. Five years later, because Sterling was growing and expanding, Sterling acquired the same branch but was forced to pay $1.9 million for it. The causal connection between the breach and the resulting damages of $1.835 million ($1.9 million – $65,000) cannot be doubted. The contracts for acquisition of Lewis Federal and Tri-Cities were about capital. Regulatory capital was the consideration for Sterling to take on the insolvent institutions. The government knew that Sterling contracted with Lewis Federal and Tri-Cities so that it would obtain more capital, capital which it intended to use for growth.

66. The government's experts' discussion of forseeability is contrary to economic logic and, in my opinion, makes no economic sense. Of course, at the time of the contracts

neither party necessarily knew or could foresee that Sterling would seek to acquire a specific branch of Great American. However, both parties knew and understood that Sterling would use the capital it garnered from the acquisition to grow and increase profits. This was clearly foreseeable and that is all that is required in calculation of lost profits from an economics or financial point of view.

67. As mentioned above, the price of the branch was $61,000 in 1989, but Sterling had to pay $1.9 million in 1994 when the transaction was consummated. The government argues that there was no damage because Sterling would not have paid $1.9 million unless it was worth that amount. This argument misses the point. No one is questioning the value of $1.9 million in 1994. The inescapable fact is that absent the breach, Sterling would have captured that value for the mere sum of $61,000.

68. Also, the substantial appreciation in value of the Great American branch reflected the need of many undercapitalized thrifts to sell branches in 1989 (proceeds directly applied to capital) as compared with premiums for branches in 1994. It further underscores the lost opportunities Sterling would have had in the early 1990s but for the breach.

69. The government similarly mischaracterized the circumstances of the CJ-4 loan. Sterling committed to a construction loan before the enactment of FIRREA. After FIRREA's enactment, Sterling was limited by the federal regulators to a $500,000 ceiling for a loan to any one borrower. Because of this limitation, Sterling was not permitted to make loan advances against this commitment that was already outstanding. The borrower then sued Sterling for breach of the loan commitment. Sometimes advancing additional funds will ensure completion of the project and repayment of the loan. Sometimes not. It is a business judgment. Sterling was not able to exercise this judgment because of its undercapitalized position. I cannot testify that Sterling made the loss calculation correctly, but my definition of wounded bank damages

would be the difference between the actual loss suffered by Sterling and the loss, if any, it would have incurred had it been able to exercise its business judgment to advance additional funds. Viewed as a whole, Sterling has an impressive record in making business decisions of this type.

70. The government motion papers seek to muddy the waters on this matter by mischaracterizing my opinion on incremental and average returns. I did not say and would not say that "as a matter of economics incremental returns earned on foregone assets are equal to average returns." I equated the two in calculating the average return on foregone assets as described above, and for the reasons set forth above, but there are certainly instances when returns on incremental assets are higher or lower than average returns. A business decision to advance funds to a troubled borrower is only done when the expectation is that above-average returns will be achieved.

## XIV. BANKHEAD REPORT

71. I have reviewed at the request of Sterling's counsel the Report of W. Barefoot Bankhead dated February 15, 2007 and submitted with the government's Motion for Summary Judgment Regarding Damages.

72. I thoroughly and vigorously disagree with the analysis made and conclusions reached by Mr. Bankhead in his Report.

73. In reviewing the Lewis Federal and Tri-Cities contracts as an economist and in an attempt to establish the true but-for bank before enactment of FIRREA and without any impact from FIRREA, I found that the goodwill generated by the Lewis Federal and Tri-Cities acquisitions counted as "capital." In addition, I noted that the contracts provided for "capital credits" that would be likewise counted as "capital" for regulatory purposes. From the standpoint of modeling of Sterling's damages, I saw nothing in these contracts that referred to or could be construed as treating this "capital" as some sort of qualified or second-class capital. In

particular, the contracts did not define this as "intangible capital." It was simply "capital." In sum, in the true but-for world or in the pre-breach world, there were no restrictions or qualifications of any kind imposed on the capital acquired by Sterling from the Lewis Federal and Tri-Cities contracts. Therefore, in the pre-breach situation, the capital provided by these contracts counts fully toward any existing or new capital requirement. When FIRREA and OTS regulations transgressed the capital provisions of these contracts, it is my understanding for purposes of calculating Sterling's damages that the Court ruled that the contracts had been breached.

74. Following the contracts and my understanding of the Court's rulings, the proper calculation of Sterling's post-breach capital position includes the capital arising from the Lewis Federal and Tri-Cities agreements, plus the amount of supervisory goodwill arising from the Central Evergreen acquisition that qualifies under the cap and phase-out rules of FIRREA. In other words, in the but-for world, FIRREA can have no capital restricting impact on the capital acquired from the Lewis Federal and Tri-Cities deals but, because the Court found the government did not breach the Central Evergreen agreement, only the supervisory goodwill acquired in that agreement is subject to FIRREA restrictions (namely, the cap and phase-out rules). This is a critical distinction. Otherwise, a damage expert confuses the but-for Sterling with the actual bank and ends up with an incorrect damage model, which is precisely what Mr. Bankhead has done.

75. I have made this distinction. That is, the capital acquired from Lewis Federal and Tri-Cities is not and cannot be subject to the limitations imposed by FIRREA on the amount of goodwill that qualifies for core capital under FIRREA. If it were, this would be contrary to the Court's decision that FIRREA breached the Lewis Federal and Tri-Cities contracts.

76. Consequently, because my damage model correctly distinguishes between Lewis Federal and Tri-Cities acquired capital as not being subject to FIRREA limitations while the Central Evergreen supervisory goodwill is subject to a cap and phase-out over time, I correctly calculated the but-for Sterling capital position as of December 31, 1989 and thereafter. ( Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 through 8, App. 169-184.) All of the Lewis Federal and Tri-Cities deals are included and only 1.5 percent of but-for Sterling assets are included as qualifying supervisory goodwill from the Central Evergreen until such goodwill is phased out, as shown on Exhibit 6, Table 4b of my December 11, 2006 Report, App. 178. Therefore, Sterling incurred lost profits from the very outset of the breach and the lost profits were correctly modeled and calculated at $58.164 million as of September 30, 2006. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.)

77. Sterling's but-for core capital position on December 31, 1989 may be summarized as follows:

| | | AMOUNT (000s) |
|---|---|---|
| o | Capital (Lewis Federal and Tri-Cities) | $15,557 |
| o | Qualifying Supervisory Goodwill (Cent. Ev.) | 10,421 |
| o | Other Qualifying Intangibles | 5,670 |
| o | 1989 Subscribed Offering | 10,500 |
| o | But for Bank Adjustments | (781) |
| o | Estimated Tangible Capital at 12/31/89 | ( 12,581) |
| | But-for Sterling Core Capital | $28,786 |

(Ex. 6, Tables 4a, 4b, 4c, 3a, respectively, Horvitz Report December 11, 2006, App. 177, 178, 179, 172)

78. The above calculation is also illustrated in the bar graph attached as Exhibit D to this Declaration which depicts the breach-related adjustments. The negative $12,581 is comprised of:

| | | AMOUNT (000s) |
|---|---|---|
| o | Actual Core Capital | ($2,273) |
| o | Actual Reported Qualifying Supervisory Goodwill | (10,308) |
| | | ($12,581) |

79. The problem with Mr. Bankhead's analysis starts with the fact that the phrase supervisory goodwill came into existence with the legislative proposals that later resulted in the passage of FIRREA and its implementing regulations. To my knowledge, it was not used prior to these proposals, either within the thrift industry or by regulators. The reason is that before FIRREA (or the banking regulation) there was no distinction between regular goodwill or goodwill found in a supervisory merger. It therefore did not have a meaning until regulators were determining how to define supervisory goodwill for purposes of implementing the new capital requirements imposed by FIRREA. The purpose of which was to limit and phase-out goodwill that would no longer count toward the capital requirements.

80. Mr. Bankhead's contention that the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be considered as "supervisory goodwill" is not meaningful and furthermore is illogical in the but-for world that the Court has directed Sterling to consider in its damages calculation. In the but-for world the goodwill and capital credits from Lewis Federal and Tri-Cities acquisitions are protected as capital. They are not subject to limitation other than defined by the contracts. They are not phased out prematurely, but in accordance with the Court's ruling, amortize over the agreed upon length of the contract. The language in the regulations implementing the limitations on supervisory goodwill is directed to capital that prior to FIRREA did count toward the regulatory capital requirements, but after FIRREA would no longer count toward the FIRREA imposed capital requirements. That is not

the case with regard to the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions - in the but-for world this capital continues to count toward regulatory capital requirements, just as it did before FIRREA.

81. To claim, as Mr. Bankhead does, that goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be factors in the qualifying supervisory goodwill tests perpetuates the breach and continues to harm Sterling. Mr. Bankhead's approach is prejudicial because it treats the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions differently from other capital. In the but-for world they should not be treated differently; they should be treated exactly like other capital. Prior to FIRREA at the time the Lewis Federal and Tri-Cities contracts were made, no distinction was drawn by regulators between different types of capital. It all counted equally as regulatory capital --- Mr. Bankhead's approach allows their presence on Sterling's balance sheet to limit what other supervisory goodwill might qualify as core or risk-based capital.

82. For example, assume a thrift identical to Sterling but with common stock capital of an equal dollar amount to the amount of Sterling's goodwill and capital credits from Lewis Federal and Tri-Cities. Also assume that this other thrift had goodwill (equivalent in amount to Central Evergreen) from a supervisory acquisition that was acknowledged to be subject to the phase-out limitations imposed by FIRREA. Both institutions are the same size and therefore have the same limitations on how much supervisory goodwill can count toward the core and risk-based capital requirements. Mr. Bankhead claims Sterling can count none of the goodwill from Central Evergreen because it doesn't qualify. The other thrift, however, would be able to count its supervisory goodwill subject to allowable qualifying percentages. It would have more capital which consequently would give it a greater ability to acquire assets and grow--the very opportunities that Mr. Bankhead's approach denies Sterling. Clearly, Mr. Bankhead's approach

continues to penalize Sterling. It is effectively another means to prolong the breach of the Lewis Federal and Tri-Cities contracts.

83. In his approach, Mr. Bankhead constructs out of whole cloth a different interpretation: FIRREA, according to Mr. Bankhead, created a bucket (equal in size on day one to 1.5 percent of assets) in which some intangibles could be temporarily counted as though they represented real capital. Into this bucket must be included first (though there is no explanation of why this comes first) the contractual capital. If the contractual capital exceeds the 1.5 percent maximum, it would be counted as capital (obviously, to do otherwise even Mr. Bankhead recognizes as a breach). But if the contractual capital does not fill the 1.5 percent bucket, Mr. Bankhead would allow Sterling to include supervisory goodwill from Central Evergreen (but only up to the total 1.5 percent maximum).

84. Although he is dealing in the hypothetical world, Mr. Bankhead allows for a possibility (which he deems implausible) that perhaps the contractual capital need not be counted first in the intangible bucket, but that the contractual capital and supervisory goodwill should be proportionately allocated space in the bucket. There is nothing in FIRREA or the regulations which suggest that any such allocation procedure is necessary.

85. Mr. Bankhead's interpretation of FIRREA is not only without basis, it would be illogical for Congress to construct a law with the intent Mr. Bankhead finds. If Mr. Bankhead is right, thrift institutions could count supervisory goodwill up to the limits of the law, unless they had entered into a contract with the Government to assist in the resolution of failing thrifts. In that case, to the extent that they gained contractual capital through those transactions, they would lose, dollar-for-dollar, the right to include supervisory goodwill toward their capital requirement. Congress would have designed law not only indifferent to the contributions of those participating

in such contracts, but actually to penalize those who had done so. It is hard to accept that Congress acted maliciously to punish those who attempted to help resolve the thrift crisis.

86. In the end, of course, Mr. Bankhead's analysis does not affect my calculations of damages. If Mr. Bankhead's interpretation of FIRREA and its regulations were correct, then the application of those regulations to Sterling would represent a continuing breach, and my analysis of the non-breached Sterling would be unaffected. Put differently, in the but-for world, Sterling's so-called contractual capital counts fully towards regulatory capital requirement as core capital without any limitation upon Sterling's right under FIRREA to count the supervisory goodwill from the Central Evergreen transaction as qualifying supervisory goodwill.

87. Lastly, with regard to Mr. Bankhead's statements in paragraph 13 of his Report, my 2004 Report is not inconsistent with my position that the capital acquired from the Lewis Federal and Tri-Cities deals is not subject to FIRREA limitations. Table 4b of my 2004 Report relates to the actual bank, not the but-for bank. At no time in my 2004 Report did I suggest that, in the but-for world, any of the capital from Lewis Federal and Tri-Cities agreements was subject to the cap and phase-out regulations of FIRREA. Mr. Bankhead has a point, but it is a rhetorical point relating to a poor choice of terminology on my part. Column C of Table 4b is headed "SGW" (supervisory goodwill) where it should have been titled "unidentified intangibles." (App. 145.) However, at no time in the text of the report did I include Tri-Cities or Lewis Federal capital with supervisory goodwill. So Mr. Bankhead draws a distinction without a difference.

88. I incorporate by reference my September 6, 2001 and February 20, 2004 Reports as though fully set forth herein and declare them to be true and correct.

**PAUL M. HORVITZ** declares under penalty of perjury under the laws of the State of Texas that he is over the age of 18, competent to be a witness herein and that he makes the foregoing declaration on personal knowledge and that the same is true and correct:

DATED this 28th day of March, 2007.

PAUL M. HORVITZ

**PAUL M. HORVITZ**

Professor of Finance Emeritus
University of Houston

## ADDRESS

150 Sugarberry Circle
Houston, Texas 77024
(713) 780-3771
E-mail: paulhorvitz@aol.com

## EDUCATION

| | | |
|---|---|---|
| Massachusetts Institute of Technology | PhD | 1958 |
| Boston University | MBA | 1956 |
| University of Chicago | BA | 1954 |

## EMPLOYMENT HISTORY

| | |
|---|---|
| **University of Houston** | |
| Professor of Finance Emeritus | 2001- |
| Professor of Finance | 1997-2000 |
| Judge James A. Elkins Professor of Banking and Finance | 1981-1997 |
| Professor of Finance | 1977-1981 |
| **Federal Deposit Insurance Corporation** | |
| Deputy to the Chairman | 1976-1977 |
| Director of Research | 1968-1976 |
| Assistant Director of Research | 1967 |
| **Comptroller of the Currency** | |
| Associate Director, Department of Banking and Economic Research | 1966-1967 |
| Senior Economist | 1963-1965 |
| **Mitre Corporation** | |
| Economic Analyst | 1962-1963 |
| **Boston University** | |
| Assistant Professor of Finance | 1960-1962 |
| **Federal Reserve Bank of Boston** | |
| Financial Economist | 1956-1960 |

**EXHIBIT A**

**SELECTED PUBLICATIONS**

Books and Monographs

Monetary Policy and the Financial System. Prentice-Hall, 6th edition, 1987.

Perspectives on Safe and Sound Banking. MIT Press, 1986 (with George Benston, Robert Eisenbeis, Edward Kane and George Kaufman).

Commercial Banking and Interstate Expansion, UMI Research Press, 1985 (with Larry A. Frieder, et al.).

Sources of Financing for Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

Problems in the Financing of Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

The Changing Environment of Non-Local Competition in U.S. Banking. American Bankers Association, 1981 (with Peter Merrill).

The Future Development of Foreign Banking Organizations in the U.S. American Bankers Association, 1981 (with Bernard Shull).

The Management of Commercial Bank Funds. American Institute of Banking, 2nd edition, 1980 (with George McKinney and William Brown).

Federal Reserve Membership. American Bankers Association, 1979 (with Peter Merrill).

Concentration and Competition in New England Banking. Federal Reserve Bank of Boston, 1958.

Articles in Professional Journals

"Lending Discrimination Claims and the Issue of Redlining," Journal of Forensic Economics, 1998, (with Andrew Holmes).

"Mortgage Loans to Non-Occupants as an Indicator of Racial Redlining," Journal of Financial Services Research, January 1997, (with Andrew Holmes).

"Commercial Banks and Real Estate Lending: The Texas Experience," Journal of Regulatory Economics, November 1996, (with Robert Eisenbeis and Rebel Cole).

"Preserving Competition in Electronic Home Banking," Journal of Money, Credit and Banking, November 1996.

"Efficiency and Antitrust Considerations in Home Banking: The Proposed Microsoft- Intuit Merger," The Antitrust Bulletin, Summer 1996.

"Forbearance: An Empirical Analysis," Journal of Financial Services Research, March 1996, (with Emile J. Brinkmann and Ying-Lin Huang).

"Banking Regulation as a Solution to Financial Fragility," Journal of Financial Services Research, December 1995.

"Risk-Based Capital Standards and the Credit Crunch," Journal of Money, Credit and Banking, August, 1995 (with Emile J. Brinkmann).

"Rules Vs. Authorities in Banking Supervision," Korea Non-Bank Deposit Insurance CorporationJournal, Spring 1995 (with Insup Lee).

"Abnormal Returns in Post-FIRREA Acquisitions of Failed Thrifts," Journal of Financial Services Research, December 1994 (with Insup Lee).

"Mortgage Redlining: Race, Risk, and Demand," Journal of Finance, March 1994 (with Andrew Holmes).

"Management Incentives and Solvency Effects in Financially Distressed Government Controlled Institutions," (with Janice Barrow), Financial Management, December 1993.

"Valuation Effects of New Securities Issuance by Bank Holding Companies: New Evidence," Financial Review, 1991, (with Insup Lee and Kerry Robertson)

"The FSLIC Crisis and the Southwest Plan," American Economic Review, May 1989.

"Fear of Failing," Yale Journal on Regulation, Spring 1987.

"The Combination of Banking and Insurance: Implications for Regulation," Growth and Change, October 1985.

"Are S&L Participations in Real Estate Ventures Too Risky?" (with Clifford Fry and John Crockett), Real Estate Review, Summer 1985.

"Comment on Deposit Insurance in a Deregulated Environment," Journal of Finance, July l984.

"The Implications of Changes in the Payments System for Interstate Banking," Journal of Corporation Law, Summer 1984.

"Reform of the Deposit Insurance System," Contemporary Policy Issues (with Tim

Campbell), May 1984.

"The Case Against Risk-Related Deposit Insurance Premiums," Housing Finance Review, September 1983. Reprinted in Gardener, UK Banking Supervision, Allen & Unwin, 1986.

"Comments on Legal Reserve Requirements," Journal of Bank Research, Spring 1983.

"Reorganization of the Financial Regulatory Agencies," Journal of Bank Research, Winter 1983.

"Regulation of the Money Order Industry," Financial Management, Winter 1980.

"A Reconsideration of the Role of Bank Examination," Journal of Money, Credit and Banking, November 1980.

"Commercial Bank Financial Reporting and Disclosure," Journal of Contemporary Business, Summer 1977.

"Bank Failures and Deposit Insurance: The Alternatives," (with Robert Barnett and Stanley Silverberg), Banking Law Journal, April 1977.

"The Committee on Interest and Dividends: An Evaluation," Policy Analysis, Spring 1977.

"Failures of Large Banks: Implications for Banking Supervision and Deposit Insurance," Journal of Financial and Quantitative Analysis, November 1975. Reprinted in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 1980.

"The Hunt Commission Report: Comment," Journal of Finance, March 1974.

"The Pricing of Textbooks and the Remuneration of Authors," American Economic Review, May 1966. Reprinted in Johnson, The Daily Economist, Prentice-Hall, 1973.

"The Bank Merger Act of 1960: A Decade After," (with Bernard Shull), Antitrust Bulletin, Winter 1971. Reprinted in Reprints in Antitrust Law and Economics, 1972.

"Branch Banking, Independent Banks and Geographic Price Discrimination," (with Bernard Shull), Antitrust Bulletin, Winter 1969.

"Price Uniformity and Banking Markets," Appalachian Financial Review, 1969.

"A Note on Textbook Pricing," American Economic Review, September 1965.

"Stimulating Bank Competition through Regulatory Action," Journal of Finance, March 1965. Reprinted in Banking Markets and Financial Institutions, Irwin, 1971.

"Loan Loss Reserves," (with Sherman Shapiro), National Banking Review, September 1964.

"The Impact of Branch Banking on Bank Performance," (with Bernard Shull), National Banking Review, December 1964. Reprinted in Banking Competition and the Banking Structure, Comptroller of the Currency, 1966.

"Branch Banking and the Structure of Competition," (with Bernard Shull), National Banking Review, March 1964. Reprinted in Banking Competition and the Banking Structure.

"Concentration Ratios and Competition," (with Deane Carson), National Banking Review, September 1963. Reprinted in Monetary Economics, Wadsworth, 1968; and Banking Competition and the Banking Structure.

"Bank Earnings and the Competition for Savings," Journal of Political Economy, February 1962.

Papers Published in Books:

"The Role of Forbearance and Its Costs in Handling Troubled and Failed Depository Institutions," in Reforming Financial Institutions and Markets in the United States. Kluwer Academic Publishers. 1994 (with Robert Eisenbeis).

"Prepaid Tuition Plans: An Exercise in Finance, Psychology and Politics," in Prepaid College Tuition Plans, The College Board, 1993.

"Banks and Banking Services," "Payment Services," "Savings," "Federal Deposit Insurance Corporation," for Encyclopedia Americana, 1992 edition.

"The Causes of Texas Bank and Thrift Failures," in If Texas Were Chile, by the Sequoia Institute, 1992.

"The Incentive Conflict Hypothesis: Opening Comment," in Reforming the American Banking System, Wharton Financial Institutions Center, 1991.

"The Collapse of the Texas S&L Industry," Restructuring the American Financial System: Recommendations from the Shadow Financial Regulatory Committee, Kluwer, 1990.

"Resolving the S&L Failures: The Southwest Plan," in Research in Financial Services, a Research Annual, JAI Press, 1990.

"Commentary on Banking Regulation," in Restructuring Banking and Financial Services in America, American Enterprise Institute, 1988.

"The Broad Segments of the Financial Markets," in The Banker's Handbook, 3rd ed., Dow Jones-Irwin, 1987.

"Is Subordinated Debt the Answer to Bank Capital Woes," in Bank Performance Annual, Warren Gorham & Lamont, 1986.

"Technological Innovation: Implications for Regulation of Financial Institutions," in Technological Innovation and the Monetary Economy, Columbia University Press, 1986.

"Financing Small Business," in Problems in the Financing of Small Business, JAI Press Inc., 1984.

"The Payments System and Public Policy," in Financial Services, Prentice-Hall for the American Assembly, 1983.

"Commercial Banks and Financial Markets," chapter in Handbook of Financial Markets: Securities, Options, Futures, F.J. Fabozzi and F.G. Zarb, eds., Homewood, Ill.: Dow-Jones-Irwin, 1981.

"Strategies for Deregulation," in The Deregulation of Depository Institutions, Proceedings of a Berkeley Business School Colloquium, David Pyle, ed., 1981.

"The Impact of Regulation of Financial Institutions on Competition and the Allocation of Resources," published in Government Regulation: Achieving Social and Economic Balance, Vol. 5, Joint Economic Committee, 1980.

"Commentary on Regulating the Solvency of Depository Institutions," published in Issues in Financial Regulation, McGraw-Hill, 1979.

"Bank Risks in the New International Financial Structure--Lessons from Bank Failures," published in The Emerging International Monetary Order, University Publishing Projects, Tel Aviv, 1976.

"The Role of Mergers in Fostering a Viable Banking System," published in Monetary Issues of the 1960s, University of Texas Press, 1968.

"Branch Banking, Mergers, and Competition," published in Banking and Monetary Studies, Richard D. Irwin, 1963.

"Economies of Scale in Banking," prepared for the Commission on Money and Credit. Published in Private Financial Institutions, Prentice-Hall, 1963.

Articles in Business Publications

"A New Bank-Thrift Charter: How to Design One," Journal of Retail Banking Services, Spring 1997.

"Financial Disclosure: Is More Always Better?" Journal of Retail Banking Services, Winter 1996.

Electronic Home Banking: Are We There Yet?," Texas Business Review, December 1996.

"ATM Surcharges: Their Effect on Competition and Efficiency," Journal of Retail Banking Services, Autumn 1996.

"What is the Future of Banking?" Harvard Business Review, July-August, 1991.

"Fraud by Thrift Insiders," American Banker, November, 1990.

"RTC Strategy: Problems with the Plan and the Process," Savings Account, March 1990.

"Should Foreign Deposits Be Subject to Insurance Assessments?," ABA Bankers Weekly, April 18, 1989.

"Capital Is the Best Deposit Insurance Protector," Outlook, July/August 1987.

"The Outlook for Financial Institutions," Midwestern Business and Economic Review, No. 5, Bureau of Business and Government Research, Midwestern State University, Fall 1986.

"How Risky Are Real Estate Ventures?" (with Clifford Fry and John Crockett), Outlook, September/October 1985.

"Lessons from the REIT Experience," The Bankers Magazine (with John H. Crockett and Clifford L. Fry), July-August 1984.

"Alternative Avenues to Interstate Banking," Economic Review, Federal Reserve Bank of Atlanta, May 1983. Reprinted in Bankers Desk Reference, 1983; and in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 2nd ed., 1984.

"Can Commercial Banks Meet the Competition?" National Association of Bank Women Journal, January 1983.

"Consolidation of the Regulatory Agency Structure," Economic Review, Federal Reserve Bank of Atlanta, December 1982.

"The Implications of the Deregulation Act for the Competitive Position of Depository Institutions," (with R. Zock), Issues in Bank Regulation, Autumn 1982.

"Geographic Restrictions on Financial Institutions," Economic Review, Federal Reserve Bank of Atlanta, September 1981.

"The Hunt Commission and Financial Reform in the 1970s," Review of Regional Economics and Business, Spring 1981.

"Viewing the Effectiveness of FDIC Cease-and-Desist Orders," Issues in Bank Regulation, Summer 1979.

"1979: A Critical Turning Point in Banking," Texas Business Executive, Spring 1979.

"Reporting to the Board of Directors," Board Reports for the Bank Director, Director Publication, Inc., 1978.

"Financial Reporting and Disclosure," Texas Business Review, April 1978.

"More Banking Laws Unneeded," Washington Post, November 6, 1977.

"Recent Changes in Bank Accounting and Reporting," Executive, Winter 1977.

"The FDIC as a Data Bank," (with Mary Mitchell) Bankers Monthly, November 1969.

"Commercial Bank Adjustments to Changes in Deposit Structure and Volume," Business Perspectives, Fall 1968.

"Area Redevelopment: Employment, Economics, Politics and New England," Boston University Business Review, Fall 1960.

"A Close Look at Bank Earnings," New England Economic Review, August 1959.

"The Investment Policies of Labor Unions," Boston University Business Review, Fall 1956.

Papers Published in Conference Proceedings

"Comment on Deposit Insurance: Do We Really Need It?," Preventing Banking Sector Crises in Latin America, The World Bank, 1996.

"The Implications of EC 1992 for U.S. Financial Markets and Institutions," (with R. Pettit). American Enterprise Institute Conference, 1992.

"Implications of the Texas Experience for Financial Regulation," Proceedings of a Conference on Banking Structure and Competition, Federal Reserve Bank of Chicago, 1989.

"The Management Consignment Program," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1987.

"The Case for High Capital Requirements," Thrift Financial Performance and Capital Adequacy, Federal Home Loan Bank of San Francisco, 1987.

"Banking Deregulation and Consumer Interests," The Changing Shape of Retail Banking, Comptroller of the Currency, 1985.

"Deposit Insurance After Deregulation," Proceedings of the Ninth Annual Conference, Federal Home Loan Bank of San Francisco, 1984.

"Deregulation and the Payments System," Payments in the Financial Services Industry of the 1980s, Federal Reserve Bank of Atlanta, 1984.

"Comments on Deposit Insurance," Proceedings of Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1983.

"Short-Run Financial Solutions for Troubled Thrift Institutions," (with R.R. Pettit), The Future of the Thrift Industry, Federal Reserve Bank of Boston Conference Series No. 24.

"Deregulation and Financial Products and Services," Deregulation of Product Lines. Proceedings of a Colloquium, Board of Governors of the Federal Reserve System, July 1982.

"Geographical Restrictions on Financial Institutions," The Future of the Financial Services Industry, Conference Proceedings, Federal Bank of Atlanta, 1981.

"Nonlocal Competition in Banking," Proceedings of a Conference on the Future of the Financial Industry, American Bankers Association, 1981.

"The Pricing of Federal Reserve Services," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1979.

"The Membership Problem of the Federal Reserve and Its Relationship to the Provision and Pricing of Payments Services," Proceedings of a Conference on Reserve Requirements and the Role of the Federal Reserve System, Federal Reserve Bank of Chicago, 1978.

"Commentary on Regulation of Bank Holding Companies," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1978.

"Commentary on the Impact of Public Disclosure of Bank Supervision and Regulation," Federal Reserve Policies and Public Disclosure, American Enterprise Institute, 1978.

"Interest Rate Regulations: Past History and Future Prospects," Proceedings of University of Houston Banking Symposium, 1977.

"Consumer Protection: Burdens and Benefits," published in Proceedings of University of Houston Banking Symposium, 1977.

"Indirect Control of Inflation," published in Inflation: 1970 Style, Southern Newspaper Publishers Association, 1970.

## PROFESSIONAL MEETINGS

Presented papers or served as discussant or session chairman at meetings of:

American Economic Association
Eastern Finance Association
Midwestern Economic Association
Western Economic Association
Western Finance Association
American Finance Association
American Statistical Association
Southern Finance Association
Financial Management Association
National Economists Club
Southwest Finance Association

## OTHER PROFESSIONAL ACTIVITIES

### Editorial

Editorial Board, Research in Financial Services, 1992-1995
Co-editor, Journal of Financial Services Research, 1987-2000
Member, Editorial Advisory Board, Journal of Bank Research, 1982-1986
Associate Editor, Journal of Financial Research, 1981-1986
Member, Editorial Board, The Financial Review, 1972-1974
Associate Editor, Financial Management, 1972-1974
Associate Editor, National Banking Review, 1963-1966

### Advisory Committees

Shadow Financial Regulatory Committee, 1986-
Federal Savings and Loan Advisory Committee, 1986-1987
Economic Advisory Council, Texas Economic Development Commission 1985-1986
Florida House of Representatives Interstate Banking Study Group, 1983
Presidential Advisory Task Force on Small Business, 1980
Advisory Committee, FDIC Study of State-Federal Regulation of Banking, 1977
Selection Panel for Research Support in Finance, National Science Foundation, 1975-1980
National Commission on Consumer Finance, 1970-1972

Other Teaching

Faculty, Stonier Graduate School of Banking, 1970-1977
Visiting Professor of Finance, George Washington University, 1974-1977
Instructor, Assembly for Bank Directors, 1974
Faculty, Pacific Coast Banking School, 1972
Lecturer, Georgetown University, 1969-1972

Testimony

Testified at Hearings
Conducted by: U.S. House Banking Committee
U.S. House Small Business Committee
U.S. House Committee on Government Operations
U.S. Senate Banking Committee
Texas Senate Economic Development Committee
U.S. Office of Thrift Supervision

Consulting

Consultant to: U.S. Treasury Department
Small Business Administration
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board
U.S. League of Savings Institutions
American Bankers Association
Association of Reserve City Bankers
Commission on Money and Credit
Commercial banks, thrift institutions, law firms

Board of Directors

Bank United of Texas (1989-2001)
Federal Home Loan Bank of Dallas (1983-1989)
PULSE EFT Association, Inc. (1990-1996)
Director of Three Savings and Loans in FSLIC Management Consignment Program, 1986-1988.

Other Professional Activities

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-1983
Columnist, The American Banker, 1981-1990.

# Sterling Savings Association
## Actual Return on Average Assets
## 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 2a




Note:
Return on Average Assets is calculated as pre-tax, pre-amortization income divided by average total assets.
* ROAA for the six-month periods ended 12/31/89, 6/30/89, 12/31/96, and the nine-month period ended 9/30/06 is annualized for comparison purposes.
† In the six months ended 12/31/96, the OTS assessed a one-time fee on thrifts to replenish the SAIF insurance fund.

**EXHIBIT B**

# Sterling Savings Association
# Actual Total Assets and Foregone Assets
# 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 1




**EXHIBIT C**

# Sterling Savings Association
# Comparison of Actual Core Capital With But-for Core Capital
# 12/31/1989

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Tables 2a, 3a, 3c, 4a, 4b, 4c, and 5




EXHIBIT D

Note: [1] Other but-for adjustments include incremental dividends on the unit offering, incremental but-for income (losses), and the cost of acquiring branches from Great American.
[2] Due to limitations in TFR reporting in December 31, 1989, this is calculated as 1.5% of Sterling's actual tangible assets.

# *Sterling Savings Association v. United States*

## Corrected Expert Report of Paul Horvitz

# STERLING SAVINGS BANK
## Damages Calculation - Corrected
## CJ-4 Loss Due to Improper Enforcement of Loans-to-One Borrower Regulation

| #8 CJ-4 ASSOCIATES | DATE | INV # | CHECK # | AMOUNT |
|---|---|---|---|---|
| LEGAL COSTS: | | | | |
| WKDT - CJ-4 ASSOCIATES | 11/14/90 | 81315-285 | | 896.25 |
| WKDT - CJ-4 ASSOCIATES | 10/23/90 | 81315-285 | | 3,557.33 |
| WKDT - CJ-4 ASSOCIATES | 9/17/90 | 81315-285 | | 947.60 |
| WKDT - CJ-4 ASSOCIATES | 6/12/90 | 81315-285 | | 712.45 |
| WKDT - CJ-4 ASSOCIATES | 8/13/90 | 81315-285 | | 1,039.30 |
| WKDT - CJ-4 ASSOCIATES | 5/11/90 | 81315-285 | | 717.90 |
| WKDT - CJ-4 ASSOCIATES | 4/10/90 | 81315-285 | | 2,468.65 |
| WKDT - CJ-4 ASSOCIATES | 2/5/90 | 81315-285 | | 1,652.71 |
| | | | | 11,992.19 |
| CJ-4 RELATED COSTS: | | | | |
| ESTABLISH LOSS AT FORECLOSURE | | 2/26/91 | | 801,450.00 |
| LOSS ON SALE OF NORTH HALF OF PROJECT | | 11/30/91 | | 9,417.43 |
| ADDITIONAL RESERVE ESTABLISHED | | | | 128,133.00 |
| RECOVERY UPON SALE OF SOUTH HALF OF PROJECT | | 9/30/92 | | (91,711.00) |
| | | | | 847,289.43 |
| INTEREST ACCRUED AT 2/26/91 WRITTEN OFF | | | | 457,394.76 |
| | months | principal | int. rate | |
| INTEREST 2/26/91 - 11/30/91(1) | 9 | 2384544 (2) | 0.095 | 169,898.76 |
| INTEREST 12/01/91 - 9/30/92(1) | 10 | 1393629 (3) | 0.095 | 110,328.96 |
| | | | 0.095 | 0.00 |
| TOTAL INTEREST | 19 | | | 280,227.72 |
| LATE CHARGES | | | | 18,240.00 |
| TOTAL COST | | | | 1,615,144.12 |

(1)THE LOAN RATE WAS BARR+1.5%, FLOOR OF 9.5%
(2)REPRESENTS THE LOAN BALANCE OF 2,400,000, LESS UNDISBURSED LIP OF 15,456.
(3)REPRESENTS THE PRIOR MONTH'S BALANCE LESS THE SALE PROCEEDS FROM THE NORTH 1/2 OF PROJECT.

Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>Senior Judge Smith |

## EXPERT REPORT OF PAUL HORVITZ - CORRECTED

I. Identification, Qualifications, and Background for Opinions

My Name is Paul Horvitz and my business address is 150 Sugarberry Circle, Houston, Texas 77024. I am Professor Emeritus of Finance at the University of Houston.

The information required by paragraph V.A.1. of the *Winstar*-related case Discovery Plan concerning my qualifications, publications, compensation and prior testimony has previously been provided to the government. Another copy of my resume is attached as Exhibit 1.

I have been retained by counsel for Sterling Savings Association and Sterling Financial Corporation to testify as an expert in this case on matters relating to the expectation damages due to Sterling as a result of the government's breach of its three

contractual agreements with Sterling relating to its acquisitions of Lewis Federal Savings and Loan Association, Tri-Cities Savings and Loan Association, and Central Evergreen Federal Savings and Loan Association.

This Report (including its Exhibits) sets forth the opinions about which I expect to testify as part of Sterling Savings direct case at the trial of this matter, together with a statement of the bases and reasons for these opinions. In forming my opinions, I have considered the data and information described in Exhibit 2 to this Report. I have also met with members of the management of Sterling Savings.

## II. The Thrift Crisis

This litigation grows out of contracts between Sterling Savings Association and the Federal Home Loan Bank Board involving acquisitions of three troubled institutions during the savings and loan crisis of the 1980s. The breach of these contracts by the government caused Sterling to suffer serious damage. Understanding the magnitude of these damages requires some background on the nature of the thrift crisis and the history and strategy of Sterling.

The traditional economic role of the savings and loan industry involved using deposits obtained from the public to make mortgage loans to homeowners. In the early 1980s thrift institutions were in serious financial condition because the unprecedented level of interest rates prevailing in the market forced them to pay interest on their deposits at rates substantially higher than the rates they were earning on their assets.

Since nearly all the deposits had very short maturities, an institution that did not pay going market rates was subject to a rapid outflow of deposits. The assets, on the other hand, were primarily long-term fixed-rate mortgage loans made at various times in the past at interest rates much lower than those prevailing in the 1980s. That is, 30-year mortgage loans made in 1975 were still on the books in 1981—providing income of 6% at a time when thrifts were paying interest on deposits at 12%.

In this environment, nearly all thrift institutions suffered monthly operating losses, and these losses reduced their book net worth. These losses were so severe that

many institutions became "technically insolvent," in the sense that their liabilities exceeded the book value of their assets.

The problem was even worse when viewed in terms of the market values of thrift mortgage assets. A 6% mortgage with an outstanding balance of, say, $100,000 is not worth $100,000 to a buyer who could buy 12% mortgages instead. In the early 1980s many thrift institutions held high-quality mortgage assets with market values equal to only 70% of their book value. Any potential buyer of such a thrift would take that into account.

It is important to recognize that the situation described in the preceding paragraphs does not apply to Sterling. Sterling opened for business in 1983, after the peak in interest rates. Sterling did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s. All the loans it held were made at current market rates, exceeding the rates it was paying on deposits. Sterling was profitable shortly after opening.[1] This distinction—important in the early 1980s when its first acquisition was done—became even more important as the nature of the thrift crisis changed in the late 1980s.

As thrift institutions attempted to work their way out of the financial weakness caused by the interest rate problem, many were tempted to invest in riskier assets, such as commercial real estate or business loans, or equity investments in real estate. This approach was facilitated and encouraged by the legislative changes enacted to deal with the problem—The Depository Institutions Deregulation and Monetary Control Act of 1980, and the Garn-St Germain Act of 1982. Because of the severe real estate depression that occurred during the late 1980s and early 1990s, many of these investments had disastrous results. Again, it is important to recognize that Sterling was not under pressure to take greater risks to order to return to solvency. Sterling was a sound financial institution all during the troubled period of the 1980s.[2]

In a number of these Goodwill cases, the government has argued that the plaintiff institutions were weak institutions themselves, and that the transactions benefited the acquirers—in some cases saving them from regulatory seizure—even though there was a breach of the contract. That argument is clearly not applicable to Sterling. This case is,

---

[1] See Exhibit 3.
[2] See Exhibit 3.

in my opinion, simpler than many others because of the financial soundness and profitability of Sterling during the relevant period. These considerations also make it easier to measure the damages due to the breach.

## III. Deposit Insurance and Regulation

The government has a long history of direct involvement in the thrift industry. Two elements of that involvement are directly relevant here: first, the government, through the Federal Savings and Loan Insurance Corporation, insured deposits at savings and loans, and was thus directly at risk when an insured institution failed; second, the government regulated the safety and solvency of thrift institutions, in large part by setting minimum capital requirements for insured institutions.

As noted above, during the 1980s many thrift institutions were unable to meet their capital requirements, and were in danger of becoming insolvent. The magnitude of the problem swamped the resources of the FSLIC. It did not have sufficient funds to follow its usual approaches to dealing with thrift failures—providing financial assistance so that a healthy institution could afford to take over a failing one, or liquidating the failed institution.

The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). Those thrifts believed that the opportunity to expand and enter new markets could justify absorbing the negative net worth of the failing institutions, given government assurances as to the manner in which the negative net worth was treated for regulatory purposes. Specifically, these transactions required the use of purchase accounting, with an understanding that the resulting goodwill would be included as an asset like all other assets in the calculation of regulatory capital. Obviously, this did not eliminate the hole, but, in effect, allowed it to be absorbed over time through amortization of the goodwill. In some cases, in addition to cash assistance, a "capital credit" provision in the contract allowed the acquiring thrift to double-count the amount of the cash assistance in its calculations of regulatory capital. This method of handling failures represented a substantial benefit to FSLIC, as the regulatory credits and forbearances represented no real cost to FSLIC, but allowed it to resolve cases at a much

lower cost than if it were forced to use cash to fill the net worth holes of the failed institutions.

Since the resulting institution would often be operating with greater leverage (as traditionally measured) than previous regulations had called for, it was important that FSLIC have confidence in the management quality and operating strength of the thrifts with which it contracted. It was common for FSLIC to perform a "viability" analysis to be sure that the resulting institution could operate successfully, even in a difficult economic environment.

## IV. The Sterling Acquisitions

The first acquisition by Sterling was of Lewis Federal Savings and Loan Association in November 1985. Lewis had assets of approximately $52.5 million.[3] The FSLIC estimated that liquidation of Lewis would cost it $6 million.[4] Sterling agreed to take over the assets and liabilities of Lewis in exchange for a cash contribution from the FSLIC of $1.75 million. Sterling was to amortize the resulting $2.044 million goodwill on a straight-line basis over 40 years. Sterling received a permanent capital credit of $1.75 million, meaning that in calculating its compliance with the capital requirements, it could add $1.75 million to the capital on its financial reports.[5]

Sterling acquired Tri-Cities Savings and Loan Association in April 1988. Tri-Cities had assets of approximately $54.5 million.[6] Sterling received cash assistance of $11.7 million, with a permanent capital credit of that amount. The resulting $2.608 million goodwill was to be amortized on a straight-line basis over 15 years.[7] The cash assistance of $11.7 million may be compared with the FSLIC estimate of $20.7 million as the cost of liquidation.[8]

---

[3] Total assets of $52.5 million as of August 31, 1985. Source: FHLBB Issues Memorandum, October 23, 1985, p. 1 [WOF014 0450]. $51.7 million estimated fair market value of assets at time of acquisition, November 1985. Source: 1986 Annual Report, Note 10.

[4] Source: FHLBB Issues Memorandum, October 23, 1985, p. 3 [WOF014 0450-0454].

[5] Source: FHLBB Issues Memorandum, October 23, 1985, p. 3 [WOF014 0450-0454], FHLBB S Memorandum, October 23, 1985, p. 6 [WOF014 0473 - 0481] and data from Sterling Savings Association.

[6] $54.5 million in total assets as of February 29, 1988. Source: FHLBB S Memorandum, March 31, 1988, p. 1 [WOF014 1079-090]. Estimated fair market value of non-intangible assets at time of acquisition was $67.2 million. Source: 1988 Annual Report, Note 11.

[7] Source: Data from Sterling Savings Association.

[8] Source: FHLBB Issue Memorandum, April 6, 1988, p. 3 [WOF014 1091-095].

Sterling agreed to take over Central Evergreen Federal Savings and Loan Association in December 1988. Central Evergreen had assets of $260.4 million and negative GAAP net worth of approximately $12.4 million.[9] Due to this acquisition, Sterling recorded $13.603 million in unidentified intangibles and $8.480 in identified intangibles ($6.48 million relating to existing deposits and $2.0 million related to loan servicing rights), which Sterling agreed to amortize on a GAAP level-yield basis over 12 and 8 years, respectively.[10] There was no cash assistance involved, though there were other provisions that are relevant to the calculation of damages from the breach. In particular, the agreement required Sterling to operate in accord with its business plan. The government estimated that alternative solutions would involve cash assistance of $8-10 million.[11] While the government did not make a formal liquidation cost analysis because the transaction did not involve direct financial assistance to Sterling, the cost of liquidation would normally be expected to exceed the negative net worth.

As with all contracts freely entered into, both parties expected to benefit although the contracts imposed obligations on them. The government resolved its deposit insurance obligations for three troubled institutions at a lower cost than any alternative solutions. The total amount of cash assistance provided by FSLIC was under $14 million, and the regulatory provisions of the contract involved no real costs to the government. Sterling expected to benefit from the contracts, and would have if they were not breached. Sterling had followed a strategy of growth, focused on deposit gathering in smaller communities. The acquisitions fit into that strategy, and justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance, provided the capital provisions of the contract were maintained. The breach in 1989, almost immediately after the Central Evergreen transaction, imposed substantial costs on Sterling, and nearly led to its seizure by the regulators.

## V. The History of Sterling up to the Breach

---

[9] As of September 30, 1988. Source: FHLBB Memorandum, December 5, 1988, p. 1 [WOT942 0329]. Estimated fair market values at the time of acquisition for assets and net worth were $226.8 million and negative $22.1 million, respectively. Source: 1989 Annual Report, Note 13.

[10] Source: 1989 Annual Report, Note 13 and data from Sterling Savings Association.

[11] Source: FHLBB Memorandum, Application for Voluntary Supervisory Conversion and Merger of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988, p. 5 [WOT942 0356].

Sterling began operations in 1983, and was profitable by the end of its first year of business. Its deposits, assets and profits increased each year without interruption through fiscal year 1989.[12] During that time period Sterling absorbed the three failing institutions with which it had contracts with the government, as well the noncontractual acquisitions of Lewis and Clark Savings and Loan and several branches.

Sterling successfully integrated all these acquisitions into its operations. Its growth and profitability were attained through sound and conservative operating policies.[13] Sterling received high marks from its state and federal examiners all during this period.[14] As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large unassisted absorption of Central Evergreen in December 1988.[15] Prior to its acquisition by Sterling, Central Evergreen was incurring large operating losses.[16] In 1989, then, prior to the breach, Sterling was well on its way towards its goal of becoming a major player in the Northwest market in accord with its original and consistently maintained business strategy.[17]

The rapid growth during the 1980s, and particularly the acquisition of troubled thrifts with liabilities in excess of assets left Sterling in an undercapitalized position. At June 30, 1989 Sterling had equity equal to 1.4% of total assets, as compared with a ratio of 2.2% a year earlier. The decrease in the ratio was a result of the Central Evergreen acquisition which involved a 70% increase in assets with no increase in regulatory capital. Despite this, Sterling had regulatory capital modestly in excess of its requirements.[18] Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million[19] that would have left the institution with a comfortable margin above the minimum requirements, and with a cushion that would

---

[12] See Exhibit 3.

[13] Source: FHLBB Memorandum, Voluntary Supervisory Conversion of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988 p. 4 [WOT942 0332].

[14] Source: Same as note 13.

[15] Source: 1989 Annual Report, p. 19.

[16] Source: FHLBB Memorandum, Voluntary Supervisory Conversion of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988, p. 2-3 [WOT942 0329 - 0331].

[17] Source: 1989 Annual Report, p. 2-3.

[18] Source: 1989 Annual Report, p. 17.

[19] Figure is net of costs. Source: 1990 Annual Report, p. 8.

allow for further growth. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement.[20]

The success of Sterling during the 1980s was due primarily to its good management.. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. The plan was implemented with considerable skill, and success was achieved despite the fact that the industry and economic environment of the 1980s was not a favorable one. It is important to recognize that Sterling had the same management team throughout this period, and the same management and business strategy would have been in place absent the breach.

## VI. Effects of the Breach on Sterling

FIRREA imposed new and higher capital requirements on all thrift institutions. Those requirements would not have been a problem for Sterling to meet, if its contractual arrangements with the government remained in force. However, the OTS issued regulations that led to a substantial reduction in the extent to which supervisory goodwill or capital credits could be counted toward the new capital requirements. The magnitude of the effect on Sterling is shown in its June 30, 1990 Annual Report. Sterling calculated that under its Agreements with the government, its regulatory capital at that time exceeded its required capital by $1.8 million.[21] Under the OTS regulations at June 30, 1990, however, Sterling had a shortfall of $21.4 million in its tangible and core requirements, and a shortfall of $26.6 million in its risk-based requirement.[22] These figures do not include Sterling's proposed $10.5 million equity offering planned in 1989. That offering was cancelled because of the OTS refusal to commit to allowing Sterling to pay dividends on the preferred stock that was part of the offering.[23] It is not surprising that investors are not interested in purchasing preferred stock on which dividends may not be paid. The inability of Sterling to obtain the use of this $10.5 million of capital is

[20] Source: Sterling Savings Association, Fiscal 1989 Business Plan update to include the acquisition of Central Evergreen, August 15, 1988, p. 2. [WON944 2310].
[21] Source: 1990 Annual Report, Note 17.
[22] Source: June 30, 1990 Thrift Financial Report (Sheshunoff).
[23] Source: 1990 Annual Report, p. 8.

part of the damage it suffered due to the breach. Absent the breach, it is clear that Sterling would have had the use of this capital. By wiping out a large part of Sterling's regulatory capital, and preventing it from raising additional capital, the breach had a devastating effect on Sterling that came within a hairsbreadth of becoming fatal.

## VII. Sterling's Response to the Breach

Following the breach, Sterling did attempt to return to compliance with the capital regulations requirements set by OTS. While on the litigation front Sterling contended that it was not subject to the regulations that disallowed contractual goodwill, on the banking side it operated as required by OTS. Because it was not in compliance with OTS capital requirements, Sterling was required to prepare and submit a capital plan, demonstrating how it could return to capital compliance, even with the immediate loss of supervisory goodwill and the scheduled future phaseout.

The new capital plan required a turn away from the growth and expansion strategy that had brought success to Sterling in the past. Since its capital ratios were low because of the breach, Sterling took action on both the numerator of the ratio (capital) and the denominator (assets).[24] Sterling shrunk its asset base, declining in size for the first time in its history. Total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%.[25]

While the planned 1989 capital raising was a victim of the breach, Sterling continued to work towards raising new capital. Virtually no capital deficient thrift institutions were able to tap the capital markets in 1990 and 1991, at least partly because the adverse effects of FIRREA and the breach. As distinct from most such institutions, however, Sterling managed to operate at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991.[26] This allowed Sterling to go to the capital market in 1991, earlier than any capital deficient thrift that I am aware of. Sterling raised gross proceeds of $23.7 million in late 1991 that allowed it to return to full capital compliance.[27]

---

[24] Source: Capital Restoration Plan, January 5,1990, p. 14-16 [SG 0705842 – SG 0705844].
[25] See Exhibit 4.
[26] See Exhibit 4.
[27] Source: 1992 Annual Report, p. 23.

It is important to be precise about the nature and effect of the breach, and Sterling's position after the breach. While there is a dispute about the applicability of the capital requirements of FIRREA to Sterling during the period covered by the August 1988 business plan, Sterling would eventually be subject to the higher FIRREA capital requirements.[28] Regardless of the dispute, even absent the breach that wiped out a large part of Sterling's regulatory capital, Sterling would have wanted additional capital. While it would have been in compliance with the FIRREA capital requirements, Sterling would not have had the capital necessary to continue its growth-oriented strategy. Based on my analysis of Sterling's financial position and strategy, and my discussions with Sterling management, it is my opinion that, absent the breach, Sterling would have raised capital as it did in 1991. That is, I do not view the 1991 capital raising as mitigation, and hence, in my opinion, the costs of that capital raising are not appropriately treated as damages due to the breach.

Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy. In the mid-1990s Sterling modified its strategy to shift back from the traditional savings institution focus on home-mortgage lending that was the result of Sterling's acquisitions, towards becoming the full-service community bank that had been part of its original strategic plan. Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits.[29] Sterling has continued to operate successfully, with increasing assets and profits during the 1990s.[30]

As in the 1980s, Sterling's success in the 1990s has been due to the quality of its management and its skill in implementing a valid business strategy. The greater success in the 1990s, after overcoming the immediate impact of the breach, was due in part to the fact that the 1990s turned out to be years with very favorable economic conditions, particularly in the Northwest.[31]

---

[28] The Central Evergreen Business Plan, August 15, 1988, which was accepted by the FHLBB in conjunction with the Central Evergreen acquisition implicitly recognized that Sterling could operate with lower capital ratios that those outlined in the FIRREA legislation.

[29] See Exhibit 5.

[30] See Exhibit 4.

[31] See for example, Mitchell Reports – US Bank Regional Economic Forecasts 1990 – 2000, Northwest Portrait and Western Region.

## VIII. Expectation Damages

The purpose of this Report is to present an estimate of the "expectation damages" suffered by Sterling as a result of the government's breach. The concept of expectation damages attempts to restore to the non-breaching party the benefit of its bargain, putting it in the position it would have been in had the breach not occurred. That is, Sterling should receive the profits it would have earned and recoup the costs it would not have incurred had the contract not been breached.

If damages were calculated and paid at the time of the breach, they would involve only future "expected" damages. However, since damages were not assessed in 1989, they must include "past" damages, from the time of the breach until trial, as well as "future" damages. Since it is a fundamental principle of economics that information is valuable, the assessment of damages must use all information available at the time of assessment. It would be inconsistent with economic theory to calculate expectation damages today using only information available at the time of the breach.

Calculating expectation damages necessarily requires a determination of what would have happened absent the breach. To do so requires an understanding of the thrift's history, financial position, management, and business strategy, as described in the preceding pages, as well as its operating environment, the economy, and interest rates, during the period from the time of the contract, through the breach, and to the present time. Since the damages to Sterling extend beyond the current time (e.g., the loss of the capital credits), making Sterling whole requires a determination of future benefits. Analyzing "what if" questions of this sort is a traditional role for economists. It is what economists are trained to do. And, of course, with respect to the past damages, all of the necessary inputs, including the economic environment and interest rates are known with certainty.

### A. Estimating Expectation Damages

The historical and factual background leads rather directly to the calculation of damages that Sterling suffered as a result of the government's breach. We know

Sterling's position at the time of the breach. The breach took away a substantial amount of Sterling's regulatory capital immediately, with more to be phased out over time. Because Sterling's goodwill exceeded its book capital, it immediately moved to a negative tangible net worth position, as compared with the 1 ½% of tangible assets requirement set by FIRREA.

It is a simple matter to calculate the amount of regulatory capital that Sterling would have had if its contracts with the government had been honored. That additional capital would have been used to support additional assets ("foregone assets"). Sterling would have earned a return on those foregone assets. Those "lost profits" from the time of the breach until today represent the past lost profits of Sterling. That is, the elimination of regulatory capital resulting from the breach forced Sterling to be smaller and less profitable than it otherwise would have been from the time of the breach to the present.

Further, if the contracts had been honored, Sterling would still have $13.48 million of the capital credits resulting from the Lewis and Tri-Cities acquisitions, and $1.329 million of unamortized supervisory goodwill from all three transactions.[32] This additional capital would support additional assets into the future on which profits would be earned. In addition, Sterling suffered damages as a result of its weakened capital position due to the breach. Sterling incurred additional costs of litigation, supervision, raising funds, and handling troubled assets that were caused by the breach; that is, costs actually incurred that would not have been incurred absent the breach. These costs – wounded bank damages – are discussed in more detail in a later section of the Report. Finally, as noted above, Sterling was not able to raise capital as planned in 1989 due to the breach. The profits lost as a result of Sterling not having that capital must be included in the lost profits calculation.

The methodology for calculating these damages involves straightforward financial modeling of the sort that has been widely accepted and used in the thrift and banking business (and by federal thrift and bank regulators) for many years. Of course, thrift earnings are affected by the economic environment and interest rates. However, for the period from the breach until the present time, both the economy and the movement of interest rates are known with absolute certainty. Indeed, Sterling's own actual earnings

[32] Data as of December 31, 2000. Source: Data from Sterling Savings Association

experience is completely known, and can be taken into account in determining the past earnings on the foregone assets. The amount of future foregone assets and the profits to be earned on them can also be determined through similar standard and well-accepted modeling techniques. This can be done to a reasonable degree of certainty, though not with the virtually complete certainty one can have about the past damages. Alternatively, the future lost profits damages can be estimated by calculating the cost today of replacing the remaining regulatory capital that Sterling would have absent the breach.

*Model assumptions and calculations*

The model used in my damage calculation is similar to the spreadsheet analyses that are standard in the industry and have been used in other cases. The derivation of the amount of disallowed regulatory capital is presented in my model.[33] The goodwill is amortized in accord with the contracts.

This capital is leveraged to determine the amount of foregone assets, as shown in Exhibit 6 – Table 5. The capital ratio used for this calculation comes directly from Sterling's 1989 Business Plan for 1989, 1990 and 1991, as specified in the contract for the Central Evergreen acquisition. For June 30, 1992 it is assumed that Sterling maintains a capital ratio of 5.5%, and that this ratio is increased over time to reach 6.75% by December 31, 1996. This is well in excess of the capital requirements set by FIRREA and FDICIA, and approximates or exceeds the capital ratio actually maintained by Sterling.

The assumption with respect to the capital ratio maintained by the non-breach bank is a crucial one to the damage model. I have opted for a conservative approach to the post-1991 capital ratio that understates the lost profits damages suffered by Sterling. It can be seen that the ratios used are conservative by reviewing the capital position of the pre-breach Sterling. Sterling had consistently emphasized a growth-oriented business strategy, and was comfortable with a relatively highly leveraged balance sheet.[34] That strategy would have been adhered to, absent the breach. In fact, the 1989 Business Plan,

---

[33] See Exhibit 6 – Table 4b.
[34] See Exhibit 4.

under which Sterling was authorized (and, indeed, required) to operate, reflects that high-leverage policy.[35]

Of course, Sterling would have complied with the minimum capital requirements that prevailed after FIRREA, and would probably have maintained some cushion above the minimum requirements (as most thrifts have done). But it is conservative to assume that Sterling, in the absence of the breach, would have maintained capital ratios that exceeded the actual Sterling. After all, Sterling in the 1990s had just come through a near-death experience—an experience due to a lack of regulatory capital. It is likely that Sterling management preferred to keep an extra cushion of capital because of that experience, and it is likely that the market enforced a similar discipline. Absent the breach, a Sterling that had always been in capital compliance even after FIRREA would not have operated with the same amount of excess capital.

The foregone assets in the model can be simply derived as the arithmetic product of the non-breach regulatory capital and the estimated leverage ratio. I imposed an additional restriction on the calculation of foregone assets, by limiting the year-to-year internal growth rate of the non-breach thrift to the internal growth rate of the actual thrift. Growth through acquisition by the actual thrift is added to the internal growth. The result is that the growth rate of the non-breach thrift is never larger than that of the actual thrift. This calculation is shown in Exhibit 6 – Tables 3e and 5.

The lost profits are based on the simple assumption that the non-breach Sterling earned profits on the foregone assets at the same rate that the actual Sterling did on its actual assets. This is a reasonable approximation, because the foregone assets are only a fraction of the actual assets. It is clear that they would have been invested subject to the same strategy and policies as the actual assets. In some other Goodwill cases, government witnesses have questioned whether a sufficient volume of assets was available in the market to meet the non-breach demands of the plaintiffs. That may be a legitimate question for thrifts with foregone assets of many billions of dollars. It is not an issue for an institution the size of Sterling. There are some other factors that must be considered, however.

---

[35] Source: Sterling Savings Association, Fiscal 1989 Business Plan update to include the acquisition of Central Evergreen, August 15, 1988 [WON944 2309].

The earnings that Sterling derived from its assets were affected by the fact that these assets were financed, to some extent, with equity capital on which no explicit interest payments were required. The foregone earning assets, on the other hand had to be financed dollar-for-dollar with interest costing liabilities. This factor would tend to make the profitability of the foregone assets less than that of the actual assets. On the other hand, there are several factors that work in the opposite direction.

It is widely believed that there are significant economies of scale in the operation of thrift institutions. That is, a larger institution will spread its fixed overhead costs over a larger volume of assets. There are economies in the acquisition of processing equipment and services. There are many fixed costs in the operation of a branch system, such that a larger volume of deposits can often be handled with very little increase in operating costs. Further, there are economies in the management of cash. An institution that grows by 50% does not generally need to hold 50% additional cash (a non-earning asset).

More important, absent the breach, Sterling would have had the opportunity to acquire assets and/or deposits from the RTC. Because of its capital deficiency in 1990 and 1991, Sterling was not able to participate in this market at the time in which the opportunities were the greatest. It has turned out to be the case that thrift institutions that purchased assets, deposits, or whole institutions from the RTC in its early years obtained great bargains. A thrift of which I have been a director made a number of such acquisitions, and these assets turned out to be very profitable. The opportunities for a thrift in the Northwest would have been substantial, particularly since Sterling would have been interested in acquisitions in smaller communities that were not desired by the giant banks and thrifts that comprised the bulk of the RTC's customers.[36]

In view of these considerations, it is my opinion that using the earnings rate of the actual Sterling as the basis for calculation of earnings on the foregone assets is conservative, and tends to understate the amount of Sterling's damages. It should be noted that I have followed this approach consistently, including the loss that Sterling suffered in 1996. The actual Sterling incurred losses in connection with a restructuring of its balance sheet and a shift in strategy toward commercial banking.[37] Sterling had about

[36] See Exhibit 7.
[37] Source: 1996 Annual Report, p.3.

$1.5 billion of assets in 1996. It is not likely that if Sterling had an additional $300 million of assets, that there would have been losses on these incremental assets. Nevertheless, I have modeled the damages on the assumption that the incremental bank suffered losses in 1996 similar to the actual Sterling experience.

Based on these parameters, I have calculated that Sterling's pre-tax profits from 1990 to 2000 would have been $75.777 million higher if there had not been a breach.[38] It is appropriate to use pre-tax figures here, since it is my understanding that any damage award paid to Sterling by the government will be subject to taxes. The calculations that lie behind this conclusion are shown in Exhibit 6.

### B. Wounded Bank Damages

In addition to these lost profits, the actual bank suffered a reduction in its profits because of additional costs it incurred as a result of its weakened capital position. These "wounded bank" damages amount to at least $5.158 million. Mr. Byrne will testify in detail about these additional costs, but I have reviewed his calculations and discussed them with him. It is my opinion that the types of costs he describes are attributable to the breach, and would not have been incurred absent the breach. To make Sterling whole requires that it be compensated for these costs.

### C. Future Damages

As of the beginning of 2001, absent the breach Sterling would still have $1.329 million of unamortized goodwill and the $13.5 million capital credit.[39] To make Sterling whole, the institution must be compensated for the value of that regulatory capital going forward. This regulatory capital would have great value, since it can be leveraged and will generate profits in the future as in the past. I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credit. His determination of the value is $21.264 million.

---

[38] See Exhibit 6 – Table 1.

[39] Data as of December 31, 2000. Source: Data from Sterling Savings Association

## IX. Summary

In summary, my determination of Sterling's expectation damages is $102.200 million. Exhibit 8 presents a summary of the amounts. As noted above, the lost earnings from 1990 through 2000 are $75.777 million, the wounded bank damages are $5.158 million, and the future damages are $21.264 million.

## X. Index of Exhibits

1. Curriculum Vitae
2. Documents Reviewed
3. Sterling Savings Association, Key Financial Data, 1983 – 1989
4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2000
5. Sterling Savings Association, Asset Composition, 1990 – 2000
6. Calculation of Lost Earnings on Foregone Assets
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

Paul Horvitz

9-6-01

Date

# PAUL M. HORVITZ

Judge James A. Elkins Professor of Banking and Finance
University of Houston

## ADDRESS

(Office)
Department of Finance
College of Business Administration
University of Houston
Houston, Texas 77204-6282
(713) 743-4765

(Residence)
150 Sugarberry Circle
Houston, Texas 77024
(713) 784-5086

## EDUCATION

| | | |
|---|---|---|
| Massachusetts Institute of Technology | Ph.D. | 1958 |
| Boston University | MBA | 1956 |
| University of Chicago | BA | 1954 |

## EMPLOYMENT HISTORY

| | |
|---|---|
| **University of Houston** | |
| Judge James A. Elkins Professor of Banking and Finance | 1981- |
| Professor of Finance | 1977-1981 |
| **Federal Deposit Insurance Corporation** | |
| Assistant to the Chairman | 1976-1977 |
| Director of Research | 1968-1976 |
| Assistant Director of Research | 1967 |
| **Comptroller of the Currency** | |
| Associate Director, Department of Banking and Economic Research | 1966-1967 |
| Senior Economist | 1963-1965 |
| **Mitre Corporation** | |
| Economic Analyst | 1962-1963 |
| **Boston University** | |
| Assistant Professor of Finance | 1960-1962 |
| **Federal Reserve Bank of Boston** | |
| Financial Economist | 1956-1960 |

## SELECTED PUBLICATIONS

### Books and Monographs

Monetary Policy and the Financial System. Prentice-Hall, 6th edition, 1987.

Perspectives on Safe and Sound Banking. MIT Press, 1986 (with George Benston, Robert Eisenbeis, Edward Kane and George Kaufman).

Commercial Banking and Interstate Expansion, UMI Research Press, 1985 (with Larry A. Frieder, et al.).

Sources of Financing for Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

Problems in the Financing of Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

The Changing Environment of Non-Local Competition in U.S. Banking. American Bankers Association, 1981 (with Peter Merrill).

The Future Development of Foreign Banking Organizations in the U.S. American Bankers Association, 1981 (with Bernard Shull).

The Management of Commercial Bank Funds. American Institute of Banking, 2nd edition, 1980 (with George McKinney and William Brown).

Federal Reserve Membership. American Bankers Association, 1979 (with Peter Merrill).

Concentration and Competition in New England Banking. Federal Reserve Bank of Boston, 1958.

### Articles in Professional Journals

"Commercial Banks and Real Estate Lending: The Texas Experience," Journal of Regulatory Economics, Forthcoming, with (Robert Eisenbeis and Rebel Cole).

"Mortgage Loans to Non-Occupants as an Indicator of Racial Redlining," Journal of Financial Services Research, Forthcoming.

"Preserving Competition in Electronic Home Banking," Journal of Money, Credit and Banking, November 1996.

"Efficiency and Antitrust Considerations in Home Banking: The Proposed Microsoft-Intuit Merger,"
The Antitrust Bulletin, Summer 1996.

"Forbearance: An Empirical Analysis," Journal of Financial Services Research, March 1996, (with Emile J. Brinkmann and Ying-Lin Huang).
"Banking Regulation as a Solution to Financial Fragility," Journal of Financial Services Research, December 1995.

"Risk-Based Capital Standards and the Credit Crunch," Journal of Money, Credit and Banking, August, 1995 (with Emile J. Brinkmann).

"Rules Vs. Authorities in Banking Supervision," Korea Non-Bank Deposit Insurance CorporationJoumal, Spring 1995 (with Insup Lee).

"Abnormal Returns in Post-FIRREA Acquisitions of Failed Thrifts," Journal of Financial Services Research, December 1994 (with Insup Lee).

"Mortgage Redlining: Race, Risk, and Demand," Journal of Finance, March 1994 (with Andrew Holmes).

"Management Incentives and Solvency Effects in Financially Distressed Government Controlled Institutions," (with Janice Barrow), Financial Management, December 1993.

"Valuation Effects of New Securities Issuance by Bank Holding Companies: New Evidence," Financial Review, 1991, (with Insup Lee and Kerry Robertson)

"The FSLIC Crisis and the Southwest Plan," American Economic Review, May 1989.

"Fear of Failing," Yale Journal on Regulation, Spring 1987.

"The Combination of Banking and Insurance: Implications for Regulation," Growth and Change, October 1985.

"Are S&L Participations in Real Estate Ventures Too Risky?" (with Clifford Fry and John Crockett), Real Estate Review, Summer 1985.

"Comment on Deposit Insurance in a Deregulated Environment," Journal of Finance, July 1984.

"The Implications of Changes in the Payments System for Interstate Banking," Journal of Corporation Law, Summer 1984.

"Reform of the Deposit Insurance System," Contemporary Policy Issues (with Tim Campbell), May 1984.

"The Case Against Risk-Related Deposit Insurance Premiums," Housing Finance Review, September 1983. Reprinted in Gardener, UK Banking Supervision, Allen & Unwin, 1986.

"Comments on Legal Reserve Requirements," Journal of Bank Research, Spring 1983.

"Reorganization of the Financial Regulatory Agencies," Journal of Bank Research, Winter 1983.

"Regulation of the Money Order Industry," Financial Management, Winter 1980.

"A Reconsideration of the Role of Bank Examination," Journal of Money, Credit and Banking, November 1980.

"Commercial Bank Financial Reporting and Disclosure," Journal of Contemporary Business, Summer 1977.

"Bank Failures and Deposit Insurance: The Alternatives," (with Robert Barnett and Stanley Silverberg), Banking Law Journal, April 1977.

"The Committee on Interest and Dividends: An Evaluation," Policy Analysis, Spring 1977.

"Failures of Large Banks: Implications for Banking Supervision and Deposit Insurance," Journal of Financial and Quantitative Analysis, November 1975. Reprinted in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 1980.

"The Hunt Commission Report: Comment," Journal of Finance, March 1974.

"The Pricing of Textbooks and the Remuneration of Authors," American Economic Review, May 1966. Reprinted in Johnson, The Daily Economist, Prentice-Hall, 1973.

"The Bank Merger Act of 1960: A Decade After," (with Bernard Shull), Antitrust Bulletin, Winter 1971. Reprinted in Reprints in Antitrust Law and Economics, 1972.

"Branch Banking, Independent Banks and Geographic Price Discrimination," (with Bernard Shull), Antitrust Bulletin, Winter 1969.

"Price Uniformity and Banking Markets," Appalachian Financial Review, 1969.

"A Note on Textbook Pricing," American Economic Review, September 1965.

"Stimulating Bank Competition through Regulatory Action," Journal of Finance, March 1965. Reprinted in Banking Markets and Financial Institutions, Irwin, 1971.

"Loan Loss Reserves," (with Sherman Shapiro), National Banking Review, September 1964.

"The Impact of Branch Banking on Bank Performance," (with Bernard Shull),

National Banking Review, December 1964. Reprinted in Banking Competition and the Banking Structure, Comptroller of the Currency, 1966.

"Branch Banking and the Structure of Competition," (with Bernard Shull), National Banking Review, March 1964. Reprinted in Banking Competition and the Banking Structure.

"Concentration Ratios and Competition," (with Deane Carson), National Banking Review, September 1963. Reprinted in Monetary Economics, Wadsworth, 1968; and Banking Competition and the Banking Structure.

"Bank Earnings and the Competition for Savings," Journal of Political Economy, February 1962.

Papers Published in Books:

"The Role of Forbearance and Its Costs in Handling Troubled and Failed Depository Institutions," in Reforming Financial Institutions and Markets in the United States. Kluwer Academic Publishers. 1994 (with Robert Eisenbeis).

"Prepaid Tuition Plans: An Exercise in Finance, Psychology and Politics," in Prepaid College Tuition Plans, The College Board, 1993.

"Banks and Banking Services," "Payment Services," "Savings," "Federal Deposit Insurance Corporation," for Encyclopedia Americana, 1992 edition.

"The Causes of Texas Bank and Thrift Failures," in If Texas Were Chile, by the Sequoia Institute, 1992.

"The Incentive Conflict Hypothesis: Opening Comment," in Reforming the American Banking System, Wharton Financial Institutions Center, 1991.

"The Collapse of the Texas S&L Industry," Restructuring the American Financial System: Recommendations from the Shadow Financial Regulatory Committee, Kluwer, 1990.

"Resolving the S&L Failures: The Southwest Plan," in Research in Financial Services, a Research Annual, JAI Press, 1990.

"Commentary on Banking Regulation," in Restructuring Banking and Financial Services in America, American Enterprise Institute, 1988.

"The Broad Segments of the Financial Markets," in The Banker's Handbook, 3rd ed., Dow Jones-Irwin, 1987.

"Is Subordinated Debt the Answer to Bank Capital Woes," in Bank Performance Annual, Warren Gorham & Lamont, 1986.

"Technological Innovation: Implications for Regulation of Financial Institutions," in Technological Innovation and the Monetary Economy, Columbia University Press, 1986.

"Financing Small Business," in Problems in the Financing of Small Business, JAI Press Inc., 1984.

"The Payments System and Public Policy," in Financial Services, Prentice-Hall for the American Assembly, 1983.

"Commercial Banks and Financial Markets," chapter in Handbook of Financial Markets: Securities, Options, Futures, F.J. Fabozzi and F.G. Zarb, eds., Homewood, Ill.: Dow-Jones-Irwin, 1981.

"Strategies for Deregulation," in The Deregulation of Depository Institutions, Proceedings of a Berkeley Business School Colloquium, David Pyle, ed., 1981.

"The Impact of Regulation of Financial Institutions on Competition and the Allocation of Resources," published in Government Regulation: Achieving Social and Economic Balance, Vol. 5, Joint Economic Committee, 1980.

"Commentary on Regulating the Solvency of Depository Institutions," published in Issues in Financial Regulation, McGraw-Hill, 1979.

"Bank Risks in the New International Financial Structure--Lessons from Bank Failures," published in The Emerging International Monetary Order, University Publishing Projects, Tel Aviv, 1976.

"The Role of Mergers in Fostering a Viable Banking System," published in Monetary Issues of the 1960s, University of Texas Press, 1968.

"Branch Banking, Mergers, and Competition," published in Banking and Monetary Studies, Richard D. Irwin, 1963.

"Economies of Scale in Banking," prepared for the Commission on Money and Credit. Published in Private Financial Institutions, Prentice-Hall, 1963.

Articles in Business Publications

"Financial Disclosure: Is More Always Better?" Journal of Retail Banking Services, Forthcoming.

Electronic Home Banking: Are We There Yet?," Texas Business Review, Forthcoming.

"ATM Surcharges: Their Effect on Competition and Efficiency," Journal of Retail Banking Services, Autumn 1996.

"What is the Future of Banking?" Harvard Business Review, July-August, 1991.

"Fraud by Thrift Insiders," American Banker, November, 1990.

"RTC Strategy: Problems with the Plan and the Process," Savings Account, March 1990.

"Should Foreign Deposits Be Subject to Insurance Assessments?," ABA Bankers Weekly, April 18, 1989.

"Capital Is the Best Deposit Insurance Protector," Outlook, July/August 1987.

"The Outlook for Financial Institutions," Midwestern Business and Economic Review, No. 5, Bureau of Business and Government Research, Midwestern State University, Fall 1986.

"How Risky Are Real Estate Ventures?" (with Clifford Fry and John Crockett), Outlook, September/October 1985.

"Lessons from the REIT Experience," The Bankers Magazine (with John H. Crockett and Clifford L. Fry), July-August 1984.

"Alternative Avenues to Interstate Banking," Economic Review, Federal Reserve Bank of Atlanta, May 1983. Reprinted in Bankers Desk Reference, 1983; and in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 2nd ed., 1984.

"Can Commercial Banks Meet the Competition?" National Association of Bank Women Journal, January 1983.

"Consolidation of the Regulatory Agency Structure," Economic Review, Federal Reserve Bank of Atlanta, December 1982.

"The Implications of the Deregulation Act for the Competitive Position of Depository Institutions," (with R. Zock), Issues in Bank Regulation, Autumn 1982.

"Geographic Restrictions on Financial Institutions," Economic Review, Federal Reserve Bank of Atlanta, September 1981.

"The Hunt Commission and Financial Reform in the 1970s," Review of Regional Economics and Business, Spring 1981.

"Viewing the Effectiveness of FDIC Cease-and-Desist Orders," Issues in Bank Regulation, Summer 1979.

"1979: A Critical Turning Point in Banking," Texas Business Executive, Spring 1979.

"Reporting to the Board of Directors," Board Reports for the Bank Director, Director Publication, Inc., 1978.

"Financial Reporting and Disclosure," Texas Business Review, April 1978.

"More Banking Laws Unneeded," Washington Post, November 6, 1977.

"Recent Changes in Bank Accounting and Reporting," Executive, Winter 1977.

"The FDIC as a Data Bank," (with Mary Mitchell) Bankers Monthly, November 1969.

"Commercial Bank Adjustments to Changes in Deposit Structure and Volume," Business Perspectives, Fall 1968.

"Area Redevelopment: Employment, Economics, Politics and New England," Boston University Business Review, Fall 1960.

"A Close Look at Bank Earnings," New England Economic Review, August 1959.

"The Investment Policies of Labor Unions," Boston University Business Review, Fall 1956.

Papers Published in Conference Proceedings

"Comment on Deposit Insurance: Do We Really Need It?," Preventing Banking Sector Crises in Latin America, The World Bank, 1996.

"The Implications of EC 1992 for U.S. Financial Markets and Institutions," (with R. Pettit). American Enterprise Institute Conference, 1992.

"Implications of the Texas Experience for Financial Regulation," Proceedings of a Conference on Banking Structure and Competition, Federal Reserve Bank of Chicago, 1989.

"The Management Consignment Program," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1987.

"The Case for High Capital Requirements," Thrift Financial Performance and Capital Adequacy, Federal Home Loan Bank of San Francisco, 1987.

"Banking Deregulation and Consumer Interests," The Changing Shape of Retail Banking, Comptroller of the Currency, 1985.

"Deposit Insurance After Deregulation," Proceedings of the Ninth Annual Conference, Federal Home Loan Bank of San Francisco, 1984.

"Deregulation and the Payments System," Payments in the Financial Services

Industry of the 1980s, Federal Reserve Bank of Atlanta, 1984.

"Comments on Deposit Insurance," Proceedings of Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1983.

"Short-Run Financial Solutions for Troubled Thrift Institutions," (with R.R. Pettit), The Future of the Thrift Industry, Federal Reserve Bank of Boston Conference Series No. 24.

"Deregulation and Financial Products and Services," Deregulation of Product Lines. Proceedings of a Colloquium, Board of Governors of the Federal Reserve System, July 1982.

"Geographical Restrictions on Financial Institutions," The Future of the Financial Services Industry, Conference Proceedings, Federal Bank of Atlanta, 1981.

"Nonlocal Competition in Banking," Proceedings of a Conference on the Future of the Financial Industry, American Bankers Association, 1981.

"The Pricing of Federal Reserve Services," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1979.

"The Membership Problem of the Federal Reserve and Its Relationship to the Provision and Pricing of Payments Services," Proceedings of a Conference on Reserve Requirements and the Role of the Federal Reserve System, Federal Reserve Bank of Chicago, 1978.

"Commentary on Regulation of Bank Holding Companies," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1978.

"Commentary on the Impact of Public Disclosure of Bank Supervision and Regulation," Federal Reserve Policies and Public Disclosure, American Enterprise Institute, 1978.

"Interest Rate Regulations: Past History and Future Prospects," Proceedings of University of Houston Banking Symposium, 1977.

"Consumer Protection: Burdens and Benefits," published in Proceedings of University of Houston Banking Symposium, 1977.

"Indirect Control of Inflation," published in Inflation: 1970 Style, Southern Newspaper Publishers Association, 1970.

## PROFESSIONAL MEETINGS

Presented papers or served as discussant or session chairman at meetings of:

American Economic Association
Eastern Finance Association
Midwestern Economic Association
Western Economic Association
Western Finance Association
American Finance Association
American Statistical Association
Southern Finance Association
Financial Management Association
National Economists Club
Southwest Finance Association

## OTHER PROFESSIONAL ACTIVITIES

### Editorial

Editorial Board, Research in Financial Services, 1992-
Co-editor, Journal of Financial Services Research, 1987-
Member, Editorial Advisory Board, Journal of Bank Research, 1982-1986
Associate Editor, Journal of Financial Research, 1981-1986
Member, Editorial Board, The Financial Review, 1972-1974
Associate Editor, Financial Management, 1972-1974
Associate Editor, National Banking Review, 1963-1966

### Advisory Committees

Shadow Financial Regulatory Committee, 1986-
Federal Savings and Loan Advisory Committee, 1986-1987
Economic Advisory Council, Texas Economic Development Commissio 1985-1986
Florida House of Representatives Interstate Banking Study Group, 1983
Presidential Advisory Task Force on Small Business, 1980
Advisory Committee, FDIC Study of State-Federal Regulation of Banking, 1977
Selection Panel for Research Support in Finance, National Science Foundation, 1975-1980
National Commission on Consumer Finance, 1970-1972

### Other Teaching

Faculty, Stonier Graduate School of Banking, 1970-1977
Visiting Professor of Finance, George Washington University, 1974-1977
Instructor, Assembly for Bank Directors, 1974

Faculty, Pacific Coast Banking School, 1972
Lecturer, Georgetown University, 1969-1972

Testimony

Testified at Hearings
Conducted by: U.S. House Banking Committee
U.S. House Small Business Committee
U.S. House Committee on Government Operations
U.S. Senate Banking Committee
Texas Senate Economic Development Committee
U.S. Office of Thrift Supervision

Consulting

Consultant to: U.S. Treasury Department
Small Business Administration
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board
U.S. League of Savings Institutions
American Bankers Association
Association of Reserve City Bankers
Commission on Money and Credit
Commercial banks, thrift institutions, law firms

Board of Directors

Bank United of Texas
Federal Home Loan Bank of Dallas (1983-1989)
PULSE EFT Association, Inc.
Director of Three Savings and Loans in FSLIC Management Consignment Program, 1986-1988.

Other Professional Activities

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-1983
Columnist, The American Banker, 1981-1990.

# Exhibit 2 - Corrected

## *Sterling Savings v. United States*

## Documents Reviewed by Paul Horvitz

### Sterling Savings Association/Financial Corporation 10-Ks

| | |
|---|---|
| Sterling Savings Association 10-K 1984 | SG-0705190-0705209 |
| Sterling Savings Association 10-K 1985 | SG-0705210-0705232 |
| Sterling Savings Association 10-K 1986 | SG-0705233-0705274 |
| Sterling Savings Association 10-K 1987 | SG-0705275-0705305 |
| Sterling Savings Association 10-K 1988 | SG-0705306-0705337 |
| Sterling Savings Association 10-K 1989 | SG-0705338-0705392 |
| Sterling Savings Association 10-K 1990 | SG-0705393-0705458 |
| Sterling Savings Association 10-K 1991 | SG-0705459-0705528 |
| Sterling Savings Association 10-K 1992 | SG-0705529-0705590 |
| Sterling Financial Corporation 10-K 1993 | SG-0705591-0705644 |
| Sterling Financial Corporation 10-K 1994 | SG-0705645-0705704 |
| Sterling Financial Corporation 10-K 1995 | SG-0705705-0705768 |
| Sterling Financial Corporation 10-K 1996 | SG-0705769-0705826 |
| Sterling Financial Corporation 10-K 1997 | SG-0702958-0703019 |
| Sterling Financial Corporation 10-K 1998 | SG-0702858-0702957 |
| Sterling Financial Corporation 10-K 1999 | SG-0703141-0703235 |
| Sterling Financial Corporation 10-K 2000 | SG-0706352-0706459 |

### Sterling Savings Association/Financial Corporation Annual Reports

Sterling Savings Association Annual Report 1983
Sterling Savings Association Annual Report 1984
Sterling Savings Association Annual Report 1985
Sterling Savings Association Annual Report 1986
Sterling Savings Association Annual Report 1987
Sterling Savings Association Annual Report 1988
Sterling Savings Association Annual Report 1989

| | |
|---|---|
| Sterling Savings Association Annual Report 1990 | |
| Sterling Savings Association Annual Report 1991 | |
| Sterling Savings Association Annual Report 1992 | |
| Sterling Financial Corporation Annual Report 1993 | |
| Sterling Financial Corporation Annual Report 1994 | |
| Sterling Financial Corporation Annual Report 1995 | |
| Sterling Financial Corporation Annual Report 1996 | |
| Sterling Financial Corporation Annual Report 1997 | SG-0703020-0703140 |
| Sterling Financial Corporation Annual Report 1998 | |
| Sterling Financial Corporation Annual Report 1999 | SG-0507880-0508002 |
| Sterling Financial Corporation Annual Report 2000 | |

## Sterling Savings Offering Circulars

| | |
|---|---|
| Sterling Savings: Offering Circular Subject to Completion, Dated 11/14/1989 | SG-0704660-0704788 |
| Sterling Savings Association: Offering Circular, Dated 11/20/1991 | SG-0704789-0704908 |
| Sterling Financial Corporation: Prospectus, Dated 2/4/1993 | SG-0704909-0704994 |
| Sterling Financial Corporation: Prospectus, Dated 5/3/1994 | SG-0704995-0705082 |
| Sterling Financial Corporation: Prospectus, Dated 5/30/1997 | SG-0705083-0705138 |
| Sterling Financial Corporation: Offering Memorandum, Dated 5/25/1999 | SG-0705139-0705189 |

## Sterling Savings Association Capital Restoration Plan

| | |
|---|---|
| Sterling Savings Association Capital Restoration Plan, January 5, 1990 | SG-0705827-0705925 |
| Sterling Savings Association Capital Restoration Plan, February 19, 1990 | SG-0705926-0705957 |

## Mitchell Reports - US Bank Regional Economic Forecasts 1990 - 2000

| | |
|---|---|
| Northwest Portrait: 1990 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700001-0700032 |
| Northwest Portrait: 1991 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-07004800700506 |

| | |
|---|---|
| Northwest Portrait: 1992 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700033-0700068 |
| Northwest Portrait: 1993 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700069-0700108 |
| Northwest Portrait: 1994 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700109-0700161 |
| Northwest Portrait: 1995 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700162-0700225 |
| Northwest Portrait: 1996 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700226-0700296 |
| US Territory 1997: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1996 | SG-0700507-0700570 |
| US Territory 1998: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1997 | SG-0700297-0700360 |
| US Territory 1999: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1998 | SG-0700361-0700411 |
| Territory 2000: US Bank Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1999 | SG-0700412-0700466 |
| Territory 2000 - Western Region: Mid-Year Regional Economic Review Prepared by the Economics Department of US Bank as of May 2000 | SG-0700571-0700598 |

## Examination Reports: 1986 - 1998

| | |
|---|---|
| Jointly - FHLB of Seattle and State of Washington: | |
| October 29, 1986 | SG-0052114-0052169 |
| Jointly - FHLB of Seattle and State of Washington: June 19, 1989 | SG-0052248-0052340 |
| Jointly - OTS and State of Washington: November 13, 1989 | SG-0052341-0052431 |
| FDIC: November 13, 1989 | SG-0052432-0052525 |
| Jointly - OTS and FDIC: September 17, 1990 | SG-0052526-0052592 |

| | |
|---|---|
| OTS: September 17, 1990 | SG-0052593-0052683 |
| Jointly - OTS and State of Washington: September 16, 1991 | SG-0052684-0052801 |
| FDIC: September 16, 1991 | SG-0052802-0052865 |
| Jointly - OTS, West Region, and State of Washington: August 10, 1992 | SG-0052866-0052929 |
| OTS: July 6, 1993 | SG-0052930-0052974 |
| OTS: June 30, 1994 | SG-0052975-0053016 |
| Jointly - State of Washington, OTS, and FDIC: August 21, 1995 | SG-0053017-0053088 |
| Jointly - State of Washington and OTS: September 16, 1996 | SG-0053089-0053164 |
| Jointly - State of Washington and OTS: October 14, 1997 | SG-0053165-0053238 |
| OTS: October 26, 1998 | SG-0053239-0053293 |

**Branch Reports and Internal Company Financial Statements: 1985 – 1989**

| | |
|---|---|
| November 1985 Financial Statements | SG-0097724-0097792 |
| 1986 Operating Budget | SG-0097353-0097366 |
| March 1986 Financial Statements | SG-0097501-0097552 |
| June 1986 Financial Statements | SG-0097367-0097408 |
| June 1987 Revised Financial Statements | SG-0099242-0099353 |
| April 1988 Financial Statements | SG-0100861-0100966 |
| June 1988 Financial Statements | SG-0101162-0101269 |
| December 1988 Financial Statements | SG-0101813-0101921 |
| June 1989 Financial Statements (no narrative) | SG-0102551-0102576 |
| June 1989 Financial Statements | SG-0102595-0102704 |
| September 1989 Financial Statements | SG-0102988-0103134 |
| December 1989 Financial Statements (no narrative) | SG-0103428-0103455 |
| December 1989 Financial Statements | SG-0103504-0103618 |

## Legal Briefs and Filings

**Amended Master Protective Order & Exhibit B Declaration of Expert**

**First Amended Complaint: April 21, 1995**

**Motion for Partial Summary Judgment Re: Liability & Affidavit of Leslie R. Weatherhead in Support of Motion with Exhibits A - G, January 16, 1997**

**Defendants First Phase II Case-Specific Interrogatories with Responses, February 24, 2000**

**Verified Complaint for Declaratory & Injunctive Relief, or in the Alternative, for Rescission & Damages, May 15, 1990**

**Defendant's Supplemental Memorandum in Opposition to Plaintiffs Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant s Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment: October 10, 2000**

| | |
|---|---|
| Exhibit 2.3: Acquisition Agreement between The Federal Savings and Loan Insurance Corporation as Receiver for Lewis Federal Savings and Loan Association and Sterling Savings Association: November 5, 1985 | DRI-07702-07716 |
| Federal Home Loan Bank Board Memo from James R. Faulstich (Principal Supervisory Agent) to Federal Home Loan Bank Board re FSLIC-Assisted Acquisition: October 8, 1985 | WOF-0140449 |
| Federal Home Loan Bank Board Letter from Jeff Sconyers (Secretary) to Sterling Savings Association, Harold B. Gilkey (CEO): November 12, 1985 | WOF-0140954-0140956 |
| Exhibit 2.1: Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association: November 5, 1985 | PwC-02716-02750 |
| Federal Home Loan Bank Board Resolution No. 85 - 985, Acquisition of Assets and Liabilities of Lewis Federal Savings and Loan Association: November 4, 1985 | WOL-6890510-6890516 |
| Federal Home Loan Bank Board Resolution 85 - 989: November 4, 1985 | XXX-1050145-1050146 |
| Federal Home Loan Bank Board Resolution No. 88 - 250P, Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings and Loan Association: April 7, 1988 | WON-9440767-9440777 |
| Federal Home Loan Bank Board Letter to Sterling Savings Association Board of Directors, Document FHLBB No. 7918: April 6, 1988 | WOR-4880389-4880390 |
| Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association: April 8, 1988 | WOL-6890111-6890193 |
| Agreement between the Federal Savings and Loan Insurance Corporation and Sterling Savings Association: December 28, 1988 | WON-8782164-8782169 |
| Federal Home Loan Bank Board Resolution No. 88 - 1273: December 8, 1988 | SG-0142033-0142039 |

| | |
|---|---|
| Coopers & Lybrand Letter to Sterling Savings Association Board of Directors: January 27, 1989 | SG-0142086-0142088 |
| Sterling Savings Association Memo from Daniel G. Byrne (Senior VP, Finance) to File: January 6, 1989 | SG-0142067-0142068 |
| Sterling Savings Association Annual Report to Shareholders: 1989 | SG-0062997-0063034 |
| Sterling Savings Association Capital Restoration Plan: February 19, 1990 | WOT-9421131-9421139 |
| Office of Thrift Supervision, Department of the Treasury, Letter from William J. Durbin (District Director) to Sterling Savings Association Board of Directors: May 22, 1990 | WOT-9421441-9421443 |
| Declaration of Carol A. Friend: June 14, 1990 | WOL-1230623-1230626 |
| Affidavit of William W. Zuppe: May 28, 1990 | WON-9520933-952095 |
| Office of Thrift Supervision, Department of the Treasury, Letter from Carol Friend (Assistant District Director) to Sterling Savings Association, Daniel G. Byrne (Senior VP, Finance): | |
| June 18, 1990 | WON-9530681 |
| Director of Office of Thrift Supervision, Department of the Treasury, Form 10 -Q for Sterling Savings Association: December 31, 1991 | WON-8801074-8801084 |
| Sterling Savings Association Letter from Daniel G. Byrne (Senior VP, Finance) to Office of Thrift Supervision, Edwin Hedlund (Assistant Regional Director): March 31, 1992 | WON-9312953-9312954 |
| Office of Thrift Supervision, Department of the Treasury, Letter from Edwin Hedlund (Assistant Regional Director) to Sterling Savings Association, Daniel G. Byrne (Senior VP, Finance): April 8, 1992 | WON-9200877 |
| Coopers & Lybrand Letter to Sterling Savings Association Board of Directors: July 28, 1988 | SG-0137651-0137652 |

**Plaintiffs' Reply to Defendants Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendants Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment (12-16-00) and Affidavit of William M. Symmes (12-15-00)**

| | |
|---|---|
| Continued Deposition Excerpts of William Zuppe: May 24, 2000 | 0000291-0000304 |
| Federal Home Loan Bank Board Resolution No. 88-1434 re approval of Supervisory Conversion and Merger of American Savings Bank | |

| | |
|---|---|
| (Springfield, IL), with Illinois Interim Federal Savings Bank Springfield, IL, and Merger with Citizens Federal Bank (Miami, FL), 1988 | 0000305 |
| Federal Home Loan Bank Board (Topeka, KS) letter from Mary Barnett, ICR Coordinator, to Commercial Federal Savings and Loan Association (Omaha, NE), Docket No. 05198, June 17, 1988 | 0000306 |
| Second Supplemental Affidavit and Exhibits of Daniel G. Byrne: December 16, 2000 | 0000307-0000353 |
| Deposition Excerpts and Exhibits of Edwin C. Hedlund: August 4, 2000 | 0000354 |
| Deposition Excerpts of Rodney W. Barnett: April 11, 2000 | 0000001-0000013 |
| Deposition Excerpts and Exhibits of Daniel G. Byrne: 07/10/00 | 0000014-0000076 |
| Deposition Excerpts and Exhibits of James R. Faulstich, Volumes I, II, III: August 1 - 3, 2000 | 0000077-0000157 |
| Deposition Excerpts of Harold Gilkey: June 6, 2000 | 0000159-0000178 |
| Deposition Excerpts of Edwin John Gray: July 26, 1999 | 0000179-0000181 |
| Deposition Excerpts and Exhibits of Patricia McJoynt: August 10, 2000 | 0000182-0000287 |
| Deposition Excerpts of Alvin W. Smuzynski: July 26, 1999 | 0000288-0000290 |

**Defendants Reply to Plaintiffs Supplemental Opposition to Defendants Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment, with Appendix: January 16, 2001**

**Motion for Partial Summary Judgment Re: Liability, and Affidavit of Leslie R. Weatherhead Re: Sterling Savings Association's Motion for Partial Summary Judgment Re: Liability, with Exhibits: January 17, 1997**

Exhibit A: Principal documentation evidencing Sterling Savings Association s agreements with the FSLIC and FHLBB in relation to Sterling's acquisition of Lewis Federal Savings and Loan Association: November 1985

Exhibit A-1: Letter from FHLBB to Harold Gilkey re forbearances: 8/14/85

Exhibit A-2: FHLBB Resolution 85-985: 11/4/85.

Exhibit A-3: FHLBB Resolution 85-990: 11/4/85

Exhibit A-4: FHLBB s Appointment of Receiver for Lewis Federal S&LA, No. 85-984: 11/4/85

Exhibit A-5: Acquisition Agreement between FSLIC as Receiver for Lewis Federal S&LA and Sterling Savings Association: 11/5/85

Exhibit A-6: Assistance Agreement between FSLIC and Sterling Savings Association: 11/5/85

Exhibit A-7: Letter from FHLBB to Harold Gilkey re forbearances: 11/12/85

Exhibit A-8: FHLBB Resolution No. 85-984: 11/4/85

Exhibit A-9: FHLBB Resolution No. 85-986: 11/4/85

Exhibit A-10: FHLBB Resolution No. 85-987: 11/4/85

Exhibit A-11: FHLBB Resolution No. 85-988: 11/4/85

Exhibit A-12: FHLBB Resolution No. 85-989: 11/4/85

Exhibit B: Principal documentation evidencing Sterling Savings Association s agreements with FSLIC and FHLBB in relation to Sterling's acquisition of Tri-Cities Savings and Loan Association: April 1988

Exhibit B-1: Letter from FHLBB to Sterling Savings Association Board of Directors re forbearances: 4/6/88

Exhibit B-2: FHLBB Resolution No. 88-250P: 4/7/88

Exhibit B-3: FHLBBs Appointment of Receiver for Tri-Cities S&LA, No. 88-249P: 4/7/88

Exhibit B-4: Acquisition Agreement between FSLIC as Receiver for Tri-Cities S&LA and Sterling Savings Association: 4/8/88

Exhibit B-5: Assistance Agreement between FSLIC and Sterling Savings Association: 4/8/88

Exhibit B-6: FHLBB Order No. 807: 4/7/88

Exhibit B-7: FHLBB Resolution No. 88-249: 4/7/88

Exhibit B-8: FHLBB Resolution No. 88-251: 4/7/88

Exhibit B-9: FHLBB Resolution No. 88-252: 4/7/88

Exhibit B-10: FHLBB Resolution No. 88-253: 4/7/88

Exhibit B-11: FHLBB Resolution No. 88-254: 4/7/88

Exhibit B-12: Letter from Coopers & Lybrand to Sterling Savings Association Board of Directors re accounting principles: 7/28/88

Exhibit C: Principal documentation evidencing Sterling Savings Association s agreements with FSLIC and FHLBB in relation to Sterlings acquition of Central Evergreen Federal Savings and Loan Association: April 1988

Exhibit C-1: Letter from Coopers & Lybrand to Sterling Savings Association (D. Byrne) re net operating loss carryforwards: 1/30/89

Exhibit C-2: Letter from Coopers & Lybrand to Sterling Savings Association Board of Directors re accounting principles: 1/27/89

Exhibit C-3: Agreement between Sterling Savings Association and FSLIC: December 28, 1988

Exhibit C-4: Certificate of Corporate Resolution of Sterling Savings Association: December 22, 1988

Exhibit C-5: Memorandum from Graham and Dunn (P. Cann) to Betty Reed, et al., re Closing Memorandum - Conversion/Merger of Central Evergreen FS&LA into Sterling Savings Association: 12/20/88

Exhibit C-6: FHLBB Resolution No. 88-1273: 12/8/88

Exhibit C-7: Acquisition Agreement between Sterling Savings Association and Central Evergreen FS&LA: 7/20/88

Exhibit D: Affidavit of Harold Gilkey, without exhibits: 5/29/90

Exhibit E: Affidavit of William Zuppe, without exhibits: 5/28/90

Exhibit F: Opinion of the United States District Court, Published as Sterling Savings Assn. v. Ryan: 8/8/90

Exhibit G: Unpublished opinion of the United States Court of Appeals for Ninth District Court: 4/14/92

**Defendants Motion to Dismiss Plaintiff Sterling Financial Corporation; Cross-Motion for Summary Judgment; and Opposition to Plaintiffs Motion for Partial Summary Judgment, with Appendix: April 1, 1997**

**Sterling's Reply to: Motion for Partial Summary Judgment; Liability and Response to Cross-Motion to Dismiss & Supplemental Affidavit of Leslie R. Weatherhead: June 16, 1997**

Sterling Savings Associations Reply Re: Motion for Partial Summary Judgment Re: Liability, and Response to Cross-Motion to Dismiss

Supplemental Affidavit of Leslie R. Weatherhead Re: Sterling Savings Associations Motion for Partial Summary Judgment Re: Liability

Supplemental Affidavit of Harold B. Gilkey

Supplemental Affidavit of Daniel G. Byrne

Affidavit of Leo Clarke

Declaration of David H. Martens

Sterling Savings Association Annual Report, Year Ending June 1986

Sterling Savings Association Annual Report, Year Ending June 1987

Sterling Savings Association Annual Report, Year Ending June 1989

Selected Pages of a Bid Package sent by FHLBB/FSLIC to Sterling Savings relative to FSLIC s sale of Lewis Federal Savings & Loan

Selected Pages of a Bid Package sent by FHLBB/FSLIC to Sterling Savings relative to FSLIC s sale of Tri-Cities Savings & Loan

FFLBB s Information for the Thrift Financial Report

Letter from Coopers & Lybrand to Sterling Savings

Sterling Savings Association Annual Report, Year Ending June 1988

**Sealed Affidavit of Leslie R. Weatherhead re: Sterling Savings Associations Motion for Partial Summary Judgment re: Liability: June 16, 1997**

| | |
|---|---|
| Copy of Memorandum from Darrel Dochow to John M. Buckley | WOF-01401066-01401068 |
| Copy of Memorandum from Jordan Luke to FHLBB | WOT-9420329-9420341 |
| Sealed Affidavit of Leslie R. Weatherhead Re: Sterling Savings Associations Motion for Partial Summary Judgment Re: Liability: June 16, 1997 | |
| Copy of Memorandum from James Faulstich, Principal Supervisory Agent, to the FHLBB | WOF-0140468-0140472 |
| Copy of Memorandum from James Faulstich to the FHLBB | WOL-0140473-0140481 |

**Plaintiffs Memorandum Re: Motion to Strike the Declaration of Joe A. Hargett and its Surreply Regarding the Permanency and Non-Amortization of the FSLIC Assistance, with Appendix: February 26, 2001**

| | |
|---|---|
| Declaration of Daniel G. Byrne Re: Motion to Strike and Surreply | |
| Letter to Ned M. Barnes, Secretary, Sterling Savings Association, from Gary Jeffers, OTS | SG-0170327-0170334 |
| Letter to Gary Jeffers, Counsel, OTS, from Daniel G. Byrne, Sr. Vice President - Finance, Sterling Savings Association, and exhibits | SG-0170335-0170347 |
| Letter to Ned M. Barnes, Secretary, Sterling Savings Association, from Gary Jeffers, Counsel, OTS, and attachments | WON-9312324-9312333 |
| FSLIC Agreement: 12/28/88 | WON-9412133-9412147 |
| Declaration of David H. Martens | |
| Statement of Financial Accounting Standards No. 72 Accounting for Certain Acquisitions of Banking or Thrift Institutions an Amendment of APB Opinion No. 17, an interpretation of APB Opinions 16 and 17, and an amendment of FASB Interpretation No. 9: February 1983 | SG-0703239-0703243 |

| | |
|---|---|
| Sterling Savings Association, Spokane, Washington, Joint Regular Examination as of June 19, 1989 | SG-0052262-0052339 |
| APB Opinion No. 16, footnote 2: August 1970 | |
| Declaration of Roger J. Orders | |
| Affidavit of William M. Symmes Re: Exhibits to Motion to Strike and Surreply | |
| Defendant s Initial Disclosure Pursuant to Paragraph IV (A) (1) of the Discovery Plan | |
| Interrogatory No. 49 Defendant s Responses and Objections to Sterlings First Set of Interrogatories | 0000377-0000379 |
| Deposition of Roger Orders | |

**Defendants Opposition to Plaintiffs Motion to Strike the Declaration of Joe A. Hargett and for Leave to File Surreply Regarding the Permanency and Non-amortization of the FSLIC Assistance, with Appendix: April 5, 2001**

**Plaintiffs Reply to Defendants Opposition to Plaintiffs Motion to Strike the Declaration of Joe A. Hargett and For Leave to File Surreply Regarding the Permanency and Non-Amortization of the FSLIC Assistance: April 26, 2001**

## Depositions

**Depositions of William W. Zuppe –May 23-26, 2000**

**Depositions of Harold Gilkey – June 6-8, 2000**

**Exhibits to Deposition of Harold Gilkey, June 6 - 8, 2000**

| | |
|---|---|
| Exhibit 1: Harold B. Gilkey Vitae Profile | |
| Exhibit 2: Memo to Bill Zuppe Re: Goal Setting and Strategy Development | |
| Exhibit 3: Form 10-K For the Fiscal Year Ended 6/30/85 | |
| Exhibit 4: Sterling Savings Association Operating Plan Fiscal Year Ending June 30, 1985 | SG-0151957-0151967 |
| Exhibit 5: Sterling Saving Association 1983 Annual Report | SG-0061542-0061561 |
| Document missing | |
| Exhibit 7: Letter to Mr. Donald w. Mochel Re: Conceptual Bid for the Acquisition of Guaranty Savings & Loan Association | SG-0501315-0501324 |
| Exhibit 8: Lewis Federal Acquisition Opportunity - Board of Directors Meeting | SG-0040442-0040463 |

| | |
|---|---|
| Exhibit 9: Information and Instructions for Preparation and Submission of Bids | SG-0040442-0040463 |
| Exhibit 10: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501207-0501210 |
| Exhibit 11: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501264-0501265 |
| Exhibit 12: Letter to Hilton S. Hewitt Re: Information and Instructions for Preparation and Submission of Bid Package for Acquisition of Lewis Federal Savings & Loan Association | |
| Exhibit 13: Letter to Harold B. Gilkey Re: The Approval by Federal Home Loan Bank Board of the Purchase of Lewis Federal Savings. | |
| Exhibit 14: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association | |
| Exhibit 15: Sterling Savings Association Fiscal 1988 Business Plan Update to Include the Acquisition of Tri-Cities Savings and Loan Association (Draft) | SG-0140704-0140748 |
| Exhibit 16: Sterling Savings Association Newsletter | SG-0501899-0501900 |
| Exhibit 17: Counter Proposal to Sterling Savings Association from Tri-Cities Savings and Loan Association | SG-0162153-0162154 |
| Exhibit 18: Letter to Hilton Hewitt Re: Approval of a Supervisory Conversion of Central Evergreen Savings and Loan Assn. to Allow Merging into Sterling. | |
| Exhibit 19: Letter to Hilton Hewitt Re: Error letter sent on March 3, 1988. | SG-0140647 |
| Exhibit 20: Sterling Savings Association Central Evergreen Federal's & L Assn. Combined Supervisory Stock Conversion and Merger (Acquisition) Application | |
| Exhibit 21: Sterling Savings Association Minutes of the Meeting of the Board of Directors 4/26/88 | SG-0191551-0191560 |
| Exhibit 22: Sterling Savings Association Minutes of the Meeting of the Board of Directors 1/14/88 | SG-0191693-0191702 |
| Exhibit 23: Sterling Savings Association Minutes of the Meeting of the Board of Directors 2/20/88 | SG-0191635-0191642 |
| Exhibit 24: Sterling Savings Association Minutes of the Meeting of the Board of Directors 6/28/88 | SG-0191988-0192000 |
| Exhibit 25: Letter to Patricia McJoynt Re: Bid to Acquire Tri-Cities Savings & Loan on a Federal Savings & Loan Insurance Corp. Assisted Basis | |

| | |
|---|---|
| Exhibit 26: Letter to the Board of Directors of Sterling Savings Association Re: The Approval of the Supervisory Acquisition of Tri-Cities Savings and Loan Association | |
| Exhibit 27: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association | |
| Exhibit 28: Letter to Hilton Kewitt Re: Request Approval of a Supervisory Merger Between Sterling Savings Assn. and Central Evergreen Savings & Loan Assn. | SG-0140747-0140747 |
| Exhibit 29: Draft of HBG Letter to George Godding 4/18/88 | SG-0152383 |
| Exhibit 30: Agreement Between Sterling Savings Assn. & Federal Savings and Loan Insurance Corporation | |
| Exhibit 31: Sterling Savings Assn. 1989 Report to Shareholders | SG-0062997-0063034 |
| Exhibit 32: Sterling Savings Assn. 1988 Annual Report | |
| Exhibit 33: Sterling Savings Assn. and Subsidiary Companies - Business Plan for Fiscal 1990 | |
| Exhibit 34: Memo to Board of Directors of Sterling Savings Association Re: New Minimum Capital Regulations | |
| Exhibit 35: Sterling Savings Association - Capital Restoration Plan | |
| Exhibit 36: Affidavit of Harold B. Gilkey | |
| Exhibit 37: Supplemental Affidavit of Harold B. Gilkey | |
| Exhibit 38: Second Supplemental Affidavit of Harold B. Gilkey | |
| Exhibit 39: Letter to Harold Gilkey Re: Additional Copy of Regulatory Bulletin 3a-1 | |
| Exhibit 40: Letter to William W. Zuppe Re: Business Banking Lending | |
| Exhibit 41: Letter to Harold Gilkey Re: The Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver | |
| Exhibit 42: Marples Business Newsletter No 1037 | |
| Exhibit 43: Letter to Harold B. Gilkey Re: How Dain Bosworth Might Assist Sterling Saving to Achieve its Goal of Raising New Capital | SG-0192176-0192178 |
| Exhibit 44: Sterling Savings Association - Minutes of Special Meeting of the Board of Directors 5/15/90 | |
| Exhibit 45: Memorandum Opinion and Order Granting Motion for Preliminary Injunction and Denying Motion to Dismiss, Inter Alia | |
| Exhibit 46: Letter to Daniel G. Byrne Re: Required Reporting by Sterling Savings | |
| Exhibit 47: Sterling Savings Association Capital Plan 7/23/91 | |

| | |
|---|---|
| Exhibit 48: Letter to the Office of Thrift Supervision Re: Sterling Savings Association | |
| Exhibit 49: Letter to Ed Hedlund OTS Re: Withdraw of the Draft Capital Plan, July 24, 1991 | |
| Exhibit 50: Letter to Ed Hedlund, OTS Re: Capital Distribution | SG-0183878-0183880 |
| Exhibit 51: Form 10-Q for the Quarterly Report Period Ended 9/30/90 | |
| Exhibit 52: News Report: Sterling Performance Let Sterling Savings Chief Into Battle with U.S. Thrift Regulators | |
| Exhibit 53: Sterling Savings Association - Minutes of Meeting of Board of Directors, June 22, 1992 | SG-0185449-0185460 |
| Exhibit 54: Sterling Financial Corporation - 1996 Annual Report | |
| Exhibit 55: Sterling Financial Corporation Fiscal year 1997 Operating and Strategic Plan | |
| Exhibit 56: News Release - Sterling to Adopt Holding Company Structure | SG-0058678-0058679 |
| Exhibit 57: SFC Road Show Scripts: 1992-1999 | SG-0129178-0129190 |

**Deposition of Daniel G. Byrne, July 10-13, 2000**

**Exhibits to Deposition of Daniel G. Byrne, July 10-13, 2000**

| | |
|---|---|
| Exhibit 1: Daniel G. Byrne Profile | |
| Exhibit 2: Letter to Penny D. Marshall Re: the Accounting Treatment Utilized to Record the Purchase of Lewis & Clark Savings & Loan Assn. | SG-0500213-0500216 |
| Exhibit 3: Letter to Daniel G. Byrne Re: Letter 2/4/85 | SG-0500233-0500234 |
| Exhibit 4: Letter to Thomas Howarth Re: Sterling Authoritative Statements Regarding the Allocation of the Lewis & Clark Saving & Loan Assn. | |
| Exhibit 5: Memo to Harold B. Gilkey Re: Pro Forma Dilutive Effect of Stock Options | SG-0179859-0179860 |
| Exhibit 6: Sterling Savings Association Planning Committee Meeting Minutes 5/28/85 | SG-0151930-0151931 |
| Exhibit 7: Harold B. Gilkey Re: Proposed FSLIC-Assisted Acquisition of Lewis Federal Savings & Loan Association | |
| Exhibit 8: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501207-0501208 |
| Exhibit 9: Memo to William W. Zuppe Re: Lewis Federal Acquisition with Handwritten notes | SG-0501264-0501265 |

| | |
|---|---|
| Exhibit 10: Federal Savings and Loan Insurance Corporation - Information & Instructions for Preparation & Submission of Bids | SG-0501291-0501327 |
| Exhibit 11: Letter to Hilton S. Hewitt Re: The Bid to Acquire Lewis Federal Savings and Loan Association | |
| Exhibit 12: Letter to Harold B. Gilkey Re: Approval by the federal Home & Loan Bank Board of the Purchase of Lewis Federal Savings and Loan Association | |
| Exhibit 14: Sterling Savings Association - 1986 Annual Report | SG-0062928-0062958 |
| Exhibit 15: Federal Home Loan Bank Board - Quarterly Financial Report | SG-0143984-0143991 |
| Exhibit 16: Sterling Savings Association - Corporate Profile | SG-0152298-0152336 |
| Exhibit 17: Sterling Savings Association - Preliminary Offering Circular, January 22, 1987 | |
| Exhibit 19: Letter to Hilton Hewitt Re: The Revised Projection of Sterling's Balance Sheet of 12/30/87 | SG-0140793-0140794 |
| Exhibit 20: Letter to Richard Earle Re: Bid to Acquire First Federal Savings and Loan Association of Longview by Sterling Savings Association | SG-0140963-0140970 |
| Exhibit 21: Memo to OTS File Re: Office of Thrift Supervision File | SG-0600021-0600032 |
| Exhibit 22: Letter to John Smoleck Re: Questions of Business Plan for the Acquisition of Tri-Cities Savings and Loan Assn. | |
| Exhibit 23: Sterling Savings Association - Business Plan Update, February 1988 (Draft) | |
| Exhibit 24: Letter to John Smolek Re: Sterling Business Plan Update | |
| Exhibit 25: Sterling's Fiscal 1988 Business Plan (Exhibit C) | |
| Exhibit 26: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation & Sterling Savings Association | |
| Exhibit 27: Letter to Patricia McJoynt Re: Bid to Acquire Tri-Cities on a Federal Savings and Loan Insurance Corporation Assisted Basis | |
| Exhibit 28: Letter to Sterling s Board of Directors Re: The Approval of the Acquisition of Tri-Cities Savings and Loan Association | |
| Exhibit 29: Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings and Loan Association | |
| Exhibit 30: Memo to Dan Byrne Re: Proposed Staffing Levels for Initial Planning Purposes | SG-0142262-0142265 |
| Exhibit 31: Letter to Hilton Hewitt Re: Request of Approval a Supervisory Conversion of Central Evergreen Savings and Loan Association | |

| | |
|---|---|
| Exhibit 32: Sterling Savings Association Fiscal 1988 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association | |
| Exhibit 33: Letter to Hilton S. Hewitt Re: Error Sending a Letter | |
| Exhibit 34: Sterling Savings Association - Offer to Exchange Shares of $2.50 Cumulative Convertible Preferred Stock - Series B | SG-0169616-0169651 |
| Exhibit 35: Sterling Savings Association, Central Evergreen Federal Savings & Loan Assn. Combined supervisory Stock Conversion & Merger (Acquisition) Application 8/15/88 | PWC-07422-07793 |
| Exhibit 36: Letter to George Godding Re: The Combined Supervisory Stock Conversion and Merger Application for Sterling Savings Association | SG-0141335 |
| Exhibit 37: Agreement Between Sterling Savings Association and The Federal Savings and Loan Insurance Corporation | |
| Exhibit 38: Sterling Savings Association 1988 Annual Report | |
| Exhibit 39: Sterling Savings Association 1989 Report to Shareholders | SG-0062997-0063034 |
| Exhibit 40: Interrogatory # 47 | |
| Exhibit 41: Sterling Savings Association - Form 10-Q Quarterly Report for the Period Ended 9/30/90 | |
| Exhibit 42: Letter to Betty Reed Re: Request for Approval to Acquire Central Evergreen Federal Savings and Loan Association | SG-0145523-0145524 |
| Exhibit 43: Sterling Savings Association Fiscal 1989 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association | SG-01421763-0142212 |
| Exhibit 44: Letter to Gary Jeffers Re: Provide Information Regarding the Amortization of Cash Assistance Amounts Included in the Regulatory Capital Computations for Sterling | SG-0170384-0170385 |
| Exhibit 45: Memo from Daniel G. Byrne Re: Central Evergreen Acquisition Agreement with FSLIC | SG-0142067-0142068 |
| Exhibit 46: Supplemental Affidavit of Daniel G. Byrne | |
| Exhibit 47: Second Supplemental Affidavit of Daniel G. Byrne | |
| Exhibit 48: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of March 31, 1989 | |
| Exhibit 49: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of June 30, 1989 | SG-0119064-0119079 |
| Exhibit 50: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of September 30, 1989 | |

| | |
|---|---|
| Exhibit 51: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of September 30, 1989 - Amended | |
| Exhibit 52: Letter to Carol A. Gamble-Friend Re: Copy of Sterling's 1990 Business Plan | |
| Exhibit 53: Draft Letter to Carol A. Gamble-Friend Re: Summary of Sterling's Plan to Meet its Regulatory Capital Requirements by January 1, 1991 | |
| Exhibit 54: Sterling Savings Association - Form Offering Circular | |
| Exhibit 55: Memorandum to Board of Directors Re: New Minimum Capital Regulations | |
| Exhibit 56: Sterling Savings Association & Central Evergreen Federal S&L Assn. Combined Supervisory Stock Conversion & Merger (Acquisition) Application 8/15/88 | |
| Exhibit 57: Fax Transmittal to Dan Byrne from Craig Nolte @ Federal Home Loan Bank Re: Seattle Bank Comments (Draft) | |
| Exhibit 58: Seattle Bank Comments | |
| Exhibit 59: Letter from Sterling Savings Assn. Re: Copies of Sterling Savings Association s Response to the Federal Home Loan Bank of Seattle | SG-0141705-0141750 |
| Exhibit 60: Letter to Carol Friend Re: Comparison of Operating Results, Actual vs. Pro Forma, 9/30/89 | |
| Exhibit 61: Letter to Carol Friend Re: Comparison of Operating Results, Actual vs. Pro Forma, 10/31/89 | 0030124-0030126 |
| Exhibit 62: Letter to Harold B. Gilkey Re: Outline How Dain Bosworth Might Assist Sterling Savings to Achieve its Goal of Raising New Capital | SG-0192176-0192178 |
| Exhibit 63: Sterling Savings Association Minutes of the Meeting of the Board of Directors 8/22/89 | SG-0140340-0140349 |
| Exhibit 64: Marples Business Newsletter | - |
| Exhibit 65: Letter to Harold Gilkey from Dain Bosworth Re: Financial Advisory Agreement and Amendment to the Letter of Intent | DRI-04503-04505 |
| Exhibit 66: Letter to Harold Gilkey from Dain Bosworth Re: Bosworth Interest in Acting as the Managing Underwriter for SSA s Offering | DRI-04506-04512 |
| Exhibit 67: Letter to Harold Gilkey from Dain Bosworth Re: Recommendation to Sterling Savings About the Public Offering | DRI-04495-04498 |
| Exhibit 68: Letter to Harold Gilkey from Dain Bosworth Re: Review & Approval of Second Amendment to the Letter of | - |

Exhibit 69: Letter to Carol Friend Re: Sterlings Non qualified Deferred Compensation Plan SG-0140397-0140399

Exhibit 70: Letter to Dan Byrne from Norm Judd Re: Annual Core Deposit Intangible Valuation Update

Exhibit 71: Letter to Daniel G. Byrne Re: Future Dividend Payments SG-0140268

Exhibit 72: Letter to William J. Zuppe Re: Permission to Pay Dividends on Sterling Saving s Outstanding Commutative Convertible Preferred stock

Exhibit 73: Letter to Carol Friend Re: Raising Sterling's Additional Capital

Exhibit 74: Sterling Savings Association Capital Restoration Plan, January 5, 1990 SG-0135608-0135707

Exhibit 75: Sterling Savings Association Capital Restoration Plan, February 19, 1990

Exhibit 76: Letter to the Board of Directors of Sterling Savings Association Re: Sterling's Strategies Toward Achieving Capital Compliance

Exhibit 77: Agreement with Dain Bosworth

Exhibit 78: Memorandum Opinion and Order Granting Notion for Preliminary Injunction and Denying Motion to Dismiss, Inter Alia

Exhibit 79: Letter to Harold Gilkey Re: Copy of Regulatory Bulletin 3a-1 Entitled Associations Subject to Greater Restrictions

Exhibit 80: Letter to William Zuppe Re: Request for Business Banking Lending Authority

Exhibit 81: Letter to Board of Directors Re: Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver

Exhibit 82: Letter to Carol Friend Re: Request to File Weekly Reports

Exhibit 83: Letter to Daniel G. Byrne Re: Temporary Restraining Order for Reports on Sterling

Exhibit 84: Letter to Carol Friend Re: List of Operating Restrictions Imposed Upon Sterling

Exhibit 85: Letter to Daniel Byrne Re: Temporary Restraining Order of May 29, 1990

Exhibit 86: Letter to Carol Friend Re: Variances from Restrictions Placed Upon Sterling

Exhibit 87: Letter to Board of Directors of Sterling Savings Assn. Re: Application for Brokered Deposit Waiver Dated 1/26/90

Exhibit 88: Letter to Daniel G. Byrne Re: Review of the Concerns Expressed in the 8/17/90 Letter

| | |
|---|---|
| Exhibit 89: Sterling Savings Association Common Stock Offering Circular Dated 11/20/91 | SG-0175744-0175862 |
| Exhibit 90: Sterling Savings Association Letter to OTS Re: Withdraw of 6/5/91 Notice of Intention | |
| Exhibit 91: Letter from OTS Re: Acknowledge Receiving the Withdraw Letter from Sterling | |
| Exhibit 92: Sterling Savings Association Capital Plan 7/23/91 | |
| Exhibit 93: Letter to Ed Hedlund Re: Reporting Exceptions to Operational Concerns Expressed to Sterling in Various Letters | SG-0137768-0137770 |
| Exhibit 94: Sterling Savings 1990 Annual Report | SG-0060042-0060076 |
| Exhibit 95: Sterling Savings Assn. Calendar Year 1997 Strategic Plan Supplement - Non-Core Funding Dependency | |
| Exhibit 96: Press Release Sterling's Goodwill Suit Transferred to the U.S. Court of Claims | DRI-03747-03748 |

**Deposition of Dale Larrabee: April 25-26, 2000**

**Deposition of Rodney W. Barnett: April 11, 2000**

## Other Case Materials

| | |
|---|---|
| Expert Report of Chris James | |
| Expert Report of John Mitchell | |
| Expert Report of William B. Conerly | |
| "Issues Memorandum" from James R. Faulstich to FHLBB re: FSLIC Assisted Acquisition of Lewis FS&LA, October 23, 1985 | WOF0140450-454 |
| "A Memorandum" from James R. Faulstich to FHLBB re: FSLIC Assisted Acquisition of Lewis FS&LA, October 23, 1985 | WOF0140468-472 |
| "A Memorandum" from James R. Faulstich to FHLBB re: FSLIC Assisted Acquisition of Lewis FS&LA, October 23, 1985 | WOB0200315-318 |
| "S Memorandum" from James R. Faulstich to FHLBB re: FSLIC Assisted Acquisition of Lewis FS&LA. October 23, 1985 | WOF0140473-481 |
| "S Memorandum" to John M. Buckley, Sec'y FHLBB, from James R. Faulstich, Principal Supervisory Agent, re: Recommendation for the Appointment of FSLIC as Receiver for and the Subsequent Acquisition of Substantially all the Assets and Liabilities of Tri-Cities S&LA by SSA, March 31, 1988 | WOF0141079-090 |

| | |
|---|---|
| "Issue Memorandum" to FHLB from James R. Faulstich, Principal supervisory agent, re: Proposed Appointment of FSLIC as Receiver for and Subsequent Acquisition of Tri-Cities S&LA by SSA, April 6, 1988 | WOF0141091-095 |
| "L Memorandum" to FHLB from Leo Clarke, General Counsel - Regulatory Affairs, FHLB Seattle regarding: FSLIC Assisted Acquisition of Tri-cities S&LA by SSA, April 6, 1988 | WOF0141069-078 |
| "Executive Summary" Memorandum for John M Buckley, Jr., Sec'y, FHLBB from Darrel W. Dochow, Exec. Dir., re: Appointment of FSLIC as Receiver for and the Subsequent Acquisition of Substantially all the Assets and Liabilities of Tri-Cities S&LA by SSA, April 6, 1988 | WOF0141066-068 |
| {Memorandum} to FHLBB from Jordan Luke, General Counsel re: Voluntary Supervisory Conversion of Central Evergreen FS&LA and Simultaneous Merger into SSA, with supporting documentation, December 5, 1988 | WOT9420329-341; WOT9420346-351; WOT9420352-365; WOT9420424-457; WOT9420381-392; WOT9420403-404; WOT9420414-415; WOT9420417-419; WOT9420421-423 |

## Other Materials

| | |
|---|---|
| Thrift Financial Reports (FHLBB) | |
| Thrift Financial Reports (Sheshunoff) | |
| Hard-copy Thrift Financial Reports, 6/83 and 12/83 | SG 0701002-011 |
| Hard-copy Thrift Financial Reports, 3/98 | SG 0614446-468 |
| Hard-copy Thrift Financial Reports, 6/98 | SG 0615575-597 |
| Hard-copy Thrift Financial Reports, 9/98 and 12/98 | |
| Analysis from Daniel G. Byrne, CFO, of Sterling Savings | |
| Coopers & Lybrand: Report of Independent Accountants on Supplementary Consolidating information, August 13, 1993 | SG 0051887-933 |
| Coopers & Lybrand: Report of Independent Accountants on Supplementary Consolidating information, August 13, 1994 | SG 0051181-237 |
| Coopers & Lybrand: Report of Independent Accountants on Supplementary Consolidating information, August 13, 1995 | SG 0050331-373 |

| | |
|---|---|
| Coopers & Lybrand: Report of Independent Accountants on Supplementary Consolidating information, August 13, 1996 | SG 0049612-652 |
| RTC Statistical Abstract, August 1989/September 1995 | |

# *Exhibit 3 - Corrected*
# *Sterling Savings Association*
## Key Financial Data
## 1983 to 1989

Source: Thirft Financial Reports (FHLBB), June 1983 - TFR (Income Statement for the 9 months ended 6/83), December 1983-TFR [Bates # SG 0701002 - 0701011]
(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1983 (June) | 1984 (June) | 1985 (June) | 1986 (June) | 1987 (June) | 1988 (June) | 1989 (June) |
| Loans | $360 | $54,857 | $70,495 | $127,255 | $172,294 | $304,126 | $502,453 |
| Mortgage Backed-Securities | $0 | $7,003 | $15,073 | $10,158 | $31,834 | $41,587 | $114,060 |
| Goodwill | $0 | $1,819 | $1,770 | $5,388 | $4,953 | $18,785 | $22,990 |
| Other Assets | $6,956 | $25,234 | $25,111 | $38,201 | $22,766 | $69,455 | $91,430 |
| Total Assets | $7,317 | $88,913 | $112,449 | $181,002 | $231,847 | $433,953 | $730,933 |
| | | | | | | | |
| Deposits | $5,135 | $71,561 | $88,205 | $142,078 | $170,755 | $305,354 | $519,389 |
| Borrowings | $0 | $12,563 | $17,928 | $29,623 | $47,665 | $98,802 | $189,362 |
| Total Liabilities | $5,170 | $84,910 | $107,835 | $173,789 | $221,377 | $410,772 | $720,414 |
| Regulatory Capital [1] | $2,147 | $4,003 | $4,614 | $7,213 | $10,470 | $23,181 | $28,614 |
| | | | | | | | |
| **Capital Ratios** | | | | | | | |
| Regulatory Capital/Average Assets | 29.34% | 8.32% | 4.58% | 4.92% | 5.07% | 6.96% | 4.91% |
| | | | | | | | |
| **Income Statement** [2] | | | | | | | |
| Income Before Taxes & Amortization | -$163 | $330 | $1,027 | $1,360 | $1,878 | $2,431 | $3,813 |
| Goodwill Amortization and Write-offs | $0 | $88 | $127 | $326 | $228 | $472 | $2,272 |
| Provision for Taxes | $0 | $0 | $122 | $205 | $560 | $752 | $560 |
| Accounting Changes and Extra Items | $0 | $26 | $166 | $0 | $0 | $0 | $0 |
| Net Income | -$163 | $216 | $612 | $829 | $1,090 | $1,207 | $981 |
| | | | | | | | |
| **Profitability Ratios** | | | | | | | |
| ROAA before taxes and Amortization | -2.22% | 0.69% | 1.02% | 0.93% | 0.91% | 0.73% | 0.65% |
| Average Assets [3] | $7,317 | $48,115 | $100,681 | $146,726 | $206,425 | $332,900 | $582,443 |

[1] For 1987 and 1988 this figure does not include general valuation allowances.
[2] Income figures for 1983 reflect nine months of data.
[3] "Average" assets for 1983 are actually total assets at 6/30/83.

# *Exhibit 4 - Corrected*

## *Sterling Savings Association*

## Consolidated Key Financial Data

## 1990 to 2000

Source: Thrift Financial Reports (Sheshunoff), except for 1998 which is based on hard-copy TFRs
(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) |
| Loans (Mortgage and Non-Mortgage) | $464,021 | $407,991 | $465,920 | $616,749 | $852,066 | $1,092,824 | $904,012 | $949,851 | $1,084,073 | $1,497,641 | $1,805,546 | $1,983,490 |
| Mortgage Backed-Securities (pool) | $115,395 | $141,040 | $98,126 | $328,279 | $331,426 | $253,337 | $393,730 | $372,057 | $456,322 | $232,256 | $227,649 | $210,653 |
| Goodwill | $19,736 | $14,573 | $10,649 | $8,431 | $17,915 | $14,945 | $11,868 | $10,147 | $7,882 | $61,180 | $55,488 | $49,998 |
| Other Assets | $89,838 | $45,395 | $66,192 | $78,087 | $162,256 | $177,575 | $166,160 | $202,732 | $322,499 | $518,768 | $447,070 | $407,630 |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 | $2,651,771 |
| | | | | | | | | | | | | |
| Deposits | $483,581 | $492,372 | $510,104 | $583,732 | $815,274 | $901,646 | $906,298 | $909,276 | $1,047,863 | $1,563,343 | $1,629,234 | $1,743,296 |
| Borrowings | $189,557 | $98,608 | $86,615 | $376,493 | $446,837 | $513,956 | $465,611 | $503,827 | $656,411 | $516,246 | $673,196 | $645,320 |
| Total Liabilities | $678,260 | $596,378 | $602,954 | $972,422 | $1,281,539 | $1,439,052 | $1,383,106 | $1,428,473 | $1,722,373 | $2,103,836 | $2,324,571 | $2,420,148 |
| Equity Capital | $10,730 | $12,621 | $38,224 | $59,124 | $82,124 | $99,629 | $92,664 | $106,314 | $148,403 | $206,008 | $211,183 | $231,620 |
| | | | | | | | | | | | | |
| **Capital Ratios** | | | | | | | | | | | | |
| Equity/Average Assets | 1.51% | 1.94% | 6.12% | 7.07% | 6.86% | 6.87% | 6.15% | 7.06% | 8.72% | 9.86% | 8.72% | 8.93% |
| | | | | | | | | | | | | |
| **Income Statement** | | | | | | | | | | | | |
| Income Before Taxes & Amortization | $3,357 | $5,678 | $9,873 | $14,340 | $16,463 | $17,944 | $14,352 | -$269 | $23,341 | $21,585 | $35,951 | $37,942 |
| Goodwill Amortization and Write-offs | $3,253 | $2,770 | $2,332 | $2,218 | $2,262 | $3,487 | $3,332 | $1,586 | $2,265 | $3,980 | $5,692 | $5,490 |
| Provision for Taxes | -$163 | $590 | $3,319 | $4,920 | $4,559 | $4,819 | $4,122 | -$621 | $7,911 | $6,420 | $11,163 | $12,008 |
| Accounting Changes and Extra Items | $0 | $298 | -$522 | -$424 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Income | $267 | $2,020 | $4,744 | $7,626 | $9,642 | $9,638 | $6,898 | -$1,234 | $13,165 | $11,185 | $19,096 | $20,444 |
| | | | | | | | | | | | | |
| **Profitability Ratios** | | | | | | | | | | | | |
| ROAA before Taxes and Amortization | 0.47% | 0.87% | 1.58% | 1.71% | 1.37% | 1.24% | 0.95% | -0.02% | 1.37% | 1.03% | 1.48% | 1.46% |
| Average Assets | $709,962 | $648,995 | $624,943 | $836,217 | $1,197,605 | $1,451,172 | $1,507,226 | $1,505,279 | $1,702,782 | $2,090,311 | $2,422,799 | $2,593,762 |

Note : All data are annual except for December 1996 which are for the 6 months ended on that date. All data are consolidated, except for data prior to 1996.

# *Exhibit 5 - Corrected*

## *Sterling Savings Association*

## Asset Composition

## 1990 to 2000

Source: Thrift Financial Reports (Sheshunoff)
(Dollars in Thousands)

| Balance Sheet | As of Fiscal Year End | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) |
| Mortgage Loans | $421,388 | $368,888 | $421,974 | $543,664 | $728,819 | $883,919 | $646,965 | $659,102 | $725,041 | $993,851 | $1,238,641 | $1,395,779 |
| Loans On: | | | | | | | | | | | | |
| 1-4 Dwelling Units: | $257,879 | $229,946 | $304,909 | $423,788 | $616,841 | $728,173 | $454,901 | $445,000 | $412,529 | $561,449 | $602,282 | $629,604 |
| Construction Loans | $15,686 | $6,865 | $5,058 | $14,015 | $37,054 | $99,414 | $119,318 | $130,850 | $82,742 | $107,621 | $112,935 | $127,617 |
| First Mtg, Closed-End Jr Liens | $242,193 | $223,081 | $299,851 | $409,773 | $579,787 | $628,759 | $335,583 | $314,150 | $329,787 | $453,828 | $489,347 | $501,987 |
| Revolving, Open-End Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5 or More Dwelling Units: | $57,298 | $43,929 | $41,975 | $56,401 | $65,152 | $80,038 | $95,415 | $134,405 | $128,207 | $188,276 | $236,302 | $282,135 |
| Construction Loans | $17,865 | $5,650 | $4,298 | $2,077 | $10,286 | $29,141 | $40,607 | $80,123 | $65,333 | $68,301 | $74,047 | $81,673 |
| Permanent Mortgages | $39,433 | $38,279 | $37,677 | $54,324 | $54,866 | $50,897 | $54,808 | $54,282 | $62,874 | $119,975 | $162,255 | $200,462 |
| Nonresidential Property: | $113,416 | $99,135 | $82,027 | $75,226 | $70,228 | $107,377 | $135,388 | $157,174 | $145,296 | $207,146 | $337,497 | $420,953 |
| Construction Loans | $15,497 | $6,579 | $3,961 | $375 | $397 | $10,753 | $27,413 | $42,159 | $23,344 | $22,196 | $29,785 | $80,559 |
| Permanent Mortgages | $97,919 | $92,556 | $78,066 | $74,851 | $69,831 | $96,624 | $107,975 | $115,015 | $121,952 | $184,950 | $307,712 | $340,394 |
| Land | $3,654 | $1,704 | $1,185 | $1,057 | $553 | $17,920 | $22,106 | $21,577 | $42,911 | $38,730 | $64,694 | $60,302 |
| Accrued Interest Receivable | $3,552 | $2,759 | $2,622 | $2,834 | $3,515 | $4,963 | $3,919 | $4,702 | $4,833 | $5,295 | $6,784 | $7,811 |
| Advances for Taxes and Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $366 | $177 | $87 | $106 | $86 |
| Less: Contra-Assets to Mtg Loans: | $14,411 | $8,585 | $10,744 | $15,642 | $27,470 | $54,552 | $64,764 | $104,122 | $8,912 | $7,132 | $9,024 | $5,112 |
| Loans in Process | $6,025 | $2,279 | $3,219 | $8,587 | $21,739 | $47,961 | $56,618 | $94,228 | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $2,404 | $2,260 | $2,818 | $2,340 | -$8 | -$628 | $495 | $1,629 | N/A | N/A | N/A | N/A |
| Valuation Allowances | $5,982 | $4,046 | $4,707 | $4,715 | $5,739 | $7,219 | $7,651 | $8,265 | N/A | N/A | N/A | N/A |

# *Exhibit 5 - Corrected*
# *Sterling Savings Association*
## Asset Composition
## 1990 to 2000

Source: Thrift Financial Reports (Sheshunoff)
(Dollars in Thousands)

| Balance Sheet | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As of Fiscal Year End | | | | | | | | | | | |
| Nonmortgage Loans | $42,633 | $39,103 | $43,946 | $73,085 | $123,247 | $208,905 | $257,047 | $290,749 | $359,032 | $503,790 | $566,905 | $587,711 |
| Commercial Loans: | $22,967 | $17,632 | $16,237 | $28,507 | $52,909 | $106,266 | $169,829 | $199,989 | $241,952 | $317,215 | $351,106 | $435,667 |
| Secured, Other than Mortgage | $22,967 | $17,632 | $15,608 | $26,415 | $51,056 | $103,386 | $160,757 | $194,461 | $233,535 | $303,216 | $327,489 | $411,879 |
| Unsecured | $0 | $0 | $629 | $2,092 | $1,853 | $2,880 | $9,072 | $5,528 | $8,417 | $13,999 | $23,617 | $23,788 |
| Financing Leases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consumer Loans: | $19,723 | $21,138 | $27,323 | $43,903 | $69,188 | $99,936 | $83,520 | $86,563 | $114,169 | $189,262 | $216,463 | $156,348 |
| Closed-End Consumer Loans: | $0 | $0 | $0 | $0 | $0 | $0 | $69,480 | $71,715 | $94,426 | $158,815 | $180,007 | $111,848 |
| Loans on Deposits | $2,619 | $2,323 | $2,660 | $2,709 | $2,709 | $4,467 | $4,386 | $4,343 | $4,924 | $5,258 | $5,135 | $5,317 |
| Home Improvement Loans | $24 | $31 | $46 | $137 | $173 | $44,929 | $22,351 | $22,900 | $23,431 | $25,489 | $27,626 | $32,882 |
| Education Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $157 | $0 | $0 |
| Auto Loans | $1,525 | $1,616 | $1,966 | $3,671 | $6,027 | $7,756 | $7,897 | $7,692 | $25,929 | $76,761 | $99,927 | $19,075 |
| Mobile Home Loans | $264 | $404 | $888 | $1,448 | $1,189 | $861 | $689 | $673 | $409 | $1,502 | $1,241 | $1,366 |
| Other Consumer Loans & Leases | $11,593 | $12,782 | $17,187 | $28,545 | $50,538 | $30,500 | $34,157 | $36,107 | $39,733 | $49,648 | $46,078 | $53,208 |
| Open-End Consumer Loans: | | | | | | | $14,040 | $14,848 | $19,743 | $30,447 | $36,456 | $44,500 |
| Loans Secured by 1-4 Family | $3,698 | $3,982 | $4,576 | $6,078 | $7,139 | $9,215 | $10,689 | $11,933 | $17,018 | $26,671 | $32,029 | $33,124 |
| Unsecured, Credit Card & Other | $0 | $0 | $0 | $1,315 | $1,413 | $2,208 | $3,351 | $2,915 | $2,725 | $3,776 | $4,427 | $11,376 |
| Accrued Interest Receivable | $444 | $293 | $332 | $418 | $717 | $1,431 | $1,859 | $2,220 | $2,911 | $4,689 | $5,641 | $6,521 |
| Less: Contra-Assets to Nonmtg Lns: | $501 | $40 | $54 | $257 | $433 | $1,272 | -$1,839 | -$1,977 | N/A | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | | | | | | | | | $0 | $7,376 | $6,305 | $10,825 |
| Loans in Process | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $39 | $81 | $92 | $261 | $435 | $1,272 | -$1,885 | -$1,997 | N/A | N/A | N/A | N/A |
| Valuation Allowances | $462 | -$41 | -$38 | -$4 | -$2 | $0 | $46 | $20 | N/A | N/A | N/A | N/A |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 | $2,651,771 |

Note: All data are consolidated, except for data prior to 1996.

# *Exhibit 6 - Corrected*

## Calculation of Lost Earnings on Foregone Assets
## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*

*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*

*Table 3b: Calculation of Returns Applicable to Foregone Assets*

*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*

*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*

*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*

*Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89*

*Table 5: But-For Bank*

# *Exhibit 6 - Corrected*
## *Sterling Savings Association*
## Calculation of Lost Earnings on Foregone Assets
### *Table 1: Summary of Lost Earnings Calculation*
($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | Incremental Bank | | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/89 | $730,933 | $730,933 | $0 | | |
| 12/31/89 | 708,213 | 752,177 | 43,964 | 0.34% | 0 |
| 6/30/90 | 688,990 | 778,984 | 89,994 | 0.25% | 110 |
| 6/30/91 | 608,999 | 846,877 | 237,878 | 0.97% | 877 |
| 6/30/92 | 640,887 | 920,687 | 279,800 | 1.79% | 4,254 |
| 6/30/93 | 1,032,538 | 1,483,325 | 450,787 | 1.81% | 5,055 |
| 6/30/94 | 1,367,978 | 1,960,061 | 592,083 | 1.39% | 6,269 |
| 6/30/95 | 1,542,367 | 2,208,457 | 666,090 | 1.30% | 7,668 |
| 6/30/96 | 1,481,893 | 2,121,866 | 639,973 | 1.06% | 7,054 |
| 12/31/96 | 1,534,787 | 2,197,603 | 662,816 | -0.03% | (161) |
| 12/31/97 | 1,870,776 | 2,678,693 | 807,917 | 1.36% | 9,024 |
| 12/31/98 | 2,309,845 | 3,194,129 | 884,284 | 1.03% | 8,306 |
| 12/31/99 | 2,535,753 | 3,506,522 | 970,769 | 1.48% | 13,113 |
| 12/31/00 | 2,651,771 | 3,666,956 | 1,015,185 | 1.46% | 14,210 |
| | | | | | **$75,777** |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From table 2a, column A.
B From table 5, column C.
D From Table 3a, column G.
E Pre-tax, pre-amortization net income from incremental assets.

Exhibit 6
Table 1

# Exhibit 6 - Corrected

# Sterling Savings Association

## Table 2a: Actual Bank and Intervest Financial Data

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill |
| 6/30/89 | 730,933 | | | | | | | | | |
| 12/31/89 | 708,213 | 627 | 324 | 1,620 | 2,571 | 112 | (994) | -0.14% | 0 | 20,983 |
| 6/30/90 | 688,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 |
| 6/30/91 | 608,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 |
| 6/30/92 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 25,819 | 10,649 |
| 6/30/93 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 |
| 6/30/94 | 1,367,978 | 10,084 | 4,789 | 2,262 | 17,135 | 1,386 | 72,764 | 5.32% | 20,000 | 17,915 |
| 6/30/95 | 1,542,367 | 10,440 | 5,236 | 3,487 | 19,163 | 4,078 | 87,919 | 5.70% | 10,200 | 14,945 |
| 6/30/96 | 1,481,893 | 8,163 | 4,779 | 3,332 | 16,274 | 4,632 | 93,097 | 6.28% | 0 | 11,868 |
| 12/31/96 | 1,534,787 | (1,234) | (621) | 1,586 | (269) | 2,487 | 101,602 | 6.62% | 13,000 | 10,147 |
| 12/31/97 | 1,870,776 | 13,165 | 7,911 | 2,265 | 23,341 | 6,077 | 141,025 | 7.54% | 30,000 | 7,882 |
| 12/31/98 | 2,309,845 | 11,185 | 6,420 | 3,980 | 21,585 | 8,088 | 143,669 | 6.22% | 52,743 | 61,180 |
| 12/31/99 | 2,535,753 | 19,096 | 11,163 | 5,692 | 35,951 | 9,579 | 168,889 | 6.66% | 10,000 | 55,488 |
| 12/31/00 | 2,651,771 | 20,444 | 12,008 | 5,490 | 37,942 | 10,004 | 184,828 | 6.97% | 0 | 49,998 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A - D & F & J Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b). Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data is merger adjusted.

G Actual data from Thrift Financial Reports (Sheshunoff). Due to lack of available data, the figure for 12/31/89 is assumed to be core capital at 6/30/90 less net income over the six months ended 6/30/90. Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data are merger adjusted.

I Based on data from Sterling Savings, except for data prior to 6/30/93 which are from annual reports and offering circulars. Figure for capital raised in 6/30/92 is the gross proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

# *Exhibit 6 - Corrected*

## *Sterling Savings Association*

### *Table 2b: Data for Intervest Mortgage Investment Company*

($ in Thousands)

| | A | B | C | D | E = B + C + D | G | H |
|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Equity |
| 6/30/89 | | | | | | | |
| 12/31/89 | | | | | | | |
| 6/30/90 | | | | | | | |
| 6/30/91 | | | | | | | |
| 6/30/92 | | | | | | | |
| 6/30/93 | 992 | 11 | 0 | - | 11 | - | 981 |
| 6/30/94 | 4,315 | 442 | 230 | - | 672 | - | 2,868 |
| 6/30/95 | 3,686 | 802 | 417 | - | 1,219 | - | 1,670 |
| 6/30/96 | 6,123 | 1,265 | 657 | - | 1,922 | - | 2,035 |
| 12/31/96 | | | | | | | |
| 12/31/97 | | | | | | | |
| 12/31/98 | | | | | | | |
| 12/31/99 | | | | | | | |
| 12/31/00 | | | | | | | |

Note: All data are as of or for the fiscal year specified. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. All data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

G Dividends were not listed in the consolidating financial statements.

Exhibit 6
Table 2b

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 3a: Estimates for the But-For and Incremental Banks

($ in Thousands)

| | A (But-For) | B (But-For) | | | C (Incremental) | D (But-For) | E (But-For) | F (But-For) | G (Incremental) |
|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Estimated Capital Ratio | Adjustments to But-For: Income | Capital, Assets | Note | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Pre-Tax, Pre-Amortization ROAA |
| 6/30/89 | | | | | | | | | |
| 12/31/89 | 4.16% | 51 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1989 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase(-$0.115m). Income: Adjustment for wounded bank damages. | 37% | See footnote [d]. | 2.91% | 0 | 0.34% |
| 6/30/90 | 4.15% | 1,141 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 6/30/91 | 4.24% | 1,299 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.97% |
| 6/30/92 | 5.50% | 1,132 | 25,819 | Capital, Assets: Gross proceeds for common stock issuance plus contribution to regulatory capital from conversion of preferred. Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.79% |
| 6/30/93 | 5.75% | 777 | 12,900 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.81% |
| 6/30/94 | 5.75% | . 2 | 21,892 | Capital, Assets: Downstreamed capital from Sterling Financial plus adjustment due to Great American branch purchase. Income: Adjustment for wounded bank damages. | 37% | | 31.34% | 11,800 | 1.39% |
| 6/30/95 | 6.00% | 34 | 10,200 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 12.50% | 3,400 | 1.30% |
| 6/30/96 | 6.30% | 21 | 0 | Income: Adjustment for wounded bank damages. | 37% | | -3.92% | 0 | 1.06% |
| 12/31/96 | 6.75% | 0 | 13,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 3.57% | 0 | -0.03% |
| 12/31/97 | 6.75% | 0 | 30,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 21.89% | 0 | 1.36% |
| 12/31/98 | 6.75% | 0 | 52,743 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 9.45% | 262,236 | 1.03% |
| 12/31/99 | 6.75% | 0 | 10,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 9.78% | 0 | 1.48% |
| 12/31/00 | 7.00% | 0 | 0 | | 37% | | 4.58% | 0 | 1.46% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 taken from projected RAP leverage ratios in Sterling's August 1989 Business Plan. From 6/30/92 on, estimated to start at 5.50%, increasing over time to 7.00%.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3d. Data from Table 3d, column F. Adjustments to but-for capital & assets based on data from Sterling Savings, except for data prior to 6/30/93 which is from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G).

C Estimated to be 37% of incremental earnings based on guidance provided by Dan Bryne, CFO, of Sterling Savings Association.

D Estimated to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per-share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is estimated that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

E From Table 3e, column F.

F From Table 3e, column B.

G From Table 3b, column F.

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 3b: Calculation of Returns Applicable to Foregone Assets

($ in Thousands)

| | A | B | C | D | E = B - C -D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| Period Ended | Actual Assets | Pre-Tax, Pre-Amortization Income | Actual Accretion Income | Adjustments to Earnings due to Non-recurring or Breach-induced Gains/(Losses) | Adjusted Pre-Tax, Pre-Amort. Earnings | Adjusted ROAA |
| 6/30/89 | 730,933 | | | | | |
| 12/31/89 | 708,213 | 2,571 | 178 | (51) | 2,444 | 0.34% |
| 6/30/90 | 688,990 | 786 | 178 | (1,141) | 1,749 | 0.25% |
| 6/30/91 | 608,999 | 5,380 | 354 | (1,299) | 6,325 | 0.97% |
| 6/30/92 | 640,887 | 10,395 | 351 | (1,132) | 11,176 | 1.79% |
| 6/30/93 | 1,032,538 | 14,775 | 437 | (777) | 15,115 | 1.81% |
| 6/30/94 | 1,367,978 | 17,135 | 447 | (2) | 16,691 | 1.39% |
| 6/30/95 | 1,542,367 | 19,163 | 350 | (34) | 18,847 | 1.30% |
| 6/30/96 | 1,481,893 | 16,274 | 282 | (21) | 16,013 | 1.06% |
| 12/31/96 | 1,534,787 | (269) | 111 | 0 | (380) | -0.03% |
| 12/31/97 | 1,870,776 | 23,341 | 159 | 0 | 23,182 | 1.36% |
| 12/31/98 | 2,309,845 | 21,585 | 95 | 0 | 21,490 | 1.03% |
| 12/31/99 | 2,535,753 | 35,951 | 25 | 0 | 35,926 | 1.48% |
| 12/31/00 | 2,651,771 | 37,942 | (24) | 0 | 37,966 | 1.46% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Actual data from Thrift Financial Reports (Sheshunoff) for Sterling Savings and from consolidating financials from 6/30/93-6/30/96 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion Income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital

($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - ( C / B ) | E | F = D + E | G |
| Period Ended | Extraordinary Items net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 6/30/89 | | | | | | | |
| 12/31/89 | $0 | $951 | $324 | $0 | ($51) | ($51) | ($115) |
| 6/30/90 | 0 | (847) | (487) | 0 | (1,141) | (1,141) | |
| 6/30/91 | 298 | 2,312 | 590 | 400 | (1,699) | (1,299) | |
| 6/30/92 | (522) | 8,585 | 3,319 | (851) | (281) | (1,132) | |
| 6/30/93 | (424) | 12,970 | 4,920 | (683) | (94) | (777) | |
| 6/30/94 | 0 | 14,201 | 4,559 | 0 | (2) | (2) | $1,892 |
| 6/30/95 | 0 | 14,457 | 4,819 | 0 | (34) | (34) | |
| 6/30/96 | 0 | 11,020 | 4,122 | 0 | (21) | (21) | |
| 12/31/96 | 0 | (1,855) | (621) | 0 | 0 | 0 | |
| 12/31/97 | 0 | 21,076 | 7,911 | 0 | 0 | 0 | |
| 12/31/98 | 0 | 17,605 | 6,420 | 0 | 0 | 0 | |
| 12/31/99 | 0 | 30,259 | 11,163 | 0 | 0 | 0 | |
| 12/31/00 | 0 | 32,452 | 12,008 | 0 | 0 | 0 | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff), except for data for 1998 which are from hardcopy TFR's.

D Extraordinary Items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.

E From Table 3d, column F.

G Source: Data from Sterling Savings Association.

# *Exhibit 6 - Corrected*

## *Sterling Savings Association*

### *Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*

($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ 4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 6/30/89 | | | | | | |
| 12/31/89 | $0 | $(51) | $0 | $0 | | ($51) |
| 6/30/90 | (6) | (75) | (1,030) | (31) | | (1,141) |
| 6/30/91 | (1,341) | (99) | 0 | (259) | | (1,699) |
| 6/30/92 | (181) | (57) | 0 | (42) | | (281) |
| 6/30/93 | (88) | 0 | 0 | (6) | | (94) |
| 6/30/94 | 0 | 0 | 0 | (2) | | (2) |
| 6/30/95 | 0 | 0 | 0 | (34) | | (34) |
| 6/30/96 | 0 | (21) | 0 | 0 | | (21) |
| 12/31/96 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/97 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/98 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/99 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/00 | 0 | 0 | 0 | 0 | | 0 |
| Total | $(1,615) | $(303) | $(1,030) | $(375) | $0 | $(3,323) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B Expense of $20,774 dated "1995-96" is assumed to have been incurred in FY96. It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date. Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9). Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 3e: Summary of Internal versus External Growth in Total Assets

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| Period Ended | Actual Total Assets | Acquired Assets | Notes | Actual Growth | Internal Growth | But-For Internal Growth Rate |
| 6/30/89 | 730,933 | 0 | | | | |
| 12/31/89 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 6/30/90 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 6/30/91 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 6/30/92 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 6/30/93 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |
| 6/30/94 | 1,367,978 | 11,800 | Acquisition of deposits of three branch facilities in Portland, Oregon (April 1994; $53m in deposits, $3m premium paid). Acquisition of deposits of five branch facilities in Washington State (May 1994; $135m in deposits, $8.8m premium paid). "Sterling used substantially all of the net funds corresponding to the acquired deposit liabilities to repay certain reverse repurchase borrowings and FBLB Seattle advances." Source: 6/31/94 AR, Note 4. | 32.49% | 31.34% | 31.34% |
| 6/30/95 | 1,542,367 | 3,400 | American Liberty acquisition (December 1994; acquired American's loan servicing portfolio of ~ $451.4m in residential loans, $3.4m in purchased mortgage servicing rights). Source: 6/31/95 AR, Note 3. | 12.75% | 12.50% | 12.50% |
| 6/30/96 | 1,481,893 | 0 | | -3.92% | -3.92% | -3.92% |
| 12/31/96 | 1,534,787 | 0 | | 3.57% | 3.57% | 3.57% |
| 12/31/97 | 1,870,776 | 0 | | 21.89% | 21.89% | 21.89% |
| 12/31/98 | 2,309,845 | 262,236 | Keybank (June 1998; $518m in assets acquired including cash, "[w]ith the net cash received from the branch acquisition, Sterling repaid approximately $322 million of certain reverse repurchase borrowings and Federal Home Loan Bank of Seattle advances") and Big Sky (November 1998; $66m in assets) acquisitions. Source: 12/31/98 10K. | 23.47% | 9.45% | 9.45% |
| 12/31/99 | 2,535,753 | 0 | | 9.78% | 9.78% | 9.78% |
| 12/31/00 | 2,651,771 | 0 | | 4.58% | 4.58% | 4.58% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A From table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 8/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. From 6/30/93 on, the growth rate on incremental assets is assumed to be the same as the internal growth of the actual bank as reflected in column E.

# Exhibit 6 - Corrected

## Sterling Savings Association

### *Table 4a:* Goodwill and Intangibles Data for the But-For Bank

($ in Thousands)

| | Supervisory Intangibles Only | | | | | | | Non-Supervisory Intangibles | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A-B-C | E | F | G | H | I | J = E + F + G + I |
| Period Ended | Total Unidentified and Identified Intangibles | Permanent FSLIC Contributed Capital | Identified Intangibles | SGW | Contractual Amortization of Supervisory Goodwill | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Balances | Total Amortization of Non-Supervisory Intangibles | Total Amortization, Adjustments and NOL's |
| 6/30/89 | $35,904 | $13,480 | $6,075 | $16,349 | 1,518 | 0 | 59 | 1,407 | 108 | 1,686 |
| 12/31/89 | 34,134 | 13,480 | 5,670 | 14,984 | 1,578 | 0 | 193 | 1,353 | 54 | 1,825 |
| 6/30/90 | 33,123 | 13,480 | 5,265 | 14,378 | 1,366 | (354) | 0 | 1,299 | 54 | 1,065 |
| 6/30/91 | 28,036 | 13,480 | 4,455 | 10,101 | 2,067 | 0 | 3,020 | 1,190 | 108 | 5,195 |
| 6/30/92 | 24,463 | 13,480 | 3,645 | 7,338 | 1,982 | 1,591 | 0 | 1,082 | 108 | 3,681 |
| 6/30/93 | 22,574 | 13,480 | 2,835 | 6,259 | 1,890 | 0 | 0 | 974 | 108 | 1,998 |
| 6/30/94 | 20,745 | 13,480 | 2,025 | 5,240 | 1,828 | 0 | 0 | 12,573 | 201 | 2,029 |
| 6/30/95 | 19,006 | 13,480 | 1,215 | 4,311 | 1,739 | 0 | 0 | 10,990 | 1,583 | 3,322 |
| 6/30/96 | 17,368 | 13,480 | 405 | 3,482 | 1,639 | 0 | 0 | 9,407 | 1,583 | 3,222 |
| 12/31/96 | 16,604 | 13,480 | 0 | 3,124 | 764 | 0 | 0 | 8,615 | 792 | 1,555 |
| 12/31/97 | 15,949 | 13,480 | | 2,468 | 655 | 0 | 0 | 7,032 | 1,583 | 2,239 |
| 12/31/98 | 15,424 | 13,480 | | 1,944 | 524 | 0 | 0 | 60,549 | 3,483 | 4,007 |
| 12/31/99 | 15,047 | 13,480 | | 1,567 | 378 | 0 | 0 | 55,165 | 5,383 | 5,761 |
| 12/31/00 | 14,809 | 13,480 | | 1,329 | 237 | 0 | 0 | 49,782 | 5,383 | 5,621 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Contractual intangibles from Lewis Federal, Tri-Cities and Central Evergreen supervisory acquisitions. Based on data from Sterling Savings Association.

B Permanent Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

E See note A above. Amortization for 12/31/96 is for the six months ended 12/31/96.

F & G Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

H & I Assumed balances and amortization of intangibles resulting from the following non-supervisory branch acquisitions or mergers: Lewis & Clark merger (FY83), acquisition of Washington and Oregon branches (FY 94) and Key Bank branch acquisition (FY98). The goodwill amortization for each of these deals is modeled on an assumed straight-line basis. All data is based on information from Sterling Annual Reports.

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89

($ in Thousands)

| | Supervisory Intangibles Only | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F = (B+C) - (D+E) | G = A + F |
| Period ended | Permanent FSLIC Contributed Capital | Identified Intangibles | SGW | Qualifying SGW | Other Qualifying Intangibles | Disallowed Identified and Unidentified Deficit Capital | Total Disallowed Intangibles |
| 6/30/89 | $13,480 | $6,075 | $16,349 | | | n/a | n/a |
| 12/31/89 | $13,480 | $5,670 | $14,984 | 10,308 | 0 | 10,345 | 23,825 |
| 6/30/90 | $13,480 | $5,265 | $14,378 | 10,036 | 0 | 9,607 | 23,087 |
| 6/30/91 | $13,480 | $4,455 | $10,101 | 8,903 | 1,584 | 4,069 | 17,549 |
| 6/30/92 | $13,480 | $3,645 | $7,338 | 6,288 | 3,327 | 1,368 | 14,848 |
| 6/30/93 | $13,480 | $2,835 | $6,259 | 7,673 | 2,575 | (1,155) | 12,326 |
| 6/30/94 | $13,480 | $2,025 | $5,240 | 5,044 | 1,916 | 305 | 13,785 |
| 6/30/95 | $13,480 | $1,215 | $4,311 | 0 | 1,220 | 4,306 | 17,786 |
| 6/30/96 | $13,480 | $405 | $3,482 | | 440 | 3,447 | 16,928 |
| 12/31/96 | $13,480 | $0 | $3,124 | | 0 | 3,124 | 16,604 |
| 12/31/97 | $13,480 | | $2,468 | | 0 | 2,468 | 15,949 |
| 12/31/98 | $13,480 | | $1,944 | | 0 | 1,944 | 15,424 |
| 12/31/99 | $13,480 | | $1,567 | | 0 | 1,567 | 15,047 |
| 12/31/00 | $13,480 | | $1,329 | | 0 | 1,329 | 14,809 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 4a, column B.

B From Table 4a, column C.

C From Table 4a, column D.

D & E Actual data from Thrift Financial Reports (Sheshunoff).

# Exhibit 6 - Corrected

## Sterling Savings Association

### Table 5: But-For Bank

($ in Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised |
| 6/30/89 | | | 730,933 | | | | | | | | |
| 12/31/89 | 752,177 | 795,423 | 752,177 | 2,622 | 343 | 1,632 | 647 | 353 | 33,050 | 4.39% | 10,385 |
| 6/30/90 | 778,984 | 807,145 | 778,984 | 2,038 | (24) | 1,420 | 642 | 241 | 33,505 | 4.30% | 0 |
| 6/30/91 | 846,877 | 866,294 | 846,877 | 7,556 | 1,395 | 2,175 | 3,986 | 876 | 36,722 | 4.34% | 0 |
| 6/30/92 | 920,687 | 1,280,944 | 920,687 | 15,781 | 5,312 | 2,090 | 8,379 | 576 | 70,452 | 7.65% | 25,819 |
| 6/30/93 | 1,483,325 | 1,635,877 | 1,483,325 | 20,607 | 7,078 | 1,998 | 11,531 | 928 | 94,063 | 6.34% | 12,900 |
| 6/30/94 | 1,960,061 | 2,235,734 | 1,960,061 | 23,406 | 7,109 | 2,029 | 14,267 | 1,868 | 128,555 | 6.56% | 21,892 |
| 6/30/95 | 2,208,457 | 2,520,581 | 2,208,457 | 26,865 | 8,086 | 3,322 | 15,457 | 4,560 | 151,235 | 6.85% | 10,200 |
| 6/30/96 | 2,121,866 | 2,546,566 | 2,121,866 | 23,348 | 7,397 | 3,222 | 12,730 | 5,114 | 160,434 | 7.56% | 0 |
| 12/31/96 | 2,197,603 | 2,525,993 | 2,197,603 | (430) | (993) | 1,555 | (993) | 2,728 | 170,505 | 7.76% | 13,000 |
| 12/31/97 | 2,678,693 | 3,176,369 | 2,678,693 | 32,365 | 11,250 | 2,239 | 18,877 | 6,559 | 214,405 | 8.00% | 30,000 |
| 12/31/98 | 3,194,129 | 4,125,208 | 3,194,129 | 29,891 | 9,493 | 4,007 | 16,391 | 8,570 | 278,452 | 8.72% | 52,743 |
| 12/31/99 | 3,506,522 | 4,608,316 | 3,506,522 | 49,064 | 16,015 | 5,761 | 27,288 | 10,061 | 311,061 | 8.87% | 10,000 |
| 12/31/00 | 3,666,956 | 4,788,907 | 3,666,956 | 52,152 | 17,266 | 5,621 | 29,265 | 10,486 | 335,223 | 9.14% | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Calculated as column c[t-1] times (1 plus table 3a, column E), plus table 3a, column F.

B Calculated as column J divided by table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractural amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column E + Table 4a, column I.)

H Assumed to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

I Calculated as the sum of the But-For Bank's previous year's core capital, plus the current year's net income, less dividends paid out, plus any additional capital raised, plus the amortization of non-supervisory intangibles. (Calculated as columns I[t-1] + G - H + K + Table 4a, column I.) 12/31/89 But-For core capital is calculated as the sum of the Actual Bank's 12/31/89 core capital, plus disallowed supervisory intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends, plus amortization of non-supervisory intangibles.
(Calculated as Table 2a, column G + Table 4b, column G + column K + ((column G - Table 2a, column B) - (column H - Table 2a, column F)) + Table 4a, column I).

K From Table 3a, column B.

# *Exhibit 7 - Corrected*

## RTC Resolutions in Washington and Oregon

Source: RTC Statistical Abstract August 1989/September 1995
(Dollars in Millions)

| Name | City | State | Charter F-Federal S-State | Conservatorship Date | Resolution Date | Assets at Takeover | Deposits at Takeover | Deposits at Resolution |
|---|---|---|---|---|---|---|---|---|
| The Benjamin Franklin FS&LA | Portland | OR | F | 2/21/90 | 9/7/90 | $4,692 | $3,214 | $2,650 |
| Far West FSB | Portland | OR | F | 5/23/91 | 4/15/94 | $2,160 | $1,273 | $714 |
| Family FSA | Dallas | OR | F | 1/11/90 | 6/22/90 | $170 | $101 | $93 |
| Family S&LA, FA | Seattle | WA | S | 2/8/91 | 7/19/91 | $101 | $60 | $44 |
| Gibraltar Savings, FSB | Seattle | WA | F | 3/31/89 | 6/29/90 | $1,816 | $1,368 | $1,029 |
| Frontier FS&LA | Walla Walla | WA | F | 2/23/90 | 6/22/90 | $162 | $119 | $98 |

Note: No resolutions were reported for Idaho institutions.

## Acquisitions Considered by Sterling

Source: Deposition of Harold Gilkey, June 6-8, 2000, pp. 69-75, 184-185, 239-245, 485-487, 511, 517, 561-594

| Name | Year |
|---|---|
| American Bank | 1992 |
| American National Bank/American Marine | 1990s |
| Ben Franklin National Bank, Pasco | 1987 |
| Benjamin Franklin, Portland, Oregon | early 1990s |
| Eastern Washington Savings | 1988 |
| Enterprise Bank | 1990s |
| Gibraltar Savings (certain branches) | 1990s |
| Family Savings | 1988 |
| Far West Federal (6 branches in Oregon) | 1988 |
| First Federal of Longview | 1988 |
| First Western Savings/First Federal (certain branches) | 1992 |
| Great Northwest Savings Bank | 1991 |
| Guaranty Savings | 1984 |
| Hamilton Financial Services | late 1990s |
| Heritage Federal | 1990s |
| Horizon | 1990s |

| Name | Year |
|---|---|
| InterWest | 1990s |
| Lynnwood Savings | 1980s |
| Mortgage Services America (First Cal) | 1995-1996 |
| Olympia Federal | 1990s |
| Pacific First Federal | early 1990s |
| Palm Springs Savings Bank | 1990s |
| Security Federal Savings Bank | 1990s |
| Security Pacific Bank (certain branches) | mid 1990s |
| Summit Savings | mid 1990s |
| U.S. Bank (certain branches) | 1990s |
| Vancouver Federal | 1990s |
| Washington Mutual (2 branches) | 1992 |
| West One (certain branches) | 1990s |
| Westcoast Bancorporation | late 1990s |
| Willamette Savings | 1995-1996 |

# *Exhibit 8 - Corrected*
# *Sterling Savings Association*
## Summary of Expectation Damages
($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | **$75,777** |
| [2] | **+ Wounded Bank Damages** | **$5,158** |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 |
| | Loss on CJ-4 Loan | $1,615 |
| | Excess Supervision Costs | $303 |
| | Cost of 1989 Units Offering | $1,030 |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $375 |
| [3] | **+ Future Damages** | **$21,264** |
| | **Total Expectation Damages** | **$102,200** |

Notes:
[2] Source: Data from Sterling Savings Association.
[3] Present value of cash flows representing the cost of replacing supervisory goodwill and permanent capital credits in 12/31/2000 dollars as calculated by Professor James.

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>Judge Wolski |

## REVISED UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ
## FEBRUARY 20, 2004

### I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in December 2000. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings Judge Damich. In an opinion dated August 4, 2003, Judge Damich ruled that the capital credits created in the Lewis Federal and Tri-Cities acquisitions were required to be amortized on a basis consistent with the terms of the forbearance clause in the contracts. I have therefore assumed that the capital credit amortizes over 40 years in the case of Lewis Federal and 15 years in the case of Tri-

Cities.[1] My updated determination of Sterling's expectation damages is that they total $83.219 million.

## II. Elements of Expectation Damages

### *A. Lost Earnings on Foregone Assets*

To update my calculations I have relied on additional documents and data provided to me by the attorneys and Sterling. I have created an addendum to Exhibit 2 of my previous report listing the additional materials supplied to me. Exhibit 4 and Exhibit 5 present financial information for Sterling and have been extended through September 2003 – the latest period for which I have financial statements.

Exhibit 6 incorporates the ruling of Judge Damich. Table 6 of Exhibit 6 has been added to present my estimate of the amortization of the capital credits.[2] In addition to adapting my calculation of Sterling's lost earnings to Judge Damich's ruling, I have updated my calculations through the present based on Sterling's recent financial performance. For 2000 through 2003 I have followed the same approach to modeling the but-for bank's performance as I did for 1990 through 1999. My methodology and rationale were described in my previous report so I will not repeat it.

In the process of updating my calculations, I identified two computational corrections that were necessary to make to the model First, my calculation of the but-for bank's core capital needed to be modified in periods when Sterling acquired branches or whole banks and goodwill was generated from the acquisition. Any goodwill generated in these acquisitions should be deducted from Sterling's core capital.[3] The effect of this correction is to reduce damages. Second, in fiscal year 1992 Sterling raised capital by issuing common stock. The amount of capital raised net of the transaction costs of the

---

[1] The FSLIC provided no cash assistance to Sterling in conjunction with the Central Evergreen acquisition, hence the accounting for Central Evergreen is unaffected by Judge Damich's ruling.

[2] Recent changes in the accounting rules related to goodwill no longer require that goodwill be amortized, rather it is subject to impairment tests. For purposes of the contractual goodwill associated with Lewis Federal and Tri-Cities I assume that for regulatory capital purposes it would amortize. The change in the accounting rules did not affect goodwill from the Central Evergreen transaction because it was fully-amortized in 2000 – before the new rules took effect. I have added a table to my calculations that presents an estimate of amounts of non-supervisory goodwill given the new accounting rules. (see Exhibit 6 – Table 7).

[3] See Exhibit 6 – Table 3a, column b.

issuance is the appropriate input into my calculation, not the gross amount (i.e. the amount excluding the transaction costs.)[4] This change also had the effect of reducing damages. Also, as warranted, I have fixed several typographical errors in the exhibits.

### *B. Future Damages*

As in my previous report, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credit. His determination of the value is $1.258 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $83.219 million. Exhibit 8 presents a summary of the amounts. As noted above, the lost earnings from 1990 through 2003 are $77.405 million, the wounded bank damages are $4.556 million, and the future damages are $1.258 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 10, 2003
3. Sterling Savings Association, Key Financial Data, 1983 – 1989
4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2003
5. Sterling Savings Association, Asset Composition, 1990 – 2003
6. Calculation of Lost Earnings on Foregone Assets Through 2003
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

[4] See Exhibit 6 – Table 3a, column b.

I reserve the right to update my report if warranted.

________________________

Paul Horvitz

________________________

Date

# Exhibit 2

## *Sterling Savings v. United States*

## Additional Documents Reviewed by Paul Horvitz in Conjunction with Updated Report – December 10, 2003

Opinion of Judge Damich in *Sterling Savings v. United States*, September 12, 2002

Opinion of Judge Damich in *Sterling Savings v. United States*, July 9, 2003

Opinion of Judge Damich in *Sterling Savings v. United States*, July 11, 2003

Opinion of Judge Damich in *Sterling Savings v. United States*, August 4, 2003

| | | |
|---|---|---|
| 12/31/01 10-K | SG0900001 | SG0900112 |
| 12/31/02 10-K | SG0900113 | SG0900225 |
| SFC-Klamath Merger prospectus | SG0900226 | SG0900371 |
| 09/30/03 10-Q | SG0900372 | SG0900409 |
| 06/30/03 10-Q | SG0900410 | SG0900447 |
| 03/31/03 10-Q | SG0900448 | SG0900487 |
| 09/03 TFR | SG0900488 | SG0900512 |
| 06/03 TFR | SG0900513 | SG0900538 |
| 03/03 TFR | SG0900539 | SG0900565 |
| 12/02 TFR | SG0900564 | SG0900592 |
| 09/02 TFR | SG0900593 | SG0900617 |
| 06/02 TFR | SG0900618 | SG0900643 |
| 03/02 TFR | SG0900644 | SG0900668 |
| 12/01 TFR | SG0900669 | SG0900694 |
| 03/01 TFR | SG0900695 | SG0900715 |
| SEC Form S-4, 08/03/01 | SG0900716 | SG0900818 |
| SEC Form S-4, 12/03/02 | SG0900819 | SG0901074 |

| | | |
|---|---|---|
| Holding Company Examination 12/27/99 | SG0901075 | SG0901089 |
| Holding Company Examination 03/26/03 | SG0901090 | SG0901109 |
| Holding Company Examination 05/13/02 | SG0901110 | SG0901122 |
| Holding Company Examination 06/23/03 | SG0901123 | SG0901136 |
| Compliance Examination 12/14/99 | SG0901137 | SG0901170 |
| Compliance Examination 03/26/01 | SG0901171 | SG0901198 |
| Letter re: OTS Termination of Supervisory Agreement, dated May 24, 2001, with attached Supervisory Agreement, dated May 24, 1999 | SG0901199 | SG0901211 |
| CRA Performance Evaluation 12/14/99 | SG0901212 | SG0901249 |
| CRA Performance Evaluation 03/26/01 | SG0901250 | SG0901287 |
| Information Technology Examination 03/26/01 | SG0901288 | SG0901300 |
| Information Technology Examination 06/14/03 | SG0901301 | SG0901312 |
| Safety and Soundness ROE 12/27/99 | SG0901313 | SG0901360 |
| Safety and Soundness ROE 03/19/01 | SG0901361 | SG0901407 |
| Safety and Soundness ROE 05/13/02 | SG0901408 | SG0901432 |
| Safety and Soundness/Compliance ROE 08/04/03 | SG0901433 | SG0901482 |
| Sterling Capital Trust III $14,000,000 Floating Rate MMCapS (Liquidation Amount $1,000 per Capital Security) Memorandum of Closing: April 10, 2003 | SG0901483 | SG0901493 |
| Sterling Financial Corporation as Issuer Indenture Dated as of April 10, 2003 Wilmington Trust Company as Trustee Floating Rate Junior Subordinated Debt Securities Due 2033 | SG0901494 | SG0901569 |
| Sterling Financial Corporation as Issuer Indenture Dated as of July 16, 2001 The Bank of New York as Trustee Junior Subordinated Debt Securities | SG0901570 | SG0901645 |
| Junior Subordinated Indenture between Sterling Financial Corporation and The Bank of New York as Trustee Dated as of My 15, 2003 | SG0901646 | SG0901722 |
| | | |

| | | |
|---|---|---|
| Sterling Financial Corporation as Issuer<br>Indenture Dated as of May 14, 2003<br>US Bank National Association as Trustee<br>Floating Rate Junior Subordinated Deferrable Interest<br>Debentures Due 2033 | SG0901723 | SG0901785 |
| Sterling Financial Corporation as Issuer<br>Indenture Dated as of June 30, 2003<br>Wilmington Trust Company as Trustee<br>Floating Rate Junior Subordinated Debt Securities Due 2033 | SG0901786 | SG0901862 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 3/31/00 | SG0901935 | SG0901939 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 6/30/00 | SG0901940 | SG0901945 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 9/31/00 | SG0901946 | SG0901951 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 12/31/00 | SG0901952 | SG0901956 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 3/31/01 | SG0901957 | SG0901961 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 6/30/01 | SG0901962 | SG0901966 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 9/31/01 | SG0901967 | SG0901971 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 12/31/01 | SG0901972 | SG0901977 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 3/31/02 | SG0901978 | SG0901983 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 6/30/02 | SG0901984 | SG0901986 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 9/31/02 | SG0901987 | SG0901989 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 12/31/02 | SG0901990 | SG0901992 |
| Sterling Savings Bank, QTD G/L Transaction History Report, 3/31/03 | SG0901993 | SG0901995 |
| Sterling Savings Bank, QTD G/L Transaction History Report, | SG0901996 | SG0901998 |

| | | |
|---|---|---|
| 6/30/03 | | |
| Sterling Savings Bank, QTD G/L Transaction History Report, 9/31/03 | SG0901999 | SG0902001 |
| | | |

**Other Materials**

| | | |
|---|---|---|
| Updated Expert Report of Professor Christopher James – December 10, 2003 | | |
| Thrift Financial Reports (Sheshunoff) – 2001 | SG0902007 | SG0902025 |
| Thrift Financial Reports (Sheshunoff) – 2002 | SG0902026 | SG0902045 |
| | | |

# *Exhibit 3*

# *Sterling Savings Association*

## Key Financial Data

## 1983 to 1989

Source: Thrift Financial Reports (FHLBB), June 1983 - TFR (Income Statement for the 9 months ended 6/83), December 1983-TFR [Bates # SG 0701002 - 0701011]

(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1983 (June) | 1984 (June) | 1985 (June) | 1986 (June) | 1987 (June) | 1988 (June) | 1989 (June) |
| Loans | $360 | $54,857 | $70,495 | $127,255 | $172,294 | $304,126 | $502,453 |
| Mortgage Backed-Securities | $0 | $7,003 | $15,073 | $10,158 | $31,834 | $41,587 | $114,060 |
| Goodwill | $0 | $1,819 | $1,770 | $5,388 | $4,953 | $18,785 | $22,990 |
| Other Assets | $6,956 | $25,234 | $25,111 | $38,201 | $22,766 | $69,455 | $91,430 |
| Total Assets | $7,317 | $88,913 | $112,449 | $181,002 | $231,847 | $433,953 | $730,933 |
| | | | | | | | |
| Deposits | $5,135 | $71,561 | $88,205 | $142,078 | $170,755 | $305,354 | $519,389 |
| Borrowings | $0 | $12,563 | $17,928 | $29,623 | $47,665 | $98,802 | $189,362 |
| Total Liabilities | $5,170 | $84,910 | $107,835 | $173,789 | $221,377 | $410,772 | $720,414 |
| Regulatory Capital [1] | $2,147 | $4,003 | $4,614 | $7,213 | $10,470 | $23,181 | $28,614 |
| | | | | | | | |
| **Capital Ratios** | | | | | | | |
| Regulatory Capital/Average Assets | 29.34% | 8.32% | 4.58% | 4.92% | 5.07% | 6.96% | 4.91% |
| | | | | | | | |
| **Income Statement [2]** | | | | | | | |
| Income Before Taxes & Amortization | -$163 | $330 | $1,027 | $1,360 | $1,878 | $2,431 | $3,813 |
| Goodwill Amortization and Write-offs | $0 | $88 | $127 | $326 | $228 | $472 | $2,272 |
| Provision for Taxes | $0 | $0 | $122 | $205 | $560 | $752 | $560 |
| Accounting Changes and Extra Items | $0 | $26 | $166 | $0 | $0 | $0 | $0 |
| Net Income | -$163 | $216 | $612 | $829 | $1,090 | $1,207 | $981 |
| | | | | | | | |
| **Profitability Ratios** | | | | | | | |
| ROAA before taxes and Amortization | -2.22% | 0.69% | 1.02% | 0.93% | 0.91% | 0.73% | 0.65% |
| Average Assets [3] | $7,317 | $48,115 | $100,681 | $146,726 | $206,425 | $332,900 | $582,443 |

[1] For 1987 and 1988 this figure does not include general valuation allowances.
[2] Income figures for 1983 reflect nine months of data.
[3] "Average" assets for 1983 are actually total assets at 6/30/83.

APP. 132

# *Exhibit 4*

## *Sterling Savings Association*

### Consolidated Key Financial Data

### 1990 to 2003

Source: Thrift Financial Reports (Sheshunoff), except for 1998 and 2003 which are based on hard-copy TFRs
(Dollars in Thousands)

| Balance Sheet | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Sep) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As of Fiscal Year End | | | | | | | | | | | | | | |
| Loans (Mortgage and Non-Mortgage) | $464,021 | $407,991 | $465,920 | $616,749 | $852,066 | $1,092,824 | $904,012 | $949,851 | $1,084,073 | $1,497,641 | $1,805,548 | $1,983,490 | $2,133,730 | $2,424,761 | $2,796,060 |
| Mortgage Backed-Securities (pool) | $115,395 | $141,040 | $98,126 | $328,279 | $331,426 | $253,337 | $393,730 | $372,057 | $456,322 | $232,256 | $227,649 | $210,653 | $617,796 | $582,011 | $812,949 |
| Goodwill | $19,738 | $14,573 | $10,649 | $8,431 | $17,915 | $14,945 | $11,868 | - $10,147 | $7,882 | $61,180 | $55,488 | $49,998 | $44,621 | $43,977 | $48,034 |
| Other Assets | $89,838 | $45,395 | $66,192 | $78,087 | $162,256 | $177,575 | $166,160 | $202,732 | $322,499 | $518,768 | $447,070 | $407,630 | $242,391 | $453,129 | $417,299 |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 | $2,651,771 | $3,038,538 | $3,503,878 | $4,074,342 |
| | | | | | | | | | | | | | | | |
| Deposits | $483,581 | $492,372 | $510,104 | $583,732 | $815,274 | $901,646 | $906,298 | $909,276 | $1,047,863 | $1,563,343 | $1,629,234 | $1,743,296 | $1,869,906 | $2,029,070 | $2,435,063 |
| Borrowings | $189,557 | $98,606 | $86,615 | $376,493 | $446,837 | $513,956 | $465,811 | $503,827 | $656,411 | $518,246 | $673,196 | $645,320 | $859,825 | $1,142,265 | $1,255,314 |
| Total Liabilities | $678,260 | $596,378 | $602,954 | $972,422 | $1,281,539 | $1,439,052 | $1,383,106 | $1,428,473 | $1,722,373 | $2,103,836 | $2,324,571 | $2,420,148 | $2,757,492 | $3,194,553 | $3,726,852 |
| Equity Capital | $10,730 | $12,621 | $38,224 | $59,124 | $82,124 | $99,629 | $92,664 | $106,314 | $148,403 | $206,008 | $211,183 | $231,620 | $281,046 | $309,328 | $347,490 |
| | | | | | | | | | | | | | | | |
| **Capital Ratios** | | | | | | | | | | | | | | | |
| Equity/Average Assets | 1.51% | 1.94% | 6.12% | 7.07% | 6.86% | 6.87% | 6.15% | 7.06% | 8.72% | 9.86% | 8.72% | 8.93% | 9.88% | 9.46% | 9.17% |
| | | | | | | | | | | | | | | | |
| **Income Statement** | | | | | | | | | | | | | | | |
| Income Before Taxes & Amortization | $3,357 | $5,678 | $9,873 | $14,340 | $16,463 | $17,944 | $14,352 | -$269 | $23,341 | $21,585 | $35,951 | $37,942 | $40,679 | $48,766 | $48,540 |
| Goodwill Amortization and Write-offs | $3,253 | $2,770 | $2,332 | $2,218 | $2,262 | $3,487 | $3,332 | $1,586 | $2,265 | $3,980 | $5,692 | $5,490 | $5,377 | $644 | $184 |
| Provision for Taxes | -$163 | $590 | $3,319 | $4,920 | $4,559 | $4,819 | $4,122 | -$621 | $7,911 | $6,420 | $11,163 | $12,008 | $12,368 | $16,260 | $17,088 |
| Accounting Changes and Extra Items | $0 | $298 | -$522 | -$424 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Income | $267 | $2,020 | $4,744 | $7,626 | $9,642 | $9,638 | $6,898 | -$1,234 | $13,165 | $11,185 | $19,096 | $20,444 | $22,934 | $31,862 | $31,268 |
| | | | | | | | | | | | | | | | |
| **Profitability Ratios** | | | | | | | | | | | | | | | |
| ROAA before Taxes and Amortization | 0.47% | 0.87% | 1.58% | 1.71% | 1.37% | 1.24% | 0.95% | -0.02% | 1.37% | 1.03% | 1.48% | 1.46% | 1.43% | 1.49% | 1.28% |
| Average Assets | $709,962 | $648,995 | $624,943 | $836,217 | $1,197,605 | $1,451,172 | $1,507,226 | $1,505,279 | $1,702,782 | $2,090,311 | $2,422,799 | $2,593,762 | $2,845,165 | $3,271,208 | $3,789,110 |

Note : All data are annual except for December 1996 which are for the 6 months ended on that date and September 2003 which are for the nine months ended on that date. All data are consolidated, except for data prior to 1996.

APP. 133

# *Exhibit 5*

## *Sterling Savings Association*

### Asset Composition

### 1990 to 2003

Source: Thrift Financial Reports
(Dollars in Thousands)

| Balance Sheet | As of Fiscal Year End | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Sep) |
| Mortgage Loans | $421,388 | $368,888 | $421,974 | $543,664 | $728,819 | $883,919 | $646,965 | $659,102 | $725,041 | $993,851 | $1,238,641 | $1,395,779 | $1,414,903 | $1,584,729 | $1,733,465 |
| Loans On: | | | | | | | | | | | | | | | |
| 1-4 Dwelling Units: | $267,670 | $229,040 | $304,909 | $423,788 | $616,841 | $728,173 | $454,001 | $445,000 | $412,520 | $561,440 | $602,282 | $629,604 | $595,980 | $694,416 | $770,462 |
| Construction Loans | $15,666 | $6,665 | $5,058 | $14,015 | $37,054 | $99,414 | $119,318 | $130,850 | $82,742 | $107,621 | $112,935 | $127,617 | $176,196 | $233,076 | $231,954 |
| First Mtg, Closed-End Jr Liens | $242,193 | $223,081 | $299,851 | $409,773 | $579,787 | $628,759 | $335,583 | $314,150 | $329,787 | $453,828 | $489,347 | $501,987 | $419,784 | $461,340 | $514,189 |
| Revolving, Open-End Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $24,319 |
| 5 or More Dwelling Units: | $57,298 | $43,929 | $41,975 | $56,401 | $65,152 | $80,038 | $95,415 | $134,405 | $128,207 | $188,276 | $236,302 | $282,135 | $275,964 | $359,184 | $366,196 |
| Construction Loans | $17,865 | $5,650 | $4,298 | $2,077 | $10,286 | $29,141 | $40,607 | $80,123 | $65,333 | $68,301 | $74,047 | $81,673 | $99,232 | $111,852 | $134,378 |
| Permanent Mortgages | $39,433 | $36,279 | $37,677 | $54,324 | $54,866 | $50,897 | $54,808 | $54,282 | $62,874 | $119,975 | $162,255 | $200,462 | $176,732 | $247,332 | $231,818 |
| Nonresidential Property: | $113,416 | $99,135 | $82,027 | $75,226 | $70,228 | $107,377 | $135,388 | $157,174 | $145,296 | $207,146 | $337,497 | $420,953 | $509,029 | $469,336 | $557,537 |
| Construction Loans | $15,497 | $8,579 | $3,961 | $375 | $397 | $10,753 | $27,413 | $42,159 | $23,344 | $22,196 | $29,785 | $80,559 | $86,421 | $91,437 | $139,531 |
| Permanent Mortgages | $97,919 | $92,556 | $78,066 | $74,851 | $69,831 | $96,624 | $107,975 | $115,015 | $121,952 | $184,950 | $307,712 | $340,394 | $422,608 | $377,899 | $418,006 |
| Land | $3,654 | $1,704 | $1,185 | $1,057 | $553 | $17,920 | $22,106 | $21,577 | $42,911 | $38,730 | $64,694 | $60,302 | $30,958 | $44,071 | $42,798 |
| Accrued Interest Receivable | $3,552 | $2,759 | $2,622 | $2,834 | $3,515 | $4,963 | $3,919 | $4,702 | $4,833 | $5,295 | $6,784 | $7,811 | $8,153 | $6,330 | $7,397 |
| Advances for Taxes and Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $368 | $177 | $87 | $106 | $86 | $141 | $81 | $32 |
| Less: Contra-Assets to Mtg Loans: | $14,411 | $8,565 | $10,744 | $15,642 | $27,470 | $54,552 | $64,764 | $104,122 | $6,912 | $7,132 | $9,024 | $5,112 | $5,322 | $8,688 | $10,957 |
| Loans In Process | $6,025 | $2,279 | $3,219 | $8,587 | $21,739 | $47,961 | $56,618 | $94,228 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $2,404 | $2,260 | $2,818 | $2,340 | -$8 | -$628 | $495 | $1,629 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Valuation Allowances | $5,982 | $4,046 | $4,707 | $4,715 | $5,739 | $7,219 | $7,651 | $8,265 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

APP. 134

# *Exhibit 5*

## *Sterling Savings Association*

### Asset Composition
### 1990 to 2003

Source: Thrift Financial Reports
(Dollars in Thousands)

| Balance Sheet | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Sep) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As of Fiscal Year End | | | | | | | | | | | | | | |
| Nonmortgage Loans | $42,633 | $39,103 | $43,946 | $73,085 | $123,247 | $208,905 | $257,047 | $290,749 | $359,032 | $503,790 | $566,905 | $587,711 | $718,827 | $860,032 | $1,082,595 |
| Commercial Loans: | $22,967 | $17,632 | $16,237 | $28,507 | $52,909 | $106,266 | $169,829 | $199,989 | $241,952 | $317,215 | $351,106 | $435,667 | $519,856 | $654,536 | $844,350 |
| Secured, Other than Mortgage | $22,967 | $17,632 | $15,608 | $26,415 | $51,056 | $103,386 | $160,757 | $194,461 | $233,535 | $303,216 | $327,489 | $411,879 | $491,323 | $618,974 | $811,101 |
| Unsecured | $0 | $0 | $629 | $2,092 | $1,853 | $2,880 | $9,072 | $5,528 | $8,417 | $13,999 | $23,617 | $23,788 | $23,254 | $32,788 | $33,249 |
| Financing Leases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,279 | $2,774 | $0 |
| Consumer Loans: | $19,723 | $21,138 | $27,323 | $43,903 | $69,188 | $99,936 | $83,520 | $86,563 | $114,169 | $189,262 | $216,463 | $156,348 | $209,240 | $218,421 | $233,835 |
| Closed-End Consumer Loans: | $0 | $0 | $0 | $0 | $0 | $0 | $69,480 | $71,715 | $94,426 | $158,815 | $180,007 | $111,848 | $158,235 | $141,934 | $166,841 |
| Loans on Deposits | $2,619 | $2,323 | $2,660 | $2,709 | $2,709 | $4,467 | $4,386 | $4,343 | $4,924 | $5,258 | $5,135 | $5,317 | $5,106 | $4,805 | $5,267 |
| Home Improvement Loans | $24 | $31 | $46 | $137 | $173 | $44,929 | $22,351 | $22,900 | $23,431 | $25,489 | $27,828 | $32,882 | $49,504 | $36,039 | $30,589 |
| Education Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $157 | $0 | $0 | $0 | $0 | $0 |
| Auto Loans | $1,525 | $1,616 | $1,966 | $3,671 | $6,027 | $7,756 | $7,897 | $7,692 | $25,929 | $76,761 | $99,927 | $19,075 | $68,095 | $69,565 | $103,114 |
| Mobile Home Loans | $264 | $404 | $888 | $1,448 | $1,189 | $861 | $889 | $673 | $409 | $1,502 | $1,241 | $1,368 | $1,137 | $956 | $1,144 |
| Other Consumer Loans & Leases | $11,593 | $12,782 | $17,187 | $28,545 | $50,538 | $30,500 | $34,157 | $36,107 | $39,733 | $49,648 | $46,078 | $53,208 | $34,393 | $30,569 | $26,727 |
| Open-End Consumer Loans: | | | | | | | $14,040 | $14,848 | $19,743 | $30,447 | $38,456 | $44,500 | $51,005 | $76,487 | $66,994 |
| Loans Secured by 1-4 Family | $3,698 | $3,982 | $4,576 | $6,078 | $7,139 | $9,215 | $10,689 | $11,933 | $17,018 | $26,671 | $32,029 | $33,124 | $35,346 | $57,347 | $45,574 |
| Unsecured, Credit Card & Other | $0 | $0 | $0 | $1,315 | $1,413 | $2,208 | $3,351 | $2,915 | $2,725 | $3,776 | $4,427 | $11,376 | $15,659 | $19,140 | $21,420 |
| Accrued Interest Receivable | $444 | $293 | $332 | $418 | $717 | $1,431 | $1,859 | $2,220 | $2,911 | $4,889 | $5,641 | $6,521 | $3,164 | $4,186 | $4,134 |
| Less: Contra-Assets to Nonmtg Lns: | $501 | $40 | $54 | $257 | $433 | $1,272 | -$1,839 | -$1,977 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | | | | | | | | | $0 | $7,378 | $6,305 | $10,825 | $13,433 | $17,111 | $19,724 |
| Loans in Process | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $39 | $81 | $92 | $261 | $435 | $1,272 | -$1,885 | -$1,997 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Valuation Allowances | $462 | -$41 | -$38 | -$4 | -$2 | $0 | $46 | $20 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,661 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 | $2,651,771 | $3,038,538 | $3,503,878 | $4,074,342 |

Note: All data are consolidated, except for data prior to 1996.

# *Exhibit 6*

## Calculation of Lost Earnings on Foregone Assets Through 2003
## Amortize Capital Credits from Lewis Federal and Tri-Cities
## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*

*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*

*Table 3b: Calculation of Returns Applicable to Foregone Assets*

*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*

*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*

*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*

*Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89*

*Table 5: But-For Bank*

*Table 6: Addendum For Supervisory Intangibles*

*Table 7: Addendum For Non-Supervisory Goodwill*

*Table 8: 2001 – 2003 Capital Downstreamed*

# Exhibit 6

## Sterling Savings Association

## Calculation of Lost Earnings on Foregone Assets

### Table 1: Summary of Lost Earnings Calculation

($ In Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | *Incremental Bank* | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 06/30/1989 | $730,933 | $730,933 | $0 | | |
| 12/31/1989 | 708,213 | 747,390 | 39,177 | 0.33% | 0 |
| 06/30/1990 | 688,990 | 748,524 | 59,534 | 0.25% | 97 |
| 06/30/1991 | 608,999 | 781,622 | 172,623 | 0.94% | 561 |
| 06/30/1992 | 640,887 | 849,745 | 208,858 | 1.78% | 3,066 |
| 06/30/1993 | 1,032,536 | 1,369,031 | 336,493 | 1.78% | 3,727 |
| 06/30/1994 | 1,367,978 | 1,809,942 | 441,964 | 1.39% | 4,679 |
| 06/30/1995 | 1,542,367 | 2,039,574 | 497,207 | 1.29% | 5,714 |
| 06/30/1996 | 1,481,893 | 1,959,605 | 477,712 | 1.06% | 5,258 |
| 12/31/1996 | 1,534,787 | 2,029,550 | 494,763 | -0.03% | (120) |
| 12/31/1997 | 1,870,776 | 2,473,851 | 603,075 | 1.36% | 6,736 |
| 12/31/1998 | 2,309,845 | 2,798,072 | 488,227 | 1.03% | 6,200 |
| 12/31/1999 | 2,535,753 | 3,071,730 | 535,977 | 1.48% | 7,240 |
| 12/31/2000 | 2,651,771 | 3,212,270 | 560,499 | 1.46% | 7,845 |
| 12/31/2001 | 3,036,538 | 3,671,443 | 632,905 | 1.43% | 8,019 |
| 12/31/2002 | 3,503,878 | 4,014,388 | 510,510 | 1.49% | 9,440 |
| 09/30/2003 | 4,074,342 | 4,636,643 | 562,301 | 1.28% | 6,542 |
| 12/31/2003 | | | | | 2,402 |
| | | | | | $77,405 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From table 2a, column A.

B From table 5, column C.

D From Table 3a, column G. For periods ending 6/30/90, 12/31/96, and 9/30/03 ROAA reflects the return for the six or nine month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets. Figure for 12/31/03 is calculated as foregone assets at 9/30/03 times the pro-rated return for the nine month period ended 9/30/03.

# Exhibit 6

## Sterling Savings Association

### Table 2a: Actual Bank and Intervest Financial Data

($ In Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill |
| 06/30/1989 | 730,933 | | | | | | | | | |
| 12/31/1989 | 708,213 | 627 | 324 | 1,620 | 2,571 | 112 | (994) | -0.14% | 0 | 20,983 |
| 06/30/1990 | 688,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 |
| 06/30/1991 | 608,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 |
| 06/30/1992 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 |
| 06/30/1993 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 |
| 06/30/1994 | 1,367,978 | 10,084 | 4,789 | 2,262 | 17,135 | 1,386 | 72,764 | 5.32% | 20,000 | 17,915 |
| 06/30/1995 | 1,542,367 | 10,440 | 5,236 | 3,487 | 19,163 | 4,078 | 87,919 | 5.70% | 10,200 | 14,945 |
| 06/30/1996 | 1,481,893 | 8,163 | 4,779 | 3,332 | 16,274 | 4,632 | 93,097 | 6.28% | 0 | 11,868 |
| 12/31/1996 | 1,534,787 | (1,234) | (621) | 1,586 | (269) | 2,487 | 101,602 | 6.62% | 13,100 | 10,147 |
| 12/31/1997 | 1,870,776 | 13,165 | 7,911 | 2,265 | 23,341 | 6,077 | 141,025 | 7.54% | 30,000 | 7,882 |
| 12/31/1998 | 2,309,845 | 11,185 | 6,420 | 3,980 | 21,585 | 8,088 | 143,669 | 6.22% | 52,743 | 61,180 |
| 12/31/1999 | 2,535,753 | 19,096 | 11,163 | 5,692 | 35,951 | 9,579 | 168,889 | 6.66% | 10,000 | 55,488 |
| 12/31/2000 | 2,651,771 | 20,444 | 12,008 | 5,490 | 37,942 | 10,004 | 184,828 | 6.97% | 0 | 49,998 |
| 12/31/2001 | 3,038,538 | 22,934 | 12,368 | 5,377 | 40,679 | 10,513 | 240,669 | 7.92% | 38,044 | 44,621 |
| 12/31/2002 | 3,503,878 | 31,862 | 16,260 | 644 | 48,766 | 11,616 | 261,585 | 7.47% | 0 | 43,977 |
| 09/30/2003 | 4,074,342 | 31,268 | 17,088 | 184 | 48,540 | 8,712 | 307,594 | 7.55% | 26,322 | 48,034 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A - D & F & J: Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b). Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data is merger adjusted. Data for the bank for 2003 are from hard-copy TFRs.

G: Actual data from Thrift Financial Reports (Sheshunoff). Due to lack of available data, the figure for 12/31/89 is assumed to be core capital at 6/30/90 less net income over the six months ended 6/30/90. Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data are merger adjusted. Data for the bank for 2003 are from hard-copy TFRs.

I: Based on data from Sterling Savings, except for data prior to 6/30/93 which are from annual reports and offering circulars, and data after 12/31/99 which are from table 8, column D. Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

# Exhibit 6

## Sterling Savings Association

### Table 2b: Data for Intervest Mortgage Investment Company

($ In Thousands)

| | A | B | C | D | E = B + C + D | G | H |
|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Equity |
| 06/30/1989 | | | | | | | |
| 12/31/1989 | | | | | | | |
| 06/30/1990 | | | | | | | |
| 06/30/1991 | | | | | | | |
| 06/30/1992 | | | | | | | |
| 06/30/1993 | 992 | 11 | 0 | - | 11 | - | 981 |
| 06/30/1994 | 4,315 | 442 | 230 | - | 672 | - | 2,868 |
| 06/30/1995 | 3,686 | 802 | 417 | - | 1,219 | - | 1,670 |
| 06/30/1996 | 6,123 | 1,265 | 657 | - | 1,922 | - | 2,035 |
| 12/31/1996 | | | | | | | |
| 12/31/1997 | | | | | | | |
| 12/31/1998 | | | | | | | |
| 12/31/1999 | | | | | | | |
| 12/31/2000 | | | | | | | |
| 12/31/2001 | | | | | | | |
| 12/31/2002 | | | | | | | |
| 09/30/2003 | | | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 9/30/03 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. All data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

G Dividends were not listed in the consolidating financial statements.

# Exhibit 6

## Sterling Savings Association

### Table 3a: Estimates for the But-For and Incremental Banks

($ In Thousands)

| | A (But-For) | B (But-For) | | | C (Incremental) | D (But-For) | E (But-For) | F (But-For) | G (Incremental) |
|---|---|---|---|---|---|---|---|---|---|
| | | Adjustments to But-For: | | | | | | | |
| Period Ended | Estimated Capital Ratio | Income | Capital, Assets | Note | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Adjusted ROAA |
| 06/30/1989 | | | | | | See footnote [d]. | | | |
| 12/31/1989 | 4.16% | 0 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1988 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase(-$0.116m). Income: Adjustment for wounded bank damages. | 37% | | 2.91% | 0 | 0.33% |
| 06/30/1990 | 4.15% | 1,116 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 06/30/1991 | 4.24% | 1,091 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.94% |
| 06/30/1992 | 5.50% | 1,057 | 23,052 | Capital, Assets: Net proceeds for common stock issuance ($21 million) plus contribution to regulatory capital from conversion of preferred ($2.1 million). Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.78% |
| 06/30/1993 | 5.75% | 591 | 12,900 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.78% |
| 06/30/1994 | 5.75% | 0 | 10,092 | Capital, Assets: Downstreamed capital from Sterling Financial ($20 million) plus adjustment due to Great American branch purchase ($1.9 million) less acquisition premium paid by Sterling for branches in Oregon ($3 million) and acquisition premium paid by Sterling for branches in Washington State ($8.8 million). Income: Adjustment for wounded bank damages. Source for acquisition premiums: 1994 AR, p. 35 | 37% | | 31.34% | 11,800 | 1.38% |
| 06/30/1995 | 6.00% | 0 | 10,200 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 12.50% | 3,400 | 1.29% |
| 06/30/1996 | 6.30% | 0 | 0 | Income: Adjustment for wounded bank damages. | 37% | | -3.92% | 0 | 1.06% |
| 12/31/1996 | 6.75% | 0 | 13,100 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 3.57% | 0 | -0.03% |
| 12/31/1997 | 6.75% | 0 | 30,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 21.89% | 0 | 1.38% |
| 12/31/1998 | 6.75% | 0 | -4,819 | Capital, Assets: Downstreamed capital from Sterling Financial ($52.7 million) less intangibles generated in the Key Bank acquisition ($57.4 million). Source for intangibles: 1998 AR, p. F-8 | 37% | | 9.45% | 262,236 | 1.03% |
| 12/31/1999 | 6.75% | 0 | 10,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 9.78% | 0 | 1.48% |
| 12/31/2000 | 7.00% | 0 | 0 | | 37% | | 4.58% | 0 | 1.46% |
| 12/31/2001 | 8.00% | 0 | 38,044 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 12.82% | 44,211 | 1.43% |
| 12/31/2002 | 8.00% | 0 | 0 | | 37% | | 15.31% | 0 | 1.49% |
| 09/30/2003 | 8.00% | 0 | 25,322 | Capital, Assets: Downstreamed capital from Sterling Financial ($26.3 million) less goodwill generated in the Empire Federal Bancorp acquisition ($1 million). Source for goodwill: Sterling Savings 3/31/03 10-Q, p.13. | 37% | | 10.14% | 215,000 | 1.28% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 taken from projected RAP leverage ratios in Sterling's August 1989 Business Plan. From 6/30/92 on, estimated to start at 5.50%, increasing over time to 8.00%.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3c, column F. Adjustments to but-for capital & assets based on data from Sterling Savings, except for data prior to 6/30/93 which is from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G).

C Estimated to be 37% of incremental earnings based on guidance provided by Dan Bryne, CFO, of Sterling Savings Association.

D Estimated to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is estimated that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

E From Table 3e, column F.

F From Table 3e, column B.

G From Table 3b, column F.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 3b: Calculation of Returns Applicable to Foregone Assets*

($ in Thousands)

| | A | B | C | D | E = B - C - D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| Period Ended | Actual Assets | Pre-Tax, Pre-Amortization Income | Actual Accretion Income | Adjustments to Earnings due to Non-recurring or Breach-Induced Gains/(Losses) | Adjusted Pre-Tax, Pre-Amort. Earnings | Adjusted ROAA |
| 06/30/1989 | 730,933 | | | | | |
| 12/31/1989 | 708,213 | 2,571 | 178 | 0 | 2,393 | 0.33% |
| 06/30/1990 | 688,990 | 786 | 178 | (1,116) | 1,724 | 0.25% |
| 06/30/1991 | 608,999 | 5,380 | 354 | (1,091) | 6,117 | 0.94% |
| 06/30/1992 | 640,887 | 10,395 | 351 | (1,057) | 11,101 | 1.78% |
| 06/30/1993 | 1,032,538 | 14,775 | 437 | (591) | 14,930 | 1.78% |
| 06/30/1994 | 1,367,978 | 17,135 | 447 | 0 | 16,688 | 1.39% |
| 06/30/1995 | 1,542,367 | 19,163 | 350 | 0 | 18,813 | 1.29% |
| 06/30/1996 | 1,481,893 | 16,274 | 282 | 0 | 15,992 | 1.06% |
| 12/31/1996 | 1,534,787 | (269) | 111 | 0 | (380) | -0.03% |
| 12/31/1997 | 1,870,776 | 23,341 | 159 | 0 | 23,182 | 1.36% |
| 12/31/1998 | 2,309,845 | 21,585 | 95 | 0 | 21,490 | 1.03% |
| 12/31/1999 | 2,535,753 | 35,951 | 25 | 0 | 35,926 | 1.48% |
| 12/31/2000 | 2,651,771 | 37,942 | (24) | 0 | 37,966 | 1.46% |
| 12/31/2001 | 3,038,538 | 40,679 | (24) | 0 | 40,703 | 1.43% |
| 12/31/2002 | 3,503,878 | 48,766 | (24) | 0 | 48,790 | 1.49% |
| 09/30/2003 | 4,074,342 | 48,540 | (18) | 0 | 48,558 | 1.28% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Actual data from Thrift Financial Reports (Sheshunoff) and hard-copy TFR's for Sterling Savings and from consolidating financials from 6/30/93-6/30/96 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. For 2001 – 2003, the accretion income in each year is assumed to be equal to the accretion income in 2000. Accretion income for 9/30/03 is pro-rated.
Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# Exhibit 6

## Sterling Savings Association

### Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital

($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - (C / B) | E | F = D + E | G |
| Period Ended | Extraordinary Items net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 06/30/1989 | | | | | | | |
| 12/31/1989 | $0 | $951 | $324 | $0 | $0 | $0 | ($115) |
| 06/30/1990 | 0 | (847) | (487) | 0 | (1,116) | (1,116) | |
| 06/30/1991 | 298 | 2,312 | 590 | 400 | (1,491) | (1,091) | |
| 06/30/1992 | (522) | 8,585 | 3,319 | (851) | (206) | (1,057) | |
| 06/30/1993 | (424) | 12,970 | 4,920 | (683) | 92 | (591) | |
| 06/30/1994 | 0 | 14,201 | 4,559 | 0 | 0 | 0 | $1,892 |
| 06/30/1995 | 0 | 14,457 | 4,819 | 0 | 0 | 0 | |
| 06/30/1996 | 0 | 11,020 | 4,122 | 0 | 0 | 0 | |
| 12/31/1996 | 0 | (1,855) | (621) | 0 | 0 | 0 | |
| 12/31/1997 | 0 | 21,076 | 7,911 | 0 | 0 | 0 | |
| 12/31/1998 | 0 | 17,605 | 6,420 | 0 | 0 | 0 | |
| 12/31/1999 | 0 | 30,259 | 11,163 | 0 | 0 | 0 | |
| 12/31/2000 | 0 | 32,452 | 12,008 | 0 | 0 | 0 | |
| 12/31/2001 | 0 | 35,302 | 12,368 | 0 | 0 | 0 | |
| 12/31/2002 | 0 | 48,122 | 16,260 | 0 | 0 | 0 | |
| 09/30/2003 | 0 | 48,356 | 17,088 | 0 | 0 | 0 | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff), except for data for 1998 which are from hardcopy TFR's, and data for 2003 which are from hard-copy TFRs.

D Extraordinary items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.

E From Table 3d, column F.

G Source: Data from Sterling Savings Association.

# Exhibit 6

## Sterling Savings Association

### Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings

($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ-4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 06/30/1989 | | | | | | |
| 12/31/1989 | $0 | $0 | $0 | $0 | | $0 |
| 06/30/1990 | (6) | (75) | (1,004) | (31) | | (1,116) |
| 06/30/1991 | (1,189) | (66) | 0 | (236) | | (1,491) |
| 06/30/1992 | (138) | (32) | 0 | (37) | | (206) |
| 06/30/1993 | 92 | 0 | 0 | 0 | | 92 |
| 06/30/1994 | 0 | 0 | 0 | 0 | | 0 |
| 06/30/1995 | 0 | 0 | 0 | 0 | | 0 |
| 06/30/1996 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/1996 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/1997 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/1998 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/1999 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/2000 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/2001 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/2002 | 0 | 0 | 0 | 0 | | 0 |
| 09/30/2003 | 0 | 0 | 0 | 0 | | 0 |
| Total | $(1,241) | $(172) | $(1,004) | $(304) | $0 | $(2,721) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date. Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9). Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

APP. 142

Revised Updated February 20, 2004

Exhibit 6
Table 3d

# Exhibit 6

## Sterling Savings Association

### Table 3e: Summary of Internal versus External Growth in Total Assets

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| Period Ended | Actual Total Assets | Acquired Assets | Notes | Actual Growth | Internal Growth | But-For Internal Growth Rate |
| 06/30/1989 | 730,933 | 0 | | | | |
| 12/31/1989 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 06/30/1990 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 06/30/1991 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 06/30/1992 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 06/30/1993 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |
| 06/30/1994 | 1,367,978 | 11,800 | Acquisition of deposits of three branch facilities in Portland, Oregon (April 1994; $53m in deposits, $3m premium paid). Acquisition of deposits of five branch facilities in Washington State (May 1994; $135m in deposits, $8.8m premium paid). "Sterling used substantially all of the net funds corresponding to the acquired deposit liabilities to repay certain reverse repurchase borrowings and FBLB Seattle advances." Source: 6/31/94 AR, Note 4. | 32.49% | 31.34% | 31.34% |
| 06/30/1995 | 1,542,367 | 3,400 | American Liberty acquisition (December 1994; acquired American's loan servicing portfolio of ~ $451.4m in residential loans, $3.4m in purchased mortgage servicing rights). Source: 6/31/95 AR, Note 3. | 12.75% | 12.50% | 12.50% |
| 06/30/1996 | 1,481,893 | 0 | | -3.92% | -3.92% | -3.92% |
| 12/31/1996 | 1,534,787 | 0 | | 3.57% | 3.57% | 3.57% |
| 12/31/1997 | 1,870,776 | 0 | | 21.89% | 21.89% | 21.89% |
| 12/31/1998 | 2,309,645 | 262,236 | Keybank (June 1998; $518m in assets acquired including cash, "[w]ith the net cash received from the branch acquisition, Sterling repaid approximately $322 million of certain reverse repurchase borrowings and Federal Home Loan Bank of Seattle advances") and Big Sky (November 1998; $66m in assets) acquisitions. Source: 12/31/98 10K. | 23.47% | 9.45% | 9.45% |
| 12/31/1999 | 2,535,753 | 0 | | 9.78% | 9.78% | 9.78% |
| 12/31/2000 | 2,651,771 | 0 | | 4.58% | 4.58% | 4.58% |
| 12/31/2001 | 3,038,538 | 44,211 | Acquisition of Source Capital. Source: 12/31/01 10-K, p.F-50. | 14.59% | 12.92% | 12.92% |
| 12/31/2002 | 3,503,878 | 0 | | 15.31% | 15.31% | 15.31% |
| 09/30/2003 | 4,074,342 | 215,000 | Acquisition of Empire Federal Bancorp. Sum of $143.6 million in cash, $67.3 million of loans, $1 million of goodwill, and $3.1 million of deposit intangibles. Source: Sterling Savings 3/31/03 10-Q, p.13. | 16.28% | 10.14% | 10.14% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03 which are for the nine months ended as of that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A From table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 8/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. From 6/30/93 on, the growth rate on incremental assets is assumed to be the same as the internal growth of the actual bank as reflected in column E.

Revised Updated February 20, 2004

Exhibit 6
Table 3e

APP. 143

# Exhibit 6

## Sterling Savings Association

### *Table 4a:* Goodwill and Intangibles Data for the But-For Bank

($ In Thousands)

| | Supervisory Intangibles Only | | | | | | | Non-Supervisory Intangibles | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A = B + C + D | B | C | D | E | F | G | H | I | J = E + F + G + I |
| Period Ended | Total Unidentified and Identified Intangibles | Capital Credit | Identified Intangibles | SGW | Contractual Amortization of Supervisory Goodwill and Capital Credit | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Balances | Total Amortization of Non-Supervisory Intangibles | Total Amortization, Adjustments and NOL's |
| 06/30/1989 | $34,766 | $12,342 | $6,075 | $16,349 | 2,344 | 0 | 59 | 1,407 | 108 | 2,512 |
| 12/31/1989 | 32,583 | 11,929 | 5,670 | 14,984 | 1,990 | 0 | 193 | 1,353 | 54 | 2,238 |
| 06/30/1990 | 31,159 | 11,516 | 5,265 | 14,378 | 1,778 | (354) | 0 | 1,299 | 54 | 1,478 |
| 06/30/1991 | 25,246 | 10,691 | 4,455 | 10,101 | 2,893 | 0 | 3,020 | 1,180 | 108 | 6,021 |
| 06/30/1992 | 20,848 | 9,865 | 3,645 | 7,338 | 2,807 | 1,591 | 0 | 1,082 | 108 | 4,506 |
| 06/30/1993 | 18,133 | 9,039 | 2,835 | 6,259 | 2,716 | 0 | 0 | 974 | 108 | 2,824 |
| 06/30/1994 | 15,478 | 8,213 | 2,025 | 5,240 | 2,654 | 0 | 0 | 12,450 | 324 | 2,978 |
| 06/30/1995 | 12,914 | 7,388 | 1,215 | 4,311 | 2,565 | 0 | 0 | 10,867 | 1,583 | 4,148 |
| 06/30/1996 | 10,449 | 6,562 | 405 | 3,482 | 2,465 | 0 | 0 | 9,284 | 1,583 | 4,040 |
| 12/31/1996 | 9,273 | 6,149 | 0 | 3,124 | 1,177 | 0 | 0 | 8,492 | 792 | 1,968 |
| 12/31/1997 | 7,792 | 5,323 | | 2,468 | 1,481 | 0 | 0 | 6,909 | 1,583 | 3,064 |
| 12/31/1998 | 6,442 | 4,497 | | 1,944 | 1,350 | 0 | 0 | 60,426 | 3,483 | 4,833 |
| 12/31/1999 | 5,238 | 3,672 | | 1,567 | 1,204 | 0 | 0 | 55,042 | 5,383 | 6,587 |
| 12/31/2000 | 4,175 | 2,846 | | 1,330 | 1,063 | 0 | 0 | 49,659 | 5,383 | 6,446 |
| 12/31/2001 | 3,227 | 2,020 | | 1,207 | 948 | 0 | 0 | 44,282 | 5,377 | 6,325 |
| 12/31/2002 | 2,279 | 1,194 | | 1,085 | 948 | 0 | 0 | 43,638 | 644 | 1,592 |
| 09/30/2003 | 1,996 | 966 | | 1,031 | 283 | 0 | 0 | 44,454 | 184 | 467 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Contractual intangibles from Lewis Federal, Tri-Cities and Central Evergreen supervisory acquisitions. Based on data from Sterling Savings Association.

B From table 6, column E. Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

D From table 6, column I. Supervisory goodwill from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

E See note A above. Amortization of the supervisory goodwill is based on data from Sterling Savings Association. Amortization of the capital credit is from table 6, columns B and D. Amortization for 12/31/96 is for the six months ended 12/31/96. Amortization for 9/30/03 is for the nine months ended 9/30/03.

F & G Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

H & I Assumed balances and amortization of intangibles resulting from the following non-supervisory branch acquisitions or mergers: Lewis & Clark merger (FY83), acquisition of Washington and Oregon branches (FY94), and Key Bank branch acquisition (FY98). The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000. In 2003, $1 million of goodwill resulted from the Empire Federal Bancorp acquisition. All data prior to 2001 is based on information from Sterling Annual Reports. For 2001 through 2003 amortization is based on the reported amounts in the TFR's for the actual bank. From table 7, columns D and H.

APP. 145

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89*

($ In Thousands)

| | Supervisory Intangibles Only | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F = (B+C) - (D+E) | G = A + F |
| Period ended | Capital Credit | Identified Intangibles | SGW | Qualifying SGW | Other Qualifying Intangibles | Disallowed Identified and Unidentified Intangible Capital | Total Disallowed Intangibles |
| 06/30/1989 | $12,342 | $6,075 | $16,349 | | | n/a | n/a |
| 12/31/1989 | $11,929 | $5,670 | $14,084 | 10,308 | 0 | 10,345 | 22,275 |
| 06/30/1990 | $11,516 | $5,265 | $14,378 | 10,036 | 0 | 9,607 | 21,123 |
| 06/30/1991 | $10,691 | $4,455 | $10,101 | 8,903 | 1,584 | 4,069 | 14,759 |
| 06/30/1992 | $9,865 | $3,645 | $7,338 | 6,288 | 3,327 | 1,368 | 11,233 |
| 06/30/1993 | $9,039 | $2,835 | $6,259 | 7,673 | 2,575 | (1,155) | 7,885 |
| 06/30/1994 | $8,213 | $2,025 | $5,240 | 5,044 | 1,916 | 305 | 8,518 |
| 06/30/1995 | $7,388 | $1,215 | $4,311 | 0 | 1,220 | 4,306 | 11,694 |
| 06/30/1996 | $6,562 | $405 | $3,482 | | 440 | 3,447 | 10,009 |
| 12/31/1996 | $6,149 | $0 | $3,124 | | 0 | 3,124 | 9,273 |
| 12/31/1997 | $5,323 | | $2,468 | | 0 | 2,468 | 7,792 |
| 12/31/1998 | $4,497 | | $1,944 | | 0 | 1,944 | 6,442 |
| 12/31/1999 | $3,672 | | $1,567 | | 0 | 1,567 | 5,238 |
| 12/31/2000 | $2,846 | | $1,330 | | 0 | 1,330 | 4,175 |
| 12/31/2001 | $2,020 | | $1,207 | | 0 | 1,207 | 3,227 |
| 12/31/2002 | $1,194 | | $1,085 | | 0 | 1,085 | 2,279 |
| 09/30/2003 | $966 | | $1,031 | | 0 | 1,031 | 1,996 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which is as of the nine months ended on that date.
Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 4a, column B.
B From Table 4a, column C.
C From Table 4a, column D.
D & E Actual data from Thrift Financial Reports (Sheshunoff).

Revised Updated February 20, 2004

# Exhibit 6

## Sterling Savings Association

### Table 5: But-For Bank

($ In Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised / Adjustments to Core Capital |
| 06/30/1989 | | | 730,933 | | | | | | | | |
| 12/31/1989 | 752,177 | 747,390 | 747,390 | 2,571 | 324 | 2,045 | 202 | 353 | 31,054 | 4.16% | 10,385 |
| 06/30/1990 | 774,026 | 748,524 | 748,524 | 1,998 | (38) | 1,833 | 204 | 241 | 31,071 | 4.15% | 0 |
| 06/30/1991 | 813,762 | 781,622 | 781,622 | 7,032 | 1,201 | 3,001 | 2,830 | 876 | 33,133 | 4.24% | 0 |
| 06/30/1992 | 849,745 | 1,135,904 | 849,745 | 14,518 | 4,845 | 2,916 | 6,758 | 576 | 62,475 | 7.35% | 23,052 |
| 06/30/1993 | 1,369,031 | 1,468,195 | 1,369,031 | 19,093 | 6,518 | 2,824 | 9,752 | 928 | 84,306 | 6.16% | 12,900 |
| 06/30/1994 | 1,809,942 | 1,829,028 | 1,809,942 | 21,814 | 6,520 | 2,978 | 12,315 | 1,868 | 105,169 | 5.81% | 10,092 |
| 06/30/1995 | 2,039,574 | 2,096,184 | 2,039,574 | 24,877 | 7,350 | 4,148 | 13,379 | 4,560 | 125,771 | 6.17% | 10,200 |
| 06/30/1996 | 1,959,605 | 2,111,110 | 1,959,605 | 21,532 | 6,725 | 4,048 | 10,760 | 5,114 | 133,000 | 6.79% | 0 |
| 12/31/1996 | 2,029,550 | 2,114,141 | 2,029,550 | (389) | (899) | 1,968 | (1,459) | 2,728 | 142,705 | 7.03% | 13,100 |
| 12/31/1997 | 2,473,851 | 2,730,929 | 2,473,851 | 30,077 | 10,403 | 3,064 | 16,609 | 6,559 | 184,338 | 7.45% | 30,000 |
| 12/31/1998 | 2,969,925 | 2,798,072 | 2,798,072 | 27,785 | 8,714 | 4,833 | 14,238 | 8,570 | 188,870 | 6.75% | (4,619) |
| 12/31/1999 | 3,071,730 | 3,214,132 | 3,071,730 | 43,191 | 13,842 | 6,587 | 22,762 | 10,061 | 216,954 | 7.06% | 10,000 |
| 12/31/2000 | 3,212,270 | 3,375,441 | 3,212,270 | 45,787 | 14,911 | 6,446 | 24,430 | 10,488 | 236,281 | 7.36% | 0 |
| 12/31/2001 | 3,671,443 | 3,696,804 | 3,671,443 | 48,698 | 15,335 | 6,325 | 27,038 | 10,995 | 295,744 | 8.06% | 38,044 |
| 12/31/2002 | 4,233,709 | 4,014,388 | 4,014,388 | 58,206 | 19,753 | 1,592 | 36,861 | 12,098 | 321,151 | 8.00% | 0 |
| 09/30/2003 | 4,636,643 | 4,659,628 | 4,636,643 | 55,082 | 19,509 | 467 | 35,107 | 9,074 | 372,690 | 8.04% | 25,322 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which is as of the nine months ended on that date. Through 1998, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Calculated as column c[t-1] times (1 plus table 3a, column E), plus table 3a, column F.

B Calculated as column I divided by table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractual amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column E + Table 4a, column I.)

H Assumed to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

I Calculated as the sum of the But-For Bank's previous year's core capital, plus the current year's net income, less dividends paid out, plus any additional capital raised, plus the amortization of non-supervisory intangibles. (Calculated as columns I[t-1] + G - H + K + Table 4a, column I.) 12/31/89 But-For core capital is calculated as the sum of the Actual Bank's 12/31/89 core capital, plus disallowed supervisory intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends, plus amortization of non-supervisory intangibles.
(Calculated as Table 2a, column G + Table 4b, column G + column K + ((column G - Table 2a, column B) - (column H - Table 2a, column F)) + Table 4a, column I).

K From Table 3a, column B.

# Exhibit 6

## Sterling Savings Association

### Table 6: Addendum For Supervisory Intangibles

($ in Thousands)

| | Capital Credit | | | | | Supervisory Goodwill | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I = F + G + H |
| | Lewis Federal | | Tri-Cities | | Total | Lewis Federal | Tri-Cities | Central Evergreen | Total |
| Period Ended | Balance | Amortization | Balance | Amortization | Balance | Balance | Balance | Balance | Balance |
| 11/05/1985 | $1,750 | | | | $1,750 | $2,044 | | | $2,044 |
| 12/31/1985 | 1,743 | $7 | | | $1,743 | 2,036 | | | 2,036 |
| 06/30/1986 | 1,721 | 22 | | | $1,721 | 1,814 | | | 1,814 |
| 06/30/1987 | 1,677 | 44 | | | $1,677 | 1,768 | | | 1,768 |
| 04/08/1988 | | | $11,730 | | | | | | |
| 06/30/1988 | 1,633 | 44 | 11,535 | $196 | $13,168 | 1,743 | $2,176 | | 3,919 |
| 06/30/1989 | 1,590 | 44 | 10,753 | 782 | $12,342 | 1,696 | 2,028 | $12,625 | 16,349 |
| 12/31/1989 | 1,568 | 22 | 10,362 | 391 | $11,929 | 1,673 | 1,955 | 11,357 | 14,984 |
| 06/30/1990 | 1,546 | 22 | 9,971 | 391 | $11,516 | 1,649 | 1,881 | 10,847 | 14,378 |
| 06/30/1991 | 1,502 | 44 | 9,189 | 782 | $10,691 | 1,603 | 1,380 | 7,118 | 10,101 |
| 06/30/1992 | 1,458 | 44 | 8,407 | 782 | $9,865 | 1,556 | 812 | 4,971 | 7,338 |
| 06/30/1993 | 1,415 | 44 | 7,625 | 782 | $9,039 | 1,509 | 736 | 4,013 | 6,259 |
| 06/30/1994 | 1,371 | 44 | 6,843 | 782 | $8,213 | 1,463 | 661 | 3,117 | 5,240 |
| 06/30/1995 | 1,327 | 44 | 6,061 | 782 | $7,388 | 1,416 | 585 | 2,310 | 4,311 |
| 06/30/1996 | 1,283 | 44 | 5,279 | 782 | $6,562 | 1,369 | 510 | 1,604 | 3,482 |
| 12/31/1996 | 1,261 | 22 | 4,888 | 391 | $6,149 | 1,346 | 472 | 1,306 | 3,124 |
| 12/31/1997 | 1,218 | 44 | 4,106 | 782 | $5,323 | 1,299 | 396 | 773 | 2,468 |
| 12/31/1998 | 1,174 | 44 | 3,324 | 782 | $4,497 | 1,253 | 321 | 371 | 1,944 |
| 12/31/1999 | 1,130 | 44 | 2,542 | 782 | $3,672 | 1,206 | 245 | 115 | 1,567 |
| 12/31/2000 | 1,086 | 44 | 1,760 | 782 | $2,846 | 1,159 | 170 | 0 | 1,330 |
| 12/31/2001 | 1,043 | 44 | 978 | 782 | $2,020 | 1,113 | 94 | 0 | 1,207 |
| 12/31/2002 | 999 | 44 | 196 | 782 | $1,194 | 1,066 | 19 | 0 | 1,085 |
| 09/30/2003 | 966 | 33 | 0 | 196 | $966 | 1,031 | 0 | 0 | 1,031 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, data for 9/30/03, which are as of the nine months ended on that date, 12/31/85, which reflects balances and amortization as of that date, and data for 11/5/85 and 4/8/88, which reflect the beginning capital credit balances from the Lewis Federal and Tri-Cities acquisitions. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A, C, F – H Based on data from Sterling Savings Association.

B Assumes a 40 year amortization schedule.

D Assumes a 15 year amortization schedule.

Revised Updated February 20, 2004

Exhibit 6
Table 6

# Exhibit 6

## Sterling Savings Association

### Table 7: Addendum for Non-Supervisory Goodwill

Source: Sterling Annual Reports and TFRs
($ in thousands)

| | Assumed Straight-Line Amortization | | | | | Balances | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A + B + C | | E | F | G | H = E + F + G |
| Period Ended | Lewis & Clark | WA & OR Branches | KeyBank | Total Amortization | Explanation | Lewis & Clark | WA & OR Branches | KeyBank | Total |
| 6/30/83 | | | | 0 | • Lewis and Clark S&LA was merged into Sterling on 6/30/83 and $2.056m in goodwill was recorded to be amortized using the interest-method over 19 years. Source: 1983 AR, Note 12. | 2,056 | | | 2,056 |
| 6/30/84 | 108 | | | 108 | | 1,948 | | | 1,948 |
| 6/30/85 | 108 | | | 108 | | 1,840 | | | 1,840 |
| 6/30/86 | 108 | | | 108 | | 1,731 | | | 1,731 |
| 6/30/87 | 108 | | | 108 | | 1,623 | | | 1,623 |
| 6/30/88 | 108 | | | 108 | | 1,516 | | | 1,515 |
| 6/30/89 | 108 | | | 108 | | 1,407 | | | 1,407 |
| 6/30/90 | 108 | | | 108 | | 1,299 | | | 1,299 |
| 6/30/91 | 108 | | | 108 | | 1,190 | | | 1,190 |
| 6/30/92 | 108 | | | 108 | | 1,082 | | | 1,082 |
| 6/30/93 | 108 | | | 108 | | 974 | | | 974 |
| 6/30/94 | 108 | 216 | | 324 | • On 4/15/94, Sterling acquired 3 branches in Oregon and paid an acquisition premium of ~$3m. On 5/13/94, Sterling acquired 5 branches in Washington and paid an acquisition premium of ~$8.8m. These premiums had amortization periods of 8 years. Source: 1994 AR, Note 4. | 866 | 11,584 | | 12,450 |
| 6/30/95 | 108 | 1,475 | | 1,583 | | 757 | 10,109 | | 10,867 |
| 6/30/96 | 108 | 1,475 | | 1,583 | | 649 | 8,634 | | 9,284 |
| 12/31/96 | 54 | 738 | | 792 | | 595 | 7,897 | | 8,492 |
| 12/31/97 | 108 | 1,475 | | 1,583 | | 487 | 6,422 | | 6,909 |
| 12/31/98 | 108 | 1,475 | 1,900 | 3,483 | • On 6/15/98, Sterling acquired 33 branches from KeyBank and recorded ~$57m in goodwill to be amortized over 15 years using the straight-line method. Source: 1998 10-K, Note 1. | 379 | 4,947 | 55,100 | 60,426 |
| 12/31/99 | 108 | 1,475 | 3,800 | 5,383 | | 271 | 3,472 | 51,300 | 55,042 |
| 12/31/00 | 108 | 1,475 | 3,800 | 5,383 | | 162 | 1,997 | 47,500 | 49,659 |
| 12/31/01 | | | | 5,377 | | | | | 44,282 |
| 12/31/02 | | | | 644 | • Sterling adopts SFAS No. 142 on January 1, 2002. Source: 2002 10-K, p.34. | | | | 43,638 |
| 9/30/03 | | | | 184 | • $1 million of goodwill was generated by the Empire Federal Bancorp acquisition on 2/28/03. Source: 3/31/03 10-Q, p.13. | | | | 44,454 |
| Total: | 1,894 | 9,803 | 9,500 | 27,402 | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/96 which are for the six months ended as of that date, and data for 9/30/03, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

D For 2001 – 2003, assumed to be equal to the total amortization of intangibles of the actual bank from table 2a, column D.

H The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000. For 2001 – 2003 balances are reduced by the amount in column D.

# Exhibit 6

## Sterling Savings Association

### Table 8: 2001 – 2003 Capital Downstreamed

Source: TFRs
($ in Thousands)

| | A | B | C | D = A + B + C | E = D - D(t-1) |
|---|---|---|---|---|---|
| | | Common Stock | | | |
| | Preferred Stock | Par Value | Paid in Excess of Par | Total | Difference from Prior Year |
| 12/31/2000 | $95,100 | $6,616 | $76,502 | $178,218 | |
| 12/31/2001 | 110,100 | 7,245 | 98,917 | 216,262 | $38,044 |
| 12/31/2002 | 110,100 | 7,245 | 98,917 | 216,262 | 0 |
| 09/30/2003 | 110,100 | 7,245 | 125,239 | 242,584 | 26,322 |

# *Exhibit 7*

## RTC Resolutions in Washington and Oregon

Source: RTC Statistical Abstract August 1989/September 1995
(Dollars in Millions)

| Name | City | State | Charter F-Federal S-State | Conserva-torship Date | Resolution Date | Assets at Takeover | Deposits at Takeover | Deposits at Resolution |
|---|---|---|---|---|---|---|---|---|
| The Benjamin Franklin FS&LA | Portland | OR | F | 02/21/1990 | 09/07/1990 | $4,692 | $3,214 | $2,650 |
| Far West FSB | Portland | OR | F | 05/23/1991 | 04/15/1994 | $2,160 | $1,273 | $714 |
| Family FSA | Dallas | OR | F | 01/11/1990 | 06/22/1990 | $170 | $101 | $93 |
| Family S&LA, FA | Seattle | WA | S | 02/08/1991 | 07/19/1991 | $101 | $60 | $44 |
| Gibraltar Savings, FSB | Seattle | WA | F | 03/31/1989 | 06/29/1990 | $1,816 | $1,368 | $1,029 |
| Frontier FS&LA | Walla Walla | WA | F | 02/23/1990 | 06/22/1990 | $162 | $119 | $98 |

Note: No resolutions were reported for Idaho Institutions.

## Acquisitions Considered by Sterling

Source: Deposition of Harold Gilkey, June 6-8, 2000, pp. 69-75, 184-185, 239-245, 485-487, 511, 517, 561-594

| Name | Year |
|---|---|
| American Bank | 1992 |
| American National Bank/American Marine | 1990s |
| Ben Franklin National Bank, Pasco | 1987 |
| Benjamin Franklin, Portland, Oregon | early 1990s |
| Eastern Washington Savings | 1988 |
| Enterprise Bank | 1990s |
| Gibraltar Savings (certain branches) | 1990s |
| Family Savings | 1988 |
| Far West Federal (8 branches in Oregon) | 1988 |
| First Federal of Longview | 1988 |
| First Western Savings/First Federal (certain branches) | 1992 |
| Great Northwest Savings Bank | 1991 |
| Guaranty Savings | 1984 |
| Hamilton Financial Services | late 1990s |
| Heritage Federal | 1990s |
| Horizon | 1990s |

| Name | Year |
|---|---|
| InterWest | 1990s |
| Lynnwood Savings | 1980s |
| Mortgage Services America (First Cal) | 1995-1996 |
| Olympia Federal | 1990s |
| Pacific First Federal | early 1990s |
| Palm Springs Savings Bank | 1990s |
| Security Federal Savings Bank | 1990s |
| Security Pacific Bank (certain branches) | mid 1990s |
| Summit Savings | mid 1990s |
| U.S. Bank (certain branches) | 1990s |
| Vancouver Federal | 1990s |
| Washington Mutual (2 branches) | 1992 |
| West One (certain branches) | 1990s |
| Westcoast Bancorporation | late 1990s |
| Willamette Savings | 1995-1996 |

# *Exhibit 8*

## *Sterling Savings Association*

## Summary of Expectation Damages

($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | **$77,405** |
| [2] | + **Wounded Bank Damages** | **$4,556** |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 |
| | Loss on CJ-4 Loan | $1,241 |
| | Excess Supervision Costs | $172 |
| | Cost of 1989 Units Offering | $1,004 |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $304 |
| [3] | + **Future Damages** | **$1,258** |
| | **Total Expectation Damages** | **$83,219** |

Notes:

[2] Source: Data from Sterling Savings Association.

[3] Present value of cash flows representing the cost of replacing supervisory goodwill and capital credits in 12/31/2000 dollars as calculated by Professor James.

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C Judge Wheeler |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ**
**DECEMBER 11, 2006**

## I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in February 2004. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings by Judge Wheeler and to account for the passage of time. In an opinion dated August 30, 2006, Judge Wheeler ruled that the "...Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA."[1] For purposes of my Report and damages calculation I have therefore assumed that the supervisory capital created in the Central Evergreen acquisition will be subject to any limitations imposed by FIRREA.

[1] Opinion of Judge Wheeler, *Sterling Savings Association v. The United States*, August 30, 2006, p. 12.

My updated determination of Sterling's expectation damages is that they total $63.361 million.

## II. Elements of Expectation Damages

### *A. Lost Earnings on Foregone Assets*

To update my calculations I have relied on additional documents and data provided to me by the attorneys and Sterling since the filing of my last Report. These are primarily financial statements from 2003 though 2006. I have created an addendum to Exhibit 2 of my previous Report listing the additional materials supplied to me. Exhibit 3 is unchanged from my previous Report. Exhibit 4 and Exhibit 5 present financial information for Sterling and have been extended through September 2006 – the latest period for which I have financial statements.

Exhibit 6 incorporates the ruling of Judge Wheeler. Tables 4a, 4b, and 4c of Exhibit 6 have been restructured or added to present the amount of supervisory intangibles that could have been included in Sterling's core capital but-for the breach. Table 4a is a summary of the goodwill and intangibles of Sterling but-for the breach of the Lewis Federal and Tri-Cities contracts. Table 4b presents the goodwill amounts related to the Central Evergreen acquisition.[2] Since the Central Evergreen acquisition was supervisory in nature, the goodwill from the acquisition is subject to the supervisory goodwill phase-out limitations of FIRREA. The phase-out provisions of FIRREA allowed supervisory goodwill to count to a limited degree toward core-capital until January 1, 1995. This table calculates how much of the supervisory goodwill from Central Evergreen could count in Sterling's core capital over time. Table 4c presents the identified intangibles related to the Central Evergreen acquisition. These intangibles were allowed under provisions of FIRREA to also count toward core capital to a limited degree.[3]

---

[2] In documents from Sterling upon which I have relied, in the context of the Central Evergreen acquisition the term "unidentified intangibles" is used synonymously with goodwill.

[3] In my previous report I noted that changes in the accounting rules related to goodwill no longer require that goodwill be amortized, rather it is subject to impairment tests. For the contractual goodwill associated with Lewis Federal and Tri-Cities I assume that for regulatory capital purposes it would amortize. The change in the accounting rules did not affect goodwill from the Central Evergreen transaction because it was fully-amortized in 2000 – before the new rules took effect. Table 7 in Exhibit 6 presents an estimate of the amounts of non-supervisory goodwill given the new accounting rules.

My estimate of expectation damages is based on a model that is similarly structured to that presented in previous versions of my Report. I believe it is appropriate at this time to reconsider some of the assumptions used in modeling the "but for" bank for two reasons: first, Judge Wheeler's recent ruling removes significant amounts of regulatory capital from Sterling Savings, and so the world is quite different from the one modeled in earlier versions of my Report; second, we know a great deal more about the capabilities and attitudes of Sterling's management and organization than we did at the time the model was originally developed. I have therefore revisited a number of assumptions used in the previous modeling, and have made modest adjustments to take account of the changes required by Judge Wheeler's ruling.

Under the belief that the "but for" bank could include all of the intangibles resulting from the Central Evergreen merger in core capital, my previous Report assumed that until June 1991 Sterling would maintain the capital ratios specified in the Business Plan developed in 1988 (before FIRREA). Obviously, this is a conservative assumption, but plausible because the Central Evergreen goodwill made that a feasible strategy. Without the ability to use the Central Evergreen intangibles as anticipated at the time of the contract, it is not reasonable to assume that Sterling would strictly adhere to the capital ratios specified in the Business Plan.[4]

We know from the business plans and testimony of bank management that Sterling desired to grow and would have been very reluctant to shrink in asset size. My modeling of the "but for" bank assumes that Sterling will remain in compliance with the core capital requirement imposed by FIRREA and will maintain its asset size. Consequently I have estimated that the but-for bank will operate with a core capital ratio of 4% from December 31, 1989 to June 30, 1991, which is only marginally less than the ratios in the Business Plan (4.15%-4.24%), and well above the 3% ratio specified by FIRREA.

[4] In my original modeling I assumed that Sterling had a permanent (nonamortizing) capital credit and all of the intangibles from Central Evergreen to include in capital. This provided enough capital for a very large increase in assets if the capital were leveraged fully. In view of the uncertainty about the ability of Sterling to manage such substantial growth, and whether profits could be maintained through a period of very rapid growth, I imposed a restrictive growth constraint on the "but for" bank. In the "but for" world resulting from Judge Wheeler's ruling (i.e., with less core capital for Sterling), and with the evidence that Sterling is capable of managing substantial growth with good profitability, it may well be more appropriate to model the "but for" bank on the basis of a leveraging of all regulatory capital to the capital ratio maintained by the actual bank.

Additionally, a few data errors in the previous calculations have been found and corrected.[5]

In addition to adapting my calculation of Sterling's lost earnings to Judge Wheeler's ruling, I have updated my calculations through the present based on Sterling's recent financial performance. For the fourth quarter of 2003 through 2006 I have followed the same approach to modeling the but-for bank's performance as I did for 1990 through 2003.[6] Since 2003 Sterling has continued to grow both by internal growth and by acquisition. It has remained profitable while achieving this growth. Additionally in 2005 Sterling converted to a bank charter.

### B. *Future Damages*

As in my previous Reports, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions. His determination of the value is $0.641 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $63.361 million. Exhibit 8 presents a summary of the amounts. The lost earnings from 1990 through 2006 are $58.164 million, the wounded bank damages are $4.556 million, and the future damages are $0.641 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 11, 2006
3. Sterling Savings Association, Key Financial Data, 1983 – 1989

---

[5] The first involved the treatment of the tax benefits from net operating loss carryforwards ("NOLs"). A second involved a recalculation of the December 1989 core capital. The TFR form in use in 1989 did not include information on core capital as defined by FIRREA, and previous Reports have used a figure based on the June 1990 TFR. I have concluded that core capital in December 1989 was about $1 million lower than the figure used previously. A third involved the amount of intangibles and assets resulting from the acquisition of Empire Savings. Each of these corrections would, other things being equal, lower the expectations damage calculation.

[6] My methodology and rationale were described in my previous reports of September 2001 and February 2004.

4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2006
5. Sterling Savings Association, Asset Composition, 1990 – 2006
6. Calculation of Lost Earnings on Foregone Assets Through 2006
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

Paul Horvitz

Dec 11, 2006

Date

# Exhibit 2

## Additional Documents Considered by *Paul M. Horvitz, Ph.D.*
## In Conjunction with Updated Report
## December 11, 2006

| | |
|---|---|
| **Legal Pleadings** | |
| Defendant's Proposed Findings of Uncontroverted Fact in Connection with Motion for Summary Judgment Regarding Damages, July 20, 2004 | |
| Defendant's Motion for Summary Judgment Regarding Damages, July 20, 2004 | |
| Opinion and Order, Judge Wheeler, Filed August 30, 2006 | |
| | |
| **Reports and Depositions** | |
| Deposition of William J. Durbin with Exhibit S-1, July 24, 2000 | |
| Amended Expert Report of Mukesh Bajaj, Ph.D. with Exhibits 1 - 2 and Tables 1-4, April 23, 2004 | |
| Deposition of Mukesh Bajaj, June 19-20, 2002 and May 17-18, 2004 | |
| Revised Expert Report of Christopher M. James, February 20, 2004 | |
| Updated Expert Report of Christopher M. James, December 11, 2006 | |
| | |
| **Thrift Financial Reports** | |
| Electronic TRF for the Quarterly Period Ending December 31, 2003 | |
| Electronic TRF for the Quarterly Period Ending March 31, 2004 | |
| Electronic TRF for the Quarterly Period Ending June 30, 2004 | |
| Electronic TRF for the Quarterly Period Ending September 30, 2004 | |
| Electronic TRF for the Quarterly Period Ending December 31, 2004 | |
| Electronic TRF for the Quarterly Period Ending March 31, 2005 | |
| Electronic TRF for the Quarterly Period Ending June 30, 2005 | |
| | |
| **Call Reports** | |
| Electronic Call Report, Year to date through September 30, 2005 | |
| Electronic Call Report, Year to date through December 31, 2005 | |
| Electronic Call Report, Year to date through March 31, 2006 | |
| Electronic Call Report, Year to date through June 30, 2006 | |
| Electronic Call Report, Year to date through September 30, 2006 | |
| | |

| | |
|---|---|
| **Examination Reports** | |
| Sterling Savings Bank Report of Examination, Start Date June 23, 2003 | |
| Sterling Financial Corporation Holding Company Report of Examination, Start Date June 14, 2004 | |
| Sterling Savings Bank Joint Report of Examination prepared by the State of Washington Division of Banks and the Office of Thrift Supervision, Start Date June 14, 2004 | |
| Sterling Savings Bank Response to the Joint Report of Examination prepared by the State of Washington and the Office of Thrift Supervision, as of June 14, 2004 | |
| Sterling Savings Bank Joint Safety and Soundness Report of Examination prepared by the FDIC and the Washington Department of Financial Institutions, Start date September 12, 2005 | |
| Sterling Savings Bank Response to the Joint Safety and Soundness Report of Examination prepared by the State of Washington and the FDIC, as of September 12, 2005. Sterling Savings Bank Secretarial Certificate dated January 12, 2006. Letter from FDIC to Sterling Savings Bank re Board Resolution Progress Reports dated January 12, 2006 | |
| Sterling Financial Corporation Report of Bank Holding Company Inspection, Start date April 10, 2006, with Federal Reserve Bank of San Francisco letter dated May 24, 2006, Sterling Financial Corporation letter of response dated July 24, 2006 and Federal Reserve Bank of San Francisco letter of acknowledgement dated August 3, 2006 | |
| | |
| **Form 10-K and Form 10-Q Reports** | |
| Sterling Financial Corporation - Form 10-Q for the Year Ended December 31, 1989 | |
| Sterling Financial Corporation - Form 10-K for the Year Ended December 31, 2003 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2004 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2004 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2004 | |
| Sterling Financial Corporation - Form 10-K for the Year Ended December 31, 2004. Form 10-K as part of the Annual Report and Form 10-K as SEC filing | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2005 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2005 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2005 | |
| Sterling Financial Corporation - 2005 Annual Report and Form 10-K for the Year Ended December 31, 2005. | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2006 | |

| | |
|---|---|
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2006 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2006 | |
| | |
| **Other Documents** | |
| Joint Examination – FHLB of Seattle and State of Washington : April 18, 1988 | SG 0052170-246 |
| Sterling Savings Bank 1989 Offering Circular Costs and Calculation of Damages - Legal, Accounting and Insurance Cost Summary | SG 0803330<br>SG 0803509 |
| Documentary Support in the form of Checks, Bills, Invoices | SG 0805404-05<br>SG 0805473; SG 0805489; SG 0805504 |
| Letter from Witherspoon, Kelley, Davenport & Toole (William Symmes) to U.S. Department of Justice (Elizabeth Hosford) re additional documentation and clarification: February 1, 2002 | |
| OTS TFR Instruction Manual for Schedule CCR, September 1991 | |
| OTS TFR Instruction Manual for Schedule CCR, March 2004 | |
| "Exhibit VII.2. -Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings. | |

# *Exhibit 3*

# *Sterling Savings Association*

## Key Financial Data

## 1983 to 1989

Source: Thirft Financial Reports (FHLBB), June 1983 - TFR (Income Statement for the 9 months ended 6/83), December 1983-TFR [Bates # SG 0701002 - 0701011]

(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1983 (June) | 1984 (June) | 1985 (June) | 1986 (June) | 1987 (June) | 1988 (June) | 1989 (June) |
| Loans | $360 | $54,857 | $70,495 | $127,255 | $172,294 | $304,126 | $502,453 |
| Mortgage Backed-Securities | $0 | $7,003 | $15,073 | $10,158 | $31,834 | $41,587 | $114,060 |
| Goodwill | $0 | $1,819 | $1,770 | $5,388 | $4,953 | $18,785 | $22,990 |
| Other Assets | $6,956 | $25,234 | $25,111 | $38,201 | $22,766 | $69,455 | $91,430 |
| Total Assets | $7,317 | $88,913 | $112,449 | $181,002 | $231,847 | $433,953 | $730,933 |
| | | | | | | | |
| Deposits | $5,135 | $71,561 | $88,205 | $142,078 | $170,755 | $305,354 | $519,389 |
| Borrowings | $0 | $12,563 | $17,928 | $29,623 | $47,665 | $98,802 | $189,362 |
| Total Liabilities | $5,170 | $84,910 | $107,835 | $173,789 | $221,377 | $410,772 | $720,414 |
| Regulatory Capital [1] | $2,147 | $4,003 | $4,614 | $7,213 | $10,470 | $23,181 | $28,614 |
| | | | | | | | |
| **Capital Ratios** | | | | | | | |
| Regulatory Capital/Average Assets | 29.34% | 8.32% | 4.58% | 4.92% | 5.07% | 6.96% | 4.91% |
| | | | | | | | |
| **Income Statement** [2] | | | | | | | |
| Income Before Taxes & Amortization | -$163 | $330 | $1,027 | $1,360 | $1,878 | $2,431 | $3,813 |
| Goodwill Amortization and Write-offs | $0 | $88 | $127 | $326 | $228 | $472 | $2,272 |
| Provision for Taxes | $0 | $0 | $122 | $205 | $560 | $752 | $560 |
| Accounting Changes and Extra Items | $0 | $26 | $166 | $0 | $0 | $0 | $0 |
| Net Income | -$163 | $216 | $612 | $829 | $1,090 | $1,207 | $981 |
| | | | | | | | |
| **Profitability Ratios** | | | | | | | |
| ROAA before taxes and Amortization | -2.22% | 0.69% | 1.02% | 0.93% | 0.91% | 0.73% | 0.65% |
| Average Assets [3] | $7,317 | $48,115 | $100,681 | $146,726 | $206,425 | $332,900 | $582,443 |

[1] For 1987 and 1988 this figure does not include general valuation allowances.
[2] Income figures for 1983 reflect nine months of data.
[3] "Average" assets for 1983 are actually total assets at 6/30/83.

# *Exhibit 4*
# *Sterling Savings Association*
## Consolidated Key Financial Data
## 1990 to 1999

Source: Thrift Financial Reports
(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
| Loans (Mortgage and Non-Mortgage) | $464,021 | $407,991 | $465,920 | $616,749 | $852,066 | $1,092,824 | $904,012 | $949,851 | $1,084,073 | $1,497,641 | $1,805,546 |
| Mortgage Backed-Securities (pool) | $115,395 | $141,040 | $98,126 | $328,279 | $331,426 | $253,337 | $393,730 | $372,057 | $456,322 | $232,256 | $227,649 |
| Goodwill & Other Intangibles | $19,736 | $14,573 | $10,649 | $8,431 | $17,915 | $14,945 | $11,868 | $10,147 | $7,882 | $61,180 | $55,488 |
| Other Assets | $89,838 | $45,395 | $66,192 | $78,087 | $162,256 | $177,575 | $166,160 | $202,732 | $322,499 | $518,768 | $447,070 |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 |
| | | | | | | | | | | | |
| Deposits | $483,581 | $492,372 | $510,104 | $583,732 | $815,274 | $901,646 | $906,298 | $909,276 | $1,047,863 | $1,563,343 | $1,629,234 |
| Borrowings | $189,557 | $98,608 | $86,615 | $376,493 | $446,837 | $513,956 | $465,611 | $503,827 | $656,411 | $516,246 | $673,196 |
| Total Liabilities | $678,260 | $596,378 | $602,954 | $972,422 | $1,281,539 | $1,439,052 | $1,383,106 | $1,428,473 | $1,722,373 | $2,103,836 | $2,324,571 |
| Equity Capital | $10,730 | $12,621 | $38,224 | $59,124 | $82,124 | $99,629 | $92,664 | $106,314 | $148,403 | $206,008 | $211,183 |
| | | | | | | | | | | | |
| **Capital Ratios** | | | | | | | | | | | |
| Equity/Average Assets | 1.51% | 1.94% | 6.12% | 7.07% | 6.86% | 6.87% | 6.15% | 7.06% | 8.72% | 9.86% | 8.72% |
| | | | | | | | | | | | |
| **Income Statement** | | | | | | | | | | | |
| Income Before Taxes & Amortization | $3,357 | $5,678 | $9,873 | $14,340 | $16,463 | $17,944 | $14,352 | -$269 | $23,341 | $21,585 | $35,951 |
| Goodwill Amortization and Write-offs | $3,253 | $2,770 | $2,332 | $2,218 | $2,262 | $3,487 | $3,332 | $1,586 | $2,265 | $3,980 | $5,692 |
| Provision for Taxes | -$163 | $590 | $3,319 | $4,920 | $4,559 | $4,819 | $4,122 | -$621 | $7,911 | $6,420 | $11,163 |
| Accounting Changes and Extra Items | $0 | $298 | -$522 | -$424 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Income | $267 | $2,020 | $4,744 | $7,626 | $9,642 | $9,638 | $6,898 | -$1,234 | $13,165 | $11,185 | $19,096 |
| | | | | | | | | | | | |
| **Profitability Ratios** | | | | | | | | | | | |
| ROAA before Taxes and Amortization | 0.47% | 0.87% | 1.58% | 1.71% | 1.37% | 1.24% | 0.95% | -0.02% | 1.37% | 1.03% | 1.48% |
| Average Assets | $709,962 | $648,995 | $624,943 | $836,217 | $1,197,605 | $1,451,172 | $1,507,226 | $1,505,279 | $1,702,782 | $2,090,311 | $2,422,799 |

Note :

All data are annual except for December 1996 which are for the 6 months ended on that date and September 2006 which are for the nine months ended on that date. All data are consolidated, except for data prior to 1996.

# *Exhibit 4*
# *Sterling Savings Association*
## Consolidated Key Financial Data
## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) | |
|---|---|---|---|---|---|---|---|---|
| Loans (Mortgage and Non-Mortgage) | $1,983,490 | $2,133,730 | $2,424,761 | $2,930,737 | $4,280,938 | $4,893,431 | $6,114,374 | [1] |
| Mortgage Backed-Securities (pool) | $210,653 | $617,796 | $582,011 | $919,540 | $2,045,348 | $1,960,583 | $1,746,734 | [2] |
| Goodwill & Other Intangibles | $49,998 | $44,621 | $43,977 | $47,955 | $132,246 | $136,838 | $137,090 | [3] |
| Other Assets | $407,630 | $242,391 | $453,129 | $376,158 | $479,517 | $565,746 | $626,338 | |
| Total Assets | $2,651,771 | $3,038,538 | $3,503,878 | $4,274,390 | $6,938,049 | $7,556,598 | $8,624,536 | |
| | | | | | | | | |
| Deposits | $1,743,296 | $1,869,906 | $2,029,070 | $2,470,941 | $3,866,129 | $4,831,232 | $5,689,311 | |
| Borrowings | $645,320 | $859,825 | $1,142,255 | $1,421,972 | $2,440,342 | $2,075,210 | $2,083,621 | [4] |
| Total Liabilities | $2,420,148 | $2,757,492 | $3,194,553 | $3,927,400 | $6,371,629 | $6,958,203 | $7,866,333 | |
| Equity Capital | $231,620 | $281,046 | $309,328 | $346,989 | $566,420 | $598,394 | $758,202 | |
| | | | | | | | | |
| **Capital Ratios** | | | | | | | | |
| Equity/Average Assets | 8.93% | 9.88% | 9.46% | 8.92% | 10.10% | 8.26% | 9.37% | |
| | | | | | | | | |
| **Income Statement** | | | | | | | | |
| Income Before Taxes & Amortization | $37,942 | $40,679 | $48,766 | $64,932 | $98,397 | $104,150 | $91,389 | |
| Goodwill Amortization and Write-offs | $5,490 | $5,377 | $644 | $263 | $2,224 | $2,222 | $1,685 | [5] |
| Provision for Taxes | $12,008 | $12,368 | $16,260 | $23,085 | $32,927 | $33,587 | $29,388 | |
| Accounting Changes and Extra Items | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Net Income | $20,444 | $22,934 | $31,862 | $41,584 | $63,246 | $68,341 | $60,316 | |
| | | | | | | | | |
| **Profitability Ratios** | | | | | | | | |
| ROAA before Taxes and Amortization | 1.46% | 1.43% | 1.49% | 1.67% | 1.76% | 1.44% | 1.13% | |
| Average Assets | $2,593,762 | $2,845,155 | $3,271,208 | $3,889,134 | $5,606,220 | $7,247,324 | $8,090,567 | |

Note:

All data are annual except for December 1996 which are for the 6 months ended on that date and September 2006 which are for the nine months ended on that date. All data are consolidated, except for data prior to 1996. Data for 2005-2006 are from FDIC Call Reports.

[1] For 2005-2006, reported figure is calculated as the sum of "Loans and Leases, Held for Sale" (RCON5369) and "Loans and leases, net of unearned income" (RCONB528) less "Allowance for loan and lease losses" (RCON3123).

[2] For 2005-2006, reported figure is the sum of mortgage backed securities in Schedule RC B, Item 4. (Calculated as RCON1698 + RCON1702 + RCON1703 + RCON1707 + RCON1709 + RCON1713 + RCON1714 + RCON1717 + RCON1718 + RCON1732 + RCON1733 + RCON1736)

[3] For 2005-2006, reported figure is the sum of "Goodwill" (RCON3163) and "Other intangible assets" (RCON0426) from Item 10 of Schedule RC.

[4] For 2005-2006, reported figure is the sum of Items 14 and 16 in Schedule RC. (RCONB993 + RCONB995 + RCON3190)

[5] For 2005-2006, reported figure is the sum of "Goodwill impairment losses" (RIADC216) and "Amortization expense and impairment losses for other intangible assets" (RIADC232) from Item 7 of Schedule RI.

# *Exhibit 5*
# *Sterling Savings Association*
## Asset Composition
## 1990 to 1999

Source: Thrift Financial Reports
(Dollars in Thousands)

| Balance Sheet | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | As of Fiscal Year End | | | | | | | | | | |
| Mortgage Loans | $421,388 | $368,888 | $421,974 | $543,664 | $728,819 | $883,919 | $646,965 | $659,102 | $725,041 | $993,851 | $1,238,641 |
| Loans On: | | | | | | | | | | | |
| 1-4 Dwelling Units: | $257,879 | $229,946 | $304,909 | $423,788 | $616,841 | $728,173 | $454,901 | $445,000 | $412,529 | $561,449 | $602,282 |
| Construction Loans | $15,686 | $6,865 | $5,058 | $14,015 | $37,054 | $99,414 | $119,318 | $130,850 | $82,742 | $107,621 | $112,935 |
| First Mtg, Closed-End Jr Liens | $242,193 | $223,081 | $299,851 | $409,773 | $579,787 | $628,759 | $335,583 | $314,150 | $329,787 | $453,828 | $489,347 |
| Revolving, Open-End Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5 or More Dwelling Units: | $57,298 | $43,929 | $41,975 | $56,401 | $65,152 | $80,038 | $95,415 | $134,405 | $128,207 | $188,276 | $236,302 |
| Construction Loans | $17,865 | $5,650 | $4,298 | $2,077 | $10,286 | $29,141 | $40,607 | $80,123 | $65,333 | $68,301 | $74,047 |
| Permanent Mortgages | $39,433 | $38,279 | $37,677 | $54,324 | $54,866 | $50,897 | $54,808 | $54,282 | $62,874 | $119,975 | $162,255 |
| Nonresidential Property: | $113,416 | $99,135 | $82,027 | $75,226 | $70,228 | $107,377 | $135,388 | $157,174 | $145,296 | $207,146 | $337,497 |
| Construction Loans | $15,497 | $6,579 | $3,961 | $375 | $397 | $10,753 | $27,413 | $42,159 | $23,344 | $22,196 | $29,785 |
| Permanent Mortgages | $97,919 | $92,556 | $78,066 | $74,851 | $69,831 | $96,624 | $107,975 | $115,015 | $121,952 | $184,950 | $307,712 |
| Land | $3,654 | $1,704 | $1,185 | $1,057 | $553 | $17,920 | $22,106 | $21,577 | $42,911 | $38,730 | $64,694 |
| Accrued Interest Receivable | $3,552 | $2,759 | $2,622 | $2,834 | $3,515 | $4,963 | $3,919 | $4,702 | $4,833 | $5,295 | $6,784 |
| Construction, land development, and other land loans | | | | | | | | | | | |
| Advances for Taxes and Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $366 | $177 | $87 | $106 |
| Less: Contra-Assets to Mtg Loans: | $14,411 | $8,585 | $10,744 | $15,642 | $27,470 | $54,552 | $64,764 | $104,122 | $8,912 | $7,132 | $9,024 |
| Loans in Process | $6,025 | $2,279 | $3,219 | $8,587 | $21,739 | $47,961 | $56,618 | $94,228 | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $2,404 | $2,260 | $2,818 | $2,340 | -$8 | -$628 | $495 | $1,629 | N/A | N/A | N/A |
| Valuation Allowances | $5,982 | $4,046 | $4,707 | $4,715 | $5,739 | $7,219 | $7,651 | $8,265 | N/A | N/A | N/A |

# *Exhibit 5*
# *Sterling Savings Association*
## Asset Composition
## 1990 to 1999
Source: Thrift Financial Reports
(Dollars in Thousands)

| Balance Sheet | As of Fiscal Year End | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
| Nonmortgage Loans | $42,633 | $39,103 | $43,946 | $73,085 | $123,247 | $208,905 | $257,047 | $290,749 | $359,032 | $503,790 | $566,905 |
| Commercial Loans: | $22,967 | $17,632 | $16,237 | $28,507 | $52,909 | $106,266 | $169,829 | $199,989 | $241,952 | $317,215 | $351,106 |
| Secured, Other than Mortgage | $22,967 | $17,632 | $15,608 | $26,415 | $51,056 | $103,386 | $160,757 | $194,461 | $233,535 | $303,216 | $327,489 |
| Unsecured | $0 | $0 | $629 | $2,092 | $1,853 | $2,880 | $9,072 | $5,528 | $8,417 | $13,999 | $23,617 |
| Financing Leases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consumer Loans: | $19,723 | $21,138 | $27,323 | $43,903 | $69,188 | $99,936 | $83,520 | $86,563 | $114,169 | $189,262 | $216,463 |
| Closed-End Consumer Loans: | $0 | $0 | $0 | $0 | $0 | $0 | $69,480 | $71,715 | $94,426 | $158,815 | $180,007 |
| Loans on Deposits | $2,619 | $2,323 | $2,660 | $2,709 | $2,709 | $4,467 | $4,386 | $4,343 | $4,924 | $5,258 | $5,135 |
| Home Improvement Loans | $24 | $31 | $46 | $137 | $173 | $44,929 | $22,351 | $22,900 | $23,431 | $25,489 | $27,626 |
| Education Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $157 | $0 |
| Auto Loans | $1,525 | $1,616 | $1,966 | $3,671 | $6,027 | $7,756 | $7,897 | $7,692 | $25,929 | $76,761 | $99,927 |
| Mobile Home Loans | $264 | $404 | $888 | $1,448 | $1,189 | $861 | $689 | $673 | $409 | $1,502 | $1,241 |
| Other Consumer Loans & Leases | $11,593 | $12,782 | $17,187 | $28,545 | $50,538 | $30,500 | $34,157 | $36,107 | $39,733 | $49,648 | $46,078 |
| Open-End Consumer Loans: | | | | | | | $14,040 | $14,848 | $19,743 | $30,447 | $36,456 |
| Loans Secured by 1-4 Family | $3,698 | $3,982 | $4,576 | $6,078 | $7,139 | $9,215 | $10,689 | $11,933 | $17,018 | $26,671 | $32,029 |
| Unsecured, Credit Card & Other | $0 | $0 | $0 | $1,315 | $1,413 | $2,208 | $3,351 | $2,915 | $2,725 | $3,776 | $4,427 |
| Accrued Interest Receivable | $444 | $293 | $332 | $418 | $717 | $1,431 | $1,859 | $2,220 | $2,911 | $4,689 | $5,641 |
| Less: Contra-Assets to Nonmtg Lns: | $501 | $40 | $54 | $257 | $433 | $1,272 | -$1,839 | -$1,977 | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | | | | | | | | | $0 | $7,376 | $6,305 |
| Loans in Process | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $39 | $81 | $92 | $261 | $435 | $1,272 | -$1,885 | -$1,997 | N/A | N/A | N/A |
| Valuation Allowances | $462 | -$41 | -$38 | -$4 | -$2 | $0 | $46 | $20 | N/A | N/A | N/A |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 |

Note: All data are consolidated, except for data prior to 1996.

# *Exhibit 5*
# *Sterling Savings Association*
## Asset Composition
## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | $1,395,779 | $1,414,903 | $1,564,729 | $1,764,417 | $2,801,588 | $3,828,670 | $4,882,466 | [1] |
| Loans On: | | | | | | | | |
| 1-4 Dwelling Units: | $629,604 | $595,980 | $694,415 | $816,295 | $1,487,551 | $1,244,016 | $1,202,662 | |
| Construction Loans | $127,617 | $176,196 | $233,075 | $238,343 | $229,960 | N/A | N/A | |
| First Mtg, Closed-End Jr Liens | $501,987 | $419,784 | $461,340 | $552,240 | $1,149,857 | $1,070,105 | $1,090,525 | |
| Revolving, Open-End Loans | $0 | $0 | $0 | $25,712 | $107,734 | $173,911 | $112,137 | |
| 5 or More Dwelling Units: | $282,135 | $275,964 | $359,184 | $367,489 | $443,254 | $459,412 | $381,084 | |
| Construction Loans | $81,673 | $99,232 | $111,852 | $131,942 | $125,298 | N/A | N/A | |
| Permanent Mortgages | $200,462 | $176,732 | $247,332 | $235,547 | $317,956 | $459,412 | $381,084 | |
| Nonresidential Property: | $420,953 | $509,029 | $469,336 | $550,566 | $743,931 | $1,079,552 | $1,209,994 | |
| Construction Loans | $80,559 | $86,421 | $91,437 | $147,313 | $168,855 | N/A | N/A | |
| Permanent Mortgages | $340,394 | $422,608 | $377,899 | $403,253 | $575,076 | $1,079,552 | $1,209,994 | |
| Land | $60,302 | $30,958 | $44,071 | $33,920 | $129,692 | N/A | N/A | |
| Accrued Interest Receivable | $7,811 | $8,153 | $6,330 | $7,039 | $11,983 | N/A | N/A | |
| Construction, land development, and other land loans | | | | | | $1,002,582 | $1,990,881 | |
| Advances for Taxes and Insurance | $86 | $141 | $81 | $109 | $192 | N/A | N/A | |
| Less: Contra-Assets to Mtg Loans: | $5,112 | $5,322 | $8,688 | $11,001 | $15,015 | N/A | N/A | |
| Loans in Process | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Unamortized Yield Adjustments | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Valuation Allowances | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |

# *Exhibit 5*
# *Sterling Savings Association*
## Asset Composition
## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) |
|---|---|---|---|---|---|---|---|
| Nonmortgage Loans | $587,711 | $718,827 | $860,032 | $1,166,320 | $1,479,350 | $1,126,531 | $1,306,004 [2] |
| Commercial Loans: | $435,667 | $519,856 | $654,536 | $941,664 | $1,301,025 | $877,614 | $993,280 [3] |
| Secured, Other than Mortgage | $411,879 | $491,323 | $618,974 | $887,209 | $1,225,273 | N/A | N/A |
| Unsecured | $23,788 | $23,254 | $32,788 | $54,455 | $75,752 | N/A | N/A |
| Financing Leases | $0 | $5,279 | $2,774 | $0 | $0 | N/A | N/A |
| Consumer Loans: | $156,348 | $209,240 | $218,421 | $241,457 | $202,842 | $248,917 | $312,724 [4] |
| Closed-End Consumer Loans: | $111,848 | $158,235 | $141,934 | $173,628 | $202,842 | N/A | N/A |
| Loans on Deposits | $5,317 | $5,106 | $4,805 | $5,862 | $6,425 | N/A | N/A |
| Home Improvement Loans | $32,882 | $49,504 | $36,039 | $30,745 | $0 | N/A | N/A |
| Education Loans | $0 | $0 | $0 | $0 | $0 | N/A | N/A |
| Auto Loans | $19,075 | $68,095 | $69,565 | $111,361 | $136,941 | N/A | N/A |
| Mobile Home Loans | $1,366 | $1,137 | $956 | $1,060 | $980 | N/A | N/A |
| Other Consumer Loans & Leases | $53,208 | $34,393 | $30,569 | $24,600 | $58,496 | N/A | N/A |
| Open-End Consumer Loans: | $44,500 | $51,005 | $76,487 | $67,829 | N/A | N/A | N/A |
| Loans Secured by 1-4 Family | $33,124 | $35,346 | $57,347 | $45,833 | N/A | N/A | N/A |
| Unsecured, Credit Card & Other | $11,376 | $15,659 | $19,140 | $21,996 | N/A | N/A | N/A |
| Accrued Interest Receivable | $6,521 | $3,164 | $4,186 | $4,905 | $6,302 | N/A | N/A |
| Less: Contra-Assets to Nonmtg Lns: | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | $10,825 | $13,433 | $17,111 | $21,706 | $30,819 | N/A | N/A |
| Loans in Process | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Valuation Allowances | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Assets | $2,651,771 | $3,038,538 | $3,503,878 | $4,274,390 | $6,938,049 | $7,556,598 | $8,624,536 |

Note:
All data are consolidated, except for data prior to 1996. Data for 2005-2006 are from FDIC Call Reports.
[1] For 2005 and 2006, reported figure is equal to Item 1 from Schedule RC C. Figures do not reflect valuation allowances.
(Calculated as RCON1415 + RCON1420 + RCON1797 + RCON5367 + RCON5368 + RCON1460 + RCON1480)
[2] For 2005 and 2006, reported figure is equal to the sum of Commercial and Consumer Loans. Figures do not reflect valuation allowances.
[3] For 2005 and 2006, reported figure is equal to the sum of Items 2, 3, and 4 from Schedule RC C. (Calculated as RCON1288 + RCON1590 + RCON1766)
[4] For 2005 and 2006, reported figure is equal to Item 6 from Schedule RC C. (Calculated as RCONB538 + RCONB539 + RCON2011)

# *Exhibit 6*

## Calculation of Lost Earnings on Foregone Assets Through 2006
## Amortize Capital Credits from Lewis Federal and Tri-Cities, and
## Treat Central Evergreen Intangibles Subject to Limitations of FIRREA
## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*

*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*

*Table 3b: Calculation of Returns Applicable to Foregone Assets*

*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*

*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*

*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*

*Table 4b: Calculation of Total Disallowed Central Evergreen Supervisory Goodwill at 12/31/89*

*Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89*

*Table 5: But-For Bank*

*Table 6a: Addendum For Lewis Federal and Tri-Cities Supervisory Intangibles*

*Table 6b: Addendum For Central Evergreen Supervisory Intangibles*

*Table 7: Addendum For Non-Supervisory Goodwill*

*Table 8: 2001 – 2006 Capital Downstreamed*

# *Exhibit 6*
## *Sterling Savings Association*
### Calculation of Lost Earnings on Foregone Assets
### *Table 1: Summary of Lost Earnings Calculation*
($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | *Incremental Bank* | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/89 | $730,933 | $730,933 | $0 | | |
| 12/31/89 | 708,213 | 719,644 | 11,431 | 0.33% | 0 |
| 6/30/90 | 688,990 | 737,187 | 48,197 | 0.25% | 28 |
| 6/30/91 | 608,999 | 725,600 | 116,601 | 0.94% | 454 |
| 6/30/92 | 640,887 | 788,840 | 147,953 | 1.78% | 2,071 |
| 6/30/93 | 1,032,538 | 1,270,906 | 238,368 | 1.78% | 2,640 |
| 6/30/94 | 1,367,978 | 1,681,060 | 313,082 | 1.39% | 3,314 |
| 6/30/95 | 1,542,367 | 1,894,583 | 352,216 | 1.29% | 4,048 |
| 6/30/96 | 1,481,893 | 1,820,299 | 338,406 | 1.06% | 3,725 |
| 12/31/96 | 1,534,787 | 1,885,272 | 350,485 | -0.03% | (85) |
| 12/31/97 | 1,870,776 | 2,297,987 | 427,211 | 1.36% | 4,772 |
| 12/31/98 | 2,309,845 | 2,610,221 | 300,376 | 1.03% | 4,392 |
| 12/31/99 | 2,535,753 | 2,865,507 | 329,754 | 1.48% | 4,454 |
| 12/31/00 | 2,651,771 | 2,996,612 | 344,841 | 1.46% | 4,827 |
| 12/31/01 | 3,038,538 | 3,427,925 | 389,387 | 1.43% | 4,933 |
| 12/31/02 | 3,503,878 | 3,761,920 | 258,042 | 1.49% | 5,808 |
| 12/31/03 | 4,274,390 | 4,439,914 | 165,524 | 1.67% | 4,310 |
| 12/31/04 | 6,938,049 | 7,146,741 | 208,692 | 1.76% | 2,906 |
| 12/31/05 | 7,556,598 | 7,783,896 | 227,298 | 1.44% | 3,000 |
| 9/30/06 | 8,624,536 | 8,873,167 | 248,631 | 1.13% | 2,568 |
| | | | | | **$58,164** |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 2a, column A.

B From Table 5, column C.

D From Table 3a, column G. For periods ending 6/30/90, 12/31/96, and 9/30/06 ROAA reflects the return for the six or nine month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets.

# Exhibit 6

## Sterling Savings Association

### Table 2a: Actual Bank and Intervest Financial Data

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill | Qualifying SGW | Other Qualifying Intangibles |
| 6/30/89 | 730,933 | | | | | | | | | | | |
| 12/31/89 | 708,213 | 627 | 324 | 1,620 | 2,571 | 112 | (2,273) | -0.32% | 0 | 20,983 | 10,308 | 0 |
| 6/30/90 | 688,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 | 10,036 | 0 |
| 6/30/91 | 608,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 | 8,903 | 1,584 |
| 6/30/92 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 | 6,288 | 3,327 |
| 6/30/93 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 | 7,673 | 2,575 |
| 6/30/94 | 1,367,978 | 10,084 | 4,789 | 2,262 | 17,135 | 1,386 | 72,764 | 5.32% | 20,000 | 17,915 | 5,044 | 1,916 |
| 6/30/95 | 1,542,367 | 10,440 | 5,236 | 3,487 | 19,163 | 4,078 | 87,919 | 5.70% | 10,200 | 14,945 | 0 | 1,220 |
| 6/30/96 | 1,481,893 | 8,163 | 4,779 | 3,332 | 16,274 | 4,632 | 93,097 | 6.28% | 0 | 11,868 | | 440 |
| 12/31/96 | 1,534,787 | (1,234) | (621) | 1,586 | (269) | 2,487 | 101,602 | 6.62% | 13,100 | 10,147 | | 0 |
| 12/31/97 | 1,870,776 | 13,165 | 7,911 | 2,265 | 23,341 | 6,077 | 141,025 | 7.54% | 30,000 | 7,882 | | 0 |
| 12/31/98 | 2,309,845 | 11,185 | 6,420 | 3,980 | 21,585 | 8,088 | 143,669 | 6.22% | 52,743 | 61,180 | | 0 |
| 12/31/99 | 2,535,753 | 19,096 | 11,163 | 5,692 | 35,951 | 9,579 | 168,889 | 6.66% | 10,000 | 55,488 | | 0 |
| 12/31/00 | 2,651,771 | 20,444 | 12,008 | 5,490 | 37,942 | 10,004 | 184,828 | 6.97% | 0 | 49,998 | | 0 |
| 12/31/01 | 3,038,538 | 22,934 | 12,368 | 5,377 | 40,679 | 10,513 | 240,669 | 7.92% | 38,044 | 44,621 | | 0 |
| 12/31/02 | 3,503,878 | 31,862 | 16,260 | 644 | 48,766 | 11,616 | 261,585 | 7.47% | 0 | 43,977 | | 0 |
| 12/31/03 | 4,274,390 | 41,584 | 23,085 | 263 | 64,932 | 11,616 | 315,386 | 7.38% | 26,322 | 47,955 | | 0 |
| 12/31/04 | 6,938,049 | 63,246 | 32,927 | 2,224 | 98,397 | 11,616 | 450,918 | 6.50% | 162,076 | 132,246 | | 0 |
| 12/31/05 | 7,556,598 | 68,341 | 33,587 | 2,222 | 104,150 | 11,619 | 507,711 | 6.72% | 0 | 136,838 | | 0 |
| 9/30/06 | 8,624,536 | 60,316 | 29,388 | 1,685 | 91,389 | 16,666 | 669,065 | 7.76% | 117,188 | 137,090 | | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.
Data prior to 1996 are unconsolidated.

A - D & F & J: Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b).
Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data is merger adjusted. Data for the bank for 2005 and later are from FDIC Call Reports, which are reported on a year-to-date basis.
Column D: Data from Call Reports include goodwill impairment losses and amortization expense and impairment losses for other intangible assets.
Column J: Data from Call Reports include goodwill and other intangible assets.

G: Actual data from Thrift Financial Reports (Sheshunoff) and Call Reports, except for figure for 12/31/89, which is from the Sterling Savings Association Capital Restoration Plan dated 2/19/90. Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data are merger adjusted. Data for the bank for 12/31/05 and 9/30/06 are Tier 1 Capital from Call Reports.

I: Based on data from Sterling Savings, except for data prior to 6/30/93 which are from annual reports and offering circulars, and data after 12/31/99 which are from Table 8, column D.
Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred.
This capital was raised before the holding company was formed in November 1992.

K - L: Actual data from Thrift Financial Reports (Sheshunoff).

# Exhibit 6

## Sterling Savings Association

### Table 2b: Data for Intervest Mortgage Investment Company

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G |
|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Equity |
| 6/30/89 | | | | | | | |
| 12/31/89 | | | | | | | |
| 6/30/90 | | | | | | | |
| 6/30/91 | | | | | | | |
| 6/30/92 | | | | | | | |
| 6/30/93 | 992 | 11 | 0 | - | 11 | - | 981 |
| 6/30/94 | 4,315 | 442 | 230 | - | 672 | - | 2,868 |
| 6/30/95 | 3,686 | 802 | 417 | - | 1,219 | - | 1,670 |
| 6/30/96 | 6,123 | 1,265 | 657 | - | 1,922 | - | 2,035 |
| 12/31/96 | | | | | | | |
| 12/31/97 | | | | | | | |
| 12/31/98 | | | | | | | |
| 12/31/99 | | | | | | | |
| 12/31/00 | | | | | | | |
| 12/31/01 | | | | | | | |
| 12/31/02 | | | | | | | |
| 12/31/03 | | | | | | | |
| 12/31/04 | | | | | | | |
| 12/31/05 | | | | | | | |
| 9/30/06 | | | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. All data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

F Dividends were not listed in the consolidating financial statements.

# Exhibit 6

## Sterling Savings Association

### Table 3a: Estimates for the But-For and Incremental Banks

($ in Thousands)

| | A (But-For) | B (But-For) | | | C (Incremental) | D (But-For) | E (But-For) | F (But-For) | G (Incremental) |
|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Estimated Capital Ratio | Adjustments to But-For: Income | Capital, Assets | Note | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Adjusted ROAA |
| 6/30/89 | | | | | | | | | |
| 12/31/89 | 4.00% | 0 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1989 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase(-$0.115m). Income: Adjustment for wounded bank damages. | 37% | See footnote [D]. | 2.91% | 0 | 0.33% |
| 6/30/90 | 4.00% | 1,116 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 6/30/91 | 4.00% | 1,091 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.94% |
| 6/30/92 | 5.50% | 1,057 | 23,052 | Capital, Assets: Net proceeds for common stock issuance ($21 million) plus contribution to regulatory capital from conversion of preferred ($2.1 million). Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.78% |
| 6/30/93 | 5.75% | 591 | 12,900 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.78% |
| 6/30/94 | 5.75% | 0 | 10,092 | Capital, Assets: Downstreamed capital from Sterling Financial ($20 million) plus adjustment due to Great American branch purchase ($1.9 million) less acquisition premium paid by Sterling for branches in Oregon ($3 million) and acquisition premium paid by Sterling for branches in Washington State ($8.8 million). Income: Adjustment for wounded bank damages. Source for acquisition premiums: 1994 AR, p. 35 | 37% | | 31.34% | 11,800 | 1.39% |
| 6/30/95 | 6.00% | 0 | 10,200 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 12.50% | 3,400 | 1.29% |
| 6/30/96 | 6.30% | 0 | 0 | Income: Adjustment for wounded bank damages. | 37% | | -3.92% | 0 | 1.06% |
| 12/31/96 | 6.75% | 0 | 13,100 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 3.57% | 0 | -0.03% |
| 12/31/97 | 6.75% | 0 | 30,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 21.89% | 0 | 1.36% |
| 12/31/98 | 6.75% | 0 | -4,619 | Capital, Assets: Downstreamed capital from Sterling Financial ($52.7 million) less intangibles generated in the Key Bank acquisition ($57.4 million). Source for intangibles: 1998 AR, p. F-9 | 37% | | 9.45% | 262,236 | 1.03% |
| 12/31/99 | 6.75% | 0 | 10,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 9.78% | 0 | 1.48% |
| 12/31/00 | 7.00% | 0 | 0 | | 37% | | 4.58% | 0 | 1.46% |
| 12/31/01 | 8.00% | 0 | 38,044 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 12.92% | 44,211 | 1.43% |
| 12/31/02 | 8.00% | 0 | 0 | | 37% | | 15.31% | 0 | 1.49% |
| 12/31/03 | 8.00% | 0 | 22,081 | Capital, Assets: Downstreamed capital from Sterling Financial ($26.3 million) less goodwill and a deposit intangible generated in the Empire Federal Bancorp acquisition ($4.2 million). Source for intangibles: Sterling Savings 12/31/03 10-K, pp. F-45-46. | 37% | | 15.43% | 229,982 | 1.67% |
| 12/31/04 | 6.75% | 0 | 75,576 | Capital, Assets: Downstreamed capital from Sterling Financial ($162.1 million) less goodwill and core deposit intangibles from KFBI acquisition ($65.7 million + $19.2 million) and goodwill from acquisition of PWWA ($1.6 million). Source for intangibles: 12/31/04 10-K, pp. F-44-45. | 37% | | 26.08% | 1,548,905 | 1.76% |
| 12/31/05 | 7.00% | 0 | 0 | | 37% | | 8.92% | 0 | 1.44% |
| 9/30/06 | 8.00% | 0 | 117,188 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 12.31% | 138,000 | 1.13% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 assumed to equal 4% based on projected RAP leverage ratios in Sterling's 8/15/88 Business Plan. From 6/30/92 on, estimated to start at 5.50%, increasing over time consistent with the increase in the actual bank's core capital ratio.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3c, column F. Adjustments to but-for capital & assets based on data from Sterling Savings, except for data prior to 6/30/93 which is from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G), and data after 12/31/99 which are from Table 8, column D.

C Estimated to be 37% of incremental earnings based on guidance provided by Dan Byrne, CFO, of Sterling Savings Association.

D Estimated to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is estimated that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

E From Table 3e, column F.

F From Table 3e, column B.

G From Table 3b, column F.

# Exhibit 6

## Sterling Savings Association

### Table 3b: Calculation of Returns Applicable to Foregone Assets

($ in Thousands)

| | A | B | C | D | E = B - C - D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| Period Ended | Actual Assets | Pre-Tax, Pre-Amortization Income | Actual Accretion Income | Adjustments to Earnings due to Non-recurring or Breach-induced Gains/(Losses) | Adjusted Pre-Tax, Pre-Amort. Earnings | Adjusted ROAA |
| 6/30/89 | 730,933 | | | | | |
| 12/31/89 | 708,213 | 2,571 | 178 | 0 | 2,393 | 0.33% |
| 6/30/90 | 688,990 | 786 | 178 | (1,116) | 1,724 | 0.25% |
| 6/30/91 | 608,999 | 5,380 | 354 | (1,091) | 6,117 | 0.94% |
| 6/30/92 | 640,887 | 10,395 | 351 | (1,057) | 11,101 | 1.78% |
| 6/30/93 | 1,032,538 | 14,775 | 437 | (591) | 14,930 | 1.78% |
| 6/30/94 | 1,367,978 | 17,135 | 447 | 0 | 16,688 | 1.39% |
| 6/30/95 | 1,542,367 | 19,163 | 350 | 0 | 18,813 | 1.29% |
| 6/30/96 | 1,481,893 | 16,274 | 282 | 0 | 15,992 | 1.06% |
| 12/31/96 | 1,534,787 | (269) | 111 | 0 | (380) | -0.03% |
| 12/31/97 | 1,870,776 | 23,341 | 159 | 0 | 23,182 | 1.36% |
| 12/31/98 | 2,309,845 | 21,585 | 95 | 0 | 21,490 | 1.03% |
| 12/31/99 | 2,535,753 | 35,951 | 25 | 0 | 35,926 | 1.48% |
| 12/31/00 | 2,651,771 | 37,942 | (24) | 0 | 37,966 | 1.46% |
| 12/31/01 | 3,038,538 | 40,679 | (24) | 0 | 40,703 | 1.43% |
| 12/31/02 | 3,503,878 | 48,766 | (24) | 0 | 48,790 | 1.49% |
| 12/31/03 | 4,274,390 | 64,932 | (24) | 0 | 64,956 | 1.67% |
| 12/31/04 | 6,938,049 | 98,397 | (24) | 0 | 98,421 | 1.76% |
| 12/31/05 | 7,556,598 | 104,150 | (24) | 0 | 104,174 | 1.44% |
| 9/30/06 | 8,624,536 | 91,389 | (18) | 0 | 91,407 | 1.13% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Actual data from Thrift Financial Reports (Sheshunoff) and hard-copy TFR's for Sterling Savings and from consolidating financials from 6/30/93-6/30/96 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion Income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. For 2001 – 2006, the accretion income in each year is assumed to be equal to the accretion income in 2000. Accretion income for 9/30/06 is pro-rated.
Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# Exhibit 6

## Sterling Savings Association

### Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital

($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - ( C / B )) | E | F = D + E | G |
| Period Ended | Extraordinary Items Net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 6/30/89 | | | | | | | |
| 12/31/89 | $0 | $951 | $324 | $0 | $0 | $0 | ($115) |
| 6/30/90 | 0 | (847) | (487) | 0 | (1,116) | (1,116) | |
| 6/30/91 | 298 | 2,312 | 590 | 400 | (1,491) | (1,091) | |
| 6/30/92 | (522) | 8,585 | 3,319 | (851) | (206) | (1,057) | |
| 6/30/93 | (424) | 12,970 | 4,920 | (683) | 92 | (591) | |
| 6/30/94 | 0 | 14,201 | 4,559 | 0 | 0 | 0 | $1,892 |
| 6/30/95 | 0 | 14,457 | 4,819 | 0 | 0 | 0 | |
| 6/30/96 | 0 | 11,020 | 4,122 | 0 | 0 | 0 | |
| 12/31/96 | 0 | (1,855) | (621) | 0 | 0 | 0 | |
| 12/31/97 | 0 | 21,076 | 7,911 | 0 | 0 | 0 | |
| 12/31/98 | 0 | 17,605 | 6,420 | 0 | 0 | 0 | |
| 12/31/99 | 0 | 30,259 | 11,163 | 0 | 0 | 0 | |
| 12/31/00 | 0 | 32,452 | 12,008 | 0 | 0 | 0 | |
| 12/31/01 | 0 | 35,302 | 12,368 | 0 | 0 | 0 | |
| 12/31/02 | 0 | 48,122 | 16,260 | 0 | 0 | 0 | |
| 12/31/03 | 0 | 64,669 | 23,085 | 0 | 0 | 0 | |
| 12/31/04 | 0 | 96,173 | 32,927 | 0 | 0 | 0 | |
| 12/31/05 | 0 | 101,928 | 33,587 | 0 | 0 | 0 | |
| 9/30/06 | 0 | 89,704 | 29,388 | 0 | 0 | 0 | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff), except for data for 1998 which are from hardcopy TFR's, and data for 2005 and later, which are from FDIC Call Reports, and are reported on a year-to-date basis.

D Extraordinary Items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.

E From Table 3d, column F.

G Source: Data from Sterling Savings Association.

# Exhibit 6
# Sterling Savings Association
## *Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*
($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ-4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 6/30/89 | | | | | | |
| 12/31/89 | $0 | $0 | $0 | $0 | | $0 |
| 6/30/90 | (6) | (75) | (1,004) | (31) | | (1,116) |
| 6/30/91 | (1,189) | (66) | 0 | (236) | | (1,491) |
| 6/30/92 | (138) | (32) | 0 | (37) | | (206) |
| 6/30/93 | 92 | 0 | 0 | 0 | | 92 |
| 6/30/94 | 0 | 0 | 0 | 0 | | 0 |
| 6/30/95 | 0 | 0 | 0 | 0 | | 0 |
| 6/30/96 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/96 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/97 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/98 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/99 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/00 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/01 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/02 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/03 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/04 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/05 | 0 | 0 | 0 | 0 | | 0 |
| 9/30/06 | 0 | 0 | 0 | 0 | | 0 |
| Total | $(1,241) | $(172) | $(1,004) | $(304) | $0 | $(2,721) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date. Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9). Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 3e: Summary of Internal versus External Growth in Total Assets*

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| Period Ended | Actual Total Assets | Acquired Assets | Notes | Actual Growth | Internal Growth | But-For Internal Growth Rate |
| 6/30/89 | 730,933 | 0 | | | | |
| 12/31/89 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 6/30/90 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 6/30/91 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 6/30/92 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 6/30/93 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |
| 6/30/94 | 1,367,978 | 11,800 | Acquisition of deposits of three branch facilities in Portland, Oregon (April 1994; $53m in deposits, $3m premium paid). Acquisition of deposits of five branch facilities in Washington State (May 1994; $135m in deposits, $8.8m premium paid). "Sterling used substantially all of the net funds corresponding to the acquired deposit liabilities to repay certain reverse repurchase borrowings and FBLB Seattle advances." Source: 6/31/94 AR, Note 4. | 32.49% | 31.34% | 31.34% |
| 6/30/95 | 1,542,367 | 3,400 | American Liberty acquisition (December 1994; acquired American's loan servicing portfolio of ~ $451.4m in residential loans, $3.4m in purchased mortgage servicing rights). Source: 6/31/95 AR, Note 3. | 12.75% | 12.50% | 12.50% |
| 6/30/96 | 1,481,893 | 0 | | -3.92% | -3.92% | -3.92% |
| 12/31/96 | 1,534,787 | 0 | | 3.57% | 3.57% | 3.57% |
| 12/31/97 | 1,870,776 | 0 | | 21.89% | 21.89% | 21.89% |
| 12/31/98 | 2,309,845 | 262,236 | Keybank (June 1998; $518m in assets acquired including cash, "[w]ith the net cash received from the branch acquisition, Sterling repaid approximately $322 million of certain reverse repurchase borrowings and Federal Home Loan Bank of Seattle advances") and Big Sky (November 1998; $66m in assets) acquisitions. Source: 12/31/98 10K. | 23.47% | 9.45% | 9.45% |
| 12/31/99 | 2,535,753 | 0 | | 9.78% | 9.78% | 9.78% |
| 12/31/00 | 2,651,771 | 0 | | 4.58% | 4.58% | 4.58% |
| 12/31/01 | 3,038,538 | 44,211 | Acquisition of Source Capital. Source: 12/31/01 10-K, p.F-50. | 14.59% | 12.92% | 12.92% |
| 12/31/02 | 3,503,878 | 0 | | 15.31% | 15.31% | 15.31% |
| 12/31/03 | 4,274,390 | 229,982 | Acquisition of Empire Federal Bancorp. Sum of $143.6 million in cash, $67.3 million of loans, $6.7 million in investments and asset backed securities, $4.2 million of goodwill and other intangibles, and $8.1 million in other assets. Source: Sterling Savings 12/31/03 10-K, pp. F-45-46. | 21.99% | 15.43% | 15.43% |
| 12/31/04 | 6,938,049 | 1,548,905 | Acquisition of KFBI, owner of Klamath First Federal Savings and Loan Association, and Peter W. Wong Associates, Inc. Sum of assets acquired in KFBI acquisition ($44.9 million in cash and cash equivalents, $778.2 million in investments and asset backed securities, $564.5 million in loans receivable, $65.7 million in goodwill, $19.2 million in core deposit intangibles, and $74.9 million in other assets) and goodwill generated from PWWA acquisition ($1.6 million in goodwill). Source: 12/31/04 10-K, pp. F-44-45. | 62.32% | 26.08% | 26.08% |
| 12/31/05 | 7,556,598 | 0 | | 8.92% | 8.92% | 8.92% |
| 9/30/06 | 8,624,536 | 138,000 | Sterling Financial Corporation acquired Lynnwood Financial, parent company of Golf Savings Bank on 7/5/06. Golf Savings Bank was maintained as a separate subsidiary of Sterling Financial Corporation. Golf Savings Bank transferred $322 million in construction loans to Sterling Savings, and Sterling Savings transferred $184 million in Federal Funds to Golf Savings Bank. Source: 9/30/06 10-Q, pp. 16-17; "Exhibit VII.2. -Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings. | 14.13% | 12.31% | 12.31% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended as of that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A From Table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 8/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. From 6/30/93 on, the growth rate on incremental assets is assumed to be the same as the internal growth of the actual bank as reflected in column E.

# Exhibit 6

## Sterling Savings Association

### *Table 4a:* Goodwill and Intangibles Data for the But-For Bank

($ in Thousands)

| | Lewis Federal and Tri-Cities Supervisory Intangibles | | | | | | Central Evergreen Supervisory Intangibles | | | | | | Non Supervisory Intangibles | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A = B + C | B | C | D | E | F | G = H + I | H | I | J | K | L | M | N | O = D + E + F + J + K + L + N |
| Period Ended | Total Intangibles | Capital Credit | Supervisory Goodwill | Amortization of Supervisory Goodwill and Capital Credit | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Unidentified and Identified Intangibles | Identified Intangibles | Supervisory Goodwill | Amortization of Identified and Unidentified Intangibles | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Balances | Total Amortization of Non-Supervisory Intangibles | Total Amortization, Adjustments and NOL's |
| 6/30/89 | $16,067 | $12,342 | $3,724 | $1,020 | $0 | $0 | $18,700 | $6,075 | $12,625 | $1,324 | $0 | $59 | $1,407 | $108 | $2,512 |
| 12/31/89 | 15,557 | 11,929 | 3,627 | 510 | 0 | 0 | 17,026 | 5,670 | 11,357 | 1,480 | 0 | 193 | 1,353 | 54 | 2,238 |
| 6/30/90 | 15,047 | 11,516 | 3,530 | 510 | 0 | 0 | 16,112 | 5,265 | 10,847 | 1,268 | (354) | 0 | 1,299 | 54 | 1,478 |
| 6/30/91 | 13,673 | 10,691 | 2,983 | 1,020 | 0 | 353 | 11,573 | 4,455 | 7,118 | 1,873 | 0 | 2,666 | 1,190 | 108 | 6,021 |
| 6/30/92 | 12,232 | 9,865 | 2,368 | 948 | 493 | 0 | 8,616 | 3,645 | 4,971 | 1,859 | 1,098 | 0 | 1,082 | 108 | 4,506 |
| 6/30/93 | 11,285 | 9,039 | 2,245 | 948 | 0 | 0 | 6,848 | 2,835 | 4,013 | 1,768 | 0 | 0 | 974 | 108 | 2,824 |
| 6/30/94 | 10,337 | 8,213 | 2,123 | 948 | 0 | 0 | 5,142 | 2,025 | 3,117 | 1,706 | 0 | 0 | 12,450 | 324 | 2,978 |
| 6/30/95 | 9,389 | 7,388 | 2,001 | 948 | 0 | 0 | 3,525 | 1,215 | 2,310 | 1,617 | 0 | 0 | 10,867 | 1,583 | 4,148 |
| 6/30/96 | 8,441 | 6,562 | 1,879 | 948 | 0 | 0 | 2,009 | 405 | 1,604 | 1,517 | 0 | 0 | 9,284 | 1,583 | 4,048 |
| 12/31/96 | 7,967 | 6,149 | 1,818 | 474 | 0 | 0 | 1,306 | 0 | 1,306 | 703 | 0 | 0 | 8,492 | 792 | 1,968 |
| 12/31/97 | 7,019 | 5,323 | 1,696 | 948 | 0 | 0 | 773 | 0 | 773 | 533 | 0 | 0 | 6,909 | 1,583 | 3,064 |
| 12/31/98 | 6,071 | 4,497 | 1,573 | 948 | 0 | 0 | 371 | 0 | 371 | 402 | 0 | 0 | 60,426 | 3,483 | 4,833 |
| 12/31/99 | 5,123 | 3,672 | 1,451 | 948 | 0 | 0 | 115 | 0 | 115 | 256 | 0 | 0 | 55,042 | 5,383 | 6,587 |
| 12/31/00 | 4,175 | 2,846 | 1,329 | 948 | 0 | 0 | 0 | 0 | 0 | 115 | 0 | 0 | 49,659 | 5,383 | 6,446 |
| 12/31/01 | 3,227 | 2,020 | 1,207 | 948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44,282 | 5,377 | 6,325 |
| 12/31/02 | 2,279 | 1,194 | 1,085 | 948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43,638 | 644 | 1,592 |
| 12/31/03 | 1,974 | 955 | 1,019 | 305 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,616 | 263 | 568 |
| 12/31/04 | 1,883 | 911 | 972 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 131,892 | 2,224 | 2,314 |
| 12/31/05 | 1,793 | 867 | 926 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 129,670 | 2,222 | 2,312 |
| 9/30/06 | 1,856 | 966 | 891 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 127,985 | 1,685 | 1,753 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Intangibles from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

B From Table 6a, column E. Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C From Table 6a, column J. Supervisory goodwill from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

D See note A above. Amortization of the supervisory goodwill is based on data from Sterling Savings Association. Amortization of the capital credit is from Table 6a, columns B and D. Amortization for 12/31/96 is for the six months ended 12/31/96. Amortization for 9/30/06 is for the nine months ended 9/30/06.

E, F, K & L Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

G Intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

H Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

I From Table 6b, column C. Based on data from Sterling Savings association.

J Calculated as Table 6b, column B + Table 6b, column D.

M & N Assumed balances and amortization of intangibles resulting from the Lewis & Clark merger (FY83). The goodwill amortization for this deal is modeled on an assumed straight-line basis through 2000. All data is based on information from Sterling Annual Reports. From Table 7, columns D and H.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 4b: Calculation of Total Disallowed Central Evergreen Supervisory Goodwill at 12/31/89*

($ in Thousands)

| | A | B | C | D | E = C * D | F = min(A,E) | G |
|---|---|---|---|---|---|---|---|
| Period ended | Central Evergreen SGW | Actual Reported Qualifying SGW | But-For Bank Beginning Period Tangible Assets | Phaseout Schedule of SGW | But-For Constraint | But-For Qualifying SGW | Adjustment to But-For Core Capital |
| 6/30/89 | $12,625 | | | | | | |
| 12/31/89 | 11,357 | $10,308 | $694,760 | 1.500% | $10,421 | $10,421 | n/a |
| 6/30/90 | 10,847 | 10,036 | 685,708 | 1.500% | 10,286 | 10,286 | (136) |
| 6/30/91 | 7,118 | 8,903 | 704,730 | 1.500% | 10,571 | 7,118 | (3,167) |
| 6/30/92 | 4,971 | 6,288 | 699,163 | 1.000% | 6,992 | 4,971 | (2,147) |
| 6/30/93 | 4,013 | 7,673 | 766,910 | 0.750% | 5,752 | 4,013 | (958) |
| 6/30/94 | 3,117 | 5,044 | 1,251,799 | 0.375% | 4,694 | 3,117 | (896) |
| 6/30/95 | 2,310 | | 1,653,132 | 0.000% | 0 | 0 | (3,117) |
| 6/30/96 | 1,604 | | 1,870,802 | 0.000% | 0 | 0 | 0 |
| 12/31/96 | 1,306 | | 1,800,566 | 0.000% | 0 | 0 | 0 |
| 12/31/97 | 773 | | 1,867,507 | 0.000% | 0 | 0 | 0 |
| 12/31/98 | 371 | | 2,283,287 | 0.000% | 0 | 0 | 0 |
| 12/31/99 | 115 | | 2,543,354 | 0.000% | 0 | 0 | 0 |
| 12/31/00 | 0 | | 2,805,226 | 0.000% | 0 | 0 | 0 |
| 12/31/01 | 0 | | 2,942,777 | 0.000% | 0 | 0 | 0 |
| 12/31/02 | 0 | | 3,380,416 | 0.000% | 0 | 0 | 0 |
| 12/31/03 | 0 | | 3,716,002 | 0.000% | 0 | 0 | 0 |
| 12/31/04 | 0 | | 4,390,324 | 0.000% | 0 | 0 | 0 |
| 12/31/05 | 0 | | 7,012,966 | 0.000% | 0 | 0 | 0 |
| 9/30/06 | 0 | | 7,652,433 | 0.000% | 0 | 0 | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which is as of the nine months ended on that date.
Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 4a, column I.
B Actual data from Thrift Financial Reports (Sheshunoff).
C Calculated as the but-for bank's assets at the beginning of the period less total intangibles at the beginning of the period. (Calculated as Table 5, column C[t-1] - (Table 4a, column A[t-1] + Table 4a, column G[t-1] + Table 4a, column M[t-1])).
D Post-FIRREA, a portion of supervisory goodwill (based on a percentage of tangible assets) was allowed to count towards core capital. Qualifying percentages are from the Thrift Financial Report Instruction Manual 1991.
G Calculated as column F[t] - column F[t-1].

# *Exhibit 6*

# *Sterling Savings Association*

## *Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89*

($ in Thousands)

| | A | B | C | D | E | F = D * E | G = min(A,F) | H |
|---|---|---|---|---|---|---|---|---|
| Period ended | Identified Intangibles | Actual Reported Other Qualifying Intangibles | Actual Tangible Capital | But-For Bank Tangible Capital + But-For Qualifying SGW | Percentage of Tangible Capital + QSGW That Can Be Counted | But-For Constraint | But-For Other Qualifying Intangibles | Adjustment to But-For Core Capital |
| 6/30/89 | $6,075 | | | | | | | |
| 12/31/89 | 5,670 | $0 | ($9,949) | $23,170 | 25.000% | $5,793 | $5,670 | |
| 6/30/90 | 5,265 | 0 | (11,390) | 23,116 | 25.000% | 5,779 | 5,265 | (405) |
| 6/30/91 | 4,455 | 1,584 | (2,567) | 24,223 | 25.000% | 6,056 | 4,455 | (810) |
| 6/30/92 | 3,645 | 3,327 | 25,651 | 24,569 | 25.000% | 6,142 | 3,645 | (810) |
| 6/30/93 | 2,835 | 2,575 | 48,191 | 52,503 | 25.000% | 13,126 | 2,835 | (810) |
| 6/30/94 | 2,025 | 1,916 | 62,936 | 74,460 | 25.000% | 18,615 | 2,025 | (810) |
| 6/30/95 | 1,215 | 1,220 | 85,029 | 95,273 | 25.000% | 23,818 | 1,215 | (810) |
| 6/30/96 | 405 | 440 | 90,622 | 113,325 | 25.000% | 28,331 | 405 | (810) |
| 12/31/96 | 0 | 0 | 101,602 | 121,105 | 25.000% | 30,276 | 0 | (405) |
| 12/31/97 | 0 | 0 | 141,025 | 131,466 | 25.000% | 32,867 | 0 | 0 |
| 12/31/98 | 0 | 0 | n/a | | | | | |
| 12/31/99 | 0 | 0 | n/a | | | | | |
| 12/31/00 | 0 | 0 | n/a | | | | | |
| 12/31/01 | 0 | 0 | n/a | | | | | |
| 12/31/02 | 0 | 0 | n/a | | | | | |
| 12/31/03 | 0 | 0 | n/a | | | | | |
| 12/31/04 | 0 | 0 | n/a | | | | | |
| 12/31/05 | 0 | 0 | n/a | | | | | |
| 9/30/06 | 0 | 0 | n/a | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which is as of the nine months ended on that date.
Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A — From Table 4a, column H.
B, C — Actual data from Thrift Financial Reports (Sheshunoff).
D — Calculated as the previous period's but-for core capital less the previous period's but-for other qualifying intangibles. (Calculated as Table 5, column I[t-1] - column G[t-1]). For 12/31/89, calculated as the but-for bank's core capital at 12/31/89 before inclusion of but-for other qualifying intangibles.
E — Post FIRREA, a maximum of 25% of (Tangible Capital + Qualifying SGW) can be counted towards Other Qualifying Intangible Assets.
H — Calculated as column G[t] - column G[t-1].

# Exhibit 6
## Sterling Savings Association
### Table 5: But-For Bank
($ in Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised / Adjustments to Core Capital | Adjustment to But-For Core Capital Due to Phaseout of Central Evergreen Intangibles + Limitation on Other Qualifying Intangibles |
| 6/30/89 | | | 730,933 | | | | | | | | | |
| 12/31/89 | 752,177 | 719,644 | 719,644 | 2,571 | 324 | 2,045 | 202 | 353 | 28,786 | 4.00% | 10,385 | n/a |
| 6/30/90 | 745,291 | 737,187 | 737,187 | 1,930 | (64) | 1,833 | 161 | 241 | 29,487 | 4.00% | 0 | (541) |
| 6/30/91 | 801,437 | 725,600 | 725,600 | 6,925 | 1,162 | 3,001 | 2,763 | 876 | 29,024 | 4.00% | 0 | (3,977) |
| 6/30/92 | 788,840 | 1,020,874 | 788,840 | 13,523 | 4,476 | 2,916 | 6,131 | 576 | 56,148 | 7.12% | 23,052 | (2,957) |
| 6/30/93 | 1,270,906 | 1,344,260 | 1,270,906 | 18,006 | 6,116 | 2,824 | 9,067 | 928 | 77,295 | 6.08% | 12,900 | (1,768) |
| 6/30/94 | 1,681,060 | 1,692,145 | 1,681,060 | 20,449 | 6,015 | 2,978 | 11,456 | 1,868 | 97,298 | 5.79% | 10,092 | (1,706) |
| 6/30/95 | 1,894,583 | 1,909,004 | 1,894,583 | 23,211 | 6,734 | 4,148 | 12,329 | 4,560 | 114,540 | 6.05% | 10,200 | (3,927) |
| 6/30/96 | 1,820,299 | 1,928,726 | 1,820,299 | 19,999 | 6,157 | 4,048 | 9,794 | 5,114 | 121,510 | 6.68% | 0 | (810) |
| 12/31/96 | 1,885,272 | 1,947,646 | 1,885,272 | (354) | (818) | 1,968 | (1,505) | 2,728 | 131,466 | 6.97% | 13,100 | (405) |
| 12/31/97 | 2,297,987 | 2,553,999 | 2,297,987 | 28,113 | 9,677 | 3,064 | 15,372 | 6,559 | 172,395 | 7.50% | 30,000 | 0 |
| 12/31/98 | 2,777,438 | 2,610,221 | 2,610,221 | 25,977 | 8,045 | 4,833 | 13,099 | 8,570 | 176,190 | 6.75% | (4,619) | 0 |
| 12/31/99 | 2,865,507 | 3,004,070 | 2,865,507 | 40,405 | 12,811 | 6,587 | 21,007 | 10,061 | 202,775 | 7.08% | 10,000 | 0 |
| 12/31/00 | 2,996,612 | 3,147,362 | 2,996,612 | 42,769 | 13,794 | 6,446 | 22,528 | 10,486 | 220,315 | 7.35% | 0 | 0 |
| 12/31/01 | 3,427,925 | 3,472,938 | 3,427,925 | 45,612 | 14,193 | 6,325 | 25,094 | 10,995 | 277,835 | 8.11% | 38,044 | 0 |
| 12/31/02 | 3,952,898 | 3,761,920 | 3,761,920 | 54,574 | 18,409 | 1,592 | 34,573 | 12,098 | 300,954 | 8.00% | 0 | 0 |
| 12/31/03 | 4,572,239 | 4,439,914 | 4,439,914 | 69,242 | 24,680 | 568 | 43,994 | 12,098 | 355,193 | 8.00% | 22,081 | 0 |
| 12/31/04 | 7,146,741 | 7,198,238 | 7,146,741 | 101,303 | 34,002 | 2,314 | 64,986 | 12,098 | 485,881 | 6.80% | 75,576 | 0 |
| 12/31/05 | 7,783,896 | 7,802,030 | 7,783,896 | 107,150 | 34,697 | 2,312 | 70,140 | 12,101 | 546,142 | 7.02% | 0 | 0 |
| 9/30/06 | 8,879,806 | 8,873,167 | 8,873,167 | 93,957 | 30,338 | 1,753 | 61,866 | 17,028 | 709,853 | 8.00% | 117,188 | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which is as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Calculated as column C[t-1] times (1 plus Table 3a, column E), plus Table 3a, column F.

B Calculated as column I divided by Table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from Table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in Table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractual amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column D + Table 4a, column J + Table 4a, column N.)

H Assumed to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

I Calculated as the sum of the but-for bank's previous period's core capital, plus the current period's net income, less dividends paid out, plus any additional capital raised, plus adjustments to but-for core capital based on phase-out of Central Evergreen Qualifying SGW and limitation on other qualifying intangibles, less adjustments to and NOL usages against Lewis Federal and Tri-Cities supervisory goodwill, plus the amortization of Central Evergreen supervisory goodwill and identified intangibles, plus the amortization of non-supervisory intangibles.
(Calculated as columns I[t-1] + G - H + K + L - Table 4a, column E - Table 4a, column F + Table 4a, column J + Table 4a, column N).
12/31/89 but-for core capital is calculated as the sum of the actual bank's 12/31/89 core capital, less Qualifying SGW, plus Lewis Federal and Tri-Cities intangibles, plus but-for Qualifying SGW, plus but-for Other Qualifying Intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends.
(Calculated as Table 2a, column G - Table 4b, column B + Table 4a, column A + Table 4b, column F + Table 4c, column G + column K + (column G - Table 2a, column B) - (column H - Table 2a, column F)).

K From Table 3a, column B.

L Table 4b, column G + Table 4c, column H.

# Exhibit 6

## Sterling Savings Association

### Table 6a: Addendum For Lewis Federal and Tri-Cities Supervisory Intangibles

($ in Thousands)

| | Capital Credit | | | | | Supervisory Goodwill | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J = F + H |
| | Lewis Federal | | Tri-Cities | | Total | Lewis Federal | | Tri-Cities | | Total |
| Period Ended | Balance | Amortization | Balance | Amortization | Balance | Balance | Amortization | Balance | Amortization | Balance |
| 11/5/85 | $1,750 | | | | $1,750 | $2,044 | | | | $2,044 |
| 12/31/85 | 1,743 | $7 | | | 1,743 | 2,036 | $8 | | | 2,036 |
| 6/30/86 | 1,721 | 22 | | | 1,721 | 1,814 | 23 | | | 1,814 |
| 6/30/87 | 1,677 | 44 | | | 1,677 | 1,768 | 46 | | | 1,768 |
| 4/8/88 | | | $11,730 | | | | | | | |
| 6/30/88 | 1,633 | 44 | 11,535 | $196 | 13,168 | 1,743 | 12 | $2,176 | | 3,919 |
| 6/30/89 | 1,590 | 44 | 10,753 | 782 | 12,342 | 1,696 | 47 | 2,028 | $148 | 3,724 |
| 12/31/89 | 1,568 | 22 | 10,362 | 391 | 11,929 | 1,673 | 23 | 1,955 | 74 | 3,627 |
| 6/30/90 | 1,546 | 22 | 9,971 | 391 | 11,516 | 1,649 | 23 | 1,881 | 74 | 3,530 |
| 6/30/91 | 1,502 | 44 | 9,189 | 782 | 10,691 | 1,603 | 47 | 1,380 | 148 | 2,983 |
| 6/30/92 | 1,458 | 44 | 8,407 | 782 | 9,865 | 1,556 | 47 | 812 | 75 | 2,368 |
| 6/30/93 | 1,415 | 44 | 7,625 | 782 | 9,039 | 1,509 | 47 | 736 | 75 | 2,245 |
| 6/30/94 | 1,371 | 44 | 6,843 | 782 | 8,213 | 1,463 | 47 | 661 | 75 | 2,123 |
| 6/30/95 | 1,327 | 44 | 6,061 | 782 | 7,388 | 1,416 | 47 | 585 | 75 | 2,001 |
| 6/30/96 | 1,283 | 44 | 5,279 | 782 | 6,562 | 1,369 | 47 | 510 | 75 | 1,879 |
| 12/31/96 | 1,261 | 22 | 4,888 | 391 | 6,149 | 1,346 | 23 | 472 | 38 | 1,818 |
| 12/31/97 | 1,218 | 44 | 4,106 | 782 | 5,323 | 1,299 | 47 | 396 | 75 | 1,696 |
| 12/31/98 | 1,174 | 44 | 3,324 | 782 | 4,497 | 1,253 | 47 | 321 | 75 | 1,573 |
| 12/31/99 | 1,130 | 44 | 2,542 | 782 | 3,672 | 1,206 | 47 | 245 | 75 | 1,451 |
| 12/31/00 | 1,086 | 44 | 1,760 | 782 | 2,846 | 1,159 | 47 | 170 | 75 | 1,329 |
| 12/31/01 | 1,043 | 44 | 978 | 782 | 2,020 | 1,113 | 47 | 94 | 75 | 1,207 |
| 12/31/02 | 999 | 44 | 196 | 782 | 1,194 | 1,066 | 47 | 19 | 75 | 1,085 |
| 12/31/03 | 955 | 44 | 0 | 196 | 955 | 1,019 | 47 | 0 | 19 | 1,019 |
| 12/31/04 | 911 | 44 | 0 | | 911 | 972 | 47 | 0 | | 972 |
| 12/31/05 | 868 | 44 | 0 | | 867 | 926 | 47 | 0 | | 926 |
| 9/30/06 | 966 | 33 | 0 | | 966 | 891 | 35 | 0 | | 891 |

Note: All data are as of or for the fiscal year specified, except: (1) data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, (2) data for 9/30/06, which are as of the nine months ended on that date, (3) 12/31/85, which reflects balances and amortization as of that date, and (4) data for 11/5/85 and 4/8/88, which reflect the beginning capital credit balances from the Lewis Federal and Tri-Cities acquisitions. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A, C, F – I Based on data from Sterling Savings Association.

B Assumes a 40 year amortization schedule.

D Assumes a 15 year amortization schedule.

# Exhibit 6

## Sterling Savings Association

### Table 6b: Addendum For Central Evergreen Supervisory Intangibles

($ in Thousands)

| | Identified Intangibles | | Unidentified Intangibles | |
|---|---|---|---|---|
| | A | B | C | D |
| Period Ended | Balance | Amortization | Balance | Amortization |
| 6/30/89 | $6,075 | 405 | $12,625 | 919 |
| 12/31/89 | 5,670 | 405 | 11,357 | 1,075 |
| 6/30/90 | 5,265 | 405 | 10,847 | 863 |
| 6/30/91 | 4,455 | 810 | 7,118 | 1,063 |
| 6/30/92 | 3,645 | 810 | 4,971 | 1,050 |
| 6/30/93 | 2,835 | 810 | 4,013 | 958 |
| 6/30/94 | 2,025 | 810 | 3,117 | 896 |
| 6/30/95 | 1,215 | 810 | 2,310 | 807 |
| 6/30/96 | 405 | 810 | 1,604 | 707 |
| 12/31/96 | 0 | 405 | 1,306 | 298 |
| 12/31/97 | | | 773 | 533 |
| 12/31/98 | | | 371 | 402 |
| 12/31/99 | | | 115 | 256 |
| 12/31/00 | | | 0 | 115 |
| 12/31/01 | | | | |
| 12/31/02 | | | | |
| 12/31/03 | | | | |
| 12/31/04 | | | | |
| 12/31/05 | | | | |
| 9/30/06 | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

B - D Based on data from Sterling Savings Association.

# Exhibit 6

# Sterling Savings Association

## Table 7: Addendum for Non-Supervisory Goodwill

Source: Sterling Annual Reports and TFRs
($ in thousands)

| | Assumed Straight-Line Amortization | | | | | Balances | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A + B + C | | E | F | G | H = E + F + G |
| Period Ended | Lewis & Clark | WA & OR Branches | KeyBank | Total Amortization | Explanation | Lewis & Clark | WA & OR Branches | KeyBank | Total |
| 6/30/83 | | | | 0 | • Lewis and Clark S&LA was merged into Sterling on 6/30/83 and $2.056m in goodwill was recorded to be amortized using the interest-method over 19 years. Source: 1983 AR, Note 12. | 2,056 | | | 2,056 |
| 6/30/84 | 108 | | | 108 | | 1,948 | | | 1,948 |
| 6/30/85 | 108 | | | 108 | | 1,840 | | | 1,840 |
| 6/30/86 | 108 | | | 108 | | 1,731 | | | 1,731 |
| 6/30/87 | 108 | | | 108 | | 1,623 | | | 1,623 |
| 6/30/88 | 108 | | | 108 | | 1,515 | | | 1,515 |
| 6/30/89 | 108 | | | 108 | | 1,407 | | | 1,407 |
| 6/30/90 | 108 | | | 108 | | 1,299 | | | 1,299 |
| 6/30/91 | 108 | | | 108 | | 1,190 | | | 1,190 |
| 6/30/92 | 108 | | | 108 | | 1,082 | | | 1,082 |
| 6/30/93 | 108 | | | 108 | | 974 | | | 974 |
| 6/30/94 | 108 | 216 | | 324 | • On 4/15/94, Sterling acquired 3 branches in Oregon and paid an acquisition premium of ~$3m. On 5/13/94, Sterling acquired 5 branches in Washington and paid an acquisition premium of ~$8.8m. These premiums had amortization periods of 8 years. Source: 1994 AR, Note 4. | 866 | 11,584 | | 12,450 |
| 6/30/95 | 108 | 1,475 | | 1,583 | | 757 | 10,109 | | 10,867 |
| 6/30/96 | 108 | 1,475 | | 1,583 | | 649 | 8,634 | | 9,284 |
| 12/31/96 | 54 | 738 | | 792 | | 595 | 7,897 | | 8,492 |
| 12/31/97 | 108 | 1,475 | | 1,583 | | 487 | 6,422 | | 6,909 |
| 12/31/98 | 108 | 1,475 | 1,900 | 3,483 | • On 6/15/98, Sterling acquired 33 branches from KeyBank and recorded ~$57m in goodwill to be amortized over 15 years using the straight-line method. Source: 1998 10-K, Note 1. | 379 | 4,947 | 55,100 | 60,426 |
| 12/31/99 | 108 | 1,475 | 3,800 | 5,383 | | 271 | 3,472 | 51,300 | 55,042 |
| 12/31/00 | 108 | 1,475 | 3,800 | 5,383 | | 162 | 1,997 | 47,500 | 49,659 |
| 12/31/01 | | | | 5,377 | | | | | 44,282 |
| 12/31/02 | | | | 644 | • Sterling adopts SFAS No. 142 on January 1, 2002. Source: 2002 10-K, p.34. | | | | 43,638 |
| | | | | | **Total Goodwill and Other Intangibles** | | | | |
| 12/31/03 | | | | 263 | • $4.2 million of goodwill and other intangibles were generated by the Empire Federal Bancorp acquisition on 2/28/03. Source: 12/31/03 10-K, pp. F-45-46. | | | | 47,616 |
| 12/31/04 | | | | 2,224 | • $65.7 million of goodwill and $19.2 million of core deposit intangibles were generated by the KFBI acquisition on 1/2/04, and $1.6 million of goodwill was generated by the Peter W. Wong Associates, Inc. acquisition on 11/30/04. Source: 12/31/04 10-K, pp. F-44-45. | | | | 131,892 |
| 12/31/05 | | | | 2,222 | | | | | 129,670 |
| 9/30/06 | | | | 1,685 | | | | | 127,985 |
| **Total:** | **1,894** | **9,803** | **9,500** | **33,612** | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/96 which are for the six months ended as of that date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

D For 2001 – 2006, assumed to be equal to the total amortization of intangibles of the actual bank from Table 2a, column D.

H The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000. For 2001 – 2006 balances are calculated as [H](t-1) less Column D(t) plus goodwill and other intangibles generated from acquisitions.

# Exhibit 6

## Sterling Savings Association

### Table 8: 2001 – 2006 Capital Downstreamed

Source: Thrift Financial Reports (Sheshunoff); Call Reports
($ in Thousands)

| | A | B | C | D = A + B + C | E = D - D(t-1) |
|---|---|---|---|---|---|
| | | Common Stock | | | |
| | Preferred Stock | Par Value | Paid in Excess of Par | Total | Difference from Prior Year |
| 12/31/00 | $95,100 | $6,616 | $76,502 | $178,218 | |
| 12/31/01 | 110,100 | 7,245 | 98,917 | 216,262 | $38,044 |
| 12/31/02 | 110,100 | 7,245 | 98,917 | 216,262 | 0 |
| 12/31/03 | 110,100 | 7,245 | 125,239 | 242,584 | 26,322 |
| 12/31/04 | 110,100 | 7,246 | 287,314 | 404,660 | 162,076 |
| 12/31/05 | 110,100 | 7,246 | 287,314 | 404,660 | 0 |
| 9/30/06 | 175,100 | 7,246 | 339,502 | 521,848 | 117,188 |

# *Exhibit 7*

## RTC Resolutions in Washington and Oregon

Source: RTC Statistical Abstract August 1989/September 1995
(Dollars in Millions)

| Name | City | State | Charter F-Federal S-State | Conserva-torship Date | Resolution Date | Assets at Takeover | Deposits at Takeover | Deposits at Resolution |
|---|---|---|---|---|---|---|---|---|
| The Benjamin Franklin FS&LA | Portland | OR | F | 2/21/90 | 9/7/90 | $4,692 | $3,214 | $2,650 |
| Far West FSB | Portland | OR | F | 5/23/91 | 4/15/94 | $2,160 | $1,273 | $714 |
| Family FSA | Dallas | OR | F | 1/11/90 | 6/22/90 | $170 | $101 | $93 |
| Family S&LA, FA | Seattle | WA | S | 2/8/91 | 7/19/91 | $101 | $60 | $44 |
| Gibraltar Savings, FSB | Seattle | WA | F | 3/31/89 | 6/29/90 | $1,816 | $1,368 | $1,029 |
| Frontier FS&LA | Walla Walla | WA | F | 2/23/90 | 6/22/90 | $162 | $119 | $98 |

Note: No resolutions were reported for Idaho institutions.

## Acquisitions Considered by Sterling

Source: Deposition of Harold Gilkey, June 6-8, 2000, pp. 69-75, 184-185, 239-245, 485-487, 511, 517, 561-594

| Name | Year |
|---|---|
| American Bank | 1992 |
| American National Bank/American Marine | 1990s |
| Ben Franklin National Bank, Pasco | 1987 |
| Benjamin Franklin, Portland, Oregon | early 1990s |
| Eastern Washington Savings | 1988 |
| Enterprise Bank | 1990s |
| Gibraltar Savings (certain branches) | 1990s |
| Family Savings | 1988 |
| Far West Federal (6 branches in Oregon) | 1988 |
| First Federal of Longview | 1988 |
| First Western Savings/First Federal (certain branches) | 1992 |
| Great Northwest Savings Bank | 1991 |
| Guaranty Savings | 1984 |
| Hamilton Financial Services | late 1990s |
| Heritage Federal | 1990s |
| Horizon | 1990s |

| Name | Year |
|---|---|
| InterWest | 1990s |
| Lynnwood Savings | 1980s |
| Mortgage Services America (First Cal) | 1995-1996 |
| Olympia Federal | 1990s |
| Pacific First Federal | early 1990s |
| Palm Springs Savings Bank | 1990s |
| Security Federal Savings Bank | 1990s |
| Security Pacific Bank (certain branches) | mid 1990s |
| Summit Savings | mid 1990s |
| U.S. Bank (certain branches) | 1990s |
| Vancouver Federal | 1990s |
| Washington Mutual (2 branches) | 1992 |
| West One (certain branches) | 1990s |
| Westcoast Bancorporation | late 1990s |
| Willamette Savings | 1995-1996 |

# *Exhibit 8*
## *Sterling Savings Association*
## Summary of Expectation Damages
($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | **$58,164** |
| [2] | + **Wounded Bank Damages** | **$4,556** |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 |
| | Loss on CJ-4 Loan | $1,241 |
| | Excess Supervision Costs | $172 |
| | Cost of 1989 Units Offering | $1,004 |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $304 |
| [3] | + **Future Damages** | **$641** |
| | **Total Expectation Damages** | **$63,361** |

Notes:
[2] Source: Data from Sterling Savings Association.
[3] Present value of cash flows representing the cost of replacing supervisory goodwill and capital credits in 9/30/06 dollars as calculated by Professor James.

In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION,<br>a state-chartered savings association,<br>STERLING FINANCIAL CORPORATION,<br>a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>(Judge Wolski) |

# Revised Expert Report of Professor Christopher James
February 20, 2004

# TABLE OF CONTENTS


**I. Qualifications** ..... 1

**II. Assignment** ..... 2

**III. Summary of Opinions** ..... 2

**IV. Approach** ..... 3

**V. Lost Profits from Un-Mitigated Supervisory Capital** ..... 4

1. Capital Raises Subsequent to Breach ..... 5
2. Leverage Ratio on Supervisory Capital and Foregone Assets ..... 7
3. Dividends on Series B Preferred Stock ..... 7

**VI. Cost of Mitigation** ..... 8

1. Cost of Mitigation – 1991 Through 2003 ..... 9
   a. The Amounts of Mitigation Capital ..... 9
   b. Dividend Costs on the Mitigation Capital ..... 11
   c. Cash Benefit of Mitigation Capital ..... 13
2. Cost of Mitigation – 2004 Through 2025 ..... 14

**VII. Transaction Costs of Mitigation Capital** ..... 14

**VIII. Wounded Bank Damages** ..... 15

**IX. Summary - Total Damages** ..... 16

# TABLE OF EXHIBITS

**Exhibit A:** Curriculum Vitae

**Exhibit B:** Testimony in the Previous Four Years

**Exhibit C:** Additional Documents Considered

**Exhibit D:** Sterling Savings Association, Summary of Lost Profits and Actual Cost of Mitigation

**Exhibit E:** Calculation of Lost Earnings on Foregone Assets Through 1993

**Exhibit F:** Sterling Savings Association, Calculation of Mitigation Damages, 1991 - 2003

**Exhibit G:** Sterling Savings Association, Capital Raised Assumed to Replace Contractual Intangibles

**Exhibit H:** Sterling Savings Association, Calculation of Cash Benefit Yield

**Exhibit I:** Sterling Savings Association, Calculation of Future Mitigation Damages, 2004-2025

**Exhibit J:** Sterling Savings Association, Transaction Costs of Mitigation Capital

**Exhibit K:** Sterling Savings Association, Summary of Wounded Bank Damages

## I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions as Visiting Scholar at the Federal Reserve Bank of San Francisco and Senior Economic Advisor to the Comptroller of Currency, Department of Treasury.

I hold a B.A. from Michigan State University as well as an M.B.A. in Finance and a Ph.D. in Economics from the University of Michigan. My academic work has been in the fields of financial institutions, corporate financial policy, resolution of financial distress and securities pricing. I have published numerous articles on economic and financial topics including the regulation of financial institutions, failure resolution policies, and capital raising by depository institutions.

I currently serve on the editorial boards of four scholarly journals including the Journal of Financial Economics. I served as an associate editor of the Journal of Finance and as editor of the Journal of Financial Intermediation from 1988 through 1999. I also serve on the Board of Directors of SunTrust Bank North Central Florida and the academic board of the Turnaround Management Association. My resume, which includes a list of my publications, is attached as Exhibit A.

A list of my testimony over the last four years is included in Exhibit B. I am being compensated at my usual hourly rate of $550.

## II. Assignment

I have been retained in this matter by counsel for the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial"), to evaluate damages should the Court conclude, as the United States experts have suggested,[1] that Sterling, by issuing capital, mitigated the loss of supervisory capital acquired in the transactions ("supervisory capital") that are the subject of this litigation.[2] As part of my assignment I was asked to examine the capital raises that occurred subsequent to the breach and asked to evaluate the cost of those capital raises. Specifically I was asked to focus on capital that Sterling raised in calendar years 1991 and 1993.

As part of my analysis, I have reviewed various documents including reports issued by experts retained by the Department of Justice, deposition testimony, court opinions, legal filings, financial statements for Sterling, and other selected documents for Sterling. A list of the documents I have considered is contained in Exhibit C. This list supplements the document lists that I previously produced in reports I issued in September 2001 and December 2003.

## III. Summary of Opinions

Sterling suffered significant damages in the event that the Court determines that Sterling was able to mitigate the loss of its supervisory capital with capital raised subsequent to the breach ("mitigation capital").[3] The damages consist of several

---

[1] See Expert Report of Mukesh Bajaj, April 22, 2002, pp. 21-24.

[2] I use the terms "supervisory capital acquired in the transactions" and "contractual intangibles" interchangeably.

[3] I am not rendering an opinion that Sterling actually replaced the supervisory capital that was generated in the contracts with the government. I believe this is counterfactual, but I have been asked to assume it for purposes of these calculations. In fact I believe the testimony of Sterling's fact witnesses was that absent the breach Sterling would have raised capital in 1989 and all of the capital it did raise. Among other facts, I

components. First, the lost profits that Sterling suffered before the capital raises I was asked to assume mitigated the loss of the supervisory capital. As I will explain later, the methodology is based on Dr. Horvitz's lost profits model, but is based on a different time period. The second consists of the net costs of substituting the mitigation capital for the supervisory capital. This represents the ongoing costs of the mitigation capital net of any benefits from the mitigation capital. The third consists of the transaction costs associated with issuing mitigation capital. The last are the wounded bank damages calculated by Daniel Byrne, the Chief Financial Officer of Sterling. In total these damages are $24.608 million. Exhibit D presents a summary of the damages.

## IV. Approach

In the first part of my damages calculation I have estimated the lost earnings Sterling suffered from supervisory capital that was not mitigated by the capital raises. The value of the supervisory capital lay in the promise of the government to count the supervisory capital towards regulatory capital, and the leverage that this treatment of supervisory capital created. As the Federal Circuit found in both Glendale and CalFed: "...it is clear that the Government's promise that was breached had substantial value."[4] My lost profits calculation is based on the leverage model that Dr. Horvitz provided in a report in December 2003. His model utilizes the actual financial performance of Sterling to determine the profits that could have been made from the supervisory capital.

In the second part of my damages calculation, I address the net costs of mitigation. As indicated above, the capital raises counted towards regulatory capital effectively replacing a portion of the supervisory capital. The capital raises (i.e.

---

examined the intended purposes of the capital raises and Sterling's track record of consistent asset growth, both of which indicate that Sterling has had a continuing need for additional capital and would have had this need absent the breach.

[4] *Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1381-82 (Fed. Cir. 2001) and *California Federal Bank, F.S.B. v. United States*, 245 F.3d. 1350 (Fed. Cir. 2001).

mitigation capital) was different from supervisory capital in two fundamental respects. First, it entailed costs in the form of dividend payments that were paid to the providers of the capital and the costs of dividends that while unpaid have accrued. Supervisory capital did not entail a dividend cost. It is a basic principal of finance that all capital has a cost. The Federal Circuit noted that capital is not a gift and that it entails a cost. It further stated that the costs could take the form of dividends, capital appreciation, or a combination thereof.[5] Second, the mitigation capital was a tangible asset and had earning power not related to its ability to be leveraged. It could be invested to generate earnings that supervisory capital could not generate. I have termed this the cash benefit of the mitigation capital. The cost of the mitigation capital is therefore the capital costs less the cash benefits.

Lastly, I assess the transaction costs associated with the mitigation capital and incorporate other costs incurred by Sterling due to the breach (i.e. "wounded bank" damages.)

## V. Lost Profits from Un-Mitigated Supervisory Capital

Leverage is valuable to thrifts. Sterling's lost profits stem from the lost leverage opportunities that resulted from the breach. The supervisory capital that was not replaced could have been used to support additional assets and generate spread income. In addition to the shrinkage Sterling experienced, it also was unable to experience the growth that it would have experienced absent the breach. The lost profits from the loss of leverage ability can be measured with the model developed by Dr. Horvitz.

Exhibit E presents my calculation of lost profits from un-mitigated supervisory capital. Table 1 of Exhibit E is a summary of the lost profits and indicates that Sterling's

[5] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003).

lost income from foregone assets was $5.447 million. My calculation of lost profits starts at the time of the breach (as does Dr. Horvitz's) and continues through February 1993 - the time when the supervisory capital would have been fully-mitigated.

To determine the lost profits from unmitigated supervisory capital I have made several adjustments to the model created by Dr. Horvitz to account for the capital raises that I have been asked to assume mitigated the supervisory capital. The first adjustment is to the amount of capital that the but-for bank would have raised. The implication of a ruling by the Court that Sterling's capital raises subsequent to the breach were initiated to mitigate the loss of the supervisory capital is that the capital raises would not have occurred absent the breach. This is the primary adjustment I have made to the lost profits model. The second change is that in light of the changed capital structure I have reevaluated the leverage ratio of the but-for bank at the end of fiscal year 1992. The final change relates to dividend payments on preferred stock that was converted into common stock at the time of the 1991 offering.

**1. Capital Raises Subsequent to Breach**

Sterling raised capital in fiscal 1992 and fiscal 1993.[6] The capital raised took several different forms.

In November of 1991 (fiscal year 1992), Sterling completed a common stock offering. Sterling issued 2.875 million shares at a price of $8.25 that generated proceeds, net of transaction costs, of $21.0 million.[7] The offering circular indicated that the primary purpose of the offering was "...to increase Sterling's regulatory capital levels. Net proceeds will be used to support the growth of Sterling's business, including the

[6] At the time, Sterling's fiscal year ended June 30. Hence fiscal year 1992 was the twelve-month period ended June 30, 1992 and fiscal year 1993 was the twelve-month period ended June 30, 1993.
[7] Sterling Savings 1992 Annual Report, pp. 23, 27.

origination of loans. Pending such applications, the net proceeds will be invested in short-term investment grade fixed income securities."[8]

In conjunction with the common stock offering, Sterling also opted to convert existing outstanding preferred stock to common stock. The conversion of the Series B preferred stock raised no funds for investment, but it increased Sterling's tangible and core capital by $2.1 million.[9]

In fiscal 1993 Sterling Financial was formed as a holding company of Sterling Savings.[10] In February 1993, the holding company issued $17.25 million of 8.75% subordinated notes due in 2000.[11] Of the proceeds raised by the holding company, $12.9 million was contributed to Sterling. In exchange for the contribution, Sterling issued preferred stock to the holding company. The preferred stock carried a coupon rate of 10.75%.[12] The intended use of the funds contributed to Sterling was "... to support the growth of its business, including funding loans and investments and expanding its branch network."[13]

Again, assuming that the Court determines that these capital raises were initiated to replace the supervisory capital, the implication is that they would not have occurred had the supervisory capital continued to fully count toward the regulatory capital requirements (or in the case of the capital raised and contributed in fiscal 1993, the portion mitigating the supervisory capital would not have occurred.) The capital raised from these issuances is therefore capital raised by the but-for bank.[14]

[8] Sterling Savings Offering Circular, November 20, 1991, p. 13.
[9] Sterling Savings Offering Circular, November 20, 1991, pp. 4, 14.
[10] Sterling Financial 1993 Annual Report, p. II.
[11] Sterling Financial 1993 Annual Report, p. XXV.
[12] Sterling Savings Bank, Summary of Capital Raising, Analysis Prepared by Daniel G. Byrne.
[13] Sterling Financial Corporation Subordinated Notes Prospectus, February 4, 1993, pp. 4, 12.
[14] As I have noted previously, I have been asked to assume that these capital raises resulted in mitigation of the supervisory capital. The stated intended uses of the offerings to support the growth of Sterling belies the premise that capital raises were mitigation.

**2. Leverage Ratio on Supervisory Capital and Foregone Assets**

It is necessary to assess the degree to which the but-for capital would have been leveraged to determine the amount of foregone assets that Sterling would have had. As part of my assessment I have reviewed the leverage ratios determined by Dr. Horvitz for the but-for bank and the actual leverage ratios employed by Sterling.

For 1989 through the end of fiscal year 1991, June 30, 1991, the leverage ratios of the but-for bank are based on the leverage ratios incorporated in Sterling's 1989 business plan. This is the business plan submitted with the application to acquire Central Evergreen.

At the end of fiscal 1992, June 30, 1992, I have adjusted the leverage ratio employed by Dr. Horvitz for the but-for bank. The leverage rate I have chosen balances Sterling's demonstrated practice to grow while maintaining capital levels in excess of the regulatory requirements. In December 1991. the FDIC Improvement Act ("FDICIA") was enacted that put into place a core capital standard that indicated that to be "well-capitalized" a thrift needed to have 5% core capital. The 5% well-capitalized core capital standard became effective in December 1992.[15] Consequently, I have assumed a 5% leverage ratio (i.e. core capital ratio) for June 30, 1992. This leverage ratio results in modest asset growth for the but-for bank from $782 million at June 20, 1991 to $786 million at June 30, 1992 while allowing for the highest capital classification under the FDICIA standards.

**3. Dividends on Series B Preferred Stock**

[15] Sterling Financial 1993 Annual Report, p. XXXXIV-XXXXV.

If the 1991 common stock offering would not have occurred, I have assumed that the Series B preferred stock would not have converted either. As noted above, the conversion of the Series B occurred in conjunction with the 1991 offering. Had the Series B preferred stock remained outstanding it would have continued to pay dividends. The Series B preferred stock paid annual dividends of $2.50 per share. The dividends were cumulative and required payment before distributions to common equity holders.[16] Prior to the conversion there existed declared but unpaid dividends that were paid at the time of the conversion.[17] I have therefore incorporated in the lost profits model dividend payments on the Series B preferred stock from the time of the conversion forward.

## VI. Cost of Mitigation

As described above, the cost of mitigation is determined by the net effect of the cost of providing mitigation capital. The net effect is the cost of capital that mitigated the loss of the contractual supervisory capital less any benefits derived from the mitigation capital that could not be derived from supervisory capital. This approach to calculating mitigation costs is consistent with the direction of the Federal Circuit in the LaSalle Talman case:

> "In general, payment of a return on capital reflects the cost of capital. However, in determining damages the benefits of that capital must be credited, as mitigation due to the replacement of goodwill with cash."[18]

The costs of mitigation are measured over the planned length of the contracts, so I have measured the costs from November 1991 to 2025.

---

[16] Sterling Savings 1991 Annual Report, p. 35.
[17] Sterling Savings 1992 Annual Report, pp. 27, 39.
[18] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003).

**1. Cost of Mitigation – 1991 Through 2003**

The net cost of mitigation capital from 1991 through 2003 is presented on Exhibit F. This exhibit presents the cost of the mitigation capital, net of the cash benefit of the mitigation capital. The net cost is $9.464 million. The following portion of my report explains the calculations on the exhibit.

**a. The Amounts of Mitigation Capital**

I have been asked to assume that the November 1991 offering and the contemporaneous conversion of Series B preferred stock to common stock acted as a substitute for the contractual supervisory capital. These capital raises initially mitigated only a portion of the contractual supervisory capital. The subsequent capital raise that I was ask to assume as mitigation capital was downstreamed from the holding company to Sterling in February 1993 and mitigated the remaining balance of the contractual supervisory capital. When the balance of the mitigation capital exceeds the amount of the contractually promised supervisory capital, I measure the mitigation costs solely on the amount that mitigated the supervisory capital.

Exhibit G presents the amount of supervisory capital that needed to be replaced and the amounts that were replaced assuming that the capital raises in fiscal years 1992 and 1993 mitigated the lost supervisory capital. My calculation is based on the mitigation costs of all of Sterling's contractually promised supervisory capital.[19] This

[19] In my previous reports estimating the anticipated costs of issuing preferred stock at the time of the breach, the contractual supervisory capital schedule reflected the ex ante expected amounts of supervisory capital. The schedule I am using in this report reflects the impact of the utilization of NOLs in the quarter ended June 30, 1991 and adjustments made in the quarter ended June 30, 1992.

schedule includes the capital credits from the Lewis Federal and Tri-Cities acquisitions amortized per Judge Damich's opinion on August 4, 2003.

In calculating the amount of the November 1991 common stock offering used to replace the supervisory capital, I have made one adjustment. In January 1990 Sterling was forced to cancel a fully-subscribed stock offering when due to the breach regulators failed to approve the ability of Sterling to pay dividends on the new stock. The stock offering would have raised approximately $12.0 million.[20] Of the $23.7 million of gross proceeds (2.875 million shares at an offering price of $8.25) raised in the November 1991 common stock offering[21], I assume that $12.0 million replaced the unit offering cancelled in January 1990.[22] The remaining balance of the November 1991 offering, $11.7 million, has been considered as mitigation of the supervisory capital.

As noted previously, I only attribute dividend costs to the amount of capital raised to mitigate the supervisory capital. In 1991, the adjusted amount of the 1991 common stock offering and all of the common stock created in the conversion of the Series B preferred stock served to mitigate the loss of the supervisory capital due to the breach. In 1993, the preferred stock issued by Sterling fully-mitigated the remaining lost supervisory capital. In subsequent years, as the contractually-promised balance of supervisory capital declines, I calculate the costs solely on the amount of the mitigation capital that equates with the contractually-promised amounts.

As the final step on Exhibit F, I reduce the amount of mitigation capital on which I calculate costs. The conversion of the Series B preferred stock into common stock

[20] The $12.0 million amount reflects the estimated proceeds of the unit offering before consideration of any transaction costs. Source: Sterling Savings 1990 Annual Report, p. 3.
[21] Sterling Savings 1992 Annual Report, p. 23.
[22] The intended use of the proceeds of the unit offering was to "reduce higher cost borrowings under reverse repurchase agreements (which currently bear interest at an average rate of 9.0%) as they mature, and for general corporate purposes." (Sterling Savings Association, Offering Circular for Unit Offering, November 14, 1989, p. 17) Had Sterling been able to complete the unit offering it have would resulted in decreased leverage and improved regulatory capital levels. If the Court were to conclude the that 1991 offering mitigated the supervisory capital, it would be consistent to considered a portion of the 1991 offering a substitution of the unit offering. For purposes of my damages calculations I have assessed no costs to portion of the 1991 offering that substituted for the unit offering.

resulted in the creation of regulatory capital, but it did not significantly change the equity claims on Sterling's earnings nor did the conversion result in any proceeds for Sterling. For these reasons I reduce the amounts of mitigation capital on which I calculate damages by the proportion of total mitigation capital represented by the converted Series B preferred stock.

**b. Dividend Costs on the Mitigation Capital**

The investors in Sterling, like any provider of capital, expected returns on their capital investment. The Federal Circuit in LaSalle Talman noted:

> "...capital is not "costless" to either the investor or the recipient. As explained by James Van Horne & John M. Wachowicz, Jr., Fundamentals of Financial Management 387 (10th ed. 1998), "the cost of capital is the required rate of return on various types of financing." A capital investment does not become a "gift," as the government characterizes the ABN AMRO investment, simply because the return on that investment is expected to be paid out of earnings."[23]

As noted earlier, Sterling has not paid cash dividends on any of its common stock, including the common stock issued in 1991. As recognized in the above quotation from the Federal Circuit's decision in LaSalle Talman that does not mean that the capital was costless to Sterling. Consider if instead Sterling had issued preferred stock in 1991 with a stated dividend rate (just as it did in 1993.) Dividend payments on the preferred stock would be at the stated rate and would represent the cost of mitigation. It would be

[23] *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363, 1374-1375 (Fed. Cir. 2003).

illogical to attribute no costs to the 1991 common stock issuance, whereas a preferred issuance would entail costs.

To estimate the cost of the 1991 common stock issuance I have considered the following factors: First, in February 1993 capital was downstreamed to Sterling from Sterling Financial. In return Sterling issued preferred stock with a dividend rate of 10.75% to its holding company. It is a basic principal of finance that common stock is more costly than preferred stock. Second, interest rates declined from November 1991, the time of the 1991 common stock issuance, to February 1993, the time when the 10.75% preferred was issued by Sterling to its holding company. Equity issued in November 1991 would therefore have a higher cost of capital than equivalent equity issued in February 1993. Additionally, the future operation of Sterling was more precarious in November 1991 than February 1993 due to the threat of regulatory seizure resulting from the breach. These factors indicate that the cost of capital for the 1991 common stock issuance would have exceeded the cost of the 1993 preferred issuance. To be conservative however, I impute a cost of 10.75% to the mitigation capital from the 1991 common stock offering.[24]

The preferred issued by Sterling in 1993 had an explicit 10.75% dividend rate. I therefore have used that rate as the cost of the mitigation capital raised in 1993.

I have measured the mitigation costs based on the *pre-tax* dividends costs that Sterling incurred on its mitigation capital. I have done so because it is my understanding should damages be awarded Sterling would be subject to taxes on the award. If the damages were calculated on an after-tax basis then Sterling would be subject to double taxation and it would not be put into the same position as it would have been had the

[24] This assumption is consistent with Judge Bruggink's damages opinion in Home Savings of America and H.F. Ahmanson & Co v. United States, September 3, 2003 that all capital which mitigates the supervisory capital has a cost.

breach not occurred. Another consideration is that the tax treatment of the dividend costs be similar to the cash benefits of the mitigation capital that are on a pre-tax basis.

**c. Cash Benefit of Mitigation Capital**

As noted earlier, the mitigation capital provided Sterling with a benefit that could not be provided by supervisory capital (i.e. the earnings generated from the investment of the cash from the proceeds of the mitigation capital.) For the period from 1991 and through 2003 I have calculated this benefit based on the returns of Sterling's actual assets. I have used this as the measure of the benefit for several reasons. First, the cash from the proceeds of the mitigation capital was fungible with other funds raised by the Sterling. Once the cash proceeds were incorporated into Sterling's accounts one cannot determine the specific uses of the proceeds from the mitigation capital. Second, the stated purposes of the 1991 and 1993 offerings were to support the growth of Sterling's business including making loans and investments. Consequently, I have taken the approach that the proceeds from the mitigation capital were invested in the same mix of assets as any other funds raised by Sterling.[25]

Exhibit H presents my calculation of the returns of Sterling's actual assets. The yield is calculated based on the interest income generated from assets, plus any gains (or less any losses) from the sale of assets, less any provisions for losses. This reflects the income that flows from Sterling's tangible assets.

At all times from 1991 through 2003, the returns of Sterling's actual assets are multiplied by the amount of mitigation capital to determine the benefit of the mitigation capital. Asset returns calculated from Sterling's financial results are on a pre-tax basis and hence are comparable to the dividends costs discussed earlier.

---

[25] An alternative would be to estimate the benefit of the cash based on risk-free Treasury rates. Had I done so, damages would be higher.

### 2. Cost of Mitigation – 2004 Through 2025

The net cost for the future cost of mitigation is $1.814 million (see Exhibit I.) I have followed the same methodology as described above with a few modifications to account for the costs that will be incurred by Sterling in the future. The modifications are:

- I have estimated the benefit of the mitigation based on the yield of Treasury securities. It is not known what yields Sterling will earn in the future, so instead I have used a safe rate. Using treasury rates to estimate the cash benefits of the mitigation capital has the important feature of mimicking the risk characteristics of supervisory capital because both supervisory capital and Treasury securities are government promises. I assume that the mitigation capital will earn a risk-free return of 5.07% based on Treasury rates at the end of 2003. To be conservative in my damages calculation, I have used the highest rate in the yield curve.
- Because the damages are in the future they need to be discounted into current dollars. The future net mitigation costs are discounted at the risk-free Treasury rate used to determine the benefits of mitigation capital.

## VII. Transaction Costs of Mitigation Capital

The transactions costs associated with issuing the assumed mitigation capital are properly considered as damages to Sterling. The transaction costs have two components. In total the costs are $3.327 (see Exhibit J). These costs would not have been incurred by

Sterling had the assumed mitigation capital not been raised. Both components are related to the 1991 common stock offering.[26]

The first component is the underwriting fee and other expenses related to issuing the common stock. These fees and expenses of the 1991 offering can be determined based on the difference between the amount of the common stock issued and the net proceeds available to Sterling. This amount is $2.767 million (see Exhibit J).

The second component, not included in the reported underwriting fees and other expenses, is the value of warrants provided to the underwriters as part of their compensation for their services. The value of the warrants is properly considered a cost of issuing the 1991 common stock and consequently is another component of the transaction costs of the mitigation capital. I have valued the warrants using a standard valuation technique. The value of the warrants was $0.560 million. The calculation is presented on page 2 of Exhibit J.

## VIII. Wounded Bank Damages

Properly included in the damages I am presenting are "wounded bank" costs. These are costs that Sterling incurred, but would otherwise not have incurred had the government not breached the contracts. These figures have been provided by Daniel G. Bryne, the CFO of Sterling. In total the wounded bank damages are $4.556 million.

---

[26] Currently I am unaware of any transaction costs of converting the Series B preferred to common stock. Any such costs would appropriately be included in my calculation.

Also, as noted earlier, the capital downstreamed to Sterling in 1993 was raised via an offering by Sterling Financial of subordinated notes. The transaction costs of the offering were borne by Sterling Financial. My analysis addresses the costs to Sterling of the mitigation capital, so consequently I have not included any costs associated with the subordinated notes offering.

## IX. Summary - Total Damages

Total damages are the sum of lost profits on un-mitigated supervisory capital, the net cost of mitigation capital, transaction cost associated with the issuance costs of mitigation capital, and wounded bank damages. The total damages are $24.608 million (see Exhibit D).

I hold the opinions expressed herein to a reasonable degree of certainty, and declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. I reserve the right to modify my report and opinions in response to reports of the government's experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

Christopher M. James

Executed 2/20/04

# VITA

| | |
|---|---|
| **NAME:** | Christopher M. James |
| **CURRENT POSITION:** | William H. Dial/SunBank Eminent Scholar in Finance, University of Florida |
| **ADDRESS:** | Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168<br>E-mail: christopher.james@cba.ufl.edu |
| **TELEPHONE:** | Office: 352-392-3486<br>Home: 352-336-2765 |
| **BIRTHDATE:** | October 12, 1951 |
| **EDUCATION:** | B.A. Michigan State University, 1973<br>M.B.A. University of Michigan (Finance), 1977<br>Ph.D. University of Michigan (Economics), 1978 |
| **RESEARCH/ TEACHING INTERESTS:** | Financial Institutions and Markets, Corporate Finance, Corporate Strategy |

**TEACHING/ RESEARCH EXPERIENCE:**

William H. Dial/SunBank Eminent Scholar in Finance, University of Florida, 1989-present

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Consultant, FDIC, 1988-1991

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

**PAPERS AND PUBLICATIONS:**

"The Technology of Risk and Return, Comment," American Economic Review, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," Journal of Financial and Quantitative Analysis, December, 1981.

"An Analysis of Bank Loan Rate Indexation," Journal of Finance, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann)., Journal of Finance, December, 1982.

"Pricing Alternatives for Loan Commitments: A Note," Journal of Bank Research, Winter, 1983.

"An Analysis of Intra-industry Differences in the Effect of Regulation: The Case of Deposit Rate Ceilings," Journal of Monetary Economics, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" )with R.O. Edmister) Journal of Portfolio Management, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), Journal of Finance, September, 1983.

"Regulation and the Determination of Bank Capital Changes: A Note," (with J.K. Dietrich), Journal of Finance, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency; The Case of Bank Holding Company Acquisitions," Journal of Law and Economics, April, 1984. Abstracted in Regulation as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery) Journal of Finance, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," Journal of Money, Credit and Banking, (with M.J. Flannery), November, 1984. Presented at the American Finance Association meetings in San Francisco, December, 1983.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," Journal of Finance, (with S. Koreisha and M. Partch), Dec, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," Journal of Financial Economics, (with J. Brickley), July 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogenous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?", Review of Financial Studies, Winter, 1995.

"CEO Compensation and Bank Risk: Is Compensation Structured in Banking Structured to Promote Risk-Taking?", Journal of Monetary Economics, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress", Journal of Finance, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims", (with J. Houston), Journal of Finance, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking", (with J. Houston and D. Marcus), Journal of Financial Economics, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?", (with J. Houston), Journal of Banking and Finance, November,1998.

"Where Do Merger Gains Come From? Bank Mergers From the Perspective of Insiders and Outsiders." (with J. Houston and M. Ryngaert), Journal of Financial Economics, May 2001.

"Do Relationships Have Limits? Banking Relationships, Financial Constraints and Investment", (with J.Houston), Journal of Business, July 2001.

"Do Banks Provide Financial Slack?", (with C.Hadlock) Journal of Finance, June 2002.

**CURRENT RESEARCH:**

"What a Difference a Month Makes: Stock Analyst Valuations Following Initial Public Offerings", (with J. Karceski and J. Houston), under revision. (Prepared for Hong Kong Corporate Finance Conference, March 2003)

"Analysts' Target Prices Following IPO's; How Much Support do Analyst Provide?", (with J. Karceski and J. Houston), working paper.

"Smart Money or Captured Money; Differences in the Performance of Retail and Institutional Mutual Funds", (with J. Karceski), working paper.

"Behavioral Finance and Fraud on the Market: More than the Cammer Factors are Needed For Market Efficiency", work in progress.

"Do 10b5 Suits Keep Management Honest? Evidence From Earnings Forecast Errors", (with M. Hintze), work in progress.

"The Effects of Leverage on Operating Performance: An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND PUBLICATIONS:**

"Are Banks Still Special? New Evidence in the Corporate Capital-Raising Process", (with D. Smith), Journal of Applied Corporate Finance, Winter 2000

"Why Are Value Enhancing Mergers In Banking So Hard to Find? A Discussion of "Is the Bank Merger Wave of the 90's Efficient? Lessons from Nine Case Studies"" Kaplan, S. (Ed.), Mergers and Productivity, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano" Journal of Banking and Finance, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking" (with J Houston) Journal of Applied Corporate Finance, Summer, 1998.

Discussion of "Financial Institutions and Regulations: The Dilemma in a Deregulated World", Proceedings from Riksbank Conference: Forces for and Implications of Structural Changes in the Financial Sector, June 1997.

"Evolution of Extinction: Where are Banks Headed,?" Journal of Applied Corporate Finance, (with J. Houston), Summer, 1996.

"RAROC at Bank of America: From Theory to Practice,≡ Journal of Applied Corporate Finance, Summer, 1996.

"Bank Equity Positions in Distressed Firms," in Anthony Saunders and Ingo Walter, Universal Banking: Financial System Design Reconsidered (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One", Journal of Applied Corporate Finance, (with C. Smith), Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," with D. Brown and M. Mooradian, in: Edward Altman, ed., Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), Journal of Applied Corporate Finance, 1994.

"Studies in Financial Institution," Commercial Banks, (with C. Smith), 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee

on Banking, Housing and Urban Affairs - 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," presented, American Economic Association, meetings 1989.

"Are Bank Loans Different?: Some Evidence From the Stock Market," Journal of Applied Corporate Finance, (with P. Wier), Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

"Discussion: The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," Proceedings of a Conference on Bank Structure and Competition, (with P. Wier), May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," A Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE ACTIVITIES:**

Associate Editor: Journal of Banking and Finance, 1999-present.

Associate Editor: Journal of Financial Economics, 1993 - present.

Associate Editor: Journal of Financial Services Research, 1989-present.

Associate Editor: Journal of Managerial and Decision Economics, 1988-present.

Associate Editor: Journal of Finance, 1988-2000.

Co-Editor: Journal of Financial Intermediation, 1988-1999.

Associate Editor: Journal of Financial and Quantitative Analysis, 1982-1984.

Academic Board: Turnaround Management Association: 1990-present

Editorial Board: Federal Reserve Bank of New York: Economic Review

Reviewer: Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics

Program Committee: Financial Management Association, Western Finance Association, American Finance Association, European Finance Association.

**CONSULTING/EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, $ID^2$, Inc.

Advisory Board, SunTrust Bank.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets

Instructor, Bank Board of Directors School: Workout Lending

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness: Cases involving antitrust, portfolio management, securities valuation, bank management, valuation of closely held firms, and regulatory matters.

Consultant: Bank product pricing, and portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds

Consultant to the FDIC, 1987-1990: Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member: Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.

**AWARDS:**

Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

# Exhibit B
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

*Citizens Federal Bank, A Federal Savings Bank, et al., v. United States of America*, No. 92-656C, United States Court of Federal Claims, deposition, 1999-2000.

*Edward E. Lucente v. IBM Corporation*, No: 99 Civ. 3987 (CM) (GAY), U.S. District Court Southern District of New York, deposition, 2000.

*Jeffrey H. Beck, as Trustee of Southeast Banking Corporation v. Deloitte & Touche and Deloitte Haskins & Sells* (U. S. District Court Southern Division of Florida, Miami Division), deposition, 2001.

*Granite Management Corporation v. United States*, No. 95-515C (U. S. Court of Federal Claims), deposition, 2001.

*Sterling Savings Association, Sterling Financial Corporation v. United States*, No. 95-829C (U. S. Court of Federal Claims), deposition, 2001.

*Astoria Federal Savings & Loan Association v. United States*, No. 95-468C (U. S. Court of Federal Claims), deposition, 2001.

*In re BankAmerica Corp. Securities Litigation*, MDL No. 1264, United States District Court, Eastern District of Missouri, deposition, 2001.

*California Federal Bank v. United States*, No. 92-138C (U. S. Court of Federal Claims), deposition and trial testimony, 2002.

*Comac Partners, L.P., et al., v. John J. Ghaznavi, et al., and Anchor Glass Container Corporation Litigation*, No. 18417, deposition, 2002.

*Ernst & Young, LLP v. Sphinx International, Inc.*, AAA No. 30-107-00252-1, arbitration testimony, 2002.

*Dr. Ben S. Branch, Trustee of Bank of New England Corporation v. Ernst & Young U.S., et al.*, C.A. No. 93-10024-RGS, deposition, 2002.

# Exhibit B
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

*Duramed Pharmaceuticals, Inc. v. Wyeth-Ayerst Laboratories, Inc.*, C.A. No. C-1-00-735, deposition, 2002.

*Fifth Third Bank of Western Ohio v. United States of America*, No. 95-503C, United States Court of Federal Claims, deposition and trial testimony, 2001, 2002, and 2003.

*KA Investments v. Number Nine Visual Technology Corp.*, No. 00 CV 10966 DPW, U.S. District Court, District of Massachusetts, deposition and trial testimony, 2003.

*In Re A.T. Cross Securities Litigation*, No. 00 203 ML, U.S. District Court, District of Rhode Island, deposition, 2003

*Long Island Savings Bank, FSB, and The Long Island Savings Bank of Centereach FSB, v. United States of America*, No. 92-517C, United States Court of Federal Claims, deposition, 1999-2000, 2003.

*LaSalle Talman Bank, F.S.B., v. United States of America*, No. 92-652C, United States Court of Federal Claims, deposition and trial testimony, 1998-1999, 2003.

*Smith v. Arthur Andersen et al.*, No. CIV-01-218-PHX-PGR, United States District Court for the District of Arizona, deposition, 2003.

*Land Development, Ltd. v. Arvida Managers-II, Inc.*, No. 96-0062-CA-15-N, The Circuit Court in and for the Eighteenth Judicial Circuit, Seminole County, Florida, deposition, 2003.

# Exhibit C

## Additional Documents Considered by *Dr. Christopher M. James* in Conjunction with Updated Report – January 9, 2004

| | | |
|---|---|---|
| Sterling Financial Corp., Press Release re Merger with Klamath First Bancorp, 1/2/04 | | |
| SFC-Klamath Merger prospectus | SG0900226 | SG0900371 |
| 09/30/03 10-Q | SG0900372 | SG0900409 |
| 06/30/03 10-Q | SG0900410 | SG0900447 |
| 03/31/03 10-Q | SG0900448 | SG0900487 |
| 09/03 TFR | SG0900488 | SG0900512 |
| 06/03 TFR | SG0900513 | SG0900538 |
| 03/03 TFR | SG0900539 | SG0900565 |
| 12/02 TFR | SG0900564 | SG0900592 |
| 09/02 TFR | SG0900593 | SG0900617 |
| 06/02 TFR | SG0900618 | SG0900643 |
| 03/02 TFR | SG0900644 | SG0900668 |
| 12/01 TFR | SG0900669 | SG0900694 |
| 03/01 TFR | SG0900695 | SG0900715 |
| SEC Form S-4, 08/03/01 | SG0900716 | SG0900818 |
| SEC Form S-4, 12/03/02 | SG0900819 | SG0901074 |
| Holding Company Examination 12/27/99 | SG0901075 | SG0901089 |
| Holding Company Examination 03/26/03 | SG0901090 | SG0901109 |
| Holding Company Examination 05/13/02 | SG0901110 | SG0901122 |
| Holding Company Examination 06/23/03 | SG0901123 | SG0901136 |
| | | |

| | | |
|---|---|---|
| Compliance Examination 12/14/99 | SG0901137 | SG0901170 |
| Compliance Examination 03/26/01 | SG0901171 | SG0901198 |
| Letter re: OTS Termination of Supervisory Agreement, dated May 24, 2001, with attached Supervisory Agreement, dated May 24, 1999 | SG0901199 | SG0901211 |
| CRA Performance Evaluation 12/14/99 | SG0901212 | SG0901249 |
| CRA Performance Evaluation 03/26/01 | SG0901250 | SG0901287 |
| Information Technology Examination 03/26/01 | SG0901288 | SG0901300 |
| Information Technology Examination 06/14/03 | SG0901301 | SG0901312 |
| Safety and Soundness ROE 12/27/99 | SG0901313 | SG0901360 |
| Safety and Soundness ROE 03/19/01 | SG0901361 | SG0901407 |
| Safety and Soundness ROE 05/13/02 | SG0901408 | SG0901432 |
| Safety and Soundness/Compliance ROE 08/04/03 | SG0901433 | SG0901482 |
| Sterling Capital Trust III $14,000,000 Floating Rate MMCapS (Liquidation Amount $1,000 per Capital Security) Memorandum of Closing: April 10, 2003 | SG0901483 | SG0901493 |
| Sterling Financial Corporation as Issuer Indenture Dated as of April 10, 2003 Wilmington Trust Company as Trustee Floating Rate Junior Subordinated Debt Securities Due 2033 | SG0901494 | SG0901569 |
| Sterling Financial Corporation as Issuer Indenture Dated as of July 16, 2001 The Bank of New York as Trustee Junior Subordinated Debt Securities | SG0901570 | SG0901645 |
| Junior Subordinated Indenture between Sterling Financial Corporation and The Bank of New York as Trustee Dated as of My 15, 2003 | SG0901646 | SG0901722 |
| Sterling Financial Corporation as Issuer Indenture Dated as of May 14, 2003 US Bank National Association as Trustee Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2033 | SG0901723 | SG0901785 |
| Sterling Financial Corporation as Issuer Indenture Dated as of June 30, 2003 | SG0901786 | SG0901862 |

| | | |
|---|---|---|
| Wilmington Trust Company as Trustee<br>Floating Rate Junior Subordinated Debt Securities Due 2033 | | |

**Other Case Materials**

| | | |
|---|---|---|
| Updated Expert Report of Professor Paul Horvitz – December 10, 2003 | | |
| Expert Report of Mukesh Bajaj – April 22, 2002 | | |
| Expert Report of William G. Hamm – April 18, 2002 | | |
| Deposition of Mukesh Bajaj – June 20, 2002 | | |
| Deposition of William G. Hamm – November 5-6, 2002 | | |
| Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings<br>• Damages Calculation: CJ-4 Loss Due To Improper Enforcement of Loans-to-One-Borrower Regulation, 1/9/04<br>• Calculation of Damages: Regulatory Supervision Costs, 1/9/04<br>• 1989 Offering Circular Costs #91-1719-4, 1/9/04<br>• Calculation of Damages: Legal, Accounting, & Insurance, 1/9/04<br>• Damages Calculation: Increased Cost to Acquire Branch from Great American Savings/RTC, 1/9/04<br>• But-For RAP Supervisory Goodwill for Lost Profits [*Unused Tri-Cities NOL Balance used in FY91*], 2001<br>• Summary of Capital Raising, 2001 | | |

**Other Materials**

| | | |
|---|---|---|
| Thrift Financial Reports (Sheshunoff) – 2001 | SG0902007 | SG0902025 |
| Thrift Financial Reports (Sheshunoff) – 2002 | SG0902026 | SG0902045 |
| Sterling Financial Corporation 10-K 2000 | SG-0706352 | SG-0706459 |
| John C. Hull, *Options, Futures and Other Derivatives*, Fourth Edition, pp. 237-263. Prentice Hall, 1999. | | |
| 9/30/98 First Federal Savings and Loan Association of Montana (Big Sky Bancorp) TFR (Sheshunoff) | | |
| Bloomberg Historical Yield Curve Data, 12/31/03 | | |

| | | |
|---|---|---|
| *LaSalle Talman, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) | | |
| *Glendale Federal Bank, F.S.B. v. United States*, 239 F.3d 1381 (Fed. Cir. 2001) | | |
| *California Federal Bank, F.S.B. v. United States*, 245 F.3d. 1350 (Fed. Cir. 2001) | | |
| *Home Savings of America, F.S.B., and H.F. Ahmanson & Co. v. United States*, 92-620C, September 3, 2003 | | |
| Federal Reserve Bank of St. Louis, 5-Year Treasury Constant Maturity Rate, 11/20/91 | | |
| Federal Reserve Bank of St. Louis, 1-Year Treasury Constant Maturity Rate, 11/1/91 – 3/1/93 | | |
| Federal Reserve Bank of St. Louis, 10-Year Treasury Constant Maturity Rate, 11/1/91 – 3/1/93 | | |
| Federal Reserve Bank of St. Louis, 30-Year Treasury Constant Maturity Rate, 11/1/91 – 3/1/93 | | |
| *CRSP* stock data, 11/21/91 – 11/19/92 | | |
| *CRSP* Data Description Guide | | |

# *Exhibit D*

## *Sterling Savings Association*

### Summary of Lost Profits and Actual Cost of Mitigation

($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Profits 1989 – 1993** | $5,447 |
| | **Net Mitigation Costs** | |
| [2] | 1991 through 2003 | $9,464 |
| [3] | 2004 Through End of Contracts | $1,814 |
| [4] | **Transaction Costs of Mitigation Capital** | $3,327 |
| [5] | **Wounded Bank Cost** | $4,556 |
| | **Total Mitigation Damages** | **$24,608** |

Notes:
[1] See Exhibit E.
[2] See Exhibit F.
[3] See Exhibit I.
[4] See Exhibit J.
[5] See Exhibit K.

# *Exhibit E*

# Assumes Mitigating Capital Raises

## Calculation of Lost Earnings on Foregone Assets Through 1993

## Amortize Capital Credits from Lewis Federal and Tri-Cities

## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*
*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*
*Table 3b: Calculation of Returns Applicable to Foregone Assets*
*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*
*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*
*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*
*Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89*

*Table 5: But-For Bank*

*Table 6: Addendum For Supervisory Intangibles*

*Table 7: Addendum For Non-Supervisory Goodwill*

# *Exhibit E*

## *Sterling Savings Association*

## Calculation of Lost Earnings on Foregone Assets

### *Table 1: Summary of Lost Earnings Calculation*

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | Incremental Bank | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/1989 | $730,933 | $730,933 | $0 | | |
| 12/31/1989 | 708,213 | 747,390 | 39,177 | 0.33% | 0 |
| 6/30/1990 | 688,990 | 748,524 | 59,534 | 0.25% | 97 |
| 6/30/1991 | 608,999 | 781,622 | 172,623 | 0.94% | 561 |
| 6/30/1992 | 640,887 | 785,718 | 144,831 | 1.78% | 3,066 |
| 6/30/1993 | | | | 1.78% | 1,723 |
| | | | | | $5,447 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90, which are for the six months ended as of each date.

A From table 2a, column A.

B From table 5, column C.

D From Table 3a, column G. For period ending 6/30/90, ROAA reflects the return for the six month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets. Figure for 6/30/93 is calculated as foregone assets at 6/30/92 times the pro-rated return for the eight month period ended 2/28/93.

# *Exhibit E*

## *Sterling Savings Association*

### *Table 2a: Actual Bank and Intervest Financial Data*

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill |
| 6/30/1989 | 730,933 | | | | | | | | | |
| 12/31/1989 | 708,213 | 627 | 324 | 1,620 | 2,571 | 112 | (994) | -0.14% | 0 | 20,983 |
| 6/30/1990 | 688,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 |
| 6/30/1991 | 608,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 |
| 6/30/1992 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 |
| 6/30/1993 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date. Data are unconsolidated.

A - D & F & J Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b).

G Actual data from Thrift Financial Reports (Sheshunoff). Due to lack of available data, the figure for 12/31/89 is assumed to be core capital at 6/30/90 less net income over the six months ended 6/30/90.

I Based on data from Sterling Savings annual reports and offering circulars. Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

# *Exhibit E*

## *Sterling Savings Association*

### *Table 2b: Data for Intervest Mortgage Investment Company*

($ in Thousands)

| | A | B | C | D | E = B + C + D | G | H |
|---|---|---|---|---|---|---|---|
| **Period Ended** | **Assets** | **Net Income** | **Taxes** | **Amortization of Goodwill** | **Pre-Tax, Pre-Amortization Income** | **Dividends** | **Equity** |
| 6/30/1989 | | | | | | | |
| 12/31/1989 | | | | | | | |
| 6/30/1990 | | | | | | | |
| 6/30/1991 | | | | | | | |
| 6/30/1992 | | | | | | | |
| 6/30/1993 | 992 | 11 | 0 | - | 11 | - | 981 |

Note: All data are as of or for the fiscal year specified. Data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

G Dividends were not listed in the consolidating financial statements.

# Exhibit E

## Sterling Savings Association

### Table 3a: Estimates for the But-For and Incremental Banks

($ in Thousands)

| | A (But-For) | B (But-For) | | | C (Incremental) | D (But-For) | E (But-For) | F (But-For) | G (Incremental) |
|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Estimated Capital Ratio | Adjustments to But-For: Income | Capital, Assets | Note | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Adjusted ROAA |
| 6/30/1989 | | | | | | | | | |
| 12/31/1989 | 4.16% | 0 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1989 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase(-$0.115m). Income: Adjustment for wounded bank damages. | 37% | See footnote [d]. | 2.91% | 0 | 0.33% |
| 6/30/1990 | 4.15% | 1,116 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 6/30/1991 | 4.24% | 1,091 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.94% |
| 6/30/1992 | 5.00% | 1,057 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.78% |
| 6/30/1993 | N/A | 591 | N/A | Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.78% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 taken from projected RAP leverage ratios in Sterling's August 1989 Business Plan.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3c, column F. Adjustments to but-for capital & assets based on data from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G).

C Estimated to be 37% of incremental earnings for 1989 – 1993, based on guidance provided by Dan Byrne, CFO, of Sterling Savings Association.

D Assumed to be the actual dividends paid plus the required dividends on the unit offering and, starting in fiscal 1992, the required dividends on the series B preferred. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89). Annual dividends on the series B preferred are calculated as $2.50, the required per share dividend, times 89,968, the number of shares outstanding at the time of conversion (Source: Sterling Savings 1991 Annual Report, p. 35, Sterling Savings 1992 Annual Report, p. 25). For fiscal 1992, the annual dividend amount of $224,920 is pro-rated to reflect approximately seven months, the time from the November 1991 conversion to the end of the fiscal year. The pro-rated amount is $136,826.

E From Table 3e, column F.

F From Table 3e, column B.

G From Table 3b, column F.

# Exhibit E

## Sterling Savings Association

### Table 3b: Calculation of Returns Applicable to Foregone Assets

($ in Thousands)

| | A | B | C | D | E = B - C -D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| Period Ended | Actual Assets | Pre-Tax, Pre-Amortization Income | Actual Accretion Income | Adjustments to Earnings due to Non-recurring or Breach-induced Gains/(Losses) | Adjusted Pre-Tax, Pre-Amort. Earnings | Adjusted ROAA |
| 6/30/1989 | 730,933 | | | | | |
| 12/31/1989 | 708,213 | 2,571 | 178 | 0 | 2,393 | 0.33% |
| 6/30/1990 | 688,990 | 786 | 178 | (1,116) | 1,724 | 0.25% |
| 6/30/1991 | 608,999 | 5,380 | 354 | (1,091) | 6,117 | 0.94% |
| 6/30/1992 | 640,887 | 10,395 | 351 | (1,057) | 11,101 | 1.78% |
| 6/30/1993 | 1,032,538 | 14,775 | 437 | (591) | 14,930 | 1.78% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Actual data from Thrift Financial Reports (Sheshunoff) for Sterling Savings and from consolidating financials for 6/30/93 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion Income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# Exhibit E

## Sterling Savings Association

### Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital

($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - ( C / B ) | E | F = D + E | G |
| Period Ended | Extraordinary Items net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 6/30/1989 | | | | | | | |
| 12/31/1989 | $0 | $951 | $324 | $0 | $0 | $0 | ($115) |
| 6/30/1990 | 0 | (847) | (487) | 0 | (1,116) | (1,116) | |
| 6/30/1991 | 298 | 2,312 | 590 | 400 | (1,491) | (1,091) | |
| 6/30/1992 | (522) | 8,585 | 3,319 | (851) | (206) | (1,057) | |
| 6/30/1993 | (424) | 12,970 | 4,920 | (683) | 92 | (591) | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.
A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff).
D Extraordinary Items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.
E From Table 3d, column F.
G Source: Data from Sterling Savings Association.

# Exhibit E

## Sterling Savings Association

### Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings

($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ-4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 6/30/1989 | | | | | | |
| 12/31/1989 | $0 | $0 | $0 | $0 | | $0 |
| 6/30/1990 | (6) | (75) | (1,004) | (31) | | (1,116) |
| 6/30/1991 | (1,189) | (66) | 0 | (236) | | (1,491) |
| 6/30/1992 | (138) | (32) | 0 | (37) | | (206) |
| 6/30/1993 | 92 | 0 | 0 | 0 | | 92 |
| Total | $(1,241) | $(172) | $(1,004) | $(304) | $0 | ($2,721) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date.
Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9).
Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

# Exhibit E

## Sterling Savings Association

### Table 3e: Summary of Internal versus External Growth in Total Assets

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| Period Ended | Actual Total Assets | Acquired Assets | Notes | Actual Growth | Internal Growth | But-For Internal Growth Rate |
| 6/30/1989 | 730,933 | 0 | | | | |
| 12/31/1989 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 6/30/1990 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 6/30/1991 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 6/30/1992 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 6/30/1993 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date. Data are unconsolidated.

A From table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 8/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. For 6/30/93, the growth rate on to be the same as the Internal growth of the actual bank as reflected in column E.

# Exhibit E

## Sterling Savings Association

### Table 4a: Goodwill and Intangibles Data for the But-For Bank

($ In Thousands)

| | Supervisory Intangibles Only | | | | | | | Non-Supervisory Intangibles | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A = B + C + D | B | C | D | E | F | G | H | I | J = E + F + G + I |
| Period Ended | Total Unidentified and Identified Intangibles | Capital Credit | Identified Intangibles | SGW | Contractual Amortization of Supervisory Goodwill and Capital Credit | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Balances | Total Amortization of Non-Supervisory Intangibles | Total Amortization, Adjustments and NOL's |
| 6/30/1989 | $34,766 | $12,342 | $6,075 | $16,349 | 2,344 | 0 | 59 | 1,407 | 108 | 2,512 |
| 12/31/1989 | 32,583 | 11,929 | 5,670 | 14,984 | 1,990 | 0 | 193 | 1,353 | 54 | 2,238 |
| 6/30/1990 | 31,159 | 11,516 | 5,265 | 14,378 | 1,778 | (354) | 0 | 1,299 | 54 | 1,478 |
| 6/30/1991 | 25,246 | 10,691 | 4,455 | 10,101 | 2,893 | 0 | 3,020 | 1,190 | 108 | 6,021 |
| 6/30/1992 | 20,848 | 9,865 | 3,645 | 7,338 | 2,807 | 1,591 | 0 | 1,082 | 108 | 4,506 |
| 6/30/1993 | 18,133 | 9,039 | 2,835 | 6,259 | 2,716 | 0 | 0 | 974 | 108 | 2,824 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Contractual Intangibles from Lewis Federal, Tri-Cities and Central Evergreen supervisory acquisitions. Based on data from Sterling Savings Association.

B From table 6, column E. Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

D From table 6, column I. Supervisory goodwill from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

E See note A above. Amortization of the supervisory goodwill is based on data from Sterling Savings Association. Amortization of the capital credit is from table 6, columns B and D.

F & G Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

H & I Assumed balances and amortization of intangibles resulting from the Lewis & Clark merger (FY83). The goodwill amortization for this deal is modeled on an assumed straight-line basis through 2000. All data is based on information from Sterling Annual Reports. From table 7, columns D and H.

# Exhibit E

## Sterling Savings Association

### Table 4b: Calculation of Total Disallowed Intangibles at 12/31/89

($ in Thousands)

| | Supervisory Intangibles Only | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F = (B+C) - (D+E) | G = A + F |
| Period ended | Capital Credit | Identified Intangibles | SGW | Qualifying SGW | Other Qualifying Intangibles | Disallowed Identified and Unidentified Intangible Capital | Total Disallowed Intangibles |
| 6/30/1989 | $12,342 | $6,075 | $16,349 | | | n/a | n/a |
| 12/31/1989 | $11,929 | $5,670 | $14,984 | 10,308 | 0 | 10,345 | 22,275 |
| 6/30/1990 | $11,516 | $5,265 | $14,378 | 10,036 | 0 | 9,607 | 21,123 |
| 6/30/1991 | $10,691 | $4,455 | $10,101 | 8,903 | 1,584 | 4,069 | 14,759 |
| 6/30/1992 | $9,865 | $3,645 | $7,338 | 6,288 | 3,327 | 1,368 | 11,233 |
| 6/30/1993 | $9,039 | $2,835 | $6,259 | 7,673 | 2,575 | (1,155) | 7,885 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A From Table 4a, column B.

B From Table 4a, column C.

C From Table 4a, column D.

D & E Actual data from Thrift Financial Reports (Sheshunoff).

# Exhibit E
## Sterling Savings Association
### Table 5: But-For Bank
($ in Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised / Adjustments to Core Capital |
| 6/30/1989 | | | 730,933 | | | | | | | | |
| 12/31/1989 | 752,177 | 747,390 | 747,390 | 2,571 | 324 | 2,045 | 202 | 353 | 31,054 | 4.16% | 10,385 |
| 6/30/1990 | 774,026 | 748,524 | 748,524 | 1,998 | (38) | 1,833 | 204 | 241 | 31,071 | 4.15% | 0 |
| 6/30/1991 | 813,762 | 781,622 | 781,622 | 7,032 | 1,201 | 3,001 | 2,830 | 876 | 33,133 | 4.24% | 0 |
| 6/30/1992 | 849,745 | 785,718 | 785,718 | 14,518 | 4,845 | 2,916 | 6,758 | 713 | 39,286 | 5.00% | 0 |
| 6/30/1993 | N/A | N/A | N/A | 17,951 | 5,776 | 2,824 | 9,351 | 1,153 | N/A | N/A | N/A |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Calculated as column c[t-1] times (1 plus table 3a, column E), plus table 3a, column F.

B Calculated as column I divided by table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractual amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column E + Table 4a, column I.)

H Assumed to be the actual dividends paid plus the required dividends on the unit offering and, starting in fiscal 1992, the required dividends on the series B preferred. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89). Annual dividends on the series B preferred are calculated as $2.50, the required per share dividend, times 89,968, the number of shares outstanding at the time of conversion (Source: Sterling Savings 1991 Annual Report, p. 35, Sterling Savings 1992 Annual Report, p. 25). For fiscal 1992, the annual dividend amount of $224,920 is pro-rated to reflect approximately seven months, the time from the November 1991 conversion to the end of the fiscal year. The pro-rated amount is $136,826.

I Calculated as the sum of the But-For Bank's previous year's core capital, plus the current year's net income, less dividends paid out, plus any additional capital raised, plus the amortization of non-supervisory intangibles. (Calculated as columns I[t-1] + G - H + K + Table 4a, column I.) 12/31/89 But-For core capital is calculated as the sum of the Actual Bank's 12/31/89 core capital, plus disallowed supervisory intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends, plus amortization of non-supervisory intangibles.
(Calculated as Table 2a, column G + Table 4b, column G + column K + ((column G - Table 2a, column B) - (column H - Table 2a, column F)) + Table 4a, column I).

K From Table 3a, column B.

# Exhibit E

## Sterling Savings Association

### Table 6: Addendum For Supervisory Intangibles

($ In Thousands)

| | Capital Credit | | | | | Supervisory Goodwill | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I = F + G + H |
| | Lewis Federal | | Tri-Cities | | Total | Lewis Federal | Tri-Cities | Central Evergreen | Total |
| Period Ended | Balance | Amortization | Balance | Amortization | Balance | Balance | Balance | Balance | Balance |
| 11/5/1985 | $1,750 | | | | $1,750 | $2,044 | | | $2,044 |
| 12/31/1985 | 1,743 | $7 | | | $1,743 | 2,036 | | | 2,036 |
| 6/30/1986 | 1,721 | 22 | | | $1,721 | 1,814 | | | 1,814 |
| 6/30/1987 | 1,677 | 44 | | | $1,677 | 1,768 | | | 1,768 |
| 4/8/1988 | | | $11,730 | | | | | | |
| 6/30/1988 | 1,633 | 44 | 11,535 | $196 | $13,168 | 1,743 | $2,176 | | 3,919 |
| 6/30/1989 | 1,590 | 44 | 10,753 | 782 | $12,342 | 1,696 | 2,028 | $12,625 | 16,349 |
| 12/31/1989 | 1,568 | 22 | 10,362 | 391 | $11,929 | 1,673 | 1,955 | 11,357 | 14,984 |
| 6/30/1990 | 1,546 | 22 | 9,971 | 391 | $11,516 | 1,649 | 1,881 | 10,847 | 14,378 |
| 6/30/1991 | 1,502 | 44 | 9,189 | 782 | $10,691 | 1,603 | 1,380 | 7,118 | 10,101 |
| 6/30/1992 | 1,458 | 44 | 8,407 | 782 | $9,865 | 1,556 | 812 | 4,971 | 7,338 |
| 6/30/1993 | 1,415 | 44 | 7,625 | 782 | $9,039 | 1,509 | 736 | 4,013 | 6,259 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date, and 11/5/85 and 4/8/88, which reflect the beginning capital credit balances from the Lewis Federal and Tri-Cities acquisitions.

A, C, F – H Based on data from Sterling Savings Association.

B Assumes a 40 year amortization schedule.

D Assumes a 15 year amortization schedule.

APP. 233

# Exhibit E

## Sterling Savings Association

### Table 7: Addendum for Non-Supervisory Goodwill

Source: Sterling Annual Reports and TFRs
($ in thousands)

| | Assumed Straight-Line Amortization | | | | | Balances | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A + B + C | | E | F | G | H = E + F + G |
| Period Ended | Lewis & Clark | WA & OR Branches | KeyBank | Total Amortization | Explanation | Lewis & Clark | WA & OR Branches | KeyBank | Total |
| 6/30/83 | | | | 0 | • Lewis and Clark S&LA was merged into Sterling on 6/30/83 and $2.056m in goodwill was recorded to be amortized using the interest-method over 19 years. Source: 1983 AR, Note 12. | 2,056 | | | 2,056 |
| 6/30/84 | 108 | | | 108 | | 1,948 | | | 1,948 |
| 6/30/85 | 108 | | | 108 | | 1,840 | | | 1,840 |
| 6/30/86 | 108 | | | 108 | | 1,731 | | | 1,731 |
| 6/30/87 | 108 | | | 108 | | 1,623 | | | 1,623 |
| 6/30/88 | 108 | | | 108 | | 1,515 | | | 1,515 |
| 6/30/89 | 108 | | | 108 | | 1,407 | | | 1,407 |
| 6/30/90 | 108 | | | 108 | | 1,299 | | | 1,299 |
| 6/30/91 | 108 | | | 108 | | 1,190 | | | 1,190 |
| 6/30/92 | 108 | | | 108 | | 1,082 | | | 1,082 |
| 6/30/93 | 108 | | | 108 | | 974 | | | 974 |
| Total: | 1,082 | 0 | 0 | 1,082 | | | | | |

H The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000.

APP. 234

Revised February 20, 2004

# *Exhibit F*

## *Sterling Savings Association*

## Actual Cost of Mitigation

## Raised Capital to Mitigate Contractual Intangibles

### *1991 through 2003*

($ in thousands)

| [1] | [2] | [3] | [4] | [5] | [6] = [2] * [5] | [7] = [4] - [6] |
|---|---|---|---|---|---|---|
| Year End | Weighted Average Capital Raised Balance | Total Dividend After Tax at 10.75% | Total Dividend Before Tax at 17.1% | Cash Benefit Rate of Capital | Cash Benefit of Capital | Net Cost of Capital |
| 12/31/1991 | 1,284.2 | 138.1 | 219.1 | 9.29% | 119.3 | 99.9 |
| 12/31/1992 | 11,718.8 | 1,259.8 | 1,999.6 | 8.76% | 1,026.9 | 972.7 |
| 12/31/1993 | 15,890.2 | 1,708.2 | 2,711.4 | 6.75% | 1,072.2 | 1,639.2 |
| 12/31/1994 | 14,282.5 | 1,535.4 | 2,437.1 | 6.66% | 951.4 | 1,485.7 |
| 12/31/1995 | 11,921.9 | 1,281.6 | 2,034.3 | 7.32% | 872.4 | 1,161.9 |
| 12/31/1996 | 9,653.7 | 1,037.8 | 1,647.3 | 7.25% | 699.8 | 947.5 |
| 12/31/1997 | 7,861.6 | 845.1 | 1,341.5 | 7.62% | 599.0 | 742.5 |
| 12/31/1998 | 6,557.4 | 704.9 | 1,118.9 | 7.29% | 478.3 | 640.6 |
| 12/31/1999 | 5,381.1 | 578.5 | 918.2 | 7.22% | 388.4 | 529.8 |
| 12/31/2000 | 4,336.7 | 466.2 | 740.0 | 7.81% | 338.9 | 401.1 |
| 12/31/2001 | 3,410.2 | 366.6 | 581.9 | 7.21% | 245.8 | 336.1 |
| 12/31/2002 | 2,536.8 | 272.7 | 432.9 | 6.04% | 153.3 | 279.6 |
| 12/31/2003 | 1,959.6 | 210.7 | 334.4 | 5.45% | 106.7 | 227.7 |
| | | | | | Total Cost = | $9,464.3 |

**Notes**

[2] See Exhibit G, column [j].

[3] Equals [2] x 10.75%.

[4] Pre-tax dividend cost of common and preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings.)

[5] See Exhibit H, column [h].

APP. 236

# *Exhibit G*

## *Sterling Savings Association*

## Capital Raised Assumed to Mitigate Contractual Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

| Date | Amortizing Capital Credit | SGW & Intangibles | Contractual Intangibles | Assumed Mitigation Capital 1991 | Conversion of Preferred 1991 | 1993 | Total | Contractual Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h]=Min([c],[g]) | [i] | [j] |
| 12/31/1989 | 11,929 | 20,654 | 32,583 | | | | - | - | | |
| 12/31/1990 | 11,104 | 18,296 | 29,399 | | | | - | - | | |
| 11/21/1991 | 10,368 | 14,000 | 24,368 | 11,719 | 2,100 | | 13,819 | 13,819 | | |
| 12/31/1991 | 10,278 | 13,471 | 23,749 | 11,719 | 2,100 | | 13,819 | 13,819 | 1,514 | 1,284 |
| 12/31/1992 | 9,452 | 10,038 | 19,490 | 11,719 | 2,100 | | 13,819 | 13,819 | 13,819 | 11,719 |
| 2/28/1993 | 9,319 | 9,738 | 19,056 | 11,719 | 2,100 | 12,900 | 26,719 | 19,056 | | |
| 12/31/1993 | 8,626 | 8,179 | 16,806 | 11,719 | 2,100 | 12,900 | 26,719 | 16,806 | 17,246 | 15,890 |
| 12/31/1994 | 7,801 | 6,396 | 14,196 | 11,719 | 2,100 | 12,900 | 26,719 | 14,196 | 15,501 | 14,283 |
| 12/31/1995 | 6,975 | 4,707 | 11,682 | 11,719 | 2,100 | 12,900 | 26,719 | 11,682 | 12,939 | 11,922 |
| 12/31/1996 | 6,149 | 3,124 | 9,273 | 11,719 | 2,100 | 12,900 | 26,719 | 9,273 | 10,477 | 9,654 |
| 12/31/1997 | 5,323 | 2,468 | 7,792 | 11,719 | 2,100 | 12,900 | 26,719 | 7,792 | 8,532 | 7,862 |
| 12/31/1998 | 4,497 | 1,944 | 6,442 | 11,719 | 2,100 | 12,900 | 26,719 | 6,442 | 7,117 | 6,557 |
| 12/31/1999 | 3,672 | 1,567 | 5,238 | 11,719 | 2,100 | 12,900 | 26,719 | 5,238 | 5,840 | 5,381 |
| 12/31/2000 | 2,846 | 1,329 | 4,175 | 11,719 | 2,100 | 12,900 | 26,719 | 4,175 | 4,707 | 4,337 |
| 12/31/2001 | 2,020 | 1,207 | 3,227 | 11,719 | 2,100 | 12,900 | 26,719 | 3,227 | 3,701 | 3,410 |
| 12/31/2002 | 1,194 | 1,085 | 2,279 | 11,719 | 2,100 | 12,900 | 26,719 | 2,279 | 2,753 | 2,537 |
| 12/31/2003 | 955 | 1,019 | 1,974 | 11,719 | 2,100 | 12,900 | 26,719 | 1,974 | 2,127 | 1,960 |
| 12/31/2004 | 911 | 972 | 1,884 | 11,719 | 2,100 | 12,900 | 26,719 | 1,884 | 1,929 | 1,778 |
| 12/31/2005 | 868 | 926 | 1,794 | 11,719 | 2,100 | 12,900 | 26,719 | 1,794 | 1,839 | 1,694 |
| 12/31/2006 | 824 | 879 | 1,703 | 11,719 | 2,100 | 12,900 | 26,719 | 1,703 | 1,748 | 1,611 |
| 12/31/2007 | 780 | 832 | 1,613 | 11,719 | 2,100 | 12,900 | 26,719 | 1,613 | 1,658 | 1,528 |
| 12/31/2008 | 736 | 786 | 1,522 | 11,719 | 2,100 | 12,900 | 26,719 | 1,522 | 1,567 | 1,444 |
| 12/31/2009 | 693 | 739 | 1,432 | 11,719 | 2,100 | 12,900 | 26,719 | 1,432 | 1,477 | 1,361 |
| 12/31/2010 | 649 | 692 | 1,341 | 11,719 | 2,100 | 12,900 | 26,719 | 1,341 | 1,387 | 1,278 |
| 12/31/2011 | 605 | 646 | 1,251 | 11,719 | 2,100 | 12,900 | 26,719 | 1,251 | 1,296 | 1,194 |
| 12/31/2012 | 561 | 599 | 1,161 | 11,719 | 2,100 | 12,900 | 26,719 | 1,161 | 1,206 | 1,111 |
| 12/31/2013 | 518 | 552 | 1,070 | 11,719 | 2,100 | 12,900 | 26,719 | 1,070 | 1,115 | 1,028 |
| 12/31/2014 | 474 | 506 | 980 | 11,719 | 2,100 | 12,900 | 26,719 | 980 | 1,025 | 944 |
| 12/31/2015 | 430 | 459 | 889 | 11,719 | 2,100 | 12,900 | 26,719 | 889 | 934 | 861 |
| 12/31/2016 | 386 | 412 | 799 | 11,719 | 2,100 | 12,900 | 26,719 | 799 | 844 | 778 |
| 12/31/2017 | 343 | 366 | 708 | 11,719 | 2,100 | 12,900 | 26,719 | 708 | 754 | 694 |
| 12/31/2018 | 299 | 319 | 618 | 11,719 | 2,100 | 12,900 | 26,719 | 618 | 663 | 611 |
| 12/31/2019 | 255 | 272 | 528 | 11,719 | 2,100 | 12,900 | 26,719 | 528 | 573 | 528 |
| 12/31/2020 | 211 | 226 | 437 | 11,719 | 2,100 | 12,900 | 26,719 | 437 | 482 | 444 |
| 12/31/2021 | 168 | 179 | 347 | 11,719 | 2,100 | 12,900 | 26,719 | 347 | 392 | 361 |
| 12/31/2022 | 124 | 132 | 256 | 11,719 | 2,100 | 12,900 | 26,719 | 256 | 301 | 278 |

# *Exhibit G*

## *Sterling Savings Association*

## Capital Raised Assumed to Mitigate Contractual Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

| Date | Amortizing Capital Credit | SGW & Intangibles | Contractual Intangibles | Assumed Mitigation Capital 1991 | Assumed Mitigation Capital Conversion of Preferred 1991 | Assumed Mitigation Capital 1993 | Total | Contractual Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
|---|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h]=Min([c],[g]) | [i] | [j] |
| 12/31/2023 | 80 | 86 | 166 | 11,719 | 2,100 | 12,900 | 26,719 | 166 | 211 | 194 |
| 12/31/2024 | 36 | 39 | 75 | 11,719 | 2,100 | 12,900 | 26,719 | 75 | 121 | 111 |
| 12/31/2025 | - | - | - | 11,719 | 2,100 | 12,900 | 26,719 | - | 38 | 35 |

Notes:

[a] Straight line amortization for Tri-Cities and Lewis Federal. Source: *But-For RAP Supervisory Goodwill (QUARTERLY recreation of "SUPERV GW") [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[b] Straight line amortization taking into account NOL adjustments for Tri-Cities, Lewis Federal and Central Evergreen. Source: *But-For RAP Supervisory Goodwill (QUARTERLY recreation of "SUPERV GW") [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[d] Based on data from 6/30/1992 Annual Reports, pp 18, 28. Figure for capital raised in 1991 is the gross proceeds for the issuance of 2.875M shares of common stock at $8.25 per share excluding the estimated gross proceeds from withdrawn 1989 Sterling unit offering of $12.0m (see Sterling Savings Association 1990 Annual Report, p.3).

[e] Based on 11/91 Offering Circular, p.14. This $2.1m in additional regulatory capital is from conversion of series B preferred to common stock. The $2.1m is taken to mitigate contractual intangibles at no cost.

[f] On 2/28/93, Sterling Financial Corporation downstreamed $12.9 million to Sterling Savings Association.

[i] For years 1991 and 1993, average amount of raised capital is calculated by weighting the newly raised capital using the timing of capital availability. For years 1992, 1994 through 2025, the average is a simple average of the column [h] for the years [t] and [t-1].

[j] = [i] * (1-([e] / [g])).

APP. 238

# *Exhibit H*

## *Sterling Savings Association*

## Calculation of Cash Benefit Yield

Source: Sterling Savings Thrift Financial Reports (Sheshunoff) and TFR's, First Federal Savings and Loan Association of Montana Thrift Financial Reports (Sheshunoff)

*(In Thousands of Dollars)*

| | [a] | Gain (Loss) on Sale of Assets: | | | | | | | | [b] | [c] | [d] | [e] | [f] | [g] = [a] + [b] - [c] - [d] | [h] = [g] / [e] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Total Interest Income | Assets Held and Available for Sale | LOCOM Adj Made to Assets Held for Sale | Securities Held to Maturity | Real Estate Held for Investment | MPS Held for Investment | Other Sec Held for Investment | Loans Held for Investment | Other Assets Held for Investment | Total Gain (Losses) on Sale of Assets | Provision for Losses on Interest Bearing Assets | Provision for Losses on Non-Interest Bearing Assets | Tangible Assets | Tangible Assets Adjusted for Mergers | Total Yield on Tangible Assets ($) | Average Yield on Tangible Assets |
| 12/31/1991 | 12,711 | 17 | 0 | | 0 | 1,369 | 210 | 0 | 0 | 1,386 | 150 | 280 | 599,408 | | 13,667 | 9.29% |
| 3/31/1992 | 12,890 | 1 | 0 | | 0 | 0 | 1,590 | 0 | 0 | 1,591 | 250 | 77 | 619,930 | | 13,954 | 2.33% |
| 6/30/1992 | 13,175 | 1,952 | 0 | | 0 | 0 | 718 | 0 | 0 | 2,670 | 600 | 50 | 628,842 | | 15,195 | 2.43% |
| 9/30/1992 | 12,582 | 1,359 | 0 | | 0 | 0 | 20 | 0 | 0 | 1,379 | 450 | 3 | 651,197 | | 13,508 | 2.11% |
| 12/31/1992 | 12,653 | 0 | 0 | | 0 | 618 | 0 | 0 | 0 | 618 | 255 | 109 | 670,955 | | 12,907 | 1.95% |
| YE 92 | 51,100 | 3,312 | 0 | | 0 | 618 | 2,328 | 0 | 0 | 6,258 | 1,555 | 239 | 634,066 | | 55,564 | 8.76% |
| 3/31/1993 | 14,036 | 33 | 0 | | 0 | 0 | 0 | 0 | 0 | 33 | 375 | 171 | 866,772 | | 13,523 | 1.76% |
| 6/30/1993 | 16,771 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 420 | 260 | 1,023,009 | | 16,091 | 1.70% |
| 9/30/1993 | 17,219 | 0 | 0 | | 0 | 451 | -349 | 0 | 0 | 102 | 400 | 148 | 1,045,099 | | 16,773 | 1.62% |
| 12/31/1993 | 17,710 | -1 | 0 | | 0 | 316 | -72 | 0 | 0 | 243 | 400 | 91 | 1,125,516 | | 17,462 | 1.61% |
| YE 93 | 65,736 | 32 | 0 | | 0 | 767 | -421 | 0 | 0 | 378 | 1,595 | 670 | 946,270 | | 63,849 | 6.75% |
| 3/31/1994 | 18,196 | 262 | 0 | | 0 | 0 | 0 | 0 | 0 | 262 | 400 | 0 | 1,186,406 | | 18,058 | 1.56% |
| 6/30/1994 | 20,600 | 126 | 0 | | 0 | 0 | 0 | 0 | 0 | 126 | 400 | 37 | 1,344,936 | | 20,289 | 1.60% |
| 9/30/1994 | 23,233 | 56 | 0 | | 0 | 0 | 0 | 0 | 1,174 | 1,230 | 400 | 0 | 1,466,423 | | 24,063 | 1.71% |
| 12/31/1994 | 25,953 | 0 | 0 | | 0 | 0 | 0 | 0 | 1,463 | 1,463 | 400 | 0 | 1,589,358 | | 27,016 | 1.77% |
| YE 94 | 87,982 | 444 | 0 | | 0 | 0 | 0 | 0 | 2,637 | 3,081 | 1,600 | 37 | 1,342,528 | | 89,426 | 6.66% |
| 3/31/1995 | 27,677 | 122 | 0 | | 0 | 0 | 0 | 0 | 1,772 | 1,894 | 695 | 0 | 1,555,111 | | 28,876 | 1.84% |
| 6/30/1995 | 27,664 | 67 | 0 | | 0 | 0 | 0 | 0 | 1,200 | 1,267 | 400 | 34 | 1,524,309 | | 28,497 | 1.85% |
| 9/30/1995 | 27,790 | -2 | 0 | | 0 | 0 | 0 | 0 | 0 | -2 | 400 | 40 | 1,541,865 | | 27,348 | 1.78% |
| 12/31/1995 | 28,034 | 451 | 0 | | 0 | 0 | 0 | 0 | 0 | 451 | 400 | 0 | 1,496,870 | | 28,085 | 1.85% |
| YE 95 | 111,165 | 638 | 0 | | 0 | 0 | 0 | 0 | 2,972 | 3,610 | 1,895 | 74 | 1,541,503 | | 112,806 | 7.32% |
| 3/31/1996 | 26,911 | 17 | 0 | 0 | | | | 0 | 0 | 17 | 400 | 0 | 1,489,576 | | 28,528 | 1.78% |
| 6/30/1996 | 26,284 | 720 | 0 | 0 | | | | 0 | 63 | 783 | 400 | 28 | 1,473,728 | | 26,639 | 1.80% |
| 9/30/1996 | 26,893 | 565 | 0 | 0 | | | | 0 | 0 | 565 | 550 | 17 | 1,526,123 | | 26,891 | 1.79% |
| 12/31/1996 | 28,954 | 519 | 0 | 0 | | | | 0 | 0 | 519 | 660 | 13 | 1,530,075 | | 28,910 | 1.80% |
| YE 96 | 109,042 | 1,821 | 0 | 0 | | | | 0 | 63 | 1,884 | 1,900 | 58 | 1,503,274 | | 108,988 | 7.25% |
| 3/31/1997 | 29,186 | 439 | 0 | 0 | | | | 0 | -22 | 417 | 550 | 34 | 1,552,827 | | 29,019 | 1.88% |
| 6/30/1997 | 30,286 | 942 | 0 | 0 | | | | 5 | 15 | 962 | 550 | 14 | 1,674,363 | | 30,684 | 1.90% |
| 9/30/1997 | 34,273 | 855 | 0 | 0 | | | | 29 | 0 | 864 | 675 | 59 | 1,800,450 | | 34,423 | 1.95% |
| 12/31/1997 | 35,420 | 356 | 0 | 0 | | | | 0 | 5 | 361 | 675 | 0 | 1,863,398 | | 35,106 | 1.89% |
| YE 97 | 129,165 | 2,592 | 0 | 0 | | | | 34 | -2 | 2,624 | 2,450 | 107 | 1,696,223 | | 129,232 | 7.62% |
| 3/31/1998 | 34,248 | 1,090 | 0 | 0 | | | | 0 | 238 | 1,328 | 800 | 0 | 1,876,450 | | 34,776 | 1.86% |
| 6/30/1998 | 36,160 | 266 | 0 | 0 | | | | 0 | -120 | 157 | 2,005 | 0 | 2,013,123 | | 33,352 | 1.71% |
| 9/30/1998 | 37,830 | 975 | 0 | 0 | | | | 0 | 0 | 975 | 800 | 0 | 2,015,900 | 2,061,057 | 38,005 | 1.80% |
| 12/31/1998 | 40,646 | 1,121 | 0 | 0 | | | | 0 | 1 | 1,122 | 800 | 0 | 2,248,665 | | 40,968 | 1.89% |
| YE 98 | 148,884 | 3,472 | 0 | 0 | | | | 0 | 110 | 3,582 | 5,365 | 0 | 2,016,539 | | 147,101 | 7.29% |
| 3/31/1999 | 40,844 | 597 | 0 | 0 | | | | 318 | 0 | 915 | 900 | 0 | 2,289,380 | | 40,859 | 1.80% |
| 6/30/1999 | 42,546 | 6 | 0 | 0 | | | | 214 | -14 | 206 | 1,000 | 0 | 2,437,732 | | 41,752 | 1.77% |
| 9/30/1999 | 44,463 | 5 | 0 | 0 | | | | 241 | 20 | 266 | 1,000 | 0 | 2,445,902 | | 43,729 | 1.79% |
| 12/31/1999 | 46,261 | 6 | 0 | 0 | | | | 196 | 0 | 202 | 1,000 | 0 | 2,480,265 | | 45,463 | 1.85% |
| YE 99 | 174,114 | 614 | 0 | 0 | | | | 969 | 6 | 1,589 | 3,900 | 0 | 2,380,389 | | 171,803 | 7.22% |
| 3/31/2000 | 47,460 | 306 | 0 | 0 | | | | 0 | 0 | 306 | 1,100 | 0 | 2,546,776 | | 46,666 | 1.86% |

# *Exhibit H*

## *Sterling Savings Association*

## Calculation of Cash Benefit Yield

Source: Sterling Savings Thrift Financial Reports (Sheshunoff) and TFR's, First Federal Savings and Loan Association of Montana Thrift Financial Reports (Sheshunoff)

*(In Thousands of Dollars)*

| Date | [a] Total Interest Income | Gain (Loss) on Sale of Assets: Assets Held and Available for Sale | LOCOM Adj Made to Assets Held for Sale | Securities Held to Maturity | Real Estate Held for Investment | MPS Held for Investment | Other Sec Held for Investment | Loans Held for Investment | Other Assets Held for Investment | [b] Total Gain (Losses) on Sale of Assets | [c] Provision for Losses on Interest Bearing Assets | [d] Provision for Losses on Non-Interest Bearing Assets | [e] Tangible Assets | [f] Tangible Assets Adjusted for Mergers | [g] = [a] + [b] - [c] - [d] Total Yield on Tangible Assets ($) | [h] = [g] / [e] Average Yield on Tangible Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/30/2000 | 50,309 | 373 | 0 | 0 | | | | 0 | 1 | 374 | 1,100 | 0 | 2,592,059 | | 49,583 | 1.93% |
| 9/30/2000 | 52,499 | 341 | 0 | 0 | | | | 0 | 1 | 342 | 1,100 | 0 | 2,624,758 | | 51,741 | 1.98% |
| 12/31/2000 | 53,637 | 294 | 0 | 0 | | | | 149 | 1 | 444 | 1,300 | 0 | 2,601,773 | | 52,781 | 2.02% |
| YE 00 | 203,905 | 1,314 | 0 | 0 | | | | 149 | 3 | 1,466 | 4,600 | 0 | 2,569,126 | | 200,771 | 7.81% |
| 3/31/2001 | 51,510 | 924 | 0 | 0 | | | | 0 | -1 | 923 | 1,400 | 25 | 2,602,306 | | 51,008 | 1.96% |
| 6/30/2001 | 49,211 | 508 | 0 | 0 | | | | 570 | 0 | 1,078 | 1,475 | 203 | 2,611,872 | | 48,611 | 1.86% |
| 9/30/2001 | 49,350 | 1,548 | 0 | 0 | | | | 0 | 0 | 1,548 | 1,525 | 106 | 2,901,860 | | 49,267 | 1.79% |
| 12/31/2001 | 49,837 | 2,655 | 0 | 0 | | | | 0 | -2 | 2,653 | 3,600 | 125 | 2,993,917 | | 48,765 | 1.65% |
| YE 01 | 199,908 | 5,635 | 0 | 0 | | | | 570 | -3 | 6,202 | 8,000 | 459 | 2,742,346 | | 197,651 | 7.21% |
| 3/31/2002 | 47,904 | 1,151 | 0 | 0 | | | | 0 | -1 | 1,150 | 2,086 | 163 | 2,951,349 | | 46,805 | 1.57% |
| 6/30/2002 | 47,148 | 856 | 0 | 0 | | | | 182 | 3 | 1,041 | 2,227 | 15 | 3,044,341 | | 45,947 | 1.53% |
| 9/30/2002 | 49,460 | 2,183 | 0 | 0 | | | | 14 | -2 | 2,195 | 3,277 | 60 | 3,285,024 | | 48,318 | 1.53% |
| 12/31/2002 | 50,605 | 2,681 | 0 | 0 | | | | 42 | -1 | 2,722 | 4,277 | 0 | 3,459,901 | | 49,050 | 1.45% |
| YE 02 | 195,117 | 6,871 | 0 | 0 | | | | 236 | -1 | 7,108 | 11,867 | 238 | 3,146,906 | | 190,120 | 6.04% |
| 3/31/2003 | 50,721 | 2,020 | 0 | 0 | | | | -146 | 10 | 2,703 | 2,250 | 130 | 3,771,500 | | 51,134 | 1.41% |
| 6/30/2003 | 51,997 | 3,212 | 0 | 0 | | | | 295 | -1 | 3,508 | 2,550 | 80 | 4,044,991 | | 52,873 | 1.35% |
| 9/30/2003 | 53,992 | 1,030 | 0 | 0 | | | | 123 | -31 | 1,122 | 2,650 | 35 | 4,026,308 | | 52,229 | 1.29% |
| YTD 9/03 | 156,710 | 7,171 | 0 | 0 | | | | 272 | -22 | 7,421 | 7,650 | 245 | 3,825,898 | | 156,236 | 5.45% |

Note: TFR data are from the Sheshunoff Database except for 1998 and 2003, which are from Sterling's hard copy TFR's for 1998 and 2003.

[e] Tangible assets at year end are calculated as the average of the five previous quarters. Tangible assets at YTD 9/03 are calculated as the average of the four previous quarters.

[f] Tangible assets are adjusted to reflect the pooling of interests merger with Big Sky Bancorp in November 1998. Source: Sterling Savings 1998 Annual Report, 9/30/98 First Federal Savings and Loan Association of Montana TFR (Sheshunoff).

[h] Quarterly average yield is calculated based on the average of the current and prior quarters' balance of tangible assets. Annual total yield is calculated based on the average of the previous five quarters.

# E... ...oit I

## *Sterling Savings Association*

## Actual Cost of Mitigation

## Raised Capital to Mitigate Contractual Intangibles

### *2004 through 2025*

($ in thousands)

| | [1] | [2a] | [2b] | [3] | [4] | [5] |
|---|---|---|---|---|---|---|
| Year End | Weighted Average Capital Raised Balance | Total Dividend After Tax at 10.75% | Total Dividend Before Tax at 17.1% | Cash Benefit of Capital at 5.07% | Net Cost of Capital | Present Value of Net Cost Discounted at 5.07% |
| 12/31/2004 | 1,929.2 | 207.4 | 329.2 | 97.8 | 231.4 | 220.2 |
| 12/31/2005 | 1,838.7 | 197.7 | 313.8 | 93.2 | 220.5 | 199.8 |
| 12/31/2006 | 1,748.3 | 187.9 | 298.3 | 88.6 | 209.7 | 180.8 |
| 12/31/2007 | 1,657.9 | 178.2 | 282.9 | 84.1 | 198.8 | 163.1 |
| 12/31/2008 | 1,567.4 | 168.5 | 267.5 | 79.5 | 188.0 | 146.8 |
| 12/31/2009 | 1,477.0 | 158.8 | 252.0 | 74.9 | 177.1 | 131.7 |
| 12/31/2010 | 1,386.6 | 149.1 | 236.6 | 70.3 | 166.3 | 117.6 |
| 12/31/2011 | 1,296.2 | 139.3 | 221.2 | 65.7 | 155.5 | 104.7 |
| 12/31/2012 | 1,205.7 | 129.6 | 205.7 | 61.1 | 144.6 | 92.7 |
| 12/31/2013 | 1,115.3 | 119.9 | 190.3 | 56.5 | 133.8 | 81.6 |
| 12/31/2014 | 1,024.9 | 110.2 | 174.9 | 52.0 | 122.9 | 71.3 |
| 12/31/2015 | 934.4 | 100.5 | 159.4 | 47.4 | 112.1 | 61.9 |
| 12/31/2016 | 844.0 | 90.7 | 144.0 | 42.8 | 101.2 | 53.2 |
| 12/31/2017 | 753.6 | 81.0 | 128.6 | 38.2 | 90.4 | 45.2 |
| 12/31/2018 | 663.2 | 71.3 | 113.2 | 33.6 | 79.5 | 37.9 |
| 12/31/2019 | 572.7 | 61.6 | 97.7 | 29.0 | 68.7 | 31.1 |
| 12/31/2020 | 482.3 | 51.8 | 82.3 | 24.5 | 57.8 | 25.0 |
| 12/31/2021 | 391.9 | 42.1 | 66.9 | 19.9 | 47.0 | 19.3 |
| 12/31/2022 | 301.4 | 32.4 | 51.4 | 15.3 | 36.2 | 14.1 |
| 12/31/2023 | 211.0 | 22.7 | 36.0 | 10.7 | 25.3 | 9.4 |
| 12/31/2024 | 120.6 | 13.0 | 20.6 | 6.1 | 14.5 | 5.1 |
| 12/31/2025 | 37.7 | 4.1 | 6.4 | 1.9 | 4.5 | 1.5 |

**Future Damages from Mitigation of Contractual Intangibles**
**Including Amortizing CC (2004 through end of contract): $1,814.0**

APP. 240

Revised February 20, 2004

# *E...oit I*

# *Sterling Savings Association*

## Actual Cost of Mitigation

## Raised Capital to Mitigate Contractual Intangibles

## *2004 through 2025*

($ in thousands)

**Notes:**

[2a] After-tax dividend cost of preferred stock which assumes a 10.75% required dividend.

[2b] Pre-tax dividend cost of preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings.)

[3] Benefit of incremental tangible capital. Assumes a 5.07% return, which approximates the yield on government treasury bills and bonds as of December 31, 2003.

[4] Net cost is the pre-tax cost of preferred stock less the benefit of capital.

[5] Net cost discounted to year-end 2002 at 5.07%, which approximates the yield on government treasury bills and bonds as of December 31, 2003.

# *Exhibit J*

# *Sterling Savings Association*

# Transaction Costs of Mitigation Capital

| **1991 Common Stock Offering** | | |
|---|---|---|
| Gross proceeds (2.875M shares @ $8.25 per share) | $23,718,750 | [1] |
| Net proceeds | $20,952,000 | [2] |
| **Underwriter discounts, commissions and other expenses** | **$2,766,750** | |
| Cost of Warrants | $560,057 | [3] |
| **Total Transaction Costs** | **$3,326,807** | |

Notes:

[1] Sterling Savings Association's 1992 Annual Report, p. 18.

[2] Sterling Savings Association's 1992 Annual Report, p. 28.

[3] See Exhibit J, p.2.

# *Exhibit J*
## *Sterling Savings Association*
## Calculation of the Value of Warrants Issued to the Underwriters For 1991 Common Stock Offering

| | | |
|---|---|---|
| [a] | Stock Price (S) | $8.25 |
| [b] | Strike Price (X) | $9.90 |
| [c] | Offer Date | 11/20/1991 |
| [d] | Annualized Volatility (σ) | 0.51 |
| [e] | Maturity (years) (T) | 5 |
| [f] | Risk-free Rate (r) | 6.56% |
| [g] | $d_1$ | 0.699 |
| [h] | $d_2$ | -0.444 |
| [i] | Call Option Value | $3.91 |
| [j] | Dilution Factor | 0.96 |
| [k]=[i]*[j] | Warrant Value | $3.73 |
| [l] | Number of Warrants Issued | 150,000 |
| **[m]=[k]*[l]** | **Total Value of Warrants Issued** | **$560,057** |

Notes:
[a] - [c], [e], [f] Source: 1991 Offering Circular.
[d] See Exhibit J, page 8.
[f] 5-Year Treasury Constant Maturity Rate as of 11/20/91.
Source: Federal Reserve Bank of St. Louis.
[g], [h], [i] Calculated using the method described in "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

[g] $$d_1 = \frac{\ln(S/X) + rT + \sigma^2 T/2}{\sigma\sqrt{T}}$$

[h] $$d_2 = d_1 - \sigma\sqrt{T}$$

[i] $$C = SN(d_1) - Xe^{-rT}N(d_2)$$

where N(x) denotes cumulative normal distribution function with mean 0 and standard deviation 1.

[j] Ratio of common stock outstanding excluding the warrants (3,216,656) to the total common stock outstanding including the warrants (3,366,656 = 3,216,656 + 150,000). See Sterling Savings Association 1991 Offering Circular, p. 4.
Common stock outstanding at the time of the offering does not include 375,000 shares exercised for the underwriters' over-allotment option. See Sterling Savings Association 1992 Annual Report, p. 18.

# *Exhibit J*
## *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 11/21/1991 | 8.50 | 6.39 | |
| 11/22/1991 | 8.50 | 6.39 | 0.00% |
| 11/25/1991 | 8.25 | 6.20 | -2.99% |
| 11/26/1991 | 8.50 | 6.39 | 2.99% |
| 11/27/1991 | 8.00 | 6.01 | -6.06% |
| 11/29/1991 | 8.00 | 6.01 | 0.00% |
| 12/2/1991 | 8.25 | 6.20 | 3.08% |
| 12/3/1991 | 8.25 | 6.20 | 0.00% |
| 12/4/1991 | 8.25 | 6.20 | 0.00% |
| 12/5/1991 | 8.25 | 6.20 | 0.00% |
| 12/6/1991 | 8.25 | 6.20 | 0.00% |
| 12/9/1991 | 8.25 | 6.20 | 0.00% |
| 12/10/1991 | 8.50 | 6.39 | 2.99% |
| 12/11/1991 | 8.50 | 6.39 | 0.00% |
| 12/12/1991 | 8.50 | 6.39 | 0.00% |
| 12/13/1991 | 8.25 | 6.20 | -2.99% |
| 12/16/1991 | 8.75 | 6.57 | 5.88% |
| 12/17/1991 | 8.38 | 6.29 | -4.38% |
| 12/18/1991 | 8.25 | 6.20 | -1.50% |
| 12/19/1991 | 8.25 | 6.20 | 0.00% |
| 12/20/1991 | 8.50 | 6.39 | 2.99% |
| 12/23/1991 | 8.50 | 6.39 | 0.00% |
| 12/24/1991 | 8.25 | 6.20 | -2.99% |
| 12/26/1991 | 8.50 | 6.39 | 2.99% |
| 12/27/1991 | 8.50 | 6.39 | 0.00% |
| 12/30/1991 | 8.50 | 6.39 | 0.00% |
| 12/31/1991 | 8.75 | 6.57 | 2.90% |
| 1/2/1992 | 8.50 | 6.39 | -2.90% |
| 1/3/1992 | 8.75 | 6.57 | 2.90% |
| 1/6/1992 | 9.00 | 6.76 | 2.82% |
| 1/7/1992 | 9.50 | 7.14 | 5.41% |
| 1/8/1992 | 9.50 | 7.14 | 0.00% |
| 1/9/1992 | 9.88 | 7.42 | 3.87% |
| 1/10/1992 | 9.63 | 7.23 | -2.56% |
| 1/13/1992 | 10.00 | 7.51 | 3.82% |
| 1/14/1992 | 9.75 | 7.33 | -2.53% |
| 1/15/1992 | 10.50 | 7.89 | 7.41% |
| 1/16/1992 | 10.25 | 7.70 | -2.41% |
| 1/17/1992 | 10.13 | 7.61 | -1.23% |
| 1/20/1992 | 10.00 | 7.51 | -1.24% |
| 1/21/1992 | 9.75 | 7.33 | -2.53% |
| 1/22/1992 | 10.50 | 7.89 | 7.41% |
| 1/23/1992 | 9.88 | 7.42 | -6.14% |
| 1/24/1992 | 10.00 | 7.51 | 1.26% |
| 1/27/1992 | 10.25 | 7.70 | 2.47% |
| 1/28/1992 | 10.25 | 7.70 | 0.00% |
| 1/29/1992 | 10.25 | 7.70 | 0.00% |
| 1/30/1992 | 10.25 | 7.70 | 0.00% |

# *Exhibit J*
## *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 1/31/1992 | 9.75 | 7.33 | -5.00% |
| 2/3/1992 | 9.88 | 7.42 | 1.27% |
| 2/4/1992 | 10.00 | 7.51 | 1.26% |
| 2/5/1992 | 10.00 | 7.51 | 0.00% |
| 2/6/1992 | 10.00 | 7.51 | 0.00% |
| 2/7/1992 | 9.75 | 7.33 | -2.53% |
| 2/10/1992 | 10.00 | 7.51 | 2.53% |
| 2/11/1992 | 9.75 | 7.33 | -2.53% |
| 2/12/1992 | 9.88 | 7.42 | 1.27% |
| 2/13/1992 | 9.50 | 7.14 | -3.87% |
| 2/14/1992 | 9.75 | 7.33 | 2.60% |
| 2/18/1992 | 9.50 | 7.14 | -2.60% |
| 2/19/1992 | 9.75 | 7.33 | 2.60% |
| 2/20/1992 | 9.38 | 7.04 | -3.92% |
| 2/21/1992 | 9.38 | 7.04 | 0.00% |
| 2/24/1992 | 9.50 | 7.14 | 1.32% |
| 2/25/1992 | 9.75 | 7.33 | 2.60% |
| 2/26/1992 | 10.25 | 7.70 | 5.00% |
| 2/27/1992 | 10.25 | 7.70 | 0.00% |
| 2/28/1992 | 10.13 | 7.61 | -1.23% |
| 3/2/1992 | 10.00 | 7.51 | -1.24% |
| 3/3/1992 | 10.25 | 7.70 | 2.47% |
| 3/4/1992 | 10.13 | 7.61 | -1.23% |
| 3/5/1992 | 10.25 | 7.70 | 1.23% |
| 3/6/1992 | 10.25 | 7.70 | 0.00% |
| 3/9/1992 | 9.75 | 7.33 | -5.00% |
| 3/10/1992 | 10.00 | 7.51 | 2.53% |
| 3/11/1992 | 9.75 | 7.33 | -2.53% |
| 3/12/1992 | 9.75 | 7.33 | 0.00% |
| 3/13/1992 | 10.00 | 7.51 | 2.53% |
| 3/16/1992 | 10.25 | 7.70 | 2.47% |
| 3/17/1992 | 10.25 | 7.70 | 0.00% |
| 3/18/1992 | 10.25 | 7.70 | 0.00% |
| 3/19/1992 | 10.00 | 7.51 | -2.47% |
| 3/20/1992 | 10.25 | 7.70 | 2.47% |
| 3/23/1992 | 10.00 | 7.51 | -2.47% |
| 3/24/1992 | 10.25 | 7.70 | 2.47% |
| 3/25/1992 | 9.75 | 7.33 | -5.00% |
| 3/26/1992 | 10.25 | 7.70 | 5.00% |
| 3/27/1992 | 10.25 | 7.70 | 0.00% |
| 3/30/1992 | 10.25 | 7.70 | 0.00% |
| 3/31/1992 | 9.75 | 7.33 | -5.00% |
| 4/1/1992 | 9.75 | 7.33 | 0.00% |
| 4/2/1992 | 9.88 | 7.42 | 1.27% |
| 4/3/1992 | 10.00 | 7.51 | 1.26% |
| 4/6/1992 | 9.50 | 7.14 | -5.13% |
| 4/7/1992 | 9.50 | 7.14 | 0.00% |
| 4/8/1992 | 9.50 | 7.14 | 0.00% |

# *Exhibit J*
# *Sterling Savings Association*
# Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 4/9/1992 | 9.50 | 7.14 | 0.00% |
| 4/10/1992 | 10.25 | 7.70 | 7.60% |
| 4/13/1992 | 10.00 | 7.51 | -2.47% |
| 4/14/1992 | 10.25 | 7.70 | 2.47% |
| 4/15/1992 | 10.25 | 7.70 | 0.00% |
| 4/16/1992 | 10.50 | 7.89 | 2.41% |
| 4/20/1992 | 10.25 | 7.70 | -2.41% |
| 4/21/1992 | 10.13 | 7.61 | -1.23% |
| 4/22/1992 | 10.50 | 7.89 | 3.64% |
| 4/23/1992 | 10.50 | 7.89 | 0.00% |
| 4/24/1992 | 11.00 | 8.26 | 4.65% |
| 4/27/1992 | 10.75 | 8.08 | -2.30% |
| 4/28/1992 | 10.50 | 7.89 | -2.35% |
| 4/29/1992 | 10.25 | 7.70 | -2.41% |
| 4/30/1992 | 10.25 | 7.70 | 0.00% |
| 5/1/1992 | 10.75 | 8.08 | 4.76% |
| 5/4/1992 | 10.25 | 7.70 | -4.76% |
| 5/5/1992 | 10.50 | 7.89 | 2.41% |
| 5/6/1992 | 10.50 | 7.89 | 0.00% |
| 5/7/1992 | 10.50 | 7.89 | 0.00% |
| 5/8/1992 | 10.63 | 7.98 | 1.18% |
| 5/11/1992 | 10.75 | 8.08 | 1.17% |
| 5/12/1992 | 10.75 | 8.08 | 0.00% |
| 5/13/1992 | 10.75 | 8.08 | 0.00% |
| 5/14/1992 | 10.00 | 7.51 | -7.23% |
| 5/15/1992 | 10.50 | 7.89 | 4.88% |
| 5/18/1992 | 10.25 | 7.70 | -2.41% |
| 5/19/1992 | 10.38 | 7.79 | 1.21% |
| 5/20/1992 | 10.63 | 7.98 | 2.38% |
| 5/21/1992 | 10.25 | 7.70 | -3.59% |
| 5/22/1992 | 10.50 | 7.89 | 2.41% |
| 5/26/1992 | 10.75 | 8.08 | 2.35% |
| 5/27/1992 | 10.75 | 8.08 | 0.00% |
| 5/28/1992 | 10.25 | 7.70 | -4.76% |
| 5/29/1992 | 10.25 | 7.70 | 0.00% |
| 6/1/1992 | 10.50 | 7.89 | 2.41% |
| 6/2/1992 | 10.00 | 7.51 | -4.88% |
| 6/3/1992 | 10.25 | 7.70 | 2.47% |
| 6/4/1992 | 10.50 | 7.89 | 2.41% |
| 6/5/1992 | 10.50 | 7.89 | 0.00% |
| 6/8/1992 | 10.50 | 7.89 | 0.00% |
| 6/9/1992 | 9.88 | 7.42 | -6.14% |
| 6/10/1992 | 9.75 | 7.33 | -1.27% |
| 6/11/1992 | 9.75 | 7.33 | 0.00% |
| 6/12/1992 | 9.50 | 7.14 | -2.60% |
| 6/15/1992 | 9.50 | 7.14 | 0.00% |
| 6/16/1992 | 9.50 | 7.14 | 0.00% |
| 6/17/1992 | 10.00 | 7.51 | 5.13% |

# *Exhibit J*
## *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| Date | Price | Adjusted Price | Log Return |
| 6/18/1992 | 9.50 | 7.14 | -5.13% |
| 6/19/1992 | 9.50 | 7.14 | 0.00% |
| 6/22/1992 | 9.88 | 7.42 | 3.87% |
| 6/23/1992 | 9.88 | 7.42 | 0.00% |
| 6/24/1992 | 9.50 | 7.14 | -3.87% |
| 6/25/1992 | 10.25 | 7.70 | 7.60% |
| 6/26/1992 | 9.50 | 7.14 | -7.60% |
| 6/29/1992 | 9.75 | 7.33 | 2.60% |
| 6/30/1992 | 10.00 | 7.51 | 2.53% |
| 7/1/1992 | 9.50 | 7.14 | -5.13% |
| 7/2/1992 | 9.50 | 7.14 | 0.00% |
| 7/6/1992 | 9.63 | 7.23 | 1.31% |
| 7/7/1992 | 10.00 | 7.51 | 3.82% |
| 7/8/1992 | 10.00 | 7.51 | 0.00% |
| 7/9/1992 | 10.25 | 7.70 | 2.47% |
| 7/10/1992 | 9.88 | 7.42 | -3.73% |
| 7/13/1992 | 9.50 | 7.14 | -3.87% |
| 7/14/1992 | 10.25 | 7.70 | 7.60% |
| 7/15/1992 | 9.63 | 7.23 | -6.29% |
| 7/16/1992 | 10.25 | 7.70 | 6.29% |
| 7/17/1992 | 9.50 | 7.14 | -7.60% |
| 7/20/1992 | 10.25 | 7.70 | 7.60% |
| 7/21/1992 | 9.75 | 7.33 | -5.00% |
| 7/22/1992 | 10.25 | 7.70 | 5.00% |
| 7/23/1992 | 10.25 | 7.70 | 0.00% |
| 7/24/1992 | 9.75 | 7.33 | -5.00% |
| 7/27/1992 | 11.00 | 8.26 | 12.06% |
| 7/28/1992 | 10.50 | 7.89 | -4.65% |
| 7/29/1992 | 10.63 | 7.98 | 1.18% |
| 7/30/1992 | 11.00 | 8.26 | 3.47% |
| 7/31/1992 | 10.75 | 8.08 | -2.30% |
| 8/3/1992 | 10.75 | 8.08 | 0.00% |
| 8/4/1992 | 11.13 | 8.36 | 3.43% |
| 8/5/1992 | 10.75 | 8.08 | -3.43% |
| 8/6/1992 | 10.75 | 8.08 | 0.00% |
| 8/7/1992 | 10.75 | 8.08 | 0.00% |
| 8/10/1992 | 11.25 | 8.45 | 4.55% |
| 8/11/1992 | 11.25 | 8.45 | 0.00% |
| 8/12/1992 | 10.88 | 8.17 | -3.39% |
| 8/13/1992 | 10.75 | 8.08 | -1.16% |
| 8/14/1992 | 11.25 | 8.45 | 4.55% |
| 8/17/1992 | 11.00 | 8.26 | -2.25% |
| 8/18/1992 | 11.38 | 8.55 | 3.35% |
| 8/19/1992 | 10.75 | 8.08 | -5.65% |
| 8/20/1992 | 11.25 | 8.45 | 4.55% |
| 8/21/1992 | 10.75 | 8.08 | -4.55% |
| 8/24/1992 | 11.00 | 8.26 | 2.30% |
| 8/25/1992 | 11.13 | 8.36 | 1.13% |

# *Exhibit J*
## *Sterling Savings Association*
## Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 8/26/1992 | 11.38 | 8.55 | 2.22% |
| 8/27/1992 | 11.00 | 8.26 | -3.35% |
| 8/28/1992 | 11.13 | 8.36 | 1.13% |
| 8/31/1992 | 11.00 | 8.26 | -1.13% |
| 9/1/1992 | 11.00 | 8.26 | 0.00% |
| 9/2/1992 | 11.00 | 8.26 | 0.00% |
| 9/3/1992 | 11.13 | 8.36 | 1.13% |
| 9/4/1992 | 11.00 | 8.26 | -1.13% |
| 9/8/1992 | 10.75 | 8.08 | -2.30% |
| 9/9/1992 | 10.75 | 8.08 | 0.00% |
| 9/10/1992 | 10.50 | 7.89 | -2.35% |
| 9/11/1992 | 11.00 | 8.26 | 4.65% |
| 9/14/1992 | 11.00 | 8.26 | 0.00% |
| 9/15/1992 | 11.00 | 8.26 | 0.00% |
| 9/16/1992 | 10.50 | 7.89 | -4.65% |
| 9/17/1992 | 10.50 | 7.89 | 0.00% |
| 9/18/1992 | 11.00 | 8.26 | 4.65% |
| 9/21/1992 | 10.75 | 8.08 | -2.30% |
| 9/22/1992 | 11.00 | 8.26 | 2.30% |
| 9/23/1992 | 10.88 | 8.17 | -1.14% |
| 9/24/1992 | 11.00 | 8.26 | 1.14% |
| 9/25/1992 | 10.63 | 7.98 | -3.47% |
| 9/28/1992 | 10.75 | 8.08 | 1.17% |
| 9/29/1992 | 11.25 | 8.45 | 4.55% |
| 9/30/1992 | 11.00 | 8.26 | -2.25% |
| 10/1/1992 | 10.50 | 7.89 | -4.65% |
| 10/2/1992 | 10.75 | 8.08 | 2.35% |
| 10/5/1992 | 10.00 | 7.51 | -7.23% |
| 10/6/1992 | 10.50 | 7.89 | 4.88% |
| 10/7/1992 | 10.25 | 7.70 | -2.41% |
| 10/8/1992 | 10.25 | 7.70 | 0.00% |
| 10/9/1992 | 10.00 | 7.51 | -2.47% |
| 10/12/1992 | 10.13 | 7.61 | 1.24% |
| 10/13/1992 | 10.00 | 7.51 | -1.24% |
| 10/14/1992 | 10.25 | 7.70 | 2.47% |
| 10/15/1992 | 10.00 | 7.51 | -2.47% |
| 10/16/1992 | 9.75 | 7.33 | -2.53% |
| 10/19/1992 | 9.75 | 7.33 | 0.00% |
| 10/20/1992 | 10.25 | 7.70 | 5.00% |
| 10/21/1992 | 10.00 | 7.51 | -2.47% |
| 10/22/1992 | 10.50 | 7.89 | 4.88% |
| 10/23/1992 | 10.13 | 7.61 | -3.64% |
| 10/26/1992 | 10.13 | 7.61 | 0.00% |
| 10/27/1992 | 10.38 | 7.79 | 2.44% |
| 10/28/1992 | 10.13 | 7.61 | -2.44% |
| 10/29/1992 | 10.13 | 7.61 | 0.00% |
| 10/30/1992 | 10.50 | 7.89 | 3.64% |
| 11/2/1992 | 10.25 | 7.70 | -2.41% |

# *Exhibit J*
# *Sterling Savings Association*
# Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]t / [b](t-1)) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 11/3/1992 | 10.00 | 7.51 | -2.47% |
| 11/4/1992 | 10.25 | 7.70 | 2.47% |
| 11/5/1992 | 10.25 | 7.70 | 0.00% |
| 11/6/1992 | 10.13 | 7.61 | -1.23% |
| 11/9/1992 | 10.25 | 7.70 | 1.23% |
| 11/10/1992 | 10.50 | 7.89 | 2.41% |
| 11/11/1992 | 10.25 | 7.70 | -2.41% |
| 11/12/1992 | 10.25 | 7.70 | 0.00% |
| 11/13/1992 | 10.63 | 7.98 | 3.59% |
| 11/16/1992 | 10.75 | 8.08 | 1.17% |
| 11/17/1992 | 10.25 | 7.70 | -4.76% |
| 11/18/1992 | 10.25 | 7.70 | 0.00% |
| 11/19/1992 | 10.38 | 7.79 | 1.21% |
| | | **[d] Annualized Volatility** | **51.11%** |

Note:

[b] CRSP adjusts for stock dividends and splits. See "CRSP Data Description Guide for the CRSP US Stock Database", pp. 95 – 96. No stock dividends or splits were recorded during the period above.

[d] Calculated as standard deviation of Log Return (column [c]), multiplied by the square root of 252, the no. of trading days in a year. See "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

# *Exhibit K*
## *Sterling Savings Association*
## Summary of Wounded Bank Damages

| | Dollars |
|---|---|
| [1] 1989 Offering Circular Costs | $1,004,363 |
| [2] Legal, Accounting and Insurance Costs | $304,006 |
| [3] Regulatory Supervision Costs | $171,977 |
| [4] CJ-4 Loss | $1,240,610 |
| [5] Increased Cost to Acquire Branch from Great American Savings/RTC | $1,835,126 |
| **Total Wounded Bank Damages** | **$4,556,081** |

Source: Analysis prepared by Daniel G. Byrne, CFO of Sterling Savings, 1/9/04.

In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION,<br>a state-chartered savings association,<br>STERLING FINANCIAL CORPORATION,<br>a Washington corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>(Judge Wheeler) |

# Updated Expert Report of Professor Christopher M. James

December 11, 2006

## TABLE OF EXHIBITS

**Exhibit A:** Curriculum Vitae

**Exhibit B:** Prior Testimony of Dr. Christopher M. James in the Previous Four Years

**Exhibit C:** Additional Documents Considered

**Exhibit D:** Summary of Lost Profits and Actual Cost of Mitigation for Lewis Federal and Tri-Cities

**Exhibit E:** Calculation of Lost Earnings on Foregone Assets Through 1993

**Exhibit F:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 1991 through 2006

**Exhibit G:** Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

**Exhibit H:** Calculation of Cash Benefit Yield

**Exhibit I:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

**Exhibit J:** Transaction Costs of Mitigation Capital for Lewis Federal and Tri-Cities

**Exhibit K:** Summary of Wounded Bank Damages

**Exhibit L:** Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

## I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Before joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions at several Federal Reserve Banks, the Federal Deposit Insurance Corporation, and the Treasury Department. I currently serve on the Advisory Board of SunTrust Bank. My academic research has been in the areas of securities pricing, corporate finance, and financial institutions. I have published numerous articles on economic and financial topics including the regulation of financial institutions, failure resolution policies, and capital raising by depository institutions. I also serve on the editorial boards of four scholarly journals including the *Journal of Financial Economics*. I served as an associate editor of the *Journal of Finance* and as editor of the *Journal of Financial Intermediation* from 1988 through 1999. A copy of my curriculum vitae is attached as Exhibit A. A list of my testimony over the last four years is included in Exhibit B. I am being compensated at my usual hourly rate of $650.

## II. Assignment

I have been retained in this matter by counsel for the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial"). I have been asked by the counsel for the plaintiffs to update my February 2004 report taking into account the Court ruling dated August 30, 2006.[1] Specifically, I was asked to:

a. Assume that the contract related to the acquisition of Central Evergreen was not subsequently breached by the government, hence did not result in damages to the plaintiffs.

b. Update my calculations through September 30, 2006.

[1] Opinion and Order, Judge Wheeler, filed August 30, 2006.

As part of my analysis, I have reviewed various documents including reports issued by experts retained by the Department of Justice, deposition testimony, court opinions, legal filings, financial statements for Sterling, and other selected documents for Sterling. A list of the additional documents I have considered is contained in Exhibit C. This list supplements the document lists that I previously produced.

## III. Summary of Opinions

Based on the Court ruling dated August 30, 2006, I was asked to assume that the contract related to the acquisition of Central Evergreen was not breached by the government. Hence, damages stem from the breach related to the acquisitions of Lewis Federal and Tri-Cities ("LF & TC") only. When calculating total damages, I followed the same methodology as in my February 2004 Expert Report, however, the calculated damages relate only to the LF & TC acquisitions.

Following similar steps as in my February 2004 Expert Report, I summed the damages resulting from the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with the issuance of mitigation capital related to LF & TC, lost profits attributable to the breach of the LF & TC contracts, and wounded bank damages related to the breach. Under the assumption of no damages pertaining to the acquisition contract for Central Evergreen, total damages are $18.708 million (see Exhibit D).

## IV. Cost of Mitigation

The calculation of the cost of mitigation in my current report follows the same methodology as in my February 2004 Expert Report albeit with updated inputs to account for the

Court's August 30, 2006 ruling.[2] Furthermore, I have updated my calculations through September 30, 2006. In these calculations only the costs of mitigating the contractual supervisory capital promises for LF & TC are considered damages. To determine these costs, in the context of my model, it is first necessary to assess which capital was raised as a substitute for LF & TC's supervisory capital as opposed to being raised for other purposes. These other purposes include raising capital to substitute for the 1989 unit offering which had been planned prior to the breach and to substitute for the supervisory capital from the Central Evergreen acquisition that was lost after the passage of FIRREA. Only capital raised as a substitute for LF & TC's supervisory capital mitigates the effect of the breach ("mitigation capital") and results in mitigation damages.

Capital that Sterling raised in the 1991 and 1993 offerings was not traceable to any specific purpose, but was generally used to support the growth of the business. In the 1991 offering prospectus Sterling stated: "The primary purpose of this Offering is to increase Sterling's regulatory capital levels. Net proceeds will be used to support the growth of Sterling's business, including the origination of loans."[3] In the 1993 offering prospectus the intended purpose of the capital contributed to Sterling was to "...improve further the Sterling Savings' capital ratios. Sterling Savings intends to use such additional capital to support the growth of the business, including funding loans and investments and expanding its branch network."[4] Neither of the offerings indicated that the purpose was to mitigate the effects of the breach or other non-breach aspects of FIRREA.[5]

---

[2] As I noted in my February 2004 Expert Report, I am not rendering an opinion on whether Sterling actually replaced the supervisory capital that was generated in the contracts with the government. For purposes of these calculations I have been asked to assume that it did.
[3] Sterling Savings Offering Circular, November 20, 1991, p. 13.
[4] Sterling Financial Corporation Subordinated Notes Prospectus, February 4, 1993, pp. 4, 12.
[5] As I noted in my February 2004 report, I have been asked to assume for purposes of these calculations that the offerings were used to mitigate the breach of Lewis Federal and Tri-Cities' contracts. I believe this premise is counterfactual based on my review of the documents and the testimony of fact witnesses but I make the assumption as the necessary basis for calculating damages at or near the time of the breach, and on the belief that it is conservative in the sense that it minimizes damages awardable against the government.

Furthermore, once capital is raised, the proceeds from such an offering are fungible. Given that Sterling did not specify whether the raised capital was attributable to either substituting for the 1989 offering, mitigating the loss of the supervisory capital of LF & TC, or substituting for supervisory capital of Central Evergreen, it is therefore necessary to allocate the proceeds to Sterling's needs when calculating the cost of mitigation. In the next paragraphs I outline the assumptions that I made in order to assess which capital was raised as a substitute for LF & TC's supervisory capital.

Consistent with my February 2004 report, I assumed that $12 million of the capital raised in the 1991 offering served as a substitute for the proceeds which Sterling would have raised in the 1989 withdrawn offering, an offering that had been planned prior to the breach. The balance of the capital raised at the time of the 1991 offering was then allocated between capital needs that arose after the passage of FIRREA. I allocated the balance proportionally between the need to substitute for the supervisory capital from the Central Evergreen acquisition and the need to mitigate the breach of LF & TC's contracts. I have continued to allocate a portion of the offering to Central Evergreen because post-FIRREA Central Evergreen's supervisory capital could no longer be counted as tangible capital. As a consequence, Sterling would have needed to find a substitute for it. Therefore, the balance of capital raised at the time of the 1991 offering (both the proceeds from the 1991 offering and capital raised due to the Preferred Stock Series B conversion) is prorated based on the respective supervisory capital balances of LF & TC (54.8%) and Central Evergreen (45.2% = 100% - 54.8%).[6]

The sum of the allocated proceeds of the 1991 offering of $11.719 million and the capital resulting from the Preferred Stock Series B conversion of $2.1 million is less than the sum of the balances of supervisory capital of LF & TC and Central Evergreen (see Exhibit G). The capital

[6] The amount of LF & TC and Central Evergreen supervisory capital as of the time of the 1991 offering is $13.346 million and $11.022 million, respectively (see Exhibit G). $13.346 million / ($13.346 million + $11.022 million) = 54.8%.

raised in 1993 is therefore necessary to fully-mitigate the loss of LF & TC's supervisory capital. In 1993, the preferred stock issued by Sterling fully-mitigated the supervisory capital of LF & TC, as well as fully-replaced Central Evergreen's.

**1. Cost of Mitigation – 1991 Through 2006**

The net cost of mitigation capital for LF & TC from 1991 through September 2006 is $7.729 million (see Exhibit F). The following updates were implemented:

1. As discussed above, I did not include in the calculated mitigation damages any costs associated with the substitution of Central Evergreen's supervisory capital. This results in a smaller average amount of capital assumed to mitigate the breach (presented in Exhibit G) and in turn lowers the net cost of capital (presented in Exhibit F).
2. I updated the calculation of the past mitigation costs to include years 2004, 2005, through September 2006.

**2. Cost of Mitigation – 2006 Through 2025**

The net future cost of mitigation for LF & TC is $1.386 million (see Exhibit I). The following updates were implemented:

1. I updated the cash benefit rate of mitigation capital and the discount rate to reflect the current yield on 30-year U.S. Treasury bonds.
2. I updated the analysis to include only the period starting on September 30, 2006 through December 31, 2025.[7]

[7] I have also made one correction to the calculation of the Weighted Average Capital Raised Balance in Exhibit I.

## V. Transaction Costs of Mitigation Capital

I updated my calculation of the transaction costs of mitigation capital taking into account the Court's ruling dated August 30, 2006. As discussed above, only capital mitigating the breach related to LF & TC contracts leads to mitigation damages. Therefore, only the portion of the transaction costs related to the capital which mitigated LF & TC's supervisory capital is included in mitigation damages. The transaction costs attributed to mitigation capital for LF & TC are $0.900 million (see Exhibit J).

## VI. Lost Profits from Un-Mitigated Supervisory Capital

My approach to lost profits follows the approach I outlined in my February 2004 report. As a result of the Court's ruling dated August 30, 2006, I calculate lost profits damages on LF & TC's supervisory capital prior to its full mitigation. As I noted in my February 2004 report, leverage is valuable to thrifts. The lost profits from the un-mitigated LF & TC supervisory capital can be measured with the model developed by Dr. Horvitz which I have adopted.[8] My calculation of lost profits starts at the time of the breach (as does Dr. Horvitz's) and continues through February 1993 – the time when the LF & TC supervisory capital would have been fully-mitigated.

As before, I have made several adjustments to Dr. Horvitz' model to account for the capital raises that I have been asked to assume mitigated the breach. The first adjustment is to the amount of capital Sterling would have raised but-for the breach. The implication of a possible ruling by the Court that Sterling's capital raises subsequent to the breach were initiated to mitigate the breach would mean that the capital would not have been raised. However not all of the capital raised in 1991 and 1993 was needed to mitigate the loss of LF & TC's supervisory capital – clearly some of the capital was raised for other purposes. Capital raised for purposes other than to

[8] Updated Expert Report of Professor Paul Horvitz, December 11, 2006.

mitigate the breach would still have been raised but-for the breach. My lost profits calculation therefore includes capital raised in 1991 that was a substitute for Central Evergreen's supervisory capital. As Exhibit E, Table 3a shows, $5.678 million of the 1991 offering and conversion of Series B Preferred is a substitute for Central Evergreen's supervisory capital.

The second adjustment I made to Dr. Horvitz's model is that in light of the changed capital structure I reevaluated the leverage ratio of the but-for bank at the end of fiscal year 1992. I have made the same adjustment as in my February 2004 report. The final adjustment relates to dividend payments on the Series B Preferred Stock that was converted into common stock at the time of the 1991 offering. To the extent that the Series B Preferred Stock was not converted , Sterling would have continued to pay dividends on the portion that was not converted.

The updated lost profits damages resulting from the un-mitigated supervisory capital from LF & TC are $4.137 million (see Exhibit E).

## VII. Wounded Bank Damages

The wounded bank damages of $4.556 million have not changed since my February 2004 report (see Exhibit K).

## VIII. Summary - Total Mitigation Damages

Total damages are the sum of the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with issuing the mitigation capital related to LF & TC, lost profits on un-mitigated supervisory capital pertaining to LF & TC, and wounded bank damages. The total damages are $18.708 million (see Exhibit D).

**IX. Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles for Dr. Horvitz's Report**

I have also been asked to update the cost of replacement damages resulting from the inability to leverage the remaining supervisory capital pertaining to LF & TC from 2006 to 2025. I have performed this calculation, showing that the net cost of replicating the supervisory capital in the future is $0.641 million (see Exhibit L). Because Sterling's rating has improved since my February 2004 report, I have updated my estimate of the dividend yield on the preferred stock that could replicate the supervisory capital of LF & TC.[9] I have assumed a 6.30% dividend yield for the preferred stock as of September 29, 2006, which is the yield on a preferred stock index with rating Baa/BBB as of September 29, 2006.[10] I have also updated the cash benefit rate of capital and the discount rate to reflect the current yield on the 30-year U.S. Treasury bonds of 4.76%.[11]

[9] Fitch upgraded Sterling's Long Term Issuer Default Rating from BB+ to BBB- on 3/22/06. (Source: *Bloomberg*)
[10] Source: www.epreferreds.com.
[11] Source: *Bloomberg*.

I hold the opinions expressed herein to a reasonable degree of certainty, and declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. I reserve the right to modify my report and opinions in response to reports of the government's experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

Christopher M. James

Executed 12/11/06

# VITA

**NAME:** Christopher M. James

**CURRENT POSITION:** William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida

**ADDRESS:** Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168
E-mail: christopher.james@cba.ufl.edu

**TELEPHONE:**
Office: 352-392-3486
Home: 352-336-2765

**BIRTHDATE:** October 12, 1951

**EDUCATION:**

| | |
|---|---|
| B.A. | Michigan State University, 1973 |
| M.B.A. | University of Michigan (Finance), 1977 |
| Ph.D. | University of Michigan (Economics: Industrial Organization, Finance), 1978 |

**RESEARCH/ TEACHING INTERESTS:** Corporate Strategy, Corporate Finance and Financial Institutions

**TEACHING/ RESEARCH EXPERIENCE:**

William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Visiting Professor, University of New South Wales, 1995

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

Consultant, FDIC, 1988-1991

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

**PAPERS AND PUBLICATIONS:**

"The Technology of Risk and Return, Comment," American Economic Review, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," Journal of Financial and Quantitative Analysis, December, 1981.

"An Analysis of Bank Loan Rate Indexation," Journal of Finance, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), Journal of Finance, December, 1982.

"Pricing Alternatives for Loan Commitments: A Note," Journal of Bank Research, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation: The Case of Deposit Rate Ceilings," Journal of Monetary Economics, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), Journal of Portfolio Management, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), Journal of Finance, September, 1983.

"Regulation and the Determination of Bank Capital Changes: A Note," (with J.K. Dietrich), Journal of Finance, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency: The Case of Bank Holding Company Acquisitions," Journal of Law and Economics, April 1984, Abstracted in Regulation as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), Journal of Finance, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), Journal of Money, Credit and Banking, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), Academy of Management Journal, 1985.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), Journal of Finance, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), Journal of Financial Economics, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?" Review of Financial Studies, Winter, 1995.

"CEO Compensation and Bank Risk: Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), Journal of Monetary Economics, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," Journal of Finance, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), Journal of Finance, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), Journal of Financial Economics, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), Journal of Banking and Finance, November, 1998.

"Where Do Merger Gains Come From? Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert), Journal of Financial Economics, May, 2001.

"Do Relationships Have Limits? Banking Relationships, Financial Constraints and Investment," (with J. Houston), Journal of Business, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), Journal of Finance, June, 2002.

"What a Difference a Month Makes: Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), Journal of Financial and Quantitative Analysis, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), forthcoming, Journal of Financial Economics, 2006, Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski), forthcoming, Journal of Banking and Finance, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles: How Good are Bankers at Spotting Winners?" (with L. Gonzalez), forthcoming, Journal of Financial Economics, 2006.

**CURRENT RESEARCH:**

"The Information Content of Bank Loan Covenants", (with Cem Demiroglu), work in progress

"The Effects of Leverage on Operating Performance: An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND PUBLICATIONS:**

"Are Banks Still Special? New Evidence in the Corporate Capital-Raising Process," (with D. Smith), Journal of Applied Corporate Finance, Winter, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find? A Discussion of 'Is the Bank Merger Wave of the 90's Efficient? Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), Mergers and Productivity, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," Journal of Banking and Finance, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J Houston), Journal of Applied Corporate Finance, Summer, 1998.

Discussion of "Financial Institutions and Regulations: The Dilemma in a Deregulated World," Proceedings from Riksbank Conference: Forces for and Implications of Structural Changes in the Financial Sector, June, 1997.

"Evolution of Extinction: Where are Banks Headed," (with J. Houston), Journal of Applied Corporate Finance, Summer, 1996.

"RAROC at Bank of America: From Theory to Practice, Journal of Applied Corporate Finance, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), Universal Banking: Financial System Design Reconsidered, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), Journal of Applied Corporate Finance, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), Journal of Applied Corporate Finance, 1994.

"Studies in Financial Institution," (with C. Smith), Commercial Banks, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE ACTIVITIES:**

Associate Editor: Journal of Banking and Finance, 1999-2001.

Associate Editor: Journal of Financial Economics, 1993-present.

Associate Editor: Journal of Financial Services Research, 1989-present.

Associate Editor: Journal of Managerial and Decision Economics, 1988-present.

Associate Editor: Journal of Finance, 1988-2000.

Co-Editor: Journal of Financial Intermediation, 1988-1999.

Associate Editor: Journal of Financial and Quantitative Analysis, 1982-1984.

Academic Board: Turnaround Management Association, 1990-2002.

Editorial Board: Federal Reserve Bank of New York: Economic Review, 1997-present.

Reviewer: Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics.

Program Committee: Financial Management Association, Western Finance Association, American Finance Association, and European Finance Association.

**CONSULTING/ EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, ID$^2$, Inc.

Advisory Board, SunTrust Bank.

Independent Distribution Consultant, Janus Funds

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Board of Directors, SunTrust Banks, 1989-2001.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School: Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness: Cases involving antitrust, portfolio management, securities valuation, bank management, valuation, and regulatory matters.

Consultant: Product pricing, valuation, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member: Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.

**AWARDS:**

Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

# Exhibit B
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

*California Federal Bank v. United States*, No. 92-138C (U. S. Court of Federal Claims), deposition and trial testimony, 2002.

*Comac Partners, L.P., et al., v. John J. Ghaznavi, et al., and Anchor Glass Container Corporation Litigation*, No. 18417, deposition, 2002.

*Ernst & Young, LLP v. Sphinx International, Inc.,* AAA No. 30-107-00252-1, arbitration testimony, 2002.

*Dr. Ben S. Branch, Trustee of Bank of New England Corporation v. Ernst & Young U.S., et al.,* C.A. No. 93-10024-RGS, deposition, 2002.

*Duramed Pharmaceuticals, Inc. v. Wyeth-Ayerst Laboratories, Inc.,* C.A. No. C-1-00-735, deposition, 2002.

*Fifth Third Bank of Western Ohio v. United States of America,* No. 95-503C, United States Court of Federal Claims, deposition and trial testimony, 2001, 2002, and 2003.

*KA Investments v. Number Nine Visual Technology Corp.,* No. 00 CV 10966 DPW, U.S. District Court, District of Massachusetts, deposition and trial testimony, 2003.

*In Re A.T. Cross Securities Litigation,* No. 00 203 ML, U.S. District Court, District of Rhode Island, deposition, 2003.

*Long Island Savings Bank, FSB, and The Long Island Savings Bank of Centereach FSB, v. United States of America*, No. 92-517C, United States Court of Federal Claims, deposition, 1999-2000, 2003.

*LaSalle Talman Bank, F.S.B., v. United States of America*, No. 92-652C, United States Court of Federal Claims, deposition and trial testimony, 1998-1999, 2004.

*Smith v. Arthur Andersen et al.*, No. CIV-01-218-PHX-PGR, United States District Court for the District of Arizona, deposition, 2003.

*Land Development, Ltd. v. Arvida Managers-II, Inc.*, No. 96-0062-CA-15-N, The Circuit Court in and for the Eighteenth Judicial Circuit, Seminole County, Florida, deposition, 2003.

*PSINet Consulting Solutions Holdings, Inc., et al.*, No. 01-14916, United States Bankruptcy Court for the Southern District of New York, deposition, 2003, trial testimony, 2004.

# Exhibit B
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

*AT&T Corp. Securities Litigation*, No. 01-CV-1883, United States District Court for the District of New Jersey, deposition, 2004.

*RaboBank vs. Coopers & Lybrand*, No. 312318, Superior Court of the State of California County of San Francisco, deposition, 2004.

*Citizens Federal Bank, FSB, et al., v. United States*, No. 92-656C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Marriott International, Inc.*, No. 50-T-168-00171-2, International Centre for Dispute Resolution American Arbitration Association, arbitration testimony, 2004.

*James Marcelli v. Bank One Trust Company,* AAA Case No. 77 148 00154 03 DEAR, arbitration testimony, 2004.

*Texas First National bank v. Kenneth Wu,* et al,. No. H-01-2661, United States District Court for the Southern District of Texas, Houston Division, deposition and trial testimony, 2004.

*Hechinger Investment Company of Delaware v. Chase Manhattan Bank*, No. 00-840-RRM, United States District Court for the District of Delaware, deposition, 2004.

*American Capital Corporation and Transcapital Financial Corporation*, *v. U.S.*, No. 95-523C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Wyeth Pharmaceuticals*, No. C-1-01-704, United States District Court for the Southern District of Ohio Western Division, deposition, 2004.

*WorldCom Securities Litigation*, No. 02 Civ. 3288 (DLC), United States District Court Southern District of New York, deposition, 2004.

*Furstenau, et al. v. AT&T Corp., et al.,* No: 02-CV-5409, United States District Court for the District of New Jersey, deposition, 2005.

*Truserv Corporation v. Ernst & Young LLP*, No. 51-Y-181-01333-02, deposition, 2004, arbitration testimony, 2005.

*Allegheny Health, Education and Research Foundation v. PriceWaterhouseCoopers*, No. 00-684, United States District Court for the Western District of Pennsylvania, deposition, 2005.

*Torchmark Corporation, v. KPMG Peat Marwick LLP, et al.,* No. CV-03-3315, Circuit Court of

# Exhibit B
# Prior Testimony of Dr. Christopher M. James
# In the Previous Four Years

the Tenth Judicial Circuit, in and for Jefferson County Alabama, deposition, 2005.

*Cisco Systems, Inc.*, No. C-01-20418-JW(HRL), United States District Court Northern District of California San Jose Division, deposition, 2006.

*Williams Securities Litigation*, No. 02-CV-72-SPF-FHM, United States District Court for the Northern District of Oklahoma, deposition, 2006.

*Asche Transportation Services v. Ernst & Young, LLP*, No. 51-107-Y-01237 04, American Arbitration Association, arbitration trial, 2006.

*Granite Management Corporation v. United States of America,* No. 95-515C, United States Court of Federal Claims, trial testimony, 2006.

*Adams Golf, Inc. Securities Litigation*, C.A. No. 99-371 KAJ, United States District Court District of Delaware, deposition, 2006.

*Enron Corporation Securities Litigation,* MDL Docket No. 1446, United States District Court, Southern District of Texas, Houston Division, deposition, 2006.

# Exhibit C

## Additional Documents Considered by *Dr. Christopher M. James* in Conjunction with Revised Report – December 11, 2006

| | | |
|---|---|---|
| 09/30/06 10-Q | | |
| 06/30/06 10-Q | | |
| 03/31/06 10-Q | | |
| 12/31/89 10-Q | | |
| 12/31/05 10-K | | |
| 12/31/04 10-K | | |
| 12/31/03 10-K | | |
| 09/06 Call Report | | |
| 06/06 Call Report | | |
| 03/06 Call Report | | |
| 12/05 Call Report | | |
| 09/05 Call Report | | |
| 06/05 TFR | | |
| 03/05 TFR | | |
| 12/04 TFR | | |
| 09/04 TFR | | |
| 06/04 TFR | | |
| 03/04 TFR | | |
| 12/03 TFR | | |

**Other Case Materials**

| | | |
|---|---|---|
| Defendant's Motion for Summary Judgment Regarding Damages, July 20, 2004 | | |
| Defendant's Proposed Findings of Uncontroverted Fact in Connection with Motion for Summary Judgment Regarding Damages, July 20, 2004 | | |
| Amended Expert Report of Mukesh Bajaj, Ph.D. with Exhibits 1 - 2 and Tables 1-4, April 23, 2004 | | |
| Opinion and Order, Judge Wheeler, Filed August 30, 2006 | | |
| Deposition of William J. Durbin with Exhibit S-1, July 24, 2000 | | |
| Updated Expert Report of Professor Paul Horvitz – December 11, 2006 | | |

**Other Materials**

| | | |
|---|---|---|
| 12/02 Empire Bank TFR | | |
| 12/03 Klamath First Federal Savings and Loan Association TFR | | |
| "Exhibit VII.2. –Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings | | |
| Bloomberg Historical Yield Curve Data, 09/29/06 | | |
| Preferred Stock Yields – www.epreferreds.com – September 29, 2006 | | |

# *Exhibit D*
# *Sterling Savings Association*
## Summary of Lost Profits and Actual Cost of Mitigation for Lewis Federal and Tri-Cities
($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Profits 1989 – 1993** | $4,137 |
| | **Net Actual Mitigation Costs for Lewis Federal and Tri-Cities** | |
| [2] | 1991 Through 2006 | $7,729 |
| [3] | 2006 Through End of Contracts | $1,386 |
| [4] | **Transaction Costs of Mitigation Capital for Lewis Federal and Tri-Cities** | $900 |
| [5] | **Wounded Bank Cost** | $4,556 |
| | **Total Loss Due to Actual Mitigation for Lewis Federal and Tri-Cities** | **$18,708** |

Notes:
[1] See Exhibit E
[2] See Exhibit F.
[3] See Exhibit I.
[4] See Exhibit J.
[5] See Exhibit K.

# *Exhibit E*
# *Assumes Mitigating Capital Raises*
## Calculation of Lost Earnings on Foregone Assets Through 1993
## Amortize Capital Credits from Lewis Federal and Tri-Cities
## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*
*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*
*Table 3b: Calculation of Returns Applicable to Foregone Assets*
*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*
*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*
*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*
*Table 4b: Calculation of Total Disallowed Central Evergreen Supervisory Goodwill at 12/31/89*
*Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89*

*Table 5: But-For Bank*

*Table 6a: Addendum For Lewis Federal and Tri-Cities Supervisory Intangibles*
*Table 6b: Addendum For Central Evergreen Supervisory Intangibles*

*Table 7: Addendum For Non-Supervisory Goodwill*

# *Exhibit E*

## *Sterling Savings Association*

### Calculation of Lost Earnings on Foregone Assets

### Table 1: Summary of Lost Earnings Calculation

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | *Incremental Bank* | | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/1989 | $730,933 | $730,933 | $0 | | |
| 12/31/1989 | 708,213 | 719,644 | 11,431 | 0.33% | 0 |
| 6/30/1990 | 688,990 | 737,187 | 48,197 | 0.25% | 28 |
| 6/30/1991 | 608,999 | 725,600 | 116,601 | 0.94% | 454 |
| 6/30/1992 | 640,887 | 773,974 | 133,087 | 1.78% | 2,071 |
| 6/30/1993 | | | | 1.78% | 1,583 |
| | | | | | 4,137 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90, which are for the six months ended as of each date.

A From Table 2a, column A.

B From Table 5, column C.

D From Table 3a, column G. For period ending 6/30/90, ROAA reflects the return for the six month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets. Figure for 6/30/93 is calculated as foregone assets at 6/30/92 times the pro-rated return for the eight month period ended 2/28/93.

# *Exhibit E*

## *Sterling Savings Association*

### Table 2a: Actual Bank and Intervest Financial Data

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period Ended** | **Assets** | **Net Income** | **Taxes** | **Amortization of Goodwill** | **Pre-Tax, Pre-Amortization Income** | **Dividends** | **Core Capital** | **Core Capital Ratio** | **Capital Raised / Down-streamed** | **Total Goodwill** | **Qualifying Supervisory Goodwill** | **Other Qualifying Intangibles** |
| 6/30/1989 | 730,933 | | | | | | | | | | | |
| 12/31/1989 | 708,213 | 627 | 324 | 1,620 | 2,571 | 112 | (2,273) | -0.32% | 0 | 20,983 | 10,308 | 0 |
| 6/30/1990 | 688,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 | 10,036 | 0 |
| 6/30/1991 | 608,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 | 8,903 | 1,584 |
| 6/30/1992 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 | 6,288 | 3,327 |
| 6/30/1993 | 1,032,538 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 | 7,673 | 2,575 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date. Data are unconsolidated.

A - D & F & J Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b).

G Actual data from Thrift Financial Reports (Sheshunoff), except for figure for 12/31/89, which is from the Sterling Savings Association Capital Restoration Plan dated 2/19/90.

I Based on data from Sterling Savings annual reports and offering circulars. Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.875m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

K - L Actual data from Thrift Financial Reports (Sheshunoff).

# *Exhibit E*

## *Sterling Savings Association*

### Table 2b: Data for Intervest Mortgage Investment Company

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | D |
|---|---|---|---|---|---|---|---|
| **Period Ended** | **Assets** | **Net Income** | **Taxes** | **Amortization of Goodwill** | **Pre-Tax, Pre-Amortization Income** | **Dividends** | **Equity** |
| 6/30/1989 | | | | | | | |
| 12/31/1989 | | | | | | | |
| 6/30/1990 | | | | | | | |
| 6/30/1991 | | | | | | | |
| 6/30/1992 | | | | | | | |
| 6/30/1993 | 992 | 11 | 0 | - | 11 | - | 981 |

Note: All data are as of or for the fiscal year specified. Data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

F Dividends were not listed in the consolidating financial statements.

# *Exhibit E*

## *Sterling Savings Association*

### Table 3a: Estimates for the But-For and Incremental Banks

($ in Thousands)

| | A (But-For) | B (But-For) | | | C (Incremental) | D (But-For) | E (But-For) | F (But-For) | G (Incremental) |
|---|---|---|---|---|---|---|---|---|---|
| | | Adjustments to But-For: | | | | | | | |
| Period Ended | Estimated Capital Ratio | Income | Capital, Assets | Note | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Adjusted ROAA |
| 6/30/1989 | | | | | | | | | |
| 12/31/1989 | 4.00% | 0 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1989 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase (-$0.115m). Income: Adjustment for wounded bank damages. | 37% | See footnote [D]. | 2.91% | 0 | 0.33% |
| 6/30/1990 | 4.00% | 1,116 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 6/30/1991 | 4.00% | 1,091 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.94% |
| 6/30/1992 | 5.00% | 1,057 | 5,678 | Capital, Assets: Portion of 11/21/91 common stock offering and conversion of preferred stock which is not considered as mitigation capital for Lewis Federal and Tri-Cities (net proceeds). Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.78% |
| 6/30/1993 | N/A | 591 | N/A | Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.78% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 assumed to equal 4% based on projected RAP leverage ratios in Sterling's 8/15/88 Business Plan.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3c, column F. Adjustments to but-for capital & assets based on data from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G).
Adjustment to but-for capital & assets in 1991 is calculated as ($11.022M / ($13.346M + $11.022M)) x ($20.925M - $10.5M + $2.1M). Lewis Federal and Tri-Cities interpolated capital credit and intangibles as of 11/21/91 is $13.346M. Central Evergreen interpolated identified and unidentified intangibles as of 11/21/91 is $11.022M. $20.925M is net proceeds from Sterling's 11/21/91 stock offering. $10.5M is net proceeds from withdrawn 1989 unit offering. On 11/21/91, Sterling also converted $2.1M of its convertible series B preferred to common stock.

C Estimated to be 37% of incremental earnings for 1989 – 1993, based on guidance provided by Dan Byrne, CFO, of Sterling Savings Association.

D Estimated to be the actual dividends paid plus the required dividends on the unit offering and, starting in fiscal 1992, the required dividends on the series B preferred. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is estimated that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89). Annual dividends on the series B preferred are calculated as $2.50, the required per share dividend, times ($13.346M / ($13.346M + $11.022M)), the portion of capital raised in 1991 allocated as mitigation capital for Lewis Federal and Tri-Cities, times 89,968, the number of shares outstanding at the time of conversion (Source: Sterling Savings 1991 Annual Report, p. 35, Sterling Savings 1992 Annual Report, p. 25). Lewis Federal and Tri-Cities interpolated capital credit and intangibles as of 11/21/91 is $13.346M. Central Evergreen interpolated identified and unidentified intangibles as of 11/21/91 is $11.022M. For fiscal 1992, the annual dividend amount of $123,183 is pro-rated to reflect approximately seven months, the time from the November 1991 conversion to the end of the fiscal year. The pro-rated amount is $74,936.

E From Table 3e, column F.

F From Table 3e, column B.

G From Table 3b, column F.

# *Exhibit E*

## *Sterling Savings Association*

### Table 3b: Calculation of Returns Applicable to Foregone Assets

($ in Thousands)

| | A | B | C | D | E = B - C - D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| **Period Ended** | **Actual Assets** | **Pre-Tax, Pre-Amortization Income** | **Actual Accretion Income** | **Adjustments to Earnings due to Non-recurring or Breach-induced Gains/(Losses)** | **Adjusted Pre-Tax, Pre-Amort. Earnings** | **Adjusted ROAA** |
| 6/30/1989 | 730,933 | | | | | |
| 12/31/1989 | 708,213 | 2,571 | 178 | 0 | 2,393 | 0.33% |
| 6/30/1990 | 688,990 | 786 | 178 | (1,116) | 1,724 | 0.25% |
| 6/30/1991 | 608,999 | 5,380 | 354 | (1,091) | 6,117 | 0.94% |
| 6/30/1992 | 640,887 | 10,395 | 351 | (1,057) | 11,101 | 1.78% |
| 6/30/1993 | 1,032,538 | 14,775 | 437 | (591) | 14,930 | 1.78% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Actual data from Thrift Financial Reports (Sheshunoff) for Sterling Savings and from consolidating financials for 6/30/93 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion Income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# *Exhibit E*
# *Sterling Savings Association*
## Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital
($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - ( C / B )) | E | F = D + E | G |
| Period Ended | Extraordinary Items Net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 6/30/1989 | | | | | | | |
| 12/31/1989 | $0 | $951 | $324 | $0 | $0 | $0 | ($115) |
| 6/30/1990 | 0 | (847) | (487) | 0 | (1,116) | (1,116) | |
| 6/30/1991 | 298 | 2,312 | 590 | 400 | (1,491) | (1,091) | |
| 6/30/1992 | (522) | 8,585 | 3,319 | (851) | (206) | (1,057) | |
| 6/30/1993 | (424) | 12,970 | 4,920 | (683) | 92 | (591) | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.
A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff).
D Extraordinary Items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.
E From Table 3d, column F.
G Source: Data from Sterling Savings Association.

# *Exhibit E*

## *Sterling Savings Association*

### Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings

($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ 4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 6/30/1989 | | | | | | |
| 12/31/1989 | $0 | $0 | $0 | $0 | | $0 |
| 6/30/1990 | (6) | (75) | (1,004) | (31) | | (1,116) |
| 6/30/1991 | (1,189) | (66) | 0 | (236) | | (1,491) |
| 6/30/1992 | (138) | (32) | 0 | (37) | | (206) |
| 6/30/1993 | 92 | 0 | 0 | 0 | | 92 |
| Total | $(1,241) | $(172) | $(1,004) | $(304) | $0 | ($2,721) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date.
Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9).
Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

# *Exhibit E*

# *Sterling Savings Association*

## Table 3e: Summary of Internal versus External Growth in Total Assets

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| **Period Ended** | **Actual Total Assets** | **Acquired Assets** | **Notes** | **Actual Growth** | **Internal Growth** | **But-For Internal Growth Rate** |
| 6/30/1989 | 730,933 | 0 | | | | |
| 12/31/1989 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 6/30/1990 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 6/30/1991 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 6/30/1992 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 6/30/1993 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date. Data are unconsolidated.

A From Table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 8/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. For 6/30/93, the growth rate on incremental assets is assumed to be the same as the internal growth of the actual bank as reflected in column E.

# Exhibit E

## Sterling Savings Association

### Table 4a: Goodwill and Intangibles Data for the But-For Bank

($ in Thousands)

| | Lewis Federal and Tri-Cities Supervisory Intangibles | | | | | | Central Evergreen Supervisory Intangibles | | | | | | Non-Supervisory Intangibles | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A = B + C | B | C | D | E | F | G = H + I | H | I | J | K | L | M | N | O = D + E + F + J + K + L + N |
| Period Ended | Total Intan-gibles | Capital Credit | Super-visory Good-will | Amorti-zation of Supervisory Goodwill and Capital Credit | Adjust-ments to Super-visory Good-will (benefit) | NOL's | Total Uniden-tified and Identi-fied Intan-gibles | Identi-fied Intan-gibles | Super-visory Good-will | Amorti-zation of Identified and Unidentified Intangibles | Adjust-ments to Super-visory Good-will (benefit) | NOL's | Total Balances | Total Amorti-zation of Non-Super-visory Intangibles | Total Amorti-zation, Adjust-ments and NOL's |
| 6/30/1989 | $16,067 | $12,342 | $3,724 | $1,020 | $0 | $0 | $18,700 | $6,075 | $12,625 | $1,324 | $0 | $59 | $1,407 | $108 | $2,512 |
| 12/31/1989 | 15,557 | 11,929 | 3,627 | 510 | 0 | 0 | 17,026 | 5,670 | 11,357 | 1,480 | 0 | 193 | 1,353 | 54 | 2,238 |
| 6/30/1990 | 15,047 | 11,516 | 3,530 | 510 | 0 | 0 | 16,112 | 5,265 | 10,847 | 1,268 | (354) | 0 | 1,299 | 54 | 1,478 |
| 6/30/1991 | 13,673 | 10,691 | 2,983 | 1,020 | 0 | 353 | 11,573 | 4,455 | 7,118 | 1,873 | 0 | 2,666 | 1,190 | 108 | 6,021 |
| 6/30/1992 | 12,232 | 9,865 | 2,368 | 948 | 493 | 0 | 8,616 | 3,645 | 4,971 | 1,859 | 1,098 | 0 | 1,082 | 108 | 4,506 |
| 6/30/1993 | 11,285 | 9,039 | 2,245 | 948 | 0 | 0 | 6,848 | 2,835 | 4,013 | 1,768 | 0 | 0 | 974 | 108 | 2,824 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Intangibles from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

B From Table 6a, column E. Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C From Table 6a, column J. Supervisory goodwill from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

D See note A above. Amortization of the supervisory goodwill is based on data from Sterling Savings Association. Amortization of the capital credit is from table 6a, columns B and D.

E, F, K, L Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

G Intangibles from Central Evergreen supervisory acquisitions. Based on data from Sterling Savings Association.

H Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

I From Table 6b, column C. Based on data from Sterling Savings Association.

J Calculated as Table 6b, column B + Table 6b, column D.

M & N Assumed balances and amortization of intangibles resulting from the Lewis & Clark merger (FY83). The goodwill amortization for this deal is modeled on an assumed straight-line basis through 2000. All data is based on information from Sterling Annual Reports. From table 7, columns D and H.

# *Exhibit E*

# *Sterling Savings Association*

## Table 4b: Calculation of Total Disallowed

## Central Evergreen Supervisory Goodwill at 12/31/89

($ in Thousands)

| | A | B | C | D | E = C * D | F = min(A,E) | G |
|---|---|---|---|---|---|---|---|
| Period ended | Central Evergreen SGW | Actual Reported Qualifying SGW | But-For Bank Beginning Period Tangible Assets | Phaseout Schedule of SGW | But-For Constraint | But-For Qualifying SGW | Adjustment to But-For Core Capital |
| 6/30/1989 | $12,625 | | | | | | |
| 12/31/1989 | $11,357 | 10,308 | 694,760 | 1.500% | 10,421 | 10,421 | N/A |
| 6/30/1990 | $10,847 | 10,036 | 685,708 | 1.500% | 10,286 | 10,286 | (136) |
| 6/30/1991 | $7,118 | 8,903 | 704,730 | 1.500% | 10,571 | 7,118 | (3,167) |
| 6/30/1992 | $4,971 | 6,288 | 699,163 | 1.000% | 6,992 | 4,971 | (2,147) |
| 6/30/1993 | $4,013 | 7,673 | 752,044 | 0.750% | 5,640 | 4,013 | (958) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A From Table 4a, column I.

B Actual data from Thrift Financial Reports (Sheshunoff).

C Calculated as the but-for bank's assets at the beginning of the period less total intangibles at the beginning of the period. (Calculated as Table 5, column C[t-1] - (Table 4a, column A[t-1] + Table 4a, column G[t-1] + Table 4a, column M[t-1])).

D Post-FIRREA, a portion of supervisory goodwill (based on a percentage of tangible assets) was allowed to count towards core capital. Qualifying percentages are from the Thrift Financial Report Instruction Manual 1991.

G Calculated as column F[t] - column F[t-1].

# *Exhibit E*

## *Sterling Savings Association*

### Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89

($ in Thousands)

| | A | B | C | D | E | F = D * E | G = min(A,F) | H |
|---|---|---|---|---|---|---|---|---|
| Period ended | Identified Intangibles | Actual Reported Other Qualifying Intangibles | Actual Tangible Capital | But-For Bank Tangible Capital + But-For Qualifying SGW | Percentage of Tangible Capital + QSGW That Can be Counted | But-For Constraint | But-For Other Qualifying Intangibles | Adjustment to But-For Core Capital |
| 6/30/1989 | $6,075 | | | | | | | |
| 12/31/1989 | $5,670 | 0 | (9,949) | 23,170 | 25.000% | 5,793 | 5,670 | N/A |
| 6/30/1990 | $5,265 | 0 | (11,390) | 23,116 | 25.000% | 5,779 | 5,265 | (405) |
| 6/30/1991 | $4,455 | 1,584 | (2,567) | 24,223 | 25.000% | 6,056 | 4,455 | (810) |
| 6/30/1992 | $3,645 | 3,327 | 25,651 | 24,569 | 25.000% | 6,142 | 3,645 | (810) |
| 6/30/1993 | $2,835 | 2,575 | 48,191 | 35,054 | 25.000% | 8,763 | 2,835 | (810) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A From Table 4a, column H.

B, C Actual data from Thrift Financial Reports (Sheshunoff).

D Calculated as the previous period's but-for core capital less the previous period's but-for other qualifying intangibles.
(Calculated as Table 5, column I[t-1] - column G[t-1]).
For 12/31/89, calculated as the but-for core capital at 12/31/89 before inclusion of but-for other qualifying intangibles.

E Post FIRREA, a maximum of 25% of (Tangible Capital + Qualifying SGW) can be counted towards Other Qualifying Intangible Assets.

H Calculated as column G[t] - column G[t-1].

# *Exhibit E*
# *Sterling Savings Association*
## Table 5: But-For Bank
($ in Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised / Adjustments to Core Capital | Adjustment to But-For Core Capital Due to Phaseout of Central Evergreen Intangibles + Limitation on Other Qualifying Intangibles |
| 6/30/1989 | | | 730,933 | | | | | | | | | |
| 12/31/1989 | 752,177 | 719,644 | 719,644 | 2,571 | 324 | 2,045 | 202 | 353 | 28,786 | 4.00% | 10,385 | N/A |
| 6/30/1990 | 745,291 | 737,187 | 737,187 | 1,930 | (64) | 1,833 | 161 | 241 | 29,487 | 4.00% | 0 | (541) |
| 6/30/1991 | 801,437 | 725,600 | 725,600 | 6,925 | 1,162 | 3,001 | 2,763 | 876 | 29,024 | 4.00% | 0 | (3,977) |
| 6/30/1992 | 788,840 | 773,974 | 773,974 | 13,523 | 4,476 | 2,916 | 6,131 | 651 | 38,699 | 5.00% | 5,678 | (2,957) |
| 6/30/1993 | N/A | N/A | N/A | 17,741 | 5,725 | 2,824 | 9,193 | 1,052 | N/A | N/A | N/A | (1,768) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Calculated as column C[t-1] times (1 plus Table 3a, column E), plus Table 3a, column F.

B Calculated as column I divided by Table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from Table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in Table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractual amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column D + Table 4a, column J + Table 4a, column N).

H Assumed to be the actual dividends paid plus the required dividends on the unit offering and, starting in fiscal 1992, the required dividends on the series B preferred. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89). Annual dividends on the series B preferred are calculated as $2.50, the required per share dividend, times ($13.346M / ($13.346M + $11.022M)), the portion of capital raised in 1991 allocated as mitigation capital for Lewis Federal and Tri-Cities, times 89,968, the number of shares outstanding at the time of conversion (Source: Sterling Savings 1991 Annual Report, p. 35, Sterling Savings 1992 Annual Report, p. 25). Lewis Federal and Tri-Cities interpolated capital credit and intangibles as of 11/21/91 is $13.346M. Central Evergreen interpolated identified and unidentified intangibles as of 11/21/91 is $11.022M. For fiscal 1992, the annual dividend amount of $123,183 is pro-rated to reflect approximately seven months, the time from the November 1991 conversion to the end of the fiscal year. The pro-rated amount is $74,936.

I Calculated as the sum of the but-for bank's previous period's core capital, plus the current period's net income, less dividends paid out, plus any additional capital raised, plus adjustments to but-for core capital based on phase-out of Central Evergreen Qualifying SGW and limitation on other qualifying intangibles, less adjustments to and NOL usages against Lewis Federal and Tri-Cities supervisory goodwill, plus the amortization of Central Evergreen supervisory goodwill and identified intangibles, plus the amortization of non-supervisory intangibles.
(Calculated as columns I[t-1] + G - H + K + L - Table 4a, column E - Table 4a, column F + Table 4a, column J + Table 4a, column N).
12/31/89 but-for core capital is calculated as the sum of the actual bank's 12/31/89 core capital, less Qualifying SGW, plus Lewis Federal and Tri-Cities intangibles, plus but-for Qualifying SGW, plus but-for Other Qualifying Intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends.
(Calculated as Table 2a, column G - Table 4b, column B + Table 4a, column A + Table 4b, column F + Table 4c, column G + column K + (column G - Table 2a, column B) - (column H - Table 2a, column F)).

K From Table 3a, column B.

L Table 4b, column G + Table 4c, column H.

# *Exhibit E*

## *Sterling Savings Association*

### Table 6a: Addendum for Lewis Federal and Tri-Cities Supervisory Intangibles

($ in Thousands)

| | Capital Credit | | | | | Supervisory Goodwill | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E = A + C | F | G | H | I | J = F + H |
| | Lewis Federal | | Tri-Cities | | Total | Lewis Federal | | Tri-Cities | | Total |
| Period Ended | Balance | Amortization | Balance | Amortization | Balance | Balance | Amortization | Balance | Amortization | Balance |
| 11/5/1985 | $1,750 | | | | $1,750 | $2,044 | | | | $2,044 |
| 12/31/1985 | 1,743 | $7 | | | 1,743 | 2,036 | $8 | | | 2,036 |
| 6/30/1986 | 1,721 | 22 | | | 1,721 | 1,814 | 23 | | | 1,814 |
| 6/30/1987 | 1,677 | 44 | | | 1,677 | 1,768 | 46 | | | 1,768 |
| 4/8/1988 | | | $11,730 | | | | | | | 0 |
| 6/30/1988 | 1,633 | 44 | 11,535 | $196 | 13,168 | 1,743 | 12 | $2,176 | | 3,919 |
| 6/30/1989 | 1,590 | 44 | 10,753 | 782 | 12,342 | 1,696 | 47 | 2,028 | $148 | 3,724 |
| 12/31/1989 | 1,568 | 22 | 10,362 | 391 | 11,929 | 1,673 | 23 | 1,955 | 74 | 3,627 |
| 6/30/1990 | 1,546 | 22 | 9,971 | 391 | 11,516 | 1,649 | 23 | 1,881 | 74 | 3,530 |
| 6/30/1991 | 1,502 | 44 | 9,189 | 782 | 10,691 | 1,603 | 47 | 1,380 | 148 | 2,983 |
| 6/30/1992 | 1,458 | 44 | 8,407 | 782 | 9,865 | 1,556 | 47 | 812 | 75 | 2,368 |
| 6/30/1993 | 1,415 | 44 | 7,625 | 782 | 9,039 | 1,509 | 47 | 736 | 75 | 2,245 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date, and 11/5/85 and 4/8/88, which reflect the beginning capital credit balances from the Lewis Federal and Tri-Cities acquisitions.

A, C, F - I Based on data from Sterling Savings Association.

B Assumes a 40 year amortization schedule.

D Assumes a 15 year amortization schedule.

# *Exhibit E*

## *Sterling Savings Association*

## Table 6b: Addendum For Central Evergreen Supervisory Intangibles

($ in Thousands)

| | Identified Intangibles | | Unidentified Intangibles | |
|---|---|---|---|---|
| | A | B | C | D |
| Period Ended | Balance | Amortization | Balance | Amortization |
| 6/30/1989 | $6,075 | 405 | $12,625 | 919 |
| 12/31/1989 | 5,670 | 405 | 11,357 | 1,075 |
| 6/30/1990 | 5,265 | 405 | 10,847 | 863 |
| 6/30/1991 | 4,455 | 810 | 7,118 | 1,063 |
| 6/30/1992 | 3,645 | 810 | 4,971 | 1,050 |
| 6/30/1993 | 2,835 | 810 | 4,013 | 958 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89 and 6/30/90 which are for the six months ended as of each date.

A Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

B - D Based on data from Sterling Savings Association.

# *Exhibit E*

## *Sterling Savings Association*

### Table 7: Addendum for Non-Supervisory Goodwill

Source: Sterling Annual Reports and TFRs
($ in Thousands)

| | *Assumed Straight-Line Amortization* | | | | | *Balances* | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A + B + C | | E | F | G | H = E + F + G |
| Period Ended | Lewis & Clark | WA & OR Branches | KeyBank | Total Amortization | Explanation | Lewis & Clark | WA & OR Branches | KeyBank | Total |
| 6/30/1983 | | | | 0 | • Lewis and Clark S&LA was merged into Sterling on 6/30/83 and $2.056m in goodwill was recorded to be amortized using the interest-method over 19 years. Source: 1983 AR, Note 12. | 2,056 | | | 2,056 |
| 6/30/1984 | 108 | | | 108 | | 1,948 | | | 1,948 |
| 6/30/1985 | 108 | | | 108 | | 1,840 | | | 1,840 |
| 6/30/1986 | 108 | | | 108 | | 1,731 | | | 1,731 |
| 6/30/1987 | 108 | | | 108 | | 1,623 | | | 1,623 |
| 6/30/1988 | 108 | | | 108 | | 1,515 | | | 1,515 |
| 6/30/1989 | 108 | | | 108 | | 1,407 | | | 1,407 |
| 6/30/1990 | 108 | | | 108 | | 1,299 | | | 1,299 |
| 6/30/1991 | 108 | | | 108 | | 1,190 | | | 1,190 |
| 6/30/1992 | 108 | | | 108 | | 1,082 | | | 1,082 |
| 6/30/1993 | 108 | | | 108 | | 974 | | | 974 |
| **Total:** | **1,082** | **0** | **0** | **1,082** | | | | | |

H The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000.

# *Exhibit F*

## *Sterling Savings Association*

### Actual Cost of Mitigation

### Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles

***1991 through 2006***

($ in Thousands)

| | [1] Year End | [2] Weighted Average Capital Raised Balance | [3] Total Dividend After Tax at 10.75% | [4] Total Dividend Before Tax at 17.1% | [5] Cash Benefit Rate of Capital | [6] = [2] * [5] Cash Benefit of Capital | [7] = [4] - [6] Net Cost of Capital |
|---|---|---|---|---|---|---|---|
| | 12/31/1991 | 703.4 | 75.6 | 120.0 | 9.29% | 65.3 | 54.7 |
| | 12/31/1992 | 6,418.1 | 689.9 | 1,095.1 | 8.76% | 562.4 | 532.7 |
| | 12/31/1993 | 9,768.1 | 1,050.1 | 1,666.8 | 6.75% | 659.1 | 1,007.7 |
| | 12/31/1994 | 9,524.2 | 1,023.8 | 1,625.2 | 6.66% | 634.4 | 990.8 |
| | 12/31/1995 | 8,650.8 | 930.0 | 1,476.1 | 7.32% | 633.1 | 843.1 |
| | 12/31/1996 | 7,777.3 | 836.1 | 1,327.1 | 7.25% | 563.8 | 763.3 |
| | 12/31/1997 | 6,903.9 | 742.2 | 1,178.0 | 7.62% | 526.0 | 652.1 |
| | 12/31/1998 | 6,030.5 | 648.3 | 1,029.0 | 7.29% | 439.9 | 589.1 |
| | 12/31/1999 | 5,157.0 | 554.4 | 880.0 | 7.22% | 372.2 | 507.8 |
| | 12/31/2000 | 4,283.6 | 460.5 | 730.9 | 7.81% | 334.8 | 396.2 |
| | 12/31/2001 | 3,410.2 | 366.6 | 581.9 | 7.21% | 245.8 | 336.1 |
| | 12/31/2002 | 2,536.8 | 272.7 | 432.9 | 5.96% | 151.1 | 281.8 |
| | 12/31/2003 | 1,959.6 | 210.7 | 334.4 | 4.96% | 97.2 | 237.2 |
| | 12/31/2004 | 1,777.5 | 191.1 | 303.3 | 5.02% | 89.3 | 214.0 |
| | 12/31/2005 | 1,694.2 | 182.1 | 289.1 | 5.72% | 97.0 | 192.1 |
| [8] | 9/30/2006 | 1,631.9 | 131.6 | 208.8 | 6.43% | 78.7 | 130.2 |
| | | | | | | Total Cost = | $7,728.7 |

**Notes:**

[2] See Exhibit G, column [j].

[3] Equals [2] x 10.75%.

[4] Pre-tax dividend cost of common and preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings).

[5] See Exhibit H, column [h].

[8] Figures [3] – [7] are prorated for the 9 months ending on 9/30/06.

# Exhibit G

## Sterling Savings Association

### Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff
($ in Thousands)

| | | | | Assumed Mitigation Capital | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Amortizing Capital Credit | Lewis Federal and Tri-Cities SGW & Intangibles | Lewis Federal and Tri-Cities Supervisory Intangibles | 1991 | Conversion of Preferred 1991 | 1993 | Total | Lewis Federal and Tri-Cities Supervisory Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h] | [i] | [j] |
| 12/31/1989 | 11,929 | 3,627 | 15,557 | | | | - | - | | |
| 12/31/1990 | 11,104 | 3,433 | 14,537 | | | | - | - | | |
| 11/21/1991 | 10,368 | 2,978 | 13,346 | 11,719 | 2,100 | | 13,819 | 7,568 | | |
| 12/31/1991 | 10,278 | 2,922 | 13,199 | 11,719 | 2,100 | | 13,819 | 7,568 | 829 | 703 |
| 12/31/1992 | 9,452 | 2,306 | 11,758 | 11,719 | 2,100 | | 13,819 | 7,568 | 7,568 | 6,418 |
| 2/28/1993 | 9,319 | 2,287 | 11,605 | 11,719 | 2,100 | 12,900 | 26,719 | 11,605 | | |
| 12/31/1993 | 8,626 | 2,184 | 10,811 | 11,719 | 2,100 | 12,900 | 26,719 | 10,811 | 10,601 | 9,768 |
| 12/31/1994 | 7,801 | 2,062 | 9,863 | 11,719 | 2,100 | 12,900 | 26,719 | 9,863 | 10,337 | 9,524 |
| 12/31/1995 | 6,975 | 1,940 | 8,915 | 11,719 | 2,100 | 12,900 | 26,719 | 8,915 | 9,389 | 8,651 |
| 12/31/1996 | 6,149 | 1,818 | 7,967 | 11,719 | 2,100 | 12,900 | 26,719 | 7,967 | 8,441 | 7,777 |
| 12/31/1997 | 5,323 | 1,696 | 7,019 | 11,719 | 2,100 | 12,900 | 26,719 | 7,019 | 7,493 | 6,904 |
| 12/31/1998 | 4,497 | 1,573 | 6,071 | 11,719 | 2,100 | 12,900 | 26,719 | 6,071 | 6,545 | 6,030 |
| 12/31/1999 | 3,672 | 1,451 | 5,123 | 11,719 | 2,100 | 12,900 | 26,719 | 5,123 | 5,597 | 5,157 |
| 12/31/2000 | 2,846 | 1,329 | 4,175 | 11,719 | 2,100 | 12,900 | 26,719 | 4,175 | 4,649 | 4,284 |
| 12/31/2001 | 2,020 | 1,207 | 3,227 | 11,719 | 2,100 | 12,900 | 26,719 | 3,227 | 3,701 | 3,410 |
| 12/31/2002 | 1,194 | 1,085 | 2,279 | 11,719 | 2,100 | 12,900 | 26,719 | 2,279 | 2,753 | 2,537 |
| 12/31/2003 | 955 | 1,019 | 1,974 | 11,719 | 2,100 | 12,900 | 26,719 | 1,974 | 2,127 | 1,960 |
| 12/31/2004 | 911 | 972 | 1,884 | 11,719 | 2,100 | 12,900 | 26,719 | 1,884 | 1,929 | 1,778 |
| 12/31/2005 | 868 | 926 | 1,794 | 11,719 | 2,100 | 12,900 | 26,719 | 1,794 | 1,839 | 1,694 |
| 9/30/2006 | 835 | 891 | 1,726 | 11,719 | 2,100 | 12,900 | 26,719 | 1,726 | 1,771 | 1,632 |
| 12/31/2006 | 824 | 879 | 1,703 | 11,719 | 2,100 | 12,900 | 26,719 | 1,703 | 1,748 | 1,611 |
| 12/31/2007 | 780 | 832 | 1,613 | 11,719 | 2,100 | 12,900 | 26,719 | 1,613 | 1,658 | 1,528 |
| 12/31/2008 | 736 | 786 | 1,522 | 11,719 | 2,100 | 12,900 | 26,719 | 1,522 | 1,567 | 1,444 |
| 12/31/2009 | 693 | 739 | 1,432 | 11,719 | 2,100 | 12,900 | 26,719 | 1,432 | 1,477 | 1,361 |
| 12/31/2010 | 649 | 692 | 1,341 | 11,719 | 2,100 | 12,900 | 26,719 | 1,341 | 1,387 | 1,278 |
| 12/31/2011 | 605 | 646 | 1,251 | 11,719 | 2,100 | 12,900 | 26,719 | 1,251 | 1,296 | 1,194 |
| 12/31/2012 | 561 | 599 | 1,161 | 11,719 | 2,100 | 12,900 | 26,719 | 1,161 | 1,206 | 1,111 |
| 12/31/2013 | 518 | 552 | 1,070 | 11,719 | 2,100 | 12,900 | 26,719 | 1,070 | 1,115 | 1,028 |
| 12/31/2014 | 474 | 506 | 980 | 11,719 | 2,100 | 12,900 | 26,719 | 980 | 1,025 | 944 |
| 12/31/2015 | 430 | 459 | 889 | 11,719 | 2,100 | 12,900 | 26,719 | 889 | 934 | 861 |
| 12/31/2016 | 386 | 412 | 799 | 11,719 | 2,100 | 12,900 | 26,719 | 799 | 844 | 778 |
| 12/31/2017 | 343 | 366 | 708 | 11,719 | 2,100 | 12,900 | 26,719 | 708 | 754 | 694 |
| 12/31/2018 | 299 | 319 | 618 | 11,719 | 2,100 | 12,900 | 26,719 | 618 | 663 | 611 |
| 12/31/2019 | 255 | 272 | 528 | 11,719 | 2,100 | 12,900 | 26,719 | 528 | 573 | 528 |

# *Exhibit G*

## *Sterling Savings Association*

### Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

Source: Documents received from Sterling Savings Association; Sheshunoff

($ in Thousands)

| | | | | Assumed Mitigation Capital | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Amortizing Capital Credit | Lewis Federal and Tri-Cities SGW & Intangibles | Lewis Federal and Tri-Cities Supervisory Intangibles | 1991 | Conversion of Preferred 1991 | 1993 | Total | Lewis Federal and Tri-Cities Supervisory Intangibles Mitigated | Annual Weighted Avg. of Raised Capital | Net Annual Weighted Avg. of Raised Capital |
| | [a] | [b] | [c] = [a] + [b] | [d] | [e] | [f] | [g]=[d]+[e]+[f] | [h] | [i] | [j] |
| 12/31/2020 | 211 | 226 | 437 | 11,719 | 2,100 | 12,900 | 26,719 | 437 | 482 | 444 |
| 12/31/2021 | 168 | 179 | 347 | 11,719 | 2,100 | 12,900 | 26,719 | 347 | 392 | 361 |
| 12/31/2022 | 124 | 132 | 256 | 11,719 | 2,100 | 12,900 | 26,719 | 256 | 301 | 278 |
| 12/31/2023 | 80 | 86 | 166 | 11,719 | 2,100 | 12,900 | 26,719 | 166 | 211 | 194 |
| 12/31/2024 | 36 | 39 | 75 | 11,719 | 2,100 | 12,900 | 26,719 | 75 | 121 | 111 |
| 12/31/2025 | - | - | - | 11,719 | 2,100 | 12,900 | 26,719 | - | 38 | 35 |

Notes:

[a] Straight line amortization for Tri-Cities and Lewis Federal based on annual schedule. Source: *But-For RAP Supervisory Goodwill for Lost Profits [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[b] Straight line amortization taking into account NOL adjustments for Tri-Cities, Lewis Federal based on annual schedule. Source: *But-For RAP Supervisory Goodwill for Lost Profits [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[d] Based on data from 6/30/1992 Annual Report, pp. 18, 28. Figure for capital raised in 1991 is the gross proceeds for the issuance of 2.875M shares of common stock at $8.25 per share excluding the estimated gross proceeds from withdrawn 1989 Sterling unit offering of $12.0M (see Sterling Savings Association 1990 Annual Report, p. 3).

[e] Based on 11/91 Offering Circular, p. 14. This $2.1M in additional regulatory capital is from conversion of series B preferred to common stock. The $2.1M is taken to mitigate contractual intangibles at no incremental cost.

[f] On 2/28/93, Sterling Financial Corporation downstreamed $12.9M to Sterling Savings Association.

[h] For years 1991 through 1992, intangibles mitigated is calculated as the min(column [c], ($13.346M / ($13.346M + $11.022M)) x column [g]). For years 1993 through 2025, intangibles mitigated is calculated as the min(column [c], column [g]). Central Evergreen interpolated identified and unidentified intangibles as of 11/21/1991 equals $11.022M (based on annual schedule). Source: *But-For RAP Supervisory Goodwill for Lost Profits [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.

[i] For years 1991 and 1993, average amount of raised capital is calculated based on the timing of the offering. For years 1992, and 1994 through 2025, the average is a simple average of the column [h] for the years [t] and [t-1].

[j] = [i] * (1-([e] / [g])).

# *Exhibit H*

## *Sterling Savings Association*

### Calculation of Cash Benefit Yield

Source: Sterling Savings Thrift Financial Reports (Sheshunoff) and TFR's; First Federal Savings and Loan Association of Montana Thrift Financial Reports (Sheshunoff); Call Reports of Sterling Savings

($ in Thousands)

| | [a] | Gain (Loss) on Sale of Assets: | | | | | | | | | | [b] | [c] | [d] | [e] | [f] | [g] = [a] + [b] - [c] - [d] | [h] = [g] / avg [e] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Total Interest Income | Assets Held and Available for Sale | LOCOM Adj Made to Assets Held for Sale | Securities Held to Maturity | Real Estate Held for Investment | MPS Held for Investment | Other Sec Held for Investment | Loans Held for Investment | Other Assets Held for Investment | Loans and Leases | Other Assets (Excl. Securities) | Total Gain (Losses) on Sale of Assets | Provision for Losses on Interest Bearing Assets | Provision for Losses on Non-Interest Bearing Assets | Tangible Assets | Tangible Assets Adjusted for Mergers | Total Yield on Tangible Assets ($) | Average Yield on Tangible Assets |
| **12/31/1991** | **12,711** | **17** | **0** | | **0** | **1,369** | **0** | **0** | **0** | | | **1,386** | **150** | **280** | **599,408** | | **13,667** | **9.29%** |
| 3/31/1992 | 12,690 | 1 | 0 | | 0 | 0 | 1,590 | 0 | 0 | | | 1,591 | 250 | 77 | 619,930 | | 13,954 | 2.33% |
| 6/30/1992 | 13,175 | 1,952 | 0 | | 0 | 0 | 718 | 0 | 0 | | | 2,670 | 600 | 50 | 628,842 | | 15,195 | 2.43% |
| 9/30/1992 | 12,582 | 1,359 | 0 | | 0 | 0 | 20 | 0 | 0 | | | 1,379 | 450 | 3 | 651,197 | | 13,508 | 2.11% |
| 12/31/1992 | 12,653 | 0 | 0 | | 0 | 618 | 0 | 0 | 0 | | | 618 | 255 | 109 | 670,955 | | 12,907 | 1.95% |
| **YE 92** | **51,100** | **3,312** | **0** | | **0** | **618** | **2,328** | **0** | **0** | | | **6,258** | **1,555** | **239** | **634,066** | | **55,564** | **8.76%** |
| 3/31/1993 | 14,036 | 33 | 0 | | 0 | 0 | 0 | 0 | 0 | | | 33 | 375 | 171 | 866,772 | | 13,523 | 1.76% |
| 6/30/1993 | 16,771 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | | 0 | 420 | 260 | 1,023,009 | | 16,091 | 1.70% |
| 9/30/1993 | 17,219 | 0 | 0 | | 0 | 451 | -349 | 0 | 0 | | | 102 | 400 | 148 | 1,045,099 | | 16,773 | 1.62% |
| 12/31/1993 | 17,710 | -1 | 0 | | 0 | 316 | -72 | 0 | 0 | | | 243 | 400 | 91 | 1,125,516 | | 17,462 | 1.61% |
| **YE 93** | **65,736** | **32** | **0** | | **0** | **767** | **-421** | **0** | **0** | | | **378** | **1,595** | **670** | **946,270** | | **63,849** | **6.75%** |
| 3/31/1994 | 18,196 | 262 | 0 | | 0 | 0 | 0 | 0 | 0 | | | 262 | 400 | 0 | 1,186,406 | | 18,058 | 1.56% |
| 6/30/1994 | 20,600 | 126 | 0 | | 0 | 0 | 0 | 0 | 0 | | | 126 | 400 | 37 | 1,344,936 | | 20,289 | 1.60% |
| 9/30/1994 | 23,233 | 56 | 0 | | 0 | 0 | 0 | 0 | 1,174 | | | 1,230 | 400 | 0 | 1,466,423 | | 24,063 | 1.71% |
| 12/31/1994 | 25,953 | 0 | 0 | | 0 | 0 | 0 | 0 | 1,463 | | | 1,463 | 400 | 0 | 1,589,358 | | 27,016 | 1.77% |
| **YE 94** | **87,982** | **444** | **0** | | **0** | **0** | **0** | **0** | **2,637** | | | **3,081** | **1,600** | **37** | **1,342,528** | | **89,426** | **6.66%** |
| 3/31/1995 | 27,677 | 122 | 0 | | 0 | 0 | 0 | 0 | 1,772 | | | 1,894 | 695 | 0 | 1,555,111 | | 28,876 | 1.84% |
| 6/30/1995 | 27,664 | 67 | 0 | | 0 | 0 | 0 | 0 | 1,200 | | | 1,267 | 400 | 34 | 1,524,309 | | 28,497 | 1.85% |
| 9/30/1995 | 27,790 | -2 | 0 | | 0 | 0 | 0 | 0 | 0 | | | -2 | 400 | 40 | 1,541,865 | | 27,348 | 1.78% |
| 12/31/1995 | 28,034 | 451 | 0 | | 0 | 0 | 0 | 0 | 0 | | | 451 | 400 | 0 | 1,496,870 | | 28,085 | 1.85% |
| **YE 95** | **111,165** | **638** | **0** | | **0** | **0** | **0** | **0** | **2,972** | | | **3,610** | **1,895** | **74** | **1,541,503** | | **112,806** | **7.32%** |
| 3/31/1996 | 26,911 | 17 | 0 | 0 | | | | 0 | 0 | | | 17 | 400 | 0 | 1,489,576 | | 26,528 | 1.78% |
| 6/30/1996 | 26,284 | 720 | 0 | 0 | | | | 0 | 63 | | | 783 | 400 | 28 | 1,473,728 | | 26,639 | 1.80% |
| 9/30/1996 | 26,893 | 565 | 0 | 0 | | | | 0 | 0 | | | 565 | 550 | 17 | 1,526,123 | | 26,891 | 1.79% |
| 12/31/1996 | 28,954 | 519 | 0 | 0 | | | | 0 | 0 | | | 519 | 550 | 13 | 1,530,075 | | 28,910 | 1.89% |
| **YE 96** | **109,042** | **1,821** | **0** | **0** | | | | **0** | **63** | | | **1,884** | **1,900** | **58** | **1,503,274** | | **108,968** | **7.25%** |
| 3/31/1997 | 29,186 | 439 | 0 | 0 | | | | 0 | -22 | | | 417 | 550 | 34 | 1,552,827 | | 29,019 | 1.88% |
| 6/30/1997 | 30,286 | 942 | 0 | 0 | | | | 5 | 15 | | | 962 | 550 | 14 | 1,674,363 | | 30,684 | 1.90% |
| 9/30/1997 | 34,273 | 855 | 0 | 0 | | | | 29 | 0 | | | 884 | 675 | 59 | 1,860,450 | | 34,423 | 1.95% |
| 12/31/1997 | 35,420 | 356 | 0 | 0 | | | | 0 | 5 | | | 361 | 675 | 0 | 1,863,398 | | 35,106 | 1.89% |
| **YE 97** | **129,165** | **2,592** | **0** | **0** | | | | **34** | **-2** | | | **2,624** | **2,450** | **107** | **1,696,223** | | **129,232** | **7.62%** |
| 3/31/1998 | 34,248 | 1,090 | 0 | 0 | | | | 0 | 238 | | | 1,328 | 800 | 0 | 1,876,450 | | 34,776 | 1.86% |
| 6/30/1998 | 36,160 | 286 | 0 | 0 | | | | 0 | -129 | | | 157 | 2,965 | 0 | 2,013,123 | | 33,352 | 1.71% |
| 9/30/1998 | 37,830 | 975 | 0 | 0 | | | | 0 | 0 | | | 975 | 800 | 0 | 2,015,909 | 2,081,057 | 38,005 | 1.89% |
| 12/31/1998 | 40,646 | 1,121 | 0 | 0 | | | | 0 | 1 | | | 1,122 | 800 | 0 | 2,248,665 | | 40,968 | 1.89% |
| **YE 98** | **148,884** | **3,472** | **0** | **0** | | | | **0** | **110** | | | **3,582** | **5,365** | **0** | **2,016,539** | | **147,101** | **7.29%** |
| 3/31/1999 | 40,844 | 597 | 0 | 0 | | | | 318 | 0 | | | 915 | 900 | 0 | 2,289,380 | | 40,859 | 1.80% |
| 6/30/1999 | 42,546 | 6 | 0 | 0 | | | | 214 | -14 | | | 206 | 1,000 | 0 | 2,437,732 | | 41,752 | 1.77% |
| 9/30/1999 | 44,463 | 5 | 0 | 0 | | | | 241 | 20 | | | 266 | 1,000 | 0 | 2,445,902 | | 43,729 | 1.79% |
| 12/31/1999 | 46,261 | 6 | 0 | 0 | | | | 196 | 0 | | | 202 | 1,000 | 0 | 2,480,265 | | 45,463 | 1.85% |
| **YE 99** | **174,114** | **614** | **0** | **0** | | | | **969** | **6** | | | **1,589** | **3,900** | **0** | **2,380,389** | | **171,803** | **7.22%** |

# *Exhibit H*

# *Sterling Savings Association*

## Calculation of Cash Benefit Yield

Source: Sterling Savings Thrift Financial Reports (Sheshunoff) and TFR's; First Federal Savings and Loan Association of Montana Thrift Financial Reports (Sheshunoff); Call Reports of Sterling Savings

($ in Thousands)

| Date | [a] Total Interest Income | Gain (Loss) on Sale of Assets: Assets Held and Available for Sale | LOCOM Adj Made to Assets Held for Sale | Securities Held to Maturity | Real Estate Held for Investment | MPS Held for Investment | Other Sec Held for Investment | Loans Held for Investment | Other Assets Held for Investment | Loans and Leases | Other Assets (Excl. Securities) | [b] Total Gain (Losses) on Sale of Assets | [c] Provision for Losses on Interest Bearing Assets | [d] Provision for Losses on Non-Interest Bearing Assets | [e] Tangible Assets | [f] Tangible Assets Adjusted for Mergers | [g] = [a] + [b] - [c] - [d] Total Yield on Tangible Assets ($) | [h] = [g] / avg [e] Average Yield on Tangible Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/31/2000 | 47,460 | 306 | 0 | 0 | | | | 0 | 0 | | | 306 | 1,100 | 0 | 2,546,776 | | 46,666 | 1.86% |
| 6/30/2000 | 50,309 | 373 | 0 | 0 | | | | 0 | 1 | | | 374 | 1,100 | 0 | 2,592,059 | | 49,583 | 1.93% |
| 9/30/2000 | 52,499 | 341 | 0 | 0 | | | | 0 | 1 | | | 342 | 1,100 | 0 | 2,624,758 | | 51,741 | 1.98% |
| 12/31/2000 | 53,637 | 294 | 0 | 0 | | | | 149 | 1 | | | 444 | 1,300 | 0 | 2,601,773 | | 52,781 | 2.02% |
| **YE 00** | **203,905** | **1,314** | **0** | **0** | | | | **149** | **3** | | | **1,466** | **4,600** | **0** | **2,569,126** | | **200,771** | **7.81%** |
| 3/31/2001 | 51,510 | 924 | 0 | 0 | | | | 0 | -1 | | | 923 | 1,400 | 25 | 2,602,306 | | 51,008 | 1.96% |
| 6/30/2001 | 49,211 | 508 | 0 | 0 | | | | 570 | 0 | | | 1,078 | 1,475 | 203 | 2,611,872 | | 48,611 | 1.86% |
| 9/30/2001 | 49,350 | 1,548 | 0 | 0 | | | | 0 | 0 | | | 1,548 | 1,525 | 106 | 2,901,860 | | 49,267 | 1.79% |
| 12/31/2001 | 49,837 | 2,655 | 0 | 0 | | | | 0 | -2 | | | 2,653 | 3,600 | 125 | 2,993,917 | | 48,765 | 1.65% |
| **YE 01** | **199,908** | **5,635** | **0** | **0** | | | | **570** | **-3** | | | **6,202** | **8,000** | **459** | **2,742,346** | | **197,651** | **7.21%** |
| 3/31/2002 | 47,904 | 1,151 | 0 | 0 | | | | 0 | -1 | | | 1,150 | 2,086 | 163 | 2,951,349 | | 46,805 | 1.57% |
| 6/30/2002 | 47,148 | 856 | 0 | 0 | | | | 182 | 3 | | | 1,041 | 2,227 | 15 | 3,044,341 | | 45,947 | 1.53% |
| 9/30/2002 | 49,460 | 2,183 | 0 | 0 | | | | 14 | -2 | | | 2,195 | 3,277 | 60 | 3,285,024 | | 48,318 | 1.53% |
| 12/31/2002 | 50,605 | 2,681 | 0 | 0 | | | | 42 | -1 | | | 2,722 | 4,277 | 0 | 3,459,901 | 3,684,385 | 49,050 | 1.45% |
| **YE 02** | **195,117** | **6,871** | **0** | **0** | | | | **238** | **-1** | | | **7,108** | **11,867** | **238** | **3,191,803** | | **190,120** | **5.96%** |
| 3/31/2003 | 50,721 | 2,929 | 0 | 0 | | | | -146 | 10 | | | 2,793 | 2,250 | 130 | 3,771,590 | | 51,134 | 1.37% |
| 6/30/2003 | 51,997 | 3,212 | 0 | 0 | | | | 295 | -1 | | | 3,506 | 2,550 | 80 | 4,044,991 | | 52,873 | 1.35% |
| 9/30/2003 | 53,992 | 1,030 | 0 | 0 | | | | 123 | -31 | | | 1,122 | 2,850 | 35 | 4,026,308 | | 52,229 | 1.29% |
| 12/31/2003 | 55,225 | 1,724 | 0 | 0 | | | | 28 | 1 | | | 1,753 | 2,850 | -49 | 4,226,435 | 5,676,569 | 54,177 | 1.31% |
| **YE 03** | **211,935** | **8,895** | **0** | **0** | | | | **300** | **-21** | | | **9,174** | **10,500** | **196** | **4,240,769** | | **210,413** | **4.96%** |
| 3/31/2004 | 72,622 | 3,003 | 0 | 0 | | | | 0 | 2 | | | 3,005 | 2,850 | 0 | 5,932,361 | | 72,777 | 1.25% |
| 6/30/2004 | 76,510 | 1,517 | 0 | 0 | | | | 153 | 0 | | | 1,670 | 3,000 | 5 | 6,103,898 | | 75,175 | 1.25% |
| 9/30/2004 | 80,991 | 1,780 | 0 | 0 | | | | 24 | 0 | | | 1,804 | 3,000 | 0 | 6,597,495 | | 79,795 | 1.26% |
| 12/31/2004 | 87,317 | 747 | 0 | 0 | | | | 0 | 0 | | | 747 | 3,300 | -26 | 6,805,803 | | 84,790 | 1.27% |
| **YE 04** | **317,440** | **7,047** | **0** | **0** | | | | **177** | **2** | | | **7,226** | **12,150** | **-21** | **6,223,225** | | **312,537** | **5.02%** |
| 3/31/2005 | 91,667 | 846 | 0 | 0 | | | | 2,546 | 136 | | | 3,528 | 3,750 | 0 | 6,878,216 | | 91,445 | 1.34% |
| 6/30/2005 | 94,937 | -278 | 0 | 0 | | | | 4,487 | 0 | | | 4,209 | 3,400 | 0 | 6,608,151 | | 95,746 | 1.42% |
| [1] 9/30/2005 | 101,452 | -625 | | 0 | | | | | | 2,257 | 1,263 | 2,895 | 3,400 | | 6,654,402 | | 100,947 | 1.52% |
| 12/31/2005 | 108,871 | 0 | | 0 | | | | | | 808 | 238 | 1,046 | 4,650 | | 7,419,760 | | 105,267 | 1.50% |
| [2] **YE 05** | **396,927** | **-57** | **0** | **0** | | | | **7,033** | **136** | **3,065** | **1,501** | **11,678** | **15,200** | **0** | **6,873,266** | | **393,405** | **5.72%** |
| 3/31/2006 | 118,015 | 0 | | 0 | | | | | | 637 | 205 | 842 | 4,650 | | 7,703,530 | | 114,207 | 1.51% |
| 6/30/2006 | 129,391 | -1 | | 0 | | | | | | 577 | 351 | 927 | 4,650 | | 7,906,750 | 8,044,750 | 125,668 | 1.61% |
| 9/30/2006 | 145,692 | 1 | | 0 | | | | | | 518 | 56 | 575 | 4,650 | | 8,487,446 | | 141,617 | 1.71% |
| [2] **YTD 9/06** | **393,098** | **0** | **0** | **0** | | | | **0** | **0** | **1,732** | **612** | **2,344** | **13,950** | | **7,913,872** | | **381,492** | **6.43%** |

Note:

TFR data are from the Sheshunoff Database except for 1998 and 2003 – 2005, which are from Sterling's hard copy TFR's for 1998 and 2003 – 2005.

TFRs are not available after June 2005, therefore call reports for Sterling Savings Association are used from September 2005 onwards.

[e] Tangible assets at year end are calculated as the average of the five previous quarters. Tangible assets at YTD 9/06 are calculated as the average of the four previous quarters. In the periods when quarterly tangible assets are adjusted for mergers, the figures adjusted for mergers are used in the calculation of average tangible assets at year end.

# *Exhibit H*

## *Sterling Savings Association*

### Calculation of Cash Benefit Yield

Source: Sterling Savings Thrift Financial Reports (Sheshunoff) and TFR's; First Federal Savings and Loan Association of Montana Thrift Financial Reports (Sheshunoff); Call Reports of Sterling Savings

($ in Thousands)

| | [a] | Gain (Loss) on Sale of Assets: | | | | | | | | | | [b] | [c] | [d] | [e] | [f] | [g] = [a] + [b] - [c] - [d] | [h] = [g] / avg [e] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Total Interest Income | Assets Held and Available for Sale | LOCOM Adj Made to Assets Held for Sale | Securities Held to Maturity | Real Estate Held for Investment | MPS Held for Investment | Other Sec Held for Investment | Loans Held for Investment | Other Assets Held for Investment | Loans and Leases | Other Assets (Excl. Securities) | Total Gain (Losses) on Sale of Assets | Provision for Losses on Interest Bearing Assets | Provision for Losses on Non-Interest Bearing Assets | Tangible Assets | Tangible Assets Adjusted for Mergers | Total Yield on Tangible Assets ($) | Average Yield on Tangible Assets |

[f] Tangible assets as adjusted to reflect the following mergers and acquisitions:
Big Sky Bancorp in November 1998. Source: Sterling Savings 1998 Annual Report, 9/30/98 First Federal Savings and Loan Association of Montana TFR (Sheshunoff).
Empire Federal Bancorp, Inc. in February 2003. Source: Sterling Savings 3/31/03 10-Q, Empire Bank TFR.
Klamath First Bancorp, Inc. in January 2004. Source: Sterling Savings 12/31/04 10-K, Klamath First Federal Savings and Loan Association TFR.
Sterling Financial Corporation acquired Lynnwood Financial, parent company of Golf Savings Bank on 7/5/06. Golf Savings Bank was maintained as a separate subsidiary of Sterling Financial Corporation. Golf Savings Bank transferred $322 million in construction loans to Sterling Savings, and Sterling Savings transferred $184 million in Federal Funds to Golf Savings Bank. Source: Sterling Savings 9/30/06 10-Q, "Exhibit VII.2. -Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings.

[h] Quarterly average yield is calculated based on the average of the current and prior quarters' balance of tangible assets. In the periods when quarterly tangible assets are adjusted for mergers, the quarterly average yield is calculated based on the average of the current quarter's balance of tangible assets and the prior quarter's balance of tangible assets adjusted for mergers. Annual total yield is calculated based on the average of the previous five quarters, using the figures adjusted for mergers. 12/31/91 and YTD 9/06 figures have been annualized.

[1] Call report income statement data is reported on a year-to-date basis only. Figures for Loans and Leases is taken from amount reported in 9/30/05 call report - sum of the amount reported under Loans Held for Investment in 3/31/05 and 6/30/05 TFRs. Figure for Other Assets (Excl. Securities) is taken from amount reported in 9/30/05 call report - sum of the amount reported under Other Assets Held for Investment in 3/31/05 and 6/30/05 TFRs.

[2] Call report income statement data is reported on a year-to-date basis only. Quarterly figures have been calculated using the year-to-date values below:

| Date | Total Interest Income | Assets Held and Available for Sale | Securities Held to Maturity | Loans and Leases | Other Assets (Excl. Securities) | Provision for Losses on Interest Bearing Assets |
|---|---|---|---|---|---|---|
| 9/30/2005 | 288,056 | -57 | 0 | 9,290 | 1,399 | 10,550 |
| 12/31/2005 | 396,927 | -57 | 0 | 10,098 | 1,637 | 15,200 |
| 3/31/2006 | 118,015 | 0 | 0 | 637 | 205 | 4,650 |
| 6/30/2006 | 247,406 | -1 | 0 | 1,214 | 556 | 9,300 |
| 9/30/2006 | 393,098 | 0 | 0 | 1,732 | 612 | 13,950 |

# *Exhibit I*

## *Sterling Savings Association*

## Actual Cost of Mitigation

## Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

| | | [1] | [2a] | [2b] | [3] | [4] | [5] |
|---|---|---|---|---|---|---|---|
| | Period Ending | Weighted Average Capital Raised Balance | Total Dividend After Tax at 10.75% | Total Dividend Before Tax at 17.1% | Cash Benefit of Capital at 4.76% | Net Cost of Capital | Present Value of Net Cost Discounted at 4.76% |
| [6] | 9/30/2006 – 12/31/2006 | 1,579.7 | 42.5 | 67.4 | 18.8 | 48.6 | 48.0 |
| | 12/31/2007 | 1,527.6 | 164.2 | 260.7 | 72.7 | 187.9 | 177.3 |
| | 12/31/2008 | 1,444.3 | 155.3 | 246.4 | 68.7 | 177.7 | 160.0 |
| | 12/31/2009 | 1,360.9 | 146.3 | 232.2 | 64.8 | 167.4 | 144.0 |
| | 12/31/2010 | 1,277.6 | 137.3 | 218.0 | 60.8 | 157.2 | 129.0 |
| | 12/31/2011 | 1,194.3 | 128.4 | 203.8 | 56.8 | 146.9 | 115.1 |
| | 12/31/2012 | 1,111.0 | 119.4 | 189.6 | 52.9 | 136.7 | 102.2 |
| | 12/31/2013 | 1,027.6 | 110.5 | 175.4 | 48.9 | 126.4 | 90.3 |
| | 12/31/2014 | 944.3 | 101.5 | 161.1 | 44.9 | 116.2 | 79.2 |
| | 12/31/2015 | 861.0 | 92.6 | 146.9 | 41.0 | 105.9 | 68.9 |
| | 12/31/2016 | 777.7 | 83.6 | 132.7 | 37.0 | 95.7 | 59.4 |
| | 12/31/2017 | 694.4 | 74.6 | 118.5 | 33.1 | 85.4 | 50.6 |
| | 12/31/2018 | 611.0 | 65.7 | 104.3 | 29.1 | 75.2 | 42.5 |
| | 12/31/2019 | 527.7 | 56.7 | 90.0 | 25.1 | 64.9 | 35.1 |
| | 12/31/2020 | 444.4 | 47.8 | 75.8 | 21.2 | 54.7 | 28.2 |
| | 12/31/2021 | 361.1 | 38.8 | 61.6 | 17.2 | 44.4 | 21.9 |
| | 12/31/2022 | 277.7 | 29.9 | 47.4 | 13.2 | 34.2 | 16.1 |
| | 12/31/2023 | 194.4 | 20.9 | 33.2 | 9.3 | 23.9 | 10.7 |
| | 12/31/2024 | 111.1 | 11.9 | 19.0 | 5.3 | 13.7 | 5.9 |
| | 12/31/2025 | 34.7 | 3.7 | 5.9 | 1.7 | 4.3 | 1.7 |

**Present Value of Future Damages from Mitigation of Lewis Federal and Tri-Cities Intangibles Including Amortizing CC (September 2006 through end of contract): $1,386.0**

# *Exhibit I*

## *Sterling Savings Association*

## Actual Cost of Mitigation

## Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

**Notes:**

[1] See Exhibit G, column [j].

[2a] After-tax dividend cost of preferred stock which assumes a 10.75% required dividend.

[2b] Pre-tax dividend cost of preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings).

[3] Benefit of incremental tangible capital. Assumes a 4.76% return, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[4] Net cost is the pre-tax cost of preferred stock less the benefit of capital.

[5] Net cost discounted to 3Q-end 2006 at 4.76%, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[6] Figures in columns [2a] – [5] are prorated for the 3 months ending on 12/31/06.

# *Exhibit J*
# *Sterling Savings Association*
## Transaction Costs of Mitigation Capital for Lewis Federal and Tri-Cities

| **1991 Common Stock Offering** | | |
|---|---|---|
| Gross proceeds (2.875M shares @ $8.25 per share) | $23,718,750 | [1] |
| Net proceeds | $20,952,000 | [2] |
| **Underwriter discounts, commissions and other expenses** | **$2,766,750** | |
| Cost of Warrants | $560,057 | [3] |
| **Total Transaction Costs** | **$3,326,807** | **[4]** |
| Transaction Costs Allocated to Withdrawn 1989 Offering: | $1,683,127 | [5] |
| Transaction Costs Allocated to Central Evergreen: | $743,476 | [6] |
| **Transaction Costs Allocated to Lewis Federal and Tri-Cities:** | **$900,204** | **[7]** |

Notes:
[1] Sterling Savings Association's 1992 Annual Report, p. 18.
[2] Sterling Savings Association's 1992 Annual Report, p. 28.
[3] See Exhibit J, p. 2.
[4] Underwriter discounts, commissions and other expenses plus cost of warrants.
[5] Proportion of transaction costs ($12.00M / $23.72M) allocated to the withdrawn 1989 offering out of the total transaction costs allocated to the 1991 offering, times the total transaction costs allocated to the 1991 offering ($23.72M).
[6] Proportion of transaction costs $11.02M / ($13.35M + $11.02M) allocated to Central Evergreen times ([4]-[5]). Lewis Federal and Tri-Cities interpolated capital credit and intangibles as of 11/21/1991 is $13.346M (based on annual schedule). Central Evergreen interpolated unidentified and identified intangibles as of 11/21/91 is $11.022M (based on annual schedule). Source: *But-For RAP Supervisory Goodwill for Lost Profits [Unused Tri-Cities NOL Balance used in FY91]* from Sterling Savings Association.
[7] Calculated as [4] - [5] - [6].

# *Exhibit J*

# *Sterling Savings Association*

## Calculation of the Value of Warrants Issued to the Underwriters For 1991 Common Stock Offering

| | | |
|---|---|---|
| [a] | Stock Price (S) | $8.25 |
| [b] | Strike Price (X) | $9.90 |
| [c] | Offer Date | 11/20/1991 |
| [d] | Annualized Volatility ($\sigma$) | 0.51 |
| [e] | Maturity (years) (T) | 5 |
| [f] | Risk-free Rate (r) | 6.56% |
| [g] | $d_1$ | 0.699 |
| [h] | $d_2$ | -0.444 |
| [i] | Call Option Value | $3.91 |
| [j] | Dilution Factor | 0.96 |
| [k]=[i]*[j] | Warrant Value | $3.73 |
| [l] | Number of Warrants Issued | 150,000 |
| [m]=[k]*[l] | **Total Value of Warrants Issued** | **$560,057** |

Notes:

[a] - [c], [e], [l] Source: 1991 Offering Circular.

[d] See Exhibit J, page 9.

[f] 5-Year Treasury Constant Maturity Rate as of 11/20/91.
Source: Federal Reserve Bank of St. Louis.

[g], [h], [i] Calculated using the method described in "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

[g] $$d_1 = \frac{\ln(S/X) + rT + \sigma^2 T/2}{\sigma\sqrt{T}}$$

[h] $$d_2 = d_1 - \sigma\sqrt{T}$$

[i] $$C = SN(d_1) - Xe^{-rT}N(d_2)$$

where N(x) denotes cumulative normal distribution function with mean 0 and standard deviation 1.

[j] Ratio of common stock outstanding excluding the warrants (3,216,656) to the total common stock outstanding including the warrants (3,366,656 = 3,216,656 + 150,000). See Sterling Savings Association 1991 Offering Circular, p. 4.
Common stock outstanding at the time of the offering does not include 375,000 shares exercised for the underwriters' over-allotment option. See Sterling Savings Association 1992 Annual Report, p. 18.

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 11/21/1991 | 8.50 | 6.39 | |
| 11/22/1991 | 8.50 | 6.39 | 0.00% |
| 11/25/1991 | 8.25 | 6.20 | -2.99% |
| 11/26/1991 | 8.50 | 6.39 | 2.99% |
| 11/27/1991 | 8.00 | 6.01 | -6.06% |
| 11/29/1991 | 8.00 | 6.01 | 0.00% |
| 12/2/1991 | 8.25 | 6.20 | 3.08% |
| 12/3/1991 | 8.25 | 6.20 | 0.00% |
| 12/4/1991 | 8.25 | 6.20 | 0.00% |
| 12/5/1991 | 8.25 | 6.20 | 0.00% |
| 12/6/1991 | 8.25 | 6.20 | 0.00% |
| 12/9/1991 | 8.25 | 6.20 | 0.00% |
| 12/10/1991 | 8.50 | 6.39 | 2.99% |
| 12/11/1991 | 8.50 | 6.39 | 0.00% |
| 12/12/1991 | 8.50 | 6.39 | 0.00% |
| 12/13/1991 | 8.25 | 6.20 | -2.99% |
| 12/16/1991 | 8.75 | 6.57 | 5.88% |
| 12/17/1991 | 8.38 | 6.29 | -4.38% |
| 12/18/1991 | 8.25 | 6.20 | -1.50% |
| 12/19/1991 | 8.25 | 6.20 | 0.00% |
| 12/20/1991 | 8.50 | 6.39 | 2.99% |
| 12/23/1991 | 8.50 | 6.39 | 0.00% |
| 12/24/1991 | 8.25 | 6.20 | -2.99% |
| 12/26/1991 | 8.50 | 6.39 | 2.99% |
| 12/27/1991 | 8.50 | 6.39 | 0.00% |
| 12/30/1991 | 8.50 | 6.39 | 0.00% |
| 12/31/1991 | 8.75 | 6.57 | 2.90% |
| 1/2/1992 | 8.50 | 6.39 | -2.90% |
| 1/3/1992 | 8.75 | 6.57 | 2.90% |
| 1/6/1992 | 9.00 | 6.76 | 2.82% |
| 1/7/1992 | 9.50 | 7.14 | 5.41% |
| 1/8/1992 | 9.50 | 7.14 | 0.00% |
| 1/9/1992 | 9.88 | 7.42 | 3.87% |
| 1/10/1992 | 9.63 | 7.23 | -2.56% |
| 1/13/1992 | 10.00 | 7.51 | 3.82% |
| 1/14/1992 | 9.75 | 7.33 | -2.53% |
| 1/15/1992 | 10.50 | 7.89 | 7.41% |
| 1/16/1992 | 10.25 | 7.70 | -2.41% |
| 1/17/1992 | 10.13 | 7.61 | -1.23% |
| 1/20/1992 | 10.00 | 7.51 | -1.24% |
| 1/21/1992 | 9.75 | 7.33 | -2.53% |
| 1/22/1992 | 10.50 | 7.89 | 7.41% |
| 1/23/1992 | 9.88 | 7.42 | -6.14% |
| 1/24/1992 | 10.00 | 7.51 | 1.26% |
| 1/27/1992 | 10.25 | 7.70 | 2.47% |
| 1/28/1992 | 10.25 | 7.70 | 0.00% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 1/29/1992 | 10.25 | 7.70 | 0.00% |
| 1/30/1992 | 10.25 | 7.70 | 0.00% |
| 1/31/1992 | 9.75 | 7.33 | -5.00% |
| 2/3/1992 | 9.88 | 7.42 | 1.27% |
| 2/4/1992 | 10.00 | 7.51 | 1.26% |
| 2/5/1992 | 10.00 | 7.51 | 0.00% |
| 2/6/1992 | 10.00 | 7.51 | 0.00% |
| 2/7/1992 | 9.75 | 7.33 | -2.53% |
| 2/10/1992 | 10.00 | 7.51 | 2.53% |
| 2/11/1992 | 9.75 | 7.33 | -2.53% |
| 2/12/1992 | 9.88 | 7.42 | 1.27% |
| 2/13/1992 | 9.50 | 7.14 | -3.87% |
| 2/14/1992 | 9.75 | 7.33 | 2.60% |
| 2/18/1992 | 9.50 | 7.14 | -2.60% |
| 2/19/1992 | 9.75 | 7.33 | 2.60% |
| 2/20/1992 | 9.38 | 7.04 | -3.92% |
| 2/21/1992 | 9.38 | 7.04 | 0.00% |
| 2/24/1992 | 9.50 | 7.14 | 1.32% |
| 2/25/1992 | 9.75 | 7.33 | 2.60% |
| 2/26/1992 | 10.25 | 7.70 | 5.00% |
| 2/27/1992 | 10.25 | 7.70 | 0.00% |
| 2/28/1992 | 10.13 | 7.61 | -1.23% |
| 3/2/1992 | 10.00 | 7.51 | -1.24% |
| 3/3/1992 | 10.25 | 7.70 | 2.47% |
| 3/4/1992 | 10.13 | 7.61 | -1.23% |
| 3/5/1992 | 10.25 | 7.70 | 1.23% |
| 3/6/1992 | 10.25 | 7.70 | 0.00% |
| 3/9/1992 | 9.75 | 7.33 | -5.00% |
| 3/10/1992 | 10.00 | 7.51 | 2.53% |
| 3/11/1992 | 9.75 | 7.33 | -2.53% |
| 3/12/1992 | 9.75 | 7.33 | 0.00% |
| 3/13/1992 | 10.00 | 7.51 | 2.53% |
| 3/16/1992 | 10.25 | 7.70 | 2.47% |
| 3/17/1992 | 10.25 | 7.70 | 0.00% |
| 3/18/1992 | 10.25 | 7.70 | 0.00% |
| 3/19/1992 | 10.00 | 7.51 | -2.47% |
| 3/20/1992 | 10.25 | 7.70 | 2.47% |
| 3/23/1992 | 10.00 | 7.51 | -2.47% |
| 3/24/1992 | 10.25 | 7.70 | 2.47% |
| 3/25/1992 | 9.75 | 7.33 | -5.00% |
| 3/26/1992 | 10.25 | 7.70 | 5.00% |
| 3/27/1992 | 10.25 | 7.70 | 0.00% |
| 3/30/1992 | 10.25 | 7.70 | 0.00% |
| 3/31/1992 | 9.75 | 7.33 | -5.00% |
| 4/1/1992 | 9.75 | 7.33 | 0.00% |
| 4/2/1992 | 9.88 | 7.42 | 1.27% |

# *Exhibit J*

# *Sterling Savings Association*

## Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 4/3/1992 | 10.00 | 7.51 | 1.26% |
| 4/6/1992 | 9.50 | 7.14 | -5.13% |
| 4/7/1992 | 9.50 | 7.14 | 0.00% |
| 4/8/1992 | 9.50 | 7.14 | 0.00% |
| 4/9/1992 | 9.50 | 7.14 | 0.00% |
| 4/10/1992 | 10.25 | 7.70 | 7.60% |
| 4/13/1992 | 10.00 | 7.51 | -2.47% |
| 4/14/1992 | 10.25 | 7.70 | 2.47% |
| 4/15/1992 | 10.25 | 7.70 | 0.00% |
| 4/16/1992 | 10.50 | 7.89 | 2.41% |
| 4/20/1992 | 10.25 | 7.70 | -2.41% |
| 4/21/1992 | 10.13 | 7.61 | -1.23% |
| 4/22/1992 | 10.50 | 7.89 | 3.64% |
| 4/23/1992 | 10.50 | 7.89 | 0.00% |
| 4/24/1992 | 11.00 | 8.26 | 4.65% |
| 4/27/1992 | 10.75 | 8.08 | -2.30% |
| 4/28/1992 | 10.50 | 7.89 | -2.35% |
| 4/29/1992 | 10.25 | 7.70 | -2.41% |
| 4/30/1992 | 10.25 | 7.70 | 0.00% |
| 5/1/1992 | 10.75 | 8.08 | 4.76% |
| 5/4/1992 | 10.25 | 7.70 | -4.76% |
| 5/5/1992 | 10.50 | 7.89 | 2.41% |
| 5/6/1992 | 10.50 | 7.89 | 0.00% |
| 5/7/1992 | 10.50 | 7.89 | 0.00% |
| 5/8/1992 | 10.63 | 7.98 | 1.18% |
| 5/11/1992 | 10.75 | 8.08 | 1.17% |
| 5/12/1992 | 10.75 | 8.08 | 0.00% |
| 5/13/1992 | 10.75 | 8.08 | 0.00% |
| 5/14/1992 | 10.00 | 7.51 | -7.23% |
| 5/15/1992 | 10.50 | 7.89 | 4.88% |
| 5/18/1992 | 10.25 | 7.70 | -2.41% |
| 5/19/1992 | 10.38 | 7.79 | 1.21% |
| 5/20/1992 | 10.63 | 7.98 | 2.38% |
| 5/21/1992 | 10.25 | 7.70 | -3.59% |
| 5/22/1992 | 10.50 | 7.89 | 2.41% |
| 5/26/1992 | 10.75 | 8.08 | 2.35% |
| 5/27/1992 | 10.75 | 8.08 | 0.00% |
| 5/28/1992 | 10.25 | 7.70 | -4.76% |
| 5/29/1992 | 10.25 | 7.70 | 0.00% |
| 6/1/1992 | 10.50 | 7.89 | 2.41% |
| 6/2/1992 | 10.00 | 7.51 | -4.88% |
| 6/3/1992 | 10.25 | 7.70 | 2.47% |
| 6/4/1992 | 10.50 | 7.89 | 2.41% |
| 6/5/1992 | 10.50 | 7.89 | 0.00% |
| 6/8/1992 | 10.50 | 7.89 | 0.00% |
| 6/9/1992 | 9.88 | 7.42 | -6.14% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 6/10/1992 | 9.75 | 7.33 | -1.27% |
| 6/11/1992 | 9.75 | 7.33 | 0.00% |
| 6/12/1992 | 9.50 | 7.14 | -2.60% |
| 6/15/1992 | 9.50 | 7.14 | 0.00% |
| 6/16/1992 | 9.50 | 7.14 | 0.00% |
| 6/17/1992 | 10.00 | 7.51 | 5.13% |
| 6/18/1992 | 9.50 | 7.14 | -5.13% |
| 6/19/1992 | 9.50 | 7.14 | 0.00% |
| 6/22/1992 | 9.88 | 7.42 | 3.87% |
| 6/23/1992 | 9.88 | 7.42 | 0.00% |
| 6/24/1992 | 9.50 | 7.14 | -3.87% |
| 6/25/1992 | 10.25 | 7.70 | 7.60% |
| 6/26/1992 | 9.50 | 7.14 | -7.60% |
| 6/29/1992 | 9.75 | 7.33 | 2.60% |
| 6/30/1992 | 10.00 | 7.51 | 2.53% |
| 7/1/1992 | 9.50 | 7.14 | -5.13% |
| 7/2/1992 | 9.50 | 7.14 | 0.00% |
| 7/6/1992 | 9.63 | 7.23 | 1.31% |
| 7/7/1992 | 10.00 | 7.51 | 3.82% |
| 7/8/1992 | 10.00 | 7.51 | 0.00% |
| 7/9/1992 | 10.25 | 7.70 | 2.47% |
| 7/10/1992 | 9.88 | 7.42 | -3.73% |
| 7/13/1992 | 9.50 | 7.14 | -3.87% |
| 7/14/1992 | 10.25 | 7.70 | 7.60% |
| 7/15/1992 | 9.63 | 7.23 | -6.29% |
| 7/16/1992 | 10.25 | 7.70 | 6.29% |
| 7/17/1992 | 9.50 | 7.14 | -7.60% |
| 7/20/1992 | 10.25 | 7.70 | 7.60% |
| 7/21/1992 | 9.75 | 7.33 | -5.00% |
| 7/22/1992 | 10.25 | 7.70 | 5.00% |
| 7/23/1992 | 10.25 | 7.70 | 0.00% |
| 7/24/1992 | 9.75 | 7.33 | -5.00% |
| 7/27/1992 | 11.00 | 8.26 | 12.06% |
| 7/28/1992 | 10.50 | 7.89 | -4.65% |
| 7/29/1992 | 10.63 | 7.98 | 1.18% |
| 7/30/1992 | 11.00 | 8.26 | 3.47% |
| 7/31/1992 | 10.75 | 8.08 | -2.30% |
| 8/3/1992 | 10.75 | 8.08 | 0.00% |
| 8/4/1992 | 11.13 | 8.36 | 3.43% |
| 8/5/1992 | 10.75 | 8.08 | -3.43% |
| 8/6/1992 | 10.75 | 8.08 | 0.00% |
| 8/7/1992 | 10.75 | 8.08 | 0.00% |
| 8/10/1992 | 11.25 | 8.45 | 4.55% |
| 8/11/1992 | 11.25 | 8.45 | 0.00% |
| 8/12/1992 | 10.88 | 8.17 | -3.39% |
| 8/13/1992 | 10.75 | 8.08 | -1.16% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| Date | [a] Price | [b] Adjusted Price | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) Log Return |
|---|---|---|---|
| 8/14/1992 | 11.25 | 8.45 | 4.55% |
| 8/17/1992 | 11.00 | 8.26 | -2.25% |
| 8/18/1992 | 11.38 | 8.55 | 3.35% |
| 8/19/1992 | 10.75 | 8.08 | -5.65% |
| 8/20/1992 | 11.25 | 8.45 | 4.55% |
| 8/21/1992 | 10.75 | 8.08 | -4.55% |
| 8/24/1992 | 11.00 | 8.26 | 2.30% |
| 8/25/1992 | 11.13 | 8.36 | 1.13% |
| 8/26/1992 | 11.38 | 8.55 | 2.22% |
| 8/27/1992 | 11.00 | 8.26 | -3.35% |
| 8/28/1992 | 11.13 | 8.36 | 1.13% |
| 8/31/1992 | 11.00 | 8.26 | -1.13% |
| 9/1/1992 | 11.00 | 8.26 | 0.00% |
| 9/2/1992 | 11.00 | 8.26 | 0.00% |
| 9/3/1992 | 11.13 | 8.36 | 1.13% |
| 9/4/1992 | 11.00 | 8.26 | -1.13% |
| 9/8/1992 | 10.75 | 8.08 | -2.30% |
| 9/9/1992 | 10.75 | 8.08 | 0.00% |
| 9/10/1992 | 10.50 | 7.89 | -2.35% |
| 9/11/1992 | 11.00 | 8.26 | 4.65% |
| 9/14/1992 | 11.00 | 8.26 | 0.00% |
| 9/15/1992 | 11.00 | 8.26 | 0.00% |
| 9/16/1992 | 10.50 | 7.89 | -4.65% |
| 9/17/1992 | 10.50 | 7.89 | 0.00% |
| 9/18/1992 | 11.00 | 8.26 | 4.65% |
| 9/21/1992 | 10.75 | 8.08 | -2.30% |
| 9/22/1992 | 11.00 | 8.26 | 2.30% |
| 9/23/1992 | 10.88 | 8.17 | -1.14% |
| 9/24/1992 | 11.00 | 8.26 | 1.14% |
| 9/25/1992 | 10.63 | 7.98 | -3.47% |
| 9/28/1992 | 10.75 | 8.08 | 1.17% |
| 9/29/1992 | 11.25 | 8.45 | 4.55% |
| 9/30/1992 | 11.00 | 8.26 | -2.25% |
| 10/1/1992 | 10.50 | 7.89 | -4.65% |
| 10/2/1992 | 10.75 | 8.08 | 2.35% |
| 10/5/1992 | 10.00 | 7.51 | -7.23% |
| 10/6/1992 | 10.50 | 7.89 | 4.88% |
| 10/7/1992 | 10.25 | 7.70 | -2.41% |
| 10/8/1992 | 10.25 | 7.70 | 0.00% |
| 10/9/1992 | 10.00 | 7.51 | -2.47% |
| 10/12/1992 | 10.13 | 7.61 | 1.24% |
| 10/13/1992 | 10.00 | 7.51 | -1.24% |
| 10/14/1992 | 10.25 | 7.70 | 2.47% |
| 10/15/1992 | 10.00 | 7.51 | -2.47% |
| 10/16/1992 | 9.75 | 7.33 | -2.53% |
| 10/19/1992 | 9.75 | 7.33 | 0.00% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 10/20/1992 | 10.25 | 7.70 | 5.00% |
| 10/21/1992 | 10.00 | 7.51 | -2.47% |
| 10/22/1992 | 10.50 | 7.89 | 4.88% |
| 10/23/1992 | 10.13 | 7.61 | -3.64% |
| 10/26/1992 | 10.13 | 7.61 | 0.00% |
| 10/27/1992 | 10.38 | 7.79 | 2.44% |
| 10/28/1992 | 10.13 | 7.61 | -2.44% |
| 10/29/1992 | 10.13 | 7.61 | 0.00% |
| 10/30/1992 | 10.50 | 7.89 | 3.64% |
| 11/2/1992 | 10.25 | 7.70 | -2.41% |
| 11/3/1992 | 10.00 | 7.51 | -2.47% |
| 11/4/1992 | 10.25 | 7.70 | 2.47% |
| 11/5/1992 | 10.25 | 7.70 | 0.00% |
| 11/6/1992 | 10.13 | 7.61 | -1.23% |
| 11/9/1992 | 10.25 | 7.70 | 1.23% |
| 11/10/1992 | 10.50 | 7.89 | 2.41% |
| 11/11/1992 | 10.25 | 7.70 | -2.41% |
| 11/12/1992 | 10.25 | 7.70 | 0.00% |
| 11/13/1992 | 10.63 | 7.98 | 3.59% |
| 11/16/1992 | 10.75 | 8.08 | 1.17% |
| 11/17/1992 | 10.25 | 7.70 | -4.76% |
| 11/18/1992 | 10.25 | 7.70 | 0.00% |
| 11/19/1992 | 10.38 | 7.79 | 1.21% |
| | | **[d] Annualized Volatility** | **51.11%** |

Note:

[b] CRSP adjusts for stock dividends and splits. See "CRSP Data Description Guide for the CRSP US Stock Database", pp. 95 – 96. No stock dividends or splits were recorded during the period above.

[d] Calculated as standard deviation of Log Return (column [c]), multiplied by the square root of 252, the no. of trading days in a year. See "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

# *Exhibit K*
# *Sterling Savings Association*
## Summary of Wounded Bank Damages

| | Dollars |
|---|---|
| [1] 1989 Offering Circular Costs | $1,004,363 |
| [2] Legal, Accounting and Insurance Costs | $304,006 |
| [3] Regulatory Supervision Costs | $171,977 |
| [4] CJ-4 Loss | $1,240,610 |
| [5] Increased Cost to Acquire Branch from Great American Savings/RTC | $1,835,126 |
| **Total Wounded Bank Damages** | **$4,556,081** |

Source: Analysis prepared by Daniel G. Byrne, CFO of Sterling Savings, 1/9/04.

# *Exhibit L*

## *Sterling Savings Association*

## Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

| | | [1] | [2a] | [2b] | [3] | [4] | [5] |
|---|---|---|---|---|---|---|---|
| | Period Ending | Weighted Average Capital Raised Balance | Total Dividend After Tax at 6.30% | Total Dividend Before Tax at 10.0% | Cash Benefit of Capital at 4.76% | Net Cost of Capital | Present Value of Net Cost Discounted at 4.76% |
| [6] | 9/30/2006 – 12/31/2006 | 1,714.5 | 27.0 | 42.9 | 20.4 | 22.5 | 22.2 |
| | 12/31/2007 | 1,657.9 | 104.4 | 165.8 | 78.9 | 86.9 | 82.0 |
| | 12/31/2008 | 1,567.4 | 98.7 | 156.7 | 74.6 | 82.1 | 74.0 |
| | 12/31/2009 | 1,477.0 | 93.1 | 147.7 | 70.3 | 77.4 | 66.5 |
| | 12/31/2010 | 1,386.6 | 87.4 | 138.7 | 66.0 | 72.7 | 59.6 |
| | 12/31/2011 | 1,296.2 | 81.7 | 129.6 | 61.7 | 67.9 | 53.2 |
| | 12/31/2012 | 1,205.7 | 76.0 | 120.6 | 57.4 | 63.2 | 47.2 |
| | 12/31/2013 | 1,115.3 | 70.3 | 111.5 | 53.1 | 58.4 | 41.7 |
| | 12/31/2014 | 1,024.9 | 64.6 | 102.5 | 48.8 | 53.7 | 36.6 |
| | 12/31/2015 | 934.4 | 58.9 | 93.4 | 44.5 | 49.0 | 31.8 |
| | 12/31/2016 | 844.0 | 53.2 | 84.4 | 40.2 | 44.2 | 27.5 |
| | 12/31/2017 | 753.6 | 47.5 | 75.4 | 35.9 | 39.5 | 23.4 |
| | 12/31/2018 | 663.2 | 41.8 | 66.3 | 31.6 | 34.7 | 19.7 |
| | 12/31/2019 | 572.7 | 36.1 | 57.3 | 27.3 | 30.0 | 16.2 |
| | 12/31/2020 | 482.3 | 30.4 | 48.2 | 23.0 | 25.3 | 13.0 |
| | 12/31/2021 | 391.9 | 24.7 | 39.2 | 18.7 | 20.5 | 10.1 |
| | 12/31/2022 | 301.4 | 19.0 | 30.1 | 14.3 | 15.8 | 7.4 |
| | 12/31/2023 | 211.0 | 13.3 | 21.1 | 10.0 | 11.1 | 5.0 |
| | 12/31/2024 | 120.6 | 7.6 | 12.1 | 5.7 | 6.3 | 2.7 |
| | 12/31/2025 | 37.7 | 2.4 | 3.8 | 1.8 | 2.0 | 0.8 |

**Present Value of Future Damages from Mitigation of Lewis Federal and Tri-Cities Intangibles Including Amortizing CC (September 2006 through end of contract): $640.7**

# *Exhibit L*

## *Sterling Savings Association*

## Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

**Notes:**

[1] See Exhibit G, column [i].

[2a] After-tax dividend cost of preferred stock which assumes a 6.30% required dividend. This is the yield published on PreferredsOnline for preferred stock index with rating Baa/BBB as of September 29, 2006. Fitch upgraded Sterling's Long Term Issuer Default Rating from BB+ to BBB- on 3/22/06. Source: *Bloomberg*; PreferredsOnline (www.epreferreds.com).

[2b] Pre-tax dividend cost of preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings).

[3] Benefit of incremental tangible capital. Calculated as 4.76% return, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[4] Net cost is the pre-tax cost of preferred stock less the benefit of capital.

[5] Net cost discounted to 3Q-end 2006 at 4.76%, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[6] Figures in columns [2a] – [5] are prorated for the 3 months ending on 12/31/06.

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

FILED IN THE U.S. DISTRICT COURT EASTERN DISTRICT OF WASHINGTON
MAY 1 1990
JAMES R. LARSEN, CLERK
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, Plaintiff, vs. T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants. | No. CS-90-0175-JLQ VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, OR IN THE ALTERNATIVE, FOR RESCISSION AND DAMAGES |

For its Complaint against defendants Director, Office of Thrift Supervision ("OTS"), and Federal Deposit Insurance Corporation ("FDIC"), plaintiff Sterling Savings Association, a state chartered savings association ("STERLING"), states as follows:



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

## I. NATURE OF ACTION AND RELIEF SOUGHT

1.1 This action arises out of written contractual promises made to plaintiff STERLING by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") which have been repeatedly and utterly breached by the defendants. These contractual promises were made to STERLING by FSLIC and FHLBB, pursuant to their statutory supervisory authority over federally insured savings and loan associations (hereinafter referred to as "thrifts" or "thrift institutions").

1.2 As more fully described below, defendant Timothy Ryan is director of the Office of Thrift Supervision ("OTS) which is the successor in interest to FHLBB. Defendant The Federal Deposit Insurance Corporation ("FDIC") is the successor in interest to FSLIC. OTS AND FDIC are bound by the written contractual commitments made by FSLIC and FHLBB, respectively, to STERLING.

1.3 Defendants requested and provided inducements to STERLING to acquire and operate certain thrift institutions whose imminent failure threatened takeover costs and acute embarrassment. To induce STERLING to make these acquisitions (which, because the troubled thrifts had a negative net worth, STERLING would not have considered otherwise), defendants promised:

(1) to refrain from applying regulatory requirements regarding minimum capital for a period of time sufficient to allow STERLING to restore its capital accounts after absorbing



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the troubled thrifts,

(2) to give specific accounting treatment to STERLING'S goodwill and capital accounts following the transactions,

(3) to cooperate with STERLING in its efforts to acquire additional capital (including, without limitations, a promise not to interfere with capital raising efforts, which contemplated payment of dividends by STERLING to enable STERLING to attract investors, and a promise that should Sterling prove unable to acquire new equity capital, STERLING could propose an alternative business plan, which would not be unreasonably rejected).

1.4 Sterling's acquisitions relieved FSLIC and FHLBB of the burden of liquidating these failing thrift institutions and, consequently, saved FSLIC's insurance fund and ultimately the U.S. taxpayer at least $50 million in liquidation and other costs.

1.51 STERLING, its shareholders and management were willing to undertake the business risk involved in taking over the losing thrifts, in exchange for the written contractual commitments described generally in paragraph 1.3 above. STERLING did not bargain for the risk that defendants would later breach their commitments and promises. But for defendants' breach, STERLING would not be before this Court.

1.6 STERLING has fully performed its obligations under its contracts with defendants, in the course of which performance STERLING has incurred significant costs and expenses through direct outlays of funds, through the addition



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of personnel, and through expenditure of management time and effort to successfully manage the acquired assets.

1.7 STERLING participated with defendants in helping to solve the problem of troubled thrift institutions. STERLING was and is a part of the solution not the problem.

1.8 Despite the foregoing and although defendants have received the benefits of their contracts with STERLING, defendants now purport to "eliminate" their contractual promises to STERLING. Such contracts, however, remain binding on defendants and the United States Government. As justification for their threatened breach, defendants arbitrarily, capriciously and erroneously rely upon the recently enacted Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. Law. No. 101-73, 103 Stat. 183, when FIRREA does not in fact require or effect the abrogation of the contracts. The threatened breach of defendants' contractual promises to STERLING would, if permitted, seriously injure STERLING, and interfere with STERLING'S right to manage its own business affairs in the best judgment of STERLING'S management, and would constitute a breach of contract, a deprivation of STERLING'S property without due process for which no adequate remedy exists in violation of the Fifth Amendment to the United States Constitution, a taking of STERLING'S property without compensation in violation of the Fifth Amendment to the United States Constitution, for which there is no adequate remedy at law. Defendants' arbitrary application of FIRREA constitutes



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

unlawful discrimination against STERLING in violation of the Fifth Amendment's guarantee of equal protection of the laws.

1.9 Sterling is a safe, well managed thrift institution. Sterling has made a profit every year it has been in business since 1983, including the last fiscal year ending June 30, 1989. Through the ten months ending April 30, 1990, Sterling has earned a profit.

1.10 Sterling is examined annually by its external auditors, Coopers & Lybrand, CPAs. At no time has Coopers & Lybrand ("C&L") issued a qualified or adverse opinion. No material weakness in operations, internal control, or management have ever been noted in C&L's annual letter to management.

1.11 In this action, STERLING seeks (1) a declaration under 28 U.S.C. §2201 that STERLING's contracts with defendants are fully enforceable, and that FIRREA does not require or justify defendants' arbitrary attempt to breach their contracts with STERLING through the arbitrary establishment and application of implementing rules and regulations, or is invalid to the extent it would, if so applied, effect a repudiation and breach of defendants' contractual obligations to STERLING and, thereby, effect a deprivation of STERLING'S property without due process for which no adequate remedy exists at law, a taking of STERLING'S property without due compensation for which there will be no adequate remedy in damages and unlawful denial of equal protection of the laws, all in violation of the Fifth



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Amendment; (2) a declaration that the regulations and rules sought to be applied to constrain STERLING'S freedom to manage its business affairs are invalid, being ultra vires, and/or are being arbitrarily and capriciously applied to STERLING; (3) a declaration that OTS is estopped to apply FIRREA and the rules to STERLING; and (4) an injunction prohibiting enforcement of the provisions of FIRREA and its implementing rules and regulations that effect a repudiation of defendants' contractual promises to STERLING; or, alternatively (5) rescission of the transactions wherein STERLING acquired the then troubled institutions; or (6) damages for the taking.

## II. THE PARTIES

2.1 STERLING is a conservatively managed, financially sound savings and loan association serving the needs of communities throughout the State of Washington. Headquartered in Spokane, Washington, STERLING was chartered by the State of Washington and is a member of the Federal Home Loan Bank System. Until August 9, 1989 -- the date on which FSLIC was abolished under FIRREA -- accounts of STERLING'S depositors were insured by FSLIC. Since August 9, 1989, such accounts have been and are now insured by defendant FDIC.

2.2 As more fully described below in paragraph 5.1 hereof, STERLING is a publicly held corporation, which was formed in 1981 and commenced operations in 1983. At the request, and with the active inducement and approval of the


WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

FHLBB, STERLING acquired Lewis Federal Savings and Loan Association of Chehalis, Washington on November 5, 1985, Tri-Cities Savings and Loan of Kennewick, Washington on April 8, 1988, and Central Evergreen Federal Savings and Loan Association of Chehalis, Washington, on December 31, 1988. The acquisitions of Lewis Federal, Tri-Cities Savings and Loan and Central Evergreen were induced, arranged and approved by FSLIC and FHLBB pursuant to their statutory supervisory authority over thrift institutions. This action arises out of contractual promises made to STERLING by FLIC and FHLBB in connection with these supervisory mergers.

2.3 Prior to enactment of FIRREA, FHLBB was an agency of the United States. Under the Home Owners' Loan Act of 1933, as amended, FHLBB was charged with, among other things, regulating and supervising federally chartered savings and loan associations, acting as the operating head of FSLIC, and enforcing compliance by such institutions with regulatory capital requirements. FHLBB delegated certain of these functions to various Federal Home Loan Banks throughout the country, subject to FHLBB's supervision. The Federal Home Loan Bank of Seattle exercised such delegated authority with respect to the operations of STERLING and each of the three institutions it acquired. Under Section 401 of FIRREA, FHLBB was abolished on October 8 1989; its functions and responsibilities, for purposes relevant to this action, have been transferred to the Director, OTS, as its successor.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

2.4 Prior to enactment of FIRREA, FSLIC was an agency of the United States established under the National Housing Act of 1934, as amended, for the purposes of, among other things, insuring the accounts of depositors in thrift institutions that are members of the Federal Home Loan Bank System and establishing and enforcing minimum levels of capital for insured institutions and enforcing compliance therewith. It was operated under the direction of the FHLBB. Under Section 401 of FIRREA, FSLIC was abolished on August 9, 1989, and its responsibilities and functions, for purposes relevant to this action, were transferred to defendant FDIC.

2.5 Defendant FDIC is an agency of the United States established under the Federal Deposit Insurance Act, as amended, for the purpose of, among other things, insuring the accounts of depositors in certain state and federal depository institutions. FDIC is designated under FIRREA as the successor in interest to FSLIC for purposes relevant to this action. FIRREA provides that no action or other proceeding against FSLIC shall abate by reason of FIRREA's enactment but that FDIC shall be substituted as its successor in interest.

2.6 OTS is an office of the United States Department of the Treasury, and defendant RYAN, Director of OTS, is an officer and agent of the United States. Under FIRREA the Director is charged with regulating and supervising all federally insured savings and loan institutions, and enforcing compliance by such institutions with the regulatory capital requirements to be established under that statute. The



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Director has been designated under FIRREA as the successor in interest to defendant FHLBB for purposes relevant to this action. FIRREA provides that no action or other proceeding against FHLBB shall abate by reason of FIRREA's enactment but that the Director shall be substituted as its successor in interest.

2.7 Defendant FHLB-Seattle is a government-sponsored agency and one of twelve Home Loan Banks in the Federal Home Loan Bank System. Prior to enactment of FIRREA, FHLB-Seattle operated under the control of FHLBB. FHLB-Seattle and other Federal Home Loan Banks are now subject to oversight by the newly-created Federal Housing Finance Board. Members of the Federal Home Loan Bank System, such as STERLING, may receive loans or "advances" from their regional Federal Home Loan Bank.

## III. JURISDICTION AND VENUE

3.1 This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337, 1346, 1361, 2201 and 5 U.S.C. §702.

3.2 This Court further has jurisdiction over defendants pursuant to 28 U.S.C. §1346 (all federal defendants), 12 U.S.C. §§1462(a) and 1464(d)(1)(a) (Director, OTS/FHLBB), 12 U.S.C. §1819(b)(2) (FDIC/FSLIC).

3.3 Venue is proper in this district under 28 U.S.C. §§1391(e) and 1402(a)(1), and 12 U.S.C. §1464(d)(1)(A).



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

## IV. BACKGROUND

4.1 During the late 1970's and early 1980's, a substantial number of thrift institutions experienced serious financial losses precipitated by a combination of changes in prevailing interest rates, the recession of 1981-1982, and poor management. From 1966 to 1980, thrifts were subject to a cap on the maximum interest rates they could pay. This restriction, coupled with sharp increases in short-term interest rates in the late 1970's and early 1980's an the greater availability of money-market instruments not limited by regulation, led to heavy withdrawals of deposits from thrifts. As a result, the cost to thrifts of attracting funds rose dramatically. At the same time, thrifts' loan portfolios consisted almost exclusively of 30-year fixed-rate mortgages at interest rates that were lower than the thrifts' increased cost of funds. This interest rate mismatch, combined with recession conditions in the industrial Northeast, Southwest, and California, led to losses in the thrift industry totalling $8.8 billion in 1981 and 1982 combined. In 1982, FHLBB AND FSLIC were forced to resolve by merger or liquidation 255 failing thrift institutions, with assets of $37 billion.

4.2 In 1980 Congress enacted the Depository Institutions Deregulation and Monetary Control Act in its first legislative attempt to deal with the thrift crisis. That statute provided for deregulation of interest rates and an increase in the level of federal deposit insurance to $100,000 as a means of allowing banks and thrifts to attract the depositors they



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

had earlier lost. Although banks and thrifts were able to recapture some of these funds by offering "NOW" and money market deposit accounts, they had to pay market interest rates in order to do so, and the interest rate mismatch problem therefore persisted.

4.3 Congress, state legislatures, and the regulators also responded to the thrift crisis by expanding the thrifts' ability to diversify their loan portfolios. In 1981, thrifts were allowed to offer adjustable rate mortgages. In 1982, the Garn-St. Germain Depository Institutions Act ("Garn-St. Germain") expanded the powers of federally-chartered thrifts to engage in commercial lending, nonresidential real estate lending, and consumer and educational lending. Many state legislatures went even further, most notably by allowing their state-chartered thrifts to greatly increase direct investment in real estate development. These state-chartered thrifts, like the federal thrifts, were backed by FSLIC insurance.

4.4 After enactment of Garn-St. Germain the thrift industry grew rapidly, as thrifts met renewed mortgage demand resulting from an economic recovery and also expanded into new business areas. From 1983 to 1986, total thrift liabilities grew 65%, from $674 billion to $1.1 trillion. The number of FHLBB and FSLIC resolutions of failing thrifts dropped to 36 in 1984, but began to increase again with the onset of the regional recession in the Southwest and the Farm Belt, rising to 55 in 1986. Reserves in the FSLIC insurance fund, already weakened by the expense of earlier resolutions, deteriorated



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

further. The United States General Accounting Office ("GAO") reported FSLIC losses of $1 billion in 1985 and $11 billion in 1986. According to the GAO, FSLIC was insolvent as of year-end 1986, with a negative net worth of $6 billion. As of April 30, 1987, there were 387 institutions in FHLBB's significant supervisory caseload, with total assets of approximately $138 billion.

4.5 With FSLIC's insurance fund insufficient to recapitalize or liquidate the increasing number of failing thrifts, from the early 1980's onward FHLBB sought in many instances to find healthy thrifts or other investors willing to merge with or acquire and recapitalize troubled institutions. A substantial portion of these supervisory transactions were "FSLIC- assisted," with the infusion of at least some capital by FSLIC, and were equally accompanied by regulatory forbearance. Nearly all the regulatory forbearances by FHLBB and/or FSLIC, permitted the acquiring institutions to operate with modified capital requirements for a period of time sufficient for capital to be increased to normally required levels, and counselled FSLIC to refrain from enforcing the minimum capital regulations or sanctioning thrifts for non-compliance. By 1986 FHLBB had developed certain "standard" forbearances for use in negotiating supervisory transactions.

4.6 Under the National Housing Act of 1934, as amended, FSLIC was at all times relevant to this action authorized to facilitate, "upon such terms and conditions as the Corporation may determine," the merger of a failing FSLIC-insured thrift



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

institution into a financially sound FSLIC-insured thrift institution by providing financial assistance in the form of promissory notes or cash contributions to the healthy institution or by guaranteeing it against losses from certain lawsuits, from liquidation of assets, and other operating losses by reason of the merger, so long as the amount of the financial assistance provided by FSLIC did not exceed the expense that would have been incurred in liquidating the institution and paying insurance claims upon its accounts.

4.7 As the crisis in the thrift industry continued to worsen, and more and more FSLIC-insured thrift institutions became insolvent or troubled, FSLIC and FHLBB recognized that continuing to facilitate supervisory mergers with cash contributions and promissory notes would quickly and entirely exhaust the insurance fund.

4.8 FSLIC and FHLBB were thus forced to revise their policies and practices regarding the provision of cash financial assistance in supervisory mergers in order to prevent, or at last forestall, exhaustion of the FSLIC insurance fund. FSLIC and FHLBB began inducing and arranging supervisory mergers by providing a broad array of inducements, some of which are discussed below.

4.9 As one such inducement, FSLIC and FHLBB routinely encouraged and approved application of the "purchase method" of accounting for the mergers. The Generally Accepted Accounting Principles ("GAAP") applicable at the time provided that in mergers and acquisitions using the purchase method of



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

accounting, the book value of the assets and liabilities of an acquired thrift institution should be adjusted to fair market value at the time of the acquisition, and that any excess in the cost of the acquisition (which includes any liabilities assumed by the acquiror) over the fair market value of the acquired assets should be separately recorded on the acquiror institution's books as an intangible, non-earning asset. Acquired assets that can be separately identified shall be assigned a portion of the total cost. (Identified intangible asset). The fair value of liabilities assumed that exceeds the fair value of tangible and intangible assets acquired constitutes an unidentified intangible asset or "goodwill".

4.10 Because of the high interest rates prevailing at the time, the fair market value of the lower yielding fixed-rate mortgage loans held by most acquired institutions was significantly less than the mortgage loans' book value (the face amount of the loans). Accordingly, in the typical supervisory merger at that time, the aggregate fair market value of the liabilities assumed by the acquiror institution exceeded the aggregate fair market value of the acquired institution's fixed-rate loans and other assets. The amount by which the acquired institution's liabilities exceed its assets and reflected on the merged institution's books as goodwill was significant. For STERLING, the amount of goodwill recorded in connection with its acquisitions of failed thrifts exceeded $17 million. Because of the high interest rates at the time of the acquisitions made by STERLING, the discount of the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

acquired loan portfolios (and hence the resulting goodwill) was a significant number, over $26 million.

4.11 This goodwill was recorded on the merged institution's balance sheet as an asset. Whereas GAAP would normally require reduction of goodwill in an amount equal to any cash assistance received, "supervisory goodwill" was not, for regulatory accounting principles, so reduced. "Supervisory goodwill" also differed from GAAP goodwill in that longer periods of amortization were available, as an accounting forbearance. The ability to amortize supervisory goodwill it over a period of up to 40 years was essential to inducing healthy acquiror institutions to merge with insolvent or troubled FSLIC-insured thrifts.

4.12 FSLIC and FHLBB offered additional regulatory inducements to acquiring thrifts in cases where cash assistance was provided. The agreements permitted the acquiring institution to include cash assistance provided in its regulatory capital account. This addition to the acquiring institution's regulatory capital account was used to determine the institution's compliance with regulatory capital requirements. It was permanent, subject to amortization over a period of up to 40 years. The ability to use regulatory capital for purposes of satisfying minimum capital requirements was essential to induce healthy thrifts to acquire insolvent thrifts.

4.13 As additional inducement to acquiror institutions, FSLIC and FHLBB offered regulatory forbearances, including





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

forbearance from enforcement of regulatory capital requirements, liquidity requirements, requirements regarding minimization of scheduled items (e.g., non-performing loans and foreclosed real estate) and miscellaneous accounting requirements.

4.14 By assuring acquiror institutions in supervisory mergers that supervisory goodwill and regulatory capital would be treated in the above-described manner for regulatory purposes, and that forbearances would be honored, FSLIC and FHLBB were able to induce and arrange supervisory mergers with minimal cash contributions and other tangible financial assistance. FSLIC and FHLBB thus saved many billions of dollars in financial assistance that FSLIC would otherwise have had to pay in order to resolve scores of insolvent and troubled FSLIC-insured thrift institutions.

## V. THE TRANSACTIONS AT ISSUE

### A. STERLING

5.1 Sterling Savings Association is a Washington-chartered, federally insured stock savings and loan association with headquarters in Spokane, Washington. Founded in 1981, STERLING commenced operations in April of 1983. STERLING is a publicly held corporation, traded on the Spokane Stock Exchange. STERLING is engaged in the business of attracting deposits from the general public and originating, purchasing, selling, and servicing secured residential, commercial, and consumer loans. STERLING'S business strategy



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

is service-oriented. STERLING has chosen to compete principally in rural communities where operating costs are lower for gathering deposits and to be near major metropolitan areas for higher volume lending activities. This strategy has been instrumental in enabling STERLING to reduce its operating costs as a percentage of total assets and to be competitive in the delivery of services and products. As of October 31, 1985, STERLING had assets of approximately $120 million and five branches in Eastern Washington. As of that time, STERLING'S capital accounts were such that STERLING would have satisfied the most stringent tests currently imposed by FIRREA, and would have continued to satisfy them to the present day but for the transactions (hereinafter described) induced and arranged by defendants, which were explicitly conditioned on defendants' forbearance from enforcing specific regulatory capital accounting requirements and on defendants' promises that the purchase method treatment of goodwill would be used. But for STERLING'S willingness to assist FSLIC, STERLING would not need relief from this Court.

B. LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION

5.2 In the spring of 1985 FHLBB judged the Lewis Federal Savings and Loan Association ("LEWIS FEDERAL") to be insolvent. Pursuant to its policy, FHLBB sought to avert LEWIS FEDERAL's failure and to preserve FSLIC's insurance fund by finding a solvent, competent thrift institution to acquire LEWIS FEDERAL. In order to minimize costs to FSLIC, FHLBB decided to request bids from selected institutions, intending



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

to select that bid which best satisfied FHLBB's two principal criteria: (1) low costs to FSLIC and (2) high probability that the acquiring institution would be able to earn its way out of LEWIS FEDERAL's negative net worth.

5.3 FHLBB sent solicitations for bids to a selected group of thrift institutions, not to all institutions. In determining which thrift institutions to send bid documents to FHLBB considered their "financial capacity, geographical location, asset size, and expressed preferences." In determining which bidder to select for the acquisition of LEWIS FEDERAL, FHLBB considered

> (a) A comparison of [FSLIC's] estimated cash outlay and estimated net present value cost to FSLIC of each proposal with that of other acquisition proposals and available alternatives, including a liquidation accompanied by a payment of insured accounts;
>
> (b) An evaluation of other contingent or potential costs and risks to the FSLIC of each acquisition proposal;
>
> (c) The projected financial viability of the association or its successor after the acquisition contemplated by the proposal;
>
> (d) A supervisory assessment of the financial and managerial resources of the prospective acquiror;;
>
> (e) The pertinent anti-competitive and antitrust considerations;
>
> (f) An overall determination of which proposal is most advantageous to the depositors and other creditors of the association and to the FSLIC; and
>
> (g) Due consideration of applicable standards imposed by statute or regulation.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

5.4 FHLBB recognized that the absorption of the insolvent LEWIS FEDERAL would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from STERLING and others, FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill and regulatory capital to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of LEWIS FEDERAL.

5.5 In June, 1985, STERLING offered to take over LEWIS FEDERAL subject to certain conditions, among which were specific forbearances of enforcement of regulatory capital requirements, and specific regulatory accounting treatment of supervisory goodwill and regulatory capital which in turn would permit STERLING to absorb a failing thrift without itself falling out of compliance with minimum capital requirements.

5.6 On November 4, 1985, FHLBB entered a resolution containing formal findings of fact that LEWIS FEDERAL was insolvent; that severe financial conditions existed which threatened LEWIS FEDERAL's stability; that FSLIC should be made receiver for LEWIS FEDERAL; that FSLIC had appropriately considered STERLING'S qualifications and competence to acquire and manage LEWIS FEDERAL, that the acquisition of LEWIS



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

FEDERAL by STERLING would reduce the risk to FSLIC; that STERLING'S offer "presents the lowest expense and least risk to the FSLIC of any proposal submitted", that transfer of LEWIS FEDERAL TO STERLING was preferable to liquidation of LEWIS FEDERAL, and would avoid the loss to LEWIS FEDERAL account holders and creditors that liquidation would entail; that acquisition by STERLING was in the best public interest; that acquisition by STERLING was necessary to prevent the probable failure of LEWIS FEDERAL, and, more importantly, that STERLING would continue to be a viable entity following the acquisition, and to induce STERLING to acquire LEWIS FEDERAL, certain regulatory forbearances and treatment of supervisory goodwill and regulatory capital would be granted to, and agreed with, STERLING.

5.7 On November 5, 1985, STERLING entered into a formal contract with FSLIC as receiver for LEWIS FEDERAL, under which STERLING agreed to take over LEWIS FEDERAL subject to the approval by FHLBB of the regulatory certain forbearances and regulatory treatment of goodwill and regulatory capital.

5.8 On November 12, 1985, FHLBB entered a formal resolution ordering that the agreed upon forbearances be granted to STERLING. In sum, FHLBB:

(1) Permitted STERLING to exclude certain of LEWIS FEDERAL's liabilities in determining compliance with certain requirements;

(2) Suspended enforcement of any regulation related to regulatory capital requirements for five years should



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

STERLING fail to comply, if STERLING'S failure to comply was caused by an increase in liabilities from the acquisition of the falling LEWIS FEDERAL, or by STERLING'S assumption of LEWIS FEDERAL's negative net worth;

(3) Ordered that STERLING could carry $1.8 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital accounting purposes;

(4) Ordered that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 40 years; and

(5) Ordered that the difference between the book value and the fair market value of LEWIS FEDERAL's loan portfolio could be amortized to income over a 15 year period.

5.9 Pursuant to its agreement with FSLIC and in accordance with the forbearances expressly granted by FHLBB, STERLING entered $3.6 million in supervisory goodwill on to its books.

5.10 As a result of STERLING'S acquisition of LEWIS FEDERAL, FSLIC avoided the need to spend not less than $5.2 million to liquidate LEWIS FEDERAL, and avoided harmful and embarrassing publicity.

C. TRI-CITIES SAVINGS AND LOAN ASSOCIATION

5.11 In the summer of 1987, FHLBB judged the Tri-Cities Savings and Loan Association ("TRI-CITIES") to be insolvent. Pursuant to its policy, FHLBB sought to preserve FSLIC's insurance fund by finding a solvent, competent thrift



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

institution to acquire TRI-CITIES. In order to minimize costs to FSLIC, FHLBB decided to request bids from selected thrift institutions, intending to select that bid which best satisfied FHLBB's two principal criteria: (1) low costs to FSLIC and (2) high probability that the acquiring thrift institution would be able to earn its way out of TRI-CITIES' negative net worth.

5.12 FHLBB sent solicitations for bids to selected thrift institutions. In determining which thrift institutions to send bids to, FHLBB considered their financial capacity and the skill and reliability of their management. In determining which bidder to select for the acquisition of TRI-CITIES, FHLBB considered:

> (a) a comparison of [FSLIC's] estimated cash outlay and estimated net present value cost to the FSLIC of each proposal with that of other acquisition proposals and available alternatives, including a liquidation accompanied by a payment of insured accounts;
>
> (b) an evaluation of other contingent or potential costs and risks to the FSLIC of each acquisition proposal;
>
> (c) the projected financial viability of the Association(s) or their successor after the acquisition contemplated by the proposal;
>
> (d) an assessment of the financial and managerial resources of the prospective acquiror;
>
> (e) the pertinent anti-competitive and antitrust considerations;
>
> (f) an overall determination of which proposal is most advantageous to the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

depositors an other creditors of the Association(s) and to the FSLIC; and

(g) due consideration of applicable standards imposed by statute or regulation.

5.13 FHLBB recognized that the acquisition of the insolvent TRI-CITIES would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from STERLING and others, FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill and regulatory capital to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of TRI-CITIES.

5.14 In November, 1987, STERLING offered to take over TRI-CITIES subject to certain conditions, among which were specific forbearances of enforcement of regulatory capital requirements, and specific regulatory accounting treatment of supervisory goodwill and regulatory capital.

5.15 On April 7, 1988, FHLBB entered a resolution containing formal findings of fact that TRI-CITIES was insolvent; that FSLIC should be made receiver for TRI-CITIES; that TRI-CITIES could not continue as a going concern without financial assistance from FSLIC; that STERLING was qualified

and competent to acquire and manage TRI-CITIES; that the acquisition was necessary to prevent the probable failure of TRI-CITIES; that the acquisition by STERLING was the most desirable alternative to liquidation or transfer to another institution, and represented the least cost to FSLIC of any alternative, that the acquisition by STERLING was in the best public interest, and in the best interests of the account holders and creditors of TRI-CITIES; that STERLING would continue to be a viable entity following the acquisition; and that to induce STERLING to acquire TRI-CITIES, certain regulatory forbearances and treatment of supervisory goodwill and regulatory capital would be granted and agreed to.

5.16 On April 8, 1988 STERLING entered into a formal contract with FSLIC as receiver for TRI-CITIES, under which STERLING agreed to take over TRI-CITIES subject to the approval by FHLBB of certain forbearances and of certain regulatory accounting treatment of supervisory goodwill.

5.17 FHLBB had already, on April 6, 1988 formally granted the agreed-upon forbearances to STERLING. In sum, FHLBB:

(1) Agreed to waive the assessment, for one year, of penalties occasioned by STERLING'S inability to satisfy liquidity requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years should STERLING fail to comply, if STERLING'S failure to comply was caused by



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

an increase in liabilities from the acquisition of TRI-CITIES, or by STERLING'S assumption of TRI-CITIES' negative net worth;

(3) Agreed that STERLING could carry $11.7 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital accounting purposes;

(4) Agreed that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of TRI-CITIES' loan portfolio could be amortized to income over eight years.

5.18 Pursuant to its agreement with FSLIC and in accordance with the forbearances expressly granted by FHLBB, STERLING entered $13.9 million in supervisory goodwill onto its books.

5.19 As a result of STERLING'S acquisition of TRI-CITIES, FSLIC avoided the need to spend not less than $13.7 million to liquidate TRI-CITIES.

D. CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

5.20 In the summer of 1987, FHLBB requested that STERLING consider acquiring Central Evergreen Federal Savings and Loan Association ("CENTRAL EVERGREEN") a troubled thrift in Chehalis, Washington. STERLING declined, pointing out that such an acquisition might create in STERLING'S books a regulatory capital deficiency. FHLBB pressed STERLING to



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

consider the acquisition anyway, affirming that the permanent regulatory capital created by the LEWIS FEDERAL and TRI-CITIES acquisitions would keep STERLING in compliance with the capital regulations if it acquired CENTRAL EVERGREEN.

5.21 STERLING studied CENTRAL EVERGREEN, and concluded that the acquisition could be done. However, STERLING concluded to be safe and sound, STERLING should arrange for an equity offering of $4 to $6 million soon after the acquisition. STERLING then agreed to acquire CENTRAL EVERGREEN contingent upon approval of FHLBB.

5.22 On December 8, 1988, FHLBB entered a resolution approving the acquisition. FHLBB entered formal findings of fact that CENTRAL EVERGREEN was insolvent; that STERLING would be a viable entity following the acquisition; that the acquisition was necessary to prevent the probable failure of CENTRAL EVERGREEN; that the purchase method treatment of goodwill should be used; and that FSLIC should enter an agreement pursuant to STERLING'S proposal calling for an infusion of capital after the acquisition.

5.23 On December 28, 1988, STERLING contracted with FSLIC, pursuant to which STERLING agreed to carry out a specific business plan. The plan was to add $4 million to $6 million in new equity within two years; the contract between STERLING and FSLIC required that whenever STERLING'S regulatory capital fell below regulatory minimums by more than an agreed percentage STERLING would raise capital sufficient to meet "the <u>lesser of</u> its minimum capital requirement on



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

the regulatory capital projected in the business plan. The failure to raise additional capital as provided in the business plan shall not be a violation of the obligation [of STERLING] if it is raised prior to December 31, 1990." Under the agreement, supervisory goodwill and the excess of book over fair market value of loans acquired from CENTRAL EVERGREEN were to be amortized over a 12 year period. STERLING, concerned about the growing thrift crisis, requested that a clause be included terminating the contract if some change in the laws made it impossible for STERLING to acquire additional equity. After negotiation, FSLIC agreed that the final contract would permit STERLING to revise its business plan should events beyond STERLING'S control prevent the contemplated equity offering. The final contract reflects this agreement.

5.24 On December 31, 1988, STERLING closed the acquisition agreement, and began to prepare for an equity offering.

5.25 As a result of STERLING'S acquisition of CENTRAL EVERGREEN, FSLIC's insurance fund and the U.S. taxpayer avoided the need to spend not less than $30.1 million to liquidate CENTRAL EVERGREEN, and avoided harmful and embarrassing publicity.

## VI. FIRREA

6.1 FIRREA was signed into law by President Bush on August 9, 1989. Section 301 of FIRREA requires the Director



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

of OTS to promulgate, no later than November 7, 1989, final regulations establishing minimum capital requirements for federally insured thrifts. These minimum capital requirements must become effective no later than December 7, 1989, and must require federally insured thrifts to:

(a) maintain "tangible capital," which excludes supervisory goodwill, in an amount not less than 1.5 percent of the thrift's assets;

(b) maintain "core capital," as defined in the statute, in an amount not less than 3 percent of the thrift's assets; and,

(c) maintain "risk-based capital" in an amount not materially less than that required by the Comptroller of the Currency for national banks.

6.2 FIRREA provides that "tangible capital" shall not include supervisory goodwill, and that only limited amounts of "core capital" may be made up of supervisory goodwill. Prior to January 1, 1992, the amount of supervisory goodwill includable in core capital may not exceed 1.5 percent of total assets. Thereafter, the amount of supervisory goodwill (as a percentage of assets) includable in core capital declines each year, in accordance with the following schedule:

January 1, 1992, to December 31, 1992 ... 1.0 percent
January 1, 1993, to December 31, 1993 ... 0.75 percent
January 1, 1994, to December 31, 1994 ... 0.375 percent
Thereafter ............................ 0 percent



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

For purposes of the minimum capital requirements, supervisory goodwill must be amortized over a period not to exceed 20 years.

6.3 FIRREA does not require that supervisory goodwill be excluded from capital for purposes of determining compliance with minimum "risk-based" or core capital requirements. Nor does FIRREA require exclusion of contractual permanent regulatory capital from minimum capital computations.

6.4 FIRREA requires that the minimum capital requirements promulgated by the Director of OTS for thrift institutions be no less stringent that those established by the Comptroller of the Currency for national banks.

FIRREA Did Not Mandate Breach of STERLING'S Agreements

6.5 Although the stringent, new capital requirements set forth in Section 301 of FIRREA are generally applicable to thrifts, they are not intended to abrogate differing capital requirements set forth in binding agreements previously entered into by the FHLBB and/or the FSLIC. Quite to the contrary, Section 401(f) provides that the abolition of the FSLIC and the FHLBB:

> shall not affect the validity of any right, duty or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which --
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Section 401(g) of FIRREA provides that the abolition of the FSLIC and the FHLBB:

> shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which --
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Similarly, Section 401(h) provides that:

> all orders, resolutions, determinations, and regulations, which --
>
> (1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and
>
> (2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law .... (Emphasis added.)



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Recognizing the continued validity and enforceability of forbearances previously granted by the FSLIC and the FHLBB, FIRREA also directs the newly created Resolution Trust Corporation to "evaluate the costs under existing [FSLIC] agreements with regard to ... forbearance ...."

6.6 In enacting FIRREA, therefore, Congress sought to impose strict new regulatory capital requirements upon thrifts, while recognizing the validity and enforceability of the federal government's specific contractual obligations to utilize different requirements with respect to those institutions that had entered into agreements such as STERLING'S. The contractual rights of STERLING to the specific contractual undertakings described above thus survived enactment of FIRREA, and remain enforceable against the Director of OTS as successor to FHLBB, against FHLB-Seattle, and against FDIC.

6.7 While FIRREA abolished both FSLIC and FHLBB, it provided that no action or other proceeding against FSLIC or FHLBB shall abate by reason of such enactment, but that FDIC and the Director shall be substituted as their respective successors in interests.

6.8 FIRREA grants OTS broad powers to assist capital-deficient thrifts to come into compliance. OTS may exempt any thrift (whether or not such thrift has a prior agreement with FSLIC or FHLBB), may make exceptions, or may issue forbearances.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

<u>The FIRREA Regulations</u>

6.9 On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA (the "Capital Regulations"), which became effective on December 7, 1989. Although OTS indicated in a press briefing shortly after enactment of FIRREA that it was "uncertain" about the impact of the statute on past FHLBB and FSLIC forbearances, notwithstanding Section 401(h) of FIRREA the Capital Regulations make no mention of existing FHLBB and FSLIC agreements or forbearances. Instead, the Capital Regulations are on their face applicable to all thrifts, including those with less restrictive capital requirements and other forbearances embodied in binding agreements with FHLBB and/or FSLIC.

6.10 In accordance with FIRREA, the OTS Capital Regulation establishes a minimum "tangible" capital requirement of 1.5 percent of total assets and a minimum "core" capital requirement of 3 percent of total assets. Supervisory goodwill cannot be counted as "tangible" capital at all, and can be counted as "core" capital only in accordance with the phase-out schedule set forth in FIRREA (see paragraph 6.2 above).

6.11 FIRREA does not require that supervisory goodwill and permanent regulatory capital be completely excluded from capital for purposes of determining compliance with minimum "risk-based" capital requirements. Nonetheless, the OTS Capital Regulation permits the inclusion of supervisory goodwill in capital for purposes of the minimum "risk-based"



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

capital requirement only in accordance with the phase-out schedule set forth in FIRREA for determining compliance with the minimum "core" capital requirement (see paragraph 6.2 above).

6.12 The regulations purport to require various levels of interference with management where regulatory capital does not meet the new minimum, irrespective of any contract or agreement. These include the following:

(a) increase the amount of its regulatory capital to a specified level or levels;

(b) convene a meeting or meetings with the OTS supervision staff for the purpose of accomplishing the objectives of this section;

(c) reduce the rate of earnings that may be paid on savings accounts;

(d) limit the receipt of deposits to those made to existing accounts;

(e) cease or limit the issuance of new accounts of any or all classes or categories, except in exchange for existing accounts;

(f) cease or limit lending or the making of a particular type or category of loan;

(g) cease or limit the purchase of loans or the making of specified other investments;

(h) limit operational expenditures to specified levels;

(i) increase liquid assets and maintain such increased liquidity at specified levels; or



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(j) take such other action or actions as the Director may deem necessary or appropriate for the safety and soundness of the savings association, or depositors or investors in the savings association, including placement of the institution in receivership.

## VII. STERLING HAS SUFFERED, AND WILL CONTINUE TO SUFFER, IRREPARABLE INJURY

7.1 STERLING is solvent, healthy, and making money. STERLING has posted positive earnings for every quarter since 1983 until third quarter, 1989. In that quarter, at the insistence of defendants, STERLING recorded a one-time charge to earnings of $1.4 million to increase its loan loss reserves. In discussions with defendant OTS, STERLING disagreed with OTS's judgment that this reserve was required, and requested an explanation. Defendant OTS defended the requirement by pointing to specific loans which it insisted should be classified. In meetings between OTS and STERLING, OTS accepted STERLING'S explanation as to why classification of the items identified by OTS in support of the adjustment to loan loss reserves was not required, and OTS accepted this explanation. OTS refused, however, to change its position regarding the need for an adjustment to loan loss reserves, and refused to explain why.

7.2 In April-June, 1987, STERLING made a public offering of $4 million worth of convertible preferred stock. In reliance upon its agreements with FSLIC, STERLING included in



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

its offering circular a description of its regulatory capital accounts calculated in light of the methods and forbearances provided in connection with the acquisition of LEWIS FEDERAL. $2.2 million worth of stock was sold in the offering. Those investors who bought the preferred stock did so in reliance upon the agreement with defendants as disclosed in the offering circular. Other investors who purchased or owned common stock may also have relied upon the agreement as disclosed in the offering circular.

7.3 Pursuant to the business plan which was a part of STERLING'S agreement with defendants (see paragraph 5.23 above), STERLING in late 1989 began preparation for an equity offering which would have raised equity in a greater amount than that required by the agreement with defendants, and which would have all but resolved STERLING'S capital deficiency (the remaining capital deficiency would, also pursuant to the business plan which formed part of the contract with defendants, have been resolved through earnings within two years). STERLING expended nearly $1 million in fees for accountants, attorneys, and underwriters in preparation for the equity offering. STERLING presented the proposed offering circular to OTS for review. OTS stated that FIRREA forbids capital-deficient institutions to pay dividends, and arbitrarily and capriciously announced that STERLING would not be permitted to pay dividends on the stock proposed to be sold. The underwriters, being of the opinion that it would be impossible to sell stock in STERLING if defendants took that



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

position, advised that the offering could not go forward. The business plan required STERLING to raise from $4 to $6 million. The equity offering planned by STERLING was to sell 525,000 units (each unit consisting of one share each of common and non-cumulative preferred stock). The underwriters advised management that the offering was not only fully subscribed, but over-subscribed to an extent, which would have returned approximately $10.7 million (net of offering expenses and costs of over-subscription options) to STERLING'S capital accounts. Four months later, in April, 1990, after the equity markets had deteriorated to a point at which STERLING'S offering was no longer viable, OTS announced that it was planning a change in policy to permit capital-deficient entities to pay dividends as an incentive to get them to raise equity capital. Defendant's action was not only arbitrary and capricious, it frustrated and breached specific and binding undertakings contained in the agreement between STERLING and defendants.

7.4 Under color of FIRREA and other rules, defendant OTS has interfered and will continue to interfere with STERLING'S management, to STERLING'S detriment and to the further frustration of STERLING'S agreements with defendants. This interference consists of operating limitations imposed on STERLING by defendants, including, but not limited to,

a. limitations on STERLING'S growth;

b. limitations on payment of dividends;





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

c. limitations on the amount of loans which may be made to any one borrower;

d. limitations on the class of persons to whom STERLING may make loans;

e. limitations on the types of loans which STERLING may make;

f. limitations on the operation of STERLING'S profitable subsidiary companies.

## VIII. FIRST CAUSE OF ACTION - DECLARATORY RELIEF

8.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 7.3 of this Complaint.

8.2 FIRREA was not intended to, and cannot abrogate STERLING'S binding contacts with the United States in violation of the Fifth Amendment to the United States Constitution's requirements of due process and just compensation, or discriminate against STERLING in violation of the equal protection guarantees of the Fifth Amendment to the United States Constitution.

8.3 The Court should declare OTS's application of FIRREA in derogation of its contracts with STERLING illegal, invalid, and unenforceable against STERLING.

## IX. SECOND CAUSE OF ACTION - DECLARATORY RELIEF

9.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 8.3 of this Complaint.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

9.2 The regulations published by defendants are ultra vires, and have been arbitrarily and capriciously applied to STERLING in breach of STERLING'S agreements with defendants.

9.3 This Court should declare OTS's application of its regulations in derogation of its contracts with STERLING illegal, invalid, and unenforceable against STERLING.

## X. THIRD CAUSE OF ACTION - DECLARATORY RELIEF

10.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 9.3 of this Complaint.

10.2 The findings of fact made by the FHLBB and the forbearances issued based upon those findings are res judicata against defendants.

10.3 This Court should declare that defendants are estopped to deny or interfere with the forbearances issued pursuant to the findings and resolutions of the FHLBB.

## XI. FOURTH CAUSE OF ACTION - INJUNCTION

11.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 10.3 of this Complaint.

11.2 STERLING has suffered and will continue to suffer irreparable damage as a result of defendants' actions, for which there is no adequate remedy at law. A financial institution such as STERLING is so dependent upon the independence and expertise of its management and upon the public credibility with which it is held that by the time any cause of action for damages is ripe, it will be impossible for



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

STERLING to establish the harm it has suffered in terms of dollars.

11.3 This Court should enjoin defendants from any further breach of their contracts with STERLING.

XII. FIFTH CAUSE OF ACTION - RESCISSION

12.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 11.3 of this Complaint.

12.2 Defendants' breach of their agreements with STERLING are deliberate and willful, are material, and go to the very essence of the bargain struck between STERLING and defendants. As a consequence of defendants' willful breach, STERLING is left in a materially worse position than it was prior to entering into the agreements. STERLING has performed in good faith all conditions required to be performed by it pursuant to the agreements, and is threatened with irreparable harm solely on account of defendants' deliberate and willful breach of the agreements.

12.3 Equity requires that this Court order rescission of the agreements between STERLING and defendants for the acquisition of some or all of the troubled thrifts, and return the parties to the status quo ante.

XIII. PRAYER FOR RELIEF

WHEREFORE, plaintiff STERLING respectfully prays:





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(a) That the Court declare that the provisions of FIRREA and the OTS Capital Regulation restricting the inclusion of STERLING'S supervisory goodwill in capital for purposes of satisfying minimum capital requirements would, if applied to STERLING, constitute a repudiation and abrogation of STERLING'S valid contract rights and effect a taking of STERLING'S property and a deprivation of STERLING'S property without due process for which no adequate remedy exists at law, in violation of the FifthAmendment to the United States Constitution;

(b) That the Court enjoin defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from enforcing any provision of FIRREA and the OTS Capital Regulation, or taking any other action that is inconsistent with their contractual obligations to STERLING;

(c) In the alternative, that the Court order rescission of the transactions, restoration to STERLING of amounts expended by it in connection with such transactions, and restoration of the parties to the status quo ante;

(d) That the court order defendants to pay STERLING'S costs and attorneys' fees herein; and

(e) That the Court grant such other and further relief as the law and evidence may justify and as the Court may deem just and proper, including damages.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

DATED this 15th day of May, 1990.

WITHERSPOON, KELLEY, DAVENPORT & TOOLE

By ______________________
WILLIAM D. SYMMES

By ______________________
LESLIE R. WEATHERHEAD
Attorneys for Plaintiff

STATE OF WASHINGTON )
) ss.
County of Spokane )

HAROLD B. GILKEY, being first duly sworn upon oath, deposes and says:

I am the Chairman of the Board and Chief Executive Officer of the plaintiff in the above-entitled matter. I have read the above and foregoing Complaint, know the contents thereof, and believe the same to be true.

______________________
HAROLD B. GILKEY

SUBSCRIBED AND SWORN to before me on this 15th day of May, 1990, by Harold B. Gilkey.

______________________
NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 2-2-93



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

FILED IN THE
U.S. DISTRICT COURT
Eastern District of Washington
MAY 29 1990
JAMES R. LARSEN, Clerk
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, Plaintiff, vs. T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants. | No. CS-90-0175-JLQ<br><br>~~PROPOSED~~ TEMPORARY RESTRAINING ORDER |

The Court having reviewed the submissions of the parties and files in this case, and having heard the argument of counsel, finds that plaintiff has established facts ~~supporting a factual finding of likelihood of succeeding on the merits and immediate irreparable harm which substantially outweighs any threat of harm or inconvenience to defendants~~ that warrant the maintenance of the status quo & that serious questions exist in this matter.

Accordingly, IT IS HEREBY ORDERED that defendants are enjoined from imposing or enforcing any regulatory restric-

tions against plaintiff, Sterling Savings, that are inconsistent with the provisions of the three (3) supervisory acquisition agreements between the parties and that the restrictions imposed by the January 26, 1990, March 9, 1990, and May 11, 1990 letters from the Department of Thrift Supervision to Sterling shall not be enforced; and it is further

ORDERED that this Temporary Restraining Order shall remain in effect through June 21, 1990, ~~at~~ at 1:30 p.m., subject to further order of the Court when plaintiff's Motion for Preliminary Injunction shall be heard; and it is further

ORDERED that defendants appear before this Court at 1:30 p.m. on the 21st day of June, 1990, then and there to show cause, if any they have, why ~~they should not be restrained and enjoined during the pendency of this cause.~~ a preliminary injunction should not be entered. The plaintiff shall post a $10,000 bond.

IT IS SO ORDERED.

The Clerk is directed to enter this Order and forward copies to counsel.

DATED this 28th of May, 1990, at 4:35 p.m.

JUSTIN L. QUACKENBUSH
United States District Judge

Presented by:

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By
WILLIAM D. SYMMES
WSBA No. 683

By
LESLIE R. WEATHERHEAD
WSBA No. 11207
Attorneys for Plaintiff

RECEIVED
AUG 0 9 1990
WITHERSPOON, KELLEY
DAVENPORT & TOOLE

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 0 8 1990

JAMES R. LARSEN, CLERK
DEPUTY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | NO. CS-90-0175-JLQ<br><br>MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTION TO DISMISS, **INTER ALIA** |

**BEFORE THE COURT** are the plaintiff Sterling Savings Association's ("Sterling") Motion for Preliminary Injunction (Ct. Rec. 16), the defendant Federal Home Loan Bank of Seattle's ("FHLB") Motion for Order of Dismissal (Ct. Rec. 37), and the defendant Director, Office of Thrift Management ("OTS") and defendant Federal Deposit Insurance Corporation's ("FDIC") Motion to Dismiss (Ct. Rec. 41), heard with oral argument on July 3, 1990. William D.

Symmes and Leslie R. Weatherhead appeared on behalf of Sterling. Edward J. O'Meara represented OTS. Gary W. Herschman and Marta W. Berkley appeared on behalf of the FDIC. Having reviewed the record and heard from counsel, the court enters this Order to memorialize the oral rulings made at the hearing in this matter.

**Factual Background**

Sterling is a state-chartered, federally insured stock savings association with headquarters in Spokane, Washington. Founded in 1983, Sterling has experienced relatively rapid expansion from its original single location to a present size of approximately 28 branch offices located throughout Washington State. Most of Sterling's management level employees, including Chairman Harold B. Gilkey, have been with Sterling from its inception and, from all indications, have managed to balance Sterling's propensity for growth with its goal of realizing annual profits. Until the recent actions by federal regulators, Sterling appeared to enjoy a favored status in the eyes of both investors and regulators alike and was viewed as a refreshing ray of light in the otherwise dim environment of the thrift industry. This status and reputation, no doubt, were due in large part to the fact that Sterling was well managed and, unlike many troubled thrifts, was not burdened with principals who engaged in insider trading, made insider loans, or

purchased expensive yachts and airplanes on behalf of the company.

Much of Sterling's growth can be attributed to various acquisitions of other thrift institutions within the same geographic region. Of relevance to this case are three particular instances in which Sterling, with the blessing and unbridled encouragement of federal regulators, acquired insolvent institutions that were on the verge of being, or already had been, placed in receivership. Armed with certain contractual agreements and promises from government regulators, and relying on the government's assurances, Sterling began the process of absorbing these failing thrifts into its then existing capital structure, thereby saving the Federal Savings and Loan Insurance Corporation ("FSLIC") the enormous expense and cost of liquidating the troubled thrifts and paying the claims of depositors.

The first of the three transactions occurred in 1985 when Sterling acquired Lewis Federal Savings and Loan Association ("Lewis Federal") located in Chehalis, Washington. Lewis Federal, at that point, was woefully insolvent and had been placed in receivership under the direction of the Federal Home Loan Bank Board ("FHLBB") and the FSLIC. At the request of federal regulators, Sterling submitted a successful bid for the acquisition of Lewis Federal and thereafter entered into a series of agreements

with the FSLIC to consummate the deal. On November 4, 1985, the FHLBB issued a resolution in which it approved the proposed sale and authorized the FSLIC to execute both an Assistance Agreement and an Acquisition Agreement on behalf of Lewis Federal. See Ct. Rec. 51, Exhibit D. These contracts were signed by the parties on November 5, 1985. See Ct. Rec. 51, Exhibits G & I. The resolution also authorized FHLBB's Secretary to issue a formal letter to Sterling granting certain forbearances from regulatory capital and accounting requirements. See Ct. Rec. 51, Exhibit D, at 6. The letter, issued on November 12, 1985, see Ct. Rec. 51, Exhibit C, and the Board's resolution were expressly referenced and saved in merger clauses contained in both the Assistance Agreement and the Acquisition Agreement. See Ct. Rec. 51, Exhibit G, § 17, at 10-11; Ct. Rec. 51, Exhibit I, § 14, at 27-28. More importantly, the letter states that the forbearances were granted "[i]n connection with" the negotiated acquisition by Sterling of the failed thrift. See Ct. Rec. 51, Exhibit C, at 1.

The second relevant acquisition occurred in April 1988 and, for all practical purposes, was identical to the Lewis Federal transaction. Tri-Cities Savings and Loan Association ("Tri-Cities"), like Lewis Federal, was an insolvent thrift that had been placed in receivership under the control of the FSLIC. Once again, hoping to avoid the serious adverse impact liquidation would have on an

already insufficient federal insurance fund, federal regulators approached Sterling to suggest the acquisition of this second troubled thrift. Relying on the same promises and assurances previously offered in the Lewis Federal transaction, Sterling submitted the top bid for Tri-Cities and proceeded to finalize the acquisition. As before, the FHLBB authorized the sale and regulatory forbearances by resolution. See Ct. Rec. 51, Exhibit F. Both an Acquisition Agreement, see Ct. Rec. 51, Exhibit H, and an Assistance Agreement, see Ct. Rec. 51, Exhibit J, were executed between Sterling and the FSLIC, and a follow-up letter was provided by the Board Secretary detailing the regulatory capital and accounting practices to be followed by Sterling during the forbearance period, see Ct. Rec. 51, Exhibit E. Although all parties to the contracts were aware that, without these negotiated exceptions, the acquisition would put Sterling's capital base below regulatory standards, they were confident that Sterling could absorb the debt and return to normal operation after the plan had run its course.

This same confidence and respect were again apparent in December 1988 when Sterling acquired Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). Like the previous two institutions, Central Evergreen was heavily in debt and considered insolvent even though a receiver had not been appointed. Unlike the prior

transactions, however, the Central Evergreen acquisition was substantially unassisted and was not contingent on the same set of specific regulatory concessions by government regulators. That is not to say that the government opposed the merger. To the contrary; the regulators' requests for Sterling's assistance in this matter were persistent enough to weather at least one negative response before Sterling capitulated. Lengthy negotiations netted a resolution by the FHLBB approving the merger, see Ct. Rec. 51, Exhibit L, and an agreement between Sterling and the FSLIC in which Sterling promised to raise additional capital pursuant to a referenced Business Plan and the FSLIC agreed to give Sterling until December 31, 1990, to comply with existing capital to asset ratios. According to the Business Plan and the FHLBB resolution, the parties contemplated that Sterling would raise a substantial amount of capital through a public stock offering to be completed by June 30, 1989. See Ct. Rec. 51, Exhibit K, Attachment A. Once again, these measures were taken in light of the apparent realization that, as a result of the merger and other acquisitions of insolvent thrifts, Sterling would be temporarily unable to meet the ratios of capital to assets outlined in the federal regulations. With the contract in place, however, the final acquisition was complete and the parties settled on the task of carrying out the various duties and obligations under the negotiated agreements.

The first sign of trouble appeared on the horizon in late 1989 when Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See Pub. L. No. 101-73, 103 Stat. 183. FIRREA was a congressional response to the "S&L crisis"--a shorthand term for the unprecedented failure of hundreds of thrift institutions throughout the country and the insolvency of the FSLIC's deposit insurance fund. One major consequence of the legislation was a wholesale restructuring of the regulatory framework in the thrift industry. FIRREA abolished the FHLBB and transferred all regulatory oversight powers and responsibilities to the newly established Office of Thrift Supervision ("OTS"). The FSLIC also was a fatality of FIRREA and the task of managing the recapitalized deposit insurance fund was assumed by the FDIC. The primary goal of the legislation, however, was to minimize the risk of continued insurance fund depletion caused by the failure of undercapitalized institutions. To that end, FIRREA imposed more stringent capital requirements and gave the Director of OTS broad enforcement powers to ensure that all thrifts were brought into compliance with the tightened regulatory controls.

From its inception, the OTS has interpreted FIRREA to require absolute compliance with the heightened capital standards by all thrifts without exception and without regard to previously negotiated capital and accounting

treatment. In essence, the OTS views FIRREA as working a wholesale abrogation of the contracts and agreements entered into by its predecessor agency, including exceptions or forbearances from certain regulatory requirements. That the contracts purported to bind all successors is said by the government agencies to be irrelevant.

In late 1989 and early 1990, the OTS declared Sterling to be out of compliance and began imposing operating restrictions. At that time, Sterling was in the final stages of preparing for a major equity offering in the public capital markets; however, the offering was cancelled after it became clear that OTS would not ensure Sterling's authority and permission to pay shareholder dividends. The relationship between OTS and Sterling further deteriorated in May 1990 when Sterling refused to execute an operating agreement in which it would have consented to the appointment of a conservator or receiver if a definitive merger agreement with another financial institution was not executed by May 31, 1990. See Ct. Rec. 43, Exhibit 7. Shortly thereafter, on May 15, 1990, Sterling filed the present action. See Ct. Rec. 1.

On May 28, 1990, this court granted the plaintiff's motion for a temporary restraining order, see Ct. Rec. 14, and noted a preliminary injunction hearing for June 21, 1990. The court found that serious questions were raised and that the need to maintain the status quo warranted the

imposition of injunctive relief. By stipulation of the parties dated June 8, 1990, the temporary restraining order was extended to July 6, 1990, and the plaintiff's Motion for Preliminary Injunction was noted for hearing on the day set aside for resolving the defendants' Motion to Dismiss on July 3, 1990.

**Discussion**

First and foremost, Sterling maintains that its negotiations with the FSLIC and the FHLBB prior to acquiring the insolvent thrifts precipitated binding and enforceable contracts that, far from being abrogated, were expressly saved under FIRREA. Sterling argues that the OTS's unyielding insistence on compliance with the newly created capital and accounting standards in this case has resulted in an unauthorized breach of contract; indeed, claims Sterling, not only is OTS acting without statutory authority, it is pursuing a policy that lies in direct contravention to its clear statutory mandate. In the alternative, and if FIRREA in fact abrogated and cancelled these contractual rights, Sterling argues that it has suffered a constitutional taking without just compensation in violation of its fifth amendment due process rights. In either instance, Sterling claims to be entitled to declaratory and injunctive relief precluding the OTS from exhibiting a continued disregard for the various agreements or, in the alternative, allowing Sterling to rescind the

contracts, thereby reversing the acquisitions and bringing the institution into technical compliance with FIRREA's heightened capital standards.

The defendants' Motion to Dismiss is largely contingent on a finding by the court that (1) Sterling did not have any contractual assurance of receiving special capital and accounting treatment in conjunction with the acquisitions of the insolvent thrifts or (2) FIRREA, in fact, abrogated any and all prior contracts or agreements entered into by the predecessor agencies relating to forbearances from regulatory requirements. The defendants concede that the court has jurisdiction to resolve this limited "statutory claim." See Ct. Rec. 57, at 18. They concede further that injunctive relief is warranted should the court rule adversely that the forbearances are contractual and are not preempted and superceded by FIRREA. Id. at 17. Thus, inasmuch as the court finds both the existence of a contractual relationship and the lack of a specific and unequivocal intent on the part of Congress to effect a taking, there is no need to reach the remaining jurisdictional arguments that constitute the core of the defendants' Motion to Dismiss. Such a finding likewise renders moot the plaintiff's constitutional claims. The sole issue at this point is whether the plaintiff has adequately established the various elements necessary to secure a preliminary injunction, concentrating specifically

on how FIRREA impacts the negotiated agreements.

Under Ninth Circuit law, the party seeking a preliminary injunction bears the burden of meeting one of two tests. Under the "traditional" standard, a court may issue preliminary relief if it finds that (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987). Under the "alternative" standard, the moving party may satisfy its burden by demonstrating either (1) a combination of probable success and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id.

Though two tests are recognized, they are not mutually exclusive or wholly distinct. Rather, they are "extremes of a single continuum." Wilson v. Watt, 703 F.2d 395, 399 (9th Cir. 1983). The critical element is the relative hardship to the parties. If the balance of hardships tips decidedly toward the plaintiff, a less substantial showing of a likelihood of success on the merits will suffice. Id. In every case, however, a plaintiff must establish at least some probability of success. "The irreducible minimum has been described by

one court as a fair chance of success on the merits, while another court has said that the question must be serious enough to require litigation. The difference between the two formulations is insignificant. Therefore, we accept either as satisfactory." Benda v. Grand Lodge of Intern. Ass'n., 584 F.2d 308, 315 (9th Cir.), cert. dismissed, 441 U.S. 957 (1979).

**A. Irreparable Injury/Balance of Hardships**

The defendants correctly point out that, generally, mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available at some later point in the litigation. Goldie's Bookstore v. Superior Court of State of Cal., 739 F.2d 466, 471 (9th Cir. 1984). Such a rule remains sound, however, only so long as the harm is reasonably calculable. Id. Thus, although mere speculative injury should not be considered, see id. at 472; Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 675 (9th Cir. 1988), damage that appears relatively imminent and that does not lend itself well to monetary appraisal may suffice. See, e.g., Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1377 (9th Cir. 1985) (loss of reputation); Foremost International Tours v. Quantas Airways Ltd., 525 F.2d 281, 287 (9th Cir. 1975) (severe decline in business).

It is undisputed in this case that OTS already has imposed operating and growth restrictions on Sterling based

on OTS's determination that Sterling is capital deficient. See Ct. Rec. 43, Exhibit 7; Ct. Rec. 9, Exhibits 4-6. OTS's actions to date also have caused the cancellation of a planned equity offering that presumably would have brought Sterling into compliance with current FIRREA standards. See Ct. Rec. 51, at 12-13, 15-16; Ct. Rec. 49, at 7.[1] More disconcerting is the distinct possibility that Sterling will be the object of a take-over by government regulators. Obviously, OTS has not yet moved on Sterling in this manner. But at this point the court must focus on what is likely to happen, not simply on what has happened. Of particular concern in this regard are counsel's statements that, out of necessity, the appointment of a conservator or receiver will take place without warning, possibly overnight. The need, therefore, to assess the likelihood of a regulatory take-over is great.

The court finds that there is sufficient evidence of

---

1. As stated above, the stock offering was abandoned after Sterling failed to receive any assurance from OTS that Sterling would be allowed to pay dividends on the stock purchased. Through the testimony of Carol A. Friend, Assistant District Director of the OTS, the defendants pass the decision off as being in accord with the longstanding policy of government regulators not to give prior approval to dividend payments. The court, however, is satisfied that Sterling was not seeking express approval to pay future dividends per se, but rather was asking for some assurance that the OTS would not later refuse such permission based only on its rigid interpretation of FIRREA that Sterling must first satisfy contemporary capital requirements, ignoring entirely the negotiated agreements. Thus viewed, the relevant conduct of the OTS in this case is causally related to the failed stock offering.

impending government action to warrant consideration of the effects of a take-over. By threatening regulatory sanctions, OTS already has attempted to coerce Sterling into consenting to the appointment of a conservator or receiver unless a merger was assured. While the intent of the regulators may never be known, the only reasonable interpretation of such action is that it was a "sell out or else" ultimatum. With the merger less than assured, Sterling and its investors understandably feared that the alternative was not long in coming. If that day were to arrive, liquidation, with its resulting loss of jobs and investor money, would be a near certainty. See Ct. Rec. 9, at 3-4.

The court also finds that Sterling already has suffered immeasurable injury in the form of damage to reputation and the accompanying loss of business. Strong evidence of this is the fact that the value of Sterling's common stock has dropped in recent months from $9.00 per share to $4.00 per share. See Ct. Rec. 9, at 5.

The defendants argue that all of this injury and harm is not irreparable because Sterling can be compensated for any loss by filing an action in the Court of Claims. This assertion, however, evinces an extremely casual attitude on the part of federal regulators toward the rights of Sterling employees, investors, and depositors. Although, theoretically, the harm to these various interests might be

compensated monetarily, common sense would dictate that, on a practical level, the true measure of the damage is beyond reasonable calculation. Indeed, the present harm to Sterling's reputation and the resulting loss of investor confidence and new business most likely will never be known. It is doubtful that the defendants, if subjected to a "straight face test," seriously could argue that such damage has not occurred. Thus, the court finds that the harm to Sterling is both immediate and irreparable. Against this finding the court must weigh any hardship an injunction likely would visit on the defendants.

While arguing on the one hand that Sterling's claimed damages are either speculative or monetarily compensable, the defendants contend on the other that they and the public's interest in ensuring adequately capitalized thrift institutions will be irreparably harmed by the issuance of an injunction. Although less than direct, the defendants imply that an order precluding the enforcement of FIRREA's capitalization requirements in this case will expose the public and the insurance fund to the imminent risk of yet another thrift failure. Not only does the court disagree, it finds the defendants' fears to be speculative beyond belief.

At the time federal regulators invited and induced Sterling to acquire the three failing thrift institutions, the FHLBB expressly found that the acquisitions and

negotiated forbearances were in the pubic interest. See, e.g., Ct. Rec. 51, Exhibit F, at 3. Moreover, there simply is no evidence or allegation in this case that Sterling has not lived up to those agreements or that Sterling is on the verge of insolvency. Indeed, the Resolution Trust Corporation ("RTC"), the agency in charge of liquidating insolvent thrifts, has consistently proclaimed Sterling's solvency and disclaimed any jurisdiction over Sterling's affairs. See Ct. Rec. 52, Exhibit A.

There also is no evidence to indicate that the officers of Sterling have engaged in questionable trading or loan practices or have shown the usual propensity for opulence that commonly is associated with failed savings and loan institutions. More important still is the uncontested fact that Sterling has shown a profit in each year of operation. With this track record, the defendants' implicit prediction of yet another thrift failure carries little weight. All available evidence indicates that Sterling's efforts to absorb the troubled thrifts were proceeding as planned and that the only intervening occurrence was the enactment of FIRREA. Yet the defendants would have this court find that, suddenly, with this single stroke of the legislative pen, Sterling's continued operation under the negotiated agreements was no longer in the public interest but, in fact, was threatening immediate and irreparable harm. The court rejects this lapse in

logic and further finds that, to the extent FIRREA saves the forbearances in this case, any claim of irreparable harm wrought upon the perceived goal of the statute--less risk through heightened capital requirements--is utterly illusory.

In sum, the court finds that the balance of hardships tips decidedly in favor of Sterling. So long as the government agencies are allowed to unilaterally disregard the agreements it entered with Sterling and continually threaten and implement regulatory sanctions in varying degrees, Sterling will continue to experience harm and injury that is incapable of monetary calculation or measure. When compared to the countervailing risk of harm or prejudice to the government or, more precisely, the public, the result is clear.

**B. Probability of Success**

Assessing the probability that Sterling will succeed on the merits of this case requires the court to interpret the intricate and sometimes obscure statutory language of FIRREA. Even before that, however, the court must decide whether the capital and accounting forbearances in this case were part and parcel of the negotiated acquisitions and, therefore, contractually binding. Little discussion is needed to show that these agreements were obligatory, both on the FHLBB and the FSLIC and, to an equal extent, on their successor agencies, the OTS and the FDIC.

Unlike the gratuitous forbearance letter that was rejected in Flagship Federal Savings Bank, et al. v. Wall, et al., Civ. No. 90-0079-GT(BTM) (S.D. Cal. February 14, 1990), the agreements in this case were the product of lengthy negotiations in which both sides promised to perform certain duties and obligations and expected valuable benefits in return. The available documents conclusively show that the forbearance letters were intended by all parties to be an essential element of the contract, and there is every indication that Sterling would not have agreed to relieve the government of these failed thrifts had the forbearances not been forthcoming. In exchange and as consideration for receiving certain regulatory concessions, Sterling agreed to perform an onerous task that government regulators appeared unwilling and unable to do; specifically, to resolve the problems caused by three failed thrift institutions. Any argument that these contracts, at least prior to FIRREA, were not binding and enforceable against the FHLBB and the FSLIC, both in terms of Sterling's duty to raise its capital to asset ratio and the government's reciprocal duty to afford Sterling the promised capital and accounting treatment, must be rejected.

The defendants also devote a substantial amount of time and effort arguing that the relevant forbearances did not bargain away Congress' sovereign authority and ability

to change existing law. Sterling, however, does not dispute the fact that Congress, if it desired, could abrogate each one of these agreements. Sterling claims simply that, instead of terminating the contracts, FIRREA expressly assured their ongoing existence. On this limited and single remaining issue, this court goes only so far as to agree that FIRREA neither nullified Sterling's agreements nor authorized the OTS to turn its regulatory back on their continued validity.

Relying on § 401, Sterling contends that FIRREA expressly saves its negotiated forbearances in this case. Section 401 provides in pertinent part:

> **(a) In general.** (1) FSLIC. Effective on the date of the enactment of this Act, the Federal Savings and Loan Insurance Corporation established under section 402 of the National Housing Act [12 USCS § 1725] is abolished. (2) FHLBB. Effective at the end of the 60-day period beginning on the date of the enactment of this Act, the Federal Home Loan Bank Board and the position of Chairman of the Federal Home Loan Bank Board are abolished.
>
> * * *
>
> **(f) Savings provisions relating to FSLIC.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any <u>right, duty, or obligation</u> of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which--
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act [12 USCS §§ 1724 et seq.]; and
>
> (B) existed on the day before the date of the enactment of this Act....
>
> **(g) Savings provisions relating to FHLBB.** (1) Existing rights, duties, and obligations not

> affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which--
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act [12 USCS §§ 1421 et seq.], the Home Owners' Loan Act of 1933 [12 USCS §§ 1461 et seq., generally; for full classification, consult USCS Tables volumes], or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act [12 USCS §§ 1724 et seq.]); and
>
> (B) existed on the day before the date of the enactment of this Act....

FIRREA § 401, 103 Stat. 354-57 (emphasis added).

As stated above, the forbearances in this case were part of the overall contract entered into between Sterling and the predecessor agencies that resulted in Sterling's acquisition of the troubled thrifts. As such, the parties to those agreements were vested with certain "rights, duties, and obligations" that, under the above statute, survived the abolition of the FHLBB and the FSLIC.

Although they disagree, the defendants are willing to accept a determination that § 401 preserved the negotiated agreements, notwithstanding the discontinuation of the previous regulatory agencies. See Ct. Rec. 57, at 6. They argue, however, that any life left in the agreements was extinguished in § 301 wherein Congress prescribed new, uniformly applicable capital requirements for all thrift institutions.[2] Specifically, the defendants rely on the

---

2. The defendants also offer their standard argument that § 401 only saved the contracts from being terminated solely by reason of the abolition of the predecessor

following provision, placing monumental emphasis on the word "all":

> **Minimum capital requirements.** (1) In general. Consistent with the purposes of section 908 of the International Lending Supervision Act of 1983 [12 USCS § 3907] and the capital requirements established pursuant to such section by the appropriate Federal banking agencies (as defined in section 903(1) of such Act [12 USCS § 3902(1)]), the Director shall require all savings associations to achieve and maintain adequate capital by--
> (A) establishing minimum levels of capital for savings associations; and
> (B) using such other methods as the Director determines to be appropriate.

12 U.S.C. § 1464(s) (emphasis added).

The defendants' entire argument hinges on one key concept: under FIRREA, the Director has no choice but to require that all thrifts, unless expressly excepted by statute, conform their capital structures to the standards set forth in § 301(t).[3] From this they infer that,

---

agencies while, here, any contractual abrogation was the product of congressional or agency action. As with Judge Panner in Far West Federal Bank, et al. v. Director, Office of Thrift Supervision, et al., CV No. 90-103-PA (D. Ore. May 4, 1990), this court rejects the argument. These agreements expressly survived the abolition of the FHLBB and the FSLIC and only additional action by Congress can cause their demise. Without such authority, the OTS certainly has no basis to override the express mandate of § 401.

3. Section 301(t) provides in part:

> **Capital standards.** (1) In general. (A) Requirement for standards to be prescribed. The Director shall, by regulation, prescribe and maintain uniformly applicable capital standards for savings associations. Those standards shall include--
> (i) a leverage limit;

because Sterling's continued operation under the agreements does not technically comply with the promulgated standards, and because the Director has no authority to make exceptions to the rule, Congress implicitly abrogated the contracts. This logic, however, breaks down if the Director indeed does have discretion to make an exception in an appropriate case. If the Director retains some limited volition, the defendants' inference would fail and the contractual arrangements in this instance, unlike the gratuitous forbearances at issue in Flagship, would bind the Director and require him to exercise his discretion in favor of Sterling. Thus, the key would appear to be whether § 301(s)(2) affords the Director such authority.

In general § 301(s) sets forth the role of "minimum" capital standards in FIRREA's overall structure and requires the Director to establish such standards for all thrifts. See 12 U.S.C. § 1464(s)(1). Section 301(s)(2) then provides:

> Minimum capital levels may be determined by Director case-by-case. The Director may,

---

> (ii) a tangible capital requirement; and
> (iii) a risk-based capital requirement.

12 U.S.C. § 1464(t)(1)(A). The statute goes on to set a base amount for each of the three categories and provides that a savings institution is not in compliance with capital standards "for purposes of this subsection" unless all three categories are met. Id. § 1464(t)(1)(B) (emphasis added). The underlined section suggests to this court that some capital standards, perhaps "minimum" levels, see id. § 1464(s)(2), might be established elsewhere in the statute.

> consistent with subsection (t), establish the minimum level of capital for a savings association at such amount or at such ratio of capital-to-assets as the Director determines to be necessary or appropriate for such association in light of the particular circumstances of the association.

12 U.S.C. § 1464(s)(2) (emphasis added).

Sterling, of course, focuses on language that permits the Director to establish minimum capital levels "at such amount" as is considered necessary under a given set of circumstances. The defendants, however, seizing the "consistent with subsection (t)" language, interpret the provision as only giving the Director authority to set minimum levels that equal or exceed those promulgated in § 301(t). In essence, they maintain that subsection (t) establishes an "absolute" minimum level of capitalization. Thus, they imply, the Director lacks the needed discretion to honor the contracts.

Although the defendants present an appealing argument, the court rejects it for several reasons. First, the word "consistent" in this instance can convey a multitude of ideas, many of which are as viable or more viable than the interpretation offered by the OTS and the FDIC.[4] For instance, it may be that Congress intended that

---

4. The defendants no doubt will object to this ruling as being contrary to the settled axiom that an agency's interpretation of a particular statute, if reasonable, is entitled to deference. See Cheveron U.S.A. v. Natural Resources Defense, Inc., 467 U.S. 837, 843 (1983). Although the court recognizes this principle, as it must, deference is unwarranted here because the court finds that



AO 72

the minimum levels should follow the same general structure as set out in subsection (t) or that the levels set would not be inordinately disproportionate to the base standards. This certainly would give the Director substantial leeway to set limits "in such amounts or at such ratio" as deemed appropriate. If Congress wished to ensure that the capital levels set by the Director were equal to or above those in subsection (t), it easily could have said as much directly.

Second, having found that Congress expressly preserved Sterling's contracts under § 401, at least from abrogation based on the discontinuation of the predecessor agencies, it would appear to be somewhat incongruous for Congress immediately to turn around and nullify those same agreements. That Congress would accomplish such a result by nothing more than mere innuendo, its intent disguised by a questionable inference, makes it all the more doubtful.

Finally, the court is persuaded further by the lack of specificity in the statute with regard to contracts of this nature.[5] Statutory authorization to effect a taking,

---

the defendants' interpretation of FIRREA, as a whole, is substantially unreasonable.

5. Of course, the defendants point to the savings clause in Title III in which Congress specifically saved certain forbearances from being swallowed up by FIRREA. See FIRREA § 302, 103 Stat. 343. The court is satisfied at this point that § 302 only excepts certain unilateral, gratuitous forbearances that otherwise would not survive FIRREA's new capital requirements. Unlike the obligatory agreements at issue here, as to which a specific savings

which of course would be the case here, must be specific either in terms of an express remedy for the act or explicit permission to perform the act. See, e.g., Outboard Marine Corp. v. Thomas, 773 F.2d 883, 891 (7th Cir. 1985), vacated on other grounds, 479 U.S. 1002 (1986); Government of Guam v. Moylan, 407 F.2d 567, 568-69 (9th Cir. 1969); Polson Logging Co. v. United States, 160 F.2d 712, 714 (9th Cir. 1947). In this case there is neither. In fact, not only is it far from clear that Congress intended to effect a taking, but the language suggests that Congress intended quite the opposite. Without some sort of clear statutory mandate, the court will not lightly infer that Congress has undertaken to abrogate the contractual rights of private citizens.[6]

**Conclusion**

The court is acutely aware of the formidable task

---

clause was already present, see FIRREA § 401, the gratuitous forbearances had to be separately preserved.

6. Sterling argues that § 501 of FIRREA, which outlines the operation and duties of the RTC, also supports its reading of the statute. Although the court does not rely on this particular portion of FIRREA in reaching the above decision, it is worth noting that, contrary to the fact-specific findings in Flagship and Far West, § 501 might have relevance here. Section 501 requires the RTC to review "existing" agreements entered into by the FSLIC prior to the enactment of FIRREA. See FIRREA § 501(b)(11)(B). That the RTC apparently is reviewing Sterling's agreements from the Tri-Cities' acquisition, see Ct. Rec. 50, and considers these contracts to fall within the category labeled "existing," seems to indicate that one regulatory agency does not completely share the OTS's interpretation of FIRREA.

facing Congress and federal regulators in nursing a failed and wounded savings and loan industry back to health. Hard times do indeed call for stern measures. But those measures should not be wholly devoid of all equity, decency, and compliance by the government with its prior agreements. In a somewhat analogous context, Justice Louis Brandeis once wrote:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy....

Olmstead v. United States, 277 U.S. 438, 485 (1927) (Brandeis, J., dissenting). Such advice and counsel is equally germane in the realm of contract. A fitting corollary is the comment of Justice Hugo Black, quoted by the court at oral argument, that "[g]reat nations, like great men, should keep their word." Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 142 (1959) (Black, J., dissenting). These principles are both sound and persuasive, and must guide this court as it performs the task of deciding between two diametrically conflicting interpretations of the same statute.

As this court reads FIRREA, Congress has honored the

promises made to Sterling. It is the regulators who, in their zeal for nonnegotiable uniformity, have discovered a contrary intent that this court finds is not clear from the statutory language. But even assuming the defendants are correct in their assertion that Congress harbored an intent to abrogate binding and enforceable contracts, as it has power to do, the court must insist that it be evidenced in a forthright and unmistakable manner. Absent a clear mandate to the contrary, the court will require the defendants to honor the contracts entered into between Sterling and the predecessor agencies.

**IT IS HEREBY ORDERED:**

1. Sterling's Motion for Preliminary Injunction (Ct. Rec. 16) is **HEREBY GRANTED**. The defendants are **HEREBY ENJOINED AND RESTRAINED** from:

a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;

b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision

to Sterling that treat Sterling as a troubled thrift;

c. placing Sterling in a receivership or conservatorship; and

d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

2. OTS and FDIC's Motion to Dismiss (Ct. Rec. 41) is **HEREBY DENIED.**

3. FHLB's Motion for Order of Dismissal (Ct. Rec. 37) is **HEREBY DENIED AS MOOT**, counsel having informed the court that the parties have reached agreement as to the stipulated dismissal of FHLB as a defendant in this action.

4. OTS and FDIC's Motion for Leave to Cite Unpublished Decisions (Ct. Rec. 31) is **HEREBY GRANTED.**

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 5th day of August 1990.

JUSTIN L. QUACKENBUSH
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, Plaintiffs, | |
| v. | No. 95-829C (Senior Judge Smith) |
| UNITED STATES OF AMERICA, Defendant. | |

DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300

October 10, 2000

Attorneys for Defendant

TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I. Sterling's Due Process Claim Should Be Dismissed Because This Court Lacks Jurisdiction To Entertain Such Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II. Sterling's Cause Of Action For A Taking Should Be Dismissed Because Sterling Cannot Show That The Government's Actions Constitute A Taking Of Its Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. Sterling's Remedies Are Governed By Their Contract, And Not By The Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. The Government's Elimination Of Goodwill From Regulatory Capital Does Not Constitute A Regulatory Taking . . . . . . . . . . . . . . . . . . . . . . . 22

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2. The *Branch* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

a) Character Of The Government Action . . . . . . . . . . . . . . . . 24

b) Economic Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

c) Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . 28

III. Sterling's Claim For Restitution Should Be Dismissed For Lack Of

Subject Matter Jurisdiction .......................................... 29

IV. Sterling's Cause Of Action For Promissory Estoppel Should Be Dismissed Because This Court Does Not Possess Jurisdiction Over Promissory Estoppel Claims .......................................... 32

V. This Court Lacks Subject Matter Jurisdiction To Entertain Sterling's Cause Of Action For Specific Performance .......................................... 33

VI. The Government's Pending Motion For Summary Judgment On The First Cause Of Action Of The Complaint, For Breach Of Contract, Should Be Granted .......................................... 34

A. Even Assuming, For The Sake Of Argument, That The Government Contracted To Permit Sterling To Count FSLIC Cash Assistance As Regulatory Capital, Sterling, By Its Own Admission, Was Required To Count FSLIC Cash Assistance As Supervisory Goodwill And Amortize It .......................................... 35

B. The Government Was Not Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Transaction Toward Regulatory Capital Requirements .......................................... 36

C. Even Assuming, For The Sake Of Argument, That The Capital Maintenance Agreement Contained A Forbearance Permitting Sterling To Count Supervisory Goodwill As Regulatory Capital, The Forbearance Expired In 1991 .......................................... 37

D. Assuming, For The Sake Of Argument, That The Government Acted Inconsistently With Any Contractual Obligation To Plaintiffs, The Inconsistent Actions Necessarily Ceased After Plaintiffs Obtained An Injunction Enjoining The Government From Taking Action Inconsistent With The Purported Contracts .......................................... 38

CONCLUSION .......................................... 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Acme Process Equipment Co. v. United States, 171 Ct. Cl. 347, F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) .......... 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 17

Baggett Transportation Co. v. United States, 969 F.2d 1028 (Fed. Cir. 1992) .......... 21

Banner, et al. v United States, 1999 WL 605631 (Fed.Cl. 1999) .......... 18

Betz v. United States, 40 Fed. Cl. 286 (1998) .......... 18

Biagioli v United States, 2 Cl. Ct. 304 (1983) .......... 33

Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41 (1986) .......... 28

Boyle v. United States, 44 Fed. Cl. 60 (1999) .......... 34

Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995), cert. denied, 519 U.S. 810 (1996) .......... *passim*

Chevron Chemicals Corp. v. United States, 5 Cl. Ct 807 (1984) .......... 21

Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602 (1993) .......... *passim*

Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211 (1986) .......... *passim*

Crocker v. United States, 125 F.3d 1475 (Fed. Cir. 1997) .......... 18

Data Transformation Corp. v. United States, 13 Cl. Ct. 165 (1987) .......... 21

Doe v. United States, 37 Fed. Cl. 74 (1996) .......... 34

Fahey v. Mallonee, 332 U.S. 245 (1947) .......... 28

Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991) .......... 4

Gates v. United States, 33 Fed. Cl. 9 (1995) .......... 34

Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91 (1979) .......... 39

Gratz v. United States, 25 Cl. Ct. 411 aff'd, 985 F.2d 583 (Fed. Cir. 1992), cert. denied, 508 U.S. 959 (1993) .......... 20

Gregory v. United States, 37 Fed. Cl. 388 (1997) .......... 32

Hamlet v. United States, 873 F.2d 1414 (Fed.Cir. 1989) .......... 17

Hercules, Inc. v. United States, 516 U.S. 417 (1996) .......... *passim*

Horowitz v. United States, 267 U.S. 458 (1925) .......... 21

Houston Oil & Refining, Inc. v. United States Federal Energy Regulatory Commission, 95 F.3d 1126 (Fed. Cir. 1996) .......... 31

J. J. Henry Co. v. United States, 188 Ct. Cl. 411 F.2d 1246 (1969) .......... 21

Kanemoto v. Reno, 41 F.3d 641 (Fed. Cir. 1994) .......... 34

Keystone Bituminous Coal Associate v. DeBenedictis, 480 U.S. 470 (1987) .......... 19, 26

Knaub v. United States, 22 Cl. Ct. 268 (1991) .......... 32, 33

LaMirage, Inc., v. United States, 44 Fed. Cl. 192 (1999) .......... 32

Linda R.S. v. Richard D., 410 U.S. 614 (1973) .......... 39

Logan Canyon Cattle Associate v. United States, 34 Fed. Cl. 165 (1995) .......... 34

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) .......... 23

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) .......... 22, 23

M&J Coal Company v. United States, 47 F.3d 1148 (Fed. Cir.), cert. denied, 116 S. Ct. 53(1995) .......... 22

Maki v. United States, 13 Cl. Ct. 779 (1987), aff'd, 852 F.2d 1293 (Fed. Cir.), cert. denied sub nom Youngberg v. United States, 488 U.S. 943 (1988) .......... 17

Marathon Oil Co. v. United States, 16 Cl. Ct. 332 (1989) .......... 21

Massachusetts v. Mellon, 262 U.S. 447 (1923) .......... 39

Merritt v. United States, 267 U.S. 338 (1925) .......... 29

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) .......... 17

Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994) .......... 28

Montalvo v. United States, 231 Ct. Cl. 980 (1982) .......... 18

Murray v. United States, 817 F.2d 1580 (Fed. Cir. 1987) .......... 18

New York Power Authority v. United States, 42 Fed. Cl. 795 (1999) .......... 18

N.L. Durant, Jr. v. United States, 16 Cl. Ct. 447 (1988) ....................32

Northwest Airlines v. United States Department of Transportation, 15 F.3d 1112 (D.C. Cir.1994) .................... 21

Octocom Systems, Inc. v. Houston Computer Services, Inc., 918 F.2d 937 (Fed. Cir. 1990) .......... 17

Pacific Architects & Eng'rs Inc. v. United States, 203 Ct. C 491 F.2d 734 (1974) .................... 31

Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329 (1983), aff'd, 738 F.2d 452 (Fed.Cir.1984) ....................32, 33

Pacific National Cellular v. United States, 41 Fed. Cl. 20 (1998) .................... 28

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922) .................... 23

Phaidin v. United States, 28 Fed. Cl. 231 (1993) .................... 33

Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174, aff'd, 133 F.3d 874 (Fed. Cir. 1997), cert. denied, 119 S. Ct. 67 (1998) .................... 21, 22

Reynolds v. Army & Air Force Exchange Service, 846 F.2d 746 (Fed.Cir. 1988) .................... 17, 32

Schuhl v. United States, 3 Cl. Ct. 207 (1983) ....................33

Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976) .................... 39

State of Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855 (1978) .................... 31

Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. Wash., 1990), vacated and remanded, 959 F.2d 241 (9th Cir. 1990) .................... *passim*

Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786 (1978)....................19, 20

Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392 (1998) .................... 21

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560 (Fed. Cir. 1987) .................... 17

Tenaska Washington Partners II v. United States, 34 Fed. Cl. 434 (1995) .................... 34

Transohio Savings Bank v. OTS, 967 F.2d 598 (D.C. Cir. 1992) .................... 28

Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269 (1992) .................... 21

Trauma Services Group v. United States, 104 F.3d 1321 (Fed. Cir. 1997) .................... 32

United States v. King, 395 U.S. 1 (1969) .................... 34

United States v. Mitchell, 463 U.S. 206, 218 (1983) .................... 32

United States v. Winstar, 518 U.S. 839 (1996) ........ *passim*

Usery v. Turner Elkhorn Mining Co, 428 U.S. 1 (1976) ........ 26

Valley Forge Christian College v. Americans United for Separation of Church and States, 454 U.S. 464 (1982) ........ 39, 40

Wheeler v. United States, 11 F.3d 156 (Fed. Cir. 1993) ........ 18

White Mountain Apache v. United States, 46 Fed. Cl. 20 (1999) ........ 34

W.P. Bill Atkinson Enterprises, Inc. v. United States, 228 Ct. Cl. 886, 888 (1981) ........ 31

## DOCKETED CASES

Plaintiffs In All Winstar Related Cases v. United States, No. 90-8C, et al. (Fed. Cl., Sept. 29, 1999) ........ 1

## FEDERAL STATUTES

12 U.S.C. § 1464(t)(3)(A),(9)(B) and (C) ........ 14

12 U.S.C. § 1464(t)(3)(A) ........ 27

12 U.S.C. § 1811 ........ 25

12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303 ........ 14

H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted in 1989 U.S.C.C.A.N. 86, 432, 443 ........ 27

12 C.F.R. § 561.13 (1987) ........ 11

12 C.F.R. § 563.13 (1988) ........ *passim*

12 C.F.R. § 563b.13 ........ 12

12 C.F.R. § 563.13(b)(2)(iv) ........ 13

12 C.F.R. § 567.10(a)(4) ........ 15

28 U.S.C. § 1491 ........ 18, 32

28 U.S.C. § 1491(a)(1) (1994) ........ 29

28 U.S.C. § 1491(a)(3) ........ 33

U.S. Const., amend. V ........ 18, 19

U.S. Const., amend. XIV ........ 18

## RULES AND TREATISES

R. Fed. Cl. 12 ..........1

R. Fed. Cl. 12(b) ..........2, 17

R. Fed. Cl. 56 ..........1, 4

R. Fed. Cl. 56(g) ..........5

1 Dan B. Dobbs, Law of Remedies § 4.1(1) (2d ed. 1993) .......... 30

1 K. Davis, Administrative Law Treatise, § 4.04 (1965) .......... 28

3 E. Allan Farnsworth, Farnsworth on Contracts § 12.1 (2d ed. 1998) .......... 30

Andrew Khull, Rationalizing Restitution, 83 Calif. L.Rev. 1191 (1995) ..........30

Joseph M. Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208 (1973) .......... 30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rules 12 and 56 of the Rules of the United States Court of Federal Claims, paragraph 5 of the Omnibus Case Management Order entered on September 18, 1996, and paragraph III of Procedural Order No. 1: Master Litigation Plan entered on August 11, 1997, the United States respectfully submits this supplemental memorandum in opposition to plaintiffs' motion for partial summary judgment and in support of defendant's partial motion to dismiss and cross-motion for partial summary judgment. Defendant requests that the Court deny Sterling Savings Association's and Sterling Financial Corporation's (collectively, "Sterling") motion for partial summary judgment, grant summary judgment in favor of the Government with respect to the first cause of action of the complaint, for breach of contract, and dismiss the second through sixth causes of action of the complaint.[1] Specifically, we request that the Court dismiss, pursuant

[1] On September 29, 1999, this Court granted the plaintiffs' motion in the First 30 cases to stay briefing in response to our dispositive motions upon issues other than breach of contract in those cases. See Plaintiffs In All Winstar Related Cases v. United States, No. 90-8C, et al. (Fed. Cl.

to Rule 12(b), the following counts of Sterling's complaint: (1) its claim for a violation of due process (the third cause of action), (2) its claim for a taking of property rights (the second cause of action), (3) its estoppel claim (fourth cause of action), (4) its claim for restitution (the fifth cause of action), and (5) its claim for specific performance (sixth cause of action).

In support of this motion, we rely upon the accompanying proposed statement of uncontroverted fact, the record already established in this case, and upon the following memorandum with the appendix.

## DEFENDANT'S MEMORANDUM

## QUESTIONS PRESENTED

1. Whether this Court possesses jurisdiction to entertain a claim for a due process violation.

2. Whether a party may maintain a claim for a taking of property rights when the purported rights in question derive from an alleged contract, and when the Government did not interfere with the party's reasonable expectations.

3. Whether this Court possesses jurisdiction to entertain implied-in-law claims for restitution and promissory estoppel.

---

Sept. 29, 1999) ("Status Conference") at Tr. 41-42. The Court's order responded, however, only to a request made by the Plaintiffs' Coordinating Committee with respect to dispositive motions filed in the First 30 cases. The Court did not amend or modify paragraph VI.B.1 of Procedural Order No. 1: Master Litigation Plan (filed on Aug. 11, 1997), which requires, without exception, that all dispositive motions regarding liability issues be filed within 45 days of the completion of fact discovery. Consistent with this deadline, and with the Court's and the parties' interest in expediting resolution of all issues in the Winstar-related litigation, we address here all dispositive issues of which we are currently aware regarding liability.

4. Whether this Court possesses jurisdiction to entertain a cause of action for specific performance.

5. Whether the Government entered into contracts with Sterling regarding the accounting treatment of supervisory goodwill and FSLIC cash assistance.

6. Whether the Government acted inconsistently with any alleged contracts with Sterling regarding the accounting treatment of supervisory goodwill and FSLIC cash assistance..

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case arises out of the acquisition by Sterling of Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen"), in November 1985, April 1988, and December 1988, respectively. Sterling alleges that these three acquisitions created contracts requiring the Government to permit Sterling to account for supervisory goodwill as an asset in computing regulatory capital and to amortize the goodwill from 12 to 40 years. In addition, with respect to the Lewis and Tri-Cities acquisitions, Sterling alleges that the Government contracted to permit Sterling to count FSLIC assistance as permanent regulatory capital.

In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990, and a preliminary injunction in August 1990. In its opinion granting the preliminary injunction, the court severely restricted OTS's and FDIC's authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA

did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Savings Association v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash., 1990), vacated and remanded, 959 F.2d 241 (9th Cir. 1990)(table). OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83.

On appeal, the Court of Appeals for the Ninth Circuit reversed the district court decision. Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1990) (table) (published at 1992 WL 73884). In Sterling, the Ninth Circuit concluded, relying upon Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991), that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling (9th Cir.), 1992 WL 73884, at *1. Upon that basis, the Ninth Circuit vacated and remanded the district court's judgment to the district court. Id.

Pursuant to an order dated September 13, 1995, the district court granted Sterling's motion to transfer the case to this Court. On January 19, 1996, Sterling filed this action, and it was stayed, on April 11, 1996, pending the Supreme Court decision in Winstar.

The parties have previously briefed issues concerning contract liability in this case. Pursuant to the Court's Omnibus Case Management Order and Rule 56 of the RCFC, on January 17, 1997, Sterling filed a motion for partial summary judgment on liability addressing the questions of (1) whether this case involves a contract between the thrift and the Government, and (2) whether the Government acted inconsistently with that contract by enacting FIRREA. On April 1, 1997, we moved to dismiss plaintiff Sterling Financial Corporation for lack of standing, cross-moved for summary judgment on the breach of contract issues, and opposed Sterling's

motion for partial summary judgment.

On December 22, 1997, after a series of briefs filed by the parties, the Court ordered the Government to show cause, in all cases with a pending short-form motion for summary judgment, why partial judgments should not be entered upon all Winstar-related "contract liability" issues.

On February 20, 1998, we filed our response to show cause in the 38 Winstar-related cases in which these issues had been fully briefed. Our response documented the evolution of the "short-form" partial summary judgment procedure from an expedited method for resolving contract allegations identical to those involved in the three Winstar cases, based upon the exchange of "core" documents, into a much broader proceeding involving significantly different contract allegations and substantial documentary materials gathered by the plaintiffs outside of normal discovery procedures. We further explained that we had no opportunity for discovery in these cases and were unaware that the Court intended to base its decisions upon extrinsic evidence.

On March 23, 1998, the Court ordered the 38 plaintiffs to file, by March 31, 1998, proposed orders on "all liability issues [they] believe[d] were resolved by the Winstar decisions and the [December 22, 1997] decision." The Court also ordered the Government to file, by April 30, 1998, a response to the plaintiffs' proposed orders. On March 31, 1998, Sterling filed its proposed order which requested summary judgment in favor of plaintiff on liability for breach of contract. On April 30, 1998, we filed our response objecting to the thrift's proposed order. We also submitted our Rule 56(g) affidavit demonstrating the need to take discovery concerning liability issues.

This motion supplements our liability arguments with information obtained during discovery and presents arguments which were outside the scope of the short-form briefing.

As demonstrated below and in our prior briefing, the Court should grant summary judgment to the United States concerning Sterling's contract claim (the first cause of action of its complaint) and the Court should dismiss Sterling's other claims, as they do not offer valid grounds for relief in this Court.

II. **Statement Of Facts**

This case arises out of the acquisition by Sterling of Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen"), in November 1985, April 1988, and December 1988, respectively. Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. Id. This case arises out of Sterling's acquisition of three failing savings and loan institutions in the 1980s: Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen").

(1) Lewis Federal. In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). App. 1. Sterling did not invest any of its own money. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement (the "Lewis Assistance Agreement") with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration.

App. 29-32 (§§ 3, 4). By Resolution No. 85-985, dated November 4, 1985, the Federal Home Loan Bank Board ("Bank board"), approved Sterling's acquisition of most of the assets and liabilities of Lewis, authorized FSLIC to enter into the Lewis Assistance Agreement with Sterling to facilitate the acquisition, and authorized and directed that a forbearance letter to sent to Sterling. App. 55, 56-57, 60.

A letter sent to Sterling by the Bank Board on November 12, 1985, stated that "the forbearances listed below are hereby granted" (the "Lewis Forbearance Letter"). App. 17. The letter then listed three forbearances, including an agreement to forbear, for five years, from FSLIC exercise of its authority over any failure of Sterling to meet the net worth requirements of 12 C.F.R. § 563.13 (1988) arising from Sterling's assumption of Lewis's liabilities. App. 18. Following the list of forbearances, the letter stated:

> [t]he forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its net worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Sterling. . . .

App. 18.

Subsequent to this statement that the Bank Board and FSLIC's agreement to forbear applied only to the three listed forbearances, the Bank Board's letter stated as follows:

> This letter will also confirm that:
>
> 1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assistance agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.
>
> 2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method. . . .

App. 19.

The letter also confirmed that Sterling was required, not later than 90 days following the date of merger, to submit to the Supervisory Agent an independent certified public accountant's opinion that Sterling accounted for the Acquisition in accordance with generally accepted accounting principles or that as herein provided by the Bank Board. Id. Sterling has not included an accountant's letter with its motion, and to the Government's knowledge, the letter was never submitted as required.

The Lewis Assistance Agreement is dated November 5, 1985. App. 20. By its own terms, it terminated three years after its effective date, or on November 5, 1988. App. 50 (§ 11(a)). The provision governing accounting of the FSLIC contribution stated as follows:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by [GAAP], all cash contributions made [by the FSLIC] shall be credited to [Sterling's] net worth account. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must

> be reflected in any filing that [Sterling] may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with [GAAP].

App. 30 (§ 3(a)(2)).

The "Accounting Principles" section of the Assistance Agreement stated as follows:

> Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition of to [sic] this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition or this Agreement, the Bank Board's resolution or action shall govern.

App. 48 (§ 9).

An integration clause incorporated into the Assistance Agreement specified that "resolutions or letters concerning the Acquisition or this Agreement issued by the Bank Board or [FSLIC] in connection with the approval of the Acquisition and this Agreement" were included within the terms of the Agreement. App. 51 (§ 14).

(2) Tri-Cities. In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Bank Board, pursuant to Resolution No. 88-250, approved the acquisition, authorized an assistance agreement and authorized and directed that a forbearance letter be sent to Sterling. App. 65, 67, 70, 71. A forbearance letter (the "Tri-Cities Forbearance Letter"), dated April 6, 1988, stated, in

pertinent part, that "the following forbearances are hereby granted:"

> 1. Capital Requirements The Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Rules and Regulations for FSLIC-Insured Institutions, for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from (1)(a) any increase in the contingency component attributable to the assets of Tri-Cities existing at the effective date, and (b) any increase in the net growth of Sterling as of the Effective Date by reason of Sterling's assumption of Tri-Cities' liabilities; or (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the effective date.
>
> 4. Regulatory Capital It is the FSLIC's intention that the initial cash contribution to be made to Sterling pursuant to the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.
>
> 5. Amortization of Unidentified Intangibles For purposes of reporting to the [Bank] Board, the value of any unidentified intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

App. 75-76.

The Tri-Cities Forbearance Letter also contained a provision requiring Sterling to submit, within 60 days of consummation of the acquisition, the opinion of an independent accountant that Sterling accounted for the transaction in accordance with GAAP, except as provided for in the Forbearance Letter. App. 76.

The Assistance Agreement ("Tri-Cities Assistance Agreement"), dated April 8, 1988, terminated five years after its effective date, or on April 8, 1993. App. 95, 151 (§§ 1(y); 18(a)). It also provided for specialized accounting treatment of an $11,730,128.00 FSLIC cash

contribution so long as GAAP reporting was not required by statute. App. 98, 154 (§§ 3(a)(1) and (2), 20, 21). Section 3(a)(2) stated:

> For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by [GAAP], the [FSLIC] cash contribution . . . shall be credited to [Sterling's] regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that [Sterling] may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

App. 98. Finally, the Accounting Principles provision and the integration clause contained in the Tri-Cities Assistance Agreement were nearly identical to the corresponding provisions of the Lewis Assistance Agreement. App. 150, 154 (§§ 16, 21).

Pursuant to a letter dated July 28, 1988, the accounting firm of Coopers and Lybrand informed the Board of Directors of Sterling that "[a] total of approximately $2,520,000 has been allocated to an unidentified intangible asset. The unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired." App. 273-74. Thus, the accountant's opinion varied from the Tri-Cities Forbearance Letter, which indicated that unidentifiable tangible assets could be amortized over 15 years. App. 76. Further, the accounting opinion did not indicate that Sterling intended to use goodwill to meet regulatory capital requirements. Id.

(3) Central Evergreen. In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and

entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and no cash assistance was provided by FSLIC. App. 160-65, 166-72.

Resolution No. 88-1273 conditioned the transaction upon, among other things, a requirement that Sterling account for the transaction in accordance with GAAP, and a requirement that Sterling enter into a written agreement with FSLIC in which Sterling would commit to operating within the scope of the business plan provided in the transaction and

> infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 [sic] as currently in effect or as hereafter amended.

App. 168-69 (¶¶ 4, 8).

On December 28, 1988, Sterling entered into an agreement with FSLIC that expressly allocated the risk of changes in regulatory capital requirements to Sterling and specifically stated that the agreement did not provide a waiver of or forbearance from any applicable regulation (the "Capital Maintenance Agreement"). App. 163 (§§ V.D., V.M). Further, the Capital Maintenance Agreement contained no terms restricting the authority of Federal regulators to enforce capital standards against Sterling. In addition, the Capital Maintenance Agreement expressly and repeatedly referenced current capital regulations and "any successor regulation," thereby demonstrating the signatories' awareness that the regulations might change. App. 161 (§§ I.F. I.G., I.H., I.I., I.J). Section III.A stated that Sterling was required to

> cause its Regulatory Capital[2] to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan.

App. 162. Section V.D. provided as follows:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

App. 163. Section V.M. provided that "[t]his Agreement is not a waiver of or forbearance from any applicable regulation." App. 164. Indeed, when Sterling's application to acquire Central Evergreen was pending, Sterling's Chairman of the Board and Chief Executive Officer stated that Sterling's Board of Directors discussed the possibility that Sterling could be subjected to stricter capital requirements in the future, and that the Board decided it was a risk worth taking. App. 232.

Pursuant to a letter dated January 27, 1989, the accounting firm of Coopers and Lybrand opined that a total of approximately $23,800,000 was allocated as an unidentified intangible asset, or goodwill, in connection with Sterling's acquisition of Central Evergreen. App. 174.

On August 8, 1989, Congress enacted FIRREA. FIRREA abolished the Bank Board and

---

2/ The Agreement defined "Regulatory Capital" as "regulatory capital defined in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto." App. 161 (§ 1(h)). "Minimum Capital Requirement" was defined as "the amount computed quarterly according to Section 463.13(c) and as adjusted by the "April Calculation" specified in section 563.13(b)(2)(iv), or any successor regulation thereto.

FSLIC, and established three new capital standards, "core capital," tangible capital," and "risk-based capital," and restricted the ability of thrifts to continue to use intangible assets to meet those requirements. Pursuant to FIRREA, supervisory goodwill could not be included in satisfying the tangible capital requirement; it had to be phased out by December 1994 in calculating core capital, and had to be amortized over a maximum of 20 years in calculating risk-based and core capital. 12 U.S.C. § 1464(t)(3)(A),(9)(B) and (C).

As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. App. 219.

Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. App. 217. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. App. 219. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. App. 221.

In April 1990, OTS approved Sterling's capital restoration plan on condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. App. 246. On May 10, 1990, Sterling declined to execute the operating agreement. App. 247. On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards and was operating without an approved capital plan, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound

operation, pursuant to 12 C.F.R. § 567.10(a)(4). App. 226.

As set forth above at pages 3-4, in May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. On appeal to the Ninth Circuit Court of Appeals, the Ninth Circuit reversed the district court decision. Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1990).

At the time the injunction was lifted in 1992, Sterling had already achieved compliance with the capital requirements imposed by FIRREA by raising in excess of $23 million through a 1991 public offering. App. 268. Consequently, by the time the injunction was lifted by the Ninth Circuit, the restrictions that the Government had been enjoined from enforcing by the district court were no longer necessary, notwithstanding the lifting of the injunction. App. 270-273.

## SUMMARY OF THE ARGUMENT

The Court should dismiss the second through sixth causes of action of Sterling's complaint and grant the our motion for summary judgment with respect to the first cause of action, the breach of contract claim.

The third cause of action, in which Sterling alleges deprivation of due process, should be dismissed because the Court does not possess jurisdiction to entertain due process allegations. The second cause of action, the taking allegation, should be dismissed because Sterling's remedies, if any, are governed by contract law, and because Sterling could not have reasonably expected that it could permanently count goodwill, including goodwill derived from FSLIC cash

assistance, in regulatory capital. Also, Sterling's claims for promissory estoppel and restitution, the fourth and fifth causes of action, should be dismissed because the Court lacks subject matter jurisdiction to consider allegations of contracts implied-in-law. The sixth cause of action, for specific performance, should be dismissed because the Court does not possess jurisdiction to provide equitable relief for breach of contract claims.

Finally, the Government's pending motion for summary judgment upon the first cause of action, for breach of contract, should be granted for the reasons set forth in prior briefing, as well as the supplemental reasons, set forth below, that the Government became aware of through discovery. The supplemental reasons include the following. First, plaintiffs have admitted in a sworn affidavit that Sterling was not permitted to count FSLIC cash assistance as a permanent credit to regulatory capital, but was instead required to amortize it. Second, in a document generated contemporaneously with Sterling's acquisition of Central Evergreen, plaintiffs admit that an agreement entered into in connection with the Central Evergreen acquisition could be superseded by subsequent regulatory changes. Third, even assuming, for the sake of argument, that the Government entered into contracts permitting Sterling to count supervisory goodwill as regulatory capital, Sterling has admitted that the contracts expired as of December 31, 1991. Similarly, even assuming, for the sake of argument, that the Government entered into contracts permitting Sterling to include supervisory goodwill as regulatory capital and permanently to count FSLIC cash assistance as regulatory capital, the Government did not act governing the accounting treatment of supervisory goodwill, the Government did not act inconsistently with those contracts after the district court enjoined the Government from taking action inconsistent with the alleged contracts.

## ARGUMENT

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). Where a motion for summary judgment is made and supported in accordance with Rule 56, it is incumbent upon the nonmovant to proffer countering evidence sufficient to create a genuine dispute of material fact. Octocom Systems, Inc. v. Houston Computer Services, Inc., 918 F.2d 937, 940 (Fed. Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Factual disputes that are irrelevant or unnecessary do not preclude summary judgment. Id.

Where the non-movant cannot "proffer countering evidence sufficient to create a genuine factual dispute," Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987), such that the trier of fact could reasonably find in favor of the non-movant, Maki v. United States, 13 Cl. Ct. 779, 781 (1987), aff'd, 852 F.2d 1293 (Fed. Cir.), cert. denied sub nom Youngberg v. United States, 488 U.S. 943 (1988), summary judgment is proper.

When considering a motion to dismiss under Rule 12(b) of the RCFC, all facts as alleged in the complaint may be considered. Reynolds v. Army & Air Force Exchange Service, 846 F.2d 746, 747 (Fed.Cir. 1988). In deciding the motion to dismiss for lack of subject matter jurisdiction, the contentions in the complaint must be viewed favorably to the plaintiff. Hamlet v. United States, 873 F.2d 1414, 1416 (Fed.Cir. 1989). As demonstrated below, this Court should enter summary judgment against Sterling and Sterling Financial on the first cause of action, for

breach of contract, and dismiss the second through sixth causes of action.

## I. Sterling's Due Process Claim Should Be Dismissed Because This Court Lacks Jurisdiction To Entertain Such Claims

In the third cause of action set forth in its complaint, Sterling alleges deprivation of due process. Compl., §X. It is well-settled that this Court lacks jurisdiction to review actions under the due process or equal protection clauses of the Fifth and Fourteenth Amendments. Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997); Wheeler v. United States, 11 F.3d 156, 159 (Fed. Cir. 1993); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987). The Tucker Act statutorily limits the jurisdiction of this Court to "non-tort money claims against the United States founded on the Constitution, federal statute or regulation, or contract." Banner, et al. v. United States, 1999 WL 605631, *5 (Fed. Cl. 1999); see 28 U.S.C. § 1491 (1994). In order for jurisdiction to attach, "either the constitutional provision at issue or a federal statute must mandate the payment of money damages as compensation." Betz v. United States, 40 Fed. Cl. 286, 292 (1998). Neither the Fifth Amendment nor the Fourteenth Amendment contain language requiring the payment of damages for violations of those amendments. New York Power Authority v. United States, 42 Fed. Cl. 795, 801 (1999). "Consequently, this Court cannot hear claims based on violations of the due process or equal protection clauses of the Fifth or Fourteenth Amendments. . . ." Id.; see also Montalvo v. United States, 231 Ct. Cl. 980, 982-3 (1982).

Accordingly, plaintiffs' due process claims do not present causes of action cognizable in this Court and must be dismissed for lack of jurisdiction.

**II. Sterling's Cause Of Action For A Taking Should Be Dismissed Because Sterling Cannot Show That The Government's Actions Constitute A Taking Of Its Property Rights**

Sterling also alleges that the Government's alleged abrogation of binding contracts effects a taking of its property without just compensation. Compl., § IX. The takings clause of the Fifth Amendment to the Constitution states that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. See Branch v. United States, 69 F.3d 1571, 1578 (Fed. Cir. 1995), cert. denied, 519 U.S. 810 (1996), citing Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223 (1986), and Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 641 (1993).

Because Sterling's rights, if any, are governed by contract, and not by the Fifth Amendment, and, alternatively, because Sterling cannot show that the Government's actions constituted a regulatory taking, Sterling cannot carry its "heavy burden" of proving that a taking occurred. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 493 (1987).

**A. Sterling's Remedies Are Governed By Their Contract, And Not By The Fifth Amendment**

The law of this circuit is well established that where a party's rights are created by contract, that party cannot state a claim for takings. In Sun Oil Co. v. United States, 215 Ct. Cl. 716, 770, 572 F.2d 786, 818 (1978), for instance, the Court of Claims dismissed a takings claim upon the ground that it sought recovery for a breach of contract. There, the plaintiffs entered into oil and gas leases with the Government. The Department of Interior later suspended the plaintiffs' oil drilling operations because of safety concerns. The plaintiffs sued the Government,

alleging, among other things, that the Government's suspension of the drilling operation amounted to a taking of its property right to drill for oil as granted by the leases between them and the Government.

The Court of Claims rejected the plaintiffs' claim, holding:

> It is established that not every deprivation of use, possession, or control of property is a taking. One must look to the character and extent of any interference with property rights whenever a taking claim is asserted. More importantly, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.

Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818 (citations omitted; emphasis added). Because there existed lease contracts between the plaintiffs and the Government, the Court held, the plaintiffs were required to look to those contracts for relief. As the Court explained:

> The interferences with plaintiffs' lease rights were grounded on matters that . . . bespoke an effort to operate within the framework of the lease. If defendant's interferences were unjustified or unreasonable, plaintiffs' rights emanate from the lease agreement, not the Fifth Amendment.

Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818 (emphasis added). Thus, if a plaintiff's rights are created by contract, its remedies are limited to contract.

This rule derives from the distinction drawn between the Government acting in its sovereign capacity and the Government acting in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992), cert. denied, 508 U.S. 959 (1993). When, by contrast, the Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (quoting Sun Oil, 215 Ct. Cl. at 770, 572

F.2d at 818). Thus, when the Government acts in a proprietary capacity by contracting, a plaintiff's sole remedy is for breach of contract. Id. ("This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiffs' sole remedy is a breach of contract claim.").[3]

This is because when a party enters into a contract, that party either has the right to receive performance or, if a breach occurs, the party has the right to receive damages pursuant to contract law. Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9, aff'd, 133 F.3d 874 (Fed. Cir. 1997), cert. denied, 119 S. Ct. 57 (1998); Northwest Airlines v. United States Department of Transportation, 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994). In fact, the plurality in Winstar held that the regulatory capital contracts at issue there specifically contemplated that, if the Government breached, the thrift could only receive damages. United States v. Winstar, 518 U.S. 839, 868-870, 886-887 (1996). Thus, when a party enters into a contract, it acquires the right, upon breach, to sue for contract damages, but it requires no additional property rights, and, therefore, cannot allege a taking under the Fifth Amendment.

As the Court explained:

> Because the Winstar ruling, which plaintiffs invoke as the basis for the Government's liability, was based on a finding by the Supreme Court that a valid contract existed between the Government and the

---

[3] See also Horowitz v. United States, 267 U.S. 458, 461 (1925) ("nor can the United States while sued [as a contractor] be made liable in damages for their acts done [as a sovereign]"); Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 404 (1998); Baggett Transportation Co. v. United States, 969 F.2d 1028, 1034 (Fed. Cir. 1992); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989); Chevron Chemical Corp. v. United States, 5 Cl. Ct. 807, 811-12 (1984); Data Transformation Corp. v. United States, 13 Cl. Ct. 165, 177 (1987); J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969).

> thrifts, plaintiffs are conceptually foreclosed from shifting the analysis to the takings context.

Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997).

Here, Sterling, which also invokes Winstar as the basis for liability, is "conceptually foreclosed" from bringing a takings claim. Here, Sterling's complaint expressly alleges that its taking claim arises from a claim for breach of contract. See Compl., at ¶ 9.2 ("The OTS's application of FIRREA abrogates Sterling's binding contracts effects [sic] a taking of Sterling's property without just compensation, in violation of the Fifth Amendment to the United States Constitution.")(emphasis added). Hence, because the rights Sterling alleges were taken were created by the contract, its sole remedy is in contract.

### B. The Government's Elimination Of Goodwill From Regulatory Capital Does Not Constitute A Regulatory Taking

#### 1. Introduction

Even if Sterling's taking claim is not precluded by the contract, the Court should nonetheless dismiss it because the Government's elimination of goodwill from regulatory capital does not constitute a taking. In determining whether a taking occurred,[4] courts apply a case-

---

[4] Before even addressing the question of whether the Government's actions constituted a taking, it is necessary to first determine the preliminary question of whether a plaintiff actually possessed the property rights it claimed were taken. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992).

The contours of a property right are limited by the purchaser's reasonable expectations at the time of acquisition. M&J Coal Company v. United States, 47 F.3d 1148, 1152-54 (Fed. Cir.), cert. denied, 116 S. Ct. 53 (1995). These reasonable expectations are defined by the law at the time of purchase. Id. at 1153 (citing Lucas).

Here, Sterling characterizes its property rights as arising from the "abrog[ation of] Sterling's binding contracts." Compl., ¶ 9.2. As explained above, Sterling's only reasonable

specific, ad hoc inquiry into the nature and justification of the governmental action. Branch v. United States, 69 F.3d 1571, 1576 (Fed. Cir. 1995); see also Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) (regulation will be a taking if it goes "too far"); Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 (1986) (describing analysis as an "ad hoc, factual inquiry").

The Supreme Court has identified the following three factors in determining whether Government regulation constitutes an ad hoc regulatory taking: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986); Concrete Pipe & Prods. Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 641 (1993).[5] As demonstrated below, Heritage cannot satisfy any of these factors.

---

expectation at the time of the deal was that it had the right to sue for breach of contract if the Government changed the capital requirements. Id. Thus, as explained above in section **B(1)**, Sterling's only remedy is in contract.

[5] The Supreme Court has recognized two discrete categories of regulatory action, called "per se," or categorical takings, in which the Court determines that the action is compensable without undertaking the three-pronged ad hoc inquiry. These categories include: (1) the permanent physical "invasion" of an owner's property (Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982) (New York statute requiring landlords to allow cable television company's installation on their property was compensable)), and (2) the denial of all economically beneficial or productive use of land. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992) (South Carolina's statute barring residents of barrier islands from erecting permanent homes there was compensable). Sterling cannot properly contend that the Government's phase-out of goodwill from regulatory capital constituted a per se taking. Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995).

2. <u>The *Branch* Case</u>

The United States Court of Appeals for the Federal Circuit has considered a takings claim by a plaintiff that complained of the effects of FIRREA. <u>Branch v. United States</u>, 69 F.3d 1571 (Fed. Cir. 1995) (relying upon <u>Connolly v. Pension Benefit Guar. Corp.</u>, 475 U.S. 211, 225 (1986), and <u>Concrete Pipe & Prods. Inc. v. Construction Laborers Pension Trust</u>, 508 U.S. 602, 641 (1993)). In order to understand the significance of <u>Branch</u>, we must review briefly its history. Prior to FIRREA, the principle of limited corporate liability gave considerable protection to bank holding companies and their member banks when one of those member banks failed. After 1989, however, FIRREA directed that when such a bank failure occurred, sister banks that were owned by the same holding company could be held liable for the loss. <u>Id</u>. at 1573. This innovation was called the "cross-guarantee" provision. Thus, the FDIC, in accordance with the cross-guarantee provision, sought to assess $99 million from the Maine National Bank when Maine National Bank's sister bank, the Bank of New England, failed. This $99 million assessment resulted in the seizure and closure of Maine National Bank, which only had $65 million in net assets. The trustee of the holding company alleged that the assessment against the Maine National Bank was a taking. <u>Id</u>.

The appellate court, applying the three factor test, determined that FIRREA's changes allowing for assessments against sister banks did not effect an ad hoc regulatory taking. <u>Id</u>. at 1573. For very similar reasons, FIRREA does not constitute a taking in this case either.

a) <u>Character Of The Government Action</u>

Regarding the first factor -- the character of the Government action -- the appellate court

explained that when Government interference with property does not appropriate that property for the Government's own use, but instead arises from "a public program that adjusts the benefits and burdens of economic life to promote the public good," a taking is less likely to have occurred. Id. at 1579 (quoting Connolly, 475 U.S. at 225). In considering the cross-guarantee provision, the court recognized that although "the immediate effect [of the provision] was to minimize losses to government insurance funds," the ultimate purpose of the legislation was to "secure the soundness of the national banking system," to "protect depositors," and "to make the pertinent insurance system self-sufficient by increasing the burden on participants in the system." Id. at 1579. Thus, the "purpose" was to "adjust[] the benefits and burdens of economic life to promote the common good." Id.

Similarly, while FIRREA's immediate effect here was to reduce Sterling's regulatory capital level, its long term purpose was to "prevent[] the collapse of the industry, attack[] the root causes of the [financial institution] crisis, restor[e] public confidence," Winstar, 518 U.S. at 856, and to protect depositors. Id. at 854; see also 12 U.S.C. § 1811 note (describing broad purposes of FIRREA). Thus, as in Branch, FIRREA was designed to promote the public good.[6]

b) Economic Impact

Regarding the second factor, a court must analyze both whether the economic impact upon the individual plaintiff is severe and, if so, whether Congress had a "rational" basis for

---

[6] Connolly and Concrete Pipe mandate the same result. In those cases, the Supreme Court upheld against a takings claim a statutory change in pension laws that resulted in the imposition of liability on companies withdrawing from multiemployer pension plans. See Connolly, 475 U.S. at 225; Concrete Pipe, 508 U.S. at 644 ("That the solvency of a pension trust may ultimately redound to the benefit of the [Government] . . . is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts.").

allocating the financial burden of legislation upon specific institutions rather than upon "taxpayers in general." Branch, 69 F.3d at 1579-80 (citing Connolly, 475 U.S. at 226); see also Concrete Pipe, 508 U.S. at 646.

In proving severity of economic impact, a plaintiff must look at its overall property and cannot "narrowly define certain segments of it property and assert that, when so defined, [the Government action] denies it economically viable use." Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 496 (1987). In addition, courts should consider whether the legislation in question contained provisions that "moderated and mitigated the economic impact" upon a particular party. Connolly, 475 U.S. at 226.

In determining whether Congress had a rational basis for allocating a substantial economic burden upon a particular party, the Branch court looked to three factors. First, it held that imposing the costs inherent in a particular business on "those who have profited from the fruits" of that business was rational. Branch, 69 F.3d at 1580, citing Usery v. Turner Elkhorn Mining Co, 428 U.S. 1, 18 (1976). Second, it ruled that imposing the cost associated with a bank's failure on that bank's sister companies instead of on all banks or on the public at large was rational since those firms have "some measure of control over the success or failure" of the associated banks. Id. Third, it explained that there was a "particularly tempting moral hazard" in the banking industry -- i.e., profits could be safeguarded while losses were underwritten by the insurance fund -- and that the cross-guarantee provision was further justified as incentive to reduce the losses. Id.

Here, Sterling cannot show either that the economic impact of FIRREA was severe, or that Congress acted irrationally by financially burdening Sterling in particular. Regarding the

economic impact, at best, Sterling could, if its complaint is viewed in a light most favorable to it show that the Government eliminated approximately $31 million in goodwill from regulatory capital. Compl. at ¶ 7.8(i). First of all, it should be noted that "goodwill is not cash," Winstar, 518 U.S. at 854, and, therefore, cannot be valued dollar for dollar. Moreover, the Winstar Court also noted that FIRREA, as with the statute at issue in Connolly, had a "limited exception intended to moderate transitional pains," id.; see also 12 U.S.C. § 1464(t)(3)(A), thereby moderating and mitigating the economic impact upon Heritage.

Furthermore, even if Sterling could show that the economic impact was substantial,[7] it cannot show that Congress's allocation of burdens was irrational, based upon the three items analyzed in Branch. First, Sterling cannot dispute that it benefitted greatly from its participation in the banking industry. Second, thrift purchasers have control over the success of the thrift and, therefore, could take steps to protect the thrift. Third, as the Winstar decision showed, the purchase of thrifts in the 1980s created "moral hazards" for the new owners, because the existence of artificial capital credits permitted them to "leverage more loans," and, thus, take risks with other people's money. Winstar, 518 U.S. at 850-851. The passage of FIRREA, however, was designed to limit risk-taking at the insurance fund's expense. H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted in 1989 U.S.C.C.A.N. 86, 432, 443. Accordingly, Congress's decision to place the burden upon Sterling, assuming that such a burden even existed, was rational.

---

[7] In Connolly, the Court held that there was no taking even though the legislation "completely deprived" the plaintiff of its money. Connolly, 475 U.S. at 225; see also Concrete Pipe, 508 U.S. at 645 ("Mere diminution in the value of the property, however serious, is insufficient to demonstrate a taking.").

c) Investment-Backed Expectations

As to the third ad hoc factor, the appellate court explained that a taking was more likely to occur when the Government regulation interfered with reasonable investment-backed expectations. Branch, 69 F.3d at 1579. It noted, however, that such expectations "are greatly reduced in a highly regulated field," and, furthermore, that this rule of reduced expectations "applies with special force" to the regulation of national banks, which have been "heavily regulated for more than a century." Branch, 69 F.3d at 1581; Connolly, 475 U.S. at 227; see also Fahey v. Mallonee, 332 U.S. 245, 250 (1947) ("Banking is one of the longest regulated and most closely supervised of public callings."); Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 55 (1986); Mitchell Arms. Inc. v. United States, 7 F.3d 212, 217 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994); Pacific National Cellular v. United States, 41 Fed. Cl. 20, 35-36 (1998); 1 K. Davis, Administrative Law Treatise, § 4.04 at 247 (1965) ("The regulation of banking may be more intensive than the regulation of any other industry."). In light of the historical practices in the bank regulatory field, the court held that the plaintiff in Branch would have been unreasonable "to expect that the bank's assets would never be subject to liability." Branch, 69 F.3d at 1582.

Similarly, Sterling here could not have expected that its regulatory capital standards were subject to protection from change. In addition to the long history of Government regulation of thrifts in general, the Government also has a long history of regulating thrift capital requirements in particular. See Transohio Savings Bank v. OTS, 967 F.2d 598, 601-02 (D.C. Cir. 1992) (describing how the capital requirements "have been the subject of numerous statutory and regulatory changes over the years"). Given the long history of Government regulation, Sterling

had no reasonable investment-backed expectation that it could permanently count goodwill in regulatory capital. Accordingly, this Court should dismiss the second cause of action of Sterling's complaint.

## III. Sterling's Claim For Restitution Should Be Dismissed For Lack Of Subject Matter Jurisdiction

Sterling's complaint also alleges restitution as an affirmative cause of action. Compl., § XII. This claim is premised upon an alleged contract implied-in-law, and, therefore, falls outside this Court's jurisdiction.

Although Sterling's complaint fails to set forth the source for the Court's jurisdiction over this case, the Court generally exercises jurisdiction over contract cases pursuant to the Tucker Act, which provides, in pertinent part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . .

28 U.S.C. § 1491(a)(1) (1994). As the Supreme Court has repeatedly held, although the Tucker Act grants this Court jurisdiction over claims based upon an implied contract, "this jurisdiction extends only to contracts . . . implied in fact, and not to claims on contracts implied in law." Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996); see also Merritt v. United States, 267 U.S. 338, 341 (1925). Although a party may seek restitution as a remedy for a breach of contract in this Court, a stand-alone, substantive restitution claim, which is equitable in nature and derives from the law of quasi-contract, is outside this Court's jurisdiction, and should be dismissed. Because Sterling's restitution claim is necessarily based upon a theory of contract implied-in-law, the claim must be dismissed.

As explained by Professor Perillo, the law of restitution has its origins in cases involving quasi-contracts, or contracts implied-in-law. Joseph M. Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208, 1208-13 (1973). In such cases, plaintiffs historically were awarded sums on the theory that the defendant should not be unjustly enriched by the plaintiff's performance. See id. at 1208, 1215.

Eventually, the concept of restitution was imported into the contractual arena as one of three possible remedies. See, e.g., 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.1, at 147-53 (2d ed. 1998) (identifying the expectation interest, the reliance interest, and the restitution interest as the three interests protected by contract law). The distinction between restitution as a substantive claim and restitution as a remedy for breach of contract has, however, endured. See Andrew Kull, Rationalizing Restitution, 83 Calif. L. Rev. 1191, 1192 (1995) ("A complete account of civil liability in our legal system requires the inclusion of restitution or some functional equivalent, because there are important instances of liability that contract and tort, conventionally defined, cannot adequately explain."); 1 Dan B. Dobbs, Law of Remedies § 4.1(1), at 556 (2d ed. 1993) ("The substantive basis of restitution is related to substantive equity. That is, courts applying substantive equity and courts applying the law of unjust enrichment are both applying a law of "good conscience." Remedially and historically speaking, however, restitution might be either a purely legal claim or a purely equitable claim."); Perillo, 73 Colum. L. Rev. at 1214-15 ("But the distinction between restitutionary rights which are primary and those which are merely secondary is sound and has important practical consequences, which are reflected in the cases. The principal difference is that when the law of quasi-contract provides the sole basis of recovery (that is, when it is the source of the claimant's

primary rights) its sole basis is very likely to be unjust enrichment. When, however, restitution is merely a secondary, remedial right in a contractual context, unjust enrichment is merely one factor in the re-allocation of gains and losses between the parties.") (emphasis in original).

This Court has honored this distinction, permitting plaintiffs to pursue restitution as a remedy for breach of contract, but recognizing that stand-alone, substantive claims for restitution based upon an equitable unjust enrichment theory are outside the jurisdiction of the Court of Federal Claims.[8] Compare Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 359, 347 F.2d 509, 530 (1965), rev'd on other grounds, 385 U.S. 138 (1966) (awarding restitution as remedy for breach of contract) and State of Arizona v. United States, 216 Ct. Cl. 221, 237-38, 575 F.2d 855, 864-65 (1978) (defining the measure of restitution for breach of contract), with W.P. Bill Atkinson Enterprises, Inc. v. United States, 228 Ct. Cl. 886, 888 (1981) ("principles of non-consensual equitable restitution . . . are not available to us under the Tucker Act); see also Houston Oil & Refining, Inc. v. United States Federal Energy Regulatory Comm'n, 95 F.3d 1126, 1134 (Fed. Cir. 1996) ("restitution is equitable in nature"). Accordingly, Sterling's substantive restitution claim should also be dismissed for lack of subject matter jurisdiction.

---

[8] Although plaintiffs in the Court of Federal Claims may pursue a restitution remedy for breach of contract, they are only entitled to recover their "prudent costs;" they are not entitled to recover on the basis of unjust enrichment. Acme Process Equipment Co., 171 Ct. Cl. at 359, 347 F.2d at 530 ("[R]estitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party."); Pacific Architects & Eng'rs Inc. v. United States, 203 Ct. Cl. 499, 516, 491 F.2d 734, 744 (1974) (plaintiff entitled to its "prudent costs" as restitution in breach of contract case).

**IV. Sterling's Cause Of Action For Promissory Estoppel Should Be Dismissed Because <u>This Court Does Not Possess Jurisdiction To Entertain Promissory Estoppel Claims</u>**

Sterling's fourth cause of action alleges that the Government should be "estopped to deny that [sic] the terms of their agreement and the contractual promises made to Sterling, " and that Sterling has been damaged by detrimental reliance. Compl., ¶¶ 11.3 - .4. This cause of action is based upon promissory estoppel. Promissory estoppel "is a doctrine for enforcing promises which reasonably induce action or inaction and which are binding to the extent necessary to avoid injustice." <u>N.L. Durant. Jr. v. United States</u>, 16 Cl. Ct. 447, 450 (1988). Plaintiffs cannot meet their burden of demonstrating that this Court has jurisdiction to entertain this claim. <u>See Trauma Services Group v. United States</u>, 104 F.3d 1321, 1324 (Fed. Cir. 1997)(plaintiff bears the burden of establishing jurisdiction for its claims); <u>Reynolds v. Army & Air Force Exchange Serv.</u>, 846 F.2d 746, 747 (Fed. Cir. 1988)(same). "It is well settled that this court is without jurisdiction to entertain claims arising from a contract based on the theory of promissory estoppel." <u>LaMirage. Inc.. v. United States</u>, 44 Fed. Cl. 192, 200 (1999) (<u>citing Hercules v. United States</u>, 516 U.S. 417, 423 (1996); <u>United States v. Mitchell</u>, 463 U.S. 206, 218 (1983); <u>Gregory v. United States</u>, 37 Fed. Cl. 388, 396 (1997); <u>Knaub v. United States</u>, 22 Cl. Ct. 268, 276 (1991); <u>Pacific Gas & Elec. Co. v. United States</u>, 3 Cl. Ct. 329, 340 (1983), <u>aff'd</u>, 738 F.2d 452 (Fed. Cir. 1984)).

The Tucker Act, 28 U.S.C. § 1491, upon which plaintiffs rely to establish jurisdiction, only vests jurisdiction in this Court to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." The promissory

estoppel doctrine is not included within the parameters of this Court's Tucker Act jurisdiction because it is not an express or implied-in-fact contract theory. See, e.g., Schuhl v. United States, 3 Cl. Ct. 207, 210-211 (1983); Biagioli v. United States, 2 Cl. Ct. 304, 307-308 (1983). "Obligations based upon promissory estoppel are founded on contracts implied-in-law (quasi contracts), where a duty is imposed by operation of law without regard to the intent of the parties." Pacific Gas & Elec. Co., 3 Cl. Ct. at 340. This Court, of course, lacks jurisdiction to entertain implied-in-law claims. Hercules v. United States, 516 U.S. 417, 423 (1996). Thus, plaintiffs' fourth cause of action, for promissory estoppel, must be dismissed because this Court does not possess jurisdiction to adjudicate that claim. See Biagioli, 2 Cl. Ct. at 308; see also Phaidin v. United States, 28 Fed. Cl. 231, 235 (1993); Knaub, 22 Cl. Ct. at 276; Pacific Gas & Elec. Co., 3 Cl. Ct. 329; Schuhl, 3 Cl. Ct. 207 (1983).

## V. This Court Lacks Subject Matter Jurisdiction To Entertain Sterling's Cause Of Action For Specific Performance

Sterling's sixth cause of action alleges that, [i]n the event Sterling does not receive monetary damages... Sterling is entitled in the alternative to specific performance of its acquisition agreements with defendants...." Compl., ¶ 13.2. The Court, however, lacks jurisdiction over Sterling's cause of action for specific performance.

> The Court of Federal Claims is an Article I trial court of limited jurisdiction that was created by Congress as a forum where private parties could sue the government for money claims, other than those sounding in tort, where the claims would otherwise be barred by sovereign immunity. . . . The remedies available in that court extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances not here pertinent. See, e.g., 28 U.S.C. § 1491(a)(3) (granting the Court of Federal Claims injunctive power in pre-award bid protest cases).

Kanemoto v. Reno, 41 F.3d 641, 644-45 (Fed. Cir. 1994)(emphasis added); accord United States v. King, 395 U.S. 1, 4 (1969); Boyle v. United States, 44 Fed. Cl. 60, 65 (1999); see also Doe v. United States, 37 Fed. Cl. 74, 79 (1996) ("It is well established that this Court generally does not have the jurisdiction to grant specific performance of a contract, as well as other equitable relief."); White Mountain Apache v. United States, 46 Fed. cl. 20, 28 (1999) ("This court does not, without express statutory authority, have jurisdiction to enter injunctive relief.") (and cases cited therein); Tenaska Washington Partners II v. United States, 34 Fed. Cl. 434, 443-444 (1995) ("However, specific performance is not a remedy available against the United States, because sovereign immunity has not been waived for such relief. . . . Issuance of an injunction similarly is not available in the circumstances of this case."); Logan Canyon Cattle Assoc. v. United States, 34 Fed. Cl. 165, 168 (1995) ("Assuming for the sake of argument that the Agreement is enforceable as a contract, the court nevertheless lacks subject matter jurisdiction over this suit because the claim is anticipatory. It is not for money, but for specific performance."); Gates v. United States, 33 Fed. Cl. 9, 12 (1995) ("Claims for specific performance are not generally within the Court of Federal Claims' subject-matter jurisdiction.") (and cases cited therein).

In summary, this Court cannot entertain claims for specific performance except in narrowly defined, statutorily provided circumstances. Sterling has failed to cite the statutory authority underlying its specific performance claim. Therefore, this Court should dismiss the claim for lack of jurisdiction.

## VI. The Government's Pending Motion For Summary Judgment With Respect To The First Cause Of Action Of The Complaint, For Breach Of Contract, Should Be Granted

The Government's pending motion for summary judgment concerning the first cause of

action in the complaint, for breach of contract, Compl., ¶¶ 8.1 - 8.5, should be granted for the reasons set forth in prior briefing and the supplemental reasons set forth below. .

A. **Even Assuming, For The Sake Of Argument, That The Government Contracted To Permit Sterling To Count FSLIC Cash Assistance As Regulatory Capital, Sterling, By Its Own Admission, Was Required To Count FSLIC Cash Assistance As Supervisory Goodwill And Amortize It**

The Government's motion to dismiss and cross-motion for summary judgment dated April 1, 1997 ("1997 motion"), as well as its reply in support of the motion dated August 4, 1997 ("1997 reply") amply demonstrate that the Government did not contract to permit Sterling to permanently count FSLIC cash assistance provided in connection with the Lewis and Tri-Cities acquisitions as regulatory capital, regardless of changes in the law. See 1997 motion, pp. 38-41 and 49-53; 1997 reply, pp. 14-17. Even assuming, however, for the sake of argument, that the Government did contract to permit Sterling to count the FSLIC cash assistance as regulatory capital, the FSLIC assistance was required to be included within supervisory goodwill (also referred to as "unidentifiable intangibles") and amortized.

At deposition, Daniel Byrne, Chief Financial Officer for Sterling, admitted that Sterling included the FSLIC assistance in unidentified intangibles (i.e., supervisory goodwill) on its balance sheet prepared for submission to the regulators. App. 253 (lines 12-17); App. 756 (lines 7-18). In addition, William Zuppe, the President of Sterling, acknowledges, in a May 28, 1990 affidavit submitted both in connection with the district court litigation and Sterling's motion for partial summary judgment on liability, that the FSLIC cash assistance was to be amortized:

> 28. On April 6, 1988, the FHLBB entered an Order formally granting the conditions, including, among others:
>
> . . .
>
> (b) Agreeing that the $11.7 million in cash

> assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years;. . .

App. 240 (lines 18-20).

Consequently, there is no factual dispute with respect to the amortization of unidentified intangibles resulting from the inclusion of FSLIC cash assistance as supervisory goodwill, and the Court should rule that Sterling was required to amortize all of its goodwill, including that arising from the FSLIC cash assistance.

**B. The Government Was Not Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Transaction Toward Regulatory Capital Requirements**

In our 1997 motion and 1997 reply, we demonstrated that the Government did not contract to permit Sterling to count the supervisory goodwill created in connection with the Central Evergreen acquisition as regulatory capital. 1997 motion, pp. 22-23, 26-34; 1997 reply, pp. 3-7. In fact, quite the opposite is true. The only agreement executed between Sterling and the Government in connection with that acquisition expressly provides that Sterling agreed to be bound by subsequent changes in regulation. In section V.D. of the agreement, Sterling promised as follows:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

App. 163 (emphasis added).

In addition, section V.M. expressly states that the agreement "is not a waiver or forbearance from any applicable regulation." App. 164. Furthermore, a document created by

plaintiffs less than one month after the agreement was provides an unambiguous indication that Sterling knew that the agreement would not exempt it from any future changes in regulation. In a January 6, 1989 memorandum to the file titled "Central Evergreen Agreement with FSLIC," Mr. Byrne, Sterling's CFO, indicates that "there were several significant issues that were discussed and finally negotiated as follows," including:

> 5. In paragraph V, M, should be noted the language was changed from early drafts. The essence of this provision is that the agreement does not supersede the regulations to which Sterling is subject.

Consequently, it is undisputed that Sterling was subject to any regulatory changes occurring after the execution of the agreement, and Sterling's claim that the agreement contained a contractual promise to permit Sterling to count supervisory goodwill as regulatory capital notwithstanding regulatory changes is baseless.

### C. Even Assuming, For The Sake Of Argument, That The Capital Maintenance Agreement Contained A Forbearance Permitting Sterling To Count Supervisory Goodwill As Regulatory Capital, The Forbearance Expired In 1991

As demonstrated above and in the our 1997 motion and 1997 reply, the Central Evergreen Capital Maintenance Agreement does not include a contractual promise by the Government to forbear from changing the regulations governing the maintenance of regulatory capital. Even, assuming, however, that the agreement did contain such a forbearance, Sterling has acknowledged that the forbearance expired as of December 31, 1999. In its 1989 Annual Report, Sterling reported the following to its shareholders:

> Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum

> capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31. 1999. from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

App. 196 (emphasis added) Thus, Sterling, in its 1989 annual report, advised its shareholders that it had a forbearance from the new FIRREA capital requirements only until 1991. Consequently, if the Court determines that Sterling had any contractual agreements regarding the treatment of supervisory goodwill for regulatory accounting purposes, it should rule that the contractual agreements expired as of December 31, 1999, consistent with Sterling's statement in its annual report.

**D. Assuming, For The Sake Of Argument, That The Government Acted Inconsistently With Any Contractual Obligation To Plaintiffs, The Inconsistent Actions Necessarily Ceased After Plaintiffs Obtained An Injunction Enjoining The Government From Taking Action Inconsistent With The Purported Contracts**

Even assuming, for the sake of argument, that the Government made contractual promises concerning the ability of Sterling to count supervisory goodwill and FSLIC cash assistance as capital, plaintiffs have no cause of action for the period during which the Government was subject to an injunction enjoining it from enforcing FIRREA in a manner inconsistent with the purported contracts. As set forth above, in May 1990, the district court for the eastern district of Washington issued a temporary restraining order, and in August 1990, a preliminary injunction, enjoining the Government from taking any regulatory action inconsistent with agreements entered into in connection with the Lewis, Tri-Cities, and Central Evergreen acquisitions.

Sterling, 751 F. Supp. at 881. The Government abided by the injunction. App. 257.

Further, when the injunction was lifted in 1992, Sterling had already achieved capital compliance by raising in excess of $23 million through a 1991 public offering. That public offering brought Sterling into compliance with the capital requirements imposed by FIRREA. App. 268. Consequently, by the time the injunction was lifted by the Ninth Circuit, the restrictions that the Government had been enjoined from enforcing by the district court were no longer necessary, notwithstanding the lifting of the injunction. App. 270-73.

Accordingly, after the injunction was imposed, plaintiffs did not suffer any injury from any purported contractual breach by defendant.

In order to invoke the judicial power of Federal courts, a plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . and that the injury fairly can be traced to the challenged action." Valley Forge Christian College v. Americans United for Separation of Church and States, 454 U.S. 464, 472 (1982), (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979), and Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 41 (1976)). In other words, "[t]he party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of" the defendant's conduct. Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973) (emphasis in original) (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)). Also, the plaintiff must show that the injury "is likely to be redressed by a favorable decision." Valley Forge 454 U.S. at 472. The failure to meet either of these requirements is fatal to plaintiff's standing. Id.

In this case, the very breach of which plaintiffs' complain was subject to the district

court's 1990 injunction, pursuant to which OTS was precluded from taking action inconsistent with the alleged contracts in this case. Accordingly, plaintiffs could not have incurred injury from the Government's purported breach after issuance of the injunction. Therefore, plaintiffs suffered no injury from the alleged breach, and lack standing to challenge the Governments actions after issuance of the injunction. Valley Forge 454 U.S. at 472.

## CONCLUSION

For the reasons stated above, we respectfully request that this Court grant the Government's motion to for summary judgment with respect to the first cause of action of the complaint, and dismiss the second through sixth causes of action. In the event that the Court denies the Government's motion for summary judgment, plaintiffs' motion for partial summary judgment should be denied and this case set down for trial.

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300
Attorneys for Defendant

October 10, 2000

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on October 10th, 2000, I caused to be served by United States mail (first-class mail, postage prepaid) copies of "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT," addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

404

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Senior Judge Smith) |

---

**PLAINTIFFS' REPLY TO "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT."**

---

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Tele: (509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WILLIAM M. SYMMES

December 15, 2000

TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . iv

I. RELIEF SOUGHT . . . . . 1

II. NATURE OF CASE . . . . . 2

III. SUPPLEMENTAL UNDISPUTED FACTS . . . . . 4

A. Supplemental Undisputed Facts Regarding the Authority of the FHLB Of Seattle . . . . . 4

1. The FSLIC and the FHLBB Delegated the Authority to the FHLB of Seattle to Process and to Negotiate The Assisted Acquisitions in District 12 (The Northwest). . . . . . 4

B. The Supplemental Undisputed Facts Regarding The Acquisition of Lewis Federal. . . . . . 5

1. The Lewis Federal Acquisition Was The Result of An Extensive Marketing and Negotiation Process . . . . . 5

a. The Defendant "Shopped" The Troubled Thrift . . . . . 5

b. Sterling Received a Bid Package That Described The Procedure for Bidding . . . . . 5

c. Sterling Submitted a Bid For Lewis Federal And Requested FSLIC Assistance Without Any Provision For its Repayment or Amortization . . . . . 6

2. The Final Forbearance Letter Does Not Contain a Provision Requiring Sterling to Amortize or to Reduce the FSLIC Infusion of Capital . . . . . 7

C. The Supplemental Undisputed Facts Regarding The Acquisition of Tri-Cities . . . . . 8

1. The Tri-Cities Acquisition Was The Result of Aggressive Marketing and Negotiations . . . . . 8

a. The Defendant "Shopped" The Troubled Thrift . . . . . 8

b. Sterling Successfully Bid for Tri-Cities and Extensively Negotiated an Agreement With Defendant . . . . . 8

D. The Supplemental Undisputed Facts Regarding The Central Evergreen Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1. The FHLB of Seattle Negotiated for Sterling to Acquire Central Evergreen On Unassisted Basis, in Part, Because of the Inducements and Permanent Capital Provided for in The Lewis Federal and Tri-Cities Transactions . 10
2. Had Sterling Not Contracted to Acquire Central Evergreen on an Unassisted Basis, FSLIC Would Have Had to Pay at Least $8 - $10 Million in FSLIC Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. STERLING'S REPLY AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL OPPOSITION AND CROSS-MOTION . . . . . . . . . . . . . . . . . . . . . 12

A. As A Matter of Law, The United States Contractually Agreed To Provide Sterling Permanent Capital That Was Not To Be Subject To Reduction or To Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. The Only Evidence in The Record Is Undisputed and Establishes That as a Matter of Law, Sterling Received Permanent Regulatory Capital as Part of the Lewis Federal and Tri-Cities Acquisitions . . . . . . . . . . . . . . . . . . . . 12

a. The Defendant's Position Misrepresents the Record . . . . . . . . . . 12
b. The Testimony of Daniel Byrne and William Zuppe Incontrovertibly Establish That Sterling Never Intended to Amortize the FSLIC Assistance or Any Asset Created Thereby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. Actually, It Is Defendant Who Undisputedly Agrees That the FSLIC Assistance Was to Be Permanent and Was Not to Be Amortized . . . . . . 15

3. The Legal Rules For Interpreting Contracts Leads to One Inescapable Result: The FSLIC Assistance Was Not Directly or Indirectly Subject to Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

a. Interpreting Contracts in The U.S. Court of Federal Claims . . . . 18
b. It Is Undisputed That The Contract Between the United States and Sterling Does Not Provide for Sterling to Amortize the Cash Assistance or Any RAP Goodwill That May Be Associated with It . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
c. The Parties' Course of Performance Prior to this Dispute Undisputedly Establishes as a Matter of Law That the Cash Assistance Not Be Amortized . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. It Remains Undisputed That The Government was Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Acquisition As Regulatory Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1. Defendant Rehashes Its Claim From 1997 . . . . . . . . . . . . . . . . . . . . . . . 22
2. The Castle Decision Controls and Dictates That, as a Matter of Law, Sterling Did Not Agree to Accept the Risk of Regulatory Change and That Defendant Breached its Contract with Sterling Regarding its Acquisition of Central Evergreen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a. The *Castle* Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
b. The *Castle* Decision is Decided on the Binding Nature of the Central Evergreen Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
c. Paragraph V., M. of The Central Evergreen Agreement Did Not Allocate The Risk of Regulatory Change to Sterling . . . . . . . . . 24
d. The Memorandum Drafted By Dan Byrne Does Not Establish That Sterling Assumed The Risk of Regulatory Change . . . . . . . . . . . 25
e. The 1989 Annual Report Only Confirms That Sterling Acquired a Forbearance to Allow it Time to Raise Capital Pursuant to the Business Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
f. Based On The Undisputed Evidence Presented in 1990, the Federal District Court Made Findings Consistent With Sterling's Understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C. Contrary to Defendant's Claim, Sterling Suffered Damages During The Pendency of The Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. Defendant Permanently Damaged Sterling Prior to the Injunction, for Which it Still Incurs Ongoing Damage Today . . . . . . . . . . . . . . . . . . . . 29
2. The Injunction Did Not Cure the Damage That Was Already Done . . . . 30
3. The Second Public Offering Did Not Replace the Capital That Sterling Would Have Raised in 1989 and Leveraged During the Years Thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
4. Contrary to Defendant's Suggestion, Defendant Did Not Fully Comply with the Injunction Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D. Sterling's Claim for Restitution Should Not Be Dismissed . . . . . . . . . . . . . . . . 34

E. Sterling's Equitable estoppel Claim Should Not Be Dismissed . . . . . . . . . . . . . 35

1. The Court has Subject mater Jurisdiction Over Claims of Equitable Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Acme Process Equipment Co. v. United States*, 171 Ct. Cl. 324, 347 F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) .......................................... 34

*Alaska American Lumber Co., Inc. v. United States*, 25 Cl. Ct. 518 (1992) 18

*American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110 (Fed.Cir.1985) .......................................................................................... 35

*Applied Companies v. United States*, 37 Fed. Cl. 749, 759 (1997)................. 18,19

*Blanchard v. United States*, 347 F.2d 268 (Ct. Cl. 1965) ..............................18,20

*Castle v. United States*, 42 Fed.Cl. 859 (1999) ............................................22,23

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99 (1957)....................................... 35

*Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 Ct. Cl. 1006 (1973) ................................................................................................... 35

*Heckler v. Community Health Service of Crawford County, Inc.*, 467 U.S. at 60-61, 104 S. Ct. 2218 ...................................................................... 35

*Hercules Inc. v. United States*, 516 U.S. 417, 116 S. Ct. 981 (1996) ........... 34

*Huna Totem Corp. v. United States*, 35 Fed.Cl. 603 (1996), *rev'd on other grounds* 135 F.3d 775 (1998) ..................................................................... 18

*Lamirage, Inc. v. United States*, 44 Fed.Cl. 192, 201 (1999).......................... 38

*Lee v. United States*, 32 Fed. Cl. 530, 537 (1995) ....................................... 36

*McAbee Construction Inc. v. United States*, 97 F.3d 1431 (Fed. Cir. 1996) 18

*New American Shipbuilders, Inc. v. United States*, 15 Cl. Ct. 141 (1988) .. 35

*Pacific Gas and Electric v. United States*, 3 Cl. Ct. 329 (1983) ................... 35

*Sterling Savings Associate v. Ryan*, 751 F. Supp. 871 (E.D. WA. 190) *vacated on other grounds*, 959 F.2d 241 (1992) ..................................................... 28

*Teradyne, Inc. v. Teledyne Industries, Inc.*, 676 F.2d 865 (1st Cir. 1982) ... 31

*Winstar Corp v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) .................... 18

**STATE CASES**

*National Controls, Inc. v. Commodore Business machines, Inc.*, 209 Cal. Rptr. 636 (Cal. App. 1985) .................... 31

**FEDERAL STATUTES**

28 U.S.C. § 1491(a) .................... 34

**STATE STATUTES**

U.C.C. § 2-708(2) .................... 31

**RULES**

RCFC 12(b) .................... 35

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Senior Judge Smith) |

**PLAINTIFFS' REPLY TO "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT."**

## I. RELIEF SOUGHT

Plaintiffs Sterling Savings Association and Sterling Financial Corporation (hereinafter collectively "Sterling") request the Court to grant its motion for partial summary judgment on liability issues, which it filed on January 21, 1997, and to deny the United States' ("Defendant") motion to dismiss and cross-motion for summary judgment, which it submitted in response on April 7, 1997.

In Sterling's 1997 briefing, it demonstrated that, as a matter of law, Defendant entered into three contracts relating to Sterling's acquisition of three failed thrifts and thereafter, breached those agreements. After completing fact discovery in August, 2000, Defendant submitted supplementary materials with the hope of precluding the granting of Sterling's motion. As demonstrated more fully

below, Defendant's supplemental materials fail to support its motion or its cross-motion, and further fail to demonstrate any material issues of fact to preclude Sterling's motion for Partial Summary Judgment on all liability issues.[1]

## II. NATURE OF CASE

Sterling seeks partial summary judgment as to all liability issues relating to Defendant's breach of three contracts entered into with Sterling for the purchase of three failing thrifts. Sterling originally brought its motion on January 21, 1997, pursuant to the *Short Form Procedure* of this Court's OMNIBUS CASE MANAGEMENT ORDER, ¶ 5 (September 18, 1996). Defendant opposed Sterling's motion and in addition, cross-moved to dismiss Plaintiff Sterling Financial Corporation for lack of standing and cross-moved for summary judgment on the substantive contract claims. In reply, Sterling demonstrated irrefutably that Defendant entered into contracts with Sterling and acted inconsistently with those contracts. See Sterling Savings Association Reply Re: Motion for Partial Summary Judgment Re: Liability, and Response To Cross Motion to Dismiss (filed on or about June 16, 1997).

On December 22, 1997, this Court ordered Defendant to show cause as to why Sterling's Motion for Partial Summary Judgment should not be granted.[2] In Defendant's February 1998 response, it agreed that, if the Court held that bid documents, associated FHLBB resolutions, and forbearance

---

[1] Sterling did not respond to Defendant's Opposition to Sterling's Constitutional Taking and Due Process claims in accordance with this Court's Order of November 2, 2000. Although Sterling reads the November 2nd Order to also stay the issues relating to this Court's subject matter jurisdiction, Sterling demonstrates below that its claims for restitutionary damages and estoppel should not be dismissed. See IV D&E, infra.

[2] Specifically, the Court ordered that "[i]n all *Winstar related* cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, that the United States shall show cause, within 60 days, as to why those motions should not be granted and liability found on . . *Winstar* contract issues based upon the instant decision." December 22, 1997 Opinion at 4[illegible]

letters always create a contract with the government, then it could offer no reasons as to why "the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case." Defendant's Response to The Court's Order To Show Cause, p.28 (filed on or about February 20, 1998). However, Defendant also suggested that, if the Court instead held that the existence of a contract depends upon the particular "contractual circumstances" in each Winstar case, then it should be given a continuance before having to respond to the Court's Order to Show Cause.

Sterling filed a Proposed Order for Partial Summary Judgment on March 31, 1998. See Sterling Savings Association's Memorandum Re: Proposed Order for Partial Summary Judgment and Order Re: Sterling's Motion For Partial Summary Judgment Re: Liability (both filed March 31, 1998). On April 30, 1998, Defendant filed its Response to Sterling's Proposed Order. See Response of the United States To Plaintiff's Proposed Order (filed April 30, 1998). In that response, Defendant again represented to the Court that it needed time to conduct discovery pursuant to RCFC 56(g) before responding to the Court's Order to Show Cause. Id. at 11-22; Declaration of Counsel (Elizabeth Hosford) (filed April 30, 1998). In reply, Sterling filed two further separate memorandums in opposition to the requested RCFC 56(g) continuance, which is still pending. See Sterling Savings Association's Reply Re: Proposed Order on Motion for Partial Summary Judgment Re: Liability (filed June 6, 1998) and Sterling's Motion to Set a Hearing for the Adjudication of the Government's Pending Rule 56(g) Motion (filed March 10, 2000).

Between August 22, 1999 and August 23, 2000, the parties conducted extensive fact discovery. On October 10, 2000, Defendant filed a Supplemental Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment (hereinafter, "Def's Supp. Brief, pp

As demonstrated below, however, Defendant's Supplemental Response still fails to identify any triable issue which would preclude Sterling's right to partial summary judgment on liability.

## III. SUPPLEMENTAL UNDISPUTED FACTS

In addition to those Undisputed Facts set forth in Sterling's Motion for Partial Summary Judgment Re Liability and Affidavit of Leslie R. Weatherhead in Support of Motion (filed on January 21, 1997) and Sterling Savings Association's Reply Re: Motion for Partial Summary Judgment Re: Liability and Response to Cross-Motion to Dismiss (filed on or about June 16, 1997), Sterling provides the following supplemental statement of undisputed facts.

### A. SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE AUTHORITY OF THE FHLB OF SEATTLE.

#### *1. The FSLIC and the FHLBB Delegated the Authority to the FHLB of Seattle to Process and to Negotiate The Assisted Acquisitions in District 12 (The Northwest).*

In the early 1980s, the FSLIC and the FHLBB delegated to the FHLB of Seattle the authority to negotiate the terms of assisted acquisitions within the Northwest. (Pls' Exs. V-1, 85:25-87:19; V-2, p. 132)[3]. As part of this authority, the FLHB of Seattle created a "special committee" charged with the responsibility of resolving the different troubled institutions. (Pls' Exs. V-1, 84:3-17; 130:19-131:4; Y-1, 183:18-184:15, 185:12-186:12, 221:23-222:1). Pat McJoynt, Senior Vice President and Assistant Regional Director of the FHLB of Seattle, managed this "special committee." Ms. McJoynt reported directly to the Principal Supervisory Agent, James Faulstich. (Pls' Exs. Y-1, 185:15-186:12; V-1, 79:10-19, 80:4-12; 85:25-87:19). Acting, in part, through this special committee, the FHLB of Seattle aggressively negotiated the terms of each assisted acquisition. (Pls' Ex. V-1, 86:15-87:19, 118:4-12;

[3] "Pls' Ex. V-1, 85: 25-87:19" refers to Plaintiffs' Exhibit V-1, page 85, beginning at line 8, through to page 87, ending at line 19. If no lines are referenced, that means Sterling is citing to a document instead of a deposition transcript.

Pls' Ex. Y-1, 188:3-21)

## B. THE SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE ACQUISITION OF LEWIS FEDERAL.

### *1. The Lewis Federal Acquisition Was The Result of An Extensive Marketing and Negotiation Process.*

#### a. The Defendant "Shopped" The Troubled Thrift.

Sterling's acquisition of Lewis Federal Savings and Loan Association ("Lewis Federal") was the product of intense marketing and negotiating on the part of Defendant. (Pls' Exs. V-1, 91:14-92:13, V-2, p. 133-34). First, Defendant marketed Lewis Federal to a number of associations on an unassisted basis. (Pls' Ex. V-2, pp. 133-34). However, none of the associations would acquire Lewis Federal, except pursuant to a contract to include FSLIC assistance. (Pls' Exs. V-1, 91:14-92:13; Pls' Exs. V-2, p. 133). As a result, Defendant marketed Lewis Federal on an assisted basis to a number of different thrifts and invited them to submit offers. (Pls' Exs. V-1, 91:14-92:13; V-2, p.133-34). Of twenty-three thrifts invited to bid, three of them, including Sterling, submitted formal bids. (Pls' Ex. V-3, p. 138-39). After receiving the bids, the FHLB of Seattle made a recommendation to the FHLBB that it should begin negotiating with Sterling, the lowest bidder. (Pls' Exs. V-1, 93:16-94:20; V-2, p. 136; V-3, p. 140).

#### b. Sterling Received a Bid Package That Described The Procedure for Bidding.

Prior to its acquisition of Lewis Federal, Defendant sent Sterling a package of information and instructions to be used in preparing its bid ("bid package"). (Pls' Exs. I,[4] ¶ 12; U-1, 15:12-16:2) The bid package, in part, described the types of financial assistance, accounting forbearances, and regulatory forbearances for which Sterling could negotiate. (Pls' Ex. I, ¶ 12; U-3, pp. 47-55). A list of boilerplate

---

[4] Pls' Exhibits A-S were filed as part of Sterling's Motion for Partial Summary Judgment in January and June of 1997, respectively.

forbearances were listed by "Forbearance Numbers," SM-1 through SM-6. (Pls' Ex. U-3, pp. 53-56). SM-1 and SM-2, when read together, provided that FSLIC assistance may be credited directly to the acquiring thrift's net worth for regulatory accounting purposes and only those intangible assets created pursuant to the purchase method of accounting (i.e. GAAP)[5] would have to be amortized. (Pls' Ex. U-3, p. 54). The bid package also explained that all terms would be the subject of negotiation and that requested forbearance language would have to be convincingly justified.[6] (Pls' Ex. U-3, p. 37, ¶ 10, p. 46).

**c. Sterling Submitted a Bid For Lewis Federal And Requested FSLIC Assistance Without Any Provision For its Repayment or Amortization.**

Early on, Sterling manifested in an internal memorandum that it wanted FSLIC assistance to remain on its balance sheet permanently. (Pls' Exs U-2, p. 33). The memorandum made clear that any bid or final agreement with the FSLIC must not contain a "provision for repayment to FSLIC." (Pls' Ex. U-2, p. 33).

On June 13, 1985, Sterling submitted its bid to acquire Lewis Federal. (Pls' Ex. U-4, pp. 63-68). That bid specifically requested, in part, the forbearance language of SM-1 and SM-2, which was consistent with its manifested desire to obtain permanent capital. (Pls' Ex. U-4, p. 67). Two other thrifts submitted bids as well: (1) Pacific First FSB and (2) Timberland Federal Savings and Loan. (Pls' Exs. V-1, 88:15:89:18; U-2, p. 133). The FHLB of Seattle negotiated and processed these bids and awarded the bid to Sterling. (Pls' Exs. V-1, 86:11-87:19; 97:24-101:3; V-2, p. 135; V-3, pp. 137-

---

[5] The term "purchase method of accounting" derives from GAAP and means that intangible assets will be valued pursuant to FASB 72 (GAAP) and not in accordance with regulatory accounting practices or "RAP." Pls' Ex. DD, p. 308, ¶¶ 6-7.

[6] SM-1 and SM-2 had to be specifically requested and were subject to negotiation. Pls' Ex. U-3, p. 48, § II. SM-4 was to be used if a Thrift failed to negotiate for SM-1 and SM-2. Pls' Ex. U-1, pp. 54-55.

140; V-4, pp. 142-49).

On October 23, 1985, the FHLB of Seattle, with the concurrence of the FSLIC, recommended to the FHLBB that it approve Sterling's terms for the acquisition of Lewis Federal because, in part, it represented the lowest cost resolution for the FSLIC. (Pls' Ex. V-1, 88:15-90:9; 91:14-92:13; 93:16-94:20; 95:17-96:2, 97:24-101:3). As part of that recommendation, the FHLB of Seattle recommended that the acquisition be accounted for under GAAP, with the exception that the FSLIC cash assistance be credited directly to Sterling's net worth. (Pls' Exs. V-1, 97:16-21, 100:10-101:3, 104:15-107:11; V-4, p. 110). Further, the FHLB of Seattle and the FSLIC recommended that the value of any intangible assets resulting from the merger in accordance with the purchase method of accounting be amortized by the straight line method over a period not to exceed 40 years. (Pls' Exs. V-1, 97:16-21, 100:10-101:3, 104:15-105:11; V-2, p. 134; V-4, p. 110).

Neither the FHLB of Seattle nor the FSLIC recommended that the FSLIC assistance be subject to reduction or amortization. (Pls' Exs. V-1, 102:15-103:15; V-2, p. 134; V-3, p. 138; V-4, p. 110). Contrarily, according to the FHLB of Seattle, Defendant (as seller) understood that the non-amortization of the cash assistance and associated credit to net worth was a critical term without which Sterling would not have consummated the deal. (Pls' Ex. V-1, 102:15-103:15, 104:15-105:14, 114:6-115:1).

### 2. *The Final Forbearance Letter Does Not Contain a Provision Requiring Sterling to Amortize or to Reduce the FSLIC Infusion of Capital.*

The FHLBB adopted without variation the recommended terms made by the FHLB of Seattle and the FSLIC. (Pls' Exs. V-1, 106:10-107:17; V-5, pp. 151-53). Further, the FHLBB's final forbearance letter did not require Sterling to amortize RAP goodwill, or through any other type of balance sheet management, to cause a reduction of the FSLIC cash assistance as a credit to capital over

time. (Pls' Exs. V-1, 106:10-107:17; V-5, pp. 232-33). The Lewis Federal assistance agreement also was void of any such requirement. Pls' Ex. A-6.

## C. THE SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE ACQUISITION OF TRI-CITIES.

### 1. *The Tri-Cities Acquisition Was The Result of Aggressive Marketing and Negotiations.*

#### a. The Defendant "Shopped" The Troubled Thrift.

Pat McJoynt's "special committee," negotiated the supervisory resolution of the Tri-Cites Savings and Loan Association ("Tri-Cities"). (Pls' Exs. Y-1, 185:10-186:7, 188:3-21, 229:3-25; V-1, 84:3-17, 130:19-131:4; U-1, 20:6-21:15). At first, this committee marketed Tri-Cities unsuccessfully on an unassisted basis to a number of different thrifts, all of which showed no interest. (Pls' Exs. Y-1, 191:5-8; Y-2, p. 231). As a result, on July 6, 1987, the FHLB of Seattle recommended an administrative transfer of Tri-Cities to the FSLIC so that it could be marketed on an assisted basis. (Pls' Exs. Y-1, 189:4-21:13; Y-2, p. 231).

Beginning in August 1987, the FHLB of Seattle implemented a comprehensive marketing strategy. It generated bidding lists of potential acquirers, sent out invitations to potential bidders, and on October 15, 1989, held a bid conference in Seattle. (Pls' Exs. Y-1, 192:3-195:10; Y-3, p. 233; Y-4, p. 234; Y-8 p. 254). As a result, the FHLB of Seattle received three bids from thrifts to acquire Tri-Cities pursuant to an assistance contract, one of which was Sterling. (Pls' Ex. Y-6, p. 252).

#### b. Sterling Successfully Bid for Tri-Cities and Extensively Negotiated an Agreement With Defendant.

Sterling submitted its bid on November 27, 1987. (Pls' Exs. Y-5, pp. 235-251; Y-7, p. 253). As with the Lewis Federal transaction, Sterling sought to obtain permanent capital and the right to amortize GAAP intangibles over twenty-five years by the straight line method. (Pls' Exs. Y-1, 196:11-19, 197:1-8, 198:14-22, 199:15-200:16; Y-5, pp. 239-240). Originally, Old Stone Bank was the

successful bidder, but it later withdrew its offer. (Pls' Exs. Y-1, 204:17-205:6; Y-8, pp. 254-256; Y-9). Therefore, the FHLB of Seattle awarded the bid to the next lowest bidder, Sterling. (Pls' Ex. Y-1, 206:14-24).

By March, 1988, the FHLB of Seattle had completed its analysis of Sterling's bid and had requested the FSLIC's authorization to negotiate the rest of the terms of the acquisition. (Pls' Exs. Y-1, 214:23-215:3; Y-11, pp. 265-267). On March 16, 1988, the FSLIC gave the FHLB of Seattle this authority. (Pls' Exs. Y-1, 217:17-218:5, 220:15-24; Y-12, p. 268). On March 31, 1988, the FHLB of Seattle provided the agreed upon terms to the FHLBB. (Pls' Ex. Y-1, 223:19-224:17). None of the terms provided by the FHLB of Seattle required Sterling to amortize the FSLIC assistance or any RAP goodwill related therewith. (Pls' Exs. Y-1,199:22-200:16; Y-12(a), pp. 278-279). The FSLIC assistance was to be permanent. (Pls' Exs. V-1, 109: 5-11). In this regard, the FHLB of Seattle provided a draft form of a forbearance letter that contained the same SM-1 and SM-2 language that Sterling successfully negotiated for in the Lewis Federal transaction. (Pls' Exs. Y-13, pp. 282-283).

On April 7, 1988, the FHLBB delegated to FHLB of Seattle the authority to execute the Assistance Agreement between the FSLIC and Sterling according to the terms negotiated between the parties. (Pls' Exs. Y-1, 190, 227:4-228:19, 229:3-25; Y-15, p. 287). On April 8, 1988, Sterling and Defendant entered into an Assistance Agreement whereby approximately $11.7 million in cash assistance was to be directly credited to Sterling's net worth. (Pls' Ex. B-5, p. 17) No where in that agreement did it suggest that Sterling was to amortize any balance sheet entry relating to the FSLIC assistance. Id. On April 6, 1988, the FSLIC provided a forbearance letter that contained roughly the same SM-1 and SM-2 language as used in the Lewis Federal acquisition. (Pls' Exs. V-1, 110:14-112:11; Pls; Ex. B-1) The forbearance letter also did not require Sterling to amortize any balance sheet entry associated with the FSLIC assistance. (Pls' Ex. B-1).

Overall, the terms of the acquisition were the result of extensive negotiations. (Pls' Exs. U-1, 20:21-21:5; Y-1, 187:15-188:5, 201:21-202:16, 203:10-20, 206:25-213:9, 215:18-22, Y-10, p. 263). Indeed, part of the requested cash assistance sought by Sterling included a $525,077 payment for assets it did not want to assume from Tri-Cities, but the FHLBB and FHLB of Seattle took the negotiating posture of requiring Sterling to assume those assets without a payment. (Pls' Exs. Y-1, 216:8-14, 217:17-218:19, 219:4-17; Y-11, p. 266; Y-12, p. 268). In the end, however, after extensive negotiation, the FSLIC agreed to assume those assets and paid Sterling the $525,077 as part of the $11.7 million of cash assistance agreed to in the Assistance Agreement. (Pls' Exs. Y-1, 225:18-227:3; Y-14, p. 284).

## D. THE SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE CENTRAL EVERGREEN ACQUISITION.

### *1. The FHLB of Seattle Negotiated for Sterling to Acquire Central Evergreen On Unassisted Basis, in Part, Because of the Inducements and Permanent Capital Provided for in The Lewis Federal and Tri-Cities Transactions.*

In the summer of 1987, the FHLBB sought to have Sterling acquire the Central Evergreen Federal Savings and Loan Association ("Central Evergreen") on an unassisted basis. (Pls' Ex. E, ¶ 33). Sterling at first was not interested in acquiring Central Evergreen on an unassisted basis because it could cause Sterling to become under-capitalized. (Pls' Exs. H ¶¶ 6-7; I, ¶ 10; W, p. 164:6-12). The FHLBB, however, was persistent and negotiated very aggressively with Sterling to enter into an agreement to acquire Central Evergreen. (Pls' Ex. V-1, 118:4-12; W, 160:4-166:6, 167:15-168:15). In order to persuade Sterling to acquire the Central Evergreen transaction, the FHLBB provided, among others, two critical inducements.

First, it provided that the entire amount of the goodwill created by the merger could be booked as an asset and counted as regulatory capital. (Pls' Ex. V-1, 116:8-16, 117:11-118:21). Without that term, Sterling would not have the capital base needed to support the acquisition. (Pls' Exs. V-1,

116:12-16, 117:11-23; W, 164:6-12). Second, Defendant reaffirmed that the *permanent* regulatory capital Sterling acquired from the Lewis Federal and Tri-Cities acquisitions would provide the requisite capital needed to prudently acquire Central Evergreen on an unassisted basis. (Pls' Exs. V-1, 122:15-124:16; 125:13-126:23; W, 163:11-21, 164:13-165:6, 171:10-15; E, ¶ 33).

In fact, it is undisputed that the Central Evergreen and Tri-Cities acquisitions were inextricably intertwined with one another. (Pls' Ex. W, 160:4-166:6, 167:15-168:15). Sterling had numerous discussions with Defendant, who persistently encouraged and induced Sterling to acquire Tri-Cities on an assisted basis, so that subsequently, it could use the permanent cash assistance as the regulatory capital needed to acquire Central Evergreen on an unassisted basis. Id. Sterling was reluctant at first, but based on the assurance that the FSLIC assistance from Tri-Cities could be counted permanently towards the regulatory capital requirements, Sterling acquired both thrifts as suggested. Id. The memoranda drafted by Defendant during that time demonstrate undisputedly that Sterling successfully negotiated for such an agreement. (EE-1, 355:18:-356:6, 357:16-21, 358:15-359:4, 359:15-360:21; EE-2, p. 361; EE-3, p. 362; EE-4, p. 363).

According to the FHLB of Seattle, Sterling could not have even considered the Central Evergreen transaction without a justifiable belief and conviction that the *permanent capital* and previous forbearances from the other acquisitions were in fact, contractual and binding upon the Government according to their terms. (Pls' Ex. V-1, 113:17-115:1).

***2. Had Sterling Not Contracted to Acquire Central Evergreen on an Unassisted Basis, FSLIC Would Have Had to Pay at Least $8 - $10 Million in FSLIC Assistance.***

The inducements provided to Sterling for acquiring Central Evergreen on an unassisted basis were given in exchange for the low cost resolution of an otherwise troubled thrift. (Pls' Ex. V-1, 118:13-21, 119:22-121:16). Had Sterling not taken the inducements and not acquired Central

Evergreen on an unassisted basis, the FSLIC would have had to spend at least $8-$10 million in assistance in order to induce another thrift to acquire Central Evergreen. (Pls' Ex. V-1, 120:8-121:16).

## IV. STERLING'S REPLY AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL OPPOSITION AND CROSS-MOTION

### A. AS A MATTER OF LAW, THE UNITED STATES CONTRACTUALLY AGREED TO PROVIDE STERLING PERMANENT CAPITAL THAT WAS NOT TO BE SUBJECT TO REDUCTION OR TO AMORTIZATION.

#### *1. The Only Evidence in The Record Is Undisputed and Establishes That as a Matter of Law, Sterling Received Permanent Regulatory Capital as Part of the Lewis Federal and Tri-Cities Acquisitions.*

**a. The Defendant's Position Misrepresents the Record.**

In its supplemental response to Sterling's partial summary judgment motion on liability, Defendant claimed that the FSLIC assistance provided as part of the Lewis Federal and Tri-Cities acquisitions also was to be included as a double book entry in unidentified intangibles and therefore, amortized. Def's Supp. Brief, pp. 35-36. The sole basis for this new position grows out of two unfounded contentions. First, that since Daniel Byrne, Sterling's Chief Financial Officer, supposedly admitted that Sterling included the FSLIC assistance in unidentified intangibles on its balance sheet prepared for submission to the regulators, he somehow conceded that the FSLIC assistance was subject to amortization. Id. at 35. Second, that William Zuppe, Sterling's Chief Operations Officer, admitted in an affidavit that the FSLIC assistance was to be amortized. Id. at 35-36. Neither is true and both are inaccurate representations of their testimony.

**b. The Testimony of Daniel Byrne and William Zuppe Incontrovertibly Establish That Sterling Never Intended to Amortize the FSLIC Assistance or Any Asset Created Thereby.**

Contrary to what Defendant suggests, Mr. Byrne unequivocally made clear during his deposition that Sterling never amortized the portion of unidentified intangibles associated with the FSLIC

assistance, because the FSLIC assistance acquired by Sterling was to be *permanent*. Mr. Byrne's full testimony on this subject reads:

Q. Did you amortize all the RAP goodwill?
A. What we amortized was the intangibles resulting on a GAAP basis.
Q. Why the intangibles resulting on a GAAP basis?
A. Because you were required to do so under the accounting rules.

********

Q. Did you include the FSLIC cash contribution which was recorded as an intangible in the amortization?
A. The cash assistance was treated as permanent regulatory capital and a credit to capital.
Q. Why was it not amortized with the other intangibles?
A. We looked at it as capital. It was permanent.

********

Q. The cash assistance was included in the line goodwill and other intangible assets on your TFR, is that correct?
A. That's correct.
Q. So on a RAP basis amortization was higher?
A. We recorded the amortization expense, the same for RAP and GAAP purposes, and that was under our GAAP, because that is how we maintained our books.
Q. So you didn't amortize the RAP intangibles?
A. We had the credit to capital that was kept permanent, and what we amortized pursuant to our books was the GAAP portion of the intangibles.
Q. And where in your agreement did it say you only had to amortize the GAAP portion?
A. It seemed to be the logical conclusion when the cash assistance was to be permanent and to remain the same and constant forever.

(Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18) Therefore, contrary to what the Defendant represented in its brief, Mr. Byrne makes indisputably clear that Sterling never admitted to amortizing the FSLIC assistance or any intangible asset associated with it. In fact, the opposite is true.

Similarly, Mr. Zuppe's Affidavit also fails to create a triable issue. First, the concepts of GAAP intangibles, RAP goodwill, and the accounting issues associated with each are complex issues over which Mr. Zuppe admitted he had no expertise. He testified no less than eight (8) times during his deposition that he is not an accountant. (Pls' Ex. AA, 292:14, 293:25-294:1, 295:21-21, 296:9, 297:13, 298:11)

Secondly, Mr. Zuppe's affidavit only refers to Sterling's right to count supervisory goodwill as regulatory capital. His reference to amortization was meant to be no more than a general comment on the length of the amortization period. He was not addressing the more specific issue of whether RAP goodwill, as differentiated from GAAP intangibles or goodwill, also would be subject to amortization. The government did not raise that issue until 10 years later.

Thirdly, when read in the context of Mr. Byrne's affidavit, filed simultaneously with Mr. Zuppe's, it becomes clear that Sterling was referring only to the GAAP intangibles or goodwill created pursuant to the purchase method of accounting:

> (g) In the Tri-Cities Forbearance letter the FHLBB:
>
> (3) Agreed that Sterling could carry 11.7 million in FSLIC cash assistance on it books as a credit to its net worth, for regulatory capital purposes;
>
> (4) Agreed that for regulatory accounting purposes, supervisory goodwill created by the transaction would be booked pursuant to the *purchase method of accounting* [i.e. GAAP goodwill] and could be amortized over 15 years ... .

(Pls' Ex. B-1, ¶¶ 3-4). (emphasis added) Mr. Byrne's affidavit is consistent with his deposition testimony wherein he testified that Sterling only ever amortized the GAAP portion of the unidentified intangible pursuant to the contract. (Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18).

Lastly, Mr. Zuppe's affidavit, when read as a whole, is not inconsistent with Sterling's undisputed understanding that the FSLIC assistance was to be permanent and remain undiminished over time. Specifically, in paragraph 30 of his affidavit, he made clear by the underlined text that Sterling always considered the FSLIC assistance to be permanent and not subject to reduction:

> 30. Pursuant to its agreement with the FSLIC and in conformity with the FHLBB Order, Sterling booked $11.7 million in permanent regulatory capital.

(Pls' Ex. E, ¶ 30). (emphasis original) As such, Defendant's suggestion that Sterling has conceded the issue completely lacks merit.

2. *Actually, It Is Defendant Who Undisputedly Agrees That the FSLIC Assistance Was to Be Permanent and Was Not to Be Amortized.*

The strongest reason why Sterling is entitled to partial summary judgment on the permanency of the cash assistance is because the key governmental personnel charged with the authority to specifically negotiate these transactions all agreed that the cash assistance was to be permanent and not amortized.

First, Pat McJoynt, the main negotiator on behalf of FHLBB with respect to the Tri-Cities acquisition, testified as follows:

**Q.** Do you understand what Sterling was proposing there?
**A.** Yes.
**Q.** And what were they proposing, from your understanding?
**A.** That the FSLIC assistance be counted toward capital.
**Q.** The cash assistance?
**A.** Yes.
**Q.** Do you see anywhere in that paragraph where they were proposing that the cash assistance in any way be paid back?
**A.** No.
**Q.** Or amortized?
**A.** No.
**Q.** Or reduced at any time, any point over time?
**A.** No.
**Q.** Would it be your understanding what they were requesting was permanent capital?
**A.** I would not disagree with that statement.

(Pls' Ex. Y-1, 199:22-200:16) (emphasis added)

Second, James Faulstich, the Principle Supervisory Agent in charge of all assisted acquisitions in Sterling's district at that time repeatedly admitted at his deposition that the cash assistance provided in the Lewis Federal and Tri-Cities acquisitions was permanent capital not subject to reduction or to

amortization. (Pls' Ex. V-1, 102:15-103:15, 104:24-105:14, 108:4-17, 109:5-11, 111:23-112:17, 113:17-115:1) In particular, Mr. Faulstich testified:

**Q.** With regards to the up-front cash contribution, I think I asked you that question with regard to the $1.75 million in Lewis Federal. It says, "This payment will count as regulatory net worth." Again, what does that statement mean? What is this telling me?
**A.** That the full amount of the FSLIC infusion would be used as capital for the association and not used to set up reserves or for whatever other purpose on the balance sheet of the association.
**Q.** Was it to be treated as permanent capital? Do you know?
**A.** It would be treated as -- as permanent capital, yeah, as a cash contribution.
**Q.** Not to be paid back at a later date? Not to be amortized over a period of time?
**A.** That would be correct.

(Pls' Ex. V-1, 108:1-17) (emphasis added) Further, he testified:

**A.** . . . to have [Sterling] embark on this ambitious plan with not a certainty that they would have the capital to sustain it would not be a very prudent venture in business. . . so I would think they would be imprudent had they embarked on this plan without a belief or conviction that this was permanent capital and that the forbearance agreements were, in fact, permanent forbearances in accordance with their terms.

(Pls' Ex. V-1, 114:16-115:1) (emphasis added)

Third, consistent with the above, Edwin John Gray, the former president of the FHLBB testified about FSLIC assistance in another *Winstar* case as follows:

**Q.** And what's your basis for your understanding that the capital credit would last in perpetuity?
**A.** Well, because if there is no modifying statement anywhere in the agreement, then – then it has to be that.
**Q.** And why is that?
**A.** Well, because – because there is no – there no basis to think otherwise. I mean there's – if you say, for example, cash contribution made under this provision shall be credited to the acquiring association net worth account and shall constitute regulatory capital, particularly because it's cash, it's a credit, it's cash, how do you – how do you put a time frame on cash?

(Pls' Ex. X, 180:15-181:5)

Likewise, Alvin W. Smuzynski, the former Assistant Director with the Office of Examinations and Supervisor at the FHLBB, testified in the same case as follows:

**Q.** Capital credits are never amortized, are they?
**A.** The capital credit would have been the cash that was provided by FSLIC. No, that would not be amortized.

(Pls' Ex. Z, 290:21-25) (emphasis added).

Lastly, although not written to Sterling, a June 17, 1988 letter drafted by the FHLB of Topeka, Kansas reveals the original intent of the FHLBB on this issue:

> [A]s a the result of several phone conversations with your association and the Federal Home Loan Bank Board in Washington D.C., it was decided that it was not the intent of the [FSLIC] to establish an asset that would be amortized, thus reducing your net income. It was ruled, therefore, that the forbearance would not show up on the balance sheet, but that the $20 million would be added back in when computing compliance with regulatory capital requirements.

(Pls' Ex. CC, p. 306).

It was only after the Defendant realized that it was going to be found liable for breach of contract in these *Winstar* cases that it developed the belief that the FSLIC assistance promised had to be amortized as part of the deals. As demonstrated above, however, the undisputed intentions at the time of executing the contracts dictate otherwise. Hence, partial summary judgment on this issue should be entered in Sterling's favor.

***3. The Legal Rules For Interpreting Contracts Leads to One Inescapable Result: The FSLIC Assistance Was Not Directly or Indirectly Subject to Amortization.***

The Defendant's argument that the FSLIC assistance was to be amortized admittedly is based on the assumption that the assistance and acquisition agreements, forbearance letters, and resolutions relating to the acquisitions of Lewis Federal and Tri-Cities were indeed contracts. See Def's Supp. Brief, p. 35. As such, the law that governs the interpretation of contracts must be applied.

### a. Interpreting Contracts in The U.S. Court of Federal Claims.

In the U.S. Court of Federal Claims, issues of contract interpretation are questions of law particularly suited to resolution on summary judgment. Huna Totem Corp. v. United States, 35 Fed.Cl. 603, 608 (1996), *rev'd on other grounds* 135 F.3d 775 (1998). "[The] principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." Winstar Corp v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995). In this regard, a Court should consider heavily the manner in which the parties performed under the contract prior to a dispute over its meaning:

> The 'practical interpretation' of the contract by the parties themselves 'during performance' is, of course, of 'great importance' in resolving disputes involving contract interpretation. [citation omitted] ... 'Acts of the parties under a contract prior to the time when the contract becomes subject to controversy,' and which are inconsistent with their subsequent contentions, 'are to be given considerable weight in interpreting a contract.' [citations omitted]

Blanchard v. United States, 347 F.2d 268, 273 (Ct. Cl. 1965).

Lastly, the Court must look to the "plain meaning of the terms of a contract to determine whether the parties' objectively manifested intent can be gleaned therefrom." Huna Totem Corp, 35 Fed.Cl. at 608. Further, putting aside whether a contract is fully or partially integrated or ambiguous, the Court may not look to extrinsic evidence that varies, contradicts, or adds to the terms of an agreement. McAbee Construction Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (emphasis added); see also Alaska American Lumber Co., Inc. v. United States, 25 Cl.Ct. 518, 527 (1992); Applied Companies v. United States, 37 Fed. Cl. 749, 759 (1997).

**b. It Is Undisputed That The Contract Between the United States and Sterling Does Not Provide for Sterling to Amortize the Cash Assistance or Any RAP Goodwill That May Be Associated with It.**

Pursuant to law of contracts as summarized above, it cannot be controverted that the FSLIC assistance was not to be amortized, or in any manner, diminished. First, the Assistance Agreements, forbearance letters, and related resolutions promulgated by the FHLBB collectively state that the cash assistance was to be a direct credit to net worth for regulatory accounting purposes without any mention of amortization. See Pls' Exs. A-E. Had Defendant really intended the cash assistance to be amortized, it would have stated so in the agreement as it did in other acquisitions. For example, in one such acquisition, the FHLBB resolution read:

> RESOLVED FURTHER, that for regulatory accounting purposes, Citizens may credit $86 million of FSLIC's initial cash contribution pursuant to the Assistance Agreement to its regulatory capital account at the Effective Date, provided that Citizens shall amortize such amount over a period of twenty-five years ....

(Pls' Ex. BB, p. 305) (emphasis added).

Unlike in that case, however, the parties here did not intend such a result, and consequently, such terms or conditions do not exist. (Pls' Exs. A-C). As a matter of law, Defendant may not now add or vary the terms of the agreement as written. Applied Companies, 37 Fed.Cl. at 759. The Court, therefore, should invoke the maxim of legal interpretation, *expressio unius est exclusio alterius* – the expression of one term is the exclusion of another. See Huna Totem Corp, 35 Fed. Cl. at 609. In other words, the Court should hold that since particular terms are expressly specified in detail in Sterling's contract, such as the amortization of unidentified intangibles created pursuant to GAAP, any other omitted terms of the same general character relating to the same subject matter (i.e., the amortization of the cash assistance or RAP goodwill) should be excluded by implication.

c. **The Parties' Course of Performance Prior to this Dispute Undisputedly Establishes as a Matter of Law That the Cash Assistance Not Be Amortized.**

As stated above, extrinsic evidence of how the parties performed under the agreement must be given considerable weight in ascertaining the intent of the parties. Blanchard, 347 F.2d at 273. In this case, the parties' acts irrefutably demonstrate that the cash assistance was not to be amortized.

First, as demonstrated above, it cannot be controverted that Sterling, in accordance with its understanding of the agreements entered into with Defendant, did not amortize the cash assistance or the RAP goodwill.[7] (Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18) Further, there is no evidence to suggest that the FHLBB, which reviewed Sterling's financials on a quarterly basis, ever told Sterling to amortize the RAP goodwill or the cash assistance.

Second, in January 1989, the FHLBB began requiring Thrifts to complete the Thrift Financial Reports ("TFRs") on a GAAP basis as opposed to on a RAP basis. (Pls' Exs. DD, ¶¶ 4-5, p. 307; DD-1, pp. 312-314). As a result, beginning in March of 1989, Defendant required Sterling to report only GAAP intangibles on Line A544 on the asset portion of the TFR, and only the amortization expense associated with that GAAP intangibles on Line E110 of the Expense Report. Id. Defendant did not even provide a line item for the amortization of the RAP goodwill. (Pls' Ex. DD, ¶ 4, p. 307).

Third, beginning in 1989, the FSLIC assistance was to now be reported separately in an *off-balance report called* "Memo Items" (Line 978) (Pls' Ex. DD-2, p. 316). Fatal to Defendant's claim is the undisputed fact that up until the passage of FIRREA, Sterling reported $13.480 million of FSLIC assistance on line 978 of the "Memo Item," which reflected the full unamortized amount of

---

[7] Moreover, Sterling has never amortized the FSLIC cash assistance or RAP goodwill on its General Ledger. Pls' Ex. DD, ¶ 8.

the assistance provided as part of the Lewis Federal and Tri-Cities acquisitions ($1.75 million + $11.73 million = $13.480 million). (Pls' Exs. DD-2, p. 316; DD-3, p. 328; DD-4, p. 344; DD-5, p. 346).

Lastly, Defendant even affirmatively approved this unamortized balance of $13.480 million and included it in its own June 19, 1989 Joint Examination Report after a full and comprehensive audit of Sterling's financials. (Pls' Ex. DD-5, pp. 346-347). Specifically, in that report, Defendant reflected that the amount of reported capital decreased by exactly $13.480 million between December 31, 1988 and March 31, 1989, which accounted for the policy change of allocating 100% of the FSLIC assistance to an *off-balance* sheet memo item.[8]

Therefore, on the TFRs established as of January 1989, Sterling reported, and was only required to report, the amount of FSLIC assistance on its books, which Sterling and the Defendant undisputedly reported as undiminished at $13.480 million, (Pls' Ex. DD-2, p. 316) Likewise, Sterling was only required to report GAAP intangibles and GAAP amortization, not RAP amortization. (Pls' Ex. DD; ¶¶ 4-7, p. 308; DD-1, pp. 313-14; DD-2, p. 316, (line 978)). The lack of any line item on the TFR for Sterling to report the amortized expense of the RAP goodwill speaks volumes and confirms the parties true intent: that Sterling was to amortize only the GAAP intangibles. If the parties' intended to have the RAP goodwill amortized, which in turn, would have

---

8 On December 31, 1988, Defendant reported that Sterling had $21.188 million of Modified Equity Capital identified as "Paid in Excess of Par." (Pls' Ex. DD-5, p. 347) On March 31, 1989, after implementing the change whereby FSLIC assistance would no longer be included in that Modified Equity Capital category, Defendant reported $7.708 million of Capital Paid in Excess of Par: exactly a $13.480 million reduction. (Pls' Ex. DD-5, p. 347). Recall, the amount of the combined FSLIC assistance provided to Sterling an account of Lewis Federal and Tri-Cities was approximately $1.75 million and $11.730 million respectively, or $13.480 million in total.

reduced the amount of regulatory capital, Defendant would have provided a line item on the 1989 TFR for that purpose.[9]

**B. IT REMAINS UNDISPUTED THAT THE GOVERNMENT WAS CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL.**

***1. Defendant Rehashes Its Claim From 1997.***

In Defendant's 1997 briefing, it also made the claim that the risk of regulatory change was expressly allocated to Sterling. See Def's Motion to Dismiss; Cross Motion for Summary Judgment et seq., pp. 27-32 (April 7, 1997). Sterling replied and demonstrated that, as a matter of law, it did not accept the risk of regulatory change. See Sterling Savings Assoc's Reply et seq., pp. 43-56 (June 16, 1997). Now, despite this Court's subsequent ruling in *Castle v. United States,*[10] Defendant seeks to re-hash the same argument solely with regard to Central Evergreen. Def's Supp. Brief, pp. 36-37. Defendant bases this claim on the language of the Central Evergreen contract, a notation made in a memorandum prepared by Mr. Byrne, and a supposed admission by Sterling in a 1989 annual report. Id. As demonstrated below, none of these create triable issues of fact to preclude partial summary judgment in favor of Sterling.[11]

***2. The Castle Decision Controls and Dictates That, as a Matter of Law, Sterling Did Not Agree to Accept the Risk of Regulatory Change and That Defendant Breached its Contract with Sterling Regarding its Acquisition of Central Evergreen.***

**a. The *Castle* Decision.**

---

9 Moreover, as described in more detail in Sterling's 1997 Reply, the business plan, which was part of Sterling's contract to acquire Central Evergreen, reveals that Sterling was at all relevant times treating the FSLIC assistance as a permanent and non-amortizing asset. (Pls' Ex. C-3, Attach A).

10 42 Fed. Cl. 859 (1999).

11 Further, Harold Gilkey's (Sterling's CEO) testimony remains undisputed that the goodwill arising from the Central Evergreen acquisition was to counted as regulatory capital. Pls' Ex. W, 164-14-165-20.

In *Castle*, the Court interpreted a contract structured similarly to the one executed by Sterling as part of the Central Evergreen acquisition. First, the contract in *Castle* consisted of an acquisition agreement, a FHLBB approval letter, and a business plan. Second, as in Sterling's case, the contract in *Castle* permitted the thrift to meet the *lesser* of either the standard regulatory requirements as set forth in the FHLBB regulations, or a modified capital requirement as set forth in the contract. Third, the contract in *Castle* provided that the thrift could include supervisory goodwill as regulatory capital and amortize it over a period of time.

Also, as in Sterling's case, the government contended that the contract expressly assigned the risk of regulatory change to the thrift through the following provision:

> All reference to regulations of the Bank Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

*Compare* Castle, 42 Fed. Cl. at 862 with Pl's Ex. C. 3, § V., D.

The Court in *Castle*, however, after reviewing the contract as a whole, held that the above language did not allocate the risk of regulatory change to the thrift and granted Plaintiff's summary judgment motion on that issue. Id. at 863-64. In so doing, the court agreed with the thrift that the "successor regulation" provision merely put the parties on notice that as capital requirements increased or decreased, the thrift's capital requirements would increase or decrease as well, *but only in a manner as agreed by the parties elsewhere in the contract -- namely that the thrift could comply with the contractual capital formula in lieu of the regulatory amount when that contractual amount was less.* See Castle, 42 Fed. Cl. at 863-64 (emphasis added). Likewise the Court found that the government's asserted interpretation rendered the provision that allowed the thrift to comply with

the contractual capital requirement in lieu of the regulatory amount superfluous because the government could "vitiate the essence of the deal at any time." Id. at 864.

b. **The *Castle* Decision is Decisive on the Binding Nature of the Central Evergreen Agreement.**

As in *Castle,* the core of the agreement between Sterling and Defendant was Sterling's right to comply with the capital standards provided for in the business plan, in lieu of more restrictive regulations that may be passed in the future. (Pls' Ex. C-3, II, III) Only if Sterling's capital fell below that amount set forth in the business plan would Sterling be required to raise additional capital to comply with a stricter regulation. Id.

Defendant, however, would now have this Court accept an interpretation whereby that provision, which is specifically aimed at allowing Sterling the means to meet capital standards while still maintaining the time and flexibility needed to absorb and rehabilitate a severely undercapitalized thrift, could be nullified at any time for any reason. As stated in *Castle*, "[i]t is unreasonable to believe that anyone ...would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time." Castle, 42 Fed. Cl. at 864. Sterling surely did not do so, nor has Defendant demonstrated otherwise.

c. **Paragraph V., M. of The Central Evergreen Agreement Did Not Allocate The Risk of Regulatory Change to Sterling.**

Defendant also cites to paragraph V., M. of the Central Evergreen Agreement in support of its claim that Sterling assumed the risk of regulatory change . Defendant's Supplemental Memo in Support of it Opposition and Cross-Motion, p.37 The paragraph reads:

> M. This Agreement is not a waiver of or a forbearance from any applicable regulation.

Pl's Ex. C3, p. 5. Again, this provision must be read consistently with the meaning of the agreement as a whole - - namely that Sterling did not accept the full risk of regulatory change because it specifically negotiated for the right to follow the capital requirements in the business plan in lieu of future capital requirements. Castle, 42 Fed. Cl. at 863.

Further, at the time the contract was entered, the pertinent regulations allowed Sterling to count goodwill as regulatory capital and therefore, the provision simply makes sense when read in the context of the regulations at that time. Contrary to what Defendant suggests, Sterling does not claim, nor need it claim, that the Government somehow waived its right to regulate Sterling. Instead, Sterling need only demonstrate, which it has, that Defendant contractually agreed to allow Sterling to include goodwill as regulatory capital for the full amortization period agreed upon in the agreement.

Moreover, for the same reasons identified above, Defendant's interpretation would, in essence, give it the right to "vitiate the essence of the deal at any time." Therefore, Defendant's interpretation makes provision "M" conflict with the provisions that permit Sterling to comply with the business plan. As a matter of law contracts are to be construed to avoid such conflicts and as such, this argument should be rejected. See Castle, 42 Fed.Cl. at 863, *citing*, Guaranty Financial Svs., Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991) ("the court should endeavor to give reading to the contract that 'harmonizes the various provisions of the contract instead of placing them in conflict'").

**d. The Memorandum Drafted By Dan Byrne Does Not Establish That Sterling Assumed The Risk of Regulatory Change.**

Defendant claims that Dan Byrne, Sterling's CFO, drafted a memorandum that purportedly

admitted that Sterling agreed to accept the risk of regulatory change. Def's Supp. Brief, p. 38. The relevant language relied upon by Defendant reads:

> The essence of this provision [¶ V., M.] is that the agreement does not supersede the regulations to which Sterling is subject.

Def's App., p. 177. Standing alone, this provision is at best ambiguous and means nothing more than what it purports to convey in light of the regulations in place at that time.

However, reading that memorandum as a whole actually reveals more clearly Sterling's manifested intent that, albeit still subject to the FHLBB capital regulations, it could comply with capital standards by meeting the capital requirements as stated in the business plan. Sterling's actual intent is more clearly revealed in the first paragraph of the same memorandum, which reads:

> The purpose of this agreement is *to ensure that Sterling will abide by the business plan ....*

Def's App. p. 176 (emphasis added). Therefore, contrary to Defendant's claim, Mr. Byrne's memorandum is simply a manifestation of Sterling's understanding that all it had to do was comply with the capital standards stated in the business plan. The memorandum suggests nothing more.

**e. The 1989 Annual Report Only Confirms That Sterling Acquired a Forbearance to Allow it Time to Raise Capital Pursuant to the Business Plan.**

Defendant also claims that "even assuming that the capital maintenance agreement contained a forbearance permitting Sterling to count supervisory goodwill as regulatory capital, the forbearance expired in 1991." Def's Supp. Brief, p. 37-38. Defendant's sole basis for that contention is a paragraph contained within Sterling's 1989 Annual Report, which reads in part:

> Management believes it has been granted a forbearance until

> December 31, 199[0][12], from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

<u>Def's Supp. Brief</u>, p. 37-38. Again, the Defendant is taking a portion of a document out of context and applying an interpretation to it after the fact with the hope of creating a triable issue where none actually exists. The full paragraph reads:

> Management believes it has been granted a forbearance until December 31, 199[0], from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. ... *[A]ny such forbearance would be conditioned upon the compliance by [Sterling] with the business plan submitted to the FSLIC by [Sterling] in conjunction with the Central Evergreen acquisition.*

<u>Def's App.</u>, 196 (italicized portion is that portion omitted from Defendant's brief).

Thus, a complete reading of the above paragraph, especially in the context of the actual language of the Central Evergreen agreement, reveals that Sterling's intent merely was to communicate that it had the right to comply with the modified capital standards agreed to in the business so long as it did so by December 30, 1990. The pertinent language from the Central Evergreen agreement confirms this point:

> The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised *prior to December 31, 1990.*

<u>Pl's Ex. C., 3, p.3</u> (emphasis added). Therefore, it cannot be controverted that the paragraph's only purpose was to describe to the shareholders and investors that Sterling had the right to comply with the business plan's capital standards and amortization schedules in lieu of any stricter regulatory

---

12 The December 31, 1991 date refereed to in the Annual Report is a typo: nowhere in the Central Evergreen Agreement is there the date of December 31, 1991. Rather the date used is December 31, 1990. <u>Pl's Ex. C</u>, p. 3.

standard, but that as a condition of that right, it had to comply with those standards by December 31, 1990. Id. The Annual Report creates no triable issues of fact.

**f. Based On The Undisputed Evidence Presented in 1990, the Federal District Court Made Findings Consistent With Sterling's Understanding.**

Consistent with Sterling's position is the fact that the Eastern District of Washington, as part of its ruling on the injunction, found:

> Exhibit L, and an agreement between Sterling and the FSLIC in which Sterling promised to raise additional capital pursuant to a referenced Business Plan [the Central Evergreen Agreement] and the FSLIC *agreed to give Sterling until December 31, 1990, to comply with existing capital asset ratios.*

Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 874 (E.D. WA. 190) *vacated on other grounds*, 959 F.2d 241 (1992). This finding is entirely consistent with Sterling's intent when it drafted the 1989 annual report.

Moreover, the court relied upon the undisputed affidavit testimony of Mr. Zuppe in making its finding, which provides:

> 40. In summary, if the regulators were required to adhere to their written contractual commitments, Sterling would be entitled to:
>
> * * * * *
>
> (c) forbearance from regulatory capital standards until December 31, 1990 if Sterling's failure to comply with the standards was caused by [Sterling's] inability to raise capital following the Central Evergreen acquisition;

Pl's Ex. 18, ¶ 40. These two additional undisputed facts not only altogether refute the notion that the 1989 annual report creates a triable issue, but also, more clearly demonstrate, as a matter of law, that Defendant contractually agreed to allow Sterling to meet those capital standards in the business plan *in lieu* of the more stricter FHLBB regulations.

## C. CONTRARY TO DEFENDANT'S CLAIM, STERLING SUFFERED DAMAGES DURING THE PENDENCY OF THE INJUNCTION.

### *1. Defendant Permanently Damaged Sterling Prior to the Injunction, for Which it Still Incurs Ongoing Damage Today.*

Defendant claims that Sterling has no cause of action during the time in which Sterling was subject to the District Court's preliminary injunction (May 30, 1990-April 14, 1992). Def's Supp. Brief, pp. 38-40. The basis of this claim is that Sterling supposedly suffered no damages during the period it was purportedly shielded by the injunction. Def's Supp. Brief, pp. 38-40. Defendant's contention, however, completely ignores the true realities of the nature and scope of damage caused to Sterling, an otherwise profitable and healthy thrift.

First, it is undisputed that prior to the May 29, 1990 injunction, Sterling suffered significant damage as a result of Defendant treating Sterling as an undercapitalized, troubled thrift. In particular, up to the time of the injunction, Defendant had forced Sterling drastically to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. (Pls' Exs. T, 2:8-25; U-5, pp. 69-70). Some of these restrictions included limiting Sterling's asset growth; limiting the amount of loans Sterling could offer to one borrower; restricting Sterling's ability to pay dividends; limiting the amount and types of transactions it could enter into, such as commercial lending and large real estate lending; and limiting its business lending to only existing customers. (Pls' Exs. T, 2:8-25; U-6, pp. 71-74). Together, these restrictions forced Sterling to curtail its operations significantly. (Pls' Ex. T, 3:15-18).

Second, the impact upon Sterling's business was significant. Irrefutably, Sterling could not grow the company, nor loan money in the same manner as it did before because of the breach. (Pls' Ex. T, 3:18-25). Also, by the time of the injunction, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate

lending severely crippled, all because of the breach. (Pls' Ex. T, 3:18-4:22). Lastly, because of the breach, Sterling lost key personnel and suffered damage to its reputation. (Pls' Ex. T, 4:2-22; AA, 299:12-14, 301:4-7).

Overall, "but for the breach," Sterling would have raised regulatory capital pursuant to its agreements with Defendant and, in turn, would have generated more earnings and more business opportunities from the leverage of that capital. (Pls' Ex. T, 5:3-12, 6:19-9:2; AA, 303:11-14, 304:11-15). Instead, Defendant considered Sterling undercapitalized and placed a stranglehold on its daily operations, causing Sterling to lose an otherwise irreplaceable economic advantage for which it bargained. (Pls' Exs. T, 2:8-25, 3:18-4:22, 5:3-12, 6:19-9:2; AA, 301:13-17, U-1, 31:18-32:5). Hence, by the time of the injunction hearing, Defendant already had breached the agreements and significantly damaged Sterling's financial position, affecting its earnings and more significantly, its earning potential. (Pls' Exs. T, 6:19-9:2; AA, 301:4-7, 302:23-303:3, 303:11-14, 304:11-15; W, 177:13-21, 178:12-22).

*2. The Injunction Did Not Cure the Damage That Was Already Done.*

Contrary to Defendant's claim, the injunction did not cure, *nor prevent*, the severe effects of Defendant's breach as described above. Instead, the injunction, as a practical matter, only provided Sterling time to raise the capital needed to meet the FIRREA standards before being exposed to receivership. (Pls' Ex. T, 7:14-22, 10:1-7, 10:24-11:10, 12:19-13:6). Had the contracts been honored by Defendant on the other hand, Sterling irrefutably would have had excess capital to leverage, and thus, could have grown and become even more profitable between 1989 and today. (Pls' Exs. T, 4:1-23, 5:2-12, 6:21-7:11, 7:23-9:2; AA, 302:23-24, 303:11-14, 304:11-15). Consequently, even with the injunction in place, Sterling's earnings and asset growth potential had

already been permanently and severely curtailed, and nothing in the injunction could give to Sterling back that which it lost.

### 3. *The Second Public Offering Did Not Replace the Capital That Sterling Would Have Raised in 1989 and Leveraged During the Years Thereafter.*

Defendant also suggests that because Sterling raised $22 million in 1991 while the injunction was in effect, that it was also able to replace the capital it originally lost in 1989 due to Defendant and therefore, suffered no damages therefrom. Def's Supp. Brief, p. 39. Defendant, however, misapprehends the seriousness of the damage done to a profitable thrift like Sterling when it was forced to forego an opportunity to go to the marketplace and raise capital in 1989.

First, it cannot be controverted that having lost the opportunity to raise capital in 1989, Sterling could never really replace the capital, nor replace it for the same cost. (Pls' Exs. T, 6:19-9:2; AA, 302:11-18). Second, it cannot be disputed that once the capital was lost, the profit opportunities and benefits that would have been derived from the use of that capital between 1989 and 1992 also were forever lost. (Pls' Ex. T, 6:19-8:2). Lastly, Sterling could never recoup the expenses associated with the canceled offering. (Pls' Ex. T, 6:24-7:2).

The injunction, therefore, did not allow Sterling to "recapture" the lost capital or to be placed in a position where it could truly enjoy the actual benefits of its bargains. (Pls' Ex. T, 7:15-22). Indeed, Sterling is not unlike the "lost volume seller" pursuant to the U.C.C. § 2-708(2), who is made whole only through an award that compensates him for the loss of his expected return. See generally Teradyne, Inc. v. Teledyne Industries, Inc., 676 F.2d 865, 868 (1st Cir. 1982) (lost volume seller entitled to damages for both sales, the first unperformed sale and the second sale); National Controls, Inc. v. Commodore Business machines, Inc., 209 Cal.Rptr 636, 642-43 (Cal. App. 1985) (same). It

is likely that Sterling could have benefitted from two offerings as opposed to one.[13] (Pls' Ex. T, 8:4-9:2).

### 4. *Contrary to Defendant's Suggestion, Defendant Did Not Fully Comply with the Injunction Order.*

Defendant takes substantial pains to convince the Court that it fully complied with the injunction and, therefore, allowed Sterling to enjoy the full benefit of its bargains. (Def's Supp. Brief, p. 39). Such is not the case though. Even after the Court entered the injunction, Defendant continued to treat Sterling as a troubled thrift. (Pls' Exs. T, 12:19-13:6; U-1, 31:18-32:5; AA, 301:3-17). Specifically, on June 5, 1990, five days after the injunction, Defendant wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. (Pls' Ex. DD-6, p. 348). Subsequently, Defendant sent other letters further manifesting its intent to restrict Sterling's operations. (Pls' Exs. DD-7, pp. 349-351; DD-8, p. 359; DD-9, p. 353). For example, on June 20, 1990, Defendant mailed a letter which, in part, read:

> As always appropriate internal controls should be in place to ensure that all regulatory requirements ***are*** adhered to. ...
>
> *********
>
> The listing attached to your letter does not correctly reflect the *asset growth restrictions that Sterling is subject to.* By virtue of the denied capital plan, no growth ***is*** permitted. In addition, residential construction lending ***is limited*** to 3.3 percent of total assets and investment authority ***restricted*** to short term investments. The institution's activities ***are*** limited to those specified in the capital plan ....

---

13 Defendant's claim essentially is an attack on Sterling's damages case, which is better suited for argument after the end of expert discovery. Therefore, to the extent necessary, Sterling reserves its right to seek a RCFC 56(g) continuance on this matter. Expert discovery will show that Sterling's earnings suffered greatly during the pendency of the injunction due to Defendant's breach and its refusal to honor the agreements.

(Pls' Ex. U-7, pp. 75-76) Defendant's post- injunction intent is clearly spelled out by use of the present tense in that correspondence. (Pls' Ex. U-1, 26:11-28:8, 30:11-20). Other correspondence sent to Sterling confirms that same intent. ( DD-7, pp. 349-351; DD-8, p. 352; DD-9, p. 353).

Defendant also. under the guise of "safety and soundness" indirectly threatened Sterling with poor performance ratings in a manner that clearly indicated its unwillingness to honor its obligations under the contract. (Pls' Exs. U-1, 24:21-25:2; W, 172:25-173:11, 174:2-9). "Safety and soundness" is the standard against which the OTS measured a thrift's performance. (Pls' Exs. AA, 299:24-300:4; W, 175:22-176:1). Defendant threatened the use of this standard against Sterling, as if a loaded gun was a pointed at its head, in order to regulate it as a troubled and undercapitalized thrift when the terms of the agreements required otherwise. (Pls' Ex. U-1, 24:21-25:24, 31:18-32:5).

Lastly, Defendant completely ignores the fact that during the pendency of the injunction, Defendant had successfully moved for a partial reconsideration and had filed an appeal with the Ninth Circuit. which eventually vacated the injunction. See Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1992). It cannot be controverted, therefore, that both parties knew all along that if Sterling acted as if no breach had occurred and aggressively made business decisions based upon a belief that Defendant would always perform in good faith (as if that could be the case. considering the immediate and significant harm), it would have exposed itself to ruin should the Ninth Circuit vacate the injunction. (Pls' Ex. U-1, 23:5-22, 24:21-25:10, 31:18-32:5). For these reasons as well, it cannot be disputed that the injunction only really had the effect of putting the Defendant at bay while Sterling clambered its way into capital compliance in accordance with the new, *non-contractual* capital standards of FIRREA. (Pls' Ex. T, 7:12-22).

In summary, but for Defendant's breach, Sterling undisputedly would have raised capital in 1989, used that capital per the three agreements, and generated more assets, profits, and revenues

in a more productive and lucrative manner. Instead, it cannot be controverted that Defendant breached its duties set forth in those agreements and caused Sterling to shrink its operations, which in turn, destroyed many of Sterling's businesses and products; reduced Sterling's actual and potential earnings; forced Sterling to re-raise capital under more adverse market conditions and under stricter standards than promised in the agreements; and caused Sterling to try to conduct business in a hostile regulatory climate where Defendant treated Sterling as a troubled thrift at all relevant times. Because Defendant failed to present any triable issue of fact, Defendant's Motion for Summary Judgment on this issue should be denied.

**D. STERLING'S CLAIM FOR RESTITUTION SHOULD NOT BE DISMISSED.**

Defendant claims that Sterling's cause of action for restitution should be dismissed pursuant to RCFC 12(b) because claims based on "implied in law" contracts are not within the jurisdiction of this Court. Def's Supp. Brief, p. 29. Defendant misapprehends Sterling's claim.

This Court clearly has jurisdiction over claims based on alleged express and implied-in-fact contracts. Hercules Inc. v. United States, 516 U.S. 417, 423, 116 S.Ct. 981, 984 (1996); 28 U.S.C. § 1491(a). Moreover, within that jurisdiction, this Court recognizes restitution as a proper measure of damages caused by a breach of an express or implied-in fact-contract. Acme Process Equipment Co. v. United States, 171 Ct.Cl. 324, 359, 347 F.2d 509, 530 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350 (1966) (awarding restitution as a remedy for breach of contract). Sterling's breach of contract claim, whether based on an express or implied-in-fact contract, arises out of three agreements and therefore, is within the subject matter jurisdiction of this Court. 28 U.S.C. § 1491(a). Additionally, Sterling's claim for restitution is nothing other than a claim for restitutionary damages and therefore, is also properly before this Court. Id. See Sterling's Second Amended

Complaint, p. 37, ¶ (5). Accordingly, Sterling's claim for restitutionary damages should not be dismissed.

E. STERLING'S EQUITABLE ESTOPPEL CLAIM SHOULD NOT BE DISMISSED.

*1. The Court has Subject Matter Jurisdiction Over Claims of Equitable Estoppel.*

Defendant incorrectly presumes that Sterling's cause of action for estoppel is a cause of action for promissory estoppel and therefore should be dismissed pursuant to RCFC 12(b). Def's Supp. Brief, pp. 32-33. However, Sterling claim is for *equitable estoppel*, which is undeniably within the subject matter jurisdiction of this Court: "[t]he doctrine of equitable estoppel is applied when a party attempts to prevent denial of a contract." New American Shipbuilders, Inc. v. United States, 15 Cl.Ct. 141, 144 (1988); Pacific Gas and Electric v. United States, 3 Cl.Ct. 329, 330 (1983). The elements of equitable estoppel are:

> (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; (4) the contractor must rely on the government's conduct to his injury.

Lamirage, Inc. v. United States, 44 Fed. Cl. 192, 201 (1999); American Electronic Laboratories, Inc. v. United States, 774 F.2d 1110, 1113 (Fed. Cir.1985); Emeco Industries, Inc. v. United States, 485 F.2d 652, 657 Ct.Cl. 1006 (1973). The Supreme Court has repeatedly held that the defendant may be sued for equitable estoppel when it is in the interests to maintain "some minimum standard of decency, honor, and reliability in their dealings with the Government." Heckler v. Community Health Serv. of Crawford County, Inc., 467 U.S. at 60-61, 104 S.Ct. 2218 (footnotes omitted).

In this case, Sterling has properly pled a cause of action for estoppel. See Second Amended Complaint, p. 35-36, ¶¶ 11.1-11.4. The court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." Lee v. United States, 32 Fed.Cl. 530, 537 (1995); *quoting* Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957). Clearly, based on the evidence presented above concerning the three acquisitions, Defendant cannot, and has not, met its burden in demonstrating that no set of facts can be proved to support Sterling's claim for estoppel. Hence, this cause of action should not be dismissed.

## V. CONCLUSION

In 1997, Sterling moved for partial summary judgment as to liability pursuant to the "Short Form" procedure. Although Sterling's contracts are practically "cookie-cutter" versions of those agreements found to be binding in the Winstar opinion and its progeny, Defendant continues to re-hash theories previously rejected by the Courts.

After numerous rounds of briefing, and more importantly, after having the opportunity to conduct full and comprehensive discovery, Defendant has failed to demonstrate any triable issues of fact that would preclude this Court from granting Sterlings' Motion for Partial Summary Judgment as to Liability.

Defendant had "the burden to present specific facts showing a genuine issue for trial." Alaska American Lumber v. United States, 25 Cl. Ct. 518, 525 (1992). Instead, Defendant only offered strained and outlandish interpretations of unambiguous contracts without producing one iota of testimony that these interpretations have merit. Therefore, based on the foregoing, and based on the previous filings submitted in support of Sterling's motion, Sterling requests this Court to grant its Motion for Partial Summary Judgment as to Liability and to deny Defendant's Motion to Dismiss and Motion for Summary Judgment.

Respectfully submitted this 16th day of December, 2000.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: [signature]
William D. Symmes, Counsel of Record
by William M. Symmes, a Member of the Bar of the
United States Court of Federal Claims
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury that on this day I sent a copy of the attached **PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL OPPOSITION** directed to the following:

| | |
|---|---|
| Clerk, U.S. Court of Federal Claims<br>717 Madison Place NW<br>Washington, D.C. 20005 | _____ United States Mail<br>_X__ Federal Express<br>_____ Facsimile |
| Elizabeth M. Hosford<br>Commercial Litigation Branch<br>Civil Division<br>U.S. Department of Justice<br>1100 L. Street, NW<br>Washington, D.C. 20530 | _____ United States Mail<br>_X__ Federal Express<br>_____ Facsimile |

Dated this December 16, 2000, at Spokane, Washington.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 95-829-C**<br>**(Chief Judge Smith)** |

**DEFENDANT'S REPLY TO PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202)514-7300

January 16, 2001

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . i

TABLE OF AUTHORITIES . . . . . iii

DEFENDANT'S MEMORANDUM . . . . . 1

I. STERLING WAS REQUIRED TO COUNT FSLIC ASSISTANCE AS SUPERVISORY GOODWILL AND TO AMORTIZE IT . . . . . 2

- A. The Rules For Interpreting Contracts Establish, As A Matter Of Law, That The Unidentified Intangibles Associated With FSLIC Assistance Were Required To Be Amortized . . . . . 2
- B. The Nonamortization In Sterling's Reporting Of Goodwill Associated With The FSLIC Assistance Generated By The Lewis Federal and Tri-Cities Acquisitions Does Not Establish That The Sterling's Interpretation Of The Lewis Federal And Tri-Cities Agreements Is Correct . . . . . 6
- C. Sterling's Witnesses Only Confirm That FSLIC Assistance Is Subject To Amortization . . . . . 9
- D. Testimony Of Former Government Employees Proffered By Plaintiffs Does Not Support Their Position . . . . . 12

II. AS A MATTER OF LAW, THE GOVERNMENT WAS NOT CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL . . . . . 15

- A. The Castle Decision Is Neither "Controlling" Nor "Decisive" In This Case . . . . . 15
- B. The Memorandum Drafted By Dan Byrne Expressly Acknowledges That Sterling Assumed The Risk Of Regulatory Change . . . . . 18
- C. Plaintiffs' Interpretation Of The 1989 Annual Report Is Contrary To Its Plain Language . . . . . 18

III. ASSUMING, FOR THE SAKE OF ARGUMENT, THAT THE GOVERNMENT ACTED INCONSISTENTLY WITH ANY CONTRACTUAL OBLIGATION TO PLAINTIFFS, THE INCONSISTENT ACTION NECESSARILY CEASED AFTER PLAINTIFFS OBTAINED AN INJUNCTION ENJOINING THE GOVERNMENT FROM TAKING ACTION INCONSISTENT WITH THE PURPORTED CONTRACTS . . . . 21

A. Plaintiffs' Argument About Pre-Injunction Alleged Damages Is Premature . . . . 21

B. Plaintiffs' Interpretation Of The Injunction Renders It Meaningless . . . . 22

C. Plaintiffs' Claim That The Second Public Offering Did Not Replace The Capital That Was Phased Out After The Enactment Of FIRREA Is Refuted By The Testimony Of Its Own Officers . . . . 24

IV. STERLING ADMITS THAT COUNT IV OF ITS COMPLAINT DOES NOT STATE A CLAIM, SO COUNT IV SHOULD BE DISMISSED . . . . 25

A. Sterling Now Alleges That Count IV Concerns A Potential Remedy, And Does Not State A Cause Of Action . . . . 25

B. The Proper Measure For Restitution Is The Non-Breaching Party's Pre-Contract Position, Not Unjust Enrichment . . . . 26

V. STERLING'S CAUSE OF ACTION FOR EQUITABLE ESTOPPEL SHOULD BE DISMISSED BECAUSE STERLING HAS NOT PLED FACTS REQUIRED TO ESTABLISH AN ESTOPPEL CLAIM . . . . 27

CONCLUSION . . . . 29

# TABLE OF AUTHORITIES

## FEDERAL CASES


Acme Process Equipment Co. v. United States, 171 Ct. C 347 F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) ........ 26, 27

Adams v. United States, 42 Fed. Cl. 463 (1982) ........ 16

Castle v. United States, 48 Fed. Cl. 187 (2000), appeal docketed ........ *passim*

Coast Federal Bank, FSB v. United States, No. 92-466, Fed. Cl. (Filed December 28, 2000) . *passim*

Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994 (11th Cir. 1991) ........ 16, 17

Hanson v. Office of Personnel Management, 833 F.2d 1568 (Fed. Cir. 1987) ........ 28

Heckler v. Community Health Servs., 467 U.S. 51 (1984) ........ 28

Henry v. United States, 870 F.2d 634 (Fed. Cir. 1989) ........ 28

Huna Totem Corp. v. United States, 35 Fed. Cl. 603 (1996) ........ 2

Office of Personnel Management v. Richmond, 496 U.S. 414 (1990) ........ 28

Pacific Architects & Eng'rs v. United States, 203 Ct. Cl. 499, 491 F.2d 734 (Cl. Ct. 1974) ........ 27

Plaintiffs in All Winstar-Related Cases At The Court v. United States, No. 90-8C Fed. Cl. (September 29, 1999) ........ 26

Rockwell Int'l Corp. v. United States, 8 Cl. Ct. 662, (1985) ........ 27

State of Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855 (1978) ........ 27

Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. WA. 1990) ........ *passim*

Sullivan v. United States, 46 Fed. Cl. 480 (2000) ........ 28

United States v. Winstar Corp, 518 U.S. 839 (1996) ........ 16

Westinghouse Electric Corp. v. United States, 41 Fed. Cl. 229, (1998) ........ 28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Senior Judge Smith)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs' supplemental opposition to defendant's partial motion to dismiss and cross motion for partial summary judgment ("plaintiffs' reply") serves only to demonstrate why the Government is entitled to summary judgment with respect to liability in this case. Plaintiffs Sterling Savings Association and Sterling Financial Corporation ("Sterling") attempt, unsuccessfully, to create an issue of fact, by responding to ten pages of briefing by the Government with 37 pages of text and 362 pages of appendix materials. As demonstrated below, partial summary judgment should be granted to the United States because plaintiffs have not met their burden for defeating our motion for summary judgment.[1]

---

[1] Pursuant to this Court's order dated November 2, 2000, Sterling has responded only to the nonconstitutional issues addressed in our supplemental memorandum in opposition to plaintiffs' motion for partial summary judgment concerning liability issues and in support of defendant's partial motion to dismiss and cross motion for partial summary judgment ("supplemental motion"). In addition, plaintiffs apparently misconstrued the requirements of RCFC 56(c)(2) in responding to our Proposed Findings Of Uncontroverted Facts ("Government's PFUF") with a statement entitled "supplemental undisputed facts." Plaintiffs' reply, p. i. Pursuant to RCFC 56(c)(2), we construe the facts section of Sterling's brief as a statement of genuine issues, and

## I. STERLING WAS REQUIRED TO COUNT FSLIC ASSISTANCE AS SUPERVISORY GOODWILL AND TO AMORTIZE IT

Plaintiffs' opposition serves only to confirm that the goodwill that corresponds to the FSLIC assistance provided to Sterling in connection with its acquisitions of Lewis Federal Savings and Loan Association ("Lewis") and Tri-Cities Savings and Loan Association ("Tri-Cities") was required to be amortized.

### A. The Rules For Interpreting Contracts Establish, As A Matter Of Law, That The Goodwill Associated With FSLIC Assistance Were Required To Be Amortized

Plaintiffs, in their opposition, argue that the rules for interpreting contracts require this Court to determine that it was not required to amortize the unidentified intangibles, or goodwill, associated with the Lewis Federal and Tri-Cities cash assistance. Plaintiffs' reply, pp. 17-19. We believe that this is properly considered a damages, not liability, issue, although we briefly raised the issue in our supplemental motion to preserve it. Nonetheless, we address plaintiffs' lengthy response to our brief argument below.

Plaintiffs acknowledge that the plain language of a contract governs its interpretation. Huna Totem Corp. v. United States, 35 Fed. Cl. 603, 608 (1996). In this case, the plain language of the agreements at issue dictates that plaintiffs were required to amortize the goodwill resulting from the cash assistance provided in connection with the Lewis Federal and Tri-Cities acquisitions. In that regard, this case is on all fours with a case recently decided by the Court, Coast Federal Bank, FSB v. United States, No. 92-466 C (Filed: December 28, 2000). In that

---

reserve the right to respond further if in fact Sterling is attempting to add undisputed facts to the Government's PFUF.

case, the Court examined the exact issue before this Court, and, based upon nearly identical agreements, determined that Coast Federal Bank, FSB was required to amortize the goodwill associated with its cash assistance. Coast, slip. op. at 28 (full discussion at pages 5-28).

In Coast, the Court first determined that the thrift's forbearance permitting it to count its FSLIC cash assistance toward regulatory capital was based upon a standard forbearance, known as SM-1, utilized by the Federal Home Loan Bank Board ("FHLBB"). Coast, slip op. at 7. Sterling's chief financial officer admitted at deposition that the forbearance regarding the treatment of cash assistance as regulatory capital granted in the Lewis and Tri-Cities acquisitions was based upon SM-1 as well. R. App. 217-20.[2] In addition, in Coast, the Court relied upon the following language from the Coast assistance agreement to support its finding that the FSLIC assistance was required to be amortized:

> Accounting Principles. Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or (FSLIC], or any resolution or action of the Bank Board approving or relating to the acquisition or to this Agreement, then this Agreement, such regulations, or such resolution or action govern.

Coast, slip op. at 8.

That provision is identical to section 9 of the Lewis Federal Assistance Agreement, and section 16 of the Tri-Cities assistance agreement. R. App. 28, 69. Like the assistance agreement

---

[2] The appendix to this brief will be referred to as "R. App." The appendix to plaintiffs' reply will be referred to as "P. App." The appendix to our supplemental motion will be referred to as D. App.

in Coast, sections 9 and 16, respectively, of the Lewis Federal and Tri-Cities assistance agreements also contain the following language relied upon by the Court in Coast to determine that amortization was required:

> In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity should be resolved in a manner consistent with [applicable FHLBB or FSLIC] regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern.

Coast, slip op. at 8.

The above-quoted provisions of the Coast, Lewis Federal and Tri-Cities assistance agreements require accounting for the acquisitions of the thrifts to be in accordance with generally accepted accounting principles, or GAAP, which requires the amortization of goodwill. Coast slip op. at 7-8. In Coast, the plaintiffs argued that GAAP did not govern its reporting of the goodwill resulting from the FSLIC cash assistance because it had a forbearance permitting it to count the FSLIC cash assistance as regulatory capital. Slip op. at 10. The Government contended, however, and the Court determined, that, based upon its plain language, the forbearance was to permit plaintiff to record more regulatory capital than it could have otherwise, rather than to exempt goodwill from amortization. Slip op. at 10-12. Moreover, the Coast court

reached that conclusion notwithstanding the fact that the Coast forbearance letter did not mention the amortization of goodwill. Slip. op. at 23.

In this case, however, the Lewis Federal and Tri-Cities forbearance letters included another standard forbearance, known as "SM-2," that required the amortization of goodwill over 40 years for Lewis Federal and 15 years for Tri-Cities. R. App. 37, 63, 191. In fact, many other institutions with both the "SM-1" and "SM-2" forbearances actually amortized the goodwill associated with cash assistance provided by FSLIC. R. App. 233-34 (affidavit of Joe A. Hargett). Consequently, Sterling's claim that it was not required to amortize the goodwill associated with its cash assistance is completely baseless, regardless of whether the Coast decision is persuasive to this Court.

Finally, in reaching its decision, the Coast Court noted that an FHLBB document supported the view that "FHLBB consistently took the position that RAP goodwill must amortize." Slip op. at 13. That document, a letter to a thrift known as Transohio Savings Bank, stated that Transohio had been "'permitted. . .to book the . . . cash contribution from FSLIC as a direct credit to net worth,'" but that "'[t]his departure from GAAP does not change the GAAP requirement that the amortization of goodwill must be charged to expense.'" Coast, slip op. at 13; see also R. App. 245. A redacted version of that document was produced to the Government in this case by Sterling's auditors in connection with its production of documents relevant to the accounting for the Sterling acquisitions. R. App. 38. The document, which predates the Tri-Cities transaction, sets forth FHLBB policy at the time. Further, the document demonstrates that it was faxed to the auditors from Sterling's attorneys. R. App. 38. Consequently, Sterling should be aware of that FHLBB policy and its application to acquisitions involving the grant of FSLIC

assistance.

In light of the foregoing, Sterling's contention that the plain meaning of the agreements associated with the Lewis Federal and Tri-Cities acquisitions did not require amortization of the goodwill associated with the FSLIC assistance is without basis, and should be rejected.

**B. The Nonamortization In Sterling's Reporting Of Goodwill Associated With The FSLIC Assistance Generated By The Lewis Federal and Tri-Cities Acquisitions Does Not Establish That The Sterling's Interpretation Of The Lewis Federal And Tri-Cities Agreements Is Correct**

Plaintiffs claim that their failure to amortize the goodwill associated with the FSLIC assistance granted in connection with the Lewis Federal and Tri-Cities acquisitions demonstrates that the agreements in those cases did not require them to do so. Plaintiffs' reply, pp. 20-21. That contention is without basis. As a preliminary matter, plaintiffs are incorrect in stating that Sterling did not "amortize cash assistance or the RAP goodwill." Id. at 20. Plaintiffs did, in fact, amortize the goodwill that was not associated with the FSLIC assistance. R. App. 146 (Section E, line 110).

Plaintiffs base their contention that the Government should have known that they were not amortizing the goodwill upon the fact that the 1989 TFR form required reporting on a GAAP rather than a RAP basis. Plaintiffs' reply, p 20, and Pls. Exs. DD, ¶¶ 4-5, p. 307; DD-1, pp. 312-314. What plaintiffs fail to reveal, however, is that, prior to 1989, the TFR form, on Line A544, required RAP goodwill and other forms of goodwill to be reported on the same line, rendering it difficult for an examiner to know that the thrift was not amortizing RAP goodwill. See Coast, slip op. at 17-18; R. App. 144 (section A, line 544). Further, Sterling's CFO admitted that the regulators specifically required Sterling to restate its September 30, 1989 TFR to reflect that the

goodwill relating to the FSLIC assistance was amortized. R. App. 227. Thus, for less than one year, Sterling utilized a form that reflected the nonamortization of the RAP goodwill. As the Coast Court noted, however, the instructions appended to the 1989 TFRs "suggest, however, that plaintiff was required to report on line C978 'the unamortized amount of the assistance that previously would have been reported on line A544,' meaning that [Coast] should have understood that the amount of the FSLIC contribution that could be reported on line C978 was amortizing." Coast slip op. at 19.

In addition, the actual reporting method used beginning January 1, 1989 required that both the balance sheet and the income statement of the TFR be presented in accordance with GAAP. Because the reporting of the FSLIC assistance as capital as well as the offsetting goodwill was a creation of RAP only, the post-January 1, 1989 income statement would, of course, have no need for a line item requiring amortization expense of this RAP goodwill. Sterling's lack of understanding of this issue is exemplified by its assertion that the 1989 TFR "lack[ed]. . .any line item. . . for Sterling to report the amortized expense of the RAP goodwill." Plaintiffs' reply, pp. 20-21. Clearly, line C798 was set aside to deal with the financial impact of the FSLIC assistance counting as capital as well as the offsetting goodwill. As the instruction indicated, this line did include the amortization impact of the FSLIC contribution.

Sterling responds that the Government should have noticed that the number on line C978 was nonamortizing, and that its failure to raise it with Sterling meant that it agreed with Sterling's interpretation of the agreements. Plaintiffs' reply, pp. 20-21. But, as was the case in Coast, "[t]he failure by [the Government] to require the correction of plaintiff's error in two quarterly reports does not show that FHLBB believed that RAP goodwill could be nonamortizing,

particularly in light of the evidence that FHLBB's policy was to amortize RAP goodwill." Id.

In addition, the Court was persuaded by a provision of the Coast assistance agreement identical to one in this case. That provision stated that "[a]ny forbearance, failure, or delay by any party in exercising or partially exercising any. . . right, power, or remedy [conferred by contract or applicable law] shall not preclude its further exercise." Coast slip. op. at 19. That language is identical to language in sections 12 and 19 of the Lewis Federal and Tri-Cities assistance agreements, respectively. R. App. 27, 140. In this case, as was the case in Coast, "a failure on multiple occasions to correct plaintiff's nonamortization did not deprive FHLBB of the right to insist on such amortization at a later time." Coast slip op. at 20.

Finally, Sterling attempts to rely upon a notation in an examination report to support its interpretation. Sterling points out that the June 19, 1989 exam report notes (without comment upon the amortization issue), that between December 31, 1988 and March 31, 1989, the amount of Sterling's reported capital decreased by the exact amount of its $13.480 million in FSLIC assistance. Plaintiffs' reply, p. 21. That statement is disingenuous, however, in that a footnote reveals that, in order to reach such a conclusion, one need review the "paid in excess of par" line of a "modified equity capital" category in the Comparative Statements of Financial Condition section of the exam report, and perform a subtraction of two numbers to ascertain that unamortized FSLIC assistance did not decrease. Plaintiffs reply, p. 21, n. 8 and Pl. App. 347. It is unreasonable for Sterling to infer that an examiner would have examined those lines and automatically reached the conclusion that Sterling was not amortizing RAP goodwill; further, the exam report contains no indication that the examiner did so note.

Moreover, as noted in the affidavit of Mr. Hargett, the line item that captured the effect of

the amortization (C978) also captured the effects of other accounting entries. R. App. 237-38. Consequently, Sterling's claim that the Government's conduct demonstrates that it knowingly permitted Sterling to violate its agreement by failing to amortize the RAP goodwill associated with the FSLIC assistance is without merit, and the Government should be granted summary judgment on this issue.

### C. Sterling's Witnesses Only Confirm That FSLIC Assistance Is Subject To Amortization

Plaintiffs also rely upon deposition testimony of Sterling's Chief Financial Officer, Daniel Byrne, to support their position. Plaintiffs' reply, p. 13. That testimony, however, only confirms the Government's interpretation, because Mr. Byrne was unable to be specific about the basis for his position that the FSLIC assistance was not to be amortized. When asked where in the agreements it specified that goodwill resulting from FSLIC assistance need not be amortized, Mr. Byrne replied: "It seemed to be the logical conclusion when the cash assistance was to be permanent and to remain the same and constant forever." Id., citing Pls. Ex. U-1, 19:2-18. Mr. Byrne effectively admitted that he was unable to point to a contract document to support his position. Therefore, his testimony does not support plaintiffs' theory.

Second, we demonstrated in our supplemental motion that Sterling's president, William Zuppe, provided sworn testimony that the FSLIC assistance was to be amortized. Supplemental motion, pp. 35-36. In response, plaintiffs resort to arguing that Mr. Zuppe, who has run Sterling since its inception, has no expertise in accounting. Plaintiffs' reply, p. 13. If that is the case, then plaintiffs should not have provided the sworn affidavit to the United States District Court for the Eastern District of Washington in 1990. The affidavit is rife with references to accounting

issues. D. App. 238-42. If, in fact, Mr. Zuppe is not familiar enough with accounting issues to swear to the statements in the affidavit, then perhaps the affidavit should have been withdrawn prior to the district court's grant of an injunction in that case. Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. WA. 1990). We are aware of no record that plaintiffs ever did so. Therefore, it is disingenuous, at best, for plaintiffs to attempt to disavow those sworn statements at this juncture.

Similarly, plaintiffs' claim that "Mr. Zuppe's affidavit refers only to Sterling's right to count supervisory goodwill as regulatory capital" is both inaccurate and misleading. Plaintiffs' reply, p. 14. First, Mr. Zuppe stated that "$11.7 million in cash assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years;..." D. App. 240 (lines 18-20). That statement is unambiguous, and plaintiffs' implication that Mr. Zuppe's statement applied only to supervisory goodwill, and not supervisory goodwill associated with FSLIC assistance, is incorrect.

Further, Mr. Zuppe's sworn statement is consistent with Mr. Byrne's deposition testimony. The FSLIC cash assistance was both credited to net worth and treated as supervisory goodwill, an unidentified intangible. At deposition, Mr. Byrne admitted that the FSLIC assistance was included among unidentified intangibles on its balance sheet prepared for submission to regulators. D. App. 253 (lines 12-17). Thus, plaintiffs' CEO has admitted that FSLIC assistance was included in goodwill, and its president admitted that the goodwill associated with FSLIC assistance was to be amortized. Further, Mr. Byrne, the CEO, also admitted that unidentified intangibles, including supervisory goodwill, were required to be amortized. R. App. 216. Consequently, it is undisputed that the supervisory goodwill associated

with the FSLIC assistance was required to be amortized.

Moreover, plaintiffs' claim that the cash assistance was "permanent" is not relevant to the amortization issue. See, e.g., Plaintiffs' reply, p. 13. We do not dispute that Sterling was permitted to maintain the actual cash as a credit to its net worth. To the extent, however, that it was also to be included among unidentified intangibles, it was required to be amortized pursuant to the forbearance letters issued in connection with the Lewis Federal and Tri-Cities acquisitions. R. App. 37, 63. The forbearance letters are unequivocal. The forbearance letter issued in connection with the Lewis Federal acquisition states that intangible assets were to be amortized over 40 years, as follows:

> For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

P. App. 153.

Similarly, the forbearance letter issued in connection with the Tri-Cities acquisition required unidentified intangibles resulting from the accounting for the acquisition in accordance with the purchase method to be amortized over 15 years. D. App. 76. In both cases, documents alleged by plaintiffs to be contractual required unidentified intangibles to be amortized, and plaintiffs' CEO, Mr. Byrne, has admitted that FSLIC assistance was included in unidentified intangibles on Sterling's balance sheet. Therefore, it is undisputed that the offsetting goodwill relating to the FSLIC assistance was to be amortized.

**D. Testimony Of Former Government Employees Proffered By Plaintiffs Does Not Support Their Position**

Plaintiffs claim that the "strongest" evidence in support of their position is the testimony of two former government employee associated with the Lewis Federal and Tri-Cities acquisitions, and two employees who played no role in the acquisitions, as well as a piece of correspondence that is completely unrelated to Sterling's acquisitions. Plaintiffs' reply, pp. 15-17. None of the proffered evidence supports Sterling's position.

First, plaintiffs rely upon deposition testimony provided in this case by Pat McJoynt, who participated in negotiation of the Tri-Cities acquisition, and James Faulstich, the principal supervisory agent at the time of the Tri-Cities and Lewis Federal acquisitions. Id. at 15-16. First, with respect to Ms. McJoynt, the deposition testimony relied upon by plaintiffs is Ms. McJoynt's comments upon a bid proposal submitted by Sterling. P. App. 196 (lines 12-18). The bid proposal is not among the documents plaintiffs have alleged form the contract with respect to the Tri-Cities acquisition. See Plaintiffs' short form motion for summary judgment and appendix. Further, the testimony relied upon does not support plaintiffs' argument that unidentified intangibles resulting from the grant of FSLIC assistance were not to be amortized. Ms. McJoynt was asked whether a specific paragraph of the bid proposal required plaintiffs to amortize FSLIC assistance. P. App., p. 200 (lines 6-11). She responded that it did not, but that paragraph merely requested that FSLIC assistance be counted toward regulatory capital. R. App. 49 (subsection f). As set forth above, the amortization of the FSLIC assistance was triggered by another paragraph of the forbearance letter, and Sterling's counsel did not ask Ms. McJoynt about

the corresponding paragraph in the bid proposal. Consequently, Ms. McJoynt's testimony is inapposite.

Mr. Faulstich's testimony is inapposite, as well. Plaintiffs rely upon his statement, at deposition, that the FSLIC cash contribution was not to be amortized. P. Reply, p. 16. Plaintiffs did not ask Mr. Faulstich whether the unidentified intangibles associated with the assistance were required to be amortized. Further, plaintiffs failed to note that, later in the deposition, Mr. Faulstich admitted that he had no first-hand knowledge about the accounting for FSLIC assistance:

> Q. Do you know how FSLIC assistance was accounted for under GAAP?
> A. I have no firsthand knowledge, no, of that. I think I testified to the fact that my assumption was that FSLIC cash assistance that we are talking about would flow to increase the capital of the institution receiving that cash assistance.
> Q. This is under GAAP?
> A. Under GAAP and RAP. It wouldn't make any difference at that point.
> Q. So is it your understanding that FSLIC assistance
> 0527
> was accounted for the same way under GAAP and RAP?
> A. No. That FSLIC assistance in the form of cash would be treated as a capital infusion.
> Q. Under which?
> A. Under -- certainly under RAP and I would think under GAAP.
> Q. Do you know whether, under GAAP or RAP, FSLIC assistance was included with intangibles?
> A. As an intangible?
> Q. Yes.
> A. I don't have any firsthand knowledge. I would suspect it would not be considered an intangible.
> Q. Why not?
> A. Because an actual cash payment was made.
> Q. Do you know whether, under GAAP, if FSLIC

assistance was provided, there had to be a
deduction from intangibles?
A. I don't have any firsthand knowledge of that. I
would think not.
Q. Do you know whether, under RAP, if FSLIC
assistance was provided, there had to be a
reduction of intangibles?
A. Same answer. I think not.
Q. Your answer is no?
A. I would think not. I don't have any firsthand
0528
knowledge of that. I'm not an expert in
accounting.

***

Q. Do you have any specific knowledge as to how FSLIC
assistance was actually booked on a balance sheet
basis under GAAP or RAP?
A. I would have no firsthand knowledge of that.

R. App. 210-12. The above-quoted testimony demonstrates that Mr. Faulstich cannot be relied upon to support an argument that, for accounting purposes, the unidentified intangibles resulting from the grant of FSLIC assistance should not be amortized.

Plaintiffs also rely upon the testimony of Edwin Gray, the former president of the FHLBB, to support their position. P. reply, p. 16. As a threshold matter, Mr. Gray was not involved in any way with the Tri-Cities and Lewis Federal acquisitions, and cannot provide testimony about the intent of the parties with respect to those acquisitions. CITE. Further, his testimony does not even address the issue of amortization with respect to FSLIC assistance. Consequently, it is irrelevant to the issue.

Plaintiffs' reliance upon the testimony of Alvin Smuzynski is similarly misplaced. P. reply, p. 17. Again, plaintiffs do not claim that Mr. Smuzynski was involved with the Lewis or Tri-Cities acquisitions. Second, his testimony is taken out of context. Further, Mr. Smuzynski

testified that the actual cash assistance was not to be amortized. He also stated, in the excerpt provided by plaintiffs, that the unidentified intangibles associated with the assistance were to be amortized. P. App. 290 (lines 17-19). See also Coast, slip op. at 15.

Finally, plaintiffs' reliance upon an excerpt from a letter, not addressed to Sterling, from the Federal Home Loan Bank of Topeka, is, at best, confusing. P. reply, p. 17. The excerpt makes no reference to FSLIC assistance or the accounting of the assistance, but instead addresses whether an unidentified forbearance would "show up on the balance sheet." This excerpt appears to bear no relevance to this case, or the amortization issue, since the transaction referenced in the letter was a sale of deposits rather than a thrift acquisition, and cannot be a basis for summary judgment.

As demonstrated above, the "strongest" evidence plaintiffs could find on the amortization issue provides absolutely no support for their position.

## II. AS A MATTER OF LAW, THE GOVERNMENT WAS NOT CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL

In their reply, plaintiffs attempt to establish a contractual promise to count supervisory goodwill generated in connection with the Central Evergreen transaction as regulatory capital by incorrectly citing a United States Court of Federal Claims case, John K. Castle, et al. v. United States, 42 Fed. Cl. 859 (1999), as "decisive" and "controlling." Plaintiffs' reply, pp. 22-24. In addition, plaintiffs attempt to support their motion for partial summary judgment by declaring that we have failed to create a "triable issue," when, in fact, the evidence is overwhelming that we are entitled to summary judgment on the issue.

**A. The Castle Decision Is Neither "Controlling" Nor "Decisive" In This Case**

In an attempt to support their claim that a goodwill contract was created in connection with the Central Evergreen acquisition, plaintiffs aver that the Castle decision "[c]ontrols." Plaintiffs' reply, p. 22. As a preliminary matter, plaintiffs are incorrect as a matter of law. This Court is not "controlled" by another decision of this Court. Adams v. United States, 42 Fed. Cl. 463, 472-73 (1982). Further, the Castle decision is not even persuasive in this case, as the circumstances of the two cases are very different.

As we established in our April 1, 1997 motion to dismiss plaintiff Sterling Financial Corporation; cross-motion for summary judgment, and opposition to plaintiffs' motion for partial summary judgment, this case is nearly identical to Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994 (11th Cir. 1991). Guaranty was cited by the Supreme Court in its Winstar decision as a case in which the parties expressly allocated the risk of regulatory change, including changes in the rules governing the use of supervisory goodwill, to the acquirer. United States v. Winstar Corp, 518 U.S. 839, 869 n. 15 (1996). In attempting to distinguish the Guaranty case, plaintiffs cling to the finding in Castle that Guaranty did not apply to the case because "'[i]t is unreasonable to believe that anyone...would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time.'" Plaintiffs' reply, p. 24, quoting Castle, 42 Fed. Cl. at 864.

What plaintiffs fail to acknowledge is that, in this case, FIRREA did not vitiate the essence of the deal because there was no agreement to permit Sterling to count supervisory goodwill resulting from the acquisition of Central Evergreen as regulatory capital. In Castle, the plaintiffs relied upon an acquisition approval letter with attached conditions to claim that they

possessed a contractual right to count regulatory goodwill as capital. Here, no such forbearance letter or acquisition approval letter exists.[3] Further, in the Guaranty case, the United States Court of Appeals for the Eleventh Circuit determined that language in the capital maintenance agreement identical to paragraph V.D. of the Sterling Capital Maintenance Agreement superseded a forbearance letter permitting the plaintiffs to count supervisory goodwill as capital. Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991). Here, there is no forbearance letter, and the Capital Maintenance Agreement expressly states that the Government did not agree to forbear from enforcement of its regulations in the event of regulatory change. As set forth in our supplemental motion, the Sterling capital maintenance agreement states as follows: "M. This Agreement is not a waiver of or forbearance from any applicable regulation." P. Supp. App. 164.[4]

In attempting to analogize this case to Castle, plaintiffs fail to acknowledge that there is no document permitting Sterling to count goodwill as capital in connection with the Central Evergreen acquisition. Further, plaintiffs ignore the fact that the language quoted above, stating that the Capital Maintenance Agreement is not a waiver or forbearance from any applicable

---

3/ The Castle court's finding in that case that the risk of regulatory change was not shifted to the acquirer is incorrect, and the subject of a notice of appeal to the United States Court of Appeals for the Federal Circuit. Castle v. United States, 48 Fed. Cl. 187 (2000), appeal docketed, No. 01-5047 (Fed. Cir. Jan 10, 2001).

4/ Plaintiffs claim that our reliance upon this provision itself "vitiate[s] the essence of the deal." Plaintiffs' reply, p. 25. What plaintiffs fail to recognize is that the provision is the essence of the deal. As stated above, this language unambiguously conveys that the parties understood that the Capital Maintenance Agreement was not to be construed as an agreement by the Government to forbear from enforcing its regulations. It could not be clearer.

regulation, was not present in the documents underlying the acquisition in Castle. Consequently, in this case, the parties could not be clearer that the Capital Maintenance Agreement was not intended to supersede or preempt the Government's right to change the regulations applicable to the calculation of regulatory capital, including the rules applicable to the treatment of supervisory goodwill for regulatory capital purposes. Therefore, Castle is inapposite.

**B. The Memorandum Drafted By Dan Byrne Expressly Acknowledges That Sterling Assumed The Risk Of Regulatory Change**

In our supplemental motion, we established that an internal memorandum drafted by Mr. Byrne confirms our interpretation of the Capital Maintenance Agreement, because Mr. Byrne expressly states that "[t]he essence of this provision [section V.M. of the Capital Maintenance Agreement] is that the agreement does not supersede the regulations to which Sterling is subject." Def's App., p. 177. In response, plaintiffs allege that the quoted language is "ambiguous," but do not explain what is ambiguous about it. Plaintiffs' reply, p. 26. To the contrary, it is not ambiguous, but clearly and concisely states Mr. Byrne's belief that the agreement was not intended to supersede the regulations to which Sterling was subject. That is entirely consistent with the 11th Circuit's holding in Guaranty, and only supports our motion for summary judgment on the issue.

Further, plaintiffs reliance upon Mr. Byrne's statement, in the same memorandum, that the "purpose of the agreement is to ensure that Sterling will abide by the business plan," plaintiffs' reply, p. 26, is misplaced, because it only supports our argument. That statement does not place any obligation upon the Government; it binds Sterling only. Therefore, we are entitled to summary judgment.

**C. Plaintiffs' Interpretation Of The 1989 Annual Report Is Contrary To Its Plain Language**

In our supplemental motion, we demonstrated that, even assuming, for the sake of argument, that the Central Evergreen capital maintenance agreement including a forbearance permitting Sterling to count the goodwill associated with the acquisition as regulatory capital, Sterling's annual report establishes that the forbearance expired in 1991, citing to the following language:

> Management believes that it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

Def.'s supplemental motion, pp. 37-38, citing Def.'s app. 196. Plaintiffs attempt to explain away this unambiguous language by first claiming that the report's reference to a forbearance expiring in 1991 is a "typo." Plaintiffs' reply, p. 27. Plaintiffs fail, however, to provide a single piece of documentary or testamentary evidence supporting its claim that the language is a typographical error. Consequently, the claim is baseless.

Further, even assuming that plaintiffs are correct in claiming that the sentence should have included the date of "December 31, 1990," the statement still establishes that plaintiffs' understanding of the "forbearance" granted in connection with the Central Evergreen acquisition is that it expired in 1990. Further, plaintiffs' attempt to attribute a different meaning to the sentence by putting it in "context," is, at best, disingenuous, since the context provided by plaintiffs omits the following language of the annual report that unambiguously explains what Sterling meant by the term "forbearance:"

> Although the Association is in compliance with existing regulatory

> capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from the "supervisory acquisitions," which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. No assurance can be given that the forbearance will be honored, however, and any such forbearance would be conditioned upon compliance by the Association with the business plan submitted to the FSLIC by the Association in conjunction with the Central Evergreen transaction.

Id. The plain language of the annual report demonstrates that Sterling made the reference to a forbearance expiring December 31, 1991 in the context of a discussion about its ability to count intangible assets, or supervisory goodwill, as capital. No reference is made to any other form of forbearance. Nonetheless, plaintiffs claim that "Sterling's intent merely was to communicate that it had the right to comply with the modified capital standards agreed to in the business so long as it did so by December 30, 1990." It is not clear what plaintiffs mean by that statement, even assuming that the word "plan" should have followed the word "business." Consequently, Sterling's attempt to engage in a post-hoc reinterpretation of the annual report must be rejected.[5]

---

[5] Further, plaintiffs' attempt to rely upon the district court decision in Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 874 (E.D. Wash. 1990), vacated, 959 F.2d 241 (1992), is unavailing. Plaintiffs' reply, pp. 28-29. That decision was vacated, and has no res judicata or collateral estoppel effect on this case.

## III. ASSUMING, FOR THE SAKE OF ARGUMENT, THAT THE GOVERNMENT ACTED INCONSISTENTLY WITH ANY CONTRACTUAL OBLIGATION TO PLAINTIFFS, THE INCONSISTENT ACTION NECESSARILY CEASED AFTER PLAINTIFFS OBTAINED AN INJUNCTION ENJOINING THE GOVERNMENT FROM TAKING ACTION INCONSISTENT WITH THE PURPORTED CONTRACTS

In their reply, plaintiffs attempt, at length, to explain why the injunction they sought and were granted should not be a bar to the award of damages for the period the injunction was in place, and thereafter. Plaintiffs' reply, pp. 29-34. In doing so, they provide citations to numerous factual assertions that they assert are "undisputed." Plaintiffs' reply, pp. 29-30. In fact, however, plaintiffs' factual assertions create genuine issues that preclude the grant of summary judgment on liability.

### A. Plaintiffs' Argument About Pre-Injunction Alleged Damages Is Premature

As a threshold matter, plaintiffs' argument about damages incurred prior to issuance of the injunction are, at best, premature. Plaintiffs' reply, pp. 29-30. Plaintiffs' assertion that it is "undisputed" that Sterling suffered damage prior to the issuance of the injunction is absurd. This briefing is solely about liability - pursuant to an order of the Court dated November 2, 2000, damages discovery does not commence until March 1, 2000. Further, plaintiffs have not established that the actions that they claim inflicted the "damage" constitute breaches of contract, or even relate to the alleged contracts at issue in this case. Plaintiffs' reply, pp. 29. Plaintiffs merely make generalized statements about "restrictions," without providing any basis for concluding that the restrictions resulted from a breach. Consequently, plaintiffs' assertion about the undisputed nature of its purported damages is baseless, and must be rejected.

**B. Plaintiffs' Interpretation Of The Injunction Renders It Meaningless**

Sterling also claims that the "injunction did not cure, nor prevent, the severe effects of Defendant's breach...." Plaintiffs' reply, p. 30 (emphasis in original). Again, this argument, along with the factual claims accompanying it, pertains to damages, and is premature. We have not yet been provided access to plaintiffs' expert reports or theories, and plaintiffs' attempt to establish that the damages suffered are undisputed is futile.

Further, Sterling's interpretation of the injunction renders it meaningless. The injunction enjoined and restrained the Government from:

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC; b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift; c. placing Sterling in a receivership or conservatorship; and d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

Sterling Savings Association v. Ryan, 751 F. Supp. 871, 881 (E.D. WA. 1990). Notwithstanding the broad scope of the injunction, Sterling claims that it merely "provided Sterling time to raise the capital needed to meet the FIRREA standards before being exposed to receivership." Plaintiffs' reply, p. 30. To the contrary, the injunction permitted Sterling to operate as it had prior to the enactment of FIRREA, and plaintiffs' attempt to create an issue of fact surrounding the effect of the injunction is unavailing.

Similarly, plaintiffs' claim that we did not "fully comply with the injunction order" is also unavailing. Plaintiffs' have provided not one single piece of documentary or testamentary

evidence to refute our showing that the Government fully complied with the injunction. In a letter dated June 18, 1990, the Assistant District Director of the Office of Thrift Supervision advised Sterling as follows:

> We fully recognize that, until the Temporary Restraining Order is dissolved or the court orders otherwise, we may not enforce the restrictions set forth in our letters of January 26, March 9th and May 11th. We intend strictly to obey the court's order.

Def. App. 257. Sterling ignores this letter, and instead argues that other letters that note the existence of the restrictions establish that the Government attempted to enforce the restrictions during the pendency of the injunction. Plaintiffs' reply, pp. 32-34. Those letters, on their face, do not indicate that the Government ever ignored or attempted to disobey the injunction. It is undisputed, however, that, during the pendency of the injunction, the restrictions, while not enforced, were still in place. On at least one occasion, however, the Government demonstrated that it was aware of the injunction and declined to take action inconsistent with the terms of it. R. App. 252-53.

Further, Sterling representatives have admitted that, notwithstanding their present claim that the Government failed to comply with the injunction, during the pendency of the injunction, Sterling never claimed that the Government was not in compliance or asked the district court for relief or enforcement of its injunction. R. App. 204. Further, several members of Sterling's board of directors testified, at deposition, that issuance of the injunction by the court provided the relief necessary for Sterling to resume normal operations. R. App. 198, 200-01 . Consequently, plaintiffs' claim that the Government failed to comply with the terms of the injunction is without basis.

Finally, Sterling claims that, had it operated pursuant to the terms of the injunction, it might have "exposed itself to ruin" if the Ninth Circuit vacated the injunction. Plaintiffs' reply, p. 33. Plaintiffs provide absolutely no evidence to support that claim except the self-serving deposition testimony of its own officers. Plaintiffs' reply, p. 33. Further, plaintiffs provide no legal authority for their assumption that Sterling would have been penalized, upon lifting of the injunction, for operating within its terms during its pendency. Moreover, Sterling does not even allege that, when the injunction was in fact lifted, it suffered "ruin." Therefore, this argument, too, is unavailing.

**C. Plaintiffs' Claim That The Second Public Offering Did Not Replace The Capital That Was Phased Out After The Enactment Of FIRREA Is Refuted By The Testimony Of Its Own Officers**

In our supplemental motion, we pointed out that plaintiffs could not claim breach of contract for the period during the injunction, or for the period after the injunction was lifted, because, by that time, 1992, Sterling had completed its 1991 public offering and achieved regulatory capital compliance. Supplemental motion, p. 39. Plaintiff contends that they did not "recapture" the regulatory capital eliminated in 1989 as a result of FIRREA. Plaintiffs' reply, p. 31. That contention is inconsistent with the deposition testimony of Sterling's officers, however. The chief executive officer, Harold Gilkey, testified that the purpose of the 1991 public offering was to meet the post-FIRREA capital requirements. R. App. 208. Similarly, Mr. Byrne, the CFO, testified that the purpose of the public offering was to achieve compliance with FIRREA. R. App. 229.

Plaintiffs' additional arguments about "profit opportunities" lost and benefits that would have been derived from the capital are premature. Plaintiffs' reply, p. 31. Sterling has not yet

provided the Government with access to any quantification of damages, or the basis for any such quantification. It is undisputed, however, that the Government was subject to a broad injunction prohibiting it from enforcing FIRREA in abrogation of alleged contracts between the Government and Sterling, 751 F. supp. at 881, and Sterling achieved capital compliance in 1991, thus negating the need for FIRREA-based restrictions, prior to the lifting of the injunction in 1992.

## IV. STERLING ADMITS THAT COUNT IV OF ITS COMPLAINT DOES NOT STATE A CLAIM, SO COUNT IV SHOULD BE DISMISSED

### A. Sterling Now Alleges That Count IV Concerns A Potential Remedy, And Does Not State A Cause Of Action

In its opposition, Sterling admits that count IV of its complaint does not state a claim. In light of the law cited by the Government in its motion, Sterling retreats from the language in its complaint and instead states that it is seeking "nothing other than a claim for restitutionary damages." Plaintiffs' reply, p. 34. As this Court has recognized, and as Sterling has acknowledged, restitution is not a cause of action, but a potential remedy. Therefore, the fifth cause of action of Sterling's complaint must be dismissed.

Judge Smith already addressed this issue in a hearing in connection with the plaintiffs' request for a stay in the 1st 30 wave of the Winstar-related cases. In those cases, as Sterling has done here, many plaintiffs included counts in their complaints for restitution. When the Government pointed out that these were not causes of actions and did not implicate liability issues, the Court ordered plaintiffs to "put those issues in their complaint, those counts that are purely damage counts, and provide the Government with that list unless the Government has an objection that this is really a liability count that they'll try to sandbag us later on and then come

up with a stipulated order." Plaintiffs in All Winstar-Related Cases At The Court v. United States, No. 90-8C, et al. (Sept. 29, 1999 hearing), p. 42 (attached as R. App. 214).

Whether Sterling is ultimately entitled to restitution damages is not implicated in the Government's motion to dismiss, and need not be decided by the Court at this time. It is undisputed, however, that the fifth cause of action of Sterling's complaint fails to state a claim, and should be dismissed.

### B. The Proper Measure For Restitution Is The Non-Breaching Party's Pre-Contract Position, Not Unjust Enrichment

This Court can grant our motion to dismiss the fifth cause of action of Sterling's complaint without addressing the proper measure of restitution. In fact, the proper measure of restitution is irrelevant to deciding whether the fifth cause of action, which Sterling now claims is a claim for restitution damages, can exist as a stand-alone, substantive claim. Therefore, the fifth cause of action should be dismissed

Nevertheless, we wish to address the proper measure of restitution, because Sterling misstates it in its complaint, although it cites the controlling case on this issue, Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 359, 347 F.2d 509, 530 (1965), rev'd on other grounds, 385 U.S. 138 (1966), in its reply at page 34. In the complaint, Sterling assumes that restitution damages are measured by the "benefits of the bargains [Sterling] struck with the government...." Compl., ¶ 7.9. The measure of restitution that Sterling posits is flatly inconsistent with the governing law in this Circuit.

The governing law on restitution in this Circuit could hardly be clearer: "[R]estitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party

to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party." Acme Process, 171 Ct. Cl. at 359, 347 F.2d 509, 530 (1965); see also State of Arizona v. United States, 216 Ct. Cl. 221, 237-38, 575 F.2d 855, 864 (1978). In calculating restitution, therefore, a court determines the cost of performance to the non-breaching party, "measured at the time of performance," because this cost of performance is "the best means of restoring the status quo ante." Acme Process, 171 Ct. Cl. at 359, 347 F.2d at 530; accord Pacific Architects & Eng'rs v. United States, 203 Ct. Cl. 499, 516, 491 F.2d 734, 744 (Cl. Ct. 1974) ("[r]estitution would entitle plaintiff merely to be restored to the status quo ante, pursuant to which it would be limited to its prudent costs"); Rockwell Int'l Corp. v. United States, 8 Cl. Ct. 662, 664 (1985) (restitution is measured by "reasonable costs" of plaintiff). From that amount, if any, the court offsets the benefits received by the nonbreaching party from the contract. State of Arizona, 216 Ct. Cl. at 238, 575 F.2d at 865.

Consequently, the fifth cause of action of the complaint should be dismissed, and, to the extent Sterling seeks restitution damages, it should be subject to the standard articulated above.

## V. STERLING'S CAUSE OF ACTION FOR EQUITABLE ESTOPPEL SHOULD BE DISMISSED BECAUSE STERLING HAS NOT PLED FACTS REQUIRED TO ESTABLISH AN ESTOPPEL CLAIM

In its reply, Sterling argues that its fourth cause of action is for equitable estoppel, rather than promissory estoppel. P. reply, p. 35. Nonetheless, the cause of action should be dismissed because Sterling has not alleged affirmative Government misconduct, a prerequisite to a claim of equitable estoppel.

An equitable estoppel claim must include facts establishing affirmative Government misconduct, and plaintiffs have not pled such misconduct. This Court has recently

acknowledged that a claim of equitable estoppel against the Government is appropriate under very limited circumstances:

> Although the United States Supreme Court and other courts have left open the narrow possibility that under limited circumstances and in cases of affirmative misconduct by a government agent an estoppel claim against the government may succeed, thus far, federal courts generally have done so only while rejecting, for a variety of reasons, each attempt at application of the estoppel theory in the particular case then before the court.

Sullivan v. United States, 46 Fed. Cl. 480, 489 (2000).[6] In other words, "without affirmative misconduct on the part of the government, there can be no equitable estoppel against the government. Id. at 489 n. 12, citing Westinghouse Electric Corp. v. United States, 41 Fed. Cl. 229, 240-41 (1998); Hanson v. Office of Personnel Management, 833 F.2d at 1569.

In this case, Sterling's complaint does not allege affirmative misconduct on the part of the Government. Consequently, its cause of action for estoppel should be dismissed.

---

[6] Citing Heckler v. Community Health Servs., 467 U.S. 51, 66 (1984) (holding that detriment faced was not so severe or imposed in such an unfair way as to invoke the estoppel doctrine); Office of Personnel Management v. Richmond, 496 U.S. 414, 434 (1990) (courts cannot estop the Constitution and, therefore, there can be no "estoppel by a claimant seeking public funds"); Henry v. United States, 870 F.2d 634, 637 (Fed. Cir. 1989) (holding that the oral advice given by an IRS agent did not constitute affirmative misconduct because the element of reasonable reliance was absent); Hanson v. Office of Personnel Management, 833 F.2d 1568, 1569 (Fed. Cir. 1987)(misrepresentations made by Office of Personnel Management and Office of Workers Compensation Programs officials to a benefits recipient did not constitute affirmative misconduct because the officials acted in good faith on the basis of the currently accepted reading of the statute).

## CONCLUSION

For the reasons stated above, we respectfully request that this Court grant the Government's motion to for summary judgment with respect to the first cause of action of the complaint, and dismiss the fourth and fifth causes of action. In the event that the Court denies the Government's motion for summary judgment, plaintiffs' motion for partial summary judgment should be denied and this case set down for trial.

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300
Attorneys for Defendant

January 16, 2001

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on January 16, 2001, I caused to be served by United States mail (first-class mail, postage prepaid) copies of "DEFENDANT'S REPLY TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT," addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

[signature]

August 14, 1985

Mr. Harold B. Gilkey, Chairman
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

Dear Sir:

In connection with the approval by the Federal Home Loan Bank Board ("Bank Board") of the merger ("Merger") of Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"), with and into Sterling Savings Association, Spokane, Washington ("Sterling"), the following forbearances are hereby granted:

1. The assets acquired by Sterling from Lewis will be deemed to have been acquired in a merger instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the Bank Board where scheduled items are referred to as "assets acquired in a merger instituted for supervisory reasons," scheduled items attributable to Lewis shall be excluded from the computation of scheduled items and in determining whether Sterling meets the requirements of such sections following the effective merger date as defined by the resolution of the Bank Board approving the Merger ("Effective Date").

2. Section 563.13 (Reserve Accounts) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") provides no exceptions permitting the exclusion of scheduled items or liabilities acquired from another institution in computing the net worth requirements of this section. However, in view of the fact that the Merger was instituted for supervisory reasons, the Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the Merger, from exercising its authority, under Section 563.13 of the Insurance Regulations, for any failure of Sterling to meet the net worth requirements of Section 563.13 arising solely from (1)(a) scheduled items attributable to the assets of Lewis existing at the Effective Date, (b) any reduction in net worth resulting from losses on assets or losses on continuing operations acquired in connection with the Merger, and (c) any increase in liabilities of Sterling as of the Effective Date by reason of Sterling's

Mr. Harold B. Gilkey
August 14, 1985
Page Two

assumption of liabilities; or (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective date.

3. For a period of one year following the Effective date, in determining whether a penalty shall be assessed against or paid by Sterling pursuant to Section 523.12 (Deficiencies and Penalties) of the Rules and Regulations for the Federal Home Loan Bank System ("Bank Regulations"), the liquidity requirements of Section 523.11 (Liquidity Requirements) of the Bank Regulations as applied to Sterling shall be reduced by (1) the amount of Lewis' liquidity deficiencies existing at the Effective Date and (2) any aggregate net withdrawals (excess of withdrawals over cash savings received) from Lewis' offices after the Effective Date.

The forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its net worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter should not and shall not be construed to constitute forbearance or waiver by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and t FSLIC expressly reserve all of their statutory rights and po with respect to Sterling, including without limitation, those under Section 5 of the HOLA and Sections 406 and 407 of the National Housing Act, as amended.

The Federal Home Loan Bank Board

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
600 STEWART STREET PHONE (206) 624-3980
SEATTLE, WASHINGTON 98101

July 29, 1985

Harold B. Gilkey, Chairman
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

FHLBB No. 7918

Dear Mr. Gilkey:

After review of proposals received in the course of a recently completed bidding procedure involving Lewis Federal Savings and Loan Association, it has been determined that your institution has submitted the lowest cost bid. According to our understanding, that proposal involves the following salient features:

1. $1.75 million in FSLIC cash assistance;

2. Indemnification for undisclosed liabilities and/or challenges to the merger, which total indemnification will not exceed $1,000,000;

3. The granting of certain regulatory forbearances including those relating to the accounting of the transaction; and,

4. A provision for partial recovery of the cash assistance by the FSLIC, which recovery in any case will not exceed $300,000 in the aggregate and will be based upon actual losses experienced on the disposition of specific real estate owned properties and the performance of mortgage loans delinquent at the time of acquisition.

As we have discussed, I intend to handle this proposal under a program currently in place that allows for the District Bank processing of certain FSLIC-assisted acquisitions. It is important, however, to point out that neither myself nor anyone at the Seattle Bank is able to commit the Federal Home Loan Bank Board in any matter where its explicit action is required. That being the case, please realize that while we find significant merit to the subject proposal, and will work towards its fruition, our authority is limited. What we can assure you of is an expedient as possible processing of the related documentation necessary for Bank Board review.

The following matters will need to be addressed in the near future:

1. Obtaining non-inducement affidavits (sample enclosed) from each director of both Lewis and Sterling;

Harold B. Gilkey, Chairman
Sterling Savings Association
Spokane, Washington
July 29, 1985
Page Two

2. A calculation, and plan for repayment, of the interest paid to date by the FSLIC on the net worth certificates outstanding to Lewis;

3. The submission of a list of the locations of each facility office to be operated by the resulting association; and,

4. The submission of a letter affirming Sterling's intention to not retain any current Lewis employee in a policy-making capacity with the resulting association. .

In the near future we hope to be able to provide you with draft copies of both the assistance and merger agreements. If you have any questions about the current status or future processing of this matter, please feel free to contact me.

Sincerely,

HILTON S. HEWITT
Supervisory Agent

rm

Enclosure

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-985, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I Kim S. Ferguson Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

Kim S. Ferguson

Assistant Secretary to the Federal Home Loan Bank Board

B

# FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985

Date:

WHEREAS, The Federal Home Loan Bank Board ("Bank Board"), by Resolution No. 85-984, dated November 4, 1985, has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver ("Receiver") for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"); and

WHEREAS, The FSLIC as Receiver is authorized by § 406(b)(1)(A) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(b)(1)(A) (1982), to liquidate Lewis in an orderly manner or to make such other disposition of the matter as it deems to be in the best interests of Lewis, its savers, and the FSLIC; and

WHEREAS, The Bank Board has considered a proposed Acquisition Agreement (a copy of which is in the Minute Exhibit File) between the FSLIC as Receiver for Lewis and Sterling Savings Association, Spokane, Washington ("Sterling"), under which Sterling will purchase substantially all of the assets and assume substantially all of the liabilities of Lewis from the Receiver ("Acquisition"); and

WHEREAS, The Bank Board has considered a proposed Receiver's Agreement (a copy of which is in the Minute Exhibit File) between the FSLIC as Receiver for Lewis and the FSLIC in its corporate capacity, pursuant to which the FSLIC in its corporate capacity will purchase from the Receiver certain assets of Lewis not purchased by Sterling and assume certain liabilities and expenses of the Receiver; and

WHEREAS, The Bank Board has considered a proposed Assistance Agreement (a copy of which is in the Minute Exhibit File) between Sterling and the FSLIC under which the FSLIC will provide certain financial assistance and indemnifications to Sterling to facilitate the Acquisition; and

WHEREAS, The Bank Board has considered memoranda from the Federal Home Loan Bank of Seattle, dated October 23, 1985, and the Office of the General Counsel, dated November 1, 1985 (copies of which memoranda are in the Minute Exhibit File):

B

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985



General Findings

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board hereby finds and determines that: (1) the transfer of assets and liabilities of Lewis provided for in the Acquisition Agreement and the Receiver's Agreement is preferable to the liquidation of Lewis accompanied by payment of insurance on its accounts in that such transfer will preserve savings and loan services for the communities served by Lewis, and avoid the loss to Lewis's accountholders and creditors that would result from a liquidation accompanied by payment of insurance of accounts; (2) the execution and implementation of the Acquisition Agreement and the Receiver's Agreement are in the public interest and in the best interests of Lewis, its savers and creditors, and of the FSLIC in its corporate capacity; and (3) delay in the execution and implementation of the Acquisition Agreement following the Receiver's taking possession of Lewis would prevent such a transfer of assets and liabilities and result in the liquidation of Lewis and the payment of insurance on its accounts; and

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the transfer of Lewis's assets and liabilities to Sterling pursuant to the Acquisition Agreement should be effected without delay, in the public interest and in the interests of Lewis, its savers and creditors, and the FSLIC in its corporate capacity; and

Authority for Receiver to Transfer
Assets and Liabilities of Lewis

RESOLVED FURTHER, That the proposed Acquisition Agreement and the Receiver's Agreement are hereby approved and the FSLIC, as Receiver for Lewis, is hereby authorized to sell and transfer the assets and liabilities of Lewis and to enter into an Acquisition Agreement and a Receiver's Agreement with respect to Lewis in the form or substantially in the form of each such proposed Agreement; provided that the final form of each Agreement has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the Special Representative of the FSLIC as Receiver of Lewis, designated in or pursuant to Bank Board Resolution No. 85- 984, dated November 4, 1985, is hereby authorized to execute on behalf of the FSLIC as Receiver an Acquisition Agree-

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985



ment and a Receiver's Agreement in the form or substantially in the form of the proposed Agreements, and to execute all other documents and perform all other provisions of the Acquisition Agreement and the Receiver's Agreement and otherwise to implement the intent and purposes of the Agreements and this Resolution, provided that the final form of each such Agreement and document has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the Director or Deputy Director, Office of the FSLIC, or such person as the Director may designate ("Director"), is hereby authorized to execute a Receiver's Agreement on behalf of the FSLIC in its corporate capacity; and

RESOLVED FURTHER, That the purchase of assets and assumption of liabilities pursuant to the Acquisition Agreement are hereby approved pursuant to § 563.22 of the Rules and Regulations of the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") 12 C.F.R. § 563.22 (1985); and

Prevention of Probable Failure

RESOLVED FURTHER, That the Bank Board hereby finds that approval of the Acquisition is necessary to prevent the probable failure of Lewis; and

Supervisory Conversion

RESOLVED FURTHER, that the Bank Board deems and finds that:

1. Pursuant to approvals given in this Resolution for the provision of assistance to facilitate the acquisition of Lewis by Sterling the FSLIC has contracted to provide assistance under § 406(f) of the NHA, 12 U.S.C. § 1729(f) (1982); and

2. Severe financial conditions exist which threaten the stability of Lewis and the authorization of the Acquisition is likely to improve the financial condition of Lewis; and

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985

Page 4

RESOLVED FURTHER, That the Bank Board as operating head of the FSLIC finds that:

1. Lewis is insolvent in that its assets are less than its obligations to creditors and others.

2. The Bank Board has the power to appoint a receiver for the purpose of liquidating Lewis;

3. Upon the liquidation of Lewis accompanied by the payment of insurance of accounts, the members of Lewis would have no realizable equity interest in Lewis apart from their claims for deposits plus accrued interest on such deposits;

4. Following the Acquisition and conversion of Lewis, Sterling (the acquiring association) will be a viable entity; and

5. The conversion of Lewis to stock form is hereby approved; and

RESOLVED FURTHER, That the Bank Board, pursuant to § 563b.1(a) of the Rules and Regulations for the FSLIC ("Insurance Regulations"), 12 C.F.R. § 563b.1(a) (1985), hereby waives the requirements of Part 563b of the Insurance Regulations with respect to the conversion of Lewis; and

Cancellation of Net Worth Certificates

RESOLVED FURTHER, That the Director or Deputy Director, Office of the FSLIC, or the Director or Deputy Director of the Office of Examinations and Supervision, or such other persons as any of them may designate ("Authorized Representative"), shall cancel and return to Sterling all Net Worth Certificates purchased by the FSLIC from Lewis upon receipt by the Authorized Representative of all evidences of the FSLIC's indebtedness to Lewis on account of such Net Worth Certificates, duly cancelled by Sterling, and the sum of $14,500 which represents the total amount of interest paid by the FSLIC to Lewis on account of such indebtedness; and

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985



Financial Assistance

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), that (1) financial assistance and indemnifications by the FSLIC are necessary to prevent the default of Lewis and to facilitate the Acquisition; and (2) the amounts of such assistance and indemnifications, to be provided in accordance with the terms and conditions of the proposed Assistance Agreement would not exceed that amount reasonably necessary to save the cost of liquidating, including paying the insured accounts of, Lewis; and

RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director is authorized to execute on behalf of the FSLIC an Assistance Agreement in the form or substantially in the form of the proposed form of such Agreement, provided, that the final form of such Agreement has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the FSLIC hereby approves, pursuant to § 561.13 of the Insurance Regulations, Sterling's inclusion of the FSLIC's $1,750,000 cash contribution to Sterling, pursuant to the terms of the Assistance Agreement, as net worth; and

RESOLVED FURTHER, That the Director is authorized to take such further actions as may be necessary or appropriate to exercise the rights and fulfill the obligations of the FSLIC contained in the Assistance Agreement; and

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985

Page 6

## Accounting

RESOLVED FURTHER, That, in accounting for the Acquisition, Sterling shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC; and

RESOLVED FURTHER, That no later than ninety (90) days following the effective date of the Acquisition, Sterling shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants satisfactory to the Supervisory Agent and the Office of Examination and Supervision, which shall (a) specifically describe as of the date of the Acquisition any intangible assets, including goodwill or the discount of assets arising from the Acquisition to be recorded on Sterling's books for purposes of separate financial statements and consolidated financial statements, and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods; and

## Forbearance

RESOLVED FURTHER, That the Secretary or an Assistant Secretary is authorized and directed to send to Sterling a letter, substantially in the form of a letter which is in the Minute Exhibit File, concerning forbearance by the Bank Board and the FSLIC with respect to certain regulatory requirements, provided, that the final form of such letter shall be approved by the Office of the General Counsel; and

## Tax Certification

RESOLVED FURTHER, That the Bank Board finds and certifies that the ground set forth in § 5(d)(6)(A)(i) of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to Lewis, in that Lewis is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

**FEDERAL HOME LOAN BANK BOARD**

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 985



RESOLVED FURTHER, That the Secretary or an Assistant Secretary is hereby authorized and directed to send to Sterling a letter certifying on behalf of the Bank Board the matters set forth in the immediately preceding resolving paragraph, and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such letter to any agency of the United States upon request; and

Bank Stock and Membership; Secondary Reserve

RESOLVED FURTHER, That the transfer of the stock of Lewis in the Federal Home Loan Bank of Seattle ("Bank") to Sterling is approved effective as of the effective date of the Acquisition; and

RESOLVED FURTHER, That pursuant to the last sentence of § 404(e) of the NHA, 12 U.S.C. § 1727(e) (1982), the FSLIC hereby provides that the pro rata share of Lewis in the secondary reserve of the FSLIC, if any, shall be transferred to Sterling as of the effective date of the Acquisition; and

RESOLVED FURTHER, That the cessation of the membership of Lewis in the Bank be noted by reason of the Acquisition approved herein, effective as of the date of the Acquisition; and

Certificate of Insurance

RESOLVED FURTHER, That the Secretary or an Assistant Secretary is hereby directed to cancel the certificate of insurance of Lewis upon surrender of the certificate to the FSLIC; and

Effective Date

RESOLVED FURTHER, That the Acquisition shall be effective upon the execution by the parties of the Acquisition Agreement.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 - G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-990, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I Kim S. Ferguson Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

Assistant Secretary to the Federal Home Loan Bank Board

**FEDERAL HOME LOAN BANK BOARD**

**Emergency Thrift Acquisition Findings and Approval of Acquisition of Lewis Federal Savings and Loan Association Chehalis, Washington**

No. 85- 990

Date: November 4, 1985

WHEREAS, The Federal Home Loan Bank Board ("Bank Board"), by Resolution No. 85- 984, dated November 4, 1985, has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver ("Receiver") for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis");

WHEREAS, That the Bank Board by Resolution No 85- 985, dated November 4 1985, has approved the acquisition of the assets and liabilities of Lewis ("Acquisition") by Sterling Savings Association, Spokane, Washington ("Sterling"):

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, hereby determines with respect to the Acquisition that:

1. Severe financial conditions exist which threaten the stability of a significant number of institutions, the accounts of which are insured by the FSLIC ("insured institutions"), and of insured institutions possessing significant financial resources;

2. Lewis is a failing institution that is eligible for assistance pursuant to § 406(f) of the National Housing Act, as amended ("NHA"), in connection with the acquisition if its assets and liabilities by another insured institution or other company;

3. The procedures used by agents of the FSLIC with respect to Lewis to solicit practicable offers from prospective purchasers or merger partners both qualified and capable of acquiring the failing institution's assets and liabilities comply with the standards of § 408(m) of the NHA;

4. The Bank Board, in making the findings and issuing the approvals contained in Resolution No. 85-985, dated November 4, 1985, has given full and due consideration to the need to minimize the cost of financial assistance, the maintenance of specialized depository institutions, and the priorities and purposes of § 408(m) of the NHA;

5. The acquisition of Lewis by Sterling will lessen the risk to the FSLIC;

FEDERAL HOME LOAN BANK BOARD

Emergency Thrift Acquistion Findings and Approval of Acquisition of Lewis Federal Savings and Loan Association Chehalis, Washington

No. 85- 990

Page 2

6. The offer of Sterling to acquire Lewis presents the lowest expense and least risk to the FSLIC of any proposal submitted; and

RESOLVED FURTHER, That, notwithstanding any provision of state law, t acquisition of Lewis by Sterling is hereby authorized under section 408(m) of the National Housing Act.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

A

# FEDERAL HOME LOAN BANK BOARD

**Appointment of Receiver for**
**Lewis Federal Savings and Loan Association**
**Chehalis, Washington**

No. 85- 984

Date: November 4, 1985

## Recitals

WHEREAS, Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"), is a federally-chartered savings and loan association, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, The Federal Home Loan Bank Board ("Bank Board") has exclusive power and jurisdiction to appoint a receiver for a Federal savings and loan association in the event that the Bank Board determines that any of the grounds specified in § 5(d)(6)(A) of the Home Owners' Loan Act of 1933, as amended ("HOLA"), 12 U.S.C. § 1464(d)(6)(A) (1982), exists with respect to such association; and

WHEREAS, Pursuant to § 5(d)(6)(D) of the HOLA, 12 U.S.C. § 1464(d)(6)(D) (1982), the Bank Board shall appoint only the FSLIC as receiver for a Federal savings and loan association; and

WHEREAS, The Bank Board has considered memoranda from the Federal Home Loan Bank of Seattle, dated October 23, 1985, and the Office of the General Counsel, dated November 1, 1985, together with accompanying attachments and exhibits (copies of which memoranda are in the Minute Exhibit File):

## Grounds for Appointment

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board finds that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to Lewis in that Lewis is insolvent in that its assets are less than its obligations to its creditors and others, including its members; and

## Appointment of Receiver

RESOLVED FURTHER, That the Bank Board, pursuant to § 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A) (1982), hereby appoints the FSLIC as sole receiver for Lewis ("Receiver"); and

EXHIBIT 3

A

**FEDERAL HOME LOAN BANK BOARD**

**Appointment of Receiver for**
**Lewis Federal Savings and Loan Association**
**Chehalis, Washington**



**Powers and Duties of Receiver**

RESOLVED FURTHER, That the Receiver shall have and exercise all powers, rights, and privileges, and shall assume, perform, and discharge all duties, responsibilities, and obligations of a receiver for a Federal savings and loan association accorded or imposed by, and subject to, applicable provisions of law and regulations and orders of the Bank Board, including, but not limited to, § 5(d)(6) of the HOLA, 12 U.S.C. § 1464(d)(6) (1982), § 406 of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729 (1982), and the provisions of Parts 547 and 549 of the Rules and Regulations for the Federal Savings and Loan System ("Federal Regulations"), 12 C.F.R. Parts 547 and 549 (1985); and

RESOLVED FURTHER, That, in addition to all powers and authority of a receiver provided for by law, regulations, and orders, the Receiver is hereby authorized and empowered, and need not seek further approval from the Bank Board, to borrow money in such amounts from any source and in any manner as the Receiver requires to fulfill its duties as receiver, to execute, acknowledge, and deliver evidence of indebtedness for such borrowing, and to secure repayment of such borrowings by mortgages, pledges, and assignments in trust, or hypothecation of any property of Lewis; and

RESOLVED FURTHER, That notwithstanding the provisions of §§ 549.2 and 548.1, as made applicable by 549.2, of the Federal Regulations, 12 C.F.R. §§ 548.1 and 549.2 (1985), the Receiver may elect to notify by certified mail all persons and entities that the Receiver knows to be holding or in possession of assets of Lewis; and

RESOLVED FURTHER, That the Receiver shall not be required to furnish any bond; and

**Implementing Authority**

RESOLVED FURTHER, That the Director or the Deputy Director of the Office of the FSLIC ("Director"), or the designee of either, is authorized to take such action as may be necessary or appropriate to carry out the obligations of the FSLIC as Receiver, pursuant to its appointment; and

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Lewis Federal Savings and Loan Association
Chehalis, Washington



RESOLVED FURTHER, That the FSLIC, in its corporate capacity and not in its capacity as Receiver, is authorized to make advances to the Receiver for the purpose of enabling the Receiver to perform its functions and duties, on such terms and conditions as the Director shall deem appropriate, and the Director may execute such documents as may be necessary to make such advances or enter into collateral agreements; and

## Special Representatives

RESOLVED FURTHER, That one or more persons shall be designated as Special Representative of the Receiver ("Special Representative"), and such designated person or persons shall have the power and authority to act in the name and on behalf of the Receiver, including the authority, subject to the direction of the Director, to take prompt possession of the books, records, property, and assets of every kind and description of Lewis and to exercise all powers of the Receiver; that, initially R. Scott Taylor, Grayson H. Bowers, Robert M. Schmid, Edward P. Gerber, Donald W. Crocker and John W. Sears shall serve as Special Representatives and, the Director may replace or remove any Special Representative and may designate such additional Special Representative(s) as the Director deems appropriate, prescribing the functions and responsibilities of each such Special Representative as he deems appropriate; and

## Termination of Employment Contracts

RESOLVED FURTHER, That every employment contract between Lewis and its officers, employees, agents, or consultants is hereby terminated by the Bank Board pursuant to the appointment of the receiver effective upon the date of default of Lewis; and

## Records and Reports

RESOLVED FURTHER, That each Special Representative shall keep a record of his or her actions as Special Representative for the Receiver, and shall report on such actions from time to time as directed by the Director; and

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85-984

Page 4

RESOLVED FURTHER, That the Director shall from time to time report the Bank Board with respect to actions taken pursuant to this Reso tion.

By the Federal Home Loan Bank Board

Jeff Sconyers

Jeff Sconyers
Secretary

B

**FEDERAL HOME LOAN BANK BOARD**

**Acquisition of Assets and Liabilities of Lewis Federal Savings and Loan Association Chehalis, Washington**

No. 85- 985

Date: November 4, 1985

WHEREAS, The Federal Home Loan Bank Board ("Bank Board"), by Resolution No. 85- 984 dated November 4, 1985, has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver ("Receiver") for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"); and

WHEREAS, The FSLIC as Receiver is authorized by § 406(b)(1)(A) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(b)(1)(A) (1982), to liquidate Lewis in an orderly manner or to make such other disposition of the matter as it deems to be in the best interests of Lewis, its savers, and the FSLIC; and

WHEREAS, The Bank Board has considered a proposed Acquisition Agreement (a copy of which is in the Minute Exhibit File) between the FSLIC as Receiver for Lewis and Sterling Savings Association, Spokane, Washington ("Sterling"), under which Sterling will purchase substantially all of the assets and assume substantially all of the liabilities of Lewis from the Receiver ("Acquisition"); and

WHEREAS, The Bank Board has considered a proposed Receiver's Agreement (a copy of which is in the Minute Exhibit File) between the FSLIC as Receiver for Lewis and the FSLIC in its corporate capacity, pursuant to which the FSLIC in its corporate capacity will purchase from the Receiver certain assets of Lewis not purchased by Sterling and assume certain liabilities and expenses of the Receiver; and

WHEREAS, The Bank Board has considered a proposed Assistance Agreement (a copy of which is in the Minute Exhibit File) between Sterling and the FSLIC under which the FSLIC will provide certain financial assistance and indemnifications to Sterling to facilitate the Acquisition; and

WHEREAS, The Bank Board has considered memoranda from the Federal Home Loan Bank of Seattle, dated October 23, 1985, and the Office of the General Counsel, dated November 1, 1985 (copies of which memoranda are in the Minute Exhibit File):

B

# FEDERAL HOME LOAN BANK BOARD

## Acquisition of Assets and Liabilities of Lewis Federal Savings and Loan Association Chehalis, Washington

No. 85-985

Page 2

### General Findings

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board hereby finds and determines that: (1) the transfer of assets and liabilities of Lewis provided for in the Acquisition Agreement and the Receiver's Agreement is preferable to the liquidation of Lewis accompanied by payment of insurance on its accounts in that such transfer will preserve savings and loan services for the communities served by Lewis, and avoid the loss to Lewis's accountholders and creditors that would result from a liquidation accompanied by payment of insurance of accounts; (2) the execution and implementation of the Acquisition Agreement and the Receiver's Agreement are in the public interest and in the best interests of Lewis, its savers and creditors, and of the FSLIC in its corporate capacity; and (3) delay in the execution and implementation of the Acquisition Agreement following the Receiver's taking possession of Lewis would prevent such a transfer of assets and liabilities and result in the liquidation of Lewis and the payment of insurance on its accounts; and

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the transfer of Lewis's assets and liabilities to Sterling pursuant to the Acquisition Agreement should be effected without delay, in the public interest and in the interests of Lewis, its savers and creditors, and the FSLIC in its corporate capacity; and

### Authority for Receiver to Transfer Assets and Liabilities of Lewis

RESOLVED FURTHER, That the proposed Acquisition Agreement and the Receiver's Agreement are hereby approved and the FSLIC, as Receiver for Lewis, is hereby authorized to sell and transfer the assets and liabilities of Lewis and to enter into an Acquisition Agreement and a Receiver's Agreement with respect to Lewis in the form or substantially in the form of each such proposed Agreement; provided that the final form of each Agreement has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the Special Representative of the FSLIC as Receiver of Lewis, designated in or pursuant to Bank Board Resolution No. 85-984, dated November 4, 1985, is hereby authorized to execute on behalf of the FSLIC as Receiver an Acquisition Agree-

B

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington



ment and a Receiver's Agreement in the form or substantially in the form of the proposed Agreements, and to execute all other documents and perform all other provisions of the Acquisition Agreement and the Receiver's Agreement and otherwise to implement the intent and purposes of the Agreements and this Resolution, provided that the final form of each such Agreement and document has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the Director or Deputy Director, Office of the FSLIC, or such person as the Director may designate ("Director"), is hereby authorized to execute a Receiver's Agreement on behalf of the FSLIC in its corporate capacity; and

RESOLVED FURTHER, That the purchase of assets and assumption of liabilities pursuant to the Acquisition Agreement are hereby approved pursuant to § 563.22 of the Rules and Regulations of the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") 12 C.F.R. § 563.22 (1985); and

Prevention of Probable Failure

RESOLVED FURTHER, That the Bank Board hereby finds that approval of the Acquisition is necessary to prevent the probable failure of Lewis; and

Supervisory Conversion

RESOLVED FURTHER, that the Bank Board deems and finds that:

1. Pursuant to approvals given in this Resolution for the provision of assistance to facilitate the acquisition of Lewis by Sterling the FSLIC has contracted to provide assistance under § 406(f) of the NHA, 12 U.S.C. § 1729(f) (1982); and

2. Severe financial conditions exist which threaten the stability of Lewis and the authorization of the Acquisition is likely to improve the financial condition of Lewis; and

B

**FEDERAL HOME LOAN BANK BOARD**

**Acquisition of Assets and Liabilities of Lewis Federal Savings and Loan Association Chehalis, Washington**



RESOLVED FURTHER, That the Bank Board as operating head of the FSLIC finds that:

1. Lewis is insolvent in that its assets are less than its obligations to creditors and others.

2. The Bank Board has the power to appoint a receiver for the purpose of liquidating Lewis;

3. Upon the liquidation of Lewis accompanied by the payment of insurance of accounts, the members of Lewis would have no realizable equity interest in Lewis apart from their claims for deposits plus accrued interest on such deposits;

4. Following the Acquisition and conversion of Lewis, Sterling (the acquiring association) will be a viable entity; and

5. The conversion of Lewis to stock form is hereby approved; and

RESOLVED FURTHER, That the Bank Board, pursuant to § 563b.1(a) of the Rules and Regulations for the FSLIC ("Insurance Regulations"), 12 C.F.R. § 563b.1(a) (1985), hereby waives the requirements of Part 563b of the Insurance Regulations with respect to the conversion of Lewis; and

**Cancellation of Net Worth Certificates**

RESOLVED FURTHER, That the Director or Deputy Director, Office of the FSLIC, or the Director or Deputy Director of the Office of Examinations and Supervision, or such other persons as any of them may designate ("Authorized Representative"), shall cancel and return to Sterling all Net Worth Certificates purchased by the FSLIC from Lewis upon receipt by the Authorized Representative of all evidences of the FSLIC's indebtedness to Lewis on account of such Net Worth Certificates, duly cancelled by Sterling, and the sum of $14,500 which represents the total amount of interest paid by the FSLIC to Lewis on account of such indebtedness; and

B

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85-985



Financial Assistance

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), that (1) financial assistance and indemnifications by the FSLIC are necessary to prevent the default of Lewis and to facilitate the Acquisition; and (2) the amounts of such assistance and indemnifications, to be provided in accordance with the terms and conditions of the proposed Assistance Agr ement would not exceed that amount reasonably necessary to save th cost of liquidating, including paying the insured accounts of, Lewis; and

RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director is authorized to execute on behalf of the FSLIC an Assistance Agreement in the form or substantially in the form of the proposed form of such Agreement, provided, that the final form of such Agreement has been approved by the Office of the General Counsel; and

RESOLVED FURTHER, That the FSLIC hereby approves, pursuant to § 561.13 of the Insurance Regulations, Sterling's inclusion of the FSLIC's $1,750,000 cash contribution to Sterling, pursuant to the terms of the Assistance Agreement, as net worth; and

RESOLVED FURTHER, That the Director is authorized to take such further actions as may be necessary or appropriate to exercise the rights and fulfill the obligations of the FSLIC contained in the Assistance Agreement; and

B

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Lewis Federal Savings and Loan Association
Chehalis, Washington



## Accounting

RESOLVED FURTHER, That, in accounting for the Acquisition, Sterling shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC; and

RESOLVED FURTHER, That no later than ninety (90) days following the effective date of the Acquisition, Sterling shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants satisfactory to the Supervisory Agent and the Office of Examination and Supervision, which shall (a) specifically describe as of the date of the Acquisition any intangible assets, including goodwill or the discount of assets arising from the Acquisition to be recorded on Sterling's books for purposes of separate financial statements and consolidated financial statements, and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods; and

## Forbearance

RESOLVED FURTHER, That the Secretary or an Assistant Secretary is authorized and directed to send to Sterling a letter, substantially in the form of a letter which is in the Minute Exhibit File, concerning forbearance by the Bank Board and the FSLIC with respect to certain regulatory requirements, provided, that the final form of such letter shall be approved by the Office of the General Counsel; and

## Tax Certification

RESOLVED FURTHER, That the Bank Board finds and certifies that the ground set forth in § 5(d)(6)(A)(i) of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to Lewis, in that Lewis is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

B

FEDERAL HOME LOAN BANK BOARD

<u>Acquisition of Assets and Liabilities of</u>
<u>Lewis Federal Savings and Loan Association</u>
<u>Chehalis, Washington</u>

No. 85-985

Page 7

RESOLVED FURTHER, That the Secretary or an Assistant Secretary is hereby authorized and directed to send to Sterling a letter certifying on behalf of the Bank Board the matters set forth in the immediately preceding resolving paragraph, and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such letter to any agency of the United States upon request; and

<u>Bank Stock and Membership; Secondary Reserve</u>

RESOLVED FURTHER, That the transfer of the stock of Lewis in the Federal Home Loan Bank of Seattle ("Bank") to Sterling is approved effective as of the effective date of the Acquisition; and

RESOLVED FURTHER, That pursuant to the last sentence of § 404(e) of the NHA, 12 U.S.C. § 1727(e) (1982), the FSLIC hereby provides that the pro rata share of Lewis in the secondary reserve of the FSLIC, if any, shall be transferred to Sterling as of the effective date of the Acquisition; and

RESOLVED FURTHER, That the cessation of the membership of Lewis in the Bank be noted by reason of the Acquisition approved herein, effective as of the date of the Acquisition; and

<u>Certificate of Insurance</u>

RESOLVED FURTHER, That the Secretary or an Assistant Secretary is hereby directed to cancel the certificate of insurance of Lewis upon surrender of the certificate to the FSLIC; and

<u>Effective Date</u>

RESOLVED FURTHER, That the Acquisition shall be effective upon the execution by the parties of the Acquisition Agreement.

By the Federal Home Loan Bank Board

Jeff Sconyers
Jeff Sconyers
Secretary

C

# FEDERAL HOME LOAN BANK BOARD

## Implementation Resolution

No. 85-986

Date: November 4, 1985

WHEREAS, The Director or Deputy Director, Office of the Federal Savings and Loan Insurance Corporation ("FSLIC"), or the designee of either of them ("Director"), have been authorized by Federal Home Loan Bank Board ("Bank Board") Resolution No. 85-985 dated November 4, 1985, to execute on behalf of the FSLIC in its corporate capacity an Assistance Agreement with Sterling Savings Association, Spokane, Washington, and a Receiver's Agreement, and other documents; and

WHEREAS, The Assistance Agreement, Receiver's Agreement, and other documents impose certain rights, duties, and obligations upon the FSLIC that do not require basic determinations of policy; and

WHEREAS, In the administration of such agreements, and of any rights or obligations of the FSLIC under them, it may be necessary or desirable that the FSLIC contract for legal, auditing, or other services or that the FSLIC authorize the settlement of certain claims:

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, finds that expenditures of the FSLIC pursuant to such agreements are necessary, nonadministrative, and made under the National Housing Act, as amended ("NHA"), and shall be incurred, allowed, and paid under the provisions of the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), without regard to the provisions of any other law governing the expenditures of public funds; and

RESOLVED FURTHER, That the Director is hereby authorized and directed to take such actions as may be desirable or necessary to fulfill the rights, duties, and obligations of the FSLIC in its corporate capacity under the Assistance Agreement, Receiver's Agreement, and other authorized documents, and to incur, allow, and pay all expenditures in fulfillment of such rights, duties, and obligations, pursuant to the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), including, but not limited to:

(1) The payment of amounts required by such agreements;

(2) The making of advances to the FSLIC as Receiver for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Receiver");

C

# FEDERAL HOME LOAN BANK BOARD

## Implementation Resolution

No. 85- 986

Page 2

(3) Contracting for legal, accounting, or other services, provided, that the form of any contract shall be approved by the Office of General Counsel;

(4) The assignment, pursuit, and settlement of claims, provided, that the form of any assignment or settlement agreement entered into by the FSLIC shall be approved by the Office of General Counsel;

(5) The administration of any asset or claim acquired from the Receiver, provided, that any contract pertaining to such asset or claims, and the satisfaction, settlement, or termination of any claim, shall be approved by the Office of the General Counsel; and

(6) The waiver, if deemed necessary or desirable by the Director, of provisions of the Assistance Agreement concerning filings, representations, warranties, or certifications by Sterling, provided, that the form of any waiver by the FSLIC shall be approved by the Office of General Counsel; and

RESOLVED FURTHER, That the General Counsel may also exercise the authority conferred by the preceding resolving paragraphs with respect to contracting on behalf of the FSLIC for legal or other related services needed to implement the agreements.

By the Federal Home Loan Bank Board

Jeff Sconyers

Jeff Sconyers
Secretary

FEDERAL HOME LOAN BANK BOARD

**Contingent Payment of Insurance of Accounts:**
**Lewis Federal Savings and Loan Association**

No. 85-987

Date: November 4, 1985

WHEREAS, The Federal Savings and Loan Insurance Corporation ("FSLIC") has been appointed as sole receiver for Lewis Savings and Loan Association, Chehalis, Washington ("Lewis"), effective as described in Federal Home Loan Bank Board ("Bank Board") Resolution No. 85-984 dated November 4, 1985; and

WHEREAS, Such appointment constitutes a default of Lewis within the meaning of § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982), and may necessitate the payment of insured accounts by the FSLIC, in its corporate capacity and not as receiver, within the meaning of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982):

NOW, THEREFORE, IT IS RESOLVED, That the Director or Deputy Director, Office of the FSLIC, or such person as either of them may designate in writing ("Director"), is hereby authorized and directed to take all necessary or appropriate steps and to incur all necessary or appropriate expenses in preparation for and to implement the payment of all insured accounts of Lewis pursuant to § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982); and

RESOLVED FURTHER, That, upon being advised by the General Counsel, or a Deputy General Counsel, that Lewis is in default and that the account liabilities of Lewis have not been assumed by another insured institution, the Director is hereby authorized and directed (1) to cause each insured account in Lewis that is surrendered and transferred to the FSLIC to be paid in cash or by making available a transferred account in another insured institution, (2) to take or cause to be taken such action(s) as may be necessary or appropriate to carry out this and any future directives of the Bank Board, and (3) to do all things necessary or appropriate to carry out expeditiously the objectives of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982) and Part 564 of the Rules and Regulations for the FSLIC, 12 C.F.R. Part 564 (1985) and for the protection of the FSLIC; and

RESOLVED FURTHER, That each Office and Division of the Bank Board is hereby requested to furnish such assistance to the Director in fulfillment for the intent of this Resolution as the Director may request.

By the Federal Home Loan Bank Board

Jeff Sconyers
Jeff Sconyers
Secretary

E

# FEDERAL HOME LOAN BANK BOARD

**Lewis Federal Savings and Loan Association**
**Chehalis, Washington**
**Pursuit of Claims**

No. 85-988

Date: November 4, 1985

WHEREAS, The Federal Home Loan Bank Board has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"), pursuant to is Resolution No. 85-984 dated November 4, 1985; and

WHEREAS, Pursuant to a proposed Receiver's Agreement and the proposed Assistance Agreement (copies of which are in the Minute Exhibit File), potential claims of Lewis against certain parties will or may be transferred to the FSLIC in its corporate capacity; and

NOW, THEREFORE, IT IS RESOLVED, That the Director or Deputy Director, Office of the FSLIC, or any person designated by either of them, is hereby authorized to take whatever actions are deemed appropriate, including litigation, to recover on such claims of Lewis from any such parties, provided that the Office of the General Counsel shall concur in any such action.

By the Federal Home Loan Bank Board

Jeff Sconyers
Secretary

F

# FEDERAL HOME LOAN BANK BOARD

**Approval of the Acquisition of Lewis Federal Savings and Loan Association, Chehalis, Washington, by Sterling Savings Association, Spokane, Washington**

No. 85-989

Date: November 4, 1985

RESOLVED, That the acquisition of Lewis Federal Savings and Loan Association, Chehalis, Washington, by Sterling Savings Association, Spokane, Washington, is hereby approved, subject to any conditions that may be imposed by the Federal Home Loan Bank Board ("Bank Board") in any concurrent resolution or action issued as of the date of this Resolution.

By the Federal Home Loan Bank Board

Jeff Sconyers

Jeff Sconyers
Secretary

G

# FEDERAL HOME LOAN BANK BOARD

## Emergency Thrift Acquisition Findings and Approval of Acquisition of Lewis Federal Savings and Loan Association Chehalis, Washington

No. 85-990

Date: November 4, 19

WHEREAS, The Federal Home Loan Bank Board ("Bank Board"), by Resolution No. 85-984, dated November 4, 1985, has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver ("Receiver") for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis");

WHEREAS, That the Bank Board by Resolution No 85-985, dated November 4 1985, has approved the acquisition of the assets and liabil ties of Lewis ("Acquisition") by Sterling Savings Association, Spok ne, Washington ("Sterling"):

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as ope ating hea of the FSLIC, hereby determines with respect to the Acquisi ion that:

1. Severe financial conditions exist which threaten the stability of a significant number of institutions, the accounts of which are insured by the FSLIC ("insured institutions"), and of insured institutions possessing significant financial resources;

2. Lewis is a failing institution that is eligible for assistance pursuant to § 406(f) of the National Housing Act, as amended ("NHA"), in connection with the acquisition if its assets and liabilities by another insured institution or other company;

3. The procedures used by agents of the FSLIC with respect to Lewis to solicit practicable offers from prospective purchasers or merger partners both qualified and capable of acquiring the failing institution's assets and liabilities comply with the standards of § 408(m) of the NHA;

4. The Bank Board, in making the findings and issuing the approvals contained in Resolution No. 85-985, dated November 4, 1985, has given full and due consideration to the need to minimize the cost of financial assistance, the maintenance of specialized depository institutions, and the priorities and purposes of § 408(m) of the NHA;

5. The acquisition of Lewis by Sterling will lessen the risk to the FSLIC;

FEDERAL HOME LOAN BANK BOARD

Emergency Thrift Acquistion Findings and Approval of Acquisition of Lewis Federal Savings and Loan Association Chehalis, Washington

No. 85-990

Page 2

6. The offer of Sterling to acquire Lewis presents the lowest expense and least risk to the FSLIC of any proposal submitted; and

RESOLVED FURTHER, That, notwithstanding any provision of state law, the acquisition of Lewis by Sterling is hereby authorized under section 408(m) of the National Housing Act.

By the Federal Home Loan Bank Board

Jeff Sconyers

Jeff Sconyers
Secretary

# ACQUISITION AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AS RECEIVER FOR LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION,
Chehalis, Washington

AND

STERLING SAVINGS ASSOCIATION
Spokane, Washington

Dated November 5, 1985

## TABLE OF CONTENTS

**ACQUISITION AGREEMENT BETWEEN
THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
AS RECEIVER FOR
LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION
AND
STERLING SAVINGS ASSOCIATION**


| | Page |
|---|---|
| Recitals | 1 |
| § 1 Purchase of Assets | 2 |
| § 2 Assumption of Liabilities | 3 |
| § 3 Records | 4 |
| § 4 Tax Reports | 5 |
| § 5 Inventory and Audit | 5 |
| § 6 Purchase Price | 5 |
| § 7 Duties with Respect to Savers | 5 |
| § 8 Office Space for the RECEIVER | 7 |
| § 9 Litigation; Power of Attorney | 7 |
| § 10 Rights and Forbearance | 8 |
| § 11 Sole Benefit | 8 |
| § 12 Successors and Assigns | 8 |
| § 13 Notices | 9 |
| § 14 Accounting Principles | 9 |
| § 15 Governing Law | 10 |
| § 16 Effective Date | 10 |
| § 17 Entire Agreement, Severability | 10 |
| § 18 Counterparts, Modification, Headings | 11 |
| § 19 Warranties | 11 |
| § 20 Continuing Cooperation | 12 |
| Signature Page | 13 |

# ACQUISITION AGREEMENT

THIS AGREEMENT is made and entered into this 5th day of November 1985, by and between the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, in its capacity as RECEIVER for Lewis Federal Savings and Loan Association, Chehalis, Washington (respectively, "RECEIVER" and "CLOSED ASSOCIATION"), and Sterling Savings Association, Spokane, Washington ("ACQUIRING ASSOCIATION").

## RECITALS

A. The CLOSED ASSOCIATION is a mutual savings and loan association organized under the laws of the United States, the accounts of which are insured by the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION in its capacity as a corporate instrumentality of the United States ("CORPORATION").

B. The FEDERAL HOME LOAN BANK BOARD ("BANK BOARD"), by its Resolution No. 85-994, dated November 4th, 1985, duly appointed the CORPORATION as RECEIVER for the CLOSED ASSOCIATION pursuant to § 5(d)(6)(A) of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1464(d)(6)(A) (1982), and the RECEIVER's appointment has become effective.

C. The RECEIVER has taken possession of the CLOSED ASSOCIATION and by operation of law has succeeded to all the rights, titles, powers, and privileges of the CLOSED ASSOCIATION.

D. The ACQUIRING ASSOCIATION is a state savings and loan association organized under the laws of the State of Washington, the accounts of which are insured by the CORPORATION.

E. It has been mutually agreed between the ACQUIRING ASSOCIATION and the RECEIVER and the BANK BOARD has determined that it is in the best interests of the CLOSED ASSOCIATION, its savers, and the CORPORATION that substantially all of the CLOSED ASSOCIATION's assets, all of its deposits or withdrawable accounts, and substantially all of its other liabilities be immediately transferred to and assumed by the ACQUIRING ASSOCIATION as provided in this Agreement.

F. In consideration of the foregoing and of the mutual covenants and agreements contained in this Agreement, the RECEIVER and the ACQUIRING ASSOCIATION enter into the following agreement.

AGREEMENT

§ 1 Purchase of Assets. The RECEIVER hereby sells to the ACQUIRING ASSOCIATION, and the ACQUIRING ASSOCIATION hereby purchases from the RECEIVER, all of the RECEIVER's right, title, and interest in and to all of the CLOSED ASSOCIATION's assets that the RECEIVER owns or holds and any of the CLOSED ASSOCIATION's assets hereafter acquired by the RECEIVER, excluding, however: (i) any known or unknown claim, demand, cause of action, or judgment against the present or former controlling persons, directors, officers, or other persons directly or indirectly exercising a controlling influence over the

management or policies of the CLOSED ASSOCIATION or any of its subsidiaries, or their sureties, including any administrator, executor, personal representative, heir, or assign of any such person, arising out of any act(s) or omission(s) of such person prior to the effective date of this Agreement ("Effective Date") with respect to the CLOSED ASSOCIATION or its property, or its subsidiary or the subsidiary's property; (ii) any claim against counsel for the CLOSED ASSOCIATION for recovery of sums paid by the CLOSED ASSOCIATION to challenge the receivership or contemporary or subsequent actions of the BANK BOARD or the CORPORATION; and (iii) such limited items, parts, or portions of the CLOSED ASSOCIATION's books and records as are specifically identified by the RECEIVER, <u>provided</u> the ACQUIRING ASSOCIATION consents to the RECEIVER's retention of such records (the "excluded papers").

§ 2 <u>Assumption of Liabilities</u>. The ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform, and discharge all of the CLOSED ASSOCIATION's liabilities, including, but not limited to, those shown on the CLOSED ASSOCIATION's books and records at such time as the RECEIVER takes possession of the CLOSED ASSOCIATION, but excluding, however, obligations under any compensation or employment contract between the CLOSED ASSOCIATION and any of its employees, officers, or directors, other than obligations to honor or satisfy any rights already vested under such contracts. The term "liability" as used in this section does not refer to any obligation to indemnify controlling persons, directors, officers, or other persons as a result of suits arising from claims described in § 1, and the AC-

QUIRING ASSOCIATION specifically does not assume by virtue of this Agreement any such obligations for indemnification of the directors, officers, or employees of the CLOSED ASSOCIATION.

§ 3 Records.

(a) The ACQUIRING ASSOCIATION acknowledges that the RECEIVER is delivering to it, as among the assets sold and purchased under § 1 of this Agreement, all of the CLOSED ASSOCIATION's books and records, except the excluded papers, if any.

(b) The ACQUIRING ASSOCIATION agrees to preserve and keep safe all of the CLOSED ASSOCIATION's books and records that it acquires pursuant to this Agreement, to permit the RECEIVER at any reasonable time to inspect, make extracts from or copies of any of such books and records, and to cooperate fully with the RECEIVER in the preparation of the inventory described below.

(c) As a condition of this Agreement, the ACQUIRING ASSOCIATION agrees at its own expense either to segregate and keep separate or, in the alternative and at the option of the ACQUIRING ASSOCIATION, to reconstruct as of the date of this Agreement, the CLOSED ASSOCIATION's books and records transferred to it until the period in which the CLOSED ASSOCIATION may file an action for removal of the RECEIVER pursuant to law has expired, or, if such action is filed, until the dismissal of such action or the issuance of an order determining an appeal from any order of a court directing the removal of the RECEIVER.

§ 4 Tax Reports.

The RECEIVER shall prepare and file or cause to be prepared and filed any and all federal and state tax reports otherwise required to be filed by the CLOSED ASSOCIATION through the Effective Date, as soon as it is practicable. The RECEIVER shall furnish a copy of all federal and state tax reports filed by RECEIVER on behalf of the CLOSED ASSOCIATION to ACQUIRING ASSOCIATION upon their completion. The ACQUIRING ASSOCIATION agrees to cooperate fully with the RECEIVER in preparing such tax reports.

§ 5 Inventory.

As soon as is practicable after the effective date of this Agreement, the RECEIVER shall make or cause to be made an inventory of the CLOSED ASSOCIATION's assets and a record of its liabilities, as directed by the BANK BOARD. The RECEIVER shall furnish a copy of the inventory of the CLOSED ASSOCIATION's assets and the record of its liabilities to the ACQUIRING ASSOCIATION upon their completion.

§ 6 Purchase Price. The purchase price of all assets sold to the ACQUIRING ASSOCIATION pursuant to § 1 shall be the assumption of liabilities provided for in § 2.

§ 7 Duties with Respect to Savers.

(a) The ACQUIRING ASSOCIATION agrees to pay, in accordance with the provisions of applicable law and the individual contracts governing the CLOSED ASSOCIATION's deposits or withdrawable accounts, all properly drawn and presented withdrawal requests by the CLOSED ASSOCIATION's depositors or withdrawable accountholders whose depos-

its or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement, to the extent that such deposits or withdrawable account balances are sufficient to permit such payments and in compliance with the contractual terms of such deposits and accounts and in all other respects to discharge, in the usual course of business, the CLOSED ASSOCIATION's duties and obligations with respect to its depositors or accountholders whose deposits and accounts are assumed by the ACQUIRING ASSOCIATION; <u>provided</u>, however, that the ACQUIRING ASSOCIATION does not assume any special or unusual duties of the CLOSED ASSOCIATION to such depositors or accountholders unles the terms of such duties are disclosed in the CLOSED ASSOCIATION's records. Further, in accordance with applicable law and the individual contracts governing such deposits or accounts, the ACQUIRING ASSOCIATION agrees to pay interest on all of the CLOSED ASSOCIATION' deposits and withdrawable accounts that are assumed pursuant to § 2 of this Agreement.

(b) If any of such depositors or withdrawable accountholders declines to accept the obligation of the ACQUIRING ASSOCIATION to pay the CLOSED ASSOCIATION's deposit or account liabilities assumed pursuant to § 2 of this Agreement and asserts a claim agains the RECEIVER for any part of such assumed deposit liabilities, the ACQUIRING ASSOCIATION shall provide the RECEIVER, upon demand, with an amount of money sufficient to enable it to pay the claim of such depositors or accountholders, less any applicable early withdrawal penalties, not exceeding the amount credited to such persons on the

ACQUIRING ASSOCI. .ON's records at the time : h demand is made, and, upon paying the RECEIVER as so demanded, the ACQUIRING ASSOCIATION shall be discharged from any further liability for such claim under this Agreement.

(c) The ACQUIRING ASSOCIATION shall give written notice, in a form approved by the RECEIVER or its counsel, to the CLOSED ASSOCIATION's depositors and withdrawable accountholders whose deposits or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement of its assumption of liability for such deposits or accounts.

§ 8 Office Space for the RECEIVER. The ACQUIRING ASSOCIATION agrees to provide the RECEIVER, without charge and, if its duties so require, for a period of one (1) year from the date of this Agreement, adequate space on the premises, including vault space and furnishings, for the RECEIVER's use in connection with the transfer and transactions required by this Agreement and with the exercise and discharge of its powers and duties as receiver of the CLOSED ASSOCIATION. After such period, the ACQUIRING ASSOCIATION shall continue to provide to the RECEIVER, at a reasonable rental to be agreed upon by the parties, such space and furnishings for such period as the RECEIVER may request.

§ 9 Litigation; Power of Attorney. In the event that any action at law or in equity in which the RECEIVER has an interest is instituted by any person against the CLOSED ASSOCIATION, the ACQUIRING ASSOCIATION, or both of them, or against the RECEIVER and either or

both of the foregoing as co-defendants, or in whi action the RE-CEIVER joins or is joined as co-defendant, the ACQUIRING ASSOCIATION agrees to file, or to join with the RECEIVER in filing, a petition to remove the action to an appropriate court, and hereby authorizes and appoints, as its attorney for the purpose of effecting such removal, any attorney designated or approved by the RECEIVER to act in that capacity.

§ 10 Rights and Forbearance. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by either party in exercising or partially exercising any right, power, or remedy shall not preclude the further exercise of such right, power, or remedy.

§ 11 Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all conditions and provisions of it, are for sole benefit of the RECEIVER and the ACQUIRING ASSOCIATION and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give any person other than RECEIVER or the ACQUIRING ASSOCIATION any legal or equitable right, remedy, or claim under or with respect to this Agreement or any of its provisions.

§ 12 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, their respective transferees, successors, and assigns, but

this Agreement may not be assigned nor may any rights under it be transferred to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 13 Notices. Any notice, request, demand, or other communication to either of the parties shall be deemed given when received and shall be given in writing and delivered in person or sent by first class mail in a prepaid envelope to such party at its address set forth below or at such other address as such party shall hereafter furnish in writing:

Sterling Savings Association
Attn: Daniel G. Byrne, Chief Financial Officer
North 120 Wall Street
Spokane, Washington 99201-0696
Attn: President

Federal Savings and Loan Insurance Corporation
Attn: Special Representative, Receiver for
Lewis Federal Savings and Loan Association
1700 G Street, N.W.
Washington, D.C. 20552

§ 14 Accounting Principles. Except as otherwise provided in this Agreement, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, any assistance agreement or agreements to which the ACQUIRING ASSOCIATION and the CORPORATION are parties, including, but not limited to, an agreement to make a contribution or loan, an agreement to purchase subordinated debt, or an agreement to issue and purchase Income Capital Certifi-

cates, applicable regulations of the BANK BOARD the CORPORATION, or any resolution or action of the BANK BOARD or CORPORATION approving, or adopted concurrently with, this Agreement, then this Agreement, such assistance agreement, such regulations, and such resolutions or actions shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with an assistance agreement, such regulations, and the BANK BOARD's or the CORPORATION's resolutions or actions. If there is a conflict between this Agreement and an assistance agreement or such regulations or such resolutions or action, then the assistance agreement or such regulations or such resolutions or actions shall govern.

§ 15 Governing Law. To the extent that federal law does not control, this Agreement and the rights and obligations under it shall be governed by the law of the State of Washington. Nothing in this Agreement shall require any unlawful action or inaction by either party.

§ 16 Effective Date. This Agreement and the transfer of the CLOSED ASSOCIATION's assets and liabilities provided for by this Agreement shall become effective upon its execution by the parties.

§ 17 Entire Agreement, Severability.

(a) This Agreement, together with any interpretation of it or any understanding agreed to in writing by the parties, constitutes the entire agreement between the ACQUIRING ASSOCIATION and the CORPORATION as RECEIVER, but not in its corporate capacity in connection

with transactions contemplated by this Agreement and supersedes all prior agreements and understandings of the parties, excepting only any resolutions or letters approved or adopted contemporaneously with this Agreement by the BANK BOARD or the CORPORATION.

(b) If any provision of this Agreement is invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties.

§ 18 Counterparts, Modification, Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall together constitute one and the same instrument, and either party may execute this Agreement by signing any such counterpart.

(b) No modification of this Agreement shall be binding unless executed in writing and signed by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 19 Warranties.

(a) The RECEIVER warrants and represents that it has authority to enter into this Agreement and that as RECEIVER it has full power and authority to transfer the CLOSED ASSOCIATION's assets and liabilities as provided by this Agreement.

(b) The ACQUIRING ASSOCIATION warrants and represents that all of the transactions contemplated by this Agreement have been or will be authorized by all necessary corporate actions and that it, by its proper officers, has executed this Agreement and shall execute and deliver all instruments, certificates, and other documents that may be necessary or incidental to the performance of this Agreement.

(c) These warranties shall survive the execution, performance, and termination of this Agreement.

§ 20 Continuing Cooperation. The RECEIVER agrees, upon the request of the ACQUIRING ASSOCIATION, to execute and deliver such further instruments and documents of conveyance as shall be necessary or proper to vest in the ACQUIRING ASSOCIATION the RECEIVER's full legal or equitable title to the property transferred to the ACQUIRING ASSOCIATION pursuant to this Agreement.

IN WITNESS WHEREOF, The parties hereto have executed this Agreement by their duly authorized officers or agents.

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION AS RECEIVER FOR LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION

Date: Nov 5 1985

Attest: Winifred A. Sutton

By: [signature]

Its: Special Representative

STERLING SAVINGS ASSOCIATION

Date: November 5 1985

Attest: [signature]

By: [signature]

Its: Chairman

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AND

STERLING SAVINGS ASSOCIATION
Spokane, Washington

Dated: November 5, 1985

EXHIBIT 2

## SUMMARY OF SUBSTANTIVE PROVISIONS

| Assistance Provided | Section in Agreement |
|---|---|
| 1. Cash Contribution of $1,750,000 | § 3 |
| 2. Indemnification for undisclosed liabilities and litigation challenging the Acquisition. | § 4 |

**ASSISTANCE AGREEMENT**
**BETWEEN**
**THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION**
**AND**
**STERLING SAVINGS ASSOCIATION**

**Table of Contents**


| | Page |
|---|---|
| Recitals ............................................. | 1 |
| Section 1. Definitions ........................... | 2 |
| (a) "Acquisition" .......................... | 2 |
| (b) "Acquisition Agreement" ............... | 2 |
| (c) "Affiliate" ............................ | 2 |
| (d) "Bank Board" ........................... | 2 |
| (e) "Books" ................................ | 2 |
| (f) "Claim" ................................ | 3 |
| (g) "Effective Date" ....................... | 3 |
| (h) "Insurance Regulations" ............... | 3 |
| (i) "Liquidation" .......................... | 3 |
| (j) "Net Proceeds Receiver"................ | 3 |
| (k) "Quarter" .............................. | 3 |
| (l) "Related Claim" ........................ | 4 |
| (m) "Subsidiary" ........................... | 4 |
| (n) "Supervisory Agent" .................... | 4 |
| Section 2. Conditions ............................ | 4 |
| Section 3. Contributions by the CORPORATION .... | 5 |
| (a) Cash Contributions ..................... | 5 |
| (b) Indemnification Contributions ........ | 6 |
| (c) Adjustments ............................ | 6 |
| Section 4. Indemnification for the Undisclosed Liabilities, Claims Against LEWIS, and Litigation Challenging the Acquisition ....... | 7 |
| (a) Indemnifications ....................... | 7 |
| (1) Undisclosed Liabilities .......... | 8 |
| (2) Challenges to the Acquisition ... | 9 |
| (b) Pursuit of Related Claims ............ | 10 |
| (c) Payments as Contributions ............ | 10 |
| (d) Limitation on Indemnification ........ | 11 |
| (e) Tax Benefits ........................... | 11 |
| Section 5. Duplicate Payments .................. | 15 |
| Section 6. Non-Reimbursable Expenses ........... | 15 |

**ASSISTANCE AGREEMENT**

**Table of Contents**


| | Page |
|---|---|
| Section 7. Reports, Records | 16 |
| (a) Quarterly Reports | 16 |
| (b) Final Accounting | 17 |
| (c) Access to Books and Records | 17 |
| (d) Audits and Examinations | 18 |
| (e) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities | 19 |
| Section 8. Covenants | 21 |
| (a) Management Standard | 21 |
| (b) Conduct of Litigation | 21 |
| (c) Disclosure of Agreement | 24 |
| Section 9. Accounting Principles | 25 |
| Section 10. Notices | 25 |
| Section 11. Termination of Agreement | 26 |
| Section 12. Rights and Forbearance | 27 |
| Section 13. Governing Law | 27 |
| Section 14. Entire Agreement, Severability | 27 |
| Section 15. Counterparts, Modifications, Headings | 28 |
| Section 16. Successors and Assigns | 28 |
| Section 17. Sole Benefit | 29 |
| Section 18. Continuing Cooperation | 29 |
| Signature Page | 30 |

**ASSISTANCE AGREEMENT**

THIS AGREEMENT, dated November 5, 1985, is entered into by and between STERLING SAVINGS ASSOCIATION, Spokane, Washington ("ACQUIRING ASSOCIATION"), and the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, a corporate instrumentality and agency of the United States ("CORPORATION").

**RECITALS**

A. The CORPORATION insures the accounts of both LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION, Chehalis, Washington ("LEWIS"), and the ACQUIRING ASSOCIATION in accordance with § 403 of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1726 (1982).

B. On November 4, 1985, the Federal Home Loan Bank Board ("Bank Board") duly appointed the CORPORATION as receiver for LEWIS ("Receiver").

C. On November 5, 1985, the Receiver entered into an Acquisition Agreement with the ACQUIRING ASSOCIATION, pursuant to which the ACQUIRING ASSOCIATION acquired substantially all of LEWIS' assets and assumed substantially all of LEWIS' liabilities.

D. The CORPORATION has decided, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), to provide financial assistance and indemnification as set forth in this Agreement, having determined that LEWIS is in danger of default and that the amount of such assistance and indemnification would be less than the losses the CORPORATION would sustain upon the liquidation of LEWIS through a receivership accompanied by the payment of insurance of accounts.

E. In consideration of the mutual promises contained in this Agreement, the parties enter into the following agreement:

## AGREEMENT

Section 1. Definitions. For the purpose of this Agreement, the following terms have the indicated meanings:

(a) "Acquisition": The acquisition of substantially all of the assets and the assumption of substantially all of the liabilities of LEWIS by the ACQUIRING ASSOCIATION.

(b) "Acquisition Agreement": The Acquisition Agreement between the Federal Savings and Loan Insurance Corporation as Receiver for LEWIS Federal Savings and Loan Association, Chehalis, Washington, and Sterling Savings Association, Spokane, Washington.

(c) "Affiliate": Affiliate, as that term is defined in § 561.25 of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation, 12 C.F.R. § 561.25 (1985).

(d) "Bank Board": The Federal Home Loan Bank Board.

(e) "Books": The general ledger books of original entry and ancillary journal records and schedules necessary to reflect the financial condition of LEWIS in accordance with generally accepted accounting principles.

(f) "Claim": Any claim, demand, or cause of action.

(g) "Effective Date": The date and time at which the Acquisition becomes effective pursuant to the terms of the Acquisition Agreement and applicable law.

(h) "Insurance Regulations": The Rules and Regulations for the Federal Savings and Loan Insurance Corporation, as now or hereinafter in effect.

(i) "Liquidation": The release, compromise, satisfaction, settlement, reduction to judgment, or assignment to other than the CORPORATION of any Claim.

(j) "Net Proceeds Received": As used in reference to the amount received upon the Liquidation of a Claim, the amount computed by deducting from the gross proceeds received all reasonable expenses in the form of payments to third parties actually incurred or paid by the ACQUIRING ASSOCIATION in connection with such Liquidation, provided that such expenses have not been reimbursed otherwise. Such "reasonable expenses" may include, without being limited to, reasonable costs that are directly related to the Liquidation of the Claim.

(k) "Quarter": A calendar quarter, provided that the first Quarter during the term of this Agreement shall be deemed to include the period, if any, from the Effective Date to the last day preceding the first day of the first full calendar quarter following the Effective Date, and provided further, that the last quarter during the term of this Agreement shall be deemed to include the period, if any,

from the first day after the last day of the last full calendar quarter during the term of this Agreement to the date on which this Agreement terminates.

(l) "Related Claim": Any counterclaim, offset, insurance settlement, or other Claim which may result in a recovery by the ACQUIRING ASSOCIATION and which is related to a Claim or liability for which the CORPORATION is obligated to indemnify the ACQUIRING ASSOCIATION under § 4(a) of this Agreement.

(m) "Subsidiary": Any corporation or other entity 25 percent or more owned, directly or indirectly by LEWIS or the ACQUIRING ASSOCIATION.

(n) "Supervisory Agent": The Principal or other Supervisory Agent of the Bank Board in Seattle, Washington.

Section 2. Conditions. The CORPORATION's obligations under this Agreement are conditioned upon the following:

(a) The CORPORATION's receipt of an opinion from counsel for the ACQUIRING ASSOCIATION, in form and substance satisfactory to the CORPORATION and its counsel, to the effect that:

(1) The Acquisition has been duly authorized by the directors of the ACQUIRING ASSOCIATION and effected in compliance with the Charter and Bylaws of the ACQUIRING ASSOCIATION and with applicable law; and

(2) This Agreement has been duly authorized, executed, and delivered, and constitutes a valid and binding obligation of the ACQUIRING ASSOCIATION, enforceable in accordance with its terms;

(b) The CORPORATION's receipt of a certified copy of the corporate resolutions of the ACQUIRING ASSOCIATION authorizing execution and delivery of the Acquisition Agreement and this Agreement;

(c) The CORPORATION's receipt of a memorandum from the Office of the Attorney General of the State of Washington indicating that the Acquisition is in compliance with Washington law;

(d) The ACQUIRING ASSOCIATION and any of its Affiliates and Subsidiaries, within the time periods specified by the terms of this Agreement or by the Bank Board, (1) having executed and delivered to the CORPORATION all other agreements, instruments, and documents required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Acquisition and related transactions, and (2) having taken all other actions imposed as conditions to the CORPORATION's obligation to provide assistance in any action by the Bank Board in approving the Acquisition and related transactions.

Section 3. Contributions by the CORPORATION.

(a) Cash Contributions.

(1) Within five business days after the Effective Date, provided that the conditions set forth in § 2(a)-(c) of this Agreement have been satisfied, and the conditions set forth in § 2(d) have been satisfied to the extent specified by the Bank Board as a condition to the CORPORATION's initial cash contribution, the CORPORATION shall wire transfer to the account of the ACQUIRING ASSOCIA-

TION at the Federal Home Loan Bank of Seattle, Account No. 7918-16, a cash contribution in the amount of One Million, Seven Hundred Fifty Thousand Dollars ($1,750,000).

(2) For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, all cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the CORPORATION that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

(b) Indemnification Contributions. Within 30 days after receipt of the ACQUIRING ASSOCIATION's quarterly reports required pursuant to § 7(a) or within 90 days of the final accounting required pursuant to § 7(b) of this Agreement, the CORPORATION shall contribute to the ACQUIRING ASSOCIATION, in its account at the Federal Home Loan Bank of Seattle, Account No. 7918-16, the reported amounts that are owed pursuant to § 4 of this Agreement.

(c) Adjustments. Any contribution or payment by the CORPORATION or any accounting or report furnished by the ACQUIRING ASSOCIATION under this Agreement shall be subject to adjustment if it subsequently appears that such contribution, payment, accounting, or

report was based upon error or was not computed in accordance with the accounting principles prescribed by this Agreement.

Section 4. Indemnification for the Undisclosed Liabilities and Litigation Challenging the Acquisition.

(a) Indemnifications. To the extent not otherwise reimbursed or reimbursable, except as provided in § 4(a)(1), the CORPORATION will indemnify the ACQUIRING ASSOCIATION for, and pay as provided in § 3(b), the amounts actually paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of the following liabilities and the reasonable costs and expenses of litigation related to such liabilities and to the defense of Claims described in § 4(a)(2), including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in connection with such satisfaction, settlement, or compromise, provided that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 8, and provided further that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 4(a), and the reports required by § 7(a) and (e) of this Agreement, in a form satisfactory to the CORPORATION, shall be submitted to the CORPORATION before such costs and expenses shall be paid by the CORPORATION pursuant to § 3(b):

(1) Undisclosed Liabilities. Except as provided in this § 4(a)(1), any liabilities of the ACQUIRING ASSOCIATION that were not disclosed or reflected on the Books or records of LEWIS immediately prior to the Effective Date and which, under generally accepted accounting principles as of the Effective Date consistently applied, are of the type that are disclosed or reflected as liabilities, but excluding any inadequacy in or lack of a valuation allowance or specific reserve, provided that, in the event that the satisfaction, settlement, or compromise of any liability or liabilities described in this § 4(a)(1) results in the acquisition by the ACQUIRING ASSOCIATION of an asset or assets, then at the CORPORATION's election:

(A) The ACQUIRING ASSOCIATION shall assign such asset or assets to the CORPORATION without cost to the CORPORATION; or

(B) The amount paid by the CORPORATION pursuant to § 4(a) shall be limited to the amount, if any, by which the amounts paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of such liability or liabilities exceed the fair market value of the asset or assets, if any, acquired as a consequence of the satisfaction, settlement, or compromise of such liability or liabilities as determined (i) by agreement between the ACQUIRING ASSOCIATION and the CORPORATION, or (ii) by an

appraisal performed by an independent appraiser approved by the CORPORATION, the cost of which appraisal shall be paid by the CORPORATION.

The CORPORATION's obligation to provide indemnification under this § 4(a)(1) shall not extend to any Subsidiaries of LEWIS or to liabilities of LEWIS incurred, prior to the Effective Date, with respect to any month or months for which the Books have not yet been completed or closed, (1) which normally recur in LEWIS' ordinary course of business and operations, (2) which are ordinarily posted on the Books on a periodic basis, and (3) which are in amounts that are materially the same as and can reasonably be predicted from prior postings on the Books, including, but not limited to, items such as (A) accrued employee salaries, (B) utility bills, (C) accrued interest due to depositors and accountholders, and (D) accrued interest payable to the Federal Home Loan Bank of Seattle, or any other lender to LEWIS, provided that, with respect to accrued interest payable to a lender, the underlying obligation to pay principal is reflected on the Books.

(2) Challenges to the Acquisition. Any action brought by other than the ACQUIRING ASSOCIATION, any of its Subsidiaries, creditors, or stockholders within a period of one year following the Effective Date to challenge or set aside the Acquisition or this Agreement that is grounded upon a Claim that an action or failure to act by the Bank Board or the CORPORATION was not in accordance with the Bank Board's or the CORPORATION's enabling legislation, and, in

the event that a court of competent jurisdiction directs the ACQUIRING ASSOCIATION to divest assets or liabilities of LEWIS on such ground, the reasonable costs and expenses of such divestiture, provided that such damages are directly attributable to such action or failure to act by the Bank Board or the CORPORATION.

(b) Pursuit of Related Claims. The ACQUIRING ASSOCIATION shall use its best efforts to reduce or minimize the CORPORATION's indemnity payments under this § 4 by the pursuit of Related Claims, and the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for reasonable and related costs and expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in complying with this § 4(b), provided that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 8, and provided further that the pursuit of Related Claims shall be subject to approval by the CORPORATION and the reports required by § 7(a) and (e) of this Agreement, in a form satisfactory to the CORPORATION, shall be submitted to the CORPORATION before costs and expenses related to the pursuit of Related Claims shall be paid by the CORPORATION pursuant to § 3(b). All sums recovered from each such Related Claim shall be paid over to the CORPORATION to the extent that the CORPORATION has made contributions pursuant to this Agreement.

(c) Payments as Contributions. All payments made by the CORPORATION to the ACQUIRING ASSOCIATION under this § 4 shall be considered contributions under this Agreement.

(d) Limitation on Indemnification. Subject to the provisions of § 11(b), the CORPORATION's obligations to provide indemnification under § 4(a)(1) shall not extend beyond three years after the Effective Date, and the CORPORATION's obligations to provide indemnification under § 4(a)(2) shall not extend beyond one year after the Effective Date. Notwithstanding anything contained in this Agreement to the contrary, the aggregate contributions made by the CORPORATION pursuant to § 4(a) shall not be in excess of One Million Dollars ($1,000,000).

(e) Tax Benefits. The ACQUIRING ASSOCIATION shall pay to the CORPORATION an amount equal to the net tax benefits, if any, realized by the ACQUIRING ASSOCIATION in any year ("Net Tax Benefits"), calculated as provided in this § 4(e). For purposes of this Agreement, the Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 4(e)(1) and (2) below ("Tax Benefit Items") that are utilized by the ACQUIRING ASSOCIATION to reduce its federal income tax liability in a given tax year as calculated in § 4(e)(3) below.

(1) The total amount of any net operating and capital loss carryovers, and any other carryovers resulting in a tax deduction from the ACQUIRING ASSOCIATION's gross income, arising from a taxable year or taxable period of LEWIS which ends on or prior to the Effective Date.

(2) Any deductions or losses which are incurred by the ACQUIRING ASSOCIATION to the extent that the ACQUIRING ASSOCIATION is entitled to receive assistance from the CORPORATION pursuant to the terms of § 4 of this Agreement.

(3) The Net Tax Benefits for a taxable year shall be equal to the excess, if any, of

(A) the federal income tax liability for such taxable year (taking into account all allowable carryovers and carry-backs to such year) which would have been imposed on the ACQUIRING ASSOCIATION, or the consolidated group of which the ACQUIRING ASSOCIATION is a member, if the Tax Benefit Items described in § 4(e)(1) and (2) had not been deducted in any taxable year, over

(B) the federal income tax liability for such taxable year (taking into account all allowable carryovers and carry-backs to such year) actually imposed on the ACQUIRING ASSOCIATION, or the consolidated group of which the ACQUIRING ASSOCIATION is a member.

(4) Net Tax Benefits shall be paid to the CORPORATION within 45 days of the date, or any extension thereof, for which a federal income tax return of the ACQUIRING ASSOCIATION for the taxable year in which such Net Tax Benefits are realized (including by way of carryovers and carrybacks) was required to be filed.

(5) The ACQUIRING ASSOCIATION shall, upon request of the CORPORATION, provide copies of the tax returns and amended tax returns of LEWIS, the ACQUIRING ASSOCIATION, and any of its Affiliates for any taxable year(s) specified by the CORPORATION.

(6) In the event Net Tax Benefits are paid with respect to Tax Benefit Items that are subsequently disallowed or that cease to be Tax Benefit Items because it is determined that payments with respect to such Tax Benefit Items were not excludible from gross income, such Net Tax Benefits shall be repaid by the CORPORATION to the ACQUIRING ASSOCIATION, with interest and any penalties assessed by the Internal Revenue Service.

(7) The total amount of Net Tax Benefits paid to the Corporation pursuant to this § 4(e) shall not exceed the total amount of assistance paid or payable by the CORPORATION to the ACQUIRING ASSOCIATION pursuant to the terms of this Assistance Agreement or any other assistance arrangements. If after the termination of this agreement, it is determined that the total amount of Net Tax Benefits paid by the ACQUIRING ASSOCIATION to the CORPORATION exceeds such total amount of the CORPORATION's assistance to the ACQUIRING ASSOCIATION, then the CORPORATION shall repay that excess amount to the ACQUIRING ASSOCIATION.

(8) This § 4(e) shall survive the termination of this Agreement.

(f) The ACQUIRING ASSOCIATION shall, within 60 days of the Effective Date, identify and list certain assets consisting of real estate owned and delinquent accounts receivable ("Listed Assets") that it acquired pursuant to the Acquisition Agreement. Such list will constitute Exhibit A to this Agreement, even though not completed as of the Effective Date. The ACQUIRING ASSOCIATION will pay to the CORPORATION the amount by which the proceeds received on the disposition or collection of any of the Listed Assets, on a cumulative basis, exceeds the sum of the following amounts:

(1) The total carrying value before any deduction for valuation reserve on the Books of LEWIS, as of a date immediately preceding the Effective Date ("Carrying Value");

(2) All costs of collection, maintenance, carrying and selling paid or incurred by the ACQUIRING ASSOCIATION with respect to the Listed Assets, which shall include (a) the actual costs paid by the ACQUIRING ASSOCIATION to preserve or enhance the value of the Listed Assets, and (b) interest from the Effective Date until the disposition or collection of the Listed Assets at the rate of 12% per annum calculated monthly on the Carrying Value of the Listed Assets as reduced by any amounts received on the disposition or collection of any of the Listed Assets; and

(3) $100,000.

The ACQUIRING ASSOCIATION will provide an accounting report to the CORPORATION not later than 45 days subsequent to each of the first three anniversaries of the Effective Date which report shall

include any dispositions or collections of the Listed Assets, maintenance, carrying and selling costs paid or incurred by the ACQUIRING ASSOCIATION, and interest as determined pursuant to this subsection 4(f), all from the Effective Date. Such accounting report shall be exempt from the reporting requirements of § 7 of this Agreement. In no event shall the total amount paid by the ACQUIRING ASSOCIATION to the CORPORATION pursuant to the terms of this section exceed $300,000.

Section 5. <u>Duplicate Payments</u>. Any cost or expense for which the ACQUIRING ASSOCIATION has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not be reimbursed to the ACQUIRING ASSOCIATION, or paid over to or retained by the CORPORATION, under any other section of this Agreement, even though such cost, expense, or recovery may be described in whole or in part in two or more sections of this Agreement.

Section 6. <u>Non-Reimbursable Expenses</u>. The ACQUIRING ASSOCIATION shall not seek reimbursement from the CORPORATION for expenses incurred in the administration of this Agreement. For purposes of this § 6, such expenses shall include, but shall not be limited to, compensation paid to employees or agents of the ACQUIRING ASSOCIATION for services performed in connection with the preparation of reports and supporting documentation required to be filed with the CORPORATION under § 7(a), (b), (d), and (e)(1) of this Agreement.

Section 7. Reports, Records. In the event of the failure of the ACQUIRING ASSOCIATION to comply with any of the following requirements, the CORPORATION may delay payment of a related charge for reimbursement under this Agreement until, in the CORPORATION's judgment, such requirement is met:

(a) Quarterly Reports. Within 45 days following the end of each Quarter in which a corporate officer of the ACQUIRING ASSOCIATION receives written notice of any Claim or liability that may cause payment by or to the CORPORATION, and for each Quarter thereafter, the ACQUIRING ASSOCIATION shall furnish a report or reports to the CORPORATION, in a format approved by the CORPORATION and supported by such data as, in the CORPORATION's judgment, may be necessary for verification, which report or reports shall include:

(1) Status information on all Claims and liabilities that may cause payment by or to the CORPORATION under this Agreement;

(2) Itemization of payments made by and due from the CORPORATION, which, with respect to charges by the ACQUIRING ASSOCIATION for reimbursement of attorneys' and accountants' fees pursuant to § 4(a) and (b) shall be supported by the following documentation and by such other documentation as the CORPORATION may request:

(A) Copies of itemized statements of charges received by the ACQUIRING ASSOCIATION from each law firm and accounting firm, which statements shall specify (i) the nature and resulting work product of each of the services performed by each individual attorney and accountant; (ii) the identity of the person who per-

formed each service; (iii) the date on which each service was performed; (iv) the hourly rate charged for each service; and (v) the total number of hours billed for such services; and

(B) Copies of any letters, contracts, or other documents that set forth the agreement between the ACQUIRING ASSOCIATION and such law firms and accounting firms concerning the basis on which fees and other compensation due such attorneys and accountants from the ACQUIRING ASSOCIATION are to be computed; and

(3) Payments made by and due from the ACQUIRING ASSOCIATION.

(b) Final Accounting. Within 90 days after the date this Agreement terminates, or such longer time as the CORPORATION may permit, the ACQUIRING ASSOCIATION shall render to the CORPORATION a final accounting, which may be prepared by the ACQUIRING ASSOCIATION's staff and shall include such information and be in such form as the CORPORATION shall request.

(c) Access to Books and Records. The ACQUIRING ASSOCIATION shall cause to be made available to the CORPORATION all books, papers, records, and information of any kind relating to any or all matters subject to the provisions of this Agreement, including any such materials or information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries.

(d) Audits and Examinations. The CORPORATION may audit or examine the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries with respect to transactions affecting the implementation

of this Agreement at any time or times chosen by the CORPORATION upon reasonable notice. Such audits shall be conducted by the CORPORATION at its own expense but with the assistance of the personnel of any of the parties hereto requested by the CORPORATION, whose salaries and expenses shall be paid by the appropriate party without reimbursement from the CORPORATION.

(e) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities.

(1) In requesting the CORPORATION's written consent, pursuant to § 8(b)(5)(A) of this Agreement, to engage attorneys or accountants, the cost of whose services may be chargeable to the CORPORATION, or otherwise incur expenses which may be chargeable to the CORPORATION under § 4(b) in connection with the pursuit of a Related Claim, the ACQUIRING ASSOCIATION, promptly upon determining the necessity to engage such attorneys or accountants or otherwise to incur such expenses, shall obtain and submit to the CORPORATION the following information, in a form satisfactory to the CORPORATION, supported by such supplementary documentation as the ACQUIRING ASSOCIATION deems necessary, or as in the opinion of the CORPORATION is necessary to enable the CORPORATION to give an informed consent to the ACQUIRING ASSOCIATION's engaging such attorneys or accountants or otherwise incurring such expenses, which information shall include, but shall not be limited to, the following:

(A) The parties to the dispute and the relationships among them;

(B) The nature of the dispute and the basic facts concerning the dispute; and

(C) A description of the specific actions taken by the ACQUIRING ASSOCIATION in pursuit of such Related Claim prior to determining the need to engage attorneys or accountants or otherwise to incur expenses in pursuit of such Related Claim.

(2) In requesting the CORPORATION's written consent, pursuant to § 8(b)(5)(B) of this Agreement, to prosecute any Related Claim by court action, the ACQUIRING ASSOCIATION, promptly upon determining the necessity for such court action, shall obtain and submit to the CORPORATION an opinion prepared by the attorney handling such Related Claim, in a form satisfactory to the CORPORATION and its counsel, supported by such supplementary documentation as the ACQUIRING ASSOCIATION or its counsel deems necessary, or as in the opinion of counsel to the CORPORATION is necessary to enable the CORPORATION to give an informed consent to the prosecution of such Related Claim by court action, which opinion shall include, but shall not be limited to the following:

(A) The parties to the dispute and the relationships among them;

(B) The nature of the dispute and the basic facts concerning the dispute;

(C) A discussion of the causes of action raised by the dispute and the defenses to such causes of action, including (i) citations to relevant statutes and significant case law, and (ii) the attorney's evaluation of the merits of such causes of action and defenses; and

(D) The attorney's estimate of (i) the time involved in prosecuting the Related Claim by court action, and (ii) the foreseeable costs and expenses, including attorneys' fees, which will be incurred in prosecuting the Related Claim by court action.

(3) In requesting the CORPORATION's written consent, pursuant to § 8(b)(5)(C) of this Agreement, to enter into a binding commitment with respect to the satisfaction, settlement, or compromise of any Claim or liability described in the introductory paragraph of § 8, the ACQUIRING ASSOCIATION, promptly upon determining that the satisfaction, settlement, or compromise of any such Claim or liability is appropriate, shall obtain and submit to the CORPORATION an opinion prepared by the attorney handling any such Claim or liability, in a form satisfactory to the CORPORATION and its counsel, supported by such supplementary documentation as the ACQUIRING ASSOCIATION or its counsel deems necessary, or as in the opinion of counsel to the CORPORATION is necessary to enable the CORPORATION to give an informed consent to the satisfaction, settlement, or compromise of such Claim or liability, which opinion and supporting documentation shall include, but shall not be limited to, the following:

(A) The information required by this § 7(e)(2)(A)-(C);

(B) Information concerning the status of litigation regarding the Claim or liability if litigation has been instituted, and, at the request of the CORPORATION, copies of all pleadings or other documents which have been filed in connection with such litigation; and

(C) The precise terms of the satisfaction, settlement, or compromise of such Claim or liability, and the attorney's basis for recommending the proposed satisfaction, settlement, or compromise of such Claim or liability.

Section 8. Covenants. In the event of the failure of the ACQUIRING ASSOCIATION to comply with any of the following covenants concerning the defense of a liability or Claim described in § 4(a), or the pursuit of a Related Claim as required under § 4(b), the CORPORATION may disallow a related charge by the ACQUIRING ASSOCIATION for indemnification:

(a) Management Standard. The ACQUIRING ASSOCIATION shall use its best efforts in pursuing Claims and defending against liabilities or Claims described in the introductory paragraph of this § 8.

(b) Conduct of Litigation. With respect to all Claims and liabilities described in the introductory paragraph of this § 8, the ACQUIRING ASSOCIATION shall:

(1) Use its best efforts to keep the CORPORATION fully informed of the status of all such Claims and liabilities by the timely filing of current reports pursuant to § 7(a) and (e) of this Agreement;

(2) Observe the right of the CORPORATION to monitor and direct their defense or prosecution, including the right to direct the ACQUIRING ASSOCIATION to file a petition to remove an action to the appropriate court or to appeal any determination of any court, provided that the CORPORATION shall bear the cost of removal or appeal and of monitoring and directing such defense or prosecution;

(3) Authorize the CORPORATION, upon the CORPORATION's election and at the CORPORATION's expense and with its own attorneys, to defend against, or to prosecute in the name of LEWIS, the ACQUIRING ASSOCIATION, or the CORPORATION, as the case may be, any such liability or Claim, and cooperate fully with the CORPORATION in such defense or prosecution, including, but not limited to, the furnishing to the CORPORATION of all applicable books, records, and other information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries;

(4) At the request of the CORPORATION, assign the CORPORATION and subrogate the CORPORATION to any right, title, or interest of the ACQUIRING ASSOCIATION in any such Claim or liability, any related defense, and any proceeds, and, in the event of such assignment, cooperate fully with the CORPORATION in the defense or

prosecution of any such Claim or liability, including, but not limited to, the causing to be made available to the CORPORATION all books, records, and other information that are in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries; and

(5) Obtain the CORPORATION's written consent before:

(A) engaging attorneys or accountants to pursue a Related Claim, the cost of whose services may be chargeable to the CORPORATION pursuant to § 4(b) of this Agreement, or otherwise incurring expenses in connection with a Related Claim that may be chargeable to the CORPORATION pursuant to § 4(b) of this Agreement;

(B) prosecuting any Related Claim by court action;

(C) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Related Claim; or

(D) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Claim, other than a Related Claim, or liability described in the introductory paragraph of this § 8, unless such satisfaction, settlement, or compromise would involve payment by the ACQUIRING ASSOCIATION of an amount not in excess of Twenty-Five Thousand Dollars ($25,000), or is entered into pursuant to an adjudication by a court of competent jurisdiction which, with the permission of the CORPORATION, the ACQUIRING ASSOCIATION has not appealed.

(c) Disclosure of Agreement. Except as otherwise required by law or generally accepted accounting principles, the ACQUIRING ASSOCIATION, shall not, without the prior consent of the CORPORATION, disclose the terms of this Agreement, or the obligation of the CORPORATION to indemnify the ACQUIRING ASSOCIATION against the Claims and liabilities described in the introductory paragraph of this § 8, to any person, other than employees or agents of the ACQUIRING ASSOCIATION.

Section 9. Accounting Principles. Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving or relating to the Acquisition of to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations shall be those in effect on the Effective Date, as subsequently

clarified or interpreted by the Bank Board or its staff; and the accounting principles shall be those in effect on the Effective Date, as clarified or interpreted by the Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants ("AICPA"). If there is a conflict between what is required by the FASB or the AICPA and what is required by the Bank Board, the interpretation of the Bank Board or its staff shall govern.

Section 10. Notices.

(a) Any notice or other communication required or permitted under this Agreement, unless otherwise specifically provided for, shall be deemed given if sent by first class mail, postage prepaid, to a party at its address set forth below or at such other address as the party shall furnish in writing:

STERLING SAVINGS ASSOCIATION
Attn: Daniel G. Byrne, Chief Financial Officer
North 120 Wall
Spokane, Washington 99201-0696

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
Attn: Director, Financial Assistance Division
1700 G Street, N.W.
Washington, D.C. 20552

(b) Unless otherwise specifically provided for, if this Agreement requires that notice be given within a certain period of time, notice shall be deemed given as of the date of posting.

Section 11. Termination of Agreement.

(a) Except as otherwise specifically provided in this Agreement, this Agreement shall terminate three years following the Effective Date or on such other date to which the parties or their successors agree in writing, provided that in the event a receiver is appointed for the purpose of liquidating the ACQUIRING ASSOCIATION, or the ACQUIRING ASSOCIATION ceases to be an association the accounts of which are insured by the CORPORATION, this Agreement and all of the CORPORATION's obligations under it shall terminate upon the effective date of such occurrence.

(b) Notwithstanding termination of this Agreement as described in § 11(a) above, the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for any loss arising from liabilities and Claims to the extent described in § 4(a), including the reasonable costs and expenses of related litigation actually incurred and payable by the ACQUIRING ASSOCIATION, for the reasonable costs and expenses actually incurred and payable by the ACQUIRING ASSOCIATION in the pursuit of a Related Claim pursuant to § 4(b), provided that any such Claim or liability is in litigation on the date that this Agreement terminates, provided further that the ACQUIRING ASSOCIATION continues to observe after the termination date all covenants, agreements of co-operation, reporting requirements, and agreements for the use of best efforts set forth in this Agreement, and provided further that any

recovery by the ACQUIRING ASSOCIATION on any Related Claims described in § 4(b) shall be paid over to the CORPORATION, subject to the limitations of § 4(b).

Section 12. Rights and Forbearance. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by any party in exercising or partially exercising any such right, power, or remedy shall not preclude its further exercise.

Section 13. Governing Law. This Agreement and the parties' rights and obligations under it shall be governed by the law of the State of Washington to the extent that Federal law does not control. Nothing in this Agreement shall require any unlawful action or inaction by either party.

Section 14. Entire Agreement, Severability.

(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Acquisition Agreement and any resolutions or letters concerning the Acquisition or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Acquisition and this Agreement, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Acquisition Agreement, the provisions of this Agreement shall govern

and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the CORPORATION are concerned.

(b) If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding upon the CORPORATION and the ACQUIRING ASSOCIATION.

Section 15. Counterparts, Modifications, Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

Section 16. Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may

any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

Section 17. Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

Section 18. Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failure of LEWIS may be prevented, the savers and other creditors of LEWIS may be protected against losses, the thrift and financing needs of the community in which LEWIS' office is located may be served, the ACQUIRING ASSOCIATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts,

cooperate with one another to carry out the purposes of this Agreement as described in this section.

IN WITNESS WHEREOF, The parties have executed this Agreement by their duly authorized officers or agents.

STERLING SAVINGS ASSOCIATION

Date: November 5, 1985

Attest: [signature]

By: [signature]

Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

Date: November 5, 1985

Attest: Kim A. Ferguson

By: [signature]

Its: Designee

**Federal Home Loan Bank Board**

1700 G Street, N.W.
Washington, D.C. 20552
Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

R R R

November 12, 1985

Harold B. Gilkey
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

Dear Sir:

In connection with the approval by the Federal Home Loan Bank Board ("Bank Board") of the purchase of substantially all of the assets and assumption of substantially all of the liabilities of Lewis Federal Savings and Loan Association, Chehalis, Washington, by Sterling Savings Association, Spokane, Washington ("Sterling"), the forbearances listed below are hereby granted.

1. The assets acquired by Sterling from Lewis will be deemed to have been acquired in a merger instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the Bank Board where scheduled items are referred to as "assets acquired in a merger instituted for supervisory reasons," scheduled items attributable to Lewis shall be excluded from the computation of scheduled items in determining whether Sterling meets the requirements of such sections following the effective merger date as defined by the resolution of the Bank Board approving the Acquisition ("Effective Date").

2. Section 563.13 (Reserve Accounts) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation ("Insurance Regulations") provides no exceptions permitting the exclusion of scheduled items or liabilities acquired from another institution in computing the net-worth requirements of this section. However, in view of the fact that the Acquisition was instituted for supervisory reasons, the Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the Acquisition, from exercising its authority, under Section 563.13 of the Insurance Regulations, for any failure of Sterling to meet the net-worth requirements of Section 563.13 arising solely from (1) (a) scheduled items attributable to the assets of Lewis' existing at the Effective Date, (b) any reduction in net worth resulting from losses on assets or losses on continuing operations acquired in connection with the Acquisition, and (c) any increase in liabilities of Sterling as of the Effective Date by reason of Sterling's assumption of liabilities; or (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective Date.

3. For a period of one year following the Effective Date, in determining whether a penalty shall be assessed against or paid by Sterling pursuant to Section 523.12 (Deficiencies and Penalties) of the Rules and Regulations for the Federal Home Loan Bank System ("Bank Regulations"), the liquidity requirements of Section 523.11 (Liquidity Requirements) of the Bank Regulations as applied to Sterling shall be reduced by (1) the amount of Lewis' liquidity deficiencies existing at the Effective Date and (2) any aggregate net withdrawals (excess of withdrawals over cash savings received) from Lewis' offices after the Effective Date.

The forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its net-worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 thorugh 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Sterling including, without limitation, those under Section 5 of the HOLA and Sections 406 and 407 of the National Housing Act, as amended.

This letter will also confirm that:

1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assitance agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.

2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

3. For purposes of reporting to the Bank Board, any discount, arising from the adjustment of Lewis' mortgage loan portfolio to its fair value, shall be amortized to income by the level yield method assuming contractually required payments will be received for 15 years, and the remaining balance will be repaid at the end of the 15th year. This amortization policy will be followed regardless of the actual repayment characteristics of the loans over time.

4. Not later than 90 days following the Effective Date, Sterling shall submit to the Supervisory Agent an independent certified public accountant's opinion that Sterling has accounted for the Acquisition in accordance with generally accepted accounting principles or that as herein provided by the Bank Board, for purposes of reporting to the Bank Board: (a) the cash contribution by the FSLIC to Sterling with respect to Lewis pursuant to the Assistance Agreement shall be deemed a contribution to net worth, and may be booked as a direct credit to Sterling, (b) the value of any intangible assets resulting from the Acquisition may be amortized by Sterling over a period of 40 years by the straight line method, and (c) any discount arising from adjusting Lewis' mortgage loan portfolio to its face value shall be amortized to income by the level yield method assuming contractual monthly payments for a 15 year period and repayment of the remaining balance at the end of the 15th year, regardless of the actual repayment experience of the loan portfolio.

By the Federal Home Loan Bank Board

Jeff Sconyers

Jeff Sconyers
Secretary

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-984, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I, Kim S. Ferguson, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

Kim S. Ferguson

Assistant Secretary to the Federal Home Loan Bank Board

-A

# FEDERAL HOME LOAN BANK BOARD

## Appointment of Receiver for Lewis Federal Savings and Loan Association Chehalis, Washington

No. 85-984

Date: November 4, 1985

### Recitals

WHEREAS, Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"), is a federally-chartered savings and loan association, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, The Federal Home Loan Bank Board ("Bank Board") has exclusive power and jurisdiction to appoint a receiver for a Federal savings and loan association in the event that the Bank Board determines that any of the grounds specified in § 5(d)(6)(A) of the Home Owners' Loan Act of 1933, as amended ("HOLA"), 12 U.S.C. § 1464(d)(6)(A) (1982), exists with respect to such association; and

WHEREAS, Pursuant to § 5(d)(6)(D) of the HOLA, 12 U.S.C. § 1464(d)(6)(D) (1982), the Bank Board shall appoint only the FSLIC as receiver for a Federal savings and loan association; and

WHEREAS, The Bank Board has considered memoranda from the Federal Home Loan Bank of Seattle, dated October 23, 1985, and the Office of the General Counsel, dated November 1, 1985, together with accompanying attachments and exhibits (copies of which memoranda are in the Minute Exhibit File):

### Grounds for Appointment

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board finds that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to Lewis in that Lewis is insolvent in that its assets are less than its obligations to its creditors and others, including its members; and

### Appointment of Receiver

RESOLVED FURTHER, That the Bank Board, pursuant to § 5(d)(6)(A) of the HOLA, 12 U.S.C. § 1464(d)(6)(A) (1982), hereby appoints the FSLIC as sole receiver for Lewis ("Receiver"); and

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85- 984



Powers and Duties of Receiver

RESOLVED FURTHER, That the Receiver shall have and exercise all powers, rights, and privileges, and shall assume, perform, and discharge all duties, responsibilities, and obligations of a receiver for a Federal savings and loan association accorded or imposed by, and subject to, applicable provisions of law and regulations and orders of the Bank Board, including, but not limited to, § 5(d)(6) of the HOLA, 12 U.S.C. § 1464(d)(6) (1982), § 406 of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729 (1982), and the provisions of Parts 547 and 549 of the Rules and Regulations for the Federal Savings and Loan System ("Federal Regulations"), 12 C.F.R. Parts 547 and 549 (1985); and

RESOLVED FURTHER, That, in addition to all powers and authority of a receiver provided for by law, regulations, and orders, the Receiver is hereby authorized and empowered, and need not seek further approval from the Bank Board, to borrow money in such amounts from any source and in any manner as the Receiver requires to fulfill its duties as receiver, to execute, acknowledge, and deliver evidence of indebtedness for such borrowing, and to secure repayment of such borrowings by mortgages, pledges, and assignments in trust, or hypothecation of any property of Lewis; and

RESOLVED FURTHER, That notwithstanding the provisions of §§ 549.2 and 548.1, as made applicable by 549.2, of the Federal Regulations, 12 C.F.R. §§ 548.1 and 549.2 (1985), the Receiver may elect to notify by certified mail all persons and entities that the Receiver knows to be holding or in possession of assets of Lewis; and

RESOLVED FURTHER, That the Receiver shall not be required to furnish any bond; and

Implementing Authority

RESOLVED FURTHER, That the Director or the Deputy Director of the Office of the FSLIC ("Director"), or the designee of either, is authorized to take such action as may be necessary or appropriate to carry out the obligations of the FSLIC as Receiver, pursuant to its appointment; and

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Lewis Federal Savings and Loan Association
Chehalis, Washington

No. 85-984



RESOLVED FURTHER, That the FSLIC, in its corporate capacity and not in its capacity as Receiver, is authorized to make advances to the Receiver for the purpose of enabling the Receiver to perform its functions and duties, on such terms and conditions as the Director shall deem appropriate, and the Director may execute such documents as may be necessary to make such advances or enter into collateral agreements; and

Special Representatives

RESOLVED FURTHER, That one or more persons shall be designated as Special Representative of the Receiver ("Special Representative"), and such designated person or persons shall have the power and authority to act in the name and on behalf of the Receiver, including the authority, subject to the direction of the Director, to take prompt possession of the books, records, property, and assets of every kind and description of Lewis and to exercise all powers of the Receiver; that, initially R. Scott Taylor, Grayson H. Bowers, Robert M. Schmid, Edward F. Gerber, Donald W. Crocker and John W. Sears shall serve as Special Representatives and, the Director may replace or remove any Special Representative and may designate such additional Special Representative(s) as the Director deems appropriate, prescribing the functions and responsibilities of each such Special Representative as he deems appropriate; and

Termination of Employment Contracts

RESOLVED FURTHER, That every employment contract between Lewis and its officers, employees, agents, or consultants is hereby terminated by the Bank Board pursuant to the appointment of the receiver effective upon the date of default of Lewis; and

Records and Reports

RESOLVED FURTHER, That each Special Representative shall keep a record of his or her actions as Special Representative for the Receiver, and shall report on such actions from time to time as directed by the Director; and

**FEDERAL HOME LOAN BANK BOARD**

**Appointment of Receiver for**
**Lewis Federal Savings and Loan Association**
**Chehalis, Washington**

No. 85- 984

Page 4

RESOLVED FURTHER, That the Director shall from time to time report to the Bank Board with respect to actions taken pursuant to this Resolution.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-986, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I, Kim S. Ferguson, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

Kim S. Ferguson

Assistant Secretary to the Federal Home Loan Bank Board

c

**FEDERAL HOME LOAN BANK BOARD**

**Implementation Resolution**

No. 85- 986

Date:

WHEREAS, The Director or Deputy Director, Office of the Federal Savings and Loan Insurance Corporation ("FSLIC"), or the designee of either of them ("Director"), have been authorized by Federal Home Loan Bank Board ("Bank Board") Resolution No. 85- 985 dated November 4, 1985, to execute on behalf of the FSLIC in its corporate capacity an Assistance Agreement with Sterling Savings Association, Spokane, Washington, and a Receiver's Agreement, and other documents; and

WHEREAS, The Assistance Agreement, Receiver's Agreement, and other documents impose certain rights, duties, and obligations upon the FSLIC that do not require basic determinations of policy; and

WHEREAS, In the administration of such agreements, and of any rights or obligations of the FSLIC under them, it may be necessary or desirable that the FSLIC contract for legal, auditing, or other services or that the FSLIC authorize the settlement of certain claims:

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, finds that expenditures of the FSLIC pursuant to such agreements are necessary, nonadministrative, and made under the National Housing Act, as amended ("NHA"), and shall be incurred, allowed, and paid under the provisions of the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), without regard to the provisions of any other law governing the expenditures of public funds; and

RESOLVED FURTHER, That the Director is hereby authorized and directed to take such actions as may be desirable or necessary to fulfill the rights, duties, and obligations of the FSLIC in its corporate capacity under the Assistance Agreement, Receiver's Agreement, and other authorized documents, and to incur, allow, and pay all expenditures in fulfillment of such rights, duties, and obligations, pursuant to the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), including, but not limited to:

(1) The payment of amounts required by such agreements;

(2) The making of advances to the FSLIC as Receiver for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Receiver");

# FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

No. 85- 986



(3) Contracting for legal, accounting, or other services, provided, that the form of any contract shall be approved by the Office of General Counsel;

(4) The assignment, pursuit, and settlement of claims, provided, that the form of any assignment or settlement agreement entered into by the FSLIC shall be approved by the Office of General Counsel;

(5) The administration of any asset or claim acquired from the Receiver, provided, that any contract pertaining to such asset or claims, and the satisfaction, settlement, or termination of any claim, shall be approved by the Office of the General Counsel; and

(6) The waiver, if deemed necessary or desirable by the Director, of provisions of the Assistance Agreement concerning filings, representations, warranties, or certifications by Sterling, provided, that the form of any waiver by the FSLIC shall be approved by the Office of General Counsel; and

RESOLVED FURTHER, That the General Counsel may also exercise the authority conferred by the preceding resolving paragraphs with respect to contracting on behalf of the FSLIC for legal or other related services needed to implement the agreements.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-987, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I, Kim S. Ferguson, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

Kim S. Ferguson

Assistant Secretary to the Federal Home Loan Bank Board

FEDERAL HOME LOAN BANK BC )

**Contingent Payment of Insurance of Accounts: Lewis Federal Savings and Loan Association**

No. 85-987

Date:

WHEREAS, The Federal Savings and Loan Insurance Corporation ("FSLIC") has been appointed as sole receiver for Lewis Savings and Loan Association, Chehalis, Washington ("Lewis"), effective as described in Federal Home Loan Bank Board ("Bank Board") Resolution No. 85-984, dated November 4, 1985; and

WHEREAS, Such appointment constitutes a default of Lewis within the meaning of § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982), and may necessitate the payment of insured accounts by the FSLIC, in its corporate capacity and not as receiver, within the meaning of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982):

NOW, THEREFORE, IT IS RESOLVED, That the Director or Deputy Director, Office of the FSLIC, or such person as either of them may designate in writing ("Director"), is hereby authorized and directed to take all necessary or appropriate steps and to incur all necessary or appropriate expenses in preparation for and to implement the payment of all insured accounts of Lewis pursuant to § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982); and

RESOLVED FURTHER, That, upon being advised by the General Counsel, or a Deputy General Counsel, that Lewis is in default and that the account liabilities of Lewis have not been assumed by another insured institution, the Director is hereby authorized and directed (1) to cause each insured account in Lewis that is surrendered and transferred to the FSLIC to be paid in cash or by making available a transferred account in another insured institution, (2) to take or cause to be taken such action(s) as may be necessary or appropriate to carry out this and any future directives of the Bank Board, and (3) to do all things necessary or appropriate to carry out expeditiously the objectives of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982) and Part 564 of the Rules and Regulations for the FSLIC, 12 C.F.R. Part 564 (1985) and for the protection of the FSLIC; and

RESOLVED FURTHER, That each Office and Division of the Bank Board is hereby requested to furnish such assistance to the Director in fulfillment for the intent of this Resolution as the Director may request.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

# Federal Home Loan Bank Board

## To all to whom these presents shall come, Greeting:

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-988, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I, Kim S. Ferguson, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

[signature]

Assistant Secretary to the
Federal Home Loan Bank Board

E

**FEDERAL HOME LOAN BANK BOARD**

Lewis Federal Savings and Loan Association
Chehalis, Washington
Pursuit of Claims

No. 85-988

Date:

WHEREAS, The Federal Home Loan Bank Board has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"), pursuant to is Resolution No. 85-984, dated November 4, 1985; and

WHEREAS, Pursuant to a proposed Receiver's Agreement and the proposed Assistance Agreement (copies of which are in the Minute Exhibit File), potential claims of Lewis against certain parties will or may be transferred to the FSLIC in its corporate capacity; and

NOW, THEREFORE, IT IS RESOLVED, That the Director or Deputy Director, Office of the FSLIC, or any person designated by either of them, is hereby authorized to take whatever actions are deemed appropriate, including litigation, to recover on such claims of Lewis from any such parties, provided that the Office of the General Counsel shall concur in any such action.

By the Federal Home Loan Bank Board

/s/ Jeff Sconyers

Secretary

# Federal Home Loan Bank Board

## To all to whom these presents shall come, Greeting:

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 85-989, adopted by the Federal Home Loan Bank Board on November 4, 1985.

In testimony whereof, I, Kim S. Ferguson, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 5th day of November, 1985

[signature]

Assistant Secretary to the Federal Home Loan Bank Board

F

# FEDERAL HOME LOAN BANK BOARD

**Approval of the Acquisition of Lewis Federal Savings and Loan Association, Chehalis, Washington, by Sterling Savings Association, Spokane, Washington**

No. 85- 989

Date: November 4, 1985

RESOLVED, That the acquisition of Lewis Federal Savings and Loan Association, Chehalis, Washington, by Sterling Savings Association, Spokane, Washington, is hereby approved, subject to any conditions that may be imposed by the Federal Home Loan Bank Board ("Bank Board") in any concurrent resolution or action issued as of the date of this Resolution.

By the Federal Home Loan Bank Board

Secretary

Federal Home Loan Bank Board

1700 G Street, N.W.
Washington, D.C. 20552
Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

April 6, 1988

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, WA 99201

FHLBB No. 7918

Members of the Board:

In connection with the approval by the Federal Home Loan Bank Board ("Board") of the supervisory acquisition of Tri-Cities Savings and Loan Association ("Tri-Cities") by Sterling Savings Association ("Sterling"), the following forbearances are hereby granted.

1. Capital Requirements The Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Rules and Regulations for FSLIC-Insured Institutions; for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from (1)(a) any increase in the contingency component attributable to the assets of Tri-Cities existing at the effective date, and (b) any increase in the net growth of Sterling as of the Effective Date by reason of Sterling's assumption of Tri-Cities' liabilities; or (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date.

2. Scheduled Items The assets acquired by Sterling from Tri-Cities will be deemed to have been acquired in an acquisition instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the Federal Home Loan Bank Board where scheduled items are referred to as "assets acquired in an acquisition instituted for supervisory reasons," scheduled items attributable to Tri-Cities shall be excluded from the computation of scheduled items in determining whether Sterling meets the requirements of such sections following the effective date of the acquisition.

3. Liquidity Deficiencies For a period of one year following the Effective Date, in determining whether a penalty shall be assessed against or paid by Sterling pursuant to 523.12 (Deficiencies and Penalties) of the Rules and Regulations for the Federal Home Loan Bank System ("Bank Regulations"), the liquidity requirements of Section 523.11 (Liquidity Requirements) of the Bank Regulations as applied to Sterling shall be reduced by (1) the amount of Tri-Cities liquidity deficiencies existing at the Effective Date and (2) any aggregate net withdrawals (excess of withdrawals over cash savings received) from Tri-Cities offices after the Effective Date.

4. Regulatory Capital It is the FSLIC's intention that the initial cash contribution to be made to Sterling pursuant to the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.

5. Amortization of Unidentifiable Intangibles For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

6. Amortization of Loan Discount For purposes of reporting to the Board, any discount, arising from the adjustment of Tri-Cities mortgage portfolio to its fair value, shall be amortized to income by the level yield method assuming contractually required payments will be received for eight years, and the remaining balance will be repaid at the end of the eighth year or by the level yield method over the average remaining life of the acquired portfolio, with the discount adjusted annually to reflect the actual prepayment experience of the portfolio.

Not later than 60 days following the date of consummation of the acquisition, Sterling shall submit to its Supervisory Agent an opinion of independent public accountants that Sterling has accounted for the transaction in accordance with generally accepted accounting principles ("GAAP") except that as herein provided by the Board, for purposes of reporting to the Board: (a) the cash contribution by the FSLIC to Sterling pursuant to the Assistance Agreement shall be deemed a contribution to regulatory capital, and may be booked as a direct credit to Sterling; (b) the value of any resulting unidentifiable intangible asset may be amortized by Sterling over a period of 15 years by the straight line method; and (c) any discount arising from adjusting the mortgage loan portfolio to its face value shall be amortized to income by the level yield method assuming contractual monthly payments for an eight year period and repayment of the remaining balance at the end of the eighth year or by the level yield method over the average life of the acquired portfolio, with the discount adjusted annually to reflect the actual prepayment experience of the portfolio.

The forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its reserve and regulatory capital condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the Corporation with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs numbered 1 through 6. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs numbered 1 through 6 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Board and the Federal Savings and Loan Insurance Corporation expressly reserve all their statutory rights and powers with respect to Sterling including, without limitation, those under Section 5 of the Home Owners' Loan Act if 1933 and Sections 406 and 407 of the National Housing Act.

By the Federal Home Loan Bank Board

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

*I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:*

Copy of Resolution No. 88-250, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort, Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 9th day of April, 1988

[signature]

Assistant Secretary to the
Federal Home Loan Bank Board

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P

Date: April 7, 1988

Recitals

WHEREAS, Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), is a state-chartered stock savings and loan association, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, The FSLIC has been appointed by the Federal Home Loan Bank Board ("Bank Board") as sole receiver ("Receiver") for the Association, effective as described in Resolution No. 88-249 P, dated April 7, 1988; and

WHEREAS, Upon the appointment of the Receiver, the Association is in "default", as such term is defined in § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982); and

WHEREAS, The FSLIC as Receiver is authorized by §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982), upon its appointment taking effect, to liquidate the Association in an orderly manner or to make such other disposition of the matter as it deems to be in the best interests of the Association, its savers and the FSLIC; and

WHEREAS, Sterling Savings Association, Spokane, Washington ("Acquiring Association"), is a state-chartered stock savings association, the accounts of which are insured by the FSLIC; and

WHEREAS, The Acquiring Association has applied to the FSLIC, pursuant to § 563.22 of the Rules and Regulations for the FSLIC ("Insurance Regulations"), 12 C.F.R. § 563.22 (1987), for approval of an increase in its accounts of an insurable type by reason of its acquisition of substantially all of the assets and assumption of substantially all of the liabilities of the Association; and

WHEREAS, The FSLIC has proposed that the Receiver transfer substantially all of the assets and liabilities of the Association to the Acquiring Association, pursuant to §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982); and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P



WHEREAS, The Bank Board has considered a proposed acquisition agreement between the Receiver and the Acquiring Association ("Acquisition Agreement"), pursuant to which agreement the Acquiring Association would purchase substantially all of the assets of the Association, or the rents, issues, profits, and proceeds therefrom, and assume substantially all of the liabilities of the Association from the Receiver, but would not assume any obligations to stockholders or holders of subordinated debt of the Association ("Acquisition") (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Bank Board has considered a proposed receiver's agreement ("Receiver's Agreement") between the Receiver and the FSLIC in its corporate capacity ("Corporation"), pursuant to which agreement the Corporation would purchase from the Receiver certain assets of the Association not purchased by the Acquiring Association, or the rents, issues, profits and proceeds therefrom, and assume certain liabilities and expenses of the Receiver (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Acquisition will be conditioned upon the execution of, and the Bank Board has considered, a proposed assistance agreement ("Assistance Agreement"), (a copy of which agreement is in the Minute Exhibit File), between the Acquiring Association and the Corporation, pursuant to which the Corporation will provide certain financial assistance and indemnifications to the Acquiring Association to facilitate the Acquisition; and

WHEREAS, the Supervisor, Division of Savings and Loans, State of Washington, has indicated orally her intent to grant at the time of closing the approvals necessary under state law to implement the Acquisition; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington, dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988,

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-___P



S Memorandum having been concurred in by the Executive Director, Office of Regulatory Policy, Oversight and Supervision ("ORPOS"), and the Issues Memorandum having been concurred in by the Executive Director of the FSLIC (copies of which memoranda are in the Minute Exhibit File), and the balance of the administrative record submitted to it:

General Findings Concerning the Acquisition of Substantially All of the Assets and Liabilities of the Association by the Acquiring Association

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby finds and determines that:

(1) The transfer of assets and liabilities of the Association provided for in the Acquisition Agreement and the Receiver's Agreement is the most desirable alternative, consistent with Bank Board and FSLIC policy, to the liquidation of the Association and the payment of insurance on its accounts, which would result in the loss of the savings and loan services provided by the Association to the communities it serves and the recovery by creditors and accountholders having uninsured funds of only ratable distributions from the liquidation of the assets of the Association;

(2) The execution and implementation of the Acquisition Agreement and the Receiver's Agreement are in the public interest and in the best interests of the Association, its savers and creditors, and the Corporation; and

(3) Delay in the execution and implementation of the Acquisition Agreement and the Receiver's Agreement following the Receiver's taking possession of the Association would prevent the sale of assets and assumption of liabilities contemplated thereby from taking place and result in the liquidation of the Association and the payment of insurance on its accounts; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P



RESOLVED FURTHER, That the Bank Board hereby finds and determines that the transfer of substantially all of the Association's assets and liabilities to the Acquiring Association in accordance with §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982), and pursuant to the Acquisition Agreement should be effected without delay, is in the public interest and is in the best interests of the Association, its savers and creditors, and the Corporation; and

Approval of Purchase and Assumption Transaction and Increase of Insurable Accounts

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby approves the transfer of substantially all of the Association's assets and the assumption of substantially all of the Association's liabilities to and by the Acquiring Association pursuant to the Acquisition Agreement, and further approves the resulting increase in the Acquiring Association's accounts of an insurable type, pursuant to § 563.22 of the Insurance Regulations, 12 C.F.R. § 563.22 (1987), provided that:

(1) The board of directors of the Acquiring Association shall authorize the execution of, and the Acquiring Association shall enter into, an agreement to purchase substantially all of the assets and assume substantially all of the liabilities of the Association, in the form, or substantially in the form, of the proposed Acquisition Agreement, provided that the final form of such Acquisition Agreement has been approved by the Office of the General Counsel ("OGC"), and the Acquiring Association shall execute such other documents as may be necessary to effect such transfer of assets and liabilities of the Association to the Acquiring Association promptly upon the Receiver taking possession of the Association;

(2) The Acquiring Association shall take such other actions as may be necessary to consummate the Acquisition, and the Acquisition shall be effected in accordance with applicable state law promptly upon the Receiver taking possession of the Association; and

B

FEDERAL HOME LOAN BANK BOARD

<u>Approval of</u>
<u>Acquisition of Assets and Liabilities of</u>
<u>Tri-Cities Savings and Loan Association,</u>
<u>Kennewick, Washington</u>

No. 88-252P



(3) Within five (5) days after the date and time at which the Acquisition becomes effective pursuant to the Acquisition Agreement ("Effective Date"), the Acquiring Association shall submit to the Principal or other Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington ("Supervisory Agent"), an opinion of counsel stating the effective date of the Acquisition and that the Acquisition has been consummated in accordance with the Acquisition Agreement, the Charter and bylaws of the Acquiring Association, this Resolution, and applicable law;

(4) Not later than sixty (60) days following the Effective Date, unless such date is extended in writing by the Supervisory Agent, the Acquiring Association shall submit evidence to the FSLIC, or to an agent thereof, that it has given notice in writing, in a form approved by the OGC, to each accountholder who had an account in the Association or the Acquiring Association prior to the Effective Date, the total of whose withdrawable accounts in the Acquiring Association will exceed the sum of $100,000 after the Acquisition, (a) of the effect of the Acquisition on the extent of the accountholder's insurance coverage, and (b) that accounts assumed by the Acquiring Association from the Association shall have separate insurance which shall terminate at the end of six months from the Effective Date, or, in the case of any certificate accounts, at the earliest maturity date of such accounts after such six-month period;

(5) All forms of accounts transferred to the Acquiring Association from the Association are hereby approved pursuant to § 563.1 of the Insurance Regulations, 12 C.F.R. § 563.1 (1987), <u>provided</u> that the Acquiring Association obtains new approvals for any such forms when and as such accounts mature; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-350 P



Authority for the Receiver to Transfer the
Assets and Liabilities of the Association

RESOLVED FURTHER, That the proposed Acquisition Agreement and the proposed Receiver's Agreement are hereby approved, and the Receiver is hereby authorized to sell and transfer to the Acquiring Association substantially all of the assets and liabilities of the Association, and to enter into an Acquisition Agreement and a Receiver's Agreement with respect to the Association in the form or substantially in the form of each such proposed agreement, provided that the final form of each such agreement has been approved by the OGC; and

RESOLVED FURTHER, That the Special Representative(s) of the Receiver ("SR"), designated in or pursuant to Bank Board Resolution No. 88-____P, dated April __, 1988, is hereby authorized to execute, on behalf of the Receiver, an Acquisition Agreement and a Receiver's Agreement with respect to the Association in the form, or substantially in the form, of each such proposed agreement, to execute all other documents necessary or desirable to implement the provisions of any such Acquisition Agreement and Receiver's Agreement or to complete the acquisition of substantially all of the assets and liabilities of the Association by the Acquiring Association, and otherwise to implement the intent and purposes of said agreements and this Resolution, provided that the final form of each such agreement and document has been approved by the OGC; and

Authorization of the Corporation
to Execute Agreements and Make Payments

RESOLVED FURTHER, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them ("Director"), is hereby authorized to execute, on behalf of the Corporation, a Receiver's Agreement in the form, or substantially in the form, of such proposed agreement, and to execute all other documents and perform all provisions of the Receiver's Agreement and otherwise to implement the intent and purpose of said agreement, provided that the final forms of such agreement and documents have been approved by the OGC; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-852P



RESOLVED FURTHER, That the Corporation is authorized to make advances and pay expenses to, or on behalf of, the Receiver in accordance with the Receiver's Agreement; and

RESOLVED FURTHER, That the Corporation is authorized to pay all necessary or appropriate expenses incurred by, or on behalf of, the Operations and Liquidations Division, Office of the FSLIC, in preparation for the appointment of the FSLIC as receiver for the Association, provided that no such expenditures to be made by the Corporation shall extend to services rendered or goods received after the date and time the Receiver takes possession of the Association; and

Grounds for Financial Assistance

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), that (1) financial assistance and indemnifications by the FSLIC are necessary to facilitate the Acquisition, and (2) the amount of such assistance and indemnifications, to be provided in accordance with the terms and conditions of the proposed Assistance Agreement, would not exceed that amount reasonably necessary to save the cost of liquidating the Association, including the payment of its insured accounts; and

RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director, or the Director, Financial Assistance Division, Office of the FSLIC, or his designee ("FAD Director"), is hereby authorized to execute, on behalf of the Corporation, an agreement in the form, or substantially in the form, of the proposed Assistance Agreement, provided that the final form of such Assistance Agreement has been approved by the OGC; and

RESOLVED FURTHER, That the Director or the FAD Director is authorized to take such further actions as may be necessary or appropriate to exercise the rights and fulfill the obligations of the FSLIC contained in the Assistance Agreement; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-252 P



Prevention of Probable Failure

RESOLVED FURTHER, That the Bank Board hereby finds that approval of the Acquisition pursuant to this Resolution is necessary to prevent the probable failure of the Association; and

Supervisory Acquisition

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the Acquisition is instituted for supervisory reasons; and

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, finds that the acquisition of the Association by the Acquiring Association is an acquisition under § 406(f) of the NHA, 12 U.S.C. 1729(f) (1982), as amended, and is deemed a supervisory case; and

Forbearances

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is authorized and directed to send to the Acquiring Association a letter concerning supervisory forbearances by the Bank Board and the FSLIC with respect to certain regulatory requirements in the form, or substantially in the form, of the letter in the Minute Exhibit File ("Forbearance Letter"), provided that the final form of such letter shall be approved by the OGC; and

Accounting

RESOLVED FURTHER, That the Acquisition shall be accounted for, and the Acquiring Association shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent authorized in the Forbearance Letter; and

RESOLVED FURTHER, That, no later than ninety (90) days following the Effective Date, the Acquiring Association shall furnish an

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington



analysis, accompanied by a concurring opinion from its independent certified public accountants (which will indicate that the Acquisition was accounted for in accordance with generally accepted accounting principles except as otherwise authorized by the Bank Board), satisfactory to the Supervisory Agent and the ORPOS, which shall (a) specifically describe, as of the Effective Date, any intangible assets, including goodwill and the discount and premiums arising from the Acquisition, to be recorded on the Acquiring Association's books, and (b) substantiate the reasonableness and conformity with regulatory requirements, including the Forbearance Letter, of the amounts attributed to intangible assets, including goodwill and the discount and premiums, and the related amortization periods and methods; and

Secondary Reserve

RESOLVED FURTHER, That the FSLIC hereby provides that the pro rata share, if any, of the Association in the statutorily prescribed amount defined by § 404(e)(2)(D) of the NHA, 12 U.S.C. § 1727(e)(2)(D) (1982), as amended, shall be transferred to the Acquiring Association, effective as of the Effective Date; and

Federal Home Loan Bank Stock and Membership

RESOLVED FURTHER, That the transfer to the Acquiring Association of the Association's stock in the Federal Home Loan Bank of Seattle ("Bank") is approved, effective as of the Effective Date, and that, upon such transfer, the membership of the Association in the Bank shall cease; and

Cancellation of Certificate of Insurance

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is hereby directed to cancel the Association's certificate of insurance upon its surrender to the FSLIC; and

Tax Certification

RESOLVED FURTHER, That the Bank Board finds and hereby certifies that the ground set forth in § 5(d)(6)(A)(i) of the HOLA,

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-252 P



12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association, in that the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

RESOLVED FURTHER, That the Bank Board finds that the record before the Bank Board contains nothing to show or from which it could be inferred that the Association had intentionally placed itself in the position of being insolvent for the purpose of obtaining any tax advantages pursuant to 26 U.S.C. § 368(a)(3)(D) (1982) as amended; and

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is hereby authorized and directed to issue and send to the Acquiring Association a letter with respect to the Association certifying on behalf of the Bank Board the matters set forth in the immediately preceding resolving paragraphs, and the Secretary or an Assistant Secretary is hereby authorized to provide copies of such letter to any agency of the United States upon request; and

Marketing and Acquisition Findings

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby finds and determines that:

(1) FSLIC and its agents offered the Association for bid on an intra-state, unassisted basis in January 1987 to FSLIC-insured institutions that might be qualified and capable of acquiring the Association;

(2) Although indications of preliminary interest were received from four institutions, all four bidders eventually determined not to submit offers on an unassisted basis;

(3) The Association was again marketed, on an inter-industry, interstate assisted basis, together with two other FSLIC-insured institutions located in the State of Washington, at a bid conference held on October 15, 1987;

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P



(4) Bids were received from three institutions, but one of the institutions subsequently withdrew its bid;

(5) Of the two remaining bids, that of the Acquiring Association was both the lower cost bid and less than the cost of liquidation; and

(6) The Acquiring Association is an in-state insured institution; and

Effective Date

RESOLVED FURTHER, That the Acquisition shall be effective in accordance with applicable state law unless such law leaves that determination to the Bank Board in which case the Acquisition shall be effective upon the execution by the appropriate parties of the Acquisition Agreement and the Assistance Agreement.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

A

# FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P

Date: April 7, 1988

## Recitals

WHEREAS, Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), is a state-chartered stock savings and loan association incorporated under the laws of the State of Washington, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, Pursuant to § 406(c)(1)(B) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(c)(1)(B) (1982) ("§ 406(c)(1)(B)"), the Federal Home Loan Bank Board ("Bank Board") has exclusive power and jurisdiction to appoint the FSLIC as sole conservator or receiver for an insured institution other than a Federal association in the event that the Bank Board determines that any of the grounds specified in § 5(d)(6)(A)(i), (ii), or (iii) of the Home Owners' Loan Act of 1933, as amended ("HOLA"), 12 U.S.C. § 1464(d)(6)(A)(i), (ii), or (iii) (1982), exists with respect to such insured institution; and

WHEREAS, Pursuant to subsection (ii)(I) of § 406(c)(1)(B), the authority conferred by § 406(c)(1)(B) may be exercised without delay with respect to the Association upon receipt of the written approval of the State official having jurisdiction over the Association that the grounds specified by the Bank Board for its exercising such authority exist; and

WHEREAS, Pursuant to subsection (i)(II) of § 406(c)(1)(B), in a case in which the Bank Board has exercised its power and jurisdiction under subsection (i)(I) of § 406(c)(1)(B), the FSLIC shall have the same powers and duties with respect to an insured institution other than a Federal association as are conferred upon it under § 406(b) of the NHA, 12 U.S.C. § 1729(b) (1982), as amended, with respect to a Federal association; and

WHEREAS, Pursuant to § 406(c)(3) of the NHA, 12 U.S.C. § 1729(c)(3) (1982), in any case in which the FSLIC is appointed receiver for an insured institution pursuant to § 406(c)(1) of

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



the NHA, 12 U.S.C. § 1729(c)(1) (1982), the provisions of § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), shall be applicable in the same manner and to the same extent as if such institution were a Federal association with respect to which the FSLIC had been appointed receiver; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington ("Seattle Bank Counsel") dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988, the S Memorandum having been concurred in by the Executive Director, Office of Regulatory Policy, Oversight and Supervision and the Issues Memorandum having been concurred in by the Executive Director of the FSLIC (copies of which memoranda are in the Minute Exhibit File), and the balance of the administrative record submitted to it:

Ground for Appointment

NOW, THEREFORE, IT IS RESOLVED, That, for the reasons set forth in the aforesaid memorandum from the General Counsel - Regulatory Affairs of the Federal Home Bank of Seattle, and on the basis of the administrative record submitted to it, including, but not limited to, oral presentations made at the Bank Board's meeting, the Bank Board hereby finds and determines that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association in that the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

Notice to State Official

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board, or an agent of the FSLIC, shall cause a letter to be delivered to the Supervisor, Division of Savings and Loans, State of Washington ("Supervisor"), notifying the Supervisor of

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



the Bank Board's determination of the existence of the ground specified above for the appointment of the FSLIC as sole receiver for the Association, and requesting written approval that the ground specified exists, provided that the final form of such letter shall be approved by the Office of the General Counsel ("OGC"); and

RESOLVED FURTHER, That, upon delivery of such letter to the Supervisor, it shall be deemed to have been received by the official of the State of Washington having jurisdiction over the Association within the meaning of subsection (ii)(I) of § 406(c)(1)(B); and

Appointment of Receiver

RESOLVED FURTHER, That the Bank Board, pursuant to § 406(c)(1)(B), hereby appoints the FSLIC as sole receiver for the Association ("Receiver") for the purpose of liquidation, provided that the exercise of this appointment shall not be effective, and this appointment shall not be exercised, unless and until an attorney of the OGC, the Seattle Bank Counsel, or fee counsel designated by the General Counsel or his designee to represent the Receiver, or any person named as a Special Representative of the Receiver, or an Assistant Secretary to the Bank Board, shall have received the written approval of the Supervisor that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association, and provided further, that the form of any such approval is satisfactory to the OGC; and

Worthlessness of Subordinated Debt
and Stock Interests

RESOLVED FURTHER, That the Bank Board finds that the Association is not a going concern and could continue as a going concern only with financial assistance from the FSLIC; and

RESOLVED FURTHER, That the Bank Board finds that the Association's financial condition is such that the Association cannot be sold to an independent third party without financial assistance from the FSLIC; and

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249P



RESOLVED FURTHER, That the Bank Board finds that, if the Association were liquidated, the proceeds that would be realized upon liquidation of the Association's assets would be insufficient to satisfy the Association's liabilities and obligations to its creditors and others, including its withdrawable accountholders, such that no amount would remain for distribution to the Association's stockholders and holders of subordinated debt, and therefore, the Association's stock (including common stock, preferred stock, permanent stock, guarantee stock, stock, non-withdrawable accounts, as defined by § 561.42 of the Rules and Regulations for the FSLIC, 12 C.F.R. § 561.42 (1987), and subordinated debt issued by the Association) is worthless; and

Powers and Duties of Receiver

RESOLVED FURTHER, That, pursuant to § 406(c)(1)(B), (c)(3), and (d) of the NHA, 12 U.S.C. § 1729(c)(1)(B), (c)(3), and (d) (1982), the FSLIC as Receiver shall have and exercise all powers, rights and privileges, and shall assume, perform, and discharge all duties, responsibilities, and obligations of a receiver for a Federal savings and loan association accorded or imposed by, and subject to, applicable provisions of law and regulations and orders of the Bank Board, as now or hereafter in effect, including, but not limited to, § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), § 406 of the NHA, 12 U.S.C. § 1729 (1982), and the provisions of Parts 547 and 549 of the Rules and Regulations for the Federal Savings and Loan System ("Federal Regulations"), 12 C.F.R. Parts 547 and 549 (1987); and

RESOLVED FURTHER, That, in addition to all powers and authority of a receiver provided for by law, regulation and order, the Receiver is hereby authorized and empowered, and need not seek further approval from the Bank Board, to borrow money in such amounts from any source and in any manner as the Receiver requires to fulfill its duties as receiver, to execute, acknowledge, and deliver evidence of indebtedness for such borrowings, and to secure repayment of such borrowings by mortgages, pledges, and assignments in trust, or by hypothecation of any property of the Association, provided that the form of any contract or security agreement for such borrowing shall be approved by the OGC; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



RESOLVED FURTHER, That the Receiver need not furnish any bond; and

RESOLVED FURTHER, That, notwithstanding the provisions of § 548.1, as made applicable by § 549.2, of the Federal Regulations, 12 C.F.R. §§ 548.1 and 549.2 (1987), the Receiver may elect to notify by certified mail all persons and entities that the Receiver knows to be holding or to be in possession of assets of the Association; and

RESOLVED FURTHER, That, if the Association has issued subordinated debt that is outstanding as of the effective date of the appointment of the Receiver, the Receiver is hereby directed to publish notice to subordinated debt holders with respect to their subordinated debt holdings, and the Receiver is in any case hereby directed to publish notice to shareholders with respect to their shareholdings; and

Implementing Authority

RESOLVED FURTHER, That the Executive Director, or a Deputy Executive Director, of the FSLIC, or a designee of any of them ("Director"), is hereby authorized to take such action as may be necessary or appropriate to exercise the rights or to carry out the obligations of the FSLIC as Receiver, pursuant to its appointment; and

RESOLVED FURTHER, That the FSLIC, in its corporate capacity and not in its capacity as Receiver, is hereby authorized to make advances to the Receiver for the purpose of enabling the Receiver to perform its functions and duties, and to pay costs and expenses of the receivership, on such terms and conditions as the Director shall deem appropriate, and the Director may execute such documents as may be necessary to make such advances or enter into related collateral agreements, provided that the final form of any such document has been approved by the OGC; and

Special Representatives

RESOLVED FURTHER, That one or more persons shall be designated as a Special Representative of the Receiver ("SR"); that such designated person or persons shall have the power and authority to act

A

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



in the name and on the behalf of the Receiver, including the authority, subject to the direction of the Director, to take prompt possession of the books, records, property, and assets, of every kind and description, of the Association, and to exercise all powers of the Receiver; that, initially, Edward F. Gerber, John W. Sears, Ann M. Barnes, John P. Marchant, Peggy H. Battle, and Douglas A. Warnecke shall each serve as an SR; and that the Director may replace or remove any SR and may designate such additional SR(s) as the Director deems appropriate, prescribing the functions and responsibilities of such SR(s) as the Director deems appropriate; provided, however, that any SR designated under this resolving paragraph shall not act for or on behalf of the FSLIC in its corporate capacity with regard to the Association in receivership; and

Termination of Employment Contracts

RESOLVED FURTHER, That the Bank Board determines that, upon the appointment of the FSLIC as receiver for the Association for the purpose of liquidation, the Association shall be in "default", as such term is defined in § 401(d) of the NHA, 12 U.S.C. § 1724(d) (1982); and

RESOLVED FURTHER, That every employment contract between the Association and its officers, employees, or agents is hereby terminated by the Bank Board, effective upon the date of default of the Association; and

Disclosure of Authority

RESOLVED FURTHER, That the Receiver shall require that any independent contractor, consultant, or counsel employed by the Receiver in connection with the liquidation of the Association shall fully disclose to all parties with which such contractor, consultant or counsel is negotiating, any limitation on the authority of such contractor, consultant or counsel to make legally binding representations on behalf of the Receiver; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88- 249 P

Page 7

Records and Reports

RESOLVED FURTHER, That each SR shall keep a record of his or her actions as SR of the Receiver, and shall report on such actions from time to time as directed by the Director; and

RESOLVED FURTHER, That the Director shall from time to time report to the Bank Board with respect to actions taken pursuant to this Resolution.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250P

Date: April 7, 1988

Recitals

WHEREAS, Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), is a state-chartered stock savings and loan association, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, The FSLIC has been appointed by the Federal Home Loan Bank Board ("Bank Board") as sole receiver ("Receiver") for the Association, effective as described in Resolution No. 88-249 P, dated April 7, 1988; and

WHEREAS, Upon the appointment of the Receiver, the Association is in "default", as such term is defined in § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982); and

WHEREAS, The FSLIC as Receiver is authorized by §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982), upon its appointment taking effect, to liquidate the Association in an orderly manner or to make such other disposition of the matter as it deems to be in the best interests of the Association, its savers and the FSLIC; and

WHEREAS, Sterling Savings Association, Spokane, Washington ("Acquiring Association"), is a state-chartered stock savings association, the accounts of which are insured by the FSLIC; and

WHEREAS, The Acquiring Association has applied to the FSLIC, pursuant to § 563.22 of the Rules and Regulations for the FSLIC ("Insurance Regulations"), 12 C.F.R. § 563.22 (1987), for approval of an increase in its accounts of an insurable type by reason of its acquisition of substantially all of the assets and assumption of substantially all of the liabilities of the Association; and

WHEREAS, The FSLIC has proposed that the Receiver transfer substantially all of the assets and liabilities of the Association to the Acquiring Association, pursuant to §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982); and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P

Page 2

WHEREAS, The Bank Board has considered a proposed acquisition agreement between the Receiver and the Acquiring Association ("Acquisition Agreement"), pursuant to which agreement the Acquiring Association would purchase substantially all of the assets of the Association, or the rents, issues, profits, and proceeds therefrom, and assume substantially all of the liabilities of the Association from the Receiver, but would not assume any obligations to stockholders or holders of subordinated debt of the Association ("Acquisition") (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Bank Board has considered a proposed receiver's agreement ("Receiver's Agreement") between the Receiver and the FSLIC in its corporate capacity ("Corporation"), pursuant to which agreement the Corporation would purchase from the Receiver certain assets of the Association not purchased by the Acquiring Association, or the rents, issues, profits and proceeds therefrom, and assume certain liabilities and expenses of the Receiver (a copy of which agreement is in the Minute Exhibit File); and

WHEREAS, The Acquisition will be conditioned upon the execution of, and the Bank Board has considered, a proposed assistance agreement ("Assistance Agreement"), (a copy of which agreement is in the Minute Exhibit File), between the Acquiring Association and the Corporation, pursuant to which the Corporation will provide certain financial assistance and indemnifications to the Acquiring Association to facilitate the Acquisition; and

WHEREAS, the Supervisor, Division of Savings and Loans, State of Washington, has indicated orally her intent to grant at the time of closing the approvals necessary under state law to implement the Acquisition; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington, dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988, the

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250P

Page 3

S Memorandum having been concurred in by the Executive Director, Office of Regulatory Policy, Oversight and Supervision ("ORPOS"), and the Issues Memorandum having been concurred in by the Executive Director of the FSLIC (copies of which memoranda are in the Minute Exhibit File), and the balance of the administrative record submitted to it:

General Findings Concerning the Acquisition of Substantially All of the Assets and Liabilities of the Association by the Acquiring Association

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby finds and determines that:

(1) The transfer of assets and liabilities of the Association provided for in the Acquisition Agreement and the Receiver's Agreement is the most desirable alternative, consistent with Bank Board and FSLIC policy, to the liquidation of the Association and the payment of insurance on its accounts, which would result in the loss of the savings and loan services provided by the Association to the communities it serves and the recovery by creditors and accountholders having uninsured funds of only ratable distributions from the liquidation of the assets of the Association;

(2) The execution and implementation of the Acquisition Agreement and the Receiver's Agreement are in the public interest and in the best interests of the Association, its savers and creditors, and the Corporation; and

(3) Delay in the execution and implementation of the Acquisition Agreement and the Receiver's Agreement following the Receiver's taking possession of the Association would prevent the sale of assets and assumption of liabilities contemplated thereby from taking place and result in the liquidation of the Association and the payment of insurance on its accounts; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P

Page 4

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the transfer of substantially all of the Association's assets and liabilities to the Acquiring Association in accordance with §§ 406(b)(1)(A)(vi) and 406(c)(3)(B) of the NHA, 12 U.S.C. §§ 1729(b)(1)(A)(vi) and (c)(3)(B) (1982), and pursuant to the Acquisition Agreement should be effected without delay, is in the public interest and is in the best interests of the Association, its savers and creditors, and the Corporation; and

Approval of Purchase and Assumption Transaction and Increase of Insurable Accounts

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby approves the transfer of substantially all of the Association's assets and the assumption of substantially all of the Association's liabilities to and by the Acquiring Association pursuant to the Acquisition Agreement, and further approves the resulting increase in the Acquiring Association's accounts of an insurable type, pursuant to § 563.22 of the Insurance Regulations, 12 C.F.R. § 563.22 (1987), provided that:

(1) The board of directors of the Acquiring Association shall authorize the execution of, and the Acquiring Association shall enter into, an agreement to purchase substantially all of the assets and assume substantially all of the liabilities of the Association, in the form, or substantially in the form, of the proposed Acquisition Agreement, provided that the final form of such Acquisition Agreement has been approved by the Office of the General Counsel ("OGC"), and the Acquiring Association shall execute such other documents as may be necessary to effect such transfer of assets and liabilities of the Association to the Acquiring Association promptly upon the Receiver taking possession of the Association;

(2) The Acquiring Association shall take such other actions as may be necessary to consummate the Acquisition, and the Acquisition shall be effected in accordance with applicable state law promptly upon the Receiver taking possession of the Association; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250p



(3) Within five (5) days after the date and time at which the Acquisition becomes effective pursuant to the Acquisition Agreement ("Effective Date"), the Acquiring Association shall submit to the Principal or other Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington ("Supervisory Agent"), an opinion of counsel stating the effective date of the Acquisition and that the Acquisition has been consummated in accordance with the Acquisition Agreement, the Charter and bylaws of the Acquiring Association, this Resolution, and applicable law;

(4) Not later than sixty (60) days following the Effective Date, unless such date is extended in writing by the Supervisory Agent, the Acquiring Association shall submit evidence to the FSLIC, or to an agent thereof, that it has given notice in writing, in a form approved by the OGC, to each accountholder who had an account in the Association or the Acquiring Association prior to the Effective Date, the total of whose withdrawable accounts in the Acquiring Association will exceed the sum of $100,000 after the Acquisition, (a) of the effect of the Acquisition on the extent of the accountholder's insurance coverage, and (b) that accounts assumed by the Acquiring Association from the Association shall have separate insurance which shall terminate at the end of six months from the Effective Date, or, in the case of any certificate accounts, at the earliest maturity date of such accounts after such six-month period;

(5) All forms of accounts transferred to the Acquiring Association from the Association are hereby approved pursuant to § 563.1 of the Insurance Regulations, 12 C.F.R. § 563.1 (1987), provided that the Acquiring Association obtains new approvals for any such forms when and as such accounts mature; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250P

Page 6

Authority for the Receiver to Transfer the
Assets and Liabilities of the Association

RESOLVED FURTHER, That the proposed Acquisition Agreement and the proposed Receiver's Agreement are hereby approved, and the Receiver is hereby authorized to sell and transfer to the Acquiring Association substantially all of the assets and liabilities of the Association, and to enter into an Acquisition Agreement and a Receiver's Agreement with respect to the Association in the form or substantially in the form of each such proposed agreement, provided that the final form of each such agreement has been approved by the OGC; and

RESOLVED FURTHER, That the Special Representative(s) of the Receiver ("SR"), designated in or pursuant to Bank Board Resolution No. 88-249P, dated April 7, 1988, is hereby authorized to execute, on behalf of the Receiver, an Acquisition Agreement and a Receiver's Agreement with respect to the Association in the form, or substantially in the form, of each such proposed agreement, to execute all other documents necessary or desirable to implement the provisions of any such Acquisition Agreement and Receiver's Agreement or to complete the acquisition of substantially all of the assets and liabilities of the Association by the Acquiring Association, and otherwise to implement the intent and purposes of said agreements and this Resolution, provided that the final form of each such agreement and document has been approved by the OGC; and

Authorization of the Corporation
to Execute Agreements and Make Payments

RESOLVED FURTHER, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them ("Director"), is hereby authorized to execute, on behalf of the Corporation, a Receiver's Agreement in the form, or substantially in the form, of such proposed agreement, and to execute all other documents and perform all provisions of the Receiver's Agreement and otherwise to implement the intent and purpose of said agreement, provided that the final forms of such agreement and documents have been approved by the OGC; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P



RESOLVED FURTHER, That the Corporation is authorized to make advances and pay expenses to, or on behalf of, the Receiver in accordance with the Receiver's Agreement; and

RESOLVED FURTHER, That the Corporation is authorized to pay all necessary or appropriate expenses incurred by, or on behalf of, the Operations and Liquidations Division, Office of the FSLIC, in preparation for the appointment of the FSLIC as receiver for the Association, provided that no such expenditures to be made by the Corporation shall extend to services rendered or goods received after the date and time the Receiver takes possession of the Association; and

Grounds for Financial Assistance

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), that (1) financial assistance and indemnifications by the FSLIC are necessary to facilitate the Acquisition, and (2) the amount of such assistance and indemnifications, to be provided in accordance with the terms and conditions of the proposed Assistance Agreement, would not exceed that amount reasonably necessary to save the cost of liquidating the Association, including the payment of its insured accounts; and

RESOLVED FURTHER, That the proposed Assistance Agreement is hereby approved, and the Director, or the Director, Financial Assistance Division, Office of the FSLIC, or his designee ("FAD Director"), is hereby authorized to execute, on behalf of the Corporation, an agreement in the form, or substantially in the form, of the proposed Assistance Agreement, provided that the final form of such Assistance Agreement has been approved by the OGC; and

RESOLVED FURTHER, That the Director or the FAD Director is authorized to take such further actions as may be necessary or appropriate to exercise the rights and fulfill the obligations of the FSLIC contained in the Assistance Agreement; and

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P



## Prevention of Probable Failure

RESOLVED FURTHER, That the Bank Board hereby finds that approval of the Acquisition pursuant to this Resolution is necessary to prevent the probable failure of the Association; and

## Supervisory Acquisition

RESOLVED FURTHER, That the Bank Board hereby finds and determines that the Acquisition is instituted for supervisory reasons; and

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, finds that the acquisition of the Association by the Acquiring Association is an acquisition under § 406(f) of the NHA, 12 U.S.C. 1729(f) (1982), as amended, and is deemed a supervisory case; and

## Forbearances

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is authorized and directed to send to the Acquiring Association a letter concerning supervisory forbearances by the Bank Board and the FSLIC with respect to certain regulatory requirements in the form, or substantially in the form, of the letter in the Minute Exhibit File ("Forbearance Letter"), provided that the final form of such letter shall be approved by the OGC; and

## Accounting

RESOLVED FURTHER, That the Acquisition shall be accounted for, and the Acquiring Association shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent authorized in the Forbearance Letter; and

RESOLVED FURTHER, That, no later than ninety (90) days following the Effective Date, the Acquiring Association shall furnish an

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington



analysis, accompanied by a concurring opinion from its independent certified public accountants (which will indicate that the Acquisition was accounted for in accordance with generally accepted accounting principles except as otherwise authorized by the Bank Board), satisfactory to the Supervisory Agent and the ORPOS, which shall (a) specifically describe, as of the Effective Date, any intangible assets, including goodwill and the discount and premiums arising from the Acquisition, to be recorded on the Acquiring Association's books, and (b) substantiate the reasonableness and conformity with regulatory requirements, including the Forbearance Letter, of the amounts attributed to intangible assets, including goodwill and the discount and premiums, and the related amortization periods and methods; and

Secondary Reserve

RESOLVED FURTHER, That the FSLIC hereby provides that the pro rata share, if any, of the Association in the statutorily prescribed amount defined by § 404(e)(2)(D) of the NHA, 12 U.S.C. § 1727(e)(2)(D) (1982), as amended, shall be transferred to the Acquiring Association, effective as of the Effective Date; and

Federal Home Loan Bank Stock and Membership

RESOLVED FURTHER, That the transfer to the Acquiring Association of the Association's stock in the Federal Home Loan Bank of Seattle ("Bank") is approved, effective as of the Effective Date, and that, upon such transfer, the membership of the Association in the Bank shall cease; and

Cancellation of Certificate of Insurance

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is hereby directed to cancel the Association's certificate of insurance upon its surrender to the FSLIC; and

Tax Certification

RESOLVED FURTHER, That the Bank Board finds and hereby certifies that the ground set forth in § 5(d)(6)(A)(i) of the HOLA,

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P

Page 10

12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association, in that the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

RESOLVED FURTHER, That the Bank Board finds that the record before the Bank Board contains nothing to show or from which it could be inferred that the Association had intentionally placed itself in the position of being insolvent for the purpose of obtaining any tax advantages pursuant to 26 U.S.C. § 368(a)(3)(D) (1982) as amended; and

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board is hereby authorized and directed to issue and send to the Acquiring Association a letter with respect to the Association certifying on behalf of the Bank Board the matters set forth in the immediately preceding resolving paragraphs, and the Secretary or an Assistant Secretary is hereby authorized to provide copies of such letter to any agency of the United States upon request; and

Marketing and Acquisition Findings

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby finds and determines that:

(1) FSLIC and its agents offered the Association for bid on an intra-state, unassisted basis in January 1987 to FSLIC-insured institutions that might be qualified and capable of acquiring the Association;

(2) Although indications of preliminary interest were received from four institutions, all four bidders eventually determined not to submit offers on an unassisted basis;

(3) The Association was again marketed, on an inter-industry, interstate assisted basis, together with two other FSLIC-insured institutions located in the State of Washington, at a bid conference held on October 15, 1987;

FEDERAL HOME LOAN BANK BOARD

B

Approval of
Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-250 P

Page 11

(4) Bids were received from three institutions, but one of the institutions subsequently withdrew its bid;

(5) Of the two remaining bids, that of the Acquiring Association was both the lower cost bid and less than the cost of liquidation; and

(6) The Acquiring Association is an in-state insured institution; and

Effective Date

RESOLVED FURTHER, That the Acquisition shall be effective in accordance with applicable state law unless such law leaves that determination to the Bank Board in which case the Acquisition shall be effective upon the execution by the appropriate parties of the Acquisition Agreement and the Assistance Agreement.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in Tri-Cities Savings and Loan Association, Kennewick, Washington

No. 88-251 P

Date: April 7, 1988

## Recitals

WHEREAS, The Federal Savings and Loan Insurance Corporation ("FSLIC") has been appointed as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), as described in Federal Home Loan Bank Board ("Bank Board") Resolution No. 88-249P, dated April 7, 1988; and

WHEREAS, Such appointment constitutes a default of the Association within the meaning of § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982), and may necessitate the payment of insured accounts by the FSLIC, in its corporate capacity and not as receiver for the Association, within the meaning of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982):

## Payment of Insurance of Accounts

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them ("Director"), is hereby authorized and directed to take all necessary or appropriate steps and to incur all necessary or appropriate expenses in preparation for and to implement the payment of all insured accounts of the Association pursuant to § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982); and

RESOLVED FURTHER, That, upon being advised by the General Counsel, or a Deputy General Counsel, that the Association is in default and that the account liabilities of the Association have not been assumed by another insured institution, the Director is hereby authorized and directed (1) to cause each insured account in the Association that is surrendered and transferred to the FSLIC to be paid in cash or by making available a transferred account in another insured institution, (2) to take or cause to be taken such action(s) as may be necessary or appropriate to carry out this and any future directives of the Bank Board, and (3) to do all things necessary or appropriate to carry out expeditiously the objectives of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982), and Part 564 of the Rules and Regulations for the FSLIC, 12 C.F.R. Part 564 (1987), and for the protection of the FSLIC; and

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-251 P

Page 2

RESOLVED FURTHER, That each Office and Division of the Bank Board is hereby requested to furnish such assistance to the Director in fulfillment of the intent of this Resolution as the Director may request.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

D

FEDERAL HOME LOAN BANK BOARD

Pursuit of Claims of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-252p

Date: April 7, 1988

Recitals

WHEREAS, The Federal Home Loan Bank Board ("Bank Board") has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), pursuant to Resolution No. 88-249p, dated April 7, 1988; and

WHEREAS, Pursuant to Resolution No. 88-250p, dated April 8, 1988, the Bank Board has approved the acquisition of substantially all of the assets and liabilities of the Association by Sterling Savings Association, Spokane, Washington ("Acquiring Association"); and

WHEREAS, Pursuant to a proposed Receiver's Agreement (a copy of which is in the Minute Exhibit File), potential claims of the Association against certain parties will be transferred to the FSLIC in its corporate capacity; and

WHEREAS, Pursuant to a proposed Assistance Agreement (a copy of which is in the Minute Exhibit File), the FSLIC in its corporate capacity has a right to take an assignment of potential claims of the Acquiring Association, as successor to the Association, against certain other parties:

Pursuit of Claims

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them, is hereby authorized to take whatever actions are deemed appropriate, including litigation, to recover on such claims of the Association and the Acquiring Association, as successor to the Association, from any such parties, provided that the Office of the General Counsel shall concur in any such action.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Saving and Loan Association
Kennewick, Washington

No. 88-253 P

Date: April 7, 1988

Recitals

WHEREAS, The Executive Director or a Deputy Executive Director of the Federal Savings and Loan Insurance Corporation ("FSLIC"), or the Director, Financial Assistance Division, Office of the FSLIC, or a designee of any of them ("Director"), has been authorized by Federal Home Loan Bank Board ("Bank Board") Resolution Nos. 88-250 P and 88-250 P, each dated April 7, 1988, to execute, on behalf of the FSLIC in its corporate capacity, a Receiver's Agreement with the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington, an Assistance Agreement with Sterling Savings Association, Spokane, Washington ("Acquiring Association"), and other documents ("Agreements"), and to pursue certain claims; and

WHEREAS, The Agreements impose certain rights, duties, and obligations upon the FSLIC in its corporate capacity, and permit the pursuit of certain claims, that do not require basic determinations of policy; and

WHEREAS, In the administration of the Agreements, and of any rights or obligations of the FSLIC under them, it may be necessary or desirable that the FSLIC, in its corporate capacity, contract for legal, auditing, or other services, or authorize the settlement of certain claims:

Implementing Authority

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, finds that expenditures of the FSLIC, in its corporate capacity, pursuant to and in the administration of the Agreements and in the pursuit of such claims, are necessary,

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Savings and Loan Association
Kennewick, Washington

No. 88-253P



nonadministrative, and made under the National Housing Act, as amended, 12 U.S.C. §§ 1724, et seq. (1982), and shall be incurred, allowed, and paid under the provisions of the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), without regard to the provisions of any other law governing the expenditure of public funds; and

RESOLVED FURTHER, That, effective upon the execution of the Agreements, the Director is hereby authorized and directed to take such actions as may be necessary or desirable to fulfill the rights, duties, and obligations of the FSLIC, in its corporate capacity, under the Agreements and in the pursuit of claims, and to incur, allow, and pay all expenditures in fulfillment of such rights, duties, and obligations, pursuant to the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), including, but not limited to:

(1) The payment of any and all amounts required by the Agreements;

(2) The making of advances to the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association");

(3) Contracting for legal, accounting, management, or other services relating to the implementation of the Agreements or the pursuit of claims, provided that the final form of any such contract shall be approved by the Office of the General Counsel ("OGC");

(4) The administration of any asset or claim acquired from the Receiver or Acquiring Association, provided that any contract pertaining to such asset or claim, and the satisfaction, settlement or termination of any claim, shall be approved by the OGC;

(5) The assignment, pursuit, and settlement of claims, provided, that the form of any assignment or settlement agreement entered into by the FSLIC shall be approved by the OGC; and

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Savings and Loan Association
Kennewick, Washington

No. 88-253P

Page 3

(6) The waiver, if deemed necessary or desirable by the Director, of provisions of the Assistance Agreement concerning filings, representations, warranties, or certifications by the Acquiring Association, provided that the form of any waiver by the FSLIC shall be approved by the OGC; and

RESOLVED FURTHER, That the General Counsel may also exercise the authority conferred by the preceding resolving paragraphs with respect to contracting on behalf of the FSLIC for legal or other related services needed to implement the Agreements and pursue claims; and

RESOLVED FURTHER, That the Director is authorized and directed to take all other actions necessary and appropriate to exercise the rights and fulfill the duties and obligations of the FSLIC in the administration of the Agreements and the pursuit of claims.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

F

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennevick, Washington

No. 88-254 P

Date: April 7, 1988

RESOLVED, That the acquisition of substantially all of the assets and liabilities of Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), by Sterling Savings Association, Spokane, Washington ("Acquiring Association"), pursuant to an Acquisition Agreement between the Federal Savings and Loan Insurance Corporation ("FSLIC"), as receiver for the Association, and the Acquiring Association, is hereby approved, effective in accordance with applicable state law unless such law leaves that determination to the Bank Board in which case the Acquisition shall be effective as of the execution of the Acquisition Agreement and the Assistance Agreement between the FSLIC, in its corporate capacity, and the Acquiring Association, and pursuant to approval by the Bank Board in a concurrent Resolution or action issued as of the date of this Resolution and subject to any conditions that may be imposed in such Resolution or action.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

# TABLE OF CONTENTS

## ACQUISITION AGREEMENT BETWEEN THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION AS RECEIVER FOR TRI-CITIES SAVINGS AND LOAN ASSOCIATION KENNEWICK, WASHINGTON

AND

## STERLING SAVINGS ASSOCIATION SPOKANE, WASHINGTON


| | | Page |
|---|---|---|
| Recitals | | 1 |
| § 1 | Purchase of Assets | 2 |
| § 2 | Assumption of Liabilities | 4 |
| § 3 | Records | 5 |
| § 4 | Inventory | 6 |
| § 5 | Purchase Price | 6 |
| § 6 | Duties with Respect to Savers | 6 |
| § 7 | Office Space for the RECEIVER | 8 |
| § 8 | Litigation; Power of Attorney | 8 |
| § 9 | Rights and Forbearance | 8 |
| § 10 | Sole Benefit | 9 |
| § 11 | Successors and Assigns | 9 |
| § 12 | Notices | 9 |
| § 13 | Accounting Principles | 10 |
| § 14 | Governing Law | 11 |
| § 15 | Effective Date | 11 |
| § 16 | Entire Agreement; Severability | 11 |
| § 17 | Counterparts; Modification; Headings | 12 |
| § 18 | Warranties | 12 |
| § 19 | Continuing Cooperation | 13 |
| § 20 | Condition | 13 |
| Signature Page | | 13 |

# ACQUISITION AGREEMENT

THIS AGREEMENT is made and entered into this 8th day of April, 1988, by and between the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, in its capacity as Receiver for TRI-CITIES SAVINGS AND LOAN ASSOCIATION, Kennewick, Washington (respectively, "RECEIVER" and "CLOSED ASSOCIATION"), and STERLING SAVINGS ASSOCIATION, Spokane, Washington ("ACQUIRING ASSOCIATION").

## RECITALS

A. The CLOSED ASSOCIATION is a stock savings and loan association organized under the laws of the State of Washington, the accounts of which are insured by the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION in its capacity as a corporate instrumentality of the United States ("CORPORATION").

B. The FEDERAL HOME LOAN BANK BOARD ("BANK BOARD"), by its Resolution No. 88-249, dated April 7, 1988, duly appointed the CORPORATION as RECEIVER for the CLOSED ASSOCIATION, and the RECEIVER's appointment has become effective.

C. The RECEIVER has taken possession of the CLOSED ASSOCIATION and by operation of law has succeeded to all the rights, titles, powers, and privileges of the CLOSED ASSOCIATION.

D. The ACQUIRING ASSOCIATION is a stock savings association organized under the laws of the State of Washington, the accounts of which are insured by the CORPORATION.

E. It has been mutually agreed between the ACQUIRING ASSOCIATION and the RECEIVER, and the BANK BOARD has determined

that it is in the best interests of the CLOSED ASSOCIATION, its savers, and the CORPORATION, that substantially all of the CLOSED ASSOCIATION's assets, all of its deposits or withdrawable accounts, and substantially all of its other liabilities be immediately transferred to and assumed by the ACQUIRING ASSOCIATION, as provided in this Agreement.

F. In consideration of the foregoing and of the mutual covenants and agreements contained herein, the RECEIVER and the ACQUIRING ASSOCIATION enter into the following agreement.

AGREEMENT

§ 1 Purchase of Assets. The RECEIVER hereby sells to the ACQUIRING ASSOCIATION, and the ACQUIRING ASSOCIATION hereby purchases from the RECEIVER, all of the RECEIVER's right, title, and interest in and to all of the CLOSED ASSOCIATION's assets that the RECEIVER owns or holds and any of the CLOSED ASSOCIATION's assets hereafter acquired by the RECEIVER, excluding, however: (a) any known or unknown claim, demand, cause of action, or judgment (i) against the CLOSED ASSOCIATION's or any of its subsidiaries' present or former employees, agents, or controlling persons, directors, officers, or other persons, directly or indirectly exercising a controlling influence over the management or policies of the CLOSED ASSOCIATION or any of its subsidiaries, (ii) against any stockholder of the CLOSED ASSOCIATION, (iii) against any appraiser, accountant, auditor, attorney, investment banker or broker, loan broker, deposit

broker, securities dealer, or other professional individual or entity performing services for the CLOSED ASSOCIATION, and (iv) against any administrator, executor, personal representative, heir, assign, director or officer of any person or entity identified in § 1(a)(i), (ii) or (iii), arising out of any act(s) or omission(s) of such person or entity prior to the effective date with respect to the CLOSED ASSOCIATION or its property, or any of its subsidiaries or the subsidiaries' property; (b) any known or unknown claim, demand, cause of action or judgment against a surety for any person or entity identified in § 1(a)(i), (ii), (iii) or (iv), including any insurer who may be liable for indemnification for the loss caused by the action or inaction of any such person or entity; (c) any claim against counsel for the CLOSED ASSOCIATION for recovery of sums paid by the CLOSED ASSOCIATION to challenge the receivership or contemporary or subsequent actions of the BANK BOARD or the CORPORATION; (d) such limited items, parts, or portions of the CLOSED ASSOCIATION's books and records as are specifically identified by the RECEIVER, <u>provided</u> that the ACQUIRING ASSOCIATION consents to the RECEIVER's retention of such records (the "excluded papers"); and (e) those assets itemized on Exhibit A attached hereto, consisting of one participation interest in a loan known as Tech Center North, one participation interest in real estate owned ("REO") known as Morningstar Hill, and one subsidiary known as Tri-West Construction (and the subsidiaries of such subsidiary), and all books and records pertaining to said assets.

§ 2 Assumption of Liabilities. The ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform, and discharge all of the CLOSED ASSOCIATION's liabilities, including, but not limited to, those shown on the CLOSED ASSOCIATION's books and records at such time as the RECEIVER takes possession of the CLOSED ASSOCIATION, but excluding, however, (a) obligations under any compensation or employment contract between the CLOSED ASSOCIATION and any of its employees, officers, or directors, other than obligations to honor or satisfy any right already vested under such contracts, and (b) any obligation of the CLOSED ASSOCIATION arising out of or related in any way to the assets itemized on Exhibit A attached hereto. The term "liability" as used in this section does not refer to any obligation of the CLOSED ASSOCIATION to its stockholders arising out of or related in any way to their stock holdings (including claims for damages or rescission arising from the purchase or sale of such stock holdings) or any obligation to indemnify controlling persons, directors, officers or other persons as a result of suits arising from claims described in § 1, and the ACQUIRING ASSOCIATION specifically does not assume by virtue of this Agreement any such obligations to the stockholders or for indemnification of the controlling persons, directors, officers or other persons. For the purposes of this Agreement, "stockholder" means a holder of stock; and "stock" includes a nonwithdrawable account, as defined by 12 C.F.R. § 561.42 (1987), stock, permanent stock, guarantee stock, common stock, preferred stock, and subordinated debt issued by the CLOSED ASSOCIATION.

§ 3 Records.

(a) The ACQUIRING ASSOCIATION acknowledges that the RECEIVER is delivering to it, among the assets sold and purchased under § 1 of this Agreement, all of the CLOSED ASSOCIATION's books and records, except those books and records pertaining to the assets itemized on Exhibit A hereto and the excluded papers, if any.

(b) The ACQUIRING ASSOCIATION agrees to preserve and keep safe all of the CLOSED ASSOCIATION's books and records that it acquires pursuant to this Agreement, to permit the RECEIVER at any reasonable time to inspect, make extracts from or copies of any of such books and records, and to cooperate fully with the RECEIVER in the preparation of the inventory described below.

(c) As a condition of this Agreement, the ACQUIRING ASSOCIATION agrees, at its own expense, either to segregate and keep separate or, in the alternative and at the option of the ACQUIRING ASSOCIATION, to reconstruct, as of the date of this Agreement, the CLOSED ASSOCIATION's books and records transferred to it until the period in which the CLOSED ASSOCIATION may file an action for removal of the RECEIVER pursuant to law has expired, or, if such action is filed, until the dismissal of such action or the issuance of an order determining an appeal from any order of a court directing the removal of the RECEIVER.

§ 4 Inventory. As soon as is practicable after the effective date of this Agreement, the RECEIVER shall make, or cause to be made, an inventory of the CLOSED ASSOCIATION's assets and a record of its liabilities, as directed by the BANK BOARD. The RECEIVER shall furnish a copy of the inventory of the CLOSED ASSOCIATION's assets and record of its liabilities to the ACQUIRING ASSOCIATION upon their completion.

§ 5 Purchase Price. The purchase price of all assets sold to the ACQUIRING ASSOCIATION pursuant to § 1 shall be the assumption of liabilities provided for in § 2.

§ 6 Duties With Respect to Savers.

(a) The ACQUIRING ASSOCIATION agrees to pay, in accordance with the provisions of applicable law and the individual contracts governing the CLOSED ASSOCIATION's deposits or withdrawable accounts, all properly drawn and presented withdrawal requests by the CLOSED ASSOCIATION's depositors or withdrawable accountholders whose deposits or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement, to the extent that such deposits or withdrawable account balances are sufficient to permit such payments and in compliance with the contractual terms of such deposits and accounts, and in all other respects to discharge, in the usual course of business, the CLOSED ASSOCIATION's duties and obligations with respect to its depositors or accountholders, provided, however, that the ACQUIRING ASSOCIATION does not assume any special or unusual duties of the CLOSED ASSOCIATION to such depositors or accountholders

unless the terms of such duties are disclosed in the CLOSED ASSOCIATION's records. Further, in accordance with applicable law and the individual contracts governing such deposits or accounts, the ACQUIRING ASSOCIATION agrees to pay interest on all of the CLOSED ASSOCIATION's deposits and withdrawable accounts that are assumed pursuant to § 2 of this Agreement.

(b) If any such depositors or withdrawable accountholders decline to accept the obligation of the ACQUIRING ASSOCIATION to pay the CLOSED ASSOCIATION's deposit or account liabilities assumed pursuant to § 2 of this Agreement and asserts a claim against the RECEIVER for any part of such assumed deposit liabilities, the ACQUIRING ASSOCIATION shall provide the RECEIVER, upon demand, with an amount of money sufficient to enable it to pay the claims of such depositors or accountholders, less any applicable early withdrawal penalties, not exceeding the amount credited to such persons on the ACQUIRING ASSOCIATION's records at the time such demand is made, and, upon paying the RECEIVER as so demanded, the ACQUIRING ASSOCIATION shall be discharged from any further liability for such claim under this Agreement.

(c) The ACQUIRING ASSOCIATION shall give written notice, in a form approved by the RECEIVER or its counsel, to the CLOSED ASSOCIATION's depositors and withdrawable accountholders whose deposits or accounts are assumed by the ACQUIRING ASSOCIATION pursuant to § 2 of this Agreement of its assumption of liability for such deposits or accounts.

§ 7 Office Space for the RECEIVER. The ACQUIRING ASSOCIATION agrees to provide the RECEIVER, without charge and, if its duties so require, for a period of one year from the date of this Agreement, adequate space, including vault space and furnishings, for the RECEIVER's use in connection with the transfers and transactions required by this Agreement and with the exercise and discharge of its powers and duties as receiver of the CLOSED ASSOCIATION. After such period, the ACQUIRING ASSOCIATION shall continue to provide to the RECEIVER, at a reasonable rental to be agreed upon by the parties, such space and furnishings for such period as the RECEIVER may request.

§ 8 Litigation; Power of Attorney. In the event that any action at law or in equity in which the RECEIVER has an interest is instituted by any person against the CLOSED ASSOCIATION, the ACQUIRING ASSOCIATION, or both of them, or against the RECEIVER and either or both of the foregoing as co-defendants, or in which action the RECEIVER joins or is joined as co-defendant, the ACQUIRING ASSOCIATION agrees to file, or to join with the RECEIVER in filing, a petition to remove the action to an appropriate court, and hereby authorizes and appoints, as its attorney for the purpose of effecting such removal, any attorney designated or approved by the RECEIVER to act in that capacity.

§ 9 Rights and Forbearance. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay to

either party in exercising or partially exercising any right, power, or remedy shall not preclude the further exercise of such right, power, or remedy.

§ 10 <u>Sole Benefit</u>. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all conditions and provisions of it, are for the sole benefit of the RECEIVER and the ACQUIRING ASSOCIATION and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give any person other than the RECEIVER or the ACQUIRING ASSOCIATION any legal or equitable right, remedy, or claim under or with respect to this Agreement or any of its provisions.

§ 11 <u>Successors and Assigns</u>. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, their respective transferees, successors, and assigns, but this Agreement may not be assigned nor may any rights under it be transferred to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 12 <u>Notices</u>. Any notice, request, demand, or other communication to either of the parties shall be deemed given when received and shall be given in writing and delivered in person or sent by first class mail in a prepaid envelope to such party at its address set forth below or at such other address as such party shall hereafter furnish in writing:

STERLINGS SAVINGS ASSOCIATION
North 120 Wall Street
Spokane, Washington 99201-0696
Attn: Senior Vice President - Finance

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
As Receiver for Tri-Cities Savings and Loan Association
1700 G Street, N.W.
Washington, D.C. 20552
Attn: Special Representative

§ 13 Accounting Principles. Except as otherwise provided in this Agreement, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, any assistance agreement or agreements to which the ACQUIRING ASSOCIATION and the CORPORATION are parties, including, but not limited to, an agreement to make a contribution or loan, an agreement to purchase subordinated debt, or an agreement to issue and purchase Income Capital Certificates, applicable regulations of the BANK BOARD or the CORPORATION, or any resolution or action of the BANK BOARD or CORPORATION approving, or adopted concurrently with, this Agreement, then this Agreement, such assistance agreement, such regulations, and such resolutions or actions shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such assistance agreement, such regulations, and the BANK BOARD's or the CORPORATION's resolutions or actions. If there is a conflict between this Agreement and such assistance

agreement or such regulations or resolutions or actions, then such assistance agreement or such regulations or resolutions or actions shall govern.

§ 14 Governing Law. To the extent that federal law does not control, this Agreement and the rights and obligations under it shall be governed by the law of the State of Washington. Nothing in this Agreement shall require any unlawful action or inaction by either party.

§ 15 Effective Date. This Agreement, and the transfer of the CLOSED ASSOCIATION's assets and liabilities provided for by this Agreement, shall become effective upon its execution by the parties.

§ 16 Entire Agreement; Severability.

(a) This Agreement, together with any interpretation of it or any understanding agreed to in writing by the parties, constitutes the entire agreement between the ACQUIRING ASSOCIATION and the CORPORATION as RECEIVER, but not in its corporate capacity, in connection with the transactions contemplated by this Agreement, and supersedes all prior agreements and understandings of the parties, excepting only any resolutions or letters approved or adopted contemporaneously with this Agreement by the BANK BOARD or the CORPORATION.

(b) If any provision of this Agreement is invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties.

§ 17 Counterparts; Modification; Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall together constitute one and the same instrument, and either party may execute this Agreement by signing any such counterpart.

(b) No modification of this Agreement shall be binding unless executed in writing and signed by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 18 Warranties.

(a) The RECEIVER warrants and represents that it has authority to enter into this Agreement and that, as RECEIVER, it has full power and authority to transfer the CLOSED ASSOCIATION's assets and liabilities as provided by this Agreement.

(b) The ACQUIRING ASSOCIATION warrants and represents that all of the transactions contemplated by this Agreement have been or will be authorized by all necessary corporate actions and that it, by its proper officers or agents, has executed this Agreement and shall execute and deliver all instruments, certificates, and other documents that may be necessary or incidental to the performance of this Agreement.

(c) These warranties shall survive the execution, performance, and termination of this Agreement.

§ 19 Continuing Cooperation. The RECEIVER agrees, upon the request of the ACQUIRING ASSOCIATION, to execute and deliver such further instruments and documents of conveyance as shall be necessary or proper to vest in the ACQUIRING ASSOCIATION the RECEIVER's full legal or equitable title to the property transferred to the ACQUIRING ASSOCIATION pursuant to this Agreement.

§ 20 Condition. The obligations of the RECEIVER and the ACQUIRING ASSOCIATION pursuant to this Agreement are conditioned upon the execution and delivery simultaneously herewith of an Assistance Agreement between the CORPORATION and the ACQUIRING ASSOCIATION.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers or agents.

Attest:

Date: April 8, 1988

By: [signature]
Assistant Secretary

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATON
AS RECEIVER FOR TRI-CITIES SAVINGS AND LOAN ASSOCIATION

By: [signature]
Special Representative

STERLING SAVINGS ASSOCIATION

Date: April 8, 1988

By: [signature]
Its: SR V.P

By: [signature]
Its: Chairman

# EXHIBIT A

## ASSETS OF TRI-CITIES SAVINGS AND LOAN ASSOCIATION RETAINED BY THE FSLIC AS RECEIVER

| BORROWER/ PROJECT NAME | DESCRIPTION | LOCATION | GROSS BALANCE | EXISTING RESERVES | NET BOOK VALUE |
|---|---|---|---|---|---|
| Tech Center North[1] | Westside FS&LA, lead lender | | 1,054,098 | 950,004 | 104,094 |
| TOTAL LOANS | | | 1,054,098 | 950,004 | 104,094 |
| Morningstar[1] | Westside FS&LA, lead lender | | 2,105,303 | 1,645,529 | 459,774 |
| TOTAL REO | | | 2,105,303 | 1,645,529 | 459,774 |
| Investment in Tri-West Construction[2] | Sub of Tri-Cities S&LA | | (38,791) | 0 | (38,791) |
| Accounts Receivable, Tri-West Construction | | | 181,770 | 181,770 | 0 |
| TOTAL TRI-WEST | | | 142,979 | 181,770 | (38,791) |

1/ Data as of 2/29/88.

2/ Data as of 1/31/88.

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION,

AND

STERLING SAVINGS ASSOCIATION
SPOKANE, WASHINGTON

DATED April 8, 1988

EXHIBIT 4

**ASSISTANCE AGREEMENT**

**BETWEEN**

**THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION,**

**AND**

**STERLING SAVINGS ASSOCIATION**
**SPOKANE, WASHINGTON**

**DATED ________________ __, 1988**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | Recitals | 1 |
| § 1 | Definitions | 3 |
| | (a) "Affiliate" or "Affiliates" | 3 |
| | (b) "Bank" | 3 |
| | (c) "Bank Board" | 3 |
| | (d) "Book Value" | 3 |
| | (e) "Claim" | 7 |
| | (f) "Covered Asset" | 7 |
| | (g) "Covered Asset Loss" | 10 |
| | (h) "Credit" | 10 |
| | (i) "Debit" | 10 |
| | (j) "Effective Date" | 10 |
| | (k) "Federal Regulations" | 10 |
| | (l) "Foreclosure" | 10 |
| | (m) "GAAP" | 11 |
| | (n) "Initial Audit" | 11 |
| | (o) "Insurance Regulations" | 11 |
| | (p) "Liquidation" | 11 |
| | (q) "Net Proceeds Received" | 12 |
| | (r) "Quarter" | 12 |
| | (s) "Real Estate Owned" or "REO" | 13 |
| | (t) "Reimbursable" | 13 |
| | (u) "Related Claim" | 13 |
| | (v) "Repossessed Personal Property" | 14 |
| | (w) "Special Reserve Account" | 14 |
| | (x) "Subsidiary" | 14 |
| | (y) "Termination Date" | 14 |
| § 2 | Conditions | 14 |
| § 3 | Contributions | 17 |
| | (a) Initial Contribution by the CORPORATION | 17 |
| | (b) Debit Balances | 17 |
| | (c) Contributions Resulting from the Purchase of Covered Assets | 18 |

Page


(d) Contributions Resulting from Assignment of Claims........................ 18
(e) Reimbursement of Credit Balances.......... 19
(f) Adjustments................................ 19
(g) Repayment.................................. 20
§ 4 Special Reserve Account............................ 20
(a) Debits to Special Reserve Account......... 21
(1) Capital Losses on Covered Assets..... 21
(2) Appraisal Costs....................... 21
(3) Payment of Credits.................... 21
(4) Indemnification....................... 22
(5) Related Claim Expenses................ 22
(6) Assignment of Related Claim.......... 22
(7) Expense to Cure....................... 22
(8) Tax Benefit Adjustment Payments...... 22
(9) Yield Subsidy......................... 22
(b) Exclusions from Debits..................... 26
(c) Credits to the Special Reserve Account.................................... 27
(1) Other Recoveries on Covered Assets................................ 27
(2) Refunds............................... 27
(3) Offset Gains.......................... 28
(4) Recoveries on Related Claims......... 28
(5) CORPORATION's Contributions.......... 28
(6) Tax Benefits.......................... 28
(7) Excess and Recalculated Yield........ 32
§ 5 Write-down of a Covered Asset..................... 33
§ 6 Inventory and Initial Audit....................... 34
§ 7 Indemnification for Undisclosed Liabilities, Unreserved-for Claims and Litigation Challenging the Acquisition......................... 35
(a) Indemnifications........................... 35
(1) Undisclosed Liabilities............... 37
(2) Unreserved-for Claims................. 38
(3) Challenges to the Acquisition........ 38
(b) Pursuit of Related Claims................. 39
(c) Payments as Contributions................. 40
(d) Scope of Indemnification.................. 40
§ 8 Duplicate Payments................................. 40
§ 9 Reports; Records.................................. 41
(a) Quarterly Reports.......................... 41
(b) Reports on Covered Assets................. 43
(c) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities................. 43
(d) Other Reports.............................. 46
(e) Access to Books and Records............... 47
(f) Audits and Examinations................... 47
(g) Final Accounting........................... 48
(h) Change of Procedure........................ 48

Page

§ 10 Covenants of the ACQUIRING ASSOCIATION............ 48
(a) Administration of Assets and Liabilities.................................. 48
(1) Management Standard.................. 48
(2) Pursuit of Claims.................... 49
(3) Conduct of Litigation................ 50
(4) Covered Asset Restrictions........... 52
(5) Covered Asset Requirements........... 53
(6) Debt Collection...................... 55
(b) Compliance with Law......................... 55
(c) Tax Benefits................................ 55
§ 11 Sale and Repair of Covered Assets.................. 57
§ 12 Foreclosures ...................................... 61
§ 13 CORPORATION's Right to Assignment of Related Claims.................................. 64
§ 14 CORPORATION's Right to Purchase Covered Assets.... 66
§ 15 Disclosure of Agreement........................... 68
§ 16 Accounting Principles............................. 69
§ 17 Notices........................................... 70
§ 18 Termination of Agreement ......................... 70
§ 19 Rights and Forbearances........................... 72
§ 20 Governing Law..................................... 73
§ 21 Entire Agreement; Severability.................... 73
§ 22 Counterparts; Modifications; Headings............. 73
§ 23 Successors and Assigns............................ 74
§ 24 Sole Benefit...................................... 74
§ 25 Continuing Cooperation............................ 75

Signature Page.................................... 75

Exhibit A: Covered Assets

## SUMMARY OF SUBSTANTIVE PROVISIONS

| Assistance Provided | Section in Agreement |
|---|---|
| 1. Cash Contribution in amount of $11,730,128 | § 3(a) |
| 2. Indemnification for Losses on Covered Assets and Yield Subsidy | § 4(a) |
| 3. Indemnification for Undisclosed Liabilities, Unreserved-for Claims and Litigation Challenging the Acquisition | § 7 |

# ASSISTANCE AGREEMENT

THIS AGREEMENT, dated April 8, 1988, is entered into by and between Sterling Savings Association, Spokane, Washington ("ACQUIRING ASSOCIATION"), a savings and loan association organized under the laws of the State of Washington, and the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, a corporate instrumentality of the United States ("CORPORATION").

## RECITALS

A. On April 7, 1988, the Corporation was appointed receiver ("Receiver") for Tri-Cities Savings and Loan Association, Kennewick, Washington, a state-chartered stock savings and loan association ("CLOSED ASSOCIATION"). The Bank Board, by Resolution No. 88-250, dated April 7 1988, has authorized the ACQUIRING ASSOCIATION to purchase and assume substantially all of the assets and liabilities, respectively, of the CLOSED ASSOCIATION from the Receiver ("Acquisition") pursuant to the Acquisition Agreement ("Acquisition Agreement") of even date herewith between the Receiver and the ACQUIRING ASSOCIATION.

B. The Bank Board, by Resolution No. 88-250, dated April 7, 1988, has certified for purposes of Section 368(a)(3)(D) of the Internal Revenue Code that the ground set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exists with respect to the CLOSED ASSOCIATION in that the CLOSED ASSOCIATION is insolvent.

C. The CORPORATION insured the accounts of the CLOSED ASSOCIATION and will continue to insure the accounts of the ACQUIRING ASSOCIATION after the Acquisition in accordance with § 403 of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1726 (1982).

D. The ACQUIRING ASSOCIATION, pursuant to the Acquisition Agreement, will succeed to substantially all of the rights, obligations, duties and liabilities of the CLOSED ASSOCIATION, and substantially all of the assets and property of every kind and character belonging to the CLOSED ASSOCIATION will be vested in and become the property of the ACQUIRING ASSOCIATION.

E. A condition to the obligation of the ACQUIRING ASSOCIATION to consummate the Acquisition pursuant to the Acquisition Agreement is that the CORPORATION and the ACQUIRING ASSOCIATION enter into an agreement in the form of this Agreement, pursuant to which the CORPORATION will provide financial assistance and indemnification to the ACQUIRING ASSOCIATION.

F. The CORPORATION has decided, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), to provide financial assistance and indemnification as set forth in this Agreement, having determined that the CLOSED ASSOCIATION is in danger of default and that the amount of such assistance and indemnification would be less than the losses the CORPORATION would sustain upon the liquidation of the CLOSED ASSOCIATION through a receivership accompanied by the payment of insurance of accounts.

G. In consideration of the mutual promises contained in this Agreement, the parties enter into the following agreement.

AGREEMENT

§ 1 Definitions. For the purposes of this Agreement the following terms have the indicated meanings:

(a) "Affiliate" or "Affiliates": This term shall be defined pursuant to § 583.15 and § 583.26 of the Regulations for Savings and Loan Holding Companies, 12 C.F.R. §§ 583.15 and 583.26 (1987).

(b) "Bank": The Federal Home Loan Bank of Seattle, Washington.

(c) "Bank Board": The Federal Home Loan Bank Board.

(d) "Book Value":

(1) Except as set forth in paragraph (d)(2) below:

(A) With respect to any Covered Asset reflected on the books and records of the CLOSED ASSOCIATION as of the Effective Date, the value of such asset as so reflected, and as adjusted by the Initial Audit and as thereafter adjusted or determined in accordance with the accounting principles required by this Agreement (but excluding any specific reserve or

valuation allowance for such Covered Asset on the books of the CLOSED ASSOCIATION immediately prior to the Effective Date); provided that with respect to a Covered Asset as defined in § 1(g)(1)(C), Book Value shall be the value of such asset as reflected on the books of the ACQUIRING ASSOCIATION as determined in accordance with the accounting principles required by this Agreement;

(B) With respect to any property or interest therein acquired after the Effective Date through Foreclosure of a lien on a Covered Asset:

(i) The outstanding principal amount of the indebtedness secured by such property (excluding any specific loss reserve relating to such indebtedness);

(ii) Any taxes or hazard insurance premiums accrued or due and payable as of the Effective Date that are subsequently paid by the ACQUIRING ASSOCIATION;

(iii) Costs, fees, and expenses of Foreclosure; provided that any costs, fees, and expenses incurred incident to the acceptance of a deed in lieu of foreclosure, or in connection with the repossession of property sold subject to a sales contract or loan which is in default, shall be included in Book Value only if approved in advance by the CORPORATION;

(iv) Expenses or assessments for the repair, rehabilitation, or completion of property that is a Covered Asset, provided that such expenses and assessments are (I) within the limits permitted by § 11(e) of this Agreement or have been approved in advance by the CORPORATION, (II) have not been reimbursed under another provision of this Agreement and (III) are determined and capitalized in accordance with the accounting principles required by this Agreement;

(v) The expenses, if approved in advance by the CORPORATION, for the removal of a lien upon a Covered Asset or security property for a Covered Asset; provided that such expenses have not been reimbursed under another provision of this Agreement; and

(vi) Any other costs, fees, and expenses associated with the acquisition of any property or interest therein that secures a Covered Asset; provided that such costs, fees, and expenses have not been reimbursed under another provision of this Agreement and have been approved in advance by the CORPORATION.

(2) There shall not be included in the determination of Book Value of Covered Assets under subparagraphs (A) or (B) of paragraph (1) above:

(A) Any amount of specific reserves and valuation reserves of Covered Assets of the CLOSED ASSOCIATION as of the Effective Date, as adjusted by the Initial Audit;

(B) Any amount of accrued and uncollected interest or late charges on the principal amount of the related indebtedness related to such Covered Asset, whether accrued prior to or after the Effective Date;

(C) The undisbursed portion of any loan in process account; provided, however, that disbursements made after the Effective Date pursuant to a legally binding commitment of the CLOSED ASSOCIATION, or with the prior written consent of the CORPORATION, shall not be excluded from Book Value;

(D) The amount of any deferred income related to a Covered Asset, including, without limitation, unearned discounts on loans purchased, unearned profit on real estate sold, deferred loan fees or acquisition credits, unearned discounts on installment loans, deferred gains on securities and other unearned discounts;

(E) With respect to any Covered Asset reflected on the CLOSED ASSOCIATION's books and records immediately prior to the Effective Date, any adjustment to the value of such Covered Asset made solely as a result of the accounting treatment of the Acquisition as a purchase of assets; and

(F) The amount of any net operating income and expenses, determined in accordance with the accounting principles required by this Agreement, that are attributable to Real Estate Owned on the books of the CLOSED ASSOCIATION immediately prior to the Effective Date or acquired as a result of Foreclosure with respect to a Covered Asset.

(3) Notwithstanding the foregoing, unless the CORPORATION expressly permits the write-down of the Book Value of a Covered Asset and a charge to the Special Reserve Account pursuant to § 4(a)(1) and (2) and § 5, no adjustment shall be made in the Book Value of a Covered Asset by reason of any uninsured casualty loss or any anticipated loss on any such asset even though a specific reserve is created for such anticipated loss or the value of such asset is written down pursuant to any regulatory requirement.

(e) "Claim": Any affirmative or defensive claim, demand, or cause of action in law or in equity.

(f) "Covered Asset":

(1) The term "Covered Asset" shall mean the following:

(A) The assets listed in Exhibit A attached hereto or any property securing such assets if such property is acquired by Foreclosure;

(B) Real Estate Owned acquired after the Effective Date as a result of a Foreclosure of any loan constituting a Covered Asset;

(C) Repossessed Personal Property acquired after the Effective Date as a result of a Foreclosure of any loan constituting a Covered Asset;

(D) Any loan, contract or investment made by the ACQUIRING ASSOCIATION in connection with or to facilitate the sale of, or to salvage a Covered Asset, or any property or interest therein received in exchange for a Covered Asset, if, prior to the making of any such loan, contract, investment or exchange of a Covered Asset, the ACQUIRING ASSOCIATION has obtained the CORPORATION's written consent to such transaction and to the treatment as a Covered Asset of such loan, contract, investment or property or interest received in exchange for a Covered Asset;

(2) Notwithstanding the provisions of the preceding subsection 1(f)(1), the term "Covered Asset" shall not include any loan as to which all delinquent interest is collected and which is reinstated as a performing loan in accordance with its original terms for ninety continuous days or more after the Effective Date; provided, that in the event that such a loan subsequently returns to nonperforming status, said loan shall again constitute a Covered Asset.

(3) The term "Covered Asset" shall not include any item not specifically set forth in subparagraph (1) above, including but not limited to:

(A) Any loan, contract or investment made by the ACQUIRING ASSOCIATION in connection with the sale of, or to salvage, a Covered Asset, or any property or interest therein received in exchange for a Covered Asset, unless prior to the making of any such loan, contract, investment or exchange of a Covered Asset, the ACQUIRING ASSOCIATION has obtained the CORPORATION's written consent to such transaction and to the treatment as a Covered Asset of such loan, contract, investment or property or interest received in exchange for a Covered Asset;

(B) The CLOSED ASSOCIATION's office buildings and facilities, any real estate or leasehold interest appurtenant thereto, and any parking lots;

(C) The CLOSED ASSOCIATION's leasehold improvements, office furniture, fixtures, and equipment;

(D) Any real estate held for development of an office site of the CLOSED ASSOCIATION; and

(E) Any property, real or personal, or interest therein, or any asset of any nature or kind that belongs to or is claimed to belong to a Subsidiary of the CLOSED ASSOCIATION, except for any item identified on Exhibit A.

(g) "Covered Asset Loss": The amount:

(1) by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the ACQUIRING ASSOCIATION upon the Liquidation of such Covered Asset; or

(2) of any write-down in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 5 of this Agreement.

(h) "Credit": An amount credited to the Special Reserve Account pursuant to the provisions of § 4(c).

(i) "Debit": An amount charged or debited to the Special Reserve Account pursuant to the provisions of § 4(a).

(j) "Effective Date": The date and time at which the Acquisition becomes effective pursuant to the terms of Bank Board resolutions and applicable law.

(k) "Federal Regulations": The Rules and Regulations for the Federal Savings and Loan System, 12 C.F.R. § 541.1 et seq. (1987), as now or hereafter in effect.

(l) "Foreclosure": Unless specifically indicated otherwise by the context, includes, in addition to foreclosure, (1) the forfeiture of a contract of sale or a contract for deed, (2) a trustee's sale under a deed of trust, (3) the grant of a deed in lieu of foreclosure, (4) the acquisition of title to real

estate pursuant to other comparable procedures allowed under applicable law, (5) the acquisition of title to personal property pursuant to procedures for the enforcement of a security interest in such property under applicable law, and (6) the exercise of rights of possession to or control over personal property arising under contract or applicable law.

(m) "GAAP": Generally accepted accounting principles.

(n) "Initial Audit": The audit conducted pursuant to § 6(b).

(o) "Insurance Regulations": The Rules and Regulations for the Federal Savings and Loan Insurance Corporation, 12 C.F.R. § 561.1 et seq. (1987), as now or hereafter in effect.

(p) "Liquidation": As used in reference to a Covered Asset, Claim, or Related Claim:

(1) A sale of any asset, whether for cash or on other terms, at other than a Foreclosure sale at which the ACQUIRING ASSOCIATION is the purchaser, whether for cash or on other terms; provided however, that the sale of any asset between the ACQUIRING ASSOCIATION and any Affiliate shall not constitute a Liquidation hereunder unless specifically approved in writing by the CORPORATION; or

(2) The release, compromise, satisfaction, settlement, reduction to judgment, or assignment to other than the CORPORATION of any Claim.

(q) "Net Proceeds Received": As used in reference to the amount received by any of the parties hereto upon Liquidation of a Covered Asset, a Related Claim, or a Claim, the amount computed by deducting from the gross proceeds received all reasonable expenses in the form of payments to third parties incurred or paid by the ACQUIRING ASSOCIATION or the CORPORATION with respect to claims assigned to the CORPORATION, in connection with such Liquidation of a Covered Asset or particular Claim; provided that such expenses have not been reimbursed otherwise. Such "reasonable expenses" may include, without being limited to, reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, commissions, inspection fees, escrow fees, title insurance and such other actual and reasonable costs as are directly related to Liquidation of the Covered Asset or particular Claim and are not included in the determination of the actual yield of any such asset for purposes of § 4(a)(9).

(r) "Quarter": A calendar quarter, provided that the first Quarter during the term of this Agreement shall be deemed to include the period, if any, from the Effective Date to and including the last day preceding the first day of the first

full calendar quarter following the Effective Date, and _provided further_, that the last quarter during the term of this Agreement shall be deemed to include the period, if any, from the first day after the last day of the last full calendar quarter during the term of this Agreement to the Termination Date.

(s) "_Real Estate Owned_" or "_REO_": Real estate or such other property acquired by Foreclosure which, following Foreclosure, is not held for investment or for use or development as an office site to be used by the ACQUIRING ASSOCIATION or an Affiliate thereof.

(t) "_Reimbursable_": As used in describing a liability, loss, Claim, or Related Claim of the ACQUIRING ASSOCIATION, "Reimbursable" shall mean a liability, loss or claim as to which the ACQUIRING ASSOCIATION had a right to reimbursement under any bond, insurance policy or other source, but as to which the ACQUIRING ASSOCIATION does not receive reimbursement due to its failure to timely or vigorously pursue such right in accordance with the management standard described in § 10(a)(1).

(u) "_Related Claim_": Any counterclaim, offset, insurance settlement or other Claim which may result in a recovery by the ACQUIRING ASSOCIATION and which is related to a Covered Asset, or to a Claim or liability for which the CORPORATION is obligated to indemnify the ACQUIRING ASSOCIATION under § 7(a).

(v) "Repossessed Personal Property": An item of personal property acquired by Foreclosure of a Covered Asset.

(w) "Special Reserve Account": The Special Reserve Account established pursuant to § 4.

(x) "Subsidiary": Any corporation, service corporation or other entity 25 percent or more owned, directly or indirectly, by the CLOSED ASSOCIATION as of the Effective Date.

(y) "Termination Date": The date five (5) years after the Effective Date.

§ 2 Conditions.

(a) The CORPORATION's obligations pursuant to this Agreement are subject to the following conditions:

(1) The execution and delivery simultaneously herewith of the Acquisition Agreement, and the occurrence of the Effective Date;

(2) Receipt of an opinion from outside counsel for the ACQUIRING ASSOCIATION, in form and substance satisfactory to the CORPORATION and its counsel, to the effect that (i) the Acquisition has been duly authorized by the Directors of the Acquiring Association and effected in compliance with the charter and by-laws of the ACQUIRING ASSOCIATION and with applicable law; (ii) this Agreement, the Acquisition

Agreement, and any other agreements executed by the ACQUIRING ASSOCIATION in connection with the Acquisition have been duly authorized, executed and delivered, and constitute the valid and binding obligations of the ACQUIRING ASSOCIATION which are enforceable in accordance with their terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors, and principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). Such opinion may be qualified as an opinion only on the laws of the State of Washington and the federal laws of the United States;

(3) Receipt of a certified copy of the corporate resolutions of the ACQUIRING ASSOCIATION authorizing the Acquisition and the execution and delivery on the behalf of the ACQUIRING ASSOCIATION of this Agreement, the Acquisition Agreement, and any other agreements or instruments executed by the ACQUIRING ASSOCIATION in connection with the Acquisition.

(4) All corporate and other proceedings taken in connection with the Acquisition, and all documents incident thereto, being satisfactory in form and substance to the CORPORATION and its counsel, and the CORPORATION and its counsel having received all such counterpart originals or certified or other copies of such documents as either may reasonably request; and

(5) The ACQUIRING ASSOCIATION and any of its Affiliates and Subsidiaries, within the time periods specified by the terms of this Agreement or by the Bank Board, (i) having executed and delivered to the CORPORATION all other agreements, instruments and documents required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Acquisition and any related transactions, and (ii) having taken all other actions imposed, in any action taken by the Bank Board approving the Acquisition or any related transactions, as conditions herein to the CORPORATION's obligation to provide assistance and indemnification hereunder.

(b) The ACQUIRING ASSOCIATION's obligations pursuant to this Agreement are conditioned upon (i) the execution and delivery simultaneously herewith of the Acquisition Agreement; (ii) the CORPORATION certifying for purposes of § 368(a)(3)(D) of the Internal Revenue Code of 1986 that the ground for appointment of a conservator or a receiver set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exists with respect to the CLOSED ASSOCIATION or will exist in the near future in the absence of action by the Bank Board; (iii) receipt of a Forbearance Letter from the CORPORATION or its designee; and (iv) receipt of a certified copy of the Federal Home Loan Bank Board's resolutions pursuant to this transaction.

§ 3 Contributions.

(a) Initial Contribution by the CORPORATION.

(1) If the conditions set forth in § 2 have been satisfied, within five business days after the Effective Date the CORPORATION shall wire transfer to the account of the ACQUIRING ASSOCIATION at the Bank immediately available funds in the amount of $11,730,128.

(2) For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by GAAP, the cash contribution made under § 3(a)(1), shall be credited to the ACQUIRING ASSOCIATION'S regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the CORPORATION that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

(b) Debit Balances. Within 30 days after receipt of each Quarterly Report required pursuant to § 9(a) or within 90 days of the final accounting required pursuant to § 9(g), the CORPORATION shall contribute to the ACQUIRING ASSOCIATION, by

deposit into the ACQUIRING ASSOCIATION's account at the Bank, an amount equal to the Debit balance of the Special Reserve Account that is not offset by Credits due to the CORPORATION. After the Termination Date, amounts payable to the ACQUIRING ASSOCIATION by the CORPORATION pursuant to § 7 shall be paid in a like manner.

(c) Contributions Resulting from the Purchase of Covered Assets. In the event that the CORPORATION exercises its right to purchase a Covered Asset pursuant to § 14, the excess, if any, of the purchase price paid by the CORPORATION over the fair market value of such asset, shall be deemed to be a contribution by the CORPORATION. Fair market value shall be determined, at the election of the CORPORATION, by (1) agreement of the CORPORATION and the ACQUIRING ASSOCIATION, or (2) an independent appraisal accepted by the CORPORATION.

(d) Contributions Resulting from Assignment of Claims. The amount of any payment made by the CORPORATION in excess of the fair market value of any Related Claim assigned to the CORPORATION pursuant to § 13, shall be deemed to be a contribution by the CORPORATION. Fair market value may be determined, at the election of the CORPORATION, by agreement of the CORPORATION and the ACQUIRING ASSOCIATION, or by an appraisal by an independent appraiser approved by the CORPORATION, the cost of which appraisal shall be paid by the CORPORATION.

(e) Reimbursement of Credit Balances.

(1) Within 30 days after the CORPORATION's receipt of each Quarterly Report, the ACQUIRING ASSOCIATION shall remit to the CORPORATION an amount equal to the aggregate amount of the net Credit balance of the Special Reserve Account as of the last day of the Quarter reported in such Quarterly Report; provided that if such amount exceeds the total of the contributions made by the CORPORATION to date and not repaid, then the ACQUIRING ASSOCIATION shall remit to the CORPORATION only so much of such amount as equals the total of such contributions, and the excess, if any, shall remain as a Credit balance in the Special Reserve Account.

(2) Within 90 days after rendering the final accounting required under § 9(g), the ACQUIRING ASSOCIATION shall remit to the CORPORATION an amount equal to the aggregate net Credit balance in the Special Reserve Account as of the Termination Date; provided that the amount so remitted shall not exceed the total contributions made by the CORPORATION under this Agreement and not repaid.

(f) Adjustments. Any contribution or payment made by the CORPORATION or the ACQUIRING ASSOCIATION pursuant to this Agreement, any Credit or Debit to the Special Reserve Account, or any accounting or report furnished by the ACQUIRING ASSOCIATION under this Agreement shall be subject to adjustment if it subsequently is determined that such contribution, payment,

Credit, Debit, accounting, or report was based upon error, or upon a tax determination that has been subsequently adjusted, or was not computed in accordance with the accounting principles prescribed by this Agreement, or, without the approval of the CORPORATION, was otherwise inconsistent with the terms of this Agreement.

(g) Repayment. In the event that, by order issued prior to the Termination Date, a court of competent jurisdiction directs the ACQUIRING ASSOCIATION to divest itself of the assets it acquired and the liabilities it assumed from the CLOSED ASSOCIATION, and such order becomes final, the contribution made by the CORPORATION pursuant to §§ 3(a)(1), (c) and (d) and all amounts debited to the Special Reserve Account pursuant to § 4(a)(1) shall be repaid to the CORPORATION by the ACQUIRING ASSOCIATION, and the Acquisition Agreement shall be rescinded. This § 3(g) shall survive the Termination Date.

§ 4 Special Reserve Account. The ACQUIRING ASSOCIATION shall establish as of the Effective Date a single memorandum account, with an opening balance of zero, to be called the Special Reserve Account, and shall maintain such account solely for the purposes of, and in accordance with, the provisions of this Agreement, without limitation of its duty to maintain its books and records in accordance with proper accounting procedures and the Insurance Regulations.

(a) Debits to Special Reserve Account. The ACQUIRING ASSOCIATION may, following the Effective Date, charge as Debits to the Special Reserve Account amounts equal to each of the following items:

(1) Capital Losses on Covered Assets. Seventy-five (75%) percent of each Covered Asset Loss, until such time as the remaining twenty-five (25%) percent share of Covered Assets Losses reaches a total of nine hundred thousand ($900,000) dollars, after which time one hundred (100%) percent of each Covered Asset Loss may be charged as a Debit to the Special Reserve Account;

(2) Appraisal Costs. The cost of any independent appraisal required by the CORPORATION pursuant to this Agreement and paid for by the ACQUIRING ASSOCIATION; provided that the appraiser selected by the ACQUIRING ASSOCIATION and the cost of appraisal have been approved in advance by the CORPORATION; and provided further, that the ACQUIRING ASSOCIATION shall instruct the appraiser (A) to deem both the ACQUIRING ASSOCIATION and the CORPORATION as its clients and (B) to conduct the appraisal in accordance with standards approved by the Bank Board;

(3) Payment of Credits. The amount of any payments made by the ACQUIRING ASSOCIATION to eliminate a Credit balance in the Special Reserve Account;

(4) Indemnification. The amounts owed by the CORPORATION under § 7(a);

(5) Related Claim Expenses. The amount of the reasonable costs and expenses incurred by the ACQUIRING ASSOCIATION in pursuit of a Related Claim and reimbursable by the CORPORATION pursuant to § 7(b);

(6) Assignment of Related Claim. The Book Value reflected on the CLOSED ASSOCIATION's books immediately prior to the Effective Date of a Related Claim assigned to the CORPORATION pursuant to § 13;

(7) Expense to Cure. The amount of payments or costs incurred with the CORPORATION's prior approval in order to cure or salvage any Covered Asset or prevent a substantial deterioration in value of a Covered Asset, provided that such payments or costs are not appropriately capitalized under GAAP;

(8) Tax Benefit Adjustment Payments. Any amount permitted to be debited to the Special Reserve Account pursuant to § 4(c)(6)(F).

(9) Yield Subsidy. (A) With respect to all assets which are, as of the Effective Date, or which become, prior to the Termination Date, Covered Assets, amounts, determined and charged at the end of each Quarter prior to the Termination Date, equal to the excess, if any, of (i) the

Guaranteed Yield Amount, as computed below, over (ii) the actual yield, whether positive or negative, during such Quarter on such Covered Assets, such actual yield to include all interest and other income received or accrued which is attributable to such Covered Assets, including, specifically, with respect to Real Estate Owned, any net operating income or net operating loss; provided, that if during any Quarter during the Term of this Agreement the actual yield exceeds the Guaranteed Yield Amount provided for hereunder, there shall be a credit calculated and applied at the end of each calender year during the term of this Agreement to the Special Reserve Account for the amount of such excess, as provided in § 4(c)(7), but only to the extent such amount to be credited does not exceed the aggregate amount debited to the Special Reserve Account pursuant to this § 4(a)(9) during such calendar year. Net operating income or operating loss on Real Estate Owned shall be determined by deducting all expenses directly attributable to such real estate, specifically excluding, however, depreciation and the ACQUIRING ASSOCIATION's administrative and overhead expenses, from the gross income attributable to such real estate.

(B) The Guaranteed Yield Amount for any Quarter constituting a full calendar quarter shall be computed by multiplying the Average Book Value of such Covered Assets for such Quarter (determined for a given Quarter by adding the Book Value of such Assets on the first day of the Quarter and on the

last day of each calendar month ending within the Quarter and dividing the sum by 4) by the Guaranteed Yield Percentage. The Guaranteed Yield Percentage shall be one-fourth of the sum of (i) the Average Treasury Bill Rate plus (ii) 150 basis points. (The Average Treasury Bill Rate shall be determined (i) for a given full calendar quarter, by adding the rate (stated as a percentage) on six-month Treasury Bills on the first day of the Quarter and on the last day of each calendar month ending within the Quarter as reported in The Wall Street Journal for each such day and dividing the sum by 4; and (ii) in the event the first Quarter during the term of this Agreement or the last part of the period prior to the Termination Date does not constitute a full calendar quarter, by adding the rate (stated as a percentage) on six-month Treasury Bills on the first day of the Quarter and on the last day of each calendar month ending within the Quarter or portion thereof as reported in The Wall Street Journal for each such day and dividing the sum by the total number of such first and last days.) In the event the first Quarter during the term of this Agreement or the last part of the period prior to the Termination Date does not constitute a full calendar quarter, the Guaranteed Yield Amount for such Quarter or portion thereof shall be the product of (i) the Average Book Value of such Covered Assets for such Quarter or portion thereof (determined by adding the Book Value of such Assets on the first day of the Quarter and on the last day of each calendar month ending within the Quarter or portion thereof and dividing the sum by the total number of

such first and last days) multiplied by a fraction (the numerator of which shall be the number of days during which this Agreement was in effect in such Quarter or portion thereof and the denominator of which shall be 365) and (ii) the Guaranteed Yield Percentage.

(C) In the event of reinstatement of a loan to income-producing status and collection of delinquent interest in accordance with the original terms of such loan so that such loan ceases to be a Covered Asset, the Guaranteed Yield Amount for any previous Quarter that included such loan in the determination of Average Book Value for all or any portion of such Quarter shall be recalculated excluding such loan, and the sum of the differences between the Guaranteed Yield Amount as recalculated and as originally calculated for each such Quarter shall be a credit to the Special Reserve Account as provided in § 4(c)(7). The calculation of the credit to be made to the Special Reserve Account, if any, pursuant to this § 4(a)(9)(C) shall be made at the end of each Quarter for all loans which cease to be Covered Assets during such Quarter.

(D) The debits to the Special Reserve Account made by the ACQUIRING ASSOCIATION under this paragraph 9 for any quarterly period prior to the Termination Date shall be computed in accordance with the accounting principles set forth in § 16.

(b) Exclusions from Debits. The ACQUIRING ASSOCIATION may not debit the Special Reserve Account and shall not seek reimbursement from the CORPORATION for:

(1) Any of the expenses or costs of the ACQUIRING ASSOCIATION incident to the Acquisition not specifically reimbursed by this Agreement;

(2) Any increase in the operating expenses of the ACQUIRING ASSOCIATION as a result of the Acquisition or the administration and management of the assets and liabilities of the CLOSED ASSOCIATION not specifically reimbursed by this Agreement;

(3) Any loss, charge, or expense to the extent caused by the ACQUIRING ASSOCIATION'S failure to comply with the management standard set forth in § 10(a) of this Agreement in its administration of the assets and liabilities of the ACQUIRED ASSOCIATION after the Effective Date;

(4) That portion of any loss, charge, or expense actually recovered or reasonably expected to be recovered by the ACQUIRING ASSOCIATION under any insurance policy or bond or other comparable provision for funding;

(5) Any expenses of the ACQUIRING ASSOCIATION incurred in the administration of this Agreement, including, but not limited to, compensation paid to employees or agents of

the ACQUIRING ASSOCIATION for services performed in connection with the preparation of reports and supporting documentation required to be filed with the CORPORATION under § 9; and

(6) The write-down of the Book Value of any Covered Asset if the CORPORATION has denied the ACQUIRING ASSOCIATION's application pursuant to § 5(b) to write down such asset, or if the CORPORATION has approved the application with modifications or conditions that the ACQUIRING ASSOCIATION has not met.

(c) Credits to the Special Reserve Account. The ACQUIRING ASSOCIATION shall promptly credit each of the following items to the Special Reserve Account:

(1) Other Recoveries on Covered Assets. One hundred (100%) percent of the amount of any recovery or benefit realized by the ACQUIRING ASSOCIATION in satisfaction of or recovery on any Covered Asset in excess of Book Value or, if such Covered Asset has been written down pursuant to § 5, in excess of Book Value as so written down, including but not limited to, any recoveries on any claim or judgment related to or in connection with such Covered Asset;

(2) Refunds. The amount of any refund received by the ACQUIRING ASSOCIATION with respect to payments or expenditures made by the CLOSED ASSOCIATION prior to the Effective Date;

(3) Offset Gains. Any amount the ACQUIRING ASSOCIATION recovers from other than the CORPORATION, whether by counterclaim, offset, insurance settlement or otherwise, with respect to any liability or Claim (including any Related Claim) as to which the ACQUIRING ASSOCIATION debited the Special Reserve Account;

(4) Recoveries on Related Claims. Any proceeds received upon the Liquidation by the ACQUIRING ASSOCIATION of any Related Claim to the extent such Claim is not reflected on the books of the CLOSED ASSOCIATION immediately prior to the Effective Date;

(5) CORPORATION's Contributions. Contributions made by the CORPORATION to eliminate a Debit balance in the Special Reserve Account;

(6) Tax Benefits. (A) The amount of the net tax benefits, if any, realized by the ACQUIRING ASSOCIATION or any consolidated group of which the ACQUIRING ASSOCIATION is a member ("Taxable Party") in any tax year ending subsequent to the Effective Date calculated as provided in § 4(c)(6)(B) ("Net Tax Benefits"). For purposes of this Agreement, the Net Tax Benefits are the tax benefits that are attributable to the following items ("Tax Benefit Items") and that are utilized by the Taxable Party to reduce its tax liability in a given tax year as calculated in § 4(c)(6)(B) below:

(i) Any federal, state or local income tax carryovers of net operating losses, capital losses, charitable contributions or business credits attributed to the CLOSED ASSOCIATION through the Effective Date. For any year or period subsequent to the Effective Date, the Taxable Party shall apply the carryovers available to it on the basis of the oldest carryovers first, whether of the CLOSED ASSOCIATION or otherwise, provided, that if some, but not all, of any net operating losses incurred during the same year, whether of the CLOSED ASSOCIATION or otherwise, are used as loss carryovers in subsequent years, the Taxable Party shall apply such net operating loss carryovers according to a ratio corresponding to the relationship between the percentage of such oldest net operating loss carryovers which are net operating losses of the CLOSED ASSOCIATION and the percentage of such oldest net operating loss carryovers which are other net operating losses.

(ii) any cost, expense or loss (1) which is incurred by the ACQUIRING ASSOCIATION, (2) for which the CORPORATION has made assistance payments to the ACQUIRING ASSOCIATION pursuant to § 7(a) or (b) or § 18(c), and (3) which is deductible on the ACQUIRING ASSOCIATION's federal or state income tax return.

(B) The Net Tax Benefits for a taxable year shall be equal to the sum of:

(i) the excess, if any, of

(1) the federal, state and local income tax liability for such taxable year, taking into account all allowable carryovers and carrybacks to such taxable year, which would have been imposed on the Taxable Party if the Tax Benefit Items described in § 4(c)(6)(A) had not been utilized in any taxable year over

(2) the federal, state and local income tax liability for such taxable year, taking into account all allowable carryovers and carrybacks to such taxable year, which would have been imposed on the Taxable Party if the Tax Benefit Items described in § 4(c)(6)(A)(ii) above had been utilized in any taxable year and if the Tax Benefit Items described in § 4(c)(6)(A)(i) above had not been utilized in any taxable year; and

(ii) fifty percent (50%) of the excess, if any, of

(1) the federal, state and local income tax liability for such taxable year, calculated as provided in § 4(c)(6)(B)(i)(2) above, over

(2) the federal, state and local income tax liability for such taxable year, taking into account all allowable carryovers and carrybacks to such taxable year, actually imposed on the Taxable Party.

(C) Net Tax Benefits shall be credited to the Special Reserve Account at the time prescribed by law for the filing, including extensions, of the federal income tax return of the Taxable Party for the taxable year in which such Net Tax Benefits are realized (including by way of carryovers and carrybacks);

(D) In the event Net Tax Benefits are credited or paid with respect to Tax Benefit Items that are subsequently disallowed, or that cease to be Tax Benefit Items because it is determined that payments with respect to losses otherwise described in § 4(c)(6)(A) were not allowable, such Net Tax Benefits shall be debited to the Special Reserve Account or shall be paid by the CORPORATION to the ACQUIRING ASSOCIATION as set forth in § 4(c)(6)(F);

(E) The ACQUIRING ASSOCIATION shall, upon request of the CORPORATION, provide copies of the tax returns and amended tax returns of itself and of the consolidated group, if any, of which it is a member, for any taxable year(s) that are specified by the CORPORATION and relevant to the determination of a Credit or Debit to the Special Reserve Account or payments required to be made to the CORPORATION or to the ACQUIRING ASSOCIATION pursuant to this § 4(c)(6);

(F) Repayments or payments by the CORPORATION required by this § 4(c)(6) shall be effected by a

Debit to the Special Reserve Account, if made prior to the Termination Date, and by a cash payment or wire transfer within ten days after the CORPORATION's receipt of written demand for payment, if made after the Termination Date; provided that in either case the CORPORATION shall receive a full written explanation of the basis for its payment obligation; and provided, further, that the ACQUIRING ASSOCIATION has complied with § 10(c) with respect to the Tax Benefit Items or Net Tax Benefits that are subject to adjustment and thereby create the CORPORATION's payment obligation; and

(G) This § 4(c)(6) shall survive the Termination Date. After the Termination Date, the ACQUIRING ASSOCIATION shall pay to the CORPORATION by cash payment or wire transfer amounts equal to all Net Tax Benefits that prior to the Termination Date would have been credited to the Special Reserve Account. The ACQUIRING ASSOCIATION agrees to use its best efforts, cooperate fully with the CORPORATION, and take all such actions as are necessary to implement the provisions of this § 4(c)(6).

(7) Excess and Recalculated Yield. With respect to the Covered Assets for which the CORPORATION provided a yield subsidy pursuant to § 4(a)(9), the amount of any excess of actual yield over the Guaranteed Yield Amount on such Covered

Assets as provided in § 4(a)(9)(A), and the amount of any credit resulting from a recalculation as provided in § 4(a)(9)(C).

§ 5 Write-down of a Covered Asset.

(a) Except with the prior written approval of the CORPORATION, the ACQUIRING ASSOCIATION shall undertake to liquidate each Covered Asset in accordance with the terms of this Agreement prior to applying to the CORPORATION for permission to write down any such Covered Asset's Book Value, which permission the CORPORATION shall not unreasonably withhold. Notwithstanding the preceding sentence, if the ACQUIRING ASSOCIATION determines that Liquidation of a Covered Asset would produce Net Proceeds Received less than the amount of Book Value of the asset, it may apply immediately to the CORPORATION for such permission.

(b) With respect to any Covered Asset, the amount of any write-down shall be determined as follows:

(1) The CORPORATION may require the ACQUIRING ASSOCIATION to write down the Book Value of any Covered Asset, and such write-down shall be debited to the Special Reserve Account in accordance with the terms of § 4(a)(1).

(2) Within 30 days of receipt of an application from the ACQUIRING ASSOCIATION setting forth the grounds for the ACQUIRING ASSOCIATION's opinion that the value of a Covered Asset is less than its Book Value, the CORPORATION may:

(A) Approve the application, with or without modifications or conditions, and permit the ACQUIRING ASSOCIATION to write down the asset's Book Value and Debit such write-down to the Special Reserve Account in accordance with the terms of this Agreement;

(B) Deny the application, in which case the CORPORATION shall direct the ACQUIRING ASSOCIATION to take such action with respect to such Covered Asset as the CORPORATION deems reasonably necessary or appropriate; or

(C) Require the ACQUIRING ASSOCIATION to submit additional information, including, but not limited to, an independent appraisal. Within 30 days after the CORPORATION'S receipt of any additional information, the CORPORATION shall approve, with or without modifications or conditions, or deny such application, in which case the CORPORATION shall direct action by the ACQUIRING ASSOCIATION as provided in paragraph (B) above.

§ 6 Inventory and Initial Audit. As soon as is practicable after the Effective Date, the CORPORATION, at its own expense but with the reasonable assistance of the ACQUIRING ASSOCIATION's personnel, whose salaries and expenses shall be paid by the ACQUIRING ASSOCIATION without reimbursement from the CORPORATION, shall:

(a) Prepare an inventory of all assets and liabilities of the CLOSED ASSOCIATION and any Subsidiaries. Such inventory shall be limited to such assets and liabilities as are shown on the books of the CLOSED ASSOCIATION and any Subsidiaries as of the Effective Date or as are reasonably ascertainable during the preparation of the inventory. A copy of the inventory, in such form as the CORPORATION shall determine, will be furnished to the ACQUIRING ASSOCIATION upon completion and approval by the CORPORATION;

(b) Conduct an audit of the CLOSED ASSOCIATION in accordance with generally accepted auditing standards, as modified by the CORPORATION or the Bank Board. A copy of the Initial Audit, in such form as the CORPORATION shall determine, shall be furnished to the ACQUIRING ASSOCIATION upon completion and approval by the CORPORATION. The scope of such audit shall be limited to that which the CORPORATION determines to be necessary to implement this Agreement and shall not include a revaluation of the assets of the CLOSED ASSOCIATION.

§ 7 <u>Indemnification for Undisclosed Liabilities, Unreserved-for Claims and Litigation Challenging the Acquisition</u>.

(a) <u>Indemnifications</u>. To the extent not otherwise reimbursed or Reimbursable, the CORPORATION will indemnify the ACQUIRING ASSOCIATION for, and pay, as provided in § 4(a),

(i) amounts actually incurred and paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of the following Claims and challenges to the Acquisition, and (ii) the reasonable costs and expenses of litigation related to such Claims and to the defense of such challenges to the Acquisition, including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in connection with such satisfaction, settlement, or compromise, provided that before such costs and expenses may be debited to the Special Reserve Account, the ACQUIRING ASSOCIATION shall comply with the covenants set forth in § 10; and provided further, that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 7(a); and provided further, that the reports required by § 9(a) and (c), in forms which are satisfactory to the CORPORATION, shall be submitted to the CORPORATION before such costs and expenses shall be paid by the CORPORATION pursuant to § 4(a); and provided further, that the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for such amounts as relate to liabilities or Claims described in this § 7 with respect to any Subsidiary only to the extent of the ACQUIRED ASSOCIATION's investment, which shall be deemed to include both debt and equity, in such Subsidiary as of the Effective Date.

(1) Undisclosed Liabilities. Except as provided in this § 7(a)(1), any liabilities of the CLOSED ASSOCIATION that were not disclosed in or reflected as a liability on the books of the CLOSED ASSOCIATION immediately prior to the Effective Date and which, under GAAP as of the Effective Date consistently applied, are of the type that are reserved for, disclosed or reflected as liabilities but excluding any inadequacy in (or lack of) an asset valuation allowance or specific reserve, provided that in the event that the satisfaction, settlement, or compromise of any such liability or liabilities described in this § 7(a)(1) results in the acquisition by the ACQUIRING ASSOCIATION of an asset or assets, then, at the CORPORATION's election, (A) the ACQUIRING ASSOCIATION shall assign such asset or assets to the CORPORATION without cost to the CORPORATION, or (B) the amount paid by the CORPORATION pursuant to § 7(a) shall be limited to the amount, if any, by which the amounts paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement or compromise of such liability or liabilities exceed the fair market value of the asset or assets, if any, acquired as a consequence of the satisfaction, settlement, or compromise of such liability or liabilities, as determined (i) by agreement between the ACQUIRING ASSOCIATION and the CORPORATION or (ii) by an appraisal performed by an independent appraiser approved by the CORPORATION, the cost of which appraisal shall be paid by the ACQUIRING ASSOCIATION. The CORPORATION's obligation to provide indemnification under this

§ 7(a)(1) shall not extend to liabilities of the CLOSED ASSOCIATION incurred prior to the Effective Date (A) which normally recurred in the CLOSED ASSOCIATION's ordinary course of business and operations, (B) which are ordinarily posted on the books on a periodic basis, and (C) which are in amounts that are materially the same as and can reasonably be predicted from prior postings on the books, including, but not limited to, items such as (i) accrued employee salaries, (ii) utility bills, (iii) accrued interest due to depositors and accountholders, and (iv) accrued interest payable to the Bank, or any other lender to the CLOSED ASSOCIATION or any Subsidiary thereof; <u>provided</u> that, with respect to accrued interest payable to a lender, the underlying obligation to pay principal is reflected on the books.

(2) <u>Unreserved-for Claims</u>. Any Claim against the CLOSED ASSOCIATION, or any Subsidiary thereof, or the ACQUIRING ASSOCIATION as successor to the CLOSED ASSOCIATION, based upon any act or failure to act on the part of the CLOSED ASSOCIATION prior to the Effective Date, whether filed before or after such date, to the extent that such Claim (A) was not adequately reserved for or provision was not made for its payment on the books of the CLOSED ASSOCIATION prior to the Effective Date, and (B) is not fully reimbursed or Reimbursable under any insurance policy, bond, or other provision for funding.

(3) <u>Challenges to the Acquisition</u>. Any action brought by other than the ACQUIRING ASSOCIATION or its

Subsidiaries, Affiliates, creditors, or stockholders, if any, within a period of one year following the Effective Date, to challenge or set aside the Acquisition or this Agreement, to the extent that such action is grounded upon an allegation that an act or failure to act on the part of the Bank Board or the CORPORATION was not in accordance with the Bank Board's or the CORPORATION's enabling legislation, and, in the event that a court of competent jurisdiction, by final order, directs the ACQUIRING ASSOCIATION to divest itself of the assets or liabilities of the CLOSED ASSOCIATION on such ground, the reasonable costs and expenses of such divestiture and any damages due to a breach of contract caused directly by such divestiture; <u>provided</u> that such damages are directly attributable to such act or failure to act on the part of the Bank Board or the CORPORATION.

(b) <u>Pursuit of Related Claims</u>. The ACQUIRING ASSOCIATION shall use its best efforts to reduce or minimize the CORPORATION's indemnity payments under this section by the pursuit of Related Claims. The CORPORATION shall indemnify the ACQUIRING ASSOCIATION for reasonable and related costs and expenses, and such other actual and reasonable costs as may be actually incurred and paid by the ACQUIRING ASSOCIATION in complying with this § 7(b), <u>provided</u> that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 10; and <u>provided further</u>, that the pursuit of Related Claims shall be subject to approval by the CORPORATION, and the reports required by § 9(a)

and (c), in forms satisfactory to the CORPORATION, shall be submitted to the CORPORATION before costs and expenses related to the pursuit of Related Claims shall be paid by the CORPORATION pursuant to § 4(a). All sums recovered from each such Related Claim shall be credited to the Special Reserve Account pursuant to § 4(c) of this Agreement. The CORPORATION's right to recovery on any Related Claim shall survive the termination of this Agreement and shall be paid in cash after such date.

(c) Payments as Contributions. All payments made by the CORPORATION to the ACQUIRING ASSOCIATION under this § 7 shall be considered contributions under this Agreement.

(d) Scope of Indemnifications. The indemnifications provided for in § 7(a) above shall not extend to capital losses on or attributable to assets of the CLOSED ASSOCIATION or which the ACQUIRING ASSOCIATION could be obligated to purchase pursuant to an obligation of the CLOSED ASSOCIATION, including any obligation that the ACQUIRING ASSOCIATION may have to fund commitments of the CLOSED ASSOCIATION.

§ 8 Duplicate Payments. Any cost or expense for which the ACQUIRING ASSOCIATION has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not also be reimbursed to the ACQUIRING ASSOCIATION, or be paid over to or retained by the CORPORATION, under any other

section of this Agreement, even though such cost, expense or recovery may be described in whole or in part in two or more sections of this Agreement.

§ 9 Reports; Records. In the event of the failure of the ACQUIRING ASSOCIATION, where appropriate, to comply with any of the following requirements, the CORPORATION may delay payment of a related charge for reimbursement under this Agreement until, in the CORPORATION's judgment, such requirement is met:

(a) Quarterly Reports. Within 30 days following the end of each Quarter, the ACQUIRING ASSOCIATION shall furnish a report or reports to the CORPORATION, in a format approved by the CORPORATION and supported by such data as, in the CORPORATION'S judgment, may be necessary to verify the report, which shall include:

(1) An accounting of all Debits and Credits to the Special Reserve Account;

(2) Status reports on all current and potential Claims and liabilities (with litigation evaluation reports) that might result in a Debit or Credit to the Special Reserve Account, other than litigation in connection with an uncontested Foreclosure action;

(3) Itemization of payments made by and due from the CORPORATION, which, with respect to charges by the

ACQUIRING ASSOCIATION for reimbursement of attorneys' and accountants' fees pursuant to § 7, shall be supported by the following documentation and by such other documentation as the CORPORATION may request:

(A) Copies of itemized statements of charges received by the ACQUIRING ASSOCIATION from each law firm and accounting firm, which statements shall specify with respect to each Claim, undisclosed liability, cause of action challenging the Acquisition or other matter with respect to which reimbursement is sought: (i) the nature and resulting work product of each of the services performed by each individual attorney and accountant; (ii) the identity of the person who performed each service; (iii) the date on which each service was performed; (iv) the hourly rate charged for each service; and (v) the total number of hours billed for such services; and

(B) Copies of any letters, contracts or other documents which set forth the agreements between the ACQUIRING ASSOCIATION and such law firms or accounting firms concerning the basis on which fees and other compensation due such attorneys or accountants from the ACQUIRING ASSOCIATION are to be computed, and litigation evaluation reports current within 30 days; and

(4) Payments made by and due from the ACQUIRING ASSOCIATION.

(b) Reports on Covered Assets. The ACQUIRING ASSOCIATION shall submit to the CORPORATION reports concerning Covered Assets. Such reports shall be in a form satisfactory to the CORPORATION and shall be submitted within 30 days of the end of each Quarter prior to the Termination Date unless for good cause the CORPORATION extends the time for submission of any report.

(c) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities.

(1) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(i), to engage attorneys or accountants the cost of whose services may be debited to the Special Reserve Account, or otherwise to incur expenses which may be debited to the Special Reserve Account under § 4(a) in connection with the pursuit of a Related Claim, the ACQUIRING ASSOCIATION, promptly upon determining the necessity to engage such attorneys or accountants or otherwise to incur such expenses, shall obtain and submit to the CORPORATION information, in a form satisfactory to the CORPORATION, supported by such supplementary documentation as in the opinion of the CORPORATION is reasonable and necessary to enable the CORPORATION to give informed consent to the ACQUIRING ASSOCIATION's engaging such attorneys or accountants or otherwise incurring such expenses, which information shall include, but shall not be limited to, the following:

(A) the parties to the dispute and the relationships among them;

(B) the nature of the dispute and the basic facts concerning the dispute; and

(C) a description of the specific actions taken by the ACQUIRING ASSOCIATION in pursuit of such Related Claim prior to determining the need to engage attorneys or accountants or otherwise to incur expenses in pursuit of or defense against any such Claim.

(2) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(ii), to prosecute any Related Claim by court action, the ACQUIRING ASSOCIATION, promptly upon determining the necessity for such court action, shall obtain and submit to the CORPORATION a report and evaluation prepared by the attorney handling such Related Claim in a form that is, in the opinion of the CORPORATION and its counsel, reasonable and satisfactory, supported by such supplementary documentation as in the opinion of the CORPORATION or its counsel is reasonable and necessary to enable the CORPORATION to give informed consent to the prosecution of such Related Claim by court action, which report shall include, but shall not be limited to, the following:

(A) the parties to the dispute and the relationships among them;

(B) the nature of the dispute and the basic facts concerning the dispute;

(C) a discussion of the causes of action raised by the dispute and the defenses to such causes of action, including (i) citations to relevant statutes and significant case law, and (ii) the attorney's evaluation of the merits of such causes of action and defenses; and

(D) the attorney's estimate of (i) the time involved in prosecuting the Related Claim by court action, and (ii) the foreseeable costs and expenses, including attorneys' fees, which will be incurred in prosecuting the Related Claim by court action.

(3) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(iii) or (iv), to enter into a binding commitment with respect to the satisfaction, settlement, or compromise of any Related Claim, Claim, liability or challenge to the Acquisition described in § 7(a), the ACQUIRING ASSOCIATION, promptly upon determining that the satisfaction, settlement, or compromise of any such Claim, liability or challenge is appropriate, shall obtain and submit to the CORPORATION a report and evaluation prepared by the attorney handling any such Claim, liability or challenge, in a form that is, in the opinion of the CORPORATION and its counsel, reasonable and satisfactory, supported by such supplementary documentation as in the opinion

of the CORPORATION or its counsel is reasonable and necessary to enable the CORPORATION to give informed consent to the satisfaction, settlement, or compromise of such Claim, liability or challenge, which report and supporting documentation shall include, but shall not be limited to, the following:

(A) the information required by subparagraphs (2)(A)-(D) of this § 9(c);

(B) information concerning the status of litigation regarding the Claim, liability or challenge if litigation has been instituted, and, at the request of the CORPORATION, copies of all pleadings or other documents which have been filed in connection with such litigation; and

(C) the precise terms of the proposed satisfaction, settlement, or compromise and the attorney's basis for recommending the proposed satisfaction, settlement, or compromise of such Claim or liability.

(d) Other Reports.

(1) Unless waived by the CORPORATION, in each year the ACQUIRING ASSOCIATION shall submit a report to the CORPORATION, prepared by the ACQUIRING ASSOCIATION's independent auditors and in a form satisfactory to the CORPORATION, showing the total Tax Benefit Items available to the ACQUIRING ASSOCIATION, or any consolidated group of which the ACQUIRING ASSOCIATION is a member ("Taxable Party"), the total Tax Benefit Items,

if any, utilized in such year, and the calculation of the Net Tax Benefits as defined in § 4(c)(6), if any, for such year. Such report shall be submitted, regardless of whether any Net Tax Benefits have been realized by the ACQUIRING ASSOCIATION or any Taxable Party, on the date Net Tax Benefits, if any, are required to be credited to the Special Reserve Account or paid to the CORPORATION pursuant to § 4(c)(6)(C).

(2) The ACQUIRING ASSOCIATION shall provide such other reports concerning the status and condition of any liabilities or assets formerly held by the CLOSED ASSOCIATION as the CORPORATION reasonably may require.

(e) Access to Books and Records. The ACQUIRING ASSOCIATION shall make available to the CORPORATION all books, papers, records, and information of any kind relating to any or all matters subject to the provisions of this Agreement, including any such material or information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates, Subsidiaries, agents or counsel.

(f) Audits and Examinations. The CORPORATION may audit or examine the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries with respect to transactions affecting the implementation of this Agreement at any reasonable time or times chosen by the CORPORATION. Such audits shall be conducted by the CORPORATION at its own expense but, if requested by the

CORPORATION, with the reasonable assistance of personnel of the ACQUIRING ASSOCIATION, whose salaries and reasonable expenses shall be paid by the ACQUIRING ASSOCIATION without reimbursement from the CORPORATION.

(g) Final Accounting. Within 90 days of the Termination Date, or such longer time as may be required pursuant to § 18 or as the CORPORATION may permit, the ACQUIRING ASSOCIATION shall render to the CORPORATION a final accounting which shall include such information and be in such form as the CORPORATION may reasonably request.

(h) Change of Procedure. By mutual written consent, the parties hereto may agree to alter, change or simplify the reports and proceedings required by this § 9.

§ 10 Covenants of the ACQUIRING ASSOCIATION.

(a) Administration of Assets and Liabilities. The failure of the ACQUIRING ASSOCIATION to comply in all material respects with any of the following covenants with respect to any asset or liability of the CLOSED ASSOCIATION or with respect to any Related Claim shall result in the disallowance of Debits to the Special Reserve Account that are related to such failure to comply or the adjustment of a contribution or payment by the CORPORATION that is related to such failure to comply:

(1) Management Standard. The ACQUIRING ASSOCIATION shall administer the assets, liabilities and Claims

to which it succeeded from the CLOSED ASSOCIATION employing the standard of prudent business practice to be used by the ACQUIRING ASSOCIATION in administering assets, liabilities and Claims of the ACQUIRING ASSOCIATION not obtained from the CLOSED ASSOCIATION. Furthermore, the ACQUIRING ASSOCIATION shall, in accordance with the management standard described in this § 10(a)(1), minimize losses and maximize gains and recoveries in the best interests of the ACQUIRING ASSOCIATION and the CORPORATION.

(2) Pursuit of Claims.

(A) The ACQUIRING ASSOCIATION shall, in accordance with the management standard described in § 10(a)(1), pursue and file actions on all potentially recoverable Related Claims which accrue to the ACQUIRING ASSOCIATION as successor in interest to the CLOSED ASSOCIATION or arise otherwise, including, but not limited to, claims under the appropriate fidelity bond or bonds or insurance policy or policies of the ACQUIRING ASSOCIATION or the CLOSED ASSOCIATION, whether discovered before or after the Effective Date.

(B) The ACQUIRING ASSOCIATION shall notify the CORPORATION before pursuing any Related Claim which could result in a Debit or Credit to the Special Reserve Account. The ACQUIRING ASSOCIATION agrees to institute any legal action with respect to a Related Claim requested by the CORPORATION in connection with this Agreement. If the ACQUIRING ASSOCIATION objects to any such request, it shall provide its reasons in

writing to the CORPORATION. If after receipt of such statement the CORPORATION nevertheless determines that a reasonable basis exists for instituting such legal action, then the ACQUIRING ASSOCIATION shall institute such action. The ACQUIRING ASSOCIATION shall be indemnified by the CORPORATION for all losses resulting from, and the reasonable costs and expenses of pursuing the action, excepting only losses arising from and to the extent attributable to the ACQUIRING ASSOCIATION's negligence or lack of due diligence in pursuing or prosecuting the action.

(3) Conduct of Litigation. With respect to all liabilities, Claims, and challenges that could result in or affect a Debit or Credit to the Special Reserve Account, the ACQUIRING ASSOCIATION, as appropriate, shall:

(A) Keep the CORPORATION fully informed of their status by the timely filing of current reports pursuant to § 9(a) and (c);

(B) Observe the right of the CORPORATION to monitor and direct their defense or prosecution, including the right to direct the ACQUIRING ASSOCIATION to file a petition to remove an action to the appropriate court or to appeal any determination of any court; provided that the CORPORATION shall bear the cost of removal or appeal and of monitoring and directing such defense or prosecution;

(C) Authorize the CORPORATION, upon the CORPORATION's election and at the CORPORATION's expense and with its own attorneys, to defend against, or to prosecute in the name of the ACQUIRING ASSOCIATION or the CORPORATION, as the case may be, any such Claim, liability, or challenge, and cooperate fully with the CORPORATION in such defense or prosecution, including, but not limited to, the furnishing to the CORPORATION of all applicable books, records, and other information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates, Subsidiaries, agents or counsel;

(D) At the request of the CORPORATION, assign to the CORPORATION and subrogate the CORPORATION to any right, title, or interest of the ACQUIRING ASSOCIATION in any such Claim, liability or challenge, any related defense (including counterclaims or set-offs) and any proceeds, and, in the event of such assignment, cooperate fully with the CORPORATION in the defense or prosecution of any such Claim, liability or challenge, including, but not limited to, the furnishing to the CORPORATION of all applicable books, records, and other information that are in the possession of the ACQUIRING ASSOCIATION, or any of its Affiliates, Subsidiaries, agents or counsel; <u>provided</u> that if a Claim had a value on the books and records of the CLOSED ASSOCIATION immediately prior to the Effective Date, the ACQUIRING ASSOCIATION shall Debit such value, as adjusted or

determined in accordance with the accounting principles required by this Agreement, to the Special Reserve Account; and

(E) Obtain the CORPORATION's written consent before (i) engaging attorneys or accountants to pursue a Related Claim, the cost of whose services may be chargeable to the CORPORATION pursuant to § 7, or otherwise incurring expenses in connection with a Related Claim that may be chargeable to the CORPORATION pursuant to § 7, (ii) prosecuting any Related Claim by court action, (iii) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Related Claim, or challenge to the Acquisition, or (iv) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Claim for which the CORPORATION is obligated to indemnify the ACQUIRING ASSOCIATION under this Agreement, other than a Related Claim or challenge to the Acquisition, unless such satisfaction, settlement, or compromise would involve payment by the ACQUIRING ASSOCIATION of an amount not in excess of $25,000.00, or is entered into pursuant to an adjudication by a court of competent jurisdiction which, with the permission of the CORPORATION, the ACQUIRING ASSOCIATION has not appealed.

(4) Covered Asset Restrictions. The ACQUIRING ASSOCIATION shall not, without the CORPORATION's written consent, unless the CORPORATION waives the following requirements in writing:

(A) lease any Covered Asset for a fixed term of more than one year;

(B) engage the services of any accountant, attorney, consultant, managing agent, or other professional in connection with the management or administration of any Covered Asset the cost of whose services may be chargeable to the CORPORATION pursuant to § 4(a); or

(C) extend, modify, or sell at a loss any loan or contract that is a Covered Asset or extend or modify any loan or contract that could become a Covered Asset and result in a Debit to the Special Reserve Account; provided that, at the direction of the CORPORATION, the ACQUIRING ASSOCIATION shall sell any such loan or contract.

(5) Covered Asset Requirements. The ACQUIRING ASSOCIATION shall, unless the CORPORATION waives such requirement in writing:

(A) Submit to the CORPORATION, upon its request, an independent appraisal, acceptable to the CORPORATION, of any Covered Asset;

(B) Promptly institute Foreclosure proceedings, as provided in § 12, with respect to any Covered Asset that is a loan at least 90 days delinquent, unless the

CORPORATION has given written approval for an alternative disposition;

(C) Proceed promptly, within the procedures provided for in § 11 and in accordance with prudent business practice, with the Liquidation of any Real Estate Owned or Repossessed Personal Property that is a Covered Asset;

(D) Retain all written offers to purchase any Covered Asset pending inspection by the CORPORATION and not dispose of any such offer without the CORPORATION's prior written approval;

(E) In accordance with the management standard described § 10(a)(1), cause each Covered Asset or the property securing such asset to be insured against loss or damage by fire (extended coverage), flood and any other such hazards that may normally be encountered with respect to such property and, to the extent applicable, in accordance with § 571.4 of the Insurance Regulations, 12 C.F.R. § 571.4 (1987), or any successor regulation. Where appropriate, all insurance contracts shall contain the standard mortgagee loss payable clause in favor of the ACQUIRING ASSOCIATION; and

(F) Finance the disposition of Covered Assets in accordance with the ACQUIRING ASSOCIATION's normal underwriting standards, and without assistance from the CORPORATION except as may otherwise be provided pursuant to § 4(a) of this Agreement.

maximize Net Tax Benefits that may result in a Credit to the Special Reserve Account pursuant to § 4(c)(6), payment to the CORPORATION, or reduction in the loss incurred by the CORPORATION; provided that this covenant shall not be interpreted as requiring the ACQUIRING ASSOCIATION or any Taxable Party to take any return position that (1) would be inconsistent with a written position of the Internal Revenue Service, unless the CORPORATION, after receipt of a request from the ACQUIRING ASSOCIATION, which request shall not be unreasonably denied, provides an opinion of independent tax counsel at the CORPORATIONs expense, to the effect that such return position has a substantial likelihood of success, or (2) would increase its tax liability. In the event that any such return position should be challenged by the Internal Revenue Service, the taxpayer shall (with the prior consent and at the expense of the CORPORATION, including reasonable attorneys' fees) take such steps as may reasonably be necessary to contest such challenge (whether by way of contesting a proposed deficiency or by way of a refund claim); provided that the taxpayer may cease to defend such return position if it determines in good faith after prior consultation with the CORPORATION that further defense of such return position would adversely affect its federal income tax posture viewed as a whole. The covenants in this § 10(c) shall survive the Termination Date.

§ 11 Sale and Repair of Covered Assets.

(a) Compliance with the terms of this Section shall be a condition precedent to the ACQUIRING ASSOCIATION's right to Debit to the Special Reserve Account, pursuant to § 4(a), the amount of any loss on the sale of a Covered Asset, or to add to the Book Value of any Real Estate Owned or Repossessed Personal Property that is a Covered Asset, any expenditure to repair, rehabilitate, or complete such Real Estate Owned or Repossessed Personal Property, or portion thereof, that exceeds the applicable limitation of § 11(e).

(b) As soon as practicable and not less than 45 days prior to the offering for sale of a Covered Asset that is a Covered Asset as of the Effective Date, and otherwise within 45 days after the completion of a Foreclosure of a loan that constitutes a Covered Asset and results in the acquisition of Real Estate Owned or Repossessed Personal Property, the ACQUIRING ASSOCIATION shall provide to the CORPORATION a schedule of each such Covered Asset setting forth a description of the Covered Asset, its Book Value, its estimated market value, the recommended listing sales price, the minimum sales price, the proposed terms of sale, and the estimated selling costs.

(c) Within 30 days after receipt of a schedule required by § 11(b), the CORPORATION shall:

(1) Approve the proposed minimum sales price and terms of sale for each Covered Asset, which may then be sold at not less than such approved minimum sales price, upon the approved sales terms, without further notice to the CORPORATION; or

(2) Disapprove the proposed minimum sales price or the terms of sale for any Covered Asset and require the ACQUIRING ASSOCIATION to order an appraisal. The cost of such appraisal shall be a Debit to the Special Reserve Account pursuant to § 4(a)(2). Within ten days of receipt of the appraisal, the CORPORATION shall establish a minimum sales price and the terms of sale. Thereafter the ACQUIRING ASSOCIATION may sell such asset, at not less than the approved price and upon the approved sales terms, without further notice to the CORPORATION; or

(3) Purchase such asset at the least of: (i) Book Value; (ii) appraised value, as determined by an independent appraisal acceptable to the CORPORATION; and (iii) the minimum sales price proposed by the ACQUIRING ASSOCIATION (minus, in all cases, estimated selling costs). Purchases by the CORPORATION pursuant to this § 11(c)(3) shall be treated as purchases by third parties for the purposes of §§ 4(a)(1) and 4(c)(1). The amount payable by the CORPORATION in connection with such a purchase shall be debited to the Special Reserve Account as of the purchase date if the purchase occurs prior to

the Termination Date and shall be paid to the ACQUIRING ASSOCIATION by the CORPORATION in immediately available funds within ten days following conveyance to the CORPORATION of the ACQUIRING ASSOCIATION's right, title, and interest in such asset if the purchase occurs after the Termination Date.

(d) The CORPORATION shall evaluate the marketing efforts made by the ACQUIRING ASSOCIATION, all written offers to purchase, current condition, and all other pertinent factors with respect to any Covered Asset on which a sales contract has not been accepted within 90 days from the date on which the CORPORATION approved its sales price. The CORPORATION thereafter shall advise the ACQUIRING ASSOCIATION in writing concerning a revised sales price or additional marketing efforts.

(e) The ACQUIRING ASSOCIATION shall not (1) expend for the repair, rehabilitation or completion of any Real Estate Owned that is a Covered Asset an amount in excess of $10,000.00 for a residential property, or in excess of $5,000.00 per family unit plus $20,000.00 for common areas, up to a maximum of $40,000.00 for a multi-family building, or in excess of $20,000.00 for a commercial property, or (2) expend any sum for the repair, rehabilitation or completion of any Covered Asset that is not Real Estate Owned, without the prior written consent of the CORPORATION, unless the CORPORATION expressly waives this requirement in writing or unless an emergency exists, such as a

deficiency of the asset that violates a provision of the sanitary, health, building, or police code of the municipality, county or state in which the asset is located or that affects its habitability, in which case the ACQUIRING ASSOCIATION may, without the CORPORATION's prior consent, expend such sums as may be necessary to correct or prevent such emergency.

(f) With respect to any Real Estate Owned that is a Covered Asset and for which the estimated costs of repair, rehabilitation, or completion exceed the limitations of § 11(e), the ACQUIRING ASSOCIATION agrees that it will prepare a schedule showing: (1) Book Value, (2) estimated market value "as is", (3) estimated cost to cure, (4) estimated time for completion, and (5) estimated market value as repaired or completed. Schedules for all such real estate shall be submitted within 180 days from the Effective Date and thereafter as necessary as requested by the CORPORATION. Within 30 days of receipt of such a schedule, the CORPORATION will advise the ACQUIRING ASSOCIATION concerning the action it shall take with respect to each asset that appears on the schedule.

(h) The CORPORATION shall have the right at any time to interview real estate agents, brokers, and others to whom listings have been given pursuant to this Section.

(i) The CORPORATION and the ACQUIRING ASSOCIATION by mutual agreement may alter the procedures required by this

§ 11, including changing the dollar limits of § 11(e); provided that any such change does not increase the ACQUIRING ASSOCIATION's duties, obligations, or expense of administration under this Agreement. The ACQUIRING ASSOCIATION and the CORPORATION agree to cooperate with each other to facilitate any possible simplification of procedures under this § 11.

§ 12 Foreclosures.

(a) Prior to the Foreclosure of any instrument securing a loan that is, or may become, a Covered Asset, the ACQUIRING ASSOCIATION shall, upon the CORPORATION's request, inspect and evaluate or appraise the security property to determine its recoverable value, taking into consideration all circumstances affecting marketability of title, including the existence of any mechanic's or materialman's liens or other encumbrances on the security property. The cost of any appraisal pursuant to this § 12(a) shall be a Debit to the Special Reserve Account pursuant to § 4(a)(2).

(1) If, in the opinion of the ACQUIRING ASSOCIATION, the security property for such loan has recoverable value and the Book Value of the related Covered Asset is less than $100,000.00, the ACQUIRING ASSOCIATION shall bid as follows:

(A) If there are no other bidders, the ACQUIRING ASSOCIATION may bid any amount which, in the ACQUIRING ASSOCIATION's opinion, will protect its interests and those of

the CORPORATION and is in accordance with the management standard described in § 10(a)(1). In no event, however, shall the amount of the bid be in excess of the principal amount of the indebtedness secured by such property immediately before Foreclosure, plus:

(i) All costs and expenses of Foreclosure;

(ii) Any taxes and hazard insurance premiums due, but unpaid as of the date of Foreclosure;

(iii) Any accrued and unpaid interest on the principal amount of the indebtedness; and

(iv) Any existing encumbrances (such as paving or sewage liens).

(B) If there are other bidders, the ACQUIRING ASSOCIATION may bid an amount not in excess of appraised value, or the amount provided in (A) above if such amount is less than the appraised value; provided that, in the ACQUIRING ASSOCIATION's opinion, such bid will protect its interests and those of the CORPORATION.

(2) If the ACQUIRING ASSOCIATION proposes to foreclose on a security property which has a recoverable value and the Book Value of the related Covered Asset is greater than $100,000.00, it shall so notify the CORPORATION in writing within

30 days of commencing Foreclosure and such notice shall state the loan's Book Value and all interest due thereon, the ACQUIRING ASSOCIATION's estimate of the market value of the property securing such instrument, and the amount of the bid proposed for such sale (the "Notice"). The ACQUIRING ASSOCIATION shall notify the CORPORATION of the Foreclosure sale date when it is determined. Within 30 days of receipt of the Notice, the CORPORATION shall:

(A) Approve the proposed bic; or

(B) Advise the ACQUIRING ASSOCIATION of any other amount it should bid at such sale; or

(C) Instruct the ACQUIRING ASSOCIATION to order an independent appraisal of the property securing such loan by an appraiser acceptable to the CORPORATION, in which case the CORPORATION shall notify the ACQUIRING ASSOCIATION, within ten days after receipt of an appraisal acceptable to the CORPORATION, of the amount to be bid at the Foreclosure sale.

(b) The ACQUIRING ASSOCIATION shall advise the CORPORATION monthly of all completed Foreclosures subject to § 12(a), citing the Book Value, appraised value, and the amount of the successful bid in each case. In addition, if the successful bid, whether by the ACQUIRING ASSOCIATION or another party, results in a deficiency, the ACQUIRING ASSOCIATION shall advise the CORPORATION concerning the likelihood of securing a judgment against the defaulting debtor.

(c) A deed in lieu of foreclosure or any equivalent instrument may not be obtained and no consideration shall be paid to the debtor under such deed without the written consent of the CORPORATION.

(d) In the case of any instrument securing a non-mortgage loan that is or may become a Covered Asset, the ACQUIRING ASSOCIATION shall follow up on such procedures and take such actions as the CORPORATION may request.

(e) Substantial good faith compliance with the provisions of this Section by the ACQUIRING ASSOCIATION shall be a condition precedent to the ACQUIRING ASSOCIATION's right to Debit the Special Reserve Account with respect to any loss resulting from a Foreclosure.

§ 13 <u>CORPORATION's Right to Assignment of Related Claims</u>.

(a) At any time prior to the Termination Date and until the later of (i) 90 days after the Termination Date, or (ii) termination of the CORPORATION's obligation to provide assistance pursuant to § 18(b), the CORPORATION shall have the right to obtain from the ACQUIRING ASSOCIATION an assignment of (1) any Related Claim or (2) the Net Proceeds Received from the Liquidation of any such Related Claim.

(b) If any Related Claim has a value reflected on the CLOSED ASSOCIATION's books immediately prior to the Effective Date, the CORPORATION shall pay for such assignment that value, as adjusted by the Initial Audit and as thereafter adjusted or determined in accordance with the accounting principles required by this Agreement. The purchase price shall be debited to the Special Reserve Account pursuant to § 4(a)(6) as of the assignment date if the assignment occurs prior to the Termination Date, or be paid in cash to the ACQUIRING ASSOCIATION by the CORPORATION within ten days after completion of such assignment if the assignment occurs after the Termination Date.

(c) If the Net Proceeds Received by the CORPORATION (1) upon the Liquidation of any Related Claim assigned to the CORPORATION or (2) as a result of an assignment of Net Proceeds Received exceed the purchase price paid for such assignment, then the amount of such excess shall be retained by the CORPORATION to the extent that it has made contributions under this Agreement other than the amount paid to purchase such assignment; provided that any recoveries in excess of the aggregate amount of the CORPORATION's contributions made under this Agreement shall be paid to the ACQUIRING ASSOCIATION and, if made prior to the Termination Date, credited to the Special Reserve Account pursuant to § 4(c)(4).

(d) In order to facilitate the assignment of any Related Claim to the CORPORATION, the ACQUIRING ASSOCIATION shall, at the CORPORATION's request:

(1) Provide the CORPORATION with such information regarding the nature of such Related Claim and all documents relating to such Related Claim as the ACQUIRING ASSOCIATION has in its possession;

(2) Execute and deliver such instruments of assignment or transfer and make endorsements in such form and manner, and at such time, as the CORPORATION requires; and

(3) Execute and deliver all other instruments that the ACQUIRING ASSOCIATION possesses and the CORPORATION deems necessary or requisite to complete such assignments or transfers.

(e) The ACQUIRING ASSOCIATION agrees to use its best efforts, cooperate fully and to take all such actions as are necessary to assist the CORPORATION in the pursuit of Related Claims.

§ 14 CORPORATION's Right to Purchase Covered Assets.

(a) At any time prior to the Termination Date and until the later of (i) 90 days after the Termination Date or (ii) termination of the CORPORATION's obligation to provide assistance pursuant to § 18(c), the CORPORATION shall have the

right to purchase at Book Value any or all Covered Assets that have not been liquidated prior to the ACQUIRING ASSOCIATION's receipt of the CORPORATION's notice that it shall exercise its right to purchase; provided that the purchase price of an asset purchased pursuant to § 11(c)(3) shall be the price provided therein.

(b) The purchase price shall be debited to the Special Reserve Account as of the purchase date if the purchase occurs prior to the Termination Date, or shall be paid to the ACQUIRING ASSOCIATION by the CORPORATION in immediately available funds within ten days following conveyance to the CORPORATION of the ACQUIRING ASSOCIATION's right, title, and interest in such asset if the purchase occurs after the Termination Date. The excess, if any, of the purchase price over the fair market value of such asset shall be deemed to be a contribution by the CORPORATION as provided in § 3(d).

(c) In order to facilitate such sale to the CORPORATION, the ACQUIRING ASSOCIATION shall, at the CORPORATION's request:

(1) Provide the CORPORATION with such information as the CORPORATION deems necessary regarding the nature or condition of the Covered Asset and documenting the Book Value of such Covered Asset;

(2) Execute and deliver such instruments of sale, grant, conveyance, or transfer and make endorsements in such form and manner and at such time as the CORPORATION shall require; and

(3) Execute and deliver all such other instruments together with all insurance policies, title policies, and title certificates which the ACQUIRING ASSOCIATION possesses and are necessary or requisite, in the opinion of the CORPORATION, to complete such sale, grant, conveyance, or transfer.

(d) The Net Proceeds Received by the CORPORATION as a result of Liquidation of any Covered Asset purchased pursuant to § 11(c)(3) or this § 14 in excess of the purchase price paid by the CORPORATION shall be retained by the CORPORATION to the extent it has made contributions under this Agreement that have not been repaid, and the remainder, if any, shall be paid to the ACQUIRING ASSOCIATION.

§ 15 Disclosure of Agreement. Except as otherwise required by law, the ACQUIRING ASSOCIATION shall not, without the prior written consent of the CORPORATION, disclose the terms of this Agreement or the obligation of the CORPORATION to indemnify the ACQUIRING ASSOCIATION to any person other than their respective employees or agents. This § 15 shall survive the Termination Date.

§ 16 Accounting Principles. Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving or relating to the Acquisition or this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiquity shall be resolved in a manner consistent with such regulations and the Bank Board's resolutions or actions relating to the Acquisition or this Agreement. If there is a conflict between such regulations and the Bank Board's resolutions and actions relating to the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern. For purposes of this Section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently changed, amended, clarified or interpreted by the Bank Board, its staff, or the Financial Accounting Standards Board ("FASB"), or any successor organizations of either. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern. The valuation of real estate assets shall be in accordance with the Bank Board's regulations, 53 Fed. Reg. 372 (January 6, 1988), to be codified at 12 C.F.R. Parts 563 and 571 (1988), and as such

regulations may subsequently be changed, amended, clarified or interpreted by the Bank Board or its staff.

§ 17 Notices.

(a) Any notices or other communication required or permitted under this Agreement, unless otherwise specifically provided for, shall be deemed given if sent by first class mail, postage prepaid, to a party at its address set forth below or at such other address as the party shall furnish in writing:

If to the ACQUIRING ASSOCIATION:

Sterling Savings Association
Attn: Daniel G. Byrne,
Senior Vice President - Finance
N. 120 Wall
Spokane, Washington 99201-0696

If to the CORPORATION:

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
Attn: Director, Financial Assistance Division
1700 G Street, N.W.
Washington, D.C. 20552

(b) Unless otherwise specifically provided for, if this Agreement requires that notice be given within a certain period of time, notice shall be deemed given as of the date of posting.

§ 18 Termination of Agreement.

(a) Except as otherwise provided in this Agreement, the obligations of the parties hereto, including, without limitation, the obligations of the CORPORATION to make payments and contributions pursuant to this Agreement, shall

terminate on the Termination Date; provided, however, that in the event that a receiver is appointed for the purpose of liquidating the ACQUIRING ASSOCIATION, or the ACQUIRING ASSOCIATION ceases to be an institution the accounts of which are insured by the CORPORATION, or its successor, this Agreement and all obligations of the CORPORATION under it shall terminate upon the effective date of such occurrence.

(b) Upon the Termination Date, the net Credit or Debit balance of the Special Reserve Account, if any, shall be paid or distributed in accordance with the provisions of § 3.

(c) Notwithstanding termination of this Agreement as described in § 18(a) above, the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for any loss arising from liabilities and Claims described in § 7(a), including the reasonable costs and expenses of related litigation actually incurred and payable by the ACQUIRING ASSOCIATION, and for the reasonable costs and expenses actually incurred and payable by the ACQUIRING ASSOCIATION in the pursuit of a Related Claim pursuant to § 7(b); provided that any such Claim or liability is in litigation on the Termination Date; and provided further, that the ACQUIRING ASSOCIATION continues to observe after the Termination Date all applicable reporting requirements, covenants, agreements of cooperation and agreements for the use of best efforts set forth in this Agreement; and provided further, that the ACQUIRING ASSOCIATION within ten days of receipt pays to the CORPORATION

any recoveries that prior to the Termination Date would have been credited to the Special Reserve Account pursuant to § 4(c); and provided further, that the ACQUIRING ASSOCIATION continues to pay to the CORPORATION Net Tax Benefits in accordance with § 4(c)(6)(G); and provided further, that the obligation of the CORPORATION stated in this subsection (c) shall terminate as stated in the proviso to § 18(a).

(d) Notwithstanding § 18(a), the CORPORATION shall consider and act upon in accordance with this Agreement all reports, applications, requests and other submissions that are subject to the CORPORATION's approval, consent or other action and that are actually received by the CORPORATION prior to the Termination Date, and the ACQUIRING ASSOCIATION shall cooperate in the resolution of all such pending submissions as contemplated in this Agreement. The final accounting required by § 9(g) shall take account of all actions taken and determinations made by the CORPORATION pursuant to this § 18(d) and any related provisions of this Agreement.

§ 19 Rights and Forbearances. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by any party in exercising or partially exercising any such right, power, or remedy shall not preclude its further exercise.

§ 20 Governing Law. To the extent that Federal law does not control, this Agreement and the parties' rights and obligations under it shall be governed by the law of the State of Washington. Nothing in this Agreement shall require any unlawful action or inaction by either party.

§ 21 Entire Agreement; Severability.

(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Acquisition or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Acquisition and this Agreement.

(b) If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding upon the CORPORATION the ACQUIRING ASSOCIATION.

§ 22 Counterparts; Modifications; Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 23 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors and assigns, but this Agreement may not be assigned by any party, nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation or otherwise, without the prior written consent of the CORPORATION.

§ 24 Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

§ 25 Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failure of the CLOSED ASSOCIATION may be prevented, the savers and other creditors of the CLOSED ASSOCIATION may be protected against losses, the thrift and financing needs of the communities in which the CLOSED ASSOCIATION's offices are located may be served, the ACQUIRING ASSOCIATION and the CORPORATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described in this Section.

In WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers or agents.

STERLING SAVINGS ASSOCIATION

By: [signature]

Attest: [signature] Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Susan M. Swenson

Attest: [signature] Its: Designee, Executive Director, OFSLI

# EXHIBIT A

Date as of 3/31/88

| BORROWER/ PROJECT NAME | PROPERTY DESCRIPTION | LOCATION | PRINCIPAL BALANCE | EXISTING RESERVES | NET BOOK VALUE |
|---|---|---|---|---|---|
| Sunwood Inn | 80 unit motel | Sierra Vista, AZ | 1,164,000 | 0 | 1,164,000 |
| Embar Equities [A] | commercial bldg | Seattle, WA | 507,592 | 251,391 | 256,201 |
| H.T. Fuel | bulk plant | Pasco, WA | 454,795 | 162,026 | 292,769 |
| TOTAL LOANS [B] | | | 2,126,387 | 413,417 | 1,712,970 |
| Viking Villa (SOLD) | multifamily | Las Vegas, NV | — | -- | -- 0 |
| Arby's Restaurant [C] | restaurant | Kaiser, OR | 661,399 | 227,966 | 433,433 |
| Leisure Firs | multifamily | Tumwater, WA | 689,405 | 207,843 | 481,562 |
| Clairemont Condos | condos | Phoenix, AZ | 953,031 | 236,995 | 716,036 |
| D&B Properties | commercial bldg | The Dalles, OR | 356,986 | 226,226 | 130,760 |
| Golden West Motel (SOLD) | motel | Pasco, WA | — | — | 0 |
| 10-Plex Apts. | multifamily | Pasco, WA | 100,000 | 60,400 | 39,600 |
| La Posada | R/E development | Colorado Springs, CO | 805,158 | 270,979 | 534,179 |
| Casa Del Prado (Windsor) | R/E development | Puyallup, WA | 1,474,780 | 60,612 | 1,414,168 |
| Sleep Inn | motel | Tucson, AZ | 652,308 | 0 | 652,308 |
| International Wildlife | museum | Tucson, AZ | 78,983 | 0 | 78,983 |
| TOTAL REO | | | 5,772,050 | 1,266,876 | 4,505,174 |
| Grace Terrace | multifamily | Tacoma, WA | 1,912,284 | 95,000 | 1,817,284 |
| TRI-WEST MORTGAGE INVESTMENT [D] | | | 1,912,284 | 95,000 | 1,817,284 |
| TOTAL COVERED ASSETS | | | $9,810,721 | 1,799,438 | 8,011,283 |
| | | | ********** | ********** | ********** |

CHAIRMAN OF THE FEDERAL HOME LOAN BANK BOARD

Order No. 807

Date: April 7, 1988

Pursuant to the powers and authority vested in or exercisable by me as Chairman of the Federal Home Loan Bank Board ("Bank Board") or otherwise, including, but not limited to, those under Reorganization Plans No. 3 of 1947 and No. 6 of 1961 respecting personnel matters, Lawrence W. Hayes, F. Clement Dinsmore, Jefferson Davis, Mary Rawlings-Milton, Theresa J. Parker, Jacquelyn J. Edwards, Lawan Young, Valerie A. Mullins, John C. Henry, Eric L. Richard, and Pamela Ward Bort are each hereby appointed Assistant Secretary to the Bank Board for the purposes of (1) signing, executing, attesting, or certifying resolutions or other documents of the Bank Board issued or authorized this date concerning the appointment of a receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), and the acquisition ("Acquisition") of substantially all of the assets and liabilities of the Association by Sterling Savings Association, Spokane, Washington, and other documents provided for in, by, or necessary to implement such resolutions; (2) delivering or accepting delivery of any notice from or to the Bank Board or the Federal Savings and Loan Insurance Corporation with respect to the Acquisition; and (3) performing other functions of the Secretary to the Bank Board necessary or appropriate for the implementation of such resolutions.

/s/ M. Danny Wall
M. Danny Wall
Chairman

# Federal Home Loan Bank Board



**To all to whom these presents shall come, Greeting:**

*I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:*

Copy of Resolution No. 88-249, adopted by the Federal Home Loan Bnak Board on April 7, 1988.



In testimony whereof, I, John M. Buckley, Jr. Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 12th day of April, 1988

Secretary to the Federal Home Loan Bank Board

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P

Date: April 7, 1988

## Recitals

WHEREAS, Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), is a state-chartered stock savings and loan association incorporated under the laws of the State of Washington, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, Pursuant to § 406(c)(1)(B) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(c)(1)(B) (1982) ("§ 406(c)(1)(B)"), the Federal Home Loan Bank Board ("Bank Board") has exclusive power and jurisdiction to appoint the FSLIC as sole conservator or receiver for an insured institution other than a Federal association in the event that the Bank Board determines that any of the grounds specified in § 5(d)(6)(A)(i), (ii), or (iii) of the Home Owners' Loan Act of 1933, as amended ("HOLA"), 12 U.S.C. § 1464(d)(6)(A)(i), (ii), or (iii) (1982), exists with respect to such insured institution; and

WHEREAS, Pursuant to subsection (ii)(I) of § 406(c)(1)(B), the authority conferred by § 406(c)(1)(B) may be exercised without delay with respect to the Association upon receipt of the written approval of the State official having jurisdiction over the Association that the grounds specified by the Bank Board for its exercising such authority exist; and

WHEREAS, Pursuant to subsection (i)(II) of § 406(c)(1)(B), in a case in which the Bank Board has exercised its power and jurisdiction under subsection (i)(I) of § 406(c)(1)(B), the FSLIC shall have the same powers and duties with respect to an insured institution other than a Federal association as are conferred upon it under § 406(b) of the NHA, 12 U.S.C. § 1729(b) (1982), as amended, with respect to a Federal association; and

WHEREAS, Pursuant to § 406(c)(3) of the NHA, 12 U.S.C. § 1729(c)(3) (1982), in any case in which the FSLIC is appointed receiver for an insured institution pursuant to § 406(c)(1) of

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



the NHA, 12 U.S.C. § 1729(c)(1) (1982), the provisions of § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), shall be applicable in the same manner and to the same extent as if such institution were a Federal association with respect to which the FSLIC had been appointed receiver; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington ("Seattle Bank Counsel") dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988, the S Memorandum having been concurred in by the Executive Director, Office of Regulatory Policy, Oversight and Supervision and the Issues Memorandum having been concurred in by the Executive Director of the FSLIC (copies of which memoranda are in the Minute Exhibit File), and the balance of the administrative record submitted to it:

Ground for Appointment

NOW, THEREFORE, IT IS RESOLVED, That, for the reasons set forth in the aforesaid memorandum from the General Counsel - Regulatory Affairs of the Federal Home Bank of Seattle, and on the basis of the administrative record submitted to it, including, but not limited to, oral presentations made at the Bank Board's meeting, the Bank Board hereby finds and determines that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association in that the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

Notice to State Official

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board, or an agent of the FSLIC, shall cause a letter to be delivered to the Supervisor, Division of Savings and Loans, State of Washington ("Supervisor"), notifying the Supervisor of

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



the Bank Board's determination of the existence of the ground specified above for the appointment of the FSLIC as sole receiver for the Association, and requesting written approval that the ground specified exists, provided that the final form of such letter shall be approved by the Office of the General Counsel ("OGC"); and

RESOLVED FURTHER, That, upon delivery of such letter to the Supervisor, it shall be deemed to have been received by the official of the State of Washington having jurisdiction over the Association within the meaning of subsection (ii)(I) of § 406(c)(1)(B); and

Appointment of Receiver

RESOLVED FURTHER, That the Bank Board, pursuant to § 406(c)(1)(B), hereby appoints the FSLIC as sole receiver for the Association ("Receiver") for the purpose of liquidation, provided that the exercise of this appointment shall not be effective, and this appointment shall not be exercised, unless and until an attorney of the OGC, the Seattle Bank Counsel, or fee counsel designated by the General Counsel or his designee to represent the Receiver, or any person named as a Special Representative of the Receiver, or an Assistant Secretary to the Bank Board, shall have received the written approval of the Supervisor that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association, and provided further, that the form of any such approval is satisfactory to the OGC; and

Worthlessness of Subordinated Debt
and Stock Interests

RESOLVED FURTHER, That the Bank Board finds that the Association is not a going concern and could continue as a going concern only with financial assistance from the FSLIC; and

RESOLVED FURTHER, That the Bank Board finds that the Association's financial condition is such that the Association cannot be sold to an independent third party without financial assistance from the FSLIC; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249P



RESOLVED FURTHER, That the Bank Board finds that, if the Association were liquidated, the proceeds that would be realized upon liquidation of the Association's assets would be insufficient to satisfy the Association's liabilities and obligations to its creditors and others, including its withdrawable accountholders, such that no amount would remain for distribution to the Association's stockholders and holders of subordinated debt, and therefore, the Association's stock (including common stock, preferred stock, permanent stock, guarantee stock, stock, nonwithdrawable accounts, as defined by § 561.42 of the Rules and Regulations for the FSLIC, 12 C.F.R. § 561.42 (1987), and subordinated debt issued by the Association) is worthless; and

Powers and Duties of Receiver

RESOLVED FURTHER, That, pursuant to § 406(c)(1)(B), (c)(3), and (d) of the NHA, 12 U.S.C. § 1729(c)(1)(B), (c)(3), and (d) (1982), the FSLIC as Receiver shall have and exercise all powers, rights and privileges, and shall assume, perform, and discharge all duties, responsibilities, and obligations of a receiver for a Federal savings and loan association accorded or imposed by, and subject to, applicable provisions of law and regulations and orders of the Bank Board, as now or hereafter in effect, including, but not limited to, § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), § 406 of the NHA, 12 U.S.C. § 1729 (1982), and the provisions of Parts 547 and 549 of the Rules and Regulations for the Federal Savings and Loan System ("Federal Regulations"), 12 C.F.R. Parts 547 and 549 (1987); and

RESOLVED FURTHER, That, in addition to all powers and authority of a receiver provided for by law, regulation and order, the Receiver is hereby authorized and empowered, and need not seek further approval from the Bank Board, to borrow money in such amounts from any source and in any manner as the Receiver requires to fulfill its duties as receiver, to execute, acknowledge, and deliver evidence of indebtedness for such borrowings, and to secure repayment of such borrowings by mortgages, pledges, and assignments in trust, or by hypothecation of any property of the Association, provided that the form of any contract or security agreement for such borrowing shall be approved by the OGC; and

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



RESOLVED FURTHER, That the Receiver need not furnish any bond; and

RESOLVED FURTHER, That, notwithstanding the provisions of § 548.1, as made applicable by § 549.2, of the Federal Regulations, 12 C.F.R. §§ 548.1 and 549.2 (1987), the Receiver may elect to notify by certified mail all persons and entities that the Receiver knows to be holding or to be in possession of assets of the Association; and

RESOLVED FURTHER, That, if the Association has issued subordinated debt that is outstanding as of the effective date of the appointment of the Receiver, the Receiver is hereby directed to publish notice to subordinated debt holders with respect to their subordinated debt holdings, and the Receiver is in any case hereby directed to publish notice to shareholders with respect to their shareholdings; and

Implementing Authority

RESOLVED FURTHER, That the Executive Director, or a Deputy Executive Director, of the FSLIC, or a designee of any of them ("Director"), is hereby authorized to take such action as may be necessary or appropriate to exercise the rights or to carry out the obligations of the FSLIC as Receiver, pursuant to its appointment; and

RESOLVED FURTHER, That the FSLIC, in its corporate capacity and not in its capacity as Receiver, is hereby authorized to make advances to the Receiver for the purpose of enabling the Receiver to perform its functions and duties, and to pay costs and expenses of the receivership, on such terms and conditions as the Director shall deem appropriate, and the Director may execute such documents as may be necessary to make such advances or enter into related collateral agreements, provided that the final form of any such document has been approved by the OGC; and

Special Representatives

RESOLVED FURTHER, That one or more persons shall be designated as a Special Representative of the Receiver ("SR"); that such designated person or persons shall have the power and authority to act

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)



in the name and on the behalf of the Receiver, including the authority, subject to the direction of the Director, to take prompt possession of the books, records, property, and assets, of every kind and description, of the Association, and to exercise all powers of the Receiver; that, initially, Edward F. Gerber, John W. Sears, Ann M. Barnes, John P. Marchant, Peggy H. Battle, and Douglas A. Warnecke shall each serve as an SR; and that the Director may replace or remove any SR and may designate such additional SR(s) as the Director deems appropriate, prescribing the functions and responsibilities of such SR(s) as the Director deems appropriate; provided, however, that any SR designated under this resolving paragraph shall not act for or on behalf of the FSLIC in its corporate capacity with regard to the Association in receivership; and

Termination of Employment Contracts

RESOLVED FURTHER, That the Bank Board determines that, upon the appointment of the FSLIC as receiver for the Association for the purpose of liquidation, the Association shall be in "default", as such term is defined in § 401(d) of the NHA, 12 U.S.C. § 1724(d) (1982); and

RESOLVED FURTHER, That every employment contract between the Association and its officers, employees, or agents is hereby terminated by the Bank Board, effective upon the date of default of the Association; and

Disclosure of Authority

RESOLVED FURTHER, That the Receiver shall require that any independent contractor, consultant, or counsel employed by the Receiver in connection with the liquidation of the Association shall fully disclose to all parties with which such contractor, consultant or counsel is negotiating, any limitation on the authority of such contractor, consultant or counsel to make legally binding representations on behalf of the Receiver; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



Records and Reports

RESOLVED FURTHER, That each SR shall keep a record of his or her actions as SR of the Receiver, and shall report on such actions from time to time as directed by the Director; and

RESOLVED FURTHER, That the Director shall from time to time report to the Bank Board with respect to actions taken pursuant to this Resolution.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
Secretary

# Federal Home Loan Bank Board

## To all to whom these presents shall come, Greeting:

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-251, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the Federal Home Loan Bank Board

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in Tri-Cities Savings and Loan Association, Kennewick, Washington

No. 88-251P

Date: April 7, 1988

## Recitals

WHEREAS, The Federal Savings and Loan Insurance Corporation ("FSLIC") has been appointed as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), as described in Federal Home Loan Bank Board ("Bank Board") Resolution No. 88-249P, dated April 7, 1988; and

WHEREAS, Such appointment constitutes a default of the Association within the meaning of § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982), and may necessitate the payment of insured accounts by the FSLIC, in its corporate capacity and not as receiver for the Association, within the meaning of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982):

## Payment of Insurance of Accounts

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them ("Director"), is hereby authorized and directed to take all necessary or appropriate steps and to incur all necessary or appropriate expenses in preparation for and to implement the payment of all insured accounts of the Association pursuant to § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982); and

RESOLVED FURTHER, That, upon being advised by the General Counsel, or a Deputy General Counsel, that the Association is in default and that the account liabilities of the Association have not been assumed by another insured institution, the Director is hereby authorized and directed (1) to cause each insured account in the Association that is surrendered and transferred to the FSLIC to be paid in cash or by making available a transferred account in another insured institution, (2) to take or cause to be taken such action(s) as may be necessary or appropriate to carry out this and any future directives of the Bank Board, and (3) to do all things necessary or appropriate to carry out expeditiously the objectives of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982), and Part 564 of the Rules and Regulations for

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-251P

Page 2

RESOLVED FURTHER, That each Office and Division of the Bank Board is hereby requested to furnish such assistance to the Director in fulfillment of the intent of this Resolution as the Director may request.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-252, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the
Federal Home Loan Bank Board

D

FEDERAL HOME LOAN BANK BOARD

Pursuit of Claims of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-252P

Date: April 7, 1988

Recitals

WHEREAS, The Federal Home Loan Bank Board ("Bank Board") has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), pursuant to Resolution No. 88-249P, dated April 7, 1988; and

WHEREAS, Pursuant to Resolution No. 88-250P, dated April 7, 1988, the Bank Board has approved the acquisition of substantially all of the assets and liabilities of the Association by Sterling Savings Association, Spokane, Washington ("Acquiring Association"); and

WHEREAS, Pursuant to a proposed Receiver's Agreement (a copy of which is in the Minute Exhibit File), potential claims of the Association against certain parties will be transferred to the FSLIC in its corporate capacity; and

WHEREAS, Pursuant to a proposed Assistance Agreement (a copy of which is in the Minute Exhibit File), the FSLIC in its corporate capacity has a right to take an assignment of potential claims of the Acquiring Association, as successor to the Association, against certain other parties:

Pursuit of Claims

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them, is hereby authorized to take whatever actions are deemed appropriate, including litigation, to recover on such claims of the Association and the Acquiring Association, as successor to the Association, from any such parties, provided that the Office of the General Counsel shall concur in any such action.

By the Federal Home Loan Bank Board

/s/ John M. Buckley Jr

# Federal Home Loan Bank Board

## To all to whom these presents shall come, Greeting:

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-253, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the
Federal Home Loan Bank Board

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Saving and Loan Association
Kennewick, Washington

No. 88-253P

Date: April 7, 1988

## Recitals

WHEREAS, The Executive Director or a Deputy Executive Director of the Federal Savings and Loan Insurance Corporation ("FSLIC"), or the Director, Financial Assistance Division, Office of the FSLIC, or a designee of any of them ("Director"), has been authorized by Federal Home Loan Bank Board ("Bank Board") Resolution Nos. 88-250P and 88-252P, each dated April 7, 1988, to execute, on behalf of the FSLIC in its corporate capacity, a Receiver's Agreement with the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington, an Assistance Agreement with Sterling Savings Association, Spokane, Washington ("Acquiring Association"), and other documents ("Agreements"), and to pursue certain claims; and

WHEREAS, The Agreements impose certain rights, duties, and obligations upon the FSLIC in its corporate capacity, and permit the pursuit of certain claims, that do not require basic determinations of policy; and

WHEREAS, In the administration of the Agreements, and of any rights or obligations of the FSLIC under them, it may be necessary or desirable that the FSLIC, in its corporate capacity, contract for legal, auditing, or other services, or authorize the settlement of certain claims:

## Implementing Authority

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, finds that expenditures of the FSLIC, in its corporate capacity, pursuant to and in the administration of the Agreements and in the pursuit of such claims, are necessary,

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Savings and Loan Association
Kennewick, Washington

No. 88-263P



nonadministrative, and made under the National Housing Act, as amended, 12 U.S.C. §§ 1724, et seq. (1982), and shall be incurred, allowed, and paid under the provisions of the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), without regard to the provisions of any other law governing the expenditure of public funds; and

RESOLVED FURTHER, That, effective upon the execution of the Agreements, the Director is hereby authorized and directed to take such actions as may be necessary or desirable to fulfill the rights, duties, and obligations of the FSLIC, in its corporate capacity, under the Agreements and in the pursuit of claims, and to incur, allow, and pay all expenditures in fulfillment of such rights, duties, and obligations, pursuant to the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), including, but not limited to:

(1) The payment of any and all amounts required by the Agreements;

(2) The making of advances to the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association");

(3) Contracting for legal, accounting, management, or other services relating to the implementation of the Agreements or the pursuit of claims, provided that the final form of any such contract shall be approved by the Office of the General Counsel ("OGC");

(4) The administration of any asset or claim acquired from the Receiver or Acquiring Association, provided that any contract pertaining to such asset or claim, and the satisfaction, settlement or termination of any claim, shall be approved by the OGC;

(5) The assignment, pursuit, and settlement of claims, provided, that the form of any assignment or settlement agreement entered into by the FSLIC shall be approved by the OGC; and

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Savings and Loan Association
Kennewick, Washington

No. 88-253P

Page 3

(6) The waiver, if deemed necessary or desirable by the Director, of provisions of the Assistance Agreement concerning filings, representations, warranties, or certifications by the Acquiring Association, provided that the form of any waiver by the FSLIC shall be approved by the OGC; and

RESOLVED FURTHER, That the General Counsel may also exercise the authority conferred by the preceding resolving paragraphs with respect to contracting on behalf of the FSLIC for legal or other related services needed to implement the Agreements and pursue claims; and

RESOLVED FURTHER, That the Director is authorized and directed to take all other actions necessary and appropriate to exercise the rights and fulfill the duties and obligations of the FSLIC in the administration of the Agreements and the pursuit of claims.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-254, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I Pamela Ward Bort Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the Federal Home Loan Bank Board

F

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-254P

Date: April 7, 1988

RESOLVED, That the acquisition of substantially all of the assets and liabilities of Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), by Sterling Savings Association, Spokane, Washington ("Acquiring Association"), pursuant to an Acquisition Agreement between the Federal Savings and Loan Insurance Corporation ("FSLIC"), as receiver for the Association, and the Acquiring Association, is hereby approved, effective in accordance with applicable state law unless such law leaves that determination to the Bank Board in which case the Acquisition shall be effective as of the execution of the Acquisition Agreement and the Assistance Agreement between the FSLIC, in its corporate capacity, and the Acquiring Association, and pursuant to approval by the Bank Board in a concurrent Resolution or action issued as of the date of this Resolution and subject to any conditions that may be imposed in such Resolution or action.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

Coopers &Lybrand

certified public accountants

Board of Directors
Sterling Savings Association
Spokane, Washington

We have read the Acquisition Agreement and the Assistance Agreement, both dated April 8, 1988, between Sterling Savings Association ("Sterling") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). We have also reviewed related schedules, supporting information and representations submitted to us by Sterling. These Agreements were consummated by Sterling acquiring certain assets and assuming the liabilities of Tri-Cities Savings and Loan Association ("Tri-Cities") in exchange for receiving a cash assistance payment of approximately $11,730,000 and indemnification against losses on certain "covered" assets and undisclosed liabilities from FSLIC. Since the combination involved the transfer of cash rather than an exchange of stock, it is contrary to the idea of combining existing stockholder interests that is the essence of a pooling-of-interests. As such, the transaction has been treated for generally accepted accounting principle purposes as a "purchase."

In our opinion, based solely upon the information and facts provided to us as described above, this acquisition does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 (APB No. 16). Therefore, we concur in the treatment of this combination as a purchase in accordance with APB No. 16 and Statement of Financial Accounting Standards No. 72 (SFAS No. 72).

Sterling has allocated the cash assistance payment received for acquiring Tri-Cities to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, again in accordance with the requirements of APB No. 16 and SFAS No. 72. We have reviewed this allocation and the propriety of the underlying valuations, as well as the proposed plan for amortizing the individual allocations, based upon information of Tri-Cities as of April 8, 1988. The more significant individual allocations and Sterling's plan for amortizing each are as follows:

1. A discount of approximately $580,000 has been allocated to the loan portfolio. This discount will be amortized using the level interest yield method over 12 years, which represents the estimated remaining term (after considering assumed prepayments) of the portfolio.

2. A premium of approximately $1,270,000 has been allocated to deposits. This premium will be amortized using the level interest yield method over periods of up to 8 years, which represents remaining terms of individual deposits.

3. A total of approximately $2,520,000 has been allocated to an unidentified intangible asset. The unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired.

In our opinion, based solely upon the information and facts provided to us as described above, the significant individual allocations and the proposed method and period of amortizing each appear proper under APB No. 16 and SFAS No. 72.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Tri-Cities transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of our examination of Sterling's consolidated financial statements for the year ended June 30, 1988 (which period will include the Tri-Cities acquisition), certain revisions to the allocations and proposed amortization may be necessary and our conclusions may change.

Coopers & Lybrand

Spokane, Washington
July 28, 1988

Coopers &Lybrand

. .tified public accountants

1600 Seafirst Financial Center
Spokane, Washington 99201

telephone (509) 455-9300

in principal areas of the world

January 30, 1989

Mr. Dan Byrne
Sterling Savings Association
N. 120 Wall
Spokane, WA 99201

Dear Mr. Byrne:

This letter is in response to your request for our opinion regarding the affect to the net operating loss carryforwards of Central Evergreen as a result of Sterling Savings Association's acquisition of Central Evergreen.

Based on our understanding of the facts and applicable law, as discussed below, the net operating loss carryforwards of Central Evergreen will succeed to Sterling Savings Association, subject to certain limitations as described below. If our understanding of the facts is incorrect, it may change our opinion substantially.

We understand the facts to be as follows:

- On December 31, 1988, Sterling Savings Association acquired by agreement with the supervisory agent 100% of the stock of Central Evergreen. Simultaneous to its acquisition, Central Evergreen was merged into Sterling and 100% of all its assets and liabilities became assets and liabilities of Sterling Savings Association. Central Evergreen is a savings and loan as defined by Internal Revenue Code Section 7701(a)(19).

- At the time of the acquisition, Central Evergreen was under a voluntary supervisory agreement with the FHLBB. The FHLBB has certified that Central Evergreen was insolvent at the time of the acquisition/merger under the grounds set forth in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, United States Code.

- Central Evergreen has three subsidiaries with which it has filed a federal consolidated income tax return. The taxable year end is December 31.

- According to its December 31, 1987 federal income tax return, Central Evergreen has approximately $8,000,000 in net operating loss carryforwards to 1988 and later years. Also, it is expected that Central Evergreen will incur a net operating loss for the 1988 tax year.

<u>Requirements to Acquire the NOL Carryovers</u>

In order for the net operating losses of Central Evergreen to succeed to Sterling Savings Association, the acquisition of Central Evergreen must qualify under either:

1. Section 332, relating to liquidations of subsidiaries, or

2. Section 361 (relating to nonrecognition of gain or loss to corporations) but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of Section 368(a)(1).

It is intended that the acquisition/merger qualifies as a reorganization under 368(a)(1)(G) (a "G" reorganization). A "G" reorganization is a transfer by a corporation of all or part of its assets to another corporation in a bankruptcy or similar case followed by the distribution of stock or securities, pursuant to a court-approved reorganization plan, by the corporation that has acquired the assets in a transaction that qualifies under Code Sec. 354, 355, or 356. A bankruptcy or similar case is a case under new Title 11 of the United States Code, or a receivership, foreclosure, or similar proceeding in a federal or state court. A federal or state agency receivership, foreclosure, or similar proceeding involving a financial institution also qualifies. A special rule has been provided for financially distressed "thrift" institutions.

Section 368(a)(3)(D) provides that a troubled thrift reorganization, otherwise satisfying the requirements of Section 368(a)(1)(G) will not be considered a taxable transaction merely because no stock or securities of the acquiring entity are issued, if all of the following requirements are met:

1. All or substantially all of the assets of the troubled institution must be transferred to a new or existing entity.

2. At the time of the reorganization, the institution must be a savings and loan as defined in Code Section 7701(a)(19). In general, the acquired association must maintain at least 60% of its assets in "qualified" assets, and it must have more than 75% of its gross income from specified sources.

3. Substantially all the institution's liabilties must be transferred to the new entity.

APP 765

4. The FHLBB or the FSLIC must certify that the institution is

insolvent in the near future in the absence of action by the FHLBB or the FSLIC) under the grounds set forth in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, United States Code.

In addition to the requirements listed in IRC Section 368(a)(3)(D), there must be a "continuity of business enterprise" with respect to the operations of the Association. While the Service has yet to issue proposed or temporary regulations under Sections 368(a)(1)(G) or 368(a)(3)(D), the Service has issued Revenue Procedure 83-81, 1983-2 C.B. 598, which deals with this issue. Based upon Rev. Proc. 83-81, the "continuity of business enterprise" requirements will be satisfied in the case of an asset acquisition if the following conditions are met: (1) the transferee assumes all of the deposits of the transferor; and (2) either (a) the transferee continues to hold at least one-half of the fair market value of the assets, including mortgage and other loans, held by the transferor at the time of the adoption of the plan of reorganization; or (b) the transferee continues the transferor's historic business.

According to the closing documents of the acquisition/merger, all assets and liabilities of Central Evergreen immediately before the acquisition/merger became assets and liabilities of Sterling immediately after the acquisition/merger. Also, according to our calculations Central Evergreen met the definition of a savings and loan as defined by Section 7701(a)(19). As previously stated, the Federal Home Loan Bank Board has given the certification of insolvency outlined in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, of the United States Code. Sterling Savings Association is assuming 100% of the deposits of Central Evergreen and plans to continue to hold at least one-half of the fair market value of the assets, including mortgages and other loans, held by Central Evergreen at the time of the adoption of the plan of adoption/merger. Also, Sterling will continue to operate Central Evergreen's historic business.

Based on our understanding of the above facts and requirements of the law, the acquisition/merger meets the definition of a tax free "G" reorganization. Thus, the net operating losses of Central Evergreen will succeed to Sterling Saving Association.

Net Operating Loss Limitations

Internal Revenue Code Section 381(B)(3) and Regulation 1.381(e)(1)-1(b) provide that a NOL of the acquiring corporation may not be carried back to offset prior year taxable income of the transferor corporation and that NOLs of the transferor corporation may not be carried back to offset prior years taxable income of the acquiring corporation. Therefore, after the acquisition, the NOLs of Central Evergreen may be carried forward

Section 382 limits the amount of net operating loss carryovers that may be utilized by a corporation after there has been a more than 50% change in ownership or shift in equity. Although the restrictions imposed by Section 382(a) generally apply to taxable and tax free reorganizations, special rules apply to Section "G" reorganizations of thrift institutions. Section 382(1)(5)(F) provides that losses of a troubled thrift will not be subject to the restrictions of Section 382(a) if the acquisition transaction qualifies as a "G" reorganization and there is a 20% "continuity of ownership" resulting from the transaction.

For purposes of the "continuity of ownership" test, depositors are treated as shareholders. Therefore, as long as the deposits of the troubled thrift are equal to 20% of the sum of the deposits and the outstanding stock, if any, in the acquiring entity immediately after the acquisition, this test is met.

It is our understanding, that Central Evergreen's deposits will be greater than 20% of the sum of the deposits and the outstanding stock of Sterling Savings Association immediately after the acquisition. Therefore, the requirements of 382(1)(5)(F) are met and the limitation of Section 382(a) will not apply.

Based upon Section 381 and the regulations thereunder, the net operating losses of the transferor corporation (Central Evergreen) may be carried over to offset post acquisition taxable income of the acquiring corporation. However, based on the consolidated return regulations, the amount of net operating loss carryover which may be utilized each year is limited to the amount of taxable income generated by the acquiring corporation (Sterling). Thus, no other member of Sterling's consolidated group may utilize Central Evergreen's net operating loss carryover.

The consolidated return regulations also limit the utilization of any net operating loss carryforward of the acquired subsidiaries. To the extent, if any, the net operating loss carryforwards are attributed to each of the acquired subsidiaries, they may only be utilized against post acquisition consolidated taxable income of each separate subsidiaries' share of the consolidated taxable income. It is anticipated that the amount of net operating loss carryforwards attributable to Central Evergreen's subsidiaries will be very minor, if any. However, the above limitation does need to be recognized and considered.

Internal Revenue Code Section 381(c)(1)(B) places limits on the amount of the transferor's NOL which may be utilized by the acquirer in its first taxable year ending after the date of transfer. In general, the amount of Central Evergreen's net operating loss carryforward utilized in the first post acquisition year is limited to the ratio of days post-acquisition over the total number of days in the tax year multiplied by the

## Period of Net Operating Loss Carryovers

There are different net operating loss carryback/carryforward periods of a savings and loan, depending on the year generated. The rules can be summarized as follows:

| Tax Year Generated | Carryback/Carryforward Period |
|---|---|
| 1976 - 1981 | Carryback 10 years - carryforward 5 years |
| 1982 - 1985 | Carryback 10 years - carryforward 8 years |
| 1986 | Carryback 10 years - carryforward 5 years |
| 1987 & after | Carryback 3 years - carryforward 15 years |

As previously stated, the acquired NOLs may only be carried forward. Based on Sterling's June 30 tax year, the net operating losses will expire as follows:

| Tax Year Generated | Approximate NOL | Expiration Period |
|---|---|---|
| 12/31/82 | 4,500,000 | 06/30/1990 |
| 12/31/83 | 3,500,000 | 06/30/1991 |
| 12/31/88 | Unknown | 06/30/2003 |

## State Considerations

The state of Washington does not have an income tax and Central Evergreen has operated solely in Washington State. Sterling Savings has just recently established a presence in Oregon, Idaho, and Utah. For purposes of this letter, we have not addressed the effect, if any, on future state income tax.

## Conclusion

Based on our understanding of fact and applicable law the net operating losses will succeed to Sterling Savings Association after the merger/acquisition. The utilization of the acquired net operating loss carryovers will be subject to the previously discussed limitations.

If you have any questions with respect to the letter, please contact Rick Beebe.

Very truly yours,

Coopers & Lybrand


RWB:r100P2:6

Coopers
&Lybrand

certified public accountants

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have been engaged to report on the appropriate application of generally accepted accounting principles to the specific transaction described below. This report is being issued to you for assistance in complying with the conditions set forth in Federal Home Loan Bank Board Resolution No. 88-1273, dated December 8, 1988, approving the acquisition of Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). Our engagement has been conducted in accordance with standards established by the American Institute of Certified Public Accountants.

We have read the Acquisition Agreement between Sterling Savings Association ("Sterling") and Central Evergreen. We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, specifically the attached schedule entitled "Central Evergreen Acquisition - Schedule of Purchase Accounting Adjustments," and all supporting workpapers.

The agreement was consummated on December 31, 1988 by Sterling acquiring 100% of the outstanding stock of Central Evergreen (immediately after it underwent a voluntary supervisory stock conversion) in exchange only for assuming its outstanding liabilities. Since the combination is contrary to the idea of combining existing stockholder interests that is the essence of a pooling-of-interests, the transaction has been treated for generally accepted accounting principle purposes as a "purchase."

In our opinion, based solely upon the information and facts provided to us as described above, this acquisition does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 ("APB No. 16"). Therefore, we concur in the treatment of this combination as a purchase under generally accepted accounting principles.

Sterling has allocated the total cost of acquiring Central Evergreen to the assets acquired and liabilities assumed based on their estimated fair values at the date of acquisition (December 31, 1988), again in accordance with the requirements of APB No. 16 and Statement of Financial Accounting Standards No. 72 ("SFAS No. 72"). We have reviewed this allocation and the propriety of the underlying valuations, as well as the proposed plan for amortizing the individual adjustments to fair value and the unidentified intangible asset, based upon

information of Central Evergreen as of December 31, 1988. The more significant individual allocations and Sterling's plan for amortizing each are as follows:

1. A discount of approximately $1,900,000 has been allocated to the loan portfolio. This discount will be amortized using the level interest yield method over 12 years, which represents the estimated remaining term (after considering assumed prepayments) of the portfolio.

2. Discounts totalling approximately $800,000 have been allocated to the investment and mortgage-backed securities portfolios. These discounts will be amortized using the level interest yield method over the estimated remaining terms of the respective portfolios, which in the case of mortgage-backed securities will not exceed 12 years.

3. A premium of approximately $1,100,000 has been allocated to office properties and equipment, after writing off the "appraised equity capital" carried on the books of Central Evergreen. This premium will be amortized using the straight-line method over the estimated remaining life of the properties and equipment revalued.

4. Discounts totalling approximately $500,000 have been allocated to deposits and FHLB advances. These discounts will be amortized using the level interest yield method over the estimated remaining terms of the outstanding deposits and advances revalued.

5. A total of approximately $23,800,000 has been allocated to an unidentified intangible asset. Since the fair value of the liabilities assumed by Sterling exceeds the fair value of the tangible assets acquired, this unidentified intangible asset must be amortized in accordance with paragraph 5 of SFAS No. 72. Accordingly, the unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired.

In our opinion, based solely upon the information and facts provided to us as described above, the significant individual allocations and the proposed method and period of amortizing each appear proper under APB No. 16 and SFAS No. 72. It should be noted that all individual adjustments to fair value have been tax-effected as appropriate since Sterling has not yet adopted Statement of Financial Accounting Standards No. 96.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgement on the appropriate application of generally accepted accounting principles for the Central

Evergreen transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of our audit of Sterling's consolidated financial statements for the year ending June 30, 1989 (which period will include the Central Evergreen acquisition), our conclusions may change.

Coopers & Lybrand

Spokane, Washington
January 27, 1989

# AGREEMENT

This Agreement is made this 25th day of December, 1988, by and between Sterling Savings Association (the "Acquirer"), hereto and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), a corporate instrumentality and agency of the United States, which is under the operating direction of the Federal Home Loan Bank Board (the "Board").

WHEREAS, the Acquirer has filed with the FSLIC the appropriate application ("Application") for approval of its proposed acquisition of control of Central Evergreen Federal Savings and Loan Association (the "Institution"); and

WHEREAS, in order to make a determination to approve the subject Application, pursuant to the applicable standards, the FSLIC requires that the Acquirer enter into this Agreement; and

WHEREAS, the Acquirer is willing to enter into this Agreement in order that the FSLIC will act favorably upon the Acquirer's Application;

NOW THEREFORE, in consideration of the FSLIC acting favorably on the Application, the Acquirer agrees as follows:

## I. DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

A. "Additional Capital" means capital that the Supervisory Agent directs the Acquirer to raise, or otherwise deems to have been raised, in satisfaction of the provisions of this Agreement.

B. "Business Plan" means the Acquirer's financial projections for the period through June 1991, a copy of which is attached hereto, as such plan may be amended from time to time with the prior written non-objection of the Supervisory Agent as provided below.

C. "Date of Acquisition" means the effective date on which the Acquirer acquires control of the Institution.

D. "Default" means the failure of the Acquirer to comply with its obligations under this Agreement.

E. "Dividend" means (a) any dividend paid or other distribution (including, but not limited to, a liquidating distribution) made on or with respect to any shares of common stock of the Acquirer, but not including a stock dividend of stock of the

Acquirer, or (b) any payment on account of the purchase, redemption or other acquisition or retirement of any such shares or any warrants or option thereon, whether made by the Acquirer or any direct or indirect subsidiary thereof.

F. "Fully Phased-In Capital Requirement" means the Acquirer's fully phased-in regulatory capital requirement as defined in 12 C.F.R. Section 563.13, or any successor regulation.

G. "Minimum Capital Requirement" means the amount computed quarterly according to Section 563.13(b) and as adjusted by the "April Calculation" specified in Section 563.13(b)(2)(iv), or any successor regulation thereto.

H. "Regulatory Capital" means regulatory capital defined in accordance with 12 C.F.R. Section 561.13, or any successor regulation hereto.

I. "Regulatory Capital Requirement" means the Acquirer's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto.

J. "Regulatory Capital Deficiency" means the amount by which the Regulatory Capital of the Acquirer, computed by the Supervisory Agent in accordance with 12 C.F.R. Section 561.13, or any successor regulation thereto, is less than the Minimum Capital Requirement.

K. "Supervisory Agent" means the Principal Supervisory Agent or any Supervisory Agent of the FHLBB and FSLIC at the Federal Home Loan Bank of Seattle.

All technical words or terms used in this Agreement for which meanings are not specified or otherwise provided by the provisions of this Agreement shall, insofar as applicable, have meanings as defined in the rules and regulations of the FHLBB. Any such technical words or terms used in the Agreement and undefined in said rules and regulations shall have meanings that accord with the best custom and usage in the thrift industry.

II. <u>BUSINESS PLAN</u>

The Acquirer shall use its best efforts to comply with its Business Plan, and the Acquirer shall not, without receiving the prior written non-objection of the Supervisory Agent, take any action (i) not provided for in or contemplated by its Business Plan or (ii) which would create a significant possibility of material deviation therefrom; provided, however, that the failure to raise additional capital as provided in the Business Plan shall not be deemed to be a deviation if it is raised prior to December 31, 1990 and if a revised Business Plan has been submitted to the

Supervisory Agent by June 30, 1989. The Acquirer shall not revise its Business Plan or adopt a new Business Plan unless the Acquirer has received from the Supervisory Agent prior written notice of non-objection to such revision or adoption. At least 30 days before the end of any period for which projections are included in the Business Plan, the Acquirer shall submit to the Supervisory Agent, in form and substance acceptable to the Supervisory Agent, new projections for the next successive twelve-month period.

The Supervisory Agent will give reasonable consideration to any revision to the Business Plan submitted, that was necessitated by actions taken by any governmental body having jurisdiction that caused the Acquirer to materially deviate from its Business Plan. Such material deviation shall not be a violation of the obligations.

## III. OBLIGATIONS OF ACQUIRER

A. The Acquirer will cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan. The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised prior to December 31, 1990.

B. The Acquirer agrees that if the ratio of regulatory capital to total assets is less than the ratio projected in the attached Business Plan by 90 basis points until the earlier of (i) December 31, 1990 or (ii) the raising of the additional capital provided for in the attached Business Plan, or subsequently 30 basis points, it will comply with the directives that are imposed under 12 C.F.R. Section 563.13(d) and will comply with the time period specified.

C. The Acquirer may not pay any common stock Dividend without the prior written approval of the Supervisory Agent.

D. The Acquirer shall submit to the Supervisory Agent quarterly variance reports in the format of the Business Plan explaining any material deviation from the approved Business Plan.

## IV. DEFAULTS

A. If the FSLIC shall determine that a Default has occurred, it shall give notice of such Default to the Acquirer and

afford the Acquirer an opportunity to cure such Default within 90 days.

B. The FSLIC, in its sole discretion, may waive or forbear any past Default hereunder and its consequences, before or after the giving of the notice of Default in the manner provided above, by delivering notice of such waiver or forbearance in writing to the Acquirer, but no such waiver or forbearance shall extend to any Default that occurs subsequent to the date of such waiver or forbearance, and no waiver or forbearance or purported waiver or purported forbearance that is not in writing shall be effective. Any waiver or forbearance of any right, power, or remedy shall not preclude its further exercise.

V. MISCELLANEOUS PROVISIONS

A. Any notice hereunder shall be in writing and shall be delivered by hand or sent by United States express mail or commercial express mail, postage prepaid, and addressed as follows:

If to the Acquirer: Daniel G. Byrne, SVP-Finance
c/o Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

If to the FSLIC: Supervisory Agent
Federal Home Loan Bank of Seattle

B. This Agreement shall be deemed a contract made under and governed by Federal law.

C. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective transferees, successors, assigns, and trustees.

D. All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

E. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties.

F. This Agreement has been duly authorized, executed, and delivered, and constitutes, in accordance with its terms, a valid and binding obligation of the Acquirer and the FSLIC. It is understood and agreed that this Agreement is a "written agreement

entered into with the Corporation" as that phrase is used in Section 407(e) of the National Housing Act ("NHA"), 12 U.S.C. Section 1730(e) (1982).

G. Any rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute, regulation, or rule of law.

H. The Supervisory Agent has the authority to act on behalf of the FSLIC in granting approvals, waivers or forbearances, giving notices of Default, or taking any other action provided for in this Agreement.

I. This Agreement shall be effective as of the Date of Acquisition.

J. If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding on the Acquirer and the FSLIC.

K. This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

L. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute the same instrument, and any party may execute this Agreement by signing any such counterpart.

M. This Agreement is not a waiver of or forbearance from any applicable regulation.

VI. <u>TERMINATION OF AGREEMENT</u>

The Acquirer's obligations under this Agreement shall terminate as follows:

A. Five years after the Date of Acquisition; or

B. Section III.A., III.B. and III.C., of this Agreement shall terminate if the Acquirer's Regulatory Capital exceeds its Fully Phased-In Capital Requirement for a period of two consecutive years.

Termination of this Agreement shall not preclude the exercise by the FSLIC of any right or remedy hereunder which arose out of a Default that occurred or existed prior to such termination, and in respect to which notice of such Default has

been given pursuant to Section III. hereof within one year following such termination. In addition, termination of this Agreement shall not terminate any of the Acquirer's obligations arising from any other source including, but not limited to, any other agreement with the FSLIC, or any statute or regulation.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officer or designated agency on this 29th day of December, 1988.

STERLING SAVINGS ASSOCIATION

By: Harold B. Gilkey

Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Edwin C. Hedlund
Supervisory Agent
Federal Home Loan Bank of Seattle

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

# ATTACHMENT A

## Executive Summary and Financial Projections

## Consolidation of Sterling and Central Evergreen with Infusion of $5 Million Preferred Stock

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

## EXECUTIVE SUMMARY

Consolidation of Central Evergreen, and Sterling on September 30, 1988. This projection assumes $5 million of convertible preferred stock has been issued by June 30, 1989. The dividend rate is $2.50 (equivalent to a 10% non-compounded yield). The assumptions used are conservative and require no extraordinary events.

## Consolidation Results of Projection

On the date of the acquisition, consolidated assets are $706 million. Growth in the balance sheet approximates 6% to 9% annually. At the end of the projection, consolidated assets are $840 million. Regulatory net worth at the date of acquisition is 3.4% of total assets.

Non-earning assets represent 11.3% of the balance sheet at the date of acquisition but decrease to 5.6% at the end of the projection. This occurs due to reduction of special assets and reduction of intangible assets through amortization and utilization of $8 million of net operating losses during the projection period.

Net income is $1,341,000, $2,885,000, and $4,261,000 during fiscal 1989, 1990 and 1991, respectively. This represents return on average assets of approximately .23% during fiscal year 1989, which increases to approximately .53% during fiscal 1991. The combination of increased lending activities, containment of costs, and increase in spread contribute to this improvement in return on average assets.

The net interest rate spread as a percentage of total earning assets increases from approximately 2.02% for the first full quarter following consolidation (December 1988) to approximately 2.29% in the last quarter of the projection period. The increase in net interest rate spread is principally due to the incremental increase of net spread on new assets and the reduction in the level of non-earning assets.

## General Assumption

This financial projection assumes that Central Evergreen and Sterling are combined on December 31, 1988. Five million dollars of preferred stock is raised through a community offering and completed on June 30, 1989. Additional capital formation occurs principally through earnings. Interest rates assumed in this projection are the same as those outlined on Exhibit B (pages B-4 and B-5) of the Business Plan for Fiscal 1989, included as Attachment D. Liability growth increases at approximately 6% to 9% annually. The effects of implementing FASB 91, Accounting for Loan Fees, are built into the projections for both Sterling and Central Evergreen.

## Specific Assumptions

A. Sterling

The operations of Sterling are assumed to be approximately the same as in its Fiscal 1989 Operating Plan, adjusted only for a reduction in asset and liability growth by approximately $30 million.

B. Central Evergreen

The operations of Central Evergreen are assumed to be relatively unchanged from its current level of activity with the following exceptions:

1. The head office function is consolidated in Spokane.

2. The lending function continues to concentrate on residential loan production. The level of loan originations increase slightly to approximately $95 million annually.

3. Operating costs reflect a net reduction of approximately $500,000 for duplicated functions and for economics of scale resulting from consolidatior

4. Added emphasis is given to sale of consumer insurance products which adds some revenue enhancement on a consolidated basis.

6. Intangible assets of $20.9 million are created principally as a result of eliminating Central Evergreen's deferred loan losses, establishing reserves for additional loan losses and writing down certain investments to current market. The intangible assets are amortized using the level-interest method over the estimated live of the loan portfolio, net of prepayments, or 12 years.

Utilization of net operating loss carryforwards of $8 million are expected t reduce intangible assets by approximately $2.8 million by the end of the projection period:

| Year Ending June 30, | NOL's Utilized | Tax Effect @ 34% |
|---|---|---|
| 1989 | $1,100,000 (1/2 year) | $ 374,000 |
| 1990 | 3,000,000 | 1,020,000 |
| 1991 | 4,000,000 | 1,360,000 |
| | $8,100,000 | $2,754,000 |

Approximately $14 million net operating loss carryforward would remain unused.

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1989

| ASSETS | PROJECTED 1st QTR SEPTEMBER | PROJECTED 2nd QTR DECEMBER | PROJECTED 3rd QTR MARCH | PROJECTED 4th QTR JUNE |
|---|---|---|---|---|
| CASH | $5,692,369 | $8,999,748 | $9,246,100 | $3,053,276 |
| INVESTMENTS | 27,000,000 | 53,240,000 | 56,240,000 | 59,240,000 |
| LOANS RECEVIABLE | 304,247,755 | 485,206,562 | 486,869,132 | 497,160,565 |
| MORTGAGE-BACKED SECURITIES | 60,000,000 | 73,326,000 | 76,399,260 | 84,473,253 |
| INVESTMENT & ADVANCES TO AFFILIATE | 14,677,810 | 16,685,997 | 16,694,486 | 16,793,177 |
| ACCRUED INTEREST RECEIVABLE | 3,300,000 | 3,375,000 | 3,450,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | 5,550,000 | 10,764,000 | 10,839,000 | 11,089,000 |
| INTANGIBLE ASSETS | 18,825,359 | 39,362,609 | 38,535,859 | 37,335,109 |
| REAL ESTATE OWNED | 5,456,000 | 9,974,000 | 7,904,000 | 7,249,000 |
| PREPAID & OTHER ASSETS | 300,000 | 5,098,000 | 5,098,000 | 5,099,000 |
| TOTAL ASSETS | $445,049,293 | $706,021,916 | $711,265,837 | $725,006,379 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| SAVINGS AND CHECKING | 302,975,100 | 528,084,500 | 532,977,935 | 542,523,430 |
| ADVANCES FROM FHLB | 55,300,000 | 85,900,000 | 85,900,000 | 81,900,000 |
| REPO FUNDS PURCHASED | 50,000,000 | 51,000,000 | 50,000,000 | 52,000,000 |
| FED FUNDS PURCHASED | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 3,600,000 | 3,750,000 | 3,900,000 | 4,050,000 |
| ACCRUED INTEREST PAYABLE | 1,400,000 | 1,400,000 | 1,400,000 | 1,400,000 |
| LOAN PARTICIPATIONS PAYABLE | 540,000 | 600,000 | 660,000 | 720,000 |
| ADVANCE PAYMENTS FOR T&I | 1,300,000 | 1,200,000 | 1,800,000 | 1,700,000 |
| DEFERRED TAXES | 384,200 | 620,800 | 987,000 | 1,471,100 |
| DEFERRED INCOME | 239,600 | 261,909 | 253,957 | 242,933 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | 1,000,000 | 4,096,000 | 4,086,000 | 4,086,000 |
| TOTAL LIABILITIES | 421,738,900 | 681,903,208 | 686,864,902 | 695,093,513 |
| **STOCKHOLDERS' EQUITY** GROWTH | | 4.75% | 62.86% | 1.93% |
| CAPITAL STOCK | 468,996 | 515,895 | 515,895 | 515,895 |
| PREFERRED STOCK | 90,169 | 90,168 | 90,168 | 290,169 |
| ADDITIONAL PAID IN CAPITAL - COMMON | 5,196,029 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | 2,050,111 | 2,050,111 | 2,050,111 | 6,950,111 |
| CONTRIBUTED CAPITAL FSLIC | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | 1,662,932 | 1,606,577 | 1,550,222 | 1,493,867 |
| UNDIVIDED PROFITS - CURRENT | 132,155 | 434,040 | 772,622 | 1,340,909 |
| TOTAL EQUITY | 23,310,393 | 24,118,708 | 24,400,935 | 29,912,967 |
| TOTAL LIABILITIES AND EQUITY | $445,049,293 | $706,021,916 | $711,265,837 | $725,006,379 |
| RAP LEVERAGE | 5.238% | 3.416% | 3.431% | 4.126% |
| GAAP LEVERAGE | 2.155% | 1.473% | 1.502% | 2.233% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | 4.230% | 5.575% | 5.419% | 5.150% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1989

| | 1st QTR SEPTEMBER | 2nd QTR DECEMBER | 3rd QTR MARCH | 4th QTR JUNE | TOTAL |
|---|---|---|---|---|---|
| **INTEREST INCOME** | | | | | |
| LOANS | $7,823,180 | $8,049,579 | $12,671,522 | $13,282,827 | $41,826,103 |
| MBS | 1,184,257 | 1,479,965 | 1,765,224 | 1,828,049 | 6,257,555 |
| INVESTMENTS | 691,324 | 603,419 | 1,086,923 | 1,225,290 | 3,607,015 |
| INVESTMENT IN AFFILIATE | 185,378 | 240,296 | 273,296 | 278,372 | 977,252 |
| LOAN DISCOUNT | 45,000 | 45,000 | 57,000 | 57,000 | 204,000 |
| TOTAL INTEREST INC. | 9,929,199 | 10,417,259 | 15,853,934 | 16,671,539 | 52,871,931 |
| **INTEREST EXPENSE** | | | | | |
| DEPOSITS | 5,427,886 | 5,588,914 | 9,912,471 | 10,504,905 | 31,434,176 |
| BORROWINGS | 2,078,099 | 2,241,158 | 2,902,914 | 2,991,115 | 10,213,286 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 |
| OTHER | 3,000 | 3,000 | 3,000 | 3,000 | 12,000 |
| TOTAL INTEREST EXP. | 7,508,984 | 7,833,072 | 12,818,385 | 13,499,020 | 41,659,462 |
| NET INT. SPREAD | $2,420,215 | $2,584,187 | $3,035,549 | $3,172,519 | $11,212,470 |
| **OTHER INC. (EXP.)** | | | | | |
| LOAN & COMMITMENT FEES | 90,000 | 93,000 | 106,000 | 109,000 | 398,000 |
| OTHER FEES | 206,666 | 213,519 | 321,270 | 317,192 | 1,058,647 |
| SERVICE INCOME | 67,500 | 81,000 | 94,500 | 108,000 | 351,000 |
| SERVICE CORP | (188,441) | 12,521 | 126,086 | 318,812 | 268,978 |
| RESERVE FOR LOANS & REO LOSSES | (150,000) | (150,000) | (100,000) | (100,000) | (500,000) |
| GAIN (LOSS) ON INVESTMENT | 37,500 | 37,500 | 43,500 | 43,500 | 162,000 |
| GAIN (LOSS) ON LOAN SALES | 0 | 0 | 315,000 | 352,500 | 667,500 |
| OTHER INCOME (EXPENSE) | 3,000 | 3,000 | 176,000 | 176,000 | 358,000 |
| TOTAL OTHER INCOME | 66,225 | 290,540 | 1,082,356 | 1,325,004 | 2,764,125 |
| **OPERATING EXP.** | | | | | |
| PERSONNEL | 826,193 | 908,122 | 1,048,397 | 1,059,896 | 3,842,558 |
| COMMUNICATIONS | 88,530 | 88,990 | 136,595 | 138,845 | 452,960 |
| ADVERTISING | 60,698 | 60,748 | 82,698 | 88,298 | 292,442 |
| TRAVEL & ENTERTAINMENT | 64,890 | 75,817 | 87,860 | 72,475 | 301,043 |
| OFFICE SUPPLIES | 77,339 | 77,439 | 108,489 | 109,439 | 372,706 |
| INSURANCE | 174,900 | 178,800 | 324,200 | 330,800 | 1,008,700 |
| DATA PROCESSING | 183,445 | 198,020 | 311,945 | 308,020 | 1,001,430 |
| TAXES AND LICENSES | 48,325 | 52,530 | 100,655 | 108,120 | 309,630 |
| LEGAL & ACCOUNTING | 63,800 | 59,800 | 66,325 | 66,300 | 256,225 |
| OCCUPANCY | 183,421 | 186,066 | 262,136 | 263,794 | 895,417 |
| DEPREC./AMORT. | 406,565 | 414,227 | 929,627 | 934,327 | 2,684,746 |
| OTHER | 101,842 | 102,492 | 129,807 | 127,732 | 461,563 |
| TOTAL OPERATING EXP. | 2,279,948 | 2,403,031 | 3,588,634 | 3,608,047 | 11,979,660 |
| NET INC (LOSS)BEFORE TAX | $206,492 | $471,696 | $52[illegible] | $889,476 | $2,096,935 |
| TAX (PROVISION) BENEFIT | (74,337) | (169,811) | (190,6[illegible]9) | (3[illegible],190) | (755,0[illegible]) |
| NET INC (LOSS) | $132,155 | $301,885 | $339,592 | $568,297 | $1,340,909 |
| PREFERRED DIVIDEND | 56,355 | 56,355 | 56,355 | 56,355 | 225,420 |
| EARNINGS AVAILABLE TO COMMON | $75,800 | $245,530 | $282,237 | $511,932 | $1,115,489 |
| YIELD ON EARNING ASSETS | 7.838% | 8.169% | 9.947% | 10.336% | 9.094% |
| COST OF SAVINGS AND BORROWINGS | 5.611% | 5.865% | 7.569% | 7.991% | 6.990% |
| SPREAD DIFFERENCE | 2.227% | 2.304% | 2.379% | 2.345% | 2.204% |
| SPREAD ON AVG EARNING ASSETS | 1.911% | 2.026% | 1.905% | 1.957% | 1.926% |

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1990

| ASSETS | PROJECTED 1st QTR | PROJECTED 2nd QTR | PROJECTED 3rd QTR | PROJECTED 4th QTR |
|---|---|---|---|---|
| CASH | $2,667,058 | $3,695,933 | $6,467,307 | $7,017,625 |
| INVESTMENTS | 60,290,000 | 61,371,500 | 62,485,445 | 63,632,809 |
| LOANS RECEVIABLE | 504,524,985 | 512,916,486 | 521,255,828 | 533,223,186 |
| MORTGAGE-BACKED SECURITIES | 89,147,955 | 90,491,465 | 92,903,740 | 95,386,859 |
| INVESTMENT & ADVANCES TO AFFILIATE | 16,783,177 | 16,793,177 | 16,793,177 | 16,793,177 |
| ACCRUED INTEREST RECEIVABLE | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | 11,089,000 | 11,099,000 | 11,099,000 | 11,089,000 |
| INTANGIBLE ASSETS | 36,497,041 | 35,658,973 | 34,820,905 | 32,962,836 |
| REAL ESTATE OWNED | 6,499,000 | 5,749,000 | 4,999,000 | 4,249,000 |
| PREPAID & OTHER ASSETS | 4,999,000 | 4,998,000 | 4,798,000 | 4,798,000 |
| TOTAL ASSETS | $735,021,216 | $746,078,535 | $759,127,402 | $772,667,491 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| SAVINGS AND CHECKING | 551,977,218 | 562,509,402 | 575,056,412 | 598,024,715 |
| ADVANCES FROM FHLB | 81,900,000 | 81,900,000 | 91,900,000 | 81,900,000 |
| REPO FUNDS PURCHASED | 52,000,000 | 52,000,000 | 52,000,000 | 52,000,000 |
| FED FUNDS PURCHASED | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,050,000 | 4,050,000 | 4,050,000 | 4,050,000 |
| ACCRUED INTEREST PAYABLE | 1,400,000 | 1,400,000 | 1,400,000 | 1,400,000 |
| LOAN PARTICIPATIONS PAYABLE | 720,000 | 720,000 | 720,000 | 720,000 |
| ADVANCE PAYMENTS FOR T&I | 1,700,000 | 1,700,000 | 1,700,000 | 1,700,000 |
| DEFERRED TAXES | 1,471,100 | 1,471,100 | 1,471,100 | 1,471,100 |
| DEFERRED INCOME | 242,983 | 242,983 | 242,983 | 242,983 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | 4,086,000 | 4,086,000 | 4,086,000 | 4,086,000 |
| TOTAL LIABILITIES | 704,547,331 | 715,079,485 | 727,626,495 | 740,594,798 |
| STOCKHOLDERS' EQUITY GROWTH | 2.57% | 2.88% | 3.28% | 3.57% |
| CAPITAL STOCK | 515,895 | 515,895 | 515,995 | 515,895 |
| PREFERRED STOCK | 290,168 | 290,168 | 290,168 | 290,168 |
| ADDITIONAL PAID IN CAPITAL - COMMON | 5,701,915 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | 6,850;111 | 6,850,111 | 6,850,111 | 6,850,111 |
| CONTRIBUTED CAPITAL FSLIC | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | 2,653,421 | 2,472,066 | 2,290,711 | 2,109,356 |
| UNDIVIDED PROFITS - CURRENT | 742,403 | 1,448,893 | 2,132,105 | 2,885,246 |
| TOTAL EQUITY | 30,473,915 | 30,999,050 | 31,500,907 | 32,072,693 |
| TOTAL LIABILITIES AND EQUITY | $735,021,216 | $746,079,535 | $759,127,402 | $772,667,491 |
| RAP LEVERAGE | 4.146% | 4.155% | 4.150% | 4.151% |
| GAAP LEVERAGE | 2.279% | 2.316% | 2.342% | 2.375% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | 4.965% | 4.780% | 4.567% | 4.266% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TOTAL |
|---|---|---|---|---|---|
| | $13,665,969 | $13,301,287 | $12,905,748 | $12,975,491 | $52,848,395 |
| | 2,193,555 | 2,132,375 | 2,093,506 | 2,114,643 | 8,534,079 |
| | 1,288,104 | 1,247,909 | 1,205,260 | 1,202,237 | 4,943,511 |
| AFFILIATE | 259,174 | 233,216 | 217,800 | 209,759 | 919,950 |
| | 57,000 | 57,000 | 57,000 | 57,000 | 228,000 |
| INC. | 17,463,702 | 16,971,786 | 16,479,315 | 16,559,131 | 67,473,934 |
| E | | | | | |
| | 10,899,787 | 10,502,117 | 10,128,259 | 10,099,500 | 41,629,662 |
| | 3,019,662 | 2,933,459 | 2,784,065 | 2,728,424 | 11,465,610 |
| DEBT | 0 | 0 | 0 | 0 | 0 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 12,000 |
| EXP. | 13,922,449 | 13,438,576 | 12,915,324 | 12,830,925 | 53,107,272 |
| | $3,541,254 | $3,533,211 | $3,563,991 | $3,728,206 | $14,366,662 |
| MENT FEES | 109,000 | 109,000 | 109,000 | 109,000 | 436,000 |
| | 330,000 | 330,000 | 330,000 | 330,000 | 1,320,000 |
| OME | 123,000 | 139,000 | 153,000 | 168,000 | 582,000 |
| | 350,000 | 350,000 | 320,000 | 320,000 | 1,340,000 |
| OANS & REO LOSSES | (100,000) | (100,000) | (100,000) | (100,000) | (400,000) |
| N INVESTMENT | 43,500 | 43,500 | 43,500 | 43,500 | 174,000 |
| ON LOAN SALES | 330,000 | 322,500 | 315,000 | 352,500 | 1,320,000 |
| (EXPENSE) | 176,000 | 176,000 | 176,000 | 176,000 | 704,000 |
| INCOME | 1,361,500 | 1,369,000 | 1,346,500 | 1,399,000 | 5,476,000 |
| | 1,119,961 | 1,163,979 | 1,192,478 | 1,277,480 | 4,753,899 |
| IS | 141,246 | 143,710 | 146,239 | 148,833 | 580,029 |
| | 94,415 | 101,096 | 108,393 | 116,364 | 420,267 |
| ERTAINMENT | 60,019 | 49,932 | 41,764 | 35,150 | 186,864 |
| ES | 110,400 | 111,374 | 112,359 | 113,355 | 447,489 |
| | 337,636 | 344,718 | 352,053 | 359,651 | 1,394,059 |
| NG | 304,169 | 300,390 | 296,692 | 293,044 | 1,194,294 |
| ICENSES | 116,535 | 126,021 | 136,714 | 148,769 | 529,039 |
| UNTING | 66,275 | 66,250 | 66,225 | 66,200 | 264,950 |
| | 265,466 | 267,153 | 268,855 | 270,572 | 1,072,047 |
| f. | 950,504 | 950,504 | 950,504 | 950,504 | 3,802,016 |
| | 155,698 | 153,704 | 151,750 | 149,835 | 610,998 |
| ING EXP. | 3,722,326 | 3,778,831 | 3,824,016 | 3,929,756 | 15,254,929 |
| BEFORE TAX | $1,180,428 | $1,123,379 | $1,096,475 | $1,197,450 | $4,587,732 |
| ON) BENEFIT | (438,025) | (416,889) | (403,262) | (444,309) | (1,702,486) |
| | $742,403 | $706,490 | $693,212 | $753,141 | $2,885,246 |
| DEND | 181,355 | 181,355 | 181,355 | 181,355 | 725,420 |
| ABLE TO COMMON | $561,048 | $525,135 | $501,857 | $571,786 | $2,159,826 |
| NG ASSETS | 10.439% | 10.189% | 9.511% | 9.472% | 9.890% |
| S AND BORROWINGS | 8.050% | 7.829% | 7.241% | 7.144% | 7.613% |
| NCE | 2.389% | 2.359% | 2.270% | 2.329% | 2.277% |
| EARNING ASSETS | 2.117% | 2.121% | 2.057% | 2.133% | 2.106% |

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1991

| ASSETS | | PROJECTED 1st QTR | PROJECTED 2nd QTR | PROJECTED 3rd QTR | PROJECTED 4th QTR |
|---|---|---|---|---|---|
| CASH | | $6,990,403 | $6,433,389 | $5,565,685 | $6,065,328 |
| INVESTMENTS | | 64,814,593 | 66,031,830 | 67,494,544 | 69,009,453 |
| LOANS RECEVIABLE | | 547,252,224 | 561,725,939 | 576,659,434 | 592,068,332 |
| MORTGAGE-BACKED SECURITIES | | 97,942,930 | 100,574,128 | 103,282,692 | 106,070,925 |
| INVESTMENT & ADVANCES TO AFFILIATE | | 16,783,177 | 16,783,177 | 16,783,177 | 16,783,177 |
| ACCRUED INTEREST RECEIVABLE | | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | | 11,099,000 | 11,089,000 | 11,089,000 | 11,089,000 |
| INTANGIBLE ASSETS | | 32,150,258 | 31,337,700 | 30,525,132 | 28,352,565 |
| REAL ESTATE OWNED | | 3,749,000 | 3,249,000 | 2,749,000 | 2,249,000 |
| PREPAID & OTHER ASSETS | | 4,799,000 | 4,798,000 | 4,798,000 | 4,798,000 |
| TOTAL ASSETS | | $789,094,594 | $805,547,164 | $822,471,664 | $840,039,841 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| SAVINGS AND CHECKING | | 599,592,976 | 611,493,104 | 623,735,016 | 636,329,929 |
| ADVANCES FROM FHLB | | 83,559,000 | 85,257,770 | 87,027,803 | 88,849,637 |
| REPO FUNDS PURCHASED | | 54,340,000 | 56,241,900 | 59,210,367 | 60,247,729 |
| FED FUNDS PURCHASED | | 5,025,000 | 5,050,125 | 5,075,376 | 5,100,753 |
| CASHIER CHECKS ISSUED & OUTSTANDING | | 4,070,250 | 4,090,601 | 4,111,054 | 4,131,610 |
| ACCRUED INTEREST PAYABLE | | 1,407,000 | 1,414,035 | 1,421,105 | 1,429,211 |
| LOAN PARTICIPATIONS PAYABLE | | 723,600 | 727,218 | 730,854 | 734,509 |
| ADVANCE PAYMENTS FOR T&I | | 1,708,500 | 1,717,043 | 1,725,629 | 1,734,255 |
| DEFERRED TAXES | | 1,479,456 | 1,485,949 | 1,493,277 | 1,500,743 |
| DEFERRED INCOME | | 244,199 | 245,419 | 246,646 | 247,879 |
| SUBORDINATED DEBT | | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | | 4,091,000 | 4,096,025 | 4,101,075 | 4,106,151 |
| TOTAL LIABILITIES | | 756,239,980 | 771,829,087 | 787,878,201 | 804,401,405 |
| **STOCKHOLDERS' EQUITY** | GROWTH | 3.93% | 4.22% | 4.18% | 4.22% |
| CAPITAL STOCK | | 515,895 | 515,895 | 515,895 | 515,895 |
| PREFERRED STOCK | | 290,168 | 290,168 | 290,168 | 290,168 |
| ADDITIONAL PAID IN CAPITAL - COMMON | | 5,701,915 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | | 6,850,111 | 6,950,111 | 6,850,111 | 6,850,111 |
| CONTRIBUTED CAPITAL FSLIC | | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | | 4,813,247 | 4,631,892 | 4,450,537 | 4,269,192 |
| UNDIVIDED PROFITS - CURRENT | | 963,277 | 2,009,094 | 3,064,836 | 4,261,163 |
| TOTAL EQUITY | | 32,854,615 | 33,718,077 | 34,593,464 | 35,608,435 |
| TOTAL LIABILITIES AND EQUITY | | $789,094,594 | $805,547,164 | $822,471,664 | $840,009,841 |
| RAP LEVERAGE | | 4.164% | 4.186% | 4.206% | 4.239% |
| GAAP LEVERAGE | | 2.425% | 2.483% | 2.538% | 2.606% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | | 4.074% | 3.890% | 3.711% | 3.375% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1991

| | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TO |
|---|---|---|---|---|---|
| **INTEREST INCOME** | | | | | |
| LOANS | $13,301,397 | $13,692,781 | $13,677,268 | $14,194,881 | $54, |
| MBS | 2,193,682 | 2,268,437 | 2,272,229 | 2,356,395 | 9, |
| INVESTMENTS | 1,222,362 | 1,250,125 | 1,240,720 | 1,283,523 | 4, |
| INVESTMENT IN AFFILIATE | 207,834 | 211,021 | 204,364 | 206,635 | |
| LOAN DISCOUNT | 57,000 | 57,000 | 57,000 | 57,000 | |
| TOTAL INTEREST INC. | 16,982,275 | 17,479,364 | 17,451,581 | 18,098,434 | 70, |
| **INTEREST EXPENSE** | | | | | |
| DEPOSITS | 10,268,150 | 10,504,451 | 10,399,269 | 10,720,573 | 41, |
| BORROWINGS | 2,762,239 | 2,859,449 | 2,850,066 | 2,955,452 | 11, |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | |
| OTHER | 3,000 | 3,000 | 3,000 | 3,000 | |
| TOTAL INTEREST EXP. | 13,033,389 | 13,366,900 | 13,252,335 | 13,679,025 | 53, |
| NET INT. SPREAD | $3,948,886 | $4,112,464 | $4,199,246 | $4,419,409 | $16, |
| **OTHER INC. (EXP.)** | | | | | |
| LOAN & COMMITMENT FEES | 109,000 | 109,000 | 109,000 | 109,000 | |
| OTHER FEES | 340,000 | 340,000 | 340,000 | 340,000 | 1, |
| SERVICE INCOME | 183,000 | 198,000 | 213,000 | 228,000 | |
| SERVICE CORP | 440,000 | 440,000 | 440,000 | 440,000 | 1, |
| RESERVE FOR LOANS & REO LOSSES | (100,000) | (100,000) | (100,000) | (100,000) | ( |
| GAIN (LOSS) ON INVESTMENT | 43,500 | 43,500 | 43,500 | 43,500 | |
| GAIN (LOSS) ON LOAN SALES | 330,000 | 360,000 | 315,000 | 330,000 | 1, |
| OTHER INCOME (EXPENSE) | 176,000 | 176,000 | 176,000 | 176,000 | |
| TOTAL OTHER INCOME | 1,521,500 | 1,566,500 | 1,536,500 | 1,566,500 | 6, |
| **OPERATING EXP.** | | | | | |
| PERSONNEL | 1,306,874 | 1,380,325 | 1,412,364 | 1,435,185 | 5, |
| COMMUNICATIONS | 149,342 | 149,854 | 150,368 | 150,885 | |
| ADVERTISING | 116,835 | 117,310 | 117,786 | 118,265 | |
| TRAVEL & ENTERTAINMENT | 35,291 | 35,432 | 35,574 | 35,717 | |
| OFFICE SUPPLIES | 113,772 | 114,191 | 114,612 | 115,035 | |
| INSURANCE | 360,749 | 361,853 | 362,962 | 364,077 | 1, |
| DATA PROCESSING | 293,994 | 294,949 | 295,909 | 296,873 | 1, |
| TAXES AND LICENSES | 149,303 | 149,839 | 150,378 | 150,920 | |
| LEGAL & ACCOUNTING | 66,326 | 66,453 | 66,589 | 66,708 | |
| OCCUPANCY | 271,565 | 272,563 | 273,565 | 274,573 | 1, |
| DEPREC./AMORT. | 925,004 | 925,004 | 925,004 | 925,004 | 3, |
| OTHER | 150,309 | 150,785 | 151,264 | 151,745 | |
| TOTAL OPERATING EXP. | 3,939,364 | 4,018,557 | 4,056,367 | 4,084,929 | 16, |
| NET INC (LOSS) BEFORE TAX | $1,531,021 | $1,660,407 | $1,679,378 | $1,900,921 | $6, |
| TAX (PROVISION) BENEFIT | (567,744) | (615,589) | ([illegible],637) | (704,592) | (2, |
| NET INC (LOSS) | $963,277 | $1,044,817 | $1,056,742 | $1,196,327 | $4, |
| PREFERRED DIVIDEND | 181,355 | 181,355 | 181,355 | 181,355 | |
| EARNINGS AVAILABLE TO COMMON | $781,922 | $863,462 | $875,387 | $1,014,972 | $3, |
| YIELD ON EARNING ASSETS | 9.385% | 9.632% | 9.175% | 9.378% | |
| COST OF SAVINGS AND BORROWINGS | 7.038% | 7.225% | 6.863% | 7.014% | |
| SPREAD DIFFERENCE | 2.347% | 2.407% | 2.311% | 2.364% | |
| SPREAD ON AVG EARNING ASSETS | 2.192% | 2.256% | 2.208% | 2.290% | |

# CERTIFICATE OF CORPORATE RESOLUTION

OF

STERLING SAVINGS ASSOCIATION

I, Ned M. Barnes, Secretary of Sterling Savings Association do hereby certify that a meeting of the Board of Directors of said corporation duly held on the 20th day of December, 1988, which a quorum was present and acting throughout, the following resolution was duly adopted and is now in full force and effect and that said resolution is not in conflict with any provisions of the Articles of Incorporation or Bylaws of the corporation:

WHEREAS, this corporation has previously directed and empowered its officers, or any one of them, to enter into an agreement for acquisition of the assets and liabilities of Central Evergreen substantially on the terms and conditions of an Acquisition Agreement presented to the Board; and

WHEREAS, pursuant to the authority granted under said resolutio this corporation entered into an Acquisition Agreement dated July 20, 1988 (the "Acquisition Agreement") and has effected the requisit applications for approval to the Federal Home Loan Bank Board and Wa ington State Supervisor of Savings and Loan Associations; and

WHEREAS, approvals have been received from the Federal Home Loa Bank Board by resolution No. 88-1273 dated December 8, 1988 ("the FHLBB Resolution") and by the Washington State Supervisor of Savings and Loan Associations office; and

WHEREAS, the FHLBB Resolution requires, among other things, that prior to the consummation of the merger and conversion contemplated by the Acquisition Agreement, the Board of Directors of this corporation, as the resulting institution, under the Acquisi- tion Agreement ratify the terms and conditions of the FHLBB Resoluti as well as the terms of the proposed conversion and merger;

NOW, THEREFORE, IT IS:

RESOLVED that the terms and conditions of the FHLBB Resolution are hereby agreed to and ratified;

BE IT FURTHER RESOLVED that the officers, or any one of them, are hereby directed and empowered to act on behalf of this corpora- tion in fulfilling the terms and conditions of the FHLBB Resolution including, without limitation, the execution of a written agree- ment which provides that for a period of five (5) years following the date of the acquisition, this corporation will operate within the scope of the business plan which was provided in connection with the application to the Federal Home Loan Bank Board and to provide reports to the supervisory agent for the Federal Home Loan Bank Board in accordance with said written agreement, as well

BE IT FURTHER RESOLVED that the effective date as called for under the Acquisition Agreement shall be December 31, 1988; and

BE IT FURTHER RESOLVED that the officers of this corporation, or any one of them, are hereby directed and empowered to execute and deliver any and all documents which may be required to consummate the acquisition under the Acquisition Agreement, to comply with the terms and conditions of the FHLBB Resolution, and to comply with any and all other terms and conditions required by any other regulatory agency having jurisdiction over the transaction and this corporation.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 1988.

Ned M Barnes
NED M. BARNES
Secretary

GRAHAM & DUNN

# MEMORANDUM

TO: Betty Reed
Ed Hedlund
Carol Gamble
Craig Nolte
Dan Byrne
Lee Greene
John Van Dijk

FROM: Parker Cann

DATE: December 20, 1988

RE: **Closing Memorandum - Conversion/Merger of Central Evergreen Federal Savings and Loan Association into Sterling Savings Association**

---

This memorandum will set forth guidelines for the closing of the conversion/merger of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") into Sterling Savings Association ("Sterling"). The conversion/merger may be referred to hereinafter sometimes as "Acquisition."

## SECTION I. PLAYERS LIST

Following is a list of the individuals who will be involved in the closing of the Acquisition, along with their addresses, phone numbers and telecopy (fax) numbers.

1. Betty Reed, Supervisor
Department of General Administration
Division of Savings & Loan Associations
217-C General Administration Building
Olympia, Washington 98504

Phone: (206) 753-5597
Fax: (206) 753-6070

2. Ed Hedlund, Senior Supervisory Agent
Carol Gamble, Senior Supervisory Analyst
Craig Nolte, Supervisory Analyst

Federal Home Loan Bank of Seattle
1501 Fourth Avenue
Seattle, WA 98101-1693
Phone: (206) 340-2300
Fax: (206) 340-2485

3. Dan Byrne, Senior Vice President/Finance

Sterling Savings Association
North 120 Wall Street
Spokane, WA 99201
Phone: (509) 624-4114
Fax: (509) 458-4013

4. Lee Greene, Esq.
(Outside counsel representing Sterling)

Witherspoon, Kelley, Davenport & Toole
1100 Old National Bank Building
Spokane, WA 99201-0390
Phone: (800) 552-0042 (from Seattle)
Fax: Call the above number and tell the person answering the phone that you need to be connected to the fax machine.

5. John Van Dijk, Senior Vice President/Chief Operating Officer

Central Evergreen Federal Savings and Loan Association
350 North Market Blvd.
Chehalis, WA 98532
Phone: (206) 748-0171
Fax: (206) 748-6377

6. J. Parker Cann, Esq.
(Outside counsel representing Central Evergreen)

Graham & Dunn
34th Floor, Rainier Bank Tower
1301 Fifth Avenue
Seattle, WA 98101-2653
Phone: (206) 624-8300
Fax: (206) 624-8731 or (206) 447-7051

In the event any of these individuals are unable to participate in the closing, appropriate individuals may act in their stead.

**SECTION II. <u>CLOSING DOCUMENTS</u>**

The parties have agreed to close the Acquisition on December 30, 1988 ("Closing Date"), and to make the Acquisition effective on December 31, 1988 ("Effective Date"). Following is a list of documentary items which must be exchanged prior to closing the Acquisition.

Item 1. A letter to Ed Hedlund, Senior Supervisory Agent, dated December 30, 1988, signed by the chief financial officer of Sterling, certifying that "no material adverse events or changes have occurred with respect to the condition of Sterling since the date of the financial statements submitted with the application to the FHLBB for the approval of the conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling."

[The letter certification is required by section 3 on page 3 of the Federal Home Loan Bank Board ("FHLBB") Resolution No. 88-1273, dated December 8, 1988, approving the Acquisition ("FHLBB Resolution"). A copy of the FHLBB Resolution is attached.]

Item 2. A certified resolution of the Board of Directors of Sterling which shall "ratify the terms and conditions of FHLBB Resolution No. 88-1273 and the terms of the proposed conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling."

[The certified resolution is required by section 5 on page 3 of the FHLBB Resolution and by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

Item 3. A written agreement executed by Sterling and the FSLIC concerning compliance with the business plan, submission of periodic reports explaining material deviations from the business plan, maintenance of capital, and sanctions for failure to do so.

[The Federal Home Loan Bank of Seattle ("FHLBank") provided a draft of the agreement to Sterling and Central Evergreen on December 19, 1988. The agreement is required by sections 6 and 8 on pages 3 and 4 of the FHLBB Resolution.]

Item 4. A letter to Ed Hedlund, Senior Supervisory Agent, dated December 30, 1988, signed by the chief financial officer of Central Evergreen, stating that "no material adverse events or changes have occurred with respect to the condition of Central Evergreen since the date of

the financial statements submitted with the application to the FHLBB for approval of the conversion/merger of Central Evergreen into Sterling Savings Association."

[The letter certification is required by section 3 on page 3 of the FHLBB Resolution.]

Item 5. A certified resolution of the Board of Directors of Central Evergreen: (i) "accepting the terms and conditions of FHLBB Resolution No. 88-1273"; and (ii) authorizing, as of the Effective Date, the Stock Charter, Bylaws, and Stock Certificate of Central Evergreen Federal Savings and Loan Association (Stock), as set forth in the Exhibits to the application to the FHLBB for approval of the conversion/merger into Sterling Savings Association.

[The portion of the certified resolution under Item 5 (i) above is required by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

Item 6. The executed Federal Stock Charter and Bylaws of Central Evergreen Federal Savings and Loan Association (Stock).

Item 7. The executed Stock Certificate of Central Evergreen Federal Savings and Loan Association (Stock), dated December 31, 1988, evidencing ownership of 100 shares of common stock, $1.00 par value per share, by Sterling.

Item 8. Certificate(s) of Succession, or document(s) of similar import, signed by an officer(s) of Central Evergreen, as may be required by Sterling.

Item 9. A letter to the chief executive officers of Central Evergreen and Sterling, dated December 31, 1988, signed by Ed Hedlund, Senior Supervisory Agent, which: (i) terminates, as of December 31, 1988, the Supervisory Agreement between the FHLBB and Central Evergreen; and (ii) provides that 12 C.F.R. Part 563b, Subpart A, is clearly inapplicable to the conversion/merger of Central Evergreen into Sterling and need not be complied with in regard thereto.

Item 10. A letter to the chief executive officers of Sterling and Central Evergreen dated December 30, 1988, signed by Ed Hedlund, Senior Supervisory Agent, which indicates: (i) that he "has determined that all conditions precedent to the conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling

Savings Association have been met and that the Boards of Directors of Sterling and Central Evergreen have accepted the terms and conditions of FHLBB Resolution No. 88-1273"; and (ii) that the conversion/merger of Central Evergreen into Sterling will take effect, pursuant to the fourth "RESOLVED FURTHER" paragraph of FHLBB Resolution No. 88-1273, at 12:01 a.m. on December 31, 1988.

[The determination under Item 10 (i) above is required by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

SECTION III. PRE-CLOSING

Certain individuals have agreed to arrange for the delivery, by telecopy or other means, of the draft of certain Items (under Section II above) to certain other parties, on or before December 21, 1988, as follows:

| Delivering Party | Draft of Documents | Delivered To |
|---|---|---|
| Dan Byrne | Items 1 & 2 | Ed Hedlund |
| Dan Byrne | Item 8 | John Van Dijk |
| John Van Dijk | Items 4 & 5 | Ed Hedlund |
| Ed Hedlund | Items 3, 9 & 10 | Dan Byrne & John Van Dijk |

Under the terms of this Closing Memorandum, an Item will not be deemed delivered until it is received by the intended recipient. The appropriate individuals will be responsible to work out any differences in the wording of these draft documents by the close of business on December 23, 1988.

SECTION IV. CLOSING

Written approvals necessary from the Washington State Supervisor of Savings and Loan Associations for closing of the conversion/merger have been received by Sterling.

Certain individuals have agreed to arrange for the delivery of the original of certain Items (under Section II above), as set forth in the chart below, to Lee Greene as escrow on or before December 27, 1988. Lee Greene will hold these documents for delivery to certain individuals until promptly after closing of the Acquisition in accordance with the following chart.

| Delivering Party | Original Documents | Delivered After Closing To |
|---|---|---|
| Dan Byrne | Items 1, 2 & 3 | Ed Hedlund |
| John Van Dijk | Items 4, 5 & 6 | Ed Hedlund |
| John Van Dijk | Items 7 & 8 | Dan Byrne |
| Carol Gamble | Items 9 & 10 | Dan Byrne |

The closing will be conditioned upon receipt by Lee Gı ne on December 30, 1988, of verbal authorizations from Carol Gar e, Dan Byrne and John Van Dijk for delivery of these documents nd closing of the conversion/merger.

Carol Gamble, Dan Byrne, John Van Dijk and Lee Greene ll join in a conference call, initiated by Lee Greene, promptl at 10:00 a.m. on December 30, 1988, for the purpose of delive ng the authorizations. Upon receipt by Lee Greene of these auth i-zations, the closing will be deemed to have occurred on De m-ber 30, 1988, and the conversion/merger will take effect on December 31, 1988. After the closing, Mr. Greene will prom ly deliver, in accordance with the chart noted above in is Section IV, the documents held in escrow.

FEDERAL HOME LOAN BANK BOARD

No. 88-1273

Date: December 8, 1[illegible]

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterlin Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December 5, 1988, a memorandum from the Office of District Banks, dated December 5, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

SUPERVISORY CASE FINDING

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

## COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

## WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

## VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

TAX CERTIFICATION

RESOLVED FURTHER, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

RESOLVED FURTHER, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS

RESOLVED FURTHER, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

EFFECTIVE DATE

RESOLVED FURTHER, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

MISCELLANEOUS

RESOLVED FURTHER, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the PSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

EXTENSION OF TIME

RESOLVED FURTHER, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and

NO. 88-1273



## MAINTENANCE OF BRANCH OFFICES

RESOLVED FURTHER, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

## FAILURE TO MEET CONDITIONS

RESOLVED FURTHER, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board

John F. Ghizzoni
Assistant Secretary

# ACQUISITION AGREEMENT

Between

STERLING SAVINGS ASSOCIATION

and

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

ACQUISITION AGREEMENT

Table of Contents


Page

RECITALS ........................................ 1

Section 1. The Acquisition ................................ 1

1.1 Agreement to Acquire and Merge .................. 1
1.2 Approval by Boards of Directors ................. 2
1.3 Filing of Required Regulatory Applications and Notices ................................. 2
1.4 Interest of Members of Central Evergreen ........ 3
1.5 Transfer of Shares Upon Conversion .............. 3
1.6 Savings Accounts and Deposits ................... 3
1.7 Offices ......................................... 3
1.8 Transfer of Assets and Assumption of Liabilities ................................. 3
1.9 Articles of Incorporation and Bylaws ............ 4
1.10 Directors and Officers of the Surviving Corporation ................................ 4
1.11 Directors, Officers and Employees of Central Evergreen ............................ 5
1.12 Effective Date of Acquisition ................... 8

Section 2. The Closing ................................ 8

Section 3. Representations and Warranties of Central Evergreen ................................ 8

3.1 Corporate Organization .......................... 8
3.2 Subsidiaries .................................... 9
3.3 Financial Statements ............................ 9
3.4 Absence of Undisclosed Liabilities .............. 9
3.5 Absence of Certain Changes ...................... 9
3.6 Litigation, Etc. ................................ 10
3.7 Contracts ....................................... 10
3.8 Title ........................................... 10
3.9 Tax Returns ..................................... 10
3.10 No Violation .................................... 11
3.11 ERISA Compliance ................................ 11

Section 4. Representations and Warranties of Sterling .... 11

4.1 Corporate Organization and Good Standing ........ 11
4.2 Capitalization .................................. 12
4.3 Financial Statements ............................ 12

4.4 Absence of Undisclosed Liabilities .............. 12
4.5 Absence of Certain Changes ...................... 12
4.6 Litigation, Etc. ................................ 12
4.7 Title ........................................... 13
4.8 Tax Returns ..................................... 13
4.9 No Violation .................................... 13

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition ............. 13

5.1 No Change in Charter or Bylaws ................... 13
5.2 Conduct of Business .............................. 14

Section 6. Access and Cooperation ........................ 14

6.1 Access ........................................... 14
6.2 Cooperation ...................................... 14

Section 7. Confidentiality and Announcements ............. 14

7.1 Confidentiality .................................. 14
7.2 Announcements .................................... 15

Section 8. Solicitation of Employees ..................... 15

Section 9. Conditions Precedent to the Obligations of Sterling ............................................ 15

Section 10. Condition Precedent to the Obligations of Central Evergreen .................................. 15

Section 11. Abandonment of Acquisition ................... 16

Section 12. Miscellaneous Provisions ..................... 17

12.1 Expenses ........................................ 17
12.2 Litigation Costs ................................ 17
12.3 Parties in Interest ............................. 17
12.4 Headings ........................................ 18
12.5 Entire Agreement/Modification/Waiver ............ 18
12.6 Counterparts .................................... 18
12.7 Governing Law ................................... 18
12.8 Binding Nature of Agreement; No Assignment ...... 18
12.9 Notice Provisions ............................... 18

# Table of Exhibits


| Exhibit | |
|---|---|
| 1 | Plan of Conversion |
| 2 | Branch Offices of Surviving Corporation |
| 3.1 | Articles of Incorporation (Sterling) |
| 3.2 | Bylaws (Sterling) |
| 4.1 | Employment Contract of George E. Godding dated December 31, 1986 |
| 4.2 | Employment Contract of John G. Van Dijk dated December 12, 1985 |
| 4.3 | Employment Contract of Carole Neuheuser dated December 13, 1985 |
| 4.4 | Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981 |
| 4.5 | Agreement with Joyce Butkus dated November 6, 1987 |
| 5 | Association Policy on Group Insurance of Retired CEF Employees/Directors dated September 10, 1986 |
| 6 | Vacation Policy Statement (Sterling) |
| 7 | Litigation (Central Evergreen) |
| 8 | Contracts (Central Evergreen) |
| 9 | Title to Property (Central Evergreen) |
| 10 | Litigation (Sterling) |

( (

# ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT is entered into as of July 20, 1988, by and between STERLING SAVINGS ASSOCIATION (hereinafter "Sterling"), and CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION (hereinafter "Central Evergreen").

## RECITALS

WHEREAS, Sterling is a stock savings and loan association duly organized and existing under the laws of the State of Washington, with its principal office located at Spokane, Washington; and

WHEREAS, Central Evergreen is a mutual savings and loan association duly organized and existing under the laws of the United States, with its principal office located at Chehalis, Washington; and

WHEREAS, the Board of Directors of the parties deem it desirable and in the best interests of the corporations, their shareholders, and members, as the case may be, that Central Evergreen be converted into a federal stock association, its stock be acquired by Sterling, and Central Evergreen be simultaneously merged into Sterling, in accordance with the applicable provisions of the laws of the State of Washington and the United States, with Sterling being the surviving corporation;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereby agree as follows:

## Section 1. The Acquisition

1.1 Agreement to Acquire and Merge. Subject to the provisions of this Acquisition Agreement ("Agreement") and the obtaining of all required regulatory approvals, Central Evergreen

shall convert into a federal stock association in a voluntary supervisory stock conversion pursuant to the Plan of Conversion attached hereto as Exhibit 1 and in accordance with 12 C.F.R. §§563b.20 through 563b.32 ("Conversion") and, as an integral part of and immediately following such Conversion, Sterling shall acquire all of the stock of Central Evergreen, and Central Evergreen shall merge with and into Sterling (the "Acquisition"), with Sterling being the surviving corporation ("Surviving Corporation"). On the Effective Date (hereinafter defined in Section 1.12), the separate corporate existence of Central Evergreen shall cease. The Surviving Corporation shall continue to operate after the Effective Date under the name and style of Sterling Savings Association, or such other name as the Board of Directors of the Surviving Corporation may determine.

1.2 Approval by Boards of Directors. At least two-thirds of the Board of Directors of Central Evergreen have approved the plan of acquisition as evidenced by this Agreement. At least a majority of the Board of Directors of Sterling have approved the plan of acquisition as evidenced by this Agreement.

1.3 Filing of Required Regulatory Applications and Notices. Upon the execution and delivery of this Agreement, Sterling and Central Evergreen shall cause to be prepared and filed with the Federal Home Loan Bank Board ("FHLBB") an application for approval of the Conversion and an application for approval of the Acquisition. In addition, Sterling shall cause to be prepared and filed in a timely manner any application or notice to the Washington State Supervisor of Savings and Loan Associations ("State Supervisor") as required by law, including without limitation RCW 33.08.110. These applications and notices shall be in such forms as may be prescribed by the respective regulatory authorities and shall contain such information as the authorities may require. The parties shall take every reasonable and necessary step and action to comply with, and secure such approval as may be required by, the statutes, rules, and regulations applicable to this Agreement and the transactions contemplated herein and shall use their best efforts to secure such

approvals on terms and conditions mutually agreeable to Ster] and Central Evergreen. Sterling shall use its best efforts secure approval of the Acquisition by the Shareholders Sterling if the State Supervisor determines that such approval required.

1.4 Interest of Members of Central Evergreen. The memb of Central Evergreen shall have no rights of approval or parti pation in the Conversion and no rights to the continuance of legal or beneficial ownership interest in Central Evergreen the Surviving Corporation.

1.5 Transfer of Shares Upon Conversion. On the Effect Date, Central Evergreen will issue all authorized shares of capital stock to Sterling.

1.6 Savings Accounts and Deposits. All savings accou and deposits in Central Evergreen shall be and become savi accounts and deposits in the Surviving Corporation without cha in their respective terms, maturities, interest rates, mini required balances or withdrawal values. As of the Effect Date, each savings account and deposit of Central Evergreen sh be considered for dividend or interest purposes as if it had b a savings account or deposit of the Surviving Corporation at t time such savings account or deposit was opened in Cent Evergreen and at all times thereafter, until such savings accou or deposit ceases to be a savings account or deposit of t e Surviving Corporation. Appropriate evidence of ownership of savings accounts or deposits in the Surviving Corporation shall be provided by the Surviving Corporation to each savings account holder and depositor of Central Evergreen.

1.7 Offices. The location of the home office of the Surviving Corporation shall be the present location of the home office of Sterling and all offices of Central Evergreen shall become branch offices of the Surviving Corporation. The location of all branch offices of the Surviving Corporation shall be as provided in Exhibit 2 attached hereto.

1.8 Transfer of Assets and Assumption of Liabilities. Upon the Effective Date, all of the assets and property of every kind

and character, real, personal and mixed, tangible and intangible, choses in action, rights, and credits then owned by Central Evergreen, or which would inure to Central Evergreen, shall immediately, and by operation of law and without any conveyance or transfer and without any further act or deed, be vested in and become the property of the Surviving Corporation, which shall have, hold and enjoy the same in its own right as fully and to the same extent as the same were possessed, held and enjoyed by Central Evergreen immediately prior to the Effective Date. The Surviving Corporation shall be deemed to be and shall be a continuation of the entity of Central Evergreen and the rights and obligations of Central Evergreen shall remain unimpaired. Upon the Effective Date, the Surviving Corporation shall assume and succeed to all of such rights and obligations and the duties and liabilities connected therewith.

1.9 Articles of Incorporation and Bylaws. The articles of incorporation and bylaws of Sterling immediately prior to the Effective Date shall continue to be the articles of incorporation and bylaws of the Surviving Corporation following the Effective Date, except as may be otherwise contemplated herein, and shall thereafter control the affairs of the Surviving Corporation unless and until amended in due and proper course. A copy of the current articles of incorporation and bylaws of Sterling are attached hereto as Exhibits 3.1 and 3.2, respectively.

1.10 Directors and Officers of the Surviving Corporation. The directors and officers of Sterling immediately prior to the Effective Date shall continue as the directors and officers of the Surviving Corporation for the full unexpired term of their offices and until their successors have been elected or appointed and qualified. In addition, Sterling's Board of Directors shall cause such changes, if any, as may be required to the Surviving Corporation's bylaws to permit the addition of two persons to the Surviving Corporation's Board of Directors and shall choose two individuals from Central Evergreen's Board of Directors, as such Board exists immediately prior to the Effective Date, to be added to the Surviving Corporation's Board of Directors.

1.11 Directors, Officers and Employees of Central Evergreen.

(a) Directors' Participation in Medical/Dental Plans of the Surviving Corporation. The parties agree that the Surviving Corporation shall use its best efforts to allow those individuals who are directors of Central Evergreen immediately prior to the Effective Date to participate, to the extent permitted under the Surviving Corporation's existing plans, at their own expense, in the medical and dental plans offered by the Surviving Corporation to its officers and employees, without regard for any plan exclusions on account of pre-existing conditions and such that coverage can be continued after the Effective Date without loss to any such directors. Such individuals may from time to time so elect to participate in said plans, at their own expense, at any time up to their death.

(b) Employees. Upon the Effective date, it is intended that the employees of Central Evergreen shall become employees of the Surviving Corporation upon terms and conditions of employment substantially equivalent to the terms and conditions of employment of all other employees of the Surviving Corporation, except as may be otherwise contemplated herein. The ultimate decisions relating to the retention, assignment, and compensation of all personnel of the Surviving Corporation will be the responsibility of management of the Surviving Corporation, subject to the provisions of this Agreement. Any employee benefits offered by the Surviving Corporation shall be made available on an equal basis to the individuals employed by Central Evergreen immediately prior to the Effective Date who are then employed by the Surviving Corporation immediately following the Effective Date ("Prior Central Evergreen Employees"), and such Employees shall receive full credit for service with Central Evergreen and its predecessors under the benefit plans offered by the Surviving Corporation, except as detailed in the following sentence and in subsection 1.11(c) below. In regard to medical and dental plans

offered by the Surviving Corporation, to the extent p mitted under Surviving Corporation's plans, the Surviv Corporation shall use its best efforts to allow the Pr. Central Evergreen Employees to participate without rega for any plan exclusions on account of pre-existing cond tions and such that coverage can be continued after t Effective Date without loss to any such Employees.

(c) Employee Retirement Plans. Prior Central Eve green Employees shall: (i) be eligible to participate the 401(k) plan of the Surviving Corporation and any oth retirement plans made available by the Surviving Corporati to its employees in accordance with the eligibility cond tions of such plans; and (ii) receive full credit fc service to Central Evergreen and its predecessors prior t the Effective Date for the purpose of establishing vestir in employer contributions to the Surviving Corporation' 401(k) or in other retirement plans, but shall not receiv such credit for participation eligibility purposes.

After the Effective Date, the Surviving Corpora- tion may determine to terminate the defined benefit pensio plan of Central Evergreen; provided, however, that such termination shall not occur until after all Prior Central Evergreen Employees have first become eligible to partici- pate in the 401(k) plan of the Surviving Corporation. Any such termination shall be effected in accordance with the provisions of such plan and applicable law. The Surviving Corporation shall continue to fund the participation of all Prior Central Evergreen Employees in the plan at appropriate levels under the plan until such termination of the plan by the Surviving Corporation is effective.

Upon termination of the defined benefit pension plan, the Prior Central Evergreen Employees shall be entitled to, at their election, cash out their interest in the plan, or receive an annuity contract which would provide benefits equivalent to those to which the employee was entitled under the plan, or roll over their interest into

the Surviving Corporation's 401(k) or other retirement plans. Any assets remaining in Central Evergreen's defined benefit pension plan after satisfaction of all obligations shall be assets of the Surviving Corporation.

(d) Assumption of Employment Agreements of Central Evergreen. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation shall assume the obligations of Central Evergreen under:

(1) the Employment Contract of George E. Godding dated December 31, 1986;

(2) the Employment Contract of John G. Van Dijk dated December 12, 1985;

(3) the Employment Contract of Carole Neuheuser dated December 13, 1985;

(4) the Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981;

(5) the Agreement with Joyce Butkus dated November 6, 1987.

Copies of said contracts and agreements are attached hereto as Exhibits 4.1, 4.2, 4.3, 4.4, and 4.5, respectively.

(e) Group Insurance for Retired Employees/Directors. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation will assume Central Evergreen's obligations under Central Evergreen's "Association Policy on Group Insurance of Retired CEF Employees/Directors," dated September 10, 1986, to Central Evergreen directors and Employees who retire prior to the Effective Date and to all Prior Central Evergreen Employees who retire after the Effective Date. A copy of said Policy is attached hereto as Exhibit 5.

(f) Vacation Leave. Notwithstanding any other provisions of this Section 1.11, the parties agree that all Prior Central Evergreen Employees shall be entitled to

vacation leave in accordance with the Vacation Pc :y Statement of Sterling, a copy of which is attached here! .s Exhibit 6.

1.12 Effective Date of Acquisition. The Acquisition s l become effective upon the date ("Effective Date") specifie y the FHLBB and State Supervisor or, in the absence of h specification, the date agreed to by the parties, after e Acquisition has been approved by all necessary governme l agencies and authorities and after all applicable wai g periods, if any, have elapsed.

Section 2. The Closing.

The parties shall use their best efforts to complete e Acquisition at the earliest practicable date following e satisfaction or waiver of all of the conditions to each pa s obligations set forth herein, but in no event later n November 30, 1988, unless the parties shall before then e otherwise agreed in writing. On or before the Effective D , the closing of the Acquisition shall take place at the princ l office of Sterling ("Closing"). The exact date and time of e Closing shall be determined by Sterling and communicated o Central Evergreen promptly after all such conditions have n satisfied or waived. If the Closing does not occur on or be e November 30, 1988, or such later date as the parties may agre n writing, this Agreement shall be deemed abandoned.

Section 3. Representations and Warranties of Central Evergre

Central Evergreen represents and warrants that:

3.1 Corporate Organization. Central Evergreen is a mu l savings and loan association duly organized and validly exis ng under the laws of the United States, and possesses all approv :, consents and licenses required to fully act as a federal mu l savings and loan association. Each of Central Evergre 's subsidiaries is a corporation duly organized, validly exis ng and in good standing under the laws of the State of Washing , and possesses all approvals, consents and licenses required :o

fully carry on its respective business. Central Evergreen and its subsidiaries are qualified to do business as foreign corporations in each jurisdiction, if any, in which their property or business requires such qualification.

3.2 Subsidiaries. Central Evergreen has the following subsidiaries which are wholly-owned by Central Evergreen: Evergreen First Service Corporation ("EFSC") and Evergreen Environmental Development Corporation. The Best Agency is the wholly-owned subsidiary of EFSC.

3.3 Financial Statements. Central Evergreen's balance sheets as of December 31, 1983, 1984, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Knight, Vale & Gregory, and the unaudited balance sheets and related statements of income and retained earnings for the quarter ended March 31, 1988, copies of which have been separately delivered by Central Evergreen to Sterling, fairly present the financial condition of Central Evergreen as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles or regulatory accounting principles consistently applied for the periods covered.

3.4 Absence of Undisclosed Liabilities. Except to the extent reflected or reserved against in Central Evergreen's balance sheet as of December 31, 1987, Central Evergreen did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles or regulatory accounting principles.

3.5 Absence of Certain Changes. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Central Evergreen to Sterling, there has been no material adverse change in the business, properties or financial condition of Central Evergreen or its subsidiaries since December 31, 1987.

3.6 Litigation, Etc. Except as disclosed on Exhibit 7 attached hereto, there is no litigation, proceeding or investigation pending or, to the knowledge of Central Evergreen, threatened against Central Evergreen or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Central Evergreen or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Central Evergreen in connection with this Agreement.

3.7 Contracts. Except as disclosed on Exhibits 4.1, 4.2, 4.3, 4.4 and 4.5, and Exhibit 8, attached hereto, neither Central Evergreen nor its subsidiaries are party to any lease, loan or credit agreement, contract or other commitment including, without limitation, employment contracts, (i) involving an aggregate payment by Central Evergreen or its subsidiaries of more than Two Thousand Dollars ($2,000.00); or (ii) involving obligations to be performed later than one year from the date hereof. Any and all requisite governmental approvals have been obtained and corporate action taken for such agreements to be effective and enforceable.

3.8 Title. Central Evergreen has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Central Evergreen as of March 31, 1988, other than property disposed of in the ordinary course of business after said date. Except as disclosed on Exhibit 9 attached hereto, such property of Central Evergreen is not subject to any mortgage, encumbrance or lien of any kind, which, as now enforced, interferes with its normal current business use.

3.9 Tax Returns. The federal income tax returns of Central Evergreen have been audited by the Internal Revenue Service for the years 1969 to 1979 and 1981 and 1982. Except as heretofore disclosed in writing by Central Evergreen to Sterling, the provisions for federal and state taxes reflected in the financial statements referred to in Section 3.3 hereof are adequate to cover any such taxes which may be assessed against Central Evergreen in respect of its business and operations during the

periods covered by said financial statements and all prior periods.

3.10 <u>No Violation</u>. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation, to which any property of Central Evergreen or its subsidiaries is subject or by which Central Evergreen or its subsidiaries is bound.

3.11 <u>ERISA Compliance</u>. Central Evergreen and its subsidiaries are in compliance in all material respects with the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and the regulations and published interpretations thereunder. It is anticipated that additional plan amendments will be made, in accordance with the time requirements set forth in federal regulations, as needed to update the plan to comply with the Tax Reform Act of 1988 and the Omnibus Budget Reconciliation Act of 1987. Without limiting the foregoing, no Reportable Event described in §4043(b) of ERISA, filing of a notice of intent to terminate under §4041 of ERISA, or any event or condition which might constitute grounds under §4042 of ERISA for termination of, or for the appointment of a trustee to administer, any pension or profit-sharing plan of Central Evergreen or its subsidiaries, has occurred with respect to any Employee Benefit Plan described in §3(3) of ERISA administered by Central Evergreen or its subsidiaries or any administrator designated by Central Evergreen or such subsidiaries. Based on reasonable projections, there are no unfunded vested liabilities under any pension plans administered by Central Evergreen, its subsidiaries or administrators designated by Central Evergreen or its subsidiaries, at December 31, 1987.

<u>Section 4. Representations and Warranties of Sterling</u>.

Sterling represents and warrants that:

4.1 <u>Corporate Organization and Good Standing</u>. Sterling is a stock savings and loan association duly organized, validly

existing and in good standing under the laws of the State of Washington, and possesses all approvals, consents, and licenses required to fully act as a Washington state stock savings and loan association.

4.2 Capitalization. Sterling's authorized capital stock consists of eight million (8,000,000) shares of Sterling common stock, One Dollar ($1.00) par value, of which 468,996 shares are issued and outstanding; and one million (1,000,000) shares of preferred stock, One Dollar ($1.00) par value, of which 90,168 shares are issued and outstanding.

4.3 Financial Statements. Sterling's balance sheets as of June 30, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Coopers & Lybrand, and the unaudited balance sheets and related statements of income and retained earnings for the periods ended September 30, 1987, December 31, 1987, March 31, 1988 and June 30, 1988, copies of which have been separately delivered by Sterling to Central Evergreen, fairly present the financial condition of Sterling as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles consistently applied for the periods covered.

4.4 Absence of Undisclosed Liabilities. Except to the extent reflected or reserved against in Sterling's balance sheet as of June 30, 1988, Sterling did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles.

4.5 Absence of Certain Changes. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Sterling to Central Evergreen, there has been no material adverse change in the business, properties or financial condition of Sterling or its subsidiaries since June 30, 1988.

4.6 Litigation, Etc. Except as disclosed on Exhibit 10 attached hereto, there is no litigation, proceeding or investi-

gation pending or, to the knowledge of Sterling, threatened against Sterling or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Sterling or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Sterling in connection with this Agreement.

4.7 Title. Sterling has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Sterling as of June 30, 1988, other than property disposed of in the ordinary course of business after said date. Such property of Sterling and its subsidiaries is not subject to any mortgage, encumbrance or lien of any kind, except as disclosed in its financial statements referred to in Section 4.3 hereof.

4.8 Tax Returns. Except as heretofore disclosed in writing by Sterling to Central Evergreen, the provisions for federal and state taxes reflected in the financial statements referred to in Section 4.3 hereof are adequate to cover any such taxes which may be assessed against Sterling in respect of its business and operations during the periods covered by said financial statements and all prior periods.

4.9 No Violation. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation to which any property of Sterling and its subsidiaries is subject or by which Sterling or its subsidiaries is bound.

## Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition.

Central Evergreen covenants that between the date of this Agreement and the Effective Date:

5.1 No Change in Charter or Bylaws. No change will be made in Central Evergreen's charter and bylaws, except as may be contemplated herein.

5.2 Conduct of Business. Central Evergreen will use its best efforts to maintain and preserve its present business organization, employee relationships and goodwill intact, and will not, without the written consent of Sterling, enter into any material commitment except in the ordinary course of business or increase, directly or indirectly, the compensation of any officer or employee whose annual rate of compensation after the increase will exceed Twenty Thousand Dollars ($20,000.00).

Section 6. Access and Cooperation.

6.1 Access. From the date hereof to the Effective Date, Sterling and Central Evergreen shall provide each other with such information and permit each other's officers and representatives such access to its properties and books and records as the other may from time to time reasonably request. If the Acquisition is not completed, all documents and other written materials received in connection with this Agreement shall be returned to the party furnishing the same, and all information so received shall be treated as confidential unless readily ascertainable from public information or sources.

6.2 Cooperation. The parties hereto will cooperate with each other in every way in carrying out the transactions contemplated herein, in obtaining all required approvals and authorizations therefor, and in executing and delivering all documents, instruments or copies thereof deemed necessary or useful by either party thereto.

Section 7. Confidentiality and Announcements.

7.1 Confidentiality. Until the Effective Date, each of the parties hereto and its employees, accountants, counsel, auditors and other representatives and agents shall keep confidential any information (unless readily ascertainable from public information or sources) obtained from the other party, except as may be required to be disclosed to shareholders of Sterling in proxy materials and as may be approved by the party from whom the information was obtained.

7.2 Announcements. Without the prior agreement of the other party, neither party shall, prior to the Effective Date, hold any press interview or conference or make any written announcement or statement to the public or to its employees concerning the transactions contemplated by this Agreement.

Section 8. Solicitation of Employees.

If this Agreement is abandoned as contemplated by Sections 2 or 11 hereof, each of the parties hereto shall, for a period of one (1) year thereafter, refrain from soliciting any officers or key employees of the other for employment unless such other party is merged with or acquired by any other entity or is put into the possession or control of a receiver or conservator.

Section 9. Conditions Precedent to the Obligations of Sterling

The obligations of Sterling under this Agreement to complete the Acquisition are subject to the satisfaction of the following conditions unless waived by Sterling on or before the Effective Date:

(a) Shareholder Approval. If and to the extent the State Supervisor shall so require, Sterling shall have obtained the approval by the Sterling shareholders of the Acquisition.

(b) Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Sterling reasonably determines are unduly burdensome.

Section 10. Condition Precedent to the Obligations of Central Evergreen.

The obligations of Central Evergreen under this Agreement to complete the Acquisition are subject to the satisfaction of the following condition, unless waived by Central Evergreen on or before the Effective Date:

( (

Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Central Evergreen reasonably determines are unduly burdensome. Moreover, the Federal Home Loan Bank of Seattle shall terminate the Supervisory Agreement of Central Evergreen.

Section 11. Abandonment of Acquisition.

This Agreement may be abandoned at any time prior to the Effective Date (i) on the agreement of the Boards of Directors of both parties; or (ii) by action of the Board of Directors of either of the parties, or one of the parties if so noted below, on the happening of any of the following events:

(a) If all the required approvals of the FHLBB and State Supervisor have not been received on or before November 30, 1988, or such later date as the parties may agree in writing;

(b) If any material action or proceeding is instituted or threatened against either of the parties which would enjoin, prohibit or restrain the completion of the Acquisition;

(c) If, between the date of this Agreement and the Effective Date, there has been, in the opinion of either Board of Directors, a material adverse change in the business or financial condition of the other corporation;

(d) If, without the prior written consent of the other party, one of the parties shall have engaged in any transaction prohibited by this Agreement;

(e) By the Board of Directors of Sterling if any one or more of the conditions provided in Section 9 hereof shall not have been satisfied, and Sterling shall not have waived such failure; and

(f) By the Board of Directors of Central Evergreen if the condition provided in Section 10 hereof shall not have

been satisfied, and Central Evergreen shall not have waived such failure.

In the event of any abandonment of this Agreement pursuant to this Section 11, written notice setting forth the reasons therefor shall forthwith be given by the party abandoning this Agreement to the other party. In the event of the abandonment of this Agreement pursuant to the provisions of Sections 2 or 11 hereof, this Agreement shall have no further effect, and there shall be no liability on the part of any party or its directors, officers, employees or members; provided, however, that if any party hereto willfully fails to perform its obligations hereunder, or exercises any powers granted hereunder in bad faith, the other party hereto damaged thereby may seek any available legal or equitable remedies. Notwithstanding the previous sentence, Sections 7.1 and 8 and the last sentence of Section 6.1 shall survive any abandonment of this Agreement.

Section 12. Miscellaneous Provisions.

12.1 Expenses. Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transaction contemplated by this Agreement.

12.2 Litigation Costs. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

12.3 Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any

party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

12.4 Headings. The subject headings of the Sections and subsections of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

12.5 Entire Agreement/Modification/Waiver. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

At any time prior to the Closing, either party may in writing waive compliance by the other party with any of the provisions hereof. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

12.6 Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart shall constitute an original instrument.

12.7 Governing Law. This Agreement shall be interpreted in accordance with and governed by the laws of the State of Washington to the extent that Federal law does not control.

12.8 Binding Nature of Agreement; No Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; except that no party may assign or transfer its rights and obligations under this Agreement without the prior written consent of the other.

12.9 Notice Provisions. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and be effected by personal delivery or by

certified mail, postage prepaid, return receipt requested, and shall be deemed delivered as of the time of actual receipt. Such notices, requests, demands and other communications shall be addressed as set forth below:

(a) If to Sterling, to:

Sterling Savings Association
North 120 Wall
Spokane, Washington 99201
Attention: Daniel Byrne

(b) If to Central Evergreen, to:

Central Evergreen Federal Savings and Loan Association
P.O. Box 1506
Chehalis, Washington 98532
Attention: George Godding

EXECUTED on behalf of the parties by their officers and sealed with their corporate seals, respectively, pursuant to the authorization of their respective Boards of Directors on the dates indicated.

STERLING SAVINGS ASSOCIATION

Date: 7-20-88

By ____________________
President

By ____________________
Secretary

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

Date: 7-20-88

By ____________________
President

By ____________________
Secretary

Office of Thrift Supervision
Department of the Treasury
Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

January 26, 1990

Harold Gilkey
Chairman of the Board and
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

An additional copy of Regulatory Bulletin 3a-1 is attached. Your attention is directed to the section entitled Associations "Subject to Greater Restrictions" on page two of the bulletin. As addressed in this section, Sterling must obtain written approval of the District Director for any new loan and investment activity. This approval is necessary given Sterlings' insolvent capital position.

An application should be filed with the District Director, with a copy also forwarded to my attention. This application should list the types of loans and investments that the institution proposes to engage in, with the appropriate justification for each activity. Given the findings of the recent examination, I would not be inclined to recommend that Sterling be permitted to continue commercial real estate lending. As you have previously stated, however, the institution has virtually shut down this type of lending on its own initiative.

Once received, the application will receive our prompt review and consideration. Until such time that the appropriate approval is obtained, lending and investment activity is limited to outstanding, legally binding commitments.

If you have any questions, or require additional clarification, please call.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh/att.
pc: Betty Reed
State Supervisor

EXHIBIT 29
WITNESS Gilkey
DAVID STOREY
STOREY & MILLER

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696

May 11, 1990

VIA FEDERAL EXPRESS

The Honorable Timothy Ryan
Director
Office of Thrift Supervision
Department of The Treasury
1700 G St, Northwest
Washington, D.C. 20552

Dear Mr. Ryan:

Over the past four years, the FSLIC and the FHLBB granted regulatory and capital forbearances to Sterling Savings Association to induce Sterling to acquire three troubled thrift associations. Sterling has now been informed not only that such forbearances have been eliminated but that, having lost such forbearances, Sterling fails to meet post-FIRREA capital standards. Further, Sterling is being treated itself as a troubled thrift and is under the threat of regulatory sanctions and enforcement proceedings. We respectfully submit that this is not only unfair, it is illegal.

Sterling has attempted to persuade the Seattle District Office of OTS that Sterling's written contracts with the United States should be honored. To ensure that our request is made at the appropriate level of authority, we are also directing it to you, as the highest ranking officer of the Office of Thrift Supervision.

Because of the equities involved in our case, including the fact that Sterling was asked by the regulators to acquire these three failed thrifts, we request that you give prompt consideration to our request that our agree-

ments be honored. We enclose a copy of Sterling's letter to Mr. William J. Durbin, setting out Sterling's position in detail.

Sincerely,

Daniel G. Byrne
Senior Vice-President, Finance

cc: Mr. Durbin

**STERLING SAVINGS Association**

N. 120 Wall • Spokane, WA 99201-0696

May 10, 1990

HAND DELIVERED

Office of Thrift Supervision
Department of the Treasury
1501 - 4th Avenue, 19th Floor
Seattle, Washington 98101-1693

Attention: Mr. William J. Durbin
District Director
Seattle District

Re: Capital Plan

Dear Mr. Durbin:

On April 16, 1990 we received your correspondence of April 11, 1990, together with the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver (the "Operating Agreement"). Having reviewed the proposed Operating Agreement and considered its potential impact on Sterling Savings Association ("Sterling" or the "Association"), we must respectfully decline to execute the Operating Agreement in its present form.

We feel very strongly that executing the Operating Agreement would be tantamount to admitting that Sterling's capital deficiency was caused by its own fault or neglect, when this is not at all the case. Also, the proposed Operating Agreement implies emphatically but incorrectly that the Office of Thrift Supervision and its predecessors (collectively, the "OTS") had nothing to do with creating Sterling's capital deficiency.

As we will explain in greater detail herein, we believe that, unfortunately, Sterling's regulators have breached existing acquisition contracts with Sterling. They have done this by purporting to "eliminate" the various regulatory capital and accounting forbearances granted to induce Sterling to acquire

troubled thrift institutions. The breach of existing contracts has thrown Sterling out of compliance with regulatory capital standards. To add insult to injury, if you will, the OTS is now treating Sterling like a troubled thrift.

We can assure you that we have not decided hastily or easily to decline to execute the Operating Agreement. Since its inception, the Association has worked diligently to develop a constructive and cooperative relationship with each of its regulators. We sincerely wish to continue that tradition by conducting a positive dialogue concerning the Association's existing capital deficiency. We believe that under the present circumstances, however, executing the Agreement in its present form would constitute an abrogation of our fiduciary responsibility to manage the affairs of the Association and to safeguard the interests of our depositors and shareholders.

As the first step toward what we trust will be a positive dialogue regarding the resolution of our capital deficiency, we intend this letter to be: 1) a comprehensive statement of the reasons for Sterling's capital deficiency, 2) our suggested alternatives for curing the deficiency, and 3) a discussion of what we would consider to be a reasonable Operating Agreement under the circumstances.

## BACKGROUND

### The Association.

Sterling commenced operations in 1983 as a Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. The Association's primary business is attracting deposits from the general public and originating, purchasing, selling and servicing secured residential, commercial and consumer loans.

Sterling's retail delivery system attracts deposits through 28 branches located primarily in smaller, rural areas of Washington. Sterling has successfully maintained a stable retail deposit base in rural areas while promoting higher volume lending activity in major metropolitan areas. Thus, the Association has achieved substantial lending volume with relatively low operating costs.

Sterling has been consistently profitable in every year since its inception, earning a total of over $5.5 million through December 31, 1989. Sterling's return on average equity exceeded 15% from 1986 through 1988 and was just below 14% during fiscal 1989. As of December 31, 1989, Sterling's net

worth under Generally Accepted Accounting Principles totalled $10.9 million.

Our management team, which has not changed significantly since inception, has always operated according to the highest principles of integrity and professional competence. In fact, were it not for their desire to live in Spokane, Washington, most of these individuals would be managers at regional or money center banks at substantially higher salaries than those they currently earn at Sterling.

Sterling is a conservative, "no-frills" institution. It is not among those institutions which have been justifiably criticized for their acquisitions of lavish headquarters buildings, art work collections, corporate jets and the like. Nor has Sterling made speculative "investments" in high yield junk bonds, land acquisition and development schemes and the like. In short, Sterling has not been, and is not now part of the problem. Rather, at the request of its regulators and always with their encouragement, support and approval, Sterling has been a part of the solution to the thrift crisis through its acquisitions of troubled thrifts.

<u>The Regulatory Background</u>.

During the late 1970's and early 1980's, a substantial number of thrift institutions experienced serious financial losses precipitated by a combination of soaring inflation, volatile interest rates, recession, and disintermediation. The Federal Savings and Loan Insurance Corporation ("FSLIC") Insurance Fund was insufficient to recapitalize or liquidate the increasing number of failing thrifts. Accordingly, from the early 1980's onward, the Federal Home Loan Bank Board ("FHLBB") sought in many instances to induce healthy thrifts such as Sterling to merge with or acquire and recapitalize troubled institutions.

At first, a substantial portion of these supervisory transactions were assisted by the infusion of FSLIC capital. In nearly all of the transactions, the FHLBB granted regulatory forbearances, typically by granting the acquiring institutions relief from applicable capital and liquidity requirements. Such relief lasted for a period of time sufficient to allow the acquiring institutions to restore their capital to normally required levels.

As the crisis in the thrift industry continued to worsen, and more and more FSLIC-insured thrift institutions became insolvent or troubled, the FSLIC and the FHLBB recognized that continuing to facilitate supervisory mergers with cash

contributions and promissory notes would quickly and entirely exhaust the Insurance Fund. Accordingly, the FSLIC and the FHLBB were forced to revise their policies and practices in order to prevent, or at least forestall, the exhaustion of the FSLIC Insurance Fund. Instead of financial assistance, the FSLIC and the FHLBB began to rely increasingly on regulatory forbearances to induce healthy thrifts to acquire troubled institutions.

For one thing, the regulators encouraged acquiring institutions to record regulatory cash assistance payments as part of their regulatory capital. For another, the regulators allowed acquiring thrifts to extend goodwill amortization periods beyond those allowed under Generally Accepted Accounting Principles. Finally, the regulators granted a variety of forbearances, such as agreements not to enforce capital requirements if a breach thereof was caused by a particular acquisition. In the course of its regulatory-assisted acquisitions, Sterling received each of these types of forbearances.

By granting such regulatory and accounting forbearances, the FSLIC and the FHLBB were able to induce healthy thrifts like Sterling to acquire troubled thrifts with minimal cash contributions or other tangible financial assistance from the FSLIC. The FSLIC and the FHLBB thus saved many billions of dollars in financial assistance that the FSLIC would otherwise have had to pay in order to resolve scores of insolvent and troubled FSLIC-insured thrift institutions.

Regulatory-Supervised Acquisitions by Sterling.

Before it had even opened its doors for business, Sterling was asked by state regulators to consider merging with Lewis & Clark Savings and Loan Association ("Lewis & Clark") of Clarkston, Washington. Since that time, Sterling has been asked to consider acquiring many institutions including Home Savings (Burien, Washington), Guaranty Savings (Longview, Washington), Lynnwood Savings (Lynnwood, Washington), Great Falls Federal Savings (Great Falls, Montana), Home Savings (Boise, Idaho) First Federal (Longview, Washington), Northwest Federal (Boise, Idaho), Mountain West (Salt Lake City, Utah), Tri-Cities Savings (Kennewick, Washington), Central Evergreen Savings (Chehalis, Washington), and Lewis Federal (Chehalis, Washington).

In addition to the Lewis & Clark acquisition, Sterling has now completed three significant acquisitions -- all at the request and with the encouragement and support of state and federal regulatory authorities. The acquisitions that led to


WOT942 1400 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

Sterling's existing capital deficiency, together with the salient facts concerning each acquisition are summarized below.

Lewis & Clark Savings and Loan Association.

By early 1983, the regulators had determined that management at Lewis & Clark was deficient in several respects including its apparent inability to manage interest rate risk. The then State Supervisor of Savings and Loans approached Sterling to request that Sterling consider merging with Lewis & Clark by the summer of 1983.

Less than three months after it commenced business, Sterling consummated a stock-for-stock acquisition of Lewis & Clark on June 30, 1983. Sterling, motivated by its desire to expand its market share and distribution network, agreed to enter into this transaction without any assistance from the regulators. The regulators, for their part, were eager to approve of the transaction since it resolved what could easily have become a $2 million problem at Lewis & Clark.

Lewis Federal Savings & Loan Association.

In the spring of 1985, the FHLBB had judged Lewis Federal Savings and Loan Association ("Lewis Federal") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Lewis Federal. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Lewis Federal's negative net worth.

The FHLBB recognized that the absorption of the insolvent Lewis Federal would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Lewis Federal.

In June, 1985, Sterling offered to acquire Lewis Federal subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital

requirements, and regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.

On November 4, 1985, the FHLBB adopted a resolution containing formal findings of fact: that Lewis Federal was insolvent; that severe financial conditions existed which threatened Lewis Federal's stability; that the FSLIC should be made receiver for Lewis Federal; that the FSLIC had appropriately considered Sterling's qualifications and competence to acquire and manage Lewis Federal; that the acquisition of Lewis Federal by Sterling would reduce the risk to the FSLIC; that Sterling's offer "present[ed] the lowest expense and least risk to the FSLIC of any proposal submitted"; that transfer of Lewis Federal to Sterling was preferable to liquidation and would avoid the loss to Lewis Federal account holders and creditors which liquidation would entail; that acquisition by Sterling was in the best public interest; that acquisition by Sterling was necessary to prevent the probable failure of Lewis Federal ; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Lewis Federal, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On November 5, 1985, Sterling entered into a formal contract with the FSLIC as Receiver for Lewis Federal, under which Sterling agreed to take over Lewis Federal subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of goodwill.

On November 12, 1985, the FHLBB entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Permitted Sterling to exclude certain of Lewis Federal's liabilities in determining compliance with certain requirements;

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal, or by Sterling's assumption of Lewis Federal's negative net worth;

(3) Agreed that Sterling could carry the $1.8 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $1.8 million in supervisory goodwill created by the transaction would be recorded pursuant to the purchase


WOT942 1402 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

method of accounting and could be amortized over 40 years; and

(5) Agreed that the difference between the book and fair market values of Lewis Federal's loan portfolio could be amortized over a 15 year period.

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $1.8 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Lewis Federal, the FSLIC would have had to spend, in our estimate, approximately $5.2 million to liquidate Lewis Federal. In addition to saving this amount, the FSLIC retained the right to utilize Lewis Federal's accumulated net operating loss carryforwards of approximately $3.0 million.

Tri-Cities Savings and Loan Association.

In the summer of 1987, the FHLBB had judged the Tri-Cities Savings and Loan Association ("Tri-Cities") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Tri-Cities. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected thrift institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Tri-Cities' negative net worth.

The FHLBB recognized that the acquisition of the insolvent Tri-Cities would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Tri-Cities.

In November, 1987, Sterling offered to acquire Tri-Cities subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital requirements, and specific regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.

On April 7, 1988, the FHLBB adopted a resolution containing formal findings of fact: that Tri-Cities was insolvent; that the FSLIC should be made receiver for Tri-Cities; that Tri-Cities could not continue as a going concern without financial assistance from the FSLIC; that Sterling was qualified and competent to acquire and manage Tri-Cities; that the acquisition has necessary to prevent the probable failure of Tri-Cities; that the acquisition by Sterling was the most desirable alternative to liquidation or transfer to another institution, and represented the least cost to the FSLIC of any alternative; that the acquisition by Sterling was in the best public interest, and in the best interests of the account holders and creditors of Tri-Cities; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Tri-Cities, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On April 8, 1988, Sterling entered into a formal contract with the FSLIC as receiver for Tri-Cities, under which Sterling agreed to take over Tri-Cities subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of supervisory goodwill.

The FHLBB had already, on April 6, 1988, entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Agreed to waive the assessment, for one year, of penalties occasioned by Sterling's inability to satisfy liquidity requirements.

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities, or by Sterling's assumption of Tri-Cities' negative net worth;

(3) Agreed that Sterling could carry the $11.7 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $11.7 million in supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized over an eight year period.

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $11.7 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Tri-Cities, the FSLIC would have had to spend, in our estimate, approximately $13.7 million to liquidate Tri-Cities. In addition to saving this amount the FSLIC also retained the right to utilize 50% of Tri-Cities' net operating loss carryforwards; the right to any realized excess over the yield maintenance subsidy covering certain assets; and the right to a share of the gain-on-sale of certain assets. In fact, the FSLIC has already become entitled to proceeds resulting from the sale of such properties for amounts in excess of the covered asset value.

Central Evergreen Federal Savings and Loan Association.

In the summer of 1987, the FHLBB requested that Sterling consider acquiring Central Evergreen Federal Savings and Loan Association ("Central Evergreen") a troubled thrift in Chehalis, Washington. Sterling demurred, pointing out that such an acquisition would create a regulatory capital deficiency. The FHLBB asked that Sterling consider the acquisition anyway, pointing out that the "permanent" regulatory capital created by the Lewis Federal and Tri-Cities acquisitions could be used to leverage Sterling into technical compliance with the regulations.

Sterling studied Central Evergreen, and concluded that the acquisition could be done, if Sterling arranged for an equity offering of between $4 to $6 million soon after the acquisition. Sterling then contracted with Central Evergreen, contingent upon approval of the FHLBB, to acquire Central Evergreen's assets and liabilities.

On December 8, 1988, the FHLBB adopted a resolution approving the acquisition. The FHLBB entered formal findings of fact that Central Evergreen was insolvent; that Sterling would be a viable entity following the acquisition; that the acquisition was necessary to prevent the probable failure of Central Evergreen; that the purchase method accounting treatment of goodwill should be used; and that the FSLIC should enter an agreement pursuant to Sterling's proposal calling for an infusion of capital after the acquisition.

On December 28, 1988, Sterling contracted with the FSLIC to carry out a specific business plan. The plan contemplated the addition of between $4 million to $6 million in new equity within two years. Under the agreement, supervisory goodwill and

the excess of book over fair market value of loans acquired from Central Evergreen were to be amortized over a 12 year period. Sterling, concerned about the growing thrift crisis, requested that a clause be included terminating the contract if some change in the laws made it impossible for Sterling to acquire additional equity. After negotiation, the FSLIC agreed to insert a clause permitting Sterling to revise its business plan should events beyond Sterling's control prevent the contemplated equity offering. On December 31, 1988, Sterling consummated the acquisition and began to prepare for an equity offering.

But for Sterling's acquisition of Central Evergreen, the FSLIC would have had to spend, in our estimate, approximately $30.1 million to liquidate Central Evergreen.

* * *

To summarize, it is reasonable to conclude that, as a result of the acquisitions discussed above, the FHLBB and the FSLIC saved in excess of $51 million. They also retained important assets such as the operating loss carryforwards accumulated by the acquired institutions and a right to reap some of the financial rewards generated by Sterling's expert management of assets acquired from the troubled institutions.

For its part, Sterling completed the acquisitions believing that the regulators would honor their contracts to:

(1) Allow Sterling to count an additional $13.5 million ($1.8 million from Lewis Federal and $11.7 million from Tri-Cities) in supervisory goodwill toward its regulatory capital requirement;

(2) Forebear from enforcing any regulatory capital regulations until November 5, 1990 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal;

(3) Forebear from enforcing any regulatory capital regulations until April 8, 1993 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities;

(4) Forebear from enforcing any regulatory capital regulations until December 31, 1990 if Sterling's failure to comply therewith was caused by an inability through no fault of Sterling to raise additional capital following the Central Evergreen acquisition;

(5) Allow Sterling to revise its business plan if events beyond Sterling's control prevented the equity offering contemplated as part of the Central acquisition;

(6) Allow Sterling to pay dividends on preferred stock issued as part of Sterling's proposed equity offering.

Sterling's Proposed Stock Offering.

As contemplated by the Central Evergreen Acquisition Agreement with the FSLIC, and in response to FIRREA and its implementing regulations, Sterling was prepared, in the fall of 1989, to add approximately $10.5 million to its capital accounts through a public offering. The public offering contemplated the sale of up to 603,750 units, each consisting of one share of the Association's common stock and one share of the Association's noncumulative convertible preferred stock. Dain Bosworth, Inc., the underwriter on the proposed stock offering, assured Sterling in December, 1989 that even more than the 603,750 units had been subscribed for.

Dain Bosworth had also performed its due diligence and satisfied itself that Sterling's earnings would be sufficient to allow for the payment of dividends. On several occasions prior to December 19, 1989, Sterling had requested the OTS' approval of the proposed payment of dividends. The OTS responded that it was in the OTS' and Sterling's mutual best interests to attract additional public capital and that prohibiting the payment of dividends would be inconsistent with the goal.

Ultimately, Sterling was forced to cancel the proposed stock offering entirely because of the OTS' refusal to allow the payment of dividends because of the fact that Sterling was a "capital deficient" institution. Sterling incurred fees and costs in connection with the aborted stock offering of nearly $1 million.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was enacted on August 9, 1989. Through FIRREA, Congress sought to impose strict new regulatory capital requirements upon thrifts. At the same time, however, Congress recognized the validity and enforceability of the federal government's specific contractual obligations to institutions such as Sterling.

It is our considered view, therefore, that Sterling's rights to the capital and regulatory forbearances described

above survived the enactment of FIRREA, and remain enforceable today. We are not persuaded that Thrift Bulletin 38-2, issued on January 9, 1990, (one day after capital plans were due) legally eliminated such forbearances as it purported to do.

Although the stringent, new capital requirements set forth in Section 301 of FIRREA are generally applicable to thrifts, they are not intended to abrogate differing capital requirements set forth in binding agreements previously entered into by the FHLBB and/or the FSLIC. Quite to the contrary, Section 401(f) provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which --
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Section 401(g) of FIRREA provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which --
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Similarly, Section 401(h) provides that

> all orders, resolutions, determinations, and regulations, which --

> (1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and
>
> (2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law .... (Emphasis added.)

Recognizing the continued validity and enforceability of forbearances previously granted by the FSLIC and the FHLBB, FIRREA also directs the newly created Resolution Trust Corporation to "evaluate the costs under existing [FSLIC] agreements with regard to ... forbearance ...."

FIRREA not only grants the OTS broad authority to grant exemptions and exceptions from the new capital standards, but it expressly preserves forbearances granted prior to FIRREA by the FHLBB and the FSLIC. For example, Section 302 of FIRREA provides:

> Notwithstanding the amendment made by this title to section 10 of the Home Owners' Loan Act and the repeal of Section 416 of the National Housing Act -
>
> (1) any plan approved by the Federal Home Loan Bank Board ... for any federal savings association shall continue in effect ...; and
>
> (2) any plan approved by the Federal Savings and Loan Insurance Corporation ... shall continue in effect ....

Former Sections 10 and 416 dealt with granting forbearances to "troubled associations" with net worths of 0.5 percent. When forbearances were granted to Sterling, Sterling was not a "troubled association." Moreover, Sterling's net worth was three times the level set by the quoted statutes. How then, we ask, can FIRREA possibly be interpreted as eliminating, or directing the elimination of, forbearances granted to a healthy institution like Sterling while preserving forbearances granted to "troubled associations" having low net worths? This just doesn't make sense.

It is clear that in enacting FIRREA, Congress recognized the continued validity and enforceability of pre-FIRREA contractual agreements such as the agreements between the FSLIC and the FHLBB, on the one hand, and Sterling on the other.

The FIRREA Regulations.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA (the "Capital Regulations"), which became effective on December 7, 1989. The OTS indicated in a press briefing shortly after enactment of FIRREA that it was "uncertain" about the impact of FIRREA on past the FHLBB and the FSLIC forbearances.

* * *

It is extremely important to note that, notwithstanding FIRREA, Sterling would not be in violation of the post-FIRREA capital standards were it not for the breach of supervisory acquisition agreements by the regulators.

It is also extremely important to note that nothing in FIRREA eliminates, or requires the regulators to eliminate, pre-existing contractual regulatory and accounting forbearances. To the contrary, the above-quoted Sections of FIRREA and others recognize the continued validity and enforceability of such regulatory and capital forbearances.

## PROPOSED ALTERNATIVE REMEDIES FOR STERLING'S CAPITAL DEFICIENCY UNDER FIRREA

Sterling completed all of its acquisitions in an orderly and controlled manner as part of its comprehensive growth strategy. Each acquisition was carried out at the request, and always with the encouragement, support and approval of the regulators. If any of Sterling's acquisitions were imprudent, or if Sterling had reason to believe that the regulators would breach their contractual commitments to Sterling, Sterling

certainly never heard as much from any of the regulators. Moreover, if Sterling had known that its regulators would attempt to breach their contractual commitments to the Association, Sterling would never have agreed to acquire the troubled thrifts in question.

Arguably, Sterling has saved the FSLIC, its successors, and ultimately, the taxpayers over $51 million through its acquisitions and its stewardship of troubled institutions. Sterling has not asked for or received one dollar more in acquisition assistance than it contracted for. Sterling has sought, and seeks today, nothing more than the benefit of its bargain with the regulators.

To our surprise, however, Sterling is now being told that, pursuant to FIRREA, the OTS is "eliminating" the very capital and accounting forbearances which the regulators contractually granted to induce Sterling to acquire troubled thrifts in the first place. Frankly, this is outrageous. Not only is it unfair by any objective standard, but we believe it is illegal. The government of the United States does not have license to breach the sanctity of its contracts any more than any one else does.

* * *

As we stated at the beginning of this letter, notwithstanding all that has transpired, we remain committed to conducting a positive dialogue concerning the Association's existing capital deficiency. We believe there are several equitable and logical solutions to our differences of opinion regarding the continuing validity of capital and regulatory forbearances previously granted to Sterling.

The following summary of alternatives is not intended to be an exclusive or comprehensive list. Each of the following alternatives could stand on its own merits or be utilized in combination with other alternatives depending upon the operational feasibilities involved. In any event we would ask for your consideration and written evaluation of these alternatives at your earliest convenience.

<u>Comply With Supervisory Acquisition Agreements</u>.

There is no way to completely undo the damage done by the violation of existing supervisory acquisition agreements with Sterling. For example, Sterling's proposed equity offering was aborted in January, 1990 because of the OTS's refusal to allow the payment of dividends on the preferred stock to be issued.


WOT942 14TH STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

The window of opportunity for that proposed equity offering closed in January, 1990.

The OTS could, however, do much to resolve Sterling's capital deficiencies by honoring existing supervisory acquisition agreements between Sterling and the regulators. This would mean that Sterling would have until November 5, 1990, December 31, 1990, and April 8, 1993, to remedy capital deficiencies caused, respectively, by the Lewis Federal, Central Evergreen, and Tri-Cities acquisitions. During these periods of time, Sterling could, pursuant to its existing supervisory acquisition agreements, count the $13.5 million in regulatory cash assistance payments toward its post-FIRREA capital requirements. In addition, Sterling's capital requirements would be reduced by $.8 million until November 5, 1990, and $1.4 million until April 8, 1993 because of forbearances associated, respectively, with the Lewis Federal and Tri-Cities acquisitions.

Separate Exemption.

The OTS, rather than addressing the forbearances granted in the various supervisory assistance agreements with Sterling, could grant a separate exemption from the existing capital requirements. The OTS has clear authority to do this pursuant to Section 301 of FIRREA, and Sterling meets all of the Section 301 standards for approval of the exemption. This exemption would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

Separate Exception.

The OTS pursuant to authority set forth in Section 301 of FIRREA, could also grant Sterling an exception to the FIRREA capital standards. Again, Sterling meets all of the Section 301 standards for approval of the exception. This exception would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

Payment of Dividends.

The OTS could allow Sterling to pay dividends on preferred stock so that the Institution could consider reviving its equity offering.

Central Evergreen - Cash Contribution.

Obviously, if the OTS is warranted in eliminating the capital and regulatory forbearances contained in the Central

Evergreen contracts, two facts become apparent. First, the contracts have no value to Sterling. Second, the contracts, as vitiated deprive us of the very tools -- the forbearances -- which allowed us to counterbalance the negative aspects of the Central Evergreen acquisition. These negative aspects included Central Evergreen's capital deficit, market valuation adjustments in the loan and investment portfolios, and the intangible assets acquired in the Central Evergreen acquisition. In the Central Evergreen acquisition, if Sterling had not been granted the forbearances, it would have required a cash contribution to compensate for the reduction in capital caused by the acquisition. In other words, the forbearances had an economic value, and the if the forbearances are now being taken away, they should be replaced by an equivalent cash contribution.

Using the formula previously applied by the FHLBB in accepting Sterling's bid proposal on Tri-Cities, the contribution would consist of Central Evergreen's capital deficit at the time of the acquisition, the net market valuation adjustments in the loan and investment portfolios, and the totals of intangible assets. Applying this formula, the cash contribution would be in the amount of $24,056,000.

Obviously, the Tri-Cities formula contemplated not only a cash contribution, but capital and regulatory forbearances. To put the Central Evergreen acquisition on a par with the typical regulatory assisted acquisition, it would also be necessary for the government to provide us today with indemnification for capital losses on certain identified assets, as well as yield maintenance subsidies on non-performing loans and real estate owned.

In a conciliatory gesture, however, we would be willing to accept the cash assistance of $24 million without indemnification, yield maintenance subsidies, or other regulatory assistance.

<u>Central Evergreen - Rescission</u>.

If the OTS is unable or unwilling to consider a cash contribution in connection with the Central Evergreen acquisition, we would suggest that the entire transaction be unwound. We believe this is an operationally feasible alternative and would involve the assumption on your part of all of Central Evergreen's assets and liabilities remaining on our books. These assets and liabilities are readily identifiable and could be easily transferred.

This alternative would involve the payment of a management fee to Sterling of approximately 1% of Central Evergreen's assets as reasonable compensation for its past and future services in connection with the management of Central Evergreen's assets and liabilities. Such a management fee could be negotiated based upon prevailing market rates for similar services.

Tri-Cities - Increased Capital Contribution.

Again, it would have been unthinkable for Sterling to complete the Tri-Cities acquisition based on the cash contribution therein if it were not for the capital and regulatory forbearances granted to Sterling in that acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents in the approximate amount, as of March 31, 1990, of $10.5 million.

Lewis Federal - Cash Contribution.

Just as it did as part of the Central and Tri-Cities acquisitions, the regulators granted Sterling critical capital and regulatory forbearances as part of the Lewis Federal acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents, as of March 31, 1990, of $1.6 million.

Stock Purchase.

The OTS could purchase common or qualifying preferred stock of the Association so that Sterling could increase its regulatory capital accounts. Sterling would be willing to repurchase such stock, out of its earnings over time commensurate with the reduction of intangible assets recorded in connection with Sterling's acquisitions.

* * *

The foregoing alternatives are not meant to be exclusive. They are all based on the same equitable principle: if contractual forbearances previously granted to Sterling are now being eliminated, it is only right that such forbearances be replaced with qualifying capital of equivalent value.

If Sterling's capital is still considered to be deficient following the selection by the OTS from among the above alternatives, the Association will become compliant through a number of steps. First, Sterling will reduce its intangibles through amortization and the use of net operating carry-forwards. Second, the Association will increase its capital

through the retention of earnings. Third, assuming OTS approves of the payment of dividends, Sterling will, if necessary, pursue another equity offering. Fourth, Sterling will consider filing an application with the Federal Deposit Insurance Corporation for open thrift assistance. Finally, the Association will reduce assets, as necessary, to reduce its capital requirement.

We reiterate that we are ready, willing and able to discuss any feasible alternative, including the foregoing alternatives, in an effort to mediate our differences over the elimination of the contractual forbearances.

THE OPERATING AGREEMENT

If the OTS had not eliminated the capital and regulatory forbearances previously granted to Sterling and refused to allow Sterling to pay dividends occasioned by its proposed equity offering in late 1989, the Association would be in compliance with the capital standards mandated by FIRREA. Under such circumstances, you would not have asked us, as you have, to execute the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver.

Quite frankly, we could take the position today that, because the OTS has breached existing contracts with Sterling and thereby thrown Sterling into noncompliance with the capital standards, the OTS has no right to insist on the execution of any supervisory agreement by Sterling. We believe that this position is amply supported by the facts and circumstances in our case.

Nonetheless, as we stated at the outset, we remain committed to continuing the constructive and cooperative relationship which we have always enjoyed with our regulators for so long as the regulators work with us constructively to mediate the differences that now exist between us. To that end, we are willing to enter into an operating agreement, provided, of course, certain of your proposed operating restrictions are modified and all of the proposed consent provisions are eliminated.

Basically, we are amenable to keeping you fully apprised of all significant developments at the Association while we continue to increase our capital to regulatory levels. We will agree to abide by our capital plan and provide you with quarterly or more frequent reports regarding out operations and condition. If we fail to do any of this, we will then abide by operating restrictions which are substantially the same as those

set forth on pages 13 through 17 of your proposed Operating Agreement.

As is the case with our proposed capital restoration alternatives, we are willing to negotiate the terms of an Operating Agreement. The most important message we wish to leave with you, however, is that we remain willing and anxious to work with you to resolve our mutual concerns.

In the meantime, we would appreciate receiving at your earliest convenience, a written response to the proposals herein for resolving Sterling's post-FIRREA capital deficiency.

Very truly yours,

STERLING SAVINGS ASSOCIATION

By______________________________
HAROLD B. GILKEY
Chief Executive Officer

By______________________________
WILLIAM W. ZUPPE
President and Chief Operating Officer



WOT942 1416 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

May 22 11 04 AM '90



VOT942 1417 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

206 340 2419
FEB-20-1991 15:20 FROM OTS-SEATTLE TO 914153935859 P.01

Post-it™ brand fax transmittal memo 7671 # of pages ▸ 4

| | |
|---|---|
| To Jim Hendriksen | From Carol Friend |
| Co. OTS/Legal | Co. OTS/Seattle |
| Dept. | Phone # |
| Fax # 27 | Fax # |

Seattle District

01-1693

June 5, 1990

OFFICE OF THRIFT SUPERVISION ELEVENTH DISTRICT
FEB 20 PM 4:16

Harold Gilkey
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

In light of the May 29, 1990 Temporary Restraining Order, please provide weekly reports of any actions taken that are not in keeping with the restrictions imposed by our letters of January 26, 1990, March 9, 1990 and May 11, 1990. The weekly report should be received by this office within four days of the end of each week (Tuesday). The first report should cover the timeframe from May 29, 1990 thru June 8, 1990.

If you have any questions please contact me.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh
pc: Betty Reed
State Supervisory

bc: Docket Section
Greg Golden, District General Counsel
Ed Hedlund, Deputy District Director
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing, FDIC

OFFICIAL FILE COPY
OTS/WEST

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

VON878 0686 F STERLING SA 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018118 OLD BOX # 95-01 W2101 FORMAL INVESTIGATION SF 910104 910206 FILE REPORTS OF EXAM J HENDRIKSENS WORKING FILES PLEADING CORRESPONDENCE GENERAL FILE; CORRESPONDENCE; FINANCIAL STATEMENTS; 900299-921299 PRIVILEGE CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696 • (509) 624-4114

June 19, 1990

Carol Friend
Office of Thrift Supervision
1501 Fourth Avenue
Seattle, WA. 98101-1693

Dear Carol:

Attached is a listing of the operating restrictions imposed upon Sterling pursuant to your letters dated November 9, 1989, January 26, 1990, March 9, 1990, and May 11, 1990. This listing identifies the restrictions, the operating procedures implemented by the Association in response to these limitations, and the internal audit procedures implemented to ensure the operating procedures are functioning.

This listing is being forwarded to you to ensure that the Association has properly identified all restrictions that you have been concerned with based on your letters of June 5, and June 18, 1990. Would you please review this listing to determine the completeness of restrictions for which you have a supervisory concern. In the meantime, I am pursuing with Sterling's legal counsel and the appropriate counsel for OTS the scope and nature of filing reports in light of the Temporary Restraining Order.

If you have any questions regarding this memo please feel free to contact me.

Sincerely,

Daniel G. Byrne
Daniel G. Byrne
Sr. Vice President

DGB/lf

Attachment

cc: Harold B. Gilkey
William W. Zuppe
Betty Reed, Division of Savings & Loan Association

EXHIBIT 84
WITNESS Byrne
DAVID STOREY
STOREY & MILLER

JUN-19-90 TUE 13:34

Sterling Savings Association
Office of Thrift Supervision Restrictions

5/22/90

| RESTRICTIONS | OPERATING PROCEDURES | INTERNAL AUDIT PROCEDURES |
|---|---|---|
| Limit in total asset growth | Senior Management notified to restrict any asset growth other than interest credited on liabilities. Monitoring done by Accounting Manager. | Review monthly financial statements. |
| No capital distributions | The Board has been notified that no capital distributions can be made. | Review monthly Board meeting minutes. |
| Investment authority limited to: | | |
| Conforming residential loans<br>Pre-sold construction | Institution and subsidiary loan production officers have issued operating instructions for conformance with directive. Control is maintained with all residential loan applications requiring approval of either Action President or Action/Sterling V. President. | New loan monthly reports are reviewed. Appropriate audit procedures initiated as deemed necessary based on review. |
| Business banking loans with specified conditions | Business banking loan manager responsible to comply with specified conditions. | New loan monthly reports are reviewed. Appropriate audit procedures initiated as deemed necessary based on review.<br>Financial statements will be reviewed to monitor requirement to lower portfolio to $23 million by 6/30/90 |
| Consumer loans | Consumer lending is restricted to 30% of assets. Sterling is considerably below that limit at 2.8% at 4/30/90. | No specific procedures. |
| Loans-to-one-borrower limit of $500,000 | All loan production areas notified of the limit. Control maintained through loan approval procedures. | Loans-to-one borrower report reviewed each month. |
| Investment authority limited to liquidity investments | Investment Committee responsible for compliance. | Review monthly financial statements. |
| Engage only in activities specified in Capital Plan | Senior Management notified to engage only in activities specified in Capital Plan. | Review monthly financial statements; Board and appropriate committee reports. |
| No purchase or sale of any asset or group of assets in excess of $500,000 without OTS approval | Senior management notified that OTS approval is required on any purchase or sale over $500,000. | Review monthly financial statements; Board and appropriate committee minutes. |
| No increase in compensation of any executive officer or director without OTS approval | Board, Chairman and President notified of restriction. | Review monthly Board minutes. |
| No uninsured deposits may be accepted | Notification has been sent to branches by Operations Department. Control procedures are being developed. | Audit procedures will be developed when controls are completed. |

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

STERLING SAVINGS ASSOC.
EXECUTIVE BR.
JUL 24 1990

July 20, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Members of the Board:

An offsite examination has been conducted of Sterling Savings Association. The examination focused on Sterling's current capital position, status of the capital plan and efforts towards addressing the capital deficiency.

Given that the capital plan has been denied and the institution has no acceptable plan towards achieving capital compliance, a composite rating of "5" has been assigned. In assigning this rating the concerns expressed during the December 1989 limited scope examination were also considered. The OTS rating system is detailed in Section 071 of the OTS Thrift Activities Regulatory Handbook, as well as the prior Report of Examination.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed
State Supervisor

"Confidential Material Subject to Protective Order"

Office of Thrift Supervision
Department of the Treasury

Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

June 20, 1990

Daniel Byrne, Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Byrne:

In response to your June 19, 1990, letter enclosed are copies of the correspondence referred to in the Temporary Restraining Order of May 29, 1990. Given that the restrictions contained within these letters have been in place for a number of months, I would not foresee any misunderstandings or need for interpretations at this time. However, should you have any specific questions, I would be available to address them.

On January 30, 1990 the Board of Directors was charged with determining that an adequate system was in place to ensure restrictions imposed by this office were adhered to. Although several were imposed after that date, it should have been expanded to include them as they became known to management and the Board. As always, appropriate internal controls should be in place to ensure that all regulatory requirements are adhered to. Such a system should include items addressed in correspondence from this office, as well as all regulations, bulletins and memos issued by the OTS.

The listing attached to your letter does not correctly reflect the asset growth restrictions that Sterling is subject to. By virtue of the denied capital plan, no growth is permitted (12 CFR 567.10). Also "executive officer" should include the Chief Financial Officer, Chief Lending Officer and any other officer with significant influence over, or participation in, major policy making decisions of the association. In addition, residential construction lending is limited to 3.3 percent of total assets and investment authority is restricted to short-term investments. The institution's activities are also limited to those specified in the capital plan to the extent contemplated in the plan.

As we have discussed previously, if you or your counsel have questions regarding the reporting requirement, I would be happy to address them. I believe that my letters have been clear as to the scope, nature and timing of reports, and that the lack of reporting by Sterling has been due to your refusal to fulfill the reporting requirement rather than a lack of understanding of what is required. If this is not the case, please contact me.

EXHIBIT 25
WITNESS Byrne
DAVID STOREY
STOREY & MILLER

Daniel Byrne
Sterling Savings Association
June 20, 1990
Page Two

On a separate issue, minutes from the May Board meetings (including board package and attachments) have not been received. These should be received no later than June 22, 1990.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

bc: Docket Section
Ed Hedlund, Deputy District Director
Carol Friend, Assistant District Director
Gregg Golden, OTS DC
John Bisset, Field Manager
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing
FDIC

TOTAL P.04

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

June 25, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Assoc tion
N rth 120 Wall Street
Spokane, Washington 99201
OTS No. 7918

Dear Mr. Byrne:

Your letter of June 21, 1990 has een reviewed and additional information is required. Although all the r ictions listed in your letter are not impacted by the Temporary Restraining rder, the following additional information is nece ry:

- Please ind cat whether dividend payments have been made, or approved for payment November 9, 1989.
- Residential co struction loans are limited to 3.3 percent of total assets. Please note the current level of these types of loans as a percent of total assets.
- Have any investment purchases been made that do not qualify for short-term liquidity purposes?
- Please indic he current level of commercial loans, in dollar terms, as we percent of assets.
- Indicate whether any commercial loans have been granted to those existing commercial banking customers as of March 9, 1990.
- Please forward your most recen monthly monitoring of outstanding commercial credits.
- Have activities been initiated at are not in keeping with the February 28, 1990, Capital Pl or that exceed levels specified in the plan?
- Please indicate whether any increase in compensation have been granted to any execut ve officer or director.

iscussed in my June 0, 90 letter, an adequate system sh d be in place to ensure that app e restrictions and regulatory requirements are adhered to. Such a syste t be able to assess compliance on an ongoing basis rsus just at month- It is not acceptable to review activity for a given th and make a determination of the level o compliance after the fact. uch monthly review, howev should be used to verify the adequacy of internal ont ols. Adequate polic es, proced es and cont ols must be in place to ensur compl ance. The olicies ar edures, as well as the internal revie tem sho vis acc

 Alaska • Guam • Hawaii • Idaho • Mon • Oregon • Utah • Washington • Wyoming

Confidential Material Subject to Protective Order

Daniel Byrne
Sterling Savings Association
June 25, 1990
Page Two

I have reviewed the FIRREA legislation and have been unable to locate a definition of "financial report" as indicated in your letter. Please provide the cite for this definition.

Although it is not clear what is intended by the last paragraph of your letter, no such assurance regarding our use of information submitted has been given. As I have stated in prior correspondence, the purpose of the reporting requirement is to inform us of those aspects of Sterling's operation that cause us concern.

The next report, as well as the information requested above, should be received by June 26, 1990.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

Confidential Material Subject to Protective Order

SG 0600074

Office of Thrift Supervision
Department of the Treasury
Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

August 20, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Byrne:

Your August 17, 1990 letter regarding the composite rating for Sterling has been received. As was noted in my July 20, 1990 letter, the off-site examination focused on Sterling's current capital position, status of the capital plan and efforts towards addressing the capital deficiency. It further noted that in light of the fact that the capital plan had been denied and Sterling has no acceptable plan towards achieving capital compliance, a composite rating of "5" was assigned.

During the November 1989 examination, both the institution and this office had every expectation that an acceptable capital plan would be filed and that efforts to recapitalize or sell the company would be successful. As noted, however, this has not been the case and the institution continues to operate with an insufficient amount of capital, in light of risks evident in the institution. As such a "5" rating is assigned.

The information previously forwarded to the Board of Directors discussed the focus of the examination and the findings; no other report will be transmitted. I also cannot comment on whether other regulatory agencies have completed examinations of Sterling. You may wish to contact them directly with any questions you may have regarding their examinations or assignment of ratings.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed
State Supervisor

"Confidential Materials Subject to Protective Order"

Federal Home Loan Bank Board **Memo**

INTER-OFFICE COMMUNICATION

ISSUES MEMORANDUM

FROM: James R. Faulstich, Principal Supervisory Agent

DATE: October 23, 1985

TO: Federal Home Loan Bank Board

SUBJECT: FSLIC Assisted Acquisition of:

| | |
|---|---|
| Lewis FS&LA<br>Chehalis, Washington<br>FHLB No. 0655<br>FSLIC Insurance: 1935 | Assets: $52.5 Million<br>NetWorth: (.05 Million)<br>NW/Assets: (.10%)<br>Data as of 8/31/85 |
| By: | |
| Sterling SA<br>Spokane, Washington<br>FHLBB No. 7918<br>FSLIC Insurance: 1983 | Assets: $118.0 Million<br>Networth: 4.7 Million<br>NW/Assets: 4.0%<br>Data as of 8/31/85 |

EXHIBIT 3/2/03 Faulstich

## Issues

Whether to approve the FSLIC assisted acquisition of Lewis FS&LA, Chehalis, Washington ("Lewis") by Sterling SA, Spokane, Washington ("Sterling").

## Background

Lewis has consistently incurred operating losses since June of 1981. Its financial problems are attributable to depressed economic conditions in its home office lending market and a negative yielding service corporation investment. Lewis, a $52 million mutual association, is a participant in the Net Worth Capital Assistance Program and as of June 30, 1985 recorded Net Worth Certificates (NWC's) totalling $150,000. The association reported a loss of $193,402 for the eight months ended August 31, 1985 and its regulatory net worth at that date stood at ($51,246), or (.10%) of assets. Additionally, excluding NWC's of $150,000 and appraised equity capital of $736,456, Lewis has a negative net worth of $937,702, or (1.8%) of assets. Lewis had reached insolvency by August 31, 1985.

This acquisition proposal has been processed at the district bank under the guidelines of FHLBB Resolution No. 84-782, which allows for the Director, FSLIC, and the Director, OES, to delegate to the Principal Supervisory Agent the negotiations and processing of assisted acquisitions under certain circumstances. The proposal meets the restrictions of that delegation in that:

1) The disappearing institution has a mutual charter with less than $300 million in assets.

2) Total projected cost to FSLIC does not exceed the lesser of 5% of assets or 40% of the projected liquidation cost, as computed by the district bank in accordance with the standard FSLIC interest rate and growth assumptions.

000080

James R. Faulst..h
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Two

3) The proposed acquirer is a financial institution with its home office located in the same state as the disappearing institution.

4) Forms of assistance are limited to:

a) Cash;

b) Indemnification for undisclosed liabilities and litigation challenging the acquisition with a stated maximum limit which does not exceed 5% of the institution's total assets. This is in in addition to the 5% of asset limitation in item 2 above.

c) Standard Forbearances as detailed in Memorandum SP-37.

Shopping Procedures

On April 5, 1985 Lewis' board of directors adopted a resolution authorizing the FSLIC to negotiate a plan of acquisition for the association. Prior to receipt of that resolution the Supervisory Agent made a determination as to what in-state FSLIC insured institutions would be eligible for acquiring Lewis. That determination was based upon the following criteria.

1) Assets greater than $50 million;

2) Net worth above 4% of assets;

3) A record of profitability; and

4) Not being subject to significant supervisory concern.

None of the associations which qualified under this criteria would acquire Lewis absent the availability of FSLIC assistance.

Once the standard consent resolution was adopted by Lewis' board of directors, and approval was granted by OES Director Schilling and OFSLIC Director Stearns (May 6, 1985), these same institutions were contacted to determine their interest on an assisted basis. The deadline for submitting a formal response to that inquiry was June 15, 1985. In addition to Sterling, two institutions submitted proposals with estimated costs as follows:

1) Pacific First FSB
Tacoma, Washington
FHLBB No. 1166
Cost of bid: $4.5 million plus capital loss coverage.

2) Timberland FS&LA
Hoquiam, Washington
FHLBB No. 1625
Cost of bid: $2.45 million plus limited indemnifications

000081

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Three

Each of these submissions featured a greater cost to FSLIC than that represented by the Sterling proposal.

Terms of Assistance

The FSLIC will infuse $1.75 million in cash assistance to the resulting association. This assistance is significantly less than 40% of the projected cost of liquidation and 5% of Lewis' total assets. In addition, the FSLIC will indemnify Sterling against undisclosed liabilities of Lewis and its subsidiaries, and against litigation challenging the transaction, provided that such indemnification does not exceed $1 million. Finally, Sterling will also be granted regulatory forbearances which are more fully described in the S Memorandum.

Sterling has offered an assistance recovery provision which stems from the establishment of a $400,000 loss reserve relating to the disposition of REO properties and seriously delinquent mortgage loans. Given the possibility that gains could be realized through the disposition process, Sterling has agreed to remit any such amounts to the FSLIC, up to a total of 75% of the reserves, or $300,000. The provision is more fully explained in Exhibit A-7.

Alternatives

| Alternative | Advantages | Disadvantages |
|---|---|---|
| Liquidation | 1. Resolution of case. | 1. Exceeds present value cost of least expensive option by $4.25 million.<br>2. Could weaken public confidence in the savings and loan system. |
| Out-of-State Bidding | 1. Might result in low cost acquisition. | 1. Solution may be more appropriate for other larger problem institutions in Washington.<br>2. Lewis' financial condition may deteriorate further in the interim.<br>3. Possibility of receiving a higher cost solution than current proposal. |

000082

| | | |
|---|---|---|
| Sterling | 1. In-State continuity. | 1. Chances of lower cost bid being received from out-of-state acquirer |
| | 2. Projected viability of resulting association. | |
| | 3. Lowest Cost bid. | |

Financial Capacity of Acquirer

Sterling is a relatively new association, having received its insurance of accounts in March of 1983. Since its incorporation the institution has shown a record of profitability and sound management. Its growth into a $100 million association has been accomplished without an inappropriate assumption of risk. On a combined basis, the resulting association is projected to have a net worth to assets ratio of 3.7%. Viability runs conducted at the district bank using standard FSLIC rate and growth assumptions consistently show a record of profitability and consequent survivability over a five year timeframe.

Personnel Issues

Sterling has declared its desire to retain Diane Rasmusson, currently the acting president of Lewis, after the acquisition. Sterling has represented that Ms. Rasmusson will not be in a policy making role with the resulting association. Because Lewis' financial problems are more closely related to poor economic conditions than management negligence, the OES and OFSLIC have expressed no objection to this proposal. Non-involvement affidavits were solicited and received from the directors of both Sterling and Lewis.

Summary and Conclusions

Sterling's proposal is the least costly option currently available to resolve the financial problems of Lewis. The present value cost of the assistance to be provided is $1.75 million, which is 3.0% of Lewis' assets. The resulting association is projected to be viable.

James R. Faulstich
Principal Supervisory Agent

I Concur

Peter C. Stearns
Director, FSLIC

000083

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Five

Recommendation

The Federal Home Loan Bank of Seattle, with the concurrence of the Office of the Federal Savings and Loan Insurance Corporation ("OFSLIC"), recommends the Federal Home Loan Bank Board ("Bank Board"):

1. Approve the proposal as submitted by the Sterling Savings Association for its FSLIC-assisted acquisition of Lewis FS&LA, such assistance to include $1.75 million in cash and indemnifications against undisclosed liabilities and acquisition related litigation not to exceed $1 million.

2. Authorize the Secretary of the Board to transmit to Sterling Savings Association a forbearance letter in the form of the exhibit attached to the S Memorandum.

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank of Seattle

I Concur:

Peter W. Stearns
Director, FSLIC

000084

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

S MEMORANDUM

To: John M. Buckley, Jr., Secretary to the Board

From: James R. Faulstich, Principal Supervisory Agent

Date: March 31, 1988

Subject: Recommendation for the Appointment of the Federal Savings and Loan Insurance Corporation ("FSLIC") as Receiver for and the Subsequent Acquisition of Substantially all the Assets and Liabilities of

Tri-Cities Savings and Loan Association
Kennewick, Washington, ("Tri-Cities") FHLBB No. 7641

By:

Sterling Savings Association, Spokane, Washington
("Sterling") FHLBB No. 7918

---

Tri-Cities' Financial Data as of February 29, 1988

| | |
|---|---|
| Total Assets: | $ 54.5 million |
| Liabilities: | $ 61.8 million |
| RAP Capital: | ($ 7.4) million |
| Capital/Assets: | 13.6% |
| Net Delinq. & Net REO | $ 10.2 million |
| Net Delinq. & Net REO/Assets: | 18.7% |

Regulatory capital includes $659,000 of deferred loan losses, and $859,000 of goodwill.

Sterling's Financial data as of February 29, 1988

| | |
|---|---|
| Total Assets: | $308.7 million |
| Liabilities: | $297.6 million |
| RAP Capital: | $ 11.1 million |
| Capital/Assets: | 3.6% |
| Net Delinq. and Net REO | $ 6.6 million |
| Net Delinq & Net REO/Assets: | 2.1% |

Regulatory capital includes $ 5.1 million of goodwill.

000711



/OF014 1079 F STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
:LOSING BOOK DATED 880407
APP 862

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

I. Proposal

Tri-Cities is a state-chartered, stock association with a home office and a branch office in Kennewick, Washington, two branch offices in Pasco, Washington, and one branch office in Richland, Washington. Because of the severe level of insolvency of Tri-Cities and the lack of any viable option to recapitalize the association, we recommend that Tri-Cities be placed into a receivership and that substantially all of the assets and all of the liabilities be acquired by Sterling Savings Association, Spokane, Washington, with the FSLIC to provide assistance to Sterling in an amount having an estimated net present value cost of $15.8 million, which is approximately 76 percent of the $20.8 million estimated net present value liquidation cost of Tri-Cities.

Under the terms of the Assistance Agreement, Sterling will receive an up-front cash payment of $11,896,273; the components of this computation are attached as Exhibit S-10. The Agreement also provides for yield maintenance by the FSLIC on covered assets (14 total assets with a net book value of $8.1 million) calculated using the average six-month treasury bill plus 150 basis points. The FSLIC will also agree to provide capital loss coverage on these covered assets. Sterling will absorb 25% of the capital losses up to a pre-tax limit of $900,000. Tax benefits will be shared on a 50/50 basis with the FSLIC. A five year indemnification covering undisclosed liabilities, claims not reserved for and asserted against the association, and litigation challenging the transaction is to be provided.

II. Statutory Criteria for Appointment of a Receiver

In Section 406(c)(1)(B) of the National Housing Act (12 USC 1729(c)(1)(B)), Congress has given to the Bank Board the exclusive power and jurisdiction to appoint ex parte and without notice the FSLIC as receiver of a FSLIC-insured, state-chartered institution, if the Bank Board determines that any of the grounds specified in Section 5(d)(6)(A)(i), (ii) or (iii) of the Home Owners' Loan Act of 1933 (12 USC 1464 (d)(6)(A), exist with respect to such institution. The grounds include:

(1) Insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members;

(2) Substantial dissipation of assets or earnings due to any violations of law, rules, or regulations, or to any unsafe or unsound practice or practices;

(3) An unsafe or unsound condition to transact business;

This memorandum provides information which supports our findings that all three grounds exist with regard to Tri-Cities. The State Supervisor of Savings and Loan Associations concurs with our findings.

000712

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

(1) INSOLVENCY

As of December 31, 1987, Tri-Cities reported a deficit regulatory capital of $6,095,000 (see composition above). GAAP capital was negative $8.5 million.

(2) SUBSTANTIAL DISSIPATION OF ASSETS OR EARNINGS

Tri-Cities has suffered substantial dissipation of assets and earnings resulting from violations of Insurance Regulation 563.13 in regards to the association's lack of underwriting of major participation loans it purchased and other commercial real estate projects for which it provided funds for. As of January 31, 1987, Tri-Cities had loss reserves on 12 major nonearning assets totaling $5.1 million.

(3) UNSAFE OR UNSOUND CONDITION TO TRANSACT BUSINESS

Tri-Cities is insolvent and has no prospects for any recapitalization due to its severe level of insolvency, its large asset quality problems, and its undesirable location in the Tri-Cities area which has been economically depressed due to the impending closure of the Hanford Nuclear Reactor. The association is losing approximately $250,000 per month on an operating basis. The board and management at Tri-Cities are not sufficient to effectively resolve the serious asset quality problems of the association. As such, Tri-Cities is transacting business while being in an unsafe and unsound condition.

III. Financial Condition of Tri-Cities

Data from Quarterly Reports to FHLBB
December 1985 through December, 1987

000's

| REPORTING PERIOD | TOTAL ASSETS | SCHED. ITEMS | % OF ASSETS | NET WORTH | % NW/TA | NET OPERATING INCOME | NET INCOME |
|---|---|---|---|---|---|---|---|
| 12/85 | 68,440 | 4,893 | 7.1 | 2,507 | 3.7 | (79) | (66) |
| 3/86 | 66,961 | 9,282 | 13.9 | 2,620 | 3.9 | 133 | 114 |
| 6/86 | 69,719 | 14,376 | 20.6 | 2,334 | 3.3 | (6) | (286) |
| 9/86 | 64,507 | 15,658 | 24.3 | (795) | (1.2) | 9 | (3,081) |
| 12/86 | 62,467 | 14,495 | 23.2 | (2,267) | (3.6) | (602) | (1,450) |
| 3/87 | 60,258 | 14,078 | 23.4 | (3,287) | (5.5) | (649) | (1,020) |
| 6/87 | 58,932 | 13,175 | 22.4 | (3,815) | (6.5) | (526) | (528) |
| 9/87 | 56,678 | 10,621 | 18.7 | (6,161) | (10.9) | (548) | (2,346) |
| 12/87 | 54,539 | 11,023 | 20.2 | (6,957) | (12.8) | (733) | (795) |



000714

APP. 864

F014 1081 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483-94-026 OTS BOX 14 OF 50
OSING BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

Tri-Cities' liquidity has been under 6 percent of the liquidity base over the past four months due to continued deposit outflows.

Tri-Cities has been losing approximately $250,000 per month on an operating basis. Operating expenses have remained high, equaling approximately 3.6 percent (annualized) of average assets, while operating income has been nominal due to the high level of nonearning assets. Nonearning assets represented 34.6 percent of average assets at December 31, 1987, of which 16 major assets having a net book value of $9.9 million has been substantially reserved for. Sterling has asked for capital loss coverage and yield maintenance on 14 of these assets, and has elected not to purchase two of them. Sterling has also elected not to purchase the association's investment in its subsidiary, Tri-West Construction (and Tri-West Construction's first- and second-tiered subsidiaries). (See Exhibit S-9, which provides a copy of Sterling's bid .)

## IV. Supervisory History of Tri-Cities

MACRO RATING SUMMARY OF LAST THREE EXAMINATIONS

| Exam Date | M A C R O | Overall Rating |
|---|---|---|
| 10/27/87 | 5 5 5 3 4 | 5 |
| 02/17/87 | 4 5 5 3 4 | 5 |
| 08/16/85 | 5 5 5 3 5 | 5 |

A cursory examination of Tri-Cities was performed on 9/13/79, and no concerns were found. Tri-Cities had 15 directors on the board which was a large number considering the size of the institution. As of that examination, the institution had only two loans that were not single-family type: one commercial loan for $70,000 and a loan for an 8-plex. No major concerns were noted in the two examinations that followed on February 15, 1980 and on June 3, 1981.

An examination was conducted as of 4/22/83, and a rating of "2C" was given. The scoping memo noted that loans on property types of over four dwelling units had increased significantly from levels existing one year earlier. Scheduled items represented 4.95% of assets or 51% of net worth, and speculative and commercial loans totaled $880,546. Sixty-six percent of these loans were composed of scheduled items.

President Schmidtke attributed the delinquencies to the economic setbacks associated with WPPSS, and stated that the institution had virtually stopped all commercial lending and had since concentrated its efforts on single-family and consumer loans and the collection of existing loans. President Schmidtke also noted that two of the major delinquent loans were not attributed to the economy, but rather to the borrowers.

The Report of Examination ("ROE") also disclosed that Tri-Cities had purchased 10% of the outstanding stock of Benefits Northwest ("BNW") for $67,300 or $673 per share. The price of the stock was based on twice the gross income divided by the number of shares issued and outstanding. Based on the 6/30/82 data, the institution paid 10.2 times book value or a price to earnings ratio of 33.7. President Schmidtke stated that the investment in BNW was a move toward

000716

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

diversification and that the goal was to increase the association's investment to a majority position. BNW's principal business activity is administering pension funds and profit sharing plans. As administrator, BNW can direct funds for investments to various financial institutions, such as Tri-Cities. One of BNW's directors: Les Adams, is also a director of Tri-Cities.

At the next examination, which was conducted as of 9/21/84, the examiner gave Tri-Cities a "2" rating. The scope was limited to a review of minutes of the institution's and service corporations' board meeting minutes, a review of the validity of FHLBB reports, lending and investment policies, loan register, internal controls, and pending litigation.

The ROE noted a decline in net worth to assets from 5.72% at 6/30/84 to 4.65% at 8/31/84, primarily due to the acquisition of $16 million in deposits and $1 million in fixed assets from the purchase of three branches from Great Western Savings Bank. It was further noted that five assets were classified as scheduled items with appraised losses aggregating $173,251 and that Tri-Cities had purchased two participations from Westside FS&LA, Seattle, totaling $4.2 million. A feasibility study had been obtained on one project, and that study contained statements contradictory to the appraiser's statements.

The major concern cited in the ROE was the dramatic growth experienced by the institution. Assets grew from $26,946,000 on 3/31/83 to $58,737,000 on 8/31/84, representing growth of 118%. The growth was largely funded by $8 million in public funds and $16 million in deposits from Tri-Cities' purchase of three Great Western's branches. The ROE indicated that over the next five-year period the institution's main goal was to maintain an annual asset growth of 40% while achieving a return on assets of .75%.

The examiner also discovered that Tri-Cities purchased $1,019,000 in corporate debt securities having an average maturity of 22 years, which was far in excess of the six year average allowed under 12 C.F.R 545.75(b)(5).

A monitoring report from the FHLB Financial Analysis Dept. prepared as of 9/30/84, noted that nonresidential loans had jumped from 0.1% of assets to 16.7% while annualized loan volume was 19%, 50.7% and 137.9% of assets for the respective first three quarters of 1984. By the third quarter of 1984, 77.6% of new loans were purchases, and construction lending had jumped from 0% to 67% of mortgage loans closed. This growth was funded primarily through jumbo CDs.

In response to these events, a supervisory letter dated 1/29/85, was sent to Tri-Cities' board requesting: (1) a current status of problem real estate properties and mortgage loans; (2) a revised policy on underwriting of loan participations; and (3) the board's assurance that they had become better informed about the various regulatory restrictions pertaining to transactions with affiliated persons. On 3/27/85, the board submitted their response letter, and on 4/22/85, board minutes were received by the supervisory agent that addressed the various requests.

On 5/29/85, the Supervisory Agent, the Assistant Director of District Operations, and the Deputy State Supervisor met with Tri-Cities' board. The topics discussed were: asset quality problems, underwriting and appraisal deficiencies, and management of the investment portfolio. As a follow-up to that meeting, a supervisory letter dated 6/7/85, was sent from the Supervisory Agent to the board





OF014 1083 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
LOSING BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

requesting that the board monitor the three major construction projects discussed at the 5/29/85 board meeting. A response letter from the board disclosed that 11 major loans had been acquired from other S&Ls, including: United Mutual Savings Bank of Tacoma, Future Savings of Albany, McIlroy Bank and Trust, Westside Federal, Investment S&L, and Perpetual Savings of Iowa. The letter also disclosed an $830,000 direct loan on the Crescent Bar project on the Columbia River. In addition, Tri-Cities had seven commitments for interim construction financing on fast food organizations.

A 6/26/85 letter from the board submitted the revised asset/liability management policy to the Supervisory Agent. The letter noted that the three construction projects appearing to have the potential for significant problems: Tech Center North, Morning Star Hill, and Claremont Condominiums were reviewed by Mr. Schmidtke personally as well as for documentation. The board concluded in their letter that upon the board's review of the Mr. Schmidtke's report on these projects, "nothing has been revealed to our Association to indicate that any of these loans have any great potential for losses."

On 9/30/85, a supervisory letter directed the immediate establishment of $198,114 in loss reserves for the Claremont Project. A few days later, on October 4, 1985, the board executed a Consent Cease and Desist Order with the State of Washington.

Tri-Cities overstated its 11/30/85, net worth by approximately $900,000. The Supervisory Agent called Mr. Schmidtke who said that the board was going to formally approve the audit report. The revised financials were received on 12/17/85.

On 2/5/86, a supervisory letter was sent expressing concern over the asset portfolio and requesting a complete discussion of the efforts made in recovering 15 major problem assets. On 2/25/86, the state examiner found that a loan had been granted by Tri-Cities despite the loan having been rejected by the State Supervisor when it was submitted for prior approval. This was a violation of the State C & D Order. Also on that date, a supervisory letter was sent transmitting the ROE of 8/16/85, and noted serious deficiencies in the areas of board oversight and effectiveness, executive management capabilities, major loan underwriting policies and procedures, investment in subsidiary corporations, and asset quality problems.

On 2/28/86, Supervisory Counsel recommended to the Office of Enforcement that a Consent Cease and Desist Order be pursued. This was followed-up with a meeting held on 3/10/86. Five violations of the State C&D Order were discussed with respect to commercial real estate loans. The State Supervisor informed the board that if Mr. Schmidtke was not replaced as managing officer, a court order would be sought to enforce the C&D.

On 3/11/86 Mr. Schmidtke submitted his letter of resignation as President/CEO to the board. Director Fisher assumed the CEO duties on an interim basis. Mr. Schmidtke had been named "Director in Charge of Special Projects." Also on that date, Kathy Flora, commercial loan closer, and Robert Chamberlain, the Chief Lending Officer, were terminated by the board due to "insubordination and flagrant violations of the Association's established policies and procedures."

On 4/3/86, the board sent its response to the Supervisory Agent addressing the concerns raised in the ROE. The board concluded that while the institution has

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

set aside $1.5 million in loss reserves and while any loss is serious, "the extent of these potential losses do (sic) not threaten the viability of this institution."

In a letter dated 6/13/86, the Supervisory Agent directed the establishment of a $207,000 loss reserve on the books of Tri-West Mortgage, Inc. This was a follow-up letter to a 6/3/86 letter directing the same loss recognition. This reserve was established by the board.

On 6/25/86, a Consent C&D Order was executed between the FHLBB and Tri-Cities which covered: net worth, loan documentation, accounting and financial reports, scheduled items, construction loan disbursements, service corporations and subsidiaries, limitations on lending, concentration of assets, business plan, and underwriting procedures. Over the next few months, the board submitted materials to the Supervisory Agent that were required under the C&D Order, and the institution was put on a monthly reporting requirement for compliance with the terms of the C&D Order.

On 9/17/96, representatives of the board agreed to remove Mr. Schmidtke from the institution as an employee and as a board member by 9/30/86. On 9/30/86, Tri-Cities voluntarily established $2,574,267 in additional loss reserves associated with assets classified by the institution, resulting in the institution's insolvency by $2,267,000.

A supervisory letter was sent to the board on 10/9/86, advising them that Tri-Cities had exceeded the maximum limitation of 5% of brokered deposits while failing to meet its minimum net worth requirement. The institution was put on a monthly reporting requirement for brokered deposits.

A Consent Agreement was executed by the board on 10/29/86, following a board meeting with representatives of the FHLB of Seattle and the State Supervisor's Office in attendance. Mr. Schmidtke resigned from the board of directors on 11/3/86.

On 12/17/86, the 9/15/86 ROE of Tri-Cities was transmitted to the board, noting several areas of continued critical concern in the institution: inadequacy of management succession, lack of regularly-scheduled audit committee meetings, continued deterioration in asset quality and additional asset classifications, nonseparation of corporate existences between Tri-Cities and two service corporations, insolvency and lack of recapitalization plan, increased interest rate risk, cash management deficiencies, poor operating results, violations of Regulation E and the Bank Security Act, and violations of outstanding enforcement actions.

The board's response letter to the ROE was received on 1/21/87, and addressed each of the areas identified in the Report and the supervisory letter, although solutions to the major problems: lack of capital and lack of management, had not been found. The institution had contracted with CCF Jennings Link to provide assistance with Tri-Cities' problem assets. CCF Jennings Link had been mentioned as a possible aquirer. The board concluded in its letter that the most logical solution to their problems appeared to be a merger or buy-out. The board, with the assistance of its outside auditors, began to actively seek an unassisted merger partner or acquirer, but no interest was found.

000719

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

Tri-Cities has been concentrating its efforts on problem-asset workouts and preserving the franchise value of the association. The Supervisory Agent is in close contact with management and receives monthly board packets. Major decisions of the association require the prior non-objection of the Supervisory Agent.

V. Marketing Efforts

Tri-Cities was marketed on an in-state, unassisted basis to FSLIC-insured institutions in January 1987. Four institutions indicated a preliminary interest, although all four later said that they were uninterested without assistance. The four institutions were: First FS&LA of Port Angeles, Columbia Federal Savings Bank, First FS&LA of Walla Walla, and Interwest Savings Bank.

Tri-Cities was later marketed on an assisted basis, along with Lynnwood S&LA and First FS&LA of Longview, at a bid conference held on October 15, 1987. Bids were received from Old Stone Corporation of Providence, Rhode Island, Sterling Savings Association of Spokane, and World S&LA, A FS&LA of Oakland, California. Old Stone submitted the lowest-cost bid but later withdrew their proposal. Sterling submitted the next lowest-cost bid. This office has recommended the acceptance of Sterling's proposal and has been handling the case under District Bank case processing.

VI. Information on Sterling Savings

Sterling is a Washington-chartered, stock savings and loan association. Sterling was organized in 1981 and commenced business in 1983. In June of 1983, Sterling acquired Lewis FS&LA of Chehalis, WA. In February of 1988, they acquired six branches of Great American First Savings Bank, Tuscon, Arizona. Sterling has ten full service offices, five offices that are primarily depository branches, and one loan production office located throughout Washington. As of February 29, 1988, Sterling had total assets of $308.7 million.

Sterling's business consists primarily of originating, purchasing, selling and servicing secured residential and commercial real estate loans. Sterling has three wholly-owned subsidiaries, Fidelity Service Corporation, Lewis and Clark Financial Corporation, and Intervest Mortgage Investment Company (formerly Lewis Service Corporation), the primary business of which are real estate acquisition and development, commercial and consumer lending, and commercial mortgage banking operations, respectively.

Net income for fiscal 1987 (ending June 30) was $935,052 or $2.21 per common share a 21 percent increase from fiscal 1986 earnings. Sterling raised $2.14 million of new capital at the close of the 1987 fiscal year through a cumulative convertible preferred stock offering. This brought regulatory capital to a level of $10.47 million or 4.53 percent of liabilities. Regulatory capital as of December 31, 1988, had climbed to $11.0 million or 4.0% of liabilities. Sterling was last examined on October 29, 1986, and received a composite rating of "2." There are no supervisory concerns with the association.

000720

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

## VII. Viability Analysis

### A. Business Plan

The business plan for Sterling after the acquisition of Tri-Cities is an ambitious one, but is consistent with growth trends of the recent past. The business plan consists of asset growth of approximately 15% annually. Liability growth is provided by growth of current offices and an aggressive deposit acquisition plan (4 de novo or acquired branches). Mortgage banking operations are expanded through new entry into urban markets (Seattle and Portland). The business plan projects that residential and commercial real estate lending will continue to dominate their activity.

The growth is supported largely by the infusion of FSLIC assistance, which is to be counted as regulatory capital. Periodic FSLIC payments to cover capital losses on specified assets will also count as regulatory assistance.

| | Yr 1 | Yr 2 | Yr 3 |
|---|---|---|---|
| Total Assets | 415.1 | 504.3 | 614.6 |
| Net Worth | 22.9 | 25.7 | 29.7 |
| NW/Liabs. | 5.84 | 5.10 | 5.08 |
| Net Income | 2,009 | 2,808 | 4,005 |
| ROA | 0.57% | 0.61% | 0.72% |

### B. Viability Model

Key results of the viability analysis utilizing the FSLIC Viability Model are summarized below:

(Table 2)

Viability Results
($ amounts in millions)
(Based on 12/31/87) data)

| | Yr 1 | Yr 3 | Yr 5 | Yr 7 | Yr 10 |
|---|---|---|---|---|---|
| Total Assets | 446.1 | 597.6 | 700.2 | 828.2 | 1077.8 |
| Net Worth | 24.7 | 23.4 | 26.5 | 30.5 | 41.9 |
| NW/Liabs. | 5.80 | 4.35 | 3.94 | 3.83 | 4.05 |
| Net Income | (248) | 1,534 | 919 | 2,327 | 4,771 |
| ROA | (0.06%) | 0.28% | 0.14% | 0.29% | 0.46% |

The viability analysis shows that the institution is profitable after the first two years. The projections in the business plan are based on a flat interest rate scenario, while the viability model uses an increasing interest rate scenario. Therefore, the income projected in the viability model is less than in Sterling's business plan. Sterling's business plan only projects results in the next couple years. The FSLIC interest rate scenario was adjusted to reflect the advance rate levels at the District Bank in Seattle.

The amount of non-performing loans and additional write-downs correspond to the assumptions used in determining the liquidation cost and the cost of bids received. The estimates were updated to reflect activity since December 31, 1987.

PRIVILEGED MATERIAL
ATTORNEY CLIENT
CONFIDENTIAL

In January, 1988, Sterling acquired six branches, which is reflected in the viability model.

The rapid growth projected by Sterling places pressure on the net worth ratio of the combined institution. In both their projections, and the results of the model, the net worth ratio declines in the first few years. Sterling has expanded rapidly in its history. A great deal of the growth has been through branch acquisition which they plan to continue for the life of their plan. Due to this history of rapid growth, Sterling's projections were used in the first three years of the viability model. Growth was then slowed to a more average level.

In our opinion, the viability model indicates that after the acquisition of Tri-Cities, Sterling will remain a profitable and adequately-capitalized institution.

Because the model alone is not an accurate predictor of net worth compliance, we have reviewed the figures provided by the applicant and find them to be reasonable given their interest rate assumptions.

## VIII. Requested Forbearances

Sterling has requested certain standard and non-standard forbearances as part of their proposal to acquire Tri Cities. Standard forbearances include the liquidity, net worth, scheduled items, amoritization of unidentifiable intangibles and amoritization of loan discount. Another standard forbearance, unauthorized service corporation activities, is usually only awarded if the acquirer shows need. Sterling's does warrant this forbearance as with the Tri Cities acquisition, they will be over their aggregate equity risk investment limitation.

Sterling has also requested, and this office endorses, the FSLIC initial cash payment and any subsequent cash payments of loss coverage on the covered assets be counted as regulatory net worth. As was shown in the viability analysis section above, Sterling needs the net worth infusion and substantial leverage is not planned. Sterling works very closely with their Supervisory Agent and he concurs a realistic business plan has been developed.

## IX. Condition of the Industry

Tri-Cities has five branches located in southeastern Washington. All of the branches are in the "tri-cities" area of Kennewick, Pasco, and Richland. Washington State's economy has recovered slowly from the economic recession of the early 1980's due to the lackluster performance of the lumber and agricultural sectors. The economy in the Tri-Cities market area is heavily dependent on the nuclear industry. With the WPPSS fiasco and other problems with the nuclear industry surfacing in the region within the past four years, Tri-Cities' economy has plummeted. That economy has not shared in the general recovery experienced in the rest of the state. FSLIC-insured thrifts in the State of Washington have been able to maintain profitability since 1983, in part because the state, especially the Puget Sound area, is more diversified than its neighbors in the Twelfth District.

The Twelfth District economy, as a whole, has fared poorly in the 1980's. The region is heavily dependent upon natural resource industries such as agriculture,





APP 871
NOF014 1088 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
... BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

timber, petroleum, and mining. The price for these commodities has been extremely weak throughout the 1980's. The thrift industry in the District has suffered accordingly. The Twelfth District thrifts as a whole have generated a positive return on assets in only one of the last six years.

The following table summarizes the financial health of the FSLIC thrift industry in the Twelfth District and in Washington State using two key indicators: regulatory net worth and return on average assets.

| | Twelfth District | | Washington State | |
|---|---|---|---|---|
| | NW | ROA | NW | ROA |
| 12/81 | 4.64 | (0.77) | 5.68 | (0.44) |
| 12/82 | 4.01 | (0.58) | 4.71 | (0.80) |
| 12/83 | 4.55 | 0.25 | 5.74 | 0.45 |
| 12/84 | 4.16 | 0.00 | 5.56 | 0.36 |
| 12/85 | 4.06 | (0.29) | 5.59 | 0.19 |
| 12/86 | 4.32 | (0.43) | 6.39 | 0.67 |
| 12/87 | 4.41 | (0.27) | 6.47 | 0.53 |

(Net worth in percentage of assets, ROA in percentage of average assets)

## X. Pledged Accounts

As of December 31, 1987, Tri-Cities had no public funds on deposit.

## XI. Fidelity Bond and Directors and Officers Coverage

Tri-Cities does not have fidelity bond coverage or directors and officers liability coverage. These policies expired on November 1, 1987, (with discovery extended to November 1, 1988), and on March 30, 1986, respectively.

000723



VOF014 1089 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
CLOSING BOOK DATED 880407
APP. 872

...ERIAL
P... ...ENT
ATTO...
...NFIDENTIAL



Recommendation for Receivership and Acquisition of Substantially
All of the Assets and All of the Liabilities of
Tri-Cities Savings and Loan Association
Kennewick, Washington; FHLBB No. 7641

EXHIBITS

S-1. FHLBB Report of Examination of Tri-Cities Dated February 17, 1987.
S-2. FHLBB Quarterly Financial Report of Tri-Cities dated December 31, 1987.
S-3 FHLBB Monthly Financial Reports of Tri-Cities dated January 31, 1988 and February 29, 1988.
S-4 Public Accountants' Audit Report for 12/31/86 and 12/31/85.
S-5 Memorandum dated July 6, 1987, from Susan M. Swenson, Supervisory Agent, to Jon M. Rundle, Assistant Director - ORPOS recommending transfer of Tri-Cities case to MAD/FSLIC.
S-6 Federal Consent Agreement dated October 29, 1986.
S-7 Federal Consent Order to Cease and Desist dated June 25, 1986.
S-8 State of Washington Consent Cease and Desist Order dated October 4, 1985.
S-9 Bid proposal dated November 27, 1987, from Sterling Savings.
S-10 Initial Cash Payment Calculation.
S-11 Forbearance Letter.
S-12 FHLBB Report of Examination of Sterling dated October 29, 1986.
S-13 FHLBB Quarterly Financial Report of Sterling dated December 31, 1987.
S-14 FHLBB Monthly Financial Report of Sterling dated January 31, 1988 and February 29, 1988.
S-15 Public Accountant's Audit Report of Sterling dated June 30, 1987.
S-16 Sterling 10-Q Report dated March 31, 1987.
S-17 Charter & Bylaws for Sterling Savings.
S-18 Charter & Bylaws for Tri-Cities Savings.
S-19 Viability Analysis.

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

April 6, 1988

ISSUE MEMORANDUM

EXHIBIT 7 Faulstich 8/2/0[illegible]

FROM: James R. Faulstich [initials]
Principal Supervisory Agent

TO: Federal Home Loan Bank Board

RE: Proposed Appointment of the Federal Savings and Loan Insurance Corporation ("FSLIC") as Receiver for and Subsequent Acquisition of

Figures in Thousands
as of Feb. 29, 1988

| | | |
|---|---|---|
| Tri Cities Savings and Loan Association | Form: | State Stock |
| Kennewick, WA | Assets: | $54,500 |
| FHLBB No. 7641 | Liabilities: | $61,800 |
| | RAP Capital: | ($7,400) |
| | NW/Liabilities: | (11.97%) |
| | Operating Loss/Mo.: | ($246) |

by:

Figures in Thousands
as of January 31, 1988

| | | |
|---|---|---|
| Sterling Savings Association | Form: | State Stock |
| Spokane, WA | Assets: | $295,326 |
| FHLBB No. 7918 | Liabilities: | $284,339 |
| | RAP Capital: | $11,104 |
| | NW/Liabilities: | 3.91% |
| | Operating Income/Mo: | $189 |

I. Issue

Whether the Bank Board should approve the appointment of a receiver and the subsequent FSLIC-assisted acquisition of substantially all the assets and liabilities of Tri Cities Savings and Loan Association ("Tri Cities") by Sterling Savings Association ("Sterling").

II. Background

Tri Cities is a state-chartered, stock association that received its insurance of accounts in 1978 and operates five branch offices in south central Washington. The economy of this market area is heavily dependent on the nuclear industry. As this new association flourished in its early years with the growth of the nuclear industry in the Tri Cities markets, it has suffered ever since the WPPSS fiasco in 1983 and other problems that have surfaced

900725

the nuclear industry within the past four years. With this lack of market demand, the institution turned its attention outside its market area and began to book commercial real estate loans that were poorly underwritten. Scheduled items peaked in September 1986 at 24% of assets and now stand at 20% of assets.

Tri Cities first reported insolvency in September 1986 due to the voluntary establishment of specific loss reserves and has continued to lose approximately $250,000 per month on an operating basis. Operating expenses have remained high at approximately 3.6 percent of average assets. With a negative one year hedged gap of 69.5%, Tri Cities remains extremely exposed to rising interest rates. Net operating loss carryforwards are estimated to be $4.2 million for financial reporting purposes as of September 30, 1987.

III. Solution Efforts

A Consent Agreement was signed on 10/29/86 by Tri Cities Board of Directors and the case was transferred to the FSLIC on 8/28/87. The Supervisory Agent marketed Tri Cities on an unassisted basis in January 1987 to all qualified in-state FSLIC institutions. Four institutions indicated a preliminary interest, although all four later said they would not proceed without assistance.

Tri Cities was marketed on an assisted basis, along with two other Washington state thrifts, at a bid conference held on October 15, 1987, on a nationwide basis to all eligible private investors from the FSLIC National Marketing list and all eligible FSLIC-insured institutions. Out-of-state acquirers were required to bid on all three institutions; however we reserved the right to accept their bid(s) on any combination of the three institutions. This solicitation generated proposals from three thrift institutions. Old Stone Corporation, Providence, Rhode Island, submitted the lowest-cost bid but later withdrew their proposal. Sterling submitted the next lowest-cost bid. This office has recommended, and FSLIC has concurred, the acceptance of Sterling's proposal.

IV. Proposed Assistance

1. Upfront cash contribution of $11,715,128 which equals the negative GAAP net worth plus additional loan losses and valuation adjustments on non-covered assets plus actual and estimated operating losses since 12/31/87 until closing at 4/8/88 less specific reserves on covered assets. This payment will count as regulatory net worth.

2. Capital loss and yield maintenance coverage (treasury bill plus 150 basis points) on 13 assets with a net book value of $8.01 million and existing reserves of $1.8 million. Sterling will absorb 25% of the capital losses up to a pre-tax limit of $900,000.

3. FSLIC will purchase three assets, two of which FSLIC as Receiver for Westside FS&LA is lead lender. These two assets have a net book value of $560,000. The third asset is Tri Cities investment in Tri-West Construction, Inc., a wholly-owned inactive subsidiary of Tri Cities.

4. Five year indemnification for undisclosed liabilities, claims not reserved for and asserted against the association, and litigation challenging the transaction. Standard forbearances regarding net worth forbearances, exclusion of scheduled items and liquidity deficiencies and service corporation

5. Tax benefits will be shared with the FSLIC on a 50/50.

V. Cost Analysis

The results of the proposal analysis performed by the Analysis and Evaluation Division using September 1987 data is as follows:

| | Present Value (in millions) | Percent of Liquidation |
|---|---|---|
| Liquidation | $20.7 | --- |
| Sterling | $15.8 | 76% |
| World S&LA | $16.9 | 82% |

VI. Capacity and Viability of Sterling

Sterling was a de novo state, stock institution that received its insurance of accounts in 1983 currently operating eleven offices throughout the state. The stock is held by Sterling officers and directors and the Spokane community--there is no one controlling shareholder. In June of 1983 Sterling acquired Lewis FS&LA, Chehalis, WA with FSLIC assistance. Sterling was last examined in October 1986 and received a composite rating of "2".

The business plan for the association after the acquisition is an ambitious one, but consistent with growth trends of the recent past. The business plan consists of asset growth of approximately 15% annually. This growth is supported largely by the infusion of the FSLIC assistance as regulatory net worth. The Supervisory Agent feels management is capable and will manage this growth prudently. The viability analysis maintains net worth above 5% for the three year period. The estimated net income the first year following the acquisition is projected to be $2 million (57 bps ROA) while the net worth to liabilities ratio should reach 5.84%.

008227

ISSUE MEMO EXHIBITS

I-1. Old Stone Bank Bid
I-2. Sterling Savings Association Bid
I-3. World S&LA Bid
I-4. Tri Cities S&LA Consent Agreement
I-5. FHLB Seattle Recommendation Memo (March 1, 1988)
I-6. FSLIC Concurrence Memo (March 16, 1988)
I-7. Liquidation Costing (January 6, 1988)

000228

VI. Comparison of Alternatives

LIQUIDATION

| | |
|---|---|
| Advantages | 1. Offers a permanent solution. |
| Disadvantages | 1. Not the least costly solution.<br>2. Possible adverse public reaction.<br>3. Could take much longer to resolve given prioritization. |

STERLING

| | |
|---|---|
| Advantages | 1. Least costly solution.<br>2. Financially strong acquirer.<br>3. Keeps capital in thrift industry. |
| Disadvantages | 1. Cheaper solution may evolve at a later date. |

WORLD S&LA

| | |
|---|---|
| Advantages | 1. Financially strong acquirer. |
| Disadvantages | 1. More costly solution.<br>2. Only bid on this shop because they "had" to. Not really interested. |

VIII. Conclusion

The District Bank staff believe the Sterling proposal to acquire Tri Cities provides the most cost effective permanent solution of this case. Therefore, the FSLIC and the Federal Home Loan Bank of Seattle recommend the Federal Home Loan Bank Board approve the acquisition of Tri Cities by Sterling. The State of Washington concurs with this recommendation.

I concur: Stuart D. Root

000729

Federal Home Loan Bank Board

1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

**TO:** The Federal Home Loan Bank Board

**DATE:** December 5, 1988

**FROM:** Jordan Luke
General Counsel

**SUBJECT:** Voluntary Supervisory Conversion of:

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington
("Central Evergreen" or "Association")
FHLBB No. 1527

**Pre-Conversion**
Total Assets: $260.4 million
RAP Regulatory Capital: $4.7 million
RAP Reg. Cap./Total Liabilities: 1.8%
GAAP Net Worth: ($12.4) million
GAAP Net Worth/Total Liabilities (4.8%)
(as of (9/30/88)

**AND:** Simultaneous Merger into

Sterling Savings Association
("Acquiror" or "Sterling")
Spokane, Washington
FHLBB No. 7918

**Post-Conversion/Merger**
Total Assets: $693.8 million
Total Liabilities: $676.6 million
Reg. Cap.: $22.1 million
Reg. Cap./Total Liabilities: 4.0%
GAAP Net Worth: $11 million
GAAP Net Worth/Total Liabilities: 1.43%

## A. GENERAL RECOMMENDATIONS

It is recommended by the Principal Supervisory Agent of the Federal Home Loan Bank of Seattle ("PSA") with the concurrence of the Office of Regulatory Activities ("ORA") and the Office of General Counsel ("OGC") that the Federal Home Loan Bank Board ("Board"):

1. Approve the voluntary supervisory conversion of Central Evergreen;

2. Direct the Secretary or Assistant Secretary of the Board to issue a letter to Central Evergreen on behalf of the Board stating that the grounds set forth in § 5(d)(6)(A)(i) of the Home Owners Loan Act ("HOLA") 12 U.S.C. § 1464(d)(6)(A)(i), exist with respect to Central Evergreen and authorize the Secretary or Assistant Secretary to provide a copy of such certification to any agency in the United States upon its request; and

3. Approve the Agreement between the Acquiror and the FSLIC, requiring the Acquiror to cause the Resulting Institution to maintain and achieve certain specified levels of regulatory capital in accordance with scheduled increases as set forth in the Business Plan; and in the event of failure to achieve RAP and GAAP Capital as scheduled or to comply in all material respects to the business plan, subject the Resulting Institution to sanctions.

In addition, pursuant to 12 C.F.R. Sections 546.2, 552.13 and 563.22b, the Office of General Counsel, the Office of District Banks and the Office of Regulatory Activities recommend that the Board approve the merger of Central Evergreen into Sterling in order to effect the proposed conversion of Central Evergreen to stock form.

The appropriate Board resolution, tax certification letter and proposed resolution are attached as Exhibit 1 to record the above-noted approvals and other necessary Board actions.

B. <u>BACKGROUND OF THE PARTIES</u>

1. <u>Central Evergreen</u>

Central Evergreen was chartered in 1922 as a federally chartered mutual savings and loan association and received insurance of accounts in 1935. The Institution is headquartered in Chehalis, Washington and operates nine branches within western Washington. As of June 30, 1988, Central Evergreen reported total assets of $254.9 million, regulatory capital of $4.6 million (1.8% of total liabilities) and negative GAAP capital of $12.7 million (negative 4.8% of liabilities).

As discussed in Exhibits 2 and 3, the Supervisory Agent at the Federal Home Loan Bank of Seattle and ORA have determined that Central Evergreen is currently insolvent when its net worth is calculated under GAAP on a going concern basis. Central Evergreen's failure is due primarily to a high level of problem assets, significant operating expenses and inadequate underwriting procedures.

The Association reported losses totalling $5.5 million from 1980 to year end 1983. Those losses, coupled with losses on sales of fixed rate, low yielding assets during the same time period, resulted in a negative GAAP capital position of $14.2 million at December 31, 1984. As was permitted by the Board, the Association elected to defer approximately $15 million in losses for regulatory purposes. Those losses continue to amortize at approximately $240,000 each quarter. The SA noted that the asset sales resulted in a negative GAAP capital position, but that the proceeds were reinvested in adjustable rate assets that lead to an improved interest rate risk position and positive earnings from 1984 to 1986. Despite the Association experiencing a positive earnings trend, the SA believes the likelihood of the Association's recapitalization or recovery through earnings retention is highly doubtful given its severely negative GAAP capital position.

Subsequent to the most recent examinations of Central Evergreen, a comprehensive Supervisory Agreement was entered into between the Association and the Federal Home Loan Bank of Seattle in 1987 and remains in place. Both the Association's management and the Federal Home Loan Bank of Seattle ("FHLBank of Seattle") actively sought merger or acquisition partners. After consideration of two other offers requiring substantial FSLIC assistance, the SA reported that Sterling's offer was accepted. Absent the proposed acquisition by Sterling, the SA stated that FSLIC assistance would very likely be required.

2. Sterling

Sterling is a state-chartered FSLIC-insured stock association which received its insurance of accounts and became a member of the Federal Home Loan Bank of Seattle in 1983. As of June 30, 1988, Sterling reported total assets of $434.4 million, regulatory capital of $26.2 million and GAAP net worth of $23.2 million (5.3% of assets). Sterling currently operates 19 branch and loan production offices in the state of Washington. Much of Sterling's growth and current level of goodwill is attributed to its acquisitions of other

troubled FSLIC-insured institutions and branch offices.[1] As of June 30, 1988, Sterling reported a goodwill to total assets ratio of 4.42% which would increase to 5.89% as a result of the subject transaction.[2]

The FSA believes that the institution has established a proven success record in demonstrating it can successfully integrate acquired institutions and/or offices into its operations while maintaining profitability and meeting minimum regulatory capital requirements. Sterling's usual method of blending an acquired institution into its operations has been characterized by first stabilizing and training staff, bringing facilities up to par with the rest of the institution, establishing a regional branch administrator and formulating a plan to attract additional retail deposits and loans.

Since its opening in 1983, Sterling has undergone four examinations and received satisfactory ratings in all areas. According to the SA, the institution continues to be well-managed, with positive earnings, good asset quality, and an acceptable capital level. Sterling has addressed examination concerns to the satisfaction of the Supervisory Agent and no significant supervisory concerns are currently outstanding.

---

1. In February 1983, Sterling acquired Lewis and Clark Savings and Loan Association, a $43.4 million institution, through an unassisted voluntary merger. On November 5, 1985, Sterling acquired Lewis Federal Savings and Loan Association, a $52 million institution, which provided for FSLIC assistance in the amount of $1.75 million cash, indemnification against undisclosed liabilities and litigation costs for challenges to the acquisition and forbearances from complying with certain FSLIC and Board regulations for periods of one to five years. Sterling's most recent acquisition took place on April 8, 1988, involving Tri-Cities Savings and Loan Association, a $54.9 million institution. Sterling received $15.8 million in FSLIC assistance, consisting of $11.73 million in cash, indemnifications, and forbearances from complying with certain net worth and liquidity requirements for periods of up to five years.

2. While experiencing asset growth of over 50% per year, Sterling has posted positive annual net income since its second quarter of operation in 1983. As of Sterling's fiscal year ending June 30, 1988, it reported a return on equity ratio of 6.15%, and a return on average assets ratio of .39%, well above its peer ratios of 2.32% and .28%, respectively. Sterling's fiscal 1988 net income represented a 9.3% increase over the previous year's income. The institution's net operating income as a percentage of average assets of .89% exceeds its peer ratio of .83% as of the same date, despite recording a small non-operating loss.

C. Structure of the Transaction

Pursuant to the terms of a merger agreement between Central Evergreen and Sterling, the acquisition of Central Evergreen will result from Central Evergreen's conversion and simultaneous merger into Sterling. Upon the conversion date, Central Evergreen will issue 100 shares of its common stock to Sterling in exchange for Sterling's assumption of Central Evergreen's liabilities. The shares received by Sterling will be canceled immediately thereafter. The resulting association will retain the name Sterling Savings Association, Spokane, Washington, and will operate under its current charter and bylaws. After the merger Central Evergreen's home and branch offices will operate as branch offices of Sterling. The transaction does not involve an infusion of cash or sale of conversion stock per se, but rather will be effected by Central Evergreen's merger into a healthy institution, thereby eliminating the risk to the FSLIC of Central Evergreen's liquidation. The proposed transaction will not involve FSLIC assistance.

D. Qualification of the Association for a Supervisory Conversion to Stock Form

The Board has the authority to approve a supervisory conversion of a mutual association to a stock savings bank pursuant to Subpart C of 12 C.F.R. Part 563b, which implements the Board's authority with respect to federal associations under Sections 5(i), and (p) of the HOLA and with respect to both federal and state-chartered institutions under Section 402(j) of the National Housing Act ("NHA"). Generally, a supervisory conversion effected under Subpart C of Part 563b involves the sale of the mutual insured institution's newly issued stock to a third party or parties in a transaction in which the institution's members have no rights of approval or participation, and no rights to the continuance of any interest in the converted institution.

Pursuant to 12 C.F.R. § 563b.24, the Board in its discretion may authorize the supervisory conversion of an insured institution when: (i) the institution's liabilities exceed its assets, as measured under GAAP on a going concern basis, and (ii) the institution would be a viable entity as determined under 12 C.F.R. § 563b.26 following the conversion.

1. Insolvency

The Supervisory Agent at the FHLBank of Seattle and ORA have determined that Central Evergreen is currently insolvent when its net worth is calculated under GAAP on a going concern basis. As of


T942 0333 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
27 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

June 30, 1988, the Association's liabilities exceeded its assets by $12,750,857. Central Evergreen's failure is due primarily to a high level of problem assets, significant operating expenses and inadequate underwriting procedures.

2. Viability

Under Section 563b.26(b), a converting institution will be considered a "viable entity" if the requirements of either subsection (b)(1) or (b)(2) and subsection (b)(3) are met. Section 563b.26(b)(1) provides that "the prospective acquiror shall infuse sufficient capital at the conversion to enable the [converting] institution to achieve a ratio of net worth to total liabilities, equal to the greater of (i) three percent of liabilities, computed on the basis of generally accepted accounting principles, or (ii) the institution's regulatory capital requirement established under Section 563.13." Although the Resulting Institution will meet its regulatory capital requirements, it will not achieve the greater amount represented by a ratio of net worth to total liabilities of 3% under GAAP. Thus, the subject transaction does not meet the viability criteria specified in subsection 563b.26(b)(1).

However, Section 563b.26(b)(2) provides that the converting institution meets the first leg of the viability standard if the prospective acquiror:

(i) infuses sufficient capital at the conversion to enable the institution to achieve a ratio of net worth to total liabilities of at least 1%, under GAAP, and

(ii) agrees in writing with the Corporation to infuse additional capital, as necessary, to enable the institution to increase its regulatory capital on a scheduled basis to meet the institution's regulatory capital requirements within five years of the date of acquisition.

Further, under subsection b(2) the acquiror must agree in writing that failure to achieve the scheduled regulatory capital levels on or before the due date, or to adhere in all material aspects to the business plan submitted with the plan of conversion, will subject the acquiror to such sanctions as the Board, in approving the application, directs to be included in the written agreement. Finally, § 563b.26(b)(3) requires a finding that the transaction taken as a whole is in the best interest of, and does not present the potential for injury to, the converting institution, its depositors and FSLIC.

After the conversion and merger, Sterling's ratio of net worth to total liabilities, under GAAP, will decrease to 1.43%. Thus, pursuant to 12 C.F.R. § 563b.26(b)(2), Sterling must agree to increase its regulatory capital on a scheduled basis and agree in

writing to meet its regulatory capital requirements in accordance with the schedule and further agree that failure to meet the schedule or to adhere to the approved business plan will subject it to such sanctions as the Board includes in the agreement. No specific sanctions have been recommended by the SA or ORA. However, in our opinion the Board may direct the SA, with the concurrence of ORA and OGC, to negotiate with the Applicant sanctions to be included in the Agreement. Further, it is our opinion that the Board may delegate authority to the SA to include such sanctions in the Agreement and, upon the failure of the Applicant to meet the schedule or business plan standards, to enforce such sanctions against the Applicant. Accordingly, the proposed resolution contains language directing the SA to negotiate and include such sanctions in the Agreement. The five year business plan that was submitted in connection with the application indicates that Sterling will be able to maintain profitability and come into compliance with its minimum regulatory capital requirement in at least five years. Moreover, Sterling has indicated that it will thereafter infuse or obtain capital, satisfactory to the Supervisory Agent, to ensure that it continues to comply with its regulatory capital requirement, and specifically, will infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of approval of the transaction.

In addition, Sterling's level of regulatory capital has kept pace with its expansion and Sterling is currently in compliance with minimum regulatory capital requirements. Sterling has demonstrated its capability to attract outside capital through the issuance of 90,168 shares of cumulative, convertible Series A preferred stock in 1987, for a net increase to capital of $2.25 million. According to the SA's digest, based upon Sterling's stable earnings, acceptable capital levels, moderate interest rate risk, access to outside capital and management expertise, its overall financial resources have not been a cause for significant supervisory concern.

According to the SA's digest the subject merger represents a prudent and well-planed strategy by Sterling which the SA believes is in the best interests of the institution and the FSLIC. The merger will provide Sterling with significantly greater market share and increased competitiveness in its current market area of Lewis County, a larger asset base, greater geographic diversification, additional savings through economies of scale and tax benefits provided by Central Evergreen's unused net operating loss carryforwards.

The SA further notes that the business plan contained in the application indicates that Sterling plans to continue its current business strategy at a much slower growth rate. For fiscal years 1990 and 1991 Sterling anticipates annual asset growth of 6.65% and 8.79%, respectively. The institution intends to maintain operation costs at 1.90%-2.00% of total assets; a negative gap of between -10%

and -15%; a return on assets ratio of .40%; and maintenance of regulatory capital in excess of 4% of total assets, and expansion of lending and secondary market activities.

Sterling's record of meeting its business plan objectives is evidenced by its continued profitability. The digest states that the FHLBank of Seattle remains confident that Sterling's management will adhere to its plan and the institution will be closely monitored to ensure an increasing level of capital to required levels and safe and sound operation. The Seattle Bank is also requiring the institution to meet certain pre-defined capital levels. In addition, the SA notes that Sterling has contingency plans in the event of unfavorable or unforeseen circumstances.

Thus, it is the opinion of this Office, with the concurrence of ORA and the Supervisory Agent, that Central Evergreen's liabilities exceed its assets, as calculated under GAAP on a going concern basis, and that the merger of Central Evergreen into Sterling satisfies the viability standards set forth in 12 C.F.R. § 563b.26(b). However, since the proposed conversion and merger of Central Evergreen will decrease Sterling's ratio of net worth to total liabilities to 1.43%, computed on a GAAP basis, in our view a significant issue of policy exists thereby mandating Board action on the subject application. Based on the record, it is our opinion that the Board would have a legal basis on which to find that the proposed transaction meets the requirements for a voluntary supervisory conversion.

E. <u>Tax Consequences</u>

Pursuant to 12 C.F.R. § 563b.27(c) of the conversion regulations, Central Evergreen has submitted an opinion of counsel stating that the supervisory conversion would constitute a reorganization within the meaning of Section 368(a)(1)(G) of the Internal Revenue Code ("Code"). <u>See</u> Exhibit 6. Therefore, no gain or loss will be recognized by Central Evergreen as a result of the conversion, provided that the reorganisation is completed pursuant to a plan, that Sterling assumes substantially all of the assets of Central Evergreen, and that the Board certifies that at least one of the grounds for the appointment for a receiver set forth in Section 5(d)(6)(A)(i), (ii) or (iii) of the HOLA exists, or will exist in the near future in the absence of action by the Board.

The grounds for the appointment of a receiver pursuant to Section 5(d)(6)(A)(i) of the HOLA are insolvency and that the assets of the association are less than its obligations to its creditors and others, including its members. 12 U.S.C. § 1464(d)(6)(A)(i) (1982). Section 563b.24(b) of the Conversion Regulations provides that insolvency may be found to exist under § 5(d)(6)(A) of the HOLA for the purpose of qualification for a voluntary supervisory conversion if Central Evergreen's liabilities exceed its assets, as calculated under GAAP on a going concern basis. ORA has concurred

with the Supervisory Agent's opinion that the Board may certify that the grounds set forth in § 5(d)(6)(A)(i) of the HOLA for the appointment of a receiver exist with respect to Central Evergreen in that Central Evergreen is insolvent. We note, however, that the Internal Revenue Service requires that the Board also certify that Central Evergreen did not intentionally place itself in a position to qualify for a tax-free reorganization. Central Evergreen is, and, since December 31, 1984, has been insolvent under GAAP. Accordingly, the proposed approval resolution directs the Secretary or Assistant Secretary to make the above described certification on behalf of the Board, and to provide a copy of such certification to any agency of the United States upon its request. See Exhibit 1.

F. Proposed Charter, Bylaws and Stock Certificate

Central Evergreen is converting from federal mutual to federal stock form pursuant to Sections 5(i) and (p) of the Home Owners' Loan Act, 12 U.S.C. § 1464(i) and (p) (1982) ("HOLA") and Part 563b of the Rules and Regulations for Insurance of Accounts (the "Insurance Regulations"). In light of the present financial condition of Central Evergreen, it is our opinion that the Association would qualify for a voluntary supervisory conversion pursuant to the eligibility standards set forth at 12 C.F.R. § 563b.24. As the merger will take place simultaneously with the conversion, it is our opinion that no stock charter need be issued to Central Evergreen. Furthermore, no stock will be issued by Central Evergreen with the exception of 100 shares to be issued to Sterling (which will be canceled immediately.)

G. Merger of Central Evergreen with and into Sterling

No stock will be issued or sold in the conversion which involves a simultaneous conversion and merger into an existing stock institution.

Due to Central Evergreen's poor financial condition, Sterling requests that the merger be deemed to be instituted for supervisory reasons pursuant to Section 552.13(i)(4) of the Federal Regulations and Section 563.22(d) of the Insurance Regulations. In its application, Sterling states that it anticipates that the stockholder notice requirement of Section 552.13(i) of the Federal Regulations and the published notice requirement of Section 563.22(c) of the Insurance Regulations will be waived.

We have reviewed the merger application under 12 C.F.R. § 552.13. In order to expedite consummation of the merger, the attached resolution approving this transaction deems the merger to be instituted for supervisory reasons and waives the stockholder notice requirement. In addition, the SA has determined, and we concur, that pursuant to Section 571.5(a), the provisions of Section 571.5(k) of the Insurance Regulations are not applicable to

supervisory merger transactions such as that contemplated by the application. In addition, we note that the proposed merger is of the type that qualifies for the exemption from stockholder approval under § 552.13(j)(2). As noted above, ODB has recommended approval of the merger. See Exhibit 5. However, the proposed resolution does include a condition that requires the Resulting Institution to provide notice to all accountholders concerning federal insurance of accounts for the merged institution, pursuant to the terms of 12 U.S.C. § 1728(a).

H. Employment Contracts

Sterling has not entered into any written employment contracts with Central Evergreen employees, however it has agreed to assume the three contracts currently in place for officers Godding, Van Dijk and Neuhauser which all expire by December 31, 1989, and a deferred compensation agreement for Central Evergreen's retiree Roy H. Alexander. The SA has advised this Office that they have no objection on a supervisory basis to assumption of the three contracts and the current deferred compensation agreement. Accordingly, this Office has no legal objection to such agreements.

I. Board of Directors and Advisory Board

After the merger, Sterling's board of directors will include two outside directors of Central Evergreen, Messrs. Fugate and Alverson. Central Evergreen's remaining directors will be retained as an advisory board for a period of up to one year without compensation. The existing advisory board of Central Evergreen will continue with compensation of $50 per meeting. This arrangement is identical to a prior agreement Sterling entered when making a previous acquisition of a troubled thrift. We have been advised by the SA that such arrangements are not objectionable and we have no legal objections to the proposed arrangement.

J. Management Interlocks and CRA

We have reviewed the proposed transaction for compliance with the Depository Institutions Management Interlocks Act ("Management Interlocks Act"), 12 U.S.C. ch. 33, the management interlocks provisions of the Act, 12 U.S.C. § 1730a(i) and the regulations adopted by the Board pursuant to those statutes, 12 C.F.R. part 563f and 12 C.F.R. § 584.9.

No issues are presented under those provisions and we defer to ORA to advise the Board as to whether Central Evergreen and Sterling are in compliance with the CRA.

K. Use of Purchase Accounting

An opinion of Coopers & Lybrand, an independent certified public accountant, that the acquisition of the Association will be accounted for as a purchase, has been submitted as part of the Application. See Exhibit 7. In addition, ORA has stated that the proposed transaction qualifies for the use of purchase accounting, and that it has no objection to this accounting method.

L. Forbearances and Waivers

The applicants have requested a waiver for submission of audited financial data required by Section 563b.27(o) of the Insurance Regulations. The applicants indicated that the supervisory nature of the acquisition,[3] its submission of audited financial data as of December 31, 1987, which demonstrates the depth of Central Evergreen's negative GAAP capital, and the unnecessary time and expense of an additional audit outweighs the necessity of the above requirement. The applicants have also provided unaudited financial statements as of June 30, 1988, prepared in the same manner as the December 31, 1987, audited reports. The SA has recommended that the waiver request be granted. We note that the clear insolvency of Central Evergreen has been demonstrated by the audited and unaudited financial statements submitted with the application, and that the request is supported by the SA's digest; furthermore Central Evergreen will be merged into Sterling, and its resulting capitalization levels will be subject to an agreement with the Corporation. Accordingly, this Office has no legal objection to such waiver being granted.

M. Antitrust Analysis

We have reviewed the antitrust analysis conducted by the SA and for the reasons stated therein, we concur with the SA's conclusion that the proposed merger would not substantially lessen competition in any relevant geographic area of the country or otherwise create a monopoly or have a significant adverse anticompetitive effect which would violate the antitrust laws.

1. Direct Competition

Sterling and Central Evergreen have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987, Lewis County was serviced by a total of 25 deposit-taking financial institution offices including

3. Section 563b.27(o) requires the submission of an audited balance sheet as of a date within 90 days of the filing of the application. We note that the audited balance sheet as of 12/31/87, was 240 days from the date the application was filed.

13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the de minimus impact of any anticompetitive effect is further negated due to the insolvent nature of Central Evergreen.

2. Faltering/Failing Company

Further, any adverse effect on competition would be mitigated by the weak financial condition of Central Evergreen. The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance.[4] Central Evergreen is insolvent. Thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, tne effect on competition of the merger of Central Evergreen into Sterling is probably procompetitive as it will return an active competitor to the market involved.

Moreover, this transaction may also be analyzed under the failing company doctrine.[5] We are aware of no other economically feasible quantifiable alternatives in this case and therefore conclude that the requirements of the doctrine are met and that it may operate as a defense to any action alleging a violation of Section 7 of the Clayton Act brought as a result of this transaction. In sum, this Office has no legal objections to approval of this transaction on antitrust grounds.

H. Summary of Other Legal Considerations

This Office has also reviewed the proposed transaction for compliance with other provisions of the NHA and, in our opinion, the transaction would be consistent with such provisions. Specifically, this Office has evaluated the transaction with respect to NHA Sections 408(c) (activities restrictions); 408(d),(p), and (t) (transactions with affiliates); 408(e)(4) (NOL carryforwards);[6]

---

4. United States v. General Dynamics, 415 U.S. 486, 503 (1974).

5. See International Shoe v. FTC, 180 U,.S. 291 (1930); Grandader v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).

6. The SA concurs in the Applicant's statement that the transaction will not result in the loss or reduction of NOL carryforwards.

408(e)(1)(A)(iii), (e)(1)(A)(iv), (e)(3), and (i)(2)(B) (prohibited acquisitions and corporate structures); 408(g) (debt); and 408(m) (emergency waiver authority). The proposed transaction raises no questions under the foregoing provisions.

This Office has also reviewed the proposed transaction for compliance with the provisions of the Board's conversion regulations at 12 C.F.R. Part 563b. In addition to the provisions discussed in detail above, we have also examined the transaction pursuant to 12 C.F.R. Sections 563b.27 (forbearances) and 563b.31 (expenses). The proposed transaction raises no significant issues under these provisions.

CORPORATE AND SECURITIES DIVISION STAFF CONTACT: Elaine A. Laye
EXT: 6453

J. Amanda Machen
Assistant Deputy Director
Corporate and Securities Division

I concur:

V. Gerard Comizio
Director, Corporate and
Securities Division

## EXHIBITS

Exhibit 1. Resolution and Tax Certification Letter
Exhibit 2. PSA Digest
Exhibit 3. ORA Digest
Exhibit 4. Plan of Conversion
Exhibit 5. ODB Memorandum
Exhibit 6. Opinion of Counsel
Exhibit 7. Certified Public Accountant's Opinion



T942 0342 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;
REEMENTS; 870300 - 910100 CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

EXHIBIT I

FEDERAL HOME LOAN BANK BOARD

No.:

Date:

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterling Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December __, 1988, a memorandum from the Office of District Banks, dated December ___, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

<u>SUPERVISORY CASE FINDING</u>

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

## COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

## WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

## VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessar[illegible] enable the institution to continue to maintain its regul[illegible]ory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

**TAX CERTIFICATION**

**RESOLVED FURTHER**, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

**RESOLVED FURTHER**, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

**CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS**

**RESOLVED FURTHER**, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

**EFFECTIVE DATE**

**RESOLVED FURTHER**, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

**MISCELLANEOUS**

**RESOLVED FURTHER**, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the FSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

**EXTENSION OF TIME**

**RESOLVED FURTHER**, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and

**MAINTENANCE OF BRANCH OFFICES**

**RESOLVED FURTHER**, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

**FAILURE TO MEET CONDITIONS**

**RESOLVED FURTHER**, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board



)T942 0349 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

Federal Home Loan Bank Board

1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

# TAX CERTIFICATION LETTER

**FHLBB Docket No. 1527**

Board of Directors
Central Evergreen Federal Savings
and Loan Association
350 N. Market Blvd.
P.O. Box 1506
Chehalis, Washington 98532

To the Board of Directors:

This certification is issued pursuant to an approval resolution from the Federal Home Loan Bank Board dated December __, 1988. By that resolution, the Federal Home Loan Bank Board found and certified that the grounds set forth in 12 U.S.C. Section 1464(d)(6)(A) exist with respect to Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen") in that Central Evergreen is insolvent.

The record before the Bank Board, on the basis of which such determination was made, did not include information that would justify a determination or conclusion that Central Evergreen has intentionally placed itself in the position where the certified ground would apply, for the purpose of obtaining any tax advantages pursuant to 16 U.S.C. § 368(a)(3)(D)(i) (1982).

By the Federal Home Loan Bank Board
Acting Secretary



VOT942 0350 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 01527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

The Board gave approval on December __, 1988, of an application by Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen") to convert to the stock form of organization pursuant to a voluntary supervisory conversion through a merger into a stock institution and gave approval of an application by Sterling Savings Association, Spokane, Washington ("Sterling") to acquire Central Evergreen by merger into Sterling.

**PLEASE NOTE THAT PAGES**
**WOT942 0424 THROUGH WOT942 0457**
**ARE REPLACEMENT PAGES FOR**
**WOT942 0352 THROUGH WOT942 0380**
**WHICH WAS MISSING PAGES 6 AND 7 OF THIS DOCUMENT**

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

RECEIVED JUN 26 1997 WITHERSPOON, KELLEY, DAVENPORT & TOOLE

To: Julie L. Williams
Deputy General Counsel

Linda Plye
Director of Corporate Activities, ORA

Date: November 7, 1988

From: James R. Faulstich
Principal Supervisory Agent

Subject: Application for Voluntary Supervisory Conversion and Merger of:

| | |
|---|---|
| Central Evergreen Federal Savings and Loan Association Chehalis, Washington FHLBB No. 1527 | (000) Assets as of 09/30/88 $260,416 |
| into: | |
| Sterling Savings Association Spokane, Washington FHLBB No. 7918 | Assets as of 09/30/88 $433,367 |
| | Consolidated Assets as of 09/30/88 $693,783 |

I. ISSUE

Whether the Federal Home Loan Bank Board ("Board") should approve the voluntary supervisory conversion and merger of Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen"), into Sterling Savings Association, Spokane, Washington ("Sterling").

The application is being submitted pursuant to Sections 563.22 and 563b. Subpart C of the Insurance regulations.

In addition to the request for approval of the supervisory conversion and merger, the Board is requested to waive submission of certain accounting information required by I.R. 563b.27(o), and discussed in Section VI of this Memo.

Sterling has requested that the FHLBB provide certification pursuant to Section 1464(d)(6)(A)(i), (ii) or (iii) of Title 12, United States Code.

II. STATUTORY AND REGULATORY STANDARDS

A. REGULATORY/STATUTORY CONSIDERATIONS

The application has been reviewed in accordance with applicable regulations including:

- I.R. 563.22 (Merger regulations)
- I.R. Subpart C of Part 563b (Voluntary Supervisory Stock Conversion regulations)
- 12 CFR 552 (Model Charter and Bylaws for Federal Stock Associations)

B. ELIGIBILITY OF CENTRAL EVERGREEN FOR CONVERSION

Pursuant to I.R. 563b.23, the Board will consider authorizing a supervisory stock conversion of an insured institution if an application containing the information and documents required by I.R. 563b.27 has been appropriately filed in accordance with procedures set forth in I.R. 563b.28, and meets the qualification criteria of I.R. 563b.24 and I.R. 563b.25, subject to standard conditions listed in I.R. 563b.29 and I.R. 563b.30.

Specifically, an institution qualifies for a voluntary supervisory conversion when: (1) its liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the institution would be a viable entity as determined under I.R. 563b.26 following the conversion. The institution also would not have any equity value realizable by the accountholders.

Based upon the above eligibility requirements, it is clear Central qualifies for voluntary supervisory conversion. As of June 30, 1988, Central's liabilities exceeded its assets by $12,750,857. Pursuant to I.R. 563b.(b)(2), Sterling will have a ratio of GAAP net worth to total liabilities of above 1% after merger and has included a business plan to steadily increase its level of capital. Based upon the representations made in the application and supporting materials, the transaction, taken as a whole, appears to be in the best interests of, and does not present the potential for injury to, the converting institution, its depositors or the FSLIC.

C. DELEGATION

No delegation is available due to the involvement of the stock conversion of Central Evergreen.

III. PLAN OF CONVERSION

Sterling proposes to acquire Central Evergreen, whereby simultaneously with conversion, Central will merge into Sterling. Central Evergreen's charter shall prescribe that the institution has the authority to issue 100 shares of common stock at $1.00 par value per share. Upon the conversion date Central Evergreen would issue the 100 shares to Sterling in exchange for assumption of Central Evergreen's liabilities. No cash or other remuneration is being paid for the stock by Sterling. After conversion and merger Central Evergreen's branches would become branches of Sterling. No liquidation account would be established for the former accountholders of Central Evergreen.

IV. CONVERTING/MERGING INSTITUTION

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington
FHLBB No. 1527

The institution was chartered in 1922 and received insurance of accounts in 1935. The institution is headquartered in Chehalis, Washington and operates nine branches within Western Washington.

Central Evergreen reported total assets of $254.9 million as of June 30, 1988, with capital of $4.6 million on a regulatory basis and negative GAAP capital of $12.7 million. The principle differences between regulatory capital and GAAP capital are Appraised Equity Capital totalling $1.8 million, deferred losses on loan and investment sales of $14.2 million and $808,000 in general loss reserves. Recent trends in these areas are summarized below.

| (millions) | Total Assets | Reg. Capital | GAAP capital | YTD Net Income |
|---|---|---|---|---|
| As of: | | | | |
| 09/30/88 | $260.4 | $ 4.7 | $(12.4) | $ .4 |
| 06/30/88 | 254.9 | 4.6 | (12.7) | .3 |
| 12/31/87 | 254.0 | 6.1 | (13.6) | (7.2) |
| 12/31/86 | 256.6 | 10.6 | ( 9.4) | 1.6 |
| 12/31/85 | 247.7 | 9.3 | (11.5) | 1.6 |
| 12/31/84 | 236.6 | 7.6 | (14.2) | 1.1 |
| %/Total Assets | | | | |
| As of: | | | | |
| 09/30/88 | | 1.8% | (4.8)% | .3% |
| 06/30/88 | | 1.8 | (5.0) | .1 |
| 12/31/87 | | 2.4 | (5.3) | (2.8) |
| 12/31/86 | | 4.1 | (3.7) | .6 |
| 12/31/85 | | 3.7 | (4.6) | .6 |
| 12/31/84 | | 3.2 | (6.0) | .5 |
| %/Total Liabilities | | | | |
| As of: | Total Liab. | | | |
| 09/30/88 | $256.5 | 1.8% | (4.8)% | .2% |
| 06/30/88 | 251.2 | 1.8 | (5.1) | .1 |
| 12/31/87 | 250.6 | 2.4 | (5.4) | (2.9) |
| 12/31/86 | 245.0 | 4.3 | (3.8) | .7 |
| 12/31/85 | 238.4 | 3.9 | (4.8) | .7 |
| 12/31/84 | 229.0 | 3.3 | (6.2) | .5 |

The association also reported losses totalling $5.5 million from 1980 to year-end 1983. These losses coupled with losses on sales of fixed rate, low yielding assets during the same time period, resulted in a negative GAAP capital position of $14.2 million at December 31, 1984. As was permitted by the FHLBB, the association elected to defer approximately $15 million in losses for regulatory purposes. These losses continue to amortize at approximately $240,000 each quarter.

Although the asset sales resulted in a negative GAAP capital position, the proceeds were reinvested in adjustable rate assets that lead to an improved


/OT942 0426 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

interest rate risk position and positive earnings from 1984 to 1986. Unfortunately, several of the purchased loans have since defaulted and account for the majority of the loss experienced in 1987. Although underwriting deficiencies were noted in a number of the credits, losses were centered in loans related to the recently liquidated North America Savings and Loan, Santa Ana, California. Although the approximate $13 million in credits related to North America performed as agreed until the institution was placed in receivership in January 1987, it was subsequently disclosed that several of the loans were affected by fraud of individuals associated with North America. Nevertheless, management has been successful in liquidating or restructuring the problem credits which now total $4 million.

Central Evergreen's major weaknesses are its negative GAAP capital position; a weak, yet positive regulatory capital position; low earnings and poor asset quality. Despite the institution's above weaknesses, management has been successful in establishing a strong single family lending program in Western Washington. Annual single family loan volume, both conventional and FHA/VHA, approximately $70 million with nearly 80% of the loan volume sold to FNMA, FHLMC and government loan investors.

The institution's balance sheet is centered in residential loans. Fifty percent of average assets are housing related, with an additional eighteen percent in non-residential mortgage loans. Central Evergreen does not have any commercial-purpose loans, and consumer loans total less than three percent of assets. The investment portfolio is centered in government securities, which account for nine percent of average assets. Funding has historically been provided through local deposits and FHLB advances, but the association also utilizes a small amount of brokered funds (1.5% of average assets).

As of June 30, 1988 delinquencies and real estate owned totalled $17 million and represent 6.7% of average assets, a slight decline from the 7.8% one year earlier. The total is principally comprised of the North America related credits and real estate acquired by deed-in-lieu of foreclosure from a local developer. Management has identified problem assets and losses in a timely manner.

The high level of problem assets has had a significant impact on the association's profitability. The loss of interest income on nonperforming credits, lower yields and higher costs of funds has resulted in a net interest margin of 1.2% for the first six months of 1988. Although management has concentrated resources on liquidating problem assets, they have also been successful in controlling operating expenses to 1.9% of average assets. After reporting operating losses throughout 1987, the association reports net operating income of $538,000 for the first six months of 1988, representing .42% of average assets. Nonoperating expenses continue to impact overall profitability, although to a lesser extent than in 1987. As a result, the year-to-date return on average assets of .26% compares favorably to 1987's (2.8%).

Although the association is experiencing a positive earnings trend, the likelihood of recapitalization or recovery through earnings retention is highly unlikely given the severely negative GAAP capital position. A one-year negative gap of 25% also has the potential to negatively impact future earnings. Although new loan originations have been adjustable rate, a large

amount of fixed rate mortgage loans funded by short term liabilities continue to be held. As a result, the association has maintained its one-year gap at 20 to 25% throughout the last twelve months.

The most recent examinations of Central Evergreen, conducted as of February 17, 1987 and November 30, 1987, resulted in a composite rating of 4 and individual MACRO ratings of 44423. Problems associated with asset quality and the potential impact on capital and earnings were the major concerns noted. Subsequent to the February, 1987 examination, a comprehensive Supervisory Agreement was executed and remains in place. The controls included in the Agreement and ongoing contact with management prevents the undertaking of new high risk business.

Since entering into the Supervisory Agreement in July 1987, both the association's management and the FHLB of Seattle have actively sought a merger or acquisition partner. Contacts have been made to individuals and financial institutions both in-state and outside the State of Washington. Of the approximately forty individuals and institutions contacted since mid-1987, two parties other than Sterling Savings have expressed interest. Both verbal offers were declined due to the requirement to provide FSLIC assistance of $8 million to $10 million. Numerous forbearances were also requested. Absent the proposed acquisition by Sterling Savings, FSLIC assistance will likely be required.

V. <u>ACQUIRING INSTITUTION</u>

A. <u>Background</u>

<u>Sterling Savings Association</u>
Spokane, Washington FHLBB No. 7918

Sterling is a State-chartered FSLIC-insured stock association which received its insurance of accounts and became a Bank member in 1983. As of June 30, 1988 the institution reported total assets of approximately $434.4 million and regulatory capital (including general loan loss reserves) of $26.2 million. The institution currently operates 19 branch and loan production offices in the State of Washington.

Much of Sterling's growth and current level of goodwill is attributed to its acquisitions of other FSLIC-insured institutions and branch offices. As of June 30, 1988, Sterling reported a goodwill to total assets ratio of 4.42%, which would increase to 5.89% as a result of the subject merger. Its first major acquisition was in February, 1983 of Lewis and Clark Savings and Loan Association, Clarkston, Washington, a troubled $43.4 institution, through an unassisted voluntary merger. On November 5, 1985 Sterling acquired $52 million Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"). The Lewis acquisition was accounted for as a purchase and involved FSLIC indemnification for any undisclosed liabilities of Lewis discovered within 3 years; costs incurred in defending a legal challenge to the acquisition, up to a maximum of $1 million; cash assistance of $1.75 million; and, forbearance from compliance with certain FSLIC and FHLBB regulations for periods of one to five years.


NOT942 0428 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 01527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

Sterling's most recent acquisition was of ailing $54.9 million Tri-Cities Savings and Loan Association, Kennewick, Washington("Tri-Cities"), involving $15.8 million in FSLIC assistance (net present value) on April 8, 1988. The acquisition was accounted for as a purchase and involved FSLIC indemnification for 75% of any capital losses on certain assets until the institution's share of losses reaches $900,000, and 100% of any capital losses on these assets thereafter; any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years, and any cost incurred in defending a legal challenge to the acquisition for a period of one year. Sterling also received from FSLIC a cash payment of $11.73 million, and agreed to refund FSLIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose before April 8, 1988. Certain FSLIC and FHLBB forbearances, regarding net worth and liquidity deficiencies, were granted for periods up to five years.

The institution's growth was also accomplished through several branch purchases including a $47.5 million six office acquisition from Great American First Savings Bank, F.S.B., Tucson, Arizona. in February, 1988. Sterling's aggressive growth posture has been well-managed and the institution was granted FHLB approval on December 28, 1987 to increase liabilities in excess of limitations set forth in I.R. 563.13-1 or by $25 million.

The institution has established a proven success record in demonstrating it can successfully integrate acquired institutions and/or offices into its operations while maintaining profitability and meeting minimum regulatory capital requirements. Sterling's usual method of blending an acquired institution into its operations has been characterized by first stabilizing and training staff, bringing facilities up to par with the rest of the institution, establishing a regional branch administrator and formulating a plan to attract additional retail deposits and loans.

Since its opening in 1983, Sterling has experienced four examinations and received satisfactory ratings in all areas. The institution continues to be well-managed, with positive earnings, good asset quality, and an acceptable capital level. Sterling has addressed examination concerns to the satisfaction of the Supervisory Agent and no significant supervisory concerns are currently outstanding. The following table describes the results of Sterling's previous examinations and includes ratings on management, asset quality, capital adequacy, risk management and operating results(MACRO). Also included in the table are composite, and compliance with Community Reinvestment Act ratings.

| Date of Examination | Type | M | A | C | R | O | Composite | CRA |
|---|---|---|---|---|---|---|---|---|
| | | Examination Ratings | | | | | | |
| 04/18/88 | Regular | 2 | 2 | 3 | 2 | 2 | 2 | 3 |
| 10/29/86 | Full Scope | 2 | 2 | 3 | 2 | 2 | 2 | 3 |
| 08/16/85 | Annual | 2 | 2 | 2 | 2 | 2 | 2 | N.R. |
| 09/16/83 | Regular | - | - | - | - | - | 2 | 3 |

Part of the reason for Sterling's continued favorable examination ratings, despite its rapid growth, is due to its careful strategic planning. Sterling has indicated that it also prepares for growth by hiring capable personnel prior to consummation of the mergers to avoid potential operational problems.

B. MANAGERIAL RESOURCES AND CAPABILITY

After merger, Sterling's board of directors will include two current directors of Central Evergreen, Messrs. Fugate and Alverson. Central Evergreen's remaining directors will be retained as an advisory board for a period of up to one year without compensation. The existing advisory boards of Central Evergreen will continue with director compensation of $50 per meeting. Sterling has not entered into any written employment contracts with Central Evergreen employees, however it has agreed to assume the three contracts currently in place for officers Godding, Van Dijk and Neuhauser which all expire by December 31, 1989, and a deferred compensation agreement for Central Evergreen's retiree Roy H. Alexander. Subsequent to filing of the subject application, this office received notification that Carol Neuhauser is no longer employed by Central, and therefore her employment contract is null and void.

The chart below represents management team and board of directors of Sterling following merger.

| Name | Position | Principal Occupation |
|---|---|---|
| Gilkey, Harold G. | Chairman, CEO | Sterling SA |
| Zuppe, William W. | President, Director | Sterling SA |
| Byrne, Daniel G. | EVP | Sterling SA |
| Harlow, John M. | EVP | Sterling SA |
| Moore, S. Midge | EVP | Sterling SA |
| Page, Stephen L. | EVP | Sterling SA |
| Parrish, Stanton C. | EVP | Sterling SA |
| Sackmann, Thomas F. | EVP | Sterling SA |
| Godding, George E.* | EVP | Sterling SA |
| Van Dijk, John G.* | VP | Sterling SA |
| Barnes, Ned M. | Director, Secretary | Attorney |
| Barnett, Rodney | Director | Pres. Elec. Supply Co. |
| Clark, T. Richard | Director | Business Consultant |
| Kroetch, Charles L. | Director | Pres/Print. Pub. Co. |
| Larrabee, Robert | Director | Owner/Funeral Home |
| Meyers, Robert E. | Director | Dentist |
| Wallace, David O. | Director | Owner/Grocery |
| Fugate, James P.* | Director | Supt. of Schools |
| Alverson, Raymond R.* | Director | Retired Pilot |

*Currently with Central Evergreen FS&LA

As indicated above Sterling's board of directors expertise and experience is well-rounded with persons holding positions in a variety of fields absent any positions which may create obvious conflict of interest or

usurpation of corporate opportunity problems. The management of Sterling has proven very capable through the institution's organization and expansion and received consistent favorable examination ratings. No interlocking relationships currently exist between a management official of either Sterling or Central Evergreen and another depository organization as defined in I.R. 563f.2.

Sterling's directors are currently divided into three classes of nearly equal number with directors of each class elected to three-year terms. Each director receives remuneration of $1,000 per year and $500 per board meeting attended. Some of the directors also serve on the audit, personnel or planning committees. Current Central Directors Fugate and Alverson whom are joining Sterling will receive the same remuneration of $8,000 per year as the other directors of Sterling, for an increase of $2,000 per year from their present fees.

Top management of Sterling is committed to the long-term viability of the institution and is actively involved in enhancing its operations. According to Sterling's most recent examination on April 18, 1988, Mr. Gilkey continues to be the driving force behind the institution's strategic direction and is very active in promoting the institution and creating a progressive image for Sterling and its employees. Mr. Gilkey currently owns 5.5% and 1% of Sterling's issued and outstanding common and preferred stock, respectively. In addition to his position of Chairman and Chief Executive Officer of Sterling, Mr. Gilkey serves on the institution's planning committee, and is Chairman of the Board of the institution's following subsidiaries: Fidelity Service Corporation; Lewis and Clark Financial Corporations; and, Lewis Service Corporation.

Besides holding the position of President, Chief Operating Officer and Director of Sterling, Mr. Zuppe serves as Director and Secretary/Treasurer of Fidelity Service Corporation; Director and Vice President of Lewis and Clark Financial Corporation; and, Director and Vice President of Lewis Service Corporation. Mr. Zuppe has also served in his present capacity since Sterling's inception and has proven his ability to successfully manage the institution through its expansion and free of significant supervisory concern.

Sterling's management's ability to transfer institution goals into successful day-to-day operations demonstrates their depth of knowledge and experience. Sterling's continued profitability is partially attributed to its management's sound judgment in identifying and pursuing favorable opportunities for the institution consistent with its business plan. The management has been responsive to any previous supervisory concerns is committed to securing a solid future for the institution. The institution's expansion has required prudent decision making and during the first part of 1988, Sterling reorganized its organizational structure to enhance effectiveness and include two subsidiary presidents on its senior management team. This reorganization proved Sterling's willingness and capability to adapt to a larger institution framework.

C. FINANCIAL RESOURCES

Sterling's primary business is attracting savings deposits, and originating, purchasing, selling and servicing loans secured by real estate liens on single family residences and commercial property. On June 30, 1988 Sterling reported holding 72.4% of its average assets in mortgage loans and contracts and 7.3% in non-mortgage loans and contracts. As of the same date the institution reporting holding 16.99% of its average assets in non-residential mortgage loans, compared to its peer ratio of 9.49%. Sterling's management experience, however, includes a strong residential and commercial banking background and the institution does not report any significant asset quality problems.

While experiencing asset growth of over 50% per year, Sterling has boasted positive annual net income since its second quarter of operation in 1983. As of Sterling's fiscal year ending June 30, 1988, it reported a return on equity ratio of 6.15%, and a return on average assets ratio of .39%, well above its peer ratios of 2.32% and .28%, respectively. Sterling's fiscal 1988 net income represented a 9.3% increase over the previous year's income. The institution's net operating income as a percentage of average assets of .89% exceeds its peer ratio of .83% as of the same date, despite recording a small non-operating loss. Pertinent financial and operational ratios are as follows: (000's omitted)

| Date | Total Assets | Total Deposits | Regulatory Capital | Required Capital | Excess Capital |
|---|---|---|---|---|---|
| 09/88 | $443,367 | $315,682 | $23,237 | $12,604 | $10,633 |
| 06/88 | 434,382 | 305,354 | 26,227 | 13,742 | 12,485 |
| 06/87 | 231,847 | 170,755 | 10,497 | 6,640 | 3,857 |
| 06/86 | 181,002 | 142,078 | 7,213 | 4,842 | 2,371 |
| 06/85 | 112,449 | 88,205 | 4,614 | 1,363 | 3,251 |

| Date | Net Income | Return on Average Assets | One Year Return on Equity (YTD) | GAP to Total Assets |
|---|---|---|---|---|
| 09/88 | 71* | .06%*** | 1.22% | -22.95 |
| 06/88 | 1,186 | .39% | 6.15% | -23.25% |
| 06/87 | 1,085 | .59% | 12.61% | -16.25% |
| 06/86 | 861 | .58% | 14.70% | 1.62% |
| 06/85 | 612 | .54% | 13.31% | N.A. |

* Represents one quarter income and includes impact of FASB 91
**Annualized

Sterling's first quarter net income is normally lower than later quarters partially due to annual stockholders meetings and report expenses and annual audit fees. Sterling's first quarter's earnings ending September 30, 1988 includes the adverse impact of implementing FASB 91 of approximately $56,000, and the amortization of goodwill resulting from its acquisition of Tri-Cities Savings and Loan Association.

As indicated in the above table, Sterling's level of regulatory capital has kept pace with its expansion and is currently in compliance with minimum regulatory capital requirements. Regardless of its regulatory capital level, as of June 30, 1988 the institution reported tangible capital of only .93% of total assets and .98% of total liabilities, compared with its peers of 5.4% and 5.88%, respectively. Sterling's ratio of GAAP capital to total assets as of the same date was 2.2%, down from 3.53% reported one year earlier. Sterling has, however, demonstrated its capability to attract outside capital through the issuance of 90,168 shares of cumulative, convertible Series A preferred stock in 1987, for a net increase to capital of $2.25 million.

Based upon Sterling's stable earnings, acceptable capital level, moderate interest rate risk, access to outside capital and management expertise, its overall financial resources are not cause for significant supervisory concern.

According to the June 30, 1988 pro-forma statement of condition contained in the application, after merger and acquisition Sterling's total assets would increase by approximately 60% to about $685 million and its ratio of RAP capital to total assets would decrease from 5.35% to 3.39% and its ratio of GAAP capital to total assets would decrease from 2.21% to 1.41%. Sterling's directors and management have indicated commitment to maintaining adequate capital levels to support future operations. In this respect, the institution intends to raise equity through a community offering of $5-10 million of preferred stock in June, 1989. Upon advise of several underwriters, Sterling decided to acquire Central Evergreen first and then attempt to sell the preferred stock. Sterling reported that current insider expressions of interest in buying the preferred stock total $1.23 million. The informal commitments include $665,000 from Sterling's board and management, $200,000 from Central's current board and management and $300,000 from a profit sharing plan for current Central employees.

Although the exact amount of the preferred stock offering has not yet been determined, based upon a minimum of $5 million sold, of which a total of 23% has already been informally committed, Sterling's June 30, 1989 RAP and GAAP capital to total assets ratio would be 4.12% and 2.23%, respectively, increasing to 4.23% and 2.61% on June 30, 1990.

Due to Sterling's June 30, 1988 one year gap to total assets of -23.25% being similar to Central Evergreen's one-year gap of -25.49%, as of the same date, no material change would result. (Given the uniqueness of some of Sterling's assets, and the inflexibility of the thrift report, the actual gap is approximately 300-500 basis points less.)

The subject merger represents a prudent and well-planned strategy by Sterling and is in the best interests of the institution and the FSLIC. The merger will provide Sterling with significantly greater market share and increased competitiveness in its current market area of Lewis County, a larger asset base, greater geographic diversification, additional savings through economies of scale and tax benefits provided by Central Evergreen' unused net operating loss carryforwards(see section VIII (e)).

Sterling will be better positioned to serve its Lewis County market area depositors due to its increased presence, and Central Evergreen's well-developed residential lending function would enhance Sterling's current lending operations. Only one branch office closure would result from the subject merger where Sterling and Central have a branch across the street from each other in Chehalis. Former Central customers will enjoy uninterrupted service through the merger and will have access to additional branch office locations.

The subject transaction is considered in the FSLIC's best interest because any other rescue effort of Central would likely result in assistance of at least $8-10 million; liquidation costs for Central would be far higher than the subject no-cost-to-FSLIC transaction; and the transaction does not present the potential for injury to the resulting institution or the FSLIC.

D. BUSINESS PLAN

The business plan contained in the application indicates that Sterling plans to continue its current business strategy however at a much slower growth rate. For fiscal years 1990 and 1991 Sterling anticipates annual asset growth of 6.65% and 8.79%, respectively. The institution intends to maintain operating costs at 1.90%-2.00% of total assets; a negative gap of between -10% and -15%; a return on assets ratio of .40%; and maintenance of regulatory capital in excess of 4% of total assets, and expansion of lending and secondary market activities.

Sterling's record of meeting its business plan objectives is evidenced by its continued profitability. We remain confident that Sterling's management will adhere to its plan and the institution will be closely monitored to ensure an increasing level of capital to required levels and safe and sound operation. We are also requiring the institution to meet certain pre-defined capital levels. In addition, Sterling has contingency plans in the event of unfavorable or unforeseen circumstances.

E. VIABILITY ANALYSIS

A viability analysis was conducted to determine whether Sterling would remain a viable entity, pursuant to I.R. 563b.26(b)(2), following the conversion and acquisition of Central. The analysis demonstrates that Sterling would have GAAP capital in excess of 1% after merger and would be able to continue meeting minimum regulatory capital requirements in two different interest rate environments. Key results of the viability analysis utilizing the FSLIC Viability Model are summarized below:

Viability Results-Rising Interest Rate Environment (000)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Assets | $747,850 | $805,965 | $871,154 | $941,497 | $1,018,529 |
| Net Worth | 28,995 | 28,538 | 28,242 | 27,406 | 27,101 |
| Net Income | 2,392 | (457) | (296) | (836) | (305) |
| Int. Rate Spread | 2.19% | 1.75% | 1.69% | 1.58% | 1.59% |
| NW/Total Liab. | 4.03% | 3.67% | 3.35% | 3.00% | 2.73% |

Viability Results-Level Interest Rate Environment (000)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Assets | $747,363 | $807,229 | $874,554 | $947,642 | $1,027,490 |
| Net Worth | 28,818 | 29,994 | 31,743 | 33,586 | 36,086 |
| Net Income | 2,215 | 1,176 | 1,749 | 1,843 | 2,499 |
| Int. Rate Spread | 2.16% | 1.94% | 1.89% | 1.83% | 1.82% |
| NW/Total Liab. | 4.01% | 3.86% | 3.77% | 3.67% | 3.64% |

As expected, the viability analysis indicated that Sterling would fare better under the level interest rate environment but remain sufficiently capitalized in an increasing interest rate scenario. The first table illustrates a "worst case" scenario without any normal portfolio restructuring a thrift would implement in such situations. Both tables include Sterling's planned capital infusion of $5 million in May, 1989; and reduction in non-performing assets, level of cost of funds, growth rates, and dividend payouts at more realistic levels to Sterling.

As of September 30, 1988 Sterling's one-year gap to total assets calculated by the FHLBB reports is -22.95%. Sterling estimates it gap to be -18.9%. Because of the uniqueness with certain assets, the FHLBB gap calculation is high and disproportionately affects the FSLIC Viability Model.

Sterling and Central have compatible operations. Both institutions use the same data processing servicer and equipment. The branch and delivery systems will complement each other. Central has well-developed residential lending and cost-effective deposit gathering functions that will help Sterling. Better financial expertise and controls should result from the combination. The merger would provide Sterling's management team with both the opportunity of additional growth in job challenge and the ability to capitalize on its experience, proven in prior acquisition, to solve problems of a troubled institution.

An additional viability analysis was conducted which indicated that Central, on a stand-alone basis, with its June 30, 1988 level of approximately ($12.7) million in GAAP capital would not be able to meet minimum regulatory capital requirements within five years.


OT942 0435 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS; GREEMENTS: 870399 - 910199 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Antitrust Considerations

1. Direct Competition

As presented in Appendix B - Anticompetitive Analysis, Sterling and Central have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987 Lewis County was serviced by a total of 25 deposit-taking financial institution offices including 13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the triggering of an anticompetitive effect is ignored due to the supervisory nature of the merger.

2. Faltering/Failing Company

Any possible adverse effects on competition which may occur also would be mitigated by the weak financial condition of the merging institutions. An antitrust analysis must consider the dynamics of the market and the real competitive strength in that market.

The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance. (See United States v. General Dynamics, 415 U.S. 486, 503 (1974).) Central is insolvent; thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, any effect on competition of the merger is probably procompetitive as the resulting institution will be seeking economies of scale by eliminating duplicate functions, thereby reducing operating costs, helping to increase the institution's ability to actively compete in the affected market areas.

Moreover, this transaction may also be analyzed under the failing company doctrine. Given the unavailability of any other economically feasible quantifiable alternatives in this case (See International Shoe v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).), we conclude that the requirements of the doctrine are met and that it may operate as a defense to any action brought as a result of this acquisition which alleges a violation of Section 7 of the Clayton Act. 15 U.S.C. 18 (1982). In conclusion, there appears to be no basis for legal objection on anticompetitive grounds to approval of this transaction.



OT942 0436 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE: EXECUTIVE SUMMARIES: RESOLUTIONS: REPORTS:

VI. WAIVER REQUESTS AND OTHER REQUESTS

1. Publication, Public Comment and Disclosure Requirements

The publication, public comment and disclosure requirements have been waived because the transaction would be approved by the FSLIC for supervisory reasons, consistent with Section 563.22 (d) of the Insurance Regulations.

2. Hart-Scott-Rodino Act Filing

The filing pursuant to the Hart-Scott-Rodino Act has been waived and is explained in Section VII (I) of the Memo.

3. Financial Data

The applicants have requested a waiver for submission of audited financial data required by Section 563b.27(o) of the Insurance Regulations. The applicants indicated that the supervisory nature of the acquisition, its submission of audited financial data as of December 31, 1987 which demonstrates the depth of Central's negative GAAP capital and the unnecessary time and expense of an additional audit, outweighs the necessity of the above requirement. The applicants have also provided unaudited financial statements as of June 30, 1988 prepared in the same manner as the December 31, 1987 audited reports.

4. FHLBB Certification

A certification has been requested, by Sterling, from the Board pursuant to Section 368(a)(3)(D)(ii)(III) of the Internal Revenue Code of 1954, as amended, that the grounds set forth in Section 1464(d)(A)(i),(ii), or (iii) of Title 12, United State Code, exist with respect to Central or will exist in the near future in the absence of action by the Federal Home Loan Bank Board.

VII. OTHER INFORMATION

A. Transaction Expenses

Both involved institutions have agreed to pay all costs incurred or to be incurred by it in connection with consummation of the transaction. Sterling estimates it will incur approximately $16,000 in legal fees and $1,000 in accounting expenses associated with the transaction. Central Evergreen anticipates incurring approximately $22,000 in legal fees with the transaction.

B. Institution Board of Director Approval

The subject transaction was approved by the board of directors of Sterling on July 18, 1988, and by Central Evergreen's board of directors on July 19, 1988.

C. Member/Shareholder Approval

The application contains an opinion from the law firm of Witherspoon, Kelly, Davenport and Toole which indicates that Washington State law does not require approval of the combination by Sterling stockholders. The opinion also states that Central members have no rights of approval pursuant to Federal law and regulations controlling voluntary stock conversions.

D. Washington State Approval

Washington State supervisory approval for the conversion and merger is not required, except as new branch offices for Sterling. The State intends to approve the branch office locations for Sterling coincident with FHLBB approval of the merger and conversion. The State's analysis indicated that the merger would allow Sterling:

- the opportunity to utilize its expertise learned from previous mergers and acquisitions
- greater geographical diversification of investments
- increased economies of scale
- increased lending volume
- improved net interest spread
- use of Central's unused net operating loss carryforwards

E. Accounting Treatment

Sterling has submitted an opinion from the accounting firm of Coopers and Lybrand which indicates that Sterling's use of purchase accounting and its proposed methods and periods of amortizing any allocated discounts or premiums and intangible assets of approximately $21 million, are in accordance with generally accepted accounting principles.

F. Tax Liability

An opinion from the law firm of Witherspooon, Kelley, Davenport and Toole was included in the application and states that there should be no tax consequences to Central Evergreen or Sterling as a result of the conversion or merger.

G. Charter and Bylaws

Central's proposed Federal Stock charter, necessary for the simultaneous conversion and merger has been reviewed and appears to be consistent with the model in 12 C.F.R. 552.


/OT942 0438 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
11527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

H. Net Operating Loss Carryforwards

Central Evergreen's net operating loss carryforwards resulted from operations during the years 1983 and 1984 and was not connected with the supervisory acquisition of another FSLIC-insured institution. Central Evergreen's current NOL carryforwards from its 1986 tax returns total $8,382,770. Sterling indicated that with the addition of real estate loan losses to be incurred prior to the transaction and a change in the method of calculating the bad debt deduction on Central Evergreen's previous tax returns the amount of NOL carryforwards may be increased by approximately $13.6 million to about $22 million. The revised schedule of NOL carryforwards is as follows:

| Year Originated | Amount Available for Carryover | Year of Expiration |
|---|---|---|
| 1983 | $4,790,013 | 1991 |
| 1984 | 3,592,757 | 1992 |
| 1986 | 5,059,000 | 1991 |
| 1987 | 1,604,000 | 1992 |
| 1988 | 7,000,000 | 1993 |
| Total | $22,045,770 | |

I. PRE-MERGER NOTIFICATION

Exemption of Proposed Transaction

The merger of Sterling and Central Evergreen is exempt from the premerger notification requirements of the Hart-Scott-Rodino Antitrust Improvements of 1976, Pub. L. No. 94-435, 90 Stat. 1390 (codified at 15 U.S.C. 18a) ("Hart-Scott-Rodino Act"). Section 18a(d)(B) of Title 15 of the U.S. Code authorizes the Federal Trade Commission, with the concurrence of the Assistant Attorney General, to promulgate rules and regulations, and to exempt certain acquisition, transfers, or transactions from the requirements of the Hart-Scott-Rodino Act. Pursuant to Section 802.8 of Title 16 of the Code of Federal Regulations, a merger, consolidation, purchase of assets or other acquisition requiring approval under Section 403 or 408(e) of the NHA or under Section 5 of the HOLA is exempt from the filing of the Hart-Scott-Rodino Act if the agency whose approval is required finds that approval is necessary to prevent the probable failure of one of the institutions involved.

Based upon our review of available financial documentation on the subject institutions, it has been determined that the above exemption is applicable to the transaction and accordingly no filing with the Federal Trade Commission and Assistant Attorney General, Antitrust Division, Justice Department, is required pursuant to the Hart-Scott-Rodino Act.

## Antitrust Considerations

1. Direct Competition

As presented in Appendix B - Anticompetitive Analysis, Sterling and Central have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987 Lewis County was serviced by a total of 25 deposit-taking financial institution offices including 13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the triggering of an anticompetitive effect is ignored due to the supervisory nature of the merger.

2. Faltering/Failing Company

Any possible adverse effects on competition which may occur also would be mitigated by the weak financial condition of the merging institutions. An antitrust analysis must consider the dynamics of the market and the real competitive strength in that market.

The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance. (See United States v. General Dynamics, 415 U.S. 486, 503 (1974).) Central is insolvent; thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, any effect on competition of the merger is probably procompetitive as the resulting institution will be seeking economies of scale by eliminating duplicate functions, thereby reducing operating costs, helping to increase the institution's ability to actively compete in the affected market areas.

Moreover, this transaction may also be analyzed under the failing company doctrine. Given the unavailability of any other economically feasible quantifiable alternatives in this case (See International Shoe v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).), we conclude that the requirements of the doctrine are met and that it may operate as a defense to any action brought as a result of this acquisition which alleges a violation of Section 7 of the Clayton Act. 15 U.S.C. 18 (1982). In conclusion, there appears to be no basis for legal objection on anticompetitive grounds to approval of this transaction.

VII. CONCLUSION

The subject acquisition represents a no-cost-to-FSLIC resolution of a GAAP-insolvent institution without presenting substantial injury or risk to the resulting institution, its depositors, shareholders or the FSLIC. A review of the application, supporting documentation and other records reveals that applicable statutory and regulatory standards have been met and that the acquiror has the financial capability and management expertise to successfully blend the target institution into its operations. It is noted that any alternative resolution of the target institution would likely result in FSLIC-assistance of a minimum $8-10 million.

Time is of the essence in approval of this application due to the applicant's willingness to waive FSLIC assistance and the November 30, 1988 consummation deadline indicated in the Acquisition Agreement when either party may withdraw from the transaction. Sterling has been advised and does no object to the recommended non-standard condition regarding increasing its level of capital (see Exhibit A) and has anticipated closing the transaction on November 30, 1988; therefore, expeditious review and approval is requested, subject to standard and non-standard conditions normally imposed in acquisition and conversion of this type and non-standard condition attached as Exhibit A.

November 7, 1988

Principal Supervisory Agent

Penny D. Marshall
Supervisory Agent

EXHIBIT A

Julie L. Williams
Issues Memo
November 7, 1988 Exhibit A

Recommended Non-Standard Condition of Approval

That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 CFR 563.13 as currently in effect or as hereafter amended; infuse capital from its planned stock offering, or by an equivalent method, no later than two years from this date; and, to comply in all material aspects with its business plan as submitted as part of the subject application. Sterling shall also agree that upon failure to achieve regulatory and GAAP capital levels consistent with its business plan during the five year period, commencing on the date of acquisition, the institution shall be be subject to such sanctions to be determined by the Supervisory Agent.

ADDENDUM A

Julie L. Williams
Issues Memo
November 7, 1988 Addendum A

INPUT FILE: CD7918A
OU~~~ FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
BALANCE SHEET
11/02/88 AT 14:44

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| IORTGAGE LOANS AND CONTRACTS | | | | | | |
| ADJUSTABLE RATE | 243,677 | 228,644 | 214,350 | 200,719 | 187,662 | 175,136 |
| 1-4 FAMILY | 201,878 | 180,788 | 166,316 | 154,884 | 143,794 | 133,603 |
| 5+ DWELLING UNITS | 36,279 | 26,838 | 20,250 | 18,015 | 15,772 | 13,943 |
| SECOND MORTGAGES | 5,449 | 4,133 | 3,232 | 2,698 | 2,165 | 1,902 |
| NEW FIXED RATE | 0 | 50,794 | 85,968 | 120,602 | 155,151 | 191,128 |
| NEW VARIABLE RATE | 0 | 63,366 | 107,132 | 150,886 | 194,757 | 240,647 |
| NEW SECOND MORTGAGES | 0 | 1,373 | 2,248 | 3,077 | 3,869 | 4,670 |
| (DISCOUNTS) | (3,216) | (3,186) | (2,877) | (2,507) | (2,123) | (1,732) |
| TOTAL MORTGAGES | 484,067 | 552,731 | 596,618 | 648,373 | 701,047 | 759,296 |
| MORTGAGE BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 | 0 |
| NONMORTGAGE LOANS | | | | | | |
| COMMERCIAL | 20,103 | 0 | 0 | 0 | 0 | 0 |
| CONSUMER | 18,595 | 8,788 | 6,135 | 5,029 | 3,817 | 3,261 |
| NEW COMMERCIAL | 0 | 7,180 | 12,431 | 17,893 | 23,581 | 29,713 |
| NEW AUTO LOAN | 0 | 16,248 | 23,864 | 28,637 | 30,980 | 32,232 |
| (DISCOUNTS) | (310) | (195) | (136) | (95) | (68) | (48) |
| ~~TAL NONMORTGAGE LOANS | 38,388 | 32,021 | 42,294 | 51,464 | 58,310 | 65,158 |
| ONPERFORMING MORTGAGES | 12,000 | 8,000 | 4,000 | 0 | 0 | 0 |
| .AL. ALLOWANCE) | (6,486) | (4,326) | (2,166) | (6) | (6) | (6) |
| NET NONPERFORMING MORTGAGES | 5,514 | 3,674 | 1,834 | (6) | (6) | (6) |
| GROSS OTHER NONPERF. LOANS | 0 | 0 | 0 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | 0 | 0 | 0 | 0 | 0 | 0 |
| NET OTHER NONPERF. LOANS | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS ORIG. REO | 13,392 | 8,928 | 4,464 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | (2,418) | (1,811) | (1,205) | (598) | (598) | (598) |
| NET ORIG. REO | 10,974 | 7,117 | 3,259 | (598) | (598) | (598) |
| GROSS NEW REO | 0 | 3,906 | 5,270 | 5,844 | 6,192 | 6,478 |
| (VAL. ALLOWANCE) | 0 | (531) | (716) | (794) | (842) | (880) |
| NET NEW REO | 0 | 3,375 | 4,554 | 5,049 | 5,350 | 5,597 |
| GROSS REH | 0 | 0 | 0 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | 0 | 0 | 0 | 0 | 0 | 0 |
| NET REH | 0 | 0 | 0 | 0 | 0 | 0 |
| CASH AND INVESTMENT SECURITIES | | | | | | |
| DEMAND | 13,041 | 13,792 | 14,930 | 16,203 | 17,590 | 19,101 |
| ~HORT-TERM | 12,142 | 10,937 | 12,110 | 13,409 | 14,847 | 16,439 |
| ~IUM-TERM | 12,526 | 13,870 | 15,357 | 17,005 | 18,829 | 20,848 |
| TERM | 37,200 | 41,190 | 45,608 | 50,501 | 55,917 | 61,915 |
| (SCOUNTS) | (2,579) | (2,478) | (2,371) | (2,274) | (2,168) | (2,052) |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL CASH AND INVESTMENTS | 72,330 | 77,310 | 85,634 | 94,843 | 105,014 | 116,251 |
| ;SETS | | | | | | |
| ↄ ASSETS | 11,159 | 11,585 | 12,026 | 12,485 | 12,961 | 13,455 |
| ESTMENT IN SERVICE CORPORATIONS | 11,723 | 12,442 | 13,206 | 14,016 | 14,876 | 15,789 |
| ,OWILL | 33,524 | 31,847 | 30,171 | 28,495 | 26,819 | 25,143 |
| OTHER ASSETS | 15,115 | 15,729 | 16,367 | 17,032 | 17,724 | 18,443 |
| TOTAL ASSETS | 682,794 | 747,850 | 805,965 | 871,154 | 941,497 | 1,018,529 |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| LIABILITIES | | | | | | |
| DEPOSITS | | | | | | |
| NOW AND TRANSACTION | 31,159 | 33,648 | 36,336 | 39,239 | 42,374 | 45,759 |
| PASSBOOK | 53,219 | 57,471 | 62,062 | 67,020 | 72,374 | 78,156 |
| MONEY MARKET | 53,909 | 58,216 | 62,866 | 67,889 | 73,312 | 79,169 |
| ‥RT-TERM CD'S | 205,379 | 218,324 | 235,141 | 253,926 | 274,212 | 296,118 |
| M-TERM CD'S | 165,103 | 175,509 | 189,029 | 204,130 | 220,437 | 238,047 |
| ,-TERM CD'S | 14,119 | 15,009 | 16,165 | 17,456 | 18,851 | 20,357 |
| (DISCOUNTS) | (16) | 33 | 34 | 27 | 20 | 12 |
| TOTAL DEPOSITS | 522,872 | 558,209 | 601,633 | 649,686 | 701,579 | 757,617 |
| BORROWING | | | | | | |
| FHLB ADVANCES SHORT-TERM (VARIABLE) | 47,800 | 52,226 | 56,166 | 60,510 | 65,190 | 70,233 |
| FHLB ADVANCES LONG-TERM (FIXED) | 39,900 | 43,594 | 46,883 | 50,509 | 54,416 | 58,625 |
| REPURCHASE AGREEMENTS | 38,072 | 50,566 | 57,466 | 65,739 | 75,205 | 86,032 |
| OTHER BORROWING - SHORT | 3,632 | 4,824 | 5,482 | 6,271 | 7,174 | 8,207 |
| OTHER BORROWING - LONG | 0 | 0 | 0 | 0 | 0 | 0 |
| NEW LIABI | 0 | 0 | 0 | 0 | 0 | 0 |
| DEBENTURES | 0 | 0 | 0 | 0 | 0 | 0 |
| LAST RESORT BORROWING | 0 | 0 | 0 | 0 | 0 | 0 |
| (DISCOUNTS) | (786) | (594) | (385) | (155) | 0 | 0 |
| TOTAL BORROWING | 128,618 | 150,616 | 165,612 | 182,875 | 201,985 | 223,097 |
| OTHER LIABILITIES | | | | | | |
| ACCRUED PAYABLES | 3,543 | 3,872 | 4,022 | 4,191 | 4,369 | 4,553 |
| DEFERRED CREDITS | 0 | 0 | 0 | 0 | 0 | 0 |
| OTHER LIABS | 6,157 | 6,157 | 6,157 | 6,157 | 6,157 | 6,157 |
| TOTAL LIABILITIES | 661,191 | 718,853 | 777,423 | 842,911 | 914,090 | 991,425 |
| NET WORTH | | | | | | |
| STOCK | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| ‥ALIFYING SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 |
| .AISED EQUITY | 0 | 0 | 0 | 0 | 0 | 0 |
| :TAINED EARNINGS | 21,603 | 23,995 | 23,538 | 23,242 | 22,406 | 22,101 |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL NET WORTH | 21,603 | 28,995 | 28,538 | 28,242 | 27,406 | 27,101 |
| AL LIABILITIES AND NET WORTH | 682,794 | 747,850 | 805,965 | 871,154 | 941,497 | 1,018,529 |
| EMO: LOAN SERVICING PORTFOLIO | 210,938 | 223,360 | 237,677 | 253,052 | 269,226 | 286,201 |

? IGENREPORT VANNINC

INPUT FILE: C07918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
INCOME STATEMENT
11/02/88 AT 14:45

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| INCOME | | | | | |
| ORIGINAL RESIDENTIAL MORTGAGES | 18,237 | 16,635 | 15,359 | 14,285 | 13,264 |
| NEW RESIDENTIAL MORTGAGES | 3,102 | 7,441 | 11,364 | 15,246 | 19,241 |
| ORIGINAL ADJUSTABLE RATE MORTGAGES | 22,717 | 21,682 | 20,686 | 19,454 | 18,239 |
| IUSTABLE RATE MORTGAGES | 3,349 | 8,447 | 12,959 | 17,383 | 21,945 |
| AMILY MORTGAGES | 3,056 | 2,329 | 1,868 | 1,647 | 1,444 |
| IINAL SECOND MORTGAGES | 520 | 411 | 333 | 275 | 229 |
| SECOND MORTGAGES | 91 | 213 | 314 | 408 | 502 |

| | | | | | |
|---|---|---|---|---|---|
| ACCRETION MORTGAGE DISCOUNTS | 30 | 308 | 370 | 383 | 391 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| MORTGAGE INTEREST | 51,103 | 57,466 | 63,253 | 69,081 | 75,255 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| IAL MBS INTEREST | 0 | 0 | 0 | 0 | 0 |
| ORIGINAL COMMERCIAL LOANS INT | 657 | 0 | 0 | 0 | 0 |
| NEW COMMERCIAL LOANS INT | 451 | 1,110 | 1,724 | 2,355 | 3,027 |
| ORIGINAL CONSUMER LOANS INT | 1,343 | 853 | 631 | 503 | 400 |
| NEW CAR LOANS INT | 1,427 | 3,010 | 3,955 | 4,479 | 4,747 |
| ACCRETION OTH LOAN DISCOUNTS | 115 | 59 | 41 | 27 | 20 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| TOTAL NONMORTGAGE LOAN INT | 3,993 | 5,032 | 6,351 | 7,364 | 8,195 |
| ORIGINATION FEES | 56 | 59 | 63 | 67 | 71 |
| SERVICING FEES | 432 | 459 | 489 | 520 | 553 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| TOTAL MORTGAGE BANKING INCOME | 488 | 518 | 552 | 587 | 624 |
| ORIGINATION FEES ON LOAN PORTFOLIO | 2,334 | 1,725 | 1,807 | 1,895 | 2,054 |
| ORIG. REO INCOME | 428 | 235 | 50 | 0 | 0 |
| CASH AND SECURITIES INTEREST | 6,096 | 6,776 | 7,713 | 8,613 | 9,610 |
| SERVICE CORP. INCOME | 3,137 | 3,329 | 3,533 | 3,750 | 3,980 |
| FIXED ASSETS INCOME | 69 | 71 | 74 | 77 | 80 |
| MISCELLANEOUS INCOME | 2,494 | 2,762 | 3,058 | 3,386 | 3,750 |
| NONPERFORMING MORTGAGES INCOME | 218 | 126 | 34 | 0 | 0 |
| GAIN (LOSS) ON SALES & VAL. ALLOWANCE CHANGES | | | | | |
| NEW REO | (775) | (800) | (828) | (861) | (895) |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| GROSS INCOME | 69,584 | 77,241 | 85,598 | 93,893 | 102,652 |

GAIN (LOSS) FROM MORTGAGE SALES IN DETAIL:

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| PENSES | | | | | |
| ITEREST EXPENSE: | | | | | |
| SAVINGS | 39,352 | 46,663 | 52,046 | 57,310 | 62,445 |
| ADVANCES VARIABLE RATE | 4,538 | 5,239 | 5,694 | 6,160 | 6,650 |
| ADVANCES FIXED RATE | 3,611 | 3,929 | 4,377 | 5,447 | 5,876 |
| REPOS | 3,359 | 4,173 | 4,786 | 5,495 | 6,297 |
| OTHER BORROWINGS VAR. RATE | 442 | 597 | 688 | 791 | 906 |
| ACCRETION DEBT DISCOUNT | 191 | 210 | 230 | 155 | 0 |
| )TAL INTEREST EXPENSE | 51,495 | 60,811 | 67,821 | 75,357 | 82,175 |
| 'ERATING EXPENSES | 13,455 | 14,623 | 15,788 | 17,063 | 18,449 |
| XED ASSET DEPRECIATION | 566 | 587 | 610 | 633 | 657 |
| OODWILL AMORTIZED | 1,676 | 1,676 | 1,676 | 1,676 | 1,676 |
| )TAL EXPENSE | 67,192 | 77,698 | 85,894 | 94,729 | 102,957 |
| T OPERATING INCOME | 2,392 | (457) | (296) | (836) | (305) |
| T TO NET WORTH | 2,392 | (457) | (296) | (836) | (305) |

7 IGENREPORT VANNCASH

INPUT FILE: CD7918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
SOURCES AND USES
11/02/88 AT 14:45

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| SOURCES | | | | | |
| INTEREST PAYMENTS: | | | | | |
| MORTGAGES | 51,073 | 57,157 | 62,883 | 68,698 | 74,863 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 3,878 | 4,973 | 6,310 | 7,337 | 8,175 |
| PRINCIPAL REDUCTION: | | | | | |
| MORTGAGES | 22,989 | 15,994 | 9,666 | 10,634 | 10,347 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 32,170 | 8,663 | 10,582 | 13,802 | 15,501 |
| NOTES RECEIVABLE | 0 | 0 | 0 | 0 | 0 |
| PREPAYMENTS: | | | | | |
| MORTGAGES | 21,055 | 22,161 | 24,701 | 27,093 | 29,639 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 0 | 0 | 0 | 0 | 0 |
| SALES: | | | | | |
| MORTGAGES | 0 | 0 | 0 | 0 | 0 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 0 | 0 | 0 | 0 | 0 |
| NONPERFORMING MORTGAGES | 1,840 | 1,840 | 1,840 | 0 | 0 |
| ~IG. REO | 3,857 | 3,857 | 3,857 | 0 | 0 |
| REO | 1,554 | 3,908 | 4,765 | 5,170 | 5,443 |
| IER SOURCES: | | | | | |
| ORIG. REO INCOME | 428 | 235 | 50 | 0 | 0 |



VOT942 0450 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
)1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS...

| | | | | | |
|---|---|---|---|---|---|
| NEW REO INCOME | 0 | 0 | 0 | 0 | 0 |
| ~NCOME | 0 | 0 | 0 | 0 | 0 |
| :E CORPORATION | 3,137 | 3,329 | 3,533 | 3,750 | 3,980 |
| .U ASSETS | 69 | 71 | 74 | 77 | 80 |
| SH AND SECURITIES INTEREST | 5,995 | 6,669 | 7,616 | 8,508 | 9,494 |
| AN FEES | 2,334 | 1,725 | 1,807 | 1,895 | 2,054 |
| ,TES RECEIVABLE | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET1 | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET2 | 0 | 0 | 0 | 0 | 0 |
| NONPERFORMING MORTGAGES | 218 | 126 | 34 | 0 | 0 |
| MORTGAGE BANKING INCOME | 488 | 518 | 552 | 587 | 624 |
| MISCELLANEOUS INCOME | 2,494 | 2,762 | 3,058 | 3,386 | 3,750 |
| MISCELLANEOUS INCOME2 | 0 | 0 | 0 | 0 | 0 |
| NCREASE (DECREASE) IN EQUITIES: | | | | | |
| SAVINGS | 35,288 | 43,423 | 48,060 | 51,900 | 56,046 |
| ADVANCES | 8,120 | 7,229 | 7,971 | 8,587 | 9,251 |
| BORROWINGS | 1,192 | 658 | 789 | 903 | 1,033 |
| NEW LIAB1 | 0 | 0 | 0 | 0 | 0 |
| REPURCHASE AGREEMENTS | 12,494 | 6,899 | 8,274 | 9,465 | 10,828 |
| DEBENTURES (LIAB) | 0 | 0 | 0 | 0 | 0 |
| DEBENTURES (NW) | 0 | 0 | 0 | 0 | 0 |
| LAST RESORT BORROWING | 0 | 0 | 0 | 0 | 0 |
| PAYABLES | 329 | 150 | 170 | 177 | 185 |
| DEFERRED CREDITS | 0 | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES | 0 | 0 | 0 | 0 | 0 |
| ICCS | 0 | 0 | 0 | 0 | 0 |
| STOCK ISSUED | 5,000 | 0 | 0 | 0 | 0 |
| TOTAL SOURCES | 216,001 | 192,348 | 206,593 | 221,968 | 241,292 |

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| JSES | | | | | |
| IEW LOANS: | | | | | |
| NEW 30Y-TERM FIXED RATE MORT | 51,873 | 38,332 | 40,159 | 42,108 | 45,634 |
| NEW VARIABLE-RATE MORT 30Y-TERM | 64,841 | 47,914 | 50,198 | 52,635 | 57,042 |
| NEW SECOND MORTGAGES | 1,441 | 1,065 | 1,116 | 1,170 | 1,268 |
| NEW MORT. BACKED SECURITIES 1 | 0 | 0 | 0 | 0 | 0 |
| NEW MORT. BACKED SECURITIES 2 | 0 | 0 | 0 | 0 | 0 |
| NEW MORT. BACKED SECURITIES 3 | 0 | 0 | 0 | 0 | 0 |
| N... OTHER LOANS FIXED RATE | 0 | 0 | 0 | 0 | 0 |
| MMERCIAL LOANS | 7,205 | 5,324 | 5,578 | 5,848 | 6,338 |
| .AR LOANS | 18,732 | 13,842 | 14,502 | 15,206 | 16,479 |

DEND AND INTEREST PAYMENTS:

| | | | | | |
|---|---|---|---|---|---|
| SAVINGS | 39,304 | 46,662 | 52,052 | 57,317 | 62,453 |
| ADVANCES | 8,150 | 9,168 | 10,071 | 11,607 | 12,526 |
| OTHER BORROWINGS | 442 | 597 | 688 | 791 | 906 |
| IAB1 | 0 | 0 | 0 | 0 | 0 |
| TURES (LIAB) | 0 | 0 | 0 | 0 | 0 |
| JENTURES (NW) | 0 | 0 | 0 | 0 | 0 |
| 'URCHASE AGREEMENTS | 3,359 | 4,173 | 4,786 | 5,495 | 6,297 |
| .ST RESORT | 0 | 0 | 0 | 0 | 0 |
| NCREASE (DECREASE) IN ASSETS: | | | | | |
| DEMAND | 751 | 1,138 | 1,273 | 1,387 | 1,511 |
| SHORT-TERM | (1,205) | 1,173 | 1,299 | 1,438 | 1,593 |
| MEDIUM-TERM | 1,344 | 1,488 | 1,647 | 1,824 | 2,020 |
| LONG-TERM | 3,990 | 4,418 | 4,892 | 5,417 | 5,998 |
| REH | 0 | 0 | 0 | 0 | 0 |
| FIXED ASSETS | 991 | 1,029 | 1,068 | 1,109 | 1,151 |
| SERVICE CORP. | 719 | 764 | 810 | 860 | 913 |
| OTHER ASSETS | 614 | 639 | 665 | 692 | 720 |
| NEW ASSET1 | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET2 | 0 | 0 | 0 | 0 | 0 |
| )THER USES: | | | | | |
| OPERATING EXPENSES | 13,455 | 14,623 | 15,788 | 17,063 | 18,449 |
| TAXES | 0 | 0 | 0 | 0 | 0 |
| CASH DIVIDENDS | 0 | 0 | 0 | 0 | 0 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| TOTAL USES | 216,004 | 192,348 | 206,591 | 221,965 | 241,297 |



IOT942 0452 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS; GREEMENTS: 870399 - 910199 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

-WREPORT VANNRAT

INPUT FILE: CD7918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
RATIO REPORT
11/02/88 AT 14:45
PAGE 1

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **YIELDS** | | | | | |
| MORTGAGE YIELD | 9.788% | 10.014% | 10.171% | 10.257% | 10.325% |
| MORT. BACKED SECURITIES YIELD | .000% | .000% | .000% | .000% | .000% |
| NONMORTGAGE LOAN YIELD | 13.035% | 13.267% | 13.302% | 13.237% | 13.121% |
| CASH AND INVESTMENTS YIELD | 8.167% | 8.324% | 8.554% | 8.626% | 8.693% |
| YIELD ON EARNING ASSETS | 9.753% | 9.994% | 10.176% | 10.261% | 10.318% |
| COST OF SAVINGS | 7.295% | 8.053% | 8.322% | 8.486% | 8.563% |
| COST OF BORROWINGS | 8.611% | 8.950% | 9.061% | 9.385% | 9.291% |
| COST OF MONEY | 7.567% | 8.246% | 8.483% | 8.686% | 8.727% |
| INT RATE SPREAD | 2.186% | 1.748% | 1.693% | 1.575% | 1.592% |
| ST MARGIN | 1.546% | 1.221% | 1.250% | 1.170% | 1.207% |
| .NG ASSETS LESS PAYING LIABILITIES | (46,743) | (42,699) | (37,882) | (39,193) | (40,009) |
| **RATIOS** | | | | | |
| OPERATING EXPENSES TO AVERAGE ASSETS | 1.884% | 1.884% | 1.884% | 1.884% | 1.884% |
| NET INCOME TO AVERAGE ASSETS | .335% | (.059%) | (.035%) | (.092%) | (.031%) |
| OTHER INCOME TO TOTAL INCOME | 13.176% | 11.350% | 10.641% | 10.326% | 10.217% |
| CASH AND INVESTMENTS TO TOTAL ASSETS | 10.338% | 10.625% | 10.887% | 11.154% | 11.414% |
| EARNING ASSETS TO TOTAL ASSETS | 88.531% | 89.898% | 91.222% | 91.808% | 92.359% |
| DEBT TO TOTAL ASSETS | 20.140% | 20.548% | 20.992% | 21.454% | 21.904% |
| NET WORTH TO TOTAL ASSETS | 3.877% | 3.541% | 3.242% | 2.911% | 2.661% |
| NET WORTH TO TOTAL LIABILITIES | 4.034% | 3.671% | 3.351% | 2.998% | 2.734% |
| NONPERF. ASSETS TO TOTAL ASSETS | 1.894% | 1.197% | .510% | .504% | .490% |
| FIXED RATE MORTS TO TOTAL MORTGAGES | 47.172% | 46.116% | 45.771% | 45.450% | 45.241% |
| **GROWTH RATES** | | | | | |
| TOTAL ASSETS | 9.528% | 7.771% | 8.088% | 8.075% | 8.182% |
| SAVINGS | 6.758% | 7.779% | 7.987% | 7.987% | 7.987% |
| BORROWINGS | 17.103% | 9.956% | 10.424% | 10.450% | 10.452% |

7 !GENREPORT VLOSS

''''IT FILE: CD7918A
FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
Purchase Accounting Adjustment Report
11/02/88 AT 14:45

| | 6 MONTHS OR LESS | >6 MONTHS TO 1 YEAR | >1 TO 3 YEARS | >3 TO 5 YEARS | >5 TO 10 YEARS | >10 TO 20 YEARS | >20 YEARS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Nonperforming Mortgages** | | | | | | | | |
| Adjustable Rate | $ 2,992 | $ 2,086 | $ 891 | $ 32 | $ 0 | $ 0 | $ 0 | $ 6,000 |
| 1-4 Family Res | $ 178 | $ 122 | $ 492 | $ 165 | $ 196 | $ 1,718 | $ 3,128 | $ 6,000 |
| Multifamily & Oth | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Second Mortgages | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Other Nonperforming Loans** | | | | | | | | |
| Consumer Loans | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Commercial Loans | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **New Mortgage Balances** | | | | | | | | |
| Adjustable Rate | $ 151,826 | $ 63,738 | $ 18,959 | $ 4,342 | $ 3,345 | $ 1,466 | $ 0 | $ 243,677 |
| 1-4 Family Res | $ 3,582 | $ 1,432 | $ 4,810 | $ 2,104 | $ 4,252 | $ 39,703 | $ 145,995 | $ 201,877 |
| Multifamily & Oth | $ 2,095 | $ 988 | $ 8,352 | $ 1,440 | $ 5,575 | $ 12,826 | $ 5,003 | $ 36,279 |
| Second Mortgages | $ 1,968 | $ 423 | $ 693 | $ 899 | $ 544 | $ 720 | $ 202 | $ 5,449 |
| **New Nonmortgage Loan Balances** | | | | | | | | |
| umer Loans | $ 4,747 | $ 2,646 | $ 3,133 | $ 2,469 | $ 3,175 | $ 2,248 | $ 177 | $ 18,595 |
| ercial Loans | $ 9,596 | $ 10,507 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 20,103 |



WOT942 0454 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #

Writedowns and Changes in Balance Sheet Accounts

| Writedowns: | | Other Balance Sheet Account Changes: | |
|---|---|---|---|
| Nonperforming Mortgages | 0 | Fixed Assets | 1,836 |
| O... Nonperforming Loans | 0 | Appraisal Increment | (1,836) |
| ...ssets | 0 | Unearned Discounts | (368) |
| ...e Corporations | 0 | Deferred Losses | (15,040) |
| ...r Assets | 0 | Net Worth | (3,779) |
| | | Nonperforming Mortgages | 12,000 |
| ...anges in Valuation Allowances | | Other Nonperforming Loans | 0 |
| Nonperforming Mortgages | 0 | | |
| Other Nonperforming Loans | 0 | | |
| Real Estate Owned | 0 | | |
| Real Estate Held for Investmt | 0 | | |

Market Losses (Gains)

| Assets: | | Liabilities: | |
|---|---|---|---|
| Medium-term Cash | 38 | Medium-term Deposits | (61) |
| Long-term Cash | 2,541 | Long-term Deposits | 45 |
| | | Long-term Advances | (786) |
| Mortgages | 1,758 | Long-term Other Borrowing | 0 |
| Non-mortgage Loans | 310 | Non-qualifying Debenture | 0 |
| | | Qualifying Debenture | 0 |

The total adjustment to goodwill is 14,739
The initial value of goodwill is 33,524

ADDENDUM B

Julie L. Williams
Issues Memo
November 7, 1988 Addendum B

ANTICOMPETITIVE ANALYSIS

| Institution | Pre-Merger % 6/87 Total Deposits | Pre-HHI (%2) | Post-Merger % 6/87 Total Deposits | Post-HHI (%2) |
|---|---|---|---|---|
| *Commercial Banks* | | | | |
| First American State Bank | 2.85 | 8.12 | 2.85 | 8.12 |
| First Interstate Bank/WA | 17.23 | 296.87 | 17.23 | 296.87 |
| Puget Sound National Bank | 3.77 | 14.21 | 3.77 | 14.21 |
| Seattle-First National Bank | 5.56 | 30.91 | 5.56 | 30.91 |
| Security State Bank | 16.86 | 284.26 | 16.86 | 284.26 |
| Rainier National Bank | 8.28 | 68.56 | 8.28 | 68.56 |
| *Credit Unions* | | | | |
| L.S.W. #2767 | .12 | .01 | $ .12 | .01 |
| *Thrift Institutions* | | | | |
| Central-Evergreen FS&LA | 25.72 | 661.52 | 0 | 0 |
| Sterling SA | 10.44 | 108.99 | 36.16 | 1,307.55 |
| West Coast S&L | 4.61 | 21.25 | 4.61 | 4.61 |
| Washington MSB | 4.56 | 20.79 | 4.56 | 4.56 |
| | $100.00 | 1,515.49 | $100.00 | 2,052.53 |

Pre-HHI = 1,515.49
Post-HHI = 2,052.53
Net Change = 537.04

EXHIBIT 3

Office of
**Regulatory Activities**

Federal Home Loan Bank System
801 Seventeenth Street, N.W.
Washington, D.C. 20006
(202) 785-5400

November 18, 1988

RECEIVED

MEMORANDUM FOR: Julie L. Williams
Deputy General Counsel

FROM: Linda B. Plye
Director
Corporate Activities

SUBJECT: Voluntary Supervisory Conversion and Merger of:

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington ("Central")
FHLBB NO. 1527

with and into

Sterling Savings Association
Spokane, Washington ("Sterling")
FHLBB NO. 7918

## EXECUTIVE SUMMARY

**PROPOSAL:**

Central, a federally chartered mutual association, proposes to convert from a mutual form to a stock association to facilitate the merger with and into Sterling. Central's charter shall decree authority to issue 100 shares of common stock with a par value of $1. Central will issue 100% of the authorized shares of common stock to Sterling in exchange for its assumption of Central's liabilities.



OT942 0382 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

Finally, the applicants request exemption from the requirements of the Hart-Scott-Rodino Antitrust Improvements of 1976. In full reliance of the Supervisory Agent's review, this Office has no supervisory objection to the request, provided, OGC determines that such a request is appropriate.

**RECOMMENDATION:**

The Supervisory Agent recommends approval of the proposed transaction. The Office of Regulatory Activities, based on the analysis by the Supervisory Agent, has no objection to the recommendation.

We do not find that there will be a loss of tax benefits from NOL carryforwards from Central, thus there is no basis for supervisory objection. We further find that Central's liabilities exceed its assets, as calculated under GAAP on a going concern basis, that the proposed transaction will satisfy the viability standards set forth in Section 563b.26(b)(2) and (3) of the Insurance Regulations, and that the proposed transaction qualifies for a voluntary supervisory conversion. We further find that the managerial resources of Sterling are such that the proposed transaction will not be detrimental to either the insured institution or to the insurance risk of the FSLIC.

**STAFF CONTACT:**

Patricia D. Goings, Financial Analyst, (202) 331-4537

EXHIBIT 4

# ACQUISITION AGREEMENT

Between

STERLING SAVINGS ASSOCIATION

and

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

ACQUISITION AGREEMENT

Table of Contents


| | Page |
|---|---|
| RECITALS | 1 |
| Section 1. The Acquisition | 1 |
| 1.1 Agreement to Acquire and Merge | 1 |
| 1.2 Approval by Boards of Directors | 2 |
| 1.3 Filing of Required Regulatory Applications and Notices | 2 |
| 1.4 Interest of Members of Central Evergreen | 3 |
| 1.5 Transfer of Shares Upon Conversion | 3 |
| 1.6 Savings Accounts and Deposits | 3 |
| 1.7 Offices | 3 |
| 1.8 Transfer of Assets and Assumption of Liabilities | 3 |
| 1.9 Articles of Incorporation and Bylaws | 4 |
| 1.10 Directors and Officers of the Surviving Corporation | 4 |
| 1.11 Directors, Officers and Employees of Central Evergreen | 5 |
| 1.12 Effective Date of Acquisition | 8 |
| Section 2. The Closing | 8 |
| Section 3. Representations and Warranties of Central Evergreen | 8 |
| 3.1 Corporate Organization | 8 |
| 3.2 Subsidiaries | 9 |
| 3.3 Financial Statements | 9 |
| 3.4 Absence of Undisclosed Liabilities | 9 |
| 3.5 Absence of Certain Changes | 9 |
| 3.6 Litigation, Etc. | 10 |
| 3.7 Contracts | 10 |
| 3.8 Title | 10 |
| 3.9 Tax Returns | 10 |
| 3.10 No Violation | 11 |
| 3.11 ERISA Compliance | 11 |
| Section 4. Representations and Warranties of Sterling | 11 |
| 4.1 Corporate Organization and Good Standing | 11 |
| 4.2 Capitalization | 12 |
| 4.3 Financial Statements | 12 |

4.4 Absence of Undisclosed Liabilities .............. 12
4.5 Absence of Certain Changes ........................ 12
4.6 Litigation, Etc. .................................. 12
4.7 Title .............................................. 13
4.8 Tax Returns ....................................... 13
4.9 No Violation ...................................... 13

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition ............ 13

5.1 No Change in Charter or Bylaws .................. 13
5.2 Conduct of Business ............................. 14

Section 6. Access and Cooperation ...................... 14

6.1 Access .......................................... 14
6.2 Cooperation ..................................... 14

Section 7. Confidentiality and Announcements ............ 14

7.1 Confidentiality ................................. 14
7.2 Announcements ................................... 15

Section 8. Solicitation of Employees ................... 15

Section 9. Conditions Precedent to the Obligations of Sterling ................................................ 15

Section 10. Condition Precedent to the Obligations of Central Evergreen .................................... 15

Section 11. Abandonment of Acquisition .................. 16

Section 12. Miscellaneous Provisions .................... 17

12.1 Expenses ....................................... 17
12.2 Litigation Costs ............................... 17
12.3 Parties in Interest ............................ 17
12.4 Headings ....................................... 18
12.5 Entire Agreement/Modification/Waiver ........... 18
12.6 Counterparts ................................... 18
12.7 Governing Law .................................. 18
12.8 Binding Nature of Agreement; No Assignment ..... 18
12.9 Notice Provisions .............................. 18



APP. 942
942 0387 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
?7 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES

## Table of Exhibits

| Exhibit | |
|---|---|
| 1 | Plan of Conversion |
| 2 | Branch Offices of Surviving Corporation |
| 3.1 | Articles of Incorporation (Sterling) |
| 3.2 | Bylaws (Sterling) |
| 4.1 | Employment Contract of George E. Godding dated December 31, 1986 |
| 4.2 | Employment Contract of John G. Van Dijk dated December 12, 1985 |
| 4.3 | Employment Contract of Carole Neuheuser dated December 13, 1985 |
| 4.4 | Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981 |
| 4.5 | Agreement with Joyce Butkus dated November 6, 1987 |
| 5 | Association Policy on Group Insurance of Retired CEF Employees/Directors dated September 10, 1986 |
| 6 | Vacation Policy Statement (Sterling) |
| 7 | Litigation (Central Evergreen) |
| 8 | Contracts (Central Evergreen) |
| 9 | Title to Property (Central Evergreen) |
| 10 | Litigation (Sterling) |

shall convert into a federal stock association in a voluntary supervisory stock conversion pursuant to the Plan of Conversion attached hereto as Exhibit 1 and in accordance with 12 C.F.R. §§563b.20 through 563b.32 ("Conversion") and, as an integral part of and immediately following such Conversion, Sterling shall acquire all of the stock of Central Evergreen, and Central Evergreen shall merge with and into Sterling (the "Acquisition"), with Sterling being the surviving corporation ("Surviving Corporation"). On the Effective Date (hereinafter defined in Section 1.12), the separate corporate existence of Central Evergreen shall cease. The Surviving Corporation shall continue to operate after the Effective Date under the name and style of Sterling Savings Association, or such other name as the Board of Directors of the Surviving Corporation may determine.

1.2 Approval by Boards of Directors. At least two-thirds of the Board of Directors of Central Evergreen have approved the plan of acquisition as evidenced by this Agreement. At least a majority of the Board of Directors of Sterling have approved the plan of acquisition as evidenced by this Agreement.

1.3 Filing of Required Regulatory Applications and Notices. Upon the execution and delivery of this Agreement, Sterling and Central Evergreen shall cause to be prepared and filed with the Federal Home Loan Bank Board ("FHLBB") an application for approval of the Conversion and an application for approval of the Acquisition. In addition, Sterling shall cause to be prepared and filed in a timely manner any application or notice to the Washington State Supervisor of Savings and Loan Associations ("State Supervisor") as required by law, including without limitation RCW 33.08.110. These applications and notices shall be in such forms as may be prescribed by the respective regulatory authorities and shall contain such information as the authorities may require. The parties shall take every reasonable and necessary step and action to comply with, and secure such approval as may be required by, the statutes, rules, and regulations applicable to this Agreement and the transactions contemplated herein and shall use their best efforts to secure such

approvals on terms and conditions mutually agreeable to Sterling and Central Evergreen. Sterling shall use its best efforts to secure approval of the Acquisition by the Shareholders of Sterling if the State Supervisor determines that such approval is required.

1.4 Interest of Members of Central Evergreen. The members of Central Evergreen shall have no rights of approval or participation in the Conversion and no rights to the continuance of any legal or beneficial ownership interest in Central Evergreen or the Surviving Corporation.

1.5 Transfer of Shares Upon Conversion. On the Effective Date, Central Evergreen will issue all authorized shares of its capital stock to Sterling.

1.6 Savings Accounts and Deposits. All savings accounts and deposits in Central Evergreen shall be and become savings accounts and deposits in the Surviving Corporation without change in their respective terms, maturities, interest rates, minimum required balances or withdrawal values. As of the Effective Date, each savings account and deposit of Central Evergreen shall be considered for dividend or interest purposes as if it had been a savings account or deposit of the Surviving Corporation at the time such savings account or deposit was opened in Central Evergreen and at all times thereafter, until such savings account or deposit ceases to be a savings account or deposit of the Surviving Corporation. Appropriate evidence of ownership of savings accounts or deposits in the Surviving Corporation shall be provided by the Surviving Corporation to each savings account holder and depositor of Central Evergreen.

1.7 Offices. The location of the home office of the Surviving Corporation shall be the present location of the home office of Sterling and all offices of Central Evergreen shall become branch offices of the Surviving Corporation. The location of all branch offices of the Surviving Corporation shall be as provided in Exhibit 2 attached hereto.

1.8 Transfer of Assets and Assumption of Liabilities. Upon the Effective Date, all of the assets and property of every kind

and character, real, personal and mixed, tangible and intangible, choses in action, rights, and credits then owned by Central Evergreen, or which would inure to Central Evergreen, shall immediately, and by operation of law and without any conveyance or transfer and without any further act or deed, be vested in and become the property of the Surviving Corporation, which shall have, hold and enjoy the same in its own right as fully and to the same extent as the same were possessed, held and enjoyed by Central Evergreen immediately prior to the Effective Date. The Surviving Corporation shall be deemed to be and shall be a continuation of the entity of Central Evergreen and the rights and obligations of Central Evergreen shall remain unimpaired. Upon the Effective Date, the Surviving Corporation shall assume and succeed to all of such rights and obligations and the duties and liabilities connected therewith.

1.9 Articles of Incorporation and Bylaws. The articles of incorporation and bylaws of Sterling immediately prior to the Effective Date shall continue to be the articles of incorporation and bylaws of the Surviving Corporation following the Effective Date, except as may be otherwise contemplated herein, and shall thereafter control the affairs of the Surviving Corporation unless and until amended in due and proper course. A copy of the current articles of incorporation and bylaws of Sterling are attached hereto as Exhibits 3.1 and 3.2, respectively.

1.10 Directors and Officers of the Surviving Corporation. The directors and officers of Sterling immediately prior to the Effective Date shall continue as the directors and officers of the Surviving Corporation for the full unexpired term of their offices and until their successors have been elected or appointed and qualified. In addition, Sterling's Board of Directors shall cause such changes, if any, as may be required to the Surviving Corporation's bylaws to permit the addition of two persons to the Surviving Corporation's Board of Directors and shall choose two individuals from Central Evergreen's Board of Directors, as such Board exists immediately prior to the Effective Date, to be added to the Surviving Corporation's Board of Directors.

7.2 Announcements. Without the prior agreement of the other party, neither party shall, prior to the Effective Date, hold any press interview or conference or make any written announcement or statement to the public or to its employees concerning the transactions contemplated by this Agreement.

Section 8. Solicitation of Employees.

If this Agreement is abandoned as contemplated by Sections 2 or 11 hereof, each of the parties hereto shall, for a period of one (1) year thereafter, refrain from soliciting any officers or key employees of the other for employment unless such other party is merged with or acquired by any other entity or is put into the possession or control of a receiver or conservator.

Section 9. Conditions Precedent to the Obligations of Sterling.

The obligations of Sterling under this Agreement to complete the Acquisition are subject to the satisfaction of the following conditions unless waived by Sterling on or before the Effective Date:

(a) Shareholder Approval. If and to the extent the State Supervisor shall so require, Sterling shall have obtained the approval by the Sterling shareholders of this Acquisition.

(b) Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Sterling reasonably determines are unduly burdensome.

Section 10. Condition Precedent to the Obligations of Central Evergreen.

The obligations of Central Evergreen under this Agreement to complete the Acquisition are subject to the satisfaction of the following condition, unless waived by Central Evergreen on or before the Effective Date:

Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Central Evergreen reasonably determines are unduly burdensome. Moreover, the Federal Home Loan Bank of Seattle shall terminate the Supervisory Agreement of Central Evergreen.

Section 11. Abandonment of Acquisition.

This Agreement may be abandoned at any time prior to the Effective Date (i) on the agreement of the Boards of Directors of both parties; or (ii) by action of the Board of Directors of either of the parties, or one of the parties if so noted below, on the happening of any of the following events:

(a) If all the required approvals of the FHLBB and State Supervisor have not been received on or before November 30, 1988, or such later date as the parties may agree in writing;

(b) If any material action or proceeding is instituted or threatened against either of the parties which would enjoin, prohibit or restrain the completion of the Acquisition;

(c) If, between the date of this Agreement and the Effective Date, there has been, in the opinion of either Board of Directors, a material adverse change in the business or financial condition of the other corporation;

(d) If, without the prior written consent of the other party, one of the parties shall have engaged in any transaction prohibited by this Agreement;

(e) By the Board of Directors of Sterling if any one or more of the conditions provided in Section 9 hereof shall not have been satisfied, and Sterling shall not have waived such failure; and

(f) By the Board of Directors of Central Evergreen if the condition provided in Section 10 hereof shall not have

Federal Home Loan Bank Board

1700 G Street, N.W.
Washington, D.C. 20552
Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

MEMORANDUM

To: Jordan Luke
General Counsel

December 5, 1988

From: Kathleen V. O'Day
Assistant Director, ODB

Subject: Increase in Accounts of an
Insurable Type via Merger of
Central Evergreen FS&LA
Chehalis, Washington
FHLBB No. 1527
into
Sterling SA
Spokane, Washington
FHLBB No. 7918

This is a combined supervisory conversion and voluntary merger which will allow Central Evergreen FS&LA to convert from a Federal mutual to a Federal stock institution and permit Sterling SA to acquire the assets and assume the liabilities of Central Evergreen in a business combination.

The Office of District Banks has no objection to the proposed merger provided the resolution is conditioned to require:

1. That the proposed merger is effective within 120 calendar days of the date of the Board's approval, unless an extension is granted by the Supervisory Agent;

2. That, not later than thirty days after the effective date of the merger, Sterling Savings Association shall submit evidence that it has given notice, in writing, to each investor whose withdrawable account in the resulting association will exceed the sum of $100,000 as a result of the merger, of the effect of the merger on the extent of his insurance coverage, such notice to include the following:

"If the aggregate amount of your existing account(s) at Sterling Savings Association and Central Evergreen Federal Savings and Loan Association exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 U.S.C. Section 1728(a) (1982). This means that the Federal Savings and Loan Insurance Corporation ("FSLIC") will insure the accounts you had at Sterling Savings Association and Central Evergreen Federal Savings and Loan Association separately until maturity in the case of a

certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling Savings Association's accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling Savings Association's accounts and will not be separately insured.";

3. That, not later than thirty days from the date of consummation of the proposed merger, Sterling Savings Association shall submit to the Supervisory Agent: (a) a certification by local counsel of each institution stating the effective date of the merger and that the merger has been consummated in accordance with the Acquisition Agreement and any amendment thereto as required by this resolution and applicable laws and regulations; and (b) a statement of the financial condition of each institution as of the effective date of the merger;

4. That a letter, signed by the chief executive officer and chief financial officer of each institution, is submitted 10 days prior to the consummation of the merger, stating that no adverse change has occurred in the condition or operations of said institutions since the date of the financial statements submitted with the application, and that the merger has been consummated consistently with the pro forma statement of condition as of June 30, 1988, or, if any such change has occurred or the merger has not been so consummated, the certification shall state in what respect has there been such a change or inconsistency with said statement of condition; and

5. That, within 90 days after the date of the approval resolution, Sterling Savings Association shall furnish analyses, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets, including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods; and (c) includes a list of all adjustments made and the rates used for calculation.

# WITHERSPOON, KELLEY, DAVENPORT & TOOLE

A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS

SUITE 1140 1111 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3204
(206) 447-7345 • telecopier (206) 447-7301

August 8, 1988

Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

RE: Central Evergreen Savings & Loan Application for Voluntary Supervisory Stock Conversion

Gentlemen:

You have requested our opinion in connection with the Application for Voluntary Supervisory Stock Conversion ("Application") of Central Evergreen Savings and Loan Association ("Central Evergreen") and consequent combination of the assets of Central Evergreen with, and assumption of the liabilities of Central Evergreen by, Sterling Savings Association ("Sterling"). A copy of the Application along with its Exhibits is incorporated by reference. Pursuant to 12.C.F.R. § 563b.27(c) the Application requires an opinion of a qualified, independent counsel regarding the tax consequences to the insured institution arising from the conversion.

Upon the request of Sterling the Federal Home Bank Board ("FHLBB") is to issue the certification provided for by Internal Revenue Code of 1986 Section 368(a)(3)(D)(ii)(III). If so issued, FHLBB certification will provide "that the grounds set forth in Section 1464 (d)(6)(A)(i)(ii) or (iii) of title 12, United States Code, exist with respect to the transfer or will exist in the near future in the absence of action by the Federal Home Loan Bank Board". This opinion is premised on the assumption such certification will be issued.

Further, this opinion is based upon the following representations by Sterling and Central Evergreen. First, that the requirement of Internal Revenue Code of 1986 (I.R.C.") Section 354(b)(1)(A) and (B) have been satisfied. I.R.C. Section 354(b)(1)(A) requires Sterling, as the transferee corporation, to acquire substantially all the assets of the transferor, Central Evergreen. It is our understanding that all of the assets of Central Evergreen will be transferred to Sterling.

Section 354(b)(1)(B) requires the stock, securities, and other properties received by Central Evergreen, as well as other properties of such transferor, to be distributed pursuant of the plan of reorganization. According to the Application Central Evergreen is not receiving any stock, securities or other property.

This opinion is also based upon the representation that substantially all of the liabilities of the transferor, Central Evergreen, immediately before the transfer will become, as a result of the transfer, liabilities of the transferee, Sterling, as required by I.R.C. Section 368(a)(3)(D)(ii)(II). Further, that the continuity of business enterprise doctrine of Treasury Regulation Section 1.368-1(d) is satisfied in that: (1) Sterling is assuming all the deposits of Central Evergreen; and (2) Sterling will continue to hold at least one-half of the fair market value of the assets held by Central Evergreen at the time of the adoption of the plan of reorganization; or Sterling will continue Central Evergreen's historic business.

Based upon the foregoing representations it is our opinion that there should be no tax consequences to Central Evergreen as a result of the conversion from a federal mutual savings and loan association to a federal stock savings and loan association. Further, the subsequent combination of Central Evergreen with and into Sterling should have no tax consequences to Central Evergreen or Sterling. Based upon the above representations, the combination will be a I.R.C. Section 368(a)(1)(G) reorganization ("G reorganization") resulting in no gain or loss to Central Evergreen or Sterling as parties to the reorganization.

No opinion is rendered as to the limitations upon the carryover of Central Evergreen's net operating losses and credits from prior years to Sterling's current, past or future tax years. Further, this opinion is based upon the assumption of management that the combination will be completed by December 31, 1988.

The foregoing opinion is limited to the application of the laws of the State of Washington and to Federal Law, to date, and no opinion is expressed herein as to any matter governed by the laws of any other jurisdiction.

This opinion is being directed to Sterling for the use of Sterling and Central Evergreen in conjunction with the Application to the Federal Home Loan Bank Board as required by 12 C.F.R. § 536b.27(C) and may not be used for any other

reasons nor relied upon by any other person or entity other than Sterling, Central Evergreen or FHLBB without our written consent.

Very truly yours,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By [signature]
STEVEN C. FROL

scf7/bc

Coopers &Lybrand

certified public accountants

Board of Directors
Sterling Savings Association
Spokane, Washington

We have read the Acquisition Agreement between Sterling Savings Association ("Sterling") and Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, and the accompanying Description of the Accounting Treatment. This Agreement is to be consummated by Sterling acquiring 100% of the outstanding stock of Central Evergreen (immediately after it undergoes a voluntary supervisory stock conversion) in exchange only for assuming its outstanding liabilities.

In our opinion, based solely upon the information and facts presented to us as briefly described above, this combination does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 (APB No. 16). Therefore, we concur in the proposed treatment of this combination as a purchase in accordance with APB No. 16 and Statement of Financial Accounting Standards No. 72 (SFAS No. 72). We also concur that the proposed methods and periods of amortizing any allocated discounts or premiums and intangible assets as set forth in the accompanying Description of the Accounting Treatment appear proper under APB No. 16 and SFAS No. 72.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Central Evergreen transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the <u>actual</u> facts and circumstances differ (from those provided to us) upon completion of an examination of Sterling's consolidated financial statements for the period that includes the Central Evergreen acquisition, our conclusions may change.

Coopers & Lybrand

Spokane, Washington
August 12, 1988

Notational Voting N-88/442 minute Entry December 7, 1988

The Bank Board, acting individually by notational voting, approved the sale of $4,419,575,000 par amount of the Federal Home Loan Bank Consolidated Discount Notes for the period November 9, 1988, through December 5, 1988. Of this amount, $82,650,000 will be issued December 6, 1988.

| DAYS | PAR AMOUNT | RATES |
|---|---|---|
| 30- 89 | $ 373,665,000 | 8.17 - 8.70% |
| 90-179 | $1,934,215,000 | 8.12 - 8.72% |
| 180-239 | $1,083,530,000 | 8.12 - 8.65% |
| 240-360 | $1,028,165,000 | 8.10 - 8.60% |

The Federal Home Loan Bank Medium Term Bond program sold $80,400,000 bonds in the period November 9, 1988, through December 5, 1988. Of this amount, $45,600,000 will be issued in the period December 6 through December 8, 1988. There are now $247,280,000 Medium Term Bonds outstanding.

| MONTHS | PAR AMOUNT | RATES |
|---|---|---|
| 12-23 | $ 23,100,000 | 8.40 - 8.75% |
| 24-59 | $ 37,000,000 | 8.60 - 9.30% |
| 60-83 | $ 0 | |
| 84 and greater | $ 20,300,000 | 9.10 - 9.45% |

The Bank Board discussed the consolidated obligation financing requirements for the forthcoming period. It was noted that $480,000,000 Series I-1988 (10.70%), and $2,000,000,000 Series BB-1988 (7.80%) will mature December 27, 1988.

In order to achieve a sales level of $4,865,020,000 for the month of December, the Bank Board authorized discount note offerings of up to $2,648,000,000 for the period from December 15, 1988, to December 31, 1988, and an amount of $1,619,000,000 (1/2 of the January request) from January 1, 1989, through January 19, 1989. In addition, the Bank Board authorized a discretionary amount for contingencies of up to $2,000,000,000 at rates up to 12.00%.

It was determined that the December public bond financing would comprise the following amounts and maturities:

| Amount | Maturity |
|---|---|
| $1,000,000,000 | 3/89 |
| $1,200,000,000 | 12/89 |
| $1,300,000,000 | 12/90 |
| $ 515,000,000 | 12/92 |
| $ 300,000,000 | 12/93 OPR |
| $ 700,000,000* | 12/95 |

OK 12/9/88

The Bank Board further authorized the Director or Deputy Director of the Office of Finance to negotiate a potential privately placed reopening of an outstanding issue in an amount up to $700,000,000, with the understanding that the size of the public bond due 12/95 would then be reduced by the amount of such reopening.

The interest rates for these issues will be established on December 13, 1988. For the December 1988 public bond financing, the Bank Board granted authority to the Director or Deputy Director of the Office of Finance to price the above issues at levels up to 100 basis points above comparable United States' Treasury issues.

* * *

I hereby certify that the above is a true and correct excerpt from an action adopted by the Federal Home Loan Bank Board on December 7, 1988.

OK 12/8/88

OK 7 Dec 88


OT942 0422 / STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

DECEMBER 1988 (Millions of dollars)

| | 1 YR FLOTR 12/89 | 1YR 12/89 | 2YR 12/90 | 3YR 12/91 | 4YR 12/92 | 5YR 12/93 | 5YR OFRD 12/93 | 7/4YR OFRD 12/95 | 7YR 12/95 | TOTAL BONDS | DISC NOTES DEC | DISC NOTES 1/2JAN | TOTAL DISC NOTES | TOTAL FINANCING BY BANK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BOS | 25 | 100 | | 50 | | 50 | | | | 225 | 366 | 379 | 745 | 970 |
| NYK | | 125 | | 150 | | | | | | 275 | 45 | 300 | 345 | 620 |
| PIT | | 50 | | 20 | | 15 | | | | 85 | 50 | 250 | 300 | 385 |
| ATL | | | 100 | | | | | 150 | | 250 | 400 | 250 | 650 | 900 |
| CIN | | 50 | | | | | | | | 50 | 50 | 100 | 150 | 200 |
| IND | | | | | | | 60 | | | 60 | 47 | 15 | 62 | 122 |
| CHI | | | | | | | | | | 0 | 20 | 0 | 20 | 20 |
| DMN | | | 200 | 100 | | | | | | 300 | 365 | 0 | 365 | 665 |
| BAL | | | 700 | | 400 | | | | 700 | 1800 | 500 | 150 | 650 | 2450 |
| TOP | | | | | 115 | | | | | 115 | 140 | 25 | 165 | 280 |
| SFR | | 750 | | | | | 100 | | | 850 | 1500 | | 1500 | 2350 |
| SEA | | 150 | 50 | | | | 50 | | | 250 | 175 | 150 | 325 | 575 |
| TOT | 25 | 1225 | 1050 | 320 | 515 | 65 | 210 | 150 | 700 | 4260 | 3658 | 1619 | 5277 | 9537 |
| Maturing | | | | | | | | | | 2480 | 1402 | 2377 | 3779 | 6259 |
| Net change | | | | | | | | | | 1780 | 2256 | -758 | 1498 | 3278 |

DECEMBER 1988 REVISED FINANCING REQUEST
($Millions of dollars)

| | 3 MIN 3/89 | 1YR 12/89 | 2YR 12/90 | 4YR 12/92 | 5/3 OPRB 12/93 | 7YR 12/95 | TOTAL BONDS | DISC NOTES DEC | DISC NOTES 1/2JAN | TOTAL DISC NOTES | TOTAL FINANCING BY BANK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOS | 240 | 125 | 50 | 0 | 10 | 0 | 425 | 166 | 379 | 545 | 970 |
| NYK | 0 | 125 | 150 | 0 | 45 | 0 | 320 | 45 | 300 | 345 | 665 |
| PIT | 0 | 50 | 0 | 25 | 0 | 0 | 75 | 0 | 250 | 250 | 325 |
| ATL | 150 | 0 | 100 | 0 | 150 | 0 | 400 | 250 | 250 | 500 | 900 |
| CIN | 0 | 0 | 50 | 0 | 0 | 0 | 50 | 50 | 100 | 150 | 200 |
| IND | 0 | 0 | 0 | 0 | 60 | 0 | 60 | 47 | 15 | 62 | 122 |
| CHI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 20 | 20 |
| DMN | 100 | 0 | 200 | 0 | 0 | 0 | 300 | 365 | 0 | 365 | 665 |
| BAL | 0 | 0 | 700 | 400 | 0 | 700 | 1800 | 500 | 150 | 650 | 2450 |
| TOP | 0 | 0 | 0 | 90 | 0 | 0 | 90 | 140 | 25 | 165 | 255 |
| SFR | 460 | 750 | 0 | 0 | 10 | 0 | 1220 | 940 | 0 | 940 | 2160 |
| SEA | 50 | 150 | 50 | 0 | 25 | 0 | 275 | 125 | 150 | 275 | 550 |
| TOT | 1000 | 1200 | 1300 | 515 | 300 | 700 | 5015 | 2648, | 1619 | 4267 | 9282 |
| Maturing | | | | | | | 2480 | 1402 | 2377 | 3779 | 6259 |
| Net change | | | | | | | 2535 | 1246 | -758 | 488 | 3023 |



OT942 0423 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #

# 1989 Report to Shareholders








STERLING SAVINGS

SG 0062997

"Confidential Material-Subject to Protective Order"

Ex. 33 Zeppa

*Our commitment to a stable growth plan, balanced with flexible, responsive leadership, has made Sterling Savings a leading financial institution in the Pacific Northwest.*

*As Washington's Hometown Helpful bank, we are now an integral part of communities across the state.*

*Sterling remains dedicated to a course of solid, profitable growth as we focus on the long-term to benefit our customers, our employees, and our shareholders.*

**ABOUT OUR COVER:**

The people of Washington enjoy an unparalleled quality of life, rich in economic and recreational opportunities. An active member of communities throughout the state, Sterling Savings is proud to share in the Washington experience, illustrated here in our cover photos.

*Front cover, right to left from the top:*

**1.** A Puget Sound ferry carries commuters between Winslow and Seattle
**2.** Raising the roof on a new office complex
**3.** Grand Coulee Dam, a major source of Washington's plentiful hydroelectric power
**4.** Spokane - center of business and finance for the entire Inland Northwest
**5.** Logging in Washington's plentiful forests
**6.** New home owners in Spokane

*Back cover from right to left:*

**7.** The aircraft industry plays an important role in Washington's economy
**8.** Wheat harvesting in wide-open Palouse country
**9.** On tour in the Cascades
**10.** One of many fishing ports that dot the state's coastline
**11.** Washington industrial workers are well-trained with a strong work ethic

## CONTENTS

Financial Highlights ____ 1
Report to Shareholders ____ 2
Corporate Profile ____ 4
Board of Directors ____ 5
Branch System ____ 6
Action Mortgage ____ 8
INTERVEST ____ 9
Loan Administration ____ 10
Operations ____ 11
Administration ____ 12
Financial Review ____ 13

SG 0062998

"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

# FINANCIAL HIGHLIGHTS

*Dollar amounts in thousands, except per share amounts.*

| | June 30, | | | | |
|---|---|---|---|---|---|
| **OPERATING DATA DURING THE YEAR** | **1989** | **1988** | **1987** | **1986** | **1985** |
| Interest income | $ 54,743 | $ 27,291 | $ 18,538 | $ 15,312 | $ 11,719 |
| Interest expense | 43,844 | 20,776 | 13,966 | 12,252 | 9,625 |
| Net interest income before provision for loan losses | 10,899 | 6,515 | 4,572 | 3,060 | 2,094 |
| Loan loss provision | (260) | (572) | (94) | (578) | (78) |
| Net interest income after provision for loan losses | 10,639 | 5,943 | 4,478 | 2,482 | 2,016 |
| Other income | 4,095 | 4,256 | 2,921 | 2,676 | 1,321 |
| Operating expenses | (13,224) | (8,228) | (5,842) | (4,295) | (2,762) |
| Income before income taxes and extraordinary items | 1,510 | 1,971 | 1,557 | 863 | 575 |
| Income tax provision | (225) | (752) | (622) | (88) | (126) |
| Income before extraordinary items | 1,285 | 1,219 | 935 | 775 | 449 |
| Extraordinary items | | | | | (4) |
| Net income | $ 1,285 | $ 1,219 | $ 935 | $ 775 | $ 445 |
| Net income per common share: | | | | | |
| Before extraordinary items | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 | $ .87 |
| Extraordinary items | | | | | (.01) |
| | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 | $ .86 |
| Weighted average shares outstanding | 520,468 | 518,897 | 521,667 | 515,491 | 515,395 |
| **FINANCIAL POSITION AT YEAR-END** | | | | | |
| Total assets | $ 730,144 | $429,316 | $239,689 | $180,000 | $112,101 |
| Loans receivable | 496,781 | 304,408 | 173,180 | 127,948 | 70,119 |
| Mortgaged-backed securities | 114,060 | 51,908 | 42,620 | 8,863 | 14,411 |
| Investments | 31,639 | 29,599 | 8,823 | 13,792 | 8,842 |
| Deposits | 519,982 | 306,152 | 170,789 | 142,064 | 88,001 |
| FHLB advances | 96,580 | 57,100 | 30,650 | 27,350 | 14,350 |
| Stockholders' equity | 10,512 | 9,467 | 8,469 | 5,389 | 4,614 |
| **STATISTICAL DATA** | | | | | |
| Number of: | | | | | |
| Employees (full-time equivalent) | 300 | 197 | 107 | 89 | 55 |
| Offices: | | | | | |
| Full-service | 28 | 19 | 8 | 8 | 5 |
| Loan production | 11 | 7 | 2 | - | - |
| Real estate loans | 12,430 | 4,854 | 3,417 | 3,286 | 1,632 |
| Deposit accounts | 71,756 | 42,082 | 22,326 | 20,063 | 10,360 |
| **RATIOS** | | | | | |
| Return on average assets | .22% | .40% | .45% | .50% | .42% |
| Return on average common stockholders' equity | 13.83% | 15.20% | 15.76% | 15.71% | 10.30% |
| Stockholders' equity to assets, at end of period | 1.44% | 2.21% | 3.53% | 2.99% | 4.12% |
| Book value per common share, at end of period | $ 15.97 | $ 13.95 | $ 12.09 | $ 10.45 | $ 8.95 |
| Net interest margin | 2.00% | 2.25% | 2.35% | 2.10% | 3.52% |
| Ratio of nonperforming loans to total assets | 2.39% | 2.13% | 3.14% | 3.08% | 1.32% |

*NOTE: Per Share amounts have been retroactively restated to reflect stock dividends paid. The above amounts reflect significant acquisitions during the years ended June 30, 1989, 1988 and 1986 - See Note 13 to the Consolidated Financial Statements. The Association prospectively changed its method of accounting for loan fees in 1989 - See Note 1 to the Consolidated Financial Statements.*



"Confidential Material-Subject to Protective Order" SG 0062999

APP. 960

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# REPORT TO SHAREHOLDERS

We are pleased to report another excellent year for Sterling Savings—a year of significant internal expansion and challenging external forces. Sterling's adherence to traditional values balanced with the ability to adapt to growth and changing times is the key to our success.

Fiscal 1989 developments illustrate the Company's strength and flexibility. Highlights include:

- **Net income for the year was $1,285,000, or $2.04 per share, compared to $1,219,000, or $1.96 per share, for fiscal 1988.**
- **During the first quarter of fiscal 1989, Sterling integrated the five Tri-Cities Savings & Loan branches into our system. Since then, we consolidated these operations into four locations and remodeled the Richland office.**
- **In December, Sterling acquired Central Evergreen Federal Savings and Loan Association. This major ten-branch acquisition gives Sterling a strong delivery system along western Washington's I-5 corridor from Seattle to Portland.**
- **Action Mortgage Company, a residential mortgage company and wholly-owned subsidiary of Sterling, expanded to eight offices in four states and increased its loan production to approximately $144 million, reflecting our commitment to single-family lending.**
- **INTERVEST-Mortgage Investment Co., an income property mortgage company and wholly-owned subsidiary of Sterling, more than doubled its volume with loan production exceeding $55 million.**
- **In April, Sterling completed construction of a new Winslow branch. This office is located near the ferry terminal on Bainbridge Island. Deposits at this branch increased 51% during fiscal 1989.**
- **The Best Agency, a wholly-owned subsidiary, was activated after the Central Evergreen acquisition. The Best Agency markets tax-deferred annuities through three financial services representatives located in western and southeastern Washington.**



*Harold B. Gilkey,*
*Chairman of the Board*

## ECONOMIC OUTLOOK:

In this time of continued mergers and consolidations by out-of-state financial institutions, it is essential to provide local, community-oriented service. We differentiate ourselves by the quality of service extended to our customers. Our commitment to service is an integral part of our corporate culture. Sterling's strong, state-wide depository base reflects our belief in the economic vitality of Washington State and the Pacific Northwest.








"Confidential Material-Subject to Protective Order"

On the national scene, congressional hearings on the savings and loan industry and the ensuing headlines affected customer confidence even though Sterling as well as other thrift institutions throughout Washington State are profitable. As demonstrated by its four acquisitions since inception, Sterling is considered by the industry and the regulators to be part of the solution, not part of the problem.

On August 9, 1989, President Bush signed the most complex financial legislation since the 1930's. The Financial Institutions Reform, Recovery and Enforcement Act, or FIRREA, will strengthen the deposit insurance system and provide a plan and funding to resolve the current savings and loan industry problems. Sterling fully supports this bill and its tougher standards even though we are frustrated by the limited transition time period. In anticipation of this legislation, Sterling's management structured its business plan and balance sheet to provide maximum flexibility in responding to the new legislation.



*William W. Zuppe,*
***President***

**THE STERLING DIFFERENCE:**

Our continued success has resulted in large measure from our clear focus on the mission of Sterling Savings: *to provide a high level of quality financial services to our customers and to manage a safe and sound financial institution which builds value for our shareholders and opportunity for our employees.* We believe that the Company as a whole possesses several factors which collectively make up the "Sterling Difference":

- **Strong delivery system across the state**
- **Diversified income-producing sources**
- **High credit quality standards**
- **"Hometown Helpful" customer service and community involvement**

We are pleased to introduce three new members of the Board of Directors. They are Raymond R. Alverson of Olympia, a retired Captain with United Airlines; James P. Fugate of Auburn, Superintendent of the Auburn School District #408; and James A. Vander Stoep of Chehalis, attorney and partner in the firm of Armstrong, Vander Stoep, Remund and Kelly. These Directors from western Washington enhance Sterling's representation and communication in those communities we serve.

Our greatest resource throughout this year of extraordinary challenge, market expansion, and growth is our staff of over 300 people. Whether in a branch in Clarkston, a loan office in Portland or a support department in Spokane, the Sterling family strives to provide "Hometown Helpful" service. Led by a strong senior management team, Sterling will continue to balance traditional banking values with a business plan responsive to changing business requirements.






"Confidential Material-Subject to Protective Order"

# CORPORATE PROFILE

### STERLING SAVINGS ASSOCIATION

Sterling Savings Association is a Washington-chartered, federally insured, stock savings and loan association, headquartered in Spokane, Washington. Sterling opened for business April 4, 1983, with assets of $2.5 million. At June 30, 1989, the Company had total assets of approximately $730 million. To date, acquisitions have accounted for approximately 60% of the growth in total assets.

Sterling conducts its business from twenty-eight full-service offices and eleven loan production offices located throughout Washington, Idaho, Oregon, and Utah. Sterling's business is primarily that of attracting deposits from the general public and originating, purchasing, selling and servicing secured residential and commercial real estate loans. Residential loans make up 72% of Sterling's loan and mortgage-backed securities portfolio.



### INTERVEST

INTERVEST-Mortgage Investment Co. is a wholly-owned subsidiary of Sterling Savings. A commercial real estate lender, INTERVEST provides financing alternatives in the $2 million range for income property loans. Specializing in commercial and multi-family real estate in the Northwest, they offer both construction and permanent financing from offices located in Portland, Oregon, and Bellevue and Spokane, Washington.

### ACTION MORTGAGE COMPANY

Action Mortgage Company is a full-service residential lender offering a complete program for the construction, purchase and refinancing of single-family homes. A wholly-owned subsidiary of Sterling Savings, Action was founded in March 1988 with offices in Spokane and Bellevue, Washington. Today Action has additional offices throughout the Pacific Northwest including Tacoma and Kennewick, Washington; Portland, Oregon; Boise and Coeur d'Alene, Idaho; and Salt Lake City, Utah.

### THE BEST AGENCY

The Best Agency, a wholly-owned subsidiary of Sterling Savings, was activated after the Central Evergreen acquisition. The Best Agency markets tax-deferred annuities through three financial services representatives located in western and southeastern Washington.



SG 0063002



"Confidential Material-Subject to Protective Order"

# BOARD OF DIRECTORS



Barnett, Vander Stoep, Alverson, Wallace, Fugate, Meyers, Clark, Gilkey, Zuppe, Larrabee, Kroetch, Barnes

HAROLD B. GILKEY — *Chairman of the Board, Chief Executive Officer*
WILLIAM W. ZUPPE — *President, Chief Operating Officer*
RAYMOND R. ALVERSON — *Retired United Airlines Pilot*
NED M. BARNES — *Principal, Witherspoon, Kelley, Davenport & Toole, PS*
RODNEY W. BARNETT — *President, Carr Sales Company*
T. RICHARD CLARK — *Business Consultant*
JAMES P. FUGATE — *Superintendent, Auburn School District*
CHARLES L. KROETCH — *President, Kroma International Graphics Center*
ROBERT LARRABEE — *Owner, Merchant Funeral Home*
ROBERT E. MEYERS — *Dentist*
JAMES A. VANDER STOEP — *Partner, Armstrong, Vander Stoep, Remund & Kelly*
DAVID O. WALLACE — *Owner, Chet's Buy-Rite Market*





"Confidential Material-Subject to Protective Order"

# BRANCH SYSTEM



*Chehalis Branch*
*Western Division Headquarters*

OUR GOAL IS TO BE OUR CUSTOMERS' PRIMARY FINANCIAL INSTITUTION FOR ALL THEIR BANKING NEEDS.




Sterling's twenty-eight full-service branch offices provide a strong financial services delivery system statewide. Our staff is committed to serving in the "Hometown Helpful" tradition.

At Sterling, we take a disciplined and focused approach to banking. Our goal is to be our customers' primary financial institution. Branch employees are dedicated to identifying and providing banking services that benefit the customer.

During fiscal 1989, Sterling acquired Central Evergreen Federal Savings & Loan Association's ten branches in western Washington. Stretching from Seattle to Portland on the I-5 corridor, these branches strengthen our presence in Washington already established with the 1988 purchase of the six Great American branches and the 1988 acquisition of the five Tri-Cities Savings and Loan Association branches.

The 1989 acquisition provided Sterling with the opportunity to continue serving the customers of Central Evergreen in a friendly, professional and personal manner. Central Evergreen's commitment





"Confidential Material-Subject to Protective Order"






*Stanton C. Parrish,*
*Sr. Vice President - Eastern Division Manager*

to customer service truly meshed with Sterling's theme of "Hometown Helpful." In a short time, this region has become an integral part of Sterling's branch system with a very positive future.

To meet the challenge of expansion, Sterling restructured branch administration into the Western and Eastern Divisions. This reorganization facilitates efficient communication and support of our expanded branch network.

Total deposits at year end were $520 million, a 70% increase over fiscal 1988. This increase reflects primarily the acquisition of Central Evergreen Federal. Frequent news reports about troubled savings and loans in other parts of the country prompted consumers throughout the nation to ask poignant questions about the security of their savings deposits. Through all this, our staff played an integral part in sorting out information from misinformation for the customers.

Our "Hometown Helpful" motto means providing quality service with financial and civic commitment to our communities. This year witnessed a significant expansion of our ability to provide these services. We are proud to be spreading our "Hometown Helpful" service across Washington state.

WE ARE PROUD TO BE SPREADING OUR "HOMETOWN HELPFUL" SERVICE ACROSS WASHINGTON STATE.

**TOTAL DEPOSITS AT END OF FISCAL YEAR**
*In Millions of Dollars*




SG 0063005 7

"Confidential Material-Subject to Protective Order"

APP. 966

# ACTION MORTGAGE COMPANY



*Thomas F. Sackmann,*
*President - Action Mortgage Company*

OUR COMMITMENT REMAINS TO BE A LEADER IN RESIDENTIAL LENDING IN THE PACIFIC NORTHWEST.

Action Mortgage Company successfully completed its first full year of operation in June 1989. With the exception of May and June, fiscal 1989 was a difficult one for all residential lenders. In spite of an adverse rate and competitive environment, Action closed almost two thousand loans, totaling approximately $144 million during the year.

Headquartered in Spokane, Action began fiscal 1989 with established origination offices in Spokane, Bellevue and Portland. New offices in Boise and Coeur d'Alene, Idaho, and Kennewick, Washington, were opened in July with the Salt Lake City, Utah, office opening in December. New offices in Tacoma and Spokane were opened shortly after the end of the fiscal year.

One of Action's major goals during fiscal 1989 was to increase production of marketable loans, principally FHA insured and VA guaranteed loans. FHA and VA loan production did, in fact, increase substantially throughout the year; and most loan production of all types was being sold into the secondary mortgage markets by June of 1989. By the close of the fiscal year, Action was able to offer a complete menu of FHA/VA, conventional and custom construction loans through all its offices as well as builder construction loans through offices in Washington and northern Idaho. Action begins fiscal 1990 well-positioned to continue its growth.



SG 0063006



"Confidential Material-Subject to Protective Order"

# INTERVEST



*John M. Harlow,*
***President - INTERVEST-Mortgage Investment Co.***

WE ARE ABLE TO OFFER SOUND, VIABLE ALTERNATIVES TAILORED TO THE UNIQUE REQUIREMENTS OF EACH CUSTOMER.

INTERVEST coordinates commercial real estate lending for Sterling. Total loan production for fiscal 1989 exceeded $55 million, including $27 million in multi-family residential lending. The key to our continued success is an experienced staff positioned in Puget Sound, Portland and eastern Washington areas to work on targeted markets.

INTERVEST specializes in small to mid-sized income property loans. For this last fiscal year, the average loan size was $1,750,000. We emphasize construction lending; and our staff works with customers to find favorable long-term financing with institutional lenders at completion. Loans made over this past fiscal year included apartments of 43 units in Puyallup, 50 in Tacoma, 140 in Salem, 135 in Olympia, 59 in Coeur d' Alene, and 58 in Spokane; a 33,000 square foot office building in Clark County and a 37,191 square foot office building in Puyallup; retail/shopping centers of 20,000, 14,000 and 34,000 square feet in Clackamas and Wilsonville, Oregon, and Clark County, Washington; a 14,400 square foot medical office building in Renton; and warehouses in Federal Way and Beaverton of 35,528 and 44,000 square feet, respectively.

At all times, our goal at INTERVEST is to provide the best possible financing package for our customers. In keeping with Sterling's overall "Hometown Helpful" consciousness, INTERVEST strives to provide timely, dependable service to meet the customers' needs. Good service is always important and particularly so when dealing with the complexities associated with large loan transactions.

INTERVEST's offices are located in Bellevue and Spokane, Washington, and Portland, Oregon.



"Confidential Material-Subject to Protective Order"

# LOAN ADMINISTRATION



*Stephen L. Page,*
*Sr. Vice President - Loan Administration*

WE ARE DEDICATED TO SAFE, SECURE BANKING PRINCIPLES.




Balance is a key concept in Sterling's Loan Administration Department. Dedicated to safe, secure banking principles, they manage and maintain the mix of loan types and uphold the highest standards for credit quality. Sterling traditionally has provided complete lines of loans and services to home builders, home buyers and commercial real estate developers.

Home ownership is one of the primary needs and often the most significant investment of our retail customers. Residential loans are originated from Sterling's wholly-owned subsidiary, Action Mortgage Company. Their well-trained staff offers a comprehensive loan origination network from eight offices located throughout four Pacific Northwest states. Sterling's commercial real estate lending is conducted from INTERVEST-Mortgage Investment Co., a wholly-owned subsidiary, with headquarters in Portland, Oregon, and offices in Bellevue and Spokane, Washington.

Sterling reaches beyond traditional home and commercial real estate lending by providing consumer loans including auto, boat and personal lines of credit as well as commercial business loans. Spokane's commercial lending department has the expertise to meet the needs of local businesses seeking lines of credit and other loans for business expansion.

Total loans originated during fiscal 1989 were $249 million. Sterling's experienced staff services the large volume of loans originated, whether retained in the portfolio or sold to other investors. This activity is an important part of our quality control program and a significant source of fee income. At the end of fiscal 1989, a total of 15,044 loans were serviced. Our staff's high level of consistent service is a major factor in our ability to sell loans in the secondary market. This in turn allows more capital to be reinvested into each of our communities. At Sterling, we believe this is a very important part of being "Hometown Helpful."



SG 0063008

"Confidential Material-Subject to Protective Order"

# OPERATIONS

The Operations Department epitomizes the expression "high-tech, high-touch." This department's expertise and experience made a year of acquisitions unnoticeable to the customer. During this fiscal year, Operations integrated 28,000 accounts and almost 8,700 loans into the Sterling system with little or no customer impact.

This department also oversees the building and remodeling of branch offices. This year, the Ellensburg, Moses Lake, Othello, Richland and North Bend offices were remodeled. Immediately following the acquisition of Central Evergreen, a major renovation of the Chehalis branch took place to accommodate the newly established Western Division Headquarters. At the same time, plans were drawn for the new Winslow branch. Winslow's construction began in late December, and the branch was moved and open for business on Monday, March 27. This spring, plans were completed for a new branch office in Pasco.

The Operations Department is also responsible for mail, forms and supply distribution between our branch network and administrative offices in Spokane. In addition, Operations provides the purchasing function for major furniture and fixture items for all locations and building maintenance for Sterling branch locations.

Throughout the year, this department's goal has been to stabilize and standardize systems. To this end, a major computer hardware system change was accomplished this spring. The technical ability of our capable staff is balanced with their desire to see each new branch become part of the Sterling family's "Hometown Helpful" environment.



*S. Midge Moore,*
*Vice President - Operations/Facilities*

WE HAVE THE TECHNOLOGY AND EXPERIENCE TO MEET STERLING'S EXPANSION AND SERVICE GOALS.



SG 0063009

"Confidential Material-Subject to Protective Order"

# ADMINISTRATION




*Heidi B. Stanley,*
*Vice President - Administration*

STERLING
IS COMMITTED
TO HIGH STANDARDS
OF CORPORATE
CITIZENSHIP
IN EACH COMMUNITY
WE SERVE.

The Administration Department serves the customer, employee, shareholder and community through its varied functions—Human Resources, Marketing and Communications.

The Human Resource Department is committed to providing the policies and procedures, training, compensation plans and the PEOPLE to ensure that our tradition of "Hometown Helpful" service continues. We strive to provide an environment where open communication and professional development are honored, where individuals are treated with respect and encouraged to succeed and to grow, and where individual accomplishment is recognized and rewarded.

Marketing constantly strives to present Sterling's image through the creation, delivery and communication of quality financial products which are responsive to the needs and wants of our customers. We have continued to position ourselves as a provider of superior services and high quality products.

The Communications Department places great emphasis on providing employees with information necessary to do their jobs and service the customer. Additionally, Communications is responsible for articulating corporate direction and goals and providing for the distribution of information to our shareholders and the public.

Our success and strength have a human and public dimension in an increased ability to fulfill our corporate social responsibilities. Sterling's management is committed to maintaining the highest standards of corporate citizenship in meeting the charitable, cultural, social and educational needs of the communities where we do business. We seek out opportunities to participate and to play a leadership role in addressing issues of concern throughout our service areas.





"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL – SUBJECT TO PROTECTIVE ORDER RSC027 0406

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS



*Daniel G. Byrne*
*Sr. Vice President, Finance*




## GENERAL

Since commencing operations in April of 1983, the Association has made significant acquisitions of other institutions and branches. These acquisitions have substantially enhanced the Association's branch delivery network and deposit gathering capabilities, and have provided the Association with significant net operating loss carryforwards, which will be available to reduce future tax liabilities. Several such acquisitions have involved troubled institutions and have resulted in an increase in the level of the Association's classified assets. Additionally, the Association's regulatory capital will decrease under FIRREA because the supervisory goodwill obtained through these acquisitions must now be deducted in determining regulatory capital (see "Liquidity and Sources of Funds" - "Capital Resources").

The Association's retail branch delivery system increased from five full service offices in 1985, to twenty-eight full service offices in 1989. Two of these branch offices were established by the Association and the remainder were obtained through acquisitions. Additionally, the Association, through its wholly-owned subsidiaries, Action Mortgage Company ("Action") and INTERVEST - Mortgage Investment Company ("Intervest"), operated eleven loan production offices at June 30, 1989. The Association has agreed, subject to regulatory approval, to purchase two branch offices from Great American with $29.5 million in deposits. A net cash payment to be received by the Association in exchange for assuming these deposits will be used to pay down other more expensive borrowings as they mature.

Due to its recent significant growth through acquisitions, the Association expects to concentrate in the near-term on integrating these various acquired operating units into its delivery network. The Association has no specific plans for acquisitions or the establishment of new branches in the next year.

During fiscal 1989, the Association also began marketing insurance and annuity products to its customers through an acquired subsidiary, The Best Agency. While the impact of these sales during 1989 was not significant, management feels the results of operations in the future will be positively impacted due to the expansion of this product line.

## RESULTS OF OPERATIONS

The Association reported net income for fiscal year 1989 of $1,285,000, a 5.4% increase over the $1,219,000 of net income reported for fiscal year 1988. Earnings increased to $2.04 per common share in fiscal year 1989 compared to $1.96 per common share in fiscal year 1988. Net income for fiscal year 1987 was $935,000, or $1.75 per common share. All earnings per share amounts have been retroactively restated to reflect all common stock dividends paid during the three-year period.

On December 31, 1988, the Association acquired Central Evergreen of Chehalis, Washington, which increased total assets by approximately $249 million and added ten branches to the Association's delivery system in Western Washington. See Note 13 to the Consolidated Financial Statements for more detailed information concerning this acquisition.

Sterling also expanded its residential mortgage lending function through Action Mortgage Company. During fiscal 1989, Action opened four more loan production offices, bringing to eight the total number of Action's loan production offices in Washington, Idaho, Oregon and Utah.

As a result of this acquisition and expansion, the Association's total assets increased 70% to $730.1 million at June 30, 1989, from $429.3 million at June 30, 1988.

Additionally, during fiscal 1989, the Association prospectively adopted the provisions of SFAS No. 91, which has substantially revised the Association's method of accounting for loan fees. As further described under "Other Income" and in Note 1 to the Consolidated Financial Statements, for all lending transactions entered into on or after July 1, 1988, the total loan origination fee and certain specifically defined direct loan origination costs are deferred, which has the effect of decreasing net fee income in the year of origination and increasing net interest income in future periods. As a means of both mitigating the impact of SFAS No. 91 and building its servicing portfolio and income therefrom, the Associa-



SG 0063011

"Confidential Material-Subject to Protective Order"

APP. 972

**QUARTERLY EARNINGS** *In Thousands of Dollars*




tion expanded its mortgage banking operations during 1989. As a result, a larger amount of loans are being originated and purchased for sale into the secondary market rather than for portfolio retention. Loans sold into the secondary market reflect a higher level of gains as a result of the net deferred fee.

#### NET INTEREST INCOME

For a financial institution, the most significant component of earnings is net interest income. Net interest income is the difference between interest income, principally from the Association's loan, investment and mortgage-backed securities portfolios, and interest expense, principally on customer deposits and borrowings. Changes in net interest income result from changes in both volume and net interest rate spread. Volume refers to the dollar level of earning assets and interest-bearing liabilities, and net interest rate spread refers to the difference between the interest yields on earning assets and the interest costs of the liabilities required to support them.

The Association's total interest income has increased steadily to $54.7 million in fiscal 1989, from $27.3 million in fiscal 1988 and $18.5 million in fiscal 1987. Total interest expense increased to $43.8 million in fiscal 1989, from $20.8 million in fiscal 1988 and $14.0 million in fiscal 1987. The Association's net interest income has increased steadily to $10.9 million for fiscal 1989, from $6.5 million and $4.6 million for fiscal 1988 and 1987, respectively. These increases in total interest income, total interest expense, and net interest income are principally attributable to the volume factor. Average interest-earning assets increased during fiscal 1989 to $545.3 million, from $289.4 million and $194.3 million during fiscal 1988 and 1987, respectively. The increases are principally the result of the Association's acquisitions of Central Evergreen midway through fiscal 1989, and Tri-Cities and six Great American branches during fiscal 1988.

The difference between the yield on the Association's interest-earning assets and the cost of its interest-bearing liabilities ("spread") for all of fiscal 1989 was 2.29%, as compared to 2.20% in fiscal 1988 and 2.36% in fiscal 1987. The increased spread during 1989 is primarily attributable to the mix of interest-earning assets relative to interest-bearing liabilities. During fiscal 1988, prevailing interest rates increased sharply compared to 1987, and rates paid on interest-bearing liabilities increased more rapidly than did rates earned on interest-earning assets.

Net interest income divided by total earning assets, or net interest margin, is influenced by the relative level and mix of interest earning assets and interest bearing liabilities. The margin declined to 2.00% during fiscal 1989, from 2.25% in fiscal 1988 and 2.35% in fiscal 1987, as a result of a lower level of interest-earning assets relative to interest-bearing liabilities acquired from Central Evergreen and Tri-Cities. Management expects net interest margin to improve as non-performing Central Evergreen and Tri-Cities assets are converted to earning assets.

#### PROVISIONS FOR LOAN AND REAL ESTATE OWNED LOSSES

It is management's policy to establish allowances for estimated potential losses on loans and real estate owned ("REO") by charging income when events have occurred indicating that losses are expected to be incurred. The evaluation of the adequacy of these allowances is an ongoing process. Economic conditions, loan portfolio composition, and historical loss experience affect the loss provisions charged against income.

The Association controls the quality of loans originated through its quality control function, which reviews loans originated or acquired to ensure compliance with appropriate underwriting criteria. The results of these reviews assist the Association in monitoring the performance of its lending personnel and independent appraisers. The Association's mortgage loan quality control program conforms to guidelines and standards established by the FHLMC and the FNMA.

Additionally, the Association has established a strict and uniform set of guidelines for classifying loans and then determining the appropriate provision for anticipated loan losses. Under these guidelines, an allowance for anticipated loan losses is established when certain conditions exist. This system for classifying and reserving loans is administered by the Association's Special Assets Department, which is responsible for curing loan deficiencies and minimizing losses. An oversight committee, comprised of senior management, meets quarterly to monitor and approve the activities and progress of the Special Assets Department, and reports these results to the Association's Board of Directors.

In fiscal 1989, total provisions of $326,000 were added to existing loss allowances through a charge to expense, of which $260,000 was allocated to loan losses and $66,000 was allocated to real estate owned losses. These total provisions compared to $951,000 and $201,000 for fiscal 1988 and 1987, respectively, of which $572,000 and $94,000 were provided for loan losses and $379,000 and $107,000 were provided for real estate owned losses. The loan loss provision for fiscal 1989 was made to increase general loan loss allowances. The loan loss provision for fiscal 1988 was higher than the provisions for either fiscal 1989 or fiscal 1987, and reflected management's intent to increase general allowances for commercial loans secured by collateral other than real estate, due in part to the general increase in this segment of the loan portfolio.

Allowances for potential loan and REO losses of $3,122,000 and $4,330,000 were carried over to the Association in the acquisitions of Tri-Cities and Central





"Confidential Material-Subject to Protective Order"

Evergreen. These allowances were necessary to cover the estimated losses in the respective portfolios of these institutions at the acquisition dates, and can be attributed primarily to certain macroeconomic conditions affecting their market areas and several large purchased loan participations.

The amount of loans and REO written off against reserves for fiscal years 1989, 1988 and 1987 were $1,858,000, $271,000 and $852,000, respectively. The amount written off in fiscal year 1989 is much higher than previous years, principally because of the high levels of problem loans and REO acquired with the Tri-Cities and Central Evergreen portfolios. The amount written off in fiscal 1987 reflects problem loans and REO of Lewis Federal, which was acquired in fiscal 1986.

Management believes the established allowances are compatible with the risks of various types of lending and the composition of the Association's loan and real estate owned portfolios.

## OTHER INCOME

Effective July 1, 1988, the Association prospectively changed its method of accounting for loan fees to comply with Statement of Financial Accounting Standards No. 91 - Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans ("SFAS No. 91"). This change substantially revised the Association's method of accounting for loan fees, which are now deferred in their entirety, net of certain specifically defined direct loan origination costs, and amortized to interest income using the level interest yield method over the contractual term of each loan as an adjustment of yield. For loans retained in the portfolio, the effect of SFAS No. 91 is to reduce loan fee income in the year of origination and increase net interest income in future periods. For loans sold into the secondary market, the effect of SFAS No. 91 is to increase the gain on sale, due to the fact that any net deferred fees effectively become part of the basis in the loans. During the year ended June 30, 1989, the net effect of adopting SFAS No. 91 was to decrease income before income taxes by $275,000. As a means of both mitigating the impact of SFAS No. 91 and building its servicing portfolio and income therefrom, the Association expanded its mortgage banking operations during 1989. As a result, a substantially larger amount of loans are being originated or purchased for sale into the secondary market rather than for portfolio retention.

The composition of other income was substantially different during fiscal 1989, compared to fiscal 1988 and 1987, as a result of these SFAS No. 91 related changes. Other income of $4,095,000 during fiscal 1989 is comprised principally of net gains on sales of loans and securities of $910,000 and service charges and fees on deposit accounts of $913,000. This compares to other income for fiscal 1988 and 1987 of $4,256,000, and $2,921,000, respectively, which was comprised principally of loan origination and commitment fees of $3,517,000 and $1,994,000, respectively.

Loan origination and commitment fees were $560,000 in fiscal 1989, $3,517,000 in fiscal 1988, and $1,994,000 in fiscal 1987. The 1989 decrease in fee income reflects the implementation of SFAS No. 91. The 1988 increase in loan fees reflects an increase, to $184.8 million, in the volume of loans originated in fiscal 1988, compared to originations of $122.6 million during fiscal 1987. The increase in loan origination volume in fiscal 1988 reflects an increase in market share and an expansion of the Association's mortgage-banking operations, principally through Action Mortgage Company.

Loan servicing fees were $471,000, $216,000, and $73,000 in fiscal years 1989, 1988 and 1987, respectively. The level of loan servicing fee income is primarily influenced by the size of the portfolio of loans being serviced for others. This portfolio has increased to $315.4 million at June 30, 1989, from $59.9 million and $41.9 million at June 30, 1988 and 1987, respectively, as a result of the increase in the Association's mortgage banking activities and the acquisitions of Tri-Cities and Central Evergreen.

Service charges and fees on deposit accounts totalled $913,000, $423,000 and $235,000, for the years ended June 30, 1989, 1988 and 1987, respectively. The increases primarily reflect the growth in the number of accounts serviced during these periods.

Net gains on sales of loans and securities were $910,000, $408,000 and $596,000 during fiscal years 1989, 1988 and 1987, respectively. During fiscal 1989, the Association became more active in its mortgage banking operations, which resulted in a higher level of secondary market sales of loans with net deferred fees attached to them (the existence of net deferred fees increases gain on sale). Both fiscal 1988 and 1987 reflect a lower level of sales of loans and securities.

Net gain (loss) on sales and operation of REO was $691,000, ($37,600), and $13,000 during fiscal years 1989, 1988 and 1987, respectively. The net gain during fiscal year 1989 is attributable to favorable operating results of acquired REO and recoveries in excess of amounts expected on acquired properties. The net loss during fiscal year 1988 is attributable to unfavorable operating results of various REO properties and the erosion in net realizable value of one REO property. The net gain for fiscal year 1987 is insignificant, and reflects a much lower level of REO being managed.






SG 0063013

"Confidential Material-Subject to Protective Order"

APP. 974

**INTEREST RATE SENSITIVITY OF ASSETS & LIABILITIES & CAPITAL**
*Percentage which reprice in one year or less*




**INTEREST RATE SENSITIVITY OF ASSETS & LIABILITIES & CAPITAL**
*Percentage which reprice in three years or less*




### OPERATING EXPENSES

Operating expenses, which were $13,224,000, $8,228,000 and $5,842,000 for fiscal years 1989, 1988 and 1987, respectively, have shown a general increase, primarily as a result of internal expansion and the acquisitions of Central Evergreen in 1989 and of Tri-Cities and six Great American branches in 1988. Since fiscal 1987, the total number of facilities, including those operated by subsidiaries, has increased from ten to thirty-nine, and the number of full-time employee equivalents has increased from 107 to 300. Employee compensation and benefits, occupancy and equipment, data processing and other expenses all contributed to the substantial increase in operating expenses.

Intangible amortization expense was $2,021,000, $462,000 and $372,000 during fiscal years 1989, 1988 and 1987, respectively. The significant increase during 1989 is attributable to the high level of intangibles recorded with the acquisition of Central Evergreen. The Association has available certain acquired tax benefits which would serve to reduce the level of intangibles, and thus amortization expense, when utilized in the future. There can be no assurance, however, that these benefits will be fully realized. See Note 10 to the Consolidated Financial Statements.

### PROVISION FOR INCOME TAXES

For the years ended June 30, 1989, 1988 and 1987, the income tax provisions were $225,000, $752,000 and $622,000, respectively. The effective tax rate in fiscal 1989 (14.9%) is lower than the statutory rate of 34%, primarily due to the tax basis bad debt deduction and nontaxable yield subsidy assistance received from the FSLIC, but partially offset by the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets and liabilities). The effective tax rate in fiscal 1988 (38.2%) is higher than the statutory rate of 34%, primarily because of the amortization of purchase accounting adjustments. The effective tax rate in fiscal 1987 (39.9%) was lower than the statutory rate of 46%, primarily due to the tax basis bad debt deduction.

The income tax provisions in fiscal 1989 and 1988 consider all applicable changes to the Tax Reform Act of 1986. Those changes which significantly affected the Association beginning July 1, 1987 were the reduction of the maximum corporate tax rate from 46% to 34%, and the reduction, from 40% to 8%, of the percentage of taxable income used to calculate the bad debt deduction under one of the available methods. These changes essentially offset each other, causing very little fluctuation in the Association's effective tax rate from fiscal 1987 to fiscal 1988. The Association now finds that it is able to obtain a greater bad debt deduction by using the "experience" method instead of the percentage of taxable income method.

In December of 1987, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 96 - <u>Accounting for Income Taxes</u> ("SFAS No. 96") which requires the application of an asset and liability approach to account for and report income taxes for financial statement purposes. SFAS No. 96 will require the Association to recognize a current or deferred tax liability for the tax consequences of all events recognized in the financial statements. The new standard represents a significant change in accounting for the effects of deferred taxes and business combinations. Deferred taxes are to be based on the difference between the tax bases of assets and liabilities (including those acquired or assumed in conjunction with purchase business combinations) and amounts reported for financial statement purposes. SFAS No. 96 also will require the Association to make a deferred tax adjustment for any remaining acquired assets and assumed liabilities to which purchase accounting tax adjustments were made in prior business combinations. The Association also will be required to recompute its tax liabilities if the tax rates change, and must recognize the effect of any such change in income. The Association has not yet determined the effects of this new standard, which presently must be adopted no later than July 1, 1990. The FASB has recently announced that it intends to defer the required implementation date of SFAS No. 96 for a minimum of nine more months, and that it is continuing to explore several possibly significant amendments to SFAS No. 96.

### LIQUIDITY AND SOURCES OF FUNDS

Federal regulations require savings institutions to maintain an average daily balance of liquid assets equal to, but not less than, a specified percentage (currently 5%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At June 30, 1989, the Association had a liquidity ratio of 6.85% compared to 5.10% and 5.50% at June 30, 1988 and 1987, respectively. The required liquidity ratio may vary from time to time, depending on economic conditions, savings flows, and loan funding needs. It is the Association's practice to maintain its liquidity level at or near the required minimum in order to maximize its yield on alternative investments.

The Association's primary sources of cash are customer deposits, principal payments on and sales of loans and mortgage-backed securities, advances from the FHLB Seattle, and borrowings under repurchase agreements. Deposits increased by $213.8 million and $135.4 million in fiscal years 1989 and 1988, respectively. The increases in fiscal 1989 and 1988 result principally from the ac-

quisitions of Central Evergreen, Tri-Cites and six Great American branches.

Principal repayments on loans and mortgage-backed securities were $115.7 million, $64.8 million and $62.1 million during fiscal years 1989, 1988 and 1987, respectively. The increase in these repayments over the past three years is a reflection of continued growth in average loan and mortgage-backed securities portfolio balances, and periodic increases in loan refinancings as the result of lower prevailing interest rates.

At June 30, 1989, the Association had borrowings outstanding from the FHLB amounting to $96.6 million, and had authority to borrow up to a total of 25% of assets, or an additional $86 million.

The Association also borrows on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At June 30, 1989, the Association had $87.3 million of securities sold subject to repurchase agreements. An additional $6 million of securities were available for sale under repurchase agreements at such date.

## CAPITAL RESOURCES

The Association's total stockholders' equity was $10,512,000 and $9,467,000 at June 30, 1989 and 1988, respectively. During fiscal 1989, stockholders' equity increased by $1,045,000, reflecting primarily net income of $1,285,000, offset by cash dividends of $225,000 declared on the Series B Preferred Stock. During fiscal 1988, total stockholders' equity increased by $998,000, primarily as the result of net income.

Return on average common stockholders' equity was 13.8% in fiscal 1989, 15.2% in fiscal 1988, and 15.8% in fiscal 1987. The moderate decline in fiscal 1989 and 1988 is due, in part, to the payment of cash dividends on the Series B Preferred Stock.

At June 30, 1989, stockholders' equity was 1.44% of total assets, compared to 2.21% at June 30, 1988. The decrease in this ratio is a result of the 70% increase in total assets attributable to the Central Evergreen acquisition completed midway through fiscal 1989.

At June 30, 1989, the Association had regulatory capital of $23.7 million, which exceeded the minimum regulatory capital requirement then in effect by $2.1 million. On August 9, 1989, the President signed into law the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which addresses problems of the FSLIC and the thrift regulatory environment. The scope of the FIRREA bill is significant, and the Association is presently in the midst of a detailed analysis and evaluation of the implications of the legislation. In addition to creating a new regulatory body (Office of Thrift Supervision - "OTS"), the most significant aspect of FIRREA will be the implementation of new regulatory capital standards. Actual regulations specifically defining these new standards, including a number of components, limitations and exceptions, must be written and promulgated by the OTS before November 7, 1989, with the new minimum capital requirements then becoming effective on December 7, 1989.

Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. No assurance can be given that this forbearance will be honored, however, and any such forbearance would be conditioned upon compliance by the Association with the business plan submitted to the FSLIC by the Association in conjunction with the Central Evergreen acquisition.

Should the Association not be in compliance when the new regulations become effective, it would be able to apply for a temporary exemption until January 1, 1991. If the Association is not in compliance with regulatory capital requirements at January 1, 1991, it would be able to apply for a further exemption. If such further exemptions were not granted, the Association would be subject to other restrictions, including limitations on asset growth and payments of dividends. Management believes the Association will be eligible for such exemptions under the standards set forth in FIRREA.

As further described in Notes 17b and c to the Consolidated Financial Statements, management of the Association is pursuing a plan for increasing its regulatory capital ratios to enable compliance with the new FIRREA requirements, including a planned stock offering and achieving the profitability goals set forth in its existing business plan. Management is also investigating other alternatives for improving its capital ratios, including a reduction of total assets accomplished by not replacing assets as they mature. If this plan is achieved, management believes, based on its preliminary understanding of the new legislation, that the Association will be in compliance with the minimum capital requirements of FIRREA by January 1, 1991.

In addition to its impact on regulatory capital, FIRREA will also result in the creation of a new depositor insurance fund to replace FSLIC and payment of higher insurance premiums thereto. FIRREA further calls for a recapitalization of the FHLB system, which could result in reduced dividends on the Association's investment in FHLB stock.

## ASSET AND LIABILITY MANAGEMENT

Since inception, the Association has maintained an asset and liability management program designed to stabilize net interest income throughout interest rate cycles by creating the means for protecting net interest spread against rapid increases in the cost of funds, and by achieving and maintaining a favorable balance between interest-earning assets and interest-bearing liabilities. The Association utilizes a variety of methods to protect net interest spread against rapid increases in interest rates, including (i) origination and retaining adjustable rate mortgages ("ARMs") secured by residential or commercial real estate and other collateral, and characterized by interest rates established at predetermined margins over a specified index that are adjusted periodically within contractual maximum limitations, (ii) selling into the secondary market substantially all long-term, fixed rate residential first mortgage loans originated or purchased, and (iii) borrowing long-term funds, principally from the FHLB of Seattle. In utilizing these methods, the Association attempts to match the maturities and interest rate sensitivity of its assets and liabilities in order to maintain adequate interest rate spread and asset quality.

The Association has formed a committee of senior management for the purpose of reviewing the composition and maturities of assets and liabilities. This committee attempts to maintain the Association's asset and liability gap position between a negative 10% and 25% at both the one- and three-year pricing intervals.

The Association's one-year and three-year cumulative gap positions (the difference between the amount of interest-earning assets and the amount of interest-bearing liabilities expected to reprice in the period) at June 30, 1989 were a negative $124.2 million, and a negative $112.9 million respectively, representing a negative cumulative gap to total assets ratio of 17.0% and 15.5% respectively. The Association believes that its gap position is reasonably matched for the current level of prevailing interest rates and that its net interest rate spread should be reasonably protected against a rapid rise in interest rates.



"Confidential Material-Subject to Protective Order"

# CONSOLIDATED BALANCE SHEETS

*Dollar amounts in thousands.*

| AS OF JUNE 30, | 1989 | 1988 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents: | | |
| Interest bearing | $ 15,139 | $ 12,941 |
| Non-interest bearing and vault | 9,225 | 5,766 |
| Restricted | 1,300 | 450 |
| Investments (market value $31,390 and $28,941) | 31,639 | 29,599 |
| Loans receivable | 496,781 | 304,408 |
| Mortgage-backed securities (market value $111,029 and $49,126) | 114,060 | 51,908 |
| Accrued interest receivable (including $582 and $593 on investments) | 6,544 | 3,989 |
| Office properties and equipment | 10,727 | 6,933 |
| Real estate owned | 16,336 | 6,804 |
| Intangibles (net of accumulated amortization of $3,645 and $1,431) | 25,722 | 5,068 |
| Prepaid expenses and other assets | 2,671 | 1,450 |
| Total assets | $730,144 | $429,316 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Deposits | $519,982 | $306,152 |
| Advances from Federal Home Loan Bank | 96,580 | 57,100 |
| Securities sold subject to repurchase agreements | 87,345 | 47,192 |
| Cashier's checks issued and payable | 4,994 | 3,488 |
| Borrowers' reserves for taxes and insurance | 2,519 | 1,218 |
| Accrued interest payable | 3,023 | 1,743 |
| Deferred income taxes | 164 | 248 |
| Accrued expenses and other liabilities | 5,025 | 2,708 |
| Total liabilities | 719,632 | 419,849 |
| Commitments | | |
| Preferred stock, $1 par value; 1,000,000 shares authorized; 90,168 shares issued and outstanding ($2,254 liquidation preference value) | 90 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; 517,228 and 470,209 shares issued and outstanding | 517 | 470 |
| Additional paid-in capital | 7,708 | 7,240 |
| Retained earnings | 2,197 | 1,667 |
| Total stockholders' equity | 10,512 | 9,467 |
| Total liabilities and stockholders' equity | $730,144 | $429,316 |

*The accompanying notes are an integral part of the consolidated financial statements.*



SG 0063016

"Confidential Material-Subject to Protective Order"

APP. 977

# CONSOLIDATED STATEMENTS OF INCOME

*Dollar amounts in thousands, except per share amounts.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Interest income: | | | |
| Loans and mortgage-backed securities | $50,399 | $25,227 | $17,217 |
| Investments and cash equivalents | 4,344 | 2,064 | 1,321 |
| | 54,743 | 27,291 | 18,538 |
| Interest expense: | | | |
| Deposits | 31,037 | 14,947 | 10,653 |
| Short-term borrowings | 10,755 | 3,310 | 1,198 |
| Long-term borrowings | 2,052 | 2,519 | 2,115 |
| | 43,844 | 20,776 | 13,966 |
| Net interest income | 10,899 | 6,515 | 4,572 |
| Provision for loan losses | 260 | 572 | 94 |
| Net interest income after provision for loan losses | 10,639 | 5,943 | 4,478 |
| Other income: | | | |
| Loan origination and commitment fees | 560 | 3,517 | 1,994 |
| Loan servicing fees | 471 | 216 | 73 |
| Net gain on sales of securities and loans | 910 | 408 | 596 |
| Service charges and fees on deposit accounts | 913 | 423 | 235 |
| Net gain (loss) on sale and operation of real estate owned | 691 | (376) | 13 |
| Other | 550 | 68 | 10 |
| Total other income | 4,095 | 4,256 | 2,921 |
| Operating expenses: | | | |
| Employee compensation and benefits | 4,621 | 3,897 | 2,583 |
| Occupancy and equipment | 2,316 | 1,153 | 702 |
| Advertising and promotion | 275 | 165 | 135 |
| Data processing | 961 | 483 | 341 |
| Depreciation and amortization | 811 | 523 | 349 |
| Amortization of intangibles | 2,021 | 462 | 372 |
| Other | 2,219 | 1,545 | 1,360 |
| Total operating expenses | 13,224 | 8,228 | 5,842 |
| Income before income taxes | 1,510 | 1,971 | 1,557 |
| Income tax provision (benefit): | | | |
| Current | 309 | 725 | 498 |
| Deferred | (84) | 27 | 124 |
| | 225 | 752 | 622 |
| Net income | $ 1,285 | $ 1,219 | $ 935 |
| Net income applicable to common shares | $ 1,060 | $ 1,016 | $ 912 |
| Net income per common share | $ 2.04 | $ 1.96 | $ 1.75 |
| Weighted average common shares outstanding | 520,468 | 518,897 | 521,667 |



*The accompanying notes are an integral part of the consolidated financial statements.*

SG 0063017

"Confidential Material-Subject to Protective Order"

# CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

*Dollar amounts in thousands, except per share amounts.*

**FOR THE YEARS ENDED JUNE 30, 1989, 1988 AND 1987**

| | PREFERRED STOCK | | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | RETAINED EARNINGS |
|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | SHARES | AMOUNT | | |
| Balance, June 30, 1986 | — | — | 387,311 | $ 3,873 | $ 875 | $ 641 |
| Common shares issued for cash | | | 490 | 4 | 3 | |
| Transfer to reflect reduction in common stock par value from $10.00 to $1.00 | | | | (3,489) | 3,489 | |
| Common stock dividend (10%) | | | 38,598 | 38 | 415 | (453) |
| Cash paid for fractional shares of common stock dividend | | | | | | (2) |
| Preferred shares issued for cash, net of offering costs of $114 | 90,168 | $ 90 | | | 2,050 | |
| Net income | | | | | | 935 |
| Balance, June 30, 1987 | 90,168 | 90 | 426,399 | 426 | 6,832 | 1,121 |
| Common shares issued for cash | | | 200 | | 2 | |
| Common stock dividend (10%) | | | 42,397 | 43 | 402 | (445) |
| Cash paid for fractional shares of common stock dividend | | | | | | (2) |
| Cash dividends on preferred stock ($2.25 per share) | | | | | | (226) |
| Common shares issued upon exercise of stock options | | | 3,750 | 4 | 32 | |
| Common shares acquired and retired upon exercise of stock options | | | (2,537) | (3) | (28) | |
| Net income | | | | | | 1,219 |
| Balance, June 30, 1988 | 90,168 | 90 | 470,209 | 470 | 7,240 | 1,667 |
| Common shares issued for cash | | | 250 | | 3 | |
| Common stock dividend (10%) | | | 46,769 | 47 | 479 | (526) |
| Cash paid for fractional shares of common stock dividend | | | | | | (4) |
| Cash dividends on preferred stock ($2.50 per share) | | | | | | (225) |
| Costs to exchange Series B preferred stock for Series A | | | | | (14) | |
| Net income | | | | | | 1,285 |
| Balance, June 30, 1989 | 90,168 | $ 90 | 517,228 | $ 517 | $ 7,708 | $ 2,197 |

*The accompanying notes are an integral part of the consolidated financial statements.*





"Confidential Material Subject to Protective Order"

# CONSOLIDATED STATEMENTS OF CASH FLOWS

*Dollar amounts in thousands.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 1,285 | $ 1,219 | $ 935 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of effects of acquisitions: | | | |
| Provisions for loan and real estate owned losses | 326 | 951 | 201 |
| Net gain on sales of securities and loans | (910) | (408) | (596) |
| Interest credited to deposits | 31,243 | 18,295 | 10,676 |
| Depreciation and amortization | 2,832 | 985 | 721 |
| Deferred income taxes | (84) | 27 | 124 |
| Change in accrued interest receivable | (1,479) | (1,423) | (723) |
| Change in accrued interest payable | 889 | 358 | 209 |
| Other, net | (142) | 239 | |
| | 33,960 | 20,243 | 11,547 |
| Change in cashier's checks issued and payable | (323) | (146) | 1,432 |
| Change in prepaid expenses and other assets | (560) | (533) | 1,565 |
| Change in borrowers' reserves and accrued expenses and other liabilities | 179 | 1,478 | 457 |
| Net origination or purchase of loans pursuant to mortgage-banking operations | (16,822) | (1,637) | |
| Net cash provided by operating activities | 16,434 | 19,405 | 15,001 |
| Cash flows from investing activities, net of effects of acquisitions: | | | |
| Loans disbursed | (173,034) | (171,789) | (122,581) |
| Loan and mortgage-backed securities principal payments | 115,723 | 64,778 | 62,134 |
| Purchase of loans and mortgage-backed securities | (13,330) | (14,140) | (88,279) |
| Proceeds from sales of loans and mortgage-backed securities | 12,411 | 14,389 | 68,198 |
| Purchase of investments | (8,238) | (28,725) | (24,607) |
| Proceeds from sales and maturities of investments | 20,807 | 13,347 | 30,171 |
| Purchase of office properties and equipment | (926) | (2,625) | (897) |
| Proceeds from sales of real estate owned | 4,962 | 1,830 | 934 |
| Net liabilities assumed as part of Tri-Cities acquisition | | 11,730 | |
| Deposit liabilities assumed as part of branch acquisitions | | 47,453 | 3,244 |
| Purchase of loan servicing rights | (826) | | |
| Other, net | | (310) | |
| Net cash used in investing activities | (42,451) | (64,062) | (71,683) |

*Continued on page 22.*



*The accompanying notes are an integral part of the consolidated financial statements.*

SG 0063019

APP. 980

"Confidential Material-Subject to Protective Order"

# CONSOLIDATED STATEMENTS OF CASH FLOWS, CONTINUED

*Dollar amounts in thousands.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Cash flows from financing activities, net of effects of acquisitions: | | | |
| Net change in NOW, passbook and money market deposits | $ (25,252) | $ (948) | $ 9,759 |
| Proceeds from sales of certificates of deposit | 488,596 | 245,574 | 160,152 |
| Payments for maturing certificates of deposit | (496,588) | (238,156) | (155,107) |
| Advances from the Federal Home Loan Bank | 101,000 | 54,000 | 14,300 |
| Repayment of Federal Home Loan Bank advances | (88,800) | (44,650) | (11,000) |
| Net change in securities sold subject to repurchase agreements | 40,153 | 24,142 | 22,366 |
| Issuance of preferred stock | | | 2,140 |
| Cash dividends on preferred stock | (225) | (226) | |
| Net cash provided by financing activities | 18,884 | 39,736 | 42,610 |
| Cash and cash equivalents acquired as part of acquisitions | 13,640 | 21,320 | |
| Net increase (decrease) in cash and cash equivalents | 6,507 | 16,399 | (14,072) |
| Cash and cash equivalents at beginning of year | 19,157 | 2,758 | 16,830 |
| Cash and cash equivalents at end of year | $ 25,664 | $ 19,157 | $ 2,758 |
| Supplemental disclosures: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 11,320 | $ 12,260 | $ 13,755 |
| Income taxes | $ 120 | $ 201 | $ 498 |
| Loans swapped for mortgage-backed securities | $ 54,430 | $ 8,232 | $ 8,128 |
| Loans converted into real estate owned | $ 5,359 | $ 2,202 | $ 1,478 |
| Assets acquired and liabilities assumed as part of Central Evergreen acquisition | $ 248,883 | | |



*The accompanying notes are an integral part of the consolidated financial statements.*





"Confidential Material-Subject to Protective Order"

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All dollar amounts in thousands, except per share amounts.*

## 1. SIGNIFICANT ACCOUNTING POLICIES:

The accounting and financial reporting policies of Sterling Savings Association (the "Association") and its subsidiaries conform to generally accepted accounting principles and to general practice within the savings and loan industry. The following is a description of the Association's significant accounting policies.

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Association and all of its wholly and majority-owned subsidiaries.

The purchase price of acquired companies has been allocated to the assets and liabilities acquired based upon their estimated fair values at the date of acquisition. Results of operations of acquired companies are included in the accompanying financial statements only since the dates of acquisition. All significant inter-company accounts and transactions have been eliminated in consolidation.

### Investments and Mortgage-Backed Securities

Investments are carried at cost, adjusted for amortization of premiums or accretion of discounts. Mortgage-backed securities are carried at their remaining unpaid principal balance, net of unamortized premium or unaccreted discount. These securities are held for long-term investment purposes and, accordingly, are not adjusted for temporary declines in market value. Premiums are amortized and discounts are accreted using the level interest yield method over the estimated remaining term of the underlying security. Gains and losses on sales of investments and mortgage-backed securities are recognized based on specific identification.

### Provision for Loan Losses

A provision for possible loan losses, when determined necessary, is charged to income based on management's evaluation of the potential losses that may occur in its loan portfolio. Such evaluation, which includes a review of all loans which may not be fully collectible, considers, among other matters, the estimated net realizable value of the underlying collateral.

### Real Estate Owned

Property acquired by foreclosure or deed in lieu of foreclosure is recorded at the lower of estimated fair value, based on appraisal of such properties, or the principal balance of the defaulted loan. Development, improvement and direct holding costs relating to the property are capitalized. The carrying value of such properties is continuously evaluated and, if necessary, allowances are established to reduce the carrying value to net realizable value (which considers, among other things, provisions for estimated direct holding costs and selling expenses).

### Office Properties and Equipment

Office properties and equipment are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for new properties and equipment and major renewals or betterments are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. When property or equipment is sold or retired, the cost and related accumulated depreciation are removed from the respective accounts, and the resulting gains or losses are reflected in income.

*Continued on page 24*



"Confidential Material-Subject to Protective Order"

### Loan Origination and Commitment Fees

Effective July 1, 1988, the Association prospectively adopted the provisions of Statement of Financial Accounting Standards No. 91 - Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans ("SFAS No. 91"). This new standard has substantially revised the Association's method of accounting for loan origination fees, which under previous accounting principles were deferred only to the extent that they exceeded the direct costs of underwriting and closing loans. For all lending transactions entered into on or after July 1, 1988, the total loan origination fee, net of certain specifically defined direct loan origination costs, is deferred. The net amount deferred is recognized as interest income using the level interest yield method over the contractual term of each loan as an adjustment of yield. If the related loan is sold, the remaining net amount deferred, which is part of the basis of the loan, is used in determining the gain or loss on sale.

Loan commitment fees are deferred until the expiration of the commitment period unless management believes there is a remote likelihood that the underlying commitment will be exercised, in which case the fees are amortized to fee income using the straight-line method over the commitment period. If a loan commitment is exercised, the deferred commitment fee is accounted for in the same manner as a loan origination fee. Deferred commitment fees associated with expired commitments are recognized as fee income.

During the year ended June 30, 1989, the effect of adopting SFAS No. 91 was to decrease income before income taxes and net income by $275 and $182, respectively. This decrease resulted in a $.35 decrease in net income per share during the year ended June 30, 1989.

### Income Per Share

Net income per share is equal to net income, reduced by dividends earned on preferred stock during the year ($225, $203 and $23 for the years ended June 30, 1989, 1988 and 1987, respectively), divided by the weighted average number of shares of common stock and common stock equivalents (stock options) outstanding during each year. All weighted average shares outstanding and per share amounts have been retroactively restated to reflect all stock dividends.

### Intangibles

Identified intangibles are amortized on a straight-line basis over the estimated life of the acquired depositor relationships (eight years). Unidentified intangibles are amortized using the level interest yield method over the estimated remaining life (assuming prepayments) of the long-term interest-bearing assets (loans receivable and mortgage-backed securities) acquired (generally a total of twelve years, with the substantial majority of the unidentified intangible being amortized in the first four years).

### Mortgage Banking Operations

The Association originates or purchases and sells loans and participating interests in loans, generally with the servicing rights retained, to provide additional funds for general corporate purposes and to generate servicing income. Loans and participating interests therein committed or held for sale are carried at the lower of cost or market value.

The Association recognizes a gain or loss on these loan sale transactions which includes a component reflecting the differential between the contractual interest rate of the loan and the interest rate which will be received by the investor in the servicing agreement. The present value of the estimated future profit for servicing the loans, together with the normal servicing fee rate ("deferred premium"), is taken into account in determining the amount of gain or loss on the sale of loans. At June 30, 1989 and 1988, net deferred premiums on loans sold of $536 and $145, respectively, were included in prepaid expenses and other assets.

The portion of the purchase price of individual loans representing the cost of acquiring the right to service those loans is capitalized if there is a definitive plan to immediately sell the loans. The amount capitalized is subject to certain limitations based on the present value of the estimated future stream of net servicing income (assuming loan prepayments), and the recognition of a gain on the loan sale transaction. The right to service loans can also be an identified intangible asset acquired in a business combination. At June 30, 1989 and 1988, total net capitalized costs related to purchased servicing rights of $2,732 and $99, respectively, were included in intangibles. The net capitalized amount at June 30, 1989 includes $1,864 of loan servicing rights acquired with Central Evergreen (see note 13a).

Deferred premiums on loan sales and the capitalized costs of purchased servicing rights are both amortized



"Confidential Material-Subject to Protective Order"

to expense in proportion to the estimated future stream of net servicing income, assuming loan prepayments (total amortization period is generally twelve years, with the substantial majority of the asset being amortized in the first four years). During the year ended June 30, 1989, amortization of deferred premiums and capitalized costs of purchased servicing rights was $28 and $193, respectively.

Premiums paid in connection with option transactions, entered into as an anticipatory hedge of movement in interest rates in connection with mortgage-banking operations, are deferred and amortized to expense over the option period.

**Cash Equivalents**

The Association considers a cash equivalent to be any highly liquid debt instrument purchased with an original maturity of three months or less.

**Reclassifications**

Certain prior year balances have been reclassified to conform with the 1989 presentation. These reclassifications had no effect on retained earnings or net income as previously reported.

## 2. INVESTMENTS:

A summary of carrying and market values of investments follows:

| | June 30, 1989 | | June 30, 1988 | |
|---|---|---|---|---|
| | Carrying Value | Market Value | Carrying Value | Market Value |
| U.S. Government and agency obligations | $23,305 | $23,053 | $25,007 | $24,349 |
| Federal Home Loan Bank stock, at cost | 7,563 | 7,563 | 4,528 | 4,528 |
| Corporate notes | 642 | 645 | | |
| Other | 129 | 129 | 64 | 64 |
| | $31,639 | $31,390 | $29,599 | $28,941 |

SG 0063023

"Confidential Material-Subject to Protective Order"

## 3. LOANS RECEIVABLE:

The components of loans receivable are:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Real estate loans: | | |
| Variable rate residential mortgage loans | $148,403 | $ 68,402 |
| Fixed rate residential mortgage loans | 82,547 | 94,710 |
| Residential mortgage loans purchased | 8,393 | 1,600 |
| Loans insured by FHA/VA | 18,548 | 9,440 |
| Variable rate commercial real estate loans | 91,732 | 47,004 |
| Fixed rate commercial real estate loans | 43,038 | 28,315 |
| Commercial real estate loans purchased | 8,414 | 6,262 |
| Construction loans | 81,369 | 56,965 |
| Participation in loans sold | 2,510 | 2,506 |
| Contracts receivable | 2,724 | 1,509 |
| Unearned discount on certain loans | (56) | (52) |
| | 487,622 | 316,661 |
| Other loans: | | |
| Commercial loans | 21,590 | 15,979 |
| Commercial and personal lines of credit | 9,451 | 8,331 |
| Consumer loans | 11,987 | 6,001 |
| Loans secured by deposits | 2,820 | 994 |
| | 45,848 | 31,305 |
| Total loans | 533,470 | 347,966 |
| Undisbursed portion of loans in process | (26,467) | (38,306) |
| Deferred loan fees, net of direct loan origination costs | (1,243) | (493) |
| Discount on loans acquired pursuant to purchase transactions | (2,529) | (989) |
| Allowance for potential loan losses | (6,450) | (3,770) |
| | $496,781 | $304,408 |

At June 30, 1989, 1988 and 1987, the Association serviced loans for the benefit of others amounting to $315,377, $59,904 and $41,857, respectively, which are not included in the amounts above.

Included in loans receivable at June 30, 1989 and 1988 are loans held for sale totalling $18,459 and $1,637, respectively. The cost basis of these loans materially equals their market value.

At June 30, 1989, contractual principal repayments of loans receivable are due approximately as follows:

| Year Ending June 30, | |
|---|---|
| 1990 | $125,568 |
| 1991-1994 | 66,085 |
| Thereafter | 341,817 |
| | $533,470 |

Included in loans receivable are loans to directors and executive officers, all of which are conforming residential, commercial and consumer loans. Following is an analysis of the activity in loans to directors and executive officers:

| | Year Ended June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Balance, beginning of year | $806 | $734 | $611 |
| Additions | 56 | 118 | 169 |
| Repayments | (67) | (46) | (46) |
| Balance, end of year | $795 | $806 | $734 |

## 4. REAL ESTATE OWNED:

The components of real estate owned are:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Residential real estate, acquired through foreclosure (including $2,095 and $1,178 from acquired institutions - see note 13) | $ 3,323 | $1,409 |
| Commercial real estate, acquired through foreclosure (including $7,565 and $5,101 from acquired institutions - see note 13) | 12,582 | 5,742 |
| Association branch building held for sale | 784 | |
| Other | 466 | |
| | 17,155 | 7,151 |
| Allowance for potential losses | (819) | (347) |
| | $16,336 | $6,804 |

Costs incurred to acquire and improve real estate of $386 and $73 had been capitalized as of June 30, 1989 and 1988, respectively.





"Confidential Material-Subject to Protective Order"

Included in commercial real estate at June 30, 1989 and 1988 is $2,188 and $4,165, respectively, related to properties for which FSLIC has indemnified the Association for 75% of any capital losses and guaranteed the Association a minimum yield (see note 13b). During the year ended June 30, 1989, the Association received $299 for loss indemnification and $600 for yield subsidies from FSLIC relating to this real estate and certain loans.

## 5. ALLOWANCES FOR POTENTIAL LOAN AND REAL ESTATE OWNED LOSSES:

Following is an analysis of the changes in the allowances for potential loan and real estate owned losses:

| | Loan | Real Estate Owned | Total |
|---|---|---|---|
| Balance, June 30, 1986 | $ 796 | $ 106 | $ 902 |
| Provision for 1987 | 94 | 107 | 201 |
| Amounts written off | (725) | (127) | (852) |
| Recoveries | 20 | 20 | 40 |
| Balance, June 30, 1987 | 185 | 106 | 291 |
| Provision for 1988 | 572 | 379 | 951 |
| Amounts written off | (128) | (143) | (271) |
| Recoveries | 19 | 5 | 24 |
| Allowance for losses on assets acquired | 3,122 | | 3,122 |
| Balance, June 30, 1988 | 3,770 | 347 | 4,117 |
| Provision for 1989 | 260 | 66 | 326 |
| Amounts written off | (1,590) | (268) | (1,858) |
| Recoveries | 50 | 304 | 354 |
| Allowance for losses on assets acquired | 3,960 | 370 | 4,330 |
| Balance, June 30, 1989 | $ 6,450 | $ 819 | $ 7,269 |

Following is a summary of loans that are not performing in accordance with their original contractual terms:

| | June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Nonaccrual loans (1) | $15,619 | $6,098 | $4,574 |
| Accruing loans which are past due 90 days or more | 125 | 2,357 | 1,759 |
| Restructured loans (2) | 1,516 | 672 | 1,197 |
| Total nonperforming loans | $17,260 | $9,127 | $7,530 |

(1) The accrual of interest is stopped on any loan when either principal or interest becomes 90 days past due, unless it meets specific criteria. Any accrued and uncollected interest is eliminated from income at that time. A loan may be put in nonaccrual status sooner than this standard would dictate if, in management's judgment, that loan may be uncollectible. Such interest is then recognized as income only if it is ultimately collected.

Included in nonaccrual loans at June 30, 1989 and 1988 is $12,434 and $2,782, respectively, relating to acquired institutions (see note 13).

(2) Restructured loans occur when the Association has compromised the contractual loan terms to provide a reduction in the rate of interest and, in most instances, an extension of payments of principal or interest, or both, because of a deterioration in the financial position of the borrower. Restructured loans performing in accordance with their new terms are not included in nonaccrual loans unless concern exists as to the ultimate collection of principal or interest.

Additional gross interest income of $1,065 would have been recorded during the year ended June 30, 1989 if nonaccrual and restructured loans had been current in accordance with their original contractual terms. Interest income of $196 was recorded during the year ended June 30, 1989 in connection with these loans.

In addition to the above loans, certain other loans totalling approximately $5,669 at June 30, 1989 are presently performing in accordance with their terms, but, in the opinion of management, there is some doubt as to the ability of the borrowers to comply with the repayment terms in the future. While management does not anticipate any losses not already provided for on these loans, economic conditions may be such as to necessitate future modifications in the repayment terms.





"Confidential Material-Subject to Protective Order"

**6. OFFICE PROPERTIES AND EQUIPMENT:**

The components of office properties and equipment are:

| | June 30, | | |
|---|---|---|---|
| | 1989 | 1988 | Estimated Useful Life |
| Buildings and improvements | $ 6,904 | $4,473 | 20-40 years |
| Furniture, fixtures and equipment | 4,240 | 3,384 | 3-10 years |
| Automobiles | 118 | 107 | 3-5 years |
| Leasehold improvements | 467 | 324 | 5-10 years |
| Equipment under capital lease | 82 | 82 | 5 years |
| | 11,811 | 8,370 | |
| Less accumulated depreciation and amortization | 3,254 | 2,475 | |
| | 8,557 | 5,895 | |
| Land | 2,170 | 1,038 | |
| | $10,727 | $6,933 | |

**7. DEPOSITS:**

The components of deposits are:

| | June 30, | |
|---|---|---|
| | 1989 | 1988 |
| Commercial NOW accounts (non-interest-bearing) | $ 4,389 | $ 2,410 |
| 5.25% NOW accounts | 30,555 | 16,669 |
| 5.50% passbook accounts | 46,076 | 26,469 |
| Money market demand accounts (5.25% to 6.15%) | 34,958 | 36,799 |
| | 115,978 | 82,347 |
| Certificate accounts: | | |
| 5.00 to 5.99% | 244 | 1,166 |
| 6.00 to 6.99% | 3,183 | 39,556 |
| 7.00 to 7.99% | 88,688 | 139,128 |
| 8.00 to 8.99% | 144,869 | 21,105 |
| 9.00 to 9.99% | 143,686 | 9,687 |
| 10.00 to 10.99% | 15,127 | 3,478 |
| 11.00 to 11.99% | 4,555 | 6,045 |
| 12.00% and over | 2,987 | 2,709 |
| | 403,339 | 222,874 |
| Net premium on deposits assumed pursuant to purchase transactions | 665 | 931 |
| | $519,982 | $306,152 |

At June 30, 1989, the amounts of scheduled maturities of certificate accounts were as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1990 | 8.76% | $333,346 |
| 1991 | 8.43% | 40,994 |
| 1992 | 8.43% | 10,013 |
| 1993 | 8.62% | 2,206 |
| Thereafter | 9.57% | 16,780 |
| | 8.75% | $403,339 |

At June 30, 1989, mortgage-backed securities with a carrying value of $19,825 were pledged as collateral for wholesale public funds deposits in accordance with Washington Public Deposit Protection Commission regulations.

The components of interest expense on deposits are:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1989 | 1988 | 1987 |
| NOW accounts | $ 1,233 | $ 584 | $ 281 |
| Passbook accounts | 2,082 | 1,128 | 734 |
| Money market demand accounts | 2,081 | 1,495 | 1,398 |
| Certificate accounts | 25,641 | 11,740 | 8,240 |
| | $31,037 | $14,947 | $10,653 |





"Confidential Material-Subject to Protective Order"

## 8. ADVANCES FROM FEDERAL HOME LOAN BANK:

The advances from the Federal Home Loan Bank at June 30, 1989 are repayable as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1990 | 9.59% | $61,000 |
| 1991 | 9.64% | 15,582 |
| 1992 | 10.13% | 5,000 |
| 1993 | 9.04% | 9,849 |
| Thereafter | 8.14% | 5,149 |
| | 9.49% | $96,580 |

Stock of the Federal Home Loan Bank, U.S. Government obligations, qualifying real estate loans, and mortgage-backed securities, in an amount equal to at least 155% of outstanding advances, are pledged as collateral for the advances. At June 30, 1989, required collateral was $150,195. Assets eligible for collateral, none of which have been specifically identified as such, are approximately as follows:

| | |
|---|---|
| Qualifying real estate loans | $321,784 |
| Mortgage-backed securities | 5,968 |
| FHLB stock and U.S. Government obligations | 30,107 |
| | 357,859 |
| Required collateral | 150,195 |
| Available collateral in excess of requirement | $207,664 |

## 9. SECURITIES SOLD SUBJECT TO REPURCHASE AGREEMENTS:

The Association enters into sales of securities under agreements to repurchase (reverse repurchase agreements). Fixed-coupon reverse repurchase agreements are treated as financings, and the obligations to repurchase securities sold are reflected as a liability in the balance sheet. The dollar amount of securities underlying the agreements remains in the applicable asset accounts. At June 30, 1989, securities sold subject to repurchase agreements (all of which call for repurchasing the same security) included investments and mortgage-backed securities with an aggregate carrying value of $97,582 (aggregate market value of $96,792). These agreements had a weighted-average interest rate of 9.98%, and all mature within sixty days. Substantially all of the Association's reverse repurchase agreements at June 30, 1989 were transacted with the Federal Home Loan Mortgage Corporation ("FHLMC"). The mortgage-backed securities underlying the agreements are being held by FHLMC. The average balance of securities sold subject to repurchase agreements was approximately $70,502 during the year ended June 30, 1989. The maximum amount outstanding at any month-end during the year ended June 30, 1989 was $87,977.

## 10. INCOME TAXES:

The Association and its subsidiaries file a single consolidated income tax return. The Association is permitted under the Internal Revenue Code to deduct an annual addition to a reserve for bad debts ("bad debt deduction") in determining taxable income, subject to certain limitations. This addition differs from the provision for loan losses recorded for financial statement purposes. Bad debt deductions for income tax purposes are included in taxable income of later years only if the accumulated bad debt reserves are subsequently used for purposes other than to absorb bad debt losses. Because the Association does not intend to use the reserves for purposes other than to absorb losses, no deferred income taxes have been provided on the bad debt deductions taken. Retained earnings at June 30, 1989 includes $1,323, which represents the tax effect of accumulated bad debt reserves on which no deferred income taxes have been provided.

The Association's effective tax rate differs from the statutory income tax rate for the following reasons:

| | Year Ended June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Income tax provision at federal statutory rate | $ 513 | $670 | $ 716 |
| Tax effect of: | | | |
| Bad debt deduction | (503) | (28) | (234) |
| Amortization of adjustments to fair market value and intangibles arising from purchase acquisitions | 562 | 107 | 106 |
| Discount attributed to acquired investments, loans, mortgage-backed securities and office properties sold | (148) | (20) | |
| Tax-exempt yield subsidy payments received from FSLIC | (204) | | |
| Other, net | 5 | 23 | 34 |
| | $ 225 | $752 | $ 622 |

*Continued on page 30.*



"Confidential Material-Subject to Protective Order"

S G0063026A

APP 988

The components of the deferred income tax provision (benefit) are:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1989 | 1988 | 1987 |
| Former use of cash basis accounting for tax purposes | $ (50) | $(50) | $ 13 |
| Equity in loss of partnership | 9 | 38 | 84 |
| Tax depreciation greater than book depreciation | 112 | 59 | 36 |
| Deferred loan fees recognized for tax purposes | (49) | (51) | |
| Adjustment of prior year classifications of current and deferred tax liabilities | (106) | 31 | (9) |
| | $ (84) | $ 27 | $124 |

As a result of the acquisitions of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") and Tri-Cities Savings and Loan Association ("Tri-Cities") (see note 13), the Association became entitled to utilize their tax basis net operating loss carryforwards to reduce consolidated taxable income earned subsequent to the dates of acquisition. Pursuant to an assistance agreement executed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), the Association agreed to refund to FSLIC 50% of the tax benefit resulting from the utilization of the Tri-Cities net operating loss carryforwards. The Association further agreed to refund to FSLIC 100% of the tax benefit resulting from capital losses on certain Tri-Cities assets for which the Association is partially indemnified by FSLIC. The Association's share of the tax benefit resulting from the utilization of acquired net operating loss carryforwards, which was $78 during the year ended June 30, 1989, is recorded as a retroactive reduction of the unidentified intangible assets acquired. If the unidentified intangible asset acquired is reduced to zero, any further tax benefit is recorded as a reduction of the identified intangible asset or long-term interest-bearing assets (loans receivable) acquired. The tax basis net operating loss carryforwards remaining at June 30, 1989 expire as follows:

| Year Ending June 30, | Association Portion | FSLIC Portion |
|---|---|---|
| 1991 | $ 5,226 | $ 923 |
| 1992 | 3,593 | |
| 1993 | 196 | 196 |
| 2002 | 3,333 | 1,555 |
| 2003 | 3,406 | |
| | $15,754 | $2,674 |

In December, 1987, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 96 - Accounting for Income Taxes ("SFAS No. 96"). This new standard requires that an asset and liability approach be used to account for and report income taxes for financial statement purposes. SFAS No. 96 will require the Association to recognize a current or deferred tax liability for the tax consequences of all events recognized in the financial statements. The new standard represents a significant change in accounting for the effects of deferred taxes and business combinations. Under SFAS No. 96, deferred taxes will be based on the difference between the tax bases of assets and liabilities (including those acquired or assumed in conjunction with purchase business combinations) and their amounts for financial statement purposes. SFAS No. 96 will require the Association to make a deferred tax adjustment for any remaining acquired assets and assumed liabilities to which purchase accounting tax adjustments were made in prior business combinations. The Association will be required to recompute its tax liabilities if the tax rates change, and to recognize the effect thereof in income. The Association has not yet determined the effects of adopting this new standard.

The Association presently must adopt the requirements of SFAS No. 96 no later than July 1, 1990. However, the FASB recently announced that it intends to defer the required implementation date of SFAS No. 96 for a minimum of nine more months, which would then require the Association to adopt the new standard during its year ending June 30, 1992. The FASB further announced that it is continuing to explore several possibly significant amendments to SFAS No. 96.

## 11. EMPLOYEE SAVINGS PLAN:

The Association maintains an employee savings plan under section 401(k) of the Internal Revenue Code. Substantially all employees are eligible to participate in the plan subject to certain requirements. Under the plan, employees may elect to contribute up to 8% of their salary and the Association will make a matching contribution equal to 25% of the employee's contribution. Employee contributions vest immediately, while employer contributions vest at the rate of 10% per year. Each employee may make a supplemental contribution of an additional 2% of their salary. Employees have the option of directing that their contributions be invested in a fixed income security account, an equity security account or the Association's



"Confidential Material-Subject to Protective Order" SG 0063027

common stock. During the years ended June 30, 1989, 1988 and 1987, the Association contributed $37, $31 and $21, respectively, to the plan.

## 12. COMMITMENTS:

At June 30, 1989, the Association had loan commitments to borrowers and brokers totalling $17,918, including $15,975 for fixed rate loans and $1,943 for variable rate loans. Substantially all loan commitments which have interest rates that float with the market until closing or until committed for sale in the secondary market. Additionally, the undisbursed portion of loans in process was $26,467 at June 30, 1989. Commitments, which are disbursed subject to certain limitations, extend over various periods of time, with the majority of funds being disbursed within a twelve-month period.

At June 30, 1989, the Association had made available various secured and unsecured commercial and personal lines of credit of approximately $13,572, of which the undisbursed portion is approximately $4,121.

Rental expense for office properties under operating leases was $785, $336 and $133 for the years ended June 30, 1989, 1988 and 1987, respectively. Future minimum rental commitments as of June 30, 1989, under noncancelable operating leases with initial or remaining terms of more than one year, are as follows:

| Year Ending June 30, | |
|---|---|
| 1990 | $ 846 |
| 1991 | 498 |
| 1992 | 410 |
| 1993 | 396 |
| 1994 | 330 |
| Thereafter | 3,521 |
| | $6,001 |

Future minimum rental payments receivable under noncancelable operating subleases with initial or remaining terms of more than one year are $277 at June 30, 1989.

## 13. ACQUISITIONS:

### a. Central Evergreen Federal Savings and Loan Association

On December 31, 1988, the Association acquired all of the outstanding stock of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") of Chehalis, Washington, in exchange only for assuming its outstanding liabilities. The acquisition was conducted under the auspices and supervision of the Federal Home Loan Bank Board ("FHLBB"), but involved no assistance or other indemnification. As part of the acquisition, the FHLBB has provided a "certification of insolvency" for Central Evergreen, which allows the Association to utilize Central Evergreen's tax basis net operating loss carryforwards.

This acquisition has been accounted for as a purchase and, accordingly, the assets acquired and liabilities assumed have been recorded based on their estimated fair market values at December 31, 1988. The excess of the liabilities assumed over the assets acquired has been recorded as an unidentified intangible asset. The estimated fair market values of the assets acquired and liabilities assumed are summarized as follows:

| | |
|---|---|
| Cash and cash equivalents | $ 13,640 |
| Investments | 14,423 |
| Loans receivable | 171,379 |
| Mortgage-backed securities | 12,566 |
| Accrued interest receivable | 1,076 |
| Office properties and equipment | 3,693 |
| Real estate owned | 9,362 |
| Identified intangibles | 8,480 |
| Unidentified intangible | 13,603 |
| Prepaid expenses and other assets | 661 |
| Total assets | $248,883 |
| Deposits | $215,992 |
| Advances from Federal Home Loan Bank | 27,232 |
| Cashier's checks issued and payable | 1,829 |
| Borrowers' reserves for taxes and insurance | 445 |
| Other liabilities | 3,385 |
| Total liabilities | $248,883 |

The discounts of $1,926 and $606 resulting from recording the Central Evergreen loans receivable and mortgage-backed securities, respectively, at their estimated fair market values, and the unidentified intangible, are being amortized to income using the

*Continued on page 32.*





"Confidential Material-Subject to Protective Order"

level interest yield method over the estimated average remaining life, assuming prepayments, of the loans and mortgage-backed securities acquired. The discounts of $472 resulting from recording the Central Evergreen deposits and borrowings at their estimated fair market values are being amortized to income using the level interest yield method over the periods in which the actual underlying deposits and borrowings are scheduled to mature (up to eight years). The premium of $1,096 resulting from recording the Central Evergreen office properties and equipment at their estimated fair market values is being amortized to income using the straight-line method over the remaining lives of the office properties and equipment acquired. A total of $8,480 was allocated to identified intangibles, including $6,480 relating to existing depositor relationships and $2,000 relating to loan servicing rights. The identified intangible related to the depositor relationships is being amortized to income on a straight-line basis over its estimated life. The identified intangible related to the acquired servicing rights is being amortized to income in proportion to the estimated future stream of net servicing income, assuming loan prepayments.

The results of operations of Central Evergreen are included in the Association's consolidated statement of income only for the period subsequent to December 31, 1988. Unaudited pro forma highlights of the consolidated results of operations of the Association assuming the acquisition of Central Evergreen had taken place on July 1, 1987 are summarized in the table below. The pro forma results are not necessarily indicative of the actual results that would have occurred had the acquisition taken place on July 1, 1987.

| | Year Ended June 30, | |
|---|---|---|
| | 1989 | 1988 |
| Interest income | $65,221 | $47,156 |
| Net income (loss) | $ 325 | $ (931) |
| Net income (loss) per share | $ .62 | $ (1.79) |

**b. Tri-Cities Savings and Loan Association**

On April 8, 1988, the Association acquired substantially all of the assets and assumed the liabilities of Tri-Cities Savings and Loan Association ("Tri-Cities") of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("FSLIC"). The acquisition was accounted for as a purchase. Pursuant to an agreement executed with FSLIC, the Association received a cash assistance payment of $11,730 from FSLIC. As part of the assistance agreement, FSLIC agreed to indemnify the Association for 75% of any capital losses on certain assets until the Association's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. FSLIC further agreed to guarantee a minimum yield to the Association on this same group of assets. FSLIC also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years. As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. The Association agreed to refund to FSLIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

**c. Great American Bank Branches**

On February 5, 1988, the Association acquired six Washington branches of Great American Bank, F.S.B. The Association assumed deposit liabilities and accrued interest thereon of $47,548 and the lease obligations on two branch buildings. In consideration thereof, the Association received all loans secured by the acquired deposits, four branch buildings, the equipment at all six branches, and a net cash payment of $45,560. This transaction was accounted for as a purchase and, accordingly, the liabilities assumed and assets acquired were recorded based on their estimated fair market values at February 5, 1988.

**d. Effect of Acquisitions on Income**

The amortization of adjustments to fair market value and intangible assets relating to all purchase acquisitions reduced the Association's income before income taxes by $1,652, $292 and $231 during the years ended June 30, 1989, 1988 and 1987, respectively. In addition, discounts relating to acquired investments, loans and mortgage-backed securities which were sold subsequent to acquisition reduced the basis of such investments, loans and mortgage-backed securities and increased income before income taxes by $435 and $60 during the years ended June 30, 1989 and 1988, respectively. There were no such asset sales during the year ended June 30, 1987.







"Confidential Material-Subject to Protective Order"

## 14. PREFERRED STOCK:

Each share of preferred stock currently outstanding (Series B) entitles its holder to (a) an annual cash dividend of $2.50 per share, (b) receive up to $25.00 per share plus accumulated unpaid dividends in the event of involuntary or voluntary liquidation, and (c) beginning March 31, 1991, convert each preferred share into 2.2 shares of common stock. Each preferred share is also convertible into 2.2 shares of common stock at the option of the Association beginning March 31, 1991. Dividends on the preferred shares are cumulative and must be paid before any distributions to holders of common stock.

## 15. INCENTIVE STOCK OPTIONS:

The Association has granted options to purchase shares of its common stock as summarized in the table below. All options granted become exercisable one year after the date of grant (all options outstanding are exercisable at June 30, 1989).

| | Number of Shares (A) | Option Price Per Share (B) | Expiration Date |
|---|---|---|---|
| Balance, June 30, 1986 | 20,656 | $7.68-$7.75 | 1988-1995 |
| Options granted | 2,750 | $10.21 | 1990 |
| Options granted | 2,000 | $10.21 | 1996 |
| Options granted | 1,000 | $10.13 | 1991 |
| Balance, June 30, 1987 | 26,406 | $7.68-$10.21 | 1988-1996 |
| Options granted | 7,000 | $9.72 | 1991 |
| Options granted | 5,344 | $9.72 | 1997 |
| Options exercised | (3,750) | $7.75 | 1988 |
| Balance, June 30, 1988 | 35,000 | $7.68-$10.21 | 1989-1997 |
| Options granted | 9,500 | $9.90 | 1992 |
| Options granted | 4,000 | $9.90 | 1998 |
| Balance, June 30, 1989 | 48,500 | $7.68-$10.21 | 1989-1998 |

(A) Stock options for a total of 22,406 shares have been granted in tandem with a corresponding number of stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock, above the option price, at the date of exercise. Payment is to be made in cash or in the form of newly issued common stock, or any combination thereof. The exercise of either rights or options serves to cancel the other. Total compensation expense of $15 is accrued at June 30, 1989 in connection with these stock appreciation rights.

(B) The exercise price associated with all options has been retroactively adjusted to recognize the effects of all stock dividends.

## 16. REGULATORY CAPITAL:

In connection with the insurance of its deposits by FSLIC, the Association is required to maintain a minimum level of regulatory capital (see Note 17b). Failure to maintain this minimum level of regulatory capital may result in regulatory action to limit operations of the Association.

Regulatory capital as computed under the current regulations of the Federal Home Loan Bank Board and FSLIC differs from total stockholders' equity as reported on the consolidated balance sheets at June 30, 1989 and 1988, as follows:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Total stockholders' equity | $10,512 | $ 9,467 |
| FSLIC assistance payments | 13,480 | 13,480 |
| Adjustment to the amortization of fair market value adjustments and intangibles, arising from acquisitions, under FHLBB regulations | (277) | 233 |
| Regulatory capital | 23,715 | 23,180 |
| Minimum regulatory capital required | 21,612 | 13,742 |
| Regulatory capital in excess of minimum required | $ 2,103 | $ 9,438 |



"Confidential Material-Subject to Protective Order" S G 0063030

## 17. SUBSEQUENT EVENTS:

### a. Great American Bank Branch Acquisition

On July 11, 1989, the Association entered into a definitive agreement to acquire two branches of Great American Bank, F.S.B. located in Spokane and Richland, Washington. The agreement calls for the Association to assume all deposit liabilities and accrued interest thereon at both branches of approximately $29,500, and the lease obligation at one branch building. In consideration thereof, the Association will receive one branch building, the equipment at both branches, and a net cash payment of approximately $29,000. The transaction is subject to regulatory approval.

### b. Financial Institutions Reform, Recovery and Enforcement Act

On August 9, 1989, the President of the United States signed into law the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which addresses problems of the FSLIC and the thrift regulatory environment. The physical size and scope of the FIRREA bill is significant, and the Association is presently in the midst of a detailed analysis and evaluation of the implications of the legislation. Among other provisions, there are new regulatory capital requirements in FIRREA that will require that minimum levels of capital be maintained under three different standards: a leverage limit, a "tangible" capital requirement, and a "risk-based" capital requirement. Actual regulations specifically defining how capital will be calculated under each standard, including a number of components, limitations and exceptions, must be written and promulgated by the new Office of Thrift Supervision ("OTS") before November 7, 1989, with the new minimum requirements then becoming effective on December 7, 1989.

Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is due to substantial portions of the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, and which must now be subtracted from existing stockholder's equity in determining regulatory capital.

Should the Association not be in compliance when the new regulations become effective, it would be able to apply for a temporary exemption until January 1, 1991. If the Association is not in compliance with regulatory capital requirements at January 1, 1991, it would be able to apply for a further exemption, pursuant to which the only sanction for noncompliance would be restrictions on asset growth. Management believes the Association will be eligible for such exemptions under the standards set forth in FIRREA.

Management of the Association is pursuing a plan for increasing its regulatory capital to enable compliance with the new FIRREA requirements. The specific components of the plan include a stock offering (see note 17c) and achieving the profitability goals set forth in its existing business plan, but management is also investigating other alternatives for improving its capital ratios. If this plan is achieved, management believes, based on its preliminary understanding of the new legislation, that the Association will be in compliance with the minimum capital requirements of FIRREA by January 1, 1991.

### c. Stock Offering

The Association has signed a letter of intent with an underwriter for a public offering of preferred and common stock. Assuming favorable market conditions exist, any potential offering would commence after receiving the appropriate clearances from regulatory and securities authorities.



"Confidential Material-Subject to Protective Order"

## 18. QUARTERLY FINANCIAL DATA (UNAUDITED):

Unaudited quarterly results of operations for the years ended June 30, 1989 and 1988 are summarized below:

**Year Ended June 30, 1989**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $10,126 | $10,693 | $16,669 | $17,255 |
| Interest expense | 7,779 | 8,322 | 13,185 | 14,558 |
| Provision for loan losses | 100 | 15 | 45 | 100 |
| Net interest income after provision for loan losses | 2,247 | 2,356 | 3,439 | 2,597 |
| Other income | 514 | 638 | 1,176 | 1,767 |
| Operating expenses | 2,441 | 2,606 | 4,187 | 3,990 |
| Income before income taxes | 320 | 388 | 428 | 374 |
| Income tax provision (benefit) | 122 | 147 | 145 | (189) |
| Net income | $ 198 | $ 241 | $ 283 | $ 563 |
| Net income applicable to common shares | $ 142 | $ 184 | $ 226 | $ 508 |
| Net income per common share | $ .27 | $ .35 | $ .44 | $ .98 |

**Year Ended June 30, 1988**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $ 5,488 | $ 6,198 | $ 6,858 | $ 8,747 |
| Interest expense | 4,147 | 4,768 | 5,324 | 6,537 |
| Provision for loan losses | 40 | 105 | 105 | 322 |
| Net interest income after provision for loan losses | 1,301 | 1,325 | 1,429 | 1,888 |
| Other income | 447 | 899 | 1,034 | 1,876 |
| Operating expenses | 1,536 | 1,747 | 1,990 | 2,955 |
| Income before income taxes | 212 | 477 | 473 | 809 |
| Income tax provision | 81 | 181 | 180 | 310 |
| Net income | $ 131 | $ 296 | $ 293 | $ 499 |
| Net income applicable to common shares | $ 81 | $ 245 | $ 242 | $ 448 |
| Net income per common share | $ .16 | $ .47 | $ .47 | $ .86 |



"Confidential Material-Subject to Protective Order" S G0063032

# INDEPENDENT AUDITOR'S REPORT

**The Board of Directors**
**Sterling Savings Association**
**Spokane, Washington**

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries as of June 30, 1989 and 1988 and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1989, 1988 and 1987. These financial statements are the responsibility of the Association's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 17b to the consolidated financial statements, newly enacted federal legislation will become effective on December 7, 1989 and will alter the regulatory environment in which the Association operates, primarily by establishing new minimum regulatory capital requirements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1989 and 1988, and the consolidated results of their operations and their cash flows for the years ended June 30, 1989, 1988 and 1987 in conformity with generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, the Association changed its method of accounting for loan fees in 1989.

Spokane, Washington
August 15, 1989

*COOPERS & LYBRAND*

# STOCK PRICE RANGE

The following table sets forth the quarterly market price ranges of the Association's Common Stock, as reported by NASDAQ with respect to fiscal year 1988 and the first three quarters of 1989, and as reported by the Spokane Stock Exchange, Spokane, WA, with respect to the fourth quarter of 1989. The prices reported by NASDAQ reflect inter-dealer prices, without regard to retail mark-ups, mark-downs or commissions, and do not necessarily represent actual transaction. The prices reported by the Spokane Stock Exchange reflect known transactions in the Association's Common Stock. In addition, the prices reported have been adjusted to reflect all stock dividends paid by the Association. The number of common shareholders of record on June 30, 1989 was approximately 493.

| | High | Low |
|---|---|---|
| *Fiscal 1989* | | |
| Fourth Quarter | 9-1/2 | 8 |
| Third Quarter | 10 | 8-3/4 |
| Second Quarter | 11-5/8 | 9-3/4 |
| First Quarter | 10-7/8 | 10 |
| *Fiscal 1988* | | |
| Fourth Quarter | 10-7/8 | 9-3/8 |
| Third Quarter | 8-5/8 | 8 |
| Second Quarter | 10-1/8 | 8-1/8 |
| First Quarter | 10-3/8 | 9-1/8 |

*Preferred Stock:*

The Association's $2.50 Cumulative, Convertible Preferred Stock-Series B has no established trading market. Accordingly, there were no known prices for trades of stock. The number of preferred shareholders of record on June 30, 1989 was approximately 296.



SG 0063033

"Confidential Material-Subject to Protective Order"

APP. 995

## EXECUTIVE OFFICERS

Harold B. Gilkey
*Chairman of the Board*
*Chief Executive Officer*

William W. Zuppe
*President*
*Chief Operating Officer*

Ned M. Barnes
*Corporate Secretary*

Daniel G. Byrne
*Senior Vice President*
*Finance*

George E. Godding
*Senior Vice President*
*Western Division Manager*

Stephen L. Page
*Senior Vice President*
*Loan Administration*

Stanton C. Parrish
*Senior Vice President*
*Eastern Division Manager*

John M. Harlow
*Vice President*

S. Midge Moore
*Vice President*
*Operations/Facilities*

Thomas F. Sackmann
*Vice President*

Heidi B. Stanley
*Vice President*
*Administration*

## THE CORPORATION

Sterling Savings Association is a Washington State chartered savings association headquartered in Spokane, Washington.

Its subsidiaries are Action Mortgage Company, The Best Agency, Evergreen Environmental Development Corporation, Evergreen First Service Corporation, Fidelity Service Corporation, INTERVEST Mortgage Investment Company, Tri-Cities Mortgage Company, and Tri-West Mortgage Company.

## THE ANNUAL MEETING

The annual meeting of shareholders of Sterling Savings Association will be held on Tuesday, October 24, 1989. The meeting will begin at 10:00 a.m. in the Conference Theater of the Agricultural Trade Center, West 334 Spokane Falls Boulevard, Spokane, Washington.

## FORM 10-K REPORT

A copy of Sterling Savings Association's Annual Report to the Federal Home Loan Bank Board on Form 10-K will be furnished without charge to the Company's shareholders upon request in writing to:

Daniel G. Byrne,
*Sr. VP and Treasurer*
Sterling Savings Association
N. 120 Wall,
Spokane, WA 99201.

## SUBSIDIARY COMPANIES

Action Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*T. Richard Clark;*
*Edward G. Ranniger;*
*Thomas F. Sackmann;*
*William W. Zuppe*

The Best Agency
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Evergreen Environmental Development Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Evergreen First Service Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Fidelity Service Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*Daniel G. Byrne;*
*Edward G. Ranniger;*
*William W. Zuppe*

INTERVEST Mortgage Investment Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*John M. Harlow;*
*Charles L. Kroetch;*
*Robert Larrabee;*
*William W. Zuppe*

Tri-Cities Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*Daniel G. Byrne;*
*William W. Zuppe*

Tri-West Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Daniel G. Byrne;*
*Thomas F. Sackmann*

"Confidential Material-Subject to Protective Order" SG 0063034

*We have built our reputation on flexible, responsive leadership and dedication to a course of solid, profitable growth*

*Nineteen Ninety*

*Annual Report*

# STERLING SAVINGS



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

# Sterling Savings Board of Directors


Harold B. Gilkey


William W. Zuppe


Raymond R. Alverson


Ned M. Barnes


Rodney W. Barnett


T. Richard Clark


James P. Fugate


Charles L. Kroetch


Robert Larrabee


ɔbert E. Meyers


James A. Vander Stoep


David O. Wallace

# FINANCIAL HIGHLIGHTS

(Dollar amounts in thousands except per share amounts)

| FOR THE YEARS ENDED JUNE 30, | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| **OPERATING DATA DURING THE YEAR** | | | | | |
| Interest income | $67,529 | $54,743 | $27,291 | $18,538 | $15,312 |
| Interest expense | 54,181 | 43,844 | 20,776 | 13,966 | 12,252 |
| Net interest income | 13,348 | 10,899 | 6,515 | 4,572 | 3,060 |
| Provision for loan losses | (1,100) | (260) | (572) | (94) | (578) |
| Net interest income after provision for loan losses | 12,248 | 10,639 | 5,943 | 4,478 | 2,482 |
| Other income | 6,800 | 4,095 | 4,256 | 2,921 | 2,676 |
| Operating expenses | (18,946) | (13.224) | (8,228) | (5,842) | (4,295) |
| Income before income taxes | 102 | 1,510 | 1,971 | 1,557 | 863 |
| Income tax benefit (provision) | 164 | (225) | (752) | (622) | (88) |
| Net income | $ 266 | $ 1,285 | $ 1,219 | $ 935 | $ 775 |
| Net income applicable to common shares | $ 41 | $ 1.060 | $ 1.016 | $ 912 | $ 775 |
| Net income per common share | $ 0.08 | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 |
| Weighted average common shares outstanding | 518,298 | 520,468 | 518,897 | 521,667 | 515,491 |
| **FINANCIAL POSITION AT YEAR END** | | | | | |
| Total assets | [illegible] | $730,144 | $429,316 | $239.589 | $180,000 |
| Loans receivable | [illegible] | [illegible] | 304,408 | [illegible] | 127,948 |
| Mortgage-backed securities | [illegible] | [illegible] | 51,908 | [illegible] | 8,863 |
| Investments | 27,271 | [illegible] | 29,599 | [illegible] | 13,792 |
| Deposits | 479,227 | 519,982 | 306,152 | 170,789 | 142,064 |
| FHLB advances | 112,976 | 96,580 | 57,100 | 30,650 | 27,350 |
| Stockholders' equity | 10,730 | 10,512 | 9,467 | 8,469 | 5,389 |
| **STATISTICAL DATA** | | | | | |
| Number of: | | | | | |
| Employees (full-time equivalents) | 290 | 300 | 197 | 107 | 89 |
| Offices: | | | | | |
| Full-service | 27 | 28 | 19 | 8 | 8 |
| Loan production | 9 | 11 | 7 | 2 | - |
| Real estate loans | 9,282 | 12,430 | 4,854 | 3,417 | 3,286 |
| Deposit accounts | 69,848 | 71,756 | 42,082 | 22,326 | 20,063 |
| **RATIOS** | | | | | |
| Return on average assets | 0.04% | 0.22% | 0.40% | 0.45% | 0.50% |
| Return on average common stockholders' equity | 0.49% | 13.83% | 15.20% | 15.76% | 15.71% |
| Stockholders' equity to assets at end of period | 1.56% | 1.44% | 2.21% | 3.53% | 2.99% |
| Book value per common share at end of period | $16.35 | $15.97 | $13.95 | $12.09 | $10.45 |
| Net interest margin | 2.04% | 2.00% | 2.25% | 2.35% | [illegible] |
| Ratio of nonperforming loans to total assets at end of period | 1.91% | 2.36% | 2.13% | 3.14% | 3.08% |

NOTE: Per Share amounts have been retroactively restated to reflect stock dividends paid. The above amounts reflect significant acquisitions during the years ended June 30, 1989, 1988 and 1986 - See Note 14 to the Consolidated Financial Statements. The Association prospectively changed its method of accounting for loan fees in 1989 - See Note 1 to the Consolidated Financial Statements.