IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

---

**APPENDIX TO**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**
**AND**
**PLAINTIFFS' BRIEF RE: MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

---

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

March 29, 2007

# APPENDIX TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND PLAINTIFFS' BRIEF RE: MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD

## TABLE OF CONTENTS


Declaration of Harold B. Gilkey 1

Declaration of Paul M. Horvitz 5

Corrected Expert Report of Paul Horvitz, Dated September 6, 2001 52

Revised Update to the Expert Report of Paul Horvitz, February 20, 2004 123

Update to the Expert Report of Paul Horvitz, December 11, 2006 152

Revised Expert Report of Professor Christopher James, February 20, 2004 187

Updated Expert Report of Professor Christopher M. James, December 11, 2006 251

Verified Complaint for Declaratory and Injunctive Relief, or in the Alternative, for Rescission and Damages, dated May 15, 1990 311

Temporary Restraining Order, dated May 29, 1990 352

Memorandum Opinion and Order Granting Motion for Preliminary Injunction and Denying Motion to Dismiss, Inter Alia, dated August 8, 1990 354

Defendants' Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment, dated October 10, 2000 382

Plaintiffs' Reply to "Defendant's Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment.", dated December 15, 2000 432

Defendant's Reply to Plaintiff's Supplemental Opposition to Defendant's Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment, dated January 16, 2001 480

Letter from FHLBB to Harold Gilkey dated, August 14, 1985 510

Resolution No. 85-985, dated November 4, 1985 514

| | |
|---|---|
| Resolution No. 85-990, dated November 4, 1985 | 522 |
| FHLBB's Appointment of Receiver no. 85-984, dated November 4, 1985 | 525 |
| Acquisition Agreement, dated November 5, 1985 | 543 |
| Assistance Agreement, dated November 5, 1985 | 557 |
| Letter from FHLBB to Harold Gilkey dated November 12, 1985 | 591 |
| FHLBB Resolution No. 85-984, dated November 4, 1985 | 594 |
| FHLBB Resolution No. 85-986 , dated November 4, 1985 | 599 |
| FHLBB Resolution No. 85-987, dated November 4, 1985 | 602 |
| FHLBB Resolution No. 85-988, dated November 4, 1985 | 604 |
| FHLBB Resolution No. 85- 989, dated November 4, 1985 | 606 |
| Letter dated April 6, 1988 from FHLBB | 608 |
| FHLBB Resolution No. 88-250, dated April 7, 1988 | 610 |
| FHLBB's Appointment of Receiver No. 88-249, dated April 7, 1988 | 622 |
| Acquisition Agreement dated April 6, 1988 | 647 |
| Assistance Agreement dated April 8, 1988 | 662 |
| Order No. 807, dated April 7, 1988 | 742 |
| FHLBB Resolution No. 88-249, dated April 7, 1988 | 743 |
| FHLBB Resolution No. 88-251, dated April 7, 1988 | 751 |
| FHLBB Resolution No. 88-252, dated April 7, 1988 | 754 |
| FHLBB Resolution No. 88-253, dated April 7, 1988 | 756 |
| FHLBB Resolution No. 88-254, dated April 7, 1988 | 760 |
| Letter from Coopers & Lybrand to Sterling dated July 28, 1988 | 762 |
| Letter from Coopers & Lybrand to Sterling dated January 30, 1989 | 764 |
| Letter from Coopers & Lybrand to Sterling's Board of Directors dated January 27, 1989 | 769 |
| Agreement dated December 28, 1988 | 772 |
| Certificate of Corporate Resolution dated December 22, 1988 | 787 |

| | |
|---|---|
| Memorandum from Graham & Dunn to Betty Reed dated December 8, 1988 | 789 |
| Federal Home Loan Bank Board Memo No. 88-1273, dated December 8, 1988 | 795 |
| Acquisition agreement dated July 20, 1988 | 801 |
| Friend letter to Gilkey, dated January 26, 1990 | 824 |
| Byrne letter to Judge Ryan, dated May 11, 1990 | 825 |
| Friend letter to Gilkey, dated June 5, 1990 | 848 |
| Byrne letter to Friend, dated June 19, 1990 | 849 |
| Friend letter to Board of Directors, dated July 20, 1990 | 851 |
| Friend letter to Byrne, dated June 20, 1990 | 852 |
| Friend letter to Byrne, dated June 25, 1990 | 854 |
| Friend letter to Byrne, dated August 20, 1990 | 856 |
| Memo to FHLBB from Faulstich, dated October 23, 1985 | 857 |
| S Memorandum to Buckley from Faulstich, dated March 31, 1988 | 862 |
| Issue Memorandum to FHLBB from Fraulstich, dated April 6, 1988 | 874 |
| Memo from Luke to FHLBB, dated December 5, 1988 | 879 |
| 1989 Annual Report | 958 |
| 1990 Annual Report | 997 |
| 1992 Annual Report | 1036 |
| Deposition of Daniel G. Byrne, commencing December 3, 2001 | 1082 |
| Deposition of Daniel G. Byrne, commencing July 10-13, 2000 | 1098 |
| Deposition of Joe Hargett | 1150 |
| Deposition of Mukesh Bajaj, commencing June 19, 2002 | 1156 |
| Deposition of Rodney W. Barnett | 1164 |
| Deposition of William W. Zuppe | 1177 |
| Deposition of Thomas M. Beil | 1183 |
| Deposition of Cajer Neely | 1212 |
| Deposition of Gary D. Crithfield | 1218 |

| | |
|---|---|
| Deposition of Harold Gilkey | 1242 |
| 1985 FHLBB Regulation | 1298 |
| 1987 FHLBB Regulation | 1307 |
| 1985 Thrift Financial Report (excerpts) | 1300 |
| 1987 Thrift Financial Report (excerpts) | 1300 |
| 1985 TRF Instructions (excerpts) | 1302 |
| 1989 Business Plan Update | 1310 |
| Affidavit of William W. Zuppe, dated May 28, 1990 | 1350 |
| Supplemental Affidavit of Daniel G. Byrne, dated June 25, 1990 | 1368 |

IN THE U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

# DECLARATION OF HAROLD B. GILKEY

1. I am Chairman of the Board and Chief Executive Officer of Sterling Financial Corporation, the holding company of Sterling Savings Association (now Sterling Savings Bank).

2. I make this Declaration of my own personal knowledge. I was deposed by the government's attorneys in this matter on June 6, June 7, and June 8, 2000.

3. I understand that the government suggests that I said in my 2000 deposition that absent the breach, Sterling would not have raised capital in 1991. When the questions were posed to me on pages 464, 465 and 466 of my deposition, I answered with regard to the already shrunken bank. In June 1989, Sterling had assets of $731 million. By June 1991, management had shrunk the bank to $600 million in order to minimize the impact of the government's action taking away Sterling's capital acquired as a result of the acquisition of insolvent thrifts in 1985 and 1988. By 1991 Sterling would have had assets, based on our growth plan and the success of the bank up to that date, measurably greater than $731 million approaching $1 billion, in which case Sterling would have needed substantially more capital.

4. That I was speaking of the shrunken bank is evident at page 465, lines 9 and 10, of my deposition where I pointed out that Sterling would not have needed more capital in 1991

"to support a company of $600 million." This was the size of the actual shrunken bank. If I had understood that the government's counsel was asking what Sterling would have needed to do had the government not breached its contracts in the first place and reduced Sterling's capital, as opposed to a hypothetical question about the already damaged bank, I would have answered that Sterling would have needed more capital. After all, Sterling raised capital in almost every year during this time frame. For example, Sterling raised or the holding company downstreamed capital in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. Given its aggressive growth strategy, Sterling has always needed more capital.

5. Significantly, the government did not ask me, "Absent the breach and assuming Sterling was not its actual size ($600 million), but was the size the but-for bank would have been in 1991, would Sterling have raised capital in 1991?" Had I been asked this question, which I was not, the answer would have been "most assuredly yes."

6. The capital raised in 1991, therefore, brought the actual Sterling into compliance with the new FIRREA capital standards. It did not replace the capital taken away from Sterling by the government. Sterling had to continue to raise capital in the market place to support its growth and always planned to. Had the government not breached, Sterling would have $31 million in additional capital then and now. But for the FIRREA legislation and the implementing regulations eliminating the capital Sterling acquired through the acquisition of the insolvent thrifts, Sterling would have been significantly larger in 1991 approaching $1 billion, than its size of $731 million in assets in June 1989 and would definitely have needed more capital.

7. I am told the government is arguing that Sterling could have grown in the period January, 1990 to November, 1991. The suggestion is not only laughable, but suicidal. Sterling was fighting for its survival in the face of regulators who, we believed, were intent on shutting it down.

8. As CEO of Sterling, I viewed the preliminary injunction Sterling obtained as useful to prevent the closure of Sterling. I was, and remain, acutely mindful of the government's continued insistence that Sterling observe government-imposed limits on its business activities, backed by threats that, the injunction notwithstanding, the government could declare Sterling's actions "unsafe or unsound." In that climate, it would have been madness for Sterling to attempt to grow. In any event, it lacked capital — because of the government's breach — necessary to support growth.

9. I am told the government argues that our damages model is unsound because Sterling has not identified specifically all assets Sterling would have, but could not obtain. That assertion is partly wrong --- I did tell the government at my deposition about branches and whole institutions we could not acquire --- but it is mostly just mistaken. Every year of its existence, Sterling has forecast and achieved growth. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth. Then Sterling has to go to the market to find those assets. It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. And this is how Sterling has grown to over $10 billion in assets at the present time. Sterling finds billions in new assets every year. If its contract capital were restored, Sterling could easily find the assets to be supported by that capital. Excluding renewals, Sterling originated $5 billion in new assets in 2006.

**HAROLD B. GILKEY** declares under penalty of perjury under the laws of the United States of America that he is over the age of 18, competent to be a witness herein and that he makes the foregoing declaration on personal knowledge and that the same is true and correct.

DATED this 29th day of March, 2007.

HAROLD B. GILKEY

IN THE U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

DECLARATION OF PAUL M. HORVITZ

## I. QUALIFICATIONS.

1. I make this Declaration of my own personal knowledge after many hours of research and investigation of the facts and circumstances surrounding the government's breach of certain contracts with Sterling Savings and following my modeling of the damages resulting from the breach.

2. I am an economist who has specialized in the economics of the banking and financial markets over the course of my entire career.

3. After graduating with a Ph.D in Economics from Massachusetts Institute of Technology in 1958, I spent approximately 18 years with the federal banking regulatory agencies, first as a Financial Economist with the Federal Reserve Bank, later as a Senior Economist and Associate Director of the Department of Banking in the Office of the Comptroller of the Currency, and then as Director of Research and Deputy to the Chairman of the Federal Deposit Insurance Corporation.

4. In 1977, I joined the faculty of the University of Houston as a Professor of Finance and served as the Judge James A. Elkins Professor of Banking and Finance from 1981

until 2000 when I retired from full time teaching. I am now Professor Emeritus of Finance at the University of Houston.

5. I have published extensively in the field of banking, finance and monetary policy: more than 10 books and monographs, over 50 articles in professional journals, approximately 20 papers published in books, as well as other articles in business publications. Most of my research has been concerned with regulation of financial institutions, and a number of my publications have dealt specifically with the thrift crises in the 1980's, the threat to the FSLIC fund, and the resulting legislation enacted by Congress in 1989.

6. I am a consultant in banking, thrift, and financial fields and have consulted over the years with the U.S. Treasury Department, Federal Deposit Insurance Corporation, Federal Home Loan Bank Board, Commission on Money and Credit, and other governmental agencies. I have testified at Hearings conducted by the U.S. Senate Banking Committee, the U.S. House Banking Committee, the U.S. House Small Business Committee, the U.S. Office of Thrift Supervision, as well as before other governmental agencies. Much of my Congressional testimony during the 1980s and 1990s related directly to the thrift crisis and public policy to deal with it. Attached as Exhibit A is a copy of my curriculum vitae.

7. I have served as a member of the Board of Directors of the Federal Home Loan Bank Board of Dallas (1983-1989) as a Director of Three Savings and Loans in the FSLIC Management Consignment Program (1986-1998) and was on the Board of Bank United of Texas, the largest thrift institution in Texas, as well as other financial entities.

8. I have been retained as an expert witness in approximately 25 cases in behalf of private litigants as well as in behalf of the federal government. I have testified in deposition and at trial in behalf of the thrift institutions in a number of *Winstar* cases.

## II. RETENTION

9. I was retained by Sterling Savings Association (hereafter "Sterling" or "Sterling Savings") in the spring of 2000 to assess and calculate damages caused by the federal government's breach of contracts between Sterling and the government over Sterling's acquisition of three insolvent thrifts located in the Pacific Northwest.

10. I issued my first Report in December 2000 followed by a corrected Report on September 6, 2001 in which I estimated Sterling's damages as a result of the breach. On February 20, 2004 I issued a Revised Updated Report in which I updated my calculation of expectation damages to incorporate the ruling made by Chief Judge Damich dated August 4, 2003 that the capital credits created in the Lewis Federal and Tri-Cities acquisition were not permanent but were required to be amortized pursuant to the forbearance provisions of those contracts; namely, over 40 years in the case of Lewis Federal and 15 years in the case of Tri-Cities. Finally, I updated my Report on December 11, 2006 to incorporate this Court's ruling on August 30, 2006 that the government did not breach the Agreement with Sterling relating to the acquisition of Central Evergreen. These Reports, incorporated herein by reference, are included in the Appendix submitted in conjunction with my Declaration and references to tables and graphs are to those attached to my Reports. The purpose of this Declaration is not to supplant my Reports but to expand on them and to comment on opinions and statements of the government's expert witnesses proffered in conjunction with the government's Motion for Summary Judgment Regarding Damages.

## III. THRIFT CRISIS

11. Understanding the magnitude and severity of the damages incurred by Sterling as a result of the government's breach of its Agreements involving Sterling's acquisition of insolvent thrifts requires some background on the economic role of the savings and loan

industry, the thrift crisis of the 1980's, the growing threat on the safety of the FSLIC insurance fund, the history and growth strategy of Sterling, and the relatively strong economy in the Pacific Northwest (where Sterling was located) compared to most of the rest of the country where the economy was troubled and the thrift crisis loomed.

12. Traditionally, the savings and loan industry used deposits from the public to make mortgage loans to homeowners. Starting in the early 1980's, many thrift institutions experienced serious financial difficulties when, because of economic conditions and Federal Reserve monetary policy, they were forced to pay interest on their deposits at substantially higher rates than they were earning on their mortgage loan and other assets. For example, a 30 year mortgage loan at a fixed rate of 6 percent was still on the thrift's books in 1981 when it was paying interest on deposits of 12 percent.

13. Nearly all thrifts suffered operating losses which reduced their book net worth. In turn, many of these thrifts became technically insolvent as their liabilities exceeded the value of their assets.

14. During the 1980s, many thrift institutions were unable to meet their capital requirements; many failed and many more were in danger of failing. This put pressure on the FSLIC insurance fund and the magnitude of the problem was greater than the resources of FSLIC to deal with it.

15. Against this background, the FSLIC sought out healthy, capital compliant, and well managed, institutions willing to absorb thrifts which had negative net worth. The well managed institutions were encouraged and provided with incentives to undertake these acquisitions of troubled institutions. Some of the incentives used by the FHLBB and FSLIC included the regulatory treatment of the goodwill resulting from the acquisition, FSLIC cash assistance, a capital credit provision in the contract allowing the acquiring thrift to double count

the amount of cash assistance in computing regulatory capital, and certain forbearances. Handling thrift failures in this manner represented a substantial savings to FSLIC as the regulatory credits and forbearances were of no real cost to FSLIC and allowed FSLIC to resolve a failed thrift without having to devote all its resources covering the negative net worth, thus preserving the insurance fund. In turn, the acquiring thrift received regulatory capital which it could leverage and grow, thus in part justifying the absorption of the negative net worth of the failing thrift, since these acquisitions came with the further assurance that under purchase accounting the resulting goodwill is included as an asset in the calculation of regulatory capital. This enabled the healthy thrift to absorb the negative net worth it had assumed as part of the acquisition over time through the amortization of the goodwill.

16. In short, virtually the entire thrift industry was in dire financial straits. The resulting threat to the insurance fund was real.

## IV. STERLING SAVINGS

17. Sterling was chartered by the State of Washington in 1983. It began operations in the same year as a federally insured stock savings and loan association headquartered in Spokane.

18. It is absolutely crucial, in appreciating the nature and extent of the damages sustained by Sterling by virtue of the government's breach, to recognize that the plight of the thrift industry in the 1980s as described above did not and does not apply to Sterling Savings. When Sterling opened its doors in 1983, this was well after the peak in interest rates. It did not have any loans made at low interest rates in the 1960s and 1970s. Sterling loans made at market rates in the 1980's generated returns in excess of the cost of deposits. Its service area was in the Pacific Northwest where the economy was strong.

19. Thus, Sterling was a profitable and sound financial institution throughout the troubled period of the 1980s. Sterling was profitable every year. (Indeed, Sterling remained profitable even after the breach up to the present day but not without serious financial harm following the breach.) Its deposits, assets and profits grew each year without interruption through the 1989 fiscal year.

20. Sterling's management had a business plan from the outset of gathering deposits in the small towns of rural Washington and lending in the bigger cities of Spokane, Western Washington, and the Portland, Oregon metropolitan area where loan demand was stronger. The plan worked to success and still does. From the standpoint of modeling and calculation of expectancy damages from the breach with reasonable certainty, it is also important to note that Sterling has the same management philosophy, the same growth-oriented strategic plan, and the same top executive management that it has had from its very beginning.

21. Although Sterling suffered a very significant setback and shrinkage due to the government's breach, which are described below, Sterling has grown from $730 million in assets at fiscal year 1989 to over $10 billion in assets as of February 28, 2007. This is largely because of the aggressive growth strategy of senior management, which strategy and team have remained consistent since Sterling's inception. The continuity of the senior management team and the success of the growth strategy also add credibility and certainty to an expectancy damage calculation in my opinion as an economist.

## V. <u>ACQUISITION OF TROUBLED THRIFTS</u>

22. During the mid to late 1980s, Sterling acquired three troubled thrifts. Each thrift was located in smaller communities and thus consistent with Sterling's growth strategy of targeting deposit generation in smaller communities.

23. The first insolvent thrift acquired by Sterling was Lewis Federal Savings and Loan Association ("Lewis Federal"), on November 15, 1985. Lewis Federal had been placed into receivership and FSLIC estimated the liquidation of Lewis Federal would cost it $6 million. Sterling agreed to take over the assets, liabilities and negative net worth of Lewis Federal in exchange for cash contributions from FSLIC of $1.75 million. It was agreed as part of the contract between the government and Sterling that the resulting goodwill of $2.044 million would be amortized in a straight line basis over 40 years and that the capital credit of $1.75 million would be made directly to net worth so that on its calculations of compliance with regulatory capital requirements, that $1.75 million would be added to the capital on its financial statements.

24. Sterling acquired Tri-Cities Savings and Loan Association ("Tri-Cities") on April 8, 1988. Tri-Cities had been placed into receivership, and FSLIC estimated the cost of liquidation to be $20.7 million. Sterling assumed the negative net worth of Tri-Cities and in exchange received $11.7 million in cash assistance, and the resulting $2.608 million in goodwill was to be amortized over 15 years on a straight-line basis. (The Court has since ruled that the cash assistance credit also amortizes.)

25. Sterling's acquisition of Central Evergreen Federal Savings and Loan ("Central Evergreen") was completed on December 31, 1998. Sterling had previously been requested by the government on two separate occasions to acquire Central Evergreen, but turned down the request each time because Central Evergreen's negative net worth was too large, and would adversely impact Sterling's capital position. On the third occasion, the government explained how with the regulatory capital acquired from the Tri-Cities acquisition, Sterling could take on the troubled thrift, thus linking the Tri-Cities and Central Evergreen transactions. Central Evergreen had a negative net worth of $12.4 million. The government had estimated that it

would take cash assistance of $8 to 10 million to induce a buyer to take on Central Evergreen, and there were few eligible buyers. No financial assistance was paid to Sterling. Because no cash assistance was paid, no formal liquidation cost study was done, but liquidation costs in my experience normally exceed the negative net worth of the failing institution (here, $12.4 million). However, Sterling recorded $8.4 million in identified intangibles and $13.6 million in unidentified intangibles which it agreed to amortize on the GAAP level-yield basis over 8 and 12 years, respectively. Parenthetically, even though it has been ruled that the government had the contractual right to avoid its agreement to include the Central Evergreen goodwill as regulatory capital, Sterling nevertheless had to record the amortization expense against retained earnings over the lifetime of the agreements, thus depressing Sterling's earnings and reducing its net worth.

26. In short, the government resolved a serious threat to its insurance fund when Sterling, a healthy thrift, stepped up and assumed the combined negative net worth of three failing thrifts totaling about $30 million. The total amount of cash assistance ($14 million) was far less than the negative net worth assumed by Sterling, and the liquidation costs avoided by the government was even greater --- Lewis Federal ($6 million), Tri-Cities ($20.7 million), and Central Evergreen (more than $10 million). Because of the ruling of the Court, no damages from the Central Evergreen transaction are included in my calculations, but the entire background is helpful in understanding my modeling and calculation of damages for the government's breach of the Lewis Federal and Tri-Cities agreements.

27. As of fiscal year end 1989, Sterling had total assets of $731 million and deposits of $519 million. It earned net income of $1.3 million for fiscal 1989, an increase over 1988 despite the absorption of Central Evergreen in December 1988. In 1989, prior to the breach,

Sterling was growing rapidly, was profitable, and was fulfilling its business strategy of becoming a major financial institution in the Pacific Northwest.

28. Rapid growth in the 1980s, but primarily the acquisition of troubled thrifts with liabilities in excess of their assets, left Sterling in a somewhat weakened capital position. As of June 30, 1989, Sterling had equity equal to 1.4 percent of total assets, as compared to an equity ratio of 2.2 percent a year earlier (before the unassisted acquisition of Central Evergreen). Though Sterling's capital was modestly in excess of its regulatory requirements, it needed additional capital, beyond that which it acquired from the troubled thrift transactions, to continue its growth strategy. So in 1988, Sterling planned an equity offering in 1989 to raise $10.5 million, sufficient to keep it in capital compliance and leave it with a comfortable margin, allowing the thrift to grow and expand in accord with its plan. The proposed equity offering was included in Sterling's Business Plan that became part of the Central Evergreen transaction.

29. In negotiating the agreements, the government and Sterling recognized the importance of capital that Sterling acquired from the agreements. For Sterling could not otherwise take on the assets and liabilities of the failing institution without resolution of the capital shortfalls created thereby. Sterling calculated that as of June 30, 1990, under its agreements with the government, its regulatory capital exceeded its required capital by $1.8 million. Yet, under the regulations in effect under FIRREA and after the breach, Sterling had a capital shortfall of over $20 million.

30. Sterling successfully integrated the three acquisitions. Sterling continued to receive high marks from its federal and state examiners during this period.

## VI. <u>EFFECTS OF BREACH ON STERLING</u>

31. FIRREA imposed new and higher capital requirements on all thrift institutions. Meeting those new requirements did not pose a problem to Sterling if the government's

contractual commitments in the acquisition of the troubled thrifts had remained in effect. However, soon after FIRREA's enactment, the Office of Thrift Supervision issued regulations gutting the amount of capital credits and supervisory goodwill that could count toward the increased capital requirements. This had an enormous negative impact on Sterling. Instead of its regulatory capital exceeding its required capital by $1.8 million on June 30, 1990, as described above, under OTS regulations Sterling had a capital shortfall of over $20 million ($21.4 million in tangible and core and $26.6 million in risk based).

32. The above figures do not include the $10.5 million equity offering planned for the fall of 1989. The offering was fully subscribed, in fact oversubscribed, but was cancelled at the last minute when the OTS refused to agree to permit payment of dividends on the preferred stock that was part of the offering. Naturally, investors are reluctant to purchase preferred stock on which no dividends are forthcoming. The inability of Sterling to obtain use of the $10.5 million in already subscribed capital is part of the damage suffered by the breach. As I stated in my original corrected Report dated September 6, 2001, by wiping out a large part of Sterling's capital and by preventing it from completing the 1989 equity offering, the breach had a devastating effect on Sterling that was nearly fatal to the institution's survival when the government threatened to close Sterling's doors.

33. Instead of treating Sterling as part of the solution in helping to preserve the FSLIC insurance fund, after FIRREA the government immediately began to regard Sterling as a troubled thrift. The government imposed operating restrictions on Sterling which included, among others: limiting the amount of loans to any one borrower; restricting business lending to existing customers; preventing Sterling from accepting deposits over $100,000; and limiting asset growth and precluding payment of dividends. Sterling was thus forced to curtail operations dramatically (literally walking good customers across the street to competitor banks) and to

abandon its growth strategy. Because of the breach, Sterling's commercial lending ability was virtually destroyed and its residential construction and real estate lending capacity severely curtailed. Key personnel abandoned Sterling, and its reputation in the banking and business communities was injured. Sterling contracted its asset base, reducing in size for the first time in history. It shrank total assets from $731 million in June of 1989 to $609 million in June 1991, a decrease of over 17 percent, to better come into FIRREA capital compliance.

34. In sum, the loss of capital due to the breaching provisions of FIRREA and the regulations issued thereunder forced Sterling to forego growth and shrink for the first time in its history. In my opinion, the shrinkage and resulting loss of profits was caused by the breach. I cannot find or think of any reason for the shrinkage other than the breach.

## VII. TEMPORARY RELIEF FROM THE DISTRICT COURT DID NOT PREVENT CONTINUED DAMAGE TO STERLING

35. After the government threatened to close Sterling approximately one year after it acquired Central Evergreen, in May 1990 Sterling sought temporary injunctive relief in the Federal District Court for the Eastern District of Washington. It is my understanding that the District Court issued a temporary restraining order in May 1990 and a preliminary injunction on July 3, 1990.

36. The temporary injunction prevented the Office of Thrift Supervision from seizing Sterling because of capital deficiency. It was not a permanent injunction. The government's experts now suggest that Sterling could have and should have ignored the regulators and FIRREA and carried through with its growth-oriented business plan. That is, they argue that the temporary injunction somehow defeats Sterling's lost profits claim.

37. Once it is understood that a temporary injunction will not be in place forever, and once the government appealed the injunction, it was and is obvious how any reasonably prudent

thrift must respond. As long as there is some risk that Sterling might lose on appeal its legal effort to prevent the government from breaching its contracts, as a business matter it would be foolish for Sterling to expand and grow. The fact that the evidence and the law seemed to support Sterling's position could provide no assurance that Sterling would prevail in its lawsuit. Any eventual loss on appeal, even if that appeared very unlikely, would require drastic shrinkage. Shrinkage is very difficult for, and costly to, a thrift institution.

38. Preventing seizure by a temporary injunction was a good move. It gave Sterling time to raise the capital necessary to meet FIRREA standards to avoid receivership. It gave Sterling time to choose what assets to liquidate and when. It also reduced the amount of damage owed by the government. For the damages incurred by a closed institution would be far greater than those where the institution was forced to shrink but remained in business.

39. Moreover, the government's argument in this regard overlooks the fact that substantial supervisory restrictions were imposed on Sterling during the period of the injunction that would not have been imposed on the capital-compliant institution that Sterling would have been absent the breach. For example, on June 5, 1990, five days <u>after</u> the temporary restraining order was issued, the government notified Sterling to report all actions inconsistent with the many restrictions imposed on Sterling before the order. On June 20, 1990, the government wrote another letter to the same effect. Later that fall, the government wrote Sterling and indirectly threatened Sterling with poor performance ratings under the safety and soundness regulations. The temporary injunction was eventually vacated by the Appellate Court; thus, Sterling was proved correct in not growing until it raised sufficient equity capital.

## VIII. MEASURING STERLING'S DAMAGES WITH REASONABLE CERTAINTY

40. Appreciating the impact of a loss of capital and the resulting forced shrinkage has on a thrift institution, in my opinion there is no question but that Sterling has been damaged. The

remaining question is how can the damage best be determined to a reasonable certainty. From the perspective of an economist, the best measure of damages is the difference between the earnings of the breached entity and the earnings it would have had absent the breach. The reason this is so is that in economic theory, the objective of a business firm is to maximize profits. Therefore, the difference in profits between the breached and non-breached firm is the logical measure of the extent of damage.

41. The calculation of lost profits is the sort of problem that economists are trained for and it comprises the major part of the work of economists --- in government, private, firms, and academia. Analyzing "what if" questions of this type is a traditional role for economists. Economists also develop forecasts of economic variables, both for the economy as a whole (GNP, inflation, employment, trade deficit, etc.) and for individual firms (sales, profits, etc.). The securities industry employs hundreds and hundreds of analysts exclusively devoted to forecasting earnings per share of publicly-traded stocks.

42. The specific question I have analyzed in my Reports is "How would the earnings of Sterling Savings differ from its actual earnings in the absence of breach?" Government's experts suggest that Sterling's lost profits are not susceptible to measurement and/or that such measurement is speculative. The suggestion is simply wrong. The discipline of economics has an established and accepted methodology for dealing with such questions, and I have performed the exercise many times over the years in my capacity as an economist. The specific task of assessing the "absence of breach earnings" or lost profits of Sterling is much easier than other assignments typically undertaken by economists (such as, what would be the effect on employment if there were an increase in the minimum wage; what would be the effect on gas prices if there were an increase or reduction in the oil supply, etc.).

43. Economic forecasting is a legitimate scientific activity that is not without some difficulty in a given case. I have had a great deal of experience in forecasting thrift earnings in my position first as an economist for the Federal Reserve Bank in the late 1950s, again in my position as Director of Research for the FDIC in the 1960s and 1970s, and again in my capacity as a Director of the Federal Home Loan Bank Board of Dallas.

44. However, it is important to recognize that my analysis and measurement of Sterling's "but for the breach" earnings do not involve any forecasting. This is simply because the key determinant of a thrift's earnings is interest rates --- interest rates on loans, and interest rates on deposits. Though interest rate forecasting is indeed difficult, here I am calculating Sterling's lost earnings only for the period of 1990 through 2006. As such, I need not forecast interest rates to calculate Sterling's earnings for that period. I can merely look them up. Nor do I have to project the economy in general or home sales in particular for this period. I can look them up. This lends markedly greater certainty and safety to a lost profits calculation.

45. Moreover, as I will make clear below, calculation of lost profits for Sterling was a much easier task than for other plaintiffs in this goodwill litigation. The vast majority of plaintiffs asserting lost profits in the *Winstar* cases had been weak financial institutions in the 1980s, before the breach and were weak in the 1990s. While Sterling was profitable throughout its history, many of the plaintiffs had a history of operating losses. Some of the plaintiffs therefore were closed. Because Sterling was always profitable, I assumed for purposes of my lost profits calculations that the "but for" Sterling would earn profits at the same rate as the actual Sterling for the past years 1990 through 2006 without having to forecast the future at all. In doing so, I ended up with a conservative approach because the "but for" bank would have been more profitable than the shrunken actual bank, at least in the early years. In sum, my opinion of Sterling's lost profits is based on a high degree of reasonable certainty.

## IX. HORVITZ LOST PROFITS METHODOLOGY

46. My lost profits methodology is simple and straightforward. It involves the type of financial modeling that has been widely accepted in the thrift and banking business (and by the federal thrift and bank regulators) for many years. First, I calculated the amount of regulatory capital that Sterling would have had if its Lewis Federal and Tri-Cities contracts with the government been honored. That is, I calculated the amount of disallowed capital. For the newly imposed tangible capital requirement, all the intangibles from Lewis Federal, Tri-Cities and Central Evergreen were disallowed from capital. For the core capital requirement, a portion of the intangibles counted as qualifying supervisory goodwill, but the majority was disallowed. This results in $15.557 million in disallowed capital from the Lewis Federal and Tri-Cities transactions as of December 31, 1989, and $11.357 million of other qualifying supervisory goodwill from the Central Evergreen transaction that was subject to the phase out limitations of FIRREA, plus $5.67 million in identified intangibles from the Central Evergreen acquisition that were subject to a separate qualifying test. Only $10.3 million of these intangibles were allowed to be included in Sterling's core capital at December 31, 1989. Had the Lewis Federal and Tri-Cities contracts been honored, all of the $15.557 million from Lewis Federal and Tri-Cities would have been included in core capital, $10.4 million of Central Evergreen's supervisory goodwill would count toward core capital, and all of the $5.67 million in identified intangibles from Central Evergreen would have counted. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 4a, 4b, and 4c, App. 177-179.) Additionally, Sterling would have been able to complete its capital offering in 1989 that would have raised an additional $10.5 million. Including other small adjustments to core capital that would have flowed from these very significant effects of the breach, Sterling would have had core capital of $28.8 million, whereas it actually reported

*negative* $2.2 million. The net effect of the breach was to disallow approximately $31.0 million of core capital at December 31, 1989.

47. Second, the additional capital would have been used to support additional assets or "foregone assets." Next, Sterling would have earned a return on those foregone assets. Then, these earnings would have been added to capital, allowing the acquisition of additional foregone assets that would yield additional profits. These lost profits, calculated on a year by year basis from the time of breach until today, represent the past lost profits of Sterling. I have summarized the lost profits calculation in Exhibit 6, Table 1 of my December 11, 2006 Report. The lost earnings from 1990 through September 2006 are $58.164 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In addition, there are wounded bank damages of $4.556 million (Horvitz Report, December 11, 2006, Exhibit 6, Table 3d, App. 175), future damages of $0.641 million based on Professor James' Report, for total expectation damages of $63.361 million --- all of which is then summarized in Exhibit 8 to my 2006 Report.

## X. RETURN ON ASSETS

48. The elimination of regulatory capital resulting directly from the breach forced Sterling to be smaller and less profitable than it otherwise would have been. There are only two inputs needed to make the calculation of lost profits: (1) the amount of foregone assets year by year and (2) the rate of profit that would be earned on the foregone assets.

49. With regard to the second input above, I assumed that the but-for Sterling would have earned profits at the same rate as the actual Sterling. This is a conservative assumption for two reasons. First, it is widely accepted that there are significant economies of scale in the operation of a thrift institution because a larger institution will spread its fixed overhead costs over a larger volume of assets, thereby reducing the unit cost. I prepared one of the earliest empirical studies on this subject in the early 1960s and subsequent research has been consistent

with my findings. Second, and more important, absent the breach, Sterling would have had the opportunity to acquire assets and deposits from the Resolution Trust Corporation ("RTC"), the governmental agency designated to liquidate failed thrifts. In the depressed markets of the early 1990s, there were great opportunities to purchase either whole institutions, branches, or asset portfolios from the RTC. There were many more institutions and assets for sale than there were eligible bidders. Such acquisitions fit with Sterling's growth strategy. However, under RTC policy, only institutions that were in full capital compliance were eligible to bid, and because of the breach, Sterling was deemed by the government to not be in capital compliance when the best opportunities were available. Based on my experience with a thrift institution that made a number of RTC acquisitions, it is my opinion that the rate of profitability on RTC assets would have significantly exceeded Sterling's rate of return on its actual assets. Attached as Exhibit 7 to my December 11, 2006 Report is a list of the RTC Resolutions of failed thrifts in Washington and Oregon, states where Sterling operated at the time. (App. 185.)

50. For the above reasons, in my opinion the but-for bank would likely have been more profitable than the actual Sterling. I have a high degree of confidence that the foregone assets would have been at least as profitable as the actual assets, and in my calculation of lost profits I have used the actual historical return-on-assets figure of Sterling to estimate the profitability of the foregone assets. In addition to my analytical calculations, there is a substantial body of actual experience that supports the reliability and credibility of the conclusions derived from my lost profits model. The evidence is contained within the repeated experiences of Sterling in response to its several injections of capital during the 1990s. In nearly every year of the 1990s, Sterling or its holding company raised capital and injected it into the thrift. In every case, Sterling successfully and profitably leveraged that capital. For example, in 1991 Sterling had a return on average assets (ROAA) before amortization and taxes of .87

percent. Sterling's actual assets at that time were $609 million. I estimated the but-for bank would have total assets of $725 million. The actual bank achieved that size during fiscal 1993, and in that year its ROAA was 1.71 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 and 3b, App. 169, 173.)

51. The largest increase in foregone assets occurred in fiscal 1994, when actual assets were $1.368 million and the but-for bank in my calculations had assets of $1.681 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180.) The actual bank had ROAA of 1.37 percent. With regard to whether it was reasonable to believe that Sterling could have maintained that ROAA on the additional $313 million in assets, there is no speculation involved. We can look it up. In 1997, the actual Sterling did reach the asset size of the 1994 but-for bank, and the ROAA was 1.36 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Table 3b, App. 173.) There is nothing speculative about these figures --- my calculations are supported by real data. Attached as Exhibit B is a chart showing that Sterling's Return on Average Assets, though it fluctuates from year-to-year, shows no tendency to decline as Sterling's asset size increases. Put another way, to reject my lost profits estimate, as the Government's experts do, they have to believe that although Sterling was able to profitably use the capital it raised (at significant expense) in 1991 and nearly every year since, but it would not have been able to make profitable use of additional (free) capital in 1989 and 1990, even though that was the time when Sterling's need for capital was the greatest and the opportunities for profitable acquisitions were the most abundant. But the Government's experts have provided absolutely no evidence to support such an extreme position.

52. The government's expert suggests, instead, that my calculation of lost profits is speculative because I do not identify the specific assets (or liabilities) that would be acquired by the but-for bank. While I do not identify specific assets, I cannot think of a single economic

reason why one would. My calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held the usual and ordinary type assets --- no exotic financial instruments or collector's items. There is no reason to doubt that additional assets of the type held by Sterling were readily available. Unlike some other goodwill cases in which the foregone assets represented a multiple of the actual assets and a large absolute volume, the foregone assets reach a peak of $427 million, but are considerably less for most of the damage period. This is not only a miniscule figure as measured by the total market, but is a small fraction of the actual Sterling assets. In fact, the bulk of lost profits are accounted for in years in which the foregone assets total less than 15 percent of the actual bank assets. Attached as Exhibit C is a graph depicting the comparison year by year of Sterling's foregone assets to actual total assets.

## XI. FOREGONE ASSETS

53. The other variable that determines lost profits is the amount of foregone assets. If Sterling had the additional capital taken away by the breach, it could have expanded to a greater extent than the actual bank.

54. Accepted economic methodology suggests that there are several alternative approaches to determine the amount of foregone assets. One approach is to consider the leveraging capacity that the additional capital provides. With a 4 percent capital requirement, an additional $1 million of capital will support an additional $25 million of assets. Similarly, with a 5 percent requirement, $20 million of additional assets can be supported. This approach is embedded in OTS guidelines for the preparation of Appraisals in connection with the conversion of mutual thrift institutions to stockholder-owned corporations.

55. Using this approach to estimating asset size requires an assumption as to the appropriate capital ratio to use. I chose to estimate the assets of the but-for bank on the

assumption that its capital-asset ratio each year (with only one exception) is at least as high as the actual Sterling capital-asset ratio for that year. While this is a reasonable approach, it results in an overly conservative capital ratio because it is likely that the breach had a long-lasting effect on Sterling's policy with respect to capital. While I can be very confident that the capital ratio of the but-for bank would not generally be higher than that maintained by the actual (breached) Sterling, in fact my calculations are based on the but-for bank maintaining a more conservative capital position than the actual bank.

56. Using this approach can result in periods of rapid growth in calculated foregone assets. So, to be sure that I err on the conservative side, I added a growth constraint which limits the growth of the but-for bank in any given year to a rate no faster than the growth of the actual bank. This means that in my calculations there are two constraints on the asset size of the but-for bank --- a capital constraint and a growth constraint. My calculations of lost profit damages are based in each year on whichever constraint results in the smaller foregone assets (and, hence, the smaller lost profits). (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180).

57. Substantial support for my foregone assets analysis is provided in the actual experience of Sterling. In my December 11, 2006 Report, I provide an estimate of the total assets of the but-for bank in Exhibit 6, Table 5, App. 180. In every case, the actual Sterling grew to a larger size than the but-for bank within a short period of time (usually within one year). In fact, the longest time that it took Sterling to exceed the but-for estimate was three years --- my 1994 estimate of $1.681 million was not exceeded until 1997. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In words, the basic reason why the but-for bank grew as rapidly as it did is because the actual bank (with the same management and business strategy operating in the identical economic environment) grew rapidly. If the government truly believes my estimates are aggressive or unreasonable, its experts should have provided some actual data

to suggest a lower growth rate, or at least provided some reason to believe that a lower growth rate would be appropriate. The government and its experts have elected not to do so.

## XII. 1991 CAPITAL RAISING DID NOT REPAIR DAMAGE TO STERLING CAUSED BY THE BREACH

58. Sterling raised $23 million in capital in 1991. The government implies that the damage caused by its breach was thereupon repaired, and Sterling in 1991 was back in the position it would have been absent the breach. This is hardly the case. Sterling lost $31.0 million in core capital because of the breach, including its attempt to raise $10.5 million in capital which failed because of the breach. Sterling had a pre-breach strategy calling for growth. That growth plan required that substantial additional capital be raised. Sterling did raise $23 million in capital in 1991, but it would have needed the capital in the absence of the breach. Nor did the 1991 offering replace the aborted 1989 offering, but it was another offering based on similar planning for growth, but now one step behind due to the breach. Analysis of the capital needs of the but-for bank must recognize the size and growth of the but-for bank. If the 1989 offering had gone through, the actual bank might not have needed the 1991 capital-raising to remain in capital compliance, but the but-for bank clearly did to pursue its objectives. Table 3a to Exhibit 6 of my December 11, 2006 Report shows that Sterling had acquired or been down-streamed capital in almost every year since 1991. (App. 172.)

59. Sterling has raised millions of dollars in capital over the past 15 years, amounts many times the amount of capital lost due to the breach. Since capital raising is costly, it is obvious that Sterling believed it could use all the capital it raised and, in fact, it has, done so. Sterling has grown to $10 billion in assets as of February 28, 2007. This picture is consistent with my interviews of management and the deposition testimony of Sterling's Chief Financial

Officer, Daniel Byrne, who has testified that Sterling's policy in the 1990s was to raise as much capital as possible.

60. I recognize the government cites deposition testimony by Harold B. Gilkey claiming that he said absent the breach, Sterling would not have raised capital in 1991, but it is clear that Mr. Gilkey was answering at pages 465 and 466 of his deposition as to an already shrunken bank with assets of "$600 million." He was not asked the question relevant for a damages inquiry --- "What would Sterling have done but-for the breach?". His response is therefore not determinative of what the but-for bank with assets of $726 million by June 1991 would have done. In my opinion, but-for the breach, Sterling demonstrably needed more capital by 1991.

61. Sterling did take two crucial (but costly) steps to minimize the government's damages. First, it filed suit to stop the government from seizing the bank. Second, it stopped growing and shrunk the size of the bank. The first step avoided the much greater losses that would have resulted from the closing of the bank. The second step reduced the extent of Sterling's capital deficiency. These efforts were important efforts to minimize damages, but they did not replace capital lost due to the breach.

## XIII. <u>WOUNDED BANK DAMAGES</u>

62. In addition to lost profits, the actual bank incurred costs and lost opportunities as a result of its weakened capital position caused by the breach. To make Sterling whole requires that it be compensated for these costs. These costs and lost opportunities, which are called wounded bank damages, are itemized in Exhibit 6, Table 3d and in Exhibit 8 to my December 11, 2006 Report. (App. 175, 186.)

63. Based on my definition of wounded bank damages, I requested that Sterling management compile a list of expenses that met my definition or criteria of this type of damage.

I have reviewed carefully the list compiled by Sterling. Although I cannot attest of my own personal knowledge as to the accuracy of the cost tabulation prepared by Sterling, assuming these costs are as they have been described to me, they meet my economic definition of wounded bank damages. In my opinion, these costs were a direct result of the breach and would not have been incurred but for the breach.

64. Based on personal experience with several financial institutions and on review of financial conditions of others, the most significant wounded bank damage Sterling suffered was the loss of opportunity to make acquisitions from the RTC at the time when the best economic opportunities existed. I have not included an estimate of this damage in my lost profits calculations, though as noted above the existence of this consideration adds to my confidence that the ROAA ratio I applied to foregone assets was conservative. Thus, there is no duplication between the lost profits calculation and the wounded bank damage figure.

65. Wounded bank damages may be best illustrated by the example of the Great American Savings Bank branch. Sterling attempted to acquire the branch for $61,000, but its request was rejected by the regulators because it was not in capital compliance following the breach. Five years later, because Sterling was growing and expanding, Sterling acquired the same branch but was forced to pay $1.9 million for it. The causal connection between the breach and the resulting damages of $1.835 million ($1.9 million – $65,000) cannot be doubted. The contracts for acquisition of Lewis Federal and Tri-Cities were about capital. Regulatory capital was the consideration for Sterling to take on the insolvent institutions. The government knew that Sterling contracted with Lewis Federal and Tri-Cities so that it would obtain more capital, capital which it intended to use for growth.

66. The government's experts' discussion of forseeability is contrary to economic logic and, in my opinion, makes no economic sense. Of course, at the time of the contracts

neither party necessarily knew or could foresee that Sterling would seek to acquire a specific branch of Great American. However, both parties knew and understood that Sterling would use the capital it garnered from the acquisition to grow and increase profits. This was clearly foreseeable and that is all that is required in calculation of lost profits from an economics or financial point of view.

67. As mentioned above, the price of the branch was $61,000 in 1989, but Sterling had to pay $1.9 million in 1994 when the transaction was consummated. The government argues that there was no damage because Sterling would not have paid $1.9 million unless it was worth that amount. This argument misses the point. No one is questioning the value of $1.9 million in 1994. The inescapable fact is that absent the breach, Sterling would have captured that value for the mere sum of $61,000.

68. Also, the substantial appreciation in value of the Great American branch reflected the need of many undercapitalized thrifts to sell branches in 1989 (proceeds directly applied to capital) as compared with premiums for branches in 1994. It further underscores the lost opportunities Sterling would have had in the early 1990s but for the breach.

69. The government similarly mischaracterized the circumstances of the CJ-4 loan. Sterling committed to a construction loan before the enactment of FIRREA. After FIRREA's enactment, Sterling was limited by the federal regulators to a $500,000 ceiling for a loan to any one borrower. Because of this limitation, Sterling was not permitted to make loan advances against this commitment that was already outstanding. The borrower then sued Sterling for breach of the loan commitment. Sometimes advancing additional funds will ensure completion of the project and repayment of the loan. Sometimes not. It is a business judgment. Sterling was not able to exercise this judgment because of its undercapitalized position. I cannot testify that Sterling made the loss calculation correctly, but my definition of wounded bank damages

would be the difference between the actual loss suffered by Sterling and the loss, if any, it would have incurred had it been able to exercise its business judgment to advance additional funds. Viewed as a whole, Sterling has an impressive record in making business decisions of this type.

70. The government motion papers seek to muddy the waters on this matter by mischaracterizing my opinion on incremental and average returns. I did not say and would not say that "as a matter of economics incremental returns earned on foregone assets are equal to average returns." I equated the two in calculating the average return on foregone assets as described above, and for the reasons set forth above, but there are certainly instances when returns on incremental assets are higher or lower than average returns. A business decision to advance funds to a troubled borrower is only done when the expectation is that above-average returns will be achieved.

## XIV. BANKHEAD REPORT

71. I have reviewed at the request of Sterling's counsel the Report of W. Barefoot Bankhead dated February 15, 2007 and submitted with the government's Motion for Summary Judgment Regarding Damages.

72. I thoroughly and vigorously disagree with the analysis made and conclusions reached by Mr. Bankhead in his Report.

73. In reviewing the Lewis Federal and Tri-Cities contracts as an economist and in an attempt to establish the true but-for bank before enactment of FIRREA and without any impact from FIRREA, I found that the goodwill generated by the Lewis Federal and Tri-Cities acquisitions counted as "capital." In addition, I noted that the contracts provided for "capital credits" that would be likewise counted as "capital" for regulatory purposes. From the standpoint of modeling of Sterling's damages, I saw nothing in these contracts that referred to or could be construed as treating this "capital" as some sort of qualified or second-class capital. In

particular, the contracts did not define this as "intangible capital." It was simply "capital." In sum, in the true but-for world or in the pre-breach world, there were no restrictions or qualifications of any kind imposed on the capital acquired by Sterling from the Lewis Federal and Tri-Cities contracts. Therefore, in the pre-breach situation, the capital provided by these contracts counts fully toward any existing or new capital requirement. When FIRREA and OTS regulations transgressed the capital provisions of these contracts, it is my understanding for purposes of calculating Sterling's damages that the Court ruled that the contracts had been breached.

74. Following the contracts and my understanding of the Court's rulings, the proper calculation of Sterling's post-breach capital position includes the capital arising from the Lewis Federal and Tri-Cities agreements, plus the amount of supervisory goodwill arising from the Central Evergreen acquisition that qualifies under the cap and phase-out rules of FIRREA. In other words, in the but-for world, FIRREA can have no capital restricting impact on the capital acquired from the Lewis Federal and Tri-Cities deals but, because the Court found the government did not breach the Central Evergreen agreement, only the supervisory goodwill acquired in that agreement is subject to FIRREA restrictions (namely, the cap and phase-out rules). This is a critical distinction. Otherwise, a damage expert confuses the but-for Sterling with the actual bank and ends up with an incorrect damage model, which is precisely what Mr. Bankhead has done.

75. I have made this distinction. That is, the capital acquired from Lewis Federal and Tri-Cities is not and cannot be subject to the limitations imposed by FIRREA on the amount of goodwill that qualifies for core capital under FIRREA. If it were, this would be contrary to the Court's decision that FIRREA breached the Lewis Federal and Tri-Cities contracts.

76. Consequently, because my damage model correctly distinguishes between Lewis Federal and Tri-Cities acquired capital as not being subject to FIRREA limitations while the Central Evergreen supervisory goodwill is subject to a cap and phase-out over time, I correctly calculated the but-for Sterling capital position as of December 31, 1989 and thereafter. ( Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 through 8, App. 169-184.) All of the Lewis Federal and Tri-Cities deals are included and only 1.5 percent of but-for Sterling assets are included as qualifying supervisory goodwill from the Central Evergreen until such goodwill is phased out, as shown on Exhibit 6, Table 4b of my December 11, 2006 Report, App. 178. Therefore, Sterling incurred lost profits from the very outset of the breach and the lost profits were correctly modeled and calculated at $58.164 million as of September 30, 2006. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.)

77. Sterling's but-for core capital position on December 31, 1989 may be summarized as follows:

| | | AMOUNT (000s) |
|---|---|---|
| o | Capital (Lewis Federal and Tri-Cities) | $15,557 |
| o | Qualifying Supervisory Goodwill (Cent. Ev.) | 10,421 |
| o | Other Qualifying Intangibles | 5,670 |
| o | 1989 Subscribed Offering | 10,500 |
| o | But for Bank Adjustments | (781) |
| o | Estimated Tangible Capital at 12/31/89 | ( 12,581) |
| | But-for Sterling Core Capital | $28,786 |

(Ex. 6, Tables 4a, 4b, 4c, 3a, respectively, Horvitz Report December 11, 2006, App. 177, 178, 179, 172)

78. The above calculation is also illustrated in the bar graph attached as Exhibit D to this Declaration which depicts the breach-related adjustments. The negative $12,581 is comprised of:

| | | AMOUNT (000s) |
|---|---|---|
| o | Actual Core Capital | ($2,273) |
| o | Actual Reported Qualifying Supervisory Goodwill | (10,308) |
| | | ($12,581) |

79. The problem with Mr. Bankhead's analysis starts with the fact that the phrase supervisory goodwill came into existence with the legislative proposals that later resulted in the passage of FIRREA and its implementing regulations. To my knowledge, it was not used prior to these proposals, either within the thrift industry or by regulators. The reason is that before FIRREA (or the banking regulation) there was no distinction between regular goodwill or goodwill found in a supervisory merger. It therefore did not have a meaning until regulators were determining how to define supervisory goodwill for purposes of implementing the new capital requirements imposed by FIRREA. The purpose of which was to limit and phase-out goodwill that would no longer count toward the capital requirements.

80. Mr. Bankhead's contention that the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be considered as "supervisory goodwill" is not meaningful and furthermore is illogical in the but-for world that the Court has directed Sterling to consider in its damages calculation. In the but-for world the goodwill and capital credits from Lewis Federal and Tri-Cities acquisitions are protected as capital. They are not subject to limitation other than defined by the contracts. They are not phased out prematurely, but in accordance with the Court's ruling, amortize over the agreed upon length of the contract. The language in the regulations implementing the limitations on supervisory goodwill is directed to capital that prior to FIRREA did count toward the regulatory capital requirements, but after FIRREA would no longer count toward the FIRREA imposed capital requirements. That is not

the case with regard to the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions - in the but-for world this capital continues to count toward regulatory capital requirements, just as it did before FIRREA.

81. To claim, as Mr. Bankhead does, that goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be factors in the qualifying supervisory goodwill tests perpetuates the breach and continues to harm Sterling. Mr. Bankhead's approach is prejudicial because it treats the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions differently from other capital. In the but-for world they should not be treated differently; they should be treated exactly like other capital. Prior to FIRREA at the time the Lewis Federal and Tri-Cities contracts were made, no distinction was drawn by regulators between different types of capital. It all counted equally as regulatory capital --- Mr. Bankhead's approach allows their presence on Sterling's balance sheet to limit what other supervisory goodwill might qualify as core or risk-based capital.

82. For example, assume a thrift identical to Sterling but with common stock capital of an equal dollar amount to the amount of Sterling's goodwill and capital credits from Lewis Federal and Tri-Cities. Also assume that this other thrift had goodwill (equivalent in amount to Central Evergreen) from a supervisory acquisition that was acknowledged to be subject to the phase-out limitations imposed by FIRREA. Both institutions are the same size and therefore have the same limitations on how much supervisory goodwill can count toward the core and risk-based capital requirements. Mr. Bankhead claims Sterling can count none of the goodwill from Central Evergreen because it doesn't qualify. The other thrift, however, would be able to count its supervisory goodwill subject to allowable qualifying percentages. It would have more capital which consequently would give it a greater ability to acquire assets and grow--the very opportunities that Mr. Bankhead's approach denies Sterling. Clearly, Mr. Bankhead's approach

continues to penalize Sterling. It is effectively another means to prolong the breach of the Lewis Federal and Tri-Cities contracts.

83. In his approach, Mr. Bankhead constructs out of whole cloth a different interpretation: FIRREA, according to Mr. Bankhead, created a bucket (equal in size on day one to 1.5 percent of assets) in which some intangibles could be temporarily counted as though they represented real capital. Into this bucket must be included first (though there is no explanation of why this comes first) the contractual capital. If the contractual capital exceeds the 1.5 percent maximum, it would be counted as capital (obviously, to do otherwise even Mr. Bankhead recognizes as a breach). But if the contractual capital does not fill the 1.5 percent bucket, Mr. Bankhead would allow Sterling to include supervisory goodwill from Central Evergreen (but only up to the total 1.5 percent maximum).

84. Although he is dealing in the hypothetical world, Mr. Bankhead allows for a possibility (which he deems implausible) that perhaps the contractual capital need not be counted first in the intangible bucket, but that the contractual capital and supervisory goodwill should be proportionately allocated space in the bucket. There is nothing in FIRREA or the regulations which suggest that any such allocation procedure is necessary.

85. Mr. Bankhead's interpretation of FIRREA is not only without basis, it would be illogical for Congress to construct a law with the intent Mr. Bankhead finds. If Mr. Bankhead is right, thrift institutions could count supervisory goodwill up to the limits of the law, unless they had entered into a contract with the Government to assist in the resolution of failing thrifts. In that case, to the extent that they gained contractual capital through those transactions, they would lose, dollar-for-dollar, the right to include supervisory goodwill toward their capital requirement. Congress would have designed law not only indifferent to the contributions of those participating

in such contracts, but actually to penalize those who had done so. It is hard to accept that Congress acted maliciously to punish those who attempted to help resolve the thrift crisis.

86. In the end, of course, Mr. Bankhead's analysis does not affect my calculations of damages. If Mr. Bankhead's interpretation of FIRREA and its regulations were correct, then the application of those regulations to Sterling would represent a continuing breach, and my analysis of the non-breached Sterling would be unaffected. Put differently, in the but-for world, Sterling's so-called contractual capital counts fully towards regulatory capital requirement as core capital without any limitation upon Sterling's right under FIRREA to count the supervisory goodwill from the Central Evergreen transaction as qualifying supervisory goodwill.

87. Lastly, with regard to Mr. Bankhead's statements in paragraph 13 of his Report, my 2004 Report is not inconsistent with my position that the capital acquired from the Lewis Federal and Tri-Cities deals is not subject to FIRREA limitations. Table 4b of my 2004 Report relates to the actual bank, not the but-for bank. At no time in my 2004 Report did I suggest that, in the but-for world, any of the capital from Lewis Federal and Tri-Cities agreements was subject to the cap and phase-out regulations of FIRREA. Mr. Bankhead has a point, but it is a rhetorical point relating to a poor choice of terminology on my part. Column C of Table 4b is headed "SGW" (supervisory goodwill) where it should have been titled "unidentified intangibles." (App. 145.) However, at no time in the text of the report did I include Tri-Cities or Lewis Federal capital with supervisory goodwill. So Mr. Bankhead draws a distinction without a difference.

88. I incorporate by reference my September 6, 2001 and February 20, 2004 Reports as though fully set forth herein and declare them to be true and correct.

**PAUL M. HORVITZ** declares under penalty of perjury under the laws of the State of Texas that he is over the age of 18, competent to be a witness herein and that he makes the foregoing declaration on personal knowledge and that the same is true and correct:

DATED this 28th day of March, 2007.

Paul M Horvitz
PAUL M. HORVITZ

# PAUL M. HORVITZ

Professor of Finance Emeritus
University of Houston

## ADDRESS

150 Sugarberry Circle
Houston, Texas 77024
(713) 780-3771
E-mail: paulhorvitz@aol.com

## EDUCATION

| | | |
|---|---|---|
| Massachusetts Institute of Technology | PhD | 1958 |
| Boston University | MBA | 1956 |
| University of Chicago | BA | 1954 |

## EMPLOYMENT HISTORY

| | |
|---|---|
| **University of Houston** | |
| Professor of Finance Emeritus | 2001- |
| Professor of Finance | 1997-2000 |
| Judge James A. Elkins Professor of Banking and Finance | 1981-1997 |
| Professor of Finance | 1977-1981 |
| **Federal Deposit Insurance Corporation** | |
| Deputy to the Chairman | 1976-1977 |
| Director of Research | 1968-1976 |
| Assistant Director of Research | 1967 |
| **Comptroller of the Currency** | |
| Associate Director, Department of Banking and Economic Research | 1966-1967 |
| Senior Economist | 1963-1965 |
| **Mitre Corporation** | |
| Economic Analyst | 1962-1963 |
| **Boston University** | |
| Assistant Professor of Finance | 1960-1962 |
| **Federal Reserve Bank of Boston** | |
| Financial Economist | 1956-1960 |

EXHIBIT A

**SELECTED PUBLICATIONS**

Books and Monographs

Monetary Policy and the Financial System. Prentice-Hall, 6th edition, 1987.

Perspectives on Safe and Sound Banking. MIT Press, 1986 (with George Benston, Robert Eisenbeis, Edward Kane and George Kaufman).

Commercial Banking and Interstate Expansion, UMI Research Press, 1985 (with Larry A. Frieder, et al.).

Sources of Financing for Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

Problems in the Financing of Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

The Changing Environment of Non-Local Competition in U.S. Banking. American Bankers Association, 1981 (with Peter Merrill).

The Future Development of Foreign Banking Organizations in the U.S. American Bankers Association, 1981 (with Bernard Shull).

The Management of Commercial Bank Funds. American Institute of Banking, 2nd edition, 1980 (with George McKinney and William Brown).

Federal Reserve Membership. American Bankers Association, 1979 (with Peter Merrill).

Concentration and Competition in New England Banking. Federal Reserve Bank of Boston, 1958.

Articles in Professional Journals

"Lending Discrimination Claims and the Issue of Redlining," Journal of Forensic Economics, 1998, (with Andrew Holmes).

"Mortgage Loans to Non-Occupants as an Indicator of Racial Redlining," Journal of Financial Services Research, January 1997, (with Andrew Holmes).

"Commercial Banks and Real Estate Lending: The Texas Experience," Journal of Regulatory Economics, November 1996, (with Robert Eisenbeis and Rebel Cole).

"Preserving Competition in Electronic Home Banking," Journal of Money, Credit and Banking, November 1996.

"Efficiency and Antitrust Considerations in Home Banking: The Proposed Microsoft- Intuit Merger," The Antitrust Bulletin, Summer 1996.

"Forbearance: An Empirical Analysis," Journal of Financial Services Research, March 1996, (with Emile J. Brinkmann and Ying-Lin Huang).

"Banking Regulation as a Solution to Financial Fragility," Journal of Financial Services Research, December 1995.

"Risk-Based Capital Standards and the Credit Crunch," Journal of Money, Credit and Banking, August, 1995 (with Emile J. Brinkmann).

"Rules Vs. Authorities in Banking Supervision," Korea Non-Bank Deposit Insurance CorporationJournal, Spring 1995 (with Insup Lee).

"Abnormal Returns in Post-FIRREA Acquisitions of Failed Thrifts," Journal of Financial Services Research, December 1994 (with Insup Lee).

"Mortgage Redlining: Race, Risk, and Demand," Journal of Finance, March 1994 (with Andrew Holmes).

"Management Incentives and Solvency Effects in Financially Distressed Government Controlled Institutions," (with Janice Barrow), Financial Management, December 1993.

"Valuation Effects of New Securities Issuance by Bank Holding Companies: New Evidence," Financial Review, 1991, (with Insup Lee and Kerry Robertson)

"The FSLIC Crisis and the Southwest Plan," American Economic Review, May 1989.

"Fear of Failing," Yale Journal on Regulation, Spring 1987.

"The Combination of Banking and Insurance: Implications for Regulation," Growth and Change, October 1985.

"Are S&L Participations in Real Estate Ventures Too Risky?" (with Clifford Fry and John Crockett), Real Estate Review, Summer 1985.

"Comment on Deposit Insurance in a Deregulated Environment," Journal of Finance, July l984.

"The Implications of Changes in the Payments System for Interstate Banking," Journal of Corporation Law, Summer 1984.

"Reform of the Deposit Insurance System," Contemporary Policy Issues (with Tim

Campbell), May 1984.

"The Case Against Risk-Related Deposit Insurance Premiums," Housing Finance Review, September 1983. Reprinted in Gardener, UK Banking Supervision, Allen & Unwin, 1986.

"Comments on Legal Reserve Requirements," Journal of Bank Research, Spring 1983.

"Reorganization of the Financial Regulatory Agencies," Journal of Bank Research, Winter 1983.

"Regulation of the Money Order Industry," Financial Management, Winter 1980.

"A Reconsideration of the Role of Bank Examination," Journal of Money, Credit and Banking, November 1980.

"Commercial Bank Financial Reporting and Disclosure," Journal of Contemporary Business, Summer 1977.

"Bank Failures and Deposit Insurance: The Alternatives," (with Robert Barnett and Stanley Silverberg), Banking Law Journal, April 1977.

"The Committee on Interest and Dividends: An Evaluation," Policy Analysis, Spring 1977.

"Failures of Large Banks: Implications for Banking Supervision and Deposit Insurance," Journal of Financial and Quantitative Analysis, November 1975. Reprinted in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 1980.

"The Hunt Commission Report: Comment," Journal of Finance, March 1974.

"The Pricing of Textbooks and the Remuneration of Authors," American Economic Review, May 1966. Reprinted in Johnson, The Daily Economist, Prentice-Hall, 1973.

"The Bank Merger Act of 1960: A Decade After," (with Bernard Shull), Antitrust Bulletin, Winter 1971. Reprinted in Reprints in Antitrust Law and Economics, 1972.

"Branch Banking, Independent Banks and Geographic Price Discrimination," (with Bernard Shull), Antitrust Bulletin, Winter 1969.

"Price Uniformity and Banking Markets," Appalachian Financial Review, 1969.

"A Note on Textbook Pricing," American Economic Review, September 1965.

"Stimulating Bank Competition through Regulatory Action," Journal of Finance, March 1965. Reprinted in Banking Markets and Financial Institutions, Irwin, 1971.

"Loan Loss Reserves," (with Sherman Shapiro), National Banking Review, September 1964.

"The Impact of Branch Banking on Bank Performance," (with Bernard Shull), National Banking Review, December 1964. Reprinted in Banking Competition and the Banking Structure, Comptroller of the Currency, 1966.

"Branch Banking and the Structure of Competition," (with Bernard Shull), National Banking Review, March 1964. Reprinted in Banking Competition and the Banking Structure.

"Concentration Ratios and Competition," (with Deane Carson), National Banking Review, September 1963. Reprinted in Monetary Economics, Wadsworth, 1968; and Banking Competition and the Banking Structure.

"Bank Earnings and the Competition for Savings," Journal of Political Economy, February 1962.

Papers Published in Books:

"The Role of Forbearance and Its Costs in Handling Troubled and Failed Depository Institutions," in Reforming Financial Institutions and Markets in the United States. Kluwer Academic Publishers. 1994 (with Robert Eisenbeis).

"Prepaid Tuition Plans: An Exercise in Finance, Psychology and Politics," in Prepaid College Tuition Plans, The College Board, 1993.

"Banks and Banking Services," "Payment Services," "Savings," "Federal Deposit Insurance Corporation," for Encyclopedia Americana, 1992 edition.

"The Causes of Texas Bank and Thrift Failures," in If Texas Were Chile, by the Sequoia Institute, 1992.

"The Incentive Conflict Hypothesis: Opening Comment," in Reforming the American Banking System, Wharton Financial Institutions Center, 1991.

"The Collapse of the Texas S&L Industry," Restructuring the American Financial System: Recommendations from the Shadow Financial Regulatory Committee, Kluwer, 1990.

"Resolving the S&L Failures: The Southwest Plan," in Research in Financial Services, a Research Annual, JAI Press, 1990.

"Commentary on Banking Regulation," in Restructuring Banking and Financial Services in America, American Enterprise Institute, 1988.

"The Broad Segments of the Financial Markets," in The Banker's Handbook, 3rd ed., Dow Jones-Irwin, 1987.

"Is Subordinated Debt the Answer to Bank Capital Woes," in Bank Performance Annual, Warren Gorham & Lamont, 1986.

"Technological Innovation: Implications for Regulation of Financial Institutions," in Technological Innovation and the Monetary Economy, Columbia University Press, 1986.

"Financing Small Business," in Problems in the Financing of Small Business, JAI Press Inc., 1984.

"The Payments System and Public Policy," in Financial Services, Prentice-Hall for the American Assembly, 1983.

"Commercial Banks and Financial Markets," chapter in Handbook of Financial Markets: Securities, Options, Futures, F.J. Fabozzi and F.G. Zarb, eds., Homewood, Ill.: Dow-Jones-Irwin, 1981.

"Strategies for Deregulation," in The Deregulation of Depository Institutions, Proceedings of a Berkeley Business School Colloquium, David Pyle, ed., 1981.

"The Impact of Regulation of Financial Institutions on Competition and the Allocation of Resources," published in Government Regulation: Achieving Social and Economic Balance, Vol. 5, Joint Economic Committee, 1980.

"Commentary on Regulating the Solvency of Depository Institutions," published in Issues in Financial Regulation, McGraw-Hill, 1979.

"Bank Risks in the New International Financial Structure--Lessons from Bank Failures," published in The Emerging International Monetary Order, University Publishing Projects, Tel Aviv, 1976.

"The Role of Mergers in Fostering a Viable Banking System," published in Monetary Issues of the 1960s, University of Texas Press, 1968.

"Branch Banking, Mergers, and Competition," published in Banking and Monetary Studies, Richard D. Irwin, 1963.

"Economies of Scale in Banking," prepared for the Commission on Money and Credit. Published in Private Financial Institutions, Prentice-Hall, 1963.

Articles in Business Publications

"A New Bank-Thrift Charter: How to Design One," Journal of Retail Banking Services, Spring 1997.

"Financial Disclosure: Is More Always Better?" Journal of Retail Banking Services, Winter 1996.

Electronic Home Banking: Are We There Yet?," Texas Business Review, December 1996.

"ATM Surcharges: Their Effect on Competition and Efficiency," Journal of Retail Banking Services, Autumn 1996.

"What is the Future of Banking?" Harvard Business Review, July-August, 1991.

"Fraud by Thrift Insiders," American Banker, November, 1990.

"RTC Strategy: Problems with the Plan and the Process," Savings Account, March 1990.

"Should Foreign Deposits Be Subject to Insurance Assessments?," ABA Bankers Weekly, April 18, 1989.

"Capital Is the Best Deposit Insurance Protector," Outlook, July/August 1987.

"The Outlook for Financial Institutions," Midwestern Business and Economic Review, No. 5, Bureau of Business and Government Research, Midwestern State University, Fall 1986.

"How Risky Are Real Estate Ventures?" (with Clifford Fry and John Crockett), Outlook, September/October 1985.

"Lessons from the REIT Experience," The Bankers Magazine (with John H. Crockett and Clifford L. Fry), July-August 1984.

"Alternative Avenues to Interstate Banking," Economic Review, Federal Reserve Bank of Atlanta, May 1983. Reprinted in Bankers Desk Reference, 1983; and in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 2nd ed., 1984.

"Can Commercial Banks Meet the Competition?" National Association of Bank Women Journal, January 1983.

"Consolidation of the Regulatory Agency Structure," Economic Review, Federal Reserve Bank of Atlanta, December 1982.

"The Implications of the Deregulation Act for the Competitive Position of Depository Institutions," (with R. Zock), Issues in Bank Regulation, Autumn 1982.

"Geographic Restrictions on Financial Institutions," Economic Review, Federal Reserve Bank of Atlanta, September 1981.

"The Hunt Commission and Financial Reform in the 1970s," Review of Regional Economics and Business, Spring 1981.

"Viewing the Effectiveness of FDIC Cease-and-Desist Orders," Issues in Bank Regulation, Summer 1979.

"1979: A Critical Turning Point in Banking," Texas Business Executive, Spring 1979.

"Reporting to the Board of Directors," Board Reports for the Bank Director, Director Publication, Inc., 1978.

"Financial Reporting and Disclosure," Texas Business Review, April 1978.

"More Banking Laws Unneeded," Washington Post, November 6, 1977.

"Recent Changes in Bank Accounting and Reporting," Executive, Winter 1977.

"The FDIC as a Data Bank," (with Mary Mitchell) Bankers Monthly, November 1969.

"Commercial Bank Adjustments to Changes in Deposit Structure and Volume," Business Perspectives, Fall 1968.

"Area Redevelopment: Employment, Economics, Politics and New England," Boston University Business Review, Fall 1960.

"A Close Look at Bank Earnings," New England Economic Review, August 1959.

"The Investment Policies of Labor Unions," Boston University Business Review, Fall 1956.

Papers Published in Conference Proceedings

"Comment on Deposit Insurance: Do We Really Need It?," Preventing Banking Sector Crises in Latin America, The World Bank, 1996.

"The Implications of EC 1992 for U.S. Financial Markets and Institutions," (with R. Pettit). American Enterprise Institute Conference, 1992.

"Implications of the Texas Experience for Financial Regulation," Proceedings of a Conference on Banking Structure and Competition, Federal Reserve Bank of Chicago, 1989.

"The Management Consignment Program," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1987.

"The Case for High Capital Requirements," Thrift Financial Performance and Capital Adequacy, Federal Home Loan Bank of San Francisco, 1987.

"Banking Deregulation and Consumer Interests," The Changing Shape of Retail Banking, Comptroller of the Currency, 1985.

"Deposit Insurance After Deregulation," Proceedings of the Ninth Annual Conference, Federal Home Loan Bank of San Francisco, 1984.

"Deregulation and the Payments System," Payments in the Financial Services Industry of the 1980s, Federal Reserve Bank of Atlanta, 1984.

"Comments on Deposit Insurance," Proceedings of Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1983.

"Short-Run Financial Solutions for Troubled Thrift Institutions," (with R.R. Pettit), The Future of the Thrift Industry, Federal Reserve Bank of Boston Conference Series No. 24.

"Deregulation and Financial Products and Services," Deregulation of Product Lines. Proceedings of a Colloquium, Board of Governors of the Federal Reserve System, July 1982.

"Geographical Restrictions on Financial Institutions," The Future of the Financial Services Industry, Conference Proceedings, Federal Bank of Atlanta, 1981.

"Nonlocal Competition in Banking," Proceedings of a Conference on the Future of the Financial Industry, American Bankers Association, 1981.

"The Pricing of Federal Reserve Services," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1979.

"The Membership Problem of the Federal Reserve and Its Relationship to the Provision and Pricing of Payments Services," Proceedings of a Conference on Reserve Requirements and the Role of the Federal Reserve System, Federal Reserve Bank of Chicago, 1978.

"Commentary on Regulation of Bank Holding Companies," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1978.

"Commentary on the Impact of Public Disclosure of Bank Supervision and Regulation," Federal Reserve Policies and Public Disclosure, American Enterprise Institute, 1978.

"Interest Rate Regulations: Past History and Future Prospects," Proceedings of University of Houston Banking Symposium, 1977.

"Consumer Protection: Burdens and Benefits," published in Proceedings of University of Houston Banking Symposium, 1977.

"Indirect Control of Inflation," published in Inflation: 1970 Style, Southern Newspaper Publishers Association, 1970.

## PROFESSIONAL MEETINGS

Presented papers or served as discussant or session chairman at meetings of:

American Economic Association
Eastern Finance Association
Midwestern Economic Association
Western Economic Association
Western Finance Association
American Finance Association
American Statistical Association
Southern Finance Association
Financial Management Association
National Economists Club
Southwest Finance Association

## OTHER PROFESSIONAL ACTIVITIES

### Editorial

Editorial Board, Research in Financial Services, 1992-1995
Co-editor, Journal of Financial Services Research, 1987-2000
Member, Editorial Advisory Board, Journal of Bank Research, 1982-1986
Associate Editor, Journal of Financial Research, 1981-1986
Member, Editorial Board, The Financial Review, 1972-1974
Associate Editor, Financial Management, 1972-1974
Associate Editor, National Banking Review, 1963-1966

### Advisory Committees

Shadow Financial Regulatory Committee, 1986-
Federal Savings and Loan Advisory Committee, 1986-1987
Economic Advisory Council, Texas Economic Development Commission 1985-1986
Florida House of Representatives Interstate Banking Study Group, 1983
Presidential Advisory Task Force on Small Business, 1980
Advisory Committee, FDIC Study of State-Federal Regulation of Banking, 1977
Selection Panel for Research Support in Finance, National Science Foundation, 1975-1980
National Commission on Consumer Finance, 1970-1972

Other Teaching

Faculty, Stonier Graduate School of Banking, 1970-1977
Visiting Professor of Finance, George Washington University, 1974-1977
Instructor, Assembly for Bank Directors, 1974
Faculty, Pacific Coast Banking School, 1972
Lecturer, Georgetown University, 1969-1972

Testimony

Testified at Hearings
Conducted by: U.S. House Banking Committee
U.S. House Small Business Committee
U.S. House Committee on Government Operations
U.S. Senate Banking Committee
Texas Senate Economic Development Committee
U.S. Office of Thrift Supervision

Consulting

Consultant to: U.S. Treasury Department
Small Business Administration
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board
U.S. League of Savings Institutions
American Bankers Association
Association of Reserve City Bankers
Commission on Money and Credit
Commercial banks, thrift institutions, law firms

Board of Directors

Bank United of Texas (1989-2001)
Federal Home Loan Bank of Dallas (1983-1989)
PULSE EFT Association, Inc. (1990-1996)
Director of Three Savings and Loans in FSLIC Management Consignment Program, 1986-1988.

Other Professional Activities

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-1983
Columnist, The American Banker, 1981-1990.

# Sterling Savings Association
# Actual Return on Average Assets
# 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 2a




Note:
Return on Average Assets is calculated as pre-tax, pre-amortization income divided by average total assets.
* ROAA for the six-month periods ended 12/31/89, 6/30/89, 12/31/96, and the nine-month period ended 9/30/06 is annualized for comparison purposes.
† In the six months ended 12/31/96, the OTS assessed a one-time fee on thrifts to replenish the SAIF insurance fund.

**EXHIBIT B**

# Sterling Savings Association
# Actual Total Assets and Foregone Assets
# 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 1




**EXHIBIT C**

# Sterling Savings Association
# Comparison of Actual Core Capital With But-for Core Capital
# 12/31/1989

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Tables 2a, 3a, 3c, 4a, 4b, 4c, and 5




**EXHIBIT D**

Note: [1] Other but-for adjustments include incremental dividends on the unit offering, incremental but-for income (losses), and the cost of acquiring branches from Great American.
[2] Due to limitations in TFR reporting in December 31, 1989, this is calculated as 1.5% of Sterling's actual tangible assets.

# *Sterling Savings Association v. United States*

## Corrected Expert Report
## of Paul Horvitz

# STERLING SAVINGS BANK
## Damages Calculation - Corrected
## CJ-4 Loss Due to Improper Enforcement of Loans-to-One Borrower Regulation

**#8 CJ-4 ASSOCIATES**

| | DATE | INV # | CHECK # | AMOUNT |
|---|---|---|---|---|
| **LEGAL COSTS:** | | | | |
| WKDT - CJ-4 ASSOCIATES | 11/14/90 | 81315-285 | | 896.25 |
| WKDT - CJ-4 ASSOCIATES | 10/23/90 | 81315-285 | | 3,557.33 |
| WKDT - CJ-4 ASSOCIATES | 9/17/90 | 81315-285 | | 947.60 |
| WKDT - CJ-4 ASSOCIATES | 6/12/90 | 81315-285 | | 712.45 |
| WKDT - CJ-4 ASSOCIATES | 8/13/90 | 81315-285 | | 1,039.30 |
| WKDT - CJ-4 ASSOCIATES | 5/11/90 | 81315-285 | | 717.90 |
| WKDT - CJ-4 ASSOCIATES | 4/10/90 | 81315-285 | | 2,468.65 |
| WKDT - CJ-4 ASSOCIATES | 2/5/90 | 81315-285 | | 1,652.71 |
| | | | | 11,992.19 |
| **CJ-4 RELATED COSTS:** | | | | |
| ESTABLISH LOSS AT FORECLOSURE | | 2/26/91 | | 801,450.00 |
| LOSS ON SALE OF NORTH HALF OF PROJECT | | 11/30/91 | | 9,417.43 |
| ADDITIONAL RESERVE ESTABLISHED | | | | 128,133.00 |
| RECOVERY UPON SALE OF SOUTH HALF OF PROJECT | | 9/30/92 | | (91,711.00) |
| | | | | 847,289.43 |
| INTEREST ACCRUED AT 2/26/91 WRITTEN OFF | | | | 457,394.78 |
| | months | principal | int. rate | |
| INTEREST 2/26/91 - 11/30/91(1) | 9 | 2384544 (2) | 0.095 | 169,898.76 |
| INTEREST 12/01/91 - 9/30/92(1) | 10 | 1393629 (3) | 0.095 | 110,328.96 |
| | | | 0.095 | 0.00 |
| TOTAL INTEREST | 19 | | | 280,227.72 |
| LATE CHARGES | | | | 18,240.00 |
| TOTAL COST | | | | 1,615,144.12 |

(1)THE LOAN RATE WAS BARR+1.5%, FLOOR OF 9.5%
(2)REPRESENTS THE LOAN BALANCE OF 2,400,000, LESS UNDISBURSED LIP OF 15,456.
(3)REPRESENTS THE PRIOR MONTH'S BALANCE LESS THE SALE PROCEEDS FROM THE NORTH 1/2 OF PROJECT.

Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C Senior Judge Smith |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## EXPERT REPORT OF PAUL HORVITZ - CORRECTED

I. Identification, Qualifications, and Background for Opinions

My Name is Paul Horvitz and my business address is 150 Sugarberry Circle, Houston, Texas 77024. I am Professor Emeritus of Finance at the University of Houston.

The information required by paragraph V.A.1. of the *Winstar*-related case Discovery Plan concerning my qualifications, publications, compensation and prior testimony has previously been provided to the government. Another copy of my resume is attached as Exhibit 1.

I have been retained by counsel for Sterling Savings Association and Sterling Financial Corporation to testify as an expert in this case on matters relating to the expectation damages due to Sterling as a result of the government's breach of its three

contractual agreements with Sterling relating to its acquisitions of Lewis Federal Savings and Loan Association, Tri-Cities Savings and Loan Association, and Central Evergreen Federal Savings and Loan Association.

This Report (including its Exhibits) sets forth the opinions about which I expect to testify as part of Sterling Savings direct case at the trial of this matter, together with a statement of the bases and reasons for these opinions. In forming my opinions, I have considered the data and information described in Exhibit 2 to this Report. I have also met with members of the management of Sterling Savings.

## II. The Thrift Crisis

This litigation grows out of contracts between Sterling Savings Association and the Federal Home Loan Bank Board involving acquisitions of three troubled institutions during the savings and loan crisis of the 1980s. The breach of these contracts by the government caused Sterling to suffer serious damage. Understanding the magnitude of these damages requires some background on the nature of the thrift crisis and the history and strategy of Sterling.

The traditional economic role of the savings and loan industry involved using deposits obtained from the public to make mortgage loans to homeowners. In the early 1980s thrift institutions were in serious financial condition because the unprecedented level of interest rates prevailing in the market forced them to pay interest on their deposits at rates substantially higher than the rates they were earning on their assets.

Since nearly all the deposits had very short maturities, an institution that did not pay going market rates was subject to a rapid outflow of deposits. The assets, on the other hand, were primarily long-term fixed-rate mortgage loans made at various times in the past at interest rates much lower than those prevailing in the 1980s. That is, 30-year mortgage loans made in 1975 were still on the books in 1981—providing income of 6% at a time when thrifts were paying interest on deposits at 12%.

In this environment, nearly all thrift institutions suffered monthly operating losses, and these losses reduced their book net worth. These losses were so severe that

many institutions became "technically insolvent," in the sense that their liabilities exceeded the book value of their assets.

The problem was even worse when viewed in terms of the market values of thrift mortgage assets. A 6% mortgage with an outstanding balance of, say, $100,000 is not worth $100,000 to a buyer who could buy 12% mortgages instead. In the early 1980s many thrift institutions held high-quality mortgage assets with market values equal to only 70% of their book value. Any potential buyer of such a thrift would take that into account.

It is important to recognize that the situation described in the preceding paragraphs does not apply to Sterling. Sterling opened for business in 1983, after the peak in interest rates. Sterling did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s. All the loans it held were made at current market rates, exceeding the rates it was paying on deposits. Sterling was profitable shortly after opening.[1] This distinction—important in the early 1980s when its first acquisition was done—became even more important as the nature of the thrift crisis changed in the late 1980s.

As thrift institutions attempted to work their way out of the financial weakness caused by the interest rate problem, many were tempted to invest in riskier assets, such as commercial real estate or business loans, or equity investments in real estate. This approach was facilitated and encouraged by the legislative changes enacted to deal with the problem—The Depository Institutions Deregulation and Monetary Control Act of 1980, and the Garn-St Germain Act of 1982. Because of the severe real estate depression that occurred during the late 1980s and early 1990s, many of these investments had disastrous results. Again, it is important to recognize that Sterling was not under pressure to take greater risks to order to return to solvency. Sterling was a sound financial institution all during the troubled period of the 1980s.[2]

In a number of these Goodwill cases, the government has argued that the plaintiff institutions were weak institutions themselves, and that the transactions benefited the acquirers—in some cases saving them from regulatory seizure—even though there was a breach of the contract. That argument is clearly not applicable to Sterling. This case is,

[1] See Exhibit 3.
[2] See Exhibit 3.

in my opinion, simpler than many others because of the financial soundness and profitability of Sterling during the relevant period. These considerations also make it easier to measure the damages due to the breach.

## III. Deposit Insurance and Regulation

The government has a long history of direct involvement in the thrift industry. Two elements of that involvement are directly relevant here: first, the government, through the Federal Savings and Loan Insurance Corporation, insured deposits at savings and loans, and was thus directly at risk when an insured institution failed; second, the government regulated the safety and solvency of thrift institutions, in large part by setting minimum capital requirements for insured institutions.

As noted above, during the 1980s many thrift institutions were unable to meet their capital requirements, and were in danger of becoming insolvent. The magnitude of the problem swamped the resources of the FSLIC. It did not have sufficient funds to follow its usual approaches to dealing with thrift failures—providing financial assistance so that a healthy institution could afford to take over a failing one, or liquidating the failed institution.

The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). Those thrifts believed that the opportunity to expand and enter new markets could justify absorbing the negative net worth of the failing institutions, given government assurances as to the manner in which the negative net worth was treated for regulatory purposes. Specifically, these transactions required the use of purchase accounting, with an understanding that the resulting goodwill would be included as an asset like all other assets in the calculation of regulatory capital. Obviously, this did not eliminate the hole, but, in effect, allowed it to be absorbed over time through amortization of the goodwill. In some cases, in addition to cash assistance, a "capital credit" provision in the contract allowed the acquiring thrift to double-count the amount of the cash assistance in its calculations of regulatory capital. This method of handling failures represented a substantial benefit to FSLIC, as the regulatory credits and forbearances represented no real cost to FSLIC, but allowed it to resolve cases at a much

lower cost than if it were forced to use cash to fill the net worth holes of the failed institutions.

Since the resulting institution would often be operating with greater leverage (as traditionally measured) than previous regulations had called for, it was important that FSLIC have confidence in the management quality and operating strength of the thrifts with which it contracted. It was common for FSLIC to perform a "viability" analysis to be sure that the resulting institution could operate successfully, even in a difficult economic environment.

## IV. The Sterling Acquisitions

The first acquisition by Sterling was of Lewis Federal Savings and Loan Association in November 1985. Lewis had assets of approximately $52.5 million.[3] The FSLIC estimated that liquidation of Lewis would cost it $6 million.[4] Sterling agreed to take over the assets and liabilities of Lewis in exchange for a cash contribution from the FSLIC of $1.75 million. Sterling was to amortize the resulting $2.044 million goodwill on a straight-line basis over 40 years. Sterling received a permanent capital credit of $1.75 million, meaning that in calculating its compliance with the capital requirements, it could add $1.75 million to the capital on its financial reports.[5]

Sterling acquired Tri-Cities Savings and Loan Association in April 1988. Tri-Cities had assets of approximately $54.5 million.[6] Sterling received cash assistance of $11.7 million, with a permanent capital credit of that amount. The resulting $2.608 million goodwill was to be amortized on a straight-line basis over 15 years.[7] The cash assistance of $11.7 million may be compared with the FSLIC estimate of $20.7 million as the cost of liquidation.[8]

---

[3] Total assets of $52.5 million as of August 31, 1985. Source: FHLBB Issues Memorandum, October 23, 1985, p. 1 [WOF014 0450]. $51.7 million estimated fair market value of assets at time of acquisition, November 1985. Source: 1986 Annual Report, Note 10.

[4] Source: FHLBB Issues Memorandum, October 23, 1985, p. 3 [WOF014 0450-0454].

[5] Source: FHLBB Issues Memorandum, October 23, 1985, p. 3 [WOF014 0450-0454], FHLBB S Memorandum, October 23, 1985, p. 6 [WOF014 0473 - 0481] and data from Sterling Savings Association.

[6] $54.5 million in total assets as of February 29, 1988. Source: FHLBB S Memorandum, March 31, 1988, p. 1 [WOF014 1079-090]. Estimated fair market value of non-intangible assets at time of acquisition was $67.2 million. Source: 1988 Annual Report, Note 11.

[7] Source: Data from Sterling Savings Association.

[8] Source: FHLBB Issue Memorandum, April 6, 1988, p. 3 [WOF014 1091-095].

Sterling agreed to take over Central Evergreen Federal Savings and Loan Association in December 1988. Central Evergreen had assets of $260.4 million and negative GAAP net worth of approximately $12.4 million.[9] Due to this acquisition, Sterling recorded $13.603 million in unidentified intangibles and $8.480 in identified intangibles ($6.48 million relating to existing deposits and $2.0 million related to loan servicing rights), which Sterling agreed to amortize on a GAAP level-yield basis over 12 and 8 years, respectively.[10] There was no cash assistance involved, though there were other provisions that are relevant to the calculation of damages from the breach. In particular, the agreement required Sterling to operate in accord with its business plan. The government estimated that alternative solutions would involve cash assistance of $8-10 million.[11] While the government did not make a formal liquidation cost analysis because the transaction did not involve direct financial assistance to Sterling, the cost of liquidation would normally be expected to exceed the negative net worth.

As with all contracts freely entered into, both parties expected to benefit although the contracts imposed obligations on them. The government resolved its deposit insurance obligations for three troubled institutions at a lower cost than any alternative solutions. The total amount of cash assistance provided by FSLIC was under $14 million, and the regulatory provisions of the contract involved no real costs to the government. Sterling expected to benefit from the contracts, and would have if they were not breached. Sterling had followed a strategy of growth, focused on deposit gathering in smaller communities. The acquisitions fit into that strategy, and justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance, provided the capital provisions of the contract were maintained. The breach in 1989, almost immediately after the Central Evergreen transaction, imposed substantial costs on Sterling, and nearly led to its seizure by the regulators.

## V. The History of Sterling up to the Breach

---

[9] As of September 30, 1988. Source: FHLBB Memorandum, December 5, 1988, p. 1 [WOT942 0329]. Estimated fair market values at the time of acquisition for assets and net worth were $226.8 million and negative $22.1 million, respectively. Source: 1989 Annual Report, Note 13.

[10] Source: 1989 Annual Report, Note 13 and data from Sterling Savings Association.

[11] Source: FHLBB Memorandum, Application for Voluntary Supervisory Conversion and Merger of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988, p. 5 [WOT942 0356].

Sterling began operations in 1983, and was profitable by the end of its first year of business. Its deposits, assets and profits increased each year without interruption through fiscal year 1989.[12] During that time period Sterling absorbed the three failing institutions with which it had contracts with the government, as well the noncontractual acquisitions of Lewis and Clark Savings and Loan and several branches.

Sterling successfully integrated all these acquisitions into its operations. Its growth and profitability were attained through sound and conservative operating policies.[13] Sterling received high marks from its state and federal examiners all during this period.[14] As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large unassisted absorption of Central Evergreen in December 1988.[15] Prior to its acquisition by Sterling, Central Evergreen was incurring large operating losses.[16] In 1989, then, prior to the breach, Sterling was well on its way towards its goal of becoming a major player in the Northwest market in accord with its original and consistently maintained business strategy.[17]

The rapid growth during the 1980s, and particularly the acquisition of troubled thrifts with liabilities in excess of assets left Sterling in an undercapitalized position. At June 30, 1989 Sterling had equity equal to 1.4% of total assets, as compared with a ratio of 2.2% a year earlier. The decrease in the ratio was a result of the Central Evergreen acquisition which involved a 70% increase in assets with no increase in regulatory capital. Despite this, Sterling had regulatory capital modestly in excess of its requirements.[18] Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million[19] that would have left the institution with a comfortable margin above the minimum requirements, and with a cushion that would

[12] See Exhibit 3.
[13] Source: FHLBB Memorandum, Voluntary Supervisory Conversion of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988 p. 4 [WOT942 0332].
[14] Source: Same as note 13.
[15] Source: 1989 Annual Report, p. 19.
[16] Source: FHLBB Memorandum, Voluntary Supervisory Conversion of Central Evergreen Federal Savings & Loan and Simultaneous Merger into Sterling Savings Association, December 5, 1988, p. 2-3 [WOT942 0329 - 0331].
[17] Source: 1989 Annual Report, p. 2-3.
[18] Source: 1989 Annual Report, p. 17.
[19] Figure is net of costs. Source: 1990 Annual Report, p. 8.

allow for further growth. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement.[20]

The success of Sterling during the 1980s was due primarily to its good management.. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. The plan was implemented with considerable skill, and success was achieved despite the fact that the industry and economic environment of the 1980s was not a favorable one. It is important to recognize that Sterling had the same management team throughout this period, and the same management and business strategy would have been in place absent the breach.

## VI. Effects of the Breach on Sterling

FIRREA imposed new and higher capital requirements on all thrift institutions. Those requirements would not have been a problem for Sterling to meet, if its contractual arrangements with the government remained in force. However, the OTS issued regulations that led to a substantial reduction in the extent to which supervisory goodwill or capital credits could be counted toward the new capital requirements. The magnitude of the effect on Sterling is shown in its June 30, 1990 Annual Report. Sterling calculated that under its Agreements with the government, its regulatory capital at that time exceeded its required capital by $1.8 million.[21] Under the OTS regulations at June 30, 1990, however, Sterling had a shortfall of $21.4 million in its tangible and core requirements, and a shortfall of $26.6 million in its risk-based requirement.[22] These figures do not include Sterling's proposed $10.5 million equity offering planned in 1989. That offering was cancelled because of the OTS refusal to commit to allowing Sterling to pay dividends on the preferred stock that was part of the offering.[23] It is not surprising that investors are not interested in purchasing preferred stock on which dividends may not be paid. The inability of Sterling to obtain the use of this $10.5 million of capital is

[20] Source: Sterling Savings Association, Fiscal 1989 Business Plan update to include the acquisition of Central Evergreen, August 15, 1988, p. 2. [WON944 2310].
[21] Source: 1990 Annual Report, Note 17.
[22] Source: June 30, 1990 Thrift Financial Report (Sheshunoff).
[23] Source: 1990 Annual Report, p. 8.

part of the damage it suffered due to the breach. Absent the breach, it is clear that Sterling would have had the use of this capital. By wiping out a large part of Sterling's regulatory capital, and preventing it from raising additional capital, the breach had a devastating effect on Sterling that came within a hairsbreadth of becoming fatal.

## VII. Sterling's Response to the Breach

Following the breach, Sterling did attempt to return to compliance with the capital regulations requirements set by OTS. While on the litigation front Sterling contended that it was not subject to the regulations that disallowed contractual goodwill, on the banking side it operated as required by OTS. Because it was not in compliance with OTS capital requirements, Sterling was required to prepare and submit a capital plan, demonstrating how it could return to capital compliance, even with the immediate loss of supervisory goodwill and the scheduled future phaseout.

The new capital plan required a turn away from the growth and expansion strategy that had brought success to Sterling in the past. Since its capital ratios were low because of the breach, Sterling took action on both the numerator of the ratio (capital) and the denominator (assets).[24] Sterling shrunk its asset base, declining in size for the first time in its history. Total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%.[25]

While the planned 1989 capital raising was a victim of the breach, Sterling continued to work towards raising new capital. Virtually no capital deficient thrift institutions were able to tap the capital markets in 1990 and 1991, at least partly because the adverse effects of FIRREA and the breach. As distinct from most such institutions, however, Sterling managed to operate at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991.[26] This allowed Sterling to go to the capital market in 1991, earlier than any capital deficient thrift that I am aware of. Sterling raised gross proceeds of $23.7 million in late 1991 that allowed it to return to full capital compliance.[27]

---

[24] Source: Capital Restoration Plan, January 5,1990, p. 14-16 [SG 0705842 – SG 0705844].
[25] See Exhibit 4.
[26] See Exhibit 4.
[27] Source: 1992 Annual Report, p. 23.

It is important to be precise about the nature and effect of the breach, and Sterling's position after the breach. While there is a dispute about the applicability of the capital requirements of FIRREA to Sterling during the period covered by the August 1988 business plan, Sterling would eventually be subject to the higher FIRREA capital requirements.[28] Regardless of the dispute, even absent the breach that wiped out a large part of Sterling's regulatory capital, Sterling would have wanted additional capital. While it would have been in compliance with the FIRREA capital requirements, Sterling would not have had the capital necessary to continue its growth-oriented strategy. Based on my analysis of Sterling's financial position and strategy, and my discussions with Sterling management, it is my opinion that, absent the breach, Sterling would have raised capital as it did in 1991. That is, I do not view the 1991 capital raising as mitigation, and hence, in my opinion, the costs of that capital raising are not appropriately treated as damages due to the breach.

Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy. In the mid-1990s Sterling modified its strategy to shift back from the traditional savings institution focus on home-mortgage lending that was the result of Sterling's acquisitions, towards becoming the full-service community bank that had been part of its original strategic plan. Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits.[29] Sterling has continued to operate successfully, with increasing assets and profits during the 1990s.[30]

As in the 1980s, Sterling's success in the 1990s has been due to the quality of its management and its skill in implementing a valid business strategy. The greater success in the 1990s, after overcoming the immediate impact of the breach, was due in part to the fact that the 1990s turned out to be years with very favorable economic conditions, particularly in the Northwest.[31]

---

[28] The Central Evergreen Business Plan, August 15, 1988, which was accepted by the FHLBB in conjunction with the Central Evergreen acquisition implicitly recognized that Sterling could operate with lower capital ratios that those outlined in the FIRREA legislation.
[29] See Exhibit 5.
[30] See Exhibit 4.
[31] See for example, Mitchell Reports – US Bank Regional Economic Forecasts 1990 – 2000, Northwest Portrait and Western Region.

## VIII. Expectation Damages

The purpose of this Report is to present an estimate of the "expectation damages" suffered by Sterling as a result of the government's breach. The concept of expectation damages attempts to restore to the non-breaching party the benefit of its bargain, putting it in the position it would have been in had the breach not occurred. That is, Sterling should receive the profits it would have earned and recoup the costs it would not have incurred had the contract not been breached.

If damages were calculated and paid at the time of the breach, they would involve only future "expected" damages. However, since damages were not assessed in 1989, they must include "past" damages, from the time of the breach until trial, as well as "future" damages. Since it is a fundamental principle of economics that information is valuable, the assessment of damages must use all information available at the time of assessment. It would be inconsistent with economic theory to calculate expectation damages today using only information available at the time of the breach.

Calculating expectation damages necessarily requires a determination of what would have happened absent the breach. To do so requires an understanding of the thrift's history, financial position, management, and business strategy, as described in the preceding pages, as well as its operating environment, the economy, and interest rates, during the period from the time of the contract, through the breach, and to the present time. Since the damages to Sterling extend beyond the current time (e.g., the loss of the capital credits), making Sterling whole requires a determination of future benefits. Analyzing "what if" questions of this sort is a traditional role for economists. It is what economists are trained to do. And, of course, with respect to the past damages, all of the necessary inputs, including the economic environment and interest rates are known with certainty.

### A. Estimating Expectation Damages

The historical and factual background leads rather directly to the calculation of damages that Sterling suffered as a result of the government's breach. We know

Sterling's position at the time of the breach. The breach took away a substantial amount of Sterling's regulatory capital immediately, with more to be phased out over time. Because Sterling's goodwill exceeded its book capital, it immediately moved to a negative tangible net worth position, as compared with the 1 ½% of tangible assets requirement set by FIRREA.

It is a simple matter to calculate the amount of regulatory capital that Sterling would have had if its contracts with the government had been honored. That additional capital would have been used to support additional assets ("foregone assets"). Sterling would have earned a return on those foregone assets. Those "lost profits" from the time of the breach until today represent the past lost profits of Sterling. That is, the elimination of regulatory capital resulting from the breach forced Sterling to be smaller and less profitable than it otherwise would have been from the time of the breach to the present.

Further, if the contracts had been honored, Sterling would still have $13.48 million of the capital credits resulting from the Lewis and Tri-Cities acquisitions, and $1.329 million of unamortized supervisory goodwill from all three transactions.[32] This additional capital would support additional assets into the future on which profits would be earned. In addition, Sterling suffered damages as a result of its weakened capital position due to the breach. Sterling incurred additional costs of litigation, supervision, raising funds, and handling troubled assets that were caused by the breach; that is, costs actually incurred that would not have been incurred absent the breach. These costs – wounded bank damages – are discussed in more detail in a later section of the Report. Finally, as noted above, Sterling was not able to raise capital as planned in 1989 due to the breach. The profits lost as a result of Sterling not having that capital must be included in the lost profits calculation.

The methodology for calculating these damages involves straightforward financial modeling of the sort that has been widely accepted and used in the thrift and banking business (and by federal thrift and bank regulators) for many years. Of course, thrift earnings are affected by the economic environment and interest rates. However, for the period from the breach until the present time, both the economy and the movement of interest rates are known with absolute certainty. Indeed, Sterling's own actual earnings

[32] Data as of December 31, 2000. Source: Data from Sterling Savings Association

experience is completely known, and can be taken into account in determining the past earnings on the foregone assets. The amount of future foregone assets and the profits to be earned on them can also be determined through similar standard and well-accepted modeling techniques. This can be done to a reasonable degree of certainty, though not with the virtually complete certainty one can have about the past damages. Alternatively, the future lost profits damages can be estimated by calculating the cost today of replacing the remaining regulatory capital that Sterling would have absent the breach.

*Model assumptions and calculations*

The model used in my damage calculation is similar to the spreadsheet analyses that are standard in the industry and have been used in other cases. The derivation of the amount of disallowed regulatory capital is presented in my model.[33] The goodwill is amortized in accord with the contracts.

This capital is leveraged to determine the amount of foregone assets, as shown in Exhibit 6 – Table 5. The capital ratio used for this calculation comes directly from Sterling's 1989 Business Plan for 1989, 1990 and 1991, as specified in the contract for the Central Evergreen acquisition. For June 30, 1992 it is assumed that Sterling maintains a capital ratio of 5.5%, and that this ratio is increased over time to reach 6.75% by December 31, 1996. This is well in excess of the capital requirements set by FIRREA and FDICIA, and approximates or exceeds the capital ratio actually maintained by Sterling.

The assumption with respect to the capital ratio maintained by the non-breach bank is a crucial one to the damage model. I have opted for a conservative approach to the post-1991 capital ratio that understates the lost profits damages suffered by Sterling. It can be seen that the ratios used are conservative by reviewing the capital position of the pre-breach Sterling. Sterling had consistently emphasized a growth-oriented business strategy, and was comfortable with a relatively highly leveraged balance sheet.[34] That strategy would have been adhered to, absent the breach. In fact, the 1989 Business Plan,

[33] See Exhibit 6 – Table 4b.
[34] See Exhibit 4.

under which Sterling was authorized (and, indeed, required) to operate, reflects that high-leverage policy.[35]

Of course, Sterling would have complied with the minimum capital requirements that prevailed after FIRREA, and would probably have maintained some cushion above the minimum requirements (as most thrifts have done). But it is conservative to assume that Sterling, in the absence of the breach, would have maintained capital ratios that exceeded the actual Sterling. After all, Sterling in the 1990s had just come through a near-death experience—an experience due to a lack of regulatory capital. It is likely that Sterling management preferred to keep an extra cushion of capital because of that experience, and it is likely that the market enforced a similar discipline. Absent the breach, a Sterling that had always been in capital compliance even after FIRREA would not have operated with the same amount of excess capital.

The foregone assets in the model can be simply derived as the arithmetic product of the non-breach regulatory capital and the estimated leverage ratio. I imposed an additional restriction on the calculation of foregone assets, by limiting the year-to-year internal growth rate of the non-breach thrift to the internal growth rate of the actual thrift. Growth through acquisition by the actual thrift is added to the internal growth. The result is that the growth rate of the non-breach thrift is never larger than that of the actual thrift. This calculation is shown in Exhibit 6 – Tables 3e and 5.

The lost profits are based on the simple assumption that the non-breach Sterling earned profits on the foregone assets at the same rate that the actual Sterling did on its actual assets. This is a reasonable approximation, because the foregone assets are only a fraction of the actual assets. It is clear that they would have been invested subject to the same strategy and policies as the actual assets. In some other Goodwill cases, government witnesses have questioned whether a sufficient volume of assets was available in the market to meet the non-breach demands of the plaintiffs. That may be a legitimate question for thrifts with foregone assets of many billions of dollars. It is not an issue for an institution the size of Sterling. There are some other factors that must be considered, however.

[35] Source: Sterling Savings Association, Fiscal 1989 Business Plan update to include the acquisition of Central Evergreen, August 15, 1988 [WON944 2309].

The earnings that Sterling derived from its assets were affected by the fact that these assets were financed, to some extent, with equity capital on which no explicit interest payments were required. The foregone earning assets, on the other hand had to be financed dollar-for-dollar with interest costing liabilities. This factor would tend to make the profitability of the foregone assets less than that of the actual assets. On the other hand, there are several factors that work in the opposite direction.

It is widely believed that there are significant economies of scale in the operation of thrift institutions. That is, a larger institution will spread its fixed overhead costs over a larger volume of assets. There are economies in the acquisition of processing equipment and services. There are many fixed costs in the operation of a branch system, such that a larger volume of deposits can often be handled with very little increase in operating costs. Further, there are economies in the management of cash. An institution that grows by 50% does not generally need to hold 50% additional cash (a non-earning asset).

More important, absent the breach, Sterling would have had the opportunity to acquire assets and/or deposits from the RTC. Because of its capital deficiency in 1990 and 1991, Sterling was not able to participate in this market at the time in which the opportunities were the greatest. It has turned out to be the case that thrift institutions that purchased assets, deposits, or whole institutions from the RTC in its early years obtained great bargains. A thrift of which I have been a director made a number of such acquisitions, and these assets turned out to be very profitable. The opportunities for a thrift in the Northwest would have been substantial, particularly since Sterling would have been interested in acquisitions in smaller communities that were not desired by the giant banks and thrifts that comprised the bulk of the RTC's customers.[36]

In view of these considerations, it is my opinion that using the earnings rate of the actual Sterling as the basis for calculation of earnings on the foregone assets is conservative, and tends to understate the amount of Sterling's damages. It should be noted that I have followed this approach consistently, including the loss that Sterling suffered in 1996. The actual Sterling incurred losses in connection with a restructuring of its balance sheet and a shift in strategy toward commercial banking.[37] Sterling had about

[36] See Exhibit 7.
[37] Source: 1996 Annual Report, p.3.

$1.5 billion of assets in 1996. It is not likely that if Sterling had an additional $300 million of assets, that there would have been losses on these incremental assets. Nevertheless, I have modeled the damages on the assumption that the incremental bank suffered losses in 1996 similar to the actual Sterling experience.

Based on these parameters, I have calculated that Sterling's pre-tax profits from 1990 to 2000 would have been $75.777 million higher if there had not been a breach.[38] It is appropriate to use pre-tax figures here, since it is my understanding that any damage award paid to Sterling by the government will be subject to taxes. The calculations that lie behind this conclusion are shown in Exhibit 6.

B. Wounded Bank Damages

In addition to these lost profits, the actual bank suffered a reduction in its profits because of additional costs it incurred as a result of its weakened capital position. These "wounded bank" damages amount to at least $5.158 million. Mr. Byrne will testify in detail about these additional costs, but I have reviewed his calculations and discussed them with him. It is my opinion that the types of costs he describes are attributable to the breach, and would not have been incurred absent the breach. To make Sterling whole requires that it be compensated for these costs.

C. Future Damages

As of the beginning of 2001, absent the breach Sterling would still have $1.329 million of unamortized goodwill and the $13.5 million capital credit.[39] To make Sterling whole, the institution must be compensated for the value of that regulatory capital going forward. This regulatory capital would have great value, since it can be leveraged and will generate profits in the future as in the past. I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credit. His determination of the value is $21.264 million.

---

[38] See Exhibit 6 – Table 1.

[39] Data as of December 31, 2000. Source: Data from Sterling Savings Association

## IX. Summary

In summary, my determination of Sterling's expectation damages is $102.200 million. Exhibit 8 presents a summary of the amounts. As noted above, the lost earnings from 1990 through 2000 are $75.777 million, the wounded bank damages are $5.158 million, and the future damages are $21.264 million.

## X. Index of Exhibits

1. Curriculum Vitae
2. Documents Reviewed
3. Sterling Savings Association, Key Financial Data, 1983 – 1989
4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2000
5. Sterling Savings Association, Asset Composition, 1990 – 2000
6. Calculation of Lost Earnings on Foregone Assets
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

Paul Horvitz

9-6-01

Date

# PAUL M. HORVITZ

Judge James A. Elkins Professor of Banking and Finance
University of Houston

**ADDRESS**

(Office)
Department of Finance
College of Business Administration
University of Houston
Houston, Texas 77204-6282
(713) 743-4765

(Residence)
150 Sugarberry Circle
Houston, Texas 77024
(713) 784-5086

**EDUCATION**

| | | |
|---|---|---|
| Massachusetts Institute of Technology | Ph.D. | 1958 |
| Boston University | MBA | 1956 |
| University of Chicago | BA | 1954 |

**EMPLOYMENT HISTORY**

| | |
|---|---|
| **University of Houston** | |
| Judge James A. Elkins Professor of Banking and Finance | 1981- |
| Professor of Finance | 1977-1981 |
| **Federal Deposit Insurance Corporation** | |
| Assistant to the Chairman | 1976-1977 |
| Director of Research | 1968-1976 |
| Assistant Director of Research | 1967 |
| **Comptroller of the Currency** | |
| Associate Director, Department of Banking and Economic Research | 1966-1967 |
| Senior Economist | 1963-1965 |
| **Mitre Corporation** | |
| Economic Analyst | 1962-1963 |
| **Boston University** | |
| Assistant Professor of Finance | 1960-1962 |
| **Federal Reserve Bank of Boston** | |
| Financial Economist | 1956-1960 |

## SELECTED PUBLICATIONS

### Books and Monographs

Monetary Policy and the Financial System. Prentice-Hall, 6th edition, 1987.

Perspectives on Safe and Sound Banking. MIT Press, 1986 (with George Benston, Robert Eisenbeis, Edward Kane and George Kaufman).

Commercial Banking and Interstate Expansion, UMI Research Press, 1985 (with Larry A. Frieder, et al.).

Sources of Financing for Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

Problems in the Financing of Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

The Changing Environment of Non-Local Competition in U.S. Banking. American Bankers Association, 1981 (with Peter Merrill).

The Future Development of Foreign Banking Organizations in the U.S. American Bankers Association, 1981 (with Bernard Shull).

The Management of Commercial Bank Funds. American Institute of Banking, 2nd edition, 1980 (with George McKinney and William Brown).

Federal Reserve Membership. American Bankers Association, 1979 (with Peter Merrill).

Concentration and Competition in New England Banking. Federal Reserve Bank of Boston, 1958.

### Articles in Professional Journals

"Commercial Banks and Real Estate Lending: The Texas Experience," Journal of Regulatory Economics, Forthcoming, with (Robert Eisenbeis and Rebel Cole).

"Mortgage Loans to Non-Occupants as an Indicator of Racial Redlining," Journal of Financial Services Research, Forthcoming.

"Preserving Competition in Electronic Home Banking," Journal of Money, Credit and Banking, November 1996.

"Efficiency and Antitrust Considerations in Home Banking: The Proposed Microsoft-Intuit Merger,"
The Antitrust Bulletin, Summer 1996.

"Forbearance: An Empirical Analysis," Journal of Financial Services Research, March 1996, (with Emile J. Brinkmann and Ying-Lin Huang).
"Banking Regulation as a Solution to Financial Fragility," Journal of Financial Services Research, December 1995.

"Risk-Based Capital Standards and the Credit Crunch," Journal of Money, Credit and Banking, August, 1995 (with Emile J. Brinkmann).

"Rules Vs. Authorities in Banking Supervision," Korea Non-Bank Deposit Insurance CorporationJournal, Spring 1995 (with Insup Lee).

"Abnormal Returns in Post-FIRREA Acquisitions of Failed Thrifts," Journal of Financial Services Research, December 1994 (with Insup Lee).

"Mortgage Redlining: Race, Risk, and Demand," Journal of Finance, March 1994 (with Andrew Holmes).

"Management Incentives and Solvency Effects in Financially Distressed Government Controlled Institutions," (with Janice Barrow), Financial Management, December 1993.

"Valuation Effects of New Securities Issuance by Bank Holding Companies: New Evidence," Financial Review, 1991, (with Insup Lee and Kerry Robertson)

"The FSLIC Crisis and the Southwest Plan," American Economic Review, May 1989.

"Fear of Failing," Yale Journal on Regulation, Spring 1987.

"The Combination of Banking and Insurance: Implications for Regulation," Growth and Change, October 1985.

"Are S&L Participations in Real Estate Ventures Too Risky?" (with Clifford Fry and John Crockett), Real Estate Review, Summer 1985.

"Comment on Deposit Insurance in a Deregulated Environment," Journal of Finance, July 1984.

"The Implications of Changes in the Payments System for Interstate Banking," Journal of Corporation Law, Summer 1984.

"Reform of the Deposit Insurance System," Contemporary Policy Issues (with Tim Campbell), May 1984.

"The Case Against Risk-Related Deposit Insurance Premiums," Housing Finance Review, September 1983. Reprinted in Gardener, UK Banking Supervision, Allen & Unwin, 1986.

"Comments on Legal Reserve Requirements," Journal of Bank Research, Spring 1983.

"Reorganization of the Financial Regulatory Agencies," Journal of Bank Research, Winter 1983.

"Regulation of the Money Order Industry," Financial Management, Winter 1980.

"A Reconsideration of the Role of Bank Examination," Journal of Money, Credit and Banking, November 1980.

"Commercial Bank Financial Reporting and Disclosure," Journal of Contemporary Business, Summer 1977.

"Bank Failures and Deposit Insurance: The Alternatives," (with Robert Barnett and Stanley Silverberg), Banking Law Journal, April 1977.

"The Committee on Interest and Dividends: An Evaluation," Policy Analysis, Spring 1977.

"Failures of Large Banks: Implications for Banking Supervision and Deposit Insurance," Journal of Financial and Quantitative Analysis, November 1975. Reprinted in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 1980.

"The Hunt Commission Report: Comment," Journal of Finance, March 1974.

"The Pricing of Textbooks and the Remuneration of Authors," American Economic Review, May 1966. Reprinted in Johnson, The Daily Economist, Prentice-Hall, 1973.

"The Bank Merger Act of 1960: A Decade After," (with Bernard Shull), Antitrust Bulletin, Winter 1971. Reprinted in Reprints in Antitrust Law and Economics, 1972.

"Branch Banking, Independent Banks and Geographic Price Discrimination," (with Bernard Shull), Antitrust Bulletin, Winter 1969.

"Price Uniformity and Banking Markets," Appalachian Financial Review, 1969.

"A Note on Textbook Pricing," American Economic Review, September 1965.

"Stimulating Bank Competition through Regulatory Action," Journal of Finance, March 1965. Reprinted in Banking Markets and Financial Institutions, Irwin, 1971.

"Loan Loss Reserves," (with Sherman Shapiro), National Banking Review, September 1964.

"The Impact of Branch Banking on Bank Performance," (with Bernard Shull),

National Banking Review, December 1964. Reprinted in Banking Competition and the Banking Structure, Comptroller of the Currency, 1966.

"Branch Banking and the Structure of Competition," (with Bernard Shull), National Banking Review, March 1964. Reprinted in Banking Competition and the Banking Structure.

"Concentration Ratios and Competition," (with Deane Carson), National Banking Review, September 1963. Reprinted in Monetary Economics, Wadsworth, 1968; and Banking Competition and the Banking Structure.

"Bank Earnings and the Competition for Savings," Journal of Political Economy, February 1962.

Papers Published in Books:

"The Role of Forbearance and Its Costs in Handling Troubled and Failed Depository Institutions," in Reforming Financial Institutions and Markets in the United States. Kluwer Academic Publishers. 1994 (with Robert Eisenbeis).

"Prepaid Tuition Plans: An Exercise in Finance, Psychology and Politics," in Prepaid College Tuition Plans, The College Board, 1993.

"Banks and Banking Services," "Payment Services," "Savings," "Federal Deposit Insurance Corporation," for Encyclopedia Americana, 1992 edition.

"The Causes of Texas Bank and Thrift Failures," in If Texas Were Chile, by the Sequoia Institute, 1992.

"The Incentive Conflict Hypothesis: Opening Comment," in Reforming the American Banking System, Wharton Financial Institutions Center, 1991.

"The Collapse of the Texas S&L Industry," Restructuring the American Financial System: Recommendations from the Shadow Financial Regulatory Committee, Kluwer, 1990.

"Resolving the S&L Failures: The Southwest Plan," in Research in Financial Services, a Research Annual, JAI Press, 1990.

"Commentary on Banking Regulation," in Restructuring Banking and Financial Services in America, American Enterprise Institute, 1988.

"The Broad Segments of the Financial Markets," in The Banker's Handbook, 3rd ed., Dow Jones-Irwin, 1987.

"Is Subordinated Debt the Answer to Bank Capital Woes," in Bank Performance Annual, Warren Gorham & Lamont, 1986.

"Technological Innovation: Implications for Regulation of Financial Institutions," in Technological Innovation and the Monetary Economy, Columbia University Press, 1986.

"Financing Small Business," in Problems in the Financing of Small Business, JAI Press Inc., 1984.

"The Payments System and Public Policy," in Financial Services, Prentice-Hall for the American Assembly, 1983.

"Commercial Banks and Financial Markets," chapter in Handbook of Financial Markets: Securities, Options, Futures, F.J. Fabozzi and F.G. Zarb, eds., Homewood, Ill.: Dow-Jones-Irwin, 1981.

"Strategies for Deregulation," in The Deregulation of Depository Institutions, Proceedings of a Berkeley Business School Colloquium, David Pyle, ed., 1981.

"The Impact of Regulation of Financial Institutions on Competition and the Allocation of Resources," published in Government Regulation: Achieving Social and Economic Balance, Vol. 5, Joint Economic Committee, 1980.

"Commentary on Regulating the Solvency of Depository Institutions," published in Issues in Financial Regulation, McGraw-Hill, 1979.

"Bank Risks in the New International Financial Structure--Lessons from Bank Failures," published in The Emerging International Monetary Order, University Publishing Projects, Tel Aviv, 1976.

"The Role of Mergers in Fostering a Viable Banking System," published in Monetary Issues of the 1960s, University of Texas Press, 1968.

"Branch Banking, Mergers, and Competition," published in Banking and Monetary Studies, Richard D. Irwin, 1963.

"Economies of Scale in Banking," prepared for the Commission on Money and Credit. Published in Private Financial Institutions, Prentice-Hall, 1963.

Articles in Business Publications

"Financial Disclosure: Is More Always Better?" Journal of Retail Banking Services, Forthcoming.

Electronic Home Banking: Are We There Yet?," Texas Business Review, Forthcoming.

"ATM Surcharges: Their Effect on Competition and Efficiency," Journal of Retail Banking Services, Autumn 1996.

"What is the Future of Banking?" Harvard Business Review, July-August, 1991.

"Fraud by Thrift Insiders," American Banker, November, 1990.

"RTC Strategy: Problems with the Plan and the Process," Savings Account, March 1990.

"Should Foreign Deposits Be Subject to Insurance Assessments?," ABA Bankers Weekly, April 18, 1989.

"Capital Is the Best Deposit Insurance Protector," Outlook, July/August 1987.

"The Outlook for Financial Institutions," Midwestern Business and Economic Review, No. 5, Bureau of Business and Government Research, Midwestern State University, Fall 1986.

"How Risky Are Real Estate Ventures?" (with Clifford Fry and John Crockett), Outlook, September/October 1985.

"Lessons from the REIT Experience," The Bankers Magazine (with John H. Crockett and Clifford L. Fry), July-August 1984.

"Alternative Avenues to Interstate Banking," Economic Review, Federal Reserve Bank of Atlanta, May 1983. Reprinted in Bankers Desk Reference, 1983; and in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 2nd ed., 1984.

"Can Commercial Banks Meet the Competition?" National Association of Bank Women Journal, January 1983.

"Consolidation of the Regulatory Agency Structure," Economic Review, Federal Reserve Bank of Atlanta, December 1982.

"The Implications of the Deregulation Act for the Competitive Position of Depository Institutions," (with R. Zock), Issues in Bank Regulation, Autumn 1982.

"Geographic Restrictions on Financial Institutions," Economic Review, Federal Reserve Bank of Atlanta, September 1981.

"The Hunt Commission and Financial Reform in the 1970s," Review of Regional Economics and Business, Spring 1981.

"Viewing the Effectiveness of FDIC Cease-and-Desist Orders," Issues in Bank Regulation, Summer 1979.

"1979: A Critical Turning Point in Banking," Texas Business Executive, Spring 1979.

"Reporting to the Board of Directors," Board Reports for the Bank Director, Director Publication, Inc., 1978.

"Financial Reporting and Disclosure," Texas Business Review, April 1978.

"More Banking Laws Unneeded," Washington Post, November 6, 1977.

"Recent Changes in Bank Accounting and Reporting," Executive, Winter 1977.

"The FDIC as a Data Bank," (with Mary Mitchell) Bankers Monthly, November 1969.

"Commercial Bank Adjustments to Changes in Deposit Structure and Volume," Business Perspectives, Fall 1968.

"Area Redevelopment: Employment, Economics, Politics and New England," Boston University Business Review, Fall 1960.

"A Close Look at Bank Earnings," New England Economic Review, August 1959.

"The Investment Policies of Labor Unions," Boston University Business Review, Fall 1956.

Papers Published in Conference Proceedings

"Comment on Deposit Insurance: Do We Really Need It?," Preventing Banking Sector Crises in Latin America, The World Bank, 1996.

"The Implications of EC 1992 for U.S. Financial Markets and Institutions," (with R. Pettit). American Enterprise Institute Conference, 1992.

"Implications of the Texas Experience for Financial Regulation," Proceedings of a Conference on Banking Structure and Competition, Federal Reserve Bank of Chicago, 1989.

"The Management Consignment Program," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1987.

"The Case for High Capital Requirements," Thrift Financial Performance and Capital Adequacy, Federal Home Loan Bank of San Francisco, 1987.

"Banking Deregulation and Consumer Interests," The Changing Shape of Retail Banking, Comptroller of the Currency, 1985.

"Deposit Insurance After Deregulation," Proceedings of the Ninth Annual Conference, Federal Home Loan Bank of San Francisco, 1984.

"Deregulation and the Payments System," Payments in the Financial Services

Industry of the 1980s, Federal Reserve Bank of Atlanta, 1984.

"Comments on Deposit Insurance," Proceedings of Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1983.

"Short-Run Financial Solutions for Troubled Thrift Institutions," (with R.R. Pettit), The Future of the Thrift Industry, Federal Reserve Bank of Boston Conference Series No. 24.

"Deregulation and Financial Products and Services," Deregulation of Product Lines. Proceedings of a Colloquium, Board of Governors of the Federal Reserve System, July 1982.

"Geographical Restrictions on Financial Institutions," The Future of the Financial Services Industry, Conference Proceedings, Federal Bank of Atlanta, 1981.

"Nonlocal Competition in Banking," Proceedings of a Conference on the Future of the Financial Industry, American Bankers Association, 1981.

"The Pricing of Federal Reserve Services," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1979.

"The Membership Problem of the Federal Reserve and Its Relationship to the Provision and Pricing of Payments Services," Proceedings of a Conference on Reserve Requirements and the Role of the Federal Reserve System, Federal Reserve Bank of Chicago, 1978.

"Commentary on Regulation of Bank Holding Companies," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1978.

"Commentary on the Impact of Public Disclosure of Bank Supervision and Regulation," Federal Reserve Policies and Public Disclosure, American Enterprise Institute, 1978.

"Interest Rate Regulations: Past History and Future Prospects," Proceedings of University of Houston Banking Symposium, 1977.

"Consumer Protection: Burdens and Benefits," published in Proceedings of University of Houston Banking Symposium, 1977.

"Indirect Control of Inflation," published in Inflation: 1970 Style, Southern Newspaper Publishers Association, 1970.

## PROFESSIONAL MEETINGS

Presented papers or served as discussant or session chairman at meetings of:

American Economic Association
Eastern Finance Association
Midwestern Economic Association
Western Economic Association
Western Finance Association
American Finance Association
American Statistical Association
Southern Finance Association
Financial Management Association
National Economists Club
Southwest Finance Association

## OTHER PROFESSIONAL ACTIVITIES

### Editorial

Editorial Board, Research in Financial Services, 1992-
Co-editor, Journal of Financial Services Research, 1987-
Member, Editorial Advisory Board, Journal of Bank Research, 1982-1986
Associate Editor, Journal of Financial Research, 1981-1986
Member, Editorial Board, The Financial Review, 1972-1974
Associate Editor, Financial Management, 1972-1974
Associate Editor, National Banking Review, 1963-1966

### Advisory Committees

Shadow Financial Regulatory Committee, 1986-
Federal Savings and Loan Advisory Committee, 1986-1987
Economic Advisory Council, Texas Economic Development Commissio 1985-1986
Florida House of Representatives Interstate Banking Study Group, 1983
Presidential Advisory Task Force on Small Business, 1980
Advisory Committee, FDIC Study of State-Federal Regulation of Banking, 1977
Selection Panel for Research Support in Finance, National Science Foundation, 1975-1980
National Commission on Consumer Finance, 1970-1972

### Other Teaching

Faculty, Stonier Graduate School of Banking, 1970-1977
Visiting Professor of Finance, George Washington University, 1974-1977
Instructor, Assembly for Bank Directors, 1974

Faculty, Pacific Coast Banking School, 1972
Lecturer, Georgetown University, 1969-1972

Testimony

Testified at Hearings
Conducted by: U.S. House Banking Committee
U.S. House Small Business Committee
U.S. House Committee on Government Operations
U.S. Senate Banking Committee
Texas Senate Economic Development Committee
U.S. Office of Thrift Supervision

Consulting

Consultant to: U.S. Treasury Department
Small Business Administration
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board
U.S. League of Savings Institutions
American Bankers Association
Association of Reserve City Bankers
Commission on Money and Credit
Commercial banks, thrift institutions, law firms

Board of Directors

Bank United of Texas
Federal Home Loan Bank of Dallas (1983-1989)
PULSE EFT Association, Inc.
Director of Three Savings and Loans in FSLIC Management Consignment Program, 1986-1988.

Other Professional Activities

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-1983
Columnist, The American Banker, 1981-1990.

# Exhibit 2 - Corrected

## *Sterling Savings v. United States*

## Documents Reviewed by Paul Horvitz

### Sterling Savings Association/Financial Corporation 10-Ks

| | |
|---|---|
| Sterling Savings Association 10-K 1984 | SG-0705190-0705209 |
| Sterling Savings Association 10-K 1985 | SG-0705210-0705232 |
| Sterling Savings Association 10-K 1986 | SG-0705233-0705274 |
| Sterling Savings Association 10-K 1987 | SG-0705275-0705305 |
| Sterling Savings Association 10-K 1988 | SG-0705306-0705337 |
| Sterling Savings Association 10-K 1989 | SG-0705338-0705392 |
| Sterling Savings Association 10-K 1990 | SG-0705393-0705458 |
| Sterling Savings Association 10-K 1991 | SG-0705459-0705528 |
| Sterling Savings Association 10-K 1992 | SG-0705529-0705590 |
| Sterling Financial Corporation 10-K 1993 | SG-0705591-0705644 |
| Sterling Financial Corporation 10-K 1994 | SG-0705645-0705704 |
| Sterling Financial Corporation 10-K 1995 | SG-0705705-0705768 |
| Sterling Financial Corporation 10-K 1996 | SG-0705769-0705826 |
| Sterling Financial Corporation 10-K 1997 | SG-0702958-0703019 |
| Sterling Financial Corporation 10-K 1998 | SG-0702858-0702957 |
| Sterling Financial Corporation 10-K 1999 | SG-0703141-0703235 |
| Sterling Financial Corporation 10-K 2000 | SG-0706352-0706459 |

### Sterling Savings Association/Financial Corporation Annual Reports

Sterling Savings Association Annual Report 1983

Sterling Savings Association Annual Report 1984

Sterling Savings Association Annual Report 1985

Sterling Savings Association Annual Report 1986

Sterling Savings Association Annual Report 1987

Sterling Savings Association Annual Report 1988

Sterling Savings Association Annual Report 1989

| | |
|---|---|
| Sterling Savings Association Annual Report 1990 | |
| Sterling Savings Association Annual Report 1991 | |
| Sterling Savings Association Annual Report 1992 | |
| Sterling Financial Corporation Annual Report 1993 | |
| Sterling Financial Corporation Annual Report 1994 | |
| Sterling Financial Corporation Annual Report 1995 | |
| Sterling Financial Corporation Annual Report 1996 | |
| Sterling Financial Corporation Annual Report 1997 | SG-0703020-0703140 |
| Sterling Financial Corporation Annual Report 1998 | |
| Sterling Financial Corporation Annual Report 1999 | SG-0507880-0508002 |
| Sterling Financial Corporation Annual Report 2000 | |

## Sterling Savings Offering Circulars

| | |
|---|---|
| Sterling Savings: Offering Circular Subject to Completion, Dated 11/14/1989 | SG-0704660-0704788 |
| Sterling Savings Association: Offering Circular, Dated 11/20/1991 | SG-0704789-0704908 |
| Sterling Financial Corporation: Prospectus, Dated 2/4/1993 | SG-0704909-0704994 |
| Sterling Financial Corporation: Prospectus, Dated 5/3/1994 | SG-0704995-0705082 |
| Sterling Financial Corporation: Prospectus, Dated 5/30/1997 | SG-0705083-0705138 |
| Sterling Financial Corporation: Offering Memorandum, Dated 5/25/1999 | SG-0705139-0705189 |

## Sterling Savings Association Capital Restoration Plan

| | |
|---|---|
| Sterling Savings Association Capital Restoration Plan, January 5, 1990 | SG-0705827-0705925 |
| Sterling Savings Association Capital Restoration Plan, February 19, 1990 | SG-0705926-0705957 |

## Mitchell Reports - US Bank Regional Economic Forecasts 1990 - 2000

| | |
|---|---|
| Northwest Portrait: 1990 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700001-0700032 |
| Northwest Portrait: 1991 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-07004800700506 |

| | |
|---|---|
| Northwest Portrait: 1992 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700033-0700068 |
| Northwest Portrait: 1993 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700069-0700108 |
| Northwest Portrait: 1994 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700109-0700161 |
| Northwest Portrait: 1995 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700162-0700225 |
| Northwest Portrait: 1996 Annual Economic Review and Outlook Prepared by U.S. Bank and the Northwest Policy Center of the University of Washington Graduate School of Public Affairs | SG-0700226-0700296 |
| US Territory 1997: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1996 | SG-0700507-0700570 |
| US Territory 1998: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1997 | SG-0700297-0700360 |
| US Territory 1999: Western Region - A Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1998 | SG-0700361-0700411 |
| Territory 2000: US Bank Regional Economic Review and Forecast Prepared by the Economics Department of US Bank as of November 1999 | SG-0700412-0700466 |
| Territory 2000 - Western Region: Mid-Year Regional Economic Review Prepared by the Economics Department of US Bank as of May 2000 | SG-0700571-0700598 |

**Examination Reports: 1986 - 1998**

| | |
|---|---|
| Jointly - FHLB of Seattle and State of Washington: | |
| October 29, 1986 | SG-0052114-0052169 |
| Jointly - FHLB of Seattle and State of Washington: June 19, 1989 | SG-0052248-0052340 |
| Jointly - OTS and State of Washington: November 13, 1989 | SG-0052341-0052431 |
| FDIC: November 13, 1989 | SG-0052432-0052525 |
| Jointly - OTS and FDIC: September 17, 1990 | SG-0052526-0052592 |

| | |
|---|---|
| OTS: September 17, 1990 | SG-0052593-0052683 |
| Jointly - OTS and State of Washington: September 16, 1991 | SG-0052684-0052801 |
| FDIC: September 16, 1991 | SG-0052802-0052865 |
| Jointly - OTS, West Region, and State of Washington: August 10, 1992 | SG-0052866-0052929 |
| OTS: July 6, 1993 | SG-0052930-0052974 |
| OTS: June 30, 1994 | SG-0052975-0053016 |
| Jointly - State of Washington, OTS, and FDIC: August 21, 1995 | SG-0053017-0053088 |
| Jointly - State of Washington and OTS: September 16, 1996 | SG-0053089-0053164 |
| Jointly - State of Washington and OTS: October 14, 1997 | SG-0053165-0053238 |
| OTS: October 26, 1998 | SG-0053239-0053293 |

**Branch Reports and Internal Company Financial Statements: 1985 – 1989**

| | |
|---|---|
| November 1985 Financial Statements | SG-0097724-0097792 |
| 1986 Operating Budget | SG-0097353-0097366 |
| March 1986 Financial Statements | SG-0097501-0097552 |
| June 1986 Financial Statements | SG-0097367-0097408 |
| June 1987 Revised Financial Statements | SG-0099242-0099353 |
| April 1988 Financial Statements | SG-0100861-0100966 |
| June 1988 Financial Statements | SG-0101162-0101269 |
| December 1988 Financial Statements | SG-0101813-0101921 |
| June 1989 Financial Statements (no narrative) | SG-0102551-0102576 |
| June 1989 Financial Statements | SG-0102595-0102704 |
| September 1989 Financial Statements | SG-0102988-0103134 |
| December 1989 Financial Statements (no narrative) | SG-0103428-0103455 |
| December 1989 Financial Statements | SG-0103504-0103618 |

## Legal Briefs and Filings

**Amended Master Protective Order & Exhibit B Declaration of Expert**

**First Amended Complaint: April 21, 1995**

**Motion for Partial Summary Judgment Re: Liability & Affidavit of Leslie R. Weatherhead in Support of Motion with Exhibits A - G, January 16, 1997**

**Defendants First Phase II Case-Specific Interrogatories with Responses, February 24, 2000**

**Verified Complaint for Declaratory & Injunctive Relief, or in the Alternative, for Rescission & Damages, May 15, 1990**

**Defendant's Supplemental Memorandum in Opposition to Plaintiffs Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant s Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment: October 10, 2000**

| | |
|---|---|
| Exhibit 2.3: Acquisition Agreement between The Federal Savings and Loan Insurance Corporation as Receiver for Lewis Federal Savings and Loan Association and Sterling Savings Association: November 5, 1985 | DRI-07702-07716 |
| Federal Home Loan Bank Board Memo from James R. Faulstich (Principal Supervisory Agent) to Federal Home Loan Bank Board re FSLIC-Assisted Acquisition: October 8, 1985 | WOF-0140449 |
| Federal Home Loan Bank Board Letter from Jeff Sconyers (Secretary) to Sterling Savings Association, Harold B. Gilkey (CEO): November 12, 1985 | WOF-0140954-0140956 |
| Exhibit 2.1: Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association: November 5, 1985 | PwC-02716-02750 |
| Federal Home Loan Bank Board Resolution No. 85 - 985, Acquisition of Assets and Liabilities of Lewis Federal Savings and Loan Association: November 4, 1985 | WOL-6890510-6890516 |
| Federal Home Loan Bank Board Resolution 85 - 989: November 4, 1985 | XXX-1050145-1050146 |
| Federal Home Loan Bank Board Resolution No. 88 - 250P, Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings and Loan Association: April 7, 1988 | WON-9440767-9440777 |
| Federal Home Loan Bank Board Letter to Sterling Savings Association Board of Directors, Document FHLBB No. 7918: April 6, 1988 | WOR-4880389-4880390 |
| Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association: April 8, 1988 | WOL-6890111-6890193 |
| Agreement between the Federal Savings and Loan Insurance Corporation and Sterling Savings Association: December 28, 1988 | WON-8782164-8782169 |
| Federal Home Loan Bank Board Resolution No. 88 - 1273: December 8, 1988 | SG-0142033-0142039 |

| | |
|---|---|
| Coopers & Lybrand Letter to Sterling Savings Association Board of Directors: January 27, 1989 | SG-0142086-0142088 |
| Sterling Savings Association Memo from Daniel G. Byrne (Senior VP, Finance) to File: January 6, 1989 | SG-0142067-0142068 |
| Sterling Savings Association Annual Report to Shareholders: 1989 | SG-0062997-0063034 |
| Sterling Savings Association Capital Restoration Plan: February 19, 1990 | WOT-9421131-9421139 |
| Office of Thrift Supervision, Department of the Treasury, Letter from William J. Durbin (District Director) to Sterling Savings Association Board of Directors: May 22, 1990 | WOT-9421441-9421443 |
| Declaration of Carol A. Friend: June 14, 1990 | WOL-1230623-1230626 |
| Affidavit of William W. Zuppe: May 28, 1990 | WON-9520933-952095 |
| Office of Thrift Supervision, Department of the Treasury, Letter from Carol Friend (Assistant District Director) to Sterling Savings Association, Daniel G. Byrne (Senior VP, Finance): | |
| June 18, 1990 | WON-9530681 |
| Director of Office of Thrift Supervision, Department of the Treasury, Form 10 -Q for Sterling Savings Association: December 31, 1991 | WON-8801074-8801084 |
| Sterling Savings Association Letter from Daniel G. Byrne (Senior VP, Finance) to Office of Thrift Supervision, Edwin Hedlund (Assistant Regional Director): March 31, 1992 | WON-9312953-9312954 |
| Office of Thrift Supervision, Department of the Treasury, Letter from Edwin Hedlund (Assistant Regional Director) to Sterling Savings Association, Daniel G. Byrne (Senior VP, Finance): April 8, 1992 | WON-9200877 |
| Coopers & Lybrand Letter to Sterling Savings Association Board of Directors: July 28, 1988 | SG-0137651-0137652 |

**Plaintiffs' Reply to Defendants Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendants Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment (12-16-00) and Affidavit of William M. Symmes (12-15-00)**

| | |
|---|---|
| Continued Deposition Excerpts of William Zuppe: May 24, 2000 | 0000291-0000304 |
| Federal Home Loan Bank Board Resolution No. 88-1434 re approval of Supervisory Conversion and Merger of American Savings Bank | |

| | |
|---|---|
| (Springfield, IL), with Illinois Interim Federal Savings Bank Springfield, IL, and Merger with Citizens Federal Bank (Miami, FL), 1988 | 0000305 |
| Federal Home Loan Bank Board (Topeka, KS) letter from Mary Barnett, ICR Coordinator, to Commercial Federal Savings and Loan Association (Omaha, NE), Docket No. 05198, June 17, 1988 | 0000306 |
| Second Supplemental Affidavit and Exhibits of Daniel G. Byrne: December 16, 2000 | 0000307-0000353 |
| Deposition Excerpts and Exhibits of Edwin C. Hedlund: August 4, 2000 | 0000354 |
| Deposition Excerpts of Rodney W. Barnett: April 11, 2000 | 0000001-0000013 |
| Deposition Excerpts and Exhibits of Daniel G. Byrne: 07/10/00 | 0000014-0000076 |
| Deposition Excerpts and Exhibits of James R. Faulstich, Volumes I, II, III: August 1 - 3, 2000 | 0000077-0000157 |
| Deposition Excerpts of Harold Gilkey: June 6, 2000 | 0000159-0000178 |
| Deposition Excerpts of Edwin John Gray: July 26, 1999 | 0000179-0000181 |
| Deposition Excerpts and Exhibits of Patricia McJoynt: August 10, 2000 | 0000182-0000287 |
| Deposition Excerpts of Alvin W. Smuzynski: July 26, 1999 | 0000288-0000290 |

**Defendants Reply to Plaintiffs Supplemental Opposition to Defendants Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment, with Appendix: January 16, 2001**

**Motion for Partial Summary Judgment Re: Liability, and Affidavit of Leslie R. Weatherhead Re: Sterling Savings Association's Motion for Partial Summary Judgment Re: Liability, with Exhibits: January 17, 1997**

Exhibit A: Principal documentation evidencing Sterling Savings Association s agreements with the FSLIC and FHLBB in relation to Sterling's acquisition of Lewis Federal Savings and Loan Association: November 1985

Exhibit A-1: Letter from FHLBB to Harold Gilkey re forbearances: 8/14/85

Exhibit A-2: FHLBB Resolution 85-985: 11/4/85

Exhibit A-3: FHLBB Resolution 85-990: 11/4/85

Exhibit A-4: FHLBB s Appointment of Receiver for Lewis Federal S&LA, No. 85-984: 11/4/85

Exhibit A-5: Acquisition Agreement between FSLIC as Receiver for Lewis Federal S&LA and Sterling Savings Association: 11/5/85

Exhibit A-6: Assistance Agreement between FSLIC and Sterling Savings Association: 11/5/85

Exhibit A-7: Letter from FHLBB to Harold Gilkey re forbearances: 11/12/85

Exhibit A-8: FHLBB Resolution No. 85-984: 11/4/85

Exhibit A-9: FHLBB Resolution No. 85-986: 11/4/85

Exhibit A-10: FHLBB Resolution No. 85-987: 11/4/85

Exhibit A-11: FHLBB Resolution No. 85-988: 11/4/85

Exhibit A-12: FHLBB Resolution No. 85-989: 11/4/85

Exhibit B: Principal documentation evidencing Sterling Savings Association s agreements with FSLIC and FHLBB in relation to Sterling's acquisition of Tri-Cities Savings and Loan Association: April 1988

Exhibit B-1: Letter from FHLBB to Sterling Savings Association Board of Directors re forbearances: 4/6/88

Exhibit B-2: FHLBB Resolution No. 88-250P: 4/7/88

Exhibit B-3: FHLBBs Appointment of Receiver for Tri-Cities S&LA, No. 88-249P: 4/7/88

Exhibit B-4: Acquisition Agreement between FSLIC as Receiver for Tri-Cities S&LA and Sterling Savings Association: 4/8/88

Exhibit B-5: Assistance Agreement between FSLIC and Sterling Savings Association: 4/8/88

Exhibit B-6: FHLBB Order No. 807: 4/7/88

Exhibit B-7: FHLBB Resolution No. 88-249: 4/7/88

Exhibit B-8: FHLBB Resolution No. 88-251: 4/7/88

Exhibit B-9: FHLBB Resolution No. 88-252: 4/7/88

Exhibit B-10: FHLBB Resolution No. 88-253: 4/7/88

Exhibit B-11: FHLBB Resolution No. 88-254: 4/7/88

Exhibit B-12: Letter from Coopers & Lybrand to Sterling Savings Association Board of Directors re accounting principles: 7/28/88

Exhibit C: Principal documentation evidencing Sterling Savings Association s agreements with FSLIC and FHLBB in relation to Sterlings acquition of Central Evergreen Federal Savings and Loan Association: April 1988

Exhibit C-1: Letter from Coopers & Lybrand to Sterling Savings Association (D. Byrne) re net operating loss carryforwards: 1/30/89

Exhibit C-2: Letter from Coopers & Lybrand to Sterling Savings Association Board of Directors re accounting principles: 1/27/89

Exhibit C-3: Agreement between Sterling Savings Association and FSLIC: December 28, 1988

Exhibit C-4: Certificate of Corporate Resolution of Sterling Savings Association: December 22, 1988

Exhibit C-5: Memorandum from Graham and Dunn (P. Cann) to Betty Reed, et al., re Closing Memorandum - Conversion/Merger of Central Evergreen FS&LA into Sterling Savings Association: 12/20/88

Exhibit C-6: FHLBB Resolution No. 88-1273: 12/8/88

Exhibit C-7: Acquisition Agreement between Sterling Savings Association and Central Evergreen FS&LA: 7/20/88

Exhibit D: Affidavit of Harold Gilkey, without exhibits: 5/29/90

Exhibit E: Affidavit of William Zuppe, without exhibits: 5/28/90

Exhibit F: Opinion of the United States District Court, Published as Sterling Savings Assn. v. Ryan: 8/8/90

Exhibit G: Unpublished opinion of the United States Court of Appeals for Ninth District Court: 4/14/92

**Defendants Motion to Dismiss Plaintiff Sterling Financial Corporation; Cross-Motion for Summary Judgment; and Opposition to Plaintiffs Motion for Partial Summary Judgment, with Appendix: April 1, 1997**

**Sterling's Reply to: Motion for Partial Summary Judgment; Liability and Response to Cross-Motion to Dismiss & Supplemental Affidavit of Leslie R. Weatherhead: June 16, 1997**

Sterling Savings Associations Reply Re: Motion for Partial Summary Judgment Re: Liability, and Response to Cross-Motion to Dismiss

Supplemental Affidavit of Leslie R. Weatherhead Re: Sterling Savings Associations Motion for Partial Summary Judgment Re: Liability

Supplemental Affidavit of Harold B. Gilkey

Supplemental Affidavit of Daniel G. Byrne

Affidavit of Leo Clarke

Declaration of David H. Martens

Sterling Savings Association Annual Report, Year Ending June 1986

Sterling Savings Association Annual Report, Year Ending June 1987

Sterling Savings Association Annual Report, Year Ending June 1989

Selected Pages of a Bid Package sent by FHLBB/FSLIC to Sterling Savings relative to FSLIC s sale of Lewis Federal Savings & Loan

Selected Pages of a Bid Package sent by FHLBB/FSLIC to Sterling Savings relative to FSLIC s sale of Tri-Cities Savings & Loan

FFLBB s Information for the Thrift Financial Report

Letter from Coopers & Lybrand to Sterling Savings

Sterling Savings Association Annual Report, Year Ending June 1988

**Sealed Affidavit of Leslie R. Weatherhead re: Sterling Savings Associations Motion for Partial Summary Judgment re: Liability: June 16, 1997**

| | |
|---|---|
| Copy of Memorandum from Darrel Dochow to John M. Buckley | WOF-01401066-01401068 |
| Copy of Memorandum from Jordan Luke to FHLBB | WOT-9420329-9420341 |
| Sealed Affidavit of Leslie R. Weatherhead Re: Sterling Savings Associations Motion for Partial Summary Judgment Re: Liability: June 16, 1997 | |
| Copy of Memorandum from James Faulstich, Principal Supervisory Agent, to the FHLBB | WOF-0140468-0140472 |
| Copy of Memorandum from James Faulstich to the FHLBB | WOL-0140473-0140481 |

**Plaintiffs Memorandum Re: Motion to Strike the Declaration of Joe A. Hargett and its Surreply Regarding the Permanency and Non-Amortization of the FSLIC Assistance, with Appendix: February 26, 2001**

| | |
|---|---|
| Declaration of Daniel G. Byrne Re: Motion to Strike and Surreply | |
| Letter to Ned M. Barnes, Secretary, Sterling Savings Association, from Gary Jeffers, OTS | SG-0170327-0170334 |
| Letter to Gary Jeffers, Counsel, OTS, from Daniel G. Byrne, Sr. Vice President - Finance, Sterling Savings Association, and exhibits | SG-0170335-0170347 |
| Letter to Ned M. Barnes, Secretary, Sterling Savings Association, from Gary Jeffers, Counsel, OTS, and attachments | WON-9312324-9312333 |
| FSLIC Agreement: 12/28/88 | WON-9412133-9412147 |
| Declaration of David H. Martens | |
| Statement of Financial Accounting Standards No. 72 Accounting for Certain Acquisitions of Banking or Thrift Institutions an Amendment of APB Opinion No. 17, an interpretation of APB Opinions 16 and 17, and an amendment of FASB Interpretation No. 9: February 1983 | SG-0703239-0703243 |

| | |
|---|---|
| Sterling Savings Association, Spokane, Washington, Joint Regular Examination as of June 19, 1989 | SG-0052262-0052339 |
| APB Opinion No. 16, footnote 2: August 1970 | |
| Declaration of Roger J. Orders | |
| Affidavit of William M. Symmes Re: Exhibits to Motion to Strike and Surreply | |
| Defendant s Initial Disclosure Pursuant to Paragraph IV (A) (1) of the Discovery Plan | |
| Interrogatory No. 49 Defendant s Responses and Objections to Sterlings First Set of Interrogatories | 0000377-0000379 |
| Deposition of Roger Orders | |

**Defendants Opposition to Plaintiffs Motion to Strike the Declaration of Joe A. Hargett and for Leave to File Surreply Regarding the Permanency and Non-amortization of the FSLIC Assistance, with Appendix: April 5, 2001**

**Plaintiffs Reply to Defendants Opposition to Plaintiffs Motion to Strike the Declaration of Joe A. Hargett and For Leave to File Surreply Regarding the Permanency and Non-Amortization of the FSLIC Assistance: April 26, 2001**

## Depositions

**Depositions of William W. Zuppe –May 23-26, 2000**

**Depositions of Harold Gilkey – June 6-8, 2000**

**Exhibits to Deposition of Harold Gilkey, June 6 - 8, 2000**

| | |
|---|---|
| Exhibit 1: Harold B. Gilkey Vitae Profile | |
| Exhibit 2: Memo to Bill Zuppe Re: Goal Setting and Strategy Development | |
| Exhibit 3: Form 10-K For the Fiscal Year Ended 6/30/85 | |
| Exhibit 4: Sterling Savings Association Operating Plan Fiscal Year Ending June 30, 1985 | SG-0151957-0151967 |
| Exhibit 5: Sterling Saving Association 1983 Annual Report | SG-0061542-0061561 |
| Document missing | |
| Exhibit 7: Letter to Mr. Donald w. Mochel Re: Conceptual Bid for the Acquisition of Guaranty Savings & Loan Association | SG-0501315-0501324 |
| Exhibit 8: Lewis Federal Acquisition Opportunity - Board of Directors Meeting | SG-0040442-0040463 |

| | |
|---|---|
| Exhibit 9: Information and Instructions for Preparation and Submission of Bids | SG-0040442-0040463 |
| Exhibit 10: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501207-0501210 |
| Exhibit 11: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501264-0501265 |
| Exhibit 12: Letter to Hilton S. Hewitt Re: Information and Instructions for Preparation and Submission of Bid Package for Acquisition of Lewis Federal Savings & Loan Association | |
| Exhibit 13: Letter to Harold B. Gilkey Re: The Approval by Federal Home Loan Bank Board of the Purchase of Lewis Federal Savings. | |
| Exhibit 14: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association | |
| Exhibit 15: Sterling Savings Association Fiscal 1988 Business Plan Update to Include the Acquisition of Tri-Cities Savings and Loan Association (Draft) | SG-0140704-0140748 |
| Exhibit 16: Sterling Savings Association Newsletter | SG-0501899-0501900 |
| Exhibit 17: Counter Proposal to Sterling Savings Association from Tri-Cities Savings and Loan Association | SG-0162153-0162154 |
| Exhibit 18: Letter to Hilton Hewitt Re: Approval of a Supervisory Conversion of Central Evergreen Savings and Loan Assn. to Allow Merging into Sterling. | |
| Exhibit 19: Letter to Hilton Hewitt Re: Error letter sent on March 3, 1988. | SG-0140647 |
| Exhibit 20: Sterling Savings Association Central Evergreen Federal's & L Assn. Combined Supervisory Stock Conversion and Merger (Acquisition) Application | |
| Exhibit 21: Sterling Savings Association Minutes of the Meeting of the Board of Directors 4/26/88 | SG-0191551-0191560 |
| Exhibit 22: Sterling Savings Association Minutes of the Meeting of the Board of Directors 1/14/88 | SG-0191693-0191702 |
| Exhibit 23: Sterling Savings Association Minutes of the Meeting of the Board of Directors 2/20/88 | SG-0191635-0191642 |
| Exhibit 24: Sterling Savings Association Minutes of the Meeting of the Board of Directors 6/28/88 | SG-0191988-0192000 |
| Exhibit 25: Letter to Patricia McJoynt Re: Bid to Acquire Tri-Cities Savings & Loan on a Federal Savings & Loan Insurance Corp. Assisted Basis | |

| | |
|---|---|
| Exhibit 26: Letter to the Board of Directors of Sterling Savings Association Re: The Approval of the Supervisory Acquisition of Tri-Cities Savings and Loan Association | |
| Exhibit 27: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation and Sterling Savings Association | |
| Exhibit 28: Letter to Hilton Kewitt Re: Request Approval of a Supervisory Merger Between Sterling Savings Assn. and Central Evergreen Savings & Loan Assn. | SG-0140747-0140747 |
| Exhibit 29: Draft of HBG Letter to George Godding 4/18/88 | SG-0152383 |
| Exhibit 30: Agreement Between Sterling Savings Assn. & Federal Savings and Loan Insurance Corporation | |
| Exhibit 31: Sterling Savings Assn. 1989 Report to Shareholders | SG-0062997-0063034 |
| Exhibit 32: Sterling Savings Assn. 1988 Annual Report | |
| Exhibit 33: Sterling Savings Assn. and Subsidiary Companies - Business Plan for Fiscal 1990 | |
| Exhibit 34: Memo to Board of Directors of Sterling Savings Association Re: New Minimum Capital Regulations | |
| Exhibit 35: Sterling Savings Association - Capital Restoration Plan | |
| Exhibit 36: Affidavit of Harold B. Gilkey | |
| Exhibit 37: Supplemental Affidavit of Harold B. Gilkey | |
| Exhibit 38: Second Supplemental Affidavit of Harold B. Gilkey | |
| Exhibit 39: Letter to Harold Gilkey Re: Additional Copy of Regulatory Bulletin 3a-1 | |
| Exhibit 40: Letter to William W. Zuppe Re: Business Banking Lending | |
| Exhibit 41: Letter to Harold Gilkey Re: The Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver | |
| Exhibit 42: Marples Business Newsletter No 1037 | |
| Exhibit 43: Letter to Harold B. Gilkey Re: How Dain Bosworth Might Assist Sterling Saving to Achieve its Goal of Raising New Capital | SG-0192176-0192178 |
| Exhibit 44: Sterling Savings Association - Minutes of Special Meeting of the Board of Directors 5/15/90 | |
| Exhibit 45: Memorandum Opinion and Order Granting Motion for Preliminary Injunction and Denying Motion to Dismiss, Inter Alia | |
| Exhibit 46: Letter to Daniel G. Byrne Re: Required Reporting by Sterling Savings | |
| Exhibit 47: Sterling Savings Association Capital Plan 7/23/91 | |

| | |
|---|---|
| Exhibit 48: Letter to the Office of Thrift Supervision Re: Sterling Savings Association | |
| Exhibit 49: Letter to Ed Hedlund OTS Re: Withdraw of the Draft Capital Plan, July 24, 1991 | |
| Exhibit 50: Letter to Ed Hedlund, OTS Re: Capital Distribution | SG-0183878-0183880 |
| Exhibit 51: Form 10-Q for the Quarterly Report Period Ended 9/30/90 | |
| Exhibit 52: News Report: Sterling Performance Let Sterling Savings Chief Into Battle with U.S. Thrift Regulators | |
| Exhibit 53: Sterling Savings Association - Minutes of Meeting of Board of Directors, June 22, 1992 | SG-0185449-0185460 |
| Exhibit 54: Sterling Financial Corporation - 1996 Annual Report | |
| Exhibit 55: Sterling Financial Corporation Fiscal year 1997 Operating and Strategic Plan | |
| Exhibit 56: News Release - Sterling to Adopt Holding Company Structure | SG-0058678-0058679 |
| Exhibit 57: SFC Road Show Scripts: 1992-1999 | SG-0129178-0129190 |

**Deposition of Daniel G. Byrne, July 10-13, 2000**

**Exhibits to Deposition of Daniel G. Byrne, July 10-13, 2000**

| | |
|---|---|
| Exhibit 1: Daniel G. Byrne Profile | |
| Exhibit 2: Letter to Penny D. Marshall Re: the Accounting Treatment Utilized to Record the Purchase of Lewis & Clark Savings & Loan Assn. | SG-0500213-0500216 |
| Exhibit 3: Letter to Daniel G. Byrne Re: Letter 2/4/85 | SG-0500233-0500234 |
| Exhibit 4: Letter to Thomas Howarth Re: Sterling Authoritative Statements Regarding the Allocation of the Lewis & Clark Saving & Loan Assn. | |
| Exhibit 5: Memo to Harold B. Gilkey Re: Pro Forma Dilutive Effect of Stock Options | SG-0179859-0179860 |
| Exhibit 6: Sterling Savings Association Planning Committee Meeting Minutes 5/28/85 | SG-0151930-0151931 |
| Exhibit 7: Harold B. Gilkey Re: Proposed FSLIC-Assisted Acquisition of Lewis Federal Savings & Loan Association | |
| Exhibit 8: Memo to William W. Zuppe Re: Lewis Federal Acquisition | SG-0501207-0501208 |
| Exhibit 9: Memo to William W. Zuppe Re: Lewis Federal Acquisition with Handwritten notes | SG-0501264-0501265 |

| | |
|---|---|
| Exhibit 10: Federal Savings and Loan Insurance Corporation - Information & Instructions for Preparation & Submission of Bids | SG-0501291-0501327 |
| Exhibit 11: Letter to Hilton S. Hewitt Re: The Bid to Acquire Lewis Federal Savings and Loan Association | |
| Exhibit 12: Letter to Harold B. Gilkey Re: Approval by the federal Home & Loan Bank Board of the Purchase of Lewis Federal Savings and Loan Association | |
| Exhibit 14: Sterling Savings Association - 1986 Annual Report | SG-0062928-0062958 |
| Exhibit 15: Federal Home Loan Bank Board - Quarterly Financial Report | SG-0143984-0143991 |
| Exhibit 16: Sterling Savings Association - Corporate Profile | SG-0152298-0152336 |
| Exhibit 17: Sterling Savings Association - Preliminary Offering Circular, January 22, 1987 | |
| Exhibit 19: Letter to Hilton Hewitt Re: The Revised Projection of Sterling's Balance Sheet of 12/30/87 | SG-0140793-0140794 |
| Exhibit 20: Letter to Richard Earle Re: Bid to Acquire First Federal Savings and Loan Association of Longview by Sterling Savings Association | SG-0140963-0140970 |
| Exhibit 21: Memo to OTS File Re: Office of Thrift Supervision File | SG-0600021-0600032 |
| Exhibit 22: Letter to John Smoleck Re: Questions of Business Plan for the Acquisition of Tri-Cities Savings and Loan Assn. | |
| Exhibit 23: Sterling Savings Association - Business Plan Update, February 1988 (Draft) | |
| Exhibit 24: Letter to John Smolek Re: Sterling Business Plan Update | |
| Exhibit 25: Sterling's Fiscal 1988 Business Plan (Exhibit C) | |
| Exhibit 26: Assistance Agreement Between The Federal Savings and Loan Insurance Corporation & Sterling Savings Association | |
| Exhibit 27: Letter to Patricia McJoynt Re: Bid to Acquire Tri-Cities on a Federal Savings and Loan Insurance Corporation Assisted Basis | |
| Exhibit 28: Letter to Sterling s Board of Directors Re: The Approval of the Acquisition of Tri-Cities Savings and Loan Association | |
| Exhibit 29: Approval of Acquisition of Assets and Liabilities of Tri-Cities Savings and Loan Association | |
| Exhibit 30: Memo to Dan Byrne Re: Proposed Staffing Levels for Initial Planning Purposes | SG-0142262-0142265 |
| Exhibit 31: Letter to Hilton Hewitt Re: Request of Approval a Supervisory Conversion of Central Evergreen Savings and Loan Association | |

| | |
|---|---|
| Exhibit 32: Sterling Savings Association Fiscal 1988 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association | |
| Exhibit 33: Letter to Hilton S. Hewitt Re: Error Sending a Letter | |
| Exhibit 34: Sterling Savings Association - Offer to Exchange Shares of $2.50 Cumulative Convertible Preferred Stock - Series B | SG-0169616-0169651 |
| Exhibit 35: Sterling Savings Association, Central Evergreen Federal Savings & Loan Assn. Combined supervisory Stock Conversion & Merger (Acquisition) Application 8/15/88 | PWC-07422-07793 |
| Exhibit 36: Letter to George Godding Re: The Combined Supervisory Stock Conversion and Merger Application for Sterling Savings Association | SG-0141335 |
| Exhibit 37: Agreement Between Sterling Savings Association and The Federal Savings and Loan Insurance Corporation | |
| Exhibit 38: Sterling Savings Association 1988 Annual Report | |
| Exhibit 39: Sterling Savings Association 1989 Report to Shareholders | SG-0062997-0063034 |
| Exhibit 40: Interrogatory # 47 | |
| Exhibit 41: Sterling Savings Association - Form 10-Q Quarterly Report for the Period Ended 9/30/90 | |
| Exhibit 42: Letter to Betty Reed Re: Request for Approval to Acquire Central Evergreen Federal Savings and Loan Association | SG-0145523-0145524 |
| Exhibit 43: Sterling Savings Association Fiscal 1989 Business Plan Update to Include the Acquisition of Central Evergreen Savings and Loan Association | SG-01421763-0142212 |
| Exhibit 44: Letter to Gary Jeffers Re: Provide Information Regarding the Amortization of Cash Assistance Amounts Included in the Regulatory Capital Computations for Sterling | SG-0170384-0170385 |
| Exhibit 45: Memo from Daniel G. Byrne Re: Central Evergreen Acquisition Agreement with FSLIC | SG-0142067-0142068 |
| Exhibit 46: Supplemental Affidavit of Daniel G. Byrne | |
| Exhibit 47: Second Supplemental Affidavit of Daniel G. Byrne | |
| Exhibit 48: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of March 31, 1989 | |
| Exhibit 49: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of June 30, 1989 | SG-0119064-0119079 |
| Exhibit 50: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of September 30, 1989 | |

| | |
|---|---|
| Exhibit 51: Federal Home Loan Bank Board Thrift Financial Report Statement of Condition as of September 30, 1989 - Amended | |
| Exhibit 52: Letter to Carol A. Gamble-Friend Re: Copy of Sterling's 1990 Business Plan | |
| Exhibit 53: Draft Letter to Carol A. Gamble-Friend Re: Summary of Sterling's Plan to Meet its Regulatory Capital Requirements by January 1, 1991 | |
| Exhibit 54: Sterling Savings Association - Form Offering Circular | |
| Exhibit 55: Memorandum to Board of Directors Re: New Minimum Capital Regulations | |
| Exhibit 56: Sterling Savings Association & Central Evergreen Federal S&L Assn. Combined Supervisory Stock Conversion & Merger (Acquisition) Application 8/15/88 | |
| Exhibit 57: Fax Transmittal to Dan Byrne from Craig Nolte @ Federal Home Loan Bank Re: Seattle Bank Comments (Draft) | |
| Exhibit 58: Seattle Bank Comments | |
| Exhibit 59: Letter from Sterling Savings Assn. Re: Copies of Sterling Savings Association s Response to the Federal Home Loan Bank of Seattle | SG-0141705-0141750 |
| Exhibit 60: Letter to Carol Friend Re: Comparison of Operating Results, Actual vs. Pro Forma, 9/30/89 | |
| Exhibit 61: Letter to Carol Friend Re: Comparison of Operating Results, Actual vs. Pro Forma, 10/31/89 | 0030124-0030126 |
| Exhibit 62: Letter to Harold B. Gilkey Re: Outline How Dain Bosworth Might Assist Sterling Savings to Achieve its Goal of Raising New Capital | SG-0192176-0192178 |
| Exhibit 63: Sterling Savings Association Minutes of the Meeting of the Board of Directors 8/22/89 | SG-0140340-0140349 |
| Exhibit 64: Marples Business Newsletter | - |
| Exhibit 65: Letter to Harold Gilkey from Dain Bosworth Re: Financial Advisory Agreement and Amendment to the Letter of Intent | DRI-04503-04505 |
| Exhibit 66: Letter to Harold Gilkey from Dain Bosworth Re: Bosworth Interest in Acting as the Managing Underwriter for SSA s Offering | DRI-04506-04512 |
| Exhibit 67: Letter to Harold Gilkey from Dain Bosworth Re: Recommendation to Sterling Savings About the Public Offering | DRI-04495-04498 |
| Exhibit 68: Letter to Harold Gilkey from Dain Bosworth Re: Review & Approval of Second Amendment to the Letter of | - |