# *Exhibit J*
# *Sterling Savings Association*
## Calculation of the Value of Warrants Issued to the Underwriters For 1991 Common Stock Offering

| | | |
|---|---|---|
| [a] | Stock Price (S) | $8.25 |
| [b] | Strike Price (X) | $9.90 |
| [c] | Offer Date | 11/20/1991 |
| [d] | Annualized Volatility (σ) | 0.51 |
| [e] | Maturity (years) (T) | 5 |
| [f] | Risk-free Rate (r) | 6.56% |
| [g] | $d_1$ | 0.699 |
| [h] | $d_2$ | -0.444 |
| [i] | Call Option Value | $3.91 |
| [j] | Dilution Factor | 0.96 |
| [k]=[i]*[j] | Warrant Value | $3.73 |
| [l] | Number of Warrants Issued | 150,000 |
| **[m]=[k]*[l]** | **Total Value of Warrants Issued** | **$560,057** |

Notes:
[a] - [c], [e], [l] Source: 1991 Offering Circular.
[d] See Exhibit J, page 9.
[f] 5-Year Treasury Constant Maturity Rate as of 11/20/91.
Source: Federal Reserve Bank of St. Louis.
[g], [h], [i] Calculated using the method described in "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

[g] $$d_1 = \frac{\ln(S/X) + rT + \sigma^2 T/2}{\sigma\sqrt{T}}$$

[h] $$d_2 = d_1 - \sigma\sqrt{T}$$

[i] $$C = SN(d_1) - Xe^{-rT}N(d_2)$$

where N(x) denotes cumulative normal distribution function with mean 0 and standard deviation 1.

[j] Ratio of common stock outstanding excluding the warrants (3,216,656) to the total common stock outstanding including the warrants (3,366,656 = 3,216,656 + 150,000). See Sterling Savings Association 1991 Offering Circular, p. 4.
Common stock outstanding at the time of the offering does not include 375,000 shares exercised for the underwriters' over-allotment option. See Sterling Savings Association 1992 Annual Report, p. 18.

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 11/21/1991 | 8.50 | 6.39 | |
| 11/22/1991 | 8.50 | 6.39 | 0.00% |
| 11/25/1991 | 8.25 | 6.20 | -2.99% |
| 11/26/1991 | 8.50 | 6.39 | 2.99% |
| 11/27/1991 | 8.00 | 6.01 | -6.06% |
| 11/29/1991 | 8.00 | 6.01 | 0.00% |
| 12/2/1991 | 8.25 | 6.20 | 3.08% |
| 12/3/1991 | 8.25 | 6.20 | 0.00% |
| 12/4/1991 | 8.25 | 6.20 | 0.00% |
| 12/5/1991 | 8.25 | 6.20 | 0.00% |
| 12/6/1991 | 8.25 | 6.20 | 0.00% |
| 12/9/1991 | 8.25 | 6.20 | 0.00% |
| 12/10/1991 | 8.50 | 6.39 | 2.99% |
| 12/11/1991 | 8.50 | 6.39 | 0.00% |
| 12/12/1991 | 8.50 | 6.39 | 0.00% |
| 12/13/1991 | 8.25 | 6.20 | -2.99% |
| 12/16/1991 | 8.75 | 6.57 | 5.88% |
| 12/17/1991 | 8.38 | 6.29 | -4.38% |
| 12/18/1991 | 8.25 | 6.20 | -1.50% |
| 12/19/1991 | 8.25 | 6.20 | 0.00% |
| 12/20/1991 | 8.50 | 6.39 | 2.99% |
| 12/23/1991 | 8.50 | 6.39 | 0.00% |
| 12/24/1991 | 8.25 | 6.20 | -2.99% |
| 12/26/1991 | 8.50 | 6.39 | 2.99% |
| 12/27/1991 | 8.50 | 6.39 | 0.00% |
| 12/30/1991 | 8.50 | 6.39 | 0.00% |
| 12/31/1991 | 8.75 | 6.57 | 2.90% |
| 1/2/1992 | 8.50 | 6.39 | -2.90% |
| 1/3/1992 | 8.75 | 6.57 | 2.90% |
| 1/6/1992 | 9.00 | 6.76 | 2.82% |
| 1/7/1992 | 9.50 | 7.14 | 5.41% |
| 1/8/1992 | 9.50 | 7.14 | 0.00% |
| 1/9/1992 | 9.88 | 7.42 | 3.87% |
| 1/10/1992 | 9.63 | 7.23 | -2.56% |
| 1/13/1992 | 10.00 | 7.51 | 3.82% |
| 1/14/1992 | 9.75 | 7.33 | -2.53% |
| 1/15/1992 | 10.50 | 7.89 | 7.41% |
| 1/16/1992 | 10.25 | 7.70 | -2.41% |
| 1/17/1992 | 10.13 | 7.61 | -1.23% |
| 1/20/1992 | 10.00 | 7.51 | -1.24% |
| 1/21/1992 | 9.75 | 7.33 | -2.53% |
| 1/22/1992 | 10.50 | 7.89 | 7.41% |
| 1/23/1992 | 9.88 | 7.42 | -6.14% |
| 1/24/1992 | 10.00 | 7.51 | 1.26% |
| 1/27/1992 | 10.25 | 7.70 | 2.47% |
| 1/28/1992 | 10.25 | 7.70 | 0.00% |

# *Exhibit J*

# *Sterling Savings Association*

## Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| Date | Price | Adjusted Price | Log Return |
| 1/29/1992 | 10.25 | 7.70 | 0.00% |
| 1/30/1992 | 10.25 | 7.70 | 0.00% |
| 1/31/1992 | 9.75 | 7.33 | -5.00% |
| 2/3/1992 | 9.88 | 7.42 | 1.27% |
| 2/4/1992 | 10.00 | 7.51 | 1.26% |
| 2/5/1992 | 10.00 | 7.51 | 0.00% |
| 2/6/1992 | 10.00 | 7.51 | 0.00% |
| 2/7/1992 | 9.75 | 7.33 | -2.53% |
| 2/10/1992 | 10.00 | 7.51 | 2.53% |
| 2/11/1992 | 9.75 | 7.33 | -2.53% |
| 2/12/1992 | 9.88 | 7.42 | 1.27% |
| 2/13/1992 | 9.50 | 7.14 | -3.87% |
| 2/14/1992 | 9.75 | 7.33 | 2.60% |
| 2/18/1992 | 9.50 | 7.14 | -2.60% |
| 2/19/1992 | 9.75 | 7.33 | 2.60% |
| 2/20/1992 | 9.38 | 7.04 | -3.92% |
| 2/21/1992 | 9.38 | 7.04 | 0.00% |
| 2/24/1992 | 9.50 | 7.14 | 1.32% |
| 2/25/1992 | 9.75 | 7.33 | 2.60% |
| 2/26/1992 | 10.25 | 7.70 | 5.00% |
| 2/27/1992 | 10.25 | 7.70 | 0.00% |
| 2/28/1992 | 10.13 | 7.61 | -1.23% |
| 3/2/1992 | 10.00 | 7.51 | -1.24% |
| 3/3/1992 | 10.25 | 7.70 | 2.47% |
| 3/4/1992 | 10.13 | 7.61 | -1.23% |
| 3/5/1992 | 10.25 | 7.70 | 1.23% |
| 3/6/1992 | 10.25 | 7.70 | 0.00% |
| 3/9/1992 | 9.75 | 7.33 | -5.00% |
| 3/10/1992 | 10.00 | 7.51 | 2.53% |
| 3/11/1992 | 9.75 | 7.33 | -2.53% |
| 3/12/1992 | 9.75 | 7.33 | 0.00% |
| 3/13/1992 | 10.00 | 7.51 | 2.53% |
| 3/16/1992 | 10.25 | 7.70 | 2.47% |
| 3/17/1992 | 10.25 | 7.70 | 0.00% |
| 3/18/1992 | 10.25 | 7.70 | 0.00% |
| 3/19/1992 | 10.00 | 7.51 | -2.47% |
| 3/20/1992 | 10.25 | 7.70 | 2.47% |
| 3/23/1992 | 10.00 | 7.51 | -2.47% |
| 3/24/1992 | 10.25 | 7.70 | 2.47% |
| 3/25/1992 | 9.75 | 7.33 | -5.00% |
| 3/26/1992 | 10.25 | 7.70 | 5.00% |
| 3/27/1992 | 10.25 | 7.70 | 0.00% |
| 3/30/1992 | 10.25 | 7.70 | 0.00% |
| 3/31/1992 | 9.75 | 7.33 | -5.00% |
| 4/1/1992 | 9.75 | 7.33 | 0.00% |
| 4/2/1992 | 9.88 | 7.42 | 1.27% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 4/3/1992 | 10.00 | 7.51 | 1.26% |
| 4/6/1992 | 9.50 | 7.14 | -5.13% |
| 4/7/1992 | 9.50 | 7.14 | 0.00% |
| 4/8/1992 | 9.50 | 7.14 | 0.00% |
| 4/9/1992 | 9.50 | 7.14 | 0.00% |
| 4/10/1992 | 10.25 | 7.70 | 7.60% |
| 4/13/1992 | 10.00 | 7.51 | -2.47% |
| 4/14/1992 | 10.25 | 7.70 | 2.47% |
| 4/15/1992 | 10.25 | 7.70 | 0.00% |
| 4/16/1992 | 10.50 | 7.89 | 2.41% |
| 4/20/1992 | 10.25 | 7.70 | -2.41% |
| 4/21/1992 | 10.13 | 7.61 | -1.23% |
| 4/22/1992 | 10.50 | 7.89 | 3.64% |
| 4/23/1992 | 10.50 | 7.89 | 0.00% |
| 4/24/1992 | 11.00 | 8.26 | 4.65% |
| 4/27/1992 | 10.75 | 8.08 | -2.30% |
| 4/28/1992 | 10.50 | 7.89 | -2.35% |
| 4/29/1992 | 10.25 | 7.70 | -2.41% |
| 4/30/1992 | 10.25 | 7.70 | 0.00% |
| 5/1/1992 | 10.75 | 8.08 | 4.76% |
| 5/4/1992 | 10.25 | 7.70 | -4.76% |
| 5/5/1992 | 10.50 | 7.89 | 2.41% |
| 5/6/1992 | 10.50 | 7.89 | 0.00% |
| 5/7/1992 | 10.50 | 7.89 | 0.00% |
| 5/8/1992 | 10.63 | 7.98 | 1.18% |
| 5/11/1992 | 10.75 | 8.08 | 1.17% |
| 5/12/1992 | 10.75 | 8.08 | 0.00% |
| 5/13/1992 | 10.75 | 8.08 | 0.00% |
| 5/14/1992 | 10.00 | 7.51 | -7.23% |
| 5/15/1992 | 10.50 | 7.89 | 4.88% |
| 5/18/1992 | 10.25 | 7.70 | -2.41% |
| 5/19/1992 | 10.38 | 7.79 | 1.21% |
| 5/20/1992 | 10.63 | 7.98 | 2.38% |
| 5/21/1992 | 10.25 | 7.70 | -3.59% |
| 5/22/1992 | 10.50 | 7.89 | 2.41% |
| 5/26/1992 | 10.75 | 8.08 | 2.35% |
| 5/27/1992 | 10.75 | 8.08 | 0.00% |
| 5/28/1992 | 10.25 | 7.70 | -4.76% |
| 5/29/1992 | 10.25 | 7.70 | 0.00% |
| 6/1/1992 | 10.50 | 7.89 | 2.41% |
| 6/2/1992 | 10.00 | 7.51 | -4.88% |
| 6/3/1992 | 10.25 | 7.70 | 2.47% |
| 6/4/1992 | 10.50 | 7.89 | 2.41% |
| 6/5/1992 | 10.50 | 7.89 | 0.00% |
| 6/8/1992 | 10.50 | 7.89 | 0.00% |
| 6/9/1992 | 9.88 | 7.42 | -6.14% |

# *Exhibit J*
# *Sterling Savings Association*
## Daily Stock Price Log Return
Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 6/10/1992 | 9.75 | 7.33 | -1.27% |
| 6/11/1992 | 9.75 | 7.33 | 0.00% |
| 6/12/1992 | 9.50 | 7.14 | -2.60% |
| 6/15/1992 | 9.50 | 7.14 | 0.00% |
| 6/16/1992 | 9.50 | 7.14 | 0.00% |
| 6/17/1992 | 10.00 | 7.51 | 5.13% |
| 6/18/1992 | 9.50 | 7.14 | -5.13% |
| 6/19/1992 | 9.50 | 7.14 | 0.00% |
| 6/22/1992 | 9.88 | 7.42 | 3.87% |
| 6/23/1992 | 9.88 | 7.42 | 0.00% |
| 6/24/1992 | 9.50 | 7.14 | -3.87% |
| 6/25/1992 | 10.25 | 7.70 | 7.60% |
| 6/26/1992 | 9.50 | 7.14 | -7.60% |
| 6/29/1992 | 9.75 | 7.33 | 2.60% |
| 6/30/1992 | 10.00 | 7.51 | 2.53% |
| 7/1/1992 | 9.50 | 7.14 | -5.13% |
| 7/2/1992 | 9.50 | 7.14 | 0.00% |
| 7/6/1992 | 9.63 | 7.23 | 1.31% |
| 7/7/1992 | 10.00 | 7.51 | 3.82% |
| 7/8/1992 | 10.00 | 7.51 | 0.00% |
| 7/9/1992 | 10.25 | 7.70 | 2.47% |
| 7/10/1992 | 9.88 | 7.42 | -3.73% |
| 7/13/1992 | 9.50 | 7.14 | -3.87% |
| 7/14/1992 | 10.25 | 7.70 | 7.60% |
| 7/15/1992 | 9.63 | 7.23 | -6.29% |
| 7/16/1992 | 10.25 | 7.70 | 6.29% |
| 7/17/1992 | 9.50 | 7.14 | -7.60% |
| 7/20/1992 | 10.25 | 7.70 | 7.60% |
| 7/21/1992 | 9.75 | 7.33 | -5.00% |
| 7/22/1992 | 10.25 | 7.70 | 5.00% |
| 7/23/1992 | 10.25 | 7.70 | 0.00% |
| 7/24/1992 | 9.75 | 7.33 | -5.00% |
| 7/27/1992 | 11.00 | 8.26 | 12.06% |
| 7/28/1992 | 10.50 | 7.89 | -4.65% |
| 7/29/1992 | 10.63 | 7.98 | 1.18% |
| 7/30/1992 | 11.00 | 8.26 | 3.47% |
| 7/31/1992 | 10.75 | 8.08 | -2.30% |
| 8/3/1992 | 10.75 | 8.08 | 0.00% |
| 8/4/1992 | 11.13 | 8.36 | 3.43% |
| 8/5/1992 | 10.75 | 8.08 | -3.43% |
| 8/6/1992 | 10.75 | 8.08 | 0.00% |
| 8/7/1992 | 10.75 | 8.08 | 0.00% |
| 8/10/1992 | 11.25 | 8.45 | 4.55% |
| 8/11/1992 | 11.25 | 8.45 | 0.00% |
| 8/12/1992 | 10.88 | 8.17 | -3.39% |
| 8/13/1992 | 10.75 | 8.08 | -1.16% |

# *Exhibit J*

# *Sterling Savings Association*

## Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 8/14/1992 | 11.25 | 8.45 | 4.55% |
| 8/17/1992 | 11.00 | 8.26 | -2.25% |
| 8/18/1992 | 11.38 | 8.55 | 3.35% |
| 8/19/1992 | 10.75 | 8.08 | -5.65% |
| 8/20/1992 | 11.25 | 8.45 | 4.55% |
| 8/21/1992 | 10.75 | 8.08 | -4.55% |
| 8/24/1992 | 11.00 | 8.26 | 2.30% |
| 8/25/1992 | 11.13 | 8.36 | 1.13% |
| 8/26/1992 | 11.38 | 8.55 | 2.22% |
| 8/27/1992 | 11.00 | 8.26 | -3.35% |
| 8/28/1992 | 11.13 | 8.36 | 1.13% |
| 8/31/1992 | 11.00 | 8.26 | -1.13% |
| 9/1/1992 | 11.00 | 8.26 | 0.00% |
| 9/2/1992 | 11.00 | 8.26 | 0.00% |
| 9/3/1992 | 11.13 | 8.36 | 1.13% |
| 9/4/1992 | 11.00 | 8.26 | -1.13% |
| 9/8/1992 | 10.75 | 8.08 | -2.30% |
| 9/9/1992 | 10.75 | 8.08 | 0.00% |
| 9/10/1992 | 10.50 | 7.89 | -2.35% |
| 9/11/1992 | 11.00 | 8.26 | 4.65% |
| 9/14/1992 | 11.00 | 8.26 | 0.00% |
| 9/15/1992 | 11.00 | 8.26 | 0.00% |
| 9/16/1992 | 10.50 | 7.89 | -4.65% |
| 9/17/1992 | 10.50 | 7.89 | 0.00% |
| 9/18/1992 | 11.00 | 8.26 | 4.65% |
| 9/21/1992 | 10.75 | 8.08 | -2.30% |
| 9/22/1992 | 11.00 | 8.26 | 2.30% |
| 9/23/1992 | 10.88 | 8.17 | -1.14% |
| 9/24/1992 | 11.00 | 8.26 | 1.14% |
| 9/25/1992 | 10.63 | 7.98 | -3.47% |
| 9/28/1992 | 10.75 | 8.08 | 1.17% |
| 9/29/1992 | 11.25 | 8.45 | 4.55% |
| 9/30/1992 | 11.00 | 8.26 | -2.25% |
| 10/1/1992 | 10.50 | 7.89 | -4.65% |
| 10/2/1992 | 10.75 | 8.08 | 2.35% |
| 10/5/1992 | 10.00 | 7.51 | -7.23% |
| 10/6/1992 | 10.50 | 7.89 | 4.88% |
| 10/7/1992 | 10.25 | 7.70 | -2.41% |
| 10/8/1992 | 10.25 | 7.70 | 0.00% |
| 10/9/1992 | 10.00 | 7.51 | -2.47% |
| 10/12/1992 | 10.13 | 7.61 | 1.24% |
| 10/13/1992 | 10.00 | 7.51 | -1.24% |
| 10/14/1992 | 10.25 | 7.70 | 2.47% |
| 10/15/1992 | 10.00 | 7.51 | -2.47% |
| 10/16/1992 | 9.75 | 7.33 | -2.53% |
| 10/19/1992 | 9.75 | 7.33 | 0.00% |

# *Exhibit J*

# *Sterling Savings Association*

## Daily Stock Price Log Return

Source: CRSP

| | [a] | [b] | [c] = ln([b]$_t$ / [b]$_{(t-1)}$) |
|---|---|---|---|
| **Date** | **Price** | **Adjusted Price** | **Log Return** |
| 10/20/1992 | 10.25 | 7.70 | 5.00% |
| 10/21/1992 | 10.00 | 7.51 | -2.47% |
| 10/22/1992 | 10.50 | 7.89 | 4.88% |
| 10/23/1992 | 10.13 | 7.61 | -3.64% |
| 10/26/1992 | 10.13 | 7.61 | 0.00% |
| 10/27/1992 | 10.38 | 7.79 | 2.44% |
| 10/28/1992 | 10.13 | 7.61 | -2.44% |
| 10/29/1992 | 10.13 | 7.61 | 0.00% |
| 10/30/1992 | 10.50 | 7.89 | 3.64% |
| 11/2/1992 | 10.25 | 7.70 | -2.41% |
| 11/3/1992 | 10.00 | 7.51 | -2.47% |
| 11/4/1992 | 10.25 | 7.70 | 2.47% |
| 11/5/1992 | 10.25 | 7.70 | 0.00% |
| 11/6/1992 | 10.13 | 7.61 | -1.23% |
| 11/9/1992 | 10.25 | 7.70 | 1.23% |
| 11/10/1992 | 10.50 | 7.89 | 2.41% |
| 11/11/1992 | 10.25 | 7.70 | -2.41% |
| 11/12/1992 | 10.25 | 7.70 | 0.00% |
| 11/13/1992 | 10.63 | 7.98 | 3.59% |
| 11/16/1992 | 10.75 | 8.08 | 1.17% |
| 11/17/1992 | 10.25 | 7.70 | -4.76% |
| 11/18/1992 | 10.25 | 7.70 | 0.00% |
| 11/19/1992 | 10.38 | 7.79 | 1.21% |
| | | **[d] Annualized Volatility** | **51.11%** |

Note:

[b] CRSP adjusts for stock dividends and splits. See "CRSP Data Description Guide for the CRSP US Stock Database", pp. 95 – 96. No stock dividends or splits were recorded during the period above.

[d] Calculated as standard deviation of Log Return (column [c]), multiplied by the square root of 252, the no. of trading days in a year. See "*Options, Futures and Other Derivatives*", John C. Hull, 1999, Prentice Hall, Fourth Edition, Chapter 11.

# *Exhibit K*

# *Sterling Savings Association*

## Summary of Wounded Bank Damages

| | Dollars |
|---|---|
| [1] 1989 Offering Circular Costs | $1,004,363 |
| [2] Legal, Accounting and Insurance Costs | $304,006 |
| [3] Regulatory Supervision Costs | $171,977 |
| [4] CJ-4 Loss | $1,240,610 |
| [5] Increased Cost to Acquire Branch from Great American Savings/RTC | $1,835,126 |
| **Total Wounded Bank Damages** | **$4,556,081** |

Source: Analysis prepared by Daniel G. Byrne, CFO of Sterling Savings, 1/9/04.

# *Exhibit L*

## *Sterling Savings Association*

## Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

| | | [1] | [2a] | [2b] | [3] | [4] | [5] |
|---|---|---|---|---|---|---|---|
| | Period Ending | Weighted Average Capital Raised Balance | Total Dividend After Tax at 6.30% | Total Dividend Before Tax at 10.0% | Cash Benefit of Capital at 4.76% | Net Cost of Capital | Present Value of Net Cost Discounted at 4.76% |
| [6] | 9/30/2006 – 12/31/2006 | 1,714.5 | 27.0 | 42.9 | 20.4 | 22.5 | 22.2 |
| | 12/31/2007 | 1,657.9 | 104.4 | 165.8 | 78.9 | 86.9 | 82.0 |
| | 12/31/2008 | 1,567.4 | 98.7 | 156.7 | 74.6 | 82.1 | 74.0 |
| | 12/31/2009 | 1,477.0 | 93.1 | 147.7 | 70.3 | 77.4 | 66.5 |
| | 12/31/2010 | 1,386.6 | 87.4 | 138.7 | 66.0 | 72.7 | 59.6 |
| | 12/31/2011 | 1,296.2 | 81.7 | 129.6 | 61.7 | 67.9 | 53.2 |
| | 12/31/2012 | 1,205.7 | 76.0 | 120.6 | 57.4 | 63.2 | 47.2 |
| | 12/31/2013 | 1,115.3 | 70.3 | 111.5 | 53.1 | 58.4 | 41.7 |
| | 12/31/2014 | 1,024.9 | 64.6 | 102.5 | 48.8 | 53.7 | 36.6 |
| | 12/31/2015 | 934.4 | 58.9 | 93.4 | 44.5 | 49.0 | 31.8 |
| | 12/31/2016 | 844.0 | 53.2 | 84.4 | 40.2 | 44.2 | 27.5 |
| | 12/31/2017 | 753.6 | 47.5 | 75.4 | 35.9 | 39.5 | 23.4 |
| | 12/31/2018 | 663.2 | 41.8 | 66.3 | 31.6 | 34.7 | 19.7 |
| | 12/31/2019 | 572.7 | 36.1 | 57.3 | 27.3 | 30.0 | 16.2 |
| | 12/31/2020 | 482.3 | 30.4 | 48.2 | 23.0 | 25.3 | 13.0 |
| | 12/31/2021 | 391.9 | 24.7 | 39.2 | 18.7 | 20.5 | 10.1 |
| | 12/31/2022 | 301.4 | 19.0 | 30.1 | 14.3 | 15.8 | 7.4 |
| | 12/31/2023 | 211.0 | 13.3 | 21.1 | 10.0 | 11.1 | 5.0 |
| | 12/31/2024 | 120.6 | 7.6 | 12.1 | 5.7 | 6.3 | 2.7 |
| | 12/31/2025 | 37.7 | 2.4 | 3.8 | 1.8 | 2.0 | 0.8 |

**Present Value of Future Damages from Mitigation of Lewis Federal and Tri-Cities Intangibles Including Amortizing CC (September 2006 through end of contract): $640.7**

# *Exhibit L*

## *Sterling Savings Association*

## Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles

### *2006 through 2025*

($ in Thousands)

**Notes:**

[1] See Exhibit G, column [i].

[2a] After-tax dividend cost of preferred stock which assumes a 6.30% required dividend. This is the yield published on PreferredsOnline for preferred stock index with rating Baa/BBB as of September 29, 2006. Fitch upgraded Sterling's Long Term Issuer Default Rating from BB+ to BBB- on 3/22/06. Source: *Bloomberg*; PreferredsOnline (www.epreferreds.com).

[2b] Pre-tax dividend cost of preferred stock. Assumes a 37% marginal tax rate. (For example, with a 37% tax rate, to pay $6.3 in dividends, Sterling must have $10 in earnings).

[3] Benefit of incremental tangible capital. Calculated as 4.76% return, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[4] Net cost is the pre-tax cost of preferred stock less the benefit of capital.

[5] Net cost discounted to 3Q-end 2006 at 4.76%, which approximates the yield on 30-year US Treasury bonds as of September 29, 2006.

[6] Figures in columns [2a] – [5] are prorated for the 3 months ending on 12/31/06.

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

FILED IN THE U.S. DISTRICT COURT EASTERN DISTRICT OF WASHINGTON
MAY 1 1990
JAMES R. LARSEN, CLERK
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, Plaintiff, vs. T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants. | No. CS-90-0175-JLQ VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, OR IN THE ALTERNATIVE, FOR RESCISSION AND DAMAGES |

For its Complaint against defendants Director, Office of Thrift Supervision ("OTS"), and Federal Deposit Insurance Corporation ("FDIC"), plaintiff Sterling Savings Association, a state chartered savings association ("STERLING"), states as follows:



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

## I. NATURE OF ACTION AND RELIEF SOUGHT

1.1 This action arises out of written contractual promises made to plaintiff STERLING by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") which have been repeatedly and utterly breached by the defendants. These contractual promises were made to STERLING by FSLIC and FHLBB, pursuant to their statutory supervisory authority over federally insured savings and loan associations (hereinafter referred to as "thrifts" or "thrift institutions").

1.2 As more fully described below, defendant Timothy Ryan is director of the Office of Thrift Supervision ("OTS) which is the successor in interest to FHLBB. Defendant The Federal Deposit Insurance Corporation ("FDIC") is the successor in interest to FSLIC. OTS AND FDIC are bound by the written contractual commitments made by FSLIC and FHLBB, respectively, to STERLING.

1.3 Defendants requested and provided inducements to STERLING to acquire and operate certain thrift institutions whose imminent failure threatened takeover costs and acute embarrassment. To induce STERLING to make these acquisitions (which, because the troubled thrifts had a negative net worth, STERLING would not have considered otherwise), defendants promised:

(1) to refrain from applying regulatory requirements regarding minimum capital for a period of time sufficient to allow STERLING to restore its capital accounts after absorbing



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the troubled thrifts,

(2) to give specific accounting treatment to STERLING'S goodwill and capital accounts following the transactions,

(3) to cooperate with STERLING in its efforts to acquire additional capital (including, without limitations, a promise not to interfere with capital raising efforts, which contemplated payment of dividends by STERLING to enable STERLING to attract investors, and a promise that should Sterling prove unable to acquire new equity capital, STERLING could propose an alternative business plan, which would not be unreasonably rejected).

1.4 Sterling's acquisitions relieved FSLIC and FHLBB of the burden of liquidating these failing thrift institutions and, consequently, saved FSLIC's insurance fund and ultimately the U.S. taxpayer at least $50 million in liquidation and other costs.

1.51 STERLING, its shareholders and management were willing to undertake the business risk involved in taking over the losing thrifts, in exchange for the written contractual commitments described generally in paragraph 1.3 above. STERLING did not bargain for the risk that defendants would later breach their commitments and promises. But for defendants' breach, STERLING would not be before this Court.

1.6 STERLING has fully performed its obligations under its contracts with defendants, in the course of which performance STERLING has incurred significant costs and expenses through direct outlays of funds, through the addition



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of personnel, and through expenditure of management time and effort to successfully manage the acquired assets.

1.7 STERLING participated with defendants in helping to solve the problem of troubled thrift institutions. STERLING was and is a part of the solution not the problem.

1.8 Despite the foregoing and although defendants have received the benefits of their contracts with STERLING, defendants now purport to "eliminate" their contractual promises to STERLING. Such contracts, however, remain binding on defendants and the United States Government. As justification for their threatened breach, defendants arbitrarily, capriciously and erroneously rely upon the recently enacted Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. Law. No. 101-75, 103 Stat. 183, when FIRREA does not in fact require or effect the abrogation of the contracts. The threatened breach of defendants' contractual promises to STERLING would, if permitted, seriously injure STERLING, and interfere with STERLING'S right to manage its own business affairs in the best judgment of STERLING'S management, and would constitute a breach of contract, a deprivation of STERLING'S property without due process for which no adequate remedy exists in violation of the Fifth Amendment to the United States Constitution, a taking of STERLING'S property without compensation in violation of the Fifth Amendment to the United States Constitution, for which there is no adequate remedy at law. Defendants' arbitrary application of FIRREA constitutes



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

unlawful discrimination against STERLING in violation of the Fifth Amendment's guarantee of equal protection of the laws.

1.9 Sterling is a safe, well managed thrift institution. Sterling has made a profit every year it has been in business since 1983, including the last fiscal year ending June 30, 1989. Through the ten months ending April 30, 1990, Sterling has earned a profit.

1.10 Sterling is examined annually by its external auditors, Coopers & Lybrand, CPAs. At no time has Coopers & Lybrand ("C&L") issued a qualified or adverse opinion. No material weakness in operations, internal control, or management have ever been noted in C&L's annual letter to management.

1.11 In this action, STERLING seeks (1) a declaration under 28 U.S.C. §2201 that STERLING's contracts with defendants are fully enforceable, and that FIRREA does not require or justify defendants' arbitrary attempt to breach their contracts with STERLING through the arbitrary establishment and application of implementing rules and regulations, or is invalid to the extent it would, if so applied, effect a repudiation and breach of defendants' contractual obligations to STERLING and, thereby, effect a deprivation of STERLING'S property without due process for which no adequate remedy exists at law, a taking of STERLING'S property without due compensation for which there will be no adequate remedy in damages and unlawful denial of equal protection of the laws, all in violation of the Fifth



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Amendment; (2) a declaration that the regulations and rules sought to be applied to constrain STERLING'S freedom to manage its business affairs are invalid, being <u>ultra</u> <u>vires</u>, and/or are being arbitrarily and capriciously applied to STERLING; (3) a declaration that OTS is estopped to apply FIRREA and the rules to STERLING; and (4) an injunction prohibiting enforcement of the provisions of FIRREA and its implementing rules and regulations that effect a repudiation of defendants' contractual promises to STERLING; or, alternatively (5) rescission of the transactions wherein STERLING acquired the then troubled institutions; or (6) damages for the taking.

## II. THE PARTIES

2.1 STERLING is a conservatively managed, financially sound savings and loan association serving the needs of communities throughout the State of Washington. Headquartered in Spokane, Washington, STERLING was chartered by the State of Washington and is a member of the Federal Home Loan Bank System. Until August 9, 1989 -- the date on which FSLIC was abolished under FIRREA -- accounts of STERLING'S depositors were insured by FSLIC. Since August 9, 1989, such accounts have been and are now insured by defendant FDIC.

2.2 As more fully described below in paragraph 5.1 hereof, STERLING is a publicly held corporation, which was formed in 1981 and commenced operations in 1983. At the request, and with the active inducement and approval of the


WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

FHLBB, STERLING acquired Lewis Federal Savings and Loan Association of Chehalis, Washington on November 5, 1985, Tri-Cities Savings and Loan of Kennewick, Washington on April 8, 1988, and Central Evergreen Federal Savings and Loan Association of Chehalis, Washington, on December 31, 1988. The acquisitions of Lewis Federal, Tri-Cities Savings and Loan and Central Evergreen were induced, arranged and approved by FSLIC and FHLBB pursuant to their statutory supervisory authority over thrift institutions. This action arises out of contractual promises made to STERLING by FLIC and FHLBB in connection with these supervisory mergers.

2.3 Prior to enactment of FIRREA, FHLBB was an agency of the United States. Under the Home Owners' Loan Act of 1933, as amended, FHLBB was charged with, among other things, regulating and supervising federally chartered savings and loan associations, acting as the operating head of FSLIC, and enforcing compliance by such institutions with regulatory capital requirements. FHLBB delegated certain of these functions to various Federal Home Loan Banks throughout the country, subject to FHLBB's supervision. The Federal Home Loan Bank of Seattle exercised such delegated authority with respect to the operations of STERLING and each of the three institutions it acquired. Under Section 401 of FIRREA, FHLBB was abolished on October 8 1989; its functions and responsibilities, for purposes relevant to this action, have been transferred to the Director, OTS, as its successor.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

2.4 Prior to enactment of FIRREA, FSLIC was an agency of the United States established under the National Housing Act of 1934, as amended, for the purposes of, among other things, insuring the accounts of depositors in thrift institutions that are members of the Federal Home Loan Bank System and establishing and enforcing minimum levels of capital for insured institutions and enforcing compliance therewith. It was operated under the direction of the FHLBB. Under Section 401 of FIRREA, FSLIC was abolished on August 9, 1989, and its responsibilities and functions, for purposes relevant to this action, were transferred to defendant FDIC.

2.5 Defendant FDIC is an agency of the United States established under the Federal Deposit Insurance Act, as amended, for the purpose of, among other things, insuring the accounts of depositors in certain state and federal depository institutions. FDIC is designated under FIRREA as the successor in interest to FSLIC for purposes relevant to this action. FIRREA provides that no action or other proceeding against FSLIC shall abate by reason of FIRREA's enactment but that FDIC shall be substituted as its successor in interest.

2.6 OTS is an office of the United States Department of the **Treasury**, and defendant RYAN, Director of OTS, is an officer and agent of the United States. Under FIRREA the Director is charged with regulating and supervising all federally insured savings and loan institutions, and enforcing compliance by such institutions with the regulatory capital requirements to be established under that statute. The



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Director has been designated under FIRREA as the successor in interest to defendant FHLBB for purposes relevant to this action. FIRREA provides that no action or other proceeding against FHLBB shall abate by reason of FIRREA's enactment but that the Director shall be substituted as its successor in interest.

2.7 Defendant FHLB-Seattle is a government-sponsored agency and one of twelve Home Loan Banks in the Federal Home Loan Bank System. Prior to enactment of FIRREA, FHLB-Seattle operated under the control of FHLBB. FHLB-Seattle and other Federal Home Loan Banks are now subject to oversight by the newly-created Federal Housing Finance Board. Members of the Federal Home Loan Bank System, such as STERLING, may receive loans or "advances" from their regional Federal Home Loan Bank.

## III. JURISDICTION AND VENUE

3.1 This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337, 1346, 1361, 2201 and 5 U.S.C. §702.

3.2 This Court further has jurisdiction over defendants pursuant to 28 U.S.C. §1346 (all federal defendants), 12 U.S.C. §§1462(a) and 1464(d)(1)(a) (Director, OTS/FHLBB), 12 U.S.C. §1819(b)(2) (FDIC/FSLIC).

3.3 Venue is proper in this district under 28 U.S.C. §§1391(e) and 1402(a)(1), and 12 U.S.C. §1464(d)(1)(A).



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

IV. BACKGROUND

4.1 During the late 1970's and early 1980's, a substantial number of thrift institutions experienced serious financial losses precipitated by a combination of changes in prevailing interest rates, the recession of 1981-1982, and poor management. From 1966 to 1980, thrifts were subject to a cap on the maximum interest rates they could pay. This restriction, coupled with sharp increases in short-term interest rates in the late 1970's and early 1980's an the greater availability of money-market instruments not limited by regulation, led to heavy withdrawals of deposits from thrifts. As a result, the cost to thrifts of attracting funds rose dramatically. At the same time, thrifts' loan portfolios consisted almost exclusively of 30-year fixed-rate mortgages at interest rates that were lower than the thrifts' increased cost of funds. This interest rate mismatch, combined with recession conditions in the industrial Northeast, Southwest, and California, led to losses in the thrift industry totalling $8.8 billion in 1981 and 1982 combined. In 1982, FHLBB AND FSLIC were forced to resolve by merger or liquidation 255 failing thrift institutions, with assets of $37 billion.

4.2 In 1980 Congress enacted the Depository Institutions Deregulation and Monetary Control Act in its first legislative attempt to deal with the thrift crisis. That statute provided for deregulation of interest rates and an increase in the level of federal deposit insurance to $100,000 as a means of allowing banks and thrifts to attract the depositors they



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

had earlier lost. Although banks and thrifts were able to recapture some of these funds by offering "NOW" and money market deposit accounts, they had to pay market interest rates in order to do so, and the interest rate mismatch problem therefore persisted.

4.3 Congress, state legislatures, and the regulators also responded to the thrift crisis by expanding the thrifts' ability to diversify their loan portfolios. In 1981, thrifts were allowed to offer adjustable rate mortgages. In 1982, the Garn-St. Germain Depository Institutions Act ("Garn-St. Germain") expanded the powers of federally-chartered thrifts to engage in commercial lending, nonresidential real estate lending, and consumer and educational lending. Many state legislatures went even further, most notably by allowing their state-chartered thrifts to greatly increase direct investment in real estate development. These state-chartered thrifts, like the federal thrifts, were backed by FSLIC insurance.

4.4 After enactment of Garn-St. Germain the thrift industry grew rapidly, as thrifts met renewed mortgage demand resulting from an economic recovery and also expanded into new business areas. From 1983 to 1986, total thrift liabilities grew 65%, from $674 billion to $1.1 trillion. The number of FHLBB and FSLIC resolutions of failing thrifts dropped to 36 in 1984, but began to increase again with the onset of the regional recession in the Southwest and the Farm Belt, rising to 55 in 1986. Reserves in the FSLIC insurance fund, already weakened by the expense of earlier resolutions, deteriorated



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

further. The United States General Accounting Office ("GAO") reported FSLIC losses of $1 billion in 1985 and $11 billion in 1986. According to the GAO, FSLIC was insolvent as of year-end 1986, with a negative net worth of $6 billion. As of April 30, 1987, there were 387 institutions in FHLBB's significant supervisory caseload, with total assets of approximately $138 billion.

4.5 With FSLIC's insurance fund insufficient to recapitalize or liquidate the increasing number of failing thrifts, from the early 1980's onward FHLBB sought in many instances to find healthy thrifts or other investors willing to merge with or acquire and recapitalize troubled institutions. A substantial portion of these supervisory transactions were "FSLIC- assisted," with the infusion of at least some capital by FSLIC, and were equally accompanied by regulatory forbearance. Nearly all the regulatory forbearances by FHLBB and/or FSLIC, permitted the acquiring institutions to operate with modified capital requirements for a period of time sufficient for capital to be increased to normally required levels, and counselled FSLIC to refrain from enforcing the minimum capital regulations or sanctioning thrifts for non-compliance. By 1986 FHLBB had developed certain "standard" forbearances for use in negotiating supervisory transactions.

4.6 Under the National Housing Act of 1934, as amended, FSLIC was at all times relevant to this action authorized to facilitate, "upon such terms and conditions as the Corporation may determine," the merger of a failing FSLIC-insured thrift



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

institution into a financially sound FSLIC-insured thrift institution by providing financial assistance in the form of promissory notes or cash contributions to the healthy institution or by guaranteeing it against losses from certain lawsuits, from liquidation of assets, and other operating losses by reason of the merger, so long as the amount of the financial assistance provided by FSLIC did not exceed the expense that would have been incurred in liquidating the institution and paying insurance claims upon its accounts.

4.7 As the crisis in the thrift industry continued to worsen, and more and more FSLIC-insured thrift institutions became insolvent or troubled, FSLIC and FHLBB recognized that continuing to facilitate supervisory mergers with cash contributions and promissory notes would quickly and entirely exhaust the insurance fund.

4.8 FSLIC and FHLBB were thus forced to revise their policies and practices regarding the provision of cash financial assistance in supervisory mergers in order to prevent, or at last forestall, exhaustion of the FSLIC insurance fund. FSLIC and FHLBB began inducing and arranging supervisory mergers by providing a broad array of inducements, some of which are discussed below.

4.9 As one such inducement, FSLIC and FHLBB routinely encouraged and approved application of the "purchase method" of accounting for the mergers. The Generally Accepted Accounting Principles ("GAAP") applicable at the time provided that in mergers and acquisitions using the purchase method of



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

accounting, the book value of the assets and liabilities of an acquired thrift institution should be adjusted to fair market value at the time of the acquisition, and that any excess in the cost of the acquisition (which includes any liabilities assumed by the acquiror) over the fair market value of the acquired assets should be separately recorded on the acquiror institution's books as an intangible, non-earning asset. Acquired assets that can be separately identified shall be assigned a portion of the total cost. (Identified intangible asset). The fair value of liabilities assumed that exceeds the fair value of tangible and intangible assets acquired constitutes an unidentified intangible asset or "goodwill".

4.10 Because of the high interest rates prevailing at the time, the fair market value of the lower yielding fixed-rate mortgage loans held by most acquired institutions was significantly less than the mortgage loans' book value (the face amount of the loans). Accordingly, in the typical supervisory merger at that time, the aggregate fair market value of the liabilities assumed by the acquiror institution exceeded the aggregate fair market value of the acquired institution's fixed-rate loans and other assets. The amount by which the acquired institution's liabilities exceed its assets and reflected on the merged institution's books as goodwill was significant. For STERLING, the amount of goodwill recorded in connection with its acquisitions of failed thrifts exceeded $17 million. Because of the high interest rates at the time of the acquisitions made by STERLING, the discount of the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

acquired loan portfolios (and hence the resulting goodwill) was a significant number, over $26 million.

4.11 This goodwill was recorded on the merged institution's balance sheet as an asset. Whereas GAAP would normally require reduction of goodwill in an amount equal to any cash assistance received, "supervisory goodwill" was not, for regulatory accounting principles, so reduced. "Supervisory goodwill" also differed from GAAP goodwill in that longer periods of amortization were available, as an accounting forbearance. The ability to amortize supervisory goodwill it over a period of up to 40 years was essential to inducing healthy acquiror institutions to merge with insolvent or troubled FSLIC-insured thrifts.

4.12 FSLIC and FHLBB offered additional regulatory inducements to acquiring thrifts in cases where cash assistance was provided. The agreements permitted the acquiring institution to include cash assistance provided in its regulatory capital account. This addition to the acquiring institution's regulatory capital account was used to determine the institution's compliance with regulatory capital requirements. It was permanent, subject to amortization over a period of up to 40 years. The ability to use regulatory capital for purposes of satisfying minimum capital requirements was essential to induce healthy thrifts to acquire insolvent thrifts.

4.13 As additional inducement to acquiror institutions, FSLIC and FHLBB offered regulatory forbearances, including



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

forbearance from enforcement of regulatory capital requirements, liquidity requirements, requirements regarding minimization of scheduled items (e.g., non-performing loans and foreclosed real estate) and miscellaneous accounting requirements.

4.14 By assuring acquiror institutions in supervisory mergers that supervisory goodwill and regulatory capital would be treated in the above-described manner for regulatory purposes, and that forbearances would be honored, FSLIC and FHLBB were able to induce and arrange supervisory mergers with minimal cash contributions and other tangible financial assistance. FSLIC and FHLBB thus saved many billions of dollars in financial assistance that FSLIC would otherwise have had to pay in order to resolve scores of insolvent and troubled FSLIC-insured thrift institutions.

## V. THE TRANSACTIONS AT ISSUE

### A. STERLING

5.1 Sterling Savings Association is a Washington-chartered, federally insured stock savings and loan association with headquarters in Spokane, Washington. Founded in 1981, STERLING commenced operations in April of 1983. STERLING is a publicly held corporation, traded on the Spokane Stock Exchange. STERLING is engaged in the business of attracting deposits from the general public and originating, purchasing, selling, and servicing secured residential, commercial, and consumer loans. STERLING'S business strategy



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

is service-oriented. STERLING has chosen to compete principally in rural communities where operating costs are lower for gathering deposits and to be near major metropolitan areas for higher volume lending activities. This strategy has been instrumental in enabling STERLING to reduce its operating costs as a percentage of total assets and to be competitive in the delivery of services and products. As of October 31, 1985, STERLING had assets of approximately $120 million and five branches in Eastern Washington. As of that time, STERLING'S capital accounts were such that STERLING would have satisfied the most stringent tests currently imposed by FIRREA, and would have continued to satisfy them to the present day but for the transactions (hereinafter described) induced and arranged by defendants, which were explicitly conditioned on defendants' forbearance from enforcing specific regulatory capital accounting requirements and on defendants' promises that the purchase method treatment of goodwill would be used. But for STERLING'S willingness to assist FSLIC, STERLING would not need relief from this Court.

B. LEWIS FEDERAL SAVINGS AND LOAN ASSOCIATION

5.2 In the spring of 1985 FHLBB judged the Lewis Federal Savings and Loan Association ("LEWIS FEDERAL") to be insolvent. Pursuant to its policy, FHLBB sought to avert LEWIS FEDERAL's failure and to preserve FSLIC's insurance fund by finding a solvent, competent thrift institution to acquire LEWIS FEDERAL. In order to minimize costs to FSLIC, FHLBB decided to request bids from selected institutions, intending



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

to select that bid which best satisfied FHLBB's two principal criteria: (1) low costs to FSLIC and (2) high probability that the acquiring institution would be able to earn its way out of LEWIS FEDERAL's negative net worth.

5.3 FHLBB sent solicitations for bids to a selected group of thrift institutions, not to all institutions. In determining which thrift institutions to send bid documents to FHLBB considered their "financial capacity, geographical location, asset size, and expressed preferences." In determining which bidder to select for the acquisition of LEWIS FEDERAL, FHLBB considered

> (a) A comparison of [FSLIC's] estimated cash outlay and estimated net present value cost to FSLIC of each proposal with that of other acquisition proposals and available alternatives, including a liquidation accompanied by a payment of insured accounts;
>
> (b) An evaluation of other contingent or potential costs and risks to the FSLIC of each acquisition proposal;
>
> (c) The projected financial viability of the association or its successor after the acquisition contemplated by the proposal;
>
> (d) A supervisory assessment of the financial and managerial resources of the prospective acquiror;;
>
> (e) The pertinent anti-competitive and antitrust considerations;
>
> (f) An overall determination of which proposal is most advantageous to the depositors and other creditors of the association and to the FSLIC; and
>
> (g) Due consideration of applicable standards imposed by statute or regulation.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

5.4 FHLBB recognized that the absorption of the insolvent LEWIS FEDERAL would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from STERLING and others, FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill and regulatory capital to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of LEWIS FEDERAL.

5.5 In June, 1985, STERLING offered to take over LEWIS FEDERAL subject to certain conditions, among which were specific forbearances of enforcement of regulatory capital requirements, and specific regulatory accounting treatment of supervisory goodwill and regulatory capital which in turn would permit STERLING to absorb a failing thrift without itself falling out of compliance with minimum capital requirements.

5.6 On November 4, 1985, FHLBB entered a resolution containing formal findings of fact that LEWIS FEDERAL was insolvent; that severe financial conditions existed which threatened LEWIS FEDERAL's stability; that FSLIC should be made receiver for LEWIS FEDERAL; that FSLIC had appropriately considered STERLING'S qualifications and competence to acquire and manage LEWIS FEDERAL, that the acquisition of LEWIS



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

FEDERAL by STERLING would reduce the risk to FSLIC; that STERLING'S offer "presents the lowest expense and least risk to the FSLIC of any proposal submitted", that transfer of LEWIS FEDERAL TO STERLING was preferable to liquidation of LEWIS FEDERAL, and would avoid the loss to LEWIS FEDERAL account holders and creditors that liquidation would entail; that acquisition by STERLING was in the best public interest; that acquisition by STERLING was necessary to prevent the probable failure of LEWIS FEDERAL, and, more importantly, that STERLING would continue to be a viable entity following the acquisition, and to induce STERLING to acquire LEWIS FEDERAL, certain regulatory forbearances and treatment of supervisory goodwill and regulatory capital would be granted to, and agreed with, STERLING.

5.7 On November 5, 1985, STERLING entered into a formal contract with FSLIC as receiver for LEWIS FEDERAL, under which STERLING agreed to take over LEWIS FEDERAL subject to the approval by FHLBB of the regulatory certain forbearances and regulatory treatment of goodwill and regulatory capital.

5.8 On November 12, 1985, FHLBB entered a formal resolution ordering that the agreed upon forbearances be granted to STERLING. In sum, FHLBB:

(1) Permitted STERLING to exclude certain of LEWIS FEDERAL's liabilities in determining compliance with certain requirements;

(2) Suspended enforcement of any regulation related to regulatory capital requirements for five years should



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

STERLING fail to comply, if STERLING'S failure to comply was caused by an increase in liabilities from the acquisition of the falling LEWIS FEDERAL, or by STERLING'S assumption of LEWIS FEDERAL's negative net worth;

(3) Ordered that STERLING could carry $1.8 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital accounting purposes;

(4) Ordered that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 40 years; and

(5) Ordered that the difference between the book value and the fair market value of LEWIS FEDERAL's loan portfolio could be amortized to income over a 15 year period.

5.9 Pursuant to its agreement with FSLIC and in accordance with the forbearances expressly granted by FHLBB, STERLING entered $3.6 million in supervisory goodwill on to its books.

5.10 As a result of STERLING'S acquisition of LEWIS FEDERAL, FSLIC avoided the need to spend not less than $5.2 million to liquidate LEWIS FEDERAL, and avoided harmful and embarrassing publicity.

C. TRI-CITIES SAVINGS AND LOAN ASSOCIATION

5.11 In the summer of 1987, FHLBB judged the Tri-Cities Savings and Loan Association ("TRI-CITIES") to be insolvent. Pursuant to its policy, FHLBB sought to preserve FSLIC's insurance fund by finding a solvent, competent thrift



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

institution to acquire TRI-CITIES. In order to minimize costs to FSLIC, FHLBB decided to request bids from selected thrift institutions, intending to select that bid which best satisfied FHLBB's two principal criteria: (1) low costs to FSLIC and (2) high probability that the acquiring thrift institution would be able to earn its way out of TRI-CITIES' negative net worth.

5.12 FHLBB sent solicitations for bids to selected thrift institutions. In determining which thrift institutions to send bids to, FHLBB considered their financial capacity and the skill and reliability of their management. In determining which bidder to select for the acquisition of TRI-CITIES, FHLBB considered:

> (a) a comparison of [FSLIC's] estimated cash outlay and estimated net present value cost to the FSLIC of each proposal with that of other acquisition proposals and available alternatives, including a liquidation accompanied by a payment of insured accounts;
>
> (b) an evaluation of other contingent or potential costs and risks to the FSLIC of each acquisition proposal;
>
> (c) the projected financial viability of the Association(s) or their successor after the acquisition contemplated by the proposal;
>
> (d) an assessment of the financial and managerial resources of the prospective acquiror;
>
> (e) the pertinent anti-competitive and antitrust considerations;
>
> (f) an overall determination of which proposal is most advantageous to the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

depositors an other creditors of the Association(s) and to the FSLIC; and

(g) due consideration of applicable standards imposed by statute or regulation.

5.13 FHLBB recognized that the acquisition of the insolvent TRI-CITIES would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from STERLING and others, FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill and regulatory capital to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of TRI-CITIES.

5.14 In November, 1987, STERLING offered to take over TRI-CITIES subject to certain conditions, among which were specific forbearances of enforcement of regulatory capital requirements, and specific regulatory accounting treatment of supervisory goodwill and regulatory capital.

5.15 On April 7, 1988, FHLBB entered a resolution containing formal findings of fact that TRI-CITIES was insolvent; that FSLIC should be made receiver for TRI-CITIES; that TRI-CITIES could not continue as a going concern without financial assistance from FSLIC; that STERLING was qualified



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

and competent to acquire and manage TRI-CITIES; that the acquisition was necessary to prevent the probable failure of TRI-CITIES; that the acquisition by STERLING was the most desirable alternative to liquidation or transfer to another institution, and represented the least cost to FSLIC of any alternative, that the acquisition by STERLING was in the best public interest, and in the best interests of the account holders and creditors of TRI-CITIES; that STERLING would continue to be a viable entity following the acquisition; and that to induce STERLING to acquire TRI-CITIES, certain regulatory forbearances and treatment of supervisory goodwill and regulatory capital would be granted and agreed to.

5.16 On April 8, 1988 STERLING entered into a formal contract with FSLIC as receiver for TRI-CITIES, under which STERLING agreed to take over TRI-CITIES subject to the approval by FHLBB of certain forbearances and of certain regulatory accounting treatment of supervisory goodwill.

5.17 FHLBB had already, on April 6, 1988 formally granted the agreed-upon forbearances to STERLING. In sum, FHLBB:

(1) Agreed to waive the assessment, for one year, of penalties occasioned by STERLING'S inability to satisfy liquidity requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years should STERLING fail to comply, if STERLING'S failure to comply was caused by



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

an increase in liabilities from the acquisition of TRI-CITIES, or by STERLING'S assumption of TRI-CITIES' negative net worth;

(3) Agreed that STERLING could carry $11.7 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital accounting purposes;

(4) Agreed that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of TRI-CITIES' loan portfolio could be amortized to income over eight years.

5.18 Pursuant to its agreement with FSLIC and in accordance with the forbearances expressly granted by FHLBB, STERLING entered $13.9 million in supervisory goodwill onto its books.

5.19 As a result of STERLING'S acquisition of TRI-CITIES, FSLIC avoided the need to spend not less than $13.7 million to liquidate TRI-CITIES.

D. CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

5.20 In the summer of 1987, FHLBB requested that STERLING consider acquiring Central Evergreen Federal Savings and Loan Association ("CENTRAL EVERGREEN") a troubled thrift in Chehalis, Washington. STERLING declined, pointing out that such an acquisition might create in STERLING'S books a regulatory capital deficiency. FHLBB pressed STERLING to



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

consider the acquisition anyway, affirming that the permanent regulatory capital created by the LEWIS FEDERAL and TRI-CITIES acquisitions would keep STERLING in compliance with the capital regulations if it acquired CENTRAL EVERGREEN.

5.21 STERLING studied CENTRAL EVERGREEN, and concluded that the acquisition could be done. However, STERLING concluded to be safe and sound, STERLING should arrange for an equity offering of $4 to $6 million soon after the acquisition. STERLING then agreed to acquire CENTRAL EVERGREEN contingent upon approval of FHLBB.

5.22 On December 8, 1988, FHLBB entered a resolution approving the acquisition. FHLBB entered formal findings of fact that CENTRAL EVERGREEN was insolvent; that STERLING would be a viable entity following the acquisition; that the acquisition was necessary to prevent the probable failure of CENTRAL EVERGREEN; that the purchase method treatment of goodwill should be used; and that FSLIC should enter an agreement pursuant to STERLING'S proposal calling for an infusion of capital after the acquisition.

5.23 On December 28, 1988, STERLING contracted with FSLIC, pursuant to which STERLING agreed to carry out a specific business plan. The plan was to add $4 million to $6 million in new equity within two years; the contract between STERLING and FSLIC required that whenever STERLING'S regulatory capital fell below regulatory minimums by more than an agreed percentage STERLING would raise capital sufficient to meet "the <u>lesser</u> <u>of</u> its minimum capital requirement on

the regulatory capital projected in the business plan. The failure to raise additional capital as provided in the business plan shall not be a violation of the obligation [of STERLING] if it is raised prior to December 31, 1990." Under the agreement, supervisory goodwill and the excess of book over fair market value of loans acquired from CENTRAL EVERGREEN were to be amortized over a 12 year period. STERLING, concerned about the growing thrift crisis, requested that a clause be included terminating the contract if some change in the laws made it impossible for STERLING to acquire additional equity. After negotiation, FSLIC agreed that the final contract would permit STERLING to revise its business plan should events beyond STERLING'S control prevent the contemplated equity offering. The final contract reflects this agreement.

5.24 On December 31, 1988, STERLING closed the acquisition agreement, and began to prepare for an equity offering.

5.25 As a result of STERLING'S acquisition of CENTRAL EVERGREEN, FSLIC's insurance fund and the U.S. taxpayer avoided the need to spend not less than $30.1 million to liquidate CENTRAL EVERGREEN, and avoided harmful and embarrassing publicity.

## VI. FIRREA

6.1 FIRREA was signed into law by President Bush on August 9, 1989. Section 301 of FIRREA requires the Director





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

of OTS to promulgate, no later than November 7, 1989, final regulations establishing minimum capital requirements for federally insured thrifts. These minimum capital requirements must become effective no later than December 7, 1989, and must require federally insured thrifts to:

(a) maintain "tangible capital," which excludes supervisory goodwill, in an amount not less than 1.5 percent of the thrift's assets;

(b) maintain "core capital," as defined in the statute, in an amount not less than 3 percent of the thrift's assets; and,

(c) maintain "risk-based capital" in an amount not materially less than that required by the Comptroller of the Currency for national banks.

6.2 FIRREA provides that "tangible capital" shall not include supervisory goodwill, and that only limited amounts of "core capital" may be made up of supervisory goodwill. Prior to January 1, 1992, the amount of supervisory goodwill includable in core capital may not exceed 1.5 percent of total assets. Thereafter, the amount of supervisory goodwill (as a percentage of assets) includable in core capital declines each year, in accordance with the following schedule:

January 1, 1992, to December 31, 1992 ... 1.0 percent
January 1, 1993, to December 31, 1993 ... 0.75 percent
January 1, 1994, to December 31, 1994 ... 0.375 percent
Thereafter .............................. 0 percent



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

For purposes of the minimum capital requirements, supervisory goodwill must be amortized over a period not to exceed 20 years.

6.3 FIRREA does not require that supervisory goodwill be excluded from capital for purposes of determining compliance with minimum "risk-based" or core capital requirements. Nor does FIRREA require exclusion of contractual permanent regulatory capital from minimum capital computations.

6.4 FIRREA requires that the minimum capital requirements promulgated by the Director of OTS for thrift institutions be no less stringent that those established by the Comptroller of the Currency for national banks.

FIRREA Did Not Mandate Breach of STERLING'S Agreements

6.5 Although the stringent, new capital requirements set forth in Section 301 of FIRREA are generally applicable to thrifts, they are not intended to abrogate differing capital requirements set forth in binding agreements previously entered into by the FHLBB and/or the FSLIC. Quite to the contrary, Section 401(f) provides that the abolition of the FSLIC and the FHLBB:

> shall not affect the validity of any right, duty or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which --
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Section 401(g) of FIRREA provides that the abolition of the FSLIC and the FHLBB:

> shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which --
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Similarly, Section 401(h) provides that:

> all orders, resolutions, determinations, and regulations, which --
>
> (1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and
>
> (2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law .... (Emphasis added.)



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

Recognizing the continued validity and enforceability of forbearances previously granted by the FSLIC and the FHLBB, FIRREA also directs the newly created Resolution Trust Corporation to "evaluate the costs under existing [FSLIC] agreements with regard to ... forbearance ...."

6.6 In enacting FIRREA, therefore, Congress sought to impose strict new regulatory capital requirements upon thrifts, while recognizing the validity and enforceability of the federal government's specific contractual obligations to utilize different requirements with respect to those institutions that had entered into agreements such as STERLING'S. The contractual rights of STERLING to the specific contractual undertakings described above thus survived enactment of FIRREA, and remain enforceable against the Director of OTS as successor to FHLBB, against FHLB-Seattle, and against FDIC.

6.7 While FIRREA abolished both FSLIC and FHLBB, it provided that no action or other proceeding against FSLIC or FHLBB shall abate by reason of such enactment, but that FDIC and the Director shall be substituted as their respective successors in interests.

6.8 FIRREA grants OTS broad powers to assist capital-deficient thrifts to come into compliance. OTS may exempt any thrift (whether or not such thrift has a prior agreement with FSLIC or FHLBB), may make exceptions, or may issue forbearances.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

## The FIRREA Regulations

6.9 On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA (the "Capital Regulations"), which became effective on December 7, 1989. Although OTS indicated in a press briefing shortly after enactment of FIRREA that it was "uncertain" about the impact of the statute on past FHLBB and FSLIC forbearances, notwithstanding Section 401(h) of FIRREA the Capital Regulations make no mention of existing FHLBB and FSLIC agreements or forbearances. Instead, the Capital Regulations are on their face applicable to all thrifts, including those with less restrictive capital requirements and other forbearances embodied in binding agreements with FHLBB and/or FSLIC.

6.10 In accordance with FIRREA, the OTS Capital Regulation establishes a minimum "tangible" capital requirement of 1.5 percent of total assets and a minimum "core" capital requirement of 3 percent of total assets. Supervisory goodwill cannot be counted as "tangible" capital at all, and can be counted as "core" capital only in accordance with the phase-out schedule set forth in FIRREA (see paragraph 6.2 above).

6.11 FIRREA does not require that supervisory goodwill and permanent regulatory capital be completely excluded from capital for purposes of determining compliance with minimum "risk-based" capital requirements. Nonetheless, the OTS Capital Regulation permits the inclusion of supervisory goodwill in capital for purposes of the minimum "risk-based"



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

capital requirement only in accordance with the phase-out schedule set forth in FIRREA for determining compliance with the minimum "core" capital requirement (see paragraph 6.2 above).

6.12 The regulations purport to require various levels of interference with management where regulatory capital does not meet the new minimum, irrespective of any contract or agreement. These include the following:

(a) increase the amount of its regulatory capital to a specified level or levels;

(b) convene a meeting or meetings with the OTS supervision staff for the purpose of accomplishing the objectives of this section;

(c) reduce the rate of earnings that may be paid on savings accounts;

(d) limit the receipt of deposits to those made to existing accounts;

(e) cease or limit the issuance of new accounts of any or all classes or categories, except in exchange for existing accounts;

(f) cease or limit lending or the making of a particular type or category of loan;

(g) cease or limit the purchase of loans or the making of specified other investments;

(h) limit operational expenditures to specified levels;

(i) increase liquid assets and maintain such increased liquidity at specified levels; or



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(j) take such other action or actions as the Director may deem necessary or appropriate for the safety and soundness of the savings association, or depositors or investors in the savings association, including placement of the institution in receivership.

## VII. STERLING HAS SUFFERED, AND WILL CONTINUE TO SUFFER, IRREPARABLE INJURY

7.1 STERLING is solvent, healthy, and making money. STERLING has posted positive earnings for every quarter since 1983 until third quarter, 1989. In that quarter, at the insistence of defendants, STERLING recorded a one-time charge to earnings of $1.4 million to increase its loan loss reserves. In discussions with defendant OTS, STERLING disagreed with OTS's judgment that this reserve was required, and requested an explanation. Defendant OTS defended the requirement by pointing to specific loans which it insisted should be classified. In meetings between OTS and STERLING, OTS accepted STERLING'S explanation as to why classification of the items identified by OTS in support of the adjustment to loan loss reserves was not required, and OTS accepted this explanation. OTS refused, however, to change its position regarding the need for an adjustment to loan loss reserves, and refused to explain why.

7.2 In April-June, 1987, STERLING made a public offering of $4 million worth of convertible preferred stock. In reliance upon its agreements with FSLIC, STERLING included in



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

its offering circular a description of its regulatory capital accounts calculated in light of the methods and forbearances provided in connection with the acquisition of LEWIS FEDERAL. $2.2 million worth of stock was sold in the offering. Those investors who bought the preferred stock did so in reliance upon the agreement with defendants as disclosed in the offering circular. Other investors who purchased or owned common stock may also have relied upon the agreement as disclosed in the offering circular.

7.3 Pursuant to the business plan which was a part of STERLING'S agreement with defendants (see paragraph 5.23 above), STERLING in late 1989 began preparation for an equity offering which would have raised equity in a greater amount than that required by the agreement with defendants, and which would have all but resolved STERLING'S capital deficiency (the remaining capital deficiency would, also pursuant to the business plan which formed part of the contract with defendants, have been resolved through earnings within two years). STERLING expended nearly $1 million in fees for accountants, attorneys, and underwriters in preparation for the equity offering. STERLING presented the proposed offering circular to OTS for review. OTS stated that FIRREA forbids capital-deficient institutions to pay dividends, and arbitrarily and capriciously announced that STERLING would not be permitted to pay dividends on the stock proposed to be sold. The underwriters, being of the opinion that it would be impossible to sell stock in STERLING if defendants took that



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

position, advised that the offering could not go forward. The business plan required STERLING to raise from $4 to $6 million. The equity offering planned by STERLING was to sell 525,000 units (each unit consisting of one share each of common and non-cumulative preferred stock). The underwriters advised management that the offering was not only fully subscribed, but over-subscribed to an extent, which would have returned approximately $10.7 million (net of offering expenses and costs of over-subscription options) to STERLING'S capital accounts. Four months later, in April, 1990, after the equity markets had deteriorated to a point at which STERLING'S offering was no longer viable, OTS announced that it was planning a change in policy to permit capital-deficient entities to pay dividends as an incentive to get them to raise equity capital. Defendant's action was not only arbitrary and capricious, it frustrated and breached specific and binding undertakings contained in the agreement between STERLING and defendants.

7.4 Under color of FIRREA and other rules, defendant OTS has interfered and will continue to interfere with STERLING'S management, to STERLING'S detriment and to the further frustration of STERLING'S agreements with defendants. This interference consists of operating limitations imposed on STERLING by defendants, including, but not limited to,

a. limitations on STERLING'S growth;

b. limitations on payment of dividends;



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

c. limitations on the amount of loans which may be made to any one borrower;

d. limitations on the class of persons to whom STERLING may make loans;

e. limitations on the types of loans which STERLING may make;

f. limitations on the operation of STERLING'S profitable subsidiary companies.

## VIII. FIRST CAUSE OF ACTION - DECLARATORY RELIEF

8.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 7.3 of this Complaint.

8.2 FIRREA was not intended to, and cannot abrogate STERLING'S binding contacts with the United States in violation of the Fifth Amendment to the United States Constitution's requirements of due process and just compensation, or discriminate against STERLING in violation of the equal protection guarantees of the Fifth Amendment to the United States Constitution.

8.3 The Court should declare OTS's application of FIRREA in derogation of its contracts with STERLING illegal, invalid, and unenforceable against STERLING.

## IX. SECOND CAUSE OF ACTION - DECLARATORY RELIEF

9.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 8.3 of this Complaint.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

9.2 The regulations published by defendants are <u>ultra vires</u>, and have been arbitrarily and capriciously applied to STERLING in breach of STERLING'S agreements with defendants.

9.3 This Court should declare OTS's application of its regulations in derogation of its contracts with STERLING illegal, invalid, and unenforceable against STERLING.

## X. <u>THIRD CAUSE OF ACTION - DECLARATORY RELIEF</u>

10.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 9.3 of this Complaint.

10.2 The findings of fact made by the FHLBB and the forbearances issued based upon those findings are <u>res judicata</u> against defendants.

10.3 This Court should declare that defendants are estopped to deny or interfere with the forbearances issued pursuant to the findings and resolutions of the FHLBB.

## XI. <u>FOURTH CAUSE OF ACTION - INJUNCTION</u>

11.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 10.3 of this Complaint.

11.2 STERLING has suffered and will continue to suffer irreparable damage as a result of defendants' actions, for which there is no adequate remedy at law. A financial institution such as STERLING is so dependent upon the independence and expertise of its management and upon the public credibility with which it is held that by the time any cause of action for damages is ripe, it will be impossible for



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

STERLING to establish the harm it has suffered in terms of dollars.

11.3 This Court should enjoin defendants from any further breach of their contracts with STERLING.

XII. FIFTH CAUSE OF ACTION - RESCISSION

12.1 STERLING realleges as though fully set forth herein paragraphs 1.1 through 11.3 of this Complaint.

12.2 Defendants' breach of their agreements with STERLING are deliberate and willful, are material, and go to the very essence of the bargain struck between STERLING and defendants. As a consequence of defendants' willful breach, STERLING is left in a materially worse position than it was prior to entering into the agreements. STERLING has performed in good faith all conditions required to be performed by it pursuant to the agreements, and is threatened with irreparable harm solely on account of defendants' deliberate and willful breach of the agreements.

12.3 Equity requires that this Court order rescission of the agreements between STERLING and defendants for the acquisition of some or all of the troubled thrifts, and return the parties to the status quo ante.

XIII. PRAYER FOR RELIEF

WHEREFORE, plaintiff STERLING respectfully prays:



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(a) That the Court declare that the provisions of FIRREA and the OTS Capital Regulation restricting the inclusion of STERLING'S supervisory goodwill in capital for purposes of satisfying minimum capital requirements would, if applied to STERLING, constitute a repudiation and abrogation of STERLING'S valid contract rights and effect a taking of STERLING'S property and a deprivation of STERLING'S property without due process for which no adequate remedy exists at law, in violation of the FifthAmendment to the United States Constitution;

(b) That the Court enjoin defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from enforcing any provision of FIRREA and the OTS Capital Regulation, or taking any other action that is inconsistent with their contractual obligations to STERLING;

(c) In the alternative, that the Court order rescission of the transactions, restoration to STERLING of amounts expended by it in connection with such transactions, and restoration of the parties to the status quo ante;

(d) That the court order defendants to pay STERLING'S costs and attorneys' fees herein; and

(e) That the Court grant such other and further relief as the law and evidence may justify and as the Court may deem just and proper, including damages.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

**DATED** this 15th day of May, 1990.

WITHERSPOON, KELLEY, DAVENPORT & TOOLE

By ______________________
WILLIAM D. SYMMES

By ______________________
LESLIE R. WEATHERHEAD
Attorneys for Plaintiff

STATE OF WASHINGTON )
) ss.
County of Spokane )

HAROLD B. GILKEY, being first duly sworn upon oath, deposes and says:

I am the Chairman of the Board and Chief Executive Officer of the plaintiff in the above-entitled matter. I have read the above and foregoing Complaint, know the contents thereof, and believe the same to be true.

______________________
HAROLD B. GILKEY

SUBSCRIBED AND SWORN to before me on this 15th day of May, 1990, by Harold B. Gilkey.

______________________
NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 2-2-93



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

FILED IN THE
U.S. DISTRICT COURT
Eastern District of Washington
MAY 29 1990
JAMES R. LARSEN, Clerk
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, Plaintiff, vs. T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants. | No. CS-90-0175-JLQ<br>~~PROPOSED~~ TEMPORARY RESTRAINING ORDER |

The Court having reviewed the submissions of the parties and files in this case, and having heard the argument of counsel, finds that plaintiff has established facts ~~supporting a factual finding of likelihood of succeeding on the merits and immediate irreparable harm which substantially outweighs any threat of harm or inconvenience to defendants~~ that warrant the maintenance of the status quo & that serious questions exist in this matter.

Accordingly, IT IS HEREBY ORDERED that defendants are enjoined from imposing or enforcing any regulatory restric-

tions against plaintiff, Sterling Savings, that are inconsistent with the provisions of the three (3) supervisory acquisition agreements between the parties and that the restrictions imposed by the January 26, 1990, March 9, 1990, and May 11, 1990 letters from the Department of Thrift Supervision to Sterling shall not be enforced; and it is further

ORDERED that this Temporary Restraining Order shall remain in effect through June 21, 1990, at 1:30 p.m., subject to further order of the Court when plaintiff's Motion for Preliminary Injunction shall be heard; and it is further

ORDERED that defendants appear before this Court at 1:30 p.m. on the 21st day of June, 1990, then and there to show cause, if any they have, why ~~they should not be restrained and enjoined during the pendency of this cause.~~ a preliminary injunction should not be entered. The plaintiff shall post a $10,000 bond.

IT IS SO ORDERED.

The Clerk is directed to enter this Order and forward copies to counsel.

DATED this 28th of May, 1990, at 4:35 p.m.

JUSTIN L. QUACKENBUSH
United States District Judge

Presented by:

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By
WILLIAM D. SYMMES
WSBA No. 683

By
LESLIE R. WEATHERHEAD
WSBA No. 11207
Attorneys for Plaintiff

RECEIVED
AUG 09 1990
WITHERSPOON, KELLEY
DAVENPORT & TOOLE

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AUG 08 1990
JAMES R. LARSEN, CLERK
DEPUTY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | NO. CS-90-0175-JLQ<br><br>MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTION TO DISMISS, **INTER ALIA** |

**BEFORE THE COURT** are the plaintiff Sterling Savings Association's ("Sterling") Motion for Preliminary Injunction (Ct. Rec. 16), the defendant Federal Home Loan Bank of Seattle's ("FHLB") Motion for Order of Dismissal (Ct. Rec. 37), and the defendant Director, Office of Thrift Management ("OTS") and defendant Federal Deposit Insurance Corporation's ("FDIC") Motion to Dismiss (Ct. Rec. 41), heard with oral argument on July 3, 1990. William D.

Symmes and Leslie R. Weatherhead appeared on behalf of Sterling. Edward J. O'Meara represented OTS. Gary W. Herschman and Marta W. Berkley appeared on behalf of the FDIC. Having reviewed the record and heard from counsel, the court enters this Order to memorialize the oral rulings made at the hearing in this matter.

## Factual Background

Sterling is a state-chartered, federally insured stock savings association with headquarters in Spokane, Washington. Founded in 1983, Sterling has experienced relatively rapid expansion from its original single location to a present size of approximately 28 branch offices located throughout Washington State. Most of Sterling's management level employees, including Chairman Harold B. Gilkey, have been with Sterling from its inception and, from all indications, have managed to balance Sterling's propensity for growth with its goal of realizing annual profits. Until the recent actions by federal regulators, Sterling appeared to enjoy a favored status in the eyes of both investors and regulators alike and was viewed as a refreshing ray of light in the otherwise dim environment of the thrift industry. This status and reputation, no doubt, were due in large part to the fact that Sterling was well managed and, unlike many troubled thrifts, was not burdened with principals who engaged in insider trading, made insider loans, or

purchased expensive yachts and airplanes on behalf of the company.

Much of Sterling's growth can be attributed to various acquisitions of other thrift institutions within the same geographic region. Of relevance to this case are three particular instances in which Sterling, with the blessing and unbridled encouragement of federal regulators, acquired insolvent institutions that were on the verge of being, or already had been, placed in receivership. Armed with certain contractual agreements and promises from government regulators, and relying on the government's assurances, Sterling began the process of absorbing these failing thrifts into its then existing capital structure, thereby saving the Federal Savings and Loan Insurance Corporation ("FSLIC") the enormous expense and cost of liquidating the troubled thrifts and paying the claims of depositors.

The first of the three transactions occurred in 1985 when Sterling acquired Lewis Federal Savings and Loan Association ("Lewis Federal") located in Chehalis, Washington. Lewis Federal, at that point, was woefully insolvent and had been placed in receivership under the direction of the Federal Home Loan Bank Board ("FHLBB") and the FSLIC. At the request of federal regulators, Sterling submitted a successful bid for the acquisition of Lewis Federal and thereafter entered into a series of agreements

with the FSLIC to consummate the deal. On November 4, 1985, the FHLBB issued a resolution in which it approved the proposed sale and authorized the FSLIC to execute both an Assistance Agreement and an Acquisition Agreement on behalf of Lewis Federal. See Ct. Rec. 51, Exhibit D. These contracts were signed by the parties on November 5, 1985. See Ct. Rec. 51, Exhibits G & I. The resolution also authorized FHLBB's Secretary to issue a formal letter to Sterling granting certain forbearances from regulatory capital and accounting requirements. See Ct. Rec. 51, Exhibit D, at 6. The letter, issued on November 12, 1985, see Ct. Rec. 51, Exhibit C, and the Board's resolution were expressly referenced and saved in merger clauses contained in both the Assistance Agreement and the Acquisition Agreement. See Ct. Rec. 51, Exhibit G, § 17, at 10-11; Ct. Rec. 51, Exhibit I, § 14, at 27-28. More importantly, the letter states that the forbearances were granted "[i]n connection with" the negotiated acquisition by Sterling of the failed thrift. See Ct. Rec. 51, Exhibit C, at 1.

The second relevant acquisition occurred in April 1988 and, for all practical purposes, was identical to the Lewis Federal transaction. Tri-Cities Savings and Loan Association ("Tri-Cities"), like Lewis Federal, was an insolvent thrift that had been placed in receivership under the control of the FSLIC. Once again, hoping to avoid the serious adverse impact liquidation would have on an



AO 72

already insufficient federal insurance fund, federal regulators approached Sterling to suggest the acquisition of this second troubled thrift. Relying on the same promises and assurances previously offered in the Lewis Federal transaction, Sterling submitted the top bid for Tri-Cities and proceeded to finalize the acquisition. As before, the FHLBB authorized the sale and regulatory forbearances by resolution. See Ct. Rec. 51, Exhibit F. Both an Acquisition Agreement, see Ct. Rec. 51, Exhibit H, and an Assistance Agreement, see Ct. Rec. 51, Exhibit J, were executed between Sterling and the FSLIC, and a follow-up letter was provided by the Board Secretary detailing the regulatory capital and accounting practices to be followed by Sterling during the forbearance period, see Ct. Rec. 51, Exhibit E. Although all parties to the contracts were aware that, without these negotiated exceptions, the acquisition would put Sterling's capital base below regulatory standards, they were confident that Sterling could absorb the debt and return to normal operation after the plan had run its course.

This same confidence and respect were again apparent in December 1988 when Sterling acquired Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). Like the previous two institutions, Central Evergreen was heavily in debt and considered insolvent even though a receiver had not been appointed. Unlike the prior

transactions, however, the Central Evergreen acquisition was substantially unassisted and was not contingent on the same set of specific regulatory concessions by government regulators. That is not to say that the government opposed the merger. To the contrary; the regulators' requests for Sterling's assistance in this matter were persistent enough to weather at least one negative response before Sterling capitulated. Lengthy negotiations netted a resolution by the FHLBB approving the merger, see Ct. Rec. 51, Exhibit L, and an agreement between Sterling and the FSLIC in which Sterling promised to raise additional capital pursuant to a referenced Business Plan and the FSLIC agreed to give Sterling until December 31, 1990, to comply with existing capital to asset ratios. According to the Business Plan and the FHLBB resolution, the parties contemplated that Sterling would raise a substantial amount of capital through a public stock offering to be completed by June 30, 1989. See Ct. Rec. 51, Exhibit K, Attachment A. Once again, these measures were taken in light of the apparent realization that, as a result of the merger and other acquisitions of insolvent thrifts, Sterling would be temporarily unable to meet the ratios of capital to assets outlined in the federal regulations. With the contract in place, however, the final acquisition was complete and the parties settled on the task of carrying out the various duties and obligations under the negotiated agreements.

The first sign of trouble appeared on the horizon in late 1989 when Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See Pub. L. No. 101-73, 103 Stat. 183. FIRREA was a congressional response to the "S&L crisis"--a shorthand term for the unprecedented failure of hundreds of thrift institutions throughout the country and the insolvency of the FSLIC's deposit insurance fund. One major consequence of the legislation was a wholesale restructuring of the regulatory framework in the thrift industry. FIRREA abolished the FHLBB and transferred all regulatory oversight powers and responsibilities to the newly established Office of Thrift Supervision ("OTS"). The FSLIC also was a fatality of FIRREA and the task of managing the recapitalized deposit insurance fund was assumed by the FDIC. The primary goal of the legislation, however, was to minimize the risk of continued insurance fund depletion caused by the failure of undercapitalized institutions. To that end, FIRREA imposed more stringent capital requirements and gave the Director of OTS broad enforcement powers to ensure that all thrifts were brought into compliance with the tightened regulatory controls.

From its inception, the OTS has interpreted FIRREA to require absolute compliance with the heightened capital standards by all thrifts without exception and without regard to previously negotiated capital and accounting


AO 72

treatment. In essence, the OTS views FIRREA as working a wholesale abrogation of the contracts and agreements entered into by its predecessor agency, including exceptions or forbearances from certain regulatory requirements. That the contracts purported to bind all successors is said by the government agencies to be irrelevant.

In late 1989 and early 1990, the OTS declared Sterling to be out of compliance and began imposing operating restrictions. At that time, Sterling was in the final stages of preparing for a major equity offering in the public capital markets; however, the offering was cancelled after it became clear that OTS would not ensure Sterling's authority and permission to pay shareholder dividends. The relationship between OTS and Sterling further deteriorated in May 1990 when Sterling refused to execute an operating agreement in which it would have consented to the appointment of a conservator or receiver if a definitive merger agreement with another financial institution was not executed by May 31, 1990. See Ct. Rec. 43, Exhibit 7. Shortly thereafter, on May 15, 1990, Sterling filed the present action. See Ct. Rec. 1.

On May 28, 1990, this court granted the plaintiff's motion for a temporary restraining order, see Ct. Rec. 14, and noted a preliminary injunction hearing for June 21, 1990. The court found that serious questions were raised and that the need to maintain the status quo warranted the

imposition of injunctive relief. By stipulation of the parties dated June 8, 1990, the temporary restraining order was extended to July 6, 1990, and the plaintiff's Motion for Preliminary Injunction was noted for hearing on the day set aside for resolving the defendants' Motion to Dismiss on July 3, 1990.

**Discussion**

First and foremost, Sterling maintains that its negotiations with the FSLIC and the FHLBB prior to acquiring the insolvent thrifts precipitated binding and enforceable contracts that, far from being abrogated, were expressly saved under FIRREA. Sterling argues that the OTS's unyielding insistence on compliance with the newly created capital and accounting standards in this case has resulted in an unauthorized breach of contract; indeed, claims Sterling, not only is OTS acting without statutory authority, it is pursuing a policy that lies in direct contravention to its clear statutory mandate. In the alternative, and if FIRREA in fact abrogated and cancelled these contractual rights, Sterling argues that it has suffered a constitutional taking without just compensation in violation of its fifth amendment due process rights. In either instance, Sterling claims to be entitled to declaratory and injunctive relief precluding the OTS from exhibiting a continued disregard for the various agreements or, in the alternative, allowing Sterling to rescind the

contracts, thereby reversing the acquisitions and bringing the institution into technical compliance with FIRREA's heightened capital standards.

The defendants' Motion to Dismiss is largely contingent on a finding by the court that (1) Sterling did not have any contractual assurance of receiving special capital and accounting treatment in conjunction with the acquisitions of the insolvent thrifts or (2) FIRREA, in fact, abrogated any and all prior contracts or agreements entered into by the predecessor agencies relating to forbearances from regulatory requirements. The defendants concede that the court has jurisdiction to resolve this limited "statutory claim." See Ct. Rec. 57, at 18. They concede further that injunctive relief is warranted should the court rule adversely that the forbearances are contractual and are not preempted and superceded by FIRREA. Id. at 17. Thus, inasmuch as the court finds both the existence of a contractual relationship and the lack of a specific and unequivocal intent on the part of Congress to effect a taking, there is no need to reach the remaining jurisdictional arguments that constitute the core of the defendants' Motion to Dismiss. Such a finding likewise renders moot the plaintiff's constitutional claims. The sole issue at this point is whether the plaintiff has adequately established the various elements necessary to secure a preliminary injunction, concentrating specifically

on how FIRREA impacts the negotiated agreements.

Under Ninth Circuit law, the party seeking a preliminary injunction bears the burden of meeting one of two tests. Under the "traditional" standard, a court may issue preliminary relief if it finds that (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987). Under the "alternative" standard, the moving party may satisfy its burden by demonstrating either (1) a combination of probable success and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id.

Though two tests are recognized, they are not mutually exclusive or wholly distinct. Rather, they are "extremes of a single continuum." Wilson v. Watt, 703 F.2d 395, 399 (9th Cir. 1983). The critical element is the relative hardship to the parties. If the balance of hardships tips decidedly toward the plaintiff, a less substantial showing of a likelihood of success on the merits will suffice. Id. In every case, however, a plaintiff must establish at least some probability of success. "The irreducible minimum has been described by

one court as a fair chance of success on the merits, while another court has said that the question must be serious enough to require litigation. The difference between the two formulations is insignificant. Therefore, we accept either as satisfactory." Benda v. Grand Lodge of Intern. Ass'n., 584 F.2d 308, 315 (9th Cir.), cert. dismissed, 441 U.S. 957 (1979).

A. Irreparable Injury/Balance of Hardships

The defendants correctly point out that, generally, mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available at some later point in the litigation. Goldie's Bookstore v. Superior Court of State of Cal., 739 F.2d 466, 471 (9th Cir. 1984). Such a rule remains sound, however, only so long as the harm is reasonably calculable. Id. Thus, although mere speculative injury should not be considered, see id. at 472; Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 675 (9th Cir. 1988), damage that appears relatively imminent and that does not lend itself well to monetary appraisal may suffice. See, e.g., Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1377 (9th Cir. 1985) (loss of reputation); Foremost International Tours v. Quantas Airways Ltd., 525 F.2d 281, 287 (9th Cir. 1975) (severe decline in business).

It is undisputed in this case that OTS already has imposed operating and growth restrictions on Sterling based

on OTS's determination that Sterling is capital deficient. See Ct. Rec. 43, Exhibit 7; Ct. Rec. 9, Exhibits 4-6. OTS's actions to date also have caused the cancellation of a planned equity offering that presumably would have brought Sterling into compliance with current FIRREA standards. See Ct. Rec. 51, at 12-13, 15-16; Ct. Rec. 49, at 7.[1] More disconcerting is the distinct possibility that Sterling will be the object of a take-over by government regulators. Obviously, OTS has not yet moved on Sterling in this manner. But at this point the court must focus on what is likely to happen, not simply on what has happened. Of particular concern in this regard are counsel's statements that, out of necessity, the appointment of a conservator or receiver will take place without warning, possibly overnight. The need, therefore, to assess the likelihood of a regulatory take-over is great.

The court finds that there is sufficient evidence of

---

1. As stated above, the stock offering was abandoned after Sterling failed to receive any assurance from OTS that Sterling would be allowed to pay dividends on the stock purchased. Through the testimony of Carol A. Friend, Assistant District Director of the OTS, the defendants pass the decision off as being in accord with the longstanding policy of government regulators not to give prior approval to dividend payments. The court, however, is satisfied that Sterling was not seeking express approval to pay future dividends per se, but rather was asking for some assurance that the OTS would not later refuse such permission based only on its rigid interpretation of FIRREA that Sterling must first satisfy contemporary capital requirements, ignoring entirely the negotiated agreements. Thus viewed, the relevant conduct of the OTS in this case is causally related to the failed stock offering.

impending government action to warrant consideration of the effects of a take-over. By threatening regulatory sanctions, OTS already has attempted to coerce Sterling into consenting to the appointment of a conservator or receiver unless a merger was assured. While the intent of the regulators may never be known, the only reasonable interpretation of such action is that it was a "sell out or else" ultimatum. With the merger less than assured, Sterling and its investors understandably feared that the alternative was not long in coming. If that day were to arrive, liquidation, with its resulting loss of jobs and investor money, would be a near certainty. See Ct. Rec. 9, at 3-4.

The court also finds that Sterling already has suffered immeasurable injury in the form of damage to reputation and the accompanying loss of business. Strong evidence of this is the fact that the value of Sterling's common stock has dropped in recent months from $9.00 per share to $4.00 per share. See Ct. Rec. 9, at 5.

The defendants argue that all of this injury and harm is not irreparable because Sterling can be compensated for any loss by filing an action in the Court of Claims. This assertion, however, evinces an extremely casual attitude on the part of federal regulators toward the rights of Sterling employees, investors, and depositors. Although, theoretically, the harm to these various interests might be

compensated monetarily, common sense would dictate that, on a practical level, the true measure of the damage is beyond reasonable calculation. Indeed, the present harm to Sterling's reputation and the resulting loss of investor confidence and new business most likely will never be known. It is doubtful that the defendants, if subjected to a "straight face test," seriously could argue that such damage has not occurred. Thus, the court finds that the harm to Sterling is both immediate and irreparable. Against this finding the court must weigh any hardship an injunction likely would visit on the defendants.

While arguing on the one hand that Sterling's claimed damages are either speculative or monetarily compensable, the defendants contend on the other that they and the public's interest in ensuring adequately capitalized thrift institutions will be irreparably harmed by the issuance of an injunction. Although less than direct, the defendants imply that an order precluding the enforcement of FIRREA's capitalization requirements in this case will expose the public and the insurance fund to the imminent risk of yet another thrift failure. Not only does the court disagree, it finds the defendants' fears to be speculative beyond belief.

At the time federal regulators invited and induced Sterling to acquire the three failing thrift institutions, the FHLBB expressly found that the acquisitions and

negotiated forbearances were in the pubic interest. See, e.g., Ct. Rec. 51, Exhibit F, at 3. Moreover, there simply is no evidence or allegation in this case that Sterling has not lived up to those agreements or that Sterling is on the verge of insolvency. Indeed, the Resolution Trust Corporation ("RTC"), the agency in charge of liquidating insolvent thrifts, has consistently proclaimed Sterling's solvency and disclaimed any jurisdiction over Sterling's affairs. See Ct. Rec. 52, Exhibit A.

There also is no evidence to indicate that the officers of Sterling have engaged in questionable trading or loan practices or have shown the usual propensity for opulence that commonly is associated with failed savings and loan institutions. More important still is the uncontested fact that Sterling has shown a profit in each year of operation. With this track record, the defendants' implicit prediction of yet another thrift failure carries little weight. All available evidence indicates that Sterling's efforts to absorb the troubled thrifts were proceeding as planned and that the only intervening occurrence was the enactment of FIRREA. Yet the defendants would have this court find that, suddenly, with this single stroke of the legislative pen, Sterling's continued operation under the negotiated agreements was no longer in the public interest but, in fact, was threatening immediate and irreparable harm. The court rejects this lapse in

logic and further finds that, to the extent FIRREA saves the forbearances in this case, any claim of irreparable harm wrought upon the perceived goal of the statute--less risk through heightened capital requirements--is utterly illusory.

In sum, the court finds that the balance of hardships tips decidedly in favor of Sterling. So long as the government agencies are allowed to unilaterally disregard the agreements it entered with Sterling and continually threaten and implement regulatory sanctions in varying degrees, Sterling will continue to experience harm and injury that is incapable of monetary calculation or measure. When compared to the countervailing risk of harm or prejudice to the government or, more precisely, the public, the result is clear.

**B. Probability of Success**

Assessing the probability that Sterling will succeed on the merits of this case requires the court to interpret the intricate and sometimes obscure statutory language of FIRREA. Even before that, however, the court must decide whether the capital and accounting forbearances in this case were part and parcel of the negotiated acquisitions and, therefore, contractually binding. Little discussion is needed to show that these agreements were obligatory, both on the FHLBB and the FSLIC and, to an equal extent, on their successor agencies, the OTS and the FDIC.

Unlike the gratuitous forbearance letter that was rejected in Flagship Federal Savings Bank, et al. v. Wall, et al., Civ. No. 90-0079-GT(BTM) (S.D. Cal. February 14, 1990), the agreements in this case were the product of lengthy negotiations in which both sides promised to perform certain duties and obligations and expected valuable benefits in return. The available documents conclusively show that the forbearance letters were intended by all parties to be an essential element of the contract, and there is every indication that Sterling would not have agreed to relieve the government of these failed thrifts had the forbearances not been forthcoming. In exchange and as consideration for receiving certain regulatory concessions, Sterling agreed to perform an onerous task that government regulators appeared unwilling and unable to do; specifically, to resolve the problems caused by three failed thrift institutions. Any argument that these contracts, at least prior to FIRREA, were not binding and enforceable against the FHLBB and the FSLIC, both in terms of Sterling's duty to raise its capital to asset ratio and the government's reciprocal duty to afford Sterling the promised capital and accounting treatment, must be rejected.

The defendants also devote a substantial amount of time and effort arguing that the relevant forbearances did not bargain away Congress' sovereign authority and ability

to change existing law. Sterling, however, does not dispute the fact that Congress, if it desired, could abrogate each one of these agreements. Sterling claims simply that, instead of terminating the contracts, FIRREA expressly assured their ongoing existence. On this limited and single remaining issue, this court goes only so far as to agree that FIRREA neither nullified Sterling's agreements nor authorized the OTS to turn its regulatory back on their continued validity.

Relying on § 401, Sterling contends that FIRREA expressly saves its negotiated forbearances in this case. Section 401 provides in pertinent part:

> **(a) In general.** (1) FSLIC. Effective on the date of the enactment of this Act, the Federal Savings and Loan Insurance Corporation established under section 402 of the National Housing Act [12 USCS § 1725] is abolished.
> (2) FHLBB. Effective at the end of the 60-day period beginning on the date of the enactment of this Act, the Federal Home Loan Bank Board and the position of Chairman of the Federal Home Loan Bank Board are abolished.
>
> * * *
>
> **(f) Savings provisions relating to FSLIC.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any <u>right, duty, or obligation</u> of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which--
> (A) arises under or pursuant to any section of title IV of the National Housing Act [12 USCS §§ 1724 et seq.]; and
> (B) existed on the day before the date of the enactment of this Act....
>
> **(g) Savings provisions relating to FHLBB.** (1) Existing rights, duties, and obligations not

affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which--

(A) arises under or pursuant to the Federal Home Loan Bank Act [12 USCS §§ 1421 et seq.], the Home Owners' Loan Act of 1933 [12 USCS §§ 1461 et seq., generally; for full classification, consult USCS Tables volumes], or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act [12 USCS §§ 1724 et seq.]); and

(B) existed on the day before the date of the enactment of this Act....

FIRREA § 401, 103 Stat. 354-57 (emphasis added).

As stated above, the forbearances in this case were part of the overall contract entered into between Sterling and the predecessor agencies that resulted in Sterling's acquisition of the troubled thrifts. As such, the parties to those agreements were vested with certain "rights, duties, and obligations" that, under the above statute, survived the abolition of the FHLBB and the FSLIC.

Although they disagree, the defendants are willing to accept a determination that § 401 preserved the negotiated agreements, notwithstanding the discontinuation of the previous regulatory agencies. See Ct. Rec. 57, at 6. They argue, however, that any life left in the agreements was extinguished in § 301 wherein Congress prescribed new, uniformly applicable capital requirements for all thrift institutions.[2] Specifically, the defendants rely on the

2. The defendants also offer their standard argument that § 401 only saved the contracts from being terminated solely by reason of the abolition of the predecessor

following provision, placing monumental emphasis on the word "all":

> **Minimum capital requirements.** (1) In general. Consistent with the purposes of section 908 of the International Lending Supervision Act of 1983 [12 USCS § 3907] and the capital requirements established pursuant to such section by the appropriate Federal banking agencies (as defined in section 903(1) of such Act [12 USCS § 3902(1)]), the Director shall require <u>all</u> savings associations to achieve and maintain adequate capital by--
> (A) establishing minimum levels of capital for savings associations; and
> (B) using such other methods as the Director determines to be appropriate.

12 U.S.C. § 1464(s) (emphasis added).

The defendants' entire argument hinges on one key concept: under FIRREA, the Director has no choice but to require that all thrifts, unless expressly excepted by statute, conform their capital structures to the standards set forth in § 301(t).[3] From this they <u>infer</u> that,

---

agencies while, here, any contractual abrogation was the product of congressional or agency action. As with Judge Panner in <u>Far West Federal Bank, et al. v. Director, Office of Thrift Supervision, et al.</u>, CV No. 90-103-PA (D. Ore. May 4, 1990), this court rejects the argument. These agreements expressly survived the abolition of the FHLBB and the FSLIC and only additional action by Congress can cause their demise. Without such authority, the OTS certainly has no basis to override the express mandate of § 401.

[3]. Section 301(t) provides in part:

> **Capital standards.** (1) In general. (A) Requirement for standards to be prescribed. The Director shall, by regulation, prescribe and maintain uniformly applicable capital standards for savings associations. Those standards shall include--
> (i) a leverage limit;

because Sterling's continued operation under the agreements does not technically comply with the promulgated standards, and because the Director has no authority to make exceptions to the rule, Congress implicitly abrogated the contracts. This logic, however, breaks down if the Director indeed does have discretion to make an exception in an appropriate case. If the Director retains some limited volition, the defendants' inference would fail and the contractual arrangements in this instance, unlike the gratuitous forbearances at issue in Flagship, would bind the Director and require him to exercise his discretion in favor of Sterling. Thus, the key would appear to be whether § 301(s)(2) affords the Director such authority.

In general § 301(s) sets forth the role of "minimum" capital standards in FIRREA's overall structure and requires the Director to establish such standards for all thrifts. See 12 U.S.C. § 1464(s)(1). Section 301(s)(2) then provides:

> Minimum capital levels may be determined by Director case-by-case. The Director may,

---

> (ii) a tangible capital requirement; and
> (iii) a risk-based capital requirement.

12 U.S.C. § 1464(t)(1)(A). The statute goes on to set a base amount for each of the three categories and provides that a savings institution is not in compliance with capital standards "for purposes of this subsection" unless all three categories are met. Id. § 1464(t)(1)(B) (emphasis added). The underlined section suggests to this court that some capital standards, perhaps "minimum" levels, see id. § 1464(s)(2), might be established elsewhere in the statute.

> consistent with subsection (t), establish the minimum level of capital for a savings association at such amount or at such ratio of capital-to-assets as the Director determines to be necessary or appropriate for such association in light of the particular circumstances of the association.

12 U.S.C. § 1464(s)(2) (emphasis added).

Sterling, of course, focuses on language that permits the Director to establish minimum capital levels "at such amount" as is considered necessary under a given set of circumstances. The defendants, however, seizing the "consistent with subsection (t)" language, interpret the provision as only giving the Director authority to set minimum levels that equal or exceed those promulgated in § 301(t). In essence, they maintain that subsection (t) establishes an "absolute" minimum level of capitalization. Thus, they imply, the Director lacks the needed discretion to honor the contracts.

Although the defendants present an appealing argument, the court rejects it for several reasons. First, the word "consistent" in this instance can convey a multitude of ideas, many of which are as viable or more viable than the interpretation offered by the OTS and the FDIC.[4] For instance, it may be that Congress intended that

---

4. The defendants no doubt will object to this ruling as being contrary to the settled axiom that an agency's interpretation of a particular statute, if reasonable, is entitled to deference. See Cheveron U.S.A. v. Natural Resources Defense, Inc., 467 U.S. 837, 843 (1983). Although the court recognizes this principle, as it must, deference is unwarranted here because the court finds that

the minimum levels should follow the same general structure as set out in subsection (t) or that the levels set would not be inordinately disproportionate to the base standards. This certainly would give the Director substantial leeway to set limits "in such amounts or at such ratio" as deemed appropriate. If Congress wished to ensure that the capital levels set by the Director were equal to or above those in subsection (t), it easily could have said as much directly.

Second, having found that Congress expressly preserved Sterling's contracts under § 401, at least from abrogation based on the discontinuation of the predecessor agencies, it would appear to be somewhat incongruous for Congress immediately to turn around and nullify those same agreements. That Congress would accomplish such a result by nothing more than mere innuendo, its intent disguised by a questionable inference, makes it all the more doubtful.

Finally, the court is persuaded further by the lack of specificity in the statute with regard to contracts of this nature.[5] Statutory authorization to effect a taking,

---

the defendants' interpretation of FIRREA, as a whole, is substantially unreasonable.

5. Of course, the defendants point to the savings clause in Title III in which Congress specifically saved certain forbearances from being swallowed up by FIRREA. See FIRREA § 302, 103 Stat. 343. The court is satisfied at this point that § 302 only excepts certain unilateral, gratuitous forbearances that otherwise would not survive FIRREA's new capital requirements. Unlike the obligatory agreements at issue here, as to which a specific savings

which of course would be the case here, must be specific either in terms of an express remedy for the act or explicit permission to perform the act. See, e.g., Outboard Marine Corp. v. Thomas, 773 F.2d 883, 891 (7th Cir. 1985), vacated on other grounds, 479 U.S. 1002 (1986); Government of Guam v. Moylan, 407 F.2d 567, 568-69 (9th Cir. 1969); Polson Logging Co. v. United States, 160 F.2d 712, 714 (9th Cir. 1947). In this case there is neither. In fact, not only is it far from clear that Congress intended to effect a taking, but the language suggests that Congress intended quite the opposite. Without some sort of clear statutory mandate, the court will not lightly infer that Congress has undertaken to abrogate the contractual rights of private citizens.[6]

## Conclusion

The court is acutely aware of the formidable task

---

clause was already present, see FIRREA § 401, the gratuitous forbearances had to be separately preserved.

[6]. Sterling argues that § 501 of FIRREA, which outlines the operation and duties of the RTC, also supports its reading of the statute. Although the court does not rely on this particular portion of FIRREA in reaching the above decision, it is worth noting that, contrary to the fact-specific findings in Flagship and Far West, § 501 might have relevance here. Section 501 requires the RTC to review "existing" agreements entered into by the FSLIC prior to the enactment of FIRREA. See FIRREA § 501(b)(11)(B). That the RTC apparently is reviewing Sterling's agreements from the Tri-Cities' acquisition, see Ct. Rec. 50, and considers these contracts to fall within the category labeled "existing," seems to indicate that one regulatory agency does not completely share the OTS's interpretation of FIRREA.

facing Congress and federal regulators in nursing a failed and wounded savings and loan industry back to health. Hard times do indeed call for stern measures. But those measures should not be wholly devoid of all equity, decency, and compliance by the government with its prior agreements. In a somewhat analogous context, Justice Louis Brandeis once wrote:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy....

Olmstead v. United States, 277 U.S. 438, 485 (1927) (Brandeis, J., dissenting). Such advice and counsel is equally germane in the realm of contract. A fitting corollary is the comment of Justice Hugo Black, quoted by the court at oral argument, that "[g]reat nations, like great men, should keep their word." Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 142 (1959) (Black, J., dissenting). These principles are both sound and persuasive, and must guide this court as it performs the task of deciding between two diametrically conflicting interpretations of the same statute.

As this court reads FIRREA, Congress has honored the

promises made to Sterling. It is the regulators who, in their zeal for nonnegotiable uniformity, have discovered a contrary intent that this court finds is not clear from the statutory language. But even assuming the defendants are correct in their assertion that Congress harbored an intent to abrogate binding and enforceable contracts, as it has power to do, the court must insist that it be evidenced in a forthright and unmistakable manner. Absent a clear mandate to the contrary, the court will require the defendants to honor the contracts entered into between Sterling and the predecessor agencies.

**IT IS HEREBY ORDERED:**

1. Sterling's Motion for Preliminary Injunction (Ct. Rec. 16) is **HEREBY GRANTED.** The defendants are **HEREBY ENJOINED AND RESTRAINED** from:

a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;

b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision

to Sterling that treat Sterling as a troubled thrift;

c. placing Sterling in a receivership or conservatorship; and

d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

2. OTS and FDIC's Motion to Dismiss (Ct. Rec. 41) is **HEREBY DENIED.**

3. FHLB's Motion for Order of Dismissal (Ct. Rec. 37) is **HEREBY DENIED AS MOOT**, counsel having informed the court that the parties have reached agreement as to the stipulated dismissal of FHLB as a defendant in this action.

4. OTS and FDIC's Motion for Leave to Cite Unpublished Decisions (Ct. Rec. 31) is **HEREBY GRANTED.**

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 5th day of August 1990.

JUSTIN L. QUACKENBUSH
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300

October 10, 2000

Attorneys for Defendant

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . i

TABLE OF AUTHORITIES . . . . . iii

DEFENDANT'S MEMORANDUM . . . . . 2

QUESTIONS PRESENTED . . . . . 2

STATEMENT OF THE CASE . . . . . 3

I. Nature Of The Case . . . . . 3

II. Statement Of Facts . . . . . 6

SUMMARY OF THE ARGUMENT . . . . . 15

ARGUMENT . . . . . 17

I. Sterling's Due Process Claim Should Be Dismissed Because This Court Lacks Jurisdiction To Entertain Such Claims . . . . . 18

II. Sterling's Cause Of Action For A Taking Should Be Dismissed Because Sterling Cannot Show That The Government's Actions Constitute A Taking Of Its Property Rights . . . . . 19

A. Sterling's Remedies Are Governed By Their Contract, And Not By The Fifth Amendment . . . . . 19

B. The Government's Elimination Of Goodwill From Regulatory Capital Does Not Constitute A Regulatory Taking . . . . . 22

1. Introduction . . . . . 22

2. The *Branch* Case . . . . . 24

a) Character Of The Government Action . . . . . 24

b) Economic Impact . . . . . 25

c) Investment-Backed Expectations . . . . . 28

III. Sterling's Claim For Restitution Should Be Dismissed For Lack Of

Subject Matter Jurisdiction ........................................ 29

IV. Sterling's Cause Of Action For Promissory Estoppel Should Be Dismissed Because This Court Does Not Possess Jurisdiction Over Promissory Estoppel Claims ........................ 32

V. This Court Lacks Subject Matter Jurisdiction To Entertain Sterling's Cause Of Action For Specific Performance ........................ 33

VI. The Government's Pending Motion For Summary Judgment On The First Cause Of Action Of The Complaint, For Breach Of Contract, Should Be Granted ............ 34

A. Even Assuming, For The Sake Of Argument, That The Government Contracted To Permit Sterling To Count FSLIC Cash Assistance As Regulatory Capital, Sterling, By Its Own Admission, Was Required To Count FSLIC Cash Assistance As Supervisory Goodwill And Amortize It ......... 35

B. The Government Was Not Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Transaction Toward Regulatory Capital Requirements .................. 36

C. Even Assuming, For The Sake Of Argument, That The Capital Maintenance Agreement Contained A Forbearance Permitting Sterling To Count Supervisory Goodwill As Regulatory Capital, The Forbearance Expired In 1991 ........................................ 37

D. Assuming, For The Sake Of Argument, That The Government Acted Inconsistently With Any Contractual Obligation To Plaintiffs, The Inconsistent Actions Necessarily Ceased After Plaintiffs Obtained An Injunction Enjoining The Government From Taking Action Inconsistent With The Purported Contracts ............................ 38

CONCLUSION ................................................ 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Acme Process Equipment Co. v. United States, 171 Ct. Cl. 347, F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) .......... 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 17

Baggett Transportation Co. v. United States, 969 F.2d 1028 (Fed. Cir. 1992) .......... 21

Banner, et al. v United States, 1999 WL 605631 (Fed.Cl. 1999) .......... 18

Betz v. United States, 40 Fed. Cl. 286 (1998) .......... 18

Biagioli v United States, 2 Cl. Ct. 304 (1983) .......... 33

Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41 (1986) .......... 28

Boyle v. United States, 44 Fed. Cl. 60 (1999) .......... 34

Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995), cert. denied, 519 U.S. 810 (1996) .......... *passim*

Chevron Chemicals Corp. v. United States, 5 Cl. Ct 807 (1984) .......... 21

Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602 (1993) .......... *passim*

Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211 (1986) .......... *passim*

Crocker v. United States, 125 F.3d 1475 (Fed. Cir. 1997) .......... 18

Data Transformation Corp. v. United States, 13 Cl. Ct. 165 (1987) .......... 21

Doe v. United States, 37 Fed. Cl. 74 (1996) .......... 34

Fahey v. Mallonee, 332 U.S. 245 (1947) .......... 28

Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991) .......... 4

Gates v. United States, 33 Fed. Cl. 9 (1995) .......... 34

Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91 (1979) .......... 39

Gratz v. United States, 25 Cl. Ct. 411 aff'd, 985 F.2d 583 (Fed. Cir. 1992), cert. denied, 508 U.S. 959 (1993) .......... 20

Gregory v. United States, 37 Fed. Cl. 388 (1997) .......... 32

Hamlet v. United States, 873 F.2d 1414 (Fed.Cir. 1989) .......... 17

Hercules, Inc. v. United States, 516 U.S. 417 (1996) .......... *passim*

Horowitz v. United States, 267 U.S. 458 (1925) .......... 21

Houston Oil & Refining, Inc. v. United States Federal Energy Regulatory Commission, 95 F.3d 1126 (Fed. Cir. 1996) .......... 31

J. J. Henry Co. v. United States, 188 Ct. Cl. 411 F.2d 1246 (1969) .......... 21

Kanemoto v. Reno, 41 F.3d 641 (Fed. Cir. 1994) .......... 34

Keystone Bituminous Coal Associate v. DeBenedictis, 480 U.S. 470 (1987) .......... 19, 26

Knaub v. United States, 22 Cl. Ct. 268 (1991) .......... 32, 33

LaMirage, Inc., v. United States, 44 Fed. Cl. 192 (1999) .......... 32

Linda R.S. v. Richard D., 410 U.S. 614 (1973) .......... 39

Logan Canyon Cattle Associate v. United States, 34 Fed. Cl. 165 (1995) .......... 34

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) .......... 23

Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) .......... 22, 23

M&J Coal Company v. United States, 47 F.3d 1148 (Fed. Cir.), cert. denied, 116 S. Ct. 53(1995) .......... 22

Maki v. United States, 13 Cl. Ct. 779 (1987), aff'd, 852 F.2d 1293 (Fed. Cir.), cert. denied sub nom Youngberg v. United States, 488 U.S. 943 (1988) .......... 17

Marathon Oil Co. v. United States, 16 Cl. Ct. 332 (1989) .......... 21

Massachusetts v. Mellon, 262 U.S. 447 (1923) .......... 39

Merritt v. United States, 267 U.S. 338 (1925) .......... 29

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) .......... 17

Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994) .......... 28

Montalvo v. United States, 231 Ct. Cl. 980 (1982) .......... 18

Murray v. United States, 817 F.2d 1580 (Fed. Cir. 1987) .......... 18

New York Power Authority v. United States, 42 Fed. Cl. 795 (1999) .......... 18

N.L. Durant. Jr. v. United States, 16 Cl. Ct. 447 (1988) ....................32

Northwest Airlines v. United States Department of Transportation,
15 F.3d 1112 (D.C. Cir.1994) .................... 21

Octocom Systems. Inc. v. Houston Computer Services. Inc., 918 F.2d 937 (Fed. Cir. 1990) .......... 17

Pacific Architects & Eng'rs Inc. v. United States, 203 Ct. C 491 F.2d 734 (1974) .................... 31

Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329 (1983),
aff'd, 738 F.2d 452 (Fed.Cir.1984) ....................32, 33

Pacific National Cellular v. United States, 41 Fed. Cl. 20 (1998) .................... 28

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922) .................... 23

Phaidin v. United States, 28 Fed. Cl. 231 (1993) .................... 33

Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174,
aff'd. 133 F.3d 874 (Fed. Cir. 1997), cert. denied, 119 S. Ct. 67 (1998) .................... 21, 22

Reynolds v. Army & Air Force Exchange Service, 846 F.2d 746 (Fed.Cir. 1988) .................... 17, 32

Schuhl v. United States, 3 Cl. Ct. 207 (1983) ....................33

Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976) .................... 39

State of Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855 (1978) .................... 31

Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. Wash., 1990), vacated and
remanded, 959 F.2d 241 (9th Cir. 1990) .................... *passim*

Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786 (1978)....................19, 20

Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392 (1998) .................... 21

Sweats Fashions. Inc. v. Pannill Knitting Co.. Inc., 833 F.2d 1560 (Fed. Cir. 1987) .................... 17

Tenaska Washington Partners II v. United States, 34 Fed. Cl. 434 (1995) .................... 34

Transohio Savings Bank v. OTS, 967 F.2d 598 (D.C. Cir. 1992) .................... 28

Transpace Carriers. Inc. v. United States, 27 Fed. Cl. 269 (1992) .................... 21

Trauma Services Group v. United States, 104 F.3d 1321 (Fed. Cir. 1997) .................... 32

United States v. King, 395 U.S. 1 (1969) .................... 34

United States v. Mitchell, 463 U.S. 206, 218 (1983) .................... 32

United States v. Winstar, 518 U.S. 839 (1996) ........ *passim*

Usery v. Turner Elkhorn Mining Co, 428 U.S. 1 (1976) ........ 26

Valley Forge Christian College v. Americans United for Separation of Church and States, 454 U.S. 464 (1982) ........ 39, 40

Wheeler v. United States, 11 F.3d 156 (Fed. Cir. 1993) ........ 18

White Mountain Apache v. United States, 46 Fed. Cl. 20 (1999) ........ 34

W.P. Bill Atkinson Enterprises, Inc. v. United States, 228 Ct. Cl. 886, 888 (1981) ........ 31

## DOCKETED CASES

Plaintiffs In All Winstar Related Cases v. United States, No. 90-8C, et al. (Fed. Cl., Sept. 29, 1999) ........ 1

## FEDERAL STATUTES

12 U.S.C. § 1464(t)(3)(A),(9)(B) and (C) ........ 14

12 U.S.C. § 1464(t)(3)(A) ........ 27

12 U.S.C. § 1811 ........ 25

12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303 ........ 14

H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted in 1989 U.S.C.C.A.N. 86, 432, 443 ........ 27

12 C.F.R. § 561.13 (1987) ........ 11

12 C.F.R. § 563.13 (1988) ........ *passim*

12 C.F.R. § 563b.13 ........ 12

12 C.F.R. § 563.13(b)(2)(iv) ........ 13

12 C.F.R. § 567.10(a)(4) ........ 15

28 U.S.C. § 1491 ........ 18, 32

28 U.S.C. § 1491(a)(1) (1994) ........ 29

28 U.S.C. § 1491(a)(3) ........ 33

U.S. Const., amend. V ........ 18, 19

U.S. Const., amend. XIV ........ 18

## RULES AND TREATISES

R. Fed. Cl. 12 .......... 1

R. Fed. Cl. 12(b) .......... 2, 17

R. Fed. Cl. 56 .......... 1, 4

R. Fed. Cl. 56(g) .......... 5

1 Dan B. Dobbs, Law of Remedies § 4.1(1) (2d ed. 1993) .......... 30

1 K. Davis, Administrative Law Treatise, § 4.04 (1965) .......... 28

3 E. Allan Farnsworth, Farnsworth on Contracts § 12.1 (2d ed. 1998) .......... 30

Andrew Khull, Rationalizing Restitution, 83 Calif. L.Rev. 1191 (1995) .......... 30

Joseph M. Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208 (1973) .......... 30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rules 12 and 56 of the Rules of the United States Court of Federal Claims, paragraph 5 of the Omnibus Case Management Order entered on September 18, 1996, and paragraph III of Procedural Order No. 1: Master Litigation Plan entered on August 11, 1997, the United States respectfully submits this supplemental memorandum in opposition to plaintiffs' motion for partial summary judgment and in support of defendant's partial motion to dismiss and cross-motion for partial summary judgment. Defendant requests that the Court deny Sterling Savings Association's and Sterling Financial Corporation's (collectively, "Sterling") motion for partial summary judgment, grant summary judgment in favor of the Government with respect to the first cause of action of the complaint, for breach of contract, and dismiss the second through sixth causes of action of the complaint.[1] Specifically, we request that the Court dismiss, pursuant

---

[1] On September 29, 1999, this Court granted the plaintiffs' motion in the First 30 cases to stay briefing in response to our dispositive motions upon issues other than breach of contract in those cases. See Plaintiffs In All Winstar Related Cases v. United States, No. 90-8C, et al. (Fed. Cl.

to Rule 12(b), the following counts of Sterling's complaint: (1) its claim for a violation of due process (the third cause of action), (2) its claim for a taking of property rights (the second cause of action), (3) its estoppel claim (fourth cause of action), (4) its claim for restitution (the fifth cause of action), and (5) its claim for specific performance (sixth cause of action).

In support of this motion, we rely upon the accompanying proposed statement of uncontroverted fact, the record already established in this case, and upon the following memorandum with the appendix.

## DEFENDANT'S MEMORANDUM

## QUESTIONS PRESENTED

1. Whether this Court possesses jurisdiction to entertain a claim for a due process violation.

2. Whether a party may maintain a claim for a taking of property rights when the purported rights in question derive from an alleged contract, and when the Government did not interfere with the party's reasonable expectations.

3. Whether this Court possesses jurisdiction to entertain implied-in-law claims for restitution and promissory estoppel.

---

Sept. 29, 1999) ("Status Conference") at Tr. 41-42. The Court's order responded, however, only to a request made by the Plaintiffs' Coordinating Committee with respect to dispositive motions filed in the First 30 cases. The Court did not amend or modify paragraph VI.B.1 of Procedural Order No. 1: Master Litigation Plan (filed on Aug. 11, 1997), which requires, without exception, that all dispositive motions regarding liability issues be filed within 45 days of the completion of fact discovery. Consistent with this deadline, and with the Court's and the parties' interest in expediting resolution of all issues in the Winstar-related litigation, we address here all dispositive issues of which we are currently aware regarding liability.

4. Whether this Court possesses jurisdiction to entertain a cause of action for specific performance.

5. Whether the Government entered into contracts with Sterling regarding the accounting treatment of supervisory goodwill and FSLIC cash assistance.

6. Whether the Government acted inconsistently with any alleged contracts with Sterling regarding the accounting treatment of supervisory goodwill and FSLIC cash assistance..

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case arises out of the acquisition by Sterling of Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen"), in November 1985, April 1988, and December 1988, respectively. Sterling alleges that these three acquisitions created contracts requiring the Government to permit Sterling to account for supervisory goodwill as an asset in computing regulatory capital and to amortize the goodwill from 12 to 40 years. In addition, with respect to the Lewis and Tri-Cities acquisitions, Sterling alleges that the Government contracted to permit Sterling to count FSLIC assistance as permanent regulatory capital.

In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990, and a preliminary injunction in August 1990. In its opinion granting the preliminary injunction, the court severely restricted OTS's and FDIC's authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA

did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Savings Association v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash., 1990), vacated and remanded, 959 F.2d 241 (9th Cir. 1990)(table). OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83.

On appeal, the Court of Appeals for the Ninth Circuit reversed the district court decision. Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1990) (table) (published at 1992 WL 73884). In Sterling, the Ninth Circuit concluded, relying upon Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991), that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling (9th Cir.), 1992 WL 73884, at *1. Upon that basis, the Ninth Circuit vacated and remanded the district court's judgment to the district court. Id.

Pursuant to an order dated September 13, 1995, the district court granted Sterling's motion to transfer the case to this Court. On January 19, 1996, Sterling filed this action, and it was stayed, on April 11, 1996, pending the Supreme Court decision in Winstar.

The parties have previously briefed issues concerning contract liability in this case. Pursuant to the Court's Omnibus Case Management Order and Rule 56 of the RCFC, on January 17, 1997, Sterling filed a motion for partial summary judgment on liability addressing the questions of (1) whether this case involves a contract between the thrift and the Government, and (2) whether the Government acted inconsistently with that contract by enacting FIRREA. On April 1, 1997, we moved to dismiss plaintiff Sterling Financial Corporation for lack of standing, cross-moved for summary judgment on the breach of contract issues, and opposed Sterling's

motion for partial summary judgment.

On December 22, 1997, after a series of briefs filed by the parties, the Court ordered the Government to show cause, in all cases with a pending short-form motion for summary judgment, why partial judgments should not be entered upon all Winstar-related "contract liability" issues.

On February 20, 1998, we filed our response to show cause in the 38 Winstar-related cases in which these issues had been fully briefed. Our response documented the evolution of the "short-form" partial summary judgment procedure from an expedited method for resolving contract allegations identical to those involved in the three Winstar cases, based upon the exchange of "core" documents, into a much broader proceeding involving significantly different contract allegations and substantial documentary materials gathered by the plaintiffs outside of normal discovery procedures. We further explained that we had no opportunity for discovery in these cases and were unaware that the Court intended to base its decisions upon extrinsic evidence.

On March 23, 1998, the Court ordered the 38 plaintiffs to file, by March 31, 1998, proposed orders on "all liability issues [they] believe[d] were resolved by the Winstar decisions and the [December 22, 1997] decision." The Court also ordered the Government to file, by April 30, 1998, a response to the plaintiffs' proposed orders. On March 31, 1998, Sterling filed its proposed order which requested summary judgment in favor of plaintiff on liability for breach of contract. On April 30, 1998, we filed our response objecting to the thrift's proposed order. We also submitted our Rule 56(g) affidavit demonstrating the need to take discovery concerning liability issues.

This motion supplements our liability arguments with information obtained during discovery and presents arguments which were outside the scope of the short-form briefing.

As demonstrated below and in our prior briefing, the Court should grant summary judgment to the United States concerning Sterling's contract claim (the first cause of action of its complaint) and the Court should dismiss Sterling's other claims, as they do not offer valid grounds for relief in this Court.

II. **Statement Of Facts**

This case arises out of the acquisition by Sterling of Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen"), in November 1985, April 1988, and December 1988, respectively. Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. Id. This case arises out of Sterling's acquisition of three failing savings and loan institutions in the 1980s: Lewis Federal Savings & Loan Association ("Lewis"), Tri-Cities Savings & Loan Association ("Tri-Cities"), and Central Evergreen Federal Savings & Loan Association ("Central Evergreen").

(1) Lewis Federal. In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). App. 1. Sterling did not invest any of its own money. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement (the "Lewis Assistance Agreement") with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration.

App. 29-32 (§§ 3, 4). By Resolution No. 85-985, dated November 4, 1985, the Federal Home Loan Bank Board ("Bank board"), approved Sterling's acquisition of most of the assets and liabilities of Lewis, authorized FSLIC to enter into the Lewis Assistance Agreement with Sterling to facilitate the acquisition, and authorized and directed that a forbearance letter to sent to Sterling. App. 55, 56-57, 60.

A letter sent to Sterling by the Bank Board on November 12, 1985, stated that "the forbearances listed below are hereby granted" (the "Lewis Forbearance Letter"). App. 17. The letter then listed three forbearances, including an agreement to forbear, for five years, from FSLIC exercise of its authority over any failure of Sterling to meet the net worth requirements of 12 C.F.R. § 563.13 (1988) arising from Sterling's assumption of Lewis's liabilities. App. 18. Following the list of forbearances, the letter stated:

> [t]he forbearances or waivers extended by this letter do not relieve Sterling of its continuing obligations to maintain records of its net worth condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Bank Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Sterling. . . .

App. 18.

Subsequent to this statement that the Bank Board and FSLIC's agreement to forbear applied only to the three listed forbearances, the Bank Board's letter stated as follows:

> This letter will also confirm that:
>
> 1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assistance agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.
>
> 2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method. . . .

App. 19.

The letter also confirmed that Sterling was required, not later than 90 days following the date of merger, to submit to the Supervisory Agent an independent certified public accountant's opinion that Sterling accounted for the Acquisition in accordance with generally accepted accounting principles or that as herein provided by the Bank Board. Id. Sterling has not included an accountant's letter with its motion, and to the Government's knowledge, the letter was never submitted as required.

The Lewis Assistance Agreement is dated November 5, 1985. App. 20. By its own terms, it terminated three years after its effective date, or on November 5, 1988. App. 50 (§ 11(a)). The provision governing accounting of the FSLIC contribution stated as follows:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by [GAAP], all cash contributions made [by the FSLIC] shall be credited to [Sterling's] net worth account. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must

> be reflected in any filing that [Sterling] may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with [GAAP].

App. 30 (§ 3(a)(2)).

The "Accounting Principles" section of the Assistance Agreement stated as follows:

> Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition of to [sic] this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition or this Agreement, the Bank Board's resolution or action shall govern.

App. 48 (§ 9).

An integration clause incorporated into the Assistance Agreement specified that "resolutions or letters concerning the Acquisition or this Agreement issued by the Bank Board or [FSLIC] in connection with the approval of the Acquisition and this Agreement" were included within the terms of the Agreement. App. 51 (§ 14).

(2) Tri-Cities. In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Bank Board, pursuant to Resolution No. 88-250, approved the acquisition, authorized an assistance agreement and authorized and directed that a forbearance letter be sent to Sterling. App. 65, 67, 70, 71. A forbearance letter (the "Tri-Cities Forbearance Letter"), dated April 6, 1988, stated, in

pertinent part, that "the following forbearances are hereby granted:"

> 1. Capital Requirements The Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Rules and Regulations for FSLIC-Insured Institutions, for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from (1)(a) any increase in the contingency component attributable to the assets of Tri-Cities existing at the effective date, and (b) any increase in the net growth of Sterling as of the Effective Date by reason of Sterling's assumption of Tri-Cities' liabilities; or (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the effective date.
>
> 4. Regulatory Capital It is the FSLIC's intention that the initial cash contribution to be made to Sterling pursuant to the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.
>
> 5. Amortization of Unidentified Intangibles For purposes of reporting to the [Bank] Board, the value of any unidentified intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

App. 75-76.

The Tri-Cities Forbearance Letter also contained a provision requiring Sterling to submit, within 60 days of consummation of the acquisition, the opinion of an independent accountant that Sterling accounted for the transaction in accordance with GAAP, except as provided for in the Forbearance Letter. App. 76.

The Assistance Agreement ("Tri-Cities Assistance Agreement"), dated April 8, 1988, terminated five years after its effective date, or on April 8, 1993. App. 95, 151 (§§ 1(y); 18(a)). It also provided for specialized accounting treatment of an $11,730,128.00 FSLIC cash

contribution so long as GAAP reporting was not required by statute. App. 98, 154 (§§ 3(a)(1) and (2), 20, 21). Section 3(a)(2) stated:

> For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by [GAAP], the [FSLIC] cash contribution . . . shall be credited to [Sterling's] regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987). It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that [Sterling] may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

App. 98. Finally, the Accounting Principles provision and the integration clause contained in the Tri-Cities Assistance Agreement were nearly identical to the corresponding provisions of the Lewis Assistance Agreement. App. 150, 154 (§§ 16, 21).

Pursuant to a letter dated July 28, 1988, the accounting firm of Coopers and Lybrand informed the Board of Directors of Sterling that "[a] total of approximately $2,520,000 has been allocated to an unidentified intangible asset. The unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired." App. 273-74. Thus, the accountant's opinion varied from the Tri-Cities Forbearance Letter, which indicated that unidentifiable tangible assets could be amortized over 15 years. App. 76. Further, the accounting opinion did not indicate that Sterling intended to use goodwill to meet regulatory capital requirements. Id.

(3) Central Evergreen. In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and