entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and no cash assistance was provided by FSLIC. App. 160-65, 166-72.

Resolution No. 88-1273 conditioned the transaction upon, among other things, a requirement that Sterling account for the transaction in accordance with GAAP, and a requirement that Sterling enter into a written agreement with FSLIC in which Sterling would commit to operating within the scope of the business plan provided in the transaction and

> infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 [sic] as currently in effect or as hereafter amended.

App. 168-69 (¶¶ 4, 8).

On December 28, 1988, Sterling entered into an agreement with FSLIC that expressly allocated the risk of changes in regulatory capital requirements to Sterling and specifically stated that the agreement did not provide a waiver of or forbearance from any applicable regulation (the "Capital Maintenance Agreement"). App. 163 (§§ V.D., V.M). Further, the Capital Maintenance Agreement contained no terms restricting the authority of Federal regulators to enforce capital standards against Sterling. In addition, the Capital Maintenance Agreement expressly and repeatedly referenced current capital regulations and "any successor regulation," thereby demonstrating the signatories' awareness that the regulations might change. App. 161 (§§ I.F. I.G., I.H., I.I., I.J). Section III.A stated that Sterling was required to

> cause its Regulatory Capital[2] to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan.

App. 162. Section V.D. provided as follows:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

App. 163. Section V.M. provided that "[t]his Agreement is not a waiver of or forbearance from any applicable regulation." App. 164. Indeed, when Sterling's application to acquire Central Evergreen was pending, Sterling's Chairman of the Board and Chief Executive Officer stated that Sterling's Board of Directors discussed the possibility that Sterling could be subjected to stricter capital requirements in the future, and that the Board decided it was a risk worth taking. App. 232.

Pursuant to a letter dated January 27, 1989, the accounting firm of Coopers and Lybrand opined that a total of approximately $23,800,000 was allocated as an unidentified intangible asset, or goodwill, in connection with Sterling's acquisition of Central Evergreen. App. 174.

On August 8, 1989, Congress enacted FIRREA. FIRREA abolished the Bank Board and

---

2/ The Agreement defined "Regulatory Capital" as "regulatory capital defined in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto." App. 161 (§ 1(h)). "Minimum Capital Requirement" was defined as "the amount computed quarterly according to Section 463.13(c) and as adjusted by the "April Calculation" specified in section 563.13(b)(2)(iv), or any successor regulation thereto.

FSLIC, and established three new capital standards, "core capital," tangible capital," and "risk-based capital," and restricted the ability of thrifts to continue to use intangible assets to meet those requirements. Pursuant to FIRREA, supervisory goodwill could not be included in satisfying the tangible capital requirement; it had to be phased out by December 1994 in calculating core capital, and had to be amortized over a maximum of 20 years in calculating risk-based and core capital. 12 U.S.C. § 1464(t)(3)(A),(9)(B) and (C).

As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. App. 219.

Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. App. 217. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. App. 219. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. App. 221.

In April 1990, OTS approved Sterling's capital restoration plan on condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. App. 246. On May 10, 1990, Sterling declined to execute the operating agreement. App. 247. On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards and was operating without an approved capital plan, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound

operation, pursuant to 12 C.F.R. § 567.10(a)(4). App. 226.

As set forth above at pages 3-4, in May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and immediately sought a temporary restraining order. The court issued a temporary restraining order in May 1990 and a preliminary injunction in August 1990. On appeal to the Ninth Circuit Court of Appeals, the Ninth Circuit reversed the district court decision. Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1990).

At the time the injunction was lifted in 1992, Sterling had already achieved compliance with the capital requirements imposed by FIRREA by raising in excess of $23 million through a 1991 public offering. App. 268. Consequently, by the time the injunction was lifted by the Ninth Circuit, the restrictions that the Government had been enjoined from enforcing by the district court were no longer necessary, notwithstanding the lifting of the injunction. App. 270-273.

## SUMMARY OF THE ARGUMENT

The Court should dismiss the second through sixth causes of action of Sterling's complaint and grant the our motion for summary judgment with respect to the first cause of action, the breach of contract claim.

The third cause of action, in which Sterling alleges deprivation of due process, should be dismissed because the Court does not possess jurisdiction to entertain due process allegations. The second cause of action, the taking allegation, should be dismissed because Sterling's remedies, if any, are governed by contract law, and because Sterling could not have reasonably expected that it could permanently count goodwill, including goodwill derived from FSLIC cash

assistance, in regulatory capital. Also, Sterling's claims for promissory estoppel and restitution, the fourth and fifth causes of action, should be dismissed because the Court lacks subject matter jurisdiction to consider allegations of contracts implied-in-law. The sixth cause of action, for specific performance, should be dismissed because the Court does not possess jurisdiction to provide equitable relief for breach of contract claims.

Finally, the Government's pending motion for summary judgment upon the first cause of action, for breach of contract, should be granted for the reasons set forth in prior briefing, as well as the supplemental reasons, set forth below, that the Government became aware of through discovery. The supplemental reasons include the following. First, plaintiffs have admitted in a sworn affidavit that Sterling was not permitted to count FSLIC cash assistance as a permanent credit to regulatory capital, but was instead required to amortize it. Second, in a document generated contemporaneously with Sterling's acquisition of Central Evergreen, plaintiffs admit that an agreement entered into in connection with the Central Evergreen acquisition could be superseded by subsequent regulatory changes. Third, even assuming, for the sake of argument, that the Government entered into contracts permitting Sterling to count supervisory goodwill as regulatory capital, Sterling has admitted that the contracts expired as of December 31, 1991. Similarly, even assuming, for the sake of argument, that the Government entered into contracts permitting Sterling to include supervisory goodwill as regulatory capital and permanently to count FSLIC cash assistance as regulatory capital, the Government did not act governing the accounting treatment of supervisory goodwill, the Government did not act inconsistently with those contracts after the district court enjoined the Government from taking action inconsistent with the alleged contracts.

## ARGUMENT

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). Where a motion for summary judgment is made and supported in accordance with Rule 56, it is incumbent upon the nonmovant to proffer countering evidence sufficient to create a genuine dispute of material fact. Octocom Systems, Inc. v. Houston Computer Services, Inc., 918 F.2d 937, 940 (Fed. Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Factual disputes that are irrelevant or unnecessary do not preclude summary judgment. Id.

Where the non-movant cannot "proffer countering evidence sufficient to create a genuine factual dispute," Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987), such that the trier of fact could reasonably find in favor of the non-movant, Maki v. United States, 13 Cl. Ct. 779, 781 (1987), aff'd, 852 F.2d 1293 (Fed. Cir.), cert. denied sub nom Youngberg v. United States, 488 U.S. 943 (1988), summary judgment is proper.

When considering a motion to dismiss under Rule 12(b) of the RCFC, all facts as alleged in the complaint may be considered. Reynolds v. Army & Air Force Exchange Service, 846 F.2d 746, 747 (Fed.Cir. 1988). In deciding the motion to dismiss for lack of subject matter jurisdiction, the contentions in the complaint must be viewed favorably to the plaintiff. Hamlet v. United States, 873 F.2d 1414, 1416 (Fed.Cir. 1989). As demonstrated below, this Court should enter summary judgment against Sterling and Sterling Financial on the first cause of action, for

breach of contract, and dismiss the second through sixth causes of action.

## I. Sterling's Due Process Claim Should Be Dismissed Because This Court Lacks Jurisdiction To Entertain Such Claims

In the third cause of action set forth in its complaint, Sterling alleges deprivation of due process. Compl., §X. It is well-settled that this Court lacks jurisdiction to review actions under the due process or equal protection clauses of the Fifth and Fourteenth Amendments. Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997); Wheeler v. United States, 11 F.3d 156, 159 (Fed. Cir. 1993); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987). The Tucker Act statutorily limits the jurisdiction of this Court to "non-tort money claims against the United States founded on the Constitution, federal statute or regulation, or contract." Banner, et al. v. United States, 1999 WL 605631, *5 (Fed. Cl. 1999); see 28 U.S.C. § 1491 (1994). In order for jurisdiction to attach, "either the constitutional provision at issue or a federal statute must mandate the payment of money damages as compensation." Betz v. United States, 40 Fed. Cl. 286, 292 (1998). Neither the Fifth Amendment nor the Fourteenth Amendment contain language requiring the payment of damages for violations of those amendments. New York Power Authority v. United States, 42 Fed. Cl. 795, 801 (1999). "Consequently, this Court cannot hear claims based on violations of the due process or equal protection clauses of the Fifth or Fourteenth Amendments. . . ." Id.; see also Montalvo v. United States, 231 Ct. Cl. 980, 982-3 (1982).

Accordingly, plaintiffs' due process claims do not present causes of action cognizable in this Court and must be dismissed for lack of jurisdiction.

## II. Sterling's Cause Of Action For A Taking Should Be Dismissed Because Sterling Cannot Show That The Government's Actions Constitute A Taking Of Its Property Rights

Sterling also alleges that the Government's alleged abrogation of binding contracts effects a taking of its property without just compensation. Compl., § IX. The takings clause of the Fifth Amendment to the Constitution states that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. See Branch v. United States, 69 F.3d 1571, 1578 (Fed. Cir. 1995), cert. denied, 519 U.S. 810 (1996), citing Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223 (1986), and Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 641 (1993).

Because Sterling's rights, if any, are governed by contract, and not by the Fifth Amendment, and, alternatively, because Sterling cannot show that the Government's actions constituted a regulatory taking, Sterling cannot carry its "heavy burden" of proving that a taking occurred. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 493 (1987).

### A. Sterling's Remedies Are Governed By Their Contract, And Not By The Fifth Amendment

The law of this circuit is well established that where a party's rights are created by contract, that party cannot state a claim for takings. In Sun Oil Co. v. United States, 215 Ct. Cl. 716, 770, 572 F.2d 786, 818 (1978), for instance, the Court of Claims dismissed a takings claim upon the ground that it sought recovery for a breach of contract. There, the plaintiffs entered into oil and gas leases with the Government. The Department of Interior later suspended the plaintiffs' oil drilling operations because of safety concerns. The plaintiffs sued the Government,

alleging, among other things, that the Government's suspension of the drilling operation amounted to a taking of its property right to drill for oil as granted by the leases between them and the Government.

The Court of Claims rejected the plaintiffs' claim, holding:

> It is established that not every deprivation of use, possession, or control of property is a taking. One must look to the character and extent of any interference with property rights whenever a taking claim is asserted. More importantly, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.

Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818 (citations omitted; emphasis added). Because there existed lease contracts between the plaintiffs and the Government, the Court held, the plaintiffs were required to look to those contracts for relief. As the Court explained:

> The interferences with plaintiffs' lease rights were grounded on matters that . . . bespoke an effort to operate within the framework of the lease. If defendant's interferences were unjustified or unreasonable, plaintiffs' rights emanate from the lease agreement, not the Fifth Amendment.

Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818 (emphasis added). Thus, if a plaintiff's rights are created by contract, its remedies are limited to contract.

This rule derives from the distinction drawn between the Government acting in its sovereign capacity and the Government acting in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992), cert. denied, 508 U.S. 959 (1993). When, by contrast, the Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (quoting Sun Oil, 215 Ct. Cl. at 770, 572

F.2d at 818). Thus, when the Government acts in a proprietary capacity by contracting, a plaintiff's sole remedy is for breach of contract. Id. ("This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiffs' sole remedy is a breach of contract claim.").[3]

This is because when a party enters into a contract, that party either has the right to receive performance or, if a breach occurs, the party has the right to receive damages pursuant to contract law. Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9, aff'd, 133 F.3d 874 (Fed. Cir. 1997), cert. denied, 119 S. Ct. 57 (1998); Northwest Airlines v. United States Department of Transportation, 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994). In fact, the plurality in Winstar held that the regulatory capital contracts at issue there specifically contemplated that, if the Government breached, the thrift could only receive damages. United States v. Winstar, 518 U.S. 839, 868-870, 886-887 (1996). Thus, when a party enters into a contract, it acquires the right, upon breach, to sue for contract damages, but it requires no additional property rights, and, therefore, cannot allege a taking under the Fifth Amendment.

As the Court explained:

> Because the Winstar ruling, which plaintiffs invoke as the basis for the Government's liability, was based on a finding by the Supreme Court that a valid contract existed between the Government and the

---

[3] See also Horowitz v. United States, 267 U.S. 458, 461 (1925) ("nor can the United States while sued [as a contractor] be made liable in damages for their acts done [as a sovereign]"); Sunrise Village Mobile Home Park, L.C. v. United States, 42 Fed. Cl. 392, 404 (1998); Baggett Transportation Co. v. United States, 969 F.2d 1028, 1034 (Fed. Cir. 1992); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989); Chevron Chemical Corp. v. United States, 5 Cl. Ct. 807, 811-12 (1984); Data Transformation Corp. v. United States, 13 Cl. Ct. 165, 177 (1987); J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969).

> thrifts, plaintiffs are conceptually foreclosed from shifting the analysis to the takings context.

Plaintiffs in All Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997).

Here, Sterling, which also invokes Winstar as the basis for liability, is "conceptually foreclosed" from bringing a takings claim. Here, Sterling's complaint expressly alleges that its taking claim arises from a claim for breach of contract. See Compl., at ¶ 9.2 ("The OTS's application of FIRREA abrogates Sterling's binding contracts effects [sic] a taking of Sterling's property without just compensation, in violation of the Fifth Amendment to the United States Constitution.")(emphasis added). Hence, because the rights Sterling alleges were taken were created by the contract, its sole remedy is in contract.

### B. The Government's Elimination Of Goodwill From Regulatory Capital Does Not Constitute A Regulatory Taking

#### 1. Introduction

Even if Sterling's taking claim is not precluded by the contract, the Court should nonetheless dismiss it because the Government's elimination of goodwill from regulatory capital does not constitute a taking. In determining whether a taking occurred,[4] courts apply a case-

---

[4] Before even addressing the question of whether the Government's actions constituted a taking, it is necessary to first determine the preliminary question of whether a plaintiff actually possessed the property rights it claimed were taken. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992).

The contours of a property right are limited by the purchaser's reasonable expectations at the time of acquisition. M&J Coal Company v. United States, 47 F.3d 1148, 1152-54 (Fed. Cir.), cert. denied, 116 S. Ct. 53 (1995). These reasonable expectations are defined by the law at the time of purchase. Id. at 1153 (citing Lucas).

Here, Sterling characterizes its property rights as arising from the "abrog[ation of] Sterling's binding contracts." Compl., ¶ 9.2. As explained above, Sterling's only reasonable

specific, ad hoc inquiry into the nature and justification of the governmental action. Branch v. United States, 69 F.3d 1571, 1576 (Fed. Cir. 1995); see also Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) (regulation will be a taking if it goes "too far"); Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 (1986) (describing analysis as an "ad hoc, factual inquiry").

The Supreme Court has identified the following three factors in determining whether Government regulation constitutes an ad hoc regulatory taking: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986); Concrete Pipe & Prods. Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 641 (1993).[5] As demonstrated below, Heritage cannot satisfy any of these factors.

---

expectation at the time of the deal was that it had the right to sue for breach of contract if the Government changed the capital requirements. Id. Thus, as explained above in section **B(1)**, Sterling's only remedy is in contract.

[5] The Supreme Court has recognized two discrete categories of regulatory action, called "per se," or categorical takings, in which the Court determines that the action is compensable without undertaking the three-pronged ad hoc inquiry. These categories include: (1) the permanent physical "invasion" of an owner's property (Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982) (New York statute requiring landlords to allow cable television company's installation on their property was compensable)), and (2) the denial of all economically beneficial or productive use of land. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992) (South Carolina's statute barring residents of barrier islands from erecting permanent homes there was compensable). Sterling cannot properly contend that the Government's phase-out of goodwill from regulatory capital constituted a per se taking. Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995).

2. The *Branch* Case

The United States Court of Appeals for the Federal Circuit has considered a takings claim by a plaintiff that complained of the effects of FIRREA. Branch v. United States, 69 F.3d 1571 (Fed. Cir. 1995) (relying upon Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986), and Concrete Pipe & Prods. Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 641 (1993)). In order to understand the significance of Branch, we must review briefly its history. Prior to FIRREA, the principle of limited corporate liability gave considerable protection to bank holding companies and their member banks when one of those member banks failed. After 1989, however, FIRREA directed that when such a bank failure occurred, sister banks that were owned by the same holding company could be held liable for the loss. Id. at 1573. This innovation was called the "cross-guarantee" provision. Thus, the FDIC, in accordance with the cross-guarantee provision, sought to assess $99 million from the Maine National Bank when Maine National Bank's sister bank, the Bank of New England, failed. This $99 million assessment resulted in the seizure and closure of Maine National Bank, which only had $65 million in net assets. The trustee of the holding company alleged that the assessment against the Maine National Bank was a taking. Id.

The appellate court, applying the three factor test, determined that FIRREA's changes allowing for assessments against sister banks did not effect an ad hoc regulatory taking. Id. at 1573. For very similar reasons, FIRREA does not constitute a taking in this case either.

a) Character Of The Government Action

Regarding the first factor -- the character of the Government action -- the appellate court

explained that when Government interference with property does not appropriate that property for the Government's own use, but instead arises from "a public program that adjusts the benefits and burdens of economic life to promote the public good," a taking is less likely to have occurred. Id. at 1579 (quoting Connolly, 475 U.S. at 225). In considering the cross-guarantee provision, the court recognized that although "the immediate effect [of the provision] was to minimize losses to government insurance funds," the ultimate purpose of the legislation was to "secure the soundness of the national banking system," to "protect depositors," and "to make the pertinent insurance system self-sufficient by increasing the burden on participants in the system." Id. at 1579. Thus, the "purpose" was to "adjust[] the benefits and burdens of economic life to promote the common good." Id.

Similarly, while FIRREA's immediate effect here was to reduce Sterling's regulatory capital level, its long term purpose was to "prevent[] the collapse of the industry, attack[] the root causes of the [financial institution] crisis, restor[e] public confidence," Winstar, 518 U.S. at 856, and to protect depositors. Id. at 854; see also 12 U.S.C. § 1811 note (describing broad purposes of FIRREA). Thus, as in Branch, FIRREA was designed to promote the public good.[6]

b) Economic Impact

Regarding the second factor, a court must analyze both whether the economic impact upon the individual plaintiff is severe and, if so, whether Congress had a "rational" basis for

[6] Connolly and Concrete Pipe mandate the same result. In those cases, the Supreme Court upheld against a takings claim a statutory change in pension laws that resulted in the imposition of liability on companies withdrawing from multiemployer pension plans. See Connolly, 475 U.S. at 225; Concrete Pipe, 508 U.S. at 644 ("That the solvency of a pension trust may ultimately redound to the benefit of the [Government] . . . is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts.").

allocating the financial burden of legislation upon specific institutions rather than upon "taxpayers in general." Branch, 69 F.3d at 1579-80 (citing Connolly, 475 U.S. at 226); see also Concrete Pipe, 508 U.S. at 646.

In proving severity of economic impact, a plaintiff must look at its overall property and cannot "narrowly define certain segments of it property and assert that, when so defined, [the Government action] denies it economically viable use." Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 496 (1987). In addition, courts should consider whether the legislation in question contained provisions that "moderated and mitigated the economic impact" upon a particular party. Connolly, 475 U.S. at 226.

In determining whether Congress had a rational basis for allocating a substantial economic burden upon a particular party, the Branch court looked to three factors. First, it held that imposing the costs inherent in a particular business on "those who have profited from the fruits" of that business was rational. Branch, 69 F.3d at 1580, citing Usery v. Turner Elkhorn Mining Co, 428 U.S. 1, 18 (1976). Second, it ruled that imposing the cost associated with a bank's failure on that bank's sister companies instead of on all banks or on the public at large was rational since those firms have "some measure of control over the success or failure" of the associated banks. Id. Third, it explained that there was a "particularly tempting moral hazard" in the banking industry -- i.e., profits could be safeguarded while losses were underwritten by the insurance fund -- and that the cross-guarantee provision was further justified as incentive to reduce the losses. Id.

Here, Sterling cannot show either that the economic impact of FIRREA was severe, or that Congress acted irrationally by financially burdening Sterling in particular. Regarding the

economic impact, at best, Sterling could, if its complaint is viewed in a light most favorable to it] show that the Government eliminated approximately $31 million in goodwill from regulatory capital. Compl. at ¶ 7.8(i). First of all, it should be noted that "goodwill is not cash," Winstar, 518 U.S. at 854, and, therefore, cannot be valued dollar for dollar. Moreover, the Winstar Court also noted that FIRREA, as with the statute at issue in Connolly, had a "limited exception intended to moderate transitional pains," id.; see also 12 U.S.C. § 1464(t)(3)(A), thereby moderating and mitigating the economic impact upon Heritage.

Furthermore, even if Sterling could show that the economic impact was substantial,[7] it cannot show that Congress's allocation of burdens was irrational, based upon the three items analyzed in Branch. First, Sterling cannot dispute that it benefitted greatly from its participation in the banking industry. Second, thrift purchasers have control over the success of the thrift and, therefore, could take steps to protect the thrift. Third, as the Winstar decision showed, the purchase of thrifts in the 1980s created "moral hazards" for the new owners, because the existence of artificial capital credits permitted them to "leverage more loans," and, thus, take risks with other people's money. Winstar, 518 U.S. at 850-851. The passage of FIRREA, however, was designed to limit risk-taking at the insurance fund's expense. H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted in 1989 U.S.C.C.A.N. 86, 432, 443. Accordingly, Congress's decision to place the burden upon Sterling, assuming that such a burden even existed, was rational.

---

[7] In Connolly, the Court held that there was no taking even though the legislation "completely deprived" the plaintiff of its money. Connolly, 475 U.S. at 225; see also Concrete Pipe, 508 U.S. at 645 ("Mere diminution in the value of the property, however serious, is insufficient to demonstrate a taking.").

c) Investment-Backed Expectations

As to the third ad hoc factor, the appellate court explained that a taking was more likely to occur when the Government regulation interfered with reasonable investment-backed expectations. Branch, 69 F.3d at 1579. It noted, however, that such expectations "are greatly reduced in a highly regulated field," and, furthermore, that this rule of reduced expectations "applies with special force" to the regulation of national banks, which have been "heavily regulated for more than a century." Branch, 69 F.3d at 1581; Connolly, 475 U.S. at 227; see also Fahey v. Mallonee, 332 U.S. 245, 250 (1947) ("Banking is one of the longest regulated and most closely supervised of public callings."); Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 55 (1986); Mitchell Arms. Inc. v. United States, 7 F.3d 212, 217 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994); Pacific National Cellular v. United States, 41 Fed. Cl. 20, 35-36 (1998); 1 K. Davis, Administrative Law Treatise, § 4.04 at 247 (1965) ("The regulation of banking may be more intensive than the regulation of any other industry."). In light of the historical practices in the bank regulatory field, the court held that the plaintiff in Branch would have been unreasonable "to expect that the bank's assets would never be subject to liability." Branch, 69 F.3d at 1582.

Similarly, Sterling here could not have expected that its regulatory capital standards were subject to protection from change. In addition to the long history of Government regulation of thrifts in general, the Government also has a long history of regulating thrift capital requirements in particular. See Transohio Savings Bank v. OTS, 967 F.2d 598, 601-02 (D.C. Cir. 1992) (describing how the capital requirements "have been the subject of numerous statutory and regulatory changes over the years"). Given the long history of Government regulation, Sterling

had no reasonable investment-backed expectation that it could permanently count goodwill in regulatory capital. Accordingly, this Court should dismiss the second cause of action of Sterling's complaint.

## III. Sterling's Claim For Restitution Should Be Dismissed For Lack Of Subject Matter Jurisdiction

Sterling's complaint also alleges restitution as an affirmative cause of action. Compl., § XII. This claim is premised upon an alleged contract implied-in-law, and, therefore, falls outside this Court's jurisdiction.

Although Sterling's complaint fails to set forth the source for the Court's jurisdiction over this case, the Court generally exercises jurisdiction over contract cases pursuant to the Tucker Act, which provides, in pertinent part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . .

28 U.S.C. § 1491(a)(1) (1994). As the Supreme Court has repeatedly held, although the Tucker Act grants this Court jurisdiction over claims based upon an implied contract, "this jurisdiction extends only to contracts . . . implied in fact, and not to claims on contracts implied in law." Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996); see also Merritt v. United States, 267 U.S. 338, 341 (1925). Although a party may seek restitution as a remedy for a breach of contract in this Court, a stand-alone, substantive restitution claim, which is equitable in nature and derives from the law of quasi-contract, is outside this Court's jurisdiction, and should be dismissed. Because Sterling's restitution claim is necessarily based upon a theory of contract implied-in-law, the claim must be dismissed.

As explained by Professor Perillo, the law of restitution has its origins in cases involving quasi-contracts, or contracts implied-in-law. Joseph M. Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208, 1208-13 (1973). In such cases, plaintiffs historically were awarded sums on the theory that the defendant should not be unjustly enriched by the plaintiff's performance. See id. at 1208, 1215.

Eventually, the concept of restitution was imported into the contractual arena as one of three possible remedies. See, e.g., 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.1, at 147-53 (2d ed. 1998) (identifying the expectation interest, the reliance interest, and the restitution interest as the three interests protected by contract law). The distinction between restitution as a substantive claim and restitution as a remedy for breach of contract has, however, endured. See Andrew Kull, Rationalizing Restitution, 83 Calif. L. Rev. 1191, 1192 (1995) ("A complete account of civil liability in our legal system requires the inclusion of restitution or some functional equivalent, because there are important instances of liability that contract and tort, conventionally defined, cannot adequately explain."); 1 Dan B. Dobbs, Law of Remedies § 4.1(1), at 556 (2d ed. 1993) ("The substantive basis of restitution is related to substantive equity. That is, courts applying substantive equity and courts applying the law of unjust enrichment are both applying a law of "good conscience." Remedially and historically speaking, however, restitution might be either a purely legal claim or a purely equitable claim."); Perillo, 73 Colum. L. Rev. at 1214-15 ("But the distinction between restitutionary rights which are primary and those which are merely secondary is sound and has important practical consequences, which are reflected in the cases. The principal difference is that when the law of quasi-contract provides the sole basis of recovery (that is, when it is the source of the claimant's

primary rights) its sole basis is very likely to be unjust enrichment. When. however. restitution is merelv a secondary. remedial right in a contractual context. unjust enrichment is merely one factor in the re-allocation of gains and losses between the parties.") (emphasis in original).

This Court has honored this distinction, permitting plaintiffs to pursue restitution as a remedy for breach of contract, but recognizing that stand-alone, substantive claims for restitution based upon an equitable unjust enrichment theory are outside the jurisdiction of the Court of Federal Claims.[8] Compare Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 359, 347 F.2d 509, 530 (1965), rev'd on other grounds, 385 U.S. 138 (1966) (awarding restitution as remedy for breach of contract) and State of Arizona v. United States, 216 Ct. Cl. 221, 237-38, 575 F.2d 855, 864-65 (1978) (defining the measure of restitution for breach of contract), with W.P. Bill Atkinson Enterprises. Inc. v. United States, 228 Ct. Cl. 886, 888 (1981) ("principles of non-consensual equitable restitution . . . are not available to us under the Tucker Act); see also Houston Oil & Refining. Inc. v. United States Federal Energy Regulatory Comm'n, 95 F.3d 1126, 1134 (Fed. Cir. 1996) ("restitution is equitable in nature"). Accordingly, Sterling's substantive restitution claim should also be dismissed for lack of subject matter jurisdiction.

---

[8] Although plaintiffs in the Court of Federal Claims may pursue a restitution remedy for breach of contract, they are only entitled to recover their "prudent costs;" they are not entitled to recover on the basis of unjust enrichment. Acme Process Equipment Co., 171 Ct. Cl. at 359, 347 F.2d at 530 ("[R]estitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party."); Pacific Architects & Eng'rs Inc. v. United States, 203 Ct. Cl. 499, 516, 491 F.2d 734, 744 (1974) (plaintiff entitled to its "prudent costs" as restitution in breach of contract case).

**IV. Sterling's Cause Of Action For Promissory Estoppel Should Be Dismissed Because This Court Does Not Possess Jurisdiction To Entertain Promissory Estoppel Claims**

Sterling's fourth cause of action alleges that the Government should be "estopped to deny that [sic] the terms of their agreement and the contractual promises made to Sterling, " and that Sterling has been damaged by detrimental reliance. Compl., ¶¶ 11.3 - .4. This cause of action is based upon promissory estoppel. Promissory estoppel "is a doctrine for enforcing promises which reasonably induce action or inaction and which are binding to the extent necessary to avoid injustice." N.L. Durant, Jr. v. United States, 16 Cl. Ct. 447, 450 (1988). Plaintiffs cannot meet their burden of demonstrating that this Court has jurisdiction to entertain this claim. See Trauma Services Group v. United States, 104 F.3d 1321, 1324 (Fed. Cir. 1997)(plaintiff bears the burden of establishing jurisdiction for its claims); Reynolds v. Army & Air Force Exchange Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)(same). "It is well settled that this court is without jurisdiction to entertain claims arising from a contract based on the theory of promissory estoppel." LaMirage, Inc., v. United States, 44 Fed. Cl. 192, 200 (1999) (citing Hercules v. United States, 516 U.S. 417, 423 (1996); United States v. Mitchell, 463 U.S. 206, 218 (1983); Gregory v. United States, 37 Fed. Cl. 388, 396 (1997); Knaub v. United States, 22 Cl. Ct. 268, 276 (1991); Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329, 340 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984)).

The Tucker Act, 28 U.S.C. § 1491, upon which plaintiffs rely to establish jurisdiction, only vests jurisdiction in this Court to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." The promissory

estoppel doctrine is not included within the parameters of this Court's Tucker Act jurisdiction because it is not an express or implied-in-fact contract theory. See, e.g., Schuhl v. United States, 3 Cl. Ct. 207, 210-211 (1983); Biagioli v. United States, 2 Cl. Ct. 304, 307-308 (1983). "Obligations based upon promissory estoppel are founded on contracts implied-in-law (quasi contracts), where a duty is imposed by operation of law without regard to the intent of the parties." Pacific Gas & Elec. Co., 3 Cl. Ct. at 340. This Court, of course, lacks jurisdiction to entertain implied-in-law claims. Hercules v. United States, 516 U.S. 417, 423 (1996). Thus, plaintiffs' fourth cause of action, for promissory estoppel, must be dismissed because this Court does not possess jurisdiction to adjudicate that claim. See Biagioli, 2 Cl. Ct. at 308; see also Phaidin v. United States, 28 Fed. Cl. 231, 235 (1993); Knaub, 22 Cl. Ct. at 276; Pacific Gas & Elec. Co., 3 Cl. Ct. 329; Schuhl, 3 Cl. Ct. 207 (1983).

## V. This Court Lacks Subject Matter Jurisdiction To Entertain Sterling's Cause Of Action For Specific Performance

Sterling's sixth cause of action alleges that, [i]n the event Sterling does not receive monetary damages... Sterling is entitled in the alternative to specific performance of its acquisition agreements with defendants...." Compl., ¶ 13.2. The Court, however, lacks jurisdiction over Sterling's cause of action for specific performance.

> The Court of Federal Claims is an Article I trial court of limited jurisdiction that was created by Congress as a forum where private parties could sue the government for money claims, other than those sounding in tort, where the claims would otherwise be barred by sovereign immunity. . . . The remedies available in that court extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances not here pertinent. See, e.g., 28 U.S.C. § 1491(a)(3) (granting the Court of Federal Claims injunctive power in pre-award bid protest cases).

Kanemoto v. Reno, 41 F.3d 641, 644-45 (Fed. Cir. 1994)(emphasis added); accord United States v. King, 395 U.S. 1, 4 (1969); Boyle v. United States, 44 Fed. Cl. 60, 65 (1999); see also Doe v. United States, 37 Fed. Cl. 74, 79 (1996) ("It is well established that this Court generally does not have the jurisdiction to grant specific performance of a contract, as well as other equitable relief."); White Mountain Apache v. United States, 46 Fed. cl. 20, 28 (1999) ("This court does not, without express statutory authority, have jurisdiction to enter injunctive relief.") (and cases cited therein); Tenaska Washington Partners II v. United States, 34 Fed. Cl. 434, 443-444 (1995) ("However, specific performance is not a remedy available against the United States, because sovereign immunity has not been waived for such relief. . . . Issuance of an injunction similarly is not available in the circumstances of this case."); Logan Canyon Cattle Assoc. v. United States, 34 Fed. Cl. 165, 168 (1995) ("Assuming for the sake of argument that the Agreement is enforceable as a contract, the court nevertheless lacks subject matter jurisdiction over this suit because the claim is anticipatory. It is not for money, but for specific performance."); Gates v. United States, 33 Fed. Cl. 9, 12 (1995) ("Claims for specific performance are not generally within the Court of Federal Claims' subject-matter jurisdiction.") (and cases cited therein).

In summary, this Court cannot entertain claims for specific performance except in narrowly defined, statutorily provided circumstances. Sterling has failed to cite the statutory authority underlying its specific performance claim. Therefore, this Court should dismiss the claim for lack of jurisdiction.

## VI. The Government's Pending Motion For Summary Judgment With Respect To The First Cause Of Action Of The Complaint, For Breach Of Contract, Should Be Granted

The Government's pending motion for summary judgment concerning the first cause of

action in the complaint, for breach of contract, Compl., ¶¶ 8.1 - 8.5, should be granted for the reasons set forth in prior briefing and the supplemental reasons set forth below. .

A. **Even Assuming, For The Sake Of Argument, That The Government Contracted To Permit Sterling To Count FSLIC Cash Assistance As Regulatory Capital, Sterling, By Its Own Admission, Was Required To Count FSLIC Cash Assistance As Supervisory Goodwill And Amortize It**

The Government's motion to dismiss and cross-motion for summary judgment dated April 1, 1997 ("1997 motion"), as well as its reply in support of the motion dated August 4, 1997 ("1997 reply") amply demonstrate that the Government did not contract to permit Sterling to permanently count FSLIC cash assistance provided in connection with the Lewis and Tri-Cities acquisitions as regulatory capital, regardless of changes in the law. See 1997 motion, pp. 38-41 and 49-53; 1997 reply, pp. 14-17. Even assuming, however, for the sake of argument, that the Government did contract to permit Sterling to count the FSLIC cash assistance as regulatory capital, the FSLIC assistance was required to be included within supervisory goodwill (also referred to as "unidentifiable intangibles") and amortized.

At deposition, Daniel Byrne, Chief Financial Officer for Sterling, admitted that Sterling included the FSLIC assistance in unidentified intangibles (i.e., supervisory goodwill) on its balance sheet prepared for submission to the regulators. App. 253 (lines 12-17); App. 756 (lines 7-18). In addition, William Zuppe, the President of Sterling, acknowledges, in a May 28, 1990 affidavit submitted both in connection with the district court litigation and Sterling's motion for partial summary judgment on liability, that the FSLIC cash assistance was to be amortized:

> 28. On April 6, 1988, the FHLBB entered an Order formally granting the conditions, including, among others:
>
> . . .
>
> (b) Agreeing that the $11.7 million in cash

> assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years;. . .

App. 240 (lines 18-20).

Consequently, there is no factual dispute with respect to the amortization of unidentified intangibles resulting from the inclusion of FSLIC cash assistance as supervisory goodwill, and the Court should rule that Sterling was required to amortize all of its goodwill, including that arising from the FSLIC cash assistance.

**B. The Government Was Not Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Transaction Toward Regulatory Capital Requirements**

In our 1997 motion and 1997 reply, we demonstrated that the Government did not contract to permit Sterling to count the supervisory goodwill created in connection with the Central Evergreen acquisition as regulatory capital. 1997 motion, pp. 22-23, 26-34; 1997 reply, pp. 3-7. In fact, quite the opposite is true. The only agreement executed between Sterling and the Government in connection with that acquisition expressly provides that Sterling agreed to be bound by subsequent changes in regulation. In section V.D. of the agreement, Sterling promised as follows:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

App. 163 (emphasis added).

In addition, section V.M. expressly states that the agreement "is not a waiver or forbearance from any applicable regulation." App. 164. Furthermore, a document created by

plaintiffs less than one month after the agreement was provides an unambiguous indication that Sterling knew that the agreement would not exempt it from any future changes in regulation. In a January 6, 1989 memorandum to the file titled "Central Evergreen Agreement with FSLIC," Mr. Byrne, Sterling's CFO, indicates that "there were several significant issues that were discussed and finally negotiated as follows," including:

> 5. In paragraph V, M, should be noted the language was changed from early drafts. The essence of this provision is that the agreement does not supersede the regulations to which Sterling is subject.

Consequently, it is undisputed that Sterling was subject to any regulatory changes occurring after the execution of the agreement, and Sterling's claim that the agreement contained a contractual promise to permit Sterling to count supervisory goodwill as regulatory capital notwithstanding regulatory changes is baseless.

### C. Even Assuming, For The Sake Of Argument, That The Capital Maintenance Agreement Contained A Forbearance Permitting Sterling To Count Supervisory Goodwill As Regulatory Capital, The Forbearance Expired In 1991

As demonstrated above and in the our 1997 motion and 1997 reply, the Central Evergreen Capital Maintenance Agreement does not include a contractual promise by the Government to forbear from changing the regulations governing the maintenance of regulatory capital. Even, assuming, however, that the agreement did contain such a forbearance, Sterling has acknowledged that the forbearance expired as of December 31, 1999. In its 1989 Annual Report, Sterling reported the following to its shareholders:

> Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum

> capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31. 1999. from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

App. 196 (emphasis added) Thus, Sterling, in its 1989 annual report, advised its shareholders that it had a forbearance from the new FIRREA capital requirements only until 1991. Consequently, if the Court determines that Sterling had any contractual agreements regarding the treatment of supervisory goodwill for regulatory accounting purposes, it should rule that the contractual agreements expired as of December 31, 1999, consistent with Sterling's statement in its annual report.

### D. Assuming, For The Sake Of Argument, That The Government Acted Inconsistently With Any Contractual Obligation To Plaintiffs, The Inconsistent Actions Necessarily Ceased After Plaintiffs Obtained An Injunction Enjoining The Government From Taking Action Inconsistent With The Purported Contracts

Even assuming, for the sake of argument, that the Government made contractual promises concerning the ability of Sterling to count supervisory goodwill and FSLIC cash assistance as capital, plaintiffs have no cause of action for the period during which the Government was subject to an injunction enjoining it from enforcing FIRREA in a manner inconsistent with the purported contracts. As set forth above, in May 1990, the district court for the eastern district of Washington issued a temporary restraining order, and in August 1990, a preliminary injunction, enjoining the Government from taking any regulatory action inconsistent with agreements entered into in connection with the Lewis, Tri-Cities, and Central Evergreen acquisitions.

Sterling, 751 F. Supp. at 881. The Government abided by the injunction. App. 257.

Further, when the injunction was lifted in 1992, Sterling had already achieved capital compliance by raising in excess of $23 million through a 1991 public offering. That public offering brought Sterling into compliance with the capital requirements imposed by FIRREA. App. 268. Consequently, by the time the injunction was lifted by the Ninth Circuit, the restrictions that the Government had been enjoined from enforcing by the district court were no longer necessary, notwithstanding the lifting of the injunction. App. 270-73.

Accordingly, after the injunction was imposed, plaintiffs did not suffer any injury from any purported contractual breach by defendant.

In order to invoke the judicial power of Federal courts, a plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . and that the injury fairly can be traced to the challenged action." Valley Forge Christian College v. Americans United for Separation of Church and States, 454 U.S. 464, 472 (1982), (quoting Gladstone. Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979), and Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 41 (1976)). In other words, "[t]he party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of" the defendant's conduct. Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973) (emphasis in original) (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)). Also, the plaintiff must show that the injury "is likely to be redressed by a favorable decision." Valley Forge 454 U.S. at 472. The failure to meet either of these requirements is fatal to plaintiff's standing. Id.

In this case, the very breach of which plaintiffs' complain was subject to the district

court's 1990 injunction, pursuant to which OTS was precluded from taking action inconsistent with the alleged contracts in this case. Accordingly, plaintiffs could not have incurred injury from the Government's purported breach after issuance of the injunction. Therefore, plaintiffs suffered no injury from the alleged breach, and lack standing to challenge the Governments actions after issuance of the injunction. Valley Forge 454 U.S. at 472.

## CONCLUSION

For the reasons stated above, we respectfully request that this Court grant the Government's motion to for summary judgment with respect to the first cause of action of the complaint, and dismiss the second through sixth causes of action. In the event that the Court denies the Government's motion for summary judgment, plaintiffs' motion for partial summary judgment should be denied and this case set down for trial.

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300
Attorneys for Defendant

October 10, 2000

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on October 10th, 2000, I caused to be served by United States mail (first-class mail, postage prepaid) copies of "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT," addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

______________________

404

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Senior Judge Smith) |

**PLAINTIFFS' REPLY TO "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT."**

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Tele: (509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WILLIAM M. SYMMES

December 15, 2000

TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

I. RELIEF SOUGHT .......... 1

II. NATURE OF CASE .......... 2

III. SUPPLEMENTAL UNDISPUTED FACTS .......... 4

A. Supplemental Undisputed Facts Regarding the Authority of the FHLB Of Seattle .......... 4

1. The FSLIC and the FHLBB Delegated the Authority to the FHLB of Seattle to Process and to Negotiate The Assisted Acquisitions in District 12 (The Northwest). .......... 4

B. The Supplemental Undisputed Facts Regarding The Acquisition of Lewis Federal. .......... 5

1. The Lewis Federal Acquisition Was The Result of An Extensive Marketing and Negotiation Process .......... 5

a. The Defendant "Shopped" The Troubled Thrift .......... 5

b. Sterling Received a Bid Package That Described The Procedure for Bidding .......... 5

c. Sterling Submitted a Bid For Lewis Federal And Requested FSLIC Assistance Without Any Provision For its Repayment or Amortization .......... 6

2. The Final Forbearance Letter Does Not Contain a Provision Requiring Sterling to Amortize or to Reduce the FSLIC Infusion of Capital .......... 7

C. The Supplemental Undisputed Facts Regarding The Acquisition of Tri-Cities .......... 8

1. The Tri-Cities Acquisition Was The Result of Aggressive Marketing and Negotiations .......... 8

a. The Defendant "Shopped" The Troubled Thrift .......... 8

b. Sterling Successfully Bid for Tri-Cities and Extensively Negotiated an Agreement With Defendant .......... 8

D. The Supplemental Undisputed Facts Regarding The Central Evergreen Acquisition . . . . . . . . . . 10

1. The FHLB of Seattle Negotiated for Sterling to Acquire Central Evergreen On Unassisted Basis, in Part, Because of the Inducements and Permanent Capital Provided for in The Lewis Federal and Tri-Cities Transactions . 10
2. Had Sterling Not Contracted to Acquire Central Evergreen on an Unassisted Basis, FSLIC Would Have Had to Pay at Least $8 - $10 Million in FSLIC Assistance . . . . . . . . . . 11

IV. STERLING'S REPLY AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL OPPOSITION AND CROSS-MOTION . . . . . . . . . . 12

A. As A Matter of Law, The United States Contractually Agreed To Provide Sterling Permanent Capital That Was Not To Be Subject To Reduction or To Amortization . . . . . . . . . . 12

1. The Only Evidence in The Record Is Undisputed and Establishes That as a Matter of Law, Sterling Received Permanent Regulatory Capital as Part of the Lewis Federal and Tri-Cities Acquisitions . . . . . . . . . . 12

a. The Defendant's Position Misrepresents the Record . . . . . . . . . . 12
b. The Testimony of Daniel Byrne and William Zuppe Incontrovertibly Establish That Sterling Never Intended to Amortize the FSLIC Assistance or Any Asset Created Thereby . . . . . . . . . . 12

2. Actually, It Is Defendant Who Undisputedly Agrees That the FSLIC Assistance Was to Be Permanent and Was Not to Be Amortized . . . . . . 15

3. The Legal Rules For Interpreting Contracts Leads to One Inescapable Result: The FSLIC Assistance Was Not Directly or Indirectly Subject to Amortization . . . . . . . . . . 17

a. Interpreting Contracts in The U.S. Court of Federal Claims . . . . 18
b. It Is Undisputed That The Contract Between the United States and Sterling Does Not Provide for Sterling to Amortize the Cash Assistance or Any RAP Goodwill That May Be Associated with It . . . . . . . . . . 19
c. The Parties' Course of Performance Prior to this Dispute Undisputedly Establishes as a Matter of Law That the Cash Assistance Not Be Amortized . . . . . . . . . . 20

B. It Remains Undisputed That The Government was Contractually Bound To Permit Sterling To Count The Supervisory Goodwill Arising From The Central Evergreen Acquisition As Regulatory Capital . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1. Defendant Rehashes Its Claim From 1997 . . . . . . . . . . . . . . . . . . . . . . 22
2. The Castle Decision Controls and Dictates That, as a Matter of Law, Sterling Did Not Agree to Accept the Risk of Regulatory Change and That Defendant Breached its Contract with Sterling Regarding its Acquisition of Central Evergreen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a. The *Castle* Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
b. The *Castle* Decision is Decided on the Binding Nature of the Central Evergreen Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
c. Paragraph V., M. of The Central Evergreen Agreement Did Not Allocate The Risk of Regulatory Change to Sterling . . . . . . . . . 24
d. The Memorandum Drafted By Dan Byrne Does Not Establish That Sterling Assumed The Risk of Regulatory Change . . . . . . . . . . . 25
e. The 1989 Annual Report Only Confirms That Sterling Acquired a Forbearance to Allow it Time to Raise Capital Pursuant to the Business Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
f. Based On The Undisputed Evidence Presented in 1990, the Federal District Court Made Findings Consistent With Sterling's Understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C. Contrary to Defendant's Claim, Sterling Suffered Damages During The Pendency of The Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. Defendant Permanently Damaged Sterling Prior to the Injunction, for Which it Still Incurs Ongoing Damage Today . . . . . . . . . . . . . . . . . . . . 29
2. The Injunction Did Not Cure the Damage That Was Already Done . . . . 30
3. The Second Public Offering Did Not Replace the Capital That Sterling Would Have Raised in 1989 and Leveraged During the Years Thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
4. Contrary to Defendant's Suggestion, Defendant Did Not Fully Comply with the Injunction Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D. Sterling's Claim for Restitution Should Not Be Dismissed . . . . . . . . . . . . . . . . 34

E. Sterling's Equitable estoppel Claim Should Not Be Dismissed . . . . . . . . . . . . . 35

1. The Court has Subject mater Jurisdiction Over Claims of Equitable Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Acme Process Equipment Co. v. United States*, 171 Ct. Cl. 324, 347 F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) ........................................ 34

*Alaska American Lumber Co., Inc. v. United States*, 25 Cl. Ct. 518 (1992) 18

*American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110 (Fed.Cir.1985) ........................................ 35

*Applied Companies v. United States*, 37 Fed. Cl. 749, 759 (1997)................ 18,19

*Blanchard v. United States*, 347 F.2d 268 (Ct. Cl. 1965) ..............................18,20

*Castle v. United States*, 42 Fed.Cl. 859 (1999) ..........................................22,23

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99 (1957)...................................... 35

*Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657 Ct. Cl. 1006 (1973) ........................................ 35

*Heckler v. Community Health Service of Crawford County, Inc.*, 467 U.S. at 60-61, 104 S. Ct. 2218 ........................................ 35

*Hercules Inc. v. United States*, 516 U.S. 417, 116 S. Ct. 981 (1996) ........... 34

*Huna Totem Corp. v. United States*, 35 Fed.Cl. 603 (1996), *rev'd on other grounds* 135 F.3d 775 (1998) ........................................ 18

*Lamirage, Inc. v. United States*, 44 Fed.Cl. 192, 201 (1999)......................... 38

*Lee v. United States*, 32 Fed. Cl. 530, 537 (1995) ...................................... 36

*McAbee Construction Inc. v. United States*, 97 F.3d 1431 (Fed. Cir. 1996) 18

*New American Shipbuilders, Inc. v. United States*, 15 Cl. Ct. 141 (1988) .. 35

*Pacific Gas and Electric v. United States*, 3 Cl. Ct. 329 (1983) .................. 35

*Sterling Savings Associate v. Ryan*, 751 F. Supp. 871 (E.D. WA. 190) *vacated on other grounds*, 959 F.2d 241 (1992) ........................................ 28

*Teradyne, Inc. v. Teledyne Industries, Inc.*, 676 F.2d 865 (1st Cir. 1982) ... 31

*Winstar Corp v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) .................... 18

**STATE CASES**

*National Controls, Inc. v. Commodore Business machines, Inc.*, 209 Cal. Rptr. 636 (Cal. App. 1985) .................... 31

**FEDERAL STATUTES**

28 U.S.C. § 1491(a) .................... 34

**STATE STATUTES**

U.C.C. § 2-708(2) .................... 31

**RULES**

RCFC 12(b) .................... 35

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Senior Judge Smith) |

**PLAINTIFFS' REPLY TO "DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING LIABILITY ISSUES AND IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT."**

## I. RELIEF SOUGHT

Plaintiffs Sterling Savings Association and Sterling Financial Corporation (hereinafter collectively "Sterling") request the Court to grant its motion for partial summary judgment on liability issues, which it filed on January 21, 1997, and to deny the United States' ("Defendant") motion to dismiss and cross-motion for summary judgment, which it submitted in response on April 7, 1997.

In Sterling's 1997 briefing, it demonstrated that, as a matter of law, Defendant entered into three contracts relating to Sterling's acquisition of three failed thrifts and thereafter, breached those agreements. After completing fact discovery in August, 2000, Defendant submitted supplementary materials with the hope of precluding the granting of Sterling's motion. As demonstrated more fully

below, Defendant's supplemental materials fail to support its motion or its cross-motion, and further fail to demonstrate any material issues of fact to preclude Sterling's motion for Partial Summary Judgment on all liability issues.[1]

## II. NATURE OF CASE

Sterling seeks partial summary judgment as to all liability issues relating to Defendant's breach of three contracts entered into with Sterling for the purchase of three failing thrifts. Sterling originally brought its motion on January 21, 1997, pursuant to the *Short Form Procedure* of this Court's OMNIBUS CASE MANAGEMENT ORDER, ¶ 5 (September 18, 1996). Defendant opposed Sterling's motion and in addition, cross-moved to dismiss Plaintiff Sterling Financial Corporation for lack of standing and cross-moved for summary judgment on the substantive contract claims. In reply, Sterling demonstrated irrefutably that Defendant entered into contracts with Sterling and acted inconsistently with those contracts. See Sterling Savings Association Reply Re: Motion for Partial Summary Judgment Re: Liability, and Response To Cross Motion to Dismiss (filed on or about June 16, 1997).

On December 22, 1997, this Court ordered Defendant to show cause as to why Sterling's Motion for Partial Summary Judgment should not be granted.[2] In Defendant's February 1998 response, it agreed that, if the Court held that bid documents, associated FHLBB resolutions, and forbearance

---

1 Sterling did not respond to Defendant's Opposition to Sterling's Constitutional Taking and Due Process claims in accordance with this Court's Order of November 2, 2000. Although Sterling reads the November 2nd Order to also stay the issues relating to this Court's subject matter jurisdiction, Sterling demonstrates below that its claims for restitutionary damages and estoppel should not be dismissed. See IV D&E, infra.

2 Specifically, the Court ordered that "[i]n all *Winstar related* cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, that the United States shall show cause, within 60 days, as to why those motions should not be granted and liability found on . . *Winstar* contract issues based upon the instant decision." December 22, 1997 Opinion at 45-[illegible]

letters always create a contract with the government, then it could offer no reasons as to why "the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case." Defendant's Response to The Court's Order To Show Cause, p.28 (filed on or about February 20, 1998). However, Defendant also suggested that, if the Court instead held that the existence of a contract depends upon the particular "contractual circumstances" in each Winstar case, then it should be given a continuance before having to respond to the Court's Order to Show Cause.

Sterling filed a Proposed Order for Partial Summary Judgment on March 31, 1998. See Sterling Savings Association's Memorandum Re: Proposed Order for Partial Summary Judgment and Order Re: Sterling's Motion For Partial Summary Judgment Re: Liability (both filed March 31, 1998). On April 30, 1998, Defendant filed its Response to Sterling's Proposed Order. See Response of the United States To Plaintiff's Proposed Order (filed April 30, 1998). In that response, Defendant again represented to the Court that it needed time to conduct discovery pursuant to RCFC 56(g) before responding to the Court's Order to Show Cause. Id. at 11-22; Declaration of Counsel (Elizabeth Hosford) (filed April 30, 1998). In reply, Sterling filed two further separate memorandums in opposition to the requested RCFC 56(g) continuance, which is still pending. See Sterling Savings Association's Reply Re: Proposed Order on Motion for Partial Summary Judgment Re: Liability (filed June 6, 1998) and Sterling's Motion to Set a Hearing for the Adjudication of the Government's Pending Rule 56(g) Motion (filed March 10, 2000).

Between August 22, 1999 and August 23, 2000, the parties conducted extensive fact discovery. On October 10, 2000, Defendant filed a Supplemental Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment (hereinafter, "Def's Supp. Brief, pp ").

As demonstrated below, however, Defendant's Supplemental Response still fails to identify any triable issue which would preclude Sterling's right to partial summary judgment on liability.

## III. SUPPLEMENTAL UNDISPUTED FACTS

In addition to those Undisputed Facts set forth in Sterling's Motion for Partial Summary Judgment Re Liability and Affidavit of Leslie R. Weatherhead in Support of Motion (filed on January 21, 1997) and Sterling Savings Association's Reply Re: Motion for Partial Summary Judgment Re: Liability and Response to Cross-Motion to Dismiss (filed on or about June 16, 1997), Sterling provides the following supplemental statement of undisputed facts.

### A. SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE AUTHORITY OF THE FHLB OF SEATTLE.

#### *1. The FSLIC and the FHLBB Delegated the Authority to the FHLB of Seattle to Process and to Negotiate The Assisted Acquisitions in District 12 (The Northwest).*

In the early 1980s, the FSLIC and the FHLBB delegated to the FHLB of Seattle the authority to negotiate the terms of assisted acquisitions within the Northwest. (Pls' Exs. V-1, 85:25-87:19; V-2, p. 132)[3]. As part of this authority, the FLHB of Seattle created a "special committee" charged with the responsibility of resolving the different troubled institutions. (Pls' Exs. V-1, 84:3-17; 130:19-131:4; Y-1, 183:18-184:15, 185:12-186:12, 221:23-222:1). Pat McJoynt, Senior Vice President and Assistant Regional Director of the FHLB of Seattle, managed this "special committee." Ms. McJoynt reported directly to the Principal Supervisory Agent, James Faulstich. (Pls' Exs. Y-1, 185:15-186:12; V-1, 79:10-19, 80:4-12; 85:25-87:19). Acting, in part, through this special committee, the FHLB of Seattle aggressively negotiated the terms of each assisted acquisition. (Pls' Ex. V-1, 86:15-87:19, 118:4-12;

[3] "Pls' Ex. V-1, 85: 25-87:19" refers to Plaintiffs' Exhibit V-1, page 85, beginning at line 8, through to page 87, ending at line 19. If no lines are referenced, that means Sterling is citing to a document instead of a deposition transcript.

Pls' Ex. Y-1, 188:3-21)

## B. The Supplemental Undisputed Facts Regarding The Acquisition of Lewis Federal.

### *1. The Lewis Federal Acquisition Was The Result of An Extensive Marketing and Negotiation Process.*

#### a. The Defendant "Shopped" The Troubled Thrift.

Sterling's acquisition of Lewis Federal Savings and Loan Association ("Lewis Federal") was the product of intense marketing and negotiating on the part of Defendant. (Pls' Exs. V-1, 91:14-92:13, V-2, p. 133-34). First, Defendant marketed Lewis Federal to a number of associations on an unassisted basis. (Pls' Ex. V-2, pp. 133-34). However, none of the associations would acquire Lewis Federal, except pursuant to a contract to include FSLIC assistance. (Pls' Exs. V-1, 91:14-92:13; Pls' Exs. V-2, p. 133). As a result, Defendant marketed Lewis Federal on an assisted basis to a number of different thrifts and invited them to submit offers. (Pls' Exs. V-1, 91:14-92:13; V-2, p.133-34). Of twenty-three thrifts invited to bid, three of them, including Sterling, submitted formal bids. (Pls' Ex. V-3, p. 138-39). After receiving the bids, the FHLB of Seattle made a recommendation to the FHLBB that it should begin negotiating with Sterling, the lowest bidder. (Pls' Exs. V-1, 93:16-94:20; V-2, p. 136; V-3, p. 140).

#### b. Sterling Received a Bid Package That Described The Procedure for Bidding.

Prior to its acquisition of Lewis Federal, Defendant sent Sterling a package of information and instructions to be used in preparing its bid ("bid package"). (Pls' Exs. I,[4] ¶ 12; U-1, 15:12-16:2) The bid package, in part, described the types of financial assistance, accounting forbearances, and regulatory forbearances for which Sterling could negotiate. (Pls' Ex. I, ¶ 12; U-3, pp. 47-55). A list of boilerplate

---

[4] Pls' Exhibits A-S were filed as part of Sterling's Motion for Partial Summary Judgment in January and June of 1997, respectively.

forbearances were listed by "Forbearance Numbers," SM-1 through SM-6. (Pls' Ex. U-3, pp. 53-56). SM-1 and SM-2, when read together, provided that FSLIC assistance may be credited directly to the acquiring thrift's net worth for regulatory accounting purposes and only those intangible assets created pursuant to the purchase method of accounting (i.e. GAAP)[5] would have to be amortized. (Pls' Ex. U-3, p. 54). The bid package also explained that all terms would be the subject of negotiation and that requested forbearance language would have to be convincingly justified.[6] (Pls' Ex. U-3, p. 37, ¶ 10, p. 46).

**c. Sterling Submitted a Bid For Lewis Federal And Requested FSLIC Assistance Without Any Provision For its Repayment or Amortization.**

Early on, Sterling manifested in an internal memorandum that it wanted FSLIC assistance to remain on its balance sheet permanently. (Pls' Exs U-2, p. 33). The memorandum made clear that any bid or final agreement with the FSLIC must not contain a "provision for repayment to FSLIC." (Pls' Ex. U-2, p. 33).

On June 13, 1985. Sterling submitted its bid to acquire Lewis Federal. (Pls' Ex. U-4, pp. 63-68). That bid specifically requested, in part, the forbearance language of SM-1 and SM-2, which was consistent with its manifested desire to obtain permanent capital. (Pls' Ex. U-4, p. 67). Two other thrifts submitted bids as well: (1) Pacific First FSB and (2) Timberland Federal Savings and Loan. (Pls' Exs. V-1, 88:15:89:18; U-2, p. 133). The FHLB of Seattle negotiated and processed these bids and awarded the bid to Sterling. (Pls' Exs. V-1, 86:11-87:19; 97:24-101:3; V-2, p. 135; V-3, pp. 137-

---

5 The term "purchase method of accounting" derives from GAAP and means that intangible assets will be valued pursuant to FASB 72 (GAAP) and not in accordance with regulatory accounting practices or "RAP." Pls' Ex. DD. p. 308, ¶¶ 6-7.

6 SM-1 and SM-2 had to be specifically requested and were subject to negotiation. Pls' Ex. U-3, p. 48, § II. SM-4 was to be used if a Thrift failed to negotiate for SM-1 and SM-2. Pls' Ex. U-1, pp. 54-55.

140; V-4, pp. 142-49).

On October 23, 1985, the FHLB of Seattle, with the concurrence of the FSLIC, recommended to the FHLBB that it approve Sterling's terms for the acquisition of Lewis Federal because, in part, it represented the lowest cost resolution for the FSLIC. (Pls' Ex. V-1, 88:15-90:9; 91:14-92:13; 93:16-94:20; 95:17-96:2, 97:24-101:3). As part of that recommendation, the FHLB of Seattle recommended that the acquisition be accounted for under GAAP, with the exception that the FSLIC cash assistance be credited directly to Sterling's net worth. (Pls' Exs. V-1, 97:16-21, 100:10-101:3, 104:15-107:11; V-4, p. 110). Further, the FHLB of Seattle and the FSLIC recommended that the value of any intangible assets resulting from the merger in accordance with the purchase method of accounting be amortized by the straight line method over a period not to exceed 40 years. (Pls' Exs. V-1, 97:16-21, 100:10-101:3, 104:15-105:11; V-2, p. 134; V-4, p. 110).

Neither the FHLB of Seattle nor the FSLIC recommended that the FSLIC assistance be subject to reduction or amortization. (Pls' Exs. V-1, 102:15-103:15; V-2, p. 134; V-3, p. 138; V-4, p. 110). Contrarily, according to the FHLB of Seattle, Defendant (as seller) understood that the non-amortization of the cash assistance and associated credit to net worth was a critical term without which Sterling would not have consummated the deal. (Pls' Ex. V-1, 102:15-103:15, 104:15-105:14, 114:6-115:1).

### 2. *The Final Forbearance Letter Does Not Contain a Provision Requiring Sterling to Amortize or to Reduce the FSLIC Infusion of Capital.*

The FHLBB adopted without variation the recommended terms made by the FHLB of Seattle and the FSLIC. (Pls' Exs. V-1, 106:10-107:17; V-5, pp. 151-53). Further, the FHLBB's final forbearance letter did not require Sterling to amortize RAP goodwill, or through any other type of balance sheet management, to cause a reduction of the FSLIC cash assistance as a credit to capital over

time. (Pls' Exs. V-1, 106:10-107:17; V-5, pp. 232-33). The Lewis Federal assistance agreement also was void of any such requirement. Pls' Ex. A-6.

## C. THE SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE ACQUISITION OF TRI-CITIES.

### *1. The Tri-Cities Acquisition Was The Result of Aggressive Marketing and Negotiations.*

#### a. The Defendant "Shopped" The Troubled Thrift.

Pat McJoynt's "special committee," negotiated the supervisory resolution of the Tri-Cites Savings and Loan Association ("Tri-Cities"). (Pls' Exs. Y-1, 185:10-186:7, 188:3-21, 229:3-25; V-1, 84:3-17, 130:19-131:4; U-1, 20:6-21:15). At first, this committee marketed Tri-Cities unsuccessfully on an unassisted basis to a number of different thrifts, all of which showed no interest. (Pls' Exs. Y-1, 191:5-8; Y-2, p. 231). As a result, on July 6. 1987, the FHLB of Seattle recommended an administrative transfer of Tri-Cities to the FSLIC so that it could be marketed on an assisted basis. (Pls' Exs. Y-1, 189:4-21:13; Y-2, p. 231).

Beginning in August 1987, the FHLB of Seattle implemented a comprehensive marketing strategy. It generated bidding lists of potential acquirers, sent out invitations to potential bidders, and on October 15, 1989. held a bid conference in Seattle. (Pls' Exs. Y-1, 192:3-195:10; Y-3, p. 233; Y-4, p. 234; Y-8 p. 254). As a result, the FHLB of Seattle received three bids from thrifts to acquire Tri-Cities pursuant to an assistance contract. one of which was Sterling. (Pls' Ex. Y-6, p. 252).

#### b. Sterling Successfully Bid for Tri-Cities and Extensively Negotiated an Agreement With Defendant.

Sterling submitted its bid on November 27. 1987. (Pls' Exs. Y-5, pp. 235-251; Y-7, p. 253). As with the Lewis Federal transaction, Sterling sought to obtain permanent capital and the right to amortize GAAP intangibles over twenty-five years by the straight line method. (Pls' Exs. Y-1, 196:11-19. 197:1-8. 198:14-22. 199:15-200:16; Y-5. pp. 239-240). Originally, Old Stone Bank was the

successful bidder, but it later withdrew its offer. (Pls' Exs. Y-1, 204:17-205:6; Y-8, pp. 254-256; Y-9). Therefore, the FHLB of Seattle awarded the bid to the next lowest bidder, Sterling. (Pls' Ex. Y-1, 206:14-24).

By March, 1988, the FHLB of Seattle had completed its analysis of Sterling's bid and had requested the FSLIC's authorization to negotiate the rest of the terms of the acquisition. (Pls' Exs. Y-1, 214:23-215:3; Y-11, pp. 265-267). On March 16, 1988, the FSLIC gave the FHLB of Seattle this authority. (Pls' Exs. Y-1, 217:17-218:5, 220:15-24; Y-12, p. 268). On March 31, 1988, the FHLB of Seattle provided the agreed upon terms to the FHLBB. (Pls' Ex. Y-1, 223:19-224:17). None of the terms provided by the FHLB of Seattle required Sterling to amortize the FSLIC assistance or any RAP goodwill related therewith. (Pls' Exs. Y-1,199:22-200:16; Y-12(a), pp. 278-279). The FSLIC assistance was to be permanent. (Pls' Exs. V-1, 109: 5-11). In this regard, the FHLB of Seattle provided a draft form of a forbearance letter that contained the same SM-1 and SM-2 language that Sterling successfully negotiated for in the Lewis Federal transaction. (Pls' Exs. Y-13, pp. 282-283).

On April 7, 1988, the FHLBB delegated to FHLB of Seattle the authority to execute the Assistance Agreement between the FSLIC and Sterling according to the terms negotiated between the parties. (Pls' Exs. Y-1, 190, 227:4-228:19, 229:3-25; Y-15, p. 287). On April 8, 1988, Sterling and Defendant entered into an Assistance Agreement whereby approximately $11.7 million in cash assistance was to be directly credited to Sterling's net worth. (Pls' Ex. B-5, p. 17) No where in that agreement did it suggest that Sterling was to amortize any balance sheet entry relating to the FSLIC assistance. Id. On April 6, 1988, the FSLIC provided a forbearance letter that contained roughly the same SM-1 and SM-2 language as used in the Lewis Federal acquisition. (Pls' Exs. V-1, 110:14-112:11; Pls; Ex. B-1) The forbearance letter also did not require Sterling to amortize any balance sheet entry associated with the FSLIC assistance. (Pls' Ex. B-1).

Overall, the terms of the acquisition were the result of extensive negotiations. (Pls' Exs. U-1, 20:21-21:5; Y-1, 187:15-188:5, 201:21-202:16, 203:10-20, 206:25-213:9, 215:18-22, Y-10, p. 263). Indeed, part of the requested cash assistance sought by Sterling included a $525,077 payment for assets it did not want to assume from Tri-Cities, but the FHLBB and FHLB of Seattle took the negotiating posture of requiring Sterling to assume those assets without a payment. (Pls' Exs. Y-1, 216:8-14, 217:17-218:19, 219:4-17; Y-11, p. 266; Y-12, p. 268). In the end, however, after extensive negotiation, the FSLIC agreed to assume those assets and paid Sterling the $525,077 as part of the $11.7 million of cash assistance agreed to in the Assistance Agreement. (Pls' Exs. Y-1, 225:18-227:3; Y-14, p. 284).

## D. THE SUPPLEMENTAL UNDISPUTED FACTS REGARDING THE CENTRAL EVERGREEN ACQUISITION.

### *1. The FHLB of Seattle Negotiated for Sterling to Acquire Central Evergreen On Unassisted Basis, in Part, Because of the Inducements and Permanent Capital Provided for in The Lewis Federal and Tri-Cities Transactions.*

In the summer of 1987, the FHLBB sought to have Sterling acquire the Central Evergreen Federal Savings and Loan Association ("Central Evergreen") on an unassisted basis. (Pls' Ex. E, ¶ 33). Sterling at first was not interested in acquiring Central Evergreen on an unassisted basis because it could cause Sterling to become under-capitalized. (Pls' Exs. H ¶¶ 6-7; I, ¶ 10; W, p. 164:6-12). The FHLBB, however, was persistent and negotiated very aggressively with Sterling to enter into an agreement to acquire Central Evergreen. (Pls' Ex. V-1, 118:4-12; W, 160:4-166:6, 167:15-168:15). In order to persuade Sterling to acquire the Central Evergreen transaction, the FHLBB provided, among others, two critical inducements.

First, it provided that the entire amount of the goodwill created by the merger could be booked as an asset and counted as regulatory capital. (Pls' Ex. V-1, 116:8-16, 117:11-118:21). Without that term, Sterling would not have the capital base needed to support the acquisition. (Pls' Exs. V-1,

116:12-16, 117:11-23; W, 164:6-12). Second, Defendant reaffirmed that the *permanent* regulatory capital Sterling acquired from the Lewis Federal and Tri-Cities acquisitions would provide the requisite capital needed to prudently acquire Central Evergreen on an unassisted basis. (Pls' Exs. V-1, 122:15-124:16; 125:13-126:23; W, 163:11-21, 164:13-165:6, 171:10-15; E, ¶ 33).

In fact, it is undisputed that the Central Evergreen and Tri-Cities acquisitions were inextricably intertwined with one another. (Pls' Ex. W, 160:4-166:6, 167:15-168:15). Sterling had numerous discussions with Defendant, who persistently encouraged and induced Sterling to acquire Tri-Cities on an assisted basis, so that subsequently, it could use the permanent cash assistance as the regulatory capital needed to acquire Central Evergreen on an unassisted basis. Id. Sterling was reluctant at first, but based on the assurance that the FSLIC assistance from Tri-Cities could be counted permanently towards the regulatory capital requirements, Sterling acquired both thrifts as suggested. Id. The memoranda drafted by Defendant during that time demonstrate undisputedly that Sterling successfully negotiated for such an agreement. (EE-1, 355:18:-356:6, 357:16-21, 358:15-359:4, 359:15-360:21; EE-2, p. 361; EE-3, p. 362; EE-4, p. 363).

According to the FHLB of Seattle, Sterling could not have even considered the Central Evergreen transaction without a justifiable belief and conviction that the *permanent capital* and previous forbearances from the other acquisitions were in fact, contractual and binding upon the Government according to their terms. (Pls' Ex. V-1, 113:17-115:1).

***2. Had Sterling Not Contracted to Acquire Central Evergreen on an Unassisted Basis, FSLIC Would Have Had to Pay at Least $8 - $10 Million in FSLIC Assistance.***

The inducements provided to Sterling for acquiring Central Evergreen on an unassisted basis were given in exchange for the low cost resolution of an otherwise troubled thrift. (Pls' Ex. V-1, 118:13-21, 119:22-121:16). Had Sterling not taken the inducements and not acquired Central

Evergreen on an unassisted basis, the FSLIC would have had to spend at least $8-$10 million in assistance in order to induce another thrift to acquire Central Evergreen. (Pls' Ex. V-1, 120:8-121:16).

## IV. STERLING'S REPLY AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL OPPOSITION AND CROSS-MOTION

### A. AS A MATTER OF LAW, THE UNITED STATES CONTRACTUALLY AGREED TO PROVIDE STERLING PERMANENT CAPITAL THAT WAS NOT TO BE SUBJECT TO REDUCTION OR TO AMORTIZATION.

#### *1. The Only Evidence in The Record Is Undisputed and Establishes That as a Matter of Law, Sterling Received Permanent Regulatory Capital as Part of the Lewis Federal and Tri-Cities Acquisitions.*

##### a. The Defendant's Position Misrepresents the Record.

In its supplemental response to Sterling's partial summary judgment motion on liability, Defendant claimed that the FSLIC assistance provided as part of the Lewis Federal and Tri-Cities acquisitions also was to be included as a double book entry in unidentified intangibles and therefore, amortized. Def's Supp. Brief, pp. 35-36. The sole basis for this new position grows out of two unfounded contentions. First, that since Daniel Byrne, Sterling's Chief Financial Officer, supposedly admitted that Sterling included the FSLIC assistance in unidentified intangibles on its balance sheet prepared for submission to the regulators, he somehow conceded that the FSLIC assistance was subject to amortization. Id. at 35. Second, that William Zuppe, Sterling's Chief Operations Officer, admitted in an affidavit that the FSLIC assistance was to be amortized. Id. at 35-36. Neither is true and both are inaccurate representations of their testimony.

##### b. The Testimony of Daniel Byrne and William Zuppe Incontrovertibly Establish That Sterling Never Intended to Amortize the FSLIC Assistance or Any Asset Created Thereby.

Contrary to what Defendant suggests, Mr. Byrne unequivocally made clear during his deposition that Sterling never amortized the portion of unidentified intangibles associated with the FSLIC

assistance, because the FSLIC assistance acquired by Sterling was to be *permanent*. Mr. Byrne's full testimony on this subject reads:

Q. Did you amortize all the RAP goodwill?
A. What we amortized was the intangibles resulting on a GAAP basis.
Q. Why the intangibles resulting on a GAAP basis?
A. Because you were required to do so under the accounting rules.

********

Q. Did you include the FSLIC cash contribution which was recorded as an intangible in the amortization?
A. The cash assistance was treated as permanent regulatory capital and a credit to capital.
Q. Why was it not amortized with the other intangibles?
A. We looked at it as capital. It was permanent.

********

Q. The cash assistance was included in the line goodwill and other intangible assets on your TFR, is that correct?
A. That's correct.
Q. So on a RAP basis amortization was higher?
A. We recorded the amortization expense, the same for RAP and GAAP purposes, and that was under our GAAP, because that is how we maintained our books.
Q. So you didn't amortize the RAP intangibles?
A. We had the credit to capital that was kept permanent, and what we amortized pursuant to our books was the GAAP portion of the intangibles.
Q. And where in your agreement did it say you only had to amortize the GAAP portion?
A. It seemed to be the logical conclusion when the cash assistance was to be permanent and to remain the same and constant forever.

(Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18) Therefore, contrary to what the Defendant represented in its brief, Mr. Byrne makes indisputably clear that Sterling never admitted to amortizing the FSLIC assistance or any intangible asset associated with it. In fact, the opposite is true.

Similarly, Mr. Zuppe's Affidavit also fails to create a triable issue. First, the concepts of GAAP intangibles, RAP goodwill, and the accounting issues associated with each are complex issues over which Mr. Zuppe admitted he had no expertise. He testified no less than eight (8) times during his deposition that he is not an accountant. (Pls' Ex. AA, 292:14, 293:25-294:1, 295:21-21, 296:9, 297:13, 298:11)

Secondly, Mr. Zuppe's affidavit only refers to Sterling's right to count supervisory goodwill as regulatory capital. His reference to amortization was meant to be no more than a general comment on the length of the amortization period. He was not addressing the more specific issue of whether RAP goodwill, as differentiated from GAAP intangibles or goodwill, also would be subject to amortization. The government did not raise that issue until 10 years later.

Thirdly, when read in the context of Mr. Byrne's affidavit, filed simultaneously with Mr. Zuppe's, it becomes clear that Sterling was referring only to the GAAP intangibles or goodwill created pursuant to the purchase method of accounting:

> (g) In the Tri-Cities Forbearance letter the FHLBB:
>
> (3) Agreed that Sterling could carry 11.7 million in FSLIC cash assistance on it books as a credit to its net worth, for regulatory capital purposes;
>
> (4) Agreed that for regulatory accounting purposes, supervisory goodwill created by the transaction would be booked pursuant to the *purchase method of accounting* [i.e. GAAP goodwill] and could be amortized over 15 years ... .

(Pls' Ex. B-1, ¶¶ 3-4). (emphasis added) Mr. Byrne's affidavit is consistent with his deposition testimony wherein he testified that Sterling only ever amortized the GAAP portion of the unidentified intangible pursuant to the contract. (Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18).

Lastly, Mr. Zuppe's affidavit, when read as a whole, is not inconsistent with Sterling's undisputed understanding that the FSLIC assistance was to be permanent and remain undiminished over time. Specifically, in paragraph 30 of his affidavit, he made clear by the underlined text that Sterling always considered the FSLIC assistance to be permanent and not subject to reduction:

> 30. Pursuant to its agreement with the FSLIC and in conformity with the FHLBB Order, Sterling booked $11.7 million in permanent regulatory capital.

(Pls' Ex. E, ¶ 30). (emphasis original) As such, Defendant's suggestion that Sterling has conceded the issue completely lacks merit.

2. *Actually, It Is Defendant Who Undisputedly Agrees That the FSLIC Assistance Was to Be Permanent and Was Not to Be Amortized.*

The strongest reason why Sterling is entitled to partial summary judgment on the permanency of the cash assistance is because the key governmental personnel charged with the authority to specifically negotiate these transactions all agreed that the cash assistance was to be permanent and not amortized.

First, Pat McJoynt, the main negotiator on behalf of FHLBB with respect to the Tri-Cities acquisition, testified as follows:

**Q.** Do you understand what Sterling was proposing there?
**A.** Yes.
**Q.** And what were they proposing, from your understanding?
**A.** That the FSLIC assistance be counted toward capital.
**Q.** The cash assistance?
**A.** Yes.
**Q.** Do you see anywhere in that paragraph where they were proposing that the cash assistance in any way be paid back?
**A.** No.
**Q.** Or amortized?
**A.** No.
**Q.** Or reduced at any time, any point over time?
**A.** No.
**Q.** Would it be your understanding what they were requesting was permanent capital?
**A.** I would not disagree with that statement.

(Pls' Ex. Y-1, 199:22-200:16) (emphasis added)

Second, James Faulstich, the Principle Supervisory Agent in charge of all assisted acquisitions in Sterling's district at that time repeatedly admitted at his deposition that the cash assistance provided in the Lewis Federal and Tri-Cities acquisitions was permanent capital not subject to reduction or to

amortization. (Pls' Ex. V-1, 102:15-103:15, 104:24-105:14, 108:4-17, 109:5-11, 111:23-112:17, 113:17-115:1) In particular, Mr. Faulstich testified:

> **Q.** With regards to the up-front cash contribution, I think I asked you that question with regard to the $1.75 million in Lewis Federal. It says, "This payment will count as regulatory net worth." Again, what does that statement mean? What is this telling me?
>
> **A.** That the full amount of the FSLIC infusion would be used as capital for the association and not used to set up reserves or for whatever other purpose on the balance sheet of the association.
>
> **Q.** Was it to be treated as permanent capital? Do you know?
>
> **A.** It would be treated as -- as permanent capital, yeah, as a cash contribution.
>
> **Q.** Not to be paid back at a later date? Not to be amortized over a period of time?
>
> **A.** That would be correct.

(Pls' Ex. V-1, 108:1-17) (emphasis added) Further, he testified:

> **A.** . . . to have [Sterling] embark on this ambitious plan with not a certainty that they would have the capital to sustain it would not be a very prudent venture in business. . . so I would think they would be imprudent had they embarked on this plan without a belief or conviction that this was permanent capital and that the forbearance agreements were, in fact, permanent forbearances in accordance with their terms.

(Pls' Ex. V-1, 114:16-115:1) (emphasis added)

Third, consistent with the above, Edwin John Gray, the former president of the FHLBB testified about FSLIC assistance in another *Winstar* case as follows:

> **Q.** And what's your basis for your understanding that the capital credit would last in perpetuity?
>
> **A.** Well, because if there is no modifying statement anywhere in the agreement, then – then it has to be that.
>
> **Q.** And why is that?
>
> **A.** Well, because – because there is no – there no basis to think otherwise. I mean there's – if you say, for example, cash contribution made under this provision shall be credited to the acquiring association net worth account and shall constitute regulatory capital, particularly because it's cash, it's a credit, it's cash, how do you – how do you put a time frame on cash?

(Pls' Ex. X, 180:15-181:5)

Likewise, Alvin W. Smuzynski, the former Assistant Director with the Office of Examinations and Supervisor at the FHLBB, testified in the same case as follows:

Q. Capital credits are never amortized, are they?
A. The capital credit would have been the cash that was provided by FSLIC. No, that would not be amortized.

(Pls' Ex. Z, 290:21-25) (emphasis added).

Lastly, although not written to Sterling, a June 17, 1988 letter drafted by the FHLB of Topeka, Kansas reveals the original intent of the FHLBB on this issue:

> [A]s a the result of several phone conversations with your association and the Federal Home Loan Bank Board in Washington D.C., it was decided that it was not the intent of the [FSLIC] to establish an asset that would be amortized, thus reducing your net income. It was ruled, therefore, that the forbearance would not show up on the balance sheet, but that the $20 million would be added back in when computing compliance with regulatory capital requirements.

(Pls' Ex. CC, p. 306).

It was only after the Defendant realized that it was going to be found liable for breach of contract in these *Winstar* cases that it developed the belief that the FSLIC assistance promised had to be amortized as part of the deals. As demonstrated above, however, the undisputed intentions at the time of executing the contracts dictate otherwise. Hence, partial summary judgment on this issue should be entered in Sterling's favor.

### *3. The Legal Rules For Interpreting Contracts Leads to One Inescapable Result: The FSLIC Assistance Was Not Directly or Indirectly Subject to Amortization.*

The Defendant's argument that the FSLIC assistance was to be amortized admittedly is based on the assumption that the assistance and acquisition agreements, forbearance letters, and resolutions relating to the acquisitions of Lewis Federal and Tri-Cities were indeed contracts. See Def's Supp. Brief, p. 35. As such, the law that governs the interpretation of contracts must be applied.

**a. Interpreting Contracts in The U.S. Court of Federal Claims.**

In the U.S. Court of Federal Claims, issues of contract interpretation are questions of law particularly suited to resolution on summary judgment. Huna Totem Corp. v. United States, 35 Fed.Cl. 603, 608 (1996), *rev'd on other grounds* 135 F.3d 775 (1998). "[The] principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." Winstar Corp v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995). In this regard, a Court should consider heavily the manner in which the parties performed under the contract prior to a dispute over its meaning:

> The 'practical interpretation' of the contract by the parties themselves 'during performance' is, of course, of 'great importance' in resolving disputes involving contract interpretation. [citation omitted] ... 'Acts of the parties under a contract prior to the time when the contract becomes subject to controversy,' and which are inconsistent with their subsequent contentions, 'are to be given considerable weight in interpreting a contract.' [citations omitted]

Blanchard v. United States, 347 F.2d 268, 273 (Ct. Cl. 1965).

Lastly, the Court must look to the "plain meaning of the terms of a contract to determine whether the parties' objectively manifested intent can be gleaned therefrom." Huna Totem Corp, 35 Fed.Cl. at 608. Further, putting aside whether a contract is fully or partially integrated or ambiguous, the Court may not look to extrinsic evidence that varies, contradicts, or adds to the terms of an agreement. McAbee Construction Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (emphasis added); see also Alaska American Lumber Co., Inc. v. United States, 25 Cl.Ct. 518, 527 (1992); Applied Companies v. United States, 37 Fed. Cl. 749, 759 (1997).

**b. It Is Undisputed That The Contract Between the United States and Sterling Does Not Provide for Sterling to Amortize the Cash Assistance or Any RAP Goodwill That May Be Associated with It.**

Pursuant to law of contracts as summarized above, it cannot be controverted that the FSLIC assistance was not to be amortized, or in any manner, diminished. First, the Assistance Agreements, forbearance letters, and related resolutions promulgated by the FHLBB collectively state that the cash assistance was to be a direct credit to net worth for regulatory accounting purposes without any mention of amortization. See Pls' Exs. A-E. Had Defendant really intended the cash assistance to be amortized, it would have stated so in the agreement as it did in other acquisitions. For example, in one such acquisition, the FHLBB resolution read:

> RESOLVED FURTHER, that for regulatory accounting purposes, Citizens may credit $86 million of FSLIC's initial cash contribution pursuant to the Assistance Agreement to its regulatory capital account at the Effective Date, provided that Citizens shall amortize such amount over a period of twenty-five years ....

(Pls' Ex. BB, p. 305) (emphasis added).

Unlike in that case, however, the parties here did not intend such a result, and consequently, such terms or conditions do not exist. (Pls' Exs. A-C). As a matter of law, Defendant may not now add or vary the terms of the agreement as written. Applied Companies, 37 Fed.Cl. at 759. The Court, therefore, should invoke the maxim of legal interpretation, *expressio unius est exclusio alterius* – the expression of one term is the exclusion of another. See Huna Totem Corp, 35 Fed. Cl. at 609. In other words, the Court should hold that since particular terms are expressly specified in detail in Sterling's contract, such as the amortization of unidentified intangibles created pursuant to GAAP, any other omitted terms of the same general character relating to the same subject matter (i.e., the amortization of the cash assistance or RAP goodwill) should be excluded by implication.

c. **The Parties' Course of Performance Prior to this Dispute Undisputedly Establishes as a Matter of Law That the Cash Assistance Not Be Amortized.**

As stated above, extrinsic evidence of how the parties performed under the agreement must be given considerable weight in ascertaining the intent of the parties. Blanchard, 347 F.2d at 273. In this case, the parties' acts irrefutably demonstrate that the cash assistance was not to be amortized.

First, as demonstrated above, it cannot be controverted that Sterling, in accordance with its understanding of the agreements entered into with Defendant, did not amortize the cash assistance or the RAP goodwill.[7] (Pls' Ex. U-1, 17:18-23, 18:9-15, 19:2-18) Further, there is no evidence to suggest that the FHLBB, which reviewed Sterling's financials on a quarterly basis, ever told Sterling to amortize the RAP goodwill or the cash assistance.

Second, in January 1989, the FHLBB began requiring Thrifts to complete the Thrift Financial Reports ("TFRs") on a GAAP basis as opposed to on a RAP basis. (Pls' Exs. DD, ¶¶ 4-5, p. 307; DD-1, pp. 312-314). As a result, beginning in March of 1989, Defendant required Sterling to report only GAAP intangibles on Line A544 on the asset portion of the TFR, and only the amortization expense associated with that GAAP intangibles on Line E110 of the Expense Report. Id. Defendant did not even provide a line item for the amortization of the RAP goodwill. (Pls' Ex. DD, ¶ 4, p. 307).

Third, beginning in 1989, the FSLIC assistance was to now be reported separately in an *off-balance report called* "Memo Items" (Line 978) (Pls' Ex. DD-2, p. 316). Fatal to Defendant's claim is the undisputed fact that up until the passage of FIRREA, Sterling reported $13.480 million of FSLIC assistance on line 978 of the "Memo Item," which reflected the full unamortized amount of

---

[7] Moreover, Sterling has never amortized the FSLIC cash assistance or RAP goodwill on its General Ledger. Pls' Ex. DD, ¶ 8.

the assistance provided as part of the Lewis Federal and Tri-Cities acquisitions ($1.75 million + $11.73 million = $13.480 million). (Pls' Exs. DD-2, p. 316; DD-3, p. 328; DD-4, p. 344; DD-5, p. 346).

Lastly, Defendant even affirmatively approved this unamortized balance of $13.480 million and included it in its own June 19, 1989 Joint Examination Report after a full and comprehensive audit of Sterling's financials. (Pls' Ex. DD-5, pp. 346-347). Specifically, in that report, Defendant reflected that the amount of reported capital decreased by exactly $13.480 million between December 31, 1988 and March 31, 1989, which accounted for the policy change of allocating 100% of the FSLIC assistance to an *off-balance* sheet memo item.[8]

Therefore, on the TFRs established as of January 1989, Sterling reported, and was only required to report, the amount of FSLIC assistance on its books, which Sterling and the Defendant undisputedly reported as undiminished at $13.480 million, (Pls' Ex. DD-2, p. 316) Likewise, Sterling was only required to report GAAP intangibles and GAAP amortization, not RAP amortization. (Pls' Ex. DD; ¶¶ 4-7, p. 308; DD-1, pp. 313-14; DD-2, p. 316, (line 978)). The lack of any line item on the TFR for Sterling to report the amortized expense of the RAP goodwill speaks volumes and confirms the parties true intent: that Sterling was to amortize only the GAAP intangibles. If the parties' intended to have the RAP goodwill amortized, which in turn, would have

---

8 On December 31, 1988, Defendant reported that Sterling had $21.188 million of Modified Equity Capital identified as "Paid in Excess of Par." (Pls' Ex. DD-5, p. 347) On March 31, 1989, after implementing the change whereby FSLIC assistance would no longer be included in that Modified Equity Capital category, Defendant reported $7.708 million of Capital Paid in Excess of Par: exactly a $13.480 million reduction. (Pls' Ex. DD-5, p. 347). Recall, the amount of the combined FSLIC assistance provided to Sterling an account of Lewis Federal and Tri-Cities was approximately $1.75 million and $11.730 million respectively, or $13.480 million in total.

reduced the amount of regulatory capital, Defendant would have provided a line item on the 1989 TFR for that purpose.[9]

**B. IT REMAINS UNDISPUTED THAT THE GOVERNMENT WAS CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL.**

***1. Defendant Rehashes Its Claim From 1997.***

In Defendant's 1997 briefing, it also made the claim that the risk of regulatory change was expressly allocated to Sterling. See Def's Motion to Dismiss; Cross Motion for Summary Judgment et seq., pp. 27-32 (April 7, 1997). Sterling replied and demonstrated that, as a matter of law, it did not accept the risk of regulatory change. See Sterling Savings Assoc's Reply et seq., pp. 43-56 (June 16, 1997). Now, despite this Court's subsequent ruling in *Castle v. United States,*[10] Defendant seeks to re-hash the same argument solely with regard to Central Evergreen. Def's Supp. Brief, pp. 36-37. Defendant bases this claim on the language of the Central Evergreen contract, a notation made in a memorandum prepared by Mr. Byrne, and a supposed admission by Sterling in a 1989 annual report. Id. As demonstrated below, none of these create triable issues of fact to preclude partial summary judgment in favor of Sterling.[11]

***2. The Castle Decision Controls and Dictates That, as a Matter of Law, Sterling Did Not Agree to Accept the Risk of Regulatory Change and That Defendant Breached its Contract with Sterling Regarding its Acquisition of Central Evergreen.***

**a. The *Castle* Decision.**

---

[9] Moreover, as described in more detail in Sterling's 1997 Reply, the business plan, which was part of Sterling's contract to acquire Central Evergreen, reveals that Sterling was at all relevant times treating the FSLIC assistance as a permanent and non-amortizing asset. (Pls' Ex. C-3, Attach A).

[10] 42 Fed. Cl. 859 (1999).

[11] Further, Harold Gilkey's (Sterling's CEO) testimony remains undisputed that the goodwill arising from the Central Evergreen acquisition was to counted as regulatory capital. Pls' Ex. W, 164-14-165-20.

In *Castle*, the Court interpreted a contract structured similarly to the one executed by Sterling as part of the Central Evergreen acquisition. First, the contract in *Castle* consisted of an acquisition agreement, a FHLBB approval letter, and a business plan. Second, as in Sterling's case, the contract in *Castle* permitted the thrift to meet the *lesser* of either the standard regulatory requirements as set forth in the FHLBB regulations, or a modified capital requirement as set forth in the contract. Third, the contract in *Castle* provided that the thrift could include supervisory goodwill as regulatory capital and amortize it over a period of time.

Also, as in Sterling's case, the government contended that the contract expressly assigned the risk of regulatory change to the thrift through the following provision:

> All reference to regulations of the Bank Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

*Compare* Castle, 42 Fed. Cl. at 862 with Pl's Ex. C. 3, § V., D.

The Court in *Castle*, however, after reviewing the contract as a whole, held that the above language did not allocate the risk of regulatory change to the thrift and granted Plaintiff's summary judgment motion on that issue. Id. at 863-64. In so doing, the court agreed with the thrift that the "successor regulation" provision merely put the parties on notice that as capital requirements increased or decreased, the thrift's capital requirements would increase or decrease as well, *but only in a manner as agreed by the parties elsewhere in the contract -- namely that the thrift could comply with the contractual capital formula in lieu of the regulatory amount when that contractual amount was less*. See Castle, 42 Fed. Cl. at 863-64 (emphasis added). Likewise the Court found that the government's asserted interpretation rendered the provision that allowed the thrift to comply with

the contractual capital requirement in lieu of the regulatory amount superfluous because the government could "vitiate the essence of the deal at any time." Id. at 864.

**b. The *Castle* Decision is Decisive on the Binding Nature of the Central Evergreen Agreement.**

As in *Castle,* the core of the agreement between Sterling and Defendant was Sterling's right to comply with the capital standards provided for in the business plan, in lieu of more restrictive regulations that may be passed in the future. (Pls' Ex. C-3, II, III) Only if Sterling's capital fell below that amount set forth in the business plan would Sterling be required to raise additional capital to comply with a stricter regulation. Id.

Defendant, however, would now have this Court accept an interpretation whereby that provision, which is specifically aimed at allowing Sterling the means to meet capital standards while still maintaining the time and flexibility needed to absorb and rehabilitate a severely undercapitalized thrift, could be nullified at any time for any reason. As stated in *Castle*, "[i]t is unreasonable to believe that anyone ...would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time." Castle, 42 Fed. Cl. at 864. Sterling surely did not do so, nor has Defendant demonstrated otherwise.

**c. Paragraph V., M. of The Central Evergreen Agreement Did Not Allocate The Risk of Regulatory Change to Sterling.**

Defendant also cites to paragraph V., M. of the Central Evergreen Agreement in support of its claim that Sterling assumed the risk of regulatory change . Defendant's Supplemental Memo in Support of it Opposition and Cross-Motion, p.37 The paragraph reads:

> M. This Agreement is not a waiver of or a forbearance from any applicable regulation.

Pl's Ex. C3, p. 5. Again, this provision must be read consistently with the meaning of the agreement as a whole - - namely that Sterling did not accept the full risk of regulatory change because it specifically negotiated for the right to follow the capital requirements in the business plan in lieu of future capital requirements. Castle, 42 Fed. Cl. at 863.

Further, at the time the contract was entered, the pertinent regulations allowed Sterling to count goodwill as regulatory capital and therefore, the provision simply makes sense when read in the context of the regulations at that time. Contrary to what Defendant suggests, Sterling does not claim, nor need it claim, that the Government somehow waived its right to regulate Sterling. Instead, Sterling need only demonstrate, which it has, that Defendant contractually agreed to allow Sterling to include goodwill as regulatory capital for the full amortization period agreed upon in the agreement.

Moreover, for the same reasons identified above, Defendant's interpretation would, in essence, give it the right to "vitiate the essence of the deal at any time." Therefore, Defendant's interpretation makes provision "M" conflict with the provisions that permit Sterling to comply with the business plan. As a matter of law contracts are to be construed to avoid such conflicts and as such, this argument should be rejected. See Castle, 42 Fed.Cl. at 863, *citing*, Guaranty Financial Svs., Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991) ("the court should endeavor to give reading to the contract that 'harmonizes the various provisions of the contract instead of placing them in conflict'").

**d. The Memorandum Drafted By Dan Byrne Does Not Establish That Sterling Assumed The Risk of Regulatory Change.**

Defendant claims that Dan Byrne, Sterling's CFO, drafted a memorandum that purportedly

admitted that Sterling agreed to accept the risk of regulatory change. Def's Supp. Brief, p. 38. The relevant language relied upon by Defendant reads:

> The essence of this provision [¶ V., M.] is that the agreement does not supersede the regulations to which Sterling is subject.

Def's App., p. 177. Standing alone, this provision is at best ambiguous and means nothing more than what it purports to convey in light of the regulations in place at that time.

However, reading that memorandum as a whole actually reveals more clearly Sterling's manifested intent that, albeit still subject to the FHLBB capital regulations, it could comply with capital standards by meeting the capital requirements as stated in the business plan. Sterling's actual intent is more clearly revealed in the first paragraph of the same memorandum, which reads:

> The purpose of this agreement is *to ensure that Sterling will abide by the business plan* ....

Def's App. p. 176 (emphasis added). Therefore, contrary to Defendant's claim, Mr. Byrne's memorandum is simply a manifestation of Sterling's understanding that all it had to do was comply with the capital standards stated in the business plan. The memorandum suggests nothing more.

**e. The 1989 Annual Report Only Confirms That Sterling Acquired a Forbearance to Allow it Time to Raise Capital Pursuant to the Business Plan.**

Defendant also claims that "even assuming that the capital maintenance agreement contained a forbearance permitting Sterling to count supervisory goodwill as regulatory capital, the forbearance expired in 1991." Def's Supp. Brief, p. 37-38. Defendant's sole basis for that contention is a paragraph contained within Sterling's 1989 Annual Report, which reads in part:

> Management believes it has been granted a forbearance until

> December 31, 199[0][12], from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

Def's Supp. Brief, p. 37-38. Again, the Defendant is taking a portion of a document out of context and applying an interpretation to it after the fact with the hope of creating a triable issue where none actually exists. The full paragraph reads:

> Management believes it has been granted a forbearance until December 31, 199[0], from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. ... *[A]ny such forbearance would be conditioned upon the compliance by [Sterling] with the business plan submitted to the FSLIC by [Sterling] in conjunction with the Central Evergreen acquisition.*

Def's App., 196 (italicized portion is that portion omitted from Defendant's brief).

Thus, a complete reading of the above paragraph, especially in the context of the actual language of the Central Evergreen agreement, reveals that Sterling's intent merely was to communicate that it had the right to comply with the modified capital standards agreed to in the business so long as it did so by December 30, 1990. The pertinent language from the Central Evergreen agreement confirms this point:

> The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised *prior to December 31, 1990.*

Pl's Ex. C., 3, p.3 (emphasis added). Therefore, it cannot be controverted that the paragraph's only purpose was to describe to the shareholders and investors that Sterling had the right to comply with the business plan's capital standards and amortization schedules in lieu of any stricter regulatory

12 The December 31, 1991 date refereed to in the Annual Report is a typo: nowhere in the Central Evergreen Agreement is there the date of December 31, 1991. Rather the date used is December 31, 1990. Pl's Ex. C, p. 3.

standard, but that as a condition of that right, it had to comply with those standards by December 31, 1990. Id. The Annual Report creates no triable issues of fact.

**f. Based On The Undisputed Evidence Presented in 1990, the Federal District Court Made Findings Consistent With Sterling's Understanding.**

Consistent with Sterling's position is the fact that the Eastern District of Washington, as part of its ruling on the injunction, found:

> Exhibit L, and an agreement between Sterling and the FSLIC in which Sterling promised to raise additional capital pursuant to a referenced Business Plan [the Central Evergreen Agreement] and the FSLIC *agreed to give Sterling until December 31, 1990, to comply with existing capital asset ratios.*

Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 874 (E.D. WA. 190) *vacated on other grounds*, 959 F.2d 241 (1992). This finding is entirely consistent with Sterling's intent when it drafted the 1989 annual report.

Moreover, the court relied upon the undisputed affidavit testimony of Mr. Zuppe in making its finding, which provides:

> 40. In summary, if the regulators were required to adhere to their written contractual commitments, Sterling would be entitled to:
>
> * * * * *
>
> (c) forbearance from regulatory capital standards until December 31, 1990 if Sterling's failure to comply with the standards was caused by [Sterling's] inability to raise capital following the Central Evergreen acquisition;

Pl's Ex. 18, ¶ 40. These two additional undisputed facts not only altogether refute the notion that the 1989 annual report creates a triable issue, but also, more clearly demonstrate, as a matter of law, that Defendant contractually agreed to allow Sterling to meet those capital standards in the business plan *in lieu* of the more stricter FHLBB regulations.

## C. CONTRARY TO DEFENDANT'S CLAIM, STERLING SUFFERED DAMAGES DURING THE PENDENCY OF THE INJUNCTION.

### *1. Defendant Permanently Damaged Sterling Prior to the Injunction, for Which it Still Incurs Ongoing Damage Today.*

Defendant claims that Sterling has no cause of action during the time in which Sterling was subject to the District Court's preliminary injunction (May 30, 1990-April 14, 1992). Def's Supp. Brief, pp. 38-40. The basis of this claim is that Sterling supposedly suffered no damages during the period it was purportedly shielded by the injunction. Def's Supp. Brief, pp. 38-40. Defendant's contention, however, completely ignores the true realities of the nature and scope of damage caused to Sterling, an otherwise profitable and healthy thrift.

First, it is undisputed that prior to the May 29, 1990 injunction, Sterling suffered significant damage as a result of Defendant treating Sterling as an undercapitalized, troubled thrift. In particular, up to the time of the injunction, Defendant had forced Sterling drastically to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. (Pls' Exs. T, 2:8-25; U-5, pp. 69-70). Some of these restrictions included limiting Sterling's asset growth; limiting the amount of loans Sterling could offer to one borrower; restricting Sterling's ability to pay dividends; limiting the amount and types of transactions it could enter into, such as commercial lending and large real estate lending; and limiting its business lending to only existing customers. (Pls' Exs. T, 2:8-25; U-6, pp. 71-74). Together, these restrictions forced Sterling to curtail its operations significantly. (Pls' Ex. T, 3:15-18).

Second, the impact upon Sterling's business was significant. Irrefutably, Sterling could not grow the company, nor loan money in the same manner as it did before because of the breach. (Pls' Ex. T, 3:18-25). Also, by the time of the injunction, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate

lending severely crippled, all because of the breach. (Pls' Ex. T, 3:18-4:22). Lastly, because of the breach, Sterling lost key personnel and suffered damage to its reputation. (Pls' Ex. T, 4:2-22; AA, 299:12-14, 301:4-7).

Overall, "but for the breach," Sterling would have raised regulatory capital pursuant to its agreements with Defendant and, in turn, would have generated more earnings and more business opportunities from the leverage of that capital. (Pls' Ex. T, 5:3-12, 6:19-9:2; AA, 303:11-14, 304:11-15). Instead, Defendant considered Sterling undercapitalized and placed a stranglehold on its daily operations, causing Sterling to lose an otherwise irreplaceable economic advantage for which it bargained. (Pls' Exs. T, 2:8-25, 3:18-4:22, 5:3-12, 6:19-9:2; AA, 301:13-17, U-1, 31:18-32:5). Hence, by the time of the injunction hearing, Defendant already had breached the agreements and significantly damaged Sterling's financial position, affecting its earnings and more significantly, its earning potential. (Pls' Exs. T, 6:19-9:2; AA, 301:4-7, 302:23-303:3, 303:11-14, 304:11-15; W, 177:13-21, 178:12-22).

2. *The Injunction Did Not Cure the Damage That Was Already Done.*

Contrary to Defendant's claim, the injunction did not cure, *nor prevent*, the severe effects of Defendant's breach as described above. Instead, the injunction, as a practical matter, only provided Sterling time to raise the capital needed to meet the FIRREA standards before being exposed to receivership. (Pls' Ex. T, 7:14-22, 10:1-7, 10:24-11:10, 12:19-13:6). Had the contracts been honored by Defendant on the other hand, Sterling irrefutably would have had excess capital to leverage, and thus, could have grown and become even more profitable between 1989 and today. (Pls' Exs. T, 4:1-23, 5:2-12, 6:21-7:11, 7:23-9:2; AA, 302:23-24, 303:11-14, 304:11-15). Consequently, even with the injunction in place, Sterling's earnings and asset growth potential had

already been permanently and severely curtailed, and nothing in the injunction could give to Sterling back that which it lost.

### 3. *The Second Public Offering Did Not Replace the Capital That Sterling Would Have Raised in 1989 and Leveraged During the Years Thereafter.*

Defendant also suggests that because Sterling raised $22 million in 1991 while the injunction was in effect, that it was also able to replace the capital it originally lost in 1989 due to Defendant and therefore, suffered no damages therefrom. Def's Supp. Brief, p. 39. Defendant, however, misapprehends the seriousness of the damage done to a profitable thrift like Sterling when it was forced to forego an opportunity to go to the marketplace and raise capital in 1989.

First, it cannot be controverted that having lost the opportunity to raise capital in 1989, Sterling could never really replace the capital, nor replace it for the same cost. (Pls' Exs. T, 6:19-9:2; AA, 302:11-18). Second, it cannot be disputed that once the capital was lost, the profit opportunities and benefits that would have been derived from the use of that capital between 1989 and 1992 also were forever lost. (Pls' Ex. T, 6:19-8:2). Lastly, Sterling could never recoup the expenses associated with the canceled offering. (Pls' Ex. T, 6:24-7:2).

The injunction, therefore, did not allow Sterling to "recapture" the lost capital or to be placed in a position where it could truly enjoy the actual benefits of its bargains. (Pls' Ex. T, 7:15-22). Indeed, Sterling is not unlike the "lost volume seller" pursuant to the U.C.C. § 2-708(2), who is made whole only through an award that compensates him for the loss of his expected return. See generally Teradyne, Inc. v. Teledyne Industries, Inc., 676 F.2d 865, 868 (1st Cir. 1982) (lost volume seller entitled to damages for both sales, the first unperformed sale and the second sale); National Controls, Inc. v. Commodore Business machines, Inc., 209 Cal.Rptr 636, 642-43 (Cal. App. 1985) (same). It

is likely that Sterling could have benefitted from two offerings as opposed to one.[13] (Pls' Ex. T, 8:4-9:2).

### 4. *Contrary to Defendant's Suggestion, Defendant Did Not Fully Comply with the Injunction Order.*

Defendant takes substantial pains to convince the Court that it fully complied with the injunction and, therefore, allowed Sterling to enjoy the full benefit of its bargains. (Def's Supp. Brief, p. 39). Such is not the case though. Even after the Court entered the injunction, Defendant continued to treat Sterling as a troubled thrift. (Pls' Exs. T, 12:19-13:6; U-1, 31:18-32:5; AA, 301:3-17). Specifically, on June 5, 1990, five days after the injunction, Defendant wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. (Pls' Ex. DD-6, p. 348). Subsequently, Defendant sent other letters further manifesting its intent to restrict Sterling's operations. (Pls' Exs. DD-7, pp. 349-351; DD-8, p. 359; DD-9, p. 353). For example, on June 20, 1990, Defendant mailed a letter which, in part, read:

> As always appropriate internal controls should be in place to ensure that all regulatory requirements ***are*** adhered to. ...
>
> *********
>
> The listing attached to your letter does not correctly reflect the *asset growth restrictions that Sterling is subject to.* By virtue of the denied capital plan, no growth ***is*** permitted. In addition, residential construction lending ***is limited*** to 3.3 percent of total assets and investment authority ***restricted*** to short term investments. The institution's activities ***are*** limited to those specified in the capital plan ....

---

13 Defendant's claim essentially is an attack on Sterling's damages case, which is better suited for argument after the end of expert discovery. Therefore, to the extent necessary, Sterling reserves its right to seek a RCFC 56(g) continuance on this matter. Expert discovery will show that Sterling's earnings suffered greatly during the pendency of the injunction due to Defendant's breach and its refusal to honor the agreements.

(Pls' Ex. U-7, pp. 75-76) Defendant's post- injunction intent is clearly spelled out by use of the present tense in that correspondence. (Pls' Ex. U-1, 26:11-28:8, 30:11-20). Other correspondence sent to Sterling confirms that same intent. ( DD-7, pp. 349-351; DD-8, p. 352; DD-9, p. 353).

Defendant also, under the guise of "safety and soundness" indirectly threatened Sterling with poor performance ratings in a manner that clearly indicated its unwillingness to honor its obligations under the contract. (Pls' Exs. U-1, 24:21-25:2; W, 172:25-173:11, 174:2-9). "Safety and soundness" is the standard against which the OTS measured a thrift's performance. (Pls' Exs. AA, 299:24-300:4; W, 175:22-176:1). Defendant threatened the use of this standard against Sterling, as if a loaded gun was a pointed at its head, in order to regulate it as a troubled and undercapitalized thrift when the terms of the agreements required otherwise. (Pls' Ex. U-1, 24:21-25:24, 31:18-32:5).

Lastly, Defendant completely ignores the fact that during the pendency of the injunction, Defendant had successfully moved for a partial reconsideration and had filed an appeal with the Ninth Circuit, which eventually vacated the injunction. See Sterling Savings Association v. Ryan, 959 F.2d 241 (9th Cir. 1992). It cannot be controverted, therefore, that both parties knew all along that if Sterling acted as if no breach had occurred and aggressively made business decisions based upon a belief that Defendant would always perform in good faith (as if that could be the case, considering the immediate and significant harm), it would have exposed itself to ruin should the Ninth Circuit vacate the injunction. (Pls' Ex. U-1, 23:5-22, 24:21-25:10, 31:18-32:5). For these reasons as well, it cannot be disputed that the injunction only really had the effect of putting the Defendant at bay while Sterling clambered its way into capital compliance in accordance with the new, *non-contractual* capital standards of FIRREA. (Pls' Ex. T, 7:12-22).

In summary, but for Defendant's breach, Sterling undisputedly would have raised capital in 1989, used that capital per the three agreements, and generated more assets, profits, and revenues

in a more productive and lucrative manner. Instead, it cannot be controverted that Defendant breached its duties set forth in those agreements and caused Sterling to shrink its operations, which in turn, destroyed many of Sterling's businesses and products; reduced Sterling's actual and potential earnings; forced Sterling to re-raise capital under more adverse market conditions and under stricter standards than promised in the agreements; and caused Sterling to try to conduct business in a hostile regulatory climate where Defendant treated Sterling as a troubled thrift at all relevant times. Because Defendant failed to present any triable issue of fact, Defendant's Motion for Summary Judgment on this issue should be denied.

**D. STERLING'S CLAIM FOR RESTITUTION SHOULD NOT BE DISMISSED.**

Defendant claims that Sterling's cause of action for restitution should be dismissed pursuant to RCFC 12(b) because claims based on "implied in law" contracts are not within the jurisdiction of this Court. Def's Supp. Brief, p. 29. Defendant misapprehends Sterling's claim.

This Court clearly has jurisdiction over claims based on alleged express and implied-in-fact contracts. Hercules Inc. v. United States, 516 U.S. 417, 423, 116 S.Ct. 981, 984 (1996); 28 U.S.C. § 1491(a). Moreover, within that jurisdiction, this Court recognizes restitution as a proper measure of damages caused by a breach of an express or implied-in fact-contract. Acme Process Equipment Co. v. United States, 171 Ct.Cl. 324, 359, 347 F.2d 509, 530 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350 (1966) (awarding restitution as a remedy for breach of contract). Sterling's breach of contract claim, whether based on an express or implied-in-fact contract, arises out of three agreements and therefore, is within the subject matter jurisdiction of this Court. 28 U.S.C. § 1491(a). Additionally, Sterling's claim for restitution is nothing other than a claim for restitutionary damages and therefore, is also properly before this Court. Id. See Sterling's Second Amended

Complaint, p. 37, ¶ (5). Accordingly, Sterling's claim for restitutionary damages should not be dismissed.

E. **STERLING'S EQUITABLE ESTOPPEL CLAIM SHOULD NOT BE DISMISSED.**

*1. **The Court has Subject Matter Jurisdiction Over Claims of Equitable Estoppel.***

Defendant incorrectly presumes that Sterling's cause of action for estoppel is a cause of action for promissory estoppel and therefore should be dismissed pursuant to RCFC 12(b). Def's Supp. Brief, pp. 32-33. However, Sterling claim is for *equitable estoppel*, which is undeniably within the subject matter jurisdiction of this Court: "[t]he doctrine of equitable estoppel is applied when a party attempts to prevent denial of a contract." New American Shipbuilders, Inc. v. United States, 15 Cl.Ct. 141, 144 (1988); Pacific Gas and Electric v. United States, 3 Cl.Ct. 329, 330 (1983). The elements of equitable estoppel are:

> (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; (4) the contractor must rely on the government's conduct to his injury.

Lamirage, Inc. v. United States, 44 Fed. Cl. 192, 201 (1999); American Electronic Laboratories, Inc. v. United States, 774 F.2d 1110, 1113 (Fed. Cir.1985); Emeco Industries, Inc. v. United States, 485 F.2d 652, 657 Ct.Cl. 1006 (1973). The Supreme Court has repeatedly held that the defendant may be sued for equitable estoppel when it is in the interests to maintain "some minimum standard of decency, honor, and reliability in their dealings with the Government." Heckler v. Community Health Serv. of Crawford County, Inc., 467 U.S. at 60-61, 104 S.Ct. 2218 (footnotes omitted).

In this case, Sterling has properly pled a cause of action for estoppel. See Second Amended Complaint, p. 35-36, ¶¶ 11.1-11.4. The court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." Lee v. United States, 32 Fed.Cl. 530, 537 (1995); *quoting* Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957). Clearly, based on the evidence presented above concerning the three acquisitions, Defendant cannot, and has not, met its burden in demonstrating that no set of facts can be proved to support Sterling's claim for estoppel. Hence, this cause of action should not be dismissed.

## V. CONCLUSION

In 1997, Sterling moved for partial summary judgment as to liability pursuant to the "Short Form" procedure. Although Sterling's contracts are practically "cookie-cutter" versions of those agreements found to be binding in the Winstar opinion and its progeny, Defendant continues to re-hash theories previously rejected by the Courts.

After numerous rounds of briefing, and more importantly, after having the opportunity to conduct full and comprehensive discovery, Defendant has failed to demonstrate any triable issues of fact that would preclude this Court from granting Sterlings' Motion for Partial Summary Judgment as to Liability.

Defendant had "the burden to present specific facts showing a genuine issue for trial." Alaska American Lumber v. United States, 25 Cl. Ct. 518, 525 (1992). Instead, Defendant only offered strained and outlandish interpretations of unambiguous contracts without producing one iota of testimony that these interpretations have merit. Therefore, based on the foregoing, and based on the previous filings submitted in support of Sterling's motion, Sterling requests this Court to grant its Motion for Partial Summary Judgment as to Liability and to deny Defendant's Motion to Dismiss and Motion for Summary Judgment.

Respectfully submitted this 16th day of December, 2000.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: ______________________
William D. Symmes, Counsel of Record
by William M. Symmes, a Member of the Bar of the
United States Court of Federal Claims
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury that on this day I sent a copy of the attached **PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL OPPOSITION** directed to the following:

Clerk, U.S. Court of Federal Claims
717 Madison Place NW
Washington, D.C. 20005

_____ United States Mail
__X__ Federal Express
_____ Facsimile

Elizabeth M. Hosford
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L. Street, NW
Washington, D.C. 20530

_____ United States Mail
__X__ Federal Express
_____ Facsimile

Dated this December 16, 2000, at Spokane, Washington.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **No. 95-829-C**<br>**(Chief Judge Smith)** |

**DEFENDANT'S REPLY TO PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202)514-7300

January 16, 2001

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. STERLING WAS REQUIRED TO COUNT FSLIC ASSISTANCE AS SUPERVISORY GOODWILL AND TO AMORTIZE IT . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Rules For Interpreting Contracts Establish, As A Matter Of Law, That The Unidentified Intangibles Associated With FSLIC Assistance Were Required To Be Amortized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Nonamortization In Sterling's Reporting Of Goodwill Associated With The FSLIC Assistance Generated By The Lewis Federal and Tri-Cities Acquisitions Does Not Establish That The Sterling's Interpretation Of The Lewis Federal And Tri-Cities Agreements Is Correct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C. Sterling's Witnesses Only Confirm That FSLIC Assistance Is Subject To Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D. Testimony Of Former Government Employees Proffered By Plaintiffs Does Not Support Their Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. AS A MATTER OF LAW, THE GOVERNMENT WAS NOT CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. The Castle Decision Is Neither "Controlling" Nor "Decisive" In This Case . . . . 15

B. The Memorandum Drafted By Dan Byrne Expressly Acknowledges That Sterling Assumed The Risk Of Regulatory Change . . . . . . . . . . . . . . . . . . . . . . 18

C. Plaintiffs' Interpretation Of The 1989 Annual Report Is Contrary To Its Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. ASSUMING, FOR THE SAKE OF ARGUMENT, THAT THE GOVERNMENT ACTED INCONSISTENTLY WITH ANY CONTRACTUAL OBLIGATION TO PLAINTIFFS, THE INCONSISTENT ACTION NECESSARILY CEASED AFTER PLAINTIFFS OBTAINED AN INJUNCTION ENJOINING THE GOVERNMENT FROM TAKING ACTION INCONSISTENT WITH THE PURPORTED CONTRACTS . . . . 21

A. Plaintiffs' Argument About Pre-Injunction Alleged Damages Is Premature . . . . 21

B. Plaintiffs' Interpretation Of The Injunction Renders It Meaningless . . . . 22

C. Plaintiffs' Claim That The Second Public Offering Did Not Replace The Capital That Was Phased Out After The Enactment Of FIRREA Is Refuted By The Testimony Of Its Own Officers . . . . 24

IV. STERLING ADMITS THAT COUNT IV OF ITS COMPLAINT DOES NOT STATE A CLAIM, SO COUNT IV SHOULD BE DISMISSED . . . . 25

A. Sterling Now Alleges That Count IV Concerns A Potential Remedy, And Does Not State A Cause Of Action . . . . 25

B. The Proper Measure For Restitution Is The Non-Breaching Party's Pre-Contract Position, Not Unjust Enrichment . . . . 26

V. STERLING'S CAUSE OF ACTION FOR EQUITABLE ESTOPPEL SHOULD BE DISMISSED BECAUSE STERLING HAS NOT PLED FACTS REQUIRED TO ESTABLISH AN ESTOPPEL CLAIM . . . . 27

CONCLUSION . . . . 29

## TABLE OF AUTHORITIES

### FEDERAL CASES

Acme Process Equipment Co. v. United States, 171 Ct. C 347 F.2d 509 (1965), rev'd on other grounds, 385 U.S. 138 (1966) .......... 26, 27

Adams v. United States, 42 Fed. Cl. 463 (1982) .......... 16

Castle v. United States, 48 Fed. Cl. 187 (2000), appeal docketed .......... *passim*

Coast Federal Bank, FSB v. United States, No. 92-466, Fed. Cl. (Filed December 28, 2000) . *passim*

Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994 (11th Cir. 1991) .......... 16, 17

Hanson v. Office of Personnel Management, 833 F.2d 1568 (Fed. Cir. 1987) .......... 28

Heckler v. Community Health Servs., 467 U.S. 51 (1984) .......... 28

Henry v. United States, 870 F.2d 634 (Fed. Cir. 1989) .......... 28

Huna Totem Corp. v. United States, 35 Fed. Cl. 603 (1996) .......... 2

Office of Personnel Management v. Richmond, 496 U.S. 414 (1990) .......... 28

Pacific Architects & Eng'rs v. United States, 203 Ct. Cl. 499, 491 F.2d 734 (Cl. Ct. 1974) .......... 27

Plaintiffs in All Winstar-Related Cases At The Court v. United States, No. 90-8C Fed. Cl. (September 29, 1999) .......... 26

Rockwell Int'l Corp. v. United States, 8 Cl. Ct. 662, (1985) .......... 27

State of Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855 (1978) .......... 27

Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. WA. 1990) .......... *passim*

Sullivan v. United States, 46 Fed. Cl. 480 (2000) .......... 28

United States v. Winstar Corp, 518 U.S. 839 (1996) .......... 16

Westinghouse Electric Corp. v. United States, 41 Fed. Cl. 229, (1998) .......... 28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Senior Judge Smith)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs' supplemental opposition to defendant's partial motion to dismiss and cross motion for partial summary judgment ("plaintiffs' reply") serves only to demonstrate why the Government is entitled to summary judgment with respect to liability in this case. Plaintiffs Sterling Savings Association and Sterling Financial Corporation ("Sterling") attempt, unsuccessfully, to create an issue of fact, by responding to ten pages of briefing by the Government with 37 pages of text and 362 pages of appendix materials. As demonstrated below, partial summary judgment should be granted to the United States because plaintiffs have not met their burden for defeating our motion for summary judgment.[1]

---

[1] Pursuant to this Court's order dated November 2, 2000, Sterling has responded only to the nonconstitutional issues addressed in our supplemental memorandum in opposition to plaintiffs' motion for partial summary judgment concerning liability issues and in support of defendant's partial motion to dismiss and cross motion for partial summary judgment ("supplemental motion"). In addition, plaintiffs apparently misconstrued the requirements of RCFC 56(c)(2) in responding to our Proposed Findings Of Uncontroverted Facts ("Government's PFUF") with a statement entitled "supplemental undisputed facts." Plaintiffs' reply, p. i. Pursuant to RCFC 56(c)(2), we construe the facts section of Sterling's brief as a statement of genuine issues, and

## I. STERLING WAS REQUIRED TO COUNT FSLIC ASSISTANCE AS SUPERVISORY GOODWILL AND TO AMORTIZE IT

Plaintiffs' opposition serves only to confirm that the goodwill that corresponds to the FSLIC assistance provided to Sterling in connection with its acquisitions of Lewis Federal Savings and Loan Association ("Lewis") and Tri-Cities Savings and Loan Association ("Tri-Cities") was required to be amortized.

### A. The Rules For Interpreting Contracts Establish, As A Matter Of Law, That The Goodwill Associated With FSLIC Assistance Were Required To Be Amortized

Plaintiffs, in their opposition, argue that the rules for interpreting contracts require this Court to determine that it was not required to amortize the unidentified intangibles, or goodwill, associated with the Lewis Federal and Tri-Cities cash assistance. Plaintiffs' reply, pp. 17-19. We believe that this is properly considered a damages, not liability, issue, although we briefly raised the issue in our supplemental motion to preserve it. Nonetheless, we address plaintiffs' lengthy response to our brief argument below.

Plaintiffs acknowledge that the plain language of a contract governs its interpretation. Huna Totem Corp. v. United States, 35 Fed. Cl. 603, 608 (1996). In this case, the plain language of the agreements at issue dictates that plaintiffs were required to amortize the goodwill resulting from the cash assistance provided in connection with the Lewis Federal and Tri-Cities acquisitions. In that regard, this case is on all fours with a case recently decided by the Court, Coast Federal Bank, FSB v. United States, No. 92-466 C (Filed: December 28, 2000). In that

---

reserve the right to respond further if in fact Sterling is attempting to add undisputed facts to the Government's PFUF.

case, the Court examined the exact issue before this Court, and, based upon nearly identical agreements, determined that Coast Federal Bank, FSB was required to amortize the goodwill associated with its cash assistance. Coast, slip. op. at 28 (full discussion at pages 5-28).

In Coast, the Court first determined that the thrift's forbearance permitting it to count its FSLIC cash assistance toward regulatory capital was based upon a standard forbearance, known as SM-1, utilized by the Federal Home Loan Bank Board ("FHLBB"). Coast, slip op. at 7. Sterling's chief financial officer admitted at deposition that the forbearance regarding the treatment of cash assistance as regulatory capital granted in the Lewis and Tri-Cities acquisitions was based upon SM-1 as well. R. App. 217-20.[2] In addition, in Coast, the Court relied upon the following language from the Coast assistance agreement to support its finding that the FSLIC assistance was required to be amortized:

> Accounting Principles. Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or (FSLIC], or any resolution or action of the Bank Board approving or relating to the acquisition or to this Agreement, then this Agreement, such regulations, or such resolution or action govern.

Coast, slip op. at 8.

That provision is identical to section 9 of the Lewis Federal Assistance Agreement, and section 16 of the Tri-Cities assistance agreement. R. App. 28, 69. Like the assistance agreement

---

[2] The appendix to this brief will be referred to as "R. App." The appendix to plaintiffs' reply will be referred to as "P. App." The appendix to our supplemental motion will be referred to as D. App.

in Coast, sections 9 and 16, respectively, of the Lewis Federal and Tri-Cities assistance agreements also contain the following language relied upon by the Court in Coast to determine that amortization was required:

> In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity should be resolved in a manner consistent with [applicable FHLBB or FSLIC] regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement. If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern.

Coast, slip op. at 8.

The above-quoted provisions of the Coast, Lewis Federal and Tri-Cities assistance agreements require accounting for the acquisitions of the thrifts to be in accordance with generally accepted accounting principles, or GAAP, which requires the amortization of goodwill. Coast slip op. at 7-8. In Coast, the plaintiffs argued that GAAP did not govern its reporting of the goodwill resulting from the FSLIC cash assistance because it had a forbearance permitting it to count the FSLIC cash assistance as regulatory capital. Slip op. at 10. The Government contended, however, and the Court determined, that, based upon its plain language, the forbearance was to permit plaintiff to record more regulatory capital than it could have otherwise, rather than to exempt goodwill from amortization. Slip op. at 10-12. Moreover, the Coast court

reached that conclusion notwithstanding the fact that the Coast forbearance letter did not mention the amortization of goodwill. Slip. op. at 23.

In this case, however, the Lewis Federal and Tri-Cities forbearance letters included another standard forbearance, known as "SM-2," that required the amortization of goodwill over 40 years for Lewis Federal and 15 years for Tri-Cities. R. App. 37, 63, 191. In fact, many other institutions with both the "SM-1" and "SM-2" forbearances actually amortized the goodwill associated with cash assistance provided by FSLIC. R. App. 233-34 (affidavit of Joe A. Hargett). Consequently, Sterling's claim that it was not required to amortize the goodwill associated with its cash assistance is completely baseless, regardless of whether the Coast decision is persuasive to this Court.

Finally, in reaching its decision, the Coast Court noted that an FHLBB document supported the view that "FHLBB consistently took the position that RAP goodwill must amortize." Slip op. at 13. That document, a letter to a thrift known as Transohio Savings Bank, stated that Transohio had been "'permitted. . .to book the . . . cash contribution from FSLIC as a direct credit to net worth,'" but that "'[t]his departure from GAAP does not change the GAAP requirement that the amortization of goodwill must be charged to expense.'" Coast, slip op. at 13; see also R. App. 245. A redacted version of that document was produced to the Government in this case by Sterling's auditors in connection with its production of documents relevant to the accounting for the Sterling acquisitions. R. App. 38. The document, which predates the Tri-Cities transaction, sets forth FHLBB policy at the time. Further, the document demonstrates that it was faxed to the auditors from Sterling's attorneys. R. App. 38. Consequently, Sterling should be aware of that FHLBB policy and its application to acquisitions involving the grant of FSLIC

assistance.

In light of the foregoing, Sterling's contention that the plain meaning of the agreements associated with the Lewis Federal and Tri-Cities acquisitions did not require amortization of the goodwill associated with the FSLIC assistance is without basis, and should be rejected.

**B. The Nonamortization In Sterling's Reporting Of Goodwill Associated With The FSLIC Assistance Generated By The Lewis Federal and Tri-Cities Acquisitions Does Not Establish That The Sterling's Interpretation Of The Lewis Federal And Tri-Cities Agreements Is Correct**

Plaintiffs claim that their failure to amortize the goodwill associated with the FSLIC assistance granted in connection with the Lewis Federal and Tri-Cities acquisitions demonstrates that the agreements in those cases did not require them to do so. Plaintiffs' reply, pp. 20-21. That contention is without basis. As a preliminary matter, plaintiffs are incorrect in stating that Sterling did not "amortize cash assistance or the RAP goodwill." Id. at 20. Plaintiffs did, in fact, amortize the goodwill that was not associated with the FSLIC assistance. R. App. 146 (Section E, line 110).

Plaintiffs base their contention that the Government should have known that they were not amortizing the goodwill upon the fact that the 1989 TFR form required reporting on a GAAP rather than a RAP basis. Plaintiffs' reply, p 20, and Pls. Exs. DD, ¶¶ 4-5, p. 307; DD-1, pp. 312-314. What plaintiffs fail to reveal, however, is that, prior to 1989, the TFR form, on Line A544, required RAP goodwill and other forms of goodwill to be reported on the same line, rendering it difficult for an examiner to know that the thrift was not amortizing RAP goodwill. See Coast, slip op. at 17-18; R. App. 144 (section A, line 544). Further, Sterling's CFO admitted that the regulators specifically required Sterling to restate its September 30, 1989 TFR to reflect that the

goodwill relating to the FSLIC assistance was amortized. R. App. 227. Thus, for less than one year, Sterling utilized a form that reflected the nonamortization of the RAP goodwill. As the Coast Court noted, however, the instructions appended to the 1989 TFRs "suggest, however, that plaintiff was required to report on line C978 'the unamortized amount of the assistance that previously would have been reported on line A544,' meaning that [Coast] should have understood that the amount of the FSLIC contribution that could be reported on line C978 was amortizing." Coast slip op. at 19.

In addition, the actual reporting method used beginning January 1, 1989 required that both the balance sheet and the income statement of the TFR be presented in accordance with GAAP. Because the reporting of the FSLIC assistance as capital as well as the offsetting goodwill was a creation of RAP only, the post-January 1, 1989 income statement would, of course, have no need for a line item requiring amortization expense of this RAP goodwill. Sterling's lack of understanding of this issue is exemplified by its assertion that the 1989 TFR "lack[ed]. . .any line item. . . for Sterling to report the amortized expense of the RAP goodwill." Plaintiffs' reply, pp. 20-21. Clearly, line C798 was set aside to deal with the financial impact of the FSLIC assistance counting as capital as well as the offsetting goodwill. As the instruction indicated, this line did include the amortization impact of the FSLIC contribution.

Sterling responds that the Government should have noticed that the number on line C978 was nonamortizing, and that its failure to raise it with Sterling meant that it agreed with Sterling's interpretation of the agreements. Plaintiffs' reply, pp. 20-21. But, as was the case in Coast, "[t]he failure by [the Government] to require the correction of plaintiff's error in two quarterly reports does not show that FHLBB believed that RAP goodwill could be nonamortizing,

particularly in light of the evidence that FHLBB's policy was to amortize RAP goodwill." Id.

In addition, the Court was persuaded by a provision of the Coast assistance agreement identical to one in this case. That provision stated that "[a]ny forbearance, failure, or delay by any party in exercising or partially exercising any. . . right, power, or remedy [conferred by contract or applicable law] shall not preclude its further exercise." Coast slip. op. at 19. That language is identical to language in sections 12 and 19 of the Lewis Federal and Tri-Cities assistance agreements, respectively. R. App. 27, 140. In this case, as was the case in Coast, "a failure on multiple occasions to correct plaintiff's nonamortization did not deprive FHLBB of the right to insist on such amortization at a later time." Coast slip op. at 20.

Finally, Sterling attempts to rely upon a notation in an examination report to support its interpretation. Sterling points out that the June 19, 1989 exam report notes (without comment upon the amortization issue), that between December 31, 1988 and March 31, 1989, the amount of Sterling's reported capital decreased by the exact amount of its $13.480 million in FSLIC assistance. Plaintiffs' reply, p. 21. That statement is disingenuous, however, in that a footnote reveals that, in order to reach such a conclusion, one need review the "paid in excess of par" line of a "modified equity capital" category in the Comparative Statements of Financial Condition section of the exam report, and perform a subtraction of two numbers to ascertain that unamortized FSLIC assistance did not decrease. Plaintiffs reply, p. 21, n. 8 and Pl. App. 347. It is unreasonable for Sterling to infer that an examiner would have examined those lines and automatically reached the conclusion that Sterling was not amortizing RAP goodwill; further, the exam report contains no indication that the examiner did so note.

Moreover, as noted in the affidavit of Mr. Hargett, the line item that captured the effect of

the amortization (C978) also captured the effects of other accounting entries. R. App. 237-38. Consequently, Sterling's claim that the Government's conduct demonstrates that it knowingly permitted Sterling to violate its agreement by failing to amortize the RAP goodwill associated with the FSLIC assistance is without merit, and the Government should be granted summary judgment on this issue.

### C. Sterling's Witnesses Only Confirm That FSLIC Assistance Is Subject To Amortization

Plaintiffs also rely upon deposition testimony of Sterling's Chief Financial Officer, Daniel Byrne, to support their position. Plaintiffs' reply, p. 13. That testimony, however, only confirms the Government's interpretation, because Mr. Byrne was unable to be specific about the basis for his position that the FSLIC assistance was not to be amortized. When asked where in the agreements it specified that goodwill resulting from FSLIC assistance need not be amortized, Mr. Byrne replied: "It seemed to be the logical conclusion when the cash assistance was to be permanent and to remain the same and constant forever." Id., citing Pls. Ex. U-1, 19:2-18. Mr. Byrne effectively admitted that he was unable to point to a contract document to support his position. Therefore, his testimony does not support plaintiffs' theory.

Second, we demonstrated in our supplemental motion that Sterling's president, William Zuppe, provided sworn testimony that the FSLIC assistance was to be amortized. Supplemental motion, pp. 35-36. In response, plaintiffs resort to arguing that Mr. Zuppe, who has run Sterling since its inception, has no expertise in accounting. Plaintiffs' reply, p. 13. If that is the case, then plaintiffs should not have provided the sworn affidavit to the United States District Court for the Eastern District of Washington in 1990. The affidavit is rife with references to accounting

issues. D. App. 238-42. If, in fact, Mr. Zuppe is not familiar enough with accounting issues to swear to the statements in the affidavit, then perhaps the affidavit should have been withdrawn prior to the district court's grant of an injunction in that case. Sterling Savings Association v. Ryan, 751 F. Supp. 871 (E.D. WA. 1990). We are aware of no record that plaintiffs ever did so. Therefore, it is disingenuous, at best, for plaintiffs to attempt to disavow those sworn statements at this juncture.

Similarly, plaintiffs' claim that "Mr. Zuppe's affidavit refers only to Sterling's right to count supervisory goodwill as regulatory capital" is both inaccurate and misleading. Plaintiffs' reply, p. 14. First, Mr. Zuppe stated that "$11.7 million in cash assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years;..." D. App. 240 (lines 18-20). That statement is unambiguous, and plaintiffs' implication that Mr. Zuppe's statement applied only to supervisory goodwill, and not supervisory goodwill associated with FSLIC assistance, is incorrect.

Further, Mr. Zuppe's sworn statement is consistent with Mr. Byrne's deposition testimony. The FSLIC cash assistance was both credited to net worth and treated as supervisory goodwill, an unidentified intangible. At deposition, Mr. Byrne admitted that the FSLIC assistance was included among unidentified intangibles on its balance sheet prepared for submission to regulators. D. App. 253 (lines 12-17). Thus, plaintiffs' CEO has admitted that FSLIC assistance was included in goodwill, and its president admitted that the goodwill associated with FSLIC assistance was to be amortized. Further, Mr. Byrne, the CEO, also admitted that unidentified intangibles, including supervisory goodwill, were required to be amortized. R. App. 216. Consequently, it is undisputed that the supervisory goodwill associated

with the FSLIC assistance was required to be amortized.

Moreover, plaintiffs' claim that the cash assistance was "permanent" is not relevant to the amortization issue. See, e.g., Plaintiffs' reply, p. 13. We do not dispute that Sterling was permitted to maintain the actual cash as a credit to its net worth. To the extent, however, that it was also to be included among unidentified intangibles, it was required to be amortized pursuant to the forbearance letters issued in connection with the Lewis Federal and Tri-Cities acquisitions. R. App. 37, 63. The forbearance letters are unequivocal. The forbearance letter issued in connection with the Lewis Federal acquisition states that intangible assets were to be amortized over 40 years, as follows:

> For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

P. App. 153.

Similarly, the forbearance letter issued in connection with the Tri-Cities acquisition required unidentified intangibles resulting from the accounting for the acquisition in accordance with the purchase method to be amortized over 15 years. D. App. 76. In both cases, documents alleged by plaintiffs to be contractual required unidentified intangibles to be amortized, and plaintiffs' CEO, Mr. Byrne, has admitted that FSLIC assistance was included in unidentified intangibles on Sterling's balance sheet. Therefore, it is undisputed that the offsetting goodwill relating to the FSLIC assistance was to be amortized.

**D. Testimony Of Former Government Employees Proffered By Plaintiffs Does Not Support Their Position**

Plaintiffs claim that the "strongest" evidence in support of their position is the testimony of two former government employee associated with the Lewis Federal and Tri-Cities acquisitions, and two employees who played no role in the acquisitions, as well as a piece of correspondence that is completely unrelated to Sterling's acquisitions. Plaintiffs' reply, pp. 15-17. None of the proffered evidence supports Sterling's position.

First, plaintiffs rely upon deposition testimony provided in this case by Pat McJoynt, who participated in negotiation of the Tri-Cities acquisition, and James Faulstich, the principal supervisory agent at the time of the Tri-Cities and Lewis Federal acquisitions. Id. at 15-16. First, with respect to Ms. McJoynt, the deposition testimony relied upon by plaintiffs is Ms. McJoynt's comments upon a bid proposal submitted by Sterling. P. App. 196 (lines 12-18). The bid proposal is not among the documents plaintiffs have alleged form the contract with respect to the Tri-Cities acquisition. See Plaintiffs' short form motion for summary judgment and appendix. Further, the testimony relied upon does not support plaintiffs' argument that unidentified intangibles resulting from the grant of FSLIC assistance were not to be amortized. Ms. McJoynt was asked whether a specific paragraph of the bid proposal required plaintiffs to amortize FSLIC assistance. P. App., p. 200 (lines 6-11). She responded that it did not, but that paragraph merely requested that FSLIC assistance be counted toward regulatory capital. R. App. 49 (subsection f). As set forth above, the amortization of the FSLIC assistance was triggered by another paragraph of the forbearance letter, and Sterling's counsel did not ask Ms. McJoynt about

the corresponding paragraph in the bid proposal. Consequently, Ms. McJoynt's testimony is inapposite.

Mr. Faulstich's testimony is inapposite, as well. Plaintiffs rely upon his statement, at deposition, that the FSLIC cash contribution was not to be amortized. P. Reply, p. 16. Plaintiffs did not ask Mr. Faulstich whether the unidentified intangibles associated with the assistance were required to be amortized. Further, plaintiffs failed to note that, later in the deposition, Mr. Faulstich admitted that he had no first-hand knowledge about the accounting for FSLIC assistance:

> Q. Do you know how FSLIC assistance was accounted for
> under GAAP?
> A. I have no firsthand knowledge, no, of that. I
> think I testified to the fact that my assumption
> was that FSLIC cash assistance that we are talking
> about would flow to increase the capital of the
> institution receiving that cash assistance.
> Q. This is under GAAP?
> A. Under GAAP and RAP. It wouldn't make any
> difference at that point.
> Q. So is it your understanding that FSLIC assistance
> 0527
> was accounted for the same way under GAAP and RAP?
> A. No. That FSLIC assistance in the form of cash
> would be treated as a capital infusion.
> Q. Under which?
> A. Under -- certainly under RAP and I would think
> under GAAP.
> Q. Do you know whether, under GAAP or RAP, FSLIC
> assistance was included with intangibles?
> A. As an intangible?
> Q. Yes.
> A. I don't have any firsthand knowledge. I would
> suspect it would not be considered an intangible.
> Q. Why not?
> A. Because an actual cash payment was made.
> Q. Do you know whether, under GAAP, if FSLIC

assistance was provided, there had to be a deduction from intangibles?
A. I don't have any firsthand knowledge of that. I would think not.
Q. Do you know whether, under RAP, if FSLIC assistance was provided, there had to be a reduction of intangibles?
A. Same answer. I think not.
Q. Your answer is no?
A. I would think not. I don't have any firsthand
0528
knowledge of that. I'm not an expert in accounting.

***

Q. Do you have any specific knowledge as to how FSLIC assistance was actually booked on a balance sheet basis under GAAP or RAP?
A. I would have no firsthand knowledge of that.

R. App. 210-12. The above-quoted testimony demonstrates that Mr. Faulstich cannot be relied upon to support an argument that, for accounting purposes, the unidentified intangibles resulting from the grant of FSLIC assistance should not be amortized.

Plaintiffs also rely upon the testimony of Edwin Gray, the former president of the FHLBB, to support their position. P. reply, p. 16. As a threshold matter, Mr. Gray was not involved in any way with the Tri-Cities and Lewis Federal acquisitions, and cannot provide testimony about the intent of the parties with respect to those acquisitions. CITE. Further, his testimony does not even address the issue of amortization with respect to FSLIC assistance. Consequently, it is irrelevant to the issue.

Plaintiffs' reliance upon the testimony of Alvin Smuzynski is similarly misplaced. P. reply, p. 17. Again, plaintiffs do not claim that Mr. Smuzynski was involved with the Lewis or Tri-Cities acquisitions. Second, his testimony is taken out of context. Further, Mr. Smuzynski

testified that the actual cash assistance was not to be amortized. He also stated, in the excerpt provided by plaintiffs, that the unidentified intangibles associated with the assistance were to be amortized. P. App. 290 (lines 17-19). See also Coast, slip op. at 15.

Finally, plaintiffs' reliance upon an excerpt from a letter, not addressed to Sterling, from the Federal Home Loan Bank of Topeka, is, at best, confusing. P. reply, p. 17. The excerpt makes no reference to FSLIC assistance or the accounting of the assistance, but instead addresses whether an unidentified forbearance would "show up on the balance sheet." This excerpt appears to bear no relevance to this case, or the amortization issue, since the transaction referenced in the letter was a sale of deposits rather than a thrift acquisition, and cannot be a basis for summary judgment.

As demonstrated above, the "strongest" evidence plaintiffs could find on the amortization issue provides absolutely no support for their position.

## II. AS A MATTER OF LAW, THE GOVERNMENT WAS NOT CONTRACTUALLY BOUND TO PERMIT STERLING TO COUNT THE SUPERVISORY GOODWILL ARISING FROM THE CENTRAL EVERGREEN ACQUISITION AS REGULATORY CAPITAL

In their reply, plaintiffs attempt to establish a contractual promise to count supervisory goodwill generated in connection with the Central Evergreen transaction as regulatory capital by incorrectly citing a United States Court of Federal Claims case, John K. Castle, et al. v. United States, 42 Fed. Cl. 859 (1999), as "decisive" and "controlling." Plaintiffs' reply, pp. 22-24. In addition, plaintiffs attempt to support their motion for partial summary judgment by declaring that we have failed to create a "triable issue," when, in fact, the evidence is overwhelming that we are entitled to summary judgment on the issue.

A. The Castle Decision Is Neither "Controlling" Nor "Decisive" In This Case

In an attempt to support their claim that a goodwill contract was created in connection with the Central Evergreen acquisition, plaintiffs aver that the Castle decision "[c]ontrols." Plaintiffs' reply, p. 22. As a preliminary matter, plaintiffs are incorrect as a matter of law. This Court is not "controlled" by another decision of this Court. Adams v. United States, 42 Fed. Cl. 463, 472-73 (1982). Further, the Castle decision is not even persuasive in this case, as the circumstances of the two cases are very different.

As we established in our April 1, 1997 motion to dismiss plaintiff Sterling Financial Corporation; cross-motion for summary judgment, and opposition to plaintiffs' motion for partial summary judgment, this case is nearly identical to Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994 (11th Cir. 1991). Guaranty was cited by the Supreme Court in its Winstar decision as a case in which the parties expressly allocated the risk of regulatory change, including changes in the rules governing the use of supervisory goodwill, to the acquirer. United States v. Winstar Corp, 518 U.S. 839, 869 n. 15 (1996). In attempting to distinguish the Guaranty case, plaintiffs cling to the finding in Castle that Guaranty did not apply to the case because "'[i]t is unreasonable to believe that anyone...would agree to a provision that would enable its contracting partner to vitiate the essence of the deal at any time.'" Plaintiffs' reply, p. 24, quoting Castle, 42 Fed. Cl. at 864.

What plaintiffs fail to acknowledge is that, in this case, FIRREA did not vitiate the essence of the deal because there was no agreement to permit Sterling to count supervisory goodwill resulting from the acquisition of Central Evergreen as regulatory capital. In Castle, the plaintiffs relied upon an acquisition approval letter with attached conditions to claim that they

possessed a contractual right to count regulatory goodwill as capital. Here, no such forbearance letter or acquisition approval letter exists.[3] Further, in the Guaranty case, the United States Court of Appeals for the Eleventh Circuit determined that language in the capital maintenance agreement identical to paragraph V.D. of the Sterling Capital Maintenance Agreement superseded a forbearance letter permitting the plaintiffs to count supervisory goodwill as capital. Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991). Here, there is no forbearance letter, and the Capital Maintenance Agreement expressly states that the Government did not agree to forbear from enforcement of its regulations in the event of regulatory change. As set forth in our supplemental motion, the Sterling capital maintenance agreement states as follows: "M. This Agreement is not a waiver of or forbearance from any applicable regulation." P. Supp. App. 164.[4]

In attempting to analogize this case to Castle, plaintiffs fail to acknowledge that there is no document permitting Sterling to count goodwill as capital in connection with the Central Evergreen acquisition. Further, plaintiffs ignore the fact that the language quoted above, stating that the Capital Maintenance Agreement is not a waiver or forbearance from any applicable

---

3/ The Castle court's finding in that case that the risk of regulatory change was not shifted to the acquirer is incorrect, and the subject of a notice of appeal to the United States Court of Appeals for the Federal Circuit. Castle v. United States, 48 Fed. Cl. 187 (2000), appeal docketed, No. 01-5047 (Fed. Cir. Jan 10, 2001).

4/ Plaintiffs claim that our reliance upon this provision itself "vitiate[s] the essence of the deal." Plaintiffs' reply, p. 25. What plaintiffs fail to recognize is that the provision is the essence of the deal. As stated above, this language unambiguously conveys that the parties understood that the Capital Maintenance Agreement was not to be construed as an agreement by the Government to forbear from enforcing its regulations. It could not be clearer.

regulation, was not present in the documents underlying the acquisition in Castle. Consequently, in this case, the parties could not be clearer that the Capital Maintenance Agreement was not intended to supersede or preempt the Government's right to change the regulations applicable to the calculation of regulatory capital, including the rules applicable to the treatment of supervisory goodwill for regulatory capital purposes. Therefore, Castle is inapposite.

**B. The Memorandum Drafted By Dan Byrne Expressly Acknowledges That Sterling Assumed The Risk Of Regulatory Change**

In our supplemental motion, we established that an internal memorandum drafted by Mr. Byrne confirms our interpretation of the Capital Maintenance Agreement, because Mr. Byrne expressly states that "[t]he essence of this provision [section V.M. of the Capital Maintenance Agreement] is that the agreement does not supersede the regulations to which Sterling is subject." Def's App., p. 177. In response, plaintiffs allege that the quoted language is "ambiguous," but do not explain what is ambiguous about it. Plaintiffs' reply, p. 26. To the contrary, it is not ambiguous, but clearly and concisely states Mr. Byrne's belief that the agreement was not intended to supersede the regulations to which Sterling was subject. That is entirely consistent with the 11th Circuit's holding in Guaranty, and only supports our motion for summary judgment on the issue.

Further, plaintiffs reliance upon Mr. Byrne's statement, in the same memorandum, that the "purpose of the agreement is to ensure that Sterling will abide by the business plan," plaintiffs' reply, p. 26, is misplaced, because it only supports our argument. That statement does not place any obligation upon the Government; it binds Sterling only. Therefore, we are entitled to summary judgment.

**C. Plaintiffs' Interpretation Of The 1989 Annual Report Is Contrary To Its Plain Language**

In our supplemental motion, we demonstrated that, even assuming, for the sake of argument, that the Central Evergreen capital maintenance agreement including a forbearance permitting Sterling to count the goodwill associated with the acquisition as regulatory capital, Sterling's annual report establishes that the forbearance expired in 1991, citing to the following language:

> Management believes that it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen.

Def.'s supplemental motion, pp. 37-38, citing Def.'s app. 196. Plaintiffs attempt to explain away this unambiguous language by first claiming that the report's reference to a forbearance expiring in 1991 is a "typo." Plaintiffs' reply, p. 27. Plaintiffs fail, however, to provide a single piece of documentary or testamentary evidence supporting its claim that the language is a typographical error. Consequently, the claim is baseless.

Further, even assuming that plaintiffs are correct in claiming that the sentence should have included the date of "December 31, 1990," the statement still establishes that plaintiffs' understanding of the "forbearance" granted in connection with the Central Evergreen acquisition is that it expired in 1990. Further, plaintiffs' attempt to attribute a different meaning to the sentence by putting it in "context," is, at best, disingenuous, since the context provided by plaintiffs omits the following language of the annual report that unambiguously explains what Sterling meant by the term "forbearance:"

> Although the Association is in compliance with existing regulatory

> capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from the "supervisory acquisitions," which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. No assurance can be given that the forbearance will be honored, however, and any such forbearance would be conditioned upon compliance by the Association with the business plan submitted to the FSLIC by the Association in conjunction with the Central Evergreen transaction.

Id. The plain language of the annual report demonstrates that Sterling made the reference to a forbearance expiring December 31, 1991 in the context of a discussion about its ability to count intangible assets, or supervisory goodwill, as capital. No reference is made to any other form of forbearance. Nonetheless, plaintiffs claim that "Sterling's intent merely was to communicate that it had the right to comply with the modified capital standards agreed to in the business so long as it did so by December 30, 1990." It is not clear what plaintiffs mean by that statement, even assuming that the word "plan" should have followed the word "business." Consequently, Sterling's attempt to engage in a post-hoc reinterpretation of the annual report must be rejected.[5]

---

[5] Further, plaintiffs' attempt to rely upon the district court decision in Sterling Savings Assoc. v. Ryan, 751 F. Supp. 871, 874 (E.D. Wash. 1990), vacated, 959 F.2d 241 (1992), is unavailing. Plaintiffs' reply, pp. 28-29. That decision was vacated, and has no res judicata or collateral estoppel effect on this case.

## III. ASSUMING, FOR THE SAKE OF ARGUMENT, THAT THE GOVERNMENT ACTED INCONSISTENTLY WITH ANY CONTRACTUAL OBLIGATION TO PLAINTIFFS, THE INCONSISTENT ACTION NECESSARILY CEASED AFTER PLAINTIFFS OBTAINED AN INJUNCTION ENJOINING THE GOVERNMENT FROM TAKING ACTION INCONSISTENT WITH THE PURPORTED CONTRACTS

In their reply, plaintiffs attempt, at length, to explain why the injunction they sought and were granted should not be a bar to the award of damages for the period the injunction was in place, and thereafter. Plaintiffs' reply, pp. 29-34. In doing so, they provide citations to numerous factual assertions that they assert are "undisputed." Plaintiffs' reply, pp. 29-30. In fact, however, plaintiffs' factual assertions create genuine issues that preclude the grant of summary judgment on liability.

### A. Plaintiffs' Argument About Pre-Injunction Alleged Damages Is Premature

As a threshold matter, plaintiffs' argument about damages incurred prior to issuance of the injunction are, at best, premature. Plaintiffs' reply, pp. 29-30. Plaintiffs' assertion that it is "undisputed" that Sterling suffered damage prior to the issuance of the injunction is absurd. This briefing is solely about liability - pursuant to an order of the Court dated November 2, 2000, damages discovery does not commence until March 1, 2000. Further, plaintiffs have not established that the actions that they claim inflicted the "damage" constitute breaches of contract, or even relate to the alleged contracts at issue in this case. Plaintiffs' reply, pp. 29. Plaintiffs merely make generalized statements about "restrictions," without providing any basis for concluding that the restrictions resulted from a breach. Consequently, plaintiffs' assertion about the undisputed nature of its purported damages is baseless, and must be rejected.