(a) Prepare an inventory of all assets and liabilities of the CLOSED ASSOCIATION and any Subsidiaries. Such inventory shall be limited to such assets and liabilities as are shown on the books of the CLOSED ASSOCIATION and any Subsidiaries as of the Effective Date or as are reasonably ascertainable during the preparation of the inventory. A copy of the inventory, in such form as the CORPORATION shall determine, will be furnished to the ACQUIRING ASSOCIATION upon completion and approval by the CORPORATION;

(b) Conduct an audit of the CLOSED ASSOCIATION in accordance with generally accepted auditing standards, as modified by the CORPORATION or the Bank Board. A copy of the Initial Audit, in such form as the CORPORATION shall determine, shall be furnished to the ACQUIRING ASSOCIATION upon completion and approval by the CORPORATION. The scope of such audit shall be limited to that which the CORPORATION determines to be necessary to implement this Agreement and shall not include a revaluation of the assets of the CLOSED ASSOCIATION.

§ 7 <u>Indemnification for Undisclosed Liabilities, Unreserved-for Claims and Litigation Challenging the Acquisition</u>.

(a) <u>Indemnifications</u>. To the extent not otherwise reimbursed or Reimbursable, the CORPORATION will indemnify the ACQUIRING ASSOCIATION for, and pay, as provided in § 4(a),

(i) amounts actually incurred and paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement, or compromise of the following Claims and challenges to the Acquisition, and (ii) the reasonable costs and expenses of litigation related to such Claims and to the defense of such challenges to the Acquisition, including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and payable by the ACQUIRING ASSOCIATION in connection with such satisfaction, settlement, or compromise, provided that before such costs and expenses may be debited to the Special Reserve Account, the ACQUIRING ASSOCIATION shall comply with the covenants set forth in § 10; and provided further, that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 7(a); and provided further, that the reports required by § 9(a) and (c), in forms which are satisfactory to the CORPORATION, shall be submitted to the CORPORATION before such costs and expenses shall be paid by the CORPORATION pursuant to § 4(a); and provided further, that the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for such amounts as relate to liabilities or Claims described in this § 7 with respect to any Subsidiary only to the extent of the ACQUIRED ASSOCIATION's investment, which shall be deemed to include both debt and equity, in such Subsidiary as of the Effective Date.

(1) Undisclosed Liabilities. Except as provided in this § 7(a)(1), any liabilities of the CLOSED ASSOCIATION that were not disclosed in or reflected as a liability on the books of the CLOSED ASSOCIATION immediately prior to the Effective Date and which, under GAAP as of the Effective Date consistently applied, are of the type that are reserved for, disclosed or reflected as liabilities but excluding any inadequacy in (or lack of) an asset valuation allowance or specific reserve, provided that in the event that the satisfaction, settlement, or compromise of any such liability or liabilities described in this § 7(a)(1) results in the acquisition by the ACQUIRING ASSOCIATION of an asset or assets, then, at the CORPORATION's election, (A) the ACQUIRING ASSOCIATION shall assign such asset or assets to the CORPORATION without cost to the CORPORATION, or (B) the amount paid by the CORPORATION pursuant to § 7(a) shall be limited to the amount, if any, by which the amounts paid by the ACQUIRING ASSOCIATION in connection with the satisfaction, settlement or compromise of such liability or liabilities exceed the fair market value of the asset or assets, if any, acquired as a consequence of the satisfaction, settlement, or compromise of such liability or liabilities, as determined (i) by agreement between the ACQUIRING ASSOCIATION and the CORPORATION or (ii) by an appraisal performed by an independent appraiser approved by the CORPORATION, the cost of which appraisal shall be paid by the ACQUIRING ASSOCIATION. The CORPORATION's obligation to provide indemnification under this

§ 7(a)(1) shall not extend to liabilities of the CLOSED ASSOCIATION incurred prior to the Effective Date (A) which normally recurred in the CLOSED ASSOCIATION's ordinary course of business and operations, (B) which are ordinarily posted on the books on a periodic basis, and (C) which are in amounts that are materially the same as and can reasonably be predicted from prior postings on the books, including, but not limited to, items such as (i) accrued employee salaries, (ii) utility bills, (iii) accrued interest due to depositors and accountholders, and (iv) accrued interest payable to the Bank, or any other lender to the CLOSED ASSOCIATION or any Subsidiary thereof; provided that, with respect to accrued interest payable to a lender, the underlying obligation to pay principal is reflected on the books.

(2) Unreserved-for Claims. Any Claim against the CLOSED ASSOCIATION, or any Subsidiary thereof, or the ACQUIRING ASSOCIATION as successor to the CLOSED ASSOCIATION, based upon any act or failure to act on the part of the CLOSED ASSOCIATION prior to the Effective Date, whether filed before or after such date, to the extent that such Claim (A) was not adequately reserved for or provision was not made for its payment on the books of the CLOSED ASSOCIATION prior to the Effective Date, and (B) is not fully reimbursed or Reimbursable under any insurance policy, bond, or other provision for funding.

(3) Challenges to the Acquisition. Any action brought by other than the ACQUIRING ASSOCIATION or its

Subsidiaries, Affiliates, creditors, or stockholders, if any, within a period of one year following the Effective Date, to challenge or set aside the Acquisition or this Agreement, to the extent that such action is grounded upon an allegation that an act or failure to act on the part of the Bank Board or the CORPORATION was not in accordance with the Bank Board's or the CORPORATION's enabling legislation, and, in the event that a court of competent jurisdiction, by final order, directs the ACQUIRING ASSOCIATION to divest itself of the assets or liabilities of the CLOSED ASSOCIATION on such ground, the reasonable costs and expenses of such divestiture and any damages due to a breach of contract caused directly by such divestiture; provided that such damages are directly attributable to such act or failure to act on the part of the Bank Board or the CORPORATION.

(b) Pursuit of Related Claims. The ACQUIRING ASSOCIATION shall use its best efforts to reduce or minimize the CORPORATION's indemnity payments under this section by the pursuit of Related Claims. The CORPORATION shall indemnify the ACQUIRING ASSOCIATION for reasonable and related costs and expenses, and such other actual and reasonable costs as may be actually incurred and paid by the ACQUIRING ASSOCIATION in complying with this § 7(b), provided that the ACQUIRING ASSOCIATION complies with the covenants set forth in § 10; and provided further, that the pursuit of Related Claims shall be subject to approval by the CORPORATION, and the reports required by § 9(a)

and (c), in forms satisfactory to the CORPORATION, shall be submitted to the CORPORATION before costs and expenses related to the pursuit of Related Claims shall be paid by the CORPORATION pursuant to § 4(a). All sums recovered from each such Related Claim shall be credited to the Special Reserve Account pursuant to § 4(c) of this Agreement. The CORPORATION's right to recovery on any Related Claim shall survive the termination of this Agreement and shall be paid in cash after such date.

(c) Payments as Contributions. All payments made by the CORPORATION to the ACQUIRING ASSOCIATION under this § 7 shall be considered contributions under this Agreement.

(d) Scope of Indemnifications. The indemnifications provided for in § 7(a) above shall not extend to capital losses on or attributable to assets of the CLOSED ASSOCIATION or which the ACQUIRING ASSOCIATION could be obligated to purchase pursuant to an obligation of the CLOSED ASSOCIATION, including any obligation that the ACQUIRING ASSOCIATION may have to fund commitments of the CLOSED ASSOCIATION.

§ 8 Duplicate Payments. Any cost or expense for which the ACQUIRING ASSOCIATION has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not also be reimbursed to the ACQUIRING ASSOCIATION, or be paid over to or retained by the CORPORATION, under any other

section of this Agreement, even though such cost, expense or recovery may be described in whole or in part in two or more sections of this Agreement.

§ 9 Reports; Records. In the event of the failure of the ACQUIRING ASSOCIATION, where appropriate, to comply with any of the following requirements, the CORPORATION may delay payment of a related charge for reimbursement under this Agreement until, in the CORPORATION's judgment, such requirement is met:

(a) Quarterly Reports. Within 30 days following the end of each Quarter, the ACQUIRING ASSOCIATION shall furnish a report or reports to the CORPORATION, in a format approved by the CORPORATION and supported by such data as, in the CORPORATION'S judgment, may be necessary to verify the report, which shall include:

(1) An accounting of all Debits and Credits to the Special Reserve Account;

(2) Status reports on all current and potential Claims and liabilities (with litigation evaluation reports) that might result in a Debit or Credit to the Special Reserve Account, other than litigation in connection with an uncontested Foreclosure action;

(3) Itemization of payments made by and due from the CORPORATION, which, with respect to charges by the

ACQUIRING ASSOCIATION for reimbursement of attorneys' and accountants' fees pursuant to § 7, shall be supported by the following documentation and by such other documentation as the CORPORATION may request:

(A) Copies of itemized statements of charges received by the ACQUIRING ASSOCIATION from each law firm and accounting firm, which statements shall specify with respect to each Claim, undisclosed liability, cause of action challenging the Acquisition or other matter with respect to which reimbursement is sought: (i) the nature and resulting work product of each of the services performed by each individual attorney and accountant; (ii) the identity of the person who performed each service; (iii) the date on which each service was performed; (iv) the hourly rate charged for each service; and (v) the total number of hours billed for such services; and

(B) Copies of any letters, contracts or other documents which set forth the agreements between the ACQUIRING ASSOCIATION and such law firms or accounting firms concerning the basis on which fees and other compensation due such attorneys or accountants from the ACQUIRING ASSOCIATION are to be computed, and litigation evaluation reports current within 30 days; and

(4) Payments made by and due from the ACQUIRING ASSOCIATION.

(b) Reports on Covered Assets. The ACQUIRING ASSOCIATION shall submit to the CORPORATION reports concerning Covered Assets. Such reports shall be in a form satisfactory to the CORPORATION and shall be submitted within 30 days of the end of each Quarter prior to the Termination Date unless for good cause the CORPORATION extends the time for submission of any report.

(c) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities.

(1) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(i), to engage attorneys or accountants the cost of whose services may be debited to the Special Reserve Account, or otherwise to incur expenses which may be debited to the Special Reserve Account under § 4(a) in connection with the pursuit of a Related Claim, the ACQUIRING ASSOCIATION, promptly upon determining the necessity to engage such attorneys or accountants or otherwise to incur such expenses, shall obtain and submit to the CORPORATION information, in a form satisfactory to the CORPORATION, supported by such supplementary documentation as in the opinion of the CORPORATION is reasonable and necessary to enable the CORPORATION to give informed consent to the ACQUIRING ASSOCIATION's engaging such attorneys or accountants or otherwise incurring such expenses, which information shall include, but shall not be limited to, the following:

(A) the parties to the dispute and the relationships among them;

(B) the nature of the dispute and the basic facts concerning the dispute; and

(C) a description of the specific actions taken by the ACQUIRING ASSOCIATION in pursuit of such Related Claim prior to determining the need to engage attorneys or accountants or otherwise to incur expenses in pursuit of or defense against any such Claim.

(2) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(ii), to prosecute any Related Claim by court action, the ACQUIRING ASSOCIATION, promptly upon determining the necessity for such court action, shall obtain and submit to the CORPORATION a report and evaluation prepared by the attorney handling such Related Claim in a form that is, in the opinion of the CORPORATION and its counsel, reasonable and satisfactory, supported by such supplementary documentation as in the opinion of the CORPORATION or its counsel is reasonable and necessary to enable the CORPORATION to give informed consent to the prosecution of such Related Claim by court action, which report shall include, but shall not be limited to, the following:

(A) the parties to the dispute and the relationships among them;

(B) the nature of the dispute and the basic facts concerning the dispute;

(C) a discussion of the causes of action raised by the dispute and the defenses to such causes of action, including (i) citations to relevant statutes and significant case law, and (ii) the attorney's evaluation of the merits of such causes of action and defenses; and

(D) the attorney's estimate of (i) the time involved in prosecuting the Related Claim by court action, and (ii) the foreseeable costs and expenses, including attorneys' fees, which will be incurred in prosecuting the Related Claim by court action.

(3) In requesting the CORPORATION's written consent, pursuant to § 10(a)(3)(E)(iii) or (iv), to enter into a binding commitment with respect to the satisfaction, settlement, or compromise of any Related Claim, Claim, liability or challenge to the Acquisition described in § 7(a), the ACQUIRING ASSOCIATION, promptly upon determining that the satisfaction, settlement, or compromise of any such Claim, liability or challenge is appropriate, shall obtain and submit to the CORPORATION a report and evaluation prepared by the attorney handling any such Claim, liability or challenge, in a form that is, in the opinion of the CORPORATION and its counsel, reasonable and satisfactory, supported by such supplementary documentation as in the opinion

of the CORPORATION or its counsel is reasonable and necessary to enable the CORPORATION to give informed consent to the satisfaction, settlement, or compromise of such Claim, liability or challenge, which report and supporting documentation shall include, but shall not be limited to, the following:

(A) the information required by subparagraphs (2)(A)-(D) of this § 9(c);

(B) information concerning the status of litigation regarding the Claim, liability or challenge if litigation has been instituted, and, at the request of the CORPORATION, copies of all pleadings or other documents which have been filed in connection with such litigation; and

(C) the precise terms of the proposed satisfaction, settlement, or compromise and the attorney's basis for recommending the proposed satisfaction, settlement, or compromise of such Claim or liability.

(d) Other Reports.

(1) Unless waived by the CORPORATION, in each year the ACQUIRING ASSOCIATION shall submit a report to the CORPORATION, prepared by the ACQUIRING ASSOCIATION's independent auditors and in a form satisfactory to the CORPORATION, showing the total Tax Benefit Items available to the ACQUIRING ASSOCIATION, or any consolidated group of which the ACQUIRING ASSOCIATION is a member ("Taxable Party"), the total Tax Benefit Items,

if any, utilized in such year, and the calculation of the Net Tax Benefits as defined in § 4(c)(6), if any, for such year. Such report shall be submitted, regardless of whether any Net Tax Benefits have been realized by the ACQUIRING ASSOCIATION or any Taxable Party, on the date Net Tax Benefits, if any, are required to be credited to the Special Reserve Account or paid to the CORPORATION pursuant to § 4(c)(6)(C).

(2) The ACQUIRING ASSOCIATION shall provide such other reports concerning the status and condition of any liabilities or assets formerly held by the CLOSED ASSOCIATION as the CORPORATION reasonably may require.

(e) <u>Access to Books and Records</u>. The ACQUIRING ASSOCIATION shall make available to the CORPORATION all books, papers, records, and information of any kind relating to any or all matters subject to the provisions of this Agreement, including any such material or information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates, Subsidiaries, agents or counsel.

(f) <u>Audits and Examinations</u>. The CORPORATION may audit or examine the ACQUIRING ASSOCIATION or any of its Affiliates or Subsidiaries with respect to transactions affecting the implementation of this Agreement at any reasonable time or times chosen by the CORPORATION. Such audits shall be conducted by the CORPORATION at its own expense but, if requested by the

CORPORATION, with the reasonable assistance of personnel of the ACQUIRING ASSOCIATION, whose salaries and reasonable expenses shall be paid by the ACQUIRING ASSOCIATION without reimbursement from the CORPORATION.

(g) Final Accounting. Within 90 days of the Termination Date, or such longer time as may be required pursuant to § 18 or as the CORPORATION may permit, the ACQUIRING ASSOCIATION shall render to the CORPORATION a final accounting which shall include such information and be in such form as the CORPORATION may reasonably request.

(h) Change of Procedure. By mutual written consent, the parties hereto may agree to alter, change or simplify the reports and proceedings required by this § 9.

§ 10 Covenants of the ACQUIRING ASSOCIATION.

(a) Administration of Assets and Liabilities. The failure of the ACQUIRING ASSOCIATION to comply in all material respects with any of the following covenants with respect to any asset or liability of the CLOSED ASSOCIATION or with respect to any Related Claim shall result in the disallowance of Debits to the Special Reserve Account that are related to such failure to comply or the adjustment of a contribution or payment by the CORPORATION that is related to such failure to comply:

(1) Management Standard. The ACQUIRING ASSOCIATION shall administer the assets, liabilities and Claims

to which it succeeded from the CLOSED ASSOCIATION employing the standard of prudent business practice to be used by the ACQUIRING ASSOCIATION in administering assets, liabilities and Claims of the ACQUIRING ASSOCIATION not obtained from the CLOSED ASSOCIATION. Furthermore, the ACQUIRING ASSOCIATION shall, in accordance with the management standard described in this § 10(a)(1), minimize losses and maximize gains and recoveries in the best interests of the ACQUIRING ASSOCIATION and the CORPORATION.

(2) Pursuit of Claims.

(A) The ACQUIRING ASSOCIATION shall, in accordance with the management standard described in § 10(a)(1), pursue and file actions on all potentially recoverable Related Claims which accrue to the ACQUIRING ASSOCIATION as successor in interest to the CLOSED ASSOCIATION or arise otherwise, including, but not limited to, claims under the appropriate fidelity bond or bonds or insurance policy or policies of the ACQUIRING ASSOCIATION or the CLOSED ASSOCIATION, whether discovered before or after the Effective Date.

(B) The ACQUIRING ASSOCIATION shall notify the CORPORATION before pursuing any Related Claim which could result in a Debit or Credit to the Special Reserve Account. The ACQUIRING ASSOCIATION agrees to institute any legal action with respect to a Related Claim requested by the CORPORATION in connection with this Agreement. If the ACQUIRING ASSOCIATION objects to any such request, it shall provide its reasons in

writing to the CORPORATION. If after receipt of such statement the CORPORATION nevertheless determines that a reasonable basis exists for instituting such legal action, then the ACQUIRING ASSOCIATION shall institute such action. The ACQUIRING ASSOCIATION shall be indemnified by the CORPORATION for all losses resulting from, and the reasonable costs and expenses of pursuing the action, excepting only losses arising from and to the extent attributable to the ACQUIRING ASSOCIATION's negligence or lack of due diligence in pursuing or prosecuting the action.

(3) Conduct of Litigation. With respect to all liabilities, Claims, and challenges that could result in or affect a Debit or Credit to the Special Reserve Account, the ACQUIRING ASSOCIATION, as appropriate, shall:

(A) Keep the CORPORATION fully informed of their status by the timely filing of current reports pursuant to § 9(a) and (c);

(B) Observe the right of the CORPORATION to monitor and direct their defense or prosecution, including the right to direct the ACQUIRING ASSOCIATION to file a petition to remove an action to the appropriate court or to appeal any determination of any court; provided that the CORPORATION shall bear the cost of removal or appeal and of monitoring and directing such defense or prosecution;

(C) Authorize the CORPORATION, upon the CORPORATION's election and at the CORPORATION's expense and with its own attorneys, to defend against, or to prosecute in the name of the ACQUIRING ASSOCIATION or the CORPORATION, as the case may be, any such Claim, liability, or challenge, and cooperate fully with the CORPORATION in such defense or prosecution, including, but not limited to, the furnishing to the CORPORATION of all applicable books, records, and other information in the possession of the ACQUIRING ASSOCIATION or any of its Affiliates, Subsidiaries, agents or counsel;

(D) At the request of the CORPORATION, assign to the CORPORATION and subrogate the CORPORATION to any right, title, or interest of the ACQUIRING ASSOCIATION in any such Claim, liability or challenge, any related defense (including counterclaims or set-offs) and any proceeds, and, in the event of such assignment, cooperate fully with the CORPORATION in the defense or prosecution of any such Claim, liability or challenge, including, but not limited to, the furnishing to the CORPORATION of all applicable books, records, and other information that are in the possession of the ACQUIRING ASSOCIATION, or any of its Affiliates, Subsidiaries, agents or counsel; <u>provided</u> that if a Claim had a value on the books and records of the CLOSED ASSOCIATION immediately prior to the Effective Date, the ACQUIRING ASSOCIATION shall Debit such value, as adjusted or

determined in accordance with the accounting principles required by this Agreement, to the Special Reserve Account; and

(E) Obtain the CORPORATION's written consent before (i) engaging attorneys or accountants to pursue a Related Claim, the cost of whose services may be chargeable to the CORPORATION pursuant to § 7, or otherwise incurring expenses in connection with a Related Claim that may be chargeable to the CORPORATION pursuant to § 7, (ii) prosecuting any Related Claim by court action, (iii) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Related Claim, or challenge to the Acquisition, or (iv) entering into any binding commitment with respect to the satisfaction, settlement, or compromise of any Claim for which the CORPORATION is obligated to indemnify the ACQUIRING ASSOCIATION under this Agreement, other than a Related Claim or challenge to the Acquisition, unless such satisfaction, settlement, or compromise would involve payment by the ACQUIRING ASSOCIATION of an amount not in excess of $25,000.00, or is entered into pursuant to an adjudication by a court of competent jurisdiction which, with the permission of the CORPORATION, the ACQUIRING ASSOCIATION has not appealed.

(4) Covered Asset Restrictions. The ACQUIRING ASSOCIATION shall not, without the CORPORATION's written consent, unless the CORPORATION waives the following requirements in writing:

(A) lease any Covered Asset for a fixed term of more than one year;

(B) engage the services of any accountant, attorney, consultant, managing agent, or other professional in connection with the management or administration of any Covered Asset the cost of whose services may be chargeable to the CORPORATION pursuant to § 4(a); or

(C) extend, modify, or sell at a loss any loan or contract that is a Covered Asset or extend or modify any loan or contract that could become a Covered Asset and result in a Debit to the Special Reserve Account; provided that, at the direction of the CORPORATION, the ACQUIRING ASSOCIATION shall sell any such loan or contract.

(5) Covered Asset Requirements. The ACQUIRING ASSOCIATION shall, unless the CORPORATION waives such requirement in writing:

(A) Submit to the CORPORATION, upon its request, an independent appraisal, acceptable to the CORPORATION, of any Covered Asset;

(B) Promptly institute Foreclosure proceedings, as provided in § 12, with respect to any Covered Asset that is a loan at least 90 days delinquent, unless the

CORPORATION has given written approval for an alternative disposition;

(C) Proceed promptly, within the procedures provided for in § 11 and in accordance with prudent business practice, with the Liquidation of any Real Estate Owned or Repossessed Personal Property that is a Covered Asset;

(D) Retain all written offers to purchase any Covered Asset pending inspection by the CORPORATION and not dispose of any such offer without the CORPORATION's prior written approval;

(E) In accordance with the management standard described § 10(a)(1), cause each Covered Asset or the property securing such asset to be insured against loss or damage by fire (extended coverage), flood and any other such hazards that may normally be encountered with respect to such property and, to the extent applicable, in accordance with § 571.4 of the Insurance Regulations, 12 C.F.R. § 571.4 (1987), or any successor regulation. Where appropriate, all insurance contracts shall contain the standard mortgagee loss payable clause in favor of the ACQUIRING ASSOCIATION; and

(F) Finance the disposition of Covered Assets in accordance with the ACQUIRING ASSOCIATION's normal underwriting standards, and without assistance from the CORPORATION except as may otherwise be provided pursuant to § 4(a) of this Agreement.

maximize Net Tax Benefits that may result in a Credit to the Special Reserve Account pursuant to § 4(c)(6), payment to the CORPORATION, or reduction in the loss incurred by the CORPORATION; provided that this covenant shall not be interpreted as requiring the ACQUIRING ASSOCIATION or any Taxable Party to take any return position that (1) would be inconsistent with a written position of the Internal Revenue Service, unless the CORPORATION, after receipt of a request from the ACQUIRING ASSOCIATION, which request shall not be unreasonably denied, provides an opinion of independent tax counsel at the CORPORATIONs expense, to the effect that such return position has a substantial likelihood of success, or (2) would increase its tax liability. In the event that any such return position should be challenged by the Internal Revenue Service, the taxpayer shall (with the prior consent and at the expense of the CORPORATION, including reasonable attorneys' fees) take such steps as may reasonably be necessary to contest such challenge (whether by way of contesting a proposed deficiency or by way of a refund claim); provided that the taxpayer may cease to defend such return position if it determines in good faith after prior consultation with the CORPORATION that further defense of such return position would adversely affect its federal income tax posture viewed as a whole. The covenants in this § 10(c) shall survive the Termination Date.

§ 11 Sale and Repair of Covered Assets.

(a) Compliance with the terms of this Section shall be a condition precedent to the ACQUIRING ASSOCIATION's right to Debit to the Special Reserve Account, pursuant to § 4(a), the amount of any loss on the sale of a Covered Asset, or to add to the Book Value of any Real Estate Owned or Repossessed Personal Property that is a Covered Asset, any expenditure to repair, rehabilitate, or complete such Real Estate Owned or Repossessed Personal Property, or portion thereof, that exceeds the applicable limitation of § 11(e).

(b) As soon as practicable and not less than 45 days prior to the offering for sale of a Covered Asset that is a Covered Asset as of the Effective Date, and otherwise within 45 days after the completion of a Foreclosure of a loan that constitutes a Covered Asset and results in the acquisition of Real Estate Owned or Repossessed Personal Property, the ACQUIRING ASSOCIATION shall provide to the CORPORATION a schedule of each such Covered Asset setting forth a description of the Covered Asset, its Book Value, its estimated market value, the recommended listing sales price, the minimum sales price, the proposed terms of sale, and the estimated selling costs.

(c) Within 30 days after receipt of a schedule required by § 11(b), the CORPORATION shall:

(1) Approve the proposed minimum sales price and terms of sale for each Covered Asset, which may then be sold at not less than such approved minimum sales price, upon the approved sales terms, without further notice to the CORPORATION; or

(2) Disapprove the proposed minimum sales price or the terms of sale for any Covered Asset and require the ACQUIRING ASSOCIATION to order an appraisal. The cost of such appraisal shall be a Debit to the Special Reserve Account pursuant to § 4(a)(2). Within ten days of receipt of the appraisal, the CORPORATION shall establish a minimum sales price and the terms of sale. Thereafter the ACQUIRING ASSOCIATION may sell such asset, at not less than the approved price and upon the approved sales terms, without further notice to the CORPORATION; or

(3) Purchase such asset at the least of: (i) Book Value; (ii) appraised value, as determined by an independent appraisal acceptable to the CORPORATION; and (iii) the minimum sales price proposed by the ACQUIRING ASSOCIATION (minus, in all cases, estimated selling costs). Purchases by the CORPORATION pursuant to this § 11(c)(3) shall be treated as purchases by third parties for the purposes of §§ 4(a)(1) and 4(c)(1). The amount payable by the CORPORATION in connection with such a purchase shall be debited to the Special Reserve Account as of the purchase date if the purchase occurs prior to

the Termination Date and shall be paid to the ACQUIRING ASSOCIATION by the CORPORATION in immediately available funds within ten days following conveyance to the CORPORATION of the ACQUIRING ASSOCIATION's right, title, and interest in such asset if the purchase occurs after the Termination Date.

(d) The CORPORATION shall evaluate the marketing efforts made by the ACQUIRING ASSOCIATION, all written offers to purchase, current condition, and all other pertinent factors with respect to any Covered Asset on which a sales contract has not been accepted within 90 days from the date on which the CORPORATION approved its sales price. The CORPORATION thereafter shall advise the ACQUIRING ASSOCIATION in writing concerning a revised sales price or additional marketing efforts.

(e) The ACQUIRING ASSOCIATION shall not (1) expend for the repair, rehabilitation or completion of any Real Estate Owned that is a Covered Asset an amount in excess of $10,000.00 for a residential property, or in excess of $5,000.00 per family unit plus $20,000.00 for common areas, up to a maximum of $40,000.00 for a multi-family building, or in excess of $20,000.00 for a commercial property, or (2) expend any sum for the repair, rehabilitation or completion of any Covered Asset that is not Real Estate Owned, without the prior written consent of the CORPORATION, unless the CORPORATION expressly waives this requirement in writing or unless an emergency exists, such as a

deficiency of the asset that violates a provision of the sanitary, health, building, or police code of the municipality, county or state in which the asset is located or that affects its habitability, in which case the ACQUIRING ASSOCIATION may, without the CORPORATION's prior consent, expend such sums as may be necessary to correct or prevent such emergency.

(f) With respect to any Real Estate Owned that is a Covered Asset and for which the estimated costs of repair, rehabilitation, or completion exceed the limitations of § 11(e), the ACQUIRING ASSOCIATION agrees that it will prepare a schedule showing: (1) Book Value, (2) estimated market value "as is", (3) estimated cost to cure, (4) estimated time for completion, and (5) estimated market value as repaired or completed. Schedules for all such real estate shall be submitted within 180 days from the Effective Date and thereafter as necessary as requested by the CORPORATION. Within 30 days of receipt of such a schedule, the CORPORATION will advise the ACQUIRING ASSOCIATION concerning the action it shall take with respect to each asset that appears on the schedule.

(h) The CORPORATION shall have the right at any time to interview real estate agents, brokers, and others to whom listings have been given pursuant to this Section.

(i) The CORPORATION and the ACQUIRING ASSOCIATION by mutual agreement may alter the procedures required by this

§ 11, including changing the dollar limits of § 11(e); provided that any such change does not increase the ACQUIRING ASSOCIATION's duties, obligations, or expense of administration under this Agreement. The ACQUIRING ASSOCIATION and the CORPORATION agree to cooperate with each other to facilitate any possible simplification of procedures under this § 11.

§ 12 Foreclosures.

(a) Prior to the Foreclosure of any instrument securing a loan that is, or may become, a Covered Asset, the ACQUIRING ASSOCIATION shall, upon the CORPORATION's request, inspect and evaluate or appraise the security property to determine its recoverable value, taking into consideration all circumstances affecting marketability of title, including the existence of any mechanic's or materialman's liens or other encumbrances on the security property. The cost of any appraisal pursuant to this § 12(a) shall be a Debit to the Special Reserve Account pursuant to § 4(a)(2).

(1) If, in the opinion of the ACQUIRING ASSOCIATION, the security property for such loan has recoverable value and the Book Value of the related Covered Asset is less than $100,000.00, the ACQUIRING ASSOCIATION shall bid as follows:

(A) If there are no other bidders, the ACQUIRING ASSOCIATION may bid any amount which, in the ACQUIRING ASSOCIATION's opinion, will protect its interests and those of

the CORPORATION and is in accordance with the management standard described in § 10(a)(1). In no event, however, shall the amount of the bid be in excess of the principal amount of the indebtedness secured by such property immediately before Foreclosure, plus:

(i) All costs and expenses of Foreclosure;

(ii) Any taxes and hazard insurance premiums due, but unpaid as of the date of Foreclosure;

(iii) Any accrued and unpaid interest on the principal amount of the indebtedness; and

(iv) Any existing encumbrances (such as paving or sewage liens).

(B) If there are other bidders, the ACQUIRING ASSOCIATION may bid an amount not in excess of appraised value, or the amount provided in (A) above if such amount is less than the appraised value; <u>provided</u> that, in the ACQUIRING ASSOCIATION's opinion, such bid will protect its interests and those of the CORPORATION.

(2) If the ACQUIRING ASSOCIATION proposes to foreclose on a security property which has a recoverable value and the Book Value of the related Covered Asset is greater than $100,000.00, it shall so notify the CORPORATION in writing within

30 days of commencing Foreclosure and such notice shall state the loan's Book Value and all interest due thereon, the ACQUIRING ASSOCIATION's estimate of the market value of the property securing such instrument, and the amount of the bid proposed for such sale (the "Notice"). The ACQUIRING ASSOCIATION shall notify the CORPORATION of the Foreclosure sale date when it is determined. Within 30 days of receipt of the Notice, the CORPORATION shall:

(A) Approve the proposed bid; or

(B) Advise the ACQUIRING ASSOCIATION of any other amount it should bid at such sale; or

(C) Instruct the ACQUIRING ASSOCIATION to order an independent appraisal of the property securing such loan by an appraiser acceptable to the CORPORATION, in which case the CORPORATION shall notify the ACQUIRING ASSOCIATION, within ten days after receipt of an appraisal acceptable to the CORPORATION, of the amount to be bid at the Foreclosure sale.

(b) The ACQUIRING ASSOCIATION shall advise the CORPORATION monthly of all completed Foreclosures subject to § 12(a), citing the Book Value, appraised value, and the amount of the successful bid in each case. In addition, if the successful bid, whether by the ACQUIRING ASSOCIATION or another party, results in a deficiency, the ACQUIRING ASSOCIATION shall advise the CORPORATION concerning the likelihood of securing a judgment against the defaulting debtor.

(c) A deed in lieu of foreclosure or any equivalent instrument may not be obtained and no consideration shall be paid to the debtor under such deed without the written consent of the CORPORATION.

(d) In the case of any instrument securing a non-mortgage loan that is or may become a Covered Asset, the ACQUIRING ASSOCIATION shall follow up on such procedures and take such actions as the CORPORATION may request.

(e) Substantial good faith compliance with the provisions of this Section by the ACQUIRING ASSOCIATION shall be a condition precedent to the ACQUIRING ASSOCIATION's right to Debit the Special Reserve Account with respect to any loss resulting from a Foreclosure.

§ 13 <u>CORPORATION's Right to Assignment of Related Claims</u>.

(a) At any time prior to the Termination Date and until the later of (i) 90 days after the Termination Date, or (ii) termination of the CORPORATION's obligation to provide assistance pursuant to § 18(b), the CORPORATION shall have the right to obtain from the ACQUIRING ASSOCIATION an assignment of (1) any Related Claim or (2) the Net Proceeds Received from the Liquidation of any such Related Claim.

(b) If any Related Claim has a value reflected on the CLOSED ASSOCIATION's books immediately prior to the Effective Date, the CORPORATION shall pay for such assignment that value, as adjusted by the Initial Audit and as thereafter adjusted or determined in accordance with the accounting principles required by this Agreement. The purchase price shall be debited to the Special Reserve Account pursuant to § 4(a)(6) as of the assignment date if the assignment occurs prior to the Termination Date, or be paid in cash to the ACQUIRING ASSOCIATION by the CORPORATION within ten days after completion of such assignment if the assignment occurs after the Termination Date.

(c) If the Net Proceeds Received by the CORPORATION (1) upon the Liquidation of any Related Claim assigned to the CORPORATION or (2) as a result of an assignment of Net Proceeds Received exceed the purchase price paid for such assignment, then the amount of such excess shall be retained by the CORPORATION to the extent that it has made contributions under this Agreement other than the amount paid to purchase such assignment; provided that any recoveries in excess of the aggregate amount of the CORPORATION's contributions made under this Agreement shall be paid to the ACQUIRING ASSOCIATION and, if made prior to the Termination Date, credited to the Special Reserve Account pursuant to § 4(c)(4).

(d) In order to facilitate the assignment of any Related Claim to the CORPORATION, the ACQUIRING ASSOCIATION shall, at the CORPORATION's request:

(1) Provide the CORPORATION with such information regarding the nature of such Related Claim and all documents relating to such Related Claim as the ACQUIRING ASSOCIATION has in its possession;

(2) Execute and deliver such instruments of assignment or transfer and make endorsements in such form and manner, and at such time, as the CORPORATION requires; and

(3) Execute and deliver all other instruments that the ACQUIRING ASSOCIATION possesses and the CORPORATION deems necessary or requisite to complete such assignments or transfers.

(e) The ACQUIRING ASSOCIATION agrees to use its best efforts, cooperate fully and to take all such actions as are necessary to assist the CORPORATION in the pursuit of Related Claims.

§ 14 <u>CORPORATION's Right to Purchase Covered Assets</u>.

(a) At any time prior to the Termination Date and until the later of (i) 90 days after the Termination Date or (ii) termination of the CORPORATION's obligation to provide assistance pursuant to § 18(c), the CORPORATION shall have the

right to purchase at Book Value any or all Covered Assets that have not been liquidated prior to the ACQUIRING ASSOCIATION's receipt of the CORPORATION's notice that it shall exercise its right to purchase; provided that the purchase price of an asset purchased pursuant to § 11(c)(3) shall be the price provided therein.

(b) The purchase price shall be debited to the Special Reserve Account as of the purchase date if the purchase occurs prior to the Termination Date, or shall be paid to the ACQUIRING ASSOCIATION by the CORPORATION in immediately available funds within ten days following conveyance to the CORPORATION of the ACQUIRING ASSOCIATION's right, title, and interest in such asset if the purchase occurs after the Termination Date. The excess, if any, of the purchase price over the fair market value of such asset shall be deemed to be a contribution by the CORPORATION as provided in § 3(d).

(c) In order to facilitate such sale to the CORPORATION, the ACQUIRING ASSOCIATION shall, at the CORPORATION's request:

(1) Provide the CORPORATION with such information as the CORPORATION deems necessary regarding the nature or condition of the Covered Asset and documenting the Book Value of such Covered Asset;

(2) Execute and deliver such instruments of sale, grant, conveyance, or transfer and make endorsements in such form and manner and at such time as the CORPORATION shall require; and

(3) Execute and deliver all such other instruments together with all insurance policies, title policies, and title certificates which the ACQUIRING ASSOCIATION possesses and are necessary or requisite, in the opinion of the CORPORATION, to complete such sale, grant, conveyance, or transfer.

(d) The Net Proceeds Received by the CORPORATION as a result of Liquidation of any Covered Asset purchased pursuant to § 11(c)(3) or this § 14 in excess of the purchase price paid by the CORPORATION shall be retained by the CORPORATION to the extent it has made contributions under this Agreement that have not been repaid, and the remainder, if any, shall be paid to the ACQUIRING ASSOCIATION.

§ 15 Disclosure of Agreement. Except as otherwise required by law, the ACQUIRING ASSOCIATION shall not, without the prior written consent of the CORPORATION, disclose the terms of this Agreement or the obligation of the CORPORATION to indemnify the ACQUIRING ASSOCIATION to any person other than their respective employees or agents. This § 15 shall survive the Termination Date.

§ 16 Accounting Principles. Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving or relating to the Acquisition or this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiquity shall be resolved in a manner consistent with such regulations and the Bank Board's resolutions or actions relating to the Acquisition or this Agreement. If there is a conflict between such regulations and the Bank Board's resolutions and actions relating to the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern. For purposes of this Section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently changed, amended, clarified or interpreted by the Bank Board, its staff, or the Financial Accounting Standards Board ("FASB"), or any successor organizations of either. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern. The valuation of real estate assets shall be in accordance with the Bank Board's regulations, 53 Fed. Reg. 372 (January 6, 1988), to be codified at 12 C.F.R. Parts 563 and 571 (1988), and as such

regulations may subsequently be changed, amended, clarified or interpreted by the Bank Board or its staff.

§ 17 Notices.

(a) Any notices or other communication required or permitted under this Agreement, unless otherwise specifically provided for, shall be deemed given if sent by first class mail, postage prepaid, to a party at its address set forth below or at such other address as the party shall furnish in writing:

If to the ACQUIRING ASSOCIATION:

Sterling Savings Association
Attn: Daniel G. Byrne,
Senior Vice President - Finance
N. 120 Wall
Spokane, Washington 99201-0696

If to the CORPORATION:

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
Attn: Director, Financial Assistance Division
1700 G Street, N.W.
Washington, D.C. 20552

(b) Unless otherwise specifically provided for, if this Agreement requires that notice be given within a certain period of time, notice shall be deemed given as of the date of posting.

§ 18 Termination of Agreement.

(a) Except as otherwise provided in this Agreement, the obligations of the parties hereto, including, without limitation, the obligations of the CORPORATION to make payments and contributions pursuant to this Agreement, shall

terminate on the Termination Date; provided, however, that in the event that a receiver is appointed for the purpose of liquidating the ACQUIRING ASSOCIATION, or the ACQUIRING ASSOCIATION ceases to be an institution the accounts of which are insured by the CORPORATION, or its successor, this Agreement and all obligations of the CORPORATION under it shall terminate upon the effective date of such occurrence.

(b) Upon the Termination Date, the net Credit or Debit balance of the Special Reserve Account, if any, shall be paid or distributed in accordance with the provisions of § 3.

(c) Notwithstanding termination of this Agreement as described in § 18(a) above, the CORPORATION shall indemnify the ACQUIRING ASSOCIATION for any loss arising from liabilities and Claims described in § 7(a), including the reasonable costs and expenses of related litigation actually incurred and payable by the ACQUIRING ASSOCIATION, and for the reasonable costs and expenses actually incurred and payable by the ACQUIRING ASSOCIATION in the pursuit of a Related Claim pursuant to § 7(b); provided that any such Claim or liability is in litigation on the Termination Date; and provided further, that the ACQUIRING ASSOCIATION continues to observe after the Termination Date all applicable reporting requirements, covenants, agreements of cooperation and agreements for the use of best efforts set forth in this Agreement; and provided further, that the ACQUIRING ASSOCIATION within ten days of receipt pays to the CORPORATION

any recoveries that prior to the Termination Date would have been credited to the Special Reserve Account pursuant to § 4(c); and provided further, that the ACQUIRING ASSOCIATION continues to pay to the CORPORATION Net Tax Benefits in accordance with § 4(c)(6)(G); and provided further, that the obligation of the CORPORATION stated in this subsection (c) shall terminate as stated in the proviso to § 18(a).

(d) Notwithstanding § 18(a), the CORPORATION shall consider and act upon in accordance with this Agreement all reports, applications, requests and other submissions that are subject to the CORPORATION's approval, consent or other action and that are actually received by the CORPORATION prior to the Termination Date, and the ACQUIRING ASSOCIATION shall cooperate in the resolution of all such pending submissions as contemplated in this Agreement. The final accounting required by § 9(g) shall take account of all actions taken and determinations made by the CORPORATION pursuant to this § 18(d) and any related provisions of this Agreement.

§ 19 Rights and Forbearances. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by any party in exercising or partially exercising any such right, power, or remedy shall not preclude its further exercise.

§ 20 Governing Law. To the extent that Federal law does not control, this Agreement and the parties' rights and obligations under it shall be governed by the law of the State of Washington. Nothing in this Agreement shall require any unlawful action or inaction by either party.

§ 21 Entire Agreement; Severability.

(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Acquisition or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Acquisition and this Agreement.

(b) If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding upon the CORPORATION the ACQUIRING ASSOCIATION.

§ 22 Counterparts; Modifications; Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 23 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors and assigns, but this Agreement may not be assigned by any party, nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation or otherwise, without the prior written consent of the CORPORATION.

§ 24 Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

§ 25 Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failure of the CLOSED ASSOCIATION may be prevented, the savers and other creditors of the CLOSED ASSOCIATION may be protected against losses, the thrift and financing needs of the communities in which the CLOSED ASSOCIATION's offices are located may be served, the ACQUIRING ASSOCIATION and the CORPORATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described in this Section.

In WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers or agents.

STERLING SAVINGS ASSOCIATION

By: [signature]

Attest: Daniel L. Byrne

Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Susan M. Swenson

Attest: [signature]

Its: Designee, Executive Director, OFSLI

**EXHIBIT A**

**Date as of 3/31/88**

| BORROWER/ PROJECT NAME | PROPERTY DESCRIPTION | LOCATION | PRINCIPAL BALANCE | EXISTING RESERVES | NET BOOK VALUE |
|---|---|---|---|---|---|
| Sunwood Inn | 80 unit motel | Sierra Vista, AZ | 1,164,000 | 0 | 1,164,000 |
| Embar Equities [A] | commercial bldg | Seattle, WA | 507,592 | 251,391 | 256,201 |
| H.T. Fuel | bulk plant | Pasco, WA | 454,795 | 162,026 | 292,769 |
| TOTAL LOANS [B] | | | 2,126,387 | 413,417 | 1,712,970 |
| Viking Villa (SOLD) | multifamily | Las Vegas, NV | — | -- | -- 0 |
| Arby's Restaurant [C] | restaurant | Kaiser, OR | 661,399 | 227,966 | 433,433 |
| Leisure Firs | multifamily | Tumwater, WA | 689,405 | 207,843 | 481,562 |
| Clairemont Condos | condos | Phoenix, AZ | 953,031 | 236,995 | 716,036 |
| D&B Properties | commercial bldg | The Dalles, OR | 356,986 | 226,226 | 130,760 |
| Golden West Motel (SOLD) | motel | Pasco, WA | — | — | 0 |
| 10-Plex Apts. | multifamily | Pasco, WA | 100,000 | 60,400 | 39,600 |
| La Posada | R/E development | Colorado Springs, CO | 805,158 | 270,979 | 534,179 |
| Casa Del Prado (Windsor) | R/E development | Puyallup, WA | 1,474,780 | 60,612 | 1,414,168 |
| Sleep Inn | motel | Tucson, AZ | 652,308 | 0 | 652,308 |
| International Wildlife | museum | Tucson, AZ | 78,983 | 0 | 78,983 |
| TOTAL REO | | | 5,772,050 | 1,266,876 | 4,505,174 |
| Grace Terrace | multifamily | Tacoma, WA | 1,912,284 | 95,000 | 1,817,284 |
| TRI-WEST MORTGAGE INVESTMENT [D] | | | 1,912,284 | 95,000 | 1,817,284 |
| TOTAL COVERED ASSETS | | | $9,810,721 | 1,799,438 | 8,011,283 |

CHAIRMAN OF THE FEDERAL HOME LOAN BANK BOARD

Order No. 807

Date: April 7, 1988

Pursuant to the powers and authority vested in or exercisable by me as Chairman of the Federal Home Loan Bank Board ("Bank Board") or otherwise, including, but not limited to, those under Reorganization Plans No. 3 of 1947 and No. 6 of 1961 respecting personnel matters, Lawrence W. Hayes, F. Clement Dinsmore, Jefferson Davis, Mary Rawlings-Milton, Theresa J. Parker, Jacquelyn J. Edwards, Lawan Young, Valerie A. Mullins, John C. Henry, Eric L. Richard, and Pamela Ward Bort are each hereby appointed Assistant Secretary to the Bank Board for the purposes of (1) signing, executing, attesting, or certifying resolutions or other documents of the Bank Board issued or authorized this date concerning the appointment of a receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), and the acquisition ("Acquisition") of substantially all of the assets and liabilities of the Association by Sterling Savings Association, Spokane, Washington, and other documents provided for in, by, or necessary to implement such resolutions; (2) delivering or accepting delivery of any notice from or to the Bank Board or the Federal Savings and Loan Insurance Corporation with respect to the Acquisition; and (3) performing other functions of the Secretary to the Bank Board necessary or appropriate for the implementation of such resolutions.

/s/ M. Danny Wall
M. Danny Wall
Chairman

# Federal Home Loan Bank Board





**To all to whom these presents shall come, Greeting:**

*I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:*

Copy of Resolution No. 88-249, adopted by the Federal Home Loan Bnak Board on April 7, 1988.

In testimony whereof, I, John M. Buckley, Jr. *Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this* 12th *day of* April, *19*88

[signature]
*Secretary to the Federal Home Loan Bank Board*

A

# FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P

Date: April 7, 1988

## Recitals

WHEREAS, Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), is a state-chartered stock savings and loan association incorporated under the laws of the State of Washington, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"); and

WHEREAS, Pursuant to § 406(c)(1)(B) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(c)(1)(B) (1982) ("§ 406(c)(1)(B)"), the Federal Home Loan Bank Board ("Bank Board") has exclusive power and jurisdiction to appoint the FSLIC as sole conservator or receiver for an insured institution other than a Federal association in the event that the Bank Board determines that any of the grounds specified in § 5(d)(6)(A)(i), (ii), or (iii) of the Home Owners' Loan Act of 1933, as amended ("HOLA"), 12 U.S.C. § 1464(d)(6)(A)(i), (ii), or (iii) (1982), exists with respect to such insured institution; and

WHEREAS, Pursuant to subsection (ii)(I) of § 406(c)(1)(B), the authority conferred by § 406(c)(1)(B) may be exercised without delay with respect to the Association upon receipt of the written approval of the State official having jurisdiction over the Association that the grounds specified by the Bank Board for its exercising such authority exist; and

WHEREAS, Pursuant to subsection (i)(II) of § 406(c)(1)(B), in a case in which the Bank Board has exercised its power and jurisdiction under subsection (i)(I) of § 406(c)(1)(B), the FSLIC shall have the same powers and duties with respect to an insured institution other than a Federal association as are conferred upon it under § 406(b) of the NHA, 12 U.S.C. § 1729(b) (1982), as amended, with respect to a Federal association; and

WHEREAS, Pursuant to § 406(c)(3) of the NHA, 12 U.S.C. § 1729(c)(3) (1982), in any case in which the FSLIC is appointed receiver for an insured institution pursuant to § 406(c)(1) of

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)



the NHA, 12 U.S.C. § 1729(c)(1) (1982), the provisions of § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), shall be applicable in the same manner and to the same extent as if such institution were a Federal association with respect to which the FSLIC had been appointed receiver; and

WHEREAS, The Bank Board has considered a memorandum and accompanying exhibits from the General Counsel - Regulatory Affairs of the Federal Home Loan Bank of Seattle, Seattle, Washington ("Seattle Bank Counsel") dated April 6, 1988, with which memorandum the General Counsel of the Bank Board has concurred, and memoranda and accompanying exhibits from the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle, Seattle, Washington, dated March 31, 1988, the S Memorandum having been concurred in by the Executive Director, Office of Regulatory Policy, Oversight and Supervision and the Issues Memorandum having been concurred in by the Executive Director of the FSLIC (copies of which memoranda are in the Minute Exhibit File), and the balance of the administrative record submitted to it:

Ground for Appointment

NOW, THEREFORE, IT IS RESOLVED, That, for the reasons set forth in the aforesaid memorandum from the General Counsel - Regulatory Affairs of the Federal Home Bank of Seattle, and on the basis of the administrative record submitted to it, including, but not limited to, oral presentations made at the Bank Board's meeting, the Bank Board hereby finds and determines that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association in that the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders; and

Notice to State Official

RESOLVED FURTHER, That the Secretary or an Assistant Secretary to the Bank Board, or an agent of the FSLIC, shall cause a letter to be delivered to the Supervisor, Division of Savings and Loans, State of Washington ("Supervisor"), notifying the Supervisor of

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



the Bank Board's determination of the existence of the ground specified above for the appointment of the FSLIC as sole receiver for the Association, and requesting written approval that the ground specified exists, provided that the final form of such letter shall be approved by the Office of the General Counsel ("OGC"); and

RESOLVED FURTHER, That, upon delivery of such letter to the Supervisor, it shall be deemed to have been received by the official of the State of Washington having jurisdiction over the Association within the meaning of subsection (ii)(I) of § 406(c)(1)(B); and

Appointment of Receiver

RESOLVED FURTHER, That the Bank Board, pursuant to § 406(c)(1)(B), hereby appoints the FSLIC as sole receiver for the Association ("Receiver") for the purpose of liquidation, provided that the exercise of this appointment shall not be effective, and this appointment shall not be exercised, unless and until an attorney of the OGC, the Seattle Bank Counsel, or fee counsel designated by the General Counsel or his designee to represent the Receiver, or any person named as a Special Representative of the Receiver, or an Assistant Secretary to the Bank Board, shall have received the written approval of the Supervisor that the ground specified in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C. § 1464(d)(6)(A)(i) (1982), exists with respect to the Association, and provided further, that the form of any such approval is satisfactory to the OGC; and

Worthlessness of Subordinated Debt
and Stock Interests

RESOLVED FURTHER, That the Bank Board finds that the Association is not a going concern and could continue as a going concern only with financial assistance from the FSLIC; and

RESOLVED FURTHER, That the Bank Board finds that the Association's financial condition is such that the Association cannot be sold to an independent third party without financial assistance from the FSLIC; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



RESOLVED FURTHER, That the Bank Board finds that, if the Association were liquidated, the proceeds that would be realized upon liquidation of the Association's assets would be insufficient to satisfy the Association's liabilities and obligations to its creditors and others, including its withdrawable accountholders, such that no amount would remain for distribution to the Association's stockholders and holders of subordinated debt, and therefore, the Association's stock (including common stock, preferred stock, permanent stock, guarantee stock, stock, nonwithdrawable accounts, as defined by § 561.42 of the Rules and Regulations for the FSLIC, 12 C.F.R. § 561.42 (1987), and subordinated debt issued by the Association) is worthless; and

Powers and Duties of Receiver

RESOLVED FURTHER, That, pursuant to § 406(c)(1)(B), (c)(3), and (d) of the NHA, 12 U.S.C. § 1729(c)(1)(B), (c)(3), and (d) (1982), the FSLIC as Receiver shall have and exercise all powers, rights and privileges, and shall assume, perform, and discharge all duties, responsibilities, and obligations of a receiver for a Federal savings and loan association accorded or imposed by, and subject to, applicable provisions of law and regulations and orders of the Bank Board, as now or hereafter in effect, including, but not limited to, § 5(d) of the HOLA, 12 U.S.C. § 1464(d) (1982), § 406 of the NHA, 12 U.S.C. § 1729 (1982), and the provisions of Parts 547 and 549 of the Rules and Regulations for the Federal Savings and Loan System ("Federal Regulations"), 12 C.F.R. Parts 547 and 549 (1987); and

RESOLVED FURTHER, That, in addition to all powers and authority of a receiver provided for by law, regulation and order, the Receiver is hereby authorized and empowered, and need not seek further approval from the Bank Board, to borrow money in such amounts from any source and in any manner as the Receiver requires to fulfill its duties as receiver, to execute, acknowledge, and deliver evidence of indebtedness for such borrowings, and to secure repayment of such borrowings by mortgages, pledges, and assignments in trust, or by hypothecation of any property of the Association, provided that the form of any contract or security agreement for such borrowing shall be approved by the OGC; and

FEDERAL HOME LOAN BANK BOARD

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



RESOLVED FURTHER, That the Receiver need not furnish any bond; and

RESOLVED FURTHER, That, notwithstanding the provisions of § 548.1, as made applicable by § 549.2, of the Federal Regulations, 12 C.F.R. §§ 548.1 and 549.2 (1987), the Receiver may elect to notify by certified mail all persons and entities that the Receiver knows to be holding or to be in possession of assets of the Association; and

RESOLVED FURTHER, That, if the Association has issued subordinated debt that is outstanding as of the effective date of the appointment of the Receiver, the Receiver is hereby directed to publish notice to subordinated debt holders with respect to their subordinated debt holdings, and the Receiver is in any case hereby directed to publish notice to shareholders with respect to their shareholdings; and

Implementing Authority

RESOLVED FURTHER, That the Executive Director, or a Deputy Executive Director, of the FSLIC, or a designee of any of them ("Director"), is hereby authorized to take such action as may be necessary or appropriate to exercise the rights or to carry out the obligations of the FSLIC as Receiver, pursuant to its appointment; and

RESOLVED FURTHER, That the FSLIC, in its corporate capacity and not in its capacity as Receiver, is hereby authorized to make advances to the Receiver for the purpose of enabling the Receiver to perform its functions and duties, and to pay costs and expenses of the receivership, on such terms and conditions as the Director shall deem appropriate, and the Director may execute such documents as may be necessary to make such advances or enter into related collateral agreements, provided that the final form of any such document has been approved by the OGC; and

Special Representatives

RESOLVED FURTHER, That one or more persons shall be designated as a Special Representative of the Receiver ("SR"); that such designated person or persons shall have the power and authority to act

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



in the name and on the behalf of the Receiver, including the authority, subject to the direction of the Director, to take prompt possession of the books, records, property, and assets, of every kind and description, of the Association, and to exercise all powers of the Receiver; that, initially, Edward F. Gerber, John W. Sears, Ann M. Barnes, John P. Marchant, Peggy H. Battle, and Douglas A. Warnecke shall each serve as an SR; and that the Director may replace or remove any SR and may designate such additional SR(s) as the Director deems appropriate, prescribing the functions and responsibilities of such SR(s) as the Director deems appropriate; provided, however, that any SR designated under this resolving paragraph shall not act for or on behalf of the FSLIC in its corporate capacity with regard to the Association in receivership; and

Termination of Employment Contracts

RESOLVED FURTHER, That the Bank Board determines that, upon the appointment of the FSLIC as receiver for the Association for the purpose of liquidation, the Association shall be in "default", as such term is defined in § 401(d) of the NHA, 12 U.S.C. § 1724(d) (1982); and

RESOLVED FURTHER, That every employment contract between the Association and its officers, employees, or agents is hereby terminated by the Bank Board, effective upon the date of default of the Association; and

Disclosure of Authority

RESOLVED FURTHER, That the Receiver shall require that any independent contractor, consultant, or counsel employed by the Receiver in connection with the liquidation of the Association shall fully disclose to all parties with which such contractor, consultant or counsel is negotiating, any limitation on the authority of such contractor, consultant or counsel to make legally binding representations on behalf of the Receiver; and

A

**FEDERAL HOME LOAN BANK BOARD**

Appointment of Receiver for
Tri-Cities Savings and Loan Association,
Kennewick, Washington
Under § 406(c)(1)(B)

No. 88-249 P



Records and Reports

RESOLVED FURTHER, That each SR shall keep a record of his or her actions as SR of the Receiver, and shall report on such actions from time to time as directed by the Director; and

RESOLVED FURTHER, That the Director shall from time to time report to the Bank Board with respect to actions taken pursuant to this Resolution.

By the Federal Home Loan Bank Board

John M. Buckley, Jr.
John M. Buckley, Jr.
Secretary

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-251, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the Federal Home Loan Bank Board

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in Tri-Cities Savings and Loan Association, Kennewick, Washington

No. 88-251P

Date: April 7, 1988

Recitals

WHEREAS, The Federal Savings and Loan Insurance Corporation ("FSLIC") has been appointed as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), as described in Federal Home Loan Bank Board ("Bank Board") Resolution No. 88-249P, dated April 7, 1988; and

WHEREAS, Such appointment constitutes a default of the Association within the meaning of § 401(d) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1724(d) (1982), and may necessitate the payment of insured accounts by the FSLIC, in its corporate capacity and not as receiver for the Association, within the meaning of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982):

Payment of Insurance of Accounts

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them ("Director"), is hereby authorized and directed to take all necessary or appropriate steps and to incur all necessary or appropriate expenses in preparation for and to implement the payment of all insured accounts of the Association pursuant to § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982); and

RESOLVED FURTHER, That, upon being advised by the General Counsel, or a Deputy General Counsel, that the Association is in default and that the account liabilities of the Association have not been assumed by another insured institution, the Director is hereby authorized and directed (1) to cause each insured account in the Association that is surrendered and transferred to the FSLIC to be paid in cash or by making available a transferred account in another insured institution, (2) to take or cause to be taken such action(s) as may be necessary or appropriate to carry out this and any future directives of the Bank Board, and (3) to do all things necessary or appropriate to carry out expeditiously the objectives of § 405(b) of the NHA, 12 U.S.C. § 1728(b) (1982), and Part 564 of the Rules and Regulations for

C

FEDERAL HOME LOAN BANK BOARD

Contingent Payment of Insurance of Accounts in
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-251P



RESOLVED FURTHER, That each Office and Division of the Bank Board is hereby requested to furnish such assistance to the Director in fulfillment of the intent of this Resolution as the Director may request.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-252, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the Federal Home Loan Bank Board

D

FEDERAL HOME LOAN BANK BOARD

Pursuit of Claims of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-252P

Date: April 7, 1988

Recitals

WHEREAS, The Federal Home Loan Bank Board ("Bank Board") has appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), pursuant to Resolution No. 88-249P, dated April 7, 1988; and

WHEREAS, Pursuant to Resolution No. 88-250P, dated April 7, 1988, the Bank Board has approved the acquisition of substantially all of the assets and liabilities of the Association by Sterling Savings Association, Spokane, Washington ("Acquiring Association"); and

WHEREAS, Pursuant to a proposed Receiver's Agreement (a copy of which is in the Minute Exhibit File), potential claims of the Association against certain parties will be transferred to the FSLIC in its corporate capacity; and

WHEREAS, Pursuant to a proposed Assistance Agreement (a copy of which is in the Minute Exhibit File), the FSLIC in its corporate capacity has a right to take an assignment of potential claims of the Acquiring Association, as successor to the Association, against certain other parties:

Pursuit of Claims

NOW, THEREFORE, IT IS RESOLVED, That the Executive Director or a Deputy Executive Director of the FSLIC, or a designee of any of them, is hereby authorized to take whatever actions are deemed appropriate, including litigation, to recover on such claims of the Association and the Acquiring Association, as successor to the Association, from any such parties, provided that the Office of the General Counsel shall concur in any such action.

By the Federal Home Loan Bank Board

/s/ John M. Buckley Jr

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88-253, adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I, Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort
Assistant Secretary to the
Federal Home Loan Bank Board

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Saving and Loan Association
Kennewick, Washington

No. 88-253 P

Date: April 7, 1988

Recitals

WHEREAS, The Executive Director or a Deputy Executive Director of the Federal Savings and Loan Insurance Corporation ("FSLIC"), or the Director, Financial Assistance Division, Office of the FSLIC, or a designee of any of them ("Director"), has been authorized by Federal Home Loan Bank Board ("Bank Board") Resolution Nos. 88-250P and 88-252P, each dated April 7, 1988, to execute, on behalf of the FSLIC in its corporate capacity, a Receiver's Agreement with the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington, an Assistance Agreement with Sterling Savings Association, Spokane, Washington ("Acquiring Association"), and other documents ("Agreements"), and to pursue certain claims; and

WHEREAS, The Agreements impose certain rights, duties, and obligations upon the FSLIC in its corporate capacity, and permit the pursuit of certain claims, that do not require basic determinations of policy; and

WHEREAS, In the administration of the Agreements, and of any rights or obligations of the FSLIC under them, it may be necessary or desirable that the FSLIC, in its corporate capacity, contract for legal, auditing, or other services, or authorize the settlement of certain claims:

Implementing Authority

NOW, THEREFORE, IT IS RESOLVED, That the Bank Board, as operating head of the FSLIC, finds that expenditures of the FSLIC, in its corporate capacity, pursuant to and in the administration of the Agreements and in the pursuit of such claims, are necessary,

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities of Tri-Cities Savings and Loan Association Kennewick, Washington

No. 88-253P



nonadministrative, and made under the National Housing Act, as amended, 12 U.S.C. §§ 1724, et seq. (1982), and shall be incurred, allowed, and paid under the provisions of the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), without regard to the provisions of any other law governing the expenditure of public funds; and

RESOLVED FURTHER, That, effective upon the execution of the Agreements, the Director is hereby authorized and directed to take such actions as may be necessary or desirable to fulfill the rights, duties, and obligations of the FSLIC, in its corporate capacity, under the Agreements and in the pursuit of claims, and to incur, allow, and pay all expenditures in fulfillment of such rights, duties, and obligations, pursuant to the fourth sentence of § 402(c)(5) of the NHA, 12 U.S.C. § 1725(c)(5) (1982), including, but not limited to:

(1) The payment of any and all amounts required by the Agreements;

(2) The making of advances to the FSLIC as receiver for Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association");

(3) Contracting for legal, accounting, management, or other services relating to the implementation of the Agreements or the pursuit of claims, provided that the final form of any such contract shall be approved by the Office of the General Counsel ("OGC");

(4) The administration of any asset or claim acquired from the Receiver or Acquiring Association, provided that any contract pertaining to such asset or claim, and the satisfaction, settlement or termination of any claim, shall be approved by the OGC;

(5) The assignment, pursuit, and settlement of claims, provided, that the form of any assignment or settlement agreement entered into by the FSLIC shall be approved by the OGC; and

E

FEDERAL HOME LOAN BANK BOARD

Implementation Resolution

Acquisition of Assets and Liabilities
of Tri-Cities Savings and Loan Association
Kennewick, Washington

No. 88-253P

Page 3

(6) The waiver, if deemed necessary or desirable by the Director, of provisions of the Assistance Agreement concerning filings, representations, warranties, or certifications by the Acquiring Association, provided that the form of any waiver by the FSLIC shall be approved by the OGC; and

RESOLVED FURTHER, That the General Counsel may also exercise the authority conferred by the preceding resolving paragraphs with respect to contracting on behalf of the FSLIC for legal or other related services needed to implement the Agreements and pursue claims; and

RESOLVED FURTHER, That the Director is authorized and directed to take all other actions necessary and appropriate to exercise the rights and fulfill the duties and obligations of the FSLIC in the administration of the Agreements and the pursuit of claims.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

# Federal Home Loan Bank Board

**To all to whom these presents shall come, Greeting:**

I CERTIFY That hereto annexed are true copies of documents described below made from records of the Federal Home Loan Bank Board, which records are in the official custody of the Secretary to said Board and are on file in its offices at 1700 G Street, Northwest, Washington in the District of Columbia, to wit:

Copy of Resolution No. 88- 254 [illegible], adopted by the Federal Home Loan Bank Board on April 7, 1988

In testimony whereof, I Pamela Ward Bort / Assistant Secretary to the Federal Home Loan Bank Board have hereunto caused the Seal of said Board to be affixed and my name subscribed hereto, in the District of Columbia, this 8th day of April, 1988

Pamela Ward Bort

Assistant Secretary to the Federal Home Loan Bank Board

F

FEDERAL HOME LOAN BANK BOARD

Acquisition of Assets and Liabilities of
Tri-Cities Savings and Loan Association,
Kennewick, Washington

No. 88-254P

Date: April 7, 1988

RESOLVED, That the acquisition of substantially all of the assets and liabilities of Tri-Cities Savings and Loan Association, Kennewick, Washington ("Association"), by Sterling Savings Association, Spokane, Washington ("Acquiring Association"), pursuant to an Acquisition Agreement between the Federal Savings and Loan Insurance Corporation ("FSLIC"), as receiver for the Association, and the Acquiring Association, is hereby approved, effective in accordance with applicable state law unless such law leaves that determination to the Bank Board in which case the Acquisition shall be effective as of the execution of the Acquisition Agreement and the Assistance Agreement between the FSLIC, in its corporate capacity, and the Acquiring Association, and pursuant to approval by the Bank Board in a concurrent Resolution or action issued as of the date of this Resolution and subject to any conditions that may be imposed in such Resolution or action.

By the Federal Home Loan Bank Board

/s/ John M. Buckley, Jr.

Coopers &Lybrand

certified public accountants

Board of Directors
Sterling Savings Association
Spokane, Washington

We have read the Acquisition Agreement and the Assistance Agreement, both dated April 8, 1988, between Sterling Savings Association ("Sterling") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). We have also reviewed related schedules, supporting information and representations submitted to us by Sterling. These Agreements were consummated by Sterling acquiring certain assets and assuming the liabilities of Tri-Cities Savings and Loan Association ("Tri-Cities") in exchange for receiving a cash assistance payment of approximately $11,730,000 and indemnification against losses on certain "covered" assets and undisclosed liabilities from FSLIC. Since the combination involved the transfer of cash rather than an exchange of stock, it is contrary to the idea of combining existing stockholder interests that is the essence of a pooling-of-interests. As such, the transaction has been treated for generally accepted accounting principle purposes as a "purchase."

In our opinion, based solely upon the information and facts provided to us as described above, this acquisition does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 (APB No. 16). Therefore, we concur in the treatment of this combination as a purchase in accordance with APB No. 16 and Statement of Financial Accounting Standards No. 72 (SFAS No. 72).

Sterling has allocated the cash assistance payment received for acquiring Tri-Cities to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, again in accordance with the requirements of APB No. 16 and SFAS No. 72. We have reviewed this allocation and the propriety of the underlying valuations, as well as the proposed plan for amortizing the individual allocations, based upon information of Tri-Cities as of April 8, 1988. The more significant individual allocations and Sterling's plan for amortizing each are as follows:

1. A discount of approximately $580,000 has been allocated to the loan portfolio. This discount will be amortized using the level interest yield method over 12 years, which represents the estimated remaining term (after considering assumed prepayments) of the portfolio.

2. A premium of approximately $1,270,000 has been allocated to deposits. This premium will be amortized using the level interest yield method over periods of up to 8 years, which represents remaining terms of individual deposits.

3. A total of approximately $2,520,000 has been allocated to an unidentified intangible asset. The unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired.

In our opinion, based solely upon the information and facts provided to us as described above, the significant individual allocations and the proposed method and period of amortizing each appear proper under APB No. 16 and SFAS No. 72.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Tri-Cities transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of our examination of Sterling's consolidated financial statements for the year ended June 30, 1988 (which period will include the Tri-Cities acquisition), certain revisions to the allocations and proposed amortization may be necessary and our conclusions may change.

Coopers & Lybrand

Spokane, Washington
July 28, 1988

Coopers &Lybrand

. .ified public accountants

1600 Seafirst Financial Center
Spokane, Washington 99201

telephone (509) 455-9300

in principal areas of the world

January 30, 1989

Mr. Dan Byrne
Sterling Savings Association
N. 120 Wall
Spokane, WA 99201

Dear Mr. Byrne:

This letter is in response to your request for our opinion regarding the affect to the net operating loss carryforwards of Central Evergreen as a result of Sterling Savings Association's acquisition of Central Evergreen.

Based on our understanding of the facts and applicable law, as discussed below, the net operating loss carryforwards of Central Evergreen will succeed to Sterling Savings Association, subject to certain limitations as described below. If our understanding of the facts is incorrect, it may change our opinion substantially.

We understand the facts to be as follows:

- On December 31, 1988, Sterling Savings Association acquired by agreement with the supervisory agent 100% of the stock of Central Evergreen. Simultaneous to its acquisition, Central Evergreen was merged into Sterling and 100% of all its assets and liabilities became assets and liabilities of Sterling Savings Association. Central Evergreen is a savings and loan as defined by Internal Revenue Code Section 7701(a)(19).

- At the time of the acquisition, Central Evergreen was under a voluntary supervisory agreement with the FHLBB. The FHLBB has certified that Central Evergreen was insolvent at the time of the acquisition/merger under the grounds set forth in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, United States Code.

- Central Evergreen has three subsidiaries with which it has filed a federal consolidated income tax return. The taxable year end is December 31.

- According to its December 31, 1987 federal income tax return, Central Evergreen has approximately $8,000,000 in net operating loss carryforwards to 1988 and later years. Also, it is expected that Central Evergreen will incur a net operating loss for the 1988 tax year.

Requirements to Acquire the NOL Carryovers

In order for the net operating losses of Central Evergreen to succeed to Sterling Savings Association, the acquisition of Central Evergreen must qualify under either:

1. Section 332, relating to liquidations of subsidiaries, or

2. Section 361 (relating to nonrecognition of gain or loss to corporations) but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of Section 368(a)(1).

It is intended that the acquisition/merger qualifies as a reorganization under 368(a)(1)(G) (a "G" reorganization). A "G" reorganization is a transfer by a corporation of all or part of its assets to another corporation in a bankruptcy or similar case followed by the distribution of stock or securities, pursuant to a court-approved reorganization plan, by the corporation that has acquired the assets in a transaction that qualifies under Code Sec. 354, 355, or 356. A bankruptcy or similar case is a case under new Title 11 of the United States Code, or a receivership, foreclosure, or similar proceeding in a federal or state court. A federal or state agency receivership, foreclosure, or similar proceeding involving a financial institution also qualifies. A special rule has been provided for financially distressed "thrift" institutions.

Section 368(a)(3)(D) provides that a troubled thrift reorganization, otherwise satisfying the requirements of Section 368(a)(1)(G) will not be considered a taxable transaction merely because no stock or securities of the acquiring entity are issued, if all of the following requirements are met:

1. All or substantially all of the assets of the troubled institution must be transferred to a new or existing entity.

2. At the time of the reorganization, the institution must be a savings and loan as defined in Code Section 7701(a)(19). In general, the acquired association must maintain at least 60% of its assets in "qualified" assets, and it must have more than 75% of its gross income from specified sources.

3. Substantially all the institution's liabilties must be transferred to the new entity.



4. The FHLBB or the FSLIC must certify that the institution is

insolvent in the near future in the absence of action by the FHLBB or the FSLIC) under the grounds set forth in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, United States Code.

In addition to the requirements listed in IRC Section 368(a)(3)(D), there must be a "continuity of business enterprise" with respect to the operations of the Association. While the Service has yet to issue proposed or temporary regulations under Sections 368(a)(1)(G) or 368(a)(3)(D), the Service has issued Revenue Procedure 83-81, 1983-2 C.B. 598, which deals with this issue. Based upon Rev. Proc. 83-81, the "continuity of business enterprise" requirements will be satisfied in the case of an asset acquisition if the following conditions are met: (1) the transferee assumes all of the deposits of the transferor; and (2) either (a) the transferee continues to hold at least one-half of the fair market value of the assets, including mortgage and other loans, held by the transferor at the time of the adoption of the plan of reorganization; or (b) the transferee continues the transferor's historic business.

According to the closing documents of the acquisition/merger, all assets and liabilities of Central Evergreen immediately before the acquisition/merger became assets and liabilities of Sterling immediately after the acquisition/merger. Also, according to our calculations Central Evergreen met the definition of a savings and loan as defined by Section 7701(a)(19). As previously stated, the Federal Home Loan Bank Board has given the certification of insolvency outlined in Section 1464(d)(6)(A)(i), (ii), or (iii) of Title 12, of the United States Code. Sterling Savings Association is assuming 100% of the deposits of Central Evergreen and plans to continue to hold at least one-half of the fair market value of the assets, including mortgages and other loans, held by Central Evergreen at the time of the adoption of the plan of adoption/merger. Also, Sterling will continue to operate Central Evergreen's historic business.

Based on our understanding of the above facts and requirements of the law, the acquisition/merger meets the definition of a tax free "G" reorganization. Thus, the net operating losses of Central Evergreen will succeed to Sterling Saving Association.

Net Operating Loss Limitations

Internal Revenue Code Section 381(B)(3) and Regulation 1.381(e)(1)-1(b) provide that a NOL of the acquiring corporation may not be carried back to offset prior year taxable income of the transferor corporation and that NOLs of the transferor corporation may not be carried back to offset prior years taxable income of the acquiring corporation. Therefore, after the acquisition, the NOLs of Central Evergreen may be carried forward

Section 382 limits the amount of net operating loss carryovers that may be utilized by a corporation after there has been a more than 50% change in ownership or shift in equity. Although the restrictions imposed by Section 382(a) generally apply to taxable and tax free reorganizations, special rules apply to Section "G" reorganizations of thrift institutions. Section 382(l)(5)(F) provides that losses of a troubled thrift will not be subject to the restrictions of Section 382(a) if the acquisition transaction qualifies as a "G" reorganization and there is a 20% "continuity of ownership" resulting from the transaction.

For purposes of the "continuity of ownership" test, depositors are treated as shareholders. Therefore, as long as the deposits of the troubled thrift are equal to 20% of the sum of the deposits and the outstanding stock, if any, in the acquiring entity immediately after the acquisition, this test is met.

It is our understanding, that Central Evergreen's deposits will be greater than 20% of the sum of the deposits and the outstanding stock of Sterling Savings Association immediately after the acquisition. Therefore, the requirements of 382(l)(5)(F) are met and the limitation of Section 382(a) will not apply.

Based upon Section 381 and the regulations thereunder, the net operating losses of the transferor corporation (Central Evergreen) may be carried over to offset post acquisition taxable income of the acquiring corporation. However, based on the consolidated return regulations, the amount of net operating loss carryover which may be utilized each year is limited to the amount of taxable income generated by the acquiring corporation (Sterling). Thus, no other member of Sterling's consolidated group may utilize Central Evergreen's net operating loss carryover.

The consolidated return regulations also limit the utilization of any net operating loss carryforward of the acquired subsidiaries. To the extent, if any, the net operating loss carryforwards are attributed to each of the acquired subsidiaries, they may only be utilized against post acquisition consolidated taxable income of each separate subsidiaries' share of the consolidated taxable income. It is anticipated that the amount of net operating loss carryforwards attributable to Central Evergreen's subsidiaries will be very minor, if any. However, the above limitation does need to be recognized and considered.

Internal Revenue Code Section 381(c)(1)(B) places limits on the amount of the transferor's NOL which may be utilized by the acquirer in its first taxable year ending after the date of transfer. In general, the amount of Central Evergreen's net operating loss carryforward utilized in the first post acquisition year is limited to the ratio of days post-acquisition over the total number of days in the tax year multiplied by the

## Period of Net Operating Loss Carryovers

There are different net operating loss carryback/carryforward periods of a savings and loan, depending on the year generated. The rules can be summarized as follows:

| Tax Year Generated | Carryback/Carryforward Period |
|---|---|
| 1976 - 1981 | Carryback 10 years - carryforward 5 years |
| 1982 - 1985 | Carryback 10 years - carryforward 8 years |
| 1986 | Carryback 10 years - carryforward 5 years |
| 1987 & after | Carryback 3 years - carryforward 15 years |

As previously stated, the acquired NOLs may only be carried forward. Based on Sterling's June 30 tax year, the net operating losses will expire as follows:

| Tax Year Generated | Approximate NOL | Expiration Period |
|---|---|---|
| 12/31/82 | 4,500,000 | 06/30/1990 |
| 12/31/83 | 3,500,000 | 06/30/1991 |
| 12/31/88 | Unknown | 06/30/2003 |

## State Considerations

The state of Washington does not have an income tax and Central Evergreen has operated solely in Washington State. Sterling Savings has just recently established a presence in Oregon, Idaho, and Utah. For purposes of this letter, we have not addressed the effect, if any, on future state income tax.

## Conclusion

Based on our understanding of fact and applicable law the net operating losses will succeed to Sterling Savings Association after the merger/acquisition. The utilization of the acquired net operating loss carryovers will be subject to the previously discussed limitations.

If you have any questions with respect to the letter, please contact Rick Beebe.

Very truly yours,

Coopers & Lybrand


RWB:r1WOOP2:6

Coopers &Lybrand | certified public accountants

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have been engaged to report on the appropriate application of generally accepted accounting principles to the specific transaction described below. This report is being issued to you for assistance in complying with the conditions set forth in Federal Home Loan Bank Board Resolution No. 88-1273, dated December 8, 1988, approving the acquisition of Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). Our engagement has been conducted in accordance with standards established by the American Institute of Certified Public Accountants.

We have read the Acquisition Agreement between Sterling Savings Association ("Sterling") and Central Evergreen. We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, specifically the attached schedule entitled "Central Evergreen Acquisition - Schedule of Purchase Accounting Adjustments," and all supporting workpapers.

The agreement was consummated on December 31, 1988 by Sterling acquiring 100% of the outstanding stock of Central Evergreen (immediately after it underwent a voluntary supervisory stock conversion) in exchange only for assuming its outstanding liabilities. Since the combination is contrary to the idea of combining existing stockholder interests that is the essence of a pooling-of-interests, the transaction has been treated for generally accepted accounting principle purposes as a "purchase."

In our opinion, based solely upon the information and facts provided to us as described above, this acquisition does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 ("APB No. 16"). Therefore, we concur in the treatment of this combination as a purchase under generally accepted accounting principles.

Sterling has allocated the total cost of acquiring Central Evergreen to the assets acquired and liabilities assumed based on their estimated fair values at the date of acquisition (December 31, 1988), again in accordance with the requirements of APB No. 16 and Statement of Financial Accounting Standards No. 72 ("SFAS No. 72"). We have reviewed this allocation and the propriety of the underlying valuations, as well as the proposed plan for amortizing the individual adjustments to fair value and the unidentified intangible asset, based upon

information of Central Evergreen as of December 31, 1988. The more significant individual allocations and Sterling's plan for amortizing each are as follows:

1. A discount of approximately $1,900,000 has been allocated to the loan portfolio. This discount will be amortized using the level interest yield method over 12 years, which represents the estimated remaining term (after considering assumed prepayments) of the portfolio.

2. Discounts totalling approximately $800,000 have been allocated to the investment and mortgage-backed securities portfolios. These discounts will be amortized using the level interest yield method over the estimated remaining terms of the respective portfolios, which in the case of mortgage-backed securities will not exceed 12 years.

3. A premium of approximately $1,100,000 has been allocated to office properties and equipment, after writing off the "appraised equity capital" carried on the books of Central Evergreen. This premium will be amortized using the straight-line method over the estimated remaining life of the properties and equipment revalued.

4. Discounts totalling approximately $500,000 have been allocated to deposits and FHLB advances. These discounts will be amortized using the level interest yield method over the estimated remaining terms of the outstanding deposits and advances revalued.

5. A total of approximately $23,800,000 has been allocated to an unidentified intangible asset. Since the fair value of the liabilities assumed by Sterling exceeds the fair value of the tangible assets acquired, this unidentified intangible asset must be amortized in accordance with paragraph 5 of SFAS No. 72. Accordingly, the unidentified intangible asset will be amortized using the level interest yield method over 12 years, which represents the estimated remaining life of the long-term interest bearing assets (loans) acquired.

In our opinion, based solely upon the information and facts provided to us as described above, the significant individual allocations and the proposed method and period of amortizing each appear proper under APB No. 16 and SFAS No. 72. It should be noted that all individual adjustments to fair value have been tax-effected as appropriate since Sterling has not yet adopted Statement of Financial Accounting Standards No. 96.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgement on the appropriate application of generally accepted accounting principles for the Central

Evergreen transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of our audit of Sterling's consolidated financial statements for the year ending June 30, 1989 (which period will include the Central Evergreen acquisition), our conclusions may change.

Coopers & Lybrand

Spokane, Washington
January 27, 1989

AGREEMENT

This Agreement is made this 25th day of December, 1988, by and between Sterling Savings Association (the "Acquirer"), hereto and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), a corporate instrumentality and agency of the United States, which is under the operating direction of the Federal Home Loan Bank Board (the "Board").

WHEREAS, the Acquirer has filed with the FSLIC the appropriate application ("Application") for approval of its proposed acquisition of control of Central Evergreen Federal Savings and Loan Association (the "Institution"); and

WHEREAS, in order to make a determination to approve the subject Application, pursuant to the applicable standards, the FSLIC requires that the Acquirer enter into this Agreement; and

WHEREAS, the Acquirer is willing to enter into this Agreement in order that the FSLIC will act favorably upon the Acquirer's Application;

NOW THEREFORE, in consideration of the FSLIC acting favorably on the Application, the Acquirer agrees as follows:

I. DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

A. "Additional Capital" means capital that the Supervisory Agent directs the Acquirer to raise, or otherwise deems to have been raised, in satisfaction of the provisions of this Agreement.

B. "Business Plan" means the Acquirer's financial projections for the period through June 1991, a copy of which is attached hereto, as such plan may be amended from time to time with the prior written non-objection of the Supervisory Agent as provided below.

C. "Date of Acquisition" means the effective date on which the Acquirer acquires control of the Institution.

D. "Default" means the failure of the Acquirer to comply with its obligations under this Agreement.

E. "Dividend" means (a) any dividend paid or other distribution (including, but not limited to, a liquidating distribution) made on or with respect to any shares of common stock of the Acquirer, but not including a stock dividend of stock of the

Acquirer, or (b) any payment on account of the purchase, redemption or other acquisition or retirement of any such shares or any warrants or option thereon, whether made by the Acquirer or any direct or indirect subsidiary thereof.

F. "Fully Phased-In Capital Requirement" means the Acquirer's fully phased-in regulatory capital requirement as defined in 12 C.F.R. Section 563.13, or any successor regulation.

G. "Minimum Capital Requirement" means the amount computed quarterly according to Section 563.13(b) and as adjusted by the "April Calculation" specified in Section 563.13(b)(2)(iv), or any successor regulation thereto.

H. "Regulatory Capital" means regulatory capital defined in accordance with 12 C.F.R. Section 561.13, or any successor regulation hereto.

I. "Regulatory Capital Requirement" means the Acquirer's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto.

J. "Regulatory Capital Deficiency" means the amount by which the Regulatory Capital of the Acquirer, computed by the Supervisory Agent in accordance with 12 C.F.R. Section 561.13, or any successor regulation thereto, is less than the Minimum Capital Requirement.

K. "Supervisory Agent" means the Principal Supervisory Agent or any Supervisory Agent of the FHLBB and FSLIC at the Federal Home Loan Bank of Seattle.

All technical words or terms used in this Agreement for which meanings are not specified or otherwise provided by the provisions of this Agreement shall, insofar as applicable, have meanings as defined in the rules and regulations of the FHLBB. Any such technical words or terms used in the Agreement and undefined in said rules and regulations shall have meanings that accord with the best custom and usage in the thrift industry.

## II. BUSINESS PLAN

The Acquirer shall use its best efforts to comply with its Business Plan, and the Acquirer shall not, without receiving the prior written non-objection of the Supervisory Agent, take any action (i) not provided for in or contemplated by its Business Plan or (ii) which would create a significant possibility of material deviation therefrom; provided, however, that the failure to raise additional capital as provided in the Business Plan shall not be deemed to be a deviation if it is raised prior to December 31, 1990 and if a revised Business Plan has been submitted to the

Supervisory Agent by June 30, 1989. The Acquirer shall not revise its Business Plan or adopt a new Business Plan unless the Acquirer has received from the Supervisory Agent prior written notice of non-objection to such revision or adoption. At least 30 days before the end of any period for which projections are included in the Business Plan, the Acquirer shall submit to the Supervisory Agent, in form and substance acceptable to the Supervisory Agent, new projections for the next successive twelve-month period.

The Supervisory Agent will give reasonable consideration to any revision to the Business Plan submitted, that was necessitated by actions taken by any governmental body having jurisdiction that caused the Acquirer to materially deviate from its Business Plan. Such material deviation shall not be a violation of the obligations.

## III. OBLIGATIONS OF ACQUIRER

A. The Acquirer will cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the lesser of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan. The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised prior to December 31, 1990.

B. The Acquirer agrees that if the ratio of regulatory capital to total assets is less than the ratio projected in the attached Business Plan by 90 basis points until the earlier of (i) December 31, 1990 or (ii) the raising of the additional capital provided for in the attached Business Plan, or subsequently 30 basis points, it will comply with the directives that are imposed under 12 C.F.R. Section 563.13(d) and will comply with the time period specified.

C. The Acquirer may not pay any common stock Dividend without the prior written approval of the Supervisory Agent.

D. The Acquirer shall submit to the Supervisory Agent quarterly variance reports in the format of the Business Plan explaining any material deviation from the approved Business Plan.

## IV. DEFAULTS

A. If the FSLIC shall determine that a Default has occurred, it shall give notice of such Default to the Acquirer and

afford the Acquirer an opportunity to cure such Default within 90 days.

B. The FSLIC, in its sole discretion, may waive or forbear any past Default hereunder and its consequences, before or after the giving of the notice of Default in the manner provided above, by delivering notice of such waiver or forbearance in writing to the Acquirer, but no such waiver or forbearance shall extend to any Default that occurs subsequent to the date of such waiver or forbearance, and no waiver or forbearance or purported waiver or purported forbearance that is not in writing shall be effective. Any waiver or forbearance of any right, power, or remedy shall not preclude its further exercise.

V. <u>MISCELLANEOUS PROVISIONS</u>

A. Any notice hereunder shall be in writing and shall be delivered by hand or sent by United States express mail or commercial express mail, postage prepaid, and addressed as follows:

If to the Acquirer: Daniel G. Byrne, SVP-Finance
c/o Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

If to the FSLIC: Supervisory Agent
Federal Home Loan Bank of Seattle

B. This Agreement shall be deemed a contract made under and governed by Federal law.

C. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective transferees, successors, assigns, and trustees.

D. All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

E. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties.

F. This Agreement has been duly authorized, executed, and delivered, and constitutes, in accordance with its terms, a valid and binding obligation of the Acquirer and the FSLIC. It is understood and agreed that this Agreement is a "written agreement

entered into with the Corporation" as that phrase is used in Section 407(e) of the National Housing Act ("NHA"), 12 U.S.C. Section 1730(e) (1982).

G. Any rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute, regulation, or rule of law.

H. The Supervisory Agent has the authority to act on behalf of the FSLIC in granting approvals, waivers or forbearances, giving notices of Default, or taking any other action provided for in this Agreement.

I. This Agreement shall be effective as of the Date of Acquisition.

J. If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding on the Acquirer and the FSLIC.

K. This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

L. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute the same instrument, and any party may execute this Agreement by signing any such counterpart.

M. This Agreement is not a waiver of or forbearance from any applicable regulation.

VI. <u>TERMINATION OF AGREEMENT</u>

The Acquirer's obligations under this Agreement shall terminate as follows:

A. Five years after the Date of Acquisition; or

B. Section III.A., III.B. and III.C., of this Agreement shall terminate if the Acquirer's Regulatory Capital exceeds its Fully Phased-In Capital Requirement for a period of two consecutive years.

Termination of this Agreement shall not preclude the exercise by the FSLIC of any right or remedy hereunder which arose out of a Default that occurred or existed prior to such termination, and in respect to which notice of such Default has

been given pursuant to Section III. hereof within one year following such termination. In addition, termination of this Agreement shall not terminate any of the Acquirer's obligations arising from any other source including, but not limited to, any other agreement with the FSLIC, or any statute or regulation.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officer or designated agency on this 29th day of December, 1988.

STERLING SAVINGS ASSOCIATION

By: [signature]

Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Edwin C. Hedlund
Supervisory Agent
Federal Home Loan Bank of Seattle

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

# ATTACHMENT A

## Executive Summary and Financial Projections

Consolidation of Sterling and Central Evergreen
with Infusion of $5 Million Preferred Stock

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

## EXECUTIVE SUMMARY

Consolidation of Central Evergreen, and Sterling on September 30, 1988. This projection assumes $5 million of convertible preferred stock has been issued by June 30, 1989. The dividend rate is $2.50 (equivalent to a 10% non-compounded yield). The assumptions used are conservative and require no extraordinary events.

### Consolidation Results of Projection

On the date of the acquisition, consolidated assets are $706 million. Growth in the balance sheet approximates 6% to 9% annually. At the end of the projection, consolidated assets are $840 million. Regulatory net worth at the date of acquisition is 3.4% of total assets.

Non-earning assets represent 11.3% of the balance sheet at the date of acquisition but decrease to 5.6% at the end of the projection. This occurs due to reduction of special assets and reduction of intangible assets through amortization and utilization of $8 million of net operating losses during the projection period.

Net income is $1,341,000, $2,885,000, and $4,261,000 during fiscal 1989, 1990 and 1991, respectively. This represents return on average assets of approximately .23% during fiscal year 1989, which increases to approximately .53% during fiscal 1991. The combination of increased lending activities, containment of costs, and increase in spread contribute to this improvement in return on average assets.

The net interest rate spread as a percentage of total earning assets increases from approximately 2.02% for the first full quarter following consolidation (December 1988) to approximately 2.29% in the last quarter of the projection period. The increase in net interest rate spread is principally due to the incremental increase of net spread on new assets and the reduction in the level of non-earning assets.

### General Assumption

This financial projection assumes that Central Evergreen and Sterling are combined on December 31, 1988. Five million dollars of preferred stock is raised through a community offering and completed on June 30, 1989. Additional capital formation occurs principally through earnings. Interest rates assumed in this projection are the same as those outlined on Exhibit B (pages B-4 and B-5) of the Business Plan for Fiscal 1989, included as Attachment D. Liability growth increases at approximately 6% to 9% annually. The effects of implementing FASB 91, Accounting for Loan Fees, are built into the projections for both Sterling and Central Evergreen.

### Specific Assumptions

A. Sterling

The operations of Sterling are assumed to be approximately the same as in its Fiscal 1989 Operating Plan, adjusted only for a reduction in asset and liability growth by approximately $30 million.

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

B. Central Evergreen

The operations of Central Evergreen are assumed to be relatively unchanged from its current level of activity with the following exceptions:

1. The head office function is consolidated in Spokane.

2. The lending function continues to concentrate on residential loan production. The level of loan originations increase slightly to approximately $95 million annually.

3. Operating costs reflect a net reduction of approximately $500,000 for duplicated functions and for economics of scale resulting from consolidatior

4. Added emphasis is given to sale of consumer insurance products which adds some revenue enhancement on a consolidated basis.

6. Intangible assets of $20.9 million are created principally as a result of eliminating Central Evergreen's deferred loan losses, establishing reserves for additional loan losses and writing down certain investments to current market. The intangible assets are amortized using the level-interest method over the estimated live of the loan portfolio, net of prepayments, or 12 years.

Utilization of net operating loss carryforwards of $8 million are expected t reduce intangible assets by approximately $2.8 million by the end of the projection period:

| Year Ending June 30, | NOL's Utilized | Tax Effect @ 34% |
|---|---|---|
| 1989 | $1,100,000 (1/2 year) | $ 374,000 |
| 1990 | 3,000,000 | 1,020,000 |
| 1991 | 4,000,000 | 1,360,000 |
| | $8,100,000 | $2,754,000 |

Approximately $14 million net operating loss carryforward would remain unused.

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1989

| ASSETS | PROJECTED 1st QTR SEPTEMBER | PROJECTED 2nd QTR DECEMBER | PROJECTED 3rd QTR MARCH | PROJECTED 4th QTR JUNE |
|---|---|---|---|---|
| CASH | $5,692,369 | $8,999,748 | $9,246,100 | $3,053,276 |
| INVESTMENTS | 27,000,000 | 53,240,000 | 56,240,000 | 59,240,000 |
| LOANS RECEVIABLE | 304,247,755 | 485,206,562 | 486,869,132 | 497,150,565 |
| MORTGAGE-BACKED SECURITIES | 60,000,000 | 73,326,000 | 76,399,260 | 84,473,253 |
| INVESTMENT & ADVANCES TO AFFILIATE | 14,677,810 | 16,685,997 | 16,694,486 | 16,793,177 |
| ACCRUED INTEREST RECEIVABLE | 3,300,000 | 3,375,000 | 3,450,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | 5,550,000 | 10,764,000 | 10,839,000 | 11,089,000 |
| INTANGIBLE ASSETS | 18,825,359 | 39,362,609 | 38,535,859 | 37,335,109 |
| REAL ESTATE OWNED | 5,456,000 | 9,974,000 | 7,904,000 | 7,249,000 |
| PREPAID & OTHER ASSETS | 300,000 | 5,098,000 | 5,098,000 | 5,098,000 |
| TOTAL ASSETS | $445,049,293 | $706,021,916 | $711,265,837 | $725,006,379 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| SAVINGS AND CHECKING | 302,975,100 | 528,084,500 | 532,977,935 | 542,523,430 |
| ADVANCES FROM FHLB | 55,300,000 | 85,900,000 | 85,900,000 | 81,900,000 |
| REPO FUNDS PURCHASED | 50,000,000 | 51,000,000 | 50,000,000 | 52,000,000 |
| FED FUNDS PURCHASED | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 3,600,000 | 3,750,000 | 3,900,000 | 4,050,000 |
| ACCRUED INTEREST PAYABLE | 1,400,000 | 1,400,000 | 1,400,000 | 1,400,000 |
| LOAN PARTICIPATIONS PAYABLE | 540,000 | 600,000 | 660,000 | 720,000 |
| ADVANCE PAYMENTS FOR T&I | 1,300,000 | 1,200,000 | 1,800,000 | 1,700,000 |
| DEFERRED TAXES | 384,200 | 620,800 | 987,000 | 1,471,100 |
| DEFERRED INCOME | 239,600 | 261,909 | 253,957 | 242,933 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | 1,000,000 | 4,096,000 | 4,086,000 | 4,086,000 |
| TOTAL LIABILITIES | 421,738,900 | 681,903,208 | 686,864,902 | 695,093,513 |
| **STOCKHOLDERS' EQUITY** GROWTH | | 4.75% | 62.86% | 1.93% |
| CAPITAL STOCK | 468,996 | 515,895 | 515,895 | 515,895 |
| PREFERRED STOCK | 90,169 | 90,168 | 90,168 | 290,169 |
| ADDITIONAL PAID IN CAPITAL - COMMON | 5,196,029 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | 2,050,111 | 2,050,111 | 2,050,111 | 6,950,111 |
| CONTRIBUTED CAPITAL FSLIC | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | 1,662,932 | 1,606,577 | 1,550,222 | 1,493,867 |
| UNDIVIDED PROFITS - CURRENT | 132,155 | 434,040 | 772,622 | 1,340,909 |
| TOTAL EQUITY | 23,310,393 | 24,118,708 | 24,400,935 | 29,912,967 |
| TOTAL LIABILITIES AND EQUITY | $445,049,293 | $706,021,916 | $711,265,837 | $725,006,379 |
| RAP LEVERAGE | 5.238% | 3.416% | 3.431% | 4.126% |
| GAAP LEVERAGE | 2.155% | 1.473% | 1.502% | 2.233% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | 4.230% | 5.575% | 5.419% | 5.150% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1989

| INTEREST INCOME | 1st QTR SEPTEMBER | 2nd QTR DECEMBER | 3rd QTR MARCH | 4th QTR JUNE | TOTAL |
|---|---|---|---|---|---|
| LOANS | $7,823,180 | $8,049,579 | $12,671,522 | $13,282,827 | $41,826,108 |
| MBS | 1,184,257 | 1,479,965 | 1,765,224 | 1,828,049 | 6,257,555 |
| INVESTMENTS | 691,324 | 603,419 | 1,086,923 | 1,225,290 | 3,607,016 |
| INVESTMENT IN AFFILIATE | 185,378 | 240,296 | 273,206 | 278,372 | 977,252 |
| LOAN DISCOUNT | 45,000 | 45,000 | 57,000 | 57,000 | 204,000 |
| TOTAL INTEREST INC. | 9,929,199 | 10,417,259 | 15,853,934 | 16,671,539 | 52,871,931 |
| INTEREST EXPENSE | | | | | |
| DEPOSITS | 5,427,886 | 5,588,914 | 9,912,471 | 10,504,905 | 31,434,176 |
| BORROWINGS | 2,078,099 | 2,241,158 | 2,902,914 | 2,991,115 | 10,213,286 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 |
| OTHER | 3,000 | 3,000 | 3,000 | 3,000 | 12,000 |
| TOTAL INTEREST EXP. | 7,508,984 | 7,833,072 | 12,818,385 | 13,499,020 | 41,659,462 |
| NET INT. SPREAD | $2,420,215 | $2,584,187 | $3,035,549 | $3,172,519 | $11,212,470 |
| OTHER INC. (EXP.) | | | | | |
| LOAN & COMMITMENT FEES | 90,000 | 93,000 | 106,000 | 109,000 | 398,000 |
| OTHER FEES | 206,666 | 213,519 | 321,270 | 317,192 | 1,058,647 |
| SERVICE INCOME | 67,500 | 81,000 | 94,500 | 108,000 | 351,000 |
| SERVICE CORP | (188,441) | 12,521 | 126,086 | 318,812 | 268,978 |
| RESERVE FOR LOANS & REO LOSSES | (150,000) | (150,000) | (100,000) | (100,000) | (500,000) |
| GAIN (LOSS) ON INVESTMENT | 37,500 | 37,500 | 43,500 | 43,500 | 162,000 |
| GAIN (LOSS) ON LOAN SALES | 0 | 0 | 315,000 | 352,500 | 667,500 |
| OTHER INCOME (EXPENSE) | 3,000 | 3,000 | 176,000 | 176,000 | 358,000 |
| TOTAL OTHER INCOME | 66,225 | 290,540 | 1,082,356 | 1,325,004 | 2,764,125 |
| OPERATING EXP. | | | | | |
| PERSONNEL | 826,193 | 908,122 | 1,048,397 | 1,059,896 | 3,842,558 |
| COMMUNICATIONS | 88,530 | 88,990 | 136,595 | 138,845 | 452,960 |
| ADVERTISING | 60,698 | 60,748 | 82,698 | 88,298 | 292,442 |
| TRAVEL & ENTERTAINMENT | 64,890 | 75,817 | 87,860 | 72,476 | 301,043 |
| OFFICE SUPPLIES | 77,339 | 77,439 | 108,489 | 109,439 | 372,706 |
| INSURANCE | 174,900 | 178,800 | 324,200 | 330,800 | 1,008,700 |
| DATA PROCESSING | 183,445 | 198,020 | 311,945 | 308,020 | 1,001,430 |
| TAXES AND LICENSES | 48,325 | 52,530 | 100,655 | 108,120 | 309,630 |
| LEGAL & ACCOUNTING | 63,900 | 59,800 | 66,325 | 66,200 | 256,225 |
| OCCUPANCY | 183,421 | 186,066 | 262,136 | 263,794 | 895,417 |
| DEPREC./AMORT. | 406,565 | 414,227 | 929,627 | 934,327 | 2,684,746 |
| OTHER | 101,842 | 102,492 | 129,807 | 127,732 | 461,563 |
| TOTAL OPERATING EXP. | 2,279,948 | 2,403,031 | 3,588,634 | 3,608,047 | 11,879,660 |
| NET INC (LOSS)BEFORE TAX | $206,492 | $471,696 | $5[illegible],271 | $889,476 | $2,096,935 |
| TAX (PROVISION) BENEFIT | (74,337) | (169,811) | (190,689) | (3[illegible]1,190) | (755,0[illegible]) |
| NET INC (LOSS) | $132,155 | $301,885 | $339,582 | $568,287 | $1,340,909 |
| PREFERRED DIVIDEND | 56,355 | 56,355 | 56,355 | 56,355 | 225,420 |
| EARNINGS AVAILABLE TO COMMON | $75,800 | $245,530 | $282,227 | $511,932 | $1,115,489 |
| YIELD ON EARNING ASSETS | 7.838% | 8.169% | 9.947% | 10.336% | 9.094% |
| COST OF SAVINGS AND BORROWINGS | 5.611% | 5.865% | 7.569% | 7.991% | 6.890% |
| SPREAD DIFFERENCE | 2.227% | 2.304% | 2.379% | 2.345% | 2.204% |
| SPREAD ON AVG EARNING ASSETS | 1.911% | 2.026% | 1.905% | 1.957% | 1.926% |

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1990

| ASSETS | PROJECTED 1st QTR | PROJECTED 2nd QTR | PROJECTED 3rd QTR | PROJECTED 4th QTR |
|---|---|---|---|---|
| CASH | $2,667,058 | $3,695,933 | $6,467,307 | $7,017,625 |
| INVESTMENTS | 60,290,000 | 61,371,500 | 62,485,445 | 63,632,809 |
| LOANS RECEIVABLE | 504,524,985 | 512,916,486 | 521,255,828 | 533,223,186 |
| MORTGAGE-BACKED SECURITIES | 89,147,955 | 90,491,465 | 92,903,740 | 95,386,959 |
| INVESTMENT & ADVANCES TO AFFILIATE | 16,783,177 | 16,793,177 | 16,793,177 | 16,793,177 |
| ACCRUED INTEREST RECEIVABLE | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | 11,089,000 | 11,099,000 | 11,099,000 | 11,089,000 |
| INTANGIBLE ASSETS | 36,497,041 | 35,658,973 | 34,820,905 | 32,962,836 |
| REAL ESTATE OWNED | 6,499,000 | 5,749,000 | 4,999,000 | 4,249,000 |
| PREPAID & OTHER ASSETS | 4,999,000 | 4,998,000 | 4,798,000 | 4,798,000 |
| TOTAL ASSETS | $735,021,246 | $746,078,535 | $759,127,402 | $772,667,491 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| SAVINGS AND CHECKING | 551,977,248 | 562,509,402 | 575,056,412 | 598,024,715 |
| ADVANCES FROM FHLB | 81,900,000 | 81,900,000 | 91,900,000 | 81,900,000 |
| REPO FUNDS PURCHASED | 52,000,000 | 52,000,000 | 52,000,000 | 52,000,000 |
| FED FUNDS PURCHASED | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,050,000 | 4,050,000 | 4,050,000 | 4,050,000 |
| ACCRUED INTEREST PAYABLE | 1,400,000 | 1,400,000 | 1,400,000 | 1,400,000 |
| LOAN PARTICIPATIONS PAYABLE | 720,000 | 720,000 | 720,000 | 720,000 |
| ADVANCE PAYMENTS FOR T&I | 1,700,000 | 1,700,000 | 1,700,000 | 1,700,000 |
| DEFERRED TAXES | 1,471,100 | 1,471,100 | 1,471,100 | 1,471,100 |
| DEFERRED INCOME | 242,983 | 242,983 | 242,983 | 242,983 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | 4,086,000 | 4,086,000 | 4,086,000 | 4,086,000 |
| TOTAL LIABILITIES | 704,547,331 | 715,079,485 | 727,626,495 | 740,594,798 |
| STOCKHOLDERS' EQUITY GROWTH | 2.57% | 2.88% | 3.28% | 3.57% |
| CAPITAL STOCK | 515,895 | 515,895 | 515,995 | 515,895 |
| PREFERRED STOCK | 290,168 | 290,168 | 290,168 | 290,168 |
| ADDITIONAL PAID IN CAPITAL - COMMON | 5,701,915 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | 6,850,111 | 6,850,111 | 6,850,111 | 6,850,111 |
| CONTRIBUTED CAPITAL FSLIC | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | 2,653,421 | 2,472,066 | 2,290,711 | 2,109,356 |
| UNDIVIDED PROFITS - CURRENT | 742,403 | 1,448,893 | 2,132,105 | 2,885,246 |
| TOTAL EQUITY | 30,473,915 | 30,999,050 | 31,500,907 | 32,072,693 |
| TOTAL LIABILITIES AND EQUITY | $735,021,246 | $746,079,535 | $759,127,402 | $772,667,491 |
| RAP LEVERAGE | 4.146% | 4.155% | 4.150% | 4.151% |
| GAAP LEVERAGE | 2.279% | 2.316% | 2.342% | 2.375% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | 4.965% | 4.780% | 4.557% | 4.266% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TOTAL |
|---|---|---|---|---|---|
| | $13,665,969 | $13,301,287 | $12,905,748 | $12,975,491 | $52,848,395 |
| | 2,193,555 | 2,132,375 | 2,093,506 | 2,114,643 | 8,534,079 |
| | 1,288,104 | 1,247,909 | 1,205,260 | 1,202,237 | 4,943,511 |
| AFFILIATE | 259,174 | 233,216 | 217,800 | 209,759 | 919,950 |
| | 57,000 | 57,000 | 57,000 | 57,000 | 228,000 |
| INC. | 17,463,702 | 16,971,786 | 16,479,315 | 16,559,131 | 67,473,934 |
| E | | | | | |
| | 10,899,787 | 10,502,117 | 10,128,259 | 10,099,500 | 41,629,662 |
| | 3,019,662 | 2,933,459 | 2,784,065 | 2,728,424 | 11,465,610 |
| DEBT | 0 | 0 | 0 | 0 | 0 |
| | 3,000 | 3,000 | 3,000 | 3,000 | 12,000 |
| EXP. | 13,922,449 | 13,438,576 | 12,915,324 | 12,830,925 | 53,107,272 |
| | $3,541,254 | $3,533,211 | $3,563,991 | $3,728,206 | $14,366,662 |
| ?.) | | | | | |
| MENT FEES | 109,000 | 109,000 | 109,000 | 109,000 | 436,000 |
| | 330,000 | 330,000 | 330,000 | 330,000 | 1,320,000 |
| OME | 123,000 | 139,000 | 153,000 | 168,000 | 582,000 |
| | 350,000 | 350,000 | 320,000 | 320,000 | 1,340,000 |
| OANS & RED LOSSES | (100,000) | (100,000) | (100,000) | (100,000) | (400,000) |
| N INVESTMENT | 43,500 | 43,500 | 43,500 | 43,500 | 174,000 |
| ON LOAN SALES | 330,000 | 322,500 | 315,000 | 352,500 | 1,320,000 |
| (EXPENSE) | 176,000 | 176,000 | 176,000 | 176,000 | 704,000 |
| INCOME | 1,361,500 | 1,369,000 | 1,346,500 | 1,399,000 | 5,476,000 |
| | 1,119,961 | 1,163,979 | 1,192,478 | 1,277,480 | 4,753,899 |
| IS | 141,246 | 143,710 | 146,239 | 148,833 | 580,029 |
| | 94,415 | 101,096 | 108,393 | 116,364 | 420,267 |
| ERTAINMENT | 60,019 | 49,932 | 41,764 | 35,150 | 186,864 |
| ES | 110,400 | 111,374 | 112,359 | 113,355 | 447,489 |
| | 337,636 | 344,718 | 352,053 | 359,651 | 1,394,059 |
| NG | 304,169 | 300,390 | 296,692 | 293,044 | 1,194,294 |
| ICENSES | 116,535 | 126,021 | 136,714 | 148,769 | 529,039 |
| UNTING | 66,275 | 66,250 | 66,225 | 66,200 | 264,950 |
| | 265,466 | 267,153 | 268,855 | 270,572 | 1,072,047 |
| f. | 950,504 | 950,504 | 950,504 | 950,504 | 3,802,016 |
| | 155,698 | 153,704 | 151,750 | 149,835 | 610,988 |
| ING EXP. | 3,722,326 | 3,778,831 | 3,824,016 | 3,929,756 | 15,254,929 |
| BEFORE TAX | $1,180,428 | $1,123,379 | $1,086,475 | $1,197,450 | $4,587,732 |
| ON) BENEFIT | (438,025) | (416,889) | (403,262) | (444,309) | (1,702,486) |
| | $742,403 | $706,490 | $683,212 | $753,141 | $2,885,246 |
| DEND | 181,355 | 181,355 | 181,355 | 181,355 | 725,420 |
| ABLE TO COMMON | $561,048 | $525,135 | $501,857 | $571,786 | $2,159,826 |
| NG ASSETS | 10.439% | 10.189% | 9.511% | 9.472% | 9.890% |
| S AND BORROWINGS | 8.050% | 7.829% | 7.241% | 7.144% | 7.613% |
| NCE | 2.389% | 2.359% | 2.270% | 2.329% | 2.277% |
| EARNING ASSETS | 2.117% | 2.121% | 2.057% | 2.133% | 2.106% |

CONSOLIDATED
BALANCE SHEET
YEAR ENDING 6\30\1991

| ASSETS | PROJECTED 1st QTR | PROJECTED 2nd QTR | PROJECTED 3rd QTR | PROJECTED 4th QTR |
|---|---|---|---|---|
| CASH | $6,990,403 | $6,433,389 | $5,565,685 | $6,065,328 |
| INVESTMENTS | 64,814,593 | 66,031,830 | 67,494,544 | 69,009,453 |
| LOANS RECEIVABLE | 547,252,224 | 561,725,939 | 576,659,434 | 592,068,332 |
| MORTGAGE-BACKED SECURITIES | 97,942,930 | 100,574,128 | 103,282,692 | 106,070,925 |
| INVESTMENT & ADVANCES TO AFFILIATE | 16,783,177 | 16,783,177 | 16,783,177 | 16,783,177 |
| ACCRUED INTEREST RECEIVABLE | 3,525,000 | 3,525,000 | 3,525,000 | 3,525,000 |
| OFFICE PROPERTIES AND EQUIPMENT | 11,099,000 | 11,089,000 | 11,089,000 | 11,089,000 |
| INTANGIBLE ASSETS | 32,150,258 | 31,337,700 | 30,525,132 | 28,352,565 |
| REAL ESTATE OWNED | 3,749,000 | 3,249,000 | 2,749,000 | 2,249,000 |
| PREPAID & OTHER ASSETS | 4,799,000 | 4,798,000 | 4,798,000 | 4,798,000 |
| TOTAL ASSETS | $789,094,594 | $805,547,164 | $822,471,664 | $840,009,841 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| SAVINGS AND CHECKING | 599,592,976 | 611,493,104 | 623,735,016 | 636,329,929 |
| ADVANCES FROM FHLB | 83,559,000 | 85,257,770 | 87,027,803 | 88,849,637 |
| REPO FUNDS PURCHASED | 54,340,000 | 56,241,900 | 59,210,367 | 60,247,729 |
| FED FUNDS PURCHASED | 5,025,000 | 5,050,125 | 5,075,376 | 5,100,753 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,070,250 | 4,090,601 | 4,111,054 | 4,131,610 |
| ACCRUED INTEREST PAYABLE | 1,407,000 | 1,414,035 | 1,421,105 | 1,429,211 |
| LOAN PARTICIPATIONS PAYABLE | 723,600 | 727,218 | 730,854 | 734,509 |
| ADVANCE PAYMENTS FOR T&I | 1,708,500 | 1,717,043 | 1,725,629 | 1,734,255 |
| DEFERRED TAXES | 1,479,456 | 1,495,949 | 1,493,277 | 1,500,743 |
| DEFERRED INCOME | 244,199 | 245,419 | 246,646 | 247,879 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES & NOTES PAYABLE | 4,091,000 | 4,096,025 | 4,101,075 | 4,106,151 |
| TOTAL LIABILITIES | 756,239,980 | 771,829,087 | 787,878,201 | 804,401,405 |
| **STOCKHOLDERS' EQUITY** GROWTH | 3.93% | 4.22% | 4.18% | 4.22% |
| CAPITAL STOCK | 515,895 | 515,895 | 515,895 | 515,895 |
| PREFERRED STOCK | 290,168 | 290,168 | 290,168 | 290,168 |
| ADDITIONAL PAID IN CAPITAL - COMMON | 5,701,915 | 5,701,915 | 5,701,915 | 5,701,915 |
| ADDITIONAL PAID IN CAPITAL - PREFERRED | 6,850,111 | 6,850,111 | 6,850,111 | 6,850,111 |
| CONTRIBUTED CAPITAL FSLIC | 13,720,002 | 13,720,002 | 13,720,002 | 13,720,002 |
| UNDIVIDED PROFITS - PRIOR | 4,813,247 | 4,631,892 | 4,450,537 | 4,269,192 |
| UNDIVIDED PROFITS - CURRENT | 963,277 | 2,009,094 | 3,064,836 | 4,261,163 |
| TOTAL EQUITY | 32,854,615 | 33,718,077 | 34,593,464 | 35,608,435 |
| TOTAL LIABILITIES AND EQUITY | $789,094,594 | $805,547,164 | $822,471,664 | $840,009,841 |
| RAP LEVERAGE | 4.164% | 4.186% | 4.206% | 4.239% |
| GAAP LEVERAGE | 2.425% | 2.483% | 2.538% | 2.606% |
| INTANGIBLE ASSETS TO TOTAL ASSETS | 4.074% | 3.890% | 3.711% | 3.375% |

CONSOLIDATED
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1991

| INTEREST INCOME | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | TO |
|---|---|---|---|---|---|
| LOANS | $13,301,397 | $13,692,781 | $13,677,269 | $14,194,881 | $54, |
| MBS | 2,193,682 | 2,268,437 | 2,272,229 | 2,356,395 | 9, |
| INVESTMENTS | 1,222,362 | 1,250,125 | 1,340,720 | 1,283,523 | 4, |
| INVESTMENT IN AFFILIATE | 207,834 | 211,021 | 204,364 | 206,635 | |
| LOAN DISCOUNT | 57,000 | 57,000 | 57,000 | 57,000 | |
| TOTAL INTEREST INC. | 16,982,275 | 17,479,364 | 17,451,581 | 18,098,434 | 70, |
| **INTEREST EXPENSE** | | | | | |
| DEPOSITS | 10,268,150 | 10,504,451 | 10,399,269 | 10,720,573 | 41, |
| BORROWINGS | 2,762,239 | 2,859,449 | 2,850,066 | 2,955,452 | 11, |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | |
| OTHER | 3,000 | 3,000 | 3,000 | 3,000 | |
| TOTAL INTEREST EXP. | 13,033,389 | 13,366,900 | 13,252,335 | 13,679,025 | 53, |
| NET INT. SPREAD | $3,948,886 | $4,112,464 | $4,199,246 | $4,419,409 | $16, |
| **OTHER INC. (EXP.)** | | | | | |
| LOAN & COMMITMENT FEES | 109,000 | 109,000 | 109,000 | 109,000 | |
| OTHER FEES | 340,000 | 340,000 | 340,000 | 340,000 | 1, |
| SERVICE INCOME | 183,000 | 198,000 | 213,000 | 228,000 | |
| SERVICE CORP | 440,000 | 440,000 | 440,000 | 440,000 | 1, |
| RESERVE FOR LOANS & REO LOSSES | (100,000) | (100,000) | (100,000) | (100,000) | ( |
| GAIN (LOSS) ON INVESTMENT | 43,500 | 43,500 | 43,500 | 43,500 | |
| GAIN (LOSS) ON LOAN SALES | 330,000 | 360,000 | 315,000 | 330,000 | 1, |
| OTHER INCOME (EXPENSE) | 176,000 | 176,000 | 176,000 | 176,000 | |
| TOTAL OTHER INCOME | 1,521,500 | 1,566,500 | 1,536,500 | 1,556,500 | 6, |
| **OPERATING EXP.** | | | | | |
| PERSONNEL | 1,306,874 | 1,380,325 | 1,412,364 | 1,435,195 | 5, |
| COMMUNICATIONS | 149,342 | 149,954 | 150,368 | 150,895 | |
| ADVERTISING | 116,835 | 117,310 | 117,786 | 119,265 | |
| TRAVEL & ENTERTAINMENT | 35,291 | 35,432 | 35,574 | 35,717 | |
| OFFICE SUPPLIES | 113,772 | 114,191 | 114,612 | 115,035 | |
| INSURANCE | 360,749 | 361,853 | 362,962 | 364,077 | 1, |
| DATA PROCESSING | 293,994 | 294,949 | 295,909 | 296,873 | 1, |
| TAXES AND LICENSES | 149,303 | 149,839 | 150,378 | 150,920 | |
| LEGAL & ACCOUNTING | 66,326 | 66,453 | 66,580 | 66,708 | |
| OCCUPANCY | 271,565 | 272,563 | 273,565 | 274,573 | 1, |
| DEPREC./AMORT. | 925,004 | 925,004 | 925,004 | 925,004 | 3, |
| OTHER | 150,309 | 150,785 | 151,264 | 151,745 | |
| TOTAL OPERATING EXP. | 3,939,364 | 4,018,557 | 4,056,367 | 4,084,929 | 16, |
| NET INC (LOSS)BEFORE TAX | $1,531,021 | $1,660,407 | $1,679,378 | $1,900,921 | $6, |
| TAX (PROVISION) BENEFIT | (567,744) | (615,589) | ([illegible],637) | (704,593) | (2, |
| NET INC (LOSS) | $963,277 | $1,044,817 | $1,056,742 | $1,196,327 | $4, |
| PREFERRED DIVIDEND | 181,355 | 181,355 | 181,355 | 181,355 | |
| EARNINGS AVAILABLE TO COMMON | $781,922 | $863,462 | $875,387 | $1,014,972 | $3, |
| YIELD ON EARNING ASSETS | 9.385% | 9.632% | 9.175% | 9.378% | |
| COST OF SAVINGS AND BORROWINGS | 7.038% | 7.225% | 6.863% | 7.014% | |
| SPREAD DIFFERENCE | 2.347% | 2.407% | 2.311% | 2.364% | |
| SPREAD ON AVG EARNING ASSETS | 2.192% | 2.256% | 2.208% | 2.290% | |

CERTIFICATE OF CORPORATE RESOLUTION

OF

STERLING SAVINGS ASSOCIATION

I, Ned M. Barnes, Secretary of Sterling Savings Association do hereby certify that a meeting of the Board of Directors of said corporation duly held on the 20th day of December, 1988, which a quorum was present and acting throughout, the following resolution was duly adopted and is now in full force and effect and that said resolution is not in conflict with any provisions of the Articles of Incorporation or Bylaws of the corporation:

WHEREAS, this corporation has previously directed and empowered its officers, or any one of them, to enter into an agreement for acquisition of the assets and liabilities of Central Evergreen substantially on the terms and conditions of an Acquisition Agreement presented to the Board; and

WHEREAS, pursuant to the authority granted under said resolutio this corporation entered into an Acquisition Agreement dated July 20, 1988 (the "Acquisition Agreement") and has effected the requisit applications for approval to the Federal Home Loan Bank Board and Wa ington State Supervisor of Savings and Loan Associations; and

WHEREAS, approvals have been received from the Federal Home Loa Bank Board by resolution No. 88-1273 dated December 8, 1988 ("the FHLBB Resolution") and by the Washington State Supervisor of Savings and Loan Associations office; and

WHEREAS, the FHLBB Resolution requires, among other things, that prior to the consummation of the merger and conversion contemplated by the Acquisition Agreement, the Board of Directors of this corporation, as the resulting institution, under the Acquisi- tion Agreement ratify the terms and conditions of the FHLBB Resoluti as well as the terms of the proposed conversion and merger;

NOW, THEREFORE, IT IS:

RESOLVED that the terms and conditions of the FHLBB Resolution are hereby agreed to and ratified;

BE IT FURTHER RESOLVED that the officers, or any one of them, are hereby directed and empowered to act on behalf of this corpora- tion in fulfilling the terms and conditions of the FHLBB Resolution including, without limitation, the execution of a written agree- ment which provides that for a period of five (5) years following the date of the acquisition, this corporation will operate within the scope of the business plan which was provided in connection with the application to the Federal Home Loan Bank Board and to provide reports to the supervisory agent for the Federal Home Loan Bank Board in accordance with said written agreement, as well

BE IT FURTHER RESOLVED that the effective date as called for under the Acquisition Agreement shall be December 31, 1988; and

BE IT FURTHER RESOLVED that the officers of this corporation, or any one of them, are hereby directed and empowered to execute and deliver any and all documents which may be required to consummate the acquisition under the Acquisition Agreement, to comply with the terms and conditions of the FHLBB Resolution, and to comply with any and all other terms and conditions required by any other regulatory agency having jurisdiction over the transaction and this corporation.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 1988.

Ned M Barnes

NED M. BARNES
Secretary

GRAHAM & DUNN

# MEMORANDUM

TO: Betty Reed
Ed Hedlund
Carol Gamble
Craig Nolte
Dan Byrne
Lee Greene
John Van Dijk

FROM: Parker Cann

DATE: December 20, 1988

RE: **Closing Memorandum - Conversion/Merger of Central Evergreen Federal Savings and Loan Association into Sterling Savings Association**

---

This memorandum will set forth guidelines for the closing of the conversion/merger of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") into Sterling Savings Association ("Sterling"). The conversion/merger may be referred to hereinafter sometimes as "Acquisition."

## SECTION I. PLAYERS LIST

Following is a list of the individuals who will be involved in the closing of the Acquisition, along with their addresses, phone numbers and telecopy (fax) numbers.

1. Betty Reed, Supervisor
Department of General Administration
Division of Savings & Loan Associations
217-C General Administration Building
Olympia, Washington 98504

Phone: (206) 753-5597
Fax: (206) 753-6070

2. Ed Hedlund, Senior Supervisory Agent
Carol Gamble, Senior Supervisory Analyst
Craig Nolte, Supervisory Analyst

Federal Home Loan Bank of Seattle
1501 Fourth Avenue
Seattle, WA 98101-1693
Phone: (206) 340-2300
Fax: (206) 340-2485

3. Dan Byrne, Senior Vice President/Finance

Sterling Savings Association
North 120 Wall Street
Spokane, WA 99201
Phone: (509) 624-4114
Fax: (509) 458-4013

4. Lee Greene, Esq.
(Outside counsel representing Sterling)

Witherspoon, Kelley, Davenport & Toole
1100 Old National Bank Building
Spokane, WA 99201-0390
Phone: (800) 552-0042 (from Seattle)
Fax: Call the above number and tell the person answering the phone that you need to be connected to the fax machine.

5. John Van Dijk, Senior Vice President/Chief Operating Officer

Central Evergreen Federal Savings and Loan Association
350 North Market Blvd.
Chehalis, WA 98532
Phone: (206) 748-0171
Fax: (206) 748-6377

6. J. Parker Cann, Esq.
(Outside counsel representing Central Evergreen)

Graham & Dunn
34th Floor, Rainier Bank Tower
1301 Fifth Avenue
Seattle, WA 98101-2653
Phone: (206) 624-8300
Fax: (206) 624-8731 or (206) 447-7051

In the event any of these individuals are unable to participate in the closing, appropriate individuals may act in their stead.

**SECTION II. CLOSING DOCUMENTS**

The parties have agreed to close the Acquisition on December 30, 1988 ("Closing Date"), and to make the Acquisition effective on December 31, 1988 ("Effective Date"). Following is a list of documentary items which must be exchanged prior to closing the Acquisition.

Item 1. A letter to Ed Hedlund, Senior Supervisory Agent, dated December 30, 1988, signed by the chief financial officer of Sterling, certifying that "no material adverse events or changes have occurred with respect to the condition of Sterling since the date of the financial statements submitted with the application to the FHLBB for the approval of the conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling."

[The letter certification is required by section 3 on page 3 of the Federal Home Loan Bank Board ("FHLBB") Resolution No. 88-1273, dated December 8, 1988, approving the Acquisition ("FHLBB Resolution"). A copy of the FHLBB Resolution is attached.]

Item 2. A certified resolution of the Board of Directors of Sterling which shall "ratify the terms and conditions of FHLBB Resolution No. 88-1273 and the terms of the proposed conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling."

[The certified resolution is required by section 5 on page 3 of the FHLBB Resolution and by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

Item 3. A written agreement executed by Sterling and the FSLIC concerning compliance with the business plan, submission of periodic reports explaining material deviations from the business plan, maintenance of capital, and sanctions for failure to do so.

[The Federal Home Loan Bank of Seattle ("FHLBank") provided a draft of the agreement to Sterling and Central Evergreen on December 19, 1988. The agreement is required by sections 6 and 8 on pages 3 and 4 of the FHLBB Resolution.]

Item 4. A letter to Ed Hedlund, Senior Supervisory Agent, dated December 30, 1988, signed by the chief financial officer of Central Evergreen, stating that "no material adverse events or changes have occurred with respect to the condition of Central Evergreen since the date of

the financial statements submitted with the application to the FHLBB for approval of the conversion/merger of Central Evergreen into Sterling Savings Association."

[The letter certification is required by section 3 on page 3 of the FHLBB Resolution.]

Item 5. A certified resolution of the Board of Directors of Central Evergreen: (i) "accepting the terms and conditions of FHLBB Resolution No. 88-1273"; and (ii) authorizing, as of the Effective Date, the Stock Charter, Bylaws, and Stock Certificate of Central Evergreen Federal Savings and Loan Association (Stock), as set forth in the Exhibits to the application to the FHLBB for approval of the conversion/merger into Sterling Savings Association.

[The portion of the certified resolution under Item 5 (i) above is required by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

Item 6. The executed Federal Stock Charter and Bylaws of Central Evergreen Federal Savings and Loan Association (Stock).

Item 7. The executed Stock Certificate of Central Evergreen Federal Savings and Loan Association (Stock), dated December 31, 1988, evidencing ownership of 100 shares of common stock, $1.00 par value per share, by Sterling.

Item 8. Certificate(s) of Succession, or document(s) of similar import, signed by an officer(s) of Central Evergreen, as may be required by Sterling.

Item 9. A letter to the chief executive officers of Central Evergreen and Sterling, dated December 31, 1988, signed by Ed Hedlund, Senior Supervisory Agent, which: (i) terminates, as of December 31, 1988, the Supervisory Agreement between the FHLBB and Central Evergreen; and (ii) provides that 12 C.F.R. Part 563b, Subpart A, is clearly inapplicable to the conversion/merger of Central Evergreen into Sterling and need not be complied with in regard thereto.

Item 10. A letter to the chief executive officers of Sterling and Central Evergreen dated December 30, 1988, signed by Ed Hedlund, Senior Supervisory Agent, which indicates: (i) that he "has determined that all conditions precedent to the conversion/merger of Central Evergreen Federal Savings and Loan Association into Sterling

Savings Association have been met and that the Boards of Directors of Sterling and Central Evergreen have accepted the terms and conditions of FHLBB Resolution No. 88-1273"; and (ii) that the conversion/merger of Central Evergreen into Sterling will take effect, pursuant to the fourth "RESOLVED FURTHER" paragraph of FHLBB Resolution No. 88-1273, at 12:01 a.m. on December 31, 1988.

[The determination under Item 10 (i) above is required by the fourth "RESOLVED FURTHER" paragraph (entitled "Effective Date") on page 5 of the FHLBB Resolution.]

**SECTION III. PRE-CLOSING**

Certain individuals have agreed to arrange for the delivery, by telecopy or other means, of the draft of certain Items (under Section II above) to certain other parties, on or before December 21, 1988, as follows:

| Delivering Party | Draft of Documents | Delivered To |
|---|---|---|
| Dan Byrne | Items 1 & 2 | Ed Hedlund |
| Dan Byrne | Item 8 | John Van Dijk |
| John Van Dijk | Items 4 & 5 | Ed Hedlund |
| Ed Hedlund | Items 3, 9 & 10 | Dan Byrne & John Van Dijk |

Under the terms of this Closing Memorandum, an Item will not be deemed delivered until it is received by the intended recipient. The appropriate individuals will be responsible to work out any differences in the wording of these draft documents by the close of business on December 23, 1988.

**SECTION IV. CLOSING**

Written approvals necessary from the Washington State Supervisor of Savings and Loan Associations for closing of the conversion/merger have been received by Sterling.

Certain individuals have agreed to arrange for the delivery of the original of certain Items (under Section II above), as set forth in the chart below, to Lee Greene as escrow on or before December 27, 1988. Lee Greene will hold these documents for delivery to certain individuals until promptly after closing of the Acquisition in accordance with the following chart.

| Delivering Party | Original Documents | Delivered After Closing To |
|---|---|---|
| Dan Byrne | Items 1, 2 & 3 | Ed Hedlund |
| John Van Dijk | Items 4, 5 & 6 | Ed Hedlund |
| John Van Dijk | Items 7 & 8 | Dan Byrne |
| Carol Gamble | Items 9 & 10 | Dan Byrne |

The closing will be conditioned upon receipt by Lee Gr ne on December 30, 1988, of verbal authorizations from Carol Gar e, Dan Byrne and John Van Dijk for delivery of these documents nd closing of the conversion/merger.

Carol Gamble, Dan Byrne, John Van Dijk and Lee Greene ll join in a conference call, initiated by Lee Greene, promptl at 10:00 a.m. on December 30, 1988, for the purpose of delive ng the authorizations. Upon receipt by Lee Greene of these auth i-zations, the closing will be deemed to have occurred on De m-ber 30, 1988, and the conversion/merger will take effect on December 31, 1988. After the closing, Mr. Greene will prom ly deliver, in accordance with the chart noted above in is Section IV, the documents held in escrow.

FEDERAL HOME LOAN BANK BOARD

No. 88-1273

Date: December 8, 19

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterlin Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December 5, 1988, a memorandum from the Office of District Banks, dated December 5, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

SUPERVISORY CASE FINDING

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

## TAX CERTIFICATION

RESOLVED FURTHER, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

RESOLVED FURTHER, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

## CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS

RESOLVED FURTHER, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

## EFFECTIVE DATE

RESOLVED FURTHER, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

## MISCELLANEOUS

RESOLVED FURTHER, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the PSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

## EXTENSION OF TIME

RESOLVED FURTHER, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and

MAINTENANCE OF BRANCH OFFICES

RESOLVED FURTHER, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

FAILURE TO MEET CONDITIONS

RESOLVED FURTHER, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board

John F. Ghizzoni
Assistant Secretary