# ACQUISITION AGREEMENT

Between

STERLING SAVINGS ASSOCIATION

and

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

# ACQUISITION AGREEMENT

## Table of Contents


| | | Page |
|---|---|---|
| RECITALS | | 1 |
| Section 1. The Acquisition | | 1 |
| 1.1 | Agreement to Acquire and Merge | 1 |
| 1.2 | Approval by Boards of Directors | 2 |
| 1.3 | Filing of Required Regulatory Applications and Notices | 2 |
| 1.4 | Interest of Members of Central Evergreen | 3 |
| 1.5 | Transfer of Shares Upon Conversion | 3 |
| 1.6 | Savings Accounts and Deposits | 3 |
| 1.7 | Offices | 3 |
| 1.8 | Transfer of Assets and Assumption of Liabilities | 3 |
| 1.9 | Articles of Incorporation and Bylaws | 4 |
| 1.10 | Directors and Officers of the Surviving Corporation | 4 |
| 1.11 | Directors, Officers and Employees of Central Evergreen | 5 |
| 1.12 | Effective Date of Acquisition | 8 |
| Section 2. The Closing | | 8 |
| Section 3. Representations and Warranties of Central Evergreen | | 8 |
| 3.1 | Corporate Organization | 8 |
| 3.2 | Subsidiaries | 9 |
| 3.3 | Financial Statements | 9 |
| 3.4 | Absence of Undisclosed Liabilities | 9 |
| 3.5 | Absence of Certain Changes | 9 |
| 3.6 | Litigation, Etc. | 10 |
| 3.7 | Contracts | 10 |
| 3.8 | Title | 10 |
| 3.9 | Tax Returns | 10 |
| 3.10 | No Violation | 11 |
| 3.11 | ERISA Compliance | 11 |
| Section 4. Representations and Warranties of Sterling | | 11 |
| 4.1 | Corporate Organization and Good Standing | 11 |
| 4.2 | Capitalization | 12 |
| 4.3 | Financial Statements | 12 |

4.4 Absence of Undisclosed Liabilities .............. 12
4.5 Absence of Certain Changes ...................... 12
4.6 Litigation, Etc. ................................ 12
4.7 Title ........................................... 13
4.8 Tax Returns ..................................... 13
4.9 No Violation .................................... 13

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition ............. 13

5.1 No Change in Charter or Bylaws .................. 13
5.2 Conduct of Business ............................. 14

Section 6. Access and Cooperation ........................ 14

6.1 Access .......................................... 14
6.2 Cooperation ..................................... 14

Section 7. Confidentiality and Announcements ............. 14

7.1 Confidentiality ................................. 14
7.2 Announcements ................................... 15

Section 8. Solicitation of Employees ..................... 15

Section 9. Conditions Precedent to the Obligations of Sterling ............................................ 15

Section 10. Condition Precedent to the Obligations of Central Evergreen .................................. 15

Section 11. Abandonment of Acquisition ................... 16

Section 12. Miscellaneous Provisions ..................... 17

12.1 Expenses ....................................... 17
12.2 Litigation Costs ............................... 17
12.3 Parties in Interest ............................ 17
12.4 Headings ....................................... 18
12.5 Entire Agreement/Modification/Waiver ........... 18
12.6 Counterparts ................................... 18
12.7 Governing Law .................................. 18
12.8 Binding Nature of Agreement; No Assignment ...... 18
12.9 Notice Provisions .............................. 18

# Table of Exhibits


| Exhibit | |
| --- | --- |
| 1 | Plan of Conversion |
| 2 | Branch Offices of Surviving Corporation |
| 3.1 | Articles of Incorporation (Sterling) |
| 3.2 | Bylaws (Sterling) |
| 4.1 | Employment Contract of George E. Godding dated December 31, 1986 |
| 4.2 | Employment Contract of John G. Van Dijk dated December 12, 1985 |
| 4.3 | Employment Contract of Carole Neuheuser dated December 13, 1985 |
| 4.4 | Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981 |
| 4.5 | Agreement with Joyce Butkus dated November 6, 1987 |
| 5 | Association Policy on Group Insurance of Retired CEF Employees/Directors dated September 10, 1986 |
| 6 | Vacation Policy Statement (Sterling) |
| 7 | Litigation (Central Evergreen) |
| 8 | Contracts (Central Evergreen) |
| 9 | Title to Property (Central Evergreen) |
| 10 | Litigation (Sterling) |

# ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT is entered into as of July 20, 1988, by and between STERLING SAVINGS ASSOCIATION (hereinafter "Sterling"), and CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION (hereinafter "Central Evergreen").

## RECITALS

WHEREAS, Sterling is a stock savings and loan association duly organized and existing under the laws of the State of Washington, with its principal office located at Spokane, Washington; and

WHEREAS, Central Evergreen is a mutual savings and loan association duly organized and existing under the laws of the United States, with its principal office located at Chehalis, Washington; and

WHEREAS, the Board of Directors of the parties deem it desirable and in the best interests of the corporations, their shareholders, and members, as the case may be, that Central Evergreen be converted into a federal stock association, its stock be acquired by Sterling, and Central Evergreen be simultaneously merged into Sterling, in accordance with the applicable provisions of the laws of the State of Washington and the United States, with Sterling being the surviving corporation;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereby agree as follows:

## Section 1. The Acquisition

1.1 Agreement to Acquire and Merge. Subject to the provisions of this Acquisition Agreement ("Agreement") and the obtaining of all required regulatory approvals, Central Evergreen

shall convert into a federal stock association in a voluntary supervisory stock conversion pursuant to the Plan of Conversion attached hereto as Exhibit 1 and in accordance with 12 C.F.R. §§563b.20 through 563b.32 ("Conversion") and, as an integral part of and immediately following such Conversion, Sterling shall acquire all of the stock of Central Evergreen, and Central Evergreen shall merge with and into Sterling (the "Acquisition"), with Sterling being the surviving corporation ("Surviving Corporation"). On the Effective Date (hereinafter defined in Section 1.12), the separate corporate existence of Central Evergreen shall cease. The Surviving Corporation shall continue to operate after the Effective Date under the name and style of Sterling Savings Association, or such other name as the Board of Directors of the Surviving Corporation may determine.

1.2 Approval by Boards of Directors. At least two-thirds of the Board of Directors of Central Evergreen have approved the plan of acquisition as evidenced by this Agreement. At least a majority of the Board of Directors of Sterling have approved the plan of acquisition as evidenced by this Agreement.

1.3 Filing of Required Regulatory Applications and Notices. Upon the execution and delivery of this Agreement, Sterling and Central Evergreen shall cause to be prepared and filed with the Federal Home Loan Bank Board ("FHLBB") an application for approval of the Conversion and an application for approval of the Acquisition. In addition, Sterling shall cause to be prepared and filed in a timely manner any application or notice to the Washington State Supervisor of Savings and Loan Associations ("State Supervisor") as required by law, including without limitation RCW 33.08.110. These applications and notices shall be in such forms as may be prescribed by the respective regulatory authorities and shall contain such information as the authorities may require. The parties shall take every reasonable and necessary step and action to comply with, and secure such approval as may be required by, the statutes, rules, and regulations applicable to this Agreement and the transactions contemplated herein and shall use their best efforts to secure such

approvals on terms and conditions mutually agreeable to Ster[l] and Central Evergreen. Sterling shall use its best efforts secure approval of the Acquisition by the Shareholders Sterling if the State Supervisor determines that such approval required.

1.4 Interest of Members of Central Evergreen. The memb of Central Evergreen shall have no rights of approval or parti pation in the Conversion and no rights to the continuance of legal or beneficial ownership interest in Central Evergreen the Surviving Corporation.

1.5 Transfer of Shares Upon Conversion. On the Effect Date, Central Evergreen will issue all authorized shares of capital stock to Sterling.

1.6 Savings Accounts and Deposits. All savings accou and deposits in Central Evergreen shall be and become savi accounts and deposits in the Surviving Corporation without cha in their respective terms, maturities, interest rates, mini required balances or withdrawal values. As of the Effect Date, each savings account and deposit of Central Evergreen sh be considered for dividend or interest purposes as if it had b a savings account or deposit of the Surviving Corporation at t time such savings account or deposit was opened in Cent Evergreen and at all times thereafter, until such savings acco t or deposit ceases to be a savings account or deposit of t e Surviving Corporation. Appropriate evidence of ownership f savings accounts or deposits in the Surviving Corporation shall be provided by the Surviving Corporation to each savings account holder and depositor of Central Evergreen.

1.7 Offices. The location of the home office of the Surviving Corporation shall be the present location of the home office of Sterling and all offices of Central Evergreen shall become branch offices of the Surviving Corporation. The location of all branch offices of the Surviving Corporation shall be as provided in Exhibit 2 attached hereto.

1.8 Transfer of Assets and Assumption of Liabilities. Upon the Effective Date, all of the assets and property of every kind

and character, real, personal and mixed, tangible and intangible, choses in action, rights, and credits then owned by Central Evergreen, or which would inure to Central Evergreen, shall immediately, and by operation of law and without any conveyance or transfer and without any further act or deed, be vested in and become the property of the Surviving Corporation, which shall have, hold and enjoy the same in its own right as fully and to the same extent as the same were possessed, held and enjoyed by Central Evergreen immediately prior to the Effective Date. The Surviving Corporation shall be deemed to be and shall be a continuation of the entity of Central Evergreen and the rights and obligations of Central Evergreen shall remain unimpaired. Upon the Effective Date, the Surviving Corporation shall assume and succeed to all of such rights and obligations and the duties and liabilities connected therewith.

1.9 Articles of Incorporation and Bylaws. The articles of incorporation and bylaws of Sterling immediately prior to the Effective Date shall continue to be the articles of incorporation and bylaws of the Surviving Corporation following the Effective Date, except as may be otherwise contemplated herein, and shall thereafter control the affairs of the Surviving Corporation unless and until amended in due and proper course. A copy of the current articles of incorporation and bylaws of Sterling are attached hereto as Exhibits 3.1 and 3.2, respectively.

1.10 Directors and Officers of the Surviving Corporation. The directors and officers of Sterling immediately prior to the Effective Date shall continue as the directors and officers of the Surviving Corporation for the full unexpired term of their offices and until their successors have been elected or appointed and qualified. In addition, Sterling's Board of Directors shall cause such changes, if any, as may be required to the Surviving Corporation's bylaws to permit the addition of two persons to the Surviving Corporation's Board of Directors and shall choose two individuals from Central Evergreen's Board of Directors, as such Board exists immediately prior to the Effective Date, to be added to the Surviving Corporation's Board of Directors.

1.11 <u>Directors, Officers and Employees of Central Evergreen</u>.

(a) <u>Directors' Participation in Medical/Dental Plans of the Surviving Corporation</u>. The parties agree that the Surviving Corporation shall use its best efforts to allow those individuals who are directors of Central Evergreen immediately prior to the Effective Date to participate, to the extent permitted under the Surviving Corporation's existing plans, at their own expense, in the medical and dental plans offered by the Surviving Corporation to its officers and employees, without regard for any plan exclusions on account of pre-existing conditions and such that coverage can be continued after the Effective Date without loss to any such directors. Such individuals may from time to time so elect to participate in said plans, at their own expense, at any time up to their death.

(b) <u>Employees</u>. Upon the Effective date, it is intended that the employees of Central Evergreen shall become employees of the Surviving Corporation upon terms and conditions of employment substantially equivalent to the terms and conditions of employment of all other employees of the Surviving Corporation, except as may be otherwise contemplated herein. The ultimate decisions relating to the retention, assignment, and compensation of all personnel of the Surviving Corporation will be the responsibility of management of the Surviving Corporation, subject to the provisions of this Agreement. Any employee benefits offered by the Surviving Corporation shall be made available on an equal basis to the individuals employed by Central Evergreen immediately prior to the Effective Date who are then employed by the Surviving Corporation immediately following the Effective Date ("Prior Central Evergreen Employees"), and such Employees shall receive full credit for service with Central Evergreen and its predecessors under the benefit plans offered by the Surviving Corporation, except as detailed in the following sentence and in subsection 1.11(c) below. In regard to medical and dental plans

offered by the Surviving Corporation, to the extent p mitted under Surviving Corporation's plans, the Surviv Corporation shall use its best efforts to allow the Pr. Central Evergreen Employees to participate without rega for any plan exclusions on account of pre-existing cond tions and such that coverage can be continued after t Effective Date without loss to any such Employees.

(c) Employee Retirement Plans. Prior Central Eve green Employees shall: (i) be eligible to participate . the 401(k) plan of the Surviving Corporation and any oth retirement plans made available by the Surviving Corporati to its employees in accordance with the eligibility cond: tions of such plans; and (ii) receive full credit fc service to Central Evergreen and its predecessors prior t the Effective Date for the purpose of establishing vestir in employer contributions to the Surviving Corporation' 401(k) or in other retirement plans, but shall not receiv such credit for participation eligibility purposes.

After the Effective Date, the Surviving Corpora- tion may determine to terminate the defined benefit pensio plan of Central Evergreen; provided, however, that such termination shall not occur until after all Prior Central Evergreen Employees have first become eligible to partici- pate in the 401(k) plan of the Surviving Corporation. Any such termination shall be effected in accordance with the provisions of such plan and applicable law. The Surviving Corporation shall continue to fund the participation of all Prior Central Evergreen Employees in the plan at appropriate levels under the plan until such termination of the plan by the Surviving Corporation is effective.

Upon termination of the defined benefit pension plan, the Prior Central Evergreen Employees shall be entitled to, at their election, cash out their interest in the plan, or receive an annuity contract which would provide benefits equivalent to those to which the employee was entitled under the plan, or roll over their interest into

the Surviving Corporation's 401(k) or other retirement plans. Any assets remaining in Central Evergreen's defined benefit pension plan after satisfaction of all obligations shall be assets of the Surviving Corporation.

(d) Assumption of Employment Agreements of Central Evergreen. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation shall assume the obligations of Central Evergreen under:

(1) the Employment Contract of George E. Godding dated December 31, 1986;

(2) the Employment Contract of John G. Van Dijk dated December 12, 1985;

(3) the Employment Contract of Carole Neuheuser dated December 13, 1985;

(4) the Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981;

(5) the Agreement with Joyce Butkus dated November 6, 1987.

Copies of said contracts and agreements are attached hereto as Exhibits 4.1, 4.2, 4.3, 4.4, and 4.5, respectively.

(e) Group Insurance for Retired Employees/Directors. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation will assume Central Evergreen's obligations under Central Evergreen's "Association Policy on Group Insurance of Retired CEF Employees/Directors," dated September 10, 1986, to Central Evergreen directors and Employees who retire prior to the Effective Date and to all Prior Central Evergreen Employees who retire after the Effective Date. A copy of said Policy is attached hereto as Exhibit 5.

(f) Vacation Leave. Notwithstanding any other provisions of this Section 1.11, the parties agree that all Prior Central Evergreen Employees shall be entitled to

vacation leave in accordance with the Vacation Pc :y Statement of Sterling, a copy of which is attached here! s Exhibit 6.

1.12 Effective Date of Acquisition. The Acquisition s l become effective upon the date ("Effective Date") specifie y the FHLBB and State Supervisor or, in the absence of h specification, the date agreed to by the parties, after e Acquisition has been approved by all necessary governme l agencies and authorities and after all applicable wai g periods, if any, have elapsed.

Section 2. The Closing.

The parties shall use their best efforts to complete e Acquisition at the earliest practicable date following e satisfaction or waiver of all of the conditions to each pai s obligations set forth herein, but in no event later n November 30, 1988, unless the parties shall before then e otherwise agreed in writing. On or before the Effective D , the closing of the Acquisition shall take place at the princ l office of Sterling ("Closing"). The exact date and time of e Closing shall be determined by Sterling and communicated o Central Evergreen promptly after all such conditions have n satisfied or waived. If the Closing does not occur on or be e November 30, 1988, or such later date as the parties may agre n writing, this Agreement shall be deemed abandoned.

Section 3. Representations and Warranties of Central Evergre

Central Evergreen represents and warrants that:

3.1 Corporate Organization. Central Evergreen is a mu l savings and loan association duly organized and validly exis ig under the laws of the United States, and possesses all approv :, consents and licenses required to fully act as a federal mu l savings and loan association. Each of Central Evergre 's subsidiaries is a corporation duly organized, validly exis ng and in good standing under the laws of the State of Washing n, and possesses all approvals, consents and licenses required o

fully carry on its respective business. Central Evergreen and its subsidiaries are qualified to do business as foreign corporations in each jurisdiction, if any, in which their property or business requires such qualification.

3.2 <u>Subsidiaries</u>. Central Evergreen has the following subsidiaries which are wholly-owned by Central Evergreen: Evergreen First Service Corporation ("EFSC") and Evergreen Environmental Development Corporation. The Best Agency is the wholly-owned subsidiary of EFSC.

3.3 <u>Financial Statements</u>. Central Evergreen's balance sheets as of December 31, 1983, 1984, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Knight, Vale & Gregory, and the unaudited balance sheets and related statements of income and retained earnings for the quarter ended March 31, 1988, copies of which have been separately delivered by Central Evergreen to Sterling, fairly present the financial condition of Central Evergreen as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles or regulatory accounting principles consistently applied for the periods covered.

3.4 <u>Absence of Undisclosed Liabilities</u>. Except to the extent reflected or reserved against in Central Evergreen's balance sheet as of December 31, 1987, Central Evergreen did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles or regulatory accounting principles.

3.5 <u>Absence of Certain Changes</u>. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Central Evergreen to Sterling, there has been no material adverse change in the business, properties or financial condition of Central Evergreen or its subsidiaries since December 31, 1987.

3.6 Litigation, Etc. Except as disclosed on Exhibit 7 attached hereto, there is no litigation, proceeding or investigation pending or, to the knowledge of Central Evergreen, threatened against Central Evergreen or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Central Evergreen or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Central Evergreen in connection with this Agreement.

3.7 Contracts. Except as disclosed on Exhibits 4.1, 4.2, 4.3, 4.4 and 4.5, and Exhibit 8, attached hereto, neither Central Evergreen nor its subsidiaries are party to any lease, loan or credit agreement, contract or other commitment including, without limitation, employment contracts, (i) involving an aggregate payment by Central Evergreen or its subsidiaries of more than Two Thousand Dollars ($2,000.00); or (ii) involving obligations to be performed later than one year from the date hereof. Any and all requisite governmental approvals have been obtained and corporate action taken for such agreements to be effective and enforceable.

3.8 Title. Central Evergreen has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Central Evergreen as of March 31, 1988, other than property disposed of in the ordinary course of business after said date. Except as disclosed on Exhibit 9 attached hereto, such property of Central Evergreen is not subject to any mortgage, encumbrance or lien of any kind, which, as now enforced, interferes with its normal current business use.

3.9 Tax Returns. The federal income tax returns of Central Evergreen have been audited by the Internal Revenue Service for the years 1969 to 1979 and 1981 and 1982. Except as heretofore disclosed in writing by Central Evergreen to Sterling, the provisions for federal and state taxes reflected in the financial statements referred to in Section 3.3 hereof are adequate to cover any such taxes which may be assessed against Central Evergreen in respect of its business and operations during the

periods covered by said financial statements and all prior periods.

3.10 <u>No Violation</u>. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation, to which any property of Central Evergreen or its subsidiaries is subject or by which Central Evergreen or its subsidiaries is bound.

3.11 <u>ERISA Compliance</u>. Central Evergreen and its subsidiaries are in compliance in all material respects with the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and the regulations and published interpretations thereunder. It is anticipated that additional plan amendments will be made, in accordance with the time requirements set forth in federal regulations, as needed to update the plan to comply with the Tax Reform Act of 1988 and the Omnibus Budget Reconciliation Act of 1987. Without limiting the foregoing, no Reportable Event described in §4043(b) of ERISA, filing of a notice of intent to terminate under §4041 of ERISA, or any event or condition which might constitute grounds under §4042 of ERISA for termination of, or for the appointment of a trustee to administer, any pension or profit-sharing plan of Central Evergreen or its subsidiaries, has occurred with respect to any Employee Benefit Plan described in §3(3) of ERISA administered by Central Evergreen or its subsidiaries or any administrator designated by Central Evergreen or such subsidiaries. Based on reasonable projections, there are no unfunded vested liabilities under any pension plans administered by Central Evergreen, its subsidiaries or administrators designated by Central Evergreen or its subsidiaries, at December 31, 1987.

<u>Section 4. Representations and Warranties of Sterling</u>.

Sterling represents and warrants that:

4.1 <u>Corporate Organization and Good Standing</u>. Sterling is a stock savings and loan association duly organized, validly

existing and in good standing under the laws of the State of Washington, and possesses all approvals, consents, and licenses required to fully act as a Washington state stock savings and loan association.

4.2 Capitalization. Sterling's authorized capital stock consists of eight million (8,000,000) shares of Sterling common stock, One Dollar ($1.00) par value, of which 468,996 shares are issued and outstanding; and one million (1,000,000) shares of preferred stock, One Dollar ($1.00) par value, of which 90,168 shares are issued and outstanding.

4.3 Financial Statements. Sterling's balance sheets as of June 30, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Coopers & Lybrand, and the unaudited balance sheets and related statements of income and retained earnings for the periods ended September 30, 1987, December 31, 1987, March 31, 1988 and June 30, 1988, copies of which have been separately delivered by Sterling to Central Evergreen, fairly present the financial condition of Sterling as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles consistently applied for the periods covered.

4.4 Absence of Undisclosed Liabilities. Except to the extent reflected or reserved against in Sterling's balance sheet as of June 30, 1988, Sterling did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles.

4.5 Absence of Certain Changes. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Sterling to Central Evergreen, there has been no material adverse change in the business, properties or financial condition of Sterling or its subsidiaries since June 30, 1988.

4.6 Litigation, Etc. Except as disclosed on Exhibit 10 attached hereto, there is no litigation, proceeding or investi-

gation pending or, to the knowledge of Sterling, threatened against Sterling or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Sterling or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Sterling in connection with this Agreement.

4.7 Title. Sterling has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Sterling as of June 30, 1988, other than property disposed of in the ordinary course of business after said date. Such property of Sterling and its subsidiaries is not subject to any mortgage, encumbrance or lien of any kind, except as disclosed in its financial statements referred to in Section 4.3 hereof.

4.8 Tax Returns. Except as heretofore disclosed in writing by Sterling to Central Evergreen, the provisions for federal and state taxes reflected in the financial statements referred to in Section 4.3 hereof are adequate to cover any such taxes which may be assessed against Sterling in respect of its business and operations during the periods covered by said financial statements and all prior periods.

4.9 No Violation. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation to which any property of Sterling and its subsidiaries is subject or by which Sterling or its subsidiaries is bound.

## Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition.

Central Evergreen covenants that between the date of this Agreement and the Effective Date:

5.1 No Change in Charter or Bylaws. No change will be made in Central Evergreen's charter and bylaws, except as may be contemplated herein.

5.2 Conduct of Business. Central Evergreen will use its best efforts to maintain and preserve its present business organization, employee relationships and goodwill intact, and will not, without the written consent of Sterling, enter into any material commitment except in the ordinary course of business or increase, directly or indirectly, the compensation of any officer or employee whose annual rate of compensation after the increase will exceed Twenty Thousand Dollars ($20,000.00).

Section 6. Access and Cooperation.

6.1 Access. From the date hereof to the Effective Date, Sterling and Central Evergreen shall provide each other with such information and permit each other's officers and representatives such access to its properties and books and records as the other may from time to time reasonably request. If the Acquisition is not completed, all documents and other written materials received in connection with this Agreement shall be returned to the party furnishing the same, and all information so received shall be treated as confidential unless readily ascertainable from public information or sources.

6.2 Cooperation. The parties hereto will cooperate with each other in every way in carrying out the transactions contemplated herein, in obtaining all required approvals and authorizations therefor, and in executing and delivering all documents, instruments or copies thereof deemed necessary or useful by either party thereto.

Section 7. Confidentiality and Announcements.

7.1 Confidentiality. Until the Effective Date, each of the parties hereto and its employees, accountants, counsel, auditors and other representatives and agents shall keep confidential any information (unless readily ascertainable from public information or sources) obtained from the other party, except as may be required to be disclosed to shareholders of Sterling in proxy materials and as may be approved by the party from whom the information was obtained.

7.2 Announcements. Without the prior agreement of the other party, neither party shall, prior to the Effective Date hold any press interview or conference or make any written announcement or statement to the public or to its employees concerning the transactions contemplated by this Agreement.

Section 8. Solicitation of Employees.

If this Agreement is abandoned as contemplated by Sections 2 or 11 hereof, each of the parties hereto shall, for a period of one (1) year thereafter, refrain from soliciting any officers or key employees of the other for employment unless such other party is merged with or acquired by any other entity or is put into the possession or control of a receiver or conservator.

Section 9. Conditions Precedent to the Obligations of Sterling

The obligations of Sterling under this Agreement to complete the Acquisition are subject to the satisfaction of the following conditions unless waived by Sterling on or before the Effective Date:

(a) Shareholder Approval. If and to the extent the State Supervisor shall so require, Sterling shall have obtained the approval by the Sterling shareholders of the Acquisition.

(b) Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Sterling reasonably determines are unduly burdensome.

Section 10. Condition Precedent to the Obligations of Central Evergreen.

The obligations of Central Evergreen under this Agreement to complete the Acquisition are subject to the satisfaction of the following condition, unless waived by Central Evergreen on or before the Effective Date:

( (

Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Central Evergreen reasonably determines are unduly burdensome. Moreover, the Federal Home Loan Bank of Seattle shall terminate the Supervisory Agreement of Central Evergreen.

Section 11. Abandonment of Acquisition.

This Agreement may be abandoned at any time prior to the Effective Date (i) on the agreement of the Boards of Directors of both parties; or (ii) by action of the Board of Directors of either of the parties, or one of the parties if so noted below, on the happening of any of the following events:

(a) If all the required approvals of the FHLBB and State Supervisor have not been received on or before November 30, 1988, or such later date as the parties may agree in writing;

(b) If any material action or proceeding is instituted or threatened against either of the parties which would enjoin, prohibit or restrain the completion of the Acquisition;

(c) If, between the date of this Agreement and the Effective Date, there has been, in the opinion of either Board of Directors, a material adverse change in the business or financial condition of the other corporation;

(d) If, without the prior written consent of the other party, one of the parties shall have engaged in any transaction prohibited by this Agreement;

(e) By the Board of Directors of Sterling if any one or more of the conditions provided in Section 9 hereof shall not have been satisfied, and Sterling shall not have waived such failure; and

(f) By the Board of Directors of Central Evergreen if the condition provided in Section 10 hereof shall not have

been satisfied, and Central Evergreen shall not have waived such failure.

In the event of any abandonment of this Agreement pursuant to this Section 11, written notice setting forth the reasons therefor shall forthwith be given by the party abandoning this Agreement to the other party. In the event of the abandonment of this Agreement pursuant to the provisions of Sections 2 or 11 hereof, this Agreement shall have no further effect, and there shall be no liability on the part of any party or its directors, officers, employees or members; provided, however, that if any party hereto willfully fails to perform its obligations hereunder, or exercises any powers granted hereunder in bad faith, the other party hereto damaged thereby may seek any available legal or equitable remedies. Notwithstanding the previous sentence, Sections 7.1 and 8 and the last sentence of Section 6.1 shall survive any abandonment of this Agreement.

Section 12. Miscellaneous Provisions.

12.1 Expenses. Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transaction contemplated by this Agreement.

12.2 Litigation Costs. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

12.3 Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any

party to this Agreement, nor shall any provision give any th d persons any right of subrogation or action over against any pa y to this Agreement.

12.4 Headings. The subject headings of the Sections d subsections of this Agreement are included for purposes f convenience only, and shall not affect the construction r interpretation of any of its provisions.

12.5 Entire Agreement/Modification/Waiver. This Agreem t constitutes the entire agreement between the parties pertain g to the subject matter contained in it and supersedes all pr r and contemporaneous agreements, representations, and understa - ings of the parties.

At any time prior to the Closing, either party may n writing waive compliance by the other party with any of t e provisions hereof. No supplement, modification, or amendment o this Agreement shall be binding unless executed in writing by a l the parties. No waiver of any of the provisions of this Agre - ment shall be deemed, or shall constitute, a waiver of any oth r provision, whether or not similar, nor shall any waiver const - tute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

12.6 Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart shall constitute an original instrument.

12.7 Governing Law. This Agreement shall be interpreted in accordance with and governed by the laws of the State of Washington to the extent that Federal law does not control.

12.8 Binding Nature of Agreement; No Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; except that no party may assign or transfer its rights and obligations under this Agreement without the prior written consent of the other.

12.9 Notice Provisions. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and be effected by personal delivery or by

certified mail, postage prepaid, return receipt requested, and shall be deemed delivered as of the time of actual receipt. Such notices, requests, demands and other communications shall be addressed as set forth below:

(a) If to Sterling, to:

Sterling Savings Association
North 120 Wall
Spokane, Washington 99201
Attention: Daniel Byrne

(b) If to Central Evergreen, to:

Central Evergreen Federal Savings
and Loan Association
P.O. Box 1506
Chehalis, Washington 98532
Attention: George Godding

EXECUTED on behalf of the parties by their officers and sealed with their corporate seals, respectively, pursuant to the authorization of their respective Boards of Directors on the dates indicated.

STERLING SAVINGS ASSOCIATION

Date: 9-20-88 By ______________
President

By ______________
Secretary

CENTRAL EVERGREEN FEDERAL
SAVINGS AND LOAN ASSOCIATION

Date: 9-20-88 By ______________
President

By ______________
Secretary

Office of Thrift Supervision
Department of the Treasury
Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

January 26, 1990

Harold Gilkey
Chairman of the Board and
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

An additional copy of Regulatory Bulletin 3a-1 is attached. Your attention is directed to the section entitled Associations "Subject to Greater Restrictions" on page two of the bulletin. As addressed in this section, Sterling must obtain written approval of the District Director for any new loan and investment activity. This approval is necessary given Sterlings' insolvent capital position.

An application should be filed with the District Director, with a copy also forwarded to my attention. This application should list the types of loans and investments that the institution proposes to engage in, with the appropriate justification for each activity. Given the findings of the recent examination, I would not be inclined to recommend that Sterling be permitted to continue commercial real estate lending. As you have previously stated, however, the institution has virtually shut down this type of lending on its own initiative.

Once received, the application will receive our prompt review and consideration. Until such time that the appropriate approval is obtained, lending and investment activity is limited to outstanding, legally binding commitments.

If you have any questions, or require additional clarification, please call.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh/att.
pc: Betty Reed
State Supervisor

EXHIBIT 29
WITNESS Gilkey
DAVID STOREY
STOREY & MILLER

**STERLING SAVINGS Association**

N. 120 Wall • Spokane, WA 99201-0696

May 11, 1990

VIA FEDERAL EXPRESS

The Honorable Timothy Ryan
Director
Office of Thrift Supervision
Department of The Treasury
1700 G St, Northwest
Washington, D.C. 20552

Dear Mr. Ryan:

Over the past four years, the FSLIC and the FHLBB granted regulatory and capital forbearances to Sterling Savings Association to induce Sterling to acquire three troubled thrift associations. Sterling has now been informed not only that such forbearances have been eliminated but that, having lost such forbearances, Sterling fails to meet post-FIRREA capital standards. Further, Sterling is being treated itself as a troubled thrift and is under the threat of regulatory sanctions and enforcement proceedings. We respectfully submit that this is not only unfair, it is illegal.

Sterling has attempted to persuade the Seattle District Office of OTS that Sterling's written contracts with the United States should be honored. To ensure that our request is made at the appropriate level of authority, we are also directing it to you, as the highest ranking officer of the Office of Thrift Supervision.

Because of the equities involved in our case, including the fact that Sterling was asked by the regulators to acquire these three failed thrifts, we request that you give prompt consideration to our request that our agree-

ments be honored. We enclose a copy of Sterling's letter to Mr. William J. Durbin, setting out Sterling's position in detail.

Sincerely,

Daniel G. Byrne
Senior Vice-President, Finance

cc: Mr. Durbin


VOT942 1396 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696

May 10, 1990

HAND DELIVERED

Office of Thrift Supervision
Department of the Treasury
1501 - 4th Avenue, 19th Floor
Seattle, Washington 98101-1693

Attention: Mr. William J. Durbin
District Director
Seattle District

Re: Capital Plan

Dear Mr. Durbin:

On April 16, 1990 we received your correspondence of April 11, 1990, together with the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver (the "Operating Agreement"). Having reviewed the proposed Operating Agreement and considered its potential impact on Sterling Savings Association ("Sterling" or the "Association"), we must respectfully decline to execute the Operating Agreement in its present form.

We feel very strongly that executing the Operating Agreement would be tantamount to admitting that Sterling's capital deficiency was caused by its own fault or neglect, when this is not at all the case. Also, the proposed Operating Agreement implies emphatically but incorrectly that the Office of Thrift Supervision and its predecessors (collectively, the "OTS") had nothing to do with creating Sterling's capital deficiency.

As we will explain in greater detail herein, we believe that, unfortunately, Sterling's regulators have breached existing acquisition contracts with Sterling. They have done this by purporting to "eliminate" the various regulatory capital and accounting forbearances granted to induce Sterling to acquire

troubled thrift institutions. The breach of existing contracts has thrown Sterling out of compliance with regulatory capital standards. To add insult to injury, if you will, the OTS is now treating Sterling like a troubled thrift.

We can assure you that we have not decided hastily or easily to decline to execute the Operating Agreement. Since its inception, the Association has worked diligently to develop a constructive and cooperative relationship with each of its regulators. We sincerely wish to continue that tradition by conducting a positive dialogue concerning the Association's existing capital deficiency. We believe that under the present circumstances, however, executing the Agreement in its present form would constitute an abrogation of our fiduciary responsibility to manage the affairs of the Association and to safeguard the interests of our depositors and shareholders.

As the first step toward what we trust will be a positive dialogue regarding the resolution of our capital deficiency, we intend this letter to be: 1) a comprehensive statement of the reasons for Sterling's capital deficiency, 2) our suggested alternatives for curing the deficiency, and 3) a discussion of what we would consider to be a reasonable Operating Agreement under the circumstances.

## BACKGROUND

The Association.

Sterling commenced operations in 1983 as a Washington-chartered, federally insured stock savings and loan association headquartered in Spokane, Washington. The Association's primary business is attracting deposits from the general public and originating, purchasing, selling and servicing secured residential, commercial and consumer loans.

Sterling's retail delivery system attracts deposits through 28 branches located primarily in smaller, rural areas of Washington. Sterling has successfully maintained a stable retail deposit base in rural areas while promoting higher volume lending activity in major metropolitan areas. Thus, the Association has achieved substantial lending volume with relatively low operating costs.

Sterling has been consistently profitable in every year since its inception, earning a total of over $5.5 million through December 31, 1989. Sterling's return on average equity exceeded 15% from 1986 through 1988 and was just below 14% during fiscal 1989. As of December 31, 1989, Sterling's net

worth under Generally Accepted Accounting Principles totalled $10.9 million.

Our management team, which has not changed significantly since inception, has always operated according to the highest principles of integrity and professional competence. In fact, were it not for their desire to live in Spokane, Washington, most of these individuals would be managers at regional or money center banks at substantially higher salaries than those they currently earn at Sterling.

Sterling is a conservative, "no-frills" institution. It is not among those institutions which have been justifiably criticized for their acquisitions of lavish headquarters buildings, art work collections, corporate jets and the like. Nor has Sterling made speculative "investments" in high yield junk bonds, land acquisition and development schemes and the like. In short, Sterling has not been, and is not now part of the problem. Rather, at the request of its regulators and always with their encouragement, support and approval, Sterling has been a part of the solution to the thrift crisis through its acquisitions of troubled thrifts.

<u>The Regulatory Background</u>.

During the late 1970's and early 1980's, a substantial number of thrift institutions experienced serious financial losses precipitated by a combination of soaring inflation, volatile interest rates, recession, and disintermediation. The Federal Savings and Loan Insurance Corporation ("FSLIC") Insurance Fund was insufficient to recapitalize or liquidate the increasing number of failing thrifts. Accordingly, from the early 1980's onward, the Federal Home Loan Bank Board ("FHLBB") sought in many instances to induce healthy thrifts such as Sterling to merge with or acquire and recapitalize troubled institutions.

At first, a substantial portion of these supervisory transactions were assisted by the infusion of FSLIC capital. In nearly all of the transactions, the FHLBB granted regulatory forbearances, typically by granting the acquiring institutions relief from applicable capital and liquidity requirements. Such relief lasted for a period of time sufficient to allow the acquiring institutions to restore their capital to normally required levels.

As the crisis in the thrift industry continued to worsen, and more and more FSLIC-insured thrift institutions became insolvent or troubled, the FSLIC and the FHLBB recognized that continuing to facilitate supervisory mergers with cash

contributions and promissory notes would quickly and entirely exhaust the Insurance Fund. Accordingly, the FSLIC and the FHLBB were forced to revise their policies and practices in order to prevent, or at least forestall, the exhaustion of the FSLIC Insurance Fund. Instead of financial assistance, the FSLIC and the FHLBB began to rely increasingly on regulatory forbearances to induce healthy thrifts to acquire troubled institutions.

For one thing, the regulators encouraged acquiring institutions to record regulatory cash assistance payments as part of their regulatory capital. For another, the regulators allowed acquiring thrifts to extend goodwill amortization periods beyond those allowed under Generally Accepted Accounting Principles. Finally, the regulators granted a variety of forbearances, such as agreements not to enforce capital requirements if a breach thereof was caused by a particular acquisition. In the course of its regulatory-assisted acquisitions, Sterling received each of these types of forbearances.

By granting such regulatory and accounting forbearances, the FSLIC and the FHLBB were able to induce healthy thrifts like Sterling to acquire troubled thrifts with minimal cash contributions or other tangible financial assistance from the FSLIC. The FSLIC and the FHLBB thus saved many billions of dollars in financial assistance that the FSLIC would otherwise have had to pay in order to resolve scores of insolvent and troubled FSLIC-insured thrift institutions.

Regulatory-Supervised Acquisitions by Sterling.

Before it had even opened its doors for business, Sterling was asked by state regulators to consider merging with Lewis & Clark Savings and Loan Association ("Lewis & Clark") of Clarkston, Washington. Since that time, Sterling has been asked to consider acquiring many institutions including Home Savings (Burien, Washington), Guaranty Savings (Longview, Washington), Lynnwood Savings (Lynnwood, Washington), Great Falls Federal Savings (Great Falls, Montana), Home Savings (Boise, Idaho) First Federal (Longview, Washington), Northwest Federal (Boise, Idaho), Mountain West (Salt Lake City, Utah), Tri-Cities Savings (Kennewick, Washington), Central Evergreen Savings (Chehalis, Washington), and Lewis Federal (Chehalis, Washington).

In addition to the Lewis & Clark acquisition, Sterling has now completed three significant acquisitions -- all at the request and with the encouragement and support of state and federal regulatory authorities. The acquisitions that led to

Sterling's existing capital deficiency, together with the salient facts concerning each acquisition are summarized below.

Lewis & Clark Savings and Loan Association.

By early 1983, the regulators had determined that management at Lewis & Clark was deficient in several respects including its apparent inability to manage interest rate risk. The then State Supervisor of Savings and Loans approached Sterling to request that Sterling consider merging with Lewis & Clark by the summer of 1983.

Less than three months after it commenced business, Sterling consummated a stock-for-stock acquisition of Lewis & Clark on June 30, 1983. Sterling, motivated by its desire to expand its market share and distribution network, agreed to enter into this transaction without any assistance from the regulators. The regulators, for their part, were eager to approve of the transaction since it resolved what could easily have become a $2 million problem at Lewis & Clark.

Lewis Federal Savings & Loan Association.

In the spring of 1985, the FHLBB had judged Lewis Federal Savings and Loan Association ("Lewis Federal") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Lewis Federal. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Lewis Federal's negative net worth.

The FHLBB recognized that the absorption of the insolvent Lewis Federal would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Lewis Federal.

In June, 1985, Sterling offered to acquire Lewis Federal subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital

requirements, and regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.

On November 4, 1985, the FHLBB adopted a resolution containing formal findings of fact: that Lewis Federal was insolvent; that severe financial conditions existed which threatened Lewis Federal's stability; that the FSLIC should be made receiver for Lewis Federal; that the FSLIC had appropriately considered Sterling's qualifications and competence to acquire and manage Lewis Federal; that the acquisition of Lewis Federal by Sterling would reduce the risk to the FSLIC; that Sterling's offer "present[ed] the lowest expense and least risk to the FSLIC of any proposal submitted"; that transfer of Lewis Federal to Sterling was preferable to liquidation and would avoid the loss to Lewis Federal account holders and creditors which liquidation would entail; that acquisition by Sterling was in the best public interest; that acquisition by Sterling was necessary to prevent the probable failure of Lewis Federal ; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Lewis Federal, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On November 5, 1985, Sterling entered into a formal contract with the FSLIC as Receiver for Lewis Federal, under which Sterling agreed to take over Lewis Federal subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of goodwill.

On November 12, 1985, the FHLBB entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Permitted Sterling to exclude certain of Lewis Federal's liabilities in determining compliance with certain requirements;

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal, or by Sterling's assumption of Lewis Federal's negative net worth;

(3) Agreed that Sterling could carry the $1.8 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $1.8 million in supervisory goodwill created by the transaction would be recorded pursuant to the purchase

method of accounting and could be amortized over 40 years; and

(5) Agreed that the difference between the book and fair market values of Lewis Federal's loan portfolio could be amortized over a 15 year period.

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $1.8 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Lewis Federal, the FSLIC would have had to spend, in our estimate, approximately $5.2 million to liquidate Lewis Federal. In addition to saving this amount, the FSLIC retained the right to utilize Lewis Federal's accumulated net operating loss carryforwards of approximately $3.0 million.

Tri-Cities Savings and Loan Association.

In the summer of 1987, the FHLBB had judged the Tri-Cities Savings and Loan Association ("Tri-Cities") to be insolvent. Pursuant to its policy, the FHLBB sought to preserve the FSLIC Insurance Fund by finding a solvent, competent thrift institution to acquire Tri-Cities. In order to minimize the costs to the FSLIC, the FHLBB decided to request bids from selected thrift institutions, and to select that bid which best satisfied the FHLBB's two principal criteria: (1) low costs to the FSLIC and (2) high probability that the acquiring institution would be able to "earn its way out" of Tri-Cities' negative net worth.

The FHLBB recognized that the acquisition of the insolvent Tri-Cities would have a negative impact on the books of any acquiring thrift institution, and might create problems in connection with the acquiror's ability to maintain the capital ratios required to be maintained by all thrift institutions. Accordingly, to solicit bids from Sterling and others, the FHLBB made it clear from the outset that forbearances from enforcement of certain regulatory capital requirements, and specific treatment of supervisory goodwill to meet certain of those requirements, could be negotiated as a part of any transaction for the acquisition of Tri-Cities.

In November, 1987, Sterling offered to acquire Tri-Cities subject to certain conditions. These conditions included a specific forbearance from the enforcement of regulatory capital requirements, and specific regulatory acceptance of purchase accounting treatment of the resulting supervisory goodwill.

On April 7, 1988, the FHLBB adopted a resolution containing formal findings of fact: that Tri-Cities was insolvent; that the FSLIC should be made receiver for Tri-Cities; that Tri-Cities could not continue as a going concern without financial assistance from the FSLIC; that Sterling was qualified and competent to acquire and manage Tri-Cities; that the acquisition has necessary to prevent the probable failure of Tri-Cities; that the acquisition by Sterling was the most desirable alternative to liquidation or transfer to another institution, and represented the least cost to the FSLIC of any alternative; that the acquisition by Sterling was in the best public interest, and in the best interests of the account holders and creditors of Tri-Cities; that Sterling would continue to be a viable entity following the acquisition; and that to induce Sterling to acquire Tri-Cities, certain regulatory forbearances and treatment of supervisory goodwill would be granted and agreed to.

On April 8, 1988, Sterling entered into a formal contract with the FSLIC as receiver for Tri-Cities, under which Sterling agreed to take over Tri-Cities subject to the FHLBB's approval of certain regulatory forbearances and purchase accounting treatment of supervisory goodwill.

The FHLBB had already, on April 6, 1988, entered an order formally granting the said conditions. Among other things, the FHLBB:

(1) Agreed to waive the assessment, for one year, of penalties occasioned by Sterling's inability to satisfy liquidity requirements.

(2) Agreed not to enforce any regulatory capital regulations for five years if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities, or by Sterling's assumption of Tri-Cities' negative net worth;

(3) Agreed that Sterling could carry the $11.7 million in cash assistance on its books as a credit to its net worth, for regulatory accounting purposes;

(4) Agreed that for regulatory accounting purposes, the $11.7 million in supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized over an eight year period.

Pursuant to its agreement with the FSLIC and in accordance with the forbearances expressly granted by the FHLBB, Sterling entered $11.7 million in permanent regulatory capital on its books.

But for Sterling's acquisition of Tri-Cities, the FSLIC would have had to spend, in our estimate, approximately $13.7 million to liquidate Tri-Cities. In addition to saving this amount the FSLIC also retained the right to utilize 50% of Tri-Cities' net operating loss carryforwards; the right to any realized excess over the yield maintenance subsidy covering certain assets; and the right to a share of the gain-on-sale of certain assets. In fact, the FSLIC has already become entitled to proceeds resulting from the sale of such properties for amounts in excess of the covered asset value.

Central Evergreen Federal Savings and Loan Association.

In the summer of 1987, the FHLBB requested that Sterling consider acquiring Central Evergreen Federal Savings and Loan Association ("Central Evergreen") a troubled thrift in Chehalis, Washington. Sterling demurred, pointing out that such an acquisition would create a regulatory capital deficiency. The FHLBB asked that Sterling consider the acquisition anyway, pointing out that the "permanent" regulatory capital created by the Lewis Federal and Tri-Cities acquisitions could be used to leverage Sterling into technical compliance with the regulations.

Sterling studied Central Evergreen, and concluded that the acquisition could be done, if Sterling arranged for an equity offering of between $4 to $6 million soon after the acquisition. Sterling then contracted with Central Evergreen, contingent upon approval of the FHLBB, to acquire Central Evergreen's assets and liabilities.

On December 8, 1988, the FHLBB adopted a resolution approving the acquisition. The FHLBB entered formal findings of fact that Central Evergreen was insolvent; that Sterling would be a viable entity following the acquisition; that the acquisition was necessary to prevent the probable failure of Central Evergreen; that the purchase method accounting treatment of goodwill should be used; and that the FSLIC should enter an agreement pursuant to Sterling's proposal calling for an infusion of capital after the acquisition.

On December 28, 1988, Sterling contracted with the FSLIC to carry out a specific business plan. The plan contemplated the addition of between $4 million to $6 million in new equity within two years. Under the agreement, supervisory goodwill and

the excess of book over fair market value of loans acquired from Central Evergreen were to be amortized over a 12 year period. Sterling, concerned about the growing thrift crisis, requested that a clause be included terminating the contract if some change in the laws made it impossible for Sterling to acquire additional equity. After negotiation, the FSLIC agreed to insert a clause permitting Sterling to revise its business plan should events beyond Sterling's control prevent the contemplated equity offering. On December 31, 1988, Sterling consummated the acquisition and began to prepare for an equity offering.

But for Sterling's acquisition of Central Evergreen, the FSLIC would have had to spend, in our estimate, approximately $30.1 million to liquidate Central Evergreen.

* * *

To summarize, it is reasonable to conclude that, as a result of the acquisitions discussed above, the FHLBB and the FSLIC saved in excess of $51 million. They also retained important assets such as the operating loss carryforwards accumulated by the acquired institutions and a right to reap some of the financial rewards generated by Sterling's expert management of assets acquired from the troubled institutions.

For its part, Sterling completed the acquisitions believing that the regulators would honor their contracts to:

(1) Allow Sterling to count an additional $13.5 million ($1.8 million from Lewis Federal and $11.7 million from Tri-Cities) in supervisory goodwill toward its regulatory capital requirement;

(2) Forebear from enforcing any regulatory capital regulations until November 5, 1990 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Lewis Federal;

(3) Forebear from enforcing any regulatory capital regulations until April 8, 1993 if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of Tri-Cities;

(4) Forebear from enforcing any regulatory capital regulations until December 31, 1990 if Sterling's failure to comply therewith was caused by an inability through no fault of Sterling to raise additional capital following the Central Evergreen acquisition;

(5) Allow Sterling to revise its business plan if events beyond Sterling's control prevented the equity offering contemplated as part of the Central acquisition;

(6) Allow Sterling to pay dividends on preferred stock issued as part of Sterling's proposed equity offering.

Sterling's Proposed Stock Offering.

As contemplated by the Central Evergreen Acquisition Agreement with the FSLIC, and in response to FIRREA and its implementing regulations, Sterling was prepared, in the fall of 1989, to add approximately $10.5 million to its capital accounts through a public offering. The public offering contemplated the sale of up to 603,750 units, each consisting of one share of the Association's common stock and one share of the Association's noncumulative convertible preferred stock. Dain Bosworth, Inc., the underwriter on the proposed stock offering, assured Sterling in December, 1989 that even more than the 603,750 units had been subscribed for.

Dain Bosworth had also performed its due diligence and satisfied itself that Sterling's earnings would be sufficient to allow for the payment of dividends. On several occasions prior to December 19, 1989, Sterling had requested the OTS' approval of the proposed payment of dividends. The OTS responded that it was in the OTS' and Sterling's mutual best interests to attract additional public capital and that prohibiting the payment of dividends would be inconsistent with the goal.

Ultimately, Sterling was forced to cancel the proposed stock offering entirely because of the OTS' refusal to allow the payment of dividends because of the fact that Sterling was a "capital deficient" institution. Sterling incurred fees and costs in connection with the aborted stock offering of nearly $1 million.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was enacted on August 9, 1989. Through FIRREA, Congress sought to impose strict new regulatory capital requirements upon thrifts. At the same time, however, Congress recognized the validity and enforceability of the federal government's specific contractual obligations to institutions such as Sterling.

It is our considered view, therefore, that Sterling's rights to the capital and regulatory forbearances described

above survived the enactment of FIRREA, and remain enforceable today. We are not persuaded that Thrift Bulletin 38-2, issued on January 9, 1990, (one day after capital plans were due) legally eliminated such forbearances as it purported to do.

Although the stringent, new capital requirements set forth in Section 301 of FIRREA are generally applicable to thrifts, they are not intended to abrogate differing capital requirements set forth in binding agreements previously entered into by the FHLBB and/or the FSLIC. Quite to the contrary, Section 401(f) provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which --
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Section 401(g) of FIRREA provides that the abolition of the FSLIC and the FHLBB

> shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which --
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board ...; and
>
> (B) existed on the day before the enactment of this Act. (Emphasis added.)

Similarly, Section 401(h) provides that

> all orders, resolutions, determinations, and regulations, which --

> (1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board (including orders, resolutions, determinations, and regulations which relate to the conduct of conservatorships and receiverships), or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and
>
> (2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law .... (Emphasis added.)

Recognizing the continued validity and enforceability of forbearances previously granted by the FSLIC and the FHLBB, FIRREA also directs the newly created Resolution Trust Corporation to "evaluate the costs under existing [FSLIC] agreements with regard to ... forbearance ...."

FIRREA not only grants the OTS broad authority to grant exemptions and exceptions from the new capital standards, but it expressly preserves forbearances granted prior to FIRREA by the FHLBB and the FSLIC. For example, Section 302 of FIRREA provides:

> Notwithstanding the amendment made by this title to section 10 of the Home Owners' Loan Act and the repeal of Section 416 of the National Housing Act -
>
> (1) any plan approved by the Federal Home Loan Bank Board ... for any federal savings association shall continue in effect ...; and
>
> (2) any plan approved by the Federal Savings and Loan Insurance Corporation ... shall continue in effect ....

Former Sections 10 and 416 dealt with granting forbearances to "troubled associations" with net worths of 0.5 percent. When forbearances were granted to Sterling, Sterling was not a "troubled association." Moreover, Sterling's net worth was three times the level set by the quoted statutes. How then, we ask, can FIRREA possibly be interpreted as eliminating, or directing the elimination of, forbearances granted to a healthy institution like Sterling while <u>preserving</u> forbearances granted to "troubled associations" having low net worths? This just doesn't make sense.

It is clear that in enacting FIRREA, Congress recognized the continued validity and enforceability of pre-FIRREA contractual agreements such as the agreements between the FSLIC and the FHLBB, on the one hand, and Sterling on the other.

<u>The FIRREA Regulations</u>.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA (the "Capital Regulations"), which became effective on December 7, 1989. The OTS indicated in a press briefing shortly after enactment of FIRREA that it was "uncertain" about the impact of FIRREA on past the FHLBB and the FSLIC forbearances.

* * *

It is extremely important to note that, notwithstanding FIRREA, Sterling would not be in violation of the post-FIRREA capital standards were it not for the breach of supervisory acquisition agreements by the regulators.

It is also extremely important to note that nothing in FIRREA eliminates, or requires the regulators to eliminate, pre-existing contractual regulatory and accounting forbearances. To the contrary, the above-quoted Sections of FIRREA and others recognize the continued validity and enforceability of such regulatory and capital forbearances.

<u>PROPOSED ALTERNATIVE REMEDIES FOR</u>
<u>STERLING'S CAPITAL DEFICIENCY UNDER FIRREA</u>

Sterling completed all of its acquisitions in an orderly and controlled manner as part of its comprehensive growth strategy. Each acquisition was carried out at the request, and always with the encouragement, support and approval of the regulators. If any of Sterling's acquisitions were imprudent, or if Sterling had reason to believe that the regulators would breach their contractual commitments to Sterling, Sterling

certainly never heard as much from any of the regulators. Moreover, if Sterling had known that its regulators would attempt to breach their contractual commitments to the Association, Sterling would never have agreed to acquire the troubled thrifts in question.

Arguably, Sterling has saved the FSLIC, its successors, and ultimately, the taxpayers over $51 million through its acquisitions and its stewardship of troubled institutions. Sterling has not asked for or received one dollar more in acquisition assistance than it contracted for. Sterling has sought, and seeks today, nothing more than the benefit of its bargain with the regulators.

To our surprise, however, Sterling is now being told that, pursuant to FIRREA, the OTS is "eliminating" the very capital and accounting forbearances which the regulators contractually granted to induce Sterling to acquire troubled thrifts in the first place. Frankly, this is outrageous. Not only is it unfair by any objective standard, but we believe it is illegal. The government of the United States does not have license to breach the sanctity of its contracts any more than any one else does.

* * *

As we stated at the beginning of this letter, notwithstanding all that has transpired, we remain committed to conducting a positive dialogue concerning the Association's existing capital deficiency. We believe there are several equitable and logical solutions to our differences of opinion regarding the continuing validity of capital and regulatory forbearances previously granted to Sterling.

The following summary of alternatives is not intended to be an exclusive or comprehensive list. Each of the following alternatives could stand on its own merits or be utilized in combination with other alternatives depending upon the operational feasibilities involved. In any event we would ask for your consideration and written evaluation of these alternatives at your earliest convenience.

<u>Comply With Supervisory Acquisition Agreements</u>.

There is no way to completely undo the damage done by the violation of existing supervisory acquisition agreements with Sterling. For example, Sterling's proposed equity offering was aborted in January, 1990 because of the OTS's refusal to allow the payment of dividends on the preferred stock to be issued.

The window of opportunity for that proposed equity offering closed in January, 1990.

The OTS could, however, do much to resolve Sterling's capital deficiencies by honoring existing supervisory acquisition agreements between Sterling and the regulators. This would mean that Sterling would have until November 5, 1990, December 31, 1990, and April 8, 1993, to remedy capital deficiencies caused, respectively, by the Lewis Federal, Central Evergreen, and Tri-Cities acquisitions. During these periods of time, Sterling could, pursuant to its existing supervisory acquisition agreements, count the $13.5 million in regulatory cash assistance payments toward its post-FIRREA capital requirements. In addition, Sterling's capital requirements would be reduced by $.8 million until November 5, 1990, and $1.4 million until April 8, 1993 because of forbearances associated, respectively, with the Lewis Federal and Tri-Cities acquisitions.

Separate Exemption.

The OTS, rather than addressing the forbearances granted in the various supervisory assistance agreements with Sterling, could grant a separate exemption from the existing capital requirements. The OTS has clear authority to do this pursuant to Section 301 of FIRREA, and Sterling meets all of the Section 301 standards for approval of the exemption. This exemption would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

Separate Exception.

The OTS pursuant to authority set forth in Section 301 of FIRREA, could also grant Sterling an exception to the FIRREA capital standards. Again, Sterling meets all of the Section 301 standards for approval of the exception. This exception would endure for a reasonable period of time during which Sterling would increase its capital to meet regulatory guidelines.

Payment of Dividends.

The OTS could allow Sterling to pay dividends on preferred stock so that the Institution could consider reviving its equity offering.

Central Evergreen - Cash Contribution.

Obviously, if the OTS is warranted in eliminating the capital and regulatory forbearances contained in the Central

Evergreen contracts, two facts become apparent. First, the contracts have no value to Sterling. Second, the contracts, as vitiated deprive us of the very tools -- the forbearances -- which allowed us to counterbalance the negative aspects of the Central Evergreen acquisition. These negative aspects included Central Evergreen's capital deficit, market valuation adjustments in the loan and investment portfolios, and the intangible assets acquired in the Central Evergreen acquisition. In the Central Evergreen acquisition, if Sterling had not been granted the forbearances, it would have required a cash contribution to compensate for the reduction in capital caused by the acquisition. In other words, the forbearances had an economic value, and the if the forbearances are now being taken away, they should be replaced by an equivalent cash contribution.

Using the formula previously applied by the FHLBB in accepting Sterling's bid proposal on Tri-Cities, the contribution would consist of Central Evergreen's capital deficit at the time of the acquisition, the net market valuation adjustments in the loan and investment portfolios, and the totals of intangible assets. Applying this formula, the cash contribution would be in the amount of $24,056,000.

Obviously, the Tri-Cities formula contemplated not only a cash contribution, but capital and regulatory forbearances. To put the Central Evergreen acquisition on a par with the typical regulatory assisted acquisition, it would also be necessary for the government to provide us today with indemnification for capital losses on certain identified assets, as well as yield maintenance subsidies on non-performing loans and real estate owned.

In a conciliatory gesture, however, we would be willing to accept the cash assistance of $24 million without indemnification, yield maintenance subsidies, or other regulatory assistance.

<u>Central Evergreen - Rescission</u>.

If the OTS is unable or unwilling to consider a cash contribution in connection with the Central Evergreen acquisition, we would suggest that the entire transaction be unwound. We believe this is an operationally feasible alternative and would involve the assumption on your part of all of Central Evergreen's assets and liabilities remaining on our books. These assets and liabilities are readily identifiable and could be easily transferred.

This alternative would involve the payment of a management fee to Sterling of approximately 1% of Central Evergreen's assets as reasonable compensation for its past and future services in connection with the management of Central Evergreen's assets and liabilities. Such a management fee could be negotiated based upon prevailing market rates for similar services.

Tri-Cities - Increased Capital Contribution.

Again, it would have been unthinkable for Sterling to complete the Tri-Cities acquisition based on the cash contribution therein if it were not for the capital and regulatory forbearances granted to Sterling in that acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents in the approximate amount, as of March 31, 1990, of $10.5 million.

Lewis Federal - Cash Contribution.

Just as it did as part of the Central and Tri-Cities acquisitions, the regulators granted Sterling critical capital and regulatory forbearances as part of the Lewis Federal acquisition. If the forbearances are eliminated, they should be replaced by cash or cash equivalents, as of March 31, 1990, of $1.6 million.

Stock Purchase.

The OTS could purchase common or qualifying preferred stock of the Association so that Sterling could increase its regulatory capital accounts. Sterling would be willing to repurchase such stock, out of its earnings over time commensurate with the reduction of intangible assets recorded in connection with Sterling's acquisitions.

* * *

The foregoing alternatives are not meant to be exclusive. They are all based on the same equitable principle: if contractual forbearances previously granted to Sterling are now being eliminated, it is only right that such forbearances be replaced with qualifying capital of equivalent value.

If Sterling's capital is still considered to be deficient following the selection by the OTS from among the above alternatives, the Association will become compliant through a number of steps. First, Sterling will reduce its intangibles through amortization and the use of net operating carryforwards. Second, the Association will increase its capital

through the retention of earnings. Third, assuming OTS approves of the payment of dividends, Sterling will, if necessary, pursue another equity offering. Fourth, Sterling will consider filing an application with the Federal Deposit Insurance Corporation for open thrift assistance. Finally, the Association will reduce assets, as necessary, to reduce its capital requirement.

We reiterate that we are ready, willing and able to discuss any feasible alternative, including the foregoing alternatives, in an effort to mediate our differences over the elimination of the contractual forbearances.

## THE OPERATING AGREEMENT

If the OTS had not eliminated the capital and regulatory forbearances previously granted to Sterling and refused to allow Sterling to pay dividends occasioned by its proposed equity offering in late 1989, the Association would be in compliance with the capital standards mandated by FIRREA. Under such circumstances, you would not have asked us, as you have, to execute the proposed Operating Agreement With Conditional Consent to the Appointment of a Conservator or Receiver.

Quite frankly, we could take the position today that, because the OTS has breached existing contracts with Sterling and thereby thrown Sterling into noncompliance with the capital standards, the OTS has no right to insist on the execution of any supervisory agreement by Sterling. We believe that this position is amply supported by the facts and circumstances in our case.

Nonetheless, as we stated at the outset, we remain committed to continuing the constructive and cooperative relationship which we have always enjoyed with our regulators for so long as the regulators work with us constructively to mediate the differences that now exist between us. To that end, we are willing to enter into an operating agreement, provided, of course, certain of your proposed operating restrictions are modified and all of the proposed consent provisions are eliminated.

Basically, we are amenable to keeping you fully apprised of all significant developments at the Association while we continue to increase our capital to regulatory levels. We will agree to abide by our capital plan and provide you with quarterly or more frequent reports regarding out operations and condition. If we fail to do any of this, we will then abide by operating restrictions which are substantially the same as those



WOT942 1415 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

set forth on pages 13 through 17 of your proposed Operating Agreement.

As is the case with our proposed capital restoration alternatives, we are willing to negotiate the terms of an Operating Agreement. The most important message we wish to leave with you, however, is that we remain willing and anxious to work with you to resolve our mutual concerns.

In the meantime, we would appreciate receiving at your earliest convenience, a written response to the proposals herein for resolving Sterling's post-FIRREA capital deficiency.

Very truly yours,

STERLING SAVINGS ASSOCIATION

By____________________________
HAROLD B. GILKEY
Chief Executive Officer

By____________________________
WILLIAM W. ZUPPE
President and Chief Operating Officer



WOT942 1416 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

MAY 22 11 04 AM '90


VOT942 1417 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS

206 340 2419
FEB-20-1991 15:20 FROM OTS-SEATTLE TO 914153935859 P.01

Post-it™ brand fax transmittal memo 7671 # of pages ▸ 4

| To Jim Hendriksen | From Carol Friend |
|---|---|
| Co. OTS / Legal | Co. OTS / Seattle |
| Dept. | Phone # |
| Fax # 27 | Fax # |

Seattle District

01-1693

June 5, 1990

OFFICE OF THRIFT SUPERVISION ELEVENTH DISTRICT
1991 FEB 20 PM 4: 15

Harold Gilkey
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

In light of the May 29, 1990 Temporary Restraining Order, please provide weekly reports of any actions taken that are not in keeping with the restrictions imposed by our letters of January 26, 1990, March 9, 1990 and May 11, 1990. The weekly report should be received by this office within four days of the end of each week (Tuesday). The first report should cover the timeframe from May 29, 1990 thru June 8, 1990.

If you have any questions please contact me.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh
pc: Betty Reed
State Supervisory

bc: Docket Section
Greg Golden, District General Counsel
Ed Hedlund, Deputy District Director
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing, FDIC

OFFICIAL FILE COPY
OTS/WEST



VON878 0686 F STERLING SA 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018118 OLD BOX # 95-01 W2101 FORMAL INVESTIGATION SF 910104 910206 FILE REPORTS OF EXAM J HENDRIKSENS WORKING FILES PLEADING CORRESPONDENCE GENERAL FILE; CORRESPONDENCE; FINANCIAL STATEMENTS; 900299-921299 PRIVILEGE CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696 • (509) 624-4114

June 19, 1990

Carol Friend
Office of Thrift Supervision
1501 Fourth Avenue
Seattle, WA. 98101-1693

Dear Carol:

Attached is a listing of the operating restrictions imposed upon Sterling pursuant to your letters dated November 9, 1989, January 26, 1990, March 9, 1990, and May 11, 1990. This listing identifies the restrictions, the operating procedures implemented by the Association in response to these limitations, and the internal audit procedures implemented to ensure the operating procedures are functioning.

This listing is being forwarded to you to ensure that the Association has properly identified all restrictions that you have been concerned with based on your letters of June 5, and June 18, 1990. Would you please review this listing to determine the completeness of restrictions for which you have a supervisory concern. In the meantime, I am pursuing with Sterling's legal counsel and the appropriate counsel for OTS the scope and nature of filing reports in light of the Temporary Restraining Order.

If you have any questions regarding this memo please feel free to contact me.

Sincerely,

Daniel G. Byrne
Sr. Vice President

DGB/lf

Attachment

cc: Harold B. Gilkey
William W. Zuppe
Betty Reed, Division of Savings & Loan Association

EXHIBIT 84
WITNESS Byrne
DAVID STOREY
STOREY & MILLER

Sterling Savings Association
Office of Thrift Supervision Restrictions

5/22/90

| RESTRICTIONS | OPERATING PROCEDURES | INTERNAL AUDIT PROCEDURES |
| --- | --- | --- |
| Limit in total asset growth | Senior Management notified to restrict any asset growth other than interest credited on liabilities. Monitoring done by Accounting Manager. | Review monthly financial statements. |
| No capital distributions | The Board has been notified that no capital distributions can be made. | Review monthly Board meeting minutes. |
| Investment authority limited to: | | |
| Conforming residential loans Pre-sold construction | Institution and subsidiary loan production officers have issued operating instructions for conformance with directive. Control is maintained with all residential loan applications requiring approval of either Action President or Action/Sterling V. President. | New loan monthly reports are reviewed. Appropriate audit procedures initiated as deemed necessary based on review. |
| Business banking loans with specified conditions | Business banking loan manager responsible to comply with specified conditions. | New loan monthly reports are reviewed. Appropriate audit procedures initiated as deemed necessary based on review. Financial statements will be reviewed to monitor requirement to lower portfolio to $23 million by 6/30/90 |
| Consumer loans | Consumer lending is restricted to 30% of assets. Sterling is considerably below that limit at 2.8% at 4/30/90. | No specific procedures. |
| Loans-to-one-borrower limit of $500,000 | All loan production areas notified of the limit. Control maintained through loan approval procedures. | Loans-to-one borrower report reviewed each month. |
| Investment authority limited to liquidity investments | Investment Committee responsible for compliance. | Review monthly financial statements. |
| Engage only in activities specified in Capital Plan | Senior Management notified to engage only in activities specified in Capital Plan. | Review monthly financial statements; Board and appropriate committee reports. |
| No purchase or sale of any asset or group of assets in excess of $500,000 without OTS approval | Senior management notified that OTS approval is required on any purchase or sale over $500,000. | Review monthly financial statements; Board and appropriate committee minutes. |
| No increase in compensation of any executive officer or director without OTS approval | Board, Chairman and President notified of restriction. | Review monthly Board minutes. |
| No uninsured deposits may be accepted | Notification has been sent to branches by Operations Department. Control procedures are being developed. | Audit procedures will be developed when controls are completed. |