OFFICE OF THRIFT SUPERVISION 1989

Office of Thrift Supervision
Department of the Treasury

Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

STERLING SAVINGS ASSOC.
EXECUTIVE BR.
JUL 24 1990

July 20, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Members of the Board:

An offsite examination has been conducted of Sterling Savings Association. The examination focused on Sterling's current capital position, status of the capital plan and efforts towards addressing the capital deficiency.

Given that the capital plan has been denied and the institution has no acceptable plan towards achieving capital compliance, a composite rating of "5" has been assigned. In assigning this rating the concerns expressed during the December 1989 limited scope examination were also considered. The OTS rating system is detailed in Section 071 of the OTS Thrift Activities Regulatory Handbook, as well as the prior Report of Examination.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed
State Supervisor

"Confidential Material Subject to Protective Order"

Office of Thrift Supervision
Department of the Treasury

Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

June 20, 1990

Daniel Byrne, Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Byrne:

In response to your June 19, 1990, letter enclosed are copies of the correspondence referred to in the Temporary Restraining Order of May 29, 1990. Given that the restrictions contained within these letters have been in place for a number of months, I would not foresee any misunderstandings or need for interpretations at this time. However, should you have any specific questions, I would be available to address them.

On January 30, 1990 the Board of Directors was charged with determining that an adequate system was in place to ensure restrictions imposed by this office were adhered to. Although several were imposed after that date, it should have been expanded to include them as they became known to management and the Board. As always, appropriate internal controls should be in place to ensure that all regulatory requirements are adhered to. Such a system should include items addressed in correspondence from this office, as well as all regulations, bulletins and memos issued by the OTS.

The listing attached to your letter does not correctly reflect the asset growth restrictions that Sterling is subject to. By virtue of the denied capital plan, no growth is permitted (12 CFR 567.10). Also "executive officer" should include the Chief Financial Officer, Chief Lending Officer and any other officer with significant influence over, or participation in, major policy making decisions of the association. In addition, residential construction lending is limited to 3.3 percent of total assets and investment authority is restricted to short-term investments. The institution's activities are also limited to those specified in the capital plan to the extent contemplated in the plan.

As we have discussed previously, if you or your counsel have questions regarding the reporting requirement, I would be happy to address them. I believe that my letters have been clear as to the scope, nature and timing of reports, and that the lack of reporting by Sterling has been due to your refusal to fulfill the reporting requirement rather than a lack of understanding of what is required. If this is not the case, please contact me.

EXHIBIT 25
WITNESS Byrne
DAVID STOREY
STOREY & MILLER



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON878 0688

Daniel Byrne
Sterling Savings Association
June 20, 1990
Page Two

On a separate issue, minutes from the May Board meetings (including board package and attachments) have not been received. These should be received no later than June 22, 1990.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

bc: Docket Section
Ed Hedlund, Deputy District Director
Carol Friend, Assistant District Director
Gregg Golden, OTS DC
John Bisset, Field Manager
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing
FDIC

TOTAL P.04

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

June 25, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Assoc tion
N rth 120 Wall Street
Spokane, Washington 99201
OTS No. 7918

Dear Mr. Byrne:

Your letter of June 21, 1990 has een reviewed and additional information is required. Although all the r ictions listed in your letter are not impacted by the Temporary Restraining rder, the following additional information is nece y:

- Please ind cat whether dividend payments have been made, or approved for payment November 9, 1989.
- Residential co struction loans are limited to 3.3 percent of total assets. Please note the current level of these types of loans as a percent of total assets.
- Have any investment purchases been made that do not qualify for short-term liquidity purposes?
- Please indic he current level of commercial loans, in dollar terms, as we percent of assets.
- Indicate whether any commercial loans have been granted to those existing commercial banking customers as of March 9, 1990.
- Please forward your most recen monthly monitoring of outstanding commercial credits.
- Have activities been initiated at are not in keeping with the February 28, 1990, Capital Pl or that exceed levels specified in the plan?
- Please indicate whether any increase in compensation have been granted to any execut ve officer or director.

iscussed in my June 20, 1990 letter, an adequate system sh d be in place to ensure that app e restrictions and regulatory requirements are adhered to. Such a syste st be able to assess compliance on an ongoing basis rsus just at month- It is not acceptable to review activity for a given th and make a determination of the level o compliance after the fact. uch monthly review, howev should be used to verify the adequacy of internal con ols. Adequate polic es, proced es and contr ols must be in place to ensur compl ance. The olicies ar edures, as well as the internal revie tem sho vis acc

 Alaska • Guam • Hawaii • Idaho • Mon • Oregon • Utah • Washington • Wyoming

Confidential Material Subject to Protective Order

Daniel Byrne
Sterling Savings Association
June 25, 1990
Page Two

I have reviewed the FIRREA legislation and have been unable to locate a definition of "financial report" as indicated in your letter. Please provide the cite for this definition.

Although it is not clear what is intended by the last paragraph of your letter, no such assurance regarding our use of information submitted has been given. As I have stated in prior correspondence, the purpose of the reporting requirement is to inform us of those aspects of Sterling's operation that cause us concern.

The next report, as well as the information requested above, should be received by June 26, 1990.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

Confidential Material Subject to Protective Order

SG 0600074

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

August 20, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Byrne:

Your August 17, 1990 letter regarding the composite rating for Sterling has been received. As was noted in my July 20, 1990 letter, the off-site examination focused on Sterling's current capital position, status of the capital plan and efforts towards addressing the capital deficiency. It further noted that in light of the fact that the capital plan had been denied and Sterling has no acceptable plan towards achieving capital compliance, a composite rating of "5" was assigned.

During the November 1989 examination, both the institution and this office had every expectation that an acceptable capital plan would be filed and that efforts to recapitalize or sell the company would be successful. As noted, however, this has not been the case and the institution continues to operate with an insufficient amount of capital, in light of risks evident in the institution. As such a "5" rating is assigned.

The information previously forwarded to the Board of Directors discussed the focus of the examination and the findings; no other report will be transmitted. I also cannot comment on whether other regulatory agencies have completed examinations of Sterling. You may wish to contact them directly with any questions you may have regarding their examinations or assignment of ratings.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed
State Supervisor

"Confidential Materials Subject to Protective Order"

SG 0600071

Federal Home Loan Bank Board **Memo**

INTER-OFFICE COMMUNICATION

ISSUES MEMORANDUM

FROM: James R. Faulstich, Principal Supervisory Agent

DATE: October 23, 1985

TO: Federal Home Loan Bank Board

SUBJECT: FSLIC Assisted Acquisition of:

Lewis FS&LA
Chehalis, Washington
FHLB No. 0655
FSLIC Insurance: 1935

Assets: $52.5 Million
NetWorth: (.05 Million)
NW/Assets:(.10%)
Data as of 8/31/85

EXHIBIT
Faulstich 4
3/2/03

By:

Sterling SA
Spokane, Washington
FHLBB No. 7918
FSLIC Insurance: 1983

Assets: $118.0 Million
Networth: 4.7 Million
NW/Assets: 4.0%
Data as of 8/31/85

## Issues

Whether to approve the FSLIC assisted acquisition of Lewis FS&LA, Chehalis, Washington ("Lewis") by Sterling SA, Spokane, Washington ("Sterling").

## Background

Lewis has consistently incurred operating losses since June of 1981. Its financial problems are attributable to depressed economic conditions in its home office lending market and a negative yielding service corporation investment. Lewis, a $52 million mutual association, is a participant in the Net Worth Capital Assistance Program and as of June 30, 1985 recorded Net Worth Certificates (NWC's) totalling $150,000. The association reported a loss of $193,402 for the eight months ended August 31, 1985 and its regulatory net worth at that date stood at ($51,246), or (.10%) of assets. Additionally, excluding NWC's of $150,000 and appraised equity capital of $736,456, Lewis has a negative net worth of $937,702, or (1.8%) of assets. Lewis had reached insolvency by August 31, 1985.

This acquisition proposal has been processed at the district bank under the guidelines of FHLBB Resolution No. 84-782, which allows for the Director, FSLIC, and the Director, OES, to delegate to the Principal Supervisory Agent the negotiations and processing of assisted acquisitions under certain circumstances. The proposal meets the restrictions of that delegation in that:

1) The disappearing institution has a mutual charter with less than $300 million in assets.

2) Total projected cost to FSLIC does not exceed the lesser of 5% of assets or 40% of the projected liquidation cost, as computed by the district bank in accordance with the standard FSLIC interest rate and growth assumptions.

000080

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Two

3) The proposed acquirer is a financial institution with its home office located in the same state as the disappearing institution.

4) Forms of assistance are limited to:

a) Cash;

b) Indemnification for undisclosed liabilities and litigation challenging the acquisition with a stated maximum limit which does not exceed 5% of the institution's total assets. This is in in addition to the 5% of asset limitation in item 2 above.

c) Standard Forbearances as detailed in Memorandum SP-37.

Shopping Procedures

On April 5, 1985 Lewis' board of directors adopted a resolution authorizing the FSLIC to negotiate a plan of acquisition for the association. Prior to receipt of that resolution the Supervisory Agent made a determination as to what in-state FSLIC insured institutions would be eligible for acquiring Lewis. That determination was based upon the following criteria.

1) Assets greater than $50 million;

2) Net worth above 4% of assets;

3) A record of profitability; and

4) Not being subject to significant supervisory concern.

None of the associations which qualified under this criteria would acquire Lewis absent the availability of FSLIC assistance.

Once the standard consent resolution was adopted by Lewis' board of directors, and approval was granted by OES Director Schilling and OFSLIC Director Stearns (May 6, 1985), these same institutions were contacted to determine their interest on an assisted basis. The deadline for submitting a formal response to that inquiry was June 15, 1985. In addition to Sterling, two institutions submitted proposals with estimated costs as follows:

1) Pacific First FSB
Tacoma, Washington
FHLBB No. 1166
Cost of bid: $4.5 million plus capital loss coverage.

2) Timberland FS&LA
Hoquiam, Washington
FHLBB No. 1625
Cost of bid: $2.45 million plus limited indemnifications

000081

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Three

Each of these submissions featured a greater cost to FSLIC than that represented by the Sterling proposal.

Terms of Assistance

The FSLIC will infuse $1.75 million in cash assistance to the resulting association. This assistance is significantly less than 40% of the projected cost of liquidation and 5% of Lewis' total assets. In addition, the FSLIC will indemnify Sterling against undisclosed liabilities of Lewis and its subsidiaries, and against litigation challenging the transaction, provided that such indemnification does not exceed $1 million. Finally, Sterling will also be granted regulatory forbearances which are more fully described in the S Memorandum.

Sterling has offered an assistance recovery provision which stems from the establishment of a $400,000 loss reserve relating to the disposition of REO properties and seriously delinquent mortgage loans. Given the possibility that gains could be realized through the disposition process, Sterling has agreed to remit any such amounts to the FSLIC, up to a total of 75% of the reserves, or $300,000. The provision is more fully explained in Exhibit A-7.

Alternatives

| Alternative | Advantages | Disadvantages |
|---|---|---|
| Liquidation | 1. Resolution of case. | 1. Exceeds present value cost of least expensive option by $4.25 million.<br>2. Could weaken public confidence in the savings and loan system. |
| Out-of-State Bidding | 1. Might result in low cost acquisition. | 1. Solution may be more appropriate for other larger problem institutions in Washington.<br>2. Lewis' financial condition may deteriorate further in the interim.<br>3. Possibility of receiving a higher cost solution than current proposal. |

000082

| | | |
|---|---|---|
| Sterling | 1. In-State continuity. | 1. Chances of lower cost bid being received from out-of-state acquirer |
| | 2. Projected viability of resulting association. | |
| | 3. Lowest Cost bid. | |

Financial Capacity of Acquirer

Sterling is a relatively new association, having received its insurance of accounts in March of 1983. Since its incorporation the institution has shown a record of profitability and sound management. Its growth into a $100 million association has been accomplished without an inappropriate assumption of risk. On a combined basis, the resulting association is projected to have a net worth to assets ratio of 3.7%. Viability runs conducted at the district bank using standard FSLIC rate and growth assumptions consistently show a record of profitability and consequent survivability over a five year timeframe.

Personnel Issues

Sterling has declared its desire to retain Diane Rasmusson, currently the acting president of Lewis, after the acquisition. Sterling has represented that Ms. Rasmusson will not be in a policy making role with the resulting association. Because Lewis' financial problems are more closely related to poor economic conditions than management negligence, the OES and OFSLIC have expressed no objection to this proposal. Non-involvement affidavits were solicited and received from the directors of both Sterling and Lewis.

Summary and Conclusions

Sterling's proposal is the least costly option currently available to resolve the financial problems of Lewis. The present value cost of the assistance to be provided is $1.75 million, which is 3.0% of Lewis' assets. The resulting association is projected to be viable.

James R. Faulstich
Principal Supervisory Agent

I Concur

Peter C. Stearns
Director, FSLIC

000083

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank Board
October 23, 1985
Page Five

Recommendation

The Federal Home Loan Bank of Seattle, with the concurrence of the Office of the Federal Savings and Loan Insurance Corporation ("OFSLIC"), recommends the Federal Home Loan Bank Board ("Bank Board"):

1. Approve the proposal as submitted by the Sterling Savings Association for its FSLIC-assisted acquisition of Lewis FS&LA, such assistance to include $1.75 million in cash and indemnifications against undisclosed liabilities and acquisition related litigation not to exceed $1 million.

2. Authorize the Secretary of the Board to transmit to Sterling Savings Association a forbearance letter in the form of the exhibit attached to the S Memorandum.

James R. Faulstich
Principal Supervisory Agent
Federal Home Loan Bank of Seattle

I Concur:

Peter W. Stearns
Director, FSLIC

000084

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

## S MEMORANDUM

To: John M. Buckley, Jr., Secretary to the Board

From: James R. Faulstich, Principal Supervisory Agent

Date: March 31, 1988

Subject: Recommendation for the Appointment of the Federal Savings and Loan Insurance Corporation ("FSLIC") as Receiver for and the Subsequent Acquisition of Substantially all the Assets and Liabilities of

Tri-Cities Savings and Loan Association
Kennewick, Washington, ("Tri-Cities") FHLBB No. 7641

By:

Sterling Savings Association, Spokane, Washington
("Sterling") FHLBB No. 7918

---

Tri-Cities' Financial Data as of February 29, 1988

| | |
|---|---|
| Total Assets: | $ 54.5 million |
| Liabilities: | $ 61.8 million |
| RAP Capital: | ($ 7.4) million |
| Capital/Assets: | 13.6% |
| Net Delinq. & Net REO | $ 10.2 million |
| Net Delinq. & Net REO/Assets: | 18.7% |

Regulatory capital includes $659,000 of deferred loan losses, and $859,000 of goodwill.

Sterling's Financial data as of February 29, 1988

| | |
|---|---|
| Total Assets: | $308.7 million |
| Liabilities: | $297.6 million |
| RAP Capital: | $ 11.1 million |
| Capital/Assets: | 3.6% |
| Net Delinq. and Net REO | $ 6.6 million |
| Net Delinq & Net REO/Assets: | 2.1% |

Regulatory capital includes $ 5.1 million of goodwill.

000711



/OF014 1079 F STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
:LOSING BOOK DATED 880407
APP 862

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

I. Proposal

Tri-Cities is a state-chartered, stock association with a home office and a branch office in Kennewick, Washington, two branch offices in Pasco, Washington, and one branch office in Richland, Washington. Because of the severe level of insolvency of Tri-Cities and the lack of any viable option to recapitalize the association, we recommend that Tri-Cities be placed into a receivership and that substantially all of the assets and all of the liabilities be acquired by Sterling Savings Association, Spokane, Washington, with the FSLIC to provide assistance to Sterling in an amount having an estimated net present value cost of $15.8 million, which is approximately 76 percent of the $20.8 million estimated net present value liquidation cost of Tri-Cities.

Under the terms of the Assistance Agreement, Sterling will receive an up-front cash payment of $11,896,273; the components of this computation are attached as Exhibit S-10. The Agreement also provides for yield maintenance by the FSLIC on covered assets (14 total assets with a net book value of $8.1 million) calculated using the average six-month treasury bill plus 150 basis points. The FSLIC will also agree to provide capital loss coverage on these covered assets. Sterling will absorb 25% of the capital losses up to a pre-tax limit of $900,000. Tax benefits will be shared on a 50/50 basis with the FSLIC. A five year indemnification covering undisclosed liabilities, claims not reserved for and asserted against the association, and litigation challenging the transaction is to be provided.

II. Statutory Criteria for Appointment of a Receiver

In Section 406(c)(1)(B) of the National Housing Act (12 USC 1729(c)(1)(B)), Congress has given to the Bank Board the exclusive power and jurisdiction to appoint ex parte and without notice the FSLIC as receiver of a FSLIC-insured, state-chartered institution, if the Bank Board determines that any of the grounds specified in Section 5(d)(6)(A)(i), (ii) or (iii) of the Home Owners' Loan Act of 1933 (12 USC 1464 (d)(6)(A), exist with respect to such institution. The grounds include:

(1) Insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members;

(2) Substantial dissipation of assets or earnings due to any violations of law, rules, or regulations, or to any unsafe or unsound practice or practices;

(3) An unsafe or unsound condition to transact business;

This memorandum provides information which supports our findings that all three grounds exist with regard to Tri-Cities. The State Supervisor of Savings and Loan Associations concurs with our findings.

000712

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

(1) INSOLVENCY

As of December 31, 1987, Tri-Cities reported a deficit regulatory capital of $6,095,000 (see composition above). GAAP capital was negative $8.5 million.

(2) SUBSTANTIAL DISSIPATION OF ASSETS OR EARNINGS

Tri-Cities has suffered substantial dissipation of assets and earnings resulting from violations of Insurance Regulation 563.13 in regards to the association's lack of underwriting of major participation loans it purchased and other commercial real estate projects for which it provided funds for. As of January 31, 1987, Tri-Cities had loss reserves on 12 major nonearning assets totaling $5.1 million.

(3) UNSAFE OR UNSOUND CONDITION TO TRANSACT BUSINESS

Tri-Cities is insolvent and has no prospects for any recapitalization due to its severe level of insolvency, its large asset quality problems, and its undesirable location in the Tri-Cities area which has been economically depressed due to the impending closure of the Hanford Nuclear Reactor. The association is losing approximately $250,000 per month on an operating basis. The board and management at Tri-Cities are not sufficient to effectively resolve the serious asset quality problems of the association. As such, Tri-Cities is transacting business while being in an unsafe and unsound condition.

III. Financial Condition of Tri-Cities

Data from Quarterly Reports to FHLBB
December 1985 through December, 1987

000's

| REPORTING PERIOD | TOTAL ASSETS | SCHED. ITEMS | % OF ASSETS | NET WORTH | % NW/TA | NET OPERATING INCOME | NET INCOME |
|---|---|---|---|---|---|---|---|
| 12/85 | 68,440 | 4,893 | 7.1 | 2,507 | 3.7 | (79) | (66) |
| 3/86 | 66,961 | 9,282 | 13.9 | 2,620 | 3.9 | 133 | 114 |
| 6/86 | 69,719 | 14,376 | 20.6 | 2,334 | 3.3 | (6) | (286) |
| 9/86 | 64,507 | 15,658 | 24.3 | (795) | (1.2) | 9 | (3,081) |
| 12/86 | 62,467 | 14,495 | 23.2 | (2,267) | (3.6) | (602) | (1,450) |
| 3/87 | 60,258 | 14,078 | 23.4 | (3,287) | (5.5) | (649) | (1,020) |
| 6/87 | 58,932 | 13,175 | 22.4 | (3,815) | (6.5) | (526) | (528) |
| 9/87 | 56,678 | 10,621 | 18.7 | (6,161) | (10.9) | (548) | (2,346) |
| 12/87 | 54,539 | 11,023 | 20.2 | (6,957) | (12.8) | (733) | (795) |



)F014 1081 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
OSING BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

Tri-Cities' liquidity has been under 6 percent of the liquidity base over the past four months due to continued deposit outflows.

Tri-Cities has been losing approximately $250,000 per month on an operating basis. Operating expenses have remained high, equaling approximately 3.6 percent (annualized) of average assets, while operating income has been nominal due to the high level of nonearning assets. Nonearning assets represented 34.6 percent of average assets at December 31, 1987, of which 16 major assets having a net book value of $9.9 million has been substantially reserved for. Sterling has asked for capital loss coverage and yield maintenance on 14 of these assets, and has elected not to purchase two of them. Sterling has also elected not to purchase the association's investment in its subsidiary, Tri-West Construction (and Tri-West Construction's first- and second-tiered subsidiaries). (See Exhibit S-9, which provides a copy of Sterling's bid .)

IV. Supervisory History of Tri-Cities

MACRO RATING SUMMARY OF LAST THREE EXAMINATIONS

| Exam Date | M A C R O | Overall Rating |
|---|---|---|
| 10/27/87 | 5 5 5 3 4 | 5 |
| 02/17/87 | 4 5 5 3 4 | 5 |
| 08/16/85 | 5 5 5 3 5 | 5 |

A cursory examination of Tri-Cities was performed on 9/13/79, and no concerns were found. Tri-Cities had 15 directors on the board which was a large number considering the size of the institution. As of that examination, the institution had only two loans that were not single-family type: one commercial loan for $70,000 and a loan for an 8-plex. No major concerns were noted in the two examinations that followed on February 15, 1980 and on June 3, 1981.

An examination was conducted as of 4/22/83, and a rating of "2C" was given. The scoping memo noted that loans on property types of over four dwelling units had increased significantly from levels existing one year earlier. Scheduled items represented 4.95% of assets or 51% of net worth, and speculative and commercial loans totaled $880,546. Sixty-six percent of these loans were composed of scheduled items.

President Schmidtke attributed the delinquencies to the economic setbacks associated with WPPSS, and stated that the institution had virtually stopped all commercial lending and had since concentrated its efforts on single-family and consumer loans and the collection of existing loans. President Schmidtke also noted that two of the major delinquent loans were not attributed to the economy, but rather to the borrowers.

The Report of Examination ("ROE") also disclosed that Tri-Cities had purchased 10% of the outstanding stock of Benefits Northwest ("BNW") for $67,300 or $673 per share. The price of the stock was based on twice the gross income divided by the number of shares issued and outstanding. Based on the 6/30/82 data, the institution paid 10.2 times book value or a price to earnings ratio of 33.7. President Schmidtke stated that the investment in BNW was a move toward

000716

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

diversification and that the goal was to increase the association's investment to a majority position. BNW's principal business activity is administering pension funds and profit sharing plans. As administrator, BNW can direct funds for investments to various financial institutions, such as Tri-Cities. One of BNW's directors: Les Adams, is also a director of Tri-Cities.

At the next examination, which was conducted as of 9/21/84, the examiner gave Tri-Cities a "2" rating. The scope was limited to a review of minutes of the institution's and service corporations' board meeting minutes, a review of the validity of FHLBB reports, lending and investment policies, loan register, internal controls, and pending litigation.

The ROE noted a decline in net worth to assets from 5.72% at 6/30/84 to 4.65% at 8/31/84, primarily due to the acquisition of $16 million in deposits and $1 million in fixed assets from the purchase of three branches from Great Western Savings Bank. It was further noted that five assets were classified as scheduled items with appraised losses aggregating $173,251 and that Tri-Cities had purchased two participations from Westside FS&LA, Seattle, totaling $4.2 million. A feasibility study had been obtained on one project, and that study contained statements contradictory to the appraiser's statements.

The major concern cited in the ROE was the dramatic growth experienced by the institution. Assets grew from $26,946,000 on 3/31/83 to $58,737,000 on 8/31/84, representing growth of 118%. The growth was largely funded by $8 million in public funds and $16 million in deposits from Tri-Cities' purchase of three Great Western's branches. The ROE indicated that over the next five-year period the institution's main goal was to maintain an annual asset growth of 40% while achieving a return on assets of .75%.

The examiner also discovered that Tri-Cities purchased $1,019,000 in corporate debt securities having an average maturity of 22 years, which was far in excess of the six year average allowed under 12 C.F.R 545.75(b)(5).

A monitoring report from the FHLB Financial Analysis Dept. prepared as of 9/30/84, noted that nonresidential loans had jumped from 0.1% of assets to 16.7% while annualized loan volume was 19%, 50.7% and 137.9% of assets for the respective first three quarters of 1984. By the third quarter of 1984, 77.6% of new loans were purchases, and construction lending had jumped from 0% to 67% of mortgage loans closed. This growth was funded primarily through jumbo CDs.

In response to these events, a supervisory letter dated 1/29/85, was sent to Tri-Cities' board requesting: (1) a current status of problem real estate properties and mortgage loans; (2) a revised policy on underwriting of loan participations; and (3) the board's assurance that they had become better informed about the various regulatory restrictions pertaining to transactions with affiliated persons. On 3/27/85, the board submitted their response letter, and on 4/22/85, board minutes were received by the supervisory agent that addressed the various requests.

On 5/29/85, the Supervisory Agent, the Assistant Director of District Operations, and the Deputy State Supervisor met with Tri-Cities' board. The topics discussed were: asset quality problems, underwriting and appraisal deficiencies, and management of the investment portfolio. As a follow-up to that meeting, a supervisory letter dated 6/7/85, was sent from the Supervisory Agent to the board

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

requesting that the board monitor the three major construction projects discussed at the 5/29/85 board meeting. A response letter from the board disclosed that 11 major loans had been acquired from other S&Ls, including: United Mutual Savings Bank of Tacoma, Future Savings of Albany, McIlroy Bank and Trust, Westside Federal, Investment S&L, and Perpetual Savings of Iowa. The letter also disclosed an $830,000 direct loan on the Crescent Bar project on the Columbia River. In addition, Tri-Cities had seven commitments for interim construction financing on fast food organizations.

A 6/26/85 letter from the board submitted the revised asset/liability management policy to the Supervisory Agent. The letter noted that the three construction projects appearing to have the potential for significant problems: Tech Center North, Morning Star Hill, and Claremont Condominiums were reviewed by Mr. Schmidtke personally as well as for documentation. The board concluded in their letter that upon the board's review of the Mr. Schmidtke's report on these projects, "nothing has been revealed to our Association to indicate that any of these loans have any great potential for losses."

On 9/30/85, a supervisory letter directed the immediate establishment of $198,114 in loss reserves for the Claremont Project. A few days later, on October 4, 1985, the board executed a Consent Cease and Desist Order with the State of Washington.

Tri-Cities overstated its 11/30/85, net worth by approximately $900,000. The Supervisory Agent called Mr. Schmidtke who said that the board was going to formally approve the audit report. The revised financials were received on 12/17/85.

On 2/5/86, a supervisory letter was sent expressing concern over the asset portfolio and requesting a complete discussion of the efforts made in recovering 15 major problem assets. On 2/25/86, the state examiner found that a loan had been granted by Tri-Cities despite the loan having been rejected by the State Supervisor when it was submitted for prior approval. This was a violation of the State C & D Order. Also on that date, a supervisory letter was sent transmitting the ROE of 8/16/85, and noted serious deficiencies in the areas of board oversight and effectiveness, executive management capabilities, major loan underwriting policies and procedures, investment in subsidiary corporations, and asset quality problems.

On 2/28/86, Supervisory Counsel recommended to the Office of Enforcement that a Consent Cease and Desist Order be pursued. This was followed-up with a meeting held on 3/10/86. Five violations of the State C&D Order were discussed with respect to commercial real estate loans. The State Supervisor informed the board that if Mr. Schmidtke was not replaced as managing officer, a court order would be sought to enforce the C&D.

On 3/11/86 Mr. Schmidtke submitted his letter of resignation as President/CEO to the board. Director Fisher assumed the CEO duties on an interim basis. Mr. Schmidtke had been named "Director in Charge of Special Projects." Also on that date, Kathy Flora, commercial loan closer, and Robert Chamberlain, the Chief Lending Officer, were terminated by the board due to "insubordination and flagrant violations of the Association's established policies and procedures."

On 4/3/86, the board sent its response to the Supervisory Agent addressing the concerns raised in the ROE. The board concluded that while the institution has



.. 014 1084 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
.OSING BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

set aside $1.5 million in loss reserves and while any loss is serious, "the extent of these potential losses do (sic) not threaten the viability of this institution."

In a letter dated 6/13/86, the Supervisory Agent directed the establishment of a $207,000 loss reserve on the books of Tri-West Mortgage, Inc. This was a follow-up letter to a 6/3/86 letter directing the same loss recognition. This reserve was established by the board.

On 6/25/86, a Consent C&D Order was executed between the FHLBB and Tri-Cities which covered: net worth, loan documentation, accounting and financial reports, scheduled items, construction loan disbursements, service corporations and subsidiaries, limitations on lending, concentration of assets, business plan, and underwriting procedures. Over the next few months, the board submitted materials to the Supervisory Agent that were required under the C&D Order, and the institution was put on a monthly reporting requirement for compliance with the terms of the C&D Order.

On 9/17/96, representatives of the board agreed to remove Mr. Schmidtke from the institution as an employee and as a board member by 9/30/86. On 9/30/86, Tri-Cities voluntarily established $2,574,267 in additional loss reserves associated with assets classified by the institution, resulting in the institution's insolvency by $2,267,000.

A supervisory letter was sent to the board on 10/9/86, advising them that Tri-Cities had exceeded the maximum limitation of 5% of brokered deposits while failing to meet its minimum net worth requirement. The institution was put on a monthly reporting requirement for brokered deposits.

A Consent Agreement was executed by the board on 10/29/86, following a board meeting with representatives of the FHLB of Seattle and the State Supervisor's Office in attendance. Mr. Schmidtke resigned from the board of directors on 11/3/86.

On 12/17/86, the 9/15/86 ROE of Tri-Cities was transmitted to the board, noting several areas of continued critical concern in the institution: inadequacy of management succession, lack of regularly-scheduled audit committee meetings, continued deterioration in asset quality and additional asset classifications, nonseparation of corporate existences between Tri-Cities and two service corporations, insolvency and lack of recapitalization plan, increased interest rate risk, cash management deficiencies, poor operating results, violations of Regulation E and the Bank Security Act, and violations of outstanding enforcement actions.

The board's response letter to the ROE was received on 1/21/87, and addressed each of the areas identified in the Report and the supervisory letter, although solutions to the major problems: lack of capital and lack of management, had not been found. The institution had contracted with CCF Jennings Link to provide assistance with Tri-Cities' problem assets. CCF Jennings Link had been mentioned as a possible aquirer. The board concluded in its letter that the most logical solution to their problems appeared to be a merger or buy-out. The board, with the assistance of its outside auditors, began to actively seek an unassisted merger partner or acquirer, but no interest was found.

000719

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

Tri-Cities has been concentrating its efforts on problem-asset workouts and preserving the franchise value of the association. The Supervisory Agent is in close contact with management and receives monthly board packets. Major decisions of the association require the prior non-objection of the Supervisory Agent.

V. Marketing Efforts

Tri-Cities was marketed on an in-state, unassisted basis to FSLIC-insured institutions in January 1987. Four institutions indicated a preliminary interest, although all four later said that they were uninterested without assistance. The four institutions were: First FS&LA of Port Angeles, Columbia Federal Savings Bank, First FS&LA of Walla Walla, and Interwest Savings Bank.

Tri-Cities was later marketed on an assisted basis, along with Lynnwood S&LA and First FS&LA of Longview, at a bid conference held on October 15, 1987. Bids were received from Old Stone Corporation of Providence, Rhode Island, Sterling Savings Association of Spokane, and World S&LA, A FS&LA of Oakland, California. Old Stone submitted the lowest-cost bid but later withdrew their proposal. Sterling submitted the next lowest-cost bid. This office has recommended the acceptance of Sterling's proposal and has been handling the case under District Bank case processing.

VI. Information on Sterling Savings

Sterling is a Washington-chartered, stock savings and loan association. Sterling was organized in 1981 and commenced business in 1983. In June of 1983, Sterling acquired Lewis FS&LA of Chehalis, WA. In February of 1988, they acquired six branches of Great American First Savings Bank, Tuscon, Arizona. Sterling has ten full service offices, five offices that are primarily depository branches, and one loan production office located throughout Washington. As of February 29, 1988, Sterling had total assets of $308.7 million.

Sterling's business consists primarily of originating, purchasing, selling and servicing secured residential and commercial real estate loans. Sterling has three wholly-owned subsidiaries, Fidelity Service Corporation, Lewis and Clark Financial Corporation, and Intervest Mortgage Investment Company (formerly Lewis Service Corporation), the primary business of which are real estate acquisition and development, commercial and consumer lending, and commercial mortgage banking operations, respectively.

Net income for fiscal 1987 (ending June 30) was $935,052 or $2.21 per common share a 21 percent increase from fiscal 1986 earnings. Sterling raised $2.14 million of new capital at the close of the 1987 fiscal year through a cumulative convertible preferred stock offering. This brought regulatory capital to a level of $10.47 million or 4.53 percent of liabilities. Regulatory capital as of December 31, 1988, had climbed to $11.0 million or 4.0% of liabilities. Sterling was last examined on October 29, 1986, and received a composite rating of "2." There are no supervisory concerns with the association.

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

VII. Viability Analysis

A. Business Plan

The business plan for Sterling after the acquisition of Tri-Cities is an ambitious one, but is consistent with growth trends of the recent past. The business plan consists of asset growth of approximately 15% annually. Liability growth is provided by growth of current offices and an aggressive deposit acquisition plan (4 de novo or acquired branches). Mortgage banking operations are expanded through new entry into urban markets (Seattle and Portland). The business plan projects that residential and commercial real estate lending will continue to dominate their activity.

The growth is supported largely by the infusion of FSLIC assistance, which is to be counted as regulatory capital. Periodic FSLIC payments to cover capital losses on specified assets will also count as regulatory assistance.

| | Yr 1 | Yr 2 | Yr 3 |
|---|---|---|---|
| Total Assets | 415.1 | 504.3 | 614.6 |
| Net Worth | 22.9 | 25.7 | 29.7 |
| NW/Liabs. | 5.84 | 5.10 | 5.08 |
| Net Income | 2,009 | 2,808 | 4,005 |
| ROA | 0.57% | 0.61% | 0.72% |

B. Viability Model

Key results of the viability analysis utilizing the FSLIC Viability Model are summarized below:

(Table 2)

Viability Results
($ amounts in millions)
(Based on 12/31/87) data)

| | Yr 1 | Yr 3 | Yr 5 | Yr 7 | Yr 10 |
|---|---|---|---|---|---|
| Total Assets | 446.1 | 597.6 | 700.2 | 828.2 | 1077.8 |
| Net Worth | 24.7 | 23.4 | 26.5 | 30.5 | 41.9 |
| NW/Liabs. | 5.80 | 4.35 | 3.94 | 3.83 | 4.05 |
| Net Income | (248) | 1,534 | 919 | 2,327 | 4,771 |
| ROA | (0.06%) | 0.28% | 0.14% | 0.29% | 0.46% |

The viability analysis shows that the institution is profitable after the first two years. The projections in the business plan are based on a flat interest rate scenario, while the viability model uses an increasing interest rate scenario. Therefore, the income projected in the viability model is less than in Sterling's business plan. Sterling's business plan only projects results in the next couple years. The FSLIC interest rate scenario was adjusted to reflect the advance rate levels at the District Bank in Seattle.

The amount of non-performing loans and additional write-downs correspond to the assumptions used in determining the liquidation cost and the cost of bids received. The estimates were updated to reflect activity since December 31, 1987.

PRIVILEGED MATERIAL
ATTORNEY CLIENT
CONFIDENTIAL

In January, 1988, Sterling acquired six branches, which is reflected in the viability model.

The rapid growth projected by Sterling places pressure on the net worth ratio of the combined institution. In both their projections, and the results of the model, the net worth ratio declines in the first few years. Sterling has expanded rapidly in its history. A great deal of the growth has been through branch acquisition which they plan to continue for the life of their plan. Due to this history of rapid growth, Sterling's projections were used in the first three years of the viability model. Growth was then slowed to a more average level.

In our opinion, the viability model indicates that after the acquisition of Tri-Cities, Sterling will remain a profitable and adequately-capitalized institution.

Because the model alone is not an accurate predictor of net worth compliance, we have reviewed the figures provided by the applicant and find them to be reasonable given their interest rate assumptions.

## VIII. Requested Forbearances

Sterling has requested certain standard and non-standard forbearances as part of their proposal to acquire Tri Cities. Standard forbearances include the liquidity, net worth, scheduled items, amoritization of unidentifiable intangibles and amoritization of loan discount. Another standard forbearance, unauthorized service corporation activities, is usually only awarded if the acquirer shows need. Sterling's does warrant this forbearance as with the Tri Cities acquisition, they will be over their aggregate equity risk investment limitation.

Sterling has also requested, and this office endorses, the FSLIC initial cash payment and any subsequent cash payments of loss coverage on the covered assets be counted as regulatory net worth. As was shown in the viability analysis section above, Sterling needs the net worth infusion and substantial leverage is not planned. Sterling works very closely with their Supervisory Agent and he concurs a realistic business plan has been developed.

## IX. Condition of the Industry

Tri-Cities has five branches located in southeastern Washington. All of the branches are in the "tri-cities" area of Kennewick, Pasco, and Richland. Washington State's economy has recovered slowly from the economic recession of the early 1980's due to the lackluster performance of the lumber and agricultural sectors. The economy in the Tri-Cities market area is heavily dependent on the nuclear industry. With the WPPSS fiasco and other problems with the nuclear industry surfacing in the region within the past four years, Tri-Cities' economy has plummeted. That economy has not shared in the general recovery experienced in the rest of the state. FSLIC-insured thrifts in the State of Washington have been able to maintain profitability since 1983, in part because the state, especially the Puget Sound area, is more diversified than its neighbors in the Twelfth District.

The Twelfth District economy, as a whole, has fared poorly in the 1980's. The region is heavily dependent upon natural resource industries such as agriculture,



000722

APP 071
NOF014 1088 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
... BOOK DATED 880407

PRIVILEGED MATERIAL
ATTORNEY - CLIENT
CONFIDENTIAL

timber, petroleum, and mining. The price for these commodities has been extremely weak throughout the 1980's. The thrift industry in the District has suffered accordingly. The Twelfth District thrifts as a whole have generated a positive return on assets in only one of the last six years.

The following table summarizes the financial health of the FSLIC thrift industry in the Twelfth District and in Washington State using two key indicators: regulatory net worth and return on average assets.

| | Twelfth District | | Washington State | |
|---|---|---|---|---|
| | NW | ROA | NW | ROA |
| 12/81 | 4.64 | (0.77) | 5.68 | (0.44) |
| 12/82 | 4.01 | (0.58) | 4.71 | (0.80) |
| 12/83 | 4.55 | 0.25 | 5.74 | 0.45 |
| 12/84 | 4.16 | 0.00 | 5.56 | 0.36 |
| 12/85 | 4.06 | (0.29) | 5.59 | 0.19 |
| 12/86 | 4.32 | (0.43) | 6.39 | 0.67 |
| 12/87 | 4.41 | (0.27) | 6.47 | 0.53 |

(Net worth in percentage of assets, ROA in percentage of average assets)

X. Pledged Accounts

As of December 31, 1987, Tri-Cities had no public funds on deposit.

XI. Fidelity Bond and Directors and Officers Coverage

Tri-Cities does not have fidelity bond coverage or directors and officers liability coverage. These policies expired on November 1, 1987, (with discovery extended to November 1, 1988), and on March 30, 1986, respectively.

000723

...ERIAL
...ENT
...TIAL



Recommendation for Receivership and Acquisition of Substantially
All of the Assets and All of the Liabilities of
Tri-Cities Savings and Loan Association
Kennewick, Washington; FHLBB No. 7641

EXHIBITS

S-1. FHLBB Report of Examination of Tri-Cities Dated February 17, 1987.
S-2. FHLBB Quarterly Financial Report of Tri-Cities dated December 31, 1987.
S-3 FHLBB Monthly Financial Reports of Tri-Cities dated January 31, 1988 and February 29, 1988.
S-4 Public Accountants' Audit Report for 12/31/86 and 12/31/85.
S-5 Memorandum dated July 6, 1987, from Susan M. Swenson, Supervisory Agent, to Jon M. Rundle, Assistant Director - ORPOS recommending transfer of Tri-Cities case to MAD/FSLIC.
S-6 Federal Consent Agreement dated October 29, 1986.
S-7 Federal Consent Order to Cease and Desist dated June 25, 1986.
S-8 State of Washington Consent Cease and Desist Order dated October 4, 1985.
S-9 Bid proposal dated November 27, 1987, from Sterling Savings.
S-10 Initial Cash Payment Calculation.
S-11 Forbearance Letter.
S-12 FHLBB Report of Examination of Sterling dated October 29, 1986.
S-13 FHLBB Quarterly Financial Report of Sterling dated December 31, 1987.
S-14 FHLBB Monthly Financial Report of Sterling dated January 31, 1988 and February 29, 1988.
S-15 Public Accountant's Audit Report of Sterling dated June 30, 1987.
S-16 Sterling 10-Q Report dated March 31, 1987.
S-17 Charter & Bylaws for Sterling Savings.
S-18 Charter & Bylaws for Tri-Cities Savings.
S-19 Viability Analysis.



OF014 1090 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 ACC # 483- 94-026 OTS BOX 14 OF 50
CLOSING BOOK DATED 880407

OFFICE OF SUPERVISORY AGENT

FEDERAL HOME LOAN BANK BOARD

1501 FOURTH AVENUE PHONE (206) 340-2300

SEATTLE, WASHINGTON 98101-1663

April 6, 1988

ISSUE MEMORANDUM

EXHIBIT 7 Faulstich 8/2/00

FROM: James R. Faulstich
Principal Supervisory Agent

TO: Federal Home Loan Bank Board

RE: Proposed Appointment of the Federal Savings and Loan Insurance Corporation ("FSLIC") as Receiver for and Subsequent Acquisition of

| | Figures in Thousands as of Feb. 29, 1988 | |
|---|---|---|
| Tri Cities Savings and Loan Association | Form: | State Stock |
| Kennewick, WA | Assets: | $54,500 |
| FHLBB No. 7641 | Liabilities: | $61,800 |
| | RAP Capital: | ($7,400) |
| | NW/Liabilities: | (11.97%) |
| | Operating Loss/Mo.: | ($246) |

by:

| | Figures in Thousands as of January 31, 1988 | |
|---|---|---|
| Sterling Savings Association | Form: | State Stock |
| Spokane, WA | Assets: | $295,326 |
| FHLBB No. 7918 | Liabilities: | $284,339 |
| | RAP Capital: | $11,104 |
| | NW/Liabilities: | 3.91% |
| | Operating Income/Mo: | $189 |

I. Issue

Whether the Bank Board should approve the appointment of a receiver and the subsequent FSLIC-assisted acquisition of substantially all the assets and liabilities of Tri Cities Savings and Loan Association ("Tri Cities") by Sterling Savings Association ("Sterling").

II. Background

Tri Cities is a state-chartered, stock association that received its insurance of accounts in 1978 and operates five branch offices in south central Washington. The economy of this market area is heavily dependent on the nuclear industry. As this new association flourished in its early years with the growth of the nuclear industry in the Tri Cities markets, it has suffered ever since the WPPSS fiasco in 1983 and other problems that have surfaced

the nuclear industry within the past four years. With this lack of market demand, the institution turned its attention outside its market area and began to book commercial real estate loans that were poorly underwritten. Scheduled items peaked in September 1986 at 24% of assets and now stand at 20% of assets.

Tri Cities first reported insolvency in September 1986 due to the voluntary establishment of specific loss reserves and has continued to lose approximately $250,000 per month on an operating basis. Operating expenses have remained high at approximately 3.6 percent of average assets. With a negative one year hedged gap of 69.5%, Tri Cities remains extremely exposed to rising interest rates. Net operating loss carryforwards are estimated to be $4.2 million for financial reporting purposes as of September 30, 1987.

III. Solution Efforts

A Consent Agreement was signed on 10/29/86 by Tri Cities Board of Directors and the case was transferred to the FSLIC on 8/28/87. The Supervisory Agent marketed Tri Cities on an unassisted basis in January 1987 to all qualified in-state FSLIC institutions. Four institutions indicated a preliminary interest, although all four later said they would not proceed without assistance.

Tri Cities was marketed on an assisted basis, along with two other Washington state thrifts, at a bid conference held on October 15, 1987, on a nationwide basis to all eligible private investors from the FSLIC National Marketing list and all eligible FSLIC-insured institutions. Out-of-state acquirers were required to bid on all three institutions; however we reserved the right to accept their bid(s) on any combination of the three institutions. This solicitation generated proposals from three thrift institutions. Old Stone Corporation, Providence, Rhode Island, submitted the lowest-cost bid but later withdrew their proposal. Sterling submitted the next lowest-cost bid. This office has recommended, and FSLIC has concurred, the acceptance of Sterling's proposal.

IV. Proposed Assistance

1. Upfront cash contribution of $11,715,128 which equals the negative GAAP net worth plus additional loan losses and valuation adjustments on non-covered assets plus actual and estimated operating losses since 12/31/87 until closing at 4/8/88 less specific reserves on covered assets. This payment will count as regulatory net worth.

2. Capital loss and yield maintenance coverage (treasury bill plus 150 basis points) on 13 assets with a net book value of $8.01 million and existing reserves of $1.8 million. Sterling will absorb 25% of the capital losses up to a pre-tax limit of $900,000.

3. FSLIC will purchase three assets, two of which FSLIC as Receiver for Westside FS&LA is lead lender. These two assets have a net book value of $560,000. The third asset is Tri Cities investment in Tri-West Construction, Inc., a wholly-owned inactive subsidiary of Tri Cities.

0C0725

4. Five year indemnification for undisclosed liabilities, claims not reserved for and asserted against the association, and litigation challenging the transaction. Standard forbearances regarding net worth forbearances, exclusion of scheduled items and liquidity deficiencies and service corporation

5. Tax benefits will be shared with the FSLIC on a 50/50.

V. Cost Analysis

The results of the proposal analysis performed by the Analysis and Evaluation Division using September 1987 data is as follows:

| | Present Value (in millions) | Percent of Liquidation |
|---|---|---|
| Liquidation | $20.7 | --- |
| Sterling | $15.8 | 76% |
| World S&LA | $16.9 | 82% |

VI. Capacity and Viability of Sterling

Sterling was a de novo state, stock institution that received its insurance of accounts in 1983 currently operating eleven offices throughout the state. The stock is held by Sterling officers and directors and the Spokane community--there is no one controlling shareholder. In June of 1983 Sterling acquired Lewis FS&LA, Chehalis, WA with FSLIC assistance. Sterling was last examined in October 1986 and received a composite rating of "2".

The business plan for the association after the acquisition is an ambitious one, but consistent with growth trends of the recent past. The business plan consists of asset growth of approximately 15% annually. This growth is supported largely by the infusion of the FSLIC assistance as regulatory net worth. The Supervisory Agent feels management is capable and will manage this growth prudently. The viability analysis maintains net worth above 5% for the three year period. The estimated net income the first year following the acquisition is projected to be $2 million (57 bps ROA) while the net worth to liabilities ratio should reach 5.84%.

ISSUE MEMO EXHIBITS

I-1. Old Stone Bank Bid
I-2. Sterling Savings Association Bid
I-3. World S&LA Bid
I-4. Tri Cities S&LA Consent Agreement
I-5. FHLB Seattle Recommendation Memo (March 1, 1988)
I-6. FSLIC Concurrence Memo (March 16, 1988)
I-7. Liquidation Costing (January 6, 1988)

000228

VI. Comparison of Alternatives

LIQUIDATION

| | |
|---|---|
| Advantages | 1. Offers a permanent solution. |
| Disadvantages | 1. Not the least costly solution.<br>2. Possible adverse public reaction.<br>3. Could take much longer to resolve given prioritization. |

STERLING

| | |
|---|---|
| Advantages | 1. Least costly solution.<br>2. Financially strong acquirer.<br>3. Keeps capital in thrift industry. |
| Disadvantages | 1. Cheaper solution may evolve at a later date. |

WORLD S&LA

| | |
|---|---|
| Advantages | 1. Financially strong acquirer. |
| Disadvantages | 1. More costly solution.<br>2. Only bid on this shop because they "had" to. Not really interested. |

VIII. Conclusion

The District Bank staff believe the Sterling proposal to acquire Tri Cities provides the most cost effective permanent solution of this case. Therefore, the FSLIC and the Federal Home Loan Bank of Seattle recommend the Federal Home Loan Bank Board approve the acquisition of Tri Cities by Sterling. The State of Washington concurs with this recommendation.

[signature]
I concur: Stuart D. Root

000729

1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank Board

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

**TO:** The Federal Home Loan Bank Board

**DATE:** December 5, 1988

**FROM:** Jordan Luke
General Counsel

**SUBJECT:** Voluntary Supervisory Conversion of:

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington
("Central Evergreen" or "Association")
FHLBB No. 1527

**AND:** Simultaneous Merger into

Sterling Savings Association
("Acquiror" or "Sterling")
Spokane, Washington
FHLBB No. 7918

**Pre-Conversion**
Total Assets: $260.4 million
RAP Regulatory Capital: $4.7 million
RAP Reg. Cap./Total Liabilities: 1.8%
GAAP Net Worth: ($12.4) million
GAAP Net Worth/Total Liabilities (4.8%)
(as of (9/30/88)

**Post-Conversion/Merger**
Total Assets: $693.8 million
Total Liabilities: $676.6 million
Reg. Cap.: $22.1 million
Reg. Cap./Total Liabilities: 4.0%
GAAP Net Worth: $11 million
GAAP Net Worth/Total Liabilities: 1.43%

## A. GENERAL RECOMMENDATIONS

It is recommended by the Principal Supervisory Agent of the Federal Home Loan Bank of Seattle ("PSA") with the concurrence of the Office of Regulatory Activities ("ORA") and the Office of General Counsel ("OGC") that the Federal Home Loan Bank Board ("Board"):

1. Approve the voluntary supervisory conversion of Central Evergreen;

2. Direct the Secretary or Assistant Secretary of the Board to issue a letter to Central Evergreen on behalf of the Board stating that the grounds set forth in § 5(d)(6)(A)(i) of the Home Owners Loan Act ("HOLA") 12 U.S.C. § 1464(d)(6)(A)(i), exist with respect to Central Evergreen and authorize the Secretary or Assistant Secretary to provide a copy of such certification to any agency in the United States upon its request; and

3. Approve the Agreement between the Acquiror and the FSLIC, requiring the Acquiror to cause the Resulting Institution to maintain and achieve certain specified levels of regulatory capital in accordance with scheduled increases as set forth in the Business Plan; and in the event of failure to achieve RAP and GAAP Capital as scheduled or to comply in all material respects to the business plan, subject the Resulting Institution to sanctions.

In addition, pursuant to 12 C.F.R. Sections 546.2, 552.13 and 563.22b, the Office of General Counsel, the Office of District Banks and the Office of Regulatory Activities recommend that the Board approve the merger of Central Evergreen into Sterling in order to effect the proposed conversion of Central Evergreen to stock form.

The appropriate Board resolution, tax certification letter and proposed resolution are attached as Exhibit 1 to record the above-noted approvals and other necessary Board actions.

B. <u>BACKGROUND OF THE PARTIES</u>

1. <u>Central Evergreen</u>

Central Evergreen was chartered in 1922 as a federally chartered mutual savings and loan association and received insurance of accounts in 1935. The Institution is headquartered in Chehalis, Washington and operates nine branches within western Washington. As of June 30, 1988, Central Evergreen reported total assets of $254.9 million, regulatory capital of $4.6 million (1.8% of total liabilities) and negative GAAP capital of $12.7 million (negative 4.8% of liabilities).

As discussed in Exhibits 2 and 3, the Supervisory Agent at the Federal Home Loan Bank of Seattle and ORA have determined that Central Evergreen is currently insolvent when its net worth is calculated under GAAP on a going concern basis. Central Evergreen's failure is due primarily to a high level of problem assets, significant operating expenses and inadequate underwriting procedures.

The Association reported losses totalling $5.5 million from 1980 to year end 1983. Those losses, coupled with losses on sales of fixed rate, low yielding assets during the same time period, resulted in a negative GAAP capital position of $14.2 million at December 31, 1984. As was permitted by the Board, the Association elected to defer approximately $15 million in losses for regulatory purposes. Those losses continue to amortize at approximately $240,000 each quarter. The SA noted that the asset sales resulted in a negative GAAP capital position, but that the proceeds were reinvested in adjustable rate assets that lead to an improved interest rate risk position and positive earnings from 1984 to 1986. Despite the Association experiencing a positive earnings trend, the SA believes the likelihood of the Association's recapitalization or recovery through earnings retention is highly doubtful given its severely negative GAAP capital position.

Subsequent to the most recent examinations of Central Evergreen, a comprehensive Supervisory Agreement was entered into between the Association and the Federal Home Loan Bank of Seattle in 1987 and remains in place. Both the Association's management and the Federal Home Loan Bank of Seattle ("FHLBank of Seattle") actively sought merger or acquisition partners. After consideration of two other offers requiring substantial FSLIC assistance, the SA reported that Sterling's offer was accepted. Absent the proposed acquisition by Sterling, the SA stated that FSLIC assistance would very likely be required.

2. Sterling

Sterling is a state-chartered FSLIC-insured stock association which received its insurance of accounts and became a member of the Federal Home Loan Bank of Seattle in 1983. As of June 30, 1988, Sterling reported total assets of $434.4 million, regulatory capital of $26.2 million and GAAP net worth of $23.2 million (5.3% of assets). Sterling currently operates 19 branch and loan production offices in the state of Washington. Much of Sterling's growth and current level of goodwill is attributed to its acquisitions of other

troubled FSLIC-insured institutions and branch offices.[1] As of June 30, 1988, Sterling reported a goodwill to total assets ratio of 4.42% which would increase to 5.89% as a result of the subject transaction.[2]

The FSA believes that the institution has established a proven success record in demonstrating it can successfully integrate acquired institutions and/or offices into its operations while maintaining profitability and meeting minimum regulatory capital requirements. Sterling's usual method of blending an acquired institution into its operations has been characterized by first stabilizing and training staff, bringing facilities up to par with the rest of the institution, establishing a regional branch administrator and formulating a plan to attract additional retail deposits and loans.

Since its opening in 1983, Sterling has undergone four examinations and received satisfactory ratings in all areas. According to the SA, the institution continues to be well-managed, with positive earnings, good asset quality, and an acceptable capital level. Sterling has addressed examination concerns to the satisfaction of the Supervisory Agent and no significant supervisory concerns are currently outstanding.

---

1. In February 1983, Sterling acquired Lewis and Clark Savings and Loan Association, a $43.4 million institution, through an unassisted voluntary merger. On November 5, 1985, Sterling acquired Lewis Federal Savings and Loan Association, a $52 million institution, which provided for FSLIC assistance in the amount of $1.75 million cash, indemnification against undisclosed liabilities and litigation costs for challenges to the acquisition and forbearances from complying with certain FSLIC and Board regulations for periods of one to five years. Sterling's most recent acquisition took place on April 8, 1988, involving Tri-Cities Savings and Loan Association, a $54.9 million institution. Sterling received $15.8 million in FSLIC assistance, consisting of $11.73 million in cash, indemnifications, and forbearances from complying with certain net worth and liquidity requirements for periods of up to five years.

2. While experiencing asset growth of over 50% per year, Sterling has posted positive annual net income since its second quarter of operation in 1983. As of Sterling's fiscal year ending June 30, 1988, it reported a return on equity ratio of 6.15%, and a return on average assets ratio of .39%, well above its peer ratios of 2.32% and .28%, respectively. Sterling's fiscal 1988 net income represented a 9.3% increase over the previous year's income. The institution's net operating income as a percentage of average assets of .89% exceeds its peer ratio of .83% as of the same date, despite recording a small non-operating loss.

C. Structure of the Transaction

Pursuant to the terms of a merger agreement between Central Evergreen and Sterling, the acquisition of Central Evergreen will result from Central Evergreen's conversion and simultaneous merger into Sterling. Upon the conversion date, Central Evergreen will issue 100 shares of its common stock to Sterling in exchange for Sterling's assumption of Central Evergreen's liabilities. The shares received by Sterling will be canceled immediately thereafter. The resulting association will retain the name Sterling Savings Association, Spokane, Washington, and will operate under its current charter and bylaws. After the merger Central Evergreen's home and branch offices will operate as branch offices of Sterling. The transaction does not involve an infusion of cash or sale of conversion stock <u>per se</u>, but rather will be effected by Central Evergreen's merger into a healthy institution, thereby eliminating the risk to the FSLIC of Central Evergreen's liquidation. The proposed transaction will not involve FSLIC assistance.

D. Qualification of the Association for a Supervisory Conversion to Stock Form

The Board has the authority to approve a supervisory conversion of a mutual association to a stock savings bank pursuant to Subpart C of 12 C.F.R. Part 563b, which implements the Board's authority with respect to federal associations under Sections 5(i), and (p) of the HOLA and with respect to both federal and state-chartered institutions under Section 402(j) of the National Housing Act ("NHA"). Generally, a supervisory conversion effected under Subpart C of Part 563b involves the sale of the mutual insured institution's newly issued stock to a third party or parties in a transaction in which the institution's members have no rights of approval or participation, and no rights to the continuance of any interest in the converted institution.

Pursuant to 12 C.F.R. § 563b.24, the Board in its discretion may authorize the supervisory conversion of an insured institution when: (i) the institution's liabilities exceed its assets, as measured under GAAP on a going concern basis, and (ii) the institution would be a viable entity as determined under 12 C.F.R. § 563b.26 following the conversion.

1. Insolvency

The Supervisory Agent at the FHLBank of Seattle and ORA have determined that Central Evergreen is currently insolvent when its net worth is calculated under GAAP on a going concern basis. As of

June 30, 1988, the Association's liabilities exceeded its assets by $12,750,857. Central Evergreen's failure is due primarily to a high level of problem assets, significant operating expenses and inadequate underwriting procedures.

2. Viability

Under Section 563b.26(b), a converting institution will be considered a "viable entity" if the requirements of either subsection (b)(1) or (b)(2) and subsection (b)(3) are met. Section 563b.26(b)(1) provides that "the prospective acquiror shall infuse sufficient capital at the conversion to enable the [converting] institution to achieve a ratio of net worth to total liabilities, equal to the greater of (i) three percent of liabilities, computed on the basis of generally accepted accounting principles, or (ii) the institution's regulatory capital requirement established under Section 563.13." Although the Resulting Institution will meet its regulatory capital requirements, it will not achieve the greater amount represented by a ratio of net worth to total liabilities of 3% under GAAP. Thus, the subject transaction does not meet the viability criteria specified in subsection 563b.26(b)(1).

However, Section 563b.26(b)(2) provides that the converting institution meets the first leg of the viability standard if the prospective acquiror:

(i) infuses sufficient capital at the conversion to enable the institution to achieve a ratio of net worth to total liabilities of at least 1%, under GAAP, and

(ii) agrees in writing with the Corporation to infuse additional capital, as necessary, to enable the institution to increase its regulatory capital on a scheduled basis to meet the institution's regulatory capital requirements within five years of the date of acquisition.

Further, under subsection b(2) the acquiror must agree in writing that failure to achieve the scheduled regulatory capital levels on or before the due date, or to adhere in all material aspects to the business plan submitted with the plan of conversion, will subject the acquiror to such sanctions as the Board, in approving the application, directs to be included in the written agreement. Finally, § 563b.26(b)(3) requires a finding that the transaction taken as a whole is in the best interest of, and does not present the potential for injury to, the converting institution, its depositors and FSLIC.

After the conversion and merger, Sterling's ratio of net worth to total liabilities, under GAAP, will decrease to 1.43%. Thus, pursuant to 12 C.F.R. § 563b.26(b)(2), Sterling must agree to increase its regulatory capital on a scheduled basis and agree in

writing to meet its regulatory capital requirements in accordance with the schedule and further agree that failure to meet the schedule or to adhere to the approved business plan will subject it to such sanctions as the Board includes in the agreement. No specific sanctions have been recommended by the SA or ORA. However, in our opinion the Board may direct the SA, with the concurrence of ORA and OGC, to negotiate with the Applicant sanctions to be included in the Agreement. Further, it is our opinion that the Board may delegate authority to the SA to include such sanctions in the Agreement and, upon the failure of the Applicant to meet the schedule or business plan standards, to enforce such sanctions against the Applicant. Accordingly, the proposed resolution contains language directing the SA to negotiate and include such sanctions in the Agreement. The five year business plan that was submitted in connection with the application indicates that Sterling will be able to maintain profitability and come into compliance with its minimum regulatory capital requirement in at least five years. Moreover, Sterling has indicated that it will thereafter infuse or obtain capital, satisfactory to the Supervisory Agent, to ensure that it continues to comply with its regulatory capital requirement, and specifically, will infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of approval of the transaction.

In addition, Sterling's level of regulatory capital has kept pace with its expansion and Sterling is currently in compliance with minimum regulatory capital requirements. Sterling has demonstrated its capability to attract outside capital through the issuance of 90,168 shares of cumulative, convertible Series A preferred stock in 1987, for a net increase to capital of $2.25 million. According to the SA's digest, based upon Sterling's stable earnings, acceptable capital levels, moderate interest rate risk, access to outside capital and management expertise, its overall financial resources have not been a cause for significant supervisory concern.

According to the SA's digest the subject merger represents a prudent and well-planed strategy by Sterling which the SA believes is in the best interests of the institution and the FSLIC. The merger will provide Sterling with significantly greater market share and increased competitiveness in its current market area of Lewis County, a larger asset base, greater geographic diversification, additional savings through economies of scale and tax benefits provided by Central Evergreen's unused net operating loss carryforwards.

The SA further notes that the business plan contained in the application indicates that Sterling plans to continue its current business strategy at a much slower growth rate. For fiscal years 1990 and 1991 Sterling anticipates annual asset growth of 6.65% and 8.79%, respectively. The institution intends to maintain operation costs at 1.90%-2.00% of total assets; a negative gap of between -10%

and -15%; a return on assets ratio of .40%; and maintenance of regulatory capital in excess of 4% of total assets, and expansion of lending and secondary market activities.

Sterling's record of meeting its business plan objectives is evidenced by its continued profitability. The digest states that the FHLBank of Seattle remains confident that Sterling's management will adhere to its plan and the institution will be closely monitored to ensure an increasing level of capital to required levels and safe and sound operation. The Seattle Bank is also requiring the institution to meet certain pre-defined capital levels. In addition, the SA notes that Sterling has contingency plans in the event of unfavorable or unforeseen circumstances.

Thus, it is the opinion of this Office, with the concurrence of ORA and the Supervisory Agent, that Central Evergreen's liabilities exceed its assets, as calculated under GAAP on a going concern basis, and that the merger of Central Evergreen into Sterling satisfies the viability standards set forth in 12 C.F.R. § 563b.26(b). However, since the proposed conversion and merger of Central Evergreen will decrease Sterling's ratio of net worth to total liabilities to 1.43%, computed on a GAAP basis, in our view a significant issue of policy exists thereby mandating Board action on the subject application. Based on the record, it is our opinion that the Board would have a legal basis on which to find that the proposed transaction meets the requirements for a voluntary supervisory conversion.

E. <u>Tax Consequences</u>

Pursuant to 12 C.F.R. § 563b.27(c) of the conversion regulations, Central Evergreen has submitted an opinion of counsel stating that the supervisory conversion would constitute a reorganization within the meaning of Section 368(a)(1)(G) of the Internal Revenue Code ("Code"). *See* Exhibit 6. Therefore, no gain or loss will be recognized by Central Evergreen as a result of the conversion, provided that the reorganisation is completed pursuant to a plan, that Sterling assumes substantially all of the assets of Central Evergreen, and that the Board certifies that at least one of the grounds for the appointment for a receiver set forth in Section 5(d)(6)(A)(i), (ii) or (iii) of the HOLA exists, or will exist in the near future in the absence of action by the Board.

The grounds for the appointment of a receiver pursuant to Section 5(d)(6)(A)(i) of the HOLA are insolvency and that the assets of the association are less than its obligations to its creditors and others, including its members. 12 U.S.C. § 1464(d)(6)(A)(i) (1982). Section 563b.24(b) of the Conversion Regulations provides that insolvency may be found to exist under § 5(d)(6)(A) of the HOLA for the purpose of qualification for a voluntary supervisory conversion if Central Evergreen's liabilities exceed its assets, as calculated under GAAP on a going concern basis. ORA has concurred

with the Supervisory Agent's opinion that the Board may certify that the grounds set forth in § 5(d)(6)(A)(i) of the HOLA for the appointment of a receiver exist with respect to Central Evergreen in that Central Evergreen is insolvent. We note, however, that the Internal Revenue Service requires that the Board also certify that Central Evergreen did not intentionally place itself in a position to qualify for a tax-free reorganization. Central Evergreen is, and, since December 31, 1984, has been insolvent under GAAP. Accordingly, the proposed approval resolution directs the Secretary or Assistant Secretary to make the above described certification on behalf of the Board, and to provide a copy of such certification to any agency of the United States upon its request. See Exhibit 1.

F. Proposed Charter, Bylaws and Stock Certificate

Central Evergreen is converting from federal mutual to federal stock form pursuant to Sections 5(i) and (p) of the Home Owners' Loan Act, 12 U.S.C. § 1464(i) and (p) (1982) ("HOLA") and Part 563b of the Rules and Regulations for Insurance of Accounts (the "Insurance Regulations"). In light of the present financial condition of Central Evergreen, it is our opinion that the Association would qualify for a voluntary supervisory conversion pursuant to the eligibility standards set forth at 12 C.F.R. § 563b.24. As the merger will take place simultaneously with the conversion, it is our opinion that no stock charter need be issued to Central Evergreen. Furthermore, no stock will be issued by Central Evergreen with the exception of 100 shares to be issued to Sterling (which will be canceled immediately.)

G. Merger of Central Evergreen with and into Sterling

No stock will be issued or sold in the conversion which involves a simultaneous conversion and merger into an existing stock institution.

Due to Central Evergreen's poor financial condition, Sterling requests that the merger be deemed to be instituted for supervisory reasons pursuant to Section 552.13(i)(4) of the Federal Regulations and Section 563.22(d) of the Insurance Regulations. In its application, Sterling states that it anticipates that the stockholder notice requirement of Section 552.13(i) of the Federal Regulations and the published notice requirement of Section 563.22(c) of the Insurance Regulations will be waived.

We have reviewed the merger application under 12 C.F.R. § 552.13. In order to expedite consummation of the merger, the attached resolution approving this transaction deems the merger to be instituted for supervisory reasons and waives the stockholder notice requirement. In addition, the SA has determined, and we concur, that pursuant to Section 571.5(a), the provisions of Section 571.5(k) of the Insurance Regulations are not applicable to

supervisory merger transactions such as that contemplated by the application. In addition, we note that the proposed merger is of the type that qualifies for the exemption from stockholder approval under § 552.13(j)(2). As noted above, ODB has recommended approval of the merger. <u>See</u> Exhibit 5. However, the proposed resolution does include a condition that requires the Resulting Institution to provide notice to all accountholders concerning federal insurance of accounts for the merged institution, pursuant to the terms of 12 U.S.C. § 1728(a).

H. <u>Employment Contracts</u>

Sterling has not entered into any written employment contracts with Central Evergreen employees, however it has agreed to assume the three contracts currently in place for officers Godding, Van Dijk and Neuhauser which all expire by December 31, 1989, and a deferred compensation agreement for Central Evergreen's retiree Roy H. Alexander. The SA has advised this Office that they have no objection on a supervisory basis to assumption of the three contracts and the current deferred compensation agreement. Accordingly, this Office has no legal objection to such agreements.

I. <u>Board of Directors and Advisory Board</u>

After the merger, Sterling's board of directors will include two outside directors of Central Evergreen, Messrs. Fugate and Alverson. Central Evergreen's remaining directors will be retained as an advisory board for a period of up to one year without compensation. The existing advisory board of Central Evergreen will continue with compensation of $50 per meeting. This arrangement is identical to a prior agreement Sterling entered when making a previous acquisition of a troubled thrift. We have been advised by the SA that such arrangements are not objectionable and we have no legal objections to the proposed arrangement.

J. <u>Management Interlocks and CRA</u>

We have reviewed the proposed transaction for compliance with the Depository Institutions Management Interlocks Act ("Management Interlocks Act"), 12 U.S.C. ch. 33, the management interlocks provisions of the Act, 12 U.S.C. § 1730a(i) and the regulations adopted by the Board pursuant to those statutes, 12 C.F.R. part 563f and 12 C.F.R. § 584.9.

No issues are presented under those provisions and we defer to ORA to advise the Board as to whether Central Evergreen and Sterling are in compliance with the CRA.

K. Use of Purchase Accounting

An opinion of Coopers & Lybrand, an independent certified public accountant, that the acquisition of the Association will be accounted for as a purchase, has been submitted as part of the Application. See Exhibit 7. In addition, ORA has stated that the proposed transaction qualifies for the use of purchase accounting, and that it has no objection to this accounting method.

L. Forbearances and Waivers

The applicants have requested a waiver for submission of audited financial data required by Section 563b.27(o) of the Insurance Regulations. The applicants indicated that the supervisory nature of the acquisition,[3] its submission of audited financial data as of December 31, 1987, which demonstrates the depth of Central Evergreen's negative GAAP capital, and the unnecessary time and expense of an additional audit outweighs the necessity of the above requirement. The applicants have also provided unaudited financial statements as of June 30, 1988, prepared in the same manner as the December 31, 1987, audited reports. The SA has recommended that the waiver request be granted. We note that the clear insolvency of Central Evergreen has been demonstrated by the audited and unaudited financial statements submitted with the application, and that the request is supported by the SA's digest; furthermore Central Evergreen will be merged into Sterling, and its resulting capitalization levels will be subject to an agreement with the Corporation. Accordingly, this Office has no legal objection to such waiver being granted.

M. Antitrust Analysis

We have reviewed the antitrust analysis conducted by the SA and for the reasons stated therein, we concur with the SA's conclusion that the proposed merger would not substantially lessen competition in any relevant geographic area of the country or otherwise create a monopoly or have a significant adverse anticompetitive effect which would violate the antitrust laws.

1. Direct Competition

Sterling and Central Evergreen have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987, Lewis County was serviced by a total of 25 deposit-taking financial institution offices including

---

3. Section 563b.27(o) requires the submission of an audited balance sheet as of a date within 90 days of the filing of the application. We note that the audited balance sheet as of 12/31/87, was 240 days from the date the application was filed.

13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the de minimus impact of any anticompetitive effect is further negated due to the insolvent nature of Central Evergreen.

2. Faltering/Failing Company

Further, any adverse effect on competition would be mitigated by the weak financial condition of Central Evergreen. The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance.[4] Central Evergreen is insolvent. Thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, the effect on competition of the merger of Central Evergreen into Sterling is probably procompetitive as it will return an active competitor to the market involved.

Moreover, this transaction may also be analyzed under the failing company doctrine.[5] We are aware of no other economically feasible quantifiable alternatives in this case and therefore conclude that the requirements of the doctrine are met and that it may operate as a defense to any action alleging a violation of Section 7 of the Clayton Act brought as a result of this transaction. In sum, this Office has no legal objections to approval of this transaction on antitrust grounds.

N. Summary of Other Legal Considerations

This Office has also reviewed the proposed transaction for compliance with other provisions of the NHA and, in our opinion, the transaction would be consistent with such provisions. Specifically, this Office has evaluated the transaction with respect to NHA Sections 408(c) (activities restrictions); 408(d),(p), and (t) (transactions with affiliates); 408(e)(4) (NOL carryforwards);[6]

---

4. United States v. General Dynamics, 415 U.S. 486, 503 (1974).

5. See International Shoe v. FTC, 180 U,.S. 291 (1930); Grandader v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).

6. The SA concurs in the Applicant's statement that the transaction will not result in the loss or reduction of NOL carryforwards.

408(e)(1)(A)(iii), (e)(1)(A)(iv), (e)(3), and (i)(2)(B) (prohibited acquisitions and corporate structures); 408(g) (debt); and 408(m) (emergency waiver authority). The proposed transaction raises no questions under the foregoing provisions.

This Office has also reviewed the proposed transaction for compliance with the provisions of the Board's conversion regulations at 12 C.F.R. Part 563b. In addition to the provisions discussed in detail above, we have also examined the transaction pursuant to 12 C.F.R. Sections 563b.27 (forbearances) and 563b.31 (expenses). The proposed transaction raises no significant issues under these provisions.

CORPORATE AND SECURITIES DIVISION STAFF CONTACT: Elaine A. Laye
EXT: 6453

J. Amanda Machen
Assistant Deputy Director
Corporate and Securities Division

I concur:

V. Gerard Comizio
Director, Corporate and
Securities Division

## EXHIBITS

Exhibit 1. Resolution and Tax Certification Letter
Exhibit 2. PSA Digest
Exhibit 3. ORA Digest
Exhibit 4. Plan of Conversion
Exhibit 5. ODB Memorandum
Exhibit 6. Opinion of Counsel
Exhibit 7. Certified Public Accountant's Opinion



T942 0342 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

EXHIBIT I

FEDERAL HOME LOAN BANK BOARD

No.:

Date:

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterling Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December __, 1988, a memorandum from the Office of District Banks, dated December ___, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

SUPERVISORY CASE FINDING

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

## COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

## WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

## VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessary enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

**TAX CERTIFICATION**

**RESOLVED FURTHER**, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

**RESOLVED FURTHER**, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

**CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS**

**RESOLVED FURTHER**, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

**EFFECTIVE DATE**

**RESOLVED FURTHER**, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

**MISCELLANEOUS**

**RESOLVED FURTHER**, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the FSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

**EXTENSION OF TIME**

**RESOLVED FURTHER**, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and



OT942 0348 STERLING S&L/S ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS; AGREEMENTS; 870309 - 910199 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

**MAINTENANCE OF BRANCH OFFICES**

RESOLVED FURTHER, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

**FAILURE TO MEET CONDITIONS**

RESOLVED FURTHER, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board

Federal Home Loan Bank Board

1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

# TAX CERTIFICATION LETTER

FHLBB Docket No. 1527

Board of Directors
Central Evergreen Federal Savings
and Loan Association
350 N. Market Blvd.
P.O. Box 1506
Chehalis, Washington 98532

To the Board of Directors:

This certification is issued pursuant to an approval resolution from the Federal Home Loan Bank Board dated December __, 1988. By that resolution, the Federal Home Loan Bank Board found and certified that the grounds set forth in 12 U.S.C. Section 1464(d)(6)(A) exist with respect to Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen") in that Central Evergreen is insolvent.

The record before the Bank Board, on the basis of which such determination was made, did not include information that would justify a determination or conclusion that Central Evergreen has intentionally placed itself in the position where the certified ground would apply, for the purpose of obtaining any tax advantages pursuant to 16 U.S.C. § 368(a)(3)(D)(i) (1982).

By the Federal Home Loan Bank Board
Acting Secretary