The Board gave approval on December __, 1988, of an application by Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen") to convert to the stock form of organization pursuant to a voluntary supervisory conversion through a merger into a stock institution and gave approval of an application by Sterling Savings Association, Spokane, Washington ("Sterling") to acquire Central Evergreen by merger into Sterling.



)T942 0351 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

**PLEASE NOTE THAT PAGES**
**WOT942 0424 THROUGH WOT942 0457**
**ARE REPLACEMENT PAGES FOR**
**WOT942 0352 THROUGH WOT942 0380**
**WHICH WAS MISSING PAGES 6 AND 7 OF THIS DOCUMENT**

OFFICE OF SUPERVISORY AGENT
FEDERAL HOME LOAN BANK BOARD
1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

RECEIVED
JUN 26 1997
WITHERSPOON, KELLEY, DAVENPORT & TOOLE

To: Julie L. Williams
Deputy General Counsel

Linda Plye
Director of Corporate Activities, ORA

Date: November 7, 1988

From: James R. Faulstich
Principal Supervisory Agent

Subject: Application for Voluntary Supervisory Conversion and Merger of:

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington FHLBB No. 1527

(000)
Assets as of 09/30/88
$260,416

into:

Sterling Savings Association
Spokane, Washington FHLBB No. 7918

Assets as of 09/30/88
$433,367

Consolidated Assets as of 09/30/88
$693,783

## I. ISSUE

Whether the Federal Home Loan Bank Board ("Board") should approve the voluntary supervisory conversion and merger of Central Evergreen Federal Savings and Loan Association, Chehalis, Washington ("Central Evergreen"), into Sterling Savings Association, Spokane, Washington ("Sterling").

The application is being submitted pursuant to Sections 563.22 and 563b. Subpart C of the Insurance regulations.

In addition to the request for approval of the supervisory conversion and merger, the Board is requested to waive submission of certain accounting information required by I.R. 563b.27(o), and discussed in Section VI of this Memo.

Sterling has requested that the FHLBB provide certification pursuant to Section 1464(d)(6)(A)(i), (ii) or (iii) of Title 12, United States Code.

## II. STATUTORY AND REGULATORY STANDARDS

### A. REGULATORY/STATUTORY CONSIDERATIONS

The application has been reviewed in accordance with applicable regulations including:

- I.R. 563.22 (Merger regulations)
- I.R. Subpart C of Part 563b (Voluntary Supervisory Stock Conversion regulations)
- 12 CFR 552 (Model Charter and Bylaws for Federal Stock Associations)

B. ELIGIBILITY OF CENTRAL EVERGREEN FOR CONVERSION

Pursuant to I.R. 563b.23, the Board will consider authorizing a supervisory stock conversion of an insured institution if an application containing the information and documents required by I.R. 563b.27 has been appropriately filed in accordance with procedures set forth in I.R. 563b.28, and meets the qualification criteria of I.R. 563b.24 and I.R. 563b.25, subject to standard conditions listed in I.R. 563b.29 and I.R. 563b.30.

Specifically, an institution qualifies for a voluntary supervisory conversion when: (1) its liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the institution would be a viable entity as determined under I.R. 563b.26 following the conversion. The institution also would not have any equity value realizable by the accountholders.

Based upon the above eligibility requirements, it is clear Central qualifies for voluntary supervisory conversion. As of June 30, 1988, Central's liabilities exceeded its assets by $12,750,857. Pursuant to I.R. 563b.(b)(2), Sterling will have a ratio of GAAP net worth to total liabilities of above 1% after merger and has included a business plan to steadily increase its level of capital. Based upon the representations made in the application and supporting materials, the transaction, taken as a whole, appears to be in the best interests of, and does not present the potential for injury to, the converting institution, its depositors or the FSLIC.

C. DELEGATION

No delegation is available due to the involvement of the stock conversion of Central Evergreen.

III. PLAN OF CONVERSION

Sterling proposes to acquire Central Evergreen, whereby simultaneously with conversion, Central will merge into Sterling. Central Evergreen's charter shall prescribe that the institution has the authority to issue 100 shares of common stock at $1.00 par value per share. Upon the conversion date Central Evergreen would issue the 100 shares to Sterling in exchange for assumption of Central Evergreen's liabilities. No cash or other remuneration is being paid for the stock by Sterling. After conversion and merger Central Evergreen's branches would become branches of Sterling. No liquidation account would be established for the former accountholders of Central Evergreen.

IV. CONVERTING/MERGING INSTITUTION

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington
FHLBB No. 1527

The institution was chartered in 1922 and received insurance of accounts in 1935. The institution is headquartered in Chehalis, Washington and operates nine branches within Western Washington.

Central Evergreen reported total assets of $254.9 million as of June 30, 1988, with capital of $4.6 million on a regulatory basis and negative GAAP capital of $12.7 million. The principle differences between regulatory capital and GAAP capital are Appraised Equity Capital totalling $1.8 million, deferred losses on loan and investment sales of $14.2 million and $808,000 in general loss reserves. Recent trends in these areas are summarized below.

| (millions) | Total Assets | Req. Capital | GAAP capital | YTD Net Income |
|---|---|---|---|---|
| As of: | | | | |
| 09/30/88 | $260.4 | $ 4.7 | $(12.4) | $ .4 |
| 06/30/88 | 254.9 | 4.6 | (12.7) | .3 |
| 12/31/87 | 254.0 | 6.1 | (13.6) | (7.2) |
| 12/31/86 | 256.6 | 10.6 | ( 9.4) | 1.6 |
| 12/31/85 | 247.7 | 9.3 | (11.5) | 1.6 |
| 12/31/84 | 236.6 | 7.6 | (14.2) | 1.1 |
| %/Total Assets | | | | |
| As of: | | | | |
| 09/30/88 | | 1.8% | (4.8)% | .3% |
| 06/30/88 | | 1.8 | (5.0) | .1 |
| 12/31/87 | | 2.4 | (5.3) | (2.8) |
| 12/31/86 | | 4.1 | (3.7) | .6 |
| 12/31/85 | | 3.7 | (4.6) | .6 |
| 12/31/84 | | 3.2 | (6.0) | .5 |
| %/Total Liabilities | | | | |
| As of: | Total Liab. | | | |
| 09/30/88 | $256.5 | 1.8% | (4.8)% | .2% |
| 06/30/88 | 251.2 | 1.8 | (5.1) | .1 |
| 12/31/87 | 250.6 | 2.4 | (5.4) | (2.9) |
| 12/31/86 | 245.0 | 4.3 | (3.8) | .7 |
| 12/31/85 | 238.4 | 3.9 | (4.8) | .7 |
| 12/31/84 | 229.0 | 3.3 | (6.2) | .5 |

The association also reported losses totalling $5.5 million from 1980 to year-end 1983. These losses coupled with losses on sales of fixed rate, low yielding assets during the same time period, resulted in a negative GAAP capital position of $14.2 million at December 31, 1984. As was permitted by the FHLBB, the association elected to defer approximately $15 million in losses for regulatory purposes. These losses continue to amortize at approximately $240,000 each quarter.

Although the asset sales resulted in a negative GAAP capital position, the proceeds were reinvested in adjustable rate assets that lead to an improved


OT942 0426 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

interest rate risk position and positive earnings from 1984 to 1986. Unfortunately, several of the purchased loans have since defaulted and account for the majority of the loss experienced in 1987. Although underwriting deficiencies were noted in a number of the credits, losses were centered in loans related to the recently liquidated North America Savings and Loan, Santa Ana, California. Although the approximate $13 million in credits related to North America performed as agreed until the institution was placed in receivership in January 1987, it was subsequently disclosed that several of the loans were affected by fraud of individuals associated with North America. Nevertheless, management has been successful in liquidating or restructuring the problem credits which now total $4 million.

Central Evergreen's major weaknesses are its negative GAAP capital position; a weak, yet positive regulatory capital position; low earnings and poor asset quality. Despite the institution's above weaknesses, management has been successful in establishing a strong single family lending program in Western Washington. Annual single family loan volume, both conventional and FHA/VHA, approximately $70 million with nearly 80% of the loan volume sold to FNMA, FHLMC and government loan investors.

The institution's balance sheet is centered in residential loans. Fifty percent of average assets are housing related, with an additional eighteen percent in non-residential mortgage loans. Central Evergreen does not have any commercial-purpose loans, and consumer loans total less than three percent of assets. The investment portfolio is centered in government securities, which account for nine percent of average assets. Funding has historically been provided through local deposits and FHLB advances, but the association also utilizes a small amount of brokered funds (1.5% of average assets).

As of June 30, 1988 delinquencies and real estate owned totalled $17 million and represent 6.7% of average assets, a slight decline from the 7.8% one year earlier. The total is principally comprised of the North America related credits and real estate acquired by deed-in-lieu of foreclosure from a local developer. Management has identified problem assets and losses in a timely manner.

The high level of problem assets has had a significant impact on the association's profitability. The loss of interest income on nonperforming credits, lower yields and higher costs of funds has resulted in a net interest margin of 1.2% for the first six months of 1988. Although management has concentrated resources on liquidating problem assets, they have also been successful in controlling operating expenses to 1.9% of average assets. After reporting operating losses throughout 1987, the association reports net operating income of $538,000 for the first six months of 1988, representing .42% of average assets. Nonoperating expenses continue to impact overall profitability, although to a lesser extent than in 1987. As a result, the year-to-date return on average assets of .26% compares favorably to 1987's (2.8%).

Although the association is experiencing a positive earnings trend, the likelihood of recapitalization or recovery through earnings retention is highly unlikely given the severely negative GAAP capital position. A one-year negative gap of 25% also has the potential to negatively impact future earnings. Although new loan originations have been adjustable rate, a large

amount of fixed rate mortgage loans funded by short term liabilities continue to be held. As a result, the association has maintained its one-year gap at 20 to 25% throughout the last twelve months.

The most recent examinations of Central Evergreen, conducted as of February 17, 1987 and November 30, 1987, resulted in a composite rating of 4 and individual MACRO ratings of 44423. Problems associated with asset quality and the potential impact on capital and earnings were the major concerns noted. Subsequent to the February, 1987 examination, a comprehensive Supervisory Agreement was executed and remains in place. The controls included in the Agreement and ongoing contact with management prevents the undertaking of new high risk business.

Since entering into the Supervisory Agreement in July 1987, both the association's management and the FHLB of Seattle have actively sought a merger or acquisition partner. Contacts have been made to individuals and financial institutions both in-state and outside the State of Washington. Of the approximately forty individuals and institutions contacted since mid-1987, two parties other than Sterling Savings have expressed interest. Both verbal offers were declined due to the requirement to provide FSLIC assistance of $8 million to $10 million. Numerous forbearances were also requested. Absent the proposed acquisition by Sterling Savings, FSLIC assistance will likely be required.

V. ACQUIRING INSTITUTION

A. Background

Sterling Savings Association
Spokane, Washington FHLBB No. 7918

Sterling is a State-chartered FSLIC-insured stock association which received its insurance of accounts and became a Bank member in 1983. As of June 30, 1988 the institution reported total assets of approximately $434.4 million and regulatory capital (including general loan loss reserves) of $26.2 million. The institution currently operates 19 branch and loan production offices in the State of Washington.

Much of Sterling's growth and current level of goodwill is attributed to its acquisitions of other FSLIC-insured institutions and branch offices. As of June 30, 1988, Sterling reported a goodwill to total assets ratio of 4.42%, which would increase to 5.89% as a result of the subject merger. Its first major acquisition was in February, 1983 of Lewis and Clark Savings and Loan Association, Clarkston, Washington, a troubled $43.4 institution, through an unassisted voluntary merger. On November 5, 1985 Sterling acquired $52 million Lewis Federal Savings and Loan Association, Chehalis, Washington ("Lewis"). The Lewis acquisition was accounted for as a purchase and involved FSLIC indemnification for any undisclosed liabilities of Lewis discovered within 3 years; costs incurred in defending a legal challenge to the acquisition, up to a maximum of $1 million; cash assistance of $1.75 million; and, forbearance from compliance with certain FSLIC and FHLBB regulations for periods of one to five years.

Sterling's most recent acquisition was of ailing $54.9 million Tri-Cities Savings and Loan Association, Kennewick, Washington("Tri-Cities"), involving $15.8 million in FSLIC assistance (net present value) on April 8, 1988. The acquisition was accounted for as a purchase and involved FSLIC indemnification for 75% of any capital losses on certain assets until the institution's share of losses reaches $900,000, and 100% of any capital losses on these assets thereafter; any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years, and any cost incurred in defending a legal challenge to the acquisition for a period of one year. Sterling also received from FSLIC a cash payment of $11.73 million, and agreed to refund FSLIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose before April 8, 1988. Certain FSLIC and FHLBB forbearances, regarding net worth and liquidity deficiencies, were granted for periods up to five years.

The institution's growth was also accomplished through several branch purchases including a $47.5 million six office acquisition from Great American First Savings Bank, F.S.B., Tucson, Arizona. in February, 1988. Sterling's aggressive growth posture has been well-managed and the institution was granted FHLB approval on December 28, 1987 to increase liabilities in excess of limitations set forth in I.R. 563.13-1 or by $25 million.

The institution has established a proven success record in demonstrating it can successfully integrate acquired institutions and/or offices into its operations while maintaining profitability and meeting minimum regulatory capital requirements. Sterling's usual method of blending an acquired institution into its operations has been characterized by first stabilizing and training staff, bringing facilities up to par with the rest of the institution, establishing a regional branch administrator and formulating a plan to attract additional retail deposits and loans.

Since its opening in 1983, Sterling has experienced four examinations and received satisfactory ratings in all areas. The institution continues to be well-managed, with positive earnings, good asset quality, and an acceptable capital level. Sterling has addressed examination concerns to the satisfaction of the Supervisory Agent and no significant supervisory concerns are currently outstanding. The following table describes the results of Sterling's previous examinations and includes ratings on management, asset quality, capital adequacy, risk management and operating results(MACRO). Also included in the table are composite, and compliance with Community Reinvestment Act ratings.

| Date of Examination | Type | M | A | C | R | O | Composite | CRA |
|---|---|---|---|---|---|---|---|---|
| 04/18/88 | Regular | 2 | 2 | 3 | 2 | 2 | 2 | 3 |
| 10/29/86 | Full Scope | 2 | 2 | 3 | 2 | 2 | 2 | 3 |
| 08/16/85 | Annual | 2 | 2 | 2 | 2 | 2 | 2 | N.R. |
| 09/16/83 | Regular | - | - | - | - | - | 2 | 3 |

Part of the reason for Sterling's continued favorable examination ratings, despite its rapid growth, is due to its careful strategic planning. Sterling has indicated that it also prepares for growth by hiring capable personnel prior to consummation of the mergers to avoid potential operational problems.

B. MANAGERIAL RESOURCES AND CAPABILITY

After merger, Sterling's board of directors will include two current directors of Central Evergreen, Messrs. Fugate and Alverson. Central Evergreen's remaining directors will be retained as an advisory board for a period of up to one year without compensation. The existing advisory boards of Central Evergreen will continue with director compensation of $50 per meeting. Sterling has not entered into any written employment contracts with Central Evergreen employees, however it has agreed to assume the three contracts currently in place for officers Godding, Van Dijk and Neuhauser which all expire by December 31, 1989, and a deferred compensation agreement for Central Evergreen's retiree Roy H. Alexander. Subsequent to filing of the subject application, this office received notification that Carol Neuhauser is no longer employed by Central, and therefore her employment contract is null and void.

The chart below represents management team and board of directors of Sterling following merger.

| Name | Position | Principal Occupation |
|---|---|---|
| Gilkey, Harold G. | Chairman, CEO | Sterling SA |
| Zuppe, William W. | President, Director | Sterling SA |
| Byrne, Daniel G. | EVP | Sterling SA |
| Harlow, John M. | EVP | Sterling SA |
| Moore, S. Midge | EVP | Sterling SA |
| Page, Stephen L. | EVP | Sterling SA |
| Parrish, Stanton C. | EVP | Sterling SA |
| Sackmann, Thomas F. | EVP | Sterling SA |
| Godding, George E.* | EVP | Sterling SA |
| Van Dijk, John G.* | VP | Sterling SA |
| Barnes, Ned M. | Director, Secretary | Attorney |
| Barnett, Rodney | Director | Pres. Elec. Supply Co. |
| Clark, T. Richard | Director | Business Consultant |
| Kroetch, Charles L. | Director | Pres/Print. Pub. Co. |
| Larrabee, Robert | Director | Owner/Funeral Home |
| Meyers, Robert E. | Director | Dentist |
| Wallace, David O. | Director | Owner/Grocery |
| Fugate, James P.* | Director | Supt. of Schools |
| Alverson, Raymond R.* | Director | Retired Pilot |

*Currently with Central Evergreen FS&LA

As indicated above Sterling's board of directors expertise and experience is well-rounded with persons holding positions in a variety of fields absent any positions which may create obvious conflict of interest or

usurpation of corporate opportunity problems. The management of Sterling has proven very capable through the institution's organization and expansion and received consistent favorable examination ratings. No interlocking relationships currently exist between a management official of either Sterling or Central Evergreen and another depository organization as defined in I.R. 563f.2.

Sterling's directors are currently divided into three classes of nearly equal number with directors of each class elected to three-year terms. Each director receives remuneration of $1,000 per year and $500 per board meeting attended. Some of the directors also serve on the audit, personnel or planning committees. Current Central Directors Fugate and Alverson whom are joining Sterling will receive the same remuneration of $8,000 per year as the other directors of Sterling, for an increase of $2,000 per year from their present fees.

Top management of Sterling is committed to the long-term viability of the institution and is actively involved in enhancing its operations. According to Sterling's most recent examination on April 18, 1988, Mr. Gilkey continues to be the driving force behind the institution's strategic direction and is very active in promoting the institution and creating a progressive image for Sterling and its employees. Mr. Gilkey currently owns 5.5% and 1% of Sterling's issued and outstanding common and preferred stock, respectively. In addition to his position of Chairman and Chief Executive Officer of Sterling, Mr. Gilkey serves on the institution's planning committee, and is Chairman of the Board of the institution's following subsidiaries: Fidelity Service Corporation; Lewis and Clark Financial Corporations; and, Lewis Service Corporation.

Besides holding the position of President, Chief Operating Officer and Director of Sterling, Mr. Zuppe serves as Director and Secretary/Treasurer of Fidelity Service Corporation; Director and Vice President of Lewis and Clark Financial Corporation; and, Director and Vice President of Lewis Service Corporation. Mr. Zuppe has also served in his present capacity since Sterling's inception and has proven his ability to successfully manage the institution through its expansion and free of significant supervisory concern.

Sterling's management's ability to transfer institution goals into successful day-to-day operations demonstrates their depth of knowledge and experience. Sterling's continued profitability is partially attributed to its management's sound judgment in identifying and pursuing favorable opportunities for the institution consistent with its business plan. The management has been responsive to any previous supervisory concerns is committed to securing a solid future for the institution. The institution's expansion has required prudent decision making and during the first part of 1988, Sterling reorganized its organizational structure to enhance effectiveness and include two subsidiary presidents on its senior management team. This reorganization proved Sterling's willingness and capability to adapt to a larger institution framework.

C. FINANCIAL RESOURCES

Sterling's primary business is attracting savings deposits, and originating, purchasing, selling and servicing loans secured by real estate liens on single family residences and commercial property. On June 30, 1988 Sterling reported holding 72.4% of its average assets in mortgage loans and contracts and 7.3% in non-mortgage loans and contracts. As of the same date the institution reporting holding 16.99% of its average assets in non-residential mortgage loans, compared to its peer ratio of 9.49%. Sterling's management experience, however, includes a strong residential and commercial banking background and the institution does not report any significant asset quality problems.

While experiencing asset growth of over 50% per year, Sterling has boasted positive annual net income since its second quarter of operation in 1983. As of Sterling's fiscal year ending June 30, 1988, it reported a return on equity ratio of 6.15%, and a return on average assets ratio of .39%, well above its peer ratios of 2.32% and .28%, respectively. Sterling's fiscal 1988 net income represented a 9.3% increase over the previous year's income. The institution's net operating income as a percentage of average assets of .89% exceeds its peer ratio of .83% as of the same date, despite recording a small non-operating loss. Pertinent financial and operational ratios are as follows: (000's omitted)

| Date | Total Assets | Total Deposits | Regulatory Capital | Required Capital | Excess Capital |
|---|---|---|---|---|---|
| 09/88 | $443,367 | $315,682 | $23,237 | $12,604 | $10,633 |
| 06/88 | 434,382 | 305,354 | 26,227 | 13,742 | 12,485 |
| 06/87 | 231,847 | 170,755 | 10,497 | 6,640 | 3,857 |
| 06/86 | 181,002 | 142,078 | 7,213 | 4,842 | 2,371 |
| 06/85 | 112,449 | 88,205 | 4,614 | 1,363 | 3,251 |

| Date | Net Income | Return on Average Assets | One Year Return on Equity (YTD) | GAP to Total Assets |
|---|---|---|---|---|
| 09/88 | 71* | .06%*** | 1.22% | -22.95 |
| 06/88 | 1,186 | .39% | 6.15% | -23.25% |
| 06/87 | 1,085 | .59% | 12.61% | -16.25% |
| 06/86 | 861 | .58% | 14.70% | 1.62% |
| 06/85 | 612 | .54% | 13.31% | N.A. |

* Represents one quarter income and includes impact of FASB 91
**Annualized

Sterling's first quarter net income is normally lower than later quarters partially due to annual stockholders meetings and report expenses and annual audit fees. Sterling's first quarter's earnings ending September 30, 1988 includes the adverse impact of implementing FASB 91 of approximately $56,000, and the amortization of goodwill resulting from its acquisition of Tri-Cities Savings and Loan Association.

OT942 0432 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;
GREEMENTS; 870399 - 910199 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

As indicated in the above table, Sterling's level of regulatory capital has kept pace with its expansion and is currently in compliance with minimum regulatory capital requirements. Regardless of its regulatory capital level, as of June 30, 1988 the institution reported tangible capital of only .93% of total assets and .98% of total liabilities, compared with its peers of 5.4% and 5.88%, respectively. Sterling's ratio of GAAP capital to total assets as of the same date was 2.2%, down from 3.53% reported one year earlier. Sterling has, however, demonstrated its capability to attract outside capital through the issuance of 90,168 shares of cumulative, convertible Series A preferred stock in 1987, for a net increase to capital of $2.25 million.

Based upon Sterling's stable earnings, acceptable capital level, moderate interest rate risk, access to outside capital and management expertise, its overall financial resources are not cause for significant supervisory concern.

According to the June 30, 1988 pro-forma statement of condition contained in the application, after merger and acquisition Sterling's total assets would increase by approximately 60% to about $685 million and its ratio of RAP capital to total assets would decrease from 5.35% to 3.39% and its ratio of GAAP capital to total assets would decrease from 2.21% to 1.41%. Sterling's directors and management have indicated commitment to maintaining adequate capital levels to support future operations. In this respect, the institution intends to raise equity through a community offering of $5-10 million of preferred stock in June, 1989. Upon advise of several underwriters, Sterling decided to acquire Central Evergreen first and then attempt to sell the preferred stock. Sterling reported that current insider expressions of interest in buying the preferred stock total $1.23 million. The informal commitments include $665,000 from Sterling's board and management, $200,000 from Central's current board and management and $300,000 from a profit sharing plan for current Central employees.

Although the exact amount of the preferred stock offering has not yet been determined, based upon a minimum of $5 million sold, of which a total of 23% has already been informally committed, Sterling's June 30, 1989 RAP and GAAP capital to total assets ratio would be 4.12% and 2.23%, respectively, increasing to 4.23% and 2.61% on June 30, 1990.

Due to Sterling's June 30, 1988 one year gap to total assets of -23.25% being similar to Central Evergreen's one-year gap of -25.49%, as of the same date, no material change would result. (Given the uniqueness of some of Sterling's assets, and the inflexibility of the thrift report, the actual gap is approximately 300-500 basis points less.)

The subject merger represents a prudent and well-planned strategy by Sterling and is in the best interests of the institution and the FSLIC. The merger will provide Sterling with significantly greater market share and increased competitiveness in its current market area of Lewis County, a larger asset base, greater geographic diversification, additional savings through economies of scale and tax benefits provided by Central Evergreen' unused net operating loss carryforwards(see section VIII (e)).

Sterling will be better positioned to serve its Lewis County market area depositors due to its increased presence, and Central Evergreen's well-developed residential lending function would enhance Sterling's current lending operations. Only one branch office closure would result from the subject merger where Sterling and Central have a branch across the street from each other in Chehalis. Former Central customers will enjoy uninterrupted service through the merger and will have access to additional branch office locations.

The subject transaction is considered in the FSLIC's best interest because any other rescue effort of Central would likely result in assistance of at least $8-10 million; liquidation costs for Central would be far higher than the subject no-cost-to-FSLIC transaction; and the transaction does not present the potential for injury to the resulting institution or the FSLIC.

D. <u>BUSINESS PLAN</u>

The business plan contained in the application indicates that Sterling plans to continue its current business strategy however at a much slower growth rate. For fiscal years 1990 and 1991 Sterling anticipates annual asset growth of 6.65% and 8.79%, respectively. The institution intends to maintain operating costs at 1.90%-2.00% of total assets; a negative gap of between -10% and -15%; a return on assets ratio of .40%; and maintenance of regulatory capital in excess of 4% of total assets, and expansion of lending and secondary market activities.

Sterling's record of meeting its business plan objectives is evidenced by its continued profitability. We remain confident that Sterling's management will adhere to its plan and the institution will be closely monitored to ensure an increasing level of capital to required levels and safe and sound operation. We are also requiring the institution to meet certain pre-defined capital levels. In addition, Sterling has contingency plans in the event of unfavorable or unforeseen circumstances.

E. <u>VIABILITY ANALYSIS</u>

A viability analysis was conducted to determine whether Sterling would remain a viable entity, pursuant to I.R. 563b.26(b)(2), following the conversion and acquisition of Central. The analysis demonstrates that Sterling would have GAAP capital in excess of 1% after merger and would be able to continue meeting minimum regulatory capital requirements in two different interest rate environments. Key results of the viability analysis utilizing the FSLIC Viability Model are summarized below:

Viability Results-Rising Interest Rate Environment (000)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Assets | $747,850 | $805,965 | $871,154 | $941,497 | $1,018,529 |
| Net Worth | 28,995 | 28,538 | 28,242 | 27,406 | 27,101 |
| Net Income | 2,392 | (457) | (296) | (836) | (305) |
| Int. Rate Spread | 2.19% | 1.75% | 1.69% | 1.58% | 1.59% |
| NW/Total Liab. | 4.03% | 3.67% | 3.35% | 3.00% | 2.73% |

Viability Results-Level Interest Rate Environment (000)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Assets | $747,363 | $807,229 | $874,554 | $947,642 | $1,027,490 |
| Net Worth | 28,818 | 29,994 | 31,743 | 33,586 | 36,086 |
| Net Income | 2,215 | 1,176 | 1,749 | 1,843 | 2,499 |
| Int. Rate Spread | 2.16% | 1.94% | 1.89% | 1.83% | 1.82% |
| NW/Total Liab. | 4.01% | 3.86% | 3.77% | 3.67% | 3.64% |

As expected, the viability analysis indicated that Sterling would fare better under the level interest rate environment but remain sufficiently capitalized in an increasing interest rate scenario. The first table illustrates a "worst case" scenario without any normal portfolio restructuring a thrift would implement in such situations. Both tables include Sterling's planned capital infusion of $5 million in May, 1989; and reduction in non-performing assets, level of cost of funds, growth rates, and dividend payouts at more realistic levels to Sterling.

As of September 30, 1988 Sterling's one-year gap to total assets calculated by the FHLBB reports is -22.95%. Sterling estimates it gap to be -18.9%. Because of the uniqueness with certain assets, the FHLBB gap calculation is high and disproportionately affects the FSLIC Viability Model.

Sterling and Central have compatible operations. Both institutions use the same data processing servicer and equipment. The branch and delivery systems will complement each other. Central has well-developed residential lending and cost-effective deposit gathering functions that will help Sterling. Better financial expertise and controls should result from the combination. The merger would provide Sterling's management team with both the opportunity of additional growth in job challenge and the ability to capitalize on its experience, proven in prior acquisition, to solve problems of a troubled institution.

An additional viability analysis was conducted which indicated that Central, on a stand-alone basis, with its June 30, 1988 level of approximately ($12.7) million in GAAP capital would not be able to meet minimum regulatory capital requirements within five years.

Antitrust Considerations

1. Direct Competition

As presented in Appendix B - Anticompetitive Analysis, Sterling and Central have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987 Lewis County was serviced by a total of 25 deposit-taking financial institution offices including 13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the triggering of an anticompetitive effect is ignored due to the supervisory nature of the merger.

2. Faltering/Failing Company

Any possible adverse effects on competition which may occur also would be mitigated by the weak financial condition of the merging institutions. An antitrust analysis must consider the dynamics of the market and the real competitive strength in that market.

The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance. (See United States v. General Dynamics, 415 U.S. 486, 503 (1974).) Central is insolvent; thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, any effect on competition of the merger is probably procompetitive as the resulting institution will be seeking economies of scale by eliminating duplicate functions, thereby reducing operating costs, helping to increase the institution's ability to actively compete in the affected market areas.

Moreover, this transaction may also be analyzed under the failing company doctrine. Given the unavailability of any other economically feasible quantifiable alternatives in this case (See International Shoe v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).), we conclude that the requirements of the doctrine are met and that it may operate as a defense to any action brought as a result of this acquisition which alleges a violation of Section 7 of the Clayton Act. 15 U.S.C. 18 (1982). In conclusion, there appears to be no basis for legal objection on anticompetitive grounds to approval of this transaction.


OT942 0436 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

VI. WAIVER REQUESTS AND OTHER REQUESTS

1. Publication, Public Comment and Disclosure Requirements

The publication, public comment and disclosure requirements have been waived because the transaction would be approved by the FSLIC for supervisory reasons, consistent with Section 563.22 (d) of the Insurance Regulations.

2. Hart-Scott-Rodino Act Filing

The filing pursuant to the Hart-Scott-Rodino Act has been waived and is explained in Section VII (I) of the Memo.

3. Financial Data

The applicants have requested a waiver for submission of audited financial data required by Section 563b.27(o) of the Insurance Regulations. The applicants indicated that the supervisory nature of the acquisition, its submission of audited financial data as of December 31, 1987 which demonstrates the depth of Central's negative GAAP capital and the unnecessary time and expense of an additional audit, outweighs the necessity of the above requirement. The applicants have also provided unaudited financial statements as of June 30, 1988 prepared in the same manner as the December 31, 1987 audited reports.

4. FHLBB Certification

A certification has been requested, by Sterling, from the Board pursuant to Section 368(a)(3)(D)(ii)(III) of the Internal Revenue Code of 1954, as amended, that the grounds set forth in Section 1464(d)(A)(i),(ii), or (iii) of Title 12, United State Code, exist with respect to Central or will exist in the near future in the absence of action by the Federal Home Loan Bank Board.

VII. OTHER INFORMATION

A. Transaction Expenses

Both involved institutions have agreed to pay all costs incurred or to be incurred by it in connection with consummation of the transaction. Sterling estimates it will incur approximately $16,000 in legal fees and $1,000 in accounting expenses associated with the transaction. Central Evergreen anticipates incurring approximately $22,000 in legal fees with the transaction.

B. Institution Board of Director Approval

The subject transaction was approved by the board of directors of Sterling on July 18, 1988, and by Central Evergreen's board of directors on July 19, 1988.

C. Member/Shareholder Approval

The application contains an opinion from the law firm of Witherspoon, Kelly, Davenport and Toole which indicates that Washington State law does not require approval of the combination by Sterling stockholders. The opinion also states that Central members have no rights of approval pursuant to Federal law and regulations controlling voluntary stock conversions.

D. Washington State Approval

Washington State supervisory approval for the conversion and merger is not required, except as new branch offices for Sterling. The State intends to approve the branch office locations for Sterling coincident with FHLBB approval of the merger and conversion. The State's analysis indicated that the merger would allow Sterling:

- the opportunity to utilize its expertise learned from previous mergers and acquisitions
- greater geographical diversification of investments
- increased economies of scale
- increased lending volume
- improved net interest spread
- use of Central's unused net operating loss carryforwards

E. Accounting Treatment

Sterling has submitted an opinion from the accounting firm of Coopers and Lybrand which indicates that Sterling's use of purchase accounting and its proposed methods and periods of amortizing any allocated discounts or premiums and intangible assets of approximately $21 million, are in accordance with generally accepted accounting principles.

F. Tax Liability

An opinion from the law firm of Witherspooon, Kelley, Davenport and Toole was included in the application and states that there should be no tax consequences to Central Evergreen or Sterling as a result of the conversion or merger.

G. Charter and Bylaws

Central's proposed Federal Stock charter, necessary for the simultaneous conversion and merger has been reviewed and appears to be consistent with the model in 12 C.F.R. 552.

H. Net Operating Loss Carryforwards

Central Evergreen's net operating loss carryforwards resulted from operations during the years 1983 and 1984 and was not connected with the supervisory acquisition of another FSLIC-insured institution. Central Evergreen's current NOL carryforwards from its 1986 tax returns total $8,382,770. Sterling indicated that with the addition of real estate loan losses to be incurred prior to the transaction and a change in the method of calculating the bad debt deduction on Central Evergreen's previous tax returns the amount of NOL carryforwards may be increased by approximately $13.6 million to about $22 million. The revised schedule of NOL carryforwards is as follows:

| Year Originated | Amount Available for Carryover | Year of Expiration |
|---|---|---|
| 1983 | $4,790,013 | 1991 |
| 1984 | 3,592,757 | 1992 |
| 1986 | 5,059,000 | 1991 |
| 1987 | 1,604,000 | 1992 |
| 1988 | 7,000,000 | 1993 |
| Total | $22,045,770 | |

I. PRE-MERGER NOTIFICATION

Exemption of Proposed Transaction

The merger of Sterling and Central Evergreen is exempt from the premerger notification requirements of the Hart-Scott-Rodino Antitrust Improvements of 1976, Pub. L. No. 94-435, 90 Stat. 1390 (codified at 15 U.S.C. 18a) ("Hart-Scott-Rodino Act"). Section 18a(d)(B) of Title 15 of the U.S. Code authorizes the Federal Trade Commission, with the concurrence of the Assistant Attorney General, to promulgate rules and regulations, and to exempt certain acquisition, transfers, or transactions from the requirements of the Hart-Scott-Rodino Act. Pursuant to Section 802.8 of Title 16 of the Code of Federal Regulations, a merger, consolidation, purchase of assets or other acquisition requiring approval under Section 403 or 408(e) of the NHA or under Section 5 of the HOLA is exempt from the filing of the Hart-Scott-Rodino Act if the agency whose approval is required finds that approval is necessary to prevent the probable failure of one of the institutions involved.

Based upon our review of available financial documentation on the subject institutions, it has been determined that the above exemption is applicable to the transaction and accordingly no filing with the Federal Trade Commission and Assistant Attorney General, Antitrust Division, Justice Department, is required pursuant to the Hart-Scott-Rodino Act.

Antitrust Considerations

1. Direct Competition

As presented in Appendix B - Anticompetitive Analysis, Sterling and Central have overlapping market areas in only one county. In Lewis County, Central currently maintains its home and three branch offices while Sterling operates a total of two facilities. As of June 30, 1987 Lewis County was serviced by a total of 25 deposit-taking financial institution offices including 13 commercial banks, 1 credit union and 11 thrift institutions. Due to the relatively rural character of Lewis County, and low number of competitors, the area contains high deposit concentrations among the above financial institutions.

As a result of the subject merger, the June, 1987 Hirfandal-Hirschman Index for Lewis County would increase by 537 from 1,515.40 to 2,052.53. Although Central and Sterling currently rank number 1 and 3 in deposits in Lewis County, the triggering of an anticompetitive effect is ignored due to the supervisory nature of the merger.

2. Faltering/Failing Company

Any possible adverse effects on competition which may occur also would be mitigated by the weak financial condition of the merging institutions. An antitrust analysis must consider the dynamics of the market and the real competitive strength in that market.

The Supreme Court has determined that a firm's probable future ability to compete is more important than its current market share based on past performance. (See United States v. General Dynamics, 415 U.S. 486, 503 (1974).) Central is insolvent; thus, irrespective of its share of deposits or lending, it has been unable to compete in the market on a profitable basis. Therefore, any effect on competition of the merger is probably procompetitive as the resulting institution will be seeking economies of scale by eliminating duplicate functions, thereby reducing operating costs, helping to increase the institution's ability to actively compete in the affected market areas.

Moreover, this transaction may also be analyzed under the failing company doctrine. Given the unavailability of any other economically feasible quantifiable alternatives in this case (See International Shoe v. FTC, 180 U.S. 291 (1930); Grandader v. Public Bank, 281 F. Supp. 120 (E.D. Mich. 1967).), we conclude that the requirements of the doctrine are met and that it may operate as a defense to any action brought as a result of this acquisition which alleges a violation of Section 7 of the Clayton Act. 15 U.S.C. 18 (1982). In conclusion, there appears to be no basis for legal objection on anticompetitive grounds to approval of this transaction.

VII. CONCLUSION

The subject acquisition represents a no-cost-to-FSLIC resolution of a GAAP-insolvent institution without presenting substantial injury or risk to the resulting institution, its depositors, shareholders or the FSLIC. A review of the application, supporting documentation and other records reveals that applicable statutory and regulatory standards have been met and that the acquiror has the financial capability and management expertise to successfully blend the target institution into its operations. It is noted that any alternative resolution of the target institution would likely result in FSLIC-assistance of a minimum $8-10 million.

Time is of the essence in approval of this application due to the applicant's willingness to waive FSLIC assistance and the November 30, 1988 consummation deadline indicated in the Acquisition Agreement when either party may withdraw from the transaction. Sterling has been advised and does no object to the recommended non-standard condition regarding increasing its level of capital (see Exhibit A) and has anticipated closing the transaction on November 30, 1988; therefore, expeditious review and approval is requested, subject to standard and non-standard conditions normally imposed in acquisition and conversion of this type and non-standard condition attached as Exhibit A.

November 7, 1988

Principal Supervisory Agent

Penny D. Marshall
Supervisory Agent

EXHIBIT A

Recommended Non-Standard Condition of Approval

That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 CFR 563.13 as currently in effect or as hereafter amended; infuse capital from its planned stock offering, or by an equivalent method, no later than two years from this date; and, to comply in all material aspects with its business plan as submitted as part of the subject application. Sterling shall also agree that upon failure to achieve regulatory and GAAP capital levels consistent with its business plan during the five year period, commencing on the date of acquisition, the institution shall be be subject to such sanctions to be determined by the Supervisory Agent.

ADDENDUM A

Julie L. Williams
Issues Memo
November 7, 1988 Addendum A

INPUT FILE: CD7918A
OU--- FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
BALANCE SHEET
11/02/88 AT 14:44

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| ORTGAGE LOANS AND CONTRACTS | | | | | | |
| ADJUSTABLE RATE | 243,677 | 228,644 | 214,350 | 200,719 | 187,662 | 175,136 |
| 1-4 FAMILY | 201,878 | 180,788 | 166,316 | 154,884 | 143,794 | 133,603 |
| 5+ DWELLING UNITS | 36,279 | 26,838 | 20,250 | 18,015 | 15,772 | 13,943 |
| SECOND MORTGAGES | 5,449 | 4,133 | 3,232 | 2,698 | 2,165 | 1,902 |
| NEW FIXED RATE | 0 | 50,794 | 85,968 | 120,602 | 155,151 | 191,128 |
| NEW VARIABLE RATE | 0 | 63,366 | 107,132 | 150,886 | 194,757 | 240,647 |
| NEW SECOND MORTGAGES | 0 | 1,373 | 2,248 | 3,077 | 3,869 | 4,670 |
| (DISCOUNTS) | (3,216) | (3,186) | (2,877) | (2,507) | (2,123) | (1,732) |
| TOTAL MORTGAGES | 484,067 | 552,751 | 596,618 | 648,373 | 701,047 | 759,296 |
| MORTGAGE BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 | 0 |
| NONMORTGAGE LOANS | | | | | | |
| COMMERCIAL | 20,103 | 0 | 0 | 0 | 0 | 0 |
| CONSUMER | 18,595 | 8,788 | 6,135 | 5,029 | 3,817 | 3,261 |
| NEW COMMERCIAL | 0 | 7,180 | 12,431 | 17,893 | 23,581 | 29,713 |
| NEW AUTO LOAN | 0 | 16,248 | 23,864 | 28,637 | 30,980 | 32,232 |
| (DISCOUNTS) | (310) | (195) | (136) | (95) | (68) | (48) |
| --TAL NONMORTGAGE LOANS | 38,388 | 32,021 | 42,294 | 51,464 | 58,310 | 65,158 |
| ONPERFORMING MORTGAGES | 12,000 | 8,000 | 4,000 | 0 | 0 | 0 |
| .AL. ALLOWANCE) | (6,486) | (4,326) | (2,166) | (6) | (6) | (6) |
| NET NONPERFORMING MORTGAGES | 5,514 | 3,674 | 1,834 | (6) | (6) | (6) |
| GROSS OTHER NONPERF. LOANS | 0 | 0 | 0 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | 0 | 0 | 0 | 0 | 0 | 0 |
| NET OTHER NONPERF. LOANS | 0 | 0 | 0 | 0 | 0 | 0 |
| GROSS ORIG. REO | 13,392 | 8,928 | 4,464 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | (2,418) | (1,811) | (1,205) | (598) | (598) | (598) |
| NET ORIG. REO | 10,974 | 7,117 | 3,259 | (598) | (598) | (598) |
| GROSS NEW REO | 0 | 3,906 | 5,270 | 5,844 | 6,192 | 6,478 |
| (VAL. ALLOWANCE) | 0 | (531) | (716) | (794) | (842) | (880) |
| NET NEW REO | 0 | 3,375 | 4,554 | 5,049 | 5,350 | 5,597 |
| GROSS REH | 0 | 0 | 0 | 0 | 0 | 0 |
| (VAL. ALLOWANCE) | 0 | 0 | 0 | 0 | 0 | 0 |
| NET REH | 0 | 0 | 0 | 0 | 0 | 0 |
| CASH AND INVESTMENT SECURITIES | | | | | | |
| DEMAND | 13,041 | 13,792 | 14,930 | 16,203 | 17,590 | 19,101 |
| -HORT-TERM | 12,142 | 10,937 | 12,110 | 13,409 | 14,847 | 16,439 |
| -IUM-TERM | 12,526 | 13,870 | 15,357 | 17,005 | 18,829 | 20,848 |
| TERM | 37,200 | 41,190 | 45,608 | 50,501 | 55,917 | 61,915 |
| (SCOUNTS) | (2,579) | (2,478) | (2,371) | (2,274) | (2,168) | (2,052) |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL CASH AND INVESTMENTS | 72,330 | 77,310 | 85,634 | 94,843 | 105,014 | 116,251 |
| SSETS | | | | | | |
| ASSETS | 11,159 | 11,585 | 12,026 | 12,485 | 12,961 | 13,455 |
| ESTMENT IN SERVICE CORPORATIONS | 11,723 | 12,442 | 13,206 | 14,016 | 14,876 | 15,789 |
| OWILL | 33,524 | 31,847 | 30,171 | 28,495 | 26,819 | 25,143 |
| OTHER ASSETS | 15,115 | 15,729 | 16,367 | 17,032 | 17,724 | 18,443 |
| TOTAL ASSETS | 682,794 | 747,850 | 805,965 | 871,154 | 941,497 | 1,018,529 |

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| LIABILITIES | | | | | | |
| DEPOSITS | | | | | | |
| NOW AND TRANSACTION | 31,159 | 33,648 | 36,336 | 39,239 | 42,374 | 45,759 |
| PASSBOOK | 53,219 | 57,471 | 62,062 | 67,020 | 72,374 | 78,156 |
| MONEY MARKET | 53,909 | 58,216 | 62,866 | 67,889 | 73,312 | 79,169 |
| RT-TERM CD'S | 205,379 | 218,324 | 235,141 | 253,926 | 274,212 | 296,118 |
| M-TERM CD'S | 165,103 | 175,509 | 189,029 | 204,130 | 220,437 | 238,047 |
| -TERM CD'S | 14,119 | 15,009 | 16,165 | 17,456 | 18,851 | 20,357 |
| (DISCOUNTS) | (16) | 33 | 34 | 27 | 20 | 12 |
| TOTAL DEPOSITS | 522,872 | 558,209 | 601,633 | 649,686 | 701,579 | 757,617 |
| BORROWING | | | | | | |
| FHLB ADVANCES SHORT-TERM (VARIABLE) | 47,800 | 52,226 | 56,166 | 60,510 | 65,190 | 70,233 |
| FHLB ADVANCES LONG-TERM (FIXED) | 39,900 | 43,594 | 46,883 | 50,509 | 54,416 | 58,625 |
| REPURCHASE AGREEMENTS | 38,072 | 50,566 | 57,466 | 65,739 | 75,205 | 86,032 |
| OTHER BORROWING - SHORT | 3,632 | 4,824 | 5,482 | 6,271 | 7,174 | 8,207 |
| OTHER BORROWING - LONG | 0 | 0 | 0 | 0 | 0 | 0 |
| NEW LIABI | 0 | 0 | 0 | 0 | 0 | 0 |
| DEBENTURES | 0 | 0 | 0 | 0 | 0 | 0 |
| LAST RESORT BORROWING | 0 | 0 | 0 | 0 | 0 | 0 |
| (DISCOUNTS) | (786) | (594) | (385) | (155) | 0 | 0 |
| TOTAL BORROWING | 128,618 | 150,616 | 165,612 | 182,875 | 201,985 | 223,097 |
| OTHER LIABILITIES | | | | | | |
| ACCRUED PAYABLES | 3,543 | 3,872 | 4,022 | 4,191 | 4,369 | 4,553 |
| DEFERRED CREDITS | 0 | 0 | 0 | 0 | 0 | 0 |
| OTHER LIABS | 6,157 | 6,157 | 6,157 | 6,157 | 6,157 | 6,157 |
| TOTAL LIABILITIES | 661,191 | 718,853 | 777,423 | 842,911 | 914,090 | 991,425 |
| NET WORTH | | | | | | |
| STOCK | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| ALIFYING SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 |
| AISED EQUITY | 0 | 0 | 0 | 0 | 0 | 0 |
| TAINED EARNINGS | 21,603 | 23,995 | 23,538 | 23,242 | 22,406 | 22,101 |



OT942 0446 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

| | | | | | | |
|---|---|---|---|---|---|---|
| T^... NET WORTH | 21,603 | 28,995 | 28,538 | 28,242 | 27,406 | 27,101 |
| AL LIABILITIES AND NET WORTH | 682,794 | 747,850 | 805,965 | 871,154 | 941,497 | 1,018,529 |
| EMO: LOAN SERVICING PORTFOLIO | 210,938 | 223,360 | 237,677 | 253,052 | 269,226 | 286,201 |

? IGENREPORT VANNINC

INPUT FILE: C07918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
INCOME STATEMENT
11/02/88 AT 14:45

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| INCOME | | | | | |
| ORIGINAL RESIDENTIAL MORTGAGES | 18,237 | 16,635 | 15,359 | 14,285 | 13,264 |
| NEW RESIDENTIAL MORTGAGES | 3,102 | 7,441 | 11,364 | 15,246 | 19,241 |
| ORIGINAL ADJUSTABLE RATE MORTGAGES | 22,717 | 21,682 | 20,686 | 19,454 | 18,239 |
| IUSTABLE RATE MORTGAGES | 3,349 | 8,447 | 12,959 | 17,383 | 21,945 |
| AMILY MORTGAGES | 3,056 | 2,329 | 1,868 | 1,647 | 1,444 |
| INAL SECOND MORTGAGES | 520 | 411 | 333 | 275 | 229 |
| SECOND MORTGAGES | 91 | 213 | 314 | 408 | 502 |



/OT942 0447 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #

| | | | | | |
|---|---|---|---|---|---|
| ACCRETION MORTGAGE DISCOUNTS | 30 | 308 | 370 | 383 | 391 |
| MORTGAGE INTEREST | 51,103 | 57,466 | 63,253 | 69,081 | 75,255 |
| IAL MBS INTEREST | 0 | 0 | 0 | 0 | 0 |
| ORIGINAL COMMERCIAL LOANS INT | 657 | 0 | 0 | 0 | 0 |
| NEW COMMERCIAL LOANS INT | 451 | 1,110 | 1,724 | 2,355 | 3,027 |
| ORIGINAL CONSUMER LOANS INT | 1,343 | 853 | 631 | 503 | 400 |
| NEW CAR LOANS INT | 1,427 | 3,010 | 3,955 | 4,479 | 4,747 |
| ACCRETION OTH LOAN DISCOUNTS | 115 | 59 | 41 | 27 | 20 |
| TOTAL NONMORTGAGE LOAN INT | 3,993 | 5,032 | 6,351 | 7,364 | 8,195 |
| ORIGINATION FEES | 56 | 59 | 63 | 67 | 71 |
| SERVICING FEES | 432 | 459 | 489 | 520 | 553 |
| TOTAL MORTGAGE BANKING INCOME | 488 | 518 | 552 | 587 | 624 |
| ORIGINATION FEES ON LOAN PORTFOLIO | 2,334 | 1,725 | 1,807 | 1,895 | 2,054 |
| ORIG. REO INCOME | 428 | 235 | 50 | 0 | 0 |
| CASH AND SECURITIES INTEREST | 6,096 | 6,776 | 7,713 | 8,613 | 9,610 |
| SERVICE CORP. INCOME | 3,137 | 3,329 | 3,533 | 3,750 | 3,980 |
| FIXED ASSETS INCOME | 69 | 71 | 74 | 77 | 80 |
| MISCELLANEOUS INCOME | 2,494 | 2,762 | 3,058 | 3,386 | 3,750 |
| NONPERFORMING MORTGAGES INCOME | 218 | 126 | 34 | 0 | 0 |
| GAIN (LOSS) ON SALES & VAL. ALLOWANCE CHANGES | | | | | |
| NEW REO | (775) | (800) | (828) | (861) | (895) |
| GROSS INCOME | 69,584 | 77,241 | 85,598 | 93,893 | 102,652 |

GAIN (LOSS) FROM MORTGAGE SALES IN DETAIL:



VOT942 0448 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
01527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| :PENSES | | | | | |
| ITEREST EXPENSE: | | | | | |
| SAVINGS | 39,352 | 46,663 | 52,046 | 57,310 | 62,445 |
| ADVANCES VARIABLE RATE | 4,538 | 5,239 | 5,694 | 6,160 | 6,650 |
| ADVANCES FIXED RATE | 3,611 | 3,929 | 4,377 | 5,447 | 5,876 |
| REPOS | 3,359 | 4,173 | 4,786 | 5,495 | 6,297 |
| OTHER BORROWINGS VAR. RATE | 442 | 597 | 688 | 791 | 906 |
| ACCRETION DEBT DISCOUNT | 191 | 210 | 230 | 155 | 0 |
| )TAL INTEREST EXPENSE | 51,495 | 60,811 | 67,821 | 75,357 | 82,175 |
| 'ERATING EXPENSES | 13,455 | 14,623 | 15,788 | 17,063 | 18,449 |
| :XED ASSET DEPRECIATION | 566 | 587 | 610 | 633 | 657 |
| XODWILL AMORTIZED | 1,676 | 1,676 | 1,676 | 1,676 | 1,676 |
| )TAL EXPENSE | 67,192 | 77,698 | 85,894 | 94,729 | 102,957 |
| :T OPERATING INCOME | 2,392 | (457) | (296) | (836) | (305) |
| :T TO NET WORTH | 2,392 | (457) | (296) | (836) | (305) |

7 IGENREPORT VANNCASH

INPUT FILE: CD7918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
SOURCES AND USES
11/02/88 AT 14:45

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| SOURCES | | | | | |
| INTEREST PAYMENTS: | | | | | |
| MORTGAGES | 51,073 | 57,157 | 62,883 | 68,698 | 74,863 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 3,878 | 4,973 | 6,310 | 7,337 | 8,175 |
| PRINCIPAL REDUCTION: | | | | | |
| MORTGAGES | 22,989 | 15,994 | 9,666 | 10,634 | 10,347 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 32,170 | 8,663 | 10,582 | 13,802 | 15,501 |
| NOTES RECEIVABLE | 0 | 0 | 0 | 0 | 0 |
| PREPAYMENTS: | | | | | |
| MORTGAGES | 21,055 | 22,161 | 24,701 | 27,093 | 29,639 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 0 | 0 | 0 | 0 | 0 |
| SALES: | | | | | |
| MORTGAGES | 0 | 0 | 0 | 0 | 0 |
| MORT. BACKED SECURITIES | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS | 0 | 0 | 0 | 0 | 0 |
| NONPERFORMING MORTGAGES | 1,840 | 1,840 | 1,840 | 0 | 0 |
| ~IG. REO | 3,857 | 3,857 | 3,857 | 0 | 0 |
| REO | 1,554 | 3,908 | 4,765 | 5,170 | 5,443 |
| IER SOURCES: | | | | | |
| ORIG. REO INCOME | 428 | 235 | 50 | 0 | 0 |



VOT942 0450 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
)1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS ...

| | | | | | |
|---|---|---|---|---|---|
| NEW REO INCOME | 0 | 0 | 0 | 0 | 0 |
| INCOME | 0 | 0 | 0 | 0 | 0 |
| E CORPORATION | 3,137 | 3,329 | 3,533 | 3,750 | 3,980 |
| ASSETS | 69 | 71 | 74 | 77 | 80 |
| SH AND SECURITIES INTEREST | 5,995 | 6,669 | 7,616 | 8,508 | 9,494 |
| AN FEES | 2,334 | 1,725 | 1,807 | 1,895 | 2,054 |
| TES RECEIVABLE | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET1 | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET2 | 0 | 0 | 0 | 0 | 0 |
| NONPERFORMING MORTGAGES | 218 | 126 | 34 | 0 | 0 |
| MORTGAGE BANKING INCOME | 488 | 518 | 552 | 587 | 624 |
| MISCELLANEOUS INCOME | 2,494 | 2,762 | 3,058 | 3,386 | 3,750 |
| MISCELLANEOUS INCOME2 | 0 | 0 | 0 | 0 | 0 |
| NCREASE (DECREASE) IN EQUITIES: | | | | | |
| SAVINGS | 35,288 | 43,423 | 48,060 | 51,900 | 56,046 |
| ADVANCES | 8,120 | 7,229 | 7,971 | 8,587 | 9,251 |
| BORROWINGS | 1,192 | 658 | 789 | 903 | 1,033 |
| NEW LIAB1 | 0 | 0 | 0 | 0 | 0 |
| REPURCHASE AGREEMENTS | 12,494 | 6,899 | 8,274 | 9,465 | 10,828 |
| DEBENTURES (LIAB) | 0 | 0 | 0 | 0 | 0 |
| DEBENTURES (NW) | 0 | 0 | 0 | 0 | 0 |
| LAST RESORT BORROWING | 0 | 0 | 0 | 0 | 0 |
| PAYABLES | 329 | 150 | 170 | 177 | 185 |
| DEFERRED CREDITS | 0 | 0 | 0 | 0 | 0 |
| OTHER LIABILITIES | 0 | 0 | 0 | 0 | 0 |
| ICCS | 0 | 0 | 0 | 0 | 0 |
| STOCK ISSUED | 5,000 | 0 | 0 | 0 | 0 |
| TOTAL SOURCES | 216,001 | 192,348 | 206,593 | 221,968 | 241,292 |

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| JSES | | | | | |
| IEW LOANS: | | | | | |
| NEW 30Y-TERM FIXED RATE MORT | 51,873 | 38,332 | 40,159 | 42,108 | 45,634 |
| NEW VARIABLE-RATE MORT 30Y-TERM | 64,841 | 47,914 | 50,198 | 52,635 | 57,042 |
| NEW SECOND MORTGAGES | 1,441 | 1,065 | 1,116 | 1,170 | 1,268 |
| NEW MORT. BACKED SECURITIES 1 | 0 | 0 | 0 | 0 | 0 |
| NEW MORT. BACKED SECURITIES 2 | 0 | 0 | 0 | 0 | 0 |
| NEW MORT. BACKED SECURITIES 3 | 0 | 0 | 0 | 0 | 0 |
| OTHER LOANS FIXED RATE | 0 | 0 | 0 | 0 | 0 |
| MMERCIAL LOANS | 7,205 | 5,324 | 5,578 | 5,848 | 6,338 |
| AR LOANS | 18,732 | 13,842 | 14,502 | 15,206 | 16,479 |

DEND AND INTEREST PAYMENTS:

| | | | | | |
|---|---|---|---|---|---|
| SAVINGS | 39,304 | 46,662 | 52,052 | 57,317 | 62,453 |
| ADVANCES | 8,150 | 9,168 | 10,071 | 11,607 | 12,526 |
| OTHER BORROWINGS | 442 | 597 | 688 | 791 | 906 |
| IAB1 | 0 | 0 | 0 | 0 | 0 |
| TURES (LIAB) | 0 | 0 | 0 | 0 | 0 |
| IENTURES (NW) | 0 | 0 | 0 | 0 | 0 |
| URCHASE AGREEMENTS | 3,359 | 4,173 | 4,786 | 5,495 | 6,297 |
| .ST RESORT | 0 | 0 | 0 | 0 | 0 |
| NCREASE (DECREASE) IN ASSETS: | | | | | |
| DEMAND | 751 | 1,138 | 1,273 | 1,387 | 1,511 |
| SHORT-TERM | (1,205) | 1,173 | 1,299 | 1,438 | 1,593 |
| MEDIUM-TERM | 1,344 | 1,488 | 1,647 | 1,824 | 2,020 |
| LONG-TERM | 3,990 | 4,418 | 4,892 | 5,417 | 5,998 |
| REH | 0 | 0 | 0 | 0 | 0 |
| FIXED ASSETS | 991 | 1,029 | 1,068 | 1,109 | 1,151 |
| SERVICE CORP. | 719 | 764 | 810 | 860 | 913 |
| OTHER ASSETS | 614 | 639 | 665 | 692 | 720 |
| NEW ASSET1 | 0 | 0 | 0 | 0 | 0 |
| NEW ASSET2 | 0 | 0 | 0 | 0 | 0 |
| )THER USES: | | | | | |
| OPERATING EXPENSES | 13,455 | 14,623 | 15,788 | 17,063 | 18,449 |
| TAXES | 0 | 0 | 0 | 0 | 0 |
| CASH DIVIDENDS | 0 | 0 | 0 | 0 | 0 |
| | ----------- | ----------- | ----------- | ----------- | ----------- |
| TOTAL USES | 216,004 | 192,348 | 206,591 | 221,965 | 241,297 |



IOT942 0452 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS; GREEMENTS: 870399 - 910199 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

-WREPORT VANNRAT

INPUT FILE: CD7918A
OUTPT FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
RATIO REPORT
11/02/88 AT 14:45
PAGE 1

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **YIELDS** | | | | | |
| MORTGAGE YIELD | 9.788% | 10.014% | 10.171% | 10.257% | 10.325% |
| MORT. BACKED SECURITIES YIELD | .000% | .000% | .000% | .000% | .000% |
| NONMORTGAGE LOAN YIELD | 13.035% | 13.267% | 13.302% | 13.237% | 13.121% |
| CASH AND INVESTMENTS YIELD | 8.167% | 8.324% | 8.554% | 8.626% | 8.693% |
| YIELD ON EARNING ASSETS | 9.753% | 9.994% | 10.176% | 10.261% | 10.318% |
| COST OF SAVINGS | 7.295% | 8.053% | 8.322% | 8.486% | 8.563% |
| COST OF BORROWINGS | 8.611% | 8.950% | 9.061% | 9.385% | 9.291% |
| COST OF MONEY | 7.567% | 8.246% | 8.483% | 8.686% | 8.727% |
| INT RATE SPREAD | 2.186% | 1.748% | 1.693% | 1.575% | 1.592% |
| ST MARGIN | 1.546% | 1.221% | 1.250% | 1.170% | 1.207% |
| .NG ASSETS LESS PAYING LIABILITIES | (46,743) | (42,699) | (37,882) | (39,193) | (40,009) |
| **RATIOS** | | | | | |
| OPERATING EXPENSES TO AVERAGE ASSETS | 1.884% | 1.884% | 1.884% | 1.884% | 1.884% |
| NET INCOME TO AVERAGE ASSETS | .335% | (.059%) | (.035%) | (.092%) | (.031%) |
| OTHER INCOME TO TOTAL INCOME | 13.176% | 11.350% | 10.641% | 10.326% | 10.217% |
| CASH AND INVESTMENTS TO TOTAL ASSETS | 10.338% | 10.625% | 10.887% | 11.154% | 11.414% |
| EARNING ASSETS TO TOTAL ASSETS | 88.531% | 89.898% | 91.222% | 91.808% | 92.359% |
| DEBT TO TOTAL ASSETS | 20.140% | 20.548% | 20.992% | 21.454% | 21.904% |
| NET WORTH TO TOTAL ASSETS | 3.877% | 3.541% | 3.242% | 2.911% | 2.661% |
| NET WORTH TO TOTAL LIABILITIES | 4.034% | 3.671% | 3.351% | 2.998% | 2.734% |
| NONPERF. ASSETS TO TOTAL ASSETS | 1.894% | 1.197% | .510% | .504% | .490% |
| FIXED RATE MORTS TO TOTAL MORTGAGES | 47.172% | 46.116% | 45.771% | 45.450% | 45.241% |
| **GROWTH RATES** | | | | | |
| TOTAL ASSETS | 9.528% | 7.771% | 8.088% | 8.075% | 8.182% |
| SAVINGS | 6.758% | 7.779% | 7.987% | 7.987% | 7.987% |
| BORROWINGS | 17.103% | 9.956% | 10.424% | 10.450% | 10.452% |

7 IGENREPORT VLOSS

'''''IT FILE: CD7918A
FILE: V7918A

DOCKET 07918 - STERLING SAVINGS ASSN IN SPOKANE, WA
Purchase Accounting Adjustment Report
11/02/88 AT 14:45

| | 6 MONTHS OR LESS | >6 MONTHS TO 1 YEAR | >1 TO 3 YEARS | >3 TO 5 YEARS | >5 TO 10 YEARS | >10 TO 20 YEARS | >20 YEARS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Nonperforming Mortgages** | | | | | | | | |
| Adjustable Rate | $ 2,992 | $ 2,086 | $ 891 | $ 32 | $ 0 | $ 0 | $ 0 | $ 6,000 |
| 1-4 Family Res | $ 178 | $ 122 | $ 492 | $ 165 | $ 196 | $ 1,718 | $ 3,128 | $ 6,000 |
| Multifamily & Oth | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Second Mortgages | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Other Nonperforming Loans** | | | | | | | | |
| Consumer Loans | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Commercial Loans | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ -0 | $ 0 | $ 0 |
| **New Mortgage Balances** | | | | | | | | |
| Adjustable Rate | $ 151,826 | $ 63,738 | $ 18,959 | $ 4,342 | $ 3,345 | $ 1,466 | $ 0 | $ 243,677 |
| 1-4 Family Res | $ 3,582 | $ 1,432 | $ 4,810 | $ 2,104 | $ 4,252 | $ 39,703 | $ 145,995 | $ 201,877 |
| Multifamily & Oth | $ 2,095 | $ 988 | $ 8,352 | $ 1,440 | $ 5,575 | $ 12,826 | $ 5,003 | $ 36,279 |
| Second Mortgages | $ 1,968 | $ 423 | $ 693 | $ 899 | $ 544 | $ 720 | $ 202 | $ 5,449 |
| **New Nonmortgage Loan Balances** | | | | | | | | |
| umer Loans | $ 4,747 | $ 2,646 | $ 3,133 | $ 2,469 | $ 3,175 | $ 2,248 | $ 177 | $ 18,595 |
| ercial Loans | $ 9,596 | $ 10,507 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 20,103 |

Writedowns and Changes in Balance Sheet Accounts

| | | | |
|---|---|---|---|
| Writedowns: | | Other Balance Sheet Account Changes: | |
| Nonperforming Mortgages | 0 | Fixed Assets | 1,836 |
| O... Nonperforming Loans | 0 | Appraisal Increment | (1,836) |
| ...ssets | 0 | Unearned Discounts | (368) |
| ...e Corporations | 0 | Deferred Losses | (15,040) |
| ...r Assets | 0 | Net Worth | (3,779) |
| | | Nonperforming Mortgages | 12,000 |
| ...anges in Valuation Allowances | | Other Nonperforming Loans | 0 |
| Nonperforming Mortgages | 0 | | |
| Other Nonperforming Loans | 0 | | |
| Real Estate Owned | 0 | | |
| Real Estate Held for Investmt | 0 | | |

Market Losses (Gains)

| | | | |
|---|---|---|---|
| Assets: | | Liabilities: | |
| Medium-term Cash | 38 | Medium-term Deposits | (61) |
| Long-term Cash | 2,541 | Long-term Deposits | 45 |
| | | Long-term Advances | (786) |
| Mortgages | 1,758 | Long-term Other Borrowing | 0 |
| Non-mortgage Loans | 310 | Non-qualifying Debenture | 0 |
| | | Qualifying Debenture | 0 |

The total adjustment to goodwill is 14,739
The initial value of goodwill is 33,524

ADDENDUM B

Julie L. Williams
Issues Memo
November 7, 1988 Addendum B

## ANTICOMPETITIVE ANALYSIS

| Institution | Pre-Merger % 6/87 Total Deposits | Pre-HHI (%2) | Post-Merger % 6/87 Total Deposits | Post-HHI (%2) |
|---|---|---|---|---|
| *Commercial Banks* | | | | |
| First American State Bank | 2.85 | 8.12 | 2.85 | 8.12 |
| First Interstate Bank/WA | 17.23 | 296.87 | 17.23 | 296.87 |
| Puget Sound National Bank | 3.77 | 14.21 | 3.77 | 14.21 |
| Seattle-First National Bank | 5.56 | 30.91 | 5.56 | 30.91 |
| Security State Bank | 16.86 | 284.26 | 16.86 | 284.26 |
| Rainier National Bank | 8.28 | 68.56 | 8.28 | 68.56 |
| *Credit Unions* | | | | |
| L.S.W. #2767 | .12 | .01 | $ .12 | .01 |
| *Thrift Institutions* | | | | |
| Central-Evergreen FS&LA | 25.72 | 661.52 | 0 | 0 |
| Sterling SA | 10.44 | 108.99 | 36.16 | 1,307.55 |
| West Coast S&L | 4.61 | 21.25 | 4.61 | 4.61 |
| Washington MSB | 4.56 | 20.79 | 4.56 | 4.56 |
| | $100.00 | 1,515.49 | $100.00 | 2,052.53 |

Pre-HHI = 1,515.49
Post-HHI = 2,052.53
Net Change = 537.04

EXHIBIT 3

Office of
Regulatory Activities

Federal Home Loan Bank System
1700 G Street, N.W.
Washington, D.C. 20552
(202) 785-5400

November 18, 1988

RECEIVED

MEMORANDUM FOR: Julie L. Williams
Deputy General Counsel

FROM: Linda B. Plye
Director
Corporate Activities

SUBJECT: Voluntary Supervisory Conversion and Merger of:

Central Evergreen Federal Savings and Loan Association
Chehalis, Washington ("Central")
FHLBB NO. 1527

with and into

Sterling Savings Association
Spokane, Washington ("Sterling")
FHLBB NO. 7918

## EXECUTIVE SUMMARY

**PROPOSAL:**

Central, a federally chartered mutual association, proposes to convert from a mutual form to a stock association to facilitate the merger with and into Sterling. Central's charter shall decree authority to issue 100 shares of common stock with a par value of $1. Central will issue 100% of the authorized shares of common stock to Sterling in exchange for its assumption of Central's liabilities.

Finally, the applicants request exemption from the requirements of the Hart-Scott-Rodino Antitrust Improvements of 1976. In full reliance of the Supervisory Agent's review, this Office has no supervisory objection to the request, provided, OGC determines that such a request is appropriate.

**RECOMMENDATION:**

The Supervisory Agent recommends approval of the proposed transaction. The Office of Regulatory Activities, based on the analysis by the Supervisory Agent, has no objection to the recommendation.

We do not find that there will be a loss of tax benefits from NOL carryforwards from Central, thus there is no basis for supervisory objection. We further find that Central's liabilities exceed its assets, as calculated under GAAP on a going concern basis, that the proposed transaction will satisfy the viability standards set forth in Section 563b.26(b)(2) and (3) of the Insurance Regulations, and that the proposed transaction qualifies for a voluntary supervisory conversion. We further find that the managerial resources of Sterling are such that the proposed transaction will not be detrimental to either the insured institution or to the insurance risk of the FSLIC.

**STAFF CONTACT:**

Patricia D. Goings, Financial Analyst, (202) 331-4537

EXHIBIT 4

# ACQUISITION AGREEMENT

Between

STERLING SAVINGS ASSOCIATION

and

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

ACQUISITION AGREEMENT

Table of Contents


Page

RECITALS .... 1

Section 1. The Acquisition .... 1

1.1 Agreement to Acquire and Merge .... 1
1.2 Approval by Boards of Directors .... 2
1.3 Filing of Required Regulatory Applications and Notices .... 2
1.4 Interest of Members of Central Evergreen .... 3
1.5 Transfer of Shares Upon Conversion .... 3
1.6 Savings Accounts and Deposits .... 3
1.7 Offices .... 3
1.8 Transfer of Assets and Assumption of Liabilities .... 3
1.9 Articles of Incorporation and Bylaws .... 4
1.10 Directors and Officers of the Surviving Corporation .... 4
1.11 Directors, Officers and Employees of Central Evergreen .... 5
1.12 Effective Date of Acquisition .... 8

Section 2. The Closing .... 8

Section 3. Representations and Warranties of Central Evergreen .... 8

3.1 Corporate Organization .... 8
3.2 Subsidiaries .... 9
3.3 Financial Statements .... 9
3.4 Absence of Undisclosed Liabilities .... 9
3.5 Absence of Certain Changes .... 9
3.6 Litigation, Etc. .... 10
3.7 Contracts .... 10
3.8 Title .... 10
3.9 Tax Returns .... 10
3.10 No Violation .... 11
3.11 ERISA Compliance .... 11

Section 4. Representations and Warranties of Sterling .... 11

4.1 Corporate Organization and Good Standing .... 11
4.2 Capitalization .... 12
4.3 Financial Statements .... 12

4.4 Absence of Undisclosed Liabilities .............. 12
4.5 Absence of Certain Changes ....................... 12
4.6 Litigation, Etc. ................................. 12
4.7 Title ............................................ 13
4.8 Tax Returns ...................................... 13
4.9 No Violation ..................................... 13

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition ............ 13

5.1 No Change in Charter or Bylaws ................... 13
5.2 Conduct of Business .............................. 14

Section 6. Access and Cooperation ...................... 14

6.1 Access ........................................... 14
6.2 Cooperation ...................................... 14

Section 7. Confidentiality and Announcements ............ 14

7.1 Confidentiality .................................. 14
7.2 Announcements .................................... 15

Section 8. Solicitation of Employees .................... 15

Section 9. Conditions Precedent to the Obligations of Sterling ............................................. 15

Section 10. Condition Precedent to the Obligations of Central Evergreen ................................... 15

Section 11. Abandonment of Acquisition .................. 16

Section 12. Miscellaneous Provisions .................... 17

12.1 Expenses ........................................ 17
12.2 Litigation Costs ................................ 17
12.3 Parties in Interest ............................. 17
12.4 Headings ........................................ 18
12.5 Entire Agreement/Modification/Waiver ............ 18
12.6 Counterparts .................................... 18
12.7 Governing Law ................................... 18
12.8 Binding Nature of Agreement; No Assignment ...... 18
12.9 Notice Provisions ............................... 18



APP. 943
942 0387 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
27 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES

## Table of Exhibits


| Exhibit | |
|---|---|
| 1 | Plan of Conversion |
| 2 | Branch Offices of Surviving Corporation |
| 3.1 | Articles of Incorporation (Sterling) |
| 3.2 | Bylaws (Sterling) |
| 4.1 | Employment Contract of George E. Godding dated December 31, 1986 |
| 4.2 | Employment Contract of John G. Van Dijk dated December 12, 1985 |
| 4.3 | Employment Contract of Carole Neuheuser dated December 13, 1985 |
| 4.4 | Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981 |
| 4.5 | Agreement with Joyce Butkus dated November 6, 1987 |
| 5 | Association Policy on Group Insurance of Retired CEF Employees/Directors dated September 10, 1986 |
| 6 | Vacation Policy Statement (Sterling) |
| 7 | Litigation (Central Evergreen) |
| 8 | Contracts (Central Evergreen) |
| 9 | Title to Property (Central Evergreen) |
| 10 | Litigation (Sterling) |


942 0388 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #
27 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

shall convert into a federal stock association in a voluntary supervisory stock conversion pursuant to the Plan of Conversion attached hereto as Exhibit 1 and in accordance with 12 C.F.R. §§563b.20 through 563b.32 ("Conversion") and, as an integral part of and immediately following such Conversion, Sterling shall acquire all of the stock of Central Evergreen, and Central Evergreen shall merge with and into Sterling (the "Acquisition"), with Sterling being the surviving corporation ("Surviving Corporation"). On the Effective Date (hereinafter defined in Section 1.12), the separate corporate existence of Central Evergreen shall cease. The Surviving Corporation shall continue to operate after the Effective Date under the name and style of Sterling Savings Association, or such other name as the Board of Directors of the Surviving Corporation may determine.

1.2 Approval by Boards of Directors. At least two-thirds of the Board of Directors of Central Evergreen have approved the plan of acquisition as evidenced by this Agreement. At least a majority of the Board of Directors of Sterling have approved the plan of acquisition as evidenced by this Agreement.

1.3 Filing of Required Regulatory Applications and Notices. Upon the execution and delivery of this Agreement, Sterling and Central Evergreen shall cause to be prepared and filed with the Federal Home Loan Bank Board ("FHLBB") an application for approval of the Conversion and an application for approval of the Acquisition. In addition, Sterling shall cause to be prepared and filed in a timely manner any application or notice to the Washington State Supervisor of Savings and Loan Associations ("State Supervisor") as required by law, including without limitation RCW 33.08.110. These applications and notices shall be in such forms as may be prescribed by the respective regulatory authorities and shall contain such information as the authorities may require. The parties shall take every reasonable and necessary step and action to comply with, and secure such approval as may be required by, the statutes, rules, and regulations applicable to this Agreement and the transactions contemplated herein and shall use their best efforts to secure such

approvals on terms and conditions mutually agreeable to Sterling and Central Evergreen. Sterling shall use its best efforts to secure approval of the Acquisition by the Shareholders of Sterling if the State Supervisor determines that such approval is required.

1.4 Interest of Members of Central Evergreen. The members of Central Evergreen shall have no rights of approval or participation in the Conversion and no rights to the continuance of any legal or beneficial ownership interest in Central Evergreen or the Surviving Corporation.

1.5 Transfer of Shares Upon Conversion. On the Effective Date, Central Evergreen will issue all authorized shares of its capital stock to Sterling.

1.6 Savings Accounts and Deposits. All savings accounts and deposits in Central Evergreen shall be and become savings accounts and deposits in the Surviving Corporation without change in their respective terms, maturities, interest rates, minimum required balances or withdrawal values. As of the Effective Date, each savings account and deposit of Central Evergreen shall be considered for dividend or interest purposes as if it had been a savings account or deposit of the Surviving Corporation at the time such savings account or deposit was opened in Central Evergreen and at all times thereafter, until such savings account or deposit ceases to be a savings account or deposit of the Surviving Corporation. Appropriate evidence of ownership of savings accounts or deposits in the Surviving Corporation shall be provided by the Surviving Corporation to each savings account holder and depositor of Central Evergreen.

1.7 Offices. The location of the home office of the Surviving Corporation shall be the present location of the home office of Sterling and all offices of Central Evergreen shall become branch offices of the Surviving Corporation. The location of all branch offices of the Surviving Corporation shall be as provided in Exhibit 2 attached hereto.

1.8 Transfer of Assets and Assumption of Liabilities. Upon the Effective Date, all of the assets and property of every kind

and character, real, personal and mixed, tangible and intangible, choses in action, rights, and credits then owned by Central Evergreen, or which would inure to Central Evergreen, shall immediately, and by operation of law and without any conveyance or transfer and without any further act or deed, be vested in and become the property of the Surviving Corporation, which shall have, hold and enjoy the same in its own right as fully and to the same extent as the same were possessed, held and enjoyed by Central Evergreen immediately prior to the Effective Date. The Surviving Corporation shall be deemed to be and shall be a continuation of the entity of Central Evergreen and the rights and obligations of Central Evergreen shall remain unimpaired. Upon the Effective Date, the Surviving Corporation shall assume and succeed to all of such rights and obligations and the duties and liabilities connected therewith.

1.9 Articles of Incorporation and Bylaws. The articles of incorporation and bylaws of Sterling immediately prior to the Effective Date shall continue to be the articles of incorporation and bylaws of the Surviving Corporation following the Effective Date, except as may be otherwise contemplated herein, and shall thereafter control the affairs of the Surviving Corporation unless and until amended in due and proper course. A copy of the current articles of incorporation and bylaws of Sterling are attached hereto as Exhibits 3.1 and 3.2, respectively.

1.10 Directors and Officers of the Surviving Corporation. The directors and officers of Sterling immediately prior to the Effective Date shall continue as the directors and officers of the Surviving Corporation for the full unexpired term of their offices and until their successors have been elected or appointed and qualified. In addition, Sterling's Board of Directors shall cause such changes, if any, as may be required to the Surviving Corporation's bylaws to permit the addition of two persons to the Surviving Corporation's Board of Directors and shall choose two individuals from Central Evergreen's Board of Directors, as such Board exists immediately prior to the Effective Date, to be added to the Surviving Corporation's Board of Directors.

7.2 Announcements. Without the prior agreement of the other party, neither party shall, prior to the Effective Date, hold any press interview or conference or make any written announcement or statement to the public or to its employees concerning the transactions contemplated by this Agreement.

Section 8. Solicitation of Employees.

If this Agreement is abandoned as contemplated by Sections 2 or 11 hereof, each of the parties hereto shall, for a period of one (1) year thereafter, refrain from soliciting any officers or key employees of the other for employment unless such other party is merged with or acquired by any other entity or is put into the possession or control of a receiver or conservator.

Section 9. Conditions Precedent to the Obligations of Sterling.

The obligations of Sterling under this Agreement to complete the Acquisition are subject to the satisfaction of the following conditions unless waived by Sterling on or before the Effective Date:

(a) Shareholder Approval. If and to the extent the State Supervisor shall so require, Sterling shall have obtained the approval by the Sterling shareholders of this Acquisition.

(b) Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Sterling reasonably determines are unduly burdensome.

Section 10. Condition Precedent to the Obligations of Central Evergreen.

The obligations of Central Evergreen under this Agreement to complete the Acquisition are subject to the satisfaction of the following condition, unless waived by Central Evergreen on or before the Effective Date:

Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Central Evergreen reasonably determines are unduly burdensome. Moreover, the Federal Home Loan Bank of Seattle shall terminate the Supervisory Agreement of Central Evergreen.

Section 11. Abandonment of Acquisition.

This Agreement may be abandoned at any time prior to the Effective Date (i) on the agreement of the Boards of Directors of both parties; or (ii) by action of the Board of Directors of either of the parties, or one of the parties if so noted below, on the happening of any of the following events:

(a) If all the required approvals of the FHLBB and State Supervisor have not been received on or before November 30, 1988, or such later date as the parties may agree in writing;

(b) If any material action or proceeding is instituted or threatened against either of the parties which would enjoin, prohibit or restrain the completion of the Acquisition;

(c) If, between the date of this Agreement and the Effective Date, there has been, in the opinion of either Board of Directors, a material adverse change in the business or financial condition of the other corporation;

(d) If, without the prior written consent of the other party, one of the parties shall have engaged in any transaction prohibited by this Agreement;

(e) By the Board of Directors of Sterling if any one or more of the conditions provided in Section 9 hereof shall not have been satisfied, and Sterling shall not have waived such failure; and

(f) By the Board of Directors of Central Evergreen if the condition provided in Section 10 hereof shall not have

1700 G Street, N.W.
Washington, D.C. 20552
Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

Federal Home Loan Bank Board

MEMORANDUM

To: Jordan Luke
General Counsel

December 5, 1988

From: Kathleen V. O'Dea
Assistant Director, ODB

Subject: Increase in Accounts of an
Insurable Type via Merger of
Central Evergreen FS&LA
Chehalis, Washington
FHLBB No. 1527
into
Sterling SA
Spokane, Washington
FHLBB No. 7918

This is a combined supervisory conversion and voluntary merger which will allow Central Evergreen FS&LA to convert from a Federal mutual to a Federal stock institution and permit Sterling SA to acquire the assets and assume the liabilities of Central Evergreen in a business combination.

The Office of District Banks has no objection to the proposed merger provided the resolution is conditioned to require:

1. That the proposed merger is effective within 120 calendar days of the date of the Board's approval, unless an extension is granted by the Supervisory Agent;

2. That, not later than thirty days after the effective date of the merger, Sterling Savings Association shall submit evidence that it has given notice, in writing, to each investor whose withdravable account in the resulting association will exceed the sum of $100,000 as a result of the merger, of the effect of the merger on the extent of his insurance coverage, such notice to include the following:

"If the aggregate amount of your existing account(s) at Sterling Savings Association and Central Evergreen Federal Savings and Loan Association exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 U.S.C. Section 1728(a) (1982). This means that the Federal Savings and Loan Insurance Corporation ("FSLIC") will insure the accounts you had at Sterling Savings Association and Central Evergreen Federal Savings and Loan Association separately until maturity in the case of a