certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling Savings Association's accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling Savings Association's accounts and will not be separately insured.";

3. That, not later than thirty days from the date of consummation of the proposed merger, Sterling Savings Association shall submit to the Supervisory Agent: (a) a certification by local counsel of each institution stating the effective date of the merger and that the merger has been consummated in accordance with the Acquisition Agreement and any amendment thereto as required by this resolution and applicable laws and regulations; and (b) a statement of the financial condition of each institution as of the effective date of the merger;

4. That a letter, signed by the chief executive officer and chief financial officer of each institution, is submitted 10 days prior to the consummation of the merger, stating that no adverse change has occurred in the condition or operations of said institutions since the date of the financial statements submitted with the application, and that the merger has been consummated consistently with the pro forma statement of condition as of June 30, 1988, or, if any such change has occurred or the merger has not been so consummated, the certification shall state in what respect has there been such a change or inconsistency with said statement of condition; and

5. That, within 90 days after the date of the approval resolution, Sterling Savings Association shall furnish analyses, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets, including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods; and (c) includes a list of all adjustments made and the rates used for calculation.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE**
A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS

SUITE 2140 1111 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3204
(206) 447-7345 • telecopier (206) 447-7301

SPOKANE OFFICE
1100 OLD NATIONAL BANK BUILDING
WEST 421 RIVERSIDE
SPOKANE, WASHINGTON [illegible]
[illegible]
telecopier [illegible]

COEUR D'ALENE OFFICE
[illegible] SHERMAN AVENUE
COEUR D'ALENE, IDAHO [illegible]
[illegible]

[illegible]

OF COUNSEL

WILLIAM V. KELLEY
[illegible]
[illegible]

August 8, 1988

Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

RE: Central Evergreen Savings & Loan Application for Voluntary Supervisory Stock Conversion

Gentlemen:

You have requested our opinion in connection with the Application for Voluntary Supervisory Stock Conversion ("Application") of Central Evergreen Savings and Loan Association ("Central Evergreen") and consequent combination of the assets of Central Evergreen with, and assumption of the liabilities of Central Evergreen by, Sterling Savings Association ("Sterling"). A copy of the Application along with its Exhibits is incorporated by reference. Pursuant to 12.C.F.R. § 563b.27(c) the Application requires an opinion of a qualified, independent counsel regarding the tax consequences to the insured institution arising from the conversion.

Upon the request of Sterling the Federal Home Bank Board ("FHLBB") is to issue the certification provided for by Internal Revenue Code of 1986 Section 368(a)(3)(D)(ii)(III). If so issued, FHLBB certification will provide "that the grounds set forth in Section 1464 (d)(6)(A)(i)(ii) or (iii) of title 12, United States Code, exist with respect to the transfer or will exist in the near future in the absence of action by the Federal Home Loan Bank Board". This opinion is premised on the assumption such certification will be issued.

Further, this opinion is based upon the following representations by Sterling and Central Evergreen. First, that the requirement of Internal Revenue Code of 1986 (I.R.C.") Section 354(b)(1)(A) and (B) have been satisfied. I.R.C. Section 354(b)(1)(A) requires Sterling, as the transferee corporation, to acquire substantially all the assets of the transferor, Central Evergreen. It is our understanding that all of the assets of Central Evergreen will be transferred to Sterling.

Section 354(b)(1)(B) requires the stock, securities, and other properties received by Central Evergreen, as well as other properties of such transferor, to be distributed pursuant of the plan of reorganization. According to the Application Central Evergreen is not receiving any stock, securities or other property.

This opinion is also based upon the representation that substantially all of the liabilities of the transferor, Central Evergreen, immediately before the transfer will become, as a result of the transfer, liabilities of the transferee, Sterling, as required by I.R.C. Section 368(a)(3)(D)(ii)(II). Further, that the continuity of business enterprise doctrine of Treasury Regulation Section 1.368-1(d) is satisfied in that: (1) Sterling is assuming all the deposits of Central Evergreen; and (2) Sterling will continue to hold at least one-half of the fair market value of the assets held by Central Evergreen at the time of the adoption of the plan of reorganization; or Sterling will continue Central Evergreen's historic business.

Based upon the foregoing representations it is our opinion that there should be no tax consequences to Central Evergreen as a result of the conversion from a federal mutual savings and loan association to a federal stock savings and loan association. Further, the subsequent combination of Central Evergreen with and into Sterling should have no tax consequences to Central Evergreen or Sterling. Based upon the above representations, the combination will be a I.R.C. Section 368(a)(1)(G) reorganization ("G reorganization") resulting in no gain or loss to Central Evergreen or Sterling as parties to the reorganization.

No opinion is rendered as to the limitations upon the carryover of Central Evergreen's net operating losses and credits from prior years to Sterling's current, past or future tax years. Further, this opinion is based upon the assumption of management that the combination will be completed by December 31, 1988.

The foregoing opinion is limited to the application of the laws of the State of Washington and to Federal Law, to date, and no opinion is expressed herein as to any matter governed by the laws of any other jurisdiction.

This opinion is being directed to Sterling for the use of Sterling and Central Evergreen in conjunction with the Application to the Federal Home Loan Bank Board as required by 12 C.F.R. § 536b.27(C) and may not be used for any other

reasons nor relied upon by any other person or entity other than Sterling, Central Evergreen or FHLBB without our written consent.

Very truly yours,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By [signature]
STEVEN C. FROL

scf7/bc

Coopers &Lybrand

certified public accountants

Board of Directors
Sterling Savings Association
Spokane, Washington

We have read the Acquisition Agreement between Sterling Savings Association ("Sterling") and Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, and the accompanying Description of the Accounting Treatment. This Agreement is to be consummated by Sterling acquiring 100% of the outstanding stock of Central Evergreen (immediately after it undergoes a voluntary supervisory stock conversion) in exchange only for assuming its outstanding liabilities.

In our opinion, based solely upon the information and facts presented to us as briefly described above, this combination does not meet all of the pooling-of-interests principles, guides, rules, and criteria specified in Accounting Principles Board Opinion No. 16 (APB No. 16). Therefore, we concur in the proposed treatment of this combination as a purchase in accordance with APB No. 16 and Statement of Financial Accounting Standards No. 72 (SFAS No. 72). We also concur that the proposed methods and periods of amortizing any allocated discounts or premiums and intangible assets as set forth in the accompanying Description of the Accounting Treatment appear proper under APB No. 16 and SFAS No. 72.

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Central Evergreen transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ (from those provided to us) upon completion of an examination of Sterling's consolidated financial statements for the period that includes the Central Evergreen acquisition, our conclusions may change.

Coopers & Lybrand

Spokane, Washington
August 12, 1988



STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #

Notational Voting N-88/1442 minute Entry December 7, 1988

The Bank Board, acting individually by notational voting, approved the sale of $4,419,575,000 par amount of the Federal Home Loan Bank Consolidated Discount Notes for the period November 9, 1988, through December 5, 1988. Of this amount, $82,650,000 will be issued December 6, 1988.

| DAYS | PAR AMOUNT | RATES |
|---|---|---|
| 30- 89 | $ 373,665,000 | 8.17 - 8.70% |
| 90-179 | $1,934,215,000 | 8.12 - 8.72% |
| 180-239 | $1,083,530,000 | 8.12 - 8.65% |
| 240-360 | $1,028,165,000 | 8.10 - 8.60% |

The Federal Home Loan Bank Medium Term Bond program sold $80,400,000 bonds in the period November 9, 1988, through December 5, 1988. Of this amount, $45,600,000 will be issued in the period December 6 through December 8, 1988. There are now $247,280,000 Medium Term Bonds outstanding.

| MONTHS | PAR AMOUNT | RATES |
|---|---|---|
| 12-23 | $ 23,100,000 | 8.40 - 8.75% |
| 24-59 | $ 37,000,000 | 8.60 - 9.30% |
| 60-83 | $ 0 | |
| 84 and greater | $ 20,300,000 | 9.10 - 9.45% |

The Bank Board discussed the consolidated obligation financing requirements for the forthcoming period. It was noted that $480,000,000 Series I-1988 (10.70%), and $2,000,000,000 Series BB-1988 (7.80%) will mature December 27, 1988.

In order to achieve a sales level of $4,865,020,000 for the month of December, the Bank Board authorized discount note offerings of up to $2,648,000,000 for the period from December 15, 1988, to December 31, 1988, and an amount of $1,619,000,000 (1/2 of the January request) from January 1, 1989, through January 19, 1989. In addition, the Bank Board authorized a discretionary amount for contingencies of up to $2,000,000,000 at rates up to 12.00%.

It was determined that the December public bond financing would comprise the following amounts and maturities:

| Amount | Maturity |
|---|---|
| $1,000,000,000 | 3/89 |
| $1,200,000,000 | 12/89 |
| $1,300,000,000 | 12/90 |
| $ 515,000,000 | 12/92 |
| $ 300,000,000 | 12/93 OPR |
| $ 700,000,000* | 12/95 |

OK [signature] 12/7/88

The Bank Board further authorized the Director or Deputy Director of the Office of Finance to negotiate a potential privately placed reopening of an outstanding issue in an amount up to $700,000,000, with the understanding that the size of the public bond due 12/95 would then be reduced by the amount of such reopening.

The interest rates for these issues will be established on December 13, 1988. For the December 1988 public bond financing, the Bank Board granted authority to the Director or Deputy Director of the Office of Finance to price the above issues at levels up to 100 basis points above comparable United States' Treasury issues.

* * *

I hereby certify that the above is a true and correct excerpt from an action adopted by the Federal Home Loan Bank Board on December 7, 1988.

OK [signature] 12/7/88

OK [signature] 7 Dec 88


OT942 0422 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET # 1527 TRANS 881231 BOX 23 OF 92 DC253 CORRESPONDENCE; EXECUTIVE SUMMARIES; RESOLUTIONS; REPORTS;

DECEMBER 1988 ($Millions of dollars)

| | 1 YR FLOTR 12/89 | 1YR 12/89 | 2YR 12/90 | 3YR 12/91 | 4YR 12/92 | 5YR 12/93 | 5YR OFRD 12/93 | 7/4YR OFRD 12/95 | 7YR 12/95 | TOTAL BONDS | DISC NOTES DEC | DISC NOTES --1/2JAN | TOTAL DISC NOTES | TOTAL FINANCING BY BANK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BOS | 25 | 100 | | 50 | | 50 | | | | 225 | 366 | 379 | 745 | 970 |
| NYK | | 125 | | 150 | | | | | | 275 | 45 | 300 | 345 | 620 |
| PIT | | 50 | | 20 | | 15 | | | | 85 | 50 | 250 | 300 | 385 |
| ATL | | | 100 | | | | | 150 | | 250 | 400 | 250 | 650 | 900 |
| CIN | | 50 | | | | | | | | 50 | 50 | 100 | 150 | 200 |
| IND | | | | | | | 60 | | | 60 | 47 | 15 | 62 | 122 |
| CHI | | | | | | | | | | 0 | 20 | 0 | 20 | 20 |
| DMN | | | 200 | 100 | | | | | | 300 | 365 | 0 | 365 | 665 |
| BAL | | | 700 | | 400 | | | | 700 | 1800 | 500 | 150 | 650 | 2450 |
| TOP | | | | | 115 | | | | | 115 | 140 | 25 | 165 | 280 |
| SFR | | 750 | | | | | 100 | | | 850 | 1500 | | 1500 | 2350 |
| SEA | | 150 | 50 | | | | 50 | | | 250 | 175 | 150 | 325 | 575 |
| TOT | 25 | 1225 | 1050 | 320 | 515 | 65 | 210 | 150 | 700 | 4260 | 3658 | 1619 | 5277 | 9537 |
| Maturing | | | | | | | | | | 2480 | 1402 | 2377 | 3779 | 6259 |
| Net change | | | | | | | | | | 1780 | 2256 | -758 | 1498 | 3278 |

DECEMBER 1988 REVISED FINANCING REQUEST
($Millions of dollars)

| | 3 MTH 3/89 | 1YR 12/89 | 2YR 12/90 | 4YR 12/92 | 5/3 OPRB 12/93 | 7YR 12/95 | TOTAL BONDS | DISC NOTES DEC | DISC NOTES - 1/2JAN | TOTAL DISC NOTES | TOTAL FINANCING BY BANK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOS | 240 | 125 | 50 | 0 | 10 | 0 | 425 | 166 | 379 | 545 | 970 |
| NYK | 0 | 125 | 150 | 0 | 45 | 0 | 320 | 45 | 300 | 345 | 665 |
| PIT | 0 | 50 | 0 | 25 | 0 | 0 | 75 | 0 | 250 | 250 | 325 |
| ATL | 150 | 0 | 100 | 0 | 150 | 0 | 400 | 250 | 250 | 500 | 900 |
| CIN | 0 | 0 | 50 | 0 | 0 | 0 | 50 | 50 | 100 | 150 | 200 |
| IND | 0 | 0 | 0 | 0 | 60 | 0 | 60 | 47 | 15 | 62 | 122 |
| CHI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 20 | 20 |
| DMN | 100 | 0 | 200 | 0 | 0 | 0 | 300 | 365 | 0 | 365 | 665 |
| BAL | 0 | 0 | 700 | 400 | 0 | 700 | 1800 | 500 | 150 | 650 | 2450 |
| TOP | 0 | 0 | 0 | 90 | 0 | 0 | 90 | 140 | 25 | 165 | 255 |
| SFR | 460 | 750 | 0 | 0 | 10 | 0 | 1220 | 940 | 0 | 940 | 2160 |
| SEA | 50 | 150 | 50 | 0 | 25 | 0 | 275 | 125 | 150 | 275 | 550 |
| TOT | 1000 | 1200 | 1300 | 515 | 300 | 700 | 5015 | 2648 | 1619 | 4267 | 9282 |
| Maturing | | | | | | | 2480 | 1402 | 2377 | 3779 | 6259 |
| Net change | | | | | | | 2535 | 1246 | -758 | 488 | 3023 |



DT942 0423 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 CENTRAL EVERGREEN FSLA DOCKET #

# 1989 Report to Shareholders













STERLING SAVINGS

SG 0062997

"Confidential Material-Subject to Protective Order"

Ex. 33

*Our commitment to a stable growth plan, balanced with flexible, responsive leadership, has made Sterling Savings a leading financial institution in the Pacific Northwest.*

*As Washington's Hometown Helpful bank, we are now an integral part of communities across the state.*

*Sterling remains dedicated to a course of solid, profitable growth as we focus on the long-term to benefit our customers, our employees, and our shareholders.*

**ABOUT OUR COVER:**

The people of Washington enjoy an unparalleled quality of life, rich in economic and recreational opportunities. An active member of communities throughout the state, Sterling Savings is proud to share in the Washington experience, illustrated here in our cover photos.

*Front cover, right to left from the top:*

**1.** A Puget Sound ferry carries commuters between Winslow and Seattle
**2.** Raising the roof on a new office complex
**3.** Grand Coulee Dam, a major source of Washington's plentiful hydroelectric power
**4.** Spokane - center of business and finance for the entire Inland Northwest
**5.** Logging in Washington's plentiful forests
**6.** New home owners in Spokane

*Back cover from right to left:*

**7.** The aircraft industry plays an important role in Washington's economy
**8.** Wheat harvesting in wide-open Palouse country
**9.** On tour in the Cascades
**10.** One of many fishing ports that dot the state's coastline
**11.** Washington industrial workers are well-trained with a strong work ethic

## CONTENTS


Financial Highlights ____ 1
Report to Shareholders ____ 2
Corporate Profile ____ 4
Board of Directors ____ 5
Branch System ____ 6
Action Mortgage ____ 8
INTERVEST ____ 9
Loan Administration ____ 10
Operations ____ 11
Administration ____ 12
Financial Review ____ 13


SG 0062998

# FINANCIAL HIGHLIGHTS

*Dollar amounts in thousands, except per share amounts.*

| | June 30, | | | | |
|---|---|---|---|---|---|
| **OPERATING DATA DURING THE YEAR** | **1989** | **1988** | **1987** | **1986** | **1985** |
| Interest income | $ 54,743 | $ 27,291 | $ 18,538 | $ 15,312 | $ 11,719 |
| Interest expense | 43,844 | 20,776 | 13,966 | 12,252 | 9,625 |
| Net interest income before provision for loan losses | 10,899 | 6,515 | 4,572 | 3,060 | 2,094 |
| Loan loss provision | (260) | (572) | (94) | (578) | (78) |
| Net interest income after provision for loan losses | 10,639 | 5,943 | 4,478 | 2,482 | 2,016 |
| Other income | 4,095 | 4,256 | 2,921 | 2,676 | 1,321 |
| Operating expenses | (13,224) | (8,228) | (5,842) | (4,295) | (2,762) |
| Income before income taxes and extraordinary items | 1,510 | 1,971 | 1,557 | 863 | 575 |
| Income tax provision | (225) | (752) | (622) | (88) | (126) |
| Income before extraordinary items | 1,285 | 1,219 | 935 | 775 | 449 |
| Extraordinary items | | | | | (4) |
| Net income | $ 1,285 | $ 1,219 | $ 935 | $ 775 | $ 445 |
| Net income per common share: | | | | | |
| Before extraordinary items | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 | $ .87 |
| Extraordinary items | | | | | (.01) |
| | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 | $ .86 |
| Weighted average shares outstanding | 520,468 | 518,897 | 521,667 | 515,491 | 515,395 |
| **FINANCIAL POSITION AT YEAR-END** | | | | | |
| Total assets | $ 730,144 | $429,316 | $239,689 | $180,000 | $112,101 |
| Loans receivable | 496,781 | 304,408 | 173,180 | 127,948 | 70,119 |
| Mortgaged-backed securities | 114,060 | 51,908 | 42,620 | 8,863 | 14,411 |
| Investments | 31,639 | 29,599 | 8,823 | 13,792 | 8,842 |
| Deposits | 519,982 | 306,152 | 170,789 | 142,064 | 88,001 |
| FHLB advances | 96,580 | 57,100 | 30,650 | 27,350 | 14,350 |
| Stockholders' equity | 10,512 | 9,467 | 8,469 | 5,389 | 4,614 |
| **STATISTICAL DATA** | | | | | |
| Number of: | | | | | |
| Employees (full-time equivalent) | 300 | 197 | 107 | 89 | 55 |
| Offices: | | | | | |
| Full-service | 28 | 19 | 8 | 8 | 5 |
| Loan production | 11 | 7 | 2 | - | - |
| Real estate loans | 12,430 | 4,854 | 3,417 | 3,286 | 1,632 |
| Deposit accounts | 71,756 | 42,082 | 22,326 | 20,063 | 10,360 |
| **RATIOS** | | | | | |
| Return on average assets | .22% | .40% | .45% | .50% | .42% |
| Return on average common stockholders' equity | 13.83% | 15.20% | 15.76% | 15.71% | 10.30% |
| Stockholders' equity to assets, at end of period | 1.44% | 2.21% | 3.53% | 2.99% | 4.12% |
| Book value per common share, at end of period | $ 15.97 | $ 13.95 | $ 12.09 | $ 10.45 | $ 8.95 |
| Net interest margin | 2.00% | 2.25% | 2.35% | 2.10% | 3.52% |
| Ratio of nonperforming loans to total assets | 2.39% | 2.13% | 3.14% | 3.08% | 1.32% |

*NOTE: Per Share amounts have been retroactively restated to reflect stock dividends paid. The above amounts reflect significant acquisitions during the years ended June 30, 1989, 1988 and 1986 - See Note 13 to the Consolidated Financial Statements. The Association prospectively changed its method of accounting for loan fees in 1989 - See Note 1 to the Consolidated Financial Statements.*



"Confidential Material-Subject to Protective Order" SG 0062999

APP. 960

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# REPORT TO SHAREHOLDERS

We are pleased to report another excellent year for Sterling Savings—a year of significant internal expansion and challenging external forces. Sterling's adherence to traditional values balanced with the ability to adapt to growth and changing times is the key to our success.

Fiscal 1989 developments illustrate the Company's strength and flexibility. Highlights include:

- **Net income for the year was $1,285,000, or $2.04 per share, compared to $1,219,000, or $1.96 per share, for fiscal 1988.**
- **During the first quarter of fiscal 1989, Sterling integrated the five Tri-Cities Savings & Loan branches into our system. Since then, we consolidated these operations into four locations and remodeled the Richland office.**
- **In December, Sterling acquired Central Evergreen Federal Savings and Loan Association. This major ten-branch acquisition gives Sterling a strong delivery system along western Washington's I-5 corridor from Seattle to Portland.**
- **Action Mortgage Company, a residential mortgage company and wholly-owned subsidiary of Sterling, expanded to eight offices in four states and increased its loan production to approximately $144 million, reflecting our commitment to single-family lending.**
- **INTERVEST-Mortgage Investment Co., an income property mortgage company and wholly-owned subsidiary of Sterling, more than doubled its volume with loan production exceeding $55 million.**
- **In April, Sterling completed construction of a new Winslow branch. This office is located near the ferry terminal on Bainbridge Island. Deposits at this branch increased 51% during fiscal 1989.**
- **The Best Agency, a wholly-owned subsidiary, was activated after the Central Evergreen acquisition. The Best Agency markets tax-deferred annuities through three financial services representatives located in western and southeastern Washington.**



*Harold B. Gilkey,*
*Chairman of the Board*

## ECONOMIC OUTLOOK:

In this time of continued mergers and consolidations by out-of-state financial institutions, it is essential to provide local, community-oriented service. We differentiate ourselves by the quality of service extended to our customers. Our commitment to service is an integral part of our corporate culture. Sterling's strong, state-wide depository base reflects our belief in the economic vitality of Washington State and the Pacific Northwest.








"Confidential Material-Subject to Protective Order"

On the national scene, congressional hearings on the savings and loan industry and the ensuing headlines affected customer confidence even though Sterling as well as other thrift institutions throughout Washington State are profitable. As demonstrated by its four acquisitions since inception, Sterling is considered by the industry and the regulators to be part of the solution, not part of the problem.

On August 9, 1989, President Bush signed the most complex financial legislation since the 1930's. The Financial Institutions Reform, Recovery and Enforcement Act, or FIRREA, will strengthen the deposit insurance system and provide a plan and funding to resolve the current savings and loan industry problems. Sterling fully supports this bill and its tougher standards even though we are frustrated by the limited transition time period. In anticipation of this legislation, Sterling's management structured its business plan and balance sheet to provide maximum flexibility in responding to the new legislation.



*William W. Zuppe,*
***President***

**THE STERLING DIFFERENCE:**

Our continued success has resulted in large measure from our clear focus on the mission of Sterling Savings: *to provide a high level of quality financial services to our customers and to manage a safe and sound financial institution which builds value for our shareholders and opportunity for our employees.* We believe that the Company as a whole possesses several factors which collectively make up the "Sterling Difference":

- **Strong delivery system across the state**
- **Diversified income-producing sources**
- **High credit quality standards**
- **"Hometown Helpful" customer service and community involvement**

We are pleased to introduce three new members of the Board of Directors. They are Raymond R. Alverson of Olympia, a retired Captain with United Airlines; James P. Fugate of Auburn, Superintendent of the Auburn School District #408; and James A. Vander Stoep of Chehalis, attorney and partner in the firm of Armstrong, Vander Stoep, Remund and Kelly. These Directors from western Washington enhance Sterling's representation and communication in those communities we serve.

Our greatest resource throughout this year of extraordinary challenge, market expansion, and growth is our staff of over 300 people. Whether in a branch in Clarkston, a loan office in Portland or a support department in Spokane, the Sterling family strives to provide "Hometown Helpful" service. Led by a strong senior management team, Sterling will continue to balance traditional banking values with a business plan responsive to changing business requirements.






"Confidential Material-Subject to Protective Order"

# CORPORATE PROFILE

## STERLING SAVINGS ASSOCIATION

Sterling Savings Association is a Washington-chartered, federally insured, stock savings and loan association, headquartered in Spokane, Washington. Sterling opened for business April 4, 1983, with assets of $2.5 million. At June 30, 1989, the Company had total assets of approximately $730 million. To date, acquisitions have accounted for approximately 60% of the growth in total assets.

Sterling conducts its business from twenty-eight full-service offices and eleven loan production offices located throughout Washington, Idaho, Oregon, and Utah. Sterling's business is primarily that of attracting deposits from the general public and originating, purchasing, selling and servicing secured residential and commercial real estate loans. Residential loans make up 72% of Sterling's loan and mortgage-backed securities portfolio.



## INTERVEST

INTERVEST-Mortgage Investment Co. is a wholly-owned subsidiary of Sterling Savings. A commercial real estate lender, INTERVEST provides financing alternatives in the $2 million range for income property loans. Specializing in commercial and multi-family real estate in the Northwest, they offer both construction and permanent financing from offices located in Portland, Oregon, and Bellevue and Spokane, Washington.

## ACTION MORTGAGE COMPANY

Action Mortgage Company is a full-service residential lender offering a complete program for the construction, purchase and refinancing of single-family homes. A wholly-owned subsidiary of Sterling Savings, Action was founded in March 1988 with offices in Spokane and Bellevue, Washington. Today Action has additional offices throughout the Pacific Northwest including Tacoma and Kennewick, Washington; Portland, Oregon; Boise and Coeur d'Alene, Idaho; and Salt Lake City, Utah.

## THE BEST AGENCY

The Best Agency, a wholly-owned subsidiary of Sterling Savings, was activated after the Central Evergreen acquisition. The Best Agency markets tax-deferred annuities through three financial services representatives located in western and southeastern Washington.



SG 0063002



"Confidential Material-Subject to Protective Order"

# BOARD OF DIRECTORS



Barnett Vander Stoep Alverson Wallace Fugate Meyers Clark Gilkey Zuppe Larrabee Kroetch Barnes

| | |
|---|---|
| HAROLD B. GILKEY | *Chairman of the Board, Chief Executive Officer* |
| WILLIAM W. ZUPPE | *President, Chief Operating Officer* |
| RAYMOND R. ALVERSON | *Retired United Airlines Pilot* |
| NED M. BARNES | *Principal, Witherspoon, Kelley, Davenport & Toole, PS* |
| RODNEY W. BARNETT | *President, Carr Sales Company* |
| T. RICHARD CLARK | *Business Consultant* |
| JAMES P. FUGATE | *Superintendent, Auburn School District* |
| CHARLES L. KROETCH | *President, Kroma International Graphics Center* |
| ROBERT LARRABEE | *Owner, Merchant Funeral Home* |
| ROBERT E. MEYERS | *Dentist* |
| JAMES A. VANDER STOEP | *Partner, Armstrong, Vander Stoep, Remund & Kelly* |
| DAVID O. WALLACE | *Owner, Chet's Buy-Rite Market* |





"Confidential Material-Subject to Protective Order"

# BRANCH SYSTEM



*Chehalis Branch*
*Western Division Headquarters*

OUR GOAL IS TO BE OUR CUSTOMERS' PRIMARY FINANCIAL INSTITUTION FOR ALL THEIR BANKING NEEDS.




Sterling's twenty-eight full-service branch offices provide a strong financial services delivery system statewide. Our staff is committed to serving in the "Hometown Helpful" tradition.

At Sterling, we take a disciplined and focused approach to banking. Our goal is to be our customers' primary financial institution. Branch employees are dedicated to identifying and providing banking services that benefit the customer.

During fiscal 1989, Sterling acquired Central Evergreen Federal Savings & Loan Association's ten branches in western Washington. Stretching from Seattle to Portland on the I-5 corridor, these branches strengthen our presence in Washington already established with the 1988 purchase of the six Great American branches and the 1988 acquisition of the five Tri-Cities Savings and Loan Association branches.

The 1989 acquisition provided Sterling with the opportunity to continue serving the customers of Central Evergreen in a friendly, professional and personal manner. Central Evergreen's commitment



SG 0063004



"Confidential Material-Subject to Protective Order"




to customer service truly meshed with Sterling's theme of "Hometown Helpful." In a short time, this region has become an integral part of Sterling's branch system with a very positive future.

To meet the challenge of expansion, Sterling restructured branch administration into the Western and Eastern Divisions. This reorganization facilitates efficient communication and support of our expanded branch network.

Total deposits at year end were $520 million, a 70% increase over fiscal 1988. This increase reflects primarily the acquisition of Central Evergreen Federal. Frequent news reports about troubled savings and loans in other parts of the country prompted consumers throughout the nation to ask poignant questions about the security of their savings deposits. Through all this, our staff played an integral part in sorting out information from misinformation for the customers.

Our "Hometown Helpful" motto means providing quality service with financial and civic commitment to our communities. This year witnessed a significant expansion of our ability to provide these services. We are proud to be spreading our "Hometown Helpful" service across Washington state.



*Stanton C. Parrish,*
*Sr. Vice President - Eastern Division Manager*

WE ARE PROUD TO BE SPREADING OUR "HOMETOWN HELPFUL" SERVICE ACROSS WASHINGTON STATE.




SG 0063005



"Confidential Material-Subject to Protective Order"

# ACTION MORTGAGE COMPANY



*Thomas F. Sackmann,*
***President - Action Mortgage Company***

OUR COMMITMENT REMAINS TO BE A LEADER IN RESIDENTIAL LENDING IN THE PACIFIC NORTHWEST.

Action Mortgage Company successfully completed its first full year of operation in June 1989. With the exception of May and June, fiscal 1989 was a difficult one for all residential lenders. In spite of an adverse rate and competitive environment, Action closed almost two thousand loans, totaling approximately $144 million during the year.

Headquartered in Spokane, Action began fiscal 1989 with established origination offices in Spokane, Bellevue and Portland. New offices in Boise and Coeur d'Alene, Idaho, and Kennewick, Washington, were opened in July with the Salt Lake City, Utah, office opening in December. New offices in Tacoma and Spokane were opened shortly after the end of the fiscal year.

One of Action's major goals during fiscal 1989 was to increase production of marketable loans, principally FHA insured and VA guaranteed loans. FHA and VA loan production did, in fact, increase substantially throughout the year; and most loan production of all types was being sold into the secondary mortgage markets by June of 1989. By the close of the fiscal year, Action was able to offer a complete menu of FHA/VA, conventional and custom construction loans through all its offices as well as builder construction loans through offices in Washington and northern Idaho. Action begins fiscal 1990 well-positioned to continue its growth.



SG 0063006



"Confidential Material-Subject to Protective Order"

# INTERVEST



*John M. Harlow,*
***President - INTERVEST-Mortgage Investment Co.***

WE ARE ABLE TO OFFER SOUND, VIABLE ALTERNATIVES TAILORED TO THE UNIQUE REQUIREMENTS OF EACH CUSTOMER.

INTERVEST coordinates commercial real estate lending for Sterling. Total loan production for fiscal 1989 exceeded $55 million, including $27 million in multi-family residential lending. The key to our continued success is an experienced staff positioned in Puget Sound, Portland and eastern Washington areas to work on targeted markets.

INTERVEST specializes in small to mid-sized income property loans. For this last fiscal year, the average loan size was $1,750,000. We emphasize construction lending; and our staff works with customers to find favorable long-term financing with institutional lenders at completion. Loans made over this past fiscal year included apartments of 43 units in Puyallup, 50 in Tacoma, 140 in Salem, 135 in Olympia, 59 in Coeur d' Alene, and 58 in Spokane; a 33,000 square foot office building in Clark County and a 37,191 square foot office building in Puyallup; retail/shopping centers of 20,000, 14,000 and 34,000 square feet in Clackamas and Wilsonville, Oregon, and Clark County, Washington; a 14,400 square foot medical office building in Renton; and warehouses in Federal Way and Beaverton of 35,528 and 44,000 square feet, respectively.

At all times, our goal at INTERVEST is to provide the best possible financing package for our customers. In keeping with Sterling's overall "Hometown Helpful" consciousness, INTERVEST strives to provide timely, dependable service to meet the customers' needs. Good service is always important and particularly so when dealing with the complexities associated with large loan transactions.

INTERVEST's offices are located in Bellevue and Spokane, Washington, and Portland, Oregon.



SG 0063007

"Confidential Material-Subject to Protective Order"

APP 968

# LOAN ADMINISTRATION



*Stephen L. Page,*
*Sr. Vice President - Loan Administration*

WE ARE DEDICATED TO SAFE, SECURE BANKING PRINCIPLES.




Balance is a key concept in Sterling's Loan Administration Department. Dedicated to safe, secure banking principles, they manage and maintain the mix of loan types and uphold the highest standards for credit quality. Sterling traditionally has provided complete lines of loans and services to home builders, home buyers and commercial real estate developers.

Home ownership is one of the primary needs and often the most significant investment of our retail customers. Residential loans are originated from Sterling's wholly-owned subsidiary, Action Mortgage Company. Their well-trained staff offers a comprehensive loan origination network from eight offices located throughout four Pacific Northwest states. Sterling's commercial real estate lending is conducted from INTERVEST-Mortgage Investment Co., a wholly-owned subsidiary, with headquarters in Portland, Oregon, and offices in Bellevue and Spokane, Washington.

Sterling reaches beyond traditional home and commercial real estate lending by providing consumer loans including auto, boat and personal lines of credit as well as commercial business loans. Spokane's commercial lending department has the expertise to meet the needs of local businesses seeking lines of credit and other loans for business expansion.

Total loans originated during fiscal 1989 were $249 million. Sterling's experienced staff services the large volume of loans originated, whether retained in the portfolio or sold to other investors. This activity is an important part of our quality control program and a significant source of fee income. At the end of fiscal 1989, a total of 15,044 loans were serviced. Our staff's high level of consistent service is a major factor in our ability to sell loans in the secondary market. This in turn allows more capital to be reinvested into each of our communities. At Sterling, we believe this is a very important part of being "Hometown Helpful."





"Confidential Material-Subject to Protective Order"

# OPERATIONS

The Operations Department epitomizes the expression "high-tech, high-touch." This department's expertise and experience made a year of acquisitions unnoticeable to the customer. During this fiscal year, Operations integrated 28,000 accounts and almost 8,700 loans into the Sterling system with little or no customer impact.

This department also oversees the building and remodeling of branch offices. This year, the Ellensburg, Moses Lake, Othello, Richland and North Bend offices were remodeled. Immediately following the acquisition of Central Evergreen, a major renovation of the Chehalis branch took place to accommodate the newly established Western Division Headquarters. At the same time, plans were drawn for the new Winslow branch. Winslow's construction began in late December, and the branch was moved and open for business on Monday, March 27. This spring, plans were completed for a new branch office in Pasco.

The Operations Department is also responsible for mail, forms and supply distribution between our branch network and administrative offices in Spokane. In addition, Operations provides the purchasing function for major furniture and fixture items for all locations and building maintenance for Sterling branch locations.

Throughout the year, this department's goal has been to stabilize and standardize systems. To this end, a major computer hardware system change was accomplished this spring. The technical ability of our capable staff is balanced with their desire to see each new branch become part of the Sterling family's "Hometown Helpful" environment.



*S. Midge Moore,*
*Vice President - Operations/Facilities*

WE HAVE THE TECHNOLOGY AND EXPERIENCE TO MEET STERLING'S EXPANSION AND SERVICE GOALS.



SG 0063009

"Confidential Material-Subject to Protective Order"

# ADMINISTRATION




*Heidi B. Stanley,*
*Vice President - Administration*

STERLING
IS COMMITTED
TO HIGH STANDARDS
OF CORPORATE
CITIZENSHIP
IN EACH COMMUNITY
WE SERVE.

The Administration Department serves the customer, employee, shareholder and community through its varied functions—Human Resources, Marketing and Communications.

The Human Resource Department is committed to providing the policies and procedures, training, compensation plans and the PEOPLE to ensure that our tradition of "Hometown Helpful" service continues. We strive to provide an environment where open communication and professional development are honored, where individuals are treated with respect and encouraged to succeed and to grow, and where individual accomplishment is recognized and rewarded.

Marketing constantly strives to present Sterling's image through the creation, delivery and communication of quality financial products which are responsive to the needs and wants of our customers. We have continued to position ourselves as a provider of superior services and high quality products.

The Communications Department places great emphasis on providing employees with information necessary to do their jobs and service the customer. Additionally, Communications is responsible for articulating corporate direction and goals and providing for the distribution of information to our shareholders and the public.

Our success and strength have a human and public dimension in an increased ability to fulfill our corporate social responsibilities. Sterling's management is committed to maintaining the highest standards of corporate citizenship in meeting the charitable, cultural, social and educational needs of the communities where we do business. We seek out opportunities to participate and to play a leadership role in addressing issues of concern throughout our service areas.



SG 0063010

"Confidential Material-Subject to Protective Order"

APP. 971

CONFIDENTIAL MATERIAL – SUBJECT TO PROTECTIVE ORDER RSC027 0406

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS



*Daniel G. Byrne*
*Sr. Vice President, Finance*

### BOOK VALUE PER COMMON SHARE




### GENERAL

Since commencing operations in April of 1983, the Association has made significant acquisitions of other institutions and branches. These acquisitions have substantially enhanced the Association's branch delivery network and deposit gathering capabilities, and have provided the Association with significant net operating loss carryforwards, which will be available to reduce future tax liabilities. Several such acquisitions have involved troubled institutions and have resulted in an increase in the level of the Association's classified assets. Additionally, the Association's regulatory capital will decrease under FIRREA because the supervisory goodwill obtained through these acquisitions must now be deducted in determining regulatory capital (see "Liquidity and Sources of Funds" - "Capital Resources").

The Association's retail branch delivery system increased from five full service offices in 1985, to twenty-eight full service offices in 1989. Two of these branch offices were established by the Association and the remainder were obtained through acquisitions. Additionally, the Association, through its wholly-owned subsidiaries, Action Mortgage Company ("Action") and INTERVEST - Mortgage Investment Company ("Intervest"), operated eleven loan production offices at June 30, 1989. The Association has agreed, subject to regulatory approval, to purchase two branch offices from Great American with $29.5 million in deposits. A net cash payment to be received by the Association in exchange for assuming these deposits will be used to pay down other more expensive borrowings as they mature.

Due to its recent significant growth through acquisitions, the Association expects to concentrate in the near-term on integrating these various acquired operating units into its delivery network. The Association has no specific plans for acquisitions or the establishment of new branches in the next year.

During fiscal 1989, the Association also began marketing insurance and annuity products to its customers through an acquired subsidiary, The Best Agency. While the impact of these sales during 1989 was not significant, management feels the results of operations in the future will be positively impacted due to the expansion of this product line.

### RESULTS OF OPERATIONS

The Association reported net income for fiscal year 1989 of $1,285,000, a 5.4% increase over the $1,219,000 of net income reported for fiscal year 1988. Earnings increased to $2.04 per common share in fiscal year 1989 compared to $1.96 per common share in fiscal year 1988. Net income for fiscal year 1987 was $935,000, or $1.75 per common share. All earnings per share amounts have been retroactively restated to reflect all common stock dividends paid during the three-year period.

On December 31, 1988, the Association acquired Central Evergreen of Chehalis, Washington, which increased total assets by approximately $249 million and added ten branches to the Association's delivery system in Western Washington. See Note 13 to the Consolidated Financial Statements for more detailed information concerning this acquisition.

Sterling also expanded its residential mortgage lending function through Action Mortgage Company. During fiscal 1989, Action opened four more loan production offices, bringing to eight the total number of Action's loan production offices in Washington, Idaho, Oregon and Utah.

As a result of this acquisition and expansion, the Association's total assets increased 70% to $730.1 million at June 30, 1989, from $429.3 million at June 30, 1988.

Additionally, during fiscal 1989, the Association prospectively adopted the provisions of SFAS No. 91, which has substantially revised the Association's method of accounting for loan fees. As further described under "Other Income" and in Note 1 to the Consolidated Financial Statements, for all lending transactions entered into on or after July 1, 1988, the total loan origination fee and certain specifically defined direct loan origination costs are deferred, which has the effect of decreasing net fee income in the year of origination and increasing net interest income in future periods. As a means of both mitigating the impact of SFAS No. 91 and building its servicing portfolio and income therefrom, the Associa-





"Confidential Material-Subject to Protective Order"

**QUARTERLY EARNINGS** *In Thousands of Dollars*




tion expanded its mortgage banking operations during 1989. As a result, a larger amount of loans are being originated and purchased for sale into the secondary market rather than for portfolio retention. Loans sold into the secondary market reflect a higher level of gains as a result of the net deferred fee.

### NET INTEREST INCOME

For a financial institution, the most significant component of earnings is net interest income. Net interest income is the difference between interest income, principally from the Association's loan, investment and mortgage-backed securities portfolios, and interest expense, principally on customer deposits and borrowings. Changes in net interest income result from changes in both volume and net interest rate spread. Volume refers to the dollar level of earning assets and interest-bearing liabilities, and net interest rate spread refers to the difference between the interest yields on earning assets and the interest costs of the liabilities required to support them.

The Association's total interest income has increased steadily to $54.7 million in fiscal 1989, from $27.3 million in fiscal 1988 and $18.5 million in fiscal 1987. Total interest expense increased to $43.8 million in fiscal 1989, from $20.8 million in fiscal 1988 and $14.0 million in fiscal 1987. The Association's net interest income has increased steadily to $10.9 million for fiscal 1989, from $6.5 million and $4.6 million for fiscal 1988 and 1987, respectively. These increases in total interest income, total interest expense, and net interest income are principally attributable to the volume factor. Average interest-earning assets increased during fiscal 1989 to $545.3 million, from $289.4 million and $194.3 million during fiscal 1988 and 1987, respectively. The increases are principally the result of the Association's acquisitions of Central Evergreen midway through fiscal 1989, and Tri-Cities and six Great American branches during fiscal 1988.

The difference between the yield on the Association's interest-earning assets and the cost of its interest-bearing liabilities ("spread") for all of fiscal 1989 was 2.29%, as compared to 2.20% in fiscal 1988 and 2.36% in fiscal 1987. The increased spread during 1989 is primarily attributable to the mix of interest-earning assets relative to interest-bearing liabilities. During fiscal 1988, prevailing interest rates increased sharply compared to 1987, and rates paid on interest-bearing liabilities increased more rapidly than did rates earned on interest-earning assets.

Net interest income divided by total earning assets, or net interest margin, is influenced by the relative level and mix of interest earning assets and interest bearing liabilities. The margin declined to 2.00% during fiscal 1989, from 2.25% in fiscal 1988 and 2.35% in fiscal 1987, as a result of a lower level of interest-earning assets relative to interest-bearing liabilities acquired from Central Evergreen and Tri-Cities. Management expects net interest margin to improve as non-performing Central Evergreen and Tri-Cities assets are converted to earning assets.

### PROVISIONS FOR LOAN AND REAL ESTATE OWNED LOSSES

It is management's policy to establish allowances for estimated potential losses on loans and real estate owned ("REO") by charging income when events have occurred indicating that losses are expected to be incurred. The evaluation of the adequacy of these allowances is an ongoing process. Economic conditions, loan portfolio composition, and historical loss experience affect the loss provisions charged against income.

The Association controls the quality of loans originated through its quality control function, which reviews loans originated or acquired to ensure compliance with appropriate underwriting criteria. The results of these reviews assist the Association in monitoring the performance of its lending personnel and independent appraisers. The Association's mortgage loan quality control program conforms to guidelines and standards established by the FHLMC and the FNMA.

Additionally, the Association has established a strict and uniform set of guidelines for classifying loans and then determining the appropriate provision for anticipated loan losses. Under these guidelines, an allowance for anticipated loan losses is established when certain conditions exist. This system for classifying and reserving loans is administered by the Association's Special Assets Department, which is responsible for curing loan deficiencies and minimizing losses. An oversight committee, comprised of senior management, meets quarterly to monitor and approve the activities and progress of the Special Assets Department, and reports these results to the Association's Board of Directors.

In fiscal 1989, total provisions of $326,000 were added to existing loss allowances through a charge to expense, of which $260,000 was allocated to loan losses and $66,000 was allocated to real estate owned losses. These total provisions compared to $951,000 and $201,000 for fiscal 1988 and 1987, respectively, of which $572,000 and $94,000 were provided for loan losses and $379,000 and $107,000 were provided for real estate owned losses. The loan loss provision for fiscal 1989 was made to increase general loan loss allowances. The loan loss provision for fiscal 1988 was higher than the provisions for either fiscal 1989 or fiscal 1987, and reflected management's intent to increase general allowances for commercial loans secured by collateral other than real estate, due in part to the general increase in this segment of the loan portfolio.

Allowances for potential loan and REO losses of $3,122,000 and $4,330,000 were carried over to the Association in the acquisitions of Tri-Cities and Central





"Confidential Material-Subject to Protective Order"

Evergreen. These allowances were necessary to cover the estimated losses in the respective portfolios of these institutions at the acquisition dates, and can be attributed primarily to certain macroeconomic conditions affecting their market areas and several large purchased loan participations.

The amount of loans and REO written off against reserves for fiscal years 1989, 1988 and 1987 were $1,858,000, $271,000 and $852,000, respectively. The amount written off in fiscal year 1989 is much higher than previous years, principally because of the high levels of problem loans and REO acquired with the Tri-Cities and Central Evergreen portfolios. The amount written off in fiscal 1987 reflects problem loans and REO of Lewis Federal, which was acquired in fiscal 1986.

Management believes the established allowances are compatible with the risks of various types of lending and the composition of the Association's loan and real estate owned portfolios.




### OTHER INCOME

Effective July 1, 1988, the Association prospectively changed its method of accounting for loan fees to comply with Statement of Financial Accounting Standards No. 91 - Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans ("SFAS No. 91"). This change substantially revised the Association's method of accounting for loan fees, which are now deferred in their entirety, net of certain specifically defined direct loan origination costs, and amortized to interest income using the level interest yield method over the contractual term of each loan as an adjustment of yield. For loans retained in the portfolio, the effect of SFAS No. 91 is to reduce loan fee income in the year of origination and increase net interest income in future periods. For loans sold into the secondary market, the effect of SFAS No. 91 is to increase the gain on sale, due to the fact that any net deferred fees effectively become part of the basis in the loans. During the year ended June 30, 1989, the net effect of adopting SFAS No. 91 was to decrease income before income taxes by $275,000. As a means of both mitigating the impact of SFAS No. 91 and building its servicing portfolio and income therefrom, the Association expanded its mortgage banking operations during 1989. As a result, a substantially larger amount of loans are being originated or purchased for sale into the secondary market rather than for portfolio retention.

The composition of other income was substantially different during fiscal 1989, compared to fiscal 1988 and 1987, as a result of these SFAS No. 91 related changes. Other income of $4,095,000 during fiscal 1989 is comprised principally of net gains on sales of loans and securities of $910,000 and service charges and fees on deposit accounts of $913,000. This compares to other income for fiscal 1988 and 1987 of $4,256,000, and $2,921,000, respectively, which was comprised principally of loan origination and commitment fees of $3,517,000 and $1,994,000, respectively.

Loan origination and commitment fees were $560,000 in fiscal 1989, $3,517,000 in fiscal 1988, and $1,994,000 in fiscal 1987. The 1989 decrease in fee income reflects the implementation of SFAS No. 91. The 1988 increase in loan fees reflects an increase, to $184.8 million, in the volume of loans originated in fiscal 1988, compared to originations of $122.6 million during fiscal 1987. The increase in loan origination volume in fiscal 1988 reflects an increase in market share and an expansion of the Association's mortgage-banking operations, principally through Action Mortgage Company.

Loan servicing fees were $471,000, $216,000, and $73,000 in fiscal years 1989, 1988 and 1987, respectively. The level of loan servicing fee income is primarily influenced by the size of the portfolio of loans being serviced for others. This portfolio has increased to $315.4 million at June 30, 1989, from $59.9 million and $41.9 million at June 30, 1988 and 1987, respectively, as a result of the increase in the Association's mortgage banking activities and the acquisitions of Tri-Cities and Central Evergreen.

Service charges and fees on deposit accounts totalled $913,000, $423,000 and $235,000, for the years ended June 30, 1989, 1988 and 1987, respectively. The increases primarily reflect the growth in the number of accounts serviced during these periods.

Net gains on sales of loans and securities were $910,000, $408,000 and $596,000 during fiscal years 1989, 1988 and 1987, respectively. During fiscal 1989, the Association became more active in its mortgage banking operations, which resulted in a higher level of secondary market sales of loans with net deferred fees attached to them (the existence of net deferred fees increases gain on sale). Both fiscal 1988 and 1987 reflect a lower level of sales of loans and securities.

Net gain (loss) on sales and operation of REO was $691,000, ($37,600), and $13,000 during fiscal years 1989, 1988 and 1987, respectively. The net gain during fiscal year 1989 is attributable to favorable operating results of acquired REO and recoveries in excess of amounts expected on acquired properties. The net loss during fiscal year 1988 is attributable to unfavorable operating results of various REO properties and the erosion in net realizable value of one REO property. The net gain for fiscal year 1987 is insignificant, and reflects a much lower level of REO being managed.

**INTEREST RATE SENSITIVITY OF ASSETS & LIABILITIES & CAPITAL**

*Percentage which reprice in one year or less*




**INTEREST RATE SENSITIVITY OF ASSETS & LIABILITIES & CAPITAL**

*Percentage which reprice in three years or less*




### OPERATING EXPENSES

Operating expenses, which were $13,224,000, $8,228,000 and $5,842,000 for fiscal years 1989, 1988 and 1987, respectively, have shown a general increase, primarily as a result of internal expansion and the acquisitions of Central Evergreen in 1989 and of Tri-Cities and six Great American branches in 1988. Since fiscal 1987, the total number of facilities, including those operated by subsidiaries, has increased from ten to thirty-nine, and the number of full-time employee equivalents has increased from 107 to 300. Employee compensation and benefits, occupancy and equipment, data processing and other expenses all contributed to the substantial increase in operating expenses.

Intangible amortization expense was $2,021,000, $462,000 and $372,000 during fiscal years 1989, 1988 and 1987, respectively. The significant increase during 1989 is attributable to the high level of intangibles recorded with the acquisition of Central Evergreen. The Association has available certain acquired tax benefits which would serve to reduce the level of intangibles, and thus amortization expense, when utilized in the future. There can be no assurance, however, that these benefits will be fully realized. See Note 10 to the Consolidated Financial Statements.

### PROVISION FOR INCOME TAXES

For the years ended June 30, 1989, 1988 and 1987, the income tax provisions were $225,000, $752,000 and $622,000, respectively. The effective tax rate in fiscal 1989 (14.9%) is lower than the statutory rate of 34%, primarily due to the tax basis bad debt deduction and nontaxable yield subsidy assistance received from the FSLIC, but partially offset by the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets and liabilities). The effective tax rate in fiscal 1988 (38.2%) is higher than the statutory rate of 34%, primarily because of the amortization of purchase accounting adjustments. The effective tax rate in fiscal 1987 (39.9%) was lower than the statutory rate of 46%, primarily due to the tax basis bad debt deduction.

The income tax provisions in fiscal 1989 and 1988 consider all applicable changes to the Tax Reform Act of 1986. Those changes which significantly affected the Association beginning July 1, 1987 were the reduction of the maximum corporate tax rate from 46% to 34%, and the reduction, from 40% to 8%, of the percentage of taxable income used to calculate the bad debt deduction under one of the available methods. These changes essentially offset each other, causing very little fluctuation in the Association's effective tax rate from fiscal 1987 to fiscal 1988. The Association now finds that it is able to obtain a greater bad debt deduction by using the "experience" method instead of the percentage of taxable income method.

In December of 1987, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 96 - Accounting for Income Taxes ("SFAS No. 96") which requires the application of an asset and liability approach to account for and report income taxes for financial statement purposes. SFAS No. 96 will require the Association to recognize a current or deferred tax liability for the tax consequences of all events recognized in the financial statements. The new standard represents a significant change in accounting for the effects of deferred taxes and business combinations. Deferred taxes are to be based on the difference between the tax bases of assets and liabilities (including those acquired or assumed in conjunction with purchase business combinations) and amounts reported for financial statement purposes. SFAS No. 96 also will require the Association to make a deferred tax adjustment for any remaining acquired assets and assumed liabilities to which purchase accounting tax adjustments were made in prior business combinations. The Association also will be required to recompute its tax liabilities if the tax rates change, and must recognize the effect of any such change in income. The Association has not yet determined the effects of this new standard, which presently must be adopted no later than July 1, 1990. The FASB has recently announced that it intends to defer the required implementation date of SFAS No. 96 for a minimum of nine more months, and that it is continuing to explore several possibly significant amendments to SFAS No. 96.

### LIQUIDITY AND SOURCES OF FUNDS

Federal regulations require savings institutions to maintain an average daily balance of liquid assets equal to, but not less than, a specified percentage (currently 5%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At June 30, 1989, the Association had a liquidity ratio of 6.85% compared to 5.10% and 5.50% at June 30, 1988 and 1987, respectively. The required liquidity ratio may vary from time to time, depending on economic conditions, savings flows, and loan funding needs. It is the Association's practice to maintain its liquidity level at or near the required minimum in order to maximize its yield on alternative investments.

The Association's primary sources of cash are customer deposits, principal payments on and sales of loans and mortgage-backed securities, advances from the FHLB Seattle, and borrowings under repurchase agreements. Deposits increased by $213.8 million and $135.4 million in fiscal years 1989 and 1988, respectively. The increases in fiscal 1989 and 1988 result principally from the ac-





"Confidential Material-Subject to Protective Order"

quisitions of Central Evergreen, Tri-Cites and six Great American branches.

Principal repayments on loans and mortgage-backed securities were $115.7 million, $64.8 million and $62.1 million during fiscal years 1989, 1988 and 1987, respectively. The increase in these repayments over the past three years is a reflection of continued growth in average loan and mortgage-backed securities portfolio balances, and periodic increases in loan refinancings as the result of lower prevailing interest rates.

At June 30, 1989, the Association had borrowings outstanding from the FHLB amounting to $96.6 million, and had authority to borrow up to a total of 25% of assets, or an additional $86 million.

The Association also borrows on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At June 30, 1989, the Association had $87.3 million of securities sold subject to repurchase agreements. An additional $6 million of securities were available for sale under repurchase agreements at such date.

## CAPITAL RESOURCES

The Association's total stockholders' equity was $10,512,000 and $9,467,000 at June 30, 1989 and 1988, respectively. During fiscal 1989, stockholders' equity increased by $1,045,000, reflecting primarily net income of $1,285,000, offset by cash dividends of $225,000 declared on the Series B Preferred Stock. During fiscal 1988, total stockholders' equity increased by $998,000, primarily as the result of net income.

Return on average common stockholders' equity was 13.8% in fiscal 1989, 15.2% in fiscal 1988, and 15.8% in fiscal 1987. The moderate decline in fiscal 1989 and 1988 is due, in part, to the payment of cash dividends on the Series B Preferred Stock.

At June 30, 1989, stockholders' equity was 1.44% of total assets, compared to 2.21% at June 30, 1988. The decrease in this ratio is a result of the 70% increase in total assets attributable to the Central Evergreen acquisition completed midway through fiscal 1989.

At June 30, 1989, the Association had regulatory capital of $23.7 million, which exceeded the minimum regulatory capital requirement then in effect by $2.1 million. On August 9, 1989, the President signed into law the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which addresses problems of the FSLIC and the thrift regulatory environment. The scope of the FIRREA bill is significant, and the Association is presently in the midst of a detailed analysis and evaluation of the implications of the legislation. In addition to creating a new regulatory body (Office of Thrift Supervision - "OTS"), the most significant aspect of FIRREA will be the implementation of new regulatory capital standards. Actual regulations specifically defining these new standards, including a number of components, limitations and exceptions, must be written and promulgated by the OTS before November 7, 1989, with the new minimum capital requirements then becoming effective on December 7, 1989.

Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is principally due to the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, which must now be subtracted from existing stockholders' equity in determining regulatory capital. Management believes it has been granted a forbearance until December 31, 1991, from meeting the FIRREA minimum capital requirements pursuant to its agreement with the FSLIC for the acquisition of Central Evergreen. No assurance can be given that this forbearance will be honored, however, and any such forbearance would be conditioned upon compliance by the Association with the business plan submitted to the FSLIC by the Association in conjunction with the Central Evergreen acquisition.

Should the Association not be in compliance when the new regulations become effective, it would be able to apply for a temporary exemption until January 1, 1991. If the Association is not in compliance with regulatory capital requirements at January 1, 1991, it would be able to apply for a further exemption. If such further exemptions were not granted, the Association would be subject to other restrictions, including limitations on asset growth and payments of dividends. Management believes the Association will be eligible for such exemptions under the standards set forth in FIRREA.

As further described in Notes 17b and c to the Consolidated Financial Statements, management of the Association is pursuing a plan for increasing its regulatory capital ratios to enable compliance with the new FIRREA requirements, including a planned stock offering and achieving the profitability goals set forth in its existing business plan. Management is also investigating other alternatives for improving its capital ratios, including a reduction of total assets accomplished by not replacing assets as they mature. If this plan is achieved, management believes, based on its preliminary understanding of the new legislation, that the Association will be in compliance with the minimum capital requirements of FIRREA by January 1, 1991.

In addition to its impact on regulatory capital, FIRREA will also result in the creation of a new depositor insurance fund to replace FSLIC and payment of higher insurance premiums thereto. FIRREA further calls for a recapitalization of the FHLB system, which could result in reduced dividends on the Association's investment in FHLB stock.

## ASSET AND LIABILITY MANAGEMENT

Since inception, the Association has maintained an asset and liability management program designed to stabilize net interest income throughout interest rate cycles by creating the means for protecting net interest spread against rapid increases in the cost of funds, and by achieving and maintaining a favorable balance between interest-earning assets and interest-bearing liabilities. The Association utilizes a variety of methods to protect net interest spread against rapid increases in interest rates, including (i) origination and retaining adjustable rate mortgages ("ARMs") secured by residential or commercial real estate and other collateral, and characterized by interest rates established at predetermined margins over a specified index that are adjusted periodically within contractual maximum limitations, (ii) selling into the secondary market substantially all long-term, fixed rate residential first mortgage loans originated or purchased, and (iii) borrowing long-term funds, principally from the FHLB of Seattle. In utilizing these methods, the Association attempts to match the maturities and interest rate sensitivity of its assets and liabilities in order to maintain adequate interest rate spread and asset quality.

The Association has formed a committee of senior management for the purpose of reviewing the composition and maturities of assets and liabilities. This committee attempts to maintain the Association's asset and liability gap position between a negative 10% and 25% at both the one- and three-year pricing intervals.

The Association's one-year and three-year cumulative gap positions (the difference between the amount of interest-earning assets and the amount of interest-bearing liabilities expected to reprice in the period) at June 30, 1989 were a negative $124.2 million, and a negative $112.9 million respectively, representing a negative cumulative gap to total assets ratio of 17.0% and 15.5% respectively. The Association believes that its gap position is reasonably matched for the current level of prevailing interest rates and that its net interest rate spread should be reasonably protected against a rapid rise in interest rates.

SG 0063015





"Confidential Material-Subject to Protective Order"

# CONSOLIDATED BALANCE SHEETS

*Dollar amounts in thousands.*

| AS OF JUNE 30, | 1989 | 1988 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents: | | |
| Interest bearing | $ 15,139 | $ 12,941 |
| Non-interest bearing and vault | 9,225 | 5,766 |
| Restricted | 1,300 | 450 |
| Investments (market value $31,390 and $28,941) | 31,639 | 29,599 |
| Loans receivable | 496,781 | 304,408 |
| Mortgage-backed securities (market value $111,029 and $49,126) | 114,060 | 51,908 |
| Accrued interest receivable (including $582 and $593 on investments) | 6,544 | 3,989 |
| Office properties and equipment | 10,727 | 6,933 |
| Real estate owned | 16,336 | 6,804 |
| Intangibles (net of accumulated amortization of $3,645 and $1,431) | 25,722 | 5,068 |
| Prepaid expenses and other assets | 2,671 | 1,450 |
| Total assets | $730,144 | $429,316 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Deposits | $519,982 | $306,152 |
| Advances from Federal Home Loan Bank | 96,580 | 57,100 |
| Securities sold subject to repurchase agreements | 87,345 | 47,192 |
| Cashier's checks issued and payable | 4,994 | 3,488 |
| Borrowers' reserves for taxes and insurance | 2,519 | 1,218 |
| Accrued interest payable | 3,023 | 1,743 |
| Deferred income taxes | 164 | 248 |
| Accrued expenses and other liabilities | 5,025 | 2,708 |
| Total liabilities | 719,632 | 419,849 |
| Commitments | | |
| Preferred stock, $1 par value; 1,000,000 shares authorized; 90,168 shares issued and outstanding ($2,254 liquidation preference value) | 90 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; 517,228 and 470,209 shares issued and outstanding | 517 | 470 |
| Additional paid-in capital | 7,708 | 7,240 |
| Retained earnings | 2,197 | 1,667 |
| Total stockholders' equity | 10,512 | 9,467 |
| Total liabilities and stockholders' equity | $730,144 | $429,316 |



*The accompanying notes are an integral part of the consolidated financial statements.*

SG 0063016

"Confidential Material-Subject to Protective Order"

APP. 977

# CONSOLIDATED STATEMENTS OF INCOME

*Dollar amounts in thousands, except per share amounts.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Interest income: | | | |
| Loans and mortgage-backed securities | $50,399 | $25,227 | $17,217 |
| Investments and cash equivalents | 4,344 | 2,064 | 1,321 |
| | 54,743 | 27,291 | 18,538 |
| Interest expense: | | | |
| Deposits | 31,037 | 14,947 | 10,653 |
| Short-term borrowings | 10,755 | 3,310 | 1,198 |
| Long-term borrowings | 2,052 | 2,519 | 2,115 |
| | 43,844 | 20,776 | 13,966 |
| Net interest income | 10,899 | 6,515 | 4,572 |
| Provision for loan losses | 260 | 572 | 94 |
| Net interest income after provision for loan losses | 10,639 | 5,943 | 4,478 |
| Other income: | | | |
| Loan origination and commitment fees | 560 | 3,517 | 1,994 |
| Loan servicing fees | 471 | 216 | 73 |
| Net gain on sales of securities and loans | 910 | 408 | 596 |
| Service charges and fees on deposit accounts | 913 | 423 | 235 |
| Net gain (loss) on sale and operation of real estate owned | 691 | (376) | 13 |
| Other | 550 | 68 | 10 |
| Total other income | 4,095 | 4,256 | 2,921 |
| Operating expenses: | | | |
| Employee compensation and benefits | 4,621 | 3,897 | 2,583 |
| Occupancy and equipment | 2,316 | 1,153 | 702 |
| Advertising and promotion | 275 | 165 | 135 |
| Data processing | 961 | 483 | 341 |
| Depreciation and amortization | 811 | 523 | 349 |
| Amortization of intangibles | 2,021 | 462 | 372 |
| Other | 2,219 | 1,545 | 1,360 |
| Total operating expenses | 13,224 | 8,228 | 5,842 |
| Income before income taxes | 1,510 | 1,971 | 1,557 |
| Income tax provision (benefit): | | | |
| Current | 309 | 725 | 498 |
| Deferred | (84) | 27 | 124 |
| | 225 | 752 | 622 |
| Net income | $ 1,285 | $ 1,219 | $ 935 |
| Net income applicable to common shares | $ 1,060 | $ 1,016 | $ 912 |
| Net income per common share | $ 2.04 | $ 1.96 | $ 1.75 |
| Weighted average common shares outstanding | 520,468 | 518,897 | 521,667 |



*The accompanying notes are an integral part of the consolidated financial statements.*

# CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

*Dollar amounts in thousands, except per share amounts.*

**FOR THE YEARS ENDED JUNE 30, 1989, 1988 AND 1987**

| | PREFERRED STOCK | | COMMON STOCK | | ADDITIONAL PAID-IN | RETAINED |
|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | SHARES | AMOUNT | CAPITAL | EARNINGS |
| Balance, June 30, 1986 | — | — | 387,311 | $ 3,873 | $ 875 | $ 641 |
| Common shares issued for cash | | | 490 | 4 | 3 | |
| Transfer to reflect reduction in common stock par value from $10.00 to $1.00 | | | | (3,489) | 3,489 | |
| Common stock dividend (10%) | | | 38,598 | 38 | 415 | (453) |
| Cash paid for fractional shares of common stock dividend | | | | | | (2) |
| Preferred shares issued for cash, net of offering costs of $114 | 90,168 | $ 90 | | | 2,050 | |
| Net income | | | | | | 935 |
| Balance, June 30, 1987 | 90,168 | 90 | 426,399 | 426 | 6,832 | 1,121 |
| Common shares issued for cash | | | 200 | | 2 | |
| Common stock dividend (10%) | | | 42,397 | 43 | 402 | (445) |
| Cash paid for fractional shares of common stock dividend | | | | | | (2) |
| Cash dividends on preferred stock ($2.25 per share) | | | | | | (226) |
| Common shares issued upon exercise of stock options | | | 3,750 | 4 | 32 | |
| Common shares acquired and retired upon exercise of stock options | | | (2,537) | (3) | (28) | |
| Net income | | | | | | 1,219 |
| Balance, June 30, 1988 | 90,168 | 90 | 470,209 | 470 | 7,240 | 1,667 |
| Common shares issued for cash | | | 250 | | 3 | |
| Common stock dividend (10%) | | | 46,769 | 47 | 479 | (526) |
| Cash paid for fractional shares of common stock dividend | | | | | | (4) |
| Cash dividends on preferred stock ($2.50 per share) | | | | | | (225) |
| Costs to exchange Series B preferred stock for Series A | | | | | (14) | |
| Net income | | | | | | 1,285 |
| Balance, June 30, 1989 | 90,168 | $ 90 | 517,228 | $ 517 | $ 7,708 | $ 2,197 |

*The accompanying notes are an integral part of the consolidated financial statements.*





"Confidential Material Subject to Protective Order"

# CONSOLIDATED STATEMENTS OF CASH FLOWS

*Dollar amounts in thousands.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 1,285 | $ 1,219 | $ 935 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of effects of acquisitions: | | | |
| Provisions for loan and real estate owned losses | 326 | 951 | 201 |
| Net gain on sales of securities and loans | (910) | (408) | (596) |
| Interest credited to deposits | 31,243 | 18,295 | 10,676 |
| Depreciation and amortization | 2,832 | 985 | 721 |
| Deferred income taxes | (84) | 27 | 124 |
| Change in accrued interest receivable | (1,479) | (1,423) | (723) |
| Change in accrued interest payable | 889 | 358 | 209 |
| Other, net | (142) | 239 | |
| | 33,960 | 20,243 | 11,547 |
| Change in cashier's checks issued and payable | (323) | (146) | 1,432 |
| Change in prepaid expenses and other assets | (560) | (533) | 1,565 |
| Change in borrowers' reserves and accrued expenses and other liabilities | 179 | 1,478 | 457 |
| Net origination or purchase of loans pursuant to mortgage-banking operations | (16,822) | (1,637) | |
| Net cash provided by operating activities | 16,434 | 19,405 | 15,001 |
| Cash flows from investing activities, net of effects of acquisitions: | | | |
| Loans disbursed | (173,034) | (171,789) | (122,581) |
| Loan and mortgage-backed securities principal payments | 115,723 | 64,778 | 62,134 |
| Purchase of loans and mortgage-backed securities | (13,330) | (14,140) | (88,279) |
| Proceeds from sales of loans and mortgage-backed securities | 12,411 | 14,389 | 68,198 |
| Purchase of investments | (8,238) | (28,725) | (24,607) |
| Proceeds from sales and maturities of investments | 20,807 | 13,347 | 30,171 |
| Purchase of office properties and equipment | (926) | (2,625) | (897) |
| Proceeds from sales of real estate owned | 4,962 | 1,830 | 934 |
| Net liabilities assumed as part of Tri-Cities acquisition | | 11,730 | |
| Deposit liabilities assumed as part of branch acquisitions | | 47,453 | 3,244 |
| Purchase of loan servicing rights | (826) | | |
| Other, net | | (310) | |
| Net cash used in investing activities | (42,451) | (64,062) | (71,683) |

*Continued on page 22.*



*The accompanying notes are an integral part of the consolidated financial statements.*



"Confidential Material-Subject to Protective Order"

# CONSOLIDATED STATEMENTS OF CASH FLOWS, CONTINUED

*Dollar amounts in thousands.*

| FOR THE YEARS ENDED JUNE 30, | 1989 | 1988 | 1987 |
|---|---|---|---|
| Cash flows from financing activities, net of effects of acquisitions: | | | |
| Net change in NOW, passbook and money market deposits | $ (25,252) | $ (948) | $ 9,759 |
| Proceeds from sales of certificates of deposit | 488,596 | 245,574 | 160,152 |
| Payments for maturing certificates of deposit | (496,588) | (238,156) | (155,107) |
| Advances from the Federal Home Loan Bank | 101,000 | 54,000 | 14,300 |
| Repayment of Federal Home Loan Bank advances | (88,800) | (44,650) | (11,000) |
| Net change in securities sold subject to repurchase agreements | 40,153 | 24,142 | 22,366 |
| Issuance of preferred stock | | | 2,140 |
| Cash dividends on preferred stock | (225) | (226) | |
| Net cash provided by financing activities | 18,884 | 39,736 | 42,610 |
| Cash and cash equivalents acquired as part of acquisitions | 13,640 | 21,320 | |
| Net increase (decrease) in cash and cash equivalents | 6,507 | 16,399 | (14,072) |
| Cash and cash equivalents at beginning of year | 19,157 | 2,758 | 16,830 |
| Cash and cash equivalents at end of year | $ 25,664 | $ 19,157 | $ 2,758 |
| Supplemental disclosures: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 11,320 | $ 12,260 | $ 13,755 |
| Income taxes | $ 120 | $ 201 | $ 498 |
| Loans swapped for mortgage-backed securities | $ 54,430 | $ 8,232 | $ 8,128 |
| Loans converted into real estate owned | $ 5,359 | $ 2,202 | $ 1,478 |
| Assets acquired and liabilities assumed as part of Central Evergreen acquisition | $ 248,883 | | |



*The accompanying notes are an integral part of the consolidated financial statements.*

SG 0063020

APP. 981

"Confidential Material-Subject to Protective Order"

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*All dollar amounts in thousands, except per share amounts.*

### 1. SIGNIFICANT ACCOUNTING POLICIES:

The accounting and financial reporting policies of Sterling Savings Association (the "Association") and its subsidiaries conform to generally accepted accounting principles and to general practice within the savings and loan industry. The following is a description of the Association's significant accounting policies.

#### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Association and all of its wholly and majority-owned subsidiaries.

The purchase price of acquired companies has been allocated to the assets and liabilities acquired based upon their estimated fair values at the date of acquisition. Results of operations of acquired companies are included in the accompanying financial statements only since the dates of acquisition. All significant intercompany accounts and transactions have been eliminated in consolidation.

#### Investments and Mortgage-Backed Securities

Investments are carried at cost, adjusted for amortization of premiums or accretion of discounts. Mortgage-backed securities are carried at their remaining unpaid principal balance, net of unamortized premium or unaccreted discount. These securities are held for long-term investment purposes and, accordingly, are not adjusted for temporary declines in market value. Premiums are amortized and discounts are accreted using the level interest yield method over the estimated remaining term of the underlying security. Gains and losses on sales of investments and mortgage-backed securities are recognized based on specific identification.

#### Provision for Loan Losses

A provision for possible loan losses, when determined necessary, is charged to income based on management's evaluation of the potential losses that may occur in its loan portfolio. Such evaluation, which includes a review of all loans which may not be fully collectible, considers, among other matters, the estimated net realizable value of the underlying collateral.

#### Real Estate Owned

Property acquired by foreclosure or deed in lieu of foreclosure is recorded at the lower of estimated fair value, based on appraisal of such properties, or the principal balance of the defaulted loan. Development, improvement and direct holding costs relating to the property are capitalized. The carrying value of such properties is continuously evaluated and, if necessary, allowances are established to reduce the carrying value to net realizable value (which considers, among other things, provisions for estimated direct holding costs and selling expenses).

#### Office Properties and Equipment

Office properties and equipment are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for new properties and equipment and major renewals or betterments are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. When property or equipment is sold or retired, the cost and related accumulated depreciation are removed from the respective accounts, and the resulting gains or losses are reflected in income.

*Continued on page 24*



"Confidential Material-Subject to Protective Order"

### Loan Origination and Commitment Fees

Effective July 1, 1988, the Association prospectively adopted the provisions of Statement of Financial Accounting Standards No. 91 - Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans ("SFAS No. 91"). This new standard has substantially revised the Association's method of accounting for loan origination fees, which under previous accounting principles were deferred only to the extent that they exceeded the direct costs of underwriting and closing loans. For all lending transactions entered into on or after July 1, 1988, the total loan origination fee, net of certain specifically defined direct loan origination costs, is deferred. The net amount deferred is recognized as interest income using the level interest yield method over the contractual term of each loan as an adjustment of yield. If the related loan is sold, the remaining net amount deferred, which is part of the basis of the loan, is used in determining the gain or loss on sale.

Loan commitment fees are deferred until the expiration of the commitment period unless management believes there is a remote likelihood that the underlying commitment will be exercised, in which case the fees are amortized to fee income using the straight-line method over the commitment period. If a loan commitment is exercised, the deferred commitment fee is accounted for in the same manner as a loan origination fee. Deferred commitment fees associated with expired commitments are recognized as fee income.

During the year ended June 30, 1989, the effect of adopting SFAS No. 91 was to decrease income before income taxes and net income by $275 and $182, respectively. This decrease resulted in a $.35 decrease in net income per share during the year ended June 30, 1989.

### Income Per Share

Net income per share is equal to net income, reduced by dividends earned on preferred stock during the year ($225, $203 and $23 for the years ended June 30, 1989, 1988 and 1987, respectively), divided by the weighted average number of shares of common stock and common stock equivalents (stock options) outstanding during each year. All weighted average shares outstanding and per share amounts have been retroactively restated to reflect all stock dividends.

### Intangibles

Identified intangibles are amortized on a straight-line basis over the estimated life of the acquired depositor relationships (eight years). Unidentified intangibles are amortized using the level interest yield method over the estimated remaining life (assuming prepayments) of the long-term interest-bearing assets (loans receivable and mortgage-backed securities) acquired (generally a total of twelve years, with the substantial majority of the unidentified intangible being amortized in the first four years).

### Mortgage Banking Operations

The Association originates or purchases and sells loans and participating interests in loans, generally with the servicing rights retained, to provide additional funds for general corporate purposes and to generate servicing income. Loans and participating interests therein committed or held for sale are carried at the lower of cost or market value.

The Association recognizes a gain or loss on these loan sale transactions which includes a component reflecting the differential between the contractual interest rate of the loan and the interest rate which will be received by the investor in the servicing agreement. The present value of the estimated future profit for servicing the loans, together with the normal servicing fee rate ("deferred premium"), is taken into account in determining the amount of gain or loss on the sale of loans. At June 30, 1989 and 1988, net deferred premiums on loans sold of $536 and $145, respectively, were included in prepaid expenses and other assets.

The portion of the purchase price of individual loans representing the cost of acquiring the right to service those loans is capitalized if there is a definitive plan to immediately sell the loans. The amount capitalized is subject to certain limitations based on the present value of the estimated future stream of net servicing income (assuming loan prepayments), and the recognition of a gain on the loan sale transaction. The right to service loans can also be an identified intangible asset acquired in a business combination. At June 30, 1989 and 1988, total net capitalized costs related to purchased servicing rights of $2,732 and $99, respectively, were included in intangibles. The net capitalized amount at June 30, 1989 includes $1,864 of loan servicing rights acquired with Central Evergreen (see note 13a).

Deferred premiums on loan sales and the capitalized costs of purchased servicing rights are both amortized



"Confidential Material-Subject to Protective Order"

to expense in proportion to the estimated future stream of net servicing income, assuming loan prepayments (total amortization period is generally twelve years, with the substantial majority of the asset being amortized in the first four years). During the year ended June 30, 1989, amortization of deferred premiums and capitalized costs of purchased servicing rights was $28 and $193, respectively.

Premiums paid in connection with option transactions, entered into as an anticipatory hedge of movement in interest rates in connection with mortgage-banking operations, are deferred and amortized to expense over the option period.

**Cash Equivalents**

The Association considers a cash equivalent to be any highly liquid debt instrument purchased with an original maturity of three months or less.

**Reclassifications**

Certain prior year balances have been reclassified to conform with the 1989 presentation. These reclassifications had no effect on retained earnings or net income as previously reported.

## 2. INVESTMENTS:

A summary of carrying and market values of investments follows:

| | June 30, 1989 | | June 30, 1988 | |
|---|---|---|---|---|
| | Carrying Value | Market Value | Carrying Value | Market Value |
| U.S. Government and agency obligations | $23,305 | $23,053 | $25,007 | $24,349 |
| Federal Home Loan Bank stock, at cost | 7,563 | 7,563 | 4,528 | 4,528 |
| Corporate notes | 642 | 645 | | |
| Other | 129 | 129 | 64 | 64 |
| | $31,639 | $31,390 | $29,599 | $28,941 |

SG 0063023

"Confidential Material-Subject to Protective Order"

## 3. LOANS RECEIVABLE:

The components of loans receivable are:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Real estate loans: | | |
| Variable rate residential mortgage loans | $148,403 | $ 68,402 |
| Fixed rate residential mortgage loans | 82,547 | 94,710 |
| Residential mortgage loans purchased | 8,393 | 1,600 |
| Loans insured by FHA/VA | 18,548 | 9,440 |
| Variable rate commercial real estate loans | 91,732 | 47,004 |
| Fixed rate commercial real estate loans | 43,038 | 28,315 |
| Commercial real estate loans purchased | 8,414 | 6,262 |
| Construction loans | 81,369 | 56,965 |
| Participation in loans sold | 2,510 | 2,506 |
| Contracts receivable | 2,724 | 1,509 |
| Unearned discount on certain loans | (56) | (52) |
| | 487,622 | 316,661 |
| Other loans: | | |
| Commercial loans | 21,590 | 15,979 |
| Commercial and personal lines of credit | 9,451 | 8,331 |
| Consumer loans | 11,987 | 6,001 |
| Loans secured by deposits | 2,820 | 994 |
| | 45,848 | 31,305 |
| Total loans | 533,470 | 347,966 |
| Undisbursed portion of loans in process | (26,467) | (38,306) |
| Deferred loan fees, net of direct loan origination costs | (1,243) | (493) |
| Discount on loans acquired pursuant to purchase transactions | (2,529) | (989) |
| Allowance for potential loan losses | (6,450) | (3,770) |
| | $496,781 | $304,408 |

At June 30, 1989, 1988 and 1987, the Association serviced loans for the benefit of others amounting to $315,377, $59,904 and $41,857, respectively, which are not included in the amounts above.

Included in loans receivable at June 30, 1989 and 1988 are loans held for sale totalling $18,459 and $1,637, respectively. The cost basis of these loans materially equals their market value.

At June 30, 1989, contractual principal repayments of loans receivable are due approximately as follows:

| Year Ending June 30, | |
|---|---|
| 1990 | $125,568 |
| 1991-1994 | 66,085 |
| Thereafter | 341,817 |
| | $533,470 |

Included in loans receivable are loans to directors and executive officers, all of which are conforming residential, commercial and consumer loans. Following is an analysis of the activity in loans to directors and executive officers:

| | Year Ended June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Balance, beginning of year | $806 | $734 | $611 |
| Additions | 56 | 118 | 169 |
| Repayments | (67) | (46) | (46) |
| Balance, end of year | $795 | $806 | $734 |

## 4. REAL ESTATE OWNED:

The components of real estate owned are:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Residential real estate, acquired through foreclosure (including $2,095 and $1,178 from acquired institutions - see note 13) | $ 3,323 | $1,409 |
| Commercial real estate, acquired through foreclosure (including $7,565 and $5,101 from acquired institutions - see note 13) | 12,582 | 5,742 |
| Association branch building held for sale | 784 | |
| Other | 466 | |
| | 17,155 | 7,151 |
| Allowance for potential losses | (819) | (347) |
| | $16,336 | $6,804 |

Costs incurred to acquire and improve real estate of $386 and $73 had been capitalized as of June 30, 1989 and 1988, respectively.







"Confidential Material-Subject to Protective Order"

Included in commercial real estate at June 30, 1989 and 1988 is $2,188 and $4,165, respectively, related to properties for which FSLIC has indemnified the Association for 75% of any capital losses and guaranteed the Association a minimum yield (see note 13b). During the year ended June 30, 1989, the Association received $299 for loss indemnification and $600 for yield subsidies from FSLIC relating to this real estate and certain loans.

## 5. ALLOWANCES FOR POTENTIAL LOAN AND REAL ESTATE OWNED LOSSES:

Following is an analysis of the changes in the allowances for potential loan and real estate owned losses:

| | Loan | Real Estate Owned | Total |
|---|---|---|---|
| Balance, June 30, 1986 | $ 796 | $ 106 | $ 902 |
| Provision for 1987 | 94 | 107 | 201 |
| Amounts written off | (725) | (127) | (852) |
| Recoveries | 20 | 20 | 40 |
| Balance, June 30, 1987 | 185 | 106 | 291 |
| Provision for 1988 | 572 | 379 | 951 |
| Amounts written off | (128) | (143) | (271) |
| Recoveries | 19 | 5 | 24 |
| Allowance for losses on assets acquired | 3,122 | | 3,122 |
| Balance, June 30, 1988 | 3,770 | 347 | 4,117 |
| Provision for 1989 | 260 | 66 | 326 |
| Amounts written off | (1,590) | (268) | (1,858) |
| Recoveries | 50 | 304 | 354 |
| Allowance for losses on assets acquired | 3,960 | 370 | 4,330 |
| Balance, June 30, 1989 | $ 6,450 | $ 819 | $ 7,269 |

Following is a summary of loans that are not performing in accordance with their original contractual terms:

| | June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Nonaccrual loans (1) | $15,619 | $6,098 | $4,574 |
| Accruing loans which are past due 90 days or more | 125 | 2,357 | 1,759 |
| Restructured loans (2) | 1,516 | 672 | 1,197 |
| Total nonperforming loans | $17,260 | $9,127 | $7,530 |

(1) The accrual of interest is stopped on any loan when either principal or interest becomes 90 days past due, unless it meets specific criteria. Any accrued and uncollected interest is eliminated from income at that time. A loan may be put in nonaccrual status sooner than this standard would dictate if, in management's judgment, that loan may be uncollectible. Such interest is then recognized as income only if it is ultimately collected.

Included in nonaccrual loans at June 30, 1989 and 1988 is $12,434 and $2,782, respectively, relating to acquired institutions (see note 13).

(2) Restructured loans occur when the Association has compromised the contractual loan terms to provide a reduction in the rate of interest and, in most instances, an extension of payments of principal or interest, or both, because of a deterioration in the financial position of the borrower. Restructured loans performing in accordance with their new terms are not included in nonaccrual loans unless concern exists as to the ultimate collection of principal or interest.

Additional gross interest income of $1,065 would have been recorded during the year ended June 30, 1989 if nonaccrual and restructured loans had been current in accordance with their original contractual terms. Interest income of $196 was recorded during the year ended June 30, 1989 in connection with these loans.

In addition to the above loans, certain other loans totalling approximately $5,669 at June 30, 1989 are presently performing in accordance with their terms, but, in the opinion of management, there is some doubt as to the ability of the borrowers to comply with the repayment terms in the future. While management does not anticipate any losses not already provided for on these loans, economic conditions may be such as to necessitate future modifications in the repayment terms.





"Confidential Material-Subject to Protective Order"

## 6. OFFICE PROPERTIES AND EQUIPMENT:

The components of office properties and equipment are:

| | June 30, 1989 | June 30, 1988 | Estimated Useful Life |
|---|---|---|---|
| Buildings and improvements | $ 6,904 | $4,473 | 20-40 years |
| Furniture, fixtures and equipment | 4,240 | 3,384 | 3-10 years |
| Automobiles | 118 | 107 | 3-5 years |
| Leasehold improvements | 467 | 324 | 5-10 years |
| Equipment under capital lease | 82 | 82 | 5 years |
| | 11,811 | 8,370 | |
| Less accumulated depreciation and amortization | 3,254 | 2,475 | |
| | 8,557 | 5,895 | |
| Land | 2,170 | 1,038 | |
| | $10,727 | $6,933 | |

## 7. DEPOSITS:

The components of deposits are:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Commercial NOW accounts (non-interest-bearing) | $ 4,389 | $ 2,410 |
| 5.25% NOW accounts | 30,555 | 16,669 |
| 5.50% passbook accounts | 46,076 | 26,469 |
| Money market demand accounts (5.25% to 6.15%) | 34,958 | 36,799 |
| | 115,978 | 82,347 |
| Certificate accounts: | | |
| 5.00 to 5.99% | 244 | 1,166 |
| 6.00 to 6.99% | 3,183 | 39,556 |
| 7.00 to 7.99% | 88,688 | 139,128 |
| 8.00 to 8.99% | 144,869 | 21,105 |
| 9.00 to 9.99% | 143,686 | 9,687 |
| 10.00 to 10.99% | 15,127 | 3,478 |
| 11.00 to 11.99% | 4,555 | 6,045 |
| 12.00% and over | 2,987 | 2,709 |
| | 403,339 | 222,874 |
| Net premium on deposits assumed pursuant to purchase transactions | 665 | 931 |
| | $519,982 | $306,152 |

At June 30, 1989, the amounts of scheduled maturities of certificate accounts were as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1990 | 8.76% | $333,346 |
| 1991 | 8.43% | 40,994 |
| 1992 | 8.43% | 10,013 |
| 1993 | 8.62% | 2,206 |
| Thereafter | 9.57% | 16,780 |
| | 8.75% | $403,339 |

At June 30, 1989, mortgage-backed securities with a carrying value of $19,825 were pledged as collateral for wholesale public funds deposits in accordance with Washington Public Deposit Protection Commission regulations.

The components of interest expense on deposits are:

| | Year Ended June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| NOW accounts | $ 1,233 | $ 584 | $ 281 |
| Passbook accounts | 2,082 | 1,128 | 734 |
| Money market demand accounts | 2,081 | 1,495 | 1,398 |
| Certificate accounts | 25,641 | 11,740 | 8,240 |
| | $31,037 | $14,947 | $10,653 |



S G0063026



"Confidential Material-Subject to Protective Order"

## 8. ADVANCES FROM FEDERAL HOME LOAN BANK:

The advances from the Federal Home Loan Bank at June 30, 1989 are repayable as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1990 | 9.59% | $61,000 |
| 1991 | 9.64% | 15,582 |
| 1992 | 10.13% | 5,000 |
| 1993 | 9.04% | 9,849 |
| Thereafter | 8.14% | 5,149 |
| | 9.49% | $96,580 |

Stock of the Federal Home Loan Bank, U.S. Government obligations, qualifying real estate loans, and mortgage-backed securities, in an amount equal to at least 155% of outstanding advances, are pledged as collateral for the advances. At June 30, 1989, required collateral was $150,195. Assets eligible for collateral, none of which have been specifically identified as such, are approximately as follows:

| | |
|---|---|
| Qualifying real estate loans | $321,784 |
| Mortgage-backed securities | 5,968 |
| FHLB stock and U.S. Government obligations | 30,107 |
| | 357,859 |
| Required collateral | 150,195 |
| Available collateral in excess of requirement | $207,664 |

## 9. SECURITIES SOLD SUBJECT TO REPURCHASE AGREEMENTS:

The Association enters into sales of securities under agreements to repurchase (reverse repurchase agreements). Fixed-coupon reverse repurchase agreements are treated as financings, and the obligations to repurchase securities sold are reflected as a liability in the balance sheet. The dollar amount of securities underlying the agreements remains in the applicable asset accounts. At June 30, 1989, securities sold subject to repurchase agreements (all of which call for repurchasing the same security) included investments and mortgage-backed securities with an aggregate carrying value of $97,582 (aggregate market value of $96,792). These agreements had a weighted-average interest rate of 9.98%, and all mature within sixty days. Substantially all of the Association's reverse repurchase agreements at June 30, 1989 were transacted with the Federal Home Loan Mortgage Corporation ("FHLMC"). The mortgage-backed securities underlying the agreements are being held by FHLMC. The average balance of securities sold subject to repurchase agreements was approximately $70,502 during the year ended June 30, 1989. The maximum amount outstanding at any month-end during the year ended June 30, 1989 was $87,977.

## 10. INCOME TAXES:

The Association and its subsidiaries file a single consolidated income tax return. The Association is permitted under the Internal Revenue Code to deduct an annual addition to a reserve for bad debts ("bad debt deduction") in determining taxable income, subject to certain limitations. This addition differs from the provision for loan losses recorded for financial statement purposes. Bad debt deductions for income tax purposes are included in taxable income of later years only if the accumulated bad debt reserves are subsequently used for purposes other than to absorb bad debt losses. Because the Association does not intend to use the reserves for purposes other than to absorb losses, no deferred income taxes have been provided on the bad debt deductions taken. Retained earnings at June 30, 1989 includes $1,323, which represents the tax effect of accumulated bad debt reserves on which no deferred income taxes have been provided.

The Association's effective tax rate differs from the statutory income tax rate for the following reasons:

| | Year Ended June 30, 1989 | 1988 | 1987 |
|---|---|---|---|
| Income tax provision at federal statutory rate | $ 513 | $670 | $ 716 |
| Tax effect of: | | | |
| Bad debt deduction | (503) | (28) | (234) |
| Amortization of adjustments to fair market value and intangibles arising from purchase acquisitions | 562 | 107 | 106 |
| Discount attributed to acquired investments, loans, mortgage-backed securities and office properties sold | (148) | (20) | |
| Tax-exempt yield subsidy payments received from FSLIC | (204) | | |
| Other, net | 5 | 23 | 34 |
| | $ 225 | $752 | $ 622 |



*Continued on page 30.*

"Confidential Material-Subject to Protective Order"

The components of the deferred income tax provision (benefit) are:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1989 | 1988 | 1987 |
| Former use of cash basis accounting for tax purposes | $ (50) | $(50) | $ 13 |
| Equity in loss of partnership | 9 | 38 | 84 |
| Tax depreciation greater than book depreciation | 112 | 59 | 36 |
| Deferred loan fees recognized for tax purposes | (49) | (51) | |
| Adjustment of prior year classifications of current and deferred tax liabilities | (106) | 31 | (9) |
| | $ (84) | $ 27 | $124 |

As a result of the acquisitions of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") and Tri-Cities Savings and Loan Association ("Tri-Cities") (see note 13), the Association became entitled to utilize their tax basis net operating loss carryforwards to reduce consolidated taxable income earned subsequent to the dates of acquisition. Pursuant to an assistance agreement executed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), the Association agreed to refund to FSLIC 50% of the tax benefit resulting from the utilization of the Tri-Cities net operating loss carryforwards. The Association further agreed to refund to FSLIC 100% of the tax benefit resulting from capital losses on certain Tri-Cities assets for which the Association is partially indemnified by FSLIC. The Association's share of the tax benefit resulting from the utilization of acquired net operating loss carryforwards, which was $78 during the year ended June 30, 1989, is recorded as a retroactive reduction of the unidentified intangible assets acquired. If the unidentified intangible asset acquired is reduced to zero, any further tax benefit is recorded as a reduction of the identified intangible asset or long-term interest-bearing assets (loans receivable) acquired. The tax basis net operating loss carryforwards remaining at June 30, 1989 expire as follows:

| Year Ending June 30, | Association Portion | FSLIC Portion |
|---|---|---|
| 1991 | $ 5,226 | $ 923 |
| 1992 | 3,593 | |
| 1993 | 196 | 196 |
| 2002 | 3,333 | 1,555 |
| 2003 | 3,406 | |
| | $15,754 | $2,674 |

In December, 1987, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 96 - Accounting for Income Taxes ("SFAS No. 96"). This new standard requires that an asset and liability approach be used to account for and report income taxes for financial statement purposes. SFAS No. 96 will require the Association to recognize a current or deferred tax liability for the tax consequences of all events recognized in the financial statements. The new standard represents a significant change in accounting for the effects of deferred taxes and business combinations. Under SFAS No. 96, deferred taxes will be based on the difference between the tax bases of assets and liabilities (including those acquired or assumed in conjunction with purchase business combinations) and their amounts for financial statement purposes. SFAS No. 96 will require the Association to make a deferred tax adjustment for any remaining acquired assets and assumed liabilities to which purchase accounting tax adjustments were made in prior business combinations. The Association will be required to recompute its tax liabilities if the tax rates change, and to recognize the effect thereof in income. The Association has not yet determined the effects of adopting this new standard.

The Association presently must adopt the requirements of SFAS No. 96 no later than July 1, 1990. However, the FASB recently announced that it intends to defer the required implementation date of SFAS No. 96 for a minimum of nine more months, which would then require the Association to adopt the new standard during its year ending June 30, 1992. The FASB further announced that it is continuing to explore several possibly significant amendments to SFAS No. 96.

## 11. EMPLOYEE SAVINGS PLAN:

The Association maintains an employee savings plan under section 401(k) of the Internal Revenue Code. Substantially all employees are eligible to participate in the plan subject to certain requirements. Under the plan, employees may elect to contribute up to 8% of their salary and the Association will make a matching contribution equal to 25% of the employee's contribution. Employee contributions vest immediately, while employer contributions vest at the rate of 10% per year. Each employee may make a supplemental contribution of an additional 2% of their salary. Employees have the option of directing that their contributions be invested in a fixed income security account, an equity security account or the Association's



"Confidential Material-Subject to Protective Order" 

common stock. During the years ended June 30, 1989, 1988 and 1987, the Association contributed $37, $31 and $21, respectively, to the plan.

## 12. COMMITMENTS:

At June 30, 1989, the Association had loan commitments to borrowers and brokers totalling $17,918, including $15,975 for fixed rate loans and $1,943 for variable rate loans. Substantially all loan commitments which have interest rates that float with the market until closing or until committed for sale in the secondary market. Additionally, the undisbursed portion of loans in process was $26,467 at June 30, 1989. Commitments, which are disbursed subject to certain limitations, extend over various periods of time, with the majority of funds being disbursed within a twelve-month period.

At June 30, 1989, the Association had made available various secured and unsecured commercial and personal lines of credit of approximately $13,572, of which the undisbursed portion is approximately $4,121.

Rental expense for office properties under operating leases was $785, $336 and $133 for the years ended June 30, 1989, 1988 and 1987, respectively. Future minimum rental commitments as of June 30, 1989, under noncancelable operating leases with initial or remaining terms of more than one year, are as follows:

| Year Ending June 30, | |
|---|---|
| 1990 | $ 846 |
| 1991 | 498 |
| 1992 | 410 |
| 1993 | 396 |
| 1994 | 330 |
| Thereafter | 3,521 |
| | $6,001 |

Future minimum rental payments receivable under noncancelable operating subleases with initial or remaining terms of more than one year are $277 at June 30, 1989.

## 13. ACQUISITIONS:

### a. Central Evergreen Federal Savings and Loan Association

On December 31, 1988, the Association acquired all of the outstanding stock of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") of Chehalis, Washington, in exchange only for assuming its outstanding liabilities. The acquisition was conducted under the auspices and supervision of the Federal Home Loan Bank Board ("FHLBB"), but involved no assistance or other indemnification. As part of the acquisition, the FHLBB has provided a "certification of insolvency" for Central Evergreen, which allows the Association to utilize Central Evergreen's tax basis net operating loss carryforwards.

This acquisition has been accounted for as a purchase and, accordingly, the assets acquired and liabilities assumed have been recorded based on their estimated fair market values at December 31, 1988. The excess of the liabilities assumed over the assets acquired has been recorded as an unidentified intangible asset. The estimated fair market values of the assets acquired and liabilities assumed are summarized as follows:

| | |
|---|---|
| Cash and cash equivalents | $ 13,640 |
| Investments | 14,423 |
| Loans receivable | 171,379 |
| Mortgage-backed securities | 12,566 |
| Accrued interest receivable | 1,076 |
| Office properties and equipment | 3,693 |
| Real estate owned | 9,362 |
| Identified intangibles | 8,480 |
| Unidentified intangible | 13,603 |
| Prepaid expenses and other assets | 661 |
| Total assets | $248,883 |
| Deposits | $215,992 |
| Advances from Federal Home Loan Bank | 27,232 |
| Cashier's checks issued and payable | 1,829 |
| Borrowers' reserves for taxes and insurance | 445 |
| Other liabilities | 3,385 |
| Total liabilities | $248,883 |

The discounts of $1,926 and $606 resulting from recording the Central Evergreen loans receivable and mortgage-backed securities, respectively, at their estimated fair market values, and the unidentified intangible, are being amortized to income using the

*Continued on page 32.*





"Confidential Material-Subject to Protective Order"

level interest yield method over the estimated average remaining life, assuming prepayments, of the loans and mortgage-backed securities acquired. The discounts of $472 resulting from recording the Central Evergreen deposits and borrowings at their estimated fair market values are being amortized to income using the level interest yield method over the periods in which the actual underlying deposits and borrowings are scheduled to mature (up to eight years). The premium of $1,096 resulting from recording the Central Evergreen office properties and equipment at their estimated fair market values is being amortized to income using the straight-line method over the remaining lives of the office properties and equipment acquired. A total of $8,480 was allocated to identified intangibles, including $6,480 relating to existing depositor relationships and $2,000 relating to loan servicing rights. The identified intangible related to the depositor relationships is being amortized to income on a straight-line basis over its estimated life. The identified intangible related to the acquired servicing rights is being amortized to income in proportion to the estimated future stream of net servicing income, assuming loan prepayments.

The results of operations of Central Evergreen are included in the Association's consolidated statement of income only for the period subsequent to December 31, 1988. Unaudited pro forma highlights of the consolidated results of operations of the Association assuming the acquisition of Central Evergreen had taken place on July 1, 1987 are summarized in the table below. The pro forma results are not necessarily indicative of the actual results that would have occurred had the acquisition taken place on July 1, 1987.

| | Year Ended June 30, | |
|---|---|---|
| | 1989 | 1988 |
| Interest income | $65,221 | $47,156 |
| Net income (loss) | $ 325 | $ (931) |
| Net income (loss) per share | $ .62 | $ (1.79) |

**b. Tri-Cities Savings and Loan Association**

On April 8, 1988, the Association acquired substantially all of the assets and assumed the liabilities of Tri-Cities Savings and Loan Association ("Tri-Cities") of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("FSLIC"). The acquisition was accounted for as a purchase. Pursuant to an agreement executed with FSLIC, the Association received a cash assistance payment of $11,730 from FSLIC. As part of the assistance agreement, FSLIC agreed to indemnify the Association for 75% of any capital losses on certain assets until the Association's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. FSLIC further agreed to guarantee a minimum yield to the Association on this same group of assets. FSLIC also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years. As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. The Association agreed to refund to FSLIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

**c. Great American Bank Branches**

On February 5, 1988, the Association acquired six Washington branches of Great American Bank, F.S.B. The Association assumed deposit liabilities and accrued interest thereon of $47,548 and the lease obligations on two branch buildings. In consideration thereof, the Association received all loans secured by the acquired deposits, four branch buildings, the equipment at all six branches, and a net cash payment of $45,560. This transaction was accounted for as a purchase and, accordingly, the liabilities assumed and assets acquired were recorded based on their estimated fair market values at February 5, 1988.

**d. Effect of Acquisitions on Income**

The amortization of adjustments to fair market value and intangible assets relating to all purchase acquisitions reduced the Association's income before income taxes by $1,652, $292 and $231 during the years ended June 30, 1989, 1988 and 1987, respectively. In addition, discounts relating to acquired investments, loans and mortgage-backed securities which were sold subsequent to acquisition reduced the basis of such investments, loans and mortgage-backed securities and increased income before income taxes by $435 and $60 during the years ended June 30, 1989 and 1988, respectively. There were no such asset sales during the year ended June 30, 1987.







"Confidential Material-Subject to Protective Order"

## 14. PREFERRED STOCK:

Each share of preferred stock currently outstanding (Series B) entitles its holder to (a) an annual cash dividend of $2.50 per share, (b) receive up to $25.00 per share plus accumulated unpaid dividends in the event of involuntary or voluntary liquidation, and (c) beginning March 31, 1991, convert each preferred share into 2.2 shares of common stock. Each preferred share is also convertible into 2.2 shares of common stock at the option of the Association beginning March 31, 1991. Dividends on the preferred shares are cumulative and must be paid before any distributions to holders of common stock.

## 15. INCENTIVE STOCK OPTIONS:

The Association has granted options to purchase shares of its common stock as summarized in the table below. All options granted become exercisable one year after the date of grant (all options outstanding are exercisable at June 30, 1989).

| | Number of Shares (A) | Option Price Per Share (B) | Expiration Date |
|---|---|---|---|
| Balance, June 30, 1986 | 20,656 | $7.68-$7.75 | 1988-1995 |
| Options granted | 2,750 | $10.21 | 1990 |
| Options granted | 2,000 | $10.21 | 1996 |
| Options granted | 1,000 | $10.13 | 1991 |
| Balance, June 30, 1987 | 26,406 | $7.68-$10.21 | 1988-1996 |
| Options granted | 7,000 | $9.72 | 1991 |
| Options granted | 5,344 | $9.72 | 1997 |
| Options exercised | (3,750) | $7.75 | 1988 |
| Balance, June 30, 1988 | 35,000 | $7.68-$10.21 | 1989-1997 |
| Options granted | 9,500 | $9.90 | 1992 |
| Options granted | 4,000 | $9.90 | 1998 |
| Balance, June 30, 1989 | 48,500 | $7.68-$10.21 | 1989-1998 |

(A) Stock options for a total of 22,406 shares have been granted in tandem with a corresponding number of stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock, above the option price, at the date of exercise. Payment is to be made in cash or in the form of newly issued common stock, or any combination thereof. The exercise of either rights or options serves to cancel the other. Total compensation expense of $15 is accrued at June 30, 1989 in connection with these stock appreciation rights.

(B) The exercise price associated with all options has been retroactively adjusted to recognize the effects of all stock dividends.

## 16. REGULATORY CAPITAL:

In connection with the insurance of its deposits by FSLIC, the Association is required to maintain a minimum level of regulatory capital (see Note 17b). Failure to maintain this minimum level of regulatory capital may result in regulatory action to limit operations of the Association.

Regulatory capital as computed under the current regulations of the Federal Home Loan Bank Board and FSLIC differs from total stockholders' equity as reported on the consolidated balance sheets at June 30, 1989 and 1988, as follows:

| | June 30, 1989 | June 30, 1988 |
|---|---|---|
| Total stockholders' equity | $10,512 | $ 9,467 |
| FSLIC assistance payments | 13,480 | 13,480 |
| Adjustment to the amortization of fair market value adjustments and intangibles, arising from acquisitions, under FHLBB regulations | (277) | 233 |
| Regulatory capital | 23,715 | 23,180 |
| Minimum regulatory capital required | 21,612 | 13,742 |
| Regulatory capital in excess of minimum required | $ 2,103 | $ 9,438 |



"Confidential Material-Subject to Protective Order" SG 0063030

## 17. SUBSEQUENT EVENTS:

### a. Great American Bank Branch Acquisition

On July 11, 1989, the Association entered into a definitive agreement to acquire two branches of Great American Bank, F.S.B. located in Spokane and Richland, Washington. The agreement calls for the Association to assume all deposit liabilities and accrued interest thereon at both branches of approximately $29,500, and the lease obligation at one branch building. In consideration thereof, the Association will receive one branch building, the equipment at both branches, and a net cash payment of approximately $29,000. The transaction is subject to regulatory approval.

### b. Financial Institutions Reform, Recovery and Enforcement Act

On August 9, 1989, the President of the United States signed into law the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which addresses problems of the FSLIC and the thrift regulatory environment. The physical size and scope of the FIRREA bill is significant, and the Association is presently in the midst of a detailed analysis and evaluation of the implications of the legislation. Among other provisions, there are new regulatory capital requirements in FIRREA that will require that minimum levels of capital be maintained under three different standards: a leverage limit, a "tangible" capital requirement, and a "risk-based" capital requirement. Actual regulations specifically defining how capital will be calculated under each standard, including a number of components, limitations and exceptions, must be written and promulgated by the new Office of Thrift Supervision ("OTS") before November 7, 1989, with the new minimum requirements then becoming effective on December 7, 1989.

Although the Association is in compliance with existing regulatory capital requirements at June 30, 1989, management believes that it may not be in compliance with the new minimum capital requirements of FIRREA when they become effective. This potential noncompliance under FIRREA is due to substantial portions of the Association's intangible assets, virtually all of which resulted from "supervisory" acquisitions, and which must now be subtracted from existing stockholder's equity in determining regulatory capital.

Should the Association not be in compliance when the new regulations become effective, it would be able to apply for a temporary exemption until January 1, 1991. If the Association is not in compliance with regulatory capital requirements at January 1, 1991, it would be able to apply for a further exemption, pursuant to which the only sanction for noncompliance would be restrictions on asset growth. Management believes the Association will be eligible for such exemptions under the standards set forth in FIRREA.

Management of the Association is pursuing a plan for increasing its regulatory capital to enable compliance with the new FIRREA requirements. The specific components of the plan include a stock offering (see note 17c) and achieving the profitability goals set forth in its existing business plan, but management is also investigating other alternatives for improving its capital ratios. If this plan is achieved, management believes, based on its preliminary understanding of the new legislation, that the Association will be in compliance with the minimum capital requirements of FIRREA by January 1, 1991.

### c. Stock Offering

The Association has signed a letter of intent with an underwriter for a public offering of preferred and common stock. Assuming favorable market conditions exist, any potential offering would commence after receiving the appropriate clearances from regulatory and securities authorities.



"Confidential Material-Subject to Protective Order" 

## 18. QUARTERLY FINANCIAL DATA (UNAUDITED):

Unaudited quarterly results of operations for the years ended June 30, 1989 and 1988 are summarized below:

| Year Ended June 30, 1989 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $10,126 | $10,693 | $16,669 | $17,255 |
| Interest expense | 7,779 | 8,322 | 13,185 | 14,558 |
| Provision for loan losses | 100 | 15 | 45 | 100 |
| Net interest income after provision for loan losses | 2,247 | 2,356 | 3,439 | 2,597 |
| Other income | 514 | 638 | 1,176 | 1,767 |
| Operating expenses | 2,441 | 2,606 | 4,187 | 3,990 |
| Income before income taxes | 320 | 388 | 428 | 374 |
| Income tax provision (benefit) | 122 | 147 | 145 | (189) |
| Net income | $ 198 | $ 241 | $ 283 | $ 563 |
| Net income applicable to common shares | $ 142 | $ 184 | $ 226 | $ 508 |
| Net income per common share | $ .27 | $ .35 | $ .44 | $ .98 |

| Year Ended June 30, 1988 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $ 5,488 | $ 6,198 | $ 6,858 | $ 8,747 |
| Interest expense | 4,147 | 4,768 | 5,324 | 6,537 |
| Provision for loan losses | 40 | 105 | 105 | 322 |
| Net interest income after provision for loan losses | 1,301 | 1,325 | 1,429 | 1,888 |
| Other income | 447 | 899 | 1,034 | 1,876 |
| Operating expenses | 1,536 | 1,747 | 1,990 | 2,955 |
| Income before income taxes | 212 | 477 | 473 | 809 |
| Income tax provision | 81 | 181 | 180 | 310 |
| Net income | $ 131 | $ 296 | $ 293 | $ 499 |
| Net income applicable to common shares | $ 81 | $ 245 | $ 242 | $ 448 |
| Net income per common share | $ .16 | $ .47 | $ .47 | $ .86 |



"Confidential Material-Subject to Protective Order" SG0063032

# INDEPENDENT AUDITOR'S REPORT

**The Board of Directors**
**Sterling Savings Association**
**Spokane, Washington**

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries as of June 30, 1989 and 1988 and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1989, 1988 and 1987. These financial statements are the responsibility of the Association's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 17b to the consolidated financial statements, newly enacted federal legislation will become effective on December 7, 1989 and will alter the regulatory environment in which the Association operates, primarily by establishing new minimum regulatory capital requirements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1989 and 1988, and the consolidated results of their operations and their cash flows for the years ended June 30, 1989, 1988 and 1987 in conformity with generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, the Association changed its method of accounting for loan fees in 1989.

Spokane, Washington
August 15, 1989

*COOPERS & LYBRAND*

# STOCK PRICE RANGE

The following table sets forth the quarterly market price ranges of the Association's Common Stock, as reported by NASDAQ with respect to fiscal year 1988 and the first three quarters of 1989, and as reported by the Spokane Stock Exchange, Spokane, WA, with respect to the fourth quarter of 1989. The prices reported by NASDAQ reflect inter-dealer prices, without regard to retail mark-ups, mark-downs or commissions, and do not necessarily represent actual transaction. The prices reported by the Spokane Stock Exchange reflect known transactions in the Association's Common Stock. In addition, the prices reported have been adjusted to reflect all stock dividends paid by the Association. The number of common shareholders of record on June 30, 1989 was approximately 493.

| | High | Low |
|---|---|---|
| *Fiscal 1989* | | |
| Fourth Quarter | 9-1/2 | 8 |
| Third Quarter | 10 | 8-3/4 |
| Second Quarter | 11-5/8 | 9-3/4 |
| First Quarter | 10-7/8 | 10 |
| *Fiscal 1988* | | |
| Fourth Quarter | 10-7/8 | 9-3/8 |
| Third Quarter | 8-5/8 | 8 |
| Second Quarter | 10-1/8 | 8-1/8 |
| First Quarter | 10-3/8 | 9-1/8 |

*Preferred Stock:*

The Association's $2.50 Cumulative, Convertible Preferred Stock-Series B has no established trading market. Accordingly, there were no known prices for trades of stock. The number of preferred shareholders of record on June 30, 1989 was approximately 296.



"Confidential Material-Subject to Protective Order"

SG 0063033

## EXECUTIVE OFFICERS

Harold B. Gilkey
*Chairman of the Board*
*Chief Executive Officer*

William W. Zuppe
*President*
*Chief Operating Officer*

Ned M. Barnes
*Corporate Secretary*

Daniel G. Byrne
*Senior Vice President*
*Finance*

George E. Godding
*Senior Vice President*
*Western Division Manager*

Stephen L. Page
*Senior Vice President*
*Loan Administration*

Stanton C. Parrish
*Senior Vice President*
*Eastern Division Manager*

John M. Harlow
*Vice President*

S. Midge Moore
*Vice President*
*Operations/Facilities*

Thomas F. Sackmann
*Vice President*

Heidi B. Stanley
*Vice President*
*Administration*

## THE CORPORATION

Sterling Savings Association is a Washington State chartered savings association headquartered in Spokane, Washington.

Its subsidiaries are Action Mortgage Company, The Best Agency, Evergreen Environmental Development Corporation, Evergreen First Service Corporation, Fidelity Service Corporation, INTERVEST Mortgage Investment Company, Tri-Cities Mortgage Company, and Tri-West Mortgage Company.

## THE ANNUAL MEETING

The annual meeting of shareholders of Sterling Savings Association will be held on Tuesday, October 24, 1989. The meeting will begin at 10:00 a.m. in the Conference Theater of the Agricultural Trade Center, West 334 Spokane Falls Boulevard, Spokane, Washington.

## FORM 10-K REPORT

A copy of Sterling Savings Association's Annual Report to the Federal Home Loan Bank Board on Form 10-K will be furnished without charge to the Company's shareholders upon request in writing to:

Daniel G. Byrne,
*Sr. VP and Treasurer*
Sterling Savings Association
N. 120 Wall,
Spokane, WA 99201.

## SUBSIDIARY COMPANIES

Action Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*T. Richard Clark;*
*Edward G. Ranniger;*
*Thomas F. Sackmann;*
*William W. Zuppe*

The Best Agency
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Evergreen Environmental Development Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Evergreen First Service Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*William W. Zuppe*

Fidelity Service Corporation
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*Daniel G. Byrne;*
*Edward G. Ranniger;*
*William W. Zuppe*

INTERVEST Mortgage Investment Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*John M. Harlow;*
*Charles L. Kroetch;*
*Robert Larrabee;*
*William W. Zuppe*

Tri-Cities Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Ned M. Barnes;*
*Daniel G. Byrne;*
*William W. Zuppe*

Tri-West Mortgage Company
*Board of Directors:*
*Harold B. Gilkey, Chairman;*
*Daniel G. Byrne;*
*Thomas F. Sackmann*

"Confidential Material-Subject to Protective Order" S G 0063034

*We have built our reputation on flexible, responsive leadership and dedication to a course of solid, profitable growth*

*Nineteen Ninety*

*Annual Report*

# STERLING SAVINGS


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

# Sterling Savings Board of Directors



Harold B. Gilkey



William W. Zuppe



Raymond R. Alverson



Ned M. Barnes



Rodney W. Barnett



T. Richard Clark



James P. Fugate



Charles L. Kroetch



Robert Larrabee



obert E. Meyers



James A. Vander Stoep



David O. Wallace

# FINANCIAL HIGHLIGHTS

(Dollar amounts in thousands except per share amounts)

| FOR THE YEARS ENDED JUNE 30, | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| **OPERATING DATA DURING THE YEAR** | | | | | |
| Interest income | $67,529 | $54,743 | $27,291 | $18,538 | $15,312 |
| Interest expense | 54,181 | 43,844 | 20,776 | 13,966 | 12,252 |
| Net interest income | 13,348 | 10,899 | 6,515 | 4,572 | 3,060 |
| Provision for loan losses | (1,100) | (260) | (572) | (94) | (578) |
| Net interest income after provision for loan losses | 12,248 | 10,639 | 5,943 | 4,478 | 2,482 |
| Other income | 6,800 | 4,095 | 4,256 | 2,921 | 2,676 |
| Operating expenses | (18,946) | (13,224) | (8,228) | (5,842) | (4,295) |
| Income before income taxes | 102 | 1,510 | 1,971 | 1,557 | 863 |
| Income tax benefit (provision) | 164 | (225) | (752) | (622) | (88) |
| Net income | $ 266 | $ 1,285 | $ 1,219 | $ 935 | $ 775 |
| Net income applicable to common shares | $ 41 | $ 1,060 | $ 1,016 | $ 912 | $ 775 |
| Net income per common share | $ 0.08 | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 |
| Weighted average common shares outstanding | 518,298 | 520,468 | 518,897 | 521,667 | 515,491 |
| **FINANCIAL POSITION AT YEAR END** | | | | | |
| Total assets | [illegible]8,376 | $730,144 | $429,316 | $239,589 | $180,0[illegible]0 |
| Loans receivable | [illegible]56,889 | 49[illegible]81 | 304,408 | 17[illegible] | 127,948 |
| Mortgage-backed securities | [illegible]13,706 | 11[illegible]060 | 51,908 | 4[illegible] | 8,863 |
| Investments | 27,271 | 3[illegible]339 | 29,599 | 8,[illegible] | 13,792 |
| Deposits | 479,227 | 519,982 | 306,152 | 170,789 | 142,064 |
| FHLB advances | 112,976 | 96,580 | 57,100 | 30,650 | 27,350 |
| Stockholders' equity | 10,730 | 10,512 | 9,467 | 8,469 | 5,389 |
| **STATISTICAL DATA** | | | | | |
| Number of: | | | | | |
| Employees (full-time equivalents) | 290 | 300 | 197 | 107 | 89 |
| Offices: | | | | | |
| Full-service | 27 | 28 | 19 | 8 | 8 |
| Loan production | 9 | 11 | 7 | 2 | - |
| Real estate loans | 9,282 | 12,430 | 4,854 | 3,417 | 3,286 |
| Deposit accounts | 69,848 | 71,756 | 42,082 | 22,326 | 20,063 |
| **RATIOS** | | | | | |
| Return on average assets | 0.04% | 0.22% | 0.40% | 0.45% | 0.50% |
| Return on average common stockholders' equity | 0.49% | 13.83% | 15.20% | 15.76% | 15.71% |
| Stockholders' equity to assets at end of period | 1.56% | 1.44% | 2.21% | 3.53% | 2.99% |
| Book value per common share at end of period | $16.35 | $15.97 | $13.95 | $12.09 | $10.45 |
| Net interest margin | 2.04% | 2.00% | 2.25% | 2.35% | [illegible]10% |
| Ratio of nonperforming loans to total assets at end of period | 1.91% | 2.36% | 2.13% | 3.14% | 3.08% |

NOTE: Per Share amounts have been retroactively restated to reflect stock dividends paid. The above amounts reflect significant acquisitions during the years ended June 30, 1989, 1988 and 1986 - See Note 14 to the Consolidated Financial Statements. The Association prospectively changed its method of accounting for loan fees in 1989 - See Note 1 to the Consolidated Financial Statements.