# FINANCIAL HIGHLIGHTS

(Dollar amounts in thousands except per share amounts)

| FOR THE YEARS ENDED JUNE 30, | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| **OPERATING DATA DURING THE YEAR** | | | | | |
| Interest income | $67,529 | $54,743 | $27,291 | $18,538 | $15,312 |
| Interest expense | 54,181 | 43,844 | 20,776 | 13,966 | 12,252 |
| Net interest income | 13,348 | 10,899 | 6,515 | 4,572 | 3,060 |
| Provision for loan losses | (1,100) | (260) | (572) | (94) | (578) |
| Net interest income after provision for loan losses | 12,248 | 10,639 | 5,943 | 4,478 | 2,482 |
| Other income | 6,800 | 4,095 | 4,256 | 2,921 | 2,676 |
| Operating expenses | (18,946) | (13.224) | (8,228) | (5,842) | (4,295) |
| Income before income taxes | 102 | 1,510 | 1,971 | 1,557 | 863 |
| Income tax benefit (provision) | 164 | (225) | (752) | (622) | (88) |
| Net income | $ 266 | $ 1,285 | $ 1,219 | $ 935 | $ 775 |
| Net income applicable to common shares | $ 41 | $ 1.060 | $ 1.016 | $ 912 | $ 775 |
| Net income per common share | $ 0.08 | $ 2.04 | $ 1.96 | $ 1.75 | $ 1.50 |
| Weighted average common shares outstanding | 518,298 | 520,468 | 518,897 | 521,667 | 515,491 |

## FINANCIAL POSITION AT YEAR END

| | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| Total assets | [illegible]8,376 | $730,144 | $429,316 | $239.689 | $180,000 |
| Loans receivable | [illegible]6,889 | [illegible] | 304,408 | [illegible] | 127,948 |
| Mortgage-backed securities | [illegible]13,706 | [illegible] | 51,908 | [illegible] | 8,863 |
| Investments | 27,271 | [illegible] | 29,599 | [illegible] | 13,792 |
| Deposits | 479,227 | 519,982 | 306,152 | 170,789 | 142,064 |
| FHLB advances | 112,976 | 96,580 | 57,100 | 30,650 | 27,350 |
| Stockholders' equity | 10,730 | 10,512 | 9,467 | 8,469 | 5,389 |

## STATISTICAL DATA

| | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| Number of: | | | | | |
| Employees (full-time equivalents) | 290 | 300 | 197 | 107 | 89 |
| Offices: | | | | | |
| Full-service | 27 | 28 | 19 | 8 | 8 |
| Loan production | 9 | 11 | 7 | 2 | - |
| Real estate loans | 9,282 | 12,430 | 4,854 | 3,417 | 3,286 |
| Deposit accounts | 69,848 | 71,756 | 42,082 | 22,326 | 20,063 |

## RATIOS

| | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|
| Return on average assets | 0.04% | 0.22% | 0.40% | 0.45% | 0.50% |
| Return on average common stockholders' equity | 0.49% | 13.83% | 15.20% | 15.76% | 15.71% |
| Stockholders' equity to assets at end of period | 1.56% | 1.44% | 2.21% | 3.53% | 2.99% |
| Book value per common share at end of period | $16.35 | $15.97 | $13.95 | $12.09 | $10.45 |
| Net interest margin | 2.04% | 2.00% | 2.25% | 2.35% | [illegible] 10% |
| Ratio of nonperforming loans to total assets at end of period | 1.91% | 2.36% | 2.13% | 3.14% | 3.08% |

NOTE: Per Share amounts have been retroactively restated to reflect stock dividends paid. The above amounts reflect significant acquisitions during the years ended June 30, 1989, 1988 and 1986 - See Note 14 to the Consolidated Financial Statements. The Association prospectively changed its method of accounting for loan fees in 1989 - See Note 1 to the Consolidated Financial Statements.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

**Harold B. Gilkey,**
Chairman of the Board



# Report to Shareholders

## THE YEAR IN REVIEW

The past year has been a time of tremendous upheaval and uncertainty in the savings and loan industry. Seldom in this country's history has a single industry attracted so much criticism from so many levels of government and society. Unfortunately, most of the criticism was well deserved, having been earned by institutions that acquired lavish headquarters buildings, art work collections, corporate jets and the like. Such institutions typically made speculative "investments" in such things as high yield junk bonds and land acquisition and development schemes. Thus, when the executive and legislative branches began to formulate a plan to curtail the excesses and curb the wrongdoers in the industry, Sterling wholeheartedly supported the attainment of those objectives.

The Association, for its part, had never been part of the problem in the thrift industry. On the contrary, Sterling had always been part of the solution to the thrift crisis and had been so recognized by the regulatory agencies. The Association, at the request and with the approval of its regulators, had acquired several troubled thrift associations prior to 1989. Sterling had thus been able to expand its asset base and profitability while conservatively managing the negative financial impact inherent in each acquisition.

Sterling and its regulators had always understood that each acquisition of a troubled thrift could have an immediate negative impact on Sterling's balance sheet and make it more difficult for Sterling to meet its present or future capital requirements. To mitigate this risk, Sterling and its regulators entered into contractual agreements in which the regulators granted the Association relief from regulatory capital and liquidity requirements for the period of time necessary for Sterling to completely absorb the troubled thrifts.

By granting such regulatory and accounting forbearances, Sterling's regulators were able to induce the Association to acquire troubled thrifts with minimal cash assistance from the regulators. We estimate that the regulators saved in excess of $50 million simply because they did not have to liquidate three of the associations which Sterling agreed to acquire.

On August 9, 1989, President Bush signed the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). Shortly after FIRREA became law, however, the newly created Office of Thrift Supervision (OTS) took the position that the FIRREA capital requirements were applicable to Sterling notwithstanding the contrary provisions of Sterling's agreements with the regulators. Obviously, we were deeply shocked by the OTS' position. The OTS, essentially, was attempting to abrogate certain of the benefits provided to the Association to induce it to acquire the troubled thrifts while insisting that Sterling continue to shoulder the burdens occasioned by the acquisitions.

The OTS' position had a number of adverse consequences for the Association. Among other things, we were forced to cancel, in January of this year, the fully-subscribed stock offering which would have raised approximately $10.5 million in new capital. The cancellation was a direct consequence of OTS actions prohibiting the Association from making any capital distributions including the payment of dividends on the new stock.

Nothing in FIRREA directs or authorizes the OTS to abrogate pre-FIRREA contractual agreements between institutions like Sterling, on the one hand, and the government, on the other. Unfortunately, the OTS has discovered a contrary intent on the part of Congress. Sterling has made every reasonable effort to work through this matter. We have consistently maintained a conciliatory attitude and have recommended alternative methods of increasing Sterling's capital to a point where disagreements about our capital position would become moot. In spite of this, the OTS has refused to exercise its authority to grant an exemption from or an exception to the new capital standards or to develop standards specific to Sterling's circumstances. At every turn, we have found intransigence rather than a willingness to work together. Therefore, Sterling has been left with no alternative but to file suit



against the OTS and the Federal Deposit Insurance Corporation (FDIC) to enjoin their misapplication of FIRREA.

As a result of the lawsuit, the United States District Court granted the Association a Temporary Restraining Order on May 29, 1990, and a Preliminary Injunction on July 3, 1990. The Preliminary Injunction prohibits the OTS and the FDIC from imposing any regulatory restrictions on the Association which are inconsistent with the provisions of our acquisition contracts with the regulators. Meanwhile, Sterling continues to honor the acquisition contracts notwithstanding the dispute over the meaning of FIRREA. As you will note in the financial information contained in this annual report, positive changes have taken place since the acquisition of Central Evergreen Federal in 1989. In fact, Sterling has performed well following all of its supervisory acquisitions and would be right on track with all financial indicators if our regulators had simply honored their agreements with us.

As you can see, much has transpired since our last report to you. In spite of the difficulties with our regulators this past year, we are pleased to report a net profit for the year of $266,000 or $.08 per share. The following is a summary of some of the major events over the past year.

MARCH 1989 - Sterling's Board of Directors and Senior Management advance a comprehensive business plan which includes a $12 million offering of common and preferred stock.

AUGUST 1989 - President Bush signs FIRREA legislation. Without any change to its balance sheet or operating plan, Sterling finds itself allegedly in noncompliance with the new capital standards.

SEPTEMBER 1989 - As part of a comprehensive plan intended to bring Sterling into full compliance with FIRREA's new capital standards by 1992, Sterling prepares for an offering of common and noncumulative convertible preferred stock. The offering would be fully underwritten by Dain Bosworth, a leading underwriter and marketmaker of thrift institutions.

DECEMBER 1989 - Sterling's fully subscribed $12 million stock offering is postponed and later cancelled due to an OTS policy disallowing the payment of dividends. Simultaneously, Sterling is forbidden from paying dividends to its existing preferred shareholders.

MARCH 1990 - Regulators direct Sterling to increase its general valuation allowances by $1.4 million. Sterling complies even though it has maintained valuation allowances at levels higher than industry averages to provide for estimated future losses in the loan portfolio.

MAY 15, 1990 - Sterling files suit against the FDIC and its chief regulator, the OTS, in the United States District Court for the Eastern District of Washington. The suit results from the OTS' erroneous conclusion that FIRREA eliminated contractual promises made to Sterling by the OTS' predecessors, the FSLIC (Federal Savings and Loan Insurance Corporation) and the FHLBB (Federal Home Loan Bank Board). These contractual promises were made for the purpose of inducing Sterling to acquire and operate certain failing thrift institutions (Lewis Federal Savings and Loan, Tri-Cities Savings and Loan, and Central Evergreen Federal Savings and Loan).

MAY 28, 1990 - Sterling receives a Temporary Restraining Order (TRO) from U.S. District Court Judge Justin L. Quackenbush preserving the status quo of the Association pending a hearing on Sterling's application for a Preliminary Injunction.

JULY 3, 1990 - Judge Quackenbush grants Sterling a Preliminary Injunction prohibiting the federal regulators from, among other things, taking any regulatory enforcement action against the Association which would be inconsistent with Sterling's contractual acquisition agreements with the regulators.

Obviously, we are frustrated by the fact that Sterling continues to be treated as a capital deficient thrift when, in [illegible] Sterling meets its applicable minimum capital levels given the contractual acquisition agreements with our regulators. We re[illegible] deeply convinced that if the regulators would s[illegible]ly honor their contractual commitments to the Association, Sterling would continue to grow and prosper as it has in the past. Through the lawsuit we will continue to try to ensure this result.

The prospects for Sterling in the 1990s are good. We are confident we can resolve the current differences with our regulators and, for those issues over which we can exercise control, we will continue to produce positive results. We have built our reputation on flexible, responsive leadership and dedication to a course of solid, profitable growth. Our focus is on the long-term benefit that our "Hometown Helpful" company brings to our shareholders, our employees and to each community we serve.

*The regulators had al[illegible] viewed Sterling Sa[illegible] part of the solution due to our sound management an[illegible] solid track record of performance and profitability.*



# Review of Operations



**William W. Zuppe,**
**President**

EXCELLING IN OUR BASIC BUSINESS

Sterling's primary strategy is to excel in managing our basic business. This means being "Hometown Helpful"—serving our customers and anticipating their needs. It means continuing to improve our products and services. And it means employing quality people who manage in a pro-active yet prudent manner.

For seven years, Sterling's management has pursued a path of expansion from one office in Spokane to twenty-seven branch offices statewide and three subsidiary companies throughout the Pacific Northwest. At a time when larger institutions are pulling out of smaller communities, particularly in Eastern Washington, Sterling's strategy of locating our deposit-gathering base in hometowns across the state remains the same. Our philosophy is to maintain banking relationships with customers we know. Our slogan reflects this – "We don't make a loan we can't drive to by lunch." This way of doing business has served us and our customers well.

OFFERING FULL-SERVICE BANKING

Sterling differentiates itself from its competitors by offering innovative financial products that meet a wide range of consumer needs. Sterling continues to place its emphasis on knowing our customers well enough to anticipate their needs and assist them in making sound financial decisions. We are proud of our highly qualified staff who offer both the traditional and innovative products with our hallmark "Hometown Helpful" service.

For example, we now offer a product which meets the needs of customers seeking to invest in a tax-deferred instrument. During fiscal 1990, Sterling's subsidiary company,The Best Agency, introduced AAA-rated annuities to our spectrum of services. These tax-deferred investment products are available systemwide from our licensed financial service representatives located in Clarkston, Spokane, Chehalis and the Tri-Cities.

In addition to home loans, Sterling is committed to providing consumer loan products to the communities we serve throughout the state. Consumer loans are made to individuals seeking to enhance the quality of their lives through home remodeling, new automobiles, boats, college educations and similar aspirations.

In addition to these more traditional consumer loans, Sterling provides personal and equity lines of credit. Once established, these products can be accessed and used at the customer's discretion. These lines of credit products also offer payment flexibility and tax advantages for our customers.






## SPECIALIZING IN RESIDENTIAL LENDING

The process of originating, selling and servicing home loans is the major source of Sterling's earnings. Our strategy is to originate home loans in large volume and to sell the finished product to institutional investors such as the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation. The sale of loans to institutional investors permits the Association to reuse these financial resources to provide residential, consumer and business financing. In this way, we provide our customers with competitive rates and products and bring outside capital to the communities we serve.

During fiscal 1990, Sterling generated record lending volumes. Sterling's wholly-owned residential lending subsidiary, Action Mortgage Company, produced up to $30 million in conforming residential loans per month with more than $314 million in actual loan production for the year. Helping our customers realize their dream of home ownership follows our first goal — to be identified as a community bank specializing in real estate finance in the Pacific Northwest.

## OPERATING STRATEGIES

Fiscal 1990 management strategies supporting our goals stressed what we call the 4 Es:

- increase equity
- provide greater earnings
- increase efficiency
- convert non-earning assets to earning assets

The Association worked diligently to add new equity capital. However, the OTS frustrated our efforts to raise the additional capital, placing that strategy beyond our control at this time and creating a significant impact on our ability to provide increased earnings. This challenged us to place even greater emphasis on the areas we can control.

Throughout our expansion phase, our staff has demonstrated an extraordinary ability to absorb and manage each acquisition. During fiscal 1990, we continued the successful intregration of Central Evergreen's ten-branch system. This spring we completed the consolidation of the two Centralia branch offices.

Our employees are committed to increasing efficiency throughout our system. During fiscal 1990, we made great strides in the areas of better staff utilization, effective use of financial and non-financial resources and improved control of operating expenses.

During the past year we significantly reduced real estate owned (REO) property acquired with Central Evergreen. We are proud of our industrywide reputation as turnaround specialists. More important, we are pleased to provide to each of the Washington communities we serve a safe, sound, "Hometown Helpful" bank.




*Helping our customers realize their dream of home ownership follows our first goal – to be identified as a community bank specializing in real estate finance in the Pacific Northwest.*

APP. 1005

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0802553




SERVING OUR COMMUNITIES

Sterling's "Hometown Helpful" motto takes on new meaning in the 1990s. We are the people in twenty-seven smaller communities across Washington who are there to help guide customers through the financial maze. By listening and responding to their changing needs, Sterling has retained a base of loyal customers. This customer service strategy has also been a major factor in keeping customers and attracting new accounts during this year of national savings and loan headlines.

Steady customer growth in the Tri-Cities area called for a spacious new Pasco office with drive-in banking convenience. Increased customer demand in the Auburn area dictated a complete renovation of the existing branch office there as well. The result of both projects is customer convenience and community pride.

We believe that knowing our customers' needs begins with knowing and caring about our communities. Sterling's employees work hard to improve the quality of life in the Northwest, volunteering actively in area Chambers of Commerce, housing groups, and a host of service clubs. Whether collecting clothing for the homeless or making a capital contribution for a new facility, we take our role seriously as a "Hometown Helpful" community leader.



MANAGING FOR THE 1990s

Sterling earned its position as a profitable, quality company through sound management practices, real estate lending expertise, and personal service to customers. Since we began in 1983, we have expanded significantly our deposit-gathering and lending activities through an orderly and controlled acquisition plan. During this period we completed five acquisitions of institutions and branches...all with the encouragement and support of state and federal regulatory authorities.

Our strength throughout this expansion period and during the FIRREA turmoil is our fine management team. Their foresight in guiding the company toward its long-range goals is balanced by the flexibility they bring to the demands of day-to-day operations.

The future of the financial industry will be determined by the quality of people in management and their ability to cope with the changing economic environment. Companies like Sterling who are managed carefully and prudently are an essential part of the success of the industry and of each community we serve in the Pacific Northwest.

*The future of the fir industry will be d by the quality of p management and th to cope with the chan economic environmen:*

The Sterling Savings senior management team (from lower left) Harold B. Gilkey, Chairman of the Board; William W. Zuppe, President; Heidi B. Stanley, Sr. V.P.-Administration; S. Midge Moore, Sr. V.P.; Thomas F. Sackmann, President-Action Mortgage Company; (from upper left) Stanton C. Parrish, President–The Best Agency; John M. Harlow, President-INTERVEST; Diane C. Rasmusson, V.P.-Western Division; Daniel G. Byrne, Sr. V.P.-Finance; Stephen L. Page, Sr. V.P.-Loan Administration.





CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

# Management's Discussion and Analysis of Financial Condition and Results of Operations

## GENERAL

The business and operations of Sterling Savings Association have been affected significantly by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and by the implementation of FIRREA by the newly created Office of Thrift Supervision ("OTS"). Prior to FIRREA, the Association had expanded significantly its asset base and deposit-gathering activities through a controlled acquisition strategy. These acquisitions, primarily of troubled institutions, were completed at the request and with the approval of Sterling's regulators. The acquisitions included Central Evergreen Federal Savings and Loan Association ("Central Evergreen") on December 31, 1988, Tri-Cities Savings and Loan Association ("Tri-Cities") on April 8, 1988, and six branches of Great American First Savings Bank, FSB ("Great American") on February 5, 1988. These acquisitions increased the assets of the Association by approximately $375.7 million and expanded its branch delivery system by nineteen branches.

Sterling and its regulators understood that each acquisition of a troubled thrift could have an immediate negative impact on Sterling's balance sheet and make it more difficult for Sterling to meet its present and future capital requirements. To mitigate this risk, Sterling's regulators entered into contractual agreements ("Agreements") with Sterling so as to allow Sterling, among other things, time to absorb each troubled thrift.

Pursuant to the Central Evergreen acquisition Agreement, the Association agreed to operate under an approved business plan ("Business Plan") through December 31, 1993, and maintain the level of regulatory capital specified in the Business Plan. The Business Plan specifically incorporated the assistance provided Sterling from two prior supervisory acquisitions including cash payments, indemnification against certain losses, and certain forbearances granting temporary relief from regulatory capital and liquidity requirements (see Note 2 to the Consolidated Financial Statements).

FIRREA, which was enacted August 9, 1989, significantly revised the regulation and permissible activities of savings associations. FIRREA also directed the OTS to establish specific capital standards and consequences for noncompliance with




these stricter new capital standards. These new standards became effective on December 7, 1989.

Beginning in October 1989, the Association received several communications from the OTS advising it that the OTS was taking the position that FIRREA capital requirements were applicable to the Association, notwithstanding contrary provisions of Sterling's Agreements with the regulators. Accordingly, the OTS deemed the Association to be in noncompliance with the new capital standards implemented as a result of FIRREA and required the Association to file a capital restoration plan.

As directed by OTS, but notwithstanding the Association's position that its regulatory capital adequacy requirements are governed by the contractual Agreements, the Association submitted several capital restoration plans, each of which was rejected. As an integral part of its primary capital plan, Sterling proposed a public offering of up to 603,750 units, each consisting of one share of the Association's common stock and one share of a newly created series of noncumulative convertible preferred stock. Even though this offering was fully-subscribed and would have yielded the Association approximately $10.5 million of new capital, the Association was forced to cancel the offering in January 1990. The cancellation was a direct consequence of the OTS' actions restricting the Association from making any capital distributions, including the proposed payment of dividends on the new preferred stock.

The Association notified the OTS that the OTS' position was unlawful and specifically contrary to FIRREA. The OTS subsequently refused to honor the Agreements or negotiate a mutually acceptable alternative solution. The Association believed that, in spite of its ongoing profitability and performance under the Agreements, it was in imminent danger of the OTS appointing a conservator or receiver. The OTS would have taken this action merely because Sterling had a capital shortfall under the OTS' interpretation of FIRREA. The appointment of a conservator or receiver would have, among other things, deprived the Association of the ability to independently manage its affairs. It would also have eliminated the shareholders' investment in the Association.

Accordingly, in May 1990, the Association filed a civil action against the OTS and the Federal Deposit Insurance Corporation ("FDIC") seeking, among other things, to have the OTS' breach of the Agreements declared unlawful. The U.S. District Court has since granted a temporary restraining order and issued a preliminary injunction that, collectively, prohibit the regulators from imposing any regulatory restrictions on the Association that are inconsistent with the provisions of its contractual Agreements (see "Capital Resources"). Specific provisions of FIRREA, the OTS' implementing regulations, the Association's lawsuit, and the potential impacts on the Association are discussed in Note 2 to the Consolidated Financial Statements.

Among the provisions of FIRREA was a drastic reduction in the aggregate amount of loans that can be made to any single borrower and a limit on the Association's total investment in nonresidential mortgage loans. Consequently, the Association substantially reduced commercial real estate lending operations conducted through its

subsidiary INTERVEST-Mortgage Investment Company ("INTERVEST"). This reduction in origination activity has resulted in the closure of two loan origination offices, a reduction in the staffing level by two-thirds and a reduction of approximately $35 million in commercial real estate loan balances. Due in large part to the Association's paying off of borrowings rather than reinvesting proceeds from principal payments on commercial real estate loans, total assets declined by $41.7 million to $688.4 million at June 30, 1990, from $730.1 million at June 30, 1989. To compensate for the reduced activity in INTERVEST, the Association has emphasized residential mortgage banking operations conducted through Action Mortgage Company ("Action"). The Association is also expanding its marketing of insurance and annuity products to its customers through a subsidiary, The Best Agency.

## RESULTS OF OPERATIONS

The Association reported net income for fiscal year 1990 of $266,000, compared to $1,285,000 for fiscal year 1989. Earnings decreased to $.08 per common share in fiscal year 1990 compared to $2.04 per common share in fiscal year 1989. Net income for fiscal year 1988 was $1,219,000, or $1.96 per common share. All earnings per share amounts have been retroactively restated to reflect all common stock dividends paid during years 1989 and 1988.

The lower earnings for fiscal year 1990 are due principally to writing off approximately $1 million of underwriting and related costs associated with the cancelled public offering, to a higher provision for loan and real estate owned losses, and to incurring legal costs to prevent Sterling's regulators from taking regulatory or enforcement action which would be inconsistent with Sterling's contractual Agreements. Fiscal year 1989 earnings increased over fiscal year 1988 principally due to increased total assets and certain tax advantages resulting from the acquisition of Central Evergreen.

## NET INTEREST INCOME

For a financial institution, the most significant component of earnings is net interest income. Net interest income is the difference between interest income, principally from the Association's loan, investment and mortgage-backed securities portfolios, and interest expense, principally on customer deposits and borrowings. Changes in net interest income result from changes in both volume and net interest rate spread. Volume refers to the dollar level of earning assets and interest-bearing liabilities, and net interest rate spread refers to the difference between the interest yields on earning assets and the interest costs of the liabilities required to support them.

**Total Assets at End of Fiscal Year**
In Millions Of Dollars




The Association's total interest income has increased steadily to $67.5 million in fiscal year 1990 from $54.7 million in fiscal year 1989 and $27.3 million in fiscal year 1988. Total interest expense increased to $54.2 million in fiscal year 1990 from $43.8 million in fiscal year 1989 and $20.8 million in fiscal year 1988. The Association's net interest income has increased steadily to $13.3 million for fiscal year 1990 from $10.9 million and $6.5 million for fiscal years 1989 and 1988, respectively. These increases in total interest income, total interest expense, and net interest income are principally attributable to the volume factor. Average interest-earning assets increased during fiscal year 1990 to $654.2 million from $545.3 million and $289.4 million during fiscal years 1989 and 1988, respectively. The increases are principally the result of the Association's acquisitions of Central Evergreen midway through fiscal year 1989 and of Tri-Cities and six Great American branches during fiscal year 1988.

The difference between the yield on the Association's interest-earning assets and the cost of its interest-bearing liabilities ("spread") for all of fiscal year 1990 was 2.36%, as compared to 2.29% in fiscal year 1989 and 2.20% in fiscal year 1988. The improved spreads in fiscal years 1990 and 1989 are primarily attributable to a change in accounting for loan fees (see "Other Income"). The impact of this change on spread in 1990 was to increase spread by 0.1[illegible] and in 1989 to increase it by 0.07%. During fiscal year 1988, the Association had utilized more borrowings relative to deposits and invested in shorter term investments which had a lower spread.

Net interest income divided by total earning assets, or net interest margin ("margin"), is influenced by the relative level and mix of interest-earning assets and interest-bearing liabilities. The margin increased modestly to 2.04% during fiscal year 1990, compared to 2.00% in fiscal year 1989 and down from 2.25% in fiscal year 1988. The decrease in fiscal year 1989 is a result of a lower level of interest-earning assets relative to interest-bearing liabilities acquired from Central Evergreen and Tri-Cities. The improvement in 1990 is due to the increased spread and reduction of non-earning assets, principally intangible assets, non-performing loans and real estate owned. Management expects net interest margin to improve as non-performing Central Evergreen and Tri-Cities assets are converted to earning assets. However, there can be no assurance that the net margin will improve.

## PROVISIONS FOR LOAN AND REAL ESTATE OWNED LOSSES

It is management's policy to establish allowances for estimated potential losses on loans and real estate owned ("REO") by charging income when events have occurred indicating that losses are expected to be incurred. The evaluation of the adequacy of these allowances is an ongoing process. Economic conditions, loan portfolio composition, and historical loss experience affect the loss provisions charged against income.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

provisions charged against income.

The Association controls the quality of loans originated through its quality control function, which reviews loans originated or acquired to ensure compliance with appropriate underwriting criteria. The results of these reviews assist the Association in monitoring the performance of its lending personnel and independent appraisers. The Association's mortgage loan quality control program conforms to guidelines and standards established by the FHLMC and the FNMA.

Additionally, the Association has established a strict and uniform set of guidelines for classifying loans and then determining the appropriate provision for anticipated loan losses. Under these guidelines, an allowance for anticipated loan losses is established when certain conditions exist. This system for classifying and reserving loans is administered by the Association's Special Assets Department, which is responsible for resolving loan deficiencies and minimizing losses. An oversight committee, comprised of senior management, meets at least quarterly to monitor and approve the activities and progress of the Special Assets Department and reports these results to the Association's Board of Directors.

In fiscal year 1990, total provisions of $1,550,000 were added to existing loss allowances through a charge to expense, of which $1,100,000 was allocated to loan losses and $450,000 was allocated to REO losses. These total provisions compared to $326,000 and $951,000 for fiscal years 1989 and 1988, respectively, of which $260,000 and $572,000 were provided for loan losses and $66,000 and $379,000 were provided for REO losses, respectively. The loan loss provision for fiscal year 1990 was made primarily to increase general valuation allowances. Of the 1990 provision, $1.4 million was recorded at the conclusion of a joint regulatory examination that was completed in the third quarter. This provision adjusts general valuation allowances to a substantially more conservative level than historically used by either the Association or the industry in accordance with a move to conform savings and loan practices to commercial banks. The Association, which has concurred with the additions, has revised its asset classification system, its estimation process, and method of analyzing valuation allowances to reflect these more conservative levels. A substantial portion of the increase relates to commercial real estate loans and the potential that the Association's market areas may experience weakening economies as have other regions of the country. If this occurs, the Association's losses on the existing portfolio may

**Total Deposits at End of Fiscal Year**
In Millions Of Dollars




exceed the historical averages on which prior valuation levels were based. The loan loss provision for fiscal year 1988 was higher than the provision for fiscal year 1989. It reflected management's intent to increase general allowances for commercial loans secured by collateral other than real estate due in part to the increase in this segment of the loan portfolio.

Allowances for potential loan and REO losses of $3,122,000 and $4,330,000 were carried over to the Association in the acquisitions of Tri-Cities and Central Evergreen. These allowances were necessary to cover the estimated losses in the respective portfolios of these institutions at the acquisition dates and can be attributed primarily to certain macroeconomic conditions affecting their market areas and several large purchased loan participations.

The amount of loans and REO written off against reserves for fiscal years 1990, 1989 and 1988 were $1,368,000, $1,858,000 and $271,000, respectively. The amount written off in fiscal years 1990 and 1989 are much higher than previous years principally because of the high levels of problem loans and REO acquired with the Central Evergreen and Tri-Cities portfolios.

Management believes the established allowances are compatible with the risks of various types of lending and the composition of the Association's loan and REO portfolios.

## OTHER INCOME

As described in Note 1 to the Consolidated Financial Statements, the Association prospectively changed its method of accounting for loan fees on July 1, 1988. Loan fees, net of direct origination costs, are now treated as an adjustment of loan yield. The impact of this change is to reduce loan fee income in the year of origination and increase net interest income in future years or, for loans sold into the secondary market, to increase the gain on sale. As a means of both mitigating the impact of this change and building its servicing portfolio and income therefrom, the Association expanded its mortgage banking operations during fiscal year 1989. As a result, a substantially larger amount of loans are being originated or purchased for sale into the secondary market (mortgage banking) rather than for portfolio retention.

The composition of other income differed substantially during fiscal year 1990, compared to fiscal years 1989 and 1988, as a result of the increase in mortgage banking operations. Other income of $6,800,000 during fiscal year 1990 is comprised principally of income from mortgage banking operations of $3,128,000 and service charges and fees on deposit accounts of $2,011,000. This compares to other income for fiscal years 1989 and 1988 of $4,095,000, and $4,256,000, respectively, which was comprised principally of income from mortgage banking operations of $1,028,000 and fees and charges on deposit accounts of $913,000 in fiscal year 1989 and loan origination and commitment fees of $3,517,000 in fiscal year 1988.

Income from mortgage banking operations primarily reflects gains on sales of loans in the secondary market offset by costs to hedge the market risk on the sales. In fiscal year 1990, mortgage banking income was $3,128,000 on loan sales of $331 million compared to income of $1,028,000 on sales of $102 million in fiscal year 1989. A majority of sales are with the servicing

retained by the Association, 63% in fiscal year 1990 and 61% in fiscal year 1989.

Service charges and fees on deposit accounts totalled $2,011,000, $913,000, and $423,000, for the fiscal years ended June 30, 1990, 1989 and 1988, respectively. The increases reflect the growth in the number of accounts serviced during these periods due to acquisitions and an emphasis on developing fee-based accounts. Fiscal year 1990 also includes $403,000 of fees on sales of annuity products through The Best Agency.

Loan commitment and origination fees were $55,000 in fiscal year 1990, $560,000 in fiscal year 1989 and $3,517,000 in fiscal year 1988. The fiscal year 1990 decrease in fee income reflects the decrease, due to FIRREA limitations, in commitments on commercial real estate which provided substantial fees to the Association in prior years. The decrease from fiscal year 1988 to fiscal year 1989 reflects the change in loan fee accounting discussed above.

Loan servicing fees were $864,000, $471,000, and $216,000 in fiscal years 1990, 1989 and 1988, respectively. The level of loan servicing fee income is influenced primarily by the size of the portfolio of loans being serviced for others. This portfolio increased to $486 million through May 1990, from $315.4 million and $59.9 million at June 30, 1989 and 1988, respectively, as a result of the Association's mortgage banking activities and the acquisition of Central Evergreen. On June 29, 1990, $312 million in loan servicing was sold, leaving a portfolio of $174 million at June 30, 1990.

Net gain (loss) on sales of securities was $241,000, ($118,000) and $408,000 during fiscal years 1990, 1989 and 1988, respectively. The gain in fiscal year 1990 reflects the disposition of the portfolio of adjustable rate mortgage-backed securities. The loss in fiscal year 1989 is a net disposition of assets acquired from Central Evergreen and Tri-Cities. Fiscal year 1988 includes gains on sale of mortgage-backed securities. Prior to commencing mortgage banking operations, the Association sometimes swapped loans for mortgage-backed securities and then sold the securities.

Net gain (loss) on sales and operation of REO was ($176,000), $757,000 and ($376,000) during fiscal years 1990, 1989 and 1988, respectively. The net loss during fiscal year 1990 is attributable to the $450,000 provision for loss on REO and $561,000 in net operating losses, offset by net gains on disposition of $835,000. The net gain during fiscal year 1989 is attributable to favorable operating results of acquired REO and recoveries in excess of amounts expected on acquired properties. The net loss during fiscal year 1988 is attributable to unfavorable operating results of various REO properties and the erosion in net realizable value of one REO property.

FDIC indemnification of capital losses represents FDIC's portion of gains on sales of REO.

Other (miscellaneous) income in fiscal year 1990 of $774,000 includes gains on sales of a former branch building and the gain on sale of loan servicing. In fiscal year 1989, other income includes a gain on the settlement of a large acquired claim. There were no material items in other income during fiscal year 1988.

## OPERATING EXPENSES

Operating expenses, which were $18,946,000, $13,224,000 and $8,228,000 for fiscal years 1990, 1989 and 1988, respectively, have shown a general increase primarily as a result of internal expansion and the acquisitions of Central Evergreen in 1989 and of Tri-Cities and six Great American branches in 1988. Fiscal year 1990 expenses represent the first full year of operations since the completion of these acquisitions. Since fiscal year 1987, the total number of facilities, including those operated by subsidiaries, has increased from 10 to 39 at June 30, 1989, but reduced to 36 at June 30, 1990. The number of full-time employee equivalents has increased from 107 at June 30, 1988, to 300 at June 30, 1989, and decreased to 290 at June 30, 1990. The decrease during fiscal year 1990 in the number of offices represents a decrease of one full-service office due to a consolidation in Western Washington and a decrease of two loan-origination offices from the prior year. Employee compensation and benefits, occupancy and equipment, data processing and other expenses all contributed to the substantial increase in operating expenses commensurate with the growth due to acquisitions.

In fiscal year 1990, operating expenses were increased significantly by a charge of approximately $1 million for underwriting and related costs associated with the cancelled public offering and $115,000 for legal costs incurred to enforce the contractual Agreements with the Association's regulators.

Intangible amortization expense was $3,253,000, $2,021,000 and $462,000 during fiscal years 1990, 1989 and 1988, respectively. The significant increase during fiscal years 1990 and 1989 is attributable to the high level of intangibles recorded with the acquisition of Central Evergreen. The Association has available certain acquired tax benefits which would serve to reduce the level of intangibles and, thus, amortization expense when utilized in the future. There can be no assurance, however, that these benefits will be fully realized (see Note 11 to the Consolidated Financial Statements).

## PROVISION FOR INCOME TAXES

For the fiscal years ended June 30, 1990, 1989 and 1988, the income tax provisions (benefit) were ($164,000), $225,000 and $752,000, respectively. The effective tax rates in fiscal years 1990 and 1989 of (160.8%) and 14.[illegible]%, respectively, are lower than the statutory rate of 34%, primarily due to the tax basis bad debt deduction and nontaxable yield subsidy assistance received from the FDIC, but partially offset by the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets and liabilities). The benefit in fiscal year 1990 reflects the maximum reversal of previously deferred taxes that will be offset by current year deductions. The effective tax rate in fiscal year 1988 of 38.2% is higher than the statutory rate of 34%, primarily because of the amortization of purchase accounting adjustments.

In December 1987, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 96 - Accounting for


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

Income Taxes ("SFAS No. 96") which requires the application of an asset and liability approach to account for and report income taxes for financial statement purposes. SFAS No. 96 represents a significant change in accounting for the effects of deferred taxes and business combinations. This statement has been both modified and delayed since issuance and may be modified again. The Association has not yet determined the effects of this new standard which presently must be adopted no later than July 1, 1992.

LIQUIDITY AND SOURCES OF FUNDS

Federal regulations require savings institutions to maintain an average daily balance of liquid assets equal to, but not less than, a specified percentage (currently 5%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At June 30, 1990, the Association had a liquidity ratio of 7.71% compared to 6.85% and 5.10% at June 30, 1989 and 1988, respectively. The required liquidity ratio may vary from time to time depending on economic conditions, savings flows, and loan funding needs. It is the Association's practice to maintain its liquidity level at or near the required minimum in order to maximize its yield on alternative investments.

The Association's primary sources of cash are customer deposits, principal payments on and sales of loans and mortgage-backed securities, advances from the FHLB of Seattle, and borrowings under repurchase agreements. Deposits decreased by $40.8 million in fiscal year 1990. This decrease occurred primarily in large customer accounts ("jumbos") as customers and the Association concentrated on maintaining deposits within insured levels. Deposits increased by $213.8 million in fiscal year 1989, resulting principally from the acquisition of Central Evergreen.

Principal repayments on loans and mortgage-backed securities were $160.8 million, $115.7 million and $64.8 million during fiscal years 1990, 1989 and 1988, respectively. The increase in these repayments over the past three years is a reflection of continued growth in average loan and mortgage-backed securities portfolio balances, and periodic increases in loan refinancing as a result of lower prevailing interest rates.

At June 30, 1990, the Association had borrowings outstanding from the FHLB of Seattle amounting to $113.0 million including $15.3 million of overnight advances. The Association's total credit line is determined on a case-by-case basis and directly related to the level of eligible collateral provided to the FHLB of Seattle. At June 30, 1990, the Association had additional availability of $8.3 million in borrowings.

The Association also borrows on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At June 30, 1990, the Association had $75.9 million of securities sold subject to repurchase agreements. An additional $28.4 million of securities were available for sale under repurchase agreements at that date.

CAPITAL RESOURCES

The Association's total stockholders' equity was $10,730,000 and $10,512,000 at June 30, 1990 and 1989, respectively. During fiscal year 1990, stockholders' equity increased by $218,000, reflecting primarily net income of $266,000, offset by cash dividends of $56,000 declared on the Series B Preferred Stock. During fiscal year 1989, total stockholders' equity increased by $1,045,000, primarily as the result of net income.

Return on average common stockholders' equity was 0.48% in fiscal year 1990, 13.8% in fiscal year 1989, and 15.2% in fiscal year 1988. The moderate decline in fiscal year 1989 is due, in part, to the payment of cash dividends on the Series B Preferred Stock. The low level in 1990 is a result of the $1 million drop in net income which was a result of write-offs and expenses pertaining to the current regulatory environment.

At June 30, 1990, stockholders' equity was 1.56% of total assets, compared to 1.44% at June 30, 1989. The increase in this ratio is a result of the decrease in total assets in fiscal year 1990.

The Association has been prohibited by regulatory authorities from paying dividends on its preferred stock for three quarterly payment periods. Accordingly, there is $1.89 per share, or $170,000 of cumulative dividends in arrears that have not been declared, paid, or subtracted from retained earnings. These dividends have preference over any distributions to common shares and have been considered in calculating net income per common share.

The Association believes that its regulatory capital adequacy requirements are governed by its aforementioned contractual Agreements with its regulators. As a part of the Central Evergreen acquisition, the Association agreed to operate according to an approved Business Plan through December 31, 1993. The Central Evergreen Agreement and the underlying Business Plan established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Agreements.

The Association has calculated its regulatory capital, as provided in the Agreements, to be approximately $24.2 million, or 3.52% of assets, at June 30, 1990, exceeding the minimum level pursuant to the Agreements by approximately $1.8 million, or 0.27% of assets (see Note 17 to the Consolidated Financial Statements). At August 31, 1990, the Association's unaudited calculation of regulatory capital under the Agreements was approximately $24.4 million, or 3.64% of assets, exceeding the minimum level required pursuant to the Agreements by approximately $2.6 million, or 0.38% of assets. No assurances can be given that the Association will continue to meet the regulatory capital levels required by the Agreements in future periods.

According to the Association's June 30, 1990, regulatory capital calculations, assuming the regulators' interpretation of the FIRREA requirements was applicable to the Association and that the Agreements were not binding on the regulators, the Association would not be in compliance with the regulatory capital regulations and would have a shortfall of tangible and core capital of approximately $21.3 million and for risk-based capital of approximately $30.2 million.

The OTS has taken the position that the capital standards promulgated pursuant to FIRREA apply to the Association notwithstanding contrary provisions of the Agreements ( see "General"). In light of the OTS' unwillingness to negotiate any alternative solution, on May 15, 1990, the Association initiated a civil action against the OTS and the FDIC seeking to have the regulators' interpretation of FIRREA and their adverse decisions regarding Sterling declared unlawful. The United States District Court for the Eastern District of Washington ("Court") granted the Association a temporary restraining order on May 29, 1990, and issued a preliminary injunction on July 3, 1990. In announcing its decision to grant a preliminary injunction, the Court stated that Sterling would probably succeed at trial on the merits of its position that the OTS and FDIC Agreements were contractually binding. The preliminary injunction prohibits the regulators from imposing any regulatory restrictions on the Association that are inconsistent with the provisions of its contractual Agreements. Sterling is in compliance with applicable minimum capital standards under the Agreements.

A trial date has not yet been set. The federal agencies may appeal the Court's order granting the preliminary injunction. Alternatively, the federal agencies may choose not to appeal the Court's order and permit the case to proceed to trial, or may seek to settle the dispute out of Court. Although there can be no assurance in this regard, the Association believes it will prevail at trial on the merits of its case.

ASSET AND LIABILITY MANAGEMENT

Since inception, the Association has maintained an asset and liability management program designed to stabilize net interest income throughout interest rate cycles by creating the means for protecting net interest spread against rapid increases in the cost of funds and by achieving and maintaining a favorable balance between interest-earning assets and interest-bearing liabilities. The Association utilizes a variety of methods to protect net interest spread against rapid increases in interest rates, including (i) originating and retaining adjustable rate mortgages ("ARMs") secured by residential or commercial real estate and other collateral and characterized by interest rates established at predetermined margins over a specified index that are adjusted periodically within contractual maximum limitations, (ii) selling into the secondary market substantially all long-term fixed-rate residential first mortgage loans originated or purchased, and (iii) borrowing long-term funds, principally from the FHLB of Seattle. In utilizing these methods, the Association attempts to match the maturities and interest rate sensitivity of its assets and liabilities in order to maintain adequate interest rate spread and asset quality.

Although the carrying values of the Association's portfolios of fixed rate loans and mortgage-backed securities exceeded their market values at June 30, 1990, these assets are funded at a positive net interest spread. Management intends to hold these fixed-rate loans and mortgage-backed securities for the foreseeable future; therefore, a decline in market value will not be realized.

The Association has formed a committee of senior management for the purpose of reviewing the composition and maturities of assets and liabilities. This committee attempts to maintain the Association's asset and liability gap position between a negative 10% and 25% at both the one- and three-year pricing intervals.

The Association's one-year and three-year cumulative gap positions (the difference between the amount of interest-earning assets and the amount of interest-bearing liabilities expected to reprice in the period) at June 30, 1990, were a negative $127.9 million and a negative $152.7 million, respectively, representing a negative cumulative gap to total assets ratio of 18.6% and 22.2%, respectively. The Association believes that its gap position is reasonably matched for the current level of prevailing interest rates and that its net interest rate spread should be reasonably protected against a rapid rise in interest rates.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## CONSOLIDATED STATEMENTS OF CASH FLOWS

for the years ended June 30, 1990, 1989 and 1988
(Dollar Amounts in Thousands)

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 266 | $ 1,285 | $ 1,219 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of effects of acquisitions: | | | |
| Provisions for loan and real estate owned losses | 1,550 | 326 | 951 |
| Stock dividends on FHLB stock | (633) | (756) | (319) |
| Net gain on sales of loans and securities | (3,328) | (154) | (89) |
| Depreciation and amortization | 3,886 | 2,832 | 985 |
| Deferred income taxes | (164) | (84) | 27 |
| Change in accrued interest receivable | 261 | (1,479) | (1,423) |
| Change in accrued interest payable | (920) | 889 | 358 |
| Other, net | (72) | (142) | 239 |
| | 846 | 2,717 | 1,948 |
| Change in cashier's checks issued and payable | (326) | (323) | (146) |
| Change in prepaid expenses and other assets | (2,712) | (560) | (533) |
| Change in borrowers' reserves and accrued expenses and other liabilities | (4,773) | 179 | 1,478 |
| Net sale (disbursement) of loans pursuant to mortgage-banking operations | 3,091 | (16,822) | (1,637) |
| Net cash provided by (used in) operating activities | (3,874) | (14,809) | 1,110 |
| Cash flows from investing activities, net of effects of acquisitions: | | | |
| Loans disbursed | (116,464) | (173,034) | (171,789) |
| Loan principal payments | 151,663 | 110,264 | 62,435 |
| Purchase of mortgage-backed securities | (28,379) | (13,330) | (14,140) |
| Mortgage-backed securities principal payments | 9,127 | 5,459 | 2,343 |
| Proceeds from sales of mortgage-backed securities | 19,837 | 12,411 | 14,389 |
| Purchase of investments | (313) | (8,238) | (28,725) |
| Proceeds from sales and maturities of investments | 5,314 | 20,807 | 13,347 |
| Purchase of office properties and equipment | (1,435) | (926) | (2,625) |
| Proceeds from sales of real estate owned | 9,874 | 4,962 | 1,830 |
| Net liabilities assumed as part of Tri-Cities acquisition | | | 11,730 |
| Deposit liabilities assumed as part of branch acquisitions | | | 47,143 |
| Purchase of loan servicing rights | (2,532) | (826) | |
| Proceeds from sale of loan servicing rights | 4,004 | | |
| Net cash provided by (used in) investing activities | 50,696 | (42,451) | (64,062) |
| Cash flows from financing activities, net of effects of acquisitions: | | | |
| Net change in NOW, passbook and money market deposits | (9,440) | (25,252) | (948) |
| Proceeds from sales of certificates of deposit | 360,265 | 488,596 | 245,574 |
| Payments for maturing certificates of deposit | (425,919) | (496,588) | (238,156) |
| Interest credited to deposits | 34,492 | 31,243 | 18,295 |
| Advances from the Federal Home Loan Bank | 97,000 | 101,000 | 54,000 |
| Repayment of Federal Home Loan Bank advances | (96,000) | (88,800) | (44,650) |
| Net change in overnight Federal Home Loan Bank advances | 15,300 | | |
| Net change in securities sold subject to repurchase agreements | (11,444) | 40,153 | 24,142 |
| Cash dividends on preferred stock | (56) | (225) | (226) |
| Net cash provided by (used in) financing activities | (35,802) | 50,127 | 58,031 |
| Cash and cash equivalents acquired as part of acquisitions | | 13,640 | 21,320 |
| Net increase in cash and cash equivalents | 11,020 | 6,507 | 16,399 |
| Cash and cash equivalents at beginning of year | 25,664 | 19,157 | 2,758 |
| Cash and cash equivalents at end of year | $ 36,684 | $ 25,664 | $ 19,157 |
| Supplemental disclosures: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 55,155 | $ 42,563 | $ 30,555 |
| Income taxes | $ 52 | $ 120 | $ 201 |
| Loans swapped for mortgage-backed securities | | $ 54,430 | $ 8,232 |
| Loans converted into real estate owned | $ 4,427 | $ 5,359 | $ 2,202 |
| Assets acquired and liabilities assumed as part of Central Evergreen acquisition | | $ 248,883 | |

The accompanying notes are an integral part of the consolidated financial statements.





CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

for the years ended June 30, 1990, 1989 and 1988
(Dollar Amounts in Thousands, Except Per Share Amounts)

| | Preferred Stock | | Common Stock | | Additional Paid-in | Retained |
|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Capital | Earnings |
| Balance, June 30, 1987 | 90,168 | $90 | 426,399 | $ 426 | $6,832 | $1,121 |
| Common shares issued for cash | | | 200 | | 2 | |
| Common stock dividend (10%) | | | 42,397 | 43 | 402 | (445) |
| Cash paid for fractional shares of common stock dividend | | | | | | (2) |
| Cash dividends on preferred stock ($2.25 per share) | | | | | | (226) |
| Common shares issued upon exercise of stock options | | | 3,750 | 4 | 32 | |
| Common shares acquired and retired upon exercise of stock options | | | (2,537) | (3) | (28) | |
| Net income | | | | | | 1,219 |
| Balance, June 30, 1988 | 90,168 | 90 | 470,209 | 470 | 7,240 | 1,667 |
| Common shares issued for cash | | | 250 | | 3 | |
| Common stock dividend (10%) | | | 46,769 | 47 | 479 | (526) |
| Cash paid for fractional shares of common stock dividend | | | | | | (4) |
| Cash dividends on preferred stock ($2.50 per share) | | | | | | (225) |
| Costs to exchange Series B preferred stock for Series A | | | | | (14) | |
| Net income | | | | | | 1,285 |
| Balance, June 30, 1989 | 90,168 | 90 | 517,228 | 517 | 7,708 | [illegible]197 |
| Cash dividends on preferred stock ($.63 per share) | | | | | | |
| Common shares issued upon exercise of stock options | | | 2,500 | 2 | 17 | |
| Common shares acquired and retired upon exercise of stock options | | | (1,341) | (1) | (10) | |
| Net income | | | | | | 266 |
| Balance, June 30, 1990 | 90,168 | $90 | 518,387 | $ 518 | $7,715 | $2,407 |

The accompanying notes are an integral part of the consolidated financial statements.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

CONSOLIDATED BALANCE SHEETS, June 30, 1990 and 1989
(Dollar Amounts in Thousands)

| ASSETS | 1990 | 1989 |
|---|---|---|
| Cash and cash equivalents: | | |
| Interest bearing, including certificates of deposit | $ 27,689 | $ 15,139 |
| Non-interest bearing and vault | 8,795 | 9,225 |
| Restricted | 200 | 1,300 |
| Investments (market value $27,050 and $31,390) | 27,271 | 31,639 |
| Loans receivable (net of allowance for losses of $6,649 and $6,450) | 441,639 | 478,440 |
| Loans held for sale | 15,250 | 18,341 |
| Mortgage-backed securities (market value $110,439 and $111,029) | 113,706 | 114,060 |
| Accrued interest receivable (including $508 and $582 on investments) | 6,283 | 6,544 |
| Office properties and equipment | 11,133 | 10,727 |
| Real estate owned | 10,172 | 16,336 |
| Intangibles: | | |
| Purchased loan servicing rights | 1,135 | 2,732 |
| Identified | 5,479 | 6,360 |
| Unidentified | 14,241 | 16,630 |
| Prepaid expenses and other assets | 5,383 | 2,671 |
| Total assets | $688,376 | $730,144 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Deposits | $479,227 | $519,982 |
| Advances from Federal Home Loan Bank | 112,976 | 96,580 |
| Securities sold subject to repurchase agreements | 75,901 | 87,345 |
| Cashier's checks issued and payable | 4,668 | 4,994 |
| Borrowers' reserves for taxes and insurance | 1,495 | 2,519 |
| Accrued interest payable | 2,103 | 3,023 |
| Deferred income taxes | | 164 |
| Accrued expenses and other liabilities | 1,276 | 5,025 |
| Total liabilities | 677,646 | 719,632 |
| Preferred stock, $1 par value; 1,000,000 shares authorized; 90,168 shares issued and outstanding ($2,254 liquidation preference value) | 90 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; 518,387 and 517,228 shares issued and outstanding | 518 | 517 |
| Additional paid-in capital | 7,715 | 7,708 |
| Retained earnings | 2,407 | 2,197 |
| Total stockholders' equity | 10,730 | 10,512 |
| Total liabilities and stockholders' equity | $688,376 | $730,144 |

The accompanying notes are an integral part of the consolidated financial statements.


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## CONSOLIDATED STATEMENTS OF INCOME

for the years ended June 30, 1990, 1989 and 1988
(Dollar Amounts in Thousands, Except Per Share Amounts)

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Interest income: | | | |
| Loans and mortgage-backed securities | $ 63,684 | $50,399 | $25,227 |
| Investments and cash equivalents | 3,362 | 3,744 | 2,064 |
| FDIC (FSLIC) yield maintenance subsidy | 483 | 600 | |
| | 67,529 | 54,743 | 27,291 |
| Interest expense: | | | |
| Deposits | 38,941 | 31,037 | 14,947 |
| Short-term borrowings | 11,692 | 10,755 | 3,310 |
| Long-term borrowings | 3,548 | 2,052 | 2,519 |
| | 54,181 | 43,844 | 20,776 |
| Net interest income | 13,348 | 10,899 | 6,515 |
| Provision for loan losses | 1,100 | 260 | 572 |
| Net interest income after provision for loan losses | 12,248 | 10,639 | 5,943 |
| Other income: | | | |
| Mortgage banking operations | 3,128 | 1,028 | |
| Fees and service charges on deposit accounts | 2,011 | 913 | 423 |
| Loan commitment and origination fees | 55 | 560 | 3,517 |
| Loan servicing fees | 864 | 471 | 216 |
| Net gain (loss) on sales of loans and securities | 241 | (118) | 408 |
| Net gain (loss) on sale and operation of real estate owned | (176) | 757 | (376) |
| FDIC (FSLIC) indemnification for loss on sale of real estate owned | (97) | (66) | |
| Other | [illegible]74 | 550 | 6[illegible] |
| Total other income | [illegible],[illegible]00 | 4,095 | 4,25[illegible] |
| Operating expenses: | | | |
| Employee compensation and benefits | 6,404 | 4,621 | 3,897 |
| Occupancy and equipment | 2,809 | 2,316 | 1,153 |
| Advertising and promotion | 296 | 275 | 165 |
| Data processing | 1,379 | 961 | 483 |
| Depreciation and amortization | 1,029 | 811 | 523 |
| Amortization of intangibles | 3,253 | 2,021 | 462 |
| Other | 3,776 | 2,219 | 1,545 |
| Total operating expenses | 18,946 | 13,224 | 8,228 |
| Income before income taxes | 102 | 1,510 | 1,971 |
| Income tax provision (benefit): | | | |
| Current | | 309 | 725 |
| Deferred | (164) | (84) | 27 |
| | (164) | 225 | 752 |
| Net income | 266 | 1,285 | 1,219 |
| Less preferred stock dividends earned | 225 | 225 | 203 |
| Net income applicable to common shares | $ 41 | $ 1,060 | $ 1,016 |
| Net income per common share | $ .08 | $ 2.04 | $ 1.96 |
| Weighted average common shares outstanding | 518,298 | 520,468 | 518,897 |

The accompanying notes are an integral part of the consolidated financial statements.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(All Dollar Amounts in Thousands, Except Per Share Amounts)

1. SIGNIFICANT ACCOUNTING POLICIES:

The accounting and financial reporting policies of Sterling Savings Association (the "Association") and its subsidiaries conform to generally accepted accounting principles and to general practice within the savings and loan industry. The following is a description of the Association's significant accounting policies.

**Principles of Consolidation**

The accompanying consolidated financial statements include the accounts of the Association and all of its wholly and majority-owned subsidiaries.

The purchase price of acquired companies has been allocated to the assets and liabilities acquired based upon their estimated fair values at the date of acquisition. Results of operations of acquired companies are included in the accompanying financial statements only since the dates of acquisition. All significant intercompany accounts and transactions have been eliminated in consolidation.

**Investments and Mortgage-Backed Securities**

Investments are carried at cost, adjusted for amortization of premiums or accretion of discounts. Mortgage-backed securities are carried at their remaining unpaid principal balance, net of unamortized premium or unaccreted discount. It is management's primary intent to hold these securities until maturity. However, these securities are occasionally sold prior to their maturity in response to unforeseen market conditions in order to limit interest rate risk. Premiums are amortized and discounts are accreted using the level interest yield method over the estimated remaining term of the underlying security. Gains and losses on sales of investments and mortgage-backed securities are recognized based on specific identification.

**Provision for Loan Losses**

A provision for possible loan losses, when determined necessary, is charged to income based on management's evaluation of the potential losses that may occur in its loan portfolio. Such evaluation, which includes a review of all loans which may not be fully collectible, considers, among other matters, the estimated net realizable value of the underlying collateral.

**Real Estate Owned**

Property acquired by foreclosure or deed in lieu of foreclosure is recorded at the lower of estimated fair value, based on appraisal of such property, or the principal balance of the defaulted loan. Development, improvement and direct holding costs relating to the property are capitalized. The carrying value of such property is continuously evaluated and, if necessary, allowances are established to reduce the carrying value to net realizable value (which considers, among other things, provisions for estimated direct holding costs and selling expenses).

**Office Properties and Equipment**

Office properties and equipment are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Expenditures for new properties and equipment and major renewals or betterments are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. When property or equipment is sold or retired, the cost and related accumulated depreciation are removed from the respective accounts, and the resulting gains or losses are reflected in income.

**Loan Origination and Commitment Fees**

Effective July 1, 1988, the Association prospectively adopted the provisions of Statement of Financial Accounting Standards No. 91 - Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans ("SFAS No. 91"). This new standard has substantially revised the Association's method of accounting for loan origination fees, which under previous accounting principles were deferred only to the extent that they exceeded the direct costs of underwriting and closing loans. For all lending transactions entered into on or after July 1, 1988, the total loan origination fee, net of certain specifically defined direct loan origination costs, is deferred. The net amount deferred is recognized as interest income using the level interest yield method over the contractual term of each loan as an adjustment of yield. If the related loan is sold, the remaining net amount deferred, which is part of the basis of the loan, is used in determining the gain or loss on sale.

Loan commitment fees are deferred until the expiration of the commitment period unless management believes there is a remote likelihood that the underlying commitment will be exercised, in which case the fees are amortized to fee income using the straight-line method over the commitment period. If a loan commitment is exercised, the deferred commitment fee is accounted for in the same manner as a loan origination fee. Deferred commitment fees associated with expired commitments are recognized as fee income.

During the year ended June 30, 1989, the effect of adopting SFAS No. 91 was to decrease income before income taxes and net income by $275 and $182, respectively, and net income per share $.35.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**SIGNIFICANT ACCOUNTING POLICIES**, Continued:

**Income Per Share**

Net income per share is equal to net income, reduced by dividends earned on preferred stock during the year, divided by the weighted average number of shares of common stock and common stock equivalents (stock options) outstanding during each year. All weighted average shares outstanding and per share amounts have been retroactively restated to reflect all stock dividends.

**Intangibles**

Identified intangibles, which represent separately identifiable intangible assets attributable to depositor relationships that exist at the date of an acquisition, are amortized on a straight-line basis over the estimated life of the depositor relationships acquired (eight years). Accumulated amortization of identified intangibles was $1,595 and $714 at June 30, 1990 and 1989, respectively.

Unidentified intangibles are amortized using the level interest yield method over the estimated remaining life (assuming prepayments) of the long-term interest-bearing assets (loans receivable and mortgage-backed securities) acquired (generally a total of twelve years, with the substantial majority of the unidentified intangible being amortized in the first four years). Accumulated amortization of unidentified intangibles was $5,110 and $2,738 at June 30, 1990 and 1989, respectively.

**Mortgage Banking Operations**

The Association originates or purchases and sells loans and participating interests in loans, generally with the servicing rights retained, to provide additional funds for general corporate purposes and to generate servicing income. Loans and participating interests therein committed or held for sale are carried at the lower of cost or market value.

The Association recognizes a gain or loss on these loan sale transactions which includes a component reflecting the differential between the contractual interest rate of the loan and the interest rate which will be received by the investor in the servicing agreement. The present value of the estimated future profit for servicing the loans, together with the normal servicing fee rate ("deferred premium"), is taken into account in determining the amount of gain or loss on the sale of loans. At June 30, 1990 and 1989, net deferred premiums on loans sold of $237 and $536, respectively, were included in prepaid expenses and other assets.

The portion of the purchase price of individual loans representing the cost of acquiring the right to service those loans is capitalized if there is a definitive plan to immediately sell the loans. The amount capitalized is subject to certain limitations based on the present value of the estimated future stream of net servicing income (assuming loan prepayments), and the recognition of a gain on the loan sale transaction. The right to service loans can also be an identified intangible asset acquired in a business combination.

Deferred premiums on loan sales and the capitalized costs of purchased servicing rights are both amortized to expense in proportion to the estimated future stream of net servicing income, assuming loan prepayments (total amortization period is generally twelve years, with the substantial majority of the asset being amortized in the first four years). During the years ended June 30, 1990 and 1989, amortization of deferred premiums was $41 and $28, respectively, and amortization of capitalized costs of purchased servicing rights was $546 and $193, respectively.

Premiums paid in connection with option transactions, entered into as an anticipatory hedge of movement in interest rates in connection with mortgage-banking operations, are deferred and amortized to expense over the option period. At June 30, 1990, net deferred premiums of $96, associated with the purchase of put options on $21,000 of unspecified mortgage-backed securities, were included in prepaid expenses and other assets. These off-balance sheet options do not create a risk of material accounting loss.

**Cash Equivalents**

The Association considers a cash equivalent to be any highly liquid debt instrument purchased with an original maturity of three months or less.

**Reclassifications**

Certain prior year balances have been reclassified to conform with the 1990 presentation. These reclassifications had no effect on retained earnings or net income as previously reported.

**2. REGULATORY MATTERS:**

During the years ended June 30, 1986, 1988 and 1989, the Association, at the request of its regulators, completed supervisory acquisitions of three troubled institutions: Lewis Federal, Tri-Cities, and Central Evergreen, respectively


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**2. REGULATORY MATTERS:**

During the years ended June 30, 1986, 1988 and 1989, the Association, with the encouragement and approval of its regulators, completed supervisory acquisitions of three troubled institutions: Lewis Federal, Tri-Cities, and Central Evergreen, respectively (see Note 14). Each of these institutions was insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on the Association's financial statements as part of accounting for the acquisition. Each of the supervisory acquisitions was subject to contractual acquisition agreements ("Agreements") with then-existing regulatory authorities.

The Lewis Federal and Tri-Cities Agreements provided for various forms of assistance to the Association to induce the Association to complete the acquisitions. Such assistance included cash payments, indemnification against certain losses, and regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreements, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisitions in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles, for purposes of calculating regulatory capital.

The Central Evergreen Agreement was based upon an approved Business Plan ("Business Plan") under which the Association would operate through December 31, 1993. The Central Evergreen Agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Agreements.

On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was enacted. FIRREA significantly revised the regulation and permissible activities of savings associations. Among other things, FIRREA virtually eliminates the solicitation of brokered deposits for "troubled thrift" institutions, and drastically reduces the aggregate amount of loans that can be made to any single borrower. FIRREA also prescribes new capital standards and consequences for non-compliance with capital standards. FIRREA further provides that, for purposes of calculating compliance with the new capital standards, savings associations will generally be required to exclude certain intangible assets and other previously allowable regulatory capital items.

In response to FIRREA, the Office of Thrift Supervision ("OTS") promulgated new capital regulations which became effective on December 7, 1989. These new standards initially require savings associations to have at least 1.5% of adjusted total assets as tangible capital, 3.0% of adjusted total assets as core capital, and 6.4% of risk weighted assets as risk-based capital.

Beginning in October 1989 the Association received several communications from the OTS advising it that the OTS was taking the position that the FIRREA capital requirements were applicable to the Association notwithstanding contrary provisions of Sterling's Agreements with the regulators. These communications further indicated that the OTS had concluded that the Association would fail to meet the new FIRREA capital standards. Therefore, the OTS indicated that it expected the Association to file a capital restoration plan.

Thrift Bulletin 38-2 was released by the OTS in January 1990 and states that the new capital standards apply to all savings associations, including associations that have been operating under previously granted capital and accounting forbearances. Further, Thrift Bulletin 38-2 purported to eliminate such capital and accounting forbearances. Other FIRREA implementing regulations require institutions that fail any one of the three new capital standards to be subject to, among other things, Regulatory Bulletin 3a-1, Policy Statement on Growth for Savings Associations, and Thrift Bulletin 36, Capital Restoration Plans. In addition, the regulations provide that the OTS may, at any time, take enforcement actions against a savings association that fails to meet any of the capital requirements, including placing it in receivership, or requiring the association to take one or more corrective actions, including: increasing its regulatory capital; restricting dividend payments; reducing the rate paid on or limiting the receipt of additional savings accounts; ceasing or limiting certain lending activities; limiting operational expenditures; increasing liquid assets; or taking any other actions deemed necessary or appropriate.

Notwithstanding the Association's belief that its regulatory capital adequacy requirements are governed by its contractual Agreements, the Association submitted several capital restoration plans to the OTS, each of which was rejected. As an integral part of its primary capital plan, Sterling undertook a public offering of common and preferred stock which would have raised approximately $10.5 million of new capital. Ultimately the Association was forced to cancel this fully subscribed offering in January 1990 as a direct consequence of the OTS prohibiting the Association from making any capital distributions, including the payment of dividends on stock (see Note 15).

In May 1990, the Association notified the OTS that it believed the position the OTS was taking was unlawful and, specifically, contrary to FIRREA. Following the OTS' subsequent refusal to honor the contractual Agreements, the Association attempted to negotiate a mutually acceptable alternative solution that would allow it to continue operating without undue interference by its regulators.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

2. **REGULATORY MATTERS,** Continued:

In light of the OTS' unwillingness to negotiate any such alternative solution, on May 15, 1990, the Association initiated a civil action against the OTS and the Federal Deposit Insurance Corporation ("FDIC"), seeking to have OTS' misapplication of FIRREA in derogation of the Agreements declared unlawful. The United States District Court for the Eastern District of Washington ("Court") granted the Association a temporary restraining order on May 29, 1990, and issued a preliminary injunction on July 3, 1990. Collectively, the temporary restraining order and preliminary injunction prohibit the regulators from imposing any regulatory restrictions on the Association that are inconsistent with the provisions of its contractual Agreements. The regulators have filed a motion to narrow the scope of the preliminary injunction issued by the Court.

A trial date for this civil action has not yet been set. The federal agencies may appeal the Court's order granting the preliminary injunction and any reconsideration thereof. Alternatively, the federal agencies may choose not to appeal the Court's order and permit the case to proceed to trial or may seek to settle the dispute out of court.

The Association has calculated its regulatory capital, as provided in the Agreements, to be approximately $24,210 (3.52% of assets) at June 30, 1990, exceeding the minimum level required pursuant to the Agreements by approximately $1,831 (0.27% of assets) (see Note 17). At August 31, 1990, the Association's unaudited calculation of regulatory capital pursuant to the Agreements was approximately $24,426 (3.64% of assets), exceeding the level required pursuant to the Agreements by approximately $2,570 (0.38% of assets). Although Sterling is in compliance with applicable minimum capital standards under the Agreement, no assurances can be given that the Association will continue to meet the regulatory capital levels required by the Agreements in future periods.

According to the Association's June 30, 1990, calculations, if the OTS' interpretation of the FIRREA requirements were applicable to the Association and if the Agreements were not binding on the regulators, the Association would not be in compliance with the capital regulations and would have a shortfall for tangible and core capital of approximately $21,278 and risk-based capital of approximately $30,173. If the Association (1) does not favorably resolve the civil action against the OTS and FDIC, (2) is unable to obtain approval of some form of capital restoration plan, or (3) is unable to otherwise comply with post-FIRREA capital standards, it may be unable to continue as a going concern. The 1990 consolidated financial statements do not include any adjustments related to the recoverability of recorded asset amounts, including the intangible assets, or the amount of liabilities that might be necessary, should the Association be unable to continue as a going concern.

The Association intends to vigorously defend itself from regulatory actions that are contrary to the Agreements, while alternatively seeking to negotiate with its regulators mutually agreed upon levels of capital consistent with the intent of FIRREA and the Agreements. In addition, the Association will continue to explore opportunities to increase its capital. The Association plans to maintain operations at levels contemplated in its Business Plan.

3. **INVESTMENTS:**

A summary of carrying and market values of investments follows:

| | June 30, 1990 | | June 30, 1989 | |
|---|---|---|---|---|
| | Carrying Value | Market Value | Carrying Value | Market Value |
| U.S. Government and agency obligations | $21,363 | $21,142 | $23,305 | $23,053 |
| Federal Home Loan Bank stock, at cost | 5,878 | 5,878 | 7,563 | 7,563 |
| Corporate notes | | | 642 | 645 |
| Other | 30 | 30 | 129 | 129 |
| | $27,271 | $27,050 | $31,639 | $31,390 |

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**4. LOANS RECEIVABLE:**

The components of loans receivable are:

| | June 30, 1990 | June 30, 1989 |
|---|---|---|
| Real estate loans: | | |
| Variable rate residential mortgage loans | $ 145,052 | $148,403 |
| Fixed rate residential mortgage loans | 64,787 | 72,584 |
| Residential mortgage loans purchased | 5,427 | 8,393 |
| Loans insured by FHA/VA | 9,692 | 10,170 |
| Variable rate commercial real estate loans | 80,370 | 91,732 |
| Fixed rate commercial real estate loans | 43,939 | 43,038 |
| Commercial real estate loans purchased | 8,772 | 8,414 |
| Construction loans | 56,140 | 81,369 |
| Participation in loans sold | 2,250 | 2,510 |
| Contracts receivable | 1,962 | 2,724 |
| Unearned discount on certain loans | (47) | (56) |
| | 418,344 | 469,281 |
| Other loans: | | |
| Commercial loans | 18,423 | 21,590 |
| Commercial and personal lines of credit | 8,331 | 9,451 |
| Consumer loans | 13,316 | 11,987 |
| Loans secured by deposits | 2,619 | 2,820 |
| | 42,689 | 45,848 |
| Total loans | 461,033 | 515,129 |
| Undisbursed portion of loans in process | (9,972) | (26,467) |
| Deferred loan fees, net of direct loan origination costs | (577) | (1,243) |
| Discount on loans acquired pursuant to purchase transactions | (2,196) | (2,529) |
| Allowance for losses | (6,649) | (6,450) |
| | $ 441,639 | $478,440 |

At June 30, 1990, 1989 and 1988, the Association serviced loans for the benefit of others amounting to $174,095, $315,377 and $59,904, respectively, which are not included in the amounts above. During the year ended June 30, 1990, the Association sold the rights to service $312,064 of loans serviced for others. A gain of $297 was recognized on this sale, net of deferred premiums and purchased servicing rights costs of $3,958. The Association will continue to service these loans through October 1990 under a subservicing agreement.

At June 30, 1990, contractual principal repayments of loans receivable are due approximately as follows:

| Year Ending June 30, | |
|---|---|
| 1991 | $ 92,267 |
| 1992-1995 | 56,582 |
| Thereafter | 312,184 |
| | $461,033 |



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**4. LOANS RECEIVABLE,** Continued:

Included in loans receivable are loans to directors and executive officers, all of which are conforming residential, commercial and consumer loans. Following is an analysis of the activity in loans to directors and executive officers:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Balance, beginning of year | $ 795 | $806 | $734 |
| Additions | 104 | 56 | 118 |
| Repayments | (156) | (67) | (46) |
| Balance, end of year | $ 743 | $795 | $806 |

The Association grants residential, commercial real estate, consumer and commercial loans throughout Washington and bordering areas, primarily northwestern Oregon. Loans originated outside this area are primarily for immediate sale into the secondary market. As of June 30, 1990, the Association had construction loans of $56,140, which are concentrated in the Seattle and Spokane, Washington, and Portland, Oregon, metropolitan areas. Although these areas have diversified economies, such borrowers' ability to honor their contracts is directly or indirectly dependent upon the aerospace industry to a large degree.

**5. REAL ESTATE OWNED:**

The components of real estate owned are:

| | June 30, | |
|---|---|---|
| | 1990 | 1989 |
| Residential real estate, acquired through foreclosure (including $541 and $2,095 from acquired institutions - see Note 14) | $ 1,158 | $ 3,323 |
| Commercial real estate, acquired through foreclosure (including $2,650 and $6,259 from acquired institutions - see Note 14) | 7,732 | 11,276 |
| Former Association branch buildings held for sale (from acquired institution) | 580 | 784 |
| Other | 670 | 466 |
| | 10,140 | 15,849 |
| Allowance for losses | (980) | (819) |
| FDIC (FSLIC) Assistance | 1,012 | 1,306 |
| | $10,172 | $16,336 |

Costs incurred to acquire and improve real estate of $108 and $386 had been capitalized as of June 30, 1990 and 1989, respectively.

Included in commercial real estate at June 30, 1990 and 1989, is $466 and $882, respectively, related to properties for which the Federal Deposit Insurance Corporation ("FDIC") has indemnified the Association for 75% of any capital losses and guaranteed the Association a minimum yield (see Note 14b). The FDIC Assistance represents 75% of prior write-downs to net realizable value that will be paid by FDIC upon disposition of the property.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

### 6. ALLOWANCES FOR LOAN AND REAL ESTATE OWNED LOSSES:

Following is an analysis of the changes in the allowances for loan and real estate owned losses:

| | Loan | Real Estate Owned | Total |
|---|---|---|---|
| Balance, June 30, 1987 | $ 185 | $ 106 | $ 291 |
| Provision for 1988 | 572 | 379 | 951 |
| Amounts written off | (128) | (143) | (271) |
| Recoveries | 19 | 5 | 24 |
| Allowance for losses on assets acquired | 3,122 | | 3,122 |
| Balance, June 30, 1988 | 3,770 | 347 | 4,117 |
| Provision for 1989 | 260 | 66 | 326 |
| Amounts written off | (1,590) | (268) | (1,858) |
| Recoveries | 50 | 304 | 354 |
| Allowance for losses on assets acquired | 3,960 | 370 | 4,330 |
| Balance, June 30, 1989 | 6,450 | 819 | 7,269 |
| Provision for 1990 | 1,100 | 450 | 1,550 |
| Amounts written off | (910) | (458) | (1,368) |
| Recoveries | 9 | 169 | 178 |
| Balance, June 30, 1990 | $ 6,649 | $ 980 | $ 7,629 |

Following is a summary of loans that are not performing in accordance with their original contractual terms:

| | June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Nonaccrual loans (1) | $10,771 | $15,619 | $6,098 |
| Accruing loans which are past due 90 days or more | 1,104 | 125 | 2,357 |
| Restructured loans (2) | 1,299 | 1,516 | 672 |
| Total nonperforming loans | $13,174 | $17,260 | $9,127 |

(1) The accrual of interest is stopped on any loan when either principal or interest becomes 90 days past due, unless it meets specific criteria. Any accrued and uncollected interest is eliminated from income at that time. A loan may be put in nonaccrual status sooner than this standard would dictate if, in management's judgment, that loan may be uncollectible. Such interest is then recognized as income only if it is ultimately collected.

Included in nonaccrual loans at June 30, 1990 and 1989, is $6,040 and $12,434, respectively, relating to acquired institutions (see Note 14).

(2) Restructured loans occur when the Association has compromised the contractual loan terms to provide a reduction in the rate of interest and, in most instances, an extension of payments of principal or interest, or both, because of a deterioration in the financial position of the borrower. Restructured loans performing in accordance with their new terms are not included in nonaccrual loans unless concern exists as to the ultimate collection of principal or interest.

Additional gross interest income of $1,053 would have been recorded during the year ended June 30, 1990, if nonaccrual and restructured loans had been current in accordance with their original contractual terms. Interest income of $170 was recorded during the year ended June 30, 1990, in connection with these loans.

In addition to the above loans, certain other loans totalling approximately $12,182 at June 30, 1990, are presently performing in accordance with their terms, but, in the opinion of management, there is some doubt as to the ability of the borrowers to comply with the repayment terms in the future. While management does not anticipate any losses not already provided for on these loans, economic conditions may be such as to necessitate future modifications in the repayment terms.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

### 7. OFFICE PROPERTIES AND EQUIPMENT:

The components of office properties and equipment are:

| | June 30, 1990 | June 30, 1989 | Estimated Useful Life |
|---|---|---|---|
| Buildings and improvements | $ 7,553 | $ 6,904 | 20-40 years |
| Furniture, fixtures and equipment | 4,872 | 4,240 | 3-10 years |
| Automobiles | 170 | 118 | 3-5 years |
| Leasehold improvements | 985 | 467 | 5-10 years |
| Equipment under capital lease | 82 | 82 | 5 years |
| | 13,662 | 11,811 | |
| Less accumulated depreciation and amortization | (4,147) | (3,254) | |
| | 9,515 | 8,557 | |
| Land | 1,618 | 2,170 | |
| | $11,133 | $ 10,727 | |

### 8. DEPOSITS

The components of deposits are:

| | June 30, 1990 | June 30, 1989 |
|---|---|---|
| Commercial NOW accounts (non-interest bearing) | $ 7,385 | $ 4,389 |
| 5.00% NOW accounts | 33,642 | 30,555 |
| 5.25% passbook accounts | 43,051 | 46,076 |
| Money market demand accounts (5.70% to 6.00%) | 30,692 | 34,958 |
| | 114,770 | 115,978 |
| Certificate accounts: | | |
| 5.00 to 5.99% | 507 | 244 |
| 6.00 to 6.99% | 145 | 3,183 |
| 7.00 to 7.99% | 72,767 | 88,688 |
| 8.00 to 8.99% | 270,563 | 144,869 |
| 9.00 to 9.99% | 12,074 | 143,686 |
| 10.00 to 10.99% | 2,946 | 15,127 |
| 11.00 to 11.99% | 3,320 | 4,555 |
| 12.00% and over | 1,592 | 2,987 |
| | 363,914 | 403,339 |
| Net premium on deposits assumed pursuant to purchase transactions | 543 | 665 |
| | $479,227 | $519,982 |

At June 30, 1990, the amounts of scheduled maturities of certificate accounts were as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1991 | 8.20% | $295,167 |
| 1992 | 8.26% | 36,597 |
| 1993 | 8.24% | 8,098 |
| 1994 | 9.45% | 7,766 |
| Thereafter | 9.06% | 16,286 |
| | 8.27% | $363,914 |

At June 30, 1990 and 1989, certificate accounts included accounts with a minimum balance of $100 ("Jumbos") of $43,915 and $98,237, respectively. At June 30, 1990, mortgage-backed securities with a carrying value of $18,575 were pledged as collateral for wholesale public funds deposits in accordance with Washington Public Deposit Protection Commission regulations.


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER