## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**8. DEPOSITS, Continued:**

The components of interest expense on deposits are:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| NOW accounts | $ 1,633 | $ 1,233 | $ 584 |
| Passbook accounts | 2,471 | 2,082 | 1,128 |
| Money market demand accounts | 2,024 | 2,081 | 1,495 |
| Certificate accounts | 32,813 | 25,641 | 11,740 |
| | $38,941 | $31,037 | $14,947 |

**9. ADVANCES FROM FEDERAL HOME LOAN BANK:**

The advances from the Federal Home Loan Bank at June 30, 1990, are repayable as follows:

| Year Ending June 30, | Weighted Average Interest Rate | Amount |
|---|---|---|
| 1991 | 8.44% | $ 55,290 |
| 1992 | 9.12% | 37,600 |
| 1993 | 8.77% | 9,900 |
| 1994 | 9.15% | 8,886 |
| Thereafter | 8.40% | 1,300 |
| | 8.75% | $112,976 |

The advances are collateralized by eligible assets with a market value equal to a specified percentage of the amount outstanding. Assets eligible for collateral are qualifying real estate loans, mortgage-backed securities, FHLB stock, and U.S. Government obligations. At June 30, 1990, the Association was part of a credit program under which it is required to specifically pledge collateral with a market value equal to a range between 110% and 120% of outstanding advances. At June 30, 1990, the Association had excess collateral available to support an additional $8.3 million of advances. Eligible assets that are pledged for collateral at June 30, 1990, are as follows:

| | |
|---|---|
| Qualifying real estate loans | $131,150 |
| Mortgage-backed securities | 16,347 |
| | $147,497 |

**10. SECURITIES SOLD SUBJECT TO REPURCHASE AGREEMENTS:**

The Association enters into sales of securities under agreements to repurchase (reverse repurchase agreements). Fixed-coupon reverse repurchase agreements are treated as financings, and the obligations to repurchase securities sold are reflected as a liability in the balance sheet. The dollar amount of securities underlying the agreements remains in the applicable asset accounts. At June 30, 1990 and 1989, securities sold subject to repurchase agreements (all of which call for repurchasing the same security) included investments and mortgage-backed securities with an aggregate carrying value of $83,038 and $97,582, respectively (aggregate market value of $81,103 and $96,792, respectively). These agreements had a weighted-average interest rate of 8.50% and 9.98%, respectively, and all mature within sixty days. Substantially all of the Association's reverse repurchase agreements at June 30, 1990, were transacted with the Federal Home Loan Mortgage Corporation ("FHLMC"). The mortgage-backed securities underlying the agreements are being held by FHLMC. The average balance of securities sold subject to repurchase agreements was $73,402, $70,502 and $25,879 during the years ended June 30, 1990, 1989 and 1988, respectively. The maximum amount outstanding at any month-end during the years ended June 30, 1990, 1989 and 1988, was $92,128, $87,977 and $47,192, respectively.

**11. INCOME TAXES:**

The Association and its subsidiaries file a single consolidated income tax return. The Association is permitted under the Internal Revenue Code to deduct an annual addition to a reserve for bad debts ("bad debt deduction") in determining taxable income, subject to certain limitations. This addition differs from the provision for loan losses recorded for financial statement purposes. Bad debt deductions for income tax purposes are included in taxable income of later years only if the accumulated bad debt reserves are subsequently used for purposes other than to absorb bad debt losses. Because the Association does not intend to use the reserves for purposes other than to absorb losses, no deferred income taxes have been provided on the bad debt deductions taken. Retained earnings at June 30, 1990, includes $2,776, which represents the tax effect of accumulated bad debt reserves on which no deferred income taxes have been provided.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**11. INCOME TAXES,** Continued:

The Association's effective tax rate differs from the statutory income tax rate for the following reasons:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Income tax provision at federal statutory rate | $ 35 | $ 513 | $670 |
| Tax effect of: | | | |
| Bad debt deduction | (1,453) | (503) | (28) |
| Amortization of fair market value adjustments and intangibles arising from purchase acquisitions | 1,072 | 562 | 107 |
| Premium (discount) attributed to acquired assets sold | 340 | (148) | (20) |
| Tax-exempt yield subsidy payments received | (164) | (204) | |
| Other, net | 6 | 5 | 23 |
| | $ (164) | $ 225 | $752 |

The components of the deferred income tax provision (benefit) are:

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Former use of cash basis accounting for tax purposes | $ (50) | $ (50) | $(50) |
| Equity in losses of partnerships | 11 | 9 | 38 |
| Tax depreciation greater than book depreciation | 121 | 112 | 59 |
| Deferred loan fees recognized for tax purposes | 89 | (49) | (51) |
| Adjustment of prior year classifications of current and deferred tax liabilities | (13) | (106) | 31 |
| Elimination of deferred taxes due to tax loss carryforward | (322) | | |
| | $(164) | $ (84) | $ 27 |

As a result of the acquisitions of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") and Tri-Cities Savings and Loan Association ("Tri-Cities") (see Note 14), the Association became entitled to utilize their tax basis net operating loss carryforwards to reduce consolidated taxable income earned subsequent to the dates of acquisition. Pursuant to an assistance agreement executed with the FSLIC, the Association agreed to refund to FSLIC (now FDIC) 50% of the tax benefit resulting from the utilization of the Tri-Cities net operating loss carryforwards. The Association further agreed to refund to FSLIC (now FDIC) 100% of the tax benefit resulting from capital losses on certain Tri-Cities assets for which the Association is partially indemnified by FSLIC (now FDIC). The Association's share of the tax benefit resulting from the utilization of acquired net operating loss carryforwards, which was $78 during the year ended June 30, 1989, is recorded as a retroactive reduction of the unidentified intangible assets acquired. If the unidentified intangible assets acquired is reduced to zero, any further tax benefit is recorded as a reduction of the identified intangible asset or long-term interest-bearing assets (loans receivable) acquired. The tax basis net operating loss carryforwards remaining at June 30, 1990, expire as follows:

| Year Ending June 30, | Association Portion | FSLIC Portion |
|---|---|---|
| 1991 | $ 4,572 | |
| 1992 | 3,593 | |
| 2002 | 405 | $ 405 |
| 2003 | 2,405 | 2,405 |
| 2004 | 3,224 | |
| 2005 | 1,059 | |
| | $15,258 | $2,810 |



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**11. INCOME TAXES,** Continued:

In December 1987, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 96 - Accounting for Income Taxes ("SFAS No. 96"). This new standard requires that an asset and liability approach be used to account for and report income taxes for financial statement purposes. SFAS No. 96 will require the Association to recognize a current or deferred tax liability for the tax consequences of all events recognized in the financial statements. The new standard represents a significant change in accounting for the effects of deferred taxes and business combinations. Under SFAS No. 96, deferred taxes will be based on the difference between the tax bases of assets and liabilities (including those acquired or assumed in conjunction with purchase business combinations) and their amounts for financial statement purposes. SFAS No. 96 will require the Association to make a deferred tax adjustment for any remaining acquired assets and assumed liabilities to which purchase accounting tax adjustments were made in prior business combinations. The Association will be required to recompute its tax liabilities if the tax rates change, and to recognize the effect thereof in income. The Association must adopt the requirements of SFAS No. 96 no later than its 1993 fiscal year. The Association has not yet determined the effects of adopting this new standard. The FASB has announced that it is continuing to explore several possibly significant amendments to SFAS No. 96.

**12. EMPLOYEE SAVINGS PLAN:**

The Association maintains an employee savings plan under section 401(k) of the Internal Revenue Code. Substantially all employees are eligible to participate in the plan subject to certain requirements. Under the plan, employees may elect to contribute up to 8% of their salary and the Association will make a matching contribution equal to 25% of the employee's contribution. Each employee may make a supplemental contribution of an additional 2% of their salary. All contributions vest immediately. Employees have the option of directing that their contributions be invested in a fixed income security account, an equity security account or the Association's common stock. During the years ended June 30, 1990, 1989 and 1988, the Association contributed $53, $37 and $31, respectively, to the plan.

**13. COMMITMENTS:**

At June 30, 1990, the Association had loan commitments to borrowers and brokers totaling $30,819, including $30,569 for fixed rate loans and $250 for variable rate loans. Substantially all loan commitments have interest rates that float with the market until closing or until committed for sale in the secondary market. Commitments, which are disbursed subject to certain limitations, extend over various periods of time with the majority of funds being disbursed within a twelve-month period.

The Association limits market risk (risk of fluctuating interest rates affecting the market value of an asset) on fixed rate commitments through the use of option transactions. At June 30, 1990, the Association had purchased options to deliver $21,000 of mortgage-backed securities (from underlying fixed rate residential mortgages) at set prices, which, in conjunction with commitments to sell specific loans, eliminates a majority of the market risk on fixed rate commitments. Substantially all of the commitments are for single family residential loans that have credit risk similar to the Association's existing portfolio.

At June 30, 1990, the Association had made available various secured and unsecured commercial and personal lines of credit of approximately $12,585, of which the undisbursed portion is approximately $4,253. These lines of credit provide for periodic adjustment to market rates of interest and have credit risk similar to the Association's existing portfolio.

Rental expense for office properties under operating leases was $933, $785 and $336 for the years ended June 30, 1990, 1989 and 1988, respectively. Future minimum rental commitments as of June 30, 1990, under noncancelable operating leases with initial or remaining terms of more than one year, are as follows:

| Year Ending June 30, | |
|---|---|
| 1991 | $ 586 |
| 1992 | 468 |
| 1993 | 455 |
| 1994 | 392 |
| 1995 | 388 |
| Thereafter | 2,615 |
| | $4,904 |

Future minimum rental payments receivable under noncancelable operating subleases with initial or remaining terms of more than one year are $591 at June 30, 1990.

[redacted]



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**14. ACQUISITIONS:**

**a. Central Evergreen Federal Savings and Loan Association**

On December 31, 1988, the Association acquired all of the outstanding stock of Central Evergreen Federal Savings and Loan Association ("Central Evergreen") of Chehalis, Washington, in exchange only for assuming its outstanding liabilities. The acquisition was accounted for as a purchase and resulted in the recording of $22,083 of intangible assets. This "supervisory" acquisition was conducted under an agreement executed with the Federal Home Loan Bank Board ("FHLBB"). As part of the acquisition, the FHLBB (now OTS) provided a "certification of insolvency" for Central Evergreen, which allows the Association to utilize Central Evergreen's tax basis net operating loss carryforwards.

The Central Evergreen acquisition did not involve cash assistance or indemnification from loss on troubled assets. The acquisition Agreement was based upon an approved Business Plan ("Business Plan") under which the Association would operate through December 31, 1993. This Agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Agreements (see below).

**b. Tri-Cities Savings and Loan Association**

On April 8, 1988, the Association acquired substantially all of the assets and assumed the liabilities of Tri-Cities Savings and Loan Association ("Tri-Cities") of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("FSLIC"). The acquisition was accounted for as a purchase and resulted in the recording of $2,239 of intangible assets. Pursuant to an agreement executed with FSLIC, the Association received a cash assistance payment of $11,730 from FSLIC. As part of the acquisition Agreement, FSLIC (now the Federal Deposit Insurance Corporation, or "FDIC") agreed to indemnify the Association for 75% of any capital losses on certain assets until the Association's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. FSLIC (now FDIC) further agreed to guarantee a minimum yield (equal to the average U.S. treasury bill rate plus 150 basis points) to the Association on this same group of assets. During the years ended June 30, 1990 and 1989, the Association received $150 and $299, respectively, for loss indemnification and $483 and $600, respectively, for yield subsidies from FSLIC (now FDIC) pursuant to the Tri-Cities acquisition Agreements . FSLIC (now FDIC) also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending pre-existing litigation of Tri-Cities for a period of five years.

As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. The Association agreed to refund to FSLIC (now FDIC) 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

The Tri-Cities acquisition Agreement provided the Association with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreement, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.

**c. Great American Bank Branches**

On February 5, 1988, the Association acquired six Washington branches of Great American Bank, F.S.B. The Association assumed deposit liabilities and accrued interest thereon of $47,548 and the lease obligations on two branch buildings. In consideration thereof, the Association received a net cash payment of $45,560 and other assets of $1,718. This transaction was accounted for as a purchase and resulted in the recording of $270 of intangible assets.

**d. Lewis Federal Savings and Loan Association**

On November 5, 1985, the Association acquired the assets and assumed the liabilities of Lewis Federal Savings and Loan Association ("Lewis Federal") from FSLIC. The acquisition was accounted for as a purchase and resulted in the recording of $1,856 of intangible assets. Pursuant to an agreement executed with FSLIC, the Association received a cash assistance payment of $1,750 from FSLIC.

The Lewis Federal acquisition Agreement provided the Association with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreement, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.

**e. Effect of Acquisitions on Income**

The amortization of adjustments to fair market value and intangible assets relating to all purchase acquisitions reduced the Association's income before income taxes by $3,111, $1,652 and $292 during the years ended June 30, 1990, 1989 and

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

14. ACQUISITIONS, Continued:

1988, respectively. In addition, discounts and premiums relating to acquired assets, which were sold subsequent to acquisition, reduced the basis of such assets and increased (decreased) income before income taxes by ($1,001), $435 and $60 during the years ended June 30, 1990, 1989 and 1988, respectively.

15. PREFERRED STOCK:

Each share of preferred stock currently outstanding (Series B) entitles its holder to (a) an annual cash dividend of $2.50 per share, (b) receive up to $25.00 per share plus accumulated unpaid dividends in the event of involuntary or voluntary liquidation, and (c) beginning April 1, 1991, convert each preferred share into 2.2 shares of common stock. Each preferred share is also convertible into 2.2 shares of common stock at the option of the Association beginning April 1, 1991. Dividends on the preferred shares are cumulative and must be paid before any distributions to holders of common stock.

The Association has been prohibited by regulatory authorities from paying dividends on its preferred stock for three quarterly payment periods (see Note 2). Accordingly, there is $1.89 per share, or $170 of cumulative dividends in arrears that have not been declared, paid, or subtracted from retained earnings. These dividends have preference over any distributions to common shares and have been considered in calculating net income per common share.

16. INCENTIVE STOCK OPTIONS:

The Association has granted options to purchase shares of its common stock as summarized in the table below. All options granted become exercisable one year after the date of grant (all options outstanding are exercisable at June 30, 1990).

| | Number of Shares (A) | Option Price Per Share (B) | Expiration Date |
|---|---|---|---|
| Balance, June 30, 1987 .............. | 26,406 | $7.68-$10.21 | 1988-1996 |
| Options granted ........................ | 7,000 | $9.72 | 1991 |
| Options granted ........................ | 5,344 | $9.72 | 1997 |
| Options exercised ..................... | (3,750) | $7.75 | 1988 |
| Balance, June 30, 1988 .............. | 35,000 | $7.68-$10.21 | 1989-1997 |
| Options granted ........................ | 9,500 | $9.90 | 1992 |
| Options granted ........................ | 4,000 | $9.90 | 1998 |
| Balance, June 30, 1989 .............. | 48,500 | $7.68-$10.21 | 1989-1998 |
| Options granted ........................ | 10,750 | $8.75 | 1993 |
| Options granted ........................ | 2,000 | $8.75 | 1999 |
| Options exercised ..................... | (2,500) | $7.68 | 1989 |
| Options cancelled ..................... | (500) | $8.75 | 1993 |
| Balance, June 30, 1990 .............. | 58,250 | $7.68-$10.21 | 1990-1999 |

(A) Stock options for a total of 24,406 shares have been granted in tandem with a corresponding number of stock appreciation rights. These rights entitle the recipient to payment for the increase in market value of the stock, above the option price, at the date of exercise. Payment is to be made in cash or in the form of newly issued common stock, or any combination thereof. The exercise of either rights or options serves to cancel the other. Since the exercise price exceeds current market value, no compensation expense is accrued at June 30, 1990 in connection with these stock appreciation rights.

(B) The exercise price associated with all options has been retroactively adjusted to recognize the effects of all stock dividends.

17. REGULATORY CAPITAL:

In connection with the insurance of its deposits by the FDIC and general regulatory oversight by the OTS, the Association is required to maintain minimum levels of regulatory capital.

Based on the regulations of the FHLBB and FSLIC in effect at June 30, 1989, the computation of the Association's regulatory capital at that date is as follows:



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

| | |
|---|---|
| Total stockholders' equity per consolidated balance sheet | $10,512 |
| Contractual regulatory capital (FSLIC cash assistance payments) | 13,480 |
| Adjustment to the amortization of fair market value adjustments and intangibles, arising from acquisitions, under FHLBB regulations | (277) |
| Regulatory capital | 23,715 |
| Minimum regulatory capital required | 21,612 |
| Regulatory capital surplus | $ 2,103 |

The regulations governing the computation of regulatory capital changed significantly with the passage of FIRREA on August 9, 1989. As discussed in detail in Note 2, the Association's beliefs on how its regulatory capital should now be computed differ from the OTS' position. The Association believes that the Agreements for the acquisitions of three troubled institutions, and the various forebearances included therein, define the methodology for computing its regulatory capital requirements. Based on these Agreements, the Association's computation of its regulatory capital at June 30, 1990, is as follows:

| | Amount | Percent of Assets |
|---|---|---|
| Total stockholders' equity | $10,730 | 1.56% |
| Contractual regulatory capital (FSLIC cash assistance payments) | 13,480 | 1.96 |
| Computed regulatory capital | 24,210 | 3.52 |
| Minimum regulatory capital required under contractual acquisition agreements (specifically Central Evergreen Business Plan) | 22,379 | 3.25 |
| Regulatory capital surplus | $ 1,831 | 0.27% |

18. QUARTERLY FINANCIAL DATA (UNAUDITED):

Unaudited quarterly results of operations for the years ended June 30, 1990 and 1989 are summarized below:

| Year Ended June 30, 1990 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $17,708 | $16,803 | $16,833 | $16,185 |
| Interest expense | 14,604 | 13,721 | 13,280 | 12,576 |
| Provision for loan losses | 60 | 90 | 950 | 0 |
| Net interest income after provision for loan losses | 3,044 | 2,992 | 2,603 | 3,609 |
| Other income | 1,604 | 1,979 | 1,023 | 2,194 |
| Operating expenses | 4,252 | 4,515 | 4,719 | 5,460 |
| Income (loss) before income taxes | 396 | 456 | (1,093) | 343 |
| Income tax provision (benefit) | 134 | 156 | (372) | (82) |
| Net income (loss) | $ 262 | $ 300 | $ (721) | $ 425 |
| Net income (loss) applicable to common shares | $ 206 | $ 244 | $ (778) | $ 369 |
| Net income (loss) per common share | $ .40 | $ .47 | $ (1.50) | $ .71 |

| Year Ended June 30, 1989 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $10,126 | $10,693 | $16,669 | $17,255 |
| Interest expense | 7,779 | 8,322 | 13,185 | 14,558 |
| Provision for loan losses | 100 | 15 | 45 | 100 |
| Net interest income after provision for loan losses | 2,247 | 2,356 | 3,439 | 2,597 |
| Other income | 514 | 638 | 1,176 | 1,767 |
| Operating expenses | 2,441 | 2,606 | 4,187 | 3,990 |
| Income before income taxes | 320 | 388 | 428 | 374 |
| Income tax provision (benefit) | 122 | 147 | 145 | (189) |
| Net income | $ 198 | $ 241 | $ 283 | $ 563 |
| Net income applicable to common shares | $ 142 | $ 184 | $ 226 | $ 508 |
| Net income per common share | $ .27 | $ .35 | $ .44 | $ .98 |





CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## INDEPENDENT AUDITOR'S REPORT

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries (the "Association") as of June 30, 1990 and 1989, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1990, 1989 and 1988. These consolidated financial statements are the responsibility of the Association's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1990 and 1989, and the consolidated results of their operations and their cash flows for the years ended June 30, 1990, 1989 and 1988 in conformity with generally accepted accounting principles.

The accompanying consolidated financial statements have been prepared assuming that the Association will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, there are uncertainties concerning (1) the ultimate outcome of a civil action against thrift industry regulatory authorities by the Association seeking to resolve the method of determining compliance with capital standards as promulgated pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") to the Association, and (2) the specific actions, if any, that regulatory authorities may later take if the Association does not prevail in its lawsuit. These matters raise substantial doubt as to the Association's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties.

As discussed in Note 1 to the consolidated financial statements, the Association changed its method of accounting for loan fees during the year ended June 30, 1989.

Coopers & Lybrand

Spokane, Washington
August 24, 1990 except for
Note 2, as to which the date
is September 20, 1990.



CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

### The Corporation

Sterling Savings Association is a Washington State chartered savings association headquartered in Spokane, Washington.

Its subsidiaries are Action Mortgage Company, The Best Agency, Evergreen Environmental Development Corporation, Evergreen First Service Corporation, Fidelity Service Corporation, INTERVEST-Mortgage Investment Company, Tri-Cities Mortgage Company, and Tri-West Mortgage Company.

### The Annual Meeting

The annual meeting of shareholders of Sterling Savings Association will be held on Tuesday, October 23, 1990. The meeting will begin at 10:00 a.m. in the Conference Theater of the Agricultural Trade Center, West 334 Spokane Falls Boulevard, Spokane, Washington.

### Form 10-K Report

A copy of Sterling Savings Association's Annual Report to the Office of Thrift Supervision on Form 10-K will be furnished without charge to the Company's shareholders upon request in writing to Heidi B. Stanley, Sr. VP Administration, Sterling Savings Association, N. 120 Wall, Spokane, WA 99201.

### STOCK PRICE RANGE

The following table sets forth the quarterly market price ranges of the Association's Common Stock as reported by NASDAQ with respect to the first three quarters of 1989 and as reported by the Spokane Stock Exchange, Spokane, Washington, with respect to the fourth quarter of 1989 and fiscal year 1990. The prices reported by NASDAQ reflect inter-dealer prices without regard to retail mark-ups, mark-downs or commissions and do not necessarily represent actual transactions. The prices reported by the Spokane Stock Exchange reflect known transactions in the Association's Common Stock. In addition, the prices reported have been adjusted to reflect all stock dividends paid by the Association. The number of common shareholders of record on June 30, 1990, was approximately 608.

| | High | Low |
|---|---|---|
| *Fiscal 1990* | | |
| Fourth Quarter | 7 | 3-1/2 |
| Third Quarter | 9 | 4 |
| Second Quarter | 9-3/4 | 6-1/2 |
| First Quarter | 9-3/8 | 7-3/8 |
| *Fiscal 1989* | | |
| Fourth Quarter | 9-1/2 | 8 |
| Third Quarter | 10 | 8-3/4 |
| Second Quarter | 11-5/8 | 9-3/4 |
| First Quarter | 10-7/8 | 10 |

Preferred Stock:
The Association's $2.50 Cumulative Convertible Preferred Stock-Series B has no established trading market. Accordingly, there were no known prices for trades of stock. The number of preferred shareholders of record on June 30, 1990, was approximately 306.

STERLING SAVINGS

North 120 Wall
Spokane, Washington 99201
(509) 624-4114


CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

# 1992 ANNUAL REPORT

STERLING SAVINGS



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER F PSG027 0473

# ANNUAL REPORT

CONTENTS

Financial Highlights
Report to Shareholders 2
Corporate Profile
Hometown Health 6
Lending 8
Financial Services 10
Administration & Community Service 12
Senior Management 14
Board of Directors 16
Financial Section 17

Confidential Material Subject to Protective Order

SG 0063077



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0474