# Senior Management

hrough sound judgment and an experienced, disciplined approach, Sterling's management team took command of those things over which they had control and produced record earnings in fiscal year 1992.

The challenges presented by a changing economic and financial environment have demanded management's commitment to the basics of our business. Therefore, Sterling's fiscal 1992 strategic plan emphasized the following elements:

- increase residential lending volume
- increase market share of deposits
- increase fee income
- reduce non-performing assets
- manage interest rate risk
- enhance regulatory capital

During ficscal 1992, Sterling improved in each of these areas.

Sterling's senior management will continue doing what they know how to do very well -- take deposits, make loans, and charge fees for our services. Bolstered by strong fiscal 1992 results, our management team looks forward to another year of growth and achievement.



We believe the future of the financial industry will be determined by the quality of people in management and their ability to cope with the ever-changing economic environment.







"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0488


Harold B. Gilkey
Chairman of the Board


William W. Zuppe
President


Daniel G. Byrne
Sr. Vice President
Finance

...thing sound judgment and an experienced disciplined approach...


Heidi B. Stanley
Sr. Vice President
Administration/Operations


Stephen L. Page
Sr. Vice President
Loan Administration


S. Midge Moore
Sr. Vice President
Branch Administration


Stanton C. Parrish
President
Harbor Financial Services, Inc.


Thomas F. Sackmann
President
Action Mortgage Company


John M. Harlow
President
INTERVEST - Mortgage Investment Co.



App. 342

S G 0063092

"Confidential Material-Subject to Protective Order"

# Board of Directors



Harold B. Gilkey
Chairman of the Board
Chief Executive Officer
Spokane



William W. Zuppe
President
Chief Operating Officer
Spokane



Ned M. Barnes
Principal - Witherspoon, Kelley, Davenport & Toole, P.S.
Spokane



Rodney W. Barnett
President
Carr Sales Company
Spokane



James P. Fugate
Superintendent
Auburn School District
Auburn



Charles L. Kroetch
President
Kroma Graphics Center, Inc.
Spokane



Robert Larrabee
Owner
Merchant Funeral Home
Clarkston



Robert E. Meyers
Dentist
Clarkston



David O. Wallace
Owner
Wallace & Associates
Spokane





"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0490

Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 19 of 26

## FINANCIAL SECTION

Management's Discussion and Analysis of Financial Condition and Results of Operations 18

Consolidated Balance Sheets 25

Consolidated Statements of Income 26

Consolidated Statement of Changes in Stockholders' Equity 27

Consolidated Statements of Cash Flows 28

Notes to Consolidated Financial Statements 29

Independent Auditor's Report 44

# Management's Discussion and Analysis of Financial Condition and Results of Operations

## General

The business and operations of Sterling Savings Association have been significantly affected by an increase in capital during this latest fiscal year. In November, 1991, Sterling sold 2.875 million shares of common stock in a public offering. This public offering resulted in a net increase in capital of approximately $21 million. During the fiscal year, Sterling also exercised an option to convert all of the outstanding shares of Series B Preferred Stock into Common Stock of the Association. As a result of the public offering, the conversion of the Series B Preferred Stock, the retention of earnings, the amortization of intangible assets and the management of the level and mix of assets, Sterling's capital levels have been significantly increased. As of June 30, 1992, Sterling exceeds all regulatory capital standards currently in effect and those scheduled to be phased-in by December 31, 1994, without reliance upon any contractual regulatory capital or forbearances resulting from various past acquisitions of insolvent thrift associations. As a result of the public offering, Sterling is operating without any "troubled thrift" limitations imposed by its primary regulator, the Office of Thrift Supervision ("OTS.") See "- Capital Resources" and Note 2 of Notes to Consolidated Financial Statements.

Sterling, with total assets of $640.1 million at June 30, 1992, attracts Federal Deposit Insurance Corporation ("FDIC") insured deposits from the general public through 27 retail branches located primarily in smaller, rural communities in Washington State. Sterling originates mortgage loans secured primarily by single family residential real estate in the major metropolitan areas of the Pacific Northwest. Sterling's revenues are derived principally from interest earned on loans and mortgage-backed securities, from mortgage banking operations and from fees and service charges. The operations of Sterling, and savings institutions generally, are influenced significantly by general economic conditions and by policies of its primary regulatory authorities, the OTS, the FDIC, and the State of Washington Supervisor of Savings and Loan Associations and Credit Unions. ("Washington Supervisor").

## Asset and Liability Management

Sterling is subject to interest rate risk. Interest rate risk refers to possible declines in Sterling's future net interest income and its market value of portfolio equity due to changing interest rates. Interest rate risk arises from the fact that Sterling's interest-bearing liabilities, consisting principally of savings deposits, Federal Home Loan Bank of Seattle ("FHLB Seattle") advances and other borrowings, mature or reprice more rapidly, or on different terms, than do its interest-earning assets, which consist primarily of intermediate or long-term real estate loans and mortgage-backed securities. The fact that liabilities mature or reprice more frequently on average than assets may be beneficial in times of declining interest rates; however, such an asset/liability structure may result in declining net interest income during periods of rising interest rates. Market value of portfolio equity ("MVPE") is defined as the net present value of assets, liabilities and off-balance sheet contracts. In accordance with OTS Thrift Bulletin 13 ("TB-13") Sterling has set specific numerical exposure limits on the maximum allowable decrease in both net interest income and the MVPE should interest rates increase or decrease by 1% to 4%. At June 30, 1992, Sterling has calculated its MVPE to be $40.5 million and that its MVPE would decrease by 18% and 36% if interest rates were to increase by 2% and 4%, respectively.

Sterling maintains an asset and liability management program intended to manage net interest income through interest rate cycles and to protect its MVPE by controlling its exposure to interest rate risk. Sterling utilizes a variety of methods to protect net interest income against rapid increases in interest rates, including (i) originating and retaining adjustable rate mortgages (ii) originating and selling long-term, fixed rate residential first mortgage loans, and (iii) borrowing long-term funds, principally from the FHLB Seattle. In utilizing these methods, Sterling attempts to match the maturities and interest rate sensitivity of its assets and liabilities in order to maintain adequate interest rate spread and asset quality.

In order to more accurately measure interest rate risk, Sterling uses a simulation model designed to measure the sensitivity of net interest income and MVPE to changes in interest rates. This simulation model enables Sterling to generate a forecast of net interest income and MVPE given various interest rate forecasts and alternative strategies as required by TB-13. The model is also designed to measure the anticipated impact that prepayment risk, basis risk, customer maturity preferences, volumes of new business, and changes in the relationship between long- and short-term interest rates ("yield curve") may have on the performance of Sterling.

Sterling also uses gap analysis, a traditional analytical tool which measures the difference between the amount of interest-earning assets and the amount of interest-bearing liabilities expected to reprice in a given period. Sterling attempts to maintain its asset and liability gap position between a positive 10% and negative 25%, at both the one-year and three-year pricing intervals. Sterling's one-year cumulative gap position was a negative 1.2% and negative 14.8% at June 30, 1992 and 1991, respectively. Sterling's three-year gap position was a negative 13.4% and negative 15.4% at June 30, 1992 and 1991, respectively. These levels are within a range Sterling believes acceptable to reasonably protect its net interest rate spread from rapidly rising interest rates. Sterling's management believes that continued close matching of maturities of assets and liabilities will provide substantial protection against excessive interest rate risk.







"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0492

### Results of Operations

Sterling reported net income of $4,743,000, or $2.01 per share for the twelve months ended June 30, 1992. This compares to net income of $1,721,000, or $2.89 per share, and $638,000, or $.80 per share, respectively, for the years ended June 30, 1991 and 1990. The return on average assets was .77% for fiscal year 1992 compared to 0.26% for fiscal year 1991, and to 0.09% for fiscal year 1990.

The increase in earnings during fiscal year 1992 reflects increases in net interest income, mortgage banking operations and net gains on the sales of mortgage backed securities. The increase in earnings during fiscal year 1991, compared to fiscal year 1990, is primarily due to increased mortgage banking operations, increased fees and service charges, a reduction in operating expenses and a reduction in the provision for loan losses. Earnings for fiscal year 1990 were lower primarily because Sterling had to charge-off approximately $1.0 million of underwriting and related costs associated with a canceled public offering, to increase provisions for loan and real state owned losses, and to pay legal costs to enforce the acquisition agreements with Sterling's regulators. See - Note 17 of Notes to Consolidated Financial Statements.

### Net Interest Income

For a financial institution, the most significant component of earnings is net interest income. Net interest income is the difference between interest income, principally from loan, investment and mortgage-backed securities portfolios and interest expense, principally on customer deposits and borrowings. Changes in net interest income result from changes in volume, spread and interest margin. Volume refers to the dollar level of interest-earning assets and interest-bearing liabilities. Net interest rate spread (the "spread") refers to the difference between the interest yields on earnings assets and the interest costs of the liabilities required to support them. Net interest margin (the "interest margin") refers to net interest income divided by total earning assets and is influenced by the level and relative mix of interest-earning assets to interest-bearing liabilities.

The volume of interest-earning assets decreased during fiscal year 1992 compared to fiscal year 1991 by approximately $27.6 million to $573.6 million. This decrease coupled with a decrease in prevailing interest rates resulted in a decrease in total interest income to $52.8 million from $60.7 million and in total interest expense to $36.1 million from $47.9 million. Net interest income, however, increased to $16.7 million from $12.8 million during fiscal year 1992 compared to fiscal year 1991 due to an improvement in the interest margin which increased to 2.92% from 2.13% during fiscal year 1992. This increase in the interest margin is a direct result of the proceeds of the stock offering which lowered the cost of funds, the restructuring of assets and liabilities during the second half of the year and improved spreads experienced with the decline in prevailing interest rates.

During fiscal year 1991, a decrease in the volume of interest-earning assets of approximately $53.1 million resulted in a decrease in total interest income to $60.7 million from $67.5 million, in total interest expense to $47.9 million from $54.2 million, and in net interest income to $12.8 million from $13.3 million during fiscal year 1991 compared to fiscal year 1990. This reduction in average earning assets is a result of Sterling's use of principal payments and proceeds from the sale of loans to reduce borrowings. The decrease in the volume of interest-earning assets was partially offset by an increase in the interest margin on average earning assets for fiscal 1991 to 2.13% from 2.04% for fiscal 1990. The increase in the interest margin is primarily due to an increase in spread as Sterling's yield on loans and investments remained stable and the cost of deposits and borrowings declined with the decline in prevailing interest rates.




Declining interest rates during fiscal year 1992, prompted borrowers to refinance their loans and increased prepayment risk for lenders, such as Sterling. During this past year, Sterling implemented a strategy to reduce its exposure to these prepayments and sold a significant portion of its high-coupon mortgage-backed securities ("MBS") portfolio. While this sale resulted in net gains of $3.6 million during the fiscal year, total interest income may be lower in future periods as a result of reinvesting the proceeds in lower yielding investments. Sterling believes that these lower yielding investments will be less subject to prepayment risk and will accordingly provide more stable cash flow and interest income. As part of this strategy, Sterling refinanced borrowings from the Federal Home Loan Bank of Seattle ("FHLB of Seattle"). This refinancing lowered total interest costs and increased the net interest spread on this portion of the portfolio. The prepayment of these borrowings resulted in an expense in the form of a prepayment penalty in the amount of $1.2 million. The prepayment penalty is reflected as an extraordinary charge, net of $423,000 in income tax benefit. See "- Extraordinary Charge."



"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0493

Sterling is attempting to maintain and increase its net interest margin. While Sterling has experienced a decrease in its cost of funds, this benefit may be offset by the increased level of refinance activity and periodic adjustments in the ARM portfolio which is likely to result in lower yields on Sterling's loan portfolio in future periods. Therefore, there can be no assurance that Sterling's net interest income will continue to be maintained or improved.

**Provision for Loan Losses**

It is management's policy to establish valuation allowances for estimated losses on loans by charging income. The evaluation of the adequacy of specific and general valuation allowances is an ongoing process. During fiscal year 1992, a $1.65 million provision was made for loan losses compared to $150,000 and $1.1 million for fiscal years 1991 and 1990, respectively. During fiscal year 1992, Sterling re-evaluated its loan loss allowance, placing greater emphasis on the recent loan loss experience of other savings institutions. While Sterling's levels of delinquent and nonperforming loans continue to decrease, the levels of such loans have increased in other regions of the country. The fiscal year 1992 provision was partially influenced by a concern for the declining California real estate market and the impact on one loan currently in foreclosure. This represents the only loan exposed to the California market.

During fiscal year 1990, Sterling revised its asset classification system, estimation process and method of analyzing valuation allowances and recorded a substantial provision for loan losses following the implementation of FIRREA and a joint regulatory examination by the OTS, the FDIC and the Washington Supervisor. These loan loss provisions were made principally for the commercial real estate and construction loan portfolios. During fiscal year 1991, the commercial real estate and construction loan portfolios declined which resulted in a lower provision. The aggregate balances of commercial real estate and construction loans were $93.2 million at June 30, 1992, compared to $110.1 million and $124.8 million at June 30, 1991 and 1990, respectively.







At June 30, 1992, Sterling's loan delinquency rate was 1.48%, down from 2.04% at June 30, 1991 and 2.71% at June 30, 1990. Total nonperforming loans were $7.1 million at June 30, 1992, down from $10.8 million at June 30, 1991 and $13.2 million at June 30, 1990. As a percentage of total assets, nonperforming assets declined to 2.2% at June 30, 1992, down from 3.2% at June 30, 1991 and 3.4% at June 30, 1990. Sterling believes that the provision for fiscal year 1992 represents an adequate addition based upon its evaluation of the factors affecting the establishment of valuation allowances. Such factors include the changing risk profile of its loan portfolio which reflect the reduced balances of its commercial real estate and construction portfolios.

Sterling's loan loss allowance was $4,745,000 at June 30, 1992, compared to $4,087,000 at June 30, 1991 and $6,649,000 at June 30, 1990. As a percentage of total loans receivable, the loan loss allowance was 1.04% compared to 1.06% and 1.44% at June 30, 1991 and June 30, 1990, respectively. The net increase from 1991 to 1992 reflects a larger provision than the amounts written off. The decrease from 1990 to 1991 primarily reflects charge offs on two loans for which specific allowances had been previously established. Management believes the allowances established are appropriate given the composition of the loan portfolio.





"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0494

**Other Income**

Other income during fiscal years 1992, 1991 and 1990 totalled $11.7 million, $7.4 million and $6.3 million, respectively. The principal sources of other income are mortgage banking operations, net gain on the sale of securities, fees and service charges, and loan servicing fees. Additionally, included are the net gain (loss) on sale and operation of real estate owned ("REO") and FDIC indemnification for loss on sale of real estate owned. The increases in other income during fiscal year 1992 reflects increases in mortgage banking operations, net gain on sale of securities, and fees and service charges.




Income from mortgage banking operations for fiscal years 1992, 1991 and 1990 was $5.3 million, $4.4 million and $3.4 million, respectively. The increases in mortgage banking operations during these years resulted from increased loan sales and sales of servicing rights and the gains on such sales.

Loan sales and sale of servicing rights have resulted in significant contributions to Sterling's income during fiscal years 1992, 1991 and 1990, respectively. While the sale of servicing rights reduces loan servicing fees in the future, Sterling expects to continue to replenish the portfolio of servicing through the sale of loans with servicing retained. Further, Sterling expects to continue sales of loans and rights to service loans in the future, there can be no assurance that sales of loans and servicing rights will continue to provide such contributions to Sterling's income.

Net gain on sales of securities were $3.6 million, $255,000 and $241,000 during fiscal years 1992, 1991 and 1990, respectively. The net gains on sale of securities in fiscal year 1992 reflect a restructuring of Sterling's mortgage-backed securities portfolio in response to the significant decline in prevailing interest rates. Such a decline in interest rates is not anticipated in the future. See "Net Interest Income." The net gains in fiscal year 1991 reflected restructuring of Sterling's liquidity portfolio. The net gains in fiscal year 1990 reflected the disposition of the portfolio of adjustable rate mortgage-backed securities for operational considerations.

| (Dollars in millions) | June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Origination of residential mortgage loans | $585.0 | $380.8 | $355.0 |
| Sales of conventional loans with servicing retained | $376.8 | $255.4 | $209.8 |
| Sales of government loans with servicing released | $ 88.7 | $110.7 | $121.1 |
| Sales of servicing rights on conventional loans with principal balance of | $172.8 | $285.0 | $312.1 |

Fees and service charges consists principally of service charges on deposit accounts and also includes fees for customer services, late charges on loans and commissions on sales of annuity products by Harbor Financial Services, Inc. The increases to $2.9 million for fiscal year 1992 and to $2.5 million for fiscal year 1991 from $2.0 million for the fiscal year 1990 are primarily due to an increase in fees on checking accounts and in commissions on sales of annuity products during these years.

Loan servicing fees were $381,000 during fiscal year 1992, a decrease from $651,000 and $864,000 during fiscal years 1991 and 1990, respectively. The fiscal year 1992 decrease results from a reduction in the servicing spread while the fiscal year 1991 decrease reflects a reduction in the relative average size of the loan servicing portfolio. Sterling's total servicing portfolio was approximately $303 million at June 30, 1992, compared to $124 million and $176 million at June 30, 1991 and 1990, respectively. During fiscal years 1992 and 1991 Sterling sold rights to service conventional loans for others with principal balances of $173 million and $285 million, respectively. Gains on these sales are included in mortgage banking operations. These servicing sales were prompted primarily by the desire to increase Sterling's regulatory capital.





"Confidential Material-Subject to Protective Order"



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0495

The net loss on sale and operation of REO was $476,000 during fiscal year 1992, compared to a net loss of $532,000 and of $176,000 in fiscal years 1991 and 1990, respectively. The losses during fiscal years 1992 and 1991 are due to a provision for losses on REO of $391,000 and $419,000, respectively, and a lower level of net gains on the sale of REO during these years. The provision for losses on REO during fiscal year 1992 reflects marketing concessions on several properties liquidated during the year, whereas the provision in fiscal year 1991 was primarily due to an increase in a specific valuation allowance on one property and the establishment of a general valuation allowance on REO.

During fiscal year 1992, Sterling had a gain (loss) of ($23,000) on FDIC indemnifications for loss on sale of REO compared to $155,000 and ($97,000) during fiscal years 1991 and 1990, respectively. The FDIC indemnification of capital losses represents the differences between the FDIC portion of gains and losses on sales of REO and the estimated amount established at the date of acquisition. Gains or losses on sales of FDIC covered assets are shared with the FDIC pursuant to contractual formula.

### Operating Expenses

Operating expenses were $18.2 million, $17.7 million and $18.1 million during fiscal years 1992, 1991 and 1990, respectively. The increase during fiscal year 1992 reflects an increase in employee compensation and benefits, and occupancy and equipment due to the increase in residential lending volumes, offset, in part, by a reduction in intangible amortization expense. The decrease during fiscal year 1991, when compared to fiscal year 1990, reflects a reduction in employee compensation and benefits resulting, in part, from Sterling's corporate reorganization during that year. This corporate reorganization was intended to improve operating efficiency and increase employee productivity. The decrease during fiscal year 1991, when compared to fiscal year 1990, also reflects a reduction in intangible amortization expense. During fiscal year 1990, other operating expenses included a charge for costs associated with a canceled public offering.

### Income Tax Provision (Benefit)

For fiscal years 1992, 1991 and 1990, the income tax provisions (benefit) were $3.4 million, $590,000 and ($164,000), respectively. The effective tax rates were 39.6%, 25.6% and (34.6%), respectively, for these same fiscal years. The higher effective tax rate in fiscal year 1992 reflects a change in accounting for income taxes.

In February 1992, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") 109, "Accounting for Income Taxes", which requires an asset and liability approach for financial accounting and reporting for income taxes. Sterling adopted SFAS 109 as of July 1, 1991. SFAS 109 establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities during the current and preceding years.

In accordance with SFAS 109, deferred income taxes for fiscal year 1992 reflect the impact of temporary differences between values recorded as assets and liabilities for financial reporting purposes and values utilized for remeasurement in accordance with tax laws. These temporary differences include purchase valuation amounts and other items not previously utilized in the determination of deferred income taxes under previously applicable generally accepted accounting principles. Accordingly, certain purchase valuation amounts have been modified as a result of the implementation of SFAS 109. In accordance with this implementation Sterling has recorded $7.7 million in deferred tax assets and $2.9 million in deferred tax liabilities at June 30, 1992. See Note 12 of Notes to Consolidated Financial Statements.

The lower effective tax rates in fiscal years 1991 and 1990 are primarily due to the amortization of purchase accounting adjustments (which adjust the financial statement basis, but not the tax return basis, of certain acquired assets), the tax basis bad debt deduction and the receipt of nontaxable FDIC Yield Subsidy assistance pursuant to the acquisition agreements.

### Extraordinary Charge

In January 1992, Sterling repaid $25 million of advances from the FHLB of Seattle prior to the scheduled maturities date. In accordance with the debt agreement, Sterling paid $1.2 million in penalties on early extinguishment of the debt. The related tax benefit of $423,000 has been deducted from the charge for financial statement presentation. See "- Net Interest Income."

### Cumulative Effect of Change In Accounting Principle

As discussed earlier, Sterling adopted SFAS 109 as of July 1, 1991. SFAS 109 establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities during the current and preceding years. It requires an asset and liability approach for financial accounting and reporting for income taxes. Sterling has implemented SFAS 109 for the fiscal year ended June 30, 1992. In accordance with this implementation, Sterling has recorded the cumulative effect on prior year's income of $375,000 as income for fiscal year 1992. See Note 12 of Notes to Consolidated Financial Statements.





0063099

"Confidential Material-Subject to Protective Order"

S G

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0496

### Effects of Federal Financial Assistance

Pursuant to an assistance agreement which will expire on April 8, 1993, the FDIC, as successor to the FSLIC, agreed to reimburse and indemnify Sterling against 75% of all capital losses with respect to certain assets ("covered assets") acquired in connection with Sterling's acquisition of Tri-Cities Savings & Loan Association ("Tri-Cities"). In addition, the FDIC agreed to limit Sterling's 25% share of total capital loss exposure to $900,000. At June 30, 1992, Sterling had absorbed approximately $649,770 in capital losses on assets covered by the FDIC assistance agreement and remaining covered assets totalled $1.0 million. In the event such covered assets are not fully liquidated prior to expiration of the assistance agreement, future operating results of Sterling may be adversely affected.

The FDIC also guaranteed Sterling a minimum yield (the "FDIC Yield Subsidy") on these covered assets equal to the average six-month Treasury bill rate plus 150 basis points. During the fiscal years ended June 30, 1992, 1991 and 1990, Sterling received $0, $159,000 and $483,000, respectively, pursuant to the FDIC Yield Subsidy. These amounts are reflected in interest income. Sterling will not receive FDIC Yield Subsidy payments after April 8, 1993.

### Liquidity and Sources of Funds

Sterling's primary sources of cash are customer deposits; principal payments on, and sales of loans and mortgage-backed securities and advances from the FHLB Seattle. During the fiscal year ended June 30, 1992, deposits increased by $17.2 million to $505.7 million from $488.5 million at June 30, 1991, primarily due to increases in retail checking accounts and public fund deposits which offset a decline in term certificates of deposits. At June 30, 1992, Sterling had $36 million of fully collateralized public entity deposits, an increase of approximately $32 million from June 30, 1991. Principal repayments on loans and mortgage-backed securities were $108.5 million and $147.1 million during the fiscal years ended June 30, 1992 and 1991, respectively. The decrease in these repayments over the prior year was a reflection of the reduction in average loan and mortgage-backed securities portfolio balances during the respective periods.

The OTS regulations require savings institutions to maintain an average daily balance of liquid assets greater than, or equal to, a specified percentage (currently 5.0%) of the average daily balance of net withdrawable accounts and borrowings payable on demand in one year or less during the preceding calendar month. At June 30, 1992, Sterling's liquidity ratio was 8.54% compared to 5.20% at June 30, 1991. The regulatory liquidity ratio does not take into account certain other sources of liquidity, such as funds invested through Sterling's subsidiaries, potential borrowings against mortgage-backed securities or investment securities, and other potential financing alternatives. The required minimum liquidity ratio may vary from time to time, depending on economic conditions, savings flows and loan funding needs. It is Sterling's practice to maintain its liquidity level at, or near, the required minimum in order to maximize its yield on alternative investments.

At June 30, 1992, Sterling had advances outstanding from the FHLB Seattle totalling $86.2 million. Sterling's credit line with the FHLB Seattle is 20% of total assets subject to maintaining an adequate level of qualifying collateral. At June 30, 1992, Sterling had immediate availability to borrow additional advances of $38.0 million and had forward commitments from the FHLB Seattle for $20 million of advances to be funded no later than April 1993. Sterling also borrows periodically on a secured basis from major broker-dealers and financial entities by selling securities subject to repurchase agreements. At June 30, 1992, Sterling had no outstanding borrowings under reverse repurchase agreements but had securities immediately available for secured borrowing of approximately $8 million, and with additional unpledged securities of $34.3 million for further borrowing.

### Capital Resources

During the quarter ended December 31, 1991, Sterling completed the sale of 2.875 million shares of Common Stock for $8.25 per share. In addition to raising approximately $21 million in new capital, Sterling converted all of its outstanding Series B Preferred Stock to Common Stock. All accumulated dividends on the Series B Preferred Stock were declared and deducted from retained earnings at December 31, 1991. All such dividends, in the approximate amount of $488,000, or $5.42 per share, were paid in January 1992.

In connection with the public offering, warrants to purchase 150,000 shares of Sterling's Common Stock were issued to underwriters at an exercise price of $9.90 per share. The warrants are exercisable between November 1992 and November 1996.

Sterling's total shareholders' equity was $38.2 million at June 30, 1992, compared to $12.6 million at June 30, 1991. At June 30, 1992, shareholders' equity was 6.0% of total assets, compared to 2.1% of total assets at June 30, 1991. The higher ratio at June 30, 1992 resulted from the stock offering and retention of earnings during the year.



"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0497

Return on average common shareholders' equity was 17.8% in fiscal year 1992, 15.5% in fiscal year 1991 and 4.8% in fiscal year 1990. Sterling's return on average equity during fiscal 1992 reflects an increase due to the stock offering, which reduced interest expense and the restructuring activities of assets and liabilities which contributed to an improvement in net interest income. The lower return on equity for fiscal year 1990 compared to fiscal year 1991, is due principally to a write off of approximately $1.0 million of underwriting and related costs associated with the canceled public offering, to higher provisions for loan and REO losses and to paying legal costs to prevent Sterling's regulators from taking regulatory and enforcement action which would be inconsistent with the acquisition agreements.

Since it commenced operations, Sterling has made a number of acquisitions in order to expand its deposit and mortgage delivery systems, to add earning assets and to geographically diversify its loan portfolio. As an inducement to acquire insolvent thrift institutions, Sterling's regulators allowed it to include certain items in the calculation of its regulatory capital. The Office of Thrift Supervision (the "OTS") has taken the position that the right to include such items in the calculation of regulatory capital was eliminated by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Nonetheless, Sterling meets its current and fully phased-in regulatory capital requirements without giving effect to regulatory capital obtained through Sterling's past acquisitions of insolvent thrift institutions.

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") was signed into law on December 19, 1991. Among other things, the FDICIA provides for expanded regulation of depository institutions and their affiliates.
It further provides the OTS, effective one year from the date of enactment of the statute, with broad powers to take "prompt corrective action" to resolve problems of insured depository institutions. The extent of these powers depends upon whether the institutions in question are "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized" or "critically undercapitalized."

On July 7, 1992, the OTS proposed regulations to implement the "prompt corrective action" provisions of the FDICIA. Due to the preliminary nature of the proposed rule, Sterling is unable to determine whether the regulations currently proposed by the OTS to implement the "prompt corrective action" provisions of FDICIA will be adopted in their present form as final regulations. If the proposed regulations were applicable to Sterling as of June 30, 1992, Sterling would have qualified as "adequately capitalized." Sterling cannot predict in what category it will qualify at the time final regulations implementing the "prompt corrective action" provisions of FDICIA become effective.

Sterling anticipates that it will continue to enhance its capital resources and its regulatory capital ratios through the retention of earnings, the amortization of intangible assets and the management of the level and mix of assets.









App. 351

SG 0063101

"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0498

APP. 1061

JPB05391

# Consolidated Balance Sheets

*June 30, 1992 and 1991 (dollar amounts in thousands)*

| ASSETS | 1992 | 1991 |
|---|---|---|
| Cash and cash equivalents: | | |
| Interest bearing | $ 12,998 | $ 1,087 |
| Non-interest bearing and vault | 8,818 | 5,821 |
| Restricted | 275 | 25 |
| Investments (market value $19,092 and $15,311) | 19,096 | 15,270 |
| Loans receivable (net of allowance for losses of $4,745 and $4,087) | 447,554 | 374,926 |
| Loans and mortgage-backed securities held for sale | 24,724 | 26,767 |
| Mortgage-backed securities (market value $89,665 and $139,356) | 88,015 | 139,119 |
| Accrued interest receivable | | |
| (including $224 and $181 on investments) | 4,067 | 5,120 |
| Office properties and equipment | 9,795 | 10,602 |
| Real estate owned | 6,877 | 8,358 |
| Intangibles | 10,649 | 14,573 |
| Prepaid expenses and other assets | 8,029 | 6,652 |
| Total assets | $640,097 | $608,320 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | 1992 | 1991 |
|---|---|---|
| Deposits | $505,730 | $488,464 |
| Advances from Federal Home Loan Bank | 86,233 | 78,971 |
| Securities sold subject to repurchase agreements | 0 | 19,213 |
| Cashier's checks issued and payable | 4,550 | 4,139 |
| Borrowers' reserves for taxes and insurance | 1,922 | 1,209 |
| Accrued interest payable | 1,261 | 1,426 |
| Accrued expenses and other liabilities | 2,178 | 2,277 |
| Total liabilities | 601,874 | 595,699 |
| Commitments and contingent liabilities | | |
| Preferred stock, $1 par value; 1,000,000 shares authorized; | | |
| 0 and 89,968 shares issued and outstanding | 0 | 90 |
| Common stock, $1 par value; 8,000,000 shares authorized; | | |
| 3,591,743 and 518,819 shares issued and outstanding | 3,592 | 519 |
| Additional paid-in capital | 25,683 | 7,714 |
| Retained earnings | 8,948 | 4,298 |
| Total stockholders' equity | 38,223 | 12,621 |
| Total liabilities and stockholders' equity | $640,097 | $608,320 |

"Confidential Material-Subject to Protective Order" SG 0063102



The accompanying notes are an integral part of the consolidated financial statements.

App. 352

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0499

APP. 1062

JPB05392