Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 15 of 20



## 16. PREFERRED STOCK

During the year ended June 30, 1992, Sterling exercised its option and converted each share of Series B cumulative, convertible preferred stock into 2.2 shares of common stock. All accumulated dividends as of the conversion date were declared and paid. Had this conversion occurred at the beginning of the fiscal year, there would have been no material effect on earnings or earnings per share as reported.

## 17. REGULATORY CAPITAL

In connection with the insurance of its deposits by the FDIC and general regulatory oversight by the OTS, Sterling is required to maintain minimum levels of regulatory capital.

As an inducement to acquire insolvent thrift institutions in the past, Sterling's regulators allowed it to include certain items in the calculation of its regulatory capital (see Note 18). The OTS has taken the position that the right to include such items in the calculation of regulatory capital was eliminated by FIRREA. Sterling's beliefs on how its regulatory capital should now be computed differ from the OTS' position. Sterling believes that the Acquisition Agreements for the acquisitions of several troubled institutions, and the various forbearances included therein, define the methodology for computing its regulatory capital requirements through December 31, 1993. Based on compliance with these Acquisition Agreements, Sterling's computation of its regulatory capital at June 30, 1992 is as follows:

| | Amount | Percent of Assets |
|---|---|---|
| Total stockholders' equity | $ 38,223 | 5.87% |
| Adjustment for amortization of goodwill under regulatory accounting | (1,980) | (.30) |
| Contractual regulatory capital (FDIC cash assistance payments) | 13,480 | 2.07 |
| | 49,723 | 7.64 |
| Computed regulatory capital | | |
| Minimum regulatory capital required under contractual acquisition agreements (specifically Central Evergreen Business Plan) | 25,730 | 3.94 |
| Regulatory capital surplus | **$23,993** | **3.70%** |

Sterling exceeds all current and fully phased-in capital requirements even if the OTS interpretation of the FIRREA requirements were applicable to Sterling and if the agreements were not binding on the regulators. The following tables set forth Sterling's tangible capital, core capital and risk-based capital at June 30, 1992, computed in accordance with the OTS capital regulations without giving effect to forbearance or capital provisions of the Acquisition Agreements (Note 18), and compares these with Sterling's tangible, core and risk-based capital requirements, under OTS capital regulations as currently in effect and as scheduled to be fully phased-in over a period ending December 31, 1994.

| | Tangible Capital at June 30, 1992 (Unaudited) | | | |
|---|---|---|---|---|
| | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio (1) | Amount | Ratio (1) |
| Total Shareholders' Equity | $ 38,223 | 6.07% | $ 38,223 | 6.07% |
| Less: | | | | |
| Intangibles (2) | (10,649) | (1.69) | (10,649) | (1.69) |
| Nonqualifying capital (3) | (408) | (.06) | (408) | (.06) |
| Shares purchased by Deferred Compensation Plan, nonvested portion (4) | (236) | (.05) | (236) | (.05) |
| Investment in non-includable subsidiary | (374) | (.06) | (374) | (.06) |
| Total tangible capital | 26,556 | 4.21 | 26,556 | 4.21 |
| Tangible capital requirement | 9,452 | 1.50 | 9,452 | 1.50 |
| Tangible capital excess | **$17,104** | **2.71%** | **$17,104** | **2.71%** |



App. 366

SG 0063116

"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0513

APP. 1076

JPB05406

Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 16 of 20



## 17. REGULATORY CAPITAL (CON'T)

| | Core Capital at June 30, 1992 (Unaudited) | | | |
|---|---|---|---|---|
| | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio (1) | Amount | Ratio (1) |
| Total tangible capital | $ 26,556 | 4.21% | $ 26,556 | 4.21% |
| Add: | | | | |
| Includable Supervisory Goodwill (2) | 6,302 | .98 | 0 | .00 |
| Qualifying identification intangibles up to 25% of other core capital | 3,327 | .52 | 3,327 | .51 |
| Total core capital | 36,185 | 5.71 | 29,883 | 4.72 |
| Core capital requirement | 19,004 | 3.00 | 19,004 | 3.00 |
| Core capital excess | $17,181 | 2.71% | $10,879 | 1.72% |

| | Risk-Based Capital at June 30, 1992 (Unaudited) | | | |
|---|---|---|---|---|
| | Current Requirements | | Fully Phased-in Requirements | |
| | Amount | Ratio (1) | Amount | Ratio |
| Total core capital | $ 36,185 | 9.75% | $ 29,883 (2) | 8.21% |
| Add: | | | | |
| Supplementary capital up to 100% of core capital: | | | | |
| General valuation allowances | 3,393 | .93 | 3,393 | .93 |
| Total risk-based capital | 39,578 | 10.68 | 33,276 | 9.14 |
| Risk-based capital requirement | 26,679 | 7.20 | 29,140 | 8.00 |
| Risk-based capital excess | $12,899 | 3.48% | $ 4,136 | 1.14% |

(1) Ratio of capital to total adjusted assets for tangible and core capital to risk-weighted assets for risk-based capital.

(2) Under existing regulations, Sterling's risk-based capital requirement is 7.2% until December 31, 1992, at which time the permanent requirement of 8% is scheduled to be phased-in. Additionally, certain items currently includable in core capital and therefore in risk-based capital are scheduled to be phased out over a period ending December 31, 1994.

(3) Excludes from capital that portion of the deferred tax assets which Sterling believes would be excluded pursuant to regulatory directives, although no specific determination by the OTS has yet been made.

(4) The assets of Sterling's nonqualified deferred compensation plan are subject to the claims of Sterling's creditors until vested in participants in the plan and as such are not included in regulatory capital.

The OTS has proposed regulations which would likely increase capital requirements for certain thrift institutions, including Sterling, above current levels. Also, under certain conditions, the OTS could establish an individual minimum capital requirement which might exceed any or all of the current or proposed capital requirements otherwise applicable to Sterling. Management expects that Sterling will remain in compliance with applicable regulatory capital requirements although, due to the preliminary nature of the proposed rule making, there can be no assurance in this regard.







"Confidential Material Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0514

Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 17 of 20



## 18. ACQUISITIONS

During the years ended June 30, 1988 and 1989, Sterling, with the approval of its regulators, completed supervisory acquisitions of two troubled institutions, Tri-Cities Savings and Loan Association ("Tri- Cities") and Central Evergreen Federal Savings and Loan Association ("Central Evergreen"), respectively. Both of these institutions were insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on Sterling's financial statements as part of accounting for the acquisitions. Both of the supervisory acquisitions were subject to contractual acquisition agreements ("Acquisition Agreements") with then-existing regulatory authorities.

a. Central Evergreen Federal Savings and Loan Association

On December 31, 1988, Sterling acquired all of the outstanding stock of Central Evergreen of Chehalis, Washington, in exchange only for assuming its outstanding net liabilities. The acquisition was accounted for as a purchase, and resulted in the recording of $22,083 of intangible assets. This "supervisory" acquisition was conducted under an Acquisition Agreement executed with the Federal Home Loan Bank Board ("FHLBB"). As part of the acquisition, the FHLBB (now OTS) provided a "certification of insolvency" for Central Evergreen, which allows Sterling to utilize Central Evergreen's tax basis net operating loss carryforwards.

The Central Evergreen acquisition did not involve cash assistance or indemnification from loss on troubled assets. The Acquisition Agreement was based upon an approved Business Plan under which Sterling would operate through December 31, 1993. This Acquisition Agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital requirements included in the Business Plan incorporated the forbearances and other provisions of certain other supervisory Acquisition Agreements, including Tri-Cities Savings and Loan Association (see below).

b. Tri-Cities Savings and Loan Association

On April 8, 1988, Sterling acquired substantially all of the assets and assumed the liabilities of Tri-Cities of Kennewick, Washington, from the Federal Savings and Loan Insurance Corporation ("ESLIC"). FSLIC was succeeded by the FDIC pursuant to FIRREA. The acquisition was accounted for as a purchase, and resulted in the recording of $2,239 of intangible assets. Pursuant to an Acquisition Agreement executed with FDIC, Sterling received a cash assistance payment of $11,730 from FDIC. As part of the acquisition Agreement, FDIC agreed to indemnify Sterling for 75% of any capital losses on certain assets until Sterling's share of losses reaches $900, and 100% of any capital losses on these assets thereafter. FDIC further agreed to guarantee a minimum yield to Sterling on this same group of assets. During the years ended June 30, 1992 and 1991, Sterling received $504 and $640, respectively, for loss indemnification and $0 and $159, respectively, for yield subsidies from FDIC pursuant to the Tri-Cities Acquisition Agreement. FDIC also indemnified the Association for any undisclosed liabilities, unreserved claims, or costs incurred in defending preexisting litigation of Tri-Cities for a period of five years.

As part of the acquisition, the FHLBB provided a "certification of insolvency" for Tri-Cities, which allows the Association to utilize Tri-Cities' tax basis net operating loss carryforwards. Sterling agreed to refund to FDIC 100% of the tax benefit resulting from capital losses on indemnified assets and 50% of the tax benefit resulting from the utilization of any tax basis net operating loss carryforward of Tri-Cities that arose prior to April 8, 1988.

The Tri-Cities Acquisition Agreement provided Sterling with regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Acquisition Agreement, Sterling was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisition in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles.



"Confidential Material-Subject to Protective Order" SG 0063118 

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0515

## 19. QUARTERLY FINANCIAL DATA (UNAUDITED)

Unaudited quarterly results of operations for the year ended June 30, 1992 was restated to reflect a change in accounting principle (Note 1). Unaudited, restated quarterly results and the effects of restatement are summarized below:

| | Year Ended June 30, 1992 First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $13,394 | $13,052 | $13,025 | $13,350 |
| Interest expense | 10,244 | 9,398 | 8,301 | 8,130 |
| Provision for loan losses | 650 | 150 | 250 | 600 |
| Net interest income after provision for loan losses | 2,500 | 3,504 | 4,474 | 4,620 |
| Other income | 2,487 | 3,052 | 3,246 | 2,948 |
| Operating expenses | 4,216 | 4,712 | 4,535 | 4,783 |
| Income before income taxes | 771 | 1,844 | 3,185 | 2,785 |
| Income tax provision | 305 | 729 | 1,260 | 1,101 |
| Net income from operations | 466 | 1,115 | 1,925 | 1,684 |
| Cumulative effect of change in accounting principle | 375 | | | |
| Extraordinary item, net of tax | | | (822) | |
| Net income | $ 841 | $1,115 | $1,103 | $1,684 |
| Net income applicable to common shares | $ 785 | $1,078 | $1,103 | $1,684 |
| Earnings per share | $ 1.51 | $ .68 | $ .31 | $ .47 |

| | Year Ended June 30, 1992 First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Effects of restatement: | | | | |
| Net income from operations, as previously reported | $ 474 | $ 1,244 | $ 2,214 | $ 1,684 |
| Effect of restatement, net of tax | (8) | (129) | (289) | 0 |
| Net income from operations, restated | 466 | 1,115 | 1,925 | 1,684 |
| Cumulative effect of change in accounting for income taxes | 375 | | | |
| Extraordinary item, as previously reported | | | (897) | |
| Effect of restatement | | | 75 | |
| Extraordinary item, as restated | | | (822) | |
| Net income, restated | $ 841 | $1,115 | $1,103 | $1,684 |







"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0516

Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 19 of 20

*Notes to Consolidated Financial Statements*

## 19. QUARTERLY FINANCIAL DATA (UNAUDITED)

| | Year Ended June 30, 1991 First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Interest income | $15,664 | $16,263 | $14,737 | $14,019 |
| Interest expense | 12,491 | 12,975 | 11,587 | 10,835 |
| Provision for loan losses | 0 | 50 | 50 | 50 |
| Net interest income after provision for loan losses | 3,173 | 3,238 | 3,100 | 3,134 |
| Other income | 1,455 | 1,582 | 2,058 | 2,313 |
| Operating expenses | 4,471 | 4,523 | 4,242 | 4,506 |
| Income before income taxes | 157 | 297 | 916 | 941 |
| Income tax provision | 40 | 76 | 234 | 240 |
| Net income | $ 117 | $ 221 | $ 682 | $ 701 |
| Net income applicable to common shares | $ 61 | $ 164 | $ 626 | $ 645 |
| Earnings per common share | $ .12 | $ .32 | $ 1.21 | $ 1.24 |

**STOCK PRICE RANGE**

The following table sets forth the high and low bid prices per share for the Common Stock for the periods indicated. The stock is currently traded in the over-the-counter market and is quoted on the NASDAQ/NMS system under the symbol STSA. Prior to November 21, 1991, the Common Stock was quoted in the "Pink Sheet" over-the-counter market. The number of common shareholders of record on June 30, 1992, was approximately 897.

| FISCAL YEAR 1992 | HIGH | LOW | FISCAL YEAR 1991 | HIGH | LOW |
|---|---|---|---|---|---|
| **FOURTH QUARTER** | **11-1/2** | **9-1/2** | FOURTH QUARTER | 4-3/4 | 3-1/4 |
| THIRD QUARTER | 10-1/2 | 8-1/2 | THIRD QUARTER | 5 | 2-1/4 |
| SECOND QUARTER | 9-1/4 | 5 | SECOND QUARTER | 4-1/8 | 2 |
| FIRST QUARTER | 6 | 4-3/4 | FIRST QUARTER | 5-1/4 | 4 |



"Confidential Material-Subject to Protective Order"

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PSG027 0517

Case 1:95-cv-00829-TCW Document 222 Filed 02/26/2007 Page 20 of 20

# Independent Auditor's Report

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have audited the accompanying consolidated balance sheets of Sterling Savings Association and subsidiaries ("Sterling") as of June 30, 1992 and 1991, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended June 30, 1992, 1991 and 1990. These consolidated financial statements are the responsibility of Sterling's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Our report, dated August 15, 1991, on Sterling's financial statements as of June 30, 1991, and for the two years in the period then ended, included an explanatory paragraph regarding uncertainties concerning the ultimate outcome of a civil action against thrift industry regulatory authorities by Sterling seeking to resolve the method of determining compliance with capital standards as promulgated pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and the specific actions, if any, that regulatory authorities might later take if Sterling does not prevail in its lawsuit. As described in Note 2, as a result of the successful public stock offering completed in the quarter ended December 31, 1991, Sterling is in compliance with all current and fully phased-in FIRREA capital requirements and, therefore, the pending legal proceedings described above are not expected to have a material adverse effect on Sterling, regardless of the ultimate outcome of the case. Accordingly, our present opinion on the 1991 and 1990 financial statements as presented herein is different from that expressed in our previous report.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Sterling Savings Association and subsidiaries at June 30, 1992 and 1991, and the consolidated results of their operations and their cash flows for the years ended June 30, 1992, 1991 and 1990 in conformity with generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, Sterling changed its method of accounting for income taxes in 1992.

Coopers & Lybrand

Spokane, Washington
August 5, 1992



"Confidential Material Subject to Protective Order"

SG 0063121



CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER L PSG027 0518



JPB05411

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, *
A STATE CHARTERED SAVINGS *
ASSOCIATION, STERLING FINANCIAL *
CORPORATION, A WASHINGTON *
CORPORATION, *
Plaintiffs, *
* CASE NO. 95-829C
V. * (Senior Judge Smith)
UNITED STATES *
Defendant. *

DEPOSITION OF DANIEL G. BYRNE

VOLUME 1

DECEMBER 3, 2001

Taken on DECEMBER 3, 2001 beginning at 2:06 p.m., in the offices of the United States Justice Department, 910 Travis, Suite 1452, Houston, Texas, before Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, pursuant to Notice, the Federal Rules of Civil Procedure and stipulations as may be stated herein.

02:46:36 PM Q. And that Note C reads, "Estimated to be 37 percent of incremental earnings based on guidance provided by Dan Byrne, CFO of Sterling Savings Association."

02:46:51 PM Can you describe for me what the guidance was that you provided?

02:46:59 PM A. As I recall, I was asked what our effective estimated taxes would be running, and based on our rate at the time was about 37 percent which represented the Federal effective tax rate, plus the rate for state income taxes since we operated in Idaho and Oregon.

02:47:31 PM Q. So is that an actual tax rate?

02:47:39 PM A. It approximates the actual rates that were paid in certain years. Yes.

Q. Okay.

02:47:49 PM A. The basis for that essentially would have been reflected in our financial statements. The best place to look at would be our annual reports for the respective years.

02:48:28 PM MR. W. D. SYMMES: Can we go off the record for a second? There is no pending question.

02:48:31 PM MR. MURPHY: I have -- I have no problem with that.

02:48:33 PM THE VIDEOGRAPHER: Going off the record. The time is 2:49.

(Discussion off the record.)
02:49:18 PM THE VIDEOGRAPHER: We're now going back on
02:49:19 PM the record. The approximate time is 2:50.
02:49:30 PM Q. (BY MR. MURPHY) Mr. Byrne, aside from the
02:49:32 PM guidance with respect to the estimated tax rate, did you
02:49:34 PM provide any additional information or analysis for Table
02:49:43 PM 3A?
02:49:44 PM A. Yes.
02:49:45 PM Q. And what would that be?
02:49:49 PM A. Looking at the fourth column over that's titled
02:49:55 PM "Capital assets, that comes off an interrogatory that we
02:49:58 PM supplied with respect to capital that was generated for
02:50:05 PM Sterling Savings Bank.
02:50:11 PM I believe that same interrogatory also
02:50:13 PM provided the information for column F, "Estimated
02:50:19 PM External Growth Acquired Assets."
02:50:27 PM I had given guidance with respect to
02:50:29 PM column A in terms of the estimated capital ratios that
02:50:38 PM Sterling would have operated on at various points in
02:50:41 PM time -- my views, at least.
02:50:57 PM I think I had commented on other aspects of
02:51:01 PM the schedule. Right offhand, I don't recall those
02:51:06 PM comments, but . . . I think that's it.
02:51:27 PM Q. Okay. What was the nature of your guidance with
02:51:29 PM respect to the estimated capital ratio? In the second

02:51:33 PM column.

02:51:34 PM MR. W. D. SYMMES: Objection to the form.

02:51:36 PM You may answer.

02:51:38 PM A. In the periods after Sterling raised capital in 1991, I was asked for my views with respect to what capital ratio Sterling would have operated under and gave those views to our expert. And I note that the capital ratios are increasing from 1992 to the year 2000 and gave some suggestions that that was appropriate for the schedule.

02:52:21 PM Q. (BY MR. MURPHY) And why in your view is it appropriate that the estimated capital ratio was growing between the early '90s and 2000?

02:52:36 PM A. The principal reason, that we would want to maintain a cushion between the minimal capital ratios and later the well-capitalized capital ratios. And as the mix of our balance sheet changed, that might require us to have a little higher level of capital ratios in later years.

02:53:06 PM Q. And when you say the mix of the balance sheet changed, what -- can you be a little more specific?

02:53:11 PM A. The mix of our loan portfolio, which at one time was very highly concentrated in residential permanent mortgages. As we diversified to consumer business banking and income property loans, that they would have