04:36:36 PM of Exhibit 2 are listed as wounded bank damages. Tab 7
04:36:43 PM itself is captioned "CJ-4 Loss Due to Improper
04:36:48 PM Enforcement of Loans to One Borrower Regulation."
04:36:54 PM Did you prepare this document?
04:36:56 PM A. Yes, I did.
04:36:59 PM Q. There should be in the page immediately behind
04:37:02 PM it a damages calculation corrected. "CJ-4 loss due to
04:37:10 PM improper enforcement of loans to one borrower
04:37:15 PM regulation." Is -- do you have that?
04:37:16 PM A. I do.
04:37:18 PM MR. MURPHY: I guess it's reversed?
04:37:19 PM MR. W. M. SYMMES: (Nods head up and down.)
04:37:24 PM Q. (BY MR. MURPHY) Okay. First, I want to focus
04:37:31 PM on the corrected one, but I first want to ask what
04:37:36 PM the -- it appears as though the changes that were made
04:37:41 PM relate to the interest section, which is the interest
04:37:49 PM accrued at write-off, and then a couple of other
04:37:54 PM interest amounts.
04:37:56 PM What -- and in the first version of this
04:38:00 PM document, the interest accrued at -- is listed at
04:38:06 PM 1/2/91, written off in the amount of $419,470. And then
04:38:12 PM it was changed to $457,394 in the corrected version.
04:38:18 PM And then the subsidiary or other interest calculations
04:38:24 PM also change.
04:38:31 PM My first question is just: What different

information arose that led to this change?

A. Well, the primary change was reflected in that there was an incorrect sequence for calculating the crude interest. In the first schedule, the interest accrued at January 2, 1991. It was for one component. The second component shows August 1, '89 through May 14, 1992, but should have followed the sequence following January 1, 1991, the previous line.

The third component appears to properly follow the second component.

Q. Okay. What was the CJ-4 loan?

A. The CJ-4 loan was a property in Belvieu, Washington that was committed to by Sterling to a group of borrowers prior to the enactment of FIRREA.

Q. And do you recall when the loan first came about?

A. I can't tell you the specifics on that without the loan file, but before FIRREA.

Q. Okay. Was the CJ-4 loan a Sterling loan, or was this a loan that you acquired with one of the supervisory acquisitions?

MR. W. D. SYMMES: Before you answer, let me interpose this notion. Just like many other questions have been gone into by Ms. Hosford during the course of her four-day deposition of Mr. Byrne this last July, I

04:40:37 PM have no objection if you continue to elaborate that in
04:40:40 PM preparation of Professor Horvitz' deposition, but I
04:40:44 PM would hope you would accommodate us in a like way.
04:40:47 PM In other words, we are now in the expert
04:40:49 PM discovery phase, and you're back in the fact discovery.
04:40:52 PM And she's already gone through this. But you may go
04:40:55 PM through it again.
04:40:56 PM I'm not saying she had the schedule in front
04:40:59 PM of her, but we went through all of these. But go ahead.
04:41:02 PM I just want to make sure it's clear we're accommodating
04:41:05 PM you. We would expect a like accommodation, if
04:41:08 PM necessary, once we receive your expert reports.
04:41:13 PM MR. MURPHY: My review of Mr. Byrne's
04:41:14 PM deposition index showed one reference to CJ-4, which
04:41:18 PM was: Was the loan file produced? I don't want to get
04:41:25 PM into --
04:41:27 PM MR. W. D. SYMMES: That's all right. Go
04:41:28 PM ahead.
04:41:28 PM MR. MURPHY: -- but we need to understand
04:41:30 PM the basis for its inclusion in the wounded bank.
04:41:33 PM MR. W. D. SYMMES: That's fine. I don't
04:41:34 PM object. I just want to make sure that it's understood
04:41:36 PM we're being accommodating here, and I don't want to be
04:41:39 PM penalized for it later.
J4:41:46 PM Q. (BY MR. MURPHY) I'm sorry. You probably

answered this, but I lost track.

The CJ-4 loan was originated by Sterling and not one of the acquired institutions?

A. That's correct.

Q. Okay. And were you involved in underwriting that loan?

A. I was not.

Q. How about approval of that loan?

A. I was not.

Q. Okay. What is the basis for the CJ-4 loss being included in a calculation of wounded bank damages?

A. The basis is that when the Government breached the contract, we were not permitted to make additional advances against the loan commitment that was already in effect when FIRREA was enacted. And the Government told us we could not make further advances; and as a consequence, this project fell behind in its construction process. And as a consequence, the borrowers sued Sterling for breaching its loan commitment. And in order to ultimately resolve the dispute with the borrowers and in order to get control of the property, because the Government was enforcing the limitation of loans to one borrower, we had to repossess the property -- foreclose on the property, repossess it and make the improvements that the borrower

04:44:03 PM would have made had we been able to advance the funds. And in the process, the market value of the property declined substantially. And when Sterling liquidated the property as part of trying to resolve this overall problem, we took a significant loss, which is summarized on this page at $1,734,267.70.

04:44:35 PM Q. And that's a -- turning to the corrected one on the next page, is the amount of 1.615?

04:44:46 PM A. That's correct. I'm sorry. Yes:

04:44:47 PM Q. Let's just -- let's just stick to this page and not doing any more referring back so --

A. Figures.

04:44:51 PM Q. Because I know I will confuse myself.

04:45:00 PM What happened to the suit that the borrowers initiated?

04:45:04 PM A. It was dropped as part of the agreement by Sterling to repossess the property, foreclose on the property, repossess it. The borrowers dropped their demands, and they were released from any commitments or financial loss in the property in order for Sterling to get control of it.

04:45:46 PM Q. And how -- let me just ask a basic question: What is the loans to one borrower regulation that you referred to?

04:46:02 PM A. The loans to one borrower regulation came in

with the FIRREA legislation that limited the size of the loan a financial institution could make to any one borrower, and it was based on the level of capital that an institution had, with a minimum of $500,000 generally.

And since the Government refused to acknowledge the contracts that existed on Central Evergreen, Tri-Cities and Lewis Federal, treated Sterling as if it had deficit capital as opposed to what our contracts said and limited us to $500,000.

This project was in excess of $500,000. The commitment was much larger, and we were unable to advance further funds following the passage of FIRREA.

Q. So is it your opinion that the loans to one borrower limitation is a breaching provision of FIRREA?

MR. W. D. SYMMES: Objection, form.

Go ahead and answer.

A. I don't know if it is a breaching form by itself. I do know the way this whole situation was handled by the Government, that we were told we could not advance any further funds by the OTS.

Q. (BY MR. MURPHY) Did the institution seek a waiver of the enforcement of the loans to one borrower provision?

A. I don't know if you would call it a waiver

05:04:09 PM THE WITNESS: 803739.

05:04:12 PM MR. W. D. SYMMES: Okay.

05:04:19 PM Q. (BY MR. MURPHY) Do you have an understanding as to why the property or project was split up into a north half and a south half?

05:04:28 PM A. From reading the file briefly, it appears that at some point the strategy was to concentrate the effort to complete one part of the project, get it liquidated and then come back and finish the other property in an attempt to minimize the overall loss on the property.

05:05:05 PM Q. And the next sort of series of documents or document, I guess, specifically is at 3741. And it's a document entitled "Real Estate Owned."

05:05:20 PM Can you explain how this -- if it was -- was relevant to your analysis?

05:05:25 PM A. Yes. The Real Estate Owned report captures the accounting information regarding the property under the third item down, CJ-4 Associates. The REO date is February 27, 1991, which approximately corresponds to the foreclosure date; and the foreclosed balance at that point was $2,384,000. The costs that had been incurred to date were $701,000. The loss at foreclosure at $801,450 would have been for both the north and the south project. It also shows that after the initial accounting, a reserve of $128,132 was established so the

05:06:28 PM total losses to date would have been the sum of that
05:06:33 PM 801,450 and the 128,132 with respect to principal only.
05:06:49 PM Q. Okay. Do you know if the 801,450 amount was
05:06:52 PM actually written off at the time of foreclosure?
05:06:55 PM A. That's what it indicates here with the loss of
05:06:58 PM recognized foreclosure account.
05:07:09 PM Q. Okay. Do you know if CJ-4 Associates had any
05:07:12 PM other outstanding loans with Sterling?
05:07:14 PM A. I do not.
05:07:37 PM Q. Then who would have made the -- or would have
05:07:41 PM been involved in making the determination to establish
05:07:43 PM the additional reserve?
05:07:46 PM A. That determination would have come from the
05:07:49 PM people managing the REO, our special assets department.
05:07:56 PM And they would have done a calculation similar to what
05:08:03 PM was reflected on 803738 trying to establish values, and
05:08:10 PM that would have been the initial basis for establishing
05:08:15 PM the reserve after the loss at foreclosure. In this
05:08:22 PM case, 128,132.
05:08:34 PM Q. And I will note that there is a reference on --
05:08:41 PM in Exhibit 3, Bates No. 803749. There is an item
05:08:49 PM entitled -- that page is a journal voucher. And the
05:08:54 PM second-to-last item on there notes reserves.
05:09:04 PM Is that the sort of material you were
05:09:08 PM referencing, or is that something different? And on

I, DANIEL G. BYRNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________________
DANIEL G. BYRNE

THE STATE OF _________)
COUNTY OF __________)

Before me, ________________, on this day personally appeared DANIEL G. BYRNE, known to me (or proved to me under oath or through ______________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _______ day of ______________, __________.

__________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________

THE STATE OF TEXAS :

I, Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, DANIEL G. BYRNE, to the interrogatories as indicated were made to me by the said witness after being first duly sworn/affirmed to testify to the truth, and same were reduced to printing under my direction; that the above and foregoing deposition as set forth in printing is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

GIVEN under my hand and seal of office on this the 10th day of December 2001.

Marie Bulfinch

Marie Bulfinch, CSR, RMR, CRR
in and for The State of Texas

Certificate No. 3748
Expires 12-31-01
1010 Lamar, Suite 1400
Houston, Texas 77002

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF DANIEL G. BYRNE

Deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 10, 2000, pursuant to the Federal Rules of Civil Procedure.



STOREY & MILLER COURT REPORTERS
601 West Riverside, Suite 1030, Spokane, WA 99201
(509) 456-0133 Toll Free 1-800-456-0142

Q. Is there anything else you can think of?
A. Offhand, no.
Q. Do you continue to maintain your CPA license?
A. I do.
Q. Can you please describe the continuing education classes that you have taken in the last three years?
A. They have been generally in the nature either of a tax update or accounting principles update, current changes within the accounting profession.
Q. Since I am not a financial person, occasionally my questions may sound uninformed, but as part of being a CPA, do you have any expertise in tax?
A. I wish I had more expertise in tax than I currently have. That was not an area that I spent a lot of time in my career specifically developing, and quite frankly, when we do get into tax matters, I usually call upon another CPA that is more experienced.
But it is an area that I do have some degree of knowledge on by virtue of the certificate I hold, and occasionally need to help other members of my family and friends on certain matters. I do try to stay up on tax issues.
Q. When you say you usually call upon another CPA, do you mean internally at Sterling?
A. Perhaps internally. Generally I would call upon

somebody from Price-Waterhouse-Coopers for those matters.

Q. Who at Sterling would you call upon, if in fact such a person exists?

A. Other CPA's that we have on staff. Over time we have had some people specializing in tax matters. Julie Shivlett at one time was an employee of our company, and had specialized in taxes when she was in public accounting. She is no longer with our staff.

We have a young man that specializes in tax matters today at Sterling, and occasionally I'll call upon him for tax-related issues.

In the past I've also consulted with other members of the accounting department staff. Curt Beyer, who was our controller at one point in time; John Van Dijk, who was our controller at one point; Norm Judd, who was our controller at one point in time; and Carolyn Gay, who is our current controller. There may have been some others, but I think that is a fairly complete description.

Q. What is Mr. Judd's current position?

A. I think his current title is assistant treasurer. His responsibilities include managing the treasury department. He has significant responsibilities in monitoring the cash management of the organization. He