also has responsibilities for the profitability systems that we have in place, and acts as the planning officer currently for the organization.

Q. What does the planning officer do?

A. He is responsible for budgeting and planning, both on a one-year basis and looking forward a couple of years.

Q. Is he at all involved in planning for future acquisitions or investment, that sort of thing?

A. Norm does get involved with acquisitions from time to time, but it is usually not in a planning capacity. It is usually once the acquisitions are far enough along that it looks like they may come to fruition that he is generally brought in.

Q. What about capital raising? Is he involved with that?

A. Same issue. Generally not from a planning perspective as he is from--if we are going forward with a capital raising, we may need to have his involvement from time to time, but again, it is kind of after the decision has been made to move forward rather than from a planning perspective.

Q. Are you the person at Sterling who is most knowledgable about accounting issues relating to the company?

and capital raising first on acquisitions, has your role in acquisitions changed over time or does it remain the same?

A. I think it has varied a little bit over time, but I think it is primarily because the transactions have gotten larger and somewhat more complex that my role has expanded. I think that some of the operational considerations have been delegated to others, where in the early days I may have taken a more active role.

Q. Operational aspects of the acquisition you mean?

A. Of the acquisitions, (nods head affirmatively). Some of the due diligence may be delegated to people that actually operate on the banking side, and they may be brought in to give their assessment on the quality of the operations that we might be evaluating, where in the early days that may have been more closely held to myself.

Q. Okay. Now, with respect to capital raising, what has your role been over time?

A. My role has been to both assist and lead in capital raising activities. Again, Mr. Gilkey would take the initial lead in developing contacts to raise capital, and my role was to support that.

In more recent years I have taken a more active leadership role in discussions with Harold, let

him know if there were certain things that we wanted to pursue. And he generally would allow me to pursue those, but we work pretty close in the capital raising arena over time.

Q. When you say in recent years you have taken more of a leadership role, can you be more specific about which years you are talking about?

A. I would say probably in 1997 to present, I have been more active in dealing with the investment bankers and suggesting ways to raise capital on behalf of Sterling. The trust preferred securities to the bank financings that we have done would be some of the transactions we have looked at.

Q. So are you saying that prior to 1997, it was generally Mr. Gilkey who would call the investment banks or whoever he was looking to to raise capital at that time? Is that what you're saying?

A. I would say that he was much more active in those years maintaining those contacts and discussing the viability of various capital raisings and maybe searching out advice as to the type of capital raising that the organization would benefit from.

And subsequent to that period of time, I have probably had as many conversations as Harold has with respect to financings.

early days of my employment and at a later time reported directly to Mr. Gilkey.

Q. Do you remember when that changeover took place?

A. I do not.

Q. As a practical matter, you may have already answered this, but during the period when you were reporting to Mr. Zuppe, were you also reporting to Mr. Gilkey with respect to acquisitions and capital raising and that sort of thing, or how did that work?

A. During the period of time that I would have reported to Bill, if there were need for my involvement on either capital raising or for mergers and acquisitions, I would have made time to assist Harold.

Q. So that was over and above the duties that were part of your job description at the time?

A. That's correct. Actually I would say they were probably part of my job description, other duties to be assigned.

Q. Okay. But they were not under Mr. Zuppe's supervision?

A. The mergers and acquisitions were generally dealt with by Harold. He always took the lead.

Q. And who reports to you?

A. That has varied from time to time as well. Generally the controller of the company has always

reported to me, and the accounting department staff at various times. The treasury department has also reported to me. It currently does not report to me.

Currently I have the--I'm searching for the title, but the treasurer of the Sterling Financial Corporation, who is Mr. Basom, reports to me directly, and the controller for the accounting department reports to him.

Prior to my being assigned for this particular case, I would have had the controller reporting directly to me. And at other times I have had other functions report to me, but over the last year or two, they have been reassigned to others in the organization.

Q. What does the treasury department do?

A. The treasury department has several duties. It is primarily responsible for the investment of excess funds or funds that the bank wants to make available to invest. It manages the investment portfolio and the yield and duration of those particular investments.

It also has responsibility of dealing with the asset/liability management of the company and serves as the head of that committee. It is responsible for assisting in the cash management, and sometimes the assistance is rather dramatic. It is

some problems with it that we had to manage through.
Q. Like what?
A. As I mentioned, the organization had had some interest rate problems coming from the late Seventies and early Eighties.
One of the things that we set about immediately was changing the character of its loan portfolio through a series of securitizations of loans and transforming a fixed rate portfolio into a variable rate portfolio, which we did through our own lending capabilities and the retraining of the staff at Lewis & Clark so that we could get a different type of product on the books, one which was more interest rate sensitive than what had previously been originated by the personnel at Lewis & Clark.
Q. Did the acquisition of Lewis & Clark enhance Sterling's delivery system in any way?
A. Yes, I believe it did. It gave us access to new markets.
Q. In any other way?
A. The fact that we added three additional branches was beneficial.
I wasn't quite done, by the way, with respect to the previous question, on some of the other problems that we had to work out.

There were some management issues and some personnel issues that we had to work through. There were a couple of employees I remember being let go because we didn't think they were qualified to move forward with Sterling post acquisition.

With respect to some of the facilities, I think there had been some deferred maintenance. So we had to do some painting the facilities of Sterling green, not in a literal sense but in a figurative sense.

Q. Can you just explain that? I am not sure I understand that?

A. We tended to, as our motto after acquisitions, paint Sterling green. It was to rebrand the organization we acquired with Sterling.

And in this case, what I was referring to with the building, because there had been some deferred maintenance, we needed to go through and update and upgrade some of the facilities. And that was part of the painting of Sterling green.

Q. When you say paint Sterling green, do you mean green in the form of money? I have never heard that expression?

A. Sterling's color is green, silver-green so we refer to it as green.

whoever came in and acquired them.
Q. Was it your view that Lewis Federal was a failed thrift?
A. They had been losing money for a number of quarters. It seemed to me that they had just started to turn the corner and had some months where they were making a small profit, other months where they were losing. But they had depleted much of their capital base so they were on the verge of failing, was my initial reaction.
Q. Did you anticipate that they would be placed into receivership by the government?
A. I don't think in the--initially. I think that came later. We attempted to put together an unassisted transaction with Lewis Federal, but it soon became apparent there wasn't sufficient amount of capital to get the deal done. So we, through Mr. Gilkey, informed the Federal Home Loan Bank that we could not complete that transaction on an unassisted basis.
Q. Well, was Sterling interested in acquiring Lewis?
A. I think Sterling was interested in expanding its base of business. It had viewed itself as being a community bank and a leader within the financial services industry.

Initially I think it was stated as being the

it more responsive to interest rate changes.

We had to do a substantial amount of rebranding of product to implement checking accounts, money market accounts into the depository base. We had a significant amount of problem assets that had to be dealt with. They had three in particular participations that they had acquired throughout the United States. We had to develop a marketing plan in order to deal with those and eventually liquidate those properties.

They had an investment in a real estate subsidiary that was an investment in the St. Helens Inn that had to be dealt with, and ultimately we disposed of that particular asset.

We had to deal with the other problems in the loan portfolio and develop action plans on how to proceed. So the asset quality activities were very substantial with respect to Lewis Federal, and all of those were designed to return the institution to profitability.

It was important that we have the opportunity to increase the size of our balance sheet, in order to leverage up the capital that came up with the Lewis Federal acquisition so that we could generate the additional earnings to help absorb the costs

associated with the Lewis Federal acquisition.

I know that we had some problems with employee defalcations, and that required us to do some additional work in the accounting systems to make sure that we didn't have other problems that might have resulted from those defalcations or perhaps other defalcations that we hadn't identified. So there was substantial amount of work that was involved absorbing Lewis Federal.

Q. Okay. Do you recall when the Tri-Cities acquisition took place?

A. The Tri-Cities acquisition took place in April of 1988.

Q. Okay. Between the Lewis Federal acquisition and Tri-Cities, do you recall whether Sterling considered other acquisitions?

A. Yes, we did.

Q. To the best of your recollection, what acquisitions did you consider?

A. Oh, I know that we completed a branch acquisition from Great American Savings just prior to the Tri-Cities acquisition. There were numerous institutions that were being put out to bid by the Federal Home Loan Bank board. We looked at some of those.

A. I don't know specifically what you mean by policy, but I can tell you that it was a philosophy at Sterling that we wanted to grow on a 50/50 basis, in the sense that we wanted to be able to grow through acquisition to bring on additional resources.

We also wanted to grow internally so that you wouldn't outstrip our systems of control, and therefore, we tended to target for growth in part through acquisitions and in part through the internal growth to achieve that.

Q. What do you mean by outstrip your systems of control?

A. If you grow too quickly, you may--too quickly through acquisitions, you may not have the internal financial controls and other controls to manage the business because you're acquiring third parties that aren't familiar with your philosophies, with the way that you market, with the way that you originate loans. They are not familiar with your loan procedures, may not be familiar with the way you operate the branch system or loan production offices.

That takes time to assimilate those acquired activities into our systems. So that the balancing effect of our philosophy is to bring in some new and marry it with internally-generated activities and

If you would like, I will make a copy of that for you at the break.

MR. SYMMES: That would be fine.

MS. HOSFORD: Obviously, that rule will apply when I'm defending depositions of my witnesses.

Q. (BY MS. HOSFORD) Do you want me to repeat the question?

A. Please.

(Pending question read.)

A. I can only speak with respect to the other acquisitions that Sterling entered into with the FSLIC and with respect to that other--that other acquisition that we contemplated, that being the First Federal of Longview.

And it was our intention that the cash assistance would in fact be a direct credit to the net worth of the institution that we acquired. I can't speak to other institutions. I have no knowledge.

Q. (BY MS. HOSFORD) Okay. Did Sterling see any benefits to be gained by acquiring Tri-Cities?

A. It did. The principal concern and opportunity was the capital that was being provided. It was a substantial amount and it would allow for further growth, both internal and through acquisition.

There were also some desires to increase the

marketplace and the deposits that came along with that acquisition, but the principal issue had to do with the capital, both in the form of the cash assistance and with respect to the treatment of the intangible assets that would be counted as capital.

Q. Did Sterling believe that an acquisition of Tri-Cities could assist it in becoming a leading savings and loan institution in Eastern Washington?

A. We felt that it would be a means to expand our book of business in the Pacific Northwest, yes.

Q. Did you consider the Tri-Cities area to be a major market in Eastern Washington?

A. In Eastern Washington, yes.

Q. And would acquiring Tri-Cities permit Sterling to achieve a presence in the Tri-Cities market?

A. It would.

Q. Did the potential Tri-Cities acquisition provide some immediate loan origination potential?

A. It had some modest amount of loan origination potential. Potential is what it turned out to be. In fact, the lending staffs of Tri-Cities were not very good. The construction business that Tri-Cities undertook was not in the Tri-Cities marketplace, but in fact in Western Washington. And it turned out that we ended up having to terminate those activities for a

respect to meeting the net worth requirements for Lewis Federal and Tri-Cities.

Q. Why did the forbearances and other provisions have to be incorporated into the Central Evergreen agreement if they were already contractual?

A. We couldn't have done the Central Evergreen transaction without the capital provisions of Lewis Federal and Tri-Cities, and we documented that in the business plan which was made part of our application and became the centerpiece of our agreement on Central Evergreen.

Q. If you contend that the forbearances and other provisions of Lewis Federal and Tri-Cities agreements were already contractual, why was it so important that they be incorporated in the Central Evergreen acquisition?

A. They were contractual, but they were also the centerpiece of the Central Evergreen acquisition. That we could not have completed the Central Evergreen transaction without the capital provisions afforded by the Tri-Cities and Lewis Federal acquisitions.

Q. You already had those?

A. I understand that, but they were the basis of our understanding of how all three linked together as we would move forward after the Central Evergreen





STOREY & MILLER COURT REPORTERS
601 West Riverside, Suite 1030, Spokane, WA 99201
(509) 456-0122 Toll Free 1-800-456-0142

acquisition.
Q. So are you saying if they had not been linked together, then the elimination of the Central Evergreen, of the Tri-Cities and Lewis Federal goodwill would not have been important?
A. I am not saying that, no. I'm just saying that for purposes of the Central Evergreen business plan, there was a linkage of the capital provisions and other provisions of Lewis Federal and Tri-Cities to make the Central Evergreen acquisition work.
It provided us the time and the money to resolve the problems to which Sterling added its management team and its own capital through the absorption of the excess of liabilities over assets. We agreed and the government agreed with us that was an appropriate plan to go forward.
Q. Did the Central Evergreen agreement change in any way the agreement that you contend you had with respect to Lewis and Tri-Cities?
A. I don't know that they changed, but they certainly heightened, in my mind, because of the capital provisions that were part of those agreements, in order to accomplish the acquisition of Central Evergreen.
Q. They heightened what?
A. They heightened the ability to complete the Central

both those fiscal years?
A. That's correct. I think I just described the impact on other fees being lower as a result. Servicing income was also affected adversely as a result of Sterling's inability to originate certain types of construction loans that would have been converted to permanent loans, and as a consequence, we did not have the ability to sell those loans on a servicing or lease basis and generate servicing income.
I also know that we had to sell servicing portfolios from time to time during this period, and as a result, the income that we would have derived from the portfolio was lost.
The service corporation income, which reflected the income from Sterling's subsidiaries, Action Mortgage Company and from Intervest Mortgage Company, were both severely affected adversely by the operating restrictions on certain lending activities and those incomes were lower.
The reserve for loan and REO losses at about the time that we were forced to take that 1.4 million dollar additional charge was increased and therefore the expense was higher.
The gain on investment may have been impacted by the inability of Sterling to manage its

investment portfolio as it had prior to the breach, and as a consequence, Sterling lost the capability of making investments and trading investments for gain purposes.

The gain on loan sales was affected by the restrictions that were placed upon various lending segments and therefore lower than what had been otherwise.

And other income and expense, I believe, was also affected by virtue of the restrictions that Sterling was placed under during that time frame.

I would add that operating expenses in a number of categories also were increased as a result of the restrictions and the actions taken by the OTS during that time.

Q. How were other income and expenses affected?

A. The other income and expense were miscellaneous gains from the sale of assets, and Sterling was precluded from making those sales.

Q. Okay. The fiscal year ending 6-30-1990, when did it begin?

A. It would begin on July 1st of 1989 and finish on June 30, 1990.

Q. So are you alleging that these affects happened in July, between July 1st and August 30th or whatever the

that we currently occupy, and I know that one of the partners was Steve McIntosh, but I can't remember the name of the partnership that was leasing that building from us.

Q. And they terminated their lease because of FIRREA?

A. Apparently so.

Q. How do you know that?

A. They told us.

Q. Do you remember exactly what they said or--

A. I don't. I know that it was a process through our asset classification group. I don't remember what they said specifically, no.

Q. Do you recall which personnel left because they felt their jobs were in jeopardy?

A. Yes. I know that Cajer Neeley left.

Q. Can you just state each person's position?

A. Cajer Neeley was the head of Sterling's, the commercial lending department. Tom Beil--

Q. Would you spell that?

A. B E I L. And Cajer, by the way, was C A J E R, Neeley, N E E L E Y, I believe.

I had a couple of clerical personnel that left within the accounting department. I can't think of their names offhand. I know our internal auditor left, Sherry Colliton.

Also, with respect to the commercial lending department, there were some loan processing personnel that left at the same time that Cajer and Tom Beil left.

I know that there were some personnel within some of the other lending, but quite frankly, I can't remember their names right offhand. Dave Roberts, I think, is one that I remember who was in the commercial real estate area. I believe Gary Crithfield left. He was in the commercial real estate as a lender. And the support staff for Gary also left.

I know that there were others. I--just right offhand I don't remember the names.

Q. Prior to the enactment of FIRREA, did you lose any members of management at any point?

A. I don't recall having lost any management prior to enactment of FIRREA.

Q. Between 1983, when you arrived, and 1989?

A. Not executive management, and I don't believe there were any in the vice-president ranks so I can't remember anybody that departed prior to that point.

Q. Was Mr. Van Dijk still there in '89?

A. Yes, he was.

Q. Did he start in '89?

A. Mr. Van Dijk joined us with the acquisition of

Central Evergreen, and so would become an employee of Sterling on January 1st of 1989.

Q. Did any operating expenses go down as a result of what you allege to be the breach?

A. We curtailed some of our advertising. Because we were forced to get out of so many areas of business, it didn't make sense to advertise for them.

Q. Anything else?

A. The level of our B&O taxes would have gone down because our income was adversely affected by the restrictions that were placed upon Sterling.

Q. Where are B&O taxes listed?

A. They are listed in the line item, taxes and licenses.

Q. Is it your position that the business plan was to represent a guaranteed performance for Sterling?

A. It was an agreed upon way of operating, following the acquisition of Central Evergreen.

Q. Could the economy have affected your ability to achieve the business plan projections?

A. Yes. In fact, we should have done much better because the economy was in an upswing at the very time that the restrictions were placed on Sterling.

Q. Could management inefficiency affect the projections in the business plan?

Q. From the perspective of the OTS, was the capital credit included in the calculation of capital ratios after FIRREA?
A. From the perspective of the OTS, they would not include the cash assistance as capital.
Q. Okay. From the perspective of the OTS, was this amount deducted from equity for the capital calculation?
A. I think I just answered that question. From the perspective of the OTS, they took the position that the cash assistance was not to be included in capital.
Q. And do you equate capital and equity?
A. Yes.
Q. So that would also not be included in equity?
A. It would not be included in equity from the perspective of the OTS.
Q. Right, okay. Do you recall when you first became aware that FIRREA might have an impact on Sterling?
A. Almost immediately after it was passed there were several signals to Sterling from the OTS. First had to do with the denial to approve two branches that we were going to acquire from the Great American, which we had been told in the Seattle office had already been approved.
And after the passage of FIRREA, when we

A. Okay.
Q. In the middle of the page, starting with the benefits, does that paragraph and the paragraph that follows it convey to the government what benefits Sterling sees in the Central Evergreen acquisition?
A. This indicates some of the opportunities we saw with respect to the acquisition of Central Evergreen. I am not sure it is a complete list of all items, but it does convey some of the opportunities that we saw at the time.
Q. Does the document use the word benefits?
A. Yes, it does.
Q. Okay, no more questions about this document.
Do you know how the enactment of FIRREA affected Sterling's operations in the first quarter of fiscal 1990?
A. That would be the quarter ended September 30, 1989 that you are referencing?
Q. Yes.
A. Well, I think I indicated earlier today that some of the impacts in the first quarter included the change of opinion and approval on the two Great American branches that Sterling was purchasing.
There was an examination underway and there was considerable amount of additional accounting and

legal work underway as a result of some of the changes being imposed by the examiners as a result of FIRREA.

I don't remember exactly when those examinations were being conducted. During that time frame, there may have been some lag when those expenses actually came in, but the costs were incurred.

I don't know whether or not the government had chosen at that time to invalidate or take the position that our contracts were null and void. I know that was communicated to us in the second quarter.

Q. Anything else?

A. Those are the things that come to mind initially.

Q. I'm going to mark this document as Byrne Exhibit 60.

(Ex. No. 60, Letter to Carol Friend from Daniel Byrne, dated 10-30-89, marked.)

Q. (BY MS. HOSFORD) (Hands document.) It is an October 30, 1989 letter, from Mr. Byrne to Ms. Friend. ADIIS number is WON 8890375.

Do you recognize this document, Mr. Byrne?

A. It has been a while, but yes, I do.

Q. If you wouldn't mind focusing on the second page. Once you have had a chance to review it at any time, let me know.

A. Sure. Let me just take a second to peruse it.

state, "However, as earlier letters indicated, we have significant supervisory concerns about the condition of Sterling and that soundness of some aspects of its operations."

We were fearful that we would be placed under further restrictions even in spite of the judge's opinion. We were trying to survive, and in fact, the OTS had informed us that they were going to appeal the judge's opinion, and I viewed this as just another continuing restriction despite the fact that Carol Friend indicated it wasn't.

We were being placed in circumstances and being required to do activities that only a troubled thrift was required to do. So while she said this, she didn't mean it or at least her actions didn't indicate that she meant it.

We weren't sure at that point in time when she said we may not. She didn't say I will not, she said she may not. We were fearful that they were still going to impose restrictions on Sterling, and in fact, they started to use the safety and soundness as a way to come after Sterling.

Q. Is there any way that you could interpret the statement, we intend strictly to obey the court's order, as an indication that the government did not

intend strictly to obey the court's order?

A. I'm sorry, where are you?

Q. Middle of the paragraph.

A. I thought that it was ironic that she made that statement and then followed with the following statement. I didn't know what to believe. I was--

Q. Did you ask for clarification?

A. I don't know if I did or not.

Q. So notwithstanding the inclusion of the language, we intend strictly to obey the court's order, you interpreted the words may not as an indication that the government didn't know whether or not it would enforce the restrictions?

A. Coupled with the last sentence of that paragraph, and other actions and other conversations I had with regulatory staff, I wasn't certain what they meant. I think they were trying to document the file, but their actions didn't match up to what this letter indicated.

Q. Did the court's order prevent the government from performing its oversight function?

A. The court order that was later published in a narrowed opinion, I believe, permitted the regulators to regulate Sterling for safety and soundness issues, which this letter was one of the first, may not have been the first but was one of the first where

regulators were starting to use safety and soundness as a way to get around the court order, in my opinion.
Q. Did the court order prevent OTS from acting on safety and soundness concerns?
A. I don't know that it specifically addressed that issue, and in fact, the government asked the court to reconsider its opinion, which is reflected as Exhibit No. 78, at a later point in time to clarify whether they had the ability to regulate Sterling for safety and soundness.
Q. As you indicated, the court did provide further clarification, did it not?
A. That's correct.
Q. Did the government ever tell you that, tell Sterling that it was prohibited from engaging in the activities that were reported upon in the reporting letters?
A. I'm sorry, would you ask that question again?
Q. Did the government ever tell Sterling that it was prohibited from engaging in the activities that you reported upon in the reporting letters?
A. I don't know.
Q. Did the government ever tell you that?
A. I don't recall.
Q. I'd like to mark a document as Byrne Exhibit 84.

that, "Further, the association reiterates its concerns for filing such a report, in light of the temporary restraining order, and believes that this reporting requirement represents a supervisory activity similar to the restrictions for which the OTS had been enjoined by the TRO."

Q. So you took issue with the reporting requirement?

A. And the restrictions, but we were continually being directed to follow the restrictions.

Q. Does this letter state Sterling's position it was required to act in accordance with the restrictions, notwithstanding the issuance of the injunction?

A. I'm sorry, I'm a little confused by your question. Could you state it again?

Q. Does this letter state anywhere that it is your position that you were required to abide by the restrictions?

A. We were trying to survive, and we had received a reprieve by the judge's order. We continually noted to our regulators we thought they were inconsistent with the temporary restraining order, but we followed their directives, as are indicated in these letters.

They were treating us like a troubled thrift. That is why they asked us to report on these restrictions on a weekly basis. And when we told them

we thought they were inconsistent with the TRO, they continued to require Sterling to report based on the restrictions on a weekly basis, because they wanted to make sure that we would meet those restrictions. They were treating Sterling like a troubled thrift.

Q. And you took issue with the reporting requirement?

A. I'm sorry?

Q. And you took issue with the reporting requirement?

A. We took issue with the reporting requirement and the restrictions. We were trying to survive.

Q. Where did you take issue with the restrictions?

A. I think that our letter, which is Exhibit No. 84, the reference that we have regarding, "In the meantime I'm pursuing with Sterling's legal counsel and the appropriate counsel for the OTS the scope and nature of filing reports in light of the temporary restraining order that also was intended to cover the restrictions, because that is what we were reporting on a weekly basis."

We reiterated that with these weekly reports, but we complied with the restrictions as directed by our regulators because we were told to do so.

Q. Were you ever told verbally to do so?

A. I don't recall at this point all of the

that, "Further, the association reiterates its concerns for filing such a report, in light of the temporary restraining order, and believes that this reporting requirement represents a supervisory activity similar to the restrictions for which the OTS had been enjoined by the TRO."

Q. So you took issue with the reporting requirement?

A. And the restrictions, but we were continually being directed to follow the restrictions.

Q. Does this letter state Sterling's position it was required to act in accordance with the restrictions, notwithstanding the issuance of the injunction?

A. I'm sorry, I'm a little confused by your question. Could you state it again?

Q. Does this letter state anywhere that it is your position that you were required to abide by the restrictions?

A. We were trying to survive, and we had received a reprieve by the judge's order. We continually noted to our regulators we thought they were inconsistent with the temporary restraining order, but we followed their directives, as are indicated in these letters.

They were treating us like a troubled thrift. That is why they asked us to report on these restrictions on a weekly basis. And when we told them

we thought they were inconsistent with the TRO, they continued to require Sterling to report based on the restrictions on a weekly basis, because they wanted to make sure that we would meet those restrictions. They were treating Sterling like a troubled thrift.

Q. And you took issue with the reporting requirement?

A. I'm sorry?

Q. And you took issue with the reporting requirement?

A. We took issue with the reporting requirement and the restrictions. We were trying to survive.

Q. Where did you take issue with the restrictions?

A. I think that our letter, which is Exhibit No. 84, the reference that we have regarding, "In the meantime I'm pursuing with Sterling's legal counsel and the appropriate counsel for the OTS the scope and nature of filing reports in light of the temporary restraining order that also was intended to cover the restrictions, because that is what we were reporting on a weekly basis."

We reiterated that with these weekly reports, but we complied with the restrictions as directed by our regulators because we were told to do so.

Q. Were you ever told verbally to do so?

A. I don't recall at this point all of the





STOREY & MILLER COURT REPORTERS
601 West Riverside, Suite 1030, Spokane, WA 99201
(509) 456-0122 Toll Free 1-800-456-0142

Q. And what is the basis for that 5 to 25 billion dollar number?

A. I've looked at the rate of growth that Sterling has enjoyed from the period of 1991 to the present, recognizing some of the opportunities that were available in the marketplace but for which Sterling was not able to participate in.

I have looked at other financial institutions that had those opportunities because they were not impeded by its regulators' breaching a contract. And I think that Sterling had the ability to grow beyond what it has actually been able to do.

Q. Did you participate in preparing responses to the interrogatories that were served upon Sterling in this case?

A. Yes, I did.

Q. Are you familiar with the interrogatory answers that list all of the potential acquisitions that may have taken place were it not for the government's alleged breaches?

A. Yes, I am.

Q. Which of those acquisitions would have been done were it not for the alleged breaches?

MR. SYMMES: Do you want to show him the interrogatories to help him?

MS. HOSFORD: No.

A. I don't recall all the names that we had listed in the interrogatories. But if you were to ask me to remind me, I could perhaps answer.

Q. (BY MS. HOSFORD) American National Bank?

A. On that particular item we had done some analysis. However, as I recall, they walked away from the transaction at an early stage.

Q. Would you have done that acquisition were it not for the government's alleged breaches?

A. I don't know.

Q. What about Palm Springs Savings Bank?

A. Palm Springs Savings Bank, we actually had gotten fairly close in discussing key elements of the acquisition. At one time I thought it was going to go forward, but it didn't.

Q. Would it have occurred were it not for the government's alleged breaches?

A. I don't know on that one.

Q. What about Horizon?

A. Horizon Bank?

Q. It is just listed as Horizon here.

A. Horizon Bank is one that we have not been able to go forward on even though there were discussions, as I understand it, because our capital position wasn't

sufficient to satisfy Horizon.
Q. Would that one have occurred were it not for the government's alleged breach?
A. Could have.
Q. It is possible?
A. Yes.
Q. What about Interwest?
A. Interwest was similar to Horizon in some respects. We had discussions that progressed. I think we even performed some analytics showing the combined companies at one point.
But as I understand it, the folks at Interwest did not like Sterling's capital structure, and I think they were scared off because of the capital structure and because of the fight that we were having with the regulators.
Q. What time frame were you looking at Interwest in?
A. Oh, I think it was in the early Nineties.
Q. Would that acquisition have occurred were it not for the government's alleged breach?
A. I think it could have.
Q. Do you know for sure?
A. They walked away.
Q. So you don't know for sure?
A. It didn't happen.

Q. So you don't know for sure?
A. I don't know why they walked away.
Q. What about West Coast Bancorporation?
A. West Coast Bancorporation, we had performed financial analysis on combining the two companies. We met with the directors or several directors, not all of the directors, and we had--and chief financial officer for West Coast was also included. And as I understand it, West Coast chose not to proceed.
Q. Why?
A. I am not sure on that one.
Q. Would that one have occurred were it not for the government's alleged breach?
A. I don't know.
Q. What about Enterprise Bank?
A. Enterprise Bank, I am not sure that we went very far in the discussions. I may have performed some financial analysis, but I don't think it progressed very far. I don't know on that one.
Q. So do you know whether that one would have been consummated were it not for the government's alleged breach?
A. I don't know on that one.
Q. What about Great American?
A. Great American Bank?

Q. It says Great American.
A. Great American, we did acquire branches at different times. We were precluded by the OTS from acquiring two branches in the summer of 1989.
Q. So would that acquisition have gone forward were it not for the government's alleged breaches?
A. I believe it would have.
Q. What about Far West Bank?
A. We did acquire some branches from the RTC which were former Far West branches. I know we had discussions earlier than that regarding branches that did not consummate in a sale.
Q. Why was that?
A. I don't know.
Q. Do you think the fact that Sterling did not buy the earlier branches resulted from the government's alleged breach?
A. On that one, I just don't know. Mr. Gilkey would be better served to answer that question.
Q. Okay. Was about Summit Savings?
A. I think we had a very good chance of getting Summit Savings. We performed substantial due diligence and analysis, but they were acquired by Washington Mutual, and I believe it was Sterling's capital structure and the fight with the government as to why they chose the

acquisition by Washington Mutual.
Q. Do you recall when those discussions took place with Summit?
A. They were in the mid-1990's.
Q. And is your position that that acquisition would have taken place were it not for the government's alleged breach?
A. I can't say whether that particular institution or others. I know that had we been in a more favorable capital position by the fact that the government would have honored their contracts, and if we had not been having litigation, we had a much stronger chance of completing some of these acquisitions. I don't know which specific ones would have gotten done.
Q. What about Lynnwood Savings? Is that one that we talked about yesterday?
A. I believe Lynnwood Savings was an institution that was put out to bid by the Federal Home Loan Bank at about the time that the Tri-Cities, Longview were put out to bid.
Q. Isn't it true that Sterling chose not to bid for ultimately?
A. I believe that's the case.
MR. SYMMES: Which one?
MS. HOSFORD: Lynnwood.

A. Unless I've got the institution mixed up with a different one.

Q. (BY MS. HOSFORD) It just says Lynnwood in here.

A. Okay.

Q. Do you recall in 1992 Sterling entertaining the acquisition of certain branches from Washington Mutual?

A. Yes.

Q. And would that acquisition have taken place were it not for the government's alleged breaches?

A. I don't know on that one. Washington Mutual withdrew those branches. They were available, but I don't know why specifically they withdrew.

Q. What about Great Northwest Savings? Do you remember discussions about that in 1991?

A. I remember that Harold had some discussions. We were precluded from going forward because of Sterling's treatment by its regulators, and the capital position, it didn't go very far.

Q. What was the form of the preclusion?

A. Pardon?

Q. Do you mean the government stepped in or Sterling decided, by virtue of its capital position, it could not complete that transaction?

A. Great Northwest did not want to pursue with Sterling because of the way it was being treated by

regulators.
Q. Would that transaction have taken place were it not for the government's alleged breach?
A. I think there is a good chance of it happening.
Q. What about Vancouver Federal? Do you remember that, 1991?
A. I think that is similar to what we just spoke of with Great Northwest. We were precluded from having much in the way of discussions. Because of the way Sterling was being treated by its regulators, the other side withdrew.
Q. Do you know whether the other side would have withdrawn were it not for the alleged breaches?
A. I know that we would have been in a much more competitive position to pursue that had the government not breached.
Q. Do you know whether the acquisition would have actually taken place?
A. I do not.
Q. What about the American Bank in Pasco, Washington? Do you recall those discussions in 1992?
A. I remember Mr. Gilkey having discussions. I don't believe those discussions went very far.
Q. Do you know why?
A. I know it had to do with capital. They were a

bank, we were a thrift. We had just come through a significant fight with our regulators, and while we had recapitalized, I don't think we were viewed as an attractive acquisition suitor.

Q. Do you know whether that acquisition would have taken place were it not for the government's alleged breaches?

A. I do not.

Q. What about Olympia Federal, again in 1992, according to the interrogatory responses?

A. Olympia Federal, I think we had a better chance of consummating a transaction with them. We had done some analysis.

I am not sure why they withdrew specifically. Mr. Gilkey could tell you that.

Q. What about Security Federal? Do you recall that one again in 1992?

A. I remember the name, but Mr. Gilkey had most of the discussions on that.

Q. What about Gibraltar Savings?

A. Gibraltar Savings, does it give a date?

Q. No, sorry.

A. I think Sterling may have had discussions on more than one occasion with Gibraltar. Again, I think it was an issue of Sterling's capital structure and its

reputation as a result of the breach by the government.
Q. Do you recall the time frame for that one?
A. I don't. That's why I asked you if it had a date.
Q. Do you know whether that acquisition would have taken place were it not for the government's alleged breach?
A. I don't know for sure.
Q. What about Benj. Franklin?
A. Mr. Gilkey had the conversations with Ben Franklin. I think at one point he seemed excited to the point that he thought there was a chance of that going forward, but it didn't.
Q. Do you know why?
A. Not specifically.
Q. Do you know generally?
A. Not specifically or generally.
Q. What about Willamette Savings?
A. I know we had discussions with Willamette. At one point I thought we had a chance of that going forward. We performed some financial analysis showing the two companies, but again, it did not go forward.
Q. Do you know why?
A. I believe in that particular case again it was Sterling's capital structure.
Q. What was it about Sterling's capital structure that

had an impact on the acquisition?
A. I think it was the level of Sterling's intangible assets and not being able to include that in capital. And the fact that Sterling had been interfered with for a couple of years specifically at that point in time, and had not earned the--had not had the earnings that it might otherwise have had.
Q. Do you remember that specifically in the context of the Willamette Savings discussions?
A. I remember generally.
Q. But not in connection with this particular potential acquisition, Willamette?
A. I am not absolutely positive it was just Willamette.
Q. You are saying it was Willamette but it may have been others?
A. It may have been others in addition.
Q. But you're sure it was Willamette?
A. I said I am not sure whether it was just Willamette.
Q. But are you sure whether it was Willamette at all?
A. I believe it was.
Q. Do you recall the time frame for those discussions?
A. I would say the early 1990's, early to mid-1990s.
Q. Okay. What about Mortgage Services of America

(First Cal)?
A. The question is?
Q. Do you recall discussions about an acquisition of that mortgage company?
A. Yes, I do.
Q. Why did that acquisition not go forward?
A. The principal, Dennis Hart, chose not to go through with the acquisition with Sterling.
Q. Do you know why?
A. Not really.
Q. Do you know whether it was acquired by somebody else or another company?
A. My recollection is they stayed independent.
Q. What about Hamilton Financial Services?
A. We had discussions with Hamilton and made a run at trying to acquire them.
Q. What happened?
A. They chose not to go with us, and they were acquired by another firm in Texas.
Q. Do you know why they chose not to go with Sterling?
A. No, I don't.
Q. Is it your position that that acquisition would have taken place were it not for the government's alleged breaches?
A. It may have.

Q. Do you know the time frame for that one?
A. I think that was in the mid-1990's.
Q. I don't think I asked you about that question about Mortgage Services of America (First Cal)?
A. The time frame then also was in the mid-1990's.
Q. Okay. Have I mentioned Security Pacific? Is that another one?
A. I don't know.
Q. Is that a potential acquisition?
A. That was a potential acquisition candidate. We weren't in a position to acquire it, because I believe that was first--wait a minute, let me think about the timing on that.
Security Pacific I think was sold to Washington Mutual in the early to mid-1990's, and Sterling didn't have sufficient capital structure to be competitive on that transaction.
Q. Would that acquisition have taken place were it not for the government's alleged breaches?
A. It may have.
Q. What about West One?
A. I think Mr. Gilkey had the discussions on West One.
Q. Do you know what the outcome of that was?
A. They were sold to U.S. Bank.
Q. And would that acquisition have taken place were it

not for the government's alleged breaches?
A. I don't know.
Q. Generally what factors influenced the viability of an acquisition?
A. I think the relative resources that both parties bring to the table is one element. In this case capital resources seemed to have been a critical item, and Sterling didn't have sufficient capital because of the breach.
Q. Anything else?
A. There may be others.
Q. That's the only factor you can think of that influenced the viability of an acquisition?
A. The customer bases for both loans and deposits would be another. The employee base as to whether or not it is a quality trained staff, the delivery system of the institutions, whether there is compatibility. There may be others.
Q. What about geographic considerations?
A. That might be at issue. Most of these institutions were in the Pacific Northwest, within the geography that we consider our territory.
Q. What about considerations regarding competition?
A. Both institutions already would have competition, and so they might be some impact but institutions

I have read the foregoing 182 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this _________ of _______________, 2000, at _________________________.

_________________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this ____ day of ______________, 2000. My commission expires on ____________.

_________________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 11th day of August, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

LESLIE R. WEATHERHEAD
WILLIAM D. SYMMES
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265
Attorneys for Plaintiff

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AUG 3 0 1990
JAMES R. LARSEN, CLERK
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, Plaintiff, vs. T. TIMOTHY RYAN, et al., Defendants. | Civ. No. 90-0175-JLQ<br>SECOND SUPPLEMENTAL AFFIDAVIT OF DANIEL G. BYRNE |

EXHIBIT

STATE OF WASHINGTON )
) ss.
County of Spokane )

DANIEL G. BYRNE, being first duly sworn upon oat deposes and says:

1. I am Senior Vice President of Sterling Savin Association, and make this affidavit from my person knowledge.

2. On July 31, 1990, the FDIC informed Sterling letter that Sterling could no longer accept brokered deposi after August 2, 1990. A true and correct copy of the lett is attached as Exhibit 1. Contrary to FDIC's perfuncto conclusion that Sterling is "deteriorating", the financi condition and tangible capital position of Sterling a considerably improved since I last reported to this Court an affidavit dated June 25, 1990. Sterling's budget i

fiscal 1991 projects continued improvement in financial condition and tangible capital.

3. On August 20, 1990, OTS notified Sterling by letter of an adverse change in its composite rating. This change was not made in connection with procedures prescribed by regulation, and was justified simply by the asserted absence of an "acceptable [capital] plan".

4. On August 14, 1990, OTS notified Sterling that an extensive examination would take place commencing on or about September 17, 1990. Sterling has been examined twice in the past fourteen (14) months. Sterling does not complain about being examined, however, these examinations are expensive, a OTS bills thrifts for examination expenses. In the last 1 months, Sterling has paid OTS approximately $138,000 in cost related to the conduct and review of examinations. A true an correct copy of OTS's letter is attached as Exhibit 2.

5. On August 21, 1990, OTS by letter insisted tha Sterling adhere to a weekly reporting schedule. A true an correct copy of OTS's letter is attached as Exhibit 3. Th letter states that weekly reporting is necessary to monito Sterling's "activities in areas that cause concern". believe this phrase is intended to relate to busines activities of Sterling which OTS attempted to restrict (whic attempt was prevented by the injunction issued by this Court).

While Sterling does not object to providing thi information, weekly reporting is costly to Sterling. Further it is redundant, as Sterling provides the same information t

OTS in other reports filed on a monthly basis. In my opinion, this requirement is imposed only because OTS continues to treat Sterling as a troubled thrift because of the ongoing dispute over capital standards.

6. On August 22, 1990, OTS's Seattle office refused to reverse its decision to require Sterling to record a $1.4 million increase to loan loss reserves, even though Sterling provided strong empirical evidence to support this reversal. Further, OTS's Washington, D.C. Corporate Securities Division has asked questions about recording this $1.4 million additional to reserves at March 31, 1990, and has pointed out that if it is not required by generally accepted accounting principles, the increase to reserves may be inconsistent reporting standards imposed by the securities laws.

An accountant from OTS's Corporate Securities Division is scheduled to visit Spokane and review Sterling's documentation on this matter.

[signature]
DANIEL G. BYRNE

SUBSCRIBED AND SWORN to before me this 30th day of August, 1990.

[signature]
NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 12/1/92





WITHERSPOON, KELLEY, DAVENPORT & TOOLE
ATTORNEYS & COUNSELORS
1100 Old National Building

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

\- - - - - - - - - - - - - - - x

STERLING SAVINGS ASSOCIATION and:
STERLING FINANCIAL CORPORATION, :
Plaintiffs, : No. 95-892C
vs. :
THE UNITED STATES OF AMERICA, : VOLUME 1
Defendant. :

\- - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, October 16, 2002

Deposition of:

JOE HARGETT

the witness, called for examination by counsel for the Plaintiff, pursuant to notice and agreement, commencing at 9:10 a.m., at Department of Justice, 1100 L Street Northwest, before Virlana Kardash, RPR, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiff:
W. SYMMES, Esquire
WITHERSPOON KELLEY DAVENPORT & TOOLE
422 West Riverside Avenue
1100 U.S. Bank Building
Spokane, Washington 99201
509-624-5265

On behalf of the Defendant:
E. HOSFORD, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street N.W.
Washington, D.C. 20530
202-514-7300

Also present: Mr. D. Byrne, Mr. J. Jindra

harm, that could be harm.
BY MR. SYMMES:
Q In light of counsel's objection, do you have an opinion as to whether or not the passage of FIRREA caused any harm to Sterling Savings?
MS. HOSFORD: Objection. He was not retained for that.
THE WITNESS: I haven't studied that issue.
BY MR. SYMMES:
Q But you are issuing an opinion as to whether or not Sterling suffered damages, are you not?
A In the context of the assertions made by Sterling and, in particular, by the expert reports retained by the plaintiffs, that's really been the scope of what I've done.
Q Okay. Fair enough. So you've been retained by the Government to render certain opinions about this matter at trial; correct?
A I've been retained, and I've formed certain opinions that I anticipate expressing at trial.
Q And you testified before that all

all three of these methods, you didn't in any way modify Dr. James' pre-breach calculations, if you will, if we can use the term "pre-breach."

You just carried his same methodologies forward; I think that's what you testified before.

A Yes, that's correct.

Q What is the basis of the 4.78 percent?

A That's an assumption I was given to assume.

Q Is that from Dr. Hamm?

A I have no idea what it's from. I was told to use 4.78 and perform the math.

Q Who gave you the 4.78?

A I think Bernie Woolfley told me to use 4.78.

Q Do you have an opinion if that's right or wrong or indifferent?

A I haven't studied that issue.

Q Okay. Are you offering any opinion as to what the terminal value of Sterling should be as of September, 1989?

A No.

Q Mathematically, your calculations come out showing, at least in this regard, that

\- - - - - - - - - - - - - - - x

STERLING SAVINGS ASSOCIATION and:
STERLING FINANCIAL CORPORATION, :
Plaintiffs, : No. 95-892C
vs. :
THE UNITED STATES OF AMERICA, :
Defendant. :
\- - - - - - - - - - - - - - - x

ACKNOWLEDGEMENT OF DEPONENT

I, JOE HARGETT, do hereby acknowledge that I have read and examined Pages 288 through 431, inclusive, of the transcript of my deposition taken on Thursday, October 17, 2002, and that:

(Check appropriate box)

[ ] The same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

[ ] except for the changes noted in the attached Errata Sheet, the same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

\---------- --------------------

Date Signature

APP. 1154

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Virlana Kardash, Registered Professional Reporter and a Notary Public in and for the District of Columbia, before whom the foregoing proceedings were taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me stenographically at the time and place noted in the caption hereof and thereafter reduced to computer-aided transcription by me; that the foregoing transcript is a true and correct record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in the outcome of the action.

Virlana Kardash, RPR, CSR
Notary Public in and for
The District of Columbia

My commission expires:
June 30, 2006

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF MUKESH BAJAJ, Ph.D.

Deposition upon oral examination of MUKESH BAJAJ, Ph.D., taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the Witherspoon, Kelley, Davenport & Toole, 1100 U.S. Bank Building, Spokane, Washington, commencing at or about 9:00 a.m., on June 19, 2002, pursuant to the Washington Rules of Civil Procedure.

APPEARANCES:

FOR THE PLAINTIFFS: WITHERSPOON KELLEY DAVENPORT & TOOLE
By: William D. Symmes
Attorney at Law
U.S. Bank Building
422 W. Riverside, #1100
Spokane, WA 99201

FOR THE DEFENDANTS: DEPARTMENT OF JUSTICE
By: Elizabeth M. Hosford
Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT: Joseph T. Schertler
Daniel G. Byrne

that may be a direct result of FIRREA regulation. I'm aware of analysts' reports that say the fact that Sterling did not expand its balance sheet during 1990 and 1991 in fact caused no economic harm to Sterling and might have actually benefited Sterling--

Q. But are referring to Jay Tejera, that is your understanding of what he said?

A. Yes, I'm aware of the fact that Sterling got a temporary restraining order in May of 1990 followed by an injunction in July if I remember correctly, or maybe it was August of 1990 to prevent OTS from not honoring what Sterling claimed to be its contractual rights as a result of or arising from the various supervisory acquisitions at issue here.

I am aware of the fact that Sterling did raise capital by 1991 that brought Sterling in compliance with regulatory capital requirements pursuant to FIRREA regulations. All those factors lead me to believe that Professor Horvitz did not properly analyze those facts and circumstances to conduct its, conduct his lost profit analysis.

Q. Let me just ask it this way. Is it your opinion as you sit here now, are you going to opine that Sterling lost no profits by virtue of the abrogation of its supervisory goodwill by virtue of the

cancellation of the accounting and other regulatory forbearances that it received under the acquisition agreements? Are you sitting here right now under oath saying that you can testify that Sterling suffered no damage of any kind?

A. I said no such thing, because what you're asking me is outside the scope of my assignment in this case, and as of today I have no expectation of offering such testimony.

Q. Okay. So as you sit here now, you're not testifying that Sterling suffered no damages as you sit here now, that is not your opinion right now?

A. Exactly.

Q. And you are not testifying and it is not your opinion as you sit here right now that Sterling suffered no lost profits?

A. That's correct.

Q. And it is not your opinion as you sit here right now that certain operating restriction were not imposed on Sterling by virtue of its being deemed capital deficient?

A. Well, I think that is a broader statement than what I understand to be the scope of my analysis and the issue in this case. I understand that the relevant question is whether as a result of the breaching

provisions of FIRREA Sterling suffered economic harm and whether those damages have been properly quantified by plaintiff's expert. This is the scope of my report. If Sterling was capital deficient and that lead to certain operating restrictions, I think that is a broader issue than whether the breaching provisions of FIRREA led Sterling to face operating restrictions that led to economic damage.

Q. Are you testifying that Sterling suffered no economic harm, you are not testifying to that, are you, as a result of the enactment of FIRREA or its regulations?

A. No, I am not testifying to that.

Q. Okay. Are you prepared to admit that Sterling did suffer economic harm--

A. No.

Q. --by virtue of the breach?

A. No, I have not conducted such an analysis, such an analysis is outside of the scope of my assignment and I cannot either admit or deny the statement that you mention.

Q. But what was within the scope of your engagement is to determine whether or not the damage model or models as constructed by Dr. Horvitz and the replacement cost of capital model as constructed by Dr. James were appropriate in your estimation, that

is what you were asked to do?
A. Correct.
Q. And it is your opinion that Dr. Horvitz's, which is what we are talking about now, Dr. Horvitz' model, lost profits model, is deficient for a variety of reasons and you list at least generally some six reasons that we have yet to go through in detail, but that is what you have really concluded?
A. Correct.
Q. So whether or not Sterling suffered large lost profits or small lost profits you don't know, you weren't asked to look into it, but you can say and you are here to opine today that Dr. Horvitz' lost profits model is deficient for a variety of reasons, okay? That is what we are really saying?
A. Now, I don't want you to paraphrase what I'm saying, I think what I said speaks for itself. I have said that the scope of my engagement was to evaluate Dr. Horvitz' report and my opinions as expressed in my report are that Dr. Horvitz's analysis does not provide a reliable nonspeculative and appropriate measure of lost profits if any that Sterling suffered as a result of the alleged breach.
Q. In the event that the court were to approve what I think what economists called the ex post lost profits

I have read the foregoing 170 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of ____________, 2002, at ________________________.

________________________

MUKESH BAJAJ, Ph.D.

Subscribed and sworn to before me this ____day of ___________, 2002. My commission expires on __________.

________________________

Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of MUKESH BAJAJ, Ph.D. on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 3rd day of July, 2002.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF RODNEY W. BARNETT

Deposition upon oral examination of RODNEY W. BARNETT, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on April 11, 2000, pursuant to the Washington Rules of Civil Procedure.

A. Yes, I'm answering you, yes.
Q. Were there any other actions that you can think of?
A. Actions?
Q. That Sterling took to deal with FIRREA?
A. Well, I mean other than operating under restrictions, and managing the company as best we can, I can't recall--no, I can't.
Q. Do you recall what the restrictions were?
A. I can recall a few of them. We were limited to loans to one borrower, we were limited in the amount of insured--we couldn't do insured deposits. We were limited in a certain, we were limited in paying dividends, we couldn't pay dividends. We were, we couldn't do certain types of loan transactions, commercial loans, large real estate loans, we were limited to one to four family presold type transactions.

Let's see what else. We were prohibited from certain large asset transactions in relationship to I think over $500,000. We couldn't acquire anybody. There is more but I can't think of them right now. There was just a series of one right after the other of things that we couldn't do that affected our ability.
Q. Our ability to what?
A. Survive.

Q. Do you just recall all these off the top of your head or did you review any document recently that refreshed your recollection?
A. I recall some off the top of my head, but I did review a document to recall, in fact I reviewed several documents to recall those things.
Q. What kind of documents?
A. The ones I mentioned earlier.
Q. Which specific ones?
A. I believe those came out, we had a--in the annual reports that Sterling had, in the 1989 or '90 reports, I reviewed that. I believe in our board minutes it said some stuff like that. And I recall it from the time that it happened as well.
Q. What impact did these restrictions have on Sterling's operations?
A. They curtailed them greatly.
Q. In what way?
A. We couldn't grow the company because we couldn't loan money to, we couldn't make any kind of loan to speak of, other than the one to four family loans that were presold. It completely cut off our commercial lending arm in Intervest in Portland, that just about ground down to nothing. Action, our residential mortgage arm, also was hurt by it.

Q. How was Action hurt?
A. We couldn't make larger real estate type transactions, we would only make small presold type transactions. Because of that we lost people, as I recall, Intervest, I don't know the exact numbers but we lost people there. All those things hurt the company.
Q. Can you quantify how it hurt the company?
A. Well, if you can't make loans, it lowers your ability for earnings, and it hurt our earnings. And the earnings stream, the company shrunk in size after this.
Q. During this period were there potential customers coming in saying we want a loan, and making application and then being denied?
A. I think--I don't know--you know, I'm going to have to suppose or--why I, because we lost customers, we lost customers that we had, customers that we would do commercial lending transactions to that we couldn't do them anymore. Certain business type loans we couldn't do so, yes, the answer to your question would be yes, we lost customers because of this.
Q. Do you remember any specific instances in which you lost customers?
A. I do not remember any specific instances. I can

transactions. That damaged the company.
Q. How did that damage the company?
A. That shortened our capital position, and we became a non or an undercapitalized thrift at that point in time which then incurred all those restrictions we just talked about. If they would have honored their part of the deal, the contracts or the agreements, our capital would have been in place and the restrictions wouldn't have landed on top of our head. And the stock offering would have gone through, the preferred dividends and the previous things would have been paid and we would have been okay.
Q. So is it your position that the loss of the supervisory goodwill caused all these restrictions?
A. I believe the loss of the supervisory goodwill put us in a position to have those restrictions laid on top of us. Because of the regulatory components of FIRREA, we became an undercapitalized thrift at that time.
Q. To your knowledge was every one of these restrictions a result of undercapitalization?
A. Not to my knowledge.
Q. You don't know?
A. I don't know.
Q. Do you recall whether in the 1989, 1990 time frame Sterling had any operational or other problems that

government.

Q. Do you recall, obviously Sterling was never sold. Do you recall what happened?

A. Well, we--I don't recall anything more than that contacted Dane Bosworth on this, so that is all I know. We didn't sell the company.

Q. Do you recall whether anybody other than Mr. Gilkey was involved in this sale proposal?

A. Not that I'm aware of.

Q. Are you glad that the company wasn't sold?

A. Yes, I'm glad.

Q. Why?

A. As a shareholder in the corporation like many others, I don't think we would have gotten a whole lot for our money back then, being an undercapitalized thrift, shrinking balance sheet, it wouldn't be something, it wouldn't be in the best interests to sell at that point in time. So I'm glad we didn't have to.

Q. To your knowledge has Sterling recovered from the problems that it had during that time period?

A. I don't think we ever recovered from the problems we had during that time period.

Q. Why not?

A. We never got the capital that was taken away from us back, and we didn't get our lost earnings back and

we didn't get the expenses it cost us for all those transactions back.
Q. And what did the loss of the capital, what did that cost you?
A. It cost us earnings because that is how the company grew, we grew through acquisitions and raising capital, being able to leverage that capital into more and more earnings. Once we lost that capital, the capital that was taken away from us, not counting the expenses that all these things added up to, all those things together cost us earnings.
Q. What about after the recapitalization?
A. '90?
Q. Whenever it happened, yeah.
A. All that did was get our heads above water. That literally, all that did in my eyes, I believe in the eyes of management, was save us from having to sell the company or put us in a position, I mean a worse position than we could have been in, it just got us well-capitalized but it didn't recapture all the last capital, all those expenses that we lost to that point, that's where we got hurt.
Q. What about after that point? What about, were you hurt after that point?
A. Not having the capital to grow and leverage as we

did moving forward, we lost that incremental difference.

Q. Can you explain that in more detail?

A. I can't explain it anymore than that, because management would have to give you those numbers but if we--we just, we didn't have the leveraged capital to gross up earnings because they took it away from us. If we would have had that, we would have earned more and been in a much better position than we are now, even though we have always been profitable.

Q. If FIRREA hadn't been enacted, would you have raised that 20 million in '90 or '91?

A. I think we probably would have raised something at some point in time because we were aggressively growing the company through acquisition, but at that time I don't think we would have because other transactions would have been allowed. We would have--we would have probably raised the 10 million dollars transaction which was already fully subscribed. We would have the profit, the preferred stock offering in place from 1987, I think the business plan which is part of the resolution of OTS and our resolution stated that we were going to have to go out and raise capital but I think that number was four to six million dollars worth at the time so no, I don't believe we would have had to

raise 20 million dollars at a higher, at a more costly rate to do that.
Q. When you say the resolution, what do you mean, you mean, are you saying what you call the agreement regarding Central Evergreen?
A. I believe in our board minutes there is a resolution.
Q. A board resolution?
A. The board resolution. And I read in, I believe I read in the agreements, there is a resolution, the OTS has a resolution that also ties down that business plan that we had with Central Evergreen.
Q. Why did you decide to raise 10 million rather than the 4 to 6?
A. I don't know the answer to that. Maybe that is all we needed at the time. I mean we weren't, I don't believe at that time we were affected by FIRREA. And that is the number that I, I think that management decided would get us, keep us well-capitalized as we moved forward.
Q. Are you talking about the 4 to 6 or the ten?
A. I'm talking about the 10 that was denied. I mean that piece right there.
Q. Do you remember when the idea of the lawsuit was first raised?

impact on Sterling's ability to raise capital?
A. I would only surmise that the fact that we had the injunction allowed us to go out and raise that capital.
Q. Why?
A. Well, I believe that everybody believed like we did that we were, we had gotten kind of a raw deal here, that the government had backed out of these contracts, we lost our capital, we weren't treated fairly, and we were profitable from day one, we weren't a part of the problem, we were a part of the solution, and I believe that otherwise all those common stockholders that bought that stock wouldn't have bought the stock, they had to believe in the company. There is no other reason on earth that they would have bought that stock, other than that fact.
Q. Do you recall whether after the injunction was put in place that the regulators considered you to be capital compliant?
A. I don't believe that after the preliminary injunction was put in place the regulators considered us capital compliant. I always, I believe, I don't believe they considered us capital compliant until we raised that stock offering. They treated us as an under-capitalized thrift.
Q. What do you base that belief on?

A. All the restrictions they placed on us. They wouldn't have put all those restrictions on us if we were well-capitalized, and the only reason they would have lifted them is if we became well-capitalized so they put restrictions on us and they raised them off of us so they must have believed that.

Q. Did you, did Sterling ever go back to the court to say, you know, why are these restrictions still here or anything like that?

A. I am not sure whether we did or not. I'm not sure whether we did. When we asked--it would seem to me that it would be commonsensical to ask for that relief when we got the TRO possibly to lift some of those restrictions, but I don't recall that.

Q. Do you recall why?

A. I don't recall doing it, I would hope that we did it, but I don't recall doing it and if we did it we didn't get the relief because we were still operating under those restrictions until we raised that capital.

Q. Okay.

THE WITNESS: Go off the record.

(Short recess was taken.)

MS. HOSFORD: I don't have anymore documents but a couple of them we are going to have to share one, because I don't know why they are not in these boxes.

I have read the foregoing 218 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of ______________ 1999, at ___________________________.

___________________________________
RODNEY W. BARNETT

Subscribed and sworn to before me this ____day of ____________, 19_____. My commission expires on ___________.

_______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of RODNEY W. BARNETT on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 1st day of May, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF WILLIAM W. ZUPPE

Deposition upon oral examination of WILLIAM W. ZUPPE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on May 23, 2000, pursuant to the Federal Rules of Civil Procedure.

Q. So you did not act as if the restrictions were in place?

A. Your question characterizes this as a black and white issue. I told you earlier that we were incapable of returning to our prior mode of operation for the reasons that I described: the loss of employees, loss of customers, the loss of reputation.

I also tried the best that I could to say as clearly and directly as I could that the OTS' objective, based on all of their actions, all of their deeds, was to take Sterling away from us.

And that we chose to take in part a mode of operation during the pendency of this problem that resulted in our operations not returning to the normal sense prior to the OTS interpreting FIRREA in the fashion that they did and considering us as a troubled thrift.

Q. So you are saying you made a business decision not to return to your operations as they were pre injunction, pre FIRREA?

MR. SYMMES: Object to the form of that question. This is what happened. You don't like an answer, you seek to vary the answer. You asked and answered. I objected, argumentative.

At some point I got to object on the ground

into those further if you like.

The first one is through the abrogation of the contracts, and then denial of the capital treatment in the various ways that we have talked about, that is the first step.

And then the second step is being treated as a troubled thrift, as being the problem, not the solution as contemplated in those contracts, and the interference on our business. And then--that is the second part, and that over time is cumulative.

And then the third part built in there as well is the cost Sterling has incurred or suffered. The one significant one that comes to my mind is the approximate million dollars in underwriting costs, investment banker fees, associated with the aborted 1989 stock offering, which would have brought to the table over twice the level of capital that we had originally committed to.

Q. Is that lost profit?

A. Well, it starts from there. It is lost profits from the point of view that those expenses as they flow through the income statement represented a deduction from capital. And that deduction from capital leads to an inability to leverage that in a normal bank fashion, all issues aside, so it does contribute to the lost

profits in my rough calculation that I shared with you earlier.

Q. Okay. You say the first one is through the abrogation of the contracts and then denial of the capital treatment and the various ways that we have talked about. That is the first step?

A. That is part one, part one--well, one of the parts, yes.

Q. Is that a cause or is that the lost profits themselves?

A. When the capital is denied, then we are unable to operate as a bank in a leveraged fashion. And the inability to leverage and operate in a normal fashion leads to the lost profits.

Q. Okay, and then are the lost profits related to that factor, that is 5 and 6 percent and 15 and 250 and all that--

A. Yes.

Q. --that you described?

A. That is part. The other two factors fit in as well, though.

Q. Into the 250?

A. Yes. I included those in my rough estimate. And again, I am not here trying to determine damage. There are other people that are a heck of a lot smarter than

I am, and you said yourself I am trying to give you a feeling.
Q. What's the difference between number one and number two?
A. Number one was the denial of capital. I don't remember, was number one the interference in our business, the operating restrictions?
Q. That is number one.
A. That's number two.
Q. What the difference between one and two?
A. Well, those lead to the inability to do the same thing, leverage the balance sheet, to carry out our business in the normal fashion, the loss of customers, the loss of employees, the inability to take on uninsured deposits, the attendant cost of funds.
But again, I am not a financial expert with the ability to build a damages model based on the lost profits approach. I just think it is an appropriate one.
Q. How many uninsured deposits would you have taken on were it not for the breaches?
A. I cannot estimate that today.
Q. How many loans would you have made if it weren't for the breaches?
A. Same answer. I think the building of that model

I have read the foregoing 85 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ____________, 2000, at ____________________________.

____________________________
WILLIAM W. ZUPPE

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ____________.

____________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of WILLIAM W. ZUPPE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 29th day of June, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF THOMAS M. BEIL

Deposition upon oral examination of THOMAS M. BEIL, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 1:00 p.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

customers that we would, that we banked on an ongoing basis, but not many.
Q. And you've been with Wells Fargo since October of '90?
A. Yes.
Q. And are you doing commercial lending there?
A. Yes.
Q. Let's look back at Beil Exhibit 1. The paragraph at the top states that this is for a time period between November 1, 1989 and June 30th, 1992. Now, if you left Sterling in October of '90, how would you have information from October of '90 to June of '92?
A. I think my point there was there were some customers at Sterling that I, that subsequently followed me after I left. I left in October of '90. There is a couple of customers that left and came up with me in 1991. I actually reviewed internal Sterling documentation up through that point, June of 1992. So I believe that is why the date June 30th of 1992, is that Dan Byrne had given me information up through that date.
Q. Okay. Let's go through the list and just talk about these customers. I'm going to ask you, you know, what kinds of loans and how you know that they left and that sort of thing.

The first one states Boyd, Bjorkman and Frickle?
A. Frickle is actually what it is.
Q. Frickle with an R?
A. F R I C K L E, right.
Q. Okay. Were they your customer at Sterling?
A. Yes.
Q. What kind of a line did they have, do you recall?
A. This was an accounting company, accounting firm and it was a term loan for equipment and leasehold improvements to their location, and I believe we also had a small credit line.
Q. Had they come with you from Old National?
A. No.
Q. Was it a customer that you had developed while at Sterling?
A. Yes.
Q. Now, I note that there is a set of empty parentheses behind that name?
A. Yes.
Q. What does that mean?
A. The dates behind there I just last night was going through the a journal that I had trying to identify when those loans were paid off and in my brief review I couldn't find the date when they actually paid off and left Sterling.

has already been produced.

MS. PETERSON: Okay. We would like, I don't believe we have anything that is put together in sort of a binder or compilation, so if we could have a list of the documents, or if they are identified by Bates number somehow so that we can find them in our document collection.

MR. MAGNUSON: Okay.

MS. PETERSON: We can talk about it later with Mr. Symmes.

MR. MAGNUSON: That would probably be better.

Q. (BY MS. PETERSON) So you went through this book again last night and just wrote down when the loans I think you said were paid off?

A. Yes, just to refresh my memory as far as when they had left the institution.

Q. When you say when the loans were paid off what does that mean?

A. They, generally, a loan is, if they should leave this institution, Sterling and go to another bank, then that other bank is going to pay us off, pay Sterling off and so it is just an indication of what year, I believe it was what year and what month those particular customers, what particular month and year those companies paid off their loans from Sterling

which would imply that they were, had moved on to somebody else.

Q. Do you know for a fact that they moved on to someone else?

A. On some of them I do, most of them I do, just because I was, I continued to be employed in the banking industry in Spokane and so I had a general idea, if they didn't follow me, where they ended up.

Q. So do you know where everybody in Spokane does their banking?

A. No.

Q. I was trying to get a sense of how this works?

A. Well, I've been in Spokane, I've been active in Spokane for, in banking for 26 years so I have a pretty good idea, given the market that I am interested in anyway, of where different companies were banking.

Q. With respect to this first line, the Boyd, Bjorkman and Frickle, you could not find when they paid off their loan with Sterling?

A. I could not, not in my review last night.

Q. Do you know, are they currently customers of yours at Wells Fargo?

A. They are not.

Q. Do you know where they are banking?

A. Well, this firm has since merged with another firm and I keep in contact with one of the individuals, but it is now a combined entity, it was somebody else and, no, I don't know where that subsequent firm is banking.

Q. How do you know that they left Sterling, that Boyd, Bjorkman and Frickle left?

A. I had a conversation with Dan Frickle, who was the contact that I normally dealt with, and they were concerned about the information that we had told our customers, and you know, this was almost a daily occurrence in the newspaper at the time, what was going on, Sterling was a high profile local bank, and there was, you know, at least once a week there was an article about the ongoing litigation. Because of that our customers were concerned that, you know, what's going to happen to them. I think most businesses, they want stability and reliability and when they read about negative news that, it is upsetting. So if we didn't call them they would call us and want to know what was behind all that.

Some customers decided to stick it out, because of, you know, allegiance to the institution, whereas others felt that the risk was too great and began to explore other banking institutions.

Q. Did you have the conversation with Mr. Frickle while you were still at Sterling?
A. Yes.
Q. Do you recall ballpark time frame when that might have been?
A. I believe it was shortly after we received the letter, but I don't, I can't give you the month. It was it was around that time frame.
Q. Did Mr. Frickle contact you or did you contact him?
A. He contacted me. We had a telephone conversation.
Q. And how did he know about this letter?
A. I think he, their initial, the initial contact was just reading newspapers articles and we also contacted our customers that had credit lines because at the time that we received the original letter, our interpretation was that we couldn't readvance on these particular lines of credit. In the situation like that, we had to notify our customers that had lines of credit. Again, I do believe that, I don't know exactly how this happened, but on a follow-up basis within a few weeks, that was relaxed.
Q. The advancing the lines of credit was relaxed?
A. Right, for existing credit facilities for existing customers. So there was quite a bit of conversation going back and forth with customers that did have

credit lines just over those issues.
Q. And what do you recall advising Mr. Frickle?
A. He was concerned the company was struggling financially, which--
Q. Sterling or his company?
A. His company, which makes it all the more upsetting that there is maybe a problem with their institution, and his concern that Sterling would be a viable bank for them to bank at. And I know that he explored with other banks about what they may have to offer. I'm hazy on the time frame on when they left, so I can't tell you exactly if it was before or after I left the institution. I know that they didn't follow me, though.
Q. Do you know where they went?
A. Well, I think again they had merged with another accounting firm, but I think it was after they left Sterling and within maybe a couple years after that they again merged with another accounting firm.
Q. And did he ever tell you he was going to leave Sterling, I mean explicitly tell you that?
A. No, because they didn't have a commitment from another institution up to that point. I think the legal problems that Sterling was having at the time gave them the, or brought it to a head that they

should start looking round.
Q. The second name on the list CRM Optical, Pat Spiger?
A. Spiger, uh-huh.
Q. What is that?
A. What kind of company is it?
Q. Yes.
A. They at the time manufactured contact lenses.
Q. Is Mr. Spiger the principal?
A. Yes.
Q. And what does the handwritten 1991 mean?
A. That was when they paid off from Sterling.
Q. What kind of loans did they have?
A. They had a couple of term equipment loans and also a credit line.
Q. And do you know why they paid off the loan in 1991?
A. They chose to follow me after I left Sterling at First Interstate.
Q. About when did that occur?
A. It was in early 1991, that was one of the first accounts that I was able to convince to move from Sterling and follow me.
Q. So when they got the loan through you at First Interstate, the Sterling loan was paid off and they moved their business to you?
A. Yes.

Q. How were you able to convince them to move with you?
A. Well, my initial discussion with Pat Spiger was before I left Sterling and he was concerned about what was going on, was going to see what other banking opportunity there might be out there. Realized that because of this and other customers that, you know, if I expected to hold onto these customers, I was going to have to find different employment.
Q. How did the conversation first come up with Mr. Spiger, is that a Mr.?
A. Yes. Again he had a credit line, he was very, also very familiar with senior management at Sterling, again senior management was very active in the community, different boards and things and I believe he knew Harold Gilkey who was, is, and is the chairman and I believe they were on a board together. So he was aware of the situation and he was also aware that it came to a head, I think, with the additional regulations that we, you know, received. So it would have been just general discussions maybe with Harold, was again news was in the paper, at least once a week back then, and then discussions I had with him regarding his credit line.
Q. And what did you advise him about Sterling's

situation at the time?
A. Well, that was kind of difficult because I didn't know what to expect. What we asked our customers to do is to ride it out for a while until things developed, and that we would try to support them in any way we could. And that worked for some customers, for some it didn't.
Q. What was your understanding of the lawsuit at the time and what Sterling's situation was?
A. Well, I know that Sterling had several acquisitions, most of those occurred prior to my joining the company. I know some of those acquisitions were initiated by the government, and I know there was, you know--and in support of those acquisitions, they could treat the goodwill, you know, the accounting treatment was such that it wouldn't violate any capital standards, and then later on those contracts or agreements were revoked, and so then Sterling was out of compliance with the current capital requirements, and, you know, could be forced to liquidate or be taken over.
Q. Were you aware of this at the time that you were working at Sterling, or is it something you have become aware of since then?
A. No, at the time I was working at Sterling.

Q. And how were you aware of it at the time?
A. Reading the paper, just understanding the policies, trying to understand the extra regulatory scrutiny that we were under, you know, we needed to have an understanding of what was going on, so we could even deal with our customers because they had questions so we tried to get up to speed as much as we can or could at the time.
Q. Did you have any involvement in decisions Sterling was making as to how to respond to the increased regulatory involvement or the lawsuit or anything like that?
A. No.
Q. And what do you recall Mr. Spiger telling you about whether he was going to stay with Sterling or leave?
A. He hadn't made a decision but he was going to look around just to see what might be available elsewhere. He did have allegiance to Sterling and to myself, so he was on the fence so to speak.
Q. And do you know what prompted him in 1991 to pay down the loan and move with you to First Interstate?
A. Well, when I left the institution, again, a lender that has been in the market for quite a while has a certain following, and I think their perception was he wasn't comfortable with what was going on at

Sterling so he decided to leave.

Had this whole situation not happened I would still probably be at Sterling today, it was not anything negative about the institution other than I was concerned about the viability going forward.

Q. Have you ever considered going back to Sterling now?

A. I had considered it a few years ago but not--I deal in a different market now, upper middle market, larger businesses, things like that and Sterling, really their niche is the small business market, so I've kind of grown beyond the market niche that they are, that they developed.

Q. Have they ever asked you to come back?

A. Yes.

Q. When did they ask you to go back?

A. I was contacted about two years ago.

Q. And I take it you decided not to?

A. Yes.

Q. And was it because of the reason you just stated?

A. Primarily, yes.

Q. Do you own any stock in Sterling?

A. I do, I've got--I bought some stock while I was there, 30 shares or something, very small amount.

Q. So Mr. Spiger left in '91. Has he been banking with you since then?

A. Actually he sold the company in, oh, approximately '95, '96, paid off our loans, and I'm not sure what he is doing right now.
Q. Did he bank with you between the time he left Sterling and sold?
A. Yes.
Q. Okay. Nelson, Robert?
A. Right.
Q. DIVCO Energy Control Company, what is DIVCO Energy Control Company?
A. They are a heating and air conditioning company.
Q. Is Robert Nelson the principal?
A. Yes.
Q. And was he a customer of yours?
A. Yes.
Q. And did you deal with him with respect to their loan?
A. Yes.
Q. And financial requirements?
A. Yes.
Q. And what do you recall about their leaving Sterling?
A. Bob was, once he heard the news, he was ready to leave. He is a very deliberate--or a very volatile individual and he had a growing business, and was demanding, and when he heard that Sterling was having problems he was ready to leave, find another

alternative.
Q. And did he call you?
A. Yes.
Q. And did you have a conversation in this regard?
A. Several conversations. I tried to convince him that he should stay. He was one of my largest accounts at the time, but he felt uncomfortable with the situation that Sterling was under, didn't blame the institution, felt that the government was being unfair, but felt that he needed to look at some different alternatives.
Q. What kind of loans did he have?
A. He had several equipment loans, he had a relatively large, at the time, credit line. He personally banked at Sterling, he had home loans at Sterling. He was you know, very loyal to me, which was frustrating to me that, his loyalty to me and still he was ready to move to a different institution.
Q. If someone had an equipment loan, how did the restrictions affect that?
A. It, I don't believe it would. They are just making a monthly payment. But Bob did have the company, had a large credit line, and potentially that, they could be affected by that. They could be affected within, that credit line typically has a one year maturity

and it is renewed every year. It was unclear at the time whether we could renew credit lines once they matured. He was obviously concerned about that. What's going to happen when my credit line matures? We really couldn't give him an answer at the time.
Q. You say he also had a home loan?
A. Yes.
Q. And would that have been affected by the restriction?
A. No, no.
Q. When he decided, then he decided to leave Sterling?
A. Yes.
Q. Did he take all of his business or just the line of credit?
A. I believe he took it all. Now, I'm not sure about the home loan but he, all of the business loans and the personal banking he moved. In fact, I would go to say that he is really the one indirectly that convinced me that I needed to find a different job. He was my largest account. He had been my customer for 10 years, yet he was willing to leave and I could, I could basically see the pattern that if I stayed, that my customer portfolio would just gradually start disintegrating, so I felt it was time for me to start looking for another opportunity.
Q. Did you tell your customers you were looking around?

A. I didn't, I didn't really tell anybody until after I had left. I didn't feel that was fair to the institution, because it wasn't my fault in my opinion when this was going on, I contacted several of them after I had left.
Q. Did Robert Nelson and DIVCO Energy leave Sterling before you did or after?
A. No, after.
Q. Did they go with you to First Interstate?
A. Yes.
Q. Is he still a customers of yours?
A. He was up until about two years ago, he actually sold his company to a national company, he actually is still a customer of Wells Fargo personally in investing, but not a business customer.
Q. What about Latah Creek Winery?
A. It is actually Latah, L A T A H, it is a local winery in Spokane. Again, like the others they were concerned about the negative press that Sterling was receiving. They had a large equipment loan and again I believe it was a credit line, this was a particular situation where one of the, not the principals but the principal's, one of the principal's father who was one of the guarantors on the loan was very concerned about the issues that Sterling was having

and convinced his daughter and son-in-law that they should look around for a different bank.

Q. And do you recall what that person's name was?

A. I don't. It was, last name was Conway, Ellena Conway, and it was her father, but I don't recall his first name.

Q. Did you ever speak with him?

A. Yes.

Q. And how did that come up, did he call you, because he was, what did you say, a guarantor on the line?

A. Yeah, they wanted to meet. We, and with this particular custom we were, on a yearly basis we review their financial results, and he wanted to understand better Sterling's situation, and what was going to happen in the future. And the problem is we could not give them assurances in the future regarding their ongoing credit needs.

You had asked the question earlier about particular equipment loans, if they would be affected by the regulations that were in effect. And I said no, because most of those businesses have ongoing equipment needs, and so they became concerned that we could grant new credit for equipment expenditures and such.

I know that was one of their concerns, and at

the time we couldn't, we really couldn't be clear
about what would probably happen. So they moved to a
different bank, U.S. Bank, and that was prior to me
leaving Sterling.
Q. And was Latah Creek one of your customers?
A. Yes.
Q. Did they during this time frame ever ask for a loan
that you had to turn down or deny, or were they sort
of asking about future possibilities?
A. That and the credit line which would be up for
renewal, I don't remember the time frame, but I think
it was probably within six months from, you know, the
date that this was happening.
Q. You mentioned a bit ago that the DIVCO Energy was
your largest customers?
A. Uh-huh, at the time.
Q. How big would that have been?
A. I think the total is about $5 million.
Q. Compared to Latah Creek how big would their business
have been?
A. We had about a million dollar term equipment loan and
then a small credit line, I don't remember the size
of the credit line.
Q. Now you have written after Latah Creek that it was in
1989?

A. That is when they actually paid off and moved to U.S. Bank.
Q. Do you know why they went to U.S. Bank?
A. Because of the unknown situation that was going on at Sterling.
Q. And how do you know that?
A. They approached U.S. Bank and I actually know the lending officer over there, they didn't say specifically or the lending officer to me didn't say specifically they are moving because of the financial issues that Sterling's having but it, you know, that often is not said. That is a direct result of companies seeking a new institution at the time.
These particular customers, you know, these particular customers, every one of them I know was loyal to me. The customers that I wasn't sure about, I didn't list on this sheet just because I couldn't be clear about it.
Q. When you say the customers you weren't sure about, what do you mean?
A. My portfolio was about 50 accounts, and if I had to on a factual basis identify ones that I was sure left because of the regulatory scrutiny, that carved that down to this list that I've typed out here.
Q. The lender that you knew at U.S Bank, did he call you

about Latah Creek?
A. No.
Q. It sounded like you had a conversation with him?
A. Well, I, Jay Lewis was his name, we have got kids that go to the same high school and years later, we have done activities and things through the school. And you know, conversations come up a little bit. I mean it was well known knowledge that other financial institutions were benefiting from the troubles Sterling was having, not just in the commercial banking area, but you know, within all departments of the bank.
Q. When you say the other institutions were benefiting what do you mean?
A. I mean they, they were, they had the ability to attract some of Sterling's customers over to their institutions because of the troubles that Sterling was having.
Q. How do you know that that is why it was happening?
A. Well, on this list here, I know that they ended up at other institutions. I know they wouldn't have made that decision, or wouldn't have left, you know, the department that I was in, because I know they had allegiance to myself. And I guess how I quantify that is, once I left I was able to kind of solicit