and attract several of these over to the institution that is, well, at First Interstate.

Q. So are you assuming that that is why some of the other divisions lost people as well?

A. Yes.

Q. Did you have any involvement with other divisions of the bank? I mean personal did you work with them, did you have any oversight position?

A. No, no, we had common customers but no.

Q. Okay. Miller-Jordin Travel, what is that, is that a travel agency?

A. It is a travel agency.

Q. Do you recall who the principal was?

A. There were three ladies. I dealt with Celia Miller was the principal bank's, my contact with them.

Q. And was this your customer?

A. Yes.

Q. And what do you recall about their financial needs and Sterling?

A. They had a credit line for just general operating expenses. They had a couple of small equipment term loans. They knew the senior management people at Sterling very well. So their knowledge of the situation wasn't just from me but I believe also from some senior management at Sterling. As with the

others, it became concerned with, you know, what the viability of the institution was that they depended on.

Q. Did you have conversations with Ms. Miller?

A. Yes, we had some verbal conversations and I believe she had probably conversations with other people within Sterling. She was very knowledgeable in the situation more than, you know, what I had told her.

Q. Were you a party to these conversations with others or you are just assuming they happened?

A. Yes, I wasn't a party to those.

Q. Did anyone tell about them or--

A. No.

Q. --how are you aware that--

A. I was just assuming that because her knowledge of the situation, the legal knowledge was more than I told her.

Q. So she had to get it from somebody?

A. Yeah, I'm assuming she had, she had a real interest in what was going on more than just a surface awareness.

Q. And what do you recall about her leaving, or the Miller-Jordin travel agency leaving Sterling?

A. Kind of the same situation, there were, didn't say they were going to leave, but felt like that on at

least a defensive manner they were going to look around at other institutions and what they could offer, and I believe they left just about the time that I did. They did not follow me to First Interstate, but I believe it was just about the same time. They could have left before, could have been a little bit after, I am not exactly sure.

Q. Do you know where they went?

A. I believe they went to Washington Trust Bank which is another local community bank. They have since, one of the ladies left and formed her own travel agency and the remaining business was merged with a larger travel agency.

Q. And are they still doing their banking at--

A. I don't know. I don't know. The size of the company is sort of below what we, what we are doing in my department, Wells Fargo. They are more of a small business, so I've kind of lost track.

Q. Do you know if they followed another Sterling lender to Washington Trust Bank?

A. No. Because I was their account officer. So they would have left, it would have been somebody unrelated to Sterling.

Q. Why wouldn't they have gone with you?

A. Well, once I got over to First Interstate I needed to

understand a bit about how that bank operated and sort of what the niche was and what they were looking for, and this was a small travel agency and it really didn't fit with what the type of customers were that we were looking for.

I also knew that they were exploring different options as far as possibly merging with another travel agency. That has been a pretty tough industry over the years. So there's been a lot of consolidation.

Q. Okay.

MS. PETERSON: We have been going for just about an hour, why don't we take about a 10 minute break.

MR. MAGNUSON: Okay.

(Short recess was taken.)

Q. (BY MS. PETERSON) Ready to go back on the record.

I want to go back to the DIVCO Energy Company?

A. Okay.

Q. Do you recall when in 1990 they left?

A. It must have been real early, well, no, it would have been late, because Bob followed me and he left in October of '90. So it would have been either late '90, well, I'm assuming it was late '90, I wrote 1990, because he was one of the first customers that followed me to First Interstate.

happened. On the $40,000 term loan it was put on a three year schedule. And that would have been one of the loans that he paid off from First Interstate when he moved in October of 1990, but I believe that the loan No. 1 with the three payments from this document anyway would have indicated that it would have paid off itself in three months, which would have been May or June probably.

Q. Do you have any independent recollection of these two loans aside from what this document is telling you?

A. No, not that I recall.

Q. Okay. Let's go back to Exhibit 1, your list of loans. I believe we had finished with the Miller-Jordin Travel loan.

Next one is for then Technologies, Inc. Can you tell me what kind of a tech company that--

A. They were a technology company, they at the time manufactured surge protectors that are used on, industrial surge protectors used on medical devices like CAT scans and such.

Q. And do you recall who the principal was?

A. Steve Baker was the president and CEO and the individual that I dealt with.

Q. Was Northern Technologies one of your customers?

A. Yes.

Q. What kind of loans did they have?
A. Primarily a credit line, an ever increasing credit line because the company was going through rapid growth.
Q. And what do you recall about their leaving Sterling?
A. I think their concern was that the company was growing so fast--they really had two concerns, one, I think they questioned whether Sterling on a long term basis could continue to bank the company. And I, just because of the size of Sterling I convinced them that, yes, that the institution was growing, that we could accommodate their needs, but it was a situation where they, you know, needed the dependability more than most companies because they were growing so rapidly. And then when of course when we went through the struggles at Sterling that confirmed in his opinion that there could be a concern and he was unwilling at that point to wait or to ride it out. And they moved their relationship to Bank of America, at the time it was Seafirst.
Q. Do you know why they went to that institution?
A. Just for those two reasons, I think they were concerned about their rapid growth and Sterling's ability to finance that growth under normal operations, and I think what compounded that concern

and the ultimate decision was that then Sterling was having some issues that they internally had to deal with.
Q. And had you disclosed this with Mr. Baker, is that who you say the principal was?
A. Right. Well, to the best of my ability, you know, what I knew at the time.
Q. So they had some concerns prior to Sterling's problems?
A. They did, but I think I had convinced them that this--this was a company that followed me from Old National Bank and so they had an existing relationship and I think I had them convinced them that, just as far as the size issue anyway that we could take care of their needs, but then when the other situation arose, it, you know, they weren't willing to listen anymore, I guess.
Q. Where did you say they went, Bank of America?
A. Bank of America which at the time was Seafirst.
Q. And did you have any more involvement or association with them?
A. No.
Q. What about Northwest Ski Exchange?
A. It was a retail ski shop in Spokane.
Q. And what kind of financial needs did they have?

A. They had expanded from one store to two stores, so they had several term loans for fixtures and leasehold improvements and also inventory financing for ski inventory, and related, you know, financing each year.

Q. And would those be term loans?

A. No, those would be credit lines.

Q. Do you recall who the principal was?

A. Ray Chase.

Q. And did you discuss their financial needs with him?

A. Yes. Actually this was an account that I think originally was handled by Cajer Neely and when I got to the bank it transitioned to me. I developed a relationship with Ray, he became concerned about the institution. I think I was generally able to alleviate those concerns, but then he became concerned--when I left the institution and went to First Interstate, he subsequently followed me over there in 1991 mid year or somewhere around that time frame. I wrote down here that it paid off from Sterling, I can't remember the month but it was 1991, and that would have been by myself when I was at First Interstate.

Q. Was there anything magic about the timing, I mean why would he have waited until 1991?

A. Well, I think he was, I think I had convinced him that we were dealing, Sterling was dealing with the issues and trying to work it out. When I became unconvinced myself that was going to happen and left, then obviously these people that I had been trying to convince, you know, grew more concerned. And Cajer Neely had also left a few months prior to me, and so it became, you know, a disruption to the whole customer base.
Q. And did, I'm sorry, whom did you say the principal was, Ray Chase?
A. Ray Chase.
Q. Did he contact you at First Interstate?
A. No, I contacted him.
Q. And why did you contact him?
A. Because he was a customer that had a viable company that would be good business to the bank that I was at.
Q. Which of the other ones went with you to First Interstate?
A. CRM Optical, DIVCO Energy Control, and Northwest Ski Exchange.
Q. And for all of the three that went with you, did you contact them, or did they contact you?
A. I contacted DIVCO and Northwest Ski Exchange. CRM

Optical, I believe, Pat gave me a call after I had switched.

Q. And after, when they called you, when you were at First Interstate, what did you tell them--did you have any restrictions on your contact with Sterling--

A. No.

Q. --clients or anything like that?

A. No.

Q. So what did you tell them when they contacted you?

A. Well, I think, yeah, initially, they asked me why I had left, and, you know, I gave them the concerns that I have given you today, that I was concerned about the ongoing viability and I, you know, didn't want to be subject to that continued stress and frustration.

And at that point when I made the decision to leave and was at First Interstate then I began to solicit some of these accounts or vice versa.

Q. Did you keep up with Sterling's lawsuit after you left?

A. Well, I was a stockholder. So I would, you know, read the annual report and information and I still had a lot of friends and people that I--that had worked at Sterling, so not more than not as an investor or as an employee, but I would read the

CORRECTION SHEET

PAGE LINE CORRECTION

I have read the foregoing 61 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of _______________, 2002, at _____________________________.

______________________________
THOMAS M. BEIL

Subscribed and sworn to before me this ____day of _____________, 2002. My commission expires on ____________.

______________________________
Notary Public

APP. 1210 A

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of THOMAS M. BEIL on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

Tom Beil reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

Customers
Boyd, Buorkman & Fickle, P.S. (            )
CRM Optical, Pat Spiger 1991
Nelson, Robert - Divco Energy Control Company 1990
Latch Creek Winery 1989
Miller-Jordin Travel 1990
Northern Technologies, Inc. 1990
Northwest Ski Exchange 1991

· Duplicates not included.

The names are provided to you and Sterling's attorney.

Acknowledged by:

Tom Beil

5/3/01
Date

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.



EXHIBIT #1
WITNESS Beil

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF CAJER NEELY

Deposition upon oral examination of CAJER NEELY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 8:00 a.m., on June 26, 2002, pursuant to the Washington Rules of Civil Procedure.

Q. Do you know how much business he took with him?
A. No.
Q. Do you know whether any of the loans that followed Mr. Beil are on the list that you compiled?
A. Yes, there are some on that list that he was the person that had the direct contact with the customer.
Q. Okay. I m, going to go ahead and mark it as Exhibit 1. Now this is a document that partly looks like a photocopy that was faxed either to or from Witherspoon Kelley on June 14, 2002, it has got the signature of Mr. Neely, dated May 2nd, '01 but it looks like there were some notes that were written after that date, there is no Bates number.
(Ex. No.1, List of clients that were lost during the period of 11-01-89 to 6-30-92, marked.)
Q. (BY MS. HOSFORD) And it doesn't have a title. I'm going to hand you this document, Mr. Neely, is this the document that we have been talking about throughout the day?
A. Yes.
Q. Could you please tell me which of the customers listed here you believe to have been Mr. Beil's before he left?
A. Metallic Arts, Red Barn, on the right column that I have written subsequent, Dave Hook, Latah Creek, that

would be it.

Q. I'm just going to ask you a few questions about this document in general, I think you testified that you--who asked you to make this list, if anybody?

A. I believe it was Dan Byrne from Sterling and this is a year ago.

Q. Why did, did he tell you why he needed the list?

A. I was aware that it was regarding the lawsuit and it was to identify--again I was reviewing the list that I identified earlier to recall from my memory what accounts left Sterling.

Q. So was that your instruction, to make a list of the accounts that left Sterling during--

A. Yes.

Q. And during what time period? This November 1, 1989 to June 30, 1992 that is listed at the top?

A. Yes.

Q. And were you asked to just identify all accounts that left or were there some, you know, were there criteria for that list?

A. There were no criteria. It was--other than they were part of the business banking, they were part of the commercial lending, that department that I have identified that I was responsible for.

Q. I think you mentioned that you left in June of 1990,

I have read the foregoing 111 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of _______________, 2002, at ______________________________.

________________________________
CAJER NEELY

Subscribed and sworn to before me this ____day of _____________, 2002. My commission expires on ____________.

________________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of CAJER NEELY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 8th day of July, 2002.

CSR No. STORED*566Q0

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

– Elizabeth
– Bernie
– Jane

Cajer Neeley reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

Customers

- U.S. Aslin-Finch
- BofA Armstrong, Dane 2MM
- U.S. Beasley, Ted 3MM
- WTB Biggs, Larry - Bovay N.W.; Worner & Associates –
- WTB Cedar Builders –
- U.S. Empire Jewelry & Loan 2MM
- BofA Hansen, George 1MM
- WTB Howell, Don 250M
- Wells Jacobs, Craig 1MM
- U.S. Lawson, Bill - A&A Construction – "LC" 50M
- Wells Manz, Michael 1MM
- Wells Metallic Arts –
- WTB Person, Grant –
- U.S. Ramey, Randy - Ramey Construction; Ramey Development –
- Wells Red Barn, NSE Inc.
- U.S. Romney, Doug
- WTB Roy Mitchell, Inc.
- U.S. Rudeen, Kevin and Chris – Rudeen Development
- BofA Schreinir, John
- U.S. Siria, Harry & Daryl
- U.S. Sodorff, G. Wesley
- WTB Vandervert Development
- WTB Walker, Mike
- BofA Wolff, Fritz – Aslin-Finch; Source Capital, A.J. Wolff
- Wells Woodland Montessori School

Duplicates not included.

U.S. – Max Kuney III (350
WTB – Dave Hook (Sr Froggy
U.S. – Latah Creek
WTB – Stahl Optical (Pat Railly)
– McDowell
U.S. – DeVries Moving
BofA → GT Graphics
Wells – (Dennis Croft)
WTB – 6th Ave. Pharma (Gerry + Meghi Sto

The names are provided to you and Sterling's attorney.

Acknowledged by:

Cajer Neeley [signature] Date 5-2-01

EXHIBIT 1 WITNESS Neely DAVID STOREY STOREY & MILLER

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF GARY D. CRITHFIELD

Deposition upon oral examination of GARY D. CRITHFIELD, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

I'm going to mark two documents as exhibits.

(Ex. No. 2, List of Customers, dated 5-2-01, marked.)

(Ex. No. 3, Note Paper with list of names, marked.)

THE WITNESS: I didn't know, did you want to enter that in, that was just a note to myself?

Q. Oh. Yes. Well, I'll ask you about this, it is a list of people.

A. Okay.

Q. I'm going to mark a document as Crithfield Exhibit 2, it bears Mr. Crithfield's signature, dated May 2nd, 2001 and it appears to be a list of customers. I'm going to hand you this document which I assume is familiar to you since you gave it to me?

A. Uh-huh.

Q. And I'm going to mark this other little small piece of note paper as Crithfield Exhibit 3. It contains a list of names and a note at the bottom that says, "Asked the developers if they would do more business, did business with them after Sterling." Okay.

Just let's look at Exhibit 3 briefly first. Is that document in your handwriting?

A. This?

Q. Yes.

A. Yes.
Q. When did you generate that document?
A. Well, after it was requested and given this and told that I was going to be at this meeting this morning.
Q. I am not sure I understand that. When did you write this document? When did you write--
A. Probably two weeks ago.
Q. Okay. Why did you write the note?
A. To remind myself of the builders that I was working with here in Spokane and the ones that I had to tell that we couldn't make any other loans to during that time frame. The time frame I'm referring to is between August of '89 and when I left.
Q. And did somebody tell you to make this list?
A. No, I did it. Some of these people are related to some of the entities that are, for instance Northwood Properties, Gunning, that is Ted Gunning, that is an entity that he used to develop Northwood Properties in the Valley.
Q. I don't see that name on this list?
A. Right.
Q. I'm talking about this piece of paper?
A. Ted Gunning right there at the bottom.
Q. Oh. Forgive me if I am not understanding you, but two weeks ago you thought to yourself, I better write

down developers who you did no more business with after 1989, is that what you're saying?
A. Well, I wrote it down because these were developers and builders I was doing business with prior to August of 1989.
Q. Okay. But--
A. I wanted to remind myself of who I was doing business with, where the volume came from, that most of the volume came from.
Q. How does this list differ from Exhibit 2, which is the--
A. It really doesn't. It ties right in.
Q. Okay. So were these additional names that you thought of?
A. No these are names that, for instance Northwood Properties is Ted Gunning's borrowing entity. Let's see, Cedar Pines General Partnership is Richard Naccarato, or Dick Naccarato.
Q. When did you make these handwritten notes on Exhibit 2?
A. Last night at about 8:00.
Q. Why did you do that?
A. Well, I just want to have, go over the list and see if I knew who I was dealing with here.
Q. You mean you were just trying to remind yourself?

A. Yes.
Q. About additional details?
A. Yes.
Q. About these people or these entities?
A. Correct.
Q. Okay. Earlier when I asked you why you generated this list, I think you testified that Mr. Byrne asked you to go through some documents and write down the names of loans you recognized, is that correct?
A. Yes.
Q. Did you write this document, Exhibit 2?
A. No, this was generated by Dan after I went through the ledgers that he had given me.
Q. Did you mean he wrote the text, the part at the top, did you write that, the first paragraph?
A. No.
Q. So did you provide the names that are listed under the columns headed customers?
A. Yes.
Q. Okay. When you gave this list to Mr. Byrne, did you tell him that these were customers lost as a direct result of the restriction imposed by the Office of Thrift Supervision on Sterling Savings?
A. I don't think I specifically said that. As I say, I went through the list looking for names that were

familiar.
Q. So you did not say that?
A. I didn't say that, no, specifically.
Q. Going through the list, did you, when you were identifying them, were you identifying them as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision?
A. Can I get the time frame that you are talking about? During the time frame of August of '89 through June when I was asked to leave of 1990 it wouldn't have made any difference which list you would have given me, I couldn't have made a commercial real estate loan to them, so during that time frame anyone, whether they were on this list or they intended to come into Sterling, I couldn't have made them a loan.
Q. Right.
A. So when you are saying, when you are asking me what specifically did I say that I couldn't make loans to these people, I just want to get the time frame, because prior to that yes, I could, after that, no, I can't.
Q. Okay. Well, what I'd like you to do is just read the first paragraph of this document, which you have said you didn't write. Please read it for me?
A. I, Gary Crithfield--

Q. You don't have to read it aloud, you can read it to yourself.

MR. WILLIAMS SYMMES, JR: I thought you meant outloud, too.

MS. HOSFORD: No.

Q. Have you read it?

A. Uh-huh.

Q. When you gave the list of customers to Mr. Byrne did you tell him that these customers were lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings' lending and deposit gathering during the period of approximately November 1, 1989 to June 30th, 1982?

A. They would have been lost had they come in and asked for a loan, some of these people did come in face-to-face. I couldn't have made a loan, yes, they would have been lost.

Q. But do you know for a fact that each one of those customers was lost because of the restrictions imposed by the Office of Thrift Supervision?

A. You mean, some of these customers have maybe an appetite for one loan for every two, three, or four, five years, some of them have an appetite for a loan every 3, 4 months, the Bill Lawson the little item three, Bill Lawson, Dick Vandervert, Bob Spears who

is a realtor and Ted Gunning have a need for money all the time. So some of these people maybe I made one loan to or two loans, but if they had come in during that time frame I couldn't have made them any additional loans so they would have been lost.

Q. Okay. How many of these people came in during that time frame?

A. Well--.

Q. When we say time frame we are talking about--

A. Everybody on the list that is on item 3.

Q. Everybody on the Exhibit 3 came in during that time frame, okay?

A. I mean I literally had a conversation with each one of these people during that time frame.

Q. So let me, I would like to do two things I want to go through that list and find out the circumstances. I would also like you to relate it back to the other list. Let's first go, I'm just going to say Exhibit 3, Exhibit 2 over and over again just for the clarity of the record.

On Exhibit 3, Bill Lawson, are you saying he came in for a loan between August of '89 and June of '90?

A. Bill Lawson had a loan at Frontier Savings and Loan, it was under construction, it was a project in the

Valley. He had it 80 percent preleased, Frontier Savings was shut down, they came in and shut the company down, said you can't fund anymore construction loans. Bill came in and said to me, can you help me out on this, I have got it 80 percent preleased, I can't get any draws. I'd like to finish the building. I said no, Bill, I can't.
Q. Why was Frontier no longer making loans?
A. Because the OTS shut them down. As a broker, at Stratford, I can tell, I ran that scenario from clients all the way up and down the coast, that their construction loans were shut down because OTS came in and shut them down, no more draws, didn't make any difference whether they had it a hundred percent leased.
Q. How much was the loan that they were requesting?
A. With Bill Lawson, I don't remember the exact amount. It's, I know where the complex is. It's--
Q. Well, do you have a ballpark amount?
A. Probably a million and a half, a million 7, somewhere in there.
Q. Okay. Now, does this Bill Lawson relate to any of the people on Exhibit 2?
A. No.
Q. It is a separate one?

A. Pardon?
Q. It is a separate name or entity from--
A. Yes.
Q. --from all of those listed on Exhibit 2. Dick Vandervert, first, is he listed anywhere on Exhibit 2?
A. Well, yeah, he is on here.
Q. Douglass and Vandervert Development?
A. Vandervert Development I think is some of the entities on here.
Q. Which ones?
A. Pines Partnership or not, that is Dick Villelli--Douglass and Vandervert Development, that is Harlan Douglass and Dick Vandervert, they were in partnership for a while, they are both separate now. So that's Vandervert and Douglass.
Q. Is that the only entities on the list that is related to Dick Vandervert?
A. That's the only one I see right now.
Q. If you see any others later, will you let me know?
A. Uh-huh, yes.
Q. And so what kind of, so are you saying that Dick Vandervert came in for a loan between August of '89 and June of 1990 and you told him you could not make the loan?

A. Correct.
Q. What kind of loan was he looking for?
A. Construction loans. We used to do all the lending for Richard Naccarato and his apartment houses. We probably made 40 to fifty million dollars worth of loans between the period of--
Q. Wait, wait, we are talking about Dick Vandervert right now?
A. Oh, excuse me.
Q. That's okay. So what kind of loans did Dick Vandervert come in for?
A. Dick is a developer, he builds hospitality, motels, he builds apartments, he builds commercial buildings, he builds a little bit of everything, he is one of the better ones in town.
Q. Between August of '89 and June of 1990 did he come in for a loan and get turned down?
A. Yes.
Q. Okay. What loan?
A. I don't know if I know specifically what loan, but yes.
Q. You have no recollection of what the loan was?
A. No. Some of these people just called after they read it in the paper and asked like immediately, are you guys still in the loan business?

Q. Okay. And you said no, as of August of 1989?
A. Well, during that time frame of August to June when I left. I have a suggestion. Why not call these guys up and ask them in, I mean I'm working on a loan right now for Dick Villelli.
Q. Mr. Crithfield--
MR. WILLIAMS SYMMES, JR: Just answer the questions.
Q. (BY MS. HOSFORD) The burden of proof is on the plaintiff who happens to be Sterling Savings here, they have listed you as a person having information about this, so until they list another person or put them on their witness list, I am not going to engage in that sort of activity. Although maybe I will now that you suggest it, thank you very much.
But let's just you want to just take a break, now seems like a good time.
MR. WILLIAMS SYMMES, JR: Sure.
(Short recess was taken.)
Q. (BY MS. HOSFORD) Back on the record. Okay. Mr. Crithfield, before the break, I think I was about to ask you about the third name on Exhibit 3, Dick Villelli, would it be, it is spelled V I L L E L L I?
A. Correct.
Q. Is it your testimony that Mr. Villelli approached you

about obtaining a loan between August of '90 and June, August of '89 and June of '90 and you had to tell him that you were unable to make the loan?
A. Yes.
Q. And what exactly, when did this happen?
A. Specific date, I couldn't give you a specific date.
Q. And did you have a conversation in which Mr. Villelli stated, I need a loan, can you, and you said we cannot make the loan?
A. Yes.
Q. And how big a loan was Villelli looking for?
A. Probably 2 million, 2 million 1--in there.
Q. And did Mr. Villelli ever follow up and make a loan application?
A. No.
Q. Did Mr. Vandervert?
A. No.
Q. Did Mr. Lawson?
A. No.
Q. Okay. What about Harlan Douglass?
Wait, wait, backing up, Dick Villelli, I see that he, you have written his name next to Pines Partnership on Exhibit 2?
A. Yes.
Q. Is he associated with any other entities listed here?

A. No.

Q. Harlan Douglass, is he associated with any entities listed on Exhibit 2?

A. Douglass and Vandervert Development.

Q. And then Douglass, Harlan D?

A. Yes.

Q. And what about Douglass, Maxine H?

A. That's his wife.

Q. So just to be more precise than I need to be, it is spelled with Douglas under Douglass and Vandervert and then it is Douglass under Harland Douglass, but they are the same?

A. I think it is one S.

Q. So those are the same, but just have different spellings?

A. Yes.

Q. What is your recollection about Harlan Douglass between August of '89 and June of '90.

A. I believe Harlan called and asked whether we were still in the loan business.

Q. Did he tell you he wanted to obtain a loan and did you tell him no, that would be impossible?

A. I told him we were not lending.

Q. So did he ever actually say he wanted to obtain a loan from Sterling?

A. I assume that's the reason he called.
Q. But did he say that?
A. Well, I, he called to discuss a loan. When I said no, then he went away.
Q. Okay. What about Richard Naccarato, Exhibit 3,is he associated with any of the entities on this--
A. Yes.
Q. --Exhibit 2?
A. Cedar Pines General Partnership.
Q. And what about Naccarato, Donna J?
A. That is his wife.
Q. And are there any other entities on Exhibit 2 that he is associated with?
A. No.
Q. Okay. What happened with Richard Naccarato?
A. We were approached to do an apartment loan, we did all of his apartment financing.
Q. And what happened?
A. I told him no, we couldn't. I think we closed the last one just prior to somewhere around the middle of '89, a construction loan on the South Hill.
Q. Do you recall the amount of the apartment loan that you were approached about?
A. No.
Q. Okay. What about Bob Spears, is he on Exhibit 2?

A. Bob Spears is a realtor/developer, did a lot of financing or a lot of work with Richard Naccarato, in fact they were partners on a couple of projects that we financed.
Q. Is he associated with any of the names on Exhibit 2?
A. No.
Q. Were you approached by Bob Spears during the time frame we are talking about?
A. Not specifically for a loan, but to ask if we were still in the loan business in case I had an inquiry.
Q. So he never actually attempted to obtain a loan from Sterling?
A. No, not during that time frame.
Q. What about Ted Gunning, first, is he on this other list?
A. Yes, Ted Gunning is North Pines or Northwood Properties.
Q. Is he associated with any other entities or individuals on the list?
A. No, I don't see it.
Q. Okay. And what happened with Ted Gunning?
A. Ted was looking for some financing related to an apartment house in the valley, I don't know the loan amount, but we couldn't help him.
Q. Can I just look at your version for a second?

Q. Not June 30th of 1990, June of 1990?
A. Yes.
Q. Okay. To the best of your recollection which of the customers on this list came into Sterling and inquired about obtaining a loan and were told they could not obtain the loan there during the time frame that you are knowledgeable about?
MR. WILLIAMS SYMMES, JR: In Exhibit 2?
MS. HOSFORD: Yes.
A. Dean Grafos, which is also Opportunity Plaza, it is the same entity.
Q. Okay.
A. Bill Lawson, excuse me, that is Exhibit 3. But he is also on, he is not on Exhibit 2, he is on my little list.
Q. Right.
A. Dick Vandervert, Richard Naccarato.
Q. Okay.
A. Ted Gunning.
Q. Okay. Any others?
A. Thompson and Brumback, actually it was Thompson, was doing business in Seattle, had a development he wanted to do in the Redmond area and we couldn't, couldn't help him. That's all I can remember. Excuse me, did I put Ted Gunning on there?

Q. Yes. What about Grafos, what happened with them?
A. They had some additional financing on their center in the valley.
Q. How much financing do you recall?
A. I think we did that one in phases, there were smaller amounts, the first phase was the largest one, second and third was probably smaller. I'd say it was 600,000 to 800,000 in there.
Q. Is that the amount that you recall during this time period that we are talking about?
A. That is about as close as I can guesstimate.
Q. And do you recall the amount requested by Thompson and Brumback?
A. No.
Q. Just, could you take another look at the list and just make sure that there aren't any others that you recall that, you know, coming in and requesting a loan and being turned down during this time period?
A. No, that's, that's all I--
Q. That's all you recall?
A. Yes.
Q. Just to take as an example, Dow, Glen Dow, to your knowledge was he a customer lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings' bank lending and

ORIGINAL HOSFORD/CRICHFIELD

HOSFORD STERLING v USA 9-6-02

CORRECTION SHEET

PAGE LINE CORRECTION

I have read the foregoing 50 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this 3rd day of September, 2002, at ______________________.

GARY D. CRITHFIELD

Subscribed and sworn to before me this 3rd day of September, 2002. My commission expires on 11/15/2005.

NOTARY PUBLIC
STATE OF WASHINGTON
VICKI J. JEFFRIES
My Appointment Expires November 15, 2005

Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of GARY D. CRITHFIELD on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0
Certified Shorthand Reporter and Notary
Public in and for the State of Washington,
residing in Spokane

Gary Crithfield reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

| Customers | Customers |
|---|---|
| Death Armstrong, Jacquelyn J. | Gumming, Theodore G. — M |
| Bob Tomlinson Best Western River Tree inn | Kirkland, Kevin |
| Bowen, Le Roy | Knutson, Ronald L. — Fairwood |
| Brumback, Donald G. | Mace Jr., Louis L. — Eng. |
| Naccarato Cedar Pines General Partnership | Miller, Jared B. — Developer — |
| — DeFelice, Armand V. | Naccarato, Donna J. — |
| Dr. Devlin, Beatrice | North 120 Wall Associates — |
| DeVries, William | Northwood Properties, Inc. — |
| Douglas and Vandervert Development | Opportunity Plaza Comm. Grafos |
| Douglass, Harlan D. | Pines Partnership |
| Douglass, Maxine H. | Rothrock Jr., Wallace F. — Realtor/Developer |
| — Dow, Glen E. | Thompson & Brumback - Developer — |
| Realtor - Feldman, William C. | United Bank — Naccarato Broker |
| Flannigan, Corrine L. | Vanderhoeff, William J. — |
| Fossen Jr., Neal R. | Walker, Philip W. — |
| Gatlin, Howard | Wolff, Sr., Alvin J. Developer/Realtor |
| Grafos, Dean and Elizabeth | Wynia, Terry P. — Developer/Hospitality |

Duplicates not included.

The names are provided to you and Sterling's attorney.

Acknowledged by:

Gary Crithfield (signature) — Gary Crithfield

Date: 5/02/01

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.



EXHIBIT
WITNESS Crithfield

- Bill Lawsey
- Dick Vandervert
- Dick Villelli
- Harland Douglas
- Richard Nascimento
- Bob Spears
- Ted Gunning

EXHIBIT
WITNESS
DAVID STOREY
STOREY & MILLER

The developers if they would do more business with them after Sterling

Mar 89 - It became clear that the added expense of completing site work during wet weather warranted delaying start-up until Spring. The Borrowers continued their in-house marketing effort and reported interest by a number of prospective tenants.

May 89 - The project was still vacant. INTERVEST agreed to allow use of the tenant improvement allowance for completion of the building shell. Although total costs exceeded amounts available under the original loan (as reallocated), the expectation was that an improved curb side appeal would attract tenants and perhaps justify an increase in the loan amount.

Jun 89 - Construction commenced with a completion date of August 31st.

Jul 89 - Coldwell-Banker was offically signed up as leasing agent.

Sep 89 - Construction complete, but still no leasing to help INTERVEST justify an increase in the loan. Borrowers unable to pay costs which exceeded original loan amount. Subcontractors therefore unwilling to complete punchlist and pickup work.

Oct 89 - Still no leasing. Negotiations continued with Borrower, but now INTERVEST insisted that additional collateral and/or cash be posted. A timetable to deliver necessary documents and materials was provided to the Borrower (copy of Oct 25th letter attached as Exhibit A). Coldwell Banker was released as leasing agent.

Nov 89 - The Borrowers did not abide by our timetable. Further, Gary Crithfield's evaluation of the proposed additional collateral concluded it is of marginal value. Other assets claimed by the Borrowers were either partnership interests purportedly with restrictions regarding assignments or cash reserves already used for other purposes.

SUMMARY: From the Borrower's standpoint, leasing was the key to making this project a success. Yet it is now INTERVEST's opinion that their marketing efforts often confused or offended prospective tenants and may have undermined the work of Coldwell Banker. From the lender's standpoint, the Borrowers offer no help in marketing this project (in fact, it appears that they are a detriment). In addition, we believe that their unwillingness to offer sufficient additional collateral or contribute cash leaves us no alternative but to foreclosure.



SG 0507013
Confidential Material–Subject to Protective Order

RECOMMENDATIONS:

(1) INTERVEST should coordinate foreclosure action. We are familiar with the work remaining and are capable of coordinating completion and buildout of the project from our Bellevue office. An estimate of costs to bring the project to stabilized occupancy is attached as Exhibit B.

(2) Once we gain ownership, an updated appraisal will be secured. The original appraised value (stabilized) was $3,450,000 based on a 50/50 mix of office and warehouse. A detail of INTERVEST's current opinion of value is attached as Exhibit C.

(3) We believe the market for this space is strong. With a sensible marketing effort conducted by professionals, we anticipate absorption to at least match our original expectation of 9-12 months. This projection combined with our opinion of value and cost to complete does not warrant any addition to loan loss reserves at this time.

(4) Loan classification should be changed from "Watchlist" to "Substandard."

David Clay
David Clay

Gary Crithfield

John M. Harlow
John M. Harlow





Confidential Material-Subject to Protective Order

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF HAROLD GILKEY

Deposition upon oral examination of HAROLD GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 6, 2000, pursuant to the Federal Rules of Civil Procedure.

salary to a secretary. Those, the cost of doing that amounted to, as I recall, about $250,000 for the 18 months that we were an organization.

Q. When you indicated that you knew the company would be big, how did you know that?

A. They couldn't afford me any other way.

Q. I am not sure I understand?

A. The company's--my view of it is companies can only afford the management that they can pay for. I had relatively senior jobs in billion dollar banks. To be the executive officer of a small thrift was not my goal. Every place I had been I grew the company. And to some extent some people would tell you that I wanted to show the Old National Bank that we could be bigger than they were.

Q. Did you have a particular size in mind at that time?

A. At the time of organization, my focus was organizing the company. Shortly after we opened for business, I had a--what I would call a planning session of the board, and I suggested there that my goal would be a billion dollars.

I can tell you that it made most of the board nervous. And so I altered that and adjusted it to 500 million. And I would guess that in our early

planning documents you would find that we defined ourself as a goal to be about $500 million.

I would point out that we put no time frames on that, but it was apparent to me that we had to grow really rapidly to afford the management that we put in place.

Q. How would rapid growth enable you to afford the management that you put in place?

A. Financial institutions make their money by leveraging capital and increasing the size of resources. And then the spread between the liability and the assets provides the income stream along with fees to pay overhead. So you needed a certain size to pay for that management team.

Q. And did you have a strategy in mind for growing really rapidly?

A. I had the strategy. We didn't execute it. The strategy when we opened was to have an office in central Spokane, one on the South Hill, which would be about four or five miles directly south of the main office, two north, one probably five miles north and one about 10 miles north. And two east, in kind of the same configuration. That would cover the geographic location. That was the strategy.

Q. I think you said you didn't implement or you didn't

to be about $10 million and in the first year to be about $40 million.

So the growth of the main office would provide the ability to create ancillary units. I would have developed it. The plan was to rent buildings in various locations, hire people that were working for either Fidelity or Lincoln, bring them on board.

Q. When did you open the first branch of Sterling Savings?

A. You could debate with me, but my argument with the group is March 28th of 1983.

Q. Could you just briefly tell me why it would be subject to debate?

A. Well, we didn't actually open the doors until April the 4th, but we took deposits in March 28 because that was the date we got the approval.

Q. Is that the branch that you grew to $10 million within the first four months?

A. I believe so, yes.

Q. And the first year, $40 million?

A. I believe so.

Q. When did the Lewis & Clark acquisition take place in relation to that?

A. Before the end of June of 1983.

Q. So before the Lewis & Clark acquisition opportunity

that an incorrect statement?
A. That's a correct statement. It was clear that we were considering acquisitions or we never would have entertained the discussion.
Q. Once Lewis and Clark was acquired, did that create a greater interest in further acquisitions on the part of Sterling?
A. No.
Q. So it was your intent from the beginning to make acquisitions when the opportunities arose?
A. If I can go back, I stated that my intent was to become a large institution, personally, a billion dollars, from a report to our staff, half a billion.
You can't do that without doing both internal growth and external growth. And as a policy consideration, within the organization, said that we had to do it on a 50/50 basis, 50 percentage acquisition, 50 percent by growth.
My initial strategy was to develop branches in Spokane, build a core business, then do acquisition. Acquisition just happened to come in advance. We took that. Then we went back to growing the company internally. Without looking, I would tell you that before we looked at another acquisition, we doubled the size of the company that we had acquired so the growth

was about 50/50.
Q. What was the basis for the 50/50 policy? Why 50/50?
A. One of the things I found in my lifetime is that there is a difference between science and art. 50/50 is an art form. It is my opinion, my artistry as a manager, that if you try to grow all internally, you will--your staff will get bored, and without having a substantial growth rate, they will leave, because the excitement is gone.
On the other hand, if you don't grow internally, you don't have the capacity to do an acquisition and integrate it appropriately. So the combination of acquisitions and internal growth was part of that initial strategy.
There is no--there is limited opportunities to start an institution from ground up and get to be a billion dollar organization in a reasonable period of time so you would have to do some acquisitions.
Q. Okay.
MR. SYMMES: Let me ask you, when were you thinking about breaking for lunch?
MS. HOSFORD: I'm flexible.
(Noon recess was taken at 12:15 p.m. and deposition reconvened at 1:30 o'clock p.m. with the same parties

MR. SYMMES: Objection. The document speaks for itself.

MS. HOSFORD: --to become a leading financial institution. If you wouldn't mind letting me finish the question before you object.

Q. (BY MS. HOSFORD) The document does say the Tri-Cities plays an important role in the strategy, is that correct?

MR. SYMMES: Same objection, go ahead.

A. That is what it says.

Q. (BY MS. HOSFORD) Why would the quality desert climate provide an provide environment in which Sterling could have an impact, based on the sentence at the top of page 2?

A. I guess I go back to is what we were trying to do was paint the right face, the best face on a problem institution. And what we are trying to say here is that while there may be some short-term negatives, the place that you live, the Tri-Cities, has got a good business community, it has got a quality lifestyle, so people would move there. The Columbia Basin is fine.

Since this time the downwinders have claimed damages from the nuclear reactor, and it is, probably none of this is true anymore there.

Q. Were those viewed as advantages of the Tri-Cities

area at the time?

A. Those were the disadvantages, were the economic disruption by the closing of the N reactor, that was the largest single employer in the Tri-Cities.

What I was trying to suggest there is that in spite of that, there were other reasons for us being here. I was trying to put a good face on a bad institution.

Q. But in here you don't say that you are putting a good face on a bad institution, is that right?

MR. SYMMES: Objection, document speaks for itself. Go ahead.

A. This was intended to express to the people in the Tri-Cities populace that we were stepping up to acquire an institution, albeit that at the time that we acquired it, it was a very difficult economic time in their area that it provided. However, there were other reasons that allowed us to step forward in the longer term nature of things.

Q. (BY MS. HOSFORD) Did you also see an acquisition of Tri-Cities as a way to expand your Eastern Washington branch network and participate in the development of the region's economic base, as the next paragraph says?

A. That's right.

Q. No more questions about this document.
Did you tell me that you couldn't remember what price had been discussed in your original discussions with Tri-Cities? I'm sorry, I don't remember what you said?
A. I don't recall right now, but it didn't make any difference. Whatever we agreed to was subject to many adjustments. It wouldn't have made any difference. If you want to, I suspect you have a copy of the love letter?
Q. You may be wrong.
A. But it doesn't make any difference even if you found it. It wouldn't--
Q. Okay. You're right, I do have a document.
A. Okay.
Q. I'm going to mark this document as Gilkey Exhibit 17.
(Ex. No. 17, Counter Proposal to Sterling Savings Association From Tri-Cities Savings and Loan Association, marked.)
Q. (BY MS. HOSFORD) I ask you if it refreshes your recollection about the terms of any sort of proposal or love letter between Tri-Cities and Sterling in the first attempt at a transaction?
MR. SYMMES: Is there a pending question?

well be his secretary who typed it.
Q. Who would DGB be down in the corner?
A. I don't have a clue. Maybe it was a transmittal to him, wanted him to have a copy of this letter.
Q. Is it possible that he drafted it?
A. It is possible, but--
Q. You said it is possible but--
A. But it is for my signature.
Q. If you wouldn't mind turning to the first paragraph of the first page. Second sentence says, "We are requesting supervisory action in order for the net operating losses (NOL) of Central Evergreen to be utilized by Sterling to reduce future federal income taxes."
Was it your understanding that you needed supervisory action in order for the net operating losses to reduce future federal income taxes?
A. It was my understanding we needed supervisory action on the whole transaction. So your point is that there was a specific item. I would broaden it to say that the while transaction would not have been entered into without supervisory action.
Q. But you could have acquired Central Evergreen without supervisory action, couldn't you? It hadn't been taken back by the government yet, had it?

If you turn to page 33, 0338, under preferred stock, which is about the 10th line from the bottom, additional paid-in capital-preferred reflects going from 2 million 50 to 6 million--I think that is 8, but I can't read it here. So it reflected the preferred stock was issued as part of our business plan. That was important to me because without it, I could not get the approval of the board of directors to execute this.

Q. Why did you assume that the language and numbers you just referred to gave you the right to issue convertible stock?

MR. SYMMES: Object to the form of the question as to the use of the words assume. Go ahead.

A. I was talking with Dan to make sure that those met. Dan informed me that these were negotiated items, and they were part and parcel of the contract. That is what I wanted to hear and that is what I heard.

Q. (BY MS. HOSFORD) So you heard it from Mr. Byrne?

A. That's right, as part of--I was--he was my subordinate, I was reviewing his work.

So it was important that that was there because I didn't have the authority to proceed from our board without having the authority to issue the preferred stock, so that was the number one issue for

A. Well, this year was focused on the retail growth of deposits.

Q. You can tell that because it projects a higher increase? Is that why you can say that?

A. Yes. Down here.

Q. Okay.

A. Generate transaction accounts have a combination of--they are already deposits and they are transaction oriented accounts.

Q. Okay.

A. I would also point out that in the early part of this that our environment in the Pacific Northwest was outstanding at the time, and there would be obviously growth in deposits. Our other competitor institutions were having some problems so I--our strategy generally was to portray ourselves as the local hometown helpful bank against the big monolith that was headquartered elsewhere. That is kind of an ongoing kind of strategy.

Q. Okay. Just correct me if I'm wrong, but I think you just said, I will also point out that the early part of this, that our environment in the Pacific Northwest was outstanding. Can you tell me what you mean by environment in this document, economic environment? Where do you see that?

A. Page 2, our regional economy.
Q. Okay. So you were talking about the economic environment there?
A. Environment, (nods head affirmatively).
Q. Okay. And which of your competitor institutions were having some problems, to your recollection?
A. It was this time that Old National Bank people were going through their discussions with U.S. Bank in Oregon. And there were considerable fall-out of that group. The thrift industry by and large statewide was still having some difficulty with the interest rate environment.
Q. Was Sterling having any difficulty with the interest rate environment?
A. No.
Q. Why not?
A. Our problems were regulatory environment.
Q. How was Sterling able to avoid the interest rate problems being experienced by other thrifts in the state?
A. We--the bulk of our assets were adjustable rate mortgages, and so we didn't have any fixed rate mortgages on the books to burden us down where other institutions did.
We had a smaller portfolio of business

customers then and any intervening period to determine, specifically in the case of Chehalis, Central Evergreen had offices in Chehalis, had offices--without looking at the clear-cut name, you could clearly identify the loss of volume there.

In the aspect of lending, there were several loans that were in excess of a million dollars, that we were instructed that our legal lending limit impaired that. So we were no longer a reliable source for our customers, and they withdrew their relationship and have gone away.

I can specifically identify in my own mind today two of those, Condron Homes here in Spokane and Baker Construction. They were our customers then and neither will do business with us today. Both of which over the last decade have produced on average about 75 new homes a year, which is a substantial loss. We can clearly identify that relationship. There are several ways you can do that. You identify the number of employees that left.

Q. Can we go back to those two customers first? How do you know that they are not banking with you because of the government's alleged breach?

A. Today?

Q. At any point.

A. Well, at the time we told them we couldn't provide credit to them over half a million dollars, they left.
Q. How do you know today that they--
A. It has been reported to me by the loan officers that they can't get those accounts and specifically because we are an unreliable source.
Q. And do they say why you are an unreliable source?
A. I didn't have the conversation with them, but it clearly is that we terminated the relationship. When you terminate a relationship, it is hard to get remarried.
Q. How long have you had that relationship?
MR. SYMMES: The question is ambiguous. I object, but if you understand it, go ahead.
Q. (BY MS. HOSFORD) At the time of termination, how long had you had the relationship?
A. I would suspect, without looking, probably varies, but three to four years.
Q. Can you think of any other customers that were subject to those circumstances?
A. The priest in Chehalis.
Q. The priest in Chehalis?
A. Chehalis.
Q. Chehalis, what happened with the priest?
A. He closed his account after we told him he had to.

It was in excess of a million dollars in deposits.
Q. Anybody else?
A. Almost all of the public depositories at the time withdrew their funds, specifically the Lewis County, but I could--Walla Walla. There was a whole number of political entities that withdrew their deposits for a period of time. Some have come back, but it has been a pure bid basis.
Q. Can you explain what you mean when you say some have come back, but it has been a pure bid basis? I'm trying to understand? Because you were the lowest bidder, that is why they came back?
A. The highest bidder.
Q. The highest bidder.
A. Fred Burnstad, Burnstad Construction in Seattle would be another one.
Q. What happened there?
A. Well, he had been my customer at Bancshares Mortgage Company. He and his family became customers of Action Mortgage Company. And when you limited my ability to do residential construction, he went away. I have had direct conversations with his sons. We are not a part of the credit for that reason.
Q. And ever since 1990 it has refused to come back because of the breach, is that what you are saying?

A. Two things, I don't remember, and I doubt that I looked at it.

Q. Was the effect of this order explained to you by anybody?

A. Yes.

Q. What was your understanding of the effect of this order?

A. Well, if I--if I recall correctly, there was a decision from the bench in July, and this was just documenting the formal--formality of that. And the key element to--the key element to this was the--I'm sorry, I don't have the page number here. I think it is page 27 that you referred me to.

Q. Okay.

A. The key element was No. 1-A, which prohibited the Office of Thrift Supervision taking any actions without considering the three contracts.

There were other pieces of the--one was the restrictions, that they couldn't enforce the restrictions given to us. I think C was part of A, and I think D gave us the opportunity to go back to the market. But it really meant it was going to take some time, that we had another--another bite at the apple, so to speak. That is the way I understood it, yes.

Q. Once this order was in place, did Sterling operate

its business as if the restrictions were no longer in place?

A. Absolutely not.

Q. Okay. Why not?

A. Because I was scared to death of what the regulators would do next.

Q. Why is that?

A. They had been waving the safety and soundness flag for some six or seven months at this point in time, and while we had taken away the big gun momentarily, it was--I just know that people don't like to get beat. And so I was scared of what they would do next. And it occurred--this was a temporary restraining order.

Right away when this was filed, there was appeals by the government to overturn. I just knew that my regulators didn't like what was happening. And I was frightened.

Q. To your mind, was the waving of the safety and soundness flag a breach of contract of some kind?

A. A waving of the safety and soundness flag was another way to close the company.

Q. And would that have been a breach of contract?

A. I just saw it as another way to close the company, and if they couldn't get us one way, they would get us another.

Q. Did you see it as a potential breach of contract?

MR. SYMMES: Objection, calls for legal conclusion. Secondly, asked and answered. Go ahead.

A. They didn't like the fact that we weren't handing them the contracts. They didn't like the fact, because we were a pain in their side.

They had decided, in my opinion, to close Sterling Savings Association. When they breached the contract, we became a very difficult painful supervisory problem. And they wanted it off their desk for any fashion.

I saw the power that they were using. One, they abrogated the contract. Two, they wouldn't listen to reason. Three, that they--I didn't trust them any longer at all.

I was in a frightened state. By this time, we had lost employees, customers were fleeing the organization, we didn't operate business as usual, yet I think my fear was justified in the fact that they immediately started to appeal the action.

Q. (BY MS. HOSFORD) Did you assume the government would ignore the court's order?

A. I didn't assume that they would, that they would do that, but I assumed they would change their tact, which they immediately did. They stated publicly and

directly that to us, that they would, that they would obey the orders, but safety and soundness was a huge concern on our organization, which is just another way of saying you are undercapitalized.

Q. Did you ever go to the court to request relief from the safety and soundness flag?

A. No.

Q. Why not?

MR. SYMMES: I'm going to object to the form of that question, lacks foundation.

Q. (BY MS. HOSFORD) Answer the question.

MR. SYMMES: I'm thinking about that. I mean, that is a very unfair question.

MS. HOSFORD: Okay.

MR. SYMMES: I'll stop. I'm thinking about instructing him not to answer.

MS. HOSFORD: You can't. There is no privilege.

MR. SYMMES: At some point you have to be reasonable in your questioning, in view of--okay.

MS. HOSFORD: No.

MR. SYMMES: I'm thinking about it anyway. Just give me a second. I'll let you know.

Can you repeat the question, rephrase it?

MS. HOSFORD: I won't rephrase it but I'll

repeat it.

MR. SYMMES: If the witness asks you to rephrase, you have--

MS. HOSFORD: The witness didn't ask me to rephrase it. You engaged in a rather long speaking objection.

MR. SYMMES: I have not.

MS. HOSFORD: You have implicitly instructed your client to tell me to rephrase the question.

MR. SYMMES: Let's read it back. I want to hear the question so I can make a decision.

MS. HOSFORD: I have it as line 42--I mean page 42, line 8.

(Pending question read.)

MR. SYMMES: My objection is noted then. With my objection noted, he can go ahead and answer.

A. From my opinion, we were already in court on the same issues. We had filed, we had received--there was an appeal pending, so I didn't see there was a reason to go forward. Sooner or later we were going to get a final decision out of the courts.

Q. (BY MS. HOSFORD) Was it your position that this safety and soundness issue was a violation of the order?

MR. SYMMES: Same objection. Also calls for

a legal conclusion. Go ahead and answer.
A. I think I have already responded to that by saying that it was my opinion that the regulatory powers were going to do what they could to close our company down. They had lost their big cannon, they were appealing forward, and they were finding other reasons to bring forth the right to close the institution.
Safety and soundness primarily starts with the lack of capital, and it proceeds from there. So I--I don't know that I looked at it in any legal sense. I just looked at it as a phase that when you hit the tiger in the mouth, he is not going to go away.
Q. (BY MS. HOSFORD) Did you see the safety and soundness issue that you said primarily starts with the lack of capital as a violation of the court's order?
MR. SYMMES: Same objection. Go ahead.
Q. (BY MS. HOSFORD) I mean, you can answer yes or no, I don't know, but I would like you to answer that question.
A. I don't know.
Q. Okay. Did the government ever provide an indication to you that it intended to violate the court's order? When I say you, I mean Sterling.
A. Once again, I was not intimately involved in the activities of Sterling operationally at the time. I do

remember having discussions with Bill and that he was having discussions with Carol, and I had discussions with Bill about the safety and soundness items that she brought up. So I guess the answer is no.

Q. Just to clarify, the answer is no to my question, which was, did the government ever provide any indication to you that it intended to violate the court's order? Your answer is no?

A. I'm sorry, I did not know what their intentions were.

Q. I'd like to mark this document as Gilkey Exhibit No. 46, please.

(Ex. No. 46, Letter to D.G. Byrne from C. Friend, dated 6-18-90, marked.)

Q. (BY MS. HOSFORD) It is a June 18, 1990 letter to Mr. Byrne from Ms. Friend, with a bc to Mr. Gilkey, No. WON 9530681. (Hands document.)

MS. HOSFORD: There you are, Mr. Symmes.

MR. SYMMES: Thank you.

(Discussion off the record.)

Q. (BY MS. HOSFORD) If you wouldn't mind taking a minute to review this document, Mr. Gilkey.

A. Yes.

Q. Do you recall, have you ever seen this letter before?

A. I may have. I don't recall.
Q. Did you have any discussions, to your recollection, with Ms. Friend about the contents of this letter?
A. I don't recall that I did. The summary of the letter was a summary of what was going on at the time.
Q. I am not sure I understand what you meant by this?
A. Well, I think this is a support of my previous conversation, statement--
Q. Why?
A. --because we were restrained, the temporary restraining order is in effect, we are going to court and the court will decide what we do.
In the meantime, Sterling and the soundness of all of its aspects of this operation, we have grave concern, didn't say grave but we have significant supervisory concerns.
You will continue to make reports, and I don't know what the June 5th letter was, but that is the tenor of her remarks to me at that time was, you may have won a battle but you are not going to win the war and we will get you.
Q. Does this letter say that?
A. No.
Q. Does this letter say in the middle of the second paragraph, "We intend strictly to obey the court's

order?"

MR. SYMMES: Objection. The document speaks for itself. You are talking it out of context.

A. Yes, it does, but the same paragraph goes on. In fact, the very next sentence says, "We have significant supervisory concerns about the condition of Sterling," which means lack of capital and the soundness of some of the aspects of its operation.

That immediately said to me, you may have won the battle but you are not going to win the war.

Q. (BY MS. HOSFORD) Where it says about the condition, how does that say capital? How does that imply capital? I don't see any basis?

A. That is the nature of the first item that all supervisors look at, is the capital structure of the organization. If you have a significant amount of capital, then condition is fine. The condition of Sterling is the balance sheet relationship as far as I'm concerned.

Q. Did the government take further action for capital noncompliance against Sterling?

MR. SYMMES: Objection, vague, but go ahead.

A. In '95 and '99 and '98, and every examination since.

Q. (BY MS. HOSFORD) I'm talking about while the

injunction was in place?

A. I'm sorry, I misunderstood your question. You said, did they ever?

Q. Right, I'm sorry, it was too broad.

A. I don't recall.

Q. Do you read this letter as Ms. Friend indicating that the government has the intention to disobey the court's order?

A. I'll try this one more time for you. I believe by her demeanor, her actions, her directness that she was very upset that we got a temporary restraining order. I think they felt that they would have--that we were not able to get the restraining order and therefore they could proceed to close us.

I believe based on conversations, her demeanor, her telephone calls, other actions, that Carol Friend was not very pleased with the court's action. I don't believe that she would--I don't believe that she would purposely violate a court order, but I also believe that this was just the first step in a long procedure. I felt very threatened by her.

Q. What about her demeanor suggested that she was not pleased with the court's order?

A. Telephone calls were short, curt and demanding.

Q. Telephone calls with her?

A. Carol, myself.

Q. And what did she say, I am not pleased with the court's action?

A. No. Just her demeanor and conversations. There were other--other things were going on. When I would call her, it was very short, curt and demanding, all during this period of time, the previous six months.

Q. What do you mean by demanding?

A. "You will do this. You are required to do that. You will no longer have your secretary take minutes at the board meeting. You will tape record your board meetings."

"I'm sending an examiner over there to review all the documents. You will prohibit your general counsel from being your secretary." Those were the kinds of conversations she was giving me. Short, curt, demanding, irritable.

Q. Were those what you call demanding illegal or not within her authority, to your knowledge?

A. We never replaced the general counsel. We never replaced our secretary.

Q. I am not sure I understand what you mean by--

A. I don't know whether they were illegal or within her authority--we never did do what she told us to do and she never took actions against us for that.

Q. Why did you never do what she told you to do?
A. She was wrong.
Q. And no action was taken?
MR. SYMMES: Excuse me, object, vague, overly broad. Go ahead. I don't know what you mean, in other words, but go ahead.
MS. HOSFORD: I was just--
A. She sent examiners in to make my life miserable, I guess.
Q. (BY MS. HOSFORD) Were these actions a violation of the court order for your contracts?
A. I don't believe they were. But I am not--I don't have--as I told you a number of times, I'm not an attorney, I don't--
Q. Did you interpret the government's filing of an immediate appeal as an indication that it would not obey the court's order?
MR. SYMMES: Let me object to that question to the effect that part of it at least calls for a legal conclusion, but go ahead and answer.
A. I've tried to explain that I was scared. This was the biggest piece of business I had ever put in. I didn't know what all of this meant.
But I do know that the government was putting undue pressure on me as an individual and

Sterling as a company. And we had taken the very unusual step--to the best of my knowledge, there is only one other institution that filed a temporary restraining order, and this was a very difficult step and taken after lots of negotiations with--and it was--Mr. Durbin at several times indicated, why don't you just sue us?

And I figured that if I--if I did sue you, that that might eliminate some of the regulatory pressure, but in fact, it didn't. It just brought on more.

So I was in a position of being in a vice. Did they think they were going to violate the court order, specifically in a very narrow function, I just did not believe they would do anything illegal, but I also felt that they would take every step they could to eliminate me.

Q. (BY MS. HOSFORD) When you say me, Sterling?
A. Me personally, or me Sterling? You will recall that I told you that Mr. Tokarz wanted to send me to jail.
Q. Eliminate you as CEO, you mean?
A. Me personally.
Q. Take criminal charges, are you implying?
A. I don't have a clue what he meant. I do know that

A. Yes.

Q. --what did they tell you was the basis of their lack of interest?

A. I don't recall. I would suspect it was our lack of earnings, the negative issues for what was seen in the marketplace as Sterling and negative carryback from not completing the first one, but I don't really recall, but that would be my suspicion.

Q. Okay. Do you recall the contents of your conversations with the other investment bankers that you don't have the names of?

A. No. I just suggested I probably did.

Q. Do you recall whether Sterling grew its asset base during the 1990 and 1991 time period?

A. The answer is we did not.

Q. Why not?

A. Well, you had--you had done the damage in the first half of the year by eliminating a major portion of our customer base and eliminating the people that would have allowed us to grow. And management had focused their attention on the survival of the company.

Q. Did Sterling make an effort to grow in the 1990 and 1991 time period?

A. Before or after the breach?

Q. After the injunction.

MR. SYMMES: You know, it occurred to me--I just realized something. I am not trying to object. You do it whatever way you want.

MS. HOSFORD: Answer the question.

MR. SYMMES: You say 90, '91. Are you talking annually or fiscal year? I interpreted your question annually. I think he is responding fiscally, but that is up to you. It might make a difference.

Q. (BY MS. HOSFORD) I'm going to say calendar years 1990, 1991, after the injunction, preliminary injunction was put in place.

A. I don't know that I was attempting to grow the assets as much as I was trying to be profitable, and I would have done that any way I possibly could.

The asset base had been severely depressed because of the actions taken the previous year. So in calendar '90, which would have been the last four months, August to the end of the year, so I don't have any recollection of "trying to grow assets." All I have a recollection of is trying to be profitable and move somewhat forward to get as much income stream as we possibly could.

Q. What about calendar '91?

A. I think much of the answer stays the same. I think I came to the conclusion that the success or the actual

survival of the organization would depend on two things, profitability and some additional capital.

And so I tried to evaluate, as best I could, what amount of capital I could generate, so I followed a downsizing in '91 to try and redo the total assets so that I could get to the market for a minimum capital or reduced number of capital.

Q. You reduced the amount of capital raised?

A. Reduced the amount. I didn't believe we could get to the market for, I think I felt, somewhere in the neighborhood of $10 to $15 million, but as it turns out, we finally were able to go for 20 because it was--because we needed that.

But it was a strategy to downsize, let run off those items that we had been prohibited from doing, and make profits as best we could elsewhere.

Q. I'll have Mr. Storey read it back to you if you would like, but in your previous answer you stated the asset base had been severely depressed because of the actions taken the previous year. So in calendar '90, which would have been the last four months, blah, blah, when you say the asset base had been severely depressed because of the actions taken the previous year, can you explain what you mean by severely depressed?

A. Well, when I--I'm--by previous year, I meant

previous fiscal year, first part of '90, January through June, or actually through August.

We were no longer a viable deliverer of loans to residential construction. We were no longer a reliable deliverer of loans to commercial real estate, either construction or permanent. The individual--we had a substantial downsizing of our commercial mortgage company and a substantial downsizing of our business banking units, because they left. And so consequently, you didn't get others.

We were prohibited during the first half of the year from taking on any new business in business banking. At one time that was interpreted any new loan, period, to anyone. We kind of finessed that with the regulators, but for all intents and purposes, the first half of the year the breach had caused Sterling to go into a liquidation--

Q. When you say that with respect to business banking, you finessed that with the regulators, can you just explain what you mean by that?

A. Exhibit 39--

Q. That's the January 26 letter?

A. --indicates--

Q. Yeah, I've got that right here.

A. Line 5, line 4, district directive for any new

Q. You did not?
A. (Shakes head negatively.)
Q. Would Sterling have pursued a public offering of this kind during this time frame had it not made the decision to achieve compliance with the current capital standards?
MR. SYMMES: Objection to form. Go ahead.
A. As I suggested to you--I didn't hear the first part of your--I don't recall the first part.
Q. (BY MS. HOSFORD) Would you like me to repeat the question?
A. I think you said did we consider--well, please repeat it.
Q. Okay. Would Sterling have pursued a public offering of this kind, the kind you completed in 1991, if you had not made the decision to achieve compliance with the capital--let me start over.
If Sterling had already been in capital compliance during this 1991 time frame, would you have pursued a public offering of this kind, to your knowledge?
MR. SYMMES: Object to form of the question, lacks foundation, assumes facts not in evidence, assumes facts not established, but go ahead.
A. If I understand your question correctly--you've

changed it from the first question to now.

Q. (BY MS. HOSFORD) Right.

A. If--it would have depended on what would have caused us to be in capital compliance. If the Federal Government would have confirmed our contracts, reestablishing it, it would have been my opinion we would not have gone to market.

Q. Why not?

A. We would have had substantial excess capital to support a company of $600 million. The only reason that I would have gone to the market if I--I would have gone to my regulators and asked for forbearance or asked for relief of the item in the contract to go to the marketplace for capital.

Q. Can you explain? I didn't understand that? Can you explain that?

A. One of the conditions of our contracts was to go to the market to get a certain amount of capital.

Q. Right.

A. The contracts were abrogated.

Q. Right.

A. We were a much different company in '91 than we were in 1989. If the contracts would have been reinstated, we would have had a substantial capital, substantial excess capital, to carry on our business.

I said that we would not have gone for additional capital at that time. Then I remembered that I had a contractual obligation. I would not have had the desire or the need to go for that capital at that time. I would have gone to my regulators and said, I've an obligation to do this. I don't see a good reason for us to do it. Would you waive that condition in your contract.

Q. Okay. Why do you assume that you would have had substantial excess capital?

A. Well, our net worth would have been approximately 50 to $60 million, which is about a 10 percent capital ratio, and that would have been above the capital requirement at that time.

Q. How do you know that your net worth would have been 50 to $60 million?

A. That was just my quick analysis of where I thought it would be.

Q. How would you have achieved that net worth during that time period?

MR. SYMMES: Object to the form of the question. I realize you are asking him, but your question lacks a tremendous amount of foundation. You are assuming a lot, but maybe you will get it out.

Q. (BY MS. HOSFORD) I'll restate my question.

A. Well, obviously, the market would be smaller, but we are such a small portion of the market that by limiting that, we have not limited ourselves for growth standards.

Q. You have not yourselves limited yourselves for what?

A. For growth standards.

Q. When you say you have not limited yourself for growth standards, I am not sure what you mean by that?

A. Well, we are limited--size of the company is limited by our capital base, so in our planning process, you plan to grow the capital to a certain size. As you do that, you then decide what kind of products you want in that, and then that establishes the size of that portfolio.

You estimate your runoff, and then you determine what kind of growth you have to have. And we are such a small portion of any of those markets, that we have a substantial market available to us.

Q. Okay. Off the record.

(Discussion off the record.)

Q. (BY MS. HOSFORD) We are back on the record. Okay, probably I'm going to be making several references to breaches of contract in this case. I know that yesterday or the day before we agreed that, we reached

an understanding when I use that term, I am not conceding that the government breached the contract, but I'm doing it for ease of speeding things up, making things move along. With that caveat in mind, I'm going to ask some questions.

Mr. Gilkey, had the government not breached the contracts, in this case, what size in total assets do you think Sterling would be today?

A. Probably a minimum of 5 billion and a maximum of about 50 billion.

Q. Is it your position that it could be anywhere between 5 billion and 50 billion?

A. Well, more than likely, it would be at the lower level of that, but minimum of 5 billion. It would have depended significantly on a couple of acquisition opportunities that would have been available that didn't get done.

Q. Which ones are you talking about?

A. Well, the primary one was the Pacific First Federal which was owned by a Canadian firm. We had discussions with their executive officers, and it just was not a doable deal.

Seattle First National Bank or--I'm sorry, Security Pacific Bank. There were several opportunities with West One, Far West, several others

in the Pacific Northwest.
Q. So are you suggesting that the growth of Sterling to between 5 and 50 billion would have been through acquisitions?
A. And internal growth. It would have--I would have followed the same strategy I always did, was to grow some internally and then match that with external growth. As external growth would have been expanded, I would have gone internally.
Now, on the high side of that, if you would have taken the larger element of that, it would have been required to buy some branches and then grow those branches up to match the internal/external growth.
Q. You mean buy branches from an institution and then grow those branches?
A. Yes.
Q. Pacific First Federal that you made reference to, when was that acquisition opportunity out there?
A. I'm not focusing on a point in time, but I'm going to guess the middle part of Nineties, early part of the Nineties.
Q. Early to middle part of the Nineties?
A. Yeah. That is just a guess.
Q. And how large an acquisition would that have been?
A. It was a 2 to $3 billion company.

Q. It was a 2 to $3 billion company?
A. Yes.
Q. How would Sterling have financed that acquisition?
A. Similar to the way it was financed. We would have issued additional stock in the form of a stock-for-stock exchange and a capital structure, with the Street providing the capital that was necessary to pay off the owners in cash.
Q. Are you saying Wall Street?
A. Yes. Securities of some kind.
Q. Did another institution end up acquiring Pacific First Federal?
A. Washington Mutual.
Q. How much capital would you have raised for that acquisition?
A. I don't know.
Q. And what would the purchase price for this acquisition have been?
A. I don't know.
Q. Did you ever have discussions with Pacific First Federal?
A. Yes.
Q. Was a purchase price ever discussed?
A. No.
Q. Why not?

from there we would have restructured that and moved out with a process.

So I think that the best standard is what you leverage that against. Capital allows a certain size of company. Once you allow that, then it is the profitability on that mix of assets that flows down.

Now, I don't particularly care whether it was thrift, mixed thrift bank or commercial bank, there would have been a profitability in the range of 15 to 18 percent during this period of time.

Q. Has Sterling ever found that it's turning away potential loan customers?

MR. SYMMES: During what point in time, may I ask?

MS. HOSFORD: At any point after enactment of FIRREA.

MR. SYMMES: Go ahead.

A. Well, from 1989, end of 1989 and latter part of '89 through almost all of '90 and part of '91, we were prohibited from doing lots of lending to customers. So we were not only turning them away, we were walking them across the street to our competitors to avoid the restrictions that we were placed under.

Q. (BY MS. HOSFORD) Did you keep records of those customers that you turned away?

A. No, because of the nature of the leverage, because we have had minimal leverage, the philosophy has always been to maintain a very conservative credit policy. Had we had a larger credit--larger equity base, we could have selectively expanded our risk tolerance in the lending arena. So there are customers we have turned away just by the nature of--just didn't fit our risk tolerance.

Q. Are you saying that had the government not breached, you would have maintained higher levels of excess capital so you could have handled more risky loans?

MR. SYMMES: Objection to the form of the question. Go ahead.

A. We would have had a higher equity base than we have had as our operating company is today. And we could have selectively selected markets, markets or products that have higher risk. We could have had higher risk tolerance.

For example, we could have moved the Beacon's Score from 700 to 680. We could have entered into a more geographic lending area, for example, because of the breach. We closed our Utah office of Action Mortgage Company and lost out on the entire economic boom of Utah.

was awfully close to an opinion question. That was the basis of my objection, but go ahead.
A. I said I don't know. I am not in possession of those numbers today. I would tell you you are best to ask that of the chief financial officer.
Q. (BY MS. HOSFORD) By that you mean Mr. Byrne?
A. Mr. Byrne, (nods head affirmatively).
MR. SYMMES: Are you thinking about taking one more break this afternoon?
(Discussion off the record.)
Q. (BY MS. HOSFORD) Mr. Gilkey, can you please tell me whether Sterling withdrew from any market as a result of the breach?
A. Utah.
Q. You mentioned that one. Are there any others?
MR. SYMMES: You know, my only objection is what do you mean by--you mean geographical markets or--but that's the objection I make. Go ahead.
MS. HOSFORD: Let's start with geographical markets.
A. I took it to mean geographic, and I gave you, to the best of my knowledge, we withdrew from Utah only.
Q. (BY MS. HOSFORD) Okay. Are there any other types of markets that you withdrew from?
A. As a result of the breach, we on our own did not

withdraw but were forced to withdraw business banking, consumer lending, commercial real estate, and residential construction activity.

There were some types of investment that we were not authorized to do. We withdrew from fixed rate lending for a period of time. We withdrew from deposit gathering of uninsured deposits, which have a significant profit center. To the most part we have revived that, we--but not to the extent that we could have. I had left out public funding.

Q. Are you saying that you withdrew from the public funding market?

A. We were forced to.

Q. When were you able to get back into the market that you have just listed, if at all, sorry?

A. Sorry, I didn't mean to interrupt your question and I did.

As I indicated to you, for the most part, we have made inroads back to those product lines. And they varied as to time based on who was available, more than anything, and how we were able to recruit.

Q. Okay. Can you answer the question about when were you permitted to get back into these lines, these markets?

A. Oh, I'm sorry, I didn't hear the word permitted.

Q. I don't think I asked it, but that is my new question?
A. When were we permitted back into these?
Q. Yes.
A. Well, I suspect that it was after we were able to recapitalize, we then had the authorization but not necessarily the capacity.
Q. Okay.
A. I'll take that back a little bit. There was some negotiation letters written back and forth--I don't remember the dates of those letters--where Bill Zuppe wrote a letter to the Federal Home Loan Bank, asked--there was some debate on that, so somewhere in early '92, but I don't recall.
Q. Okay. Can you explain how the operations of Intervest Mortgage could have been different if the alleged breach had not occurred?
A. I thought we had agreed it was a breach and we are going to use breach rather than alleged?
Q. Sometimes.

(Discussion off the record.)

A. Well, it would have been a much different company with the breach, two-thirds of the then existing staff left. And we eliminated virtually all of our lending. And we used compensation and held the two people that

were critical to the organization.

But the producers were all gone so there was a drain on the means to maintain them. Had we not had the breach, those people would not have left. We would have substantially increased the size of that staff. We would have developed along the lines we have, but in a much more rapid sense, with significant more correspondent relationships.

So it would have been much larger, much more diverse. We would have covered Northern California, Oregon, Idaho, a little of Utah, Montana, and Washington. And we would have been able to follow our customers to geographic locations for specific loans that would have created a servicing portfolio of significant value to the company.

Q. (BY MS. HOSFORD) Okay.

(Discussion off the record.)

Q. (BY MS. HOSFORD) Do you still have a copy of the complaint?

A. I don't know what number it is.

Q. I don't know that we marked it.

MR. SYMMES: I don't think we marked it.

Mr. BYRNE: It was between 30 and 31, I believe.

(Discussion off the record.)

funds to buy the participation out and liquidated the company faster, but we couldn't do it because we didn't have--the lending limit was half a million dollars.

Q. Okay.

A. So both of those had to do with the half a million dollar lending function or investment function.

Q. On H, there is the "Over $3.2 million in damages resulting from OTS's refusal to permit the acquisition of certain branches of Great American Savings Bank, because it regarded Sterling as not in capital compliance."

What's the basis for that claim?

A. At or about in the fourth quarter of 1989, we had negotiated the acquisition of two branches of Great American, one in Richland, Washington, one in Spokane, Washington. We received the approval from the Federal Home Loan Bank, and we were proceeding to head to the negotiation.

The Federal Home Loan--I could be wrong now--they could have transferred already to the OTS. We received the approval from the Seattle office of either the OTS or the FD--Federal Home Loan Bank, during the fourth quarter of 1989.

When we started to proceed ahead, we were then called and notified that these branches needed to

steps contemplated and-or consummated as part of each such expansion, and the timing of each such expansion."

And one section of the answer says--

MS. HOSFORD: You want this?

MR. SYMMES: No. I was going to suggest two things, one, he have an opportunity to read it. And that I, number two, would have an opportunity to interpose the same objection. But I'll let him answer. Go ahead, pose your question. Let him read it. I will interpose my objection.

Q. (BY MS. HOSFORD) Part of your answer says, "Sterling Savings Association was forbidden to engage in residential construction lending. As a consequence, its residential mortgage subsidiary was required to abandon plans to expand into the Seattle, (WA) and Portland (OR), metro areas (Lake Oswego)."

I'm wondering if you could tell me the circumstances surrounding that, what I just said?

MR. SYMMES: Would you give him the opportunity to review the rest of it, the rest of the answer, the question and the answer, and the complete answer so that he is reading it in context. That is all I'm asking.

Then to make this simple, I will just invoke the same objection to the question. That is basically

set forth by way of answer to Interrogatory No. 22, although this question I think is clearer but not nearly as overbroad, but I want him to answer the question to the extent that he can.

A. To the best of my knowledge--and Tom Sackmann could be a better source, but to the best of my knowledge, when you limited our legal lending limit to half a million dollars, as we got the restriction, that virtually took us out of residential construction.

At the time we had hired Tom in February of '88, and we had a plan to significantly expand that in the residential area, which is the highest profit, and the Pacific Northwest was very active in that period of time from an economic standpoint.

So we had plans of what I would call Seattle, South King County, Portland. In Portland you really kind of look at Vancouver, Washington, Portland itself, west side, and then Lake Oswego, which is Portland south side, and we had plans to--for Boise, and for Salt Lake City.

Salt Lake we opened up, but only as a production office of single family loans, did not do construction. We then found that we couldn't make money doing that without the construction. It was closed, we withdrew.

The Boise office we just didn't do residential construction, but we were able to make money on the single family production. We kept it open but in small function.

Tom had been the president of Moore Mortgage, and he had a number of people available for the other locations. But before we were able to get there, we had the restriction placed on us, and he never opened those offices.

Q. (BY MS. HOSFORD) Are those offices the ones listed here or someplace else?

A. It is these offices, Seattle, Portland, Lake Oswego. We didn't list Utah, but I remember the plans. So we never opened those until sometime after January of 1982. And by that time, we had lost our contact, the people that Tom had as direct supervisors had gone elsewhere so we started looking around.

We found one individual in Portland. We have opened the Lake Oswego office. It has been an extremely highly profitable company, but we lost, I would guess, four years of time in that location.

The King County, the Seattle region, we opened up sometime later because we were able to finally get the people. Both those offices are highly profitable, but again we lost some time.

As far--those are the ones that are listed here, but we don't have--we never went back to Salt Lake, and we did finally expand the office in Boise.

Q. I think in the beginning of that answer you said 1982. Did you mean 1992?

A. Sorry, 1992, (nods head affirmatively).

Q. Can I just look at this again?

A. It is all yours.

Q. Here it makes reference to Action's business plan to quadruple lending activity. Was that to be achieved through the expansion of all these offices you are talking about?

A. The answer is yes.

Q. Do you remember an opportunity for Sterling to acquire branches of Summit Savings?

A. Not branches. We were offered the opportunity to buy the whole bank. And we had discussions with Jim Grabicki.

Mr. BYRNE: G R A B I C K I.

A. I had ongoing discussions with Jim, and he sold his company to Washington Mutual.

Q. (BY MS. HOSFORD) Do you recall what the content of your conversations with Mr. Grabicki were?

A. He had an interest in selling the company, wanted to know if I was interested in buying it, and we met,

I have read the foregoing 214 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ____________________________.

______________________________
HAROLD GILKEY

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ___________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of HAROLD GILKEY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 29th day of June, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

# PAGES 1295 THROUGH 1297 OMITTED ON PURPOSE

Westlaw.



TITLE 12--BANKS AND BANKING
Chapter V--Federal Home Loan Bank Board
Subchapter D--Federal Savings and Loan Insurance Corporation
Part 561--Definitions

s 561.13 Regulatory net worth.

(a) The term "regulatory net worth" means the sum of all reserve accounts (except specific or valuation reserves), retained earnings, common stock, preferred stock, mutual capital certificates (issued pursuant to § 563.7-4 of this subchapter), subordinated debt securities (issued pursuant to § 563.8-1 of this subchapter), securities which constitute permanent equity capital in accordance with generally accepted accounting principles (if approved by the Corporation), appraised equity capital (as defined in § 563.13(c) of this subchapter), and any other nonwithdrawable accounts of an insured institution: Provided, that for any non-permanent instrument qualifying as regulatory net worth under this definition, either (1) the remaining period to maturity or required redemption (or time of any required sinking fund or other prepayment or reserve allocation, with respect to the amount of such prepayment or reserve) is not less than one year, or (2) the redemption or prepayment is only at the option of the issuer and such payments would not cause the institution to fail to meet its statutory-reserve or net-worth requirement under § 563.13 of this subchapter; and provided further, that capital stock may be included as net worth without limitation if it would otherwise qualify but for either (i) a provision permitting redemption in the event of a merger, consolidation, or reorganization approved by the Corporation where the issuing institution is not the survivor, or (ii) a provision permitting a redemption where the funds for redemption are raised by the issuance of permanent stock.

(b) The term "regulatory net worth" also includes the sum of outstanding net worth certificates issued in accordance with Part 572 of this Subchapter or which the Corporation is committed to purchase by virtue of § 572.1(c).

(c) Unless the context indicates otherwise, the term "net worth" wherever used in this subchapter shall mean "regulatory net worth" as defined in paragraphs (a) and (b) of this section, except that the term as used in § 563.8-4 shall not include items permitted to be used as part of the reserve calculations pursuant to § 563.13(c).

(Sec. 409, 94 Stat. 160; secs. 402, 403, 407, 48 Stat. 1256, 1257, 1260, as amended (12 U.S.C. 1725, 1726, 1730); sec. 5A, 47 Stat. 727, as amended by sec. 1, 64 Stat. 256, as amended; sec. 17, 47 Stat. 736, as amended (12 U.S.C. 1464); Reorg. Plan No. 3 of 1947, 12 FR 4981, 3 CFR, 1943-48 Comp., p. 1071)

[38 FR 6058, Mar. 6, 1973, as amended at 45 FR 50720, July 31, 1980; 45 FR 82158, Dec. 15, 1980; 46 FR 50052, Oct. 9, 1981; 47 FR 52965, Nov. 24, 1982; 47 FR 58225, Dec. 30, 1982; 48 FR 8257, Feb. 28, 1983]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Authority: 12 U.S.C. 1724, 1725, 1726, 1728, 1730.

12 CFR s **561.13**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/07918

**FEDERAL HOME LOAN BANK BOARD**
**QUARTERLY FINANCIAL REPORT**
**Statement of Condition**
As of Dec 31, 19 85

DISTRICT/DOCKET 12/07918

STERLING SAVINGS ASSN
NORTH 120 WALL STREET
SPOKANE WA 99201-0000

(REPORT IN THOUSANDS OF DOLLARS)

PREPARED BY: Norman L. Judd

PHONE NUMBER (Include Area Code) (509) 624-4114

AMENDED 6/30/86

SECTION A
ASSETS

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| **MORTGAGE LOANS AND CONTRACTS** | | | | |
| FHA/VA AND OTHER FEDERALLY INSURED OR GUARANTEED LOANS | 010 | | | 708 |
| **CONVENTIONAL LOANS ON:** | | | | |
| 1-4 Dwelling Units | 020 | | 73 | 747 |
| 5 or More Dwelling Units | 030 | | 10 | 356 |
| Other Improved Real Estate | 040 | | 33 | 638 |
| Developed Building Lots, Acquisition and Development of Land, and Unimproved Land | 050 | | 1 | 553 |
| Nonconforming Loans / Contracts to Facilitate Sale of Real Estate Owned | 060 | | | 0 |
| **MORTGAGE-BACKED PASS-THROUGH SECURITIES.** | | | | |
| Insured or Guaranteed by an Agency or Instrument of the United States | 070 | | 3 | 944 |
| Conventional | 080 | | | 0 |
| Accrued Interest Receivable | 090 | | 1 | 442 |
| Advances for Borrowers' Taxes and Insurance | 100 | | | 0 |
| **CONTRA-ASSETS TO MORTGAGE LOANS** | | | | |
| Loans in Process | 110 | | 4 | 021 |
| Unearned Discounts and Deferred Loan Fees | 120 | | 2 | 547 |
| Valuation Allowances for Mortgages "Held For Sale" | 129 | | | 793 |
| Specific Reserves and Other Valuation Allowances | 131 | | | |
| NET MORTGAGE LOANS AND CONTRACTS (140 = 010 thru 100 minus 110 thru 131) | 140 | | 118 | 027 |
| **NONMORTGAGE LOANS** | | | | |
| **COMMERCIAL LOANS:** | | | | |
| Secured (Other than Mortgage) | 150 | | 7 | 078 |
| Unsecured | 160 | | | 521 |
| **CONSUMER LOANS:** | | | | |
| Loans on Deposits | 170 | | | 447 |
| Home Improvement Loans | 180 | | | 22 |
| Education Loans | 190 | | | 309 |
| Consumer Auto Loans | 200 | | | 436 |
| Other Closed-End Consumer Loans | 210 | | 1 | 784 |
| Credit Cards, and Other Open-End Credit Extended to Consumers | 220 | | | 689 |
| Mobile Home Loans - Retail | 230 | | | 39 |
| **FINANCING LEASES:** | | | | |
| Consumer | 240 | | | 0 |
| Nonconsumer | 250 | | | 0 |
| Accrued Interest Receivable | 260 | | | 283 |
| **CONTRA-ASSETS TO NONMORTGAGE LOANS** | | | | |
| Loans in Process | 270 | | | 0 |
| Unearned Discounts and Deferred Loan Fees | 280 | | | 0 |
| Specific Reserves and Valuation Allowances | 290 | | | 254 |
| NET NONMORTGAGE LOANS AND CONTRACTS (300 = 150 thru 260 minus 270 thru 290) | 300 | | 11 | 354 |

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| **REPOSSESSED ASSETS** | | | | |
| Foreclosed Real Estate and Real Estate in Judgment (Net) | 310 | | 1 | 247 |
| Other Repossessed Assets (Net) | 320 | | | 0 |
| Valuation Allowances | 330 | | | 143 |
| **REAL ESTATE HELD FOR DEVELOPMENT/INVESTMENT/RESALE** | | | | |
| Residential Property (Net) | 342 | | | 0 |
| Nonresidential Property (Net) | 344 | | | 0 |
| Valuation Allowances | 350 | | | 0 |
| **CASH, DEPOSITS AND INVESTMENT SECURITIES** | | | | |
| Cash and Demand Deposits | 360 | | 3 | 279 |
| U.S. Government & Agency Securities | 370 | | 10 | 598 |
| Common and Preferred Stock (except FHLB) | 382 | | | 57 |
| Other Investments | 384 | | 5 | 616 |
| Accrued Interest Receivable | 390 | | | 72 |
| Valuation Allowances | 400 | | | 0 |
| **FIXED ASSETS** | | | | |
| Office Building (Land and Improvements) (Net) | 410 | | 2 | 819 |
| Leasehold Improvements (Net) | 420 | | | 0 |
| Appraisal Increment | 430 | | | 0 |
| Furniture, Fixtures, & Equipment (Net) | 440 | | | 343 |
| Valuation Allowances | 450 | | | 0 |
| **OTHER ASSETS** | | | | |
| Financial Futures/Options: Initial Margin | 460 | | | 0 |
| Maintenance Margin | 470 | | | 0 |
| Financial Options Fees Paid | 480 | | | 11 |
| Service Corporations/Subsidiaries: Equity Investment | 490 | | 6 | 808 |
| Appraisal Increment | 500 | | | 0 |
| Deferred Net Losses (Gains) on Futures/Options Hedging Assets | 510 | | | 0 |
| Deferred Net Losses (Gains) on Loans Sold | 520 | | | 0 |
| Other Assets Sold | 530 | | | 0 |
| Goodwill and Other Intangible Assets | 540 | | 6 | 046 |
| Leased Property (Net): Consumer | 550 | | | 0 |
| Nonconsumer | 560 | | | 0 |
| Accounts Receivable Secured by Pledged Deposits | 570 | | | 0 |
| Other Assets | 580 | | 1 | 720 |
| Valuation Allowances | 590 | | | 0 |
| TOTAL ASSETS (800 = 140 + 300 + 310 + 320 + 342 + 344 + 360 thru 390 + 410 thru 440 + 460 thru 580 Minus 330, 350, 400, 450, 590) | 800 | | 167 | 854 |

**MEMO**

| | | | | |
|---|---|---|---|---|
| Amount Eligible for Regulatory Liquidity Included on Lines A070, A090, and A360 thru A390 | 900 | | 10 | 830 |
| Assets Acquired For Stock: Real Estate (Net) | 910 | | | 0 |
| Other | 920 | | | 0 |
| Construction Loans Included on Lines A010 thru A040 for: Residential Property, 1-4 Dwelling Units | 931 | | | |
| Residential Property, 5 or More Dwelling Units | 932 | | | 940 |
| | 933 | | | |
| Nonresidential Property | 934 | | | 567 |
| Debt Securities on Line A384 Rated Below Investment Grade or Unrated, Including Those Held by Service Corporations/Subsidiaries | 936 | | | 0 |
| Foreign Loans and Investments Included in Section A | 938 | | | 0 |
| Number of Wholly-Owned Service Corporations (ACTUAL NUMBER) | 940 | | | 3 |

APP. 1300