IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
William D. Symmes, Counsel of Record
and Member of the Bar of the United States
Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

March 29, 2007

# TABLE OF CONTENTS

Page

I. CASE STATUS AND RELIEF REQUESTED ..... 1

II. INTRODUCTION ..... 2

III. BACKGROUND ..... 4

A. PROCEDURAL BACKGROUND ..... 4

B. UNDISPUTED MATERIAL FACTS ..... 5

1. STERLING'S GROWTH-BASED BUSINESS PLAN AND THE THREE TROUBLED THRIFT ACQUISITIONS ..... 5

2. THE GOVERNMENT BREACHED ITS AGREEMENTS AND STERLING SUFFERED HARM AND SOUGHT INJUNCTIVE RELIEF ..... 8

3. THE HARM TO STERLING CONTINUES DESPITE THE INJUNCTION ..... 9

4. STERLING'S POST-BREACH PERFORMANCE AND GROWTH STRATEGY ..... 10

IV. ARGUMENT ..... 12

A. LEGAL STANDARD FOR CROSS MOTIONS FOR SUMMARY JUDGMENT ..... 12

B. EXPERT TESTIMONY ALONE CAN CREATE A SUFFICIENT FACTUAL DISPUTE TO DEFEAT SUMMARY JUDGMENT ..... 12

C. THIS COURT AND THE FEDERAL CIRCUIT HOLD THAT SUMMARY JUDGMENT IS AN INAPPROPRIATE METHOD TO REJECT LOST PROFITS CLAIMS ..... 13

D. A LOST PROFITS MEASURE OF DAMAGES IS THE APPROPRIATE METHOD TO APPLY UNDER THE FACTS PRESENTED BY THIS CASE ..... 15

1. A LOST PROFITS MEASURE IS AN APPROPRIATE METHOD TO CALCULATE THE AMOUNT OF DAMAGES DUE TO BREACH OF A CONTRACT TO RECOGNIZE GOODWILL ..... 15

2. STERLING WOULD HAVE MET CAPITAL REQUIREMENTS *ABSENT THE BREACH* ..... 17

3. THE UNDISPUTED FACTS DEMONSTRATE THAT STERLING DID NOT FULLY MITIGATE FOR THE GOVERNMENT'S BREACH THROUGH ITS 1991 ........ OFFERING ..... 18

4. DR. HORVITZ PROPERLY OPINED THAT STERLING SUFFERED DAMAGES BEFORE AND DURING THE PERIOD IN WHICH THE TEMPORARY *INJUNCTION WAS IN PLACE* .......... 21

a. The Government Permanently Damaged Sterling Prior To The Injunction, And The Injunction Did Not Cure The Damage That Was Already Done .......... 21

b. The Harm Continued During The Injunction .......... 22

5. DR. HORVITZ'S MODEL ACCOUNTS FOR THE FOREGONE ASSETS .......... 25

a. Sterling Was Forced To Reduce Its Operations And Forgo Profitable Business Expansion Of Its Subsidiary Companies .......... 27

b. Sterling Lost Specific Accounts And Transactions From Current Clients, And Could Not Service New Accounts Due To The Government's Breach And Restrictions .......... 29

c. Sterling Was Unable To Take Advantage Of Investment .......... Opportunities Because Of Capital Deficiencies .......... 31

6. CONTRARY TO THE GOVERNMENT'S ASSERTIONS, DR. HORVITZ CONSIDERED STERLING'S COMPETITORS IN HIS ANALYSIS .......... 32

E. DR. JAMES' COST OF MITIGATION ANALYSIS IS VALID .......... 32

F. STERLING HAS DEMONSTRATED THAT ITS WOUNDED BANK CLAIMS WERE CAUSED BY THE BREACH .......... 34

1. STERLING'S LOSS RELATED TO THE ACQUISITION OF THE GREAT AMERICAN SAVINGS BANK BRANCHES WAS CAUSED BY THE BREACH .......... 35

2. STERLING INCURRED SUPERVISION COSTS DUE TO THE BREACH .......... 36

3. STERLING SUFFERED LOSSES ON THE CJ-4 LOAN .......... 36

4. THE GOVERNMENT REFUSED TO PERMIT THE 1989 OFFERING *AND DAMAGED STERLING* .......... 37

G. BECAUSE THE ONLY EVIDENCE BEFORE THE COURT QUANTIFYING STERLING'S DAMAGES ARE THE OPINIONS OF DR. HORVITZ AND DR. JAMES, THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF STERLING AND AWARD DAMAGES IN CONFORMANCE WITH THEIR ANALYSES .......... 38

V. CONCLUSION .......... 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Court No. 95-829-C

(Judge Wheeler)

**Memorandum Of Points And Authorities In Support Of Sterling's Motion For Summary Judgment Regarding Damages And In Response To Revised Motion For Summary judgment Regarding Damages**

## I. CASE STATUS AND RELIEF REQUESTED

This is a *Winstar* case filed in May 1990 by Sterling Savings Association ("Sterling"), seeking damages for the Government's breach of three contracts related to acquisitions of three thrifts by Sterling. The Court has ruled that the Government, as a matter of law, breached two of the contracts through application of certain capital standards to Sterling after the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and determined that Sterling assumed the risk of regulatory change as to the third acquisition. This matter is set for trial on damages starting on June 25, 2007.

The Government has renewed its motion for summary judgment on damages, asking that the Court reject all damages theories propounded by two of Sterling's experts on the basis that the models utilized are speculative and further rule that Sterling is entitled to no damages at all for the

[1] The Government ignores the expert analyses conducted by Dr. William B. Conerly and Dr. John W. Mitchell,

Sterling herein moves for a ruling as a matter of law that, because its damages theories meet the standards for expert testimony, and because the Government offers no alternative method of calculation, there is nothing left for trial and summary judgment should be granted in Sterling's favor.

## II. INTRODUCTION

This is a garden-variety breach of contract case in which a profitable business entered into a contract, suffered a breach, temporarily changed its business plan to cope with the breach, continued to make a profit, and eventually was able to return to its original, pre-breach plan for growth but without the continuing benefit of its bargain. Unlike most *Winstar* plaintiffs, Sterling has been profitable throughout its existence, managed by the same executive team, and is a relatively small thrift with no significant market share, therefore escaping the negative economic effects suffered by other *Winstar* thrifts. The Pacific Northwest, where Sterling is located, underwent a unique real estate boom in the late 1980s and early 1990s, precisely the time that Sterling was forced to downsize its lending activity to stay in compliance after the Government's breach. The particular circumstances and effect on Sterling of FIRREA are not comparable to that on larger thrifts located in different parts of the country. Summary judgment on the theory that the damage analyses rejected as to other thrifts must also be rejected as to Sterling is unfounded because Sterling, unlike many of the thrifts who brought *Winstar* suits, survived FIRREA, remained profitable, and, indeed, eventually returned to its original plan of growth under the same leadership and business plan.

Sterling has presented the only evidence before the Court quantifying the damage suffered due to the Government's breach. Though this Court has found that the Government breached its

---

erroneously claiming that since neither quantifies damages and "their opinions are not relied upon by Professor James and Dr. Horvitz, their opinions are irrelevant." *See* Government's Br., p. 2. To the contrary, Dr. Mitchell and Dr. Conerly's findings support the analyses rendered by Dr. James and Dr. Horvitz and explain facts related to the economic climate of the Pacific Northwest relied upon by Dr. James and Dr. Horvitz.

obligations to Sterling under the various agreements, the Government has proffered no analysis or testimony as to the measure of damages suffered by Sterling. Moreover, the Government does not contest the qualifications of the experts who have rendered analyses quantifying Sterling's loss. Instead, the Government only challenges the methodologies of two of those experts.

To be clear, the Government's opposition to Sterling's expert testimony regarding damages, in the form of its motion for summary judgment regarding damages is, in reality, a request that this Court disregard the evidence presented by indisputably-qualified economic experts and make credibility judgments regarding testimony from fact witnesses. However, summary judgment standards under Rule 56 of the Federal Rules of Civil Procedure have not been modified for *Winstar* cases, and the Government must still demonstrate that, on the basis of undisputed facts with all inferences in favor of Sterling, Sterling cannot prove, as a matter of law, that it has incurred damage due to the Government's breach. The Government has failed to meet this burden. The Government's argument is that the expert opinions of two of Sterling's experts, Dr. Horvitz and Professor James, are not sufficiently based in fact, *i.e.*, the methodology is improper, so as to render their analyses unable to support a claim of damages as a matter of law. However, Dr. Horvitz and Professor James' analyses rely upon undisputed facts; therefore, this issue is ripe for summary judgment, but only in favor of Sterling, as the Government has not proffered a competing measure of or quantification of the damages suffered by Sterling due to the breach, though it does not deny that Sterling was harmed.

Because it is undisputed that Sterling's qualified experts have reached the only measure of damage based upon undisputed facts, leaving nothing for trial, the Court should grant summary judgment to Sterling and find that the Government's breach caused a compensable loss to Sterling of $63.61 million (compensating for lost profits, wounded bank damages and future damages).[2]

[2] Sterling has offered the opinion of Dr. Christopher James, who opines as to the cost of mitigation. Neither Sterling

## III. BACKGROUND

### A. PROCEDURAL BACKGROUND

This litigation grows out of contracts between Sterling and the Federal Home Loan Bank Board ("FHLBB") involving acquisitions of three troubled institutions during the savings and loan crisis of the 1980s. Pursuant to agreements with the Government, Sterling acquired three failing thrifts: (1) Lewis Federal Savings & Loan Association of Chehalis ("Lewis"); (2) Tri-Cities Saving & Loan Association of Kennewick, Washington ("Tri-Cities"); and (3) Central Evergreen Federal Savings & Loan Association of Chehalis, Washington ("Central Evergreen").

This Court has determined that the Government breached its obligations to Sterling under the Lewis Federal and Tri-Cities agreements. *Sterling Savings v. United States*, 53 Fed. Cl. 599, 615 (2002). Specifically, the Court held that an express promise that goodwill resulting from the acquisitions could be counted toward regulatory capital by Sterling resulted from Sterling's acquisitions of Lewis Federal and Tri-Cities. *Id.* The Court held that Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1464, breached the Government's agreements with Sterling and granted summary judgment in favor of Sterling. *Id.* In a later decision, the Court held that Sterling has standing to assert claims for damages incurred during the period of time governed by an injunction barring the Government from taking certain adverse action against Sterling. *Sterling Savings v. United States*, 57 Fed. Cl. 234 (2003).

As to the Central Evergreen transaction, this Court held on reconsideration that Sterling assumed the risk of regulatory change and, therefore, application of FIRREA to Sterling did not breach the agreement. *Sterling Savings v. United States*, 72 Fed. Cl. 404 (2006).

The Court's prior decisions detail the specific factual background of this action. Sterling

---

nor Dr. James agree that this is the appropriate measure of Sterling's harm. App. 255, note 5. Nonetheless, Sterling offers Dr. James' opinion in case this or another court finds that lost profits is the incorrect measure of harm and instead finds that the correct measure of harm is the cost of mitigation without lost profits. Dr. James measures this cost to be $18.708 million. App. 259.

herein incorporates the Court's lengthy discussion of the facts in *Sterling*, 53 Fed. Cl. 599 (2002) and highlights only those facts relevant to the instant motion and those facts which separate Sterling from the other *Winstar* plaintiffs for purposes of damages.

## B. UNDISPUTED MATERIAL FACTS

### *1. Sterling's Growth-Based Business Plan And The Three Troubled Thrift Acquisitions.*

Sterling began operations in 1983 as a State of Washington-chartered federally insured stock savings and loan association headquartered in Spokane, Washington. App. 1245:8-21. In contrast to the vast majority of thrifts, Sterling was a profitable and sound financial institution all during the troubled period of the 1980s. App. 9, ¶ 18; App. 105. During this time, Sterling's market area enjoyed more favorable growth than most states, and completely avoided the 1990-1991 recession. App. 3-4, ¶ 11; App. 1253:11-1254:4. Because Sterling opened in 1983, after peak interest rates, it did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s, but instead held all loans at current market rates, exceeding the rates it was paying on deposits. App. 1254:18-24; App. 131.

By the end of its first year of business, Sterling was profitable. App. 10, ¶ 19; App. 131. Its deposits, assets and profits increased each year without interruption through fiscal year 1989. App. 10, ¶ 19; App. 105. Sterling had a relatively small market share in the markets that it entered, so it had a substantial market available to it for growth. App. 1278:1-19.

The success of Sterling during the 1980s was due primarily to its good management. App. 10, ¶¶ 20-21; App. 61. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. *Id.* The plan was implemented with considerable skill, and success was achieved. *Id.* It is important to recognize that Sterling had the same management team throughout this period (and

still does), and the same management and business strategy would have been in place absent the breach. *Id.*

The supervisory acquisitions that are the focus of this litigation were consistent with the growth plan, which from the outset included goals to achieve steady and consistent growth. App. 10, ¶ 22; App. 59. According to Daniel Byrne, Sterling's Chief Financial Officer, Sterling pursued a strategy of internal growth combined with strategically-suited acquisitions:

> I can tell you that it was a philosophy of Sterling that we wanted to grow on a 50/50 basis, in the sense that we wanted to be able to grow through acquisition to bring on additional resources. We also wanted to grow internally so that you wouldn't outstrip our systems of control, and therefore, we tended to target for growth in part through acquisitions and in part through the internal growth to achieve that.

App. 1111:1-10. Sterling's plan was to grow aggressively through a balanced combination of acquisitions and branch creation. *Id.*; App. 1240:11-1247:19.

By the late 1980s, the number of insolvent thrifts threatened to swamp the resources of the FSLIC. *United States v. Winstar Corp.*, 518 U.S. 839, 847, 116 S.Ct. 2432 (1996) (noting that by 1988 the FSLIC was itself insolvent by over $50 billion). The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). *Id.* at 848.

The Government recognized Sterling's ability to meet its business plan, and on this basis recommended it as a thrift capable of acquiring troubled institutions. App. 1353-54, ¶¶ 16-17, 1356, ¶ 25, 1358, ¶ 33. Sterling completed three of these acquisitions of troubled thrifts, Lewis Federal, Tri-Cities and Central Evergreen. The details of these acquisitions are delineated in the Court's earlier rulings. *See Sterling*, 53 Fed. Cl. at 602-08.

These acquisitions were consistent with Sterling's growth strategy of targeting deposit gathering in smaller communities. App. 10, ¶ 22; App. 59. However, the capital promises offered

by the Government in exchange for these three acquisitions were the key factor that justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance. App. 1108:13-19, 1112:19-1113:5, 1114:12-1115:23; App. 1251:18-22. Sterling would not have done the deals without the capital promises made by the Government. App. 273:18-22, 292:1-9; App. 1108:13-19, 1109:21-1110:1, 1112:19-1113:5.

Sterling's growth and profitability were attained through sound and conservative operating policies. App. 10, ¶¶ 20-21; App. 882. As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. App. 958-996. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large, unassisted absorption of Central Evergreen in December 1988. App. 978. In 1989, then, prior to the breach, Sterling was well on its way towards its goal of becoming a major player in the Northwest market in accord with its original and consistently-maintained business strategy. App. 961-62.

However, this rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, each with liabilities in excess of its assets, left Sterling in an undercapitalized position under GAAP, although it had regulatory capital modestly in excess of its requirements. App. 13, ¶ 28; App. 60. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue. App. 1008. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement. App. 779. As noted below, this offering did not take place due to the Government's breach. App. 14, ¶ 32.

2. *The Government Breached Its Agreements And Sterling Suffered Harm And Sought Injunctive Relief.*

After the enactment of FIRREA, the Government began to treat Sterling as an

undercapitalized, troubled thrift. App. 1165:8-25; App. 849-850. The Government forced Sterling to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. *Id.* These restrictions included: (1) a limit on asset growth; (2) a moratorium on capital distributions; (3) limits on residential loans to conforming loans; (4) consumer lending restrictions; (5) loans to one borrower limits of $500,000; (6) no authority to purchase or sell any asset or group of assets in excess of $500,000; (7) approval of OTS required to increase compensation of any executive officer or director; and (8) inability to accept uninsured deposits. *Id.*

Sterling was forced to curtail its operations significantly. *Id.*; App. 1166;15-1167:12. From June 1989 to June 1991, Sterling shrunk its asset base, declining in size for the first time in its history. App. 10, ¶ 21; App. 161-63; App. 1271:13-1274:17. Sterling's total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%. App. 161-63. Because of the breach, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate lending crippled. App. 1116:2-1117:15; App. 1255:1-18, 1256:19-1257;1, 1257:15-23, 1284-85, 1286:22-1287:15, 1288:1-3, 1290-92. Sterling lost valuable employees. App. 1118:15-1122; App. 1286:15-1287:15. Sterling was forced to forgo investment opportunities, including acquisitions. App. 1121:17-24; App. 1131:22-1144:2; App. 1279:13-1281:8. Moreover, Sterling suffered damage to its reputation because of the Government's restrictions on the type and amount of business in which Sterling could engage. App. 1213:7-1214:24, 1217, 1219:22-1233:24, 1234:3-1235:14, 1238-39, 1255-57. In addition, Sterling was forced to cancel the 1989 offering because the OTS refused to commit to allow Sterling to pay dividends on the preferred stock that was part of the offering. App. 1008. Not surprisingly, investors were not interested in purchasing preferred stock on which dividends could not be paid. *Id.*

The Government eventually threatened to shut Sterling down completely. App. 23, ¶¶ 7-8. In May 1990, Sterling filed suit against the OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. App. 311-51. The district court issued a temporary restraining order in May of 1990 and a preliminary injunction in August 1990. App. 352-81.

3. *The Harm To Sterling Continues Despite The Injunction.*

Though the injunction did provide Sterling time to raise the capital necessary to meet FIRREA standards to avoid a receivership, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by the Government, which eliminated Sterling's most profitable opportunities. App. 2-3, ¶¶ 7-8; App. 1165:8-25. Moreover, the Government continued to treat Sterling as a troubled thrift, even under the injunction. App. 2-3, ¶¶ 7-8; App. 849-850. Specifically, on June 5, 1990 (five days after issuance of the injunction), the Government wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. App. 848. Subsequently, the Government sent Sterling other correspondence manifesting its intent to regulate Sterling's operations. App. 824; App. 851; App. 856. On June 20, 1990, the Government sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**...The listing attached to your letter does not reflect **the asset growth restrictions that Sterling is subject to**. By virtue of the denied capital plan, **no growth is permitted**. In additional, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. **The institution's activities are limited to those specified in the capital plan**....

App. 852-53 (emphasis added).

The preliminary injunction forbade the OTS to breach the contracts, but it did not forbid the Government to regulate Sterling. Notably, the injunction did not prevent the OTS from treating

Sterling as a "troubled thrift" under so-called "safety and soundness" regulations. App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9. Under the guise of "safety and soundness" regulation, the Government indirectly threatened Sterling with poor performance ratings. App. 2-3, ¶¶ 7-8. The threatened use of this standard showed the Government's intent to regulate Sterling as a troubled thrift, in breach of its contracts, despite the contracts and injunction.

Finally, the Government successfully moved for a partial reconsideration and appealed to the Ninth Circuit, which eventually vacated the injunction. *Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992). Thus, Sterling knew all along that if Sterling made aggressive business decisions, Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. App. 2-3, ¶¶ 7-8. This caution was validated by the Ninth Circuit's ruling. It cannot reasonably be disputed that the injunction only had the effect of keeping the Government at bay while Sterling fought to reach capital compliance in accordance with the new, non-contractual capital standards of FIRREA. *Id.*; App. 1170:12-22.

*4. Sterling's Post-Breach Performance And Growth Strategy.*

Because Sterling's capital ratios were low after the breach, Sterling was forced to turn away from the growth and expansion strategy that had brought success to Sterling in the past. App. 1165:8-25. Though the planned 1989 stock offering (which could have raised capital) was rendered impossible by the Government's refusal to commit to allow Sterling to pay dividends on the preferred stock, Sterling continued to seek other ways to raise capital. In contrast to most capital deficient thrifts, Sterling operated at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991. App. 18, ¶ 45; App. 163. Sterling thus could go to the capital market in 1991, earlier than most other capital deficient thrifts. App. 62. Sterling raised gross proceeds of $23.7 million in late 1991, which put Sterling back in full capital compliance. App. 1060.

To be clear, there is no true replacement or substitute for the Government's promise to allow Sterling to utilize the contractual goodwill as regulatory capital, though it can be monetized. Unlike being able to purchase a substitute truck, one cannot go to the market and buy a Government promise; the only replacement would be an identical promise by the Government.

In any event, the 1991 offering, like all equity offerings, raised capital. It saved Sterling from the clutches of the Government by returning Sterling to full capital compliance. However, even if the breach and the resultant non-compliance had not occurred, Sterling's business strategy called for periodic offerings to raise capital in line with its growth-oriented strategy. App. 1111; App. 1243:4-25, 1244:1-6, 1246:11-1247:19. Given that the 1989 offering was not allowed by the Government, the 1991 offering was more critical, but not resultant. Stated differently, the 1991 offering did not replace the defunct 1989 offering or the contractual capital, but simply was another offering in a previously planned sequence, the type of which would have occurred but for the breach. App. 1-2, ¶¶ 3-6; App. 63.

Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy of growth through deposit-gathering and raising capital, which it did in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. App. 162-67; App. 1-2, ¶ 4. In the mid-1990s, Sterling modified its strategy to shift from the traditional savings institution focus on home mortgage lending toward becoming the full service community bank that had been part of its original strategic plan. *Id.* Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits. *Id.* This direction has put Sterling back on the path to growth from which it was derailed by the breach. Since 1990 and continuing through the present, Sterling operated successfully, with increasing assets and profits. App. 3, ¶ 9; App. 162-63.

# IV. ARGUMENT

## A. LEGAL STANDARD FOR CROSS MOTIONS FOR SUMMARY JUDGMENT.

"When both parties move for summary judgment, grant of the motion in favor of one party must satisfy this rule concerning factual inferences; cross-motions do not change the requirement that all justificable inferences must be drawn in favor of the losing party." *Murphy Exploration & Production Company v. Oryx Energy Company*, 101 F.3d 670, 673 (Fed. Cir. 1996). A court deciding cross-motions "must consider each motion separately, drawing inferences against each movant in turn." *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995); *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981) ("the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration"). All doubts about factual issues must be resolved in favor of the non-moving party, and all reasonable inferences must be drawn in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995).

## B. EXPERT TESTIMONY ALONE CAN CREATE A SUFFICIENT FACTUAL DISPUTE TO DEFEAT SUMMARY JUDGMENT.

Expert opinion evidence is admissible when: (1) the subject of the testimony is beyond the "common knowledge of the average layman; (2) the witness has sufficient expertise; and (3) the state of the pertinent...knowledge permits the assertion of a reasonable opinion." *Maffei v. Northern Insurance Company of New York*, 12 F.3d 892, 897 (9th Cir. 1993). In a summary judgment context, courts should not exclude expert testimony if such exclusion eliminates a permissible inference in the non-movant's favor:

> [I]t is reversible error in a summary judgment proceeding to exclude expert testimony offered by a plaintiff to a factual issue if the exclusion deprives the plaintiff of a permissible inference that could

> be drawn by the finder of fact on that issue.

*Id.* Indeed, "[e]xpert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton International Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994), *citing Bultheis v. Rexall Corp.*, 789 F.2d 1315, 1317-18 (9th Cir. 1985).

In its gatekeeper role for expert testimony, the trial court has wide latitude to determine whether proffered evidence is relevant and reliable. *E.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Therefore, even if the opposing party's expert disagrees with an expert's methodology, so long as the expert's testimony is reliable, the appropriate forum to determine which theory is more sound is during trial, not on a motion for summary judgment. *See, e.g., EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000).

### C. THIS COURT AND THE FEDERAL CIRCUIT HOLD THAT SUMMARY JUDGMENT IS AN INAPPROPRIATE METHOD TO REJECT LOST PROFITS CLAIMS.

This Court and the Federal Circuit have repeatedly rejected the Government's attempts to reject lost profits claims in *Winstar* cases at the summary judgment stage. The overwhelming majority of *Winstar* cases have proceeded to trial on the issue of damages claims for lost profits due to material facts remaining in dispute after discovery. *See, e.g., California Federal Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001); *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 125 (2004); *S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 57 Fed. Cl. 598, 622, 627 (2003); *Suess v. United States*, 52 Fed. Cl. 221, 228 (2002); *Bank United of Tex. FSB v. United States*, 50 Fed. Cl. 645, 645 (2001), *aff'd in part, rev'd in part*, 80 Fed.Appx. 663 (Fed. Cir. 2003).

Indeed, as the Federal Circuit noted:

> Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute. [Here, Plaintiff] submitted considerable

> evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits.

*Cal. Fed. Bank*, 245 F.3d at 1350. "[T]his [c]ourt often has rejected the use of summary judgment in considering claims for expectancy damages." *Astoria Fed. S&L Ass'n v. United States*, 72 Fed. Cl. 712, 717 (2006).

Given the fact-centric analysis required to determine whether expectancy damages should be awarded, this Court "has struggled with the appropriateness of granting motions for summary judgment with regard to expectancy damages claims." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 233-34 (2003). Relying on *Cal. Fed.*, several judges of this Court reject the use of summary judgment to foreclose lost profits damages claims. *See Globe Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 86, 96 (2003); *Anchor Sav. Bank, FSB v. United States*, 59 Fed. Cl. 126, 143 (2003); *Citizens Fin. Services, FSB v. United States*, 57 Fed. Cl. 64, 73 (2003); *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108, 134 (2003); *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 702 (2002); *Citizens Fed. Bank, FSB v. United States*, 52 Fed. Cl. 561, 563 (2002).

Indeed, research discloses only four cases in which *Winstar* lost profits claims have been decided on summary judgment, and these four decisions expressly recognize that it is only "the *rara avis*…that could merit summary judgment [on a lost profits claim]." *See Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223, 235-36 (2003) (granting summary judgment given complete lack of proof of any indication that plaintiff bank would have allocated its hypothetical asset base absent the breach in a certain way); *Southern National Corp. v. United States*, 57 Fed. Cl. 294 (2003) (same); *Standard Federal Bank v. United States*, 62 Fed. Cl. 265, 298-99 (2004) (granting summary judgment only after holding "adversarial, mini-hearing" that included direct testimony and cross-examination of expert witnesses as well as considering post-hearing briefs);

*American Federal Bank, FSB v. United States*, 68 Fed. Cl. 346, 358-59 (2005) (thrift's model for lost profits damages was "so far removed from actual events" that summary judgment for the Government was appropriate). As discussed below, in contrast to *Fifth Third*, *American Federal*, *Southern National*, Sterling's continued profitability and adherence to a business model makes measuring Sterling's damages straightforward and not speculative. App. 16-18, ¶¶ 40-45. Therefore, the Court should deny the Government's motion.

### D. A Lost Profits Measure Of Damages Is The Appropriate Method To Apply Under The Facts Presented By This Case.

#### *1. A Lost Profits Measure Is An Appropriate Method To Calculate The Amount Of Damages Due To Breach Of A Contract To Recognize Goodwill.*

"The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003). These expectancy damages "are normally equated with lost profits, although other measures of damages may be applied. *American Federal Bank*, 68 Fed. Cl. at 355; *California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001). Williston notes:

> Because the goal of protecting the plaintiff's expectation interest is to place the promisee in the same position as performance would have done, it follows that an award of damage will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because **only by awarding lost profits will the plaintiff be made fully whole**.

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002), p. 24 (emphasis added). To establish lost profits, a plaintiff must demonstrate by a preponderance of the evidence that: "(1) the loss was a proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating those lost profits with reasonable certainty." *Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 344 (2004) (awarding $5,602,000 of damages under lost profits analysis after trial).

The Government does not dispute that Sterling's lost profits were foreseeable.[3] The Government disputes only whether Sterling can demonstrate that the lost profits were proximately caused by the breach and whether lost profits can be calculated with reasonable certainty. Specifically, the Government alleges that Sterling's model, created by Dr. Horvitz, is speculative and cannot support an award for damages for four reasons: (1) Sterling allegedly cannot show that, absent the breach, Sterling would have met FIRREA's capital requirements; (2) Sterling allegedly fully mitigated its damages by "replacing" the contractual goodwill eliminated by FIRREA and Dr. Horvitz assumed otherwise; (3) Dr. Horvitz incorrectly assumes that Sterling could not increase its assets during the term of the injunction; and (4) no assets are identified by Dr. Horvitz that Sterling would have acquired absent the breach. The Government's assertions lack merit.

Sterling, unlike the vast majority of *Winstar* plaintiffs, is able to utilize damages models based on the performance of the actual bank because it was not closed down. Further, under the terms of the contracts at issue, Sterling is permitted to count its contractual capital as regulatory capital under the regulations in place at the time of the contracts, and, therefore, the Government's assertion that FIRREA would have limited the amount of such capital for regulatory purposes in the but-for world fails. Dr. Horvitz's model is based upon the same principles utilized by financial markets and analysts and confirmed by the performance of the actual bank, and should be accepted by the Court.

2. *Sterling Would Have Met Capital Requirements Absent The Breach.*

The fulcrum of the Government's argument is the assertion that, even assuming Sterling was

[3] In *Winstar*, the Supreme Court determined that the foreseeable and direct consequence of the Government's breach was to deny to victims of the breach profits the victim thrifts would have had the capacity to generate through their income-producing activities. *See* 518 U.S. at 851 ("the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)."). Here, therefore, the purpose of the contracts was to provide Sterling with the opportunity to increase profits by leveraging goodwill. *See, e.g., id.* at 850-51, 861 (nature of the underlying transactions demonstrated that goodwill was a valuable "cash substitute," "allow[ed] the thrift to leverage more loans," and was "critical to make the transaction[s] possible in the first place").

permitted to utilize the full amount of its contractual capital from the Lewis Federal and Tri-Cities acquisitions, Sterling still would have failed to meet the regulatory capital requirements of FIRREA in the but for world, rendering it unable to profit even if the breach had not occurred. *Def's Brief*, pp. 15-16. This claim is based on a new theory (from a new expert, W. Barefoot Bankhead) that the Government would not have permitted Sterling to utilize both its contractual capital and the so-called non-contractual goodwill from the Central Evergreen acquisition. *Id.* This claim lacks merit and Sterling has moved that Mr. Bankhead's opinions not be considered by the Court and stricken under RCFC 56(e). *See Plaintiff's Motion To Strike The Expert Report of W. Barefoot Bankhead* ("*Pl's Mot. To Strike*"), filed herewith and incorporated herein by reference. In short, Mr. Bankhead's opinions cannot establish material facts which the Court may consider on summary judgment because they are legal conclusions as to the meaning of FIRREA and its application to Sterling's contracts with the Government. *Pl's Mot. To Strike*, pp. 2-4. Mr. Bankhead's opinions also cannot be considered in support of the Government's motion for summary judgment because the opinions contradict both established *Winstar* precedent and the express terms of Sterling's contracts with the Government. *Id.*, pp. 2-6.

More specifically, Mr. Bankhead disregards that, under established *Winstar* precedent and the express terms of Sterling's contracts, the capital credits obtained as part of Sterling's acquisition of Lewis Federal and Tri-Cities count fully toward the regulatory capital requirements without any limitation imposed by FIRREA. In other words, Sterling's contractual capital stands on equal footing with that of cash or stock under FIRREA, and cannot be limited by the ostensible requirement under 12 CFR 567.1(w) that the contractual capital be considered as "qualifying supervisory goodwill, a classification of regulatory capital that did not exist at the time the parties entered into their agreements. *Id.* at pp. 2-6. As the Supreme Court held:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, **the Bank Board had to**

> **offer a 'cash substitute'** to induce a healthy thrift to assume a failed thrift's obligations.

*Winstar*, 518 U.S. 839, 849-50, 116 S.Ct. 2432, 2443 (1996) (emphasis added).

Sterling's contracts make clear that the capital acquired by virtue of its acquisitions of Lewis Federal and Tri-Cities was as defined under the regulations as then existed and not under FIRREA's regulations. *Pl's Mot. To Strike*, pp. 4-6. It is more than obvious that Sterling and the Government could not have agreed that the capital Sterling acquired was to be classified as a lesser form of regulatory capital entitled "qualifying supervisory goodwill" when such a classification did not even exist at the time of contracting.

In sum, *Winstar* precedent and the express terms of Sterling's contracts with the Government establish, as a matter of law, that, to apply, directly or indirectly, FIRREA's definitions of regulatory capital to Sterling's contracts in the but for world, and the restrictions that said definitions would place on Sterling's contractual capital in the but for world, would constitute a different sort of breach. *Pl's Mot. To Strike*, pp. 3-6. Therefore, the argument based on the opinions of Mr. Bankhead should be rejected out of hand.

*3. The Undisputed Facts Demonstrate That Sterling Did Not Fully Mitigate For The Government's Breach Through Its 1991 Offering.*

The Government argues that Dr. Horvitz's model is flawed because Sterling replaced the regulatory capital eliminated by FIRREA through a 1991 offering, fully mitigating any harm caused by the breach. This argument lacks merit.

The Government relies upon deposition testimony of Sterling's CEO, Harold Gilkey, and argues that Mr. Gilkey testified that Sterling would not have raised capital in 1991 absent the breach.[4] Mr. Gilkey, however, was attempting to answer improper hypothetical questions posed to

[4] Sterling notes that the deposition testimony relied upon by the Government was subject to objections by counsel for Sterling. Sterling objects to consideration of these questions as improper hypothetical questions. Because the questions are flawed, the answers thereto are inadmissible and should not be considered by the Court.

him by the Government. Mr. Gilkey did not testify, or even imply, that Sterling would not have raised capital in 1991 in the but for world. Instead, Mr. Gilkey's statements concerning raising capital in 1991 related to the actual, shrunken bank at $600 million, not the but for bank. The testimony cited by the Government is simply not probative of anything related to the but for world.

According to Mr. Gilkey's declaration filed herewith, had the Government asked Mr. Gilkey what Sterling would have needed to do at that time had the Government not breached its contracts in the first place and reduced Sterling's capital, as opposed to a hypothetical question about the already damaged bank, the answer would have been that Sterling would have needed more capital. App. 1-2, ¶¶ 4-5. Indeed, Sterling raised capital in almost every year during this time frame; Sterling raised or the holding company downstreamed capital in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. App. 1-2, ¶ 4. Given its aggressive growth strategy, Sterling has always needed more capital. *Id.*

Sterling's position is analogous to that of a lost volume seller as considered in a breach of contract situation in the sales context. Like a lost volume seller, Sterling: (1) possessed the capacity to raise more capital (or, stated differently, make additional sales and profits); (2) it would have been profitable for Sterling to raise more capital; and (3) Sterling would have raised more capital absent the breach. *See R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) (company established status as lost volume seller despite being unable to point to exact unit and resale buyer of unit at issue in breached contract). Stated differently, the lost volume seller, like Sterling, is unable to take other opportunities for profits because of its inability to gain the initial profit from the breached contract. Sterling will always be behind on its profits compared to where it would have been absent the breach. *See Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619, 627 (3d Cir. 1990) (even where the seller resells the item, the seller is still not made whole because of the lost profit from the initial breach); *Advanced Medical, Inc. v. Arden Medical*

*Systems, Inc.*, 955 F.2d 188, 200-01 (3d Cir. 1992) (a lost volume seller "will always, in the end, have only one sale instead of two, and therefore will suffer damages"); *Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218, 221 (3d Cir. 1998) (vacating order of summary judgment as to damages where disputed facts remained as to whether seller lost other sales as a result of having to resend shipment to buyer after buyer lost first shipment in transit). In sum, Sterling will always have had one offering instead of two, and be behind on its growth due to the cancellation of the 1989 offering.

Importantly, the Government's motion seeks to discredit the opinion of Dr. Horvitz by claiming that he ignored Sterling's mitigation efforts. This is not true. As noted above, the 1991 offering certainly mitigated for the breach in the sense that, like the preliminary injunction, it saved Sterling from the Government which was bent on closing the institution, but it did not fully mitigate – it did not restore Sterling to the position it would have occupied absent the breach. Further, Dr. Horvitz explicitly considered the actual mitigation steps taken by Sterling, namely, the lawsuit (which minimized the potential damage that would have occurred if Sterling had been forced to close) and the shrinkage of Sterling's assets and abandonment of its growth plan. The Government admits so when it claims that Dr. Horvitz improperly assumed that Sterling was unable to grow its assets during the term of the injunction. The Government simply does not like Dr. Horvitz's conclusion as to the effect of these mitigating steps. In sum, because Dr. Horvitz considered the mitigating actions taken by Sterling, his model is valid and admissible evidence of the quantity of the harm suffered by Sterling.

4. *Dr. Horvitz Properly Opined That Sterling Suffered Damages Before And During The Period In Which The Temporary Injunction Was In Place.*

The Government raises in its instant Motion the same argument rejected by the Court during the liability phase of this action, that Sterling could not have been harmed during the period when the preliminary injunction was in place, and now argues that Dr. Horvitz's model fails for assuming

that Sterling could not grow its assets during that time. In its Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment (the "Supplemental Memorandum"), the Government claimed that Sterling had no cause of action for damages because the injunction prevented the Government from enforcing any regulation against Sterling inconsistent with the acquisition agreements. App. 382. The Court rejected this argument. *See Sterling Savings, et. al. v. United States*, 57 Fed. Cl. 234, 234-35 (2003).

**a. The Government Permanently Damaged Sterling Prior To The Injunction, And The Injunction Did Not Cure The Damage That Was Already Done.**

The Government does not dispute that, prior to the injunction, Sterling suffered significant damage as the result of the Government treating Sterling as an undercapitalized, troubled thrift. The Government forced Sterling to drastically shrink its business operations and abandon its growth strategy. App. 1165:8-25; App. 849-50. Sterling could not grow the company nor loan money in the same manner as before the breach. *Id.*; App. 1166:15-1167;12. Sterling lost key personnel and suffered damage to its reputation. App. 1118:15-1120:2; App. 1286:15-1287:15; App. 1213:7-1214:24; App. 1217; App. 1219:22-1233:24, 1234:3-1235:14; App. 1238-39; App. 1255-57. But for the breach, Sterling would have raised regulatory capital pursuant to its agreements with the Government and, in turn, would have generated more earnings and more business opportunities from the leverage of that capital. App. 1168:3-12, 1169:19-1172:2; App. 1178:13-17; App. 1127:18-1128:5. Instead, the Government considered Sterling undercapitalized and placed a stranglehold on its daily operations, causing Sterling to lose an otherwise irreplaceable economic advantage for which it bargained. *Id.*; App. 1165:8-25; App. 849-50; App. 1166:15-1167:12.

Moreover, the injunction did not cure, nor prevent, the severe effects of the Government's breach. As a practical matter, the injunction merely provided Sterling time to raise the capital

needed to meet FIRREA's standards before being exposed to receivership. App. 1170:14-22, 1171:1-7, 1171:24-1172:10, 1173:19-1174:6. Had the Government honored the contracts, Sterling irrefutably would have had excess capital to leverage and thus could have grown and become even more profitable between 1989 and today. App. 1167:1-23, 1168:2-12, 1169:21-1170:11; App. 1179:23-24, 1180:11-14, 1181:11-15.

**b. The Harm Continued During The Injunction.**

The injunction, contrary to the Government's argument, did not allow Sterling free rein to grow and profit. As an initial matter, the Government ignores the very nature of a temporary injunction. The temporary injunction was, by its terms, a stop-gap measure which Sterling could not assume would continue indefinitely. For Sterling to act as though the injunction was permanent would have been fiscally irresponsible and foolhardy. During the effective term of the injunction, the Government successfully moved for partial reconsideration and filed an appeal with the Ninth Circuit. *See Sterling Savings Association v. Ryan*, 959 F.2d 241 (9th Cir. 1992). Had Sterling acted if no breach had occurred and made growth-based decisions upon a belief that the Government would act in good faith, Sterling would have exposed itself to ruin had the injunction been vacated (and it was). *See id.* At the very least, Sterling's officers reasonably perceived that the bank would suffer tremendous harm if an aggressive growth plan were implemented pending appeal. App. 1258;25-1270:17.

The Government supposes that because it was not held in contempt for violations of the temporary injunction, it did not breach the contracts. In reality, Sterling was treated as a troubled thrift even during the period in which the injunction was in place. Sterling, knowing that the injunction was on appeal, could not return to its pre-breach mode of operations. The Government continued to regulate Sterling and restrict its activities, despite the injunction. Under the guise of safety and soundness concerns (which arise from a baseline concern of lack of appropriate capital),

the Government imposed more and more demands on Sterling. For example, five days after the injunction was imposed, the Government notified Sterling that it must report all actions inconsistent with the restrictions imposed upon it prior to the injunction. App. 848. Subsequently, the Government sent other letters further manifesting its intent to restrict Sterling's operations. App. 824; App. 851; App. 856. This correspondence clearly telegraphed the Government's intent to regulate Sterling's growth and business despite the injunction:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**...
>
> * * *
>
> The listing attached to your letter does not correctly reflect the asset growth restrictions that Sterling **is** subject to. By virtue of the denied capital plan, **no growth is permitted**. In addition, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. The institution's activities are limited to those specified in the capital plan.

App. 852-53 (emphasis added). The Government's use of the present tense signifies that, regardless of the injunction, the restrictions are still applicable. Sterling's CEO was "scared to death" of what the regulators would do during this time, and highly concerned that the Government would shut down the Bank through another avenue. App. 1258:25-1270:17. Sterling was acutely mindful of the Government's continued insistence that Sterling observe Government-imposed limits on its business activities, backed by threats that, notwithstanding the injunction, the Government could declare Sterling's actions "unsafe or unsound." App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9. Simply put, it is absurd to claim that Sterling would have or could have attempted to implement an aggressive growth strategy in the contemporaneous regulatory environment.

In short, these restrictions, imposed during the effective term of the injunction, would not have been implemented had Sterling been capital-compliant as it would have been absent the breach. The injunction merely allowed Sterling some time to liquidate assets and plan to raise capital so as to be prepared for either a reversal of the injunction or other ruling as to the breach.

In the liability phase, the Court recognized the disputed facts related to whether Sterling could show harm during the period in which the injunction was in place and found that Sterling "has asserted sufficient economic injury as a result of the breach to establish standing [for harm during that period], regardless of the injunction." 57 Fed. Cl. at 237. The Court expressly noted the disputed facts raised by the parties and discussed above. Thus, though the Government may argue that the injunction has some effect on the measure of damages during that period, the Government cannot claim that any claim for damages during that period must fail as a matter of law.

More importantly, the Government itself recognized that Sterling presented disputed facts regarding the effects of the injunction during the liability case. *See* App. 500 ("plaintiffs' factual assertions create genuine issues"). The Government further acknowledged even then that Sterling's officers testified of the effects of the injunction and Sterling's fear that the injunction may not continue post-appeal. App. 501-02. While the Government then characterized this testimony as "self-serving" (and now ignores its very existence), these facts clearly are disputed and must be taken in Sterling's favor. Therefore, summary judgment denying Sterling any right to damages claimed during the period in which the injunction was in place is precluded.

*5. Dr. Horvitz's Model Accounts For The Foregone Assets.*

The Government claims that Dr. Horvitz's model is speculative because he does not identify the exact assets he assumes would have been acquired by Sterling and "merely assumes that the but-for thrift would have replicated what Sterling did in the real world." *Def's Br.*, p. 23. Stated differently, the Government asks this Court to reject a model based on the rationale that no one can be sure what Sterling would have done if the breach had not occurred and, therefore, any predictive analysis must be "speculative" as a matter of law. The Government misses the point. Such predictive analysis is exactly what economic experts do. No one, not even the Government's experts, has the ability to state with absolute certainty, what would have happened in the past if

certain events (the breach) had not occurred. The standard for expert testimony does not require such talents, the law does not require such certainty, and that standard should be summarily rejected by this Court.

Indeed, Dr. Horvitz's model is not based on economic forecasting because Sterling, almost uniquely among Winstar plaintiffs, survived the breach and profited. Dr. Horvitz assumed that but-for Sterling would earn profits at the same rate as the actual Sterling. App. 18-20. In other lost profits cases, this assumption is invalid due to the other thrifts' history of operating losses or closure upon enforcement of FIRREA. App. 18, ¶ 45. Here, the model is a straightforward method of calculation the lost profits of Sterling. The amount of regulatory capital Sterling would have had if its contracts had been honored by the Government would have been used to support additional assets. App. 19-26. Sterling would have earned a return on those assets. *Id.* These earnings would be added to capital and allowed the acquisition of additional foregone assets that would yield additional profits. *Id.* Such cumulative lost profits from the time of the breach to the present represent Sterling's damages.

To calculate the return on assets, Dr. Horvitz assumed that the but for Sterling would have earned at the same rate as the actual Sterling. App. 20-21. This assumption, based on undisputed facts, is conservative because: (1) as Sterling grew, its fixed overhead costs would have been spread under economies of scale; (2) absent the breach, Sterling would have had the opportunity to acquire failing thrift institutions from the Government, which would have been more profitable than Sterling's actual return on assets; and (3) the balance between Sterling's earnings assets and interest-bearing liabilities would have worked to the earnings advantage of but-for Sterling for the first few years until the goodwill shrank in comparison to Sterling's assets. *Id.* The assumption that but-for Sterling would have earned returns at at least the same rate as actual Sterling is further verified by the return on average assets obtained by Sterling when the actual bank reached the size

of the but-for bank. *Id.* Indeed, the Government cites no reason why Dr. Horvitz cannot reasonably assume that the but-for bank (operating with identical management and business strategy in the same and ideal economic environment) will not grow at least at the rate of the actual bank. Absent evidence of an actual slower growth rate, which the Government has not provided, Dr. Horvitz's method remains the only analysis before the Court quantifying Sterling's lost profits.

The Government argues that because Dr. Horvitz does not specify the exact assets that he assumes Sterling would have acquired absent the breach, Sterling cannot prove damage from lost opportunities. This argument is not supported by any economic reason why the actual assets held by actual Sterling would not have been available to but-for Sterling. Moreover, the foregone assets are not a large part of the relevant market (or, indeed, even an amount that could affect the market), but also are less than 15% of the actual bank's assets in most years. App. 22-23, ¶ 52. Dr. Horvitz does not depend upon accessibility to exotic financial instruments or strange holdings, but the actual types of assets that were readily available at the time of the breach through the present and in which Sterling customarily invested. *Id.* There is no reason why he is required to list each and every loan that Sterling may have acquired.

Indeed, Sterling has, in every year of its existence, forecasted and achieved growth. App. 3, ¶ 9. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth, and then go to the market to find those assets. *Id.* It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. *Id.* Using this method, Sterling has grown to over $10 billion in assets. *Id.* To be clear, Sterling finds billions in new assets every year. *Id.* Sterling originated $5 billion in new assets in 2006. *Id.* It is beyond dispute that, if its contract capital were restored, Sterling could easily find the assets to be supported by that capital. *See id.*

However, even assuming Dr. Horvitz is required to describe specific acquisitions available to Sterling but foregone because of the breach, both Dr. Horvitz and numerous fact witnesses cite definitive acquisitions consistent with Sterling's pre-breach growth plan that Sterling could not make as a result of the Government's breach. Dr. Horvitz notes that the types of assets that Sterling would have acquired are known both from Sterling's business plans and the known market. App. 22-23, ¶ 52. In addition, as detailed below, Sterling's officers and employees testified at length regarding Sterling's abandonment of its growth strategy in response to FIRREA, the inability to grow in areas which would have been highly profitable given the economic boom of the Pacific Northwest at that time, foregone investment opportunities, and lost customers and the inability to serve new customers as a result of the breach.

**a. Sterling Was Forced To Reduce Its Operations And Forgo Profitable Business Expansion Of Its Subsidiary Companies.**

FIRREA forced Sterling to shrink its business operations and abandon its growth strategy. For example, the Government's breach severely damaged Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage. App. 1290:5-9. Residential construction lending was a high profit area. App. 1290:10-14. Prior to the breach, Sterling intended to expand Action Mortgage into Seattle, Portland, Vancouver (WA), Lake Oswego (OR), Boise and Salt Lake City. App. 1290-91. Action's business plan was to quadruple lending activity, to be achieved through opening these offices. App. 1292:9-13. However, the Government limited Sterling's ability to lend for construction. Despite this limitation, Sterling attempted to support an Action Mortgage office in Salt Lake City, but could not make a profit without the ability to engage in construction lending. App. 1290:21-25. Sterling thus had to close that office. *Id.* Sterling was able to keep open a Boise office to handle single family loans, but could not expand that office into residential construction lending, the more profitable side of Action Mortgage. App. 1291:1-4.. Utah subsequently underwent an economic upswing, which Sterling could not benefit from because

the Action office had to be closed. App. 1283:15-25.

The restriction also stopped Sterling from opening Action Mortgage offices in Seattle, Portland and Lake Oswego until after January of 1992. App. 1291:12-25, 1292:4-6. By that time, Sterling had lost contact with the persons it intended to hire to supervise those offices, thus leading to further cost to find appropriate staff. App. 1291:15-17. Sterling eventually opened the Seattle and Lake Oswego offices, which have been highly profitable. App. 1291:19-21. However, Sterling lost approximately years of time in Lake Oswego and Seattle due to the breach. *Id.*

Sterling faced similar problems with its Intervest subsidiary. Two-thirds of the existing staff of Intervest left following the Government's breach, including all of the big producers of assets, and Intervest was forced by the breach to eliminate almost all of its lending. App. 1286:22-1287:15. Had the larger producers stayed and the breach not occurred, Intervest would have been able to substantially increase the size of its staff and therefore the size of its assets and lending capacity. *Id.* Specifically, Intervest's operations would have expanded to cover northern California, Oregon, Idaho, parts of Utah, Montana and Washington. App. 1287:9-15. With this capacity to follow its customers to this geographic region to service specific loans and interests, Intervest would have created a portfolio of significant value to Sterling.

**b. Sterling Lost Specific Accounts And Transactions From Current Clients, And Could Not Service New Accounts Due To The Government's Breach And Restrictions.**

Additionally, Sterling suffered a reduction in servicing income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans. App. 1116:2-1117:15. Sterling was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. App. 1285:1-3. The Government forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. Sterling also was forced to stop gathering uninsured deposits. App. 1285:4-9.

Moreover, Sterling lost specific deposits and/or customers due to the OTS restrictions on Sterling in the wake of FIRREA. Sterling lost many customers with deposits in excess of $100,000, including a priest in Salish who had deposits in excess of $ 1 million. App. 1255:1-11, 1256:15-19, 1257:1. Also, Condron Homes and Baker Construction left due to OTS limitations on Sterling. App. 1255:12-18. Also, Fred Burstad and Burstad Construction of Seattle left due to OTS limitations. App. 1257:15-23. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions; "[Sterling was] not only turning them away, we were walking them across the street to our competitors to avoid the restrictions that we were placed under." App. 1282:20-23. The effects of having to direct its own customers to its own competitors, both financial and in the context of public relations in a small community, cannot be underestimated.

Moreover, the public was aware of the Government's adverse actions toward Sterling, and many of Sterling's customers, concerned about the Bank's viability, chose to leave for other financial institutions. Specifically, the following customers left Sterling as a result of uncertainty about the Bank: (1) Boyd, Bjockman & Frickle, an accounting firm with term loans for equipment and leasehold improvements as well as a credit line; (2) CRM Optical, a contact lens manufacturer with multiple term equipment loans and a credit line; (3) DIVCO Energy Control Company, a heating and air conditioning company, and its principal, Robert Nelson, considered a $5 million customer, with several equipment loans and a large credit line; (4) Latah Creek Winery, which had a $1 million equipment loan and a credit line; (5) Miller-Jordan Travel, a travel agency, had a credit line and a few equipment term loans; (6) Northern Technologies, Inc., a technology company that manufactured surge protectors, had a rapidly increasing credit line designed to keep pace with the company's growth; and (7) Northwest Ski Exchange, a retail shop, had several term loans and inventory financing. App. 1184:8-1185:16, 1186:17-1193:7, 1193A:14-1193B:5, 1193B:24-

1204:25, 1205:12-1210:18, 1211. Sterling's inability to continue commercial activity and the uncertainty of when the issues with the Government would be resolved cost Sterling many valuable business customers, including the following: (1) Aslin-Finch; (2) Dane Armstrong; (3) Ted Beasley; (4) Larry Biggs; (5) Cedar Builders; (6) Empire Jewelry and Loan; (7) George Hansen; (8) Don Howell; (9) Craig Jacobs; (10) Bill Lawson of A & A Construction; (11) Michael Manz; (12) Metallic Arts; (13) Grant Person; (14) Randy Ramey of Ramey Construction and Ramey Development; (15) Red Barn, NSE Inc.; (16) Doug Romney; (17) Roy Mitchell, Inc.; (18) Kevin and Chris Rudeen, Rudeen Development; (19) John Schreinir; (20) Harry and Daryl Siria; (21) G. Wesley Sodoroff; (22) Vandervert Development; (23) Mike Walker; and (24) Woodland Montessori School. App. 1213:7-1214:24, 1217.

Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them, including the following: (1) Bill Lawson, who sought approximately $1.5 million; (2) Dick Vandervert; (3) Dick Villelli, who sought approximately $2.0 million; (4) Harlan Douglas; (5) Richard Naccarato of Cedar Pines General Partnership; (6) Bob Spears; (7) Ted Gunning; (8) Dean Grafos of Opportunity Plaza; (9) Thompson and Brumback. App. 1219:22-1233:24, 1234:3-1235:14.

In sum, Sterling not only was unable to grow through new customers due to the public concern over its problems with the Government, but it had to turn away the customers it already had.

**c. Sterling Was Unable To Take Advantage Of Investment Opportunities Because Of Capital Deficiencies.**

Just as Sterling could not expand its subsidiaries or keep pace with its customers' needs, without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities. App. 1279:13-25, 1280:17-25, 1281:1-8. The acquisition of two Great American branches was denied by the OTS. App. 1121:17-24. Further, a

number of other acquisitions failed in part or as a direct result of Sterling's post-FIRREA, weakened capital position. App. 1132-1144. For example, Sterling entered into discussions to acquire Horizon Bank, but could not satisfy Horizon as to Sterling's level of capital. App. 1131-32. Likewise, Intervest ended negotiations for an acquisition due to the capital structure and Sterling's problems with the Government. App. 1132-33. Sterling started discussions with Great Northwest Savings and Vancouver Federal in 1991, but Sterling was unable to convince either institution to go forward because of the Government's treatment of Sterling and Sterling's resultant poor capital position. App. 1136-38. Sterling attempted to acquire Summit Savings in the mid-1990s, but Summit chose to go with another institution due to Sterling's capital structure and the breach. App. 1134-35. Sterling had similar experiences with Gibraltar Savings, Willamette Savings, Hamilton Financial Services, and Security Pacific. App. 1138-44. All of these transactions may have been completed if Sterling had had sufficient capital to be a competitive candidate for acquisition. *E.g., id.*

Dr. Horvitz explicitly considered these potential acquisitions when formulating his analysis. The Government's argument that Sterling cannot show definitive losses of assets fails. Unlike in *Fifth Third* and *Southern National*, Sterling can point to specific transactions that could not be completed, and specific customers lost, due to the Government's breach. Therefore, Sterling's lost profits theory states a viable damages claim.

*6. Contrary To The Government's Assertions, Dr. Horvitz Considered Sterling's Competitors In His Analysis.*

Finally, the Government claims that Dr. Horvitz's model is invalid because "the model fails to account for, or even acknowledge, that there would have been competition in the market for the assets Sterling assumes it would acquire." *Def's Br.*, p. 3. To the contrary, Dr. Horvitz did examine the effect of Sterling's competitors, and testified to that effect in response to Government deposition questions:

> Q: So you can ignore the actions that would have been taken by competitors then?
>
> A: I'm saying this would have been so small in the context of a competitive and efficient market that it would not have been perceptible to – to other participants in the market.
>
> * * *
>
> Q: But that conservative approach wasn't based upon some study of what their competitors would have done?
>
> A: **I have looked at their competitors and their market share**. It's not that I have ignored that. **I have concluded that the – that the effect on the market would have been insignificant.** It's saying that it's insignificant or saying that it's zero, doesn't mean that I have ignored it.

App. 1385:1-6, 13-21 (emphasis added). The Government's argument that Dr. Horvitz did not consider other competitors thus fails; his expert opinion is that, given the size of Sterling, the effect of the but-for bank on the market would have been minimal.

## E. Dr. James' Cost Of Mitigation Analysis Is Valid.

Though Sterling does not believe that Government promises can be replaced,[5] Sterling, in an abundance of caution, asked Dr. James to calculate the cost of replacement of the Government's broken promises to Sterling. Sterling notes, however, that the facts of this case demonstrate that the proper measure of damages is lost profits, as measured by Dr. Horvitz.

Should this or another court disagree, however, Sterling promulgates through Dr. James an analysis of damages incurred assuming that Sterling was able to fully mitigate for the losses by raising capital sufficient to return to compliance under FIRREA. This theory calculates the actual costs to Sterling of becoming compliant through an actual capital raising. App. 187-310.

The Government's main opposition to Dr. James' analysis is the claim that there can be no damages for issuing common stock except for transaction costs (though the Government does not

[5] It is Dr. James' expert opinion that the supposition that Sterling actually replaced the supervisory capital generated by the contracts is counterfactual, but he assumes as such for the purposes of his analysis. App. 255, n.5.

attempt to quantify these costs). This contradicts basic economic and finance principles. An investor who purchases common stock does not do so as a charitable act. The Company is obligated to retain earnings and generate profits. Indeed, both the Supreme Court and the Federal Circuit has recognized that common stock has a cost:

> The cost of each component of the utility's capital is considered, *i.e.*, the cost of debt, the cost of preferred stock, **and the cost of common stock [,] [t]he latter being determined by the return required to sell such stock upon reasonable terms in the market.**

*Duquesne Light Co. v. Barasch*, 488 U.S. 299, 312 n.7 (1989) (emphasis added) (internal citation omitted) (alterations in original). The Federal Circuit has explicitly rejected the Government's argument:

> We see no abuse of discretion in the trial court's methodology for calculating the cost of replacement capital. The court correctly discounted the argument made by the government's expert that capital has no cost other than transaction costs, as this court had already rejected the same argument.

*Home Savings of America v. United States*, 399 F.3d 1341, 1354 (2005), citing LaSalle Talman, 317 F.3d at 1374-75. Other federal appellate courts likewise recognize that all capital raised by corporations has a cost, regardless of whether the capital investor holds debt instruments or common stock equity. *See City of Los Angeles v. United States DOT,* 165 F.3d 972, 979 (D.C. Cir. 1999) ("[C]apital costs of the business.... include the service of the debt and dividends on the stock"); *see also Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990); *United Gas Pipe Line Co. v. Federal Energy Regulatory Com.*, 618 F.2d 1127, 1131 (5th Cir. 1980); *Chicago & North Western Transp. Co. v. United States*, 582 F.2d 1043, 1055 n.23 (7th Cir. 1978); *State Corp. Com, v. Federal Power Com.*, 206 F.2d 690, 722 (8th Cir. 1953).

Here, Dr. James takes the actual costs to Sterling of mitigating its damages from the Government's breach and calculates, using economic principles of valuation, the price paid. Thus, Dr. James' analysis is not "hypothetical," but based on the actual costs. Here, unlike *LaSalle*

*Talman*, *Granite Management Corp. v. United States*, 58 Fed. Cl. 766 (2003), *aff'd in part, remanded in part on other grounds*, 416 F.3d 1373 (Fed. Cir. 2005), and *Citizens Financial*, the mitigation theory follows what plaintiff actually did. The analysis is based upon stock issuance to replace capital, the actual methodology used by Sterling. The Government's bare assertions that his assumptions, based upon Sterling's actual actions, are in fact groundless should be rejected.

### F. STERLING HAS DEMONSTRATED THAT ITS WOUNDED BANK CLAIMS WERE CAUSED BY THE BREACH.

Wounded bank damages are costs resulting from a bank's "perilous financial condition created by a breach of contract." *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402, 434 (2000), *citing Cal Fed*, 43 Fed. Cl. at 448. Such costs are awarded to "reimburse [the thrift] for the losses caused by its reliance on the contract, and to put the thrift in as good a position as it would have occupied if the contract had never been made." *Franklin Fed*, 55 Fed. Cl. at 123-24 (awarded summary judgment in favor of thrift on wounded bank claim). Sterling thus must put forward evidence tending to prove that the breach was a substantial factor in causing such damages. *Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004). However, causation is a question of fact which ordinarily should be determined at trial. *Id.* at 91, *citing Globe Savings v. United States*, 59 Fed. Cl. at 98; *Anchor Savings*, 59 Fed. Cl. at 147, *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001).

The Government's argument related to wounded bank damages focuses on the fact that Dr. Horvitz devoted less space in his report to these claims and that Dr. Horvitz relies upon facts and calculations conducted by Daniel Byrne, Sterling's Chief Financial Officer. Contrary to the Government's assertions, expert testimony is not invalid because it is succinct, nor because it relies upon facts from non-expert witnesses. As discussed below, Sterling has demonstrated wounded bank damages caused by the breach.

#### 1. *Sterling's Loss Related To The Acquisition Of The Great American Savings Bank*

*Branches Was Caused By The Breach.*

First, Sterling's claim regarding the acquisition of Great American Savings Bank branches, like the other lost opportunities described above, flows directly from the Government's breach and refusal to permit goodwill to count as regulatory capital left Sterling unable to present a tempting acquisition plan to other banks. Prior to the breach, Sterling's business plan had always included acquisitions as an appropriate method of growth. The increase in the price of the Great American Savings Bank branch is supported by testimony of Sterling officers and, as all inferences must be drawn in Sterling's favor, any attacks on the weight of this evidence is more appropriately raised at trial. The negative effect on Sterling's capital for purposes of acquisitions were a foreseeable consequence of the breach – the Government knew that by contravening its obligation to permit Sterling to permit goodwill to count as regulatory capital Sterling would be in a position of less capital and be, therefore, a less attractive acquisition candidate.

The simple fact is that, absent the breach, Sterling would have been able to acquire the branch for only $61,000, when, because of the breach, it was forced to pay $1.9 million five years later. The Government knew that that Sterling contracted regarding Lewis Federal and Tri-Cities so that it would have more capital, capital it intended to use. Because of the breach, Sterling was unable to acquire the Great American branch because the Government refused to recognize the capital attained through the contracts. Sterling's loss for this foregone asset is directly attributable to the breach, and should be compensated as wounded bank damages.

2. *Sterling Incurred Supervision Costs Due To The Breach.*

The undisputed facts establish that Sterling incurred excess supervision costs due to the breach. The Government argues that testimony of Sterling's officers and experts cannot be credited as the sole reason to attack these costs. Here, Sterling's chief financial officer and Dr. Horvitz detail the excess costs caused by the breach related to supervision. Again, in the summary

judgment context, evidence must be viewed in the light most favorable to the non-moving party. Here, the Government admits that both expert and fact witnesses testify to these costs. Without counter-affidavits or testimony, Sterling's sworn testimony on this issue "must be accepted as resolving the question." *See, e.g., Holcomb v. United States*, 146 F.Supp. 224, 227 (Ct. Cl. 1956).

3. *Sterling Suffered Losses On The CJ-4 Loan.*

The CJ-4 loan was a property in Bellevue, Washington, that Sterling committed to loan for construction prior to the enactment of FIRREA. App. 1089:12-14. FIRREA limited the size of a loan a financial institution could make to any one borrower, based on the level of capital an institution possessed. When the Government breached and refused to acknowledge the contracts for the three acquisitions, Sterling was treated as if it had deficit capital and limited to a $500,000 ceiling for a loan to any one borrower. App. 1093:6-13. Because the CJ-4 loan was in excess of $500,000, Sterling was not permitted to make additional advances against the loan commitment that was already in effect. *Id.* Because the Government would not allow Sterling to make further advances, the project fell behind on construction. App. 1091:10-1092:9. The borrowers then sued Sterling for breaching the loan commitment. *Id.* To resolve the dispute with the borrowers, Sterling was forced to foreclose on the property, repossess it, and make the improvements which the borrowers would have made if Sterling had been able to advance the funds per the loan commitment. *Id.* In the process of foreclosure, repossession and improvements, the market value of the property declined significantly. *Id.* When Sterling liquidated the property, therefore, Sterling suffered a $1.615 million loss. App. 1094:6-1095:2; App. 1288:1-3.

Sterling's inability to fulfill its contractual obligations to a borrower under the CJ-4 Loan was directly caused by the Government's restriction on the amount of funds that could be loaned to one borrower. Sterling explored the possibility of an exception and spoke to government regulators, but was denied the right to advance further funds. Taking all facts and inferences in

Sterling's favor, therefore, the wounded bank claim related to the CJ-4 Loan does not fail as a matter of law.

4. *The Government Refused To Permit The 1989 Offering And Damaged Sterling.*

The Government applies the same analysis to Sterling's claim of damages arising out of the 1989 public offering that was cancelled due to the Government's breach. The Government's refusal to approve the payment of dividends on the 1989 preferred stock offering had the effect of forcing Sterling to forgo the offering altogether. Sterling was therefore injured by the Government's prevention of the offering. Had the offering occurred, Sterling would not have lost the costs that went into the offering. A successful offering (or, minimally, one that occurred years later) is not the same as an offering which the Government forced Sterling to cancel. The injury suffered by Sterling from the 1989 public offering is directly traceable to the breach.

In sum, Sterling has provided factual evidence in support of its wounded bank damages claims, and expert testimony validating that the calculations demonstrate costs that Sterling incurred, due to its weakened capital position (caused by the breach) that it would not have occurred absent the breach, and profit opportunities that Sterling lost because of its weakened condition. The wounded bank damages claims are valid and the Government's motion for a ruling that they lack merit as a matter of law should be denied.

**G. BECAUSE THE ONLY EVIDENCE BEFORE THE COURT QUANTIFYING STERLING'S DAMAGES ARE THE OPINIONS OF DR. HORVITZ AND DR. JAMES, THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF STERLING AND AWARD DAMAGES IN CONFORMANCE WITH THEIR ANALYSES.**

As discussed above, the Court should deny the Government's motion for summary judgment because Sterling's expert testimony on damages meets the *Daubert/Kumho* standard for admissibility, is based on the specific facts presented, and is not speculative. This has the result of leaving the Court with only the analyses of Dr. Horvitz and Dr. James as to the actual amount of damages suffered by Sterling. The Government's experts have not opined as to the amount of

damage, or proffered any alternative calculation, but have confined their opinions to critiques of those proposed by Dr. Horvitz and Dr. James. App. 1158-1161; App. 1152, 1153. No expert has opined that Sterling did not suffer harm; in fact, the Government's experts admit that Sterling was harmed, and merely dispute the methodology proposed by Sterling to calculate that harm while disclaiming (disingenuously, perhaps) any idea of about how to measure the damages.

Here, the Court is not even faced with a battle of experts, but rather, experts, testifying for Sterling, whose opinions are the only ones addressing how much harm was caused and, for the Government, contrasting experts who merely challenge their methodologies. Because Sterling has established that its experts' methodologies are valid under *Daubert/Kumho*, disposing of the Government's argument, there is nothing left for trial. Sterling's motion should be granted.

## V. CONCLUSION

For these reasons, the Government's Revised Motion for Summary Judgment Regarding Damages should be denied. Sterling's Motion for Summary Judgment should be granted.

Respectfully submitted this 29th day of March, 2007.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: /s/ William D. Symmes

William D. Symmes, Counsel of Record
And Member of the Bar of the United States Court of Federal Claims
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on March 29, 2007, a copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiffs

TABLE OF AUTHORITIES

Page

**Cases**


Advanced Medical, Inc. v. Arden Medical Systems, Inc., 955 F.2d 188 (3d Cir. 992)..............19

*American Federal Bank, FSB v. United States*, 68 Fed.Cl. 346 (2005)........................................15

Anchor Sav. Bank, FSB v. United States, 59 Fed.Cl. 126 (2003)..............  ..................14, 34

*Astoria Fed. S&L Ass'n v. United States*, 72 Fed. Cl. 712 (2006)...................................14

*Bank United of Tex. FSB v. United States*, 50 Fed.Cl. 645 (2001), aff'd in part, rev'd in part, 80 Fed.Appx. 663 (Fed. Cir. 2003). . . . . ..........................................................13

Bluebonnet Savings Bank, FSB v. United States, 266 F.3d 1348 (Fed. Cir. 2001)...................34

*Bultheis v. Rexall Corp.*, 789 F.2d 1315 (9th Cir. 1985)...........................................13

*California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed. Cir. 2001)...............passim

Chicago & North Western Transp. Co. v. United States, 582 F.2d 1043 (7th Cir. 1978)...........33

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303 (Fed. Cir. 1998)...12

*Citizens Fed. Bank, FSB v. United States*, 52 Fed.Cl. 561 (2002)...................................14

Citizens Fin. Services, FSB v. United States, 57 Fed.Cl. 64 (2003)................... ............34

*City of Los Angeles v. United States DOT*, 165 F.3d 972 (D.C. Cir. 1999)........................33

Coast Federal Bank, FSB v. United States, 48 Fed.Cl. 402 (2000)................... .............34

*Columbia First Bank, FSB v. United States*, 54 Fed.Cl. 693 (2002)............................13, 14

Commercial Federal Bank, F.S.B. v. United States, 59 Fed.Cl. 338 (2004)................. .........15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).....13, 37, 39

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989)...............................................38

EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594 (1st Cir. 1995)........................12

*EFCO Corp. v. Symons Corp.*, 219 F.3d 734 (8th Cir. 2000) ........................................13

Fifth Third Bank of W. Ohio v. United States, 55 Fed.Cl. 223 (2003)..........................14, 15

*Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108 (2003)..............................14, 34

Gasser Chair Co. v. Infanti Chair Mfg. Corp., 60 F.3d 770 (Fed. Cir. 1995)......................12

*Globe Sav. Bank, F.S.B. v. United States*, 59 Fed.Cl. 86 (2003)................................14, 34

*Granite Management Corp. v. United States*, 58 Fed. Cl. 766 (2003), aff'd in part, remanded *in part on other grounds*, 416 F.3d 1373 (Fed. Cir. 2005).......................................33

*Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990).....................................34

*Holcomb v. United States*, 146 F.Supp. 224 (Ct. Cl. 1956).........................................36

Home Savings of America v. United States, 399 F.3d 1341 (2005)...............................39

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).........................................13, 37 39

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)...........15, 33, 34

Long Island Savings Bank, FSB v. United States, 60 Fed.Cl. 80 (2004)..........................34

Maffei v. Northern Insurance Company of New York, 12 F.3d 892 (9th Cir. 1993)..........12, 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).........................12

Murphy Exploration & Production Company v. Oryx Energy Company, 101 F.3d 670 (Fed. Cir. 1996)..........................................................................12

*R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir. 1991).......................19

*Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619 (3d Cir. 1990)..........................19

Robert Burton Associates, Inc. v. Preston Trucking Co., 149 F.3d 218 (3d Cir. 1998)...........19

S. Cal. Fed. Sav. & Loan Assoc. v. United States, 57 Fed.Cl. 598 (2003)........................13

*Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305 (2d Cir. 1981).......................12

*Southern National Corp. v. United States,* 57 Fed.Cl. 294 (2003).........................14, 15, 36

Standard Federal Bank v. United States, 62 Fed.Cl. 265 (2004)..................................14

*State Corp. Com, v. Federal Power Com.*, 206 F.2d 690 (8th Cir. 1953)..........................33

*Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992)........................ ......10, 22

*Sterling Savings v. United States*, 53 Fed.Cl. 599 (2002)...................................4, 5, 6

*Sterling Savings v. United States*, 57 Fed.Cl. 234 (2003)......................................4, 24

*Sterling Savings v. United States*, 72 Fed.Cl. 404 (2006).........................................4

*Suess v. United States*, 52 Fed.Cl. 221 (2002)...............................................13

Thomas v. Newton International Enterprises, 42 F.3d 1266 (9th Cir. 1994)......................15

United Gas Pipe Line Co. v. Federal Energy Regulatory Com., 618 F.2d 1127 (5th Cir. 1980)...........................................................................33

*United States v. Winstar Corp.*, 518 U.S. 839, 116 S. Ct. 2432 (1996)....................6, 17, 18

**Statutes**

12 U.S.C. § 1464..............................................................................4

**Other Authorities**

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002), p. 24..................15

**Rules**

12 CFR 567..................................................................................19

FRCP 56......................................................................................3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**Memorandum Of Points And Authorities In Support Of Sterling's Motion For Summary Judgment Regarding Damages And In Response To Revised Motion For Summary judgment Regarding Damages**

## I. CASE STATUS AND RELIEF REQUESTED

This is a *Winstar* case filed in May 1990 by Sterling Savings Association ("Sterling"), seeking damages for the Government's breach of three contracts related to acquisitions of three thrifts by Sterling. The Court has ruled that the Government, as a matter of law, breached two of the contracts through application of certain capital standards to Sterling after the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and determined that Sterling assumed the risk of regulatory change as to the third acquisition. This matter is set for trial on damages starting on June 25, 2007.

The Government has renewed its motion for summary judgment on damages, asking that the Court reject all damages theories propounded by two of Sterling's experts on the basis that the models utilized are speculative and further rule that Sterling is entitled to no damages at all for the

[1] The Government ignores the expert analyses conducted by Dr. William B. Conerly and Dr. John W. Mitchell,

Sterling herein moves for a ruling as a matter of law that, because its damages theories meet the standards for expert testimony, and because the Government offers no alternative method of calculation, there is nothing left for trial and summary judgment should be granted in Sterling's favor.

## II. INTRODUCTION

This is a garden-variety breach of contract case in which a profitable business entered into a contract, suffered a breach, temporarily changed its business plan to cope with the breach, continued to make a profit, and eventually was able to return to its original, pre-breach plan for growth but without the continuing benefit of its bargain. Unlike most *Winstar* plaintiffs, Sterling has been profitable throughout its existence, managed by the same executive team, and is a relatively small thrift with no significant market share, therefore escaping the negative economic effects suffered by other *Winstar* thrifts. The Pacific Northwest, where Sterling is located, underwent a unique real estate boom in the late 1980s and early 1990s, precisely the time that Sterling was forced to downsize its lending activity to stay in compliance after the Government's breach. The particular circumstances and effect on Sterling of FIRREA are not comparable to that on larger thrifts located in different parts of the country. Summary judgment on the theory that the damage analyses rejected as to other thrifts must also be rejected as to Sterling is unfounded because Sterling, unlike many of the thrifts who brought *Winstar* suits, survived FIRREA, remained profitable, and, indeed, eventually returned to its original plan of growth under the same leadership and business plan.

Sterling has presented the only evidence before the Court quantifying the damage suffered due to the Government's breach. Though this Court has found that the Government breached its

---

erroneously claiming that since neither quantifies damages and "their opinions are not relied upon by Professor James and Dr. Horvitz, their opinions are irrelevant." *See* Government's Br., p. 2. To the contrary, Dr. Mitchell and Dr. Conerly's findings support the analyses rendered by Dr. James and Dr. Horvitz and explain facts related to the economic climate of the Pacific Northwest relied upon by Dr. James and Dr. Horvitz.

obligations to Sterling under the various agreements, the Government has proffered no analysis or testimony as to the measure of damages suffered by Sterling. Moreover, the Government does not contest the qualifications of the experts who have rendered analyses quantifying Sterling's loss. Instead, the Government only challenges the methodologies of two of those experts.

To be clear, the Government's opposition to Sterling's expert testimony regarding damages, in the form of its motion for summary judgment regarding damages is, in reality, a request that this Court disregard the evidence presented by indisputably-qualified economic experts and make credibility judgments regarding testimony from fact witnesses. However, summary judgment standards under Rule 56 of the Federal Rules of Civil Procedure have not been modified for *Winstar* cases, and the Government must still demonstrate that, on the basis of undisputed facts with all inferences in favor of Sterling, Sterling cannot prove, as a matter of law, that it has incurred damage due to the Government's breach. The Government has failed to meet this burden. The Government's argument is that the expert opinions of two of Sterling's experts, Dr. Horvitz and Professor James, are not sufficiently based in fact, *i.e.*, the methodology is improper, so as to render their analyses unable to support a claim of damages as a matter of law. However, Dr. Horvitz and Professor James' analyses rely upon undisputed facts; therefore, this issue is ripe for summary judgment, but only in favor of Sterling, as the Government has not proffered a competing measure of or quantification of the damages suffered by Sterling due to the breach, though it does not deny that Sterling was harmed.

Because it is undisputed that Sterling's qualified experts have reached the only measure of damage based upon undisputed facts, leaving nothing for trial, the Court should grant summary judgment to Sterling and find that the Government's breach caused a compensable loss to Sterling of $63.61 million (compensating for lost profits, wounded bank damages and future damages).[2]

---

[2] Sterling has offered the opinion of Dr. Christopher James, who opines as to the cost of mitigation. Neither Sterling

## III. BACKGROUND

### A. Procedural Background

This litigation grows out of contracts between Sterling and the Federal Home Loan Bank Board ("FHLBB") involving acquisitions of three troubled institutions during the savings and loan crisis of the 1980s. Pursuant to agreements with the Government, Sterling acquired three failing thrifts: (1) Lewis Federal Savings & Loan Association of Chehalis ("Lewis"); (2) Tri-Cities Saving & Loan Association of Kennewick, Washington ("Tri-Cities"); and (3) Central Evergreen Federal Savings & Loan Association of Chehalis, Washington ("Central Evergreen").

This Court has determined that the Government breached its obligations to Sterling under the Lewis Federal and Tri-Cities agreements. *Sterling Savings v. United States*, 53 Fed. Cl. 599, 615 (2002). Specifically, the Court held that an express promise that goodwill resulting from the acquisitions could be counted toward regulatory capital by Sterling resulted from Sterling's acquisitions of Lewis Federal and Tri-Cities. *Id.* The Court held that Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1464, breached the Government's agreements with Sterling and granted summary judgment in favor of Sterling. *Id.* In a later decision, the Court held that Sterling has standing to assert claims for damages incurred during the period of time governed by an injunction barring the Government from taking certain adverse action against Sterling. *Sterling Savings v. United States*, 57 Fed. Cl. 234 (2003).

As to the Central Evergreen transaction, this Court held on reconsideration that Sterling assumed the risk of regulatory change and, therefore, application of FIRREA to Sterling did not breach the agreement. *Sterling Savings v. United States*, 72 Fed. Cl. 404 (2006).

The Court's prior decisions detail the specific factual background of this action. Sterling

nor Dr. James agree that this is the appropriate measure of Sterling's harm. App. 255, note 5. Nonetheless, Sterling offers Dr. James' opinion in case this or another court finds that lost profits is the incorrect measure of harm and instead finds that the correct measure of harm is the cost of mitigation without lost profits. Dr. James measures this cost to be $18.708 million. App. 259.

herein incorporates the Court's lengthy discussion of the facts in *Sterling*, 53 Fed. Cl. 599 (2002) and highlights only those facts relevant to the instant motion and those facts which separate Sterling from the other *Winstar* plaintiffs for purposes of damages.

## B. UNDISPUTED MATERIAL FACTS

### *1. Sterling's Growth-Based Business Plan And The Three Troubled Thrift Acquisitions.*

Sterling began operations in 1983 as a State of Washington-chartered federally insured stock savings and loan association headquartered in Spokane, Washington. App. 1245:8-21. In contrast to the vast majority of thrifts, Sterling was a profitable and sound financial institution all during the troubled period of the 1980s. App. 9, ¶ 18; App. 105. During this time, Sterling's market area enjoyed more favorable growth than most states, and completely avoided the 1990-1991 recession. App. 3-4, ¶ 11; App. 1253:11-1254:4. Because Sterling opened in 1983, after peak interest rates, it did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s, but instead held all loans at current market rates, exceeding the rates it was paying on deposits. App. 1254:18-24; App. 131.

By the end of its first year of business, Sterling was profitable. App. 10, ¶ 19; App. 131. Its deposits, assets and profits increased each year without interruption through fiscal year 1989. App. 10, ¶ 19; App. 105. Sterling had a relatively small market share in the markets that it entered, so it had a substantial market available to it for growth. App. 1278:1-19.

The success of Sterling during the 1980s was due primarily to its good management. App. 10, ¶¶ 20-21; App. 61. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. *Id.* The plan was implemented with considerable skill, and success was achieved. *Id.* It is important to recognize that Sterling had the same management team throughout this period (and

still does), and the same management and business strategy would have been in place absent the breach. *Id.*

The supervisory acquisitions that are the focus of this litigation were consistent with the growth plan, which from the outset included goals to achieve steady and consistent growth. App. 10, ¶ 22; App. 59. According to Daniel Byrne, Sterling's Chief Financial Officer, Sterling pursued a strategy of internal growth combined with strategically-suited acquisitions:

> I can tell you that it was a philosophy of Sterling that we wanted to grow on a 50/50 basis, in the sense that we wanted to be able to grow through acquisition to bring on additional resources. We also wanted to grow internally so that you wouldn't outstrip our systems of control, and therefore, we tended to target for growth in part through acquisitions and in part through the internal growth to achieve that.

App. 1111:1-10. Sterling's plan was to grow aggressively through a balanced combination of acquisitions and branch creation. *Id.*; App. 1240:11-1247:19.

By the late 1980s, the number of insolvent thrifts threatened to swamp the resources of the FSLIC. *United States v. Winstar Corp.*, 518 U.S. 839, 847, 116 S.Ct. 2432 (1996) (noting that by 1988 the FSLIC was itself insolvent by over $50 billion). The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). *Id.* at 848.

The Government recognized Sterling's ability to meet its business plan, and on this basis recommended it as a thrift capable of acquiring troubled institutions. App. 1353-54, ¶¶ 16-17, 1356, ¶ 25, 1358, ¶ 33. Sterling completed three of these acquisitions of troubled thrifts, Lewis Federal, Tri-Cities and Central Evergreen. The details of these acquisitions are delineated in the Court's earlier rulings. *See Sterling*, 53 Fed. Cl. at 602-08.

These acquisitions were consistent with Sterling's growth strategy of targeting deposit gathering in smaller communities. App. 10, ¶ 22; App. 59. However, the capital promises offered

by the Government in exchange for these three acquisitions were the key factor that justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance. App. 1108:13-19, 1112:19-1113:5, 1114:12-1115:23; App. 1251:18-22. Sterling would not have done the deals without the capital promises made by the Government. App. 273:18-22, 292:1-9; App. 1108:13-19, 1109:21-1110:1, 1112:19-1113:5.

Sterling's growth and profitability were attained through sound and conservative operating policies. App. 10, ¶¶ 20-21; App. 882. As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. App. 958-996. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large, unassisted absorption of Central Evergreen in December 1988. App. 978. In 1989, then, prior to the breach, Sterling was well on its way towards its goal of becoming a major player in the Northwest market in accord with its original and consistently-maintained business strategy. App. 961-62.

However, this rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, each with liabilities in excess of its assets, left Sterling in an undercapitalized position under GAAP, although it had regulatory capital modestly in excess of its requirements. App. 13, ¶ 28; App. 60. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue. App. 1008. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement. App. 779. As noted below, this offering did not take place due to the Government's breach. App. 14, ¶ 32.

2. *The Government Breached Its Agreements And Sterling Suffered Harm And Sought Injunctive Relief.*

After the enactment of FIRREA, the Government began to treat Sterling as an

undercapitalized, troubled thrift. App. 1165:8-25; App. 849-850. The Government forced Sterling to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. *Id.* These restrictions included: (1) a limit on asset growth; (2) a moratorium on capital distributions; (3) limits on residential loans to conforming loans; (4) consumer lending restrictions; (5) loans to one borrower limits of $500,000; (6) no authority to purchase or sell any asset or group of assets in excess of $500,000; (7) approval of OTS required to increase compensation of any executive officer or director; and (8) inability to accept uninsured deposits. *Id.*

Sterling was forced to curtail its operations significantly. *Id.*; App. 1166;15-1167:12. From June 1989 to June 1991, Sterling shrunk its asset base, declining in size for the first time in its history. App. 10, ¶ 21; App. 161-63; App. 1271:13-1274:17. Sterling's total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%. App. 161-63. Because of the breach, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate lending crippled. App. 1116:2-1117:15; App. 1255:1-18, 1256:19-1257;1, 1257:15-23, 1284-85, 1286:22-1287:15, 1288:1-3, 1290-92. Sterling lost valuable employees. App. 1118:15-1122; App. 1286:15-1287:15. Sterling was forced to forgo investment opportunities, including acquisitions. App. 1121:17-24; App. 1131:22-1144:2; App. 1279:13-1281:8. Moreover, Sterling suffered damage to its reputation because of the Government's restrictions on the type and amount of business in which Sterling could engage. App. 1213:7-1214:24, 1217, 1219:22-1233:24, 1234:3-1235:14, 1238-39, 1255-57. In addition, Sterling was forced to cancel the 1989 offering because the OTS refused to commit to allow Sterling to pay dividends on the preferred stock that was part of the offering. App. 1008. Not surprisingly, investors were not interested in purchasing preferred stock on which dividends could not be paid. *Id.*

The Government eventually threatened to shut Sterling down completely. App. 23, ¶¶ 7-8. In May 1990, Sterling filed suit against the OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. App. 311-51. The district court issued a temporary restraining order in May of 1990 and a preliminary injunction in August 1990. App. 352-81.

*3. The Harm To Sterling Continues Despite The Injunction.*

Though the injunction did provide Sterling time to raise the capital necessary to meet FIRREA standards to avoid a receivership, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by the Government, which eliminated Sterling's most profitable opportunities. App. 2-3, ¶¶ 7-8; App. 1165:8-25. Moreover, the Government continued to treat Sterling as a troubled thrift, even under the injunction. App. 2-3, ¶¶ 7-8; App. 849-850. Specifically, on June 5, 1990 (five days after issuance of the injunction), the Government wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. App. 848. Subsequently, the Government sent Sterling other correspondence manifesting its intent to regulate Sterling's operations. App. 824; App. 851; App. 856. On June 20, 1990, the Government sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**...The listing attached to your letter does not reflect **the asset growth restrictions that Sterling is subject to**. By virtue of the denied capital plan, **no growth is permitted**. In additional, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. **The institution's activities are limited to those specified in the capital plan**....

App. 852-53 (emphasis added).

The preliminary injunction forbade the OTS to breach the contracts, but it did not forbid the Government to regulate Sterling. Notably, the injunction did not prevent the OTS from treating

Sterling as a "troubled thrift" under so-called "safety and soundness" regulations. App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9. Under the guise of "safety and soundness" regulation, the Government indirectly threatened Sterling with poor performance ratings. App. 2-3, ¶¶ 7-8. The threatened use of this standard showed the Government's intent to regulate Sterling as a troubled thrift, in breach of its contracts, despite the contracts and injunction.

Finally, the Government successfully moved for a partial reconsideration and appealed to the Ninth Circuit, which eventually vacated the injunction. *Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992). Thus, Sterling knew all along that if Sterling made aggressive business decisions, Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. App. 2-3, ¶¶ 7-8. This caution was validated by the Ninth Circuit's ruling. It cannot reasonably be disputed that the injunction only had the effect of keeping the Government at bay while Sterling fought to reach capital compliance in accordance with the new, non-contractual capital standards of FIRREA. *Id.*; App. 1170:12-22.

*4. Sterling's Post-Breach Performance And Growth Strategy.*

Because Sterling's capital ratios were low after the breach, Sterling was forced to turn away from the growth and expansion strategy that had brought success to Sterling in the past. App. 1165:8-25. Though the planned 1989 stock offering (which could have raised capital) was rendered impossible by the Government's refusal to commit to allow Sterling to pay dividends on the preferred stock, Sterling continued to seek other ways to raise capital. In contrast to most capital deficient thrifts, Sterling operated at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991. App. 18, ¶ 45; App. 163. Sterling thus could go to the capital market in 1991, earlier than most other capital deficient thrifts. App. 62. Sterling raised gross proceeds of $23.7 million in late 1991, which put Sterling back in full capital compliance. App. 1060.

To be clear, there is no true replacement or substitute for the Government's promise to allow Sterling to utilize the contractual goodwill as regulatory capital, though it can be monetized. Unlike being able to purchase a substitute truck, one cannot go to the market and buy a Government promise; the only replacement would be an identical promise by the Government.

In any event, the 1991 offering, like all equity offerings, raised capital. It saved Sterling from the clutches of the Government by returning Sterling to full capital compliance. However, even if the breach and the resultant non-compliance had not occurred, Sterling's business strategy called for periodic offerings to raise capital in line with its growth-oriented strategy. App. 1111; App. 1243:4-25, 1244:1-6, 1246:11-1247:19. Given that the 1989 offering was not allowed by the Government, the 1991 offering was more critical, but not resultant. Stated differently, the 1991 offering did not replace the defunct 1989 offering or the contractual capital, but simply was another offering in a previously planned sequence, the type of which would have occurred but for the breach. App. 1-2, ¶¶ 3-6; App. 63.

Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy of growth through deposit-gathering and raising capital, which it did in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. App. 162-67; App. 1-2, ¶ 4. In the mid-1990s, Sterling modified its strategy to shift from the traditional savings institution focus on home mortgage lending toward becoming the full service community bank that had been part of its original strategic plan. *Id.* Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits. *Id.* This direction has put Sterling back on the path to growth from which it was derailed by the breach. Since 1990 and continuing through the present, Sterling operated successfully, with increasing assets and profits. App. 3, ¶ 9; App. 162-63.

## IV. ARGUMENT

### A. LEGAL STANDARD FOR CROSS MOTIONS FOR SUMMARY JUDGMENT.

"When both parties move for summary judgment, grant of the motion in favor of one party must satisfy this rule concerning factual inferences; cross-motions do not change the requirement that all justificable inferences must be drawn in favor of the losing party." *Murphy Exploration & Production Company v. Oryx Energy Company*, 101 F.3d 670, 673 (Fed. Cir. 1996). A court deciding cross-motions "must consider each motion separately, drawing inferences against each movant in turn." *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995); *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981) ("the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration"). All doubts about factual issues must be resolved in favor of the non-moving party, and all reasonable inferences must be drawn in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995).

### B. EXPERT TESTIMONY ALONE CAN CREATE A SUFFICIENT FACTUAL DISPUTE TO DEFEAT SUMMARY JUDGMENT.

Expert opinion evidence is admissible when: (1) the subject of the testimony is beyond the "common knowledge of the average layman; (2) the witness has sufficient expertise; and (3) the state of the pertinent...knowledge permits the assertion of a reasonable opinion." *Maffei v. Northern Insurance Company of New York*, 12 F.3d 892, 897 (9th Cir. 1993). In a summary judgment context, courts should not exclude expert testimony if such exclusion eliminates a permissible inference in the non-movant's favor:

> [I]t is reversible error in a summary judgment proceeding to exclude expert testimony offered by a plaintiff to a factual issue if the exclusion deprives the plaintiff of a permissible inference that could

> be drawn by the finder of fact on that issue.

*Id.* Indeed, "[e]xpert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton International Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994), *citing Bultheis v. Rexall Corp.*, 789 F.2d 1315, 1317-18 (9th Cir. 1985).

In its gatekeeper role for expert testimony, the trial court has wide latitude to determine whether proffered evidence is relevant and reliable. *E.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Therefore, even if the opposing party's expert disagrees with an expert's methodology, so long as the expert's testimony is reliable, the appropriate forum to determine which theory is more sound is during trial, not on a motion for summary judgment. *See, e.g., EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000).

## C. This Court And The Federal Circuit Hold That Summary Judgment Is An Inappropriate Method To Reject Lost Profits Claims.

This Court and the Federal Circuit have repeatedly rejected the Government's attempts to reject lost profits claims in *Winstar* cases at the summary judgment stage. The overwhelming majority of *Winstar* cases have proceeded to trial on the issue of damages claims for lost profits due to material facts remaining in dispute after discovery. *See, e.g., California Federal Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001); *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 125 (2004); *S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 57 Fed. Cl. 598, 622, 627 (2003); *Suess v. United States*, 52 Fed. Cl. 221, 228 (2002); *Bank United of Tex. FSB v. United States*, 50 Fed. Cl. 645, 645 (2001), *aff'd in part, rev'd in part*, 80 Fed.Appx. 663 (Fed. Cir. 2003).

Indeed, as the Federal Circuit noted:

> Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute. [Here, Plaintiff] submitted considerable

> evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits.

*Cal. Fed. Bank*, 245 F.3d at 1350. "[T]his [c]ourt often has rejected the use of summary judgment in considering claims for expectancy damages." *Astoria Fed. S&L Ass'n v. United States*, 72 Fed. Cl. 712, 717 (2006).

Given the fact-centric analysis required to determine whether expectancy damages should be awarded, this Court "has struggled with the appropriateness of granting motions for summary judgment with regard to expectancy damages claims." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 233-34 (2003). Relying on *Cal. Fed.*, several judges of this Court reject the use of summary judgment to foreclose lost profits damages claims. *See Globe Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 86, 96 (2003); *Anchor Sav. Bank, FSB v. United States*, 59 Fed. Cl. 126, 143 (2003); *Citizens Fin. Services, FSB v. United States*, 57 Fed. Cl. 64, 73 (2003); *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108, 134 (2003); *Columbia First Bank, FSB v. United States*, 54 Fed. Cl. 693, 702 (2002); *Citizens Fed. Bank, FSB v. United States*, 52 Fed. Cl. 561, 563 (2002).

Indeed, research discloses only four cases in which *Winstar* lost profits claims have been decided on summary judgment, and these four decisions expressly recognize that it is only "the *rara avis*…that could merit summary judgment [on a lost profits claim]." *See Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223, 235-36 (2003) (granting summary judgment given complete lack of proof of any indication that plaintiff bank would have allocated its hypothetical asset base absent the breach in a certain way); *Southern National Corp. v. United States*, 57 Fed. Cl. 294 (2003) (same); *Standard Federal Bank v. United States*, 62 Fed. Cl. 265, 298-99 (2004) (granting summary judgment only after holding "adversarial, mini-hearing" that included direct testimony and cross-examination of expert witnesses as well as considering post-hearing briefs);

*American Federal Bank, FSB v. United States*, 68 Fed. Cl. 346, 358-59 (2005) (thrift's model for lost profits damages was "so far removed from actual events" that summary judgment for the Government was appropriate). As discussed below, in contrast to *Fifth Third*, *American Federal*, *Southern National*, Sterling's continued profitability and adherence to a business model makes measuring Sterling's damages straightforward and not speculative. App. 16-18, ¶¶ 40-45. Therefore, the Court should deny the Government's motion.

## D. A Lost Profits Measure Of Damages Is The Appropriate Method To Apply Under The Facts Presented By This Case.

### 1. *A Lost Profits Measure Is An Appropriate Method To Calculate The Amount Of Damages Due To Breach Of A Contract To Recognize Goodwill.*

"The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003). These expectancy damages "are normally equated with lost profits, although other measures of damages may be applied. *American Federal Bank*, 68 Fed. Cl. at 355; *California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001). Williston notes:

> Because the goal of protecting the plaintiff's expectation interest is to place the promisee in the same position as performance would have done, it follows that an award of damage will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because **only by awarding lost profits will the plaintiff be made fully whole**.

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002), p. 24 (emphasis added). To establish lost profits, a plaintiff must demonstrate by a preponderance of the evidence that: "(1) the loss was a proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating those lost profits with reasonable certainty." *Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 344 (2004) (awarding $5,602,000 of damages under lost profits analysis after trial).

The Government does not dispute that Sterling's lost profits were foreseeable.[3] The Government disputes only whether Sterling can demonstrate that the lost profits were proximately caused by the breach and whether lost profits can be calculated with reasonable certainty. Specifically, the Government alleges that Sterling's model, created by Dr. Horvitz, is speculative and cannot support an award for damages for four reasons: (1) Sterling allegedly cannot show that, absent the breach, Sterling would have met FIRREA's capital requirements; (2) Sterling allegedly fully mitigated its damages by "replacing" the contractual goodwill eliminated by FIRREA and Dr. Horvitz assumed otherwise; (3) Dr. Horvitz incorrectly assumes that Sterling could not increase its assets during the term of the injunction; and (4) no assets are identified by Dr. Horvitz that Sterling would have acquired absent the breach. The Government's assertions lack merit.

Sterling, unlike the vast majority of *Winstar* plaintiffs, is able to utilize damages models based on the performance of the actual bank because it was not closed down. Further, under the terms of the contracts at issue, Sterling is permitted to count its contractual capital as regulatory capital under the regulations in place at the time of the contracts, and, therefore, the Government's assertion that FIRREA would have limited the amount of such capital for regulatory purposes in the but-for world fails. Dr. Horvitz's model is based upon the same principles utilized by financial markets and analysts and confirmed by the performance of the actual bank, and should be accepted by the Court.

2. *Sterling Would Have Met Capital Requirements Absent The Breach.*

The fulcrum of the Government's argument is the assertion that, even assuming Sterling was

[3] In *Winstar*, the Supreme Court determined that the foreseeable and direct consequence of the Government's breach was to deny to victims of the breach profits the victim thrifts would have had the capacity to generate through their income-producing activities. *See* 518 U.S. at 851 ("the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)."). Here, therefore, the purpose of the contracts was to provide Sterling with the opportunity to increase profits by leveraging goodwill. *See, e.g., id.* at 850-51, 861 (nature of the underlying transactions demonstrated that goodwill was a valuable "cash substitute," "allow[ed] the thrift to leverage more loans," and was "critical to make the transaction[s] possible in the first place").

permitted to utilize the full amount of its contractual capital from the Lewis Federal and Tri-Cities acquisitions, Sterling still would have failed to meet the regulatory capital requirements of FIRREA in the but for world, rendering it unable to profit even if the breach had not occurred. *Def's Brief*, pp. 15-16. This claim is based on a new theory (from a new expert, W. Barefoot Bankhead) that the Government would not have permitted Sterling to utilize both its contractual capital and the so-called non-contractual goodwill from the Central Evergreen acquisition. *Id.* This claim lacks merit and Sterling has moved that Mr. Bankhead's opinions not be considered by the Court and stricken under RCFC 56(e). *See Plaintiff's Motion To Strike The Expert Report of W. Barefoot Bankhead* ("*Pl's Mot. To Strike*"), filed herewith and incorporated herein by reference. In short, Mr. Bankhead's opinions cannot establish material facts which the Court may consider on summary judgment because they are legal conclusions as to the meaning of FIRREA and its application to Sterling's contracts with the Government. *Pl's Mot. To Strike*, pp. 2-4. Mr. Bankhead's opinions also cannot be considered in support of the Government's motion for summary judgment because the opinions contradict both established *Winstar* precedent and the express terms of Sterling's contracts with the Government. *Id.*, pp. 2-6.

More specifically, Mr. Bankhead disregards that, under established *Winstar* precedent and the express terms of Sterling's contracts, the capital credits obtained as part of Sterling's acquisition of Lewis Federal and Tri-Cities count fully toward the regulatory capital requirements without any limitation imposed by FIRREA. In other words, Sterling's contractual capital stands on equal footing with that of cash or stock under FIRREA, and cannot be limited by the ostensible requirement under 12 CFR 567.1(w) that the contractual capital be considered as "qualifying supervisory goodwill, a classification of regulatory capital that did not exist at the time the parties entered into their agreements. *Id.* at pp. 2-6. As the Supreme Court held:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, **the Bank Board had to**

> **offer a 'cash substitute'** to induce a healthy thrift to assume a failed thrift's obligations.

*Winstar*, 518 U.S. 839, 849-50, 116 S.Ct. 2432, 2443 (1996) (emphasis added).

Sterling's contracts make clear that the capital acquired by virtue of its acquisitions of Lewis Federal and Tri-Cities was as defined under the regulations as then existed and not under FIRREA's regulations. *Pl's Mot. To Strike*, pp. 4-6. It is more than obvious that Sterling and the Government could not have agreed that the capital Sterling acquired was to be classified as a lesser form of regulatory capital entitled "qualifying supervisory goodwill" when such a classification did not even exist at the time of contracting.

In sum, *Winstar* precedent and the express terms of Sterling's contracts with the Government establish, as a matter of law, that, to apply, directly or indirectly, FIRREA's definitions of regulatory capital to Sterling's contracts in the but for world, and the restrictions that said definitions would place on Sterling's contractual capital in the but for world, would constitute a different sort of breach. *Pl's Mot. To Strike*, pp. 3-6. Therefore, the argument based on the opinions of Mr. Bankhead should be rejected out of hand.

3. *The Undisputed Facts Demonstrate That Sterling Did Not Fully Mitigate For The Government's Breach Through Its 1991 Offering.*

The Government argues that Dr. Horvitz's model is flawed because Sterling replaced the regulatory capital eliminated by FIRREA through a 1991 offering, fully mitigating any harm caused by the breach. This argument lacks merit.

The Government relies upon deposition testimony of Sterling's CEO, Harold Gilkey, and argues that Mr. Gilkey testified that Sterling would not have raised capital in 1991 absent the breach.[4] Mr. Gilkey, however, was attempting to answer improper hypothetical questions posed to

---

[4] Sterling notes that the deposition testimony relied upon by the Government was subject to objections by counsel for Sterling. Sterling objects to consideration of these questions as improper hypothetical questions. Because the questions are flawed, the answers thereto are inadmissible and should not be considered by the Court.

him by the Government. Mr. Gilkey did not testify, or even imply, that Sterling would not have raised capital in 1991 in the but for world. Instead, Mr. Gilkey's statements concerning raising capital in 1991 related to the actual, shrunken bank at $600 million, not the but for bank. The testimony cited by the Government is simply not probative of anything related to the but for world.

According to Mr. Gilkey's declaration filed herewith, had the Government asked Mr. Gilkey what Sterling would have needed to do at that time had the Government not breached its contracts in the first place and reduced Sterling's capital, as opposed to a hypothetical question about the already damaged bank, the answer would have been that Sterling would have needed more capital. App. 1-2, ¶¶ 4-5. Indeed, Sterling raised capital in almost every year during this time frame; Sterling raised or the holding company downstreamed capital in 1991 (fiscal year 1992), 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, and 2006. App. 1-2, ¶ 4. Given its aggressive growth strategy, Sterling has always needed more capital. *Id.*

Sterling's position is analogous to that of a lost volume seller as considered in a breach of contract situation in the sales context. Like a lost volume seller, Sterling: (1) possessed the capacity to raise more capital (or, stated differently, make additional sales and profits); (2) it would have been profitable for Sterling to raise more capital; and (3) Sterling would have raised more capital absent the breach. *See R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) (company established status as lost volume seller despite being unable to point to exact unit and resale buyer of unit at issue in breached contract). Stated differently, the lost volume seller, like Sterling, is unable to take other opportunities for profits because of its inability to gain the initial profit from the breached contract. Sterling will always be behind on its profits compared to where it would have been absent the breach. *See Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619, 627 (3d Cir. 1990) (even where the seller resells the item, the seller is still not made whole because of the lost profit from the initial breach); *Advanced Medical, Inc. v. Arden Medical*

*Systems, Inc.*, 955 F.2d 188, 200-01 (3d Cir. 1992) (a lost volume seller "will always, in the end, have only one sale instead of two, and therefore will suffer damages"); *Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218, 221 (3d Cir. 1998) (vacating order of summary judgment as to damages where disputed facts remained as to whether seller lost other sales as a result of having to resend shipment to buyer after buyer lost first shipment in transit). In sum, Sterling will always have had one offering instead of two, and be behind on its growth due to the cancellation of the 1989 offering.

Importantly, the Government's motion seeks to discredit the opinion of Dr. Horvitz by claiming that he ignored Sterling's mitigation efforts. This is not true. As noted above, the 1991 offering certainly mitigated for the breach in the sense that, like the preliminary injunction, it saved Sterling from the Government which was bent on closing the institution, but it did not fully mitigate – it did not restore Sterling to the position it would have occupied absent the breach. Further, Dr. Horvitz explicitly considered the actual mitigation steps taken by Sterling, namely, the lawsuit (which minimized the potential damage that would have occurred if Sterling had been forced to close) and the shrinkage of Sterling's assets and abandonment of its growth plan. The Government admits so when it claims that Dr. Horvitz improperly assumed that Sterling was unable to grow its assets during the term of the injunction. The Government simply does not like Dr. Horvitz's conclusion as to the effect of these mitigating steps. In sum, because Dr. Horvitz considered the mitigating actions taken by Sterling, his model is valid and admissible evidence of the quantity of the harm suffered by Sterling.

4. *Dr. Horvitz Properly Opined That Sterling Suffered Damages Before And During The Period In Which The Temporary Injunction Was In Place.*

The Government raises in its instant Motion the same argument rejected by the Court during the liability phase of this action, that Sterling could not have been harmed during the period when the preliminary injunction was in place, and now argues that Dr. Horvitz's model fails for assuming

that Sterling could not grow its assets during that time. In its Supplemental Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Concerning Liability Issues and in Support of Defendant's Partial Motion to Dismiss and Cross-Motion for Partial Summary Judgment (the "Supplemental Memorandum"), the Government claimed that Sterling had no cause of action for damages because the injunction prevented the Government from enforcing any regulation against Sterling inconsistent with the acquisition agreements. App. 382. The Court rejected this argument. *See Sterling Savings, et. al. v. United States*, 57 Fed. Cl. 234, 234-35 (2003).

**a. The Government Permanently Damaged Sterling Prior To The Injunction, And The Injunction Did Not Cure The Damage That Was Already Done.**

The Government does not dispute that, prior to the injunction, Sterling suffered significant damage as the result of the Government treating Sterling as an undercapitalized, troubled thrift. The Government forced Sterling to drastically shrink its business operations and abandon its growth strategy. App. 1165:8-25; App. 849-50. Sterling could not grow the company nor loan money in the same manner as before the breach. *Id.*; App. 1166:15-1167;12. Sterling lost key personnel and suffered damage to its reputation. App. 1118:15-1120:2; App. 1286:15-1287:15; App. 1213:7-1214:24; App. 1217; App. 1219:22-1233:24, 1234:3-1235:14; App. 1238-39; App. 1255-57. But for the breach, Sterling would have raised regulatory capital pursuant to its agreements with the Government and, in turn, would have generated more earnings and more business opportunities from the leverage of that capital. App. 1168:3-12, 1169:19-1172:2; App. 1178:13-17; App. 1127:18-1128:5. Instead, the Government considered Sterling undercapitalized and placed a stranglehold on its daily operations, causing Sterling to lose an otherwise irreplaceable economic advantage for which it bargained. *Id.*; App. 1165:8-25; App. 849-50; App. 1166:15-1167:12.

Moreover, the injunction did not cure, nor prevent, the severe effects of the Government's breach. As a practical matter, the injunction merely provided Sterling time to raise the capital

needed to meet FIRREA's standards before being exposed to receivership. App. 1170:14-22, 1171:1-7, 1171:24-1172:10, 1173:19-1174:6. Had the Government honored the contracts, Sterling irrefutably would have had excess capital to leverage and thus could have grown and become even more profitable between 1989 and today. App. 1167:1-23, 1168:2-12, 1169:21-1170:11; App. 1179:23-24, 1180:11-14, 1181:11-15.

**b. The Harm Continued During The Injunction.**

The injunction, contrary to the Government's argument, did not allow Sterling free rein to grow and profit. As an initial matter, the Government ignores the very nature of a temporary injunction. The temporary injunction was, by its terms, a stop-gap measure which Sterling could not assume would continue indefinitely. For Sterling to act as though the injunction was permanent would have been fiscally irresponsible and foolhardy. During the effective term of the injunction, the Government successfully moved for partial reconsideration and filed an appeal with the Ninth Circuit. *See Sterling Savings Association v. Ryan*, 959 F.2d 241 (9th Cir. 1992). Had Sterling acted if no breach had occurred and made growth-based decisions upon a belief that the Government would act in good faith, Sterling would have exposed itself to ruin had the injunction been vacated (and it was). *See id.* At the very least, Sterling's officers reasonably perceived that the bank would suffer tremendous harm if an aggressive growth plan were implemented pending appeal. App. 1258;25-1270:17.

The Government supposes that because it was not held in contempt for violations of the temporary injunction, it did not breach the contracts. In reality, Sterling was treated as a troubled thrift even during the period in which the injunction was in place. Sterling, knowing that the injunction was on appeal, could not return to its pre-breach mode of operations. The Government continued to regulate Sterling and restrict its activities, despite the injunction. Under the guise of safety and soundness concerns (which arise from a baseline concern of lack of appropriate capital),

the Government imposed more and more demands on Sterling. For example, five days after the injunction was imposed, the Government notified Sterling that it must report all actions inconsistent with the restrictions imposed upon it prior to the injunction. App. 848. Subsequently, the Government sent other letters further manifesting its intent to restrict Sterling's operations. App. 824; App. 851; App. 856. This correspondence clearly telegraphed the Government's intent to regulate Sterling's growth and business despite the injunction:

> As always appropriate internal controls should be in place **to ensure that all regulatory requirements are adhered to**...

*   *   *

> The listing attached to your letter does not correctly reflect the asset growth restrictions that Sterling **is** subject to. By virtue of the denied capital plan, **no growth is permitted**. In addition, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. The institution's activities are limited to those specified in the capital plan.

App. 852-53 (emphasis added). The Government's use of the present tense signifies that, regardless of the injunction, the restrictions are still applicable. Sterling's CEO was "scared to death" of what the regulators would do during this time, and highly concerned that the Government would shut down the Bank through another avenue. App. 1258:25-1270:17. Sterling was acutely mindful of the Government's continued insistence that Sterling observe Government-imposed limits on its business activities, backed by threats that, notwithstanding the injunction, the Government could declare Sterling's actions "unsafe or unsound." App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9. Simply put, it is absurd to claim that Sterling would have or could have attempted to implement an aggressive growth strategy in the contemporaneous regulatory environment.

In short, these restrictions, imposed during the effective term of the injunction, would not have been implemented had Sterling been capital-compliant as it would have been absent the breach. The injunction merely allowed Sterling some time to liquidate assets and plan to raise capital so as to be prepared for either a reversal of the injunction or other ruling as to the breach.

In the liability phase, the Court recognized the disputed facts related to whether Sterling could show harm during the period in which the injunction was in place and found that Sterling "has asserted sufficient economic injury as a result of the breach to establish standing [for harm during that period], regardless of the injunction." 57 Fed. Cl. at 237. The Court expressly noted the disputed facts raised by the parties and discussed above. Thus, though the Government may argue that the injunction has some effect on the measure of damages during that period, the Government cannot claim that any claim for damages during that period must fail as a matter of law.

More importantly, the Government itself recognized that Sterling presented disputed facts regarding the effects of the injunction during the liability case. *See* App. 500 ("plaintiffs' factual assertions create genuine issues"). The Government further acknowledged even then that Sterling's officers testified of the effects of the injunction and Sterling's fear that the injunction may not continue post-appeal. App. 501-02. While the Government then characterized this testimony as "self-serving" (and now ignores its very existence), these facts clearly are disputed and must be taken in Sterling's favor. Therefore, summary judgment denying Sterling any right to damages claimed during the period in which the injunction was in place is precluded.

*5. Dr. Horvitz's Model Accounts For The Foregone Assets.*

The Government claims that Dr. Horvitz's model is speculative because he does not identify the exact assets he assumes would have been acquired by Sterling and "merely assumes that the but-for thrift would have replicated what Sterling did in the real world." *Def's Br.*, p. 23. Stated differently, the Government asks this Court to reject a model based on the rationale that no one can be sure what Sterling would have done if the breach had not occurred and, therefore, any predictive analysis must be "speculative" as a matter of law. The Government misses the point. Such predictive analysis is exactly what economic experts do. No one, not even the Government's experts, has the ability to state with absolute certainty, what would have happened in the past if

certain events (the breach) had not occurred. The standard for expert testimony does not require such talents, the law does not require such certainty, and that standard should be summarily rejected by this Court.

Indeed, Dr. Horvitz's model is not based on economic forecasting because Sterling, almost uniquely among Winstar plaintiffs, survived the breach and profited. Dr. Horvitz assumed that but-for Sterling would earn profits at the same rate as the actual Sterling. App. 18-20. In other lost profits cases, this assumption is invalid due to the other thrifts' history of operating losses or closure upon enforcement of FIRREA. App. 18, ¶ 45. Here, the model is a straightforward method of calculation the lost profits of Sterling. The amount of regulatory capital Sterling would have had if its contracts had been honored by the Government would have been used to support additional assets. App. 19-26. Sterling would have earned a return on those assets. *Id.* These earnings would be added to capital and allowed the acquisition of additional foregone assets that would yield additional profits. *Id.* Such cumulative lost profits from the time of the breach to the present represent Sterling's damages.

To calculate the return on assets, Dr. Horvitz assumed that the but for Sterling would have earned at the same rate as the actual Sterling. App. 20-21. This assumption, based on undisputed facts, is conservative because: (1) as Sterling grew, its fixed overhead costs would have been spread under economies of scale; (2) absent the breach, Sterling would have had the opportunity to acquire failing thrift institutions from the Government, which would have been more profitable than Sterling's actual return on assets; and (3) the balance between Sterling's earnings assets and interest-bearing liabilities would have worked to the earnings advantage of but-for Sterling for the first few years until the goodwill shrank in comparison to Sterling's assets. *Id.* The assumption that but-for Sterling would have earned returns at at least the same rate as actual Sterling is further verified by the return on average assets obtained by Sterling when the actual bank reached the size

of the but-for bank. *Id.* Indeed, the Government cites no reason why Dr. Horvitz cannot reasonably assume that the but-for bank (operating with identical management and business strategy in the same and ideal economic environment) will not grow at least at the rate of the actual bank. Absent evidence of an actual slower growth rate, which the Government has not provided, Dr. Horvitz's method remains the only analysis before the Court quantifying Sterling's lost profits.

The Government argues that because Dr. Horvitz does not specify the exact assets that he assumes Sterling would have acquired absent the breach, Sterling cannot prove damage from lost opportunities. This argument is not supported by any economic reason why the actual assets held by actual Sterling would not have been available to but-for Sterling. Moreover, the foregone assets are not a large part of the relevant market (or, indeed, even an amount that could affect the market), but also are less than 15% of the actual bank's assets in most years. App. 22-23, ¶ 52. Dr. Horvitz does not depend upon accessibility to exotic financial instruments or strange holdings, but the actual types of assets that were readily available at the time of the breach through the present and in which Sterling customarily invested. *Id.* There is no reason why he is required to list each and every loan that Sterling may have acquired.

Indeed, Sterling has, in every year of its existence, forecasted and achieved growth. App. 3, ¶ 9. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth, and then go to the market to find those assets. *Id.* It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. *Id.* Using this method, Sterling has grown to over $10 billion in assets. *Id.* To be clear, Sterling finds billions in new assets every year. *Id.* Sterling originated $5 billion in new assets in 2006. *Id.* It is beyond dispute that, if its contract capital were restored, Sterling could easily find the assets to be supported by that capital. *See id.*

However, even assuming Dr. Horvitz is required to describe specific acquisitions available to Sterling but foregone because of the breach, both Dr. Horvitz and numerous fact witnesses cite definitive acquisitions consistent with Sterling's pre-breach growth plan that Sterling could not make as a result of the Government's breach. Dr. Horvitz notes that the types of assets that Sterling would have acquired are known both from Sterling's business plans and the known market. App. 22-23, ¶ 52. In addition, as detailed below, Sterling's officers and employees testified at length regarding Sterling's abandonment of its growth strategy in response to FIRREA, the inability to grow in areas which would have been highly profitable given the economic boom of the Pacific Northwest at that time, foregone investment opportunities, and lost customers and the inability to serve new customers as a result of the breach.

**a. Sterling Was Forced To Reduce Its Operations And Forgo Profitable Business Expansion Of Its Subsidiary Companies.**

FIRREA forced Sterling to shrink its business operations and abandon its growth strategy. For example, the Government's breach severely damaged Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage. App. 1290:5-9. Residential construction lending was a high profit area. App. 1290:10-14. Prior to the breach, Sterling intended to expand Action Mortgage into Seattle, Portland, Vancouver (WA), Lake Oswego (OR), Boise and Salt Lake City. App. 1290-91. Action's business plan was to quadruple lending activity, to be achieved through opening these offices. App. 1292:9-13. However, the Government limited Sterling's ability to lend for construction. Despite this limitation, Sterling attempted to support an Action Mortgage office in Salt Lake City, but could not make a profit without the ability to engage in construction lending. App. 1290:21-25. Sterling thus had to close that office. *Id.* Sterling was able to keep open a Boise office to handle single family loans, but could not expand that office into residential construction lending, the more profitable side of Action Mortgage. App. 1291:1-4.. Utah subsequently underwent an economic upswing, which Sterling could not benefit from because

the Action office had to be closed. App. 1283:15-25.

The restriction also stopped Sterling from opening Action Mortgage offices in Seattle, Portland and Lake Oswego until after January of 1992. App. 1291:12-25, 1292:4-6. By that time, Sterling had lost contact with the persons it intended to hire to supervise those offices, thus leading to further cost to find appropriate staff. App. 1291:15-17. Sterling eventually opened the Seattle and Lake Oswego offices, which have been highly profitable. App. 1291:19-21. However, Sterling lost approximately years of time in Lake Oswego and Seattle due to the breach. *Id.*

Sterling faced similar problems with its Intervest subsidiary. Two-thirds of the existing staff of Intervest left following the Government's breach, including all of the big producers of assets, and Intervest was forced by the breach to eliminate almost all of its lending. App. 1286:22-1287:15. Had the larger producers stayed and the breach not occurred, Intervest would have been able to substantially increase the size of its staff and therefore the size of its assets and lending capacity. *Id.* Specifically, Intervest's operations would have expanded to cover northern California, Oregon, Idaho, parts of Utah, Montana and Washington. App. 1287:9-15. With this capacity to follow its customers to this geographic region to service specific loans and interests, Intervest would have created a portfolio of significant value to Sterling.

**b. Sterling Lost Specific Accounts And Transactions From Current Clients, And Could Not Service New Accounts Due To The Government's Breach And Restrictions.**

Additionally, Sterling suffered a reduction in servicing income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans. App. 1116:2-1117:15. Sterling was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. App. 1285:1-3. The Government forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. Sterling also was forced to stop gathering uninsured deposits. App. 1285:4-9.

Moreover, Sterling lost specific deposits and/or customers due to the OTS restrictions on Sterling in the wake of FIRREA. Sterling lost many customers with deposits in excess of $100,000, including a priest in Salish who had deposits in excess of $ 1 million. App. 1255:1-11, 1256:15-19, 1257:1. Also, Condron Homes and Baker Construction left due to OTS limitations on Sterling. App. 1255:12-18. Also, Fred Burstad and Burstad Construction of Seattle left due to OTS limitations. App. 1257:15-23. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions; "[Sterling was] not only turning them away, we were walking them across the street to our competitors to avoid the restrictions that we were placed under." App. 1282:20-23. The effects of having to direct its own customers to its own competitors, both financial and in the context of public relations in a small community, cannot be underestimated.

Moreover, the public was aware of the Government's adverse actions toward Sterling, and many of Sterling's customers, concerned about the Bank's viability, chose to leave for other financial institutions. Specifically, the following customers left Sterling as a result of uncertainty about the Bank: (1) Boyd, Bjockman & Frickle, an accounting firm with term loans for equipment and leasehold improvements as well as a credit line; (2) CRM Optical, a contact lens manufacturer with multiple term equipment loans and a credit line; (3) DIVCO Energy Control Company, a heating and air conditioning company, and its principal, Robert Nelson, considered a $5 million customer, with several equipment loans and a large credit line; (4) Latah Creek Winery, which had a $1 million equipment loan and a credit line; (5) Miller-Jordan Travel, a travel agency, had a credit line and a few equipment term loans; (6) Northern Technologies, Inc., a technology company that manufactured surge protectors, had a rapidly increasing credit line designed to keep pace with the company's growth; and (7) Northwest Ski Exchange, a retail shop, had several term loans and inventory financing. App. 1184:8-1185:16, 1186:17-1193:7, 1193A:14-1193B:5, 1193B:24-

1204:25, 1205:12-1210:18, 1211. Sterling's inability to continue commercial activity and the uncertainty of when the issues with the Government would be resolved cost Sterling many valuable business customers, including the following: (1) Aslin-Finch; (2) Dane Armstrong; (3) Ted Beasley; (4) Larry Biggs; (5) Cedar Builders; (6) Empire Jewelry and Loan; (7) George Hansen; (8) Don Howell; (9) Craig Jacobs; (10) Bill Lawson of A & A Construction; (11) Michael Manz; (12) Metallic Arts; (13) Grant Person; (14) Randy Ramey of Ramey Construction and Ramey Development; (15) Red Barn, NSE Inc.; (16) Doug Romney; (17) Roy Mitchell, Inc.; (18) Kevin and Chris Rudeen, Rudeen Development; (19) John Schreinir; (20) Harry and Daryl Siria; (21) G. Wesley Sodoroff; (22) Vandervert Development; (23) Mike Walker; and (24) Woodland Montessori School. App. 1213:7-1214:24, 1217.

Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them, including the following: (1) Bill Lawson, who sought approximately $1.5 million; (2) Dick Vandervert; (3) Dick Villelli, who sought approximately $2.0 million; (4) Harlan Douglas; (5) Richard Naccarato of Cedar Pines General Partnership; (6) Bob Spears; (7) Ted Gunning; (8) Dean Grafos of Opportunity Plaza; (9) Thompson and Brumback. App. 1219:22-1233:24, 1234:3-1235:14.

In sum, Sterling not only was unable to grow through new customers due to the public concern over its problems with the Government, but it had to turn away the customers it already had.

**c. Sterling Was Unable To Take Advantage Of Investment Opportunities Because Of Capital Deficiencies.**

Just as Sterling could not expand its subsidiaries or keep pace with its customers' needs, without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities. App. 1279:13-25, 1280:17-25, 1281:1-8. The acquisition of two Great American branches was denied by the OTS. App. 1121:17-24. Further, a

number of other acquisitions failed in part or as a direct result of Sterling's post-FIRREA, weakened capital position. App. 1132-1144. For example, Sterling entered into discussions to acquire Horizon Bank, but could not satisfy Horizon as to Sterling's level of capital. App. 1131-32. Likewise, Intervest ended negotiations for an acquisition due to the capital structure and Sterling's problems with the Government. App. 1132-33. Sterling started discussions with Great Northwest Savings and Vancouver Federal in 1991, but Sterling was unable to convince either institution to go forward because of the Government's treatment of Sterling and Sterling's resultant poor capital position. App. 1136-38. Sterling attempted to acquire Summit Savings in the mid-1990s, but Summit chose to go with another institution due to Sterling's capital structure and the breach. App. 1134-35. Sterling had similar experiences with Gibraltar Savings, Willamette Savings, Hamilton Financial Services, and Security Pacific. App. 1138-44. All of these transactions may have been completed if Sterling had had sufficient capital to be a competitive candidate for acquisition. *E.g., id.*

Dr. Horvitz explicitly considered these potential acquisitions when formulating his analysis. The Government's argument that Sterling cannot show definitive losses of assets fails. Unlike in *Fifth Third* and *Southern National*, Sterling can point to specific transactions that could not be completed, and specific customers lost, due to the Government's breach. Therefore, Sterling's lost profits theory states a viable damages claim.

6. *Contrary To The Government's Assertions, Dr. Horvitz Considered Sterling's Competitors In His Analysis.*

Finally, the Government claims that Dr. Horvitz's model is invalid because "the model fails to account for, or even acknowledge, that there would have been competition in the market for the assets Sterling assumes it would acquire." *Def's Br.*, p. 3. To the contrary, Dr. Horvitz did examine the effect of Sterling's competitors, and testified to that effect in response to Government deposition questions:

> Q: So you can ignore the actions that would have been taken by competitors then?
>
> A: I'm saying this would have been so small in the context of a competitive and efficient market that it would not have been perceptible to – to other participants in the market.
>
> * * *
>
> Q: But that conservative approach wasn't based upon some study of what their competitors would have done?
>
> A: **I have looked at their competitors and their market share**. It's not that I have ignored that. **I have concluded that the – that the effect on the market would have been insignificant.** It's saying that it's insignificant or saying that it's zero, doesn't mean that I have ignored it.

App. 1385:1-6, 13-21 (emphasis added). The Government's argument that Dr. Horvitz did not consider other competitors thus fails; his expert opinion is that, given the size of Sterling, the effect of the but-for bank on the market would have been minimal.

### E. DR. JAMES' COST OF MITIGATION ANALYSIS IS VALID.

Though Sterling does not believe that Government promises can be replaced,[5] Sterling, in an abundance of caution, asked Dr. James to calculate the cost of replacement of the Government's broken promises to Sterling. Sterling notes, however, that the facts of this case demonstrate that the proper measure of damages is lost profits, as measured by Dr. Horvitz.

Should this or another court disagree, however, Sterling promulgates through Dr. James an analysis of damages incurred assuming that Sterling was able to fully mitigate for the losses by raising capital sufficient to return to compliance under FIRREA. This theory calculates the actual costs to Sterling of becoming compliant through an actual capital raising. App. 187-310.

The Government's main opposition to Dr. James' analysis is the claim that there can be no damages for issuing common stock except for transaction costs (though the Government does not

---

[5] It is Dr. James' expert opinion that the supposition that Sterling actually replaced the supervisory capital generated by the contracts is counterfactual, but he assumes as such for the purposes of his analysis. App. 255, n.5.

attempt to quantify these costs). This contradicts basic economic and finance principles. An investor who purchases common stock does not do so as a charitable act. The Company is obligated to retain earnings and generate profits. Indeed, both the Supreme Court and the Federal Circuit has recognized that common stock has a cost:

> The cost of each component of the utility's capital is considered, *i.e.*, the cost of debt, the cost of preferred stock, **and the cost of common stock [,] [t]he latter being determined by the return required to sell such stock upon reasonable terms in the market.**

*Duquesne Light Co. v. Barasch*, 488 U.S. 299, 312 n.7 (1989) (emphasis added) (internal citation omitted) (alterations in original). The Federal Circuit has explicitly rejected the Government's argument:

> We see no abuse of discretion in the trial court's methodology for calculating the cost of replacement capital. The court correctly discounted the argument made by the government's expert that capital has no cost other than transaction costs, as this court had already rejected the same argument.

*Home Savings of America v. United States*, 399 F.3d 1341, 1354 (2005), citing LaSalle Talman, 317 F.3d at 1374-75. Other federal appellate courts likewise recognize that all capital raised by corporations has a cost, regardless of whether the capital investor holds debt instruments or common stock equity. *See City of Los Angeles v. United States DOT,* 165 F.3d 972, 979 (D.C. Cir. 1999) ("[C]apital costs of the business.... include the service of the debt and dividends on the stock"); *see also Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990); *United Gas Pipe Line Co. v. Federal Energy Regulatory Com.*, 618 F.2d 1127, 1131 (5th Cir. 1980); *Chicago & North Western Transp. Co. v. United States*, 582 F.2d 1043, 1055 n.23 (7th Cir. 1978); *State Corp. Com, v. Federal Power Com.*, 206 F.2d 690, 722 (8th Cir. 1953).

Here, Dr. James takes the actual costs to Sterling of mitigating its damages from the Government's breach and calculates, using economic principles of valuation, the price paid. Thus, Dr. James' analysis is not "hypothetical," but based on the actual costs. Here, unlike *LaSalle*

*Talman*, *Granite Management Corp. v. United States*, 58 Fed. Cl. 766 (2003), *aff'd in part, remanded in part on other grounds*, 416 F.3d 1373 (Fed. Cir. 2005), and *Citizens Financial*, the mitigation theory follows what plaintiff actually did. The analysis is based upon stock issuance to replace capital, the actual methodology used by Sterling. The Government's bare assertions that his assumptions, based upon Sterling's actual actions, are in fact groundless should be rejected.

**F. STERLING HAS DEMONSTRATED THAT ITS WOUNDED BANK CLAIMS WERE CAUSED BY THE BREACH.**

Wounded bank damages are costs resulting from a bank's "perilous financial condition created by a breach of contract." *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402, 434 (2000), *citing Cal Fed*, 43 Fed. Cl. at 448. Such costs are awarded to "reimburse [the thrift] for the losses caused by its reliance on the contract, and to put the thrift in as good a position as it would have occupied if the contract had never been made." *Franklin Fed*, 55 Fed. Cl. at 123-24 (awarded summary judgment in favor of thrift on wounded bank claim). Sterling thus must put forward evidence tending to prove that the breach was a substantial factor in causing such damages. *Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004). However, causation is a question of fact which ordinarily should be determined at trial. *Id.* at 91, *citing Globe Savings v. United States*, 59 Fed. Cl. at 98; *Anchor Savings*, 59 Fed. Cl. at 147, *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001).

The Government's argument related to wounded bank damages focuses on the fact that Dr. Horvitz devoted less space in his report to these claims and that Dr. Horvitz relies upon facts and calculations conducted by Daniel Byrne, Sterling's Chief Financial Officer. Contrary to the Government's assertions, expert testimony is not invalid because it is succinct, nor because it relies upon facts from non-expert witnesses. As discussed below, Sterling has demonstrated wounded bank damages caused by the breach.

*1. Sterling's Loss Related To The Acquisition Of The Great American Savings Bank*

*Branches Was Caused By The Breach.*

First, Sterling's claim regarding the acquisition of Great American Savings Bank branches, like the other lost opportunities described above, flows directly from the Government's breach and refusal to permit goodwill to count as regulatory capital left Sterling unable to present a tempting acquisition plan to other banks. Prior to the breach, Sterling's business plan had always included acquisitions as an appropriate method of growth. The increase in the price of the Great American Savings Bank branch is supported by testimony of Sterling officers and, as all inferences must be drawn in Sterling's favor, any attacks on the weight of this evidence is more appropriately raised at trial. The negative effect on Sterling's capital for purposes of acquisitions were a foreseeable consequence of the breach – the Government knew that by contravening its obligation to permit Sterling to permit goodwill to count as regulatory capital Sterling would be in a position of less capital and be, therefore, a less attractive acquisition candidate.

The simple fact is that, absent the breach, Sterling would have been able to acquire the branch for only $61,000, when, because of the breach, it was forced to pay $1.9 million five years later. The Government knew that that Sterling contracted regarding Lewis Federal and Tri-Cities so that it would have more capital, capital it intended to use. Because of the breach, Sterling was unable to acquire the Great American branch because the Government refused to recognize the capital attained through the contracts. Sterling's loss for this foregone asset is directly attributable to the breach, and should be compensated as wounded bank damages.

2. *Sterling Incurred Supervision Costs Due To The Breach.*

The undisputed facts establish that Sterling incurred excess supervision costs due to the breach. The Government argues that testimony of Sterling's officers and experts cannot be credited as the sole reason to attack these costs. Here, Sterling's chief financial officer and Dr. Horvitz detail the excess costs caused by the breach related to supervision. Again, in the summary

judgment context, evidence must be viewed in the light most favorable to the non-moving party. Here, the Government admits that both expert and fact witnesses testify to these costs. Without counter-affidavits or testimony, Sterling's sworn testimony on this issue "must be accepted as resolving the question." *See, e.g., Holcomb v. United States*, 146 F.Supp. 224, 227 (Ct. Cl. 1956).

*3. Sterling Suffered Losses On The CJ-4 Loan.*

The CJ-4 loan was a property in Bellevue, Washington, that Sterling committed to loan for construction prior to the enactment of FIRREA. App. 1089:12-14. FIRREA limited the size of a loan a financial institution could make to any one borrower, based on the level of capital an institution possessed. When the Government breached and refused to acknowledge the contracts for the three acquisitions, Sterling was treated as if it had deficit capital and limited to a $500,000 ceiling for a loan to any one borrower. App. 1093:6-13. Because the CJ-4 loan was in excess of $500,000, Sterling was not permitted to make additional advances against the loan commitment that was already in effect. *Id.* Because the Government would not allow Sterling to make further advances, the project fell behind on construction. App. 1091:10-1092:9. The borrowers then sued Sterling for breaching the loan commitment. *Id.* To resolve the dispute with the borrowers, Sterling was forced to foreclose on the property, repossess it, and make the improvements which the borrowers would have made if Sterling had been able to advance the funds per the loan commitment. *Id.* In the process of foreclosure, repossession and improvements, the market value of the property declined significantly. *Id.* When Sterling liquidated the property, therefore, Sterling suffered a $1.615 million loss. App. 1094:6-1095:2; App. 1288:1-3.

Sterling's inability to fulfill its contractual obligations to a borrower under the CJ-4 Loan was directly caused by the Government's restriction on the amount of funds that could be loaned to one borrower. Sterling explored the possibility of an exception and spoke to government regulators, but was denied the right to advance further funds. Taking all facts and inferences in

Sterling's favor, therefore, the wounded bank claim related to the CJ-4 Loan does not fail as a matter of law.

*4. The Government Refused To Permit The 1989 Offering And Damaged Sterling.*

The Government applies the same analysis to Sterling's claim of damages arising out of the 1989 public offering that was cancelled due to the Government's breach. The Government's refusal to approve the payment of dividends on the 1989 preferred stock offering had the effect of forcing Sterling to forgo the offering altogether. Sterling was therefore injured by the Government's prevention of the offering. Had the offering occurred, Sterling would not have lost the costs that went into the offering. A successful offering (or, minimally, one that occurred years later) is not the same as an offering which the Government forced Sterling to cancel. The injury suffered by Sterling from the 1989 public offering is directly traceable to the breach.

In sum, Sterling has provided factual evidence in support of its wounded bank damages claims, and expert testimony validating that the calculations demonstrate costs that Sterling incurred, due to its weakened capital position (caused by the breach) that it would not have occurred absent the breach, and profit opportunities that Sterling lost because of its weakened condition. The wounded bank damages claims are valid and the Government's motion for a ruling that they lack merit as a matter of law should be denied.

**G. BECAUSE THE ONLY EVIDENCE BEFORE THE COURT QUANTIFYING STERLING'S DAMAGES ARE THE OPINIONS OF DR. HORVITZ AND DR. JAMES, THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF STERLING AND AWARD DAMAGES IN CONFORMANCE WITH THEIR ANALYSES.**

As discussed above, the Court should deny the Government's motion for summary judgment because Sterling's expert testimony on damages meets the *Daubert/Kumho* standard for admissibility, is based on the specific facts presented, and is not speculative. This has the result of leaving the Court with only the analyses of Dr. Horvitz and Dr. James as to the actual amount of damages suffered by Sterling. The Government's experts have not opined as to the amount of

damage, or proffered any alternative calculation, but have confined their opinions to critiques of those proposed by Dr. Horvitz and Dr. James. App. 1158-1161; App. 1152, 1153. No expert has opined that Sterling did not suffer harm; in fact, the Government's experts admit that Sterling was harmed, and merely dispute the methodology proposed by Sterling to calculate that harm while disclaiming (disingenuously, perhaps) any idea of about how to measure the damages.

Here, the Court is not even faced with a battle of experts, but rather, experts, testifying for Sterling, whose opinions are the only ones addressing how much harm was caused and, for the Government, contrasting experts who merely challenge their methodologies. Because Sterling has established that its experts' methodologies are valid under *Daubert/Kumho*, disposing of the Government's argument, there is nothing left for trial. Sterling's motion should be granted.

## V. CONCLUSION

For these reasons, the Government's Revised Motion for Summary Judgment Regarding Damages should be denied. Sterling's Motion for Summary Judgment should be granted.

Respectfully submitted this 29th day of March, 2007.

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By: /s/ William D. Symmes

William D. Symmes, Counsel of Record
And Member of the Bar of the United States Court of Federal Claims
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on March 29, 2007, a copy of the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND IN RESPONSE TO REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiffs