IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

# CONTINUED APPENDIX TO REPLY TO THE GOVERNMENT'S OPPOSITION TO STERLING'S MOTION TO STRIKE THE GOVERNMENT'S UNDISCLOSED WITNESSES

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
William D. Symmes, Counsel of Record
and Member of the Bar of the United States
Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

April 2, 2007

**CONTINUED APPENDIX TO**
**REPLY TO THE GOVERNMENT'S OPPOSITION TO STERLING'S**
**MOTION TO STRIKE THE GOVERNMENT'S UNDISCLOSED WITNESSES**

**TABLE OF CONTENTS**

Omnibus Case Management Order, September 18, 1996 . . . . . . . . . . 184

Procedural Order No. 1: Master Litigation Plan, August 11, 1997 . . . . . . . . . . 194

Opinion & Order, July 11, 2003 . . . . . . . . . . 203

Joint Status Report, November 22, 2002 . . . . . . . . . . 218

Joint Status Report Excerpts, July 21, 2003 . . . . . . . . . . 223

Transcript Excerpts, February 26, 2002 . . . . . . . . . . 228

Transcript Excerpts, June 21, 2006 . . . . . . . . . . 231

Plaintiffs' Brief Re: Plaintiffs' Motion To Strike The Expert Report Of W. Barefoot Bankhead, March 29, 2007 . . . . . . . . . . 235

Defendant's Response To Court's Order Dated November 10, 2003, And Opposition to Plaintiffs' Brief Re: Amending Damage Expert Reports Pursuant To The Court's November 10, 2003 Order Excerpts, December 2, 2003 . . . . . . . . . . 242

Updated to the Expert Report of Paul Horvitz, December 11, 2006 . . . . . . . . . . 245

Updated Expert Report of Professor Christopher M. James, December 11, 2006 . . . . . . 251

# In the United States Court of Federal Claims

| | |
|---|---|
| PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT, Plaintiffs, v. THE UNITED STATES, Defendant. | Nos. 90-8 C, et al. (Chief Judge Smith) FILED SEP 18 1996 |

## OMNIBUS CASE MANAGEMENT ORDER

Pursuant to the Rules 1, 16, 77 and 77.1 of the United States Court of Federal Claims, the Court ORDERS as follows:

1. Scope

a. This Order applies to all Winstar-related cases ("Winstar cases" or "cases"), including any claims, special pleas in fraud, defenses, affirmative defenses, setoffs, counterclaims, or any other issues raised in those cases, except that this Order does not apply to Glendale Federal Bank, FSB v. United States, No. 90-772C, or Statesman Holding Corp., et al. v. United States, No. 90-773C.

b. This Order is intended to supplement, and not to replace, any Rule of the United States Court of Federal Claims, except as inconsistent with this Order.

**2. Administration**

**a. Reassignment Of All Winstar Cases**

In order to provide consistent treatment of all matters related to Winstar cases, to conserve the resources of the Court and the parties, and for the efficient administration of justice, all Winstar cases have been reassigned to Chief Judge Smith, who will serve as the Managing Judge.

**b. Managing Judge**

The Managing Judge will administer this Order and will be responsible for all matters relating to the management of Winstar cases, including, unless otherwise assigned, the resolution of procedural matters upon which the Coordinating Committees are unable to agree.

**c. Issue Judges, Trial Judges, Discovery Judges And Special Masters**

The Managing Judge may assign specific matters or cases to another Judge or Judges of this Court for resolution. For example, the Managing Judge may assign any issue common to a significant number of cases to another Judge ("Issue Judge"). The Issue Judges will allow all interested parties to participate in the resolution of common issues and will set the briefing and oral argument schedules. Additionally, the Managing Judge may assign cases to other Judges ("Trial Judges") for trial. The Managing Judge also may assign discovery issues to a "Discovery Judge" or to a special master.

**d. Status Conferences**

The Managing Judge may schedule status conferences as necessary with the parties' Coordinating Committees. These status conferences will be open to the public and on the record.

**e. Certain Pretrial Procedures Suspended**

The requirements for Early Meeting Of Counsel and for Joint Preliminary Status Reports set forth in Appendix G of the Rules are suspended for all Winstar cases.

**3. Organization of the Parties**

**a. Plaintiffs**

i. The plaintiffs will designate three attorneys to serve as a Plaintiffs' Coordinating Committee. The members of the Plaintiffs' Coordinating Committee will serve as primary spokespersons for plaintiffs on matters relating to the administration of Winstar cases. The Plaintiffs' Coordinating Committee will have the authority to bind all plaintiffs with respect to procedural matters concerning pleadings, motions, discovery, trials, and related scheduling. In situations where the Committee is unable to speak on behalf of all plaintiffs, the Committee may speak to the Court on behalf of the plaintiffs who agree with the Committee's position. In these situations, the Court will provide an opportunity for other plaintiffs to present their differing views to the Court.

ii. Communications among plaintiffs' counsel (except communications with the Federal Deposit Insurance Corporation, to the extent that it is or may seek to participate as a plaintiff ("FDIC as receiver")), will be protected by a joint attorney-client privilege.

iii. The FDIC as receiver, to the extent that it is or may seek to participate as a plaintiff in any Winstar case, will designate one or more attorneys to represent it in all proceedings.

**b. Defendant**

The defendant will designate three attorneys to serve as a Defendant's Coordinating Committee. The Defendant's Coordinating Committee will have the authority to bind the defendant with respect to procedural matters concerning pleadings, motions, discovery, and related scheduling, except to the extent that any governmental entity is or may seek to participate as a plaintiff.

**c. Functions of Coordinating Committees**

The Coordinating Committees will develop and implement a Master Litigation Plan, which will include a comprehensive discovery plan and will address such matters as the resolution of common issues, dispositive motions, and trials. Any counsel for any plaintiff or their assistants or staff, and any counsel for the defendant or their assistants or staff, may attend joint meetings of the Plaintiffs' and Defendant's Coordinating Committees; however, the Coordinating Committees (and representatives of the FDIC as receiver) will be the principal spokespersons for the plaintiffs and defendant.

**4. Initial Discovery**

a. **Exchange of Core Documents**

i. Within two weeks of the date of entry of this Order, the parties will exchange "core documents," as defined below. If a Master Protective Order has not been entered by that date, the exchange of core documents shall occur within two business days of the entry of that order.

ii. The defendant's core documents consist of case-specific "board packages," "closing books," and assistance agreements that the defendant has gathered to date.

iii. A plaintiff's core documents consist of all documents, in plaintiff's possession to date, that each plaintiff contends constitute the contract(s) in its case, together with all modifications to the alleged contract(s), whether or not these have been previously supplied to the defendant.

iv. Each party will certify that it has made a diligent search for the core documents in its custody or control and will produce that certification along with its core documents. If a party believes that some or all core documents are in the custody or control of third parties, the certification shall so indicate.

v. In cases involving institutions placed in receivership or conservatorship, the parties shall also serve the core documents and certifications on FDIC as receiver.

vi. In any case in which defendant moves to dismiss on grounds of the statute of limitations, a plaintiff may notify the defendant within ten days of the entry of this Order that it will not file a motion for summary judgment until after the motion to dismiss is resolved. In such a case, neither party shall be required to serve core documents on any

other party or on FDIC as receiver until two weeks after the motion to dismiss is denied.

b. <u>Exchange of Document Indices</u>

i. No later than September 26, 1996, counsel for the parties will exchange all available existing indices of documents, or of boxes of documents, that may be relevant to each case. If a Master Protective Order has not been entered by that date, the exchange of indices shall occur within five days of the entry of that order.

ii. Each party will certify that it has made a diligent search for all indices within its custody or control and will produce that certification along with the indices.

5. <u>Initial Determinations Regarding Liability</u>

a. Following the exchange of core documents, any plaintiff may file a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, regarding two liability-related issues only: (1) whether a contract(s) existed in each case; and (2) whether the Government acted inconsistently with that contract(s). Any plaintiff may utilize a so-called "short form" format substantially similar to the sample attached to this Order as Appendix A. In any event, neither party shall be required to submit the "Proposed Findings of Uncontroverted Fact" or the "Statement of Genuine Issues" identified in Rule 56(d).

b. The defendant will respond within 60 days with respect to those two issues, except that the defendant need not respond to motions filed in cases in which (1) the defendant has filed

a motion to dismiss on grounds of the statute of limitations, or (2) the FDIC as receiver has moved to intervene and take control of the case. In these cases, the defendant shall respond according to the schedule set forth below in ¶ 5(e). The defendant need not identify any defenses of any kind, counterclaims, setoffs, pleas in fraud, etc. ("defenses") in responding to the motions, and the failure to assert those defenses in its response will not constitute a waiver. Any common issues identified in the defendant's responses shall be resolved in a manner similar to resolution of the issues identified in Paragraph 6 below.

c. The defendant shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of the defendant's not having filed an answer to any complaint. In addition, no allegation shall be deemed admitted, nor shall defendant be estopped from denying any allegation, by reason of not having filed an answer to any complaint. No plaintiff shall file an answer to any counterclaim or plea in fraud, and no defense to any counterclaim or plea in fraud, nor any argument of any kind, shall be deemed waived by reason of the plaintiff's not having filed an answer to a counterclaim or plea in fraud. In addition, no allegation shall be deemed admitted, nor shall a plaintiff be estopped from denying any allegation, by reason of that plaintiff's not having filed an answer to a counterclaim or plea in fraud.

d. Within 120 days of the filing of a motion for partial summary judgment, except as set forth in ¶ 5(e), the defendant shall set forth, in accordance with the requirements of the rules of this Court, any defenses of which it knows or has reason to know that relate to the two issues asserted in the motion. The Coordinating Committees will attempt to agree upon further

procedures to resolve any defenses asserted, including any necessary discovery and further motions or cross-motions. If the Committees are unable to agree, they will submit their respective proposals to the Managing Judge for resolution. Any issues or defenses not identified at that time will be addressed in accordance with the Rules of the Court or pursuant to the alternative procedures agreed upon by the Coordinating Committees or ordered by the Court.

e. In cases in which (1) the defendant has filed a motion to dismiss on grounds of the statute of limitations, or (2) the FDIC has moved to intervene and take control of the case as receiver, the defendant shall file its response to the motion for partial summary judgment within 30 days of denial of such motion. This response shall include the matters addressed in ¶ 5(b) and ¶ 5(d) of this Order.

f. The Coordinating Committees will attempt to agree upon procedures applicable to any case in which a party asserts a need to take discovery in order to file or oppose a motion for partial summary judgment regarding the two issues identified above. If the Coordinating Committees are unable to reach agreement, they may submit separate proposals to the Managing Judge for resolution.

**6. <u>Resolution of Common Issues</u>**

The parties agree that the following issues are common issues requiring prompt resolution before summary judgment proceedings are resolved with respect to affected cases: (1) statute of limitations; and (2) FDIC standing as receiver. These issues are to be resolved in all cases

in which the issue is raised prior to any discovery in those cases, other than the exchange of core documents, in accordance with procedures set forth in Appendix B (for statute of limitations) and Appendix C (for FDIC standing). The Managing Judge may assign these cases to Issue Judges for prompt resolution. The FDIC as receiver may participate in the resolution of an issue if that issue is raised in any case in which the FDIC as receiver may assert an interest. The Coordinating Committees will meet promptly to identify cases that raise these common issues and to advise the Court of these. The Coordinating Committees shall also meet to prepare procedures for resolution of other common issues, including other standing issues, issues identified in the defendant's responses to motions for partial summary judgment, and any other common issues.

**7. Master Litigation Plan**

a. The Coordinating Committees will attempt to agree by October 1, 1996, upon a Master Litigation Plan to govern all further proceedings. The Master Litigation Plan, which may be in phases, will include procedures for resolving common issues (other than the common issues covered by this Order), dispositive motions, trials, discovery schedules, protocols for depositions, document production, expert witnesses, document numbering systems, joint or uniform discovery requests from plaintiffs, master protective order, and other matters. The cases listed in Appendix D to this Order shall be accorded priority in the scheduling of cases for trial. The first of these trials shall begin four months after completion of trials in Glendale and Statesman, and trials shall continue thereafter until all cases are resolved. If the

Committees are unable to reach agreement concerning a Master Litigation Plan, they may submit separate proposals by October 4, 1996, and the Managing Judge will adopt a plan.

b. In developing a Master Litigation Plan, the parties agree to be guided by the following principles regarding discovery:

i. The parties will coordinate discovery requests to the maximum extent possible to reduce the burden and expense imposed upon any party or witness.

ii. The Coordinating Committees will mutually prioritize cases for case-specific discovery. Discovery regarding liability issues (except as provided in part 4 above) for any case will not proceed until after the later of (1) the entry of a Master Litigation Plan; and (2) the resolution of the statute of limitations and standing-related common issues for that case. Discovery regarding damages issues for any case will not proceed until after the later of (1) the entry of a Master Litigation Plan, or (2) the completion of trials in Glendale and Statesman, but in no event later than March 1, 1997.

iii. A Master Protective Order will be entered for all cases, which provides, among other terms, for the non-waiver of privilege and the protection of confidential information.

September 18, 1996

Loren A. Smith
Chief Judge

# In the United States Court of Federal Claims

(Filed: August 11, 1997)

RECEIVED
AUG 18 1997
WITHERSPOON, KELLEY, DAVENPORT & TOOLE

| | | |
|---|---|---|
| PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT, Plaintiffs, | * | |
| v. | * | No. 90-8 C, et al. |
| THE UNITED STATES, Defendant. | * | |

PROCEDURAL ORDER NO. 1:
MASTER LITIGATION PLAN

Pursuant to Rules l, 16, 77, and 77.1 of the Rules of the United States Court of Federal Claims, and to the Omnibus Case Management Order entered by the Court on September 18, 1996 ("Case Management Order" or "CMO"), the Court ORDERS as follows:

I. SCOPE OF THIS ORDER

A. This Order applies to all *Winstar*-related cases before the Court except for (a) the *Glendale* and *Statesman* cases, and (b) the Priority Cases identified in Appendix D to the CMO. In the event that a case is removed from the list of Priority Cases, it shall thereafter be subject to the terms of this Order.

B. This Order establishes a Master Litigation Plan ("Procedural Order No. 1") and incorporates by reference the CMO, the Master Protective Order ("MPO"), the other procedural

orders entered in the *Winstar*-related cases, and the Rules of the Court of Federal Claims to the extent that the Rules are not superseded by orders issued under the CMO or MPO.

C. This Order contemplates that additional provisions regarding a Discovery Plan shall be set forth in a subsequent Procedural Order No. 2.

D. Except insofar as this plan expressly authorizes the parties to agree to modifications of time limits, the parties may not stipulate to an increase or extension of any limitation or deadline in this Master Litigation Plan without approval of the Court.

II. DISCOVERY

A. Phase I: Initial Discovery of Key Documents

1. Phase I discovery shall consist of (a) the exchange of "core documents" and document indices pursuant to Paragraph 4 of the CMO, (b) the exchange of "CD-ROM Documents" and "Reciprocal Documents" pursuant to the Stipulations and Orders Concerning Implementation of Paragraph 5.f. of the CMO, and, (c) if permitted by Court Order of the Discovery Judge, the exchange of core documents pertaining to unassisted transactions ("CDU").

2. Plaintiffs' requests for documents covered by Paragraph II.A.1. shall be submitted to the defendant no later than December 31, 1997.

3. The exchange and production of documents contemplated by Paragraph II.A.1. shall be completed no later than February 15, 1998.

4. For any *Winstar*-related case filed after entry of the CMO, no Phase I discovery shall be required or available except by leave of the Court.

5. All short-form summary judgment motions to be submitted pursuant to the CMO shall be filed no later than April 3, 1998.

B. Phase II: General Fact Discovery

Phase II discovery shall include (a) certain common discovery, and (b) general discovery concerning case-specific issues of liability and damages. Unless otherwise ordered by the Court, expert discovery shall not be taken during Phase II.

Common Discovery

1. Common Discovery shall begin on or after August 11, 1997 and, except for good cause shown, shall be completed by December 31, 1997.

2. On or before August 22, 1997, defendant shall produce to both the Plaintiffs Coordinating Committee ("Plaintiffs Committee") and the FDIC, a set of all documents responsive to the definition of "Common Documents" set forth in Paragraph II.B.3. The Plaintiffs Committee shall be responsible for making such documents available to other plaintiffs' counsel, and defendant shall not be required to make any further production of such documents in individual cases.

3. As used herein, the term "Common Documents" includes:

(a) All documents for the period 1980 through 1989 that relate to the establishment, interpretation, or application of FHLBB, FSLIC, and FHLB policies, practices, guidance, rules and regulations concerning supervisory acquisitions, conversions and/or mergers of thrift institutions and the approval of and accounting for such transactions, including all internal memoranda and tapes and transcripts of meetings relating to such matters.

(b) As they relate to the FSLIC, Resolution Trust Corporation, and the FSLIC Resolution Fund from 1980 to date all documents, other than those containing exclusively case-specific information, referring or relating to: investment account records; investment results; investment policies, procedures, and guidelines; resolution policies, procedures, and guidelines; resolution costs; asset management and disposition procedures, policies, guidelines, and results; and viability, liquidation, and Phoenix modeling systems, procedures, assumptions, policies, guidelines, and models; FSLIC contingency plans, business plans and financial projections; and studies and analyses concerning FSLIC's ability to cope with failures of large thrifts or large numbers of thrift failures, and/or the consequences to FSLIC of such events, including without limitation all internal memoranda and tapes and transcripts of meetings relating to such matters.

4. On or after September 8, 1997, the Plaintiffs Committee and the FDIC may submit common discovery interrogatories to defendant with respect to issues of liability and damages. Such discovery shall be conducted in accordance with the provisions of Procedural Order No. 2.

5. On or after September 8, 1997, the Plaintiffs Committee, the FDIC, and defendant may all conduct common discovery depositions of present and former government employees, with respect to issues of liability and damages. Such discovery shall be conducted in accordance with the provisions of Procedural Order No. 2.

Case-Specific Fact Discovery

6. Cases shall enter Phase II case-specific discovery in waves of 30 cases each; the first 30 cases shall commence on January 2, 1998; the second 30 cases on January 2, 1999; the third 30 cases on January 2, 2000 and any remaining cases shall begin discovery on January 2, 2001.

7. Any plaintiff that does not want to be considered for participation in Phase II case-specific discovery in any given year must "opt-out." Any plaintiff that does not "opt-out" of a particular discovery wave must participate if it subsequently is designated for inclusion in that discovery wave. A plaintiff that "opts-out" shall be eligible to participate in any subsequent Phase II case-specific discovery wave.

8. Each plaintiff that decides to "opt-out" of Phase II case-specific discovery in a given year must provide written notice to the Court, the Coordinating Committees and the FDIC. For the first wave of cases scheduled to begin discovery on January 2, 1998, such notice shall be given no later than 30 days after the Court renders decisions on the Summary Judgment Motions which are the subject of the August 7 and 8, 1997 Oral Arguments. For each succeeding discovery wave, such notice shall be given no later than 90 days before the scheduled start of that discovery wave. The

"opt-out" period shall close at that time and notification of decisions to "opt-out" submitted after that time shall not be effective for the upcoming discovery wave. This "opt-out" process shall be repeated for each succeeding discovery wave.

9. Each year after the "opt-out" period closes, the 30 remaining cases with the earliest filing dates, based on the date of filing in this Court, will be designated to participate in the next scheduled discovery wave. That designation will be made by the Coordinating Committees no later than 30 days after the "opt-out" period closes for each Phase II case-specific discovery wave.

10. Fact discovery concerning each case shall be completed no later than 12 months from the date of commencement of such discovery, except for good cause shown.

11. The plaintiffs in each discovery wave and defendant shall make good faith efforts to coordinate depositions so as to minimize the number of times an individual fact witness is deposed during that discovery wave. The plaintiffs in each discovery wave shall form a Plaintiffs Discovery Committee for this purpose in accordance with the provisions of Paragraph IV.A.2. of Case Management Procedural Order No. 2.

C. Phase III: Expert Discovery

1. Ordinarily discovery of experts and expected expert testimony shall not commence in a case until after Phase II case-specific discovery is completed, and shall be conducted in accordance with the provisions of Section V of Procedural Order No. 2.

2. The Court, under unusual circumstances, may enter an Order allowing particular expert discovery at an earlier time in a given case, for good cause shown.

D. De Bene Esse Depositions

Nothing in this Order shall be construed to limit or restrict the taking of depositions pursuant to the Master Order Concerning De Bene Esse Depositions.

## III. PROCEDURES FOR DISPOSITIVE MOTIONS OTHER THAN SHORT FORM SUMMARY JUDGMENT MOTIONS FILED PURSUANT TO THE CMO

A. General Procedures

1. Any party may submit dispositive motions on liability issues at any time prior to the dispositive motion deadline for a case under Paragraph VI.B.1. All dispositive motions filed prior to the assignment of a case to a Trial Judge shall be filed with the Managing Judge.

2. The Managing Judge may assign any dispositive motion to an Issue Judge for resolution under common issue procedures, or to a Motion Judge for individual resolution. In the event that a dispositive motion has been assigned to an Issue or Motion Judge, all further submissions with respect to that motion shall so indicate in the caption of the case, and shall be directed by the Clerk to the attention of the Issue or Motion Judge.

3. Nothing in this Order shall be construed to limit the availability of discovery necessary to oppose a dispositive motion. Such discovery may be taken by mutual consent of the parties or by Order of the Managing Judge, Issue Judge or Motion Judge, as appropriate.

B. Dispositive Motions on Liability

1. Any party may file a motion for summary judgment seeking a determination of liability at any time prior to the dispositive motion deadline. The opposing party shall have 50 days from the service of such motion to file its response. The moving party shall then have 25 days from the service of the response to file its reply.

2. Cross-motions shall be permitted consistent with Rule 83.2(e) of the Rules of the Court of Federal Claims. If a party files a cross-motion as to liability, the party opposing the cross-motion shall have 50 days from the service of such motion to file its combined reply and response, and the party filing the cross-motion shall then have 25 days from the service of the combined response and reply to file its reply.

IV. PROCEDURES FOR OTHER MOTIONS

A. Resolution of Common Issues

1. A "common issue" is an issue the resolution of which (a) would require minimal discovery; (b) may affect a significant number of *Winstar*-related cases; and (c) can be resolved on facts common to those cases without undue case-specific inquiry.

2. The Coordinating Committees and the FDIC shall monitor all summary judgment motions and other dispositive motions and recommend to the Court any issues that are appropriate to "common issue" resolution.

3. Any party that believes an issue is appropriate for "common issue" treatment shall bring such issue to the attention of the Coordinating Committees and the FDIC.

4. The Coordinating Committees and the FDIC shall attempt to agree whether the issue is appropriate for "common issue" treatment and, if so, shall attempt to reach agreement on the

definition of the issue and on procedures for resolution of the issue. If agreement can be reached, the parties shall submit an appropriate stipulated proposed Order for consideration by the Court.

5. If the Coordinating Committees and the FDIC are unable to reach agreement regarding whether an issue is appropriate for "common issue" treatment and/or regarding the statement of the issue or the procedures for resolution of the issue, then either Coordinating Committee or the FDIC may file a motion with the Managing Judge seeking designation of an issue for "common issue" treatment and proposing procedures for resolution of that issue. Any response to said motion shall be filed within 20 days of service of the motion, and any reply shall be filed within 10 days of service of the response.

6. Procedures for application of rulings on common issues to individual cases shall be established by a separate Order.

V. CONSOLIDATION OF RELATED CASES

A. The parties are encouraged to identify "related cases" in the sense of RCFC 77(f)(2) and to seek consolidation of those cases.

B. Motions to consolidate related cases, whether stipulated or contested, shall be filed with the Managing Judge.

C. Cases that are consolidated shall be treated as one case for purposes of Paragraph II.B.6. of this Order.

VI. PRETRIAL PROCEDURES

A. <u>Responses to Pleadings</u>

1. Within 30 days after the commencement of Phase II case-specific discovery in a case, the defendant shall file a response to the Complaint in accordance with the Rules of this Court,

unless a dispositive motion (including a partially dispositive motion) is pending. In cases in which a dispositive motion is pending, the defendant shall file a response to the Complaint within 30 days after issuance of an Order resolving the motion, to the extent a response is necessary. Plaintiffs shall file responses to any cross-claims, counter-claims, offsets or pleas in fraud, or other pleading, in accordance with the Rules of the Court.

B. Dispositive Motion Deadline

1. All dispositive motions on issues of liability shall be filed no later than 45 days after completion of Phase II case-specific discovery.

C. Assignment For Trial

A case shall become eligible for trial when 60 days have elapsed after completion of Phase II case-specific discovery. Ordinarily, the Managing Judge will not assign a case to a Trial Judge for final pretrial proceedings and trial prior to that time.

D. Further Procedural Order Governing Pretrial and Trial

Final pretrial and trial procedures shall be determined after consultation between plaintiff and defendant in accordance with the provisions of this Order and Procedural Order No. 2, and with the requirements and preferences of the Trial Judge to whom each case is assigned.

LOREN A. SMITH
CHIEF JUDGE

7/11/03

# In the United States Court of Federal Claims

No. 95-829 C
(Filed: July 11, 2003)

* * * * * * * * * * * * * * * * * * * * *

**STERLING SAVINGS, ET AL.,**

Plaintiffs,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * *

**FILED UNDER SEAL**

*Winstar*-related case; breach of contract; accounting treatment; goodwill; FSLIC cash contribution.

*William D. Symmes*, Spokane, WA, counsel of record for Plaintiffs, with whom were *Leslie R. Weatherhead* and *William M. Symmes*.

*Elizabeth M. Hosford*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were *Jeanne E. Davidson*, Deputy Director; *David M. Cohen*, Director; and *Stuart E. Schiffer*, Deputy Assistant Attorney General.

---

**OPINION & ORDER**

---

**DAMICH**, Chief Judge.

Before the Court in this *Winstar*-related case[1] are the parties' cross-motions for partial summary judgment on the issue of whether the offsetting goodwill associated with Federal Savings and Loan Insurance Corporation ("FSLIC") cash assistance, credited to Sterling's "net worth," was to be amortized by Sterling. For the reasons stated herein, the Court GRANTS Defendant's Cross-Motion for Partial Summary Judgment with respect to this issue and DENIES Plaintiff's Motion for Partial Summary Judgment on this issue.

---

[1] *See generally United States v. Winstar Corp.*, 518 U.S. 839 (1996).

## I. Background

The parties have thoroughly briefed the issue *sub judice*.[2] The Court must resolve the question whether the goodwill associated with FSLIC's cash contributions, in connection with Sterling's acquisition of two failed thrifts, Lewis Federal Savings & Loan Association of Chehalis, Washington ("Lewis") and Tri-Cities Savings & Loan Association of Kennewick, Washington ("Tri-Cities"), was to be to be amortized by Sterling according to the parties' agreements.[3] Lewis was a failed thrift that was taken over by the FSLIC in 1985 and thereafter acquired by Plaintiff. *Sterling Savings v. United States*, 53 Fed. Cl. 599, 602 (2002). The FSLIC contributed $1.75 million to the acquisition and Sterling did not invest any money in the acquisition. *Id.* Sterling acquired Tri-Cities in 1988 in response to a bid proposal by FSLIC. In connection with the Tri-Cities acquisition, the FSLIC contributed $11,730,128 pursuant to the terms of the Assistance Agreement. Thus, the total contribution by the FSLIC with respect to these acquisitions was $13,480,128.

The Government frames the issue as whether the goodwill created by the FSLIC's cash contributions to the Lewis and Tri-Cities acquisitions was to be permanently recorded and reported as a nonamortizing intangible asset. Sterling believes it is more generally an issue of the parties' intent to treat the FSLIC cash contributions as permanent regulatory capital and that resort to extrinsic evidence will reveal the parties' true intent. Nevertheless, neither party

---

[2] The parties filed two supplemental briefs concerning the Federal Circuit's decision, 309 F.3d 1353, and decision *en banc* in *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035 (Fed. Cir. 2003).

[3] The Court issued an opinion on the Government's contractual liability on September 12, 2002, *see* 53 Fed. Cl. 599, wherein the underlying facts with respect to these acquisitions are discussed at length. Thus, the Court will only discuss the facts as necessary, when they are relevant to the disposition of the parties' motions for partial summary judgment. By way of background, in the Lewis and Tri-Cities acquisitions, the Court found an express promise based on the Assistance and Acquisition Agreements, bank board resolutions, and forbearance letters entered into in connection with these acquisitions. The Court held that the Government, in enacting and enforcing the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, (codified in scattered sections of 12 U.S.C.) against Sterling, breached the contractual promises with Sterling. Specifically the Court held, in relevant part, that Defendant breached the contractual rights of Sterling to use supervisory goodwill and FSLIC cash contributions for regulatory capital purposes and to amortize the goodwill over 40 and 15 years respectively. Sterling actually acquired three thrifts (the third was Central Evergreen Federal Savings & Loan Association of Chehalis, Washington, ("Central Evergreen")). Nevertheless, the issue before the Court is only relevant to the Lewis and Tri-Cities acquisitions because the Central Evergreen acquisition was unassisted.

disputes that the contract itself is unambiguous on its face. *See e.g.,* Plaintiffs' Memorandum Re: Motion to Strike the Declaration of Joe A. Hargett and Its Surreply Regarding the Permanency and Non-Amortization of the FSLIC Assistance at 10-11, 15-16 (hereinafter, "Pl.'s Mem. & Sur.") ("the parties mutual intent in this case may be gleaned from the plain language of the agreements . . . ."); Defendant's Supplemental Brief Addressing the Effect of the Federal Circuit's En Banc Decision in Coast Federal Bank, FSB v. United States on Sterling Savings Association, et al. v. United States (hereinafter "Def.'s Second Supp. Br.") at 2-3. Moreover, the Government agrees that the FSLIC cash assistance was provided to Sterling on a permanent, nonrefundable basis. Defendant's Supplemental Reply Brief With Respect to the Amortization of Offsetting Goodwill Associated with FSLIC Assistance, filed Jan. 24, 2003, at 6 (hereinafter "Def.'s Supp. Reply"). The Government contends, however, that the issue is not the permanence of the cash itself, but rather, the amortization of the offsetting goodwill associated with the assistance. Defendant argues that pursuant to the terms of the contract, Sterling was to amortize all intangibles, including the offsetting goodwill. A review of the parties' agreements and the accounting treatment relevant to these transactions is necessary to appreciate the issue posed by the parties' motions for partial summary judgment.

When Sterling acquired the failed thrifts, Defendant permitted Sterling to record on the books the thrifts' negative net worth as an unidentified intangible or goodwill. The goodwill was counted toward regulatory capital. *See Sterling*, 53 Fed. Cl. at 609. "[G]oodwill is created when a purchaser pays an amount in excess of the fair value of the net assets of an entity to acquire that entity . . . even if the purchaser pays nothing to acquire the entity." Pl.'s App. K ¶ 4; *see also Coast,* 323 F.3d at 1039 ("Goodwill, an intangible asset, is the excess of cost over the fair value of the identifiable net assets acquired."). Under the policy of the Financial Accounting Standards Board ("FASB"), FASB Statement No. 72 ("FASB 72"), titled, "Accounting for Certain Acquisitions of Banking or Thrift Institutions," issued in 1982, goodwill is amortized over a period no greater than the estimated remaining life of the long term interest-bearing assets acquired and any additional goodwill would be amortized on a straight-line basis over the expected life of the unidentified intangible, not to exceed 25 years. Pl.'s App. K ¶ 4. FASB 72 guided Sterling's accounting practices.

FSLIC cash contributions provided the acquirer of a failed or failing thrift with the opportunity to "reduce or eliminate the net deficiency in assets." Pl.'s App. K ¶ 6. According to FASB 72, any FSLIC cash contributions recorded in accordance with generally accepted accounting principles ("GAAP") would reduce the corresponding amount of goodwill associated with the acquisition. Pl.'s App. K ¶ 6. Only a forbearance from GAAP reporting would allow an acquirer, such as Sterling, to report the cash assistance as regulatory capital and not reduce the amount of goodwill reported. Pl.'s App. K ¶ 7. This type of goodwill was referred to as Regulatory Accounting Practices ("RAP") goodwill.[4] *Id.* at ¶ 8. Plaintiff requested such a

---

[4] RAP and GAAP were the two systems of accounting that thrifts used in connection with their reporting requirements. *Winstar*, 518 U.S. at 846. In many instances, RAP replaced GAAP, which the House Banking Committee believed attributed to "the worsening

forbearance, which was granted and reflected in Sterling's contracts with Defendant. Sterling was actually granted 3 different forbearances, the SM-1, SM-2, and SM-3 forbearances, as described in Memorandum SP-37a, which sets forth various standard regulatory forbearances granted by the then Federal Home Loan Bank Board ("FHLBB" or "Bank Board"). *See* Defendant's Supplemental Appendix ("Def.'s Supp. App.") filed Dec. 16, 2002, at 121. In relevant part, the forbearance letter to Sterling in connection with the Lewis transaction provided:

> 1. It is the FSLIC's intention that the cash contribution to be made to Sterling pursuant to an assitance [sic] agreement ("Assistance Agreement") to be entered into between the FSLIC and Sterling is to be a credit to Sterling's net worth; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its net worth.

Def.'s Supp. App. at 119. This language is virtually identical to the SM-1 forbearance set forth in Memorandum SP-37a. Def.'s Supp. App. at 131. The Tri-Cities forbearance letter provided similarly:

> 4. Regulatory Capital It is the FSLIC's intention that the initial cash contribution to be made to Sterling pursuant to the Assistance Agreement is to be a credit to Sterling's regulatory capital; therefore, for regulatory accounting purposes, Sterling may book such contribution as a direct addition to its capital.

Def.'s Supp. App. at 116.

The SM-1 forbearance was incorporated into the text of the Assistance Agreement itself in both the Lewis and Tri-Cities transactions. Section 3(a)(2) of the Lewis Agreement provides:

> For purposes of reports to the Bank Board other than reports or financial statements that are required to be governed by generally accepted accounting principles, **all cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account**. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board or not, that requires the submission of financial statements prepared in accordance with generally accepted accounting principles.

Def.'s Supp. App. at 147 (emphasis added).

---

financial condition of the industry." *Id.*

Similarly Section 3(a)(2) of the Tri-Cities Agreement states:

> For purposes of reports to the Bank Board other than reports or financial statements prepared for reporting or disclosure purposes that are required to be governed by GAAP, the cash contribution made under § 3(a)(1), **shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations. 12 C.F.R. § 561.13 (1987)**. It is understood by the parties that the preceding sentence is not intended to address in any way the accounting treatment of contributions from the [FSLIC] that must be reflected in any filing that the ACQUIRING ASSOCIATION may make, whether to the Bank Board (for reporting or disclosure purposes) or otherwise, that requires the submission of financial statements prepared in accordance with GAAP.

Appendix to Defendant's Supplemental Brief Addressing the Effect of the Federal Circuit's En Banc Decision in Coast Federal Bank, FSB v. United States on Sterling Savings Association, et. al. v. United States (hereinafter "Def.'s Second Supp. App.") at 56 (emphasis added).[5]

The Assistance Agreements also specified that any computations made in connection with the agreements were governed by GAAP, unless GAAP conflicted with applicable regulations of the Bank Board or FSLIC or any resolution or action of the Bank Board related to the agreements. For example, § 16 of the Tri-Cities Assistance Agreement stated:

> § 16 <u>Accounting Principles</u> Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such

---

[5] Regulatory Capital was defined as:

> [T]he sum of all reserve accounts, retained earnings, permanent common stock, permanent preferred stock, nonpermanent preferred stock issued prior to July 23, 1985, mutual capital certificates (issued pursuant to § 563.7-4 of this subchapter), securities which constitute permanent equity capital in accordance with generally accepted accounting principles (if approved by the Corporation), appraised equity capital (as defined in § 563.13(c) of this subchapter), allowances for loan losses except specific allowances, (including those specific allowances established pursuant to §§ 561.16c, 563.17-2, and 571.1a of this subchapter) and any other nonwithdrawable accounts of an insured institution (excluding any Treasury shares held by the insured institution).

12 C.F.R. § 561.13 (1987). The Lewis Assistance Agreement did not mention regulatory capital. *See* § 3(a)(2) of the Assistance Agreement. Def.'s Supp. App. at 147.

> principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition or this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

Def.'s Second Supp. App. at 108. *See also* § 9 of the Lewis Assistance Agreement. Def.'s Second Supp. App. at 28. Section 16 also set forth the authority that controls in the case of an ambiguity:

> In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolutions or actions relating to the Acquisition or this Agreement. If there is a conflict between such regulations and the Bank Board's resolutions and actions relating to the Acquisition or this Agreement, the Bank Board's resolutions and actions shall govern.

Def.'s Second Supp. App. at 108. *See also* § 9 of the Lewis Assistance Agreement. Def.'s Second Supp. App. at 28.

Nevertheless, the forbearance letters in connection with these acquisitions likewise granted Sterling what is known as an SM-2 forbearance. *See, e.g.*, Def.'s Supp. App. at 131. The SM-2 forbearance allowed Sterling to deviate from GAAP when recording the amortization of intangible assets, which according to FASB 72, would be amortized "over a period no greater than the estimated remaining life of the long term interest-bearing assets acquired." Pl.'s App. K ¶ 4. The Lewis forbearance letter provided:

> 2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 40 years by the straight line method.

Def.'s Supp. App. at 120. Likewise, the Tri-Cities forbearance letter provided:

> 5. Amortization of Unidentifiable Intangibles For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed 15 years by the straight line method.

*See* Def.'s Supp. App. at 117. The SM-2 forbearance allowed Sterling to deviate from GAAP and FASB 72 governing the amortization of intangible assets. While the Government notes that

the SM-2 forbearance granted to Sterling did not differentiate between RAP and GAAP goodwill, Sterling argues that SM-2 only applied to GAAP goodwill and not the RAP goodwill associated with FSLIC assistance. To support its argument Sterling points to the term "purchase method" in the SM-2 forbearance granted to Sterling. Plaintiff argues that the term "purchase method" is "widely accepted as the accounting treatment prescribed by FASB 72," which is the GAAP standard and "requires the goodwill to be reduced by the cash assistance before being amortized to expense." Pl.'s Mem. & Sur. at 13. Defendant says the entirety of the Lewis and Tri-Cities acquisitions were governed by the purchase method (as opposed to the pooling method for recording mergers), which requires the acquired thrift's assets to be "marked to market" in order to reflect the current market value cost, rather than the historical book value cost. Def.'s Opp. to Pl.'s Mot. to Strike at 15. The resulting net worth deficit is then recorded as goodwill. *Id.* Defendant contends that the SM-2 forbearance applied to all intangible assets, including RAP goodwill.

Similar arguments were raised by the parties in *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000). In *Coast*, the agreement at issue was strikingly similar. However, Coast requested, but was not granted, the SM-2 forbearance as Sterling was in the present case. *Coast*, 48 Fed. Cl. at 420. Nevertheless, plaintiff argued that the SM-1 forbearance was outside GAAP because it allowed a deviation from GAAP and its agreement with defendant did not require it to amortize RAP goodwill. *Coast*, 48 Fed. Cl. at 411. Plaintiff also argued that the history of nonamortization in the bank's reporting demonstrated that the parties did not intend amortization. *Id.* Defendant argued that the effect of the SM-1 forbearance was simply to allow the bank to record more regulatory capital than it otherwise would have under GAAP. *Id.* Judge Hewitt found for Defendant and interpreted the agreement to require the amortization of goodwill according to GAAP. *Id.* at 421.

On appeal, the Federal Circuit agreed with Judge Hewitt's analysis in that the agreement was somewhat ambiguous, but otherwise disagreed that the contract required the amortization of goodwill according to GAAP. *Coast,* 309 F.3d at 1360-61. An *en banc* opinion vacated the panel decision. *Coast Federal Bank, FSB, v. United States*, 323 F.3d 1035 (Fed. Cir. 2003). The Federal Circuit held that the contract was clear and unambiguous and the goodwill associated with FSLIC cash assistance was intended to amortize according to GAAP. *Id.* at 1038. Specifically, the court held that § 20 of the Assistance Agreement in Coast, which is nearly identical to §§ 16 and 9 of the Lewis and Tri-Cities Assistance Agreements, respectively, provided that GAAP would govern the accounting treatment of goodwill associated with the acquisition. *Id.* The court recognized that § 6(a)(1)(c), which specified that FSLIC cash contribution "shall constitute regulatory capital" and "shall be credited" to the bank's net worth, conflicted with GAAP and FASB 72. *Id.* Although this section of the agreement allowed Coast to credit the FSLIC cash contribution to increase its regulatory capital, instead of crediting the cash contribution to decrease an equal amount of goodwill associated with the transaction, the agreement did not provide for an additional departure from GAAP or "the nonamortization of goodwill corresponding in amount to the [FSLIC cash contribution] credit to regulatory capital." *Id.* at 1039. The Federal Circuit stated that Coast could not rely on extrinsic evidence to

"contradict the plain language of the Agreement." *Id.* at 1040. The court stated "Coast's assumption that if regulatory capital is 'permanent' then goodwill *must* be nonamortizing is flawed." *Id.* First, the Federal Circuit pointed to the Supreme Court's decision in *Winstar*, 518 U.S. at 867, which recognized that permanent regulatory capital and goodwill can coexist. *Id.* Second, the court explained that even if Coast's regulatory capital were permanent, it does not follow that goodwill would be nonamortizing. *Id.* Judge Gajarsa, writing for the *en banc* court, reviewed the "fundamental equation of accounting," which "requires that assets equal liabilities plus shareholder's equity." *Id.* The Court expounded:

> Here, the $299 million "permanent" credit to regulatory capital (equity) must be balanced by either a debit to an asset account (not *necessarily* goodwill), a debit to a liability account, a debit to shareholder equity, or any combination of debits corresponding in amount to the credit to regulatory capital. Thus, the "permanent" regulatory capital, for example, can be balanced by an equal amount of unspent cash. That possibility negates the need for nonamortizing goodwill.

*Id.* Thus, the Court concluded that the agreement, which was "unambiguous on its face," required amortization of goodwill in accordance with GAAP. *Id.* at 1040-41. Judge Michel, writing a concurring opinion, explained the original panel's error in reasoning when it held that the goodwill was nonamortizing:

> To the extent the panel deduced from such added language ["shall constitute regulatory capital," "shall be credited"] the parties' agreement to provide the capital credit with 'permanence,' the panel was correct. Where it erred was to assume that permanence of the right to credit the amount to capital (right-hand side) in year one and each subsequent year *necessarily* meant also that the parties *impliedly* agreed to forbear the amortization of the portion of "goodwill" (left-hand side) corresponding to that amount. Admittedly, such non-amortization would be a sharp departure from the requirement of GAAP.

*Id.* at 1041. Judge Michel went on to explain that the contributed capital is permanent "in the sense that it increases Total Regulatory Capital compared to what it would otherwise be, year by year. But all this can occur without *also* requiring that the goodwill not amortize." *Id.* at 1042. The Court now considers Sterling's contracts in light of the Federal Circuit's guidance in *Coast*.

## II. Discussion

### *A. The Standard for Summary Judgment*

Summary judgment is appropriate when there are no genuine issues of material fact, and thus the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979, 982 (Fed. Cir. 1993). "One of the principal purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 325. The Court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995).

*B. The Plain Meaning of the Parties' Agreements Controls*

The issue of whether the parties' agreements provided for the nonamortization of RAP goodwill is a matter of contract interpretation. Contract interpretation is an issue of law and begins with the language of the agreement at issue. *Coast*, 323 F.3d at 1038; *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). Both the Lewis and Tri-Cities Assistance Agreements are strikingly similar to the agreement at issue in *Coast*, as discussed *supra* Part I. Section 3(a)(2) of the Lewis and Tri-Cities Assistance Agreements are similar to § 6(a)(1)(C) of the Coast Assistance Agreement in that they provide that the FSLIC cash contribution "shall be credited" to the bank's net worth, and in the Tri-Cities acquisition, specifically "shall constitute regulatory capital . . . ." Moreover, §§ 9 and 16, respectively, are nearly identical to § 20 of the Coast Assistance Agreement. In the present case, as in *Coast*, the parties agree that the Assistance Agreements are unambiguous. *See e.g.,* Pl.'s Mem. & Sur. at 10-11, 15-16; Def.'s Second Supp. Br. at 2-3. The Federal Circuit agreed with the parties and held that the provisions of the Coast Agreement were "phrased in clear and unambiguous language," and thus, "they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Coast* 323 F.3d at 1038.

Given the similarity of the language in the Lewis and Tri-Cities Assistance Agreements, the Court can only come to this same conclusion. The plain meaning of the contracts controls and the Court may not resort to extrinsic evidence to vary the terms of the agreements. *Coast* 323 F.3d at 1038; *The American and British Manufacturing Co. v. United States*, 50 Ct. Cl. 204 (1915) ("The scope of a contract, as well as the intention of the parties in making the same, is to be gathered from the instrument itself, unless ambiguities intervene so patent upon the face of the writing that extraneous testimony alone will explain them."); *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("[E]xtrinsic evidence . . . may not be considered unless an ambiguity is identified in the contract language . . . Outside evidence may not be brought in to create an ambiguity where the language is clear."); *HRE, Inc. v. United States*, 142 F.3d 1274, 1276 (Fed. Cir. 1998); *McAbee Construction, Inc., v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The plain language of the Assistance Agreements at issue does not support an interpretation that the goodwill associated with the FSLIC cash assistance is nonamortizing. Permanent regulatory capital and amortizing goodwill can coexist. *Winstar*, 518 U.S. at 866-67

(discussing the "permanent capital credit" to Statesman's regulatory capital and the amortizing goodwill); *Coast*, 323 F.3d at 1040, 48 Fed. Cl. at 419. As the Federal Circuit explained in *Coast*, merely because a provision of the contract(s) provides that the cash contribution "shall be credited" to Sterling's net worth or regulatory capital account or "shall constitute regulatory capital" does not likewise mean that the goodwill associated with that assistance is nonamortizing. Even if the capital is permanent, it can be balanced by any debit to an asset account, not necessarily goodwill. *Coast*, 323 F.3d at 1040. The *Coast* Court provided the example where permanent capital could be balanced by an equal amount of unspent cash. *Id.*

Section 3(a)(2) of the Lewis and Tri-Cities Assistance Agreements clearly provides a deviation from GAAP in that it allows Sterling to record the full amount of the FSLIC cash contribution without reducing its goodwill by the same amount, as FASB 72 provides. This deviation from GAAP, an SM-1 forbearance, was promised to Sterling in its forbearance letters and was bargained for and incorporated into the terms of the Assistance Agreements. A further deviation from GAAP would be unwarranted in light of *Coast* unless bargained for and agreed to by the parties. *Coast*, 323 F.3d at 1039-41.

Unlike the plaintiff in *Coast*, Sterling did indeed request and was granted a further departure from GAAP. It was granted the SM-2 forbearance. As stated *supra* Part I, the SM-2 forbearance allowed Sterling to deviate from GAAP when recording the amortization of intangible assets, which according to FASB 72, would be amortized "over a period no greater than the estimated remaining life of the long term interest-bearing assets acquired." Pl.'s App. K ¶ 4. Thus, Sterling's acquisition documents differ from the Coast Agreement in that they allow it a further deviation from GAAP and FASB 72; the SM-2 forbearance granted to Sterling allows it to amortize the goodwill associated with FSLIC cash assistance for a period of 40 and 15 years respectively.[6] In sum, Sterling was allowed to credit the FSLIC cash assistance to its total

---

[6] The Lewis forbearance letter provided:

> 2. For purposes of reporting to the Bank Board, the value of any intangible assets resulting from accounting for the Acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed ***40 years*** by the straight line method.

Def.'s Supp. App. at 120 (emphasis added). Likewise, the Tri-Cities forbearance letter provided:

> 5. <u>Amortization of Unidentifiable Intangibles</u> For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Sterling over a period not to exceed ***15 years*** by the straight line method.

regulatory capital, without reducing a corresponding amount of goodwill. This was done pursuant to the SM-1 forbearance and § 3(a)(2) of the Lewis and Tri-Cities Assistance Agreements. Sterling was also allowed a further deviation from GAAP, which allowed it to amortize the goodwill associated with that transaction over a period longer than that provided for by GAAP. The agreements do not provide for the complete nonamortization of goodwill.

Plaintiff's contention that the SM-2 forbearance did not apply to RAP goodwill, and rather to only GAAP goodwill, is unsupported by the record. Likewise, Plaintiff's suggestion that the "purchase method" language used in SM-2 is an indication that the forbearance only applies to GAAP is likewise unsupported. Applying the SM-2 forbearance in a merger reported under the purchase method does not make SM-2 inapplicable when RAP goodwill is involved. Nor does SM-2 somehow differentiate between RAP and GAAP goodwill. It merely allows a departure from GAAP with respect to the amortization of all intangible assets. Judge Hewitt rejected a similar argument by the plaintiff in *Coast*. Plaintiff argued that RAP goodwill did not arise from the application of the purchase method and that SM-2 therefore did not apply to RAP goodwill. Judge Hewitt explained that "purchase method accounting marked [the thrift's] assets and liabilities to market, rather than incorporating them into plaintiff's balance sheet without conducting an independent valuation." *Coast*, 48 Fed. Cl. at 420. Judge Hewitt concluded "[o]nly the purchase method creates goodwill, and it creates RAP goodwill . . . as well as GAAP goodwill." *Coast*, 48 Fed. Cl. at 420-421. The Court finds Judge Hewitt's analysis illustrative. Nothing in the SM-2 forbearance suggests it does not apply to both RAP and GAAP goodwill, which was created by the purchase method of accounting. The forbearance does not distinguish between intangible assets.

Furthermore, Plaintiff's attempts to get this Court to consider extrinsic evidence when the Assistance Agreements are clear on their face are contrary to law and must fail. Plaintiff relies on *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999), to support its contention that the Court should consider extrinsic evidence of the parties' intent. It is true that *Metric Constructors* would allow this Court to consider extrinsic evidence, such as trade usage, when determining whether the agreements at issue are ambiguous, 169 F.3d at 752-53; however, the Court has considered the record and determined that the agreements are clear on their face. "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term." *Id.* at 751. Likewise, "[a] contracting party cannot, for example, invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting." *Id.* at 752. Although the Court need not consider extrinsic evidence in order to interpret the parties' unambiguous agreements, *Coast*, 323 F.3d at 1040, for sake of argument, even if the Court considers the extrinsic evidence offered by Plaintiff, it does not support a contrary meaning or otherwise suggest an ambiguity in the contract language. The Court now examines the extrinsic

---

*See* Def.'s Supp. App. at 117 (emphasis added).

evidence offered by the parties.

*C. The Extrinsic Evidence Does Not Support the Nonamortization of Goodwill Associated with FSLIC Assistance.*

As already stated, even if the Court were to consider the extrinsic evidence, it does not support Plaintiff's interpretation of the agreements. First, Sterling's course of performance suggests that the goodwill was amortizing. In fact, Sterling actually amortized the goodwill associated with the FSLIC cash assistance on its thrift financial reports ("TFRs") from 1986 to 1988. Ms. Nancy Shatto, a Sterling employee, attests that she recorded amortization of the total amount of intangible assets that Sterling reported on a "RAP basis" until 1989 because no one had instructed her to do otherwise. Pl.'s Supp. App. SS at 896 ¶ 12. She did this based on her knowledge of accounting. Likewise, Mr. Norman Judd, Shatto's supervisor, who was in charge of the books for a period during the relevant time, testified in deposition that he believed he was correctly amortizing the goodwill associated with the FSLIC cash assistance. Def.'s Supp. App. at 111. It was not until 1989 that Ms. Shatto amended the TFRs to *not* reflect the amortization of RAP goodwill. Pl's Supp. App. PP at 791. There is no clear reason why amortization stopped, other than Ms. Shatto's speculation that she was instructed to amend the 1989 TFR, by someone named "Cal," at the Office of Thrift Supervision ("OTS"). After talking with Cal, Ms. Shatto reduced the amount of amortizing goodwill associated with cash assistance to $0 and increased the amount of Total Regulatory Capital. Nevertheless, Ms. Shatto cannot remember the specifics of her conversation with Cal, rather she relies on her contemporaneous notes indicating the change after speaking with "Cal." Def.'s Supp. App. at 113-15; Pl.'s Supp. App. SS at 894-96 ¶¶ 4 - 11. Mr. William Byrne, Sterling's Chief Financial Officer ("CFO") at the time, states that Sterling "overlooked informing these employees not to amortize the goodwill." Pl.'s Supp. App. TT at 918, ¶ 8. Mr. Byrne said that although he reviewed the TFRs from time to time, he "never did a specific review of what was contained in line A-544 'Goodwill and Other,' or to what extent it is amortized." *Id.* These facts are undisputed. Sterling argues that this failure to amortize or communicate some direction to its employees does not constitute a waiver of its contractual rights. This may be true, but evidence of amortization does not support Sterling's contention that the goodwill associated with FSLIC was intended to be nonamortizing.

Moreover, other statements in the record do not support the argument that RAP goodwill was intended to be nonamortizing. First, Sterling's President and Chief Operating Officer, Mr. William Zuppe, believed that amortization was required. In connection with the Tri-Cities acquisition, Mr. Zuppe said that the FHLBB allowed Sterling to credit $11.7 million in cash assistance, which "could be credited to net worth and treated as supervisory goodwill amortized over 15 years." Def.'s Supp. App. at 128. Mr. Zuppe's understanding is consistent with the plain language of the Tri-Cities Assistance Agreement. Mr. Byrne, Sterling's CFO, who believed that only GAAP goodwill required amortization, was unable to point to any language in the agreements during deposition that stated amortization was only required for the GAAP portion. Def.'s Second Supp. App. at 140. Mr. Byrne stated that "it seemed to be the logical conclusion."

*Id.* Nevertheless, Mr. Byrne's assumptions about the agreements are not enough to create an ambiguity when the language is clear; an ambiguity is not created when the parties merely differ in their respective interpretations of a contractual term. *Metric Constructors, Inc.*, 169 F.3d at 751.

A review of the record shows support for Defendant's interpretation of the agreements, that the goodwill was to amortize according to the schedule set forth in the Lewis and Tri-Cities forbearance letters. For example, Darrell Dochow, the director of the division of FHLBB that was involved in negotiating and approving forbearances at the time of the Tri-Cities transaction, stated in deposition that all intangible assets would amortize according to the SM-2 forbearance, including goodwill. Def.'s Supp. App. at 379-380. He made no distinction for the goodwill associated with FSLIC cash assistance. *Id.* This deposition testimony is consistent with the plain meaning of the Assistance Agreements. Likewise, Ms. Patricia McJoynt, who negotiated the Tri-Cities acquisition for the Government, has said that the phrase "shall constitute regulatory capital" in § 3(a)(2) was not intended to address the nonamortization of the goodwill associated with the cash contribution and neither was ¶ 4 of the Tri-Cities forbearance letter. Def.'s Supp. App. at 195-198, 234. In contrast, Ms. McJoynt's deposition lends support to the interpretation that the capital credit was permanent, which may coexist with amortizing goodwill on the balance sheet. Def.'s Supp. App. at 223. The testimony of Mr. James Faulstich, the FHLBB negotiator involved with the Lewis acquisition, is consistent with Ms. McJoynt's testimony. He said in deposition that the FSLIC cash assistance was to be treated as permanent capital, "which would help [Sterling] to meet the regulatory requirements, capital requirements, as set forth by the Bank Board." Pl.'s App. JJ at 572. This statement is likewise consistent with the plain meaning of the Assistance Agreements. Mr. Faulstich also testified in deposition that the $1.75 million FSLIC cash contribution was to be treated as permanent capital:

> Q. Was it to be treated as permanent capital? Do you know?
>
> A. It would be treated as – permanent capital, yeah, as a cash contribution.
>
> Q. Not to be paid back at a later date? Not to be amortized over a period of time?
>
> A. That would be correct.

Pl.'s App. V-1 at 108. The Court finds little support for the nonamortization of the *goodwill* associated with the cash assistance; permanent regulatory capital does not necessarily mean that the goodwill associated with that capital is nonamortizing. *See Coast*, 323 F.3d at 1041-42.

Furthermore, the opinion of Mr. Roger Orders, who is Plaintiff's expert, stating that the forbearances granted to Sterling only address and apply to GAAP goodwill is unsupported by the record. There is nothing in the forbearance letters that distinguishes between RAP and GAAP goodwill, rather the relevant language refers to intangible assets. Pl.'s App. UU at 1019 -1031.

Mr. Orders's opinion testimony cannot be used to alter the plain meaning of the agreements.

Finally, the Central Evergreen Agreement, including the business plan and the negotiations in connection with that agreement, do not support Plaintiff's assertion that the goodwill associated with the Lewis and Tri-Cities acquisitions is nonamortizing. Although Mr. Byrne attests that the parties were agreeing in the Central Evergreen Agreement "to include intangible assets as capital," Pl.'s App. FF-3 at 387, a declaration by Edward C. Hedland, the FHLBB supervisory agent that was involved in the negotiations shows that he disagrees. Mr. Hedland attests that although he knew of the Lewis and Tri-Cities acquisitions, "neither the Central Evergreen Agreement, nor the attached business plan and accompanying pro forma schedules, were intended to address the accounting treatment for the additional goodwill created by the FSLIC's cash contribution . . . ." Def.'s Second Supp. App. at 183, ¶ 8. Moreover, Mr. Byrne's assertions that Sterling bargained for permanent capital and would be able to count the capital as permanent if Sterling was to acquire Central Evergreen, Pl.'s App. NN, at 722, are not inconsistent with the plain meaning of the Lewis and Tri-Cities Assistance Agreements. The Assistance Agreements allowed Sterling to count the FSLIC cash contributions toward its net worth. Nor are Mr. Byrne's statements about permanent capital inconsistent with the understanding of Mr. Harold Gilkey, who represented Sterling in the acquisition of Central Evergreen and who believed that Sterling had acquired permanent regulatory capital in connection with the Lewis and Tri-Cities acquisitions. Pl.'s App. KK at 580.

In addition, the business plan and pro formas do little to contradict the clear language of the Lewis and Tri-Cities Assistance Agreements. As Defendant points out, some of Sterling's financial pro formas reported the full amount of FSLIC cash assistance on a separate equity line item, as "contributed capital," and there are no separate line items distinguishing between intangibles. Def.'s Second Supp. App. 201-202. Finally, Mr. Roger Orders, Plaintiff's expert who analyzed the Central Evergreen business plan, could not determine precisely "what went into the business plan in terms of amortization;" nor could he conclude whether it was prepared on a RAP or GAAP basis. Def.'s Second Supp. App. at 214-215; Pl.'s App. LL 610-11. Mr. Orders did not have detailed amortization schedules to rely on in forming his opinion, rather he reconstructed the numbers "based upon the numbers that are reflected in the business plan what probably was included in the amortization of goodwill," and from this Mr. Orders concluded that it could not have included the amortization of goodwill associated with cash assistance. Pl.'s App. LL 601-611. The Court does not find his opinion helpful to Plaintiff. Def.'s Second Supp. App. at 214-215. Thus, the Court cannot find that the Central Evergreen business plan "is a significant manifestation of the parties' understanding about how it was to calculate regulatory capital" or the business plan evinces their mutual intent to forego the amortization of RAP goodwill as Plaintiff urges it does. Pl.'s Supp. Resp. at 16.

In sum, viewing the facts in light most favorable to Sterling, the extrinsic evidence neither supports an interpretation contrary to that of the plain meaning of the Assistance Agreements nor does it suggest an ambiguity. Based on the plain meaning of the both the Lewis

and Tri-Cities Assistance Agreements, goodwill associated with FSLIC cash assistance was to amortize according the schedule set forth in the forbearance letters issued by the FHLBB in connection with the thrift acquisitions, for 40 and 15 years respectively.

## IV. Conclusion

For the reasons stated above, the Court GRANTS Defendant's Cross-Motion for Partial Summary Judgment on the issue of the amortization of goodwill associated with FSLIC cash assistance. The goodwill associated with this assistance was to amortize according to the terms of the SM-2 forbearance. Thus, Plaintiff's Motion for Partial Summary Judgment with respect to this issue is DENIED. The parties are ORDERED to file, within 10 days of the filing of this opinion, a joint status report as to future proceedings in this case and are to include three mutually agreeable dates for a status conference.

Some of the information contained herein may be subject to a protective order. The opinion shall be **filed under seal** until the parties review the opinion to see if any information should be redacted prior to publication in accordance with the terms of the protective order. The parties shall also file a joint report indicating any such information that should be redacted within 10 days of the filing of this opinion.

Edward J. Damich

EDWARD J. DAMICH
Chief Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Chief Judge Damich)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**JOINT STATUS REPORT**

Plaintiffs, Sterling Savings Association and Sterling Financial Corporation (collectively, "Plaintiff"), and Defendant, the United States of America, respectfully submit this joint status report pursuant to the Court's Order dated October 1, 2002, directing the parties to "file a joint status report no later than November 22, 2002."

## I. COMPLETION OF EXPERT DISCOVERY.

The parties completed expert discovery on November 6, 2002.

## II. THE COURT'S ORDER DATED OCTOBER 16, 2002, AND OUTSTANDING MOTIONS BEFORE THE COURT.

### *1. The Capital Credit Issue.*

The Court conducted an in-person status conference on October 15, 2002, and issued an Order setting forth a time schedule for the damages phase of the case. Pursuant to that Order, Defendant is to file a supplemental brief addressing "whether the FSLIC's cash contributions in connection with Tri-Cities and Lewis acquisitions were to be recorded as an asset on a permanent basis or whether they were to be amortized" by no later than December 9, 2002. Plaintiff is to file

its response by December 23, 2002. Defendant may reply seven (7) days after service of Plaintiff's response. Following the Court's ruling on that issue, a status conference will be held to discuss a time schedule for resolving all other issues relating to damages.

The Court also directed Defendant to notify it if a petition for Panel rehearing or rehearing en banc is filed in the *Coast* case. If such a filing takes place, the parties are jointly to schedule a telephonic status conference to discuss how the Federal Circuit's action on the petition in *Coast* may affect the time schedule in this case. To date, the Department of Justice has not reached a final decision as to whether to file a petition on behalf of the United States.

2. ***The Standing Issue.***

The Court also provided Plaintiff the opportunity to file a supplemental brief on "whether it lacked standing in this case due to the issuance of an injunction in the district court proceeding in the Eastern District of Washington." Plaintiff notified the Court and Defendant, by letter dated October 25, 2002, that it is satisfied that the issue of standing was fully briefed and Plaintiff will not submit further materials. The standing issue is addressed by the parties' in their memoranda and appendices dated October 10, 2000, December 15, 2000, and January 16, 2001.

3. ***Other Issues Relating to Damages.***

Pursuant to the Court's order, any other issues relating to damages in this case are not to be addressed until after the Court has ruled upon the above-referenced standing and capital credit issues. The parties anticipate that, after these issues are resolved, a status conference will be held to discuss (1) Plaintiff's proposal to amendment its expert reports to bring them up to date and to make any changes that might become necessary in light of the Court's rulings on the two outstanding issues identified above; (2) identification of remaining issues to be decided in connection with the

damages phase of the case; (3) Plaintiff's proposal to bifurcate trial (or summary judgment) of expectancy and alternative damages theories; and (4) establishment of a calendar for summary judgment upon and/or trial of the remaining damages issue(s). Defendant proposes that, if Plaintiff intends to propose amendment of its expert reports and a bifurcated trial or summary judgment schedule, Plaintiff shall be required to provide Defendant with a detailed description of its proposals prior to a status conference in order to afford Defendant an opportunity to formulate a response, if necessary.

Respectfully submitted,

WITHERSPOON, KELLEY,
DAVENPORT & TOOLE, P.S.

By: ______________________
William D. Symmes, Counsel of Record
by William M. Symmes, a Member
of the Bar of the United States Court
of Federal Claims

Attorneys for Plaintiffs

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 514-7300

Attorneys for Defendant

November 22, 2002

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on November 22, 2002, I caused to be served by United States mail (first-class mail, postage prepaid), and facsimile, copies of "JOINT STATUS REPORT, " addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Chief Judge Damich)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**JOINT STATUS REPORT**

Plaintiffs, Sterling Savings Association and Sterling Financial Corporation (collectively, "Sterling"), and Defendant, the United States, respectfully submit this joint status report pursuant to the Court's Order, in an opinion dated July 11, 2003, directing the parties to file a joint status report as to future proceedings in this case and to include three mutually agreeable dates for a status conference.

## I. INTRODUCTION

As of the last status conference, the Court issued an Order conveying its intent to resolve the pending capital credit and standing issues before proceeding to the damages phase of the case. In opinions dated July 9, 2003 and July 11, 2003, the Court resolved those two remaining issues. The parties have been unable to agree upon a proposal for future proceedings. Accordingly, this status report provides the parties' respective proposals for future proceedings, beginning with Sterling's.

## II. THE GOVERNMENT'S PROPOSAL FOR FUTURE PROCEEDINGS

### A. Damages Summary Judgment Briefing Can Commence Immediately

#### 1. Sterling's Proposal For Unlimited Amendment Of Its Expert Reports Is Unacceptable

This section sets forth the Government's proposal for future proceedings. Although its proposal is not detailed, Sterling apparently proposes that the Court permit it to perform wholesale amendments to the five remaining, relevant expert reports that it has submitted to the Government.[1] This proposal is unacceptable because the deadline for filing of expert reports by Sterling in this case occurred in 2001, and the Government has expended considerable time, expense and resources in formulating comprehensive responses to Sterling's damages theories. To date, all expert reports have been filed by both parties, and each expert has been deposed. Further, the Government would be prejudiced if Sterling, upon reviewing the Government's comprehensive responses to its damages claims and deposing our experts, is permitted "another bite at the apple" to cure any deficiencies in its approach. Sterling first filed a complaint in this case in 1990, and has had ample time, nearly 10 years, to develop its damages theories. Consequently, Sterling's proposal to amend its expert reports, apparently without limit, is inappropriate.

---

[1] Two of Sterling's seven expert reports, by Messrs. Orders and Taylor, are no longer relevant in light of the Court's ruling on the capital credit issue.

Respectfully submitted,

WITHERSPOON, KELLEY,
DAVENPORT & TOOLE, P.S.

By: ______________________
William D. Symmes, Counsel of Record
by William M. Symmes, a Member
of the Bar of the United States Court
of Federal Claims

Attorneys for Plaintiffs

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 514-7300

Attorneys for Defendant

July 21, 2003

Respectfully submitted,

WITHERSPOON, KELLEY,
DAVENPORT & TOOLE, P.S.

By:________________________________
William D. Symmes, Counsel of Record
by William M. Symmes, a Member
of the Bar of the United States Court
of Federal Claims

Attorneys for Plaintiffs

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

Jeanne E. Davidson / by William Ry
JEANNE E. DAVIDSON
Deputy Director

Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 514-7300

Attorneys for Defendant

July 21, 2003

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on July 21, 2003, I caused to be served by United States mail (first-class mail, postage prepaid), and facsimile, copies of "JOINT STATUS REPORT," addressed as follows:

William D. Symmes, Esq.
Witherspoon, Kelley, Davenport & Poole
1100 U.S. Bank Building
Spokane, Washington 99201
Tel.: (509) 624-5265

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STERLING SAVINGS, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Docket No.: 95-829C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

RECEIVED
APR 09 2002
WITHERSPOON, KELLEY, DAVENPORT, TOOLE, P.S.

Pages: 1 through 42

Place: Washington, D.C.

Date: February 26, 2002

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

order should be very workable.

THE COURT: Okay. Good.

MS. HOSFORD: I agree.

THE COURT: All right. And then fact discovery, of course, is closed. Is that correct?

MS. HOSFORD: That's correct, except for those outstanding depositions that we spoke about earlier that will go to the capital credit issue, which we've agreed to defer until damages.

THE COURT: All right. And when do you -- now that liability is not -- a decision on liability is not impeded by that fact discovery, when will that take place?

MS. HOSFORD: We would be in a position to take those depositions within the next few months. I mean, I don't see why we shouldn't be able to take them contemporaneously with the expert discovery with respect to our experts unless plaintiffs disagree.

THE COURT: So what the Court is basically doing -- for some reason, I have this tidiness tendency, so I like to think of things as clearly as possible. What in effect is happening is fact discovery is being extended and presumably we can make it contemporaneous with the close of expert discovery on July 22, 2002. Does that meet with your agreement?

MS. HOSFORD: That sounds reasonable, Your Honor.

REPORTER'S CERTIFICATE

DOCKET NO.: 95-829C

CASE TITLE: Sterling Savings v. U.S

HEARING DATE: February 26, 2002

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: February 26, 2002

Charles Kera

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N. W.

Washington, D. C. 20005-4018

# UNITED STATES
# COURT OF FEDERAL CLAIMS

RECEIVED
AUG 1 8
WITHERSPOON ... DAVENPORT & ...

| | | |
|---|---|---|
| STERLING SAVINGS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 95-829C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 25

Place: Washington, D.C.

Date: June 21, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

MR. WEATHERHEAD: Your Honor, Les Weatherhead, with the Court's permission?

THE COURT: Yes.

MR. WEATHERHEAD: As to lifting the stay, I think if the Court is referring to the stay on the briefing of the government's motion for summary judgment on damages --

THE COURT: Yes, but perhaps I misspoke. I've got to take a look at the stay actually, but I don't want there to be any stay in effect in this case to tie anyone's hands on what needs to be done. But by the same token, I also don't see a need to respond to the motion for summary judgment at the same time or considering the motion for reconsideration because that might be kind of a wasted effort.

MR. WEATHERHEAD: Thank you, Your Honor. I just wanted to be clear about that.

THE COURT: Let us deal with the motion for reconsideration first and try to resolve that way the issue of liability, and then we can move on to damages from there, but again in an expeditious way. What is the status of discovery in this case?

MS. HOSFORD: Discovery has been concluded since, I believe, early 2004 with respect to damages. As I mentioned before, Your Honor, when I filed my

motion for summary judgment, Plaintiffs indicated that they might want to put in more evidence from their experts and fact witnesses, which I indicated at the time in an opposition to a motion for enlargement of time, would spur additional discovery, but so far since they haven't responded, I don't know whether they're going to do that. But as far as I'm concerned, discovery is closed.

MR. WEATHERHEAD: Your Honor, Les Weatherhead. I agree that the period set by the Court for discovery has concluded and we've all taken fact depositions and expert depositions. It is true that we would reserve the right afforded any ordinary litigant to file affidavits in opposition to a motion for summary judgment. I'm not understanding why that's viewed as irregular by the government. But we certainly would intend where appropriate to put in affidavits in opposition to summary judgment.

MS. HOSFORD: Your Honor, with all due respect to Mr. Weatherhead, I agree that under normal circumstances affidavits would be perfectly appropriate to append to a motion for summary judgment. In these Winstar cases, they were set up so that all discovery and all support for expert opinions and damages claims would be put in expert reports and

## REPORTER'S CERTIFICATE

| | |
|---|---|
| DOCKET NO.: | 95-829C |
| CASE TITLE: | Sterling Savings, et al. v. U.S. |
| HEARING DATE: | June 21, 2006 |
| LOCATION: | Washington, D.C. |

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: June 21, 2006

Kyle Patrick Johnson
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**PLAINTIFFS' BRIEF RE: PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

## I. RELIEF SOUGHT/SUMMARY OF ARGUMENT

Pursuant to RCFC 56(e), Plaintiff Sterling moves for an order striking the Expert Report of W. Barefoot Bankhead (the "Report"). The Government submitted the Report as evidentiary support for its Revised Motion for Summary Judgment Regarding Damages. *See Def's Rev. Brief*, p. 15-16 [and *Def's App*. Vol. II, pp. 805-15 [Doc. 222]. The Report does not comply with RCFC 56(e) and should be stricken because: (1) the Report is an unsworn statement, rendering it inadmissible hearsay; (2) the opinions within the Report consist of legal conclusions as to the meaning and application of FIRREA and regulations passed thereunder; and (3) the Report consists of opinions that contradict the express terms of Sterling's contracts with the Government.[1]

[1] As also set forth in Sterling's Motion to Strike the Government's Undisclosed Witnesses, the Report also should be stricken also because the Government did not timely designate Mr. Bankhead as an expert witness. Likewise, though not submitted in support of the Government's motion for summary judgment, the Updated Report of Mr. Hargett and his opinions should be excluded from trial upon the same grounds set forth herein.

## II. ARGUMENT

### A. THE REPORT IS AN INADMISSIBLE UNSWORN STATEMENT.

To establish facts in support of summary judgment, a party must submit evidence that would be admissible at trial. RCFC 56(e). Unsworn statements are inadmissible on summary judgment and cannot establish either undisputed facts for the moving party or a triable issue for the non-moving party. *See* RCFC 56(e); *Adarbe v. United States*, 58 Fed. Cl. 707, 711 n.1 (2003); *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *United States v. Dibble*, 429 F.2d 598, 601-02 (9th Cir. 1970). The requirements of RCFC 56(e) therefore apply to exclude on summary judgment any unsworn statements in expert reports. *See Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 569 (2003), *affirmed in part, rev'd in part*, 407 F.3d 1352 (2005) (FRE 703 does not permit expert reports to be considered as evidence). Because the Report is nothing more than an unsworn statement, it may not be considered under RCFC 56(e) and should be stricken.

### B. THE REPORT COMPRISES INADMISSIBLE LEGAL CONCLUSIONS.

Assuming for the sake of the argument that the Report was a sworn affidavit or declaration, it should be stricken regardless because it consists of legal conclusions over the meaning of FIRREA and its application to Sterling's contracts in the but for world. Such legal conclusions may not be considered on summary judgment. *Adarbe*, 58 Fed. Cl. at 711 n.1; *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1540-41 (11th Cir. 1990); *Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258-59 (2nd Cir. 1987); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2nd Cir.), *cert denied*, 434 U.S. 861, 98 S.Ct. 188 (1977) (the meaning and application of contract terms are questions of law for the court about which an expert may not opine); *CFM Comm., LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233-34 (E.D. Cal. 2005) (the meaning and application of federal statutes and regulations are questions of law for the court).

In the Report, Mr. Bankhead opines how, in the but for world, FIRREA would apply to Sterling's contracts with the Government; in particular he opines as to how FIRREA supposedly required Sterling's RAP capital, or, as what he refers to as contractual capital, to be re-categorized as "qualifying supervisory goodwill" under 12 CFR 567.1(w), a classification of regulatory capital that did not exist at the time Sterling contracted with the Government. These opinions constitute inadmissible legal conclusions over the meaning of FIRREA and its application to Sterling's contracts and should be stricken.

Moreover, Mr. Bankhead's opinions should be stricken not only because they comprise legal conclusions, but because they are contrary to *Winstar* precedent. This Court, as well the United States Supreme Court and Federal Circuit, has held that the passage of FIRREA breached the agreements because, through the statute, Congress eliminated the right to count intangible assets toward what FIRREA refers to as "core" and "tangible" capital. *United States v. Winstar Corp.*, 518 U.S. 839, 870, 116 S.Ct. 2432, 2452-53 (1996); *Winstar Corp. v. United States*, 64 F.3d 1531, 1538, 1544-45 (Fed. Cir. 1995); *Coast Fed. Bank FSB v. United States*, 48 Fed. Cl. 402, 427-29 (2000); *Statesman v. United States*, 26 Cl. Ct. 904, 913 (1992); *Winstar Corp. v. United States*, 25 Cl. Ct. 541, 549 -50 (1992). The courts have additionally held that the FIRREA regulations relied upon by Mr. Bankhead furthered the breach by interpreting FIRREA's restrictions on the regulatory use of intangible assets as applying both to contractual and non-contractual capital, requiring them to be classified as "qualifying supervisory goodwill" subject to the FIRREA cap and phase-out.[2] *See Winstar*, 64 F.3d at 1545 ("The OTS by regulation treated capital credits in the same manner as supervisory goodwill, *see* 12 CFR 567.1(w), thereby restricting the use of such credits for regulatory capital purposes."). Accordingly, when

[2] Prior to FIRREA, the Savings and Loan Industry did not classify regulatory capital into different categories of core, tangible, or risk based capital. 12 CFR 561.13 (1985) (App. 1298-99); 12 CFR 561.13 (1987) (App. 1307-09); Instructions to the Thrift Financial Reports ("TFRs") of 1987 (App. 1303-06). RAP capital stood on equal footing with stock or cash. *Winstar*, 518 U.S. at 849-50, 116 S.Ct. at 2443.

Mr. Bankhead, in his report, applies FIRREA's definition of qualifying supervisory goodwill under 12 CFR 567.1(w) to Sterling's capital credits in the but-for world, he did that which the various *Winstar* courts have held to constitute a breach.[3]

Stated differently, Mr. Bankhead's opinions contravene the courts' holdings that, as a matter of law, Sterling's so-called contractual capital in the but for world would have counted fully towards its regulatory capital requirement without restriction and on par with other recognized tangible and core assets, such as cash:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, <u>the Bank Board had to offer a 'cash substitute'</u> to induce a healthy thrift to assume a failed thrift's obligations.

*Winstar*, 518 U.S. at 849-50, 116 S.Ct. at 2443 (emphasis added). Therefore, in the but for world, Sterling is entitled to count as regulatory capital <u>both</u> the capital credits from its contracts with the Government and the so-called lessor class of non-contractual, supervisory goodwill from the Central Evergreen acquisition, though the Central Evergreen capital would be subject to the cap and phase-out requirements of FIRREA.

In sum, Mr. Bankhead's opinions in the Report not only should be stricken as legal conclusions, but as conclusions that would lead to a different sort of breach under well-established *Winstar* case law.[4]

---

[3] Mr. Bankhead's Report suggests that he is not applying FIRREA to the capital credits insofar as he credits Sterling for the full amount of regulatory capital required by the contracts. This suggestion is disingenuous. Though Mr. Bankhead gives full credit to Sterling's contractual capital in the but for world, he still nonetheless classifies the capital as the more restricted form of qualifying supervisory goodwill under 12 CFR 567.1(w). As discussed in Section C, this classification of Sterling's RAP capital under the contracts is in violation of the express terms of Sterling's contracts that causes harm by restricting the amount of capital to which Sterling would be entitled in the but for world under both the contracts and FIRREA.

[4] Sterling notes that the Government's arguments concerning Mr. Bankhead mirror those presented by the Government and rejected by the Court in *Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 70 (2006).

C. MR. BANKHEAD'S OPINIONS CONTRADICT THE EXPRESS TERMS OF STERLING'S CONTRACTS WITH THE GOVERNMENT.

Mr. Bankhead's opinions concerning the meaning and application of Sterling's contracts in the but for world also should be stricken because they are contrary to the contracts' express terms. The Lewis Federal Assistance Agreement expressly stated that the cash assistance shall constitute regulatory net worth as then defined, not as later defined by FIRREA. The Assistance Agreement and the Forbearance Letter made this clear by stating that, for regulatory accounting purposes, the cash assistance was to be credited directly to Sterling's net worth account. (App. 566, 592) The terms "net worth" and "net worth account" referred to "Regulatory Net Worth" as then defined in 12 CFR § 561.13 (1985) (App. 1298-99) and the TFRs. (App. 1301) The November 4, 1985 FHLBB Resolution consummating the transaction reiterated that the capital to be acquired was regulatory capital as then defined by 12 CFR § 561.13 (1985):

> RESOLVED FURTHER, That the FSLIC hereby approves, pursuant to § 561.13 of the Insurance Regulations, Sterling's inclusion of the FSLIC's $1,750,000 cash contribution to Sterling, pursuant to the terms of the Assistance Agreement, as net worth, . . .

(App. 519) (emphasis added). Indeed, contrary to what Mr. Bankhead suggests, Sterling and the Government could not have agreed to a classification of regulatory capital that did not exist at the time of the agreements.

The same holds true for the RAP capital acquired as part of the Tri-Cities acquisition. The Assistance Agreement in that transaction expressly stated:

> "the cash contribution . . . shall be credited to [Sterling's] regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 CFR § 561.13 (1987)."

(App. 683).[5] Thus, as with Lewis Federal, Sterling's contract for Tri-Cities made clear that the

[5] By 1987, 12 CFR 561.13 no longer referred to "Regulatory Net Worth", but to "Regulatory Capital." *See* 12 CFR § 561.13 (1987) (App.1307-09).

regulatory capital obtained by Sterling was regulatory capital as contemporaneously defined and not as defined later by the regulators. As Chief Judge Damich previously held, Sterling's contracts with the Government gave it the express right to count the capital credits towards the regulatory capital requirement as it then existed, not as later restricted by FIRREA and 12 CFR 567.1(w). *Sterling Sav. v. United States*, 53 Fed. Cl. 599, 610-11 (2002), *vac., in part, on other grounds*, 72 Fed. Cl. 404 (2006).

In short, Mr. Bankhead's application of FIRREA's restricted definition of regulatory capital to Sterling's capital in the but for world violates its bargained-for rights and, consequently, would be a breach in the but for world. In the but for world, Sterling is entitled under the contracts to count its RAP capital as equivalent to, for example, common stock capital of equal dollar value or any other recognized tangible or core capital and, under FIRREA, to count the supervisory goodwill from Central Evergreen as qualifying supervisory goodwill under FIRREA subject to FIRREA's cap and phase-out rules. Mr. Bankhead's Report should be stricken on these grounds alone.

## III. CONCLUSION

Based upon the foregoing, Sterling requests that the Court strike the Report in its entirety.

Respectfully submitted this 29th day of March, 2007.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member Of the Bar of the United States Court of Federal Claims
1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I certify under penalty of perjury that on March 29, 2007, a copy of the foregoing **PLAINTIFFS' BRIEF RE: PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wolski)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO COURT'S ORDER DATED NOVEMBER 10, 2003, AND OPPOSITION TO PLAINTIFFS' BRIEF RE: AMENDING DAMAGE EXPERT REPORTS PURSUANT TO THE COURT'S NOVEMBER 10, 2003 ORDER**

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

WILLIAM F. RYAN
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300
FAX: (202) 305-7643

December 2, 2003

Attorneys for Defendant



526

specific (or "fact") discovery. Sterling identified seven experts on May 2, 2001, and filed seven expert reports on July 2, 2001. Expert depositions were held throughout the fall of 2001, and, in 2002, we filed three expert reports, which were followed by depositions of the three experts by Sterling. The last deposition was held in November 2002. Thus, expert discovery concluded over a year ago.

The Discovery Plan set forth in Procedural Order No. 2 provides for a single round of expert discovery. There is no opportunity under these rules to submit new theories of damages after the cut-off dates. We respectfully request that this Court strictly adhere to, and enforce, these deadlines.

C. Sterling's Attempt To Justify Its Advancement Of A New Theory At This Late Date By Claiming That The Theory Was Not Relevant Until Recently Is Contrary To The Record

Sterling claims that its last minute addition of an actual cost of replacement capital theory of damages is justified because "the recent decisions of the Court of Appeals in LaSalle, and of the Court of Federal claims in Home Savings and Franklin Federal, suggest that in *law* hypothetical costs may not relevant, and actual costs of capital actually raised are the relevant measure." Sterling brief, p. 11 (emphasis in original). As a preliminary matter, Sterling's claim that "recent" decisions "suggest that in *law* hypothetical costs may not be relevant," Sterling brief, p. 11 (emphasis in original), is disingenuous. In 1999, well before the filing of Sterling's expert reports in 2001, the trial court in LaSalle rejected a hypothetical cost of replacement capital theory. LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 110-111 (1999), aff'd in part, vacated in part, and remanded, 317 F.3d 1363 (Fed. Cir. 2003). Of greater importance, however, is that the "relevance" of capital actually raised in mitigation, the theory

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court deny Sterling's request to amend its expert reports, with the exception of the amendments to reduce damages necessitated by the Court's recent ruling on the amortization of goodwill associated with FSLIC assistance.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

WILLIAM F. RYAN
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 514-7300

December 2, 2003

Attorneys for Defendant

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION,<br>a state-chartered savings association,<br>STERLING FINANCIAL CORPORATION,<br>a Washington corporation<br><br>Plaintiffs,<br><br><br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Court No. 95-829-C<br>Judge Wheeler |

**UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ**
**DECEMBER 11, 2006**

## I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in February 2004. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings by Judge Wheeler and to account for the passage of time. In an opinion dated August 30, 2006, Judge Wheeler ruled that the "…Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA."[1] For purposes of my Report and damages calculation I have therefore assumed that the supervisory capital created in the Central Evergreen acquisition will be subject to any limitations imposed by FIRREA.

[1] Opinion of Judge Wheeler, *Sterling Savings Association v. The United States*, August 30, 2006, p. 12.

My updated determination of Sterling's expectation damages is that they total $63.361 million.

## II. Elements of Expectation Damages

### *A. Lost Earnings on Foregone Assets*

To update my calculations I have relied on additional documents and data provided to me by the attorneys and Sterling since the filing of my last Report. These are primarily financial statements from 2003 though 2006. I have created an addendum to Exhibit 2 of my previous Report listing the additional materials supplied to me. Exhibit 3 is unchanged from my previous Report. Exhibit 4 and Exhibit 5 present financial information for Sterling and have been extended through September 2006 – the latest period for which I have financial statements.

Exhibit 6 incorporates the ruling of Judge Wheeler. Tables 4a, 4b, and 4c of Exhibit 6 have been restructured or added to present the amount of supervisory intangibles that could have been included in Sterling's core capital but-for the breach. Table 4a is a summary of the goodwill and intangibles of Sterling but-for the breach of the Lewis Federal and Tri-Cities contracts. Table 4b presents the goodwill amounts related to the Central Evergreen acquisition.[2] Since the Central Evergreen acquisition was supervisory in nature, the goodwill from the acquisition is subject to the supervisory goodwill phase-out limitations of FIRREA. The phase-out provisions of FIRREA allowed supervisory goodwill to count to a limited degree toward core-capital until January 1, 1995. This table calculates how much of the supervisory goodwill from Central Evergreen could count in Sterling's core capital over time. Table 4c presents the identified intangibles related to the Central Evergreen acquisition. These intangibles were allowed under provisions of FIRREA to also count toward core capital to a limited degree.[3]

---

[2] In documents from Sterling upon which I have relied, in the context of the Central Evergreen acquisition the term "unidentified intangibles" is used synonymously with goodwill.

[3] In my previous report I noted that changes in the accounting rules related to goodwill no longer require that goodwill be amortized, rather it is subject to impairment tests. For the contractual goodwill associated with Lewis Federal and Tri-Cities I assume that for regulatory capital purposes it would amortize. The change in the accounting rules did not affect goodwill from the Central Evergreen transaction because it was fully-amortized in 2000 – before the new rules took effect. Table 7 in Exhibit 6 presents an estimate of the amounts of non-supervisory goodwill given the new accounting rules.

My estimate of expectation damages is based on a model that is similarly structured to that presented in previous versions of my Report. I believe it is appropriate at this time to reconsider some of the assumptions used in modeling the "but for" bank for two reasons: first, Judge Wheeler's recent ruling removes significant amounts of regulatory capital from Sterling Savings, and so the world is quite different from the one modeled in earlier versions of my Report; second, we know a great deal more about the capabilities and attitudes of Sterling's management and organization than we did at the time the model was originally developed. I have therefore revisited a number of assumptions used in the previous modeling, and have made modest adjustments to take account of the changes required by Judge Wheeler's ruling.

Under the belief that the "but for" bank could include all of the intangibles resulting from the Central Evergreen merger in core capital, my previous Report assumed that until June 1991 Sterling would maintain the capital ratios specified in the Business Plan developed in 1988 (before FIRREA). Obviously, this is a conservative assumption, but plausible because the Central Evergreen goodwill made that a feasible strategy. Without the ability to use the Central Evergreen intangibles as anticipated at the time of the contract, it is not reasonable to assume that Sterling would strictly adhere to the capital ratios specified in the Business Plan.[4]

We know from the business plans and testimony of bank management that Sterling desired to grow and would have been very reluctant to shrink in asset size. My modeling of the "but for" bank assumes that Sterling will remain in compliance with the core capital requirement imposed by FIRREA and will maintain its asset size. Consequently I have estimated that the but-for bank will operate with a core capital ratio of 4% from December 31, 1989 to June 30, 1991, which is only marginally less than the ratios in the Business Plan (4.15%-4.24%), and well above the 3% ratio specified by FIRREA.

[4] In my original modeling I assumed that Sterling had a permanent (nonamortizing) capital credit and all of the intangibles from Central Evergreen to include in capital. This provided enough capital for a very large increase in assets if the capital were leveraged fully. In view of the uncertainty about the ability of Sterling to manage such substantial growth, and whether profits could be maintained through a period of very rapid growth, I imposed a restrictive growth constraint on the "but for" bank. In the "but for" world resulting from Judge Wheeler's ruling (i.e., with less core capital for Sterling), and with the evidence that Sterling is capable of managing substantial growth with good profitability, it may well be more appropriate to model the "but for" bank on the basis of a leveraging of all regulatory capital to the capital ratio maintained by the actual bank.

Additionally, a few data errors in the previous calculations have been found and corrected.[5]

In addition to adapting my calculation of Sterling's lost earnings to Judge Wheeler's ruling, I have updated my calculations through the present based on Sterling's recent financial performance. For the fourth quarter of 2003 through 2006 I have followed the same approach to modeling the but-for bank's performance as I did for 1990 through 2003.[6] Since 2003 Sterling has continued to grow both by internal growth and by acquisition. It has remained profitable while achieving this growth. Additionally in 2005 Sterling converted to a bank charter.

### *B. Future Damages*

As in my previous Reports, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions. His determination of the value is $0.641 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $63.361 million. Exhibit 8 presents a summary of the amounts. The lost earnings from 1990 through 2006 are $58.164 million, the wounded bank damages are $4.556 million, and the future damages are $0.641 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 11, 2006
3. Sterling Savings Association, Key Financial Data, 1983 – 1989

---

[5] The first involved the treatment of the tax benefits from net operating loss carryforwards ("NOLs"). A second involved a recalculation of the December 1989 core capital. The TFR form in use in 1989 did not include information on core capital as defined by FIRREA, and previous Reports have used a figure based on the June 1990 TFR. I have concluded that core capital in December 1989 was about $1 million lower than the figure used previously. A third involved the amount of intangibles and assets resulting from the acquisition of Empire Savings. Each of these corrections would, other things being equal, lower the expectations damage calculation.

[6] My methodology and rationale were described in my previous reports of September 2001 and February 2004.

4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2006
5. Sterling Savings Association, Asset Composition, 1990 – 2006
6. Calculation of Lost Earnings on Foregone Assets Through 2006
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

[signature]

Paul Horvitz

Dec 11, 2006

Date

In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C (Judge Wheeler) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# Updated Expert Report of Professor Christopher M. James
December 11, 2006

## TABLE OF EXHIBITS

**Exhibit A:** Curriculum Vitae

**Exhibit B:** Prior Testimony of Dr. Christopher M. James in the Previous Four Years

**Exhibit C:** Additional Documents Considered

**Exhibit D:** Summary of Lost Profits and Actual Cost of Mitigation for Lewis Federal and Tri-Cities

**Exhibit E:** Calculation of Lost Earnings on Foregone Assets Through 1993

**Exhibit F:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 1991 through 2006

**Exhibit G:** Capital Raised Assumed to Mitigate Lewis Federal and Tri-Cities Intangibles

**Exhibit H:** Calculation of Cash Benefit Yield

**Exhibit I:** Actual Cost of Mitigation, Raised Capital to Mitigate Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

**Exhibit J:** Transaction Costs of Mitigation Capital for Lewis Federal and Tri-Cities

**Exhibit K:** Summary of Wounded Bank Damages

**Exhibit L:** Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles, 2006 through 2025

## I. Qualifications

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. Before joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions at several Federal Reserve Banks, the Federal Deposit Insurance Corporation, and the Treasury Department. I currently serve on the Advisory Board of SunTrust Bank. My academic research has been in the areas of securities pricing, corporate finance, and financial institutions. I have published numerous articles on economic and financial topics including the regulation of financial institutions, failure resolution policies, and capital raising by depository institutions. I also serve on the editorial boards of four scholarly journals including the *Journal of Financial Economics*. I served as an associate editor of the *Journal of Finance* and as editor of the *Journal of Financial Intermediation* from 1988 through 1999. A copy of my curriculum vitae is attached as Exhibit A. A list of my testimony over the last four years is included in Exhibit B. I am being compensated at my usual hourly rate of $650.

## II. Assignment

I have been retained in this matter by counsel for the plaintiffs, Sterling Savings Association ("Sterling") and Sterling Financial Corporation ("Sterling Financial"). I have been asked by the counsel for the plaintiffs to update my February 2004 report taking into account the Court ruling dated August 30, 2006.[1] Specifically, I was asked to:

a. Assume that the contract related to the acquisition of Central Evergreen was not subsequently breached by the government, hence did not result in damages to the plaintiffs.
b. Update my calculations through September 30, 2006.

[1] Opinion and Order, Judge Wheeler, filed August 30, 2006.

As part of my analysis, I have reviewed various documents including reports issued by experts retained by the Department of Justice, deposition testimony, court opinions, legal filings, financial statements for Sterling, and other selected documents for Sterling. A list of the additional documents I have considered is contained in Exhibit C. This list supplements the document lists that I previously produced.

## III. Summary of Opinions

Based on the Court ruling dated August 30, 2006, I was asked to assume that the contract related to the acquisition of Central Evergreen was not breached by the government. Hence, damages stem from the breach related to the acquisitions of Lewis Federal and Tri-Cities ("LF & TC") only. When calculating total damages, I followed the same methodology as in my February 2004 Expert Report, however, the calculated damages relate only to the LF & TC acquisitions.

Following similar steps as in my February 2004 Expert Report, I summed the damages resulting from the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with the issuance of mitigation capital related to LF & TC, lost profits attributable to the breach of the LF & TC contracts, and wounded bank damages related to the breach. Under the assumption of no damages pertaining to the acquisition contract for Central Evergreen, total damages are $18.708 million (see Exhibit D).

## IV. Cost of Mitigation

The calculation of the cost of mitigation in my current report follows the same methodology as in my February 2004 Expert Report albeit with updated inputs to account for the

Court's August 30, 2006 ruling.[2] Furthermore, I have updated my calculations through September 30, 2006. In these calculations only the costs of mitigating the contractual supervisory capital promises for LF & TC are considered damages. To determine these costs, in the context of my model, it is first necessary to assess which capital was raised as a substitute for LF & TC's supervisory capital as opposed to being raised for other purposes. These other purposes include raising capital to substitute for the 1989 unit offering which had been planned prior to the breach and to substitute for the supervisory capital from the Central Evergreen acquisition that was lost after the passage of FIRREA. Only capital raised as a substitute for LF & TC's supervisory capital mitigates the effect of the breach ("mitigation capital") and results in mitigation damages.

Capital that Sterling raised in the 1991 and 1993 offerings was not traceable to any specific purpose, but was generally used to support the growth of the business. In the 1991 offering prospectus Sterling stated: "The primary purpose of this Offering is to increase Sterling's regulatory capital levels. Net proceeds will be used to support the growth of Sterling's business, including the origination of loans."[3] In the 1993 offering prospectus the intended purpose of the capital contributed to Sterling was to "…improve further the Sterling Savings' capital ratios. Sterling Savings intends to use such additional capital to support the growth of the business, including funding loans and investments and expanding its branch network."[4] Neither of the offerings indicated that the purpose was to mitigate the effects of the breach or other non-breach aspects of FIRREA.[5]

---

[2] As I noted in my February 2004 Expert Report, I am not rendering an opinion on whether Sterling actually replaced the supervisory capital that was generated in the contracts with the government. For purposes of these calculations I have been asked to assume that it did.
[3] Sterling Savings Offering Circular, November 20, 1991, p. 13.
[4] Sterling Financial Corporation Subordinated Notes Prospectus, February 4, 1993, pp. 4, 12.
[5] As I noted in my February 2004 report, I have been asked to assume for purposes of these calculations that the offerings were used to mitigate the breach of Lewis Federal and Tri-Cities' contracts. I believe this premise is counterfactual based on my review of the documents and the testimony of fact witnesses but I make the assumption as the necessary basis for calculating damages at or near the time of the breach, and on the belief that it is conservative in the sense that it minimizes damages awardable against the government.

Furthermore, once capital is raised, the proceeds from such an offering are fungible. Given that Sterling did not specify whether the raised capital was attributable to either substituting for the 1989 offering, mitigating the loss of the supervisory capital of LF & TC, or substituting for supervisory capital of Central Evergreen, it is therefore necessary to allocate the proceeds to Sterling's needs when calculating the cost of mitigation. In the next paragraphs I outline the assumptions that I made in order to assess which capital was raised as a substitute for LF & TC's supervisory capital.

Consistent with my February 2004 report, I assumed that $12 million of the capital raised in the 1991 offering served as a substitute for the proceeds which Sterling would have raised in the 1989 withdrawn offering, an offering that had been planned prior to the breach. The balance of the capital raised at the time of the 1991 offering was then allocated between capital needs that arose after the passage of FIRREA. I allocated the balance proportionally between the need to substitute for the supervisory capital from the Central Evergreen acquisition and the need to mitigate the breach of LF & TC's contracts. I have continued to allocate a portion of the offering to Central Evergreen because post-FIRREA Central Evergreen's supervisory capital could no longer be counted as tangible capital. As a consequence, Sterling would have needed to find a substitute for it. Therefore, the balance of capital raised at the time of the 1991 offering (both the proceeds from the 1991 offering and capital raised due to the Preferred Stock Series B conversion) is prorated based on the respective supervisory capital balances of LF & TC (54.8%) and Central Evergreen (45.2% = 100% - 54.8%).[6]

The sum of the allocated proceeds of the 1991 offering of $11.719 million and the capital resulting from the Preferred Stock Series B conversion of $2.1 million is less than the sum of the balances of supervisory capital of LF & TC and Central Evergreen (see Exhibit G). The capital

---

[6] The amount of LF & TC and Central Evergreen supervisory capital as of the time of the 1991 offering is $13.346 million and $11.022 million, respectively (see Exhibit G). $13.346 million / ($13.346 million + $11.022 million) = 54.8%.

raised in 1993 is therefore necessary to fully-mitigate the loss of LF & TC's supervisory capital. In 1993, the preferred stock issued by Sterling fully-mitigated the supervisory capital of LF & TC, as well as fully-replaced Central Evergreen's.

**1. Cost of Mitigation – 1991 Through 2006**

The net cost of mitigation capital for LF & TC from 1991 through September 2006 is $7.729 million (see Exhibit F). The following updates were implemented:

1. As discussed above, I did not include in the calculated mitigation damages any costs associated with the substitution of Central Evergreen's supervisory capital. This results in a smaller average amount of capital assumed to mitigate the breach (presented in Exhibit G) and in turn lowers the net cost of capital (presented in Exhibit F).
2. I updated the calculation of the past mitigation costs to include years 2004, 2005, through September 2006.

**2. Cost of Mitigation – 2006 Through 2025**

The net future cost of mitigation for LF & TC is $1.386 million (see Exhibit I). The following updates were implemented:

1. I updated the cash benefit rate of mitigation capital and the discount rate to reflect the current yield on 30-year U.S. Treasury bonds.
2. I updated the analysis to include only the period starting on September 30, 2006 through December 31, 2025.[7]

[7] I have also made one correction to the calculation of the Weighted Average Capital Raised Balance in Exhibit I.

## V. Transaction Costs of Mitigation Capital

I updated my calculation of the transaction costs of mitigation capital taking into account the Court's ruling dated August 30, 2006. As discussed above, only capital mitigating the breach related to LF & TC contracts leads to mitigation damages. Therefore, only the portion of the transaction costs related to the capital which mitigated LF & TC's supervisory capital is included in mitigation damages. The transaction costs attributed to mitigation capital for LF & TC are $0.900 million (see Exhibit J).

## VI. Lost Profits from Un-Mitigated Supervisory Capital

My approach to lost profits follows the approach I outlined in my February 2004 report. As a result of the Court's ruling dated August 30, 2006, I calculate lost profits damages on LF & TC's supervisory capital prior to its full mitigation. As I noted in my February 2004 report, leverage is valuable to thrifts. The lost profits from the un-mitigated LF & TC supervisory capital can be measured with the model developed by Dr. Horvitz which I have adopted.[8] My calculation of lost profits starts at the time of the breach (as does Dr. Horvitz's) and continues through February 1993 – the time when the LF & TC supervisory capital would have been fully-mitigated.

As before, I have made several adjustments to Dr. Horvitz' model to account for the capital raises that I have been asked to assume mitigated the breach. The first adjustment is to the amount of capital Sterling would have raised but-for the breach. The implication of a possible ruling by the Court that Sterling's capital raises subsequent to the breach were initiated to mitigate the breach would mean that the capital would not have been raised. However not all of the capital raised in 1991 and 1993 was needed to mitigate the loss of LF & TC's supervisory capital – clearly some of the capital was raised for other purposes. Capital raised for purposes other than to

[8] Updated Expert Report of Professor Paul Horvitz, December 11, 2006.

mitigate the breach would still have been raised but-for the breach. My lost profits calculation therefore includes capital raised in 1991 that was a substitute for Central Evergreen's supervisory capital. As Exhibit E, Table 3a shows, \$5.678 million of the 1991 offering and conversion of Series B Preferred is a substitute for Central Evergreen's supervisory capital.

The second adjustment I made to Dr. Horvitz's model is that in light of the changed capital structure I reevaluated the leverage ratio of the but-for bank at the end of fiscal year 1992. I have made the same adjustment as in my February 2004 report. The final adjustment relates to dividend payments on the Series B Preferred Stock that was converted into common stock at the time of the 1991 offering. To the extent that the Series B Preferred Stock was not converted , Sterling would have continued to pay dividends on the portion that was not converted.

The updated lost profits damages resulting from the un-mitigated supervisory capital from LF & TC are \$4.137 million (see Exhibit E).

## VII. Wounded Bank Damages

The wounded bank damages of \$4.556 million have not changed since my February 2004 report (see Exhibit K).

## VIII. Summary - Total Mitigation Damages

Total damages are the sum of the net cost of mitigation capital pertaining to LF & TC, transaction costs associated with issuing the mitigation capital related to LF & TC, lost profits on un-mitigated supervisory capital pertaining to LF & TC, and wounded bank damages. The total damages are \$18.708 million (see Exhibit D).

**IX. Cost of Replicating Preferred Stock on September 30, 2006 with Terms Equivalent to Lewis Federal and Tri-Cities Intangibles for Dr. Horvitz's Report**

I have also been asked to update the cost of replacement damages resulting from the inability to leverage the remaining supervisory capital pertaining to LF & TC from 2006 to 2025. I have performed this calculation, showing that the net cost of replicating the supervisory capital in the future is $0.641 million (see Exhibit L). Because Sterling's rating has improved since my February 2004 report, I have updated my estimate of the dividend yield on the preferred stock that could replicate the supervisory capital of LF & TC. [9] I have assumed a 6.30% dividend yield for the preferred stock as of September 29, 2006, which is the yield on a preferred stock index with rating Baa/BBB as of September 29, 2006.[10] I have also updated the cash benefit rate of capital and the discount rate to reflect the current yield on the 30-year U.S. Treasury bonds of 4.76%.[11]

[9] Fitch upgraded Sterling's Long Term Issuer Default Rating from BB+ to BBB- on 3/22/06. (Source: *Bloomberg*)
[10] Source: www.epreferreds.com.
[11] Source: *Bloomberg.*

I hold the opinions expressed herein to a reasonable degree of certainty, and declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. I reserve the right to modify my report and opinions in response to reports of the government's experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

__________________________

Christopher M. James

Executed 12/11/06