**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION**
**TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

Pursuant to Rules 7 and 56 of the United States Court of Federal Claims, defendant, the United States, respectfully submits this response to plaintiffs' Motion to Strike the Expert Report of W. Barefoot Bankhead.

**INTRODUCTION**

Plaintiffs seek to strike Mr. Bankhead's expert report from consideration in support of our revised motion for summary judgment. Plaintiffs contend that his report is an unsworn statement, that it contains legal conclusions, and that it contradicts terms of Sterlings Savings Bank's ("Sterling") contracts with the Government. Pl. Mot. at 1.

Plaintiffs' motion does not withstand scrutiny: First, plaintiffs misstate the standard set forth in Rule 56 of the Rules of this Court. Second, Mr. Bankhead's calculations are not, as plaintiff describes, "legal conclusions," Pl. Mot. at 3, but are the application of then-existing accounting regulations to the "but-for" world to measure the breach's effect. Experts have performed such calculations in virtually every Winstar-related case to date.

Third, plaintiffs' complaint that Mr. Bankhead's calculations are contrary to Sterling's contracts with the Government exposes a larger problem. Mr. Bankhead calculated Sterling's post-breach capital position, giving plaintiffs the full benefit of all of the contractual goodwill prescribed by the Court's liability opinions. These calculations revealed that, absent the breach, Sterling would not have had sufficient capital to sustain plaintiffs' lost-profits theory. Mr. Bankhead also demonstrated that Dr. Horvitz's most recent assessment of Sterling's post-breach core capital position included not only goodwill from the two contractual mergers, but included an additional $10.4 million in goodwill from the Central Evergreen merger, far exceeding the goodwill permitted by regulations. The contracts in this case, as found by this Court, did not guarantee Sterling that it could count Central Evergreen's goodwill towards its regulatory capital requirement.

## I. Plaintiffs Misunderstand Rule 56

Plaintiffs' contention that Mr. Bankhead's report should be "stricken" errs in several respects. First, plaintiffs imply that Rule 56 requires that a party submit sworn statements if it wishes to establish facts in support of summary judgment. Pl. Mot. at 2. This is plainly incorrect: Rule 56 (b) of the Rules of The Court of Federal Claims ("RCFC") provides that the defendant "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor." RCFC 56(b) (emphasis supplied). Thus, plaintiffs' contention that we were required to submit a sworn statement to establish certain facts is without foundation.[1]

[1] Plaintiffs' citation to Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544, 569 (2003), as support for its argument pertaining to Rule 56, is also misplaced. In Westfed, the Court considered the admissibility of an expert report at trial, and not whether expert reports may be cited in summary judgment briefing. Id. ("The court determined that expert reports were not

Plaintiffs neglect the standard set forth in the text of Rule 56: When there exists "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Pursuant to this rule, as the movant, we bore the burden of explaining that there were no genuine disputes of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Our reliance upon Mr. Bankhead's report comported with this standard: Mr. Bankhead explained that even with the full benefit of all of its contractual goodwill, Sterling's core capital levels would be far below that projected by plaintiffs. Def. Revised Mot. for Summ. Judgment Regarding Damages at 15-16. This fact is beyond genuine dispute: the assumptions underlying Mr. Bankhead's calculations – which plaintiffs now contest – were adopted by plaintiffs' own expert, Dr. Horvitz, in his first report. See Ex. 1 at 6. Thus, because Mr. Bankhead's calculations and conclusions are premised upon the same assumptions adopted by plaintiffs, and are plainly directed by the Court's liability opinions, there should exist no genuine dispute about these calculations. As the Federal Circuit emphasized in Sweats Fashions, Inc. v. Pannill Knitting Co., "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court] – that there is an absence of evidence to support the non-moving party's case." 833 F.2d 1560, 1563 (Fed. Cir. 1987) (emphasis omitted) (quoting Celotex Corp., 477 U.S. at 325).

At best, plaintiffs' cavil is that there does exist a genuine dispute of fact between the parties. This, however, would not support a motion to strike; rather, it would be relevant only to plaintiffs' opposition to summary judgment.

---

admissible [at trial] for the truth of the matters asserted therein.").

## II. Plaintiffs' Arguments Regarding The Nature Of Mr. Bankhead's Testimony Are Factually Incorrect And Without Legal Support

Plaintiffs contend that Mr. Bankhead's report must be stricken from consideration on summary judgment because it consists of legal conclusions, and that "such legal conclusions may not be considered on summary judgment." Pl. Mot. at 2. Here, plaintiffs err both in terms of their description of Mr. Bankhead's conclusions and their understanding of the applicable law.

First and foremost, Mr. Bankhead does not offer "legal conclusions." Mr. Bankhead merely applies his 30 years of experience and expertise in regulatory accounting to calculate Sterling's capital position after the breach, giving Sterling the benefit of goodwill that emerged from mergers that the Court deemed to be contractual. Such calculations have been performed by experts in virtually every Winstar-related case within which post-breach capital compliance was an issue. See, e.g., Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 417, 430 (2005) (describing accounting expert's testimony regarding a thrift's capital compliance but-for the breach). Mr. Bankhead's opinion necessarily relies upon the Court's liability opinions as well as his experience applying FIRREA's capital regulations, but his opinions contain no legal analysis.

Even if Mr. Bankhead's opinions could be described as "legal conclusions," plaintiffs' statement that "such legal conclusions may not be considered on summary judgment[,]" Pl. Mot. at 2, is legal error. First, the cases that plaintiffs cite in support of their argument do not even address this issue. The footnote to which plaintiffs cite in Adarbe v. United States, 58 Fed. Cl. 707, 711 n.1 (2003), relates neither to summary judgment nor to expert testimony. The passages cited in Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2nd Cir. 1977), Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1258-59 (2nd Cir. 1987), and CFM Comm., LLC v.

Mitts Telecasting Co., 424 F.Supp. 1229, 1233-34 (E.D. Ca. 2005), relate to whether an expert witness may testify at trial, and make no mention of summary judgment. Plaintiffs otherwise cite to no support for this argument.

Further, even assuming that Mr. Bankhead were offering a legal conclusion, and even if this were somehow relevant to its motion to strike at the summary judgment stage, plaintiffs' suggestion that experts may not provide testimony regarding legal matters reflects a misunderstanding of Federal Rule of Evidence 702. The threshold determination regarding admissibility turns upon whether an expert's testimony "will assist the trier of fact to understand the evidence . . . ." Fed. R. Evid. 702. Accordingly, expert testimony that reaches legal conclusions has been admitted where it was determined that such testimony would assist the trier of fact. See, e.g., United States v. Dazey, 403 F.3d 1147, 1172 (10th Cir. 2005) (permitting Federal Reserve bank fraud expert's opinion that the scheme at issue was a "prime bank fraud" because "[e]ven if his testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment"); United States v. Windfelder, 790 F.2d 576, 581-82 (7th Cir. 1986) (holding that an IRS agent may analyze a transaction and give expert testimony about its tax consequences). Therefore, plaintiffs' statement that experts may not opine on legal matters is irrelevant to this motion and, even if it were relevant, is overbroad.

In sum, plaintiffs' description of Mr. Bankhead's calculations as "legal conclusions" are wrong, and their contention that legal conclusions may not be offered at the summary judgment stage is without legal support.

**III. Plaintiffs May Not Expand Sterling's Contract Rights Beyond That Directed By The Court's Liability Opinions**

Finally, plaintiffs argue that our citation to Mr. Bankhead's report should be stricken because Mr. Bankhead's opinions "are contrary to the contracts' express terms." Pl. Mot. at 5. Plaintiffs assert that "Sterling's contracts with the Government gave it the express right to count the capital credits towards the regulatory capital requirement as it then existed, not as later restricted by FIRREA and 12 CFR 567.1(w)." Id. at 6. Plaintiffs conclude that, "Sterling is entitled . . . to count the supervisory goodwill from Central Evergreen as qualifying supervisory goodwill under FIRREA subject to FIRREA's cap and phase-out rules. Mr. Bankhead's Report should be stricken on these grounds alone." Id.

Plaintiffs cite to no support for the proposition that Mr. Bankhead's report should be "stricken" from our summary judgment brief because they believe that his opinion contradicts contract provisions. There is no such rule. Even if plaintiffs' argument cohered, and even if Mr. Bankhead's assumptions were incorrect, this would not provide a basis to "strike" his report from consideration on summary judgment.

Although it is without merit, plaintiffs' argument reveals a broader stratagem. Mr. Bankhead's report exposes a significant weakness in plaintiffs' case: Mr. Bankhead's calculations reveal that even giving Sterling the full benefit of all of the goodwill from the contracts in this case, Sterling's "but-for" capital position would not support plaintiffs' lost profits theory. See Bankhead Report (Ex. 1) at 3. Mr. Bankhead also explained that plaintiffs' expert, Dr. Horvitz, added to his calculation of "core capital" an additional $10.4 million in goodwill from the Central Evergreen transaction, which the Court has determined did not result

in a breach of contract. See Sterling Savings Assoc. v. United States, 72 Fed. Cl. 404, 411 (2006) ("Sterling II") ("Section V, pararaph D of the Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA.").

Since this Court has determined that goodwill from two of the mergers is contractual, plaintiffs were entitled to count all of the goodwill remaining from these two mergers as regulatory capital. Accordingly, when calculating Sterling's "but-for" core capital position, Mr. Bankhead gives plaintiff full credit for all of the goodwill from these two transactions. Ex. 1 at 6. However, plaintiffs' expert, Dr. Horvitz, takes it one step further, and includes in his "but-for" core capital calculation not only goodwill from the two contractual transactions, but on top of that, $10.4 million in additional goodwill from the Central Evergreen transaction, far exceeding the amount of goodwill permitted by regulation. Ex. 1 at 6-7. This calculation is erroneous. In essence, by using Dr. Horvitz to add back goodwill from the Central Evergreen merger, plaintiffs effectively circumvent the Court's ruling that the Central Evergreen agreement was not breached by the Government. Cf. Sterling II, 72 Fed. Cl. at 411.

Accordingly, plaintiffs' effort to strike the report of Mr. Bankhead from consideration at the summary judgment stage is without legal basis, and is based upon a misinterpretation of this Court's opinions.

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court deny plaintiffs' Motion to Strike the Expert Report of W. Barefoot Bankhead.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel

TIMOTHY J. ABRAHAM
MELINDA H. HART
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
DELISA SANCHEZ

April 16, 2007

**Exhibit 1**
**to**
**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD**

# Expert Report of W. Barefoot Bankhead

*Sterling Savings Association, et al. v. United States of America*

Case No. 95-829 C

---

## I. Qualifications

1. My name is W. Barefoot Bankhead, and I am a Managing Director with Navigant Consulting, which provides professional services to its clients in various areas, including financial, accounting and economic analysis. I graduated from the University of Texas in December 1976 with a Bachelor of Business Administration degree and a major in accounting. I am a certified public accountant in the State of Texas. From 1977 through 1987, I worked in public accounting, the last several years of which were with a then "big eight" firm, primarily serving clients in the financial services and real estate industries.

2. In April 1987, I began a two-year accounting fellowship with the Federal Home Loan Bank Board, now the Office of Thrift Supervision, the primary regulatory body for the savings and loan industry. After my fellowship and prior to joining Navigant Consulting in August 1998, I worked for nine years in a variety of positions with financial institutions. During that time, I served as an audit director for one of the largest bank holding companies in the country and as chief financial officer and member of the board of directors for a savings bank. My current resume is provided as Exhibit A. My hourly billing rate is $468.

## II. Background

3. From November 1985 through December 31, 1988, Sterling Savings Association ("Sterling") acquired the assets and liabilities of three thrift institutions through a series of assisted acquisitions as reflected in Table 1.

**Table 1. Thrift Acquisitions by Sterling Savings Association**

| Date | Acquired Institution | Location |
|---|---|---|
| November 5, 1985 | Lewis Federal Savings and Loan Association | Chehalis, Washington |
| April 8, 1988 | Tri-Cities Savings and Loan Association | Kennewick, Washington |
| December 31, 1988 | Central Evergreen Savings and Loan Association | Chehalis, Washington |

Source:
Sterling Savings Association, Annual Report for the years ended June 30, 1986 (pp. 22-23), 1988 (pp. 30-31) and 1989 (pp. 31-32) [SG2005 2526-2527; 2459-2460; 2399-2400]

4. In conjunction with the Lewis Federal and Tri-Cities acquisitions, Sterling and the Government entered into agreements that, among other things, provided certain forbearances related to the accounting for the goodwill created in the acquisitions.[1] Sterling alleged that certain documents governing the Central Evergreen transaction provided a similar goodwill accounting forbearance.

5. The Financial Institutions Reform, Recovery and Enhancement Act ("FIRREA") was enacted on August 8, 1989. Capital regulations adopted as a result of FIRREA required, among other things, thrifts to deduct goodwill from regulatory capital.

[1] Forbearance letters from the Federal Home Loan Bank Board ("FHLBB") to Sterling dated November 12, 1985 and April 6, 1988 grant certain accounting forbearances in the Lewis Federal and Tri-Cities acquisitions, respectively.

6. On September 12, 2002, the Court of Federal Claims ("the Court") initially determined that various contractual documents associated with all three of Sterling's acquisitions gave it the right to include goodwill in regulatory capital and that the enforcement of the FIRREA capital regulations represented a breach of the Government's commitment under those contracts. In an effort to estimate the damages associated with those breaches, Sterling submitted expert reports authored by Dr. Paul Horvitz and Dr. Christopher James. Dr. Horvitz's report, which was dated February 20, 2004 ("the Horvitz 2004 Report"), calculated alleged lost profits that resulted from the breaches. Dr. James's report, which was also dated February 20, 2004, calculated alleged damages related to the hypothetical raising of mitigation capital as replacement for the goodwill.[2]

7. On August 30, 2006, the Court amended its previous ruling and determined that the enforcement of the FIRREA capital regulations did not result in a breach of the Central Evergreen contract as there was no forbearance related to the accounting for the Central Evergreen-related goodwill. Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz ("Horvitz 2006 Report") and Dr. James issued his Update to the Expert Report of Dr. Christopher James ("James 2006 Report") on December 11, 2006, to amend the plaintiffs' damages claim reflecting the Court's updated ruling.

8. The United States Department of Justice ("DOJ") has asked me to evaluate Dr. Horvitz's calculation of core capital in the Horvitz 2006 Report. Because Dr.

[2] Dr. Horvitz and Dr. James initially issued damages reports in 2001. However, during 2003, the Court issued an opinion related to the amortization of goodwill associated with certain Federal Savings and Loan Insurance Corporation ("FSLIC") assistance. The 2004 reports represent Dr. Horvitz's and Dr. James's efforts to amend their reports to reflect the impact of the Court's 2003 opinion related to the amortization of goodwill associated with FSLIC assistance.

James has adopted Dr. Horvitz's lost profits methodology, DOJ has also asked me to evaluate the lost profit calculations in the James 2006 report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiffs' experts.

**III. Summary of Opinions**

9. Based upon my review and analysis of the documents cited in Exhibit B and my relevant education and experience, I have formed the following opinions:

- Dr. Horvitz's calculation of but-for Sterling's core capital erroneously includes goodwill in excess of amounts permitted under the regulation governing the phase-out of goodwill. Correcting for this error eliminates any lost profits as calculated by Dr. Horvitz.

- Even calculating but-for Sterling's core capital by allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill, Dr. Horvitz's model produces no lost profits.

- Since Dr. James has adopted Dr. Horvitz's lost profits calculation during the period between the breach and the date of full mitigation, his analysis of lost profits suffers from the same flaws that I have identified with Dr. Horvitz's model. Once the error in Dr. James's core capital calculations is corrected, Dr. James's model produces no lost profits.

**IV. Dr. Horvitz's Failure to Correctly Calculate Core Capital in the But-For Bank**

10. The FIRREA capital regulation established three capital requirements – tangible, core, and risk-based. Thrifts were required, among other things, to deduct all intangible assets, including goodwill, in the calculation of tangible capital; limit identified intangible assets included in core and risk-based capital; and phase out supervisory goodwill from core and risk-based capital over a five-year period ending December 31, 1994.[3] Through December 31, 1994, thrifts were not required to deduct qualifying supervisory goodwill in calculating core capital.[4] Qualifying supervisory goodwill was limited to 1.5 percent of assets (as defined in the regulation) through December 31, 1991, and the includable amount then declined as a percentage of assets until January 1, 1995, when all supervisory goodwill was required to be deducted in calculating core capital.

---

[3] 12 CFR 567.1(ee) defined supervisory goodwill as goodwill resulting from the acquisition, merger, consolidation, purchase of assets, or other business combination (if such transaction occurred on or before April 12, 1989) of (1) a savings association where the fair market value of assets was less than the fair market value of liabilities at the acquisition date; or (2) a problem institution.

[4] 12 CFR 567.1(w) defined qualifying supervisory goodwill as (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices less any amortization that would have occurred subsequent to April 12, 1989 through the current reporting period where the amortization is calculated on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for regulatory accounting practices; plus (2) the lesser of (i) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under generally accepted accounting principles ("GAAP"); or (ii)(A) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under GAAP; (B) plus any amortization of the goodwill in (ii)(A) that occurred subsequent to April 12, 1989 for GAAP reporting purposes; (C) minus the amortization of the goodwill in (ii)(A) through the current period that results when the goodwill is amortized subsequent to April 12, 1989 on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for GAAP reporting purposes.

11. Sterling's supervisory goodwill exceeded the amount that could be included as qualifying supervisory goodwill in core capital under the FIRREA capital regulation. Table 2 summarizes Dr. Horvitz's determination of Sterling's supervisory goodwill as of December 31, 1989.

**Table 2. Sterling's Supervisory Goodwill, December 31, 1989**

| Institution | Amount (000s) |
|---|---|
| Lewis Federal and Tri-Cities (determined to be contractual) | $15,557 |
| Central Evergreen (determined to be non-contractual) | 11,357 |
| Total Supervisory Goodwill | $26,914 |
| Qualifying Supervisory Goodwill (1.5% of but-for Sterling's assets) | $10,421 |

12. The Court has determined that the Government breached contracts allowing Sterling to include the Lewis Federal and Tri-Cities goodwill in regulatory capital. Consequently, in the but-for world constructed by Dr. Horvitz, Sterling can include all of the $15,557,000 of Lewis Federal and Tri-Cities supervisory goodwill in regulatory capital as of December 31, 1989.

13. In his 2006 Report, Dr. Horvitz assumes that Sterling's Lewis Federal and Tri-Cities contractual supervisory goodwill is exempt from the limitations on the amount of supervisory goodwill that qualifies for core capital. This assumption is inconsistent with his 2004 report. In the Horvitz 2004 Report, Dr. Horvitz included contractual supervisory goodwill in his calculation of qualifying supervisory goodwill for purposes of determining the amount of disallowed intangibles due to the breach. (See Horvitz 2004 Report, Exhibit 6, Table 4b.) As illustrated in Table 3 below, Dr. Horvitz's 2006 Report erroneously assumes that

an additional $10,421,000 of but-for Sterling's non-contractual supervisory goodwill was qualifying supervisory goodwill and includable in core capital.

**Table 3. Dr. Horvitz's Calculation of But-For Sterling's Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Contractual goodwill (Lewis Federal and Tri-Cities) | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen) | 10,421 |
| ***Other Adjustments*** | |
| Identified intangibles | 5,670 |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| **But-For Sterling's Core Capital** | **$28,786** |

14. But-for Sterling could consider all $15,557,000 of the Lewis Federal and Tri-Cities contractual supervisory goodwill as qualifying supervisory goodwill even though this amount exceeded the $10,421,000 of qualifying supervisory goodwill otherwise permissible under the FIRREA capital regulation. However, Dr. Horvitz has erroneously included $25,978,000, or 3.74 percent of but-for Sterling's assets, as qualifying supervisory goodwill even though the FIRREA capital regulation permits only 1.5 percent and the contractual supervisory goodwill totals only 2.24 percent.[5]

15. The FIRREA capital regulation does not distinguish between contractual and non-contractual supervisory goodwill. In addition, the regulation clearly limits the amount of supervisory goodwill that qualifies as core capital. It is

[5] See Exhibit C.

implausible to assume that but-for Sterling would have been permitted to include the non-contractual Central Evergreen supervisory goodwill as qualifying supervisory goodwill when the contractual supervisory goodwill already exceeded the 1.5 percent maximum amount of qualifying supervisory goodwill includable in core capital as of December 31, 1989. To illustrate the impact of Dr. Horvitz's error, I have recalculated but-for Sterling's core capital using the information contained in the Horvitz 2006 Report:

**Table 4. But-For Sterling's Adjusted Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[6] | 15,557 |
| ***Other Adjustments*** | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles [7] | 3,174 |
| **But-For Sterling's Core Capital** | **$15,869** |

16. Adjusting Dr. Horvitz's model for the one change to correct the calculation of qualifying supervisory goodwill includable in core capital as of

[6] Qualifying supervisory goodwill as calculated by Dr. Horvitz totals only $10,421. However, because of the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill for purposes of calculating regulatory capital.

[7] The FIRREA capital regulation permits certain identified intangibles to be included in core capital up to a limit of 25 percent of core capital (before inclusion of identified intangibles).

December 31, 1989, results in negative lost profits, thus eliminating Sterling's entire lost profits claim.[8]

17. As shown below in Table 5, the contractual supervisory goodwill included as qualifying supervisory goodwill as a result of the Court's decisions exceeds the amount permissible under the FIRREA regulation at all times through December 31, 1994. Consequently, but-for Sterling would have been required to deduct all non-contractual supervisory goodwill (*i.e.*, goodwill associated with the Central Evergreen transaction) when calculating core capital. However, by erroneously including non-contractual supervisory goodwill as qualifying supervisory goodwill, Dr. Horvitz's but-for Sterling includes supervisory goodwill from two to nearly three times the amount permitted by the FIRREA capital regulation through December 31, 1994.

**Table 5. But-For Sterling's Total Supervisory Goodwill**

| Year Ended | FIRREA Allowable % of Tangible Assets | Total But-For Contractual Goodwill | Total But-For Supervisory Goodwill |
|---|---|---|---|
| 12/31/1989 | 1.500% | 2.239% | 3.739% |
| 6/30/1990 | 1.500% | 2.194% | 3.694% |
| 6/30/1991 | 1.500% | 1.940% | 2.950% |
| 6/30/1992 | 1.000% | 1.750% | 2.461% |
| 6/30/1993 | 0.750% | 1.471% | 1.995% |
| 6/30/1994 | 0.375% | 0.826% | 1.075% |

Source: Exhibit C

[8] As a result of this correction, but-for Sterling's core capital would have been 2.21 percent, below the 3 percent core capital required by the FIRREA capital regulation, effective with the filing of the March 31, 1990 Thrift Financial Report.

18. Even if one were to assume that allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill would have been appropriate, which, based upon my experiences at the FHLBB and in the thrift industry, I do not believe to be a plausible assumption, Dr. Horvitz's model would still result in no lost profits damages. To illustrate, I have recalculated but-for Sterling's core capital under this proportional allocation methodology to determine the potential impact at December 31, 1989, as shown in Table 6.

**Table 6. But-For Sterling's Core Capital at December 31, 1989 (Proportional Allocation)**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[9] | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen)[10] | 4,398 |
| ***Other Adjustments*** | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles[11] | 4,273 |
| **But-For Sterling's Core Capital** | **$21,366** |

[9] Qualifying supervisory goodwill under the FIRREA capital regulation totals $10,421. Sterling's total supervisory goodwill from both contractual and non-contractual acquisitions was $26,914 ($15,557 from Lewis Federal and Tri-Cities and $11,357 from Central Evergreen). Allocating the $10,421 qualifying supervisory goodwill proportionally between contractual and non-contractual results in $6,023 (57.8 percent) allocated to the Lewis Federal and Tri-Cities contractual supervisory goodwill. However, per the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill in calculating regulatory capital. Consequently, $15,557 of the Lewis and Tri-Cities contractual supervisory goodwill is considered to be qualifying supervisory goodwill for purposes of calculating core capital.

[10] Allocating the $10,421 qualifying supervisory goodwill proportionally results in $4,398 (42.2 percent) allocated to the Central Evergreen non-contractual supervisory goodwill.

[11] See Footnote 7.

19. I have adjusted Dr. Horvitz's model to reflect this lower level of core capital at December 31, 1989. After making this one change, the amount of lost profits generated under Dr. Horvitz's model is negative (*i.e.*, no lost profits).

## V. Dr. James's Adoption of Dr. Horvitz's Erroneous But-For Sterling Core Capital Calculations

20. DOJ has asked me to review certain portions of the James 2006 Report that purport to calculate lost profits during the period between the breach and the date of full mitigation (February 28, 1993). Dr. James effectively adopts Dr. Horvitz's lost profits model, thus Dr. James's analysis of lost profits in the James 2006 Report suffers from the same flaws that I have identified in the Horvitz 2006 Report. As I did with Dr. Horvitz's model, I have adjusted for the error in the calculation of qualifying supervisory goodwill and determined that Dr. James's model, like Dr. Horvitz's model, results in no lost profits.

21. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work is ongoing.

February 15, 2007

W. Barefoot Bankhead

**Exhibit A**

NAVIGANT CONSULTING

# W. Barefoot Bankhead, CPA*

W. Barefoot Bankhead
Managing Director

Navigant Consulting
2001 Ross Avenue, Suite 500
Dallas, Texas 75201
Tel 214.712.1514
Fax 214.765.6582

bbankhead@navigantconsulting.com

Service Lines

- Banking and Financial Institutions
- Fraud and Investigative Accounting
- Complex Commercial Litigation
- Accounting Malpractice

Professional History

- 1998 to Present: Navigant Consulting
- 1993 – 1998: Bank One Corporation (now J.P. Morgan Chase and Company) – Audit Director, Regional Audit Director, Sr. Risk Advisor
- 1990 – 1993: First Cook Community Bank, FSB (now Republic Bank)– Chief Financial Officer, Treasurer, Director
- 1989 – 1990: Superior Bank, FSB – Sr. VP and Managing Director of Mergers & Acquisitions
- 1987 – 1989: Federal Home Loan Bank Board (now OTS) – Professional Accounting Fellow
- 1982 – 1987: Coopers & Lybrand (now PricewaterhouseCoopers) – Audit Manager
- 1977 – 1981: Cheatham, Brady & Lafferty – Audit Staff

Education and Certification

- BBA – Accounting, December 1976
  The University of Texas at Austin
- Certified Public Accountant (CPA)*

Professional Associations

- American Institute of Certified Public Accountants

Teaching/Lecturing

- McCombs School of Business, The University of Texas - Guest Lecturer
- Richland College, Former Accounting Instructor

W. Barefoot Bankhead specializes in providing damage analysis and accounting and regulatory expertise to clients in the financial services and professional services industries. Additionally, Mr. Bankhead has led numerous fraud and accounting investigations. Before joining Navigant Consulting in 1998, Mr. Bankhead had over twenty years of experience in banking and public accounting, including a two-year accounting fellowship with a federal banking regulator.

## Litigation and Investigations

Since joining Navigant Consulting, Mr. Bankhead has led consulting engagements for a number of clients in the financial services industry. He has provided expert testimony in several cases, including a series of cases involving alleged breach of contract that include claims for lost profits, restitution and reliance damages. Additionally, Mr. Bankhead has testified on damages and causation in professional accounting malpractice engagements. His work has involved the assessment of the economic impact on the plaintiffs' business; the evaluation of costs and benefits to both parties in the dispute; valuations of financial assets and liabilities and the evaluation of operational, financial, accounting and regulatory issues.

Mr. Bankhead has provided expert witness testimony on various matters related to financial institutions including financial institution valuation, management and regulation; the valuation of certain assets such as loans, real estate, deposit intangibles, residuals and other securitization interests; and the evaluation of lending practices, regulatory capital and failed institutions.

In relation to various engagements, Mr. Bankhead has:

» Reviewed financial institutions' practices for valuing and accounting for loans and investments (including asset-backed securities). Analysis involved determining allowances for losses, accounting for impairment, amortizing/accreting deferred fees and premiums/discounts, and accounting for various types of financial instruments.

*Navigant Consulting is not a CPA firm.

- Analyzed loan underwriting practices on commercial real estate, commercial, mortgage, subprime mortgage, home equity and credit card loans to determine compliance with regulatory requirements, internal policies and procedures, securitization agreements, representations and warranties in contractual agreements, or industry standards.

- Valued financial institutions and various financial assets such as residual interests in securitizations, loans, mortgage derivatives and other investments and mortgage servicing rights.

- Reviewed the valuation of financial institution branches/deposit franchises that have been sold as a result of alleged breaches of contract.

- Reviewed the purchase accounting adjustments related to acquisitions of financial institutions, including allocations to core deposit intangibles, mortgage servicing rights and the resulting goodwill.

- Reviewed the adequacy of due diligence in the acquisition of financial institutions such as banks, thrifts, and subprime mortgage lenders.

- Evaluated wholesale banking strategies, including the use of high-risk mortgage derivatives and the impact of those strategies on interest rate risk and regulatory compliance.

- Assessed the lending, investing and operating practices of financial institutions to determine their viability. Also assessed the operations and strategies of failed institutions to determine causes of failure. Assessments often included an evaluation of losses on major assets such as large commercial real estate loans, real estate investments and mortgage derivatives.

- Analyzed causation and damage claims related to exiting lines of business or the sale of subsidiaries engaged in banking, lease finance and nonconforming mortgage securitization.

- Assisted clients with SEC investigations related to loan loss allowances and the accounting for impairment of debt securities and assisted with the development and implementation of lending, loss allowance and loan fee policies and procedures.

- Reviewed employee expense accounts for evidence of inappropriate charges.

- Evaluated causation and damages related to professional accounting malpractice claims.

- Analyzed potential fiduciary claims against an investment company managing pension funds under Department of Labor regulations.

- Analyzed the surplus/deficits of bank holding company subsidiaries to assess the impact of the cross-guarantee provisions of the Financial Institutions Reform, Recovery and Enhancement Act of 1989.

- Evaluated and calculated damages related to lender liability claims.

## Financial Services

Mr. Bankhead has extensive experience in the financial services industry, having held a variety of positions with financial institutions. Mr. Bankhead was an Audit Director for one of the largest bank holding companies in the country, served as Chief Financial Officer (CFO) and member of the Board of Directors of a savings bank, and was Managing Director of Mergers and Acquisitions for another savings bank.

As an Audit Director, Mr. Bankhead was responsible for the development and execution of the corporate audit plan for over 25 separately chartered banks with over $30 billion in assets. Mr. Bankhead then assumed corporate audit responsibility for the bank's National Commercial Banking Group, a $30-billion line of business that included commercial lending and credit administration, asset-based lending, commercial loan operations, syndications, derivative product sales and international trade finance.

As a CFO, Mr. Bankhead was responsible for all financial, accounting and investment activities of the institution and chaired the bank's asset/liability committee. He also managed the bank's mortgage banking, real estate and investment management divisions. As a member of the Board of Directors, Mr. Bankhead served on the lending committee, whose responsibilities included approval of all large lending credits.

As Managing Director of Mergers and Acquisitions, Mr. Bankhead was responsible for identifying acquisition candidates, conducting due diligence and managing the bid process. He performed due diligence on numerous financial institutions including reviews of problem loans and troubled real estate. He also advised the president and CFO on SEC reporting matters, asset securitizations and other capital market transactions.

## Regulatory

During his accounting fellowship with the Federal Home Loan Bank Board, Mr. Bankhead responded to questions from financial institutions and their constituents on accounting, financial reporting, regulatory and other matters; wrote issues papers and opinions on accounting matters; and provided accounting, auditing and litigation support to the federal banking agency. Additionally, he frequently spoke and lectured on current banking issues at various conferences and seminars throughout the country.

## Public Accounting

While in public accounting with an international accounting firm, Mr. Bankhead served primarily financial institution and real estate clients. In addition to audit engagement responsibilities, he

advised clients on a number of matters including mergers and acquisitions, branch sales, capital market transactions, real estate workouts and regulatory matters.

## Testimony

» Northeast Savings, F.A. v. United States, United States Court of Federal Claims, No. 92-550C (deposition and trial)

» Beverly Hills Bancorp Inc. fka Wilshire Financial Services Group, Inc., v. Merrill Lynch Mortgage Capital Inc., and Wilshire Credit Corporation, Superior Court of the State of California and for the County of Los Angeles (deposition)

» Chapman Industries, et al. v. United Insurance Company of America, Second Judicial District Court of the State of Nevada and for the County of Washoe, No. CV87-6780 (deposition and hearing)

» Reliance Insurance Company v. KeyBank USA National Association v. Swiss Reinsurance America Corporation, et al., United States District Court for the Northern District of Ohio, Eastern Division, No. 1:01CV0062 (deposition)

» Anchor Savings Bank, FSB v. United States, United States Court of Federal Claims, No. 95-39C (deposition and trial)

» The Long Island Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 92-517C (deposition, declaration and trial)

» The Globe Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 91-1550C (deposition and trial)

» Caroline Hunt Trust Estate v. United States, United States Court of Federal Claims, No. 95-531C (deposition and trial)

» Chase Manhattan Mortgage Corporation and Chase Manhattan Mortgage Company of the Southeast v. Advanta Corp., et al., U.S. District Court for the District of Delaware, No. 01-507, (deposition and trial)

» LaSalle Talman Bank, F.S.B. v. United States, United States Court of Federal Claims, No. 92-652C (deposition and trial)

» Blitz Holdings Corp. and GCM Corporation, LTD. v. Grant Thornton, L.L.P., et al., 280th Judicial District, Harris County, Texas, No. 2002-32582 (deposition)

- WestFed Holdings, Inc., et al. v. United States, United States Court of Federal Claims, No. 92-820C (deposition, affidavit and trial)
- Bank United, et al. v. United States, United States Court of Federal Claims, No. 95-473C (deposition and trial)
- Standard Federal Bank v. United States, United States Court of Federal Claims, No. 92-844C (deposition)
- Homer J. Holland and Howard R. Ross v. United States, United States Court of Federal Claims, No. 95-524C (deposition)
- H. C. Bailey, et al. v. United States, United States Court of Federal Claims, No. 92-577C (deposition)
- Transamerica Home Loan v. ITT Industries, Inc., U.S. District Court for the Southern District of New York, No. 98 Civ. (deposition)

**EXHIBIT B**

**STERLING SAVINGS ASSOCIATION ET AL. V. UNITED STATES OF AMERICA**

*DOCUMENTS CONSIDERED BY W. BAREFOOT BANKHEAD*

| Document | Date | Begins | Ends |
|---|---|---|---|
| | | | |
| **Plaintiff's Expert Reports** | | | |
| Expert Report of Paul Horvitz - Corrected | 09/06/01 | | |
| Revised Update to the Expert Report of Paul Horvitz | 02/20/04 | | |
| Update to the Expert Report of Paul Horvitz | 12/11/06 | | |
| Expert Report of Professor Christopher M. James - Corrected | 9/2001 | | |
| Revised Update to the Expert Report of Professor Christopher M. James | 02/20/04 | | |
| Update Expert Report of Professor Christopher M. James | 12/11/06 | | |
| **Deposition Transcripts** | | | |
| Deposition of Paul Horvitz | 01/25/07 | | |
| **Legal Documents** | | | |
| Chief Judge Damich's 2002 Opinion | 09/12/02 | | |
| Chief Judge Damich's 2003 Opinion | 08/04/03 | | |
| Judge Wheeler's 2006 Opinion | 08/30/06 | | |
| **Case Documents** | | | |
| Annual Report - Sterling Savings | 06/30/86 | SG2005 2502 | SG2005 2532 |
| Annual Report - Sterling Savings | 06/30/88 | SG2005 2429 | SG2005 2466 |
| Annual Report - Sterling Savings | 06/30/89 | SG2005 2367 | SG2005 2405 |
| Forbearance letter - Lewis Federal | 11/12/85 | WOF014 0599 | WOF014 0601 |
| Forbearance letter - Tri-Cities | 04/06/88 | WOF014 1397 | WOF014 1398 |
| **Miscellaneous** | | | |
| Dr. Horvitz Components of Core Capital @ December 31, 1989 (Horvitz 2007 Deposition Exhibit 3) | | | |
| Dr. Horvitz Components of Core Capital @ June 30, 1990 (Horvitz 2007 Deposition Exhibit 4) | | | |
| **Industry Material** | | | |
| 12 CFR Section 567 | 11/89 | | |
| Thrift Financial Report Instruction Manuals | 8/90 | | |

**Exhibit C**

## *"But-For" Sterling Supervisory Goodwill Includable in Core Capital*

**(Dollars in Thousands)**

| | | Non-Contractual SGW (Central Evergreen) | | Contractual SGW (Lewis Federal & Tri-Cities) | | |
|---|---|---|---|---|---|---|
| Year Ended | "But-For" Sterling Tangible Assets [1] (000s) | "But-For" Qualifying Supervisory Goodwill [2] (000s) | "But=For" Qualifying Supervisory Goodwill (%) | "But-For" Supervisory Goodwill [3] (000s) | "But-For" Supervisory Goodwill (%) | Total "But-For" Supervisory Goodwill (%) |
| | A | B | C = B / A | D | E = D / A | F = C + E |
| 12/31/1989 | $694,760 | $10,421 | 1.500% | $15,557 | 2.239% | 3.739% |
| 6/30/1990 | 685,708 | 10,286 | 1.500% | 15,047 | 2.194% | 3.694% |
| 6/30/1991 | 704,730 | 7,118 | 1.010% | 13,673 | 1.940% | 2.950% |
| 6/30/1992 | 699,163 | 4,971 | 0.711% | 12,232 | 1.750% | 2.461% |
| 6/30/1993 | 766,910 | 4,013 | 0.523% | 11,285 | 1.471% | 1.995% |
| 6/30/1994 | 1,251,799 | 3,117 | 0.249% | 10,337 | 0.826% | 1.075% |

**Notes:**

(1) See Horvitz 2006 Report, Exhibit 6, Table 4b, Column C.

(2) See Horvitz 2006 Report, Exhibit 6, Table 4b, Column F.

(3) See Horvitz 2006 Report, Exhibit 6, Table 4a, Column A.

**CERTIFICATE OF FILING**

I hereby certify that on April 16, 2007, a copy of "DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT OF W. BAREFOOT BANKHEAD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford