**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-829C (Judge Wheeler) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO STRIKE**
**THE DECLARATION OF DR. PAUL M. HORVITZ**

Defendant, the United States, respectfully files this motion to strike the March 28, 2007 declaration of expert witness Dr. Paul M. Horvitz attached to plaintiffs Sterling Savings Association and Sterling Financial Corporation's ("Sterling" or "plaintiffs") response to our motion for summary judgment. The Court should strike this declaration because it is untimely and contains new opinions by Dr. Horvitz. In the alternative, we respectfully request the opportunity to depose Dr. Horvitz regarding these new opinions.

**BACKGROUND**

In its September 27, 2006 Order, the Court reopened discovery and set a trial date of June 25, 2007. The order directed plaintiffs to submit revised expert reports on damages by December 11, 2006, and required completion of depositions of those experts by February 10, 2007. Ex. A. The order allowed the Government to submit responsive expert reports by February 17, 2007, and required completion of depositions of our experts by March 17, 2007. Id. The Court also noted that any party could file a motion for partial summary judgment but that pending motions would not delay the start of trial. Id.

On December 11, 2006, Dr. Paul Horvitz, Sterling's lost profits expert, issued a new expert report "updating" his February 2004 report. Ex. B. On January 25, 2007, Dr. Horvitz was deposed regarding this report. Defendant's expert, W. Barefoot Bankhead, an accounting expert, issued a responsive expert report on February 15, 2007, addressing the new core capital ratio and damages calculations included in Dr. Horvitz's 2006 report. Ex. C. Plaintiffs have not yet deposed Mr. Bankhead.

On February 26, 2007, we filed a revised motion for summary judgment regarding damages. On March 29, 2007, plaintiffs filed an opposition to our motion and a cross-motion for summary judgment as to damages. In support of its motion, plaintiffs filed a memorandum of points and authorities, an appendix, and a motion to strike the expert report of W. Barefoot Bankhead. In plaintiffs' appendix, it included a new declaration of Dr. Horvitz. Ex. D; see also Pls.' MSJ App. 5-51. Dr. Horvitz's new declaration states: "The purpose of this Declaration is not to supplant my Reports but to expand on them and to comment on the opinions and statements of the government's expert witnesses proffered in conjunction with the government's Motion for Summary Judgment Regarding Damages." Id. at ¶ 10. Indeed, Dr. Horvitz's declaration contains new opinions including new criticisms of Mr. Bankhead's expert report, new justifications of his own prior expert opinions, and other new responses to the reports of our experts. Id. at ¶¶ 36-39, 42-45, 52, 54, 57, 71-87.

## ARGUMENT

### I. Dr. Horvitz's Declaration Is Untimely and Improper

Because RCFC 26(a)(2)(C) provides that the disclosure of expert testimony "shall be made at the times and in the sequence directed by the court," the Court should strike Dr.

Horvitz's new declaration as untimely under the Court's order. On September 27, 2006, the Court issued a scheduling order requiring plaintiffs to disclose their expert opinions in revised reports by December 11, 2006. Pursuant to this order, we deposed Dr. Horvitz concerning his revised expert report in preparation for trial, and produced reports from our experts that specifically addressed the model and theory of damages disclosed. Now, over 100 days after the deadline set by the Court, and well after the close of expert discovery, plaintiffs present new and modified opinions by way of Dr. Horvitz's March 28, 2007 declaration.

Dr. Horvitz admits that the purpose of the declaration was not to replace his previous expert reports but "to expand on them." Ex. D at ¶ 10. In other words, he offers new, previously undisclosed, opinions after the close of expert discovery. These new opinions include new justifications of the conclusions in his previous expert reports and new criticisms of our experts. The Court should not allow plaintiffs to disclose new expert opinions in contravention of the Court's orders in order to attempt to survive the Government's motion for summary judgment. Instead, plaintiffs must rely on the opinions in their expert reports. Therefore, the Court should strike the declaration and not consider it in ruling on the pending motions for summary judgment.[1]

Although neither Dr. Horvitz nor Sterling refer to the new declaration as a rebuttal expert

---

[1] The Court has the discretion to exclude expert reports and opinions that are not timely disclosed. See e.g., Trilogy Communications, Inc. v. Time Fiber Communications, Inc., 109 F.3d 739, 745 (Fed. Cir. 1997) (no abuse of discretion in striking expert report submitted after the due date); Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 509 (5th Cir. 1999) (upholding trial court's exclusion of expert not identified in accordance with pre-trial order); Cooper Distributing Co., Inc. v. Amana Refrigeration, Inc., 180 F.3d 542, 549 n.1 (3rd Cir. 1999) (finding "no defect" with district court's refusal to allow party to amend an expert report). The Court should exercise that discretion here.

report, it can be construed as such. Nonetheless, it is an untimely and improper disclosure of expert opinion. The Court did not provide either side with the opportunity to file rebuttal expert reports and plaintiffs did not specifically seek leave of the Court to provide new responses to our experts after the close of discovery. Consequently, the declaration violates not only the Court's orders but the Winstar procedural orders governing expert opinions. Absent agreement of the parties otherwise, we are entitled to a written report containing a "complete statement of all opinions to be expressed by the witness." See Procedural Order No. 2: Discovery Plan at § V(A)(2) (Ex. E). Because we never agreed otherwise, Dr. Horvitz's responses should have been filed as an expert report and not a declaration.[2] This violation of Procedural Order No. 2 also requires that the Court strike the declaration. See Procedural Order No. 2: Discovery Plan at § V(A)(4) (Ex. E).

If the Court does not grant our motion to strike, we request, in the alternative, that it grant our request to depose Dr. Horvitz regarding the new opinions disclosed in his declaration in preparation for the upcoming trial. We have already contacted Sterling's counsel regarding a deposition of Dr. Horvitz regarding his declaration, but they do not consent to the deposition. Because plaintiffs were required to include their newly disclosed expert opinions in a report issued prior to the Court's deadline or at a minimum, seek leave of the Court to file a rebuttal expert report, we are entitled to depose Dr. Horvitz with respect to the new opinions disclosed in his declaration. See Procedural Order No. 2: Discovery Plan at § V(A)(3) (Ex. E). See also

[2] Pursuant to Rule 26(a)(2)(B), "[e]xcept as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case . . .be accompanied by a written report prepared and signed by the witness." This Rule is consistent with the parties' agreement under the Procedural Order and also requires Sterling to have filed a written report instead of a declaration.

RCFC 26(a)(4)(A) ("A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided."). The Court should not permit plaintiffs to render new opinions without the opportunity for discovery upon those opinions simply because the opinions were untimely and disclosed as part of a "declaration" after the close of expert discovery.

**CONCLUSION**

For the reasons set forth above, we respectfully request that the Court grant our motion to strike the declaration of Dr. Horvitz, or in the alternative, allow us to depose Dr. Horvitz regarding the expert opinions included in his declaration.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY J. ABRAHAM
WILLIAM G. KANELLIS
ELIZABETH A. HOLT

April 16, 2007

# Exhibit A

# In the United States Court of Federal Claims

No. 95-829C

(Filed: September 27, 2006)

****************************************** *
*
STERLING SAVINGS ASSOCIATION, *
*
Plaintiff, *
*
v. *
*
THE UNITED STATES, *
*
Defendant. *
*
****************************************** *

**SCHEDULING ORDER**

The Court has reviewed the proposed pretrial schedules submitted by counsel for the parties on September 25, 2006. Based upon those submittals, the Court hereby establishes the following schedule:

1. Plaintiff shall submit to Defendant revised expert reports on damages on or before December 11, 2006. Any depositions of Plaintiff's experts shall be completed on or before February 10, 2007. The scope of the depositions shall be limited to any new material not addressed in prior depositions.

3. Defendant shall submit to Plaintiff its responsive expert reports on or before February 17, 2007. Any depositions of Defendant's experts shall be completed on or before March 17, 2007. The scope of the depositions shall be limited to any new material not addressed in prior depositions.

4. Trial in this case shall begin on June 25, 2007. The Court will conduct a telephonic Pretrial Conference, on the record, on December 15, 2006 at 2:00 PM (EST). At that time, the Court will address the location of trial, the time to be allocated for trial, as well as pretrial and trial procedures.

5. On December 13, 2006, counsel shall exchange and file with the Court proposed witness lists, indicating the name and address for each witness, a brief summary of the subjects on which the witness is expected to testify, and the estimated time of direct testimony. Counsel shall also indicate the names of any persons who would have been called to testify, but who are deceased, unable to testify, or unable to travel for reasons of health.

6. Any party desiring to file a pretrial motion, including a motion *in limine* or motion for partial summary judgment, shall do so sufficiently in advance of trial so that the motion may be fully briefed and considered by the Court. The existence of any pending motion will not under any circumstances serve to delay the start of trial.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

# Exhibit B

# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation | ) | |
| Plaintiffs, | ) | |
| v. | ) | Court No. 95-829-C Judge Wheeler |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## UPDATE TO THE EXPERT REPORT OF PAUL HORVITZ
## DECEMBER 11, 2006

### I. Assignment and Conclusion

This Report (including the Exhibits) is an update to a report that I previously prepared in this case in February 2004. I was asked by Sterling's counsel to update my expectation damages calculation to incorporate findings by Judge Wheeler and to account for the passage of time. In an opinion dated August 30, 2006, Judge Wheeler ruled that the "...Agreement relating to Central Evergreen shifted to Sterling the risk of regulatory changes, such as FIRREA. Therefore, the Government did not breach the Agreement with Sterling through the enactment of FIRREA."[1] For purposes of my Report and damages calculation I have therefore assumed that the supervisory capital created in the Central Evergreen acquisition will be subject to any limitations imposed by FIRREA.

[1] Opinion of Judge Wheeler, *Sterling Savings Association v. The United States*, August 30, 2006, p. 12.

My updated determination of Sterling's expectation damages is that they total $63.361 million.

## II. Elements of Expectation Damages

### *A. Lost Earnings on Foregone Assets*

To update my calculations I have relied on additional documents and data provided to me by the attorneys and Sterling since the filing of my last Report. These are primarily financial statements from 2003 though 2006. I have created an addendum to Exhibit 2 of my previous Report listing the additional materials supplied to me. Exhibit 3 is unchanged from my previous Report. Exhibit 4 and Exhibit 5 present financial information for Sterling and have been extended through September 2006 – the latest period for which I have financial statements.

Exhibit 6 incorporates the ruling of Judge Wheeler. Tables 4a, 4b, and 4c of Exhibit 6 have been restructured or added to present the amount of supervisory intangibles that could have been included in Sterling's core capital but-for the breach. Table 4a is a summary of the goodwill and intangibles of Sterling but-for the breach of the Lewis Federal and Tri-Cities contracts. Table 4b presents the goodwill amounts related to the Central Evergreen acquisition.[2] Since the Central Evergreen acquisition was supervisory in nature, the goodwill from the acquisition is subject to the supervisory goodwill phase-out limitations of FIRREA. The phase-out provisions of FIRREA allowed supervisory goodwill to count to a limited degree toward core-capital until January 1, 1995. This table calculates how much of the supervisory goodwill from Central Evergreen could count in Sterling's core capital over time. Table 4c presents the identified intangibles related to the Central Evergreen acquisition. These intangibles were allowed under provisions of FIRREA to also count toward core capital to a limited degree.[3]

---

[2] In documents from Sterling upon which I have relied, in the context of the Central Evergreen acquisition the term "unidentified intangibles" is used synonymously with goodwill.

[3] In my previous report I noted that changes in the accounting rules related to goodwill no longer require that goodwill be amortized, rather it is subjeet to impairment tests. For the contractual goodwill associated with Lewis Federal and Tri-Cities I assume that for regulatory capital purposes it would amortize. The change in the accounting rules did not affect goodwill from the Central Evergreen transaction because it was fully-amortized in 2000 – before the new rules took effect. Table 7 in Exhibit 6 presents an estimate of the amounts of non-supervisory goodwill given the new accounting rules.

My estimate of expectation damages is based on a model that is similarly structured to that presented in previous versions of my Report. I believe it is appropriate at this time to reconsider some of the assumptions used in modeling the "but for" bank for two reasons: first, Judge Wheeler's recent ruling removes significant amounts of regulatory capital from Sterling Savings, and so the world is quite different from the one modeled in earlier versions of my Report; second, we know a great deal more about the capabilities and attitudes of Sterling's management and organization than we did at the time the model was originally developed. I have therefore revisited a number of assumptions used in the previous modeling, and have made modest adjustments to take account of the changes required by Judge Wheeler's ruling.

Under the belief that the "but for" bank could include all of the intangibles resulting from the Central Evergreen merger in core capital, my previous Report assumed that until June 1991 Sterling would maintain the capital ratios specified in the Business Plan developed in 1988 (before FIRREA). Obviously, this is a conservative assumption, but plausible because the Central Evergreen goodwill made that a feasible strategy. Without the ability to use the Central Evergreen intangibles as anticipated at the time of the contract, it is not reasonable to assume that Sterling would strictly adhere to the capital ratios specified in the Business Plan.[4]

We know from the business plans and testimony of bank management that Sterling desired to grow and would have been very reluctant to shrink in asset size. My modeling of the "but for" bank assumes that Sterling will remain in compliance with the core capital requirement imposed by FIRREA and will maintain its asset size. Consequently I have estimated that the but-for bank will operate with a core capital ratio of 4% from December 31, 1989 to June 30, 1991, which is only marginally less than the ratios in the Business Plan (4.15%-4.24%), and well above the 3% ratio specified by FIRREA.

---

[4] In my original modeling I assumed that Sterling had a permanent (nonamortizing) capital credit and all of the intangibles from Central Evergreen to include in capital. This provided enough capital for a very large increase in assets if the capital were leveraged fully. In view of the uncertainty about the ability of Sterling to manage such substantial growth, and whether profits could be maintained through a period of very rapid growth, I imposed a restrictive growth constraint on the "but for" bank. In the "but for" world resulting from Judge Wheeler's ruling (i.e., with less core capital for Sterling), and with the evidence that Sterling is capable of managing substantial growth with good profitability, it may well be more appropriate to model the "but for" bank on the basis of a leveraging of all regulatory capital to the capital ratio maintained by the actual bank.

Additionally, a few data errors in the previous calculations have been found and corrected.[5]

In addition to adapting my calculation of Sterling's lost earnings to Judge Wheeler's ruling, I have updated my calculations through the present based on Sterling's recent financial performance. For the fourth quarter of 2003 through 2006 I have followed the same approach to modeling the but-for bank's performance as I did for 1990 through 2003.[6] Since 2003 Sterling has continued to grow both by internal growth and by acquisition. It has remained profitable while achieving this growth. Additionally in 2005 Sterling converted to a bank charter.

### *B. Future Damages*

As in my previous Reports, I understand that Professor James has prepared an analysis of the value of the remaining goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions. His determination of the value is $0.641 million.

## III. Summary

In summary, my determination of Sterling's expectation damages is $63.361 million. Exhibit 8 presents a summary of the amounts. The lost earnings from 1990 through 2006 are $58.164 million, the wounded bank damages are $4.556 million, and the future damages are $0.641 million.

## IV. Index of Exhibits

2. Addendum - Additional Documents Reviewed in Conjunction with Updated Report – December 11, 2006
3. Sterling Savings Association, Key Financial Data, 1983 – 1989

---

[5] The first involved the treatment of the tax benefits from net operating loss carryforwards ("NOLs"). A second involved a recalculation of the December 1989 core capital. The TFR form in use in 1989 did not include information on core capital as defined by FIRREA, and previous Reports have used a figure based on the June 1990 TFR. I have concluded that core capital in December 1989 was about $1 million lower than the figure used previously. A third involved the amount of intangibles and assets resulting from the acquisition of Empire Savings. Each of these corrections would, other things being equal, lower the expectations damage calculation.

[6] My methodology and rationale were described in my previous reports of September 2001 and February 2004.

4. Sterling Savings Association, Consolidated Key Financial Data, 1990 – 2006
5. Sterling Savings Association, Asset Composition, 1990 – 2006
6. Calculation of Lost Earnings on Foregone Assets Through 2006
7. List of actual acquisitions in Sterling's region (WA, OR, No. Idaho) through the RTC in 1990 – 1991. List of specific branch deals/ acquisitions that Sterling considered both before and after the breach.
8. Summary of Expectation Damages

I reserve the right to update my report if warranted.

Paul Horvitz

Dec 11, 2006

Date

# Exhibit 2

## Additional Documents Considered by *Paul M. Horvitz, Ph.D.*
## In Conjunction with Updated Report
## December 11, 2006

| | |
|---|---|
| **Legal Pleadings** | |
| Defendant's Proposed Findings of Uncontroverted Fact in Connection with Motion for Summary Judgment Regarding Damages, July 20, 2004 | |
| Defendant's Motion for Summary Judgment Regarding Damages, July 20, 2004 | |
| Opinion and Order, Judge Wheeler, Filed August 30, 2006 | |
| | |
| **Reports and Depositions** | |
| Deposition of William J. Durbin with Exhibit S-1, July 24, 2000 | |
| Amended Expert Report of Mukesh Bajaj, Ph.D. with Exhibits 1 - 2 and Tables 1-4, April 23, 2004 | |
| Deposition of Mukesh Bajaj, June 19-20, 2002 and May 17-18, 2004 | |
| Revised Expert Report of Christopher M. James, February 20, 2004 | |
| Updated Expert Report of Christopher M. James, December 11, 2006 | |
| | |
| **Thrift Financial Reports** | |
| Electronic TRF for the Quarterly Period Ending Deeember 31, 2003 | |
| Electronic TRF for the Quarterly Period Ending March 31, 2004 | |
| Electronic TRF for the Quarterly Period Ending June 30, 2004 | |
| Electronic TRF for the Quarterly Period Ending September 30, 2004 | |
| Electronic TRF for the Quarterly Period Ending December 31, 2004 | |
| Electronic TRF for the Quarterly Period Ending March 31, 2005 | |
| Electronic TRF for the Quarterly Period Ending June 30, 2005 | |
| | |
| **Call Reports** | |
| Electronic Call Report, Year to date through September 30, 2005 | |
| Electronic Call Report, Year to date through December 31, 2005 | |
| Electronic Call Report, Year to date through March 31, 2006 | |
| Electronic Call Report, Year to date through June 30, 2006 | |
| Electronic Call Report, Year to date through September 30, 2006 | |
| | |

| | |
|---|---|
| **Examination Reports** | |
| Sterling Savings Bank Report of Examination, Start Date June 23, 2003 | |
| Sterling Financial Corporation Holding Company Report of Examination, Start Date June 14, 2004 | |
| Sterling Savings Bank Joint Report of Examination prepared by the State of Washington Division of Banks and the Office of Thrift Supervision, Start Date June 14, 2004 | |
| Sterling Savings Bank Response to the Joint Report of Examination prepared by the State of Washington and the Office of Thrift Supervision, as of June 14, 2004 | |
| Sterling Savings Bank Joint Safety and Soundness Report of Examination prepared by the FDIC and the Washington Department of Financial Institutions, Start date September 12, 2005 | |
| Sterling Savings Bank Response to the Joint Safety and Soundness Report of Examination prepared by the State of Washington and the FDIC, as of September 12, 2005. Sterling Savings Bank Secretarial Certificate dated January 12, 2006. Letter from FDIC to Sterling Savings Bank re Board Resolution Progress Reports dated January 12, 2006 | |
| Sterling Financial Corporation Report of Bank Holding Company Inspection, Start date April 10, 2006, with Federal Reserve Bank of San Francisco letter dated May 24, 2006, Sterling Financial Corporation letter of response dated July 24, 2006 and Federal Reserve Bank of San Francisco letter of acknowledgement dated August 3, 2006 | |
| | |
| **Form 10-K and Form 10-Q Reports** | |
| Sterling Financial Corporation - Form 10-Q for the Year Ended December 31, 1989 | |
| Sterling Financial Corporation - Form 10-K for the Year Ended December 31, 2003 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2004 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2004 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2004 | |
| Sterling Financial Corporation - Form 10-K for the Year Ended December 31, 2004. Form 10-K as part of the Annual Report and Form 10-K as SEC filing | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2005 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2005 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2005 | |
| Sterling Financial Corporation - 2005 Annual Report and Form 10-K for the Year Ended December 31, 2005. | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended March 31, 2006 | |

| | |
|---|---|
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended June 30, 2006 | |
| Sterling Financial Corporation - Form 10-Q for the Quarterly Period Ended September 30, 2006 | |
| | |
| **Other Documents** | |
| Joint Examination – FHLB of Seattle and State of Washington : April 18, 1988 | SG 0052170-246 |
| Sterling Savings Bank 1989 Offering Circular Costs and Calculation of Damages - Legal, Accounting and Insurance Cost Summary | SG 0803330<br>SG 0803509 |
| Documentary Support in the form of Checks, Bills, Invoices | SG 0805404-05<br>SG 0805473; SG 0805489; SG 0805504 |
| Letter from Witherspoon, Kelley, Davenport & Toole (William Symmes) to U.S. Department of Justice (Elizabeth Hosford) re additional documentation and clarification: February 1, 2002 | |
| OTS TFR Instruction Manual for Schedule CCR, September 1991 | |
| OTS TFR Instruction Manual for Schedule CCR, March 2004 | |
| "Exhibit VII.2. -Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings. | |

# *Exhibit 3*

# *Sterling Savings Association*

## Key Financial Data

## 1983 to 1989

Source: Thirft Financial Reports (FHLBB), June 1983 - TFR (Income Statement for the 9 months ended 6/83), December 1983-TFR [Bates # SG 0701002 - 0701011]
(Dollars In Thousands)

| | As of Fiscal Year End | | | | | | |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1983 (June) | 1984 (June) | 1985 (June) | 1986 (June) | 1987 (June) | 1988 (June) | 1989 (June) |
| Loans | $360 | $54,857 | $70,495 | $127,255 | $172,294 | $304,126 | $502,453 |
| Mortgage Backed-Securities | $0 | $7,003 | $15,073 | $10,158 | $31,834 | $41,587 | $114,060 |
| Goodwill | $0 | $1,819 | $1,770 | $5,388 | $4,953 | $18,785 | $22,990 |
| Other Assets | $6,956 | $25,234 | $25,111 | $38,201 | $22,766 | $69,455 | $91,430 |
| Total Assets | $7,317 | $88,913 | $112,449 | $181,002 | $231,847 | $433,953 | $730,933 |
| | | | | | | | |
| Deposits | $5,135 | $71,561 | $88,205 | $142,078 | $170,755 | $305,354 | $519,389 |
| Borrowings | $0 | $12,563 | $17,928 | $29,623 | $47,665 | $98,802 | $189,362 |
| Total Liabilities | $5,170 | $84,910 | $107,835 | $173,789 | $221,377 | $410,772 | $720,414 |
| Regulatory Capital [1] | $2,147 | $4,003 | $4,614 | $7,213 | $10,470 | $23,181 | $28,614 |
| | | | | | | | |
| **Capital Ratios** | | | | | | | |
| Regulatory Capital/Average Assets | 29.34% | 8.32% | 4.58% | 4.92% | 5.07% | 6.96% | 4.91% |
| | | | | | | | |
| **Income Statement [2]** | | | | | | | |
| Income Before Taxes & Amortization | -$163 | $330 | $1,027 | $1,360 | $1,878 | $2,431 | $3,813 |
| Goodwill Amortization and Write-offs | $0 | $88 | $127 | $326 | $228 | $472 | $2,272 |
| Provision for Taxes | $0 | $0 | $122 | $205 | $560 | $752 | $560 |
| Accounting Changes and Extra Items | $0 | $26 | $166 | $0 | $0 | $0 | $0 |
| Net Income | -$163 | $216 | $612 | $829 | $1,090 | $1,207 | $981 |
| | | | | | | | |
| **Profitability Ratios** | | | | | | | |
| ROAA before taxes and Amortization | -2.22% | 0.69% | 1.02% | 0.93% | 0.91% | 0.73% | 0.65% |
| Average Assets [3] | $7,317 | $48,115 | $100,681 | $146,726 | $206,425 | $332,900 | $582,443 |

[1] For 1987 and 1988 this figure does not include general valuation allowances.
[2] Income figures for 1983 reflect nine months of data.
[3] "Average" assets for 1983 are actually total assets at 6/30/83.

# *Exhibit 4*

# *Sterling Savings Association*

## Consolidated Key Financial Data

## 1990 to 1999

Source: Thrift Financial Reports
(Dollars in Thousands)

| | As of Fiscal Year End | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
| Loans (Mortgage and Non-Mortgage) | $464,021 | $407,991 | $465,920 | $616,749 | $852,066 | $1,092,824 | $904,012 | $949,851 | $1,084,073 | $1,497,841 | $1,805,546 |
| Mortgage Backed-Securities (pool) | $115,395 | $141,040 | $98,126 | $328,279 | $331,426 | $253,337 | $393,730 | $372,057 | $456,322 | $232,256 | $227,649 |
| Goodwill & Other Intangibles | $19,736 | $14,573 | $10,649 | $8,431 | $17,915 | $14,945 | $11,868 | $10,147 | $7,882 | $61,180 | $55,488 |
| Other Assets | $89,838 | $45,395 | $66,192 | $78,087 | $162,256 | $177,575 | $166,160 | $202,732 | $322,499 | $518,768 | $447,070 |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 |
| | | | | | | | | | | | |
| Deposits | $483,581 | $492,372 | $510,104 | $583,732 | $815,274 | $901,646 | $906,298 | $909,276 | $1,047,863 | $1,563,343 | $1,629,234 |
| Borrowings | $189,557 | $98,608 | $86,615 | $376,493 | $446,837 | $513,956 | $465,611 | $503,827 | $656,411 | $516,246 | $673,196 |
| Total Liabilities | $678,260 | $596,378 | $602,954 | $972,422 | $1,261,539 | $1,439,052 | $1,383,106 | $1,428,473 | $1,722,373 | $2,103,836 | $2,324,571 |
| Equity Capital | $10,730 | $12,621 | $38,224 | $59,124 | $82,124 | $99,629 | $92,664 | $106,314 | $148,403 | $206,008 | $211,183 |
| | | | | | | | | | | | |
| **Capital Ratios** | | | | | | | | | | | |
| Equity/Average Assets | 1.51% | 1.94% | 6.12% | 7.07% | 6.86% | 6.87% | 6.15% | 7.06% | 8.72% | 9.86% | 6.72% |
| | | | | | | | | | | | |
| **Income Statement** | | | | | | | | | | | |
| Income Before Taxes & Amortization | $3,357 | $5,678 | $9,873 | $14,340 | $16,463 | $17,944 | $14,352 | -$269 | $23,341 | $21,585 | $35,951 |
| Goodwill Amortization and Write-offs | $3,253 | $2,770 | $2,332 | $2,218 | $2,262 | $3,487 | $3,332 | $1,586 | $2,265 | $3,980 | $5,692 |
| Provision for Taxes | -$163 | $590 | $3,319 | $4,920 | $4,559 | $4,819 | $4,122 | -$621 | $7,911 | $6,420 | $11,163 |
| Accounting Changes and Extra Items | $0 | $298 | -$522 | -$424 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Income | $267 | $2,020 | $4,744 | $7,626 | $9,642 | $9,638 | $6,898 | -$1,234 | $13,165 | $11,185 | $19,096 |
| | | | | | | | | | | | |
| **Profitability Ratios** | | | | | | | | | | | |
| ROAA before Taxes and Amortization | 0.47% | 0.87% | 1.58% | 1.71% | 1.37% | 1.24% | 0.95% | -0.02% | 1.37% | 1.03% | 1.48% |
| Average Assets | $709,962 | $648,995 | $624,943 | $836,217 | $1,197,605 | $1,451,172 | $1,507,226 | $1,505,279 | $1,702,782 | $2,090,311 | $2,422,799 |

Note:

All data are annual except for December 1996 which are for the 6 months ended on that date and September 2006 which are for the nine months ended on that date. All data are consolidated, except for data prior to 1996.

# *Exhibit 4*

# *Sterling Savings Association*

## Consolidated Key Financial Data

## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) | |
|---|---|---|---|---|---|---|---|---|
| Loans (Mortgage and Non-Mortgage) | $1,983,490 | $2,133,730 | $2,424,761 | $2,930,737 | $4,280,938 | $4,893,431 | $6,114,374 | [1] |
| Mortgage Backed-Securities (pool) | $210,653 | $617,796 | $562,011 | $919,540 | $2,045,348 | $1,960,583 | $1,746,734 | [2] |
| Goodwill & Other Intangibles | $49,998 | $44,621 | $43,977 | $47,955 | $132,246 | $138,838 | $137,090 | [3] |
| Other Assets | $407,630 | $242,391 | $453,129 | $376,158 | $479,517 | $565,748 | $626,338 | |
| Total Assets | $2,851,771 | $3,038,538 | $3,503,878 | $4,274,390 | $6,938,049 | $7,558,598 | $8,624,536 | |
| | | | | | | | | |
| Deposits | $1,743,296 | $1,869,906 | $2,029,070 | $2,470,941 | $3,866,129 | $4,831,232 | $5,689,311 | |
| Borrowings | $645,320 | $859,825 | $1,142,255 | $1,421,972 | $2,440,342 | $2,075,210 | $2,083,621 | [4] |
| Total Liabilities | $2,420,148 | $2,757,492 | $3,194,553 | $3,927,400 | $6,371,629 | $8,958,203 | $7,866,333 | |
| Equity Capital | $231,820 | $281,046 | $309,328 | $346,989 | $566,420 | $598,394 | $758,202 | |
| | | | | | | | | |
| **Capital Ratios** | | | | | | | | |
| Equity/Average Assets | 8.93% | 9.88% | 9.46% | 8.92% | 10.10% | 8.28% | 9.37% | |
| | | | | | | | | |
| **Income Statement** | | | | | | | | |
| Income Before Taxes & Amortization | $37,942 | $40,679 | $48,788 | $84,932 | $98,397 | $104,150 | $91,389 | |
| Goodwill Amortization and Write-offs | $5,490 | $5,377 | $644 | $263 | $2,224 | $2,222 | $1,685 | [5] |
| Provision for Taxes | $12,008 | $12,368 | $16,260 | $23,085 | $32,927 | $33,587 | $29,388 | |
| Accounting Changes and Extra Items | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Net Income | $20,444 | $22,934 | $31,862 | $41,584 | $63,246 | $68,341 | $60,316 | |
| | | | | | | | | |
| **Profitability Ratios** | | | | | | | | |
| ROAA before Taxes and Amortization | 1.46% | 1.43% | 1.49% | 1.87% | 1.76% | 1.44% | 1.13% | |
| Average Assets | $2,593,762 | $2,645,155 | $3,271,208 | $3,889,134 | $5,606,220 | $7,247,324 | $8,090,567 | |

Note:

All data are annual except for December 1996 which are for the 6 months ended on that date and September 2006 which are for the nine months ended on that date. All data are consolidated, except for data prior to 1996. Data for 2005-2006 are from FDIC Call Reports.

[1] For 2005-2006, reported figure is calculated as the sum of "Loans and Leases, Held for Sale" (RCON5369) and "Loans and leases, net of unearned income" (RCONB528) less "Allowance for loan and lease losses" (RCON3123).

[2] For 2005-2006, reported figure is the sum of mortgage backed securities in Schedule RC B, Item 4. (Calculated as RCON1698 + RCON1702 + RCON1703 + RCON1707 + RCON1709 + RCON1713 + RCON1714 + RCON1717 + RCON1718 + RCON1732 + RCON1733 + RCON1736)

[3] For 2005-2006, reported figure is the sum of "Goodwill" (RCON3163) and "Other intangible assets" (RCON0426) from Item 10 of Schedule RC.

[4] For 2005-2006, reported figure is the sum of Items 14 and 16 in Schedule RC. (RCON8993 + RCONB995 + RCON3190)

[5] For 2005-2006, reported figure is the sum of "Goodwill impairment losses" (RIADC216) and "Amortization expense and impairment losses for other intangible assets" (RIADC232) from Item 7 of Schedule RI.

# *Exhibit 5*

# *Sterling Savings Association*

## Asset Composition

## 1990 to 1999

Source: Thrift Financial Reports
(Dollars In Thousands)

| Balance Sheet | As of Fiscal Year End | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
| Mortgage Loans | $421,388 | $368,886 | $421,974 | $543,864 | $728,819 | $883,919 | $846,985 | $859,102 | $725,041 | $993,851 | $1,238,641 |
| Loans On: | | | | | | | | | | | |
| 1-4 Dwelling Units: | $257,879 | $229,948 | $304,909 | $423,788 | $616,841 | $728,173 | $454,901 | $445,000 | $412,529 | $561,449 | $602,282 |
| Construction Loans | $15,686 | $6,865 | $5,058 | $14,015 | $37,054 | $99,414 | $119,318 | $130,850 | $82,742 | $107,621 | $112,935 |
| First Mtg, Closed-End Jr Liens | $242,193 | $223,081 | $299,651 | $409,773 | $579,787 | $628,759 | $335,583 | $314,150 | $329,787 | $453,828 | $489,347 |
| Revolving, Open-End Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5 or More Dwelling Units: | $57,298 | $43,929 | $41,975 | $56,401 | $65,152 | $80,038 | $95,415 | $134,405 | $128,207 | $188,276 | $236,302 |
| Construction Loans | $17,865 | $5,650 | $4,298 | $2,077 | $10,286 | $29,141 | $40,807 | $80,123 | $65,333 | $68,301 | $74,047 |
| Permanent Mortgages | $39,433 | $38,279 | $37,677 | $54,324 | $54,866 | $50,897 | $54,608 | $54,282 | $62,874 | $119,975 | $162,255 |
| Nonresidential Property: | $113,416 | $99,135 | $82,027 | $75,226 | $70,228 | $107,377 | $135,388 | $157,174 | $145,296 | $207,146 | $337,497 |
| Construction Loans | $15,497 | $6,579 | $3,961 | $375 | $397 | $10,753 | $27,413 | $42,159 | $23,344 | $22,196 | $29,765 |
| Permanent Mortgages | $97,919 | $92,556 | $76,066 | $74,851 | $69,831 | $96,624 | $107,975 | $115,015 | $121,952 | $184,950 | $307,712 |
| Land | $3,654 | $1,704 | $1,185 | $1,057 | $553 | $17,920 | $22,106 | $21,577 | $42,911 | $38,730 | $64,694 |
| Accrued Interest Receivable | $3,552 | $2,759 | $2,622 | $2,834 | $3,515 | $4,963 | $3,919 | $4,702 | $4,833 | $5,295 | $6,764 |
| Construction, land development, and other land loans | | | | | | | | | | | |
| Advances for Taxes and Insurance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $366 | $177 | $87 | $106 |
| Less: Contra-Assets to Mtg Loans: | $14,411 | $8,585 | $10,744 | $15,642 | $27,470 | $54,552 | $64,764 | $104,122 | $8,912 | $7,132 | $9,024 |
| Loans In Process | $6,025 | $2,279 | $3,219 | $8,587 | $21,739 | $47,961 | $56,818 | $94,228 | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $2,404 | $2,260 | $2,616 | $2,340 | -$6 | -$628 | $495 | $1,629 | N/A | N/A | N/A |
| Valuation Allowances | $5,982 | $4,046 | $4,707 | $4,715 | $5,739 | $7,219 | $7,651 | $8,265 | N/A | N/A | N/A |

# *Exhibit 5*

# *Sterling Savings Association*

## Asset Composition

## 1990 to 1999

Source: Thrift Financial Reports
(Dollars in Thousands)

| Balance Sheet | As of Fiscal Year End | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990 (June) | 1991 (June) | 1992 (June) | 1993 (June) | 1994 (June) | 1995 (June) | 1996 (June) | 1996 (Dec) | 1997 (Dec) | 1998 (Dec) | 1999 (Dec) |
| Nonmortgage Loans | $42,633 | $39,103 | $43,946 | $73,085 | $123,247 | $208,905 | $257,047 | $290,749 | $359,032 | $503,790 | $566,905 |
| Commercial Loans: | $22,967 | $17,632 | $18,237 | $28,507 | $52,909 | $106,266 | $169,829 | $199,989 | $241,952 | $317,215 | $351,106 |
| Secured, Other than Mortgage | $22,967 | $17,632 | $15,608 | $26,415 | $51,056 | $103,386 | $160,757 | $194,461 | $233,535 | $303,216 | $327,489 |
| Unsecured | $0 | $0 | $629 | $2,092 | $1,853 | $2,880 | $9,072 | $5,528 | $8,417 | $13,999 | $23,617 |
| Financing Leases | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Consumer Loans: | $19,723 | $21,138 | $27,323 | $43,903 | $69,186 | $99,936 | $83,520 | $86,563 | $114,169 | $189,262 | $216,463 |
| Closed-End Consumer Loans: | $0 | $0 | $0 | $0 | $0 | $0 | $69,480 | $71,715 | $94,426 | $158,815 | $180,007 |
| Loans on Deposits | $2,619 | $2,323 | $2,660 | $2,709 | $2,709 | $4,467 | $4,386 | $4,343 | $4,924 | $5,258 | $5,135 |
| Home Improvement Loans | $24 | $31 | $46 | $137 | $173 | $44,929 | $22,351 | $22,900 | $23,431 | $25,489 | $27,626 |
| Education Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $157 | $0 |
| Auto Loans | $1,525 | $1,616 | $1,968 | $3,671 | $6,027 | $7,756 | $7,897 | $7,692 | $25,929 | $76,761 | $99,927 |
| Mobile Home Loans | $264 | $404 | $888 | $1,448 | $1,169 | $861 | $689 | $673 | $409 | $1,502 | $1,241 |
| Other Consumer Loans & Leases | $11,593 | $12,782 | $17,187 | $28,545 | $50,538 | $30,500 | $34,157 | $36,107 | $39,733 | $49,648 | $46,078 |
| Open-End Consumer Loans: | | | | | | | $14,040 | $14,848 | $19,743 | $30,447 | $36,456 |
| Loans Secured by 1-4 Family | $3,698 | $3,982 | $4,576 | $6,076 | $7,139 | $9,215 | $10,689 | $11,933 | $17,018 | $26,671 | $32,029 |
| Unsecured, Credit Card & Other | $0 | $0 | $0 | $1,315 | $1,413 | $2,208 | $3,351 | $2,915 | $2,725 | $3,776 | $4,427 |
| Accrued Interest Receivable | $444 | $293 | $332 | $418 | $717 | $1,431 | $1,859 | $2,220 | $2,911 | $4,889 | $5,641 |
| Less: Contra-Assets to Nonmtg Lns: | $501 | $40 | $54 | $257 | $433 | $1,272 | -$1,839 | -$1,977 | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | | | | | | | | | $0 | $7,376 | $6,305 |
| Loans in Process | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | N/A | N/A | N/A |
| Unamortized Yield Adjustments | $39 | $81 | $92 | $261 | $435 | $1,272 | -$1,885 | -$1,997 | N/A | N/A | N/A |
| Valuation Allowances | $462 | -$41 | -$38 | -$4 | -$2 | $0 | $46 | $20 | N/A | N/A | N/A |
| Total Assets | $688,990 | $608,999 | $640,887 | $1,031,546 | $1,363,663 | $1,538,681 | $1,475,770 | $1,534,787 | $1,870,776 | $2,309,845 | $2,535,753 |

Note: All data are consolidated, except for data prior to 1996.

# *Exhibit 5*
# *Sterling Savings Association*
## Asset Composition
## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) |
|---|---|---|---|---|---|---|---|
| Mortgage Loans | $1,395,779 | $1,414,903 | $1,564,728 | $1,764,417 | $2,801,588 | $3,828,670 | $4,882,466 [1] |
| Loans On: | | | | | | | |
| 1-4 Dwelling Units: | $629,604 | $595,980 | $694,415 | $816,295 | $1,487,551 | $1,244,016 | $1,202,662 |
| Construction Loans | $127,617 | $176,196 | $233,075 | $238,343 | $229,960 | N/A | N/A |
| First Mtg, Closed-End Jr Liens | $501,987 | $419,784 | $461,340 | $552,240 | $1,149,857 | $1,070,105 | $1,090,525 |
| Revolving, Open-End Loans | $0 | $0 | $0 | $25,712 | $107,734 | $173,911 | $112,137 |
| 5 or More Dwelling Units: | $282,135 | $275,964 | $359,184 | $367,489 | $443,254 | $459,412 | $381,084 |
| Construction Loans | $81,673 | $99,232 | $111,852 | $131,942 | $125,298 | N/A | N/A |
| Permanent Mortgages | $200,462 | $176,732 | $247,332 | $235,547 | $317,956 | $459,412 | $381,084 |
| Nonresidential Property: | $420,953 | $509,029 | $469,336 | $550,586 | $743,931 | $1,079,552 | $1,209,994 |
| Construction Loans | $80,559 | $86,421 | $91,437 | $147,313 | $168,855 | N/A | N/A |
| Permanent Mortgages | $340,394 | $422,808 | $377,899 | $403,253 | $575,078 | $1,079,552 | $1,209,994 |
| Land | $60,302 | $30,958 | $44,071 | $33,920 | $129,882 | N/A | N/A |
| Accrued Interest Receivable | $7,811 | $8,153 | $6,330 | $7,039 | $11,983 | N/A | N/A |
| Construction, land development, and other land loans | | | | | | $1,002,582 | $1,990,881 |
| Advances for Taxes and Insurance | $88 | $141 | $81 | $109 | $192 | N/A | N/A |
| Less: Contra-Assets to Mtg Loans: | $5,112 | $5,322 | $8,688 | $11,001 | $15,015 | N/A | N/A |
| Loans in Process | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Valuation Allowances | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

# *Exhibit 5*

# *Sterling Savings Association*

## Asset Composition

## 2000 to 2006

Source: Thrift Financial Reports; Call Reports
(Dollars in Thousands)

| Balance Sheet | 2000 (Dec) | 2001 (Dec) | 2002 (Dec) | 2003 (Dec) | 2004 (Dec) | 2005 (Dec) | 2006 (Sep) |
|---|---|---|---|---|---|---|---|
| Nonmortgage Loans | $587,711 | $718,627 | $860,032 | $1,166,320 | $1,479,350 | $1,126,531 | $1,306,004 [2] |
| Commercial Loans: | $435,667 | $519,856 | $654,536 | $941,664 | $1,301,025 | $877,614 | $993,280 [3] |
| Secured, Other than Mortgage | $411,879 | $491,323 | $618,974 | $887,209 | $1,225,273 | N/A | N/A |
| Unsecured | $23,788 | $23,254 | $32,788 | $54,455 | $75,752 | N/A | N/A |
| Financing Leases | $0 | $5,279 | $2,774 | $0 | $0 | N/A | N/A |
| Consumer Loans: | $156,348 | $209,240 | $218,421 | $241,457 | $202,842 | $248,917 | $312,724 [4] |
| Closed-End Consumer Loans: | $111,848 | $158,235 | $141,934 | $173,628 | $202,842 | N/A | N/A |
| Loans on Deposits | $5,317 | $5,106 | $4,805 | $5,862 | $6,425 | N/A | N/A |
| Home Improvement Loans | $32,882 | $49,504 | $36,039 | $30,745 | $0 | N/A | N/A |
| Education Loans | $0 | $0 | $0 | $0 | $0 | N/A | N/A |
| Auto Loans | $19,075 | $68,095 | $69,565 | $111,361 | $136,941 | N/A | N/A |
| Mobile Home Loans | $1,366 | $1,137 | $956 | $1,060 | $980 | N/A | N/A |
| Other Consumer Loans & Leases | $53,208 | $34,393 | $30,569 | $24,600 | $58,496 | N/A | N/A |
| Open-End Consumer Loans: | $44,500 | $51,005 | $76,487 | $67,829 | N/A | N/A | N/A |
| Loans Secured by 1-4 Family | $33,124 | $35,346 | $57,347 | $45,833 | N/A | N/A | N/A |
| Unsecured, Credit Card & Other | $11,376 | $15,659 | $19,140 | $21,996 | N/A | N/A | N/A |
| Accrued Interest Receivable | $6,521 | $3,164 | $4,186 | $4,905 | $8,302 | N/A | N/A |
| Less: Contra-Assets to Nonmtg Lns: | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Allowance for Loan & Lease Losses | $10,825 | $13,433 | $17,111 | $21,706 | $30,819 | N/A | N/A |
| Loans in Process | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Unamortized Yield Adjustments | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Valuation Allowances | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Total Assets | $2,651,771 | $3,038,538 | $3,503,878 | $4,274,390 | $6,938,049 | $7,556,598 | $8,624,536 |

Note:

All data are consolidated, except for data prior to 1996. Data for 2005-2006 are from FDIC Call Reports.

[1] For 2005 and 2006, reported figure is equal to Item 1 from Schedule RC C. Figures do not reflect valuation allowances. (Calculated as RCON1415 + RCON1420 + RCON1797 + RCON5367 + RCON5368 + RCON1460 + RCON1480)

[2] For 2005 and 2006, reported figure is equal to the sum of Commercial and Consumer Loans. Figures do not reflect valuation allowances.

[3] For 2005 and 2006, reported figure is equal to the sum of Items 2, 3, and 4 from Schedule RC C. (Calculated as RCON1288 + RCON1590 + RCON1766)

[4] For 2005 and 2006, reported figure is equal to Item 6 from Schedule RC C. (Calculated as RCONB538 + RCONB539 + RCON2011)

# *Exhibit 6*

## Calculation of Lost Earnings on Foregone Assets Through 2006
## Amortize Capital Credits from Lewis Federal and Tri-Cities, and
## Treat Central Evergreen Intangibles Subject to Limitations of FIRREA
## Index of Tables

*Table 1: Summary of Lost Earnings Calculation*

*Table 2a: Actual Bank and Intervest Financial Data*

*Table 2b: Data for Intervest Mortgage Investment Company*

*Table 3a: Estimates for the But-For and Incremental Banks*

*Table 3b: Calculation of Returns Applicable to Foregone Assets*

*Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*

*Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings*

*Table 3e: Summary of Internal versus External Growth in Total Assets*

*Table 4a: Goodwill and Intangibles Data for the But-For Bank*

*Table 4b: Calculation of Total Disallowed Central Evergreen Supervisory Goodwill at 12/31/89*

*Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89*

*Table 5: But-For Bank*

*Table 6a: Addendum For Lewis Federal and Tri-Cities Supervisory Intangibles*

*Table 6b: Addendum For Central Evergreen Supervisory Intangibles*

*Table 7: Addendum For Non-Supervisory Goodwill*

*Table 8: 2001 – 2006 Capital Downstreamed*

# *Exhibit 6*

# *Sterling Savings Association*

## Calculation of Lost Earnings on Foregone Assets

### *Table 1: Summary of Lost Earnings Calculation*

($ in Thousands)

| | A | B | C = B - A | D | E = C(t-1) * D |
|---|---|---|---|---|---|
| | | | | Incremental Bank | |
| Period Ended | Actual Assets | But-For Assets | Foregone Assets | ROAA | Income from Foregone Incremental Assets |
| 6/30/89 | $730,933 | $730,933 | $0 | | |
| 12/31/89 | 708,213 | 719,644 | 11,431 | 0.33% | 0 |
| 6/30/90 | 688,990 | 737,187 | 48,197 | 0.25% | 28 |
| 6/30/91 | 608,999 | 725,600 | 116,801 | 0.94% | 454 |
| 6/30/92 | 640,887 | 788,840 | 147,953 | 1.78% | 2,071 |
| 6/30/93 | 1,032,538 | 1,270,906 | 238,368 | 1.78% | 2,640 |
| 6/30/94 | 1,367,978 | 1,681,080 | 313,082 | 1.39% | 3,314 |
| 6/30/95 | 1,542,367 | 1,894,583 | 352,216 | 1.29% | 4,048 |
| 6/30/96 | 1,481,893 | 1,820,299 | 338,406 | 1.06% | 3,725 |
| 12/31/96 | 1,534,787 | 1,885,272 | 350,485 | -0.03% | (85) |
| 12/31/97 | 1,870,776 | 2,297,987 | 427,211 | 1.36% | 4,772 |
| 12/31/98 | 2,309,845 | 2,610,221 | 300,376 | 1.03% | 4,392 |
| 12/31/99 | 2,535,753 | 2,865,507 | 329,754 | 1.48% | 4,454 |
| 12/31/00 | 2,651,771 | 2,996,612 | 344,841 | 1.46% | 4,827 |
| 12/31/01 | 3,038,538 | 3,427,925 | 389,387 | 1.43% | 4,933 |
| 12/31/02 | 3,503,878 | 3,761,920 | 258,042 | 1.49% | 5,808 |
| 12/31/03 | 4,274,390 | 4,439,914 | 165,524 | 1.67% | 4,310 |
| 12/31/04 | 6,938,049 | 7,146,741 | 208,692 | 1.76% | 2,906 |
| 12/31/05 | 7,556,598 | 7,783,896 | 227,298 | 1.44% | 3,000 |
| 9/30/06 | 8,624,536 | 8,873,167 | 248,631 | 1.13% | 2,568 |
| | | | | | $58,164 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 2a, column A.

B From Table 5, column C.

D From Table 3a, column G. For periods ending 6/30/90, 12/31/96, and 9/30/06 ROAA reflects the return for the six or nine month period presented (and is not presented on a per annum basis).

E Pre-tax, pre-amortization net income from incremental assets.

# *Exhibit 6*

# *Sterling Savings Association*

## *Table 2a: Actual Bank and Intervest Financial Data*

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G | H = G / A | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Core Capital | Core Capital Ratio | Capital Raised/ Downstreamed | Total Goodwill | Qualifying SGW | Other Qualifying Intangibles |
| 6/30/89 | 730,933 | | | | | | | | | | | |
| 12/31/89 | 706,213 | 627 | 324 | 1,620 | 2,571 | 112 | (2,273) | -0.32% | 0 | 20,983 | 10,308 | 0 |
| 6/30/90 | 668,990 | (360) | (487) | 1,633 | 786 | 0 | (1,354) | -0.20% | 0 | 19,736 | 10,038 | 0 |
| 6/30/91 | 808,999 | 2,020 | 590 | 2,770 | 5,380 | 394 | 7,920 | 1.30% | 0 | 14,573 | 8,903 | 1,584 |
| 6/30/92 | 640,887 | 4,744 | 3,319 | 2,332 | 10,395 | 94 | 35,266 | 5.50% | 23,052 | 10,649 | 6,288 | 3,327 |
| 6/30/93 | 1,032,536 | 7,637 | 4,920 | 2,218 | 14,775 | 446 | 59,420 | 5.75% | 12,900 | 8,431 | 7,673 | 2,575 |
| 6/30/94 | 1,367,978 | 10,084 | 4,769 | 2,262 | 17,135 | 1,388 | 72,764 | 5.32% | 20,000 | 17,915 | 5,044 | 1,916 |
| 6/30/95 | 1,542,367 | 10,440 | 5,236 | 3,487 | 19,163 | 4,078 | 87,919 | 5.70% | 10,200 | 14,945 | 0 | 1,220 |
| 6/30/96 | 1,481,893 | 8,163 | 4,779 | 3,332 | 16,274 | 4,632 | 93,097 | 6.28% | 0 | 11,868 | | 440 |
| 12/31/96 | 1,534,787 | (1,234) | (621) | 1,586 | (269) | 2,487 | 101,602 | 6.62% | 13,100 | 10,147 | | 0 |
| 12/31/97 | 1,670,776 | 13,165 | 7,911 | 2,265 | 23,341 | 6,077 | 141,025 | 7.54% | 30,000 | 7,882 | | 0 |
| 12/31/98 | 2,309,845 | 11,185 | 6,420 | 3,980 | 21,585 | 6,086 | 143,669 | 6.22% | 52,743 | 61,160 | | 0 |
| 12/31/99 | 2,535,753 | 19,098 | 11,163 | 5,692 | 35,951 | 9,579 | 166,869 | 6.66% | 10,000 | 55,486 | | 0 |
| 12/31/00 | 2,651,771 | 20,444 | 12,008 | 5,490 | 37,942 | 10,004 | 184,828 | 6.97% | 0 | 49,998 | | 0 |
| 12/31/01 | 3,038,538 | 22,934 | 12,368 | 5,377 | 40,679 | 10,513 | 240,689 | 7.92% | 38,044 | 44,621 | | 0 |
| 12/31/02 | 3,503,678 | 31,862 | 16,260 | 644 | 48,766 | 11,618 | 261,585 | 7.47% | 0 | 43,977 | | 0 |
| 12/31/03 | 4,274,390 | 41,584 | 23,085 | 263 | 64,932 | 11,616 | 315,386 | 7.38% | 26,322 | 47,955 | | 0 |
| 12/31/04 | 6,938,049 | 63,246 | 32,927 | 2,224 | 98,397 | 11,616 | 450,918 | 6.50% | 162,076 | 132,246 | | 0 |
| 12/31/05 | 7,556,598 | 68,341 | 33,587 | 2,222 | 104,150 | 11,619 | 507,711 | 6.72% | 0 | 136,838 | | 0 |
| 9/30/06 | 8,624,536 | 60,316 | 29,368 | 1,685 | 91,369 | 16,866 | 669,065 | 7.76% | 117,188 | 137,090 | | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are for the nine months ended on that date. Through 1998, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A - D & F & J: Actual data from Thrift Financial Reports (Sheshunoff) for the bank, plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b). Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data is merger adjusted. Data for the bank for 2005 and later are from FDIC Call Reports, which are reported on a year-to-date basis.
Column D: Data from Call Reports include goodwill impairment losses and amortization expense and impairment losses for other intangible assets.
Column J: Data from Call Reports include goodwill and other intangible assets.

G: Actual data from Thrift Financial Reports (Sheshunoff) and Call Reports, except for figure for 12/31/89, which is from the Sterling Savings Association Capital Restoration Plan dated 2/19/90. Data for the bank for 1998 are from hard-copy TFRs as Sheshunoff data are merger adjusted. Data for the bank for 12/31/05 and 9/30/06 are Tier 1 Capital from Call Reports.

I: Based on data from Sterling Savings, except for data prior to 6/30/93 which are from annual reports and offering circulars, and data after 12/31/99 which are from Table 8, column D. Figure for capital raised in 6/30/92 is the net proceeds for the issuance of 2.675m shares of common stock plus the addition to regulatory capital from conversion of series B preferred. This capital was raised before the holding company was formed in November 1992.

K - L: Actual data from Thrift Financial Reports (Sheshunoff).

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 2b: Data for Intervest Mortgage Investment Company*

($ in Thousands)

| | A | B | C | D | E = B + C + D | F | G |
|---|---|---|---|---|---|---|---|
| Period Ended | Assets | Net Income | Taxes | Amortization of Goodwill | Pre-Tax, Pre-Amortization Income | Dividends | Equity |
| 6/30/89 | | | | | | | |
| 12/31/89 | | | | | | | |
| 6/30/90 | | | | | | | |
| 6/30/91 | | | | | | | |
| 6/30/92 | | | | | | | |
| 6/30/93 | 992 | 11 | 0 | - | 11 | - | 981 |
| 6/30/94 | 4,315 | 442 | 230 | - | 672 | - | 2,868 |
| 6/30/95 | 3,686 | 802 | 417 | - | 1,219 | - | 1,670 |
| 6/30/96 | 6,123 | 1,265 | 657 | - | 1,922 | - | 2,035 |
| 12/31/96 | | | | | | | |
| 12/31/97 | | | | | | | |
| 12/31/98 | | | | | | | |
| 12/31/99 | | | | | | | |
| 12/31/00 | | | | | | | |
| 12/31/01 | | | | | | | |
| 12/31/02 | | | | | | | |
| 12/31/03 | | | | | | | |
| 12/31/04 | | | | | | | |
| 12/31/05 | | | | | | | |
| 9/30/06 | | | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. All data are from the corresponding year's consolidating balance sheets for Sterling Financial and are for years in which Intervest was not a subsidiary of the bank.

D Amortization was not listed as a separate line item on the consolidating income statement.

F Dividends were not listed in the consolidating financial statements.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 3a: Estimates for the But-For and Incremental Banks*

($ in Thousands)

| | A *(But-For)* | B *(But-For)* | | | C *(Incremental)* | D *(But-For)* | E *(But-For)* | F *(But-For)* | G *(Incremental)* |
|---|---|---|---|---|---|---|---|---|---|
| | | Adjustments to But-For: | | | | | | | |
| Period Ended | Estimated Capital Ratio | *Income* | *Capital, Assets* | *Note* | Estimated Tax Rate | Dividends Paid Out | Maximum Internal Asset Growth Rate | Estimated External Growth (Acquired Assets) | Adjusted ROAA |
| 6/30/89 | | | | | | | | | |
| 12/31/89 | 4.00% | 0 | 10,385 | Capital, Assets: Estimated net proceeds from withdrawn 1989 Sterling unit offering ($12.0m - 1.5m = $10.5m) plus adjustment due to Great American branch purchase(-$0.115m). Income: Adjustment for wounded bank damages. | 37% | See footnote [D]. | 2.91% | 0 | 0.33% |
| 6/30/90 | 4.00% | 1,116 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 3.56% | 0 | 0.25% |
| 6/30/91 | 4.00% | 1,091 | 0 | Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 0.94% |
| 6/30/92 | 5.50% | 1,057 | 23,052 | Capital, Assets: Net proceeds for common stock issuance ($21 million) plus contribution to regulatory capital from conversion of preferred ($2.1 million). Income: Adjustment for wounded bank damages. | 37% | | 8.72% | 0 | 1.78% |
| 6/30/93 | 5.75% | 591 | 12,900 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 61.11% | 0 | 1.78% |
| 6/30/94 | 5.75% | 0 | 10,092 | Capital, Assets: Downstreamed capital from Sterling Financial ($20 million) plus adjustment due to Great American branch purchase ($1.9 million) less acquisition premium paid by Sterling for branches in Oregon ($3 million) and acquisition premium paid by Sterling for branches in Washington State ($8.8 million). Income: Adjustment for wounded bank damages. Source for acquisition premiums: 1994 AR, p. 35 | 37% | | 31.34% | 11,900 | 1.39% |
| 6/30/95 | 6.00% | 0 | 10,200 | Capital, Assets: Downstreamed capital from Sterling Financial. Income: Adjustment for wounded bank damages. | 37% | | 12.50% | 3,400 | 1.29% |
| 6/30/96 | 6.30% | 0 | 0 | Income: Adjustment for wounded bank damages. | 37% | | -3.92% | 0 | 1.06% |
| 12/31/96 | 6.75% | 0 | 13,100 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 3.57% | 0 | -0.03% |
| 12/31/97 | 6.75% | 0 | 30,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 21.89% | 0 | 1.36% |
| 12/31/98 | 6.75% | 0 | -4,619 | Capital, Assets: Downstreamed capital from Sterling Financial ($52.7 million) less intangibles generated in the Key Bank acquisition ($57.4 million). Source for intangibles: 1998 AR, p. F-9 | 37% | | 9.45% | 262,236 | 1.03% |
| 12/31/99 | 6.75% | 0 | 10,000 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 9.76% | 0 | 1.48% |
| 12/31/00 | 7.00% | 0 | 0 | | 37% | | 4.68% | 0 | 1.46% |
| 12/31/01 | 6.00% | 0 | 38,044 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 12.92% | 44,211 | 1.43% |
| 12/31/02 | 8.00% | 0 | 0 | | 37% | | 15.31% | 0 | 1.49% |
| 12/31/03 | 8.00% | 0 | 22,081 | Capital, Assets: Downstreamed capital from Sterling Financial ($26.3 million) less goodwill and a deposit intangible generated in the Empire Federal Bancorp acquisition ($4.2 million). Source for intangibles: Sterling Savings 12/31/03 10-K, pp. F-45-46. | 37% | | 15.43% | 229,982 | 1.67% |
| 12/31/04 | 8.75% | 0 | 75,576 | Capital, Assets: Downstreamed capital from Sterling Financial ($162.1 million) less goodwill and core deposit intangibles from KFBI acquisition ($65.7 million + $19.2 million) and goodwill from acquisition of PWWA ($1.6 million). Source for intangibles: 12/31/04 10-K, pp. F-44-45. | 37% | | 26.06% | 1,548,905 | 1.76% |
| 12/31/05 | 7.00% | 0 | 0 | | 37% | | 8.92% | 0 | 1.44% |
| 9/30/06 | 8.00% | 0 | 117,188 | Capital, Assets: Downstreamed capital from Sterling Financial. | 37% | | 12.31% | 138,000 | 1.13% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Capital ratios for 12/31/89, 6/30/90 and 6/30/91 assumed to equal 4% based on projected RAP leverage ratios in Sterling's 8/15/88 Business Plan. From 6/30/92 on, estimated to start at 5.50%, increasing over time consistent with the increase in the actual bank's core capital ratio.

B Adjustments to but-for income based on wounded bank damages summarized in Table 3c, column F. Adjustments to but-for capital & assets based on data from Sterling Savings, except for data prior to 6/30/93 which is from the annual reports or offering circulars (Data from Table 2a, column I), Great American Purchase adjustments (Data from Table 3c, column G), and data after 12/31/99 which are from Table 8, column D.

C Estimated to be 37% of incremental earnings based on guidance provided by Dan Byrne, CFO, of Sterling Savings Association.

D Estimated to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the 525,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is estimated that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/89).

E From Table 3a, column F.

F From Table 3a, column B.

G From Table 3b, column F.

# Exhibit 6

## Sterling Savings Association

### Table 3b: Calculation of Returns Applicable to Foregone Assets

($ in Thousands)

| | A | B | C | D | E = B - C - D | F = E / (average A, A(t-1)) |
|---|---|---|---|---|---|---|
| Period Ended | Actual Assets | Pre-Tax, Pre-Amortization Income | Actual Accretion Income | Adjustments to Earnings due to Non-recurring or Breach-induced Gains/(Losses) | Adjusted Pre-Tax, Pre-Amort. Earnings | Adjusted ROAA |
| 6/30/89 | 730,933 | | | | | |
| 12/31/89 | 708,213 | 2,571 | 178 | 0 | 2,393 | 0.33% |
| 6/30/90 | 688,990 | 786 | 178 | (1,116) | 1,724 | 0.25% |
| 6/30/91 | 608,999 | 5,380 | 354 | (1,091) | 6,117 | 0.94% |
| 6/30/92 | 640,887 | 10,395 | 351 | (1,057) | 11,101 | 1.78% |
| 6/30/93 | 1,032,538 | 14,775 | 437 | (591) | 14,930 | 1.78% |
| 6/30/94 | 1,367,978 | 17,135 | 447 | 0 | 16,688 | 1.39% |
| 6/30/95 | 1,542,367 | 19,163 | 350 | 0 | 18,813 | 1.29% |
| 6/30/96 | 1,481,893 | 16,274 | 282 | 0 | 15,992 | 1.06% |
| 12/31/96 | 1,534,787 | (269) | 111 | 0 | (380) | -0.03% |
| 12/31/97 | 1,870,776 | 23,341 | 159 | 0 | 23,182 | 1.36% |
| 12/31/98 | 2,309,845 | 21,585 | 95 | 0 | 21,490 | 1.03% |
| 12/31/99 | 2,535,753 | 35,951 | 25 | 0 | 35,926 | 1.48% |
| 12/31/00 | 2,651,771 | 37,942 | (24) | 0 | 37,966 | 1.46% |
| 12/31/01 | 3,038,538 | 40,679 | (24) | 0 | 40,703 | 1.43% |
| 12/31/02 | 3,503,878 | 48,766 | (24) | 0 | 48,790 | 1.49% |
| 12/31/03 | 4,274,390 | 64,932 | (24) | 0 | 64,956 | 1.67% |
| 12/31/04 | 6,938,049 | 98,397 | (24) | 0 | 98,421 | 1.76% |
| 12/31/05 | 7,556,598 | 104,150 | (24) | 0 | 104,174 | 1.44% |
| 9/30/06 | 8,624,536 | 91,389 | (18) | 0 | 91,407 | 1.13% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Actual data from Thrift Financial Reports (Sheshunoff) and hard-copy TFR's for Sterling Savings and from consolidating financials from 6/30/93-6/30/96 for Intervest. Data from Table 2a column A.

B From Table 2a, column E.

C Accretion income for the six months ended 12/31/89 and 6/30/90 is assumed to be half of total accretion for the year ended 6/30/90. For 2001 – 2006, the accretion income in each year is assumed to be equal to the accretion income in 2000. Accretion income for 9/30/06 is pro-rated.
Source: Accretion schedule from Dan Byrne, CFO, of Sterling Savings Association.

D From Table 3c, column F.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 3c: Adjustments to Pre-Tax, Pre-Amortization Earnings or Capital*

($ in Thousands)

| | Adjustments [ Revenue / (Expense) ] due to: | | | | | | Adjustments [Capital] due to: |
|---|---|---|---|---|---|---|---|
| | A | B | C | D = A / (1 - ( C / B )) | E | F = D + E | G |
| Period Ended | Extraordinary Items Net of Tax | Income Before Taxes | Total Income Taxes | Extraordinary Items Before Tax | Wounded Bank Costs | Total | Great American Branch Purchase |
| 6/30/89 | | | | | | | |
| 12/31/89 | $0 | $951 | $324 | $0 | $0 | $0 | ($115) |
| 6/30/90 | 0 | (847) | (487) | 0 | (1,116) | (1,116) | |
| 6/30/91 | 298 | 2,312 | 590 | 400 | (1,491) | (1,091) | |
| 6/30/92 | (522) | 8,585 | 3,319 | (851) | (206) | (1,057) | |
| 6/30/93 | (424) | 12,970 | 4,920 | (683) | 92 | (591) | |
| 6/30/94 | 0 | 14,201 | 4,559 | 0 | 0 | 0 | $1,892 |
| 6/30/95 | 0 | 14,457 | 4,819 | 0 | 0 | 0 | |
| 6/30/96 | 0 | 11,020 | 4,122 | 0 | 0 | 0 | |
| 12/31/96 | 0 | (1,855) | (621) | 0 | 0 | 0 | |
| 12/31/97 | 0 | 21,076 | 7,911 | 0 | 0 | 0 | |
| 12/31/98 | 0 | 17,605 | 6,420 | 0 | 0 | 0 | |
| 12/31/99 | 0 | 30,259 | 11,163 | 0 | 0 | 0 | |
| 12/31/00 | 0 | 32,452 | 12,008 | 0 | 0 | 0 | |
| 12/31/01 | 0 | 35,302 | 12,368 | 0 | 0 | 0 | |
| 12/31/02 | 0 | 48,122 | 16,260 | 0 | 0 | 0 | |
| 12/31/03 | 0 | 64,669 | 23,085 | 0 | 0 | 0 | |
| 12/31/04 | 0 | 96,173 | 32,927 | 0 | 0 | 0 | |
| 12/31/05 | 0 | 101,928 | 33,587 | 0 | 0 | 0 | |
| 9/30/06 | 0 | 89,704 | 29,388 | 0 | 0 | 0 | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A - C Data are for Sterling Savings only. Data are from Thrift Financial Reports (Sheshunoff), except for data for 1998 which are from hardcopy TFR's, and data for 2005 and later, which are from FDIC Call Reports, and are reported on a year-to-date basis.

D Extraordinary items net of taxes grossed up for taxes based on actual tax rate for Sterling in each quarter.

E From Table 3d, column F.

G Source: Data from Sterling Savings Association.

# Exhibit 6

## Sterling Savings Association

### Table 3d: Summary of Wounded Bank Adjustments to Pre-Tax, Pre-Amortization Earnings

($ in Thousands)

| | Wounded Bank Costs [Benefit / (Costs)] due to: | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| Period ended | Loss on CJ-4 Loan | Excess Supervision Costs | Cost of 1989 Units Offering | Increased Legal and Accounting to Defend against Regulatory Interference | Other | Total |
| 6/30/89 | | | | | | |
| 12/31/89 | $0 | $0 | $0 | $0 | | $0 |
| 6/30/90 | (6) | (75) | (1,004) | (31) | | (1,116) |
| 6/30/91 | (1,169) | (66) | 0 | (236) | | (1,491) |
| 6/30/92 | (138) | (32) | 0 | (37) | | (206) |
| 6/30/93 | 92 | 0 | 0 | 0 | | 92 |
| 6/30/94 | 0 | 0 | 0 | 0 | | 0 |
| 6/30/95 | 0 | 0 | 0 | 0 | | 0 |
| 6/30/96 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/96 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/97 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/98 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/99 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/00 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/01 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/02 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/03 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/04 | 0 | 0 | 0 | 0 | | 0 |
| 12/31/05 | 0 | 0 | 0 | 0 | | 0 |
| 9/30/06 | 0 | 0 | 0 | 0 | | 0 |
| Total | $(1,241) | $(172) | $(1,004) | $(304) | $0 | $(2,721) |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Undated additional costs associated with additional reserves and late fees are assumed to have been incurred in FY 93. Source: Data from Sterling Savings Association.

B It is assumed that 1/3 of the FDIC General Assessment paid was due to Sterling's "troubled thrift" status. Expenses are assigned to a fiscal year by report date. Source: Data from Sterling Savings Association.

C Includes all costs incurred. Costs were expensed in quarter ended 3/31/90 (per D. Byrne, CFO, of Sterling Savings Association and 1990 Annual Report, p. 9). Source: Data from Sterling Savings Association.

D Source: Data from Sterling Savings Association.

# Exhibit 6

## Sterling Savings Association

### Table 3e: Summary of Internal versus External Growth in Total Assets

($ in Thousands)

| | A | B | C | D = (A/A(t-1)) - 1 | E = ((A-B)/A(t-1)) - 1 | F |
|---|---|---|---|---|---|---|
| | | | | Growth Rates | | |
| Period Ended | Actual Total Assets | Acquired Assets | Notes | Actual Growth | Internal Growth | But-For Internal Growth Rate |
| 6/30/89 | 730,933 | 0 | | | | |
| 12/31/89 | 708,213 | 0 | | -3.11% | -3.11% | 2.91% |
| 6/30/90 | 688,990 | 0 | | -2.71% | -2.71% | 3.56% |
| 6/30/91 | 608,999 | 0 | | -11.61% | -11.61% | 8.72% |
| 6/30/92 | 640,887 | 0 | | 5.24% | 5.24% | 8.72% |
| 6/30/93 | 1,032,538 | 0 | | 61.11% | 61.11% | 61.11% |
| 6/30/94 | 1,367,978 | 11,800 | Acquisition of deposits of three branch facilities in Portland, Oregon (April 1994; $53m in deposits, $3m premium paid). Acquisition of deposits of five branch facilities in Washington State (May 1994; $135m in deposits, $6.6m premium paid). "Sterling used substantially all of the net funds corresponding to the acquired deposit liabilities to repay certain reverse repurchase borrowings and FBLB Seattle advances." Source: 6/31/94 AR, Note 4. | 32.49% | 31.34% | 31.34% |
| 6/30/95 | 1,542,367 | 3,400 | American Liberty acquisition (December 1994; acquired American's loan servicing portfolio of ~ $451.4m in residential loans, $3.4m in purchased mortgage servicing rights). Source: 6/31/95 AR, Note 3. | 12.75% | 12.50% | 12.50% |
| 6/30/96 | 1,481,893 | 0 | | -3.92% | -3.92% | -3.92% |
| 12/31/96 | 1,534,787 | 0 | | 3.57% | 3.57% | 3.57% |
| 12/31/97 | 1,870,776 | 0 | | 21.89% | 21.89% | 21.89% |
| 12/31/98 | 2,309,845 | 262,236 | Keybank (June 1998; $518m in assets acquired including cash, "[w]ith the net cash received from the branch acquisition, Sterling repaid approximately $322 million of certain reverse repurchase borrowings and Federal Home Loan Bank of Seattle advances") and Big Sky (November 1998; $68m in assets) acquisitions. Source: 12/31/98 10K. | 23.47% | 9.45% | 9.45% |
| 12/31/99 | 2,535,753 | 0 | | 9.78% | 9.78% | 9.78% |
| 12/31/00 | 2,651,771 | 0 | | 4.58% | 4.58% | 4.58% |
| 12/31/01 | 3,038,538 | 44,211 | Acquisition of Source Capital. Source: 12/31/01 10-K, p.F-50. | 14.59% | 12.92% | 12.92% |
| 12/31/02 | 3,503,878 | 0 | | 15.31% | 15.31% | 15.31% |
| 12/31/03 | 4,274,390 | 229,982 | Acquisition of Empire Federal Bancorp. Sum of $143.6 million in cash, $67.3 million of loans, $8.7 million in investments and asset backed securities, $4.2 million of goodwill and other intangibles, and $6.1 million in other assets. Source: Sterling Savings 12/31/03 10-K, pp. F-45-46. | 21.99% | 15.43% | 15.43% |
| 12/31/04 | 6,938,049 | 1,548,905 | Acquisition of KFBI, owner of Klamath First Federal Savings and Loan Association, and Peter W. Wong Associates, Inc. Sum of assets acquired in KFBI acquisition ($44.9 million in cash and cash equivalents, $778.2 million in investments and asset backed securities, $584.5 million in loans receivable, $85.7 million in goodwill, $19.2 million in core deposit intangibles, and $74.9 million in other assets) and goodwill generated from PWWA acquisition ($1.0 million in goodwill). Source: 12/31/04 10-K, pp. F-44-45. | 62.32% | 26.08% | 26.08% |
| 12/31/05 | 7,556,598 | 0 | | 8.92% | 8.92% | 6.92% |
| 9/30/06 | 8,624,536 | 138,000 | Sterling Financial Corporation acquired Lynnwood Financial, parent company of Golf Savings Bank on 7/5/06. Golf Savings Bank was maintained as a separate subsidiary of Sterling Financial Corporation. Golf Savings Bank transferred $322 million in construction loans to Sterling Savings, and Sterling Savings transferred $184 million in Federal Funds to Golf Savings Bank. Source: 9/30/06 10-Q, pp. 16-17; "Exhibit VII.2. -Capital ratios, Golf Savings Bank Pro Forma" schedule provided by Sterling Savings. | 14.13% | 12.31% | 12.31% |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06 which are for the nine months ended as of that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st. Data prior to 1996 are unconsolidated.

A From Table 2a, column A. Actual data for the bank plus data for Intervest Mortgage for years in which Intervest was not a subsidiary of the bank (see Table 2b).

F For 12/31/89-6/30/91, the growth rate on incremental assets is assumed to be the same as projected in Sterling's 6/15/88 Business Plan. The rate for 6/30/92 is assumed to be the same as projected for 6/30/91. From 6/30/93 on, the growth rate on incremental assets is assumed to be the same as the internal growth of the actual bank as reflected in column E.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 4a:* Goodwill and Intangibles Data for the But-For Bank

($ in Thousands)

| | *Lewis Federal and Tri-Cities Supervisory Intangibles* | | | | | | *Central Evergreen Supervisory Intangibles* | | | | | | *Non Supervisory Intangibles* | | O = D + E + F + J + K + L + N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A = B + C | B | C | D | E | F | G = H + I | H | I | J | K | L | M | N | |
| Period Ended | Total Intangibles | Capital Credit | Supervisory Goodwill | Amortization of Supervisory Goodwill and Capital Credit | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Unidentified and Identified Intangibles | Identified Intangibles | Supervisory Goodwill | Amortization of Identified and Unidentified Intangibles | Adjustments to Supervisory Goodwill (benefit) | NOL's | Total Balances | Total Amortization of Non-Supervisory Intangibles | Total Amortization, Adjustments and NOL's |
| 6/30/89 | $16,067 | $12,342 | $3,724 | $1,020 | $0 | $0 | $16,700 | $6,075 | $12,625 | $1,324 | $0 | $59 | $1,407 | $108 | $2,512 |
| 12/31/89 | 15,557 | 11,929 | 3,627 | 510 | 0 | 0 | 17,028 | 5,670 | 11,357 | 1,480 | 0 | 193 | 1,353 | 54 | 2,238 |
| 6/30/90 | 15,047 | 11,516 | 3,530 | 510 | 0 | 0 | 16,112 | 5,265 | 10,847 | 1,268 | (354) | 0 | 1,299 | 54 | 1,476 |
| 6/30/91 | 13,673 | 10,691 | 2,983 | 1,020 | 0 | 353 | 11,573 | 4,455 | 7,118 | 1,873 | 0 | 2,666 | 1,190 | 108 | 6,021 |
| 6/30/92 | 12,232 | 9,865 | 2,368 | 948 | 493 | 0 | 8,616 | 3,645 | 4,971 | 1,859 | 1,098 | 0 | 1,092 | 108 | 4,506 |
| 6/30/93 | 11,285 | 9,039 | 2,245 | 948 | 0 | 0 | 6,848 | 2,835 | 4,013 | 1,768 | 0 | 0 | 974 | 108 | 2,824 |
| 6/30/94 | 10,337 | 6,213 | 2,123 | 948 | 0 | 0 | 5,142 | 2,025 | 3,117 | 1,706 | 0 | 0 | 12,450 | 324 | 2,978 |
| 6/30/95 | 9,389 | 7,388 | 2,001 | 948 | 0 | 0 | 3,525 | 1,215 | 2,310 | 1,617 | 0 | 0 | 10,867 | 1,583 | 4,148 |
| 6/30/96 | 8,441 | 6,562 | 1,879 | 948 | 0 | 0 | 2,009 | 405 | 1,604 | 1,517 | 0 | 0 | 9,284 | 1,583 | 4,048 |
| 12/31/96 | 7,967 | 6,149 | 1,818 | 474 | 0 | 0 | 1,306 | 0 | 1,306 | 703 | 0 | 0 | 8,492 | 792 | 1,968 |
| 12/31/97 | 7,019 | 5,323 | 1,698 | 948 | 0 | 0 | 773 | 0 | 773 | 533 | 0 | 0 | 6,909 | 1,583 | 3,064 |
| 12/31/98 | 6,071 | 4,497 | 1,573 | 948 | 0 | 0 | 371 | 0 | 371 | 402 | 0 | 0 | 60,426 | 3,483 | 4,833 |
| 12/31/99 | 5,123 | 3,672 | 1,451 | 946 | 0 | 0 | 115 | 0 | 115 | 258 | 0 | 0 | 55,042 | 5,383 | 6,587 |
| 12/31/00 | 4,175 | 2,846 | 1,329 | 948 | 0 | 0 | 0 | 0 | 0 | 115 | 0 | 0 | 49,659 | 5,383 | 6,446 |
| 12/31/01 | 3,227 | 2,020 | 1,207 | 948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44,282 | 5,377 | 6,325 |
| 12/31/02 | 2,279 | 1,194 | 1,085 | 948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43,638 | 644 | 1,592 |
| 12/31/03 | 1,974 | 955 | 1,019 | 305 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,618 | 263 | 588 |
| 12/31/04 | 1,883 | 911 | 972 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 131,692 | 2,224 | 2,314 |
| 12/31/05 | 1,793 | 867 | 926 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 128,870 | 2,222 | 2,312 |
| 9/30/06 | 1,858 | 966 | 891 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 127,985 | 1,665 | 1,753 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Intangibles from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

B From Table 6a, column E. Capital Credit from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

C From Table 6a, column J. Supervisory goodwill from Lewis Federal and Tri-Cities supervisory acquisitions. Based on data from Sterling Savings Association.

D See note A above. Amortization of the supervisory goodwill is based on data from Sterling Savings Association. Amortization of the capital credit is from Table 6a, columns B and D. Amortization for 12/31/96 is for the six months ended 12/31/96. Amortization for 9/30/06 is for the nine months ended 9/30/06.

E, F, K & L Adjustments to and NOL usages against goodwill. Based on data from Sterling Savings Association. It is assumed that the remaining NOL balance of $1.9m associated with the Tri-Cities acquisition was used in the fiscal year ended 6/30/91. 50% of this benefit is assumed to have been shared with the government.

G Intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

H Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

I From Table 6b, column C. Based on data from Sterling Savings association.

J Calculated as Table 6b, column 6 + Table 6b, column D.

M & N Assumed balances and amortization of intangibles resulting from the Lewis & Clark merger (FY93). The goodwill amortization for this deal is modeled on an assumed straight-line basis through 2000. All data is based on information from Sterling Annual Reports. From Table 7, columns D and H.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 4b: Calculation of Total Disallowed Central Evergreen Supervisory Goodwill at 12/31/89*

($ in Thousands)

| | A | B | C | D | E = C * D | F = min(A,E) | G |
|---|---|---|---|---|---|---|---|
| Period ended | Central Evergreen SGW | Actual Reported Qualifying SGW | But-For Bank Beginning Period Tangible Assets | Phaseout Schedule of SGW | But-For Constraint | But-For Qualifying SGW | Adjustment to But-For Core Capital |
| 6/30/89 | $12,625 | | | | | | |
| 12/31/89 | 11,357 | $10,308 | $694,760 | 1.500% | $10,421 | $10,421 | n/a |
| 6/30/90 | 10,847 | 10,036 | 685,708 | 1.500% | 10,286 | 10,286 | (136) |
| 6/30/91 | 7,118 | 8,903 | 704,730 | 1.500% | 10,571 | 7,118 | (3,167) |
| 6/30/92 | 4,971 | 6,288 | 699,163 | 1.000% | 6,992 | 4,971 | (2,147) |
| 6/30/93 | 4,013 | 7,673 | 766,910 | 0.750% | 5,752 | 4,013 | (958) |
| 6/30/94 | 3,117 | 5,044 | 1,251,799 | 0.375% | 4,694 | 3,117 | (896) |
| 6/30/95 | 2,310 | | 1,653,132 | 0.000% | 0 | 0 | (3,117) |
| 6/30/96 | 1,604 | | 1,870,802 | 0.000% | 0 | 0 | 0 |
| 12/31/96 | 1,306 | | 1,800,566 | 0.000% | 0 | 0 | 0 |
| 12/31/97 | 773 | | 1,867,507 | 0.000% | 0 | 0 | 0 |
| 12/31/98 | 371 | | 2,283,287 | 0.000% | 0 | 0 | 0 |
| 12/31/99 | 115 | | 2,543,354 | 0.000% | 0 | 0 | 0 |
| 12/31/00 | 0 | | 2,805,226 | 0.000% | 0 | 0 | 0 |
| 12/31/01 | 0 | | 2,942,777 | 0.000% | 0 | 0 | 0 |
| 12/31/02 | 0 | | 3,380,416 | 0.000% | 0 | 0 | 0 |
| 12/31/03 | 0 | | 3,716,002 | 0.000% | 0 | 0 | 0 |
| 12/31/04 | 0 | | 4,390,324 | 0.000% | 0 | 0 | 0 |
| 12/31/05 | 0 | | 7,012,966 | 0.000% | 0 | 0 | 0 |
| 9/30/06 | 0 | | 7,652,433 | 0.000% | 0 | 0 | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which is as of the nine months ended on that date.
Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 4a, column I.

B Actual data from Thrift Financial Reports (Sheshunoff).

C Calculated as the but-for bank's assets at the beginning of the period less total intangibles at the beginning of the period. (Calculated as Table 5, column C[t-1] - (Table 4a, column A[t-1] + Table 4a, column G[t-1] + Table 4a, column M[t-1])).

D Post-FIRREA, a portion of supervisory goodwill (based on a percentage of tangible assets) was allowed to count towards core capital. Qualifying percentages are from the Thrift Financial Report Instruction Manual 1991.

G Calculated as column F[t] - column F[t-1].

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 4c: Calculation of Total Disallowed Central Evergreen Identified Intangibles at 12/31/89*

($ in Thousands)

| | A | B | C | D | E | F = D * E | G = min(A,F) | H |
|---|---|---|---|---|---|---|---|---|
| Period ended | Identified Intangibles | Actual Reported Other Qualifying Intangibles | Actual Tangible Capital | But-For Bank Tangible Capital + But-For Qualifying SGW | Percentage of Tangible Capital + QSGW That Can Be Counted | But-For Constraint | But-For Other Qualifying Intangibles | Adjustment to But-For Core Capital |
| 6/30/89 | $6,075 | | | | | | | |
| 12/31/89 | 5,670 | $0 | ($9,949) | $23,170 | 25.000% | $5,793 | $5,670 | |
| 6/30/90 | 5,265 | 0 | (11,390) | 23,116 | 25.000% | 5,779 | 5,265 | (405) |
| 6/30/91 | 4,455 | 1,584 | (2,567) | 24,223 | 25.000% | 6,056 | 4,455 | (810) |
| 6/30/92 | 3,645 | 3,327 | 25,651 | 24,569 | 25.000% | 6,142 | 3,645 | (810) |
| 6/30/93 | 2,835 | 2,575 | 48,191 | 52,503 | 25.000% | 13,126 | 2,835 | (810) |
| 6/30/94 | 2,025 | 1,916 | 62,936 | 74,460 | 25.000% | 18,615 | 2,025 | (810) |
| 6/30/95 | 1,215 | 1,220 | 85,029 | 95,273 | 25.000% | 23,818 | 1,215 | (810) |
| 6/30/96 | 405 | 440 | 90,622 | 113,325 | 25.000% | 28,331 | 405 | (810) |
| 12/31/96 | 0 | 0 | 101,602 | 121,105 | 25.000% | 30,276 | 0 | (405) |
| 12/31/97 | 0 | 0 | 141,025 | 131,466 | 25.000% | 32,867 | 0 | 0 |
| 12/31/98 | 0 | 0 | n/a | | | | | |
| 12/31/99 | 0 | 0 | n/a | | | | | |
| 12/31/00 | 0 | 0 | n/a | | | | | |
| 12/31/01 | 0 | 0 | n/a | | | | | |
| 12/31/02 | 0 | 0 | n/a | | | | | |
| 12/31/03 | 0 | 0 | n/a | | | | | |
| 12/31/04 | 0 | 0 | n/a | | | | | |
| 12/31/05 | 0 | 0 | n/a | | | | | |
| 9/30/06 | 0 | 0 | n/a | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/06, which is as of the nine months ended on that date.
Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A From Table 4a, column H.
B, C Actual data from Thrift Financial Reports (Sheshunoff).
D Calculated as the previous period's but-for core capital less the previous period's but-for other qualifying intangibles. (Calculated as Table 5, column I[t-1] - column G[t-1]).
For 12/31/89, calculated as the but-for bank's core capital at 12/31/89 before inclusion of but-for other qualifying intangibles.
E Post FIRREA, a maximum of 25% of (Tangible Capital + Qualifying SGW) can be counted towards Other Qualifying Intangible Assets.
H Calculated as column G[t] - column G[t-1].

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 5: But-For Bank*

($ in Thousands)

| | A | B | C | D | E | F | G = D - E - F | H | I | J = I / C | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period ended | Growth Constrained Assets | Capital Constrained Assets | Assets | Pre-Tax, Pre-Amort. Income | Taxes | Total Amortization of Intangibles | Net Income | Dividends | Core Capital | Core Capital Ratio | Additional Capital Raised / Adjustments to Core Capital | Adjustment to But-For Core Capital Due to Phaseout of Central Evergreen Intangibles + Limitation on Other Qualifying Intangibles |
| 6/30/89 | | | 730,933 | | | | | | | | | |
| 12/31/89 | 752,177 | 719,644 | 719,644 | 2,571 | 324 | 2,045 | 202 | 353 | 28,786 | 4.00% | 10,385 | n/a |
| 6/30/90 | 745,291 | 737,167 | 737,167 | 1,930 | (64) | 1,833 | 161 | 241 | 29,487 | 4.00% | 0 | (541) |
| 6/30/91 | 801,437 | 725,600 | 725,600 | 6,925 | 1,162 | 3,001 | 2,763 | 678 | 29,024 | 4.00% | 0 | (3,977) |
| 6/30/92 | 788,640 | 1,020,874 | 788,640 | 13,523 | 4,476 | 2,916 | 6,131 | 576 | 56,148 | 7.12% | 23,052 | (2,857) |
| 6/30/93 | 1,270,906 | 1,344,280 | 1,270,906 | 18,006 | 6,116 | 2,824 | 9,067 | 926 | 77,295 | 6.08% | 12,900 | (1,769) |
| 6/30/94 | 1,681,060 | 1,892,145 | 1,681,060 | 20,449 | 6,015 | 2,978 | 11,456 | 1,688 | 97,298 | 5.78% | 10,092 | (1,706) |
| 6/30/95 | 1,894,583 | 1,909,004 | 1,894,583 | 23,211 | 6,734 | 4,148 | 12,329 | 4,560 | 114,540 | 6.05% | 10,200 | (3,927) |
| 6/30/96 | 1,820,299 | 1,928,726 | 1,820,299 | 19,999 | 6,157 | 4,048 | 8,794 | 5,114 | 121,510 | 6.68% | 0 | (610) |
| 12/31/96 | 1,885,272 | 1,947,648 | 1,885,272 | (354) | (818) | 1,968 | (1,505) | 2,728 | 131,466 | 6.97% | 13,100 | (405) |
| 12/31/97 | 2,297,987 | 2,553,999 | 2,297,987 | 28,113 | 9,677 | 3,064 | 15,372 | 8,559 | 172,395 | 7.50% | 30,000 | 0 |
| 12/31/98 | 2,777,438 | 2,610,221 | 2,610,221 | 25,977 | 8,045 | 4,633 | 13,099 | 8,570 | 176,190 | 6.75% | (4,819) | 0 |
| 12/31/99 | 2,885,507 | 3,004,070 | 2,885,507 | 40,405 | 12,811 | 6,587 | 21,007 | 10,061 | 202,775 | 7.08% | 10,000 | 0 |
| 12/31/00 | 2,996,612 | 3,147,362 | 2,996,612 | 42,769 | 13,794 | 6,446 | 22,528 | 10,468 | 220,315 | 7.35% | 0 | 0 |
| 12/31/01 | 3,427,925 | 3,472,938 | 3,427,925 | 45,612 | 14,193 | 6,325 | 25,094 | 10,995 | 277,835 | 8.11% | 36,044 | 0 |
| 12/31/02 | 3,952,698 | 3,761,920 | 3,761,920 | 54,574 | 18,409 | 1,592 | 34,573 | 12,098 | 300,954 | 8.00% | 0 | 0 |
| 12/31/03 | 4,572,239 | 4,439,914 | 4,439,914 | 69,242 | 24,680 | 568 | 43,994 | 12,096 | 355,193 | 8.00% | 22,681 | 0 |
| 12/31/04 | 7,146,741 | 7,196,236 | 7,146,741 | 101,303 | 34,002 | 2,314 | 64,988 | 12,098 | 485,681 | 6.80% | 75,576 | 0 |
| 12/31/05 | 7,783,896 | 7,802,030 | 7,783,896 | 107,150 | 34,697 | 2,312 | 70,140 | 12,101 | 546,142 | 7.02% | 0 | 0 |
| 9/30/06 | 8,879,806 | 8,873,167 | 8,873,167 | 93,957 | 30,338 | 1,753 | 61,866 | 17,028 | 709,853 | 8.00% | 117,166 | 0 |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, and data for 9/30/03, which is as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Calculated as column C[t-1] times (1 plus Table 3a, column E), plus Table 3a, column F.

B Calculated as column I divided by Table 3a, column A.

C Calculated as the minimum of columns A and B.

D Assumes that up to the level of assets in the actual bank, pre-tax, pre-amortization income is unchanged, except for adjustments due to wounded bank costs from Table 3a, column B, and that the incremental assets earn the assumed pre-tax, pre-amortization return on beginning assets in Table 3a, column G.

E Assumes that up to the level of pre-tax, pre-amortization income in the actual bank, taxes are unchanged, and that the incremental pre-tax, pre-amortization income plus adjustments due to wounded bank damages is taxed at 37%.

F Total contractual amortization of supervisory intangibles plus total amortization of intangibles resulting from non-supervisory acquisitions. (Calculated as Table 4a, column D + Table 4a, column J + Table 4a, column N.)

H Assumed to be the actual dividends paid plus the required dividends on the unit offering. Required dividends on the unit offering are $482,340 annually, which is calculated as the $25,000 units times $0.92, the required per share dividend (calculated as $10.50 (half of the mean of per unit price filing range of $20-$22; it is assumed that the one common and one preferred share comprising the unit would be priced equally) times 8.75% (the mean of the range given for the dividend yield - 8.5% - 9%)) (Source: "Blue-Top" for Unit Offering, dated 11/14/90).

I Calculated as the sum of the but-for bank's previous period's core capital, plus the current period's net income, less dividends paid out, plus any additional capital raised, plus adjustments to but-for core capital based on phase-out of Central Evergreen Qualifying SGW and limitation on other qualifying intangibles, less adjustments to and NOL usages against Lewis Federal and Tri-Cities supervisory goodwill; plus the amortization of Central Evergreen supervisory goodwill and identified intangibles, plus the amortization of non-supervisory intangibles.
(Calculated as columns I[t-1] + G - H + K + L - Table 4a, column E - Table 4a, column F + Table 4a, column J + Table 4a, column N).
12/31/89 but-for core capital is calculated as the sum of the actual bank's 12/31/89 core capital, less Qualifying SGW, plus Lewis Federal and Tri-Cities intangibles, plus but-for Qualifying SGW, plus but-for Other Qualifying Intangibles, plus additional capital raised by the But-For Bank, plus the incremental bank's net income, less the incremental bank's dividends.
(Calculated as Table 2a, column G - Table 4b, column B + Table 4a, column A + Table 4b, column F + Table 4c, column G + column K + (column G - Table 2a, column B) - (column H - Table 2a, column F)).

K From Table 3a, column B.

L Table 4b, column G + Table 4c, column H.

# *Exhibit 6*

# *Sterling Savings Association*

## *Table 6a: Addendum For Lewis Federal and Tri-Cities Supervisory Intangibles*

($ in Thousands)

| | Capital Credit | | | | | Supervisory Goodwill | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J = F + H |
| | Lewis Federal | | Tri-Cities | | Total | Lewis Federal | | Tri-Cities | | Total |
| Period Ended | Balance | Amortization | Balance | Amortization | Balance | Balance | Amortization | Balance | Amortization | Balance |
| 11/5/85 | $1,750 | | | | $1,750 | $2,044 | | | | $2,044 |
| 12/31/85 | 1,743 | $7 | | | 1,743 | 2,036 | $8 | | | 2,036 |
| 6/30/86 | 1,721 | 22 | | | 1,721 | 1,614 | 23 | | | 1,814 |
| 6/30/87 | 1,677 | 44 | | | 1,677 | 1,768 | 46 | | | 1,768 |
| 4/8/88 | | | $11,730 | | | | | | | |
| 6/30/88 | 1,633 | 44 | 11,535 | $196 | 13,168 | 1,743 | 12 | $2,176 | | 3,919 |
| 6/30/89 | 1,590 | 44 | 10,753 | 782 | 12,342 | 1,696 | 47 | 2,028 | $148 | 3,724 |
| 12/31/89 | 1,568 | 22 | 10,362 | 391 | 11,929 | 1,673 | 23 | 1,955 | 74 | 3,627 |
| 6/30/90 | 1,546 | 22 | 9,971 | 391 | 11,516 | 1,649 | 23 | 1,881 | 74 | 3,530 |
| 6/30/91 | 1,502 | 44 | 9,189 | 782 | 10,691 | 1,603 | 47 | 1,380 | 148 | 2,983 |
| 6/30/92 | 1,458 | 44 | 8,407 | 782 | 9,865 | 1,556 | 47 | 812 | 75 | 2,368 |
| 6/30/93 | 1,415 | 44 | 7,625 | 782 | 9,039 | 1,509 | 47 | 736 | 75 | 2,245 |
| 6/30/94 | 1,371 | 44 | 6,843 | 782 | 8,213 | 1,463 | 47 | 661 | 75 | 2,123 |
| 6/30/95 | 1,327 | 44 | 6,061 | 782 | 7,388 | 1,416 | 47 | 585 | 75 | 2,001 |
| 6/30/96 | 1,283 | 44 | 5,279 | 782 | 6,562 | 1,369 | 47 | 510 | 75 | 1,879 |
| 12/31/96 | 1,261 | 22 | 4,888 | 391 | 6,149 | 1,346 | 23 | 472 | 38 | 1,818 |
| 12/31/97 | 1,218 | 44 | 4,106 | 782 | 5,323 | 1,299 | 47 | 396 | 75 | 1,698 |
| 12/31/98 | 1,174 | 44 | 3,324 | 782 | 4,497 | 1,253 | 47 | 321 | 75 | 1,573 |
| 12/31/99 | 1,130 | 44 | 2,542 | 782 | 3,672 | 1,206 | 47 | 245 | 75 | 1,451 |
| 12/31/00 | 1,086 | 44 | 1,760 | 782 | 2,846 | 1,159 | 47 | 170 | 75 | 1,329 |
| 12/31/01 | 1,043 | 44 | 978 | 782 | 2,020 | 1,113 | 47 | 94 | 75 | 1,207 |
| 12/31/02 | 999 | 44 | 196 | 782 | 1,194 | 1,066 | 47 | 19 | 75 | 1,085 |
| 12/31/03 | 955 | 44 | 0 | 196 | 955 | 1,019 | 47 | 0 | 19 | 1,019 |
| 12/31/04 | 911 | 44 | 0 | | 911 | 972 | 47 | 0 | | 972 |
| 12/31/05 | 868 | 44 | 0 | | 867 | 926 | 47 | 0 | | 926 |
| 9/30/06 | 966 | 33 | 0 | | 966 | 891 | 35 | 0 | | 891 |

Note: All data are as of or for the fiscal year specified, except: (1) data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, (2) data for 9/30/06, which are as of the nine months ended on that date, (3) 12/31/85, which reflects balances and amortization as of that date, and (4) data for 11/5/85 and 4/8/88, which reflect the beginning capital credit balances from the Lewis Federal and Tri-Cities acquisitions. Through 1998, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A, C, F – I Based on data from Sterling Savings Association.

B Assumes a 40 year amortization schedule.

D Assumes a 15 year amortization schedule.

# Exhibit 6

## Sterling Savings Association

### Table 6b: Addendum For Central Evergreen Supervisory Intangibles

($ in Thousands)

| Period Ended | Identified Intangibles A Balance | Identified Intangibles B Amortization | Unidentified Intangibles C Balance | Unidentified Intangibles D Amortization |
|---|---|---|---|---|
| 6/30/89 | $6,075 | 405 | $12,625 | 919 |
| 12/31/89 | 5,670 | 405 | 11,357 | 1,075 |
| 6/30/90 | 5,265 | 405 | 10,847 | 863 |
| 6/30/91 | 4,455 | 810 | 7,118 | 1,063 |
| 6/30/92 | 3,645 | 810 | 4,971 | 1,050 |
| 6/30/93 | 2,835 | 810 | 4,013 | 958 |
| 6/30/94 | 2,025 | 810 | 3,117 | 896 |
| 6/30/95 | 1,215 | 810 | 2,310 | 807 |
| 6/30/96 | 405 | 810 | 1,604 | 707 |
| 12/31/96 | 0 | 405 | 1,306 | 298 |
| 12/31/97 | | | 773 | 533 |
| 12/31/98 | | | 371 | 402 |
| 12/31/99 | | | 115 | 256 |
| 12/31/00 | | | 0 | 115 |
| 12/31/01 | | | | |
| 12/31/02 | | | | |
| 12/31/03 | | | | |
| 12/31/04 | | | | |
| 12/31/05 | | | | |
| 9/30/06 | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/89, 6/30/90 and 12/31/96 which are for the six months ended as of each date, data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

A Identified intangibles from Central Evergreen supervisory acquisition. Based on data from Sterling Savings Association.

B - D Based on data from Sterling Savings Association.

# *Exhibit 6*

## *Sterling Savings Association*

### *Table 7: Addendum for Non-Supervisory Goodwill*

Source: Sterling Annual Reports and TFRs
($ in thousands)

| | Assumed Straight-Line Amortization | | | | | Balances | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D = A + B + C | | E | F | G | H = E + F + G |
| Period Ended | Lewis & Clark | WA & OR Branches | KeyBank | Total Amortization | Explanation | Lewis & Clark | WA & OR Branches | KeyBank | Total |
| 6/30/83 | | | | 0 | • Lewis and Clark S&LA was merged into Sterling on 6/30/83 and $2.056m in goodwill was recorded to be amortized using the interest-method over 19 years. Source: 1983 AR, Note 12. | 2,056 | | | 2,056 |
| 6/30/84 | 108 | | | 108 | | 1,946 | | | 1,948 |
| 6/30/85 | 108 | | | 108 | | 1,840 | | | 1,940 |
| 6/30/86 | 108 | | | 106 | | 1,731 | | | 1,731 |
| 6/30/87 | 106 | | | 108 | | 1,623 | | | 1,623 |
| 6/30/88 | 108 | | | 108 | | 1,515 | | | 1,515 |
| 6/30/89 | 108 | | | 108 | | 1,407 | | | 1,407 |
| 6/30/90 | 108 | | | 108 | | 1,299 | | | 1,299 |
| 6/30/91 | 108 | | | 108 | | 1,190 | | | 1,190 |
| 6/30/92 | 106 | | | 108 | | 1,082 | | | 1,082 |
| 6/30/93 | 106 | | | 108 | | 974 | | | 974 |
| 6/30/94 | 106 | 216 | | 324 | • On 4/15/94, Sterling acquired 3 branches in Oregon and paid an acquisition premium of ~$3m. On 5/13/94, Sterling acquired 5 branches in Washington and paid an acquisition premium of ~$8.8m. These premiums had amortization periods of 6 years. Source: 1994 AR, Note 4. | 866 | 11,584 | | 12,450 |
| 6/30/95 | 108 | 1,475 | | 1,583 | | 757 | 10,109 | | 10,867 |
| 6/30/96 | 108 | 1,475 | | 1,583 | | 649 | 8,634 | | 9,284 |
| 12/31/96 | 54 | 738 | | 792 | | 595 | 7,897 | | 8,492 |
| 12/31/97 | 108 | 1,475 | | 1,583 | | 487 | 6,422 | | 6,909 |
| 12/31/98 | 108 | 1,475 | 1,900 | 3,483 | • On 6/15/98, Sterling acquired 33 branches from KeyBank and recorded ~$57m in goodwill to be amortized over 15 years using the straight-line method. Source: 1998 10-K, Note 1. | 379 | 4,947 | 55,100 | 60,426 |
| 12/31/99 | 108 | 1,475 | 3,800 | 5,383 | | 271 | 3,472 | 51,300 | 55,042 |
| 12/31/00 | 108 | 1,475 | 3,800 | 5,383 | | 162 | 1,997 | 47,500 | 49,659 |
| 12/31/01 | | | | 5,377 | | | | | 44,282 |
| 12/31/02 | | | | 644 | • Sterling adopts SFAS No. 142 on January 1, 2002. Source: 2002 10-K, p.34. | | | | 43,638 |
| | | | | | *Total Goodwill and Other Intangibles* | | | | |
| 12/31/03 | | | | 263 | • $4.2 million of goodwill and other intangibles were generated by the Empire Federal Bancorp acquisition on 2/28/03. Source: 12/31/03 10-K, pp. F-45-40. | | | | 47,616 |
| 12/31/04 | | | | 2,224 | • $85.7 million of goodwill and $19.2 million of core deposit intangibles were generated by the KFBI acquisition on 1/2/04, and $1.6 million of goodwill was generated by the Peter W. Wong Associates, Inc. acquisition on 11/30/04. Source: 12/31/04 10-K, pp. F-44-45. | | | | 131,892 |
| 12/31/05 | | | | 2,222 | | | | | 129,670 |
| 9/30/06 | | | | 1,685 | | | | | 127,985 |
| Total: | 1,894 | 9,803 | 6,600 | 33,612 | | | | | |

Note: All data are as of or for the fiscal year specified, except data for 12/31/96 which are for the six months ended as of that date, and data for 9/30/06, which are as of the nine months ended on that date. Through 1996, Sterling's fiscal year ended on June 30th; however, in 1997, the fiscal year was changed to end on December 31st.

D For 2001 – 2006, assumed to be equal to the total amortization of intangibles of the actual bank from Table 2a, column D.

H The goodwill amortization for each of these deals is modeled on an assumed straight-line basis through 2000. For 2001 – 2006 balances are calculated as (H)(t-1) less Column D(t) plus goodwill and other intangibles generated from acquisitions.

# *Exhibit 6*

# *Sterling Savings Association*

## *Table 8: 2001 – 2006 Capital Downstreamed*

Source: Thrift Financial Reports (Sheshunoff); Call Reports
($ in Thousands)

| | A | B | C | D = A + B + C | E = D - D(t-1) |
|---|---|---|---|---|---|
| | | Common Stock | | | |
| | Preferred Stock | Par Value | Paid in Excess of Par | Total | Difference from Prior Year |
| 12/31/00 | $95,100 | $6,616 | $76,502 | $178,218 | |
| 12/31/01 | 110,100 | 7,245 | 98,917 | 216,262 | $38,044 |
| 12/31/02 | 110,100 | 7,245 | 98,917 | 216,262 | 0 |
| 12/31/03 | 110,100 | 7,245 | 125,239 | 242,584 | 26,322 |
| 12/31/04 | 110,100 | 7,246 | 287,314 | 404,660 | 162,076 |
| 12/31/05 | 110,100 | 7,246 | 287,314 | 404,660 | 0 |
| 9/30/06 | 175,100 | 7,246 | 339,502 | 521,848 | 117,188 |

# *Exhibit 7*

## RTC Resolutions in Washington and Oregon

Source: RTC Statistical Abstract August 1989/September 1995
(Dollars in Millions)

| Name | City | State | Charter F-Federal S-State | Conserva-torship Date | Resolution Date | Assets at Takeover | Deposits at Takeover | Deposits at Resolution |
|---|---|---|---|---|---|---|---|---|
| The Benjamin Franklin FS&LA | Portland | OR | F | 2/21/90 | 9/7/90 | $4,692 | $3,214 | $2,650 |
| Far West FSB | Portland | OR | F | 5/23/91 | 4/15/94 | $2,160 | $1,273 | $714 |
| Family FSA | Dallas | OR | F | 1/11/90 | 6/22/90 | $170 | $101 | $93 |
| Family S&LA, FA | Seattle | WA | S | 2/8/91 | 7/19/91 | $101 | $60 | $44 |
| Gibraltar Savings, FSB | Seattle | WA | F | 3/31/89 | 6/29/90 | $1,816 | $1,368 | $1,029 |
| Frontier FS&LA | Walla Walla | WA | F | 2/23/90 | 6/22/90 | $162 | $119 | $98 |

Note: No resolutions were reported for Idaho institutions.

## Acquisitions Considered by Sterling

Source: Deposition of Harold Gilkey, June 6-8, 2000, pp. 69-75, 184-185, 239-245, 485-487, 511, 517, 561-594

| Name | Year |
|---|---|
| American Bank | 1992 |
| American National Bank/American Marine | 1990s |
| Ben Franklin National Bank, Pasco | 1987 |
| Benjamin Franklin, Portland, Oregon | early 1990s |
| Eastern Washington Savings | 1988 |
| Enterprise Bank | 1990s |
| Gibraltar Savings (certain branches) | 1990s |
| Family Savings | 1988 |
| Far West Federal (6 branches in Oregon) | 1988 |
| First Federal of Longview | 1988 |
| First Western Savings/First Federal (certain branches) | 1992 |
| Great Northwest Savings Bank | 1991 |
| Guaranty Savings | 1984 |
| Hamilton Financial Services | late 1990s |
| Heritage Federal | 1990s |
| Horizon | 1990s |

| Name | Year |
|---|---|
| InterWest | 1990s |
| Lynnwood Savings | 1980s |
| Mortgage Services America (First Cal) | 1995-1996 |
| Olympia Federal | 1990s |
| Pacific First Federal | early 1990s |
| Palm Springs Savings Bank | 1990s |
| Security Federal Savings Bank | 1990s |
| Security Pacific Bank (certain branches) | mid 1990s |
| Summit Savings | mid 1990s |
| U.S. Bank (certain branches) | 1990s |
| Vancouver Federal | 1990s |
| Washington Mutual (2 branches) | 1992 |
| West One (certain branches) | 1990s |
| Westcoast Bancorporation | late 1990s |
| Willamette Savings | 1995-1996 |

# *Exhibit 8*

# *Sterling Savings Association*

## Summary of Expectation Damages

($ in Thousands)

| | | |
|---|---|---|
| [1] | **Lost Earnings on Foregone Assets** | **$58,164** |
| [2] | **+ Wounded Bank Damages** | **$4,556** |
| | Cost of Great American branch denied because of OTS Capital Standards | $1,835 |
| | Loss on CJ-4 Loan | $1,241 |
| | Excess Supervision Costs | $172 |
| | Cost of 1989 Units Offering | $1,004 |
| | Increased Legal and Accounting to Defend against Regulatory Interference | $304 |
| [3] | **+ Future Damages** | **$641** |
| | **Total Expectation Damages** | **$63,361** |

Notes:

[2] Source: Data from Sterling Savings Association.

[3] Present value of cash flows representing the cost of replacing supervisory goodwill and capital credits in 9/30/06 dollars as calculated by Professor James.

# Exhibit C

# Expert Report of W. Barefoot Bankhead

*Sterling Savings Association, et al. v. United States of America*

Case No. 95-829 C

---

## I. Qualifications

1. My name is W. Barefoot Bankhead, and I am a Managing Director with Navigant Consulting, which provides professional services to its clients in various areas, including financial, accounting and economic analysis. I graduated from the University of Texas in December 1976 with a Bachelor of Business Administration degree and a major in accounting. I am a certified public accountant in the State of Texas. From 1977 through 1987, I worked in public accounting, the last several years of which were with a then "big eight" firm, primarily serving clients in the financial services and real estate industries.

2. In April 1987, I began a two-year accounting fellowship with the Federal Home Loan Bank Board, now the Office of Thrift Supervision, the primary regulatory body for the savings and loan industry. After my fellowship and prior to joining Navigant Consulting in August 1998, I worked for nine years in a variety of positions with financial institutions. During that time, I served as an audit director for one of the largest bank holding companies in the country and as chief financial officer and member of the board of directors for a savings bank. My current resume is provided as Exhibit A. My hourly billing rate is $468.

## II. Background

3. From November 1985 through December 31, 1988, Sterling Savings Association ("Sterling") acquired the assets and liabilities of three thrift institutions through a series of assisted acquisitions as reflected in Table 1.

**Table 1. Thrift Acquisitions by Sterling Savings Association**

| Date | Acquired Institution | Location |
|---|---|---|
| November 5, 1985 | Lewis Federal Savings and Loan Association | Chehalis, Washington |
| April 8, 1988 | Tri-Cities Savings and Loan Association | Kennewick, Washington |
| December 31, 1988 | Central Evergreen Savings and Loan Association | Chehalis, Washington |

Source:
Sterling Savings Association, Annual Report for the years ended June 30, 1986 (pp. 22-23), 1988 (pp. 30-31) and 1989 (pp. 31-32) [SG2005 2526-2527; 2459-2460; 2399-2400]

4. In conjunction with the Lewis Federal and Tri-Cities acquisitions, Sterling and the Government entered into agreements that, among other things, provided certain forbearances related to the accounting for the goodwill created in the acquisitions.[1] Sterling alleged that certain documents governing the Central Evergreen transaction provided a similar goodwill accounting forbearance.

5. The Financial Institutions Reform, Recovery and Enhancement Act ("FIRREA") was enacted on August 8, 1989. Capital regulations adopted as a result of FIRREA required, among other things, thrifts to deduct goodwill from regulatory capital.

---

[1] Forbearance letters from the Federal Home Loan Bank Board ("FHLBB") to Sterling dated November 12, 1985 and April 6, 1988 grant certain accounting forbearances in the Lewis Federal and Tri-Cities acquisitions, respectively.

6. On September 12, 2002, the Court of Federal Claims ("the Court") initially determined that various contractual documents associated with all three of Sterling's acquisitions gave it the right to include goodwill in regulatory capital and that the enforcement of the FIRREA capital regulations represented a breach of the Government's commitment under those contracts. In an effort to estimate the damages associated with those breaches, Sterling submitted expert reports authored by Dr. Paul Horvitz and Dr. Christopher James. Dr. Horvitz's report, which was dated February 20, 2004 ("the Horvitz 2004 Report"), calculated alleged lost profits that resulted from the breaches. Dr. James's report, which was also dated February 20, 2004, calculated alleged damages related to the hypothetical raising of mitigation capital as replacement for the goodwill.[2]

7. On August 30, 2006, the Court amended its previous ruling and determined that the enforcement of the FIRREA capital regulations did not result in a breach of the Central Evergreen contract as there was no forbearance related to the accounting for the Central Evergreen-related goodwill. Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz ("Horvitz 2006 Report") and Dr. James issued his Update to the Expert Report of Dr. Christopher James ("James 2006 Report") on December 11, 2006, to amend the plaintiffs' damages claim reflecting the Court's updated ruling.

8. The United States Department of Justice ("DOJ") has asked me to evaluate Dr. Horvitz's calculation of core capital in the Horvitz 2006 Report. Because Dr.

---

[2] Dr. Horvitz and Dr. James initially issued damages reports in 2001. However, during 2003, the Court issued an opinion related to the amortization of goodwill associated with certain Federal Savings and Loan Insurance Corporation ("FSLIC") assistance. The 2004 reports represent Dr. Horvitz's and Dr. James's efforts to amend their reports to reflect the impact of the Court's 2003 opinion related to the amortization of goodwill associated with FSLIC assistance.

James has adopted Dr. Horvitz's lost profits methodology, DOJ has also asked me to evaluate the lost profit calculations in the James 2006 report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiffs' experts.

**III. Summary of Opinions**

9. Based upon my review and analysis of the documents cited in Exhibit B and my relevant education and experience, I have formed the following opinions:

- Dr. Horvitz's calculation of but-for Sterling's core capital erroneously includes goodwill in excess of amounts permitted under the regulation governing the phase-out of goodwill. Correcting for this error eliminates any lost profits as calculated by Dr. Horvitz.
- Even calculating but-for Sterling's core capital by allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill, Dr. Horvitz's model produces no lost profits.
- Since Dr. James has adopted Dr. Horvitz's lost profits calculation during the period between the breach and the date of full mitigation, his analysis of lost profits suffers from the same flaws that I have identified with Dr. Horvitz's model. Once the error in Dr. James's core capital calculations is corrected, Dr. James's model produces no lost profits.

## IV. Dr. Horvitz's Failure to Correctly Calculate Core Capital in the But-For Bank

10. The FIRREA capital regulation established three capital requirements – tangible, core, and risk-based. Thrifts were required, among other things, to deduct all intangible assets, including goodwill, in the calculation of tangible capital; limit identified intangible assets included in core and risk-based capital; and phase out supervisory goodwill from core and risk-based capital over a five-year period ending December 31, 1994.[3] Through December 31, 1994, thrifts were not required to deduct qualifying supervisory goodwill in calculating core capital.[4] Qualifying supervisory goodwill was limited to 1.5 percent of assets (as defined in the regulation) through December 31, 1991, and the includable amount then declined as a percentage of assets until January 1, 1995, when all supervisory goodwill was required to be deducted in calculating core capital.

---

[3] 12 CFR 567.1(ee) defined supervisory goodwill as goodwill resulting from the acquisition, merger, consolidation, purchase of assets, or other business combination (if such transaction occurred on or before April 12, 1989) of (1) a savings association where the fair market value of assets was less than the fair market value of liabilities at the acquisition date; or (2) a problem institution.

[4] 12 CFR 567.1(w) defined qualifying supervisory goodwill as (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices less any amortization that would have occurred subsequent to April 12, 1989 through the current reporting period where the amortization is calculated on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for regulatory accounting practices; plus (2) the lesser of (i) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under generally accepted accounting principles ("GAAP"); or (ii)(A) supervisory goodwill that is included in goodwill that is reflected in the current reporting period under GAAP; (B) plus any amortization of the goodwill in (ii)(A) that occurred subsequent to April 12, 1989 for GAAP reporting purposes; (C) minus the amortization of the goodwill in (ii)(A) through the current period that results when the goodwill is amortized subsequent to April 12, 1989 on a straight-line basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989 for GAAP reporting purposes.

11. Sterling's supervisory goodwill exceeded the amount that could be included as qualifying supervisory goodwill in core capital under the FIRREA capital regulation. Table 2 summarizes Dr. Horvitz's determination of Sterling's supervisory goodwill as of December 31, 1989.

**Table 2. Sterling's Supervisory Goodwill, December 31, 1989**

| Institution | Amount (000s) |
|---|---|
| Lewis Federal and Tri-Cities (determined to be contractual) | $15,557 |
| Central Evergreen (determined to be non-contractual) | 11,357 |
| Total Supervisory Goodwill | $26,914 |
| Qualifying Supervisory Goodwill (1.5% of but-for Sterling's assets) | $10,421 |

12. The Court has determined that the Government breached contracts allowing Sterling to include the Lewis Federal and Tri-Cities goodwill in regulatory capital. Consequently, in the but-for world constructed by Dr. Horvitz, Sterling can include all of the $15,557,000 of Lewis Federal and Tri-Cities supervisory goodwill in regulatory capital as of December 31, 1989.

13. In his 2006 Report, Dr. Horvitz assumes that Sterling's Lewis Federal and Tri-Cities contractual supervisory goodwill is exempt from the limitations on the amount of supervisory goodwill that qualifies for core capital. This assumption is inconsistent with his 2004 report. In the Horvitz 2004 Report, Dr. Horvitz included contractual supervisory goodwill in his calculation of qualifying supervisory goodwill for purposes of determining the amount of disallowed intangibles due to the breach. (See Horvitz 2004 Report, Exhibit 6, Table 4b.) As illustrated in Table 3 below, Dr. Horvitz's 2006 Report erroneously assumes that

an additional $10,421,000 of but-for Sterling's non-contractual supervisory goodwill was qualifying supervisory goodwill and includable in core capital.

**Table 3. Dr. Horvitz's Calculation of But-For Sterling's Core Capital at December 31, 1989**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| ***Adjustments Related to Unidentified Intangibles*** | |
| Contractual goodwill (Lewis Federal and Tri-Cities) | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen) | 10,421 |
| ***Other Adjustments*** | |
| Identified intangibles | 5,670 |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| **But-For Sterling's Core Capital** | **$28,786** |

14. But-for Sterling could consider all $15,557,000 of the Lewis Federal and Tri-Cities contractual supervisory goodwill as qualifying supervisory goodwill even though this amount exceeded the $10,421,000 of qualifying supervisory goodwill otherwise permissible under the FIRREA capital regulation. However, Dr. Horvitz has erroneously included $25,978,000, or 3.74 percent of but-for Sterling's assets, as qualifying supervisory goodwill even though the FIRREA capital regulation permits only 1.5 percent and the contractual supervisory goodwill totals only 2.24 percent.[5]

15. The FIRREA capital regulation does not distinguish between contractual and non-contractual supervisory goodwill. In addition, the regulation clearly limits the amount of supervisory goodwill that qualifies as core capital. It is

[5] See Exhibit C.

implausible to assume that but-for Sterling would have been permitted to include the non-contractual Central Evergreen supervisory goodwill as qualifying supervisory goodwill when the contractual supervisory goodwill already exceeded the 1.5 percent maximum amount of qualifying supervisory goodwill includable in core capital as of December 31, 1989. To illustrate the impact of Dr. Horvitz's error, I have recalculated but-for Sterling's core capital using the information contained in the Horvitz 2006 Report:

**Table 4. But-For Sterling's Adjusted Core Capital at December 31, 1989**

| | **Amount (000s)** |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| *Adjustments Related to Unidentified Intangibles* | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[6] | 15,557 |
| *Other Adjustments* | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles [7] | 3,174 |
| **But-For Sterling's Core Capital** | **$15,869** |

16. Adjusting Dr. Horvitz's model for the one change to correct the calculation of qualifying supervisory goodwill includable in core capital as of

[6] Qualifying supervisory goodwill as calculated by Dr. Horvitz totals only $10,421. However, because of the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill for purposes of calculating regulatory capital.

[7] The FIRREA capital regulation permits certain identified intangibles to be included in core capital up to a limit of 25 percent of core capital (before inclusion of identified intangibles).

December 31, 1989, results in negative lost profits, thus eliminating Sterling's entire lost profits claim.[8]

17. As shown below in Table 5, the contractual supervisory goodwill included as qualifying supervisory goodwill as a result of the Court's decisions exceeds the amount permissible under the FIRREA regulation at all times through December 31, 1994. Consequently, but-for Sterling would have been required to deduct all non-contractual supervisory goodwill (*i.e.*, goodwill associated with the Central Evergreen transaction) when calculating core capital. However, by erroneously including non-contractual supervisory goodwill as qualifying supervisory goodwill, Dr. Horvitz's but-for Sterling includes supervisory goodwill from two to nearly three times the amount permitted by the FIRREA capital regulation through December 31, 1994.

**Table 5. But-For Sterling's Total Supervisory Goodwill**

| Year Ended | FIRREA Allowable % of Tangible Assets | Total But-For Contractual Goodwill | Total But-For Supervisory Goodwill |
|---|---|---|---|
| 12/31/1989 | 1.500% | 2.239% | 3.739% |
| 6/30/1990 | 1.500% | 2.194% | 3.694% |
| 6/30/1991 | 1.500% | 1.940% | 2.950% |
| 6/30/1992 | 1.000% | 1.750% | 2.461% |
| 6/30/1993 | 0.750% | 1.471% | 1.995% |
| 6/30/1994 | 0.375% | 0.826% | 1.075% |

Source: Exhibit C

[8] As a result of this correction, but-for Sterling's core capital would have been 2.21 percent, below the 3 percent core capital required by the FIRREA capital regulation, effective with the filing of the March 31, 1990 Thrift Financial Report.

18. Even if one were to assume that allocating qualifying supervisory goodwill proportionally between contractual and non-contractual supervisory goodwill would have been appropriate, which, based upon my experiences at the FHLBB and in the thrift industry, I do not believe to be a plausible assumption, Dr. Horvitz's model would still result in no lost profits damages. To illustrate, I have recalculated but-for Sterling's core capital under this proportional allocation methodology to determine the potential impact at December 31, 1989, as shown in Table 6.

**Table 6. But-For Sterling's Core Capital at December 31, 1989 (Proportional Allocation)**

| | Amount (000s) |
|---|---|
| **Tangible Capital at 12/31/89:** | **($12,581)** |
| *Adjustments Related to Unidentified Intangibles* | |
| Qualifying supervisory goodwill (Lewis Federal and Tri-Cities)[9] | 15,557 |
| Qualifying supervisory goodwill (Central Evergreen)[10] | 4,398 |
| *Other Adjustments* | |
| Capital raising | 10,500 |
| Incremental but-for bank adjustments | (781) |
| Identified intangibles[11] | 4,273 |
| **But-For Sterling's Core Capital** | **$21,366** |

[9] Qualifying supervisory goodwill under the FIRREA capital regulation totals $10,421. Sterling's total supervisory goodwill from both contractual and non-contractual acquisitions was $26,914 ($15,557 from Lewis Federal and Tri-Cities and $11,357 from Central Evergreen). Allocating the $10,421 qualifying supervisory goodwill proportionally between contractual and non-contractual results in $6,023 (57.8 percent) allocated to the Lewis Federal and Tri-Cities contractual supervisory goodwill. However, per the Court's opinions, but-for Sterling can include all of the Lewis Federal and Tri-Cities supervisory goodwill in calculating regulatory capital. Consequently, $15,557 of the Lewis and Tri-Cities contractual supervisory goodwill is considered to be qualifying supervisory goodwill for purposes of calculating core capital.

[10] Allocating the $10,421 qualifying supervisory goodwill proportionally results in $4,398 (42.2 percent) allocated to the Central Evergreen non-contractual supervisory goodwill.

[11] See Footnote 7.

19. I have adjusted Dr. Horvitz's model to reflect this lower level of core capital at December 31, 1989. After making this one change, the amount of lost profits generated under Dr. Horvitz's model is negative (*i.e.*, no lost profits).

## V. Dr. James's Adoption of Dr. Horvitz's Erroneous But-For Sterling Core Capital Calculations

20. DOJ has asked me to review certain portions of the James 2006 Report that purport to calculate lost profits during the period between the breach and the date of full mitigation (February 28, 1993). Dr. James effectively adopts Dr. Horvitz's lost profits model, thus Dr. James's analysis of lost profits in the James 2006 Report suffers from the same flaws that I have identified in the Horvitz 2006 Report. As I did with Dr. Horvitz's model, I have adjusted for the error in the calculation of qualifying supervisory goodwill and determined that Dr. James's model, like Dr. Horvitz's model, results in no lost profits.

21. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work is ongoing.

February 15, 2007

W. Barefoot Bankhead

W. Barefoot Bankhead

**Exhibit A**

NAVIGANT CONSULTING

# W. Barefoot Bankhead, CPA*

**W. Barefoot Bankhead**
Managing Director

**Navigant Consulting**
2001 Ross Avenue, Suite 500
Dallas, Texas 75201
Tel 214.712.1514
Fax 214.765.6582

bbankhead@navigantconsulting.com

**Service Lines**

- Banking and Financial Institutions
- Fraud and Investigative Accounting
- Complex Commercial Litigation
- Accounting Malpractice

**Professional History**

- 1998 to Present: Navigant Consulting
- 1993 – 1998: Bank One Corporation (now J.P. Morgan Chase and Company) – Audit Director, Regional Audit Director, Sr. Risk Advisor
- 1990 – 1993: First Cook Community Bank, FSB (now Republic Bank)– Chief Financial Officer, Treasurer, Director
- 1989 – 1990: Superior Bank, FSB – Sr. VP and Managing Director of Mergers & Acquisitions
- 1987 – 1989: Federal Home Loan Bank Board (now OTS) – Professional Accounting Fellow
- 1982 – 1987: Coopers & Lybrand (now PricewaterhouseCoopers) – Audit Manager
- 1977 – 1981: Cheatham, Brady & Lafferty – Audit Staff

**Education and Certification**

- BBA – Accounting, December 1976
  The University of Texas at Austin
- Certified Public Accountant (CPA)*

**Professional Associations**

- American Institute of Certified Public Accountants

**Teaching/Lecturing**

- McCombs School of Business, The University of Texas - Guest Lecturer
- Richland College, Former Accounting Instructor

W. Barefoot Bankhead specializes in providing damage analysis and accounting and regulatory expertise to clients in the financial services and professional services industries. Additionally, Mr. Bankhead has led numerous fraud and accounting investigations. Before joining Navigant Consulting in 1998, Mr. Bankhead had over twenty years of experience in banking and public accounting, including a two-year accounting fellowship with a federal banking regulator.

## Litigation and Investigations

Since joining Navigant Consulting, Mr. Bankhead has led consulting engagements for a number of clients in the financial services industry. He has provided expert testimony in several cases, including a series of cases involving alleged breach of contract that include claims for lost profits, restitution and reliance damages. Additionally, Mr. Bankhead has testified on damages and causation in professional accounting malpractice engagements. His work has involved the assessment of the economic impact on the plaintiffs' business; the evaluation of costs and benefits to both parties in the dispute; valuations of financial assets and liabilities and the evaluation of operational, financial, accounting and regulatory issues.

Mr. Bankhead has provided expert witness testimony on various matters related to financial institutions including financial institution valuation, management and regulation; the valuation of certain assets such as loans, real estate, deposit intangibles, residuals and other securitization interests; and the evaluation of lending practices, regulatory capital and failed institutions.

In relation to various engagements, Mr. Bankhead has:

» Reviewed financial institutions' practices for valuing and accounting for loans and investments (including asset-backed securities). Analysis involved determining allowances for losses, accounting for impairment, amortizing/accreting deferred fees and premiums/discounts, and accounting for various types of financial instruments.

*Navigant Consulting is not a CPA firm.

- Analyzed loan underwriting practices on commercial real estate, commercial, mortgage, subprime mortgage, home equity and credit card loans to determine compliance with regulatory requirements, internal policies and procedures, securitization agreements, representations and warranties in contractual agreements, or industry standards.

- Valued financial institutions and various financial assets such as residual interests in securitizations, loans, mortgage derivatives and other investments and mortgage servicing rights.

- Reviewed the valuation of financial institution branches/deposit franchises that have been sold as a result of alleged breaches of contract.

- Reviewed the purchase accounting adjustments related to acquisitions of financial institutions, including allocations to core deposit intangibles, mortgage servicing rights and the resulting goodwill.

- Reviewed the adequacy of due diligence in the acquisition of financial institutions such as banks, thrifts, and subprime mortgage lenders.

- Evaluated wholesale banking strategies, including the use of high-risk mortgage derivatives and the impact of those strategies on interest rate risk and regulatory compliance.

- Assessed the lending, investing and operating practices of financial institutions to determine their viability. Also assessed the operations and strategies of failed institutions to determine causes of failure. Assessments often included an evaluation of losses on major assets such as large commercial real estate loans, real estate investments and mortgage derivatives.

- Analyzed causation and damage claims related to exiting lines of business or the sale of subsidiaries engaged in banking, lease finance and nonconforming mortgage securitization.

- Assisted clients with SEC investigations related to loan loss allowances and the accounting for impairment of debt securities and assisted with the development and implementation of lending, loss allowance and loan fee policies and procedures.

- Reviewed employee expense accounts for evidence of inappropriate charges.

- Evaluated causation and damages related to professional accounting malpractice claims.

- Analyzed potential fiduciary claims against an investment company managing pension funds under Department of Labor regulations.

- Analyzed the surplus/deficits of bank holding company subsidiaries to assess the impact of the cross-guarantee provisions of the Financial Institutions Reform, Recovery and Enhancement Act of 1989.

» Evaluated and calculated damages related to lender liability claims.

## Financial Services

Mr. Bankhead has extensive experience in the financial services industry, having held a variety of positions with financial institutions. Mr. Bankhead was an Audit Director for one of the largest bank holding companies in the country, served as Chief Financial Officer (CFO) and member of the Board of Directors of a savings bank, and was Managing Director of Mergers and Acquisitions for another savings bank.

As an Audit Director, Mr. Bankhead was responsible for the development and execution of the corporate audit plan for over 25 separately chartered banks with over $30 billion in assets. Mr. Bankhead then assumed corporate audit responsibility for the bank's National Commercial Banking Group, a $30-billion line of business that included commercial lending and credit administration, asset-based lending, commercial loan operations, syndications, derivative product sales and international trade finance.

As a CFO, Mr. Bankhead was responsible for all financial, accounting and investment activities of the institution and chaired the bank's asset/liability committee. He also managed the bank's mortgage banking, real estate and investment management divisions. As a member of the Board of Directors, Mr. Bankhead served on the lending committee, whose responsibilities included approval of all large lending credits.

As Managing Director of Mergers and Acquisitions, Mr. Bankhead was responsible for identifying acquisition candidates, conducting due diligence and managing the bid process. He performed due diligence on numerous financial institutions including reviews of problem loans and troubled real estate. He also advised the president and CFO on SEC reporting matters, asset securitizations and other capital market transactions.

## Regulatory

During his accounting fellowship with the Federal Home Loan Bank Board, Mr. Bankhead responded to questions from financial institutions and their constituents on accounting, financial reporting, regulatory and other matters; wrote issues papers and opinions on accounting matters; and provided accounting, auditing and litigation support to the federal banking agency. Additionally, he frequently spoke and lectured on current banking issues at various conferences and seminars throughout the country.

## Public Accounting

While in public accounting with an international accounting firm, Mr. Bankhead served primarily financial institution and real estate clients. In addition to audit engagement responsibilities, he

advised clients on a number of matters including mergers and acquisitions, branch sales, capital market transactions, real estate workouts and regulatory matters.

## Testimony

» Northeast Savings, F.A. v. United States, United States Court of Federal Claims, No. 92-550C (deposition and trial)

» Beverly Hills Bancorp Inc. fka Wilshire Financial Services Group, Inc., v. Merrill Lynch Mortgage Capital Inc., and Wilshire Credit Corporation, Superior Court of the State of California and for the County of Los Angeles (deposition)

» Chapman Industries, et al. v. United Insurance Company of America, Second Judicial District Court of the State of Nevada and for the County of Washoe, No. CV87-6780 (deposition and hearing)

» Reliance Insurance Company v. KeyBank USA National Association v. Swiss Reinsurance America Corporation, et al., United States District Court for the Northern District of Ohio, Eastern Division, No. 1:01CV0062 (deposition)

» Anchor Savings Bank, FSB v. United States, United States Court of Federal Claims, No. 95-39C (deposition and trial)

» The Long Island Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 92-517C (deposition, declaration and trial)

» The Globe Savings Bank, FSB, et al. v. United States, United States Court of Federal Claims, No. 91-1550C (deposition and trial)

» Caroline Hunt Trust Estate v. United States, United States Court of Federal Claims, No. 95-531C (deposition and trial)

» Chase Manhattan Mortgage Corporation and Chase Manhattan Mortgage Company of the Southeast v. Advanta Corp., et al., U.S. District Court for the District of Delaware, No. 01-507, (deposition and trial)

» LaSalle Talman Bank, F.S.B. v. United States, United States Court of Federal Claims, No. 92-652C (deposition and trial)

» Blitz Holdings Corp. and GCM Corporation, LTD. v. Grant Thornton, L.L.P., et al., 280th Judicial District, Harris County, Texas, No. 2002-32582 (deposition)

- WestFed Holdings, Inc., et al. v. United States, United States Court of Federal Claims, No. 92-820C (deposition, affidavit and trial)

- Bank United, et al. v. United States, United States Court of Federal Claims, No. 95-473C (deposition and trial)

- Standard Federal Bank v. United States, United States Court of Federal Claims, No. 92-844C (deposition)

- Homer J. Holland and Howard R. Ross v. United States, United States Court of Federal Claims, No. 95-524C (deposition)

- H. C. Bailey, et al. v. United States, United States Court of Federal Claims, No. 92-577C (deposition)

- Transamerica Home Loan v. ITT Industries, Inc., U.S. District Court for the Southern District of New York, No. 98 Civ. (deposition)

**EXHIBIT B**

**STERLING SAVINGS ASSOCIATION ET AL. V. UNITED STATES OF AMERICA**

*DOCUMENTS CONSIDERED BY W. BAREFOOT BANKHEAD*

| Document | Date | Begins | Ends |
|---|---|---|---|
| | | | |
| **Plaintiff's Expert Reports** | | | |
| Expert Report of Paul Horvitz - Corrected | 09/06/01 | | |
| Revised Update to the Expert Report of Paul Horvitz | 02/20/04 | | |
| Update to the Expert Report of Paul Horvitz | 12/11/06 | | |
| Expert Report of Professor Christopher M. James - Corrected | 9/2001 | | |
| Revised Update to the Expert Report of Professor Christopher M. James | 02/20/04 | | |
| Update Expert Report of Professor Christopher M. James | 12/11/06 | | |
| **Deposition Transcripts** | | | |
| Deposition of Paul Horvitz | 01/25/07 | | |
| **Legal Documents** | | | |
| Chief Judge Damich's 2002 Opinion | 09/12/02 | | |
| Chief Judge Damich's 2003 Opinion | 08/04/03 | | |
| Judge Wheeler's 2006 Opinion | 08/30/06 | | |
| **Case Documents** | | | |
| Annual Report - Sterling Savings | 06/30/86 | SG2005 2502 | SG2005 2532 |
| Annual Report - Sterling Savings | 06/30/88 | SG2005 2429 | SG2005 2466 |
| Annual Report - Sterling Savings | 06/30/89 | SG2005 2367 | SG2005 2405 |
| Forbearance letter - Lewis Federal | 11/12/85 | WOF014 0599 | WOF014 0601 |
| Forbearance letter - Tri-Cities | 04/06/88 | WOF014 1397 | WOF014 1398 |
| **Miscellaneous** | | | |
| Dr. Horvitz Components of Core Capital @ December 31, 1989 (Horvitz 2007 Deposition Exhibit 3) | | | |
| Dr. Horvitz Components of Core Capital @ June 30, 1990 (Horvitz 2007 Deposition Exhibit 4) | | | |
| **Industry Material** | | | |
| 12 CFR Section 567 | 11/89 | | |
| Thrift Financial Report Instruction Manuals | 8/90 | | |

Exhibit C

*"But-For" Sterling Supervisory Goodwill Includable in Core Capital*

(Dollars in Thousands)

| | | Non-Contractual SGW (Central Evergreen) | | Contractual SGW (Lewis Federal & Tri-Cities) | | |
|---|---|---|---|---|---|---|
| Year Ended | "But-For" Sterling Tangible Assets [(1)] (000s) | "But-For" Qualifying Supervisory Goodwill [(2)] (000s) | "But=For" Qualifying Supervisory Goodwill (%) | "But-For" Supervisory Goodwill [(3)] (000s) | "But-For" Supervisory Goodwill (%) | Total "But-For" Supervisory Goodwill (%) |
| | A | B | C = B / A | D | E = D / A | F = C + E |
| 12/31/1989 | $694,760 | $10,421 | 1.500% | $15,557 | 2.239% | 3.739% |
| 6/30/1990 | 685,708 | 10,286 | 1.500% | 15,047 | 2.194% | 3.694% |
| 6/30/1991 | 704,730 | 7,118 | 1.010% | 13,673 | 1.940% | 2.950% |
| 6/30/1992 | 699,163 | 4,971 | 0.711% | 12,232 | 1.750% | 2.461% |
| 6/30/1993 | 766,910 | 4,013 | 0.523% | 11,285 | 1.471% | 1.995% |
| 6/30/1994 | 1,251,799 | 3,117 | 0.249% | 10,337 | 0.826% | 1.075% |

**Notes:**

(1) See Horvitz 2006 Report, Exhibit 6, Table 4b, Column C.

(2) See Horvitz 2006 Report, Exhibit 6, Table 4b, Column F.

(3) See Horvitz 2006 Report, Exhibit 6, Table 4a, Column A.

# Exhibit D

IN THE U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**DECLARATION OF PAUL M. HORVITZ**

## I. QUALIFICATIONS.

1. I make this Declaration of my own personal knowledge after many hours of research and investigation of the facts and circumstances surrounding the government's breach of certain contracts with Sterling Savings and following my modeling of the damages resulting from the breach.

2. I am an economist who has specialized in the economics of the banking and financial markets over the course of my entire career.

3. After graduating with a Ph.D in Economics from Massachusetts Institute of Technology in 1958, I spent approximately 18 years with the federal banking regulatory agencies, first as a Financial Economist with the Federal Reserve Bank, later as a Senior Economist and Associate Director of the Department of Banking in the Office of the Comptroller of the Currency, and then as Director of Research and Deputy to the Chairman of the Federal Deposit Insurance Corporation.

4. In 1977, I joined the faculty of the University of Houston as a Professor of Finance and served as the Judge James A. Elkins Professor of Banking and Finance from 1981

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 11 of 105

until 2000 when I retired from full time teaching. I am now Professor Emeritus of Finance at the University of Houston.

5. I have published extensively in the field of banking, finance and monetary policy: more than 10 books and monographs, over 50 articles in professional journals, approximately 20 papers published in books, as well as other articles in business publications. Most of my research has been concerned with regulation of financial institutions, and a number of my publications have dealt specifically with the thrift crises in the 1980's, the threat to the FSLIC fund, and the resulting legislation enacted by Congress in 1989.

6. I am a consultant in banking, thrift, and financial fields and have consulted over the years with the U.S. Treasury Department, Federal Deposit Insurance Corporation, Federal Home Loan Bank Board, Commission on Money and Credit, and other governmental agencies. I have testified at Hearings conducted by the U.S. Senate Banking Committee, the U.S. House Banking Committee, the U.S. House Small Business Committee, the U.S. Office of Thrift Supervision, as well as before other governmental agencies. Much of my Congressional testimony during the 1980s and 1990s related directly to the thrift crisis and public policy to deal with it. Attached as Exhibit A is a copy of my curriculum vitae.

7. I have served as a member of the Board of Directors of the Federal Home Loan Bank Board of Dallas (1983-1989) as a Director of Three Savings and Loans in the FSLIC Management Consignment Program (1986-1998) and was on the Board of Bank United of Texas, the largest thrift institution in Texas, as well as other financial entities.

8. I have been retained as an expert witness in approximately 25 cases in behalf of private litigants as well as in behalf of the federal government. I have testified in deposition and at trial in behalf of the thrift institutions in a number of *Winstar* cases.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 12 of 105

## II. RETENTION

9. I was retained by Sterling Savings Association (hereafter "Sterling" or "Sterling Savings") in the spring of 2000 to assess and calculate damages caused by the federal government's breach of contracts between Sterling and the government over Sterling's acquisition of three insolvent thrifts located in the Pacific Northwest.

10. I issued my first Report in December 2000 followed by a corrected Report on September 6, 2001 in which I estimated Sterling's damages as a result of the breach. On February 20, 2004 I issued a Revised Updated Report in which I updated my calculation of expectation damages to incorporate the ruling made by Chief Judge Damich dated August 4, 2003 that the capital credits created in the Lewis Federal and Tri-Cities acquisition were not permanent but were required to be amortized pursuant to the forbearance provisions of those contracts; namely, over 40 years in the case of Lewis Federal and 15 years in the case of Tri-Cities. Finally, I updated my Report on December 11, 2006 to incorporate this Court's ruling on August 30, 2006 that the government did not breach the Agreement with Sterling relating to the acquisition of Central Evergreen. These Reports, incorporated herein by reference, are included in the Appendix submitted in conjunction with my Declaration and references to tables and graphs are to those attached to my Reports. The purpose of this Declaration is not to supplant my Reports but to expand on them and to comment on opinions and statements of the government's expert witnesses proffered in conjunction with the government's Motion for Summary Judgment Regarding Damages.

## III. THRIFT CRISIS

11. Understanding the magnitude and severity of the damages incurred by Sterling as a result of the government's breach of its Agreements involving Sterling's acquisition of insolvent thrifts requires some background on the economic role of the savings and loan

industry, the thrift crisis of the 1980's, the growing threat on the safety of the FSLIC insurance fund, the history and growth strategy of Sterling, and the relatively strong economy in the Pacific Northwest (where Sterling was located) compared to most of the rest of the country where the economy was troubled and the thrift crisis loomed.

12. Traditionally, the savings and loan industry used deposits from the public to make mortgage loans to homeowners. Starting in the early 1980's, many thrift institutions experienced serious financial difficulties when, because of economic conditions and Federal Reserve monetary policy, they were forced to pay interest on their deposits at substantially higher rates than they were earning on their mortgage loan and other assets. For example, a 30 year mortgage loan at a fixed rate of 6 percent was still on the thrift's books in 1981 when it was paying interest on deposits of 12 percent.

13. Nearly all thrifts suffered operating losses which reduced their book net worth. In turn, many of these thrifts became technically insolvent as their liabilities exceeded the value of their assets.

14. During the 1980s, many thrift institutions were unable to meet their capital requirements; many failed and many more were in danger of failing. This put pressure on the FSLIC insurance fund and the magnitude of the problem was greater than the resources of FSLIC to deal with it.

15. Against this background, the FSLIC sought out healthy, capital compliant, and well managed, institutions willing to absorb thrifts which had negative net worth. The well managed institutions were encouraged and provided with incentives to undertake these acquisitions of troubled institutions. Some of the incentives used by the FHLBB and FSLIC included the regulatory treatment of the goodwill resulting from the acquisition, FSLIC cash assistance, a capital credit provision in the contract allowing the acquiring thrift to double count

the amount of cash assistance in computing regulatory capital, and certain forbearances. Handling thrift failures in this manner represented a substantial savings to FSLIC as the regulatory credits and forbearances were of no real cost to FSLIC and allowed FSLIC to resolve a failed thrift without having to devote all its resources covering the negative net worth, thus preserving the insurance fund. In turn, the acquiring thrift received regulatory capital which it could leverage and grow, thus in part justifying the absorption of the negative net worth of the failing thrift, since these acquisitions came with the further assurance that under purchase accounting the resulting goodwill is included as an asset in the calculation of regulatory capital. This enabled the healthy thrift to absorb the negative net worth it had assumed as part of the acquisition over time through the amortization of the goodwill.

16. In short, virtually the entire thrift industry was in dire financial straits. The resulting threat to the insurance fund was real.

## IV. <u>STERLING SAVINGS</u>

17. Sterling was chartered by the State of Washington in 1983. It began operations in the same year as a federally insured stock savings and loan association headquartered in Spokane.

18. It is absolutely crucial, in appreciating the nature and extent of the damages sustained by Sterling by virtue of the government's breach, to recognize that the plight of the thrift industry in the 1980s as described above did not and does not apply to Sterling Savings. When Sterling opened its doors in 1983, this was well after the peak in interest rates. It did not have any loans made at low interest rates in the 1960s and 1970s. Sterling loans made at market rates in the 1980's generated returns in excess of the cost of deposits. Its service area was in the Pacific Northwest where the economy was strong.

19. Thus, Sterling was a profitable and sound financial institution throughout the troubled period of the 1980s. Sterling was profitable every year. (Indeed, Sterling remained profitable even after the breach up to the present day but not without serious financial harm following the breach.) Its deposits, assets and profits grew each year without interruption through the 1989 fiscal year.

20. Sterling's management had a business plan from the outset of gathering deposits in the small towns of rural Washington and lending in the bigger cities of Spokane, Western Washington, and the Portland, Oregon metropolitan area where loan demand was stronger. The plan worked to success and still does. From the standpoint of modeling and calculation of expectancy damages from the breach with reasonable certainty, it is also important to note that Sterling has the same management philosophy, the same growth-oriented strategic plan, and the same top executive management that it has had from its very beginning.

21. Although Sterling suffered a very significant setback and shrinkage due to the government's breach, which are described below, Sterling has grown from $730 million in assets at fiscal year 1989 to over $10 billion in assets as of February 28, 2007. This is largely because of the aggressive growth strategy of senior management, which strategy and team have remained consistent since Sterling's inception. The continuity of the senior management team and the success of the growth strategy also add credibility and certainty to an expectancy damage calculation in my opinion as an economist.

## V. ACQUISITION OF TROUBLED THRIFTS

22. During the mid to late 1980s, Sterling acquired three troubled thrifts. Each thrift was located in smaller communities and thus consistent with Sterling's growth strategy of targeting deposit generation in smaller communities.

23. The first insolvent thrift acquired by Sterling was Lewis Federal Savings and Loan Association ("Lewis Federal"), on November 15, 1985. Lewis Federal had been placed into receivership and FSLIC estimated the liquidation of Lewis Federal would cost it $6 million. Sterling agreed to take over the assets, liabilities and negative net worth of Lewis Federal in exchange for cash contributions from FSLIC of $1.75 million. It was agreed as part of the contract between the government and Sterling that the resulting goodwill of $2.044 million would be amortized in a straight line basis over 40 years and that the capital credit of $1.75 million would be made directly to net worth so that on its calculations of compliance with regulatory capital requirements, that $1.75 million would be added to the capital on its financial statements.

24. Sterling acquired Tri-Cities Savings and Loan Association ("Tri-Cities") on April 8, 1988. Tri-Cities had been placed into receivership, and FSLIC estimated the cost of liquidation to be $20.7 million. Sterling assumed the negative net worth of Tri-Cities and in exchange received $11.7 million in cash assistance, and the resulting $2.608 million in goodwill was to be amortized over 15 years on a straight-line basis. (The Court has since ruled that the cash assistance credit also amortizes.)

25. Sterling's acquisition of Central Evergreen Federal Savings and Loan ("Central Evergreen") was completed on December 31, 1998. Sterling had previously been requested by the government on two separate occasions to acquire Central Evergreen, but turned down the request each time because Central Evergreen's negative net worth was too large, and would adversely impact Sterling's capital position. On the third occasion, the government explained how with the regulatory capital acquired from the Tri-Cities acquisition, Sterling could take on the troubled thrift, thus linking the Tri-Cities and Central Evergreen transactions. Central Evergreen had a negative net worth of $12.4 million. The government had estimated that it

would take cash assistance of $8 to 10 million to induce a buyer to take on Central Evergreen, and there were few eligible buyers. No financial assistance was paid to Sterling. Because no cash assistance was paid, no formal liquidation cost study was done, but liquidation costs in my experience normally exceed the negative net worth of the failing institution (here, $12.4 million). However, Sterling recorded $8.4 million in identified intangibles and $13.6 million in unidentified intangibles which it agreed to amortize on the GAAP level-yield basis over 8 and 12 years, respectively. Parenthetically, even though it has been ruled that the government had the contractual right to avoid its agreement to include the Central Evergreen goodwill as regulatory capital, Sterling nevertheless had to record the amortization expense against retained earnings over the lifetime of the agreements, thus depressing Sterling's earnings and reducing its net worth.

26. In short, the government resolved a serious threat to its insurance fund when Sterling, a healthy thrift, stepped up and assumed the combined negative net worth of three failing thrifts totaling about $30 million. The total amount of cash assistance ($14 million) was far less than the negative net worth assumed by Sterling, and the liquidation costs avoided by the government was even greater --- Lewis Federal ($6 million), Tri-Cities ($20.7 million), and Central Evergreen (more than $10 million). Because of the ruling of the Court, no damages from the Central Evergreen transaction are included in my calculations, but the entire background is helpful in understanding my modeling and calculation of damages for the government's breach of the Lewis Federal and Tri-Cities agreements.

27. As of fiscal year end 1989, Sterling had total assets of $731 million and deposits of $519 million. It earned net income of $1.3 million for fiscal 1989, an increase over 1988 despite the absorption of Central Evergreen in December 1988. In 1989, prior to the breach,

Sterling was growing rapidly, was profitable, and was fulfilling its business strategy of becoming a major financial institution in the Pacific Northwest.

28. Rapid growth in the 1980s, but primarily the acquisition of troubled thrifts with liabilities in excess of their assets, left Sterling in a somewhat weakened capital position. As of June 30, 1989, Sterling had equity equal to 1.4 percent of total assets, as compared to an equity ratio of 2.2 percent a year earlier (before the unassisted acquisition of Central Evergreen). Though Sterling's capital was modestly in excess of its regulatory requirements, it needed additional capital, beyond that which it acquired from the troubled thrift transactions, to continue its growth strategy. So in 1988, Sterling planned an equity offering in 1989 to raise $10.5 million, sufficient to keep it in capital compliance and leave it with a comfortable margin, allowing the thrift to grow and expand in accord with its plan. The proposed equity offering was included in Sterling's Business Plan that became part of the Central Evergreen transaction.

29. In negotiating the agreements, the government and Sterling recognized the importance of capital that Sterling acquired from the agreements. For Sterling could not otherwise take on the assets and liabilities of the failing institution without resolution of the capital shortfalls created thereby. Sterling calculated that as of June 30, 1990, under its agreements with the government, its regulatory capital exceeded its required capital by $1.8 million. Yet, under the regulations in effect under FIRREA and after the breach, Sterling had a capital shortfall of over $20 million.

30. Sterling successfully integrated the three acquisitions. Sterling continued to receive high marks from its federal and state examiners during this period.

## VI. EFFECTS OF BREACH ON STERLING

31. FIRREA imposed new and higher capital requirements on all thrift institutions. Meeting those new requirements did not pose a problem to Sterling if the government's

contractual commitments in the acquisition of the troubled thrifts had remained in effect. However, soon after FIRREA's enactment, the Office of Thrift Supervision issued regulations gutting the amount of capital credits and supervisory goodwill that could count toward the increased capital requirements. This had an enormous negative impact on Sterling. Instead of its regulatory capital exceeding its required capital by $1.8 million on June 30, 1990, as described above, under OTS regulations Sterling had a capital shortfall of over $20 million ($21.4 million in tangible and core and $26.6 million in risk based).

32. The above figures do not include the $10.5 million equity offering planned for the fall of 1989. The offering was fully subscribed, in fact oversubscribed, but was cancelled at the last minute when the OTS refused to agree to permit payment of dividends on the preferred stock that was part of the offering. Naturally, investors are reluctant to purchase preferred stock on which no dividends are forthcoming. The inability of Sterling to obtain use of the $10.5 million in already subscribed capital is part of the damage suffered by the breach. As I stated in my original corrected Report dated September 6, 2001, by wiping out a large part of Sterling's capital and by preventing it from completing the 1989 equity offering, the breach had a devastating effect on Sterling that was nearly fatal to the institution's survival when the government threatened to close Sterling's doors.

33. Instead of treating Sterling as part of the solution in helping to preserve the FSLIC insurance fund, after FIRREA the government immediately began to regard Sterling as a troubled thrift. The government imposed operating restrictions on Sterling which included, among others: limiting the amount of loans to any one borrower; restricting business lending to existing customers; preventing Sterling from accepting deposits over $100,000; and limiting asset growth and precluding payment of dividends. Sterling was thus forced to curtail operations dramatically (literally walking good customers across the street to competitor banks) and to

abandon its growth strategy. Because of the breach, Sterling's commercial lending ability was virtually destroyed and its residential construction and real estate lending capacity severely curtailed. Key personnel abandoned Sterling, and its reputation in the banking and business communities was injured. Sterling contracted its asset base, reducing in size for the first time in history. It shrank total assets from $731 million in June of 1989 to $609 million in June 1991, a decrease of over 17 percent, to better come into FIRREA capital compliance.

34. In sum, the loss of capital due to the breaching provisions of FIRREA and the regulations issued thereunder forced Sterling to forego growth and shrink for the first time in its history. In my opinion, the shrinkage and resulting loss of profits was caused by the breach. I cannot find or think of any reason for the shrinkage other than the breach.

## VII. TEMPORARY RELIEF FROM THE DISTRICT COURT DID NOT PREVENT CONTINUED DAMAGE TO STERLING

35. After the government threatened to close Sterling approximately one year after it acquired Central Evergreen, in May 1990 Sterling sought temporary injunctive relief in the Federal District Court for the Eastern District of Washington. It is my understanding that the District Court issued a temporary restraining order in May 1990 and a preliminary injunction on July 3, 1990.

36. The temporary injunction prevented the Office of Thrift Supervision from seizing Sterling because of capital deficiency. It was not a permanent injunction. The government's experts now suggest that Sterling could have and should have ignored the regulators and FIRREA and carried through with its growth-oriented business plan. That is, they argue that the temporary injunction somehow defeats Sterling's lost profits claim.

37. Once it is understood that a temporary injunction will not be in place forever, and once the government appealed the injunction, it was and is obvious how any reasonably prudent

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 21 of 105

thrift must respond. As long as there is some risk that Sterling might lose on appeal its legal effort to prevent the government from breaching its contracts, as a business matter it would be foolish for Sterling to expand and grow. The fact that the evidence and the law seemed to support Sterling's position could provide no assurance that Sterling would prevail in its lawsuit. Any eventual loss on appeal, even if that appeared very unlikely, would require drastic shrinkage. Shrinkage is very difficult for, and costly to, a thrift institution.

38. Preventing seizure by a temporary injunction was a good move. It gave Sterling time to raise the capital necessary to meet FIRREA standards to avoid receivership. It gave Sterling time to choose what assets to liquidate and when. It also reduced the amount of damage owed by the government. For the damages incurred by a closed institution would be far greater than those where the institution was forced to shrink but remained in business.

39. Moreover, the government's argument in this regard overlooks the fact that substantial supervisory restrictions were imposed on Sterling during the period of the injunction that would not have been imposed on the capital-compliant institution that Sterling would have been absent the breach. For example, on June 5, 1990, five days after the temporary restraining order was issued, the government notified Sterling to report all actions inconsistent with the many restrictions imposed on Sterling before the order. On June 20, 1990, the government wrote another letter to the same effect. Later that fall, the government wrote Sterling and indirectly threatened Sterling with poor performance ratings under the safety and soundness regulations. The temporary injunction was eventually vacated by the Appellate Court; thus, Sterling was proved correct in not growing until it raised sufficient equity capital.

## VIII. MEASURING STERLING'S DAMAGES WITH REASONABLE CERTAINTY

40. Appreciating the impact of a loss of capital and the resulting forced shrinkage has on a thrift institution, in my opinion there is no question but that Sterling has been damaged. The

remaining question is how can the damage best be determined to a reasonable certainty. From the perspective of an economist, the best measure of damages is the difference between the earnings of the breached entity and the earnings it would have had absent the breach. The reason this is so is that in economic theory, the objective of a business firm is to maximize profits. Therefore, the difference in profits between the breached and non-breached firm is the logical measure of the extent of damage.

41. The calculation of lost profits is the sort of problem that economists are trained for and it comprises the major part of the work of economists --- in government, private, firms, and academia. Analyzing "what if" questions of this type is a traditional role for economists. Economists also develop forecasts of economic variables, both for the economy as a whole (GNP, inflation, employment, trade deficit, etc.) and for individual firms (sales, profits, etc.). The securities industry employs hundreds and hundreds of analysts exclusively devoted to forecasting earnings per share of publicly-traded stocks.

42. The specific question I have analyzed in my Reports is "How would the earnings of Sterling Savings differ from its actual earnings in the absence of breach?" Government's experts suggest that Sterling's lost profits are not susceptible to measurement and/or that such measurement is speculative. The suggestion is simply wrong. The discipline of economics has an established and accepted methodology for dealing with such questions, and I have performed the exercise many times over the years in my capacity as an economist. The specific task of assessing the "absence of breach earnings" or lost profits of Sterling is much easier than other assignments typically undertaken by economists (such as, what would be the effect on employment if there were an increase in the minimum wage; what would be the effect on gas prices if there were an increase or reduction in the oil supply, etc.).

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 23 of 105

43. Economic forecasting is a legitimate scientific activity that is not without some difficulty in a given case. I have had a great deal of experience in forecasting thrift earnings in my position first as an economist for the Federal Reserve Bank in the late 1950s, again in my position as Director of Research for the FDIC in the 1960s and 1970s, and again in my capacity as a Director of the Federal Home Loan Bank Board of Dallas.

44. However, it is important to recognize that my analysis and measurement of Sterling's "but for the breach" earnings do not involve any forecasting. This is simply because the key determinant of a thrift's earnings is interest rates --- interest rates on loans, and interest rates on deposits. Though interest rate forecasting is indeed difficult, here I am calculating Sterling's lost earnings only for the period of 1990 through 2006. As such, I need not forecast interest rates to calculate Sterling's earnings for that period. I can merely look them up. Nor do I have to project the economy in general or home sales in particular for this period. I can look them up. This lends markedly greater certainty and safety to a lost profits calculation.

45. Moreover, as I will make clear below, calculation of lost profits for Sterling was a much easier task than for other plaintiffs in this goodwill litigation. The vast majority of plaintiffs asserting lost profits in the *Winstar* cases had been weak financial institutions in the 1980s, before the breach and were weak in the 1990s. While Sterling was profitable throughout its history, many of the plaintiffs had a history of operating losses. Some of the plaintiffs therefore were closed. Because Sterling was always profitable, I assumed for purposes of my lost profits calculations that the "but for" Sterling would earn profits at the same rate as the actual Sterling for the past years 1990 through 2006 without having to forecast the future at all. In doing so, I ended up with a conservative approach because the "but for" bank would have been more profitable than the shrunken actual bank, at least in the early years. In sum, my opinion of Sterling's lost profits is based on a high degree of reasonable certainty.

## IX. HORVITZ LOST PROFITS METHODOLOGY

46. My lost profits methodology is simple and straightforward. It involves the type of financial modeling that has been widely accepted in the thrift and banking business (and by the federal thrift and bank regulators) for many years. First, I calculated the amount of regulatory capital that Sterling would have had if its Lewis Federal and Tri-Cities contracts with the government been honored. That is, I calculated the amount of disallowed capital. For the newly imposed tangible capital requirement, all the intangibles from Lewis Federal, Tri-Cities and Central Evergreen were disallowed from capital. For the core capital requirement, a portion of the intangibles counted as qualifying supervisory goodwill, but the majority was disallowed. This results in $15.557 million in disallowed capital from the Lewis Federal and Tri-Cities transactions as of December 31, 1989, and $11.357 million of other qualifying supervisory goodwill from the Central Evergreen transaction that was subject to the phase out limitations of FIRREA, plus $5.67 million in identified intangibles from the Central Evergreen acquisition that were subject to a separate qualifying test. Only $10.3 million of these intangibles were allowed to be included in Sterling's core capital at December 31, 1989. Had the Lewis Federal and Tri-Cities contracts been honored, all of the $15.557 million from Lewis Federal and Tri-Cities would have been included in core capital, $10.4 million of Central Evergreen's supervisory goodwill would count toward core capital, and all of the $5.67 million in identified intangibles from Central Evergreen would have counted. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 4a, 4b, and 4c, App. 177-179.) Additionally, Sterling would have been able to complete its capital offering in 1989 that would have raised an additional $10.5 million. Including other small adjustments to core capital that would have flowed from these very significant effects of the breach, Sterling would have had core capital of $28.8 million, whereas it actually reported

*negative* \$2.2 million. The net effect of the breach was to disallow approximately \$31.0 million of core capital at December 31, 1989.

47. Second, the additional capital would have been used to support additional assets or "foregone assets." Next, Sterling would have earned a return on those foregone assets. Then, these earnings would have been added to capital, allowing the acquisition of additional foregone assets that would yield additional profits. These lost profits, calculated on a year by year basis from the time of breach until today, represent the past lost profits of Sterling. I have summarized the lost profits calculation in Exhibit 6, Table 1 of my December 11, 2006 Report. The lost earnings from 1990 through September 2006 are \$58.164 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In addition, there are wounded bank damages of \$4.556 million (Horvitz Report, December 11, 2006, Exhibit 6, Table 3d, App. 175), future damages of \$0.641 million based on Professor James' Report, for total expectation damages of \$63.361 million --- all of which is then summarized in Exhibit 8 to my 2006 Report.

## X. <u>RETURN ON ASSETS</u>

48. The elimination of regulatory capital resulting directly from the breach forced Sterling to be smaller and less profitable than it otherwise would have been. There are only two inputs needed to make the calculation of lost profits: (1) the amount of foregone assets year by year and (2) the rate of profit that would be earned on the foregone assets.

49. With regard to the second input above, I assumed that the but-for Sterling would have earned profits at the same rate as the actual Sterling. This is a conservative assumption for two reasons. First, it is widely accepted that there are significant economies of scale in the operation of a thrift institution because a larger institution will spread its fixed overhead costs over a larger volume of assets, thereby reducing the unit cost. I prepared one of the earliest empirical studies on this subject in the early 1960s and subsequent research has been consistent

with my findings. Second, and more important, absent the breach, Sterling would have had the opportunity to acquire assets and deposits from the Resolution Trust Corporation ("RTC"), the governmental agency designated to liquidate failed thrifts. In the depressed markets of the early 1990s, there were great opportunities to purchase either whole institutions, branches, or asset portfolios from the RTC. There were many more institutions and assets for sale than there were eligible bidders. Such acquisitions fit with Sterling's growth strategy. However, under RTC policy, only institutions that were in full capital compliance were eligible to bid, and because of the breach, Sterling was deemed by the government to not be in capital compliance when the best opportunities were available. Based on my experience with a thrift institution that made a number of RTC acquisitions, it is my opinion that the rate of profitability on RTC assets would have significantly exceeded Sterling's rate of return on its actual assets. Attached as Exhibit 7 to my December 11, 2006 Report is a list of the RTC Resolutions of failed thrifts in Washington and Oregon, states where Sterling operated at the time. (App. 185.)

50. For the above reasons, in my opinion the but-for bank would likely have been more profitable than the actual Sterling. I have a high degree of confidence that the foregone assets would have been at least as profitable as the actual assets, and in my calculation of lost profits I have used the actual historical return-on-assets figure of Sterling to estimate the profitability of the foregone assets. In addition to my analytical calculations, there is a substantial body of actual experience that supports the reliability and credibility of the conclusions derived from my lost profits model. The evidence is contained within the repeated experiences of Sterling in response to its several injections of capital during the 1990s. In nearly every year of the 1990s, Sterling or its holding company raised capital and injected it into the thrift. In every case, Sterling successfully and profitably leveraged that capital. For example, in 1991 Sterling had a return on average assets (ROAA) before amortization and taxes of .87

percent. Sterling's actual assets at that time were $609 million. I estimated the but-for bank would have total assets of $725 million. The actual bank achieved that size during fiscal 1993, and in that year its ROAA was 1.71 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 and 3b, App. 169, 173.)

51. The largest increase in foregone assets occurred in fiscal 1994, when actual assets were $1.368 million and the but-for bank in my calculations had assets of $1.681 million. (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180.) The actual bank had ROAA of 1.37 percent. With regard to whether it was reasonable to believe that Sterling could have maintained that ROAA on the additional $313 million in assets, there is no speculation involved. We can look it up. In 1997, the actual Sterling did reach the asset size of the 1994 but-for bank, and the ROAA was 1.36 percent. (Horvitz Report, December 11, 2006, Exhibit 6, Table 3b, App. 173.) There is nothing speculative about these figures --- my calculations are supported by real data. Attached as Exhibit B is a chart showing that Sterling's Return on Average Assets, though it fluctuates from year-to-year, shows no tendency to decline as Sterling's asset size increases. Put another way, to reject my lost profits estimate, as the Government's experts do, they have to believe that although Sterling was able to profitably use the capital it raised (at significant expense) in 1991 and nearly every year since, but it would not have been able to make profitable use of additional (free) capital in 1989 and 1990, even though that was the time when Sterling's need for capital was the greatest and the opportunities for profitable acquisitions were the most abundant. But the Government's experts have provided absolutely no evidence to support such an extreme position.

52. The government's expert suggests, instead, that my calculation of lost profits is speculative because I do not identify the specific assets (or liabilities) that would be acquired by the but-for bank. While I do not identify specific assets, I cannot think of a single economic

reason why one would. My calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held the usual and ordinary type assets --- no exotic finaneial instruments or eolleetor's items. There is no reason to doubt that additional assets of the type held by Sterling were readily available. Unlike some other goodwill cases in which the foregone assets represented a multiple of the actual assets and a large absolute volume, the foregone assets reach a peak of $427 million, but are considerably less for most of the damage period. This is not only a miniscule figure as measured by the total market, but is a small fraction of the actual Sterling assets. In fact, the bulk of lost profits are accounted for in years in which the foregone assets total less than 15 percent of the actual bank assets. Attached as Exhibit C is a graph depicting the comparison year by year of Sterling's foregone assets to actual total assets.

## XI. FOREGONE ASSETS

53. The other variable that determines lost profits is the amount of foregone assets. If Sterling had the additional capital taken away by the breach, it could have expanded to a greater extent than the actual bank.

54. Accepted economic methodology suggests that there are several alternative approaches to determine the amount of foregone assets. One approach is to consider the leveraging capacity that the additional capital provides. With a 4 percent capital requirement, an additional $1 million of capital will support an additional $25 million of assets. Similarly, with a 5 percent requirement, $20 million of additional assets can be supported. This approach is embedded in OTS guidelines for the preparation of Appraisals in connection with the conversion of mutual thrift institutions to stockholder-owned corporations.

55. Using this approach to estimating asset size requires an assumption as to the appropriate capital ratio to use. I chose to estimate the assets of the but-for bank on the

assumption that its capital-asset ratio each year (with only one exception) is at least as high as the actual Sterling capital-asset ratio for that year. While this is a reasonable approach, it results in an overly conservative capital ratio because it is likely that the breach had a long-lasting effect on Sterling's policy with respect to capital. While I can be very confident that the capital ratio of the but-for bank would not generally be higher than that maintained by the actual (breached) Sterling, in fact my calculations are based on the but-for bank maintaining a more conservative capital position than the actual bank.

56. Using this approach can result in periods of rapid growth in calculated foregone assets. So, to be sure that I err on the conservative side, I added a growth constraint which limits the growth of the but-for bank in any given year to a rate no faster than the growth of the actual bank. This means that in my calculations there are two constraints on the asset size of the but-for bank --- a capital constraint and a growth constraint. My calculations of lost profit damages are based in each year on whichever constraint results in the smaller foregone assets (and, hence, the smaller lost profits). (Horvitz Report, December 11, 2006, Exhibit 6, Table 5, App. 180).

57. Substantial support for my foregone assets analysis is provided in the actual cxperience of Sterling. In my December 11, 2006 Report, I provide an estimate of the total assets of the but-for bank in Exhibit 6, Table 5, App. 180. In every case, the actual Sterling grew to a larger size than the but-for bank within a short period of time (usually within one year). In fact, the longest time that it took Sterling to exceed the but-for estimate was three years --- my 1994 estimate of $1.681 million was not exceeded until 1997. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.) In words, the basic reason why the but-for bank grew as rapidly as it did is because the actual bank (with the same management and business strategy operating in the identical economic environment) grew rapidly. If the government truly believes my estimates are aggressive or unreasonable, its experts should have provided some actual data

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 30 of 105

to suggest a lower growth rate, or at least provided some reason to believe that a lower growth rate would be appropriate. The government and its experts have elected not to do so.

## XII. 1991 CAPITAL RAISING DID NOT REPAIR DAMAGE TO STERLING CAUSED BY THE BREACH

58. Sterling raised $23 million in capital in 1991. The government implies that the damage caused by its breach was thereupon repaired, and Sterling in 1991 was back in the position it would have been absent the breach. This is hardly the case. Sterling lost $31.0 million in core capital because of the breach, including its attempt to raise $10.5 million in capital which failed because of the breach. Sterling had a pre-breach strategy calling for growth. That growth plan required that substantial additional capital be raised. Sterling did raise $23 million in capital in 1991, but it would have needed the capital in the absence of the breach. Nor did the 1991 offering replace the aborted 1989 offering, but it was another offering based on similar planning for growth, but now one step behind due to the breach. Analysis of the capital needs of the but-for bank must recognize the size and growth of the but-for bank. If the 1989 offering had gone through, the actual bank might not have needed the 1991 capital-raising to remain in capital compliance, but the but-for bank clearly did to pursue its objectives. Table 3a to Exhibit 6 of my December 11, 2006 Report shows that Sterling had acquired or been down-streamed capital in almost every year since 1991. (App. 172.)

59. Sterling has raised millions of dollars in capital over the past 15 years, amounts many times the amount of capital lost due to the breach. Since capital raising is costly, it is obvious that Sterling believed it could use all the capital it raised and, in fact, it has, done so. Sterling has grown to $10 billion in assets as of February 28, 2007. This picture is consistent with my interviews of management and the deposition testimony of Sterling's Chief Financial

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 31 of 105

Officer, Daniel Byrne, who has testified that Sterling's policy in the 1990s was to raise as much capital as possible.

60. I recognize the government cites deposition testimony by Harold B. Gilkey claiming that he said absent the breach, Sterling would not have raised capital in 1991, but it is clear that Mr. Gilkey was answering at pages 465 and 466 of his deposition as to an already shrunken bank with assets of "$600 million." He was not asked the question relevant for a damages inquiry --- "What would Sterling have done but-for the breach?". His response is therefore not determinative of what the but-for bank with assets of $726 million by June 1991 would have done. In my opinion, but-for the breach, Sterling demonstrably needed more capital by 1991.

61. Sterling did take two crucial (but costly) steps to minimize the government's damages. First, it filed suit to stop the government from seizing the bank. Second, it stopped growing and shrunk the size of the bank. The first step avoided the much greater losses that would have resulted from the closing of the bank. The second step reduced the extent of Sterling's capital deficiency. These efforts were important efforts to minimize damages, but they did not replace capital lost due to the breach.

## XIII. WOUNDED BANK DAMAGES

62. In addition to lost profits, the actual bank incurred costs and lost opportunities as a result of its weakened capital position caused by the breach. To make Sterling whole requires that it be compensated for these costs. These costs and lost opportunities, which are called wounded bank damages, are itemized in Exhibit 6, Table 3d and in Exhibit 8 to my December 11, 2006 Report. (App. 175, 186.)

63. Based on my definition of wounded bank damages, I requested that Sterling management compile a list of expenses that met my definition or criteria of this type of damage.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 32 of 105

I have reviewed carefully the list compiled by Sterling. Although I cannot attest of my own personal knowledge as to the accuracy of the cost tabulation prepared by Sterling, assuming these costs are as they have been described to me, they meet my economic definition of wounded bank damages. In my opinion, these costs were a direct result of the breach and would not have been incurred but for the breach.

64. Based on personal experience with several financial institutions and on review of financial conditions of others, the most significant wounded bank damage Sterling suffered was the loss of opportunity to make acquisitions from the RTC at the time when the best economic opportunities existed. I have not included an estimate of this damage in my lost profits calculations, though as noted above the existence of this consideration adds to my confidence that the ROAA ratio I applied to foregone assets was conservative. Thus, there is no duplication between the lost profits calculation and the wounded bank damage figure.

65. Wounded bank damages may be best illustrated by the example of the Great American Savings Bank branch. Sterling attempted to acquire the branch for $61,000, but its request was rejected by the regulators because it was not in capital compliance following the breach. Five years later, because Sterling was growing and expanding, Sterling acquired the same branch but was forced to pay $1.9 million for it. The causal connection between the breach and the resulting damages of $1.835 million ($1.9 million – $65,000) cannot be doubted. The contracts for acquisition of Lewis Federal and Tri-Cities were about capital. Regulatory capital was the consideration for Sterling to take on the insolvent institutions. The government knew that Sterling contracted with Lewis Federal and Tri-Cities so that it would obtain more capital, capital which it intended to use for growth.

66. The government's experts' discussion of forseeability is contrary to economic logic and, in my opinion, makes no economic sense. Of course, at the time of the contracts

neither party necessarily knew or could foresee that Sterling would seek to acquire a specific branch of Great American. However, both parties knew and understood that Sterling would use the capital it garnered from the acquisition to grow and increase profits. This was clearly foreseeable and that is all that is required in calculation of lost profits from an economics or financial point of view.

67. As mentioned above, the price of the branch was $61,000 in 1989, but Sterling had to pay $1.9 million in 1994 when the transaction was consummated. The government argues that there was no damage because Sterling would not have paid $1.9 million unless it was worth that amount. This argument misses the point. No one is questioning the value of $1.9 million in 1994. The inescapable fact is that absent the breach, Sterling would have captured that value for the mere sum of $61,000.

68. Also, the substantial appreciation in value of the Great American branch reflected the need of many undercapitalized thrifts to sell branches in 1989 (proceeds directly applied to capital) as compared with premiums for branches in 1994. It further underscores the lost opportunities Sterling would have had in the early 1990s but for the breach.

69. The government similarly mischaracterized the circumstances of the CJ-4 loan. Sterling committed to a construction loan before the enactment of FIRREA. After FIRREA's enactment, Sterling was limited by the federal regulators to a $500,000 ceiling for a loan to any one borrower. Because of this limitation, Sterling was not permitted to make loan advances against this commitment that was already outstanding. The borrower then sued Sterling for breach of the loan commitment. Sometimes advancing additional funds will ensure completion of the project and repayment of the loan. Sometimes not. It is a business judgment. Sterling was not able to exercise this judgment because of its undercapitalized position. I cannot testify that Sterling made the loss calculation correctly, but my definition of wounded bank damages

would be the difference between the actual loss suffered by Sterling and the loss, if any, it would have incurred had it been able to exercise its business judgment to advance additional funds. Viewed as a whole, Sterling has an impressive record in making business decisions of this type.

70. The government motion papers seek to muddy the waters on this matter by mischaracterizing my opinion on incremental and average returns. I did not say and would not say that "as a matter of economics incremental returns earned on foregone assets are equal to average returns." I equated the two in calculating the average return on foregone assets as described above, and for the reasons set forth above, but there are certainly instances when returns on incremental assets are higher or lower than average returns. A business decision to advance funds to a troubled borrower is only done when the expectation is that above-average returns will be achieved.

## XIV. BANKHEAD REPORT

71. I have reviewed at the request of Sterling's counsel the Report of W. Barefoot Bankhead dated February 15, 2007 and submitted with the government's Motion for Summary Judgment Regarding Damages.

72. I thoroughly and vigorously disagree with the analysis made and conclusions reached by Mr. Bankhead in his Report.

73. In reviewing the Lewis Federal and Tri-Cities contracts as an economist and in an attempt to establish the true but-for bank before enactment of FIRREA and without any impact from FIRREA, I found that the goodwill generated by the Lewis Federal and Tri-Cities acquisitions counted as "capital." In addition, I noted that the contracts provided for "capital credits" that would be likewise counted as "capital" for regulatory purposes. From the standpoint of modeling of Sterling's damages, I saw nothing in these contracts that referred to or could be construed as treating this "capital" as some sort of qualified or second-class capital. In

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 35 of 105

particular, the contracts did not define this as "intangible capital." It was simply "capital." In sum, in the true but-for world or in the pre-breach world, there were no restrictions or qualifications of any kind imposed on the capital acquired by Sterling from the Lewis Federal and Tri-Cities contracts. Therefore, in the pre-breach situation, the capital provided by these contracts counts fully toward any existing or new capital requirement. When FIRREA and OTS regulations transgressed the capital provisions of these contracts, it is my understanding for purposes of calculating Sterling's damages that the Court ruled that the contracts had been breached.

74. Following the contracts and my understanding of the Court's rulings, the proper calculation of Sterling's post-breach capital position includes the capital arising from the Lewis Federal and Tri-Cities agreements, plus the amount of supervisory goodwill arising from the Central Evergreen acquisition that qualifies under the cap and phase-out rules of FIRREA. In other words, in the but-for world, FIRREA can have no capital restricting impact on the capital acquired from the Lewis Federal and Tri-Cities deals but, because the Court found the government did not breach the Central Evergreen agreement, only the supervisory goodwill acquired in that agreement is subject to FIRREA restrictions (namely, the cap and phase-out rules). This is a critical distinction. Otherwise, a damage expert confuses the but-for Sterling with the actual bank and ends up with an incorrect damage model, which is precisely what Mr. Bankhead has done.

75. I have made this distinction. That is, the capital acquired from Lewis Federal and Tri-Cities is not and cannot be subject to the limitations imposed by FIRREA on the amount of goodwill that qualifies for core capital under FIRREA. If it were, this would be contrary to the Court's decision that FIRREA breached the Lewis Federal and Tri-Cities contracts.

76. Consequently, because my damage model correctly distinguishes between Lewis Federal and Tri-Cities acquired capital as not being subject to FIRREA limitations while the Central Evergreen supervisory goodwill is subject to a cap and phase-out over time, I correctly calculated the but-for Sterling capital position as of December 31, 1989 and thereafter. ( Horvitz Report, December 11, 2006, Exhibit 6, Tables 1 through 8, App. 169-184.) All of the Lewis Federal and Tri-Cities deals are included and only 1.5 percent of but-for Sterling assets are included as qualifying supervisory goodwill from the Central Evergreen until such goodwill is phased out, as shown on Exhibit 6, Table 4b of my December 11, 2006 Report, App. 178. Therefore, Sterling incurred lost profits from the very outset of the breach and the lost profits were correctly modeled and calculated at $58.164 million as of September 30, 2006. (Horvitz Report, December 11, 2006, Exhibit 6, Table 1, App. 169.)

77. Sterling's but-for core capital position on December 31, 1989 may be summarized as follows:

| | | AMOUNT (000s) |
|---|---|---|
| o | Capital (Lewis Federal and Tri-Cities) | $15,557 |
| o | Qualifying Supervisory Goodwill (Cent. Ev.) | 10,421 |
| o | Other Qualifying Intangibles | 5,670 |
| o | 1989 Subscribed Offering | 10,500 |
| o | But for Bank Adjustments | (781) |
| o | Estimated Tangible Capital at 12/31/89 | ( 12,581) |
| | But-for Sterling Core Capital | $28,786 |

(Ex. 6, Tables 4a, 4b, 4c, 3a, respectively, Horvitz Report December 11, 2006, App. 177, 178, 179, 172)

78. The above calculation is also illustrated in the bar graph attached as Exhibit D to this Declaration which depicts the breach-related adjustments. The negative $12,581 is comprised of:

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 37 of 105

| | | AMOUNT (000s) |
|---|---|---|
| ° | Actual Core Capital | ($2,273) |
| ° | Actual Reported Qualifying Supervisory Goodwill | (10,308) |
| | | ($12,581) |

79. The problem with Mr. Bankhead's analysis starts with the fact that the phrase supervisory goodwill came into existence with the legislative proposals that later resulted in the passage of FIRREA and its implementing regulations. To my knowledge, it was not used prior to these proposals, either within the thrift industry or by regulators. The reason is that before FIRREA (or the banking regulation) there was no distinction between regular goodwill or goodwill found in a supervisory merger. It therefore did not have a meaning until regulators were determining how to define supervisory goodwill for purposes of implementing the new capital requirements imposed by FIRREA. The purpose of which was to limit and phase-out goodwill that would no longer count toward the capital requirements.

80. Mr. Bankhead's contention that the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be considered as "supervisory goodwill" is not meaningful and furthermore is illogical in the but-for world that the Court has directed Sterling to consider in its damages calculation. In the but-for world the goodwill and capital credits from Lewis Federal and Tri-Cities acquisitions are protected as capital. They are not subject to limitation other than defined by the contracts. They are not phased out prematurely, but in accordance with the Court's ruling, amortize over the agreed upon length of the contract. The language in the regulations implementing the limitations on supervisory goodwill is directed to capital that prior to FIRREA did count toward the regulatory capital requirements, but after FIRREA would no longer count toward the FIRREA imposed capital requirements. That is not

the case with regard to the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions - in the but-for world this capital continues to count toward regulatory capital requirements, just as it did before FIRREA.

81. To claim, as Mr. Bankhead does, that goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions would be factors in the qualifying supervisory goodwill tests perpetuates the breach and continues to harm Sterling. Mr. Bankhead's approach is prejudicial because it treats the goodwill and capital credits from the Lewis Federal and Tri-Cities acquisitions differently from other capital. In the but-for world they should not be treated differently; they should be treated exactly like other capital. Prior to FIRREA at the time the Lewis Federal and Tri-Cities contracts were made, no distinction was drawn by regulators between different types of capital. It all counted equally as regulatory capital --- Mr. Bankhead's approach allows their presence on Sterling's balance sheet to limit what other supervisory goodwill might qualify as core or risk-based capital.

82. For example, assume a thrift identical to Sterling but with common stock capital of an equal dollar amount to the amount of Sterling's goodwill and capital credits from Lewis Federal and Tri-Cities. Also assume that this other thrift had goodwill (equivalent in amount to Central Evergreen) from a supervisory acquisition that was acknowledged to be subject to the phase-out limitations imposed by FIRREA. Both institutions are the same size and therefore have the same limitations on how much supervisory goodwill can count toward the core and risk-based capital requirements. Mr. Bankhead claims Sterling can count none of the goodwill from Central Evergreen because it doesn't qualify. The other thrift, however, would be able to count its supervisory goodwill subject to allowable qualifying percentages. It would have more capital which consequently would give it a greater ability to acquire assets and grow--the very opportunities that Mr. Bankhead's approach denies Sterling. Clearly, Mr. Bankhead's approach

continues to penalize Sterling. It is effectively another means to prolong the breach of the Lewis Federal and Tri-Cities contracts.

83. In his approach, Mr. Bankhead constructs out of whole cloth a different interpretation: FIRREA, according to Mr. Bankhead, created a bucket (equal in size on day one to 1.5 percent of assets) in which some intangibles could be temporarily counted as though they represented real capital. Into this bucket must be included first (though there is no explanation of why this comes first) the contractual capital. If the contractual capital exceeds the 1.5 percent maximum, it would be counted as capital (obviously, to do otherwise even Mr. Bankhead recognizes as a breach). But if the contractual capital does not fill the 1.5 percent bucket, Mr. Bankhead would allow Sterling to include supervisory goodwill from Central Evergreen (but only up to the total 1.5 percent maximum).

84. Although he is dealing in the hypothetical world, Mr. Bankhead allows for a possibility (which he deems implausible) that perhaps the contractual capital need not be counted first in the intangible bucket, but that the contractual capital and supervisory goodwill should be proportionately allocated space in the bucket. There is nothing in FIRREA or the regulations which suggest that any such allocation procedure is necessary.

85. Mr. Bankhead's interpretation of FIRREA is not only without basis, it would be illogical for Congress to construct a law with the intent Mr. Bankhead finds. If Mr. Bankhead is right, thrift institutions could count supervisory goodwill up to the limits of the law, unless they had entered into a contract with the Government to assist in the resolution of failing thrifts. In that case, to the extent that they gained contractual capital through those transactions, they would lose, dollar-for-dollar, the right to include supervisory goodwill toward their capital requirement. Congress would have designed law not only indifferent to the contributions of those participating

in such contracts, but actually to penalize those who had done so. It is hard to accept that Congress acted maliciously to punish those who attempted to help resolve the thrift crisis.

86. In the end, of course, Mr. Bankhead's analysis does not affect my calculations of damages. If Mr. Bankhead's interpretation of FIRREA and its regulations were correct, then the application of those regulations to Sterling would represent a continuing breach, and my analysis of the non-breached Sterling would be unaffected. Put differently, in the but-for world, Sterling's so-called contractual capital counts fully towards regulatory capital requirement as core capital without any limitation upon Sterling's right under FIRREA to count the supervisory goodwill from the Central Evergreen transaction as qualifying supervisory goodwill.

87. Lastly, with regard to Mr. Bankhead's statements in paragraph 13 of his Report, my 2004 Report is not inconsistent with my position that the capital acquired from the Lewis Federal and Tri-Cities deals is not subject to FIRREA limitations. Table 4b of my 2004 Report relates to the actual bank, not the but-for bank. At no time in my 2004 Report did I suggest that, in the but-for world, any of the capital from Lewis Federal and Tri-Cities agreements was subject to the cap and phase-out regulations of FIRREA. Mr. Bankhead has a point, but it is a rhetorical point relating to a poor choice of terminology on my part. Column C of Table 4b is headed "SGW" (supervisory goodwill) where it should have been titled "unidentified intangibles." (App. 145.) However, at no time in the text of the report did I include Tri-Cities or Lewis Federal capital with supervisory goodwill. So Mr. Bankhead draws a distinction without a difference.

88. I incorporate by reference my September 6, 2001 and February 20, 2004 Reports as though fully set forth herein and declare them to be true and correct.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 41 of 105

**PAUL M. HORVITZ** declares under penalty of perjury under the laws of the State of Texas that he is over the age of 18, competent to be a witness herein and that he makes the foregoing declaration on personal knowledge and that the same is true and correct:

DATED this 28th day of March, 2007.

Paul M Horvitz
PAUL M. HORVITZ

# PAUL M. HORVITZ

Professor of Finance Emeritus
University of Houston

## ADDRESS

150 Sugarberry Circle
Houston, Texas 77024
(713) 780-3771
E-mail: paulhorvitz@aol.com

## EDUCATION

| | | |
|---|---|---|
| Massachusetts Institute of Technology | PhD | 1958 |
| Boston University | MBA | 1956 |
| University of Chicago | BA | 1954 |

## EMPLOYMENT HISTORY

| | |
|---|---|
| University of Houston | |
| Professor of Finance Emeritus | 2001- |
| Professor of Finance | 1997-2000 |
| Judge James A. Elkins Professor of Banking and Finance | 1981-1997 |
| Professor of Finance | 1977-1981 |
| Federal Deposit Insurance Corporation | |
| Deputy to the Chairman | 1976-1977 |
| Director of Research | 1968-1976 |
| Assistant Director of Research | 1967 |
| Comptroller of the Currency | |
| Associate Director, Department of Banking and Economic Research | 1966-1967 |
| Senior Economist | 1963-1965 |
| Mitre Corporation | |
| Economic Analyst | 1962-1963 |
| Boston University | |
| Assistant Professor of Finance | 1960-1962 |
| Federal Reserve Bank of Boston | |
| Financial Economist | 1956-1960 |

EXHIBIT A

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 43 of 105



## SELECTED PUBLICATIONS

### Books and Monographs

Monetary Policy and the Financial System. Prentice-Hall, 6th edition, 1987.

Perspectives on Safe and Sound Banking. MIT Press, 1986 (with George Benston, Robert Eisenbeis, Edward Kane and George Kaufman).

Commercial Banking and Interstate Expansion, UMI Research Press, 1985 (with Larry A. Frieder, et al.).

Sources of Financing for Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

Problems in the Financing of Small Business. JAI Press Inc., 1984 (edited by Paul M. Horvitz and R.R. Pettit).

The Changing Environment of Non-Local Competition in U.S. Banking. American Bankers Association, 1981 (with Peter Merrill).

The Future Development of Foreign Banking Organizations in the U.S. American Bankers Association, 1981 (with Bemard Shull).

The Management of Commercial Bank Funds. American Institute of Banking, 2nd edition, 1980 (with George McKinney and William Brown).

Federal Reserve Membership. American Bankers Association, 1979 (with Peter Merrill).

Concentration and Competition in New England Banking. Federal Reserve Bank of Boston, 1958.

### Articles in Professional Journals

"Lending Discrimination Claims and the Issue of Redlining," Journal of Forensic Economics, 1998, (with Andrew Holmes).

"Mortgage Loans to Non-Occupants as an Indicator of Racial Redlining," Journal of Financial Services Research, January 1997, (with Andrew Holmes).

"Commercial Banks and Real Estate Lending: The Texas Experience," Journal of Regulatory Economics, November 1996, (with Robert Eisenbeis and Rebel Cole).

"Preserving Competition in Electronic Home Banking," Journal of Money, Credit and Banking, November 1996.

"Efficiency and Antitrust Considerations in Home Banking: The Proposed Microsoft- Intuit Merger,"
The Antitrust Bulletin, Summer 1996.

"Forbearance: An Empirical Analysis," Journal of Financial Services Research, March 1996, (with Emile J. Brinkmann and Ying-Lin Huang).

"Banking Regulation as a Solution to Financial Fragility," Journal of Financial Services Research, December 1995.

"Risk-Based Capital Standards and the Credit Crunch," Journal of Money, Credit and Banking, August, 1995 (with Emile J. Brinkmann).

"Rules Vs. Authorities in Banking Supervision," Korea Non-Bank Deposit Insurance CorporationJournal, Spring 1995 (with Insup Lee).

"Abnormal Returns in Post-FIRREA Acquisitions of Failed Thrifts," Journal of Financial Services Research, December 1994 (with Insup Lee).

"Mortgage Redlining: Race, Risk, and Demand," Journal of Finance, March 1994 (with Andrew Holmes).

"Management Incentives and Solvency Effects in Financially Distressed Government Controlled Institutions," (with Janice Barrow), Financial Management, December 1993.

"Valuation Effects of New Securities Issuance by Bank Holding Companies: New Evidence," Financial Review, 1991, (with Insup Lee and Kerry Robertson)

"The FSLIC Crisis and the Southwest Plan," American Economic Review, May 1989.

"Fear of Failing," Yale Journal on Regulation, Spring 1987.

"The Combination of Banking and Insurance: Implications for Regulation," Growth and Change, October 1985.

"Are S&L Participations in Real Estate Ventures Too Risky?" (with Clifford Fry and John Crockett), Real Estate Review, Summer 1985.

"Comment on Deposit Insurance in a Deregulated Environment," Journal of Finance, July l984.

"The Implications of Changes in the Payments System for Interstate Banking," Journal of Corporation Law, Summer 1984.

"Reform of the Deposit Insurance System," Contemporary Policy Issues (with Tim

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 45 of 105



Campbell), May 1984.

"The Case Against Risk-Related Deposit Insurance Premiums," Housing Finance Review, September 1983. Reprinted in Gardener, UK Banking Supervision, Allen & Unwin, 1986.

"Comments on Legal Reserve Requirements," Journal of Bank Research, Spring 1983.

"Reorganization of the Financial Regulatory Agencies," Journal of Bank Research, Winter 1983.

"Regulation of the Money Order Industry," Financial Management, Winter 1980.

"A Reconsideration of the Role of Bank Examination," Journal of Money, Credit and Banking, November 1980.

"Commercial Bank Financial Reporting and Disclosure," Journal of Contemporary Business, Summer 1977.

"Bank Failures and Deposit Insurance: The Alternatives," (with Robert Barnett and Stanley Silverberg), Banking Law Journal, April 1977.

"The Committee on Interest and Dividends: An Evaluation," Policy Analysis, Spring 1977.

"Failures of Large Banks: Implications for Banking Supervision and Deposit Insurance," Journal of Financial and Quantitative Analysis, November 1975. Reprinted in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 1980.

"The Hunt Commission Report: Comment," Journal of Finance, March 1974.

"The Pricing of Textbooks and the Remuneration of Authors," American Economic Review, May 1966. Reprinted in Johnson, The Daily Economist, Prentice-Hall, 1973.

"The Bank Merger Act of 1960: A Decade After," (with Bernard Shull), Antitrust Bulletin, Winter 1971. Reprinted in Reprints in Antitrust Law and Economics, 1972.

"Branch Banking, Independent Banks and Geographic Price Discrimination," (with Bernard Shull), Antitrust Bulletin, Winter 1969.

"Price Uniformity and Banking Markets," Appalachian Financial Review, 1969.

"A Note on Textbook Pricing," American Economic Review, September 1965.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 46 of 105



"Stimulating Bank Competition through Regulatory Action," Journal of Finance, March 1965. Reprinted in Banking Markets and Financial Institutions, Irwin, 1971.

"Loan Loss Reserves," (with Sherman Shapiro), National Banking Review, September 1964.

"The Impact of Branch Banking on Bank Performance," (with Bernard Shull), National Banking Review, December 1964. Reprinted in Banking Competition and the Banking Structure, Comptroller of the Currency, 1966.

"Branch Banking and the Structure of Competition," (with Bernard Shull), National Banking Review, March 1964. Reprinted in Banking Competition and the Banking Structure.

"Concentration Ratios and Competition," (with Deane Carson), National Banking Review, September 1963. Reprinted in Monetary Economics, Wadsworth, 1968; and Banking Competition and the Banking Structure.

"Bank Eamings and the Competition for Savings," Journal of Political Economy, February 1962.

Papers Published in Books:

"The Role of Forbearance and Its Costs in Handling Troubled and Failed Depository Institutions," in Reforming Financial Institutions and Markets in the United States. Kluwer Academic Publishers. 1994 (with Robert Eisenbeis).

"Prepaid Tuition Plans: An Exercise in Finance, Psychology and Politics," in Prepaid College Tuition Plans, The College Board, 1993.

"Banks and Banking Services," "Payment Services," "Savings," "Federal Deposit Insurance Corporation," for Encyclopedia Americana, 1992 edition.

"The Causes of Texas Bank and Thrift Failures," in If Texas Were Chile, by the Sequoia Institute, 1992.

"The Incentive Conflict Hypothesis: Opening Comment," in Reforming the American Banking System, Wharton Financial Institutions Center, 1991.

"The Collapse of the Texas S&L Industry," Restructuring the American Financial System: Recommendations from the Shadow Financial Regulatory Committee, Kluwer, 1990.

"Resolving the S&L Failures: The Southwest Plan," in Research in Financial Services, a Research Annual, JAI Press, 1990.

"Commentary on Banking Regulation," in Restructuring Banking and Financial Services in America, American Enterprise Institute, 1988.

"The Broad Segments of the Financial Markets," in The Banker's Handbook, 3rd ed., Dow Jones-Irwin, 1987.

"Is Subordinated Debt the Answer to Bank Capital Woes," in Bank Performance Annual, Warren Gorham & Lamont, 1986.

"Technological Innovation: Implications for Regulation of Financial Institutions," in Technological Innovation and the Monetary Economy, Columbia University Press, 1986.

"Financing Small Business," in Problems in the Financing of Small Business, JAI Press Inc., 1984.

"The Payments System and Public Policy," in Financial Services, Prentice-Hall for the American Assembly, 1983.

"Commercial Banks and Financial Markets," chapter in Handbook of Financial Markets: Securities, Options, Futures, F.J. Fabozzi and F.G. Zarb, eds., Homewood, Ill.: Dow-Jones-Irwin, 1981.

"Strategies for Deregulation," in The Deregulation of Depository Institutions, Proceedings of a Berkeley Business School Colloquium, David Pyle, ed., 1981.

"The Impact of Regulation of Financial Institutions on Competition and the Allocation of Resources," published in Government Regulation: Achieving Social and Economic Balance, Vol. 5, Joint Economic Committee, 1980.

"Commentary on Regulating the Solvency of Depository Institutions," published in Issues in Financial Regulation, McGraw-Hill, 1979.

"Bank Risks in the New International Financial Structure--Lessons from Bank Failures," published in The Emerging International Monetary Order, University Publishing Projects, Tel Aviv, 1976.

"The Role of Mergers in Fostering a Viable Banking System," published in Monetary Issues of the 1960s, University of Texas Press, 1968.

"Branch Banking, Mergers, and Competition," published in Banking and Monetary Studies, Richard D. Irwin, 1963.

"Economies of Scale in Banking," prepared for the Commission on Money and Credit. Published in Private Financial Institutions, Prentice-Hall, 1963.

Articles in Business Publications

"A New Bank-Thrift Charter: How to Design One," Journal of Retail Banking Services, Spring 1997.

"Financial Disclosure: Is More Always Better?" Journal of Retail Banking Services, Winter 1996.

Electronic Home Banking: Are We There Yet?," Texas Business Review, December 1996.

"ATM Surcharges: Their Effect on Competition and Efficiency," Journal of Retail Banking Services, Autumn 1996.

"What is the Future of Banking?" Harvard Business Review, July-August, 1991.

"Fraud by Thrift Insiders," American Banker, November, 1990.

"RTC Strategy: Problems with the Plan and the Process," Savings Account, March 1990.

"Should Foreign Deposits Be Subject to Insurance Assessments?," ABA Bankers Weekly, April 18, 1989.

"Capital Is the Best Deposit Insurance Protector," Outlook, July/August 1987.

"The Outlook for Financial Institutions," Midwestern Business and Economic Review, No. 5, Bureau of Business and Government Research, Midwestern State University, Fall 1986.

"How Risky Are Real Estate Ventures?" (with Clifford Fry and John Crockett), Outlook, September/October 1985.

"Lessons from the REIT Experience," The Bankers Magazine (with John H. Crockett and Clifford L. Fry), July-August 1984.

"Alternative Avenues to Interstate Banking," Economic Review, Federal Reserve Bank of Atlanta, May 1983. Reprinted in Bankers Desk Reference, 1983; and in Fraser and Rose, Financial Institutions and Markets in a Changing World, Business Publications, Inc., 2nd ed., 1984.

"Can Commercial Banks Meet the Competition?" National Association of Bank Women Journal, January 1983.

"Consolidation of the Regulatory Agency Structure," Economic Review, Federal Reserve Bank of Atlanta, December 1982.

"The Implications of the Deregulation Act for the Competitive Position of Depository Institutions," (with R. Zock), Issues in Bank Regulation, Autumn 1982.

"Geographic Restrictions on Financial Institutions," Economic Review, Federal Reserve Bank of Atlanta, September 1981.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 49 of 105



"The Hunt Commission and Financial Reform in the 1970s," Review of Regional Economics and Business, Spring 1981.

"Viewing the Effectiveness of FDIC Cease-and-Desist Orders," Issues in Bank Regulation, Summer 1979.

"1979: A Critical Turning Point in Banking," Texas Business Executive, Spring 1979.

"Reporting to the Board of Directors," Board Reports for the Bank Director, Director Publication, Inc., 1978.

"Financial Reporting and Disclosure," Texas Business Review, April 1978.

"More Banking Laws Unneeded," Washington Post, November 6, 1977.

"Recent Changes in Bank Accounting and Reporting," Executive, Winter 1977.

"The FDIC as a Data Bank," (with Mary Mitchell) Bankers Monthly, November 1969.

"Commercial Bank Adjustments to Changes in Deposit Structure and Volume," Business Perspectives, Fall 1968.

"Area Redevelopment: Employment, Economics, Politics and New England," Boston University Business Review, Fall 1960.

"A Close Look at Bank Earnings," New England Economic Review, August 1959.

"The Investment Policies of Labor Unions," Boston University Business Review, Fall 1956.

Papers Published in Conference Proceedings

"Comment on Deposit Insurance: Do We Really Need It?," Preventing Banking Sector Crises in Latin America, The World Bank, 1996.

"The Implications of EC 1992 for U.S. Financial Markets and Institutions," (with R. Pettit). American Enterprise Institute Conference, 1992.

"Implications of the Texas Experience for Financial Regulation," Proceedings of a Conference on Banking Structure and Competition, Federal Reserve Bank of Chicago, 1989.

"The Management Consignment Program," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1987.

"The Case for High Capital Requirements," Thrift Financial Performance and Capital Adequacy, Federal Home Loan Bank of San Francisco, 1987.

"Banking Deregulation and Consumer Interests," The Changing Shape of Retail Banking, Comptroller of the Currency, 1985.

"Deposit Insurance After Deregulation," Proceedings of the Ninth Annual Conference, Federal Home Loan Bank of San Francisco, 1984.

"Deregulation and the Payments System," Payments in the Financial Services Industry of the 1980s, Federal Reserve Bank of Atlanta, 1984.

"Comments on Deposit Insurance," Proceedings of Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1983.

"Short-Run Financial Solutions for Troubled Thrift Institutions," (with R.R. Pettit), The Future of the Thrift Industry, Federal Reserve Bank of Boston Conference Series No. 24.

"Deregulation and Financial Products and Services," Deregulation of Product Lines. Proceedings of a Colloquium, Board of Governors of the Federal Reserve System, July 1982.

"Geographical Restrictions on Financial Institutions," The Future of the Financial Services Industry, Conference Proceedings, Federal Bank of Atlanta, 1981.

"Nonlocal Competition in Banking," Proceedings of a Conference on the Future of the Financial Industry, American Bankers Association, 1981.

"The Pricing of Federal Reserve Services," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1979.

"The Membership Problem of the Federal Reserve and Its Relationship to the Provision and Pricing of Payments Services," Proceedings of a Conference on Reserve Requirements and the Role of the Federal Reserve System, Federal Reserve Bank of Chicago, 1978.

"Commentary on Regulation of Bank Holding Companies," Proceedings of a Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1978.

"Commentary on the Impact of Public Disclosure of Bank Supervision and Regulation," Federal Reserve Policies and Public Disclosure, American Enterprise Institute, 1978.

"Interest Rate Regulations: Past History and Future Prospects," Proceedings of University of Houston Banking Symposium, 1977.

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 51 of 105



"Consumer Protection: Burdens and Benefits," published in Proceedings of University of Houston Banking Symposium, 1977.

"Indirect Control of Inflation," published in Inflation: 1970 Style, Southern Newspaper Publishers Association, 1970.

## PROFESSIONAL MEETINGS

Presented papers or served as discussant or session chairman at meetings of:

American Economic Association
Eastern Finance Association
Midwestern Economic Association
Western Economic Association
Western Finance Association
American Finance Association
American Statistical Association
Southern Finance Association
Financial Management Association
National Economists Club
Southwest Finance Association

## OTHER PROFESSIONAL ACTIVITIES

### Editorial

Editorial Board, Research in Financial Services, 1992-1995
Co-editor, Journal of Financial Services Research, 1987-2000
Member, Editorial Advisory Board, Journal of Bank Research, 1982-1986
Associate Editor, Journal of Financial Research, 1981-1986
Member, Editorial Board, The Financial Review, 1972-1974
Associate Editor, Financial Management, 1972-1974
Associate Editor, National Banking Review, 1963-1966

### Advisory Committees

Shadow Financial Regulatory Committee, 1986-
Federal Savings and Loan Advisory Committee, 1986-1987
Economic Advisory Council, Texas Economic Development Commission 1985-1986
Florida House of Representatives Interstate Banking Study Group, 1983
Presidential Advisory Task Force on Small Business, 1980
Advisory Committee, FDIC Study of State-Federal Regulation of Banking, 1977
Selection Panel for Research Support in Finance, National Science Foundation, 1975-1980
National Commission on Consumer Finance, 1970-1972

Other Teaching

Faculty, Stonier Graduate School of Banking, 1970-1977
Visiting Professor of Finance, George Washington University, 1974-1977
Instructor, Assembly for Bank Directors, 1974
Faculty, Pacific Coast Banking School, 1972
Lecturer, Georgetown University, 1969-1972

Testimony

Testified at Hearings
Conducted by: U.S. House Banking Committee
U.S. House Small Business Committee
U.S. House Committee on Government Operations
U.S. Senate Banking Committee
Texas Senate Economic Development Committee
U.S. Office of Thrift Supervision

Consulting

Consultant to: U.S. Treasury Department
Small Business Administration
Federal Deposit Insurance Corporation
Federal Home Loan Bank Board
U.S. League of Savings Institutions
American Bankers Association
Association of Reserve City Bankers
Commission on Money and Credit
Commercial banks, thrift institutions, law firms

Case 1:95-cv-00829-TCW Document 233-2 Filed 03/30/2007 Page 53 of 105



Board of Directors

Bank United of Texas (1989-2001)
Federal Home Loan Bank of Dallas (1983-1989)
PULSE EFT Association, Inc. (1990-1996)
Director of Three Savings and Loans in FSLIC Management Consignment Program, 1986-1988.

Other Professional Activities

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-1983
Columnist, The American Banker, 1981-1990.

APP. 49



# Sterling Savings Association
# Actual Return on Average Assets
# 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 2a




Note:
Return on Average Assets is calculated as pre-tax, pre-amortization income divided by average total assets.
* ROAA for the six-month periods ended 12/31/89, 6/30/89, 12/31/96, and the nine-month period ended 9/30/06 is annualized for comparison purposes.
† In the six months ended 12/31/96, the OTS assessed a one-time fee on thrifts to replenish the SAIF insurance fund.

**EXHIBIT B**

APP. 50

# Sterling Savings Association
# Actual Total Assets and Foregone Assets
# 1989 – 2006

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Table 1




**EXHIBIT C**

APP. 51

# Sterling Savings Association
# Comparison of Actual Core Capital With But-for Core Capital
# 12/31/1989

Source: Expert Report of Paul Horvitz, 12/11/06, Exhibit 6 - Tables 2a, 3a, 3c, 4a, 4b, 4c, and 5




EXHIBIT D

Note: [1] Other but-for adjustments include incremental dividends on the unit offering, incremental but-for income (losses), and the cost of acquiring branches from Great American.
[2] Due to limitations in TFR reporting in December 31, 1989, this is calculated as 1.5% of Sterling's actual tangible assets.

# Exhibit E

FILED
AUG 11 1997
U.S. COURT OF
FEDERAL CLAIMS

# In the United States Court of Federal Claims

(Filed: August 11, 1997)

PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 90-8 C, et al.

## PROCEDURAL ORDER NO. 2: DISCOVERY PLAN

Pursuant to Rules 1, 16, 77 and 77.1 of the Rules of the United States Court of Federal Claims, and to the Omnibus Case Management Order entered by the Court on September 18, 1996, ("Case Management Order" or "CMO"), the Court ORDERS as follows:

I. SCOPE OF THIS ORDER AND GENERAL PROVISIONS

A. This Discovery Plan governs discovery in all *Winstar*-related cases before the court except for (a) the *Glendale* and *Statesman* cases, and (b) the Priority Cases identified in Appendix D to the CMO. In the event that a case is removed from the list of Priority Cases it shall thereafter be subject to the terms of this Order.

B. The Discovery Plan is subject to the CMO, Procedural Order Number One ("Procedural Order No. 1"), the Master Order Concerning De Bene Esse Depositions, the Master Protective Order ("MPO"), and other procedural orders of the Managing Judge. The Rules of the Court of Federal

Claims ("RCFC") govern discovery, except where in conflict with the CMO, Procedural Order No. 1, the MPO, or this Discovery Plan.

C. No provision of the Discovery Plan shall be construed to permit any party any discovery not otherwise permitted by the CMO, Procedural Order No. 1, the MPO, other Orders of this Court, or the RCFC.

D. Except insofar as this plan expressly states that the parties may agree to modification of time limits, the parties may not stipulate to an extension or increase of any Discovery Plan deadline or limitation without approval of the Court.

II. DISCOVERY CONVENTIONS

The following conventions apply to all discovery, including the common discovery procedures set forth in Section III. Production of "Common Documents" shall be governed by the provisions of Paragraph II.B.2. of Procedural Order No. 1.

A. <u>Conventions for Production of Documents</u>

1. Document production shall take place in Washington, D.C. or where the documents are maintained in the ordinary course of business, at the option of the producing party. The parties shall confer prior to a document production to establish dates and procedures for selection, review, and duplication of documents. Where the documents subject to a production are indexed, the producing party may require the requesting party to select groups or boxes of documents for production and review using the most current available indices prior to the commencement of the production.

2. Document production pursuant to a document request shall commence within 30 days of receipt of such document request and be completed within 60 days of receipt of such

document request, absent agreement of the parties to extend the deadline for such production, with such agreement to extend not to be unreasonably withheld.

3. Within thirty days of the deadline for production of documents, the producing party shall provide the requesting party with a privilege log specifically identifying any documents that the producing party did not produce pursuant to an assertion of privilege, and the nature of the privilege claimed. Identification of privileged documents that were produced in accordance with the CMO, shall continue to be subject to the provisions of the MPO. A party need not produce or identify in the privilege log (a) any document prepared pursuant to the attorney-client or work-product privileges prepared in connection with the present litigation, excluding expert reports, which shall be produced in accordance with the provisions of Section V, or (b) any document prepared pursuant to the attorney-client or work-product privileges developed or generated in the context of an enforcement proceeding or investigation, including criminal investigations.

B. Conventions for Depositions

1. Absent agreement between the parties participating in a deposition and the deponent, a deposition shall take place within 75 miles of the deponent's residence or place of employment and ordinarily shall be conducted between 9:00 am. and 5:30 p.m. on successive weekdays, excluding holidays. Depositions may be attended only by a court reporter and persons authorized under the MPO to have access to confidential information absent agreement between the parties.

2. The deponent may be questioned by no more than one attorney for the defendant and one attorney for each plaintiff at a time. An objection by one counsel for a plaintiff shall be deemed an objection by all plaintiffs' counsel who are present at a deposition.

3. Where a deposition is recorded by videotape, the appearance or demeanor of attorneys and the deponent shall not be distorted through camera or sound-recording techniques. To the extent practicable, a videotaped deposition will be conducted in a neutral setting against a solid background, with only such lighting as is required for accurate video recording. Camera angle, lens setting, and field of view will be changed only as necessary to record the natural body movements of the deponent or to portray exhibits and materials used during the deposition. No part of a videotaped deposition shall be released or made available to any member of the press or general public unless authorized by the Court.

4. Where a party intends to examine a non-party witness pursuant to a subpoena duces tecum, the parties shall use their best efforts to arrange for inspection and/or copying of the documents at least one week before the scheduled deposition.

5. The deponent shall execute the original deposition transcript within 30 days after receiving it from the court reporter. The court reporter shall distribute an errata sheet to counsel for the noticing party and to all counsel who requested copies of the deposition transcript. If a deponent fails to execute the deposition transcript within thirty days of receipt, the parties may use the deposition transcript as if it had been executed. The parties may use a certified copy of a deposition transcript in lieu of the original for all purposes.

C. Other Conventions

When serving a discovery request or response, a party shall also provide a copy of the request or response, excluding any produced documents, in an electronic form suitable to the parties.

III. COMMON DISCOVERY

A. General Provisions

1. Common discovery from the Government is limited to the discovery of information and production of documents that are not solely specific to any case or institution. Defendant has no obligation to respond to common discovery requests which seek only case-specific information, and Defendant shall not withhold documents or information directly relevant to common discovery merely because such documents or information also reference specific institutions or specific transactions.

2. Case-specific discovery in individual *Winstar* cases may not duplicate discovery already provided by defendant to Plaintiffs Coordinating Committee ("Plaintiffs Committee") in connection with common discovery under Procedural Order No. 1 and this Discovery Plan.

3. The Plaintiffs Committee is responsible for preparing common discovery interrogatories and a list of individuals or organizations for common discovery depositions as provided in this Discovery Plan. The Plaintiffs Committee is responsible for serving defendant with common discovery requests and ensuring that all common discovery material produced by defendant is available to all *Winstar* plaintiffs.

4. Any disputes concerning discovery referenced in Section III.A., including disputes over whether a request calls for only case-specific information, shall be raised, in the first instance, with the Coordinating Committees and the FDIC. The Coordinating Committees and the FDIC will attempt to resolve any disputes. If they are unable to reach agreement, either Coordinating Committee or the FDIC may file a motion with the Discovery Judge.

B. Common Discovery Interrogatories and Requests for Admissions

The Plaintiffs Committee shall prepare common discovery interrogatories. The Plaintiffs Committee shall serve the common discovery interrogatories on or after September 8, 1997, and

defendant shall serve its responses on the Plaintiffs Committee and the FDIC within 45 days thereafter.

C. Common Discovery Depositions

1. The Plaintiffs Committee shall submit a list to identify individuals or organizations that it will depose for purposes of common discovery. The list may not include damages expert witnesses for the defendant except for, and only to the extent they are, fact witnesses. The Plaintiffs Committee shall serve defendant with its initial list of these individuals and organizations on or after September 8, 1997. For depositions of organizations pursuant to RCFC 30(b)(6), the Plaintiffs Committee also shall inform defendant of the topics on which examination is required.

2. Defendant shall submit a list to identify individuals that it will depose for purposes of common discovery. The list may not include damage witnesses for a plaintiff except for, and only to the extent they are, fact witnesses. Defendant shall serve the Plaintiffs Committee with its initial list of these individuals on or after September 8, 1997.

3. The Coordinating Committees shall attempt to agree on a schedule for all common discovery depositions, including an estimated length of time for each deposition. If the Coordinating Committees are unable to agree, notice of a common discovery deposition and an estimated length of time for that deposition must be served on the opposing party at least 14 days prior to the date of the deposition.

4. At least 7 days prior to the commencement of a common discovery deposition, the Plaintiffs Committee shall identify no more than three attorneys who shall conduct the initial questioning on behalf of all plaintiffs. Additional plaintiffs' counsel, including the FDIC, may question a deponent only after completion of the examination by counsel designated by the Plaintiffs

Committee and may not repeat any questions posed previously in that deposition except to the limited extent required to establish a predicate or framework for examination on a new topic or for more detailed examination of topics previously covered.

IV. CASE-SPECIFIC DISCOVERY IN INDIVIDUAL WINSTAR CASES

A. Initial Disclosures

1. Within 30 days after the commencement of Phase II case-specific discovery in a case, a party shall, without awaiting a discovery request, provide to the other parties, to the extent known, the name and title of any current or former employee, agent, or representative of a party likely to have discoverable information relevant to the allegations in the Complaint, and any Cross-Claim or Counterclaim, identifying the subject of the information.

2. The plaintiffs, including the FDIC, participating in each wave of discovery shall form a Plaintiffs Discovery Committee to attempt, to the extent practicable, to coordinate discovery from third parties and depositions of fact witnesses.

B. Requests For Production of Documents

1. Parties may submit case-specific requests for production of documents at any time after commencement of Phase II case-specific discovery in a case. Such document production requests shall be governed by the provisions of this Order, Procedural Order No. 1 and the MPO.

C. Interrogatories, Requests for Admissions and Depositions

1. In addition to the common discovery and case-specific document discovery discussed above, a party in an individual case may submit case-specific interrogatories and requests for admissions, and take case-specific depositions. Such interrogatories and requests for admission

may not be submitted, and such depositions may not be taken, until 90 days after commencement of Phase II case-specific discovery in a case.

2. A party shall respond to interrogatories and requests for admissions within 45 days of service.

3. Where a plaintiff seeks to depose an individual or organization already deposed during common discovery, the deposition will be focused on case-specific topics. The parties shall attempt to agree on a schedule for all case-specific depositions, including an estimated length of time for each deposition. If the parties are unable to agree, notice of a deposition and an estimated length of time for that deposition must be served on a party at least 14 days prior to the date of the deposition.

4. Disputes over scheduling the deposition of a witness for case-specific discovery shall be resolved by the Discovery Judge.

V. EXPERT WITNESSES

A. Discovery of Plaintiffs' Expert Witnesses

1. Thirty days after Phase II case-specific discovery is completed in a case under the provisions of Procedural Order No. 1, each plaintiff shall provide defendant with the identity of each witness that plaintiff intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, each plaintiff shall deliver to defendant a final written report prepared and signed by each witness identified pursuant to Paragraph V.A.1. within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, defendant shall depose each of plaintiff's expert witnesses within 90 days after receiving the expert's final written report. Each plaintiff shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of that plaintiff.

B. Discovery of Defendant's Expert Witnesses

1. Thirty days after defendant receives a plaintiffs' expert reports pursuant to Paragraph V.A.2. defendant shall provide such plaintiff with the identity of each witness whom defendant intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, defendant shall deliver to each plaintiff a final written report prepared and signed by each witness identified pursuant to Paragraph V.B.1. within

90 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, a plaintiff shall depose defendant's expert witnesses within 60 days after receiving the experts' final report. The defendant shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If defendant fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of defendant.

VI. DISCOVERY DISPUTES

A. All discovery motions shall hereafter be filed with and resolved by the Discovery Judge, unless otherwise directed by the Managing Judge, Issue Judge or the Motion Judge.

B. In the event that a discovery dispute (a) appears to raise generic issues that may be relevant to a significant number of *Winstar*-related cases, or (b) raises concerns regarding a risk of substantial and burdensome duplication of discovery among different cases, the parties shall bring (or the Discovery Judge may refer) the dispute to the attention of the Coordinating Committees and the FDIC to consider whether the dispute should be subject to "common issue" treatment.

LOREN A. SMITH
CHIEF JUDGE

CERTIFICATE OF FILING

I hereby certify that on April 16, 2007, a copy of foregoing "DEFENDANT'S MOTION TO STRIKE THE DECLARATION OF DR. PAUL M. HORVITZ AND FOR EXPEDITED BRIEFING AND CONSIDERATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford