IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

# PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

April 25, 2007

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. FACTS TO BE PROVEN AT TRIAL ........ 2

A. STERLING WAS A PROSPEROUS THRIFT WITH A STRONG BUSINESS STRATEGY AND MANAGEMENT TEAM ........ 2

1. Sterling Had A Substantial Market Available For Growth And Was Not Hampered By Older Loans With Unfavorable Interest Rates ........ 2

2. Sterling's Strong Management Team Has Remained In Place From the 1980s To The Present Day. ........ 2

B. AT THE GOVERNMENT'S REQUEST, STERLING ACQUIRED THREE FAILING THRIFTS ........ 3

1. The Lewis Federal Acquisition ........ 4

2. The Tri-Cities and Central Evergreen Acquisitions ........ 5

C. STERLING ABSORBED THE THREE THRIFTS AND PLANNED AN OFFERING TO ACHIEVE A COMFORTABLE MARGIN OF CAPITAL AND PROVIDE FOR CONTINUED GROWTH ........ 8

D. THE GOVERNMENT APPLIED FIRREA TO STERLING IN BREACH OF ITS CONTRACTS AND INTENDED TO SHUT STERLING DOWN ........ 9

1. The Government Refused To Allow Sterling To Pay Dividends, Dooming Its Planned Offering Meant To Improve Sterling's Capital Ratios ........ 10

2. OTS Restricted Sterling's Operations and Forced Sterling To Shrink And Abandon Its Growth Strategy ........ 10

3. Sterling Lost Deposits And Customers Because Of The Government's Restrictions On Its Activities ........ 14

4. Sterling Was Unable To Take Advantage Of Potential Acquisition Opportunities ........ 15

5. OTS Threatened To Close Sterling ....................................................16

E. STERLING OBTAINED INJUNCTIVE RELIEF, BUT OTS CONTINUED TO IMPOSE COSTLY OPERATING RESTRICTIONS ON STERLING, EXACERBATING THE HARM TO STERLING ....................................................17

F. STERLING SUCCESSFULLY RAISED CAPITAL AND SURVIVED THE FINANCIAL CRISIS THAT DEVASTATED MOST *WINSTAR* PLAINTIFFS. ................20

III. CONTENTIONS OF LAW ....................................................22

A. THE LAW OF THE CASE FROM THE COURT'S PRIOR RULINGS ..........................22

B. THE COURT SHOULD AWARD STERLING $63.631 MILLION, REPRESENTING ITS LOST PROFITS AND WOUNDED BANK DAMAGES ................22

1. The Thrift Industry Crisis In The 1980s Did Not Affect Sterling As It Did Other Thrifts ....................................................23

2. A Lost Profits Measure Is An Appropriate Method To Calculate The Amount of Damages Caused By Breach Of A Contract To Recognize Goodwill ....................................................24

3. The Harm To Sterling Was Caused By The Breach ............................25

a. *Standard to Establish Causation of Lost Profits* ......................25

b. *Sterling's Lost Profits Were Caused By the Breach* .................25

i. Historically, Sterling Had Achieved Growth................25

ii. Sterling's Strong Management Team Implemented A Successful Business Strategy To Grow Sterling.......25

iii. The Government's Breach Forced Sterling To Reduce Its Operations and Forego Profitable Business Expansion Of Its Subsidiary Companies .......26

iv. Sterling Lost Investment Opportunities Because Of Capital Deficiencies ................................................27

v. Sterling's Wounded Bank Damages Were Caused By The Breach ................................................27

aa. Sterling's Loss Related To The Acquisition Of The Great American Savings Bank Branches Was Caused By The Breach.............28

bb. Sterling Incurred Supervision Costs Because Of The Breach ..................................28

cc. Sterling Suffered Losses on the CJ-4 Loan.......28

dd. The Government Refused To Permit The 1999 Offering and Damaged Sterling...............29

4. The Damages Incurred By Sterling Caused By The Government's Breach Were Foreseeable ..........................................................29

a. *Standard To Establish Foreseeability*.....................................30

b. *Sterling's Lost Profits Were Foreseeable*................................30

c. *The Wounded Bank Damages Were Foreseeable*.....................31

5. The Measure Of Sterling's Damages Is Reasonably Certain................31

a. *Standard To Establish Reasonable Certainty*..........................31

b. *Sterling's Lost Profits Calculation Is Reasonably Certain*.......32

c. *Sterling's Wounded Bank Damages Calculations Are Based On Documentary Evidence Of Costs Incurred Because Of The Breach*.........................................................34

C. THE GOVERNMENT'S CLAIM THAT STERLING ONLY INCURRED TRANSACTION COSTS AS A RESULT OF ITS BREACH SHOULD BE REJECTED ....34

1. Sterling Suffered Damages Before And During The Period In Which The Temporary Injunction Was In Place .................................35

2. The Success Of The 1991 Offering Did Not Erase The Damage Done To Sterling Caused By The Government's Breach.....................38

3. The Court Should Not Accept The Government's New Argument That It Would Have Applied Different, Subsequently-Enacted Regulations To Limit The Value Of The Capital Granted to Sterling..39

IV. CONCLUSION........................................................................................................40

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Advanced Medical, Inc. v. Arden Medical Systems, Inc.*, 955 F.2d 188 (3d Cir. 1992)....39

*American Federal Bank, FSB v. United States*, 68 Fed. Cl. 346 (2005) ..........................24

*Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed.Cl. 126 (2003) .................................30

*California Federal Bank v. United States,*, 395 F.3d 1263 (Fed. Cir. 2005) ........... passim

*California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed. Cir. 2001)..........24

*California Federal v. United States*, 43 Fed.Cl. 445 (1999) ..........................................27

*Citizens Fed. Bank v. United States,* 474 F.3d 1314 (Fed. Cir. 2007) .............................24

*Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000)................................27

*Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) ...................24

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)..........................24

*First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, ___ Fed. Cl. ___, 2007 WL 1160294 (April 13, 2007) ........................................... passim

*Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108 (2003) ..................................27

*Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308 (Fed. Cir. 2004) ................31

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003).........24, 31

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64 (1999) .............................31

*Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80 (2004) .........................27

*R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir. 1991)...................38

*Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619 (3d Cir. 1990)..........................38

*Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218 (3d Cir. 1998) ....39

*Sterling Savings Association v. Ryan*, 959 F.2d 241 (9th Cir. 1992)................................19

*Sterling Savings Association v. United States*, 53 Fed.Cl. 599 (2002) ............................22

*Sterling Savings Association v. United States*, 72 Fed.Cl. 404 (2006).............................22

*Sterling Savings Association v. United States,* 751 F.Supp. 871 (E.D. Wa. 1990)...........19

*United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432 (1996).................................22, 40

**OTHER AUTHORITIES**

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002)...........................24

Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund*, Thrift Bulletin No. 38-2, 1990 WL 309397 (Jan. 9, 1990) ..........................................................................................................9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I. INTRODUCTION

This is a *Winstar* case filed in May 1990 by Sterling Savings Association ("Sterling"), seeking damages for the Government's breach of two contracts related to acquisitions of three thrifts by Sterling. Sterling was founded in 1983. It has grown from four branches in Washington to an institution with assets of $12.5 billion and over 200 branches in five states. It has been profitable for every quarter of its existence. It seeks an award of additional profits it would have earned had the Government not breached two contracts to permit Sterling to count as capital cash assistance paid to Sterling in connection with Sterling's takeover of two failed banks (at the Government's request). Today, Sterling has approximately $12.5 billion in assets.

The Court has ruled that the Government, as a matter of law, is liable for the breach of the two contracts with Sterling via the application of certain capital standards to Sterling after the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").

The trial in this matter is to determine the amount of damages the Government must pay

Sterling in compensation for its breach of the Lewis and Tri-Cities contracts. Sterling respectfully submits this Memorandum of Contentions of Fact and Law in support of its request for an award of $63.631 million.

## II. FACTS TO BE PROVEN AT TRIAL

### A. Sterling Was A Prosperous Thrift With A Strong Business Strategy And Management Team.

#### 1. Sterling Had A Substantial Market Available For Growth And Was Not Hampered By Older Loans With Unfavorable Interest Rates.

1. Sterling began operations in 1983 as a State of Washington-chartered federally insured stock savings and loan association headquartered in Spokane, Washington.

2. In contrast to the vast majority of thrifts, Sterling was a profitable and sound financial institution all during the troubled period of the 1980s. Sterling's market area, the Pacific Northwest, enjoyed more favorable growth than most regions, and completely avoided the 1990-1991 recession. Sterling also had a relatively small market share in the markets that it entered, so it had a substantial market available to it for growth.

3. Another reason why Sterling was successful despite the national economic downturn in the late 1980s was that Sterling did not have a portfolio of low-mortgage loans made in the 1960s or 1970s. Because Sterling opened in 1983, after peak interest rates, Sterling instead held all loans at current market rates, exceeding the rates it paid on deposits.

4. Sterling was profitable by the end of its first year of business, and its deposits, assets and profits increased each year without interruption through fiscal year 1989.

#### 2. Sterling's Strong Management Team Has Remained In Place From the 1980s To The Present Day.

5. Sterling has been run by the same management team from its founding through the present day. Those managers were not new to the banking industry when Sterling opened its

doors unlike many other thrift operations, they came from established careers and were trained commercial bankers who understood, and are capable of managing, credit work, interest rate risk and leverage risk to a degree exceeding the capabilities of many thrifts managers. Sterling has always had a specific and focused business plan for controlled growth. The proven and successful track record of Sterling's management caused the Government repeatedly to encourage Sterling to acquire other, less-well-managed thrifts, beginning before Sterling's founders had even opened for business, when the regulatory authorities urged Sterling to merge with Lewis and Clark Savings & Loan.

6. Sterling's success during the 1980s is attributable to its strong management. Sterling's management team developed and adopted a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. This plan was implemented with considerable skill and achieved success.

7. Sterling's goal was to achieve steady and consistent growth. Sterling pursued a strategy of 50% growth through acquisitions and 50% internal growth through branch creations.

8. Sterling has had the same management team in place throughout its entire history, and this same management and business strategy would have been in place absent the Government's breach.

## B. AT THE GOVERNMENT'S REQUEST, STERLING ACQUIRED THREE FAILING THRIFTS.

9. By the late 1980s, the number of insolvent thrifts threatened to swamp the resources of the FSLIC.

10. The FSLIC found that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets).

11. The Government recognized that Sterling had the ability to achieve its business plan despite the economic trouble affecting many other thrifts. In 1985 and 1988, the Government solicited Sterling to acquire two thrifts that had failed -- Lewis Federal in 1985 and Tri-Cities in 1988 – and one trust that was failing – Central Evergreen, in 1988.

12. Sterling would not have considered the acquisitions had Sterling not been asked to submit a bid and had the bid packages not contained specific financial inducements to acquire the insolvent thrifts, including, importantly, promises to increase Sterling's capital (as measured by regulators).

**1. The Lewis Federal Acquisition.**

13. Sterling acquired Lewis Federal Savings & Loan Association ("Lewis") in 1985. The regulators had put Lewis in receivership and estimated that it would cost $6 million to liquidate it. In exchange for Sterling's promise to take over Lewis's assets, liabilities and negative net worth, the Government agreed, *inter alia*, to pay Sterling cash assistance of $1.75 million and allow Sterling to count that cash assistance as regulatory capital:

> ...[A]ll cash contributions made under this § 3 shall be credited to the ACQUIRING ASSOCIATION's net worth account...

(P-19, § 3(a)(2).)

14. The Government confirmed this promise in the Federal Home Loan Bank Board's ("FHLBB's") resolution concerning the financial assistance associated with the acquisitions:

> RESOLVED FURTHER, That the FSLIC hereby approves...Sterling's inclusion of the FSLIC's $1,750,000 cash contribution to Sterling, pursuant to the terms of the Assistance Agreement, as net worth;...

(P-11, SG1005532.)

15. The Government also agreed to forbear, for five years after the transaction, from exercising its regulatory authority against Sterling for any failure to meet regulatory capital

caused by the assumption of Lewis's negative net worth.

2. **The Tri-Cities and Central Evergreen Acquisitions.**

16. The regulators requested that Sterling acquire the failed Tri-Cities Savings & Loan Association ("Tri-Cities"). Tri-Cities was in receivership and the regulators estimated the cost of liquidation to be $20.7 million. When Sterling bid on Tri-Cities, however, it originally was not the low bidder. The Government intended to select Old Stone Corporation for the acquisition. (P-373, § II(A).)

17. Meanwhile, the regulators contacted Sterling twice and requested that it acquire Central Evergreen. Central Evergreen was poorly managed, had severe problems with bad commercial loans, and was on the brink of failure. Sterling twice refused because Sterling did not have enough capital to support Central Evergreen's assets and because Central Evergreen's negative net worth was too large and would adversely impact Sterling's capital position. The Government, however, remained enthusiastic about Sterling as a potential acquirer of Central Evergreen. (P-372; P-376.)

18. The Government contacted Sterling and made the request that it acquire Central Evergreen. This time, Hilton Hewitt, at that time Sterling's principal regulator, assured Sterling that it would have ample capital if it were the successful bidder for the Tri-Cities deal because the cash assistance from that deal would count as "permanent" capital. Based on this assurance, Sterling agreed to consider the Central Evergreen transaction.

19. Shortly thereafter, Sterling learned that Old Stone Corporation had withdrawn its bid and it was then considered the low bidder for Tri-Cities and the likely acquirer. (See P-374.) Sterling then agreed to apply to merge with Central Evergreen, subject to it acquiring Tri-Cities. (P-375; P-389.)

20. Sterling relied upon Hewitt's assurances and representations that the capital

forbearances and capital obtained in the Tri-Cities acquisition would be binding. Without this commitment, Sterling would not have considered the acquisition of Central Evergreen or Tri-Cities.

21. The Government knew at the time it was negotiating the Central Evergreen transaction both that Sterling needed the Lewis Federal and Tri-Cities cash assistance to be credited to its net worth in compliance with its agreement with the Government to make the Central Evergreen transaction possible for Sterling and that Sterling did not agree that the Government's promise to allow Sterling to credit its net worth with the cash assistance could be reversed. (P-391.) The Tri-Cities acquisition closed in April 1988. There was a delay in the Central Evergreen merger as Sterling's now principal regulator, Ed Hedlund, sought to confirm with Washington, D.C. that there was nothing wrong with using the regulatory capital from Lewis Federal and Tri Cities to leverage into the Central Evergreen merger.

22. The delay continued into December 1988. When it appeared that closing might not be possible before December 31, 1988 (which would cause Sterling to lose certain tax advantages (Net Operating Loss carryovers)) which the regulators had promised as an additional financial inducement, Sterling threatened to withdraw from the Central Evergreen merger. (P-401.) Hedlund vigorously told his supervisors that if Sterling didn't merge, the Government would lose $12 million. The Government proceeded; it was anxious to complete the unassisted Central Evergreen transaction.

23. Sterling's acquisition of Central Evergreen would not have occurred but for its acquisition of Tri-Cities, and vice versa. Sterling's agreement to acquire Central Evergreen was subject to Sterling acquiring Tri-Cities. (P-375; P-389.)

24. For the Tri-Cities transaction, the Government promised to pay Sterling cash

assistance of $11.7 million and to credit that amount to Sterling's net worth:

> ...[A]ll cash contributions made under § 3(a)(1) shall be credited to the ACQUIRING ASSOCIATION's regulatory capital account and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987)...

(P-38, § 3(a)(2).)

25. The Government further promised to forbear, for five years after the transaction, from exercising its regulatory authority against Sterling for failing to meet any regulatory ratio caused by the assumption of Tri-Cities' negative net worth.

26. Sterling acquired Tri-Cities on April 8, 1988.

27. Central Evergreen had a negative net worth of $12.4 million. The Government had estimated that it would take cash assistance of $8 to 12 million to induce a buyer to take on Central Evergreen, and there were few eligible buyers. Sterling was not paid financial assistance for its takeover of Central Evergreen, and recorded $8.4 in identified intangibles and $13.6 million in unidentified intangibles which it agreed to amortize on the GAAP level-yield basis over 8 and 12 years, respectively.

28. The Central Evergreen transaction closed on December 28, 1988.

29. These three acquisitions were consistent with Sterling's growth strategy of targeting deposit gathering in smaller communities. However, the capital promises by the Government in exchange for the three acquisitions were the key factor that justified Sterling's assumption of liabilities in excess of the total assets acquired plus cash assistance. Sterling would not have done the deals without the capital promises made by the Government. It could not have; to attempt it would have been madness..

30. The Government resolved a serious threat to its insurance fund when Sterling, a healthy thrift, stepped up and assumed the combined tangible negative net worth of three failing

thrifts, totaling about $30 million. The total amount of cash assistance ($14 million) was far less than the negative net worth assumed by Sterling, and the liquidation costs avoided by the Government were even greater.

### C. STERLING ABSORBED THE THREE THRIFTS AND PLANNED AN OFFERING TO ACHIEVE A COMFORTABLE MARGIN OF CAPITAL AND PROVIDE FOR CONTINUED GROWTH.

31. Sterling's growth and profitability were attained through sound and conservative operating policies. As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large, unassisted absorption of Central Evergreen in December 1988.

32. In 1989, prior to the breach, Sterling was well on its way to becoming a major player in the Northwest market in accord with its original and consistently-maintained business strategy.

33. However, Sterling's rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, left Sterling with little capital under GAAP, although it had regulatory capital sufficient to meet its regulatory requirements.

34. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue. The proposed equity offering was included in Sterling's 1989 Business Plan (then forecast at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement. Sterling had negotiated, as part of the Central Evergreen deal, a provision that it would raise additional capital, including the right to pay dividends on preferred stock, by December 31, 1990. (*See* P-397.)

35. Later, after the preferred stock offering was successfully prepared – in fact, it was

over-subscribed, needing only regulatory approval for payment of preferred dividends to close and fund -- the OTS refused, in January 1990, to permit payment of dividends on the preferred stock to be sold, causing the cancellation of the offering. (P-255.)

### D. THE GOVERNMENT APPLIED FIRREA TO STERLING IN BREACH OF ITS CONTRACTS AND INTENDED TO SHUT STERLING DOWN.

36. The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") was enacted on August 9, 1989.

37. After the enactment of FIRREA, the regulators (now OTS) formally instructed Sterling that, contrary to its contracts, it would not add cash assistance to its regulatory requirements, and began to treat Sterling as an undercapitalized, troubled thrift, in Thrift Bulletin 38-2:

> The Office of Thrift Supervision is applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances. Section 5(t) of HOLA as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) eliminates these forbearances. All savings associations presently operating with these forbearances, therefore, should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards. (Any FSLIC capital contribution that resulted in the creation of goodwill will be subject to the requirements for goodwill established to the capital regulation).

Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund*, Thrift Bulletin No. 38-2, 1990 WL 309397 (Jan. 9, 1990).

38. OTS forced Sterling to curtail its operations significantly. From June 1989 to June 1991, as demanded by OTS, Sterling shrunk its asset base, declining in size for the first time in its history. Sterling's total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17%.

39. The regulators' actions, described below, foreclosed Sterling from participating in the most profitable forms of lending (construction and commercial), and raised Sterling's costs in engaging in deposit gathering.

**1. <u>The Government Refused To Allow Sterling To Pay Dividends, Dooming Its Planned Offering Meant To Improve Sterling's Capital Ratios.</u>**

40. On November 9, 1989, the Government notified Sterling that it believed that Sterling would fail to meet the capital requirements imposed pursuant to FIRREA and required submission of a capital restoration plan. (P-247.) Sterling requested that OTS allow Sterling to pay dividends on certain stock to allow for the success of a new planned offering, now in the neighborhood of $15-18 million. (P-250; P-251.)

41. Sterling met with OTS to ask for permission to pay the dividends and insure the success of the offering. (P-253.) OTS indicated that it was still establishing its policies and procedures under the new regulations and that further deliberation was needed, but that, if any institution was worthy of an exemption, it was Sterling. (P-253.)

42. OTS denied Sterling's request and refused to allow the payment of dividends. (P-253; P-254.) Without the dividends, the offering could not succeed and did not occur.

**2. <u>OTS Restricted Sterling's Operations And Forced Sterling To Shrink And Abandon Its Growth Strategy.</u>**

43. OTS increased the limitations on Sterling's business, imposing costly operating restrictions that curtailed Sterling's profits:

- Sterling was not allowed to grow beyond its net interest credited. (P-247.)
- Sterling was not allowed to pay dividends on any stock issuance. (P-255.)
- Sterling was not allowed to accept any uninsured deposits. (P-256.)
- Sterling was required to obtain written approval from the OTS District Director for any new loan or investment activity. (P-258.)

- Sterling was not allowed to participate in commercial real estate lending. (P-258.)

- Sterling was forced entirely out of the lucrative construction and business lending business outside of pre-sold residential (1-4 units) construction lending. (P-266.)

- Sterling was forced to reduce total business banking loans to $23 million by June 30, 1990.

- Sterling could only grant loans to existing business customers. (P-266.)

- Sterling was forced to adhere to the $500,000 loans-to-one borrower restriction. (P-266.)

- Sterling was limited to activities contained within the February 28, 1990 Capital Plan to the extent contemplated in the Plan. (P-273.)

- Sterling could not purchase or sell any asset or group of assets in excess of $500,000. (P-273.)

- Most significantly, Sterling was utterly foreclosed from highly lucrative commercial lending and commercial construction lending (P-266; P-258.)

44. OTS required Sterling to abide by FIRREA's limitations on troubled thrifts' accepting, renewing or rolling over of funds obtained from deposit brokers. (P-249.)

45. OTS required Sterling to create a capital restoration plan and informed Sterling that "while the plan is under consideration, the association will not, without the prior approval of its District Director: grow beyond net interest credited; make any additional capital distributions; or act inconsistently with any other limitations on activities established by statute, regulation or by the Office in supervisory guidance for savings associations not meeting capital standards." (P-247.) It was clear to Sterling that OTS was treating it as an insolvent thrift at that point.

46. Sterling was forced to virtually discontinue all commercial real estate lending as it was considered an association "subject to greater restrictions" because of its noncompliance with the FIRREA capital requirements. (P-258.) The Government did, however, permit Sterling to ask for permission to engage in commercial real estate lending. (P-258.)

47. When Sterling made that request, however, OTS granted it only sparingly, reminding Sterling that growth was discouraged. (P-239; P-260.) OTS further cautioned that the approval may be rescinded if Sterling's capital position deteriorated or if the activity did not meet "safety and soundness" standards. (P-260.)

48. The practical consequence of OTS's approach was to all but destroy Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage. Residential construction lending was a high profit area. Prior to the breach, Sterling intended to expand Action Mortgage into Seattle, Portland, Vancouver (WA), Lake Oswego (OR), Boise and Salt Lake City. Action's business plan was to quadruple lending activity, to be achieved through opening these offices.

49. Sterling attempted to support an Action Mortgage office in Salt Lake City, but could not make a profit, as it was deprived of the ability to engage in construction lending. (P-238.) Sterling thus had to close that office. Utah subsequently underwent an economic upswing, from which Sterling was excluded.

50. Sterling was able to keep open a Boise office of Action Mortgage to handle single family loans, but could not expand that office into residential construction lending, the more profitable side of Action Mortgage.

51. The restriction also stopped Sterling from opening Action Mortgage offices in Seattle, Portland and Lake Oswego until after January of 1992. By that time, Sterling had lost contact with the persons it intended to hire to supervise those offices, thus leading to further cost to find appropriate staff. Sterling eventually opened the Seattle and Lake Oswego offices, which have been highly profitable. However, Sterling lost years of time in Lake Oswego and Seattle because of the breach.

52. Sterling faced even more severe problems with its commercial lending subsidiary, Intervest. Intervest is a lender in the highly lucrative areas of commercial income-property finance and income-property construction. It represents the highest realization of Sterling's overall strategy of gathering low-cost funds (deposits) in rural areas, and maintaining high-profit loans in urban areas. Two-thirds of the existing staff of Intervest left following the Government's breach, including all of the loan producers. Loan producers, the bank officers who are in the market place competing to make loans, are they key to successful banking. They represent the sales force that creates the bank's book of assets. Intervest was effectively out of business for two years due to the breach.

53. Had the breach not occurred, and the loan producers stayed, Intervest intended to substantially increase the size of its staff and therefore the size of its assets and lending capacity. Specifically, Intervest planned to expand its operations to cover northern California, Oregon, Idaho, parts of Utah, Montana and Washington. With this capacity to follow its customers to this geographic region to service specific loans and interests, Intervest would have created a portfolio of significant value to Sterling and have contributed importantly to its planned growth.

54. The OTS forbade Sterling to gain assets. While OTS allowed Sterling to make limited pre-sold residential construction loans, it demanded that "all other construction and lending business should be curtailed." (P-263.) OTS was clear that Sterling was not allowed to engage in any lending other than the commercial real estate and limited residential construction loans, and even that limited activity could not be assured:

> ...Sterling Savings is not authorized to engage in any other types of lending then [sic] those detailed above and in my January 31, 1990 letter. This approved lending authority is applicable to purchased loans, as well and is limited to loans within the institution['s] current loans-to-one borrower limitation of $500,000. In addition, if these activities are not conducted in a

> manner consistent with this approval or in a safe and sound manner and compliant with regulatory requirements, or if Sterling's capital position materially deteriorates, this approval may be rescinded.

(P-263; *see also* P-264.)

55. Sterling suffered a reduction in servicing income because these restrictions did not permit it to originate certain types of residential construction loans typically convert to permanent residential mortgage loans.

56. OTS later allowed Sterling to originate Business Banking loans, but its permission was limited. It required Sterling to: (1) reduce total Business Banking loans to $23 million by June 30, 1990; (2) grant such loans only to existing Business Banking customers; (3) adhere to the loans-to-one borrower limit of $500,000; and (4) refrain from letters of credit. (P-266.)

57. Sterling was forced to withdraw completely from certain lucrative business banking, consumer lending, commercial real estate and residential construction activity. The Government forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. Sterling also was forced to stop gathering uninsured deposits, which increased its cost of funds.

58. These restrictions were not lifted until 1991, when Sterling came into compliance with FIRREA (P-299.)

### 3. **Sterling Lost Deposits And Customers Because Of The Government's Restrictions On Its Activities.**

59. Moreover, Sterling lost significant deposits and/or customers because of the OTS restrictions on Sterling in the wake of FIRREA. Sterling lost many customers with deposits in excess of $100,000. (*See, e.g.*, P-352; P-353; P-354; P-355.)

60. Likewise, Sterling had to turn business away. Existing and prospective customers sought construction loans from Sterling during that time or inquired about the possibility of loans

and Sterling was unable to accommodate them. (*E.g.*, P-356.)

61. Sterling was forced to refer customers to other financial institutions; Sterling was not only turning them away, but Sterling officers were literally walking its customers across the street to its competitors so its customers could get the loans they needed.

62. The effects of having to direct its own customers to its own competitors, both financial and in the context of public relations in a small community, cannot be underestimated. The public was aware of the Government's adverse actions toward Sterling, and many of Sterling's customers, concerned about the Bank's viability, chose to leave for other financial institutions. Sterling's marketing was hampered because OTS would not let it offer a full range of services to its customers. Sterling thus was not only was unable to grow through new customers because of the public concern over its problems with the Government, but it had to turn away the customers it already had.

4. **<u>Sterling Was Unable To Take Advantage Of Potential Acquisition Opportunities.</u>**

63. Just as Sterling could not grow its business internally or expand its subsidiaries or keep pace with its customers' needs, without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities.

64. The acquisition of two Great American branches was denied by the OTS, because OTS refused to recognize Sterling's contracts and considered Sterling undercapitalize. Sterling intended to acquire the branches to gain access to $50 million in low-cost depositions, which it would use to fund loans. Sterling was required to use higher-cost borrowing to fund its loans. Later when Sterling was out from under the regulatory cloud, it bought the branches at an additional cost to it over the cost it had originally contracted to pay $1.8 million. (P-413.)

65. Further, a number of other acquisitions failed in part or as a direct result of OTS's

post-FIRREA, treatment of Sterling as a troubled thrift. For example, Sterling entered into discussions to acquire Horizon Bank, but could not satisfy Horizon as to the adequacy of Sterling's level of capital in the face of OTS's contrary pronouncements.

66. Likewise, Intervest ended negotiations for an acquisition because of the capital structure and Sterling's problems with the Government.

67. Sterling started discussions with Great Northwest Savings and Vancouver Federal in 1991, but Sterling was unable to convince either institution to go forward because of the OTS's treatment of Sterling as a capital-deficient bank.

68. Sterling attempted to acquire Summit Savings in the mid-1990s, but Summit chose to go with another institution because of OTS's breach.

69. Sterling had similar experiences with Gibraltar Savings, Willamette Savings, Hamilton Financial Services, Security Pacific, and Pacific First Federal.

70. All of these transactions (and others) could have been completed if OTS had not blackened Sterling as a capital-deficient thrift, in breach of its contract.

**5. <u>OTS Threatened To Close Sterling.</u>**

71. On March 30, 1990, OTS recommended conservatorship of Sterling on the grounds of insolvency and an unsafe or unsound condition to transact business. (P-268.) OTS noted that though Sterling had previously been in compliance with regulatory capital requirements, FIRREA's new requirements (which breached the Government's capital promises by validating them) resulted in "significant noncompliance" by Sterling. (P-268, p. 5.) The Government was clear that Sterling's asserted lack of capital compliance was caused by FIRREA. (P-268, p. 8.)

72. Sterling met with OTS to discuss Sterling's concerns with the proposed operating agreement with consent for appointment of conservatorship or receivership. (P-274.) William

Durbin from OTS indicated that FIRREA changed the rules and Sterling got "stiffed" as a result. (P-274.)

73. Sterling refused to consent to a takeover by OTS, and requested that OTS honor its contracts regarding the acquisitions. (P-270; P-272.) Sterling was concerned that the proposed consent agreement did not preserve Sterling's right to seek judicial review as to the enforceability of its contracts. (P-275.) Sterling's refusal led to more severe operating restrictions. (P-273.)

74. Sterling believed that, absent judicial relief, OTS would close down the bank. Sterling was correct; the OTS intended exactly that. It is undisputed that OTS intended to put Sterling into receivership and close the bank, which would not exist today. (*See* P-268.) It was prevented by judicial intervention in the form of an injunction. The injunction mitigated Sterling's harm by forestalling closure, but did not cure the damage from the breach or put Sterling in the same place it would be in absent the breach.

## E. Sterling Obtained Injunctive Relief, But OTS Continued To Impose Costly Operating Restrictions On Sterling, Exacerbating The Harm To Sterling.

75. In May 1990, Sterling filed suit against the OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. The district court issued a temporary restraining order in May of 1990 and a preliminary injunction in August 1990. (P-421.)

76. Though the injunction prevented the Government's planned closure and takeover of Sterling, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by OTS, which eliminated Sterling's most profitable opportunities. Moreover, OTS continued to impose operating restrictions on Sterling, even during the term of the injunction. The restrictions issued prior to the injunction were not

lifted.

77. OTS informed Sterling that it was still subject to the restrictions imposed prior to the injunction. (P-277; P-279; P-281.)

78. Subsequently, OTS, through its regulatory powers, limited Sterling's operations in a way that increased Sterling's costs and eliminated Sterling's profits.

79. On June 20, 1990, OTS sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place to ensure that all regulatory requirements are adhered to...The listing attached to your letter does not reflect the asset growth restrictions that Sterling is subject to. By virtue of the denied capital plan, no growth is permitted. In additional, residential construction lending is limited to 3.3 percent of total assets and investment authority restricted to short term investments. The institution's activities are limited to those specified in the capital plan....

(P-281.)

80. The restrictions imposed after issuance of the injunction were costly to Sterling. OTS prevented Sterling from engaging in profitable lending and its activities were severely curtailed:

- Sterling was required to file weekly reports within four days of the end of each week to document its compliance with the restrictions imposed both prior to and following the temporary injunction. (P-277.)
- Sterling was told that "no growth is permitted" beyond its May 31, 1900 level. (P-281.)
- Sterling was not authorized to make any dividend payments. (P-283.)
- Sterling was no longer allowed to accept, renew or rollover any brokered deposits. (P-285.)
- Sterling was prohibited from purchasing securities or loans in excess of $1 million, or to incur additional debt in excess of $1 million without prior written approval of the OTS. (P-290.)

81. Sterling was not only subject to the restrictions imposed prior to the injunction,

but was further constrained by more limitations even after the injunction was issued.

82. The Government made its intention to keep Sterling unprofitable clear:

> . . . [Y]ou are directed to make no further purchase of securities or loans in excess of $1 million, or to incur additional debt in excess of $1 million, without our prior written approval.
>
> * * *
>
> We are also compelled to remind you that imprudent actions resulting in loss to the institution may expose affiliated parties of Sterling Savings to the risk of civil money penalties, demands for restitution or more severe sanctions.

(P-290.)

> . . . [We have] serious concern as to the decision making and oversight of the financial management of Sterling. Such serious concerns would necessitate our immediate and thorough evaluation of such a situation in any institution. When such concerns are coupled with a sudden large investment financed with borrowings, the situation becomes critical. When an institution exhibiting these traits also has a very small, or negative, market value of portfolio equity the situation becomes more critical still.

(P-292.)

83. Despite its legal arguments that the contracts were not enforceable, OTS required Sterling to abide by its own promises, including to comply with the Business Plan negotiated with the Central Evergreen transaction. (P-289.)

84. OTS moved for reconsideration of the injunction on August 22, 1990, arguing that the injunction was overbroad, FIRREA's legislative history indicated Congress' intent that some existing contracts would be breached, and that Judge Quackenbush misconstrued the discretionary authority vested in the Director of OTS. This motion was granted in part, 731 F. Supp. 8741, 882 (E.D. Wa. 1990) and the Ninth Circuit eventually vacated the injunction. *Sterling Savings Assoc. v. Ryan*, 959 F.2d 241 (9th Cir. 1992).

85. Sterling knew all along that if Sterling made aggressive business decisions that

defied the limits imposed by the OTS, Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. This caution was ultimately validated by the Ninth Circuit's ruling.

86. Given that Sterling knew the injunction could be reversed and given that OTS did not refrain from limiting Sterling's business as a capital-deficient thrift (in breach of its contracts with Sterling) during the term of the injunction, the injunction only had the effect of keeping the Government partially at bay while Sterling fought to reach capital compliance in accordance with the standards of FIRREA without the benefit of its contracts.

### F. STERLING SUCCESSFULLY RAISED CAPITAL AND SURVIVED THE FINANCIAL CRISIS THAT DEVASTATED MOST *WINSTAR* PLAINTIFFS.

87. OTS forced Sterling to abandon for nearly two years, the growth and expansion strategy that had brought success to Sterling in the past.

88. Though the planned 1989 stock offering (which would have raised capital) was thwarted by OTS's refusal to allow Sterling to pay dividends on the preferred stock, Sterling continued to seek other ways to raise capital.

89. In contrast to most thrifts deemed capital-deficient at the time, Sterling operated at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991. Sterling was thus able to go to the capital market in 1991, earlier than most others.

90. Sterling sold stock and raised gross proceeds of $23.7 million in November 1991, which put Sterling back in full capital compliance, even in the eyes of the OTS.

91. The cost of the 1991 capital raising was $14.152 million. The future cost to Sterling of its inability to leverage the unamortized supervisory capital from the Lewis Federal and Tri-Cities acquisitions for the years 2006 to 2025 is $0.641 million.

92. There is no replacement or substitute for a governmental promise to allow Sterling to add as specific sum to its capital. Unlike being able to purchase a substitute truck,

one cannot go to the market and buy a government promise; the only replacement would be an identical promise by the government. Sterling asked for that promise, specifically requesting an exception or exemption to FIRREA's capital requirements. (P-270.) The OTS refused.

93. The 1991 offering raised capital sufficient to return Sterling in OTS's judgment to full capital compliance. The threat of Government takeover was abated. In that sense, Sterling further mitigated its potential damages from the breach – it was not shut down, and resumed its strategy of growth and profitability, but it did so, and continues to do so, without the benefit of its contract with the United States.

94. Sterling's business strategy before and after the breach called for periodic offerings to raise capital in line with its growth-oriented strategy.

95. The 1991 offering allowed Sterling to return to its pre-breach business strategy. Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy of growth through deposit-gathering and raising capital, which it did in 1991, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, 2006 and 2007.

96. In the mid-1990s, Sterling resumed its strategic plan, gradually shifting from the traditional savings institution focused on home mortgage lending to becoming a full service community bank. Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits. This direction has put Sterling back on the path to growth and profitability from which it was temporarily derailed by the breach.

97. Since 1990 and continuing through the present, Sterling has operated successfully, with increasing assets and profits. Sterling has grown from $730 million in assets at fiscal year end 1989 to over $12.5 billion in assets as of March 31, 2007.

## III. CONTENTIONS OF LAW

### A. THE LAW OF THE CASE FROM THE COURT'S PRIOR RULINGS.

Approximately five years ago, the Court granted Sterling's Motion for Summary Judgment on liability, holding that the Government breached its agreements with Sterling. Noting that the Government agreed that Sterling failed to meet the minimum capital requirements because of the enactment of FIRREA, the Court held that there was an express agreement that Sterling would be permitted to count the capital assistance arising from the Lewis and Tri-Cities acquisitions for purposes of regulatory capital requirements. *Sterling Savings v. United States*, 53 Fed.Cl. 599, 610-12 (2002). The Court was clear that Sterling did not bear the risk of regulatory change as to these acquisitions, quoting from Justice Scalia's concurrence in *United States v. Winstar*, 518 U.S. 839, 921, 116 S.Ct. 2422 (1996) (Scalia, J., concurring):

> "If, as the dissent believes, the Government committed only 'to provide [certain] treatment unless and until there is subsequent action'...then the Government in effect said 'we promise to regulate in this fashion for as long as we choose to regulate in this fashion' – which is an absolutely classic description of an illusory promise."...[Here,] the mere fact that the Plaintiff is required by the Assistance Agreement to comply with a change in statute or regulation – which it must do in any event – does not permit the limiting clause to operate as an illusory promise or otherwise permit Defendant to revoke its own obligations toward Plaintiff without liability.

*Id.* at 611 (internal citations omitted).

Chief Judge Damich also ruled that Sterling did not accept the risk of regulatory change as to the Central Evergreen transaction. *Id.* at 614. This ruling was later reversed as to Central Evergreen. 72 Fed.Cl. 404, 410-11.

### B. THE COURT SHOULD AWARD STERLING $63.631 MILLION, REPRESENTING ITS LOST PROFITS AND WOUNDED BANK DAMAGES.

The contracts between the Government and Sterling for the acquisitions of Lewis and

Tri-Cities provided that Sterling could credit the cash assistance to its net worth. (P-19, § 3(a)(2); P-38, § 3 (a)(2).) The Government did not permit Sterling to do so and therefore breached its contracts. 53 Fed.Cl. at 610-12. Sterling lost the ability to use that capital, which it could have leveraged at the time of the breach through the present to add deposits and loans to its balance sheet and thus increase its profits. The harm to Sterling should be redressed as calculable under the lost profits and wounded bank measures of damages.

**1. <u>The Thrift Industry Crisis In The 1980s Did Not Affect Sterling As It Did Other Thrifts.</u>**

As described above, the thrift industry crisis in the 1980s, caused in part by thrifts having to pay interest on their deposits at a substantially higher rate than they were earning on their mortgage loans and other assets, did not affect Sterling. Sterling began operations in 1983, after the peak in interest rates and without any loans made in the 1960s and 1970s at which it would have to pay high interest. Sterling's loans made at market rates in the 1980s generated returns in excess of the cost of deposits.

Further, Sterling's service area was exclusively the Pacific Northwest, where the economy was strong. Sterling was a profitable and sound institution throughout the troubled period of the 1980s, and was profitable every year (even after the breach, despite the significant financial harm suffered therefrom).

This is largely attributable to Sterling's strong management and business plan. Sterling's management team has been constant from 1983 through the present day. From the outset, Sterling's business plan focused on gathering deposits in the small towns of rural Washington and lending in the larger cities of Spokane, Western Washington, and Portland, Oregon, where loan demand was stronger.

Thus, Sterling, unlike the vast majority of *Winstar* plaintiffs, is able to utilize damages

models based on the performance of the actual bank because it was not closed down.

### 2. A Lost Profits Measure Is An Appropriate Method To Calculate The Amount Of Damages Caused By Breach Of A Contract To Recognize Goodwill.

"The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003). These expectancy damages "are normally equated with lost profits, although other measures of damages may be applied. *American Federal Bank, F.S.B. v. United States*, 68 Fed. Cl. 346, 355 (2005); *California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001). Williston notes:

> Because the goal of protecting the plaintiff's expectation interest is to place the promisee in the same position as performance would have done, it follows that an award of damage will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because **only by awarding lost profits will the plaintiff be made fully whole.**

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002), p. 24 (emphasis added).

The Federal Circuit has established that, in order to be entitled to lost profits damages, the plaintiff must establish that: (1) the breach caused its failure to earn the alleged lost profits; (2) the loss was foreseeable; and (3) the measure of damages is "reasonably certain." *California Federal Bank v. United States*, 395 F.3d 1263, 1267; *Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 344 (2004) (awarding $5,602,000 of damages under lost profits analysis after trial); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318; *see also First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, __ Fed.Cl. __, 2007 WL 1160294, *slip op.* at 9 (April 13, 2007).

### 3. The Harm To Sterling Was Caused By The Breach.

#### a. *Standard To Establish Causation Of Lost Profits.*

To establish causation of lost profits, a plaintiff need not establish that the breach is "the sole factor or sole cause" of the lost profits. *First Federal*, *slip op.* at 10, *quoting Cal. Fed. Bank*, 395 F.3d at 1267. "The existence of other factors operating in confluence with the breach" will not preclude recovery. *Id.* "The causal connection between the breach and the loss of profits must be 'definitely established' so that 'the nonbreaching party will not be awarded more than it would have received if the contract had been performed.'" *Id.*, *quoting Cal. Fed. Bank*, 395 F.3d at 1267.

#### b. *Sterling's Lost Profits Were Caused By The Breach.*

##### i. Historically, Sterling Had Achieved Growth.

As noted above, prior to the breach, Sterling implemented a business strategy of growth through deposit gathering and acquisitions. Sterling was successful despite the general economic downturn in the late 1980s and 1990s because Sterling did not have a portfolio of low-mortgage loans made in the 1960s or 1970s. Because Sterling opened in 1983, after peak interest rates, Sterling instead held all loans at current market rates, exceeding the rates it paid on deposits. Sterling was profitable by the end of its first year of business, and its deposits, assets and profits increased each year without interruption through fiscal year 1989. Indeed, in 1989, Sterling was one of the fastest growing thrifts in the Pacific Northwest. (P-414.)

##### ii. Sterling's Strong Management Team Implemented A Successful Business Strategy To Grow Sterling.

Sterling's management team has remained constant from its inception to the present day. The Government repeatedly noted, during 1989, that Sterling's management was "above-average" and viewed its planning favorably. (P-404; P-407.) The Government complimented

the "involved management style and positive leadership" shown by Sterling's team. (P-407.) The industry also took note, and business journals commented that Sterling's growth formula "works." (P-414.)

The Government knew of Sterling's intent to grow. Sterling clearly stated that its growth strategy included both acquisition of branches and internal generation of deposits. (P-383; P-387.) Sterling and the Government discussed that Sterling intended to leverage the assistance received in the Lewis and Tri-Cities acquisitions. (P-389; P-391.)

**iii. The Government's Breach Forced Sterling To Reduce Its Operations And Forgo Profitable Business Expansion Of Its Subsidiary Companies.**

After the Government refused to comply with its contracts, Sterling was forced Sterling to shrink its business operations and abandon its growth strategy. For example, as discussed above, the Government's breach severely damaged Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage and similarly forced Sterling to eliminate almost all of the lending of its Intervest subsidiary.

Sterling suffered a reduction in servicing income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans, and was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. OTS forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. Sterling also was forced to stop gathering uninsured deposits. Moreover, Sterling lost specific deposits and/or customers because of the OTS restrictions on Sterling in the wake of FIRREA. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions, the effect of which, in a small community, cannot be underestimated. Indeed, the public was aware of the Government's adverse actions toward Sterling, and many of Sterling's customers, concerned

about the Bank's viability, chose to leave for other financial institutions. Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them.

In sum, Sterling not only was unable to grow through new customers because of the public concern over its problems with the Government, but it had to turn away the customers it already had.

#### iv. Sterling Lost Investment Opportunities Because Of Capital Deficiencies.

Just as Sterling could not expand its subsidiaries or keep pace with its customers' needs, without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities. As noted above, the acquisition of branches of Great American, as well as Horizon Bank, Great Northwest Savings, Vancouver Federal, Summit Savings, Gibraltar Savings, Willamette Savings, Hamilton Financial Services, and Security Pacific. All of these transactions (and others) may have been completed if Sterling had had sufficient capital to be a competitive candidate for acquisition.

#### v. Sterling's Wounded Bank Damages Were Caused By The Breach.

Wounded bank damages are costs resulting from a bank's "perilous financial condition created by a breach of contract." *Coast Federal Bank, FSB v. United States*, 48 Fed. Cl. 402, 434 (2000), *citing Cal. Fed.*, 43 Fed. Cl. 346, 448 (2003). Such costs are awarded to "reimburse [the thrift] for the losses caused by its reliance on the contract, and to put the thrift in as good a position as it would have occupied if the contract had never been made." *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108, 123-24 (2004) (awarded summary judgment in favor of thrift on wounded bank claim). Sterling thus must put forward evidence tending to prove that the breach was a substantial factor in causing such damages. *Long Island Savings Bank, FSB v.*

*United States*, 60 Fed. Cl. 80, 90 (2004).

**aa. Sterling's Loss Related To The Acquisition Of The Great American Savings Bank Branches Was Caused By The Breach.**

First, Sterling's claim regarding the acquisition of Great American Savings Bank branches, like the other lost opportunities described above, flows directly from the Government's breach. The Government's refusal to permit cash assistance to be added to Sterling's net worth left Sterling unable to present a tempting acquisition plan to other banks. Absent the breach, Sterling would have been able to acquire the branch for only $61,000, when, because of the breach, it was forced to pay $1.9 million five years later. The increased cost to acquire the branches totaled $1,835,126. (P-340.) Sterling would have acquired the branches but the Government refused to let it do so because of the inadequate capital existing only because of the Government's refusal to adhere to its contracts with Sterling. (See P-341; P-413.)

**bb. Sterling Incurred Supervision Costs Because Of The Breach.**

Sterling incurred excess supervision costs because of the breach. Because OTS declared Sterling to be a "troubled thrift" (because of the lack of compliance with regulatory capital requirements due to the breach), Sterling was subject to costly regulatory exams. At that time, the FDIC assessments for troubled thrifts was 1 ½ times that for healthy thrifts. Sterling's costs attributable to the supervision caused by the breach total $171,977.33. (P-337.)

Likewise, Sterling incurred legal, accounting and insurance costs because of its treatment as a troubled thrift. Due to the regulatory treatment of Sterling caused by the Government's breach, Sterling incurred $304,005.79 in legal, accounting and insurance costs.

**cc. Sterling Suffered Losses On The CJ-4 Loan.**

The CJ-4 loan was a property in Bellevue, Washington, that Sterling committed to loan

for construction prior to the enactment of FIRREA. FIRREA limited the size of a loan a financial institution could make to any one borrower, based on the level of capital an institution possessed. When the Government breached and refused to acknowledge the contracts for the three acquisitions, Sterling was treated as if it had deficit capital and limited to a $500,000 ceiling for a loan to any one borrower.

Because the CJ-4 loan was in excess of $500,000, Sterling was not permitted to make additional advances against the loan commitment that was already in effect. Because the Government would not allow Sterling to make further advances, the project fell behind on construction. The borrowers then sued Sterling for breaching the loan commitment. To resolve the dispute with the borrowers, Sterling was forced to foreclose on the property, repossess it, and make the improvements which the borrowers would have made if Sterling had been able to advance the funds per the loan commitment. In the process of foreclosure, repossession and improvements, the market value of the property declined significantly. When Sterling liquidated the property, therefore, Sterling suffered a $1,240,609.54 loss. (P-336.)

**dd. The Government Refused To Permit The 1989 Offering And Damaged Sterling.**

As discussed above, Sterling was forced to cancel a planned offering in 1989 because the Government refused to approve the payment of dividends. Had the offering occurred, Sterling would not have lost the costs that went into the offering. The injury suffered by Sterling from the 1989 public offering is directly traceable to the breach. That loss totals $1,004,362.87. (P-338.)

In sum, the Court should find that the breach caused Sterling $ 4,384,104.20 in wounded bank damages.

**4. The Damages Incurred By Sterling Caused By The Government's Breach Were Foreseeable.**

***a. Standard To Establish Foreseeability.***

The damages to Sterling were foreseeable. Sterling is not required to establish actual foresight of the harm, but merely "reason to foresee...It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in contemplation of the parties at the time they made the contract." *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed.Cl. 126, 146 (2003); *see also First Federal, slip op.* at 21.

***b. Sterling's Lost Profits Were Foreseeable.***

The Government had reason to foresee lost profits as a result of its breach. As in *First Federal*, the contracts with Sterling allowed Sterling to credit the cash assistance to its net worth. It was reasonably foreseeable that breaching the contracts, and disallowing Sterling that capital, would cause Sterling to curtail growth of profitable assets and thereby lose profits it would have realized.

Indeed, the Government clearly knew that Sterling would use the capital granted by the agreements to support an asset structure for growth. Noting that Sterling's business plan after the acquisition of Tri-Cities was "ambitious" but "consistent with growth trends of the recent past", the Government noted that the growth "is supported largely by the infusion of FSLIC assistance, which is to be counted as regulatory capital." (P-24, § VII (A); *see also* P-27, § VI (Sterling's "business plan consists of asset growth of approximately 15% annually. This growth is supported largely by the infusion of the FSLIC assistance as regulatory net worth."). When the Government was attempting to convince Sterling to acquire the failing Central Evergreen, the key factor for Sterling was its abilities to leverage as capital the cash assistance received in the Tri-Cities acquisition. (*See* P-389.)

Thus, at the time the Lewis and Tri-Cities agreements were executed, it was reasonably foreseeable that Sterling would continue to follow its strategic business plan to achieve growth

through deposit gathering, lending and acquisitions, and that the Government's breach of the agreements would cause Sterling to lose those profits. *See First Federal, slip op.* at 22.

***c. The Wounded Bank Damages Were Foreseeable.***

The wounded bank damages to Sterling were likewise foreseeable. The Government knew that Sterling's plan for growth included strategic acquisitions, such as the Great American Bank branches, and that its failure to permit Sterling to credit the cash assistance as net worth and subsequent denial of permission to make the acquisition due to a resulting lack of capital from the breach would harm Sterling. Similarly, the Government could reasonably foresee that its breach and subsequent treatment of Sterling as a troubled thrift would result in increased supervision, legal, accounting and regulatory costs.

In addition, it is reasonable to foresee that the limitations imposed by the Government, only imposed because of Sterling's capital position due to the breach, would harm Sterling, leading to losses such as the CJ-4 loan loss. Finally, the Government should have reasonably foreseen that its breach and resulting treatment of Sterling as though Sterling lacked adequate capital, including its refusal to permit the payment of dividends, would foreclose successful offerings to raise capital, such as the one Sterling planned for 1989.

**5. The Measure Of Sterling's Damages Is Reasonably Certain.**

***a. Standard To Establish Reasonable Certainty.***

A plaintiff seeking recovery for lost profits is not required to prove an exact amount; if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Cal. Fed. Bank*, 395 F.3d at 1267, *quoting Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004). "The 'reasonable certainty' test allows some flexibility." *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 88 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003).

To prove lost profits with reasonable certainty, a plaintiff must establish: "(1) the estimated reduction in the amount of profitable assets caused by the breach; and (2) the appropriate average return, based on comparable historical results, that would have been earned on such lost assets." *First Federal*, *slip op.* at 23. Even though Sterling's expert is "required to opine on what would have happened in a world that never was", such testimony constitutes a sufficient and sound basis for the Court to award lost profits. *See First Federal*, *Id.*

***b. Sterling's Lost Profits Calculation Is Reasonably Certain.***

Sterling, in contrast to other *Winstar* plaintiffs, does not require that economic forecasting or speculation be used to determine the amount of its lost profits. The vast majority of *Winstar* plaintiffs had been weak financial institutions in the 1980s, before the breach, and were weak in the 1990s. While Sterling has been profitable throughout its history, many of the plaintiffs had a history of operating losses. Some of the plaintiffs were forced to close after the breach.

Here, the model is a straightforward method of calculating the lost profits of Sterling. The amount of regulatory capital Sterling would have had if its contracts had been honored by the Government is a known quantity. It would have been used to support additional assets. Sterling would have earned a return on those assets, at a known rate. These earnings would be added to capital and allowed the acquisition of additional foregone assets that would yield additional profits. Such cumulative lost profits from the time of the breach to the present total $58.164 million.

Dr. Horvitz' model is conservative constructed using constraints that limit profit. Dr. Horvitz's calculations of foregone assets used in the model are limited in each year by capital and growth constraints. Foregone assets are never assumed to be any larger than allowed by the more limiting or smaller of these constraints. Lost profits are thus limited by the conservative small size of assumed foregone assets.

The lost profit calculation assumes that the but for Sterling would earn profits at the same rate as the actual Sterling for the years 1990 through 2006. This assumption, based on undisputed facts, is conservative because: (1) the model does not include Sterling's actual losses from breaching conduct that raised its costs and lowered its income; (2) the model uses Sterling's actual rate of return during the period that the Government was in fact suppressing Sterling's return by its breaches of contract; (3) as Sterling grew, its fixed overhead costs would have been spread under economies of scale; (4) absent the breach, Sterling would have had the opportunity to acquire failing thrift institutions from the Government, which would have been more profitable than Sterling's actual return on assets; and (5) the assumption that but-for Sterling would have earned returns at at least the same rate as actual Sterling is further verified by the return on average assets obtained by Sterling when the actual bank reached the size of the but-for bank.

Moreover, Sterling's proffered calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held usual and ordinary type assets. There is no reason to doubt that additional assets of the type held by Sterling were readily available and Sterling has, in every year of its existence, forecasted and achieved growth. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth, and then go to the market to find those assets. It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. Using this method, Sterling has grown to over $12.5 billion in assets.

Indeed, Sterling finds billions in new assets every year. Sterling originated $5 billion in

new assets in 2006. It is beyond dispute that, if its contract capital were restored, Sterling could easily find the assets to be supported by that capital.

The conservatism of Sterling's calculations is further confirmed by the growth of the actual bank. Dr. Horvitz assumed, in 2000, a conservative rate of growth in his but for model. The actual Sterling grew to a larger size than the but for bank within a short period of time (usually within one year). The basic reason why the but for bank grew as rapidly as it did is because the actual bank (with the same management and business strategy operating in the identical economic environment) grew rapidly. There is no reason to believe that Sterling would not have used the capital lost to Sterling due to the Government's breach in the same way it has used the capital it was permitted to utilize. The Court should therefore find that Sterling's lost profits caused by the breach total $58.164 million.

In sum, the calculation of Sterling's lost profits depends upon the actual bank's performance in the ideal economic environment and under the direction of the same management in place at the time of the breach. The measure is reasonably certain and should be credited. The Court should award Sterling lost profits damages in the amount of $58.164 million.

***c. Sterling's Wounded Bank Damages Calculations Are Based On Documentary Evidence Of Costs Incurred Because Of The Breach.***

Sterling's wounded bank damages are calculated based upon the increased costs incurred by Sterling as a result of the breach. Because the documentary evidence of these costs renders these damages proven, the Court should award Sterling wounded bank damages in the amount of $4,384,104.20.

**C. THE GOVERNMENT'S CLAIM THAT STERLING ONLY INCURRED TRANSACTION COSTS AS A RESULT OF ITS BREACH SHOULD BE REJECTED.**

The Government raises three arguments in support of its claim that the only damages incurred as a result of the breach are transaction costs associated with the 1991 offering. First,

the Government claims that the injunction obtained by Sterling, which had the effect of stopping the Government's takeover and closure of the bank, mitigated any damage from the breach. Second, the Government alleges that the 1991 offering, after which Sterling was in full compliance with FIRREA, mitigated any damage to Sterling. Finally, the Government, for the first time after seventeen years of litigation, has alleged that, even assuming it did not breach the contracts by refusing to recognize the cash assistance as a credit to Sterling's net worth, it would have applied different, subsequently-enacted regulations to limit the value of that capital so as to render Sterling out of compliance with the FIRREA regulations. These arguments lack merit.

### 1. Sterling Suffered Damages Before And During The Period In Which The Temporary Injunction Was In Place.

The injunction did not serve to erase the damage done to Sterling. Sterling was permanently damaged by the Government's breach prior to the injunction. The Government forced Sterling to drastically shrink its business operations and abandon its growth strategy. Sterling could not grow the company nor loan money in the same manner as before the breach. Sterling lost key personnel and suffered damage to its reputation. But for the breach, Sterling would have raised regulatory capital pursuant to its agreements with the Government and, in turn, would have generated more earnings and more business opportunities from the leverage of that capital. Instead, the Government considered Sterling undercapitalized and placed a stranglehold on its daily operations, causing Sterling to lose an otherwise irreplaceable economic advantage for which it bargained.

Moreover, the injunction did not cure, nor prevent, the severe effects of the Government's breach. As a practical matter, the injunction stopped the Government from closing the bank, and provided Sterling time to raise the capital needed to meet FIRREA's standards before being exposed to receivership. Had the Government honored the contracts,

Sterling irrefutably would have had excess capital to leverage and thus could have grown and become even more profitable between 1989 and today.

Indeed, the Government continued to harm Sterling during the term of the injunction. First, the temporary injunction was, by its terms, a stop-gap measure which Sterling could not assume would continue indefinitely. For Sterling to act as though the injunction was permanent would have been fiscally irresponsible and foolhardy. During the effective term of the injunction, the Government successfully moved for partial reconsideration and filed an appeal with the Ninth Circuit. 959 F.2d 241. Had Sterling acted as if no breach had occurred and made growth-based decisions upon a belief that the Government would act in good faith, Sterling would have exposed itself to ruin had the injunction been vacated (and it was). *See id.* At the very least, Sterling's officers reasonably perceived that the bank would suffer tremendous harm if an aggressive growth plan were implemented pending appeal.

Second, the Government's regulation of Sterling under the new rules imposed by FIRREA did not stop with the issuance of the injunction. Sterling was treated as a troubled thrift even during the period in which the injunction was in place. Under the guise of safety and soundness concerns (which arose from a baseline concern of lack of appropriate capital, which only occurred because of the breach), the Government imposed more and more demands on Sterling.

Because of the breach, the Government treated Sterling as an undercapitalized, "troubled thrift," imposing costly restrictions that hindered Sterling's profitability:

- Sterling was not allowed to grow beyond its net interest credited. (P-247.)
- Sterling was not allowed to make any capital distributions. (P-247.)
- Sterling was not allowed to pay dividends on any stock issuance. (P-255.)
- Sterling was not allowed to accept any uninsured deposits. (P-256.)

- Sterling was required to obtain written approval from the OTS District Director for any new loan or investment activity. (P-258.)

- Sterling was not allowed to participate in commercial real estate lending. (P-258.)

- Sterling was forced entirely out of the lucrative construction and business lending business outside of pre-sold residential (1-4 units) construction lending. (P-266.)

- Sterling was forced to reduce total business banking loans to $23 million by June 30, 1990.

- Sterling could only grant loans to existing business customers. (P-266.)

- Sterling was forced to adhere to the $500,000 loans-to-one borrower restriction. (P-266.)

- Sterling was limited in the compensation it could pay any executive officer or director. (P-273.)

- Sterling was limited to activities contained within the February 28, 1990 Capital Plan to the extent contemplated in the Plan. (P-273.)

- Sterling could not purchase or sell any asset or group of assets in excess of $500,000. (P-273.)

- Sterling was required to file weekly reports within four days of the end of each week to document its compliance with the restrictions imposed both prior to and following the temporary injunction. (P-277.)

- Sterling was told that "no growth is permitted" beyond its May 31, 1900 level. (P-281.)

- Sterling was not authorized to make any dividend payments. (P-283.)

- Sterling was no longer allowed to accept, renew or rollover any brokered deposits. (P-285.)

- Sterling was prohibited from purchasing securities or loans in excess of $1 million, or to incur additional debt in excess of $1 million without prior written approval of the OTS. (P-290.)

In short, these restrictions, effective during the term of the injunction, would not have been implemented had Sterling been capital-compliant as it would have been absent the breach. The injunction merely allowed Sterling some time to liquidate assets and plan to raise capital so

as to be prepared for either a reversal of the injunction or other ruling as to the breach.

2. **<u>The Success Of The 1991 Offering Did Not Erase The Damage Done To Sterling Caused By The Government's Breach.</u>**

The Government further has argued that Sterling replaced the regulatory capital eliminated by FIRREA through a 1991 offering, and thus only incurred the transaction costs associated with that offering.[1] This argument ignores Sterling's growth plan. Sterling does not, as implied by the Government, only raise capital for a special purpose. Indeed, Sterling raised capital in almost every year since 1991; Sterling raised or the holding company downstreamed capital in 1991, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, 2006 and 2007. Given its aggressive growth strategy, Sterling has always needed more capital.

Sterling's position is analogous to that of a lost volume seller as considered in a breach of contract situation in the sales context. Like a lost volume seller, Sterling: (1) possessed the capacity to raise more capital (or, stated differently, make additional sales and profits); (2) it would have been profitable for Sterling to raise more capital; and (3) Sterling would have raised more capital absent the breach. *See R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) (company established status as lost volume seller despite being unable to point to exact unit and resale buyer of unit at issue in breached contract). Stated differently, the lost volume seller, like Sterling, is unable to take other opportunities for profits because of its inability to gain the initial profit from the breached contract. Sterling will always be behind on its profits compared to where it would have been absent the breach. *See Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619, 627 (3d Cir. 1990) (even where the seller resells the item, the

[1] At trial, Sterling will offer the opinion of Dr. Christopher James, who opines as to the cost of replacing the lost capital. Neither Sterling nor Dr. James agree that this is the appropriate measure of Sterling's harm. Nonetheless, Sterling offers Dr. James' opinion in case this or another court finds that lost profits is the incorrect measure of harm and instead finds that the correct measure of harm is the cost of raising the capital that saved the bank from threatened closure by OTS. Dr. James measures this cost to be $14.152 million, exclusive of wounded bank damages. The future cost to Sterling of its inability to leverage the unamortized supervisory capital from the Lewis and Tri-Cities acquisitions for the years 2006 to 2025 is $0.641 million.

seller is still not made whole because of the lost profit from the initial breach); *Advanced Medical, Inc. v. Arden Medical Systems, Inc.*, 955 F.2d 188, 200-01 (3d Cir. 1992) (a lost volume seller "will always, in the end, have only one sale instead of two, and therefore will suffer damages"); *Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218, 221 (3d Cir. 1998) (vacating order of summary judgment as to damages where disputed facts remained as to whether seller lost other sales as a result of having to resend shipment to buyer after buyer lost first shipment in transit). In sum, Sterling will always have had one offering instead of two, and be behind on its growth because of the cancellation of the 1989 offering.

As noted above, the 1991 offering certainly mitigated for the breach in the sense that, like the preliminary injunction, it saved Sterling from the Government which was bent on closing the institution, but it did not cure the harm from the breach; it did not restore Sterling to the position it would have occupied absent the breach.

### 3. <u>The Court Should Not Accept The Government's New Argument That It Would Have Applied Different, Subsequently-Enacted Regulations To Limit The Value Of The Capital Granted To Sterling.</u>

In its Motion for Summary Judgment on Damages, the Government, for the first time, raised, through the opinion of a new expert, an argument that Sterling would not have been able to meet regulatory capital requirements absent the breach because Sterling would not have been permitted to count the full amount of contractual capital for regulatory purposes. This argument lacks merit. Under the terms of the contracts at issue, Sterling is permitted to count its contractual capital as regulatory capital under the regulations in place at the time of the contracts. At the time of the contracts, there were no regulations in place limiting how much capital assistance could be utilized to meet regulatory capital requirements. Sterling and the Government could not have agreed that the capital Sterling acquired was to be classified as a lesser form of regulatory capital entitled "qualifying supervisory goodwill" when such a

classification did not even exist at the time of contracting. The Government's new argument is tantamount to a request that the Court find that the Government, but for the breach, would have breached the contracts in a different way, by applying other future regulations to limit the value of the capital assistance acquired by Sterling.

This argument not only contradicts the plain language of the agreements, but also established *Winstar* precedent:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations.

*Winstar*, 518 U.S. at 849-50, 116 S.Ct. at 2443. As a "cash substitute", there could be no limit on the use of the acquired capital. The Court should reject the Government's attempt to, in effect, claim that it would have breached its agreements a different way to reach the same result that its actual breach caused.

## IV. CONCLUSION

For these reasons, Sterling respectfully requests an order finding Sterling has been damaged in the amount of $63.631 million.

DATED this 25th day of April, 2007.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member of the Bar of the U.S.
Court of Federal Claims

422 West Riverside Avenue, #1100
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on April 25, 2007, a copy of the foregoing **STERLING'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff