**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND OPPOSITION TO STERLING'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**Respectfully submitted,**

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**Attorneys for Defendant**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**TIMOTHY ABRAHAM**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**April 30, 2007**

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

APPENDIX TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

DEFENDANT'S REPLY IN SUPPORT OF ITS REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND OPPOSITION TO STERLING'S CROSS MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. STERLING'S MOTION FOR SUMMARY JUDGMENT REGARDING ITS LOST PROFITS CLAIM SHOULD BE DENIED, AND OUR MOTION FOR SUMMARY JUDGMENT GRANTED, BECAUSE STERLING'S LOST PROFITS CLAIM IS SPECULATIVE AND WITHOUT FACTUAL BASIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. THERE IS NO BASIS FOR AWARDING LOST PROFITS ON SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. STERLING'S LOST PROFITS MODEL FAILS AS A MATTER OF LAW BECAUSE IT ASSUMES THAT STERLING NEVER REPLACED A PENNY OF THE $15 MILLION IN CONTRACTUAL GOODWILL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. THE LOST PROFITS DAMAGES IN DR. HORVITZ'S MODEL FAIL TO MEET THE CAUSATION STANDARD . . . . . . . . . . . . . . . . . . . . . . 8

D. DR. HORVITZ ERRONEOUSLY ASSUMES THAT STERLING WAS UNABLE TO GROW ITS ASSETS DURING THE PENDENCY OF THE DISTRICT COURT INJUNCTION . . . . . . . . . . 12

E. DR. HORVITZ'S LOST PROFITS MODEL IS INVALID BECAUSE IT FAILS TO IDENTIFY THE ASSETS THAT WOULD HAVE BEEN ACQUIRED ABSENT THE BREACH OR THE LIABILITIES THAT WOULD HAVE FUNDED THOSE ASSETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. DR. HORVITZ'S LOST PROFITS MODEL IS INDISTINGUISHABLE FROM THE MODELS REJECTED IN FIFTH THIRD, SOUTHERN NATIONAL AND STANDARD FEDERAL . . . . . . . . . 17

2. STERLING'S CLAIM THAT THE BREACH FORCED IT TO FORGO OPPORTUNITIES FOR GROWTH IS UNSUPPORTED BY THE RECORD . . . . . 20

a. STERLING PROVIDES NO EVIDENCE TO SUPPORT ITS CLAIM THAT IT WOULD HAVE MADE NUMEROUS ADDITIONAL ACQUISITIONS OF THRIFTS AND THRIFT BRANCHES ABSENT THE BREACH . . . . . 21

b. EVIDENCE OF STERLING'S SHRINK DOES NOT SUPPORT DR. HORVITZ'S CLAIM, THAT, ABSENT THE BREACH, IT WOULD HAVE ACHIEVED THE GROWTH ASSUMED IN HIS MODEL . . . . . 22

II. DR. JAMES'S COST OF MITIGATION ANALYSIS IS INVALID . . . . . 24

III. PLAINTIFFS' WOUNDED BANK DAMAGES FAIL AS A MATTER OF LAW . . . . . 26

A. THE BREACH DID NOT CAUSE STERLING TO INCUR INCREASED COSTS IN PURCHASING A BRANCH OF GREAT AMERICAN BANK . . . . . 26

B. STERLING HAS NOT ESTABLISHED THAT ITS PURPORTED "EXCESS SUPERVISION COSTS" ARE ATTRIBUTABLE TO THE BREACH . . . . . 27

C. LOSSES ATTRIBUTABLE TO THE CJ-4 LOAN WERE NOT CAUSE BY THE BREACH . . . . . 27

D. STERLING'S INABILITY TO PAY DIVIDENDS IN CONNECTION WITH ITS 1989 UNITS OFFERING WAS NOT CAUSED BY THE BREACH . . . . . 28

E. STERLING'S CLAIM FOR LEGAL AND ACCOUNTING COSTS SHOULD BE DISMISSED UPON SUMMARY JUDGMENT BECAUSE STERLING FAILS TO EVEN RESPOND TO OUR MOTION . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

Advanced Medical, Inc. v. Arden Medical Sys. Inc.,
955 F.2d 188 (3rd Cir. 1992) .......... 8

American Federal Bank, FSB v. United States,
68 Fed. Cl. 346 (2005),
appeal docketed, No. 2007-5040 (Fed. Cir. Jan 9, 2007) .......... *passim*

Bank United v. United States,
50 Fed. Cl. 645 (2001),
aff'd in relevant part, 80 Fed. Appx. 663,
2003 WL 22177282 (Fed. Cir. 2003), cert. denied, 543 U.S. 916 (2004) .......... 6, 25

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001) .......... 3, 4

California Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir. 2001),
cert. denied, 534 U.S. 1113 (2002) .......... *passim*

California Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 344 (2005) .......... 5

Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795 (1999) .......... 7

Fifth Third Bank of W. Ohio v. United States,
55 Fed. Cl. 223 (2003) .......... *passim*

Fifth Third Bank v. United States,
402 F.3d 1221 (Fed. Cir. 2005) .......... 5

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003) .......... 18, 28

Glendale Fed. Bank, F.S.B., v. United States,
378 F.3d 1308 (Fed. Cir. 2004),
cert. denied, 544 U.S. 904 (2005) .......... 4

Granite Mgt. Corp. v. United States,
58 Fed. Cl. 766 (2003),
aff'd in part, 416 F.3d 1373 (Fed. Cir. 2005) ........ 3, 26

Imperial Tobacco Ltd. v. Phillip Morris, Inc.,
899 F.2d 1575 (Fed. Cir. 1990) ........ 26

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003) ........ *passim*

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ........ 17

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006),
petition for reh'g & reh'g en banc denied, (Fed. Cir. Sep 21, 2006),
petition for cert. filed, No. 06-837 (Sup. Ct. Dec 14, 2006) ........ 5

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) ........ 7, 25

Sinskey v. Pharmacia Ophthalmics, Inc., 982 F. 2d 494 (Fed. Cir. 1992) ........ 7

Southern National Corp. V. United States,
57 Fed. Cl. 294 (2003) ........ *passim*

Standard Federal Bank v. United States,
62 Fed. Cl. 265 (2004) ........ *passim*

Sterling Sav. Assn. v. Ryan,
751 F.Supp. 871 (E.D. Wash. 1990) ........ 16

Sterling Sav. Assn. v. United States,
53 Fed. Cl. 599 (2002) ........ 1, 11

Sterling Sav. Assn. v. United States,
57 Fed. Cl. 445 (2003) ........ 10, 13

Sterling Sav. Assn. v. United States,
72 Fed. Cl. 404 (2006) ........ 10

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) ........ 27

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) .......... 5

**STATUTES**

12 C.F.R. § 567.9(a) (1989) .......... 11

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA") .......... *passim*

**MISCELLANEOUS**

Restatement (Second) of Contracts, § 347 (1981) .......... 4

Restatement (Second) of Contracts, § 350, cmt. b .......... 7

Restatement (Second) of Contracts, § 351 (1981) .......... 4

Restatement (Second) of Contracts, § 352 (1981) .......... 4

## INDEX TO APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Deposition of Paul Horvitz (Excerpts), dated January 25, 2007 | 1 |
| Expert Report of Joe A. Hargett, dated February 15, 2007 | 4 |
| Sterling Capital Restoration Plan, dated February 19, 1990 | 17 |
| Sterling Savings Association, Composite Macro Rating | 25 |
| Letter from Daniel Byrne to Ed Hedlund, dated May 21, 1991 Re: Exceptions to Operational Concerns | 26 |
| Deposition of Harold Gilkey (Excerpts), dated June 8, 2000 | 29 |
| Sterling Savings Association 1990 Business Plan (Excerpt) | 31 |
| FHLB Report of Examination dated June 19, 1989 (Excerpts) | 32 |
| OTS Special Limited Report of Examination dated November 13, 1989 (Excerpts) | 34 |
| Sterling Savings Association Form 10-K, dated June 30, 1989 (Excerpts) | 36 |
| Sterling Savings Association Form 10-K, dated June 30, 1990 (Excerpts) | 38 |
| Sterling Savings 1990 Annual Report (Excerpts) | 40 |
| OTS Special Limited Report of Examination dated November 13, 1989 (Excerpts) | 42 |
| Updated Amended Expert Report of Mukesh Bajaj, PhD, dated February 15, 2007 (Excerpts) | 44 |
| Deposition of Cajer Neely, dated June 26, 2002 (Excerpts) | 49 |
| OTS Letter from Ronald N. Karr to Harold B. Gilkey, dated October 13, 1989 Re: Sterling Application (Excerpts) | 54 |
| **[Pages 57-59 intentionally omitted]** | |
| Sterling Financial Corporation Form-10-K, dated June 30, 1996 (Excerpts) | 60 |

Sterling Savings Association Joint Report of Examination,
dated October 14, 1997(Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Deposition of Robert Meyers (Excerpts), dated April 25, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . 64

Deposition of Robert Larrabee (Excerpts), dated April 26, 2000 . . . . . . . . . . . . . . . . . . . . . . . . 66

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND OPPOSITION TO STERLING'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Pursuant to Rule 56 of the United States Court of Federal Claims and this Court's Order dated September 27, 2006, defendant, the United States, respectfully submits this reply in support of our revised motion for summary judgment regarding damages ("Govt. Motion") and in opposition to plaintiffs' cross-motion for summary judgment and memorandum of points and authorities in support thereof ("Sterling Memo").

Plaintiff Sterling Savings Association ("Sterling") requests summary judgment upon its $58.1 million lost profits claim and four "wounded bank" damages claims comprising approximately $4.2 million in damages. Sterling Memo at 3; App. 186.[1] Sterling's lost profits claim is premised upon its incorrect "belief that Government promises can never be replaced," and its related concession that, notwithstanding in excess of $471 million in capital raising

[1] Sterling does not request summary judgment with respect to its alternative claim for approximately $14 million in actual mitigation costs.

between 1991 and 2006, it never replaced the $15 million in contractual goodwill eliminated by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"). Sterling Memo at 32. These concessions demonstrate that Sterling has not made a reasonable attempt to mitigate its damages, contrary to law. For this reason, the Court should deny Sterling's motion for summary judgment regarding damages, and the Court should grant our motion.

Even assuming, however, that Sterling can overcome this fatal flaw in its case, our motion should be granted nonetheless because Sterling has not overcome the other legal flaws in its damages theories. For example, Sterling's protracted listing of potential acquisitions allegedly forgone and customers purportedly lost due to the breach (Sterling Memo at 27-31) does not overcome the admitted failure of its expert, Dr. Paul Horvitz, to identify the assets and liabilities that would have been acquired absent the breach.

Similarly, Sterling has not established a genuine issue of fact with respect to our demonstration that Dr. Horvitz's lost profits calculation ignores the fact that the District Court for the Eastern District of Washington issued an injunction prohibiting the Government from enforcing any restrictions imposed on Sterling due to the breach, thus precluding its claim that the breach prevented it from growing and earning additional profits. Finally, Sterling has not identified a genuine issue of fact with respect to our showing that its lost profits claim is invalid because it would have been out of capital compliance, and subject to the restrictions imposed in accordance with FIRREA, even absent the breach. Sterling contends only that our method of calculating capital in the non-breach scenario is incorrect as a matter of law. Sterling's motion at 17-18. That argument, however, ignores the fact that, even if core capital is calculated using Dr.

Horvitz's methodology, Sterling still would not have been in compliance with FIRREA's minimum capital requirements as of December 31, 1989, when the noncontractual goodwill associated with its acquisition of Central Evergreen Savings and Loan Association ("Central Evergreen") was eliminated. App. 177; Govt. Supp. App. 17.

Moreover, Sterling's alternative claim for "actual" mitigation damages is invalid as a matter of law because Sterling's expert, Professor Christopher James, bases his model upon hypothetical, rather than actual, costs of replacing goodwill, contrary to law. See Granite Mgt. Corp. v. United States, 58 Fed. Cl. 766, 779 (2003), aff'd in part, remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005).

Finally, Sterling's attempt to rebut our showing that it is not entitled to wounded bank damages does not overcome the legal flaws in its calculations identified in our motion.

In attempting to support its motion for summary judgment, Sterling contends only that its motion should be granted because we have not provided an alternative estimate of damages. Sterling Memo at 37-38. This contention is invalid as a matter of law. See, e.g., Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (plaintiff bears burden of proving damages). Moreover, as set forth in our motion, we believe that Sterling replaced the approximately $13.3 million in contractual goodwill remaining when it raised $23.5 million in capital in 1991, and is entitled, at most, to the transaction costs associated with the replacement of the contractual goodwill. Govt. Motion at 16.

For these reasons, which we describe in greater detail below, The Court should grant our motion fro summary judgment, and deny Sterling's motion for summary judgment.

**I. Sterling's Motion For Summary Judgment Regarding Its Lost Profits Claim Should Be Denied, And Our Motion For Summary Judgment Granted, Because Sterling's Lost Profits Claim Is Speculative And Without Factual Basis**

**A. There Is No Basis For Awarding Lost Profits On Summary Judgment**

In our motion for summary judgment , we demonstrated that Sterling's lost profits claim is speculative and has no basis in fact. In response, Sterling both opposes our motion and asks the Court to award it $58.1 million in lost profits upon summary judgment. Sterling App. 186. With respect to its motion, Sterling has cited to no case in which a court has awarded lost profits on summary judgment to a plaintiff in a Winstar-related. In fact, no such case exists. Sterling attempts to justify an award of $58.1 in lost profits damages upon summary judgment for the sole reason that "the Government's experts have not opined as to the amount of damage, or proffered any alternative calculation." Sterling memo at 37-38. This assertion is incorrect as a matter of law and fact.

First, it is axiomatic that to recover expectation damages, a plaintiff bears the burden of demonstrating that the damages it seeks "are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); see also Restatement (Second) of Contracts §§ 347, 351, 352 (1981) ("Restatement"). The defendant is not obliged to create a lost profits model or calculation for the plaintiff. Indeed, in four separate opinions, the appellate court has explained the applicable legal requirements of lost profits claims and the factual circumstances in which these claims arise in Winstar -related cases, and then observed that, "given the speculative nature of such a damages claim, . . . experience suggests that it is largely waste of time and effort to attempt to prove such damages" in a Winstar-related case. Glendale

Fed. Bank, F.S.B., v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); California Fed. Bank, FSB v. United States, 395 F.3d 1263, 1270-71 (Fed. Cir. 2005); Fifth Third Bank v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005).

In a fifth case dealing with a breach that reduced a bank's ability to leverage, the Court held that, "attempting to determine what would have happened if the guarantee had been issued [a guarantee that would have increased the bank's leverage capacity] necessarily involves a highly speculative and conjectural inquiry." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (emphasis added). Thus, an award of lost profits on summary judgment would be inconsistent with the guidance from the appellate court.

Further, Sterling's claim that we have not provided an alternative basis for a damages award is factually incorrect. As set forth in our opening brief, one of our damages experts has opined that Sterling is entitled, at most, to the transaction costs associated with replacing the contractual goodwill. Govt. Motion at 26, citing Govt. App. 785. Consequently, there is no basis for the Court to award Sterling $58.1 in lost profits upon summary judgment.

In its brief, moreover, Sterling concedes that lost profits claims have been decided upon summary judgment in favor of the Government in four Winstar-related cases -- Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223, 235-36 (2003), Southern National Corp. V. United States, 57 Fed. Cl. 294 (2003), Standard Federal Bank v. United States, 62 Fed. Cl. 265, 298-99 (2004), and American Federal Bank, FSB v. United States, 68 Fed. Cl. 346 (2005). Sterling Memo at 14-15. Sterling, nonetheless, attempts to distinguish this case upon the grounds that "Sterling's continued profitability and adherence to a business model makes

measuring Sterling's damages straightforward and not speculative." Sterling Memo at 15. As a preliminary matter, this general statement does not distinguish this case from Fifth Third, Southern National, and Standard Federal, because all three thrift plaintiffs in those cases were profitable, and their profitability formed the basis for their alleged profitability in the lost profits model. Nonetheless, this Court rejected each model upon summary judgment. Fifth Third, 55 Fed. Cl. at 228, 240-42; Southern National, 57 Fed. Cl. at 303-04; Standard Federal, 62 Fed. Cl. at 276-77.[2] Further, in American Federal, the Court rejected the lost profits model without addressing profitability. American Federal, 68 Fed. Cl. at 358-59. Thus, the opinion provides no basis for distinguishing the case from the undisputed facts here.

In our initial brief, we explained that the proper measure of damages, in any are available, is the cost of replacing capital necessitated by the breach. Govt. Motion at 16. Sterling erroneously insists that lost profits are the only appropriate measure of damages in this Winstar-related case because it believes that "Government promises cannot be replaced." This position is contrary to Federal Circuit precedent. See, e.g., California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (awarding damages equal to the actual cost of replacing goodwill); Bank United v. United States, 50 Fed. Cl. 645, 662 (2001), aff'd, 80 Fed. Appx. 663, 2003 WL 22177282, at *9 (Fed. Cir., Sept. 22, 2003).

Thus, the Court should reject Sterling's motion for summary judgment regarding lost profits, and, instead, award summary judgment on that claim to the Government.

---

[2] Fifth Third, Southern National, Standard Federal and American Federal are indistinguishable from this case in many other respects addressed in detail below at Section I.E.1.

### B. Sterling's Lost Profits Model Fails As A Matter Of Law Because It Assumes That Sterling Never Replaced A Penny Of The $15 Million In Contractual Goodwill

In our opening brief, we established that Sterling mitigated its damages when it raised $23.1 million in regulatory capital in 1991. In response, Sterling claims that it never replaced a single penny of the $15 million in contractual goodwill eliminated by FIRREA, notwithstanding shrinkage,[3] Sterling memo at 11, and $471 million in capital raising between 1991 and today. Such an assumption, however, precludes Sterling from an award of lost profits because, as demonstrated in our opening brief at pages 16-18, it possessed a duty to mitigate, and it "cannot recover damages for loss that [ ] could have [been] avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts, § 350, cmt. b).[4]

---

[3] We note that this is a new allegation, and it is not reflected in Sterling's damages claims. Sterling's lost profits model is based not upon shrinking, but upon its alleged inability to take on additional, i.e., incremental, assets by leveraging the contractual goodwill eliminated by FIRREA. Further, Sterling does not allege that shrinking actually replaced the goodwill. To the contrary, Sterling's lost profits expert, Dr. Horvitz, has affirmatively testified that Sterling never replaced the goodwill.

[4] Sterling seeks to create an issue of fact with respect to mitigation by attempting to circumvent the admission by its chief executive officer, Mr. Harold Gilkey, at his July 2000 deposition, that Sterling would not have raised $23.1 million of capital in 1991 absent the breach. Sterling memo at 18-19. In a March 2007 declaration, Sterling App. 1-2, Mr. Gilkey now claims that he was not talking about the "but for" world in testifying at his deposition. This new declaration is an obvious, post hoc, litigation-driven change of position designed to support Sterling's lost profits claim, which was not final until mid-2001. Because testimony subject to cross examination is inherently superior to that given in an ex parte situation, a declaration inconsistent with previous deposition or trial testimony is not sufficient basis for denying a motion for summary judgment. Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 806 (1999); Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992). Nonetheless, Mr. Gilkey's declaration does not aid Sterling's case. If anything, Mr. Gilkey's claim that Sterling did not replace the $15 million in contractual goodwill when it raised $23.1 million in new capital in 1991, or at any time since then, Sterling App. 1-2, demonstrates Sterling's failure to

Sterling does not dispute that failure to mitigate precludes a damages award. See generally Sterling memo at 18-21. Instead, it claims that, as a "lost volume seller," it was impossible for it to replace the goodwill eliminated by FIRREA. Sterling Memo at 19-20. As a preliminary matter, Sterling is not a "lost volume seller." A "lost volume seller" is one who, upon a breach of contract, resells an article, e.g., a piece of equipment, to a second purchaser who would have purchased the item anyway, thus resulting in a lost sale. See, e.g., Advanced Medical, Inc. v. Arden Medical Sys., 955 F.2d 188, 200-01 (3rd Cir. 1992). Sterling's goodwill was not a piece of equipment that it could mass produce. Instead, it was a nonearning asset that could be replaced through the acquisition of tangible capital. California Federal, 245 F.3d at 1350. Further, Sterling has not advanced any facts to support its claim that it was incapable of raising sufficient capital to mitigate for the loss of $15 million in contractual goodwill, and, as stated above, the fact that it has raised nearly $500 million since 1991 renders such a claim incredible as a matter of law. Therefore, the Court should reject Sterling's lost profits claim because its model assumes that, from 1989 to the present, Sterling never replaced a penny of the $15 million in contractual goodwill eliminated by FIRREA.

### C. The Lost Profits Damages In Dr. Horvitz's Model Fail To Meet The Causation Standard

The Court should grant our motion for summary judgment because Sterling has failed to establish a material dispute of fact with respect to causation.[5] The undisputed facts demonstrate

---

mitigate.

[5] In its memorandum of points and authorities, Sterling claims that we do "not dispute" that its damages were foreseeable. Sterling Memo at 15-16. That is a misstatement. While we do not believe that Sterling's alleged lost profits were foreseeable, in light of, among other things, the small amount of contractual goodwill eliminated by FIRREA, we did not expressly

that. Specifically, our expert, Mr. Barefoot Bankhead, a certified public accountant, former banker, and former regulator with the Federal Home Loan Bank Board ("FHLBB"), has opined that, even absent a breach, FIRREA's elimination of the noncontractual goodwill attributable to the Central Evergreen acquisition would have rendered Sterling noncompliant with the statute's minimum capital requirements as of March 30, 1990. Govt. App. 813 n.8.[6] Further, he has demonstrated that Dr. Horvitz's methodology for calculating core capital is incorrect, and, if core capital were properly calculated, Dr. Horvitz's model would result in zero damages. Id. at 811-815. Consequently, even absent the breach, Sterling would have been subject to the restrictions imposed by OTS for noncompliance with FIRREA's regulatory capital requirements. Indeed, Sterling was actually better off in the actual world, in which a district court judge erroneously ruled that the Government breached a contract with respect to the Central Evergreen acquisition, than it would have been in a "but-for" world in which the noncontractual Central Evergreen goodwill would have been excluded from regulatory capital.

In response to these arguments, Sterling relies in part upon a new declaration, issued on March 28, 2007, by Dr. Horvitz.[7] Sterling App. 36. Dr. Horvitz is neither a certified public

---

base our motion for summary judgment upon that prerequisite to an award of damages because, even if foreseeable, Sterling's damages were neither caused by the breach nor has it met the reasonable certainty test. See generally Govt. Motion at 12-30. We reserve our right to challenge foreseeability at trial in the event that our motion for summary judgment is denied.

[6] Sterling, in its memorandum at pages 17-18, references a motion to strike Mr. Bankhead's expert report. We have briefed that motion separately. Our April 16, 2007, opposition to the motion to strike responds to the arguments in Sterling's memorandum.

[7] On April 16, 2007, we filed a motion to strike the declaration on the grounds that it includes new expert opinions rendered after the close of expert discovery. In the alternative, we have asked that the Court permit us to depose Dr. Horvitz with respect to the new opinions if the new opinions will be presented at trial.

accountant nor an expert in regulatory accounting. Govt. Supp. App. 2-3. Nonetheless, he attempts to rebut Mr. Bankhead's methodology for calculating capital regulatory capital in the "but-for" world with mere conclusions, unsupported by analysis, about the application of FIRREA to the calculation of regulatory capital. Sterling App. 25-31. These bald statements, which are not based upon citation to accounting literature or regulation, and without expertise in accounting, are of no value, and cannot be relied upon to rebut Mr. Bankhead's conclusions. Further, Mr. Bankhead's opinion with respect to the calculation of regulatory capital in the "but-for" world is supported by Mr. Joe Hargett, another accounting expert and former accounting fellow with the FHLBB. Govt. Supp. App. 4-16. Sterling has not rebutted Mr. Hargett's report.

Sterling's claim that Mr. Bankhead's methodology fails to take into account the contractual nature of goodwill associated with its acquisitions of Lewis Federal Savings and Loan Association ("Lewis Federal") and Tri-Cities Savings and Loan Association ("Tri-Cities") is equally unavailing. Even a cursory review of Mr. Bankhead's report demonstrates that, in calculating Sterling's capital in the "but-for" world, Mr. Bankhead counts the contractual Tri-Cities and Lewis Federal goodwill toward regulatory capital for all purposes. The error in Dr. Horvitz's calculation lies in his treatment of the noncontractual Central Evergreen goodwill. Govt. App. 809-15.

Sterling's contention that the Tri-Cities and Lewis Federal goodwill should not be viewed as "supervisory goodwill" is also without merit. This Court's opinions in this case have expressly identified it as such. See, e.g., Sterling Sav. Assn. v. United States, 72 Fed. Cl. 404, 404-06 (2006); Sterling Sav. Assn. v. United States, 57 Fed. Cl. 445, 453 (2003).

Finally, even if Dr. Horvitz's methodology for calculating regulatory capital were correct, Sterling still cannot establish causation because the thrift would not have met the tangible capital requirements even absent the breach. Dr. Horvitz incorrectly assumes that, absent the breach, Sterling would have raised approximately $10.5 million in tangible capital in December 1989. Mr. Bankhead's analysis establishes that, even taking into account that incorrect assumption, Sterling would not have met FIRREA's capital requirements absent the breach. Govt. App. 813 n.8.

Sterling, however, has not established that the breach prevented it from raising $10.5 million in new capital in December 1989. It bases the assumption upon its claim that the Government was committed to permit it to pay preferred stock dividends, and its failure to do so resulted in the failure of the capital raising effort. Sterling Memo at 8. This argument has already been resolved by the Court as a matter of law, however, when it determined that Sterling did not possess a contractual right to pay preferred stock dividends. Sterling, 53 Fed. Cl. at 615

Thus, even assuming that Dr. Horvitz's method for calculating capital is correct, Sterling, absent the assumed $10.5 million capital raising in 1989, would not have been in compliance with FIRREA's minimum tangible capital requirement absent the breach. Indeed, Sterling's own documents demonstrate that inclusion of the contractual Lewis Federal and Tri-Cities goodwill in calculating tangible capital would only improve its tangible capital *deficit* from negative $22.833 million to negative $7.276 million. Sterling App. 177; Govt. Supp. App. 17. That tangible capital deficit would have rendered Sterling non-compliant with the 1.5 percent minimum tangible capital requirement of FIRREA, 12 C.F.R. § 567.9(a) (1989), and subjected it to the restrictions that were imposed in the actual world. Thus, as stated above, Sterling was

better off in the actual world because it obtained an injunction prohibiting the enforcement of the restrictions based upon an erroneous legal finding that its Central Evergreen goodwill was contractual.

For these reasons, Sterling cannot meet its burden of proving that the breach caused the thrift to incur any lost profits, and our motion should be granted.

**D. Dr. Horvitz Erroneously Assumes That Sterling Was Unable To Grow Its Assets During The Pendency Of The District Court Injunction**

Sterling does not dispute that the district court issued a temporary restraining order ("TRO") in May 1990 and an injunction in August 1990 which prohibited the Government from taking action inconsistent with contracts entered into in connection with the Tri-Cities, Lewis Federal and Central Evergreen acquisitions. Further, Sterling does not address, much less dispute, our point that it was better off under the injunction than it would have been had no breach occurred because the district court judge erroneously found a breach of contract with respect to Central Evergreen. Nonetheless, Sterling claims, without supporting evidence, that, the Government violated the injunction and improperly forced Sterling to comply with the enjoined restrictions. Sterling Memo at 22-24. In addition, Sterling claims, with absolutely no factual basis much less a factual basis that creates a dispute of fact, that adherence to its pre-breach business plan while the injunction was in effect would have led to "ruin." As neither of these claims is supported by fact, they cannot preclude the Court from granting our motion for summary judgment.

As a preliminary matter, Sterling incorrectly claims that summary judgment on this issue is precluded because the Court held that it has standing to sue for damages notwithstanding the

issuance of the injunction. Sterling Memo at 21. In so contending, Sterling ignores the Court's acknowledgment, in the same opinion, that the injunction issue "may be relevant to the calculation of damages." Sterling, 57 Fed. Cl. at 240.

Further, Sterling's claim that it "suffered significant damage" prior to issuance of the TRO and injunction in May and August of 1990 is belied by Sterling's own expert's report. Sterling Memo at 21. Dr. Horvitz estimates that, prior to June 30, 1990 (after the TRO was issued), Sterling was forced to forgo $28,000 in earnings as a result of the breach. As established above, his calculation is invalid as a matter of law because he fails to acknowledge that Sterling would have been out of capital compliance even in the "but-for" world due to the elimination of the noncontractual Central Evergreen goodwill from regulatory capital. Nonetheless, $28,000 cannot be viewed as "significant" damage under any measure relevant to the Winstar-related cases, and certainly cannot provide a basis for arguing that the TRO, which was issued in May 1990, did not provide Sterling with an opportunity to recoup the alleged $28,000 loss.

Sterling's claim that it was prevented by regulators from "returning to its pre-breach mode of operations" during the pendency of the injunction is undermined by the thrift's conduct. While the injunction was in place, Sterling never alleged that the Government had failed to comply with the injunction. This failure to seek remedy by the district court obliterates Sterling's claim. Without contemporaneous evidence to support its claim that the Government violated the injunction, Sterling is left to create an issue of fact by "cherry picking" documents from the record. Sterling Memo at 22. For example, Sterling relies upon a June 5, 1990, letter from an Office of Thrift Supervision ("OTS") official indicating that Sterling would be required to report all that would have been prohibited in the absence of the injunction. Sterling App. 848. On its

face, the letter demonstrates that Sterling was permitted to engage in those activities, or there would be no need for such a report. Further, Sterling fails to acknowledge that, in response to a request for clarification of the requirement by Sterling's chief financial officer, the author, Ms. Carol Friend, expressly stated OTS's intent to "strictly obey" the district court order prohibiting it from enforcing any restrictions in contravention of the contracts. Govt. App. 46. Officials of the other regulatory agency responsible for Sterling, the Federal Deposit Insurance Corporation ("FDIC"), also complied with the injunction. Govt. App. 48-49. In fact, the FDIC, without knowledge of the injunction, attempted to enforce one of the restrictions affecting brokered deposits, and, upon learning of the injunction, reversed its decision and affirmatively determined that Sterling did not fit the definition of an "undercapitalized depository institution" notwithstanding its noncompliance with its regulatory minimums. Id. at 49.

Sterling also cites to OTS's transmittal of a report of examination assigning Sterling a rating of "5," which was the lowest rating available. Sterling fails to acknowledge, however, much less dispute, that the 1990 exam report that was the subject of the transmittal letter expressly stated the following:

> [Sterling's] overall capital position is considered poor even after giving full consideration and effect to the provisions of the November 1985, April 1988 and December 1988 acquisitions related agreements. Management maintains that the capital standards mandated by [ ] FIRREA do not apply to Sterling because of the association's prior "agreements" with the FSLIC/FHLBB. The Board and management have filed a lawsuit against OTS and FDIC in an effort to enforce their position and a preliminary injunction has been issued by the United States District Court enjoining the OTS from taking actions inconsistent with its order. Were OTS permitted to apply the FIRREA-mandated capital requirements, the association would not be in a capital compliant position.

Govt. App. 59. As demonstrated above, OTS was mindful of the district court's prohibition against taking any action for noncompliance with the capital requirements of FIRREA.

In 1991, Mr. Edwin Hedlund, Deputy Regional Director of the OTS office that supervised Sterling, acknowledged in writing that OTS was prohibited from taking action inconsistent with the injunction regardless of the examination rating assigned to Sterling. Govt. Supp. App. 25. None of the evidence cited by Sterling in its memorandum at pages 22-23 is at odds with this fact. To the contrary, Sterling cites to deposition testimony in which its chief executive officer, Mr. Harold Gilkey, acknowledges that Government personnel never advised him that they intended to take action in contravention of the injunction. Sterling Memo at 22; Sterling App. 1263-64. Therefore, summary judgment is appropriate.

Next, Sterling argues, with no support, that adherence to its business plan while the temporary injunction was in place would have "exposed" it to "ruin" if the injunction were dissolved.[8] Sterling Memo at 22, citing Sterling App. 1258-70 (Gilkey deposition). The deposition testimony of CEO Harold Gilkey cited for this point, however, does not address it. Elsewhere, Mr. Gilkey asserts that resumption of normal operations during the pendency of the injunction could have been "suicidal." Mr. Gilkey offered no facts to support the assertion other than his incorrect claim that OTS did not intend to abide by the injunction. App. 2-3. The only factual evidence in the record is the testimony of members of Sterling's board of directors that issuance of the injunction provided the relief necessary for Sterling to resume normal operations.

---

[8] In so contending, Sterling implies that a "temporary" injunction, because it is temporary, provides less protection from adverse action than a permanent injunction. Id. A permanent injunction, however, would also have been subject to appeal, and, theoretically, should have provided no more protection than the temporary injunction.

Govt. Supp. App. 65, 66. Sterling's claim that any effort by OTS to ensure safe and sound operation of the thrift would have contravened the terms of the injunction is similarly misplaced. Sterling Memo at 22-23. As stated above, the district court's decision imposing the injunction expressly recognizes that OTS retained the ability to regulate Sterling, subject to the contracts. Sterling Sav. Assn. v. Ryan, 751 F. Supp. 871, 884 (1990). Also, Sterling has provided no evidence or legal authority to support its apparent assumption that, upon dissolution of the injunction, Sterling would have been penalized for operating within its terms during its pendency. Thus, Sterling has not identified a genuine dispute of material fact that would defeat our motion.

Finally, Sterling erroneously argues that we have conceded that this issue involves a dispute of fact. Sterling Memo at 24. Our statement, in a January 16, 2001, brief in support of a motion for summary judgment upon liability, that disputed issues of fact were raised was not made in the context of our motion for summary judgment with respect to the effect of the injunction. To the contrary, we established that there were no genuine issues of factual dispute to defeat our motion for summary judgment on the issue. App. 501-02. We noted, however, that Sterling's assertions in its briefs created factual disputes defeating its cross-motion for summary judgment on liability. App. 500. Consequently, Sterling's attempt to utilize a statement we made in a 2001 briefing in the context of a liability motion cannot be relied upon to create a genuine dispute of fact in the context of this motion for summary judgment upon damages.

### E. Dr. Horvitz's Lost Profits Model Is Invalid Because It Fails To Identify The Assets That Would Have Been Acquired Absent The Breach Or The Liabilities That Would Have Funded Those Assets

In response to our demonstration that Dr. Horvitz's model is identical to the models rejected upon summary judgment in Fifth Third and Southern National, and Standard Federal, Sterling makes no attempt to distinguish those cases. Instead, Sterling argues that all damages models are inherently speculative and that Dr. Horvitz properly assumed that Sterling would have been as profitable in the "but-for" world as it was in the actual world. Sterling Memo at 26-27. As demonstrated below, similar arguments were offered and rejected by the plaintiffs in Fifth Third, Southern National, and Standard Federal. Finally, Sterling has not met its burden of alleging specific facts that show a genuine dispute of fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574-586-87 (1986). Sterling's attempt to create an issue of fact by identifying the names of customers allegedly lost or growth opportunities allegedly forgone is unavailing because the deposition testimony relied upon for the facts alleged either does not connect the loss to the breach or ignores the district court's injunction.

#### 1. Dr. Horvitz's Lost Profits Model Is Indistinguishable From The Models Rejected In Fifth Third, Southern National and Standard Federal

In our opening brief, we established that Dr. Horvitz's conclusion that Sterling's asset base would be up to $427 million larger absent the breach is speculative as a matter of law because he concedes that he did not identify the assets that would have been acquired absent the breach or the liabilities that would have funded those incremental assets. Govt. Motion at 22, citing Govt. App. 380-81. In fact, he acknowledged that the composition of the foregone assets was not an essential part of his analysis. Govt. Motion at 22, citing Govt. App. 385. Sterling

does not dispute that Dr. Horvitz made such concessions. Instead, it claims that such analysis was unnecessary because Sterling has always been profitable, while, "in other lost profits cases, this assumption is invalid due to the other thrifts' history of operating losses or foreclosure upon enforcement of FIRREA." Sterling Memo at 25. Relying upon its assumption that profitability is the sole prerequisite to a lost profits claim, Sterling effectively contends that its model is insulated from summary judgment. Id. at 25-26. This contention ignores the Fifth Third, Southern National and Standard Federal opinions, in which the Court rejected, upon summary judgment, damages models nearly identical to Dr. Horvitz's because the expert estimated damages by assuming that the additional assets and liabilities acquired by the "but-for" bank would be as profitable as the actual bank, without addressing the composition of the purported forgone assets and liabilities.[9]

In Fifth Third, the expert retained by the plaintiff to estimate lost profits used the same methodology employed by Dr. Horvitz here - - he merely used the contractual goodwill eliminated by FIRREA to "lever" up the but-for bank's assets and assumed a rate of return, or profitability, lower than that experienced by the actual bank. 55 Fed. Cl. at 228. The Court, in granting summary judgment to the Government, acknowledged that the plaintiff was profitable. Id. at 241. Moreover, there was evidence that the thrift intended to invest, in the "but-for" world, in the same types of assets and liabilities in which it had invested in the actual world, which is

---

[9] In addition, this assumption ignores the American Federal decision, in which the Court did not expressly address profitability, but rejected, upon summary judgment, the lost profits model advanced by plaintiff's expert because, like Dr. Horvitz, he "did not 'try to identify specific [profitable] opportunities of one kind [or] another'. . .[r]ather, he alleged only that American Federal would have leveraged its lost regulatory capital to 'support additional earnings assets' that would have generated profits." American Federal, 68 Fed. Cl. at 358.

consistent with what Dr. Horvitz assumes. Id. at 240-41. The Court rejected the model notwithstanding the fact that the plaintiff's expert, unlike Dr. Horvitz, assumed a level of profitability that was less than the actual bank's actual return on assets. Id. at 228. The Court also assumed, for purposes of the motion, that the plaintiff shrank in response to the breach, and recognized that the plaintiff thrift was forced to sell one of its divisions, a claim similar to Sterling's allegation that it shrunk and lost customers in response to the breach. Id. at 228, 242. Nonetheless, the Court granted summary judgment to the Government because that evidence did not satisfy plaintiff's burden of showing "what investments it would have made or activities in which it would have engaged in a hypothetical world without FIRREA and with its competitors restored to the real-world banking environment." Id. at 242.

Similarly, in Southern National, the plaintiff's expert based his lost profits projection upon the profitability of the actual thrift, and assumed, like Dr. Horvitz in this case, that, in the "but-for" world, the thrift would invest in the same types of assets and liabilities that it had relied upon to earn profits in the actual world. 57 Fed. Cl. at 303-04. In that case, lost profits would not have been generated by the model if the actual thrift had not been profitable, yet summary judgment was granted to the Government because the model did not reveal how the plaintiff would have acquired the additional assets absent the breach. Sterling does not deny that the models used by the experts in Fifth Third and Southern National are similar to, and perhaps better than, Dr. Horvitz's model. Therefore, the Court should reject Dr. Horvitz's model for the same reasons.

Standard Federal also presents similar facts. In that case, plaintiff's expert projected profitability by the "but-for" bank similar to that enjoyed by the actual bank. 62 Fed. Cl. at 276-

77. Nonetheless, the Court granted summary judgment to the Government, after limited testimony by the experts, because the model utilized merely assumed growth without identifying specific opportunities for growth. Id. at 277.

Here, Sterling boasts that, notwithstanding the breach, it has experienced growth from under $1 billion in assets to over $10 billion due to "aggressive" growth strategies. Sterling Memo at 26. Nonetheless, it claims that, notwithstanding this "aggressive" approach, the addition of only $15 million in goodwill, a nonearning asset, would have added, over a period of time, as much as an additional $427 million in assets and in excess of $58 million in additional profits. Dr. Horvitz's failure to identify the additional assets and liabilities Sterling would have acquired notwithstanding its already "aggressive" approach renders his model speculative as a matter of law. Further, the speculative nature of his model is magnified by his assumption that Sterling never replaced a single dollar of that $15 million in nonearning assets notwithstanding the fact that it raised in excess of $500 million in new capital between 1991 and 2006. Sterling App. 170. Absent that assumption, Dr. Horvitz's lost profits model is insupportable, and should be rejected upon summary judgment.

**2. Sterling's Claim That The Breach Forced It To Forgo Opportunities For Growth Is Unsupported By The Record**

In an attempt to overcome Dr. Horvitz's admitted failure to identify the assets and liabilities that would have supported the peak of $427 million of additional growth assumed in his model, Sterling spends several pages of its brief purportedly identifying customers who left due to the breach and acquisitions of other thrifts or thrift branches forgone due to the breach. A cursory inspection of this "evidence" demonstrates that the claim is without basis. Moreover,

even if Sterling could demonstrate that some customers left due to the breach, we would still be entitled to summary judgment because similar evidence existed in Fifth Third and Southern National, and the Court granted summary judgment to the Government nonetheless.

**a. Sterling Provides No Evidence To Support Its Claim That It Would Have Made Numerous Additional Acquisitions of Thrifts And Thrift Branches Absent The Breach**

Sterling claims, without citation, that "Dr. Horvitz and numerous fact witnesses cite definitive acquisitions consistent with Sterling's pre-breach growth plan that Sterling could not make as a result of the Government's breach." Sterling Memo at 27. Ultimately, Sterling cites to deposition testimony by its chief financial officer, Mr. Daniel Byrne, and CEO Gilkey that allegedly establishes that the breach rendered Sterling unable to make acquisitions. With only one exception, the deposition testimony relied upon, however, actually establishes that, while Sterling considered many potential acquisitions over the years, Mr. Byrne and Mr. Gilkey did not know whether the breach was a factor in the decision by Sterling or the acquisition target not to move forward. See, e.g., Sterling App. 1279-81, 1132-44; see also Govt. Supp. App. 30. This is obvious with respect to each of the potential acquisitions mentioned by name on page 31 of Sterling's brief. The evidence merely shows that Sterling considered many acquisitions, but did not complete them, and Sterling does not mention that it accomplished a series of successful acquisitions that were a contributor to the thrift's growth. Sterling App. 176.

First, Sterling claims that the breach prevented its acquisition of two branches of Great American Bank. This claim is also the subject of a wounded bank damages claim. Sterling has not established, however, that the acquisition, which was initiated prior to the imposition of restrictions pursuant to FIRREA, would have occurred absent a breach.

Consequently, Sterling's "evidence" of acquisitions prevented by the breach provides no basis for Dr. Horvitz's assumption that, absent the breach, Sterling would have acquired an additional $284 million in assets. Indeed, Dr. Horvitz's model does not contemplate growth through acquisition of additional whole thrifts or thrift branches, because it does not factor in the purchase price or deposit premia that would have been involved with such acquisitions. Sterling App. 172.

**b. Evidence Of Sterling's Shrink Does Not Support Dr. Horvitz's Claim, That, Absent The Breach, It Would Have Achieved The Growth Assumed In His Model**

In an attempt to provide evidence of the additional assets and liabilities that Dr. Horvitz assumes would have been available to Sterling absent a breach, Sterling points out that it shrank after FIRREA was enacted, and did not grow its business as planned. Sterling Memo at 27-30. This line of argument suffers from two compelling flaws. First, the plaintiff thrift in Fifth Third made an identical claim, and, while the Court assumed in that case that the shrink was attributable to the breach, summary judgment was granted to the Government nonetheless because that fact did not provide the "missing elements" of the model, i.e., the business opportunities that would have been pursued absent the breach. Fifth Third, 55 Fed. Cl. at 242.

Second, Sterling's claims that, absent the breach, it would have expanded existing offices and quadrupled one of its existing lines of business by opening new offices, Sterling Memo at 27-28, fails to account for the fact that, once the injunction was in place, it was not precluded from doing so, and, instead, made a business decision not to pursue the opportunities allegedly available to it. Thus, it was not the breach that prevented Sterling from growing, if, in fact, the opportunities existed and could have been easily exploited, but Sterling itself that prevented its

growth. Moreover, while Sterling personnel testified anecdotally at deposition about individual customers who were turned away during the breach (e.g., a priest in Salish who had deposits in excess of $1 million), its executives also admitted that it kept no record of the customers who allegedly left due to the breach. Sterling App. 1282-83.

Moreover, close scrutiny of the "evidence" cited by Sterling to support the list, at pages 29 and 30 of its brief, of customers that purportedly left due to the breach reveals that Sterling has no idea whether the customers left due to the breach. The numbered list on page 29 of the brief refers only to customers that a former Sterling employee believes left during a specific timeframe. That employee acknowledged, however, that he did not know whether the customers left due to the breach. Sterling App. 1184-1211. Similarly, the list, at page 30 of Sterling's memorandum, of potential customers who were turned away is supported only by deposition testimony stating that these potential customers contacted Sterling during the time that the restrictions were in place. The deponent did not claim to know, with respect to the vast majority of the list, whether, absent the breach, the potential customers listed would have obtained loans from Sterling. Govt. Supp. App. 50-53.

Finally, in response to our point that Dr. Horvitz, like the expert in Fifth Third, 55 Fed. Cl. at 242, failed to take into account competitors in the market that would have interfered with Sterling's growth, Sterling does not direct the Court to evidence in Dr. Horvitz's reports or underlying data that he studied the effect of competitors on Sterling's ability to achieve additional growth beyond what it actually achieved. Instead, it selectively cites to deposition testimony in which Dr. Horvitz states that he "looked" at Sterling's competitors and Sterling's market share. Sterling Memo at 32, citing Sterling App. 1385. Sterling fails to mention,

however, that, in the same page of Dr. Horvitz's deposition, he conceded that he had not attempted to study what Sterling's competitors would have done. Sterling App. 1385:7-12. Therefore, our point is unrebutted.

In short, the "evidence" of business opportunities forgone by Sterling due to the breach is completely unsupported, and cannot overcome our showing that, in constructing his lost profits model, Dr. Horvitz committed the same fatal error that resulted in summary judgment for the Government in Fifth Third, Southern National, Standard Federal, and American Federal.

## II. DR. JAMES'S COST OF MITIGATION ANALYSIS IS INVALID

In our opening brief we demonstrated that Dr. James's "mitigation" model is invalid because it is based upon hypothetical, rather than actual, costs to replace the $15 million in contractual goodwill eliminated by FIRREA. Govt. Motion at 24-26, 28-31. In response, Sterling makes only two points. First, it claims that it never mitigated because "Government promises can never be replaced." Sterling Memo at 32. As demonstrated below, that claim is contrary to undisputed evidence that Sterling raised in excess of $23 million in capital in 1991, and more than $470 million since then, Sterling App. 170, and overwhelming precedent establishing that numerous thrifts replaced goodwill eliminated by FIRREA through capital raising. Second, Sterling claims that, assuming replacement is possible, its expert, Dr. James, has established the actual costs associated with the common stock issued in 1991. That claim is equally baseless, since neither Sterling nor Dr. James deny that his estimate of "actual costs" associated with the issuance of common stock uses a subsequent, unrelated preferred stock issuance as a "proxy" for the "actual" costs.

Sterling's claim that Government promises can never be replaced is contrary to the Winstar-related cases in which this Court and the Federal Circuit have held that goodwill can be replaced. See, e.g., LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1374-1375 (Fed. Cir. 2003); California Fed., 245 F.3d at 1350; Bank United v. United States, 50 Fed. Cl. at 662. Further, Sterling has, in fact, raised over $470 million in real capital since the enactment of FIRREA. Therefore its claim that goodwill "cannot be replaced" is baseless.[10] See American Federal, 68 Fed. Cl. At 359 (thrift cannot claim lost profits when it has fully mitigated).

With respect to Sterling's claim that economic and financial principles mandate a finding that the issuance of common stock bears a cost, Sterling Memo at 32-33, Sterling has not met its burden of showing that any actual costs, other than transactions costs, were incurred in its issuance of common stock. To the contrary, Professor James conceded that "Sterling has not paid cash dividends on any of its common stock, including the common stock issued in 1991." Govt. App. 574. He then asks the Court to "consider if instead Sterling had issued preferred stock in 1991 with a stated dividend rate (just like it did in 1993)." Id. Thus, Sterling has used a 1993 preferred stock dividend rate as a "proxy" for actual costs incurred in issuing, two years earlier, common stock on which no dividends were paid.

As demonstrated in our opening brief, this methodology has been affirmatively rejected by the Federal Circuit. LaSalle, 317 F.3d at 1375. In response, Sterling contends only that the dividend rate utilized by Professor James is based upon an actual capital raising. That argument,

---

[10] Further, as shown above, Sterling's failure to acknowledge that goodwill can be replaced demonstrates that it has not satisfied its obligation to mitigate any harm resulting from the breach." Robinson v. United States, 305 F.3d at 1333; see also Bank United, 50 Fed. Cl. At 662 ("In sum, plaintiffs had a duty to mitigate the lost leverage and they did mitigate.").

in defense of a conceptually identical model offered by Professor James, was rejected by this Court, which found that, with respect to the actual replacement capital, the plaintiff had not paid any dividends. Granite, 58 Fed. Cl. at, 779 (cost of replacement model rejected because plaintiff "was not required to, nor did it, ever make any dividend payments" with respect to capital raised). Therefore, plaintiff was not entitled to damages. That holding was affirmed by the Federal Circuit. Granite, 416 F.3d at 1381-82.

For these reasons, the Court should grant our motion for summary judgment with respect to Sterling's mitigation claim.

## III. PLAINTIFFS' WOUNDED BANK DAMAGES FAIL AS A MATTER OF LAW

With respect to its alleged wounded bank damages, Sterling cannot overcome the legal flaws in the five categories of "wounded bank" damages advanced by its experts.

### A. The Breach Did Not Cause Sterling To Incur Increased Costs In Purchasing A Branch Of Great American Bank

Sterling alleges that it was damaged by purchasing a branch of Great American Bank in 1994 or 1995, yet it does not dispute that the breach did not cause it to purchase the branch. Sterling Memo at 34-35. Therefore, Sterling cannot meet the foreseeability or causation prerequisites to maintain of the claim. Further, Sterling provides absolutely no evidence to support its assertion that it was unable to acquire the branch in 1991, when it originally pursued the idea, because the "Government refused to recognize the capital attained through the contracts." It is well settled that self-serving conclusory statements as to the ultimate issue asserted by a party's witnesses do not raise a genuine issue of material fact. Imperial Tobacco

Ltd. v. Phillip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1564 (Fed. Cir. 1987)); RCFC 56.

Finally, Sterling has provided no factual support for its motion for summary judgment upon this issue. For these reasons, the Court should grant our motion.

**B. Sterling Has Not Established That Its Purported "Excess Supervision Costs" Are Attributable To The Breach**

In response to our showing that Sterling has not established that the breach caused it to incur excess supervision costs, Sterling provides no evidence to support its claim and instead argues that the mere assertion by its chief financial officer and expert that such costs were incurred should be enough to overcome summary judgment. Sterling Memo at 35-36. That is incorrect. Sterling has provided no evidence demonstrating that the breach resulted in higher supervision costs than would have been incurred absent the breach. It has merely alleged that supervision costs were incurred.

In addition, as was the case with its claim for alleged costs associated with the Great American Bank acquisition, Sterling has cited no facts to support its motion for summary judgment upon this issue. Therefore, the Court should grant our motion.

**C. Losses Attributable To The CJ-4 Loan Were Not Caused By The Breach**

With respect to losses on its CJ-4 Loan, Sterling, in its brief, provides evidence establishing only that it incurred losses on the loan. It provides no evidence establishing, nor does it even allege, that the losses were caused by the breach. Sterling Memo at 36. Therefore, for the same reasons articulated above with respect to its claims with respect to the Great

American Bank branch and excess supervision costs, Sterling's motion should be denied, and the Court should grant our motion for summary judgment upon this claim.

### D. Sterling's Inability To Pay Dividends In Connection With Its 1989 Units Offering Was Not Caused By The Breach

As was the case with the other wounded bank claims, with respect to its claim for costs associated with the 1989 Units Offering, Sterling merely asserts, in its brief, that its damage was "traceable" to the breach, and fails to cite a single fact in support of the assertion. Sterling Memo at 37. Therefore, its motion should be denied, and our motion should be granted.

### E. Sterling's Claim For Legal And Accounting Costs Should Be Dismissed Upon Summary Judgment Because Sterling Has Failed To Rebut Our Motion

In our motion, we demonstrated that Sterling has not provided facts establishing that legal and accounting fees it incurred were caused by the breach. Govt. Motion at 38-40. In addition, we showed that recovery of legal fees incurred in litigating against the Government is barred as a matter of law. Id. at 38-39, citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108, 123 (2003).

In its memorandum responding to our motion, Sterling fails to even acknowledge this claim, much less rebut it. Therefore, the Court should grant our motion for summary judgment with respect to the claim.

## CONCLUSION

For the reasons set forth above, the Court should grant the Government's motion for summary judgment regarding plaintiffs' damages claims, and dismiss those claims, and deny Sterling's motion for summary judgment.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM G. KANELLIS
ELIZABETH HOLT

April 30, 2007

CERTIFICATE OF FILING

I hereby certify that on April 30, 2007, a copy of foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS REVISED MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES AND OPPOSITION TO STERLING'S CROSS-MOTION FOR SUMMARY JUDGMENT," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford