# INDEX TO APPENDIX


**DOCUMENT** **PAGE**

Deposition of Paul Horvitz (Excerpts), dated January 25, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Expert Report of Joe A. Hargett, dated February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sterling Capital Restoration Plan, dated February 19, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sterling Savings Association, Composite Macro Rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Letter from Daniel Byrne to Ed Hedlund, dated May 21, 1991
Re: Exceptions to Operational Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Deposition of Harold Gilkey (Excerpts), dated June 8, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sterling Savings Association 1990 Business Plan (Excerpt) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

FHLB Report of Examination dated June 19, 1989 (Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

OTS Special Limited Report of Examination dated November 13, 1989 (Excerpts) . . . . . . . . . 34

Sterling Savings Association Form 10-K, dated June 30, 1989 (Excerpts) . . . . . . . . . . . . . . . . . 36

Sterling Savings Association Form 10-K, dated June 30, 1990 (Excerpts) . . . . . . . . . . . . . . . . . 38

Sterling Savings 1990 Annual Report (Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

OTS Special Limited Report of Examination dated November 13, 1989
(Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Updated Amended Expert Report of Mukesh Bajaj, PhD,
dated February 15, 2007 (Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Deposition of Cajer Neely, dated June 26, 2002 (Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

OTS Letter from Ronald N. Karr to Harold B. Gilkey, dated October 13, 1989
Re: Sterling Application (Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**[Pages 57-59 intentionally omitted]**

Sterling Financial Corporation Form-10-K, dated June 30, 1996 (Excerpts) . . . . . . . . . . . . . . . 60

Sterling Savings Association Joint Report of Examination,
dated October 14, 1997(Excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Deposition of Robert Meyers (Excerpts), dated April 25, 2000 . . . . . . . . . . . . . . . . . . . . . . . . 64

Deposition of Robert Larrabee (Excerpts), dated April 26, 2000 . . . . . . . . . . . . . . . . . . . . . . . . 66

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x

STERLING SAVINGS ASSOCIATION, a :
State-chartered savings :
Association, STERLING FINANCIAL :
CORPORATION, a Washington :
Corporation, :
Plaintiffs, :
v. : COURT NO. 95-829-C
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - - - - -x

Videotaped Deposition of PAUL HORVITZ, PH.D.

Washington, D.C.

Thursday, January 25, 2007

9:00 A.M.

Reference No.: 3837-8

Pages 1 through 203

Reported by: Cassandra E. Ellis, RPR

to what had to be done in terms of the calculations.

Q Okay. So the structure and set up of the calculations in tables 4B and 4C were -- were -- arose from instructions to you by Mr. Schirtler, from you to Mr. Schirtler?

A Yes.

Q Okay.

A Tables 4B and 4C did not exist in the previous report.

Q Right?

A These calculations were not necessary in the previous report. So this is the thing that is -- that is new and added as a result the Judge's decision.

Q Okay. All right, we're going to return to these tables in a lot more detail, later. You -- are you a CPA?

A No.

Q Are you -- do you consider yourself to be an expert in accounting?

A No, I'm certainly not an expert in accounting, though I've obviously made a lot of use of

-- of accounting statements, and I can read accounting statements, but I'm not an accountant.

Q Thank you. Okay, but other than Mr. Schirtler, did anybody else at Cornerstone help you with preparing this new report?

A Well, there were people who -- who -- on Mr. Schirtler's staff who -- who were involved.

Q Did you work directly with any of them?

A No.

Q So you had no conversations with anyone except Mr. Schirtler?

A That's correct.

Q Okay. In connection with the preparation of the report at any point did you discuss the report with counsel for Sterling or Sterling management?

A Yes.

Q When?

A At some point in November I -- I spoke to -- to Mr. Weatherhead and I spoke to Mr. Symmes in connection, just with the scheduling of -- of this deposition.

Q So you had no substantive conversations

# SUPPLEMENTAL EXPERT REPORT OF JOE A. HARGETT

***STERLING SAVINGS ASSOCIATION ET. AL. v. UNITED STATES OF AMERICA***
**Case No. 95-829-C**

---

## I. QUALIFICATIONS

1. My name is Joe A. Hargett. I graduated summa cum laude from the University of Alabama with a Bachelor of Science degree in Commerce and Business Administration with a major in accounting. From 1984 to early 1989, I worked in the audit department of KPMG Peat Marwick, an international accounting firm. While there, I was designated as an industry expert in financial institution matters and served as a national instructor for the firm on financial institutions.

2. In March 1989, I began a two-year fellowship with the Federal Home Loan Bank System / Office of Thrift Supervision (OTS), the primary regulatory body for the savings and loan industry. My assignments included, among other things, (1) writing issue papers and opinions on accounting matters, (2) drafting segments of regulations and other regulatory guidance for the savings and loan industry, and (3) developing training materials and teaching courses on capital standards, recent accounting issues and other areas.

3. From 1991 to October 2003, I worked as a financial consultant at Navigant Consulting, Inc. (Navigant Consulting) or one of its predecessor firms. From April 1999 to October 2003, I was a Director with Navigant Consulting. From October 2003 until September 2006, I remained as an employee of Navigant Consulting, working on a part-time basis. In September 2006, I retired from Navigant Consulting. I remain primarily retired, but have worked as a private, independent consultant/contractor since September 2006. While employed at Navigant, my assignments involved the financial services industry as well as the performance and/or evaluation of damage analyses. Additional information is provided in my resume at Exhibit A.

## II. Background and Assignment

4. During 2001, I was asked by the U.S. Department of Justice to review and analyze various accounting issues surrounding the acquisition of certain thrifts undertaken by Sterling Savings Bank, FSB (Sterling) during the 1985-1988 time period. In April 2002, I issued a report in which I responded to certain claims made in reports issued by Dr. Christopher James and Dr. Paul Horvitz during September 2001. I also responded to certain claims regarding wounded bank damages that were made by Mr. Daniel Byrne, the CFO of Sterling. While my opinions regarding wounded bank damages remain relevant to the ongoing litigation, my understanding is that the other issues I addressed have been resolved by the United States Court of Federal Claims (the Court) or will not be presented by Sterling at trial.

5. On August 30, 2006, the Court issued a ruling that determined that the enactment of FIRREA did not breach the terms of the Central Evergreen contract and that the supervisory goodwill that was recorded as part of that transaction was not contractually protected from the new capital regulations. In other words, the Central Evergreen acquisition was a non-contractual acquisition. In contrast, the Tri-Cities and Lewis Federal transactions are considered to be contractual acquisitions. As a result of this new ruling, Dr. Horvitz issued his Update to the Expert Report of Paul Horvitz (the "Horvitz 2006 Report"), on December 11, 2006 to amend the plaintiff's damages claim.

6. During January 2007, I was asked by the U.S. Department of Justice to review and consider how core capital was calculated within the 2006 Horvitz report. More specifically, I have been asked to review the expert report prepared by W. Barefoot Bankhead (the Bankhead Report) in this matter and to opine on the methodologies

used to calculate core capital that are described within that report. The documents I have considered in preparing this report are listed in Exhibit B. As my work in this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiff's experts.

## III. Analysis of Dr. Horvitz's Core Capital Calculations

7. As an accounting fellow for the Office of Thrift Supervision from 1989 to 1991, one of my responsibilities was to serve on the working group that was responsible for implementing the capital regulations that were issued to implement the new capital requirements of the FIRREA legislation. As part of that working group, I served as the initial drafter of certain parts of that regulation, including items relating to supervisory goodwill. As such, I was one of the regulators involved in the creation and implementation of guidelines for the calculation of core capital during the 1989-1991 time period. I also developed training materials for a course on the new capital regulation, and served as one of the primary instructors to train selected regulatory personnel from the field offices of OTS.

8. The capital regulations that were drafted during the post-FIRREA time period represented a new standard by which to analyze a thrift's capital levels. The new capital regulation allowed for the inclusion of a portion of supervisory goodwill in the calculation of core capital during the 1989-1994 time periods. This portion of allowable supervisory goodwill was known as Qualifying Supervisory Goodwill and was defined as follows:

> (1) any unamortized goodwill (FSLIC Capital Contributions as reported in the September 30, 1989 Thrift Financial Report) that existed on April 12, 1989 resulting from prior regulatory accounting practices…plus (2) the lesser of: (i) supervisory goodwill as defined in 567.1 (ee)… (12 CFR § 567.1 (w)).

---

9. Under a scenario in which OTS, during the 1989 to 1994 time period, was working to allow all contractual goodwill to be included in the new regulatory core capital requirements of FIRREA (including the 1.5% limit of supervisory goodwill in regulatory capital), it is my opinion that all contractual goodwill would have been first applied to the 1.5% limit. Under this scenario, had contractual goodwill exceeded the 1.5% limit, it would have been allowed to continue to count despite the 1.5% limit. To the extent that contractual goodwill was less than 1.5%, other non-contractual goodwill, if any, could have been used up to the 1.5% limit. My opinion under this scenario is based upon (1) my employment as an accounting fellow for OTS from 1989 to 1991 (including my responsibilities on the working group that was responsible for implementing the capital regulations that were issued to implement the new capital requirements of the FIRREA legislation), and (2) all my experiences as an accountant and consultant over the years. Even without my unique background at OTS in 1989-1991, it is my opinion that the treatment described earlier in this paragraph would be the correct, and only correct, answer. This would have been the most appropriate methodology as it would have given a priority to supervisory goodwill that had been generated from a contractual transaction. To not do so could have resulted in a scenario in which institutions that were involved in non-contractual acquisitions would have received equally favorable treatment to those with contractual goodwill despite the FIRREA legislation's 1.5% supervisory limit (as well as other limits, including requirements that standards be no less stringent that those applicable to national banks.)

10. I have reviewed the Bankhead Report and I concur with Mr. Bankhead's conclusions regarding the calculation of core capital. I see no support for the adoption of the core capital calculations created by Dr. Horvitz and believe that such calculations result in an overstatement of Sterling's "but-for" core capital position.

**SUPPLEMENTAL EXPERT REPORT OF JOE A. HARGETT**

***STERLING SAVINGS ASSOCIATION ET. AL. v. UNITED STATES OF AMERICA***
**Case No. 95-829-C**

---

11. I hold these opinions to a reasonable degree of certainty and plan to testify to these issues at trial. As noted above, my work in this matter is ongoing and, if necessary, I will supplement my findings based on the results of my continuing work, or as a result of any new matters raised by plaintiff's experts.

Joe A. Hargett

February 15, 2007

**Date**

**Exhibit A**

**JOE A. HARGETT**
6295 TIMARRON COVE LANE
BURKE, VA 22015

---

| | |
|---|---|
| **SEPTEMBER 2006-CURRENT** | **Retired/Part-time consultant/contractor** |
| **FEBRUARY 1991-SEPTEMBER 2006** | **Navigant Consulting, Inc./Peterson Consulting** |

***Positions Held:***

| | |
|---|---|
| October 2003 – September 2006 | Part-time Hourly Employee |
| April 1999 – October 2003 | Director |
| January 1993 – March 1999 | Vice President |
| February 1991 – December 1992 | Executive Consultant |

Responsible for numerous financial consulting assignments in a variety of industries including the financial services industry. Experience has included numerous damage analyses involving professional malpractice, fidelity bond and other matters. Responsibilities for management of engagements have included assessment of available information, overall planning of work to be performed, supervision of the execution of work, analyses and summarization of information.

Engagement experiences have included investigation and fact-finding related to loan and investment portfolios (including loss recognition), loan servicing portfolios, fraud investigation, reconstruction of the reasons for losses, collateral evaluation, analyses and evaluation of appraisals, as well as other valuation related work.

Instructor for over twenty national training courses involving accounting, financial and litigation matters primarily in the financial services industry. These courses have been presented to government agencies, accounting firm personnel as well as law firms.

---

**MARCH 1989 - FEBRUARY 1991**

**Federal Home Loan Bank System/Office of Thrift Supervision ("OTS")**

***Position Held:*** Professional Accounting Fellow

Received a fellowship appointment to work for the savings and loan industry's primary regulatory body. Assignments included, among other things, (1) writing issue papers and opinions on accounting matters; (2) drafting segments of regulations and other regulatory guidance for the savings and loan industry; (3) serving as a frequent speaker to various industry and accounting groups throughout the United States; (4) developing training material and teaching courses on capital standards, recent accounting issues and other areas for OTS; (5) answering questions from financial institutions, CPA's and others on technical accounting matters; and (6) briefing the Director of OTS and other senior policy personnel on accounting and regulatory matters.

Special projects while at OTS included matters involving regulatory capital standards, investment portfolio issues, as well as evaluating mortgage banking operations and their loan servicing operations.

**1984 - 1989**

**KPMG Peat Marwick**

***Positions Held:***

| | |
|---|---|
| 1984 - 1985 | Assistant Accountant |
| 1985 - 1986 | Senior Accountant |
| 1986 - 1987 | Supervising Senior Accountant |
| 1987 - 1989 | Manager |

Worked on both audit and consulting engagements including many engagements involving the financial services industry. Responsibilities included engagement planning and supervision, evaluation of internal controls, execution of engagements, supervision of staff, report preparation and client interface.

**JOE A. HARGETT**
*(Continued)*

| | |
|---|---|
| **PUBLICATIONS** | In June 1990, an article written by Mr. Hargett entitled "Developing Strategies to Capitalize Subsidiaries" was published in the *Regulatory Report*, a publication of an organization known at the time as the U.S. League of Savings Institutions. |
| **EDUCATION** | University of Alabama, Bachelor of Science degree, graduated December 1983 summa cum laude with major in accounting. |
| **ORGANIZATIONS** | Member of the American Institute of Certified Public Accountants |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY**

| | |
|---|---|
| Case Name: | Frank P. Slattery, Jr. et al., v. United States of America (Case No. 93-280C) |
| Date: | June 2003 / July 2003 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Sterling Savings Association, a state chartered savings association, Sterling Financial Corporation, a Washington Corporation v. United States of America (Case No. 95-829C) |
| Date: | October 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Mid-Continent Federal Savings Bank v. The United States (Case No. 95-472C) |
| Date: | May 2002 / July 2003 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

| | |
|---|---|
| Case Name: | Standard Federal Bank v. The United States (Case No. 95-478C) |
| Date: | April 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Granite Management Corporation v. United States (Case No. 95-515C) |
| Date: | March 2002 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Standard Federal Bank (formerly known as Heritage Federal Savings Bank) v. United States (Case No. 92-844C) |
| Date: | July 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Barron Bancshares, et al. v. United States (Case No. 90-830C) |
| Date: | June 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Southern California Federal Savings and Loan Association, et al. v. United States (Case No. 93-52C) |
| Date: | May 2000 |
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | April 2000 |

---

| | |
|---|---|
| Type of Testimony: | Deposition |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | John K. Castle, et al. v. United States (Case No. 90-1291C) |
| Date: | 1998/1999/2000 |
| Type of Testimony: | Deposition and Trial |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | FDIC v. Arthur Andersen LLP (JAG Case No. 97-1166) |
| Date: | 1998 |
| Type of Testimony: | Arbitration |
| Forum: | Arbitration |

| | |
|---|---|
| Case Name: | Shorewood Associates, Inc. v. Resolution Trust Corporation, as Receiver for Centrust Federal Savings Bank |
| Date: | 1998 |
| Type of Testimony: | Deposition and Arbitration |
| Forum: | USDC Southern District of Florida – Miami Division |

| | |
|---|---|
| Case Name: | Statesman Savings Holdings Corp., et al., Plaintiffs, vs. United States of America, Defendant. |
| Date: | 1997/1998 |
| Type of Testimony: | Deposition and Trial |
| Forum: | United States Court of Federal Claims |

**SUMMARY OF DEPOSITION AND TRIAL TESTIMONY, CONTINUED**

| | |
|---|---|
| Case Name: | United Savings Association of Texas, et al. (OTS Order No. AP 95-40 Dated December 26, 1995) |
| Date: | 1997 |
| Type of Testimony: | Deposition and Hearing |
| Forum: | Enforcement Proceeding Before the OTS |

**JOE A. HARGETT**
*(Continued)*

---

| | |
|---|---|
| Case Name: | Freidkin vs. Fidelity Investments |
| Date: | 1996 |
| Type of Testimony: | Arbitration |
| Forum: | NASD Arbitration |

| | |
|---|---|
| Case Name: | Computer Discounters, Inc. vs. CompUSA, Inc., et al. |
| Date: | 1996 |
| Type of Testimony: | Trial |
| Forum: | Circuit Court, Fairfax County, Virginia |

| | |
|---|---|
| Case Name: | RTC as Receiver for Charter Savings Bank, F.S.B. v. Ross, et al. |
| Date: | 1995 |
| Type of Testimony: | Deposition |
| Forum: | USDC Southern District of Mississippi |

| | |
|---|---|
| Case Name: | Lincoln Federal Savings and Loan Association, et al. v. E.F. Hutton & Company, Inc. |
| Date: | 1994 |
| Type of Testimony: | Deposition |
| Forum: | USDC Western District of Kentucky |

**SUMMARY OF DECLARATIONS AND AFFIDAVITS SINCE 2000**

| | |
|---|---|
| Case Name: | Sterling Savings Association, a state chartered savings association, Sterling Financial Corporation, a Washington Corporation v. United States of America (Case No. 95-829C) |
| Date: | January 2001 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

**JOE A. HARGETT**
*(Continued)*

---

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | November 2000 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Coast Federal Bank, FSB v. United States (Case No. 92-466C) |
| Date: | October 2000 |
| Type of Testimony: | Affidavit |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Republic Savings Bank, et al. v. United States (Case No. 92-265C) |
| Date: | April 2000 |
| Type of Testimony: | Affidavit |
| Forum: | U.S. Court of Federal Claims |

| | |
|---|---|
| Case Name: | Columbia First Bank, FSB v. United States (Case No. 95-510C) |
| Date: | March 2000 |
| Type of Testimony: | Declaration |
| Forum: | U.S. Court of Federal Claims |

**Exhibit B**

**Sterling Savings Association et al. v. The United States**
**Documents Considered by Joe A. Hargett**

| No. | Date | Document | ADIIS or Bates Range |
|---|---|---|---|
| | | **Audited Financials** | |
| 1 | 06/30/89 | Report on Audit of Consolidated Financial Statements | PSG039 1643 - PSG039 1680 |
| 2 | 06/30/90 | Report on Audit of Consolidated Financial Statements | PSG039 1602 - PSG039 1642 |
| | | **Thrift Financial Reports** | |
| 3 | 03/31/89 | Quarterly Thrift Financial Report | WON889 1730 - WON889 1742 |
| 4 | 03/31/89 | Quarterly Thrift Financial Report-Amended | WON933 1586 - WON933 1588 |
| 5 | 06/30/89 | Quarterly Thrift Financial Report | PSG044 2279 - PSG044 2294 |
| 6 | 06/30/89 | Quarterly Thrift Financial Report-Amended | PSG044 2242 - PSG044 2244 |
| 7 | 09/30/89 | Quarterly Thrift Financial Report | WON937 1603 - WON937 1604 |
| 8 | 09/30/89 | Quarterly Thrift Financial Report-Amended | WON933 2027 - WON933 2042 |
| 9 | 12/31/89 | Quarterly Thrift Financial Report | PSG009 1317 - PSG009 1333 |
| | | **Legal Documents** | |
| 10 | 09/12/02 | Opinion, Chief Judge Damich in the United States Court of Federal Claims | None |
| 11 | 08/04/03 | Opinion, Chief Judge Damich in the United States Court of Federal Claims | None |
| 12 | 08/30/06 | Opinion and Order, Judge Wheeler in the United States Court of Federal Claims | None |
| | | **Expert Reports / Deposition** | |
| 13 | 01/15/07 | Expert Report of W. Barefoot Bankhead | None |
| 14 | 12/11/06 | Update to the Expert Report of Paul Horvitz | None |
| 15 | 01/27/07 | Deposition of Paul Horvitz | |
| | | **Miscellaneous** | |
| 16 | xx/xx/xx | Dr. Horvitz Components of Core Capital @ December 31, 1989 (Horvitz 2007 deposition exhibit 3) | None |
| 17 | xx/xx/xx | Dr. Horvitz Components of Core Capital @ June 30, 1990 (Horvitz 2007 deposition exhibit 4) | None |
| | | **General Industry Documents** | |
| 18 | 11/08/89 | Federal Register Vol. 54, No. 215, pgs. 46845-46875 | None |
| 19 | 08/90 | Thrift Financial Report Instruction Manuals | None |

STERLING SAVINGS ASSOCIATION

CAPITAL RESTORATION PLAN

February 19, 1990

Plan Summary

This document represents Sterling Savings Association's capital restoration plan as required by Thrift Bulletin 36. As of December 31, 1989, Sterling had regulatory capital, as documented on Exhibit 2, as follows:

| | Tangible Capital | Core Capital | Risk-based Capital |
|---|---|---|---|
| Total capital (deficiency) under FIRREA at 12/31/89 | $(12,553) | $ (2,273) | $ (2,273) |
| Minimum requirement | 10,280 | 20,738 | 30,012 |
| Capital surplus (deficiency) | $(22,833) | $(23,011) | $(32,285) |
| Ratio of Capital to Adjusted Assets | (1.89%) | (0.3%) | (0.3%) |

The principal reason for the capital deficiencies is a direct result of a change in the regulations by Congress in August 1989. The FIRREA legislation eliminated $13 million in FSLIC-contributed "permanent" capital which Sterling contractually obtained in its acquisitions of Tri-Cities Savings and Loan Association and Lewis Federal Savings and Loan Association. Additionally, as a result of the supervisory acquisition of Central Evergreen Federal Savings and Loan Association, completed without FSLIC assistance, Sterling increased its intangible assets by $22 million to approximately $25 million, for which the FIRREA legislation now penalizes Sterling by causing a reduction from GAAP capital in determining regulatory capital.

Sterling has developed a strategy to resolve its capital deficiency by being acquired by another financial institution. Sterling has retained Dain Bosworth Incorporated in an agreement dated January 10, 1990, to represent the Association to prospective acquirers. In the three weeks following the initiation of this arrangement, Sterling and Dain Bosworth Incorporated have prepared a prospect list of approximately 25 potential acquirers. At the same time, Sterling has been in the process of preparing

financial information which would be needed by these potential acquirers to determine the suitability of acquiring the Association. Through the third week of February, Dain Bosworth Incorporated will be contacting these potential acquirers, soliciting their interest, and determining institutions that would pursue the acquisition of the Association.

Beginning the last week of February 1990, it is expected that the field will be narrowed to between four and five potential acquirers. The next step would be to schedule on-site due diligence reviews. These due diligence reviews, which will begin on February 26, 1990, and are expected to last between two and four days each, should be completed by the middle of March 1990. Dain Bosworth will contact these institutions to solicit their levels of interest and present the findings to Sterling's Board of Directors at the March meeting.

Following the March Board meeting, Sterling's Board sub-committee will review bids and make recommendations at the April Board meeting. By the May Board meeting, a definitive agreement should be negotiated and presented for approval by Sterling's Board of Directors. Following the May Board meeting, it is anticipated that proxy material would be prepared and disseminated to shareholders in preparation for a special shareholders' meeting which would be held in July 1990. Additionally, the merger application will be prepared and filed following the selection of the acquisition candidate. The Association anticipates a closing date between July 1 and September 30, 1990. It should be noted that the schedule is subject to the discretion of the purchasers and to regulatory approval. The Association would work diligently to accomplish an expeditious closing. A closing date of July 1 or later would allow certain balance sheet structurings to occur and to take advantage of expiring tax benefits. The potential acquirer may also have a desire to base the final purchase price of the Association on audited financial information as of the end of Sterling's fiscal year end, June 30, 1990. Ultimately, even though the Association cannot control the purchasers timing, we would expect to have a commitment letter by September 30, 1990.

As part of this Capital Restoration Plan, management and the Board of Directors of Sterling have a strong desire to maintain the franchise value at the highest level. Accordingly, the Association intends to continue to operate profitably as is reflected in the financial projections of Exhibit 1. Furthermore, the Association is

dedicated to operating in a safe and sound manner as is contemplated by the FIRREA legislation. The projected financial information incorporates various operating limitations affecting the Association. These restrictions are further discussed elsewhere in this Capital Restoration Plan.

Form of Sale

The Association has received interest from a variety of acquirers. Depending on the acquirer, the sale could take a variety of forms. The various forms all have the result of bringing the Association into compliance by converting the Association into part of a capital compliant institution. The alternative forms may include:

1. Sale of the Association to one financial institution. This is the most likely transaction and is advantageous by being easy to coordinate and potentially less costly to complete.

2. Sale of the Association in two or more components rather than as a single transaction. The Association has received considerable interest in portions of the Association's delivery system rather than as a complete unit. With its financial advisor, Dain Bosworth, the Association will evaluate whether the sale of the institution to multiple purchasers has more merit than the sale to a single acquirer. In essence, this strategy will evaluate whether the sum of the parts provides greater value than the whole unit.

3. Mutual conversion: Sterling and its financial advisor, Dain Bosworth, have been approached by a consultant representing a mutual institution with the proposition of converting the mutual and simultaneously acquiring Sterling. Due to the longer time frame anticipated to consummate this transaction, the Association feels this is less likely to occur. However, should this alternative develop greater interest, Sterling would work diligently with OTS to complete the transaction.

The sale for cash is considered the most likely alternative due to relative value of one sale transaction and the timeliness of completing the transaction. Presently there is much interest in the other alternatives and the Association will consider any offers received in terms of both value received and timeliness of completing the transaction. The Association considers all of the above forms of acquisition to be part of the sale of the company strategy.

Strategic Alternatives

While the Association's primary strategy to become compliant with the new capital standards is to seek a merger candidate, it has also evaluated alternative secondary strategies to become compliant as required by Thrift Bulletin 36. If acceptable bids are not received, the Association will consider the following alternative.

1. Remaining independent but downsizing the institution. Due to the disruption caused in the marketplace currently as a result of Resolution Trust Corp. activities, the Association is concerned with the nature of bids it will receive. As an alternative, the Association had evaluated the means to remain independent and comply with the new capital standards. This strategy entailed reduction in total assets of between $200 and $400 million. This strategy further resulted in the sale of branch facilities, portions of the Association's loan portfolio, and the sale of the Association's servicing portfolio. The premiums received on the sale of branch deposits and servicing portfolios were to be used to enhance regulatory capital, either as an increase to earnings or as a reduction to intangible assets. A marketing program designed to sell these branches and to liquidate assets to fund the transfer of deposit liabilities perhaps would have a longer time frame than the Association's primary strategy of selling the Company. It is expected, however, that this strategy could be completed by the end of 1990.

   Additionally as part of this strategy, the Association explored the ability to negotiate a private placement of the Association's common or preferred stock as a means to increase the capital ratios under the new capital standards. The Association had received interest in such a transaction.

The Association does not consider this alternative feasible under current conditions and is not currently pursuing it. This alternative strategy would be considered in the event no acquirers could be arranged.

Pro forma financial information of contemplated transactions (TB 36,#5):

The only contemplated transaction by the Association at this time is the sale of the company to another financial institution. Should an alternative strategy become a feasibility, Sterling would work closely with OTS to develop this strategy while preserving Sterling's capital position and franchise value.

Pro forma consolidated and unconsolidated financial statements (TB 36, #6)

Included in Exhibits 1 (consolidated financial information) and 9 (unconsolidated financial information) are the Association's computed projected balance sheet and income statements for each quarter through September 30, 1990.

Previous consolidated financial information (TB 36, #7):

As Exhibit 8, we have included Sterling's financial statements for the immediately preceding four quarters.

Compliance with the limitations and restrictions under FIRREA (TB 36, #8):

Although the Association has not been significantly limited or restricted to activities or investments in the past, FIRREA legislation and regulatory bulletins impose a variety of limitations on the Association. The Association intends to comply with all such limitations and restrictions. Specifically, the Association is now limited in loans to one borrower, asset growth, commercial lending, consumer lending, nonresidential lending, solicitation of brokered deposits, and capital distributions.

Based on the Association's negative regulatory capital level as of December 31, 1989, the following limitations and restrictions apply to the Association:

A. Loans-to-One-Borrower Limitations:

| | | 12/31/89 |
|---|---|---|
| Unsecured loans limit | - 15% | $500,000 |
| Secured loans limit | - 25% | 500,000 |
| Sale of REO limit | - 50% | 500,000 |

The Association intends to comply with the established loans-to-one-borrower ("LTOB") limitations as outlined above and will make a concentrated effort to reduce the current levels of loans to one borrower which may exceed these new limits. The Association has suspended all income property lending and is redirecting the resources of its subsidiary toward updating its credit file documentation and marketing its non-residential loan portfolio. The limitations on the sale of REO loans should not be a major factor for the Association, as the majority of REO sales are based on cash sales.

B. Growth Limitations

With FIRREA legislation, the Association's asset growth is limited to interest credited to deposits per quarter. It is the Association's intent to comply with the growth limitations by continuing the mortgage banking activities and selling loans into the secondary market. Principal and interest payments on loans and the liquidation of other assets are expected to be invested in liquidity-qualifying instruments in order to enhance liquidity levels.

C. Commercial Lending Limitations

Commercial lending is currently 3.86% of assets, substantially below the 10% limit. Future activity is dependent upon the Association's application for investment authority.

D. Consumer Lending Limitations:

| | | |
|---|---|---|
| Consumer loan portfolio limit | - 30% of assets | $210 million |
| Current consumer loan portfolio | | $ 19 million |

The Association is in compliance with the limits established for consumer lending activity. It is the Association's intent to continue current volume of consumer lending for home improvement, automobile, and personal line of credit purposes.

E. Nonresidential Loan Limitations:

| | |
|---|---|
| Nonresidential loan limitations 400% of core and supplemental capital | -0- |
| Current nonresidential loan portfolio | $149,061,000 |

The FIRREA legislation limits the level of the nonresidential lending portfolio. Currently, the Association is not in compliance with the limitations. It is the Association's intent to curtail this type of lending activity and reduce the current portfolio through marketing efforts.

F. Brokered Deposit Restrictions:

Per the FIRREA legislation, the Association is restricted from accepting deposits involving third parties. The Association's only brokered deposits consist solely of Washington State public funds obtained through one broker. In anticipation of the FIRREA limitations, the Association has been reducing its level of these brokered deposits. The Association expects to curtail solicitation of deposits using this one broker and anticipates it will be able to replace these funds with local deposits as the brokered deposits mature. The Association anticipates no problems with maintaining its liquidity as a result of the outflow of these brokered deposits.

Increase in assets

The Association does not anticipate any increase in assets beyond interest credited to deposits. In fact, the Association expects some reduction in total assets by June 30, 1990, of approximately $10-$25 million. Changing environments or deposit flows may temporarily cause the Association to reflect month-to-month growth, but the general emphasis is to reduce total assets and increase liquidity.

Interest rate risk management (TB 36, #10)

The Association's Asset and Liability Committee ("ALCO") has been delegated the responsibility for managing the interest rate risk by the Board of Directors. The ALCO is responsible for developing an interest rate risk measuring system which will allow for multiple scenarios of interest rate movements, and measure levels of exposure to interest rate risk.

Until the publication of Thrift Bulletin 13, the Association's principal measurement of interest rate risk was the Asset and Liability Gap Report. Recently the Association has internally developed a computer program which will allow it to measure the sensitivity of interest income and market value of the portfolio equity as required by TB 13. In response to a request by its supervisory agent, the Association is reviewing its Interest Rate Risk policy and expects to have amendments approved at the February 1990 Board of Directors meeting.

Major changes in assets and liabilities and capital distributions (TB 36, #11):

The Association's anticipated changes in assets and liabilities are discussed under "ASSUMPTIONS FOR THE PROJECTED FINANCIAL STATEMENTS."

#7918

OFFICIAL FILE COPY
OTS/WEST

STERLING SAVINGS ASSOCIATION

COMPOSITE MACRO RATING: 5

LAST EXAM DATE: 7/11/90

REASON(S) WHY NO FORMAL ENFORCEMENT ACTION HAS BEEN TAKEN:

Sterling Savings was in compliance with its regulatory capital requirements until FIRREA became effective. Subsequently, Sterling Savings submitted a capital plan which was approved contingent on the sale of the institution by May 31, 1990, and the Board signing an Operating Agreement. The conditions of approval were not met and the capital plan was subsequently denied. A Capital Directive was issued on May 23, 1990.

Sterling Savings had filed the lawsuit against the federal regulators on May 15, 1990. A Temporary Restraining Order was subsequently requested and granted on May 20, 1990, after the Board of Directors refused to consent to the Capital Directive. A Preliminary Injunction was issued on July 3, 1990. An appeal was filed by OTS on December 27, 1990. Until the injunction is removed, the federal regulators can take no supervisory action against the thrift inconsistent with previous "agreements".

Ed Hedlund
Assistant Regional Director

Date: 4/15/91

I concur: [signature]
Deputy Regional Director

Date: 5/13/91



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER FL WON924 1177

7918
fb 20

MAY 23 10 18 AM '91

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696

May 21, 1991

Ed Hedlund
Assistant Regional Director
Office of Thrift Supervision
2201 - 6th Avenue, Suite 1500
Seattle, WA. 98121-1899

OFFICIAL FILE COPY
OTS/WEST

Dear Ed:

Pursuant to your letters from Carol Friend dated June 5, June 18, and June 25, 1990, Sterling is reporting to you any exceptions to operational concerns expressed to Sterling in various letters which are identified in order below. This report covers the period May 11 through May 17, 1991, unless otherwise specified:

| Date of OTS Letter | Subject | Response |
|---|---|---|
| 11/9/89 | Capital distributions. | There has been no authorization nor payment of dividends during the reporting period. |
| 1/31/90 | Investments. | No investment transactions other than those qualifying for liquidity were transacted during this reporting period. |
| 2/26/90 | Construction lending. | The Association has established procedures to identify this operational concern testing by the Association's by the Internal Auditor. Daily reports do not separate residential from commercial construction, therefore, daily balances are not currently available to provide you a precise ratio. However, based on the April 30, 1991 month-end balance, the policies and procedures in place, the limited amount of loans being approved, and reduction through payoffs, the Association expects May 10, 1991 balances to remain below $23 million threshold indicated in your letter. |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER F WON924 1171

| Date of OTS Letter | Subject | Response |
|---|---|---|
| 3/9/90 | Business banking loans. | Based on the internal financial statements at April 30, 1991 Sterling is below $23 million threshold indicated in your letter. A procedure has been established that all business banking loans are granted only to existing customers. There are no items to report this week. |
| | FIRREA loans-to-one-borrower limitation. | All loan production managers have been notified of the loans-to-one borrower FIRREA limit. Discussions with lending personnel indicate that compliance is being maintained. A further procedure has been implemented to confirm compliance by Sterling's Internal Auditor by reviewing monthly loan origination reports. There are no items to report this week. |
| | Letters of credit. | No new or renewed letters of credit were extended during the reporting period. |
| | Underwriting policies. | It is Sterling's policy to follow prudent underwriting policies. |
| 5/11/90 | Capital plan. | The Association notes that the 2/28/90 capital plan has been rejected by OTS and appears to be outdated as the financial projections were made only through September 30, 1990. Further, this capital plan was submitted only after OTS refused permission for payment of dividends which was integral to its original plan. The Association reiterates its position that the financial statements which are integral to the Agreement dated December 28, 1988, between Sterling and FSLIC establishes standards for measurement. |
| | Sale of assets exceeding $500,000. | There are no items to report this period. |
| | Compensation increases for any Executive Officers or Directors. | There have been no salary adjustments for Executive Officers or Directors of Sterling during the reporting period. |

| Date of OTS Letter | Subject | Response |
|---|---|---|
| | Uninsured deposits. | The Association has established a procedure whereby the Branch Managers are responsible for not accepting uninsured deposits. Further review is conducted by the Operations Department. |
| 6/20/90 | Asset growth. | Assets for this reporting period are below the level reported at May 31, 1990. |

This letter is intended to be a response to your expressed supervisory concerns and is not intended to be as accurate or definitive as a financial report as referred by FIRREA in Section 305 (v). All responses are to the best of our knowledge without detailed investigation. Further, the Association reiterates its concerns for filing such a report in light of the Preliminary Injunction and believes that this reporting requirement represents a supervisory activity similar to the restrictions for which OTS has been enjoined by the Injunction. Nevertheless, the Association is filing this report in an attempt to be cooperative with its supervisory agent.

If there are any questions regarding the aforementioned, please feel free to contact me.

Sincerely,

Daniel G. Byrne
Sr. Vice President

DGB/lf

cc: Betty Reed
Harold B. Gilkey
William W. Zuppe
Rod Barnett

# Continued Deposition of

# Harold Gilkey

June 8, 2000

STERLING V USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

in the Pacific Northwest.
Q. So are you suggesting that the growth of Sterling to between 5 and 50 billion would have been through acquisitions?
A. And internal growth. It would have--I would have followed the same strategy I always did, was to grow some internally and then match that with external growth. As external growth would have been expanded, I would have gone internally.
Now, on the high side of that, if you would have taken the larger element of that, it would have been required to buy some branches and then grow those branches up to match the internal/external growth.
Q. You mean buy branches from an institution and then grow those branches?
A. Yes.
Q. Pacific First Federal that you made reference to, when was that acquisition opportunity out there?
A. I'm not focusing on a point in time, but I'm going to guess the middle part of Nineties, early part of the Nineties.
Q. Early to middle part of the Nineties?
A. Yeah. That is just a guess.
Q. And how large an acquisition would that have been?
A. It was a 2 to $3 billion company.

512

Q. It was a 2 to $3 billion company?
A. Yes.
Q. How would Sterling have financed that acquisition?
A. Similar to the way it was financed. We would have issued additional stock in the form of a stock-for-stock exchange and a capital structure, with the Street providing the capital that was necessary to pay off the owners in cash.
Q. Are you saying Wall Street?
A. Yes. Securities of some kind.
Q. Did another institution end up acquiring Pacific First Federal?
A. Washington Mutual.
Q. How much capital would you have raised for that acquisition?
A. I don't know.
Q. And what would the purchase price for this acquisition have been?
A. I don't know.
Q. Did you ever have discussions with Pacific First Federal?
A. Yes.
Q. Was a purchase price ever discussed?
A. No.
Q. Why not?

513

A. We were not in a position to do it. We were capital short. They were trying to avoid going into the hands of Washington Mutual.
Q. Why were they trying to avoid going into the hands of Washington Mutual?
A. They were long-term competitors, didn't like each other.
Q. Why did Pacific First Federal want to be acquired?
A. Their owner was a Canadian firm, and the advantages of being--my assumption was the advantages of being a Canadian firm had disappeared with their ownership down here, and the profitability that they had anticipated didn't occur.
Q. Did you talk to any investment bankers about this potential acquisition?
A. I had some discussions about this and other institutions with Jay Tejera.
Q. At Dain-Bosworth?
A. Yes.
Q. What did Mr. Tejera--
A. We both viewed it more hypothetical because of the problems we had with the federal lawsuit and where we were with our investment.
Your premise for this line of questioning was, if the breach had not taken place, what would you

514

have done? I'm saying that in spite of the breach, we still had conversations. Had the breach not taken place, we would have had significantly more material conversations. I am not suggesting for a minute that that was a hundred percent sure, but at least we would have had a running chance at it.
Q. Did the conversations about Pacific First Federal occur after the capital raising in 1991?
A. Yes.
Q. Okay. What was stopping Sterling from going out and raising capital to acquire Pacific First Federal at that point?
A. We were so minimally capitalized that it did not make legitimate sense.
Q. Why not?
A. As I said, it was hypothetical.
Q. Well--
A. If you don't have enough capital, you can't get in the game. We had minimal capital.
Q. But if we are talking about the actual post-1991 period, that is not necessarily hypothetical, though, right?
A. Well, you were the one that posed the premise here. The premise was that.
Q. Right, but then the next question was--

515

STERLING SAVINGS ASSOCIATION
1990 BUSINESS PLAN
HIGHLIGHTS

1. Operating Results per the budget are as follows:

| | |
|---|---|
| EPS | $2.40 |
| ROE | 15.6% |
| ROA | .22% |
| Avg. Assets | $730 million |

The income statement reflects implementation of FASB 91, wherein loans fees and direct incremental costs are deferred.

| | Dollars (in thousands) | % Avg. Total Assets | Avg. Earning Assets ($ in Millions) | % Earning Assets and Liabilities |
|---|---|---|---|---|
| Interest income | $70,078 | 9.60% | $678,503 | 10.33% |
| Interest expense | (55,690) | (7.63) | 702,787 | 7.93 |
| Net interest margin | 14,388 | 1.97 | $678,503 | 2.13% |
| Other income | 4,278 | .58 | | |
| Operating expenses | (16,140) | (2.21) | | |
| Net income before FIT | 2,526 | .34 | | |
| FIT (at 38%) | (909) | (.12) | | |
| Net income | 1,617 | .22 | | |
| Preferred dividend (at $2.50) | (226) | (.03) | | |
| Earnings to common | $ 1,391 | .19% | | |

Note: Interest rates are assumed to generally decline throughout the year, and the yield curve which is currently inverted is expected to return to a positively sloped curve by midyear.

2. Balance Sheet:

Total assets remain stable at $730 million.

Loans receivable increase $20 million, mortgage-backed securities decrease $9 million.

Deposits increase $52 million, and reflect an acquisition from Great American in November of approximate $28 million in deposits.

Borrowings (FHLB Advances and reverse repos) decrease $60 million.

Liquidity is increased to 6.5%-7%.

| | 6/89 | 6/90 |
|---|---|---|
| Earning assets | $674.4 | $682.9 |
| Costing Liabilities | 703.2 | 702.1 |
| | $ 28.8 | $ 21.4 |
| Earning Asset Ratio | 96.0% | 97.2% |



GOV'T SUPP APP 31

STERLING SAVINGS ASSOCIATION
Spokane, Washington

Joint Regular Examination
as of

June 19, 1989





Confidential Material Subject to Protective Order

Date: June 19, 1989 Docket No.: 07[illegible]

RISK MANAGEMENT

The examination included a review of Sterling Savings' asset liability structure, interest rate risk management, and adequacy of liquidity and funding sources.

Sterling Savings is exposed to above average levels of risk as evidenced by the substantial growth in assets and increasing level of interest rate risk in relation to a declining capital position. However, the risks are partially offset by the institution's adequate liquidity position, low-risk investment portfolio, and strong retail deposit base. Management monitors and reviews existing risk factors and alternative strategies to reduce risks on a regular basis.

Interest Rate Risk

Sterling Savings' level of interest rate risk is high and could have an adverse impact on earnings. Based on the FHLB's gap model, the institution's 1-year cumulative hedged interest-sensitive gap equals negative 27.3 percent of assets. According to Sterling Savings' internal gap model, the 1-year gap is reduced to negative 18.1 percent of assets. Peer group institutions report a 1-year gap of negative 18.7 percent. Sterling Savings' current mismatch between rate-sensitive assets and rate-sensitive liabilities exposes the institution to risk of loss in a rising rate environment. For example, a sustained 1 percent increase in interest rates would reduce earnings by an estimated $986,000. This approximates a 10 percent decline in net interest income. Subsequent to March 31, 1989, management purchased $20 million in adjustable-rate, mortgage-backed securities as part of their strategy to reduce the gap position.

Gap figures are also used to determine the institution's maturity matching credit for purposes of calculating the minimum regulatory capital requirement. For the past four quarters, Sterling Savings' gap model reports a reduction in the cumulative negative gap position of approximately 30 percent for the 1-year and 3-year periods. This amounts to a 22 percent reduction in the minimum capital requirement for the March 31, 1989, quarter. Given the significant differences in the gap position based on internal calculations and the impact on the capital requirement, management should obtain the Supervisory Agent's approval to use internal calculations when determining the maturity matching credit. The association's interest rate risk gap assumptions should be outlined in accordance with the guidelines established in Supervisory Bulletin 87-7.

Senior Vice President Daniel G. Byrne stated that Sterling Savings will formally request approval and anticipates filing by September 30, 1989. President William W. Zuppe concurred with the response.



Confidential Material Subject to Protective Order

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

| Name and Address of Institution | District | Docket No. |
|---|---|---|
| Sterling Savings Association<br>North 120 Wall Street<br>Spokane, Washington 99201 | Seattle<br><br>Type of Examination<br>Special Limited | 07918 |

Examination Commenced: November 13, 1989
Examination Concluded: January 8, 1990

Service Corporations and Other Affiliates Which Are a Part of This Report:

Not Applicable

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstance shall the institution, or any of its directors, officers, or employees disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the Seattle District Director should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued the process, should be advised of the above prohibition and referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 1816

Date: November 13, 1989 Docket No.: 07918

## ASSET QUALITY

Examination procedures consisted of reviewing a sample of management's internally classified assets and nonclassified mortgage loans using balances as of October 31, 1989. The sample of internally classified assets included 32 real estate loans totaling $14.1 million, 13 commercial loans totaling $2.2 million, and 21 parcels of real estate owned totaling $6.6 million. The sample of internally classified assets represents 71.6 percent of the total dollar volume of internally classified assets reported as of September 30, 1989.

Approximately 200 nonclassified real estate loans totaling $103.1 million were reviewed for adherence to sound underwriting principles as well as proper classification. The total nonclassified loans reviewed represents nearly 60.0 percent of the dollar volume of total outstanding nonresidential real estate loans. The sample includes 34 commercial real estate loans totaling $65.5 million granted by the Intervest-Mortgage Investment Company office located in Lake Oswego, Oregon.

Overall, asset quality and loan administration was found to be unsatisfactory, as noted by the negative trend in classified assets and noncompliance with internal and regulatory policies.

### Trends in Classified Assets

Asset quality has deteriorated since the June 19, 1989, examination. Classified assets total $40.0 million, representing 5.7 percent of total assets, compared to $32.6 million, representing 4.5 percent of total assets, at the prior examination. Unreserved losses identified during the current examination total $1.3 million and represent 4.7 percent of regulatory capital. The following table presents the current level of classified assets.

| (In Thousands) | Current Examination | Previous Examination |
|---|---|---|
| Substandard | $37,251 | $30,952 |
| Doubtful | 1,420 | 1,691 |
| Loss | 1,342 | 0 |
| Total Classified Assets | $40,013 | $32,643 |
| Percent of Total Assets | 5.7 | 4.5 |
| Percent of Regulatory Capital | 141.3 | 117.2 |

The Substandard figure includes approximately $3.4 million in assets covered under a FSLIC indemnification agreement which are internally classified Substandard by management. Excluding these assets results in total classified assets of $36.6 million, or 5.2 percent of total assets and 130.0 percent of capital. The amount classified Loss includes a $482,000 contra-asset account that must be established for the Beitz wrap-around loan, $197,000 in capitalized real estate owned (REO) expenses, $213,000 in REO losses and $450,000 in actual loan losses. The Beitz loan wraps around a first mortgage held by a third party which has not been booked by Sterling Savings.

Date: November 13, 1989 Docket No.: 07918

CLASSIFIED ASSETS (continued)

| Account Identification No.<br>Name of Borrower(s)<br>Description of Assets<br>Net Book Balance<br>Comments<br>Participants | CLASSIFICATION<br>Substandard | <br>Doubtful | <br>Loss |
|---|---|---|---|
| CJ-4 ASSOCIATES | | | |
| Loan No. 92-013123005091-3 | | | |
| By: Jon C. Peterson<br>Charles W. Anderson | | | |
| Guarantors: Jon C. Peterson<br>Charles W. Anderson | | | |
| Gross Book Balance: $2,400,000<br>Loss Reserve : ( 0) | | | |
| Net Book Balance : $2,400,000 | $2,400,000 | | |

This is the balance of a $2.4 million loan granted June 27, 1988, proceeds of which were used to construct two office/warehouse buildings in Bellevue, Washington. Terms call for monthly interest-only payments at 12.0 percent and a maturity date of January 1, 1990. The loan is five months past due for payments and has been placed on nonaccrual status.

Collateral consists of a deed of trust on the two office/warehouse buildings with a combined gross building area of 42,000 square feet. An appraisal report dated March 15, 1988, values the subject at $3.45 million based on a blended lease rate of 0.73 cents per foot.

Cost overruns associated with site work and engineering errors totaled approximately $250,000. The loan proceeds funded the cost overruns and allowed the shell of the building to be completed; however, money to finish tenant improvements was not available.

Currently the building is vacant, although management indicates that three prospective tenants have expressed interest in leasing portions of the subject. Management is considering advancing additional funds to complete tenant improvements although a final decision has not been reached.

Financial statements dated July 1987 and January 1988 show a combined net worth of approximately $4.1 million dollars. Apparently, the borrowers do not possess the financial strength or willingness to keep the loan current.

Date: November 13, 1989 Docket No.: 07918

CLASSIFIED ASSETS (continued)

| Account Identification No. Name of Borrower(s) Description of Assets Net Book Balance Comments Participants | CLASSIFICATION Substandard | Doubtful | Loss |
|---|---|---|---|

CJ-4 ASSOCIATES (continued)

Conversations with management indicate that foreclosure or sale of the property prior to foreclosure will be the likely resolution to this problem asset. The loan has been placed on nonaccrual status and has been turned over to counsel for collection.

This loan is classified Substandard because of nonperformance, financial weakness associated with the borrowers, untimely resolution and possible foreclosure.

President William Zuppe concurred with the classification.

GOV'T SUPP APP 35B



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON934 1860

DIRECTOR OF OFFICE OF THRIFT SUPERVISION
FEDERAL DEPOSIT INSURANCE CORPORATION
Washington, D.C. 20552

# FORM 10-K

Annual Report
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

For the Fiscal Year Ended June 30, 1989 FHLB Docket Number 7918

## STERLING SAVINGS ASSOCIATION

(Exact name of registrant as specified in its charter)

Washington
(State or other jurisdiction of incorporation or organization)

91-1166044
(I.R.S. Employer Identification No.)

North 120 Wall Street
Spokane, Washington
(Address of principal executive offices)

99201
(Zip Code)

(509) 624-4132
(Registrant's telephone number including area code)

Securities registered pursuant to Section 12 (g) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($1.00 par value) | Spokane Stock Exchange |
| $2.50 Cumulative Convertible Preferred Stock - Series B ($1.00 par value) | Over-the-Counter |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for at least the past 90 days. Yes X No ___

The aggregate market value of the voting stock held by non-affiliates of the registrant is approximately $5,211,400.(1)

The number of shares outstanding of the registrant's classes of Common and Preferred Stock as of August 31, 1989 is as follows:

Common Stock - 518,387 Preferred Stock (Series B) - 90,168

The Exhibit Index is located on page 48 of this Form 10-K, which contains a total of 49 pages.

DOCUMENTS INCORPORATED BY REFERENCE

Parts II and IV:
Annual Report to Shareholders,
dated June 30, 1989

Part III:
Proxy Statement,
dated September 26, 1989

(1) The aggregate dollar amount of the voting stock set forth equals the respective number of shares of Common and Preferred Stock outstanding, reduced by the respective number of shares of Common and Preferred Stock held by executive officers, directors and shareholders owning in excess of 10% of the class of stock, multiplied by the respective reported bid prices for the Common and Preferred Stock on August 31, 1989.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER SG 0705338

PART I

Item 1. BUSINESS

Overview of the Savings and Loan Industry

The principal business of savings institutions has historically consisted of attracting deposits from the general public and originating long-term, fixed-rate loans secured by first mortgage liens on residential and other real estate. The Association's operations, and the operations of savings institutions generally, are significantly influenced by general economic conditions, by the related monetary and fiscal policies of the federal government and by the policies of regulatory authorities, including the Federal Reserve Board, the Federal Home Loan Bank Board (the "FHLB") and the Federal Deposit Insurance Corporation (the "FDIC"). (See "Regulation.") Deposit flows and costs of funds are influenced by interest rates on competing investments and general market rates of interest. Lending activities are affected by the demand for mortgage financing and for consumer and other types of loans, which in turn is affected by the interest rates at which such financing may be offered. Lending activities are also influenced by other factors affecting the supply of housing and the availability of funds.

Federal legislation other than the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") (see "Regulation") has significantly affected the operations of federally regulated financial institutions during the last several years and has increased competition among savings institutions, commercial banks, and other financial institutions. Legislation has provided for the gradual elimination of limitations on the interest rates that banks and savings institutions may pay on deposits and has expanded lending, investment, and other powers. As a result, savings institutions are now better able to compete with other financial institutions. Additionally, interest rates have declined from the record levels that were reached during the period from 1980 to 1982, and many savings institutions have begun to experience improved spreads between the interest rates they receive on loans and investments and the interest rates they pay on deposits and borrowings. However, the industry continues to face uncertainties, including increased competition in a substantially deregulated savings market and fluctuating loan demand. The deregulation of interest rates has substantially increased the sensitivity of the liabilities of savings institutions to short-term interest rate fluctuations. Consequently, if interest rates were to rise significantly again, the cost of funds to the savings industry may increase and interest rate spreads, which have a significant impact on the profitability of savings institutions, may be adversely affected.





CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

6-I

**OFFICE OF THRIFT SUPERVISION**
**DEPARTMENT OF THE TREASURY**
1700 G Street, N.W.
Washington, D.C. 20552

# FORM 10–K

(Mark One)
X ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
**For the fiscal year ended June 30, 1990**

OR

___ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from ____________ to ________________

## STERLING SAVINGS ASSOCIATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington**<br>(State or other jurisdiction of incorporation or organization) | **91–1166044**<br>(I.R.S. Employer Identification No.) |
| | Docket Number **7918** |
| **North 120 Wall Street**<br>**Spokane, Washington**<br>(Address of principal executive offices) | **99201**<br>(Zip Code) |

Registrant's telephone number, including area code **(509) 624–4114**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock ($1.00 par value)** | **Spokane Stock Exchange** |
| **$2.50 Cumulative Convertible Preferred Stock – Series B ($1.00 par value)** | **Over–the–counter** |

Securities registered pursuant to Section 12(g) of the Act:
(Title of Class)
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. **Yes X No ____**

As of August 31, 1990, the aggregate market value of the voting stock held by non-affiliates of the registrant was approximately **$2,840,885.(1)**

The number of shares outstanding of the registrant's classes of Common and Preferred Stock as of August 31, 1990 is as follows:

**Common Stock – 518,387 Preferred Stock (Series B) – 90,168**

The Exhibit Index is located on page 54 of this Form 10-k, which contains a total of 65 pages.

DOCUMENTS INCORPORATED BY REFERENCE

| | |
|---|---|
| Parts II and IV:<br>Annual Report to Shareholders, dated June 30, 1990 | Part III:<br>Proxy Statement, dated September 28, 1990 |

(1) The aggregate dollar amount of the voting stock set forth assumes that the Preferred Stock is converted to Common Stock in the specified conversion formula, with aggregate market value equal to number of shares of Common Stock outstanding, reduced by the respective number of shares of Common Stock held by executive officers, directors and shareholders owning in excess of 10% of the class of stock, multiplied by an average of the reported bid and asked prices for the Common Stock on August 31, 1990.

PART I

**Item 1.** **BUSINESS**

**Overview of the Savings and Loan Industry**

The principal business of savings institutions has historically consisted of attracting deposits from the general public and originating long-term, fixed rate loans secured by first mortgage liens on residential and other real estate. The Association's operations, and the operations of savings institutions generally, are significantly influenced by general economic conditions, by the related monetary and fiscal policies of the federal government and by the policies of regulatory authorities, including the Federal Reserve Board, the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC"). See "Regulation." Deposit flows and costs of funds are influenced by interest rates on competing investments and general market rates of interest. Lending activities are affected by the demand for mortgage financing and for consumer and other types of loans, which in turn are affected by the interest rates at which such financing may be offered. Lending activities are also influenced by other factors affecting the supply of housing and the availability of funds.

The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was enacted on August 9, 1989 and resulted in a major restructuring of the federal regulatory framework applicable to thrift institutions. Among other things, FIRREA abolished the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings & Loan Insurance Corporation ("FSLIC"). Many of the previous regulatory functions of the FHLBB were transferred to the newly created OTS. The regulatory functions of the FSLIC have been shifted to the FDIC and the Resolution Trust Corporation ("RTC"). Additionally the role of the Federal Home Loan Banks ("FHLBs") in supervising thrifts has been shifted to the OTS. The FHLBs continue to serve as the central liquidity facility for thrifts and as a source of long-term funds for housing finance. The FDIC administers two separate deposit insurance funds: 1) the Savings Association Insurance Fund ("SAIF"), which generally insures the deposits of institutions insured by the FSLIC prior to the enactment of FIRREA, and 2) the Bank Insurance Fund ("BIF"), which generally insures the deposits of institutions insured by the FDIC prior to the enactment of FIRREA. FIRREA contains numerous provisions affecting individual aspects of the operation and regulation of thrift institutions. See "Regulation."

Federal legislation other than the FIRREA has significantly affected the operations of federally regulated financial institutions during the last several years and has increased competition among savings institutions, commercial banks, and other financial institutions. Legislation has provided for the gradual elimination of limitations on the interest rates that banks and savings institutions may pay on deposits and has expanded lending, investment, and other powers of financial institutions. As a result, savings institutions are now better able to compete with other financial institutions. Interest rates have generally declined from the record levels that were reached during the period from 1980 to 1982, and such declines have generally resulted in improved spreads between the interest rates savings institutions receive on loans and investments and the interest rates they pay on deposits and borrowings. However, the industry continues to face uncertainties, including increased competition in a substantially deregulated savings market and fluctuating loan demand. The deregulation of interest rates has substantially increased the sensitivity of the liabilities of savings institutions to short-term

*We have built our reputation on flexible, responsive leadership and dedication to a course of solid, profitable growth*

*Nineteen Ninety*

*Annual Report*

# STERLING SAVINGS

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS, Continued:

**2. REGULATORY MATTERS:**

During the years ended June 30, 1986, 1988 and 1989, the Association, with the encouragement and approval of its regulators, completed supervisory acquisitions of three troubled institutions: Lewis Federal, Tri-Cities, and Central Evergreen, respectively (see Note 14). Each of these institutions was insolvent at the date of acquisition, which resulted in the recording of significant intangible assets on the Association's financial statements as part of accounting for the acquisition. Each of the supervisory acquisitions was subject to contractual acquisition agreements ("Agreements") with then-existing regulatory authorities.

The Lewis Federal and Tri-Cities Agreements provided for various forms of assistance to the Association to induce the Association to complete the acquisitions. Such assistance included cash payments, indemnification against certain losses, and regulatory forbearances granting temporary relief from applicable regulatory capital and liquidity requirements. Also, as part of the Agreements, the Association was specifically allowed to: (1) record regulatory cash assistance payments received as part of regulatory capital; (2) include intangible assets resulting from the acquisitions in the determination of regulatory capital; and (3) extend intangible amortization periods beyond those allowed under generally accepted accounting principles, for purposes of calculating regulatory capital.

The Central Evergreen Agreement was based upon an approved Business Plan ("Business Plan") under which the Association would operate through December 31, 1993. The Central Evergreen Agreement and the underlying Business Plan also established the level and methodology of computing regulatory capital. The regulatory capital projections included in the Business Plan specifically incorporated the forbearances and other provisions of the Lewis Federal and Tri-Cities Agreements.

On August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was enacted. FIRREA significantly revised the regulation and permissible activities of savings associations. Among other things, FIRREA virtually eliminates the solicitation of brokered deposits for "troubled thrift" institutions, and drastically reduces the aggregate amount of loans that can be made to any single borrower. FIRREA also prescribes new capital standards and consequences for non-compliance with capital standards. FIRREA further provides that, for purposes of calculating compliance with the new capital standards, savings associations will generally be required to exclude certain intangible assets and other previously allowable regulatory capital items.

In response to FIRREA, the Office of Thrift Supervision ("OTS") promulgated new capital regulations which became effective on December 7, 1989. These new standards initially require savings associations to have at least 1.5% of adjusted total assets as tangible capital, 3.0% of adjusted total assets as core capital, and 6.4% of risk weighted assets as risk-based capital.

Beginning in October 1989 the Association received several communications from the OTS advising it that the OTS was taking the position that the FIRREA capital requirements were applicable to the Association notwithstanding contrary provisions of Sterling's Agreements with the regulators. These communications further indicated that the OTS had concluded that the Association would fail to meet the new FIRREA capital standards. Therefore, the OTS indicated that it expected the Association to file a capital restoration plan.

Thrift Bulletin 38-2 was released by the OTS in January 1990 and states that the new capital standards apply to all savings associations, including associations that have been operating under previously granted capital and accounting forbearances. Further, Thrift Bulletin 38-2 purported to eliminate such capital and accounting forbearances. Other FIRREA implementing regulations require institutions that fail any one of the three new capital standards to be subject to, among other things, Regulatory Bulletin 3a-1, Policy Statement on Growth for Savings Associations, and Thrift Bulletin 36, Capital Restoration Plans. In addition, the regulations provide that the OTS may, at any time, take enforcement actions against a savings association that fails to meet any of the capital requirements, including placing it in receivership, or requiring the association to take one or more corrective actions, including: increasing its regulatory capital; restricting dividend payments; reducing the rate paid on or limiting the receipt of additional savings accounts; ceasing or limiting certain lending activities; limiting operational expenditures; increasing liquid assets; or taking any other actions deemed necessary or appropriate.

Notwithstanding the Association's belief that its regulatory capital adequacy requirements are governed by its contractual Agreements, the Association submitted several capital restoration plans to the OTS, each of which was rejected. As an integral part of its primary capital plan, Sterling undertook a public offering of common and preferred stock which would have raised approximately $10.5 million of new capital. Ultimately the Association was forced to cancel this fully subscribed offering in January 1990 as a direct consequence of the OTS prohibiting the Association from making any capital distributions, including the payment of dividends on stock (see Note 15).

In May 1990, the Association notified the OTS that it believed the position the OTS was taking was unlawful and, specifically, contrary to FIRREA. Following the OTS' subsequent refusal to honor the contractual Agreements, the Association attempted to negotiate a mutually acceptable alternative solution that would allow it to continue operating without undue interference by its regulators.

OFFICE OF THRIFT SUPERVISION
AND STATE OF WASHINGTON
DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

| Name and Address of Institution | District | Docket No. |
| --- | --- | --- |
| Sterling Savings Association<br>North 120 Wall Street<br>Spokane, Washington 99201 | Seattle<br><br>Type of Examination<br>Special Limited | 07918 |

Examination Commenced: November 13, 1989
Examination Concluded: January 8, 1990

Service Corporations and Other Affiliates Which Are a Part of This Report:

Not Applicable

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstance shall the institution, or any of its directors, officers, or employees disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the Seattle District Director should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued the process, should be advised of the above prohibition and referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

Date: November 13, 1989 Docket No.: 07918

## ASSET QUALITY

Examination procedures consisted of reviewing a sample of management's internally classified assets and nonclassified mortgage loans using balances as of October 31, 1989. The sample of internally classified assets included 32 real estate loans totaling $14.1 million, 13 commercial loans totaling $2.2 million, and 21 parcels of real estate owned totaling $6.6 million. The sample of internally classified assets represents 71.6 percent of the total dollar volume of internally classified assets reported as of September 30, 1989.

Approximately 200 nonclassified real estate loans totaling $103.1 million were reviewed for adherence to sound underwriting principles as well as proper classification. The total nonclassified loans reviewed represents nearly 60.0 percent of the dollar volume of total outstanding nonresidential real estate loans. The sample includes 34 commercial real estate loans totaling $65.5 million granted by the Intervest-Mortgage Investment Company office located in Lake Oswego, Oregon.

Overall, asset quality and loan administration was found to be unsatisfactory, as noted by the negative trend in classified assets and noncompliance with internal and regulatory policies.

### Trends in Classified Assets

Asset quality has deteriorated since the June 19, 1989, examination. Classified assets total $40.0 million, representing 5.7 percent of total assets, compared to $32.6 million, representing 4.5 percent of total assets, at the prior examination. Unreserved losses identified during the current examination total $1.3 million and represent 4.7 percent of regulatory capital. The following table presents the current level of classified assets.

| (In Thousands) | Current Examination | Previous Examination |
|---|---|---|
| Substandard | $37,251 | $30,952 |
| Doubtful | 1,420 | 1,691 |
| Loss | 1,342 | 0 |
| Total Classified Assets | $40,013 | $32,643 |
| Percent of Total Assets | 5.7 | 4.5 |
| Percent of Regulatory Capital | 141.3 | 117.2 |

The Substandard figure includes approximately $3.4 million in assets covered under a FSLIC indemnification agreement which are internally classified Substandard by management. Excluding these assets results in total classified assets of $36.6 million, or 5.2 percent of total assets and 130.0 percent of capital. The amount classified Loss includes a $482,000 contra-asset account that must be established for the Beitz wrap-around loan, $197,000 in capitalized real estate owned (REO) expenses, $213,000 in REO losses and $450,000 in actual loan losses. The Beitz loan wraps around a first mortgage held by a third party which has not been booked by Sterling Savings.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation** | ) | |
| Plaintiffs, | ) | **No. 95-829-C** |
| v. | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

# UPDATED AMENDED EXPERT REPORT OF MUKESH BAJAJ, Ph.D.

**February 15, 2007**

# Table 3
# Sterling Savings Association
# Tangible Capital
**($ in thousands)**

| Year End | Actual Tangible Capital | | Tangible Capital Requirement | | Capital Excess |
|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | Amount |
| 06/30/92 | $ 26,556 | 4.21 | $ 9,452 | 1.50 | *$ 17,104* |
| 06/30/93 | 49,306 | 4.83 | 15,335 | 1.50 | *33,971* |
| 06/30/94 | 62,936 | 4.68 | 20,174 | 1.50 | *42,762* |
| 06/30/95 | 85,037 | 5.53 | 22,866 | 1.50 | *62,171* |
| 06/30/96 | 90,622 | 6.15 | 22,106 | 1.50 | *68,516* |
| 12/31/96 | 101,589 | 6.64 | 22,934 | 1.50 | *78,655* |
| 12/31/97 | 148,228 | 7.70 | 28,876 | 1.50 | *119,352* |

(Note: Sterling did not report its tangible capital ratios in its Annual Reports in subsequent years.)

*Sources: Sterling Annual Reports; Sterling Financial Annual Reports*

GOV'T SUPP APP 45

# Table 3 (continued)
# Sterling Savings Association
# Core Capital (Tier I to Adjusted Assets)

($ in thousands)

| Year End | Actual Core Capital | | Minimum Capital Requirements | | Capital Excess | Well-Capitalized Requirements | | Capital Excess |
|---|---|---|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | Amount | Amount | Ratio | Amount |
| 06/30/92 | $ 36,185 | 5.71 | $ 19,004 | 3.00 | *$ 17,181* | n/a | n/a | *n/a* |
| 06/30/93 | 59,548 | 5.81 | 30,747 | 3.00 | *28,801* | n/a | n/a | *n/a* |
| 06/30/94 | 69,896 | 5.19 | 40,406 | 3.00 | *29,490* | n/a | n/a | *n/a* |
| 06/30/95 | 86,258 | 5.65 | 45,770 | 3.00 | *40,488* | $ 85,352 | 5.00 | *$ 906* |
| 06/30/96 | 91,062 | 6.18 | 44,225 | 3.00 | *46,837* | 73,708 | 5.00 | *17,354* |
| 12/31/96 | 101,589 | 6.64 | 45,868 | 3.00 | *55,721* | 76,446 | 5.00 | *25,143* |
| 12/31/97 | 148,228 | 7.70 | 57,751 | 3.00 | *90,477* | 96,252 | 5.00 | *51,976* |
| 12/31/98 | 143,669 | 6.39 | 89,900 | 4.00 | *53,769* | 112,375 | 5.00 | *31,294* |
| 12/31/99 | 168,889 | 6.77 | 99,738 | 4.00 | *69,151* | 124,673 | 5.00 | *44,216* |
| 12/31/00 | 184,829 | 7.10 | 104,199 | 4.00 | *80,630* | 130,249 | 5.00 | *54,580* |
| 12/31/01 | 240,669 | 8.03 | 119,926 | 4.00 | *120,743* | 149,908 | 5.00 | *90,761* |
| 12/31/02 | 261,585 | 7.57 | 138,171 | 4.00 | *123,414* | 172,714 | 5.00 | *88,871* |
| 12/31/03 | 315,386 | 7.43 | 169,711 | 4.00 | *145,675* | 212,139 | 5.00 | *103,247* |
| 12/31/04 | 450,918 | 6.62 | 272,599 | 4.00 | *178,319* | 340,748 | 5.00 | *110,170* |
| 12/31/05 [1] | 507,711 | 7.20 | 283,573 | 4.00 | *224,138* | 354,466 | 5.00 | *153,245* |
| 09/30/06 | 669,065 | 8.10 | 332,394 | 4.00 | *336,671* | 415,492 | 5.00 | *253,573* |

*Sources: Sterling Annual Reports; Sterling Financial Annual Reports and 10K's; Sterling Financial 10-Q at September 30, 2006*
*Note: [1] On July 8, 2005, Sterling Savings Bank converted to a commercial bank.*

GOV'T SUPP APP 46

GOV'T SUPP APP 47

# Table 3 (continued)
# Sterling Savings Association
# Core Capital (Tier I to Risk-Weighted Assets)

($ in thousands)

| Year End | | Actual Core Capital | | Minimum Capital Requirements | | Capital Excess | Well-Capitalized Requirements | | Capital Excess |
|---|---|---|---|---|---|---|---|---|---|
| | | Amount | Ratio | Amount | Ratio | Amount | Amount | Ratio | Amount |
| 06/30/95 | | $ 86,258 | 10.11 | n/a | n/a | *n/a* | $ 51,211 | 6.00 | *$ 35,047* |
| 06/30/96 | | 91,062 | 10.50 | n/a | n/a | *n/a* | 52,021 | 6.00 | *39,041* |
| 12/31/96 | | 101,589 | 10.99 | n/a | n/a | *n/a* | 55,442 | 6.00 | *46,147* |
| 12/31/97 | | 148,228 | 13.60 | n/a | n/a | *n/a* | 67,049 | 6.00 | *81,179* |
| 12/31/98 | | 143,669 | 9.40 | $ 61,127 | 4.00 | *$ 82,542* | 91,691 | 6.00 | *51,978* |
| 12/31/99 | | 168,889 | 9.50 | 71,009 | 4.00 | *97,880* | 106,649 | 6.00 | *62,240* |
| 12/31/00 | | 184,829 | 9.71 | 76,141 | 4.00 | *108,688* | 114,211 | 6.00 | *70,618* |
| 12/31/01 | | 240,669 | 10.83 | 88,882 | 4.00 | *151,787* | 133,322 | 6.00 | *107,347* |
| 12/31/02 | | 261,585 | 10.03 | 104,300 | 4.00 | *157,285* | 156,449 | 6.00 | *105,136* |
| 12/31/03 | | 315,386 | 9.89 | 127,313 | 4.00 | *188,073* | 190,970 | 6.00 | *124,416* |
| 12/31/04 | | 450,918 | 9.70 | 185,404 | 4.00 | *265,514* | 278,105 | 6.00 | *172,813* |
| 12/31/05 | [1] | 507,711 | 9.20 | 221,248 | 4.00 | *286,463* | 331,871 | 6.00 | *175,840* |
| 09/30/06 | | 669,065 | 9.70 | 277,061 | 4.00 | *392,004* | 415,591 | 6.00 | *253,474* |

*Sources: Sterling Annual Reports; Sterling Financial Annual Reports and 10K's; Sterling Financial 10-Q at September 30, 2006*
*Note: [1] On July 8, 2005, Sterling Savings Bank converted to a commercial bank.*

GOV'T SUPP APP 48

# Table 3 (continued)
# Sterling Savings Association
# Risk-Based Capital

($ in thousands)

| Year End | | Actual Risk-Based Capital | | Minimum Capital Requirements | | Capital Excess | Well-Capitalized Requirements | | Capital Excess |
|---|---|---|---|---|---|---|---|---|---|
| | | Amount | Ratio | Amount | Ratio | Amount | Amount | Ratio | Amount |
| 06/30/92 | | $ 39,578 | 10.68 | $ 26,679 | 7.20 | *$ 12,899* | n/a | n/a | *n/a* |
| 06/30/93 | | 60,841 | 12.27 | 39,653 | 8.00 | *21,188* | n/a | n/a | *n/a* |
| 06/30/94 | | 72,925 | 10.92 | 53,413 | 8.00 | *19,512* | n/a | n/a | *n/a* |
| 06/30/95 | | 92,134 | 10.79 | 69,087 | 8.00 | *23,047* | $ 85,352 | 10.00 | *$ 6,782* |
| 06/30/96 | | 98,014 | 11.30 | 70,167 | 8.00 | *27,847* | 86,703 | 10.00 | *11,311* |
| 12/31/96 | | 109,034 | 11.80 | 74,870 | 8.00 | *34,164* | 93,351 | 10.00 | *15,683* |
| 12/31/97 | | 156,650 | 14.03 | 89,398 | 8.00 | *67,252* | 111,748 | 10.00 | *44,902* |
| 12/31/98 | | 157,373 | 10.30 | 122,254 | 8.00 | *35,119* | 152,818 | 10.00 | *4,555* |
| 12/31/99 | | 184,218 | 10.36 | 142,199 | 8.00 | *42,019* | 177,748 | 10.00 | *6,470* |
| 12/31/00 | | 195,054 | 10.25 | 152,281 | 8.00 | *42,773* | 190,352 | 10.00 | *4,702* |
| 12/31/01 | | 259,706 | 11.69 | 177,763 | 8.00 | *81,943* | 222,204 | 10.00 | *37,502* |
| 12/31/02 | | 285,907 | 10.96 | 208,599 | 8.00 | *77,308* | 260,749 | 10.00 | *25,158* |
| 12/31/03 | | 347,370 | 10.91 | 254,627 | 8.00 | *92,743* | 318,283 | 10.00 | *29,087* |
| 12/31/04 | | 496,752 | 10.70 | 370,807 | 8.00 | *125,945* | 463,509 | 10.00 | *33,243* |
| 12/31/05 | [1] | 563,194 | 10.20 | 442,495 | 8.00 | *120,699* | 553,119 | 10.00 | *10,075* |
| 09/30/06 | | 739,391 | 10.70 | 554,121 | 8.00 | *185,270* | 692,652 | 10.00 | *46,739* |

*Sources: Sterling Annual Reports; Sterling Financial Annual Reports and 10K's; Sterling Financial 10-Q at September 30, 2006*
*Note: [1] On July 8, 2005, Sterling Savings Bank converted to a commercial bank.*

COPY

Deposition of

Cajer Neely

June 26, 2002

STERLING V USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

I left.
Wes Sodorff left before I left.
Vandervert left before I left.
The same with Mike walker.
And the same with Wolff.
Woodland Montessori followed me.
Max Kuney I don't recall.
Dave Hook would have left after I left.
Latah Creek left before I left.
And Stahl Optical left before.
McDowell I don't recall.
DeVries would have left after I left.
GT Graphics left, they left after I left.
And the same with Sixth Avenue.
Q. Now, did you at some time speak with each and every one of these customers and ask them why they left Sterling?
A. That would have been part of the discussion, after they had left. The discussion would have been both why they left, because I mean that was a common path that we had. And that would have been part of the discussion, and the other part was that I was calling on them to do additional business with them.
Q. How are Aslin-Finch and Fritz Wolff related, if any at all?



A. Fritz Wolff is the owner of Aslin-Finch.
Q. So you haven't got two separate entries, why is that?
A. Just because they, because they were listed separately on those reports. But Wolff has other, he has other entities, Source Capital, AJ Wolff, but Aslin Finch was listed as a separate customer on one of those reports that I looked at.
Q. Okay. With respect to each of these customers, could you just tell me what conversation you had with them and what they told about why they left Sterling or what their other circumstances surrounding, can you just--sorry, I just want to make it a complete question, or if there are other circumstances under which you have determined that they left Sterling and the reasons why, explain those too if there was something other than a conversation?
A. I don't recall exact conversations, other than the couple I mentioned to you, the letter of credit example with A&A construction, the example of Randy Ramey, those two conversations I just happened to remember more specifically. I don't remember exact conversations, but I do remember that it was related to the limitation on Sterling to continue commercial activity and the uncertainty as to the timing of a resolution, and I can say that the general



conversation with the others would have been along that line, too.
Q. Okay. The specific ones you remember are A&A Construction and Randy Ramey, right?
A. Yes.
Q. We'll get back to those but I would like you to go through the list and with respect to the other ones tell me everything you remember about why they left Sterling because of the restrictions?
A. Okay. I mean I can go through every one, but I don't remember exact conversations, but what I remember is--like I say, what I remember is much of my job during those last few months was discussion with customers regarding whether they should stay at Sterling or if they should look for other banking alternatives.
Q. All right. Let me just to explain to you that everything that you are testifying to today could potentially be used at trial and there are rules of evidence that govern what's admissible and what's not so I'd like to do this in as organized a fashion as I can. To the extent you may be testifying at trial, this list may be submitted. I'd like you to go through each one, if you don't remember the exact circumstances or the exact conversations just tell me



that, but I just need to know everything that you remember about each one.
A. Okay, Aslin-Finch, I do remember that Fritz Wolff, Fritz Wolff is a prominent developer in Spokane. He would be an example of somebody that had another banking relationship at U.S. Bank at the time. And the discussion would have been around whether or not Aslin-Finch was a business versus real estate development, so that I do remember a discussion with Fritz Wolff in general about Aslin-Finch. Dain Armstrong.
Q. On Aslin-Finch, they already had a relationship with U.S. Bank?
A. No, Aslin-Finch did not, Fritz Wolff did.
Q. Fritz Wolff did and Aslin-Finch was one of his companies?
A. Yes.
Q. So Aslin-Finch was doing all of its business with Sterling but Fritz Wolff, the owner, did some by at U.S. Bank, is that correct?
A. Uh-huh.
Q. Do you remember having this conversation with Mr. Wolff?
A. I remember him being somebody that I had had a conversation with, but I don't remember the

conversation, no.
Q. You don't remember anything about the conversation, anything that was said?
A. Other than I would remember, I would remember the Aslin-Finch part and I would remember his, his concern over considering leaving that part of the business, because again, Aslin-Finch would be an example of a customer that had a credit line, had a checking account.
Q. So his concern was over leaving that part of the business, what?
A. I'm sorry, say that again–
Q. You testified that you would remember his, I think you were referring to Mr. Wolff's, concern over considering leaving that part of his business because again Aslin-Finch would be an example of a customer had a credit line, which part?
A. To the extent that he did, Aslin Finch would be different from the rest of Fritz Wolff's business, in that it would be an example of the ongoing credit line and checking account. Aslin-Finch would have had a more immediate need from the bank as opposed to, Fritz Wolff does multifamily development also. And I don't remember at the time but if he didn't have a project scheduled, that wouldn't have been as

69

urgent to him. But the Aslin-Finch part would have been more urgent because that represented a business activity.
Q. Okay, and am I correct in stating that it is your testimony that you remember Mr. Wolff expressed general concern about Aslin-Finch but you don't remember the specifics of the conversation at all?
A. That would be correct.
Q. What about Dain Armstrong?
A. I don't remember any specific conversation with Dain.
Q. Then why do you, why have you concluded that they left Sterling because of restrictions?
A. Because Dain, Dain does ongoing real estate development, Dain's a customer of mine now, I don't know from any conversations with him specifically other than he's a developer that has done subsequent real estate loans.
Q. So is Dain Armstrong an individual person?
A. Yes.
Q. Is that somebody's name, did Dain Armstrong or anybody who works for him tell you or anybody else tell you that Dain Armstrong left because of the restrictions?
A. No.
Q. Okay. What about Ted Beasley?

70

A. Ted Beasley, I do, I mean I've continued to do business with Ted, and Ted and I would have had conversations.
Q. Do you remember them?
A. The conversations with Ted would have been both in relation to the restrictions as far as how long they were going to last and Ted is one of the ones I stated that followed me.
Q. When you say the conversations would have been, do you remember the conversations?
A. No.
Q. So you–
A. I don't remember the exact dialogue of the conversation. I remember that Ted would have been somebody that I, he would have been one of the people that I would have talked to.
Q. When you say would have, did you talk to him?
A. Yes.
Q. And do you remember what exactly was said?
A. No.
Q. Do you remember what generally was said?
A. Yes.
Q. And what was that?
A. That would have, what generally would have been discussed would have been how long are the

71

restrictions going to last–
Q. Can I stop you for a second. When you say would have been, that is kind of confusing to me, if you could just say what the general conversations were to the extent you remember, if you don't remember tell me that, too, but please try not to speculate what the conversations would have been.
A. Okay. Ted and I discussed the restrictions and we discussed his relationship with the bank.
Q. Did he tell you that he was moving his business from Sterling because of the restrictions?
A. Ted would have–excuse me, Ted told me that he was going to move his business if there was not a resolution.
Q. What kind of resolution?
A. The resolution would have–I can't remember the exact resolution, a removal of the restriction to allow us to make a loan to Ted for operating.
Q. Larry Biggs?
A. I did not have any specific conversation with Larry.
Q. So are you saying that neither Larry Biggs nor anybody else associated with him told you that they left Sterling because of the restrictions?
A. Yes.
Q. What about Cedar Builders?

72

A. Rich Naccarato is the owner of Cedar Builders, I had discussions with Rich. Rich had a credit line. He also did--he had development loans that were with the income property side of Sterling. My memory of the specific conversation would not be good, I can't remember.
Q. To your knowledge did Rich Naccarato or anybody associated with Cedar Builders or anybody else for that matter tell you that Cedar Builders took its business from Sterling to elsewhere because of the restrictions?
A. I don't recall that.
Q. What about Empire Jewelry and Loan?
A. Mark Lax and Mark Silver are the principals of Empire. I had discussion with Mark Lax and Mark Silver, they asked me what--they would, they asked me what my estimate was of the restrictions as far as estimate of time. And my response to them was that I did not know what, how long the time would, the time frame would be of the restrictions, and they, I don't remember their response other than I can recall concern on their part, because they, they are a, they are a retail jewelry operation and a pawnshop and they, and they did move their business based on that conversation.

73

Q. Did anybody associated with Empire Jewelry and Loan tell you that they were moving their business as a result of the restrictions?
A. I can't remember the exact conversation.
Q. George Hansen?
A. I don't recall a meeting with George.
Q. Do you recall any conversation of any kind?
A. No.
Q. Then why did you put him on this list?
A. Because I, I do business with George, I did business with George at the time and he borrowed from me, borrowed from West One back after I moved to West One Bank.
Q. But George Hansen, is he a company or is it an individual?
A. George Hansen is both an individual and, they have an investment company called Shamrock Investment.
Q. Okay. Did George Hansen or anybody else ever tell you that George Hansen moved his business from Sterling because of the restrictions?
A. No.
Q. Okay. How about Don Howell?
A. I don't recall a, I don't remember having a meeting with Don Howell.
Q. Did Don Howell or anyone else tell you that Don

74

Howell moved his business from Sterling as a result of the restrictions?
A. No.
Q. What about Craig Jacobs?
A. Craig Jacobs, I don't remember a meeting before, but Craig Jacobs met with me after, after I left and he moved his business to me after the, after the, after I left. He did not make a statement as to why, but he moved because he had additional borrowing needs at that point.
Q. So what, he never told you why he moved his business from Sterling to West One?
A. Well, I'm trying to recall I guess the circumstances, he, the circumstances with Jacobs would have been that I would have called on him after I left or he would have contacted me, I don't remember. He had a borrowing need and he did not borrow at Sterling.
Q. Do you remember him telling you that?
A. No.
Q. Did Craig Jacobs or anyone else ever tell you that Craig Jacobs moved his business from Sterling because of the restrictions?
A. No.
Q. What about Bill Lawson, this is A&A construction which I know you've made reference to earlier.

75

A. Uh-huh. With Bill Lawson I'm recalling again that he was the individual with the letter of credit and, again, I can't say that he made the statement to me that he moved, but he is one that moved his business to U.S. Bank, either because of that LC, that letter of credit circumstance or because of the other, the credit line that he had also.
Q. But no one ever told you that was the reason he moved his business?
A. No.
Q. Was this A&A Construction the subject of a phone call with Carol Friend or was that something else?
A. The letter of credit was the subject of phone call to Carol Friend. I cannot sit here and say for 100 percent sure that it was A&A, but, I recall that that is who it was, but I'm estimating that is who it was.
Q. It could have been another company but--
A. Uh-huh.
Q. --but that's your best guess?
A. Yes.
Q. Michael Manz?
A. Yeah, I mean, I would say, one, I do have meetings with the Manzes, they moved because I moved.
Q. Did anyone ever tell you that the Manzes moved because of the restrictions placed upon Sterling?

76

A. I don't remember that.
Q. Metallic Arts?
A. Metallic Arts is one that was an account of Tom Beil's that moved after I moved, so I did not have a meeting with them.
Q. Did you ever talk to Tom Beil about them?
A. I don't recall talking–
Q. Did anyone ever tell you that Metallic Arts left Sterling because of the restrictions?
A. I do know that Metallic Arts left because of the restrictions because they are an account that subsequently came to West One Bank after I was there.
Q. Did they tell you that when they came there?
A. I don't recall–again I don't recall that exact statement.
Q. What do you recall?
A. With Metallic Arts I recall that they actually, a step that they went through was to get an SBA loan which is circumstances, there are–if you can get an SBA loan, that is a loan that is not a revolving line of credit, and Metallic Arts got an SBA loan which was an in-between strategy, a temporary strategy to provide funding that was not on a revolving loan. And–but that, I would say maybe approximately six months after I left is when they, that they left

77

Sterling because they still needed a credit line in addition to the, in addition to the term loan.
Q. So you know that they got an SBA loan at some time, is that what you're saying?
A. Uh-huh.
Q. From that you assume that they left Sterling because of the restrictions?
A. Again picture, Metallic Arts has a credit line, that credit line is paid down, they can't re-advance on it. So as an alternative they get a term loan that happened to be guaranteed by SBA that gave them money that they could operate on. It, that strategy lasted for a while, but was not a permanent solution, and then, and subsequent to that is when they moved, moved their business because there was no credit line available.
Q. Did anyone ever tell you that the reason Metallic Arts moved its business from Sterling is because Sterling was being restricted as a result of FIRREA?
A. I don't–no.
Q. Is Metallic Arts the one that you said eventually moved some of its business back to Sterling or was that another one?
A. That was Randy Ramey.
Q. What about Grant Person, what do you remember–

78

A. I don't remember any meeting with Grant Person.
Q. Do you remember any conversations with anybody associated with Grant Person?
A. No.
Q. Did anyone ever tell you that Grant Person moved his or its business from Sterling as a result of the restrictions imposed after the enactment of FIRREA?
A. No.
Q. Randy Ramey, I know you provided some testimony on that already, could you just, did you have any conversations with him or his representatives about the circumstances surrounding the company leaving Sterling?
A. I do remember conversations with Randy Ramey and the conversation was, and actually I would have had multiple conversations with Randy Ramey, where he asked me again the timing of resolution to the restrictions and that one of the final conversations would have been that he–if he could not get resolution, if he could not get a response from me or the bank that identified when the restriction would be removed, that he was going to have to move, and he is the one that I identified that he had a credit line, he was a growing contractor at the time, and he did leave.

79

Q. So you do remember a specific conversation with Mr. Ramey?
A. Yes.
Q. And was it with him, with Mr. Ramey himself?
A. Yes.
Q. And he told you that he planned to move his business because of restrictions placed upon Sterling, is that correct?
A. Yes.
Q. And he asked you about potential resolution?
A. Yes.
Q. Do you recall the exact time frame when Randy Ramey left?
A. It would have been before I left the bank. So–
Q. Before June, '90?
A. Before June of '90.
Q. When you left the bank were you aware of any lawsuit that was pending in the district court for the Eastern District of Washington here in Spokane?
A. No.
Q. Were you ever aware of the fact that a court issued a temporary restraining order prohibiting the regulators from the restrictions that had been placed upon it?
A. I was not aware that a restraining order had been

80

**Office of Thrift Supervision**
Department of the Treasury
1501 Fourth Ave., 19th Floor, Seattle, WA 98101-1693

October 13, 1989

Harold B. Gilkey, Chairman of the Board
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

Docket No. 7918

Dear Mr. Gilkey:

We have considered the complete record of the cause and the merits of the application filed by Sterling Savings Association, Spokane, Washington, for permission to increase accounts of an insurable type through the acquisition of certain branch offices of Great American Bank, A Federal Savings Bank, Tucson, Arizona, located at 1275 Lee Boulevard, Richland, Washington; and, West 615 Sprague, Spokane, Washington.

It having been determined that the application is eligible for approval under Section 563.22(h)(1) of the Insurance Regulations, please be advised that the application shall be deemed approved as of the close of business on November 12, 1989, subject to the following conditions:

1. That notice of the application is appropriately published in accordance with the attached instructions; and, that no substantial communication in protest of said application is filed with the Deputy Director within the time period set forth in the published notice;

2. That not later than 30 days from the effective date of the acquisition, Sterling Savings Association shall submit evidence to the Deputy Dirctor that the institution has given notice, in writing, to each investor whose withdrawable account in that institution will exceed the sum of $100,000 as a result of the acquisition, of the effect of the acquisition on the extent of the depositor's insurance coverage. Such notice is to include the following sentences:

   "If the aggregate amount of your existing account(s) at Sterling Savings Association and Great American Bank, a Federal Savings Bank, exceeds $100,000, you should be aware the Federal Law provides that, whenever a savings account of an insured institution is assumed by another institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 U.S.C. Section 1728(a) (1982). This means that the SAIF will insure the accounts you had at Sterling Savings Association and Great American Bank, A Federal Savings Bank, separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts, such as passbook and NOW accounts. After expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling Savings Association accounts for



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER F WON929 1903

insurance purposes. Any accounts opened or deposits made after (date of purchase) will be aggregated with your Sterling Savings Association account(s) and will not be separately insured."

3. That the proposed transaction is consummated no later than 120 days from the date of the approval;

4. That not later than 30 days from the effective date of the acquisition, Sterling Savings Association shall submit:

   a) a certification by local counsel stating that the acquisition has been consummated in accordance with the signed agreement, dated July 11, 1989 and the conditions imposed with this approval;

   b) a letter signed by the chief executive officer of <u>each</u> institution stating that, at the time of consummation of the acquisition, no adverse change has occurred in the condition or operations of said institution, and that the acquisition has been consummated consistent with the June 30, 1989 pro forma statement of condition as set forth in the application, or if any change has occurred or the acquisition has not been so consummated, in which respect there has been a change or inconsistency with the specified statements of condition;

   c) a balance sheet for <u>each</u> institution reflecting the financial condition immediately prior to the acquisition, all adjustments to be made as a result of the acquisition and, the financial condition immediately following the acquisition; and,

5. That not later than 30 days from the effective date of the acquisition, Sterling Savings Association shall submit information satisfactory to this office, along with the written opinion of the association's independent accounting firm which:

   a) states the total purchase price;

   b) specifically describes as of the date of purchase any intangible assets arising from the purchase, to be recorded on the institution's books; and

   c) substantiates the reasonableness of amounts attributable to intangible assets, including goodwill, and any discount of assets and related amortization periods and methods.

6. That Sterling Savings Association closes its branch offices located at West 615 Sprague, Spokane, Washington (acquired office), and 211 Torbett Street, Richland, Washington, no later than February 28, 1990.

7. That the subject transaction does not result in any growth in Sterling's total liabilities and that the institution continues to

adhere to its business plan on file at the District 12 Office of Thrift Supervision.

8. That Sterling shall not enter into this transaction until the institution is in full compliance with its tangible capital requirement as defined in the Office of Thrift Supervision Regulations promulgated under the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

An original and three copies of all compliance materials should be submitted to the Deputy Director.

Sincerely yours,

Ronald N. Karr
District Director
Seattle District

CAN:jlg

cc: Betty Reed, Supervisor, Div. of S&LAs, State of Washington
Ronald L. Sheriden, President, Great American Bank, A FSB
Lou Knierim, Great American Bank, a FSB

bc: Jackie Durham, Regional Director, ODB, OTS
Chief, Micrographics and Records, Dockets Section, OTS
Office of the Secretary, OTS
Sidney C. Mar, Assistant Director, OTS-San Francisco
John M. Crossley, Supervisory Analyst, OTS-San Francisco
Carol A. Friend, Deputy Director, OTS-Seattle District
Pat Stimac, Supervisory Analyst, OTS-Seattle District
Edwin C. Hedlund, Executive Deputy Dirctor, Supervisory Operations



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON929 1905

# PAGES 57-59 INTENTIONALLY OMITTED

# FORM 10-K

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

(Mark One)

_X_ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [Fee required]
**For the fiscal year ended June 30, 1996**
OR

___ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [No fee required]
For the transition period from ___________ to ___________

COMMISSION FILE NUMBER 0-20800

**STERLING FINANCIAL CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington**<br>(State or other jurisdiction of incorporation or organization) | **91-1572822**<br>(I.R.S. Employer Identification No.) |
| **111 North Wall Street, Spokane, Washington**<br>(Address of principal executive offices) | **99201**<br>(Zip code) |

Registrant's telephone number, including area code: (509) 458-2711

Securities registered pursuant to Section 12(b) of the Act:

| None | None |
|---|---|
| (Title of class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act:
**Common Stock ($1.00 par value)**
**$1.8125 Cumulative Convertible Preferred Stock ($1.00 par value)**
**8.75% subordinated Notes Due 2000**
**Warrants to Purchase Common Stock**
(Title of class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes_X_ No___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Park III of this Form 10-K or any amendment to this Form 10-K.

As of August 31, 1996, the aggregate market value of the voting stock held by non-affiliates of the registrant, computed by reference to the average of the bid and asked prices on such date as reported by the Nasdaq National Market, was $72,427,946.

The number of shares outstanding of the Registrant's Common Stock, par value $1.00 per share, as of August 31, 1996 was 5,537,328.

DOCUMENTS INCORPORATED BY REFERENCE

Specific portions of the Registrant's 1996 Annual Report to Shareholders are incorporated by reference into Parts I, II and IV hereof. Specific portions of the Registrant's Proxy Statement dated September 24, 1996 are incorporated by reference into Part III hereof.

Exhibit 22.2(b)



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER F WOL131 0996

***One-to-Four Family Residential Lending.*** A significant lending activity of Sterling has been the granting of mortgage loans to enable borrowers to purchase one-to-four family homes on properties within Sterling's principal market area. Sterling also originates one-to-four family residential construction loans.

Sterling originates primarily fixed-rate mortgages. Sterling also originates ARMs, which have interest rates that adjust annually and are indexed to either the weekly average yield on one-year U.S. Treasury securities or the Federal Home Loan Bank of Seattle Eleventh or Twelfth District Cost of Funds Indices.

Since fiscal year 1994, there has been a significant decrease in the volume of Sterling's permanent residential mortgage lending due to a shrinking market. During fiscal years 1996 and 1995, Sterling's residential lending arm, Action Mortgage, increased its residential construction lending in an effort to offset this decline in permanent residential lending and to improve its operating margins. Sterling has also placed greater emphasis on business banking and consumer lending.

Sterling continues to originate conventional and government-insured residential loans for sale into the secondary mortgage market. Within the secondary mortgage market for conventional loans, Sterling sells its residential loans primarily on a servicing-released basis to others. Sterling also sells loans to the Federal Home Loan Mortgage Corporation (the "FHLMC") and the Federal National Mortgage Association (the "FNMA"). Of all residential loans sold by it into the secondary market, Sterling sold 3.0% during fiscal year 1996 to such agencies, compared to 33.4% in fiscal year 1995. This decrease reflects Sterling's increased sales of loans to others on a servicing-released basis. Loans sold into the secondary market are all sold without recourse to Sterling, except that Sterling may be obligated to repurchase any loans which are not underwritten in accordance with FHLMC and FNMA or applicable investor underwriting guidelines. Sterling endeavors to underwrite residential loans in compliance with FHLMC and FNMA underwriting standards. During fiscal years 1996, 1995 and 1994, the number and amount of loans repurchased from the FHLMC and the FNMA were not significant in light of the number and amount of loans sold to the FHLMC and the FNMA.

Conventional residential mortgage loans are originated for up to 95% of the appraised value or selling price of the mortgaged property, whichever is less. All loans with loan-to-value ratios in excess of 80% carry a requirement that the customer purchase private mortgage insurance from approved third parties so that Sterling's risk is limited to approximately 80% of the appraised value. Sterling's residential lending programs are designed to comply with all applicable regulatory requirements. For a discussion of Sterling's management of interest rate risk on conventional loans, see "*– Secondary Market Activities.*"

Sterling makes residential construction loans on custom homes, pre-sold homes and homes that are not pre-sold. Construction financing is generally considered to involve a higher degree of risk than long-term financing on improved, occupied real estate. Sterling's risk of loss on construction loans depends largely upon the accuracy of the initial estimate of the property's value at completion of construction or development and the estimated cost (including interest) of construction. If the estimate of construction costs proves to be inaccurate, Sterling might have to advance funds beyond the amount originally committed to permit completion of the development and to protect its security position. Sterling might also be confronted, at or prior to maturity of the loan, with a project with insufficient value to ensure full repayment. Sterling's underwriting, monitoring and disbursement practices with respect to construction financing are intended to ensure that sufficient funds are available to complete construction projects. Sterling endeavors to limit its risk through its underwriting procedures, by using only approved, qualified appraisers and by dealing only with qualified builders/borrowers.

2

DFI-BK-001 (1/94)

STERLING SAVINGS ASSOCIATION

(Name of Bank)

OF SPOKANE, WASHINGTON

# EXAMINER'S REPORT OF EXAMINATION

At Close of Business OCTOBER 14, 1997, 19

Examiner

STATE - WARD SMITH
OTS - JEFF CRUMP

OTS

## THIS REPORT OF EXAMINATION IS STRICTLY CONFIDENTIAL

This report has been made by an examiner appointed by the Director of Financial Institutions for use in the supervision of the bank. The information contained in this report is based upon the books and records of the bank, upon statements made to the Examiner by directors or trustees, officers, and employees, and presumed by the Examiner to be correct.

The report of examination is furnished by the Division of Banks of the State of Washington for the information and consideration of your board of directors or trustees. Under the provisions of Section 30.04.270 RCW, the officer receiving this report shall submit it and any relative correspondence to the board of directors or trustees of the bank at its next succeeding meeting and the fact shall be noted in the minutes of the meeting of such board. In making the review of the report, it should be kept in mind that an examination is not the same as an audit, and this report should not be considered to be an audit report.

This copy of the report is the property of the Department of Financial Institutions of the State of Washington and is furnished to the bank examined for its confidential use. **If a subpoena or other legal process is received calling for production of this report, the Director of the Department of Financial Institutions must be notified immediately.** The attorney at whose instance the process was issued and, if necessary, the court which issued it, should be advised of these restrictions.

DIRECTOR OF FINANCIAL INSTITUTIONS

Date Received by Bank February 13, 1998

Noted in Minutes of Meeting Held

**Net Interest Margin (NIM)**

Sterling's NIM is improving, and is now comparable to its OTS peer. However, it remains weak in comparison to commercial bank peers. The improvement in the margin is primarily a result of the change in the association's asset mix over the last several years. The following table illustrates Sterling's asset mix at June 30, 1997, relative to its OTS Peer, and to a peer of all Washington State commercial banks.

| Approximate % of Total Assets | Sterling Savings | All WA State Commercial Banks | All West Region Thrifts |
|---|---|---|---|
| SFR Loans | 19 | 18 | 45 |
| Construction Loans | 12 | 7 | 1 |
| Multifamily and Commercial RE | 11 | 20 | 18 |
| Commercial and Farm Loans (Not secured by RE) | 14 | 20 | 1 |
| Consumer Loans | 4 | 5 | 3 |
| **All Loans** | **60** | **70** | **68** |
| Securities | 34 | 20 | 18 |
| Other Assets | 6 | 10 | 14 |
| **Total Assets** | **100** | **100** | **100** |

As the table indicates, Sterling's asset mix is now closer to that of a commercial bank than to its thrift peer. It should therefore be expected that Sterling's asset yields would be closer to those of commercial banks. However, Sterling's overall yields on assets are still well below commercial peers. This is due, in some part, to a lower percentage of loans vs. securities. The high percentage of securities is a result of the recent capital injection, and is expected to be temporary until quality loans can be obtained. Sterling may also be getting lower yields than peers for comparable loans, but this is a less significant component of the situation.

Aside from the high percentage of securities, the major reason Sterling's margins remain lower than commercial banks is due to its high cost of funds. Sterling's cost of funds is 11 basis points higher than its OTS peer, but fully 50 basis points higher than the commercial bank peer. The cause, as in the past, is Sterling's high percentage of wholesale funding. Because Sterling has been unable to grow deposits (and particularly retail deposits) at a rate equal to loan growth, the association must continue to rely on borrowings to a much greater extent than commercial or even thrift peers. Sterling has benefitted in the past year from rolling over long term borrowings at lower interest rates. However, further improvements in the net interest margin will depend on the association's ability to convert securities to higher yielding quality loans, and to increase retail deposits faster than asset growth. Both goals present management with significant challenges in the current economy, particularly the deposit growth goals.



Confidential Material Subject to Protective Order

Deposition of

Robert E. Meyers

April 25, 2000

Sterling v USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

A. Pardon?
Q. And it was after the issuance of this decision, in your opinion, that faith in Sterling began to increase again?
A. 1991 especially.
Q. What was different about 1991?
A. Well, that is when we got back on track with our return on earnings.
Q. And was that a result of the issuance of the decision by the court?
A. I believe so, it had much to do with it.
Q. Okay. Do you recall how things changed once this injunction was issued?
A. There was considerable relief on management and the board that we could go back to our regular activities and perform as we had before.
Q. Did you start performing as you had before?
A. Yes.
Q. How did you perform as you had before?
A. With our loan portfolio, deposit gathering and image to the public in general.
Q. Let me ask you this question. Prior to filing of the lawsuit, do you recall any discussion of a potential sale of Sterling?
A. No, except by the regulators.

125

Q. What do you mean by except by the regulators?
A. They posed that as one of the things that we should do.
Q. And do you recall whether Sterling considered it?
A. Not really.
Q. You don't recall or you don't think they did?
A. I don't think they did.
Q. Okay.
MS. HOSFORD: I'd like to mark this document as Meyers Exhibit No. 10. It is WON 9370484, and it is board minutes dated February 27, 1990.
(Ex. No. 10, Board Minutes, dated 2-27-90, marked.)
Q. (BY MS. HOSFORD) (Hands document.) If you wouldn't mind looking at page 0494. Actually it is the document pages--it would be page 9 and 10.
A. 9 and 10?
Q. Yes. If you would read the last paragraph on the page, moving over to the next paragraph on the 9th page, does it refresh your recollection about the potential for a sale of Sterling?
A. I don't remember this.
Q. Do you recall any of the potential buyers?
A. No, I don't.
Q. Do you recall why no sale happened?

126

A. Why?
Q. Yes.
A. I assume we were looking at all possibilities of what might develop, management, I mean.
Q. I'm sorry, I interrupted, management what?
A. No. It was up to management to explore all possibilities of what we might do.
Q. Do you recall whether there were any offers made?
A. No, I don't.
Q. Do you recall whether you were in favor of a sale?
A. No, I don't.
Q. Do you recall when Sterling achieved capital compliance?
A. Say that again, please?
Q. Do you recall when Sterling achieved capital compliance?
A. I don't remember the date, but we completed a 22 million stock offering, preferred.
Q. And was it--
A. In 1991, I believe.
Q. Was it the stock offering that brought you into compliance?
A. Was it the stock offering what, please?
Q. Was it the stock offering that brought Sterling into capital compliance?

127

A. I believe it did.
Q. Do you recall why Sterling was able to raise capital at that time?
A. We had a better image with the public at that time, I'm sure.
Q. Do you recall any other reasons why?
A. Yes, that is one of the main reasons why.
Q. Do you remember any others?
A. The company had always made a profit, return on earnings.
Q. Any other reasons?
A. I assumed the investing public thought it was a good buy at that time.
Q. Do you remember that specifically or are you just now speculating? Do you recall any--
A. I don't recall any specifics, no.
MS. HOSFORD: I'm going to mark this document as Meyers Exhibit No. 11. It is WON 8780052. A letter dated March 15, 1991, to Carol Friend from Sterling Savings.
(Ex. No. 11, Letter to Carol Friend from Sterling Savings, dated 3-15-91, marked.)
Q. (BY MS. HOSFORD) Dr. Meyers, would you mind taking a couple minutes to look through this letter, please?
A. Okay. Yes, okay.

128

# Deposition of

# Robert Dale Larrabee

## April 26, 2000

## STERLING V USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

A. Well, that they also said that we could only make certain type loans, I think maximum loan you could make as I recall, was a half million dollars, limited in amount to one person, limited to types of loans that could be made, limited the type of deposits that could be taken, and virtually tied our hands. It was a troubled time.
Q. Did it tie your hands with respect to every aspect of your operations?
A. It restricted most of our capability at the time, as I recall. We could still make single family loans as long as they conformed and commercial lending was pretty much gone. That's about what I remember.
Q. So Action Mortgage was still heavily involved in making single family loans at this point?
A. I think Action, it was the activity of Action that kept us all afloat.
Q. Do you recall making any changes in your business plans at that point to deal with the impact of FIRREA?
A. In my mind our focus was on a remedy to cure the taking, unlawful taking of capital from our organization. And, of course, we had to stay in business and so I know that at that time Mr. Gilkey says, let me worry about the regulators, to Bill Zuppe. He says, you get this thing tuned up and make us, you

118

know, we got to have--we got to make some good loans. And I think, as I recall, Action provided that activity that kept us--kept us going.
Q. When you say that there was an unlawful taking of capital, did Sterling ever have to turn over cash to the government?
A. It is my understanding that it was just a breach of contract, that they said that these contracts provided that we, because we were helping out, we were saving the government millions of dollars by taking over these troubled institutions, that they would allow us to put this goodwill capital on the books, and that we would be exempt from any capital restraints for a certain period of time. And then the FIRREA and the OTS took the position that they weren't going to pay attention to those contracts.
Q. That goodwill capital, was it actual dollars?
A. It was capital as far as regulatory capital was concerned. It allowed us to operate without being especially supervised because of not having enough capital.
Q. So, in other words, it kept you in compliance with the capital requirements?
A. That's right.
Q. But it wasn't cash that you could use to make loans

119

or anything like that?
A. No. It was regulatory capital.
Q. Do you recall what impact Judge Quackenbush's decision had on the operations of Sterling?
A. I think it saved its life.
Q. How?
A. By telling government it had to keep hands off, we had been a profitable institution since the day we opened the doors, and that we had specific contracts with the United States government to allow us to operate using goodwill capital. And that the government like individual people had to honor their contracts.
Q. When you say you told the government to keep hands off, what do you mean by that?
A. That they couldn't come in and shut us down like they were planning on doing that week.
Q. Did it have any other impact on what the government could and couldn't do to your recollection?
A. I don't recall.
Q. Once the injunction, to use your words, saved Sterling's life, did Sterling go back to business as usual?
A. Sterling in 1991, I believe, raised 20 million dollars worth of capital.

120

Q. Why did Sterling do that?
A. Because they were--they wanted to get back on, in capital compliance without the regulatory capital, because it had been stolen from us. So they raised the 20 some million dollars as I remember and became a well-capitalized organization.
Q. Would you have raised that money if you didn't have to get back into capital compliance?
A. I can't, I don't--I can't answer that.
Q. If the judge had said, hands off, why did you feel the need to raise the capital?
A. We knew that there was a temporary restraining order, and it allowed us a given period of time, so we kept on operating and made a good amount of loans. And to me it was a miracle that we were able to raise 20 million dollars after having gone through the publicity and all the negative things that the government put upon us.
Q. So you don't think you should have been able to raise that?
A. Well, I'm--I think it is--when somebody reads that you are about ready to be shut down by the government, and then the next year you go out and go to that same public and say, hey, we got some offering, I mean it takes a certain amount of faith to be able to raise 20

121