**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation, | ) |
| Plaintiffs, | ) |
| v. | ) No. 95-829C<br>(Judge Wheeler) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

**DEFENDANT'S RESPONSE TO STERLING'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH ITS CROSS-MOTION FOR SUMMARY JUDGMENT AS TO DAMAGES**

Pursuant to 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), the United States submits the following responses to the proposed findings of uncontroverted fact submitted by plaintiffs Sterling Savings Association and Sterling Financial Corporation ("Sterling" or "plaintiffs"), in support of Plaintiffs Cross-Motion for Summary Judgment as to Damages served on March 29, 2007.

**General Objections:**

1. The Government objects to plaintiffs' proposed findings of uncontroverted fact ("proposed findings") to the extent that they set forth legal conclusions with respect to the ultimate issue in this case – whether Sterling Savings Association ("Sterling") suffered damages as a result of the Government's breach of its contracts with Lewis Federal Savings & Loan Association ("Lewis Federal") and Tri-Cities Savings & Loan Association ("Tri-Cities"). We have responded to the legal issues presented by Sterling in our response to its cross-motion for summary judgment on damages.

2. We object, upon the ground of vagueness, to Sterling's proposed findings which ask us to confirm the content of a specific witness's testimony, or the contents of a specific document. While we have attempted to answer these questions, our answers are limited solely to determining whether the cited transcript, declaration, document, or affidavit are consistent with the proposed finding. The proposed findings do not ask whether the document is accurate or whether the witness has offered other testimony which is contradictory or which undermines the cited testimony, and we have not sought to provide such information in our answers. Similarly, the proposed findings do not seek information as to the admissibility of the cited testimony or document (such a request would ask for a legal conclusion) and we have not sought to address the admissibility of the cited testimony. As such, we reserve our right to challenge the admissibility, accuracy, and veracity of any of the cited testimony or documents under the Federal Rules of Evidence, the RCFC, and 12 C.F.R. § 510.5 (1990).

Subject to the forgoing qualifications and objections, pursuant to 56(h)(2), defendant submits the following responses to the proposed findings of uncontroverted fact submitted by Sterling.

1. Sterling began operations in 1983 as a State of Washington-chartered federally insured stock savings and loan association headquartered in Spokane, Washington. App. 1245:8-21.

**Defendant's Response:** Undisputed.

2. In contrast to the vast majority of thrifts, Sterling was a profitable and sound financial institution all during the troubled period of the 1980s. App. 9, ¶ 18; App. 105.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "vast majority," "sound," and "troubled period." Disputed because the document cited does not substantiate this vague, overbroad assertion. Sterling cites to an unsubstantiated assertion in an affidavit by Mr. Gilkey**.** Sterling also cites to a summary of Sterling financial data from 1983 to 1989, but provides no information or analysis about its peer institutions or the thrift industry as a whole.

3. During this time, Sterling's market area enjoyed more favorable growth than most states, and completely avoided the 1990-1991 recession. App. 3-4, ¶ 11; App. 1253:11-12:54:4.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "market area," "favorable growth," and "completely avoided." Disputed because the document cited as App 3-4, ¶ 11 does not substantiate this overbroad assertion. First, there is no ¶ 11 in App. 3-4. Second, App. 3 addresses the temporary restraining order Sterling obtained and responds to the Government's argument that Sterling's damages model is "unsound." While there is mention of Sterling's growth, App. 3 does not address Sterling's growth with respect to other states, nor the 1990-1991 recession. App. 4 is the signature page for the Declaration of Harold B. Gilkey, which begins on App. 1. Further, the document cited as App. 1253:11-1254:4 does not substantiate this overbroad assertion. App. 1254:11-1254:4 is

deposition testimony discussing the "outstanding" environment in the Pacific Northwest and "some problems" at unidentified "other competitor institutions" at an unreferenced time period.

4. Because Sterling opened in 1983, after peak interest rates, it did not have a portfolio of low-rate mortgage loans made in the 1960s or 1970s, but instead held all loans at current market rates, exceeding the rates it was paying on deposits. App. 1254:18-24; 2006 App. 131.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "peak interest rates" and "current market rates." Disputed because App. 1254:18-24 does not support this vague, overbroad assertion and because it is unclear what Sterling is citing to when it references 2006 App. 131. Undisputed to the extent that Sterling commenced operations in 1983. Comp. ¶ 1.1. Undisputed to the extent that the document cited as App. 1254:18-24, an excerpt from Harold Gilkey's June 6, 2000 deposition, states:

> Q. How was Sterling able to avoid the interest rate problems being experienced by other thrifts in the state?
>
> A. We – the bulk of our assets were adjustable rate mortgages, and so we didn't have any fixed rate mortgages on the books to burden us down where other institutions did.

5. By the end of its first year of business, Sterling was profitable. App. 10, ¶ 19; App. 131.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See

General Objection 2. Object to the proposed finding because it is vague as to time period. Sterling's citation to page 131 of its appendix indicates that as of fiscal year end June 30, 1983, Sterling had negative net income of ($130,000) and a return on average assets of negative 2.22 percent. Undisputed only to the extent that plaintiffs are referring to Sterling's first full fiscal year-end June 30, 1994, and that Sterling's "ROAA before taxes and Amortization" was .69 percent for that period. App. 131.

6. Its deposits, assets and profits increased each year without interruption through fiscal year 1989. App. 10, ¶ 19; App. 105.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. Disputed because the documents cited do not support the proposed finding. According to page 105 of Sterling's appendix, as Sterling's total assets increased from $433.953 million as of June 30, 1988, to $730.933 million as of June 30, 1989, its net income decreased from $1.2 million to $981,000, respectively. According to this same document, Sterling's profitability decreased from fiscal year end June 30,1986, through fiscal year end June 30, 1989, as demonstrated by its return on average assets which declined as follows: 1.02 percent for 1985, .93 percent for 1986, .91 percent for 1987, .73 percent for 1988 and .65 percent for 1989. Thus, although Sterling's deposits and assets increased through fiscal year 1989, its profitability steadily declined during the same period.

7. Sterling had a relatively small market share in the markets that it entered, so it had a substantial market available to it for growth. App. 1278:1-19.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "relatively small market share," "markets that it entered," and "substantial market available." Undisputed to the extent that Mr. Gilkey, in his June 6, 2000 deposition, testified, without substantiation, that "we are such a small portion of any of those markets, that we have a substantial market available to us." App. 1278:17-19. Disputed to the extent that in that same portion of testimony Mr. Gilkey also testified that "we are limited – size of the company is limited by our capital base." App. 1278:10-11. Also disputed in that, even if the plaintiff had a "small portion" of the relevant markets, that does not lead to the conclusion that the remainder of that market was necessarily available" to Sterling.

8. The success of Sterling during the 1980s was due primarily to its good management. App. 10, ¶¶ 20-21; App. 61.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the word "success." Disputed because, as demonstrated by page 105 of Sterling's appendix and discussed in our response to PFUF No. 6 above, although Sterling's deposits and assets generally increased throughout the 1980's, its profitability steadily declined as indicated by its return on average assets profitability ratio, which consistently decreased every fiscal year from 1.02 percent in 1985 to .47 percent in 1990.

9. Management success included the development and adoption of a business strategy that focused on generating deposits in Spokane and small towns in Washington, and building a lending capability in Spokane and Western Washington where loan demand was stronger. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "success" and "loan demand was stronger." Disputed because Sterling's business strategy had a broader focus than indicated in the proposed finding. As detailed in a Securities and Exchange Commission filing in 1989, subsequent to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"), Sterling desired to achieve "a more geographically diversified loan portfolio." Govt. App. 34. In addition, in 1993 Sterling implemented a growth strategy predicated upon buying wholesale assets funded with wholesale liabilities. Def. App. 777.

10. Sterling's plan was implemented with considerable skill, and success was achieved. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "considerable skill" and "success was achieved." Undisputed only to the

extent that Sterling's acquisitions furthered its strategy to grow its asset base by acquiring other thrifts rather than opening its own branches.

11. Sterling had the same management team throughout this period (and still does), and the same management and business strategy would have been in place absent the breach. *Id.*

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period. Undisputed only to the extent that Harold Gilkey, William Zuppe, and Daniel Byrne were executive officers between 1984 and today.

12. The supervisory acquisitions that are the focus of this litigation were consistent with the growth plan, which from the outset included goals to achieve steady and consistent growth. App. 10, ¶ 22; App. 59.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "growth plan" and "steady and consistent." Disputed because the statement is inconsistent with Sterling's own pre-FIRREA business plan, which projected no-growth. Gov't Supp. App. 31.

13. Sterling pursued a strategy of internal growth combined with strategically-suited acquisitions. App. 1111:1-10.

**Defendant's Response:** Undisputed

14. Sterling's plan was to grow aggressively through a balanced combination of acquisitions and branch creation. Id.; App. 1243:4-25, 1244:1-6, 1240:11-1247:19.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "grow aggressively" and "balanced combination." Disputed because Sterling pursued a strategy to grow its asset base by acquiring other thrifts rather than opening its own branches. Undisputed only to the extent that Sterling instituted a 50/50 growth policy, whereby it planned to grow through 50 percent acquisition and 50 percent internal growth. App. 1246:9-1247:1.

15. By the late 1980s, the number of insolvent thrifts threatened to swamp the resources of the FSLIC. Winstar, 518 U.S. at 847 (noting that by 1988 the FSLIC was itself insolvent by over $50 billion).

**Defendant's Response:** Undisputed only to the extent that the FSLIC's resources were insufficient to cover its potential financial commitments by the late 1980s.

16. The FSLIC found, however, that some healthy institutions were willing, under certain circumstances, to take on thrifts whose liabilities exceeded the value of their assets without cash assistance sufficient to fill the net worth "hole" (excess of liabilities over assets). Id. at 848.

**Defendant's Response:** Object to the proposed finding because it is vague as to time period and the meaning of the words "net worth hole" and "certain circumstances." Otherwise, undisputed.

17. The Office of Thrift Supervision recognized Sterling's ability to meet its business plan, and on this basis recommended it as a thrift capable of acquiring troubled institutions. App. 1353-54, ¶¶ 16-17, 1356, ¶ 25, 1358, ¶ 33.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "troubled institutions." Object to the proposed finding as irrelevant. The Government has already been held liable for breach of contract in connection with Sterling's acquisitions of Lewis Federal and Tri-Cities. Paragraph 17 of App. 1354 relates to the insolvency and acquisition of Lewis Federal, for which "the FHLBB asked Sterling to submit a takeover bid." Paragraph 25 of App. 1356 relates to the acquisition of Tri-Cities, for which Sterling was "one of the thrifts asked" to bid. App. 1358, ¶ 33 relates to the insolvency and acquisition of Central Evergreen Federal Savings & Loan Association ("Central Evergreen"), which Sterling initially sought to acquire without Government involvement. Further object to the proposed finding as irrelevant because App. 1358, ¶ 33 discusses the acquisition of Central Evergreen, and Sterling has been found not to have breached a contract with respect to Central Evergreen. Sterling Sav. Ass'n v. United States, 72 Fed. Cl. 404 (2006). Disputed to the extent that the Office of Thrift Supervision ("OTS") was not in existence prior to FIRREA. Further disputed to the extent that the documents cited do not discuss Sterling's "ability to meet its

business plan" and, therefore, whether that was the basis upon which Sterling was "recommended [] as a thrift capable of acquiring troubled institutions." PFUF No. 17. Undisputed to the extent that App. 1354-54, ¶¶ 16-17, from Mr. Zuppe's May 28, 1990 affidavit, states only: "As a solvent and healthy thrift, Sterling was asked, commencing in 1985, by the FSLIC and the FHLBB, its regulators, to acquire certain troubled thrifts."

18. Sterling completed three of these acquisitions of troubled thrifts, Lewis, Tri-Cities and Central Evergreen. E.g., id.

**Defendant's Response:** Undisputed.

19. These acquisitions were consistent with Sterling's growth strategy of gathering deposits gathering in smaller communities. App. 10, ¶ 22; App. 59.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and, as worded, is unclear. Undisputed only to the extent that each of Sterling's acquisitions were accomplished in furtherance of its strategy to grow its asset base by acquiring other thrifts rather than opening its own branches. Govt. App. 34.

20. The inducements offered by the Government in exchange for these three acquisitions were the key factor that justified Sterling's assumption of liabilities in excess of the total of assets acquired plus cash assistance. App. 1108:13-19, 1112:19-1113:5, 1114:12-1115:23; App. 1251:18-22.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See

General Objection 2. Sterling's acquisitions were the result of several key factors that it viewed as advantageous. In a 1989 Securities and Exchange Commission filing, submitted subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions as follows:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits . . . . Through consolidation, the Association has reduced the cost of performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities and Central Evergreen will result in increased profitability to [Sterling.]

Govt. App. 34.

21. Sterling would not have done the deals without the Capital Inducements made by the Government. App. 1108:13-19, 1109:21-1110:1, 1112:19-1113:5; App. 273:18-22, 292:1-9.

**Defendant's Response:** Disputed. See our response to PFUF No. 20 above.

22. Sterling's growth and profitability were attained through sound and conservative operating policies. App. 10, ¶¶ 20-21; App. 882.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "sound," "conservative," and "operating policies." Disputed because the documents cited do not support the proposed finding. Further, Sterling's operating policies allowed for high interest rate risk, which is an unsafe and unsound practice for attaining growth and profitability. Gov't Supp. App. 33.

23. As of June 30, 1989, Sterling had total assets of $731 million, and deposits of $519 million. App. 958-996.

**Defendant's Response:** Undisputed to the extent that, as of June 30, 1989, Sterling had total assets of $730.1 million and total deposits of $519.9 million. App. 977.

24. It earned net income of $1.3 million for fiscal year 1989 (an actual increase from 1988) despite the very large, unassisted absorption of Central Evergreen in December 1988. App. 978.

**Defendant's Response:** Disputed. Object to the proposed finding because it is vague as to the meaning of the words "net income" and is misleading as written. As indicated on page 105 of Sterling's appendix, Sterling Savings Association's net income decreased from $1.2 million for fiscal year 1988, to $981,000 for fiscal year 1989. Similarly, consolidated net income before taxes decreased from $1.971 million for fiscal year 1988, to $1.571 million for fiscal year 1989. Consolidated net income after taxes increased slightly from $1.219 million for fiscal year 1988, to $1.285 million for fiscal year 1989. Thus, the isolated and minimal increase in consolidated net income after taxes was solely due to a $527,000 decrease in the provision for income taxes that slightly exceeded the $460,000 drop in consolidated net income before taxes over the same period. Thus, absent Sterling's reduced 1989 tax liability, its consolidated net income after taxes would have also decreased, just as Sterling's net income decreased. Undisputed to the extent that Sterling (consolidated) reported $1.285 million in after-tax income for the fiscal year-end 1989, App. 978, and that this was below the projected after-tax net income for the fiscal year-end 1989 of $1.341 million stated in Sterling's Central Evergreen business plan. App. 1330.

25. In 1989, then, prior to the breach, Sterling was well on its way towards its goal of

becoming a major player in the Northwest market in accord with its original and consistently maintained business strategy. App. 961-62.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague with respect to the meaning of the words "well on its way" and "major player." Undisputed that each of Sterling's acquisitions was accomplished in furtherance of its strategy to grow its asset base, and that Sterling viewed its execution of this strategy as successful.

Evidence shows however, that, although Sterling viewed its execution of this strategy as successful, regulators and others had issues with some of Sterling's assets and business strategies. Gov't Supp. App. 35. Other documents show that Sterling, like other thrifts in the area, also faced challenges during this period as a result of a weakening economy, interest rate pressures, and competition, among other factors. See, e.g., Gov't Supp. App. 37, 39.

26. However, this rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, each with liabilities in excess of its assets, left Sterling in an undercapitalized position, although it had regulatory capital modestly in excess of its requirements. App. 13, ¶ 28; App. 60.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "rapid growth," "troubled thrifts," "undercapitalized position," and

"modestly in excess of its requirements." Object to the proposed finding because it is irrelevant. To the extent that Sterling's "rapid growth" left it "in an undercapitalized position," this is irrelevant to the determination of whether Sterling suffered damages as a result of the finding that the Government breached two contracts with Sterling. Similarly, Sterling's acquisition of Central Evergreen is irrelevant to Sterling's claim for damages because the Court has already determined that the enactment of FIRREA did not result in a breach of contract with respect to the acquisition. Sterling, 72 Fed. Cl. 404. In addition, Sterling was provided cash assistance in the Lewis Federal and Tri-Cities acquisitions in the amount of $1.75 million and $11.73 million, respectively. Govt. App. 17, 24.

27. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue. App. 1008.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object that the proposed finding is vague with respect to the meaning of the words "sensitive," "comfortable margin," and "minimum requirements." The cited document does not support the proposed finding. App. 1008 does not indicate Sterling's capital relative to any "minimum requirement," with or without the planned equity offering. Undisputed that Sterling planned an equity offering of $10.5 million in 1989. Disputed that the $10.5 million capital offering would have provided a sufficient capital base for consistent growth and attainment of future regulatory capital requirements. As page 1008 of Sterling's appendix

indicates, the proposed equity offering of preferred stock provided for the payment of dividends, a capital disbursement, which would have reduced Sterling's regulatory capital by unforeseeable amounts.

Further, this proposed finding is misleading and irrelevant to the extent that the elimination of the noncontractual goodwill attributable to the Central Evergreen acquisition would have rendered Sterling noncompliant with the minimum capital requirements of FIRREA as of December 31, 1989. Def. App. 813 n.8

28. The proposed equity offering was included in Sterling's 1989 Business Plan (although at a level of $5 million), to which Sterling and the government were committed by the terms of the Central Evergreen acquisition agreement. App. 779.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "committed by the terms." Object to the proposed finding as irrelevant because the Government has been found not to have breached a contract with respect to Sterling's acquisition of Central Evergreen. Sterling, 72 Fed. Cl. 404. Disputed because Sterling has not cited to evidence demonstrating that the Government was committed to an offering. In fact, the Court has held that the Government was not contractually obligated to permit Sterling to pay dividends. Sterling Sav. Ass'n v. United States, 53 Fed. Cl. 599, 614-15 (2002). Undisputed only to the extent that a $5 million proposed equity offering was included in Sterling's Fiscal 1989 Business Plan Update. App. 778-779. See also Response to PFUF No. 27.

29. This offering did not take place due to the Government's breach. App. 14, ¶ 32.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding as irrelevant because Sterling has been found not to have breached a contract with respect to its acquisition of Central Evergreen. Sterling, 72 Fed. Cl. 404. Disputed because Sterling has not identified any document or testimony demonstrating that the Government was committed to a proposed payment offering. In fact, the Court has held that the Government was not contractually obligated to pay dividends after raising capital. Sterling, 53 Fed. Cl. at 614-15. Undisputed only to the extent that a $5 million proposed equity offering was included in Sterling's Fiscal 1989 Business Plan Update. App. 778-779.

30. After the enactment of FIRREA, the Government began to treat Sterling as an undercapitalized, troubled thrift, forcing Sterling to shrink its business operations and to abandon its growth strategy through the imposition of certain operating restrictions. App. 1165:8-25; App. 849-50.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. Sterling was, in fact, undercapitalized as a result of the new capital regulations resulting from FIRREA, which became effective on December 7, 1989. Gov't Supp. App. 41. Further, OTS's first examination of Sterling subsequent to FIRREA disclosed a deterioration in asset quality. Gov't Supp. App. 35. Further disputed with respect to Sterling's statement in the proposed

finding: "forcing Sterling to shrink." Sterling's own document states that it was allowed to grow so long as growth did not exceed net interest credited. App. 850.

31. These restrictions included: (1) a limit on asset growth; (2) a moratorium on capital distributions; (3) limits on residential loans to conforming loans; (4) consumer lending restrictions; (5) loans to one borrower limits of $500,000; (6) no authority to purchase or sell any asset or group of assets in excess of $500,000; (7) approval of OTS required to increase compensation of any executive officer or director; and (8) inability to accept uninsured deposits. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of all of the alleged "restrictions" listed in PFUF No. 31. Undisputed to the extent that Rodney W. Barnett, in his April 11, 2000 deposition, identified, in an answer to a question that does not identify the time period, certain "restrictions" placed upon Sterling. App. 1165:8-25. In addition, the document cited as App. 849-850 is misleading. This citation is to a June 19, 1990 letter to Carol Friend, OTS, from Daniel G. Byrne, Senior Vice President, Sterling Savings Association, attaching a "listing of the operating restrictions imposed upon Sterling pursuant to your letters dated November 9, 1989, January 26, 1990, March 9, 1990, and May 11, 1990." Mr. Byrne's letter is in response to Ms. Friend's letters of June 5, and June 18, 1990.

Ms. Friend's June 5, 1990 letter specifically states: "In light of the May 29, 1990 Temporary Restraining Order, please provide weekly reports of any actions taken that are not in keeping with the restrictions imposed by our letters of January 26, 1990, March 9, 1990 and May

11, 1990." App. 848. This June 5, 1990 letter, on its face, conveys that Sterling was permitted to engage in those activities that it was not permitted to engage in prior to the entering of the injunction. If Sterling was not allowed to engage in those activities, there would be no need for such a report because Sterling otherwise would have been prohibited from engaging in the activities.

The June 5, 1990 letter was clarified in Ms. Friend's June 18, 1990 letter, Govt. App. 46, which is the other letter to which Mr. Byrne responds in his June 19, 1990 letter, App. 849-850. In Ms. Friend's June 18, 1990 letter, she expressly stated OTS's intent to "strictly obey" the district court order prohibiting it from enforcing any restrictions in contravention of the contracts. Govt. App. 46.

Therefore, Mr. Byrne's June 19, 1990 letter does not refer to operating restrictions placed upon Sterling by the OTS, in violation of the temporary restraining order, but was only required to be a report of those activities in which Sterling would not have been permitted to engage in the absence of the temporary restraining order. App. 849.

32. Sterling was forced to curtail its operations significantly. App. 1166:15-1167:12.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time and the meaning of the words "curtail its operations significantly." Disputed because Sterling has not demonstrated that a breach caused Sterling to curtail its operations. See Responses to PFUF Nos. 31 and 36.

33. From June 1989 to June 1991, Sterling shrunk its asset base, declining in size for the first time in its history. App. 10, ¶ 21; App. 161-163; App. 1271:13-1274:17.

**Defendant's Response:** Undisputed that Sterling shrank its asset base between June 30, 1989, and June 30, 1991, and, as a part of that reduction, reduced its nonperforming assets by 43 percent. Govt. App. 601.

34. Sterling's total assets shrank to $609 million in June 1991 from the $731 million of June 1989, a decline of over 17 percent. App. 161-63.

**Defendant's Response:** Disputed. The percentage decline in Sterling's total assets from June 30, 1989, to June 30, 1991, did not exceed 17 percent, but was slightly less. As part of that reduction, Sterling reduced its nonperforming assets by 43 . Govt. App. 601. Otherwise, undisputed.

35. Because of the breach, Sterling's commercial lending ability was all but destroyed, its residential construction mortgage business severely curtailed, and its real estate lending crippled. App. 1116:2-1117:15; App. 1255:1-18, 1256:19-1257:1, 1257:15-23, 1284-85, 1286:22-1287:15, 1288:1-3; 1290-92.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "all but destroyed," "severely curtailed," and "crippled." Disputed because Sterling has not demonstrated that a breach caused these effects. See Responses to PFUF Nos. 31 and 36.

36. Sterling lost valuable employees. App. 1118:15-1120:2; App. 1286:15-1287:15.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "lost" and "valuable employees." Object to the proposed finding as irrelevant with respect to the testimony cited as App. 1118:15-1120:2. The testimony at App. 1118:15-1120:2 includes names of employees that left Sterling, but does not contain any reason as to why these employees left. To the extent the employees left for reasons not related to the breach, their actions are irrelevant to the determination of whether the alleged breach caused Sterling damages.

Further, this proposed finding is misleading and irrelevant to the extent that, but for the breach, the elimination of the noncontractual goodwill attributable to the Central Evergreen acquisition would have rendered Sterling noncompliant with the minimum capital requirements of FIRREA as of December 31, 1989, even incorrectly assuming, as Dr. Horvitz did, that Sterling would have completed a $10.5 million public offering in December 1989. Def. App. 813 n.8. In calculating tangible capital in a "but-for" world that does not assume that such a public offering would have occurred, the addition of the contractual Lewis Federal and Tri-Cities goodwill would only improve Sterling's tangible capital *deficit* from negative $22.833 million to negative $7.276 million. App. 177 (Horvitz 2006 Report, Ex. 6, Table 4a); Gov't Supp. App. 17. That tangible capital deficit would have rendered Sterling non-compliant with the 1.5 percent minimum tangible capital requirement of FIRREA, 12 C.F.R. § 567.9(a) (1989), and subjected it to the restrictions that were imposed in the actual world.

Also, to the extent that Mr. Gilkey, in his June 6, 2000 deposition, at App. 1286:15-1287:15, testified that employees of Intervest Mortgage left because of the breach, he incorrectly assumed that the Central Evergreen goodwill was contractual.

37. Sterling was forced to forgo investment opportunities, including acquisitions. App. 1121:17-24, 1131:22-1144:2; App. 1279:13-1281:8.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "forced," "investment opportunities," and "acquisitions." As demonstrated by Sterling's return on average assets profitability ratio, which steadily declined from 1.02 percent in 1985, to .65 percent in 1989, Sterling's profitability declined as its asset base steadily increased from $112 million in 1985, to $730 million in 1989. Therefore, a primary reason for any decisions by Sterling to forgo any investment opportunities or business acquisitions would have been the institution's need to return to profitability. In addition, this proposed finding ignores the fact that Sterling obtained an injunction that prohibited the Government from enforcing any restrictions inconsistent with Sterling's acquisition agreements. The implication that Sterling was "forced" to forgo opportunities is also misleading because Sterling maintained significant excess capital after its 1991 recapitalization. Govt. Supp. App. 45.

Finally, we object to the proposed finding because, even absent the breach, the elimination of the noncontractual Central Evergreen goodwill from regulatory capital would have rendered Sterling noncompliant with the minimum regulatory capital requirements. See Response to PFUF No. 36. In addition, Sterling ignores the fact that, as of May 1990, the

District Court of the Eastern District of Washington enjoined the Government from enforcing any restrictions imposed in connection with FIRREA's minimum capital requirements. See Response to PFUF No. 31.

38. Moreover, Sterling suffered damage to its reputation because of the Government's restrictions on the type and amount of business in which Sterling could engage. App. 1213:7-1214:24; App. 1217; App. 1219:22-1233:24, 1234:3-1235:14; App. 1238-1239; App. 1255-57.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "damage," "reputation," "restrictions," "type and amount of business," and "engage." Disputed because, even absent the breach, the elimination of the noncontractual Central Evergreen goodwill from regulatory capital would have rendered Sterling noncompliant with the minimum regulatory capital requirements. See Response to PFUF No. 36. In addition, Sterling ignores the fact that, as of May 1990, the District Court of the Eastern District of Washington enjoined the Government from enforcing any restrictions imposed in connection with FIRREA's minimum capital requirements. See Response to PFUF No. 31.

Finally, the deposition testimony relied upon for this proposed finding does not establish a causal link between the enactment of FIRREA and changes in Sterling's operations. See, e.g., App. 1222-23; see also App. 1255-56.

39. In addition, Sterling was forced to cancel the 1989 offering because the OTS refused to commit to allow Sterling to pay dividends on the preferred stock that was part of the offering. App. 1008.

**Defendant's Response:** Disputed. The court has already determined that Sterling was not contractually entitled to pay dividends. Sterling, 53 Fed. Cl. At 615. Further, the document cited as App. 1008, an annual report that provides only self-serving and unsubstantiated assertions by Sterling's management after its filing of a suit in federal district court, does not support this finding. Sterling was permitted to continue with its 1989 offering provided that no open-ended commitments to pay future dividends, a capital disbursement, were included as part of the equity offering. As an alternative, Sterling could have offered $10.5 million in non-preferred or common stock, which would not have carried the same unascertainable risks to future capital as a preferred stock offering requiring future dividend payments.

40. The Government's breach severely damaged Sterling's ability to engage in residential construction lending through its subsidiary, Action Mortgage. App. 1290:5-9.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "severely damaged." We object to this finding because, even in the absence of the breach, the elimination of the noncontractual Central Evergreen goodwill from regulatory capital would have rendered Sterling noncompliant with the minimum regulatory capital requirements. See Response to PFUF No. 36. In addition, Sterling ignores the fact that,

as of May 1990, the district court enjoined the Government from enforcing any restrictions imposed in connection with FIRREA's minimum capital requirements. See Response to PFUF No. 31.

41. Residential construction lending was a high profit area. App. 1290:10-14.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "high profit area." Furthermore, the cited deposition merely states that residential construction lending was a high profit area without providing any supporting evidence.

42. Prior to the breach, Sterling intended to expand Action Mortgage into Seattle, Portland, Vancouver (WA), Lake Oswego (OR), Boise and Salt Lake City. App. 1290-91.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period. The testimony is irrelevant because Sterling has not demonstrated that a breach prevented the opening of these offices. See Responses to PFUFs No. 31 and 36.

43. Action's business plan was to quadruple lending activity, to be achieved through opening these offices. App. 1292:9-13.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See

General Objection 2. Sterling also fails to cite Action's business plan. Undisputed to the extent that Mr. Gilkey's testimony is consistent with the proposed finding, although the testimony is irrelevant because Sterling has not demonstrated that a breach prevented the opening of these offices. See Responses to PFUFs No. 31 and 36.

44. Sterling attempted to support an Action Mortgage office in Salt Lake City, but could not make a profit without the ability to engage in construction lending. App. 1290:21-25.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. Object as irrelevant because Sterling has not demonstrated that a breach caused its inability to provide construction lending. See Responses to PFUFs No. 31 and 36. Undisputed to the extent that Mr. Gilkey's testimony is consistent with the proposed finding.

45. Sterling thus had to close that office. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the word "thus." Object as irrelevant because Sterling has not demonstrated that a breach caused its inability to provide construction lending. See Responses to PFUFs No. 31 and 36. Undisputed to the extent that Mr. Gilkey testified: "Salt Lake we opened up, but only as a production office of single family loans, did not do construction. We then found that we couldn't make money doing that without the construction. It was closed, we withdrew." App. 1290:21-25.

46. Sterling was able to keep open a Boise office to handle single family loans, but could not expand that office into residential construction lending, the more profitable side of Action Mortgage. App. 1291:1-4.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. We dispute this proposed uncontroverted fact because the cited testimony does not support the contention that residential construction lending was "the more profitable side of Action Mortgage."

47. Utah subsequently underwent an economic upswing, which Sterling could not benefit from because the Action office had to be closed. App. 1283:15-25.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. Disputed because Sterling has not demonstrated that a breach caused the closure of its Utah office. See Responses to PFUFs No. 31 and 36. Undisputed to the extent that Mr. Gilkey, at a 2000 deposition, testified, in response to being asked about the government's "breach," that "[w]e closed our Utah office of Action Mortgage Company and lost out on the entire economic boom of Utah." App. 1283:23-25.

48. The restriction also stopped Sterling from opening Action Mortgage offices in Seattle, Portland and Lake Oswego until after January of 1992. App. 1291:12-25; App. 1292:4-6.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the word "restriction." Disputed because Sterling has not demonstrated that a breach prevented Sterling from opening these offices until 1992. See Responses to PFUFs No. 31 and 36.

49. By that time, Sterling had lost contact with the persons it intended to hire to supervise those offices, thus leading to further cost to find appropriate staff. App. 1291:15-17.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "further cost" and "lost contact." Disputed because Sterling has not demonstrated that a breach prevented Sterling from contacting these individuals until 1992. See Responses to PFUFs No. 31 and 36.

50. Sterling eventually opened the Seattle and Lake Oswego offices, which have been highly profitable. App. 1291:19-21.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "eventually" and "highly profitable." We do not dispute that Sterling opened these offices.

51. However, Sterling lost years of time in Lake Oswego and in Seattle due to the breach. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "years of time." Disputed because Sterling has not demonstrated that a breach prevented Sterling from opening these offices. See Responses to PFUFs No. 31 and 36.

52. Two-thirds of the existing staff of Intervest, another Sterling subsidiary, left following the Government's breach, including all of the big producers of assets, and Intervest was forced by the breach to eliminate almost all of its lending. App. 1286:22-1287:15.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "big producers." Disputed because Sterling has not demonstrated that a breach caused Sterling to eliminate all of Intervest's lending. See Responses to PFUFs No. 31 and 36.

53. Had the larger producers stayed and the breach not occurred, Intervest would have been able to substantially increase the size of its staff and therefore the size of its assets and lending capacity. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the word "substantially." Disputed because Sterling has not demonstrated that a breach caused Sterling to eliminate all of Intervest's lending. See Responses to PFUFs No. 31 and 36. Further, the cited testimony does not support Sterling's contention that Intervest would have been able to substantially increase the size of its assets and lending capacity.

54. Specifically, Intervest's operations would have expanded to cover northern California, Oregon, Idaho, parts of Utah, Montana and Washington. 1287:9-15.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to proposed finding because it is vague as to time period and under what circumstances the operations "would have expanded." Disputed because Sterling has not demonstrated that a breach caused Sterling to eliminate all of Intervest's lending. See Responses to PFUFs No. 31 and 36.

55. Sterling suffered a reduction in servicing income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans. App. 1116:2-1117:15.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See

General Objection 1. Object to the proposed finding because it is vague as to time period. Disputed because Sterling has not demonstrated that a breach prevented Sterling from originating such loans. See Responses to PFUFs No. 31 and 36.

56. Sterling was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. App. 1285:1-3.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and what "forced" Sterling to withdraw. Disputed because Sterling has not demonstrated that a breach caused Sterling to withdraw from the activities listed. See Responses to PFUFs No. 31 and 36.

57. The Government forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. App. 1285:4-9.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding as vague as to "period of time." Disputed because Sterling has not demonstrated that a breach caused Sterling to withdraw from the activities listed. See Responses to PFUFs No. 31 and 36.

58. Sterling also was forced to stop gathering uninsured deposits. App. 1285:6-10.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and as

to what "forced" Sterling to stop gathering uninsured deposits. Disputed because Sterling has not demonstrated that a breach caused Sterling to withdraw from the activity. See Responses to PFUFs No. 31 and 36.

59. Sterling lost many customers with deposits in excess of $100,000, including a priest in Salish who had deposits in excess of $ 1 million. App. 1255:1-11; App. 1256:19-15; App. 1257:1.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the word "lost." Disputed because the same individual's testimony also indicates that some depositors withdrew and then returned. App. 1257:7-8. Further, Sterling has not demonstrated that a breach caused the priest to withdraw deposits. See Responses to PFUFs No. 31 and 36.

60. Condron Homes and Baker Construction left due to OTS limitations on Sterling. App. 1255:12-18.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "OTS limitations" and "lost." Disputed because Sterling has not demonstrated that a breach caused the end of the customer relationship. See Responses to PFUFs No. 31 and 36.

61. Fred Burstad and Burstad Construction of Seattle left due to OTS limitations. App. 1257:15-23.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "OTS limitations." Disputed because Sterling has not demonstrated that a breach caused the end of the customer relationship. See Responses to PFUFs No. 31 and 36.

62. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions; "[Sterling was] not only turning them away, we were walking them across the street to our competitors to avoid the restrictions that we were placed under." App. 1282:20-23.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period. Disputed because Sterling has not demonstrated that a breach caused it to lose customers. See Responses to PFUFs No. 31 and 36.

63. The following customers left Sterling as a result of uncertainty about the Bank: (1) Boyd, Bjockman & Frickle, an accounting firm with a term loan for equipment and leasehold improvements as well as a credit line; (2) CRM Optical, a contact lens manufacturer with multiple term equipment loans and a credit line; (3) DIVCO Energy Control Company, a heating and air conditioning company, and its principal, Robert Nelson, considered a $5 million

customer, with several equipment loans and a large credit line; (4) Latah Creek Winery, which had a $1 million equipment loan and a credit line; (5) Miller-Jordan Travel, a travel agency, had a credit line and a few equipment term loans; (6) Northern Technologies, Inc., a technology company that manufactured surge protectors, had a rapidly increasing credit line designed to keep pace with the company's growth; and (7) Northwest Ski Exchange, a retail shop, had several term loans and inventory financing. App. 1184:8-1185:16, 1186:17-1193:7, 1193A:14-1193B:5, 1193B:24-1204:25, 1205:12-1210:18; App. 1211.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "uncertainty about the Bank." We dispute this proposed finding of fact because Sterling has not demonstrated that a breach caused the end of these customer relationships. See Responses to PFUFs No. 31 and 36. The cited testimony also indicates that the customers left for various other reasons unrelated to the breach, including: because of their own changing business needs, because they were contacted by Mr. Beil after he started working for a new bank, and because some customers followed Mr. Beil to his new bank. App. 1191-92; 1195-1196; 1206-1207; 1209:13-18.

64. Sterling's inability to continue commercial activity and the uncertainty of when the issues with the Government would be resolved cost Sterling many valuable business customers, including the following: (1) Aslin-Finch; (2) Dane Armstrong; (3) Ted Beasley; (4) Larry Biggs; (5) Cedar Builders; (6) Empire Jewelry and Loan; (7) George Hansen; (8) Don Howell; (9) Craig Jacobs; (10) Bill Lawson of A & A Construction; (11) Michael Manz; (12)

Metallic Arts; (13) Grant Person; (14) Randy Ramey of Ramey Construction and Ramey Development; (15) Red Barn, NSE Inc.; (16) Doug Romney; (17) Roy Mitchell, Inc.; (18) Kevin and Chris Rudeen, Rudeen Development; (19) John Schreinir; (20) Harry and Daryl Siria; (21) G. Wesley Sodoroff; (22) Vandervert Development; (23) Mike Walker; and (24) Woodland Montessori School. App. 1213:7-1214:24; App. 1217.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding as calling for legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "issues with the Government." Disputed because the cited deposition testimony does not support this proposed finding. The deponent, Mr. Cajer Neely, was merely asked to list accounts that left Sterling during a specific time period, and he admitted that he did not know why the vast majority of the accounts left. Govt. App. 50-53. Further, we dispute this proposed finding of fact because Sterling has not demonstrated that a breach caused the end of these customer relationships. See Responses to PFUFs No. 31 and 36.

65. Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them, including the following: (1) Bill Lawson, who sought approximately $1.5 million; (2) Dick Vandervert; (3) Dick Villelli, who sought approximately $2.0 million; (4) Harlan Douglas; (5) Richard Naccarato of Cedar Pines General Partnership; (6) Bob Spears; (7) Ted Gunning; (8) Dean Grafos of Opportunity Plaza; (9) Thompson and Brumback. App. 1219:22-1233:24, 1234:3-1235:14.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Objection to proposed finding as vague as to "during that time" and as to "unable to accommodate." Disputed because the cited testimony does not establish that loans would have been made to these individuals absent a breach. App. 1230:13-19; 1233:11-13. See also Responses to PFUFs No. 31 and 36.

66. Sterling could not expand its subsidiaries or keep pace with its customers' needs; without the promised regulatory capital, Sterling was capital deficient and unable to take advantage of many potential acquisition opportunities. App. 1279:13-25; App. 1280:17-25; App. 1281:1-8.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Objection to the proposed finding because it is vague as to time period and the meaning of the words "capital deficient." Disputed because Sterling has not demonstrated that a breach caused its alleged inability to keep pace with customers' needs or undertake acquisitions. See Responses to PFUFs No. 31 and 36. Also, the cited testimony does not support the proposed finding to the extent that "Sterling could not expand its subsidiaries or keep pace with its customers' needs." In addition, Mr. Gilkey admitted, at deposition, that he did not know whether the breach was a factor in the decision by Sterling or potential acquisition targets not to move forward. See, e.g., Sterling App. 1279-81; see also Def. Supp. App. 30.

67. The acquisition of two Great American branches was denied by the OTS. App.

1121:17-24.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. In addition, OTS approved the Great American acquisition, subject to conditions. Def. Supp. App. 54.

68. Further, a number of other acquisitions failed in part or as a direct result of Sterling's post-FIRREA, weakened capital position. App. 1132-1144.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "weakened capital position." Disputed because the deposition testimony relied upon actually establishes that, while Sterling considered many potential acquisitions over the years, Mr. Byrne did not know whether the breach was a factor in the decision by Sterling or the acquisition target not to move forward. App. 1132-44.

69. For example, Sterling entered into discussions to acquire Horizon Bank, but could not satisfy Horizon as to Sterling's level of capital. App. 1131-32.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "satisfy Horizon." Disputed because the deposition testimony relied upon establishes that Mr. Byrne did not know whether the breach was a factor in the decision by

Sterling or the Horizon Bank not to move forward. App. 1132-33.

70. Likewise, Intervest ended negotiations for an acquisition due to the capital structure and Sterling's problems with the Government. App. 1132-33.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Objection to the proposed finding because it is vague as to time period and the meaning of the words "Sterling's problems with the Government." Disputed because the deposition testimony relied upon establishes that Mr. Byrne did not know whether the breach was a factor in the decision by Sterling or Intervest not to move forward. App. 1132-33.

71. Sterling started discussions with Great Northwest Savings and Vancouver Federal in 1991, but Sterling was unable to convince either institution to go forward because of the Government's treatment of Sterling and Sterling's resultant poor capital position. App. 1136-38.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "Government's treatment of Sterling." Object as irrelevant to the extent that the "Government's treatment of Sterling" is not the breach and also because Sterling would not have been in capital compliance in the post-FIRREA but-for world. See Response to PFUF No. 36. The testimony cited does not support the contention that the acquisitions did not happen because of the breach because the same individual testified that absent "the breaches," he does not know whether the Vancouver Federal acquisition would have actually taken place. App.

1138:17-19. Further, we dispute this proposed finding of fact because Sterling has not demonstrated that, but for the breach, the Great Northwest Savings acquisition would have occurred. See Responses to PFUFs No. 31 and 36.

72. Sterling attempted to acquire Summit Savings in the mid-1990s, but Summit chose to go with another institution due to Sterling's capital structure and the breach. App. 1134-35.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "capital structure" and "breach." Disputed because the deposition testimony relied upon establishes that Mr. Byrne did not know whether the breach was a factor in the decision by Sterling or Summit Savings not to move forward. App. 1135-36.

73. Sterling had similar experiences with Gibraltar Savings, Willamette Savings, Hamilton Financial Services, and Security Pacific. App. 1138-44.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and because it is vague and overbroad as to "similar experiences." The cited testimony does not support the proposed finding that each of these acquisitions did not happen for similar reasons. Disputed because the deposition testimony relied upon establishes that Mr. Byrne did not know whether the breach was a factor in the decision by Sterling and Gibraltar Savings, Willamette

Savings, Hamilton Financial Services, and Security Pacific not to move forward. App. 1140-44.

74. All of these transactions may have been completed if Sterling had sufficient capital to be a competitive candidate for acquisition. E.g., id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and the meaning of the words "these transactions" and "sufficient capital." We dispute this contention because the deposition testimony relied upon establishes that the deponents do not know whether the acquisitions would have occurred absent a breach. See Responses to PFUFs No. 68-73.75.

The CJ-4 loan was a property in Bellevue, Washington, that Sterling committed to loan for construction prior to the enactment of FIRREA. App. 1089:12-14.

**Defendant's Response:** Undisputed.

76. FIRREA limited the size of a loan a financial institution could make to any one borrower, based on the level of capital an institution possessed. App. 1092:25-1093:5.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Disputed because Sterling has not demonstrated that a breach limited Sterling's ability to make loans. See Responses to PFUF Nos. 31 and 36.

Undisputed to the extent that the testimony cited as App. 1092:25-1093:5 reflects that Mr. Byrne answered as follows to an un-cited-to question during his December 3, 2001 deposition:

> A. The loans to one borrower regulation came in with the FIRREA

> legislation that limited the size of the loan a financial institution could make to any one borrower, and it was based on the level of capital that an institution had, with a minimum of $500,000 generally.

Mr. Byrne's testimony is irrelevant, however, because he admitted that he did not know if the loans to one borrower limitation was a breaching provision of FIRREA. App. 1093:14-21.

77. When the Government breached and refused to acknowledge the contracts for the three acquisitions, Sterling was treated as if it had deficit capital and limited to a $500,000 ceiling for a loan to any one borrower. App. 1093:6-13.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period. Disputed and irrelevant because Sterling has been found not to have breached a contract with respect to Central Evergreen. Sterling, 72 Fed. Cl. 404. Disputed because Sterling has not demonstrated that a breach limited Sterling's ability to make loans. See Responses to PFUF Nos. 31 and 36.

Undisputed to the extent that the testimony cited as App. 1093:6-13 reflects that Mr. Byrne answered as follows to an un-cited-to question during his December 3, 2001 deposition:

> A. And since the Government refused to acknowledge the contracts that existed on Central Evergreen, Tri-Cities and Lewis Federal, treated Sterling as if it had deficient capital as opposed to what our contracts said and limited us to $500,000.
>
> This project was in excess of $500,000. The commitment was much larger, and we were unable to advance further funds following the passage of FIRREA.

Mr. Byrne's testimony is irrelevant, however, because he admitted that he did not know if the loans to one borrower limitation was a breaching provision of FIRREA. App. 1093:14-21.

78. Because the CJ-4 loan was in excess of $500,000, Sterling was not permitted to make additional advances against the loan commitment that was already in effect. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period, including failing to identify the date upon which the Government allegedly restricted Sterling's ability to make advances, and because it fails to identify who allegedly decided Sterling "was not permitted to make additional advances. . . ." Disputed because the cited reference does not mention the CJ-4 loan. This proposed finding is also incorrect because it misstates the actual facts related to advances upon this loan. During April 1990, Sterling advanced at least $60,000 to improve this property. Gov't App. 415. Further, the OTS provided no indication that it would have prohibited Sterling from advancing additional funds. Gov't App. 100. Disputed because Sterling has not demonstrated that, but for the breach, it could have made additional advances. See Responses to PFUF Nos. 31 and 36.

79. Because the Government would not allow Sterling to make further advances, the project fell behind on construction. App. 1091:10-1092:9.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See

General Objection 1. Object to the proposed finding because it is vague as to time period. Disputed because Sterling has provided no evidence that it requested, and was denied, the right to advance such additional funds, and ignores the fact that the injunction obtained in May 1990 prohibited the Government from enforcing any restrictions inconsistent with Sterling's acquisition agreements. See Responses to PFUF Nos. 31 and 36. Further disputed because this proposed finding is incorrect. Examination reports indicate that this project was already behind on construction prior to the enactment of FIRREA and that the issues associated with the project were not solely related to the Government's alleged decision to prevent funding. For example, OTS regulators classified the loan as "substandard" in the November 13, 1989 examination because of "nonperformance, financial weakness associated with the borrowers, untimely resolution and possible foreclosure." Gov't Supp. App. 35A-35B. In addition, the evidence demonstrates that Sterling's examiners were aware that Sterling was considering the advance of additional funds to the borrower, and did not object. Govt. App. 100. Undisputed to the extent that PFUF No. 79 is a summary of Daniel G. Byrne's December 3, 2001 deposition testimony located at App. 1091:10-1092:9.

80. The borrowers then sued Sterling for breaching the loan commitment. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and does not define who the "borrowers" were. Sterling has failed to provide any evidence that its alleged failures to provide the funding were the cause of this lawsuit. Disputed because this proposed finding is incorrect. Examination reports indicate that this project was already behind

on construction prior to the enactment of FIRREA and that the issues associated with the project were not solely related to the Government's alleged decision to prevent funding. For example, OTS regulators classified the loan as "substandard" in the November 13, 1989 examination because of "nonperformance, financial weakness associated with the borrowers, untimely resolution and possible foreclosure." Govt. Supp. App. 35A-35B. In addition, the evidence demonstrates that Sterling's examiners were aware that Sterling was considering the advance of additional funds to the borrower, and did not object. Govt. App. 100.81. To resolve the dispute with the borrowers, Sterling was forced to foreclose on the property, repossess it, and make the improvements which the borrowers would have made if Sterling had been able to advance the funds per the loan commitment. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and does not define who the "borrowers" were. Disputed because this proposed finding is incorrect for reasons discussed in our response to Sterling's PFUF No. 80. Undisputed to the extent that PFUF No. 81 is a summary of Mr. Byrne's December 3, 2001 deposition testimony at App. 1091:18-1092:1.

82. In the process of foreclosure, repossession and improvements, the market value of the property declined significantly. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See

General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the word "significantly." This proposed finding is also vague because it fails to provide any specificity regarding the nature of the market declines and the time period that it took for such improvements to be completed. Appraised values of the property declined by 15 percent between an appraisal performed on March 15, 1988, and an appraisal performed on November 15, 1989. App.. 415. Disputed to the extent that Mr. Byrne's December 3, 2001 deposition testimony states that "the market value of the property declined substantially" and that "we took a significant loss." App. 1092:2-5. Further, Sterling does not acknowledge that it is undisputed that Sterling's Loan Committee approved the initiation of foreclosure in November 1989, prior to the date that the regulations implementing FIRREA went into effect. Def. App. 413, 415.

83. When Sterling liquidated the property, therefore, Sterling suffered a $1.615 million loss. App. 1094:6-1095:2; App. 1288:1-3.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Disputed to the extent that the testimony cited does not substantiate a $1.615 million loss. This proposed finding is incorrect in that it relates to the alleged CJ-4 loan losses that were contained within Dr. Horvitz's 2001 expert report. These amounts were subsequently reduced to $1.124 million in subsequent expert reports. Compare App. 122 with App. 186. Further, Sterling does not acknowledge that it is undisputed that Sterling's Loan

Committee approved the initiation of foreclosure in November 1989, prior to the date that the regulations implementing FIRREA went into effect. Def. App. 413, 415.

84. The Government eventually threatened to shut Sterling down completely. App. 23, ¶¶ 7-8.

**Defendant's Response:** Disputed. Object to the proposed finding because it is vague as to time period and the meaning of the word "threatened." Disputed because the cited reference does not have anything to do with Sterling's statement in PFUF No. 84, but instead is an excerpt from the March 28, 2007 Declaration of Paul M. Horvitz related to "Return on Assets" and "Foregone Assets."

85. In May 1990, Sterling filed suit against the OTS in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. App. 311-351.

**Defendant's Response:** Undisputed to the extent that App. 311-351 is a complaint filed by Sterling in the United States District Court for the Eastern District of Washington against OTS and the Federal Deposit Insurance Corporation ("FDIC") seeking declaratory and injunctive relief or, in the alternative, rescission and damages.

86. The district court issued a temporary restraining order in May of 1990 and a preliminary injunction in August 1990. App. 352-381.

**Defendant's Response:** Undisputed.

87. Though the injunction did provide Sterling time to raise the capital necessary to meet FIRREA standards to avoid a receivership, Sterling's earnings and asset growth had already been severely limited both by the shrinkage of its assets and the limitations imposed by the

Government, which eliminated Sterling's most profitable opportunities. App. 2-3, ¶¶ 7-8; App. 1165:8-25.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and meaning of the words "severely limited" and "most profitable opportunities." Disputed because the cited references do not substantiate this overbroad assertion, but merely express the opinions of Sterling's witnesses through declarations or depositions – including a general discussion of why Mr. Gilkey believed Sterling could not grow between 1990 and 1991 – and/or are unclear as to the time period of these assertions. Further disputed to the extent that, even in the absence of the breach, the elimination of the noncontractual Central Evergreen goodwill would have rendered Sterling noncompliant with the minimum regulatory capital requirements. See Response to PFUF No. 36.

88. Moreover, the Government continued to treat Sterling as a troubled thrift, even under the injunction. App. 2-3, ¶¶ 7-8; App. 849-850.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "troubled thrift." Disputed because, in contrast to App. 2-3, ¶¶ 7-8, an excerpt from the March 29, 2007 declaration of Mr. Gilkey, the Chairman and CEO of Sterling, Mr. Gilkey previously acknowledged, under oath in his June 6, 2000 deposition, that

Government personnel never advised him that they intended to take action in contravention of the injunction. Furthermore, App. 2-3, ¶¶ 7-8 does not substantiate this vague, overbroad proposed finding, but just generally discusses why Mr. Gilkey believed Sterling could not grow between 1990 and 1991.

With respect to Sterling's citation to App. 849-850, this citation is to a June 19, 1990 letter to Carol Friend, OTS, from Daniel G. Byrne, Senior Vice President, Sterling Savings Association, attaching a "listing of the operating restrictions imposed upon Sterling pursuant to your letters dated November 9, 1989, January 26, 1990, March 9, 1990, and May 11, 1990." Mr. Byrne's letter is in response to Ms. Friend's letters of June 5, and June 18, 1990.

Ms. Friend's June 5, 1990 letter specifically states: "In light of the May 29, 1990 Temporary Restraining Order, please provide weekly reports of any actions taken that are not in keeping with the restrictions imposed by our letters of January 26, 1990, March 9, 1990 and May 11, 1990." App. 848. This June 5, 1990 letter, on its face, conveys that Sterling was permitted to engage in those activities that it would not have been permitted to engage in absent the injunction. If Sterling was not allowed to engage in those activities, there would be no need for such a report because Sterling otherwise would have been prohibited from engaging in the activities.

The June 5, 1990 letter was clarified in Ms. Friend's June 18, 1990 letter, Govt. App. 46, which is the other letter to which Mr. Byrne responds in his June 19, 1990 letter, App. 849-850. In Ms. Friend's June 18, 1990 letter, she expressly stated OTS's intent to "strictly obey" the district court order prohibiting it from enforcing any restrictions in contravention of the contracts. Govt. App. 46.

Therefore, Mr. Byrne's June 19, 1990 letter does not refer to operating restrictions placed upon Sterling by the OTS, in violation of the temporary restraining order, but was only required to be a report of those activities in which Sterling was not permitted to engage prior to issuance of the temporary restraining order. App. 849.

Further, in 1991, Mr. Edwin Hedlund, Deputy Regional Director of the OTS office that supervised Sterling, acknowledged in writing that OTS was prohibited from taking action inconsistent with the injunction. Def. Supp. App. 25.

Officials at the FDIC, the other regulatory agency responsible for Sterling, similarly complied with the injunction. Def. App 48-49. In the case of the FDIC, it, without knowledge of the injunction, attempted to enforce one of the restrictions affecting brokered deposits and, upon learning of the injunction, reversed its decision and affirmatively determined that Sterling did not fit the definition of an "undercapitalized depository institution," notwithstanding its noncompliance with its regulatory minimums. Def. App. 49.

89. Specifically, on June 5, 1990 (five days after issuance of the injunction), the Government wrote Sterling notifying it to report all actions inconsistent with those restrictions imposed upon it prior to the entering of the injunction. App. 848.

**Defendant's Response:** Disputed because PFUF No. 89 is misleading for the reasons discussed in our response to PFUF No. 88.

90. Subsequently, the Government sent Sterling other correspondence manifesting its intent to regulate Sterling's operations. App. 824; App. 851; App. 856.

**Defendant's Response:** Disputed. Object to the proposed finding because it is vague as to time period and the meaning of the words "other correspondence" and "manifesting." Object

to the proposed finding to the extent it is irrelevant. The Government always maintained the ability to regulate Sterling's operations, but pursuant to the temporary restraining order, merely could not regulate Sterling's operations in contravention of the contracts. Disputed because the letter cited as App. 824 was sent to Sterling on January 26, 1990, prior to the temporary restraining order. As such, it is irrelevant with respect the Government's actions subsequent to the temporary restraining order. The July 20, 1990 letter from Ms. Friend to the Board of Directors at Sterling, informs Sterling that a composite rating of "5" had been assigned, but does not indicate any Government intent to take adverse action against Sterling. App. 851. Similarly, the August 20, 1990 letter from Ms. Friend to Ms. Byrne, elaborates upon the assignment of the composite rating of "5." The letter does not reflect an intent to restrict or interfere with Sterlings' goals as a result of the rating. App. 856.

In 1991, however, as discussed in our response to PFUF No. 88, Mr. Hedlund, Deputy Regional Director of the OTS office that supervised Sterling, acknowledged in writing that OTS was prohibited from taking action inconsistent with the injunction, regardless of the examination ratings assigned to Sterling. Def. Supp. App. 25.

91. On June 20, 1990, the Government sent a letter which confirmed the stranglehold on Sterling:

> As always appropriate internal controls should be in place t**o ensure that all regulatory requirements are adhered to**… The listing attached to your letter does not reflect **the asset growth restrictions that Sterling is subject to.** By virtue of the denied capital plan, no growth is permitted. In additional, **residential construction lending is limited** to 3.3 percent of total assets and **investment authority restricted** to short term investments. **The institution's activities are limited to those specified in the capital plan….**

App. 852-53 (emphasis added).

**Defendant's Response:** Disputed. Object to the proposed finding because it is vague as to the meaning of the word "stranglehold." Disputed because Sterling's characterization of the June 20, 1990 letter from Ms. Friend at the OTS to Mr. Byrne is misleading for the reasons discussed in our response to PFUF NO. 88. Ms. Friend's June 20, 1990 letter to Mr. Byrne, App. 852-853, simply attempts to clarify for Mr. Byrne that the report he submitted with his letter of June 19, 1990, App. 849-850, did not comply with the reporting requirements referred to in Ms. Friend's June 5, 1990 letter, App. 848. Read in the context of the chain of letters between Ms. Friend and Mr. Byrne, see Response to PFUF No. 88, it is clear that Ms. Friend's June 20, 1990 letter, App. 852-853, is not regulating or restricting Sterling in violation of the temporary restraining order, but is merely requesting a report of those activities in which Sterling would not have been permitted to engage in the absence of the temporary restraining order.

92. Sterling's CEO was "scared to death" of what the regulators would do during this time, and highly concerned that the Government would shut down the Bank through another avenue. App. 1258:25-1270:17.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "'scared to death,'" "this time," "highly concerned," and "another avenue." Object to the extent that it is irrelevant whether the Government "would shut down the Bank" for reasons other than the breach of the contracts, or had concerns about Sterling for reasons unrelated to the breach of the contracts. The Government always maintained the ability to regulate Sterling's operations, but pursuant to the temporary restraining order, merely could not

regulate Sterling's operations in contravention of the contracts. The district court's decision imposing the injunction expressly recognizes that the OTS retained the ability to regulate Sterling, subject to the contracts. Sterling Sav. Ass'n v. Ryan, 751 F. Supp. 871, 884 (1990). Undisputed to the extent the Government agrees that Mr. Gilkey, in his June 6, 2000 deposition, testified that he "was scared to death of what the regulators would do next," App. 1259:5-6, and that he believed that the regulators were "waving the safety and soundness flag," App. 1259:8-21, which was "another way to close the company." App. 1259:20-21. Mr. Gilkey, however, also acknowledged during this deposition that Government personnel never advised him that they intended to take action in contravention of the injunction. App. 1263:21-1264:10.

93. The preliminary injunction ostensibly restricted the ability of OTS and FDIC to regulate Sterling; however, the injunction did not prevent the OTS from treating Sterling as a "troubled thrift" under so-called "safety and soundness" regulations. App. 2-3, ¶¶ 7-8; App. 1248:25-1249:11, 1250:2-9.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "ostensibly," "'troubled thrift,'" "so-called," and "'safety and soundness' regulations." Object to the extent that it is irrelevant whether the OTS treated Sterling "as a 'troubled thrift' under so-called 'safety and soundness' regulations" for reasons unrelated to the breach of the contracts. The Government always maintained the ability to regulate Sterling's operations, but pursuant to the temporary restraining order, merely could not regulate Sterling's operations in contravention of the contracts. The district court's decision imposing the

injunction expressly recognizes that the OTS retained the ability to regulate Sterling, subject to the contracts. Sterling, 751 F. Supp. at 884. Disputed because the document cited as App. 2-3, ¶¶ 7-8 does not substantiate this proposed finding, but just generally discusses why Mr. Gilkey believed Sterling could not grow between 1990 and 1991. The testimony cited as App. 1248:25-1249:11, 1250:2-9 does not substantiate this proposed finding. The deposition testimony at App. 1248:25-1249:11 and 1250:2-9 addresses the acquisition of Tri-Cities. Nonetheless, the Government properly obeyed the temporary restraining order and did not act in contravention of the contracts. See also Responses to PFUF Nos. 87-92.

94. Under the guise of "safety and soundness" regulation, the Government indirectly threatened Sterling with poor performance ratings. App. 2-3, ¶¶ 7-8.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and as to the meaning of the words "guise," "'safety and soundness' regulation," "indirectly threatened," and "poor performance ratings." Object to the extent that it is irrelevant whether Sterling did not comply with "'safety and soundness' regulations" and/or was given "poor performance ratings" for reasons unrelated to the breach of the contracts. The Government always maintained the ability to regulate Sterling's operations, but pursuant to the temporary restraining order, merely could not regulate Sterling's operations in contravention of the contracts. The district court's decision imposing the injunction expressly recognizes that the OTS retained the ability to regulate Sterling, subject to the contracts. Sterling, 751 F. Supp. 871 at 884. Disputed because the document cited as App. 2-3, ¶¶ 7-8 does not substantiate this proposed finding to the extent

that the citation does not discuss "poor performance ratings," but just generally discusses why Mr. Gilkey believed Sterling could not grow between 1990 and 1991. Nonetheless, the Government properly obeyed the temporary restraining order and did not act in contravention of the contracts. See also Responses to PFUF Nos. 87-92.

In addition, when Sterling was awarded a rating of "5" by the OTS, the September 17, 1990 examination expressly stated the following:

> [Sterling's] overall capital position is considered poor even after giving full consideration and effect to the provisions of the November 1985, April 1988 and December 1988 acquisitions related agreements. Management maintains that the capital standards mandated by [] FIRREA do not apply to Sterling because of the association's prior "agreements" with the FSLIC/FHLBB. The Board and management have filed a lawsuit against OTS and FDIC in an effort to enforce their position and a preliminary injunction has been issued by the United States Distrcit Court enjoining the OTS from taking actions inconsistent with its order. Were OTS permitted to apply the FIRREA-mandated capital requirements, the association would not be in a capital compliant position.

Govt. App. 59.

95. The Government successfully moved for a partial reconsideration and appealed to the Ninth Circuit, which eventually vacated the injunction. Sterling Savings Assoc. v. Ryan, 959 F.2d 241 (9th Cir. 1992).

**Defendant's Response:** Undisputed to the extent that the Ninth Circuit vacated the injunction. Disputed to the extent that, upon reconsideration, the district court did not provide all of the relief requested by the Government. Sterling, 751 F.Supp. at 884.

96. Thus, Sterling knew all along that if Sterling made aggressive business decisions,

Sterling could have exposed itself to ruin should the Ninth Circuit vacate the injunction. App. 2-3, ¶¶ 7-8.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "aggressive," "knew all along," and "ruin." Object to the proposed finding because it calls for speculation. Object to the proposed finding because it is irrelevant. Because the Government acted in compliance with the temporary restraining order and the breaching provisions of FIRREA were not applied to Sterling during the time the injunction was in place, any business decisions made by Sterling during the application of the temporary restraining order cannot be found to have been caused by FIRREA. The document cited as App. 2-3, ¶¶ 7-8 does not support the proposed finding, but generally discusses why Mr. Gilkey believed regulators would not abide by the injunction.

97. The injunction only had the effect of keeping the Government at bay while Sterling fought to reach capital compliance in accordance with the new, non-contractual capital standards of FIRREA. App. 2-3, ¶¶ 7-8; App. 1170:12-22.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time period and the meaning of the words "only," "at bay," and "fought." Disputed because the document cited as App. 2-3, ¶¶ 7-8 does not support this vague, overbroad assertion, but just generally discusses why Mr. Gilkey believed Sterling could not grow between 1990 and 1991. The reference to App.

1170:12-22 also does not support this vague, overbroad assertion, but merely acknowledges that Sterling's recapitalization resulted in Sterling being "well-capitalized."

This proposed finding is also misleading. In accordance with the temporary restraining order, the Government did not regulate Sterling in contravention of the contracts. See also Responses to PFUFs No. 87-92. Further, this proposed finding is misleading and irrelevant to the extent that, in the absence of the breach, the elimination of the noncontractual Central Evergreen goodwill from regulatory capital would have rendered Sterling noncompliant with the minimum regulatory capital requirements. See Response to PFUF No. 36.

98. Because Sterling's capital ratios were low after the breach, Sterling was forced to turn away from the growth and expansion strategy that had brought success to Sterling in the past. App. 1165:8-25.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time period and meaning of the words "low," "growth and expansion strategy," and "success." Disputed because the cited reference does not substantiate this vague, overbroad assertion. The cited reference discussion "restrictions," apparently imposed upon Sterling during an unreferenced time period. Further, the cited reference does not discuss whether Sterling ever had a "growth and expansion strategy" or ever had "success . . . in the past." PFUF No. 98. Disputed because, but for the breach, the elimination of the noncontractual Central Evergreen goodwill from regulatory capital would have rendered Sterling noncompliant with the minimum regulatory capital requirements.

See Response to PFUF No. 36. In addition, Sterling ignores the fact that, as of May 1990, the Government was enjoined from enforcing any restrictions imposed in connection with FIRREA's minimum capital requirements. See Response to PFUF No. 36; see also Responses to PFUFs No. 87-92.

99. In contrast to most capital deficient thrifts, Sterling operated at a small profit in fiscal 1990, and returned to near its past record of profitability in 1991. App. 18, ¶ 45; App. 163.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to the meaning of the words "most capital deficient thrifts," and "past record of profitability." Disputed because the document cited as App. 18 ¶ 45 does not support the proposed finding. The citation is from a paragraph in Paul M. Horvitz's September 6, 2001 corrected expert report, and discusses Dr. Horvitz's calculation of lost profits for the years 1990 through 2006. The citation does not state that Sterling "operated at a small profit in fiscal 1990," nor that it "returned to near its past record of profitability in 1991." The document cited as App. 163 also does not support the proposed finding. The citation is from Exhibit 4 to Dr. Horvitz's December 11, 2001 updated expert report, and purports to show "Consolidated Key Financial Data" from 2000 to 2006.

App. 162, Exhibit 4 from Dr. Horvitz's September 6, 2001 corrected expert report, however, purports to show that Sterling had a "ROAA before Taxes and Amortization" of 0.47 percent in 1990, and "Average Assets" of $709,962, compared with a "ROAA before Taxes and Amortization" of 0.87 percent in 1991, and "Average Assets" of $648,995. In addition, App. 162, Exhibit 4 from Dr. Horvitz's September 6, 2001 corrected expert report, purports to show

that, between 1983 and 1989, Sterling's "ROAA before Taxes and Amortization" varied between -2.22 percent and 1.02 percent, and "Average Assets" increased from $7,317 to $582,443.

100. Sterling thus could go to the capital market in 1991, earlier than most other capital deficient thrifts. App. 62.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to the meaning of the words "earlier" and "capital deficient." Undisputed to the extent that the document cited as App. 62 is from Dr. Horvitz's September 6, 2001 corrected expert report, which states: "This allowed Sterling to go to the capital market in 1991, earlier than any capital deficient thrift that I am aware of." Undisputed to the extent that in November 1991, Sterling did raise approximately $21 million through a public offering of common stock. Def. App. 329. The public offering brought Sterling into compliance with all of FIRREA's minimum capital ratios. Id. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

Govt. App. 209. In addition, Sterling's 1992 Annual Report indicated that completion of the equity offering brought Sterling into compliance with FIRREA's capital standards:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our

> primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late '80s. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

Govt. App. 329 (emphasis added).

101. Sterling raised gross proceeds of $23.7 million in late 1991, which put Sterling back in full capital compliance. App. 1060.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is vague as to time and the meaning of the words "full capital compliance." Disputed to the extent that the document cited as App. 1060 does not support Sterling's assertion. The citation states:

> During the quarter ended December 31, 1991, Sterling completed the sale of 2.875 million shares of Common Stock for $8.25 per share. In addition to raising approximately $21 million in new capital, Sterling converted all of its outstanding Series B Preferred Stock to Common Stock. All accumulated dividends in the Series B Preferred Stock were declared and deducted from retained earnings at December 31, 1991. All such dividends, in the approximate amount of $488,000, or $5.42 per share, were pain in January 1992.

App. 1060. Undisputed to the extent that in November 1991, Sterling did raise approximately $21 million through a public offering of common stock. Def. App. 329. The public offering brought Sterling into compliance with all of FIRREA's minimum capital ratios. Id.

102. Sterling's business strategy called for periodic offerings to raise capital in line with its growth-oriented strategy. App. 1111; App. 1243:4-25, 1244:1-6, 1246:11-1247:19.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time and the meaning of the words "periodic offerings," "in line," and "growth-oriented strategy." Disputed because the testimony cited as App. 1111 does not substantiate this vague, overbroad assertion, but instead discusses generally a philosophy of growth "on a 50/50 basis," App. 1111:1-5, and growth through acquisition and internally, App. 1111:1-10, including a discussion of problems that can arise from growing "too quickly through acquisitions." App. 1111:11-25. The testimony cited as App. 1243:4-25 and App. 1244:1–6 does not substantiate this vague, overbroad assertion, but instead reflects Mr. Gilkey's opinion, in his June 6, 2000 deposition, that he knew Sterling would be big because "[t]hey couldn't afford me any other way," App. 1243:4-15, that he proposed suggestions as to his goal for the size of Sterling, App. 1243:16-25, and that he "put no time frames on that [growth], but it was apparent to me that we had to grow really rapidly to afford the management that we put in place." App. 1244:3-6. The testimony cited as App. 1246:11-1247:19 does not substantiate this vague, overbroad assertion, but instead contains testimony by Mr. Gilkey, in his June 6, 2000 deposition, generally discussing a desire to grow Sterling on a "50/50 basis," through internal growth and acquisition, and his reasons for this approach. App. 1246:11-1247:19.

103. Sterling would have raised capital in 1991 even if the breach had not occurred. App. 1-2, ¶¶ 3-6; App. 63.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it calls for a legal conclusion. See General Objection 1. Object to the proposed finding because it is speculative. Disputed to the extent that Mr. Gilkey, as Sterling's CEO, admitted in his July 2000 deposition that the 1991 capital raising would not have occurred if Sterling had already been in capital compliance at the time, because Sterling would have had substantial excess capital. Def. App. 373.

104. Following the profit recovery in fiscal 1991 and the capital offering in late 1991, Sterling returned to its basic business strategy of growth through deposit-gathering. App. 162-167.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time and the meaning of the words "profit recovery," "basic business strategy," "growth," and "deposit-gathering." Undisputed to the extent that our response to PFUF No. 101 reflects that in November 1991, Sterling raised approximately $21 million through a public offering of common stock. Def. App. 329. The public offering brought Sterling into compliance with all of FIRREA's minimum capital ratios. Id. Undisputed to the extent that App. 162-167 are Exhibits 4 and 5 to the December 11, 2006 "Update to the Expert Report of Paul Horvitz," and purport to show that Sterling's "Average Assets" declined between fiscal years 1991 and 1992, 1996 (June) and 1996 (December), and increased for all other fiscal years between 1991 and 2006, App. 162-163; that Sterling's "Deposits" increased for all fiscal years between 1991 and 2006, App. 162-

163; and that Sterling's "Total Asserts" increased for all fiscal years between 1991 and 2006, except for between 1995 and 1996.

105. In the mid-1990s, Sterling modified its strategy to shift from the traditional savings institution focus on home mortgage lending toward becoming the full service community bank that had been part of its original strategic plan. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time and the meaning of the words "strategy," "traditional savings institution focus," "full service community bank," and "original strategic plan." Disputed because the document cited does not support this vague, overbroad assertion. The document cited does not discuss Sterling modifying its strategy, nor whether it became "the full service community bank that had been part of its original strategic plan." Instead, the citation is to Exhibits 4 and 5 of Dr. Horvitz's December 11, 2006 updated expert report, which purports to reflect Sterling's "Consolidated Key Financial Data" and "Asset Composition" from 1990 through 2006. Undisputed that since fiscal year 1994, Sterling significantly decreased its volume of permanent residential mortgage lending due to a shrinking market. Gov't Supp. App. 61. Disputed, however, that this was part of Sterling's "original strategic plan."

106. Sterling reduced its holdings of mortgage assets, and has increased its commercial real estate, business, consumer and construction lending, while continuing to stress retail deposits. Id.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to time and the meaning of the words "continuing to stress." Disputed because the document cited does not support this vague, overbroad assertion. The document cited does not discuss what assets Sterling "continu[ed] to stress." Instead, the citation is to Exhibits 4 and 5 of Dr. Horvitz's December 11, 2006 updated expert report, which purports to reflect Sterling's "Consolidated Key Financial Data" and "Asset Composition" from 1990 through 2006. App. 164 and 166 purports to show that Sterling's "Mortgage Loans" decreased between fiscal year 1990 and 1991, increased between 1991 and 1995, decreased between 1995 and 1996, and increased them 1996 and 2006. App. 164 and 166 purports to show that Sterling's "Nonmortgage Loans" decreased between fiscal years 1990 and 1991, increased between 1991 and 2003, decreased between 2003 and 2005, and increased between 2005 and 2006. App. 165, 167**.**

Undisputed that since fiscal year 1994, Sterling significantly decreased its volume of permanent residential mortgage lending due to a shrinking market. Govt. Supp. App. 61. Sterling's examiners, however, indicated a concern with Sterling's high percentage of wholesale funding and its inability to grow retail deposits in the mid-1990s. Gov't Supp. App. 63.

107. Since 1990 and continuing through the present, Sterling operated successfully, with increasing assets and profits. App. 3, ¶ 9; App. 162-63.

**Defendant's Response:** Disputed. Object to the proposed finding upon the grounds of vagueness, because it asks us to confirm the contents of a specific witness's testimony. See General Objection 2. Object to the proposed finding because it is vague as to the meaning of the

words “operated successfully.” Undisputed to the extent that App. 162-163 is Exhibit 4 to the December 11, 2006, “Update to the Expert Report of Paul Horvitz” and purports to show that Sterling’s “Average Assets” declined between fiscal years 1990 and 1992, and 1996 (June) and 1996 (December), and increased for all other fiscal years between 1991 and 2006, App. 162-163; and that Sterling’s “ROAA before Taxes and Amortization” increased between fiscal year 1990 and 1993, decreased between 1993 and 1996, increased between 1996 and 1997, decreased between 1997 and 1998, increased between 1998 and 1999, decreased between 1999 and 2001, increased between 2001 and 2004, and decreased between 2004 and 2006.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM G. KANELLIS
ELIZABETH HOLT

April 30, 2007

CERTIFICATE OF FILING

I hereby certify that on April 30, 2007, a copy of foregoing "DEFENDANT'S RESPONSE TO STERLING'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN CONNECTION WITH ITS CROSS-MOTION FOR SUMMARY JUDGMENT AS TO DAMAGES," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford