IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

May 17, 2007

TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

II. ARGUMENT .......... 2

A. STERLING'S EXPERTS' OPINIONS ARE ADMISSIBLE UNDER RULE 702 .......... 2

1. Legal Standards .......... 2

2. A Lost Profits Measure of Damages Is Not Speculative As A Matter Of Law .......... 3

3. Dr. Horvitz's Opinions Are Not Speculative As A Matter of Law .......... 4

a. *Standard To Establish Causation of Lost Profits* .......... 4

b. *The Undisputed Facts Demonstrate That The Breach Caused Sterling Harm, Including Lost Profits* .......... 4

c. *The Government Does Not Dispute These Facts, And Its Arguments That Sterling Cannot Demonstrate Causation As A Matter Of Law Lack Merit* .......... 5

i. It Is Undisputed That Sterling Legitimately Feared That The Government Would Shut It Down Even During The Term Of The Injunction, And That The Government Continued To Threaten Sterling .......... 6

ii. The Government's Allegation That, Even Assuming It Did Not Breach The Contracts With Sterling By Failing To Recognize The Cash Assistance As A Credit To Net Worth, It Would Have Breached The Contracts Another Way To Eliminate The Benefit Of The Bargain Lacks Merit .......... 8

iii. The Undisputed Facts Demonstrate That The Government Caused Sterling's 1989 Offering To Be Cancelled .......... 9

d. *It is Undisputed That The Harm To Sterling Was Foreseeable* .......... 11

e. *The Measure of Sterling's Damages Is Reasonably Certain* ..... 11

i. Despite Sterling's Success In Raising Capital, Sterling Could Not Replace The Promise Rescinded By The Breach ..... 11

A. *It Is Undisputed That Sterling Attempted To Mitigate* ..... 11

B. *Under The Undisputed Facts, The 1991 Offering Did Not Cure The Damage Caused By the Breach* ..... 13

ii. Dr. Horvitz Is Not Required To Identify Actual Assets That Would Have Been Acquired Because It Is Undisputed That Sterling Has Always Been Able To Acquire Assets ..... 14

B. THE UNDISPUTED FACTS SUPPORT AN AWARD OF WOUNDED BANK DAMAGES TO STERLING ..... 15

III. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page**

**CASES**

*American Federal Bank, FSB v. United States*, 68 Fed.Cl. 346 (2005) .............................3

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) .......................4

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).....................1

*Fifth Third Bank of Western Ohio v. United States*, 55 Fed.Cl. 223 (2003) .......................4

*First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, __ Fed.Cl. __, 2007 WL 1160294 (April 13, 2007)..........................3, 4, 11

*Hometown Financial, Inc. v. United States*, 409 F.3d 1360 (2003) ..................................3

*Liquid Dynamics Corp. v. Vaughan Company, Inc.*, 449 F.3d 1209 (Fed. Cir. 2006)........3

*Maffei v. Northern Insurance Company of New York*, 12 F.3d 892 (9th Cir. 1993) ...........2

*Southern National Corporation v. United States*, 57 Fed.Cl. 294 (2003) ..........................4

*Standard Federal Bank v. United States*, 62 Fed.Cl. 265 (2004) ......................................4

*United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2422 (1996)........................................9

**OTHER AUTHORITY**

Fed. R. Evid. 702 .........................................................................................passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This matter is before the Court on cross-motions for summary judgment. The Government has moved for summary judgment in its favor on the ground that, because Sterling's experts' opinions quantifying the damages caused to Sterling from the Government's breach allegedly are speculative as a matter of law and cannot be credited by the Court, the Court should deny Sterling damages. Sterling has cross-moved because: (1) Sterling's experts' opinions are not speculative as a matter of law and are admissible testimony pursuant to Rule 702 of the Federal Rules of Evidence; and (2) because such opinions are only contested as "speculative" by the Government (an argument that lacks merit), and the Government has proffered no contravening facts to these opinions, summary judgment should be granted in favor of Sterling and an award made based upon Sterling's experts' opinions.

The fulcrum of the Government's argument as to why summary judgment should be granted in its favor and denied to Sterling is that Sterling's experts' opinions are speculative, *i.e.*, are not admissible at trial. Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786 (1993) and Rule 702 of the Federal Rules of Evidence, expert testimony is admissible

when the testimony will assist the trier of fact, or, put another way, is both relevant and reliable. If the Court denies the Government's motion for summary judgment, the Court will have held that Sterling's expert testimony is not speculative so as to render it inadmissible. Because the Government relies entirely upon its allegation that the opinions are speculative, and offers no contravening facts or competing calculations of Sterling's damages, if the Government's motion is denied, there will be nothing left to try. Stated differently, if the Court denies the Government's motion for summary judgment, the only expert evidence presented at trial as to quantification of damages will be Sterling's experts' testimony, and the only opposition will be the Government's expert testimony that Sterling's experts' opinions are speculative, a proposition that the Court will already properly have rejected.[1]

Because Sterling's experts' opinions are admissible under Rule 702, and will be the only substantive evidence quantifying damages before the Court, summary judgment should be entered in favor of Sterling and the Court should award Sterling $63.361 million, compensating for lost profits, wounded bank damages, and future damages.

## II. ARGUMENT

### A. STERLING'S EXPERTS' OPINIONS ARE ADMISSIBLE UNDER RULE 702.

#### 1. Legal Standards.

Expert opinion evidence is admissible when: (1) the subject of the testimony is beyond the "common knowledge of the average layman; (2) the witness has sufficient expertise; and (3) the state of the pertinent...knowledge permits the assertion of a reasonable opinion." *Maffei v.*

[1] Sterling notes that the Government concedes that Sterling is entitled to its transaction costs for the 1991 offering. *Def's Reply*, p. 3 [Doc. 144]. The Government's motion asking for a judgment that Sterling is entitled to $0.00 must therefore be denied.

*Northern Insurance Company of New York*, 12 F.3d 892, 897 (9th Cir. 1993).[2] The Government does not contest that either of Sterling's experts, Dr. Horvitz and Professor James, has sufficient expertise, nor does the Government contest that the economic analysis of Sterling's damages is beyond the common knowledge of the average layman. The only opposition raised by the Government (and the basis for its motion for summary judgment) is that the opinions asserted are speculative and thus should not be considered.

2. A Lost Profits Measure Of Damages Is Not Speculative As A Matter Of Law.

The fundamental flaw with the Government's response to Sterling's motion is that the Government fails to acknowledge that any *Winstar* plaintiff can prove a lost profits damages theory. The Government dismisses as a "waste of time" any effort by any *Winstar* plaintiff to prove lost profits. To the contrary, however, the most recent *Winstar* decision, awarding $96.581 million[3] after trial under a lost profits measure of damages, demonstrates that this theory is, at a minimum, not a waste of the Court's time. The Court should therefore reject the Government's claim that this case is indistinguishable from other *Winstar* cases; the Federal Circuit has stated that each *Winstar* case must be considered on its own facts. *E.g., Hometown Financial, Inc. v. United States*, 409 F.3d 1360, 1370 (2003).

Indeed, the case law relied upon by the Government features facts at odds with the undisputed record here. In those cases, plaintiffs seeking damages under a lost profits theory did not identify the types of investments or categories of activities that would have been pursued by the plaintiffs. *See American Federal Bank, FSB v. United States*, 68 Fed.Cl. 346, 358-59 (2005) (also holding that lost profits could not be awarded because the bank fully mitigated and such an

[2] Regional circuit law controls the district court's evidentiary rulings. *See Liquid Dynamics Corp. v. Vaughan Company, Inc.*, 449 F.3d 1209, 1218 (Fed. Cir. 2006).

[3] This amount will be reduced by an offset to be calculated. *First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, __ Fed.Cl. __, 2007 WL 1160294, *slip op.* at 68 (April 13, 2007).

award would be a windfall); *Standard Federal Bank v. United States*, 62 Fed.Cl. 265, 285-89 (2004) (also noting that the corporate documents contravened that the bank planned to grow as opined by the expert); *Southern National Corporation v. United States*, 57 Fed.Cl. 294, 304-05 (2003); *Fifth Third Bank of Western Ohio v. United States*, 55 Fed.Cl. 223, 241 (2003). Here, Sterling has presented not only specific evidence of specific customers and acquisitions lost due to the breach, but also uncontraverted testimony that Sterling has, in each year of its existence, acquired assets despite not knowing exactly what those assets would be at the start of the year. App. 3, ¶ 9.

3. Dr. Horvitz's Opinions Are Not Speculative As A Matter Of Law.

The Federal Circuit has established that, in order to be entitled to lost profits damages, the plaintiff must establish that: (1) the breach caused its failure to earn the alleged lost profits; (2) the loss was foreseeable; and (3) the measure of damages is "reasonably certain." *California Federal Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005); *see also First Federal, slip op.* at 9. Dr. Horvitz's analysis meets all three factors and therefore is competent evidence under Rule 702.

***a. Standard To Establish Causation Of Lost Profits.***

To establish causation of lost profits, a plaintiff need not establish that the breach is "the sole factor or sole cause" of the lost profits. *First Federal, slip op.* at 10, *quoting Cal. Fed. Bank*, 395 F.3d at 1267. "The existence of other factors operating in confluence with the breach" will not preclude recovery. *Id.*

***b. The Undisputed Facts Demonstrate That The Breach Caused Sterling Harm, Including Lost Profits.***

It is undisputed that historically Sterling had achieved growth, and that, at the time of the breach in 1989, Sterling was one of the fastest growing thrifts in the Pacific Northwest, a trend

which the Government knew Sterling intended to continue. *E.g.*, Supp. App. 24. It is further undisputed that Sterling, from the time of its inception, has been managed by the same skilled management team, a group which garnered confidence and compliments from the Government. Finally, it is undisputed that the breach forced Sterling to shrink its business operations and abandon its growth strategy. The undisputed facts demonstrate that Sterling was unable to take advantage of investment opportunities because of the capital deficiencies that only existed because of the breach. As discussed in Sterling's opening brief, Sterling's capital position negatively affected the potential acquisition of branches of many area banks. Such transactions would have been completed if Sterling had had sufficient capital to be a competitive candidate for acquisition. The Government argues that Sterling cannot prove that the breach caused these transactions to fail, but does not dispute that an undercapitalized institution (which the breach caused Sterling to be) is viewed unfavorably by selling banks and that the type of regulatory trouble caused for Sterling from the breach would negatively affect its status as a potential acquirer.

***c. The Government Does Not Dispute These Facts, And Its Arguments That Sterling Cannot Demonstrate Causation As A Matter Of Law Lack Merit.***

The Government does not dispute the facts discussed above, but instead argues that, as a matter of law, Dr. Horvitz's model fails because: (1) Sterling was allegedly not constricted from growth during the term of the injunction; (2) the Government's experts opine that Sterling could not have met capital requirements even absent the breach; and (3) the Government did not cause the 1989 offering to fail. The undisputed facts contravene these assumptions, and they therefore do not preclude summary judgment in favor of Sterling.

i. It Is Undisputed That Sterling Legitimately Feared That The Government Would Shut It Down Even During The Term Of The Injunction, And That The Government Continued To Threaten Sterling.

The Government argues that, because Sterling never moved for a finding of contempt of court, Sterling is estopped from arguing that the Government continued to harm Sterling's growth and profitability during the term of the injunction. The Government would require Sterling to rely upon an injunction that was on appeal (and was later vacated) and continue to act as though there was no possibility that Sterling's legal action would fail, to the detriment of its shareholders. This is patently absurd. *See* App. 2-3, ¶¶ 7-8.

Indeed, the Government continued to harm Sterling during the term of the injunction. Under the guise of safety and soundness concerns (which arose from a baseline concern of lack of appropriate capital, which only occurred because of the breach), the Government imposed more and more demands on Sterling. Because of the breach, the Government treated Sterling as an undercapitalized, "troubled thrift," imposing costly restrictions that hindered Sterling's profitability:

- Sterling was not allowed to grow beyond its net interest credited.
- Sterling was not allowed to make any capital distributions.
- Sterling was not allowed to pay dividends on any stock issuance.
- Sterling was not allowed to accept any uninsured deposits.
- Sterling was required to obtain written approval from the OTS District Director for any new loan or investment activity.
- Sterling was not allowed to participate in commercial real estate lending.
- Sterling was forced entirely out of the lucrative construction and business lending business outside of pre-sold residential (1-4 units) construction lending.
- Sterling was forced to reduce total business banking loans to $23 million by June 30, 1990.

- Sterling could only grant loans to existing business customers.

- Sterling was forced to adhere to the $500,000 loans-to-one borrower restriction.

- Sterling was limited in the compensation it could pay any executive officer or director.

- Sterling was limited to activities contained within the February 28, 1990 Capital Plan to the extent contemplated in the Plan.

- Sterling could not purchase or sell any asset or group of assets in excess of $500,000.

- Sterling was required to file weekly reports within four days of the end of each week to document its compliance with the restrictions imposed both prior to and following the temporary injunction.

- Sterling was told that "no growth is permitted" beyond its May 31, 1900 level.

- Sterling was not authorized to make any dividend payments.

- Sterling was no longer allowed to accept, renew or rollover any brokered deposits.

- Sterling was prohibited from purchasing securities or loans in excess of $1 million, or to incur additional debt in excess of $1 million without prior written approval of the OTS.

App. 2-3, ¶¶ 7-8; Supp. App. 2-19. It is undisputed that these restrictions would not have been implemented had Sterling been capital-compliant as it would have been absent the breach. In fact, they were lifted immediately after Sterling returned to capital compliance in November 1991.

The issue, however, is not whether or not the Government would actually have utilized safety and soundness regulations to punish Sterling for the noncompliance with capital requirements caused by the Government's breach --- the disregard of Sterling's contracts <u>was</u> the breach. The issue is whether Dr. Horvitz's model is rendered invalid because he relies upon the undisputed testimony of Sterling management as to whether Sterling was constrained from growth during the term of the injunction. Because the injunction merely allowed Sterling some

time to liquidate assets and plan to raise capital so as to be prepared for either a reversal of the injunction or other ruling as to the breach, and because the evidence is undisputed as to the breadth of restrictions imposed upon Sterling and Sterling's response thereto, Dr. Horvitz properly opined that the injunction did not render Sterling cured of harm.

ii. The Government's Allegation That, Even Assuming It Did Not Breach The Contracts With Sterling By Failing To Recognize The Cash Assistance As A Credit To Net Worth, It Would Have Breached The Contracts Another Way To Eliminate The Benefit Of The Bargain Lacks Merit.

The Government, based upon Mr. Bankhead's opinion, claims that Dr. Horvitz's analysis fails to demonstrate causation because, even assuming the Government did not breach the contracts by refusing to recognize the cash assistance as a credit to Sterling's net worth, it would have applied different, subsequently-enacted regulations to limit the value of that capital so as to render Sterling out of compliance with the FIRREA regulations. The Government asks the Court to deny summary judgment to Sterling and grant it to the Government on the basis that, according to the Government's expert, the Government would have found another way to negate the benefit of Sterling's bargain no matter what.

The Government bases this argument solely upon the opinion of its expert, Mr. Bankhead, who opined that the Government would have applied subsequent regulations not in existence at the time of the contracts to limit the use of the cash assistance as regulatory capital. The argument should be rejected for two reasons.

First, under the plain terms of the contracts at issue, Sterling is permitted to count its contractual capital as regulatory capital under the regulations in place at the time of the contracts. At the time of the contracts, there were no regulations in place limiting how much capital assistance could be utilized to meet regulatory capital requirements. Sterling and the Government could not have agreed that the capital Sterling acquired was to be classified as a

lesser form of regulatory capital entitled "qualifying supervisory goodwill" when such a classification did not even exist at the time of contracting. Mr. Bankhead's opinion that the Government would have imposed then-non-existing regulations lacks merit.

Second, established *Winstar* precedent holds that the Government's promise was a "cash substitute", and cash was an asset whose treatment could not be limited or classified as a subordinate form of capital:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations.

*United States v. Winstar*, 518 U.S. 839, 849-50, 116 S.Ct. 2422, 2443 (1996). Under *Winstar*, as a "cash substitute", there could be no limit on the use of the acquired capital.

The undisputed facts demonstrate that, under the plain terms of the contracts, had the Government taken the action Mr. Bankhead opines it would have taken it would still be in breach. Mr. Bankhead's scenario, therefore, completely fails to describe a situation that would exist "but for" any breach of Sterling's contracts. The Government has failed to contravene the undisputed facts proffered by Sterling and summary judgment is appropriate in Sterling's favor.

iii. The Undisputed Facts Demonstrate That The Government Caused Sterling's 1989 Offering To Be Cancelled.

It is undisputed that Sterling's rapid growth during the 1980s, coupled with the acquisitions of the three troubled thrifts, left Sterling with little capital under GAAP, although it had regulatory capital sufficient to meet its regulatory requirements. Sterling had always been sensitive to its capital needs, and in 1989 planned an equity offering of $10.5 million that would have left the institution with a comfortable margin above the minimum requirements, and would provide for the growth Sterling intended to pursue.

The proposed equity offering was included in Sterling's 1989 Business Plan (then forecast at a level of $5 million), to which Sterling and the Government were committed by the terms of the Central Evergreen acquisition agreement. Sterling had negotiated, as part of the Central Evergreen deal, a provision that it would raise additional capital, including the right to pay dividends on preferred stock, by December 31, 1990. *See* Supp. App. 22-23, 30-31. Later, after the preferred stock offering was successfully prepared --- in fact, it was over-subscribed, needing only regulatory approval for payment of preferred dividends to close and fund --- the OTS refused, in January 1990, to permit payment of dividends on the preferred stock to be sold, causing the cancellation of the offering. Supp. App. 4.

The Court held that the Government was not contractually obligated to allow Sterling to pay the dividends. 53 Fed. Cl. at 615. The Government claims that, absent a contractual obligation, its refusal to allow the dividends cannot have caused Sterling harm. This argument is a non-sequitur. Even if the Government was not contractually obligated to allow the dividends, its refusal to do so harmed Sterling. It is undisputed that the Government foresaw --- actually knew --- that after the unassisted absorption of Central Evergreen, Sterling planned for an offering. The OTS noted that the approval of the Central Evergreen transaction "was conditioned in Sterling agreeing to raise additional capital during 1989" and, [i]n keeping with the agreement...management planned to issue additional preferred stock…." Supp. App. 30-31. It is further undisputed that, absent the ability to pay dividends, that offering could not succeed. Finally, it is undisputed that Sterling would have had the ability to pay the dividends if the Government had not barred Sterling from doing so. The Government has failed to point to contravening facts and, as such, failed to preclude summary judgment in favor of Sterling.

***d. It Is Undisputed That The Harm To Sterling Was Foreseeable.***

The Government concedes that, for purposes of the cross-motions for summary judgment, it has not contested that the harm to Sterling caused by the breach was foreseeable. *Def's Reply*, pp. 8-9, n. 5 [Doc. 244].

***e. The Measure Of Sterling's Damages Is Reasonably Certain.***

To prove lost profits with reasonable certainty, a plaintiff must establish: "(1) the estimated reduction in the amount of profitable assets caused by the breach; and (2) the appropriate average return, based on comparable historical results, that would have been earned on such lost assets." *First Federal, slip op.* at 23. Even though Sterling's expert is "required to opine on what would have happened in a world that never was", such testimony constitutes a sufficient and sound basis for the Court to award lost profits. *See id.*

The Government argues that Dr. Horvitz's calculations are not reasonably certain because: (1) Dr. Horvitz assumes that Sterling did not replace the Government's promise to count the cash assistance for regulatory capital purposes; and (2) Dr. Horvitz does not identify the assets that would have been acquired absent the breach. Both claims lack merit.

i. <u>Despite Sterling's Success In Raising Capital, Sterling Could Not Replace The Promise Rescinded By The Breach.</u>

*A. It Is Undisputed That Sterling Attempted To Mitigate.*

The crux of the Government's response to Sterling's motion is that Sterling was too successful; stated differently, the Government argues that Sterling was either not harmed by the breach because of Sterling's subsequent success or that Sterling must have failed to mitigate if, despite its success, it could not itself cure the Government's breach. The Government asks the Court to punish Sterling for not failing like many *Winstar* plaintiffs, and rule that, because

Sterling has successfully raised hundreds of millions of dollars in capital in the past 15 years, its inability to replace the Government's promise to count cash assistance as capital for regulatory purposes shows a refusal on the part of Sterling to mitigate. The Government wants to have it both ways: (1) if Sterling had failed and not survived the Government's breach, the Government would argue that its failure showed that Sterling had an inherent weakness and the breach did not cause it to fail; but (2) because, as happened in the real world, Sterling grew and profited despite the breach, the Government argues that Sterling suffered no harm from the breach.

The Government is aware, however, that Sterling did mitigate its damages from the very time of the breach. Sterling did not fail, despite the body-blows administered by the Government; it does not seek its entire franchise value in damages, as it would had it not substantially mitigated the harm caused by the breach. Sterling mitigated by obtaining the injunction, which prevented the Government's intended closure of Sterling. Sterling mitigated further by raising capital and attaining compliance with FIRREA in 1991, but has never, since January 1990, enjoyed the benefit from the Government's promise to treat the cash assistance as regulatory capital. That promise was intended to create profits for Sterling, and Sterling is entitled to damages for the benefit of its bargain.

The Government's claim that Sterling failed to mitigate contravenes the Government's arguments as to why Sterling is only entitled to transaction costs. The Government argues that Sterling mitigated fully by its 1991 offering, which brought it back into capital compliance and that the injunction issued by the United States District Court cured any harm suffered by Sterling. The Government is simultaneously arguing that Sterling both failed to mitigate and did fully mitigate. The undisputed facts, however, demonstrate that, though the 1991 offering and the preliminary injunction mitigated for the breach in the sense that they saved Sterling from the

Government which was bent on closing the institution, these actions did not cure the harm from the breach; the offering and the injunction did not restore Sterling to the position it would have occupied absent the breach, because they did not enable the additional leverage (and profits) above real capital that the Government promised.

*B. Under The Undisputed Facts, The 1991 Offering Did Not Cure The Damage Caused By The Breach.*

It is undisputed that Sterling's capital raising in 1991 was part of Sterling's normal growth plan. Sterling raised capital in almost every year since 1991; Sterling raised or the holding company downstreamed capital in 1991, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, 2006 and 2007. Given its aggressive growth strategy, Sterling has always needed more capital. Moreover, Sterling had to pay for that capital out of the profits related to each tranche. No capital was ever extended to Sterling without a new cost to "replace" the Government's promise. In this way, Sterling's damages claim is analogous to that of the lost volume seller. Just as the lost volume seller can always make additional sales, but cannot replace the buyer who breaches, Sterling can always raise real capital and make profits, but cannot replace the Government's promise and the profits attributable to it.

The 1991 offering was just one in Sterling's sequence; it was not a purely reactionary event that would not have occurred but for the breach. Because Sterling could not complete the 1989 offering due to the Government's refusal to allow the payment of dividends, and because the Government deprived Sterling of the use of the cash assistance as capital, Sterling has been harmed, even though it has been in regulatory compliance since 1991.

ii. <u>Dr. Horvitz Is Not Required To Identify Actual Assets That Would Have Been Acquired Because It Is Undisputed That Sterling Has Always Been Able To Acquire Assets.</u>

Dr. Horvitz's calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held usual and ordinary type assets. There is no reason to doubt that additional assets of the type held by Sterling were readily available and Sterling has, in every year of its existence, forecasted and achieved growth. That means, in the real world, each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth, and then go to the market to find those assets. It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. Using this method, Sterling has grown to over $12.5 billion in assets.

Indeed, Sterling finds billions in new assets every year. Sterling originated $5 billion in new assets in 2006. App. 3, ¶ 9. It is beyond dispute that, if its contract capital were restored, Sterling could easily find the assets to be supported by that capital. The Government has pointed to no evidence, expert or otherwise, that supports its argument that Sterling could not have done in the but for world what it does in the actual world, acquire assets each year without knowing in advance what those assets will be.

In sum, the calculation of Sterling's lost profits depends upon the actual bank's performance in the ideal economic environment and under the direction of the same management in place at the time of the breach. The measure is reasonably certain and should be credited. Because Dr. Horvitz's analysis meets the standards of Rule 702 of the Federal Rules of Evidence and because the Government points to no facts in dispute related to Dr. Horvitz's opinion,

summary judgment is appropriate in favor of Sterling. The Court should award Sterling lost profits damages in the amount of $58.164 million.

### B. THE UNDISPUTED FACTS SUPPORT AN AWARD OF WOUNDED BANK DAMAGES TO STERLING.

In response to Sterling's claim for wounded bank damages, the Government merely disagrees that Sterling has set forth evidence sufficient to form a basis for recovery. The Government does not, notably, point to contravening facts as required to defeat a motion for summary judgment. Sterling respectfully submits that the discussion set forth in its opening brief demonstrates that summary judgment is appropriate in favor of Sterling on the wounded bank damages, and requests entry of an award of $ 4,384,104.20 in wounded bank damages.

## III. CONCLUSION

For these reasons, Sterling respectfully requests an order finding Sterling has been damaged in the amount of $63.361 million.

DATED this 17th day of May, 2007.

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By: /s/ William D. Symmes

William D. Symmes, Counsel of Record
And Member of the Bar of the U.S.
Court of Federal Claims

422 West Riverside Avenue, #1100
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on May 17, 2007, a copy of the foregoing **STERLING'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff