# APPENDIX

# INDEX TO APPENDIX

**DOCUMENT** **PAGE**


Memorandum re New Minimum Capital Regulations, dated November 9, 1989 .................... 2

Letter re Review of Sterling's Capital Plan, dated January 18, 1990 .................... 4

Letter re Uninsured Deposits, dated January 25, 1990 .................... 6

Letter Attaching Regulatory Bulletin 3a-1, dated January 26, 1990 .................... 7

Letter re Reconsidered Request for Business Banking Lending Authority, dated March 9, 1990 .................... 10

Letter re Additional Restrictions, dated May 11, 1990 .................... 11

Letter re OTS No. 7918 and TRO, dated June 5, 1990 .................... 13

Letter re OTS No. 7918, dated June 20, 1990 .................... 14

Letter Requesting Additional Information, dated June 25, 1990 .................... 16

Letter Re Application for Brokered Deposit Waiver Denied, dated July 31, 1990 .................... 18

Letter re Sterling's Purchase of Securities at Cost of $35 million, dated October 1, 1990 ...... 19

Combined Supervisory Stock Conversion and Acquisition Application Between Sterling and Central Evergreen, dated August 15, 1988 .................... 20

Marple's Business Newsletter: More New Offerings, dated December 6, 1989 .................... 24

S Memorandum re Recommendation for Conservatorship of Sterling, dated March 30, 1990 .................... 25

**Office of Thrift Supervision**
Department of the Treasury
1501 Fourth Ave., 19th Floor, Seattle, WA 98101-1693
(206) 340-2300

COPY

MEMORANDUM

TO: Board of Directors
Harold B. Gilkey, Chief Executive Officer
Sterling Savings Association
Docket No. 7918

FROM: Carol A. Friend
Supervisory Agent

DATE: November 9, 1989

SUBJECT: New Minimum Capital Regulations

On November 7, 1989, the Office of Thrift Supervision issued new regulations governing the minimum capital standards that will apply to the thrift industry, effective December 7, 1989. These standards were adopted following the Notice of Proposed Rulemaking issued by the Federal Home Loan Bank Board on December 15, 1988, as modified in order to respond to public comments on that proposal and to conform with the requirements of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

These regulations require each thrift institution to hold capital at least sufficient to meet three requirements -- tangible capital, core capital (or the "leverage ratio"), and risk-based capital. The statute and the implementing regulations require institutions that fail any one of these three standards to take certain actions. The purpose of this letter is to draw your attention to these actions.

Any institution failing its capital requirements is subject, effective immediately upon failing its capital requirement, to Regulatory Bulletin 3a (RB-3a). Regulatory Bulletin 3a limits growth by undercapitalized institutions in ways that the Office has determined are consistent with principles of safety and soundness. In addition, such institutions will also be subject to any other restrictions on undercapitalized institutions that the Office has adopted by regulation or policy. Each such institution must also submit a capital restoration plan to the District Offices by the first business day after January 6, 1990.

EXHIBIT
WITNESS Gilkey
DAVID STONES
SIMMONS & MILLER

The capital restoration plan, which is subject to approval by the Office, must detail the actions that the institution will take to meet its capital requirements as quickly as possible. Thrift Bulletin 36, attached, provides further details on the requirements and process for submitting capital restoration plans. In any event, the submission of the plan must be accompanied by a certification (signed by the Board of Directors) that, while the plan is under consideration, the association will not, without the prior approval of its District Director:

- o grow beyond net interest credited;
- o make any capital distributions; or
- o act inconsistently with any other limitations on activities established by statute, regulation or by the Office in supervisory guidance for savings associations not meeting capital standards (including compliance with any existing supervisory orders as agreements).

Based on the data submitted in your Thrift Financial Report from June 30, 1989, we believe that you will fail one or more of the capital requirements imposed on December 7. As a result, you must either submit a capital restoration plan to this office by the first business day after January 6, 1990, or provide us with sufficient information to demonstrate that you meet the new standards.

We recognize, however, that the new requirements are quite different than the old ones and that the effective date does not provide a great deal of time to assimilate these new requirements. To assist you in determining your own compliance with the new standards, we are providing a worksheet and summary instructions (attached) for your use in calculating your position. Please provide this Office with a copy of the completed worksheet by December 7. The Thrift Financial Report will be fully revised during the next few weeks to provide more complete directions.

If you have further questions, you should contact this office.

Attachments

bc: File #1 - Part II
Chron File

CONFIDENTIAL MATERIAL – SUBJECT TO PROTECTIVE ORDER L WON889 0371

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

January 18, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Members of the Board:

The capital plan filed with this office on January 8, 1990, has been reviewed. The review disclosed that the plan does not accurately reflect Sterling Savings' current strategies towards achieving capital compliance and is, therefore, in need of expansion and/or revision.

The primary strategy to be addressed relates to the issuance of preferred stock and the payment of dividends. Although management has informed us otherwise, the plan's primary capital compliance strategy is to issue a combination of preferred and common stock, which requires the payment of dividends. Since the issuance does not result in full capital compliance, the payment of dividends are not allowed, as addressed in our December 19, 1989 letter. In this letter management was informed that the payment of dividends would not be allowed until such time that Sterling was in full capital compliance. The payment of dividends should, therefore, not be included in pro forma financial statements prior to the point when capital compliance is projected.

All sections of the plan dealing with the issuance of preferred stock and the payment of dividends should be revised to accurately reflect Sterling's ability to pay such dividends. If the stock issuance has been cancelled, the plan should be revised accordingly and current strategies incorporated. The revised capital plan in its entirety should be filed no later than February 19, 1990.

Sincerely,

CAF

Carol A. Friend
Assistant District Director
Industry Supervision

kh
pc: Betty Reed
State Supervisor

4.76 Byrne

bc: Docket Section
David Moore, OTS - DC
William Durbin, District Director
Ed Hedlund, Deputy District Director
Penny Marshall, Applications Director
Carol Friend, Assistant District Director
John Bisset, Field Manager
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing
FDIC

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

January 25, 1990

William W. Zuppe
President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Subject: Uninsured Deposits

Dear Mr. Zuppe:

Institutions that are failing their tangible and core capital requirements must use their best efforts to discourage the acceptance or renewal of any uninsured deposit and to obtain the proper documentation for all deposit accounts.

Please submit to me a summary of any uninsured deposits with your institution, and a description of the methods that you will be using to discourage the acceptance and renewal of uninsured deposits. This summary should be received by February 9, 1990.

Sincerely,

CF

Carol A. Friend
Assistant District Director
Industry Supervision

kh

bc: Bill Durbin, District Director
Ed Hedlund, Deputy District Director.
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing
FDIC

EXHIBIT 33 8/4/98 Hedlund Sterling

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

OT703 0038 F STERLING SAVS ASSOC 05 8206 STERLING SA DOCKET # 07918 OTS BOX 11157 ACC # 00700

**Office of Thrift Supervision**
Department of the Treasury
Seattle District

1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

January 26, 1990

Harold Gilkey
Chairman of the Board and
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

An additional copy of Regulatory Bulletin 3a-1 is attached. Your attention is directed to the section entitled Associations "Subject to Greater Restrictions" on page two of the bulletin. As addressed in this section, Sterling must obtain written approval of the District Director for any new loan and investment activity. This approval is necessary given Sterlings' insolvent capital position.

An application should be filed with the District Director, with a copy also forwarded to my attention. This application should list the types of loans and investments that the institution proposes to engage in, with the appropriate justification for each activity. Given the findings of the recent examination, I would not be inclined to recommend that Sterling be permitted to continue commercial real estate lending. As you have previously stated, however, the institution has virtually shut down this type of lending on its own initiative.

Once received, the application will receive our prompt review and consideration. Until such time that the appropriate approval is obtained, lending and investment activity is limited to outstanding, legally binding commitments.

If you have any questions, or require additional clarification, please call.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh/att.
pc: Betty Reed
State Supervisor

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

WON931 2962 FL STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018235 OLD BOX # 99-329 W2126 GENERAL THRIFT CORRESPONDENCE 20.10 FILE; REPORTS; CHARTS; CORRESPONDENCE; AGENDUM; HANDWRITTEN NOTES; FINANCIAL STATEMENTS; NEWS ARTICLE 900699-921299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

Office of Thrift Supervision
Regulatory Bulletin

Handbook: Thrift Activities
Subjects: Capital; Asset/Liability Structure

Sections: 320; 410
RB3a-1

January 9, 1990

# Policy Statement on Growth for Savings Associations

*Summary:* This Bulletin rescinds and replaces Regulatory Bulletin 3a (RB 3a), which established supervisory policy with respect to growth policies for undercapitalized or insolvent savings associations. The purpose of this Bulletin is to conform OTS's growth policies with the new capital standards required by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and Thrift Bulletin 36, which provides guidelines on FIRREA capital plans, exemptions and exceptions.

*For Further Information Contact:* The District Office in which you are located or the Supervision Policy Division of OTS, Washington, D.C.

*Regulatory Bulletin 3a-1*

## Background

Regulatory Bulletin 3a (RB 3a) was issued on September 7, 1988 and established supervisory policy with respect to the growth of undercapitalized and insolvent savings associations.

Since the publication of the Bulletin, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) amended the Home Owners' Loan Act of 1933 by adding section 5(t) requiring the Office of Thrift Supervision (OTS) to adopt minimum regulatory capital standards for savings associations. The OTS published its regulatory capital regulations implementing FIRREA on November 8, 1989. The effective date of these regulations was December 7, 1989.

The Office of Thrift Supervision has also published Thrift Bulletin 36 (TB 36), dated November 6, 1989, in order to provide guidelines for the FIRREA-required filing of capital plans.

It is necessary to rescind Regulatory Bulletin 3a and issue Regulatory Bulletin 3a-1 in order to conform OTS's growth policies with the new capital standards and TB 36.

## General Policy

It is the general policy of the Office of Thrift Supervision to ensure that asset and liability growth of savings associations is prudent, adequately capitalized and conducted in a manner that is consistent with safety and soundness and the interests of the insurance fund. District Directors are responsible for implementing and monitoring this policy.

Excessive asset growth by any association, as determined by the District Director on the basis of the association's management and asset quality, capital adequacy, interest rate risk profile and operating controls and procedures, is an unsafe and unsound practice. As a general rule, associations "requiring more than normal supervision" or "subject to greater restrictions" will be permitted little to no growth under this policy, subject to District Director discretion and waiver authority.

In addition, all associations except those whose regulatory capital already exceeds the "fully phased-in" requirement[1] must increase their tangible, core and total capital by the capital requirements applicable at the time to support the growth at the time the assets are increased. Associations that meet the "fully phased-in" capital requirements must ensure that proposed growth will not cause them to fall below those requirements in the future. On a case-by-case basis, where appropriate, District Directors retain the authority and flexibility to impose more stringent growth restrictions than outlined below for associations with capital plans pending or that are otherwise of supervisory concern.

## Associations "Requiring More than Normal Supervision"

For purposes of this Bulletin, associations "requiring more than normal supervision" are defined as those with a composite MACRO rating of 4 or 5, associations failing any one of their minimum regulatory capital requirements, or associations otherwise identified as in need of more than normal supervision by supervisory personnel.

Without the prior written approval of the District Director, any association requiring more than normal supervision shall not increase its total assets[2] during any quarter in excess of an amount equal to net interest credited on deposit liabilities (or earnings credited on share accounts) during the quarter. If on the date an association becomes subject to RB 3a or RB 3a-1, it has outstanding loans-in-process obligations or legally binding loan commitments that require disbursements during the quarter in excess of an amount equal to net interest credited, the association should not engage in any further growth beyond that necessary to fund the loans-in-process and legal-



WON931 2963 FL STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018235 OLD BOX # 99-329
W2126 GENERAL THRIFT CORRESPONDENCE 20.10 FILE; REPORTS; CHARTS; CORRESPONDENCE; AGENDUM; HANDWRITTEN NOTES; FINANCIAL STATEMENTS; NEWS ARTICLE 900699-921299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

ly binding loan commitments without the prior written approval of the District Director.

Beginning January 1, 1991, Section 5(t)(6)(B)(i) of the Home Owners' Loan Act of 1933 prohibits any asset growth for an association not in compliance with its capital standards. This Section also permits a limited growth exception only up to the level of net interest credited upon approval by the Director. Thus, capital plans submitted by associations requiring more than normal supervision may not be approved if they envision growth above that level after January 1, 1991.

**Associations "Subject to Greater Restrictions"**

The following savings associations are defined as associations "subject to greater restrictions" and may not make any new loans or investments except with the prior written approval of the District Director:

a) All associations that had previously been prohibited from making any new loans or investments under RB 3a prior to December 7, 1989;

b) All associations failing any minimum capital standard as of December 7, 1989 that have not submitted a capital plan to their District Director by January 8, 1990;

c) All associations subsequently falling out of compliance with any minimum capital standard that have not submitted a capital plan within 60 days of their failure to comply with the capital standards;

d) All associations that have submitted capital plans that are rejected by their District Director;

e) All associations that have had their capital plans approved, but subsequently fall out of compliance with the targets or requirements of the plan that either do not submit a revised capital plan within 30 days of the notice of intent to terminate (or any shorter time frame deemed appropriate by the District Director) or have their revised capital plans rejected; and

f) All associations that are insolvent[3] during the time between their submission of a capital plan and its approval or rejection by their District Director.

In the event of writedowns on assets, the subsequent asset balance will become the new balance on which to base the approval or disapproval of further growth for associations requiring more than normal supervision and associations subject to greater restrictions.

Except as noted below, District Director approval for such savings associations to make new loans or investments should only be granted when it is clearly documented to be reasonable in the context of the association's operations and does not significantly increase the risk profile of the association. Limited and controlled growth for associations subject to greater restrictions may be approved to maintain an association's "franchise value" if such growth is put on in a safe and sound manner. Moreover, growth may be approved only up to an amount equal to or less than the level of net interest credited on deposit liabilities (or earnings credited to share accounts).

The association's franchise value is typically determined by core retail deposits that enhance the attractiveness of a firm to an acquirer and help lower the costs of resolution to the deposit insurance fund. Another case where limited growth may be appropriate is to maintain the viability of such an association's mortgage lending operation. The District Director is authorized to issue a blanket waiver to an association subject to greater restrictions to engage in controlled low-risk growth to maintain the association's franchise value with such growth not to exceed the level of net interest credited on deposit liabilities (or earnings credited to share accounts).

In the case of a savings association that is deemed an association "subject to greater restrictions" because it is insolvent and has submitted a capital plan that has not been approved or rejected, the District Director may temporarily permit growth up to the level of net interest credited upon determining that such growth is capitalized according to the requirements of the capital regulation, poses no significant risk and is appropriate under the individual circumstances.

1. The fully phased-in capital requirement is that amount of capital that an association will be required to hold on December 31, 1994 when the risk-based capital requirements will be fully phased-in and certain assets will be fully deducted in calculating an association's capital position.

2. For these purposes, "total assets" are defined as consolidated total assets as reported on the association's quarterly thrift financial report.

3. For the purpose of this guidance, an association is "insolvent" when its core capital (as defined in 12 C.F.R. 567.5(a)(1)) plus other preferred stock that counts as supplementary capital less qualifying supervisory goodwill and minority interests in consolidated subsidiaries is 0 or less.

Jonathan L. Fiechter

— Jonathan L. Fiechter
Senior Deputy Director, Supervision Policy

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

STERLING SAVINGS ASSOC.
EXECUTIVE DR.
MAR 13 1990

March 9, 1990

William W. Zuppe, President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Zuppe:

We have reconsidered your request for Business Banking lending authority. We have no objection to Sterling Savings Association originating Business Banking loans, subject to the following conditions:

1. Total Business Banking loans are reduced to $23 million by June 30, 1990.

2. Loans are granted only to existing Business Banking customers.

3. Adherence to the loans-to-one-borrower limitation.

4. No Letters of Credit.

5. A listing, as of February 28, 1990, of all Business Banking customers and their respective loan and deposit relationships is provided to us within 30 days.

6. A cost accounting analysis of the Business Banking area is provided to us within 30 days.

7. Prudent underwriting policies are followed that include monthly monitoring of the credits and periodic paydown or payoff of the commercial business loans.

If you have any questions regarding the above conditions, call Carol Friend, Assistant District Director, at (206) 340-2437.

Sincerely,

Will J. Durbin

William J. Durbin
District Director
Seattle District

ECH/kjs

cc: Betty Reed

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

SG1005459

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

May 11, 1990

STERLING SAVINGS ASSOC.
EXECUTIVE BR.
MAY 12 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Members of the Board:

In light of the fact that the Operating Agreement with Conditional Consent to the Appointment of a Conservator or Receiver has not been executed in accordance with our conditional approval of the February 28, 1990 Capital Plan, the institution is subject to the following additional restrictions, effective immediately:

- The institution shall only engage in those activities specified in the Capital Plan to the extent contemplated in the Plan. Any variation must receive our prior nonobjection.
- The institution shall not enter into any agreement to purchase or sell any asset or group of assets in excess of $500,000, without our prior nonobjection. This restriction applies to any off balance sheet items held by the institution, including but not limited to loan servicing.
- The institution shall not increase the compensation of any executive officer or director without the prior nonobjection of this office. In this regard, "compensation" includes all salary, benefits and any other direct or indirect renumeration to officers or directors of the institution.
- The institution shall not accept any uninsured deposits.

In addition, all operating restrictions previously communicated to the institution continue to be in force and are not in any manner impacted by the addition of the above restrictions, except to the extent that those listed above are more restrictive. These include, but are not limited to, growth, lending and investment restrictions.

Board of Directors
Sterling Savings Association
May 11, 1990
Page Two

Until such time that the required agreements are fully executed, Sterling Savings Association is deemed to be operating without an approved capital plan.

Sincerely,

William J. Durbin
District Director
Seattle District

CAF/kh
pc: Betty Reed
State Supervisor

FEB-20-1991 15:20 FROM OTS-SEATTLE TO 914153335353 P.01

Post-it™ brand fax transmittal memo 7671 # of pages ▸ 4

| | |
|---|---|
| To Jim Hendriksen | From Carol Friend |
| Co. OTS/Legal | Co. OTS/Seattle |
| Dept. | Phone # |
| Fax # 27 | Fax # |

Seattle District

01-1693

June 5, 1990

OFFICE OF THRIFT SUPERVISION ELEVENTH DIST. '91 FEB 20 PM 4 16

Harold Gilkey
Chief Executive Officer
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Gilkey:

In light of the May 29, 1990 Temporary Restraining Order, please provide weekly reports of any actions taken that are not in keeping with the restrictions imposed by our letters of January 26, 1990, March 9, 1990 and May 11, 1990. The weekly report should be received by this office within four days of the end of each week (Tuesday). The first report should cover the timeframe from May 29, 1990 thru June 8, 1990.

If you have any questions please contact me.

Sincerely,

CF

Carol Friend
Assistant District Director
Industry Supervision

kh
pc: Betty Reed
State Supervisory

bc: Docket Section
Greg Golden, District General Counsel
Ed Hedlund, Deputy District Director
Pat Stimac, Supervisory Analyst
File 1-II
KHChron, Chron File, Routing, FDIC

OFFICIAL FILE COPY
OTS/WEST

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

VON878 0686 F STERLING SA 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018118 OLD BOX #95-01 W2101 FORMAL INVESTIGATION SF 910104 910206 FILE REPORTS OF EXAM J HENDRIKSENS WORKING FILES PLEADING CORRESPONDENCE GENERAL FILE; CORRESPONDENCE; FINANCIAL STATEMENTS; 900299-921299 PRIVILEGE CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

0000348

JUN-20-1990 15:?? FROM STERLING SAVINGS TO 4th FLR WALL P.02

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

June 20, 1990

Daniel Byrne, Senior Vice President
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Dear Mr. Byrne:

In response to your June 19, 1990, letter enclosed are copies of the correspondence referred to in the Temporary Restraining Order of May 29, 1990. Given that the restrictions contained within these letters have been in place for a number of months, I would not foresee any misunderstandings or need for interpretations at this time. However, should you have any specific questions, I would be available to address them.

On January 30, 1990 the Board of Directors was charged with determining that an adequate system was in place to ensure restrictions imposed by this office were adhered to. Although several were imposed after that date, it should have been expanded to include them as they became known to management and the Board. As always, appropriate internal controls should be in place to ensure that all regulatory requirements are adhered to. Such a system should include items addressed in correspondence from this office, as well as all regulations, bulletins and memos issued by the OTS.

The listing attached to your letter does not correctl_ -flect the asset growth restrictions that Sterling is subject to. By virtue of the denied capital plan, no growth is permitted (12 CFR 567.10). Also "executive officer" should include the Chief Financial Officer, Chief Lending Officer and any other officer with significant influence over, or participation in, major policy making decisions of the association. In addition, residential construction lending is limited to 3.3 percent of total assets and investment authority is restricted to short-term investments. The institution's activities are limited to those specified in the capital plan to the extent contemplated in the plan.

As we have discussed previously, if you or your counsel have questions regarding the reporting requirement, I would be happy to address them. I believe that my letters have been clear as to the scope, nature and timing of reports, and that the lack of reporting by Sterling has been due to your refusal to fulfill the reporting requirement rather than a lack of understanding of what is required. If this is not the case, please contact me.

SG1005455

JUN-23-1990 15:27 FROM STERLING SAVINGS TO 4th FLR WALL P.03

Daniel Byrne
Sterling Savings Association
June 20, 1990
Page Two

On a separate issue, minutes from the May Board meetings (including board package and attachments) have not been received. These should be received no later than June 22, 1990.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

SG1005456

Office of Thrift Supervision
Department of the Treasury Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

June 25, 1990

Daniel G. Byrne
Senior Vice President
Sterling Savings Assoc tion
N th 120 Wall Street
Spokane, Washington 99201
OTS No. 7918

Dear Mr. Byrne:

Your letter of June 21, 1990 has een reviewed and additional information is required. Although all the r ictions listed in your letter are not impacted by the Temporary Restraining rder, the following additional information is nece y:

- Please ind cat whether dividend payments have been made, or approved for payment November 9, 1989.
- Residential co struction loans are limited to 3.3 percent of total assets. Please note the current level of these types of loans as a percent of total assets.
- Have any investment purchases been made that do not qualify for short-term liquidity purposes?
- Please indic he current level of commercial loans, in dollar terms, as we percent of assets.
- Indicate whether any commercial loans have been granted to those existing commercial banking customers as of March 9, 1990.
- Please forward your most recen monthly monitoring of outstanding commercial credits.
- Have activities been initiated at are not in keeping with the February 28, 1990, Capital Pl or that exceed levels specified in the plan?
- Please indicate whether any increase in compensation have been granted to any execut ve officer or director.

iscussed in my June 0, 90 letter, an adequate system sho d be in place to ensure that app e restrictions and regulatory requirements are adhered to. Such a syste t be able to assess compliance on an ongoing basis sus just at month- It is not acceptable to review activity for a given h and make a determination of the level o compliance after the fact. uch monthly review, howev should be used to verify the adequacy of internal co ols. Adequate poli es, proced es and controls must be in place to ensu compliance. The olicies ar dures as well as the internal revie em sho vis acc



Confidential Materials Subject to Protective Order

Daniel Byrne
Sterling Savings Association
June 25, 1990
Page Two

I have reviewed the FIRREA legislation and have been unable to locate a definition of "financial report" as indicated in your letter. Please provide the cite for this definition.

Although it is not clear what is intended by the last paragraph of your letter, no such assurance regarding our use of information submitted has been given. As I have stated in prior correspondence, the purpose of the reporting requirement is to inform us of those aspects of Sterling's operation that cause us concern.

The next report, as well as the information requested above, should be received by June 26, 1990.

Sincerely,

Carol Friend

Carol Friend
Assistant District Director
Industry Supervision

kh

pc: Betty Reed, State Supervisor
Harold Gilkey, Chief Executive Officer

Confidential Material Subject to Protective Order

SG 0600074

**FDIC**
Federal Deposit Insurance Corporation
Washington, DC 20429

Division of Supervision

July 31, 1990

Board of Directors
Sterling Savings Association
N. 120 Wall Street
Spokane, Washington 99201-0696

Members of the Board:

Pursuant to authority delegated by the Board of Directors of the Federal Deposit Insurance Corporation, you are advised that your application for brokered deposit waiver dated January 26, 1990 is denied. Upon the August 2, 1990 expiration of the current temporary waiver, the institution may no longer accept, renew or rollover any brokered deposits.

The condition of your association has deteriorated to the degree where additional capital is urgently needed. The use of alternative funding sources should be continued [we acknowledge that brokered funds have been reduced from $18 million at yearend 1989 to $4 million at June 30, 1990] since the utilization of brokered deposits without realistic prospects for capital augmentation is believed inappropriate. If capital is raised, the FDIC would be willing to reconsider your request.

If you have questions, emergency liquidity needs, or would like to further discuss your application, please contact the San Francisco Regional Office at (415) 546-0160.

Sincerely,

John W. Stone
Associate Director

CONFIDENTIAL MATERIAL – SUBJECT TO PROTECTIVE ORDER FL WON953 0920

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

October 1, 1990

Board of Directors
Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

OTS No. 7918

Member of the Board:

During the last two weeks Sterling Savings Association purchased FHLMC Mortgage Backed Securities at an approximate cost of $35 million, with funds provided by Federal Home Loan Bank of Seattle advances. Our preliminary review of the transaction indicates that the association's evaluation of it was so materially deficient as to be unsafe and unsound. Further, it appears that the transaction contains significant interest rate risk and needlessly exposes the FDIC insurance fund to additional risk of loss.

Until we complete our review of this transaction, you are directed to make no further purchase of securities or loans in excess of $1 million, or to incur additional debt in excess of $1 million, without our prior written approval. Securities purchased in an amount less than $1 million should be limited to those meeting the definition of short-term liquid assets as defined by 12 CFR 566.1(h).

We will promptly investigate this transaction once we are provided with information as to how this transaction impacts Sterling Savings' interest rate risk. This information should be received by October 5, 1990. In the event our fears prove to be unfounded, these restrictions can be quickly withdrawn.

We are also compelled to remind you that imprudent actions resulting in loss to the institution may expose affiliated parties of Sterling Savings to the risk of civil money penalties, demands for restitution or more severe sanctions.

We expect your compliance with this directive immediately. Please acknowledge receipt of this letter by Wednesday, October 3, 1990 by signing the enclosed copy of this letter and returning it to the attention of Carol Friend, Assistant District Director.

Sincerely,

William J. Durbin
Seattle District Director

Alaska • Guam • Hawaii • Idaho • Montana • Oregon • Utah • Washington • Wyoming

SG1005454

STERLING SAVINGS ASSOCIATION

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

COMBINED SUPERVISORY STOCK CONVERSION
AND
MERGER (ACQUISITION) APPLICATION

AUGUST 15, 1988

PwC 07422

"Confidential Material - Subject to Protective Order"

"CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER" SG2004 0190

STERLING SAVINGS ASSOCIATION

IV. FINANCIAL DATA

A. Statement of Condition and Financial Data

STERLING SAVINGS ASSOCIATION
FISCAL 1989 BUSINESS PLAN UPDATE TO INCLUDE
THE ACQUISITION OF CENTRAL EVERGREEN

August 15, 1988

8. Continued high emphasis on asset and liability function with greater tolerance of maturity mismatch than in prior years. With reasonable flexibility provided, the goal is to remain between 10% and 15% negative A/L gap.

III. THE IMPACT OF CENTRAL EVERGREEN ACQUISITION:

Central Evergreen Savings and Loan Association ("Central Evergreen") is approximately $255 million in total assets, representing a ten branch delivery system located in western Washington along the I-5 corridor. Adding Central Evergreen to Sterling provides economy of scale in a number of functions such as special assets, data processing, and operations. Central Evergreen has a well developed residential lending function which would enhance Sterling's origination capability. Central Evergreen's depository locations provide a stable and cost effective source of deposits and have potential to grow and increase in market share. While Central Evergreen has experienced financial difficulty in the past due to problem loans and a deteriorating net interest rate spread, the institution has dealt with its problems, controlled its operating costs and has returned to profitability.

Sterling's analysis is that Central Evergreen's operations, staff, and systems are compatible with Sterling. Both are on ISC equipment and utilize Fiserv for data processing services with similar products. With Central Evergreen's familiarity of the ISC equipment, the conversion should be transparent to the customer.

The operations of Central Evergreen will be conducted as part of the Western Region of Sterling Savings. Accordingly, the following specific measures will be implemented:

1. Consolidation of the head office activities into the Sterling management in Spokane, thus providing standardization and acceptable level of internal controls as well as consistent policy and procedures companywide and effective asset and liability management.

2. Conversion of the data processing activities of Central Evergreen into the Sterling system which is presently utilizing the service bureau, Fiserv, Inc., thus providing a homogeneous system for general ledger income and expense controls, fixed assets, and savings and investment activities. Since Fiserv currently provides data processing services to Central Evergreen, conversion will be relatively easy.

3. Implementation of a program to infuse GAAP capital of $5 million during the three to six month period following the closing date. In our discussions with several underwriters, including Ed D. Jones; Piper, Jaffray and Hopwood, Inc.; and Gallagher and Associates, we are told that it is feasible to sell stock in either a public or community offering, depending on the timing. However, their recommendation is that we should consolidate first and then go to the market.

Sterling's management is committed to infusing capital and has received non-binding expressions of interest to purchase a preferred stock product similar to Sterling $2.50 Cumulative Convertible Preferred Stock - Series B. Mr. Harold B. Gilkey, Chairman of the Board and C.E.O., and Mr. William W. Zuppe, President and C.O.O., have indicated an interest for this preferred stock of approximately



PwC 07644
"Confidential Material - Subject to Protective Order"
"CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER" SG2004 0413

[redacted]



$250,000 and $100,000, respectively. Sterling's directorate and management has expressed an interest for an additional $100,000 and $215,000, respectively. Existing shareholders have expressed an interest for an additional $85,000 of this preferred stock. Further, Central Evergreen's directorate and senior management has expressed an interest for approximately $200,000. Additionally, approximately $300,000 of preferred stock is expected to be sold to senior management and employees as a result of IRA rollovers from the terminated Central Evergreen profit sharing plan. These expressions of interest total $1,250,000 or one-quarter of the total preferred stock committed for sale.

Sterling has experience in the sale of preferred stock through a community offering completed June 30, 1987. As part of this offering, Sterling's management and directors purchased 15% of the stock. It can be expected that this ratio of stock sold to insiders would be attained on future offerings and based upon the indicated interest of insiders, management is confident that at least $5 million can be raised.

Sterling intends to begin its offering circular application to sell this preferred stock product immediately upon completion of acquisition accounting and reporting, which we anticipate will take 30-60 days. At such time as this product is available, Sterling will solicit from those individuals who have expressed an interest in the preferred stock. The success of future offerings will require market timing and the support from OSC in Washington, D.C. to eliminate delays experienced in the past.

4. Central Evergreen appears to have identified their problem assets and under the direction of George Godding, have an action plan already in process to reasonably manage these special assets. As part of Sterling's due diligence function, it appears that the concern for problem assets has been appropriately addressed, and that all problem assets have been identified.

   Upon consolidation, the special assets function will be transferred to Mr. Greg Leland in order to centralize the management of delinquencies, troubled assets, real estate in foreclosure and in judgment. The management of the special asset function will be coordinated with Mr. George Godding to ensure the workout of the special assets is within the level of reserves established. We don't anticipate additional staffing requirements to effectively manage Central Evergreen's special assets.

5. We anticipate the consolidation of the depository branches in Chehalis but may retain the other building for a loan production office, subject to a market analysis and an alternative use analysis for one or the other building. Further, should Sterling be unable to market a reasonable amount of capital, management would consider the sale of additional branches to improve the net worth position.

6. George Godding of Central Evergreen would become Sterling's Western Regional Manager. George Godding has over 25 years in the savings and loan industry and is a qualified and experienced real estate lender. By assuming the responsibility for the Western Region, Mr. Godding will be able to concentrate on loan origination activity, complementing the activities of Sterling's mortgage banking function. Diane Rasmusson, Sterling's current Southwestern Regional Manager in Chehalis, would become the Western Region's Operations Manager.

PwC 07645



"Confidential Material - Subject to Protective Order"

"CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER" SG2004 0414

EXHIBIT 6
WITNESS Barnett
DAVID STOREY
STOREY & MILLER

Marple's Business Newsletter
Covering the Pacific Northwest since 1949
Founded by Elliot Marple


Michael J. Parks

911 Western Ave., Room 509, Seattle WA 98104 (206) 622-0155

Wednesday, December 6, 1989 No. 1037



MORE NEW OFFERINGS: Sterling Savings, Celerex, Washington First International Bank

Stockbrokers in the Pacific Northwest will be busy between now and the end of the year. Two banks and a company that wants to revolutionize the use of the credit card seek new capital. Here's a quick rundown on the new offerings:

Sterling Savings Association (Harold B. Gilkey, chmn.), Spokane, will bring out the largest offering, 525,000 units consisting of a share each of common and noncumulative convertible preferred. Tentative price: $20 to $22 a unit. The stock currently changes hands between $6.50 and $9.00 in a thin market.

Gilkey, 49, then a veteran of 19 years in banking in Spokane, founded Sterling in 1981. He's turned it into one of the fastest-growing thrifts in the Pacific NW (table), mainly by buying up troubled thrifts (five deals since 1983). His strategy: Gather deposits in smaller, largely rural Washington markets and lend in metropolitan areas like Seattle, Portland, Spokane, Boise and Salt Lake City.

The formula works. Sterling has 28 branches on both sides of the Cascades in Washington and nine loan offices. And, as the table shows, it has been consistently profitable. But asset growth long since outran Sterling's slim capital base.

| Sterling Savings Assn | 3 mos to 9/30 | | Fiscal years to June 30 | | | | |
|---|---|---|---|---|---|---|---|
| selected data* | 1989 | 1988 | 1989 | 1988 | 1987 | 1986 | 1985 |
| Net interest income | 3,044 | 2,247 | 10,639 | 5,943 | 4,478 | 2,482 | 2,016 |
| Other income | 1,604 | 561 | 4,095 | 4,256 | 2,921 | 2,676 | 1,321 |
| Operating expense | 4,252 | 2,488 | 13,224 | 8,228 | 5,842 | 4,295 | 2,762 |
| Net income | 262 | 198 | 1,285 | 1,219 | 935 | 775 | 445 |
| Per share | $0.40 | $0.27 | $2.04 | $1.96 | $1.75 | $1.50 | $0.86 |
| Per share** | $1.97 | $0.61 | $5.92 | $2.85 | $2.46 | $2.12 | $1.11 |
| (Selected balance-sheet data at end of period) | | | | | | | |
| Assets | 705,263 | 449,274 | 730,144 | 429,316 | 239,689 | 180,000 | 112,001 |
| Deposits | 511,261 | 316,560 | 519,982 | 306,152 | 170,789 | 142,064 | 88,001 |
| Stockholders' equity | 10,726 | 9,595 | 10,512 | 9,467 | 8,469 | 5,389 | 4,614 |
| Per share | $16.34 | $14.19 | $15.97 | $13.95 | $12.09 | $10.45 | $8.95 |
| Approx stock price | 9 - 7 | 11 - 10 | 12 - 8 | 11 - 8 | 13 - 10 | 13 - 6 | 9 - 6 |

* in thousands, except per share. **: Net income per share before amortization of intangible assets that totaled $25.3-million on Sept. 30, 1989.

The balance sheet would make most accountants blush: just $10.7-million of equity (at Sept. 30) supporting $705-million of assets, a meager ratio of 1.5%. Even so, Sterling met regulatory capital requirements before Congress overhauled thrift regulation. Not so now. Even after raising money Sterling will come up short on one of three key capital ratios; it will apply for a temporary exception.

Besides bolstering Sterling's capital, the offering should broaden the market for its stock, dropped by NASDAQ at mid-year for lack of market makers. What's in it for buyers of the securities? For starters, the dividend on the preferred and the conversion ratio are likely to be attractive.

And for its size Sterling has relatively little stock outstanding, 518,387 shares now, 1,043,387 after the offering (before conversion of preferred to common), or nearly $700 of assets behind each common share. Sterling's reported earnings are penalized now by the required amortization of intangibles such as goodwill acquired during the growth spurt, but the worst will be over on this front in a few years. Dain Bosworth Inc. heads the underwriting syndicate.

Office of Thrift Supervision
Department of the Treasury
Seattle District
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

COPY

# Memorandum

Date: March 30, 1990

To: Alvin W. Smuzynski, Deputy Director

From: William J. Durbin, District Director

Subject: Recommendation for Conservatorship of
Sterling Savings Association
OTS No. 7918

At this time, Sterling Savings Association is not recommended for transfer to the Resolution Trust Corporation.

Although the capital plan has not been formally approved, such an approval is in the process of being developed. Acceptance of the Plan will be dependent on Sterling signing a definitive agreement to sell the entire company by May 31, 1990. The approval will also be contingent on the execution of a Supervisory Agreement, which will require the execution of a Consent Agreement if the sales agreement is not in place by the above date.

If the capital plan is not adhered to and the sales agreement is not signed by May 31, 1990, the appropriate recommendation regarding the transfer to RTC will be made.

CF/kh

bc: Docket Section
Ed Hedlund, Deputy District Director
Carol Friend, Assistant District Director (attachment excluding exhibits)
John Bisset, Field Manager same
Pat Stimac, Supervisory Analyst same
File 1-I (original, including exhibits)
KHChron, Chron File, Routing
FDIC (attachment, excluding exhibits)



)T942 1314 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
'RRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS
'99 - 901299 WOT9421314 CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

Office of Thrift Supervision
Department of the Treasury
1501 Fourth Avenue, 19th Floor, Seattle, WA 98101-1693
Telephone: (206) 340-2300 • Fax: (206) 340-2419

Seattle District

S Memorandum

Date: March 30, 1990

To: Alvin W. Smuzynski, Deputy Director

From: William J. Durbin, District Director

Subject: Recommendation for Conservatorship of: Sterling Savings Association

I. Overview of Institution

Type of Charter: Federal ____ State X

Ownership Type: STOCK X : Publicly Held X
Closely Held ____
Holding Co. ____

Major Shareholders: (Closely Held/HC) Harold Gilkey 5.8 %
Walter Selby 4.6 %

MUTUAL ____

Branch Network: Single State X Multi-State ____

| No. Offices | State |
|---|---|
| 28 | Washington |

Institution also has three wholly owned subsidiaries operating in three states, Washington, Oregon and Utah.

Financial Information as of December 31, 1989:

| (000's) | |
|---|---|
| Total Assets: | $708,213 |
| Total Liabilities: | 697,179 |
| Tangible Capital: | ( 12,553) |
| Tangible Cap. Requirement: | 10,280 |
| Purchased Mort. Servicing Rights: | 4,130 |
| % of Tangible Capital | -- |
| Supervisory Goodwill: | 20,983 |
| % of Tangible Capital | -- |
| Core Capital: | ( 2,273) |
| Core Capital Requirement: | 20,738 |
| Risk-based Capital: | ( 2,273) |

EXHIBIT 35 8/4/98 Holland Sterling



NOT942 1315 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS
880499 - 901299 WOT9421315 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Risk-based Cap. Requirement: | 30,012 |
| GAAP Capital: | 11,034 |
| Classified Assets: | 30,694 |
| Classified Assets/Assets: | 4.3% |
| GAAP Capital/Assets: | 1.6% |
| Tangible Capital/Assets: | (1.8%) |
| Total NI Last Four Qtrs. | 1,424 |
| Total NOI Last Four Qtrs. | 873 |

II. Recommendation

The purpose of this memorandum is to recommend:

_X_ Conservatorship under RTC
____ Pass-through Receivership
____ Other (explained below)

III. Statutory Criteria for Appointment of Receiver

As discussed individually below, the following grounds exist for the recommended action:

_X_ insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members (12 U.S.C. 1464(d)(2)(A)(i); 12 U.S.C. 1464(d)(2)(C)(i));

____ substantial dissipation of assets or earnings due to any violation or violations of law or regulations, or to any unsafe or unsound practice or practices (12 U.S.C. 1464(d)(2)(A)(ii); 12 U.S.C. 1464(d)(2)(C)(ii));

_X_ an unsafe or unsound condition to transact business, including having substantially insufficient capital or otherwise (12 U.S.C. 1464(d)(2)(A)(iii); 12 U.S.C. 1464(d)(2)(c)(iii));

____ willful violation of a cease-and-desist order which has become final (12 U.S.C. 1464(d)(2)(A)(iv) -- Federal association, only);

____ concealment of books, papers, records, or assets of the savings association or refusal to submit books, papers, records, or affairs of the association for inspection to any examiner or to any lawful agent of the Director (12 U.S.C. 1464(d)(2)(A)(v) -- Federal association, only);

____ the association is not likely to be able to meet the demands of its depositors or pay its obligations in the normal course of business (12 U.S.C. 1464(d)(2)(A)(vi); 12 U.S.C. 1464(d)(2)(C)(iv));

_____ (I)the association has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and (II) there is no reasonable prospect for the replenishment of the capital of the association without Federal assistance (12 U.S.C 1464(d)(2)(A)(vii); 12 U.S.C. 1464(d)(2)(C)(v));

_____ there is a violation or violations of laws or regulations, or an unsafe or unsound practice or condition which is likely to cause insolvency or substantial dissipation of assets or earnings, or is likely to weaken the condition of the association or otherwise seriously prejudice the interests of its depositors (12 U.S.C 1464(d)(2)(A)(viii); 12 U.S.C. 1464(d)(2)(C)(vi));

_____ the association by resolution of its board of directors or of its members, consents to such appointment (12 U.S.C. 1464(d)((2)(B)(i) -- Federal association, only);

_____ the association is removed from membership in any Federal home loan bank, or its status as an institution the accounts of which are insured by the Corporation is terminated (12 U.S.C. 1464(d)(2)(B)(ii) -- Federal association, only).

While it is not clear at this time precisely what constitutes "insolvency" under FIRREA, the definition contained in RB 3a-1 will be utilized in this analysis. The Regulatory Bulletin definition is "when core capital [12 CFR 567.5(a)(1)] plus other preferred stock that counts as supplementary capital less qualifying supervisory goodwill and minority interest in consolidated subsidiaries is zero or less." Sterling's core capital as of December 31, 1989, was negative $2.3 million. It had no preferred stock that counted as supplementary capital, $10.3 million in qualifying supervisory goodwill, and no minority interest in consolidated subsidiaries. The resulting capital figure is negative $12.6 million, which is also the tangible capital total. Under the RB 3a-1 definition, Sterling is insolvent.

IV. Financial Condition

The following presents key financial information for the last three fiscal years (000's omitted):

| Reporting Date | Total Assets | Class. Assets | % of TA | Reg. Cap. | % of TA | GAAP Cap. | % of TA | NOI | NI |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/89 | $708,213 | $30,694 | 4.33% | $28,007 | 3.95% | $10,969 | 1.55% | $ 873 | $1,424 |
| 12/31/88 | 712,179 | 12,270 | 1.72 | 26,805 | 3.76 | 9,779 | 1.37 | 1,821 | 895 |
| 12/31/87 | 285,641 | 4,380 | 1.53 | 10,997 | 3.85 | 8,822 | 3.09 | 2,007 | 1,156 |

During 1987, Sterling was profitable with moderate amounts of credit and interest rate risk. Its return on assets was 44 basis points, which was twice the peer average of 22 basis points. The institution was in compliance with the capital requirements, but both regulatory and GAAP capital were below the peer averages. Classified assets were low at 1.53 percent of total assets. Interest rate risk exposure was acceptable--the 1-year cumulative gap was negative 19.84 percent.

As the institution grew, profitability declined. The return on assets fell to 13 basis points in 1988. The net interest margin was about the same as it was in 1987 but noninterest income, particularly loan fees, was reduced in large part because of implementing SFAS 91. Meanwhile, operating expenses (personnel, occupancy, and other expenses associated with the expansion) increased. Sterling remained in compliance with the capital regulation--both regulatory and GAAP capital ratios were on par with peer averages. As the institution grew, Sterling acquired some nonperforming assets. These acquisitions increased the level of classified assets to $12.3 million, which equaled 1.72 percent of total assets. Interest rate risk exposure also increased: the 1-year cumulative gap was negative 26.2 percent.

Return on assets for 1989 was 20 basis points, about the same as it was in 1988. The net interest margin was hurt because of increased cost of funds. Sterling's interest expense was 76 basis points higher than peers at December 31, 1989, because of its reliance on reverse repurchase agreements. Noninterest income and operating expenses as a percent of total assets were comparable to the 1988 ratios. With the acquisition of Central Evergreen, intangible assets increased by $22.0 million. 1989 earnings were hurt because of the amortization of goodwill associated with this acquisition. The Central Evergreen acquisition also reduced GAAP capital to 1.55 percent. Once again, Sterling acquired more troubled assets, which brought the classified assets total to $30.7 million, equal to 4.33 percent of total assets. Interest rate risk, as measured by the 1-year gap, decreased during the last quarter to negative 19.8 percent.

During a Special Limited examination which began on November 13, 1989, examiners classified an additional $7.4 million of assets which had not been internally identified as of September 31, 1989. Excluding $3.4 million in FSLIC-covered assets resulted in a classified asset total of $35.5 million, which represents 5.2 percent of total assets and 130.0 percent of regulatory capital.

Due to the increased classifications at the November examination, additional general valuation allowances of $1.4 million were directed to be established. The increase will be reflected on the institution's January Thrift Financial Report and will result in a net loss for the month of $1.5 million, reducing tangible capital to ($14.0) million.

V. <u>Supervisory History</u>

Sterling Savings is headquartered in Spokane, Washington and operates 28 branches throughout Washington State. It commenced operations in 1983. In addition to its branch operations, Sterling operates three subsidiaries, Intervest, Action Mortgage Company and The Best Agency. Intervest's activities are centered in commercial real estate lending, both construction and permanent from two offices in Washington and one in Portland, Oregon. Since the passage of FIRREA, however; Intervest's activities have been curtailed and it is operating in a liquidation mode. Action Mortgage Company is a full service residential lender and operates through eight offices in Washington; Portland, Oregon and Salt Lake City, Utah. The Best Agency offers annuity products through three offices in Washington.

Since its inception, expansion and growth has been achieved principally through the acquisition of Washington based thrift institutions and branch purchases. The growth has been managed in a safe and sound manner, and management has successfully integrated acquired operations into Sterling's. The executive management team that organized the institution in 1983 had substantial commercial banking backgrounds and brought significant experience to the new institution. That team continues to be in place.

The various acquisitions are detailed below.

With capital provided at the time of inception, Sterling acquired Lewis and Clark Savings and Loan Association in 1983. This acquisition expanded its the branch network by three and added total assets of $44.0 million. The acquisition was completed soon after the institution commenced operations.

Approximately two years later on November 5, 1985, Sterling acquired Lewis Federal Savings and Loan Association in a FSLIC assisted transaction. The acquisition increased assets by $53 million and added two branch offices in western Washington. Assistance of $1.7 million was provided to Sterling. Although prior to the acquisition Sterling's operations were limited to eastern Washington, they successfully incorporated the operations of Lewis Federal into theirs.

During 1987, Sterling expanded its mortgage banking operation into areas that were experiencing economic growth, namely Bellevue, Washington, and Portland, Oregon. With the expansion of these operations, additional management was brought on who had significant lending experience and knowledge of the new lending territories. Adequate underwriting and systems of internal control and reporting were in place, and the growth in this area was managed effectively.

To further expand its presence in western Washington, Sterling purchased six branches from Great American First Savings Bank in 1988. The acquired branches complimented the existing branch network and added approximately $47.0 million in deposits.

In another FSLIC assisted transaction, Sterling acquired Tri-Cities Savings and Loan Association on April 8, 1988. This added five branches and included FSLIC assistance of $11.7 million. During this same year, Central Evergreen Federal Savings and Loan Association headquartered in Chehalis, Washington was acquired. This GAAP insolvent institution, had total assets of approximately $250 million and did not involve any assistance by the FSLIC. The approval of this acquisition was conditioned on Sterling agreeing to raise additional capital during 1989. Given the troubled nature of both acquired institutions, intangible assets increased by approximately $20 million, bringing total goodwill to $26 million.

As of December 31, 1989, Sterling's goodwill totalled approximately $21.0 million. Although Sterling had previously been in compliance with regulatory capital requirements, the FIRREA mandated capital requirements resulted in significant noncompliance with newly revised capital standards.

In keeping with the agreement executed in conjunction with the Central Evergreen acquisition, management planned to issue additional preferred stock in late 1989. The projected offering, however, would not have brought the institution into capital compliance. Because of this, prior approval would not be issued for the payment of dividends on the "to be issued" preferred stock. Investment advisors for the institution indicated that non-dividend bearing stock would not be received well in the market place, and advised management accordingly. Due to the inability to pay dividends, Sterling decided not to go ahead with the offering

Early in 1990, management began marketing Sterling. Numerous financial institutions have expressed interest in acquiring all or parts of Sterling and one potential purchaser has completed due diligence.

VI. Examination History

Dates and ratings for the last four examinations are as follows:

| Exam Date | Exam. Type | Composite | M | A | C | R | O | CRA |
|---|---|---|---|---|---|---|---|---|
| 11-13-89 | 40 | 4 | 4 | 4 | 5 | 3 | 3 | N/A |
| 10-02-89 | 22 | 4 | N | N | 4 | N | N | N/A |
| 06-19-89 | 10 | 3 | 2 | 3 | 3 | 3 | 3 | 2 |
| 04-18-88 | 10 | 2 | 2 | 2 | 2 | 2 | 2 | 3 |
| 10-29-86 | 10 | 2 | 2 | 2 | 3 | 2 | 2 | 3 |

N/A = Not applicable.

Supervisory concerns and actions taken with respect to the last two examinations are discussed below in greater detail.

Examination as of: November 13, 1989 - (Exhibit S-1)

This Special Limited examination concentrated on an analysis of asset quality, capital and operating results. Although asset quality had been subject to comment in prior examinations, criticism was related principally to acquired assets. In addition to the acquired troubled assets, this limited scope review revealed deterioration in Sterling acquired assets, as well as underwriting deficiencies associated with the same. In addition, capital was insufficient to meet the requirements of FIRREA, and operating results were marginal. The examination report also expressed concerns with overall management performance, however, most concerns were related to the absence of documentation to support actions taken vs unsafe or unsound practices.

Classified assets totaled $40.0 million and represented 5.7 percent of total assets. This was an increase of $7.4 million, or of 1.2 percent of total assets, since the June 19, 1989, examination. Included within the total were $3.4 million in assets which are under a FSLIC indemnification agreement. Excluding the FSLIC-covered assets results in a total classified figure of $35.5 million, which represents 5.2 percent of total assets and 130.0 percent of regulatory capital.

WOT942 1320 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS
880499 - 901299 WOT9421320 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER.

Most of the $7.4 million increase in classified assets resulted from examiners identifying problem assets that had not been internally classified. This resulted partially because management did not follow its internal classification policy and, in the case of commercial real estate, did not routinely update appraisals or perform net realizable value calculations.

General valuation allowances (GVAs) were not considered adequate in light of management not identifying and classifying all problem assets, the growth in nonresidential loans (an average of 51.2 percent for the last 4 years), and the lack of updated financial data and the calculation of net realizable values on problem commercial real estate loans. Losses of $1.3 million were identified during the examination, which additionally reduced the level of GVAs. Examiners directed Sterling to replenish its GVAs by $1.4 million. Additionally, GVAs had not been analyzed internally to determine whether the level was sufficient to protect the institution from potential loan losses.

Sterling does not meet the capital requirements legislated by FIRREA. As of December 7, 1989, tangible capital was estimated to be negative $13.7 million and core capital was negative $3.4 million. Both tangible and core capital deficiencies totaled $23.9 million and the risk-based deficiency was $31.9 million. The association has $22.0 million in intangible assets (including supervisory goodwill) and $3.4 million in purchased loan servicing.

Overall operating performance has suffered because of the acquisition of troubled institutions in 1988. The annualized return on average assets was 20 basis points for the 9 months ended September 30, 1989, and the net interest margin was 1.6 percent. Sterling's cost of funds have increased due to reliance on short-term borrowings, including reverse repurchase agreements and wholesale deposits.

Other concerns related to benefits--deferred compensation, employment contracts, and stock options--for the two executive managers, Harold Gilkey and William Zuppe. Also, the annual retainer for Directors was increased from $2,000 to $5,000, which are in additional to fees of $500 per board meeting. Both actions were directed to be reversed.

<u>Examination as of : June 19, 1989</u> - (Exhibit S-2)

The major problem identified during this Federal Regular examination was the need for additional capital. GAAP capital was 1.4 percent of total assets and tangible capital was negative 2.6 percent. Sterling planned to market additional common and preferred stock by the end of 1989 but the proposed offering probably would not have brought the institution into compliance with the FIRREA requirements.

Sterling acquired with no assistance Central Evergreen Federal Savings and Loan Association on December 31, 1988. This was the most recent of a series of acquisitions that have strained capital and reduced earnings because of the increased level of acquired nonperforming assets.

Classified assets totaled $32.6 million, equal to 4.5 percent of total assets and 119.0 percent of regulatory capital. The increase was primarily due to acquired assets--52.0 percent of these assets were originated by Central Evergreen. At the time of the prior examination, classified assets

WOT942 1321 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS
880499 - 901299 WOT9421321 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

represented 2.5 percent of total assets and 68.0 percent of regulatory capital. Examiners identified the risk that these assets would not be disposed of in a short period of time and would be sold at prices that were below the book values.

Earnings were below average, with the return on average assets of less than 20 basis points for 1988, compared to 50 basis points for 1987. As of March 31, 1989, the annualized return on assets was approximately 20 basis points. This same profitability is projected for 1990, which is insufficient to support growth and to increase needed capital.

VII. Enforcement Actions

| Type: | Date Taken | Has Institution Complied with EA Yes | No |
|---|---|---|---|
| ___ Consent Agreement | | | |
| ___ Supervisory Agreement | | | |
| ___ Cease-and-Desist | | | |
| ___ Removal Order | | | |
| ___ 407 Investigation | | | |
| ___ Other (specify) | | | |
| X None | | | |

Details of enforcement actions, including any noncompliance are discussed below:

No enforcement actions are, or have been, taken regarding Sterling.* The association has been given until May 1990 to sell the institution. Management's efforts are being closely monitored.

* The lack of capital compliance is due to the implementation of FIRREA versus unsafe and unsound operating practices. Lending restrictions imposed by RB 3a are in place. With the acceptance or rejection of this capital plan, a formal enforcement document will be executed.

VIII. Condition of Industry

Date: February 1990

DISTRICT: Seattle

| Total No. Institutions | Projected # Failing Capital Requirement | Expected # to Be Transferred to RTC |
|---|---|---|
| 87 | 26 | 11 |

Distribution of Seattle District Institutions by OTS Classification:

| Category | Number of Institutions |
|---|---|
| Healthy | 38 |
| Marginal | 24 |
| Distressed | 5 |
| Resolutions II | 9 |
| Resolutions I | 2 |
| Conservatorship | 9 |
| Total | 87 |

STATE OF: Washington

| Total No. Institutions | Projected # Failing Capital Requirement | Expected # to Be Transferred to RTC |
|---|---|---|
| 29 | 5 | 3 |

The Washington state economy as a whole was very strong in 1989 and promises to be the same in 1990. Employment growth has been greater than the national rate, with local labor market conditions becoming much tighter. The rising wages and serious shortage of workers in some occupations are emerging as powerful constraints on further growth. Some of the labor shortages are being moderated by the influx of immigrants, most of whom have settled in and around the Seattle area.

The strength of the state economy and the flood of new people--a significant portion of whom are cash-rich Asians and Californians--have created a huge demand for real estate. As a result of the tight real estate market conditions, a heavy volume of new residential development has occurred over the past two years. Since the outlook for the state economy is rosy for the next few years and the strong in-migration is expected to continue, the residential markets should be able to comfortably absorb the new construction.

Sterling is headquartered in Spokane and has branches throughout Washington state. With the exception of Spokane, most branches are located in rural areas vs metropolitan areas. Spokane has experienced solid employment growth during 1989, as has been true throughout the state. (The exception to this trend is the Tri-Cities but even this area is beginning to show signs of strength.) Construction activity levels remain uniformly strong, with the greatest gains having occurred in the Bellingham and Spokane areas. Both area economies have strengthened markedly because they are perceived as attractive alternatives to the congestion, rising costs, and other problems encountered in the Seattle area.

WOT942 1323 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 BOX 23 OF 92 DC253
CORRESPONDENCE; AGREEMENTS; EXECUTIVE SUMMARY; RESOLUTIONS; COURT FILINGS; FINANCIAL REPORTS
880499 - 901299 WOT9421323 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

IX. Management Assessment

_____ Institution does not employ anyone under the terms of an employment contract or similar agreement.

__X__ The following individuals are employed under the terms of an employment contract or similar agreement (Copies of contracts/agreements are attached as Exhibit S-3):

Name: Harold B. Gilkey
Position: Chairman of the Board and Chief Executive Officer

Name: William W. Zuppe
Position: President and Chief Operating Officer

Both employment contracts were signed on July 23, 1985, and have 10-year terms. Benefits include life insurance, incentive bonuses, deferred compensation, stock options, and automobiles. The employee may terminate employment six months after giving written notice. Compensation will be paid during the 90-day period after the termination.

If the employer terminates employment without cause, benefits do not have to be paid if they would impair capital. Otherwise, Mr. Gilkey and Mr. Zuppe are entitled to 300.0 percent of their base salaries either paid in a lump sum or paid over a five-year period, at the employee's option.

If termination is for cause, benefits cease.

The agreements also contain noncompete clauses, which are in effect for five years after employment and cover a 75-mile radius around Spokane.

__X__ No institution personnel are recommended for termination by the receiver/conservator.

_____ This office recommends termination of the following personnel of the institution by the receiver/conservator:

X. Net Worth Assistance

__X__ No Net Worth Certificates or Income Capital Certificates outstanding.

_____ Institution has Net Worth or Income Capital Certificates outstanding as discussed below.

XI. Forbearances

__X__ Institution is not operating under any regulatory forbearances.

_____ Institution operates under the following regulatory forbearances:

XII. Capital Plan

____ No capital plan has been submitted by the institution under Section 5(t) of HOLA.

_X_ Capital plan submitted; status as follows: (copy of plan attached as Exhibit S-4)
____ Request for exception submitted; status as follows:
_X_ Request for exemption submitted; status as follows:

Date Submitted: February 19, 1990
Date Accepted: Under review ** (Refer to page 11.)
Assessment of Viability/Feasibility of Capital Plan:

Sterling's strategy to resolve its capital deficiencies is to be acquired by another financial institution. It retained Dain Bosworth Incorporated on January 10, 1990, to represent the association to prospective acquirers. During January, a list of potential acquirers was to be developed and Dain Bosworth was to contact these institutions.

Beginning the last week of February, the field of potential acquirers was to be narrowed to four or five potential candidates and due diligence was to be scheduled. Bids were to be reviewed and presented at the April board meeting and by the May meeting a definitive agreement is to be negotiated and presented for board approval. By September the transaction is expected to be complete.

The capital plan discusses three types of sale: (1) sale to one financial institution, which is the most likely; (2) sale of components since Dain Bosworth has received considerable interest in portions of the institution; and, (3) mutual conversion, which would involve converting to a mutual and being simultaneously acquired. This last option is least likely to occur.

Sale of Sterling as a whole is the most preferable option from a regulatory perspective. One institution has completed due diligence and is expected to make a decision regarding the purchase of Sterling in April 1990.

Date Rejected: Under review **

** Although the capital plan has not been formally approved, such an approval is in the process of being developed. Acceptance of the Plan will be dependent on Sterling signing a definitive agreement to sell the entire company by May 31, 1990. The approval will also be contingent on the execution of an Operating Agreement, which will require the execution of a Consent Agreement if the sales agreement is not in place by the above date.

The chart below reflects the institution's various measures of capital as of December 31, 1989.

| (000's Omitted) Type of Capital | Actual | Required | Deficiency |
|---|---|---|---|
| Tangible | $(12,553) | $10,280 | $(22,833) |
| Core | ( 2,273) | 20,738 | (23,011) |
| Risk-Based | ( 2,273) | 30,012 | (32,285) |

__X__ The institution's failure to meet its capital requirements is not accompanied by any of the following:

____ The institution's failure to meet its capital requirements is accompanied by the following as more fully discussed below:

____ a pattern of consistent losses;

____ substantial dissipation of assets;

____ evidence of imprudent management or business behavior;

____ a material violation of any Federal law, any law of any State to which such association is subject, or any applicable regulation;

____ any other unsafe or unsound condition or activity, other than the failure to meet such capital standards.