**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C (Judge Thomas C. Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM OF**
**<u>CONTENTIONS OF FACT AND LAW</u>**

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 616-0332

OF COUNSEL:
TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH HOLT

May 23, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

CONTENTIONS OF FACT . . . . . 5

I. STERLING'S ACQUISITIONS . . . . . 5

II. STERLING'S POST-FIRREA INJUNCTION AND CAPITAL RAISING . . . . . 8

III. STERLING'S LITIGATION IN THE COURT OF FEDERAL CLAIMS . . . . . 14

CONTENTIONS OF LAW . . . . . 15

I. THE APPLICABLE LEGAL STANDARDS . . . . . 15

II. THE COURT SHOULD REJECT STERLING'S LOST PROFITS MODEL BECAUSE IT IS SPECULATIVE AND HAS NO BASIS IN FACT . . . . . 18

A. Dr. Horvitz's Flawed Lost Profits Model . . . . . 18

B. The Lost Profits Damages In Dr. Horvitz's Model Are Invalid As A Matter Of Law Because His Calculations Ignore Sterling's Mitigation Of Damages Through Recapitalization in 1991 . . . . . 20

C. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal and Tri-Cities . . . . . 24

D. Sterling Cannot Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model . . . . . 26

1. Dr. Horvitz's Lost Profits Calculation Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling's Failure To Meet FIRREA's Minimum Capital Requirements . . . . . 28

a. Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach . . . . . 28

b. Dr. Horvitz Incorrectly Assumes That Sterling Would Meet The Minimum Core Capital Requirement Absent The Breach . . . . . . . . . . . . . . . . . . . . 30

2. Dr. Horvitz's Model Erroneously Assumes That The The Breach Caused Sterling To Cease The Pursuit Of Profitable Opportunities During A Period When The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E. Dr. Horvitz's Damages Estimates Are Speculative . . . . . . . . . . . . . . . . . 37

1. Dr. Horvitz's Model Is Invalid Because He Fails To Identify The Assets And Liabilities That Would Have Been Obtained Absent The Breach . . . . . . . . . . . . . . . . . . . . . . . 37

a. Fifth Third, Southern National And Standard Federal Are Indistinguishable From This Case . . . . . . . . . . . . . . . . 40

b. Dr. Horvitz's Lost Profits Model In This Case Suffers From The Same Flaws As The Models Proffered In Citizens Financial And SoCal . . . . . . . . . . . 42

c. First Federal of Rochester Is Inapposite . . . . . . . . . . . . . . 44

2. Dr. Horvitz's Growth Rate Is At Odds With Sterling's Underusage Of Its Leverage Capacity In The Actual World . . . . 44

3. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES AS A MATTER OF LAW BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COST TO RAISE REPLACEMENT CAPITAL . . . . . . . . . . 46

A. Professor James's Mitigation Theory, Which Is Based Upon The Payment Of Preferred Stock Dividends, Should Be Rejected Because The Only Costs Associated With Raising Capital Are Transactions Cost . . . . . . . . . . . . . . . . . . . . . 49

B. The Court Should Reject Professor James's Mitigation Damages Theory Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

C. Even Were The Court To Award Sterling Its Claimed Cost-Of-Replacement Damages, It Is Not Entitled To A Tax "Gross-Up" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IV. PLAINTIFFS' ALLEGED WOUNDED BANK CLAIMS FAIL AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank . . . . . . . . . . . 57

B. Losses Incurred In Connection With The CJ-4 Loan Are Not Attributable To The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

C. Excess Supervision Costs Are Not Attributable To The Breach . . . . . . . 61

D. Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Units Offering Is Not Breach-Related . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That Other Legal And Accounting Fees Are Attributable To A Breach . 63

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

# TABLE OF AUTHORITIES

## CASES

Admiral Fin'l Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004) .................................... 14

Advanced Medical, Inc. v. Arden Medical Sys., 955 F.2d 188 (3rd Cir. 1992) ........................ 24

American Federal Bank, FSB v. United States, 68 Fed. Cl. 346 (2005) .............................. 22, 40

Bank of America, FSB v. United States, 67 Fed. Cl. 577 (2005)
appeals argued, Nos. 2006-5008, -5089, -5090 (Fed. Cir. Apr. 4, 2007) .......................... passim

Bank of America, FSB v. United States, 70 Fed. Cl. 246 (2006) ............................................ 55

Bank United v. United States, 50 Fed. Cl. 645 (2001), aff'd, 80 Fed. Appx. 663
(Fed. Cir. Sept. 22, 2003) ................................................................................. passim

Bluebonnet Sav. Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001) ................................ 15

California Fed. Bank, FSB v. United States, 395 F.3d 1263 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 344 (2005) ..................................................................... passim

California Federal Bank v. United States ("CalFed"), 43 Fed. Cl. 445 (1999),
aff'd in part, 245 F.3d 1342 (Fed. Cir. 2001) ....................................................... passim

Castle v. United States, 48 Fed.Cl. 187 (2000), aff'd, 301 F.3d 1328
(Fed. Cir. 2002) ......................................................................................................... 37

Centex Corp. v. United States, 55 Fed. Cl. 381 (2003),
aff'd, 395 F.3d 1283 (Fed. Cir. 2005) ........................................................................ 55

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953) ............................................ 21

Citizens Fed. Bank v. United States, 59 Fed. Cl. 507 ........................................................ 54, 55

Citizens Federal Bank v. United States, No. 05-5173, 2007 WL 162820
(Fed. Cir. Jan. 24, 2007) ............................................................................................. 27

Citizens Fin'l, Services, 57 Fed. Cl. 64 (Fed. Cl, 2003) ......................................................... 51

Citizens Fin'l Services, FSB v. United States, 64 Fed. Cl. 498 (2005),
aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006) ........................................................... passim

Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402 (2000), aff'd, 323 F.3d F.3d 1035 (Fed. Cir. 2003) .......... 4, 55

Columbia First Bank, FSB v. United States, 54 Fed. Cl. 693 (2002) .......... 3, 52

Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97 (2004) .......... 39

Commercial Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338 (2004) .......... 55

Dolphin Tours, Inc. v. Pacifico Creative Service Inc., 773 F.2d 1506 (9th Cir. 1985) .......... 18

Estate of Berg v. United States, 231 Ct. Cl. 466, 687 F.2d 377 (1982) .......... 16, 65

Everett Plywood Corp. v. United States, 206 Ct. Cl. 244, 512 F.2d 1082 (1975) .......... 17

Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991) .......... 13

Fawick Corp. v. United States, 149 Ct. Cl. 623 (1960) .......... 22

Fifth Third Bank v. United States, 402 F.3d 1221 (Fed. Cir. 2005) .......... passim

First Fed. Sav. and Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106 (Fed. Cir. 2007) .......... 40

First Heights Bank, F.S.B. v. United States, 57 Fed. Cl. 162 (2003) .......... 55

Franklin Fed. Savings Bank v. United States, 55 Fed. Cl. 108 (2003) .......... passim

General Elec. Co. v. Joiner, 522 U.S. 136 (1997) .......... 38

Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390 (1999), aff’d in part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001) .......... 49

Glendale Fed. Bank, FSB v. United States, 239 F.3d 1371 (Fed. Cir. 2001) .......... 1

Glendale Fed. Bank, F.S.B., v. United States, 378 F.3d 1308 (Fed. Cir. 2004) .......... 16

Granite, 416 F.3d 1373 (Fed. Cir. 2005) .......... 4, 53

Granite Management Corp. v. United States, 58 Fed. Cl. 766 aff'd in part and remanded on other grounds, 416 F.3d 1373 (Fed. Cir. 2005) .......... passim

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001) .......... 27, 28

Krauss v. Greenbarg, 137 F.2d 569 (3d Cir. 1943) .......... 27

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) .......... 38

LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64 (1999),
aff'd in part, vacated in part, 317 F.3d 1363 (Fed. Cir. 2003) .......... 56, 64

LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363 (Fed. Cir. 2003) .......... passim

Landmark Land Co. v. United States, 256 F.3d 1365 (Fed. Cir. 2001) .......... 24, 25

Local Okla. Bank, N.A. v. United States, 59 Fed. Cl. 713 (2004),
aff'd, 452 F.3d 1371 (Fed. Cir. 2006) (same) .......... 55

Midwest Indus. Painting v. United States, 4 Cl. Ct. 124 (1983) .......... 17, 21

Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707 (1975) .......... 21, 57

Old Stone Corp. v. United States, 450 F.3d 1360 (Fed. Cir. 2006) .......... 16

Piggly Wiggly Corp. v. United States, 112 Ct. Cl. 391, 81 F. Supp. 819 (1949) .......... 64

Prudential Ins. Co. of America v. The United States, 801 F.2d 1295 (Fed. Cir. 1986) .......... 57

Quiman v. United States, 39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313
(Fed. Cir. 1999) .......... 16, 17

R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954 (M.D. Pa. 1981) .......... 18

Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951) .......... 27, 55

Robinson v. United States, 305 F.3d 1330 (Fed. Cir. 2002) .......... 21, 24

Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344 (Fed. Cir. 1999) .......... 27

Southern Calif. Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005) .......... 15, 39

Southern California Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598 (2003),
aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319
(Fed. Cir. 2005) .......... passim

Southern National Corp. v. United States, 57 Fed. Cl. 294 (2003) .......... 39, 40, 41

Standard Fed. Bank v. United States, 62 Fed. Cl. 265 (Fed. Cl. 2004) .......... 39, 42

Sterling Sav. Assn. v. Ryan, 751 F. Supp. 871 (E.D. Wash. 1990),
rev'd, 959 F.2d 241 (9th Cir. 1992) .......... passim

Sterling Sav. Assn. v. United States, 57 Fed. Cl. 234 (2003) .......... 15

Sterling Sav. Assn. v. United States, 57 Fed. Cl. 445 (2003) .......... 14, 19

Sterling Sav. Assn. v. United States, 72 Fed. Cl. 404 (2006) .......... passim

Sterling Savings Assoc. v. Ryan, 959 F.2d 241 (9th Cir. 1992) .......... 13, 32

Sterling Savings, et al. v. United States, No. 95-829C, slip op., pp. 3-4
(Nov. 15, 2002) .......... 62, 63

Sterling Savings v. United States, 53 Fed. Cl. 599 (2002) .......... passim

Sun Cal, Inc. v. United States, 25 Cl. Ct. 426 (1992) .......... 17

Suess v. United States, 74 Fed. Cl. 510 (2006) .......... 55

Toledo P. & W. Ry. v. Metro Waste Sys., 59 F.3d 637 (7th Cir. 1995) .......... 21

United States v. Burton Coal Co., 273 U.S. 337 (1927) .......... 16

Wells Fargo Bank v. United States, 88 F.3d 1012 (Fed. Cir. 1996) .......... 55

WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135 (2002) .......... 27

**STATUTES**

12 C.F.R. §563.13 .......... 7

12 C.F.R. §§ 567.1 567.2, 567.5 (1990) .......... 7

12 C.F.R. § 567.8 (1989) .......... 30, 31

12 C.F.R. § 567.9(a) (1989) .......... 29

12 C.F.R. § 567.10(a)(4) .......... 9

12 U.S.C. §1464(t) (1989) .......... 7

12 U.S.C. §1464(t) .......... 7

12 U.S.C.A. § 1464(s)(4) .......... 9

103 Stat. 183, 303 .......... 9

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA") .......... passim

**MISCELLANEOUS**

5 A. Corbin, Corbin On Contracts §1039 (1964) .......... 18

E. Allen Farnsworth, Farnsworth On Contracts §12.11 at 217 (1990) .......... 18

Restatement of Contracts § 335 .......... 21

Restatement (Second) of Contracts §§ 347, 351, 352 (1981) .......... 15

Restatement (Second) of Contracts §347cmt. e .......... 20

Restatement (Second) of Contracts § 350 .......... 18

Restatement (Second) of Contracts § 350 cmt a. .......... 22

Restatement (Second) of Contracts § 350 cmt b. .......... 21, 24

Restatement (Second) of Contracts § 350(1) (1981) .......... passim

Restatement (Second) of Contracts §351 (1) .......... 25

Restatement (Second) of Contracts §351 (2) .......... 25

Restatement (Second) of Contracts § 351 cmt a. (1981) .......... 25

Restatement (Second) of Contracts § 351 cmt e. .......... 26

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM OF**
**CONTENTIONS OF FACT AND LAW**

Pursuant to Paragraph 11, Appendix A of the Rules of the United States Court of Federal Claims, and this Court's Pretrial Order dated January 3, 2007, defendant, the United States, submits the following Memorandum of Contentions of Fact and Law.

## INTRODUCTION

Plaintiff Sterling Savings Association ("Sterling") asserts lost profits,"mitigation," and wounded bank damages[1] that were purportedly incurred as a result of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA").

The Court should reject Sterling's lost profits model because it is speculative and has no basis in fact. As a preliminary matter, Sterling's lost profits model is premised upon the thrift's

[1] Prior to December 2006, Sterling also maintained claims for restitution, reliance, and hypothetical replacement costs of capital damages. Sterling acknowledged, however, at the status conference held on December 15, 2006, that these theories are barred by precedent of the United States Court of Appeals for the Federal Circuit, and, therefore, will not be presented at trial. See, e.g., Fifth Third Bank v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1371, 1381 (Fed. Cir. 2001).

invalid assumption that, between 1989 and 2006, it never replaced a single dollar of the $15.557 in contractual goodwill eliminated by FIRREA, notwithstanding a legal duty to mitigate and actual mitigation. In 1991, Sterling raised $23 million in capital, achieving full compliance with FIRREA's regulatory capital requirements and fully replacing all of the contractual goodwill attributable to its acquisitions of Lewis Federal Savings and Loan Association ("Lewis Federal") and Tri-Cities Savings and Loan Association ("Tri-Cities"). Thus, Sterling's lost profits model projects damages through 2006 on the plainly incorrect assumption that Sterling never replaced the regulatory capital eliminated by FIRREA.

Further, Sterling cannot demonstrate that its alleged lost profits were caused by the breach because the thrift would have been out of compliance with FIRREA's minimum capital requirements in 1989, even if the goodwill attributable to the Lewis Federal and Tri-Cities acquisitions had been permitted to count as regulatory capital.

The lost profits model suffers from other fatal flaws that render it invalid. First, the model incorrectly assumes that FIRREA prevented Sterling from pursuing its investment strategy. It is undisputed that, in 1990, Sterling obtained an injunction prohibiting the Office of Thrift Supervision ("OTS") from enforcing any restrictions imposed due to Sterling's noncompliance with FIRREA's regulatory capital requirements. Moreover, the injunction applied to noncontractual goodwill associated with Sterling's acquisition of Central Evergreen Savings & Loan Association ("Central Evergreen") as well as the contractual goodwill associated with Sterling's acquisitions of Lewis Federal and Tri-Cities, thus rendering Sterling better off than it would have been absent the breach. Therefore, Sterling's lost profits model is

counterfactual to the extent that it assumes that FIRREA prevented Sterling from achieving the thrift's growth projections.

The model also fails to identify the assets and liabilities that Sterling would have acquired absent a breach, thus rendering its claimed lost profits speculative. In addition, the model fails to account for, or even acknowledge, that there would have been competition in the market for the assets Sterling assumes it would acquire. Similarly, the model's assumption that Sterling would have achieved additional growth absent the breach is inconsistent with the thrift's track record. Specifically, Sterling had faced difficulty in acquiring assets due to competition and lack of supply. Moreover, Sterling's assumptions that growth equates with profits and that incremental assets earn the same return as actual assets is at odds with its actual experience and fundamental principles of finance and economics. For these reasons, the court should reject the model.

Sterling also advances a "mitigation" damages theory that purports to calculate the actual costs of replacing regulatory capital eliminated by FIRREA, although Sterling steadfastly maintains that it never replaced the goodwill. Indeed, Sterling devotes only one factual contention and one footnote to the theory in its contentions of fact and law. Sterling's Contentions at 11, 38. With the exception of the estimated transaction costs incurred in replacing the Lewis Federal and Tri-Cities goodwill, the Court should reject Sterling's mitigation theory because its hypothetical premise has been repeatedly rejected by the Federal Circuit and this Court. Fifth Third, 402 F.3d at 1237; LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003); California Federal Bank v. United States ("CalFed"), 43 Fed. Cl. 445, 460-61 (1999), aff'd in part, 245 F.3d 1342, 1350 (Fed. Cir. 2001); Franklin Fed. Savings Bank v. United States, 55 Fed. Cl. 108, 134-39 (2003); Columbia First Bank, FSB v. United

States, 54 Fed. Cl. 693, 697-98 (2002);; Bank United v. United States, 50 Fed. Cl. 645, 655-56 (2001), aff'd, 80 Fed. Appx. 663 (Fed. Cir. Sept. 22, 2003).

In 1991, Sterling replaced all of the goodwill attributable to its acquisition of Lewis Federal and Tri-Cities through a common stock offering and a conversion of preferred stock to common stock. Through this offering, Sterling achieved compliance with FIRREA's new capital standards. Sterling's expert, however, does not attempt to quantify the actual costs of issuing those securities in 1991. Instead, he assumes that, in 1991, Sterling sold preferred stock, and uses the dividend rate for that hypothetical preferred stock offering to calculate damages. This hypothetical model is contrary to the Federal Circuit ruling in LaSalle, 317 F.3d 1363 at 1375, and this Court in Granite Management Corp. v. United States, 58 Fed. Cl. 766, 778-79, aff'd in part and remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005). The only true measure of Sterling's cost to replace its capital is its transaction costs. CalFed, 43 Fed. Cl. at 460-61 ("[o]n the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs.").

Sterling also offers an assortment of so-called "wounded bank" damage claims, pursuant to which it seeks: 1) increased costs allegedly incurred to acquire a branch of another thrift known as Great American Savings and Loan; 2) losses on a loan, known as the CJ-4 Loan, claimed to result from FIRREA's requirements; 3) excess supervision costs purportedly based upon its status as a "troubled thrift," 4) transaction costs attributable to an unsuccessful 1989 public offering; and 5) legal, accounting, and insurance costs allegedly incurred in defending against regulatory interference. Plaintiffs offer no proof that the alleged breach caused these increased costs, or that the damages were foreseeable. In Coast Fed. Bank, FSB v. United States,

48 Fed. Cl. 402, 434-41 (2000), aff'd, 323 F.3d F.3d 1035 (Fed. Cir. 2003), the trial court rejected a wounded bank claim upon summary judgment where plaintiff failed to demonstrate a causal link between the alleged damage and FIRREA. Further, Sterling's wounded bank claims suffer from other infirmities. For example, Sterling claims that the increased costs allegedly incurred in connection with the 1989 public offering resulted from its inability to pay preferred stock dividends. This claim is foreclosed because the Court has previously ruled that Sterling was not contractually entitled to pay dividends. Sterling Savings v. United States, 53 Fed. Cl. 599, 614-15 (2002). In addition, Sterling's claim for legal fees encompasses fees incurred in litigation that are foreclosed by statute.

For these reasons, the Court should award a judgment to Sterling equal only to the transaction costs incurred in replacing the goodwill attributable to its acquisition of Lewis Federal and Tri-Cities.

## CONTENTIONS OF FACT

### I. STERLING'S ACQUISITIONS

Sterling is a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1. Sterling commenced operations in 1983. Id. Sterling's damages claim arises out of the thrift's acquisition of two failing savings and loan institutions in the 1980s: Lewis Federal and Tri-Cities. While Sterling acquired another thrift in 1988, Central Evergreen Savings & Loan Association ("Central Evergreen"), the Court has held that the Government did not commit a breach of contract in connection with the acquisition. Sterling Sav. Assn. v. United States, 72 Fed. Cl. 404, 411 (2006).

In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). P-18. Sterling did not invest any money in the acquisition. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration. P-19. In addition, the Federal Home Loan Bank Board issued a forbearance letter. P-20. The Lewis Federal acquisition resulted in the creation of $3,606,389 in goodwill. P-72, p. SG1005264.[2]

In April 1988, Sterling acquired Tri-Cities. On April 7, 1988, the Federal Home Loan Bank Board ("FHLBB"), pursuant to Resolution No. 88-250, approved the acquisition, authorized an Assistance Agreement, and authorized and directed that a forbearance letter be sent to Sterling. P-30. The Assistance Agreement required a FSLIC cash contribution of $11,730,128.00. Again, Sterling did not invest any money in the acquisition. P-38. The Tri-Cities acquisition resulted in the creation of approximately $14 million in goodwill. P-76, p. 0062989-0062990.

In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and FSLIC did not provide cash

---

[2] For purposes of this memorandum, the goodwill associated with the Lewis Federal and Tri-Cities acquisitions will be referred to as the “contractual goodwill,” while the goodwill associated with the Central Evergreen acquisition will be referred to as the “noncontractual goodwill.”

assistance. P-47; DX 338. The Central Evergreen acquisition resulted in the creation of $22,803,000 million in noncontractual goodwill. P-78, p. PSG0270425.

Sterling considered each of its acquisitions to be a success. In an OTS filing submitted in 1989, subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits. . . . Through consolidation, the Association has reduced the cost of performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to [Sterling.]

DX 908.

Prior to the enactment of FIRREA, Sterling considered shrinking its asset base to $650 million in an attempt to improve the negative tangible capital position that resulted from its acquisition of Central Evergreen. DX 342.

On August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA established new capital requirements. In particular, FIRREA, and the regulations promulgated to implement it, required thrifts to comply with three separate regulatory capital standards: a leverage (or "core capital") standard, a tangible capital standard, and a risk-based capital standard. 12 U.S.C. §1464(t) (1989); 12 C.F.R. §§ 567.1, 567.2, 567.5 (1990). "Qualifying supervisory goodwill" was to be phased-out gradually between 1990 and 1995. 12 U.S.C. §1464(t); 12 C.F.R. §563.13. In the intervening years, eligible savings associations were

permitted to include qualifying supervisory goodwill to satisfy core and risk-based capital standards. Id.

In November 1989, prior to the effective date of FIRREA's implementing regulations, OTS approved Sterling's application to acquire two branches of Great American Savings Bank. DX 376.

Further, one of Sterling's assets, known as the "CJ-4" Loan, was placed into foreclosure by Sterling in November 1989. In connection with this loan, thrift examiners were aware that Sterling was considering the advance of additional funds to the borrower, and did not object. P-181.

Pursuant to a business plan adopted in connection with its acquisition of Central Evergreen, Sterling was required to raise $5 million in capital between 1989 and 1990. DX 1041. In December 1989, OTS declined to provide preapproval of Sterling's payment of dividends in connection with its pending plan to raise $12.5 million in capital through a preferred stock "units offering." P-415. This Court has held that Sterling did not have a contractual right to the payment of dividends. Sterling, 53 Fed. Cl. at 615.

## II. STERLING'S POST-FIRREA INJUNCTION AND CAPITAL RAISING

As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. DX 422. At the time, Sterling retained only $15.557 in contractual goodwill attributable to the Lewis Federal and Tri-Cities acquisitions. DX 1046, Exh. 6, Table 4a. Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for

increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. DX 422. In that plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. Id. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. Id.

In April 1990, OTS approved Sterling's capital restoration plan on the condition that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator in the event that Sterling did not execute a definitive merger agreement. P-269. On May 10, 1990, Sterling declined to execute the operating agreement. P-270.

On May 22, 1990, because Sterling had failed to meet FIRREA's capital standards, refused to consent to the operating agreement, and did not propose an acceptable remedy for its capital deficiency, OTS denied the capital plan and imposed certain operating restrictions on the thrift in an effort to ensure its safe and sound operation, pursuant to 12 C.F.R. § 567.10(a)(4). P-420.

In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and sought a temporary restraining order. The court issued a temporary restraining order ("TRO") in May 1990 and a preliminary injunction in August 1990. In its opinion granting the preliminary injunction, the court severely restricted OTS's and the Federal Deposit Insurance Corporations's ("FDIC") authority to regulate Sterling pursuant to FIRREA because the court determined that FIRREA did not preclude the agencies from honoring what it

determined to be contracts with Sterling. Sterling Sav. Assn. v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash. 1990), rev'd, 959 F.2d 241 (9th Cir. 1992).

As a result of the injunction, the Government was "enjoined and restrained from:"

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and FHLBB and the FSLIC;
>
> b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letter from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;
>
> c. placing Sterling in receivership or conservatorship; and
>
> d. interfering with Sterling's proposed public offering contemplated in the 1988 Central Evergreen acquisition agreement.

Id. OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83. The court determined that the prohibition against placing Sterling into conservatorship or receivership was overly broad, and narrowed that portion of the injunction to clarify that the "Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect." Id. at 884.

OTS complied with the injunction's terms. In June, 1990, OTS notified Sterling that the agency intended to "strictly obey" the district court's order prohibiting it from enforcing any restrictions contrary to the agreements Sterling entered into in connection with its acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. P-279, P-285, P-288. Nonetheless, the agency

did require Sterling to report any activity inconsistent with pre-injunction restrictions. P-279. This reporting requirement, however, did not affect Sterling's ability to realize any growth plans in place prior to the issuance of the injunction. Further, while the injunction was in place, the OTS permitted Sterling to operate as if its Central Evergreen goodwill was contractual regulatory capital notwithstanding this Court's ultimate determination that it was not. Sterling, 72 Fed. Cl. at 411.

During the pendency of the injunction, which ultimately was dissolved in 1992, Sterling never needed to initiate an action to compel enforcement of the injunction or complain of Government noncompliance with the injunction. Indeed, Sterling's internal audit department referred to restrictions imposed prior to the issuance of the injunction as "OTS operational concerns stayed by preliminary injunction." DX 534. Moreover, in exam reports issued during the pendency of the injunction, examiners expressly acknowledged that OTS was enjoined from enforcing FIRREA's capital requirements. P-182, DX 252.

While the injunction was in place, Sterling shrank its asset base. That shrink improved the thrift's profitability. DX 1051. Prior to the enactment of FIRREA, as Sterling's total assets increased from $433.953 million as of June 30, 1988, to $730.933 million as of June 30, 1989, Sterling's net income decreased from $1.2 million to $981,000, respectively. DX 1046, Exh. 3. Similarly, Sterling's profitability decreased from the fiscal year ended June 30,1986, through fiscal year end June 30, 1989, as demonstrated by its return on average assets, which declined as follows: 1.02 percent for 1985, .93 percent for 1986, .91 percent for 1987, .73 percent for 1988 and .65 percent for 1989. Id.

In November 1991, Sterling raised approximately $23 million through a public offering of common stock and the conversion of $2.1 million in preferred stock to common stock. P-84, pp. 18, 28, 39; P-310, p. 14. At the time, Sterling held only $13.346 million in contractual goodwill. DX 1047, Exh. G. The public offering brought Sterling into compliance with all of FIRREA's minimum capital ratios. Id. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

DX 913, p. 4. In addition, Sterling's 1992 Annual Report indicated that completion of the equity offering brought Sterling into compliance with FIRREA's capital standards:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

P-84, p. 2 (emphasis added).

The same 1992 annual report advised Sterling shareholders that, due to the capital raising, the Government' appeal of the issuance of the injunction was "not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case." Id. at 31.

According to Harold Gilkey, Sterling's Chief Executive Officer, the 1991 capital raising would not have occurred if Sterling had already been in capital compliance at the time, because Sterling would have had substantial excess capital. Deposition of Harold Gilkey, June 8, 2000, pp. 464-66. On more than one occasion, Sterling has acknowledged that the 1991 offering permitted it to recapitalize after FIRREA. DX 923, p. 3; DX 1002, p. 3.

On April 14, 1992, the United States Court of Appeals for the Ninth Circuit reversed the district court decision imposing the injunction. Sterling Savings Assoc. v. Ryan, 959 F.2d 241. Relying upon Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991), the Ninth Circuit concluded that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling, 959 F.2d at 241. On that basis, the Ninth Circuit vacated the district court's judgment and remanded the case to the district court. Id. By the time the Ninth Circuit issued its decision, however, Sterling had already completed its public offering and achieved compliance with FIRREA’s capital requirements.

In 1993, Sterling's holding company, Sterling Financial Corporation (“SFC”), raised approximately $17 million through a preferred stock offering, and downstreamed approximately $12 million to Sterling. In the prospectus, SFC noted increased capital requirements would be phased-in as of December 31, 1994. P-316, p. 7. As of September 30, 1992 (prior to the offering), however, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." Id. at 10. Further, it was anticipated that Sterling would continue to meet all regulatory requirements in the future, although "there can be no assurance in this regard." Id. at 7.

## III. STERLING'S LITIGATION IN THE COURT OF FEDERAL CLAIMS

In 1995, Sterling filed its complaint in this Court. In 2002, the Court determined that the Government breached contracts permitting goodwill to count as regulatory capital in connection with Sterling's acquisitions of Lewis Federal, Tri-Cities and Central Evergreen. Sterling, 53 Fed. Cl. at 615. As stated above, in 2006, the Court, upon reconsideration requested in light of the decision of the United States Court of Appeals for the Federal Circuit in Admiral Fin'l Corp. v. United States, 378 F.3d 1336, 1341 (Fed. Cir. 2004), determined that a breach had not occurred with respect to the Central Evergreen acquisition. Sterling, 72 Fed. Cl. at 411.

The Court has issued several other rulings applicable to this proceeding. First, the Court has dismissed all contract claims asserted by plaintiff SFC because it did not exist at the time of Sterling's acquisitions, and is not in privity of contract with the Government. Sterling, 53 Fed. Cl. at 602 n.1.[3] Therefore, SFC is barred from recovering upon the contract claims asserted by Sterling. Further, the Court, as indicated above, has determined that the Government did not undertake a contractual obligation to permit Sterling to pay preferred stock dividends after raising capital. Sterling, 53 Fed. Cl. at 614-15. Similarly, Sterling, in connection with its acquisition of Central Evergreen, did not obtain a contractual right to maintain regulatory capital at levels at variance with regulations. Id. at 615.

In 2003, the Court determined that Sterling's Lewis Federal and Tri-Cities contracts required it to amortize any goodwill associated with FSLIC cash assistance it obtained at the time of the acquisition. Sterling Sav. Assn. v. United States, 57 Fed. Cl. 445, 455 (2003). In a

[3] Only one noncontractual claim remains at issue in that both Sterling and SFC allege a taking of property contrary to law. The Court has deferred a ruling upon the taking claim until all contract claims are resolved. Sterling, 53 Fed. at 616 n.4.

separate opinion, the Court determined that, while the District Court's issuance of the injunction in 1990 did not deprive Sterling of standing to sue, it may be relevant to damages. Sterling Sav. Assn. v. United States, 57 Fed. Cl. 234, 240 (2003). Sterling, at a status conference held on December 15, 2006, indicated its intent to abandon claims for restitution as a remedy, reliance, and hypothetical cost of replacement damages that had been asserted in the complaint.

In addition, the Court has dismissed plaintiffs' claims for restitution as an affirmative claim, specific performance, and due process. Sterling, 53 Fed. Cl. at 616, n.4.

## CONTENTIONS OF LAW

### I. THE APPLICABLE LEGAL STANDARDS

Sterling seeks expectation damages in this case. To recover expectation damages, Sterling must demonstrate that the damages it seeks "are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); see also Southern Calif. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005); Bank of America, FSB v. United States, 67 Fed. Cl. 577, 584-85, (2005), appeals argued, Nos. 2006-5008, -5089, -5090 (Fed. Cir. Apr. 4, 2007); Restatement (Second) of Contracts §§ 347, 351, 352 (1981). The issues of causation, certainty, and foreseeability are questions of fact and, as we will demonstrate at trial, under the facts of this case, Sterling cannot prove entitlement to damages beyond the transaction costs associated with its 1991 capital raising.

Sterling's statement of the legal standard applicable to expectation damages assumes that lost profits are the sole source of expectation damages, and must be awarded in each case. Sterling Contentions at 24. That assumption is contrary to precedent. The Court of Appeals for

the Federal Circuit has reviewed many Winstar-related cases and has assessed the ability of plaintiffs to prove claims such as those presented by Sterling. In four opinions, the appellate court has explained the legal requirements applicable to lost profits claims and the factual circumstances in which these claims arise in Winstar -related cases, and observed that, "given the speculative nature of such a damages claim, . . . experience suggests that it is largely waste of time and effort to attempt to prove such damages" in a Winstar-related case. Glendale Fed. Bank, F.S.B., v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); CalFed, 395 F.3d at 1270-71; Fifth Third, 402 F.3d at 1237.

This Court, like all courts, applies the least speculative, cost-minimizing methodology for calculating damages in a given case. See, e.g., Quiman v. United States, 39 Fed. Cl. 171, 185 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). Courts do not seek to "penalize" parties that breach contracts. CalFed, 43 Fed. Cl. at 461 (punitive damages are "not the purpose of contract remedies"). Instead, the purpose of expectation damages is to put the non-breaching party in the financial position it would have been in had the breach not occurred, subject to the limitations upon these damages. Accordingly, the usual remedy for a breach of contract is "cover," or the difference between the cost of the item under the breached contract and the market price of the item at the time of the breach. See, e.g., United States v. Burton Coal Co., 273 U.S. 337 (1927); Estate of Berg v. United States, 231 Ct. Cl. 466, 469-74, 687 F.2d 377 (1982) (damages for the Government's breach of its obligation to redeem bonds at par value is the difference between the par value of the bonds and their market value at the time of breach).

Sterling's assumption that lost profits are the only appropriate measure of its damages also ignores the thrift's[4] duty to mitigate. Here, Sterling raised over $500 million in capital between 1991 and 2006, yet it claims that it never replaced, and could not replace, the $15.557 million in Lewis Federal and Tri-Cities goodwill remaining when FIRREA became effective. Sterling Contentions at 38.

The duty to mitigate potential damages by raising replacement capital applies to claims for lost profits in the Winstar-related cases. Bank United, 50 Fed. Cl. at 662. Black-letter law requires a non-breaching party to attempt to mitigate its damages following another party's breach of contract. See, e.g., Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); Midwest Indus. Painting v. United States, 4 Cl. Ct. 124, 133 (1983). Accordingly, Sterling "may not recover those damages which could have been avoided by reasonable precautionary action on its part." Midwest Indus., 4 Cl. Ct. at 133.

Because Sterling cannot recover expectancy damages if it "failed to take action to mitigate such damages," Quiman, 39 Fed. Cl. at 185-86, this Court precludes plaintiffs, like Sterling, from recovering expectancy damages when they did not make sufficient efforts to mitigate their damages. Everett Plywood Corp. v. United States, 206 Ct. Cl. 244, 512 F.2d 1082, 1092 (1975) (denying lost profits damages to a buyer of timber because there was no attempt to mitigate its losses by a cover transaction, such as procuring other timber as a substitute; nor evidence that such a substitute transaction would cost the plaintiff more than the withheld timber

[4] While Sterling converted to a commercial bank in 2005, we will, for the sake of convenience, refer to it as a "thrift" herein.

would have cost it); Restatement (Second) on Contracts § 350; 5 A. Corbin, Corbin On Contracts §1039 (1964); E. Allen Farnsworth, Farnsworth On Contracts §12.11 at 217 (1990).

These decisions show that the Court should not award "lost profits" related to an investment strategy unless the plaintiff can prove it attempted to acquire capital in order to pursue that opportunity.

## II. THE COURT SHOULD REJECT STERLING'S LOST PROFITS MODEL BECAUSE IT IS SPECULATIVE AND HAS NO BASIS IN FACT

### A. Dr. Horvitz's Flawed Lost Profits Model

Sterling's lost profits claim is presented by Dr. Paul Horvitz. Dr. Horvitz estimates damages by creating a hypothetical "but for" bank in which supervisory goodwill counts as capital post-FIRREA.[5] The hypothetical "but for" bank is based in its entirety upon a series of unrealistic assumptions. For instance, Dr. Horvitz simply assumes that, but for the alleged breach, Sterling would have had a much larger balance sheet and would have earned profits on the balance sheet at the same rate as the actual Sterling. DX 1036, p. 14. Dr. Horvitz also assumes that Sterling suffered damage during the pendency of the temporary injunction, notwithstanding the fact that the issuance of the injunction prohibited the Government from enforcing any breach-related growth restrictions. See generally DX 1036. In addition, he

[5] The model assumes Sterling would be free from FIRREA's breaching provisions while other institutions with alleged goodwill contracts would be subject to the same provisions. Under the case law, however, all similarly situated institutions must be treated the same way in a "but for" world. See, e.g. Dolphin Tours, Inc. v. Pacifico Creative Service Inc., 773 F.2d 1506, 1510-12 (9th Cir. 1985) (a valid damage model must account for the fact that if one market participant becomes free of anti-competitive behavior, other similarly situated market participants become free as well); R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966 (M.D. Pa. 1981) (same). Putting aside other flaws in Dr. Horvitz's model, the incorrect assumption concerning other market participants, in and of itself, renders the model invalid.

assumes that the "but for" Sterling would have raised $10.5 million in new capital in December 1989. DX 1046, Exh. 6, Table 3a. Absent that capital, his model yields zero damages. DX 1049. Moreover, Dr. Horvitz ignores the fact that, according to Sterling's own witness, Sterling replaced its goodwill in 1991. Gilkey Deposition, June 8, 2000, pp. 464-66.

Using this invalid methodology, Dr. Horvitz incorrectly opines that Sterling incurred $58.164 million in lost profits damages between 1990 and September 30, 2006. DX 1046, Exh. 8.

According to Dr. Horvitz's latest model,[6] the addition of $15.557 in contractual goodwill to regulatory capital would have enabled the "but for" bank to acquire up to $427 million more in assets than those of the actual bank between 1989 and 2006. DX 1046, Exh. 6, Tables 1, 4a. According to the model, these incremental assets would have earned the same average return as Sterling's actual assets. DX 1036, p. 14. Dr. Horvitz calculates that the earnings on these "foregone assets" would have been approximately $58.164 million as of September 30, 2006. DX 1046. He also claims that the value of the goodwill remaining at that date would have been approximately $641,000, based upon Professor James's replacement model. DX 1046, p. 4.

---

[6] In an initial expert report, dated September 6, 2001, Dr. Horvitz calculated lost profits through 2000 of $75.777 million, plus future damages of $21.264 million. DX 1036, p. 16. Dr. Horvitz based this calculation on his belief that goodwill associated with FSLIC assistance should not be amortized. In a supplemental report issued in February 2004, Dr. Horvitz adjusted his damages calculation to acknowledge that goodwill associated with FSLIC assistance provided in connection with the Lewis Federal and Tri-Cities acquisitions was required to be amortized. Sterling Savings v, United States, 57 Fed. Cl. 445, 455 (2003). DX 1044, pp. 1-2. The 2004 adjustment, however, resulted in greater lost profits, in the amount of $77.405 million, because Dr. Horvitz extended the lost profits calculation through 2003. Id. at 3. The damages alleged in Dr. Horvitz's current report, dated December 11, 2006, allegedly reflect this Court's recent ruling that the Government did not breach a contract in connection with Sterling's acquisition of Central Evergreen. Sterling, 72 Fed. Cl. at 411.

At trial, we will demonstrate that Dr. Horvitz's lost profits model is invalid because he assumes that Sterling made no attempt to mitigate by replacing the $15.557 in contractual goodwill remaining as of December 31, 1989, notwithstanding Sterling's raising of nearly $500 million in new capital since that date and its acknowledgment that a 1991 capital raising resulted in recapitalization. Further, Dr. Horvitz's alleged lost profits were neither foreseeable at the time of contracting nor caused by the breach, and fail to meet the reasonable certainty test, as explained in greater detail below.

### B. The Lost Profits Damages In Dr. Horvitz's Model Are Invalid As A Matter Of Law Because His Calculations Ignore Sterling's Mitigation Of Damages Through Recapitalization In 1991

Dr. Horvitz's lost profits model is premised upon his assumption that, between 1989 and 2006, Sterling never replaced a single dollar of the $15.557 in contractual goodwill eliminated by FIRREA. This assumption, which ignores Sterling's duty to mitigate as well as its actual mitigation in 1991 by raising $23 million in new capital, renders the entire model invalid.[7]

The Court of Appeals for the Federal Circuit requires the Court to account for any mitigation a plaintiff undertakes as a result of a breach. LaSalle, 317 F.3d at 1371-72 (citing Restatement (Second) of Contracts §347(c) cmt. e). In LaSalle, the Federal Circuit held that recapitalization of the thrift that resulted in replacement of the lost goodwill constituted a substitute transaction that mitigated damages. Id. Here, Sterling's 1991 recapitalization, which it admits was for purposes of reaching capital compliance and would not have occurred but for the breach, is also a form of mitigation. Indeed, Sterling possessed a duty to mitigate. Bank United,

[7] Professor James's estimate of lost profits is consistent with Dr. Horvitz's model and invalid for the same reasons.

50 Fed. Cl. at 662. A plaintiff must mitigate "at the least cost to the defendant," Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975), and is "under an obligation to avoid by a reasonable effort any damages which it should have foreseen," Chain Belt Co. v. United States, 115 F. Supp. 701, 714 (Ct. Cl. 1953) (citing Restatement of Contracts § 335), and "cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original) (quoting Restatement (Second) of Contracts § 350, cmt. b).

If a nonbreaching party fails to make any attempt to mitigate its damages, but instead merely attempts to impose all loss, even if it could have been avoided, upon the breaching party, the nonbreaching party will be precluded from recovering the amount of loss that could have been avoided. See, e.g., Midwest Indus., 4 Cl. Ct. at 133 ("nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part"); Toledo P. & W. Ry. v. Metro Waste Sys., 59 F.3d 637, 640 (7th Cir. 1995) ("[i]n the event [the injured party] fails to take reasonable steps to avoid additional harm, [the injured party] bears the risk of any increased damages which could have been avoided"); Restatement (Second) of Contracts § 350(1), at 126 (1981). The rationale of this rule is to provide an incentive to the nonbreaching party to reduce any damages resulting from the breach:

> Rationale. The rules stated in this Section reflect the policy of encouraging the injured party to attempt to avoid loss. The rule stated in Subsection (1) encourages him to make such efforts as he can to avoid loss by barring him from recovery for loss that he could have avoided if he had done so. The exception stated in

> Subsection (2) protects him if he has made actual efforts by allowing him to recover, regardless of the rule stated in Subsection (1), if his efforts prove unsuccessful.

Restatement (Second) of Contracts § 350 cmt. a, at 127 (1981) (citation omitted).

This Court's predecessor, the Court of Claims, has held that, if a contractor's damage is a direct result of the Government's breach of contract, and the contractor could have reduced its loss by expending money and subsequently seeking recovery of that money from the Government (in lieu of the entire claimed amount of the loss absent mitigation), the contractor's failure to do so precludes recovery. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960).

This principle applies in the Winstar-related cases as well. In American Federal Bank, FSB v. United States, 68 Fed. Cl. 346, 358-59 (2005), the Court rejected the plaintiff's lost profits claim in part because the model failed to recognize that the plaintiff had mitigated by raising replacement capital.

In this case, in 1991, Sterling raised approximately $23 million in regulatory capital for purposes of achieving compliance with FIRREA's capital requirements. P-84, pp. 3, 27, 31. Sterling's Chief Executive Officer, Harold Gilkey, acknowledged at deposition that, absent the breach, Sterling would not have raised capital in 1991. Gilkey Deposition, June 8, 2000, pp. 364-66. Further, Sterling's 1992 Annual Report to shareholders expressly states:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with

> capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

P-84, p. 2 (emphasis added). The same 1992 annual report advised Sterling shareholders that, due to the capital raising, this litigation was "not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case." Id. at 31. Consequently, Sterling mitigated its damages.[8] Nonetheless, in his model, Dr. Horvitz assumes that, between 1989 and 2006, Sterling never replaced a penny of the goodwill associated with the Lewis Federal and Tri-Cities acquisitions. Based on this assumption, he calculates damages through September 30, 2006.

Dr. Horvitz's assumption that Sterling has never mitigated its damages invalidates his model as a matter of law.[9] Further, Dr. Horvitz's failure to acknowledge Sterling's 1991 capital raising, as well as nearly $470 million in additional capital raising since 1991, DX 1046, Table 2a, reinforces another fatal flaw in his model. Specifically, the model posits that it is reasonably certain that replacement of the $15 million in contractual goodwill would have resulted in over $58 million in additional profits for Sterling. Id. at Exh. 6, Table 1. If, in fact, replacement of the $15 million in goodwill would have foreseeably resulted in $58 million in additional profits for the company, then Sterling, which acknowledges that it has raised nearly $500 million in capital since the enactment of FIRREA, should have experienced no difficulty in raising an additional $15 million in order to realize these profits. Thus, Sterling's, and Dr. Horvitz's,

---

[8] Thus, at most, Sterling would be entitled to the transaction costs incurred in connection with the recapitalization.

[9] As we explain below, the lost profits that allegedly arose before the 1991 recapitalization are not recoverable for other reasons.

insistence that Sterling never mitigated renders Dr. Horvitz's model inherently speculative, and precludes an award of lost profits because, as demonstrated above, it possessed a duty to mitigate, and it "cannot recover damages for loss that [ ] could have [been] avoided by reasonable efforts." Robinson v. United States, 305 F.3d at 1333 (emphasis in original)(quoting Restatement (Second) of Contracts, § 350, cmt. b).

Sterling attempts to avoid its duty to mitigate by claiming that its status as a "lost volume seller" rendered it impossible to replace the goodwill eliminated by FIRREA. Sterling Contentions at 38-39. As a preliminary matter, Sterling is not a "lost volume seller." A "lost volume seller" is one who, upon a breach of contract, resells an article, e.g., a piece of equipment, to a second purchaser who would have purchased the item anyway, thus resulting in a lost sale. See, e.g., Advanced Medical, Inc. v. Arden Medical Sys., 955 F.2d 188, 200-01 (3rd Cir. 1992). Sterling's goodwill was not a piece of equipment that it could mass produce. Instead, it was a nonearning asset that this Court and the Federal Circuit have already held could be replaced through the acquisition of tangible capital. See, e.g., CalFed, 245 F.3d at 1350; Bank United, 50 Fed. Cl. at 655. To date, "numerous courts have indeed allowed recovery based on the cost to an injured thrift of mitigating its damages, specifically, the cost incurred by the thrift in replacing its lost goodwill." Bank of America, 67 Fed. Cl. at 580 (2005). Consequently, Sterling's "lost volume seller" theory is inapplicable to this case, and should be rejected.

### C. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal And Tri-Cities

Sterling bears the burden of proving that "both the magnitude and the type of damages were foreseeable." Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001).

The Federal Circuit applies the following test: "'[l]oss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'" Id. (quoting Restatement (Second) of Contracts § 351(2)).

Moreover, the loss for which damages are claimed "must have been foreseeable to the party in breach at the time of contract formation." Id. (citing Restatement (Second) of Contracts § 351(1)). Even more pertinently, "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id (emphasis added); see Restatement (Second) of Contracts § 351 cmt a. (1981).

Sterling cannot meet these requirements. First, Sterling implicitly admits that, if it had raised capital, it could have replicated its lost profits model. Yet, Sterling claims that no such funds were ever available, notwithstanding its ability to raise over $500 million in capital after FIRREA's enactment, and Dr. Horvitz's opinion that an additional $15.557 in capital would have yielded $58.1 million in additional profits. According to the Restatement of Contracts, Sterling's theory is the classic, text-book example of an unforeseeable claim. In analogous breach of contract cases where defendants guarantee loans to businesses, courts limit damages to the cost of replacement because it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit:

> The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach. In most cases,

> then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

Restatement (Second) of Contracts § 351 cmt. e. Thus, Sterling's claim that it had profitable opportunities and the thrift's simultaneous allegation that it could not convince its own shareholders or any other prospective investors to infuse an additional $15.557 million in funds to pursue these profits is the classic example of an unforeseeable claim. DX 1046, Exh. 6, Table 4a.

Further, it was not foreseeable that, after a breach, Sterling would (1) obtain an injunction preventing the Government from acting inconsistently with its contracts; and (2) nonetheless choose to pass up profitable investment opportunities, particularly if such opportunities were readily available in the market and easily accessed, as Dr. Horvitz assumes.

Finally, it would have been unforeseeable that the loss of the Lewis Federal and Tri-Cities goodwill, alone, would have resulted in the damages Sterling claims, when the elimination of the noncontractual Central Evergreen goodwill would have placed Sterling in peril even absent a breach.

### D. Sterling Cannot Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model

With respect to causation, a plaintiff must prove that its damages "'inevitably and naturally, not possibly nor probably' flow from the defendant's breach." CalFed, 395 F.3d at 1267. The appellate court in CalFed specifically considered the proposed "less exacting standard . . . that the breach need only be a 'substantial factor' contributing to the loss," CalFed, 395 F.3d at 1267, and it held that the trial court "correctly rejected the 'substantial factor' test." Id. at

1268. Sterling, in its contentions of law, relies upon the CalFed decision in reciting the causation standard applicable to this case. Sterling Contentions at 25. Therefore, there is no question that the "but for" standard of causation is applicable to this case.[10]

Moreover, it is clear that, "[f]or a damage to be direct there must be no intervening incident . . . . The cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 433, 101 F. Supp. 353, 357 (1951). Thus, a plaintiff who exercises an independent business decision to incur a cost (i.e., forgo lost profits) by refusing to mitigate or avoid that cost cannot be said to have incurred that cost as a direct result of a breach. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001); Bank United, 50 Fed. Cl. at 658 n.13 (recognizing write-down of goodwill for independent business reasons).

As demonstrated below, Dr. Horvitz's model does not meet the causation test because plaintiffs cannot prove that, absent the breach, Sterling would have met FIRREA's capital requirements. Moreover, Sterling's lost profits damages cannot meet the causation test because

[10] Recently, in Citizens Federal Bank v. United States, No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007), the Federal Circuit purported to modify that long-standing rule, finding that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion" and permitting the trial court to utilize the "substantial factor" causation test rather than the "but for" test. Id. at *3. While we disagree with the Citizens Federal decision, it is irrelevant in this case because, as noted above, Sterling's reliance upon the CalFed decision indicates that we are in agreement that the "substantial factor" test is inapplicable here. Even if the "substantial factor" test were applicable, the plaintiff cannot avoid its obligation to establish that, absent the breach, it would not have incurred the costs that it is seeking. A plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999).

Dr. Horvitz's model incorrectly assumes that Sterling never mitigated its damages notwithstanding its replacement of every dollar of contractual goodwill eliminated by FIRREA. Also, as previously shown, to the extent that Sterling refuses to acknowledge that it mitigated, its failure to mitigate notwithstanding a demonstrated ability to raise capital when needed proves that its lost profits were not caused by the breach. Hughes, 271 F.3d at 1071.

**1. Dr. Horvitz's Lost Profits Calculation Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling's Failure To Meet FIRREA's Minimum Capital Requirements**

Dr. Horvitz assumes that, absent the breach, Sterling would have been in compliance with FIRREA's minimum capital requirements, and would not have been subject to any restrictions or limitations upon growth of assets. DX 1046, pp. 2-3. Consequently, he also assumes that, absent the breach, Sterling would have been in a position to leverage the goodwill attributable to the Lewis Federal and Tri-Cities acquisitions after FIRREA's enactment. That assumption is invalid. Even assuming that the Lewis Federal and Tri-Cities goodwill continued to count as regulatory capital after FIRREA, elimination of the noncontractual, Central Evergreen goodwill would have rendered Sterling non-compliant with FIRREA's minimum capital requirements, thus breaking the chain of causation between breach and alleged damages.

**a) Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach**

Dr. Horvitz's model is invalid because he fails to take into account that Sterling would have failed FIRREA's tangible capital requirements even absent the breach. Sterling's own documents demonstrate that inclusion of the contractual Lewis Federal and Tri-Cities goodwill in calculating tangible capital would only improve its tangible capital deficit from negative $22.833

million to negative $7.276 million. DX 422; DX 1046, Table 4a. That tangible capital deficit would have rendered Sterling non-compliant with FIRREA's 1.5 percent minimum tangible capital requirement, 12 C.F.R. § 567.9(a) (1989), and subjected the thrift to the restrictions that were imposed in the actual world. Indeed, as stated above, Sterling was better off in the actual world because it obtained an injunction prohibiting the enforcement of the restrictions based upon the District Court's erroneous legal finding that its Central Evergreen goodwill was contractual. For these reasons, Sterling cannot meet its burden of proving that the breach caused the thrift to incur any lost profits.

In an attempt to overcome this fundamental flaw in Sterling's damages claim, Dr. Horvitz's model incorrectly assumes that, absent the breach, Sterling would have raised $10.5 million in new regulatory capital in December 1989, thus permitting Sterling to achieve tangible capital compliance. DX 1046, Exh. 6, Table 3a. Dr. Horvitz includes this assumption in his model in reliance upon Sterling's claim that the capital raising effort failed because the Government breached its contractual obligation to permit the thrift to pay preferred stock dividends. Sterling Contentions at 8-9. This argument has already been resolved by the Court as a matter of law, however, when it determined that Sterling did not possess a contractual right to pay preferred stock dividends. Sterling, 53 Fed. Cl. at 615.

Consequently, Dr. Horvitz's model is invalid because Sterling cannot prove that the breach caused the thrift's failure to comply with FIRREA's capital standards.

**b) Dr. Horvitz Incorrectly Assumes That Sterling Would Meet The Minimum Core Capital Requirement Absent The Breach**

As demonstrated above, Dr. Horvitz's assumption that Sterling would have raised $10.5 million in December 1989 absent the breach renders his model invalid. Even assuming, however, that Dr. Horvitz is correct about the 1989 capital raising, Sterling nonetheless cannot prove that the breach caused its damage. Our expert, Mr. Barefoot Bankhead, a certified public accountant, former banker, and former regulator with the Federal Home Loan Bank Board ("FHLBB"), will demonstrate that, as of March 30, 1990, Sterling would not have met FIRREA's minimum core capital requirement, even assuming that: (1) absent the breach, Sterling would have raised $10.5 million in regulatory capital in December 1989; and (2) the contractual Lewis Federal and Tri-Cities goodwill would have counted as regulatory capital after FIRREA. DX 1049, p. 8; 12 C.F.R. § 567.8 (1989). Consequently, even absent the breach, Sterling would have been subject to the restrictions imposed by OTS for noncompliance with FIRREA's regulatory capital requirements.

Mr. Bankhead will also demonstrate that, if core capital were calculated properly, Dr. Horvitz's model would result in zero damages. Id. at 7-11.[11]

Sterling's claim that Mr. Bankhead's methodology fails to take into account the contractual nature of goodwill associated with its acquisitions of Lewis Federal and Tri-Cities is unfounded. Sterling Contentions at 39-40. Contrary to Sterling's assertion, Mr. Bankhead's opinion does not place a "limit" on Sterling's use of its contractual goodwill in the "but for"

---

[11] Sterling's Witness List indicates that it has recently retained a new expert, Mr. Paul Allen Schott, to respond to Mr. Bankhead's opinions. We reserve the right to present rebuttal by our experts to Mr. Schott's opinions at trial.

world. Id. at 40. His opinion assumes, instead, that there are limits upon Sterling's use of its noncontractual Central Evergreen goodwill, and demonstrates that the error in Dr. Horvitz's calculation lies in his treatment of the Central Evergreen goodwill. DX 1049, pp. 5-11.

**2. Dr. Horvitz's Model Erroneously Assumes That The Breach Caused Sterling To Cease The Pursuit of Profitable Opportunities During A Period When The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions**

The speculative nature of Dr. Horvitz's lost profits model is amply demonstrated by the fact that he did not account for the issuance of a TRO, issued in May 1990, that prevented the Government from enforcing any of the provisions of FIRREA related to Sterling's alleged contracts. DX 981. The temporary restraining order was followed by a preliminary injunction; in an opinion dated August 8, 1990, the United States District Court for the Eastern District of Washington enjoined and restrained the Government from:

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the [Lewis Federal, Tri-Cities and Central Evergreen] supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;
>
> b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;
>
> c. placing Sterling in a receivership or conservatorship; and
>
> d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

Sterling, 751 F. Supp. at 881-82. In response to a motion for reconsideration, the district court determined that the restriction on placement of Sterling in receivership or conservatorship was

overly broad, and amended its ruling to provide that "[t]he Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect." Id. at 884. Consequently, the district court amended subsection "a" of its order to prevent "any attempt by the defendants to appoint a receiver or conservator based on a reason that, either directly or indirectly, is inconsistent with the contracts." Id. Thereafter, the Government was precluded from enforcing any provision of FIRREA that was contrary to the contracts found by the district court, including the Central Evergreen contract, which the Court has ruled was not breached. Sterling, 53 Fed. Cl. at 614.

The injunction remained effective until April 14, 1992, when the Ninth Circuit dissolved it. At that point, however, Sterling had replaced the contractual goodwill and was in full capital compliance. Sterling, 959 F.2d 241.

Therefore, the injunction permitted Sterling to implement any growth plans that were in place pre-breach, and prohibited the Government from restricting Sterling's ability to implement the plans. Notwithstanding this prohibition, Dr. Horvitz, in his lost profits damages model, assumes that Sterling suffered damage between July 1, 1990, after the temporary restraining order had been issued, and 1992, the year that the injunction was lifted. That alleged damage is in the form of lost earnings on assets that Sterling allegedly would have acquired in the absence of a breach. DX 1046, Exh. 6, Table 1. Dr. Horvitz's assumption is not only baseless, but it is affirmatively inconsistent with the undisputed facts of the case. Sterling could not have been injured while the Government was prohibited from enforcing any of FIRREA's restrictions to the extent that the restrictions were inconsistent with any contract provisions. Sterling, 751 F. Supp. at 881-82.

Nonetheless, based upon his counter-factual assumption that Sterling was unable to grow its assets while the injunction was in place, Dr. Horvitz concluded that Sterling earned less than it would have otherwise earned in 1990 and 1991 due to the breach. DX 1046, Exh. 6, Table 1. Further, the error extends beyond 1991 because Dr. Horvitz assumes that the earnings allegedly forgone in 1990 and 1991 would have been utilized to acquire more assets in later years, resulting in additional lost profits. Id. The result of these incorrect assumptions is that Sterling cannot prove that the lost profits projected by Dr. Horvitz were caused by the breach, rendering the model inherently speculative.

Sterling does not dispute that the district court issued a TRO in May 1990 and an injunction in August 1990 which prohibited the Government from taking action inconsistent with contracts entered into in connection with the Tri-Cities, Lewis Federal and Central Evergreen acquisitions.

Instead, Sterling argues that adherence to its business plan while the temporary injunction was in place would have "exposed" it to "ruin" if the injunction were vacated. Sterling Contentions at 36. A member of Sterling's board of directors, however, concluded that issuance of the injunction provided the relief necessary for Sterling to resume normal operations. Deposition of Robert Larrabee, April 26, 1990, p. 120.

Further, Sterling's claim that it "suffered significant damage" prior to issuance of the TRO is belied by Sterling's own expert's report. Sterling Memo at 21. Dr. Horvitz estimates that, prior to June 30, 1990 (after the TRO was issued), Sterling was forced to forgo $28,000 in earnings as a result of the breach. DX 1046, Exh. 6, Table 1. Twenty-eight thousand dollars cannot be viewed as "significant" damage under any measure relevant to the Winstar-related

cases. Further, Dr. Horvitz does not acknowledge that the TRO provided Sterling with an opportunity to recoup the alleged $28,000 loss. Moreover, as demonstrated above, Dr. Horvitz's calculation is invalid as a matter of law because he fails to acknowledge that Sterling would have been out of capital compliance even in the "but-for" world. DX 422.

Sterling also claims, without supporting evidence, that the Government violated the injunction and improperly forced Sterling to comply with the enjoined restrictions. Sterling Memo at 22-24. This claim is undermined by the thrift's contemporaneous conduct. While the injunction was in place, Sterling never alleged that the Government had failed to comply with the injunction. Sterling's decision not to challenge the Government's conduct while the injunction was pending demonstrates that Sterling either believed the Government was acting within the parameters of the injunction, or that any transgressions were not material.

Further, Sterling provides no evidence that the Government violated the injunction. Instead, Sterling misstates the record by citing to the Government's pre-injunction restrictions that the injunction rendered unenforceable. See, e.g., P-247, P-248, P-255, P-256, P-258, P-266, P-273). Sterling also "cherry picks" documents from the record and misstates their contents. Sterling Contentions at 36-37. For example, Sterling relies upon a June 5, 1990, letter from an OTS official indicating that Sterling would be required to report activity inconsistent with the restrictions imposed prior to issuance of the injunction. P-277. On its face, the letter demonstrates that Sterling was permitted to engage in those activities, or there would be no need for such a report. Further, Sterling fails to acknowledge that, in response to Sterling's request for clarification of the requirement, the author, Ms. Carol Friend, expressly stated that OTS intended to "strictly obey" the district court's injunction. P-279. Officials of the other regulatory agency

responsible for Sterling, the FDIC, also complied with the injunction. P-285, P-288. In fact, the FDIC, without knowledge of the injunction, attempted to enforce one of the restrictions affecting brokered deposits, and, upon learning of the injunction, reversed its decision and affirmatively determined that Sterling did not fit the definition of an "undercapitalized depository institution" notwithstanding its noncompliance with its regulatory minimums. P-288; compare P-285..

Sterling also cites to OTS's transmittal of a report of examination assigning Sterling a rating of "5," which was the lowest rating available. Sterling fails to acknowledge, however, much less dispute, that the 1990 exam report that was the subject of the transmittal letter expressly stated the following:

> [Sterling's] overall capital position is considered poor even after giving full consideration and effect to the provisions of the November 1985, April 1988 and December 1988 acquisitions related agreements. Management maintains that the capital standards mandated by [ ] FIRREA do not apply to Sterling because of the association's prior "agreements" with the FSLIC/FHLBB. The Board and management have filed a lawsuit against OTS and FDIC in an effort to enforce their position and a preliminary injunction has been issued by the United States District Court enjoining the OTS from taking actions inconsistent with its order. Were OTS permitted to apply the FIRREA-mandated capital requirements, the association would not be in a capital compliant position.

DX 496, p. 1.1. As demonstrated above, OTS was mindful of the district court's prohibition against taking any action for noncompliance with FIRREA's capital requirements.

In 1991, Mr. Edwin Hedlund, Deputy Regional Director of the OTS office that supervised Sterling, acknowledged that the injunction prohibited OTS from taking action inconsistent with the goodwill contracts regardless of the examination rating assigned to Sterling. DX 998. None of the evidence cited by Sterling in its memorandum of contentions at pages 36-37 is at odds with

this fact. Therefore, Sterling has not demonstrated that it suffered damage after the issuance of the district court's injunction.

### 3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities

In its contentions of fact and law, Sterling claims that the breach forced it to forgo profitable opportunities by (1) shrinking, (2) driving away existing and potential customers, and (3) preventing Sterling from pursuing potential acquisitions. Sterling's Contentions at 26-27. As demonstrated above, the district court's injunction and Sterling's replacement of the contractual goodwill in 1991 preclude such a claim. Even absent those factors, however, Sterling cannot establish that the breach caused any lost business opportunities because the record does not support Sterling's contention.

With respect to potential acquisitions, the evidence will show that, while Sterling considered many potential acquisitions over the years, chief financial officer Daniel Byrne and chief executive officer Harold Gilkey do not know whether the breach was a factor in the decision by Sterling or the acquisition target not to move forward. See, e.g., Gilkey Deposition, June 6, 2000, pp. 511-13; Deposition of Daniel G. Byrne, July 10, 2000, pp. 615-627; see also Citizens Fin'l Servcs., FSB v. United States, 64 Fed. Cl. 498, 508 (2005)(rejecting lost profits model proffered by Dr. Horvitz notwithstanding evidence of potential acquisitions due to absence of evidence establishing that breach prevented acquisitions from occurring), aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006).

Further, the evidence will show that Sterling personnel do not know exactly how many customers left due to the breach. Deposition of Thomas M. Beil, July 9, 2002, pp. 22-61;

Deposition of Cajer Neely, June 26, 2002, pp. 65-80. While Sterling did shrink after the enactment of FIRREA, the vast majority of the shrink occurred after the injunction was in place, thus undercutting Sterling's claim that the breach caused the shrink. Further, even if that were true, this Court has previously rejected a lost profits model based upon assumptions similar to Dr. Horvitz's because the fact of the shrink did not provide the "missing elements" of the model, i.e., the business opportunities that would have been pursued absent the breach. Fifth Third, 55 Fed. Cl. at 242.

Consequently, Sterling cannot demonstrate that the breach caused its alleged lost profits.

**E. Dr. Horvitz's Damages Estimates Are Speculative**

"In order for [a lost profits] claim to satisfy the reasonable certainty standard, the proof relied upon must be rooted in fact." Castle v. United States, 48 Fed.Cl. 187, 206 (2000), aff'd, 301 F.3d 1328, 1338 (Fed. Cir. 2002). In his model, Dr. Horvitz claims that, but for the breach, Sterling had $15.557 in contractual goodwill to increase its asset base up to $427 million larger than the level actually maintained. Dr. Horvitz concludes that these hypothetical assets would have produced the same rate of return Sterling's actual assets, resulting in $58.1 million in incremental earnings. DX 1046, Exh. 6, Table 1

Dr. Horvitz's assumptions regarding asset selection, growth rate, and the thrift's profitability render Sterling's damage claim speculative and unreliable as a matter of law.

**1. Dr. Horvitz's Model Is Invalid Because He Fails To Identify The Assets And Liabilities That Would Have Been Obtained Absent The Breach**

Dr. Horvitz's conclusion that Sterling's asset base would be up to $427 million larger absent the breach is speculative as a matter of law because he does not identify the assets that

Sterling would have acquired absent the breach or the liabilities that would have funded those claimed incremental costs.

Dr. Horvitz did not determine the specific asset mix in the "but for" world. Deposition of Dr. Paul Horvitz, December 6, 2001, p. 340. Indeed, he made no effort to construct the assets or liabilities of the "but for" thrift. Id. at 340-42, 404. Thus, Dr. Horvitz merely assumes, without analyzing what the assets would have been or whether they would have been available, that Sterling would have acquired up to $427 million in additional assets absent the breach.

Further compounding the model's speculative nature is Dr. Horvitz's incorrect assumption that, in the but-for world, Sterling would have operated unfettered by the breaching provisions of FIRREA, while all of Sterling's competitors would have been constrained. Thus, Dr. Horvitz assumes that, in the but-for world, Sterling would have had more regulatory capital, while its competitors would not, as FIRREA's provisions would have applied to them. Id. at 356. Moreover, although Sterling operates in a competitive market, Dr. Horvitz made no effort to determine whether the presence of Sterling's competitors in the market would have affected its ability to expand its asset base. Id. at 365-68, 381-83.

As the Supreme Court has observed, "nothing . . . . requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999), (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Here, Dr. Horvitz simply assumes that Sterling would have achieved up to $427 million in additional growth absent the breach, and earned the identical return on the additional assets that the actual bank earned, with absolutely no determination, or even an

attempt to determine, how that growth would have been achieved.[12] This renders his model invalid as a matter of law because he merely assumes that the but-for thrift would have replicated Sterling's rate of return in the real world, but with a significantly larger asset base. There is no evidence or basis upon which to support Dr. Horvitz's assumption. See Fifth Third, 55 Fed. Cl. at 241 (rejecting, upon summary judgment, a model nearly identical to Dr. Horvitz's because the expert failed to identify the investments or opportunities foregone by the thrift); Southern National Corp. v. United States, 57 Fed. Cl. 294, 304-06 (2003) (same); see also Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 115 (2004) (rejecting lost-profits claim because plaintiff could not prove that it would have acquired more assets absent the breach); Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 279-81, 285 (same). In fact, Dr. Horvitz's lost profits models have been rejected in every Winstar-related case in which they have been presented. See, e.g., Citizens Fin'l, 64 Fed. Cl. at 513-14; Southern California Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598, 625-27 (2003), aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir. 2005).

Sterling does not dispute that Dr. Horvitz's model lacks the elements specified above. Instead, it claims that the model is impervious to criticism because Sterling has been profitable,

[12] Dr. Horvitz acknowledges that, in 1993, if Sterling had replicated its actual experience, by growing assets through the purchase of mortgage-backed securities, the incremental assets would not have earned the same rate as the actual assets. Horvitz Deposition, December 6, 2001, p. 451; DX 1051, pp. 50-52. Consistent with this concession, in Citizens Fin'l, 64 Fed. Cl. at 513-14, the Court's rejection of Dr. Horvitz's model lost profits model was based in part upon its finding that, as a matter of economics, incremental assets do not earn the same rate of return as actual assets. Further, Sterling has acknowledged that the acquisition of new assets and liabilities can be adversely affected by competition, which affects returns. P-85, p. 27; DX 725, p. 5. Finally, regulators noted that Sterling's efforts to increase deposits would require the payment of higher interest rates on those deposits. DX 287, p. L-4.

and "many of the [Winstar] plaintiffs had a history of operating losses." Sterling's Contentions Memo at 32. Relying upon its assumption that profitability is the sole prerequisite to a lost profits claim, Sterling contends that its claim is insulated from dismissal. Id. at 25-26. This contention ignores the Fifth Third, Southern National and Standard Federal opinions, in which the Court rejected, upon summary judgment, damages models nearly identical to Dr. Horvitz's because the expert estimated damages by assuming that the additional assets and liabilities acquired by the "but-for" bank would be as profitable as the actual bank, without addressing the composition of the purported forgone assets and liabilities.[13] Moreover, it ignores Citizens Financial, and SoCal, wherein the Court rejected models, created and presented by Dr. Horvitz, that are virtually identical to the model advanced here on Sterling's behalf. Finally, Sterling's reliance upon the recent decision in First Fed. Sav. and Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106 (Fed. Cir. 2007), is misplaced.

#### a) Fifth Third, Southern National And Standard Federal Are Indistinguishable From This Case

In Fifth Third, plaintiff's expert estimated lost profits using the same methodology employed by Dr. Horvitz here - - he merely used the contractual goodwill eliminated by FIRREA to "lever" up the but-for bank's assets and assumed a rate of return, or profitability, lower than that experienced by the actual bank. 55 Fed. Cl. at 228. The Court, in granting summary judgment to the Government, acknowledged that the plaintiff was profitable. Id. at 241.

[13] In addition, this assumption ignores the American Fed. decision, in which the Court did not expressly address profitability, but rejected, upon summary judgment, the lost profits model advanced by plaintiff's expert because, like Dr. Horvitz, he "did not 'try to identify specific [profitable] opportunities of one kind [or] another'. . .[r]ather, he alleged only that American Federal would have leveraged its lost regulatory capital to 'support additional earnings assets' that would have generated profits." American Fed., 68 Fed. Cl. at 358.

Moreover, there was evidence that the thrift intended to invest, in the "but-for" world, in the same types of assets and liabilities in which it had invested in the actual world, which is consistent with what Dr. Horvitz assumes. Id. at 240-41. The expert in Fifth Third was actually more conservative than Dr. Horvitz. The Fifth Third expert, unlike Dr. Horvitz, assumed a level of profitability that was less than the actual bank's actual return on assets. Id. at 228.

The Fifth Third Court also assumed, for purposes of the motion, that the plaintiff shrank in response to the breach, and recognized that the plaintiff thrift was forced to sell one of its divisions, a claim similar to Sterling's allegation that it shrunk and lost customers in response to the breach. Id. at 228, 242. Nonetheless, the Court granted summary judgment to the Government because that evidence did not satisfy plaintiff's burden of showing "what investments it would have made or activities in which it would have engaged in a hypothetical world without FIRREA and with its competitors restored to the real-world banking environment." Id. at 242.

Similarly, in Southern Nat'l, the plaintiff's expert based his lost profits projection upon the actual thrift's profitability, and assumed, like Dr. Horvitz in this case, that, in the "but-for" world, the thrift would invest in the same types of assets and liabilities that it had relied upon to earn profits in the actual world. 57 Fed. Cl. at 303-04. In Southern Nat'l, lost profits would not have been generated by the model if the actual thrift had not been profitable, yet the Court granted summary judgment to the Government because the plaintiff's model did not reveal how the thrift would have acquired the additional assets absent the breach. Sterling does not deny that the models used by the experts in Fifth Third and Southern Nat'l are similar to, and perhaps

better than, Dr. Horvitz's model. Therefore, the Court should reject Dr. Horvitz's model for the same reasons.

Standard Fed. addressed a similarly inadequate lost profits model. In that case, plaintiff's expert projected profitability by the "but-for" bank similar to that enjoyed by the actual bank. 62 Fed. Cl. at 276-77. Nonetheless, the Court granted summary judgment to the Government, after limited testimony by the experts, because the model utilized merely assumed growth without identifying specific opportunities for growth. Id. at 277.

Here, Sterling boasts that, notwithstanding the breach, it has experienced growth from under $1 billion in assets to over $12 billion due to "aggressive" growth strategies. Sterling Contentions at 1, 38. Nonetheless, it claims that, notwithstanding this "aggressive" approach, the addition of only $15 million in goodwill, a nonearning asset, would have added, over a period of time, as much as an additional $427 million in assets and in excess of $58 million in additional profits. Dr. Horvitz's failure to identify the additional assets and liabilities Sterling would have acquired notwithstanding its already "aggressive" approach renders his model speculative as a matter of law. Further, the speculative nature of his model is magnified by his assumption that Sterling never replaced a single dollar of that $15 million in nonearning assets notwithstanding the fact that it raised in excess of $500 million in new capital between 1991 and 2006. DX 1046, Exh. 6, Table 2a. Given these errors, Dr. Horvitz's lost-profits model is insupportable.

**b) Dr. Horvitz's Lost Profits Model In This Case Suffers From The Same Flaws As The Models Proffered In Citizens Financial And SoCal**

Dr. Horvitz presented a lost profits model in Citizens Fin'l that is virtually indistinguishable from the one presented in this case. In Citizens Fin'l, he assumed that there

were unlimited assets and liabilities available to enable the plaintiff thrift to leverage all of its capital and realize a 1.1 percent return. The Court rejected the model because Dr. Horvitz failed to identify the assets and liabilities that would support such growth, and he failed to take into account the well-established principle that returns on incremental assets cannot emulate returns on existing assets. 64 Fed. Cl. at 511-512. Under that principle, economists assume that a thrift buys the most profitable assets first; thus, any incremental assets are expected to be less profitable than those already held. DX 1051. Nevertheless, Dr. Horvitz opined in Citizens Fin'l, that the structure of the forgone asset portfolio did not matter, and that the returns he projected would be earned "regardless of what the combination of assets is." Id. at 512. The Court rejected his model on the grounds that it was too speculative, and, in so holding, reasoned that the model suffered from the same flaws that resulted in rejection of similar models upon summary judgment in Fifth Third, Southern Nat'l, and Standard Fed. Id. at 513-14

Similarly, in SoCal, the Court rejected a lost profits model, presented by Dr. Horvitz, that had much in common with the model he has generated in this case. Specifically, the SoCal model assumed the acquisition of incremental assets and liabilities and applied a rate of growth without establishing that the assets and liabilities were available or that profits would have been realized upon the incremental assets. SoCal, 57 Fed. Cl. at 625-27. In that case, plaintiffs alleged, as Sterling does here, that Dr. Horvitz's approach was "conservative," Sterling Contentions at 32-34, but the Court rejected the model nonetheless because it was based upon speculation. SoCal, 57 Fed. Cl. At 626. In SoCal, the Court found that Dr. Horvitz's growth projections were unrealistic. Id. In this case, it is equally speculative for Dr. Horvitz to claim that, notwithstanding nearly $500 million in capital raising and growth from $700 million in

assets to $12.5 billion between 1989 and 2006, the mere addition of $15 million in goodwill would have facilitated up to $427 million in additional growth and $58.1 million in additional earnings. Further, even assuming that Dr. Horvitz is correct in concluding that an additional $15 million in capital would have resulted in $58.1 million in additional profits, it is pure speculation for Sterling to claim that it was unable to attract investors, including its own holding company, to infuse the capital required to achieve such profits.

#### c) First Federal of Rochester Is Inapposite

Sterling's reliance upon First Fed. of Rochester is misplaced for several reasons. First, First Fed. of Rochester is not yet final. Second, in First Fed. of Rochester, the plaintiff's expert, unlike Dr. Horvitz, actually identified the assets and liabilities that would have been acquired absent a breach. 76 Fed. Cl. at 116-17. Third, in First Fed. of Rochester, the Court found that the thrift, which possessed over $6 billion in assets prior to the breach, would have grown by in excess of $400 million in 1989 alone. Id. at 117. Based upon this finding, the Court awarded approximately $26 million of lost profits damages. Here, Sterling claims lost profits of $58.1 million based upon an assumption that, absent the breach, it would have grown by $11 million prior to 1990. DX 1046, Exh. 6, Table 1. Further, Sterling, unlike First Federal of Rochester, obtained an injunction prohibiting the Government from taking action inconsistent with its alleged contracts. Thus, this case has nothing in common with First Fed. of Rochester.

### 2. Dr. Horvitz's Growth Rate Is At Odds With Sterling's Underusage Of Its Leverage Capacity In The Actual World

Dr. Horvitz's model assumes that Sterling has always used all of its ability to leverage, and would have had further capacity to do so if it had retained the contractual goodwill. This is

contrary to Sterling's track record, which demonstrates that Sterling has experienced difficulty in acquiring assets due to competition and lack of supply. See, e.g., DX 1051, pp. 35-36, DX 709, p. WON920 1291; DX 706, p. WON920 1294; DX 711, p. WON935 2211; DX 710, p. WON935 2182; P-81, pp. 6,7, 37; P-83, pp. 7, 34; P-85, pp. 2, 3, 24; DX 738, p. WON935 1503. Dr. Horvitz's counterfactual assumptions regarding Sterling's use of leverage render his model speculative.

**3. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits**

Dr. Horvitz also assumes that increased assets in the "but for" world will result in increased profits. This is contrary to this Court's holdings and to Sterling's actual experience. In SoCal, the Court rejected Dr. Horvitz's lost profits model in part because it found this assumption to be speculative. 57 Fed. Cl. at 626 (". . .most importantly, growth does not necessarily equal profits.").

Moreover, Sterling's own financial statements demonstrate that, between 1990 and 1991, Sterling shrank its assets by $140 million, but nonetheless increased its income by nearly $300,000. DX 1051, p. 44; P-82, p. 1. Thus, Sterling's actual experience demonstrates that Dr. Horvitz's assumption is invalid.

**4. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative**

Prior to the Court's recent holding that FIRREA's elimination of Sterling's noncontractual Central Evergreen goodwill from regulatory capital was not a breach, Dr. Horvitz estimated lost profits damages at approximately $80 million. That estimate was based, in part, upon his assumption that, absent the breach, Sterling would have maintained regulatory capital at the levels projected in its pre-breach capital plan. DX 1044, p. 3. In his most recent report, Dr.

Horvitz generates $58.1 million in damages, even assuming that the Central Evergreen goodwill was not contractual. This new estimate depends, in part, upon his new assumption that, absent the breach, Sterling would have maintained regulatory capital at levels lower than the levels specified in the pre-breach business plan. Absent this assumption, Dr. Horvitz's damages estimate would be reduced by 70 percent. DX 1052, p. 30.

Dr. Horvitz attempts to justify this new assumption on his belief that, in a "but for" world in which the Central Evergreen goodwill did not count as capital, Sterling would have maintained less regulatory capital. DX 1046, p. 3. This claim is speculative. Sterling has provided no factual basis to conclude that its capital level in a "but for" world wherein all goodwill counted toward capital would be different from that maintained in a "but for" world in which only the Tri-Cities and Lewis Federal goodwill counted as capital. Therefore, Dr. Horvitz's assumption is baseless.

Further, as a matter of finance and economics, Sterling would not have reduced the level of capital it maintained in the face of the elimination of the Central Evergreen goodwill from capital. In doing so, Sterling would have increased its level of risk with no guarantee of increased profitability. DX 1052, pp. 34-36.

## III. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES AS A MATTER OF LAW BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL

In an expert report initially issued on January 9, 2004, Sterling's expert, Professor Christopher James, offered a "mitigation" theory for measuring damages. This theory merely recycled a hypothetical model of damages that Sterling has chosen not to pursue at trial because

it is barred by precedent of the Federal Circuit and this Court. See footnote one above. Apparently in recognition that this theory is flawed, Sterling has devoted only one conclusory contention of fact[14] and one footnote in its contentions of law in support of the claim. The footnote implies that the theory is not an appropriate, alternative measure of damages. Sterling's Contentions at 38, n.1. For this reason alone, Sterling should not be permitted to present this "cost of replacement" theory of damages.

If the Court considers this claim, then the Court should reject it because, conceptually, the claim is indistinguishable from the "hypothetical" replacement cost theory that Sterling has abandoned. Instead, Sterling should be awarded only the transaction costs it incurred in replacing its goodwill. DX 1051, p. 21.

Sterling's "mitigation" theory, which purports to measure Sterling's actual costs of replacing its goodwill, acknowledges that Sterling successfully raised approximately $21 million of regulatory capital in the form of common stock, and converted $2.1 million of Series B preferred stock to common stock, in November of 1991. DX 1045, pp. 5-6. Further, it is undisputed that, after the 1991 capital raising, Sterling achieved compliance with all of the FIRREA's required capital ratios. P-84, p. 2. In fact, Professor James quotes the offering circular for the 1991 common stock offering, which states that the primary purpose of the offering was "'to increase Sterling's regulatory capital levels." DX 1045, p. 5.

---

[14] The contention of fact states: "The cost of the 1991 capital raising was $14.152 million." Dr. James's report also includes a future lost profits component, for $641,000 in damages, that has been adopted by Dr. Horvitz. Sterling's Contentions at 20. Dr. James's lost profits estimate is invalid for the same reasons provided above in response to Dr. Horvitz's model. Professor James also incorporates the "wounded bank" damages into his estimate, although he provides no analysis to support the damages, and merely relies upon their inclusion in Dr. Horvitz's report; those damages should not be awarded for the reasons set forth below.

In calculating damages, however, Professor James does not attempt to calculate the actual costs associated with the common stock offering that occurred in 1991, except to the extent that he includes transaction costs in the measure of damages. Further, he does not acknowledge that Sterling achieved regulatory compliance, in part, merely by converting $2.1 million of existing preferred stock to common stock at no cost. Instead, he assumes that Sterling issued preferred stock with a set coupon rate in 1991. Professor James then calculates damages based upon this hypothetical preferred stock offering, using a methodology nearly identical to the hypothetical replacement cost theory that Sterling has abandoned.[15] DX 1045, p. 11.

Sterling achieved capital compliance with the 1991 offering, and, in raising $23 million, raised far in excess of the $13.3 million of contractual goodwill remaining at that time. DX 1047, Exh. G. Nonetheless, Professor James assumes, for purposes of calculating damages, that $12 million of the $21 million raised through the common stock offering should be ignored because Sterling had unsuccessfully attempted to raise that amount of capital in 1989. DX 1045, p. 10. He also allocates a portion of the 1991 proceeds to replacement of the noncontractual Central Evergreen goodwill. DX 1047, pp. 6-7. Based upon these faulty assumptions, he then assumes that a portion of a preferred stock issuance by Sterling's holding company, Sterling Financial Corporation, in 1993 was also an act of mitigation, and attributes damage to that capital raising. Id.

This theory does not fare any better than plaintiff's abandoned hypothetical replacement cost of capital theory. First, basic financial economics recognizes that investment in securities

[15] Sterling's hypothetical cost of replacement theory is detailed in Dr. James's 2001 expert report. DX 1037.

has zero net present value. DX 1051, p. 80. This principle has been affirmed by the Federal Circuit in both Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 401-02 (1999), aff'd in part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001), and CalFed, 245 F.3d at 1350. Therefore, assuming Sterling actually replaced the regulatory capital eliminated by FIRREA, the only damages it is entitled to are the transaction, or flotation, costs associated with the capital raising, as acknowledged by the Government's expert. DX 1051, p. 102; see CalFed, 245 F.3d at 1350; see also Bank United, 50 Fed. Cl. at 665. Second, Professor James's theory is entirely hypothetical, rather than reflecting actual costs, and should be rejected upon that basis.

### A. Professor James's Mitigation Theory, Which Is Based Upon The Payment of Preferred Stock Dividends, Should Be Rejected Because The Only Costs Associated With Raising Capital Are Transactions Costs

Professor James has admitted that, in general, capital raising does not involve any cost to the issuer except transaction costs. Deposition of Professor Christopher James, November 26, 2001, pp. 139-41. He makes an exception, however, for capital that is raised to replace goodwill, purportedly because the goodwill did not require dividend payments. Id. This exception is baseless as a matter of both law and economics. Sterling's hypothetical model conflicts with bedrock corporate finance principles, affirmed by the Federal Circuit, establishing that the value of expected dividend or interest payments on capital raised as a cost, and the value of having cash in place of goodwill as a benefit, offset one another on the date of issuance, save transactions costs. CalFed, 43 Fed. Cl. at 460-61 ("[o]n the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs."), aff'd in part, 245 F.3d at 1350 ("the value of the cash proceeds of Cal Fed's newly-raised capital equaled the cost of future dividends"); Glendale, 43 Fed. Cl. at 401-02.

In other words, basic financial economics recognizes that investment in risky as well as risk-free securities has zero net present value. DX 1051, pp. 65-66. To the extent that Dr. James ignores this principle, he is at odds with Dr. Horvitz, who acknowledges that capital market transactions occur at zero net present value, and there is no money to be made or lost by financing market rate assets with market rate liabilities. Horvitz Deposition, December 6, 2001, pp. 448.

Like the cost-of-replacement models this Court rejected in other Winstar-related decisions, Sterling's cost-of-substitute-capital model generates estimates that suggest damages are nearly equal to the total amount of contractual goodwill excluded from Sterling's regulatory capital. Professor James's model estimates the hypothetical cost of raising $13.3 million in capital as approximately $10 million. DX 1047, p. 7, Exh. G. In other words, a dollar of goodwill is worth nearly a dollar in cash. In Bank United, this Court recognized that a model generating estimated costs of substitute capital at even 50 cents on the dollar was "absurd on its face." Bank United, 50 Fed. Cl. at 655-56. Thus, the Court should reject Professor James's "absurd" model because the only damages related to raising the replacement capital are transaction costs. Consequently, Sterling is entitled to no more than the transaction costs associated with replacement of its contractual goodwill.

### B. The Court Should Reject Professor James's Mitigation Damages Theory Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost

Even assuming that, under certain circumstances, the actual cost of raising replacement capital can exceed transaction costs, LaSalle, 317 F.3d at 1374-75, Sterling cannot meet the

standard established by the Federal Circuit in LaSalle because the costs asserted here are not "actual."

This Court has rejected upon summary judgment alleged "actual" cost of replacement theories where the plaintiffs calculated "actual" damages by assuming a strategy that was not the one chosen by the thrift to replace regulatory capital lost due to FIRREA. For instance, in Granite, 58 Fed. Cl. at 777, the Court rejected a purported "actual" cost of replacement model that was "inconsistent with the manner in which plaintiff allegedly replaced its supervisory capital. . . ." In that case, the thrift replaced regulatory capital through a cash infusion from its parent company, while its cost of replacement model was based upon a hypothetical preferred stock issuance. Id.

Similarly, in Citizens Fin'l, 57 Fed. Cl. at 71, the Court rejected a "hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy." In that case, the plaintiff mitigated damages and achieved regulatory capital compliance by shrinking, but plaintiffs constructed a hypothetical replacement cost of capital theory for achieving regulatory capital compliance. Id. at 71-72. The Federal Circuit's decision in LaSalle further supports dismissal of Sterling's hypothetical model. While rejecting the trial court's conclusion that dividend payments could not be a "cost of capital" merely because they are not legally obligatory, the Federal Circuit expressly agreed with the trial court's rejection of plaintiff's replacement capital calculations that were not based on actual payments:

> We too do not adopt this calculation, for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

LaSalle, 317 F.3d at 1375 (emphasis added); see also Franklin Federal, 55 Fed. Cl. at 134-39 (dismissing hypothetical cost of replacement theory upon summary judgment after recognizing Winstar authority rejecting these models as "absurd on their face," "not credible," and "inherently odd"); Columbia First , 54 Fed. Cl. at 697-99 (rejecting cost of replacement theory at summary judgment because it was hypothetical and not based on costs actually incurred); see also Bank United, 50 Fed Cl. at 655-56.

Here, plaintiffs achieved regulatory compliance in 1991 by raising approximately $21 million in common stock and converting $2.1 million of preferred stock to common stock. In his expert report, Professor James concedes that "Sterling has not paid cash dividends on any of its common stock, including the common stock issued in 1991." DX 1045, p. 11. He then asks the Court to "consider if instead Sterling had issued preferred stock in 1991 with a stated dividend rate (just like it did in 1993)." Id. This hypothetical model, which assumes a preferred stock issuance that involved dividends, does not present the actual costs of mitigation, and must be rejected. If, in fact, there were costs, over and above transaction costs, associated with the 1991 common stock offering, then Professor James would not ask the Court to “consider instead if Sterling had issued preferred stock in 1991.” DX 1045, p. 11.

While the dividend rate utilized in Professor James’s model to measure the cost of the 1991 common stock offering is based upon an actual preferred stock offering in 1993, this fact does not distinguish this case from the cases in which the Court has rejected hypothetical costs of

replacement. In a prior decision, this Court considered a Winstar plaintiff's contention that its hypothetical model was valid because it was based upon an actual capital raising. Granite, 58 Fed. Cl. at 779. The Court rejected the argument, and the model, because the Court determined that, with respect to the actual replacement capital, the plaintiff was not required to pay dividends, nor had it paid any dividends. Therefore, plaintiff was not entitled to damages. Id. The Federal Circuit affirmed that holding. Granite, 416 F.3d at 1381-82.

Professor James's reliance upon nonexistent preferred stock dividend payments as a basis for damage is equally invalid with respect to Sterling's conversion of $2.1 million of preferred stock to common stock. Sterling raised the $2.1 million in preferred stock prior to FIRREA's enactment, and, in 1991, converted the preferred stock, which paid dividends, to common stock, which did not. Therefore, Professor James's assumption that this conversion of capital that Sterling already possessed resulted in damage is groundless.

Finally, Professor James's attempt to create damages by assuming that part of Sterling's 1993 preferred stock offering constitutes mitigation, when Sterling had already achieved capital compliance in 1991 through its common stock offering and conversion of preferred stock to common stock, is incorrect. As a preliminary matter, the Court should reject as baseless Professor James's claim that $12 million of the $21 million in capital raised in 1991 should be disregarded because it was intended to replace a capital offering that would have occurred in 1989 absent a breach. There is absolutely no evidence that the purpose of the 1991 common stock offering was to replace previously abandoned efforts. Sterling's Contentions at 8-9. Further, Sterling has maintained that the 1989 offering failed because the Government breached a contractual obligation to permit it to pay preferred stock dividends. That argument is now

foreclosed, as the Court determined that Sterling never received a contractual promise that it would be permitted to pay such dividends. Sterling, 53 Fed. Cl. at 615.

Similarly, it is clear that the purpose of the 1993 preferred stock offering was not to replace contractual goodwill eliminated by FIRREA. The prospectus for the offering stated that, as of September 30, 1992, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." P-316, p. 10. Consequently, Professor James's attempt to create "actual" damages by assuming that part of the 1993 offering was a mitigation effort is meritless. Thus, the Court should reject Professor James's mitigation model as a matter of law.

### C. Even Were The Court To Award Sterling Its Claimed Cost-Of-Replacement Damages, It Is Not Entitled To A Tax "Gross-Up"

Professor James's mitigation model assumes that, because cost-of-replacement damages would be taxed upon receipt, those damages must be "grossed up" to place Sterling in the same position it would have occupied absent the breach. DX 1045, pp. 12-13. Professor James, however, is not a tax expert and does not opine upon whether the damages would be taxable; instead, he merely states his "understanding" regarding taxability. Further, Sterling has offered no evidence, nor has it proffered a witness to provide the tax expertise to support such an assumption, notwithstanding its clear burden to establish such taxability. Bank of America, 67 Fed. Cl. at 596-97, citing Citizens Fed. Bank, FSB v. United States, 59 Fed. Cl. 507, 521 (2004) (plaintiff must establish gross-up is necessary to make plaintiff whole, that it is taxable, and the appropriate rate). Such expertise is critical in this case, in which Sterling concedes that it has never paid dividends on its 1991 common stock offering. Therefore, Sterling cannot prove that it

ever paid dividends that were exempt from tax. Moreover, we reserve the right to amend our witness list in the event that Sterling attempts to offer such expertise.

In any event, consideration of such a tax "gross up" is premature, and should not be considered by the Court unless Sterling is actually awarded cost of replacement damages on a post-tax basis and can demonstrate that taxes were actually assessed with respect to such damages. See, e.g., Bank of America, FSB v. United States, 70 Fed. Cl. 246, 251-53 (2006); Suess v. United States, 74 Fed. Cl. 510, 514-15 (2006).[16] Accordingly, Sterling's request for that any award of replacement costs occur on a pre-tax basis, resulting in a tax "gross-up," should be denied.[17]

## IV. PLAINTIFFS' ALLEGED WOUNDED BANK CLAIMS FAIL AS A MATTER OF LAW

To recover wounded bank damages, plaintiffs must meet the requirements of reasonable certainty, foreseeability, causation, and mitigation. Wells Fargo Bank v. United States,, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951)). In Coast, 48 Fed. Cl. at 434-41, the trial court rejected plaintiffs' wounded bank claim for increased deposit costs upon summary judgment where plaintiff failed to demonstrate a causal link between the alleged damage and the breaching provisions of FIRREA.

---

[16] See also Commercial Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338, 355-56 (2004); Citizens Fed. Bank, 59 Fed. Cl. at 521-23 (rejecting "gross-up" on summary judgment in part due to uncertainty regarding taxability); Local Okla. Bank, N.A. v. United States, 59 Fed. Cl. 713, 720-21 (2004), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) (same); First Heights Bank, F.S.B. v. United States, 57 Fed. Cl. 162, 175 (2003); Centex Corp. v. United States, 55 Fed. Cl. 381, 388-89 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005).

[17] Further, we reserve the right to argue that this Court may not grant a gross-up because it lacks jurisdiction to do so and because a gross-up award is barred by the unmistakability doctrine.

Here, the plaintiffs cannot establish that the alleged wounded bank costs resulted '"inevitably and naturally, not possibly nor even probably. . . from the. . . breach."' CalFed, 395 F.3d at 1267-68.[18] Further, each of the wounded bank claims also fail to satisfy the foreseeability and reasonable certainty tests.

As a preliminary matter, each of the wounded bank claims purports to be endorsed by one of Sterling's experts, Dr. Horvitz. Dr. Horvitz, however, devoted less than one page of his expert report to the five wounded bank claims, and acknowledges that all of the calculations were performed by Mr. Byrne, Sterling's CFO. DX 1036, p. 16. Further, Dr. Horvitz has not attested to the validity or correctness of any of the wounded bank damages calculations. Horvitz Deposition, December 7, 2001, pp. 532-35. While Dr. Horvitz reviewed summaries of the claims, he did not review the underlying documentation, and he relied upon conversations with Mr. Byrne for his understanding of the nature of the claims. Id.; Horvitz Deposition, February 25, 2004, pp. 30, 31. Consequently, Sterling's wounded bank damages claims, while reviewed by Dr. Horvitz, are, in fact, the result of work performed solely by Mr. Byrne, who has been proffered by Sterling as a fact, rather than expert, witness. As demonstrated below, Mr. Byrne's "analysis" of these claims suffers from his own failure to apply proper legal principles.

---

[18] With respect to its alleged wounded bank damages, Sterling appears to argue that the "substantial factor" test rejected by the Federal Circuit in CalFed should be applied in evaluating causation, notwithstanding its concession that the CalFed test applies to its lost profits claim. Sterling's Contentions at 27-28; compare p. 25. This claim is contrary to prior rulings of the Court. Franklin Federal, 55 Fed. Cl. at 124-26 (wounded bank damages may be awarded only if they are proximately caused by the breach); LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 97 (1999), aff'd in part, vacated in part, 317 F.3d 1363 (Fed. Cir. 2003) (wounded bank damages may be awarded if they would not have been incurred but for the breach). Further, as demonstrated above, at p. 27 n.10, while the "but for" standard is the correct test, application of a "substantial factor" test would not result in Sterling's satisfaction of the causation prerequisite to an award of damages.

**A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank**

Sterling alleges that the Government's alleged breach of a contractual obligation to permit goodwill to count as regulatory capital prevented it from purchasing a branch of Great American Savings Bank in 1989 for $61,000, and caused it to purchase the branch in 1994 or 1995 at a cost of $1.892 million, resulting in damages of $1.835 million. DX 1044, Exh. 8; DX 1051, pp. 58, 59. This claim is meritless. First, as a matter of causation, Sterling has provided no documentary evidence establishing that the branch of Great American Savings Bank was available for a purchase price of $61,000 in 1989, or that the Government had any role in Sterling's decision not to purchase the branch. Further, Sterling's has not alleged that the breach caused it to purchase the branch in 1994; that was an independent business decision. Consequently, the Court should reject this claim.

Even if the causation hurdle could be overcome, however, Sterling cannot not establish that damages resulting from an inability to purchase a branch of Great American was foreseeable by the Government at the time Sterling acquired Lewis Federal and Tri-Cities. "[F]oreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made." Prudential Ins. Co. of America v. The United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986)(citing Northern Helex, 207 Ct. Cl. 862, 524 F.2d at 714-15). In other words, foreseeability is measured by determining the intent of the nonbreaching party at the time the contract is executed, rather than at the time of breach.

Sterling does not claim that it was required to purchase branches as a condition of its acquisitions in this case, or that the Government was on notice that it intended to buy branches.

Consequently, neither Sterling's alleged inability to buy a branch after the enactment of FIRREA, nor its decision to buy the branch five years later at a price allegedly 6,203 percent higher than the original purchase price, DX 1051, pp. 58-59, could have been foreseen by the Government, and this claim for damages must fail as a matter of law. See Bank of America, 67 Fed. Cl. at 595-96 (no wounded bank damages when Government could not have foreseen that thrift would, after the enactment of FIRREA, enter into independent business obligation that would cause loss).

Third, Sterling's claim that it incurred a 6,203 percent increase in the purchase price of the Great American branch must fail because it does not meet the test for reasonable certainty. As a matter of simple economics, it is absurd to claim that an increase in the purchase price of the branch is damage when we have no information about the branch’s relative values during the two periods at issue. For instance, even if the branch ultimately acquired was, in fact, worth $61,000 in 1989, Sterling has provided no information supporting its apparent assumption that the increase in value was attributable to pure appreciation, rather than substantial investment in the branches by the previous owner. In fact, Dr. Horvitz admitted that he did not know whether the branch ultimately acquired would have been operated in the same way, and whether the same value would have accrued if Sterling had purchased it in 1989. Horvitz Deposition, December 7, 2001, pp. 533-35. Further, Sterling has provided no evidence establishing that any thrift, much less the Great American branch, appreciated by six thousand percent between 1989 and 1994 or 1995.

Moreover, Sterling's simplistic claim ignores the fact, as noted above, that Sterling was not required to buy the branches; consequently, when it decided to purchase one of them in the

1994-95 time period for $1.892 million, the branch must have been worth that amount to Sterling.[19] Therefore, Sterling incurred no damage, and its wounded bank claim raised in connection with the Great American branch must be rejected as a matter of law.

### B. Losses Incurred In Connection With The CJ-4 Loan Are Not Attributable To The Breach

Sterling's claim with respect to the CJ-4 Loan also fails to meet all three legal prerequisites to an award.

Sterling claims that its inability to advance additional funds to a borrower on a loan known as the "CJ-4 Loan" forced the loan into foreclosure, resulting in a loss of $1.241 million. DX 1044, Exh. 8; Compl. ¶7.8(g). Sterling claims that it was unable to advance additional funds due to certain loan-to-one-borrower limitations Deposition of Daniel G. Byrne, December 5, 2001, pp. 70-71.

With respect to causation, it is undisputed that Sterling's Loan Committee approved the initiation of foreclosure in November 1989, prior to the date that the regulations implementing FIRREA went into effect. DX 1040, p. 35; DX 943. Further, between the date the loan was first advanced, March 15, 1988, and September 1990, the property decreased in value from $3.45 million to $1.6 million. Sterling has not produced a single piece of evidence demonstrating that the losses it incurred would have been avoided absent a breach. DX 943; P-182, p. A-12.4. Thus,

---

[19] Moreover, Mr. Byrne, who calculated the alleged damages incurred by Sterling in connection with the branch purchase, when asked the basis for the difference in deposit premium between 1989 and 1994, responded that it was due to "a great job on my part to negotiate the first transaction in '89." Byrne Deposition, December 4, 2001, p. 137. Clearly, this damage claim was not the subject of objective, empirical financial or economic analysis.

the property securing the CJ-4 loan experienced massive losses completely unrelated to any Government action.

Further, Sterling's claim that it was prevented by OTS from advancing additional funds to the borrower is without basis. There is no evidence that Sterling requested, and was denied, the right to advance such additional funds. Sterling ignores the fact that the injunction obtained in May 1990 prohibited the Government from enforcing any restrictions inconsistent with Sterling's acquisition agreements. In fact, the undisputed evidence demonstrates that Sterling's examiners were aware that Sterling was considering the advance of additional funds to the borrower, and did not object. P-182, p. A-12.4; DX 943. Consequently, Sterling cannot prove that any loss on the loan was attributable to Government action.

Moreover, it could not have been foreseeable that the enactment of FIRREA would result in losses to Sterling on a loan that was in foreclosure prior to the effective date of the regulations implementing the statute.

The claim also does not meet the reasonable certainty test. Mr. Byrne, and, consequently, Dr. Horvitz, merely assume that additional incremental funding of the CJ-4 Loan would have resulted in greater returns on the investment. DX 1051, p. 57. This assumption is directly contrary to Dr. Horvitz's assertion, in calculating alleged lost profits, that, as a matter of economics, incremental returns earned on foregone assets are equal to average returns. Id. Consequently, even if Sterling were correct that the Government prevented it from advancing additional monies on the CJ-4 Loan, the assumption that the incremental investment would result in a greater return is contradicted by its own expert, Dr. Horvitz. Therefore, the Court should reject Sterling’s claim for wounded bank damages attributable to the CJ-4 Loan.

**C. Excess Supervision Costs Are Not Attributable To The Breach**

Sterling also claims $172,000 in "excess supervision costs" as wounded bank damages. DX 1044, Exh. 8. As was the case with the Great American Bank and CJ-4 Loan wounded bank damages, Sterling's sole support for these damages is the testimony of its chief financial officer, Mr. Byrne. Sterling's expert in economics, Dr. Horvitz, devotes one paragraph of his eighteen-page report to wounded bank damages, and performs no analysis of his own. He merely endorses Mr. Byrne's work based upon a review of Mr. Byrne's calculations and discussion with him.

Further, as was the case with the Great American Bank and CJ-4 Loan damages, Sterling cannot establish that the alleged excess supervision costs were caused by a breach of any of the acquisition agreements. The costs cited are all apparently attributable to examinations of Sterling, yet neither Mr. Byrne nor Dr. Horvitz attempt to determine whether the so-called excess supervision costs would have been assessed in the absence of a breach. DX 1051, p. 59. For instance, the excess supervision cost damages alleged by Sterling include costs incurred during 1995 and 1996, when it is undisputed that Sterling was categorized as a "well capitalized" thrift. DX 1040, p. 36. Further, Sterling appears to have included all of the costs associated with certain regulatory examinations performed by OTS and the State of Washington, when such examinations are routinely performed regardless of a thrift's financial condition. Id.[20]

---

[20] In his 2004 report, Dr. Horvitz reduces the wounded bank damages attributable to excess supervision costs to $172,000, a reduction from the $303,000 claimed in his original report. When asked to explain this change at his deposition, he reported only that Mr. Byrne had reduced the number by including only "excess deposit insurance premiums paid for being a problem bank." Horvitz Deposition, February 25, 2004, p. 31. Dr. Horvitz, however, provided no documentation of these costs or the process through which the adjustment occurred, and, as was the case with the $303,000 number in his 2001 Report, did not verify the numbers reported by Mr. Byrne. Id.

This claim also fails to meet the foreseeability test. When the Lewis Federal and Tri-Cities contracts were entered into, the Government could not have foreseen that a breach of those agreements would lead to increased supervision costs attributable to the elimination of the noncontractual Central Evergreen goodwill as well as the contractual goodwill.

Finally, Sterling alleges that its claim includes “FDIC assessments,” Sterling’s Contentions at 28, yet the documentation in support of this claim is devoid of any costs assessed by the Federal Deposit Insurance Corporation (“FDIC”). Consequently, Sterling cannot establish such damages with reasonable certainty.

### D. Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Units Offering Is Not Breach-Related

Sterling claims that a 1989 public offering was terminated because OTS would not preapprove the payment of dividends upon preferred stock. Sterling’s Contentions at 8-9; Compl. ¶ 7.8(b). This claim is based upon Sterling's assumption that it obtained a contractual right to pay dividends on a public offering of preferred stock when it entered into an agreement in connection with its acquisition of Central Evergreen. Sterling, 53 Fed. Cl. at 615. This damage claim is now foreclosed. As noted above, the Court has determined that Sterling was not accorded a contractual right to pay dividends on preferred stock when it acquired Central Evergreen because it "cannot point to any language in the [Central Evergreen] Agreement that stated or implied that Defendant was obliged to permit Plaintiff to do anything with respect to any stock dividends, common or preferred." Id. Indeed, plaintiffs, in requesting clarification of the Court's ruling on this issue, admitted that the absence of a contractual obligation would require an adjustment in the amount of damages claimed. Sterling Savings, et al. v. United

States, No. 95-829C, slip op., pp. 3-4 (Nov. 15, 2002). Because the Court declined to alter its holding on the issue, id., the claim is meritless.

Further, as a practical matter, the costs allegedly incurred in connection with the 1989 public offering may not be recovered because they do not meet the causation standard. In this case, Sterling's expert, Dr. Horvitz, admitted that the costs incurred in connection with the 1989 public offering would have been incurred absent the breach. Horvitz Deposition, December 7, 2001, pp. 569-70. He attempted to justify inclusion of these costs within wounded bank damages nonetheless by observing that he was advised by Mr. Byrne that the costs were charged off rather than included in the proceeds of the offering. Id. This is a distinction without meaning. Regardless of how the costs would have been treated for accounting purposes, it is undisputed that they would have been incurred in Sterling's "but-for" world. Therefore, the costs cannot be recovered as a matter of law.

**E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That Other Legal And Accounting Fees Are Attributable To A Breach**

Sterling's final wounded bank damages claim is based upon its allegation that it should be awarded $304,005.79 in legal, accounting, and insurance costs it incurred in defending against OTS's enforcement of FIRREA. Sterling's Contentions at 28. Sterling, however has admitted that a portion of these fees are attributable to fees incurred in litigating against the Government in connection with the application of FIRREA to Sterling. Byrne Deposition, December 4, 2001, pp. 128-30; Horvitz Deposition, December 7, 2001, pp. 573-75. The recovery of such fees is barred as a matter of law. Attorneys fees "incurred in litigating against the Government are not recoverable absent an express statutory provision allowing them." Franklin Federal, 55 Fed. Cl.

at 123 (citing Piggly Wiggly Corp. v. United States, 112 Ct. Cl. 391, 432, 81 F. Supp. 819 (1949)); LaSalle, 45 Fed. Cl. at 97. In Franklin Federal, the Court granted the Government summary judgment with respect to a wounded bank damages claim for attorney fees incurred in obtaining an injunction against enforcement of FIRREA. Franklin Federal, 55 Fed. Cl. at 123. Here, Sterling seeks, as wounded bank damages, legal fees incurred in obtaining an injunction and handling an appeal of the injunction. Byrne Deposition, December 4, 2001, pp. 121-30. As was the case in Franklin Federal, there is no statutory provision allowing the award of such fees, and judgment with respect to this claim should be granted in favor of the Government.

With respect to legal fees allegedly incurred for activities other than litigation, Sterling has not met its burden of establishing that such fees were, in fact, not related to litigation, and it has not established that they were caused by the breach. DX 294. Sterling's litigation counsel, Witherspoon, Kelley, Davenport and Toole, apparently rolled all of its fees, for litigation and regulatory matters, into one billing category known as "Alpha." Byrne Deposition, December 4, 2001, pp. 125-26. Further, Mr. Byrne has acknowledged that much of the work categorized as "Alpha" related either to litigation over the injunction or post-injunction legal advice. All of these fees are barred. Id. at 125-30. To the extent that any other regulatory matters were encompassed in the "Alpha" category, Sterling's records do not provide an adequate explanation as to whether the fees were incurred as a result of the alleged breach in this case, or for other reasons.

Moreover, Sterling's claim includes other litigation-related attorneys fees. Sterling has included invoices from the law firm of Arnold and Porter for legal advice related to the injunction. Id. at 122-23. In addition, Sterling's claim includes invoices from Hogan and

Hartson, a well-known law firm. Id. at 123. Mr. Byrne, however, mistakenly believes that Hogan and Hartson is a consulting firm. Id. To the extent that Hogan and Hartson actually provided legal advice, the fees cannot be claimed as wounded bank damages.

Further, Sterling's claim includes fees for regulatory advice provided after it replaced all of its goodwill in 1991, notwithstanding Mr. Byrne's acknowledgment that any alleged "regulatory interference" ended after the goodwill was replaced. Id. at 130. Finally, with respect to the vast majority of the fees allegedly incurred for accounting matters, Sterling has not provided a basis for the Court to conclude that the fees were incurred as a result of the alleged breaches. Id. at 125-30. Further, expenses incurred in litigation, "whether legal, accounting, secretarial, or other," are not awarded against the United States. Berg's Estate, 687 F.2d at 383. Therefore, these claims cannot be sustained.

For all of these reasons, Sterling has not met its burden with respect to its wounded bank damages claim for legal, accounting, and insurance costs.[21]

## CONCLUSION

For the foregoing reasons, and based upon the facts we will prove at trial, Sterling is entitled, at most, to an award of transactions cost damages to compensate for its replacement of contractual goodwill.

---

[21] Although Sterling's one-page summary of legal and accounting fees includes "insurance" in the heading, the itemized list of fees that Sterling seeks to recover appears not to include any insurance costs. DX 294.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH HOLT

May 23, 2007

CERTIFICATE OF FILING

I hereby certify that on May 23, 2007, a copy of foregoing "DEFENDANT'S CONTENTIONS OF FACT AND LAW," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford