**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS**

Pursuant to Rule 802 of the Federal Rules of Evidence and the Court's January 3, 2007 Pretrial Order, defendant, the United States, respectfully requests that hearsay testimony and exhibits offered by plaintiff Sterling Savings Association ("Sterling") be excluded from evidence. Specifically, we request exclusion of the testimony of Messrs. Cajer Neely, Gary Crithfield, and Thomas M. Beil concerning "knowledge of customers lost as a result of the government's breach of the contracts." Pl. May 23, 2007 Revised Witness List, pp. 4,6. We also request exclusion of Sterling's exhibits P-352 ("Results of Dan King's review of Sterling's loan reports"), P-353 ("Results of Gary Crithfield's review of Sterling's loan reports"), P-354 ("Results of Tom Beil's review of Sterling's loan reports"), P-355 ("Results of Cajer Neely's review of Sterling's loan reports"), and P-356 ("List of developers") because they are hearsay.[1]

---

[1] Exhibits P-352 through P-356 are Attachment A to this motion.

## FACTUAL BACKGROUND

Sterling's memorandum of contentions of fact and law, filed April 25, 2007, includes the following contention: "Sterling Lost Deposits And Customers Because Of The Government's Restrictions On Its Activities." Pl. Mem. at 14. Specifically, plaintiffs contend that "Sterling lost significant deposits and/or customers because of the OTS restrictions on Sterling in the wake of FIRREA. Sterling lost many customers with deposits in excess of $100,000." Id.; see also id. at 26-27. For support, Sterling cites exhibits P-352, P-353, P-354, and P-355 as examples. Id. at 14. Sterling also specifically contends that "Sterling had to turn business away. Existing and prospective customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them." Id. at 14-15; see also id. at 27. For support, Sterling cites exhibit P-356 as an example. Id. at 15.

In its revised witness list, filed May 23, 2007, Sterling states that Messrs. Neely, Crithfield, and Beil are all former loan officers who will or may testify and have "knowledge of customers lost as a result of the government's breach of the contracts in Sterling's acquisitions of Lewis Federal Savings & Loan and Tri-Cities Savings & Loan." Pl. Revised Witness List at 4, 6.

## ARGUMENT

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A "statement" can be either an "oral or written assertion." Fed. R. Evid. 801(a). If the significance of a statement is that the statement was simply made, then the statement is not

offered for its truth and is not hearsay or is called nonhearsay. Of course, the statement nevertheless must be relevant pursuant to rules 401 and 402.[2]

## I. Statements Made To Sterling's Former Loan Officers By Third Parties Concerning The Impact Of The Breach Upon Sterling's Deposits And Customers Are Inadmissable Hearsay

Plaintiffs intend to introduce alleged statements made by existing and prospective customers to Messrs. Neely, Crithfield, and Beil. Pl. Mem. at 14-15, 26-27; Pl. Revised Witness List at 4, 6. These alleged statements concern whether existing and prospective customers moved their deposits and banking from Sterling "because of the OTS restrictions on Sterling in the wake of FIRREA." Pl. Mem. at 14.

Such statements exhibit all of the classic elements of hearsay. The third-party declarants, i.e., the existing and prospective customers, made oral statements out of court to Messrs. Neely, Crithfield, and Beil to explain their alleged reasons for not banking with Sterling. Upon this basis, the statements should be excluded. See, e.g., Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1342 (Fed. Cir. 1999); Sanjuan v. IBP, Inc., 160 F.3d 1291, 1297 (10th Cir. 1998); Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 563 (7th Cir. 1998) (employee complaints of harassment in an affidavit intended to prove complaints were made and that the employer did nothing are hearsay).

Nor can plaintiffs argue that these statements are not offered for their truth and are nonhearsay. This argument fails because if the statements are not offered for their truth, they (1)

---

[2] Rule 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states, in relevant part: "Evidence which is not relevant is not admissible."

have no independent legal significance; and (2) are irrelevant and unhelpful to the trier of fact. See Fed. R. Evid. 402.

Plaintiffs' burden is to affirmatively show that the breach caused it to lose existing and prospective customers and deposits, which resulted in financial injury. Assuming the statements made by third parties to plaintiffs' loan officers are not being offered for their truth, the statements have no legal significance. See, e.g., United States v. Blandina, 895 F.2d 293, 300 (7th Cir. 1989) (requiring statements, if not offered for the truth, to have independent legal significance). The loss of existing and prospective customers and deposits, by themselves, do not show the breach caused plaintiffs' damages. The statements, without alluding to the breach as the cause of not remaining or becoming a Sterling customer, do not establish a fact of consequence.

Similarly, the statements, if offered simply to show that current and prospective customers and deposits were lost, are irrelevant to the case. To the extent plaintiffs are excluded from inquiring into the details of those third-party statements – i.e., the reason customers and deposits left Sterling – the statements do not tend to make more likely than not that the breach was the reason for moving business from Sterling. If the statements are not offered for their truth, they are not relevant to causation and should be excluded.

## II. Exhibits Signed By Plaintiffs' Loan Officers In Preparation For Litigation Are Inadmissable Hearsay

Plaintiffs intend to introduce exhibits P-352,[3] P-353, P-354, and P-355, signed by Messrs.

[3] Plaintiffs' exhibit P-352 is entitled "Results of Dan King's review of Sterling's loan reports." Mr. King is not listed as a may- or will-call witness upon Sterling's revised witness list, filed May 23, 2007.

Neely, Crithfield, Beil and Daniel King, to support their claim that existing and prospective customers and deposits were lost as a result "of the OTS restrictions on Sterling in the wake of FIRREA." Pl. Mem. at 14. Further, exhibit P-356, signed by Mr. Crithfield, purports to list "[e]xisting and prospective customers [that] sought construction loans from Sterling . . . or inquired about the possibility of loans and Sterling was unable to accommodate them." Pl. Mem. at 14-15.

These exhibits are hearsay. These exhibits are written statements, not made by Messrs. Neely, Crithfield, King, and Beil while testifying at trial, to explain why existing and prospective customers and deposits were lost and why Sterling was unable to accommodate loan requests from existing and prospective customers. Upon that basis, the Court should exclude these statements. See, e.g., Air Land Forwarders, Inc., 172 F.3d at 1342; Sanjuan, 160 F.3d at 1297; Morrow, 152 F.3d at 563.

In addition, these exhibits are not admissible pursuant to an exception to the hearsay rule. See Fed. R. Evid. 803. Plaintiffs' exhibits P-352, P-353, P-354, and P-355 were each prepared in 2001, and state that the loan officers, none of whom were employed by Sterling in 2001, "reviewed Sterling Savings loan reports and the following were identified by [them] as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992." P-356 is a handwritten list written by Mr. Crithfield approximately two weeks prior to his July 9, 2002 deposition. See Deposition of Gary D. Crithfield, dated July 9, 2002, at p. 26-28 (Attachment B). Therefore, these documents were not prepared at the time Sterling's existing and prospective customers and deposits were allegedly lost or when Sterling

was allegedly unable to accommodate loan requests from existing and prospective customers. See Fed. R. Evid. 803(1).

In addition, these exhibits are not "[r]ecords of [r]egularly [c]onducted [a]ctivity," but are records made for litigation. See Fed. R. Evid. 803(6). Indeed, these documents were not prepared by Messrs. King, Crithfield, Neely, and Beil. While these individuals generated lists, the exhibits were prepared by Sterling personnel and presented to these Sterling employees for signature. See, e.g., Deposition of Cajer Neely, dated June 26, 2002, at p. 48-53 (Attachment C). As such, they are not admissible pursuant to the business records exception to the hearsay rule. Id. "'It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business.'" United States v. Gwathney, 465 F.3d 1133, 1141 (10th Cir. 2006) , cert. denied, — S. Ct. —, 2007 WL 1237887 (U.S. April 30, 2007) (quoting Timberlake Const. Co. v. U.S. Fidelity and Guar. Co., 71 F.3d 335, 342 (10th Cir. 1995)). Finally, because these exhibits were prepared for the purposes of litigation, they lack the "circumstantial guarantees of trustworthiness" to be admitted pursuant the residual exception to the hearsay rule. Fed. R. Evid. 807.

Nor can plaintiffs argue that these exhibits are not offered for their truth and are nonhearsay. This argument fails because, for the very reasons discussed with respect to third-party statements, if the exhibits are not offered for their truth, they (1) have no independent legal significance; and (2) are irrelevant and unhelpful to the trier of fact. See Fed. R. Evid. 402.

Plaintiffs' burden is to affirmatively show that the breach caused it to lose existing and prospective customers and deposits. Assuming the exhibits are not being offered for their truth, the exhibits have no legal significance independent of causation. See, e.g., Blandina, 895 F.2d at

300 (requiring statements, if not offered for the truth, to have independent legal significance). The loss of existing and prospective customers and deposits and Sterling's inability to accommodate loan requests from existing and prospective customers, by themselves, do not show the breach caused plaintiffs' damages. The exhibits, without alluding to the breach as the cause of not remaining a Sterling customer or granting a loan, do not establish a fact of consequence.[4]

Similarly, the exhibits, if offered simply to show that existing and prospective customers and deposits were lost or loans were not made, are irrelevant to the case. To the extent plaintiffs are excluded from inquiring into the details of these exhibits – i.e., the reason customers and deposits left Sterling or loans were not made – the exhibits do not tend to make more likely than not that the breach was the reason for removing business from Sterling. If the exhibits are not offered for their truth, they are not relevant to causation and should be excluded.

---

[4] P-352, P-353, P-354, and P-355 each state that the loan officer referenced "reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992."

In order to not be offered for their truth, this statement would need to be stricken from each exhibit, because it is hearsay for the very reasons discussed in this motion. See Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these parts."). "'Double hearsay exists when the record is prepared by an employee with information supplied by another person.'" Gwathney, 465 F.3d at 1141 (quoting Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (10 th. Cir. 1991)). "Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." Gwathney, 465 F.3d at 1141 (citing Wilson, 939 F.2d at 271).

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant its motion in limine to exclude hearsay testimony and exhibits.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH A. HOLT

May 30, 2007

# ATTACHMENT A

Dan King reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

Customers
Anvil Welding S
B&E Trophy Lt
Barber, George E.
Bargreen-Elling
Bonuccelli, Aleck
Chase, Raymond
Flerchinger, R. G.
Hanson-Hurburt
L and W Investment
Leff, Wenzel A.
Lou-Gar Construction
McDowell & Howe
McIntyre, P. W.
Northwest Distribution
Quinn, W.
Redinger, R. L.
Silvey Construction
Sleeth, William R.
Spiger, R. Patrick
Villelli, Richard A.
Wilson, R. L.
Wolff, A.J.

Duplicates not included.

The names are provided to you and to Sterling's attorney. Acknowledge by signing.

Acknowledged by:

______________________ ______________________
Dan King Date

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.

EXHIBIT
WITNESS
DAVID STOREY
STOREY & MILLER

Gary Crithfield reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

| Customers | Customers |
|---|---|
| Armstrong, Jacquelyn J. | Gunning, Theodore G. |
| Best Western River Tree inn | Kirkland, Kevin |
| Bowen, Le Roy | Knutson, Ronald L. |
| Brumback, Donald G. | Mace Jr., Louis L. |
| Cedar Pines General Partnership | Miller, Jared B. |
| DeFelice, Armand V. | Naccarato, Donna J. |
| Devlin, Beatrice | North 120 Wall Associates |
| DeVries, William | Northwood Properties, Inc. |
| Douglas and Vandervert Development | Opportunity Plaza Comm. |
| Douglass, Harlan D. | Pines Partnership |
| Douglass, Maxine H. | Rothrock Jr., Wallace F. |
| Dow, Glen E. | Thompson & Brumback |
| Feldman, William C. | United Bank |
| Flannigan, Corrine L. | Vanderhoeff, William J. |
| Fosseen Jr., Neal R. | Walker, Philip W. |
| Gatlin, Howard | Wolff, Sr., Alvin J. |
| Grafos, Dean and Elizabeth | Wynia, Terry P. |

Duplicates not included.

The names are provided to you and Sterling's attorney.

Acknowledged by:

Gary Crithfield    Date 5/02/01

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.

EXHIBIT
STOREY & MILLER

Tom Beil reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

Customers
Boyd, Buorkman & Fickle, P.S. ( )
CRM Optical, Pat Spiger 1991
Nelson, Robert - Divco Energy Control Company 1990
Latch Creek Winery 1989
Miller-Jordin Travel 1990
Northern Technologies, Inc. 1990
Northwest Ski Exchange 1991

- Duplicates not included.

The names are provided to you and Sterling's attorney.

Acknowledged by:

Tom Beil

5/3/01
Date

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.

EXHIBIT
STOREY & MILLER

– Elizabeth
– Bernie
– Jane

Cajer Neeley reviewed Sterling Savings loan reports and the following were identified by him as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings Bank's lending and deposit-gathering during the period of approximately November 1, 1989 to June 30, 1992.

Customers

U.S. Aslin-Finch
BofA Armstrong, Dane 2MM
U.S. Beasley, Ted 3MM
WTB Biggs, Larry - Bovay N.W.; Wormer & Associates —
WTB Cedar Builders —
U.S. Empire Jewelry & Loan 2MM
BofA Hansen, George 1MM
WTB Howell, Don 250M
Wells Jacobs, Craig 1MM
U.S. Lawson, Bill - A&A Construction — "LC" 50M
Wells Manz, Michael 1MM
Wells Metallic Arts —
WTB Person, Grant —
U.S. Ramey, Randy - Ramey Construction; Ramey Development —
Wells Red Barn, NSE Inc.
U.S. Romney, Doug
WTB Roy Mitchell, Inc.
U.S. Rudeen, Kevin and Chris – Rudeen Development
BofA Schreinir, John
U.S. Siria, Harry & Daryl
U.S. Sodorff, G. Wesley
WTB Vandervert Development
WTB Walker, Mike
BofA Wolff, Fritz – Aslin-Finch; Source Capital, A.J. Wolff
Wells Woodland Montessori School

Duplicates not included.

U.S. – Max Kuney III (350M)
WTB – Dave Hook (Sr Froggy)
U.S. – Latah Creek
WTB – Stahl Optical (Pat Reilly)
– McDowell
U.S. – DeVries Moving
BofA → GT Graphics
Wells – (Dennis Craft)
– 6th Ave. Pharmacy
WTB – (Gerry + Meghin Stocker)

The names are provided to you and Sterling's attorney.

Acknowledged by:

[signature]
Cajer Neeley

5-2-01
Date

EXHIBIT
WITNESS Neely
DAVID STOREY
STOREY & MILLER

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any review, dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this message in error is requested to notify the sender immediately by telephone or return email and to delete the message from his or her computer.

1/86 – 6/90

95-829-C
P - 355

- Bill Lawney
- Dick Vandervert
- Dick Vilkelli
- Harland Douglas
- Richard Nascovato
- Bob Spears
- Ted Gunning

EXHIBIT 53
WITNESS Cathey
DAVID STOREY
STOREY & MILLER

The developers if they would do more business with them after Sterling

# ATTACHMENT B

# COPY

Deposition of

Gary D. Crithfield

July 9, 2002

STERLING V USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

the CJ-4 Associates loan?
A. A little bit. CJ-4 was a loan in Bellevue on a hillside and I believe the city changed, and this is substantiated, I believe the city changed some of the permit requirements related to the construction of it. I don't recall evaluating additional collateral.
Q. As is referenced in the document?
A. Yeah, and I obviously didn't sign this.
Q. Does this document refresh your recollection as to whether CJ-4 was a problem loan in this time period?
A. Yeah, it looks like it was, yes.
Q. Is generally, and I know you didn't sign this, but is the text of this document consistent with your recollection about what was going on with CJ-4 at the time?
A. Yeah, they were having troubles. My recollection is the city changed the rules on them when they were under construction, and they then had to meet those requirements, they had cost overruns to start with, and I don't think they had the cash to finish it. That's the reason they needed the advance.
Q. Do you recall whether nonjudicial foreclosure proceedings were ever instituted?
A. No.
Q. No more questions on this document.



I'm going to mark two documents as exhibits.
(Ex. No. 2, List of Customers, dated 5-2-01, marked.)
(Ex. No. 3, Note Paper with list of names, marked.)
THE WITNESS: I didn't know, did you want to enter that in, that was just a note to myself?
Q. Oh. Yes. Well, I'll ask you about this, it is a list of people.
A. Okay.
Q. I'm going to mark a document as Crithfield Exhibit 2, it bears Mr. Crithfield's signature, dated May 2nd, 2001 and it appears to be a list of customers. I'm going to hand you this document which I assume is familiar to you since you gave it to me?
A. Uh-huh.
Q. And I'm going to mark this other little small piece of note paper as Crithfield Exhibit 3. It contains a list of names and a note at the bottom that says, "Asked the developers if they would do more business, did business with them after Sterling." Okay.
Just let's look at Exhibit 3 briefly first. Is that document in your handwriting?
A. This?
Q. Yes.



A. Yes.
Q. When did you generate that document?
A. Well, after it was requested and given this and told that I was going to be at this meeting this morning.
Q. I am not sure I understand that. When did you write this document? When did you write--
A. Probably two weeks ago.
Q. Okay. Why did you write the note?
A. To remind myself of the builders that I was working with here in Spokane and the ones that I had to tell that we couldn't make any other loans to during that time frame. The time frame I'm referring to is between August of '89 and when I left.
Q. And did somebody tell you to make this list?
A. No, I did it. Some of these people are related to some of the entities that are, for instance Northwood Properties, Gunning, that is Ted Gunning, that is an entity that he used to develop Northwood Properties in the Valley.
Q. I don't see that name on this list?
A. Right.
Q. I'm talking about this piece of paper?
A. Ted Gunning right there at the bottom.
Q. Oh. Forgive me if I am not understanding you, but two weeks ago you thought to yourself, I better write



down developers who you did no more business with after 1989, is that what you're saying?
A. Well, I wrote it down because these were developers and builders I was doing business with prior to August of 1989.
Q. Okay. But--
A. I wanted to remind myself of who I was doing business with, where the volume came from, that most of the volume came from.
Q. How does this list differ from Exhibit 2, which is the--
A. It really doesn't. It ties right in.
Q. Okay. So were these additional names that you thought of?
A. No these are names that, for instance Northwood Properties is Ted Gunning's borrowing entity. Let's see, Cedar Pines General Partnership is Richard Naccarato, or Dick Naccarato.
Q. When did you make these handwritten notes on Exhibit 2?
A. Last night at about 8:00.
Q. Why did you do that?
A. Well, I just want to have, go over the list and see if I knew who I was dealing with here.
Q. You mean you were just trying to remind yourself?

# ATTACHMENT C

COPY

# Deposition of

# Cajer Neely

# June 26, 2002

# STERLING V USA

**CONDENSED TRANSCRIPT AND CONCORDANCE**

**PREPARED BY**

**STOREY & MILLER COURT REPORTERS**

**601 W. Riverside Avenue**
**Suite 1030**
**Spokane WA 99201-0910**
**Phone: (509) 456-0122**
**Fax: (509) 456-0169**

wanted loans for business purposes?
A. I don't.
Q. Okay. I think now is probably a good time to make a break. I can make a copy of the list and then we can--is 15 minutes okay?
THE WITNESS: Sounds good.
MS. HOSFORD: We can go off the record.
(Short recess was taken.)
Q. (BY MS. HOSFORD) We can go back on the record now, please.
Mr. Neely, I think you mentioned a few minutes ago that in addition to making the move from Sterling to West One, you also moved from West One to Wells Fargo and Wells Fargo to Washington Mutual.
Other than the move from Sterling to West One when you made moves from these other companies did you ever take customers with you?
A. Yes.
Q. And why?
A. Typically in banks that is one of the reasons you are hired is to develop business, and part of the relationship I had with some of those customers they followed.
Q. Do you think that could have been part of the reason that some of the customers left Sterling and went to

45

West One?
A. Part of it was the relationship with me, but it was definitely the, I guess the reason I went was because of the situation and the customers were--well, some of them followed me, but some of them, some of them were going to go, some of them did not go to West One, too.
Q. Some of them did not go. They stayed at Sterling?
A. No, some of them went.
Q. They went elsewhere?
A. Went elsewhere, yeah.
Q. So this list is comprised of both of those categories, those that went to West One and those that went elsewhere?
A. Yes.
Q. Had it not been for the enactment of FIRREA and its impacts on Sterling do you think you would still be at Sterling today?
A. Yes.
Q. Why?
A. I can tell you--I had a very good relationship there with people. Most everybody from Harold Gilkey to Bill Zuppe to Dan Byrne, it is the hardest professional decision I've ever made.
Q. And the move that you made from other companies, have

46

your relationships not been as good with your superiors there?
A. No, the moves I made were because of better opportunities, better compensation after the subsequent moves.
Q. Did Sterling have other loan officers that left during 1989 and 1990?
A. Tom Beil left, he left shortly after me, but I don't remember exactly, and Tom was a senior loan officer that worked for, he was the more senior officer that worked for me there.
Q. You mean among the loan officers that worked?
A. Among the other four that were there.
Q. Can I just remind you, we are doing a little bit of talking over each other. So to the extent that I am asking a question, if you could just wait until I'm done and I'll try to do the same for you.
A. Okay.
Q. And did you say that Mr. Beil left, you said, is Mr. Beil the only person you can think who left during that period?
A. He is the only loan officer that left during that period that I can recall.
Q. Did he take business with him?
A. Yes, he would have.

47

Q. Do you know how much business he took with him?
A. No.
Q. Do you know whether any of the loans that followed Mr. Beil are on the list that you compiled?
A. Yes, there are some on that list that he was the person that had the direct contact with the customer.
Q. Okay. I m, going to go ahead and mark it as Exhibit 1. Now this is a document that partly looks like a photocopy that was faxed either to or from Witherspoon Kelley on June 14, 2002, it has got the signature of Mr. Neely, dated May 2nd, '01 but it looks like there were some notes that were written after that date, there is no Bates number.
(Ex. No.1, List of clients that were lost during the period of 11-01-89 to 6-30-92, marked.)
Q. (BY MS. HOSFORD) And it doesn't have a title. I'm going to hand you this document, Mr. Neely, is this the document that we have been talking about throughout the day?
A. Yes.
Q. Could you please tell me which of the customers listed here you believe to have been Mr. Beil's before he left?
A. Metallic Arts, Red Barn, on the right column that I have written subsequent, Dave Hook, Latah Creek, that

48

would be it.
Q. I'm just going to ask you a few questions about this document in general, I think you testified that you--who asked you to make this list, if anybody?
A. I believe it was Dan Byrne from Sterling and this is a year ago.
Q. Why did, did he tell you why he needed the list?
A. I was aware that it was regarding the lawsuit and it was to identify--again I was reviewing the list that I identified earlier to recall from my memory what accounts left Sterling.
Q. So was that your instruction, to make a list of the accounts that left Sterling during--
A. Yes.
Q. And during what time period? This November 1, 1989 to June 30, 1992 that is listed at the top?
A. Yes.
Q. And were you asked to just identify all accounts that left or were there some, you know, were there criteria for that list?
A. There were no criteria. It was--other than they were part of the business banking, they were part of the commercial lending, that department that I have identified that I was responsible for.
Q. I think you mentioned that you left in June of 1990,

49

is that correct?
A. Yes.
Q. Okay. So how did you obtain knowledge about customers that left between that time and June 30th, 1992?
A. Both from customers that followed me and from follow-up business development efforts that I made after some of these customers had left and gone to other banks.
Q. You mean you called them and said, hey, why did you go there?
A. No, I called them to pursue their business.
Q. Did you ever call any of them while they were still at Sterling?
A. There would have been some that would have fallen into that category, too.
Q. Which ones?
A. I can't remember that.
Q. So it is possible that some of the customers on this list stayed with Sterling until you called and asked them to come to where you were at West One?
A. Yeah, there were circumstances, the way I would identify that is that some customers depending on the type of transactions that, you know, back to when I was describing the credit lines, that were more

50

immediately affected, and were willing to give more time to the situation than others, as in what I described with those annual credit lines that mature sometime during a 12 month period, there were, there were customers that were in a position that they could ride, ride out the situation longer than others.
Q. So they made the decision to stay at Sterling notwithstanding the existence of these restrictions for some period, is that what you are saying?
A. That would be accurate.
Q. Which ones were those on this list?
A. I can't remember any of these specifically. There are some--Cedar Builders is a customer, theirs was more real estate-related, i.e., meaning they, they wouldn't necessarily have had a credit line that was going to be up for renewal.
Fritz Wolff fell under that category.
Rudeen did, Vandervert, so again they were more, they were developers that were doing real estate-related activity from a business standpoint, so they did not rely on the availability of a day to day credit line.
Q. The list that is handwritten on the right side of the piece of paper, when was that written?

51

A. That was written in approximately a week ago.
Q. And how did you come to add those names?
A. That's from the same, the same set of reports that I looked at a week ago.
Q. You mean you looked at the reports again and found more instances and then added them to the list?
A. Yes.
Q. Do you recall whose idea it was for you to sign this thing and date it?
A. I don't.
Q. Did you type this yourself?
A. No.
Q. Who did?
A. I believe it would have been from Sterling.
Q. What do you mean--
A. Meaning as opposed to Witherspoon Kelley.
Q. Did you handwrite a list and give it to them and then they typed it up or something?
A. Yes.
Q. Did you write out everything on this piece of paper or what did you write and submit to them?
A. Some of them were handwritten, some of they were either X'd or highlighted again that were, there were about three groups of reports there were paid-off loan reports, there were loans to one borrower, and

52

some type of trial balance. The loans to one borrower was not as, I'm sorry, the paid-off loan report was not as long, so that's, as I recall, that's the report that I marked and the one that is more voluminous, I handwrote names down.
Q. Did you write down the part where it says Cajer Neely reviewed Sterling Savings loan reports, et cetera?
A. No.
Q. And how was this November 1, 1981 to June 30, 1992 time frame arrived at, was that the date of the reports or something?
A. I don't, I don't know that.
Q. You don't know that?
A. I don't know that it was the date of the reports, when I signed this I would have seen that date and it would have been an approximate time frame of when I was aware that these customers left.
Q. You see these little notes that you have to the left of the names, U.S., what is the second one, B O A?
A. B of A.
Q. B of A, what–
A. That represents banks that, where I know these customers went or took some of their business.
Q. What is U.S.?
A. U.S. Bank.



Q. BOA is Bank of America?
A. Yes.
Q. WTB?
A. Washington Trust.
Q. Is Wells Fargo–
A. Yes.
Q. Which of the individuals on this list were your direct customers?
A. They would be the ones that I, other than the ones that I identified that Tom Beil did not move the business. So any of them other than those, those customers.
Q. So Metallic Arts, Red Barn, Dave, I'm sorry, can you tell me again what that says, Hook?
A. Dave Hook, yes.
Q. And Latah Creek?
A. Latah Creek.
Q. Those were Bill's, the rest were yours?
A. Yes.
Q. Just for purposes of clarity since this may be used as an exhibit at trial I am having a hard time reading some of this?
A. Okay.
Q. If you look at the right-hand column, is that bottom entry, is that Sixth Avenue Pharmacy?



A. Sixth Avenue pharmacy and Jerry and Marilyn Stocker were the owners.
Q. Marilyn?
A. Yes.
Q. Could you tell me how that is spelled?
A. The last name?
Q. Marilyn's name and then the last name?
A. I do not know how Marilyn is spelled. I think M A R I L Y N.
Q. And the last name?
A. S T O C K E R.
Q. Okay, and then the one above that? What is it just–
A. GT Graphics.
Q. And in parenthesis?
A. Dennis Craft.
Q. That is Craft?
A. Yes.
Q. C R A F T?
A. Yes.
Q. And then the one above that, DeVries Moving?
A. It is pronounced DeVries, D E V R I E S.
Q. And then McDowell?
A. Yes.
Q. And then Stahl Optical?
A. Yes, the name is Pat Railly, I believe it is spelled



R A I L L Y.
Q. Is that person a principal of that company?
A. Yes.
Q. And then Latah Creek, L A T A H?
A. Yes.
Q. Then Dave Hook, Sr.
A. Senior Froggie is the name of his business.
Q. Is that a–
A. Restaurant.
Q. Above that is Max Kuney, III?
A. Yes.
Q. K U N E Y?
A. Yes.
Q. What is the notation?
A. That's the amount of the loan. I would have pulled that from one of those loan lists, 3,500,000.
Q. And then where you have notations in handwriting like 2 MM or 3 MM does that mean million?
A. Yes.
Q. And are those numbers, what are those numbers meant to represent?
A. I went through this list and was recalling to myself dollar amounts of that those customers borrow. Actually it is numbers that they borrow right now. I was just going down through that list identifying,

CERTIFICATE OF FILING

I hereby certify that on May 30, 2007, a copy of foregoing "DEFENDANT'S MOTION IN LIMINE TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford