# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered Savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

## STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government has moved to exclude evidence of breach of contract or damage with respect to Sterling Savings Association's ("Sterling's") acquisition of Central Evergreen Federal Savings and Loan ("Central Evergreen"), the last of the three acquisitions made by Sterling of failing thrifts at the Government's request. The Motion should be denied because the Central Evergreen transaction was inextricably intertwined with the acquisition of Tri-Cities Savings and Loan ("Tri-Cities"). This trial will determine the amount of damages owed to Sterling as a result of the Government's breach of Sterling's contract related to Tri-Cities, and the facts surrounding the Central Evergreen transaction provide necessary context to the Tri-Cities deal. The Tri-Cities transaction cannot be explained without considering Central Evergreen; both parties, in undertaking the Tri-Cities transaction, did so with the Central Evergreen transaction in mind.

Sterling will be prejudiced if evidence of the Central Evergreen transaction is excluded, and the Motion should be denied.

Sterling does, however, recognize that this Court held that enactment of the Financial Institutions Recovery and Reform Enforcement Act ("FIRREA") did not breach Sterling's contract to acquire Central Evergreen. Sterling herein submits, to preserve its record, an offer of proof of the undisputed facts demonstrating that the Government did breach the Central Evergreen contract. Sterling does not intend to offer proof at trial related to any claim of breach, or damages, in regards to the Central Evergreen contract, or any fact about Central Evergreen not connected to its claim for damages from the two contracts the Court has ruled were breached.

## ARGUMENT

### A. THE MOTION SHOULD BE DENIED BECAUSE STERLING'S ACQUISITION OF TRI-CITIES IS INEXTRICABLY LINKED TO STERLING'S ACQUISITION OF CENTRAL EVERGREEN.

#### *1. During The Course Of Negotiations For Tri-Cities, The Government Aggressively Pursued Sterling's Acquisition Of Central Evergreen*

The Federal Home Loan Bank Board ("FHLBB") first approached Sterling regarding a potential acquisition of Central Evergreen in the summer of 1987, at the same time Sterling's acquisition of Tri-Cities was under discussion. App. 13-14; App. 33. Despite repeated overtures from the Government, Sterling stated that it did not have enough capital to acquire a $250 million thrift. *Id.* Sterling's Chief Executive Officer, Harold Gilkey, informed Hilton Hewitt, Sterling's Supervisory Agent at the time, that Sterling would not be able to acquire Central Evergreen without substantial FSLIC assistance and that he had no interest in pursuing that track at this juncture. App. 86:5-9.

Again in early 1988, Hilton Hewitt contacted Harold Gilkey and renewed his request that Sterling consider an acquisition of Central Evergreen. App. 22-23. Mr. Gilkey expressed his

concerns that Sterling would be able to acquire and absorb two insolvent thrifts within eight months (Tri-Cities Savings and Loan Institution ("Tri-Cities") in April, 1988 and Central Evergreen in December, 1988). *Id.* Sterling did not have the capital to take control of Central Evergreen. Because of this fact, when the Government attempted to convince Sterling to acquire the failing Central Evergreen thrift, the key factor for Sterling was its abilities to leverage as capital the cash assistance received in the Tri-Cities acquisition. App. 180.

*2. Sterling's Acquisition of Tri-Cities Savings & Loan Would Not Have Occurred Unless Sterling Had An Agreement In Place To Pursue Acquisition of Central Evergreen*

Sterling's acquisition of Central Evergreen would not have occurred but for its acquisition of Tri-Cities, and vice versa. The evidence in the record is undisputed that Sterling's agreement to acquire Central Evergreen was subject to Sterling acquiring Tri-Cities and that the Government facilitated the Tri-Cities deal so that Sterling would take Central Evergreen. App. 179; App. 180. Hilton Hewitt affirmed to Sterling that it would have the requisite capital necessary for the acquisition of Central Evergreen based upon leveraging the permanent regulatory capital infusions and supervisory goodwill from both the Lewis Federal Savings and Loan Institution ("Lewis Federal") ($1.8 million) and Tri-Cities ($11.7 million) acquisitions. App. 14; App. 22; App. 33; App. 86:19-24.

The Government intended to induce Sterling to enter into an agreement to acquire Central Evergreen by promising a successful bid as to Tri-Cities. Although bidding had not yet closed on the Tri-Cities acquisition, Hilton Hewitt informed Harold Gilkey that he could arrange for Sterling to be the selected bidder as long as Sterling's bid was competitive. App. 87:1-5, 89:4-17. Mr. Gilkey and Mr. Hewitt entered into a quid pro quo agreement, memorialized not by a document but by a handshake, whereby Sterling agreed to acquire Central Evergreen if it was

selected as the low bidder on the Tri-Cities acquisition. App. 92:22-93:15. Harold Gilkey understood this agreement as creating mutual obligations: the Government ensured that Sterling would be the selected bidder on the Tri-Cities acquisition, and, in turn, Sterling committed to bid on the Central Evergreen acquisition without Financial Savings and Loan Insurance Corporation ("FSLIC") assistance. App. 95:12-15. Although there was no written document that codified their agreement, Mr. Gilkey felt obligated, by virtue of his word, to move forward with the Central Evergreen merger. App. 95:20-24. True to Mr. Gilkey's word, Sterling did undertake to merge with Central Evergreen.

During the Tri-Cities bid review process, Sterling learned that it was not the selected low bidder. Based upon this information, Sterling concluded the deal to acquire Tri-Cities was off. App. 90:23-91:5. Within a day or two of learning that Sterling had not been selected as the low bidder on the Tri-Cities acquisition, however, Hilton Hewitt called Harold Gilkey and told him that he would "take care of [his] end." App. 90-91. Shortly after this conversation, Sterling was informed that it was the selected bidder for Tri-Cities and that the previous low bidder, Old Stone Savings Bank, had withdrawn its application. App. 91:6-12; App. 22-23. When asked how Sterling had succeeded over the previous low bidder, Mr. Hewitt informed Mr. Gilkey that "these things have a way of working themselves out." App. 99:10-15; App. 55:22-25.

Later, Ed Hedlund, FHLB-Seattle's Supervisory Agent for both Sterling and Central Evergreen, summarized the results of an internal conversation with other members of the FHLB-Seattle leadership on June 30, 1988, and specifically mentioned Sterling's ability to leverage the capital it received as a result of the Tri-Cities acquisition, thus further emphasizing the Government's understanding of the interrelatedness of the two transactions. App. 180. Without counting the supervisory goodwill from the Tri-Cities acquisition as an asset, Sterling would,

following its acquisition of Central Evergreen, have had negative net worth, a situation it would have been "madness" to get into without the clear understandings it had reached with the FHLBB/FSLIC concerning future regulatory compliance. *United States v. Winstar Corp*., 518 U.S. 839, 910 (1996). The unrebutted testimony of Sterling's officers and the Government officials charged with the task of negotiating the Tri-Cities and Central Evergreen acquisitions that the two institutions were part and parcel of the same greater transaction. The Tri-Cities contract and damages cannot be properly interpreted in the pending damage action without consideration of evidence pertaining to the subsequent Central Evergreen acquisition. Without Central Evergreen on the horizon, Sterling would never have been selected as the low bidder on the Tri-Cities acquisition. The mutual purpose of the parties to the Tri-Cities contract was the Central Evergreen merger. The two transactions are intimately connected and Sterling cannot present its case as to Tri-Cities absent reference to the Central Evergreen transaction.

*3. Sterling Had The Requisite Capital Level To Acquire Central Evergreen Only As A Result Of The Recently Closed Tri-Cities Acquisition*

The FHLBB and FSLIC "shopped" Central Evergreen to several possible acquirers, and the Government would have spent approximately $8 to $10 million to liquidate and dissolve Central Evergreen had Sterling not undertaken the acquisition. App. 80:8-81:16; App. 114:25-115:3. Sterling's acquisition of Tri-Cities closed on April 8, 1988. On July 20, 1988, Sterling and Central Evergreen entered into an Acquisition Agreement that governed the rights between the two institutions, independent of the Government. Acquisition Agreement between Sterling Savings Association and Central Evergreen Federal Savings and Loan Association, dated July 20, 1988. This initial agreement came barely three months after Sterling had closed the Tri-Cities acquisition. Prior to the close of the Tri-Cities acquisition, Sterling lacked the requisite

amount of capital to present a bid for Central Evergreen's acquisition; after the acquisition, it was allowed to acquire Central Evergreen by the Government. Both parties knew and intended that Sterling's acquisition of Tri-Cities was a necessary condition to its acquisition of Central Evergreen. Indeed, Supervisory Agent Hilton Hewitt asked Sterling to consider acquiring Central Evergreen and, when Sterling replied that it lacked sufficient capital to consider the acquisition, reiterated that if Sterling acquired Tri-Cities, the regulatory capital thereby created could be used to acquire Central Evergreen. App. 14; App. 22; App. 33; App. 86:19-24. Sterling relied to its detriment on the Lewis and Tri-Cities contracts (and FSLIC/FLHBB's undisputed characterization of those contracts as creating permanent capital) in agreeing to take over Central Evergreen.

The instant Motion attempts to exclude relevant evidence to the Tri-Cities transaction. The evidence is undisputed that the Central Evergreen acquisition and the context of that transaction are linked directly to the Tri-Cities contract, no matter that this Court has determined that the Central Evergreen transaction itself was not breached. Indeed, the record demonstrates that each of Sterling’s three acquisitions of troubled thrifts (at the Government’s request and with the Government’s assistance) was built upon, and used leverage acquired through, previous agreements. The full intent of the parties and scope of the damage cannot be evaluated in a vacuum; the contracts must be compared and the circumstances around their formation must be explained. The Motion should be denied, and Sterling should be permitted to introduce evidence related to the Central Evergreen transaction.

## B. STERLING'S OFFER OF PROOF DEMONSTRATES THAT THE GOVERNMENT BREACHED THE CENTRAL EVERGREEN CONTRACT.

### *1. An Offer Of Proof Is Appropriate To Preserve The Record For Appeal Upon A Court's Exclusion Of Evidence*

Federal Rule of Evidence 103, in relevant part, provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and … [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

F.R.E. 103(a)(2). The Court has granted the Government's motion to reconsider and has ruled the contract for the Central Evergreen transaction was not breached. Sterling does not intend to offer evidence on that issue, but respectfully makes an offer of proof regarding the acquisition of Central Evergreen, the Government's breach of that contract, and the damages Sterling incurred as a result, for purposes of preserving the record.

### *2. The Central Evergreen Contract Included The Negotiated-For Business Plan That Controlled The Level Of Capital To Which Sterling Agreed To Adhere.*

1. On July 20, 1988, Sterling and Central Evergreen entered into an Acquisition Agreement that governed the rights between the two institutions, independent of the Government. *See* App. 125 *et. seq.*

2. The Government had estimated that it would take cash assistance of $8 to 12 million to induce a buyer to take on Central Evergreen, and there were few eligible buyers. App. 80:8-81:16; App. 114:25-115:3.

Sterling was able to take on Central Evergreen only because it was able to us the supervisory goodwill acquired through the Tri-Cities transaction as regulatory capital. App. 14; App. 22; App. 33; App. 86:19-24.

3. Pursuant to the Agreement, Sterling agreed to certain obligations: primarily, (1)

maintaining its regulatory capital at or above the minimum capital requirement; and (2) raising additional capital whenever its regulatory capital would fall below either the lesser of the minimum capital requirement or the capital projected in the Business Plan. App. 188.

4. Sterling and the Government negotiated the resolutions which established that Sterling could use supervisory goodwill as an asset. App. 154-159; App. 160-161.

5. The FHLBB Resolution executed as part of the agreement for Sterling's acquisition of Central Evergreen mandates the creation of a mutually acceptable Business Plan which would govern the operation of the merged Sterling/Central Evergreen institution for the subsequent five years and require Sterling's infusion of capital, as contemplated by the same Business Plan. App. 154-159.

6. Through its own Board resolution, Sterling assented to the terms of the FHLBB resolution. App. 160-161.

7. It is undisputed that Sterling and the Government negotiated the Business Plan in which the parties' specific agreement as to how Sterling's regulatory capital would be maintained (including supervisory goodwill) was detailed. App. 107-113.

8. The Business Plan was negotiated prior to the completion of the Agreement and was the most important aspect of the deal to Sterling. App. 172-177.

9. Sterling and the Government further negotiated for a provision in the agreement that would allow Sterling to amend its agreed-to Business Plan if necessary due to "actions taken by any governmental body having jurisdiction that caused [Sterling] to materially deviate from its business plan." App. 184-185.

10. Sterling further bargained for and obtained some leeway in its obligation to maintain regulatory capital in the Business Plan should circumstances change. App. 184-185.

11. Sterling was aware of pending regulatory changes being proposed by FSLIC and debated in Congress, and negotiated for specific protections within the Agreement for its rights under the Business Plan. App. 59-60.

12. Because Sterling was aware of the potential for regulatory change, Sterling bargained for the right to count supervisory goodwill as regulatory capital. App. 59-60.

13. Because the agreement, including the Business Plan, preserved Sterling's right to count supervisory goodwill as regulatory capital regardless of any future regulatory changes as well as Sterling's right to comply with the lesser of capital levels set by such regulations or the Business Plan, the Government breached the agreement. App. 59-60; App. 172-177; App. 184-185; App. 107-113.

## CONCLUSION

For these reasons, the Government's Motion in Limine to Exclude Evidence of Breach of Contract or Damage with Respect to Central Evergreen should be denied. In the alternative, Sterling hereby provides its Offer of Proof regarding the formation, breach and damages incurred from Sterling's acquisition of Central Evergreen.

Respectfully submitted this 15th day of June, 2007.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member Of the Bar of the United States Court of Federal Claims

1100 U.S. Bank Building, 422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on June 15, 2007, a copy of the foregoing **STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**APPENDIX TO**
**STERLING'S RESPONSE BRIEF TO MOTIONS IN LIMINE TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS**
**AND**
**STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN**

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

June 15, 2007

# APPENDIX TO STERLING'S RESPONSE BRIEF TO MOTIONS IN LIMINE TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS AND STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN

## TABLE OF CONTENTS

Affidavit of Daniel G. Byrne . . . . . . . . . . 1

Supplemental Affidavit of Daniel G. Byrne . . . . . . . . 4

Supplemental Affidavit of Harold B. Gilkey . . . . . . . . 20

Affidavit of William W. Zuppe . . . . . . . . . 25

Excerpts of Deposition of Thomas M. Beil, July 9, 2002 . . . . . . 43

Excerpts of Deposition of Daniel G. Byrne, July 10, 2000 . . . . . . 54

Excerpts of Deposition of Daniel G. Byrne, July 11, 2000 . . . . . . 58

Excerpts of Deposition of Daniel G. Byrne, July 12, 2000 . . . . . . 63

Excerpts of Deposition of Gary D. Crithfield, July 9, 2002 . . . . . . 71

Excerpts of Deposition of James R. Faulstich, August 2, 2000 . . . . . 79

Exceprts of Deposition of Harold Gilkey, June 6, 2000, . . . . . . 84

Excerpts of Deposition of Harold Gilkey, June 7, 2000 . . . . . . 98

Excerpts of Deposition of Harold Gilkey, June 8, 2000 . . . . . . 102

Excerpts of Deposition of Edwin C. Hedlund, August 4, 2000 . . . . . 106

Excerpts of Deposition of Cajer Neely, June 26, 2002 . . . . . . 118

Trial Exhibit P-43 . . . . . . . . . . 125

Trial Exhibit P-47 . . . . . . . . . . 154

Trial Exhibit P-79 . . . . . . . . . . 160

Trial Exhibit P-224 . . . . . . . . . . 163

Trial Exhibit P-375 . . . . . . . . . . 179

Trial Exhibit P-389 . . . . . . . . . . 180

Trial Exhibit P-391 . . . . . . . . . . 181

Trial Exhibit P-399 . . . . . . . . . . 182

Trial Exhibit P-401 . . . . . . . . . . 183

Trial Exhibit DX-340 . . . . . . . . . . 185

Trial Exhibit P-53 . . . . . . . . . . 186

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624 5265

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS 90-0175-JLQ<br><br>AFFIDAVIT OF DANIEL G. BYRNE |

STATE OF WASHINGTON )
) ss.
COUNTY OF SPOKANE )

Daniel G. Byrne, being first duly sworn on oath, deposes and says:

1. That I am Senior Vice-President of Sterling Savings Association "Sterling".

2. That on May 29, 1990, Sterling's President, Bill



APP. 1

Zuppe, and I met with representatives of the Office of Thrift Supervision ("OTS").

3. That, during the course of the meeting, the representatives of the OTS refused to give us any assurance that they would not move for the immediate appointment of a receiver or conservator for Strling.

4. That, when Mr. Zuppe and I asked the regulators whether it would be appropriate for us to immediately request that this Court issue a Temporary Restraining Order, the representatives of the OTS indicated that this would be an advisable course of action.

5. That I am of the opinion, based on the meeting with the representatives of the OTS this morning, that Sterling is under the immediate threat of the appointment of a Conservator or Receiver for the Association.

11. That, based upon my experience in the industry, and upon my knowledge of the facts and circumstances surrounding the closure of other thrift associations, I believe that if Sterling were placed in conservatorship or receivership, the value of its preferred and common stock would be substantially impaired if not eliminated and Spokane would be ultimately deprived of a thrift institution that is profitable, well-managed, and providing valuable services to the community and to other communities across the state of Washington.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

SUBSCRIBED AND SWORN TO before me this 24 day of May 1990.

S/ Donald J Luckes
Notary Public in and for the State of Washington, residing at Spokane
My commission expires:





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

RECEIVED
JUN 25 1990
U.S. ATTORNEY
SPOKANE, WA

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
JUN 25 1990
JAMES R. LARSEN, CLERK
DEPUTY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

STERLING SAVINGS ASSOCIATION a state-chartered savings association,

Plaintiff,

vs.

T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,

Defendants.

No. CS 90-0175-JLQ

SUPPLEMENTAL AFFIDAVIT OF DANIEL G. BYRNE

STATE OF WASHINGTON )
) ss.
County of Spokane )

DANIEL G. BYRNE, being first duly sworn on oath, deposes and says:

1. I am senior Vice-President and Chief Financial Officer of Sterling Savings Association ("Sterling").

2. I have been a certified public accountant licensed to practice in the State of Washington since 1979.



APP. 4

3. I was personally involved in negotiations with the Federal Home Loan Bank Board (the "FHLBB") and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), which negotiations culminated in Sterling's acquisition of three insolvent thrift associations: Lewis Federal Savings and Loan Association ("Lewis Federal"); Tri-Cities Savings and Loan Association ("Tri-Cities"); and Central Evergreen Federal Savings and Loan Association ("Central Evergreen").

4. I have personally reviewed Defendants OTS's and FDIC's Memorandum in Support of Motion to Dismiss and in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Defendant's Memorandum") and the supporting exhibits filed therewith including the Declaration of Carol A. Friend ("Friend Declaration").

5. As pointed out in the defendant's memorandum, in the early to mid-1980s, "FSLIC was faced with hundreds of problem thrifts and its insurance fund was virtually wiped out." (Defendant's Memorandum at p. 3.)

6. With the insurance fund virtually wiped out, everyone connected with the thrift industry recognized that the successful acquisition of an insolvent thrift into a healthy one depended on three essential ingredients: management, money and time. The FHLBB and the FSLIC, recognizing that Sterling was not part of the thrift problem, asked Sterling to become part of the thrift solution by supplying the management expertise and most of the money to resolve three troubled thrift problems. The FHLBB and the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

FSLIC supplied the third essential ingredient, time, in the form of contractual regulatory and accounting forbearances. These forbearances were intended by all parties involved in the acquisitions to allow Sterling time to absorb the insolvent thrift associations while remaining in compliance with the other applicable regulations.

7. The government would now tell Sterling that although Sterling has supplied the management expertise and money necessary to resolve three insolvent thrifts, the contracts by which the government granted Sterling the time necessary to absorb the insolvent thrifts do not bind the government.

8. It is a fact that Sterling bargained for and received contractual regulatory and accounting forbearances in exchange for, and as conditions of, Sterling's acquisitions of Lewis Federal and Tri-Cities.

9. It is also a fact that, to induce Sterling to buy Central Evergreen, the FHLBB and the FSLIC promised Sterling in writing time to absorb Central Evergreen and to meet more stringent capital standards than then existed.

10. If the FHLBB and the FSLIC had not requested and encouraged Sterling to acquire the Tri-Cities, Central Evergreen thrifts (and save the FSLIC $51 million in the process), Sterling would be in full compliance with all post-FIRREA capital requirements today.

11. If the Office of Thrift Supervision ("OTS") had not arbitrarily blocked Sterling's 1989 equity offering and purported to eliminate the contractual regulatory and account-





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

ing forbearances to which Sterling is entitled, Sterling would be in full compliance with all post-FIRREA capital standards today.

A. <u>Lewis Federal and Tri-Cities Acquisitions</u>.

12. As an integral part of the negotiations and contracts relating to Sterling's acquisition of Lewis Federal and Tri-Cities, the FSLIC and the FHLBB granted contractual regulatory provision and accounting forbearances as part of the consideration for Sterling's acquisitions. But for such consideration, Sterling would never have contemplated, let alone consummated, the acquisition of sick thrifts like Lewis Federal and Tri-Cities.

(a) Prior to its acquisition of Lewis Federal and Tri-Cities, Sterling received packages of information and instructions relating to the preparation and submission of bids (the "Lewis Federal Bid Package" which is attached hereto as Exhibit "A" and the "Tri-Cities Bid Package" which is attached hereto as Exhibit "B", both of which may be collectively referred to as the "Bid Packages"). The Lewis Federal and Tri-Cities Bid Packages described the types of financial assistance, accounting forbearances, and regulatory forbearances which would be provided by the FHLBB and the FSLIC as part of the acquisitions of Lewis Federal and Tri-Cities.

(b) The Bid Packages did not state or imply in any way that regulatory and accounting forbearances would be less than contractual in nature. To the contrary, the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Bid Packages, particularly Attachment 2 thereof, made it clear that requests for forbearances had to be "convincingly justified" and that "blanket requests for forbearances" would not be acceptable. (Attachments 2, "Requests for Forbearances and Exceptions to Filing Requirements Regarding Supervisory Institutions" are dated April 24, 1984 and March 7, 1986, respectively, and will be referred to herein as "SP-37" and "SP 37a", respectively.) SP-37 and SP 37a both provide:

> The basic purpose in granting forbearances is to give realistic incentives to potential aquirors of the problem institutions. The incentives, however, must be limited to those actually necessary for an acquiror to complete a supervisory merger or acquisition. (SP 37, p. 2.)

The quoted language accurately summarizes the understanding and intent of the parties at the time of the Lewis Federal and Tri-Cities acquisitions: the regulatory provisions and accounting forbearances were the necessary conditions of each acquisition. Without the forbearances and the acquisitions of $13.5 million in permanent capital, the deals wouldn't work and the acquisitions wouldn't be consummated. For the government to suggest that the forbearances were anything less than part of the acquisition contracts is difficult to comprehend. The granting of forbearances would not have been so carefully limited by the FHLBB if the forbearances had never been intended to bind the FHLBB and the FSLIC.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(c) The Bid Packages also made it clear that the FHLBB and the FSLIC would agree to forebear from enforcing certain regulations and accounting principles only for a very limited period of time. For example, the forbearance from enforcement of any reserve or net worth requirement was to last only "for a period of five years following the [acquisitions]." (SP 37 and SP 37a, both at p. 3.) The forbearances would not have been so carefully limited in time if they had never been intended to bind the government during that period of time.

(d) During both the Lewis Federal and Tri-Cities negotiations, each of the regulatory and accounting forbearances ultimately contained in the acquisition contracts was specifically negotiated by Sterling, on one hand, and the FHLBB and the FSLIC on the other. Again, the forbearances would never have been so carefully negotiated by the FHLBB and the FSLIC if they had not been intended to bind the government.

(e) Ultimately, as part of both the Lewis Federal and Tri-Cities closing processes, the FHLBB and the FSLIC delivered Forbearance Letters to Sterling together with the FHLBB Resolutions specifically authorizing the financial assistance, accounting forbearances and regulatory forbearances granted as consideration for Sterling's acquisition of Lewis Federal and Tri-Cities. (The Lewis Federal Forbearance Letter and Resolution No. 85-985 are attached hereto as Exhibits "C" and "D" respectively, and



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the Tri-Cities Forbearance Letter and Resolution 88-250P are attached hereto as Exhibits "E" and "F" respectively.)

(f) In the Lewis Federal Forbearance Letter the FHLBB:

(1) Permitted Sterling to exclude certain of Lewis Federal's liabilities in determining compliance with certain requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years (until November of 1990) if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of the failing Lewis Federal, or by Sterling's assumption of Lewis Federal's negative net worth;

(3) Ordered that Sterling could carry $1.8 million in FSLIC cash assistance on its books as a credit to its net worth, for permanent regulatory capital purposes;

(4) Ordered that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 40 years; and

(5) Ordered that the difference between the book value and the fair market value of Lewis Federal's loan portfolio could be amortized to income over a 15-year period.

(g) In the Tri-Cities Forbearance Letter the FHLBB:





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(1) Agreed to waive the assessment, for one year, of penalties occasioned by Sterling's inability to satisfy liquidity requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years (until April of 1993) if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of the failing Tri-Cities, or by Sterling's assumption of Tri-Cities' negative net worth;

(3) Agreed that Sterling could carry $11.7 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital purposes;

(4) Agreed that for regulatory accounting purposes, supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized to income over eight years.

(h) Resolutions 85-985 and 88-250P both "authorized and directed" the FHLBB Secretary to send the applicable Forbearance Letters "provided that the final form of such letter[s] ... be approved by the Office of the General Counsel." It is incredible to suggest that the FHLBB and the FSLIC engaged in such a deliberative process leading to the granting of forbearances, even including the adoption of formal Resolutions by the Bank



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Board itself authorizing and directing the issuance of the Forbearance Letters, but first requiring the Letters to be approved by the General Counsel, if the forbearances were never intended to bind the FHLBB and the FSLIC.

(i) The Lewis Federal and Tri-Cities Acquisition Agreements between the FSLIC, as receiver, and Sterling (which Agreements are attached hereto as Exhibits "G" and "H" respectively) stated, on pages 10 and 11 thereof respectively:

> This Agreement, together with any interpretation of it or any understanding agreed to in writing by the parties, constitutes the entire agreement between [Sterling] and the [FSLIC] as receiver ... and supersedes all prior agreements and understandings of the parties, excepting only any resolutions or letters approved or adopted contemporaneously with this Agreement by the [FHLBB] or the [FSLIC].

The quoted language should resolve any doubt as to whether the regulatory and accounting forbearances and specifically the Forbearance Letters themselves were contractual in nature. If nothing else it gave Sterling a right to rely on the government's promises to give Sterling time to absorb Lewis Federal and Tri-Cities, it was the fact that Resolution 85-985 and the Lewis Federal Forbearance Letter were specifically incorporated into the Lewis Federal Contract, and Resolution 88-250P and the Tri-Cities Forbearance Letter were specifically incorporated into the Tri-Cities Contract. Were it otherwise, it would have been completely illogical for the FSLIC and the FHLBB to carefully negotiate the for-





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

bearances, to refrain from granting them unless the acquisitions depended upon them, to limit the forbearances in terms of time, and to grant them only as a result of deliberations and approvals at so many consecutive levels of government, right up to and including the Chairman of the FHLBB and the members of the Board of Directors of the FHLBB.

(j) Finally, the Lewis Federal and Tri-Cities Assistance Agreements between the FSLIC and Sterling (which are attached hereto as Exhibits "I" and "J" respectively) contained, at pages 27 and 72, respectively, language identical to that quoted in the previous subparagraph. The Agreements provided, at pages 28 and 74, respectively, that the Assistance Agreements would "be binding upon and inure to the benefit of the parties and their respective transferees, successors and assigns." This language was understood by all parties to the Lewis Federal and Tri-Cities transactions to mean that the contractual obligations of the FSLIC and the FHLBB, including specifically the obligation to honor the forbearances, would be binding not only on the FHLBB and the FSLIC, but on all successor regulators such as the OTS.

B. <u>As Consideration for Sterling's Acquisition of Central Evergreen, the Government Agreed to Give Sterling Time and a Fair Opportunity to Absorb Central Evergreen and Meet All Future Capital Standards.</u>

10. To be understood, the Central Evergreen transaction must be examined in the context of the previous acquisitions.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

It is important to note that it was in the summer of 1987, prior to the time Sterling's bid on Tri-Cities had been accepted, that the FHLBB requested that Sterling consider acquiring Central Evergreen. Sterling demurred, pointing out that such an acquisition might create a regulatory capital deficiency in the future. The FHLBB and the FSLIC had discussed with Sterling the possibility that existing regulatory capital standards would be increased, and Sterling had otherwise learned as much through industry sources. The FHLBB and the FSLIC asked that Sterling consider the acquisition anyway, pointing out that the "permanent" regulatory capital created by the Lewis Federal and Tri-Cities acquisitions could be used to "leverage" Sterling into technical compliance with the regulations.

11. Sterling studied Central Evergreen, and concluded that, even though Sterling would still be in compliance following the acquisition with existing regulatory capital requirements, Sterling would not complete the acquisition unless it would be allowed to raise between $4 and $6 million in new capital to offset the financial impact of the acquisition. Sterling discussed this concern at length with the regulators, and, as part of the negotiations leading up to the Central Evergreen agreement (the "Central Evergreen Agreement" which is attached hereto as Exhibit "K"), Sterling insisted that a clause be inserted to mitigate Sterling's regulatory risk that the existing regulatory capital standards might be increased. In response, the FHLBB and the FSLIC amended the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

draft Central Evergreen Agreement to provide that Sterling would be allowed to amend its business plan (to, for example, raise additional capital) if such amendment became necessary due to "actions taken by any governmental body having jurisdiction that caused [Sterling] to materially deviate from its business plan." (Central Evergreen Agreement at p. 3.)

12. On December 8, 1988, the FHLBB adopted a Resolution of approving the acquisition. (The Resolution, No. 88-1273, is attached hereto as Exhibit "L".) The Resolution was based on formal findings of fact that, among other things, Sterling "would be a viable entity" following the acquisition. The FHLBB Resolution directed that the FSLIC should enter into an agreement pursuant to Sterling's proposal calling for an infusion of capital after the acquisition.

13. On December 28, 1988, Sterling contracted with the FSLIC to carry out a specific business plan. The plan contemplated the addition of between $4 and $6 million in new equity capital within two years.

14. Once again, in exchange for Sterling's agreement to provide the management expertise and money necessary to resolve the Central Evergreen problem, the FHLBB and the FSLIC agreed to provide Sterling with the time and a reasonable opportunity to absorb Central Evergreen. By entering into this agreement, the FHLBB and the FSLIC agreed to cooperate with Sterling in Sterling's efforts to raise additional equity capital.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

15. Unfortunately, the OTS and FDIC chose to violate the Central Evergreen Agreement by blocking Sterling's 1989 equity offering. As discussed elsewhere in this case (see, e.g., Affidavit of A. Adjate Duer, and Plaintiff's Verified Complaint), Sterling's 1989 equity offering was so well received by the marketplace that Sterling would have raised approximately $10.8 million in new, qualifying regulatory capital had the OTS not arbitrarily blocked the offering by refusing to approve of Sterling's payment of the proposed dividends.

C. If Tri-Cities and Central Evergreen Acquisitions are Backed Out, Sterling Complies with FIRREA Capital Standards.

16. Sterling has substantially absorbed Lewis Federal as it promised to do, prior to the end of the agreed time frame (November of 1990). For that reason, the Lewis Federal transaction is a good example of how Sterling planned to and did absorb the assets and liabilities of an insolvent thrift association. This was not the first time Sterling had assisted regulators by acquiring an insolvent thrift association. On June 30, 1983, Sterling had acquired Lewis and Clark Savings & Loan Association ("Lewis and Clark"). The Lewis and Clark acquisition increased Sterling's assets by approximately 600 percent (from $7.4 million to $51.6 million). Similarly, the Lewis Federal acquisition increased Sterling's assets by approximately 42.5 percent (from $125.9 million to $179.4 million). That these acquisitions were successfully completed and the insolvent thrifts were absorbed





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

in spite of the tremendous increases in Sterling's balance sheet, is a testament to Sterling's financial and management strength.

17. In a similar manner, Sterling has been absorbing Tri-Cities and Central Evergreen as it promised to do prior to the end of the agreed time frames (April of 1993 and December of 1990, respectively).

18. The sole reason that Sterling is alleged not to be in compliance with present capital standards is because it acquired Tri-Cities and Central Evergreen. Any potential noncompliance was contemplated before and addressed in the Tri-Cities and Central Evergreen acquisition agreements. I have prepared the attached Exhibit "M" to demonstrate that the Tri-Cities and Central Evergreen acquisitions are the sole reason for Sterling's alleged noncompliance with present capital standards.

19. Exhibit "M" is a report of Sterling's capital position as of May 31, 1990, without including Tri-Cities or Central Evergreen. As is apparent, Sterling would exceed its tangible capital requirement of 1.5 percent by 78 basis points, or 52 percent. Sterling would exceed its core capital requirement by 28 basis points, or 9 percent. Finally, Sterling would exceed its risk-based capital requirement of 6.4 percent by 3.5 basis points, or .05 percent.

20. In contrast with the information contained in the Friend Declaration, Sterling is in compliance with all post-FIRREA standards today if the Tri-Cities and Central



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Evergreen transactions are backed out of Sterling's capital calculation. The following summary of Exhibit "M" shows Sterling's actual capital position on May 31, 1990, on this basis:

| | Tangible | Core | Risk-based |
|---|---|---|---|
| Required | $5,400,000 | $10,799,000 | $15,484,000 |
| Actual | 8,213,000 | 11,797,000 | 15,568,000 |
| Excess Capital | $2,813,000 | $ 998,000 | $ 84,000 |

21. In reviewing Carol Friend's Declaration, I observed that she apparently omitted the $13.5 million in permanent (regulatory) capital that Sterling acquired in the Lewis Federal and Tri-Cities transactions, and other intangibles qualifying under FIRREA.

22. In summary, if the Tri-Cities and Central Evergreen acquisitions are backed out (for which the capital forbearances and the time to absorb them were obtained by Sterling), Sterling is in compliance with all three FIRREA capital standards as of the most recent month end prior to the court hearing.

D. If Sterling had been Permitted to Conduct Public Offering, Sterling Would Comply With All Existing Capital Standards.

23. If the OTS had not arbitrarily blocked Sterling's 1989 equity offering and purported to eliminate the contractual regulatory capital and accounting forbearances to which





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Sterling is entitled, Sterling would be in full compliance with all post-FIRREA capital standards today.

24. I have prepared Exhibit "N" to illustrate that Sterling would be in full compliance with each of the post-FIRREA capital standards today if OTS had complied with its existing contracts with Sterling. On this assumption, Sterling would exceed its tangible capital requirement by 72 basis points, or 48 percent. Sterling would exceed its core capital requirement by 151 basis points, or 50 percent. Finally, Sterling would exceed its risk-based capital requirement by 126 basis points, or 20 percent.

Daniel G. Byrne

DANIEL G. BYRNE
Senior Vice President and
Chief Financial Officer of
Sterling Savings Association

SUBSCRIBED AND SWORN to before me this 25th day of June, 1990.

[signature]

NOTARY PUBLIC in and for the State of
Washington, residing at Spokane

My appointment expires: 2-2-93





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS-90-0175-JLQ<br><br>SUPPLEMENTAL AFFIDAVIT OF HAROLD B. GILKEY |

STATE OF WASHINGTON )
) ss.
County of Spokane )

HAROLD B. GILKEY, being first duly sworn upon oath, deposes and says:

1. I am now and have been since its inception the Chairman of the Board and Chief Executive Officer of Sterling Savings Association ("Sterling").





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

2. Sterling is a profitable and solvent savings association. Sterling has earned a profit each year it has been in business. June 30 1989 year end was the most profitable in history. Sterling has earned a profit for the 11 months ending May 31, 1990, despite imposition in 1990 of operating restrictions by OTS because of Sterling's alleged capital deficiency.

3. With respect to the capital solvency of Sterling, the Resolution Trust Corporation ("RTC") has repeatedly said that Sterling is solvent. In example, attached hereto as Exhibit "A" is a copy of a letter dated June 1, 1990 from RTC to Ruth P. Hanson of Chehalis, Washington, in which RTC states that it "has no jurisdiction over solvent institutions such as Sterling." There are literally dozens of such RTC letters addressed to interested depositors, borrowers, and shareholders, copies of which have been furnished to Sterling.

4. I was involved in the Sterling acquisitions of the Tri-Cities and Central Evergreen thrifts. Sterling would not have considered the bid proposals sent to Sterling by FHLBB and FSLIC had Sterling not been asked to submit a bid and had the bid packages not contained financial inducements to acquire the insolvent thrifts, such as capital forbearances.

5. Sterling has substantially absorbed the acquisition of the insolvent Lewis Federal, although it enjoys forbearances by reason of this acquisition until November, 1990. On the other hand, Sterling has, by virtue of its agreement with FHLBB and FSLIC, until April, 1993 to absorb Tri-Cities. If



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the Tri-Cities and Central Evergreen acquisitions are backed out of Sterling's books, Sterling is in compliance with all three (tangible, core, and risk-based) capital standards under FIRREA as of May 31, as more fully described in the Affidavits of Gordon Budke and Daniel Byrne. In other words, the sole reason for the alleged non-compliance with post-FIRREA capital standards is the acquisition of Tri-Cities and Central Evergreen from which Sterling received contractual commitments from the regulators and without which Sterling would not have made the acquisitions of the insolvent thrifts.

6. The Tri-Cities and Central Evergreen acquisitions and, therefore, the capital forbearances and other inducements, were interrelated. When Sterling bid on Tri-Cities, it was originally not the low bidder. In early 1988, Hilton Hewitt, Sterling's Supervisory Agent from FHLB-Seattle, contacted me and requested that Sterling consider acquiring the insolvent Central Evergreen. I said that Sterling may not have sufficient capital to acquire two insolvent thrifts in the same year (April, 1988 and December, 1988). Hewitt responded that Sterling would have ample capital by using the supervisory goodwill and permanent capital it would obtain from the Tri-Cities thrift to qualify for the acquisition of Central Evergreen.

7. I told Hewitt that, under the circumstances as he assured me, Sterling would look at Central Evergreen. Shortly thereafter, Sterling learned that it moved ahead of the low bidder, Old Stone Savings Bank, and was now the likely aquiror





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of Tri-Cities. I relied on Hilton Hewitt's assurances and representations that the capital forbearances, supervisory goodwill, and permanent capital obtained in the Tri-Cities acquisitions were binding on the regulators. Without such a commitment, Sterling would not have considered the acquisition of Central Evergreen or, for that matter, Tri-Cities. Sterling further negotiated with FHLBB, as part of the Central Evergreen deals, the right to raise additional capital, including the right to pay dividends on preferred stock, by December 31, 1990. Later, after the preferred stock offering was fully subscribed, the Office of Thrift Supervision ("OTS") refused in January 1990 to permit payment of dividends on the preferred stock to be sold, despite FHLBB's previous agreement with Sterling to the contrary, thereby resulting in the cancellation of the offering. At the time, Sterling still had by the terms of its agreement one year, or until December 31, 1990, within which to complete its offering for new capital. Six months of that time has been lost.

8. Sterling has approximately 300 employees in its 28 branches throughout Washington. It has approximately 72,000 customer account relationships. As a result of the action taken by OTS to date and the attendant publicity, Sterling has already experienced the loss of employees, including several key middle managers, who are concerned about their futures. Their untimely departure has already begun to affect the bottom line. For the same reasons, Sterling has begun to experience a loss of depositors and account relationships in





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

April and May, 1990. Further, Sterling has begun to lose investor confidence, as evidenced by the fact that Sterling's stock has dropped in price over the last several months from over $9 per share to $4 per share. Unless OTS and FDIC are enjoined pending trial on the merits, Sterling will be irreparably and incalculably harmed. Loss of confidence in the depositor and investor community cannot be easily repaired. Moreover, it cannot be judged or calculated in terms of lost profits because Sterling does not and will not know which depositor or borrower will never bank at Sterling by reason of the OTS and FDIC action. Consumer confidence in Sterling and Sterling's reputation in the community are fragile, particularly in the current regulatory environment, and the loss thereof is virtually impossible to measure.

Harold B. Gilkey

HAROLD B. GILKEY

SUBSCRIBED AND SWORN to before me this 25 day of June, 1990, by Harold B. Gilkey.

NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 2-2-93



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS-90-0175-JLQ<br><br>AFFIDAVIT OF WILLIAM W. ZUPPE |

STATE OF WASHINGTON )
) ss.
County of Spokane )

WILLIAM W. ZUPPE, being first duly sworn upon oath, deposes and says:

1. I make this affidavit of my own personal knowledge.

2. I am President, Chief Operating Officer, and a director of Sterling Savings Association (hereinafter



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

"Sterling"). I have been in the banking or mortgage banking business for the past 26 years.

3. Sterling is a state chartered, federally insured, stock savings and loan association, founded in 1983, and headquartered in Spokane, Washington.

4. Sterling has 28 branches through the State of Washington, employs approximately 300 employees, and enjoys more than 72,000 customer account relationships.

5. Sterling is the only thrift institution headquartered in the Inland Empire. It has deposits of approximately $490 million and assets of nearly $690 million.

6. Sterling is engaged in the business of attracting deposits from the public and originating, purchasing, selling, and servicing secured residential, commercial, and consumer loans.

7. Sterling has a June 30 fiscal year end. Its books are audited annually by the public accounting firm of Coopers and Lybrand, CPAs.

8. Sterling is a profitably and efficiently run savings association. Sterling has earned a profit each year it has been in business. It has never experienced an operating loss. For the year ending June 30, 1989, Sterling generated net after- tax earnings of $1,285,000. This is the highest in Sterling's history. Net post-tax earnings have increased each year. For example, in 1985, after-tax earnings were $445,000; 1986, $775,000; 1987, $935,000; and 1988, $1,219,000. It generates a healthy 15% return on shareholders' equity. The



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

book value per common share of stock, like after-tax earnings, has steadily increased each year since inception.

9. Attached hereto as Exhibit "1" is the 1989 Report to Shareholders containing, among other things, the audited financial statements prepared on a comparative basis for the years 1989, 1988, and 1987. Also attached as Exhibit "2" is 1986 Annual Report containing the audited financial statements from 1986 back to 1984, the first full year of operation.

10. Sterling has earned a profit for the ten-month period ending April 30, 1990.

11. At the present time, Sterling management is in the process of budgeting income and expenses for the fiscal year end June 30, 1991. Based on preliminary budget projections, not yet refined, it appears that Sterling will earn approximately $1 million after tax for the year ending June 30, 1991.

12. As of December 31, 1989, Sterling's net worth under Generally Accepted Accounting Principles amounted to $10.9 million. Sterling has over 900 shareholders.

13. Sterling's Board of Directors consists of 12 members of the business community throughout the State of Washington. Harold B. Gilkey is Chairman of the Board and Chief Executive Officer. Mr. Gilkey has been in the banking or mortgage banking business for the past 28 years.

14. Sterling is a conservative, well managed, "no frills" institution. Unlike some savings institutions discussed in the media, Sterling has no corporate jets, art





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

work collections, or lavish headquarter buildings. It has not made nonconforming insider loans or speculative investments such as in high yield junk bonds or land acquisition and development schemes.

15. During the early to mid-1980's, a number of thrift institutions experienced financial losses due to volatile interest rates and inflation, among other reasons. The Federal Savings and Loan Insurance Corporation ("FSLIC"), which provided deposit insurance to thrifts, eventually was unable to recapitalize or liquidate the increasing number of troubled thrifts. Beginning in the early 1980's, the Federal Home Loan Bank Board ("FHLBB"), which regulated thrifts, asked certain healthy thrifts to take over or merge with ailing thrifts, thereby reducing pressure on the FSLIC Insurance Fund and relieving regulators of a burden. To induce healthy thrifts to take over ailing thrifts, the regulators offered various financial and accounting inducements and capital forbearances.

16. As a solvent and healthy thrift, Sterling was asked, commencing in 1985, by the FSLIC and the FHLBB, its regulators, to acquire certain troubled thrifts, and was promised specific capital forbearances and accounting treatment whereby Sterling could acquire the troubled thrifts and thus save the FSLIC and the FHLBB literally millions of dollars. The inducements consisted, in part, of (a) permitting the acquiring institution to record regulatory cash assistance as a part of their permanent regulatory capital, (b) allowing acquiring





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

thrifts to extend goodwill amortization periods beyond those allowed under Generally Accepted Accounting Principles thereby increasing their capital, and (c) granting forbearances such as agreeing not to enforce capital requirements if the breach of such requirements was caused by the acquisition of the troubled thrifts by the healthy thrift. Over time, Sterling agreed to bail out three troubled thrifts, thereby saving the FSLIC millions of dollars, and in the process received each of the foregoing types of contractual inducements. In short, Sterling agreed to be part of the solution to the problem of troubled thrifts.

17. In early 1985, the FHLBB declared Lewis Federal Savings and Loan Association ("Lewis Federal") of Chehalis, Washington, to be insolvent. Pursuant to its announced policy of finding a well managed, solvent thrift to acquire an insolvent thrift so as to preserve the Insurance Fund, the FHLBB asked Sterling to submit a takeover bid recognizing that, as the acquiring institution, Sterling would be given time to earn its way out of the absorption of Lewis Federal's negative net worth. Specifically, the FHLBB offered all bidders (a) forbearances from enforcement of certain regulatory capital requirements, and (b) special treatment of supervisory goodwill to meet capital requirements.

18. In June, 1985, responding to the FHLBB's request for bid, Sterling offered to acquire Lewis Federal.

19. On November 4, 1985, the FHLBB adopted a resolution containing formal findings of fact that Lewis Federal was



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

insolvent, that Sterling was competent and safe to acquire Lewis Federal, that the Sterling acquisition would reduce risk to the Insurance Fund, that Sterling would continue to be a viable entity after the acquisition, and that to induce Sterling to acquire Lewis Federal, the FHLBB would grant capital forbearances and purchase accounting treatment of goodwill. Attached hereto as Exhibit "3" is the Resolution.

20. On November 5, 1985, Sterling entered into a written contract with the FSLIC as receiver for Lewis Federal to take over the insolvent thrift subject to the FHLBB's approval of the conditions set forth below. Attached as Exhibit "4" is the contract.

21. On November 12, 1985, the FHLBB entered an Order formally granting to Sterling the capital forbearances and supervisory goodwill accounting treatment, as follows:

(a) Permitting Sterling to exclude certain Lewis Federal liabilities in calculating compliance with certain regulations;

(b) Waiving enforcement of any regulatory capital regulations for five years, or until November, 1990, if Sterling's failure to comply was caused by the increase in liabilities and/or the assumption of negative net worth from the Lewis Federal acquisition;

(c) Agreeing that Sterling carry $1.8 million in cash assistance on its books as a credit to net worth for regulatory accounting purposes;



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(d) Agreeing that the $1.8 million in supervisory goodwill created by the acquisition would be capitalized and amortized over 40 years;

(e) Agreeing that the difference between the book and fair market values of Lewis Federal's loan portfolio would be capitalized and amortized over 15 years.

Attached hereto as Exhibit "5" is a copy of the Order.

22. Pursuant to the foregoing agreement and Order, Sterling entered $1.8 million in permanent capital on its books.

23. In acquiring Lewis Federal, Sterling and its shareholders saved the FSLIC approximately $5.2 million to liquidate Lewis Federal.

24. In the summer of 1987, the FHLBB adjudged the Tri-Cities Savings and Loan Association ("Tri-Cities") to be insolvent.

25. To preserve the Insurance Fund, the FHLBB asked for bids from selected thrift institutions to acquire Tri-Cities. Sterling was one of the thrifts asked. Selection criteria included (a) low cost to the FSLIC and (b) high probability that the acquiring institution would be able to "earn its way out" of Tri-Cities' negative net worth.

26. Sterling submitted a bid in November, 1987, to acquire Tri-Cities subject to essentially the same conditions as with the Lewis Federal bid: (a) forbearance from regulatory capital requirements and (b) acceptance by the FHLBB of the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

purchase accounting treatment of the resulting supervisory goodwill.

27. On April 7, 1988, the FHLBB adopted a resolution to the effect that Tri-Cities was insolvent, that Sterling was a well qualified, competent, and healthy thrift to acquire and manage Tri-Cities, that the FSLIC Insurance Fund would be preserved by the acquisition, and that Sterling would be granted certain regulatory forbearances and other conditions of purchase to induce it to buy the troubled Tri-Cities thrift. Attached hereto as Exhibit "6" is a copy of the Resolution.

28. On April 6, 1988, the FHLBB entered an Order formally granting the conditions, including, among others:

(a) Agreeing not to enforce any regulatory capital rules for <u>five years</u>, or until <u>April, 1993</u>, if Sterling's failure to comply was caused by the acquisition of Tri-Cities;

(b) Agreeing that the $11.7 million in cash assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years; and

(c) Agreeing that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized over 8 years.

Attached hereto as Exhibit "7" is a copy of the Order.

29. On April 8, 1988, Sterling entered into a written contract with the FSLIC as Tri-Cities' receiver subject to the foregoing forbearance and purchase accounting treatment of the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

supervisory goodwill. Attached hereto as Exhibit "8" is a copy of the contract.

30. Pursuant to its agreement with the FSLIC and in conformity with the FHLBB Order, Sterling booked $11.7 million in permanent regulatory capital.

31. As of April, 1988, the FHLBB contractually agreed and then ordered that Sterling be permitted to count an additional $13.5 million ($1.8 from Lewis Federal and $11.7 from Tri-Cities) in supervisory goodwill toward its regulators' capital requirement.

32. But for Sterling's acquisition of the insolvent Tri-Cities, the FSLIC would have had to spend approximately $13.7 million additionally to liquidate Tri-Cities.

33. In the summer of 1987, the FHLBB asked Sterling to acquire Central Evergreen Federal Savings and Loan Association ("Central Evergreen"), an insolvent thrift located in Chehalis, Washington. Sterling stated it did not have enough capital to acquire a $250 million deposit thrift. The FHLBB persisted, asking Sterling to at least look at Central Evergreen. Sterling did, but still turned down the request because it did not have sufficient capital on its own to acquire a large insolvent thrift. The supervisory agent, Hilton Hewitt of the Seattle Office of FHLBB, reiterated that if Sterling acquired Tri-Cities, the permanent regulatory capital thereby created could be used to acquire Central Evergreen and remain in capital compliance.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

34. Based on the FHLBB's further assurances that Sterling would be in compliance with capital standards if it took Central Evergreen off of the FSLIC's hands, Sterling reevaluated Central Evergreen and concluded an acquisition could be done to help the FSLIC and FHLBB on the express condition that Sterling be permitted to raise $4 to $6 million in additional equity capital soon after the acquisition. Sterling then contracted to acquire Central Evergreen contingent upon capital forbearance and other commitments fr m the FHLBB.

35. Under the "purchase method of accounting" for mergers, GAAP permits adjusting assets and liabilities to fair market value, then the excess over the fair market value of the acquired liabilities over assets is entered on Sterling's books as goodwill.

36. On December 8, 1988, the FHLBB adopted a resolution approving the acquisition and, as before, found that Central Evergreen was insolvent, that the acquisition would preserve the Insurance Fund, that Sterling was a viable entity and would be so after the acquisition, that "the purchase method accounting treatment of goodwill" should be used, and that Sterling should be permitted to raise equity capital after the acquisition pursuant to a new business plan with the FSLIC. Attached as Exhibit "9" is a copy of the Resolution.

37. On December 28, 1988, Sterling contracted with the FSLIC to implement a new business plan including the addition



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of $4 to $6 million in new equity by December 31, 1990. Attached as Exhibit "10" is a copy of the contract.

38. As part of the foregoing agreement, the FSLIC agreed to permit Sterling to revise its business plan "should events beyond Sterling's control" prevent the contemplated offering.

39. By acquiring Central Evergreen, Sterling saved the FSLIC approximately $30.1 million in liquidation costs. As a result of the three acquisitions described above, Sterling and its shareholders saved the FSLIC and the American tax-payers over $51 million.

40. In summary, if the regulators were required to adhere to their written contractual commitments, Sterling would be entitled to:

(a) forbearance from regulatory capital standards until November 5, 1990 if Sterling's failure to comply was caused by an increase in liabilities from the acquisition of Lewis Federal;

(b) forbearance from regulatory capital standards until April 8, 1993 if Sterling's failure to comply therewith was caused by an increase in liabilities form the acquisition of Tri-Cities;

(c) forbearance from regulatory capital standards until December 31, 1990 if Sterling's failure to comply with the standards was caused by inability to raise capital following the Central Evergreen acquisition;



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(d) raise equity capital through a public offering and pay dividends on the preferred stock issued, all as part of the Central Evergreen transaction;

(e) count $13.5 million from the Lewis Federal and Tri-Cities acquisitions as supervisory goodwill toward its regulatory capital requirement.

41. Pursuant to regulatory commitments made to it in the Central Evergreen contracts with the FSLIC in the fall of 1989, Sterling prepared to add approximately $10.5 million in capital through a public offering. By December, 1989, Dain Bosworth, Inc., the underwriter on the proposed stock offering, confirmed that the 603,750 units of noncumulative preferred stock had been subscribed to. Dain Bosworth, Inc. had already completed by this time the necessary due diligence to assure itself that Sterling's earnings would be sufficient to pay dividends.

42. Prior to and during December, 1989, Sterling requested regulatory confirmation of its previous contractual commitment to permit payment of dividends on the new stock to be offered. Without regulatory approval of the payment of dividends, the new stock offering was futile. Without the stock offering promised by the FHLBB and FSLIC, Sterling would never have acquired Central Evergreen no matter how many pleas it received from the regulators.

43. By this time, the fall of 1989, the FHLBB had been replaced by the Office of Thrift Supervision (the "OTS"). The OTS initially responded that the proposed public offering was



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

in the mutual interest of Sterling and the OTS. By late **December**, 1989, the OTS changed its mind, refused to honor the **contract** of its predecessor in interest, and refused payment of dividends on the new offering, thereby aborting the offering.

44. As a result, Sterling incurred nearly <u>$1 million</u> in underwriting fees, as well as accounting and attorney fees, in preparation for the equity offering.

45. By not later than December, 1989, it became evident that the OTS was intending to disregard the capital forbearance commitments made by its predecessor, the FHLBB, and the supervisory goodwill acquired by Sterling as a result of the Lewis Federal, Tri-Cities and Central Evergreen bail out acquisitions.

46. Although Sterling had assisted the regulators in the three thrift bailouts described above and had negotiated contracts covering each of the conditions, promises, and covenants of the acquisitions, the OTS abrogated the written contracts and began to treat Sterling as if it were a troubled thrift. After unilaterally cancelling the (a) capital forbearance, (b) supervisory goodwill, and (c) permanent capital ($13.5 million) provisions of Lewis Federal, Tri-Cities and Central Evergreen acquisition agreements and orders, the OTS took the position that Sterling is technically capital deficient under Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

47. As part of the OTS' wrongful and wholly unjustified treatment of Sterling as a troubled thrift, in late December, 1989 the OTS directed Sterling to file a plan for resolving the perceived capital deficiency. If OTS had honored its contracts and orders to begin with, Sterling would not have had to incur the time and considerable expense in preparing the capital plan.

48. Were it not for the breach by the OTS of the supervisory acquisition agreements, the OTS could not maintain that Sterling was in violation of the post-FIRREA capital standards.

49. Again in violation of its contractual commitment, the OTS began in 1990, and is now, imposing a series of operating restrictions on Sterling which collectively hampers Sterling's ability to generate a profit, though it has still continued to do so.

50. Without conceding that the OTS was entitled to treat Sterling as a troubled thrift and having made it clear to the regulators that Sterling had contractual forbearances, Sterling was required by an OTS policy directive to submit a capital plan in January, 1990 demonstrating the long term viability of Sterling as a thrift institution.

51. By early April, 1990, despite the fact that Sterling had made a profit each and every year of its operations and also for the six months ending December 31, 1989, the OTS insisted that Sterling sign an Operating Agreement giving the OTS the right to appoint a conservator or receiver. The OTS premised its insistence on the basis that it had cancelled the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

capital forbearance, the supervisory goodwill, and the **permanent** capital provisions of the supervisory acquisitions.

52. The Operating Agreement proposed by the OTS made Sterling concede (a) that the three supervisory acquisition agreements were of no force or effect, (b) that Sterling was therefore subject to FIRREA, (c) that Sterling had insufficient capital now that the forbearances, supervisory goodwill, and permanent capital were cancelled, and (d) that the OTS could appoint a conservator or force the sale of the Association.

53. The proposed Operating Agreement, if signed, could require Sterling's Board to resign at any time without cause and to recommend to the shareholders that they abandon their investment in the Association, despite the fact that Sterling was and is profitable. The Board declined to execute the Operating Agreement because of its duties to the depositors and shareholders. Attached hereto as Exhibit "11" is a copy of the proposed "Operating Agreement with Conditional Consent to the Appointment of Conservator or Receiver."

54. On May 10, 1990, Sterling, having tried to convince the OTS to comply with its contractual commitments, hand delivered the Seattle Office of the OTS a letter, attached hereto as Exhibit "12", which explained to the OTS the reasons why the Sterling Board did not sign the proposed Operating Agreement. The OTS has not responded to this letter directly, except to repeat its position that the agreements were abrogated.

...



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

55. Affiant attended the May 10 meeting of the Seattle Office of the OTS. Present for the OTS were William J. Durbin, District Director of Seattle District, Ed Hedlund, and Carol Friend. Present for Sterling were Harold Gilkey, Dan Byrne, Chief Financial Officer, and affiant. At this meeting, William Durbin admitted to Sterling that it was "being stiffed, but the government can do that. It comes from the right of kings." On that occasion, William Durbin confirmed that "OTS has no problem whatsoever" with Sterling management and asked Ed Hedlund to concur in this opinion, which he did. On one previous occasion, Carol Friend told affiant that "you are ... good managers."

56. Sterling has built a reputation of being "turn around specialists." That is why FHLBB and FSLIC came to Sterling in the first place to take over Lewis Federal, Tri-Cities, and Central Evergreen, because Sterling knows how to efficiently run a thrift bank, manage troubled loans or accounts, build capital, protect its depositors, and make a profit. If it were otherwise, FHLBB and FSLIC would not have asked Sterling in the first place to help out the Insurance Fund and acquire the three troubled thrifts. Sterling would be in compliance with current FIRREA tangible and core capital requirements but for the acquisitions of (or backing out the) Tri-Cities and Central Evergreen supervisory acquisitions. Alternatively, Sterling is in compliance with FIRREA capital standards if the forbearance and accounting commitments of the supervisory acquisition agreements are honored. Either way,



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Sterling is not in violation and needs the protection of this Court.

57. Despite Sterling's repeated explanations and suggested reasonable alternatives as to how to proceed (see Exhibit "12"), the OTS has not responded substantively. Instead, the OTS has proposed a Capital Directive which, if enforced, is tantamount to a shutdown of Sterling.

58. Sterling has thoroughly exhausted its administrative remedies.

59. Sterling is in imminent danger and threat of being shut down by the OTS and having the value of its shareholders' investment wiped out, even though Sterling is a profitable savings institution.

60. Sterling has fully performed or is in compliance with every provision of the three supervisory acquisition agreements. Now that the FHLBB and FSLIC have the benefit of their bargain, the OTS seeks to cancel the agreements before Sterling gets its share of the deal and before Sterling has had the opportunity of "turning around" the assets and liabilities of the three acquired thrifts within the dates described in the supervisory acquisition agreements; namely, November 1990, December 1990, and April 1993. In this regard, OTS wrongfully frustrated Sterling's public offering which was fully subscribed to over $10 million, despite the fact that it



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

agreed to this as a condition of the Central Evergreen acquisition. This arbitrary conduct cost Sterling $1 million in costs which will be charged off by June 30th.

WILLIAM W. ZUPPE

SUBSCRIBED AND SWORN to before me this 28th day of May, 1990, by William W. Zuppe.

NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 3-3-93





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF THOMAS M. BEIL

Deposition upon oral examination of THOMAS M. BEIL, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 1:00 p.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

A. Focused on community banking, how to run a community bank, lending was a part of that, both consumer, real estate, commercial lending, asset and liability management.
Q. How long was that?
A. It was two weeks.
Q. When you say community bank, what do you mean by that?
A. Well, community banking tends to be the smaller institutions versus a large regional and national bank. For instance, Sterling was, well, is still a community bank primarily in the Washington or the Northwest area. Whereas Wells Fargo is considered a large regional bank and we are in 26 different states.
Q. When you left Old National and went to Sterling, did some of your commercial lending customers go with you?
A. Yes.
Q. And why would they do that?
A. I think they developed an allegiance not only to the, primarily to the lender, to the relationship manager. Often it takes quite a while to build up trust and credibility with a particular business, and if that individual should leave, often they think it is in

their best interests, you know, to follow that individual.
Q. Do you have any idea of the approximate number of customers that would have left Old National and gone to Sterling with you?
A. Oh, approximately a dozen, I would say, at that point.
Q. And what kind of percentage of your customers would that have been?
A. Maybe 25 percent.
Q. When you went to Sterling were you in the commercial lending department?
A. Yes.
Q. Who else was in the department at the time?
A. Well, several people, Cajer Neely was our manager. He actually replaced an individual that left shortly thereafter. We had, I think, three lenders and then maybe five or six support staff at the time.
Q. What was your position, did you have a title?
A. Commercial loan officer, assistant vice-president and commercial loan officer.
Q. Did you hold any position at Sterling Financial, the holding company?
A. No.
Q. What did your job entail?

participate with.
Q. Do you recall what that ceiling was?
A. I don't recall, no.
Q. Do you recall what the loans to one borrower limitation was?
A. I don't recall that, that information.
Q. What was the typical size loan that you would make?
A. Well, on a relationship maybe up to a couple million dollars at that time. It could be several loans, but an average basis, our customers were, you know, 1 to $3,000,000 maybe with an average of around a couple million.
Q. Did you hold the same position the entire time you were at Sterling?
A. Yes.
Q. And did you tell me you had left in October of '90?
A. Yes.
Q. Why did you leave?
A. I came back from vacation and we had, the institution had received a letter that suspended the borrowing limits, suspended our ability to attract new business, and in fact the initial interpretation was that even on existing credit lines that we couldn't readvance new funds as they were paid down. And if you understand Spokane, the Spokane market, it is

very competitive bankingwise, and if an institution is having financial problems it is not long before there is an intensive effort on the other banks calling on your customers, trying to get them to move those relationships to their bank.
Q. Who was this letter from?
A. I don't recall that. I don't know if this was a direct letter from the regulators or this was an internal document that referenced that.
Q. Did you see this letter?
A. Yes.
Q. And now you said that the initial interpretation was that you couldn't advance new funds as they were paid down?
A. On revolving credit lines, revolving meaning generally customers on a daily basis would pay it down and then maybe readvance or reborrow at some point in the future, maybe the next day or the next week.
Q. And did that interpretation change at some point?
A. You know, I don't recall. I think that was, I think that was relaxed a bit. But I know, I think what the, the biggest effect was not being able to do, to attract new business or originate new loans to existing customers.

Q. And do you recall, you said you had come back from vacation and this letter had come in, what time frame was that?
A. I am not, I can't be real definite, I think it was sometime in 1989, maybe mid year 1989, summer of '89, maybe, but I am not real definite on that, I'm a little hazy on that time frame.
Q. Would it have been after the FIRREA legislation?
A. Yes, I'm almost sure it was. At least I think it was. I really can't recall, I really shouldn't say that.
Q. Okay. Do you know what it was in response to?
A. It was, well, it was changes in the way that Sterling could treat their goodwill on their balance sheet, and the change in interpretation then I think left the institution out of compliance with certain capital guidelines. And because of that, then it, we became subject to more regulatory scrutiny.
Q. When did that occur in relation to when you left Sterling in October of '90?
A. I'm not, I think it was within a year, sometime within a year's time frame.
Q. And how did that affect your decision to leave Sterling, were you asked to leave?
A. No, I was, I was unsure what the viability of the

institution was going to be. I was concerned for my job. Primarily I left because my customers were starting to leave, and the value, my value in the community was my customers. And I felt it was in my best interests to change banks so I could hold onto as many of those customers as I could, and personally, you know, I had a house and two little kids at the time and wasn't sure what the viability, continued viability was going to be.

Q. Did you have any involvement with the acquisitions of Tri-Cities or Central Evergreen while you were at Sterling?

A. No.

Q. No involvement at all?

A. No.

Q. Did you have any involvement with assets that had been acquired from either of those institutions?

A. Only to the extent that they had some commercial borrowers with those institutions, primarily real estate, but they did have in some cases some commercial borrowers, most of those commercial borrowers were special credits or problem, problem borrowers that were being worked out through our special credits department so very little impact on the commercial loan department. There were some

about Latah Creek?
A. No.
Q. It sounded like you had a conversation with him?
A. Well, I, Jay Lewis was his name, we have got kids that go to the same high school and years later, we have done activities and things through the school. And you know, conversations come up a little bit. I mean it was well known knowledge that other financial institutions were benefiting from the troubles Sterling was having, not just in the commercial banking area, but you know, within all departments of the bank.
Q. When you say the other institutions were benefiting what do you mean?
A. I mean they, they were, they had the ability to attract some of Sterling's customers over to their institutions because of the troubles that Sterling was having.
Q. How do you know that that is why it was happening?
A. Well, on this list here, I know that they ended up at other institutions. I know they wouldn't have made that decision, or wouldn't have left, you know, the department that I was in, because I know they had allegiance to myself. And I guess how I quantify that is, once I left I was able to kind of solicit

and attract several of these over to the institution that is, well, at First Interstate.
Q. So are you assuming that that is why some of the other divisions lost people as well?
A. Yes.
Q. Did you have any involvement with other divisions of the bank? I mean personal did you work with them, did you have any oversight position?
A. No, no, we had common customers but no.
Q. Okay. Miller-Jordin Travel, what is that, is that a travel agency?
A. It is a travel agency.
Q. Do you recall who the principal was?
A. There were three ladies. I dealt with Celia Miller was the principal bank's, my contact with them.
Q. And was this your customer?
A. Yes.
Q. And what do you recall about their financial needs and Sterling?
A. They had a credit line for just general operating expenses. They had a couple of small equipment term loans. They knew the senior management people at Sterling very well. So their knowledge of the situation wasn't just from me but I believe also from some senior management at Sterling. As with the

ORIGINAL PETERSON/BEIL

HOSFORD

STERLING v USA

CORRECTION SHEET

PAGE LINE CORRECTION

I have read the foregoing 61 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this 20 of August, 2002.

at Spokane

THOMAS M. BEIL

Subscribed and sworn to before me this 20th day of August, 2002. My commission expires on 4-29-06

Notary Public

9-6-02

SANDRA L. GODLEY NOTARY PUBLIC STATE OF WASHINGTON COMMISSION EXPIRES 4-29-06

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of THOMAS M. BEIL on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0
Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF DANIEL G. BYRNE

Deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 10, 2000, pursuant to the Federal Rules of Civil Procedure.

that the goodwill generated by the acquisition could then be used in the Central Evergreen acquisition?

A. I don't know that I remember seeing anything that specifically relates to the Tri-Cities agreement that links the Central Evergreen. I think it was the other way around, the Central Evergreen agreement linked the Tri-Cities capital.

Q. That one conversation between Mr. Hewitt and Mr. Gilkey, the king of Chehalis conversation, were there any other conversations you know of between Mr. Gilkey and Mr. Hewitt about this linkage that you testified about?

MR. SYMMES: Object to the form of the question. Go ahead.

A. Yeah, I believe there were. I don't know how many additional conversations, but I do know at one time it had appeared as if we had kind of gotten word from somebody within the regulatory ranks that Sterling was probably not going to be the selected bidder on Tri-Cities, that somebody else, some other institution had a better bid.

And there was a conversation between Mr. Hewitt and Mr. Gilkey that indicated--or Hewitt had indicated to Harold not to worry, that things have a way of working out.

I have read the foregoing 182 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ________________, 2000, at ______________________________.

______________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this _____ day of ______________, 2000. My commission expires on ______________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 31st day of July, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF DANIEL G. BYRNE

Continued deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 11, 2000, pursuant to the Washington Rules of Civil Procedure.

Tri-Cities acquisition.

We at one time approached them--well, first off they approached us, saying that the provisions of these contracts, primarily the Tri-Cities agreement, remained in force.

At a later point in time we approached the RTC about trying to resolve the contractual issues, and they referred us back to the OTS.

Q. And it is your understanding that OTS as an agency took the position that this agreement was violated by the enactment of FIRREA?

A. Yes.

Q. Okay. No more questions on that then.

Do you agree that changes to the regulations of the bank board or the FSLIC could increase or decrease the acquirer's obligation under the December 28, 1988 agreement?

A. We were concerned at the time that we negotiated and agreed to the acquisition of Central Evergreen that there may be some changes forthcoming in regulatory capital requirements.

As a consequence, not knowing what those changes may take the form of, we chose to establish the capital ratios in the business plan on the face of the balance sheet is where they are documented.

Q. Why is D in here, 5-D?
A. I'm sorry, 5-D? It was something that the FSLIC wanted in. We had heartburn with it, but we thought we protected ourselves by adding the language that we were discussing on paragraph 3-A and B, and we also added the last paragraph, paragraph section 2, with respect to changing our business plan.
Q. So you thought you protected yourself with 2 and with 3-A, is that what you're saying?
A. 3-A and 3-B.
Q. So you thought you protected yourself with 2 and 3-A and 3-B?
A. That's correct.
Q. Why didn't you just simply require that section 5-D be taken out of the agreement?
A. We made that recommendation one time, maybe several times.
Q. And what happened?
A. Ed Hedlund told me that the people he was talking with at FSLIC and the bank board did not want that to come out.
Q. Okay.
A. And that was the reason why we specifically added additional language in section 2 and 3-A and B.
Q. I'd like to mark this document as Byrne

I have read the foregoing 174 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ______________________________.

______________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this ____ day of ______________, 2000. My commission expires on ____________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 4th day of August, 2000.

CSR No. STORED*566QO
Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,

Plaintiffs,

vs. NO. 95-829C

UNITED STATES,

Defendant.

CONTINUED DEPOSITION OF DANIEL G. BYRNE

Continued deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 12, 2000, pursuant to the Federal Rules of Civil Procedure.

A. Not specifically, but based on the date, October 24, 1991, it would have been about the time that we were raising capital and may have been a response or a comment from the reviewer of our offering circular.

Q. No more questions on this document. I'd like to mark a document as Byrne Exhibit No. 45.

(Ex. No. 45, Memorandum dated January 6, 1989, from Daniel G. Byrne to the file, marked.)

Q. (BY MS. HOSFORD) (Hands document.) It is a memorandum dated January 6, 1989, from Daniel G. Byrne to the file, and the ADIIS number is PSG 0290993. If you wouldn't mind taking a couple minutes or however long it takes to read memorandum, Mr. Byrne, and let me know when you are finished.

A. Okay.

Q. Do you recall--first of all, did you draft this memorandum?

A. Yes, I did.

Q. Do you recall why you drafted it?

A. I drafted it to document some of the discussions and negotiations that I had with Ed Hedlund regarding the agreement on Central Evergreen.

Q. Does this document accurately reflect, well, first of all, the subject is Central Evergreen acquisition

agreement with FSLIC. Can you tell me what that is a reference to?

A. It is the Central Evergreen agreement that we were discussing yesterday as exhibit--I lost track of exhibits here--Exhibit No. 37.

Q. The December 28, 1988 agreement?

A. That's correct.

Q. Does this memorandum accurately reflect your interpretation of that agreement?

A. It references several items that were negotiated, it is not intended to be a summary of the entire agreement, but merely some of the points that were negotiated.

Q. Does it accurately reflect your interpretation of the points that are discussed in the memo?

A. I believe it does.

Q. If you wouldn't mind looking at paragraph 3, it states, "Sterling was concerned that actions or events outside of its control might prevent Sterling from selling stock. Sterling raised the concern about the current FSLIC crisis about the current FSLIC crisis and reports by the GAO suggesting that FSLIC extract a one percent of all FSLIC institutions net worth to help bail out FSLIC."

A. Yes.

Q. In the second sentence of that what I have just read, are you talking about FSLIC potentially requiring thrifts to pay one percent of its net worth as some sort of fee or payment to the government?

A. That was the concern that we had at the time that there might be a one time assessment equal to one percent of our net worth.

Q. Were you concerned that that might prevent Sterling from selling stock?

A. We were concerned it might have an adverse effect on Sterling's ability to raise stock because the assessment would be reflected as an expense and may not look good as you are trying to sell stock to investors.

Q. Okay. No more questions on this document.

If you wouldn't mind turning to the document that is the 1989 report to shareholders which we went over yesterday, unfortunately I don't know the exhibit number--

A. Exhibit No. 39.

Q. Okay. Would you please turn to page 13 of that document?

A. The page titled management's discussion end analysis of financial condition and result of operations?

Q. Yes. I notice that your picture is below that

I have read the foregoing 138 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ______________________________.

______________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ____________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 9th day of August, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

To: WPS
July, 10-13, 00 Sent Byrne

**Changes And Signature Associated with Deposition of Daniel Byrne, Spokane, WA July 10-13, 2000**

| Pg/Ln | Change |
|---|---|
| 96/9 | Add, after "part of this memo.": "Sterling wanted assurance that it was receiving permanent capital and Sterling was told by Ed Hedlund which forbearances to choose to secure that assurance." |
| 101/16 | "include capital" should be "include permanent capital". |
| 106/10 | "accepted accounting principles." should be "accepted accounting principles and had the effect of making the capital permanent." |
| 114/9 | "capital credit." should be "capital credit and also in the forbearance letters." |
| 115/25 | "You take the amount of intangible assets" should be "You take the amount of GAAP intangible assets." |
| 116/14 | "Yes" should be "Yes, 1/40th of GAAP goodwill." |
| 123/18 | "same and constant forever." should be "same and constant forever and also pursuant to SM-2." |
| 173/11 | "Lettie Clark" should be "Leo Clark". |
| 196/21 | "They did not." should be "They did not say anything to me other than that the cash assistance was permanent." |
| 197/3 | "raise the topic." should be "raise the topic with me. I was told the cash assistance was to be permanent capital." |
| 394/7 | "better looking at 1990." should be "better looking at 1990 or 1991." |
| 395/9 | "servicing or lease basis" should be "servicing released basis". |
| 397/6 | "first quarter September" should be "first quarter ended September". |
| 426/19-20 | "Steven Page" should be "Norm Judd:. |
| 461/14 | "Steven Page" should be "Norm Judd". |
| 464/3 | "No, I don't believe it was binding." should be "No, I believe it was binding." |

| | |
|---|---|
| 465/7 | "Dr. Judge" should be "Judge". |
| 528/5 | "knowledge" should be "acknowledge". |
| 568/24-25 | "representing the OTS, did not believe these restrictions or believed" should be "representing the OTS believed". |
| 607/13 | "on." should be "to." |
| 630/5 | "6 million dollars" should be "26 million dollars". |
| 676/9 | "2.6 million dollars" should be "2.6 billion dollars". |
| 681/19-20 | "excess liabilities over excess assets." should be "excess liabilities over assets." |

I, DANIEL G. BYRNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Daniel G. Byrne
DANIEL G. BYRNE

(State of Washington)
) ss.
County of Spokane )

Before me, Rheta R. Vanderholm, on this day personally appeared DANIEL G. BYRNE, known to me (or proved to me under oath or through ______ ________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 28th day of January, 2001.

\\Wk\doc\B\bhg\bhg\Sterling v. US\Byrne July 2000 depo corrections.012502.wpd

RHETA R. VANDERHOLM
NOTARY PUBLIC
STATE OF WASHINGTON
Commission Expires JUNE 1, 2005

Rheta R. Vanderholm
NOTARY PUBLIC in and for the State of Washington,
residing at: Mead
My commission expires: June 1 2005

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF GARY D. CRITHFIELD

Deposition upon oral examination of GARY D. CRITHFIELD, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

familiar.
Q. So you did not say that?
A. I didn't say that, no, specifically.
Q. Going through the list, did you, when you were identifying them, were you identifying them as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision?
A. Can I get the time frame that you are talking about? During the time frame of August of '89 through June when I was asked to leave of 1990 it wouldn't have made any difference which list you would have given me, I couldn't have made a commercial real estate loan to them, so during that time frame anyone, whether they were on this list or they intended to come into Sterling, I couldn't have made them a loan.
Q. Right.
A. So when you are saying, when you are asking me what specifically did I say that I couldn't make loans to these people, I just want to get the time frame, because prior to that yes, I could, after that, no, I can't.
Q. Okay. Well, what I'd like you to do is just read the first paragraph of this document, which you have said you didn't write. Please read it for me?
A. I, Gary Crithfield--

Q. You don't have to read it aloud, you can read it to yourself.

MR. WILLIAMS SYMMES, JR: I thought you meant outloud, too.

MS. HOSFORD: No.

Q. Have you read it?

A. Uh-huh.

Q. When you gave the list of customers to Mr. Byrne did you tell him that these customers were lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings' lending and deposit gathering during the period of approximately November 1, 1989 to June 30th, 1982?

A. They would have been lost had they come in and asked for a loan, some of these people did come in face-to-face. I couldn't have made a loan, yes, they would have been lost.

Q. But do you know for a fact that each one of those customers was lost because of the restrictions imposed by the Office of Thrift Supervision?

A. You mean, some of these customers have maybe an appetite for one loan for every two, three, or four, five years, some of them have an appetite for a loan every 3, 4 months, the Bill Lawson the little item three, Bill Lawson, Dick Vandervert, Bob Spears who

is a realtor and Ted Gunning have a need for money all the time. So some of these people maybe I made one loan to or two loans, but if they had come in during that time frame I couldn't have made them any additional loans so they would have been lost.

Q. Okay. How many of these people came in during that time frame?

A. Well--.

Q. When we say time frame we are talking about--

A. Everybody on the list that is on item 3.

Q. Everybody on the Exhibit 3 came in during that time frame, okay?

A. I mean I literally had a conversation with each one of these people during that time frame.

Q. So let me, I would like to do two things I want to go through that list and find out the circumstances. I would also like you to relate it back to the other list. Let's first go, I'm just going to say Exhibit 3, Exhibit 2 over and over again just for the clarity of the record.

On Exhibit 3, Bill Lawson, are you saying he came in for a loan between August of '89 and June of '90?

A. Bill Lawson had a loan at Frontier Savings and Loan, it was under construction, it was a project in the

A. Yes.
Q. What about any others?
A. Bill Lawson, put him down, I had a deal on an apartment loan in the valley for him, didn't materialize.
Q. Anyone else?
A. No.
Q. When you say broker?
A. Oh, yes, Plese.
Q. Lewis L. Plese, Jr.?
A. Yes. Brokered a deal to Washington State retirement.
Q. When you say brokered a deal, you mean you don't make the loan, you just get a commission for bringing a loan in to someone?
A. I put, I bring a borrower to a lender, or vice versa with terms that they like.
Q. You made reference several times to the fact that from August of 1989 through your departure from Sterling in June of 1990 that your department, the commercial real estate department, was unable to make loans.
Do you recall why you were unable to make loans?
A. Well, I couldn't get any of them approved through management, through the loan committee.
Q. And why was that?

A. I was told that under restrictions we were operating that they wanted to restrict, we were told to restrict and reduce the size of the commercial loan department, I mean the commercial, not department, but the commercial loans that were on the books, in other words.
Q. The portfolio?
A. Portfolio, yes.
Q. And were you told what specific restrictions had resulted in this situation?
A. No.
Q. Do you have any recollection about Sterling going to court in 1990 to try to obtain an injunction against OTS?
A. No.
Q. You have no recollection of that?
A. Oh, I have a recollection that they won, but I don't have a recollection of getting ready to go to court.
Q. Do you have any recollection of, I guess, let me make my question more precise.
Were you involved in any conversations about it while you were at Sterling?
A. No.
Q. Were you aware of it while you were at Sterling?
A. No.

CORRECTION SHEET

PAGE LINE CORRECTION

I have read the foregoing 50 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of ______________, 2002, at ___________________________.

______________________________
GARY D. CRITHFIELD

Subscribed and sworn to before me this ____day of ____________, 2002. My commission expires on ___________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of GARY D. CRITHFIELD on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0
Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) NOS. 95-660C,
) 95-7311C,
THE UNITED STATES OF AMERICA, ) 95-7917C,
) 95-8031C
Defendant. )

DEPOSITION OF JAMES R. FAULSTICH
(VIDEOTAPED)
VOLUME II

August 2, 2000
Seattle, Washington

CERTIFIED COPY

thrift.
Q. Okay. Can you tell me specifically why you would classify them as a troubled thrift?
A. Because they had no tangible capital, none as I recall from this minute, and they had a very -- they didn't have outlook for being able to recover -- to regain capital.
Q. Okay. If you look at this memorandum, it says that -- indicates approximately 40 individuals and institutions were contacted since mid-'87 and two other parties other than Sterling expressed interest but both those parties wanted financial or FSLIC assistance up in the $8 to $10 million range. Do you see that?
A. I see that.
Q. Would that be indicative of the fact or does that indicate -- does the request of FSLIC assistance of $8 to $10 million, is that indicative of the severe nature of Central Evergreen's financial position at that time?
A. I would take it that that would be a good indicator of the financial difficulties of Central Evergreen.
Q. The document also says, "Numerous forbearances were also requested." No recollection or any

indication -- no recollection as to what those forbearances would have been?

A. None.

Q. And no indication of this memorandum, from your review of it, as to what those forbearances might have been?

A. No.

Q. Okay. And it appears then, in all fairness, that at least in this paragraph, according to your signature, you came to the conclusion that absent a proposed acquisition by Sterling, FSLIC assistance would likely be required. Do you see that?

A. I see that, yes.

Q. There is no reason to dispute that?

A. Would be consistent with the memorandum.

Q. Okay. The next section is "Acquiring Institution." Of course this is about Sterling. A few questions with regard to Sterling Savings.

In the second paragraph it starts off, "Much of Sterling's growth and current level of goodwill is attributed to its acquisition of other FSLIC-insured institutions and branch offices."

Would that, in part, refer to the prior transactions?

that they will agree to meet.
Q. But you have no specific recollection of --
A. No.
Q. Okay.
A. It seems like a good idea.
Q. Let me ask if you know this. In those conversations about business plans and the fact they were submitted at different times -- actually, forget it.
A. Okay.
MR. SIMMS: Two minutes just to talk with him. I think I am done.
MS. MATTHEWS: We are now going off the record. The time is 5:50.
(Recess.)

MS. MATTHEWS: We are now back on the record. The time is 5:53. This concludes the deposition for today. We are now going off the record at 5:53.

(Signature waived.)
(Deposition adjourned at 5:53 p.m.)

STATE OF WASHINGTON ) I, KAREN A. ANDERSON,
) ss CCR, RPR,
) #AN-DE-RK-A399J1,
County of King ) a duly authorized Notary Public in and for the State of Washington residing at Renton, do hereby certify:

That the foregoing deposition of JAMES R. FAULSTICH was taken before me and completed on August 2, 2000, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness waived the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney .

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this day of , 2000.

Karen Anderson

Karen A. Anderson, CCR, RPR
Notary Public in and for the State of Washington, residing at Renton.

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF HAROLD GILKEY

Deposition upon oral examination of HAROLD GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 6, 2000, pursuant to the Federal Rules of Civil Procedure.

recognize this document, Mr. Gilkey, and if you do, what is it?

A. No, I don't, but it would be--I don't recall ever seeing this document, but it is the bid package that would normally be sent out for the institutions, as I previously described to you.

Q. So this is the bid packet? This is an example of the bid package that you had described earlier?

A. My brief look at it says it is.

Q. Okay. Do you recall whether during the course of the Lewis Federal acquisition that you would have reviewed this document?

A. I recall I would not have.

Q. You would not have. Okay. Do you know who would have?

A. Our lawyers and Dan Byrne, and for sure.

Q. Who was the lawyer representing you in connection with Lewis Federal?

A. The Witherspoon firm.

Q. Was there an individual?

A. I don't recall who the--I would guess offhand it was Doug Siddoway, but I am not positive.

Q. Were your lawyers involved in putting together the bid proposal?

A. Of course.

Federal Home Loan Bank and suggested strongly never to trust a regulator, but through that, I mean, it was kind of a whiny discussion, "Woe is me," and, "I don't know how I can get out of this."

I then reported back to Hilton that I didn't--I believe it was Hilton Hewitt--that I didn't think that there was a way that we could be part of any saviour of Central Evergreen without substantial injection of capital.

Q. When did these discussions take place?

A. As I said, suggested the summer and fall of '87. In late fall there was a discussion with Hilton and myself that several institutions were coming up for bid. As I recall right now, that would be Lynnwood Savings in Lynnwood, Washington, and I don't--I think it was First Federal of Longview in Longview, Washington, but I could be wrong in that, and Tri-Cities Savings.

And he suggested to me that we should bid on Tri-Cities and then we would have enough capital to do the Central Evergreen transaction. And I said, well, we tried that once before a couple of years ago, and it didn't work with Guaranty, and so we bantered back and forth a little bit.

And in the process I said, and besides that

the bid is a competitive bid, and I wouldn't want to waste my time looking at Central Evergreen. And he said to me that he could make arrangements for us to be the selected bidder of Tri-Cities Savings, assuming I made a competitive bid.

Q. Why did you not have enough capital to do the Central Evergreen transaction?

A. Would have put us out of compliance with regulatory net worth. That Central Evergreen was about, I'm guessing off the top of my head, about $250 million in size and had a negative net worth and substantial loan problems.

Q. How would Tri-Cities give you enough capital?

A. Well, it was a similar transaction to the Lewis Federal. And that given the bid package, we would bid and the capital contribution would be credited to net worth and the discount on the loans would be credited to supervisory goodwill. And that by itself would have given us substantial capital.

I don't remember the numbers right offhand. I could look through. I'm guessing that we ended up with something like--well, I won't guess, but substantial net worth, which far exceeded the net worth requirement of carrying a $50 million institution.

And that combining those two would be a $300

million institution and the supervisory goodwill that came up with Central Evergreen, the supervisory goodwill that came up with Tri-Cities and the permanent regulatory capital that came up with Tri-Cities would have given us substantial capital to manage both the locations.

Q. Did he specifically tell you those three things?

A. I would--in summary I would say yes to that. I don't know that specifically he said that, but that was the essence of our conversation, yes.

Q. To the best of your recollection, what did he say to you, specifically?

A. He said that I would have capital enough to acquire Central Evergreen.

Q. Did he mention goodwill from Central Evergreen?

MR. SYMMES: From? Did you misspeak or not?

MS. HOSFORD: I did not.

Q. (BY MS. HOSFORD) Did he mention--

A. He did mention that the goodwill of Central Evergreen would be part and parcel of that transaction, along with the goodwill that came from Tri-Cities, as well as the supervisory--the words aren't specific to me, but the general nature of our conversation led me to those discussions.

What he was saying is that it was

significant, there was enough capital in the Tri-Cities transaction and the Central Evergreen transaction to consolidate the two.

Q. And he also said that he could make arrangements for Sterling to be the selected bidder?

A. Yes.

Q. Did you think there was anything unusual about that?

A. I felt kind of strange, but they were at--I felt that the Federal Home Loan Bank was doing everything that they could to eliminate problem assets at the time, so it was--I just assumed that if they said they could do it, they could do it.

Q. Was it your understanding that you--that Sterling would be selected even if it wasn't the low bidder?

A. Yes, as long as I was competitive. Those were his exact words.

Q. What was the attraction of Central Evergreen?

MR. SYMMES: Object to the form of that question, lacks foundation, assumes facts not established, but you may go ahead.

A. Well, again, it goes back to the fact that I am a cleanup person, that I find my ability to take on somebody else's dirty linen and fix it.

When I looked at the problem loans, I felt

institutions.

We did a marginal review of Lynnwood because it was not--while we were put on the bid list, we weren't going to bid, or if we did, it wouldn't be meaningful. They didn't have anything to provide to us.

Longview, First Federal of Longview made sense as long as it was in connection with Central Evergreen, because there were substantial cost savings in branch units and in the long-term substantial savings of operating expenses in supervision.

And we went back and redid our due diligence on Tri-Cities, and we had a set of due diligence here and a new set of due diligence and compared those. And then we made--I don't recall right offhand whether we made a bid on Lynnwood or not, but if we did, it was so far out that we wouldn't have got it.

We made a bid on First Federal of Longview, contingent on us also acquiring Central Evergreen. Hilton called me and said, what are you doing? And said that that bid was nonresponsive and we wouldn't play that game there.

So then I got a letter from someone--I don't recall who--that said that our bid was nonresponsive. Then it became known in the community that, the thrift

community at large--and it was reported to me by someone else that we were not the selected low bidder on Tri-Cities. So I figure that the deal was off, that maybe our bid wasn't competitive and therefore there was no transaction to proceed with.

Within a day or two of that Hilton called me and said, don't worry, I'll take care of my end. And I did think that was real strange, but in a short period of time, two or three, maybe a day, up to a week later, we were informed that we were the selected bidder on Tri-Cities Savings, that the first bidder had chosen to withdraw.

I then said to him, now we can proceed on Central Evergreen. So in the--we sent in, I guess, an application on Central Evergreen within a short period of time after that. And Hilton called me and said, what are you trying to do? And this is not the time to send that in. We got to make sure we get Tri-Cities done first before we make additional applications.

So we wrote a letter and asked to withdraw the application for Central Evergreen. We then proceeded to document the Tri-Cities transaction and bring it to conclusion, and I would guess that was in April of '88, but it was about that time.

And then following that, we then resubmitted

our application for Central Evergreen. Somewhere in there Hilton, after--somewhere in that period of time Hilton was transferred to Utah, and Ed Hedlund stepped in to go through the remaining transaction of Central Evergreen.

MR. SYMMES: Let's go off the record.

(Discussion off the record.)

Q. (BY MS. HOSFORD) Back on the record. I was reminded during the break that I had not properly identified Exhibit No. 17. It is a counter proposal to Sterling Savings Association from Tri-Cities Savings and Loan Association. PSG 0480408 is the number.

Okay. Mr. Gilkey, before break you gave us a rather long explanation of the circumstances or a partial explanation of the circumstances surrounding the bid for Tri-Cities and the application for Central Evergreen.

And I'm just trying to figure out where you are coming from on this. Was it Sterling's position at the time that it would not acquire Tri-Cities unless it could also acquire Central Evergreen?

A. I'll try to shorten the explanation again. Hilton came to me, asked me whether I would be interested in Central Evergreen. I said no. He then provided an opportunity for me to bid and told me that we would be

the successful bidder if we were competitive.
Q. On what?
A. On Tri-Cities. And therefore, there would be a quid pro quo for us then to acquire Central Evergreen and a handshake agreement, or he agreed to provide that to me. I agreed to buy Central Evergreen at the time.
It was a takeoff on our discussions a number of years ago with Don Mochel with Guaranty and Lewis Federal. It was a similar kind of transaction.
Q. Are you saying that you had an agreement with Mr. Hewitt that if you were selected as the bidder on Tri-Cities, you would also acquire Central Evergreen?
A. Yes, and as a piece of that agreement. That the acquisition of Tri-Cities would provide me the capital to do both transactions.
Q. Was that ever documented anywhere, that agreement that you had with Mr. Hewitt?
A. No.
Q. Did you ever ask Mr. Hewitt whether he had the authority to make such an agreement with you?
A. No.
Q. Was it Mr. Hewitt who ultimately signed off on the acquisitions?
A. I would have to look at the document, but I think that he was transferred to Utah before the Central

Evergreen transaction was completed.

Q. Was he involved in the Central Evergreen transaction then?

A. In the initial stages, yes.

Q. Which initial stages?

A. Well, that I have already described, number one.

Number two is that during that early stage where we had been the selected bidder, and we submitted our proposal and then withdrew it--sorry, our application and then withdrew it, and then for a period of time he was involved in the negotiations of the business plan of the Central Evergreen agreement.

Q. After Mr. Hewitt's departure, did you ever discuss with any other government representatives that you had this agreement with Mr. Hewitt?

A. No.

Q. Was it your understanding that they knew about it?

A. My understanding is that they were proceeding ahead to negotiate on the Central Evergreen transaction based on the documents that we dealt with Hilton in the early stages so I would have assumed that they would have known about it.

Q. But my question is, did anybody from the government tell you that they were proceeding with the Central Evergreen acquisition on the terms that you say you

agreed to verbally with Mr. Hewitt?
A. No.
Q. And Mr. Hewitt was not there when the Central Evergreen transaction was--
A. Finalized.
Q. --finalized, is that right?
A. That's right.
Q. You just assumed that they would move forward under the terms that you discussed with Mr. Hewitt?
MR. SYMMES: Object to the form of that question. You may answer.
A. He made the--as far as I was concerned, he made a commitment to provide Tri-Cities to us on an assisted bid basis. And then I had the obligation to acquire Central Evergreen as part of my activity.
Q. (BY MS. HOSFORD) What would have happened if you hadn't acquired Central Evergreen?
A. As far as I was concerned, that was your problem, not mine.
Q. So then you were not contractually obligated in any way to acquire Central Evergreen after the Tri-Cities acquisition was complete, were you?
A. No, but I'm a man of my word, Elizabeth, and if I tell you I'm going to do something, I'll do it.
Q. But there was no written agreement to do so? This

I have read the foregoing 198 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ____________________________.

____________________________
HAROLD GILKEY

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ___________.

____________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of HAROLD GILKEY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 23rd day of June, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF HAROLD B. GILKEY

Deposition upon oral examination of HAROLD B. GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 7, 2000, pursuant to the Washington Rules of Civil Procedure.

circumstances surrounding Old Stone's removal or departure from the bidder's list for Tri-Cities?

A. If I could go back, I think my statement at the time was--or yesterday was that I got--I became aware probably from Bill Zuppe or probably just in general that we were not the selected bidder. And that came, I believe, because someone from the Federal Home Loan Bank called and told us that there was--that we were not the selected bidder.

That came as somewhat of a surprise to me, and, but I didn't do anything. I just said, well. And then I got a phone call from Hilton Hewitt. And he told me not to worry, that hold on for a couple of days, and it would all work out. And so I just said okay, and waited.

The next thing I knew was that we were the selected bidder. I was unaware at the time or until this last week or last couple of weeks that Old Stone was the low bidder or was a bidder.

Q. So you didn't even know that Old Stone was a bidder--

A. That's right.

Q. --until the last couple of weeks?

A. Yeah. I knew there were three institutions that bid, and that we were not the low institution, but I

I have read the foregoing 180 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ______________________________.

______________________________
HAROLD B. GILKEY

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ____________.

______________________________
Notary Public





APR. 100

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of HAROLD B. GILKEY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 26th day of June, 2000.

CSR No. STORED*566QO
Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF HAROLD B. GILKEY

Deposition upon oral examination of HAROLD B. GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 8, 2000, pursuant to the Federal Rules of Civil Procedure.

withdraw but were forced to withdraw business banking, consumer lending, commercial real estate, and residential construction activity.

There were some types of investment that we were not authorized to do. We withdrew from fixed rate lending for a period of time. We withdrew from deposit gathering of uninsured deposits, which have a significant profit center. To the most part we have revived that, we--but not to the extent that we could have. I had left out public funding.

Q. Are you saying that you withdrew from the public funding market?

A. We were forced to.

Q. When were you able to get back into the market that you have just listed, if at all, sorry?

A. Sorry, I didn't mean to interrupt your question and I did.

As I indicated to you, for the most part, we have made inroads back to those product lines. And they varied as to time based on who was available, more than anything, and how we were able to recruit.

Q. Okay. Can you answer the question about when were you permitted to get back into these lines, these markets?

A. Oh, I'm sorry, I didn't hear the word permitted.

I have read the foregoing 214 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of _____________, 2000, at ____________________________.

______________________________
HAROLD GILKEY

Subscribed and sworn to before me this ____ day of _____________, 2000. My commission expires on ____________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of HAROLD GILKEY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 29th day of June, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary
Public in and for the State of Washington,
residing in Spokane

UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) NOS. 95-660C,
) 95-7311C,
THE UNITED STATES OF AMERICA, ) 95-7917C,
) 95-8031C
Defendant. )

DEPOSITION OF EDWIN C. HEDLUND
(VIDEOTAPED)

(This deposition transcript has been designated attorneys' eyes only.)

August 4, 2000
Seattle, Washington

CERTIFIED COPY

A. Craig was an application analyst.
Q. Do you know what role Mr. Nolte played in connection with the Central Evergreen acquisition, if any?
A. I don't know.

(Exhibit Hedlund Sterling No. 23 marked for identification.)

THE WITNESS: (Witness peruses document.)
Q. (By Mr. Weatherhead) Do you recognize Exhibit 23?
A. I recognize the handwriting.
Q. Is that your handwriting?
A. Yes, it is.
Q. Is this another memorandum of oral communication that you made for your file?
A. Yes, it is.
Q. Do you have any recall of this meeting that is recorded here?
A. No, I don't.
Q. Do you remember anything about any negotiations between anybody on behalf of the Federal Home Loan Bank of Seattle and Sterling Savings regarding capital levels or targets?
A. Certainly the negotiation of the agreement that I

remember part of.
Q. Can you tell me what you remember about the negotiation of that agreement?
A. It was long, ongoing negotiations that needed to get done.
Q. What were the issues that were being negotiated, as you recall?
A. The entire agreement.
Q. All right.
(Exhibit Hedlund Sterling No. 24 marked for identification.)

Q. (By Mr. Weatherhead) Handing you Exhibit 24, when you say the entire agreement, would Exhibit 24 be what you were referring to?
A. Yes, it is.
Q. And did you negotiate this agreement on behalf of Federal Home Loan Bank of Seattle?
A. Yes, I did.
Q. Is that your signature at Page 6 of the document?
A. Yes, it is.
Q. Do you remember who you negotiated with to form this agreement?
A. I remember I negotiated with Dan Byrn. I don't recall if there was other people from Sterling

that I negotiated with.
Q. Do you have any specific memories, as you sit here today, or as may be refreshed by looking through the agreement, of what issues were negotiated or how the discussions went?
A. There was -- you start with the title of the agreement all the way through as negotiated.
Q. Okay.
A. There probably wasn't a word that wasn't negotiated.
Q. All right. And is it your recollection that all of those discussions took place between yourself and Dan Byrn?
A. I recollect that I discussed a lot with Dan Byrn. I don't recollect if there was others involved in the discussion.
Q. I guess what I'm asking now is, can you remember specific discussions with Dan Byrn? He-said, she-said kind of recollections, where you can ascribe to yourself statements that you made and recount for me statements that Mr. Byrn might have made?
A. A recall a number of conversations, recall statements. I don't recall specific statements.
Q. Would it help you to read through the agreement? Do you think if you read through it and looked at

the specific provisions in it, that you might
recall any specific discussions on any of the
topics in there?
A. If I looked at it -- obviously, we discussed
wording. We discussed capital levels. We
discussed the business plan, which is part of it.
We discussed the major provisions.
Do I recall the exact conversations? No.
Q. Okay. Without recalling exact conversations, can
you remember specific issues that were negotiated?
A. I recall discussing V M. I recall discussing
VI A. V M is, "This Agreement is not a waiver of
or forbearance from any applicable regulation."
Q. Who did you discuss that with?
A. Mr. Byrn.
Q. What did you say and what did he say?
A. I told you I don't recall what I said, what he
said.
Q. Fair enough. Then VI A?
A. The one that -- the extent -- that is obviously a
five-year from the date of acquisition, when
agreements terminate.
As I said, we discussed it all many a time,
but I can't say what I said and what he said, what
she said.

Q. All right. And are there any other specific
issues in here other than V M and VI A that you
recall having discussed in particular?
A. I recall we discussed definitions. We discussed
all -- if you want me to read through and tell you
whether we discussed it or not.
Q. If you remember, that would help me.
A. We discussed the definitions. Section II, the
business plan. The obligations of the acquirer.
I mentioned earlier we discussed the title of the
agreement and changed the agreement.
Q. When you say you discussed the title of the
agreement and changed the agreement, what --
A. Changed the title of the agreement.
Q. What was it changed from, if you recall?
A. You have it in the records, I'm sure.
Q. Let's assume that I don't. Can you tell me what
the change was?
A. Not exactly. I don't recall specifically he-said,
she-said conversations.
Q. Any other issues besides those that you have
identified that you recall?
A. We discussed everything.
Q. All right.
A. Everything.

Q. What about Attachment A?
A. We discussed Attachment A.
Q. Was there an exchange of drafts of Attachment A?
A. This was the pertinent part of a very large set of documents, approximately a half inch, that -- and, you know, we discussed -- discussed it.
You know, we don't discuss -- I'm sure I didn't discuss the level of advance payments for T and I to that detail. We would have discussed RAP leverage, the GAAP leverage, the asset size, the growth and the income, the spreads.
Q. When you say "this was the pertinent part," what do you mean by that?
A. What I said earlier was -- this is coming loose -- I assume A-8 is the last page I'm supposed to have.
Q. Yes.
What did you mean when you said that this was the pertinent part of a larger set of documents?
A. That their entire business plan was about a half inch thick. This had the financial information. This had the summary of it. It's the part that was included.
I mean, there was a lot of other information, a lot of financial pro formas, discussion,

etcetera.
Q. Did you hand these pro formas back and forth? Did you mark them up? Did you criticize them as being too aggressive or too conservative for --
A. I don't recall.
Q. You recall that you did discuss the business plan?
A. Yes.
Q. Was that a subject of the negotiation? Do you recall that?
A. Yes.

(Exhibit Hedlund Sterling No. 25 marked for identification.)

THE WITNESS: (Witness peruses document.) Okay.
Q. (By Mr. Weatherhead) What is Exhibit 25?
A. It's a memo from me dated November 28th, 1988, concerning Central Evergreen and Sterling, addressed to Julie Williams and Linda Plye.
Q. What was the purpose of the memo?
A. To get them to move, that -- to let them know that Sterling could easily walk away from this transaction if they wanted to, that Central Evergreen could walk away from the transaction if they wanted to, and that we had spent enough time

Sterling was hesitating because of risk-based
capital proposals that were floating around, why
would that hesitation be cured by prompt approval
by D.C.?
A. Can you repeat the question or rephrase it?
Q. I will try. Was it your expectation, as of the
writing of this, that Sterling had not yet
withdrawn from its interest in merging with
Central Evergreen?
A. I mean, I wrote in here Sterling is threatening to
withdraw.
Q. All right.
A. And --
Q. So they hadn't yet withdrawn?
A. Correct.
Q. You were hoping to speed things along in D.C. so
that Sterling would not withdraw?
A. I was just trying to get an answer out of D.C. I
mean, they had this thing, it's documented, for
quite some time.
In the previous paragraph they had it deemed
complete since October 18th. Now we are into
December 2nd. Do the calculations. They had
plenty of time.
Q. If the resolution was lost, there would be a

likely cost to FSLIC of more than $10 million?
A. That was based on informal shopping, which was known analysis as informal shopping.
Q. Your hope was that the merger would go forward to avoid that cost or whatever the cost would end up being?
A. I wanted to see, at this point in time, the merger go forward.
Q. I guess what I'm interested in is why wouldn't -- why would Sterling complete the merger even -- in view of the risk-based capital proposals that were out there, what did that have to do with whether or not Sterling would complete the merger, assuming approval were given?
A. At the time there was talk of the capital requirement being higher.
Q. Was the idea to lock in this merger prior to capital requirements changing?
A. It was two-fold. I mean, that, and the NOL issue was expiring at 12/31, which, you know, there was a combination of issues. I don't think it was to lock -- it was to lock it in before 12/31, or 12/30, whenever the stuff expired.
Q. Then why even mention it?
A. Their proposal -- what I recollect is there was

record. The time is 2:43. This concludes the deposition for today.

(Signature reserved.)

(Deposition concluded at 2:43.)

______________________________

Witness signature

Subscribed and sworn to before me this _____ day of

______________________________, 200_____.

______________________________

Notary Public

*My commission expires:* ______________________________

STATE OF WASHINGTON ) I, KAREN A. ANDERSON,
) ss CCR, RPR,
) #AN-DE-RK-A399J1,
County of King ) a duly authorized Notary Public in and for the State of Washington residing at Renton, do hereby certify:

That the foregoing deposition of EDWIN C. HEDLUND was taken before me and completed on August 4, 2000, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney .

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 18th day of August, 2000.

Karen Anderson

Karen A. Anderson, CCR, RPR
Notary Public in and for the State of Washington, residing at Renton.

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF CAJER NEELY

Deposition upon oral examination of CAJER NEELY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 8:00 a.m., on June 26, 2002, pursuant to the Washington Rules of Civil Procedure.

had been provided to Sterling we had explicit directions on what we could and couldn't do from a lending standpoint.

Q. Did you state anything else about that to Mr. Symmes?

A. I explained to him a couple of examples with a couple of customers that happened.

Q. And which examples?

A. One of them is Randy Ramey and Ramey Construction which was a situation with a contractor who had a credit line of 250,000. Because of our and I can't remember exactly the language of the letter. I don't even remember if it was the letter from the government or if it was a reproduction of a list of what we couldn't do, but the circumstances there were that this contractor wanted to increase their credit line and we were unable to do it.

The other example would be, and I can't remember it exactly, but I believe it was Lawson A&A Construction and the circumstance there was a request for a letter of credit or the LC is the acronym that is referred to, and that we were, that was one of the four or five items on the list that we could do not do, was a letter of credit.

Q. Did you say Lawson A&A Construction?

A. Yes, and the circumstance there was that they wanted

a letter of credit somewhere in the range of 50 to a hundred thousand, and we had called the supervisor or the regulator in Seattle to get an exception on that restriction based on the fact that it was going to be secured by a Sterling Savings certificate, certificate of deposit, and that it was denied.

Q. Who was the supervisor that you talked to?

A. I believe it was Carol, I can't--I, somebody reminded me of the name recently, but I can't I can't, in our conversation with Dan and Bill, but I can't think of her last name.

Q. Could it possibly have been Friend?

A. Yes.

Q. Did you have this conversation with her personally?

A. I was sitting at Bill Zuppe's desk and Bill Zuppe called her.

Q. Was it a conference call, I mean a speaker phone call?

A. I don't remember that it was. I believe he was just on the phone and I was sitting there listening to the conversation.

Q. Okay. Now, when I asked you in general what you had spoken to Mr. Symmes about, you said something about you told him about your position--

A. Yes.

West One?
A. Part of it was the relationship with me, but it was definitely the, I guess the reason I went was because of the situation and the customers were--well, some of them followed me, but some of them, some of them were going to go, some of them did not go to West One, too.
Q. Some of them did not go. They stayed at Sterling?
A. No, some of them went.
Q. They went elsewhere?
A. Went elsewhere, yeah.
Q. So this list is comprised of both of those categories, those that went to West One and those that went elsewhere?
A. Yes.
Q. Had it not been for the enactment of FIRREA and its impacts on Sterling do you think you would still be at Sterling today?
A. Yes.
Q. Why?
A. I can tell you--I had a very good relationship there with people. Most everybody from Harold Gilkey to Bill Zuppe to Dan Byrne, it is the hardest professional decision I've ever made.
Q. And the move that you made from other companies, have

your relationships not been as good with your superiors there?

A. No, the moves I made were because of better opportunities, better compensation after the subsequent moves.

Q. Did Sterling have other loan officers that left during 1989 and 1990?

A. Tom Beil left, he left shortly after me, but I don't remember exactly, and Tom was a senior loan officer that worked for, he was the more senior officer that worked for me there.

Q. You mean among the loan officers that worked?

A. Among the other four that were there.

Q. Can I just remind you, we are doing a little bit of talking over each other. So to the extent that I am asking a question, if you could just wait until I'm done and I'll try to do the same for you.

A. Okay.

Q. And did you say that Mr. Beil left, you said, is Mr. Beil the only person you can think who left during that period?

A. He is the only loan officer that left during that period that I can recall.

Q. Did he take business with him?

A. Yes, he would have.

I have read the foregoing 111 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of ______________, 2002, at ___________________________.

___________________________
CAJER NEELY

Subscribed and sworn to before me this ____day of ____________, 2002. My commission expires on ___________.

___________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of CAJER NEELY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 8th day of July, 2002.

CSR No. STORED*566Q0

Certified Shorthand Reporter and Notary
Public in and for the State of Washington,
residing in Spokane

# ACQUISITION AGREEMENT

Between

STERLING SAVINGS ASSOCIATION

and

CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION

ACQUISITION AGREEMENT

Table of Contents


| | | Page |
|---|---|---|
| RECITALS | | 1 |
| Section 1. The Acquisition | | 1 |
| 1.1 | Agreement to Acquire and Merge | 1 |
| 1.2 | Approval by Boards of Directors | 2 |
| 1.3 | Filing of Required Regulatory Applications and Notices | 2 |
| 1.4 | Interest of Members of Central Evergreen | 3 |
| 1.5 | Transfer of Shares Upon Conversion | 3 |
| 1.6 | Savings Accounts and Deposits | 3 |
| 1.7 | Offices | 3 |
| 1.8 | Transfer of Assets and Assumption of Liabilities | 3 |
| 1.9 | Articles of Incorporation and Bylaws | 4 |
| 1.10 | Directors and Officers of the Surviving Corporation | 4 |
| 1.11 | Directors, Officers and Employees of Central Evergreen | 5 |
| 1.12 | Effective Date of Acquisition | 8 |
| Section 2. The Closing | | 8 |
| Section 3. Representations and Warranties of Central Evergreen | | 8 |
| 3.1 | Corporate Organization | 8 |
| 3.2 | Subsidiaries | 9 |
| 3.3 | Financial Statements | 9 |
| 3.4 | Absence of Undisclosed Liabilities | 9 |
| 3.5 | Absence of Certain Changes | 9 |
| 3.6 | Litigation, Etc. | 10 |
| 3.7 | Contracts | 10 |
| 3.8 | Title | 10 |
| 3.9 | Tax Returns | 10 |
| 3.10 | No Violation | 11 |
| 3.11 | ERISA Compliance | 11 |
| Section 4. Representations and Warranties of Sterling | | 11 |
| 4.1 | Corporate Organization and Good Standing | 11 |
| 4.2 | Capitalization | 12 |
| 4.3 | Financial Statements | 12 |




0145049
SG
"Confidential Material – Subject to Protective Order

4.4 Absence of Undisclosed Liabilities .............. 12
4.5 Absence of Certain Changes ...................... 12
4.6 Litigation, Etc. ................................ 12
4.7 Title ........................................... 13
4.8 Tax Returns ..................................... 13
4.9 No Violation .................................... 13

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition ............. 13

5.1 No Change in Charter or Bylaws .................. 13
5.2 Conduct of Business ............................. 14

Section 6. Access and Cooperation ...................... 14

6.1 Access .......................................... 14
6.2 Cooperation ..................................... 14

Section 7. Confidentiality and Announcements ............. 14

7.1 Confidentiality ................................. 14
7.2 Announcements ................................... 15

Section 8. Solicitation of Employees ..................... 15

Section 9. Conditions Precedent to the Obligations of Sterling ................................................. 15

Section 10. Condition Precedent to the Obligations of Central Evergreen ........................................ 15

Section 11. Abandonment of Acquisition .................. 16

Section 12. Miscellaneous Provisions .................... 17

12.1 Expenses ....................................... 17
12.2 Litigation Costs ............................... 17
12.3 Parties in Interest ............................ 17
12.4 Headings ....................................... 18
12.5 Entire Agreement/Modification/Waiver ........... 18
12.6 Counterparts ................................... 18
12.7 Governing Law .................................. 18
12.8 Binding Nature of Agreement; No Assignment ...... 18
12.9 Notice Provisions .............................. 18




SG ~0145050
"Confidential Material – Subject to Protective Order

## Table of Exhibits


| Exhibit | |
|---|---|
| 1 | Plan of Conversion |
| 2 | Branch Offices of Surviving Corporation |
| 3.1 | Articles of Incorporation (Sterling) |
| 3.2 | Bylaws (Sterling) |
| 4.1 | Employment Contract of George E. Godding dated December 31, 1986 |
| 4.2 | Employment Contract of John G. Van Dijk dated December 12, 1985 |
| 4.3 | Employment Contract of Carole Neuheuser dated December 13, 1985 |
| 4.4 | Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981 |
| 4.5 | Agreement with Joyce Butkus dated November 6, 1987 |
| 5 | Association Policy on Group Insurance of Retired CEF Employees/Directors dated September 10, 1986 |
| 6 | Vacation Policy Statement (Sterling) |
| 7 | Litigation (Central Evergreen) |
| 8 | Contracts (Central Evergreen) |
| 9 | Title to Property (Central Evergreen) |
| 10 | Litigation (Sterling) |




—0145051
SG
"Confidential Material – Subject to Protective Ord

# ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT is entered into as of July 20, 1988, by and between STERLING SAVINGS ASSOCIATION (hereinafter "Sterling"), and CENTRAL EVERGREEN FEDERAL SAVINGS AND LOAN ASSOCIATION (hereinafter "Central Evergreen").

## RECITALS

WHEREAS, Sterling is a stock savings and loan association duly organized and existing under the laws of the State of Washington, with its principal office located at Spokane, Washington; and

WHEREAS, Central Evergreen is a mutual savings and loan association duly organized and existing under the laws of the United States, with its principal office located at Chehalis, Washington; and

WHEREAS, the Board of Directors of the parties deem it desirable and in the best interests of the corporations, their shareholders, and members, as the case may be, that Central Evergreen be converted into a federal stock association, its stock be acquired by Sterling, and Central Evergreen be simultaneously merged into Sterling, in accordance with the applicable provisions of the laws of the State of Washington and the United States, with Sterling being the surviving corporation;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereby agree as follows:

## Section 1. The Acquisition

1.1 Agreement to Acquire and Merge. Subject to the provisions of this Acquisition Agreement ("Agreement") and the obtaining of all required regulatory approvals, Central Evergreen



SG 0145052
"Confidential Material – Subject to Protective Order"

shall convert into a federal stock association in a voluntary supervisory stock conversion pursuant to the Plan of Conversion attached hereto as Exhibit 1 and in accordance with 12 C.F.R. §§563b.20 through 563b.32 ("Conversion") and, as an integral part of and immediately following such Conversion, Sterling shall acquire all of the stock of Central Evergreen, and Central Evergreen shall merge with and into Sterling (the "Acquisition"), with Sterling being the surviving corporation ("Surviving Corporation"). On the Effective Date (hereinafter defined in Section 1.12), the separate corporate existence of Central Evergreen shall cease. The Surviving Corporation shall continue to operate after the Effective Date under the name and style of Sterling Savings Association, or such other name as the Board of Directors of the Surviving Corporation may determine.

1.2 Approval by Boards of Directors. At least two-thirds of the Board of Directors of Central Evergreen have approved the plan of acquisition as evidenced by this Agreement. At least a majority of the Board of Directors of Sterling have approved the plan of acquisition as evidenced by this Agreement.

1.3 Filing of Required Regulatory Applications and Notices. Upon the execution and delivery of this Agreement, Sterling and Central Evergreen shall cause to be prepared and filed with the Federal Home Loan Bank Board ("FHLBB") an application for approval of the Conversion and an application for approval of the Acquisition. In addition, Sterling shall cause to be prepared and filed in a timely manner any application or notice to the Washington State Supervisor of Savings and Loan Associations ("State Supervisor") as required by law, including without limitation RCW 33.08.110. These applications and notices shall be in such forms as may be prescribed by the respective regulatory authorities and shall contain such information as the authorities may require. The parties shall take every reasonable and necessary step and action to comply with, and secure such approval as may be required by, the statutes, rules, and regulations applicable to this Agreement and the transactions contemplated herein and shall use their best efforts to secure such



SG "Confidential Material – Subject to Protective Ord

approvals on terms and conditions mutually agreeable to Sterling and Central Evergreen. Sterling shall use its best efforts to secure approval of the Acquisition by the Shareholders of Sterling if the State Supervisor determines that such approval is required.

1.4 Interest of Members of Central Evergreen. The members of Central Evergreen shall have no rights of approval or participation in the Conversion and no rights to the continuance of any legal or beneficial ownership interest in Central Evergreen or the Surviving Corporation.

1.5 Transfer of Shares Upon Conversion. On the Effective Date, Central Evergreen will issue all authorized shares of its capital stock to Sterling.

1.6 Savings Accounts and Deposits. All savings accounts and deposits in Central Evergreen shall be and become savings accounts and deposits in the Surviving Corporation without change in their respective terms, maturities, interest rates, minimum required balances or withdrawal values. As of the Effective Date, each savings account and deposit of Central Evergreen shall be considered for dividend or interest purposes as if it had been a savings account or deposit of the Surviving Corporation at the time such savings account or deposit was opened in Central Evergreen and at all times thereafter, until such savings account or deposit ceases to be a savings account or deposit of the Surviving Corporation. Appropriate evidence of ownership of savings accounts or deposits in the Surviving Corporation shall be provided by the Surviving Corporation to each savings account holder and depositor of Central Evergreen.

1.7 Offices. The location of the home office of the Surviving Corporation shall be the present location of the home office of Sterling and all offices of Central Evergreen shall become branch offices of the Surviving Corporation. The location of all branch offices of the Surviving Corporation shall be as provided in Exhibit 2 attached hereto.

1.8 Transfer of Assets and Assumption of Liabilities. Upon the Effective Date, all of the assets and property of every kind





0145054
SG
Confidential Material – Subject to Protective Ord

and character, real, personal and mixed, tangible and intangible, choses in action, rights, and credits then owned by Central Evergreen, or which would inure to Central Evergreen, shall immediately, and by operation of law and without any conveyance or transfer and without any further act or deed, be vested in and become the property of the Surviving Corporation, which shall have, hold and enjoy the same in its own right as fully and to the same extent as the same were possessed, held and enjoyed by Central Evergreen immediately prior to the Effective Date. The Surviving Corporation shall be deemed to be and shall be a continuation of the entity of Central Evergreen and the rights and obligations of Central Evergreen shall remain unimpaired. Upon the Effective Date, the Surviving Corporation shall assume and succeed to all of such rights and obligations and the duties and liabilities connected therewith.

1.9 Articles of Incorporation and Bylaws. The articles of incorporation and bylaws of Sterling immediately prior to the Effective Date shall continue to be the articles of incorporation and bylaws of the Surviving Corporation following the Effective Date, except as may be otherwise contemplated herein, and shall thereafter control the affairs of the Surviving Corporation unless and until amended in due and proper course. A copy of the current articles of incorporation and bylaws of Sterling are attached hereto as Exhibits 3.1 and 3.2, respectively.

1.10 Directors and Officers of the Surviving Corporation. The directors and officers of Sterling immediately prior to the Effective Date shall continue as the directors and officers of the Surviving Corporation for the full unexpired term of their offices and until their successors have been elected or appointed and qualified. In addition, Sterling's Board of Directors shall cause such changes, if any, as may be required to the Surviving Corporation's bylaws to permit the addition of two persons to the Surviving Corporation's Board of Directors and shall choose two individuals from Central Evergreen's Board of Directors, as such Board exists immediately prior to the Effective Date, to be added to the Surviving Corporation's Board of Directors.





SG 0145055
"Confidential Material – Subject to Protective Order

1.11 Directors, Officers and Employees of Central Evergreen.

(a) Directors' Participation in Medical/Dental Plans of the Surviving Corporation. The parties agree that the Surviving Corporation shall use its best efforts to allow those individuals who are directors of Central Evergreen immediately prior to the Effective Date to participate, to the extent permitted under the Surviving Corporation's existing plans, at their own expense, in the medical and dental plans offered by the Surviving Corporation to its officers and employees, without regard for any plan exclusions on account of pre-existing conditions and such that coverage can be continued after the Effective Date without loss to any such directors. Such individuals may from time to time so elect to participate in said plans, at their own expense, at any time up to their death.

(b) Employees. Upon the Effective date, it is intended that the employees of Central Evergreen shall become employees of the Surviving Corporation upon terms and conditions of employment substantially equivalent to the terms and conditions of employment of all other employees of the Surviving Corporation, except as may be otherwise contemplated herein. The ultimate decisions relating to the retention, assignment, and compensation of all personnel of the Surviving Corporation will be the responsibility of management of the Surviving Corporation, subject to the provisions of this Agreement. Any employee benefits offered by the Surviving Corporation shall be made available on an equal basis to the individuals employed by Central Evergreen immediately prior to the Effective Date who are then employed by the Surviving Corporation immediately following the Effective Date ("Prior Central Evergreen Employees"), and such Employees shall receive full credit for service with Central Evergreen and its predecessors under the benefit plans offered by the Surviving Corporation, except as detailed in the following sentence and in subsection 1.11(c) below. In regard to medical and dental plans





SG 0145056
"Confidential Material – Subject to Protective Orde

offered by the Surviving Corporation, to the extent permitted under Surviving Corporation's plans, the Surviving Corporation shall use its best efforts to allow the Prior Central Evergreen Employees to participate without regard for any plan exclusions on account of pre-existing conditions and such that coverage can be continued after the Effective Date without loss to any such Employees.

(c) Employee Retirement Plans. Prior Central Evergreen Employees shall: (i) be eligible to participate in the 401(k) plan of the Surviving Corporation and any other retirement plans made available by the Surviving Corporation to its employees in accordance with the eligibility conditions of such plans; and (ii) receive full credit for service to Central Evergreen and its predecessors prior to the Effective Date for the purpose of establishing vesting in employer contributions to the Surviving Corporation's 401(k) or in other retirement plans, but shall not receive such credit for participation eligibility purposes.

After the Effective Date, the Surviving Corporation may determine to terminate the defined benefit pension plan of Central Evergreen; provided, however, that such termination shall not occur until after all Prior Central Evergreen Employees have first become eligible to participate in the 401(k) plan of the Surviving Corporation. Any such termination shall be effected in accordance with the provisions of such plan and applicable law. The Surviving Corporation shall continue to fund the participation of all Prior Central Evergreen Employees in the plan at appropriate levels under the plan until such termination of the plan by the Surviving Corporation is effective.

Upon termination of the defined benefit pension plan, the Prior Central Evergreen Employees shall be entitled to, at their election, cash out their interest in the plan, or receive an annuity contract which would provide benefits equivalent to those to which the employee was entitled under the plan, or roll over their interest into





0145057
SG
"Confidential Material – Subject to Protective Ord

the Surviving Corporation's 401(k) or other retirement plans. Any assets remaining in Central Evergreen's defined benefit pension plan after satisfaction of all obligations shall be assets of the Surviving Corporation.

(d) Assumption of Employment Agreements of Central Evergreen. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation shall assume the obligations of Central Evergreen under:

(1) the Employment Contract of George E. Godding dated December 31, 1986;

(2) the Employment Contract of John G. Van Dijk dated December 12, 1985;

(3) the Employment Contract of Carole Neuheuser dated December 13, 1985;

(4) the Deferred Compensation Agreement of Roy H. Alexander dated June 16, 1981;

(5) the Agreement with Joyce Butkus dated November 6, 1987.

Copies of said contracts and agreements are attached hereto as Exhibits 4.1, 4.2, 4.3, 4.4, and 4.5, respectively.

(e) Group Insurance for Retired Employees/Directors. Notwithstanding any other provisions of this Section 1.11, the parties agree that the Surviving Corporation will assume Central Evergreen's obligations under Central Evergreen's "Association Policy on Group Insurance of Retired CEF Employees/Directors," dated September 10, 1986, to Central Evergreen directors and Employees who retire prior to the Effective Date and to all Prior Central Evergreen Employees who retire after the Effective Date. A copy of said Policy is attached hereto as Exhibit 5.

(f) Vacation Leave. Notwithstanding any other provisions of this Section 1.11, the parties agree that all Prior Central Evergreen Employees shall be entitled to



0145058
SG
"Confidential Material – Subject to Protective Order

vacation leave in accordance with the Vacation Policy Statement of Sterling, a copy of which is attached hereto as Exhibit 6.

1.12 Effective Date of Acquisition. The Acquisition shall become effective upon the date ("Effective Date") specified by the FHLBB and State Supervisor or, in the absence of such specification, the date agreed to by the parties, after the Acquisition has been approved by all necessary governmental agencies and authorities and after all applicable waiting periods, if any, have elapsed.

Section 2. The Closing.

The parties shall use their best efforts to complete the Acquisition at the earliest practicable date following the satisfaction or waiver of all of the conditions to each party's obligations set forth herein, but in no event later than November 30, 1988, unless the parties shall before then have otherwise agreed in writing. On or before the Effective Date, the closing of the Acquisition shall take place at the principal office of Sterling ("Closing"). The exact date and time of the Closing shall be determined by Sterling and communicated to Central Evergreen promptly after all such conditions have been satisfied or waived. If the Closing does not occur on or before November 30, 1988, or such later date as the parties may agree in writing, this Agreement shall be deemed abandoned.

Section 3. Representations and Warranties of Central Evergreen.

Central Evergreen represents and warrants that:

3.1 Corporate Organization. Central Evergreen is a mutual savings and loan association duly organized and validly existing under the laws of the United States, and possesses all approvals, consents and licenses required to fully act as a federal mutual savings and loan association. Each of Central Evergreen's subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the State of Washington, and possesses all approvals, consents and licenses required to





0145059
SG
"Confidential Material – Subject to Protective Order"

fully carry on its respective business. Central Evergreen and its subsidiaries are qualified to do business as foreign corporations in each jurisdiction, if any, in which their property or business requires such qualification.

3.2 Subsidiaries. Central Evergreen has the following subsidiaries which are wholly-owned by Central Evergreen: Evergreen First Service Corporation ("EFSC") and Evergreen Environmental Development Corporation. The Best Agency is the wholly-owned subsidiary of EFSC.

3.3 Financial Statements. Central Evergreen's balance sheets as of December 31, 1983, 1984, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Knight, Vale & Gregory, and the unaudited balance sheets and related statements of income and retained earnings for the quarter ended March 31, 1988, copies of which have been separately delivered by Central Evergreen to Sterling, fairly present the financial condition of Central Evergreen as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles or regulatory accounting principles consistently applied for the periods covered.

3.4 Absence of Undisclosed Liabilities. Except to the extent reflected or reserved against in Central Evergreen's balance sheet as of December 31, 1987, Central Evergreen did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles or regulatory accounting principles.

3.5 Absence of Certain Changes. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Central Evergreen to Sterling, there has been no material adverse change in the business, properties or financial condition of Central Evergreen or its subsidiaries since December 31, 1987.



SG 0145060
Confidential Material – Subject to Protective Order

3.6 Litigation, Etc. Except as disclosed on Exhibit 7 attached hereto, there is no litigation, proceeding or investigation pending or, to the knowledge of Central Evergreen, threatened against Central Evergreen or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Central Evergreen or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Central Evergreen in connection with this Agreement.

3.7 Contracts. Except as disclosed on Exhibits 4.1, 4.2, 4.3, 4.4 and 4.5, and Exhibit 8, attached hereto, neither Central *Evergreen nor its subsidiaries are party to any lease, loan or* credit agreement, contract or other commitment including, without limitation, employment contracts, (i) involving an aggregate payment by Central Evergreen or its subsidiaries of more than Two Thousand Dollars ($2,000.00); or (ii) involving obligations to be performed later than one year from the date hereof. Any and all requisite governmental approvals have been obtained and corporate action taken for such agreements to be effective and enforceable.

3.8 Title. Central Evergreen has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Central Evergreen as of March 31, 1988, other than property disposed of in the ordinary course of business after said date. Except as disclosed on Exhibit 9 attached hereto, such property of Central Evergreen is not subject to any mortgage, encumbrance or lien of any kind, which, as now enforced, interferes with its normal current business use.

3.9 Tax Returns. The federal income tax returns of Central Evergreen have been audited by the Internal Revenue Service for the years 1969 to 1979 and 1981 and 1982. Except as heretofore disclosed in writing by Central Evergreen to Sterling, the provisions for federal and state taxes reflected in the financial statements referred to in Section 3.3 hereof are adequate to cover any such taxes which may be assessed against Central Evergreen in respect of its business and operations during the





SG — 0145061
"Confidential Material – Subject to Protective Order

periods covered by said financial statements and all prior periods.

3.10 <u>No Violation</u>. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation, to which any property of Central Evergreen or its subsidiaries is subject or by which Central Evergreen or its subsidiaries is bound.

3.11 <u>ERISA Compliance</u>. Central Evergreen and its subsidiaries are in compliance in all material respects with the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and the regulations and published interpretations thereunder. It is anticipated that additional plan amendments will be made, in accordance with the time requirements set forth in federal regulations, as needed to update the plan to comply with the Tax Reform Act of 1988 and the Omnibus Budget Reconciliation Act of 1987. Without limiting the foregoing, no Reportable Event described in §4043(b) of ERISA, filing of a notice of intent to terminate under §4041 of ERISA, or any event or condition which might constitute grounds under §4042 of ERISA for termination of, or for the appointment of a trustee to administer, any pension or profit-sharing plan of Central Evergreen or its subsidiaries, has occurred with respect to any Employee Benefit Plan described in §3(3) of ERISA administered by Central Evergreen or its subsidiaries or any administrator designated by Central Evergreen or such subsidiaries. Based on reasonable projections, there are no unfunded vested liabilities under any pension plans administered by Central Evergreen, its subsidiaries or administrators designated by Central Evergreen or its subsidiaries, at December 31, 1987.

<u>Section 4. Representations and Warranties of Sterling</u>.

Sterling represents and warrants that:

4.1 <u>Corporate Organization and Good Standing</u>. Sterling is a stock savings and loan association duly organized, validly



SG 0145062
"Confidential Material – Subject to Protective Order

existing and in good standing under the laws of the State of Washington, and possesses all approvals, consents, and licenses required to fully act as a Washington state stock savings and loan association.

4.2 Capitalization. Sterling's authorized capital stock consists of eight million (8,000,000) shares of Sterling common stock, One Dollar ($1.00) par value, of which 468,996 shares are issued and outstanding; and one million (1,000,000) shares of preferred stock, One Dollar ($1.00) par value, of which 90,168 shares are issued and outstanding.

4.3 Financial Statements. Sterling's balance sheets as of June 30, 1985, 1986, and 1987, and the related statements of income and retained earnings for the years then ended, all certified by Coopers & Lybrand, and the unaudited balance sheets and related statements of income and retained earnings for the periods ended September 30, 1987, December 31, 1987, March 31, 1988 and June 30, 1988, copies of which have been separately delivered by Sterling to Central Evergreen, fairly present the financial condition of Sterling as of said dates and the results of its operations for the periods then ended, in conformity with generally accepted accounting principles consistently applied for the periods covered.

4.4 Absence of Undisclosed Liabilities. Except to the extent reflected or reserved against in Sterling's balance sheet as of June 30, 1988, Sterling did not have, at that date, any liabilities or obligations (secured, unsecured, contingent or otherwise) of a nature customarily reflected in a savings and loan association balance sheet prepared in accordance with generally accepted accounting principles.

4.5 Absence of Certain Changes. Except as heretofore disclosed in the financial statements or otherwise in writing provided by Sterling to Central Evergreen, there has been no material adverse change in the business, properties or financial condition of Sterling or its subsidiaries since June 30, 1988.

4.6 Litigation, Etc. Except as disclosed on Exhibit 10 attached hereto, there is no litigation, proceeding or investi-





SG 0145063
"Confidential Material – Subject to Protective Order

gation pending or, to the knowledge of Sterling, threatened against Sterling or its subsidiaries which would have a material adverse affect on the business, properties or financial condition of Sterling or its subsidiaries or which questions the validity or legality of this Agreement or of any action taken or to be taken by Sterling in connection with this Agreement.

4.7 Title. Sterling has good and marketable title to all the real property used in its business, including such property reflected in the balance sheet of Sterling as of June 30, 1988, other than property disposed of in the ordinary course of business after said date. Such property of Sterling and its subsidiaries is not subject to any mortgage, encumbrance or lien of any kind, except as disclosed in its financial statements referred to in Section 4.3 hereof.

4.8 Tax Returns. Except as heretofore disclosed in writing by Sterling to Central Evergreen, the provisions for federal and state taxes reflected in the financial statements referred to in Section 4.3 hereof are adequate to cover any such taxes which may be assessed against Sterling in respect of its business and operations during the periods covered by said financial statements and all prior periods.

4.9 No Violation. Consummation of the Acquisition will not constitute or result in a material breach or a material default under any provision of any charter, bylaw, indenture, mortgage, lease or agreement, or any order, judgment, decree, law or regulation to which any property of Sterling and its subsidiaries is subject or by which Sterling or its subsidiaries is bound.

Section 5. Conduct of Business of Central Evergreen Pending the Effective Date of the Acquisition.

Central Evergreen covenants that between the date of this Agreement and the Effective Date:

5.1 No Change in Charter or Bylaws. No change will be made in Central Evergreen's charter and bylaws, except as may be contemplated herein.







SG
"Confidential Material – Subject to Protective Ord

5.2 Conduct of Business. Central Evergreen will use its best efforts to maintain and preserve its present business organization, employee relationships and goodwill intact, and will not, without the written consent of Sterling, enter into any material commitment except in the ordinary course of business or increase, directly or indirectly, the compensation of any officer or employee whose annual rate of compensation after the increase will exceed Twenty Thousand Dollars ($20,000.00).

Section 6. Access and Cooperation.

6.1 Access. From the date hereof to the Effective Date, Sterling and Central Evergreen shall provide each other with such information and permit each other's officers and representatives such access to its properties and books and records as the other may from time to time reasonably request. If the Acquisition is not completed, all documents and other written materials received in connection with this Agreement shall be returned to the party furnishing the same, and all information so received shall be treated as confidential unless readily ascertainable from public information or sources.

6.2 Cooperation. The parties hereto will cooperate with each other in every way in carrying out the transactions contemplated herein, in obtaining all required approvals and authorizations therefor, and in executing and delivering all documents, instruments or copies thereof deemed necessary or useful by either party thereto.

Section 7. Confidentiality and Announcements.

7.1 Confidentiality. Until the Effective Date, each of the parties hereto and its employees, accountants, counsel, auditors and other representatives and agents shall keep confidential any information (unless readily ascertainable from public information or sources) obtained from the other party, except as may be required to be disclosed to shareholders of Sterling in proxy materials and as may be approved by the party from whom the information was obtained.


"Confidential Material – Subject to Protective Order

7.2 Announcements. Without the prior agreement of the other party, neither party shall, prior to the Effective Date, hold any press interview or conference or make any written announcement or statement to the public or to its employees concerning the transactions contemplated by this Agreement.

Section 8. Solicitation of Employees.

If this Agreement is abandoned as contemplated by Sections 2 or 11 hereof, each of the parties hereto shall, for a period of one (1) year thereafter, refrain from soliciting any officers or key employees of the other for employment unless such other party is merged with or acquired by any other entity or is put into the possession or control of a receiver or conservator.

Section 9. Conditions Precedent to the Obligations of Sterling.

The obligations of Sterling under this Agreement to complete the Acquisition are subject to the satisfaction of the following conditions unless waived by Sterling on or before the Effective Date:

(a) Shareholder Approval. If and to the extent the State Supervisor shall so require, Sterling shall have obtained the approval by the Sterling shareholders of this Acquisition.

(b) Government Approvals. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Sterling reasonably determines are unduly burdensome.

Section 10. Condition Precedent to the Obligations of Central Evergreen.

The obligations of Central Evergreen under this Agreement to complete the Acquisition are subject to the satisfaction of the following condition, unless waived by Central Evergreen on or before the Effective Date:





SG 0145066
"Confidential Material – Subject to Protective Order

<u>Government Approvals</u>. The parties hereto shall have received approval of the transactions contemplated by this Agreement from all necessary governmental agencies and authorities without the imposition of any conditions which Central Evergreen reasonably determines are unduly burdensome. Moreover, the Federal Home Loan Bank of Seattle shall terminate the Supervisory Agreement of Central Evergreen.

<u>Section 11. Abandonment of Acquisition</u>.

This Agreement may be abandoned at any time prior to the Effective Date (i) on the agreement of the Boards of Directors of both parties; or (ii) by action of the Board of Directors of either of the parties, or one of the parties if so noted below, on the happening of any of the following events:

(a) If all the required approvals of the FHLBB and State Supervisor have not been received on or before November 30, 1988, or such later date as the parties may agree in writing;

(b) If any material action or proceeding is instituted or threatened against either of the parties which would enjoin, prohibit or restrain the completion of the Acquisition;

(c) If, between the date of this Agreement and the Effective Date, there has been, in the opinion of either Board of Directors, a material adverse change in the business or financial condition of the other corporation;

(d) If, without the prior written consent of the other party, one of the parties shall have engaged in any transaction prohibited by this Agreement;

(e) By the Board of Directors of Sterling if any one or more of the conditions provided in Section 9 hereof shall not have been satisfied, and Sterling shall not have waived such failure; and

(f) By the Board of Directors of Central Evergreen if the condition provided in Section 10 hereof shall not have



SG
"Confidential Material – Subject to Protective Orde

been satisfied, and Central Evergreen shall not have waived such failure.

In the event of any abandonment of this Agreement pursuant to this Section 11, written notice setting forth the reasons therefor shall forthwith be given by the party abandoning this Agreement to the other party. In the event of the abandonment of this Agreement pursuant to the provisions of Sections 2 or 11 hereof, this Agreement shall have no further effect, and there shall be no liability on the part of any party or its directors, officers, employees or members; provided, however, that if any party hereto willfully fails to perform its obligations hereunder, or exercises any powers granted hereunder in bad faith, the other party hereto damaged thereby may seek any available legal or equitable remedies. Notwithstanding the previous sentence, Sections 7.1 and 8 and the last sentence of Section 6.1 shall survive any abandonment of this Agreement.

<u>Section 12. Miscellaneous Provisions</u>.

12.1 <u>Expenses</u>. Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transaction contemplated by this Agreement.

12.2 <u>Litigation Costs</u>. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

12.3 <u>Parties in Interest</u>. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any







SG "Confidential Material – Subject to Protective Ord

party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

12.4 Headings. The subject headings of the Sections and subsections of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

12.5 Entire Agreement/Modification/Waiver. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.

At any time prior to the Closing, either party may in writing waive compliance by the other party with any of the provisions hereof. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

12.6 Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart shall constitute an original instrument.

12.7 Governing Law. This Agreement shall be interpreted in accordance with and governed by the laws of the State of Washington to the extent that Federal law does not control.

12.8 Binding Nature of Agreement; No Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; except that no party may assign or transfer its rights and obligations under this Agreement without the prior written consent of the other.

12.9 Notice Provisions. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and be effected by personal delivery or by



SG
Confidential Material – Subject to Protective Order

certified mail, postage prepaid, return receipt requested, and shall be deemed delivered as of the time of actual receipt. Such notices, requests, demands and other communications shall be addressed as set forth below:

(a) If to Sterling, to:

Sterling Savings Association
North 120 Wall
Spokane, Washington 99201
Attention: Daniel Byrne

(b) If to Central Evergreen, to:

Central Evergreen Federal Savings
and Loan Association
P.O. Box 1506
Chehalis, Washington 98532
Attention: George Godding

EXECUTED on behalf of the parties by their officers and sealed with their corporate seals, respectively, pursuant to the authorization of their respective Boards of Directors on the dates indicated.

STERLING SAVINGS ASSOCIATION

Date: 7-20-88

By ______________________
President

By ______________________
Secretary

CENTRAL EVERGREEN FEDERAL
SAVINGS AND LOAN ASSOCIATION

Date: 7-20-88

By ______________________
President

By ______________________
Secretary

HWG3





0145070
SG
"Confidential Material – Subject to Protective Order"

# EXHIBIT 1

## Plan of Conversion

(Pursuant to Section 1.1 of the Acquisition Agreement dated as of July ___, 1988, between Sterling Savings Association and Central Evergreen Federal Savings and Loan Association)

See attached document immediately following.



SG
"Confidential Material – Subject to Protective Order

# PLAN OF CONVERSION

## General

On July 19, 1988, the Board of Directors ("Board") of Central Evergreen Federal Savings and Loan Association, P.O. Box 1506, Chehalis, Washington ("Central Evergreen"), by a favorable vote of not less than two-thirds, adopted this Plan of Conversion ("Plan") whereby Central Evergreen will convert from the mutual to the stock form of organization in a voluntary supervisory stock conversion pursuant to Federal Home Loan Bank Board ("FHLBB") regulations set forth at 12 C.F.R. §§ 563b.20 to 563b.32 ("Conversion"). Pursuant to this Plan and the Acquisition Agreement between Central Evergreen and Sterling Savings Association, North 120 Wall, Spokane, Washington ("Sterling"), and after all required regulatory approvals have been obtained, Central Evergreen will convert to stock form, issue all authorized shares of its stock to Sterling, and merge into Sterling which will be the Surviving Corporation ("Surviving Corporation"). The Board intends that the Conversion, issuance of shares to Sterling, and merger into Sterling ("Merger") shall be one integrated process with each step immediately followed by the next. The Board may adopt a separate Plan of Merger to detail the Merger aspects of the transaction.

## FHLBB Application

Central Evergreen shall prepare and file with the FHLBB, after seeking input from Sterling, an application for the Conversion.

## Interest of Central Evergreen's Members

The members of Central Evergreen shall have no rights of approval or participation in the Conversion or Merger, no rights to subscribe to any of the stock issued in the Conversion, and no rights to the continuance of any legal or beneficial ownership interest in Central Evergreen or the Surviving Corporation. No liquidation account for the benefit of Central Evergreen's depositors will be established by Central Evergreen or the Surviving Corporation.

## Qualification for Voluntary Supervisory Stock Conversion

Based on financial statements certified by Central Evergreen's accounting firm, Knight, Vale and Gregory, the Board believes that Central Evergreen qualifies for a voluntary supervisory stock conversion under 12 C.F.R. § 563b.24(a), in that Central Evergreen's liabilities exceed its assets under generally accepted accounting principles. The Board believes that Sterling







SG
"Confidential Material – Subject to Protective Order

intends to infuse sufficient capital so that the Surviving Corporation will be a viable entity as determined under 12 C.F.R. § 563b.26(b). The Board believes that the Conversion/Merger is, taken as a whole, in the best interests of Central Evergreen, its depositors, and the Federal Savings and Loan Insurance Corporation.

**Conversion**

As part of the Conversion, the Charter and Bylaws of Central Evergreen will be amended into an appropriate form for a stock federal savings and loan association, as adopted by the Board and approved by the FHLBB. The stock charter shall prescribe that Central Evergreen has the authority to issue, in total, 100 shares of common stock, $1.00 par value per share. All authorized shares (100) of Central Evergreen stock will be issued to Sterling on the effective date of the Merger ("Effective Date"), in consideration of the assumption by Sterling of all of the liabilities of Central Evergreen. No shares of Central Evergreen will be purchased or otherwise acquired by directors or officers of Central Evergreen, or by their affiliates or associates. Sterling has no prior relationship with Central Evergreen, outside the ordinary course of business.

**Amendment or Termination of Plan**

If necessary or desirable, the Board may amend this Plan at any time, and may terminate this Plan at any time, prior to completion of the Conversion/Merger.

**Expenses of Conversion**

Central Evergreen shall use its best efforts to assure that expenses incurred by Central Evergreen in connection with the Conversion/Merger shall be reasonable.



SG 0145073
"Confidential Material – Subject to Protective Ord

EXHIBIT 2

**Branch Offices of Surviving Corporation**

(Pursuant to Section 1.7 of the Acquisition Agreement dated as of July ___, 1988, between Sterling Savings Association and Central Evergreen Federal Savings and Loan Association)

1. HEAD OFFICE (ADMINISTRATION)
   (BRANCH 90)
   North 120 Wall Street
   Spokane, WA 99201-0690
   (509) 624-4132 or
   1-800-772-7791

2. NORTHTOWN OFFICE (BRANCH 06)
   460 Northtown Shopping Center
   Spokane, WA 99207
   (509) 483-0425

3. MANITO OFFICE (BRANCH 07)
   Sterling Square
   30th & Grand Boulevard
   Spokane, WA 99203
   (509) 624-8238

4. CLARKSTON OFFICE (BRANCH 02)
   303 Diagonal
   Mail: P.O. Box 160
   Clarkston, WA 99403
   (509) 758-5501

5. POMEROY OFFICE (BRANCH 03)
   782 Main
   Mail: P.O. Box 8
   Pomeroy, WA 99347
   (509) 843-1895

6. COLFAX OFFICE (BRANCH 04)
   803 North Main
   Mail: P.O. Box 309
   Colfax, WA 99111
   (509) 397-4681

7. WALLA WALLA OFFICE
   (BRANCH 05)
   2 East Main Street
   Mail: P.O. Box 835
   Walla Walla, WA 99362
   (509) 522-2044

8. KENNEWICK - CLEARWATER
   STREET OFFICE (BRANCH 15)
   7601 West Clearwater
   Mail: P.O. Box F
   Kennewick, WA 99336
   (509) 783-7307

9. PASCO - COURT STREET
   OFFICE (BRANCH 16)
   2003 West Court Street
   Pasco, WA 99301
   (509) 545-5000

10. RICHLAND OFFICE (BRANCH 17)
    211 Torbett Street
    Richland, WA 99352
    (509) 943-4633

11. KENNEWICK - VISTA WAY
    OFFICE (BRANCH 18)
    138 Vista Way
    Kennewick, WA 99336
    (509) 735-2545

12. CHEHALIS BRANCH (BRANCH 20)
    401 North Market Boulevard
    Mail: P.O. Box 329
    Chehalis, WA 98532
    (206) 748-8623



SG
"Confidential Material – Subject to Protective Order

13. CENTRALIA OFFICE
(BRANCH 21)
1111 Harrison Avenue
Centralia, WA 98531
(206) 736-0131

14. NORTH BEND (BRANCH 31)
146 West Second Street
Mail: P.O. Box 1433
North Bend, WA 98045
(206) 888-1616

15. WINSLOW BRANCH (BRANCH 32)
154 Winslow Way E.
Mail: P.O. Box 11140
Winslow, WA 98110
(206) 842-8676

16. PORT ANGELES (BRANCH 33)
1033 East First Street
Mail: P.O. Box 2041
Port Angeles, WA 98362
(206) 452-6831

17. OTHELLO (BRANCH 50)
450 East Main
Mail: P.O. Box 220
Othello, WA 99344
(509) 488-9601

18. MOSES LAKE (BRANCH 51)
West 109 Third Avenue
Mail: P.O. Box 1079
Moses Lake, WA 98837
(509) 765-7867

19. ELLENSBURG (BRANCH 52)
Fifth and Main
Mail: P.O. Box 797
Ellensburg, WA 98926
(509) 925-4134

20. CHEHALIS
350 North Market Boulevard
Chelalis, WA 98532
(206) 748-0171

21. LACEY
817 Sleater-Kinney Road
Lacey, WA 98503
(206) 491-4340

22. MORTON
2nd & Adams
Morton, WA 98532
(206) 496-5155

23. WINLOCK
401 N.E. First
Winlock, WA 98596
(206) 785-4111

24. OLYMPIA
2000 Harrison Avenue N.W.
Olympia, WA 98502
(206) 943-8086

25. AUBURN
1261 Auburn Way North
Auburn, WA 98002
(206) 939-0071

26. PANORAMA CITY
150 Circle Drive
Lacey, WA 98503
(206) 459-8251

27. CENTRALIA
215 North Pearl
Centralia, WA 98531
(206) 736-3363

28. ROCHESTER
Highway 12 & Foster
Rochester, WA 98579
(206) 273-5509

29. CLARK COUNTY
14610 S.E. Mill Plain Blvd.
Vancouver, WA 98664
(206) 892-4911



SG
"Confidential Material – Subject to Protective Order

EXHIBIT 3.1

<u>Articles of Incorporation (Sterling)</u>

(Pursuant to Section 1.9 of the Acquisition Agreement dated as of July ___, 1988, between Sterling Savings Association and Central Evergreen Federal Savings and Loan Association)

See attached document immediately following.



SG
"Confidential Material – Subject to Protective Orde

FEDERAL HOME LOAN BANK BOARD

No.: 88-1273

Date: December 8, 1988

WHEREAS, Central Evergreen Federal Savings and Loan Association, Chehalis, Washington, ("Old Association"), as authorized by a majority vote of its board of directors, filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an application ("Application") pursuant to § 402(j) of the National Housing Act ("NHA"), 12 U.S.C. § 1725(j), §§ 5(i) and (p) of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. §§ 1464(i) and (p) and Subpart C of 12 C.F.R. Part 563b for permission to convert to a federally-chartered stock association through a merger into Sterling Savings Association, Spokane, Washington ("Acquiring Association") with Acquiring Association as the surviving institution ("Resulting Institution").

WHEREAS, The Old Association and the Resulting Institution have filed an application for merger and a resulting increase in the insurable accounts of the Resulting Institution pursuant to 12 C.F.R. §§ 552.13 and 563.22;

WHEREAS, the Federal Home Loan Bank Board ("Board"), as the operating head of the FSLIC, has considered the applications, as well as a memorandum from the General Counsel, with exhibits, dated December 5, 1988, a memorandum from the Office of District Banks, dated December 5, 1988, a memorandum from the Office of Regulatory Activities ("ORA"), dated November 18, 1988, with attachments, and a digest and other memoranda from the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Seattle dated November 7, 1988, and, based on the Board's review of the foregoing has determined to approve all of the aforesaid applications; and

WHEREAS, the Board, as operating head of the FSLIC, finds that (1) the Old Association's liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, and (2) the Resulting Institution would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26;

SUPERVISORY CASE FINDING

WHEREAS, the Board hereby finds and determines that all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of the Old Association;

SG 0142033

"Confidential Material – Subject to Protective Order"

95 - 829 - C

P - 047

COMPETITIVE FACTORS FINDINGS

WHEREAS, the Board hereby finds that the merger, instituted for supervisory reasons, would not result in a monopoly, be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the savings and loan business in any part of the United States, nor would the acquisition substantially lessen competition or tend to create a monopoly, or in any other manner be in restraint of trade;

WAIVER OF PUBLICATION

WHEREAS, because of the supervisory nature of the transactions addressed herein, the Board hereby waives under applicable regulatory provisions, all public notice and publication requirements of the regulations applicable to the applications addressed herein;

VOLUNTARY SUPERVISORY CONVERSION AND MERGER

NOW THEREFORE IT IS RESOLVED, that the Old Association is hereby authorized to convert from the federal mutual to the federal stock form of organization; the Old Association is hereby authorized to merge into the Resulting Institution; Resulting Institution is hereby authorized to increase its insurable accounts as a result of that merger; and the requirements of 12 C.F.R. § 552.13(i), (j), (l), and (m) are hereby waived, pursuant to § 552.15; and the Application is determined to have met the requirements of § 563b.27(o) pursuant to §§ 563b.1(a) and .20(a); provided that the following conditions are complied with to the satisfaction of the Supervisory Agent:

1. That within 90 days of the date of this Resolution, the conversion of the Old Association by merger into the Resulting Institution, has been completed in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Plan of Merger and Combination), applicable state and federal laws and regulations as administered by the Board and FSLIC; and that within 30 days thereafter the Resulting Institution shall file with the Corporate and Securities Division ("CASD") of the Office of General Counsel and the Principal Supervisory Agent at the Federal Home Loan Bank of Seattle an opinion of independent legal counsel that the conversion, and the merger have been so completed, which opinion must specify the effective date(s) thereof;

2. That within 30 days after consummation of the acquisition, counsel for the Resulting Institution shall submit an opinion to Supervisory Agent, indicating that the proposed conversion and merger did not result in any significant tax liability to the Resulting Institution or the Old Association;

3. That on the business day immediately preceding the consummation of the conversion and merger, the chief financial officers of the Acquiring Association and of the Old Association shall certify to the Supervisory Agent in writing that no material adverse events or changes have occurred with respect to the condition of Acquiring Association or the Old Association since the date of the financial statements submitted with the application;

4. That within 30 days after consummation of the conversion and merger the Resulting Institution shall furnish analyses satisfactory to the Supervisory Agent, accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible assets and the discount of assets and the related amortization periods and methods;

5. That prior to the consummation of the merger and conversion the board of directors of the Resulting Institution shall ratify the terms and conditions of this approval resolution and the terms of the proposed conversion and merger and, within 30 days thereof, shall submit a certified copy of the board of director's resolution to the Supervisory Agent;

6. That prior to consummation of the proposed transaction, the Resulting Institution shall execute a written agreement with the Corporation that for a period of five years following the date of the acquisition (i) Resulting Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval from the Supervisory Agent of any changes which would cause Resulting Institution to materially deviate from the business plan; and (ii) within 30 days of the date of the date of the close of each calendar quarter, Resulting Institution shall submit to the Supervisory Agent a variance report in the format of the business plan's pro forma financial statements explaining any material deviation from the approved business plan;

PAGE.004 DEC 6 '88 15:11 FROM FHLB/SEA 206 340 2485

SG 0142035
"Confidential Material – Subject to Protective Order"

7. Within 30 days following the date of consummation of the conversion and merger, Resulting Institution shall submit to the Supervisory Agent an opinion from its independent accountant concerning the effects this transaction will have on the Old Association's net operating loss carryforwards;

8. That Sterling shall agree in writing with the Corporation to infuse capital as necessary to enable the institution to continue to maintain its regulatory capital requirement pursuant to 12 C.F.R. § 563b.13 as currently in effect or as hereafter amended, and to infuse capital from its planned stock offering, or by an equivalent method, no later than two years from the date of acquisition, in order to meet the scheduled increases of capital as set forth in the business plan. Sterling shall also agree that, during the 5 year period of the agreement commencing on the date of acquisition, upon failure to achieve regulatory and GAAP capital levels consistent with the scheduled increases of capital as set forth in the business plan or failure to comply in all material respects with the business plan, the institution shall be subject to such sanctions as negotiated with the SA, with the concurrence of ORA & OGC, and included in the Agreement.

9. That, not later than thirty (30) days following the effective date of the merger, Sterling shall submit evidence that it has given notice, in writing, to each accountholder whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the merger, such notice to include the following sentence:

"If the aggregate amount of your existing account(s) at the Resulting Institution, Sterling Savings Association, exceeds $100,000, you should be aware that Federal law provides that, whenever a savings account of an insured institution is assumed by another insured institution pursuant to a merger or consolidation, the assumed account will be separately insured for six (6) months from the date of the assumption or, in the case of a certificate account, until the certificate matures. 12 USC Section 1728(a) (1982). This means that the FSLIC will insure the accounts you had at Central Evergreen and Sterling separately until maturity in the case of a certificate account and for six (6) months in the case of other accounts such as passbook and NOW accounts. After the expiration of the six (6) month period, or upon renewal in the case of a certificate account, the account will be aggregated with your Sterling accounts for insurance purposes. Any accounts opened or deposits made after the date of merger will be aggregated with your Sterling accounts and will not be separately insured";

PAGE.025

SG 0142036
"Confidential Material – Subject to Protective Order"

**TAX CERTIFICATION**

RESOLVED FURTHER, That the board finds and certifies that the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to Central Evergreen in that it is insolvent;

RESOLVED FURTHER, That the Secretary or Assistant Secretary is hereby authorized to send to the Old Association a letter certifying on behalf of the Board that the grounds set forth 12 U.S.C. § 1464(d)(6)(A)(i) exist with respect to the Old Association (a copy of which is included in the Exhibits); and the Secretary or an Assistant Secretary is hereby authorized to provide a copy of such certification to any agency of United States upon its request; and

**CESSATION OF BANK MEMBERSHIP AND INSURANCE OF ACCOUNTS**

RESOLVED FURTHER, It is also hereby directed that the cessation of the membership of the Old Association in the Federal Home Loan Bank of Seattle be noted upon consummation of the proposed merger, effective as of the effective date of said merger, and that the transfer of the stock of the Old Association in the Federal Home Loan Bank of Seattle to the Resulting Institution is hereby approved; and further, that, in such event the certificate of insurance issued to the Old Association shall be cancelled as of the effective date of the merger; and

**EFFECTIVE DATE**

RESOLVED FURTHER, The transaction approved herein will become effective at 12:01 A.M. local standardized time at the Old Association's home office locale on the day following the date on which the Supervisory Agent has determined that all conditions precedent have been met and determined that the Acquiring Association has accepted, and that the Resulting Institution and the Old Association, having been duly authorized by their respective boards of directors, have accepted, the terms and conditions of this approval Resolution; and

**MISCELLANEOUS**

RESOLVED FURTHER, That all forms issued after the effective date of the supervisory conversion evidencing funds on deposit with the Resulting Institution shall be in a form approved by the PSA pursuant to 12 C.F.R. § 563.1, and shall indicate that the Resulting Institution is a stock association; and

**EXTENSION OF TIME**

RESOLVED FURTHER, that the Supervisory Agent may extend for good cause all time periods specified herein for an additional 180 days; and

DEC 9 '88 15:14 FROM FHLB-SEA TO 202 340 2125 PAGE.006

SG 0142037

"Confidential Material – Subject to Protective Order"

NO. 88-1273



MAINTENANCE OF BRANCH OFFICES

RESOLVED FURTHER, That the Resulting Association is hereby authorized to retain the former home office and branch offices of the Old Association upon consummation of the merger of the Old Association into the Resulting Association;

FAILURE TO MEET CONDITIONS

RESOLVED FURTHER, that if the above conditions are not met:

1. All approvals given under this Resolution and concurrent Resolutions, if any, shall be cancelled and withdrawn;

2. The General Counsel, or his delegates, and the Secretary or an Acting or Assistant Secretary to the Board are authorized and directed to take all necessary and appropriate actions to effect the foregoing provisions of this Resolution.

By the Federal Home Loan Bank Board

John F. Ghizzoni
Assistant Secretary

TOTAL P.05

SG 0142038

"Confidential Material – Subject to Protective Order"

CERTIFICATE OF CORPORATE RESOLUTION

OF

STERLING SAVINGS ASSOCIATION

I, Ned M. Barnes, Secretary of Sterling Savings Association do hereby certify that a meeting of the Board of Directors of said corporation duly held on the 20th day of December, 1988, which a quorum was present and acting throughout, the following resolution was duly adopted and is now in full force and effect and that said resolution is not in conflict with any provisions of the Articles of Incorporation or Bylaws of the corporation:

WHEREAS, this corporation has previously directed and empowered its officers, or any one of them, to enter into an agreement for acquisition of the assets and liabilities of Central Evergreen substantially on the terms and conditions of an Acquisition Agreement presented to the Board; and

WHEREAS, pursuant to the authority granted under said resolution this corporation entered into an Acquisition Agreement dated July 20, 1988 (the "Acquisition Agreement") and has effected the requisite applications for approval to the Federal Home Loan Bank Board and Was ington State Supervisor of Savings and Loan Associations; and

WHEREAS, approvals have been received from the Federal Home Loan Bank Board by resolution No. 88-1273 dated December 8, 1988 ("the FHLBB Resolution") and by the Washington State Supervisor of Savings and Loan Associations office; and

WHEREAS, the FHLBB Resolution requires, among other things, that prior to the consummation of the merger and conversion contemplated by the Acquisition Agreement, the Board of Directors of this corporation, as the resulting institution, under the Acquisition Agreement ratify the terms and conditions of the FHLBB Resolutio as well as the terms of the proposed conversion and merger;

NOW, THEREFORE, IT IS:

RESOLVED that the terms and conditions of the FHLBB Resolution are hereby agreed to and ratified;

BE IT FURTHER RESOLVED that the officers, or any one of them, are hereby directed and empowered to act on behalf of this corporation in fulfilling the terms and conditions of the FHLBB Resolution including, without limitation, the execution of a written agreement which provides that for a period of five (5) years following the date of the acquisition, this corporation will operate within the scope of the business plan which was provided in connection with the application to the Federal Home Loan Bank Board and to provide reports to the supervisory agent for the Federal Home Loan Bank Board in accordance with said written agreement, as well as all other terms and conditions of the FHLBB Resolution; and,

BE IT FURTHER RESOLVED that the effective date as called for under the Acquisition Agreement shall be December 31, 1988; and

BE IT FURTHER RESOLVED that the officers of this corporation, or any one of them, are hereby directed and empowered to execute and deliver any and all documents which may be required to consummate the acquisition under the Acquisition Agreement, to comply with the terms and conditions of the FHLBB Resolution, and to comply with any and all other terms and conditions required by any other regulatory agency having jurisdiction over the transaction and this corporation.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 1988.

Ned M. Barnes

NED M. BARNES
Secretary

WON889 0279 L STERLING 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018136 OLD BOX # 99 OF 324 W2112 CORRESPONDENCE 889999 FILE; CORRESPONDENCE; FINANCIAL STATEMENTS; INDICES; REPORTS; CAPITAL RESTORATION PLAN; EXHIBITS; BULLETIN; HANDWRITTEN NOTES; NEWS ARTICLES 850799-900299 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

STERLING SAVINGS ASSOCIATION
MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
December 20, 1988

The regular meeting of the Board of Directors of Sterling Savings Association was called to order on the 20th day of December, 1988 at 1:30 p.m. in the Board Room of the main office of Sterling Savings Association, North 120 Wall Street, Spokane, Washington. The following directors were present: Rodney W. Barnett, T. Richard Clark, Harold B. Gilkey, Charles L. Kroetch, Robert Larrabee, Robert E. Meyers, David O. Wallace, William W. Zuppe, and Ned M. Barnes. There being a quorum present, the meeting was called to order for the transaction of business. A draft of the minutes of the regular meeting of the Board of Directors held November 21, 1988 was reviewed. There being no additions or corrections, the minutes were approved as presented.

Mr. Zuppe commenced the meeting with his president's report. He reported that we have had a lot of activity with less than exciting results. Lending activity continues to lag because there are too many lenders with too many dollars. As a result, there are flat yield curves and we do not have any incentives to compromise credit or our pricing standards. Mr. Zuppe reported that this problem is universal. November commitments are up but our closings and pipelines are down. Savings activity shows a poor November with lots of competition. The administration and operating staff has been focusing on the acquisition of Centeral Evergreen which will be our biggest acquisition to date. We have made our plans and are ready to proceed. As a result, our re-forecasting is lagging. Mr. Zuppe was pleased to inform the Board that the Manito Branch exceeded $10 million on December 8, 1988.

The first matter on the agenda is a loan status report. Commitments exceeded $21 million with $14.8 million being


Confidential Material – Subject to Protective Order

committed by Sterling and $6.9 million being committed by Intervest. Intervest closed loans in November totalling $1.44 million. Total loans closed for November equalled $13,713,126.00, including the Intervest loans. Closed commercial bank loans totalled $2.1 million with $540,000.00 representing renewals or extensions and $1.5 million representing new loans. Residential closings totalled $6,640,000.00 in the conventional arena and $2.9 million in the governmental arena. Closed consumer loans totalled $526,000.00 and closed passbook loans totalled $114,000.00.

Mr. Zuppe reported that our delinquency ratio was reduced for November to 2.74%, which is a drop of over one-tenth of 1%. This delinquency ratio shows steady improvement since the first of the company's fiscal year. In reviewing individual loan classifications, income property loans totalled 4.53%, commercial bank loans 3.69%, residential construction loans 14.27%, residential loans .71%, and consumer loans 1.39%, with the overall portfolio at 2.74%. Mr. Clark expressed some concern in the comparison of delinquencies over 60 days and delinquencies over 90 days. Also reviewed were delinquencies on loans which are being serviced for others. Mr. Zuppe reported that real estate owned was reduced $400,000.00 last month with real estate owned going from $5.8 million in October to $5.4 million in November.

Next on the agenda are loans to report. The first loan to report is a loan to Feldman-Person, Inc., which is guaranteed by J. Grant Person and William C. Feldman. This actually amounts to two loans, one in the amount of $67,202.00 and the other in the amount of $55,000.00. The first loan is a renewal of a single-pay note originally granted in December of 1986 for $96,000.00 to fund a 50% equity in the Charbonneau Apartments. This loan is secured by an assignment of an undivided 50% interest in partnership equity in the Charbonneau Apartments, and is also secured by a first deed of trust on a lot located in Manito Estates valued at $42,000.00. Sterling Savings Association will receive $25,000.00 to apply on this loan upon sale of the lot located in Manito. This first loan is priced at



SG 0192366

Subject to Protective Order

Bank of America reference rate plus 2.5%, with a fee of 1% and a maturity in six months. Interest is payable monthly with a $25,000.00 balloon principal payment due February 1, 1989. The second loan is to amortize an existing line of credit originally granted to fund start-up costs of a South Hill office. It is secured by a security agreement on furniture and equipment and an assignment of proceeds on an account receivable due Feldman-Person from Tomlinson Realty. It is priced at Bank of America reference rate plus 2.5%, with a fee of 1%, a maturity of 12 months, and principal and interest payments monthly of $1,100.00.

The next loan to report is a loan to Totem Pacific Corporation which will be guaranteed by Steve Sabin and Ed Burge. Again, this is two loans, one in the amount of $175,000.00 and the other in the amount of $225,000.00. The first loan is an annual renewal of a credit line used to fund operating expenses and is secured by a first lien on accounts receivable plus a lien on inventory and fixed assets subject to a prior lien by the SBA. It is priced at Bank of America reference rate plus 2.5%, adjusted monthly, with a fee of 2% and a maturity of October 1, 1989. The second loan is to partially fund repayment of accounts payable and will be secured by a second lien on all company assets subject to the loans of the Small Business Administration. It is priced at the lowest Wall Street Journal prime rate plus 2.25%, adjusted monthly, with a fee of .25%. This loan matures on July 1, 1989.

The next loan to report is a loan in the amount of $15,000.00 to Senor Froggy, Inc. This loan is guaranteed by David R. Hooke. The purpose of the loan is to fund operating costs during a seasonal slow down of the restaurant. It is secured by a third lien position on equipment, fixtures, inventory and leasehold improvements. It is priced at Bank of America reference rate plus 2%, adjusted monthly. It requires payment of a 1% fee. The maturity is May 1, 1989.

The next loan to report is a loan in the amount of $20,000.00 to Robert and Marilyn Wood and will be guaranteed by Paul M. Fruci. This is to provide funds for living expenses





Confidential Material – Subject to Protective Order

until Mr. Wood can obtain a position in petroleum engineering. It is secured by a second deed of trust on a personal residence located at South 2727 Mohawk in Spokane. It is priced at the 26-week Treasury Bill rate plus 4%. The fee is 1.5% and the maturity is November 1, 1989. Interest is payable monthly with the balance due at maturity.

The next loan to report is a loan to Dr. and Mrs. Robert W. Allen. The total loan is $173,500.00. This combines two prior loans and provides for an extension of the original term. It is secured by all equipment, inventory and accounts receivable of Dr. Allen. It is priced at Bank of America reference rate plus 2%, adjusted monthly, with a floor of 9.5% and a ceiling of 16%. The fee is 2%. The maturity is five years and will be payable based on a 15-year amortization.

The next loan to report is a loan to Northern Technologies, Inc., in the amount $250,000.00. This loan is guaranteed by Steve Baker, Doug Walton and Don Campbell. It represents an increase in a credit line of $200,000.00 to $250,000.00 to fund increased levels of account receivables. It is secured by a first lien on accounts receivables, inventory and equipment. It is priced at Bank of America reference rate plus 1.25%, adjusted monthly. The fee is .5% on the new money. The maturity is May 1, 1989.

The next loan to report is a loan to Fabric McLoughlin Limited Partnership in the amount of $1,100,000.00. This loan is guaranteed by Riley R. Taylor and William B. Hoffee. It is to finance construction of a Fabric Land store located in Clackamas County, Oregon. It is secured by a first deed of trust on land and improvements located in Clackamas County, Oregon. It is priced at Bank of America reference rate plus 1.25%, adjusted monthly. The fee is $16,500.00 and the maturity is 12 months with the borrower to have the right to obtain one six-month extension upon payment of a fee of $5,500.00.

The last loan to report is a request to extend a loan in the amount of $163,293.89. The borrower is Plaza 23 Investments, which is guaranteed by all of the partners of the partnership.





"Confidential Material – Subject to Protective Ord

It is requested that their loan be extended for another five-year period. The rate is 3% over the 26-week Treasury Bill auction rate, adjusted semi-annually and is to have a term of five years. The fee is 1%. The loan secured by a first deed of trust on a commercial office/warehouse in the Spokane Valley.

Next on the agenda are certain loans to be approved by the Board. The following loans were submitted to the Board for approval:

I.

The first loan is to Neil and Wilma Mason, d/b/a Masons' Meat Packing Company. This loan is guaranteed by Bart and Diane Triesch. The loan is in the amount of $21,000.00 and is to finance the purchase of equipment from Tri-State Market Supply. It is secured by equipment with a purchase price of $26,000.00. It is priced at Bank of America reference rate plus 2.5%, adjusted monthly. The fee is 1%. The loan will be amortized over five years and have a maturity in five years.

II.

The next loan for approval is a modification of a loan made to Northwood Properties, Inc., which is a partnership of Richard D. Naccarato and Theodore G. Gunning. The original loan was in the amount of $775,000.00 and required payment of a fee of 1%. The rate was 3.25% in excess of the 26-week Treasury Bill rate, adjusted semi-annually with a floor of 9.5% and a ceiling of 15%. The beginning rate was 10%. The term was ten years and payments were based on a 30-year amortization. The borrowers have requested an additional advance of $5,000.00 and a change in the interest rate. With the additional advance of $5,000.00, the total loan will be $777,899.59. The rate is to be changed to 2.625% over the 11th District Cost of Funds, adjusted on the first day of March, June, September and December of each year, with a floor of 9.25% and a ceiling 15%. The borrower will pay a fee of .5%. Ninety percent of this loan will be sold to First Federal Savings & Loan Association in Coeur d'Alene. The participant will receive a 1% fee and the servicing spread will be .25% to Sterling.

III.

The next request is a modification of a loan previously approved to Nordevin, Inc. The request is that the Board waive the limited funding requirement that was part of the original loan approval. It is secured by the Arbor Square Apartments in Olympia, Washington. Otherwise, the construction loan of $4.1 million and the permanent of $4.4 million would be unchanged.





"Confidential Material – Subject to Protective Order"

IV.

The next loan for approval is a loan to Northside Medical Center. The first portion of this loan is a $300,000.00 term loan to purchase furniture, fixtures and equipment for an emergency medical clinic. It will be secured by a first lien position on furniture, fixtures and leasehold improvements and will be priced at Bank of America reference rate plus 1%, with the rate being adjusted monthly. The floor is 10%. The fee is 1%. The maturity is seven years and will be amortized over that period. The second portion of the loan is a loan in the amount of $100,000.00 to provide operating expenses to fund a permanent level of accounts receivable. It will be secured by a first lien position on accounts receivable and be priced at Bank of America reference rate plus 1%, adjusted monthly, with a floor of 10%. The fee is 1%. The maturity is one year.

V.

The next loan for approval is a loan to William J. and Carol K. Lawson, which is secured by two condominium units located in Mountain View Estates. The first loan is in the amount of $65,550.00 and the second loan is in the same amount. Each loan is secured by a condominium unit located in Mountain View Estates. The rate for both loans is 9.87%, adjusted annually to the 11th District Cost of Funds, plus a margin of 3.25%, with a 2% annual cap and a 13.875% maximum rate. The fee is 2.5%. Both loans will be payable over 30 years and will mature January 1, 2019.

VI.

The next loan for approval is a $200,000.00 over-line to Caelus, Inc., which is guaranteed by Stan Hatch and Gerald Work. The loan purpose is to increase a credit line for temporary operating expenses. It is secured by a first lien on accounts receivable. It is priced at Bank of America reference rate plus 2%, and requires payment of a 3% fee. The maturity is March 1, 1989.

Upon motion duly made, seconded and unanimously passed, all the loans were approved as submitted.

Next on the agenda is the approval of a $200,000.00 loan to Mr. Edward Ranniger, which is a renewal of an existing preferred line of credit. This comes to the Board as a result of Mr. Ranniger's position as a director of Action Mortgage Company, a subsidiary of Sterling Savings Association. It is secured by a first deed of trust on a personal residence and is priced at Bank of America reference rate plus 1.5%, adjusted daily, with a





"Confidential Material - Subject to Protective Order

maximum rate of 15%. The maturity is October 15, 1991. It is payable at interest only. Mr. Zuppe reported that the interest rate exceeds our cost of funds. Upon motion duly made, seconded and unanimously passed, the loan to Mr. Ranniger was approved as submitted.

The last loan to be approved is a loan to Oswego Village Association in the amount of $6,550,000.00. Because of the size of this loan, management requested a special review of the terms. This loan will be guaranteed by George H. Killian, Richard A. Eckard and J. Michael Moody. The purpose of the loan is a construction loan to acquire a center and renovate existing space and additions to the center. It is secured by a first lien deed of trust on a shopping center which has an appraised value of $8,800,000.00. The loan is priced at Bank of America reference plus 1.25%, adjusted monthly. The fees total $81,875.00 but if the loan is repaid within nine months, the fee will be reduced to $65,500.00. The maturity is 12 months with the borrower having the right to obtain a six-month extension upon payment of a $40,000.00 fee. It is payable interest only until maturity. The Board had the opportunity to review the entire project, including the proposed leases. Existing leases include a Thriftway Store and a new Albertsons Supermarket with the center leased to 80%. In addition, there is a permanent loan commitment outstanding issued by Benjamin Franklin Savings & Loan which will be sufficient to completely pay off Sterling Savings Association. The Board inquired as to the ability of Benjamin Franklin to take out this loan and their past history in honoring permanent commitments. The Board was advised that Benjamin Franklin is very good at their take-outs. This loan was also committed by Security Pacific, but they have been unable to fund the loan prior to the December 31, 1988. In reviewing the borrower's total net worth, the accumulated net worth totals in excess of $8 million. Mr. Harlow indicated that he would obtain a participant for a portion of the loan in the first quarter of 1989, but because of the time constraints to close the loan, he has not had an opportunity to obtain a participant to date. It is a shopping




"Subject to Protective Order"

center which is located in Lake Oswego on State Street and is one of the few remaining commercial sites available. The Board then reviewed photographs of the center. After a thorough evaluation of the loan, upon motion duly made, seconded and unanimously passed, the loan was approved as submitted.

One of the matters left over in the November meeting related to the approval of John M. Harlow and Gary C. Crithfield as review appraisers for Sterling Savings Association and Intervest-Mortgage Investment Company. The Board reviewed their experience as appraisers and upon motion duly made, seconded and unanimously passed, they were approved as review appraisers for Sterling Savings Association.

Next on the agenda was the approval of certain appraisers. Prior to reviewing each appraiser, the staff reported on the approval process and limitations as to what each appraiser is qualified to appraise and the locations. The following appraisers were approved as requested:

(1) Susan L. Davis:

| | |
|---|---|
| Single-family residential, 2-4 family, condo/PUDs | Spokane County, Washington |

(2) J. Martell Bodell:

| | |
|---|---|
| Single-family residential, 2-4 family, condo/PUDs | Salt Lake County, Utah |

(3) Jason B. Urry:

| | |
|---|---|
| Single-family residential, 2-4 family, condo/PUDs | Salt Lake and Summit Counties, Utah |

(4) Alan D. Thornton:

| | |
|---|---|
| Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Davis and Summit Counties, Utah |

(5) Kerry P. Green:

| | |
|---|---|
| Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Davis and Summit Counties, Utah |



SG 0192372
Subject to Protective Order

| | | |
|---|---|---|
| (6) | Gary Evans: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Davis, Weber, Tooele, Box Elder, Rich, Morgan, Cache, Summit and Wasatch Counties, Utah |
| (7) | Gary D. Alder: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Davis, Utah, Weber, Summit, Tooele and Wasatch Counties, Utah |
| (8) | Blake Ingram: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Summit and South Davis Counties, Utah |
| (9) | Paul D. Maritsas: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake County, Utah |
| (10) | Robert B. Vincent: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake, Davis and Summit Counties, Utah |
| (11) | Michael J. Baxter: | |
| | Single-family residential, 2-4 family, condo/PUDs | Utah and Salt Lake Counties, Utah |
| (12) | J. D. Rogers: | |
| | Single-family residential, 2-4 family, condo/PUDs | Salt Lake County, Utah |
| (13) | Gary R. Free: | |
| | Single-family residential, 2-4 family, condo/PUDs | Cache County, Utah |
| (14) | James A. Lyon: | |
| | All types of commercial development | Oregon: I-5 Corridor, Portland to Grants Pass; Washington: Vancouver, Goldendale, Longview and Battle Ground |





"Subject to Protective Order"

In order to sell an 90% participation in the Northwood Properties loan, we have been requested by the participant to obtain a Board authorization of the sale. Upon motion duly made, seconded and unanimously passed, the following resolution as adopted:

> WHEREAS, Sterling Savings Association previously loaned to Northwood Properties, Inc. the sum of $775,000.00 in order to construct a 28-unit, six-building apartment complex located at 2215 North Houk Road, Spokane, Washington 99206, which loan was to be secured by the said apartment complex; and
>
> WHEREAS, the present outstanding balance of said loan totals $772,899.59 and the borrower has requested that said obligation be increased by $5,000.00 to $777,899.59; and
>
> WHEREAS, Sterling Savings Association has agreed to lend said additional $5,000.00, make certain modifications in the interest rate, and sell a portion of said loan to First Federal Savings Bank located in Coeur d'Alene, Idaho.
>
> RESOLVED, that said modifications be made in said loan and that a 90% participation in such loan be sold to First Federal Savings Bank located in Coeur d'Alene, Idaho.
>
> RESOLVED FURTHER, that the officers of Sterling Savings Association are hereby authorized to execute such documentation, evidencing said sale of this participation to First Federal Savings Bank.

Mr. Zuppe then reviewed the savings report. As he pointed out, the Manito Branch exceeded $10 million for total deposits in December. This was the highlight of the month. Retail deposits decreased by $1 million in November. Although deposits year to date increased by a little more than $9 million, they are less than budget by $4.6 million. We saw negative growth for the month in Spokane, Tri-Cities, Southwest Washington and the Peninsula. Central Washington and Southeast Washington showed increases.



SG 0192374
"Confidential Material - Subject to Protective Order"

Mr. Byrne then reviewed the financial statements. Assets decreased by $5.6 million in November. Loans decreased by $3.8 million on $14.7 million in sales and swaps. Investments declined due to a reduction in Fed funds sold, and the deposits decreased by $8.6 million, including the $7.6 million in public funds.

November income totalled $61,522.00, which was $110,000.00 less than budget. Net interest spread was $774,908.00, which was off $150,000.00 from budget. The spread continues to be impacted by rising liability rates and lower than budgeted earning assets. Other income totalled $94,000.00. Earnings from subsidiaries were unfavorable due to increased borrowing rates and decreased loan volumes. Operating expenses total $807,464.00, which was $3,000.00 over budget.

Mr. Gilkey made a report on Central Evergreen. The acquisition of Central Evergreen was approved by the Federal Home Loan Bank Board based upon their approval of our five-year plan. We received an agreement prepared by the Federal Home Loan Bank Board which was totally unacceptable. This agreement is now under reconsideration but until it is satisfactory, Sterling will not go through with the transaction. Part of our five-year plan is to raise an $5 million in additional equity capital. Mr. Gilkey then asked the Board to approve a resolution authorizing the acquisition of Central Evergreen subject to reaching satisfactory terms contained in the Federal Home Loan Bank Board written agreement. After discussion and upon motion duly made, seconded and unanimously passed, the following resolution was adopted:

> WHEREAS, this corporation has previously directed and empowered its officers, or any one of them, to enter into an agreement for acquisition of the assets and liabilities of Central Evergreen substantially on the terms and conditions of an Acquisition Agreement presented to the Board; and
>
> WHEREAS, pursuant to the authority granted under said resolution, this corporation entered into an Acquisition Agreement dated

July 20, 1988 (the "Acquisition Agreement") and has effected the requisite applications for approval of the Federal Home Loan Bank Board and the Washington State Supervisor of Savings and Loan Associations; and

WHEREAS, approvals have been received from the Federal Home Loan Bank Board by resolution No. 88-1273 dated December 8, 1988 (the "FHLBB Resolution") and by the Washington State Supervisor of Savings and Loan Association office; and

WHEREAS, the FHLBB Resolution requires, among other things, that prior to the consummation of the merger and conversion contemplated by the Acquisition Agreement, the Board of Directors of this corporation, as the resulting institution, under the Acquisition Agreement ratify the terms and conditions of the FHLBB Resolution, as well as the terms of the proposed conversion and merger;

NOW, THEREFORE, IT IS:

RESOLVED, that the terms and conditions of the FHLBB Resolution are hereby agreed to and ratified; and

RESOLVED FURTHER, that the officers, or any one of them, are hereby directed and empowered to act on behalf of this corporation in fulfilling the terms and conditions of the FHLBB Resolution, including, without limitation, the execution of a written agreement which provides that for a period of five (5) years following the date of the acquisition, this corporation will operate within the scope of the business plan which was provided in connection with the application to the Federal Home Loan Bank Board and to provide reports to the supervisory agent for the Federal Home Loan Bank Board in accordance with said written agreement as well as all other terms and conditions of the FHLBB Resolution; and

RESOLVED FURTHER, that the effective date as called for under the Acquisition Agreement shall be December 31, 1988; and

RESOLVED FURTHER, that the officers of this corporation, or any one of them, are hereby directed and empowered to execute and deliver





... Material – Subject to Protective Order

> any and all documents which may be required to consummate the acquisition under the Acquisition Agreement, to comply with the terms and conditions of the FHLBB Resolution, and to comply with any and all other terms and conditions required by any other regulatory agency having jurisdiction over the transaction and this corporation.

Mr. Gilkey requested that the Board be increased in size to twelve directors. In this regard, he asked Mr. Barnes how to accomplish this increase. Mr. Barnes informed Mr. Gilkey that to increase the number of directors we are required to proceed in the same manner as we amend the Bylaws. To amend the Bylaws, we must obtain the consent of the State Supervisor 30 days before its effective date, or obtain the Supervisor's waiver of the 30-day period. Mr. Barnes indicated that he would prepare the necessary paperwork to increase the Board to twelve members and request the Supervisor waive the 30-day notification. If we can obtain the waiver, we will prepare a Consent to Action which will be effective December 31, 1988. Upon motion duly made, seconded and unanimously passed, and contingent upon the number of directors being increased to twelve, Dr. James F. Fugate of Auburn, Washington, Raymond R. Alverson of Olympia, Washington, and James Vander Stoep of Chehalis, Washington are elected to the Board of Directors effective January 1, 1989. Dr. Fugate's term will expire in 1990 and Mr. Alverson's and Mr. Vander Stoep's terms will expire in 1991.

Mr. Gilkey requested that the Board elect additional officers to the corporation subject to the acquisition of Central Evergreen effective December 31, 1988, upon closing of the transaction. Upon motion duly made, seconded and unanimously passed, the following officers were elected to the positions set forth opposite their name:

| | |
|---|---|
| George E. Godding | Senior Vice President and Western Division Manager |
| John Van Dijk | Vice President |
| Richard N. Shisler | Vice President |




"... Subject to Protective Order"

| | |
|---|---|
| Richard C. Lahti | Assistant Vice President |
| Peter B. Lewis | Vice President |
| Gary Feldtman | Vice President |
| Lois Bertels | Vice President |
| Cheryl L. Noel | Assistant Vice President |

In order to facilitate no break in the operation of Central Evergreen upon its acquisition, the Board was requested to pass four resolutions authorizing certain officers of Sterling to consummate the sales of some existing commitments on certain residential mortgages held by or in the process of being closed by Central Evergreen. Upon motion duly made, seconded and unanimously passed, the following resolutions were adopted:

I.

WHEREAS, Sterling Savings Association is successor in interest to Central Evergreen Federal Savings and Loan Association; and

WHEREAS, Central Evergreen Federal Savings and Loan Association had obtained commitments to purchase certain individual VA and FHA mortgages presently being processed by Central Evergreen Federal Savings and Loan Association;

RESOLVED, that George E. Godding, Senior Vice President, and Cheryl L. Noel, Assistant Vice President of Sterling Savings Association, are hereby authorized and empowered in the name of and on behalf of Sterling Savings Association as successor in interest to Central Evergreen Federal Savings and Loan Association from time to time to execute such documents as necessary to enable the corporation to deliver closed committed loans on behalf of Sterling Savings Association to Empire of America Realty Credit Corporation, or its designated purchaser and to execute any and all assignments, endorsements and issuance of checks or drafts, reports, mortgage documents and other papers in connection with documents and furnish any information required to be deemed necessary





Subject to Protective Orde

and proper by the above corporation to deliver said closed committed loans.

II.

WHEREAS, Sterling Savings Association is successor in interest to Central Evergreen Federal Savings and Loan Association; and

WHEREAS, Central Evergreen Federal Savings and Loan Association had obtained commitments to purchase certain individual VA and FHA mortgages presently being processed by Central Evergreen Federal Savings and Loan Association;

RESOLVED, that George E. Godding, Senior Vice President, and Cheryl L. Noel, Assistant Vice President of Sterling Savings Association, are hereby authorized and empowered in the name of and on behalf of Sterling Savings Association as successor in interest to Central Evergreen Federal Savings and Loan Association from time to time to execute such documents as necessary to enable the corporation to deliver closed committed loans on behalf of Sterling Savings Association to Countrywide Funding Corporation, or its designated purchaser and to execute any and all assignments, endorsements and issuance of checks or drafts, reports, mortgage documents and other papers in connection with documents and furnish any information required to be deemed necessary and proper by the above corporation to deliver said closed committed loans.

III.

WHEREAS, Sterling Savings Association is successor in interest to Central Evergreen Federal Savings and Loan Association; and

WHEREAS, Central Evergreen Federal Savings and Loan Association had obtained commitments to purchase certain individual VA and FHA mortgages presently being processed by Central Evergreen Federal Savings and Loan Association;

RESOLVED, that George E. Godding, Senior Vice President, and Cheryl L. Noel, Assistant Vice President of Sterling Savings Association, are hereby authorized and empowered in





Subject to Protective Order

the name of and on behalf of Sterling Savings Association as successor in interest to Central Evergreen Federal Savings and Loan Association from time to time to execute such documents as necessary to enable the corporation to deliver closed committed loans on behalf of Sterling Savings Association to City Federal Mortgage Company, or its designated purchaser and to execute any and all assignments, endorsements and issuance of checks or drafts, reports, mortgage documents and other papers in connection with documents and furnish any information required to be deemed necessary and proper by the above corporation to deliver said closed committed loans.

IV.

WHEREAS, Sterling Savings Association is successor in interest to Central Evergreen Federal Savings and Loan Association; and

WHEREAS, Central Evergreen Federal Savings and Loan Association had obtained commitments to purchase certain individual VA and FHA mortgages presently being processed by Central Evergreen Federal Savings and Loan Association;

RESOLVED, that George E. Godding, Senior Vice President, and Cheryl L. Noel, Assistant Vice President of Sterling Savings Association, are hereby authorized and empowered in the name of and on behalf of Sterling Savings Association as successor in interest to Central Evergreen Federal Savings and Loan Association from time to time to execute such documents as necessary to enable the corporation to deliver closed committed loans on behalf of Sterling Savings Association to Duncan-Williams, Inc., or its designated purchaser and to execute any and all assignments, endorsements and issuance of checks or drafts, reports, mortgage documents and other papers in connection with documents and furnish any information required to be deemed necessary and proper by the above corporation to deliver said closed committed loans.

Mr. Gilkey reported that we had entered into a settlement agreement concerning Tri-West Mortgage subject to approval by FSLIC.



SG 0192380

Confidential Material - Subject to Protective Order

Mr. Barnett was requested to make a report of the Audit Committee. He reported that the internal auditor had reviewed the security area, signature cards, travelers checks and, basically, the operations of a number of branches which he listed. Problems were found in the security area, signature cards and travelers checks, but nothing was found to be a significant problem. The Audit Committee also discussed the rash of bank robberies in the area. Mr. Barnett reported that at the next audit meeting the Audit Committee will receive a new schedule of audits and review the operational manuals.

Mr. Gilkey reported that option trading will be discussed at the next meeting with a report of all options entered into from September 30, 1988 forward. We will review our guidelines and the authorities for options.

There being no further business, the meeting was adjourned.

NED M. BARNES, Secretary

Attest:

WILLIAM W. ZUPPE, President

NMB2A



SG 0132381
Confidential Material – Subject to Protective Ord

DOCKET NUMBER: 1527
FILE: 1-II

**MEMORANDUM OF ORAL COMMUNICATION**

By Phone ✓ In Person ____

DATE: 2/16 & 17/88
INSTITUTION: Central Evergreen FS&LA, Chehalis, WA
BY: Ed Hedlund
WITH: George Godding
ORIGINATOR:
SUBJECT:
SUMMARY:

George signed an agreement with Sterling. - Will send a copy. The due diligence team is on site. Agreement is subject to Sterling getting Tri Cities.

Relayed to George that the OCC received a complaint that Central Evergreen is paying 5% interest on corporate checking accounts. Geo. checked into it and said that they are aware of the restrictions and it is not their practice. There may be 1 or 2 that slipped by. Will await the details from the OCC.

FOLLOW-UP REQUIRED:

EXHIBIT 14 8/4/03 Hedlund Sterling

DISTRIBUTION: (✓)

**REGULATORY AFFAIRS**

___ Director of Regulatory Affairs
___ Director of Examinations and Supervision
___ Assistant Director-Supervisory Activities
___ Assistant Director-Field Operations
___ Assistant Director-Mergers & Acquisitions
___ General Counsel, Regulatory Affairs
___ Field Manager
✓ Supervisory Agent Hedlund
___ Supervisory Analyst Gamble

**OTHER**

___ Jim Faulstich
___ Steve Smith
___ State Supervisor ______
___ ORPOS, DC
___ Other ______

WUN926 1320 FL STERLING SAVS ASSOC 95-829C CENTRAL EVERGREEN FSLA DOCKET # 01527 TRANS 881231 WIN BOX # 000018213 OLD BOX # 99-359 W2121 CORRESPONDENCE V 2 20.10 FILE; CORRESPONDENCE; REPORTS; APPRAISAL; SUMMARY; AGREEMENTS; HANDWRITTEN NOTES; CHECK COPIES 860899-891299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

95-829-C
P - 375

79118.

DOCKET NUMBER: 1527

FILE: 1-II both w/st. tgt. <attach>

MEMORANDUM OF ORAL COMMUNICATION

Internal Meeting

By Phone____In Person X

DATE: 6-30-88

INSTITUTION: Central Evergreen - Sterling Savings

BY: CG

WITH: DH, RK, ECH, PMarsh., PMcJ, CG

ORIGINATOR: ECH

SUBJECT: potential acquisition

EXHIBIT 18 8/4/08 Hedlund Sterling

SUMMARY:

Purpose of meeting was to discuss proposed acquisition of Central Evergreen by Sterling Savings - Ed presented recap of transaction <attached> Specific items that were discussed:

- resulting level of capital <projections for three years
- resulting level of problem assets and Sterling's ability to manage level
- findings of recent exam
- Issue of learning assistance received in Old cities acquisition
- Ability to raise capital before merger (manag. has said would not be able too)

FOLLOW-UP REQUIRED:

- alternative solutions for Central Evergreen
  - shop w/ asst. PMcJ indicated likely a lot of interest, just to get into Wash.
  - open bank assistance - need Rap insolvency - most likely no problem to get to zero on Rap basis <Treasury reg.-def. loss>
- Issue of FSLIC asst. as capital - FHLBB (ORPOS) could reverse decision to count as capital — ECH to contact Linda Pley to discuss specifics of transaction to get ORPOS's viewpoint — followup from there —

DISTRIBUTION: (✓)

REGULATORY AFFAIRS

- __ Director of Regulatory Affairs
- __ Director of Examinations and Supervision
- __ Assistant Director-Supervisory Activities
- __ Assistant Director-Field Operations
- __ Assistant Director-Mergers & Acquisitions
- __ General Counsel, Regulatory Affairs
- __ Field Manager
- __ Supervisory Agent Hedlund
- __ Supervisory Analyst Gamble

OTHER

- __ Jim Faulstich
- __ Steve Smith
- __ State Supervisor________
- __ ORPOS, DC
- __ Other________

→ Superv. Conversion would need ORPOS/OGC approv. not FHLBB

WON949 2343 F STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018256 OLD BOX # 99-331 W2144 CORRESPONDENCE; AGREEMENT; EXHIBITS; CERTIFICATE; FORM; LIST; FINANCIAL STATEMENTS; REPORTS; CHART; INDICES 760699-860299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

95-829-C

P - 389

DOCKET NUMBER: 7918 1527
FILE: 1-II both inst.

MEMORANDUM OF ORAL COMMUNICATION

By Phone____In Person X

DATE: 7-1-88
INSTITUTION: Sterling Savings - Central Evergreen
BY: CG
WITH: Harold Gilkey, George Godding RL, ECH CG
ORIGINATOR: -
SUBJECT: Sterling acquisition of Central Evergreen
SUMMARY:

Purpose of meeting was to discuss acquisition of Central Evergreen by Sterling. Harold recapped proposed transaction including plans to raise additional capital subsequent to transaction - combined capital 1.6% GAAP - 3.50% RAP. He feels they cannot go to market prior to transaction because of disclosures relating to Central Everg. - looks better when combined w/ Sterling - would raise ≈4-6 mm. Management is confident stock offering would be successful but could cut proposed growth & expenses if not and still do ok. BOD wants GAAP capital at least 20%/TA w/ in 1 yr of acquisition. Harold indicated he does not see any down-side risk to FSLIC or Sterling - doesn't think Central Evergreen can be recapit. Want FSLIC assistance. Needs to accomp by 12/31 because of NOLs (6-8 mm) - target is to file application by 7/30.
ECH recapped highlights of 6/30's internal meeting including possibility of ORPOS not permitting FSLIC assist. to count to

FOLLOW-UP REQUIRED: Reg. capital - following up w/ Linda Pleye now vs waiting till app. is received. Harold did not agree that the condition could be reversed.

→ Ed to contact Harold once issue is discussed w/ ORPOS. Ron indicated Seattle was behind proposed transaction as presented - Harold to update proformas to 6/30

DISTRIBUTION: (✓)

REGULATORY AFFAIRS

- ___ Director of Regulatory Affairs
- ___ Director of Examinations and Supervision
- ___ Assistant Director-Supervisory Activities
- ___ Assistant Director-Field Operations
- ___ Assistant Director-Mergers & Acquisitions
- ___ General Counsel, Regulatory Affairs
- ___ Field Manager Wharf
- ___ Supervisory Agent Hedlund
- ___ Supervisory Analyst Gamble

OTHER

- ___ Jim Faulstich
- ___ Steve Smith
- ___ State Supervisor
- ___ ORPOS, DC
- ___ Other

EXHIBIT 19 Hedlund 8/4/05

WON922 0897 FL STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018208 OLD BOX # 99-40
W2117 20.10 CORRESPONDENCE FILE; EXAMINATIONS; HANDWRITTEN NOTES; FINANCIAL STATEMENTS; POLICIES; REPORTS; FORMS 10Q; INDICES 821299-881299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

95-829-C
P - 391

OFFICE OF SUPERVISORY AGENT

# FEDERAL HOME LOAN BANK BOARD

1501 FOURTH AVENUE PHONE (206) 340-2300
SEATTLE, WASHINGTON 98101-1693

TO: Julie Williams
Deputy General Counsel

Linda Plye
Director of Corporate Activities, ORA

FROM: Edwin C. Hedlund ECH/CG
Senior Supervisory Agent

DATE: November 28, 1988

SUBJECT: Central Evergreen FS&LA
Chehalis, Washington
FHLBB No. 1527

Sterling SA
Spokane, Washington
FHLBB No. 7918

If the supervisory conversion and merger of Central Evergreen FS&LA is not acted on by November 30, 1988, it is probable that the acquiror, Sterling SA, will back out of the transaction. Either party can withdraw on November 30, 1988.

If this transaction is not consummated because of the timeliness of our action, it will be an embarrassment to the system. The application has been in process since August 18, 1988 and was deemed complete on October 18, 1988. Central Evergreen has deficit capital of $12.4 million, or 4.8 percent of assets. An estimated $10 million of FSLIC assistance would be required under any other resolution. Central Evergreen has been unable to retain management because of its situation and will have an extremely difficult time recovering if the transaction is not completed.

When one considers that resolutions of troubled institutions can be expedited when the proper attention is given, the desired timing of this transaction is not unreasonable. A quick "no" would be preferable to dragging the situation out. I am the Supervisory Agent for both institutions and would be happy to answer any of your questions; my phone number is (206) 340-2436. Craig Nolte handled the application and is also available.

ECH:kjb

bc: Docket Section
Edwin C. Hedlund, Senior Supervisory Agent
Carol A. Gamble, Senior Supervisory Analyst
E. L. White, Field Manager
File #1 - Part II
KJB Chron, Chron File, Routing Copy

EXHIBIT 25 8/4/8 Hedlund Stallins

ON881 0363 STERLING SAVS ASSOC 95-829C CENTRAL EVERGREEN FSLA DOCKET # 01527 TRANS 881231 STERLING SA DOCKET # 07918 WIN BOX # WC00018124 OLD BOX # 99-361 W2104 MERGERS & ACQUISITIONS 889999 V 1 FILE; CORRESPONDENCE; REPORTS; EXHIBITS; HANDWRITTEN NOTES; FINANCIAL STATEMENTS 851299- 881299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

61

I N T E R O F F I C E   M E M O R A N D U M

Date: 2-Dec-1988 11:15am PST
From: Ed Hedlund
EHEDLU
Dept: SUPERVISION
Tel No:

TO: Remote Addressee ( KASWELLM@A1@WASHDC )
TO: Remote Addressee ( MEYERR@A1@WASHDC )
TO: Remote Addressee ( PAYLANE@A1@WASHDC )

CC: Remote Addressee ( LUKEJ@A1@WASHDC )

Subject: Central Evergreen FS&LA

We need your assistance to prevent the loss of an unassisted resolution of a $12 million GAAP (4.8 percent) insolvent institution. Central Evergreen Federal Savings and Loan Association, Chehalis, Washington (Docket No. 1527), has been working towards a supervisory conversion and merger with Sterling Savings Association, Spokane, Washington (Docket No. 7918), for the past 10 months.

The application was received on August 16, 1988 and deemed complete on October 18, 1988. The application is currently at OGC and is expected to be at the Board on Monday, December 5. The acquisition agreement expired on [illegible]er 30, 1988.

Ste[illegible]ing is threatening to withdraw, and I expect that they will if we do not take action the first part of next week. Sterling is hesitating for two reasons: (1) the 50 percent reduction of NOLs if it is not consummated prior to December 31, 1988, and (2) the risk based capital proposals.

Informal shopping indicates that if this resolution is lost, the cost to FSLIC will likely exceed $10 million.

If there are any questions I can answer, please do not hesitate to call me at (206) 340-2436. I appreciate your efforts to expedite the processing of this application.

ECH:kjb

PENGAD-Bayonne, N.J.
EXHIBIT
27
Hedlund Sterling 8/4/03

VON881 0353 STERLING SAVS ASSOC 95-829C CENTRAL EVERGREEN FSLA DOCKET # 01527 TRANS 881231 STERLING SA DOCKET # 07918 WIN BOX # WC00018124 OLD BOX # 99-361 W2104 MERGERS & ACQUISITIONS 889999 V 1 FILE; CORRESPONDENCE; REPORTS; EXHIBITS; HANDWRITTEN NOTES; FINANCIAL STATEMENTS 851299- 881299 CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

# MEMO

STERLING SAVINGS ASSOCIATION

DEFENDANT'S EXHIBIT DX 340 Sterling v. US

DATE: January 6, 1989

FROM: Daniel G. Byrne
Sr. V.P. Finance

TO: File

SUBJECT: Central Evergreen Acquisition Agreement with FSLIC

Attached is a copy of the final and preliminary drafts of the acquisition agreement for Central Evergreen between Sterling and FSLIC. The purpose of this agreement is to insure that Sterling will abide by the business plan that was submitted with its application to acquire Central Evergreen, principally in that it will infuse capital by either selling stock or other means within two years of the date of acquisiton. There were several significant issues that were discussed and finally negotiated as follows:

1. The final draft deleted a requirement that FSLIC wanted, that permitted would have supervisory agent to invoke its supervisory authority for sanctions by breach of contract. Sterling objected to this clause principally because the supervisory agent has the authority under law and did not need it by virtue of this contract. Additionally, this contract has cease and desist authority available to the supervisory agent in paragraph V, F.

2. Sterling wanted a threshold to be established with some "wriggle room" allowed. The negotiations settled on the business plan reflecting the infusion of capital at June, 1989 and that the "wriggle room" would be 90 B.P. below the regulatory net worth reflected in that business plan for the first two years. Thus providing for the event that the stock would not be infused until the latest time permitted and agreed upon. After the time that capital is infused or two years, the "wriggle room" becomes 30 B.P. below the threshold. This provision is reflected in III, B

3. Sterling was concerned that actions or events outside of its control might prevent Sterling from selling stock. Sterling raised the concern about the current FSLIC ~~prices~~ cost and reports by the GAO suggesting that FSLIC extract a 1% of all FSLIC institutions' net worth to help bail out FSLIC.

EXHIBIT 45 WITNESS Byrne DAVID STOREY STOREY & MILLER

5-300 6 '83

SG 0142067

"Confidential Material – Subject to Protective Order"

Sterling was attempting to have a provision added which would terminate the contract in such an event indicated above. However, FSLIC was unwilling to provide a termination clause but instead in paragraph II last paragraph added language which the supervisory agent would give consideration for a revision to Sterlings' business plan necessitated by such an action contemplated in the paragraph above i.e. an action or event outside of Sterlings' control caused by governmental agency. Sterling is satisfied that the intent of this language is not to penalize Sterling should it be unable to meet its business plan as originally submitted with the application by virtue of external events beyond its control to meet it business plan.

Additionally, it should be noted that this paragraph developed from a conern by Sterling that should such external events occur, Sterling did not want to be a "lone sheep" by virtue of this contract. This is Sterling wanted to be subject to the same rules applying to all institutions in the industry rather than having this contract set it on a higher threshold than the industry.

4. In paragraph IV, B, Sterling was concerned that the language would prevent Sterling from seeking a waiver of forebearance in advance of an event that would cause default. The discussions with supervisory agent indicated that the language did not prohibit Sterling seeking such a waiver or forebearance before the event had occurred but rather the intention of the language in this paragraph was that a waiver or forebearance of event that occurred would not be carried over to a subsequent event automatically, but instead that subsequent event would require the seeking of a separate waiver or forebearance.

5. In paragraph V, M, should be noted the language was changed from early drafts. The essence of this provision is that the agreement does not supersede the regulations to which Sterling is subject.

6. In VI B, should be noted that the sections and provisions of this agreement are suspended if Sterling exceeds its fully paid-in-capital requirement for two consecutive years. Its important to know that this threshold is roughly 6% regulatory capital.

lf

0142068

SG

"Confidential Material – Subject to Protective Order"

# AGREEMENT

This Agreement is made this 28th day of December, 1988, by and between Sterling Savings Association (the "Acquirer"), hereto and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), a corporate instrumentality and agency of the United States, which is under the operating direction of the Federal Home Loan Bank Board (the "Board").

WHEREAS, the Acquirer has filed with the FSLIC the appropriate application ("Application") for approval of its proposed acquisition of control of Central Evergreen Federal Savings and Loan Association (the "Institution"); and

WHEREAS, in order to make a determination to approve the subject Application, pursuant to the applicable standards, the FSLIC requires that the Acquirer enter into this Agreement; and

WHEREAS, the Acquirer is willing to enter into this Agreement in order that the FSLIC will act favorably upon the Acquirer's Application;

NOW THEREFORE, in consideration of the FSLIC acting favorably on the Application, the Acquirer agrees as follows:

## I. DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

A. "Additional Capital" means capital that the Supervisory Agent directs the Acquirer to raise, or otherwise deems to have been raised, in satisfaction of the provisions of this Agreement.

B. "Business Plan" means the Acquirer's financial projections for the period through June 1991, a copy of which is attached hereto, as such plan may be amended from time to time with the prior written non-objection of the Supervisory Agent as provided below.

C. "Date of Acquisition" means the effective date on which the Acquirer acquires control of the Institution.

D. "Default" means the failure of the Acquirer to comply with its obligations under this Agreement.

E. "Dividend" means (a) any dividend paid or other distribution (including, but not limited to, a liquidating distribution) made on or with respect to any shares of common stock of the Acquirer, but not including a stock dividend of stock of the

Acquirer, or (b) any payment on account of the purchase, redemption or other acquisition or retirement of any such shares or any warrants or option thereon, whether made by the Acquirer or any direct or indirect subsidiary thereof.

F. "Fully Phased-In Capital Requirement" means the Acquirer's fully phased-in regulatory capital requirement as defined in 12 C.F.R. Section 563.13, or any successor regulation.

G. "Minimum Capital Requirement" means the amount computed quarterly according to Section 563.13(b) and as adjusted by the "April Calculation" specified in Section 563.13(b)(2)(iv), or any successor regulation thereto.

H. "Regulatory Capital" means regulatory capital defined in accordance with 12 C.F.R. Section 561.13, or any successor regulation hereto.

I. "Regulatory Capital Requirement" means the Acquirer's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto.

J. "Regulatory Capital Deficiency" means the amount by which the Regulatory Capital of the Acquirer, computed by the Supervisory Agent in accordance with 12 C.F.R. Section 561.13, or any successor regulation thereto, is less than the Minimum Capital Requirement.

K. "Supervisory Agent" means the Principal Supervisory Agent or any Supervisory Agent of the FHLBB and FSLIC at the Federal Home Loan Bank of Seattle.

All technical words or terms used in this Agreement for which meanings are not specified or otherwise provided by the provisions of this Agreement shall, insofar as applicable, have meanings as defined in the rules and regulations of the FHLBB. Any such technical words or terms used in the Agreement and undefined in said rules and regulations shall have meanings that accord with the best custom and usage in the thrift industry.

II. BUSINESS PLAN

The Acquirer shall use its best efforts to comply with its Business Plan, and the Acquirer shall not, without receiving the prior written non-objection of the Supervisory Agent, take any action (i) not provided for in or contemplated by its Business Plan or (ii) which would create a significant possibility of material deviation therefrom; provided, however, that the failure to raise additional capital as provided in the Business Plan shall not be deemed to be a deviation if it is raised prior to December 31, 1990 and if a revised Business Plan has been submitted to the

Supervisory Agent by June 30, 1989. The Acquirer shall not revise its Business Plan or adopt a new Business Plan unless the Acquirer has received from the Supervisory Agent prior written notice of non-objection to such revision or adoption. At least 30 days before the end of any period for which projections are included in the Business Plan, the Acquirer shall submit to the Supervisory Agent, in form and substance acceptable to the Supervisory Agent, new projections for the next successive twelve-month period.

The Supervisory Agent will give reasonable consideration to any revision to the Business Plan submitted, that was necessitated by actions taken by any governmental body having jurisdiction that caused the Acquirer to materially deviate from its Business Plan. Such material deviation shall not be a violation of the obligations.

III. <u>OBLIGATIONS OF ACQUIRER</u>

A. The Acquirer will cause its Regulatory Capital to be maintained at a level at or above the Minimum Capital Requirement, and as necessary, will raise Additional Capital, in a form satisfactory to the Supervisory Agent, in an amount necessary to restore its Regulatory Capital to a position where it meets its Minimum Capital Requirement whenever its Regulatory Capital falls below the <u>lesser</u> of its Minimum Capital Requirement or the Regulatory Capital projected in the Business Plan. The failure to raise additional capital as provided in the Business Plan shall not be a violation of the obligations if it is raised prior to December 31, 1990.

B. The Acquirer agrees that if the ratio of regulatory capital to total assets is less than the ratio projected in the attached Business Plan by 90 basis points until the earlier of (i) December 31, 1990 or (ii) the raising of the additional capital provided for in the attached Business Plan, or subsequently 30 basis points, it will comply with the directives that are imposed under 12 C.F.R. Section 563.13(d) and will comply with the time period specified.

C. The Acquirer may not pay any common stock Dividend without the prior written approval of the Supervisory Agent.

D. The Acquirer shall submit to the Supervisory Agent quarterly variance reports in the format of the Business Plan explaining any material deviation from the approved Business Plan.

IV. <u>DEFAULTS</u>

A. If the FSLIC shall determine that a Default has occurred, it shall give notice of such Default to the Acquirer and



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WON878 2166

afford the Acquirer an opportunity to cure such Default within 90 days.

B. The FSLIC, in its sole discretion, may waive or forbear any past Default hereunder and its consequences, before or after the giving of the notice of Default in the manner provided above, by delivering notice of such waiver or forbearance in writing to the Acquirer, but no such waiver or forbearance shall extend to any Default that occurs subsequent to the date of such waiver or forbearance, and no waiver or forbearance or purported waiver or purported forbearance that is not in writing shall be effective. Any waiver or forbearance of any right, power, or remedy shall not preclude its further exercise.

V. MISCELLANEOUS PROVISIONS

A. Any notice hereunder shall be in writing and shall be delivered by hand or sent by United States express mail or commercial express mail, postage prepaid, and addressed as follows:

If to the Acquirer: Daniel G. Byrne, SVP-Finance
c/o Sterling Savings Association
North 120 Wall Street
Spokane, Washington 99201

If to the FSLIC: Supervisory Agent
Federal Home Loan Bank of Seattle

B. This Agreement shall be deemed a contract made under and governed by Federal law.

C. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective transferees, successors, assigns, and trustees.

D. All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this Agreement.

E. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties.

F. This Agreement has been duly authorized, executed, and delivered, and constitutes, in accordance with its terms, a valid and binding obligation of the Acquirer and the FSLIC. It is understood and agreed that this Agreement is a "written agreement

entered into with the Corporation" as that phrase is used in Section 407(e) of the National Housing Act ("NHA"), 12 U.S.C. Section 1730(e) (1982).

G. Any rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute, regulation, or rule of law.

H. The Supervisory Agent has the authority to act on behalf of the FSLIC in granting approvals, waivers or forbearances, giving notices of Default, or taking any other action provided for in this Agreement.

I. This Agreement shall be effective as of the Date of Acquisition.

J. If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding on the Acquirer and the FSLIC.

K. This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.

L. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute the same instrument, and any party may execute this Agreement by signing any such counterpart.

M. This Agreement is not a waiver of or forbearance from any applicable regulation.

VI. <u>TERMINATION OF AGREEMENT</u>

The Acquirer's obligations under this Agreement shall terminate as follows:

A. Five years after the Date of Acquisition; or

B. Section III.A., III.B. and III.C., of this Agreement shall terminate if the Acquirer's Regulatory Capital exceeds its Fully Phased-In Capital Requirement for a period of two consecutive years.

Termination of this Agreement shall not preclude the exercise by the FSLIC of any right or remedy hereunder which arose out of a Default that occurred or existed prior to such termination, and in respect to which notice of such Default has

been given pursuant to Section III. hereof within one year following such termination. In addition, termination of this Agreement shall not terminate any of the Acquirer's obligations arising from any other source including, but not limited to, any other agreement with the FSLIC, or any statute or regulation.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officer or designated agency on this 29th day of December, 1988.

STERLING SAVINGS ASSOCIATION

By: [signature]

Its: Chairman

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Edwin C. Hedlund
Supervisory Agent
Federal Home Loan Bank of Seattle