IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation.

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Court No. 95-829-C

(Judge Wheeler)

---

**APPENDIX TO**
**STERLING'S RESPONSE BRIEF TO MOTIONS IN LIMINE TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS**
**AND**
**STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN**

---

Respectfully submitted,

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
William D. Symmes, Counsel of Record and Member of the Bar of the United States Court of Federal Claims

1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Telephone: (509) 624-5265
Facsimile: (509) 458-2717

Attorneys for Plaintiffs

June 15, 2007

# APPENDIX TO
# STERLING'S RESPONSE BRIEF TO MOTIONS IN LIMINE TO EXCLUDE HEARSAY TESTIMONY AND EXHIBITS
# AND
# STERLING SAVINGS ASSOCIATION'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BREACH OF CONTRACT OR DAMAGE WITH RESPECT TO CENTRAL EVERGREEN

## TABLE OF CONTENTS

Affidavit of Daniel G. Byrne . . . . . . . . . . 1

Supplemental Affidavit of Daniel G. Byrne . . . . . . . . 4

Supplemental Affidavit of Harold B. Gilkey . . . . . . . . 20

Affidavit of William W. Zuppe . . . . . . . . . 25

Excerpts of Deposition of Thomas M. Beil, July 9, 2002 . . . . . . 43

Excerpts of Deposition of Daniel G. Byrne, July 10, 2000 . . . . . . 54

Excerpts of Deposition of Daniel G. Byrne, July 11, 2000 . . . . . . 58

Excerpts of Deposition of Daniel G. Byrne, July 12, 2000 . . . . . . 63

Excerpts of Deposition of Gary D. Crithfield, July 9, 2002 . . . . . . 71

Excerpts of Deposition of James R. Faulstich, August 2, 2000 . . . . . 79

Exceprts of Deposition of Harold Gilkey, June 6, 2000, . . . . . . 84

Excerpts of Deposition of Harold Gilkey, June 7, 2000 . . . . . . 98

Excerpts of Deposition of Harold Gilkey, June 8, 2000 . . . . . . 102

Excerpts of Deposition of Edwin C. Hedlund, August 4, 2000 . . . . . 106

Excerpts of Deposition of Cajer Neely, June 26, 2002 . . . . . . 118

Trial Exhibit P-43 . . . . . . . . . . 125

Trial Exhibit P-47 . . . . . . . . . . 154

Trial Exhibit P-79 . . . . . . . . . . 160

Trial Exhibit P-224 . . . . . . . . . . 163

Trial Exhibit P-375 . . . . . . . . . . 179

Trial Exhibit P-389 . . . . . . . . . . 180

Trial Exhibit P-391 . . . . . . . . . . 181

Trial Exhibit P-399 . . . . . . . . . . 182

Trial Exhibit P-401 . . . . . . . . . . 183

Trial Exhibit DX-340 . . . . . . . . . . 185

Trial Exhibit P-53 . . . . . . . . . . 186

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624 5265

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION a state-chartered savings association, Plaintiff, vs. T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants. | No. CS 90-0175-JLQ<br><br>AFFIDAVIT OF DANIEL G. BYRNE |

STATE OF WASHINGTON )
) ss.
COUNTY OF SPOKANE )

Daniel G. Byrne, being first duly sworn on oath, deposes and says:

1. That I am Senior Vice-President of Sterling Savings Association "Sterling".

2. That on May 29, 1990, Sterling's President, Bill





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Zuppe, and I met with representatives of the Office of Thrift Supervision ("OTS").

3. That, during the course of the meeting, the representatives of the OTS refused to give us any assurance that they would not move for the immediate appointment of a receiver or conservator for Strling.

4. That, when Mr. Zuppe and I asked the regulators whether it would be appropriate for us to immediately request that this Court issue a Temporary Restraining Order, the representatives of the OTS indicated that this would be an advisable course of action.

5. That I am of the opinion, based on the meeting with the representatives of the OTS this morning, that Sterling is under the immediate threat of the appointment of a Conservator or Receiver for the Association.

11. That, based upon my experience in the industry, and upon my knowledge of the facts and circumstances surrounding the closure of other thrift associations, I believe that if Sterling were placed in conservatorship or receivership, the value of its preferred and common stock would be substantially impaired if not eliminated and Spokane would be ultimately deprived of a thrift institution that is profitable, well-managed, and providing valuable services to the community and to other communities across the state of Washington.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

SUBSCRIBED AND SWORN TO before me this 24 day of May 1990.

S/ Donald J. Lukes
Notary Public in and for the State of Washington, residing at Spokane
My commission expires:





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE
1100 Old National Building
Spokane, WA 99201
(509) 624-5265

RECEIVED
JUN 25 1990
U.S. ATTORNEY
SPOKANE, WA

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
JUN 25 1990
JAMES R. LARSEN, CLERK
DEPUTY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

STERLING SAVINGS ASSOCIATION a state-chartered savings association,

Plaintiff,

vs.

T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,

Defendants.

No. CS 90-0175-JLQ

SUPPLEMENTAL AFFIDAVIT OF DANIEL G. BYRNE

STATE OF WASHINGTON )
) ss.
County of Spokane )

DANIEL G. BYRNE, being first duly sworn on oath, deposes and says:

1. I am senior Vice-President and Chief Financial Officer of Sterling Savings Association ("Sterling").

2. I have been a certified public accountant licensed to practice in the State of Washington since 1979.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

3. I was personally involved in negotiations with the Federal Home Loan Bank Board (the "FHLBB") and the Federal Savings and Loan Insurance Corporation (the "FSLIC"), which negotiations culminated in Sterling's acquisition of three insolvent thrift associations: Lewis Federal Savings and Loan Association ("Lewis Federal"); Tri-Cities Savings and Loan Association ("Tri-Cities"); and Central Evergreen Federal Savings and Loan Association ("Central Evergreen").

4. I have personally reviewed Defendants OTS's and FDIC's Memorandum in Support of Motion to Dismiss and in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Defendant's Memorandum") and the supporting exhibits filed therewith including the Declaration of Carol A. Friend ("Friend Declaration").

5. As pointed out in the defendant's memorandum, in the early to mid-1980s, "FSLIC was faced with hundreds of problem thrifts and its insurance fund was virtually wiped out." (Defendant's Memorandum at p. 3.)

6. With the insurance fund virtually wiped out, everyone connected with the thrift industry recognized that the successful acquisition of an insolvent thrift into a healthy one depended on three essential ingredients: management, money and time. The FHLBB and the FSLIC, recognizing that Sterling was not part of the thrift problem, asked Sterling to become part of the thrift solution by supplying the management expertise and most of the money to resolve three troubled thrift problems. The FHLBB and the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

FSLIC supplied the third essential ingredient, time, in the form of contractual regulatory and accounting forbearances. These forbearances were intended by all parties involved in the acquisitions to allow Sterling time to absorb the insolvent thrift associations while remaining in compliance with the other applicable regulations.

7. The government would now tell Sterling that although Sterling has supplied the management expertise and money necessary to resolve three insolvent thrifts, the contracts by which the government granted Sterling the time necessary to absorb the insolvent thrifts do not bind the government.

8. It is a fact that Sterling bargained for and received contractual regulatory and accounting forbearances in exchange for, and as conditions of, Sterling's acquisitions of Lewis Federal and Tri-Cities.

9. It is also a fact that, to induce Sterling to buy Central Evergreen, the FHLBB and the FSLIC promised Sterling in writing time to absorb Central Evergreen and to meet more stringent capital standards than then existed.

10. If the FHLBB and the FSLIC had not requested and encouraged Sterling to acquire the Tri-Cities, Central Evergreen thrifts (and save the FSLIC $51 million in the process), Sterling would be in full compliance with all post-FIRREA capital requirements today.

11. If the Office of Thrift Supervision ("OTS") had not arbitrarily blocked Sterling's 1989 equity offering and purported to eliminate the contractual regulatory and account-





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

ing forbearances to which Sterling is entitled, Sterling would be in full compliance with all post-FIRREA capital standards today.

A. Lewis Federal and Tri-Cities Acquisitions.

12. As an integral part of the negotiations and contracts relating to Sterling's acquisition of Lewis Federal and Tri-Cities, the FSLIC and the FHLBB granted contractual regulatory provision and accounting forbearances as part of the consideration for Sterling's acquisitions. But for such consideration, Sterling would never have contemplated, let alone consummated, the acquisition of sick thrifts like Lewis Federal and Tri-Cities.

(a) Prior to its acquisition of Lewis Federal and Tri-Cities, Sterling received packages of information and instructions relating to the preparation and submission of bids (the "Lewis Federal Bid Package" which is attached hereto as Exhibit "A" and the "Tri-Cities Bid Package" which is attached hereto as Exhibit "B", both of which may be collectively referred to as the "Bid Packages"). The Lewis Federal and Tri-Cities Bid Packages described the types of financial assistance, accounting forbearances, and regulatory forbearances which would be provided by the FHLBB and the FSLIC as part of the acquisitions of Lewis Federal and Tri-Cities.

(b) The Bid Packages did not state or imply in any way that regulatory and accounting forbearances would be less than contractual in nature. To the contrary, the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Bid Packages, particularly Attachment 2 thereof, made it clear that requests for forbearances had to be "convincingly justified" and that "blanket requests for forbearances" would not be acceptable. (Attachments 2, "Requests for Forbearances and Exceptions to Filing Requirements Regarding Supervisory Institutions" are dated April 24, 1984 and March 7, 1986, respectively, and will be referred to herein as "SP-37" and "SP 37a", respectively.) SP-37 and SP 37a both provide:

> The basic purpose in granting forbearances is to give realistic incentives to potential aquirors of the problem institutions. The incentives, however, must be limited to those actually necessary for an acquiror to complete a supervisory merger or acquisition. (SP 37, p. 2.)

The quoted language accurately summarizes the understanding and intent of the parties at the time of the Lewis Federal and Tri-Cities acquisitions: the regulatory provisions and accounting forbearances were the necessary conditions of each acquisition. Without the forbearances and the acquisitions of $13.5 million in permanent capital, the deals wouldn't work and the acquisitions wouldn't be consummated. For the government to suggest that the forbearances were anything less than part of the acquisition contracts is difficult to comprehend. The granting of forbearances would not have been so carefully limited by the FHLBB if the forbearances had never been intended to bind the FHLBB and the FSLIC.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(c) The Bid Packages also made it clear that the FHLBB and the FSLIC would agree to forebear from enforcing certain regulations and accounting principles only for a very limited period of time. For example, the forbearance from enforcement of any reserve or net worth requirement was to last only "for a period of five years following the [acquisitions]." (SP 37 and SP 37a, both at p. 3.) The forbearances would not have been so carefully limited in time if they had never been intended to bind the government during that period of time.

(d) During both the Lewis Federal and Tri-Cities negotiations, each of the regulatory and accounting forbearances ultimately contained in the acquisition contracts was specifically negotiated by Sterling, on one hand, and the FHLBB and the FSLIC on the other. Again, the forbearances would never have been so carefully negotiated by the FHLBB and the FSLIC if they had not been intended to bind the government.

(e) Ultimately, as part of both the Lewis Federal and Tri-Cities closing processes, the FHLBB and the FSLIC delivered Forbearance Letters to Sterling together with the FHLBB Resolutions specifically authorizing the financial assistance, accounting forbearances and regulatory forbearances granted as consideration for Sterling's acquisition of Lewis Federal and Tri-Cities. (The Lewis Federal Forbearance Letter and Resolution No. 85-985 are attached hereto as Exhibits "C" and "D" respectively, and



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the Tri-Cities Forbearance Letter and Resolution 88-250P are attached hereto as Exhibits "E" and "F" respectively.)

(f) In the Lewis Federal Forbearance Letter the FHLBB:

(1) Permitted Sterling to exclude certain of Lewis Federal's liabilities in determining compliance with certain requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years (until November of 1990) if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of the failing Lewis Federal, or by Sterling's assumption of Lewis Federal's negative net worth;

(3) Ordered that Sterling could carry $1.8 million in FSLIC cash assistance on its books as a credit to its net worth, for permanent regulatory capital purposes;

(4) Ordered that for regulatory accounting purposes supervisory goodwill created by the transaction would be booked pursuant to the purchase method of acçounting and could be amortized over 40 years; and

(5) Ordered that the difference between the book value and the fair market value of Lewis Federal's loan portfolio could be amortized to income over a 15-year period.

(g) In the Tri-Cities Forbearance Letter the FHLBB:





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(1) Agreed to waive the assessment, for one year, of penalties occasioned by Sterling's inability to satisfy liquidity requirements;

(2) Agreed not to enforce any regulation related to regulatory capital requirements for five years (until April of 1993) if Sterling's failure to comply therewith was caused by an increase in liabilities from the acquisition of the failing Tri-Cities, or by Sterling's assumption of Tri-Cities' negative net worth;

(3) Agreed that Sterling could carry $11.7 million in FSLIC cash assistance on its books as a credit to its net worth, for regulatory capital purposes;

(4) Agreed that for regulatory accounting purposes, supervisory goodwill created by the transaction would be booked pursuant to the purchase method of accounting and could be amortized over 15 years; and

(5) Agreed that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized to income over eight years.

(h) Resolutions 85-985 and 88-250P both "authorized and directed" the FHLBB Secretary to send the applicable Forbearance Letters "provided that the final form of such letter[s] ... be approved by the Office of the General Counsel." It is incredible to suggest that the FHLBB and the FSLIC engaged in such a deliberative process leading to the granting of forbearances, even including the adoption of formal Resolutions by the Bank





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Board itself authorizing and directing the issuance of the Forbearance Letters, but first requiring the Letters to be approved by the General Counsel, if the forbearances were never intended to bind the FHLBB and the FSLIC.

(i) The Lewis Federal and Tri-Cities Acquisition Agreements between the FSLIC, as receiver, and Sterling (which Agreements are attached hereto as Exhibits "G" and "H" respectively) stated, on pages 10 and 11 thereof respectively:

> This Agreement, together with any interpretation of it or any understanding agreed to in writing by the parties, constitutes the entire agreement between [Sterling] and the [FSLIC] as receiver ... and supersedes all prior agreements and understandings of the parties, excepting only any resolutions or letters approved or adopted contemporaneously with this Agreement by the [FHLBB] or the [FSLIC].

The quoted language should resolve any doubt as to whether the regulatory and accounting forbearances and specifically the Forbearance Letters themselves were contractual in nature. If nothing else it gave Sterling a right to rely on the government's promises to give Sterling time to absorb Lewis Federal and Tri-Cities, it was the fact that Resolution 85-985 and the Lewis Federal Forbearance Letter were specifically incorporated into the Lewis Federal Contract, and Resolution 88-250P and the Tri-Cities Forbearance Letter were specifically incorporated into the Tri-Cities Contract. Were it otherwise, it would have been completely illogical for the FSLIC and the FHLBB to carefully negotiate the for-





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

bearances, to refrain from granting them unless the acquisitions depended upon them, to limit the forbearances in terms of time, and to grant them only as a result of deliberations and approvals at so many consecutive levels of government, right up to and including the Chairman of the FHLBB and the members of the Board of Directors of the FHLBB.

(j) Finally, the Lewis Federal and Tri-Cities Assistance Agreements between the FSLIC and Sterling (which are attached hereto as Exhibits "I" and "J" respectively) contained, at pages 27 and 72, respectively, language identical to that quoted in the previous subparagraph. The Agreements provided, at pages 28 and 74, respectively, that the Assistance Agreements would "be binding upon and inure to the benefit of the parties and their respective transferees, successors and assigns." This language was understood by all parties to the Lewis Federal and Tri-Cities transactions to mean that the contractual obligations of the FSLIC and the FHLBB, including specifically the obligation to honor the forbearances, would be binding not only on the FHLBB and the FSLIC, but on all successor regulators such as the OTS.

B. <u>As Consideration for Sterling's Acquisition of Central Evergreen, the Government Agreed to Give Sterling Time and a Fair Opportunity to Absorb Central Evergreen and Meet All Future Capital Standards.</u>

10. To be understood, the Central Evergreen transaction must be examined in the context of the previous acquisitions.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

It is important to note that it was in the summer of 1987, prior to the time Sterling's bid on Tri-Cities had been accepted, that the FHLBB requested that Sterling consider acquiring Central Evergreen. Sterling demurred, pointing out that such an acquisition might create a regulatory capital deficiency in the future. The FHLBB and the FSLIC had discussed with Sterling the possibility that existing regulatory capital standards would be increased, and Sterling had otherwise learned as much through industry sources. The FHLBB and the FSLIC asked that Sterling consider the acquisition anyway, pointing out that the "permanent" regulatory capital created by the Lewis Federal and Tri-Cities acquisitions could be used to "leverage" Sterling into technical compliance with the regulations.

11. Sterling studied Central Evergreen, and concluded that, even though Sterling would still be in compliance following the acquisition with existing regulatory capital requirements, Sterling would not complete the acquisition unless it would be allowed to raise between $4 and $6 million in new capital to offset the financial impact of the acquisition. Sterling discussed this concern at length with the regulators, and, as part of the negotiations leading up to the Central Evergreen agreement (the "Central Evergreen Agreement" which is attached hereto as Exhibit "K"), Sterling insisted that a clause be inserted to mitigate Sterling's regulatory risk that the existing regulatory capital standards might be increased. In response, the FHLBB and the FSLIC amended the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

draft Central Evergreen Agreement to provide that Sterling would be allowed to amend its business plan (to, for example, raise additional capital) if such amendment became necessary due to "actions taken by any governmental body having jurisdiction that caused [Sterling] to materially deviate from its business plan." (Central Evergreen Agreement at p. 3.)

12. On December 8, 1988, the FHLBB adopted a Resolution of approving the acquisition. (The Resolution, No. 88-1273, is attached hereto as Exhibit "L".) The Resolution was based on formal findings of fact that, among other things, Sterling "would be a viable entity" following the acquisition. The FHLBB Resolution directed that the FSLIC should enter into an agreement pursuant to Sterling's proposal calling for an infusion of capital after the acquisition.

13. On December 28, 1988, Sterling contracted with the FSLIC to carry out a specific business plan. The plan contemplated the addition of between $4 and $6 million in new equity capital within two years.

14. Once again, in exchange for Sterling's agreement to provide the management expertise and money necessary to resolve the Central Evergreen problem, the FHLBB and the FSLIC agreed to provide Sterling with the time and a reasonable opportunity to absorb Central Evergreen. By entering into this agreement, the FHLBB and the FSLIC agreed to cooperate with Sterling in Sterling's efforts to raise additional equity capital.



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

15. Unfortunately, the OTS and FDIC chose to violate the Central Evergreen Agreement by blocking Sterling's 1989 equity offering. As discussed elsewhere in this case (see, e.g., Affidavit of A. Adjate Duer, and Plaintiff's Verified Complaint), Sterling's 1989 equity offering was so well received by the marketplace that Sterling would have raised approximately $10.8 million in new, qualifying regulatory capital had the OTS not arbitrarily blocked the offering by refusing to approve of Sterling's payment of the proposed dividends.

C. If Tri-Cities and Central Evergreen Acquisitions are Backed Out, Sterling Complies with FIRREA Capital Standards.

16. Sterling has substantially absorbed Lewis Federal as it promised to do, prior to the end of the agreed time frame (November of 1990). For that reason, the Lewis Federal transaction is a good example of how Sterling planned to and did absorb the assets and liabilities of an insolvent thrift association. This was not the first time Sterling had assisted regulators by acquiring an insolvent thrift association. On June 30, 1983, Sterling had acquired Lewis and Clark Savings & Loan Association ("Lewis and Clark"). The Lewis and Clark acquisition increased Sterling's assets by approximately 600 percent (from $7.4 million to $51.6 million). Similarly, the Lewis Federal acquisition increased Sterling's assets by approximately 42.5 percent (from $125.9 million to $179.4 million). That these acquisitions were successfully completed and the insolvent thrifts were absorbed





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

in spite of the tremendous increases in Sterling's balance sheet, is a testament to Sterling's financial and management strength.

17. In a similar manner, Sterling has been absorbing Tri-Cities and Central Evergreen as it promised to do prior to the end of the agreed time frames (April of 1993 and December of 1990, respectively).

18. The sole reason that Sterling is alleged not to be in compliance with present capital standards is because it acquired Tri-Cities and Central Evergreen. Any potential noncompliance was contemplated before and addressed in the Tri-Cities and Central Evergreen acquisition agreements. I have prepared the attached Exhibit "M" to demonstrate that the Tri-Cities and Central Evergreen acquisitions are the sole reason for Sterling's alleged noncompliance with present capital standards.

19. Exhibit "M" is a report of Sterling's capital position as of May 31, 1990, without including Tri-Cities or Central Evergreen. As is apparent, Sterling would exceed its tangible capital requirement of 1.5 percent by 78 basis points, or 52 percent. Sterling would exceed its core capital requirement by 28 basis points, or 9 percent. Finally, Sterling would exceed its risk-based capital requirement of 6.4 percent by 3.5 basis points, or .05 percent.

20. In contrast with the information contained in the Friend Declaration, Sterling is in compliance with all post-FIRREA standards today if the Tri-Cities and Central



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Evergreen transactions are backed out of Sterling's capital calculation. The following summary of Exhibit "M" shows Sterling's actual capital position on May 31, 1990, on this basis:

| | Tangible | Core | Risk-based |
|---|---|---|---|
| Required | $5,400,000 | $10,799,000 | $15,484,000 |
| Actual | 8,213,000 | 11,797,000 | 15,568,000 |
| Excess Capital | $2,813,000 | $ 998,000 | $ 84,000 |

21. In reviewing Carol Friend's Declaration, I observed that she apparently omitted the $13.5 million in permanent (regulatory) capital that Sterling acquired in the Lewis Federal and Tri-Cities transactions, and other intangibles qualifying under FIRREA.

22. In summary, if the Tri-Cities and Central Evergreen acquisitions are backed out (for which the capital forbearances and the time to absorb them were obtained by Sterling), Sterling is in compliance with all three FIRREA capital standards as of the most recent month end prior to the court hearing.

D. If Sterling had been Permitted to Conduct Public Offering, Sterling Would Comply With All Existing Capital Standards.

23. If the OTS had not arbitrarily blocked Sterling's 1989 equity offering and purported to eliminate the contractual regulatory capital and accounting forbearances to which





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Sterling is entitled, Sterling would be in full compliance with all post-FIRREA capital standards today.

24. I have prepared Exhibit "N" to illustrate that Sterling would be in full compliance with each of the post-FIRREA capital standards today if OTS had complied with its existing contracts with Sterling. On this assumption, Sterling would exceed its tangible capital requirement by 72 basis points, or 48 percent. Sterling would exceed its core capital requirement by 151 basis points, or 50 percent. Finally, Sterling would exceed its risk-based capital requirement by 126 basis points, or 20 percent.

[signature]
DANIEL G. BYRNE
Senior Vice President and
Chief Financial Officer of
Sterling Savings Association

SUBSCRIBED AND SWORN to before me this 25th day of June, 1990.

[signature]
NOTARY PUBLIC in and for the State of Washington, residing at Spokane
My appointment expires: 2-2-93





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS-90-0175-JLQ<br><br>SUPPLEMENTAL AFFIDAVIT OF HAROLD B. GILKEY |

STATE OF WASHINGTON )
) ss.
County of Spokane )

HAROLD B. GILKEY, being first duly sworn upon oath, deposes and says:

1. I am now and have been since its inception the Chairman of the Board and Chief Executive Officer of Sterling Savings Association ("Sterling").

2. Sterling is a profitable and solvent savings association. Sterling has earned a profit each year it has been in business. June 30 1989 year end was the most profitable in history. Sterling has earned a profit for the 11 months ending May 31, 1990, despite imposition in 1990 of operating restrictions by OTS because of Sterling's alleged capital deficiency.

3. With respect to the capital solvency of Sterling, the Resolution Trust Corporation ("RTC") has repeatedly said that Sterling is solvent. In example, attached hereto as Exhibit "A" is a copy of a letter dated June 1, 1990 from RTC to Ruth P. Hanson of Chehalis, Washington, in which RTC states that it "has no jurisdiction over solvent institutions such as Sterling." There are literally dozens of such RTC letters addressed to interested depositors, borrowers, and shareholders, copies of which have been furnished to Sterling.

4. I was involved in the Sterling acquisitions of the Tri-Cities and Central Evergreen thrifts. Sterling would not have considered the bid proposals sent to Sterling by FHLBB and FSLIC had Sterling not been asked to submit a bid and had the bid packages not contained financial inducements to acquire the insolvent thrifts, such as capital forbearances.

5. Sterling has substantially absorbed the acquisition of the insolvent Lewis Federal, although it enjoys forbearances by reason of this acquisition until November, 1990. On the other hand, Sterling has, by virtue of its agreement with FHLBB and FSLIC, until April, 1993 to absorb Tri-Cities. If



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

the Tri-Cities and Central Evergreen acquisitions are backed out of Sterling's books, Sterling is in compliance with all three (tangible, core, and risk-based) capital standards under FIRREA as of May 31, as more fully described in the Affidavits of Gordon Budke and Daniel Byrne. In other words, the sole reason for the alleged non-compliance with post-FIRREA capital standards is the acquisition of Tri-Cities and Central Evergreen from which Sterling received contractual commitments from the regulators and without which Sterling would not have made the acquisitions of the insolvent thrifts.

6. The Tri-Cities and Central Evergreen acquisitions and, therefore, the capital forbearances and other inducements, were interrelated. When Sterling bid on Tri-Cities, it was originally not the low bidder. In early 1988, Hilton Hewitt, Sterling's Supervisory Agent from FHLB-Seattle, contacted me and requested that Sterling consider acquiring the insolvent Central Evergreen. I said that Sterling may not have sufficient capital to acquire two insolvent thrifts in the same year (April, 1988 and December, 1988). Hewitt responded that Sterling would have ample capital by using the supervisory goodwill and permanent capital it would obtain from the Tri-Cities thrift to qualify for the acquisition of Central Evergreen.

7. I told Hewitt that, under the circumstances as he assured me, Sterling would look at Central Evergreen. Shortly thereafter, Sterling learned that it moved ahead of the low bidder, Old Stone Savings Bank, and was now the likely aquiror





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of Tri-Cities. I relied on Hilton Hewitt's assurances and representations that the capital forbearances, supervisory goodwill, and permanent capital obtained in the Tri-Cities acquisitions were binding on the regulators. Without such a commitment, Sterling would not have considered the acquisition of Central Evergreen or, for that matter, Tri-Cities. Sterling further negotiated with FHLBB, as part of the Central Evergreen deals, the right to raise additional capital, including the right to pay dividends on preferred stock, by December 31, 1990. Later, after the preferred stock offering was fully subscribed, the Office of Thrift Supervision ("OTS") refused in January 1990 to permit payment of dividends on the preferred stock to be sold, despite FHLBB's previous agreement with Sterling to the contrary, thereby resulting in the cancellation of the offering. At the time, Sterling still had by the terms of its agreement one year, or until December 31, 1990, within which to complete its offering for new capital. Six months of that time has been lost.

8. Sterling has approximately 300 employees in its 28 branches throughout Washington. It has approximately 72,000 customer account relationships. As a result of the action taken by OTS to date and the attendant publicity, Sterling has already experienced the loss of employees, including several key middle managers, who are concerned about their futures. Their untimely departure has already begun to affect the bottom line. For the same reasons, Sterling has begun to experience a loss of depositors and account relationships in





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

April and May, 1990. Further, Sterling has begun to lose investor confidence, as evidenced by the fact that Sterling's stock has dropped in price over the last several months from over $9 per share to $4 per share. Unless OTS and FDIC are enjoined pending trial on the merits, Sterling will be irreparably and incalculably harmed. Loss of confidence in the depositor and investor community cannot be easily repaired. Moreover, it cannot be judged or calculated in terms of lost profits because Sterling does not and will not know which depositor or borrower will never bank at Sterling by reason of the OTS and FDIC action. Consumer confidence in Sterling and Sterling's reputation in the community are fragile, particularly in the current regulatory environment, and the loss thereof is virtually impossible to measure.

Harold B. Gilkey

HAROLD B. GILKEY

SUBSCRIBED AND SWORN to before me this 25 day of June, 1990, by Harold B. Gilkey.

NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 2-2-93



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association,<br><br>Plaintiff,<br><br>vs.<br><br>T. TIMOTHY RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; FEDERAL HOME LOAN BANK OF SEATTLE, and THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation,<br><br>Defendants. | No. CS-90-0175-JLQ<br><br>AFFIDAVIT OF WILLIAM W. ZUPPE |

STATE OF WASHINGTON )
) ss.
County of Spokane )

WILLIAM W. ZUPPE, being first duly sworn upon oath, deposes and says:

1. I make this affidavit of my own personal knowledge.

2. I am President, Chief Operating Officer, and a director of Sterling Savings Association (hereinafter



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

"Sterling"). I have been in the banking or mortgage banking business for the past 26 years.

3. Sterling is a state chartered, federally insured, stock savings and loan association, founded in 1983, and headquartered in Spokane, Washington.

4. Sterling has 28 branches through the State of Washington, employs approximately 300 employees, and enjoys more than 72,000 customer account relationships.

5. Sterling is the only thrift institution headquartered in the Inland Empire. It has deposits of approximately $490 million and assets of nearly $690 million.

6. Sterling is engaged in the business of attracting deposits from the public and originating, purchasing, selling, and servicing secured residential, commercial, and consumer loans.

7. Sterling has a June 30 fiscal year end. Its books are audited annually by the public accounting firm of Coopers and Lybrand, CPAs.

8. Sterling is a profitably and efficiently run savings association. Sterling has earned a profit each year it has been in business. It has never experienced an operating loss. For the year ending June 30, 1989, Sterling generated net after- tax earnings of $1,285,000. This is the highest in Sterling's history. Net post-tax earnings have increased each year. For example, in 1985, after-tax earnings were $445,000; 1986, $775,000; 1987, $935,000; and 1988, $1,219,000. It generates a healthy 15% return on shareholders' equity. The



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

book value per common share of stock, like after-tax earnings, has steadily increased each year since inception.

9. Attached hereto as Exhibit "1" is the 1989 Report to Shareholders containing, among other things, the audited financial statements prepared on a comparative basis for the years 1989, 1988, and 1987. Also attached as Exhibit "2" is 1986 Annual Report containing the audited financial statements from 1986 back to 1984, the first full year of operation.

10. Sterling has earned a profit for the ten-month period ending April 30, 1990.

11. At the present time, Sterling management is in the process of budgeting income and expenses for the fiscal year end June 30, 1991. Based on preliminary budget projections, not yet refined, it appears that Sterling will earn approximately $1 million after tax for the year ending June 30, 1991.

12. As of December 31, 1989, Sterling's net worth under Generally Accepted Accounting Principles amounted to $10.9 million. Sterling has over 900 shareholders.

13. Sterling's Board of Directors consists of 12 members of the business community throughout the State of Washington. Harold B. Gilkey is Chairman of the Board and Chief Executive Officer. Mr. Gilkey has been in the banking or mortgage banking business for the past 28 years.

14. Sterling is a conservative, well managed, "no frills" institution. Unlike some savings institutions discussed in the media, Sterling has no corporate jets, art





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

work collections, or lavish headquarter buildings. It has not made nonconforming insider loans or speculative investments such as in high yield junk bonds or land acquisition and development schemes.

15. During the early to mid-1980's, a number of thrift institutions experienced financial losses due to volatile interest rates and inflation, among other reasons. The Federal Savings and Loan Insurance Corporation ("FSLIC"), which provided deposit insurance to thrifts, eventually was unable to recapitalize or liquidate the increasing number of troubled thrifts. Beginning in the early 1980's, the Federal Home Loan Bank Board ("FHLBB"), which regulated thrifts, asked certain healthy thrifts to take over or merge with ailing thrifts, thereby reducing pressure on the FSLIC Insurance Fund and relieving regulators of a burden. To induce healthy thrifts to take over ailing thrifts, the regulators offered various financial and accounting inducements and capital forbearances.

16. As a solvent and healthy thrift, Sterling was asked, commencing in 1985, by the FSLIC and the FHLBB, its regulators, to acquire certain troubled thrifts, and was promised specific capital forbearances and accounting treatment whereby Sterling could acquire the troubled thrifts and thus save the FSLIC and the FHLBB literally millions of dollars. The inducements consisted, in part, of (a) permitting the acquiring institution to record regulatory cash assistance as a part of their permanent regulatory capital, (b) allowing acquiring





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

thrifts to extend goodwill amortization periods beyond those allowed under Generally Accepted Accounting Principles thereby increasing their capital, and (c) granting forbearances such as agreeing not to enforce capital requirements if the breach of such requirements was caused by the acquisition of the troubled thrifts by the healthy thrift. Over time, Sterling agreed to bail out three troubled thrifts, thereby saving the FSLIC millions of dollars, and in the process received each of the foregoing types of contractual inducements. In short, Sterling agreed to be part of the solution to the problem of troubled thrifts.

17. In early 1985, the FHLBB declared Lewis Federal Savings and Loan Association ("Lewis Federal") of Chehalis, Washington, to be insolvent. Pursuant to its announced policy of finding a well managed, solvent thrift to acquire an insolvent thrift so as to preserve the Insurance Fund, the FHLBB asked Sterling to submit a takeover bid recognizing that, as the acquiring institution, Sterling would be given time to earn its way out of the absorption of Lewis Federal's negative net worth. Specifically, the FHLBB offered all bidders (a) forbearances from enforcement of certain regulatory capital requirements, and (b) special treatment of supervisory goodwill to meet capital requirements.

18. In June, 1985, responding to the FHLBB's request for bid, Sterling offered to acquire Lewis Federal.

19. On November 4, 1985, the FHLBB adopted a resolution containing formal findings of fact that Lewis Federal was



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building

insolvent, that Sterling was competent and safe to acquire **Lewis Federal**, that the Sterling acquisition would reduce risk to the Insurance Fund, that Sterling would continue to be a viable entity after the acquisition, and that to induce Sterling to acquire Lewis Federal, the FHLBB would grant capital forbearances and purchase accounting treatment of goodwill. Attached hereto as Exhibit "3" is the Resolution.

20. On November 5, 1985, Sterling entered into a written contract with the FSLIC as receiver for Lewis Federal to take over the insolvent thrift subject to the FHLBB's approval of the conditions set forth below. Attached as Exhibit "4" is the contract.

21. On November 12, 1985, the FHLBB entered an Order formally granting to Sterling the capital forbearances and supervisory goodwill accounting treatment, as follows:

(a) Permitting Sterling to exclude certain Lewis Federal liabilities in calculating compliance with certain regulations;

(b) Waiving enforcement of any regulatory capital regulations for five years, or until November, 1990, if Sterling's failure to comply was caused by the increase in liabilities and/or the assumption of negative net worth from the Lewis Federal acquisition;

(c) Agreeing that Sterling carry $1.8 million in cash assistance on its books as a credit to net worth for regulatory accounting purposes;





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(d) Agreeing that the $1.8 million in supervisory goodwill created by the acquisition would be capitalized and amortized over 40 years;

(e) Agreeing that the difference between the book and fair market values of Lewis Federal's loan portfolio would be capitalized and amortized over 15 years.

Attached hereto as Exhibit "5" is a copy of the Order.

22. Pursuant to the foregoing agreement and Order, Sterling entered $1.8 million in permanent capital on its books.

23. In acquiring Lewis Federal, Sterling and its share-holders saved the FSLIC approximately $5.2 million to liquidate Lewis Federal.

24. In the summer of 1987, the FHLBB adjudged the Tri-Cities Savings and Loan Association ("Tri-Cities") to be insolvent.

25. To preserve the Insurance Fund, the FHLBB asked for bids from selected thrift institutions to acquire Tri-Cities. Sterling was one of the thrifts asked. Selection criteria included (a) low cost to the FSLIC and (b) high probability that the acquiring institution would be able to "earn its way out" of Tri-Cities' negative net worth.

26. Sterling submitted a bid in November, 1987, to acquire Tri-Cities subject to essentially the same conditions as with the Lewis Federal bid: (a) forbearance from regulatory capital requirements and (b) acceptance by the FHLBB of the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

purchase accounting treatment of the resulting supervisory goodwill.

27. On April 7, 1988, the FHLBB adopted a resolution to the effect that Tri-Cities was insolvent, that Sterling was a well qualified, competent, and healthy thrift to acquire and manage Tri-Cities, that the FSLIC Insurance Fund would be preserved by the acquisition, and that Sterling would be granted certain regulatory forbearances and other conditions of purchase to induce it to buy the troubled Tri-Cities thrift. Attached hereto as Exhibit "6" is a copy of the Resolution.

28. On April 6, 1988, the FHLBB entered an Order formally granting the conditions, including, among others:

(a) Agreeing not to enforce any regulatory capital rules for <u>five years</u>, or until <u>April, 1993</u>, if Sterling's failure to comply was caused by the acquisition of Tri-Cities;

(b) Agreeing that the $11.7 million in cash assistance could be credited to net worth and treated as supervisory goodwill amortized over 15 years; and

(c) Agreeing that the difference between the book and fair market values of Tri-Cities' loan portfolio could be amortized over 8 years.

Attached hereto as Exhibit "7" is a copy of the Order.

29. On April 8, 1988, Sterling entered into a written contract with the FSLIC as Tri-Cities' receiver subject to the foregoing forbearance and purchase accounting treatment of the



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390

supervisory goodwill. Attached hereto as Exhibit "8" is a copy of the contract.

30. Pursuant to its agreement with the FSLIC and in conformity with the FHLBB Order, Sterling booked $11.7 million in permanent regulatory capital.

31. As of April, 1988, the FHLBB contractually agreed and then ordered that Sterling be permitted to count an additional $13.5 million ($1.8 from Lewis Federal and $11.7 from Tri-Cities) in supervisory goodwill toward its regulators' capital requirement.

32. But for Sterling's acquisition of the insolvent Tri-Cities, the FSLIC would have had to spend approximately $13.7 million additionally to liquidate Tri-Cities.

33. In the summer of 1987, the FHLBB asked Sterling to acquire Central Evergreen Federal Savings and Loan Association ("Central Evergreen"), an insolvent thrift located in Chehalis, Washington. Sterling stated it did not have enough capital to acquire a $250 million deposit thrift. The FHLBB persisted, asking Sterling to at least look at Central Evergreen. Sterling did, but still turned down the request because it did not have sufficient capital on its own to acquire a large insolvent thrift. The supervisory agent, Hilton Hewitt of the Seattle Office of FHLBB, reiterated that if Sterling acquired Tri-Cities, the permanent regulatory capital thereby created could be used to acquire Central Evergreen and remain in capital compliance.





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

34. Based on the FHLBB's further assurances that Sterling would be in compliance with capital standards if it took Central Evergreen off of the FSLIC's hands, Sterling reevaluated Central Evergreen and concluded an acquisition could be done to help the FSLIC and FHLBB on the express condition that Sterling be permitted to raise $4 to $6 million in additional equity capital soon after the acquisition. Sterling then contracted to acquire Central Evergreen contingent upon capital forbearance and other commitments fr:m the FHLBB.

35. Under the "purchase method of accounting" for mergers, GAAP permits adjusting assets and liabilities to fair market value, then the excess over the fair market value of the acquired liabilities over assets is entered on Sterling's books as goodwill.

36. On December 8, 1988, the FHLBB adopted a resolution approving the acquisition and, as before, found that Central Evergreen was insolvent, that the acquisition would preserve the Insurance Fund, that Sterling was a viable entity and would be so after the acquisition, that "the purchase method accounting treatment of goodwill" should be used, and that Sterling should be permitted to raise equity capital after the acquisition pursuant to a new business plan with the FSLIC. Attached as Exhibit "9" is a copy of the Resolution.

37. On December 28, 1988, Sterling contracted with the FSLIC to implement a new business plan including the addition



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

of $4 to $6 million in new equity by December 31, 1990. Attached as Exhibit "10" is a copy of the contract.

38. As part of the foregoing agreement, the FSLIC agreed to permit Sterling to revise its business plan "should events beyond Sterling's control" prevent the contemplated offering.

39. By acquiring Central Evergreen, Sterling saved the FSLIC approximately $30.1 million in liquidation costs. As a result of the three acquisitions described above, Sterling and its shareholders saved the FSLIC and the American taxpayers over $51 million.

40. In summary, if the regulators were required to adhere to their written contractual commitments, Sterling would be entitled to:

(a) forbearance from regulatory capital standards until November 5, 1990 if Sterling's failure to comply was caused by an increase in liabilities from the acquisition of Lewis Federal;

(b) forbearance from regulatory capital standards until April 8, 1993 if Sterling's failure to comply therewith was caused by an increase in liabilities form the acquisition of Tri-Cities;

(c) forbearance from regulatory capital standards until December 31, 1990 if Sterling's failure to comply with the standards was caused by inability to raise capital following the Central Evergreen acquisition;



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

(d) raise equity capital through a public offering and pay dividends on the preferred stock issued, all as part of the Central Evergreen transaction;

(e) count $13.5 million from the Lewis Federal and Tri-Cities acquisitions as supervisory goodwill toward its regulatory capital requirement.

41. Pursuant to regulatory commitments made to it in the Central Evergreen contracts with the FSLIC in the fall of 1989, Sterling prepared to add approximately $10.5 million in capital through a public offering. By December, 1989, Dain Bosworth, Inc., the underwriter on the proposed stock offering, confirmed that the 603,750 units of noncumulative preferred stock had been subscribed to. Dain Bosworth, Inc. had already completed by this time the necessary due diligence to assure itself that Sterling's earnings would be sufficient to pay dividends.

42. Prior to and during December, 1989, Sterling requested regulatory confirmation of its previous contractual commitment to permit payment of dividends on the new stock to be offered. Without regulatory approval of the payment of dividends, the new stock offering was futile. Without the stock offering promised by the FHLBB and FSLIC, Sterling would never have acquired Central Evergreen no matter how many pleas it received from the regulators.

43. By this time, the fall of 1989, the FHLBB had been replaced by the Office of Thrift Supervision (the "OTS"). The OTS initially responded that the proposed public offering was





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

in the mutual interest of Sterling and the OTS. By late December, 1989, the OTS changed its mind, refused to honor the contract of its predecessor in interest, and refused payment of dividends on the new offering, thereby aborting the offering.

44. As a result, Sterling incurred nearly $1 million in underwriting fees, as well as accounting and attorney fees, in preparation for the equity offering.

45. By not later than December, 1989, it became evident that the OTS was intending to disregard the capital forbearance commitments made by its predecessor, the FHLBB, and the supervisory goodwill acquired by Sterling as a result of the Lewis Federal, Tri-Cities and Central Evergreen bail out acquisitions.

46. Although Sterling had assisted the regulators in the three thrift bailouts described above and had negotiated contracts covering each of the conditions, promises, and covenants of the acquisitions, the OTS abrogated the written contracts and began to treat Sterling as if it were a troubled thrift. After unilaterally cancelling the (a) capital forbearance, (b) supervisory goodwill, and (c) permanent capital ($13.5 million) provisions of Lewis Federal, Tri-Cities and Central Evergreen acquisition agreements and orders, the OTS took the position that Sterling is technically capital deficient under Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

47. As part of the OTS' wrongful and wholly unjustified treatment of Sterling as a troubled thrift, in late December, 1989 the OTS directed Sterling to file a plan for resolving the perceived capital deficiency. If OTS had honored its contracts and orders to begin with, Sterling would not have had to incur the time and considerable expense in preparing the capital plan.

48. Were it not for the breach by the OTS of the supervisory acquisition agreements, the OTS could not maintain that Sterling was in violation of the post-FIRREA capital standards.

49. Again in violation of its contractual commitment, the OTS began in 1990, and is now, imposing a series of operating restrictions on Sterling which collectively hampers Sterling's ability to generate a profit, though it has still continued to do so.

50. Without conceding that the OTS was entitled to treat Sterling as a troubled thrift and having made it clear to the regulators that Sterling had contractual forbearances, Sterling was required by an OTS policy directive to submit a capital plan in January, 1990 demonstrating the long term viability of Sterling as a thrift institution.

51. By early April, 1990, despite the fact that Sterling had made a profit each and every year of its operations and also for the six months ending December 31, 1989, the OTS insisted that Sterling sign an Operating Agreement giving the OTS the right to appoint a conservator or receiver. The OTS premised its insistence on the basis that it had cancelled the





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

capital forbearance, the supervisory goodwill, and the **permanent** capital provisions of the supervisory acquisitions.

52. The Operating Agreement proposed by the OTS made Sterling concede (a) that the three supervisory acquisition agreements were of no force or effect, (b) that Sterling was therefore subject to FIRREA, (c) that Sterling had insufficient capital now that the forbearances, supervisory goodwill, and permanent capital were cancelled, and (d) that the OTS could appoint a conservator or force the sale of the Association.

53. The proposed Operating Agreement, if signed, could require Sterling's Board to resign at any time without cause and to recommend to the shareholders that they abandon their investment in the Association, despite the fact that Sterling was and is profitable. The Board declined to execute the Operating Agreement because of its duties to the depositors and shareholders. Attached hereto as Exhibit "11" is a copy of the proposed "Operating Agreement with Conditional Consent to the Appointment of Conservator or Receiver."

54. On May 10, 1990, Sterling, having tried to convince the OTS to comply with its contractual commitments, hand delivered the Seattle Office of the OTS a letter, attached hereto as Exhibit "12", which explained to the OTS the reasons why the Sterling Board did not sign the proposed Operating Agreement. The OTS has not responded to this letter directly, except to repeat its position that the agreements were abrogated.

...



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

55. Affiant attended the May 10 meeting of the Seattle Office of the OTS. Present for the OTS were William J. Durbin, District Director of Seattle District, Ed Hedlund, and Carol Friend. Present for Sterling were Harold Gilkey, Dan Byrne, Chief Financial Officer, and affiant. At this meeting, William Durbin admitted to Sterling that it was "being stiffed, but the government can do that. It comes from the right of kings." On that occasion, William Durbin confirmed that "OTS has no problem whatsoever" with Sterling management and asked Ed Hedlund to concur in this opinion, which he did. On one previous occasion, Carol Friend told affiant that "you are ... good managers."

56. Sterling has built a reputation of being "turn around specialists." That is why FHLBB and FSLIC came to Sterling in the first place to take over Lewis Federal, Tri-Cities, and Central Evergreen, because Sterling knows how to efficiently run a thrift bank, manage troubled loans or accounts, build capital, protect its depositors, and make a profit. If it were otherwise, FHLBB and FSLIC would not have asked Sterling in the first place to help out the Insurance Fund and acquire the three troubled thrifts. Sterling would be in compliance with current FIRREA tangible and core capital requirements but for the acquisitions of (or backing out the) Tri-Cities and Central Evergreen supervisory acquisitions. Alternatively, Sterling is in compliance with FIRREA capital standards if the forbearance and accounting commitments of the supervisory acquisition agreements are honored. Either way,





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

Sterling is not in violation and needs the protection of this Court.

57. Despite Sterling's repeated explanations and suggested reasonable alternatives as to how to proceed (see Exhibit "12"), the OTS has not responded substantively. Instead, the OTS has proposed a Capital Directive which, if enforced, is tantamount to a shutdown of Sterling.

58. Sterling has thoroughly exhausted its administrative remedies.

59. Sterling is in imminent danger and threat of being shut down by the OTS and having the value of its shareholders' investment wiped out, even though Sterling is a profitable savings institution.

60. Sterling has fully performed or is in compliance with every provision of the three supervisory acquisition agreements. Now that the FHLBB and FSLIC have the benefit of their bargain, the OTS seeks to cancel the agreements before Sterling gets its share of the deal and before Sterling has had the opportunity of "turning around" the assets and liabilities of the three acquired thrifts within the dates described in the supervisory acquisition agreements; namely, November 1990, December 1990, and April 1993. In this regard, OTS wrongfully frustrated Sterling's public offering which was fully subscribed to over $10 million, despite the fact that it



WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

agreed to this as a condition of the Central Evergreen acquisition. This arbitrary conduct cost Sterling $1 million in costs which will be charged off by June 30th.

WILLIAM W. ZUPPE

SUBSCRIBED AND SWORN to before me this 28th day of May, 1990, by William W. Zuppe.

NOTARY PUBLIC in and for the State of Washington, residing at Spokane

My appointment expires: 3-3-93





WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
ATTORNEYS & COUNSELORS
1100 Old National Building
Spokane, Washington 99201-0390
(509) 624-5265

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF THOMAS M. BEIL

Deposition upon oral examination of THOMAS M. BEIL, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 1:00 p.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

A. Focused on community banking, how to run a community bank, lending was a part of that, both consumer, real estate, commercial lending, asset and liability management.

Q. How long was that?

A. It was two weeks.

Q. When you say community bank, what do you mean by that?

A. Well, community banking tends to be the smaller institutions versus a large regional and national bank. For instance, Sterling was, well, is still a community bank primarily in the Washington or the Northwest area. Whereas Wells Fargo is considered a large regional bank and we are in 26 different states.

Q. When you left Old National and went to Sterling, did some of your commercial lending customers go with you?

A. Yes.

Q. And why would they do that?

A. I think they developed an allegiance not only to the, primarily to the lender, to the relationship manager. Often it takes quite a while to build up trust and credibility with a particular business, and if that individual should leave, often they think it is in

their best interests, you know, to follow that individual.
Q. Do you have any idea of the approximate number of customers that would have left Old National and gone to Sterling with you?
A. Oh, approximately a dozen, I would say, at that point.
Q. And what kind of percentage of your customers would that have been?
A. Maybe 25 percent.
Q. When you went to Sterling were you in the commercial lending department?
A. Yes.
Q. Who else was in the department at the time?
A. Well, several people, Cajer Neely was our manager. He actually replaced an individual that left shortly thereafter. We had, I think, three lenders and then maybe five or six support staff at the time.
Q. What was your position, did you have a title?
A. Commercial loan officer, assistant vice-president and commercial loan officer.
Q. Did you hold any position at Sterling Financial, the holding company?
A. No.
Q. What did your job entail?

participate with.
Q. Do you recall what that ceiling was?
A. I don't recall, no.
Q. Do you recall what the loans to one borrower limitation was?
A. I don't recall that, that information.
Q. What was the typical size loan that you would make?
A. Well, on a relationship maybe up to a couple million dollars at that time. It could be several loans, but an average basis, our customers were, you know, 1 to $3,000,000 maybe with an average of around a couple million.
Q. Did you hold the same position the entire time you were at Sterling?
A. Yes.
Q. And did you tell me you had left in October of '90?
A. Yes.
Q. Why did you leave?
A. I came back from vacation and we had, the institution had received a letter that suspended the borrowing limits, suspended our ability to attract new business, and in fact the initial interpretation was that even on existing credit lines that we couldn't readvance new funds as they were paid down. And if you understand Spokane, the Spokane market, it is

very competitive bankingwise, and if an institution is having financial problems it is not long before there is an intensive effort on the other banks calling on your customers, trying to get them to move those relationships to their bank.

Q. Who was this letter from?

A. I don't recall that. I don't know if this was a direct letter from the regulators or this was an internal document that referenced that.

Q. Did you see this letter?

A. Yes.

Q. And now you said that the initial interpretation was that you couldn't advance new funds as they were paid down?

A. On revolving credit lines, revolving meaning generally customers on a daily basis would pay it down and then maybe readvance or reborrow at some point in the future, maybe the next day or the next week.

Q. And did that interpretation change at some point?

A. You know, I don't recall. I think that was, I think that was relaxed a bit. But I know, I think what the, the biggest effect was not being able to do, to attract new business or originate new loans to existing customers.

Q. And do you recall, you said you had come back from vacation and this letter had come in, what time frame was that?
A. I am not, I can't be real definite, I think it was sometime in 1989, maybe mid year 1989, summer of '89, maybe, but I am not real definite on that, I'm a little hazy on that time frame.
Q. Would it have been after the FIRREA legislation?
A. Yes, I'm almost sure it was. At least I think it was. I really can't recall, I really shouldn't say that.
Q. Okay. Do you know what it was in response to?
A. It was, well, it was changes in the way that Sterling could treat their goodwill on their balance sheet, and the change in interpretation then I think left the institution out of compliance with certain capital guidelines. And because of that, then it, we became subject to more regulatory scrutiny.
Q. When did that occur in relation to when you left Sterling in October of '90?
A. I'm not, I think it was within a year, sometime within a year's time frame.
Q. And how did that affect your decision to leave Sterling, were you asked to leave?
A. No, I was, I was unsure what the viability of the

institution was going to be. I was concerned for my job. Primarily I left because my customers were starting to leave, and the value, my value in the community was my customers. And I felt it was in my best interests to change banks so I could hold onto as many of those customers as I could, and personally, you know, I had a house and two little kids at the time and wasn't sure what the viability, continued viability was going to be.

Q. Did you have any involvement with the acquisitions of Tri-Cities or Central Evergreen while you were at Sterling?

A. No.

Q. No involvement at all?

A. No.

Q. Did you have any involvement with assets that had been acquired from either of those institutions?

A. Only to the extent that they had some commercial borrowers with those institutions, primarily real estate, but they did have in some cases some commercial borrowers, most of those commercial borrowers were special credits or problem, problem borrowers that were being worked out through our special credits department so very little impact on the commercial loan department. There were some

about Latah Creek?
A. No.
Q. It sounded like you had a conversation with him?
A. Well, I, Jay Lewis was his name, we have got kids that go to the same high school and years later, we have done activities and things through the school. And you know, conversations come up a little bit. I mean it was well known knowledge that other financial institutions were benefiting from the troubles Sterling was having, not just in the commercial banking area, but you know, within all departments of the bank.
Q. When you say the other institutions were benefiting what do you mean?
A. I mean they, they were, they had the ability to attract some of Sterling's customers over to their institutions because of the troubles that Sterling was having.
Q. How do you know that that is why it was happening?
A. Well, on this list here, I know that they ended up at other institutions. I know they wouldn't have made that decision, or wouldn't have left, you know, the department that I was in, because I know they had allegiance to myself. And I guess how I quantify that is, once I left I was able to kind of solicit

and attract several of these over to the institution that is, well, at First Interstate.
Q. So are you assuming that that is why some of the other divisions lost people as well?
A. Yes.
Q. Did you have any involvement with other divisions of the bank? I mean personal did you work with them, did you have any oversight position?
A. No, no, we had common customers but no.
Q. Okay. Miller-Jordin Travel, what is that, is that a travel agency?
A. It is a travel agency.
Q. Do you recall who the principal was?
A. There were three ladies. I dealt with Celia Miller was the principal bank's, my contact with them.
Q. And was this your customer?
A. Yes.
Q. And what do you recall about their financial needs and Sterling?
A. They had a credit line for just general operating expenses. They had a couple of small equipment term loans. They knew the senior management people at Sterling very well. So their knowledge of the situation wasn't just from me but I believe also from some senior management at Sterling. As with the

ORIGINAL PETERSON/BEIL

Hosford

Sterling v USA

9-6-02

CORRECTION SHEET

| PAGE | LINE | CORRECTION |
|---|---|---|

I have read the foregoing 61 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this 20 of August, 2002 at Spokane.

Thomas M. Beil

THOMAS M. BEIL

Subscribed and sworn to before me this 20th day of August, 2002. My commission expires on 4-29-06

Sandra L. Godley

Notary Public

SANDRA L. GODLEY NOTARY PUBLIC STATE OF WASHINGTON COMMISSION EXPIRES 4-29-06

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of THOMAS M. BEIL on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,

Plaintiffs,

vs.

NO. 95-829C

UNITED STATES,

Defendant.

DEPOSITION OF DANIEL G. BYRNE

Deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 10, 2000, pursuant to the Federal Rules of Civil Procedure.

that the goodwill generated by the acquisition could then be used in the Central Evergreen acquisition?

A. I don't know that I remember seeing anything that specifically relates to the Tri-Cities agreement that links the Central Evergreen. I think it was the other way around, the Central Evergreen agreement linked the Tri-Cities capital.

Q. That one conversation between Mr. Hewitt and Mr. Gilkey, the king of Chehalis conversation, were there any other conversations you know of between Mr. Gilkey and Mr. Hewitt about this linkage that you testified about?

MR. SYMMES: Object to the form of the question. Go ahead.

A. Yeah, I believe there were. I don't know how many additional conversations, but I do know at one time it had appeared as if we had kind of gotten word from somebody within the regulatory ranks that Sterling was probably not going to be the selected bidder on Tri-Cities, that somebody else, some other institution had a better bid.

And there was a conversation between Mr. Hewitt and Mr. Gilkey that indicated--or Hewitt had indicated to Harold not to worry, that things have a way of working out.

I have read the foregoing 182 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ________________, 2000, at ________________________________.

______________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this _____ day of ______________, 2000. My commission expires on ______________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 31st day of July, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF DANIEL G. BYRNE

Continued deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 11, 2000, pursuant to the Washington Rules of Civil Procedure.

Tri-Cities acquisition.

We at one time approached them--well, first off they approached us, saying that the provisions of these contracts, primarily the Tri-Cities agreement, remained in force.

At a later point in time we approached the RTC about trying to resolve the contractual issues, and they referred us back to the OTS.

Q. And it is your understanding that OTS as an agency took the position that this agreement was violated by the enactment of FIRREA?

A. Yes.

Q. Okay. No more questions on that then.

Do you agree that changes to the regulations of the bank board or the FSLIC could increase or decrease the acquirer's obligation under the December 28, 1988 agreement?

A. We were concerned at the time that we negotiated and agreed to the acquisition of Central Evergreen that there may be some changes forthcoming in regulatory capital requirements.

As a consequence, not knowing what those changes may take the form of, we chose to establish the capital ratios in the business plan on the face of the balance sheet is where they are documented.

Q. Why is D in here, 5-D?
A. I'm sorry, 5-D? It was something that the FSLIC wanted in. We had heartburn with it, but we thought we protected ourselves by adding the language that we were discussing on paragraph 3-A and B, and we also added the last paragraph, paragraph section 2, with respect to changing our business plan.
Q. So you thought you protected yourself with 2 and with 3-A, is that what you're saying?
A. 3-A and 3-B.
Q. So you thought you protected yourself with 2 and 3-A and 3-B?
A. That's correct.
Q. Why didn't you just simply require that section 5-D be taken out of the agreement?
A. We made that recommendation one time, maybe several times.
Q. And what happened?
A. Ed Hedlund told me that the people he was talking with at FSLIC and the bank board did not want that to come out.
Q. Okay.
A. And that was the reason why we specifically added additional language in section 2 and 3-A and B.
Q. I'd like to mark this document as Byrne

I have read the foregoing 174 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ______________________________.

________________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ____________.

________________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 4th day of August, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF DANIEL G. BYRNE

Continued deposition upon oral examination of DANIEL G. BYRNE, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 12, 2000, pursuant to the Federal Rules of Civil Procedure.

A. Not specifically, but based on the date, October 24, 1991, it would have been about the time that we were raising capital and may have been a response or a comment from the reviewer of our offering circular.
Q. No more questions on this document. I'd like to mark a document as Byrne Exhibit No. 45.
(Ex. No. 45, Memorandum dated January 6, 1989, from Daniel G. Byrne to the file, marked.)
Q. (BY MS. HOSFORD) (Hands document.) It is a memorandum dated January 6, 1989, from Daniel G. Byrne to the file, and the ADIIS number is PSG 0290993. If you wouldn't mind taking a couple minutes or however long it takes to read memorandum, Mr. Byrne, and let me know when you are finished.
A. Okay.
Q. Do you recall--first of all, did you draft this memorandum?
A. Yes, I did.
Q. Do you recall why you drafted it?
A. I drafted it to document some of the discussions and negotiations that I had with Ed Hedlund regarding the agreement on Central Evergreen.
Q. Does this document accurately reflect, well, first of all, the subject is Central Evergreen acquisition

agreement with FSLIC. Can you tell me what that is a reference to?
A. It is the Central Evergreen agreement that we were discussing yesterday as exhibit--I lost track of exhibits here--Exhibit No. 37.
Q. The December 28, 1988 agreement?
A. That's correct.
Q. Does this memorandum accurately reflect your interpretation of that agreement?
A. It references several items that were negotiated, it is not intended to be a summary of the entire agreement, but merely some of the points that were negotiated.
Q. Does it accurately reflect your interpretation of the points that are discussed in the memo?
A. I believe it does.
Q. If you wouldn't mind looking at paragraph 3, it states, "Sterling was concerned that actions or events outside of its control might prevent Sterling from selling stock. Sterling raised the concern about the current FSLIC crisis about the current FSLIC crisis and reports by the GAO suggesting that FSLIC extract a one percent of all FSLIC institutions net worth to help bail out FSLIC."
A. Yes.

Q. In the second sentence of that what I have just read, are you talking about FSLIC potentially requiring thrifts to pay one percent of its net worth as some sort of fee or payment to the government?

A. That was the concern that we had at the time that there might be a one time assessment equal to one percent of our net worth.

Q. Were you concerned that that might prevent Sterling from selling stock?

A. We were concerned it might have an adverse effect on Sterling's ability to raise stock because the assessment would be reflected as an expense and may not look good as you are trying to sell stock to investors.

Q. Okay. No more questions on this document.

If you wouldn't mind turning to the document that is the 1989 report to shareholders which we went over yesterday, unfortunately I don't know the exhibit number--

A. Exhibit No. 39.

Q. Okay. Would you please turn to page 13 of that document?

A. The page titled management's discussion end analysis of financial condition and result of operations?

Q. Yes. I notice that your picture is below that

I have read the foregoing 138 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ____________________________.

______________________________
DANIEL G. BYRNE

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ___________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of DANIEL G. BYRNE on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 9th day of August, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

To: WDS
July, 10-13, 00 sent Byrne

# Changes And Signature Associated with Deposition of Daniel Byrne, Spokane, WA July 10-13, 2000

| Pg/Ln | Change |
|---|---|
| 96/9 | Add, after "part of this memo.": "Sterling wanted assurance that it was receiving permanent capital and Sterling was told by Ed Hedlund which forbearances to choose to secure that assurance." |
| 101/16 | "include capital" should be "include permanent capital". |
| 106/10 | "accepted accounting principles." should be "accepted accounting principles and had the effect of making the capital permanent." |
| 114/9 | "capital credit." should be "capital credit and also in the forbearance letters." |
| 115/25 | "You take the amount of intangible assets" should be "You take the amount of GAAP intangible assets." |
| 116/14 | "Yes" should be "Yes, 1/40th of GAAP goodwill." |
| 123/18 | "same and constant forever." should be "same and constant forever and also pursuant to SM-2." |
| 173/11 | "Lettie Clark" should be "Leo Clark". |
| 196/21 | "They did not." should be "They did not say anything to me other than that the cash assistance was permanent." |
| 197/3 | "raise the topic." should be "raise the topic with me. I was told the cash assistance was to be permanent capital." |
| 394/7 | "better looking at 1990." should be "better looking at 1990 or 1991." |
| 395/9 | "servicing or lease basis" should be "servicing released basis". |
| 397/6 | "first quarter September" should be "first quarter ended September". |
| 426/19-20 | "Steven Page" should be "Norm Judd:. |
| 461/14 | "Steven Page" should be "Norm Judd". |
| 464/3 | "No, I don't believe it was binding." should be "No, I believe it was binding." |

| | |
|---|---|
| 465/7 | "Dr. Judge" should be "Judge". |
| 528/5 | "knowledge" should be "acknowledge". |
| 568/24-25 | "representing the OTS, did not believe these restrictions or believed" should be "representing the OTS believed". |
| 607/13 | "on." should be "to." |
| 630/5 | "6 million dollars" should be "26 million dollars". |
| 676/9 | "2.6 million dollars" should be "2.6 billion dollars". |
| 681/19-20 | "excess liabilities over excess assets." should be "excess liabilities over assets." |

I, DANIEL G. BYRNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Daniel G. Byrne
DANIEL G. BYRNE

(State of Washington)
) ss.
County of Spokane )

Before me, Rheta R. Vanderholm, on this day personally appeared DANIEL G. BYRNE, known to me (or proved to me under oath or through ____________ ______________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 28th day of January, 2001.

\\Wk\doc\B\bkg\bbg\Sterling v. US\Byrne July 2000 depo corrections.012502.wpd

RHETA R. VANDERHOLM NOTARY PUBLIC STATE OF WASHINGTON Commission Expires JUNE 1, 2005

Rheta R. Vanderholm
NOTARY PUBLIC in and for the State of Washington,
residing at: Mead
My commission expires: June 1 2005

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF GARY D. CRITHFIELD

Deposition upon oral examination of GARY D. CRITHFIELD, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566Q0, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on July 9, 2002, pursuant to the Federal Rules of Civil Procedure.

familiar.
Q. So you did not say that?
A. I didn't say that, no, specifically.
Q. Going through the list, did you, when you were identifying them, were you identifying them as customers lost as a direct result of the restrictions imposed by the Office of Thrift Supervision?
A. Can I get the time frame that you are talking about? During the time frame of August of '89 through June when I was asked to leave of 1990 it wouldn't have made any difference which list you would have given me, I couldn't have made a commercial real estate loan to them, so during that time frame anyone, whether they were on this list or they intended to come into Sterling, I couldn't have made them a loan.
Q. Right.
A. So when you are saying, when you are asking me what specifically did I say that I couldn't make loans to these people, I just want to get the time frame, because prior to that yes, I could, after that, no, I can't.
Q. Okay. Well, what I'd like you to do is just read the first paragraph of this document, which you have said you didn't write. Please read it for me?
A. I, Gary Crithfield--

Q. You don't have to read it aloud, you can read it to yourself.

MR. WILLIAMS SYMMES, JR: I thought you meant outloud, too.

MS. HOSFORD: No.

Q. Have you read it?

A. Uh-huh.

Q. When you gave the list of customers to Mr. Byrne did you tell him that these customers were lost as a direct result of the restrictions imposed by the Office of Thrift Supervision on Sterling Savings' lending and deposit gathering during the period of approximately November 1, 1989 to June 30th, 1982?

A. They would have been lost had they come in and asked for a loan, some of these people did come in face-to-face. I couldn't have made a loan, yes, they would have been lost.

Q. But do you know for a fact that each one of those customers was lost because of the restrictions imposed by the Office of Thrift Supervision?

A. You mean, some of these customers have maybe an appetite for one loan for every two, three, or four, five years, some of them have an appetite for a loan every 3, 4 months, the Bill Lawson the little item three, Bill Lawson, Dick Vandervert, Bob Spears who

is a realtor and Ted Gunning have a need for money all the time. So some of these people maybe I made one loan to or two loans, but if they had come in during that time frame I couldn't have made them any additional loans so they would have been lost.

Q. Okay. How many of these people came in during that time frame?

A. Well--.

Q. When we say time frame we are talking about--

A. Everybody on the list that is on item 3.

Q. Everybody on the Exhibit 3 came in during that time frame, okay?

A. I mean I literally had a conversation with each one of these people during that time frame.

Q. So let me, I would like to do two things I want to go through that list and find out the circumstances. I would also like you to relate it back to the other list. Let's first go, I'm just going to say Exhibit 3, Exhibit 2 over and over again just for the clarity of the record.

On Exhibit 3, Bill Lawson, are you saying he came in for a loan between August of '89 and June of '90?

A. Bill Lawson had a loan at Frontier Savings and Loan, it was under construction, it was a project in the

A. Yes.
Q. What about any others?
A. Bill Lawson, put him down, I had a deal on an apartment loan in the valley for him, didn't materialize.
Q. Anyone else?
A. No.
Q. When you say broker?
A. Oh, yes, Plese.
Q. Lewis L. Plese, Jr.?
A. Yes. Brokered a deal to Washington State retirement.
Q. When you say brokered a deal, you mean you don't make the loan, you just get a commission for bringing a loan in to someone?
A. I put, I bring a borrower to a lender, or vice versa with terms that they like.
Q. You made reference several times to the fact that from August of 1989 through your departure from Sterling in June of 1990 that your department, the commercial real estate department, was unable to make loans.
Do you recall why you were unable to make loans?
A. Well, I couldn't get any of them approved through management, through the loan committee.
Q. And why was that?

A. I was told that under restrictions we were operating that they wanted to restrict, we were told to restrict and reduce the size of the commercial loan department, I mean the commercial, not department, but the commercial loans that were on the books, in other words.
Q. The portfolio?
A. Portfolio, yes.
Q. And were you told what specific restrictions had resulted in this situation?
A. No.
Q. Do you have any recollection about Sterling going to court in 1990 to try to obtain an injunction against OTS?
A. No.
Q. You have no recollection of that?
A. Oh, I have a recollection that they won, but I don't have a recollection of getting ready to go to court.
Q. Do you have any recollection of, I guess, let me make my question more precise.
Were you involved in any conversations about it while you were at Sterling?
A. No.
Q. Were you aware of it while you were at Sterling?
A. No.

CORRECTION SHEET

| PAGE | LINE | CORRECTION |
|---|---|---|

I have read the foregoing 50 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________of _______________, 2002, at ____________________________.

______________________________
GARY D. CRITHFIELD

Subscribed and sworn to before me this ____day of ____________, 2002. My commission expires on ____________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of GARY D. CRITHFIELD on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 6th day of August, 2002.

CSR No. STORED*566Q0

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) NOS. 95-660C,
) 95-7311C,
THE UNITED STATES OF AMERICA, ) 95-7917C,
) 95-8031C
Defendant. )

DEPOSITION OF JAMES R. FAULSTICH
(VIDEOTAPED)
VOLUME II

August 2, 2000
Seattle, Washington

CERTIFIED COPY

thrift.
Q. Okay. Can you tell me specifically why you would classify them as a troubled thrift?
A. Because they had no tangible capital, none as I recall from this minute, and they had a very -- they didn't have outlook for being able to recover -- to regain capital.
Q. Okay. If you look at this memorandum, it says that -- indicates approximately 40 individuals and institutions were contacted since mid-'87 and two other parties other than Sterling expressed interest but both those parties wanted financial or FSLIC assistance up in the $8 to $10 million range. Do you see that?
A. I see that.
Q. Would that be indicative of the fact or does that indicate -- does the request of FSLIC assistance of $8 to $10 million, is that indicative of the severe nature of Central Evergreen's financial position at that time?
A. I would take it that that would be a good indicator of the financial difficulties of Central Evergreen.
Q. The document also says, "Numerous forbearances were also requested." No recollection or any

indication -- no recollection as to what those
forbearances would have been?
A. None.
Q. And no indication of this memorandum, from your
review of it, as to what those forbearances might
have been?
A. No.
Q. Okay. And it appears then, in all fairness, that
at least in this paragraph, according to your
signature, you came to the conclusion that absent
a proposed acquisition by Sterling, FSLIC
assistance would likely be required. Do you see
that?
A. I see that, yes.
Q. There is no reason to dispute that?
A. Would be consistent with the memorandum.
Q. Okay. The next section is "Acquiring
Institution." Of course this is about Sterling.
A few questions with regard to Sterling Savings.
In the second paragraph it starts off, "Much
of Sterling's growth and current level of goodwill
is attributed to its acquisition of other
FSLIC-insured institutions and branch offices."
Would that, in part, refer to the prior
transactions?

that they will agree to meet.

Q. But you have no specific recollection of --

A. No.

Q. Okay.

A. It seems like a good idea.

Q. Let me ask if you know this. In those conversations about business plans and the fact they were submitted at different times -- actually, forget it.

A. Okay.

MR. SIMMS: Two minutes just to talk with him. I think I am done.

MS. MATTHEWS: We are now going off the record. The time is 5:50.

(Recess.)

MS. MATTHEWS: We are now back on the record. The time is 5:53. This concludes the deposition for today. We are now going off the record at 5:53.

(Signature waived.)

(Deposition adjourned at 5:53 p.m.)

STATE OF WASHINGTON ) I, KAREN A. ANDERSON,
) ss CCR, RPR,
) #AN-DE-RK-A399J1,
County of King ) a duly authorized Notary Public in and for the State of Washington residing at Renton, do hereby certify:

That the foregoing deposition of JAMES R. FAULSTICH was taken before me and completed on August 2, 2000, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness waived the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney .

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this day of , 2000.

Karen Anderson

Karen A. Anderson, CCR, RPR
Notary Public in and for the State of Washington, residing at Renton.

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION,
a state chartered savings
association, STERLING FINANCIAL
CORPORATION, a Washington
corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

DEPOSITION OF HAROLD GILKEY

Deposition upon oral examination of HAROLD GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 6, 2000, pursuant to the Federal Rules of Civil Procedure.

recognize this document, Mr. Gilkey, and if you do, what is it?

A. No, I don't, but it would be--I don't recall ever seeing this document, but it is the bid package that would normally be sent out for the institutions, as I previously described to you.

Q. So this is the bid packet? This is an example of the bid package that you had described earlier?

A. My brief look at it says it is.

Q. Okay. Do you recall whether during the course of the Lewis Federal acquisition that you would have reviewed this document?

A. I recall I would not have.

Q. You would not have. Okay. Do you know who would have?

A. Our lawyers and Dan Byrne, and for sure.

Q. Who was the lawyer representing you in connection with Lewis Federal?

A. The Witherspoon firm.

Q. Was there an individual?

A. I don't recall who the--I would guess offhand it was Doug Siddoway, but I am not positive.

Q. Were your lawyers involved in putting together the bid proposal?

A. Of course.

Federal Home Loan Bank and suggested strongly never to trust a regulator, but through that, I mean, it was kind of a whiny discussion, "Woe is me," and, "I don't know how I can get out of this."

I then reported back to Hilton that I didn't--I believe it was Hilton Hewitt--that I didn't think that there was a way that we could be part of any saviour of Central Evergreen without substantial injection of capital.

Q. When did these discussions take place?

A. As I said, suggested the summer and fall of '87. In late fall there was a discussion with Hilton and myself that several institutions were coming up for bid. As I recall right now, that would be Lynnwood Savings in Lynnwood, Washington, and I don't--I think it was First Federal of Longview in Longview, Washington, but I could be wrong in that, and Tri-Cities Savings.

And he suggested to me that we should bid on Tri-Cities and then we would have enough capital to do the Central Evergreen transaction. And I said, well, we tried that once before a couple of years ago, and it didn't work with Guaranty, and so we bantered back and forth a little bit.

And in the process I said, and besides that

the bid is a competitive bid, and I wouldn't want to waste my time looking at Central Evergreen. And he said to me that he could make arrangements for us to be the selected bidder of Tri-Cities Savings, assuming I made a competitive bid.

Q. Why did you not have enough capital to do the Central Evergreen transaction?

A. Would have put us out of compliance with regulatory net worth. That Central Evergreen was about, I'm guessing off the top of my head, about $250 million in size and had a negative net worth and substantial loan problems.

Q. How would Tri-Cities give you enough capital?

A. Well, it was a similar transaction to the Lewis Federal. And that given the bid package, we would bid and the capital contribution would be credited to net worth and the discount on the loans would be credited to supervisory goodwill. And that by itself would have given us substantial capital.

I don't remember the numbers right offhand. I could look through. I'm guessing that we ended up with something like--well, I won't guess, but substantial net worth, which far exceeded the net worth requirement of carrying a $50 million institution.

And that combining those two would be a $300

million institution and the supervisory goodwill that came up with Central Evergreen, the supervisory goodwill that came up with Tri-Cities and the permanent regulatory capital that came up with Tri-Cities would have given us substantial capital to manage both the locations.

Q. Did he specifically tell you those three things?

A. I would--in summary I would say yes to that. I don't know that specifically he said that, but that was the essence of our conversation, yes.

Q. To the best of your recollection, what did he say to you, specifically?

A. He said that I would have capital enough to acquire Central Evergreen.

Q. Did he mention goodwill from Central Evergreen?

MR. SYMMES: From? Did you misspeak or not?

MS. HOSFORD: I did not.

Q. (BY MS. HOSFORD) Did he mention--

A. He did mention that the goodwill of Central Evergreen would be part and parcel of that transaction, along with the goodwill that came from Tri-Cities, as well as the supervisory--the words aren't specific to me, but the general nature of our conversation led me to those discussions.

What he was saying is that it was

significant, there was enough capital in the Tri-Cities transaction and the Central Evergreen transaction to consolidate the two.

Q. And he also said that he could make arrangements for Sterling to be the selected bidder?

A. Yes.

Q. Did you think there was anything unusual about that?

A. I felt kind of strange, but they were at--I felt that the Federal Home Loan Bank was doing everything that they could to eliminate problem assets at the time, so it was--I just assumed that if they said they could do it, they could do it.

Q. Was it your understanding that you--that Sterling would be selected even if it wasn't the low bidder?

A. Yes, as long as I was competitive. Those were his exact words.

Q. What was the attraction of Central Evergreen?

MR. SYMMES: Object to the form of that question, lacks foundation, assumes facts not established, but you may go ahead.

A. Well, again, it goes back to the fact that I am a cleanup person, that I find my ability to take on somebody else's dirty linen and fix it.

When I looked at the problem loans, I felt

institutions.

We did a marginal review of Lynnwood because it was not--while we were put on the bid list, we weren't going to bid, or if we did, it wouldn't be meaningful. They didn't have anything to provide to us.

Longview, First Federal of Longview made sense as long as it was in connection with Central Evergreen, because there were substantial cost savings in branch units and in the long-term substantial savings of operating expenses in supervision.

And we went back and redid our due diligence on Tri-Cities, and we had a set of due diligence here and a new set of due diligence and compared those. And then we made--I don't recall right offhand whether we made a bid on Lynnwood or not, but if we did, it was so far out that we wouldn't have got it.

We made a bid on First Federal of Longview, contingent on us also acquiring Central Evergreen. Hilton called me and said, what are you doing? And said that that bid was nonresponsive and we wouldn't play that game there.

So then I got a letter from someone--I don't recall who--that said that our bid was nonresponsive. Then it became known in the community that, the thrift

community at large--and it was reported to me by someone else that we were not the selected low bidder on Tri-Cities. So I figure that the deal was off, that maybe our bid wasn't competitive and therefore there was no transaction to proceed with.

Within a day or two of that Hilton called me and said, don't worry, I'll take care of my end. And I did think that was real strange, but in a short period of time, two or three, maybe a day, up to a week later, we were informed that we were the selected bidder on Tri-Cities Savings, that the first bidder had chosen to withdraw.

I then said to him, now we can proceed on Central Evergreen. So in the--we sent in, I guess, an application on Central Evergreen within a short period of time after that. And Hilton called me and said, what are you trying to do? And this is not the time to send that in. We got to make sure we get Tri-Cities done first before we make additional applications.

So we wrote a letter and asked to withdraw the application for Central Evergreen. We then proceeded to document the Tri-Cities transaction and bring it to conclusion, and I would guess that was in April of '88, but it was about that time.

And then following that, we then resubmitted

our application for Central Evergreen. Somewhere in there Hilton, after--somewhere in that period of time Hilton was transferred to Utah, and Ed Hedlund stepped in to go through the remaining transaction of Central Evergreen.

MR. SYMMES: Let's go off the record.

(Discussion off the record.)

Q. (BY MS. HOSFORD) Back on the record. I was reminded during the break that I had not properly identified Exhibit No. 17. It is a counter proposal to Sterling Savings Association from Tri-Cities Savings and Loan Association. PSG 0480408 is the number.

Okay. Mr. Gilkey, before break you gave us a rather long explanation of the circumstances or a partial explanation of the circumstances surrounding the bid for Tri-Cities and the application for Central Evergreen.

And I'm just trying to figure out where you are coming from on this. Was it Sterling's position at the time that it would not acquire Tri-Cities unless it could also acquire Central Evergreen?

A. I'll try to shorten the explanation again. Hilton came to me, asked me whether I would be interested in Central Evergreen. I said no. He then provided an opportunity for me to bid and told me that we would be

the successful bidder if we were competitive.
Q. On what?
A. On Tri-Cities. And therefore, there would be a quid pro quo for us then to acquire Central Evergreen and a handshake agreement, or he agreed to provide that to me. I agreed to buy Central Evergreen at the time.
It was a takeoff on our discussions a number of years ago with Don Mochel with Guaranty and Lewis Federal. It was a similar kind of transaction.
Q. Are you saying that you had an agreement with Mr. Hewitt that if you were selected as the bidder on Tri-Cities, you would also acquire Central Evergreen?
A. Yes, and as a piece of that agreement. That the acquisition of Tri-Cities would provide me the capital to do both transactions.
Q. Was that ever documented anywhere, that agreement that you had with Mr. Hewitt?
A. No.
Q. Did you ever ask Mr. Hewitt whether he had the authority to make such an agreement with you?
A. No.
Q. Was it Mr. Hewitt who ultimately signed off on the acquisitions?
A. I would have to look at the document, but I think that he was transferred to Utah before the Central

Evergreen transaction was completed.

Q. Was he involved in the Central Evergreen transaction then?

A. In the initial stages, yes.

Q. Which initial stages?

A. Well, that I have already described, number one.

Number two is that during that early stage where we had been the selected bidder, and we submitted our proposal and then withdrew it--sorry, our application and then withdrew it, and then for a period of time he was involved in the negotiations of the business plan of the Central Evergreen agreement.

Q. After Mr. Hewitt's departure, did you ever discuss with any other government representatives that you had this agreement with Mr. Hewitt?

A. No.

Q. Was it your understanding that they knew about it?

A. My understanding is that they were proceeding ahead to negotiate on the Central Evergreen transaction based on the documents that we dealt with Hilton in the early stages so I would have assumed that they would have known about it.

Q. But my question is, did anybody from the government tell you that they were proceeding with the Central Evergreen acquisition on the terms that you say you

agreed to verbally with Mr. Hewitt?
A. No.
Q. And Mr. Hewitt was not there when the Central Evergreen transaction was--
A. Finalized.
Q. --finalized, is that right?
A. That's right.
Q. You just assumed that they would move forward under the terms that you discussed with Mr. Hewitt?
MR. SYMMES: Object to the form of that question. You may answer.
A. He made the--as far as I was concerned, he made a commitment to provide Tri-Cities to us on an assisted bid basis. And then I had the obligation to acquire Central Evergreen as part of my activity.
Q. (BY MS. HOSFORD) What would have happened if you hadn't acquired Central Evergreen?
A. As far as I was concerned, that was your problem, not mine.
Q. So then you were not contractually obligated in any way to acquire Central Evergreen after the Tri-Cities acquisition was complete, were you?
A. No, but I'm a man of my word, Elizabeth, and if I tell you I'm going to do something, I'll do it.
Q. But there was no written agreement to do so? This

I have read the foregoing 198 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ______________, 2000, at ______________________________.

______________________________
HAROLD GILKEY

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ___________.

______________________________
Notary Public

STATE OF WASHINGTON )
) ss: Reporter's Certificate
COUNTY OF SPOKANE )

I, David Storey, a Certified Shorthand Reporter and Notary Public in and for the State of Washington,

DO HEREBY CERTIFY:

That the foregoing is a true and correct transcription of my shorthand notes as taken upon the deposition of HAROLD GILKEY on the date and at the time and place as shown on page one hereto,

That the witness was sworn upon his oath to tell the truth, the whole truth and nothing but the truth, and did thereafter make answers as appear herein,

That I am not related to any of the parties to this litigation and have no interest in the outcome of said litigation,

Witness my hand and seal this 23rd day of June, 2000.

CSR No. STORED*566QO

Certified Shorthand Reporter and Notary Public in and for the State of Washington, residing in Spokane

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,
Plaintiffs,

vs. NO. 95-829C

UNITED STATES,
Defendant.

CONTINUED DEPOSITION OF HAROLD B. GILKEY

Deposition upon oral examination of HAROLD B. GILKEY, taken at the request of the Defendant, before David Storey, a Notary Public, CSR No. STORED*566QO, at the offices of the United States Attorney, 920 W. Riverside, Suite 300, Spokane, Washington, commencing at or about 9:00 a.m., on June 7, 2000, pursuant to the Washington Rules of Civil Procedure.

circumstances surrounding Old Stone's removal or departure from the bidder's list for Tri-Cities?
A. If I could go back, I think my statement at the time was--or yesterday was that I got--I became aware probably from Bill Zuppe or probably just in general that we were not the selected bidder. And that came, I believe, because someone from the Federal Home Loan Bank called and told us that there was--that we were not the selected bidder.

That came as somewhat of a surprise to me, and, but I didn't do anything. I just said, well. And then I got a phone call from Hilton Hewitt. And he told me not to worry, that hold on for a couple of days, and it would all work out. And so I just said okay, and waited.

The next thing I knew was that we were the selected bidder. I was unaware at the time or until this last week or last couple of weeks that Old Stone was the low bidder or was a bidder.
Q. So you didn't even know that Old Stone was a bidder--
A. That's right.
Q. --until the last couple of weeks?
A. Yeah. I knew there were three institutions that bid, and that we were not the low institution, but I

I have read the foregoing 180 pages of my testimony and believe the same to be true, except for the corrections noted above.

Dated this ________ of ________________, 2000, at ____________________________.

______________________________
HAROLD B. GILKEY

Subscribed and sworn to before me this ____ day of ____________, 2000. My commission expires on ____________.

______________________________
Notary Public





APR. 100