IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**MOTION FOR LEAVE TO PRESENT TESTIMONY BY DEPOSITION AND DECLARATION IN SUPPORT THEREOF**

## I. MOTION

Plaintiff, Sterling Savings Association ("Sterling") respectfully moves for leave to present the testimony of A. Adgate Duer by deposition at trial. As discussed in the Declaration subjoined hereto, Mr. Duer can no longer appear at trial due to unforeseen and significant personal and financial reasons.

RCFC 32 provides:

> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> * * *
>
> (C) **that the witness is unable to attend or testify** because of age, illness, infirmity, or imprisonment; or
>
> * * *
>
> (E) **upon application and notice, that the witness is at a greater distance than 100 miles from the place of trial** or hearing, unless the court also finds...that it is not in the interest of justice, with due regard to the importance of

1

> presenting the testimony of witnesses orally in open court, to allow the deposition to be used; or
>
> (F) **upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court**, to allow the deposition to be used.

RCFC 32 (emphasis added).

Here, Mr. Duer is unable to attend and resides over 100 miles from the place of trial. Sterling submits that the interests of justice require allowing Sterling to present the limited deposition testimony representing what would have been elicited from Mr. Duer at trial. The portions of the deposition are attached hereto as Exhibit A.

Sterling therefore respectfully requests entry of an Order allowing the pages of Mr. Duer's deposition attached hereto to be considered as testimony at trial.

DATED this 24th day of June, 2007.

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member of the Bar of the U.S.
Court of Federal Claims

422 West Riverside Avenue, #1100
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

## II. DECLARATION

I, William M. Symmes, do hereby declare and say:

1. I am over the age of 18 and am competent to testify to the matters asserted herein. I am one of the attorneys representing Sterling in this matter.

2. In preparation for trial, I spoke on several occasions to A. Adgate Duer, who had earlier indicated he was able to testify at trial on behalf of Sterling.

3. Mr. Duer is currently living in Seattle, Washington, more than 100 miles from Spokane.

4. Until June 21, 2007, I believed Mr. Duer would appear at trial. He had indicated as such during our prior conversations.

5. Mr. Duer has since communicated to this firm, however, that he has experienced significant financial issues that have and are significantly affecting his personal life and financial well-being, making appearing at trial impracticable. Mr. Duer was adamant that having to appear at trial, via subpoena or otherwise, would further exacerbate these issues.

6. I have made every attempt under these unique and unfortunate circumstances to procure his presence for trial.

7. Sterling will be prejudiced if Mr. Duer's testimony is not permitted to occur by deposition; conversely, the Government faces no prejudice because it had full opportunity to question him at the deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2007

William M. Symmes

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on June ~~15~~ 24, 2007, a copy of the foregoing **MOTION FOR LEAVE TO PRESENT TESTIMONY BY DEPOSITION AND DECLARATION IN SUPPORT THEREOF** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

```
STERLING SAVINGS          )
ASSOCIATION, a            )
state-chartered           )
savings association;      )
STERLING FINANCIAL        )
CORPORATION, a            )
Washington                )
corporation,              )
        Plaintiffs,       )
    v.                    ) No. 95-829C
UNITED STATES OF          )
AMERICA,                  )
        Defendant.        )
```

---

Deposition Upon Oral Examination Of

A. Adgate Duer

COPY

---

Monday, July 24, 2000, 9:10 AM

UNITED STATES ATTORNEY, WESTERN DIVISION

601 Union, Suite 5100

Seattle, WA 98101

REPORTED BY: Cheryl A. Lord, CCR, RPR, CRR

APPEARANCES:

For Plaintiffs:

William D. Symmes
WITHERSPOON & KELLEY
422 W. Riverside, Suite 1100
Spokane, WA 99201

For Defendant:

Elizabeth M. Hosford
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, N.W.
Washington, D.C. 20530

Also Present: Daniel Byrne

Monday, July 24, 2000, 9:10 AM
Seattle, Washington

----------------------------

A. Adgate Duer:

Witness herein, having been duly sworn by the notary, testified as follows:

MS. HOSFORD: On the record.
Thank you for coming here today, Mr. Duer.
Before we start, I'd just like to have all attorneys introduce themselves. My name is Elizabeth Hosford. I'm with the United States Department of Justice, and I'm here representing the United States in this case, Sterling Savings versus United States, which is in the Court of Federal Claims, and it's 95, dash, 829 C.
Mr. Symmes?
MR. SYMMES: William Symmes, for Sterling Savings.
MS. HOSFORD: And Mr. Byrne, would you

introduce yourself too, please.

MR. BYRNE: Mr. Daniel Gordon Byrne, representing Sterling Savings Bank.

MS. HOSFORD: Mr. Byrne, you are not an attorney; is that correct?

MR. BYRNE: That's correct.

EXAMINATION

BY MS. HOSFORD:

Q. Mr. Duer, are you represented by counsel today?

A. I'm not.

Q. Have you ever been -- first, can I have your name for the record, please?

A. Andrew Adgate Duer.

Q. And your business address, please?

A. 700 5th Avenue, 48th floor, Seattle, Washington.

Q. Okay. Have you ever been deposed?

A. I have.

Q. Can you tell me, how many cases have you been deposed in?

A. Two.

Q. Can you tell me generally the nature of those cases, please.

Q. Commercial banks?
A. No.
Q. When did you leave Interstate -- First Interstate?
A. First Interstate, 1986.
Q. And what was your next position?
A. Dain Bosworth Incorporated.
Q. Okay. And what was your position when you joined Dain Bosworth?
A. Associate of corporate finance department.
Q. What were your duties?
A. Business development and financings.
Q. And what types of financings?
A. Included the -- well, first one was the sale of a nearly bankrupt thrift.
Q. Which one?
A. Shoreline Savings Bank.
Q. Is that a Washington thrift?
A. It was.
Q. You say it was a sale?
A. It was.
Q. And was it sold?
A. To Washington Mutual, yes, it was.
Q. And what was your role in that sale?
A. Pretty much due diligence, as well as most of

the conversations relating to likely acquirors for the thrift.

Q. And how long did your position as an associate last?

A. About 12 months.

Q. Other than the nearly bankrupt thrift, did you work on any other financings?

A. I did, specialty retailer public offering, high-technology turnaround manufacturer. We were looking at my entire career at Dain Bosworth, which was three and a half years, four years, a number of S and L conversions, some biomedical work, real estate, financings, pretty much across the board with a concentration of financial institutions.

Q. You indicated that your first year, you were an associate.

What were you after that?

A. An associate vice president, and then vice president, ultimately.

Q. In all of those positions, did your responsibilities -- in those positions, did you do the same sort of work only at a different level?

A. I think that titles were basically -- changes

were basically catching up with the same level of work that I was doing. The head of corporate finance, for instance, after my first year and the first title change, said to me on the phone, the only way that we got you as an associate is because you wanted to get out of commercial banking.

So for four years running, I was the leading fee income producer for the group, although others had higher titles.

Q. Okay. So I guess my question is, throughout the four years there, was the type of work you did pretty consistent?

A. It was. Business development and financings, and pretty much in a lead role.

Q. Okay. And you mentioned that you did financings in a variety of industries, but you considered banking to be your specialty; is that correct?

A. Well, I wouldn't -- it was an area that I spent more time than other areas, yes.

Q. Do you recall how many financings you did in the financial institutions industry?

A. At a minimum, four.

Q. Are you saying there may have been more --

management, and the attendant expenses.

Q. And when you make reference to a unit offering, are you talking about preferred stock?

A. My recollection is a share of common and a share of preferred with dividend paying back in 1989 with the unit offering.

Q. Maybe --

A. Unit offerings can be structured a number of different ways.

Q. What is a unit offering?

A. A unit offering is where you have two different types of equities linked as a unit, and you sell the units together. They can either be strippable or nonstrippable, meaning that you can either divide the separate units and develop two different markets, or the units just trade in a single market, but you're establishing markets for both common -- as an example, you can establish markets for both common shares and preferred shares, or separately, you could just establish a single market for a unit.

Q. So that would be a market that would be interested in having both?

A. Key Bank National Association investment banking group.
Q. How long have you been there?
A. Since August last year.
Q. Prior to that, were you on your own?
A. Yes -- well, yes, in a number of short assignments, including some turnaround work and some employee positions on capital raising, high tech and low tech both.
Q. So you basically had your own consulting firm, company?
A. Pretty much.
Q. And now that you're with Key, are you attempting to get back into the financial institutions industry, or not?
A. No.
Q. When did you have your first contact with Sterling Savings Association back in the '89 time period?
A. I don't really recall. I know one of my colleagues, who was from Spokane, met with them.
Q. Who?
A. Tom Simpson. He was an associate at the time. Runs a venture group in Spokane. But

a local Spokane gentleman had encouraged us to meet with Harold Gilkey and Dan Byrne, but I can't recall -- late spring, early summer.
Q. Is 1989 the year?
A. I'm pretty sure it is, yeah.
Q. So a colleague of yours had encouraged you to meet with them and --
A. Right. He was really not following financial institutions work, but he was from Spokane, did a bit of work over in the Spokane area, and had met briefly, calling it a marketing effort basis.
Q. Did you then meet with them?
A. I did.
Q. I mean, when you met with them, did you have anything in mind?
A. No.
Q. It was just a general business development-type meeting?
A. (Nodding head.)
Q. At the time, did you have any knowledge of Sterling's operations?
A. No --
Q. Did you have any knowledge of --
A. -- not really.

bankers at the time?
A. They were talking to others, yes.
Q. And do you recall whether anyone from Sterling ever told you why they ultimately -- well, did they ultimately choose to go with Dain Bosworth?
A. We had -- I don't recall them saying anything. We had clearly the best research analyst on the street, and he and I had double-teamed on some pretty interesting stuff in the marketplace, one in investment banking and one in research.
We were a good team. We were selected because of our winning personalities, I think.
Q. Who was the research analyst?
A. Jay Tahara.
Q. When you say, the best research analyst on the street, are you talking about Wall Street?
A. I'm talking about Wall Street and the Pacific Northwest clearly, yeah.
Q. Okay. And what stuff in the marketplace have you double-teamed on?
A. The conversions of -- well, practically every

they had conversations with regulators or had received correspondence that indicated that there may be an issue?

A. The honest answer is, I don't recall. I do not know. I know when it was very clear to me that the issue was, are we going to be able to pay dividends, and that was in December, because it was a very long red-eye flight to Washington, D.C., to get that answer. It was after the red herring was produced.

Q. When you say, red herring, can you explain what that means?

A. The red -- in securities registration, there's always a preliminary prospectus and a final. The red herring is the common term of art for the preliminary prospectus. It's the document on which you sell, the final prospectus being the one that is delivered to complete the sale, which is the exchange of stock certificates for cash.

Q. So is it your testimony that Dain Bosworth reached an independent conclusion that with respect to Central Evergreen, Sterling would be permitted to tout good will as capital

regardless of changes in law?

A. No. That's putting words into my mouth. I don't have -- you know, first off, we didn't come up with independent conclusions. We were represented by counsel as a firm. I won't state what Dain Bosworth overall felt.

It believed that we could proceed with regulatory acquiescence, if not direct approval, to the raising of the capital in the marketplace of the quantity that we defined might be achievable, and kept them up to speed on what would be achievable in a rapidly changing marketplace.

We looked at documents regarding acquisitions. Our counsel looked at documents. It was part of the due diligence process. But we weren't focused on that one tree in this overall forest of information relating to Sterling Savings and what was going on in the marketplace.

I can't make independent representations for myself or for Dain Bosworth. My deposition here is to say, we proceeded on a good-faith basis, both with our client, Sterling Savings, as well as an understanding

with regulators that we would be able to raise capital at a very difficult time without having the prospect of a regulatory postfinancing maneuver that would cause harm to the investors who had just come into the offering expecting dividends.

Q. So is it your testimony that Dain Bosworth did not reach an independent conclusion that with respect to Central Evergreen, Sterling would be permitted to count good will as capital regardless of changes in law?

MR. SYMMES: I'm not going to object, but let me just ask you --

MS. HOSFORD: No.

MR. SYMMES: I'll wait until he answers. Then I want to ask you a question.

A. As I recall, during due diligence, drafting the documents, one of the representations of Sterling's counsel was that the contractual agreements with regulatory authorities permitted good will.

Q. BY MS. HOSFORD: So Sterling's counsel made that representation?

A. And our counsel at Dain Bosworth believed, given conversations with regulators,

to an additional 78,750 units.
Is that the Green Shoe?
A. It is.
Q. Do you recall who would have determined the underwriting discount that was going to be applied or used?
A. Yeah. Dain Bosworth would have likely in this case as the lead underwriter.
Q. At what point did Dain Bosworth -- well, at any point, did Dain Bosworth market this proposed public offering to investors?
A. Oh, yes.
Q. When did you start?
A. At the date of this final.
Q. November 14th, 1989?
A. Yes.
Q. How would you know that?
Is it because you always date these?
A. Because as I've mentioned previously, an offering is sold based off of a red herring prospectus with expectation of final delivery of the final prospectus. This is what's registered. This is the initial registration.
Q. Could you sell shares on the basis of this

offering circular?
A. No. You sold shares on the basis of the final prospectus, which was delivered at the time that everything was delivered, certificates, cash.
Q. And did that ever happen in this case?
A. It did not.
Q. So --
A. But as with every public offering, you sell on the basis -- you presell on the basis of the red herring prospectus. All of the marketing is done on the basis of the preliminary prospectus, and when you have a deal that is closeable, you can complete the transaction.
Q. And had you presold in this case?
A. It was.
Q. How much had been presold?
A. It was fully subscribed.
Q. And once -- what exactly -- could you just explain to me what exactly the potential buyer had to do in order to sign up.
A. Sure. Investors in any transaction will deliver cash to an account with a stockbroker for the purpose of exchanging that cash for

their clients, some new, some old, that are committing to buy.
Q. When somebody signs up to buy, do they -- let me restate that question.
When the stock is being marketed, are prospectus investors given this red herring?
A. Yes. They must be given the red herring.
Q. Are they given anything else?
A. No, not according to the law. The registration document contains the entire story.
Q. So are you saying that the offering was fully subscribed on the basis that potential purchasers of the stock were given this red herring and then decided to buy?
A. Yeah. In fact, there's overage amount. There's always an overage amount, meaning that there were -- there was an excess of demand over supply for the units being offered. And that is of necessity, that you create an environment where there is an excess of demand over supply.
Q. And if you look at the first page in the middle paragraph, there's a section that's all caps and bolded. Take a look at that

section.
A. M-hm. Okay.
Q. Is it fair to say that the offering was oversubscribed with an understanding that dividends may not be paid based upon this section?
A. There is a risk in any offering, including the fact that stock can go down in value from the purchase price. There was an expectation that dividends would be paid, and people were willing to take that risk as long as it was disclosed. This is a disclosure item, a significant disclosure item, and only that.
Q. Why didn't Sterling, Dain Bosworth just go forward with the public offering, then, since buyers were buying with this disclosure?
A. Gets back to that earlier comment I made in the deposition. Dain Bosworth could not proceed because there was a significant disclosure that had not been made to investors, and that was the statement by the regulators in Washington, D.C., with whom I met with Harold Gilkey and Dan Byrne, that they were sorry, but there were no exceptions to the new rules being implemented, there was

huge jeopardy, huge risk, good will was not
going to be counted, and essentially,
Sterling was going to come under the gun.
Q. But this says, the association will not be in compliance with regulatory capital requirements.
A. Shouldn't be terribly confusing. This is a required risk factor disclosure, which would be prominently displayed. It's of the most significant, and the SEC would require it, if not any other institution.
Q. But based upon this disclosure, you were able to oversubscribe the offering?
A. There are always levels of risk to be assumed in any offering, and this was a discloseable item with that potential risk being relatively reduced because of statements that had been made up to the point where that final statement was made. It became pretty clear as that final statement was made that this was in fact insufficient disclosure, because not only weren't there going to be an allowance for dividends, but point-blank, I was told, representing this company, that this company wasn't going to be around, it

was going to be regulated very strongly.
Q. What do you mean by, regulated very strongly?
A. That they were not going to be able to continue to pursue their growth and development plan, that they weren't going to have good will count for regulatory capital, that they would be -- that there would probably be cease and desist orders, there would probably be a whole number of items that had not been disclosed, and that they would be thrown into the bucket of bad thrift institutions that had to have the problem resolved.
That was the essence of the communication, though not the exact words used.
Q. Did you ever attempt to go back to the potential investments and make a further disclosure?
A. That was a level of risk in which no investment bank would put any investors. It was not an issue of disclosure.
To suggest to you the timing of what was occurring in 1989, by the way, having met with the regulators in D.C. and finding the

questioning. I'm sorry. I don't understand.
Q. You know there was a market for thrift issuances in 1989, but it was only for certain thrifts?
A. There was a very difficult market for thrift issuances in 1989. And it became even more difficult as the year went on nationally. And I don't know how many were completed in the last half of the year as a for-instance.
I have no idea. I could go back and look at the record at that time, but I know that a lot of deals were being pulled.
Q. But wouldn't it be fair to say that if Sterling had -- was able to, as you say, subscribe to a stock offering, then other thrifts would have been able to also?
A. No, one can't say that. I mean, that's like saying, Microsoft writes software, and so a whole bunch of other people write software, therefore, they can raise capital just like Microsoft can. It's a non sequitur.
Q. Are you saying there were no other thrifts out there comparable to Sterling that could have raised capital at that time?
A. In the Northwest?

Q. Yes.
A. No.
Q. They were the only ones?
A. In that sort of regional setting with the purported commitments to deal with capital issues that had developed at the regulatory level, I cannot think -- that was a nonconversion, an already stock company that was trying to raise additional capital. I can't think of any that were in the billions arena that could have done that. But I don't have perfect recollection. It was a decade-plus ago.
Q. What about a billion and above?
Were there thrifts in the 1 billion and above market that could have raised capital in 1989?
A. I don't know. I don't even know if Washington Mutual could have.
Q. Why not?
A. I don't know.
Q. So it's possible they could have?
A. Where is this questioning going? I mean, anything is possible.
Q. Just answer my questions, please.

capital. In the last quarter of 1989, I don't think there were many in the Pacific Northwest.
Q. But there were possibly some?
A. The number would be equal to the number of thrifts that existed in the Northwest at the time. That's the number of possibilities.
Q. So would you not say that the market was closed to thrifts in 1989?
Let me rephrase that.
Would you say --
A. I'll answer that. The market was not closed to thrifts in 1989. I could have completed this deal with Dain Bosworth.
Q. So the market was open to thrifts in 1989?
A. It was open to this thrift, which I think is the question that we're on right now.
Q. And potentially could have been open to other thrifts?
A. Possible.
Q. Even in the last quarter of 1989?
A. Don't know. Wasn't involved with other thrifts at that point.
Q. It could have been possible even in the last quarter of 1989; is that correct?

A. Jay Tahara.
Q. Were there other companies or firms involved, accounting firms?
A. The company's accountants.
Q. Sterling's accountants?
A. Sterling's accountants, Sterling's attorneys, our attorneys, underwriters' attorneys, being Perkins Coie. Can't recall anybody else.
MS. HOSFORD: I have no more questions. We can go off the record, unless Mr. Symmes has some.
MR. SYMMES: I have nothing at this time. Thank you.
He should read this.
You have the opportunity, and it's your choice --
THE WITNESS: -- to read my own deposition?
Absolutely.
MR. SYMMES: Send the reading and signing copy August 28.
(Deposition adjourned at 3:00 PM.)
(Signature reserved.)

S I G N A T U R E

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the CHANGE SHEET flyleaf page hereof. Signed in......................., Washington, on the......day of................., 2000.

.........................

A. Adgate Duer

Taken: July 24, 2000

Cheryl A. Lord, CCR, RPR

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I, Cheryl A. Lord, Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, and officer of the Court under my commission as a Notary Public for the State of Washington, hereby certify that the foregoing deposition upon oral examination of A. Adgate Duer was taken before me on July 24, 2000, and transcribed by me with computer-aided transcription;

That the witness was duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of, any of the parties to the action or any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this date: August 3, 2000.

NOTARY PUBLIC in and for the State of Washington, residing at Seattle. Commission expires: 2-8-02.

Cheryl A. Lord

CCR No. LORDCA513C0