they had conversations with regulators or had received correspondence that indicated that there may be an issue?

A. The honest answer is, I don't recall. I do not know. I know when it was very clear to me that the issue was, are we going to be able to pay dividends, and that was in December, because it was a very long red-eye flight to Washington, D.C., to get that answer. It was after the red herring was produced.

Q. When you say, red herring, can you explain what that means?

A. The red -- in securities registration, there's always a preliminary prospectus and a final. The red herring is the common term of art for the preliminary prospectus. It's the document on which you sell, the final prospectus being the one that is delivered to complete the sale, which is the exchange of stock certificates for cash.

Q. So is it your testimony that Dain Bosworth reached an independent conclusion that with respect to Central Evergreen, Sterling would be permitted to tout good will as capital

16

regardless of changes in law?
A. No. That's putting words into my mouth. I don't have -- you know, first off, we didn't come up with independent conclusions. We were represented by counsel as a firm. I won't state what Dain Bosworth overall felt.

It believed that we could proceed with regulatory acquiescence, if not direct approval, to the raising of the capital in the marketplace of the quantity that we defined might be achievable, and kept them up to speed on what would be achievable in a rapidly changing marketplace.

We looked at documents regarding acquisitions. Our counsel looked at documents. It was part of the due diligence process. But we weren't focused on that one tree in this overall forest of information relating to Sterling Savings and what was going on in the marketplace.

I can't make independent representations for myself or for Dain Bosworth. My deposition here is to say, we proceeded on a good-faith basis, both with our client, Sterling Savings, as well as an understanding

with regulators that we would be able to raise capital at a very difficult time without having the prospect of a regulatory postfinancing maneuver that would cause harm to the investors who had just come into the offering expecting dividends.

Q. So is it your testimony that Dain Bosworth did not reach an independent conclusion that with respect to Central Evergreen, Sterling would be permitted to count good will as capital regardless of changes in law?

MR. SYMMES: I'm not going to object, but let me just ask you --

MS. HOSFORD: No.

MR. SYMMES: I'll wait until he answers. Then I want to ask you a question.

A. As I recall, during due diligence, drafting the documents, one of the representations of Sterling's counsel was that the contractual agreements with regulatory authorities permitted good will.

Q. BY MS. HOSFORD: So Sterling's counsel made that representation?

A. And our counsel at Dain Bosworth believed, given conversations with regulators,

to an additional 78,750 units.
Is that the Green Shoe?
A. It is.
Q. Do you recall who would have determined the underwriting discount that was going to be applied or used?
A. Yeah. Dain Bosworth would have likely in this case as the lead underwriter.
Q. At what point did Dain Bosworth -- well, at any point, did Dain Bosworth market this proposed public offering to investors?
A. Oh, yes.
Q. When did you start?
A. At the date of this final.
Q. November 14th, 1989?
A. Yes.
Q. How would you know that?
Is it because you always date these?
A. Because as I've mentioned previously, an offering is sold based off of a red herring prospectus with expectation of final delivery of the final prospectus. This is what's registered. This is the initial registration.
Q. Could you sell shares on the basis of this

offering circular?
A. No. You sold shares on the basis of the final prospectus, which was delivered at the time that everything was delivered, certificates, cash.
Q. And did that ever happen in this case?
A. It did not.
Q. So --
A. But as with every public offering, you sell on the basis -- you presell on the basis of the red herring prospectus. All of the marketing is done on the basis of the preliminary prospectus, and when you have a deal that is closeable, you can complete the transaction.
Q. And had you presold in this case?
A. It was.
Q. How much had been presold?
A. It was fully subscribed.
Q. And once -- what exactly -- could you just explain to me what exactly the potential buyer had to do in order to sign up.
A. Sure. Investors in any transaction will deliver cash to an account with a stockbroker for the purpose of exchanging that cash for

their clients, some new, some old, that are committing to buy.

Q. When somebody signs up to buy, do they -- let me restate that question.

When the stock is being marketed, are prospectus investors given this red herring?

A. Yes. They must be given the red herring.

Q. Are they given anything else?

A. No, not according to the law. The registration document contains the entire story.

Q. So are you saying that the offering was fully subscribed on the basis that potential purchasers of the stock were given this red herring and then decided to buy?

A. Yeah. In fact, there's overage amount. There's always an overage amount, meaning that there were -- there was an excess of demand over supply for the units being offered. And that is of necessity, that you create an environment where there is an excess of demand over supply.

Q. And if you look at the first page in the middle paragraph, there's a section that's all caps and bolded. Take a look at that