section.
A. M-hm. Okay.
Q. Is it fair to say that the offering was oversubscribed with an understanding that dividends may not be paid based upon this section?
A. There is a risk in any offering, including the fact that stock can go down in value from the purchase price. There was an expectation that dividends would be paid, and people were willing to take that risk as long as it was disclosed. This is a disclosure item, a significant disclosure item, and only that.
Q. Why didn't Sterling, Dain Bosworth just go forward with the public offering, then, since buyers were buying with this disclosure?
A. Gets back to that earlier comment I made in the deposition. Dain Bosworth could not proceed because there was a significant disclosure that had not been made to investors, and that was the statement by the regulators in Washington, D.C., with whom I met with Harold Gilkey and Dan Byrne, that they were sorry, but there were no exceptions to the new rules being implemented, there was

22

huge jeopardy, huge risk, good will was not going to be counted, and essentially, Sterling was going to come under the gun.

Q. But this says, the association will not be in compliance with regulatory capital requirements.

A. Shouldn't be terribly confusing. This is a required risk factor disclosure, which would be prominently displayed. It's of the most significant, and the SEC would require it, if not any other institution.

Q. But based upon this disclosure, you were able to oversubscribe the offering?

A. There are always levels of risk to be assumed in any offering, and this was a discloseable item with that potential risk being relatively reduced because of statements that had been made up to the point where that final statement was made. It became pretty clear as that final statement was made that this was in fact insufficient disclosure, because not only weren't there going to be an allowance for dividends, but point-blank, I was told, representing this company, that this company wasn't going to be around, it

was going to be regulated very strongly.
Q. What do you mean by, regulated very strongly?
A. That they were not going to be able to continue to pursue their growth and development plan, that they weren't going to have good will count for regulatory capital, that they would be -- that there would probably be cease and desist orders, there would probably be a whole number of items that had not been disclosed, and that they would be thrown into the bucket of bad thrift institutions that had to have the problem resolved.
That was the essence of the communication, though not the exact words used.
Q. Did you ever attempt to go back to the potential investments and make a further disclosure?
A. That was a level of risk in which no investment bank would put any investors. It was not an issue of disclosure.
To suggest to you the timing of what was occurring in 1989, by the way, having met with the regulators in D.C. and finding the

questioning. I'm sorry. I don't understand.
Q. You know there was a market for thrift issuances in 1989, but it was only for certain thrifts?
A. There was a very difficult market for thrift issuances in 1989. And it became even more difficult as the year went on nationally. And I don't know how many were completed in the last half of the year as a for-instance.
I have no idea. I could go back and look at the record at that time, but I know that a lot of deals were being pulled.
Q. But wouldn't it be fair to say that if Sterling had -- was able to, as you say, subscribe to a stock offering, then other thrifts would have been able to also?
A. No, one can't say that. I mean, that's like saying, Microsoft writes software, and so a whole bunch of other people write software, therefore, they can raise capital just like Microsoft can. It's a non sequitur.
Q. Are you saying there were no other thrifts out there comparable to Sterling that could have raised capital at that time?
A. In the Northwest?

Q. Yes.
A. No.
Q. They were the only ones?
A. In that sort of regional setting with the purported commitments to deal with capital issues that had developed at the regulatory level, I cannot think -- that was a nonconversion, an already stock company that was trying to raise additional capital. I can't think of any that were in the billions arena that could have done that. But I don't have perfect recollection. It was a decade-plus ago.
Q. What about a billion and above?
Were there thrifts in the 1 billion and above market that could have raised capital in 1989?
A. I don't know. I don't even know if Washington Mutual could have.
Q. Why not?
A. I don't know.
Q. So it's possible they could have?
A. Where is this questioning going? I mean, anything is possible.
Q. Just answer my questions, please.

capital. In the last quarter of 1989, I don't think there were many in the Pacific Northwest.
Q. But there were possibly some?
A. The number would be equal to the number of thrifts that existed in the Northwest at the time. That's the number of possibilities.
Q. So would you not say that the market was closed to thrifts in 1989?
Let me rephrase that.
Would you say --
A. I'll answer that. The market was not closed to thrifts in 1989. I could have completed this deal with Dain Bosworth.
Q. So the market was open to thrifts in 1989?
A. It was open to this thrift, which I think is the question that we're on right now.
Q. And potentially could have been open to other thrifts?
A. Possible.
Q. Even in the last quarter of 1989?
A. Don't know. Wasn't involved with other thrifts at that point.
Q. It could have been possible even in the last quarter of 1989; is that correct?