**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Thomas C. Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION**
**FOR JUDGMENT BASED UPON PARTIAL FINDINGS**

**Respectfully submitted,**

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**Attorneys for Defendant**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**TIMOTHY ABRAHAM**
**WILLIAM KANELLIS**
**ELIZABETH A. HOLT**

**July 9, 2007**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

ARGUMENT . . . . . 3

I. STANDARD OF REVIEW . . . . . 3

II. STERLING'S LOST PROFITS MODEL FAILS BECAUSE IT HAS NO BASIS IN THE FACTS INTRODUCED AT TRIAL AND IS SPECULATIVE AS A MATTER OF LAW . . . . . 3

A. Legal Standards For Expectancy Damages . . . . . 4

B. Dr. Horvitz's Flawed Lost Profits Model . . . . . 7

C. Dr. Horvitz's Lost Profits Model Does Not Measure Harm Attributable To Sterling's Alleged Loss Of Employees, Loans, Customers, And Reputation . . . . . 8

D. Dr. Horvitz's Lost Profits Model Ignores Sterling's Conversion To A Commercial Bank . . . . . 11

E. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact Because Dr. Horvitz's Model Ignores Sterling's Concerns About Its Risk-Based Capital . . . . . 11

F. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact And Law Because Dr. Horvitz's Model Ignores Sterling's Mitigation Of Damages Through Recapitalization In 1991 . . . . . 12

G. Dr. Horvitz's Lost Profits Model Fails For Lack Of Causation . . . . . 14

1. Dr. Horvitz's Lost Profits Model Is Invalid As A Matter Of Law Because The Breach Did Not Cause Sterling's Failure To Meet FIRREA's Minimum Capital Requirements . . . . . . . . . . . . . . . . 14

a. Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

b. Sterling Would Have Failed FIRREA's Core Capital Requirement Absent The Breach . . . . . . . . . . . . . 16

c. Dr. Horvitz's New Opinion Regarding The Lewis Federal And Tri-Cities Forbearance Letters Is Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling To Cease The Pursuit of Profitable Opportunities Even Though The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

H. Dr. Horvitz's Lost Profits Model Fails For Lack Of Foreseeability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I. The Damages Arising From Dr. Horvitz's Lost Profits Model Are Not Reasonably Certain . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Fails To Identify Profitable Opportunities That Would Have Been Obtained Absent The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. Dr. Horvitz's Growth Rate Is At Odds With Sterling's Underusage Of Its Leverage Capacity In The Actual World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative . . . . 32

5. Dr. Horvtiz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages To Create Lost Profits . . . . 33

III. THE COURT SHOULD REJECT STERLING'S "MITIGATION" DAMAGES CLAIM BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL . . . . 34

IV. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW . . . . 39

A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank . . . . 40

B. The Breach Did Not Cause Sterling To Incur Losses Associated With The CJ-4 Loan . . . . 42

C. The Breach Did Not Cause Sterling To Incur Excess Supervision Costs . . . . 43

D. The Breach Did Not Cause Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Offering . . . . 44

E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That The Breach Caused Its Other Legal And Accounting Fees . . . . 45

CONCLUSION . . . . 47

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Am. Fed. Bank, FSB v. United States,
68 Fed. Cl. 346 (2005) . . . . . . . . . . 27, 29

Am-Pro Protective Agency v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . 21

Bank of Am., FSB v. United States,
67 Fed. Cl. 577 (2005), appeals argued, Nos. 2006-5088,
-5089, -5090 (Fed. Cir. Apr. 4, 2007) . . . . . . . . . . 41

Bank United of Tex,, FSB v. United States,
50 Fed. Cl. 645 (2001), aff'd, 80 Fed. Appx. 663 (Fed. Cir. Sept. 22, 2003) . . . . . . . . . . passim

Berg's Estate v. United States,
687 F.2d 377 (Ct. Cl. 1982) . . . . . . . . . . 46

Bohac v. Dep't of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 5

Cal. Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) . . . . . . . . . . passim

Cal. Fed. Bank, FSB v. United States,
43 Fed. Cl. 445 (1999), aff'd in part, 245 F.3d 1342 (Fed. Cir. 2001) . . . . . . . . . . 35

Capitol Elec. Co. v. United States,
729 F.2d 743 (Fed. Cir. 1984) . . . . . . . . . . 4

Citizens Fed. Bank, FSB v. United States,
474 F.3d 1314 (Fed. Cir. 2007) . . . . . . . . . . 4

Citizens Fin. Servs., FSB v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006) . . . . . . . . . . passim

Citizens Fin. Servs., FSB v. United States,
57 Fed. Cl. 64 (2003) . . . . . . . . . . 37

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) . . . . . . . . . . 39

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Columbia First Bank, FSB v. United States,
54 Fed. Cl. 693 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cooper v. United States,
37 Fed. Cl. 28 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

District of Columbia v. United States,
67 Fed. Cl. 292 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.2d 1506 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fifth Third Bank v. United States,
402 F.3d 1221 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45, 46

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vacated in part,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Granite Mgmt. Corp. v. United States,
58 Fed. Cl. 766 (2003), aff'd in part, and
remanded on other grounds, 416 F.3d 1373 (Fed Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Howard Indus. v. United States,
115 F. Supp. 481 (Ct. Cl. 1953) . . . . . . . . . . 3

Kaiser Alum. & Chem. Corp. v. Ill. Cent. Gulf,
615 F.2d 470 (8th Cir. 1980) . . . . . . . . . . 23

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) . . . . . . . . . . 5

LaSalle Talman Bank, FSB v. United States,
64 Fed. Cl. 90 (2005) . . . . . . . . . . 27

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . passim

LaSalle Talman Bank, FSB v. United States,
45 Fed. Cl. 64 (1999), aff'd in part, vacated in part,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . 46

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . 5, 6

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . 34

Midwest Indus. Painting v. United States,
4 Cl. Ct. 124 (1983) . . . . . . . . . . 6

N. Helex Co. v. United States,
524 F.2d 707 (1975) . . . . . . . . . . 41

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006) . . . . . . . . . . 6

Piggly Wiggly Corp. v. United States,
81 F. Supp. 819 (1949) . . . . . . . . . . 45

Prudential Ins. Co. of Am. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . 41

Quiman v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . 7

R.S.E., Inc. v. Pennsy Supply, Inc.,
523 F. Supp. 954 (M.D. Pa. 1981) . . . . . . . . . . 7

Ramsey v. United States,
101 F. Supp. 353 (1951) . . . . . . . . . . 39

Reynolds v. Roberts,
207 F.3d 1288 (11th Cir. 2000) . . . . . . . . . . 21

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . 13

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . 6

Ross-Simons of Warwick, Inc. v. Baccarat,
182 F.R.D. 386 (D.R.I. 1998) . . . . . . . . . . 22

Rumsfeld v. Applied Cos., Inc.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . 6

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 6

Shyface v. Sec'y of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) . . . . . . . . . . 5

S. Cal. Fed. Sav. & Loan v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in part, and
remanded on other grounds, 422 F.3d 1319 (Fed Cir. 2005) . . . . . . . . . . passim

S. Nat'l. Corp. v. United States,
57 Fed. Cl. 294 (2003) . . . . . . . . . . passim

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004) . . . . . . . . . . passim

Sterling Sav. Ass'n v. Ryan,
959 F.2d 241 (9th Cir. 1992) . . . . . . . . . . 19

Sterling Sav. Ass'n v. Ryan,
751 F. Supp. 871 (E.D. Wash. 1990), rev'd, 959 F.2d 241 (9th Cir. 1992) . . . . . . . . . . 18, 19

Sterling Sav. Ass'n v. United States,
72 Fed. Cl. 404 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sterling Sav. Ass'n v. United States,
No. 95-829C, slip op. at 3-4 (Nov. 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Sterling Sav. Ass'n v. United States,
53 Fed. Cl. 599 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sun Cal, Inc. v. United States,
25 Cl. Ct. 426 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**STATUTES, RULES, AND REGULATIONS**

12 C.F.R. § 567.8 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12 C.F.R. § 567.9 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12 C.F.R. Pt. 3, App. A § 2(c)(1)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Evid. 803(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101 -73, 103 Stat. 183 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

RCFC 52(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

**MISCELLANEOUS**

Restatement (Second) of Contracts § 347 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

Restatement (Second) of Contracts § 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

Restatement (Second) of Contracts § 351 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25

Restatement (Second) of Contracts § 352 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION**
**FOR JUDGMENT BASED UPON PARTIAL FINDINGS**

Defendant, the United States, respectfully requests the Court to enter judgment pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims ("RCFC") against plaintiff, Sterling Savings Association ("Sterling"). Based upon the applicable precedent and the record Sterling has presented, Sterling cannot prevail upon any of its claims. Accordingly, we are entitled to judgment as a matter of law with respect to Sterling's lost profits, "mitigation," and wounded bank damages claims. In support of our motion, we rely upon the record established at trial and the following brief.

**INTRODUCTION**

Rule 52(c) allows for the entry of judgment upon partial findings at the close of a party's case if that party has been fully heard and the Court finds that the party is not entitled to judgment as a matter of law. Here, Sterling has made a detailed presentation of its claims and has been fully heard.

First, although the Court has heard from some of Sterling's current and former employees, officers, and directors whom allege that Sterling suffered harm as a result of "the

breach" through the loss of employees, loans, customers, and reputation, Sterling has put forth no evidence to quantify any of these alleged losses. Nor are any of these alleged losses captured in any of Sterling's damages models. Therefore, even if the Court were to agree with Sterling's witnesses' testimony, such alleged harm is irrelevant to the damages claims Sterling has put forth in this case, thus precluding the award of damages upon this testimony.

Second, Sterling has admitted that it both tried, and succeeded, to mitigate the breach. As such, Sterling is only entitled to the transaction costs incurred in mitigating.

Third, Sterling has asserted three damages claims, each of which independently fail. Sterling's lost profits claim fails because it has no basis in the facts introduced at trial and is speculative as a matter of law. Sterling's "mitigation" damages claim fails because it does not calculate the actual costs to Sterling to replace the regulatory capital eliminated by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"), but instead calculates damages based upon a dividend rate for a hypothetical preferred stock offering. The hypothetical premise of Sterling's "mitigation" damages claim fails as a matter of law under binding precedent.

Finally, Sterling asserts various so-called "wounded bank" damages claims. Specifically, it seeks: (1) increased costs allegedly incurred to acquire a branch of Great American Savings and Loan; (2) losses upon the CJ-4 loan; (3) excess supervision costs purportedly based upon its status as a "troubled thrift;" (4) transaction costs attributable to an unsuccessful 1989 public offering; and (5) legal, accounting, and insurance costs allegedly incurred in defending against regulatory interference. Sterling's wounded bank claims fail because the evidence introduced at trial shows that these alleged damages were not related to the breach, are foreclosed by prior

rulings of this Court, and/or encompass fees incurred in litigation that are foreclosed by statute.

## ARGUMENT

### I. STANDARD OF REVIEW

Pursuant to RCFC 52(c), the Court should enter judgment against Sterling after the conclusion of its case-in-chief if, under controlling law, Sterling has failed to present sufficient evidence to prevail and the relevant damages issues must be decided against it. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101-02 (2004). At this time, the question is not whether the plaintiff has made a prima facie case, as it would be for a directed verdict motion in a jury trial. Cooper v. United States, 37 Fed. Cl. 28, 35 (1996). Instead, "[a] plaintiff who has a full opportunity to put on his own case and has failed to convince the Judge, as trier of the facts, of a right to relief, has no legal right . . . to hear the defendant's case." Howard Indus. v. United States, 115 F. Supp. 481, 484-85 (Ct. Cl. 1953). Because this Court serves "as both the trier of fact and the trier of law," RCFC 52(c) permits weighing the evidence and, in contrast to a summary judgment motion, does not require that credibility determinations be resolved in favor of the plaintiff. Howard Indus., 115 F. Supp. at 484-85.

### II. STERLING'S LOST PROFITS MODEL FAILS BECAUSE IT HAS NO BASIS IN THE FACTS INTRODUCED AT TRIAL AND IS SPECULATIVE AS A MATTER OF LAW

Dr. Paul Horvitz presented Sterling's lost profits claim. The Court should conclude that Dr. Horvitz's lost profits model is invalid because the evidence introduced at trial shows that the breach did not harm Sterling. In addition, among other flaws, Dr. Horvitz's model assumes that Sterling made no attempt to mitigate by replacing the $15.557 million in contractual goodwill remaining as of December 31, 1989, notwithstanding: (1) Sterling's raising of over $900 million

in new capital after that date, Tr. 290:13-19; Tr. 408:24-424:6; and (2) Sterling's acknowledgment that it did mitigate the breach through its 1991 recapitalization, Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17; see also Tr. 18:22-25 ("Sterling had a duty in law, and as a practical proposition, an obligation to its shareholders to try to mitigate the breach. And it did try to mitigate."); Tr. 20:25-21:1 ("There's no question, Your Honor, that this raising of capital mitigated Sterling's harm."). Finally, Dr. Horvitz's lost profits model is speculative because it does not meet the legal standards required for expectancy damages.

**A. Legal Standards For Expectancy Damages**

To recover expectancy damages, Sterling must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably certain. See Cal. Fed. Bank v. United States, 395 F.3d 1263, 1266 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) ("CalFed").

With respect to causation, Sterling must prove that "profits would have been made but for the breach," id. at 1268, "the causal connection between the breach and the loss of profits must be 'definitely established[,]'" id., and the lost profits must have "inevitably and naturally, not possibly or even probably, flow[ed] from the defendant's breach." Id. at 1267 (citation omitted).[1]

---

[1] We respectfully disagree with the Court of Appeals for the Federal Circuit's decision in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), which indicated that the trial court possessed discretion to impose a "substantial factor" test for causation, rather than a "but for" test. Regardless, the panel decision in Citizens Federal cannot be understood to overrule the previous panel decision in CalFed. Capitol Elec. Co. v. United States, 729 F.2d 743 (Fed. Cir. 1984) (only Court sitting en banc can overrule earlier panel decision). In addition, Sterling relied upon CalFed in its memorandum of contentions of fact and law, indicating its agreement that the "but for" test applies to this case.

Under Federal Circuit precedent, because a lost profits award should not place the plaintiff in a better position than it would have occupied absent the breach, costs that were caused by factors other than the breach must be subtracted from damages. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004); Restatement (Second) of Contracts § 347, cmt. b (1981).

With respect to foreseeability, the Court examines whether the alleged loss was foreseeable at the time of contracting. Bohac v. Dep't of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (citation omitted). The loss for which damages are claimed "must have been foreseeable to the party in breach at the time of contract formation." Id. (citing Restatement (Second) of Contracts § 351(1)). Moreover, "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. (emphasis added); see Restatement (Second) of Contracts § 351 cmt a. Sterling must prove "both the

---

Even if the "substantial factor" test was applicable, however, Sterling failed to establish that, absent the breach, it would not have incurred the costs that it is seeking. A plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Shyface v. Sec'y of Health and Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999); Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943).

magnitude and the type of damages were foreseeable." Landmark, 256 F.3d at 1378 (emphasis added).

In addition, Sterling must establish the fact of lost profits and prove the amount with reasonable certainty. See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (citation omitted); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Restatement (Second) of Contracts § 352. Unreliable lost profits models cannot give rise to recovery. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). Because the courts have rejected nearly every lost profits claim in Winstar-related cases, the Federal Circuit has noted that these claims are often "inherently unreliable" and that lost profits models are largely a "waste of time and effort." Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); CalFed, 395 F.3d at 1270-71; Fifth Third Bank v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005).

Finally, Sterling had a duty to mitigate potential damages. The duty to mitigate potential damages by raising replacement capital applies to claims for lost profits in the Winstar-related cases. Bank United v. United States, 50 Fed. Cl. 645, 662 (2001), aff'd, 80 Fed. Appx. 663 (Fed. Cir. Sept. 22, 2003). Black-letter law requires a non-breaching party to attempt to mitigate its damages following another party's breach of contract. See, e.g., Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); Midwest Indus. Painting v. United States, 4 Cl. Ct. 124, 133 (1983). Accordingly, Sterling "may not recover those damages which could have been avoided by reasonable precautionary action on its part." Midwest Indus., 4 Cl. Ct. at 133. Here, however,

Sterling raised over $900 million in capital between 1991 and 2007, Tr. 290:13-19; Tr. 408:24-424:6, and admits that it mitigated its damages through its 1991 capital raising. Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17; see also Tr. 18:22-25 ("Sterling had a duty in law, and as a practical proposition, an obligation to its shareholders to try to mitigate the breach. And it did try to mitigate."); Tr. 20:25-21:1 ("There's no question, Your Honor, that this raising of capital mitigated Sterling's harm.").[2]

Under these standards, Sterling's expectancy claim for lost profits fails.

**B. Dr. Horvitz's Flawed Lost Profits Model**

Dr. Horvitz estimates damages by creating a hypothetical "but for" bank in which all contractual supervisory goodwill counts as capital after 1989.[3] The hypothetical "but for" bank is based in its entirety upon a series of unrealistic assumptions. For instance, Dr. Horvitz assumes that, but for the alleged breach, Sterling would have had a much larger balance sheet and would have earned profits upon the balance sheet at the same rate as the actual Sterling. Tr. 2039:8-16; Tr. 2129:3-2130:22. Dr. Horvitz also assumes that Sterling suffered damage during the pendency

[2] If, however, this Court believes that Sterling did not mitigate, Sterling nonetheless cannot recover expectancy damages because it "failed to take action to mitigate such damages." Quiman v. United States, 39 Fed. Cl. 171, 185-86 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999); Restatement (Second) on Contracts § 350.

[3] Dr. Horvitz's model assumes that Sterling would be free from FIRREA's breaching provisions while other institutions with alleged goodwill contracts would nevertheless be subject to FIRREA's breaching provisions. Under the case law, however, all similarly situated institutions must be treated the same way in a "but for" world. See, e.g. Dolphin Tours, Inc. v. Pacifico Creative Serv. Inc., 773 F.2d 1506, 1510-12 (9th Cir. 1985) (a valid damage model must account for the fact that if one market participant becomes free of anti-competitive behavior, other similarly situated market participants become free as well); R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966 (M.D. Pa. 1981) (same). Putting aside other flaws in Dr. Horvitz's model, the incorrect assumption concerning other market participants, in and of itself, renders the model invalid.

of the temporary injunction, notwithstanding the fact that the issuance of the injunction prohibited the Government from enforcing any breach-related growth restrictions. See generally P-454. Indeed, that was the reason Sterling bothered to seek the injunction. In addition, Dr. Horvitz assumes that the "but for" Sterling would have raised $10.5 million in new capital in December 1989. Tr. 2091:9-18; Tr. 2092:20-2094:19; P-548. Absent that capital, his model yields zero damages. Tr: 2757:8-18. Moreover, Dr. Horvitz ignores the fact that, according to Sterling's own witnesses, Sterling replaced its goodwill in 1991. See, e.g., Tr. 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17.

Using this invalid methodology, Dr. Horvitz incorrectly opines that the addition of $15.557 million in contractual goodwill to regulatory capital would have enabled the "but for" bank to acquire up to $427 million more in assets than those of the actual bank between 1989 and 2006. P-454, Ex. 6, Tables 1, 4a. Dr. Horvitz estimates that the earnings upon these "foregone assets" would have been approximately $58.164 million as of September 30, 2006. Tr. 2123:10-24; P-454. He also claims that the value of the goodwill remaining at that date would have been approximately $600,000, based upon the replacement model of Professor Christopher James, another of Sterling's expert witnesses. Tr. 2541:15-2543:4.

**C. Dr. Horvitz's Lost Profits Model Does Not Measure Harm Attributable To Sterling's Alleged Loss Of Employees, Loans, Customers, And Reputation**

Some of Sterling's current and former employees, directors, and officers testified about post-FIRREA harm Sterling suffered by the alleged loss of employees, loans, customers, and reputation. The evidence does not support such allegations and, even if true, the claims are irrelevant to this case.

First, Sterling's witnesses have not provided evidence that "the breach" caused the thrift to lose employees, loans, customers, and reputation. See, e.g., Tr. 762:15-21 (witness was not shown any documents demonstrating that Sterling lost a specific customer because of a lack of capital); Tr. 807:18-23 (Intervest was allowed to honor existing loan contracts); Tr. 853:9-15 (witness claims customers were unable to come to Intervest, but could point to no paperwork showing that these customers would qualify for a loan); Tr. 1037:16-1039:18 (after leaving Sterling, loan officer became a competitor of Sterling and was motivated to move customers to his new employer); Tr. 1041:5-16 (witness does not remember actually turning away any specific customer who wanted loan or deposit products); Tr. 1041:17-20 (witness does not recall turning away any new customer that wanted loans for business purposes); Tr. 1042:3-1043:19 (discussing various reasons why customers may choose to leave a financial institution); Tr. 1068:24-1069:4 (witness does not recall any existing customers leaving Sterling or taking their business loans elsewhere); Tr. 1286:25-1287:13 (despite testifying that documents indicated why employees left Sterling, witness was shown no documents).

Second, "the breach" that was discussed by these witnesses was a breach of the Lewis Federal Savings and Loan Association ("Lewis Federal"), Tri-Cities Savings and Loan Association ("Tri-Cities"), and Central Evergreen Savings & Loan Association ("Central Evergreen") contracts. See, e.g., Tr. 874:20-24 (witness claims Intervest lost loan originations because of "FIRREA," but does not know how many); Tr. 1017:19-1019:16 (former loan officer discussing impact of "FIRREA"); Tr. 1202:6-22 (witness's testimony of alleged harm based upon the loss of goodwill from all three transactions); Tr. 1208:4-1209:20 (same); Tr. 1256:13-1257:25 (addressing consequences of "FIRREA" upon human resources, including employee

turnover). This Court, however, has ruled that the Government is only liable to Sterling for the breach of the Lewis Federal and Tri-Cities contracts. Sterling Sav. Ass'n v. United States, 72 Fed. Cl. 404, 411 (2006). Sterling's witnesses have offered no evidence of whether the alleged loss of employees, loans, customers, and reputation would have occurred based upon the breach of only the Lewis Federal and Tri-Cities contracts.

Third, Sterling's witnesses have not quantified the harm to Sterling upon the alleged loss of these employees, loans, customers, and reputation, regardless of their definition of "the breach." See, e.g., Tr. 874:20-24 (witness claims Intervest lost loan originations because of "FIRREA," but does not know how many); Tr. 848:25-850:7 (witness does not know how Intervest would have specifically grown absent the Government's breach); Tr. 850:17-21 (witness does not know how big Intervest would have been absent the Government's breach); Tr. 1067:16-1068:14 (former loan officer testified he could not make commercial real estate loans to certain customers, but customers never filed loan applications); Tr. 1287:23-1288:5 (witness never attempted to quantify amount of damages to Sterling's reputation that were allegedly caused by the breach).

Finally, even accepting the testimony of these witnesses as true, such testimony is irrelevant because Dr. Horvitz does not rely upon it in his damages model. See generally P-454. Dr. Horvitz's model measures profits that allegedly would have been earned upon incremental assets, rather than measuring the income that would have been earned on specific loans that Sterling divested or was unable to make. Nor do any of Sterling's other damages claims rely upon such testimony. Therefore, the Court should not award any damages based upon the alleged loss of employees, loans, customers, and reputation.

### D. Dr. Horvitz's Lost Profits Model Ignores Sterling's Conversion To A Commercial Bank

Sterling converted to a commercial bank in July 2005. Tr. 582:17-583:4. Sterling does not contend that it would have converted to a commercial bank at a different time absent the breach. Once Sterling converted to a commercial bank, regulations prohibited it from counting supervisory goodwill as regulatory capital. 12 C.F.R. Part 3, Appx. A, § 2(c)(1)(I). As a result, even absent the breach, upon Sterling's conversion in July 2005, it would no longer have been able to count supervisory goodwill towards regulatory capital. Therefore, Sterling should not be awarded lost profits – or any other damages – after July of 2005.

### E. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact Because Dr. Horvitz's Model Ignores Sterling's Concerns About Its Risk-Based Capital

Mr. Daniel Byrne, the Chief Financial Officer and Executive Vice President, Finance, for Sterling Financial Corporation, Tr. 1311:11-20, and formerly Sterling's Chief Financial Officer, Tr. 1316:10-17, testified that "for Sterling, the constraining capital has really been risk-based capital," Tr. 1347:18-19, and that as a result, "we did not have [] excess capital," Tr. 1349:1-4, because Sterling's risk-based capital was "just barely above the 10 percent well-capitalized threshold," Tr. 1348:16-25, and Sterling wanted to ensure it was well-capitalized with respect to risk-based capital, Tr. 1347:8-1349:4.

This testimony renders Dr. Horvitz's lost profits model invalid because Dr. Horvitz testified that, by applying the core capital ratios in his lost profits model to the "but for" bank, Sterling would have failed to meet the well-capitalized requirement for risk-based capital. Tr. 2768:22-2769:11.

### F. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact And Law Because Dr. Horvitz's Model Ignores Sterling's Mitigation Of Damages Through Recapitalization In 1991

Dr. Horvitz's lost profits model is premised upon his assumption that, between 1989 and 2006, Sterling never replaced a single dollar of the $15.557 million in contractual goodwill eliminated by FIRREA. Tr. 2546:7-24. This assumption: (1) ignores Sterling's duty to mitigate, as well as its actual mitigation in 1991 by raising $21 million in new capital and converting $2.1 million of preferred stock to common stock, see, e.g., Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17; and (2) renders Dr. Horvitz's entire model invalid.[4] In fact, Mr. Byrne testified that the breach period was only from "late 1989 through 1991." Tr. 1665:16-19.

The Federal Circuit requires this Court to account for any mitigation a plaintiff undertakes as a result of a breach. LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1371-72 (Fed. Cir. 2003) (citing Restatement (Second) of Contracts §347(c) cmt. e). In LaSalle, the Federal Circuit held that the thrift's recapitalization replaced the lost goodwill and mitigated damages. Id. Here, Sterling mitigated its damages by its 1991 recapitalization, which it admits was for purposes of reaching capital compliance and would not have occurred absent the breach. Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17. Sterling's acknowledgment that it mitigated is reflected not only in its witnesses' testimony, but also in its 1992 Annual Report to shareholders, which stated:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to

[4] Professor James's estimate of lost profits is consistent with Dr. Horvitz's model and invalid for the same reasons.

> have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

P-84, p.2 (emphasis added). The Annual Report also stated that as a result of raising capital, this litigation was "not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case." P-85, p. 31; see also Tr. 635:23-637:2. In addition, during opening statements, Sterling's counsel acknowledged that the 1991 capital raising was mitigation. Tr. 18:22-25; Tr. 20:25-21:1.

Consequently, Sterling mitigated its damages.[5] Therefore, Dr. Horvitz's assumption that, between 1989 and September 30, 2006, Sterling never replaced a penny of the goodwill associated with the Lewis Federal and Tri-Cities acquisitions undermines his model.

Indeed, Dr. Horvitz's assumption that Sterling has never mitigated its damages also invalidates his model as a matter of law,[6] because if Sterling did not mitigate, it nonetheless possessed both a duty and opportunity to do so and "cannot recover damages for loss that [ ] could have [been] avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original) (quoting Restatement (Second) of Contracts, § 350, cmt. b). Further, Dr. Horvitz's failure to acknowledge Sterling's 1991 capital raising, as well as

---

[5] Thus, at most, Sterling would be entitled to the transaction costs incurred during the recapitalization.

[6] As we explain below, the lost profits that allegedly arose before the 1991 recapitalization are not recoverable for other reasons.

over $900 million in additional capital raised after 1991, emphasizes another flaw in his model. Specifically, the model posits that it is reasonably certain that replacement of the $15 million in contractual goodwill would have resulted in over $58 million in additional profits for Sterling. P-454, Ex. 6, Table 1. If, in fact, replacement of the $15 million in goodwill would have foreseeably resulted in $58 million in additional profits for the company, then Sterling, which acknowledges that it has raised over $900 million in capital since the enactment of FIRREA, Tr. 290:13-19; Tr. 408:24-424:6, should have experienced no difficulty in raising an additional $15 million in order to realize these profits. Thus, Dr. Horvitz's insistence that Sterling never mitigated renders Dr. Horvitz's model invalid as a matter of fact and law, as well as inherently speculative. Accordingly, the Court should reject this model and the damages claimed therein.

### G. Dr. Horvitz's Lost Profits Model Fails For Lack Of Causation

Dr. Horvitz's model does not meet the causation requirement because Sterling has not proven that, absent the breach, Sterling would have met FIRREA's capital requirements. Moreover, Sterling cannot establish causation because Dr. Horvitz's model incorrectly assumes that Sterling had to forego profitable opportunities, despite (1) receiving an injunction, (2) replacing every dollar of contractual goodwill eliminated by FIRREA, and (3) not having profitable opportunities. Indeed, Dr. Horvitz calculates lost profits upon the wounded bank damages, contrary to law.

#### 1. Dr. Horvitz's Lost Profits Model Is Invalid As A Matter Of Law Because The Breach Did Not Cause Sterling's Failure To Meet FIRREA's Minimum Capital Requirements

Dr. Horvitz assumes that, absent the breach, Sterling would have been in compliance with FIRREA's minimum capital requirements and would not have been subject to any restrictions or

limitations upon its asset growth. Tr. 2089:14-21; P-548. Consequently, he also assumes that, absent the breach, Sterling would have been in a position to leverage the goodwill attributable to the Lewis Federal and Tri-Cities acquisitions after FIRREA's enactment. The Court should reject these assumptions as erroneous.

First, Dr. Horvitz assumes that Sterling would have been in capital compliance but for the breach. This, however, admittedly only holds true based upon his further assumptions that: (1) absent the breach, Sterling would have raised $10.5 million in new regulatory capital in December 1989, Tr. 2089:14-21; P-548; and (2) a portion of the Central Evergreen supervisory goodwill would have counted towards core capital. Tr. 2089:14-2090:1. Dr. Horvitz's inclusion of the $10.5 million in his model is improper. This Court has already rejected Sterling's assertion that the $10.5 million capital raising effort failed because the Government breached its contractual obligation to permit Sterling to pay preferred stock dividends. Sterling Sav. Ass'n v. United States, 53 Fed. Cl. 599, 615 (2002). In addition, Dr. Horvitz's inclusion of a portion of the Central Evergreen goodwill is improper.

Second, Dr. Horvitz's assumption that Sterling would have been in capital compliance but for the breach is contrary to the evidence Sterling introduced at trial. Mr. Byrne admitted that, even assuming the Lewis Federal and Tri-Cities goodwill continued to count as regulatory capital after FIRREA, elimination of Central Evergreen's goodwill may have rendered Sterling non-compliant with FIRREA's minimum capital requirements. Tr. 1816:12-18. As discussed below, Sterling's own documents support Mr. Byrne's testimony.

Third, Dr. Horvitz improperly introduced a new opinion and calculations at trial related to Sterling's Lewis Federal and Tri-Cities forbearance letters. Tr. 2071:11-2081:2. Nonetheless,

his interpretation of these letters is incorrect, because Sterling would not be in capital compliance but for the breach, and is yet another attempt to avoid the Court's liability decision. See Sterling, 72 Fed. Cl. at 411.

Consequently, the Court should reject Dr. Horvitz's model because Sterling cannot prove that the breach caused the thrift's failure to comply with FIRREA's capital standards.

**a) Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach**

Dr. Horvitz's model is invalid because he fails to take into account that Sterling would have failed FIRREA's tangible capital requirements even absent the breach. Sterling's own documents demonstrate that inclusion of the contractual Lewis Federal and Tri-Cities goodwill in calculating tangible capital would only improve its tangible capital deficit from negative $22.833 million to negative $7.276 million. DX 422; Tr. 2743:16-2745:21; P-454, Table 4a. That tangible capital deficit would have rendered Sterling non-compliant with FIRREA's 1.5 percent minimum tangible capital requirement, 12 C.F.R. § 567.9(a) (1989), and subjected the thrift to the restrictions that were imposed in the actual world.

**b) Sterling Would Have Failed FIRREA's Core Capital Requirement Absent The Breach**

As demonstrated above, Dr. Horvitz's assumption that absent the breach, Sterling would have raised $10.5 million in December 1989, renders his model invalid. Even assuming, however, that Dr. Horvitz is correct about the 1989 capital raising, Sterling nonetheless cannot prove that the breach caused its damage. This is because, as of March 30, 1990, Sterling would not have met FIRREA's minimum core capital requirement, even assuming that: (1) absent the breach, Sterling would have raised $10.5 million in regulatory capital in December 1989; and (2)

the contractual Lewis Federal and Tri-Cities goodwill would have counted as regulatory capital after FIRREA. Tr. 2745:22-2748:22; P-454, p. 8; 12 C.F.R. § 567.8 (1989). In addition, if core capital were calculated properly, Dr. Horvitz's model would result in zero damages. See Tr.2495:17-2497:7; Tr. 2745:22-2753:12; P-454.

### c) Dr. Horvitz's New Opinion Regarding The Lewis Federal And Tri-Cities Forbearance Letters Is Incorrect

In a new opinion and calculations, Dr. Horvitz relies upon the Lewis Federal and Tri-Cities forbearance letters for the proposition that, because Sterling was out of capital compliance based solely upon the Lewis Federal and Tri-Cities acquisitions, the forbearance letters given Sterling as part of the Lewis Federal an Tri-Cities acquisitions would apply, thus forbearing the OTS from taking any action against Sterling. Tr. 2082:1-2088:21; P-551; P-552.

In supporting his opinion, Dr. Horvitz relies upon the following language in Sterling's forbearance letters: FSLIC "will forbear . . . from exercising its authority. . . for any failure of Sterling to meet the net worth requirements of Section 563.13 arising solely from . . . (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective Date." P-20 (Lewis Federal forbearance letter); Tr. 2082:1-2088:21; see also P-28 (Tri-Cities forbearance letter states: FSLIC "will forbear . . . for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from . . . (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date."). Dr. Horvitz opines that the Lewis Federal and Tri-Cities acquisitions created a "net worth" or "capital" deficiency, thus allowing for a forbearance if Sterling fell out of capital compliance because of one or both of these acquisitions. Tr. 2082:1-2088:21.

During the course of his cross-examination, Dr. Horvitz acknowledged that he is not an expert in accounting, Tr. 2002:1-16, is not qualified to give a legal interpretation of the acquisition contracts in this case, Tr. 2721:13-23; Tr. 2003:4-7, of which the forbearance letters are necessarily a part; and readily agreed that his interpretation of the forbearance letter would lead to a "double counting" of the supervisory goodwill associated with the Lewis Federal and Tri-Cities contracts. Tr. 2782:1-2783:12. He also admitted that he has never seen this approach used by any other thrift or regulators and that he has never seen any Sterling document that contains these types of calculations. Tr. 2783:24-2784:24. In fact, Sterling's own exhibits show that Dr. Horvitz's calculations are incorrect and would not serve as the basis for any type of net worth forbearance. The language Dr. Horvitz is relying upon in the forbearance letters expressly applies only to situations where the transaction creates a "net worth" or "capital" deficiency. P-20; P-28. As noted by Sterling's own CFO (Mr. Byrne), the Lewis Federal and Tri-Cities acquisitions did not create a "net worth" or "capital" deficiency. Tr. 1873:17-1874:20. As such, the forbearance letters do not apply and Dr. Horvitz's new opinion is incorrect; thus, Sterling was out of capital compliance even with the inclusion of the Lewis Federal and Tri-Cities goodwill.

**2. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling To Cease The Pursuit of Profitable Opportunities Even Though The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions**

The speculative nature of Dr. Horvitz's lost profits model is amply demonstrated by the fact that he did not account for a temporary restraining order ("TRO"), issued in May 1990, that prevented the Government from enforcing any of FIRREA's provisions related to Sterling's alleged contracts. Sterling Sav. Ass'n v. Ryan, 751 F. Supp. 871, 875 (E.D. Wash. 1990), rev'd,

959 F.2d 241 (9th Cir. 1992). The TRO was followed by a preliminary injunction, whereby, in an opinion dated August 8, 1990, the United States District Court for the Eastern District of Washington enjoined and restrained the Government from:

> a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the [Lewis Federal, Tri-Cities and Central Evergreen] supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;
>
> b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;
>
> c. placing Sterling in a receivership or conservatorship; and
>
> d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

Id. In response to a motion for reconsideration, the district court determined that the restriction upon placement of Sterling in receivership or conservatorship was overly broad. Id. at 884. Consequently, the district court amended subsection "a" of its order to prevent "any attempt by the defendants to appoint a receiver or conservator based upon a reason that, either directly or indirectly, is inconsistent with the contracts." Id. Thereafter, the Government was precluded from enforcing any provision of FIRREA that was contrary to the contracts found by the district court, including the Central Evergreen contract, which this Court has subsequently ruled was not breached. Sterling, 53 Fed. Cl. at 614.

The injunction remained effective until April 14, 1992, when the United States Court of Appeals for the Ninth Circuit dissolved it. Sterling, 959 F.2d 241. At that point, however,

Sterling had replaced the contractual goodwill and was in full capital compliance. P-316, p. 10.

Therefore, the injunction permitted Sterling to implement any growth plans that were in place pre-breach, and prohibited the Government from restricting Sterling's ability to implement the plans. Notwithstanding this prohibition, Dr. Horvitz's lost profits model assumes that Sterling suffered damage between July 1, 1990, after the temporary restraining order had been issued, and 1992, the year the court of appeals lifted the injunction.

Dr. Horvitz's assumption is not only baseless, but affirmatively inconsistent with undisputed facts. Testimony shows that Sterling was not, in fact, injured while the Government was prohibited from enforcing any of FIRREA's restrictions to the extent that the restrictions were inconsistent with any contract provision. See, e.g., DX 700 ("because of the Court order, there never were operating restrictions on Sterling, so there is no need to remove such restrictions"); Tr. 1189:6-14 ("[W]e received a temporary restraining order which then was advanced or moved to injunction. So we got injunctive relief, which then gave us time over that period of time to work within the restrictions of the OTS and to eventually, with that time that we had with that injunction, raise the capital necessary to be compliant under the eyes of the OTS at that time."); Tr. 1827:13-16; Tr. 1832:19-1834:19; Tr. 1849:8-15; P-288; DX 700; DX 533.

Nonetheless, based upon his counterfactual assumption that Sterling was unable to grow its assets while the injunction was in place, Dr. Horvitz concludes that the breach caused Sterling to earn less than it would have otherwise earned in 1990 and 1991. P-454, Ex. 6, Table 1. Further, the error extends beyond 1991, because Dr. Horvitz assumes that Sterling would have used the earnings allegedly forgone in 1990 and 1991, to acquire more assets in later years, resulting in additional lost profits. Id.

Further, Sterling did not suffer significant damage prior to the issuance of the TRO. Dr. Horvitz estimates that, prior to June 30, 1990, Sterling was forced to forgo $28,000 in earnings as a result of the breach. Id.

Sterling also claims that the Government violated the injunction and improperly forced Sterling to comply with the enjoined restrictions. Mr. Byrne testified that "the OTS was trying to circumvent the [injunction]." Tr. 1516:2-7. Thus, Sterling claims that the OTS operated in bad faith. In order to show that the OTS operated in bad faith, however, Sterling must meet the higher evidentiary standard of "clear and convincing" evidence. Am-Pro Protective Agency v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). The evidence Sterling introduced does not show that the OTS was operating in bad faith, but was merely regulating Sterling as permitted by the district court. See, e.g., P-277; P-279; P-285; P-288; DX 496. For example, Mr. Byrne admitted that the OTS was allowed to regulate Sterling for the purposes of safety and soundness. Tr. 1827:13-16.

In addition, while the injunction was in place, Sterling never alleged that the Government had failed to comply with the injunction. Sterling's decision not to challenge the Government's conduct while the injunction was pending demonstrates that Sterling either believed the Government was acting within the parameters of the injunction, or that any transgressions were not material. Alternatively, Sterling's choice not to go to court to enforce its injunction was its own independent business choice. Sterling had the right to enforce its injunction, if, in fact, the Government was violating the injunction. Sterling made the choice not to enforce the injunction. DX 1078. It cannot now be heard to complain that its own decision to fail to enforce the injunction caused it harm for which it should now be compensated. See Reynolds v. Roberts,

207 F.3d 1288, 1298 (11th Cir. 2000) ("If the plaintiff . . . believes that the defendant . . . is failing to comply with the [injunction's] mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjusted in civil contempt and sanctioned."); Ross-Simons of Warwick, Inc. v. Baccarat, 182 F.R.D. 386, 399 (D.R.I. 1998) (noting that a plaintiff seeking to enforce an injunction must bring an action for civil contempt rather than a separate action for damages).

The result of Dr. Horvitz's incorrect assumptions and the evidence introduced at trial is that Sterling cannot prove that the lost profits projected by Dr. Horvitz were caused by the breach, rendering his model inherently speculative.

#### 3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities

Sterling also has not shown that it was prevented from pursuing profitable opportunities. In fact, Sterling provided testimony so utterly inconsistent with the premises of Dr. Horvitz's lost profits model that the testimony alone should be sufficient to defeat Sterling's claim.

First, with respect to potential acquisitions, while Sterling considered many potential acquisitions, Harold Gilkey, Chairman of the Board and Chief Executive Officer of Sterling Financial Corporation, and former Chairman of the Board and Chief Executive Officer of Sterling, Tr. 55:22-56:9, testified that he did not know whether the breach was a factor in the decision by Sterling or the acquisition target to move forward in all potential acquisitions that were unsuccessful. Tr. 541:7-552:25; see also Citizens Fin. Servs., FSB v. United States, 64 Fed. Cl. 498, 508 (2005) (rejecting lost profits model proffered by Dr. Horvitz notwithstanding evidence of potential acquisitions due to absence of evidence establishing that breach prevented

acquisitions from occurring), aff'd 170 Fed. Appx. 129 (Fed. Cir. 2006). Specifically, Mr. Gilkey could not say which acquisitions would or would not have been completed absent the breach, in part because Sterling did not control the entire negotiations, as the negotiations involved two sides. Tr. 551:3-19. In addition, he testified that Sterling had to compete with other institutions upon a bid basis to make RTC acquisitions, and that he could not say which RTC deals would have happened absent the breach because RTC could sell to whomever they wanted. Tr. 543:18-546:2.[7]

In addition, Mr. Rodney Barnett, a member of Sterling's Board of Directors since Sterling's inception, Tr. 1179:4-8, testified that as a regular practice, Sterling's Board would have reviewed data and analyses to determine whether a potential acquisition was in Sterling's best interest. Tr. 1217:16-1219:3. Notwithstanding 17 years of litigation, however, beginning as early as May 1990, Mr. Barnett could point to no documents demonstrating that Sterling contemplated an acquisition, but was unable to consummate a transaction because of a lack of capital. Tr. 1220:15-1224:15. Nor did Sterling offer such documentation into evidence through any witness. The absence of documents which plaintiff admits would have been created in the regular course of its business practice is proof that Sterling did not lose acquisitions to the breach. Fed. R. Evid. 803(7); See Kaiser Aluminum & Chem. Corp. v. Ill. Cent. Gulf, 615 F.2d 470, 476 (8th Cir. 1980) ("Although the ICG introduced evidence that its normal business practice was to inspect and clean its cars and retain a record of this information, no such records were introduced into evidence. [T]he nonoccurrence or nonexistence of any cleaning or

---

[7] In addition, Dr. Horvitz admitted that the RTC sales were made in a competitive manner and sold for full market value. Tr. 2729:25-2730:9.

inspection of these cars may be assumed under 803(7).").

Second, Sterling was not always able to acquire the assets that it budgeted for in a given year. See, e.g., Tr. 1155:15-1156:8; Tr. 467:14-17; DX 186; DX 196; DX 205; DX 208. Nonetheless, Dr. Horvitz assumes that in these same years, Sterling would have had no problem finding assets above and beyond the assets that Sterling projected it would acquire, despite Sterling's failure to acquire those assets that it projected it would acquire. See, e.g., Tr. 1155:15-1156:8; Tr. 467:14-17; DX 186; DX 196; DX 205; DX 208.

Nor does the fact that Sterling uses "stretch" budgets overcome the flaw in Dr. Horvitz's model. As Mr. Byrne admitted, Sterling would not create a budget it could not achieve. Tr. 1732:23-1733:13. In addition, as Stephen L. Page, Sterling's Executive Vice President and Credit Officer, testified, Sterling would not budget for more loans receivable than it had the capital to hold. As a result, in those years that Sterling did not meet its "stretch" budget, any constraint upon Sterling's growth was not the result of a capital shortage. Tr. 1155:15-1156:8.

Third, that the breach did not cause Sterling to lose profitable opportunities is further undermined by the fact that Sterling Financial Corporation, Sterling's holding company, raised significant amounts of money, but failed to downstream all of that money to Sterling. Tr. 1743:1-1755:21; Tr. 1760:19-1761:13; Tr. 1762:2-1763:1; P-488; P-88; P-93; P-96; P-300. One of the reasons Sterling Financial was formed was to downstream capital to Sterling to help Sterling's growth. Tr. 1743:1-6. Sterling Financial's decision not to downstream all of the capital it raised demonstrates that Sterling did not have additional profitable opportunities.

As a result, Sterling has not proven that the breach caused it to forego profitable opportunities.

### H. Dr. Horvitz's Lost Profits Model Fails For Lack Of Foreseeability

Sterling's lost profits claim fails for lack of foreseeability. The Government could not have foreseen at the time of the contract the magnitude of damages calculated by Dr. Horvitz. Dr. Horvitz even admits that an investor could not have foreseen that Sterling would have grown and been as profitable as it has been. Tr. 2693:5-10.

In addition, Sterling implicitly admits that, if it had raised capital, it could have replicated its lost profits model. Yet, by claiming lost profits, Sterling is claiming that notwithstanding its ability to raise over $900 million in capital after FIRREA's enactment, Tr. 290:13-19; Tr. 408:24-424:6, and Dr. Horvitz's opinion that an additional $15.557 million in capital would have yielded $58.1 million in additional profits, P-454, Ex. 6, Table 1, no such funds were ever available to Sterling. According to the Restatement of Contracts, Sterling's theory is the text-book example of an unforeseeable claim. In analogous breach of contract cases where defendants guarantee loans to businesses, courts limit damages to the cost of replacement because it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit:

> The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach. In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

Restatement (Second) of Contracts § 351 cmt. e. Thus, it is not foreseeable that Sterling would raise over $900 million in capital after FIRREA's enactment, Tr. 290:13-19; Tr. 408:24-424:6,

yet still claim that it could not convince its own shareholders or any other prospective investors to infuse an additional $15.557 million in funds to pursue these additional profits. See P-454, Ex. 6, Table 4a.

Further, it was not foreseeable that, after the breach, Sterling would: (1) obtain an injunction preventing the Government from acting inconsistently with its contracts; and (2) nonetheless choose to pass up profitable investment opportunities, particularly if such opportunities were readily available in the market and easily accessed, as Dr. Horvitz assumes. See Tr. 2039:8-16; Tr. 2129:3-2130:22.

Finally, it would have been unforeseeable that the loss of the Lewis Federal and Tri-Cities goodwill, alone, would have resulted in the damages Sterling claims, when the elimination of the noncontractual Central Evergreen goodwill would have placed Sterling in peril even absent a breach. See II.G.1.

### I. The Damages Arising From Dr. Horvitz's Lost Profits Model Are Not Reasonably Certain

Dr. Horvitz testified that, but for the breach, Sterling had $15.557 in contractual goodwill that would enable it to increase its asset base up to $427 million larger than the level it actually maintained. P-454, Ex. 6, Table 1. Dr. Horvitz concludes that these hypothetical assets would have produced the same rate of return as Sterling's actual assets, resulting in $58.1 million in incremental earnings. Tr. 2039:8-16; Tr. 2129:3-2130:22; P-454, Ex. 6, Table 1.

Dr. Horvitz's assumptions regarding profitable opportunities, including Sterling's asset selection, growth rate, and profitability, render Sterling's damage claim speculative and unreliable as a matter of law. Where, as here, plaintiff's expert has merely assumed that the "but-

for" bank would obtain profitable incremental assets, but has failed to identify with specificity the profitable opportunities that plaintiff would have acquired in the "but-for" world, this Court has rejected plaintiffs' lost profits claims. See, e.g., Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358 (2005) ("AmFed"); Citizens Fin. Servs., 64 Fed. Cl. at 514; LaSalle Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 101-04 (2005); Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 279-81 (2004); Columbia First, 60 Fed. Cl. at 115; S. Cal. Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598, 625-27 (2003), aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal"); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 304-06 (2003); Fifth Third Bank v. United States, 55 Fed. Cl. 223, 241-42 (2003). Similarly, the Federal Circuit has found that it is appropriate to deny lost profits claims in Winstar-related cases that assume that growth would have automatically led to profits, see, e.g., Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1378 (Fed. Cir. 2001); that assume that the profitability of a thrift pre-breach is the sole prerequisite to a lost profits claims, see, e.g., Standard Fed., 62 Fed. Cl. at 279-81; SoCal, 57 Fed. Cl. at 625-27; and that assume that incremental assets earn the same return as actual assets. Citizens Fin., 64 Fed. Cl. at 514.

In fact, Dr. Horvitz's lost profits models have been rejected in every Winstar-related case in which they have been presented. See, e.g., Citizens Fin., 64 Fed. Cl. at 513-14; SoCal, 57 Fed. Cl. at 598.

**1. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Fails To Identify Profitable Opportunities That Would Have Been Obtained Absent The Breach**

Dr. Horvitz's conclusion that Sterling's asset base would be up to $427 million larger absent the breach is speculative as a matter of law because he does not identify the assets that

Sterling would have acquired absent the breach or the liabilities that would have funded those claimed incremental costs.

Dr. Horvitz did not determine the specific asset mix in the "but for" world. Tr. 2616:2-25. Indeed, he made no effort to construct the assets or liabilities of the "but for" thrift. Tr. 2616:2-2619:25. Instead, Dr. Horvitz merely assumes, without analyzing what the assets would have been or whether they would have been available, that Sterling would have achieved up to $427 million in additional growth absent the breach, and earned the identical return upon the additional assets that the actual bank earned, with absolutely no determination, or even an attempt to determine, how that growth would have been achieved. This renders his model invalid as a matter of law because he merely assumes that the but-for thrift would have replicated Sterling's rate of return in the real world, but with a significantly larger asset base. There is no evidence or basis upon which to support Dr. Horvitz's assumption. See Fifth Third, 55 Fed. Cl. at 241 (rejecting, upon summary judgment, a model nearly identical to Dr. Horvitz's because the expert failed to identify the investments or opportunities foregone by the thrift); S. Nat'l Corp., 57 Fed. Cl. at 304-06 (same); see also Columbia First, 60 Fed. Cl. at 115 (rejecting lost-profits claim because plaintiff could not prove that it would have acquired more assets absent the breach); Standard Fed., 62 Fed. Cl. at 279-81, 285 (same).

In contrast, the evidence introduced at trial shows that Dr. Horvitz's assumption that the but-for thrift would have replicated Sterling's rate of return in the real world is false. Mr. Gilkey testified that Sterling obtained the best assets first, and that there was no guarantee that additional assets would perform as well as assets Sterling already had. Tr. 489:23-490:14.

Moreover, although Sterling operates in a competitive market, Dr. Horvitz did not

consider whether the presence of Sterling's competitors in the market would have affected its ability to expand its asset base. In Southern National, this Court rejected a lost profits model that failed to account for competition, stating that plaintiff's expert "did not factor the element of competition into his calculation. He did not believe that competition from other banks 'would have [made] a substantial difference' in the way First Federal obtained additional assets, so his lost profits calculation does not take competition into account." 57 Fed. Cl. at 305. In rejecting the plaintiff's lost profits theory, the Court went on to note:

> Plaintiffs' counsel at oral argument presented the novel theory that First Federal's presence as a "small player in a very, very large and liquid market" obviated the need for [its expert] to account for competition in his lost profits calculation. Plaintiffs have offered no evidence to support this theory, and the court does not credit it, either as a matter of fact or of common sense.

Id. at 305, n.11 (citations omitted).

Nor do Sterling's assertions that it was profitable, Tr. 154:25-153:19, insulate its lost profits claim. Such assertions ignore Fifth Third, 55 Fed. Cl. at 240-42; Southern National, 57 Fed. Cl. at 303-04; and Standard Federal, 62 Fed. Cl. at 276-77, wherein the Court rejected, upon summary judgment, damages models nearly identical to Dr. Horvitz's because the expert estimated damages by assuming that the additional assets and liabilities acquired by the "but-for" bank would be as profitable as the actual bank, without addressing the composition of the purported forgone assets and liabilities.[8] In this case, however, Dr. Horvitz has testified that

[8] In addition, such testimony is irrelevant because it ignores the American Federal decision, in which the Court did not expressly address profitability, but rejected, upon summary judgment, the lost profits model advanced by plaintiff's expert because, like Dr. Horvitz, he "did not 'try to identify specific [profitable] opportunities of one kind [or] another'. . .[r]ather, he alleged only that American Federal would have leveraged its lost regulatory capital to 'support additional earnings assets' that would have generated profits." AmFed, 68 Fed. Cl. at 358.

Sterling's earnings have not been "outstanding." Tr. 2139:24-2140:6.

Here, Sterling boasts that, notwithstanding the breach, it has raised over $900 million in capital after FIRREA's enactment, Tr. 290:13-19; Tr. 408:24-424:6. Nonetheless, it claims that, notwithstanding this growth, the addition of only $15 million in goodwill, a nonearning asset, would have added, over a period of time, as much as an additional $427 million in assets and in excess of $58 million in additional profits. See P-454, Ex. 6, Table 1. Given these errors, Dr. Horvitz's lost-profits model is insupportable.

Moreover, Dr. Horvitz's lost profits model ignores Citizens Financial, 64 Fed. Cl. at 512-14, and SoCal, 57 Fed. Cl. at 625-26, wherein the Court rejected models, created and presented by Dr. Horvitz, that are virtually identical to the model advanced here upon Sterling's behalf.

In Citizens Financial, Dr. Horvitz assumed that there were unlimited assets and liabilities available to enable the plaintiff thrift to leverage all of its capital and realize a 1.1 percent return. The Court rejected the model because Dr. Horvitz failed to identify the assets and liabilities that would support such growth, and he failed to take into account the well-established principle that returns upon incremental assets cannot emulate returns upon existing assets. Citizens Fin., 64 Fed. Cl. at 511-12. Under that principle, economists assume that a thrift buys the most profitable assets first; thus, any incremental assets are expected to be less profitable than those already held. See Tr. 2636:3-2638:12. Nevertheless, Dr. Horvitz opined in Citizens Financial the structure of the foregone assets portfolio did not matter, and the returns he projected would be earned "regardless of what the combination of assets is." 64 Fed. Cl. at 512. The Court rejected his model upon the grounds that it was too speculative, and, in so holding, reasoned that the model suffered from the same flaws that resulted in rejection of similar models upon summary

judgment in Fifth Third, Southern National, and Standard Federal. Citizens Fin., 64 Fed. Cl. at 513-14.

Similarly, in SoCal, the Court rejected a lost profits model, presented by Dr. Horvitz, that had much in common with the model he has generated in this case. Specifically, the SoCal model assumed the acquisition of incremental assets and liabilities and applied a rate of growth without establishing that the assets and liabilities were available or that profits would have been realized upon the incremental assets. SoCal, 57 Fed. Cl. at 625-27. In that case, plaintiff alleged, as Sterling does here, that Dr. Horvitz's approach was conservative, see, e.g., Tr. 2130:2-22, but the Court rejected the model nonetheless because it was speculative. SoCal, 57 Fed. Cl. at 626.

In SoCal, the Court found that Dr. Horvitz's growth projections were unrealistic. Id. Dr. Horvitz has attempted to distinguish his model in SoCal by testifying that, unlike in Sterling's situation, the thrift in SoCal never earned significant profits and failed to meet the projections in its business plans. Tr. 2037:3-2038:21; Tr. 2041:22-2042:3. Dr. Horvitz's attempt fails, however, because Sterling did not always meet its budget projections in its business plans, see, e.g., Tr. 1155:15-1156:8; Tr. 467:14-17; DX 186; DX 196; DX 205; DX 208, and because of the magnitude of the growth Dr. Horvitz attributes to the "but-for" bank.

### 2. Dr. Horvitz's Growth Rate Is At Odds With Sterling's Underusage Of Its Leverage Capacity In The Actual World

Dr. Horvitz's model assumes that Sterling has always used all of its ability to leverage, and would have had further capacity to do so if it had retained the contractual goodwill. This is contrary to Sterling's track record, which demonstrates that Sterling has experienced difficulty in acquiring assets due to competition and lack of supply. See, e.g., Tr. 505:14-506:7; DX 738 at

WON935 1503; DX 709 at WON920 1291; DX 711 at WON935 2211; DX 710 at WON935 2182; P-81, pp. 6,7, 37; P-83, pp. 7, 34; P-85, pp. 2, 3, 24. Thus, Dr. Horvitz's counterfactual assumptions regarding Sterling's use of leverage render his model speculative.

### 3. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits

Dr. Horvitz also assumes that increased assets in the "but for" world will result in increased profits. This is contrary to this Court's holdings and to Sterling's actual experience. In SoCal, the Court rejected Dr. Horvitz's lost profits model in part because it found this assumption to be speculative. 57 Fed. Cl. at 626 (". . .most importantly, growth does not necessarily equal profits."). Further, David Welch, an investment banker presented by Sterling, testified that there is no statistical correlation between growth and profitability. Tr. 1618:24-1619:9.

The testimony and evidence in this case shows that greater asset size did not equal greater profitability for Sterling. For example, Sterling, after shrinking, made more money in 1992 than in any prior fiscal year. Tr. 485:15-486:8; see P-454, Ex. 3 ($730 million asset bank made $981,000 in net income in fiscal year 1989, but $640 million asset bank made $4.74 million in net income in fiscal year 1992). Thus, Sterling's actual experience demonstrates that Dr. Horvitz's assumption is invalid. In addition, this Court has previously rejected a lost profits model based upon assumptions similar to Dr. Horvitz's, because the fact of the shrink did not provide the "missing elements" of the model, i.e., the business opportunities that would have been pursued absent the breach. Fifth Third, 55 Fed. Cl. at 242.

### 4. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative

Prior to the Court's recent holding that FIRREA's elimination of Sterling's

noncontractual Central Evergreen goodwill from regulatory capital was not a breach, Dr. Horvitz estimated lost profits damages at approximately $80 million. Dr. Horvitz based that estimate, in part, upon his assumption that, absent the breach, Sterling would have maintained regulatory capital at the levels projected in its pre-breach capital plan. Tr. 2772:11-2774:7. In his most recent report, Dr. Horvitz generates $58.1 million in damages, even assuming that the Central Evergreen goodwill was not contractual. This new estimate depends upon his new assumption that, absent the breach, Sterling would have maintained regulatory capital at levels lower than the levels specified in the pre-breach business plan. Tr. 2774:8-2776:24. Absent this assumption, Dr. Horvitz's damages estimate would decrease. Tr. 2763:5-11; Tr. 2774:8-24.

Dr. Horvitz reached this conclusion based upon the new assumption that, in a "but for" world in which the Central Evergreen goodwill did not count as capital, Sterling would have maintained less regulatory capital. Tr. 2774:8-2776:24. This claim is speculative. Sterling provided no evidence that would lead to the conclusion that its capital level in a "but for" world wherein all goodwill counted toward capital would be different from that maintained in a "but for" world in which only the Tri-Cities and Lewis Federal goodwill counted as capital. Therefore, Dr. Horvitz's assumption is baseless.

#### 5. Dr. Horvitz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages To Create Lost Profits

Dr. Horvitz adds to his lost profits model the wounded bank damages presented by Sterling through Mr. Byrne. Tr. 2127:8-2128:2; P-454, Ex. 6, Table 3-d. As discussed further in the wounded bank section of this brief, Sterling has not proven it is entitled to these wounded bank damages. To the extent that Sterling has not proven it is entitled to these wounded bank

damages, Dr. Horvitz's addition of them into his model is in error and precludes his damages calculation from being reasonably certain.

In addition, as a matter of law, even if Sterling could prove its wounded bank damages, it should not be entitled to lost profits upon the wounded bank damages. Essentially, by including these damages, which grow from year to year, Sterling is asking for an extreme form of pre-judgment interest upon its wounded bank damages. Prejudgment interest is barred as a matter of law. 28 U.S.C. § 2516(a); Library of Congress v. Shaw, 478 U.S. 310, 317 (1986); District of Columbia v. United States, 67 Fed. Cl. 292, 341 (2003) ("No matter what term plaintiff uses, compensation for the belated receipt of money violates the no-interest rule absent an express statutory waiver of sovereign immunity from liability for interest.").

For these reasons, Dr. Horvitz's lost profits model is not reasonably certain.

## III. THE COURT SHOULD REJECT STERLING'S "MITIGATION" DAMAGES CLAIM BECAUSE PROFESSOR JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL

Sterling's expert, Professor Christopher James, offered a "mitigation" theory for measuring damages. In its memorandum of contentions of law and fact, Sterling concedes that it believes that the mitigation damages are inappropriate, and Professor James agrees. For this reason alone, the Court should reject Sterling's "mitigation" damages claim. Sterling's trial testimony, moreover, does not support its "mitigation" theory. Accordingly, the Court should only award Sterling the transaction costs it incurred in replacing its goodwill.

Sterling's "mitigation" damages claim, which purports to measure Sterling's actual costs of replacing its goodwill, acknowledges that Sterling successfully raised approximately $21

million of regulatory capital in the form of common stock, and converted $2.1 million of Series B preferred stock to common stock, in November of 1991. 07/09/07 Tr. Further, it is undisputed that, after the 1991 capital raising, Sterling achieved compliance with all of FIRREA's required capital ratios, Tr. 635:25-637:2; P-84, p. 2, and that the capital raising was mitigation. Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17; see also Tr. 18:22-25 ("Sterling had a duty in law, and as a practical proposition, an obligation to its shareholders to try to mitigate the breach. And it did try to mitigate."); Tr. 20:25-21:1 ("There's no question, Your Honor, that this raising of capital mitigated Sterling's harm.").

Professor James's "mitigation" theory is entirely hypothetical and should be rejected as a matter of law upon that basis. First, Sterling's hypothetical model conflicts with bedrock corporate finance principles, affirmed by the Federal Circuit, establishing that the value of expected dividend or interest payments upon capital raised as a cost, and the value of having cash in place of goodwill as a benefit, offset one another upon the date of issuance, save transactions costs. Cal. Fed. Bank, FSB v. United States, 43 Fed. Cl. 445, 460-61 ("[o]n the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs.") (1999), aff'd in part, 245 F.3d at 1350 (Fed. Cir. 2001) ("the value of the cash proceeds of Cal Fed's newly-raised capital equaled the cost of future dividends") ("CalFed"); Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 401-02 (1999).

In fact, Dr. Horvitz, who presented Sterling's lost profits claim, testified that if Sterling mitigated, the cost of raising that capital would be the sole amount of damages subsequent to mitigation. Tr. 2705:23-2706:7; see also Tr. 2581:12-2583:15; Tr. 2602:14-2604:22. Like the

cost-of-replacement models this Court rejected in other Winstar-related decisions, Sterling's cost-of-substitute-capital model – i.e., its "mitigation" model – generates estimates that suggest damages are nearly equal to the total amount of contractual goodwill excluded from Sterling's regulatory capital. Professor James's model estimates the hypothetical cost of raising $13.3 million in capital as approximately $10 million. 07/09/07 Tr. In other words, a dollar of goodwill is worth nearly a dollar in cash. In Bank United, this Court recognized that a model generating estimated costs of substitute capital at even 50 cents upon the dollar was "absurd on its face." 50 Fed. Cl. at 655-56. Thus, the Court should reject Professor James's "absurd" model because the only damages related to raising the replacement capital are transaction costs. Consequently, Sterling is entitled to no more than the transaction costs associated with replacement of its contractual goodwill.

Second, even assuming that, under certain circumstances, the actual cost of raising replacement capital can exceed transaction costs, LaSalle, 317 F.3d at 1374-75, Sterling cannot meet the standard established by the Federal Circuit in LaSalle because the costs asserted here are not "actual."

This Court has rejected upon summary judgment alleged "actual" cost of replacement theories wherein the plaintiff calculated "actual" damages by assuming a strategy that was not the one chosen by the thrift to replace regulatory capital lost due to FIRREA. For instance, in Granite Management Corp. v. United States, 58 Fed. Cl. 766, 777, aff'd in part and remanded on other grounds, 416 F.3d 1373 (Fed. Cir. 2005), the Court rejected a purported "actual" cost of replacement model that was "inconsistent with the manner in which plaintiff allegedly replaced its supervisory capital. . . ." In that case, the thrift replaced regulatory capital through a cash

infusion from its parent company, while its cost of replacement model was based upon a hypothetical preferred stock issuance. Id.

Likewise, the Federal Circuit's decision in LaSalle further supports dismissal of Sterling's hypothetical model. While rejecting the trial court's conclusion that dividend payments could not be a "cost of capital" merely because they are not legally obligatory, the Federal Circuit expressly agreed with the trial court's rejection of plaintiff's replacement capital calculations that were not based on actual payments:

> We too do not adopt this calculation, for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

LaSalle, 317 F.3d at 1375 (emphasis added); see also Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108, 134-39 (2003) (dismissing hypothetical cost of replacement theory upon summary judgment after recognizing Winstar authority rejecting these models as "absurd on their face," "not credible," and "inherently odd"); Columbia First Bank, FSB v. United States, 54 Fed. Cl. 693, 697-99 (2002) (rejecting cost of replacement theory at summary judgment because it was hypothetical and not based upon costs actually incurred); see also Bank United, 50 Fed Cl. at 655-56; Citizens Fin. Servs., FSB v. United States, 57 Fed. Cl. 64, 71 (2003) (rejecting a "hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy").

Here, Sterling achieved regulatory compliance in 1991 by raising approximately $21 million in common stock and converting $2.1 million of preferred stock to common stock. Professor James concedes that Sterling never paid any dividends upon its common stock until 2005, and, although Sterling began paying common stock dividends in 2005, Professor James

ignores those payments in calculating damages, choosing instead to use preferred stock as a hypothetical proxy. Therefore, his hypothetical model, which assumes a preferred stock issuance that involved dividends, does not present the actual costs of mitigation. Accordingly, the Court should reject this model.

Professor James's reliance upon nonexistent preferred stock dividend payments as a basis for damage is equally invalid with respect to Sterling's conversion of $2.1 million of preferred stock to common stock. Sterling raised the $2.1 million in preferred stock prior to FIRREA's enactment, and, in 1991, converted the preferred stock, which paid dividends, to common stock, which did not. Therefore, Professor James's assumption that this conversion of capital that Sterling already possessed resulted in damages is groundless.

Up until the time of trial, Professor James assumed full mitigation did not occur until the preferred stock offering in February 1993. During trial, Professor James presented a new, alternative damages calculation, whereby he assumed full mitigation occurred as a result of the common stock offering in November 1991, thus eliminating the need for the preferred stock offering for purposes of mitigation. 07/09/07 Tr. This change of assumption has the net effect of decreasing Professor James's "mitigation" damages claim by $2.4 million in total damages. Despite this change, however, Professor James continues to apply a hypothetical dividend to yield his "mitigation" damages. Consequently, Professor James's attempt to create "actual" damages is meritless. Thus, the Court should reject Professor James's mitigation model as a matter of law.

## IV. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW

Wounded bank damages are also expectancy damages. Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 434-41, aff'd 323 F.3d 1035 (Fed. Cir. 2003). Therefore, to recover wounded bank damages, Sterling must meet the requirements of reasonable certainty, foreseeability, causation, and mitigation. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951)). In Coast, 48 Fed. Cl. at 434-41, the trial court rejected, upon summary judgment, plaintiff's wounded bank claim for increased deposit costs, where plaintiff failed to demonstrate a causal link between the alleged damage and FIRREA's breaching provisions. Here, Sterling has not established that the alleged wounded bank costs resulted '"inevitably and naturally, not possibly nor even probably . . . from the . . . breach.'" CalFed, 395 F.3d at 1267-68. Further, the wounded bank damages claims also fail to satisfy the foreseeability and reasonable certainty tests.

As a preliminary matter, Dr. Horvitz claims to endorse each of the wounded bank claims. P-454. Mr. Byrne, however, performed all of the wounded bank calculations. Tr. 1874:21-1875:7. While Dr. Horvitz reviewed summaries of the claims, he did not review the underlying documentation, and he relied upon conversations with Mr. Byrne for his understanding of the nature of the claims. Tr. 2800:24-2801:16. As demonstrated below, Mr. Byrne's "analysis" of these claims suffers from his own failure to apply proper legal principles. Further, Mr. Byrne did not even testify about his calculation of the wounded bank damages attributable to the alleged increased purchase price of a branch of Great American Savings Bank, as acknowledged by

Sterling's counsel. Tr. 2737:5-2738:1.

Furthermore, neither Mr. Byrne nor Dr. Horvitz has adjusted Sterling's wounded bank damages claims pursuant to the Court's decision that the Government's breach only involved the Lewis Federal and Tri-Cities acquisitions. Sterling, 72 Fed. Cl. at 411; see, e.g., Tr. 1882:13-1883:7; Tr. 1902:25-1903:15; Tr. 1915:25-1917:1. As discussed above, Sterling was out of capital compliance due to the loss of the Central Evergreen goodwill alone. See, e.g., Tr. 1816:12-18; DX 422. Therefore, Sterling has not proven that any wounded bank damages incurred were the result of the loss of merely the Lewis Federal and Tri-Cities goodwill, nor, to the extent that the breach may have caused some damages, has Sterling reduced its damages claim to discount those damages associated with the loss of the Central Evergreen goodwill. As such, the Court should reject Sterling's wounded bank damages claim.

### A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank

Sterling alleges that the Government's breach prevented it from purchasing a branch of Great American Savings Bank in 1989 for approximately $63,000, and caused it to purchase the branch in 1994 at a cost of approximately $1.8 million, resulting in damages of $1.83 million. Tr. 212:8-216:1. This claim is meritless. First, as a matter of causation, Sterling has provided no documentary evidence establishing that the branch of Great American Savings Bank was available for a purchase price of $63,000 in 1989. Further, Sterling has not alleged that the breach caused it to purchase the branch in 1994; that was an independent business decision. Consequently, the Court should reject this claim. Indeed, if the 1994 acquisition caused the alleged injury, the thrift erred in pursuing it.

Second, even if Sterling could overcome the causation hurdle, Sterling cannot establish that damages resulting from an inability to purchase a branch of Great American was foreseeable by the Government at the time Sterling acquired Lewis Federal and Tri-Cities. "[F]oreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made." Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986) (citing N. Helex, 207 Ct. Cl. 862, 524 F.2d 707, 714-15 (1975)). In other words, foreseeability is measured by determining the intent of the nonbreaching party at the time the contract is executed, rather than at the time of breach.

Sterling has not alleged that it was required to purchase branches as a condition of its acquisitions in this case, or that the Government was on notice that it intended to buy branches. Consequently, neither Sterling's alleged inability to buy a branch after the enactment of FIRREA, nor its decision to buy the branch five years later at a price allegedly over six thousand percent higher than the original purchase price, could have been foreseen by the Government, and this claim for damages must fail as a matter of law. See Bank of Am, FSB v. United States., 67 Fed. Cl. 577, 595-96 (2005) (no wounded bank damages when Government could not have foreseen that thrift would, after the enactment of FIRREA, enter into independent business obligation that would cause loss), appeals argued, Nos. 2006-5008, -5089, -5090 (Fed. Cir. Apr. 4, 2007).

Third, Sterling's claim that it incurred an increase in the purchase price of the Great American branch must fail because it does not meet the test for reasonable certainty. As a matter of simple economics, it is absurd to claim that an increase in the purchase price of the branch is damage when we have no information about the branch's relative values during the two periods at issue. For instance, even if the branch ultimately acquired was, in fact, worth approximately

$63,000 in 1989, Sterling has provided no information supporting its apparent assumption that the increase in value was attributable to pure appreciation, rather than substantial investment in the branches by the previous owner. Further, Sterling has provided no evidence establishing that any thrift, much less the Great American branch, appreciated by six thousand percent between 1989 and 1994.

### B. The Breach Did Not Cause Sterling To Incur Losses Associated With The CJ-4 Loan

Sterling claims that its inability to advance additional funds to a borrower upon a loan known as the "CJ-4 Loan" forced the loan into foreclosure, resulting in a loss of $1.240 million. Tr. 1673:14-1674:9; P-336; P-336A. Sterling's claim with respect to the CJ-4 Loan fails to meet the legal prerequisites to an award.

With respect to causation, it is undisputed that Sterling's Loan Committee approved the initiation of foreclosure of this loan in November 1989, prior to the date that the regulations implementing FIRREA went into effect. DX 1040, p. 35; DX 943. Further, the loan first became delinquent in June of 1989, Tr. 1885:18-1886:15; P-180; the project was experiencing numerous problems as of August and October of 1989, Tr. 1889:21-1890:13; DX 943; and between March 15, 1988, and November 15, 1989, the property decreased in value by approximately $500,000, Tr. 1890:14-1891:10; DX 943. In addition, Sterling actually made a $60,000 advance upon the loan after FIRREA. Tr. 1893:1-9. Thus, the property securing the CJ-4 loan experienced massive losses completely unrelated to any Government action, and Sterling has not proven that any loss upon the loan was attributable to Government action.

Moreover, it could not have been foreseeable that the enactment of FIRREA would result

in losses to Sterling upon a loan that was in foreclosure prior to the effective date of the regulations implementing the statute.

This claim also does not meet the reasonable certainty test. The underlying assumption to Sterling's claim, that additional incremental funding of the CJ-4 Loan would have resulted in greater returns upon the investment, is contrary to Dr. Horvitz's assertion, in calculating alleged lost profits, that, as a matter of economics, incremental returns earned upon foregone assets are less than average returns. Tr. 2715:22-2716:20. Consequently, even if Sterling were correct that the Government prevented it from advancing additional monies upon the CJ-4 Loan, the assumption that the incremental investment would result in a greater return is contradicted by its own expert, Dr. Horvitz. Therefore, the Court should reject Sterling's claim for wounded bank damages attributable to the CJ-4 Loan.

**C. The Breach Did Not Cause Sterling To Incur Excess Supervision Costs**

Sterling also claims $171,977.33 in "excess supervision costs" as wounded bank damages. P-337; P-337A. Sterling has not established that the alleged excess supervision costs were caused by a breach of any of the acquisition agreements. Mr. Byrne claims that these charges were for extra examinations of Sterling and for "troubled thrift" assessments, whereby Sterling was charged one and a half times that of a non-troubled thrift for its insurance. Tr. 1680:11-1682:3. The evidence, however, does not support this contention. For example, the first assessment listed, for $51,993, was a charge by the OTS to all thrift institutions, at a flat rate based upon total assets. Tr. 1918:24-1921:16. In addition, when Sterling objected to being charged as a "troubled thrift" for purposes of other claimed assessments, the OTS informed Sterling that "even after taking the terms of the injunction into account," Sterling would still be

considered a "troubled thrift." DX 514; Tr. 1928:13-1929:25.

Finally, this claim is not reasonably certain because Mr. Byrne admitted that he did not know if the OTS would have continued to examine Sterling at the same rate if the exclusion of only the Central Evergreen goodwill resulted in Sterling being out of capital compliance. Tr. 1932:3-1933:17.

### D. The Breach Did Not Cause Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Offering

Sterling claims that it should be reimbursed for costs associated with the termination of its 1989 public offering, because the OTS would not preapprove the payment of dividends upon preferred stock. Tr. 1684:7-1685:16; P-338; P-338A. This Court, however, has previously ruled that Sterling did not obtain a contractual right to pay dividends upon a public offering of preferred stock when it entered into an agreement in connection with its acquisition of Central Evergreen. Sterling, 53 Fed. Cl. at 615. As such, Sterling's "wounded bank" damages claim associated with its failed 1989 public offering is now foreclosed. Indeed, Sterling, in requesting clarification of the Court's ruling upon this issue, admitted that the absence of a contractual obligation would require an adjustment in the amount of damages claimed. Sterling Sav. Ass'n v. United States, No. 95-829C, slip op., pp. 3-4 (Nov. 15, 2002). The Court declined to alter its holding upon the issue. Id. Nonetheless, despite Sterling's acknowledgment that its damages claim would have to be adjusted, Mr. Byrne testified that he made no adjustments to this damages claim after the Court's ruling. Tr. 1902:25-1903:8.

As a practical matter, the costs allegedly incurred in connection with the 1989 public offering may not be recovered because they do not meet the causation standard. In this case,

Sterling's expert, Dr. Horvitz, admitted that the costs incurred in connection with the 1989 public offering would have been incurred absent the breach. Tr. 2800:12-23. Furthermore, these costs are not reasonably certain because, as shown at trial, many of the claimed costs have nothing to do with the 1989 offering, but instead were claimed by Sterling pursuant to their designation under a specific billing code. Tr. 1903:9-1915:24.

**E. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That The Breach Caused Its Other Legal And Accounting Fees**

Sterling's final wounded bank damages claim is based upon its allegation that it should be awarded $304,005.79 in legal, accounting, and insurance costs it incurred in defending against OTS's enforcement of FIRREA. Tr. 1695:21-1696:12; P-339; P-339A. The Court should reject these claims as legally unsupported.

First, there are no insurance costs contained in this claim. The "insurance" cost Sterling refers to is a bond for its temporary restraining order, which Mr. Byrne admitted was associated with Sterling's litigation. Tr. 1934:13-1935:12. In addition, Mr. Byrne also admitted at trial that the majority of costs contained in this claim are litigation-related. Tr. 1935:8-1948:16. In fact, the costs claimed by Mr. Byrne were those costs included under an "Alpha" billing code category, and he admitted that "[a]pparently, on this, we did not" try to segregate out costs that were actually related to supervision and those that were related to litigation. Tr. 1937:8-19.

The recovery of such fees incurred in litigating against the Government in connection with the application of FIRREA is barred as a matter of law. Attorneys fees "incurred in litigating against the Government are not recoverable absent an express statutory provision allowing them." Franklin Fed., 55 Fed. Cl. at 123 (citing Piggly Wiggly Corp. v. United States,

112 Ct. Cl. 391, 432, 81 F. Supp. 819 (1949)); LaSalle Talman Bank, FSB v. United States, 45 Fed. Cl. 64, 97 (1999), aff'd in part, vacated in part, 317 F.3d 1363 (Fed. Cir. 2003). In Franklin Federal, the Court granted the Government summary judgment with respect to a wounded bank damages claim for attorney fees incurred in obtaining an injunction against enforcement of FIRREA. 55 Fed. Cl. at 123. As was the case in Franklin Federal, there is no statutory provision allowing the award of such fees. In addition, "in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial or other," are not recoverable against the Government. Berg's Estate v. United States, 687 F.2d 377, 383 (Ct. Cl. 1982). Therefore, judgment with respect to this claim should be granted in favor of the Government.

With respect to legal fees allegedly incurred for activities other than litigation, Sterling has not met its burden of establishing that such fees were, in fact, not related to litigation, and it has not established that they were caused by the breach. Tr. 1934:13-1948:16; P-339; P-339A. To the extent that any other regulatory matters were encompassed in the "Alpha" category, Sterling's records do not provide an adequate explanation as to whether the fees were incurred as a result of the alleged breach in this case, or for other reasons. Tr. 1934:13-1948:16; P-339; P-339A.

Further, Sterling's claim includes fees for regulatory advice provided after it replaced all of its goodwill in 1991, notwithstanding that Sterling replaced its goodwill in 1991. Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17. For all of these reasons, Sterling has not met its burden with respect to its wounded bank damages claim for legal, accounting, and insurance costs

## CONCLUSION

For the above reasons, we respectfully request that the Court grant our motion for judgment based upon partial findings.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
TIMOTHY ABRAHAM
WILLIAM KANELLIS
ELIZABETH A. HOLT

July 9, 2007

CERTIFICATE OF FILING

I hereby certify that on July 9, 2007, a copy of foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON PARTIAL FINDINGS," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Elizabeth M. Hosford
Elizabeth M. Hosford