IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S PROFFER RE: INADVERTENTLY OMITTED EXHIBITS**

Plaintiff Sterling Savings Association ("Sterling") respectfully submits a proffer regarding inadvertently omitted exhibits that Sterling had intended to admit during the direct testimony of Daniel Byrne, specifically P-340 and P-341 (a copy of which is attached hereto). P-340 comprises a calculation of harm to Sterling due to the Government's denial of Sterling's application to acquire two branches of Great American First Savings Bank, FSB ("Great American") and the underlying documents used in the analysis. P-341 is the Notice of Application for the purchase of the Great American branches, created by the Federal Home Loan Bank Board of Seattle and produced by the Government during discovery.

As soon as possible after learning of the omission, Sterling requested that it be permitted to recall Mr. Byrne. The Court denied that request, and Sterling herein submits this proffer for the record prior to resting its case. Though Sterling believes that evidence sufficient to prove its wounded bank damages claim related to the Great American branches has been introduced through the testimony of Harold Gilkey, Sterling requests

admission of these supporting exhibits, both to aid the Court and to foreclose an argument by the Government that omission of an exhibit containing the precise calculation is somehow decisive. Sterling's omission of these exhibits during Mr. Byrne's testimony was unintentional and Sterling did not realize the exhibits had been omitted until the Government's cross-examination of Dr. Horvitz, after which Mr. Byrne's examination had already concluded.

The Government will not suffer prejudice should the Court admit P-340 and P-341. Mr. Byrne was cross-examined at length during his deposition regarding P-340, and his testimony at trial would have been substantially similar. As demonstrated by the excerpts from Mr. Byrne's deposition attached hereto (see p. 133, line 14 through 139, line 2), P-340 and Mr. Byrne's creation thereof was subject to exhaustive inquiry by the Government, and the Government would therefore suffer no prejudice by its admission.

Likewise, the Government will not be prejudiced by the admission of P-341. P-341 is a Government document created by a Government employee, and therefore is admissible as an admission by a party opponent. Fed. R. Evid. 801(d)(2); *see also Globe Savings Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 94 (2004) (it is a "widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility."). Further, its authenticity is stipulated pursuant to the December 7, 1999 Master Stipulation and Order Concerning Authenticity of Documents, Videotaping of Depositions, Exhibit Lists, Order of Trial Witnesses and Production of Demonstrative Exhibits, ¶ B(1) at 2; *see also Westfed Holdings v. United States*, 55 Fed.Cl. 544, 563 (2003) (discussing Master Stipulation), *aff'd in part, rev'd in part on other grounds*, 407 F.3d 1352 (2005); *Columbia First Bank, FSB v. United*

*States*, 58 Fed.Cl. 333, 336-37 (2003) (same). Thus, the parties have stipulated that all documents produced in discovery are what they purport to be, and testimony of a person with knowledge (under Rules 602 or 901) is not required for admission of a Government document produced in discovery.

For these reasons, Sterling therefore respectfully requests admission of P-340 and P-341.

DATED this 9th day of July, 2007.

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member of the Bar of the U.S.
Court of Federal Claims

422 West Riverside Avenue, #1100
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on July 9, 2007, a copy of the foregoing **STERLING'S PROFFER RE: INADVERTENTLY OMITTED EXHIBITS** as filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

STERLING SAVINGS BANK
DAMAGES CALCULATION
INCREASED COST TO ACQUIRE BRANCH FROM GREAT AMERICAN SAVINGS/RTC

| | | | |
|---|---|---|---|
| VALUE RECEIVED BY RTC UPON SALE OF BRANCHES: | | | |
| SPOKANE | | | 1,892,000 |
| COST ASCRIBED TO DEPOSIT PREMIUM IN STERLING'S BID | | | (61,000) |
| TRANSACTION COSTS: | DATE | INVOICE # | |
| COOPERS & LYBRAND | 8/22/1989 | 20262 | 500.00 |
| WKDT | 7/21/1989 | 81316-906 | 1,750.50 |
| COOPERS & LYBRAND | 8/29/1989 | | 775.11 |
| DIVISION OF SAVINGS AND LOAN | | | 1,100 |
| | | | 4,125.61 |
| INCREASED COST OF PURCHASEOF SPOKANE BR. | | | 1,835,126 |

Note: Cost ascribed to deposit premium in 1989 for Spokane and Richland branches was $61,000. Sterling also expected to incur costs of $54,000 related to closing the transaction and winding down operations at the Spokane branch.

Analysis Prepared by Daniel G. Byrne, CFO of Sterling Savings, 1/9/04



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

SG0902063

95 - 829 - C
P - 340

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696 • (509) 624-4114

August 16, 1989

Betty Reed, Supervisor
Division of Savings and Loan Association
217-C General Administration Building
Olympia, Washington 98504-0622

Dear Betty:

Earlier you were forwarded a copy of the Application for Transfer of Branch Assets/Liabilities of two branches from Great American Bank, FSB, to Sterling Savings Association.

We are enclosing a check for $1,100, representing the branch application fee ($500 per branch) and a Certificate of Authority ($50 per branch) for the two branches.

Below is a listing of the business hours and managing officer for each branch:

| Branch | Business Hours | Managing Officer |
|---|---|---|
| Spokane | M-Th 9:00-4:30, Fr 9:00-6:00 | Tracy Heartbury |
| Richland | M-Th 9:00-5:00, Fr 9:00-6:00 | Tracie Straalsund |

Sincerely,

Stanton L. Parrish
Sr. Vice President

lac
Enclosure

CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER SG 0803464

THE FACE OF THIS DOCUMENT HAS A GREEN BACKGROUND – NOT A WHITE BACKGROUND

STERLING SAVINGS Association

NORTH 120 WALL STREET
SPOKANE, WASHINGTON 99201

28-7174
3251

AUG16-89

No. 028547

PAY ******$1,100 DOLLARS AND 00 CENTS ******$1,100.00

TO THE ORDER OF DIVISION OF SAVINGS AND LOAN ASSOCIATIONS

STERLING SAVINGS ASSOCIATION

William W Gruppe

AUTHORIZED SIGNATURE

⑈028547⑈ ⑆325171740⑆ 0170100001 88⑈

STERLING SAVINGS ASSOCIATION – SPOKANE, WASHINGTON

REMITTANCE ADVICE

STERLING SAVINGS ASSOCIATION • SPOKANE, WA 99203

No. 028547

| DATE | DESCRIPTION | ACCOUNT NUMBER | AMOUNT |
|---|---|---|---|
| AUG16-89 | [illegible]<br>APP [illegible] | [illegible]8547 | ******$1,100.00 |

DETACH AND RETAIN FOR YOUR RECORDS
PLEASE CASH OR DEPOSIT WITHIN 30 DAYS

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803465

STERLING SAVINGS Association

N. 120 Wall • Spokane, WA 99201-0696 • (509) 624-4114

July 28, 1989

Laurie Linskins, Branch Operations
Great American Bank, FSB
401 West 24th Street
National City, California 92050

Dear Laurie:

Enclosed is our portion of the application to purchase branches. In addition to the items provided by Great American, please note the following:

2. The Notice of Filing of Application for Purchase of Branch Office's and/or Transfer of Savings needs a filing date and signatures. This has been partially completed by Sterling.

2. An executed copy of the Agreement, including exhibits, are to be filed in Section II.

It is my understanding that distribution will be:

| | |
|---|---|
| 1 original, plus 3 copies | Federal Home Loan Bank of Seattle<br>Attn: Penny D. Marshall, Supervisory Agent<br>1501 Fourth Avenue<br>Seattle, Washington 98101-1693 |
| 1 copy | Federal Home Loan Bank of San Francisco |
| 1 copy | Betty Reed, Supervisor<br>Division of Savings and Loan Association<br>217-C General Administration Building<br>Olympia, Washington 98504 |
| 3 copies | Sterling Savings Association<br>Attn: Daniel G. Byrne, SVP - Finance<br>N. 120 Wall Street<br>Spokane, Washington 99201 |

Please let me know if you require additional information.

Sincerely,

Daniel G. Byrne
Daniel G. Byrne
Sr. Vice President - Finance

CONFIDENTIAL MATERIAL—SUBJECT TO PROTECTIVE ORDER SG 0803467

Entry to record

| | Spo | Rich | | |
|---|---|---|---|---|
| CASH | | | 29076 042 | |
| Passbook Loans Receivable | | | 23122 | |
| Accrued Int | | | 750 | |
| RE | | | 400 000 | |
| EQUIP | | | 18 900 | |
| Intangible Asset | | | 61100 | |
| Deposits | | | | 29 543 824 |
| Accrued interest | | | | 58 090 |
| | | | 29 601.914 | 29 601 914 |

480,000 (bracketed beside RE, EQUIP and Intangible Asset)

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803468

## Purchase Accounting

| | | |
|---|---|---|
| Acquisition Cost: | | |
| Purchase Price | | 480 000 |
| Value of Blg - Richland | 400 000 | |
| Spokane | 5900 | |
| ROVID Richland | 15 000 | (415 900) |
| Value assigned to deposits | | 61 100 |
| Rent - Spokane 5 months x 3255 | | 16275 |
| Excess personnel cost: | | |
| Spokane NOV - JAN (3 mos) 2417 x 3 | | 7251 |
| Richland NOV - JAN (3 mos) 2667 x 3 | | 8001 |
| Legal | | 4 000 |
| Accounting | | 1500 |
| Appraisal | | 700 |
| Travel | | 1000 |
| DP Conversion | | 5000 |
| D.T Training | | 500 |
| | | 105327 |
| Misc | | 9673 |
| Capitalized costs | | 115000 |
| Deposits Acquired | 89 503 524 | |
| | .38 | |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803469

Operating plan assumptions

Spokane:
Assume [illegible] branch closed 3/1/90 with all accts
+ 1½ FTE transferred to Spokane Main

loss of deposits through 6/30/90 = 1.5K

Duplicated personnel cost of ___ is capitalized
Rent for last 4 months is capitalized

Richland:
Assume Sterling's branch is consolidated on 3/1/90
with only a net increase in FTE's of 1½.

loss of deposits [illegible] = 1K.

Duplicated personnel cost of ___ is capitalized

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

Operating Plan
Income

| | | Spo | Rich |
|---|---|---|---|
| Net Interest Margin | | | |
| Yield on Assets | | 9.45 | 9.45 |
| Cost of Funds | | 8.442 | 8.338 |
| | | | |
| Jumbo Accts | 9.291 | | |
| FHLB Advances | 9.522 | | |
| Repo | 9.980 | | |

FHLB Advances:

| | | |
|---|---|---|
| 10/25/99 | 10.65% 2k | |
| 11/2/94 | 9.70 3k | |
| 11/7/89 | 9.40 5k | |
| | 9.32 10k | |
| Jumbo | 9.30 9k | |
| Repo | 9.75 10k | |
| | 955 29 | |

Fee Income - Transaction Accts

| | # of Accts | | Spo | Rich |
|---|---|---|---|---|
| ( BR 35 | 272 | mostly NSF | 520 A | |
| 37 | 7 | | 860 M | 2700 |
| 36 | 533 | | | |
| Budget | | | 750 | 2700 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803471

Operating Plan
Personnel

| | P+L | Monthly Budget |
|---|---|---|
| Spokane | | |
| Personnel: # of employees | | |
| MGR | | |
| 2 FT | | |
| 1/2 PT | | |
| | | 1950 (1) |
| Reg P+L excludes incentive | 8500 (1) | |
| Payroll Tax | 1085 (1) | |
| Pers. Benefits Education | 440 (1) | + |
| Memberships + T+E | 652 (1) | 100 |
| Auto | 127 (1) | -0- |

(1) per May monthly Actual P+L

| | | |
|---|---|---|
| Richland | | |
| # of employees | | |
| MGR | | |
| FT | | |
| PT | | |
| | | 2340 (1) |
| Compensation | 4527 | |
| Payroll Taxes | 534 | |
| Personal [illegible] | [illegible] | |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803472

[illegible]

Operating Plan

| | Springdale Actual P&L | Springdale Budget | Actual P&L | Richland Budget |
|---|---|---|---|---|
| Communications: | * will be budgeted in DP | | | |
| Telephone + Data lines* | 1763 | 1200 | 1100 A / 1349 M | 1200 |
| Postage + Delivery | 868 | 850 | 837 | 840 |
| Should be adequate to cover [illegible] | | 2050 | | 2040 |
| Office Supplies | 400 A / 345 M | 350 | 305 A / 401 M | 350 |
| Occupancy | | | | |
| Rent | 3750 | 3750 | — | |
| Sublease rental | (783) | (783) | — | |
| HVAC | 116 | 100 | 260 A | 200 |
| Janitorial | 769 | 400 | 600 A | 600 |
| Tax + Ins | 288. | ~~488~~ 290 | 612 M | 600 |
| Utilities | 705 | 500 | 500 M | 500 |
| Security System | | | | |
| Advertising Promo | | 1500 | | 1500 |
| Insurance | 16,200 | 33 745 Annual | 13,300 | 27 710 |
| FSLIC = .0020833 | | 2810 Month | | 2310 |
| Property, Fidelity ETC | | 300 Month | | 300 |
| Depreciation | | | | |
| Blg 250,000 25yr | | | | 833 (m) |
| EQUIP 13000 5yr | | | | 216 (m) |
| 5900 5yr | | 100 (m) | | |
| Goodwill est 115000 8yrs 1200 | | 540 | | 660 |
| Data Processing: | | 250 | | 260 |
| [illegible] | | [illegible] | | [illegible] |

Occupancy + EQUIP. Assume 8 MOS Richland, 3 MOS Springdale

3 MOS

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803473

but unpaid interest) as of the close of business on the Closing Date assumed by Buyer hereunder, such amount to be decreased by the amount required to be paid by Buyer pursuant to Section 4(b) of this Agreement.

(b) From Buyer to Seller. In consideration for the assets transferred by Seller to Buyer pursuant to Sections 2 and 3 of this Agreement and an intangible associated with the assumption of the Accounts pursuant to Section 1 of this Agreement, Buyer shall pay to Seller, by offset to the wire transfer required to be made by Seller pursuant to Section 4(a) hereof, the sum of (i) the amount of cash on hand at the Subject Offices as of the Closing transferred to Buyer, (ii) the outstanding principal amount of the Account Loans and any accrued but unpaid interest thereon as of the Closing; and (iii) $480,000, provided, however, that, if the aggregate balance of the Accounts (including accrued but unpaid interest) as of the close of business on the Closing Date is less than $23,500,000, the amount required to be paid by Seller pursuant to this subparagraph (iii) shall be equal to 1.75% of the balance of the Accounts assumed by Buyer hereunder (including accrued but unpaid interest) less $20,000.

(c) The payments required by this Section 4 shall be made on the Monday following the date of the Conversion (as hereinafter defined) and shall include interest for the period from, and including, the date of the Conversion to, but excluding, the date such payment is made at the per annum rate, calculated on the basis of a 365-day year, equal to the bid rate for federal funds in effect for such period, as such rate is published in the Western Edition of The Wall Street Journal.

5. Prorations.

All real and personal property and other taxes, rents, assessments, insurance (including FSLIC insurance to the extent that Buyer is not subject to additional FSLIC insurance assessments attributable to the Accounts for the period with

Cost on Purchase of Two Branches from Great American:

Accounting & Legal Charges:

| | |
|---|---|
| Coopers & Lybrand | $500 |
| Witherspoon, Kelley, Davenport & Toole | $2,526 |
| | $3,026 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

Coopers & Lybrand | certified public accountants I.D. # 13-5218870 | 1600 Seafirst Financial Center Spokane, WA 99201-0640 telephone (509) 455-8300 | in principal areas of the world

August 22, 1989

STERLING SAVINGS ASSOCIATION
MR DAN BYRNE
NORTH 120 WALL
SPOKANE WA 99201

INVOICE NUMBER **Nº 20262**

Professional services rendered in connection with:

| | |
|---|---|
| . Audit of the Association's (& Action's) consolidated financial statements for the year ended June 30, 1989 (in progress) | $27,500.00 |
| . Preparation of letter regarding propriety of accounting treatment for proposed Great American branch acquisition (including reading agreement, review of pro-forma & other schedules, etc.) | 500.00 |
| . Assistance with preparation & review of Central Evergreen's December 31, 1988 final consolidated income tax return | 750.00 |
| . Preliminary work associated with the Association's proposed stock offering (including meetings with underwriters, numerous discussions, coordinating SEC reviewer involvement, etc.) | 2,000.00 |
| | $30,750.00 |

*All payments are due upon receipt of the invoice. Accounts unpaid within thirty (30) days of the date of invoice are subject to a delinquency charge of 1½%. The delinquency charge has a corresponding annual percentage rate of 18%.*

[redacted] [redacted]

WITHERSPOON, KELLEY, DAVENPORT & TOOLE
A PROFESSIONAL SERVICE CORPORATION
ATTORNEYS & COUNSELORS

1100 OLD NATIONAL BUILDING
SPOKANE, WASHINGTON 99201
(509) 624-5265
TAX ID #91-1083732

Sterling Savings Association
Attn: Mr. Daniel Byrne
N. 120 Wall
Spokane, WA 99201

JULY 21 1989
Account No. 81316- 905

PAGE 1

Previous Balance Due 5.00

Statement 582086

For Professional Services Rendered:
Acquisition of Great American Branches

| | | | |
|---|---|---|---|
| JUNE 13 89 HWG | Review of agreement and preparation of comments. | 1.30 | |
| JUNE 22 89 NMB | Conference with D. Byrne. | 1.20 | |
| JUNE 22 89 DJL | Conference with NMB; review Savings Assumption and Purchase Agreement; brief legal research re Covenants Not To Compete; draft amendments to agreement. | 4.10 | |
| JUNE 23 89 NMB | Meeting with Dan Byrne re changes in deal. | 1.50 | |
| JUNE 23 89 DJL | Revise Purchase and Sale Agreement; draft additional clauses; conference with NMB. | 2.30 | |
| JUNE 26 89 NMB | Review letter. | .70 | |
| JUNE 28 89 NMB | Prepare new draft of agreement. | 3.50 | |

| | | | |
|---|---|---|---|
| NMB | 6.90 | 130.00 | 897.00 |
| HWG | 1.30 | 115.00 | 149.50 |
| DJL | 6.40 | 110.00 | 704.00 |
| Total Hours | 14.60 | | |
| Total Fees | | | 1,750.50 |

Total Balance Due $1,750.50

OK BB

OK BB

84-44/0.7

THIS STATEMENT MAY NOT INCLUDE EXPENSES FOR WHICH WE HAVE NOT BEEN BILLED.
INTEREST ON UNPAID ACCOUNTS AT THE RATE OF 1% PER MONTH (ANNUAL RATE OF 12%) WILL BE IMPOSED COMMENCING 30 DAYS AFTER DATE OF STATEMENT.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803477

WITHERSPOON, KELLEY, DAVENPORT & TOOLE
A PROFESSIONAL SERVICE CORPORATI
ATTORNEYS & COUNSELORS

1100 OLD NATIONAL BUILDING
SPOKANE, WASHINGTON 99201
(509) 624-5265
TAX ID 91-1063732

Sterling Savings Association
Attn: Mr. Daniel Byrne
N. 120 Wall
Spokane, WA 99201

AUGUST 29 1989
Account No. 81316- 905

PAGE 1

Previous Balance Due $.00

Statement 607066

For Professional Services Rendered:
Acquisition of Great American Branches

| | | | | | |
|---|---|---|---|---|---|
| JULY 06 89 NMB | Telephone conference with D. Byrne. | | | 1.80 | |
| JULY 07 89 NMB | Conference with D. Bryne. | | | .80 | |
| JULY 10 89 NMB | Telephone conference with D. Byrne. | | | 1.00 | |
| JULY 12 89 NMB | Review contract. | | | 1.80 | |
| NMB | | 5.40 | 130.00 | 702.00 | |
| | Total Hours | | | 5.40 | |
| | Total Fees | | | | 702.00 |

Disbursements:

| | | |
|---|---|---|
| Copy expense | 11.60 | |
| Postage | 9.75 | |
| Telephone expense | 25.76 | |
| Telecopy | 26.00 | |
| Total Disbursements | | 73.11 |
| Total Balance Due | | $775.11 |

RECEIVED
SEP 1 1 1989
ACCOUNTING

89.4710.0

THIS STATEMENT MAY NOT INCLUDE EXPENSES FOR WHICH WE HAVE NOT BEEN BILLED.
INTEREST ON UNPAID ACCOUNTS AT THE RATE OF 1% PER MONTH (ANNUAL RATE OF 12%) WILL BE IMPOSED COMMENCING 30 DAYS AFTER DATE OF STATEMENT.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803478

## Great American FSB - Individual Branches

| Branch Priority | Branch # | Branch Name | Total Deposits 31-Mar-93 | Dollar Premium on Total Deposits | Percent Premium on Total Deposits | Core Deposits 31-Mar-93 | Dollar Premium on Core Deposits | Percent Premium on Core Deposits | 0.400% Insured Deposits 31-Mar-93 | Dollar Premium on Insured Deposits | Percent Premium on Insured Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4435 | Spokane | $26,240 | $1,892 R1 | 7.21% | $17,714 | $1,892 | 10.68% | $26,135 | $1,884 | 7.21% |

## Great American FSB - Tacoma Cluster

| Branch Priority | Branch # | Branch Name | Total Deposits 31-Mar-93 | Dollar Premium on Total Deposits | Percent Premium on Total Deposits | Core Deposits 31-Mar-93 | Dollar Premium on Core Deposits | Percent Premium on Core Deposits | 0.400% Insured Deposits 31-Mar-93 | Dollar Premium on Insured Deposits | Percent Premium on Insured Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4424 | Tacoma Mall | $37,094 | $2,637 | 7.11% | $23,462 | $2,637 | 11.24% | $36,946 | $2,627 | 7.11% |
| | 4425 | Federal Way | $24,450 | $1,738 | 7.11% | $15,757 | $1,738 | 11.03% | $24,352 | $1,731 | 7.11% |
| | | | $61,544 | $4,378 | 7.11% | $39,219 | $4,376 | 11.16% | $61,298 | $4,358 | 7.11% |

## Great American FSB - Aberdeen Cluster

| Branch Priority | Branch # | Branch Name | Total Deposits 31-Mar-93 | Dollar Premium on Total Deposits | Percent Premium on Total Deposits | Core Deposits 31-Mar-93 | Dollar Premium on Core Deposits | Percent Premium on Core Deposits | 0.400% Insured Deposits 31-Mar-93 | Dollar Premium on Insured Deposits | Percent Premium on Insured Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4402 | Montesano | $17,495 | $918 | 5.26% | $15,760 | $918 | 5.83% | $17,425 | $915 | 5.26% |
| | 4405 | Aberdeen | $29,838 | $1,566 | 5.25% | $24,504 | $1,566 | 6.39% | $29,719 | $1,560 | 5.26% |
| | | | $47,333 | $2,485 | 5.25% | $40,264 | $2,485 | 6.17% | $47,144 | $2,475 | 5.26% |

## at American FSB - Total Successful Bid

| Branch Priority | Branch # | Branch Name | Total Deposits 31-Mar-93 | Dollar Premium on Total Deposits | Percent Premium on Total Deposits | Core Deposits 31-Mar-93 | Dollar Premium on Core Deposits | Percent Premium on Core Deposits | 0.400% Insured Deposits 31-Mar-93 | Dollar Premium on Insured Deposits | Percent Premium on Insured Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cluster 12 | | 5 Branches | $135,117 | $8,753 | 6.48% | $97,197 | $8,753 | 9.01% | $134,577 | $8,718 | 6.48% |

out of pocket
Spokane
Richland

3·*+
R1 1,892·+
1,300·+

003

3,195·*

05 13/34 19:47 6 206 945 5383 GREAT AMERICAN 02
MAY-13-1994 19:40 FROM GAF FINANCE TO 912069435383 P.01
MAY 13 '94 22:04 FROM RTC COMM PAGE.002

RTC
RESOLUTION TRUST CORPORATION
Resolving The Crisis
Restoring The Confidence

# NEWS RELEASE

Office of Corporate Communications
801 17th Street, NW
Washington, DC 20434
(202) 416-7357

FOR IMMEDIATE RELEASE PR-53-94 (5-13-94)

GREAT AMERICAN FEDERAL SAVINGS ASSOCIATION,
SAN DIEGO, CALIFORNIA,
ACQUIRED BY SEVEN FINANCIAL INSTITUTIONS

The Resolution Trust Corporation (RTC) has approved the sale of Great American Federal Savings Association (Great American), San Diego, California, to seven financial institutions.

Services to Great American's former customers will continue without interruption. The former Great American's 84 banking offices will reopen on Monday, May 16, 1994, and will operate according to their normal schedules.

As part of this transaction, the acquirers will assume all insured deposits totaling approximately $2 billion. The acquirers are also purchasing $91.7 million of the failed institution's assets, which include cash, share loans, and overdrafts.

Great American's 60 Arizona banking offices and their acquirors are:

- The insured deposits of 58 banking offices in Phoenix, and Tucson, (36 of which are located in Fry's Food and Drug Stores), totaling approximately $1.4 billion, were acquired by Bank One, Arizona, NA (Bank One), Phoenix, Arizona. Bank One is also

-more-

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803480

-2-

purchasing $91 million of the failed institution's assets with no putback options. Bank One paid the RTC a franchise premium of $49.36 million. Deposits will be insured by the Federal Deposit Insurance Corporation (FDIC) Savings Association Insurance Fund (SAIF). 3.5

- The insured deposits of the 2 banking offices located at 32 North Stone, Tucson, and 1833 6th Avenue, Tucson, totaling approximately $66.4 million, were acquired by Washington Federal Savings (Washington Federal), Seattle, Washington. Washington Federal is also purchasing $117,000 of the failed institution's assets with no putback options. Washington Federal paid the RTC a franchise premium of $400,000. Deposits will be insured by the FDIC SAIF.

Great American's 24 Washington banking offices and their acquirers are:

- The insured deposits of the 15 banking offices in Seattle and Olympia, totaling approximately $368.7 million, were acquired by First Interstate Bank of Washington, N.A. (First Interstate), Seattle, Washington. First Interstate is also purchasing $421,000 of the failed institution's assets with no putback options. First Interstate paid the RTC a franchise premium of $26 million. Deposits will be insured by the FDIC SAIF. 7.05%

- The insured deposits of the 8 banking offices in Tacoma, Federal Way, Montesano, Aberdeen, and Spokane, totaling approximately $140.1 million, were acquired by Sterling Savings

-more-

05 13 '94 19:48 8 206 943 5303 GREAT AMERICAN 04
MAY-13-1994 19:41 FROM GAF FINANCE TO 912069433303 P.03
MAY 13 '94 22:05 FROM RTC COMM PAGE.004

-3-

Association (Sterling), Spokane, Washington. Sterling is also purchasing $188,000 of the failed institution's assets with no putback options. Sterling paid the RTC a franchise premium of $8.7 million. Deposits will be insured by the FDIC SAIF. 6.21

- The insured deposits of the 2 banking offices in Vancouver and Longview, totaling approximately $47.7 million, were acquired by Riverview Savings Bank, FSB (Riverview), Camas, Washington. Riverview is also purchasing $19,000 of the failed institution's assets with no putback options. Riverview paid the RTC a franchise premium of $3.2 million. Deposits will be insured by the FDIC SAIF. 6.70% $2.6 (SA)

- The insured deposits of the banking office in Wenatchee, totaling approximately $25.6 million, were acquired by InterWest Savings Bank (InterWest), Oak Harbor, Washington. InterWest is also purchasing $15,000 of the failed institution's assets with no putback options. InterWest paid the RTC a franchise premium of $1.75 million. Deposits will be insured by the FDIC SAIF. $1.43 (SA)

- The insured deposits of the banking office in Richland, totaling approximately $18.2 million, were acquired by Key Bank of Washington (Key Bank), Tacoma, Washington. Key Bank is also purchasing $19,000 of the failed institution's assets with no putback options. Key Bank paid the RTC a franchise premium of $1.3 million. Deposits will be insured by the FDIC SAIF. 7.14% 1.282 (SA)

Depositors who had insured accounts with Great American can automatically continue to conduct business transactions with the

-more-

CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER SG 0303482

acquirers. All checks drawn on Great American accounts, up to the $100,000 federal deposit insurance limit, will continue to be honored as usual. Depositors should, however, visit the institutions during the next several weeks to discuss continuation of their specific services and to affirm and claim their accounts.

The U.S. Congress has directed the RTC to offer deposits that remain unclaimed after 18 months to the state listed as the depositor's residence on the records of a closed savings institution. After 18 months, depositors who have failed to affirm their accounts may have to claim the deposits from the state.

Depositors with uninsured funds will receive a receiver's certificate for that portion of their accounts above the insurance level. On Tuesday, May 31, 1994, the RTC will begin to pay an advance dividend to owners of the uninsured funds representing 28.5 percent of the balance above the insurance limit. These depositors may receive additional dividend checks from the RTC as recoveries from the sale of Great American's assets are collected.

Great American had total assets of $1.47 billion and total liabilities of $2.4 billion, including $2.08 billion in approximately 169,000 deposit accounts and $281.8 million in secured liabilities. Secured liabilities will not pass to the acquirers in this transaction. Great American's core, or local retail, deposit base is estimated to be $1.53 billion. The franchise premiums paid to the RTC by the acquirers totaled $90.7 million.

-more-

A listing of Great American's 84 banking offices and their acquirers is attached.

The RTC will advance an estimated $1.8 billion to the acquirers and will retain approximately $1.36 billion of the closed institution's assets. The RTC will recover a portion of its advance through the sale of assets to be held in the receivership. The ultimate cost to the RTC of this transaction is estimated at $1.18 billion.

The RTC invited 171 potential purchasers to bid on the institution. The acquirers' combined bids were determined by the RTC to be the least costly of the 61 proposals submitted to the agency.

The RTC was established by Congress in August 1989 to contain, manage, and sell failed savings institutions and recover taxpayer funds through the management and sale of the institutions' assets. Prior to today's transactions, the RTC has closed or sold 714 savings institutions and achieved asset sales and collections of more than $361 billion. Approximately 23 million depositors and approximately $207 billion in deposits have been protected by the RTC's closing of insolvent thrifts.

###

05/13/94 19:58 8 206 943 5305 GREAT AMERICAN 07

MAY-13-1994 19:44 FROM GAF FINANCE TO 912069435303 P.06

MAY 13 '94 22:06 FROM RTC COMM PAGE.007

## Great American Federal Savings Association, San Diego, Ca.
## Branch Clusters

| # | Branch Name | Address | Deposits (in 000's) |
|---|---|---|---|
| | **Branches Acquired By Bank One, Arizona, N.A.:** | | |
| 1 | Metro Center | 2759 West Peoria Avenue, Phoenix | $27,030 |
| 2 | 99th & Peoria | 10050 North 99th Avenue, Peoria | $31,259 |
| 3 | Apache Trail | 8060 East Apache Trail, Mesa | $48,593 |
| 4 | Scottsdale & Shea | 10441 North Scottsdale Road, Scottsdale | $51,249 |
| 5 | Sun City Bell | 10701 West Bell Road, Sun City | $87,646 |
| 6 | Fiesta Mall | 1250 South Alma School Road, Mesa | $21,947 |
| 7 | Sun City West – Sundome | 19428 R.H.Johnson Blvd., Sun City West | $87,700 |
| 8 | 7th & Thunderbird | 13802 North 7th Street, Phoenix | $84,676 |
| 9 | Ahwatukee | 4665 East Warner Road, Phoenix | $20,567 |
| 10 | Christown Plaza | 5725 North 19th Avenue, Phoenix | $55,850 |
| 11 | Lincoln & Scottsdale | 6613 North Scottsdale Road, Scottsdale | $19,485 |
| 12 | 32nd & Camelback | 3200 East Camelback #100, Phoenix | $40,899 |
| 13 | Phoenix Tower | 3200 North Central Avenue, Phoenix | $41,671 |
| 14 | Speedway/El Rancho | 6333 East Speedway Blvd., Tucson | $40,925 |
| 15 | Broadway & Wilmot | 11 N. Wilmot, 6259 E. Broadway, Tucson | $56,906 |
| 16 | Amphitheater | 920 East Fort Lowell, Tucson | $20,280 |
| 17 | Flowing Wells | 1815 West Prince Road, Tucson | $25,894 |
| 18 | Camino Seco & Broadway | 8676 East Broadway, Tucson | $37,963 |
| 19 | Tanque Verde | 7070 East Tanque Verde Road, Tucson | $30,290 |
| 20 | Plaza Del Oro | 6456 North Oracle Road, Tucson | $20,435 |
| 21 | Swan & Sunrise | 4789 East Sunrise Drive, Tucson | $35,802 |
| 22 | Green Valley | 201 West Continental, Green Valley | $27,6[illegible] |
| 23 | 43rd & Bell | 4315 West Bell Road, Phoenix | $19,908 |
| 24 | Guadalupe & McClintock | 1855 East Guadalupe Road, Tempe | $24,254 |
| 25 | Indian School & Miller | 7535-A E. Indian School Rd., Scottsdale | $45,789 |
| 26 | University & Gilbert | 1900 East University, Mesa | $21,944 |
| 27 | University & Greenfield | 4425 East University, Mesa | $21,861 |
| 28 | 51st & Olive | 5119 West Olive, Glendale | $16,422 |
| 29 | 75th & Indian School | 7445 West Indian School Road, Phoenix | $7,191 |
| 30 | 19th & Union Hills | 18420 North 19th Avenue, Phoenix | $12,364 |
| 31 | 67th & Bethany Home | 6710 West Bethany Home Road, Glendale | $6,267 |
| 32 | Litchfield/Van Buren | 390 North Litchfield, Goodyear | $7,609 |
| 33 | 30th & Thomas | 3050 East Thomas Road, Phoenix | $21,086 |
| 34 | Ray/Ranch Circle | 3616 East Ray Road, Phoenix | $821 |
| 35 | Casa Grande | 1395 East Florence Blvd., Casa Grande | $2,509 |
| 36 | Ray & Dobson | 1960 West Ray Road, Chandler | $4,090 |
| 37 | 59th & Thunderbird | 5771 West Thunderbird Road, Glendale | $14,494 |
| 38 | 40th & Thunderbird | 3901 East Thunderbird Road, Phoenix | $29,904 |
| 39 | Elliot & Alma School Rd. | 981 West Elliot Road, Chandler | $24,843 |
| 40 | 7th & Bell | 731 East Bell Road, Phoenix | $14,173 |
| 41 | 35th & Thunderbird | 3421 West Thunderbird Road, Phoenix | $12,820 |
| 42 | Southern & McClintock | 3115 South McClintock, Tempe | $17,598 |
| 43 | 82nd & Main | 8225 East Main Street, Mesa | $20,193 |
| 44 | Gilbert & Southern | 1244 South Gilbert Road, Mesa | $10,961 |
| 45 | 75th & Cactus | 7455 West Cactus Road, Peoria | $10,078 |
| 46 | 43rd & Bethany Home | 4333 West Bethany Home Road, Glendale | $16,505 |
| 47 | 48th & Baseline | 2700 West Baseline Road, Tempe | $9,796 |
| 48 | 51st & Indian School | 5127 West Indian School Road, Phoenix | $13,018 |
| 49 | 22nd & Alvernon | 4150 East 22nd Street, Tucson | $23,102 |
| 50 | Oro Valley | 10661 North Oracle Road, Oro Valley | $1,160 |
| 51 | Ina & Thornydale | 3770 West Ina Road, Tucson | $14,772 |
| 52 | Alvernon & Grant | 3920 East Grant Road, Tucson | $10,257 |
| 53 | 1st & Grant | 555 East Grant Road, Tucson | $13,280 |
| 54 | Magee & Oracle | 7051 North Oracle Road, Tucson | $10,206 |
| 55 | Speedway & Pantano | 7850 East Speedway Blvd., Tucson | $16,981 |
| 56 | 10th & Ajo | 3040 South 16th Avenue, Tucson | $11,376 |
| 57 | Golf Links & Kolb | 7050 East Golf Links Road, Tucson | $11,325 |
| 58 | 22nd & Harrison | 9401 East 22nd Street, Tucson | $5,882 |
| | Total | | $1,598,103 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803485

05/13/94 19:51 ☎ 206 943 5303 GREAT AMERICAN 08

MAY-13-1994 19:44 FROM GAF FINANCE TO 912069435303 P.07

MAY 13 '94 22:07 FROM RTC COMM

## Great American Federal Savings Association, San Diego, Ca.
## Branch Clusters

| # | Branch Name | Address | Deposits (in 000's) |
|---|---|---|---|
| **Branches Acquired By Washington FS&LA:** | | | |
| 1 | Downtown Tucson Tower | 32 North Stone, Tucson | $44,889 |
| 2 | South Tucson | 1808 6th Avenue, Tucson | $21,704 |
| | Total | | $66,593 |
| **Branches Acquired By First Interstate Bank of Washington:** | | | |
| 1 | Queene Anne | 400 Queen Anne Avenue North, Seattle | $26,934 |
| 2 | Greenwood | 5420 Dayton Avenue North, Seattle | $40,800 |
| 3 | Gateway | 16350 Midvale Avenue, Seattle | $34,910 |
| 4 | Issaquah | 11 Front Street South, Issaquah | $24,186 |
| 5 | Totem Lake | 12550 120th Avenue N.E., Kirkland | $39,766 |
| 6 | Silverdale | 10300 Silverdale Way N.W., Silverdale | $29,662 |
| 7 | Downtown Seattle | 611 Pine Street, Seattle | $22,881 |
| 8 | Bellevue | 10425 N.E. 8th Street, Bellevue | $28,150 |
| 9 | Bothell | 10134 Main Street, Bothell | $15,197 |
| 10 | Everett | 1020 S.E. Everett Mall Way, Everett | $15,998 |
| 11 | Olympia | 425 South Franklin Street, Olympia | $28,804 |
| 12 | Shelton | 108 West Railroad, Shelton | $19,707 |
| 13 | Tumwater | 3242/6238 Capitol Blvd., Tumwater | $14,170 |
| 14 | Lacey | 4110 Pacific Avenue, Lacey | $20,975 |
| 15 | West Olympia | 1500 Black Lake Blvd., Olympia | $10,160 |
| | Total | | $368,738 |
| **Branches Acquired By Sterling Savings Association:** | | | |
| 1 | Tacoma Mall | 4502 Tacoma Mall Blvd., Tacoma | $39,667 |
| 2 | Federal Way | 33525 Pacific Highway South, Federal Way | $29,453 |
| 3 | Montesano | 211 South Main Street, Montesano | $17,553 |
| 4 | Aberdeen | 101 North Broadway, Aberdeen | $50,108 |
| 5 | Spokane | 615 West Sprague Avenue, Spokane | $27,223 |
| | Total | | $140,151 |
| **Branches Acquired By Riverview Savings Bank:** | | | |
| 1 | Vancouver | 7798 N.E. Highway 99, Vancouver | $33,520 |
| 2 | Longview | 1011 Washington Way, Longview | $14,219 |
| | Total | | $47,739 |
| **Branch Acquired By InterWest Savings Bank:** | | | |
| 1 | Wenatchee | 700 North Mission Avenue, Wenatchee | $25,561 |
| **Branch Acquired By Key Bank of Washington:** | | | |
| 1 | Richland | 1278 Lee Boulevard, Richland | $10,209 |

TOTAL P.07

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803486

Coopers &Lybrand

certified public accountants

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have been engaged to report on the appropriate application of generally accepted accounting principles to the specific transaction described below. This report is being issued to you for assistance in complying with the requirements of the Association's application to the Federal Home Loan Bank Board (FHLBB) to purchase certain assets and assume certain liabilities of two branches (located in Spokane and Richland, Washington) of Great American First Savings Bank, FSB ("Great American"). Our engagement has been conducted in accordance with standards established by the American Institute of Certified Public Accountants.

We have read the Savings Assumption and Purchase Agreement between Sterling Savings Association ("Sterling") and Great American. We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, specifically the attached schedule entitled "Acquisition of Two Branches from Great American FSB-Balance Sheet" and all supporting workpapers.

Based on the reviews described above, it is our understanding that the contemplated transaction will include the following major components:

1. Sterling will assume all deposit liabilities of the two branches and a minor amount of accrued interest thereon in exchange for receiving a cash payment equal to the book value of the deposits as recorded by Great American (approximately $29,602,000). Sterling intends to record the deposits and accrued interest assumed at an amount equal to the cash payment received, which is materially equal to their estimated fair values.

2. Sterling will purchase all loans secured by deposits and all overdraft loans at the two branches, and a minor amount of accrued interest thereon, by making a cash payment equal to the book value of the loans as recorded by Great American (approximately $24,000). Sterling intends to record the loans and accrued interest purchased at an amount equal to the cash payment made, which is materially equal to their estimated fair values.

3. Sterling will purchase the land and building at the Richland branch, the furniture, fixtures and equipment at both branches, and the intangible asset associated with the

deposits assumed at both branches, by making a cash payment to Great American of $480,000. In addition, Sterling expects to capitalize certain costs related to closing the transaction and winding down operations at the leased Spokane branch, estimated at approximately $54,000.

Sterling intends to record the fixed assets (land, building, furniture, fixtures, and equipment) at an amount equal to their estimated fair values (approximately $419,000). The $115,000 difference between this amount and the sum of the cash payment to Great American and Sterling's costs will be recorded as an identified intangible asset. This identified intangible, which can be ascribed to the value of existing depositor relationships at the two branches, will be amortized over a period not to exceed eight years.

Although the transaction described above is not a true business combination or acquisition as contemplated by Accounting Principles Board Opinion No. 16 (APB No. 16) and Statement of Financial Accounting Standards No. 72 (SFAS No. 72), many of the concepts and principles inherent in these two standards are still applicable to the proposed transaction, and have appropriately been considered by Sterling in developing its proposed accounting treatment. In our opinion, based solely upon the information and facts provided to us as described above, Sterling's proposed accounting treatment for the purchase of certain assets and the assumption of certain liabilities of two Great American branches, as described above and as documented on the attached schedule, is in accordance with generally accepted accounting principles (specifically, APB No. 16 and SFAS No. 72).

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Great American transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of an audit of Sterling's consolidated financial statements, our conclusions may change.

Coopers & Lybrand

Spokane, Washington
July 28, 1989

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

From Application to Acquire branches

IV. FINANCIAL DATA

B. Statement of Condition and Financial Data

The following pages include financial data and pro forma Statements of Condition for Sterling as of June 30, 1989. The adjustments reflect the value ascribed to Great American's branches of $480,000, Great American's deposits for the two branches as of June 30, 1989 of $29,544,000 (rounded), estimated accrued interest on deposits of $58,000, and approximate value of share loans as of June 30, 1989. Adjustments also reflect the paydown of other borrowings.

20-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

| ASSETS | STERLING BEGINNING BALANCE 6\30\89 | | DEBIT | CREDIT | | NET ASSETS ACQUIRED & LIAB ASSUMED | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|---|
| CASH | $14,336 | (1) | $29,602 | $504 | (2) | $98 | $14,434 |
| | | | 0 | 29,000 | (4) | | |
| INVESTMENTS | 41,353 | | 0 | 0 | | 0 | 41,353 |
| LOANS RECEIVABLE | 499,128 | (2) | 23 | 0 | | 23 | 499,151 |
| MORTGAGE-BACKED SECURITIES | 114,060 | | 0 | 0 | | 0 | 114,060 |
| INVESTMENT & ADVANCES TO AFFILIATE | 6,575 | | 0 | 0 | | 0 | 6,575 |
| ACCRUED INTEREST RECEIVABLE | 6,301 | (2) | 1 | 0 | | 1 | 6,302 |
| OFFICE PROPERTIES AND EQUIPMENT | 9,614 | (2) | 419 | 0 | | 419 | 10,033 |
| INTANGIBLE ASSETS | 25,949 | (2) | 61 | 0 | | 115 | 26,064 |
| | | (3) | 54 | 0 | | | |
| REAL ESTATE OWNED | 12,200 | | 0 | 0 | | 0 | 12,200 |
| PREPAID & OTHER ASSETS | 1,454 | | 0 | 0 | | 0 | 1,454 |
| TOTAL ASSETS | $731,170 | | | | | $656 | $731,826 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | | | |
| SAVINGS AND CHECKING | 519,382 | (4) | 10,000 | 29,344 | (1) | 19,344 | 538,726 |
| ADVANCES FROM FHLB | 96,500 | (4) | 9,000 | 0 | | (9,000) | 87,500 |
| REPO FUNDS PURCHASED | 87,345 | (4) | 10,000 | 0 | | (10,000) | 77,345 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,994 | | 0 | 0 | | 0 | 4,994 |
| ACCRUED INTEREST PAYABLE | 3,023 | | 0 | 58 | (1) | 58 | 3,081 |
| OTHER LIABILITIES | 9,327 | | 0 | 54 | (3) | 54 | 9,381 |
| TOTAL LIABILITIES | 720,651 | | 29,000 | 29,456 | | 656 | 721,307 |
| STOCKHOLDERS' EQUITY | | | | | | | |
| CAPITAL STOCK | 517 | | 0 | 0 | | 0 | 517 |
| PREFERRED STOCK | 90 | | 0 | 0 | | 0 | 90 |
| ADDITIONAL PAID IN CAPITAL | 7,709 | | 0 | 0 | | 0 | 7,709 |
| UNDIVIDED PROFITS | 2,203 | | 0 | 0 | | 0 | 2,203 |
| TOTAL EQUITY | 10,519 | | | | | 0 | 10,519 |
| TOTAL LIABILITIES AND EQUITY | $731,170 | | | | | $656 | $731,826 |
| GAAP LEVERAGE | 1.4392 | | | | | | 1.4371 |

EXPLANATIONS:
[illegible]

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803490

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

28-Jul-89
07:14 AM

| ASSETS | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL |
|---|---|---|---|
| CASH | $20,000 | $20,000 | $40,000 |
| INVESTMENTS | 0 | 0 | 0 |
| LOANS RECEIVABLE | 6,100 | 17,022 | 23,122 |
| MORTGAGE-BACKED SECURITIES | 0 | 0 | 0 |
| INVESTMENT & ADVANCES TO AFFILIATE | 0 | 0 | 0 |
| ACCRUED INTEREST RECEIVABLE | 150 | 600 | 750 |
| OFFICE PROPERTIES AND EQUIPMENT | 5,900 | 413,000 | 418,900 |
| INTANGIBLE ASSETS | 74,750 | 40,250 | 115,000 |
| REAL ESTATE OWNED | 0 | 0 | 0 |
| PREPAID & OTHER ASSETS | 0 | 0 | 0 |
| TOTAL ASSETS | $106,900 | $490,872 | $597,772 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| SAVINGS AND CHECKING | 16,214,807 | 13,329,017 | 29,543,824 |
| ADVANCES FROM FHLB | 0 | 0 | 0 |
| REPO FUNDS PURCHASED | 0 | 0 | 0 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 0 | 0 | 0 |
| ACCRUED INTEREST PAYABLE | 20,762 | 37,328 | 58,090 |
| OTHER LIABILITIES & NOTES PAYABLE | 0 | 0 | 0 |
| TOTAL LIABILITIES | 16,235,569 | 13,366,345 | 29,601,914 |
| TOTAL EQUITY | 0 | 0 | 0 |
| TOTAL LIABILITIES AND EQUITY | $16,235,569 | $13,366,345 | $29,601,914 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

20-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL |
|---|---|---|---|
| INTEREST INCOME | $1,018,667 | $827,667 | 1,846,333 (1) |
| INTEREST EXPENSE | $900,480 | $722,627 | 1,623,107 (1) |
| NET INT. SPREAD | 118,187 | 105,040 | 223,227 (1) |
| OTHER INCOME: | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 6,000 | 21,600 | 27,600 (2) |
| LOAN SERVICING INCOME | 0 | 0 | 0 |
| SUBSIDIARY OPERATIONS | 0 | 0 | 0 |
| REO OPERATIONS | 0 | 0 | 0 |
| RESERVE FOR LOANS & REO LOSSES | 0 | 0 | 0 |
| GAIN (LOSS) ON INVSTMT & LOANS | 0 | 0 | 0 |
| OTHER INCOME (EXPENSE) | 0 | 0 | 0 |
| TOTAL OTHER INCOME | 6,000 | 21,600 | 27,600 |
| OPERATING EXP. | | | |
| EMPLOYEE COMP. & BENEFITS | 15,600 | 18,720 | 34,320 (3) |
| OCCUPANCY & EQUIPMENT | 19,971 | 34,320 | 54,291 (4) |
| ADVERTISING & PROMOTION | 1,500 | 1,500 | 3,000 (5) |
| DATA PROCESSING | 2,460 | 5,000 | 7,460 (6) |
| INSURANCE | 17,936 | 13,936 | 31,871 (7) |
| DEPRECIATION & AMORTIZATION | 5,120 | 13,672 | 18,792 (8) |
| OTHER | 0 | 0 | 0 |
| TOTAL OPERATING EXPENSE | 62,587 | 87,148 | 149,734 |
| NET INC (LOSS)BEFORE TAX | $61,600 | $39,492 | $101,092 |
| TAX (PROVISION) BENEFIT | 0 | 0 | 0 |
| NET INC (LOSS) | 61,600 | 39,492 | 101,092 |
| AVERAGE DEPOSITS | 16,000,000 | 13,000,000 | |
| AVERAGE YIELD | 9.550% | 9.550% | |
| AVERAGE COST OF FUNDS | 8.442% | 8.338% | |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803492

28-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | PROJECTION FOR STERLING FISCAL 1990 | ADJUSTMENTS (BOTH BRANCHES) | | PRO FORMA COMBINED |
|---|---|---|---|---|
| INTEREST INCOME | 70,078,000 | 1,846,333 | (1) | 71,924,333 |
| INTEREST EXPENSE | 55,864,000 | 1,623,107 | (1) | 57,487,107 |
| NET INT. SPREAD | 14,214,000 | 223,227 | (1) | 14,437,227 |
| OTHER INCOME: | | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 1,648,000 | 27,600 | (2) | 1,675,600 |
| LOAN SERVICING INCOME | 970,000 | 0 | | 970,000 |
| SUBSIDIARY OPERATIONS | 1,603,000 | 0 | | 1,603,000 |
| REO OPERATIONS | 114,000 | 0 | | 114,000 |
| RESERVE FOR LOANS & REO LOSSES | (360,000) | 0 | | (360,000) |
| GAIN (LOSS) ON INVSTMT & LOANS | 210,000 | 0 | | 210,000 |
| OTHER INCOME (EXPENSE) | 12,000 | 0 | | 12,000 |
| TOTAL OTHER INCOME | 4,197,000 | 27,600 | | 4,224,600 |
| OPERATING EXP. | | | | |
| EMPLOYEE COMP. & BENEFITS | 4,781,000 | 34,320 | (3) | 4,815,320 |
| OCCUPANCY & EQUIPMENT | 2,280,000 | 54,291 | (4) | 2,334,291 |
| ADVERTISING & PROMOTION | 293,000 | 3,000 | (5) | 296,000 |
| DATA PROCESSING | 1,297,000 | 7,460 | (6) | 1,304,460 |
| INSURANCE | 1,224,000 | 31,871 | (7) | 1,255,871 |
| DEPRECIATION & AMORTIZATION | 4,262,000 | 18,792 | (8) | 4,280,792 |
| OTHER | 1,876,000 | 0 | | 1,876,000 |
| TOTAL OPERATING EXP. | 16,013,000 | 149,734 | | 16,162,734 |
| NET INC (LOSS)BEFORE TAX | 2,398,000 | 101,092 | | 2,499,092 |
| TAX (PROVISION) BENEFIT | 863,280 | 36,393 | | 899,673 |
| NET INC (LOSS) | $1,534,720 | $64,699 | | $1,599,419 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803493

NOTES TO THE PROJECTED STATEMENT OF PROFIT AND LOSS

General Assumptions

It is generally assumed that Sterling will close the Spokane branch on February 1, 1990, and transfer the deposits to its main office. It is also assumed that on March 1, 1990, Sterling will close its branch in Richland, Washington, and relocate the staff and transfer the deposits to the branch acquired from Great American. Sterling will continue to pay the monthly lease payments on the Spokane branch through its expiration of June 6, 1990.

Specific Assumptions

(1) It assumed that average deposits for Spokane and Richland will average $16.0 million and $13.0 million, respectively. The cost of deposits is assumed to be 8.442% and 8.338% for Spokane and Richland, respectively. Sterling will use the funds obtained from Great American to pay down wholesale public funds, reverse repos, and Federal Home Loan Bank advances. It is assumed the average cost to be 9.55%. The improvement on net interest margin, obtained from these assumptions, is approximately 1.13% for eight months.

(2) Fee income consists of transaction account fees. The projection reflects historical levels within these branches.

(3) Personnel expense consists of adding one full-time equivalent on a permanent basis in each of these two branches, plus benefit expense.

(4) Occupancy and equipment expense consists of telephone, postage and delivery expenses, office supplies, rent (net of sublease rental income), heating and air conditioning, janitorial, and utilities expenses. In the case of Spokane, the expenses are for three months only, whereas for Richland, they represent a full eight months.

(5) Sterling anticipates only a minor advertising campaign as a result of this

(7) Insurance expense includes FSLIC insurance on the acquired deposits reduced for the wholesale deposits paid off from the obtained from Great American. Insurance expense also includes an amount for property and fidelity insurance expense for these two branches.

(8) The building in Richland is being depreciated over a 25-year life, straight-line method. The equipment in both Spokane and Richland are being depreciated over a 5-year life, and the intangible associated with the deposit base of approximately $115,000 is being amortized on the straight-line method over 8 years.

# STATEMENT OF CONDITION

AS OF June 30 1989

(000's OMITTED)

(See Instructions on Reverse)

| LINE ITEMS | NAME OF INSTITUTION Sterling Savings Association AMOUNT | PERCENT OF TOTAL ASSETS | ADJUSTMENTS DEBIT | ADJUSTMENTS CREDIT | PROFORMA STATEMENT AMOUNT | PERCENT OF TOTAL ASSETS |
|---|---|---|---|---|---|---|
| | $ 570,749 | 76.7 | $ | | $ 570,749 | 76.63 |
| | 46,537 | 6.3 | (2) 24 | | 46,561 | 6.25 |
| | 12,080 | 1.6 | | | 12,080 | 1.62 |
| ...h Stock | 7,563 | 1.0 | | | 7,563 | 1.02 |
| | 50,130 | 6.7 | (1) 29,602 | 504 + 29,000 (2)+(4) | 50,228 | 6.7[illegible] |
| | 6,408 | .9 | | | 6,408 | 0.86 |
| | 9,615 | 1.3 | (2) 419 | | 10,034 | 1.3[illegible] |
| | 37,747 | 5.1 | (2)+(3) 61 + 54 = 115 | | 37,862 | 5.0[illegible] |
| | 3,307 | .4 | | | 3,307 | 0.4[illegible] |
| | $ 744,136 | 100.0% | $ 30,160 | 29,504 | $ 744,792 | 100.0[illegible] |
| | ( 4,093 ) | ( ) | | | ( 4,093 ) | ( ) |
| ...ccounts - Rate | $ 50,465 | 6.8 | $ | $ 4,068 (1) | $ 54,533 | 7.3[illegible] |
| | 468,924 | 63.0 | (4) 10,000 | 25,476 (1) | 484,400 | 65.0[illegible] |
| | 189,042 | 25.4 | (4) 19,000 | | 170,042 | 22.8[illegible] |
| | 70 | .0 | | | 70 | .01 |
| ...s | 11,435 | 1.5 | | 58 + 54 = 112 (1)+(3) | 11,547 | 1.5[illegible] |
| | 0 | .0 | | | 0 | .0[illegible] |
| ...ilities | 478 | .1 | | | 478 | .0[illegible] |
| | $ 720,414 | 96.8 | $ 29,000 | $ 29,656 | $ 726,070 | 96.81 |
| ...s | $ 21,795 | 2.9 | $ | $ | $ 21,795 | 2.9[illegible] |
| ...al Certificates | | | | | | |
| | | | | | | |
| | 1,927 | .3 | | | 1,927 | .2[illegible] |
| ...d | | | | | | |
| ...ies | | | | | | |
| ...l Debentures | | | | | | |
| *WORTH | $ 23,722 | 3.2 | $ | $ | $ 23,722 | 3.1[illegible] |
| | | | | | | |
| ...l | $ 744,136 | 100.0% | $ 29,000 | $ 29,656 | $ 744,792 | 100.[illegible] |
| ...k Authorized | ( 9,000,000 ) | | | | ( 9,000,000 ) | |
| ...k Outstanding | ( 607,396 ) | | | | ( 607,396 ) | |
| | ( ) | ( ) | $ | $ | ( ) | ( ) |

*Show profit or loss on sale as adjustment to regulatory net worth account

-3-

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803496

NOTES TO THE STATEMENT OF CONDITION AS OF JUNE 30, 1989

(1) Represents cash paid to Starling for assumption of deposits.

(2) Represents cash paid by Starling to purchase real property, office equipment, savings loans and intangibles.

(3) Represents anticipated costs of acquisition, including computer conversion, legal, accounting, travel, training, and duplicated rent and salaries prior to consolidation.

(4) Represents the anticipated use of funds to pay off borrowings.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803497

IV. FINANCIAL DATA

C. CPA Opinion

An opinion from Coopers & Lybrand, Sterling's Public Accountant is included. The opinion explains the proposed accounting treatment on the transaction by Sterling Savings Association.

CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER SG 0803498

Coopers &Lybrand | certified public accountants

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have been engaged to report on the appropriate application of generally accepted accounting principles to the specific transaction described below. This report is being issued to you for assistance in complying with the requirements of the Association's application to the Federal Home Loan Bank Board (FHLBB) to purchase certain assets and assume certain liabilities of two branches (located in Spokane and Richland, Washington) of Great American First Savings Bank, FSB ("Great American"). Our engagement has been conducted in accordance with standards established by the American Institute of Certified Public Accountants.

We have read the Savings Assumption and Purchase Agreement between Sterling Savings Association ("Sterling") and Great American. We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, specifically the attached schedule entitled "Acquisition of Two Branches from Great American FSB-Balance Sheet" and all supporting workpapers.

Based on the reviews described above, it is our understanding that the contemplated transaction will include the following major components:

1. Sterling will assume all deposit liabilities of the two branches and a minor amount of accrued interest thereon in exchange for receiving a cash payment equal to the book value of the deposits as recorded by Great American (approximately $29,602,000). Sterling intends to record the deposits and accrued interest assumed at an amount equal to the cash payment received, which is materially equal to their estimated fair values.

2. Sterling will purchase all loans secured by deposits and all overdraft loans at the two branches, and a minor amount of accrued interest thereon, by making a cash payment equal to the book value of the loans as recorded by Great American

deposits assumed at both branches, by making a cash payment to Great American of $480,000. In addition, Sterling expects to capitalize certain costs related to closing the transaction and winding down operations at the leased Spokane branch, estimated at approximately $54,000.

Sterling intends to record the fixed assets (land, building, furniture, fixtures, and equipment) at an amount equal to their estimated fair values (approximately $419,000). The $115,000 difference between this amount and the sum of the cash payment to Great American and Sterling's costs will be recorded as an identified intangible asset. This identified intangible, which can be ascribed to the value of existing depositor relationships at the two branches, will be amortized over a period not to exceed eight years.

Although the transaction described above is not a true business combination or acquisition as contemplated by Accounting Principles Board Opinion No. 16 (APB No. 16) and Statement of Financial Accounting Standards No. 72 (SFAS No. 72), many of the concepts and principles inherent in these two standards are still applicable to the proposed transaction, and have appropriately been considered by Sterling in developing its proposed accounting treatment. In our opinion, based solely upon the information and facts provided to us as described above, Sterling's proposed accounting treatment for the purchase of certain assets and the assumption of certain liabilities of two Great American branches, as described above and as documented on the attached schedule, is in accordance with generally accepted accounting principles (specifically, APB No. 16 and SFAS No. 72).

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Great American transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of an audit of Sterling's consolidated financial statements, our conclusions may change.

Coopers & Lybrand

26-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

| ASSETS | STERLING BEGINNING BALANCE 6\30\89 | | DEBIT | CREDIT | | NET ASSETS ACQUIRED & LIAB ASSUMED | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|---|
| CASH | $14,336 | (1) | $29,602 | $504 | (2) | 198 | $14,434 |
| | | | 0 | 29,000 | (4) | | |
| INVESTMENTS | 41,353 | | 0 | 0 | | 0 | 41,353 |
| LOANS RECEIVABLE | 499,128 | (2) | 23 | 0 | | 23 | 499,151 |
| MORTGAGE-BACKED SECURITIES | 114,060 | | 0 | 0 | | 0 | 114,060 |
| INVESTMENT & ADVANCES TO AFFILIATE | 6,375 | | 0 | 0 | | 0 | 6,575 |
| ACCRUED INTEREST RECEIVABLE | 6,301 | (2) | 1 | 0 | | 1 | 6,302 |
| OFFICE PROPERTIES AND EQUIPMENT | 9,614 | (2) | 419 | 0 | | 419 | 10,033 |
| INTANGIBLE ASSETS | 25,949 | (2) | 61 | 0 | | 115 | 26,064 |
| | | (3) | 54 | 0 | | | |
| REAL ESTATE OWNED | 12,200 | | 0 | 0 | | 0 | 12,209 |
| PREPAID & OTHER ASSETS | 1,654 | | 0 | 0 | | 0 | 1,654 |
| TOTAL ASSETS | $731,170 | | | | | $656 | $731,826 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| SAVINGS AND CHECKING | 519,382 | (4) | 10,000 | 29,544 | (1) | 19,544 | 538,926 |
| ADVANCES FROM FHLB | 96,380 | (4) | 9,000 | 0 | | (9,000) | 87,380 |
| REPO FUNDS PURCHASED | 87,345 | (4) | 10,000 | 0 | | (10,000) | 77,345 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,994 | | 0 | 0 | | 0 | 4,994 |
| ACCRUED INTEREST PAYABLE | 3,023 | | 0 | 58 | (1) | 58 | 3,081 |
| OTHER LIABILITIES | 9,327 | | 0 | 54 | (3) | 54 | 9,381 |
| TOTAL LIABILITIES | 720,651 | | 29,000 | 29,656 | | 656 | 721,307 |
| **STOCKHOLDERS' EQUITY** | | | | | | | |
| CAPITAL STOCK | 517 | | 0 | 0 | | 0 | 517 |
| PREFERRED STOCK | 90 | | 0 | 0 | | 0 | 90 |
| ADDITIONAL PAID IN CAPITAL | 7,709 | | 0 | 0 | | 0 | 7,709 |
| UNDIVIDED PROFITS | 2,203 | | 0 | 0 | | 0 | 2,203 |
| TOTAL EQUITY | 10,519 | | | | | 0 | 10,519 |
| TOTAL LIABILITIES AND EQUITY | $731,170 | | | | | $656 | $731,826 |
| GAAP LEVERAGE | 1.439% | | | | | | 1.437% |

EXPLANATIONS:

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803501

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

29-Jul-89
07:14 AM

| ASSETS | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL |
|---|---|---|---|
| CASH | $20,000 | $20,000 | $40,000 |
| INVESTMENTS | 0 | 0 | 0 |
| LOANS RECEIVABLE | 6,100 | 17,022 | 23,122 |
| MORTGAGE-BACKED SECURITIES | 0 | 0 | 0 |
| INVESTMENT & ADVANCES TO AFFILIATE | 0 | 0 | 0 |
| ACCRUED INTEREST RECEIVABLE | 150 | 600 | 750 |
| OFFICE PROPERTIES AND EQUIPMENT | 5,900 | 413,000 | 418,900 |
| INTANGIBLE ASSETS | 74,750 | 40,250 | 115,000 |
| REAL ESTATE OWNED | 0 | 0 | 0 |
| PREPAID & OTHER ASSETS | 0 | 0 | 0 |
| TOTAL ASSETS | $106,900 | $490,872 | $597,772 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| SAVINGS AND CHECKING | 16,214,807 | 13,329,017 | 29,543,824 |
| ADVANCES FROM FHLB | 0 | 0 | 0 |
| REPO FUNDS PURCHASED | 0 | 0 | 0 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 0 | 0 | 0 |
| ACCRUED INTEREST PAYABLE | 20,762 | 37,328 | 58,090 |
| OTHER LIABILITIES & NOTES PAYABLE | 0 | 0 | 0 |
| TOTAL LIABILITIES | 16,235,569 | 13,366,345 | 29,601,914 |
| TOTAL EQUITY | 0 | 0 | 0 |
| TOTAL LIABILITIES AND EQUITY | $16,235,569 | $13,366,345 | $29,601,914 |

28-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL | |
|---|---|---|---|---|
| INTEREST INCOME | $1,018,667 | $827,667 | 1,846,333 | (1) |
| INTEREST EXPENSE | $900,480 | $722,627 | 1,623,107 | (1) |
| NET INT. SPREAD | 118,187 | 105,040 | 223,227 | (1) |
| OTHER INCOME: | | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 6,000 | 21,600 | 27,600 | (2) |
| LOAN SERVICING INCOME | 0 | 0 | 0 | |
| SUBSIDIARY OPERATIONS | 0 | 0 | 0 | |
| REO OPERATIONS | 0 | 0 | 0 | |
| RESERVE FOR LOANS & REO LOSSES | 0 | 0 | 0 | |
| GAIN (LOSS) ON INVSTMT & LOANS | 0 | 0 | 0 | |
| OTHER INCOME (EXPENSE) | 0 | 0 | 0 | |
| TOTAL OTHER INCOME | 6,000 | 21,600 | 27,600 | |
| OPERATING EXP. | | | | |
| EMPLOYEE COMP. & BENEFITS | 15,600 | 18,720 | 34,320 | (3) |
| OCCUPANCY & EQUIPMENT | 19,971 | 34,320 | 54,291 | (4) |
| ADVERTISING & PROMOTION | 1,500 | 1,500 | 3,000 | (5) |
| DATA PROCESSING | 2,460 | 5,000 | 7,460 | (6) |
| INSURANCE | 17,936 | 13,936 | 31,871 | (7) |
| DEPRECIATION & AMORTIZATION | 5,120 | 13,672 | 18,792 | (8) |
| OTHER | 0 | 0 | 0 | |
| TOTAL OPERATING EXPENSE | 62,507 | 87,148 | 149,734 | |
| NET INC (LOSS)BEFORE TAX | $61,680 | $39,492 | $101,092 | |
| TAX (PROVISION) BENEFIT | 0 | 0 | 0 | |
| NET INC (LOSS) | 61,680 | 39,492 | 101,092 | |
| AVERAGE DEPOSITS | 16,000,000 | 13,000,000 | | |
| AVERAGE YIELD | 9.550% | 9.550% | | |
| AVERAGE COST OF FUNDS | 8.442% | 8.338% | | |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803503

28-Jul-99
07:14 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | PROJECTION FOR STERLING FISCAL 1990 | ADJUSTMENTS (BOTH BRANCHES) | | PRO FORMA COMBINED |
|---|---|---|---|---|
| INTEREST INCOME | 70,078,000 | 1,846,333 | (1) | 71,924,333 |
| INTEREST EXPENSE | 55,864,000 | 1,623,107 | (1) | 57,487,107 |
| NET INT. SPREAD | 14,214,000 | 223,227 | (1) | 14,437,227 |
| OTHER INCOME: | | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 1,648,000 | 27,600 | (2) | 1,675,600 |
| LOAN SERVICING INCOME | 970,000 | 0 | | 970,000 |
| SUBSIDIARY OPERATIONS | 1,603,000 | 0 | | 1,603,000 |
| REO OPERATIONS | 114,000 | 0 | | 114,000 |
| RESERVE FOR LOANS & REO LOSSES | (360,000) | 0 | | (360,000) |
| GAIN (LOSS) ON INVSTMT & LOANS | 210,000 | 0 | | 210,000 |
| OTHER INCOME (EXPENSE) | 12,000 | 0 | | 12,000 |
| TOTAL OTHER INCOME | 4,197,000 | 27,600 | | 4,224,600 |
| OPERATING EXP. | | | | |
| EMPLOYEE COMP. & BENEFITS | 4,781,000 | 34,320 | (3) | 4,815,320 |
| OCCUPANCY & EQUIPMENT | 2,280,000 | 54,291 | (4) | 2,334,291 |
| ADVERTISING & PROMOTION | 293,000 | 3,000 | (5) | 296,000 |
| DATA PROCESSING | 1,297,000 | 7,460 | (6) | 1,304,460 |
| INSURANCE | 1,224,000 | 31,871 | (7) | 1,255,871 |
| DEPRECIATION & AMORTIZATION | 4,262,000 | 18,792 | (8) | 4,280,792 |
| OTHER | 1,876,000 | 0 | | 1,876,000 |
| TOTAL OPERATING EXP. | 16,013,000 | 149,734 | | 16,162,734 |
| NET INC (LOSS)BEFORE TAX | 2,398,000 | 101,092 | | 2,499,092 |
| TAX (PROVISION) BENEFIT | 863,280 | 36,393 | | 899,673 |
| NET INC (LOSS) | $1,534,720 | $64,699 | | $1,599,419 |

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

NOTES TO THE PROJECTED STATEMENT OF PROFIT AND LOSS

General Assumptions

It is generally assumed that Sterling will close the Spokane branch on February 1, 1990, and transfer the deposits to its main office. It is also assumed that on March 1, 1990, Sterling will close its branch in Richland, Washington, and relocate the staff and transfer the deposits to the branch acquired from Great American. Sterling will continue to pay the monthly lease payments on the Spokane branch through its expiration of June 6, 1990.

Specific Assumptions

(1) It assumed that average deposits for Spokane and Richland will average $16.0 million and $13.0 million, respectively. The cost of deposits is assumed to be 8.442% and 8.338% for Spokane and Richland, respectively. Sterling will use the funds obtained from Great American to pay down wholesale public funds, reverse repos, and Federal Home Loan Bank advances. It is assumed the average cost to be 9.55%. The improvement on net interest margin, obtained from these assumptions, is approximately 1.13% for eight months.

(2) Fee income consists of transaction account fees. The projection reflects historical levels within these branches.

(3) Personnel expense consists of adding one full-time equivalent on a permanent basis in each of these two branches, plus benefit expense.

(4) Occupancy and equipment expense consists of telephone, postage and delivery expenses, office supplies, rent (net of sublease rental income), heating and air conditioning, janitorial, and utilities expenses. In the case of Spokane, the expenses are for three months only, whereas for Richland, they represent a full eight months.

(5) Sterling anticipates only a minor advertising campaign as a result of this

(7) Insurance expense includes FSLIC insurance on the acquired deposits reduced for the wholesale deposits paid off from the obtained from Great American. Insurance expense also includes an amount for property and fidelity insurance expense for these two branches.

(8) The building in Richland is being depreciated over a 25-year life, straight-line method. The equipment in both Spokane and Richland are being depreciated over a 5-year life, and the intangible associated with the deposit base of approximately $115,000 is being amortized on the straight-line method over 8 years.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803506

IV. FINANCIAL DATA

D. Fees to be Paid

No fees have been, or will be, paid to any individual by Sterling or Great American for a finder's or consultant's fee. Fees paid to legal counsel, Witherspoon, Kelley, Davenport, and Toole, P.S., for representation of Sterling for the preparation of this application, review of legal documents and closing of the real estate transfer are expected to be less than $4,000 and are the normal fees charged for such necessary services rendered in an arms-length transaction.

Fees paid to Sterling's accountants, Coopers & Lybrand, for review of the accounting to be employed to record the transfer of assets and liabilities are expected to be less than $1,500 and are the normal fees charged for such necessary services rendered in an arms-length transaction.

IV. FINANCIAL DATA

E. Basis for Issuing Savings Accounts

The terms and conditions of Great American's Certificates of Deposit will continue unaltered until maturity. Any changes to terms and conditions on post-maturity of Great American's Certificate of Deposit account holders would be through the normal regulatory notification process to customers. Any changes to terms and conditions would be consistent to those offered all deposit customers throughout Sterling's branch network.

The terms and conditions of Great American's transaction accounts (passbook, statement savings, NOW, money market accounts) would continue unaltered unless Sterling Savings gives proper notification to Great American's customers of any changes that could affect their accounts and any changes would be consistent to the terms and conditions offered all transaction account customers throughout Sterling's branch network.

NOW checking and money market accounts will be issued new checks with micro encoding which will allow for clearing against Sterling's FHLB bank account.

December 22, 1987

**NOTICE OF FILING OF APPLICATION
FOR PURCHASE OF BRANCH OFFICES
AND TRANSFER OF SAVINGS ACCOUNTS**

This is to inform the public that under Section 563.22 of the Rules and Regulations for FSLIC-Insured Institutions, Sterling Savings Association, Spokane, Washington, has filed an application with the Federal Home Loan Bank of Seattle for permission to increase accounts of an insurable type through the acquisition of six branch offices of Great American First Savings Bank, FSB, Tucson, Arizona, located at:

Fifth and Main, Ellensburg, Washington
West 109 Third Avenue, Moses Lake, Washington
146 Second Street, North Bend, Washington
450 East Main, Othello, Washington
1033 East First Street, Port Angeles, Washington
154 Winslow Way East, Winslow, Washington

Anyone may write in favor or protest of the application. Four copies must be sent to "Supervisory Agent, Federal Home Loan Bank of Seattle, 1501 Fourth Avenue, Seattle, Washington 98101", within 10 days of the publication of this notice. An additional 7 days to submit comments may be obtained if a written request is received by the Supervisory Agent within the 10-day period.

Anyone sending a protest deemed substantial by the Principal Supervisory Agent may request an oral argument on the application by submitting a written request to the Supervisory Agent during the 10-day period. For a protest to be considered substantial, it must be written and received on time, the reasons for the protest must be consistent with the regulatory basis for denial of the application, and the protest must be supported by the information specified in Section 543.2(e)(4) of the Federal Regulations.

You may look at the application and all comments filed at the Federal Home Loan Bank of Seattle, unless any such materials are exempt by law from disclosure. If you have any questions concerning these procedures, contact the Federal Home Loan Bank of Seattle (206) 340-2456.

Sterling Savings Association
Spokane, Washington

---

Applicant has been requested to publish this notice one time in a newspaper(s) in general circulation in the home office community of each institution.

EXHIBIT 11
Faulstich Sep. 8/2/?

)N929 1192 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383
2124 B & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL
'ATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

95-829-C
P - 341

SUPERVISORY AGENT'S DIGEST AND RECOMMENDATION FOR APPLICATION FOR PERMISSION TO INCREASE ACCOUNTS OF AN INSURABLE TYPE THROUGH THE PURCHASE OF SIX BRANCH OFFICES

Application No. ~~12870627~~ 12880643

Recommendation: SA ODB

District No. 12

Approval (D.A.) X
Disapproval

10-30-86
Filing Date

| Acquiring Institution: | (S) Stock (M) Mutual | Date of Incorporation | Date Insured | (000) Assets as of 9/30/87 |
|---|---|---|---|---|
| Sterling Savings Association Spokane, Washington FHLBB No. 7918 | S | 1981 | 1983 | $ 244,963 |
| **Selling Institution:** | | | | |
| Great American First Savings Bank, FSB Tucson, AZ FHLBB No. 0789 | S | 1937 | 1937 | $4,117,815 |

A. THE PROPOSAL

Sterling Savings Association, Spokane, Washington ("Sterling"), proposes to purchase six branch offices of Great American First Savings Bank, FSB, Tucson, Arizona, ("Great American") located at:

Fifth and Main, Ellensburg, Washington
West 109 Third Avenue, Moses Lake, Washington
146 Second Street, North Bend, Washington
450 East Main, Othello, Washington
1033 East First Street, Port Angeles, Washington
154 Winslow Way East, Winslow, Washington

B. COMMENTS AND RECOMMENDATION

The subject application has been reviewed by this office consistent with the provisions of Sections 563.22 and 571.5 of the Insurance Regulations, and, in our opinion, the acquisition raises no significant antitrust or anticompetitive issues. On December 22, 1987, the application was deemed conditionally approved subject to standard conditions normally imposed on similar-type applications.

ON929 1193 F STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383
'2124 B & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL
TATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

The subject application represents significant geographic expansion and asset growth by Sterling. The six offices to be acquired are not located in counties currently served by full service branch offices of Sterling and, therefore, would result in a substantial increase in market area. The deposits to be assumed, or about $47 million, equal about 23% of Sterling's current deposit base.

Great American is supervised and monitored by the Federal Home Loan Bank of San Francisco, therefore, this digest primarily focuses on pertinent elements of the application and its impact on Sterling. On December 1, 1987, the FHLB of San Francisco issued a memo to the FHLB of Seattle indicating it has no material supervisory concerns regarding the subject transaction. Due to the relative small size of the transaction, the branch office sales would have minimal impact on Great American's financial condition. As a result of the sales, Great American would record a gain of approximately $231,000 and an increase of its ratio of net worth to total liabilities from 4.8% to 4.9%. The institution anticipates an increase in its cost of funds of less than two basis points and no material change in its yield on assets. The transaction appears to be consistent with Great American's long-term plan of concentrating branching along the I-5 corridor and maintaining offices with a minimum deposit base of $12-15 million.

This office is currently evaluating Sterling's bid to acquire two troubled thrifts with offices within Washington State and a liability growth application. Regardless of the ultimate decision on those applications, based upon the information contained in the subject application and supplementary materials, approval is recommended, in that the transaction would: (1) enhance Sterling's net worth over the longer term due to the acquired office's projected profitability and low premium paid; (2) not substantially increase risk to the institution, or the FSLIC, through reinvestment of funds received from Great American; (3) be consistent with its business plan; and (4) lower the institution's overall cost of funds.

C. AGREEMENT

Savings Assumption and Purchase Agreement
November 2, 1987

On November 2, 1987, Sterling agreed to acquire the real property and/or leasehold interest, furniture, fixtures and equipment, savings deposits and share loans of the six subject branch offices of Great American. At closing, American would transfer in cash to Sterling $47 million for deposits transferred, and Sterling would transfer in cash to Great American $1.8 million which includes $165,516 for book value of furniture, fixtures and equipment, $163,000 for share loans and about $310,000 for goodwill (0.66% of deposits).

No employment contracts or non-competitive agreements are a part of this agreement. Shareholder vote is not required by either institution for the subject transaction.

The application is accompanied by an opinion from the accounting firm of Coopers and Lybrand that the proposed accounting treatment is in accordance with generally accepted accounting principles.

D. FINANCIAL DATA

Sterling Savings Association
Spokane, Washington

Sterling, incorporated in 1981, received its insurance of accounts and became a Bank member in 1983.

| Examination Date | Type | Composite Rating | CRA Rating |
|---|---|---|---|
| 10/29/86 | Full Scope | 2 | Satisfactory |
| 8/16/85 | 12-Month | 2 | Satisfactory |

At the association's October 29, 1986, CRA assessment, a satisfactory rating was received. The association's CRA statement is in compliance with Section 563(e) of the Insurance Regulations and its community delineation does not appear to arbitrarily exclude any minority or low income areas.

At Sterling's most recent examination on October 29, 1986, significant items of concern noted include decreasing net worth and increasing scheduled items and substandard assets, partially attributable to its acquisition of a troubled thrift in May 1985. Pertinent financial and operational ratios are as follows:

(000s Omitted)

| Date | Total Assets | Total Savings | Actual Net Worth | Required Net Worth | Excess Net Worth |
|---|---|---|---|---|---|
| 9/30/87 | $231,798 | $179,858 | $10,613 | $7,031 | $3,582 |
| 6/30/87 | 244,971 | 170,755 | 10,475 | 6,640 | 3,835 |
| 6/30/86 | 180,879 | 142,078 | 7,245 | 4,252 | 2,993 |
| 6/30/85 | 112,449 | 88,205 | 4,614 | 1,363 | 3,251 |
| 6/30/84 | 88,913 | 71,561 | 4,003 | N/A | N/A |

ON929 1195 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383 W2124 & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

| Date | Net Income | Net Worth To Total Liabilities | Net Income To Average Assets | Net Income To Net Worth | Scheduled Items to Average Assets |
|---|---|---|---|---|---|
| 9/30/87 | $ 142* | 4.53% | 0.25% ** | 5.35% ** | 3.45% |
| 6/30/87 | 1,085 | 4.73% | 0.50% | 10.36%% | 3.90% |
| 6/30/86 | 861 | 4.17% | 0.49% | 11.88% | 3.15% |
| 6/30/85 | 612 | 4.07% | 0.55% | 13.26% | 1.40% |
| 6/30/84 | 216 | 4.71% | 0.28% | 5.40% | 1.09% |

* Represents first quarter net income
** Annualized net income

As indicated above, Sterling has maintained profitable operations and increasing net worth despite its aggressive growth posture. The institution's percentage of excess net worth to its capital requirement has also been increasing from 29% on June 30, 1985, to 66% as of September 30, 1987. Sterling's current business plan states a goal of 0.55-0.60% ROA; 15-20% ROE; and maintenance of GAP net worth in excess of 4% of total assets and RAP net worth above 5% of total assets.

As of September 30, 1987, Sterling's one-year hedged gap was negative 17.57% of total assets, up from 3.79% reported the prior year on that date, possibly due to the institution's increase in volatile deposits to average deposits from 8.02% to 14.82%. The institution has also experienced a decrease in liquidity from 11.91% to 5.35% of its liquidity base. The institution's increase in the use of brokered funds (Evergreen Financial Services) from 0.78% in September 1986 to 8.81% in September 1987 may account for a portion of the above increase in volatile deposits.

E. EFFECT OF TRANSACTION

According to the September 30, 1987, pro forma Statement of Condition and other information contained in the application, the acquisition by Sterling would have a significant impact on its financial condition. The acquisition would result in an increase of Sterling's total liabilities of approximately 20% and a subsequent decrease in its ratios of net worth to total liabilities from 4.5% to 3.8% and net worth to total assets from 4.3% to 3.6%.

Sterling reported that despite the initial drop in percentage of capital, the acquisition of the six offices would increase its long-term income. For the year ended September 30, 1988, Sterling anticipates that the acquired offices would boost the institution's net income by $197,825. No material effect to Sterling's yield on assets is expected through the acquisition.

Sterling intends to utilize a portion of the funds received through the branch office purchase to repay short-term FHLB borrowings, Federal funds and reverse repurchase agreements made in November 1987 in anticipation of the association's approval. The November 1988 borrowings were invested into longer term Treasury bills, GNMAs, and CMOs, and are expected to result in liability growth in excess of the limitations of Insurance Regulations 563.13-1 as of December 31, 1987. Sterling filed a liability growth application on December 8, 1987.

Sterling indicated that the current mismatch of short-term borrowings funding longer term investments will result in an increased gap until the funds are replaced by the deposits of the subject application. The institution's cost of funds is also expected to increase for the interim, due to the higher cost borrowings, until replaced by the lower cost deposits. The deposits to be acquired equal 23% of Sterling's total deposits and are 18 basis points lower than its average cost of funds, therefore no increase in the institution's cost of funds.

The branch acquisitions appear to be consistent with Sterling's long range plan for increasing its presence east of the Cascade Mountains in both Oregon and Washington. The three offices to be acquired located in the Puget Sound region were not as attractive to Sterling as the other three offices; however, Great American was willing to lower its deposit premium if Sterling would take all six offices. The deposit premium of 0.66%, in my opinion, is quite attractive based on the profitability of the offices (1). After acquisition, Sterling intends to pay approximately $300,000, or about $50,000 per branch location, for remodeling, redecorating, and re-signing. Sterling's current business plan accounted for two branch office acquisitions in October 1987 of approximately the same size as the subject transaction, and indicated that the institution would explore the feasibility of adding branches through acquisition. Sterling intends to amortize the deposit premium over eight years, or approximately $38,750 per year.

(1) Using the present value method of the projected income, the premium would be $1,228,913. Using an average market rate for branches sold of 2%, the premium would be $940,000. The deposit premium to be paid by Sterling is $310,000.

ON929 1197 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383 W2124 & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL 'ATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

F. ANTICOMPETITIVE ANALYSIS

An evaluation in accordance with Section 571.5(b)(3) of the Insurance Regulations indicates that no significant anticompetitive effect would result from the proposed office purchases. All of the offices to be acquired are located in market areas not currently served by Sterling, therefore no change in the area's Hirfindahl-Hirschman Index (HHI) would result.

The savings and lending market area for the Ellensburg, Washington, branch office has been determined as Kittitas County. Situated in South Central Washington, the primarily rural county encompasses approximately 2,308 square miles and holds about 0.6% of the state's total population, with about 47% residing within the City of Ellensburg. The county's HHI has been calculated as 1,815.04.

Grant County has been determined as the savings and lending market area for the Moses Lake, Washington branch office. The rural county is located in the central eastern portion of the state and encompasses approximately 2,660 square miles. The county holds about 1.2% of the state's total population, with 22% residing within the City of Moses Lake*. The county's HHI has been calculated as 1,278.63.

King County has been determined as the savings and lending market area for the North Bend branch office. As the state's most populous county, King County is located in northwest Washington, encompasses approximately 2,128 square miles and boasts about 31% of the state's total population with less than 5,000 persons residing with the City of North Bend*. The county's HHI has been calculated as 872.93.

The Othello, Washington, branch office's savings and lending market area has been identified as Adams County. The county, situated in Eastern Washington, encompasses approximately 1,921 square miles and holds a population of about 0.32% of the state's total population*. The county's HHI has been calculated as 1860.41.

The savings and lending market area for the Port Angeles branch office has been determined as Clallam County. The county is located in northwestern Washington on the Olympic Peninsula and encompasses approximately 1,753 square miles. Clallam County holds a population of approximately 1% of the state's total population, with about 34% residing within Port Angeles*. The county's HHI has been calculated as 2,499.38.

The Winslow, Washington, branch's savings and lending market area has been delineated as Kitsap county. The county also located in northwestern Washington, encompasses only approximately 393 square miles and holds about 4% of the state's total population*. The county's HHI has been calculated as 947.41.

* Based upon 4/1/80 census data
** See attachment

G. ADDITIONAL INFORMATION

On December 22, 1987, the applicants were notified to publish the notice of filing within their respective home office communities in accordance with Section 563.22(c) of the Insurance Regulations.

Transaction Expenses

No finders or consultant fees were paid by Sterling or Great American in connection with the subject transaction. Sterling estimated its legal fees would be less than $3,500, and accounting fees would be less than $1,000. Great American indicated that all research and preparation of the application was performed as part of normally assigned responsibilities with normal compensation to employees, therefore, no additional fees were incurred, except for an accountant's opinion which resulted in a fee of $914.

Tax Liability

Great American's in-house corporate tax manager indicated that the institution will incur approximately $143,000 in additional tax liability from the subject transaction.

December 22, 1987

Principal Supervisory Agent

Supervisory Agent

DN929 1199 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383 W2124
& PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL
STATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, *
A STATE CHARTERED SAVINGS *
ASSOCIATION, STERLING FINANDIAL *
CORPORATION, A WASHINGTON *
CORPORATION, *
Plaintiffs, *
* CASE NO. 95-829C
V. * (Senior Judge Smith)
UNITED STATES *
Defendant. *

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL G. BYRNE
VOLUME 2
DECEMBER 4, 2001

Taken on DECEMBER 4, 2001 beginning at 8:47 a.m., in the offices of the United States Justice Department, 910 Travis, Suite 1452, Houston, Texas, before Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, pursuant to Notice, the Federal Rules of Civil Procedure and stipulations as may be stated herein.

08:47:34 AM THE VIDEOGRAPHER: We're now beginning
08:47:35 AM Tape 3 of this deposition. Today is December 4, 2001.
08:47:39 AM The approximate time is 8:48. We're now on the video
08:47:42 AM record.

DANIEL G. BYRNE

having been previously sworn, testified further as follows:

EXAMINATION

BY MR. MURPHY:

08:47:43 AM Q. Good morning, Mr. Byrne.
08:47:44 AM A. Good morning.
08:47:46 AM Q. I'll just remind you that you're still under
08:47:48 AM oath from yesterday.
08:47:49 AM If I could get you to turn back to either
08:47:53 AM tab 9 -- yeah, tab 9 of Exhibit 2, I believe, is where
08:48:00 AM we left off yesterday. I just have a couple of
08:48:09 AM questions with respect to that.
08:48:12 AM We went through most of this yesterday.
08:48:15 AM There is one charge that I want to ask you about that's
08:48:21 AM in the first section on legal fees.
08:48:23 AM A. Yes.
08:48:24 AM Q. There is -- you see three lines down, there is a
08:48:27 AM Witherspoon, Kelley charge for 25,775.06?
08:48:33 AM A. Uh-huh.

you as Exhibit 6 that were produced to us in support of your analysis with respect to the legal accounting and insurance costs for a wounded bank, is there anything aside from these documents that you're relying on and your discussion with the Coopers & Lybrand partner for the increased audit fee for their inclusion?

A. Well, my knowledge of activities that were occurring at the time and what we had requested with respect to our law firm and, in turn, when they needed to go to third parties such at Arnold & Porter for additional advice as to the nature of what those activities were. I think that's it.

Q. Okay. Okay. We're done with Exhibit 6.

Now, if I could get you to turn to tab 11 of Exhibit 2, which is the additional materials relied on by Horvitz.

A. I'm sorry. The tab was?

Q. Tab 11. This one is headed "Increased Costs to Acquire Branch From Great American Savings/RTC." And it notes at the bottom, "Analysis prepared by Daniel G. Byrne, CFO of Sterling" -- "Sterling Savings."

I believe yesterday you testified that this was information you had developed in response to an interrogatory.

Can you just tell me your basis for the

09:31:32 AM inclusion of these costs in your wounded bank analysis?
09:31:35 AM A. Yes. Sterling was in the process of acquiring
09:31:38 AM two branches from Great American in the summer of 1989
09:31:46 AM and had gained regulatory approval in a preliminary form
09:31:57 AM from the --
THE REPORTER: In a what form?
THE WITNESS: Preliminary form.
09:31:58 AM A. -- from the Federal Home Loan Bank of Seattle
09:32:01 AM staff.
09:32:05 AM When FIRREA was passed, that preliminary
09:32:10 AM approval was rescinded and the application was forwarded
09:32:17 AM to Washington, D.C. And as a result of the review in
09:32:23 AM Washington, D.C., the acquisition of these branches was
09:32:32 AM scuttled by the OTS in the sense that it required
09:32:36 AM Sterling to meet the FIRREA capital requirements,
09:32:43 AM excluding the contractual rights of our three contracts
09:32:46 AM with respect to capital. In other words, they ignored
09:32:49 AM the capital that we had in our contracts.
09:32:52 AM Consequence, we did not complete this
09:32:54 AM transaction in the summer of 1989. Later, in 1990 -- I
09:33:03 AM forget the dates -- 1994, 1995, Sterling had the
09:33:07 AM opportunity to bid on branches being offered by the RTC,
09:33:11 AM which included the two branches that we were trying to
09:33:16 AM acquire. Sterling bid on both, was successful on only
09:33:20 AM the Spokane branch. And what this schedule represents

09:33:24 AM is the increased costs that we incurred to acquire that
09:33:29 AM branch over what our costs would have been in 1989 had
09:33:35 AM the Government not breached our contract.
09:33:44 AM Q. And how did you determine the value received by
09:33:46 AM the RTC upon sale of the branches?
09:33:51 AM A. The $1,892,000 represents the value paid by
09:33:58 AM Sterling for that branch, and it was referenced in
09:34:03 AM documents that had been produced with respect to a news
09:34:10 AM article put out by the RTC as to the total amount paid
09:34:14 AM by Sterling and Sterling's internal bid worksheet which
09:34:18 AM identified the Spokane branch with this dollar amount
09:34:24 AM being paid or bid on by the RTC.
09:34:32 AM Q. And what is the item -- the next item, costs
09:34:37 AM described to deposit premium in Sterling's bid?
09:34:40 AM A. That essentially is the cost that Sterling would
09:34:42 AM have paid to Great American in 1989 for this one branch.
09:34:50 AM And actually there is a note at the bottom that the
09:34:53 AM premium for both branches, Spokane and Richland, would
09:34:58 AM have been $61,000, and that Sterling expected to incur
09:35:02 AM an additional $54,000 relating to the closing of the
09:35:05 AM transaction in winding down the operations at the
09:35:11 AM Spokane branch. I think what this schedule was
09:35:13 AM attempting to do was split the costs between the Spokane
09:35:18 AM and Richland branch, but basically what it would have
09:35:22 AM cost in 1989 versus what it cost in the 1994 or '5 time

09:35:29 AM frame.

09:35:37 AM Q. And the transaction costs that are listed, what are those?

09:35:39 AM A. Those are the transaction costs that were incurred in 1989 by the various vendors to acquire the branches from Great American up until the time that the Government basically forced us to terminate that acquisition.

09:36:01 AM Q. So those are actual costs incurred?

09:36:03 AM A. Out-of-pocket expenses.

09:36:16 AM Q. The $1.892 million, is that cash that was paid by Sterling for the branch?

09:36:28 AM A. Essentially, yes. By virtue of the fact that Sterling assumed deposit liabilities, it was paid cash for those deposits; but then we deducted the amount of the premium from the amount of cash that Sterling received.

09:36:47 AM So effectively it was cash paid by Sterling back to the RTC to acquire those branches.

09:37:24 AM Q. So does the 1.892 represent the premium, or how is that related to the premium?

09:37:32 AM A. That is the premium and the cost --

09:37:34 AM Q. Okay.

09:37:35 AM A. -- that Sterling paid to acquire those branch -- that Spokane branch.

09:37:58 AM Q. So how -- just to make sure I understand this correctly. In 1989, Sterling ascribed the premium value to the premium branches of $61,000. Is that correct?

09:38:14 AM A. That's correct.

09:38:15 AM Q. And in 19 -- when the branch was acquired from the RTC, Sterling effectively paid a $1.892 million premium. Is that correct?

09:38:30 AM A. That's correct.

09:38:30 AM Q. Okay. Do you have an opinion as to what the difference is a result of?

09:38:42 AM A. Difference of?

09:38:45 AM Q. The difference between the value that Sterling ascribed to the two branches in 1989 and the premium Sterling actually paid in -- when it acquired the branch from the RTC.

09:39:03 AM A. That was a great job on my part to negotiate the first transaction in '89.

09:39:23 AM Q. So would it have been a bargain purchase in 1989?

09:39:27 AM A. I think it represented the market in 1989.

09:39:41 AM Q. Did you do any analysis of whether the deposit base changed between 1989 and the time the branch was actually acquired?

09:39:55 AM A. We did some analysis in terms of the level of deposits and the mix of deposits between CDs and

09:40:04 AM transaction accounts. I don't recall what that analysis indicated.

09:40:16 AM Q. And is it your opinion that the franchise value of the Great American Savings branches or branch increased by 1.83 million between 1989 and 1994 or '95?

09:40:38 AM MR. W. D. SYMMES: Object to the form of that question.

09:40:40 AM You may answer.

09:40:45 AM A. I guess I'm having a little struggle with your term "franchise value" because we're talking one single branch that was primarily a depository, with very little in the way of loans. There just wasn't much franchise.

09:41:03 AM Q. (BY MR. MURPHY) So is it your opinion that the value of that branch increased by $1.83 million between 1989 and 1994/'95?

09:41:12 AM MR. W. D. SYMMES: Same objection.

09:41:18 AM A. I know that the market ascribed more value to it.

09:41:53 AM Q. (BY MR. MURPHY) Do you have an opinion as to whether or not the market for the value of deposit premiums generally increased between '89 and '94?

09:42:01 AM MR. W. D. SYMMES: Same objection.

09:42:02 AM Go ahead.

09:42:09 AM A. I really didn't study the market in terms of deposit premiums during the '90 through '93 period

09:42:23 AM because of our battle with the Government. So I just --
09:42:28 AM no. I just don't have an opinion.
09:42:47 AM Q. (BY MR. MURPHY) Okay. You can turn to tab 12
09:42:49 AM now. We're done with that one.
09:43:00 AM Tab 12 of Exhibit 2 is titled "Schedule of
09:43:03 AM Purchase Accounting Accretion/Amortization" and notes on
09:43:08 AM the bottom left, "Analysis prepared by Daniel G. Byrne,
09:43:14 AM CFO of Sterling." And it's a two-page document. It's
09:43:17 AM not the world's greatest copy, but it's the best one I
09:43:21 AM have.
09:43:22 AM If you could just generally explain to me
09:43:24 AM what the analysis is that you prepared here.
09:43:27 AM A. I was asked by Professor Horvitz to identify for
09:43:36 AM the three acquisitions in this case what any purchase
09:43:43 AM accounting adjustments had been made with respect to
09:43:48 AM discounting or putting premiums on other assets and
09:43:54 AM liabilities and what the amortization or accretion of
09:44:00 AM those premiums and discounts were over time.
09:44:06 AM And so this schedule basically summarizes
09:44:08 AM what was in Sterling's general ledger with respect to
09:44:13 AM that topic.
09:44:22 AM Q. Okay. That was an easy one. If you can go to
09:44:24 AM tab 13 now. Tab 13 of Exhibit 2 is captioned "Sterling
09:44:35 AM Savings Bank Summary, Capital Raising."
09:44:38 AM And in the lower left, it again notes

THE STATE OF TEXAS :

I, Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, DANIEL G. BYRNE, to the interrogatories as indicated were made to me by the said witness after being first duly sworn/affirmed to testify to the truth, and same were reduced to printing under my direction; that the above and foregoing deposition as set forth in printing is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

GIVEN under my hand and seal of office on this the 11th day of December 2001.

Marie Bulfinch, CSR, RMR, CRR
in and for The State of Texas

Certificate No. 3748
Expires 12-31-01
1010 Lamar, Suite 1400
Houston, Texas 77002

**CHANGES AND SIGNATURE ASSOCIATED WITH DEPOSITION OF DANIEL BYRNE, HOUSTON, TEXAS DECEMBER 3, 2001.**

| Pg/Ln | Change |
|---|---|
| 17/10 | "amount" should be "days" |
| 51/17 | Add, after "Central Evergreen.": "Although Sterling bargained for an received permanent cash assistance as part of the Lewis Federal and Tri-Cities acquisitions, it was when the Central Evergreen transaction was closed in December 1988 that Sterling focused again on how cash assistance was being treated in the TFRs. Sterling never amortized cash assistance in its general ledger or in the Central Evergreen Business Plan." |
| 60/13 | ""the books and records"" |
| 60/23 | Add, after "on a GAAP basis": "In other words, Sterling was not amortizing cash assistance." |
| 68/4 | "crude" should be "accrued" |
| 68/12 | "Belvieu" should be "Bellevue" |
| 72/10 | "and limited" should be "and the government limited" |
| 79/22 | "9,41743" should be 9,417.43 |
| 84/25 | "That was not recorded as income" should be "That was initially recorded as income and the reversed out upon foreclosure" |
| 85/4 | "That's correct." should be "That's correct. That was not recorded as income." |
| 89/13 | "in the December through" should be "in the September through" |
| 98/16 | "March" should be "September" |
| 98/17 | "1990" should be "1991" |
| 104/3 | "operating" should be "offering" |
| 117/7 | "the FDIC in" should be "the FDIC and" |
| 134/20 | "in 1990" should be "in the mid-1990s" |

| | |
|---|---|
| 135/25 | "1994 or '5" should be "1994 or 1995" |
| 144/24 | "Nortown" should be "Northtown" |
| 145/4 | "Nortown" should be "Northtown" |
| 146/11 | "Nortown" should be "Northtown" |
| 148/10 | "Nortown" should be "Northtown" |
| 148/16 | "Nortown" should be "Northtown" |
| 152/13 | "Nortown" should be "Northtown" |
| 190/1 | "ledger" should be "ledger and the GL History" |
| 201/2 | "statements and" should be "statements , accounting schedules on amortization and" |
| 202/1 | "six" should be "six hours" |

I, DANIEL G. BYRNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Daniel G Byrne
DANIEL G. BYRNE

(State of Washington)
) ss.
County of Spokane )

Before me, Rheta R. Vanderholm, on this day personally appeared DANIEL G. BYRNE, known to me (or proved to me under oath or through ____________ ____________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 28th day of January, 2002.

RHETA R. VANDERHOLM NOTARY PUBLIC STATE OF WASHINGTON Commission Expires JUNE 1, 2005

Rheta R. Vanderholm
NOTARY PUBLIC in and for the State of Washington,
residing at: Mead
My commission expires: June 1 2005

\\Wk\doc\B\bhg\bhg\Sterlin... depo corrections 012103, rev'd 0125...