NOTES TO THE STATEMENT OF CONDITION AS OF JUNE 30, 1989

(1) Represents cash paid to Starling for assumption of deposits.

(2) Represents cash paid by Starling to purchase real property, office equipment, savings loans and intangibles.

(3) Represents anticipated costs of acquisition, including computer conversion, legal, accounting, travel, training, and duplicated rent and salaries prior to consolidation.

(4) Represents the anticipated use of funds to pay off borrowings.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER

SG 0803497

IV. FINANCIAL DATA

C. CPA Opinion

An opinion from Coopers & Lybrand, Sterling's Public Accountant is included. The opinion explains the proposed accounting treatment on the transaction by Sterling Savings Association.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803498

Coopers &Lybrand | certified public accountants

The Board of Directors
Sterling Savings Association
Spokane, Washington

We have been engaged to report on the appropriate application of generally accepted accounting principles to the specific transaction described below. This report is being issued to you for assistance in complying with the requirements of the Association's application to the Federal Home Loan Bank Board (FHLBB) to purchase certain assets and assume certain liabilities of two branches (located in Spokane and Richland, Washington) of Great American First Savings Bank, FSB ("Great American"). Our engagement has been conducted in accordance with standards established by the American Institute of Certified Public Accountants.

We have read the Savings Assumption and Purchase Agreement between Sterling Savings Association ("Sterling") and Great American. We have also reviewed related schedules, supporting information and representations submitted to us by Sterling, specifically the attached schedule entitled "Acquisition of Two Branches from Great American FSB-Balance Sheet" and all supporting workpapers.

Based on the reviews described above, it is our understanding that the contemplated transaction will include the following major components:

1. Sterling will assume all deposit liabilities of the two branches and a minor amount of accrued interest thereon in exchange for receiving a cash payment equal to the book value of the deposits as recorded by Great American (approximately $29,602,000). Sterling intends to record the deposits and accrued interest assumed at an amount equal to the cash payment received, which is materially equal to their estimated fair values.

2. Sterling will purchase all loans secured by deposits and all overdraft loans at the two branches, and a minor amount of accrued interest thereon, by making a cash payment equal to the book value of the loans as recorded by Great American

deposits assumed at both branches, by making a cash payment to Great American of $480,000. In addition, Sterling expects to capitalize certain costs related to closing the transaction and winding down operations at the leased Spokane branch, estimated at approximately $54,000.

Sterling intends to record the fixed assets (land, building, furniture, fixtures, and equipment) at an amount equal to their estimated fair values (approximately $419,000). The $115,000 difference between this amount and the sum of the cash payment to Great American and Sterling's costs will be recorded as an identified intangible asset. This identified intangible, which can be ascribed to the value of existing depositor relationships at the two branches, will be amortized over a period not to exceed eight years.

Although the transaction described above is not a true business combination or acquisition as contemplated by Accounting Principles Board Opinion No. 16 (APB No. 16) and Statement of Financial Accounting Standards No. 72 (SFAS No. 72), many of the concepts and principles inherent in these two standards are still applicable to the proposed transaction, and have appropriately been considered by Sterling in developing its proposed accounting treatment. In our opinion, based solely upon the information and facts provided to us as described above, Sterling's proposed accounting treatment for the purchase of certain assets and the assumption of certain liabilities of two Great American branches, as described above and as documented on the attached schedule, is in accordance with generally accepted accounting principles (specifically, APB No. 16 and SFAS No. 72).

The ultimate responsibility for a decision on the appropriate application of generally accepted accounting principles for an actual transaction rests with the preparers of financial statements. Our judgment on the appropriate application of generally accepted accounting principles for the Great American transaction is based solely on the unaudited information and facts provided to us as briefly described above. Should the actual facts and circumstances differ from those provided to us upon completion of an audit of Sterling's consolidated financial statements, our conclusions may change.

Coopers & Lybrand

26-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

| ASSETS | STERLING BEGINNING BALANCE 6\30\89 | | DEBIT | CREDIT | | NET ASSETS ACQUIRED & LIAB ASSUMED | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|---|
| CASH | $14,336 | (1) | $29,602 | $504 | (2) | 198 | $14,534 |
| | | | 0 | 29,000 | (4) | | |
| INVESTMENTS | 41,353 | | 0 | 0 | | 0 | 41,353 |
| LOANS RECEIVABLE | 499,128 | (2) | 23 | 0 | | 23 | 499,151 |
| MORTGAGE-BACKED SECURITIES | 114,060 | | 0 | 0 | | 0 | 114,060 |
| INVESTMENT & ADVANCES TO AFFILIATE | 6,575 | | 0 | 0 | | 0 | 6,575 |
| ACCRUED INTEREST RECEIVABLE | 6,301 | (2) | 1 | 0 | | 1 | 6,302 |
| OFFICE PROPERTIES AND EQUIPMENT | 9,614 | (2) | 419 | 0 | | 419 | 10,033 |
| INTANGIBLE ASSETS | 25,949 | (2) | 61 | 0 | | 115 | 26,064 |
| | | (3) | 54 | 0 | | | |
| REAL ESTATE OWNED | 12,209 | | 0 | 0 | | 0 | 12,209 |
| PREPAID & OTHER ASSETS | 1,654 | | 0 | 0 | | 0 | 1,654 |
| TOTAL ASSETS | $731,170 | | | | | $656 | $731,826 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| SAVINGS AND CHECKING | 519,382 | (4) | 10,000 | 29,544 | (1) | 19,544 | 538,926 |
| ADVANCES FROM FHLB | 96,580 | (4) | 9,000 | 0 | | (9,000) | 87,580 |
| REPO FUNDS PURCHASED | 87,345 | (4) | 10,000 | 0 | | (10,000) | 77,345 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 4,994 | | 0 | 0 | | 0 | 4,994 |
| ACCRUED INTEREST PAYABLE | 3,023 | | 0 | 58 | (1) | 58 | 3,081 |
| OTHER LIABILITIES | 9,327 | | 0 | 54 | (3) | 54 | 9,381 |
| TOTAL LIABILITIES | 720,651 | | 29,000 | 29,656 | | 656 | 721,307 |
| **STOCKHOLDERS' EQUITY** | | | | | | | |
| CAPITAL STOCK | 517 | | 0 | 0 | | 0 | 517 |
| PREFERRED STOCK | 90 | | 0 | 0 | | 0 | 90 |
| ADDITIONAL PAID IN CAPITAL | 7,709 | | 0 | 0 | | 0 | 7,709 |
| UNDIVIDED PROFITS | 2,203 | | 0 | 0 | | 0 | 2,203 |
| TOTAL EQUITY | 10,519 | | | | | 0 | 10,519 |
| TOTAL LIABILITIES AND EQUITY | $731,170 | | | | | $656 | $731,826 |
| GAAP LEVERAGE | 1.439% | | | | | | 1.437% |

EXPLANATIONS:

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803501

STERLING SAVINGS ASSOCIATION
ACQUISITION OF TWO BRANCHES FROM GREAT AMERICAN FSB
BALANCE SHEET
BEGINNING 6\30\1989

29-Jul-89
07:14 AM

| ASSETS | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL |
|---|---|---|---|
| CASH | $20,000 | $20,000 | $40,000 |
| | | | |
| INVESTMENTS | 0 | 0 | 0 |
| LOANS RECEIVABLE | 6,100 | 17,022 | 23,122 |
| MORTGAGE-BACKED SECURITIES | 0 | 0 | 0 |
| INVESTMENT & ADVANCES TO AFFILIATE | 0 | 0 | 0 |
| ACCRUED INTEREST RECEIVABLE | 150 | 600 | 750 |
| OFFICE PROPERTIES AND EQUIPMENT | 5,900 | 413,000 | 418,900 |
| INTANGIBLE ASSETS | 74,750 | 40,250 | 115,000 |
| | | | |
| REAL ESTATE OWNED | 0 | 0 | 0 |
| PREPAID & OTHER ASSETS | 0 | 0 | 0 |
| TOTAL ASSETS | $106,900 | $490,872 | $597,772 |
| | | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | |
| SAVINGS AND CHECKING | 16,214,807 | 13,329,017 | 29,543,824 |
| ADVANCES FROM FHLB | 0 | 0 | 0 |
| REPO FUNDS PURCHASED | 0 | 0 | 0 |
| CASHIER CHECKS ISSUED & OUTSTANDING | 0 | 0 | 0 |
| ACCRUED INTEREST PAYABLE | 20,762 | 37,328 | 58,090 |
| OTHER LIABILITIES & NOTES PAYABLE | 0 | 0 | 0 |
| TOTAL LIABILITIES | 16,235,569 | 13,366,345 | 29,601,914 |
| TOTAL EQUITY | 0 | 0 | 0 |
| TOTAL LIABILITIES AND EQUITY | $16,235,569 | $13,366,345 | $29,601,914 |

CONFIDENTIAL MATERIAL—SUBJECT TO PROTECTIVE ORDER SG 0803502

20-Jul-89
07:14 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | SPOKANE BRANCH | RICHLAND BRANCH | TOTAL |
|---|---|---|---|
| INTEREST INCOME | $1,018,667 | $927,667 | 1,946,333 (1) |
| INTEREST EXPENSE | $900,480 | $722,627 | 1,623,107 (1) |
| NET INT. SPREAD | 118,187 | 105,040 | 223,227 (1) |
| OTHER INCOME: | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 6,000 | 21,600 | 27,600 (2) |
| LOAN SERVICING INCOME | 0 | 0 | 0 |
| SUBSIDIARY OPERATIONS | 0 | 0 | 0 |
| REO OPERATIONS | 0 | 0 | 0 |
| RESERVE FOR LOANS & REO LOSSES | 0 | 0 | 0 |
| GAIN (LOSS) ON INVSTMT & LOANS | 0 | 0 | 0 |
| OTHER INCOME (EXPENSE) | 0 | 0 | 0 |
| TOTAL OTHER INCOME | 6,000 | 21,600 | 27,600 |
| OPERATING EXP. | | | |
| EMPLOYEE COMP. & BENEFITS | 15,600 | 18,720 | 34,320 (3) |
| OCCUPANCY & EQUIPMENT | 19,971 | 34,320 | 54,291 (4) |
| ADVERTISING & PROMOTION | 1,500 | 1,500 | 3,000 (5) |
| DATA PROCESSING | 2,460 | 5,000 | 7,460 (6) |
| INSURANCE | 17,936 | 13,936 | 31,871 (7) |
| DEPRECIATION & AMORTIZATION | 5,120 | 13,672 | 18,792 (8) |
| OTHER | 0 | 0 | 0 |
| TOTAL OPERATING EXPENSE | 62,587 | 87,148 | 149,734 |
| NET INC (LOSS)BEFORE TAX | $61,600 | $39,492 | $101,092 |
| TAX (PROVISION) BENEFIT | 0 | 0 | 0 |
| NET INC (LOSS) | 61,600 | 39,492 | 101,092 |
| AVERAGE DEPOSITS | 16,000,000 | 13,000,000 | |
| AVERAGE YIELD | 9.550% | 9.350% | |
| AVERAGE COST OF FUNDS | 8.442% | 8.338% | |

CONFIDENTIAL MATERIAL--SUBJECT TO PROTECTIVE ORDER

SG 0803503

28-Jul-99
07:11 AM

STERLING SAVINGS ASSOCIATION
STATEMENT OF OPERATIONS
(PROJECTED)
YEAR ENDING 6\30\1990

| | PROJECTION FOR STERLING FISCAL 1990 | ADJUSTMENTS (BOTH BRANCHES) | | PRO FORMA COMBINED |
|---|---|---|---|---|
| INTEREST INCOME | 70,078,000 | 1,846,333 | (1) | 71,924,333 |
| INTEREST EXPENSE | 55,864,000 | 1,623,307 | (1) | 57,487,307 |
| NET INT. SPREAD | 14,214,000 | 223,227 | (1) | 14,437,227 |
| OTHER INCOME: | | | | |
| TRANSACTION ACCOUNT & OTHER FEES | 1,648,000 | 27,600 | (2) | 1,675,600 |
| LOAN SERVICING INCOME | 970,000 | 0 | | 970,000 |
| SUBSIDIARY OPERATIONS | 1,603,000 | 0 | | 1,603,000 |
| REO OPERATIONS | 114,000 | 0 | | 114,000 |
| RESERVE FOR LOANS & REO LOSSES | (360,000) | 0 | | (360,000) |
| GAIN (LOSS) ON INVSTMT & LOANS | 210,000 | 0 | | 210,000 |
| OTHER INCOME (EXPENSE) | 12,000 | 0 | | 12,000 |
| TOTAL OTHER INCOME | 4,197,000 | 27,600 | | 4,224,600 |
| OPERATING EXP. | | | | |
| EMPLOYEE COMP. & BENEFITS | 4,781,000 | 34,320 | (3) | 4,815,320 |
| OCCUPANCY & EQUIPMENT | 2,280,000 | 54,291 | (4) | 2,334,291 |
| ADVERTISING & PROMOTION | 293,000 | 3,000 | (5) | 296,000 |
| DATA PROCESSING | 1,297,000 | 7,460 | (6) | 1,304,460 |
| INSURANCE | 1,224,000 | 31,871 | (7) | 1,255,871 |
| DEPRECIATION & AMORTIZATION | 4,262,000 | 18,792 | (8) | 4,280,792 |
| OTHER | 1,876,000 | 0 | | 1,876,000 |
| TOTAL OPERATING EXP. | 16,013,000 | 149,734 | | 16,162,734 |
| NET INC (LOSS)BEFORE TAX | 2,398,000 | 101,092 | | 2,499,092 |
| TAX (PROVISION) BENEFIT | 863,280 | 36,393 | | 899,673 |
| NET INC (LOSS) | $1,534,720 | $64,699 | | $1,599,419 |

CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER SG 0803504

NOTES TO THE PROJECTED STATEMENT OF PROFIT AND LOSS

General Assumptions

It is generally assumed that Sterling will close the Spokane branch on February 1, 1990, and transfer the deposits to its main office. It is also assumed that on March 1, 1990, Sterling will close its branch in Richland, Washington, and relocate the staff and transfer the deposits to the branch acquired from Great American. Sterling will continue to pay the monthly lease payments on the Spokane branch through its expiration of June 6, 1990.

Specific Assumptions

(1) It assumed that average deposits for Spokane and Richland will average $16.0 million and $13.0 million, respectively. The cost of deposits is assumed to be 8.442% and 8.338% for Spokane and Richland, respectively. Sterling will use the funds obtained from Great American to pay down wholesale public funds, reverse repos, and Federal Home Loan Bank advances. It is assumed the average cost to be 9.55%. The improvement on net interest margin, obtained from these assumptions, is approximately 1.13% for eight months.

(2) Fee income consists of transaction account fees. The projection reflects historical levels within these branches.

(3) Personnel expense consists of adding one full-time equivalent on a permanent basis in each of these two branches, plus benefit expense.

(4) Occupancy and equipment expense consists of telephone, postage and delivery expenses, office supplies, rent (net of sublease rental income), heating and air conditioning, janitorial, and utilities expenses. In the case of Spokane, the expenses are for three months only, whereas for Richland, they represent a full eight months.

(5) Sterling anticipates only a minor advertising campaign as a result of this

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803505

(7) Insurance expense includes FSLIC insurance on the acquired deposits reduced for the wholesale deposits paid off from the obtained from Great American. Insurance expense also includes an amount for property and fidelity insurance expense for these two branches.

(8) The building in Richland is being depreciated over a 25-year life, straight-line method. The equipment in both Spokane and Richland are being depreciated over a 5-year life, and the intangible associated with the deposit base of approximately $115,000 is being amortized on the straight-line method over 8 years.

CONFIDENTIAL MATERIAL–SUBJECT TO PROTECTIVE ORDER SG 0803506

IV. FINANCIAL DATA

D. Fees to be Paid

No fees have been, or will be, paid to any individual by Sterling or Great American for a finder's or consultant's fee. Fees paid to legal counsel, Witherspoon, Kelley, Davenport, and Toole, P.S., for representation of Sterling for the preparation of this application, review of legal documents and closing of the real estate transfer are expected to be less than $4,000 and are the normal fees charged for such necessary services rendered in an arms-length transaction.

Fees paid to Sterling's accountants, Coopers & Lybrand, for review of the accounting to be employed to record the transfer of assets and liabilities are expected to be less than $1,500 and are the normal fees charged for such necessary services rendered in an arms-length transaction.

IV. FINANCIAL DATA

E. Basis for Issuing Savings Accounts

The terms and conditions of Great American's Certificates of Deposit will continue unaltered until maturity. Any changes to terms and conditions on post-maturity of Great American's Certificate of Deposit account holders would be through the normal regulatory notification process to customers. Any changes to terms and conditions would be consistent to those offered all deposit customers throughout Sterling's branch network.

The terms and conditions of Great American's transaction accounts (passbook, statement savings, NOW, money market accounts) would continue unaltered unless Sterling Savings gives proper notification to Great American's customers of any changes that could affect their accounts and any changes would be consistent to the terms and conditions offered all transaction account customers throughout Sterling's branch network.

NOW checking and money market accounts will be issued new checks with micro encoding which will allow for clearing against Sterling's FHLB bank account.

December 22, 1987

**NOTICE OF FILING OF APPLICATION**
**FOR PURCHASE OF BRANCH OFFICES**
**AND TRANSFER OF SAVINGS ACCOUNTS**

This is to inform the public that under Section 563.22 of the Rules and Regulations for FSLIC-Insured Institutions, Sterling Savings Association, Spokane, Washington, has filed an application with the Federal Home Loan Bank of Seattle for permission to increase accounts of an insurable type through the acquisition of six branch offices of Great American First Savings Bank, FSB, Tucson, Arizona, located at:

Fifth and Main, Ellensburg, Washington
West 109 Third Avenue, Moses Lake, Washington
146 Second Street, North Bend, Washington
450 East Main, Othello, Washington
1033 East First Street, Port Angeles, Washington
154 Winslow Way East, Winslow, Washington

Anyone may write in favor or protest of the application. Four copies must be sent to "Supervisory Agent, Federal Home Loan Bank of Seattle, 1501 Fourth Avenue, Seattle, Washington 98101", within 10 days of the publication of this notice. An additional 7 days to submit comments may be obtained if a written request is received by the Supervisory Agent within the 10-day period.

Anyone sending a protest deemed substantial by the Principal Supervisory Agent may request an oral argument on the application by submitting a written request to the Supervisory Agent during the 10-day period. For a protest to be considered substantial, it must be written and received on time, the reasons for the protest must be consistent with the regulatory basis for denial of the application, and the protest must be supported by the information specified in Section 543.2(e)(4) of the Federal Regulations.

You may look at the application and all comments filed at the Federal Home Loan Bank of Seattle, unless any such materials are exempt by law from disclosure. If you have any questions concerning these procedures, contact the Federal Home Loan Bank of Seattle (206) 340-2456.

Sterling Savings Association
Spokane, Washington

---

Applicant has been requested to publish this notice one time in a newspaper(s) in general circulation in the home office community of each institution.

EXHIBIT 11
Faulstich

)N929 1192 L STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383
2124 B & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL
ATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

SUPERVISORY AGENT'S DIGEST AND RECOMMENDATION FOR APPLICATION FOR PERMISSION TO INCREASE ACCOUNTS OF AN INSURABLE TYPE THROUGH THE PURCHASE OF SIX BRANCH OFFICES

Application No. ~~12870627~~ 12880643

| Recommendation: | SA | ODB | District No. 12 |
|---|---|---|---|
| Approval (D.A.) | X | | 10-30-86 |
| Disapproval | | | Filing Date |

| Acquiring Institution: | (S) Stock (M) Mutual | Date of Incorporation | Date Insured | (000) Assets as of 9/30/87 |
|---|---|---|---|---|
| Sterling Savings Association Spokane, Washington FHLBB No. 7918 | S | 1981 | 1983 | $ 244,963 |
| **Selling Institution:** | | | | |
| Great American First Savings Bank, FSB Tucson, AZ FHLBB No. 0789 | S | 1937 | 1937 | $4,117,815 |

A. THE PROPOSAL

Sterling Savings Association, Spokane, Washington ("Sterling"), proposes to purchase six branch offices of Great American First Savings Bank, FSB, Tucson, Arizona, ("Great American") located at:

Fifth and Main, Ellensburg, Washington
West 109 Third Avenue, Moses Lake, Washington
146 Second Street, North Bend, Washington
450 East Main, Othello, Washington
1033 East First Street, Port Angeles, Washington
154 Winslow Way East, Winslow, Washington

B. COMMENTS AND RECOMMENDATION

The subject application has been reviewed by this office consistent with the provisions of Sections 563.22 and 571.5 of the Insurance Regulations, and, in our opinion, the acquisition raises no significant antitrust or anticompetitive issues. On December 22, 1987, the application was deemed conditionally approved subject to standard conditions normally imposed on similar-type applications.

ON929 1193 F STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383
'2124 B & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL
TATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

The subject application represents significant geographic expansion and asset growth by Sterling. The six offices to be acquired are not located in counties currently served by full service branch offices of Sterling and, therefore, would result in a substantial increase in market area. The deposits to be assumed, or about $47 million, equal about 23% of Sterling's current deposit base.

Great American is supervised and monitored by the Federal Home Loan Bank of San Francisco, therefore, this digest primarily focuses on pertinent elements of the application and its impact on Sterling. On December 1, 1987, the FHLB of San Francisco issued a memo to the FHLB of Seattle indicating it has no material supervisory concerns regarding the subject transaction. Due to the relative small size of the transaction, the branch office sales would have minimal impact on Great American's financial condition. As a result of the sales, Great American would record a gain of approximately $231,000 and an increase of its ratio of net worth to total liabilities from 4.8% to 4.9%. The institution anticipates an increase in its cost of funds of less than two basis points and no material change in its yield on assets. The transaction appears to be consistent with Great American's long-term plan of concentrating branching along the I-5 corridor and maintaining offices with a minimum deposit base of $12-15 million.

This office is currently evaluating Sterling's bid to acquire two troubled thrifts with offices within Washington State and a liability growth application. Regardless of the ultimate decision on those applications, based upon the information contained in the subject application and supplementary materials, approval is recommended, in that the transaction would: (1) enhance Sterling's net worth over the longer term due to the acquired office's projected profitability and low premium paid; (2) not substantially increase risk to the institution, or the FSLIC, through reinvestment of funds received from Great American; (3) be consistent with its business plan; and (4) lower the institution's overall cost of funds.

C. AGREEMENT

Savings Assumption and Purchase Agreement
November 2, 1987

On November 2, 1987, Sterling agreed to acquire the real property and/or leasehold interest, furniture, fixtures and equipment, savings deposits and share loans of the six subject branch offices of Great American. At closing, American would transfer in cash to Sterling $47 million for deposits transferred, and Sterling would transfer in cash to Great American $1.8 million which includes $165,516 for book value of furniture, fixtures and equipment, $163,000 for share loans and about $310,000 for goodwill (0.66% of deposits).

No employment contracts or non-competitive agreements are a part of this agreement. Shareholder vote is not required by either institution for the subject transaction.

The application is accompanied by an opinion from the accounting firm of Coopers and Lybrand that the proposed accounting treatment is in accordance with generally accepted accounting principles.

D. FINANCIAL DATA

Sterling Savings Association
Spokane, Washington

Sterling, incorporated in 1981, received its insurance of accounts and became a Bank member in 1983.

| Examination Date | Type | Composite Rating | CRA Rating |
|---|---|---|---|
| 10/29/86 | Full Scope | 2 | Satisfactory |
| 8/16/85 | 12-Month | 2 | Satisfactory |

At the association's October 29, 1986, CRA assessment, a satisfactory rating was received. The association's CRA statement is in compliance with Section 563(e) of the Insurance Regulations and its community delineation does not appear to arbitrarily exclude any minority or low income areas.

At Sterling's most recent examination on October 29, 1986, significant items of concern noted include decreasing net worth and increasing scheduled items and substandard assets, partially attributable to its acquisition of a troubled thrift in May 1985. Pertinent financial and operational ratios are as follows:

(000s Omitted)

| Date | Total Assets | Total Savings | Actual Net Worth | Required Net Worth | Excess Net Worth |
|---|---|---|---|---|---|
| 9/30/87 | $231,798 | $179,858 | $10,613 | $7,031 | $3,582 |
| 6/30/87 | 244,971 | 170,755 | 10,475 | 6,640 | 3,835 |
| 6/30/86 | 180,879 | 142,078 | 7,245 | 4,252 | 2,993 |
| 6/30/85 | 112,449 | 88,205 | 4,614 | 1,363 | 3,251 |
| 6/30/84 | 88,913 | 71,561 | 4,003 | N/A | N/A |

)N929 1195 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383 W2124 & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL 'ATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

| Date | Net Income | Net Worth To Total Liabilities | Net Income To Average Assets | Net Income To Net Worth | Scheduled Items to Average Assets |
|---|---|---|---|---|---|
| 9/30/87 | $ 142* | 4.53% | 0.25% ** | 5.35% ** | 3.45% |
| 6/30/87 | 1,085 | 4.73% | 0.50% | 10.36%% | 3.90% |
| 6/30/86 | 861 | 4.17% | 0.49% | 11.88% | 3.15% |
| 6/30/85 | 612 | 4.07% | 0.55% | 13.26% | 1.40% |
| 6/30/84 | 216 | 4.71% | 0.28% | 5.40% | 1.09% |

* Represents first quarter net income
** Annualized net income

As indicated above, Sterling has maintained profitable operations and increasing net worth despite its aggressive growth posture. The institution's percentage of excess net worth to its capital requirement has also been increasing from 29% on June 30, 1985, to 66% as of September 30, 1987. Sterling's current business plan states a goal of 0.55-0.60% ROA; 15-20% ROE; and maintenance of GAP net worth in excess of 4% of total assets and RAP net worth above 5% of total assets.

As of September 30, 1987, Sterling's one-year hedged gap was negative 17.57% of total assets, up from 3.79% reported the prior year on that date, possibly due to the institution's increase in volatile deposits to average deposits from 8.02% to 14.82%. The institution has also experienced a decrease in liquidity from 11.91% to 5.35% of its liquidity base. The institution's increase in the use of brokered funds (Evergreen Financial Services) from 0.78% in September 1986 to 8.81% in September 1987 may account for a portion of the above increase in volatile deposits.

E. EFFECT OF TRANSACTION

According to the September 30, 1987, pro forma Statement of Condition and other information contained in the application, the acquisition by Sterling would have a significant impact on its financial condition. The acquisition would result in an increase of Sterling's total liabilities of approximately 20% and a subsequent decrease in its ratios of net worth to total liabilities from 4.5% to 3.8% and net worth to total assets from 4.3% to 3.6%.

Sterling reported that despite the initial drop in percentage of capital, the acquisition of the six offices would increase its long-term income. For the year ended September 30, 1988, Sterling anticipates that the acquired offices would boost the institution's net income by $197,825. No material effect to Sterling's yield on assets is expected through the acquisition.

Sterling intends to utilize a portion of the funds received through the branch office purchase to repay short-term FHLB borrowings, Federal funds and reverse repurchase agreements made in November 1987 in anticipation of the association's approval. The November 1988 borrowings were invested into longer term Treasury bills, GNMAs, and CMOs, and are expected to result in liability growth in excess of the limitations of Insurance Regulations 563.13-1 as of December 31, 1987. Sterling filed a liability growth application on December 8, 1987.

Sterling indicated that the current mismatch of short-term borrowings funding longer term investments will result in an increased gap until the funds are replaced by the deposits of the subject application. The institution's cost of funds is also expected to increase for the interim, due to the higher cost borrowings, until replaced by the lower cost deposits. The deposits to be acquired equal 23% of Sterling's total deposits and are 18 basis points lower than its average cost of funds, therefore no increase in the institution's cost of funds.

The branch acquisitions appear to be consistent with Sterling's long range plan for increasing its presence east of the Cascade Mountains in both Oregon and Washington. The three offices to be acquired located in the Puget Sound region were not as attractive to Sterling as the other three offices; however, Great American was willing to lower its deposit premium if Sterling would take all six offices. The deposit premium of 0.66%, in my opinion, is quite attractive based on the profitability of the offices (1). After acquisition, Sterling intends to pay approximately $300,000, or about $50,000 per branch location, for remodeling, redecorating, and re-signing. Sterling's current business plan accounted for two branch office acquisitions in October 1987 of approximately the same size as the subject transaction, and indicated that the institution would explore the feasibility of adding branches through acquisition. Sterling intends to amortize the deposit premium over eight years, or approximately $38,750 per year.

(1) Using the present value method of the projected income, the premium would be $1,228,913. Using an average market rate for branches sold of 2%, the premium would be $940,000. The deposit premium to be paid by Sterling is $310,000.

F. ANTICOMPETITIVE ANALYSIS

An evaluation in accordance with Section 571.5(b)(3) of the Insurance Regulations indicates that no significant anticompetitive effect would result from the proposed office purchases. All of the offices to be acquired are located in market areas not currently served by Sterling, therefore no change in the area's Hirfindahl-Hirschman Index (HHI) would result.

The savings and lending market area for the Ellensburg, Washington, branch office has been determined as Kittitas County. Situated in South Central Washington, the primarily rural county encompasses approximately 2,308 square miles and holds about 0.6% of the state's total population, with about 47% residing within the City of Ellensburg. The county's HHI has been calculated as 1,815.04.

Grant County has been determined as the savings and lending market area for the Moses Lake, Washington branch office. The rural county is located in the central eastern portion of the state and encompasses approximately 2,660 square miles. The county holds about 1.2% of the state's total population, with 22% residing within the City of Moses Lake*. The county's HHI has been calculated as 1,278.63.

King County has been determined as the savings and lending market area for the North Bend branch office. As the state's most populous county, King County is located in northwest Washington, encompasses approximately 2,128 square miles and boasts about 31% of the state's total population with less than 5,000 persons residing with the City of North Bend*. The county's HHI has been calculated as 872.93.

The Othello, Washington, branch office's savings and lending market area has been identified as Adams County. The county, situated in Eastern Washington, encompasses approximately 1,921 square miles and holds a population of about 0.32% of the state's total population*. The county's HHI has been calculated as 1860.41.

The savings and lending market area for the Port Angeles branch office has been determined as Clallam County. The county is located in northwestern Washington on the Olympic Peninsula and encompasses approximately 1,753 square miles. Clallam County holds a population of approximately 1% of the state's total population, with about 34% residing within Port Angeles*. The county's HHI has been calculated as 2,499.38.

The Winslow, Washington, branch's savings and lending market area has been delineated as Kitsap county. The county also located in northwestern Washington, encompasses only approximately 393 square miles and holds about 4% of the state's total population*. The county's HHI has been calculated as 947.41.

* Based upon 4/1/80 census data
** See attachment

VON929 1198 STERLING SAVS ASSOC 95-829C STERLING SA DOCKET # 07918 WIN BOX # WC00018231 OLD BOX # 99-383 W2124 3 & PUR 6 GREAT AMERICAN FIRST SB FSB ATS # 12880643 ATS # 12880664 COMPLIANCE MATERIALS FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; HANDWRITTEN NOTES 861299- 880399 CONFIDENTIAL MATERIAL--SUBJECT TO

G. ADDITIONAL INFORMATION

On December 22, 1987, the applicants were notified to publish the notice of filing within their respective home office communities in accordance with Section 563.22(c) of the Insurance Regulations.

Transaction Expenses

No finders or consultant fees were paid by Sterling or Great American in connection with the subject transaction. Sterling estimated its legal fees would be less than $3,500, and accounting fees would be less than $1,000. Great American indicated that all research and preparation of the application was performed as part of normally assigned responsibilities with normal compensation to employees, therefore, no additional fees were incurred, except for an accountant's opinion which resulted in a fee of $914.

Tax Liability

Great American's in-house corporate tax manager indicated that the institution will incur approximately $143,000 in additional tax liability from the subject transaction.

December 22, 1987

Principal Supervisory Agent

Penny D. Marshall /cor
Supervisory Agent

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, *
A STATE CHARTERED SAVINGS *
ASSOCIATION, STERLING FINANDIAL *
CORPORATION, A WASHINGTON *
CORPORATION, *
Plaintiffs, *
* CASE NO. 95-829C
V. * (Senior Judge Smith)
UNITED STATES *
Defendant. *

ORAL AND VIDEOTAPED DEPOSITION OF
DANIEL G. BYRNE
VOLUME 2
DECEMBER 4, 2001

Taken on DECEMBER 4, 2001 beginning at 8:47 a.m., in the offices of the United States Justice Department, 910 Travis, Suite 1452, Houston, Texas, before Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, pursuant to Notice, the Federal Rules of Civil Procedure and stipulations as may be stated herein.

08:47:34 AM THE VIDEOGRAPHER: We're now beginning
08:47:35 AM Tape 3 of this deposition. Today is December 4, 2001.
08:47:39 AM The approximate time is 8:48. We're now on the video
08:47:42 AM record.

DANIEL G. BYRNE

having been previously sworn, testified further as follows:

EXAMINATION

BY MR. MURPHY:

08:47:43 AM Q. Good morning, Mr. Byrne.
08:47:44 AM A. Good morning.
08:47:46 AM Q. I'll just remind you that you're still under
08:47:48 AM oath from yesterday.
08:47:49 AM If I could get you to turn back to either
08:47:53 AM tab 9 -- yeah, tab 9 of Exhibit 2, I believe, is where
08:48:00 AM we left off yesterday. I just have a couple of
08:48:09 AM questions with respect to that.
08:48:12 AM We went through most of this yesterday.
08:48:15 AM There is one charge that I want to ask you about that's
08:48:21 AM in the first section on legal fees.
08:48:23 AM A. Yes.
08:48:24 AM Q. There is -- you see three lines down, there is a
08:48:27 AM Witherspoon, Kelley charge for 25,775.06?
08:48:33 AM A. Uh-huh.

09:29:21 AM you as Exhibit 6 that were produced to us in support of
09:29:27 AM your analysis with respect to the legal accounting and
09:29:35 AM insurance costs for a wounded bank, is there anything
09:29:38 AM aside from these documents that you're relying on and
09:29:42 AM your discussion with the Coopers & Lybrand partner for
09:29:44 AM the increased audit fee for their inclusion?

09:30:01 AM A. Well, my knowledge of activities that were
09:30:04 AM occurring at the time and what we had requested with
09:30:10 AM respect to our law firm and, in turn, when they needed
09:30:17 AM to go to third parties such at Arnold & Porter for
09:30:22 AM additional advice as to the nature of what those
09:30:24 AM activities were. I think that's it.

09:30:38 AM Q. Okay. Okay. We're done with Exhibit 6.

09:30:43 AM Now, if I could get you to turn to tab 11 of
09:30:46 AM Exhibit 2, which is the additional materials relied on
09:30:50 AM by Horvitz.

09:30:59 AM A. I'm sorry. The tab was?

09:31:01 AM Q. Tab 11. This one is headed "Increased Costs to
09:31:04 AM Acquire Branch From Great American Savings/RTC." And it
09:31:09 AM notes at the bottom, "Analysis prepared by Daniel G.
09:31:13 AM Byrne, CFO of Sterling" -- "Sterling Savings."

09:31:16 AM I believe yesterday you testified that this
09:31:18 AM was information you had developed in response to an
09:31:22 AM interrogatory.

09:31:27 AM Can you just tell me your basis for the

09:31:32 AM inclusion of these costs in your wounded bank analysis?
09:31:35 AM A. Yes. Sterling was in the process of acquiring
09:31:38 AM two branches from Great American in the summer of 1989
09:31:46 AM and had gained regulatory approval in a preliminary form
09:31:57 AM from the --
THE REPORTER: In a what form?
THE WITNESS: Preliminary form.
09:31:58 AM A. -- from the Federal Home Loan Bank of Seattle
09:32:01 AM staff.
09:32:05 AM When FIRREA was passed, that preliminary
09:32:10 AM approval was rescinded and the application was forwarded
09:32:17 AM to Washington, D.C. And as a result of the review in
09:32:23 AM Washington, D.C., the acquisition of these branches was
09:32:32 AM scuttled by the OTS in the sense that it required
09:32:36 AM Sterling to meet the FIRREA capital requirements,
09:32:43 AM excluding the contractual rights of our three contracts
09:32:46 AM with respect to capital. In other words, they ignored
09:32:49 AM the capital that we had in our contracts.
09:32:52 AM Consequence, we did not complete this
09:32:54 AM transaction in the summer of 1989. Later, in 1990 -- I
09:33:03 AM forget the dates -- 1994, 1995, Sterling had the
09:33:07 AM opportunity to bid on branches being offered by the RTC,
09:33:11 AM which included the two branches that we were trying to
09:33:16 AM acquire. Sterling bid on both, was successful on only
.9:33:20 AM the Spokane branch. And what this schedule represents

09:33:24 AM is the increased costs that we incurred to acquire that branch over what our costs would have been in 1989 had the Government not breached our contract.

09:33:44 AM Q. And how did you determine the value received by the RTC upon sale of the branches?

09:33:51 AM A. The $1,892,000 represents the value paid by Sterling for that branch, and it was referenced in documents that had been produced with respect to a news article put out by the RTC as to the total amount paid by Sterling and Sterling's internal bid worksheet which identified the Spokane branch with this dollar amount being paid or bid on by the RTC.

09:34:32 AM Q. And what is the item -- the next item, costs described to deposit premium in Sterling's bid?

09:34:40 AM A. That essentially is the cost that Sterling would have paid to Great American in 1989 for this one branch. And actually there is a note at the bottom that the premium for both branches, Spokane and Richland, would have been $61,000, and that Sterling expected to incur an additional $54,000 relating to the closing of the transaction in winding down the operations at the Spokane branch. I think what this schedule was attempting to do was split the costs between the Spokane and Richland branch, but basically what it would have cost in 1989 versus what it cost in the 1994 or '5 time

frame.

Q. And the transaction costs that are listed, what are those?

A. Those are the transaction costs that were incurred in 1989 by the various vendors to acquire the branches from Great American up until the time that the Government basically forced us to terminate that acquisition.

Q. So those are actual costs incurred?

A. Out-of-pocket expenses.

Q. The $1.892 million, is that cash that was paid by Sterling for the branch?

A. Essentially, yes. By virtue of the fact that Sterling assumed deposit liabilities, it was paid cash for those deposits; but then we deducted the amount of the premium from the amount of cash that Sterling received.

So effectively it was cash paid by Sterling back to the RTC to acquire those branches.

Q. So does the 1.892 represent the premium, or how is that related to the premium?

A. That is the premium and the cost --

Q. Okay.

A. -- that Sterling paid to acquire those branch -- that Spokane branch.

09:37:58 AM Q. So how -- just to make sure I understand this correctly. In 1989, Sterling ascribed the premium value to the premium branches of $61,000. Is that correct?
09:38:14 AM A. That's correct.
09:38:15 AM Q. And in 19 -- when the branch was acquired from the RTC, Sterling effectively paid a $1.892 million premium. Is that correct?
09:38:30 AM A. That's correct.
09:38:30 AM Q. Okay. Do you have an opinion as to what the difference is a result of?
09:38:42 AM A. Difference of?
09:38:45 AM Q. The difference between the value that Sterling ascribed to the two branches in 1989 and the premium Sterling actually paid in -- when it acquired the branch from the RTC.
09:39:03 AM A. That was a great job on my part to negotiate the first transaction in '89.
09:39:23 AM Q. So would it have been a bargain purchase in 1989?
09:39:27 AM A. I think it represented the market in 1989.
09:39:41 AM Q. Did you do any analysis of whether the deposit base changed between 1989 and the time the branch was actually acquired?
09:39:55 AM A. We did some analysis in terms of the level of deposits and the mix of deposits between CDs and

09:40:04 AM transaction accounts. I don't recall what that analysis
09:40:08 AM indicated.
09:40:16 AM Q. And is it your opinion that the franchise value
09:40:23 AM of the Great American Savings branches or branch
09:40:29 AM increased by 1.83 million between 1989 and 1994 or '95?
09:40:38 AM MR. W. D. SYMMES: Object to the form of
09:40:39 AM that question.
09:40:40 AM You may answer.
09:40:45 AM A. I guess I'm having a little struggle with your
09:40:48 AM term "franchise value" because we're talking one single
09:40:52 AM branch that was primarily a depository, with very little
09:40:58 AM in the way of loans. There just wasn't much franchise.
09:41:03 AM Q. (BY MR. MURPHY) So is it your opinion that the
09:41:04 AM value of that branch increased by $1.83 million between
09:41:09 AM 1989 and 1994/'95?
09:41:12 AM MR. W. D. SYMMES: Same objection.
09:41:18 AM A. I know that the market ascribed more value to
09:41:22 AM it.
09:41:53 AM Q. (BY MR. MURPHY) Do you have an opinion as to
09:41:54 AM whether or not the market for the value of deposit
09:41:57 AM premiums generally increased between '89 and '94?
09:42:01 AM MR. W. D. SYMMES: Same objection.
09:42:02 AM Go ahead.
09:42:09 AM A. I really didn't study the market in terms of
09:42:15 AM deposit premiums during the '90 through '93 period

09:42:23 AM because of our battle with the Government. So I just --
09:42:28 AM no. I just don't have an opinion.

09:42:47 AM Q. (BY MR. MURPHY) Okay. You can turn to tab 12
09:42:49 AM now. We're done with that one.

09:43:00 AM Tab 12 of Exhibit 2 is titled "Schedule of
09:43:03 AM Purchase Accounting Accretion/Amortization" and notes on
09:43:08 AM the bottom left, "Analysis prepared by Daniel G. Byrne,
09:43:14 AM CFO of Sterling." And it's a two-page document. It's
09:43:17 AM not the world's greatest copy, but it's the best one I
09:43:21 AM have.

09:43:22 AM If you could just generally explain to me
09:43:24 AM what the analysis is that you prepared here.

09:43:27 AM A. I was asked by Professor Horvitz to identify for
09:43:36 AM the three acquisitions in this case what any purchase
09:43:43 AM accounting adjustments had been made with respect to
09:43:48 AM discounting or putting premiums on other assets and
09:43:54 AM liabilities and what the amortization or accretion of
09:44:00 AM those premiums and discounts were over time.

09:44:06 AM And so this schedule basically summarizes
09:44:08 AM what was in Sterling's general ledger with respect to
09:44:13 AM that topic.

09:44:22 AM Q. Okay. That was an easy one. If you can go to
09:44:24 AM tab 13 now. Tab 13 of Exhibit 2 is captioned "Sterling
09:44:35 AM Savings Bank Summary, Capital Raising."

09:44:38 AM And in the lower left, it again notes

THE STATE OF TEXAS :

I, Marie Bulfinch, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, DANIEL G. BYRNE, to the interrogatories as indicated were made to me by the said witness after being first duly sworn/affirmed to testify to the truth, and same were reduced to printing under my direction; that the above and foregoing deposition as set forth in printing is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

GIVEN under my hand and seal of office on this the 11th day of December 2001.

Marie Bulfinch, CSR, RMR, CRR
in and for The State of Texas

Certificate No. 3748
Expires 12-31-01
1010 Lamar, Suite 1400
Houston, Texas 77002

**CHANGES AND SIGNATURE ASSOCIATED WITH DEPOSITION OF DANIEL BYRNE, HOUSTON, TEXAS DECEMBER 3, 2001.**

| Pg/Ln | Change |
|---|---|
| 17/10 | "amount" should be "days" |
| 51/17 | Add, after "Central Evergreen.": "Although Sterling bargained for an received permanent cash assistance as part of the Lewis Federal and Tri-Cities acquisitions, it was when the Central Evergreen transaction was closed in December 1988 that Sterling focused again on how cash assistance was being treated in the TFRs. Sterling never amortized cash assistance in its general ledger or in the Central Evergreen Business Plan." |
| 60/13 | ""the books and records"" |
| 60/23 | Add, after "on a GAAP basis": "In other words, Sterling was not amortizing cash assistance." |
| 68/4 | "crude" should be "accrued" |
| 68/12 | "Belvieu" should be "Bellevue" |
| 72/10 | "and limited" should be "and the government limited" |
| 79/22 | "9,41743" should be 9,417.43 |
| 84/25 | "That was not recorded as income" should be "That was initially recorded as income and the reversed out upon foreclosure" |
| 85/4 | "That's correct." should be "That's correct. That was not recorded as income." |
| 89/13 | "in the December through" should be "in the September through" |
| 98/16 | "March" should be "September" |
| 98/17 | "1990" should be "1991" |
| 104/3 | "operating" should be "offering" |
| 117/7 | "the FDIC in" should be "the FDIC and" |
| 134/20 | "in 1990" should be "in the mid-1990s" |

| | |
|---|---|
| 135/25 | "1994 or '5" should be "1994 or 1995" |
| 144/24 | "Nortown" should be "Northtown" |
| 145/4 | "Nortown" should be "Northtown" |
| 146/11 | "Nortown" should be "Northtown" |
| 148/10 | "Nortown" should be "Northtown" |
| 148/16 | "Nortown" should be "Northtown" |
| 152/13 | "Nortown" should be "Northtown" |
| 190/1 | "ledger" should be "ledger and the GL History" |
| 201/2 | "statements and" should be "statements , accounting schedules on amortization and" |
| 202/1 | "six" should be "six hours" |

I, DANIEL G. BYRNE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Daniel G. Byrne
DANIEL G. BYRNE

(State of Washington)
) ss.
County of Spokane )

Before me, Rheta R. Vanderholm, on this day personally appeared DANIEL G. BYRNE, known to me (or proved to me under oath or through __________ __________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 28th day of January, 2002.

RHETA R. VANDERHOLM Commission Expires NOTARY PUBLIC JUNE 1, 2005 STATE OF WASHINGTON

Rheta R. Vanderholm
NOTARY PUBLIC in and for the State of Washington,
residing at: Mead
My commission expires: June 1 2005

\\Wk\doc\B\bhg\bhg\Sterlin... depo corrections 012103, rev'd 0125...