**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

---

# DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT AND LAW

---

**Respectfully submitted,**

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**September 21, 2007**

**Attorneys for Defendant**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . vi

SUMMARY OF ARGUMENT. . . . 1

ISSUES PRESENTED.. . . . 9

PROPOSED FINDINGS OF FACT. . . . 9

I. STERLING'S ACQUISITIONS. . . . 9

A. The 1985 Lewis Federal Acquisition. . . . 10

B. The 1988 Tri-Cities Acquisition. . . . 12

C. The Central Evergreen Acquisition. . . . 14

II. POST-FIRREA. . . . 16

A. Sterling's Application To Acquire Branches Of Great American Savings Bank. . . . 16

B. The "CJ-4" Loan. . . . 17

C. The Terminated 1989 Public Offering. . . . 19

D. Post-FIRREA Supervision Of Sterling. . . . 21

III. STERLING'S POST-FIRREA INJUNCTION AND RECAPITALIZATION. . . . 22

A. Post-FIRREA Restrictions Upon Sterling. . . . 22

B. Sterling Obtained A Temporary Restraining Order And Preliminary Injunction Prohibiting Enforcement Of FIRREA-Related Restrictions.. . . . 24

C. OTS Complied With The TRO And Preliminary Injunction.. . . . 25

D. Sterling Profited From A Shrink In Assets While The Injunction Was Pending. . . . 29

E. Sterling Replaced The Contractual Goodwill When It Recapitalized in 1991.. . . . . 30

IV. STERLING'S POST-1991 CAPITAL RAISING AND GROWTH. . . . . 32

A. Sterling And Its Holding Company, SFC, Have Raised More Capital Than Needed To Replace The Contractual Goodwill Eliminated By FIRREA. . . . . 33

B. Since 1992, Sterling Has Continuously Held Excess Capital. . . . . 36

C. Sterling Has Been Unable To Meet Its Budgeted Growth Targets. . . . . 37

D. Sterling Has Frequently Faced Competition And Other Market Obstacles To The Acquisition Of Loans And Deposits.. . . . . 38

V. STERLING'S LITIGATION IN THE COURT OF FEDERAL CLAIMS. . . . . 40

CONTENTIONS OF LAW. . . . . 41

I. THE APPLICABLE LEGAL STANDARDS. . . . . 41

II. THE COURT SHOULD REJECT STERLING'S LOST PROFITS MODEL BECAUSE IT IS SPECULATIVE AND HAS NO BASIS IN FACT. . . . . 44

A. Dr. Horvitz's Flawed Lost Profits Model. . . . . 44

B. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact And Law Because Dr. Horvitz's Model Ignores Sterling's Mitigation Of Damages Through Recapitalization In 1991. . . . . 45

C. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal And Tri-Cities. . . . . 50

D. Sterling Failed To Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model.. . . . . 52

1. Dr. Horvitz's Lost Profits Model Is Invalid As A Matter Of Law Because The Breach Did Not Cause Sterling's Failure To Meet FIRREA's Minimum Capital Requirements.. . . . . 52

a. Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach.. . . . . 54

b. Sterling Would Have Failed FIRREA's Core Capital Requirement Even Absent The Breach. . . . . . . . . . . . . . . . 55

c. Dr. Horvitz's New Opinion Regarding The Lewis Federal And Tri-Cities Forbearance Letters Is Incorrect And Does Not Render "But-For" Sterling Compliant With FIRREA's Core Capital Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

d. Sterling Did Not Prove That It Would Have Complied With FIRREA's Risk-Based Capital Requirement Absent The Breach. . . . . . . . . . . . . . . . . . . . . . . . . . 65

2. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling To Cease The Pursuit Of Profitable Opportunities Even Though The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

E. The Damages Arising From Dr. Horvitz's Lost Profits Model Are Not Reasonably Certain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

1. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Fails To Identify Profitable Opportunities That Would Have Been Obtained Absent The Breach.. . . . . . . . . . . . . . . . . . . . 76

2. Dr. Horvitz's Model Is Invalid Because He Assumes That Sterling Would Have Earned The Same Return On Incremental Assets As It Earned On Actual Assets. . . . . . . . . . . . . . . . . . 78

3. Sterling's Profitability In The Actual World Does Not Render Dr. Horvitz's Model Reasonably Certain. . . . . . . . . . . . . . . . . . . 82

4. Sterling's Failure To Meet Its Budgeted Growth Targets Renders Dr. Horvitz's Assumption That Profitable Incremental Assets Would Have Been Available Speculative.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

5. Dr. Horvitz's Model Ignores The Fact That Sterling Has Maintained Excess Regulatory Capital Since 1992. . . . . . . . . . . . . . . . . . . 83

6. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

7. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

8. Dr. Horvitz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages To Create Lost Profits. . . . . . . . . . . . 89

III. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES BECAUSE DR. JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL. . . . . . . . . . . . . . . . 90

A. The Court Should Reject Dr. James's Mitigation Theory Because The Only Costs Associated With Raising Capital Are Transactions Costs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

B. The Court Should Reject Dr. James's Mitigation Damages Theory Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

C. Dr. James's Lost Profits Suffers From A Series Of Errors That Render It Speculative And Unreliable As A Matter Of Law. . . . . . . . . . . . . . . . . 100

D. Sterling Is Not Entitled To A Tax "Gross-Up". . . . . . . . . . . . . . . . . . . . . . . . . . 101

1. Sterling's Tax Gross Up Claim Is Speculative And Unfounded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

2. Sterling's Tax "Gross Up" Claim Is Barred As A Matter Of Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

3. Any Tax "Gross-Up" Here Would Constitute An Improper Windfall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

IV. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

A. The Breach Did Not Cause Sterling To Incur Increased Costs In

Acquiring A Branch Of Great American Savings Bank . . . . . . . . . . . . . . . . . . . 106

B. The Breach Did Not Cause Sterling To Incur Losses Associated With The CJ-4 Loan.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

C. The Breach Did Not Cause Sterling To Incur Excess Supervision Costs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

D. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That The Breach Caused Its Other Legal And Accounting Fees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

E. The Breach Did Not Cause Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Offering.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004). . . . . . . . . . 40

Advanced Med., Inc. v. Arden Med. Sys. Inc.,
955 F.2d 188 (3rd Cir. 1992).. . . . . . . . . . 49

Am. Fed. Bank, FSB v. United States,
68 Fed. Cl. 346 (2005). . . . . . . . . . *passim*

Bank of America, FSB v. United States,
67 Fed. Cl. 577 (2005), aff'd ___ F.3d ___, 2007 WL
2137774 (Fed. Cir. Jul. 26, 2007). . . . . . . . . . *passim*

Bank United FSB v. United States,
50 Fed. Cl. 645 (2001), aff'd in part, 80
Fed. Appx. 663 (Fed. Cir. Sept. 21 2003). . . . . . . . . . *passim*

Berg's Estate v. United States,
231 Ct.Cl. 466, 687 F.2d 377 (1982). . . . . . . . . . 113

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001). . . . . . . . . . 41

Bohac v. Dep't of Agric.,
239 F.3d 1334 (Fed. Cir. 2001). . . . . . . . . . 42

Cal. Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005). . . . . . . . . . *passim*

Cal. Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002). . . . . . . . . . *passim*

Cal. Fed. Bank, FSB v. United States,
43 Fed. Cl. 445 (1999), aff'd in part,
245 F.3d 1342 (Fed. Cir. 2001). . . . . . . . . . 6, 7

Carabetta Enters., Inc. v. United States,
482 F.3d 1360 (Fed Cir. 2007).. . . . . . . . . . 101

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd 301 F.3d 1328
(Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 85

Citizens Fin. Servs., FSB v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed. Appx. 129,
2006 WL 618792 (Fed. Cir. Mar. 9, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Citizens Fin. Servs., FSB v. United States,
57 Fed. Cl. 64 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) (en banc). . . . . . . . . . . . . . . . . . 105

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Columbia First Bank, FSB v. United States,
54 Fed. Cl. 693 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 95

Comm'r v. Glenshaw Glass Co.,
348 U.S. 426, 431 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 107

District of Columbia v. United States,
67 Fed. Cl. 292 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 89

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.2d 1506 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Far West Federal Bank v. OTS,
951 F.2d 1093 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Fifth Third Bank of W. Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 94

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Franklin Fed. Savings Bank v. United States,
55 Fed. Cl. 108 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Glendale Fed. Bank, F.S.B., v. United States,
378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 94

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vacated
in part, & remanded, 239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 93

Granite Management Corp. v. United States,
58 Fed. Cl. 766 aff'd in partand remanded in part
on other grounds, 416 F.3d 1373 (Fed. Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Home Sav. of Am., FSB. v. United States,
399 F.3d 1341 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 103

Kaiser Aluminum & Chem. Corp. v. Ill. Cent. Gulf R.R.,
615 F.2d 470 (8th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LaSalle Talman Bank, F.S.B. v. United States,
462 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

LaSalle Talman Bank, F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LaSalle Talman Bank, F.S.B. v. United States,
64 Fed. Cl. 90 (2005), appeal argued, No. 05-5164
(Fed. Cir. July 13, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

LaSalle Talman Bank, FSB v. United States,
45 Fed. Cl. 64, 97 (1999), aff'd in part, vacated in part,
317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 115

Library of Congress v. Shaw,
478 U.S. 310 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 103

Micro Chem., Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Midwest Indus. Painting of Fl., Inc. v. United States,
4 Cl. Ct. 124 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 48

Myerle v. United States,
33 Ct. Cl. 1 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

N. Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 107

Piggly Wiggly Corp. v. United States,
112 Ct. Cl. 391, 81 F. Supp. 819 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 115

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Prudential Ins. Co. of Am. v. United States,
801 F.2d 1295 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Quiman, S.A. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 44

R.S.E., Inc. v. Pennsy Supply, Inc.,
523 F.Supp. 954 (M.D. Pa. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Reynolds v. Roberts,
207 F.3d 1288 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
182 F.R.D. 386 (D.R.I. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Rumsfeld v. Applied Cos., Inc.,
325 F.3d 1328 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Shore v. United States,
9 F.3d 1524 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Southern Cal. Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Southern Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in part, & remanded,
422 F.3d 1319 (Fed. Cir. 2005), cert. denied, __ S. Ct. __, 2006
WL 1725639, 74 U.S.L.W. 3715, 74 U.S.L.W. 3720 (U.S. June
26, 2006) (No. 05-1221). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Sterling Savings Assoc. v. Ryan,
959 F.2d 241, 1992 WL 73884 (9th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 68

Sterling Sav. Assn. v. Ryan,
751 F. Supp. 871 (E.D. Wash. 1990), rev'd, 959 F.2d 241 (9th Cir. 1992). . . . . . . . . . . . . . *passim*

Sterling Sav. Assn. v. United States,
72 Fed. Cl. 404 (2006). . . . . . . . . . *passim*

Sterling Sav. Assn. v. United States,
57 Fed. Cl. 445 (2003). . . . . . . . . . 41

Sterling Savings v. United States,
53 Fed. Cl. 599 (2002). . . . . . . . . . *passim*

Sterling Sav. Ass'n v. United States,
No. 95-829C, slip op. (Nov. 15, 2002). . . . . . . . . . 114

Sun Cal, Inc. v. United States,
25 Cl. Ct. 426 (1992). . . . . . . . . . 43

Toledo Peoria & W. Ry. v. Metro Waste Sys., Inc.,
59 F.3d 637 (7th Cir. 1995). . . . . . . . . . 48

United States v. Gotcher,
401 F.2d 118 (5th Cir. 1968). . . . . . . . . . 102

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996). . . . . . . . . . 105

Westfed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002), aff'd, 407 F.3d 1352 (Fed. Cir. 2005). . . . . . . . . . 107

Winstar Corp. v. United States,
64 F.3d 1531 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996). . . . . . . . . . *passim*

## STATUTES

12 C.F.R. § 563.13. . . . . . . . . . 12, 16

12 C.F.R. § 565.4 (1993). . . . . . . . . . 37, 83

12 C.F.R. § 567.1 (1990). . . . . . . . . . 16, 56

12 C.F.R. § 567.2 (1990). . . . . . . . . . 16

12 C.F.R. § 567.5 (1990). . . . . 16, 56

12 C.F.R. § 567.8 (1989). . . . . 55

12 C.F.R. § 567.9(a) (1989). . . . . 54

12 U.S.C.A. § 1464(s)(4). . . . . 22

12 U.S.C. §1464(t) (1989). . . . . 16

26 U.S.C. § 61. . . . . 103

28 U.S.C. § 2412(a). . . . . 103

28 U.S.C. § 2412(d). . . . . 103

28 U.S.C. § 2516(a). . . . . 89

26 U.S.C. § 6103. . . . . 104

Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, 105 Stat. 2236 (1991). . . . . 37

Financial Institutions Recovery, Reform and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA") . . . . . *passim*

**MISCELLANEOUS**

Fed. R. Evid. 803(7).. . . . . 74

Fed. R. P. 702.. . . . . 8, 104

Rev. Ruling 81-277. . . . . 103

Restatement (Second) of Contracts § 347 (1981). . . . . 41

Restatement (Second) of Contracts § 347, cmt. b (1981). . . . . 42

Restatement (Second) of Contracts § 347, cmt. e. . . . . 46

Restatement (Second) on Contracts § 350. . . . . 44

Restatement (Second) of Contracts § 350 cmt. a (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Restatement (Second) of Contracts § 350 cmt. b.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Restatement (Second) of Contracts § 350(1) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Restatement (Second) of Contracts § 351 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Restatement (Second) of Contracts § 351 cmt a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Restatement (Second) of Contracts, § 351 cmt. e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 51

Restatement (Second) of Contracts § 351(1) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Restatement (Second) of Contracts § 352 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT AND LAW

Pursuant to Paragraph 11, Appendix A of the Rules of the United States Court of Federal Claims, and this Court's Order dated July 24, 2007, defendant, the United States, respectfully submits the following Post-trial Proposed Findings of Fact and Law.

## SUMMARY OF ARGUMENT

At trial, Plaintiff Sterling Savings Association ("Sterling") attempted to prove that it suffered lost profits, or, in the alternative, "mitigation" damages, as well as wounded bank damages, that were purportedly incurred as a result of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA").

The Court should reject Sterling's lost profits model because it is speculative and has no basis in fact. As a preliminary matter, Sterling's lost profits model is premised upon the counterfactual assumption that, between 1989 and 2006, Sterling never replaced a single dollar of the $15.557 in contractual goodwill eliminated by FIRREA, notwithstanding a legal duty to mitigate and actual mitigation. In 1991, Sterling raised $23 million in capital, achieving full

compliance with FIRREA's regulatory capital requirements and replacing all of the contractual goodwill attributable to its acquisitions of Lewis Federal Savings and Loan Association ("Lewis Federal") and Tri-Cities Savings and Loan Association ("Tri-Cities"). Since then, Sterling has raised over $515 million in new capital. Thus, Sterling's lost profits model projects damages through 2006 on the plainly incorrect assumption that Sterling never replaced the regulatory capital eliminated by FIRREA. Because Sterling mitigated, it is entitled to only $900,204.00 in transaction costs incurred in replacing the contractual goodwill eliminated by FIRREA.

Further, Sterling failed to prove that it met any of the three prerequisites to establishment of a lost profits claim: foreseeability, causation, and reasonable certainty. Cal. Fed. Bank v. United States, 395 F.3d 1263, 1266 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) ("CalFed"). Sterling's expert, Dr. Paul Horvitz, conceded at trial that the lost profits projected in his model were not foreseeable. Tr. 2694:7-13 (Horvitz). This concession was unavoidable. If, in fact, replacement of the $15.557 million in contractual goodwill eliminated by FIRREA would have foreseeably resulted in $58 million in additional profits for the company, then Sterling, which acknowledges that it has raised more than $515 in capital since the enactment of FIRREA, should have experienced no difficulty in raising an additional $15 million in order to realize these profits. For that reason alone, the model should be rejected on foreseeability grounds.

More specifically, Dr. Horvitz admitted that if a firm had profitable opportunities, in efficient markets, it "would always be able to get the capital to pursue those profitable opportunities." Tr. 2678:10-14. (Horvitz). Dr. Horvitz admitted that if any potential lender could foresee the profits in his model, they would have lent the $15.557 million money to Sterling financial, which in turn would have infused it as capital into the bank, and no profits

would have been lost. Tr. 2693:11-2694:13. (Horvitz). Dr. Horvitz, however, admitted that the profits in his model were not foreseeable to "any potential investor at the time." Tr. 2694:7-13. Thus, Sterling's damages claim is admittedly not foreseeable.

Indeed, according to the Restatement of Contracts, Sterling's theory is the classic text-book example of an unforeseeable claim. In analogous breach of contract cases where defendants guarantee loans to businesses, courts limit damages to the cost of replacement because it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit:

> The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach. In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

Restatement (Second) of Contracts § 351 cmt. e. Thus, Sterling's claim that it had profitable opportunities and the thrift's simultaneous allegation that it could not convince its own shareholders or any other prospective investors to infuse an additional $15.557 million to pursue these profits is the classic example of an unforeseeable claim.

Furthermore, Sterling's own documents mandate a finding that the lost profits claim is unforeseeable. In 1992, Sterling expressly stated, in its 1993 business plan, that it expected to maintain its capital in excess of fully-phased in capital requirements, and did "not foresee limitations on its ability to increase total assets." DX 228, p. WON884 1563. Thus, it could not

have been foreseeable that Sterling would suffer damages due to an inability to increase its asset size, as assumed by Dr. Horvitz.

Sterling also failed to prove that its alleged lost profits were caused by the breach. At trial, we demonstrated, and Sterling did not refute, that it was out of compliance with FIRREA's minimum capital requirements in 1989, even if the contractual goodwill attributable to the Lewis Federal and Tri-Cities acquisitions had been permitted to count as regulatory capital. Tr. 2215:18-2218:18 (Friend); DX 1080 (Friend demo); Tr. 2744:2-2748:14 (Horvitz); DX 422, p. 1631; P-454, table 4a. In addition, Sterling's model ignores the fact that Sterling successfully sought, in May 1990, a temporary restraining order (which was converted to a preliminary injunction in August 1990) prohibiting the Government from taking action inconsistent with its contracts. While the injunction was pending, Sterling has no basis for alleging that Government action caused any of its alleged damages.

Finally, with respect to the reasonable certainty test, the "forgone assets" lost profits model advanced by Dr. Horvitz (and endorsed by Dr. Christopher James), suffers from the same flaws that resulted in its rejection by this Court in eight separate cases, including two cases in which Dr. Horvitz presented the model. Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358 (2005) ("AmFed"); Citizens Fin. Servs. v. United States, 64 Fed. Cl. 498, 514, aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006) (model presented by Dr. Horvitz); LaSalle Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 101-04 (2005)(model presented by Dr. James); Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 279-81 (2004); Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 115 (2004); S. Cal. Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598, 625-27 (2003), aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir.

2005) ("SoCal") (model presented by Dr. Horvitz); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 304-06 (2003); Fifth Third Bank v. United States, 55 Fed. Cl. 223, 241-42 (2003).

In each of these cases, the plaintiff estimated lost profits by merely assuming that, absent a breach, goodwill eliminated by FIRREA would have been utilized to obtain unidentified assets and liabilities that would result in profits equal to that realized by the thrift on its actual assets. At trial, Dr. Horvitz conceded that his model is virtually indistinguishable from the model he presented in Citizens Fin. Tr. 2627:5-2628:4 (Horvitz). In both cases, Dr. Horvitz failed to identify the assets and liabilities that Sterling would have acquired absent a breach, ignored competition, and incorrectly assumed that incremental assets earn profit at the same rate as actual assets. Further, Dr. Horvitz's model in this case, like the models previously rejected, assumes that the addition of a dollar of regulatory capital into a thrift automatically results in profits, contrary to basic principles of finance and economics.

These errors, in addition to others discussed below, render it impossible for Sterling's lost profits model, like the virtually identical models rejected in the eight cases listed above, to meet the reasonable certainty standard. Moreover, Sterling's profitability in the actual world does not provide a basis to distinguish Sterling's model from the models previously rejected by the Court. In at least five of the eight cases in which the forgone assets methodology has been rejected, the model projected profitability at the same rate, or a lesser rate, than that actually attained by the plaintiff thrift. See Fifth Third, 55 Fed. Cl. at 240-42; Southern National, 57 Fed. Cl. at 303-04; and Standard Federal, 62 Fed. Cl. at 276-77; LaSalle, 64 Fed. Cl. at 101-04; Columbia First, 60 Fed. Cl. at 115-118.

Sterling's lost profits model suffers from an additional fatal flaw not present in the eight cases in which the model has already been rejected. In calculating lost profits, Dr. Horvitz does not simply add the contractual goodwill eliminated by FIRREA back to Sterling's regulatory capital, and estimate lost profits based upon the loss of the goodwill. In order to generate lost profits, he also inputs Sterling's wounded bank, or consequential damages, into the lost profits model. As a preliminary matter, this is invalid as a matter of law because the resulting profits constitute an extreme form of prejudgment interest, which Sterling is barred from seeking. District of Columbia v. United States, 67 Fed. Cl. 292, 341 (2003). If Dr. Horvitz had included only the contractual goodwill in his calculation, lost profits would be zero. Tr. 4166:22-4167:4(Bajaj). Thus, Sterling's lost profits claim must be rejected.

At trial, Sterling also proffered a "mitigation" damages theory that purported to calculate the actual costs of replacing regulatory capital eliminated by FIRREA. With the exception of the estimated transaction costs incurred in replacing the Lewis Federal and Tri-Cities goodwill, the Court should reject Sterling's mitigation theory because its hypothetical premise has been repeatedly rejected by the Federal Circuit and this Court. Fifth Third, 402 F.3d at 1237; LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003); Cal. Fed. Bank v. United States ("CalFed"), 43 Fed. Cl. 445, 460-61 (1999), aff'd in part, 245 F.3d 1342, 1350 (Fed. Cir. 2001); Franklin Fed. Savings Bank v. United States, 55 Fed. Cl. 108, 134-39 (2003); Columbia First Bank, FSB v. United States, 54 Fed. Cl. 693, 697-98 (2002); Bank United v. United States, 50 Fed. Cl. 645, 655-56 (2001), aff'd in part, 80 Fed. Appx. 663 (Fed. Cir. Sept. 22, 2003).

In 1991, Sterling replaced all of the goodwill attributable to its acquisition of Lewis Federal and Tri-Cities through a common stock offering and a conversion of preferred stock to common stock. Through this offering, Sterling achieved compliance with FIRREA's new capital standards. Sterling's expert, Dr. Christopher James, however, did not attempt to quantify the actual costs of issuing those securities in 1991. To the contrary, he conceded that he did not measure actual, out-of-pocket costs incurred by Sterling in raising common stock in 1991. Tr. 3054:4-7 (James). Instead, he assumes that, in 1991, Sterling sold preferred stock, and uses the dividend rate for that hypothetical preferred stock offering as a "proxy" for estimating damages. Virtually the same methodology was rejected by this Court when Dr. James offered it in Granite Management Corp. v. United States, 58 Fed. Cl. 766, 778-79, aff'd in part and remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005). The Federal Circuit affirmed that holding. The only true measure of Sterling's cost to replace its capital is its transaction costs. CalFed, 43 Fed. Cl. at 460-61 ("[o]n the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs."). Therefore, Sterling is entitled to no more than $900,204.00 in mitigation damages.

Sterling also offers an assortment of so-called "wounded bank" damage claims, pursuant to which it seeks: 1) increased costs allegedly incurred to acquire a branch of another thrift known as Great American Savings and Loan; 2) losses on a loan, known as the CJ-4 Loan, claimed to result from FIRREA's requirements; 3) excess supervision costs purportedly based upon its status as a "troubled thrift," 4) legal, accounting, and insurance costs allegedly incurred in defending against regulatory interference; and 5) transaction costs attributable to an unsuccessful 1989 public offering.

With respect to the Great American acquisition, Sterling failed to provide the minimum evidence needed to assess the validity of the claim pursuant to Rule 702 of the Federal Rules of Procedure and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). Further, Sterling provided no evidence that the breach caused it to purchase the branch at an increased price.

The Court should also reject Sterling's claim for costs associated with the CJ-4 Loan because Sterling failed to prove that the loan's losses were breach-related.

Similarly, the Court should not award Sterling's increased supervision costs because Sterling did not prove that the costs were caused by a breach.

Also, the evidence presented at trial revealed that the legal, accounting, and insurance costs allegedly incurred in defending against regulatory interference were virtually all litigation-related or based upon work that Sterling could not establish was breach-related. Sterling is barred from recovering such costs as a matter of law.

Finally, Sterling claims that the increased costs allegedly incurred in connection with the 1989 public offering resulted from its inability to pay preferred stock dividends. This claim is foreclosed because the Court has previously ruled that Sterling was not contractually entitled to pay dividends. Sterling Savings v. United States, 53 Fed. Cl. 599, 614-15 (2002). Further, we demonstrated that the denial of Sterling's request for preapproval to pay preferred stock dividends was not caused by the breach, but was based upon well-reasoned, longstanding agency policy precluding such preapproval.

For these reasons, the Court should award a judgment of $900,204 to Sterling as compensation for the transaction costs incurred in replacing the goodwill attributable to its acquisition of Lewis Federal and Tri-Cities.

## ISSUES PRESENTED

1. Whether Sterling's mitigation through replacement of the contractual goodwill eliminated by FIRREA precludes a claim for lost profits.

2. Whether Sterling's alleged failure to mitigate precludes an award of lost profits.

3. Whether Sterling failed to prove that its alleged lost profits damages were foreseeable, were caused by a breach, or can be ascertained with reasonable certainty.

4. Whether Sterling failed to demonstrate that it is entitled, as a matter of law, to replacement costs over and above transaction costs incurred in replacing goodwill with tangible capital.

5. Whether Sterling failed to demonstrate that its purported "actual mitigation" damages reflect out-of-pocket costs incurred to replace regulatory capital eliminated by FIRREA.

6. Whether Sterling failed to prove that its alleged wounded bank damages were foreseeable, were caused by a breach, or can be ascertained with reasonable certainty.

## PROPOSED FINDINGS OF FACT

### I. STERLING'S ACQUISITIONS

1. Sterling is a commercial bank. Tr. 4166:22-4167:4 (Gilkey); P-103, p. SG1003465. Prior to July 8, 2005, it was a state-chartered, federally-insured stock savings association headquartered in Spokane, Washington. Compl. ¶ 1.1; P-103, p. SG1003465. Sterling commenced operations in 1983. Compl. ¶ 1.1.

2. Sterling's damages claims arise from the thrift's acquisition of two failing savings and loan institutions in the 1980s: Lewis Federal and Tri-Cities.

3. While Sterling acquired another thrift in 1988, Central Evergreen Savings & Loan Association ("Central Evergreen"), the Court has held that the Government did not commit a breach of contract in connection with the acquisition. Sterling Sav. Assn. v. United States, 72 Fed. Cl. 404, 411 (2006).

## A. The 1985 Lewis Federal Acquisition

4. In November 1985, Sterling successfully bid for and acquired Lewis Federal, an insolvent institution with assets of approximately $52.5 million, pursuant to an acquisition agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC"). P-18. Sterling did not invest any money in the acquisition. Instead, FSLIC, in its corporate capacity, executed an Assistance Agreement with Sterling in which FSLIC contributed $1.75 million to the acquisition, as well as other financial consideration. P-19, pp. XXX105 0098-99. In addition, the Federal Home Loan Bank Board ("FHLBB") issued a forbearance letter permitting Sterling to amortize intangible assets over a period of 40 years. P-20, p. WOF014 0601. The Lewis Federal acquisition resulted in the creation of $3,606,389 in goodwill. P-72, p. SG1005264.[1]

5. The forbearance letter issued in connection with the Lewis Federal acquisition included a provision requiring FSLIC to forbear, for five years, from exercising its authority, under 12 C.F.R. § 563.13, for any failure of Sterling to meet its capital requirements arising solely from two sets of circumstances. P-20, ¶2, p. WOF014 0600. The forbearance stated:

> 2. Section 563.13 (Reserve Accounts) of the Rules and Regulations for the Federal Savings and Loan Insurance

[1] For purposes of this memorandum, the goodwill associated with the Lewis Federal and Tri-Cities acquisitions will be referred to as the "contractual goodwill," while the goodwill associated with the Central Evergreen acquisition will be referred to as the "noncontractual goodwill."

> Corporation ("Insurance Regulations") provides no exceptions permitting the exclusion of scheduled items or liabilities acquired from another institution in computing the net-worth requirements of this section. However, in view of the fact that the Acquisition was instituted for supervisory reasons, the Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Insurance Regulations, for any failure of Sterling to meet the net-worth requirements of Section 563.13 arising solely from (1)(a) scheduled items attributable to the assets of Lewis' existing at the Effective Date, (b) any reduction in net wroth resulting from losses on assets or losses on continuing operations acquired in connection with the Acquisition, and (c) any increase in liabilities of Sterling as of the Effective Date by reason of Sterling's assumption of liabilities; or (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective Date.

Id. (emphasis in original). The forbearance was based upon standard language utilized in supervisory acquisitions. Tr. 3479:23-3482:4 (Hargett). Subsections (1) and (2) of the forbearance are provided in the alternative, and their applicability is dependent upon the method of accounting utilized in structuring the acquisition. Subsection two, which refers to "assumption of net worth deficiency," applies to acquisitions achieved pursuant to the pooling method of accounting, while subsection one applies to acquisitions accomplished pursuant to the purchase method of accounting. Tr. 3436:23-3437:16, 3432:21-3433:20 (Hargett). The provisions are provided in the alternative because, at the time the forbearance letter is drafted, the accounting methodology to be applied may not be known. Tr. 3435:9-25 (Hargett).

6. Subsection two of the forbearance letter is not applicable to the Lewis Federal acquisition because Sterling did not assume a net worth deficit. Instead, pursuant to the purchase method of accounting, the gap between liabilities and assets was filled by goodwill. Tr. 3435:25-

3436:22, 3437:17-3438:1 (Hargett); Tr. 1873:17-1874:20 (Byrne); see also Tr. 2780:6-21 (Horvitz).

**B. The 1988 Tri-Cities Acquisition**

7. In February 1988, FSLIC selected Sterling as the low bidder for Tri-Cities after another bidder, Old Stone, advised the FHLBB that it intended to withdraw its bid. P-374, p. CSG0180013; P-377, p. WOB005 1223. Upon Old Stone's withdrawal, FSLIC determined that Sterling was the low bidder. P-374: Tr. 335:11-23 (Faulstich). James Faulstich, the president of the Federal Home Loan Bank of Seattle and principal supervisory agent for Sterling, has no reason to doubt that Old Stone voluntarily withdrew from the bidding process, and no knowledge about a purported effort by his staff to eliminate Old Stone from the bidding process. Tr. 371:10-15, 374:17-23, 383:9-18 (Faulstich).

8. In April 1988, Sterling acquired Tri-Cities. P-27. On April 7, 1988, the FHLBB, pursuant to Resolution No. 88-250, approved the acquisition, authorized an Assistance Agreement, and authorized and directed that FSLIC send a forbearance letter to Sterling. Id. The Assistance Agreement required a FSLIC cash contribution of $11,730,128.00. Again, Sterling did not invest any money in the acquisition. P-38, p. SG100 5656-59. The Tri-Cities acquisition resulted in the creation of approximately $14 million in goodwill, to be amortized over 25 years. P-28, p. WOF014 1397; Joint Stipulations of Fact, dated June 6, 2007, ¶ 5.

9. The forbearance letter issued in connection with the Tri-Cities acquisition, like the Lewis Federal forbearance letter, included a provision requiring FSLIC to forbear, for five years, from exercising its authority under 12 C.F.R. 563.13, for any failure of Sterling to meet its capital

requirements arising solely from two sets of circumstances. P-28, ¶1, p. WOF014 1397. The forbearance stated:

> 1. Capital Requirements. The Federal Savings and Loan Insurance Corporation ("FSLIC") will forbear, for a period of five years following consummation of the acquisition, from exercising its authority, under Section 563.13 of the Rules and Regulations for FSLIC-insured institutions, for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from (1)(a) any increase in the contingency component attributable to the assets of Tri-Cities existing at the effective date, and (b) any increase in the net growth of Sterling as of the Effective Date by reason of Sterling's assumption of Tri-Cities' liabilities; or (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date.

Id. Like the five-year forbearance in the Lewis Federal forbearance letter, the Tri-Cities forbearance was based upon standard language utilized in supervisory acquisitions. Tr. 3479:23-3482:4 (Hargett). Because the accounting methodology to be utilized may not have been known when the forbearance letter was drafted, the standard language provides for two scenarios: subsection two applies to acquisitions achieved pursuant to the pooling method of accounting, while subsection one applies to acquisitions accomplished pursuant to the purchase method of accounting. Tr. 3432:21-3433:20, 3435:9-25 (Hargett).

10. Subsection two of the forbearance letter is not applicable to the Tri-Cities acquisition because, as was the case with the Lewis Federal acquisition, Sterling did not acquire a net worth deficit. As was the case in the Lewis Federal acquisition, pursuant to the purchase method of accounting, the gap between liabilities and assets was filled by goodwill. Tr. 3435:25-3436:22, 3437:17-3438:1 (Hargett); Tr. 1873:17-1874:20 (Byrne); see also Tr. 2780:6-21 (Horvitz).

**C. The Central Evergreen Acquisition**

11. In December 1988, Sterling acquired Central Evergreen. Although the Bank Board issued a resolution, No. 88-1273, approving the acquisition, and entered into an agreement with Sterling governing the maintenance of regulatory capital by Sterling, the Bank Board did not issue a forbearance letter or enter into an assistance agreement, and FSLIC did not provide cash assistance. Joint Stipulations of Fact, dated June 6, 2007, ¶6. The Central Evergreen acquisition resulted in the creation of $22,0833,000 million in noncontractual goodwill. P-78, p. PSG0270425.

12. Sterling submitted its 1988 Business Plan with its application to acquire Central Evergreen in August 1988. P-196. The business plan required Sterling to maintain minimum capital ratios of 4.16, 4.15, and 4.24 for the years ending in December 1989, June 1990, and June 1991, respectively. Sterling was contractually bound to maintain these ratios. Id. at PSG029 1135, 1137; Tr. 2773:13-23; 2774:4-18 (Horvitz); DX 1081.

13. There was no agreement between Sterling and the Government obligating Sterling to acquire Central Evergreen after the acquisition of Tri-Cities. Tr. 3664:1-11 (Hedlund). Indeed, Sterling could have withdrawn its application to acquire Central Evergreen at any point prior to November 30, 1988 (well after the April 1988 acquisition of Tri-Cities). Indeed, Sterling threatened to just that when FHLBB's approval of the acquisition was delayed. P-401, ¶3; Tr. 3666:16-3668:6, 3668:7-9 (Hedlund).

14. Mr. Harold Gilkey, Chairman of the Board and Chief Executive Officer of Sterling Financial Corporation (SFC), and former Chairman of the Board and Chief Executive Officer of Sterling, Tr. 55:22-56:9 (Gilkey), understood that the Central Evergreen acquisition was risky

due to the asset size of the acquired institution and its troubled status. 3668:10-3669:5 (Hedlund).

15. Sterling considered each of its acquisitions to be a success. In an OTS filing submitted in 1989, subsequent to the enactment of FIRREA, Sterling detailed the advantages of its acquisitions:

> These acquisitions have enabled [Sterling] to expand its deposit and mortgage delivery systems considerably in a relatively short period and have added significant assets, a more geographically diversified loan portfolio, and potential future tax benefits. . . . Through consolidation, the Association has reduced the cost of performing administrative functions and increased the operating efficiencies of these acquired institutions. Management of the Association believes that continued disciplined supervision of the assets acquired from Lewis Federal, Tri-Cities, and Central Evergreen will result in increased profitability to [Sterling.]

DX 908.

16. Prior to FIRREA's enactment, Sterling considered shrinking its asset base to $650 million in an attempt to improve the negative tangible capital position that resulted from its acquisition of Central Evergreen. 3671:16-22 (Hedlund); P-404, WON889 0474. Further, on August 3, 1989, when Mr. Daniel Byrne, Sterling' chief financial officer, believed that Sterling's goodwill would be grandfathered by FIRREA, he submitted a business plan for 1990 that was a "no-growth plan in terms of total assets." DX 358, p. WON879 0180; Tr. 1794:10-25, 1797:14-20 (Byrne).

17. OTS examined Sterling in 1989, prior to FIRREA's enactment. P-178. The findings of the examination, dated June 19, 1989, "did not reflect the new standards promulgated by FIRREA." Tr. 2186:16-18 (Friend). The examination, however, did reference FIRREA purely

for informational purposes. Tr. 2379:11-2382:17 (Friend). At the time of the examination, Sterling was experiencing problems with capital, criticized assets, earnings, and interest rate risk. Tr. 2187:22-2191:21 (Friend). Further, its earnings were below the peer group average and insufficient for the amount of growth Sterling had experienced. Tr. 2188:8-11 (Friend). While Sterling was in compliance with regulatory requirements applicable at the time, its tangible capital was negative and a source of concern for regulators. P-178, p. SG0052263.

18. On August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA established new capital requirements. In particular, FIRREA, and the regulations promulgated to implement it, required thrifts to comply with three separate regulatory capital standards: a leverage (or "core capital") standard, a tangible capital standard, and a risk-based capital standard. 12 U.S.C. §1464(t) (1989); 12 C.F.R. §§ 567.1, 567.2, 567.5 (1990). "Qualifying supervisory goodwill" was to be phased-out gradually between 1990 and 1995. 12 U.S.C. §1464(t); 12 C.F.R. §563.13. In the intervening years, eligible savings associations were permitted to include qualifying supervisory goodwill in satisfying the core and risk-based capital standards. Id.

## II. POST-FIRREA

### A. Sterling's Application To Acquire Branches Of Great American Savings Bank

19. On October 12, 1989, OTS approved Sterling's application to acquire two branches of Great American Savings Bank. P-344. The approval was conditioned upon compliance with the FIRREA's minimum tangible capital requirements. Id. at p. 3.

20. At the time of the approval, Sterling would not have complied with the tangible and core capital ratios that would be applied pursuant to FIRREA, even including the "contractual" goodwill attributable to the Tri-Cities and Lewis Federal acquisitions. Tr. 2215:18-2218:18 (Friend); DX 1080 (Friend demo); Tr. 2744:2-2748:14 (Horvitz); DX 422, p. 1631; P-454, table 4a. With respect to tangible capital, Sterling fell short of the minimum by $7.26 million. DX 422; Tr. 2743:16-2745:21 (Horvitz); P-454, table 4a.

21. Sterling had negative tangible capital prior to the enactment of FIRREA. P-178, p. SG0052263. Sterling's regulators considered tangible capital levels in evaluating applications to acquire branches before enactment of the minimum tangible capital requirement. Tr. 3724:2-11, 3727:7-13 (Hedlund). When it requested approval of the acquisition of the Great American branches, Sterling's capital condition was poor due to its recent acquisition of Central Evergreen. Tr. 3724:20-3725:3 (Hedlund).

**B. <u>The "CJ-4" Loan</u>**

22. One of Sterling's assets, known as the "CJ-4" Loan, was troubled as of the fall of 1989. Sterling placed the loan, which was initially approved on or about June 27, 1988, into nonjudicial foreclosure in November 1989, before the effective date of the regulations implementing FIRREA. DX 943; Tr. 3399:1-7, 3399:16-3400:6 (Hargett). Payments on the loan were current only through June 1989. DX 943; Tr. 3399:1-7 (Hargett). By August 1989, the project had experienced numerous problems related to cost overruns, construction delays, and an ineffective marketing effort. DX 943. Among other things, the property subject to the loan, which was to house an office park, contained a natural spring that Sterling was unaware of when it made the loan. Tr. 3098:23-3099:17 (Zuppe). The natural water spring did not add any value

to the office park, and there were unanticipated costs in connection with the spring's removal. Tr. 3099:6-17 (Zuppe).

23. Before Sterling placed the $2.4 million loan into foreclosure, the loan had already been funded in the amount of $2.384 million, although tenant improvements had not yet begun. DX 389; Tr. 3402:2-20 (Hargett). Further, the property's appraised value had dropped from $3.45 million as of March 15, 1988, to $2.95 million a of November 15, 1989. DX 943.

24. In December of 1989, Sterling placed the property into judicial foreclosure "due to the apparent substantial deficiency to be realized upon the sale of the real estate and [Sterling's] indication that the Borrowers possessed additional assets." Id. The estimated cost to complete the improvements was $541,000. DX 389; Tr. 3402:21-3403:18 (Hargett). After Sterling's commencement of judicial foreclosure proceedings, the borrowers filed a countersuit. DX 943.

25. When FIRREA's regulations became effective in December 1989, Sterling needed, under loan-to-one-borrower limitations, $19.6 million in unimpaired (i.e., tangible) capital in order to support the monies already lent as well as an additional $541,000, the estimated cost to complete improvements to the buildings that were the subject of the loan. Tr. 3405:14-3407:6 (Hargett). As of late 1989, even assuming that the Tri-Cities and Lewis Federal goodwill counted as regulatory capital, Sterling had only $3 million in tangible capital. DX 422, p. WON952 1631; P-454, table 4a.

26. Nonetheless, as of September 1990, thrift examiners knew that Sterling was considering the advance of additional funds to the borrower, and did not object. P-181, p. 2-A-3.

27. Sterling never formally requested permission to make a new loan to the CJ-4 borrowers. Tr. 3099:18-3100:6; 3100:15-3101:9 (Zuppe).

## C. The Terminated 1989 Public Offering

28. Pursuant to a business plan adopted in connection with its acquisition of Central Evergreen, Sterling was required to raise $5 million in capital between 1989 and 1990. P-196, p. PSG029 1124. In late September of 1989, Sterling and its investment bankers structured a public "units" offering that would include both preferred and common stock. P-342, p. WON889 0397; P-345, p. SG0600050. Ultimately, the public offering was expected to yield approximately $12.5 million in new capital. DX 910.

29. In September 1989, Sterling met with OTS to request an "exemption" in the form of preapproval of the payment of future dividends upon preferred stock. P-345, p. 1. At the meeting, Mr. Ron Karr advised Mr. Byrne and Mr. Gilkey that policies for the payment of dividends by thrifts, whether "capitalized or under capitalized," were being developed. P-345, p. 1. At the time, Sterling believed that it possessed a contractual right to the payment of dividends. Tr. 1819:13-17 (Byrne). In August 2006, the Court ruled that Sterling did not possess such a right. Sterling, 53 Fed. Cl. at 615.

30. Following the meeting, Mr. Byrne requested, in an October 3, 1989 letter to OTS, "nonobjection" to the payment of such dividends. P-342. On October 12, 1989, Ms. Carol Friend, Sterling's supervisory agent, advised Mr. Byrne that OTS could not provide the nonobjection requested. DX 374. She indicated that the payment of dividends would be dependent upon earnings performance, and that it would be helpful if Sterling submitted a capital plan outlining, among other things, its future earnings projections. Id. Sterling did not submit such a plan before issuing its offering circular for the proposed offering. Tr. 2222:12-2223:6 (Friend).

31. In general, OTS policy prohibited the blanket preapproval of the payment of future (as opposed to already accrued) dividends by a thrift because it would deprive OTS of its ability to regulate the safety and soundness of the thrift's operations, and to monitor its earnings performance. Tr. 3675:23-3676:8 (Hedlund); Tr. 2221:23-2222:5 (Friend). Because dividends are paid out of current earnings, OTS needed to know what level of current earnings would be on the books and available when a dividend would be paid. Tr. 2226:17-21 (Friend). Indeed, it was "unprecedented" for OTS to provide unconditional prior approval of future dividends. Tr. 3676:9-3677:6 (Hedlund); Tr. 2221:11-19 (OTS's policy of not preapproving dividend payments was "long-standing"). A blanket approval of the type requested by Sterling was unreasonable because it was impossible to know what the earnings, asset quality, and interest rate risk of the thrift would be into the future. Tr. 3677:7-3678:10. Further, OTS had concerns with the "quality and quantity of Sterling's earnings" at the time the thrift requested the preapproval. Tr. 2226:25-2227:1 (Friend). OTS's policy did not prevent Sterling from issuing preferred stock with a dividend feature. Tr. 2223:11-2224:24 (Friend).

32. As of October 30, 1989, Mr. Byrne projected that Sterling would not meet the new minimum capital requirements specified in the proposed regulations implementing FIRREA. DX 384, p. WON952 1887-88. Mr. Byrne attributed the noncompliance primarily to intangible assets, or goodwill, attributable to the Central Evergreen and Tri-Cities acquisitions. Id.

33. In a November 9, 1989 memorandum, Ms. Friend advised Sterling that failure to comply with the new regulations, which would be effective on December 7, 1989, would result in application of restrictions pursuant to Regulatory Bulletin 3a (RB-3a). P-247, pp. 1-2. RB-3a imposed limitations upon growth and capital distributions (i.e., dividend payments). Id.

34. Nonetheless, Sterling chose to continue with its public offering, issuing a preliminary offering circular on November 14, 1989. DX 910; Tr. 1812:5-1813:9, 1814:13-18 (Byrne). On December 19, 1989, OTS reiterated that it would not preapprove the payment of dividends. P-254. As of December 14, 1989, however, prior to issuance of OTS's the December 19 letter, Mr. Gilkey had already decided not to move forward with the public offering because additional reserves and asset writedowns required by FDIC during the examination process "kill[ed the] public deal." DX 396.

35. The uncertainty surrounding the payment of dividends on its 1989 offering would have existed even if the Tri-Cities and Lewis Federal goodwill had been grandfathered under FIRREA. Tr. 1815:11-1816:24 (Byrne).

### D. Post-FIRREA Supervision Of Sterling

36. In November 1989, OTS conducted a "special limited" examination of Sterling. P-180, p. SG0630971. The examination occurred concurrently with an FDIC examination. Id., pp. SG0630972, SG0630981. P-179. Before November 1989, FDIC did not possess authority to examine thrifts. Tr. 2198:17-2199:13 (Friend). FDIC's examination of Sterling prompted OTS to schedule its own exam. Id. (Friend).

37. In March 1990, OTS imposed assessed Sterling $51,993 pursuant to its authority to utilize a general assessment process to fund OTS operations. P-337, p. SG0803453. OTS calculated the assessment using a formula that applied to all thrifts, regardless of their exam rating. The methodology required OTS to multiply each thrift's level of assets by a standard rate, thus resulting in the assessment. P-337, pp. SG0803453-54, SG0803460; Tr. 1918:24-1920:10, 1975:8-1976:5 (Byrne).

38. In 1990 and 1991, Sterling was assessed as a troubled thrift because OTS's examinations during the period rated Sterling "5," the lowest rating possible. See, e.g., P-337, pp. SG0803460-61. Although a district court had enjoined OTS from taking action inconsistent with Sterling's contracts, the "5" rating was not inconsistent with the injunction. DX 514, p. WON924 0804-05; see also P-337, p. WOR081 0005. This conclusion would have been based upon a review of past reports of examination, ratings, and the injunction. Tr. 3717:12-20 (Hedlund).

## III. STERLING'S POST-FIRREA INJUNCTION AND RECAPITALIZATION

39. As of December 31, 1989, Sterling failed to meet FIRREA's minimum capital requirements. By its own calculations, Sterling failed its tangible, core, and risk-based capital requirements by $22.8 million, $23.0 million, and $32.3 million, respectively. DX 422, pp.WON952 1631-32. At the time, Sterling retained only $15.557 in contractual goodwill attributable to the Lewis Federal and Tri-Cities acquisitions. P-454, Table 4a.

### A. Post-FIRREA Restrictions Upon Sterling

40. Pursuant to FIRREA's directive that all capital deficient thrifts "submit and adhere to" a plan setting forth the institution's strategy for increasing capital, Sterling filed an amended "Capital Restoration Plan" on February 28, 1990. DX 422; 12 U.S.C.A. § 1464(s)(4), 103 Stat. 183, 303. In the plan, Sterling acknowledged that, as of December 31, 1989, it failed to meet each of FIRREA's new capital standards. DX422, p. WON952 1631-32. To resolve its capital deficiency, Sterling proposed that it be acquired by another financial institution by May 31, 1990. Id.

41. In April 1990, OTS approved Sterling's capital restoration plan provided that Sterling's board execute an operating agreement which, among other things, consented to the appointment of a receiver or conservator if Sterling did not find a merger partner. P-269. On May 10, 1990, Sterling declined to execute the operating agreement. P-270, p. WOT942 1374.

42. On May 22, 1990, OTS denied the capital plan because Sterling had (1) failed to meet FIRREA's capital standards; (2) refused to consent to the operating agreement; and (3) did not propose an acceptable remedy for its capital deficiency. P-275A, p. WON 953 0619.

43. Between January and May, 1990, OTS imposed a variety of operating restrictions upon Sterling. As of January 26, 1990, OTS subjected Sterling to Regulatory Bulletin 3a-1 (RB 3a-1). RB 3a-1 prohibited institutions, like Sterling, "subject to greater restrictions," to obtain written approval for any new loans or investments. P-258, p. WON931 2964. OTS would have subjected Sterling to the restrictions contained in RB 3a-1 even absent a breach, because the loss of the Central Evergreen goodwill alone rendered Sterling noncompliant with FIRREA's minimum tangible capital ratios. Tr. 2211:19-2212:11 (Friend).

44. In a letter dated March 9, 1990, Sterling was permitted to originate business banking loans (i.e., loans to fund business operations) subject to a variety of conditions, including, among other things, a reduction in such loans to $23 million by June 30, 1989, grant of new loans only to existing business banking customers, and adherence to loans-to-one-borrower limitations. P-266. As of dated May 11, 1990, OTS prohibited Sterling from entering into an agreement to purchase or sell assets in excess of $500,000, without prior nonobjection. P-273, p. SG100 5457. Similarly, Sterling was prohibited from accepting uninsured deposits, from increasing the

compensation of its executives, and from engaging in any activities not specified in its capital plan without obtaining prior nonobjection." Id.

**B. Sterling Obtained A Temporary Restraining Order And Preliminary Injunction Prohibiting Enforcement Of FIRREA-Related Restrictions**

45. In May 1990, Sterling filed suit in the United States District Court for the Eastern District of Washington and sought a temporary restraining order ("TRO"). The court issued a TRO on May 29, 1990, and a written opinion issuing a preliminary injunction on August 8, 1990.[2] In its opinion granting the preliminary injunction, the court restricted OTS's and the FDIC's authority to regulate Sterling because the court determined that FIRREA did not preclude the agencies from honoring what it determined to be contracts with Sterling. Sterling Sav. Assn. v. Ryan, 751 F. Supp. 871, 881-82 (E.D. Wash. 1990), rev'd, 959 F.2d 241 (9th Cir. 1992); see also DX 460.

46. As a result of the injunction, the Government was "enjoined and restrained from:"

a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and FHLBB and the FSLIC;

b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letter from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;

c. placing Sterling in receivership or conservatorship; and

---

[2] The district court had previously granted the motion for preliminary injunction from the bench, on July 3, 1990.

d. interfering with Sterling's proposed public offering contemplated in the 1988 Central Evergreen acquisition agreement.

Id.

47. OTS and FDIC filed a motion for reconsideration, which the court granted in part and denied in part in November 1990. Sterling, 751 F. Supp. at 882-83. The court determined that the prohibition against placing Sterling into conservatorship or receivership was overly broad, and narrowed that portion of the injunction to clarify that the "Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect." Id. at 884.

48. On December 27, 1990, the Government filed an appeal of the district court's issuance of the injunction. Tr. 768:1-24.

**C. OTS Complied With The TRO And Preliminary Injunction**

49. OTS complied with the terms of the TRO and injunction. Upon issuance of the TRO, OTS immediately took steps to learn about the injunction's terms and scope. OTS's managers discussed the matter internally and with attorneys at the OTS office in Washington, D.C. Tr. 2237:16-2239:24 (Friend). Given that the court prohibited OTS from enforcing FIRREA's capital standards, OTS asked Sterling to provide reports on activities protected by the TRO. Tr. 2240:9-2242:10 (Friend); P-277.

50. On June 5, 1990, OTS requested that Sterling provide weekly reports of activities by Sterling that had been restricted prior to issuance of the TRO. P-277. OTS understood that the TRO prevented the agency from enforcing restrictions against Sterling. The reporting

requirement was not a restriction. Tr. 2242:11-23 (Friend). Ms. Friend's June 5, 1990, letter demonstrated that OTS planned to comply with the TRO. P-277.

51. Nonetheless, Mr. Byrne, in telephone conversations, and in a June 18, 1990 letter to Ms. Friend, asked for clarification of the reporting requirement. P-279. Tr. 2245:3-2247:25 (Friend). Ms. Friend, within two hours of receiving the June 18 letter from Mr. Byrne, reiterated that the reporting requirement was not a restriction, and that OTS was "not restricting anything." DX 1077; Tr. 2245:3-2247:25 (Friend).

52. On the same day, Ms. Friend also notified Mr. Byrne, in writing, that OTS intended to "strictly obey" the district court's order prohibiting it from enforcing any restrictions contrary to the alleged agreements Sterling entered into in connection with its acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. P-279. The next day, Mr. Byrne provided Ms. Friend with a listing of the restrictions subject to the reporting requirement, and asked if he had accurately listed the restrictions. P-280. In a letter dated June 20, 1989, Ms. Friend advised Mr. Byrne that he had not accurately listed one of the restrictions. P-281, p. SG100 5455. The letter, however, did not require Sterling to comply with the restrictions; it merely sought to achieve accurate reporting of any activity inconsistent with the restrictions. Tr. 2249:17-2255:10 (Friend); Tr. 626:18-21 (Gilkey).

53. The reporting requirement did not affect Sterling's ability to undertake growth planned before restrictions were imposed. Indeed, in a meeting with OTS on July 24, 1990, Sterling acknowledged that, notwithstanding the reporting requirement, it could engage in activities that OTS had restricted before the court issued the injunction. DX 659. Subsequently, in a letter dated June 28, 1990, Mr. Byrne advised Mr. Friend that, although Sterling recognized

that it was not required to comply with the restrictions, it made a business decision to comply with the restrictions. DX 1078, p. WON939 0204.

54. In a September 7, 1990 letter, FDIC advised Sterling that, pursuant to the injunction, the thrift complied with "applicable minimum capital levels," and did not "fall within the definition of an undercapitalized insured depository institution . . . ." Consequently, FDIC permitted Sterling to use brokered deposits. P-288. This letter reversed FDIC's prior denial of a brokered deposit waiver. P-285. At the time of the denial, FDIC had not yet learned of the injunction. Upon learning about the injunction, FDIC reversed its position. P-288.

55. Consistent with OTS's reporting requirement, Sterling reported to OTS, on April 2, 1991, that it intended to engage in the sale of securities, contrary to a pre-injunction restriction upon such sales. DX 512, p. WON924 0851. Later in 1991, Sterling sold an additional $35 million in securities. DX 540. Further, on at least one occasion, Sterling accepted an uninsured deposit, contrary to a pre-injunction restriction. DX 534, p. PSG060 0073; P-273, p. SG1005457.

56. Similarly, in September 1990, pursuant to the reporting requirement, Sterling advised OTS that it had purchased $35 million of mortgage backed securities ("MBS"). DX 477, p. SG0492940. OTS, in response to the report, requested further information about the purchase. P-289. While, initially, OTS advised Sterling that the information was required by Regulatory Bulletin RB 3a-1, which applied to troubled thrifts, soon thereafter Ms. Friend instructed Mr. Byrne to ignore the reference to RB 3a-1 because it had been referenced in error. DX 481, p. WON9340605; see also P-258 (January 26, 1990 letter subjecting Sterling to growth guidelines, pursuant to RB 3a-1, that OTS was enjoined from enforcing).

57. Although OTS did not disallow the purchase, the agency expressed concern about it from a safety and soundness standpoint, and directed Sterling to make no further purchases of securities over $1 million without approval. P-290. In an October 22, 1990 letter, OTS's counsel advised Sterling that requests for information about the $35 million MBS purchase did not conflict with the district court's preliminary injunction. DX 481; see also P-293, p. SG1007930-32.

58. OTS never advised Sterling, verbally or in writing, that it was required to comply with the restrictions that the agency was enjoined from enforcing. Tr. 1822:18-1823:13 (Byrne). To the contrary, Sterling claims that it assumed that OTS's authority to ensure that the thrift conducted business in a safe and sound manner was evidence of noncompliance with the injunction. 1826:20-1827:1 (Byrne). Mr. Byrne, however, acknowledged that the Tri-Cities and Lewis Federal contracts did not provide Sterling the right to act in an unsafe and unsound manner. Tr. 1827:13-16 (Byrne). Further, while the injunction was in place, OTS permitted Sterling to operate as if its Central Evergreen goodwill was contractual regulatory capital notwithstanding this Court's ultimate determination that it was not. Sterling, 72 Fed. Cl. at 411.

59. Indeed, Sterling's internal audit department referred to restrictions imposed prior to the issuance of the injunction as "OTS operational concerns stayed by preliminary injunction." DX523, p. PSG060 0203; DX 534, p. PSG060 0073. Further, Sterling, in July and September 1990, advised OTS that it intended to engage in businesses, including commercial loans and speculative lending, that had been subject to the pre-injunction restrictions. DX 485, p. PSG039 0009; DX 452; Tr. 3687:17-3690:24 (Hedlund). Moreover, in exam reports issued during the

pendency of the injunction, examiners expressly acknowledged that OTS was enjoined from enforcing FIRREA's capital requirements. P-182, p. SG0052602.

60. Although Sterling, in confidential OTS exam reports that were not distribute to the public, was rated a "5" during the pendency of the injunction, OTS expressly recognized that it could not take enforcement action against Sterling in connection with the rating. DX 998; Tr. 3694:9-23 (Hedlund).

61. The injunction also enjoined OTS from enforcing a restriction prohibiting the acceptance of uninsured deposits by Sterling. P-273, p. SG1005457. The State of Washington, which also regulated Sterling, was not subject to the injunction, and restricted Sterling's ability to accept uninsured deposits. DX 452; 3690:25-3692:16 (Hedlund).

62. During the pendency of the injunction, which ultimately was dissolved in 1992, Sterling never initiated an action to enforce the injunction or to complain of Government noncompliance with the injunction. Tr. 1829:14-1830:6 (Byrne).

### D. Sterling Profited From A Shrink In Assets While The Injunction Was Pending

63. While the injunction was in place, Sterling shrank its asset base. That shrink improved the thrift's profitability. Prior to FIRREA's enactment, as Sterling's total assets increased from $433.953 million as of June 30, 1988, to $730.933 million as of June 30, 1989, Sterling's net income decreased from $1.2 million to $981,000. DX 1046, Exh. 3. Similarly, Sterling's profitability decreased from the fiscal year ended June 30,1986, through fiscal year end June 30, 1989, as demonstrated by its return on average assets, which declined as follows: 1.02 percent for 1985; .93 percent for 1986; .91 percent for 1987; .73 percent for 1988; and .65

percent for 1989. Id. Sterling's net interest margin also declined while its assets grew between 1987 and 1989. DX 371, p. SG20011415; 1801:23.1802:23 (Byrne).

64. Between 1989 and 1992, Sterling shrank its asset size from $731 million to $640 million. Nonetheless, its net earnings grew from the pre-FIRREA level of $981,000 to $4,744,000 in 1992. Tr. 4125:6-4126:20 (Bajaj); P-157, p. SG1007276. Thus, in 1991 and 1992, Sterling's earnings were twice as large and four times as large, respectively, as they had ever been in the thrift's entire history. Tr. 4125:10-4126:20 (Bajaj); Tr. 486:1-8 (Gilkey); DX 3502.[3]

### E. Sterling Replaced The Contractual Goodwill When It Recapitalized in 1991

65. In November 1991, Sterling recapitalized by raising approximately $23 million through (1) a public offering of common stock that yielded $20.95 million in proceeds; and (2) the conversion of $2.1 million in preferred stock to common stock. Tr. 583:11-18 (Gilkey); Tr. 4139:19-4140:10 (Bajaj); DX 3508; P-84, pp. 18, 28, 39; P-310, p. 14; DX 1002, p. 3. At the time, Sterling held only $13.346 million in contractual goodwill. Tr. 4140:1-10 (Bajaj). The public offering permitted Sterling to exceed all of FIRREA's minimum capital ratios. Tr. 4141:1-22 (Bajaj); DX 3509; DX 1002, p. 3. After the offering, Sterling had $12.3 million in excess tangible capital, $16.4 million in excess core capital, and $12.3 million in excess risk-based capital. Tr. 4141:1-18 (Bajaj); DX 3509.

---

[3] Sterling experienced a slight downturn in earnings during 1990. The downturn resulted from a writedown of earnings required by regulators in order to address asset quality problems that had existed for several years. If the regulators or Sterling had identified the asset quality problem at the time that the problems occurred, then Sterling's 1990 earnings would also have exceeded the thrift's earnings prior to the enactment of FIRREA. Tr. 4125:10-4126:20 (Bajaj); DX 3502.

66. The prospectus for the offering set forth the purpose for raising the capital:

> The primary purpose of the offering is to increase Sterling's regulatory capital levels. The net proceeds from this offering will be used to support the growth of Sterling's business, including the origination of loans.

DX 913, p. 4. Sterling raised the capital to comply with the applicable capital requirements. Tr. 583:11-14 (Gilkey). Absent the breach, Sterling would not have needed additional capital in 1991. Tr. 583:23-584:19; Tr. 585:4-7 (Gilkey). In addition, Sterling's 1992 Annual Report indicated that the equity offering brought Sterling into compliance with FIRREA's capital standards:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

P-84, p. 2 (emphasis added).

67. The same 1992 annual report advised Sterling shareholders that, due to the capital raising, the Government's appeal of the issuance of the injunction was "not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case." Id. at 31. This statement was repeated in Sterling's Form 10Q for the quarter ended December 31, 1999, which the thrift filed with the Securities and Exchange Commission. P-114, p. 9.

68. In 1992, Sterling stated, in its business plan, that it expected to maintain its capital in excess of fully-phased in capital requirements, and did "not foresee limitations on its ability to increase total assets." DX 228, p. WON884 1563.

69. On April 14, 1992, the United States Court of Appeals for the Ninth Circuit reversed the district court decision imposing the injunction. Sterling Savings Assoc. v. Ryan, 959 F.2d at 241. Relying upon Far West Federal Bank v. OTS, 951 F.2d 1093 (9th Cir. 1991), the Ninth Circuit concluded that "the stricter capital requirements in FIRREA apply to thrift institutions notwithstanding prior agreements by the government such as the agreements alleged by Sterling." Sterling, 959 F.2d at 241. On that basis, the Ninth Circuit vacated the district court's judgment and remanded the case to the district court. Id. By the time the Ninth Circuit issued its decision, however, Sterling had already completed its public offering and achieved compliance with FIRREA's capital requirements.

## IV. STERLING'S POST-1991 CAPITAL RAISING AND GROWTH

70. Subsequent to the 1991 recapitalization, the elimination of Sterling's goodwill from regulatory capital had no impact upon the thrift's growth or its ability to raise capital. Tr. 759:11-22 (Gilkey); Tr. 1635:10-12 (Welch)(capital adequacy was not an impediment to acquisitions); DX 228, p. WON884 1563. Sterling has possessed sufficient capital to hold the assets available to it regardless of whether it exceeded or fell short of budget. Tr. 759:11-22 (Gilkey); Tr. 1155:15-1156:9 (Page).

**A. Sterling And Its Holding Company, SFC, Have Raised More Capital Than Needed To Replace The Contractual Goodwill Eliminated By FIRREA**

71. Since the enactment of FIRREA, Sterling has raised in excess of $515 million through its 1991 recapitalization and infusions from its holding company, Sterling Financial Corporation ("SFC"). Tr. 4152:15-20 (Bajaj); P-454, tables 2a and 4a; DX 3515. When profitable opportunities have been available, Sterling has obtained capital from SFC. Tr. 615:16-24 (Gilkey); see also P-432 (letter from investment banker Dain Bosworth indicating that capital is available for profitable opportunities). Indeed, the only impediment to Sterling's ability to raise capital was litigation driven: Sterling was unwilling to raise common stock out of fear that "[a]ny capital issuance in advance of settling the goodwill claim would unfairly penalize the existing shareholders." DX 233, p. 0718; see also Tr. 1627:21-1628:15 (Welch).

72. By the end of the 1993 fiscal year, SFC had raised $17.25 in new debt securities, yet it downstreamed only $12.9 million to Sterling in the form of preferred stock. P-86, p. 0063142. In the prospectus issued in connection with the debt securities, SFC noted increased capital requirements would be phased-in as of December 31, 1994. P-316, p. 7. As of September 30, 1992 (prior to the offering), however, Sterling "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." Id. at 10. Further, it was anticipated that Sterling would continue to meet all regulatory requirements in the future." Id. at 7.

73. After the capital raising was complete, Sterling's investment banker, Dain Bosworth, indicated that there was demand for stock in an amount double the size of the offering. P-431.

Similarly, SFC had access to a $5 million line of credit which it did not tap and downstream to Sterling. P-85, p. SG070 5611.

74. In the fiscal year ending on June 30, 1994, SFC raised $24.6 in new capital, P-88, p. 0802740, but downstreamed only $20 million of the proceeds to Sterling. P-159, p. SG1007330. As was the case in 1993, SFC chose, during fiscal year 1994, not to tap the $5 million available through its line of credit. Consequently, it was not downstreamed to Sterling for growth. P-89, p. SG070 5727.

75. During fiscal year 1995, SFC raised $3.6 million of new capital and downstreamed $10.2 million to Sterling. P-93, p. SG0703104; P-90, p. 24 (0048626). As was the case in 1993 and 1994, SFC did not tap the $5 million line of credit available to it. P-89, p. SG0705727.

76. Between June 1995 and December 1996,[4] SFC added $16.159 in new capital and debt, and downstreamed $13 million to Sterling. P-93, pp. SG0703104, SG0703061; P-92B, p. SG4002 0751. Once again, SFC neither tapped nor downstreamed to Sterling the $5 million available through a line of credit. P-93, p. SG0703061.

77. In fiscal year 1997, SFC added $40 million in new debt, and downstreamed $30 million to Sterling. P-93, p. SG0703061, SG0703138. SFC again chose not to tap the $5 million line of credit. P-93, p. SG0703061.

78. In fiscal year 1998, SFC raised $7.754 million in new capital, and established a new, $40 million line of credit. P-300; P-95, p. SG070 2938. SFC tapped the $40 million line of credit and downstreamed it to Sterling, along with an additional $12.743 in capital. P-95, p.

---

[4] Until 1996, Sterling's fiscal years ended in June. In 1996, Sterling began using the calendar year as its fiscal year. P-92B, p. SG4002 0667.

SG0702955; P-488; compare P-162, p. SG100 7409 and P-162, p. SG1007427.[5] The $5 million line of credit remained untapped in 1998, and Sterling knew that SFC possessed the ability to downstream additional capital for profitable investments. P-95, p. SG0702878; DX 197, p. WOL130 2183; Tr. 766:9-13 (Gilkey).

79. Further, SFC's operating plan for 1998 stated that the holding company had "capacity to make additional capital contributions in 1998 if the capital can be profitably invested." DX 197, p. 2183.

80. In 1999, SFC added $30 million in new debt and downstreamed only $10 million to Sterling. P-96, pp. SG0703220-3221, SG0703235. In addition, SFC obtained an additional $10 million line of credit, which it did not access. P-96, pp. SG07033220-21. Combined with the separate, $5 million line of credit that remained untouched, SFC chose neither to tap nor downstream $15 million available through lines of credit. Id.

81. In 2000, SFC did not raise new capital or increase its line of credit. It had access to $15 million from existing lines of credit, however, and neither tapped the $15 million nor downstreamed it to Sterling. P-97, pp. SG0706434-35.

82. In 2001, SFC added $33.1 million in new capital and debt, and downstreamed $38 million to Sterling. P-98, p. SG0900088-89, 107; see also P-454, table 8. It did not access the existing $5 million line of credit. P-98, p. SG0900022. In 2002, SFC added $25 million in new debt; none of the proceeds were downstreamed to Sterling. P-99, p. SG0900205. Moreover, SFC did not access its $5 million line of credit. P-99, p. SG0900134. In 2003, SFC added $83.2

---

[5] Sterling's 1999 Annual Report shows an increase of $52.7 million in Sterling's capital accounts between December 31, 1997 and December 31, 1998. P-162, p. 7409 ($115.476 million in capital) and P-162, p. 7427 ($168.219 million in capital).

million in new capital and debt, and downstreamed $26.3 million to Sterling. P-100, pp. SG100 3335, 3352; P-454, table 8. Again, it did not draw funds from the existing $5 million line of credit. P-100, p. SG1003300.

83. In 2004, SFC raised $145.9 million in new capital, and downstreamed $162.1 million, in total, to Sterling that year. P-102, pp. SG1003219, 3242, P-454, table 8.

84. On July 9, 2005, Sterling converted to a commercial bank. P-103, p. SG 100 3465. At that point, it was no longer subject to regulation by OTS. Nonetheless, SFC obtained a $40 million line of credit in 2005. The line of credit remained unused at year's end. P-103, p. SG100 3480.

85. Finally, during the first nine months of 2006, SFC added $166.6 million in new capital and debt, and downstreamed $117.2 million to Sterling. P-127A, p. SG1003877, 3884; P-454, table 8; Tr. 2706:8-13 (Horvitz). In addition, SFC obtained a $30 million line of credit to replace the unused $40 million line of credit. Again, SFC did not tap into this new line of credit and it remained unused at the end of the year. P-105, p. SG1005777.

86. Between 1992 and September 30, 2006, SFC added, in total, $633.3 million in new debt and capital. Of the $633.3 million added by SFC, $492.4 million was downstreamed to Sterling.

87. Thus, since the enactment of FIRREA, Sterling has raised in excess of $515 in new capital through its own capital raising in 1991 and infusions from SFC. P-454, table 8.

**B. <u>Since 1992, Sterling Has Continuously Held Excess Capital</u>**

88. Between 1992 and 2006, Sterling continuously held excess core capital. Between 1992 and 1996, Sterling maintained core capital in excess of the level needed to meet the "well-

capitalized" standard required by the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L.No. 102-242, 105 Stat. 2236 (1991); 12 C.F.R. § 565.4 (1993) ("FDICIA"). Tr. 4160:8-16 (Bajaj); DX 3517. In each year between 1996 and 2006, Sterling held excess core capital of at least 100 basis points (i.e., one percent) over the level needed to meet the "well-capitalized" standard. Tr. 3841:23:3844:1 (Hamm); DX 3019; P-454, table 1, Column C and table 2a. Further, the cushion was 300 basis points in excess of the statutory minimum, and 200 basis points in excess of FDICIA's "adequately capitalized" level. Tr. 3842:11-3844:1 (Hamm).

89. Similarly, between 1992 and 1997, the only years for which data are available in Sterling's annual reports, Sterling exceeded FIRREA's minimum tangible capital requirement of 1.5 percent. Tr. 4158:13-4159:9 (Bajaj); DX 3516. In each of those years, Sterling's tangible capital level was at least four percent. DX 3516.

90. Moreover, between 1992 and 2006, Sterling continuously maintained risk-based capital above ten percent, the level needed to achieve "well-capitalized" status under FDICIA. Tr. 4161:2-12 (Bajaj); DX 3518.

### C. Sterling Has Been Unable To Meet Its Budgeted Growth Targets

91. In at least six years since late 1991, when it achieved capital compliance, Sterling has failed to meet its budgeted growth targets, notwithstanding the fact that it held sufficient capital . Tr. 759:11-22 (Gilkey); Tr. 1155:23-1156:9 (Page). Mr. Gilkey and Mr. John Harlow, who heads Sterling's commercial loan operation, acknowledged that Sterling has not always been able to acquire all the assets it projected to be available. Tr. 467:14-17 (Gilkey); Tr. 840:7-13 (Harlow).

92. In 1995, Sterling fell $168,178,000 short of its budgeted asset target. DX 186, p. 1345. In 1996, Sterling fell short of its budgeted asset target by $155,000,000 in assets. P-92, p. SG08002283; P-203, pp. 1-4. In 1996, Sterling's budgeted growth exceeded actual growth by $155,000,000. P-92, p. SG0802283; P-203, pp. 1-4. In 1997, Sterling fell short of its asset target by $131,069,000, DX 196, p. 3242, while, in 1999, Sterling fell short of budgeted growth by $117,140,000. DX 205, p. 3155. Similarly, in 2000, Sterling failed to meet its budgeted asset target by $55,838,000. DX 208, p. 0919.

**D. Sterling Has Frequently Faced Competition And Other Market Obstacles To The Acquisition Of Loans And Deposits**

93. Throughout its post-FIRREA history, Sterling has faced stiff competition. Tr. 846:8-10 (Harlow); Tr. 512:2-8 (Gilkey). In 1992, although Sterling's capital raising had mitigated its capital concerns, the thrift experienced trouble meeting its deposit targets due to the interest rate environment, and due to competition, because "Seafirst, Washington Mutual and U.S. Bank" were "throwing money at savings" and heavily advertising. DX 704, p. PSG055 0843; Tr. 500:20-502:16 (Gilkey). Mr. Gilkey acknowledged this competition, conceding that "when big banks want it, they get it." Tr. 502:10-16 (Gilkey).

94. During this period, Sterling's applications for home mortgages were also dropping due to competition. DX 723; Tr. 503:25-504:12 (Gilkey); DX 738, p. WON943 0197; DX 716, p. WON935 2203; Tr. 1151:22-1153:2 (Page); DX 718, p. 1503. By midyear, Sterling considered shrinking its balance sheet to eliminate excess cash. DX 709, p. WON920 1291; DX 710, p. WON935 2182.

95. Further, at year end 1992, Sterling's Investment Committee minutes reflected that new applications for mortgages had "dropped markedly," and that pricing was "very competitive" due to national competitors moving into Sterling's market and attempting to "maintain volumes." DX 723. Retail deposits at this time were also "dismal" due to low interest rates and potential depositors' access to alternative investments. DX 725; Tr. 535:1-16 (Gilkey).

96. This problem continued into 1993 and 1994. In 1993, Sterling's Asset and Liability Committee and its Investment Committee reported stiff competition from large competitors that were able to price aggressively. This competition undermined Sterling's ability to keep up with budgeted loan production. DX 737, p. 1870; Tr. 532:3-17; DX 738, p. 0197; Tr. 504:16-506:7 (Gilkey); DX 740, p. 2370; Tr. 525:3-526:8 (Gilkey); DX 741, p. 2331; DX 743, p. 2309.

97. In 1994, loan production remained below budget throughout the year. DX 752, p. 2024; DX 762, p. 1681; TR. 532:23-533:19 (Gilkey); DX 764, p. 1632; see also P-88, p. 080 2746; Tr. 507:11-508:18 (Gilkey). In 1995, Sterling's loan production was hindered by its unwillingness to price as aggressively as its competitors. DX 780, p. 1369; Tr. 1153:3-1155:3 (Page); P-90, p. 1608; Tr. 528:16-530:3 (Gilkey).

98. In 1996, Sterling's president, Mr. William Zuppe, reported to the Investment Committee that "generating earning assets is [Sterling's] biggest challenge in the coming year." DX 799, p. 0287. Sterling's commercial banking was lagging because competitors were underpricing Sterling, and Mr. Harlow requested pricing modifications in order to increase competitiveness. DX 801, p. 0232.

99. In 1998, Sterling's Board of Directors noted, in its minutes, that, although consumer

loans had grown, they were less than budget, and business banking was not meeting budget. DX 839, p. 0585; Tr. 537:20-538:19 (Gilkey).

## V. STERLING'S LITIGATION IN THE COURT OF FEDERAL CLAIMS

100. In 1995, Sterling filed its complaint in this Court. In 2002, the Court determined that the Government breached contracts permitting goodwill to count as regulatory capital in connection with Sterling's acquisitions of Lewis Federal, Tri-Cities, and Central Evergreen. Sterling, 53 Fed. Cl. at 615. As stated above, in 2006, the Court reconsidered its holding in light of the Federal Circuit's decision in Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1341 (Fed. Cir. 2004). The Court determined that a breach had not occurred with respect to the Central Evergreen acquisition. Sterling, 72 Fed. Cl. at 409-11.

101. The Court has issued several other relevant rulings. First, the Court has dismissed all of SFC's contract claims because it did not exist at the time of Sterling's acquisitions, and is not in privity of contract with the Government. Sterling, 53 Fed. Cl. at 602 n.1.[6] Therefore, SFC cannot recover upon Sterling's contract claims. Further, as indicated above, the Court determined that the Government did not undertake a contractual obligation to permit Sterling to pay preferred stock dividends after raising capital. Sterling, 53 Fed. Cl. at 614-15. Similarly, Sterling, in connection with its acquisition of Central Evergreen, did not obtain a contractual right to maintain regulatory capital at levels at variance with regulations. Id. at 615.

102. In 2003, the Court determined that Sterling's Lewis Federal and Tri-Cities contracts required it to amortize any goodwill associated with FSLIC cash assistance it obtained at the time

[6] Only one noncontractual claim remains at issue in that both Sterling and SFC allege a taking of property contrary to law. The Court has deferred a ruling upon the taking claim until all contract claims are resolved. Sterling, 53 Fed. at 615 n.4.

of the acquisition. Sterling Sav. Assn. v. United States, 57 Fed. Cl. 445, 455 (2003). In a separate opinion, the Court determined that, while the District Court's issuance of the injunction in 1990 did not deprive Sterling of standing to sue, it may be relevant to damages. Sterling Sav. Assn. v. United States, 57 Fed. Cl. 234, 240 (2003). Sterling, at a status conference held on December 15, 2006, abandoned claims for restitution as a remedy, reliance, and hypothetical cost of replacement damages that had been asserted in the complaint. In addition, the Court dismissed plaintiffs' claims for restitution as an affirmative claim, specific performance, and due process. Sterling, 53 Fed. Cl. at 615, n.4.

## CONTENTIONS OF LAW

## I. THE APPLICABLE LEGAL STANDARDS

To recover expectancy damages, Sterling must demonstrate that the damages it seeks were "actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); see also Southern Calif. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005); Bank of America, FSB v. United States, 67 Fed. Cl. 577, 584-85, (2005), aff'd, __ F.3d __ , 2007 WL 213774 (Fed. Cir. July 26, 2007); Restatement (Second) of Contracts §§ 347, 351, 352 (1981). With respect to causation, Sterling must prove that "profits would have been made but for the breach." Cal. Fed. Bank v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) ("CalFed"). "[T]he causal connection between the breach and the loss of profits must be 'definitely established[,]'" id., and the lost profits must have "'inevitably and naturally, not possibly or even probably,' flow[ed] from the defendant's breach." Id. at 1267 (citation omitted). Under Federal Circuit precedent,

because a lost profits award should not place the plaintiff in a better position than it would have occupied absent the breach, costs caused by factors other than the breach must be subtracted from damages. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004); Restatement (Second) of Contracts § 347, cmt. b (1981).

With respect to foreseeability, the Court examines whether the alleged loss was foreseeable at the time of contracting. Bohac v. Dep't of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (citation omitted). The alleged injury "must have been foreseeable to the party in breach at the time of contract formation." Id. (citing Restatement (Second) of Contracts § 351(1)). Moreover, "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. (emphasis added); see Restatement (Second) of Contracts § 351 cmt a. Sterling must prove that "both the magnitude and the type of damages were foreseeable." Landmark, 256 F.3d at 1378 (emphasis added).

In addition, Sterling must establish the fact of lost profits and prove the amount with reasonable certainty. See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (citation omitted); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Restatement (Second) of Contracts § 352. Unreliable lost profits models cannot give rise to

recovery. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

The Court of Appeals for the Federal Circuit has reviewed many Winstar-related cases and has assessed the ability of plaintiffs to prove claims similar to those presented by Sterling. In four opinions, the appellate court has (1) explained the legal requirements applicable to lost profits claims and the factual circumstances in which these claims arise in Winstar -related cases; and (2) observed that these claims are "inherently unreliable," and "given the[ir] speculative nature . . . experience suggests that it is largely waste of time and effort to attempt to prove such damages" in a Winstar-related case. Glendale Fed. Bank, F.S.B., v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); CalFed, 395 F.3d at 1270-71; Fifth Third Bank v. United States, 402 F.3d at 1221, 1237 (Fed. Cir. 2005).

Finally, Sterling had a duty to mitigate potential damage by raising replacement capital. Bank United, 50 Fed. Cl. at 662. Black-letter law requires a non-breaching party to attempt to mitigate its damages following another party's breach of contract. See, e.g., Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); Midwest Indus. Painting v. United States, 4 Cl. Ct. 124, 133 (1983). Accordingly, Sterling "may not recover those damages which could have been avoided by reasonable precautionary action on its part." Midwest Indus., 4 Cl. Ct. at 133.

Here, Sterling and its holding company raised over $515 million in capital between 1991 and 2006, P-454, table 8; Tr. 290:13-19; Tr. 408:24-424:6. Moreover, at trial, Sterling's counsel

acknowledged that Sterling mitigated its damages through its 1991 capital raising. Tr 583:11-585:25; Tr. 1575:10-23; Tr. 1611:14-1612:17; see also Tr. 20:25-21:1 ("There's no question, Your Honor, that this raising of capital mitigated Sterling's harm.").[7]

Sterling has failed to meet these standards, and, accordingly, the thrift's expectancy claim for lost profits fails.

## II. THE COURT SHOULD REJECT STERLING'S LOST PROFITS MODEL BECAUSE IT IS SPECULATIVE AND HAS NO BASIS IN FACT

### A. Dr. Horvitz's Flawed Lost Profits Model

Dr. Horvitz estimates damages by creating a hypothetical "but for" bank in which all contractual supervisory goodwill counts as capital after 1989.[8] The hypothetical "but for" bank is based in its entirety upon a series of unrealistic assumptions. For instance, Dr. Horvitz assumes that, but for the alleged breach, Sterling would have obtained up to $427 million in additional assets, and that Sterling's rate of return on those assets would equal the return on its actual assets. Tr. 2039:8-16, 2129:3-2130:22 (Horvitz); P-454, table 1. Dr. Horvitz also assumes that Sterling

[7] If, however, this Court believes that Sterling did not mitigate, Sterling nonetheless cannot recover expectancy damages because it "failed to take action to mitigate such damages." Quiman v. United States, 39 Fed. Cl. 171, 185-86 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999); Restatement (Second) on Contracts § 350.

[8] Dr. Horvitz's model assumes that Sterling would be free from FIRREA's breaching provisions while other institutions with alleged goodwill contracts would nevertheless be subject to FIRREA's breaching provisions. Tr. 3766:16-3769:2. (Hamm). Under case law, however, all similarly situated institutions must be treated the same way in a "but for" world. See, e.g. Dolphin Tours, Inc. v. Pacifico Creative Serv. Inc., 773 F.2d 1506, 1510-12 (9th Cir. 1985) (a valid damage model must account for the fact that if one market participant becomes free of anti-competitive behavior, other similarly situated market participants become free as well); R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966 (M.D. Pa. 1981) (same). Putting aside other flaws in Dr. Horvitz's model, the incorrect assumption concerning other market participants, in and of itself, renders the model invalid.

suffered damage during the pendency of the temporary injunction, notwithstanding the fact that the injunction prohibited the Government from enforcing any breach-related growth restrictions. See generally P-454. Indeed, that was why Sterling sought the injunction.

In addition, Dr. Horvitz assumes that the "but for" Sterling would have raised $10.5 million in new capital in December 1989. Tr. 2091:9-18, 2092:20-2094:19 (Horvitz). Absent that hypothetical capital, Dr. Horvitz's model yields zero damages. Tr: 2757:8-18 (Horvitz). Moreover, Dr. Horvitz ignores the fact that, according to Sterling's own witnesses, Sterling replaced its goodwill in 1991. See, e.g., Tr. 583:11-585:25 (Gilkey); Tr. 1611:14-1612:17 (Welch); Tr. 1226:9-19 (Barnett). Consequently, Sterling mitigated its damages.

Using this invalid methodology, Dr. Horvitz incorrectly opines that the addition of $15.557 million in contractual goodwill to regulatory capital would have enabled the "but for" bank to acquire up to $427 million more in assets than the actual bank between 1989 and 2006. P-454, Ex. 6, tables 1, 4a. Dr. Horvitz estimates that the earnings upon these "foregone assets" would have been approximately $58.164 million as of September 30, 2006. Tr. 2123:10-24; P-454. He also claims that the value of the goodwill remaining at that date would have been approximately $600,000, based upon the replacement model of Dr. Christopher James, another of Sterling's expert witnesses. Tr. 2541:15-2543:4.

### B. Sterling's Lost Profits Claim Is Invalid As A Matter Of Fact And Law Because Dr. Horvitz's Model Ignores Sterling's Mitigation Of Damages Through Recapitalization In 1991

Dr. Horvitz premised his lost profits model is premised upon the assumption that, between 1989 and 2006, Sterling never replaced a single dollar of the $15.557 million in contractual goodwill eliminated by FIRREA. Tr. 2546:7-24. This assumption renders Dr.

Horvitz's model invalid because he ignored Sterling's actual mitigation, in 1991, when the thrift raised $21 million in new capital and converted $2.1 million of preferred stock to common stock. see, e.g., Tr 583:11-585:25 (Gilkey); Tr. 1611:14-1612:17 (Welch) ;Tr. 4139:19-4140:10 (Bajaj); DX 3508; P-84, pp. 18, 28, 39; P-310, p. 14. At the time, Sterling held only $13.346 million in contractual goodwill. Tr. 4140:1-10 (Bajaj). The public offering permitted Sterling to exceed all of FIRREA's minimum capital ratios. Tr. 4141:1-22 (Bajaj); DX 3509.

Further, Dr. Horvitz's assumption that Sterling did not mitigate, notwithstanding the addition of in excess of $500 million in new capital since the breach, ignores Sterling's duty to mitigate.

The Federal Circuit requires this Court to account for any mitigation a plaintiff undertakes as a result of a breach. LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1371-72 (Fed. Cir. 2003) (citing Restatement (Second) of Contracts §347(c) cmt. e). In LaSalle, the Federal Circuit held that the thrift's recapitalization replaced the lost goodwill and mitigated damages. Id. Here, Sterling mitigated its damages through its 1991 recapitalization, which it admits was for purposes of reaching capital compliance and would not have occurred absent the breach. Tr 583:11-585:25; Tr. 1611:14-1612:17 (Byrne). Sterling's acknowledgment that it mitigated is reflected not only in its witnesses' testimony, but also in its 1992 Annual Report to shareholders, which stated:

> Fiscal 1992 was an outstanding year for Sterling Savings. Your company, profitable every year since its inception, reported record earnings this fiscal year. We also completed a $21 million equity offering, making Sterling one of the only thrifts in the nation to have met all applicable capital requirements after having been deemed to be in non-compliance with such requirements. Our primary regulator, OTS, had taken the position that FIRREA

> eliminated most of the capital regulatory provisions of acquisition agreements entered into during the late 80's. Our compliance with capital standards is a victory for us all – our shareholders, customers, employees, and the communities we serve across the Pacific Northwest.

P-84, p.2 (emphasis added). The 1993 Annual Report also stated that as a result of raising capital, the district court litigation was "not expected to have a material adverse effect on Sterling regardless of the ultimate outcome of the case." P-85, p. 31. At trial, Mr. Gilkey confirmed that the Annual Report accurately reflected Sterling's view of the capital raising. Tr. 635:23-637:2 (Gilkey). Similarly, David Welch, an investment banker involved in the 1991 capital raising, acknowledged that the breach of contract in this case was a "direct catalyst" for the capital raising, Tr. 1611:14-1612:17 (Welch), and Mr. Byrne conceded that the breach period was only from "late 1989 through 1991." Tr. 1665:16-19 (Byrne). Finally, during opening statements, Sterling's counsel acknowledged that the 1991 capital raising was mitigation. Tr. 18:22-25, 20:25-21:5 (Weatherhead opening statement).

Consequently, Sterling mitigated its damages by replacing the contractual goodwill eliminated by FIRREA. Therefore, Dr. Horvitz's assumption that, between 1989 and September 30, 2006, Sterling never replaced a penny of the goodwill associated with the Lewis Federal and Tri-Cities acquisitions undermines his model.

Indeed, Dr. Horvitz's assumption that Sterling has never mitigated its damages also invalidates his model as a matter of law,[9] because if Sterling did not mitigate, it nonetheless possessed both a duty and opportunity to do so and "cannot recover damages for loss that [ ]

---

[9] As we explain below, the lost profits that allegedly arose before the 1991 recapitalization are not recoverable for other reasons.

could have [been] avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original) (quoting Restatement (Second) of Contracts, § 350, cmt. b). If a nonbreaching party refuses to mitigate its damages, but instead merely attempts to impose all loss, even if it could have been avoided, upon the breaching party, the nonbreaching party is precluded from recovering the amount of loss that could have been avoided. See, e.g., Midwest Indus., 4 Cl. Ct. at 133 ("nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part"); Toledo P. & W. Ry. v. Metro Waste Sys., 59 F.3d 637, 640 (7th Cir. 1995) ("[i]n the event [the injured party] fails to take reasonable steps to avoid additional harm, [the injured party] bears the risk of any increased damages which could have been avoided"); Restatement (Second) of Contracts § 350(1), at 126 (1981). This rule encourages the nonbreaching party to reduce any damages resulting from the breach:

> Rationale. The rules stated in this Section reflect the policy of encouraging the injured party to attempt to avoid loss. The rule stated in Subsection (1) encourages him to make such efforts as he can to avoid loss by barring him from recovery for loss that he could have avoided if he had done so. The exception stated in Subsection (2) protects him if he has made actual efforts by allowing him to recover, regardless of the rule stated in Subsection (1), if his efforts prove unsuccessful.

Restatement (Second) of Contracts § 350 cmt. a, at 127 (1981) (citation omitted).

This Court's predecessor, the Court of Claims, held that if a contractor's damage is a direct result of the Government's breach of contract, and the contractor could have reduced its loss by expending money and subsequently seeking recovery of that money from the Government

(in lieu of the entire claimed amount of the loss absent mitigation), the contractor's failure to do so precludes recovery. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960).

This principle applies in the Winstar-related cases as well. In Bank United, 50 Fed. Cl. at 654, the Court rejected the plaintiff's lost profits claim in part because the model failed to recognize that the plaintiff had mitigated by raising replacement capital.

In this case, Sterling raised well over $500 million between 1991 and 2006, thus demonstrating its ability to raise capital when profitable opportunities presented themselves. Further, Sterling had the ability to raise more capital. DX 197, p. 2183; Tr. 1593:17-1594:1, 1631:1-8 (Welch). Thus, Dr. Horvitz's assumption that Sterling never mitigated renders Dr. Horvitz's model invalid as a matter of fact and law, as well as inherently speculative. Accordingly, the Court should reject this model and the damages claimed therein.

Sterling has attempted to avoid its duty to mitigate by claiming that its status as a "lost volume seller" rendered it impossible to replace the goodwill eliminated by FIRREA. As a preliminary matter, Sterling bears the burden of proving that it is a "lost volume seller." Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 495 (2006). Sterling cannot meet that burden in this case. A "lost volume seller" is one who, upon a breach of contract, can demonstrate that it was not possible to mitigate a breach of contract. For instance, a lost volume seller can be one who resells an article, e.g., a piece of equipment, to a second purchaser who would have purchased the item anyway, thus resulting in a lost sale. See, e.g., Advanced Medical, Inc. v. Arden Medical Sys., 955 F.2d 188, 200-01 (3rd Cir. 1992). In this case, it has already been established that goodwill is merely a nonearning asset that can be replaced through the acquisition of tangible capital. See, e.g., CalFed, 245 F.3d at 1350; Bank United, 50 Fed. Cl.

at 655. To date, "[n]umerous courts have indeed allowed recovery based on the cost to an injured thrift of mitigating its damages, specifically, the cost incurred by the thrift in replacing its lost goodwill." Bank of America, 67 Fed. Cl. at 580 (2005).

Sterling replaced its goodwill in 1991, and, since then, has raised hundreds of millions of dollars of additional capital. Nonetheless, on numerous occasions it has been unable to profitably employ all of the capital available to it, and has had access to more capital than it can use. See Proposed Findings of Fact No. 71-92. Therefore, Sterling cannot meet it burden of proving that its contractual goodwill could not be replaced. Consequently, the Court should reject Sterling's "lost volume seller" theory.

### C. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal And Tri-Cities

Sterling bears the burden of proving that the loss for which it claims damages was "foreseeable to the party in breach at the time of contract formation." Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 351(1)).

Sterling did not meet this burden. To the contrary, Sterling's primary expert, Dr. Horvitz, a professor emeritus of finance and economics and former member of the board of directors of a thrift, Tr. 1978:18-23, 1995:21-1996:4 (Horvitz), conceded that the profits he calculated were not foreseeable. Dr. Horvitz opined that, if potential investors had foreseen the profits assumed in his model, they would have provided the capital needed to achieve those profits. Tr. 2694:7-13 (Horvitz). He then candidly acknowledged that the lost profits in his model were, in fact, not foreseeable to any potential investor. Id. If such profits were not foreseen to investors at any

point between 1989 and 2006, then the profits could not have been foreseen by the Government in 1985 and 1988, when the Lewis Federal and Tri-Cities acquisitions occurred.

Consequently, Sterling's lost profits theory is the text book example of an unforeseeable claim. In analogous breach of contract cases where defendants guarantee loans to businesses, courts limit damages to the cost of replacement because it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit:

> The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach. . . . In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

Restatement (Second) of Contracts § 351 cmt. e.

Thus, Sterling's claim that it had profitable opportunities and the thrift's simultaneous allegation that it could not convince its own shareholders or any other prospective investors to infuse an additional $15.557 million in funds to pursue these profits (P-454, table 4a, column A) is the classic example of an unforeseeable claim. Indeed, if replacement of the $15 million in goodwill would foreseeably have resulted in $58 million in additional profits for the company, then Sterling, which claims that it has raised over $900 million in capital since the enactment of FIRREA, Tr. 290:13-19 (Gilkey), 408:24-424:6 (Gilkey); P-505, should have easily raised an additional $15 million to realize these profits.

Further, it was not foreseeable that, after the breach, Sterling would: (1) obtain an injunction preventing the Government from acting inconsistently with its contracts; and (2)

nonetheless choose to pass up profitable investment opportunities, particularly if such opportunities were readily available in the market and easily accessed, as Dr. Horvitz assumes. See Tr. 2039:8-16; Tr. 2129:3-2130:22.

Finally, it was unforeseeable that the loss of the Lewis Federal and Tri-Cities goodwill, alone, would have resulted in the damages Sterling claims, when the elimination of just Central Evergreen noncontractual goodwill would have rendered Sterling noncompliant with FIRREA's minimum capital requirements. See Section II.D.1, below.

### D. Sterling Failed To Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model

With respect to causation, a plaintiff must prove that its damages "'inevitably and naturally, not possibly nor probably' flow from the defendant's breach." CalFed, 395 F.3d at 1267, quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897).

Dr. Horvitz's model does not meet the causation requirement because Sterling has not proven that, absent the breach, Sterling would have met FIRREA's capital requirements. Moreover, Sterling cannot establish causation because Dr. Horvitz's model incorrectly assumes that Sterling had to forego profitable opportunities, despite (1) receiving an injunction, (2) replacing every dollar of contractual goodwill eliminated by FIRREA, and (3) not having profitable opportunities.

#### 1. Dr. Horvitz's Lost Profits Model Is Invalid As A Matter Of Law Because The Breach Did Not Cause Sterling's Failure To Meet FIRREA's Minimum Capital Requirements

Dr. Horvitz assumes that, absent the breach, Sterling would have been in compliance with FIRREA's minimum capital requirements and would not have been subject to any restrictions or

limitations upon its asset growth. Tr. 2089:14-21 (Horvitz). Consequently, he also assumes that, absent the breach, Sterling would have been in a position to leverage the goodwill attributable to the Lewis Federal and Tri-Cities acquisitions after FIRREA's enactment. The Court should reject these erroneous assumptions.

Even assuming that the Lewis Federal and Tri-Cities goodwill continued to count as regulatory capital after FIRREA, elimination of the noncontractual, Central Evergreen goodwill would have rendered Sterling non-compliant with FIRREA's minimum capital requirements, thus breaking the chain of causation between breach and alleged damages.

As a preliminary matter, Mr. Byrne conceded that, even assuming the Lewis Federal and Tri-Cities goodwill continued to count as regulatory capital after FIRREA, elimination of Central Evergreen's goodwill may have rendered Sterling non-compliant with FIRREA's minimum capital requirements. Tr. 1816:12-18 (Byrne). As discussed below, Sterling's own documents, as well as trial testimony by Ms. Friend and our experts, Mr. Bankhead and Mr. Hargett, confirm that Sterling would have been non-compliant even if the contractual goodwill had continued to count as capital after Congress enacted FIRREA.

Further, Dr. Horvitz's improper introduction of a new opinion and calculations at trial related to Sterling's Lewis Federal and Tri-Cities forbearance letters does not aid Sterling in establishing causation. Tr. 2071:11-2081:2 (Horvitz). Dr. Horvitz's erroneous interpretation of those letters brings about results that are, as he acknowledged, illogical. Tr. 2781:4-13; 2782:8-12; Tr. 2783:8-11, 2783:24-2784:6, 2784:19-24 (Horvitz).

Consequently, the Court should reject Dr. Horvitz's model because Sterling cannot prove that the breach caused the thrift's failure to comply with FIRREA's capital standards.

**a. Sterling Would Have Failed FIRREA's Tangible Capital Requirement Absent The Breach**

Sterling's own documents demonstrate that including the contractual goodwill in calculating tangible capital only would have improved Sterling's tangible capital deficit from $22.833 million to $7.276 million. DX 422, p. WON952 1631; P-454, table 4a. That deficit would have rendered Sterling non-compliant with FIRREA's 1.5 percent minimum tangible capital requirement, 12 C.F.R. § 567.9(a) (1989), and subjected the thrift to the restrictions that were imposed in the actual world. Dr. Horvitz acknowledged this. Tr. 2744:2-2745:21 (Horvitz). Indeed, as stated above, Sterling was better off in the actual world because it obtained an injunction prohibiting the enforcement of the restrictions based upon the District Court's erroneous legal finding that its Central Evergreen goodwill was contractual. For these reasons, Sterling cannot meet its burden of proving that the breach caused the thrift to incur any lost profits.

In an attempt to overcome this fundamental flaw in Sterling's damages claim, Dr. Horvitz incorrectly assumes that, absent the breach, Sterling would have raised $10.5 million in new regulatory capital in December 1989, thus permitting Sterling to achieve tangible capital compliance. P-454, table 3a; Tr. 2089:14-21. This argument is based upon Sterling's contention that the Government breached its contracts by failing to preapprove of the payment of preferred stock dividends in connection with the thrift's proposed 1989 capital raising. Tr. 1445:15-20 (Byrne). The Court has already resolved this argument, however, when it determined that Sterling did not possess a contractual right to pay preferred stock dividends. Sterling, 53 Fed. Cl. at 614-615.

Further, we demonstrated at trial that Sterling's request for an "exemption" or blanket preapproval of future dividends in advance of the issuance of the preferred stock was unprecedented and contrary to OTS policy, regardless of whether a thrift was over or under capitalized. Tr. 3676:9-3677:6 (Hedlund); Tr. 2221:11-19 (Friend)(OTS's policy of not preapproving dividends payments was "long-standing"). OTS policy prohibited the blanket preapproval of a thrift's future dividend payment (as opposed to already accrued payments) because it would deprive OTS of its ability to regulate the safety and soundness of thrift operations, and to monitor earnings. Tr. 3675:23-3676:8 (Hedlund); Tr. 2221:23-2222:25, 2226:17-21 (Friend). Therefore, Sterling has not met its burden of demonstrating that, absent the breach, OTS would have provided the preapproval allegedly required in order to complete the 1989 offering.

Consequently, Dr. Horvitz's model is invalid because Sterling cannot prove that the breach caused the thrift's failure to comply with FIRREA's capital standards.

**b. Sterling Would Have Failed FIRREA's Core Capital Requirement Even Absent The Breach**

Even assuming that, absent the breach, Sterling would have had an additional $10.5 million of capital on its books as of December 1989, a position with which we disagree, Sterling would nonetheless have failed to satisfy FIRREA's minimum core capital requirement. Tr. 2745:22-2748:22 (Horvitz); 12 C.F.R. § 567.8 (1989). In addition, if core capital were calculated properly, Dr. Horvitz's model would result in zero damages. See Tr. Tr. 2745:22-2753:12.

Mr. Barefoot Bankhead, an accounting expert, demonstrated at trial that Dr. Horvitz miscalculated Sterling's "but-for" core capital position as of March 30, 1990. The error occurred

because, in determining how much "qualifying supervisory goodwill" to include in core capital under the regulations implementing FIRREA, Dr. Horvitz improperly included both Sterling's contractual goodwill and the noncontractual goodwill associated with the Central Evergreen acquisition. Tr. 3311:17-21, 3325:22-3326:9 (Bankhead).

The regulation implementing FIRREA permitted thrifts, between 1990 and 1994, to include a portion of their supervisory goodwill in regulatory capital for purposes of calculating core capital. 12 C.F.R. §§ 567.1, 567.5 (1990); Tr. 3316:25-3318:5 (Bankhead). For 1990, thrifts could include supervisory goodwill in core capital in an amount not to exceed 1.5 percent of the thrift's asset size. Between 1990 and 1994, the amount of supervisory goodwill that could be included in core capital gradually declined, until it was zero. 12 C.F.R. § 567.5 (1990). It is undisputed that, in 1990, Sterling's asset size was $694 million, thus permitting it to include $10,421,000 of supervisory goodwill, or 1.5 percent of that amount, in core capital. Tr. 3320:3-3321:7 (Bankhead); DX 2009. It is also undisputed that the goodwill associated with all three of Sterling's acquisitions, Lewis Federal, Tri-Cities, and Central Evergreen, met the regulation's definition of "supervisory goodwill." Tr. 2494:10-14 (Schott).

Mr. Bankhead is a certified public accountant, former banker, and former regulator with the FHLBB. The Court qualified him to testify in the areas of: (1) auditing and accounting for depository financial institutions, including, but not limited to, GAAP and RAP accounting; (2) financial institution management and regulation specifically as it relates to accounting and capital regulations; and (3) financial analysis of and valuing depository financial institutions, including their underlying assets and liabilities. Tr. 3285:3-16; 3291:6-8. Mr. Bankhead has extensive experience in accounting for financial institutions, and, in 1987, was accepted into the FHLBB's

professional accounting fellowship program. Tr. 3271:1-5 (Bankhead). During his two-year tenure in the program, Mr. Bankhead worked with FHLBB's chief accountant, providing accounting and auditing expertise to the FHLBB, the Federal Savings and Loan Insurance Corporation, and the Federal Home Loan Bank system. Tr. 3271:6-17 (Bankhead).

At trial, Mr. Bankhead demonstrated that, while the regulation implementing FIRREA allowed Sterling to include a maximum of $10,421,000 of its supervisory goodwill in core capital, absent the breach, Sterling would have been permitted to exceed the maximum by including all of its $15.557 million of contractual goodwill in core capital. Tr. 3325:15-3326:9 (Bankhead). Inclusion of all of the contractual goodwill in core capital would have allowed Sterling to include 2.239 percent of its asset size in core capital, rather than 1.5 percent, as specified in the regulation. Tr. 3323:9-3324:6 (Bankhead); DX 2011. The goodwill associated with the Central Evergreen acquisition, however, should not be added to core capital because the 1.5 percent limit would already have been exceeded. Id.; Tr. 3325:15-3326:23 (Bankhead).

Mr. Joel Hargett, also an accounting expert, opined that Mr. Bankhead's methodology for calculating Sterling's "but-for" core capital position as of March 1990 was reasonable and appropriate. Tr. 3413:20-3414:24 (Hargett); see also Tr. 3431:12-20 (agreeing with Bankhead's core capital calculations) (Hargett). In 1989, when OTS regulations drafted and promulgated regulations implementing FIRREA, Mr. Hargett was a fellow with the FHLBB. Tr. 3376:6-16, 3371:21-3373:23 (Hargett). His tenure as an accounting fellow followed Mr. Bankhead's tenure, which concluded in 1989. Tr. 3271:1-17 (Bankhead). While retained by the FHLBB as an accounting fellow, Mr. Hargett worked with others to promulgate the FIRREA regulations. Tr. 3379:3-3380:7 (Hargett). In that capacity, Mr. Hargett participated in drafting the regulations,

including the definition of "qualifying supervisory goodwill" that appeared in the final regulation. Tr. 3380:8-3381:21 (Hargett); DX 968, p. 46845 (the regulations, which list Mr. Hargett as a point of contact for information).

The Court qualified Mr. Hargett as an expert in the following areas: (1) accounting standards used in the savings and loans industry, including both GAAP and RAP accounting; (2) application of regulations and regulatory guidance applicable to savings and loans; (3) financial analysis of savings and loan institutions and specific analysis of loan transactions; and (4) damage analysis of loan transactions. Tr. 3391:2-3392:12 (Hargett).

Mr. Hargett agreed with Mr. Bankhead's interpretation of the definition of "qualifying supervisory goodwill" and with his application of the regulation to Sterling for purposes of calculating its "but-for" core capital. Tr. 3413:20-3414:24 (Hargett); Tr. 3431:12-20 (Hargett). In the FIRREA regulations, OTS intended to eliminate supervisory goodwill from regulatory capital. Tr. 3415:8-3417:20 (Hargett). Thus, in the "but-for" world, in which OTS would have been obligated to include the contractual goodwill in core capital, the contractual goodwill would have been applied first in determining the amount of "qualifying supervisory goodwill.". Tr. 3421:16-3423:16 (Hargett). As Mr. Bankhead demonstrated, the contractual goodwill would have exceeded the 1.5 percent limit; therefore, the noncontractual Central Evergreen would not have been included in calculating core capital. Tr. 3423:14-3424:20 (Hargett).

Pursuant to the methodology applied by Mr. Bankhead and deemed reasonable and appropriate by Mr. Hargett, Sterling would not have met FIRREA's three percent minimum core capital requirement, even with the contractual goodwill. Tr. 3329:13-17 (Bankhead). Further, it is undisputed that, applying this methodology for calculating core capital, Dr. Horvitz's model

would yield zero lost profits. Tr. 3328:25-3329:7 (Bankhead); Tr. 2495:17-2497:7 (Horvitz).

Dr. Horvitz conceded that he is not a certified public accountant and does not possess a degree in accounting. Tr. 2002:8-12 (Horvitz). Further, he was never an employee of OTS and did not draft the regulations implementing FIRREA. Tr. 2002:20-2003:3 (Horvitz). Morever, between 1989 and 1992, he had no regulatory authority over thrifts, and he does not claim expertise in contract interpretation. Id. Therefore, the Court should give no weight to Dr. Horvitz's assumption that, absent the breach, regulators would have included, when calculating Sterling's core capital ratio.

Similarly, Mr. Paul Schott's opinion with respect to the "but-for" calculation of core capital is not helpful to the Court. Mr. Schott, an expert witness presented by Sterling, is a lawyer, not an accountant. At trial, he conceded that, when he wrote his expert report, he was not familiar with the statutory or regulatory definition of the term "supervisory goodwill." Tr. 2445:21-2446:1 (Schott). Indeed, he did not know whether the term had a statutory or regulatory definition. Tr. 2447:3-7 (Schott). Further, although he attempted to interpret the forbearance letters issued in connection with the Lewis Federal and Tri-Cities acquisitions, he admitted that those documents do not address the Central Evergreen goodwill. Tr. 2482:3-2483:13 (Schott). He also admitted that, if a regulator had determined that the Central Evergreen goodwill would not count toward regulatory capital, such a determination would be consistent with the Central Evergreen, Lewis Federal, and Tri-Cities contracts. Tr. 2487:16-2489:25 (Schott).

Mr. Schott also conceded that Mr. Bankhead included all of the contractual goodwill in computing Sterling's "but-for" core capital ratio, and that the amount of goodwill attributable to those acquisitions exceeded the maximum amount of supervisory goodwill that could be included

in core capital pursuant to the regulation implementing FIRREA. Tr. 2491:7-19 (Schott).

Moreover, while Mr. Schott testified about the treatment of "contractual assistance" under the post-FIRREA regulations, he admitted that he created the term, and that the term had no basis in statute or regulation. Tr. 2492:5-10 (Schott). Indeed, he acknowledged that the Tri-Cities and Lewis Federal goodwill fit the regulatory definition of "supervisory goodwill." Tr. 2494:10-14 (Schott). Consequently, his testimony merely served to bolster Mr. Bankhead's and Mr. Hargett's opinions that the Central Evergreen goodwill would not be included in core capital in the "but-for" world because the Lewis Federal and Tri-Cities goodwill would meet and exceed the maximum amount of supervisory goodwill that regulators would count toward the core capital requirement.

Finally, Mr. Schott admitted that lack of tangible capital was perceived by Congress, the Office of the Comptroller of the Currency ("OCC"), and Mr. Schott to be a major cause of the thrift crisis. Tr. 2474:9-2476:9. Mr. Schott and Congress generally believed that requiring thrifts to invest more tangible capital in their own firms would help the thrift industry in general. Id. Indeed, Mr. Schott, Congress, and the OCC believed that thrifts would perform better if they had a higher ratio of tangible capital to assets. Id. In short, Mr. Schott agreed that Congress "determined that one of the major problems was a lack of capital and one of the major solutions was the addition of capital." Tr. 2477:12-16 (Schott). Thus, Sterling's model is premised entirely on the counterfactual assumption that Congress and the regulators would choose to permit Sterling to count noncontractual goodwill as regulatory capital, and to operate without any tangible capital, even though they determined that such practice was the major cause of the thrift

crisis.[10]

As a result, Sterling cannot demonstrate that the breach caused its damages. Even absent a breach, and assuming that Sterling would have raised $10.5 million in new regulatory capital in December 1989 (an assumption with which we disagree), Sterling would have failed to meet the core capital requirement, and would have been subject to the restrictions placed upon it in the actual world. Tr. 3328:15-24, 3329:13-17 (Bankhead). Further, as conceded by Dr. Horvitz, the adjustment to his core capital calculation identified by Mr. Bankhead reduces Dr. Horvitz's lost profits estimate to zero. Tr. 2495:17-2497:7 (Horvitz).

#### c. Dr. Horvitz's New Opinion Regarding The Lewis Federal And Tri-Cities Forbearance Letters Is Incorrect And Does Not Render "But-For" Sterling Compliant With FIRREA's Core Capital Requirement

In a new opinion, Dr. Horvitz opined that, assuming Mr. Bankhead's exclusion of the Central Evergreen goodwill from Sterling's core capital calculation was correct, Sterling nonetheless would have met FIRREA's core capital requirement. Specifically, Dr. Horvitz suggested that a forbearance would permit Sterling to add the Lewis Federal and Tri-Cities goodwill to core capital twice, if required to avoid noncompliance with the minimum capital requirements. Tr. 2082:1-2088:21, 2782:1-2783:12 (Horvitz).

In support of this opinion, Dr. Horvitz relied upon the following language in Sterling's

---

[10] Similarly, in 1989 Dr. Horvitz wrote that thrifts with little capital are likely to take imprudent risk. "Since the new owners have little capital of their own at stake, there is a strong tendency towards excessive risk taking." Tr. 2739:12-2740:8 (Horvitz). He stated that this was precisely the cause of the thrift crisis. Tr. 2740:3-2741:5 (Horvitz). Consequently, it would have been irrational for the regulators to permit Sterling to count noncontractual goodwill as regulatory capital, over and above the contractual goodwill.

forbearance letters: FSLIC "will forbear . . . from exercising its authority. . . for any failure of Sterling to meet the net worth requirements of Section 563.13 arising solely from . . . (2) Sterling's assumption of the net worth deficiency of Lewis as of the Effective Date." P-20, p. WOF014 0600 (Lewis Federal forbearance letter); Tr. 2082:1-2088:21 (Horvitz); see also P-28, p. WOF014 1397 (Tri-Cities forbearance letter states: FSLIC "will forbear . . . for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from . . . (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date."). Dr. Horvitz opined that the Lewis Federal and Tri-Cities acquisitions created a "net worth" or "capital" deficiency, allowing for forbearance if Sterling fell out of capital compliance because of one or both of these acquisitions. Tr. 2082:1-2088:21 (Horvitz).

The language Dr. Horvitz relied upon in the forbearance letters expressly applied only to situations where the transaction creates a "net worth" or "capital" deficiency. P-20; P-28. Mr. Byrne, Sterling's CFO, however, testified that the Lewis Federal and Tri-Cities acquisitions did not create a "net worth" or "capital" deficiency. Instead, goodwill filled the gap between liabilities and assets. Tr. 1873:17-1874:20 (Byrne); see also Tr. 2780:6-21 (Horvitz).

Mr. Byrne's testimony was confirmed by our experts, Mr. Hargett and Mr. Bankhead, both of whom were qualified as experts in the area of financial institution regulatory accounting and accounting under GAAP. Tr. 3391:2-3392:12 (Hargett); Tr. 3285:3-16; 3291:6-8 (Bankhead). Sterling did not assume the net worth deficiencies of the thrifts it acquired because the application of purchase accounting eliminated any deficiencies on the day the transactions were effectuated. Tr. 3345:18-3346:10 (Bankhead). Thus, Sterling's acquisitions of Lewis Federal and Tri-Cities did not result in deficits. Tr. 3347:4-14 (Bankhead). Therefore, Dr.

Horvitz, in effect, double-counted the goodwill when he included both the goodwill and the gap between assets and liabilities of Lewis Federal and Tri-Cities when he calculated core capital. Tr. 3347:15-3348:2 (Bankhead).

During cross-examination, Dr. Horvitz acknowledged that he is not an expert in accounting, Tr. 2002:1-16 (Horvitz), and not qualified to give a legal interpretation of the acquisition contracts in this case, Tr. 2003:4-7, 2721:13-23 (Horvitz), of which the forbearance letters are necessarily a part. He also readily agreed that his interpretation of the forbearance letter would lead to a "double counting" of the supervisory goodwill associated with the Lewis Federal and Tri-Cities contracts. Tr. 2782:1-2784:18 (Horvitz). Indeed, he candidly acknowledged that he may have misinterpreted the forbearance. Tr. 2782:13-2783:2 (Horvitz). He also admitted that he has never seen this approach used by any other thrift or regulators and that he has never seen any Sterling document that contains these types of calculations. Tr. 2783:24-2784:24. In fact, the forbearance letters themselves show that Dr. Horvitz's interpretation is incorrect and would not serve as the basis for any type of "net worth" forbearance in connection with Lewis Federal and Tri-Cities.

Mr. Hargett explained that the Lewis Federal and Tri-Cities forbearances relied upon by Dr. Horvitz are based upon standard language utilized in supervisory acquisitions. Tr. 3479:16-3482:4 (Hargett). Subsections (1) and (2) of the Lewis Federal and Tri-Cities forbearances are provided in the alternative, and their applicability is dependent upon the method of accounting utilized in structuring the acquisition. See Proposed Findings of Fact No. 5, 9; P-20, ¶2, p. WOF014 0600; P-28, ¶1, p. WOF014 1397. Subsection two, which, in the Lewis Federal letter refers to "assumption of net worth deficiency," applies to acquisitions achieved pursuant to the

pooling method of accounting, while subsection one applies to acquisitions accomplished pursuant to the purchase method of accounting. Tr. 3436:23-3437:16, 3432:21-3433:20 (Hargett). The provisions are provided in the alternative because, at the time the forbearance letter is drafted, the accounting methodology to be applied may not be known. Tr. 3435:9-25 (Hargett).

Subsection two of the forbearance letter is not applicable to the Lewis Federal acquisition because Sterling did not assume a net worth deficit. The deficit disappeared and became goodwill as an asset because Lewis Federal was accounted for as a purchase acquisition. Tr. 3435:25-3436:22, 3437:17-3438:1 (Hargett); Tr. 1873:17-22 (Byrne).

Like the five-year forbearance in the Lewis Federal forbearance letter, the Tri-Cities forbearance was based upon standard language utilized in supervisory acquisitions. Tr. 3479:23-3482:4 (Hargett). Because the accounting methodology to be utilized may not have been known when FSLIC drafted the forbearance letter, the standard language provides for two scenarios: subsection two applies to acquisitions achieved pursuant to the pooling method of accounting, while subsection one applies to acquisitions accomplished pursuant to the purchase method of accounting. Tr. 3432:21-3433:20, 3435:9-25 (Hargett).

Subsection two of the forbearance letter is not applicable to the Tri-Cities acquisition because, as was the case with the Lewis Federal acquisition, Sterling did not acquire a net worth deficit. The deficit disappeared and became goodwill as an asset because Tri-Cities was accounted for as a purchase acquisition. Tr. 3435:25-3436:22 (Hargett); Tr. 1873:17-22 (Byrne).

Correcting for Dr. Horvitz's misapplication of these forbearances eliminates the entire

core capital surplus assumed by Dr. Horvitz, along with any lost profits. Tr. 3348:3-3349:3 (Bankhead).

**d. Sterling Did Not Prove That It Would Have Complied With FIRREA's Risk-Based Capital Requirement Absent The Breach**

At trial, Mr. Byrne testified, on direct examination, that Sterling's practice is to maintain its "risk-based" capital level at or above the "well-capitalized" standard of approximately ten percent. Tr. 1347:8-1349:4 (Byrne): P-513. He also explained that calculation of the risk-based capital requirement is fairly complex, requiring Sterling to apply a risk-weighting measure to each of its categories of assets. Tr. 1341:18-1345:19 (Byrne); see also 1729:9-1731:4 (Byrne). In calculating damages, Dr. Horvitz did not attempt to determine the risk-based capital ratio that would be maintained by his "but-for" Sterling. Tr. 3619:10-3620:14 (Hamm). Such a calculation appears nowhere in his expert report, and, in fact, could not be calculated, because Dr. Horvitz does not identify the assets and liabilities that comprise the incremental asset portfolio in his model. Tr. 2616:2-2619:25 (Horvitz); Tr. 3620:19-3622:4, 3622:23-3623:7 (Hamm); DX 3007. Therefore, he admitted that he does not know whether his "but-for" Sterling would have met the "well-capitalized" standard for risk-based capital. Tr. 2768:25-2769:6 (Horvitz). Nonetheless, at trial, he assumed that his "but-for" Sterling would meet the "adequately capitalized" standard of eight percent applied to risk-based assets. Tr. 3622:4-22 (Hamm).

Dr. William Hamm, an expert in finance, economics, and banking, demonstrated that Dr. Horvitz's failure to identify the assets and liabilities in his "but-for" portfolio renders it impossible to determine whether "but-for" Sterling would have complied with FIRREA's risk-

based capital requirements. Tr. 3620:19-3622:4 (Hamm); DX 3007. Dr. Horvitz's only justification for the conclusion was his assumption that the assets held by the "but-for" bank would be similar to those held by the actual bank, which has held excess core capital, and excess core capital would demonstrate likely compliance with risk-based capital requirements. Tr. 3623:13-3624:15 (Hamm). This assumption is unfounded, however, because Mr. Byrne testified that the breach caused Sterling to cease expansion of its business and commercial lending, and expand residential lending. Tr. 1666:8-18 (Byrne). If true, then the "but-for" bank would be more heavily invested in business and commercial lending, which carries a risk rating double that of residential lending, thus refuting Horvitz's assumption. Tr. 3624:16-3626:10 (Hamm). Therefore, Dr. Horvitz's claim that Sterling would have complied with the risk-based capital requirement absent the breach is speculative on its face. Accordingly, it is impossible for Sterling to prove that the breach caused it to fail the risk-based capital requirement.

Either Sterling was willing to constrain its growth in the "but-for" world to meet the well-capitalized risk based capital standard or it was not. Sterling's lost profits claim fails under either possibility.

If Sterling was willing to constrain growth in order to meet the well-capitalized risk-based capital requirement, then Dr. Horvitz's lost profits model fails. Dr. Horvitz admits that he does not know whether Sterling would meet the well-capitalized standard in the "but-for" world assumed in his model. Instead, he claims that Sterling would meet the less stringent, "adequately capitalized" standard. Thus, in a realistic "but-for" world, Sterling would possess more risk-based capital than assumed by Dr. Horvitz. Tr. 4162:17-4163:20 (Bajaj). This inconsistency between Sterling's actual policy and the "but-for" policy assumed in Dr. Horvitz's model renders

the model speculative on its face. The asset levels, and associated profits, in his model cannot be achieved if, absent the breach, Sterling would have acted consistently with its real-world policy of maintaining risk-based capital at the "well-capitalized" level.

If, on the other hand, Sterling was willing to fall below well-capitalized risk-based capital in order to pursue growth, the model also fails. Sterling has consistently maintained risk-based capital at a level well above the "adequately capitalized" standard, but has not utilized the excess capital to grow. Therefore, it is counterfactual and speculative for Dr. Horvitz to assume that, absent a breach, Sterling would have used any capital in excess of the adequately capitalized standard to achieve growth in assets. Tr. 4163:21-4164:8 (Bajaj).

**2. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Incorrectly Assumes That The Breach Caused Sterling To Cease The Pursuit Of Profitable Opportunities Even Though The Government Was Enjoined From Enforcing FIRREA's Breaching Provisions**

Dr. Horvitz's failed to account for the TRO, issued in May 1990, that prevented the Government from enforcing any of FIRREA's provisions that were inconsistent with Sterling's alleged contracts. Sterling, 751 F. Supp. at 875. The TRO was followed by a preliminary injunction, whereby, in an opinion dated August 8, 1990, the United States District Court for the Eastern District of Washington enjoined and restrained the Government from taking any regulatory action inconsistent with the Lewis Federal, Tri-Cities, and Central Evergreen contracts. Id. at 881-82. The Government was precluded from enforcing any provision of FIRREA that was inconsistent with the contracts found by the district court, including the Central Evergreen contract, which this Court has subsequently ruled was not breached. Sterling, 72 Fed. Cl. at 411.

The injunction remained effective until April 14, 1992, when the United States Court of Appeals for the Ninth Circuit dissolved it. Sterling, 959 F.2d at 241. At that point, however, Sterling had replaced the contractual goodwill and was in full capital compliance. P-316, p. SG070491810.

Therefore, the injunction permitted Sterling to implement any growth plans that were in place pre-breach, and prohibited the Government from restricting Sterling's ability to implement the plans. Notwithstanding this prohibition, Dr. Horvitz's lost profits model assumes that Sterling suffered damage between July 1990, after the temporary restraining order had been issued, and 1992, the year the court of appeals dissolved the injunction. That alleged damage is in the form of lost earnings on assets that Sterling allegedly would have acquired in the absence of a breach. P-454, table 1.

Dr. Horvitz's assumption is inconsistent with the facts. Sterling could not have been injured while the Government was prohibited from enforcing any of FIRREA's restrictions to the extent that the restrictions were inconsistent with any contract provisions. See Sterling, 751 F. Supp. at 881-82. Therefore, the only potential basis for Dr. Horvitz's assumption is that the Government violated the injunction by enforcing FIRREA's restrictions. Tr. 1516:2-7 (Byrne). At trial, however, the overwhelming evidence demonstrated that the Government did not violate the injunction. To the contrary, OTS expressly conveyed its intent to "strictly obey" the court order to Sterling, P-279, p. WON953 0681, and was acutely aware of its injunctive obligation to honor the contracts. Tr. 2242:11-23, 2245:3-2247:25, 2249:17-2255:10 (Friend); Tr. 3964:9-23 (Hedlund); DX 1077; DX 998.

Further, FDIC, upon learning of the injunction from OTS, did an "about face" and reversed its prior denial of Sterling's request for a brokered deposit waiver because Sterling was deemed to be in compliance with "applicable minimum capital levels," and did not "fall within the definition of an undercapitalized insured depository institution. . . ." P-288.

While OTS required Sterling to report activity that had previously been restricted, Sterling's CEO, Mr. Gilkey, recognized that the reporting requirement did not amount to enforcement of the restrictions. Tr. 626:18-21 (Gilkey). In addition, Mr. Byrne admitted that no one from OTS ever told Sterling that it was required to comply with the restrictions that the agency was enjoined from enforcing. Tr. 1826:18-1827:13 (Byrne). To the contrary, he acknowledged, in a letter to OTS dated July 28, 1990, that Sterling was not required to comply with the restrictions. DX 1078, p. WON939 0204; see also DX 700, p. WON920 1310-11 (Mr. Gilkey's acknowledgment of Mr. Hedlund's view that ". . .because of the Court order, there never were operating restrictions on Sterling, so there is no need to remove such restrictions"); Tr. 1827:13-16 (Byrne); Tr. 1832:19-1834 (Byrne):19; Tr. 1849:8-15 (Byrne); P-288; DX 533.

Notwithstanding these facts, Dr. Horvitz assumed that Sterling was unable to grow its assets while the injunction was in place, and concluded that the breach caused Sterling to earn less than it would have otherwise earned in 1990 and 1991, resulting in damages of approximately $1.3 million. Tr. 4122:6-4123:3 (Bajaj); P-680; P-454, table 1; .[11] Further, the error extends beyond 1991, because Dr. Horvitz assumes that Sterling would have used the

[11] Moreover, Sterling did not suffer significant damage prior to the issuance of the TRO. Dr. Horvitz estimates that, prior to June 30, 1990, Sterling was forced to forgo $28,000 in earnings as a result of the breach. P-454, table 1.

earnings allegedly forgone in 1990 and 1991 to acquire more assets in later years, resulting in additional lost profits. P-454, table 1.

Finally, while the injunction was in place, Sterling never alleged that the Government had failed to comply with the injunction. Sterling's decision not to challenge the Government's conduct while the injunction was pending demonstrates that Sterling either correctly believed the Government was acting within the boundaries of the injunction, or that any transgressions were not material. Alternatively, Sterling's choice not to go to court to enforce its injunction was its own independent business decision. Certainly, Sterling had the right to enforce its injunction if it believed there was a violation Further, Mr. Byrne testified that he consulted with lawyers, but did not ultimately go to court. Tr. 1830:14-1831:2 (Byrne).

The Court should conclude that Sterling may not seek compensation while the injunction was effective. See Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir. 2000) ("If the plaintiff . . . believes that the defendant . . . is failing to comply with the [injunction's] mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned."); Ross-Simons of Warwick, Inc. v. Baccarat, 182 F.R.D. 386, 399 (D.R.I. 1998) (noting that a plaintiff seeking to enforce an injunction must bring an action for civil contempt rather than a separate action for damages).

Sterling did not prove that it lost profits as a result of the breach. Therefore, the Court should reject Sterling's lost profits claim.[12]

---

[12] At trial, some of Sterling's current and former employees, directors, and officers testified about post-FIRREA harm Sterling suffered by the alleged loss of employees, loans, customers, and reputation. See, e.g., Tr. 1009:19-1010:11 (Neely). Such testimony is irrelevant because Dr. Horvitz does not rely upon it in his damages model. Tr. 4309:20-4310:4 (Bajaj). Dr. Horvitz's model measures profits that allegedly would have been earned upon incremental

**3. The Breach Did Not Cause Sterling To Forgo Profitable Opportunities**

Sterling failed to prove that the breach prevented the thrift from pursuing profitable opportunities. In fact, Sterling provided testimony so utterly inconsistent with the premises of Dr. Horvitz's lost profits model that the testimony alone should be sufficient to defeat Sterling's claim.

First, while Sterling considered many potential acquisitions, Mr. Gilkey did not know which acquisitions would or would not have been completed absent the breach, in part because Sterling did not control the entire negotiations. Tr. 551:3-19; see also Tr. 541:7-552:25 (Gilkey). He testified that Sterling had to compete with other institutions upon a bid basis to make acquisitions from the Resolution Trust Corporation (RTC), and that he could not say which RTC deals would have happened absent the breach because RTC could sell to whomever they wanted. Tr. 543:18-546:2; see also Citizens Fin. Servs., FSB v. United States, 64 Fed. Cl. 498, 508 (2005) (rejecting lost profits model proffered by Dr. Horvitz notwithstanding evidence of potential acquisitions due to absence of evidence establishing that acquisitions could have been accomplished profitably), aff'd 170 Fed. Appx. 129 (Fed. Cir. 2006)..[13]

Similarly, Mr. Welch, the investment banker and adviser who held numerous conversations with Mr. Gilkey about potential acquisitions, testified that, after 1991, when he

---

assets, rather than measuring the income that would have been earned on specific loans that Sterling divested or was unable to make.

[13] In addition, Dr. Horvitz admitted that the RTC sales were made in a competitive manner and sold for full market value. Tr. 2729:25-2730:9 (Horvitz).

began his association with Sterling, capital adequacy was not an issue for Sterling in its acquisition activity. Tr. 1635:10-12 (Welch).

Dr. Hamm, one of the Government's economic experts, agreed, opining that the breach did not prevent Sterling from making acquisitions prior to 1991. Dr. Hamm was admitted without objection as an expert in, among other things, economics and the thrift industry. Tr. 3531:22-3532:9, 3534:18-19 (Hamm). He explained that it was speculative for Dr. Horvitz to assume that Sterling could have achieve the growth projected in his models through acquisition of branches or whole thrifts. Thrift acquisitions are difficult to accomplish, uncertain, and not under management control. Tr. 3802:3-23 (Hamm). A successful thrift acquisition requires the potential acquirer to (1) find an institution; (2) model the acquisition to ensure that it makes financial sense; (3) ascertain a purchase price; (4) convince the owner to sell; (5) reach agreement regarding price; (6) outbid competitors; (7) arrange and secure financing (8) meet conditions of any regulatory approval; and (9) gain shareholder approval. Tr. 3803:2-3804:10 (Hamm); DX 3015. In Dr. Hamm's experience as a former thrift executive, 80 to 90 percent of potential acquisitions do not ultimately occur. Tr. 3805:14-24 (Hamm).

Dr. Horvitz's model, moreover, makes no allowance for the payment of a cash premium for the acquisitions he assumes would have occurred. Tr. 3806:21-3807:6 (Hamm). Thrift acquisitions require the acquirer to pay more than fair market value for the acquired asset's net worth. That excess is a premium, and it usually ranges between one and nine percent, although it can reach 15 percent. Tr. 3805:25-3806:20 (Hamm). Such premiums are generally in the form of cash. Id. Consequently, in Dr. Horvitz's "but-for" world in which goodwill counts as

regulatory capital, Sterling would have been no better off, because the goodwill is not tangible, and could not have been utilized to pay a premium. Tr. 3807:7-22 (Hamm).

Similarly, even absent the breach, Sterling would not have been in a better position to acquire assets, either branches or whole thrifts, from the RTC. Tr. 3811:20-3812:7 (Hamm). RTC required bidders to obtain the approval of their primary regulators. In this case, Sterling's primary regulator would have been OTS, and OTS did not allow acquisitions by financially weak institutions. Tr. 3811:20-3812:7 (Hamm). Institutions seeking to make such acquisitions were required to have sufficient tangible net worth to convince OTS and RTC that the acquiring thrift could afford to give up a portion of its net worth to pay a premium. Id. There were instances in which capital compliant thrifts were not permitted to bid because they did not possess the financial strength to support the acquisition. Tr. 3812:8-22 (Hamm).

Moreover, Sterling would not have been a viable candidate for RTC acquisitions, even absent the breach, because it was insolvent on a tangible net worth basis prior to the enactment of FIRREA. Tr. 3813:11-3814:5 (Hamm). As of June 1989, Sterling had tangible net worth of negative 2.6 percent. P-178, p. SG005 2263; Tr. 3819:17-3820:25 (Hamm). Consequently, Sterling did not prove that, absent the breach, it would have been in a position to grow through acquisition.

Dr. Hamm's opinion is consistent with the fact testimony of Mr. Rodney Barnett, a member of Sterling's Board of Directors since Sterling's inception. Tr. 1179:4-8 (Barnett). Mr. Barnett testified that as a regular practice, Sterling's Board would have reviewed data and analyses to determine whether a potential acquisition was in Sterling's best interest. Tr. 1217:16-1219:3 (Barnett). Notwithstanding 17 years of litigation, however, beginning as early as May

1990, Mr. Barnett could point to no documents demonstrating that Sterling contemplated an acquisition which the thrift was unable to consummate because of a lack of capital. Tr. 1220:15-1224:15 (Barnett). Nor did Sterling offer such documentation into evidence through any witness. The absence of documents, which plaintiff admits would have been created in the regular course of its business practice, is proof that Sterling did not lose acquisitions to the breach. Fed. R. Evid. 803(7); See Kaiser Aluminum & Chem. Corp. v. Ill. Cent. Gulf, 615 F.2d 470, 476 (8th Cir. 1980) ("Although the ICG introduced evidence that its normal business practice was to inspect and clean its cars and retain a record of this information, no such records were introduced into evidence. . . . [T]he nonoccurrence or nonexistence of any cleaning or inspection of these cars may be assumed under 803(7).").

Finally, Dr. Horvitz's assumption that the breach caused Sterling to lose profitable opportunities is further undermined by the fact that SFC, Sterling's holding company, raised significant amounts of money, but failed to downstream all of that money to Sterling. Tr. 1743:1-1755:21 (Byrne); Tr. 1760:19-1761:13 (Byrne); Tr. 1762:2-1763:1 (Byrne); See Proposed Findings of Fact No. 71-87. One of the reasons investors formed SFC was to downstream capital to Sterling. Tr. 1743:1-6 (Byrne). Sterling Financial's decision not to downstream all of the capital it raised demonstrates that Sterling did not have additional profitable opportunities. As a result, Sterling failed to prove that the breach caused it to forego profitable opportunities.

### E. The Damages Arising From Dr. Horvitz's Lost Profits Model Are Not Reasonably Certain

Dr. Horvitz testified that, but for the breach, Sterling would have had an additional $15.557 in contractual goodwill available to leverage. P-454, table 4a. In addition, he assumes

that Sterling would have leveraged $10.5 million in capital that it would have raised in December 1989 absent the breach. P-454, table 3a, Column B. Finally, Dr. Horvitz assumes that, had the breach not occurred, Sterling would have leveraged the $4.5 million that it now claims as wounded bank damages. P-454, tables 3c, Columns E and G. All of this additional capital, according to Dr. Horvitz, would have been employed to increase Sterling's asset base up to $427 million larger than the level it actually maintained. P-454, table 1; Tr. 2620:21-2621:3 (Horvitz); Tr. 3537:19-3538:16 (Hamm). Dr. Horvitz concludes that these hypothetical assets would have produced the same rate of return as Sterling's actual assets, resulting in $58.1 million in incremental earnings. Tr. 2039:8-16 (Horvitz); Tr. 2129:3-2130:22 (Horvitz); P-454, table 1.

"In order for [a lost profits] claim to satisfy the reasonable certainty standard, the proof relied upon must be rooted in fact." Castle v. United States, 48 Fed.Cl. 187, 206 (2000), aff'd, 301 F.3d 1328, 1338 (Fed. Cir. 2002). In eight separate cases, where the plaintiff's expert, like Dr. Horvitz, merely assumed that the "but-for" bank would obtain profitable incremental assets, but failed to identify with specificity the profitable opportunities that plaintiff would have acquired in the "but-for" world, this Court has rejected plaintiffs' lost profits claims. See, e.g., Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358 (2005) ("AmFed"); Citizens Fin., 64 Fed. Cl. at 514; LaSalle, 64 Fed. Cl. at 101-04; Standard Fed., 62 Fed. Cl. at 279-81 (2004); Columbia First, 60 Fed. Cl. at 115; S. Cal., 57 Fed. Cl. at 625-27; S. Nat'l Corp., 57 Fed. Cl. at 304-06 (2003); Fifth Third, 55 Fed. Cl. at 241-42. Similarly, the Federal Circuit has held that it is appropriate to deny lost profits claims in Winstar-related cases that assume that growth would have automatically led to profits, see, e.g., Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1378 (Fed. Cir. 2001); that assume that the profitability of a thrift pre-breach is the sole

prerequisite to a lost profits claims, see, e.g., Standard Fed., 62 Fed. Cl. at 279-81; SoCal, 57 Fed. Cl. at 625-27; and that assume that incremental assets earn the same return as actual assets. Citizens Fin., 64 Fed. Cl. at 514.

In fact, Dr. Horvitz's lost profits models have been rejected in each Winstar-related case in which they have been presented. See Citizens Fin., 64 Fed. Cl. at 513-14; SoCal, 57 Fed. Cl. at 598.

As demonstrated at trial and below, Dr. Horvitz's "forgone assets" model suffers from the same flaws that resulted in rejection of such models by this court in the eight cases listed above, as well as other flaws that render it unreliable and speculative as a matter of law.

**1. Dr. Horvitz's Model Is Invalid As A Matter Of Law Because He Fails To Identify Profitable Opportunities That Would Have Been Obtained Absent The Breach**

Dr. Horvitz's conclusion that Sterling's asset base would be up to $427 million larger absent the breach is speculative because his model is, in effect, a "money machine" that does not identify the assets that Sterling would have acquired absent the breach or the liabilities that would have funded those claimed incremental costs.

Dr. Horvitz did not determine the specific asset mix in the "but for" world. Tr. 2616:2-25 (Horvitz). Indeed, he made no effort to identify the assets or liabilities of the "but- for" thrift. Tr. 2616:2-2619:25 (Horvitz). Nor does his model purport to address the nature or cost of any hedging instruments needed to control the interest rate risk associated with the assumed assets and liabilities. Id. In fact, Dr. Horvitz conceded this issue in stating: "I'll agree that there are a million things you say that the model doesn't include." Tr. 2618:10-11 (Horvitz).

Instead, Dr. Horvitz merely assumes that Sterling would have achieved up to $427 million in additional growth absent the breach, and earned the identical return upon the additional assets that the actual bank earned, with absolutely no determination, or even an attempt to determine, how that growth would have been achieved. Tr. 3559:9-21 (Hamm). In so assuming, he fails to consider the following factors, each of which is critical in forecasting profitability: type of assets and liabilities, source of the assets and liabilities, how the assets and liabilities were acquired, the asset's risk rating, the duration of the assets and liabilities, the yield of the assets, and the cost of the liabilities. Tr. 3560:2-3561:16 (Hamm); DX 3007. Further, while Sterling is willing to take interest rate risk, the model ignores this factor, and does not take into account the "hedging" that would be necessary in order to bring interest rate risk exposure within bounds in the "but-for" world. Tr. 3561:17-25 (Hamm); Tr. 3197:21-16 (Potthast).

The absence of these fundamental factors renders Dr. Horvitz's lost profits model invalid as a matter of law because, in a circular fashion, he merely assumes that the but-for thrift would have replicated Sterling's rate of return in the real world, but with a significantly larger asset base. Tr. 3559:9-21 (Hamm). In other words, the model is a "money machine" in which each dollar of capital added to Sterling automatically earns a guaranteed return and adds approximately $20 in additional assets that also earn a guaranteed return. Tr. 3999:23-4001:24 (Bajaj). This is exactly what Dr. Horvitz did in Citizens Fin. - he assumed that additional assets and liabilities would be acquired and did not identify them, because he did not think such identification was necessary. Tr. 2627:19-25 (Horvitz). The Court in Citizens Fin., disagreed, and rejected Dr. Horvitz's model for failure to meet the reasonable certainty requirement. Citizens Fin., 64 Fed. Cl. at 514; Tr. 2636:17-2637:2; see also Fifth Third, 55 Fed. Cl. at 241

(rejecting, upon summary judgment, a model nearly identical to Dr. Horvitz's because the expert failed to identify the investments or opportunities foregone by the thrift); S. Nat'l Corp., 57 Fed. Cl. at 304-06 (same); see also Columbia First, 60 Fed. Cl. at 115 (rejecting lost-profits claim because plaintiff could not prove that it would have acquired more assets absent the breach); Standard Fed., 62 Fed. Cl. at 279-81, 285 (same).

### 2. Dr. Horvitz's Model Is Invalid Because He Assumes That Sterling Would Have Earned The Same Return On Incremental Assets As It Earned On Actual Assets

The evidence undermines Dr. Horvitz's assumption that the but-for thrift would have replicated Sterling's rate of return in the real world. Specifically, the law of diminishing returns undermines Dr. Horvitz's claim that the "but-for" thrift would have replicated Sterling's rate of return. Tr. 4007:17-4013:4 (Bajaj). The law of diminishing returns holds that thrifts borrow their cheapest funds first, and when that source of funds is exhausted, they move to a more expensive source, and when the more expensive source is exhausted, they move to an even more expensive source. Id.; Tr. 2633:7-2635:14 (Horvitz). With respect to assets, firms invest in the most profitable assets first, and then the less profitable assets. Id.

Mr. Gilkey conceded that Sterling obtained the best assets first, and that there was no guarantee that additional assets would perform as well as assets previously acquired. Tr. 489:23-490:14 (Gilkey). Dr. Horvitz conceded that the existence of liabilities ranging in cost from one percent to six percent demonstrated that Sterling was unable to find sufficient liabilities at the lower cost to fund its balance sheet. Tr. 2653:7-14; 2653:25-2654:10 (Horvitz); P-95, p. 34 (Sterling 10-k providing financial information for 1995-1998). He also admitted that, over time,

all banks move to increasingly more expensive sources of funding for their balance sheets. Tr. 2667:6-2668:21 (Horvitz).

Similarly, with respect to assets, Sterling was forced to supplement its loans with mortgage backed securities (MBS) that typically yield less than its average loans. Tr. 2647:6-2648:6 (Horvitz). Further, as a thrift resorts to less desirable assets and liabilities, such as MBS and Federal Home Loan Bank (FHLB) advances, the spread between the cost of the liabilities and return on the assets, narrows to the point where additional investment is no longer justified because the risks would be "far greater than the return." Tr. 2654:11-2658:17 (Horvitz).

Dr. Hamm also opined that the existence of wholesale assets and liabilities (MBS and FHLB advances) on Sterling's balance sheet demonstrated that it was unable to fill its balance sheet with higher yielding assets and lower-cost liabilities. Tr. 3772:18-3775:14 (Hamm); 3775:24-3778:3 (Hamm); DX3012; DX3013. This inability is documented in Sterling Board of Directors and committee minutes that reflect its ongoing difficulty in dealing with competition and acquiring profitable assets. See, e.g., Tr. 505:14-506:7 (Gilkey); DX 738 at WON935 1503; DX 709 at WON920 1291; DX 711 at WON935 2211; DX 710 at WON935 2182; P-81, pp. 6, 7, 37; P-83, pp. 7, 34; P-85, pp. 2, 3, 24; see also Proposed Findings of Fact No. 93-99. Thus, Dr. Horvitz's counterfactual assumptions regarding Sterling's use of leverage render his model speculative.

Moreover, although Sterling operates in a competitive market, Dr. Horvitz did not consider whether the presence of Sterling's competitors would have affected its ability to earn the same rate of return on a larger asset base. Dr. Hamm opined, without rebuttal, that Dr. Horvitz's failure to account for competition in his model rendered it unreliable because it did not reflect the

strong competition for additional assets and liabilities. Tr. 3628:9-3629:2 (Hamm). To increase its asset base, i.e., market share, in the "but-for" world, Sterling would have been forced to take assets and liabilities off the books of its competitors. Tr. 3631:14-3632:17 (Hamm). To do so, Sterling would have had to offer higher deposit rates and lower loan rates. This often results in price wars, thus prompting even higher deposit rates, and even lower loan rates. Tr. 3635:6-3643:5 (Hamm). Dr. Horvitz's makes no allowance for these market forces. Tr. 3643:6-3644:2.

In Southern National, this Court rejected a lost profits model that failed to account for competition, stating that plaintiff's expert "did not believe that competition from other banks 'would have [made] a substantial difference' in the way First Federal obtained additional assets, so his lost profits calculation does not take competition into account." 57 Fed. Cl. at 305. In rejecting the plaintiff's lost profits theory, the Court noted:

> Plaintiffs' counsel at oral argument presented the novel theory that First Federal's presence as a "small player in a very, very large and liquid market" obviated the need for [its expert] to account for competition in his lost profits calculation. Plaintiffs have offered no evidence to support this theory, and the court does not credit it, either as a matter of fact or of common sense.

Id. at 305, n.11 (citations omitted). Dr. Horvitz, like the expert in Southern National, erroneously assumed that competition is irrelevant to his analysis. Tr. 2040:2-15.

Indeed, Dr. Horvitz's assumption that incremental assets earn at the same rate as actual assets has been rejected in the two Winstar-related cases in which Dr. Horvitz presented a forgone assets model. In Citizens Fin., Dr. Horvitz assumed that there were unlimited assets and liabilities available to enable the plaintiff thrift to leverage all of its capital and realize a 1.1 percent return. The Court rejected the model because Dr. Horvitz failed to identify the assets and liabilities that would support such growth, and he failed to take into account the well-established

principle that returns upon incremental assets cannot emulate returns upon existing assets. Citizens Fin., 64 Fed. Cl. at 511-12. Nevertheless, Dr. Horvitz opined in Citizens Fin., that the structure of the foregone assets portfolio did not matter, and the returns he projected would be earned "regardless of what the combination of assets is." 64 Fed. Cl. at 512. The Court rejected his model upon the grounds that it was too speculative, and, in so holding, reasoned that the model suffered from the same flaws that resulted in rejection of similar models upon summary judgment in Fifth Third, Southern National, and Standard Federal. Citizens Fin., 64 Fed. Cl. at 513-14.

At trial, Dr. Horvitz acknowledged that, in Citizens Fin., his model assumed that incremental assets would earn the same rate of return as actual assets. He further acknowledged that the Court rejected his model upon the grounds that such an assumption is speculative as a matter of law and economics. Tr. 2627:5-2629:10 (Horvitz).

In SoCal, the Court again rejected Dr. Horvitz's lost profits model; a model that had much in common with the model he has generated in this case. Specifically, the SoCal model assumed the thrift acquired incremental assets and liabilities without establishing that the assets and liabilities were available or that profits would have been realized upon the incremental assets. SoCal, 57 Fed. Cl. at 625-27. In that case, plaintiff alleged, as Sterling does here, that Dr. Horvitz's approach was conservative. See, e.g., Tr. 2130:2-22. The Court rejected the model nonetheless because it was speculative. SoCal, 57 Fed. Cl. at 626.

Consequently, Dr. Horvitz's assumption that Sterling would earn the same return on its incremental assets as it earned on its actual assets its baseless, rendering his model speculative as a matter of law.

### 3. Sterling's Profitability In The Actual World Does Not Render Dr. Horvitz's Model Reasonably Certain

Sterling's assertions that it was profitable, Tr. 152:6-153:19 (Gilkey), cannot insulate Dr. Horvitz's lost profits claim from being speculative and unreliable. Such assertions ignore Fifth Third, 55 Fed. Cl. at 240-42;[14] Southern National, 57 Fed. Cl. at 303-04; and Standard Federal, 62 Fed. Cl. at 276-77, wherein the Court rejected, upon summary judgment, damages models nearly identical to Dr. Horvitz's because the expert estimated damages by assuming that the additional assets and liabilities acquired by the "but-for" bank would be as profitable as the actual bank, without addressing the composition of the purported forgone assets and liabilities.[15] Similarly, in LaSalle and Columbia First, the Court rejected models based upon the actual profitability of the plaintiff thrifts. LaSalle, 64 Fed. Cl. at 106; Columbia First, 60 Fed. Cl. at 125. Thus, Sterling's profitability in the real world cannot be used as a basis for a lost profits claim in the absence of the evidence demonstrating that it would have been able to acquire the incremental assets and liabilities assumed in the "but-for" world at a rate of return equal to that achieved in the actual world.[16]

---

[14] In Fifth Third, the expert used a return on average assets (ROAA), or measure of profitability, that was lower than the actual bank's, and, therefore, more conservative than the Dr. Horvitz's assumption in this case. The model was nonetheless properly rejected on the grounds that it was speculative. Fifth Third, 55 Fed. Cl. at 228, 240-42.

[15] In addition, such testimony is irrelevant because it ignores the American Federal decision, in which the Court rejected the lost profits model because the plaintiff's expert "did not 'try to identify specific [profitable] opportunities of one kind [or] another'. . .[r]ather, he alleged only that American Federal would have leveraged its lost regulatory capital to 'support additional earnings assets' that would have generated profits." AmFed, 68 Fed. Cl. at 358.

[16] In this case, Dr. Horvitz acknowledged, on direct, that Sterling's earnings have not been "outstanding." Tr. 2139:24-2140:6 (Horvitz).

**4. Sterling's Failure To Meet Its Budgeted Growth Targets Renders Dr. Horvitz's Assumption That Profitable Incremental Assets Would Have Been Available Speculative**

Ample evidence that Sterling was not always able to acquire the assets that it budgeted for in a given year undermines Dr. Horvitz's assumption that, absent the breach, Sterling would have experienced no difficulty in acquiring incremental assets. See, e.g., Tr. 1155:15-1156:9 (Page); Tr. 467:14-17, 759:10-22 (Gilkey); Tr. 840:7-13 (Harlow); see also Proposed Findings of Fact No. 91-92 (demonstrating that Sterling failed to meet its budget in 1995, 1996, 1997, 1999, 2000).

Sterling's use of "stretch" budgets does not overcome this flaw in Dr. Horvitz's model. As Mr. Byrne admitted, Sterling would not create a budget it could not achieve. Tr. 1732:23-1733:13 (Byrne). In addition, Stephen L. Page, Sterling's Executive Vice President and Credit Officer, testified that Sterling would not budget for more loans receivable than it had the capital to hold. As a result, in those years that Sterling did not meet its "stretch" budget, any constraint upon Sterling's growth was not the result of a capital shortage. Tr. 1155:15-1156:8 (Page).

**5. Dr. Horvitz's Model Ignores The Fact That Sterling Has Maintained Excess Regulatory Capital Since 1992**

In assuming that, absent the breach, Sterling would have leveraged the contractual goodwill and earned profits, Dr. Horvitz ignores the fact that, between 1992 and 2006, Sterling continuously held excess core capital.

Between 1992 and 1996, Sterling maintained core capital in excess of the level needed to meet FDICIA's "well-capitalized" standard. 12 C.F.R. § 565.4 (1993); Tr. 4160:8-16 (Bajaj); DX 3517; Tr. 3842:14-3844:16 (Hamm). In each year between 1996 and 2006, Sterling held

excess core capital of at least 100 basis points (i.e., one percent) over the level needed to meet the "well-capitalized" standard. Tr. 3841:23:3844:1 (Hamm); DX 3019; P-454, table 1, Column C and table 2a. Further, the cushion was 300 basis points in excess of the statutory minimum, and 200 basis points in excess of FDICIA's "adequately capitalized" level. Tr. 3842:11-3844:1 (Hamm).

Dr. Hamm demonstrated that this excess regulatory capital demonstrates that there were insufficient profitable opportunities for Sterling to employ the regulatory capital it maintained in the actual, purportedly breach-affected world. Tr. 3842:14-3844:16 (Hamm). Therefore, it is implausible for Dr. Horvitz to assume that, in a no-breach world, Sterling would have earned additional profits.

Sterling maintained excess tangible and risk-based capital, as well. Between 1992 and 1997, the only years for which data are available in Sterling's annual reports, Sterling exceeded FIRREA's minimum tangible capital requirement of 1.5 percent. Tr. 4158:21-4159:9 (Bajaj); DX 3516. In each of those years, Sterling's tangible capital level was at least four percent. DX 3516.

Moreover, between 1992 and 2006, Sterling continuously maintained risk-based capital above ten percent, the level needed to achieve "well-capitalized" status under FDICIA. Tr. 4161:2-12 (Bajaj); DX 3518.

Dr. Horvitz's failure to account for Sterling's excess regulatory capital and its inability to leverage that capital is inconsistent with his assumption that Sterling, given the opportunity, would have leveraged the contractual goodwill eliminated by FIRREA. Indeed, this court rejected another model, co-sponsored by Dr. Horvitz, precisely because, the breached thrift had

excess capital and was not taking advantage of the opportunities alleged in its model. This demonstrated that the alleged opportunities "either do not exist, or are not as profitable as the model would suggest." Glendale Federal Bank v. United States, 43 Fed. Cl. 390, 401 n.3 (1999), aff'd in part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001). Therefore, Dr. Horvitz's model is speculative and fails to meet the reasonable certainty test, which requires that damages claims be "rooted in fact." Castle, 48 Fed.Cl. at 206, aff'd, 301 F.3d at 1338.

### 6. Dr. Horvitz Incorrectly Assumes That Growth Equates With Profits

Dr. Horvitz also assumes that increased assets in the "but for" world will result in increased profits. This is contrary to this Court's holdings and to Sterling's actual experience. In SoCal, the Court rejected Dr. Horvitz's lost profits model in part because it found this assumption to be speculative. 57 Fed. Cl. at 626 (". . .most importantly, growth does not necessarily equal profits."). Further, Mr. Welch testified that there is no statistical correlation between growth and profitability. Tr. 1648:16-1649:6. (Welch). To the contrary, Mr. Welch testified, size is not a factor he would evaluate in measuring profitability. Tr. 1648:16-1649:6. (Welch).

The testimony and evidence in this case shows that greater asset size did not equal greater profitability for Sterling. In 1989, prior to the breach, Sterling possessed approximately $731 million in assets, yet its earnings were less than $1 million. In 1991 and 1992, Sterling shrunk its asset size, yet its net earnings were twice as large and four times as large, respectively, as they ever had been in the thrift's history. Tr. 4125:10-4126:20 (Bajaj): DX 3502.[17] Mr. Gilkey

[17] As Dr. Bajaj demonstrated, Sterling achieved such profitability without growth by originating fixed-rate loans and selling them back into the marketplace without including them on the balance sheet. This strategy was profitable because, between 1990 and 1993, interest rates

acknowledged that Sterling was more profitable after it shrunk. Tr. 485:15-486:8 (Gilkey); see P-454, Ex. 3 ($730 million asset bank realized $981,000 in net income in fiscal year 1989, but $640 million asset bank realized $4.74 million in net income in fiscal year 1992). Consequently, there is no credible evidence that Sterling suffered lost profits as a result of its shrink. Tr. 4126:21-4127:10 (Bajaj).

Thus, both facts and case law undermine Dr. Horvitz's assumption that an increase in size equates with additional profits. In addition, this Court has previously rejected a lost profits model based upon assumptions similar to Dr. Horvitz's, because the fact of the shrink did not provide the "missing elements" of the model, i.e., the business opportunities that would have been pursued absent the breach. Fifth Third, 55 Fed. Cl. at 242.

### 7. The Assumed Capital Ratios In Dr. Horvitz's Model Are Speculative

Before the Court held that FIRREA's elimination of Sterling's noncontractual Central Evergreen goodwill from regulatory capital was not a breach, Dr. Horvitz estimated lost profits damages at approximately $80 million. Dr. Horvitz based that estimate, in part, upon his assumption that, absent the breach, Sterling would have maintained regulatory capital at the levels projected in its pre-breach business plan, to which he believes Sterling was contractually bound. Tr. 2772:11-2774:7, 2773: 13-23, 2774: 4-18 (Horvitz).

---

fell precipitously (over 400 basis points) and thrifts did not want to keep fixed-rate loans on their books because such loans increased interest rate risk (IRR) exposure. Tr. 4170:11-4172:5, 4175:5-4176:4 (Bajaj); DX 3523. Thus, while its balance sheet was shrinking, Sterling was still profitably originating loans. This demonstrates that balance sheet size is not an indicator of profitability. Tr. 4167:19-4169:23 (Bajaj); DX 3521. Further, while Sterling's earnings were not stellar in 1990, that was due to a writedown, required by the regulators, to account for weaknesses in asset quality that existed in prior years. If the problems had been detected earlier, Sterling would have experienced superior performance in 1990 as well as 1991 an 1992. Tr. 4125:10-4126:20 (Bajaj).

The business plan required Sterling to maintain minimum capital ratios of 4.16, 4.15, and 4.24 for the years ending in December 1989, June 1990, and June 1991, respectively. P-196, p. PSG029 1135, 1137; Tr. 3577:1-17 (Hamm). In his most recent report, and at trial, Dr. Horvitz generated $58.1 million in damages, even assuming that the Central Evergreen goodwill was not contractual. P-454, table 1. This estimate depends upon his new assumption that, absent the breach, Sterling would have maintained regulatory capital at levels lower than the levels specified in the pre-breach business plan. Tr. 2774:8-2776:24 (Horvitz). The assumed capital ratio is 4.0 for the years ending December 1989, June 1990, and June 1991. P-454, table 3a, Column A; Tr. 3577:1-17 (Hamm); DX 1081.[18] Although the change in ratios appears slight, when applied to the model, it greatly increases damages because the assets added to "but-for" Sterling's books in 1989, 1990, and 1991 have, over time, a large cumulative impact on its profitability. Tr. 3583:21-3584:17 (Hamm). The small decrease in the capital ratios, alone, increases Dr. Horvitz's lost profits estimate from $34.265 million to $58.1 million. Tr. 3582:15-3583:3, 3754:15-3755:25 (Hamm); Tr. 2763:5-11, 2774:8-24 (Horvitz).

Dr. Horvitz offers no real explanation for his manipulation of capital ratios over the various iterations of his model. Instead, he cloaks these changes in a new assumption: that, in a "but for" world in which the Central Evergreen goodwill did not count as capital, Sterling would

[18] DX 1081 reflects that, in three separate reports issued in 2001, 2004, and 2006, Dr. Horvitz used progressively lower capital ratios in calculating the return on the incremental assets. Although he used the business plan's ratios of 4.16, 4.15, and 4.24 as the basis for both the 2001 and 2004 reports, the actual ratios used in 2001 were much higher (4.39, 4.30 and 4.34) because his model utilized a capital constraint and growth constraint in determining asset growth for a year. In the 2001 report, the growth constraint kicked in before the capital constraint. Tr. 3577:1-17, 3578:10-3579:15 (Hamm). The practical effect of this is that Dr. Horvitz's capital ratios decreased twice, i.e., between the 2001 and 2004 reports, and between the 2004 and 2006 reports, thus maximizing damages.

have maintained less regulatory capital. Tr. 2774:8-2776:24 (Horvitz). This assumption is speculative. Sterling provided absolutely no evidence, testamentary or documentary, that would lead to the conclusion that its capital level in a "but- for" world wherein all goodwill counted toward capital would be different from that maintained in a "but for" world in which only the Tri-Cities and Lewis Federal goodwill counted as capital.

Further, our expert, Dr. Hamm, demonstrated that, in a "but-for" world, a reasonable thrift would not have maintained less capital. First, the regulation was more stringent after FIRREA; therefore, even if Sterling still possessed the contractual goodwill, it would have desired a larger capital cushion in order to insulate itself from the regulatory consequences of noncompliance with the minimum capital ratios. Tr. 3596:9-3598:21, 3604:19-3605:20 (Hamm).

Second, Dr. Horvitz's assumption that Sterling would have decreased its capital cushion in order to meet its asset targets is at odds with the way the thrift industry works. Thrifts determine their capital cushion, and then base their asset size upon maintenance of that cushion. Tr. 3609:1-3610:25 (Hamm). Even growth-oriented thrifts, like Sterling, operate in that manner, as evidenced by the March 1988 business plan. The plan explained that, in the case of unforeseen events, Sterling would take certain actions to increase regulatory capital. This demonstrated its intention to decrease risk, rather than increase risk by sacrificing its capital cushion to achieve growth. Tr. 3611:1-3615:1 (Hamm); P-194, p. 9.

Finally, Dr. Hamm opined that the regulators would have been concerned about, and not easily acquiesced to, a change in business plan that increased risk. This was particularly applicable to Sterling, which was insolvent on a tangible book basis prior to FIRREA's enactment. Tr. 3616:14-3617:3, 3618:12-3619:9 (Hamm).

Therefore, Dr. Horvitz's assumption is baseless, and his arbitrary change to the capital ratios that would be maintained in Sterling's "but-for" world renders his model speculative as a matter of law.

**8. Dr. Horvitz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages To Create Lost Profits**

Dr. Horvitz adds to his lost profits model the wounded bank damages presented by Sterling through Mr. Byrne. Tr. 2127:8-2128:2 (Horvitz); P-454, Ex. 6, table 3-d. As discussed further in the wounded bank section of this brief, Sterling has not proven it is entitled to these wounded bank damages. Thus, Dr. Horvitz's addition of these damages into his model is in error and precludes his damages calculation from being reasonably certain.

In addition, as a matter of law, even if Sterling could prove its wounded bank damages, it is not entitled to lost profits upon such wounded bank damages, which are consequential in nature. In essence, by including these damages, which grow from year to year, Sterling is asking for an extreme form of pre-judgment interest upon its wounded bank damages. Prejudgment interest is barred as a matter of law. 28 U.S.C. § 2516(a); Library of Congress v. Shaw, 478 U.S. 310, 317 (1986); District of Columbia v. United States, 67 Fed. Cl. 292, 341 (2003) ("No matter what term plaintiff uses, compensation for the belated receipt of money violates the no-interest rule absent an express statutory waiver of sovereign immunity from liability for interest.").

In this case, the $4.6 million in wounded bank damages alleged by Sterling, when plugged into Dr. Horvitz's model, results in an additional $34.6 million of lost profits. This result is arbitrary and speculative on its face, and further demonstrates that the model is merely a

"money machine," generating enormous profits for each dollar added. Tr. 4114:21-4116:10 (Bajaj); DX3546; DX 3577.

For these reasons, the Court should reject Dr. Horvitz's lost profits model.

## III. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES BECAUSE DR. JAMES'S MODEL REFLECTS HYPOTHETICAL, RATHER THAN ACTUAL, COSTS TO RAISE REPLACEMENT CAPITAL

At trial, Dr. James, offered, as an alternative to Dr. Horvitz's lost profits model, a "mitigation" theory for measuring damages. This theory purported to measure the actual costs of replacing the contractual goodwill eliminated by FIRREA. The Court should reject this claim because the model, which is hypothetical in nature, has been repeatedly rejected by this Court and the Federal Circuit. See, e.g., Granite Management Corp. v. United States, 58 Fed. Cl. 766, 778-79, aff'd in part and remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005). Instead, the Court should award Sterling $900,204, the transaction costs associated with Sterling's actual replacement of its contractual goodwill. Tr. 4097:20-4098:10; 4264:6-4265:1 (Bajaj); P-672.[19]

Dr. James's "mitigation" theory, which purports to measure Sterling's actual costs of replacing its goodwill, acknowledges that Sterling successfully raised approximately $21 million of regulatory capital in the form of common stock, and converted $2.1 million of Series B preferred stock to common stock, in November of 1991. P-647A. It is undisputed that, after the 1991 capital raising, Sterling achieved compliance with all of the FIRREA's capital ratios, and never fell out of compliance thereafter. Tr. 4140:23-4141:22 (Bajaj); P-84, p. 2; DX 3509.

---

[19] Although Dr. Bajaj agrees that Dr. James's estimate of the transaction costs in the amount of $900,204 is "approximately the correct number," he disagrees with Dr. James's methodology. Tr. 4098:4-4102:5 (Bajaj); see footnote 20 below.

In calculating damages, however, Dr. James does not attempt to calculate the actual costs associated with the common stock offering that occurred in 1991. Further, he does not acknowledge that Sterling achieved regulatory compliance, in part, merely by converting $2.1 million of existing preferred stock to common stock at no cost. Instead, he assumes that Sterling issued preferred stock with a set coupon rate in 1991. Dr. James using the preferred stock dividend coupon rate as a "proxy," estimates damages. Tr. 2875:21-2876:22 (James); P-500, p. 11 (James 2004 Report ". . . Consider if instead Sterling had issued preferred stock in 1991. . .")

In raising $23 million, Sterling exceeded the $13.3 million of contractual goodwill remaining at that time. P-460. Nonetheless, Dr. James assumes, for purposes of calculating damages, that full mitigation does not occur until 1993, when SFC raised $17.25 million and downstreamed $12.9 million to Sterling in exchange for preferred stock. P-460; P-86, p. 0063142.

In support of this assumption, Dr. James claims that $12 million of the $23 million raised through the common stock offering should be ignored because Sterling had unsuccessfully attempted to raise that amount of capital in 1989. DX 1047, p. 6; P-460, column [d]. He also allocates a portion of the 1991 proceeds to replacement of the noncontractual Central Evergreen goodwill. P-460, column [h]; DX 1047, pp. 6-7.

Based upon these faulty assumptions, he then assumes that Sterling replaced $7.5 million in contractual goodwill in its 1991 common stock offering, and the remaining, $4 million in contractual goodwill in 1993, when it issued preferred stock to SFC at a dividend coupon rate of 10.75 percent. Tr. 4017:4-17; 4058:20-4059:23 (Bajaj); P-658; P-659. On that basis, he estimates the costs of replacement at $9.115 million. P-668. In addition, Dr. James uses Dr.

Horvitz's methodology to calculate lost profits prior to replacing the contractual goodwill. Dr. James opined that Sterling lost $4.137 before mitigation. P-653. In addition to the $900,204 in transaction costs, Dr. James includes $4.556 million in wounded bank damages, for a total damages estimate of $18.708 million. P-457. He also calculates "future" lost profits, i.e., those beyond 2006 at $640,700. P-465 (included in Horvitz's damage estimate at P-534).

At trial, for the first time, Dr. James also presented a "thought experiment' that assumed that Sterling replaced all of the contractual goodwill in 1991, when it issued common stock, thus eliminating the need for the 1993 preferred stock issuance for purposes of mitigation. Tr. 2952:21-2593:22 (James); P-678A. This change of assumption has the net effect of decreasing Dr. James's "mitigation" damages claim by $2.4 million, to $16.3 million, to yield his "mitigation" damages. P-680.

The Court should reject Dr. James's hypothetical cost of replacement damages for two reasons. First, basic financial economics recognizes that the only costs associated with capital raising are transactions costs. Second, even assuming that, under certain circumstances, the actual cost of raising replacement capital can exceed transaction costs, LaSalle, 317 F.3d at 1374-75, Sterling cannot meet the standard established by the Federal Circuit in LaSalle because the costs asserted here are not "actual." To the contrary, Dr. James's hypothetical model is virtually indistinguishable from the hypothetical models sponsored by Dr. James and rejected by this Court in LaSalle, Fifth Third, and Granite.

### A. The Court Should Reject Dr. James's Mitigation Theory Because The Only Costs Associated With Raising Capital Are Transactions Costs

Basic financial economics recognizes that investment in securities has zero net present value. Tr. 4017:18-4018:20 (Bajaj). Thus, if a company issues $11 million in stock, it provides the investors with a cash flow of $11 million and receives $11 million in return. Id. Dr. Horvitz acknowledged that this principle is correct. Tr. 2605:24- 2606:26 (Horvitz). Further, the principle has been affirmed by the Federal Circuit in both Glendale, 43 Fed. Cl. at 401-02 (1999), and CalFed, 245 F.3d at 1350. Therefore, the only damages Sterling is entitled to are the $900,204 in transaction, or flotation, costs associated with the capital raising. Tr. 4097:20-4098:10; 4264:6-4265:1 (Bajaj); P-672;[20] see CalFed, 245 F.3d at 1350; see also Bank United, 50 Fed. Cl. at 665.

Like the cost-of-replacement models this Court rejected in other Winstar-related decisions, Sterling's mitigation model generates estimates that suggest damages are nearly equal to the total amount of contractual goodwill excluded from Sterling's regulatory capital. Dr. James's model estimates the hypothetical cost of raising $13.3 million in capital as approximately $10 million. Tr. 2893:11-2894:14 (James); P-650. In Dr. James's model, a dollar of goodwill is worth nearly a dollar in cash. In Bank United, this Court recognized that a model

[20] Dr. James originally attributed $900,204 to transaction costs. P-672. Dr. Bajaj agreed that this was a reasonable number but never agreed with Dr. James's methodology. Tr. 4098:4-15. The correct way to determine the transaction costs is to look at Sterling securities filings. In its offering memorandum, Sterling was required to declare all costs of issuance. Tr. 4099:10-13 (Bajaj); DX 913 at 1. Sterling paid $.61 per share in transaction costs. That price covered more services than merely transaction costs, so using that price inflates damages. Given the price of shares issued, Sterling needed about 1.47 million shares to replace the goodwill. At 61 cents per share, the thrift paid approximately $900,000 to replace the contractual goodwill. Tr. 4099:2-4102:5 (Bajaj); DX 913 at 1.

generating estimated costs of substitute capital at even 50 cents on the dollar was "absurd on its face." Bank United, 50 Fed. Cl. at 655-56. The Court should reject Dr. James's model because he assumes estimated costs (i.e., approximately 75 cents on the dollar) well in excess of those deemed by the Court to be "absurd" in Bank United. Consequently, Sterling is entitled to no more than the transaction costs associated with replacement of its contractual goodwill.

### B. The Court Should Reject Dr. James's Mitigation Damages Theory Because It Is Based Upon A Hypothetical Regulatory Capital Replacement Cost

Even assuming that, under certain circumstances, the actual cost of raising replacement capital can exceed transaction costs, LaSalle, 317 F.3d at 1374-75, Sterling cannot meet the standard established by the Federal Circuit in LaSalle because Dr. James's model is hypothetical.[21] To the contrary, The Federal Circuit's decision in LaSalle further supports dismissal of Sterling's hypothetical model. While rejecting the trial court's conclusion that dividend payments could not be a "cost of capital" merely because they are not legally obligatory, in LaSalle the Federal Circuit expressly agreed with the trial court's rejection of Dr. James's replacement capital calculations that were not based on "actual" payments:

> We too do not adopt this calculation, for it does not reflect the

[21] Prior to December 2006, Sterling also maintained claims for restitution, reliance, and hypothetical replacement cost of capital damages. Sterling acknowledged, however, at a status conference held on December 15, 2006, that these theories are barred by precedent of the United States Court of Appeals for the Federal Circuit, and did not present them at trial. See, e.g., Fifth Third Bank v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005); Glendale, 239 F.3d at 1381. Sterling's "mitigation" theory merely recycles the hypothetical replacement cost model of damages that Sterling chose not to pursue at trial because it is barred by precedent of the Federal Circuit and this Court. The only difference between the two models is that the mitigation model assumed replacement in 1991 and 1993, while the prior replacement model assumed that replacement occurred in 1989. Conceptually, they are the same. Tr. 4062:8-4069:1 (Bajaj); DX 3568.

> actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

LaSalle, 317 F.3d at 1375 (emphasis added); see also Fifth Third, 55 Fed. Cl. at 242 (rejecting hypothetical cost of replacement model presented by Dr. James); Franklin Federal, 55 Fed. Cl. at 134-39 (dismissing hypothetical cost of replacement theory upon summary judgment after recognizing Winstar authority rejecting these models as "absurd on their face," "not credible," and "inherently odd"); Columbia First , 54 Fed. Cl. at 697-99 (rejecting cost of replacement theory at summary judgment because it was hypothetical and not based on costs actually incurred); see also Bank United, 50 Fed Cl. at 655-56.

This Court has rejected, upon summary judgment, alleged "actual" cost of replacement theories where the plaintiffs calculated "actual" damages by assuming a strategy that was not the one chosen by the thrift to replace regulatory capital lost due to FIRREA. For instance, in Granite, 58 Fed. Cl. at 777, the Court rejected a purported "actual" cost of replacement model that was "inconsistent with the manner in which plaintiff allegedly replaced its supervisory capital. . . ." In that case, the thrift replaced regulatory capital through a cash infusion from its parent company, while its cost of replacement model, presented by Dr. James, was based upon a hypothetical preferred stock issuance. Id. The Court rejected the model because Dr. James had used a preferred stock issuance as a "proxy" for estimating the costs of a the capital infusion from the parent company to the thrift:

> The court is cognizant of the fact that plaintiff's model is offered as a proxy for the costs it alleges were incurred. The fatal flaw in plaintiff's argument and its implementing model, however, is that they fail to "reflect the [plaintiff's] actual experience. [citation omitted] Dr. James' model in this case, therefore, presents the

> same concerns as his model that was rejected by the Federal Circuit in LaSalle Talman. . . . Plaintiff's "actual experience" involved a capital infusion that replaced the supervisory capital that had been eliminated. Plaintiff was in possession of $250 million in cash as opposed to an approximate equivalent in supervisory capital, and could continue its operations. Plaintiff was not constrained from investing the money and earning a return on it. Plaintiff also benefitted from the infusion as it was not required to, nor did it, ever make any dividend payments.

Granite, 58 Fed. Cl. at 779, aff'd, 416 F.3d at 1381-82; see also Citizens Fin., 57 Fed. Cl. at 71 (in which the Court rejected a "hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy").

Dr. James's model in this case suffers from the same "fatal flaw." Here, plaintiffs achieved regulatory compliance in 1991 by raising approximately $21 million in common stock and converting $2.1 million of preferred stock to common stock. At trial, Dr. James conceded that Sterling did not pay dividends on the common stock issued in 1991 between issuance and 2004. Tr. 3054:4-7 (James); P-500 (James 2004 report), p. 11; see also Tr. 4021:1-15 (Bajaj).[22] He further conceded that the costs he calculated are not identified in any of Sterling's financial data. Tr. 3057:18-3058:22 (James). Instead, Dr. James acknowledged, he utilized the 1993 preferred stock issuance by Sterling to its holding company as a "proxy" for the costs associated with the 1991 common stock offering. Tr. 2876:5-7, 3051:15-17 (James); P-500, pp. 11-12.

This hypothetical model, which assumes a preferred stock issuance that involved

---

[22] In 2005, Sterling commenced the payment of dividends on its common stock. Tr. 1775:3-9. (Byrne); P-103, p. SG100 3530. Dr. James, however, does not offer those dividends as a basis for an award of damages. In fact, the payments are de minimus, and, even if considered as actual costs, would result in no damages because the cash benefits of the capital raised would far exceed the amount of dividends paid on the common stock. Tr. 4021:1-15, 4022:16-4023:18. 4047:8-22; 4049:10-22 (Bajaj). Indeed, the payment of the dividends commenced before he issued his most recent expert report, in December 2006.

dividends, instead of a common stock offering upon which dividends were not paid, must be rejected on the same grounds that the model was rejected in Granite - because it is not based upon Sterling's actual experience. If, in fact, there were actual dividends, over and above transaction costs, associated with the 1991 common stock offering, then Dr. James would not have asked the Court to substitute a preferred stock offering as a "proxy" or "estimate" of actual costs. Tr. 2875:21-2876:7, 3051:15-20 (James); P-500, p. 11.

Dr. James's reliance upon nonexistent preferred stock dividend payments as a basis for damage is equally invalid with respect to Sterling's conversion of $2.1 million of preferred stock to common stock. Sterling raised the $2.1 million in preferred stock prior to FIRREA's enactment, and, in 1991, converted the preferred stock, which paid dividends, to common stock, which did not. Therefore, Dr. James's assumption that this conversion of capital that Sterling already possessed resulted in damage is groundless.

Finally, as described above, Dr. James offered two mitigation damages estimates. One estimate, presented for the first time at trial, assumes that Sterling fully mitigated through its 1991 offering of common stock. Under this approach, Dr. James estimates damages based entirely upon a dividend rate associated with Sterling's 1993 issuance of preferred stock to SFC. Tr. 2959:9-2960:4 (James). As demonstrated above, that estimate is entirely hypothetical in nature, and must be rejected upon that basis.

Dr. James's second estimate assumes that the contractual goodwill was partially replaced in 1991, with the remaining $4 million replaced in 1993 through the preferred stock offering. Tr. 4017:4-17; 4058:20-4059:23 (Bajaj); P-658; P-659. Dr. James's erroneously creates damages by assuming that part of Sterling's 1993 preferred stock offering constitutes mitigation, when

Sterling had already achieved capital compliance in 1991 through its common stock offering and conversion of preferred stock to common stock. As a preliminary matter, the Court should reject as baseless Dr. James's claim that $12 million of the $21 million in capital raised in 1991 should not be considered mitigation because it was intended to replace a capital offering that would have occurred in 1989 absent a breach. Tr. 2908:18-2909:16 (James). Sterling offered no evidence to support that assertion.

To the contrary, it is clear that the purpose of the 1993 preferred stock offering was not to replace contractual goodwill eliminated by FIRREA. The prospectus for the offering stated that, as of September 30, 1992, Sterling already "exceeded all regulatory capital requirements, including requirements . . . scheduled to be phased in through December 31, 1994." P-316, p. 10. Further, Mr. Gilkey acknowledged that the 1991 offering had resulted in recapitalization. Tr. 583:11-18 (Gilkey).

Even assuming, however, that $4 million of contractual goodwill eliminated by FIRREA was replaced in 1993 through the issuance of preferred stock, Sterling is not entitled to damages. It is well-established that, in calculating actual cost-of-replacement damages, the costs associated with actual dividends paid must be offset by the corresponding benefits gained through the investment of the cash raised to replace goodwill. LaSalle, 317 F.3d at 1375. The corresponding benefits on the $7.57 million that Dr. James claims to be replacement capital for the common stock offering began to accrue in 1991. P-658. As stated above, there is no cost associated with that replacement capital. According to Dr. James's own analysis, however, Sterling enjoyed a

cash benefit of about 7 percent.[23] Tr. 4059:24-4061:24 (Bajaj); P-459. This offsetting benefit of Sterling's capital raising exceeds the cost associated with the $4.04 million of capital allegedly replaced in 1993. Tr. 4059:24-4061:24 (Bajaj). The net cost of the capital replacement, even if the Court assumes that a portion of the mitigation occurred in 1993, is negative. Tr. 4059:24-4061:24 (Bajaj). Consequently, Dr. James's cannot create "actual" damages by assuming that a portion of the 1993 offering replaced contractual goodwill eliminated by FIRREA.

Finally, the Court should reject Dr. James's "future" replacement damages for an additional reason. In calculating "future" damages, Dr. James estimates the benefits of replacement capital raised by discounting to the present using a risk-free Treasury rate to measure the benefit, rather than a projection of what Sterling will actually earn upon investments made with the cash it raised. Tr. 4075:21-4076:4 (Bajaj). This method of calculation is contrary to the basic economic principle that, in valuing future cash flows, an appropriate risk must be assigned to the cash flow, as acknowledged by Dr. Horvitz. Tr. 2605:24-2606:13 (Horvitz). Dr. James failed to assign an appropriate risk in performing the discounting required to estimate future damages. If the proper rate had been applied, the future damages would have been zero. Tr. 4078:6-4079:20 (Bajaj).

For these reasons, the Court should reject Dr. James's mitigation model as a matter of law.

---

[23] The cash benefit rates used by Dr. James for the period between 1991 and 2006 ranged from 4.96 percent to 9.29 percent, for an average of approximately 7 percent. P-459, column [5].

**C. Dr. James's Lost Profits Suffers From A Series Of Errors That Render It Speculative And Unreliable As A Matter Of Law**

Dr. James's estimate of lost profits is consistent with Dr. Horvitz's model and invalid for the same reasons. Tr. 4232:13-020 (Bajaj); DX 3561; Tr. 3583:4-20 (Hamm). In addition, Dr. James's lost profits estimate suffers from a series of errors that are unique to his model.

In his model, which measures lost profits through the date of mitigation, Dr. James assumes a "but-for" leverage ratio for 1991 that is both inconsistent with the ratio assumed by Dr. Horvitz and lower than the leverage ratio Sterling chose in the actual world. While Dr. Horvitz assumed that the "but-for" Sterling would have maintained a core capital ratio of 5.5 percent as of June 30, 1992, Dr. James assumes that it is only five percent. Tr. 4233:17-4234:4 (Bajaj); DX 3562. Correction of this error alone would reduce Dr. James's lost profits from $4.137 to $3.3 million. Id. Further, in the actual world, Sterling maintained a core capital ratio of 5.71 percent as of June 30, 1992. If five percent was appropriate, as claimed by Dr. James, then Sterling did not need to forgo any assets, as it could have leveraged an additional 71 basis points (i.e., .71 percent of capital). Sterling's failure to do so demonstrates that it had no further profitable opportunities. Tr. 4234:18-4236:2 (Bajaj); DX 3563.

Second, Dr. James's model is internally inconsistent. In one of the model's iterations, Dr. James assumes partial mitigation in 1991 and full mitigation in 1993. Nonetheless, he continues lost profits beyond 1991 in a manner that assumes that no capital replacement occurs prior to 1993. This is a mathematical error that renders his model unreliable. Tr. 4236:22-4237:25 (Bajaj); DX 3564.

Finally, Dr. James erroneously includes all of the noncontractual Central Evergreen goodwill in his "but-for" bank and simultaneously assumes that Sterling replaced the goodwill, resulting in a double counting that permits Sterling to leverage the Central Evergreen goodwill twice and artificially inflate damages. Tr. 4240:25-4242:1 (Bajaj); DX 3566; see also Tr. 3015:17-3019:24, 3020:14-20, 3022:3-18 (James).

**D. Sterling Is Not Entitled To A Tax "Gross-Up"**

Sterling's claim for a tax "gross-up" of its purported cost-of-replacement damages is counterfactual and contrary to law. Resting on the testimony of Dr. James, an expert witness never qualified in either accounting or corporate taxation in this action, Tr. 2820:22-2822:5 (James), and with admittedly has no expertise in these areas, Tr. 3062:6-13 (James), Sterling failed to prove its entitlement to a tax gross-up with reasonable certainty.

Sterling's claim fails for several reasons. First, an award of cost-of- replacement damages would represent a recovery that is excludable from taxable income. Second, even assuming such damages are taxable, awarding a tax gross-up is beyond this Court's authority. Third, a tax gross-up would constitute an unfair windfall to Sterling.

**1. Sterling's Tax Gross Up Claim Is Speculative And Unfounded**

"[A] tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." Carabetta Enters., Inc. v. United States, 482 F.3d 1360, 1367 (Fed Cir. 2007) (tax gross-up claim denied for failure to prove entitlement to a tax gross-up of alleged damages). When a plaintiff fails to prove with reasonable certainty that a damages award would be treated as taxable upon receipt, Federal Circuit precedent holds that a tax gross-up may not be granted. Home Sav. of Am., FSB v. United States, 399 F.3d 1341, 1356

(Fed. Cir. 2005) (finding "a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable," and reviewing trial court's determination for clear error); LaSalle Talman Bank, F.S.B. v. United States, 462 F.3d 1331, 1338 (Fed. Cir. 2006).

At trial, Dr. James assumed that Sterling's claimed cost-of-replacement damages would be taxable upon receipt. Tr. 2943:10-24 (James). To this end, Dr. James used a 37 percent tax rate to gross up a 10.75 percent dividend yield rate that he imputed on a hypothetical preferred stock offering. Tr. 3061:6-19 (James). Under Dr. James's damages model, the dividends on this hypothetical preferred stock offering were used as a proxy for Sterling's purported cost of replacement capital. If we accept Dr. James's assumption that these hypothetical dividends reflect costs actually incurred by Sterling,[24] then any recovery of these costs would be excluded from taxable income.

"Inherent in [§ 61] of the Code is the concept of economic gain. For a taxpayer to have income under section 61, there must be an economic gain that benefits the taxpayer personally." Rev. Ruling 81-277 (citing United States v. Gotcher, 401 F.2d 118 (5th Cir. 1968)). Thus, when a monetary recovery merely restores a taxpayer to his original economic status, there is no "accession to wealth," and any recovery is non-taxable. Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

Because Sterling's claimed cost-of-replacement damages would replace a previously incurred cost of Sterling, any recovery of such damages would merely restore Sterling to its

[24] If Dr. James's assumption is incorrect, and the hypothetical dividends do not reflect an actual cost of Sterling's replacement capital, then Sterling is not entitled to either its claimed cost-of-replacement damages or a tax gross-up.

original economic status, and therefore, be excluded from the definition of "gross income" found at 26 U.S.C. § 61. Id.; see also Rev. Ruling 81-277. It is unlikely that the IRS would treat Sterling's cost-of-replacement damages as taxable income. To be sure, Sterling presented no evidence supporting Dr. James's assumption that Sterling's claimed cost-of-replacement damages would be taxable, and legal authority clearly demonstrates this assumption to be unfounded. Further, Dr. James admitted that he is unqualified to testify as to the legal issues surrounding the taxability of a damages award. Tr. 3062:6-13 (James). Consequently, Sterling's tax gross up claim is untenable and legally unsupportable.

**2. Sterling's Tax "Gross Up" Claim Is Barred As A Matter Of Law**

Even assuming that Sterling has proven its entitlement to a tax gross-up with reasonable certainty, awarding such relief is barred as a matter of law. Awarding a tax "gross-up" is beyond the trial court's authority because the United States has not waived sovereign immunity for tax "gross-up" claims.[25]

A breaching party is not liable for damages or restitution not directly caused by the breach. Myerle, 33 Ct. Cl. at 19; see also CalFed, 395 F.3d at 1267. For any indirect award to be recoverable against the United States, a separate waiver of sovereign immunity is necessary, especially where the indirect award is incurred as a result of the plaintiff's initiation of litigation. See 28 U.S.C. §§ 2412(a), (d) (separate waiver of sovereign immunity for costs and attorney fees against the Government); Library of Congress v. Shaw, 478 U.S. 310, 311, 315-17 (1986).

For a tax "gross-up" to compensate a plaintiff for harm it has suffered, the plaintiff must

[25] We recognize that the Federal Circuit has affirmed the award of a tax "gross-up" in Home Sav. v. United States, 399 F.3d 1341, 1356 (Fed. Cir. 2005), and LaSalle, 462 F.3d at 1338. Neither of those cases, however, address the issue of jurisdiction.

be forced to actually pay taxes upon the award. This only happens if three conditions are met: (1) the Court awards a recovery as a result of plaintiff's decision to initiate litigation; (2) Congress has enacted laws making the award taxable; and (3) the plaintiff does not shelter the award from taxes. Because these three steps necessarily exist between the breach and the recovery, taxation of the award is not compensable as a direct effect of the breach, and a separate waiver of sovereign immunity is necessary for the Court to entertain this claim.[26]

Even if this Court has the authority to entertain a tax "gross-up" claim, the Court should deny the claim because the breach did not cause taxation of any award. See Myerle, 33 Ct. Cl. at 19; Calfed, 395 F.3d at 1267-68 (plaintiff must prove that claimed damages would not have been lost "but for the breach;" the claimed damages must "inevitably and naturally, not possibly nor even probably flow from the defendant's breach," and this causal connection between the breach and the claimed losses must be "definitely established") (internal marks and citation omitted)).

### 3. Any Tax "Gross-Up" Here Would Constitute An Improper Windfall

Finally, a tax "gross-up" in this case will undoubtedly constitute a windfall because it will place Sterling in a better position than it would have occupied absent the breach. A tax "gross-up" guarantees Sterling a rebate now for a tax that will likely never be paid, and there is no way for the Court or defendant to monitor whether Sterling will ever pay taxes upon any award, or receive a refund of any such payment. See 26 U.S.C. § 6103 (barring IRS disclosure of taxpayer return information). Given Sterling's inability to prove taxability with reasonable certainty, a tax gross-up would be speculative and an impermissible windfall for Sterling.

---

[26] This Court also lacks the authority to entertain Sterling's claim because a tax "gross up" represents a pre-emptive tax refund, and this Court only has jurisdiction over refund suits if the tax has been paid in full. See Shore v. United States, 9 F.3d 1524, 1526-27 (Fed. Cir. 1993).

## IV. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW

Wounded bank damages are also expectancy damages. Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 434-41 (2000), aff'd 323 F.3d 1035 (Fed. Cir. 2003). Therefore, to recover wounded bank damages, Sterling must meet the requirements of reasonable certainty, foreseeability, causation, and mitigation. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951)). In Coast, 48 Fed. Cl. at 434-41, the trial court rejected, upon summary judgment, plaintiff's wounded bank claim for increased deposit costs, where plaintiff failed to demonstrate a causal link between the alleged damage and FIRREA's breaching provisions. Here, Sterling has not established that the alleged wounded bank costs resulted '"inevitably and naturally, not possibly nor even probably flow from the . . . breach.'" CalFed, 395 F.3d at 1267-68. Further, the wounded bank damages claims also fail to satisfy the foreseeability and reasonable certainty tests.

Although Dr. Horvitz included the wounded bank claims in his damages estimate, P-454, table 3d, Mr. Byrne, performed all of the wounded bank calculations. Tr. 1874:21-1875:7 (Byrne). Dr. Horvitz, moreover, did not review the underlying documentation supporting the calculations. Instead, he relied upon conversations with Mr. Byrne for his understanding of the nature of the claims. Tr. 2800:24-2802:4 (Horvitz).

Neither Mr. Byrne nor Dr. Horvitz, however, has adjusted Sterling's wounded bank damages claims pursuant to the Court's decision that the Government's breach only involved the Lewis Federal and Tri-Cities acquisitions. Sterling, 72 Fed. Cl. at 411; see, e.g., Tr. 1882:13-

1883:7, 1902:25-1903:15, 1915:25-1917:1 (Byrne). As discussed above, Sterling was out of capital compliance due to the loss of the Central Evergreen goodwill alone. Tr. 2744:2-2748:14 (Horvitz); DX 422, p. 1631. Therefore, Sterling has not proven that any alleged wounded bank damages were the result of the loss of the contractual goodwill. Indeed, even if the breach caused some damages, Sterling has not reduced its damages claim to discount those damages associated with the loss of the Central Evergreen goodwill. As such, the Court should reject Sterling's wounded bank damages claims. In addition, the wounded bank claims should be denied for the following reasons.

### A. The Breach Did Not Cause Sterling To Incur Increased Costs In Acquiring A Branch Of Great American Savings Bank

Sterling alleges that the Government's breach prevented it from purchasing a branch of Great American Savings Bank in 1989, resulting in damages of $1.83 million. P-454, table 3d. This claim is meritless. First, Sterling did not meet its evidentiary burden. With respect to the Great American claim, Dr. Horvitz provided no substantive testimony. Further, Sterling's counsel acknowledged that Mr. Byrne failed to testify about his calculation of the damage attributable to the Great American Saving Bank wounded bank claim. Therefore, there is no basis for the claim in the record. Tr. 2737:5-2738:1 (Weatherhead).[27] For this reason alone, the Court should reject the claim, because Sterling has rendered it impossible for the Court, pursuant

[27] The only reference to Great American in the record is Mr. Gilkey's assertion that Sterling attempted to purchase two branches of Great American Savings Bank in 1989 for $63,000, and ultimately paid, on an unspecified date, $1.8 million for one branch. Tr. 215:10-216:1 (Gilkey). He did not testify about the basis for the difference in price, nor did he testify that the Sterling's ultimate purchase of one of the branches harmed the thrift. See generally Tr. 212:8-216:1 (Gilkey). Therefore, his testimony does not assist the court in assessing Sterling's claim for $1.83 million in damage.

to Rule 702 of the Federal Rules of Procedure and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993), to assess the reasoning and methodology underlying Dr. Horvitz's opinion, and to determine whether there is a "reliable foundation in principles and method" for the opinion. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Second, Sterling cannot establish that damage resulting from an inability to purchase a branch of Great American was foreseeable by the Government at the time Sterling acquired Lewis Federal and Tri-Cities. "[F]oreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made." Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986) (citing N. Helex v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 714-15 (1975)).

Moreover, the loss for which damages are claimed "'must have been foreseeable to the party in breach at the time of contract formation'" and "must be proximately caused by the breach." Old Stone, 450 F.3d at 1375 (quoting Westfed, 407 F.3d at 1365). Even more pertinently, "'[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.'" Id. at 1376 (emphasis in original)(quoting Restatement (Second) of Contracts § 351 cmt a. (1981)).

Even if the branch was available for $63,000 in 1989, that price, by definition, indicates that no one foresaw that the branch would have been worth over $1.8 million five years later. If Great American or any one else foresaw that the branch would increase 62-fold in 5 years, then they certainly would not have sold it for $63,000. If anyone foresaw this increase, the price of the asset would have immediately risen to reflect that anticipated increase. Tr. 4110:23-4112:19

(Bajaj). Thus, the damage Sterling alleges, even if we accept as true all of its implausible assertions, was simply not foreseeable. The Government could not have foreseen, at the time of contracting, that Sterling would have the opportunity to buy a $1.8 million branch for $63,000.

Sterling has not alleged that it was required to purchase branches as a condition of its acquisitions in this case, or that the Government was on notice that it intended to buy branches. Consequently, neither Sterling's alleged inability to buy a branch after the enactment of FIRREA, nor its decision to buy the branch five years later at a price allegedly over six thousand percent higher than the original purchase price, could have been foreseen by the Government at the time of contracting, and this claim must fail as a matter of law. Tr. 4110:23-4112:19 (Bajaj); See Bank of Am, FSB v. United States., 67 Fed. Cl. 577, 595-96 (2005) (no wounded bank damages when Government could not have foreseen that thrift would, after the enactment of FIRREA, enter into independent business obligation that would cause loss).

**B. The Breach Did Not Cause Sterling To Incur Losses Associated With The CJ-4 Loan**

Sterling claims that its inability to advance additional funds to a borrower upon a loan known as the "CJ-4 Loan" forced the loan into foreclosure, resulting in a loss of $1.240 million. Tr. 1673:14-1674:9 (Byrne); P-336; P-336A. Sterling's claim with respect to the CJ-4 Loan fails to meet the legal prerequisites to an award.

Mr. Hargett, an accounting and financial damages expert, demonstrated that the breach did not cause Sterling's losses on the CJ-4 Loan. Mr. Hargett is an expert in evaluating troubled loans, loan workouts, commercial real estate, and analyzing the financial consequences of those transactions. Tr. 3469:7-3470:12 (Hargett). He opined that Sterling would have incurred losses

upon the CJ-4 Loan even absent a breach. First, Mr. Hargett explained that the loan was troubled before enactment of FIRREA. The project experienced loan cost overruns of $250,000, and nonpayment of interest began in June 1989. Tr. 3396:10-3397:22, 3399:1-7 (Hargett); DX 943; Tr. 1885:18-1886:15 (Byrne); P-180, p. SG0131016. Further, the project was experiencing numerous problems as of August and October of 1989, Tr. 1889:21-1890:13 (Byrne); DX 943; and between March 15, 1988, and November 15, 1989, the property's value dropped by approximately $500,000. Tr. 1890:14-1891:10 (Byrne); DX 943. Thus, the property securing the CJ-4 Loan experienced massive losses completely unrelated to any Government action, and Sterling has not proven that any loss upon the loan was attributable to the breach.

Second, the loan was placed into foreclosure prior to the effective date of the regulations implementing FIRREA, and foreclosure often leads to a loss. Tr. 3399:16-3400:6, 3400:14-3401:18 (Hargett). Sterling's Loan Committee approved the initiation of nonjudicial foreclosure of this loan in November 1989, prior to the date that the regulations implementing FIRREA went into effect. DX 943; DX 389 (November 24, 1989 Sterling memorandum referencing "foreclosure" in the "game plan" for the property).

Further, although Mr. Zuppe testified that Sterling was unable to advance additional funds on the loan due to FIRREA's loans-to-one-borrower requirements, Tr. 3082:9-17 (Zuppe), Sterling has not proven that, absent the breach, it would have possessed sufficient capital to provide an advance on the loan. Mr. Hargett opined, and Sterling did not dispute, that, under FIRREA, Sterling required, under loans-to-one-borrower limitations, $19.6 million in unimpaired (i.e., tangible) capital in order to support the monies already lent as well as an additional $541,000, the estimated cost to complete improvements to the buildings that were the

subject of the loan. Tr. 3405:14-3407:6 (Hargett). As of late 1989, even assuming that the Tri-Cities and Lewis Federal goodwill counted as regulatory capital, Sterling had only $3 million in tangible capital.[28] DX 422, p. WON952 1631; P-454, table 4a. Therefore, the breach could not have caused Sterling's inability to advance the substantial funds necessary.

Mr. Hargett's third opinion was that, at the same time that the CJ-4 Loan was nonperforming, the value of the collateral was declining, from $3.45 million in March 1988, to $1.6 million in September 1990. Tr. 3407:18-3409:22 (Hargett); P-182, p. SG005 2643; see also DX 943.

Finally, it could not have been foreseeable that the enactment of FIRREA would result in losses to Sterling upon a loan that was in foreclosure prior to the effective date of the regulations implementing the statute.

Therefore, the Court should reject Sterling's claim for wounded bank damages attributable to the CJ-4 Loan.

### C. The Breach Did Not Cause Sterling To Incur Excess Supervision Costs

Sterling has not established that $171,977.33 in "excess supervision costs" were caused by a breach. P-337.

Mr. Byrne claims that $33,711.00 of these alleged wounded bank charges were for an examination of Sterling in 1990 that would not have occurred absent a breach. P-337, p. SG0803442; Tr. 1680:11-1682:3 (Byrne). The remainder of the claim is based upon eight

---

[28] As of December 31, 1989, Sterling reported $12.443 million in negative tangible capital. DX 422, p. WON952 1631. In addition, Dr. Horvitz estimates that $15.557 million of unamortized contractual capital remained as of December 31, 1989. P-454, table 4a. When the $15.557 million is added back to negative $12.553 million, it leaves "but-for" Sterling with only $3 million in tangible capital.

assessments OTS imposed upon Sterling. P-337. Mr. Byrne claimed that, with respect to those assessments, the breach caused Sterling to be deemed a "troubled thrift" assessed at one and a half times that of a non-troubled thrift. Tr. 1680:11-1682:3 (Byrne). The evidence, however, does not support these contentions.

With respect to the examination for which Sterling was charged $33,711.00, the evidence demonstrates that the examination was conducted for reasons unrelated to the breach. Commencing in November 1989, OTS conducted a "special limited" examination of Sterling. P-180. Ms. Friend, Sterling's supervisory agent at the time, testified that, the examination occurred concurrently with an examination conducted by the FDIC. Tr. 2198:17-2199:13 (Friend); P-179. Prior to its November 1989 exam, FDIC had not possessed authority to examine thrifts. Tr. 2198:17-2199:13 (Friend). FDIC's examination of Sterling prompted OTS to schedule its own exam. Id. (Friend). Therefore, the examination was unrelated to FIRREA and Sterling's capital position at the time.

This claim is also not reasonably certain, even assuming that the examination was based upon Sterling's capital position. Mr. Byrne conceded that he did not know whether OTS would have conducted the examination if the exclusion of the noncontractual Central Evergreen goodwill alone would have resulted in Sterling's noncompliance with the minimum capital requirements. Tr. 1932:3-1933:17 (Byrne).

The Court should also reject Sterling's claim for excess supervision costs. In March 1990, OTS imposed an assessment of $51,993 upon Sterling. P-337. The assessment was calculated using a formula that applied to all thrifts, regardless of their exam rating. The methodology required OTS to multiply the level of assets maintained by each thrift by a standard

rate. P-337, pp. SG0803453-54, SG0803460; Tr. 1918:24-1920:10, 1975:8-1976:5 (Byrne). Consequently, Sterling's claim that the assessment was based upon its "troubled thrift" status is baseless.

In 1990 and 1991, Sterling was assessed as a troubled thrift because OTS's examinations during the period rated Sterling "5," the lowest rating possible. See, e.g., P-337, pp. SG0803460-61. When Sterling complained that the "5" rating was inconsistent with the injunction prohibiting action inconsistent with its contracts, OTS concluded that the rating was not inconsistent with the injunction. DX 514; see also P-337, p. WOR081 0005. This conclusion would have been based upon a review of past reports of examination, ratings, and the injunction. Tr. 3719:12-20 (Hedlund). Consequently, Sterling's troubled thrift status, and the increased assessments based upon that status, could not have been caused by the breach.

For these reasons, Sterling's claim for "excess supervision costs" is without basis, and should be denied by the Court.

**D. Increased Legal Fees To Litigate The Alleged Breach Of Contract Are Barred As A Matter Of Law, And Sterling Has Not Established That The Breach Caused Its Other Legal And Accounting Fees**

Sterling's final wounded bank damages claim is based upon its allegation that it should be awarded $304,005.79 in legal, accounting, and insurance costs it incurred in defending against OTS's enforcement of FIRREA. Tr. 1695:21-1696:13 (Byrne); P-339; P-339A. The Court should reject these claims as legally unsupported.

First, there are no insurance costs contained in this claim. The "insurance" cost Sterling refers to is a bond, issued by a company known as Sedgwick James, posted by Sterling in obtaining its temporary restraining order. Mr. Byrne testified that this bond was associated with

Sterling's litigation. Tr. 1934:13-1935:17 (Byrne); P-339, p. SG0803529. Mr. Byrne also admitted at trial that the majority of costs encompassed by this claim are litigation-related. Tr. 1935:8-1948:16 (Byrne); see, e.g., P-339, pp. SG0803685, 3687, 3691, 3693, 3695, 3697, 3699, 3702, 3713, 3715, 3523, 3540, 3542, 3544; see also P-339, pp. SG0803532, 3551, 3557-90, 3594-97, 3607-3610. In fact, the costs claimed by Mr. Byrne were those costs included under an "Alpha" billing code category, and he admitted that "[a]pparently, on this, we did not" attempt to segregate out costs that were actually related to supervision and those that were related to litigation. Tr. 1937:8-19 (Byrne).

The recovery of fees incurred in litigating against the Government in connection with the application of FIRREA is barred as a matter of law. Attorneys fees "incurred in litigating against the Government are not recoverable absent an express statutory provision allowing them." Franklin Fed., 55 Fed. Cl. at 123 (citing Piggly Wiggly Corp. v. United States, 112 Ct. Cl. 391, 432, 81 F. Supp. 819 (1949)); LaSalle Talman Bank, FSB v. United States, 45 Fed. Cl. 64, 97 (1999), aff'd in part, vacated in part, 317 F.3d 1363 (Fed. Cir. 2003). In Franklin Federal, the Court granted the Government summary judgment with respect to a wounded bank damages claim for attorney fees incurred in obtaining an injunction against FIRREA's enforcement. 55 Fed. Cl. at 123. The Court concluded that there is no statutory provision allowing the award of such fees. Id.; see also Berg's Estate v. United States, 687 F.2d 377, 383 (Ct. Cl. 1982)( "'in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial or other,'" are not recoverable against the Government). Sterling's wounded bank claim regarding fees is indistinguishable from the one rejected in Franklin Federal. Thus, the Court should grant judgment with respect to this claim to the Government.

With respect to legal fees allegedly incurred for activities other than litigation, Sterling has not met its burden of establishing that such fees were, in fact, not related to litigation, and it has not established that they were caused by the breach. Tr. 1934:13-1948:16 (Byrne); see, e.g., P-339, pp. SG0803537-38, 3546, 3549-50, 3611. To the extent that any other regulatory matters were encompassed in the "Alpha" category, Sterling's records do not provide an adequate explanation as to whether the fees were incurred as a result of the alleged breach in this case, or for other reasons. Tr. 1934:13-1948:16 (Byrne); P-339; P-339A.

For these reasons, Sterling has not met its burden with respect to its wounded bank damages claim for legal, accounting, and insurance costs.

**E. The Breach Did Not Cause Sterling's Inability To Guarantee The Payment Of Preferred Stock Dividends In Connection With The 1989 Offering**

Sterling claims that it should be reimbursed for costs associated with the termination of its 1989 public offering, because the OTS would not preapprove the payment of dividends upon preferred stock. Tr. 1445:15-20; 1684:7-1685:16 (Byrne); P-338; P-338A. This Court, however, has previously ruled that Sterling did not obtain a contractual right to pay dividends upon a public offering of preferred stock when it entered into an agreement in connection with its acquisition of Central Evergreen. Sterling, 53 Fed. Cl. at 615. As such, Sterling's "wounded bank" damages claim associated with its failed 1989 public offering is now foreclosed. Indeed, Sterling, in requesting clarification of the Court's ruling upon this issue, admitted that the absence of a contractual obligation would require an adjustment in the amount of damages claimed. Sterling Sav. Ass'n v. United States, No. 95-829C, slip op., pp. 3-4 (Nov. 15, 2002). The Court declined to alter its holding upon the issue. Id. Nonetheless, despite Sterling's

acknowledgment that its damages claim would have to be adjusted, Mr. Byrne testified that he made no adjustments to this damages claim after the Court's ruling. Tr. 1902:25-1903:8 (Byrne).

As a practical matter, the costs allegedly incurred in connection with the 1989 public offering may not be recovered because they do not meet the causation standard. In this case, Sterling's expert, Dr. Horvitz, admitted that the costs incurred in connection with the 1989 public offering would have been incurred absent the breach. Tr. 2800:12-23 (Horvitz). Furthermore, these costs are not reasonably certain because, as shown at trial, many of the claimed costs have nothing to do with the 1989 offering, but instead were claimed by Sterling pursuant to their designation under a specific billing code. Tr. 1903:9-1915:24 (Byrne); see, e.g., P-338A, pp. SG0803391, 1392, 3393 (wrong code); 3396, 3398 (litigation-related). Indeed, it is obvious that some of the claim costs pertain to litigation, and are barred as a matter of law. See, e.g., P-338A, pp. SG0803391, 1392; Franklin Fed., 55 Fed. Cl. at 123 (citing Piggly Wiggly, 112 Ct. Cl. at 432); LaSalle Talman Bank, FSB v. United States, 45 Fed. Cl. at 97.

Further, Mr. Byrne admitted that, the uncertainty surrounding the payment of dividends on the 1989 offering would have existed even if the Tri-Cities and Lewis Federal goodwill had been grandfathered under FIRREA. TR. 1815:11-1816:24 (Byrne). Indeed, Ms. Friend and Mr. Hedlund testified that OTS policy did not permit the preapproval of dividend payments. In general, OTS policy prohibited the blanket preapproval of the payment of future (as opposed to already accrued) dividends by a thrift because it would deprive OTS of its ability to regulate the safety and soundness of the thrift's operations, and to monitor the thrift's earnings. Tr. 3675:20-3676:8 (Hedlund); Tr. 2221:20-2222:5 (Friend). Because dividends are paid out of current earnings, OTS needed to know what level of current earnings would be on the books and

available at the time each dividend would be paid. Tr. 2226:17-21 (Friend). Indeed, it was "unprecedented" for OTS to provide unconditional, prior approval of future dividends because doing so would render the agency unable to reserve its ability to object at a later date, particularly if the request were for approval for more than one or two quarters into the future. Tr. 3676:9-3677:6 (Hedlund); Tr. 2221:11-19 (OTS's policy of not preapproving dividend payments was "long-standing")(Friend). A blanket approval of the type requested by Sterling was unreasonable because it is impossible to know what the thrift's earnings, asset quality, and interest rate risk would be into the future. Tr. 3677:7-3678:10 (Hamm). Further, OTS had concerns with the "quality and quantity of [Sterling's] earnings" at the time that the preapproval was requested. Tr. 2226:25-2227:1 (Friend).

Dr. Hamm confirmed Ms. Friend's and Mr. Hedlund's testimony. Based upon his experience in the thrift industry, regulators typically did not give blanket approval in advance for the payment of dividends. Such approval was provided for only a quarter (of a year) or so at a time. Tr. 3857:24-3858:12 (Hamm).

When a thrift pays a dividend, capital leaves the bank. OTS's concern about Sterling's earnings, combined with the thrift's negative tangible net worth, neither of which were breach-related, provided a sound economic basis for OTS 's enforcement of its policy prohibiting preapproval of the payment of dividends into the future. Tr. 3859:9-20 (Hamm).

Moreover, OTS's policy did not <u>prevent</u> Sterling from issuing preferred stock with a dividend feature. Tr. 2223:11-2224:24 (Friend); Tr. 3857:6-11 (Hamm). Therefore, Sterling did not prove that the breach caused its inability to obtain preapproval of the payment of dividends in connection with its 1989 public offering.

**CONCLUSION**

For the foregoing reasons, Sterling is entitled, at most, to an award of transactions cost damages in the amount of $900,204.00, to compensate for its replacement of contractual goodwill.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

Attorneys for Defendant

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
WILLIAM KANELLIS
ELIZABETH HOLT

September 21, 2007

CERTIFICATE OF FILING

I hereby certify that on September 21, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT AND LAW," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford