IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

Court No. 95-829-C

(Judge Wheeler)

**STERLING'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.
1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Tele: (509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WILLIAM M. SYMMES

September 21, 2007

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . 1

II. ISSUES PRESENTED . . . . . 4

III. PROPOSED FINDINGS OF FACT . . . . . 5

A. STERLING HAS ALWAYS EMPLOYED A GROWTH STRATEGY AND IN IMPLEMENTING THAT STRATEGY HAS GROWN FROM A TWO MILLION DOLLAR INSTITUTION TO AN INSTITUTION WITH ASSETS IN EXCESS OF TEN BILLION DOLLARS AS OF 2007 . . . . . 5

1. Sterling Constantly Increases Assets, Profits And Capital . . . . . 5

2. Sterling's Corporate Management And Geographic Location Have Contributed To Its Continued And Near Constant Growth . . . . . 7

3. Sterling's Pre-FIRREA Relationship With Government Regulators Was Uniformly Positive . . . . . 8

B. Consistent With Its Plans, And In Exchange For Significant Promises, Sterling Accepted The Government's Invitation To Contract To Acquire Three Failed Thrifts . . . . . 11

1. Sterling Acquired Lewis Federal Savings & Loan In 1985 . . . . . 11

a. The Government Approached Sterling And Asked It To Investigate An Acquisition Of Lewis Federal . . . . . 11

b. Sterling Bargained For And Received Contractual Provisions And Incentives Before Agreement To The Acquisition . . . . . 12

2. Sterling Acquired Tri-Cities Savings & Loan In 1988 . . . . . 13

a. Following The Acquisition Of Lewis Federal, The Government Approached Sterling Regarding Tri-Cities . . . . . 13

b. The Tri-Cities Acquisition Was Directly Linked To Sterling's Acquisition Of Central Evergreen . . . . . 13

c. Sterling Bargained For And Received Contractual Provisions And Incentives Before Agreeing To The Acquisition . . . . . 14

d. Following The Acquisition Of Tri-Cities, Sterling Had Sufficient Capital To

Acquire Central Evergreen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C. FIRREA Was Implemented And The Government Enforced Its Regulations On Sterling In Breach Of The Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. The Enactment of FIRREA And Adoption Of Regulations Led To Breach . . 16

2. Sterling Tried in Vain To Obtain Relief From The Government's New Restrictions Under FIRREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. In Accordance With Its Business Plan, Sterling Attempted To Raise Capital In 1989 That Would Have Brought It Into Compliance With FIRREA's Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4. Sterling Attempted To Mitigate The Harm Caused By Its FIRREA Non-Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a. Sterling Shrank Its Assets To Meet Required Capital Ratios . . . . . . . . . 22

b. Sterling Obtained A TRO And An Injunction . . . . . . . . . . . . . . . . . . . . . 23

i. Despite The Injunction, The Government Continued To Regulate Sterling As A Capital-Deficient Thrift . . . . . . . . . . . . . . . . . . . . . . 25

ii. The Court Issued A Preliminary Injunction Continuing The Terms Of The TRO, But The Government Persisted In Unlawful Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

c. Sterling Ultimately Raised Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. STERLING SUFFERED HARM AS A RESULT OF THE GOVERNMENT'S ACTIONS . . . . . 29

1. Sterling Lost Valuable Assets And Was Precluded From Seeking Others . . . . 29

a. Sterling Lost Valuable Business Customers . . . . . . . . . . . . . . . . . . . . . . 29

b. Experienced Employees Left Sterling Following The Breach . . . . . . . . 31

c. The Government's Regulations Precluded Sterling From Pursuing Business Banking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2. Two Profitable Subsidiaries Faced Severely Restricted Business Activities . . 32

a. Intervest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

b. Action Mortgage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. Following The Lifting Of The Restrictions And Sterling's Return To Capital Compliance, Sterling Began To Grow Again But Was Never Able To Attain The Growth It Would Have Had If It Not Been Restricted After FIRREA . . . . . . . 34

a. Sterling Is A Smaller Bank Than It Would Have Been But-For The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

b. Sterling Could Have Used The Additional Capital It Lost As A Result Of The Breach To Support Additional Assets . . . . . . . . . . . . . . . . . . . . . . . . . . 36

c. Sterling's Profits Continued To Grow Even As It Acquired More Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E. STERLING SUFFERED DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. QSGW And Contractual Goodwill Are Different Things . . . . . . . . . . . . . . . . 57

F. Wounded Bank Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

1. Sterling Incurred Additional Litigation And Accounting Costs . . . . . . . . . . . . 60

2. Sterling Incurred Losses On The CJ-4 Loan Losses . . . . . . . . . . . . . . . . . . . . . 61

3. Sterling Incurred Additional Regulatory And Supervisory Costs Incurred . . . 61

4. Sterling Incurred Costs From The Withdrawn 1989 Offering . . . . . . . . . . . . . 62

5. Sterling Incurred Damages As A Result of The Increased Purchase Price Of Great American Bank Branches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

6. Sterling Incurred Damages As A Result Of Not Being Able To Bid On Resolution Trust Corporation Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

G. COST OF CAPITAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1. Dr. Christopher James Is A Qualified Expert In Thrift Economics And Finance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2. Supervisory Capital Was Valuable Prior To FIRREA . . . . . . . . . . . . . . . . . . . 65

3. Similarities And Differences Between Supervisory Capital And Tangible Equity Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

4. Capital Raised By Sterling In The Assumed Mitigation Was Costly . . . . . . . . 66

5. Components Of Damages Arising From Assumed Replacement . . . . . . . . . . . 67

6. Sterling Incurred Costs Related To Mitigation . . . . . . . . . . . . . . . . . . . . . . . . 68

H. Cost of Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

A. STERLING IS A "LOST VOLUME SELLER" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

1. Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

2. Legal Standards For A Lost Volume Seller . . . . . . . . . . . . . . . . . . . . . . . . . 71

3. Sterling Has Demonstrated That It Would Have Done The Business It Did And More . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

B. A LOST PROFITS MEASURE IS THE APPROPRIATE MEASURE TO CALCULATE THE DAMAGES OWED STERLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

1. Sterling Has Established Causation Of Lost Profits Damages . . . . . . . . . . . . . 76

a. Standard To Establish Causation Of Lost Profits . . . . . . . . . . . . . . . . . . 76

b. Sterling's Lost Profits Were Caused By The Breach . . . . . . . . . . . . . . . . 76

c. The Damages Incurred By Sterling Caused By The Government's Breach Were Foreseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

2. The Measure Of Sterling's Damages Is Reasonably Certain . . . . . . . . . . . . . . 78

a. Standard To Establish Reasonable Certainty . . . . . . . . . . . . . . . . . . . . . . 78

b. Sterling's Lost Profits Calculation Is Reasonably Certain . . . . . . . . . . . . 79

C. THE ACTUAL PERFORMANCE OF STERLING IS THE BEST EVIDENCE OF ITS DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

D. STERLING MITIGATED, BUT DID NOT CURE, THE HARM CAUSED BY THE BREACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

E. Professor Horvitz's Opinion That Sterling Would Be Permitted To Count Both The QSGW From Central Evergreen And The Contractual Goodwill From Lewis Federal And Tri-Cities Is Correct As A Matter Of Law And Undisputed Fact . . . . . . . . . . . 84

1. Sterling's Right To Count The Supervisory Goodwill From Central Evergreen Is Also Contractual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2. Messrs. Bankhead's And Hargett's Opinions Improperly Categorize QSGW And Contractual Goodwill As Being Identical . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

a. Contractual Goodwill May Be Treated As Tangible Capital Under FIRREA; Non-contractual Goodwill May Not . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

b. Other Important Distinctions Invalidate Messrs. Bankhead's And Hargett's Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

F. Sterling Suffered Wounded Bank Damages As A Result Of The Government's Breach Of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

G. If The Court Agrees That Sterling Replaced The Lost Capital, Damages Should Be Awarded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advent Systems, Limited v. Unisys Corporation*, 925 F.2d 670 (3d Cir. 1991) . . . . . . . . . . . . . 83

*American Federal Bank, F.S.B. v. United States*, 68 Fed. Cl. 346 (2005) . . . . . . . . . . . . . . . . . 75

*Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126 (2003) . . . . . . . . . . . . . . . . . . . . . . 77

*Bank United of Texas, FSB v. United States*, 50 Fed. Cl. 645 n. 11 (2001), *aff'd in part, rev'd in part*, 80 Fed. Appx. 663 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 83

*Bluebonnet Sav. Bank, F.S.B. v. U.S.*, 266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . 79

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 75, 76, 79

*California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed. Cir. 2001) . . . . . . . 75, 90

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . 76

*Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . 82, 83

*Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) . . . . . . . . . . . . . . . 75

*Dura Pharmaceuticals, Inc. v. Broudo, U.S.*, 161 L. Ed. 2d 577, 125 S.Ct. 1627 (2005) . . . . . . 95

*Elec. & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237, 416 F.2d 1345 (Ct. Cl.1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . 76

*Fifth Third Bank v. United States*, 71 Fed. Cl. 56 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, __ Fed. Cl. __, 2007 WL 1160294, slip op. at 9 (April 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 76-78

*Glendale Federal Bank, FSB v. United States*, 239 F.2d 1374 (Fed. Cir. 2001) . . . . . . . 3, 79, 90

*Globe Savings Bank, F.S.B. v. U.S.*, 65 Fed. Cl. 330 (Ct. Fed. Cl. 2005) . . . . . . . . . . . . . . 93, 95

*Home Savings Bank of America v. United States*, 399 F.3d 1341 (Fed. Cir 2005) . . . . . . . . 93, 95

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . 75, 93, 95

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 95

*Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80 (2004) . . . . . . . . . . . . . . . 83, 96

*Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 490 (2006) . . . . . . . . . . . 71, 72

*R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir. 1991) . . . . . . . . . . . . . . 74

*Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . 74

*Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218 (3d Cir. 1998) . . . . . . . 74

*Southern California Federal Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319 (Fed. Cir. 2005) . . . . 90

*Specialty Assembling & Packing Co. v. United States*, 174 Ct. Cl. 153, 355 F.2d 554 (1966) . . 79

*Sterling Savings Assoc. v. USA*, 53 Fed. Cl. 599 (2002), *amended on other grounds*, 72 Fed. Cl. 404 (2003), *vacated in part on rehearing* by 72 Fed. Cl. 404 (2006) . . . . . . . . . 12, 14, 15, 58, 85

*Sterling Savings Assoc., v. United States*, 72 Fed. Cl. 404 (2006) . . . . . . . . . . . . . . . . . . . . 58, 85

*Winstar*, 518 U.S. 839, 116 S. Ct. 2432 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**FEDERAL STATUTES**

Financial Institutions Reform, Recovery and Enforcement Act of 1989 . . . . . . . . . . . *ad passim*

**OTHER AUTHORITIES**

FUNDAMENTALS OF FINANCIAL MANAGEMENT 387 (10th ed. 1998) . . . . . . . . . . . . . . . . . . . . . 95

Office of Thrift Supervision, Capital Adequacy: Guidance on the Status of Capital Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund, Thrift Bulletin No. 38-2, 1990 WL 309397 (Jan. 9, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

RESTATEMENT (SECOND) OF CONTRACTS § 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

THE LAW OF CONTRACTS, § 14.16 (4th ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

UNIFORM COMMERCIAL CODE § 7-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Via the enactment, implementation and enforcement of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), the United States breached two contracts with Sterling Savings Association ("Sterling") that were made at the Government's request to help the Government remedy a nationwide thrift crisis. The issue before the Court is the appropriate damages due to Sterling resulting from that breach. The evidence and expert testimony presented at trial demonstrate that the lost profits measure of damages most appropriately compensates Sterling for the losses it suffered because of the breach, and Sterling, therefore, requests entry of an award of $63.327 million representing lost profits and wounded bank damages.

Sterling has always been a profitable business, run by well-respected and experienced bankers. It has grown from $2.1 million in assets in 1983 to over $10 billion today. Throughout

its existence, it has been managed by the same team of executive officers.

When the savings and loan crisis threatened the thrift industry, the Government sought out healthy thrifts like Sterling and induced them to acquire failing thrifts. Sterling, a highly-rated institution with strong management, was approached several times by the Government, and eventually acquired three failing thrifts. In exchange for taking the failing thrifts off of the Government's hands, Sterling was given cash assistance, credits to its regulatory net worth and forbearances from adverse action by the Government for specified terms. The consideration paid to Sterling was a mere fraction of what it would have otherwise cost the Government to liquidate these three thrifts.

Months after the last transaction closed, however, the newly-enacted FIRREA legislation and regulations issued under the Act rendered the contracts, in the Government's eyes, void. The Government turned on the very thrifts it had looked to in a crisis for help, including Sterling, and decided those thrifts were the problem. The Government foreclosed nearly all avenues of profitability for Sterling, regulating it almost out of existence and, finally, planned to shut it down because of a perceived negative capital ratio that resulted from Sterling's acquisitions of the failing thrifts and from the Government's refusal to recognize the contractual capital credits in favor of Sterling. A temporary restraining order kept Sterling open, but the Government persevered in threatening Sterling with more sanctions should it venture outside of the limited activity allowed by the Government and attempt to regain the progressive growth that it had enjoyed prior to the breach. Ultimately, Sterling raised capital and got a reprieve from the regulatory death sentence against it and has since remained a profitable institution, despite the breach. But it has never cured the damage done by the Government's broken promises.

During the three-week trial, the Government proffered two theories: (1) that Sterling fully mitigated the breach two years after it occurred and should only be compensated for its transaction costs; and, alternatively (2) that if Sterling did not fully mitigate, it is at fault for failing to do so and should recover nothing. Stated differently, the Government wants this Court to permit it to use the fact that Sterling has prospered in spite of the Government's breach to elide, via accounting, the harm its breach wrought. This should be rejected for two reasons. The United States Government's promise had value which would have been cumulative to the success Sterling enjoyed and black letter contract law requires a party who breaches a contract to pay the costs occasioned by his or her breach:

> Much of law and legal liability turns on fault, on the notion of wrong-doing, and of providing retribution for and discouraging such conduct. Contract law, and the consequences of breach of contract, do not. When parties enter into a contract, and promise each other that they will perform in accordance with the terms of their agreement, they retain a choice: when the time comes they can perform, and accept whatever benefits and losses the contract gives them, or they can refuse to perform and pay the consequences.

*Glendale Federal Bank, FSB v. United States*, 239 F.2d 1374, 1379-80 (Fed. Cir. 2001) (emphasis added). The Government is not excepted from this rule. Whether FIRREA was justified as sound legislation is immaterial. The Government's breach may well have been an "efficient breach", but the Government must pay damages for the efficiency it gained. The Government breached a valid and binding contract and it is obliged to substitute its performance with money damages.

## II. ISSUES PRESENTED

1. What is the amount of damages to which Sterling is entitled for breach of contract?

2. Whether the lost profits measure of damages reflect the actual harm done to Sterling by the Government's breach?

3. In the event the Court determines that the lost profits analysis should not be applied, what amount for the cost of replacement capital is the appropriate award of damages?

## III. PROPOSED FINDINGS OF FACT

### A. STERLING HAS ALWAYS EMPLOYED A GROWTH STRATEGY AND IN IMPLEMENTING THAT STRATEGY HAS GROWN FROM A TWO MILLION DOLLAR INSTITUTION TO AN INSTITUTION WITH ASSETS IN EXCESS OF TEN BILLION DOLLARS AS OF 2007.

#### *1. Sterling Constantly Increases Assets, Profits And Capital.*

1. Sterling opened its doors on April 4, 1983, with $2.1 million in capital. (Gilkey, Tr. 68, lines 19-25; Gilkey, Tr. 70, lines 13-16; see also Joint Stipulation of Facts ("JSF") #1)

2. For every year of its operations, Sterling has been profitable. (Gilkey, Tr. 153, lines 3-19; Horvitz, Tr. 2036, lines 7-18, 2528, line 20 through 2529, line 5). In its entire history, Sterling has only shown a loss in one single quarter; this occurred in 1996, because of an extraordinary SAIF premium being imposed upon Sterling by the Government. (Byrne, Tr. 684, line 7 through 687, line 2)

3. From the very beginning, Sterling intended to grow quickly and has been successful in this strategy. (Gilkey, Tr. 78, line 18 through 79 line 9; Gilkey, Tr. 82, line 3 through 83, line 13)

4. Sterling's strategy has been to grow the company by internal or organic growth at an equal proportion to the growth by acquisition and to use leverage risk for the company's benefit. (Gilkey, Tr. 83, lines 3-19).

5. Sterling's growth plan recognizes that rural farm communities lack loan opportunities, and accordingly Sterling took deposits from rural communities and used those funds to make loans in metropolitan market areas through its mortgage company operations, specifically, in Spokane, Boise, Portland, and Seattle. (Gilkey, Tr. 76 line 15 through 77 line 14)

6. Sterling has always sought ways to add capital through acquisitions or public

offerings. (Gilkey, Tr. 147, lines 16-20)

7. Sterling has always grown through acquisitions, and has, over time, acquired approximately 20 banks or thrifts. (Gilkey, Tr. 83, lines 11-13; P-503; Gilkey, Tr. 398, line 25 through 399, line 11)

8. Sterling's business strategy for growth had always consistently included calculated leverage risk. (Gilkey, Tr. 77, line 15 through 78 line 7).

9. Sterling's planned operation as a highly-leveraged company has historically placed it in the lowest 10 percent for capital ratio among its peers. (Gilkey, Tr. 148, lines 5-15; Hamm, Tr. 3975, lines 20-22; Hamm, Tr. 3976, lines 5-6)

10. As a consequence of Sterling's capital ratios, its regulators have consistently taken the position that Sterling needs additional capital. (Gilkey, Tr. 147, line 3 through 148, line 15; DX-263 (SG0053028))

11. During Sterling's history, it never encountered difficulty adding assets except for immediately after the implementation of FIRREA. (Gilkey, Tr. 156, lines 7-12).

12. After the Lewis & Clark acquisition, Sterling had roughly $4 million in capital; within a year, after leveraging that $4 million, Sterling grew to approximately $100 million. (Gilkey, Tr. 82, line 14 through 83, line 2)

13. Even facing competitive markets, Sterling grew from an initial capital input of approximately $2 million to an asset size of over $10 billion with 3,000 employees spread over nine states as of 2007. (Barnett, Tr. 1180, lines 7-17)

14. As of 2007, Sterling is well over $10 billion in size, and has branches in Washington, Idaho, Montana, Oregon, California, Nevada, Colorado, Utah and Arizona. (Gilkey, Tr. 153,

line 20 through 154, line 4; P-501)

15. Sterling currently intends to continue to make more acquisitions, and requires more capital to do so. (Gilkey, Tr. 442, lines 1-12)

16. But for the breach, Sterling would have been between a $25 billion and $50 billion institution. (Gilkey, Tr. 405, lines 1-21)

17. Sterling still intends to grow, and eventually become an institution with a value in excess of $50 billion. (Gilkey, Tr. 440, line 20 through 441, line 14)

18. Since 1991, Sterling has raised capital every year but two. (Gilkey, Tr. 290, lines 1-7 and 13-19; P-501; P-505; Gilkey, Tr. 418, line 24 through 419, line 2)

***2. Sterling's Corporate Management And Geographic Location Have Contributed To Its Continued And Near Constant Growth.***

19. Sterling was formed by managers with commercial banking backgrounds, which gave the Government great confidence in its ability to succeed. (Faulstich, Tr. 344, line 7 through 345, line 25; Horvitz, Tr. 2042, line 10 through 2043, line 8).

20. Since opening Sterling Savings Bank, its management has formed a number of related companies contributing to Sterling's market success: (1) In 1992 a holding company called Sterling Financial Corporation ("SFC") was formed. (Gilkey, Tr. 73, line 24 through 74, line 4; (Gilkey, Tr. 74, lines 5-11); (2) Action Mortgage Company, a Sterling subsidiary of Sterling in the business of residential mortgage construction, headquartered in Spokane, opened in 1988. (Gilkey, Tr. 72, lines 11-25; Gilkey, Tr. 123, line 24 through 124 line 5); (3) Intervest Mortgage Investment, another Sterling subsidiary in the business of commercial mortgages and concentrating both in construction and permanent loans for income-producing property, headquartered in Lake Oswego, Oregon (a suburb of Portland), opened in 1987. (Gilkey, Tr. 72,

lines 13-22; Gilkey, Tr. 124, lines 5-7)

21. In the thrift industry, $5 of equity or capital will translate to approximately $100 of assets using leverage. (Gilkey, Tr. 78 lines 10-17; Horvitz, Tr. 2022, lines 17-21)

22. The economy in the Pacific Northwest during the early 1990s was positive, with growth in the population, personal income, employment, and agricultural economy. (Gilkey, Tr. 284 lines 3-12; Faulstich, Tr. 343, line 20 through 344 line 6; Conerly, Tr. 885, lines 5-10; P-268, p. 9)

23. In addition to its corporate form and organization, Sterling's growth was aided by the fact that from 1985 through 2000, the Washington, Oregon and Idaho economies were consistently growing, in contrast to other parts of the country and the overall U.S. economy. (Conerly, Tr. 888, line 2 through 891, line 4; Conerly, Tr. 894, line 21 through 899, line 18; Conerly, Tr. 917, line 11 through 919, line 13; Conerly, Tr. 922, line 18 through 926, line 6; Conerly, Tr. 931, line 20 through 934, line 6; Conerly, Tr. 942, line 17 through 944, line 9; Conerly 946, line 19 through 948, line 1; Conerly, Tr. 957, line 24 through 959, line 2; P-514; P-515; P-516; P-517; P-518; P-519A; P-521; P-268, p. 9)

24. A company operating in the Northwest would be in a favorable environment compared to a comparable company operating in another part of the country. (Conerly, Tr. 959, line 23 through 960, line 13)

25. Sterling's market area enjoyed stronger growth than most states. (Conerly, Tr. 963, lines 21-25)

26. It is more likely that a financial institution will grow in a growing economy. (Conerly, Tr. 984, lines 20-23; Conerly, Tr. 986, line 20-987, line 9)

### *3. Sterling's Pre-FIRREA Relationship With Government Regulators Was Uniformly Positive.*

27. The Government knew from the very beginning of Sterling's existence that it intended to grow, and the President of the FHLB of Seattle had confidence in management's ability to grow. (Faulstich, Tr. 340, lines 5-23)

28. From 1983 to 1988 Sterling's examination and supervisory ratings, which provide a snapshot of an institution's safety and soundness regulatory condition, were "exceptionally positive" and reflected good management. (Faulstich, Tr. 352, line 2 through 353, line 15; Horvitz, Tr. 2049, lines 21-23, 2051, lines 12-14; P-45, pp. 6-7; P-541)

29. Prior to the enactment of FIRREA, Sterling's relationship with its regulators was one of mutual respect. (Gilkey, Tr. 141, lines 1-8.)

30. In 1988, the FHLB of Seattle noted that Sterling's management was strong. (P-40, p. 1)

31. The President of the FHLB of Seattle never considered Sterling to be a troubled thrift and, indeed, thought of it as an ally because of its good management and willingness to acquire troubled thrifts which aided the FHLBB. (Faulstich, Tr. 320, line 21 through 321, line 15)

32. Mr. James Faulstich never believed Sterling was being mismanaged or run in an unsafe or unsound manner prior to the enactment of FIRREA. (Faulstich, Tr. 354, line 20 through 355, line 1; *see also* Faulstich, Tr. 363, lines 5-12)

33. Prior to the enactment of FIRREA and its corresponding regulations, Sterling was in full capital compliance. (Gilkey, Tr. 183, lines 3-8)

34. Before FIRREA, the Federal Home Loan Bank of Seattle never considered Sterling to be a troubled thrift. (Faulstich, Tr. 230, lines 21-24)

35. Before FIRREA, the Federal Home Loan Bank of Seattle considered Sterling to be an ally in resolving troubled thrift issues. (Faulstich, Tr. 231, lines 3-15)

36. At the time of the Tri-Cities acquisition the Federal Home Loan Bank of Seattle had "no supervisory concerns with" Sterling. (P-24; p. 8).

37. The Federal Home Loan Bank of Seattle viewed Sterling's business plan after the Tri-Cities acquisition as "an ambitious one," but consistent with Sterling's prior growth trends. (Faulstich, Tr. 336, lines 13-20; P-24, p. 9).

38. Mr. Faulstich, the principal supervisory agent for the Federal Home Loan Bank of Seattle, had high regard for Sterling's management. This opinion was validated by Mr. Gilkey's high degree of competence and by Sterling's success. (Faulstich, Tr. 344, lines 4-19)

39. As of November 7, 1988 the Federal Home Loan Bank of Seattle considered Sterling to have "a proven success record in demonstrating it can successfully integrate acquired institutions and/or offices into its operations while maintaining profitability and meeting minimum regulatory capital requirements." (P-45, p. 6)

40. As of November 7, 1988 the Federal Home Loan Bank of Seattle believed that "[p]art of the reason for continued favorable examination ratings, despite its rapid growth, is due to its careful strategic planning. Sterling has indicated that it also prepares for growth by hiring capable personnel prior to consummation of the mergers to avoid potential operational problems." (P-45, p. 7)

41. As of November 7, 1988 the Federal Home Loan Bank of Seattle wrote of Sterling, "[s]ince its opening in 1983, Sterling has experienced four examinations and received satisfactory ratings in all areas. The institution continues to be well-managed with positive earnings, good

asset quality, and acceptable capital level." (P-45, p. 46)

#### *4. Early In Sterling's Existence, Government Regulators Looked To It For Assistance.*

42. Before Sterling even opened for business, it was approached by state regulators and asked to enter negotiations to acquire Lewis & Clark Savings ("Lewis & Clark") located in Clarkston, Washington. (Gilkey, Tr. 75, lines 4-16; Gilkey, Tr. 87, lines 4-13)

43. Sterling agreed and acquired Lewis & Clark on or about June 30, 1983. (Gilkey, Tr. 87 lines 4-22)

44. Sterling's acquisition of Lewis & Clark was consistent with its business plan of taking deposits in rural communities in order to make loans in metropolitan areas. (Gilkey, Tr. 76, lines 12-18)

45. After the Lewis & Clark acquisition, regulators from the state and the Federal Home Loan Bank asked Sterling's management team to consider other acquisitions and to given them opinions as to the specific problems facing the failing thrifts. (Gilkey, Tr. 88, line 21 through 89, line 15).

## B. CONSISTENT WITH ITS PLANS, AND IN EXCHANGE FOR SIGNIFICANT PROMISES, STERLING ACCEPTED THE GOVERNMENT'S INVITATION TO CONTRACT TO ACQUIRE THREE FAILED THRIFTS.

### *1. Sterling Acquired Lewis Federal Savings & Loan In 1985.*

#### a. The Government Approached Sterling And Asked It To Investigate An Acquisition Of Lewis Federal.

46. In early 1984, Ed Hedlund, the branch supervisor for the Federal Home Loan Bank of Seattle ("FHLB of Seattle"), asked Sterling to look into acquiring the Lewis Federal Savings and Loan Association ("Lewis Federal"), a failing Washington State thrift. (Gilkey, Tr. 90, line 15 through 91, line 17)

47. Unless Lewis Federal was acquired, the Government would have been obliged to pay an expected $6.049 million to liquidate the thrift. (P-1, p. 1)

48. By the time Sterling was contacted, the FHLB of Seattle had placed Lewis Federal into conservatorship and asked for bids. (Gilkey, Tr. 93, line 23 through 24, line 2)

49. Sterling bid on Lewis Federal and was selected to acquire the thrift; this transaction closed in early 1985. (Gilkey, Tr. 93, line 23 through 94, line 2; P-18; P-19)

50 In November 1985, Sterling acquired Lewis Federal Savings and Loan Association ("Lewis Federal"), a thrift with negative regulatory net worth.

51. When Sterling acquired Lewis Federal, Lewis Federal's liabilities were greater than the assets and it had a negative net worth. (Gilkey, Tr. 101, line 16 through 102, line 1)

**b. Sterling Bargained For And Received Contractual Provisions And Incentives Before Agreement To The Acquisition.**

52. In negotiating the acquisition of Lewis Federal, Sterling requested that the Government grant it certain regulatory forbearances, in order to allow Sterling appropriate time to evaluate and reform problem assets and deal with unanticipated problems. (Gilkey, Tr. 94, 16-23; P-3)

53. The FHLB agreed to grant Sterling a forbearance from adverse action, arising from its failure to meet net worth requirements, which resulted from Sterling's acquisition of Lewis Federal. (*Sterling Savings Assoc. v. USA*, 53 Fed. Cl. 599, 610-11 (2002), *amended on other grounds*, 72 Fed. Cl. 404 (2003), *vacated in part on rehearing* by 72 Fed. Cl. 404 (2006); Horvitz, Tr. 2024, line 20 through 2026, line 25; P-20, p. 2)

54. This forbearance meant that Sterling could subtract Lewis Federal from its total assets in determining Sterling's net worth for regulatory purposes or, alternatively, could subtract Lewis

Federal's deficiency capital. (Gilkey, Tr. 99, lines 3-18; Horvitz, Tr. 2099, line 9 through 2101, line 24; P-549)

55. This forbearance was designed to protect Sterling from any damaging consequences as a result of its acquisition of Lewis Federal, for a period of five years. (Gilkey, Tr. 99, lines 8-18)

56. In addition to the forbearance discussed above, Sterling received $1.75 million in cash assistance from Federal Savings and Loan Insurance Corporation ("FSLIC"), which the Assistance Agreement stated would be credited to Sterling's net worth account. (Gilkey, Tr. 108, lines 13-23; P-19, p. 6; JSF #3)

57. The acquisition of Lewis Federal provided Sterling with additional capital to leverage, and fit within Sterling's business plan of gathering rural deposits for metropolitan lending. (Gilkey, Tr. 114, line 19 through 116 line 6)

***2. Sterling Acquired Tri-Cities Savings & Loan In 1988.***

**a. Following The Acquisition Of Lewis Federal, The Government Approached Sterling Regarding Tri-Cities.**

58. After Sterling's successful acquisition of Lewis Federal, the managing officer of Tri-Cities Savings and Loan Association ("Tri-Cities") contacted Sterling and asked if it would be interested in acquiring Tri-Cities. (Gilkey, Tr. 125, lines 16-25)

59. Sterling and Tri-Cities entered into a letter of intent, permitting Sterling to conduct due diligence and evaluate a proposed private acquisition. (Gilkey, Tr. 125, lines 16-25)

60. After only three hours of conducting due diligence, Sterling opted not to acquire Tri-Cities where problems were significant; Sterling's decision was confirmed by Federal Regulators who expressed surprise that Sterling would even consider acquiring such a troubled thrift.

(Gilkey, Tr. 126, lines 1-15)

**b. The Tri-Cities Acquisition Was Directly Linked To Sterling's Acquisition Of Central Evergreen.**

61. Hilton Hewitt, Federal Home Loan Bank of Seattle supervisory agent to Central Evergreen Savings and Loan Association ("Central Evergreen") called Mr. Gilkey and asked if he wanted to be the "King of Chehalis" by acquiring Central Evergreen. (Gilkey, Tr. 126, line 16 through 127, line 8)

62. Mr. Gilkey declined, on behalf of Sterling, stating that Central Evergreen was too big, too problematic, and did not have capital. (Gilkey, Tr. 127, lines 1-8)

63. Two days after Sterling declined to acquire Central Evergreen, Mr. Hewitt again called and informed Sterling that if it acquired Tri-Cities, Sterling would have sufficient capital to acquire Central Evergreen. (Gilkey, Tr. 127, lines 9-17)

64. Sterling conducted due diligence on both Central Evergreen and Tri-Cities and bid on an assisted acquisition of Tri-Cities, however Sterling was not the original low bidder on Tri-Cities. (Gilkey, Tr. 127, lines 18-22; Gilkey, Tr. 158, line 22 through 159, line 6)

65. Upon learning that it was not the successful bidder on Tri-Cities, Sterling contacted Mr. Hewitt who told Sterling not to worry about the other bidder and that Sterling would win the bid. (Gilkey, Tr., 127, line 4 to 128, line 1; Gilkey, Tr. 159, lines 12-22)

66. Shortly after Mr. Gilkey's conversation with Mr. Hewitt, Sterling "magically" became the low bidder on Tri-Cities, and started the process for that acquisition and for acquisition of Central Evergreen. (Gilkey, Tr. 160, lines 3-16)

67. Sterling acquired Tri-Cities on April 8, 1988; and in doing so was able to obtain the capital to acquire Central Evergreen. (P-37; Gilkey, Tr. 733, line 12 through 734, line 8; Barnett,

Tr. 1207, lines 19-22; Horvitz, Tr. 2049, lines 3-23; *see also* P-391; JSF #4)

68. Shortly after the Tri-Cities acquisition, Sterling's MACRO ratings were at "2", the highest level typically awarded in practice. (Gilkey, Tr. 143, lines 10-18; Faulstich, Tr. 352, line 8 through 353, line 10; Horvitz, Tr. 2050, lines 8-20; P-40; P-268, p. 6)

**c. Sterling Bargained For And Received Contractual Provisions And Incentives Before Agreeing To The Acquisition.**

69. As with Lewis Federal, Sterling contracted for forbearances in connection with the Tri-Cities acquisition. (*Sterling Savings*, 53 Fed. Cl. at 610-11.; Gilkey, Tr. 129, lines 2-6; Horvitz, Tr. 2099, linen 9 through 2101, line 24; P-549)

70. Sterling's need for a forbearance in the Tri-Cities acquisition was even stronger than in the Lewis Federal transaction because Tri-Cities faced significant problems, including defalcation by the executive officer and the directorship and numerous problem assets which would take time for Sterling to resolve. (Gilkey, Tr. 132, line 22 through 133, line 15)

71. As part of the Tri-Cities acquisition, the Federal Home Loan Bank Board ("FHLBB") agreed that the initial cash contribution made pursuant to the Assistance Agreement would be a credit to Sterling's regulatory capital. (*Sterling Savings*, 53 Fed. Cl. at 610-11; P-28, ¶ 4)

72. The FHLBB also agreed to forbear from regulatory action for any failure by Sterling to meet capital requirements, for a five year period following the acquisition. (*Sterling Savings*, 53 Fed. Cl. at 610-11; P-28, ¶ 1)

73. Sterling received $11,730,128 in cash assistance from FSLIC. (*Sterling Savings*, 53 Fed. Cl. at 610-11; P-38, p. 17; JSF #5)

74. Sterling viewed the Tri-Cities acquisition as beneficial because of the capital it brought to Sterling. (Gilkey, Tr. 140, lines 6-12)

**d. Following The Acquisition Of Tri-Cities, Sterling Had Sufficient Capital To Acquire Central Evergreen.**

75. The Office of Thrift Supervision ("OTS") and Sterling understood that Sterling lacked sufficient capital to acquire Central Evergreen without the Government's cash assistance from the Tri-Cities transaction. (Friend, Tr. 2285, line 13 through 2286, line 12)

76. Recognizing the realities regarding Sterling's capital, Ed Hedlund, the OTS regulator for Central Evergreen, stated that Sterling's acquisition of Central Evergreen transaction was "subject to Sterling getting Tri-Cities." (P-375)

77. On July 1, 1988, Mr. Gilkey met with a representative of the OTS, and George Godding, president of Central Evergreen, to discuss Sterling's potential acquisition of Central Evergreen. (P-391)

78. The FHLBB obtained internal confirmation that Sterling could leverage FSLIC assistance, and at that meeting Sterling was told that the capital would be counted in such a way as to permit Sterling to acquire Central Evergreen. (Gilkey, Tr. 733, line 12 through 735, line 11; Gilkey, Tr. 739, line 15 through 740, line 4; P-390, P-391, P-392, P-393, P-399)

**C. FIRREA WAS IMPLEMENTED AND THE GOVERNMENT ENFORCED ITS REGULATIONS ON STERLING IN BREACH OF THE CONTRACTS.**

***1. The Enactment of FIRREA And Adoption Of Regulations Led To Breach.***

79. FIRREA was enacted in August 1989, and became effective in November 1989. (JSF #9)

80. FIRREA changed the computation of the capital ratio required to support assets. (Byrne, Tr. 1340, line 7 through 1342, line 10)

81. After FIRREA, an institution was required to meet a three-tier measurement: (1)

tangible capital at 1½ percent of tangible assets; (2) core capital divided by adjusted tangible assets at 3%; and (3) risk-based capital at 6.4% (which graduated over time to 8%). (Byrne, Tr. 1341, line 18 through 1342, line 10; Byrne, Tr. 1346, lines 7-12)

82. Before FIRREA, Sterling had total assets of $731 million and deposits of $519 million. (JSF #8)

83. However, even before FIRREA became effective, in July 1989, Sterling's "composite rating" was reduced to a "3" because of its anticipated capital deficiencies under the pending FIRREA legislation:

> The unassisted acquisition of Central Evergreen…at year-end 1988 has resulted in an increase in Sterling's overall level of risk. The primary concern is a currently low level of capital adequacy and increasing future capital requirements due to proposed legislative action increasing capital requirements and precluding, over a period of time, the inclusion of goodwill as capital.

(Horvitz, Tr. 2050, lines 15-20; Horvitz, Tr. 2053, line 9 through 2054, line 7; P-407, p. 1)

84. The OTS recognized that Sterling's perceived capital deficiency was a direct result of FIRREA, and was not a result of poor management or operations: "[t]he lack of capital compliance is due to the implementation of FIRREA versus unsafe and unsound operating procedures." (P-268, p. 8)

85. After the adoption of regulations following the enactment of FIRREA, Sterling's regulators (now OTS) formally instructed Sterling that, contrary to its contracts, it would not permit Sterling to treat the Government's cash assistance and supervisory goodwill as regulatory capital; as a direct result, the Government began to treat Sterling as an undercapitalized, troubled thrift, in Thrift Bulletin 38-2:

> The Office of Thrift Supervision is applying the new capital standards to all savings associations, including those associations that have been operating under

> previously granted capital and accounting forbearances. Section 5(t) of HOLA as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) eliminates these forbearances. All savings associations presently operating with these forbearances, therefore, should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards. (Any FSLIC capital contribution that resulted in the creation of goodwill will be subject to the requirements for goodwill established to the capital regulation).

Office of Thrift Supervision, Capital Adequacy: Guidance on the Status of Capital Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund, Thrift Bulletin No. 38-2, 1990 WL 309397 (Jan. 9, 1990).

### *2. Sterling Tried in Vain To Obtain Relief From The Government's New Restrictions Under FIRREA.*

86. After FIRREA's enactment, the Government informed Sterling that the Government was no longer obliged to comply with the terms of its contracts with Sterling, however the Government also informed Sterling that Sterling was obliged to comply with the same contracts. (Byrne, Tr. 1451, lines 6-11)

87. Holding Sterling to the contracts it had just disclaimed, the OTS maintained that Sterling "had a legal obligation" to raise capital under the Central Evergreen agreement. (Friend, Tr. 2309, line 24 through 2310, line 8; Friend, Tr. 2311, lines 8-14; Friend, Tr. 2019, line 18-23)

88. The OTS maintained that the Government's contracts with Sterling had no relevance to Sterling's demand for capital under the regulations; the Government also maintained that despite the fact that Sterling's capital-deficiency was a direct result of the Government's breach, FIRREA's regulations needed to be enforced and Sterling must enter a conservatorship. (Friend, Tr. 2335, line 1 through 2338, line 18)

89. With the enactment of FIRREA the Government ceased viewing Sterling as an ally

and began to see it as a problem:

> We were perceived, up until the time of FIRREA, as a savior for the savings and loan industry because of how we were approached by the Government to take over these failing thrifts. We saw it as a business opportunity. The Government saw it as a way to handle some issues that they really didn't want to handle. But when FIRREA came along, the interpretation of FIRREA, I believe, by the OTS and those contracts, how they interpreted the contracts, which negated the net worth and put us in an undercapitalized position in the eyes or the law of FIRREA, that's what happened. Now, because we were deemed to be an undercapitalized thrift that was in trouble at that time based on the fact that the capital that we had was taken away from us and based upon the law of FIRREA which basically said you have to have X capital, we didn't have it because it was taken away, the OTS applied restrictions to us . . .

(Barnett, Tr. 1198, line 16 through 1199, line 11)

90. Viewing Sterling as an undercapitalized troubled thrift, on November 9, 1989, OTS ordered Sterling to cease to grow its assets beyond growth incidental to interest credited to existing deposit accounts. (P-247)

91. The Government also hamstrung Sterling's ability to grow through acquisitions; for example, the Government refused to permit Sterling to purchase two branches of Great American Bank ("Great American") until Sterling was in compliance with FIRREA's new capital requirements. (Gilkey, Tr. 212, lines 15-24; Friend, Tr. 2307, line 19 through 2308, line 15; P-413; DX-388)

92. The Government also discouraged Sterling from accepting or renewing uninsured deposits, or deposits that exceeded the $100,000 insured by the FDIC. (Gilkey, Tr. 231, line 16 through 232, line 21; P-256)

93. Additionally, the Government imposed a $500,000 lending limitation, which forced Sterling to discontinue its commercial real estate lending. (Gilkey, Tr. 237, line 3 through 239, line 6; P-258)

94. The Government also denied Sterling the right to accept, renew or rollover brokered deposits, again based upon Sterling's capital position. (P-285; P-288)

95. As a result of this Government action, Sterling was severely limited in the amount of loans it could make; this in turn curtailed its profitability. (Gilkey, Tr. 232, lines 9-21; Gilkey, Tr. 233, line 6 through 236 line 10)

96. Sterling was unable to grow between November 1989 and November 1991 due to FIRREA's impact on its capital levels and the OTS' resulting operating restrictions. (Byrne, Tr. 1965, line 14 through 1966, line 6)

### ***3. In Accordance With Its Business Plan, Sterling Attempted To Raise Capital In 1989 That Would Have Brought It Into Compliance With FIRREA's Regulations.***

97. In July 1989, the Government knew that Sterling intended to raise capital of up to $20 million through a public stock offering. (Gilkey, Tr. 178, lines 1-17; P-407, p. 2; P-246A, p. 2)

98. Mr. Potthast, an OTS field manager, stated the obvious, but fundamental: "You have to have capital to grow." (Potthast, Tr. 3250, lines 20-22; *see also* P-268, p. 6)

99. In or about August 1989, the Government told Sterling it was still obligated to complete the offering under its contracts, even though the Government was in breach after FIRREA. (Gilkey, Tr. 186, line 25 through 187, line 10)

100. Sterling entered into an agreement with its investment bankers, Dain Bosworth, to proceed with a public offering of $18 million. (P-408, p. 1)

101. In October 1989, the offering amount was reduced to $10 million. The reduction was necessary in order to preserve a net operating loss tax benefit that benefitted both to Sterling and the Government. (Gilkey, Tr. 190, line 8 through 192, line 16; Friend, Tr. 2220, line 20 through 2221, line 6; P-306; P-411)

102. Because Sterling did not then meet FIRREA's capital ratios (without the benefit of its contracts), on advice of its investment bankers, Sterling sought:

> . . .assurance with respect to Sterling's ability to continue to pay dividends, notwithstanding temporary noncompliance with the capital requirements under FIRREA. Specifically, we ask that you indicate that the Office of Thrift Supervision - Twelfth District would not object to Sterling's payment of dividend on the Preferred Stock in the future assuming that Sterling continued its operations in a safe and sound manner and that funds for the payment of such dividends were legally available, notwithstanding noncompliance with the capital requirements under FIRREA.

(Gilkey, Tr. 196, lines 4-16; Welch, Tr. 1575, line 4 through 1578, line 6; *see also* P-268, p. 6; P-342)

103. Sterling had strong investor support for the 1989 offering, which was oversubscribed. (Byrne, Tr. 1433, lines 4-20; Gilkey, Tr. 195, line 4 through 196, line 3)

104. The OTS knew that the offering could not succeed without its non-objection to Sterling paying future dividends on the stated conditions. (Friend, Tr. 2316, line 16 through 2317, line 14; Friend, Tr. 2323, line 14 through 2324, line 10)

105. The OTS indicated that it was in the Government's and Sterling's best interests for Sterling to raise capital, and that it therefore would be illogical to deny Sterling's request. (Byrne, Tr. 1962, line 21 through 1963, line 24; P-345; *see also* DX-373)

106. This statement encouraged Sterling to proceed with the road shows and other preludes to the offering. (Byrne, Tr. 1962, line 21 through 1963, line 24)

107. On December 12, 1989, Mr. Gilkey and Mr. Byrne met with Donald Dochow, the second in command of the OTS in Washington, D.C., to discuss the need for the acceleration of the process for review of the dividend issue. (Gilkey, Tr. 198, line 7 through 199, line 18; P-253)

108. After hearing of Sterling's plans to regain capital compliance, Mr. Dochow indicated

that if any institution was worthy of an exemption from FIRREA's capital requirements, Sterling appeared to qualify. (Gilkey, Tr. 203, lines 1-12; P-253)

109. Sterling was not granted an exemption. Instead the OTS denied the request for nonobjection to future payment pay dividends because Sterling was not in compliance with the capital ratios of FIRREA; the OTS never granted FIRREA requirements. (Friend, Tr. 2413, lines 5-21; Friend, Tr. 2309, lines 1-23; P-254)

110. The planned stock offering was cancelled because OTS refused to state its nonobjection. (Byrne, Tr. 1445, lines 15-23; Horvitz, Tr. 2094, lines 12-19; James, Tr. 2891, line 16 through 2892, line 6; P-268, p. 6; *see also* JSF #10)

111. Sterling incurred costs paid to Dain Bosworth and for printing costs and road shows as a result of the Government's refusal to allow dividends and resulting cancellation of the offering. (Gilkey, Tr. 208, line 10 through 209, line 5)

112. The Government knew its position "would be death to a new offering." (Gilkey, Tr. 211, line 25 through 212, line 7)

113. On November 9, 1989, while Sterling was in the process of promoting the offering described above, the Government notified Sterling that it believed that Sterling would fail to meet FIRREA's capital requirements and that Sterling was therefore obliged to submit a capital restoration plan; this required Sterling to limit its expected growth by seventy-five percent (75%). (Byrne, Tr. 1430, line 6 through 1431, line14; P-247, p. 1; Gilkey, Tr. 227, line 1 through 228, line 6; P-247, p. 2)

### ***4. Sterling Attempted To Mitigate The Harm Caused By Its FIRREA Non-Compliance.***

#### **a. Sterling Shrank Its Assets To Meet Required Capital Ratios.**

114. Having been denied the benefit of its contracts with the Government, Sterling's regulatory capital fell short of FIRREA's requirements; due to the OTS' restriction of Sterling as a capital-noncompliant thrift, Sterling was wholly unable to grow from January 26, 1990 to November 1991. (Byrne, Tr. 1538, lines 12-20; Page, Tr. 1125, lines 15-24)

115. Sterling could not raise capital because of the regulators' refusal to state that they would not object to endorse dividends so long as Sterling was in compliance. (Gilkey, Tr. 211, line 25 through 212, line 7)

116. Due to the Government order that it cease growing and in light of the Government's refusal to honor its contractual capital promises and forbearances, Sterling attempted to shrink its assets to reduce the regulatory threat. (*See* P-280, 281) Sterling was forced to stop making most types of construction loans, one of Sterling's most profitable markets; Sterling was also unable to renew active loans, thereby further reducing its profitability. (Byrne, Tr. 1462, line 19 through 1463, line 12; P-280, P-281)

117. Between 1989 and 1991, Sterling reduced its assets from approximately $730 million to approximately $590 million. (Gilkey, Tr. 278, line 8 through 279, line 2; *see* JSF#11)

118. Sterling had not planned to shrink in 1990 or 1991. (Page, Tr. 1144, lines 7-9)

**b. Sterling Obtained A TRO And An Injunction.**

119. By April 11, 1990, the Government began the process of closing Sterling by sending its Board of Directors a letter for consent to an appointment of a conservator; Sterling's Board refused to consent to a conservatorship, pointing out that any capital deficiency was caused by the Government's breach of the contracts. (P-269; P-270)

120. OTS regulators invited themselves to a Sterling board meeting to impress upon the

directors that the directors were obligated to agree to a conservatorship. (Friend, Tr. 2335, line 1 through 2338, line 18)

121. Sterling met with the OTS in Seattle to convey its concerns about the proposed conservatorship; the OTS stated, regardless of the contracts, "the FIRREA legislation has made these contracts null and void." (P-274)

122. The day after this meeting, the Government sent correspondence insisting that Sterling sign the agreement. (P-271)

123. Contemporaneously, the head of the Seattle office of the OTS and Ed Hedlund, Sterling's regulator, stated that despite the OTS's intent to shut Sterling down, there were no problems with Sterling's management. (P-274, p. 7)

124. Sterling appealed to the Director of the OTS, again asking that its contracts be honored. (P-272)

125. The Government imposed more restrictions through a letter sent to the Board of Directors at their homes; these regulations effectively shut down any profitable business. (Gilkey, Tr. 247, lines 3-15; P-273)

126. These letters were implied threats that if the board did not acquiesce to the OTS's desires the directors would be individually and personally liable. (Barnett, Tr. 1186, lines 5-21)

127. OTS personnel appeared at board meetings and made similar threats to both the individual members and the company; again the Government threatened Sterling's directors with personal liability if they did not surrender the company. (Barnett, Tr. 1187, lines 13-20)

128. The Government ordered Sterling to execute a Capital Directive, which would end Sterling's remaining business opportunities and waive Sterling's right to judicial review.

(P-275A)

129. Sterling again met with the OTS in an attempt to find a solution to the capital deficiency caused by the Government's breach, however the OTS refused to provide Sterling time to raise the necessary capital. (P-276, pp. 2-7)

130. Sterling offered several capital plans with alternatives to gain the necessary capital, including shrinking the company, selling branches, returning Tri-Cities and Central Evergreen to the Government and reviving the offering that failed in November 1990. (Byrne, Tr. 1474, line 16 through 1476, line 3)

131. Despite Sterling's efforts, the Government maintained that the only option was to sell Sterling Savings Bank. (Byrne, Tr. 1476, lines 7-11)

132. At this point Sterling faced Government Regulators intent on closing it down and had no choice but to, on May 29, 1990, petition the Court for a temporary restraining order ("TRO"), which it obtained. (Gilkey, Tr. 249, lines 21-23; JSF #13)

**i. Despite The Injunction, The Government Continued To Regulate Sterling As A Capital-Deficient Thrift.**

133. Six days after Sterling obtained the TRO, the OTS imposed a new restriction, this time requiring Sterling to provide weekly reports of any actions not in compliance with the previous restrictions. (P-277)

134. Sterling objected, noting that in its view this new restriction violated the terms of the temporary restraining order. The OTS stated, via reply letter, that the TRO in no way impacted the concerns it had regarding Sterling, and rephrased the basis for its concern in terms of "safety and soundness":

> We fully recognize that, until the Temporary Restraining Order is dissolved or the court orders otherwise, we may not enforce the restrictions set forth in our letters of January 26th, March 9th and May 11th. We intend to strictly obey the court's order. However, as our earlier letters indicated, we have significant Supervisory concerns about the condition of Sterling and the soundness of some aspects of its operations.

(P-278; P-279)

135. Sterling understood the OTS' letter to indicate that, despite the TRO, the Government would not be dissuaded from shutting Sterling down under the aegis of "safety and soundness" "concerns":

> They use the words safety and soundness to open the doors to regulatory activity. To me, it meant big trouble.

(Gilkey, Tr. 252, lines 9-22)

136. The Government's expressions of "concerns" about "safety and soundness" were driven by Sterling's perceived capital deficiency. (P-268; P-284, P-464)

137. Despite the Government's expression of concern about Sterling's "safety and soundness", it internally recognized that there were, in fact, no safety and soundness grounds to sanction Sterling and that its problem was solely capital deficiency after FIRREA:

> The lack of capital compliance is due to the implementation of FIRREA versus unsafe and unsound operating practices. Lending restrictions imposed by RB 3a are in place. With the acceptance or rejection of this capital plan, a formal enforcement document will be executed.

(P-268, p. 9)

138. Sterling did believe and was told numerous times that the restrictions were still operative, despite the TRO. (Byrne, Tr. 1822, lines 2-12; Byrne, Tr. 1501, lines 17-24; ; P-281 DX-441)

139. Despite the TRO, the OTS continued to indicate that Sterling was subject to such

restrictions. (Friend, Tr. 2352, line 18 through 2356, line 10; P-281)

140. Given the OTS' continued restrictions in spite of the TRO, Sterling decided to comply with the reporting restriction to avoid further regulatory punishment. (Gilkey, Tr. 254, line 12 through 256, line 18; P-280)

141. On June 20, 1990, while the TRO was in full effect, the Government re-confirmed that Sterling was permitted no growth; Sterling continued to report variances from restrictions imposed upon Sterling. (P-282; Gilkey, Tr. 257, lines 12-22; P-281)

142. On June 25, 1990, the Government explained that the restrictions were justified independently of any problems resulting from the Government's breach; Sterling concluded that the only protection the TRO afforded was that the Government could not close Sterling unless it established a violation of one of the restrictions that the Government claimed was unaffected by the TRO. ( Gilkey, Tr. 258, line 19 through 259, line 7; P-283; Gilkey, Tr. 258, line 25 through 259, line 7)

143. Notwithstanding that Sterling's capital deficiency was due to the Government's breach, and the Court's Order restraining the it from taking action inconsistent with the terms of the contracts, the Government conducted an examination focused on Sterling's capital position and assigned a "5" rating – the lowest possible. (P-284; P-287)

**ii. The Court Issued A Preliminary Injunction Continuing The Terms Of The TRO, But The Government Persisted In Unlawful Enforcement.**

144. On August 8, 1990, the Court issued a preliminary injunction continuing the terms of the TRO; subsequent to that Order, the Government sought, and received, an order clarifying that the TRO/injunction did not forbid it to regulate on the basis of "safety and soundness". (Gilkey, Tr. 263, lines 7-12; DX-460; Gilkey, Tr. 741, line 24 through 742, line 16; JSF #13, JSF #14, JSF

#15)

145. In September 1990, Sterling invested $35 million in mortgaged-backed securities, funding the investment with borrowings from the FHLB of Seattle; even though the FHLB was involved, the OTS "came down with both feet" and responded with examiners and requests for documentation. (Gilkey, Tr. 263, line 13 through 264, line 13; Gilkey, Tr. 264, lines 14-20; Gilkey, Tr. 627, lines 17-24; P-289)

146. By that time the Government had disclaimed any duty to comply with its contracts with Sterling; however, the Government nonetheless demanded that Sterling provide documentation showing that the above transaction complied with the Business Plan "included with the Central Evergreen Agreement." (P-289)

147. The Government again sent letters to Sterling's Board members at their homes; again imposed additional restrictions; and again threatened the board with individual liability and civil monetary penalties. (Gilkey, Tr. 265, line 3 through 266, line 22; P-290)

148. Sterling considered seeking a contempt order on the grounds that the OTS was not complying with the Court's injunctions, but decided that, in view of its desire to run a business, initiating further litigation would only harm the thrift. (Gilkey, Tr. 267, line 17 through 269, line 1; Gilkey, Tr. 753, lines 6-14; P-291)

149. After Sterling reminded the OTS of the preliminary injunction, the OTS retreated somewhat, but reiterated its intent to regulate Sterling as a troubled thrift but requesting more information for its evaluation. (P-292)

150. Sterling responded: (1) that the OTS was treating Sterling as a troubled institution because of the capital deficiency caused by the Government's breach; (2) that OTS regulators

were present at the Board meeting at which the above transaction was approved and yet waited until the transaction was completed to question it; and (3) by demonstrating that the transaction complied with the Business Plan of the Central Evergreen agreement. (P-293)

151. For its part, the FDIC acknowledged that Sterling would meet its capital requirements if the Government were to honor the contracts. Thus, on September 7, 1990, FDIC reversed its designation that Sterling was capital-deficient. (P-288) Despite this acknowledgment, the OTS did not lift the operating restrictions on Sterling until April 1992. (Gilkey, Tr. 622, lines 9-14; Gilkey, Tr. 726, line 14 through 727, line 8 P-288; P-299B)

152. The Government appealed the preliminary injunction; Sterling continued to report to the Government regarding the restrictions during the pendency of the appeal. (Gilkey, Tr. 273, lines 13-23; P-297) On April 14, 1992, the 9th Circuit Court of Appeals vacated the injunction. (JSF #17)

153. The injunction did not enable Sterling to grow as it had planned to grow prior to the breach; specifically, the remaining restrictions left Sterling without the capacity to increase its lending business either from a regulatory or management standpoint. (Gilkey, Tr. 284, line 17 through 285, line 12; Gilkey, Tr. 284, line 17 through 285 line 12)

154. In fact, the OTS steadfastly refused to deviate from the restrictions, even when Sterling requested permission to fund a risk-free loan. (Neely, Tr. 1025, line 16 through 1028, line 12)

155. Sterling continued to lose customers both during and after the injunction. (Beil, Tr. 1307, lines 3-13)

**c. Sterling Ultimately Raised Capital.**

156. In November 1991, Mr. Hedlund told Sterling's investment banker that if capital was raised, the regulatory problems would disappear. (Welch, Tr. 1575, line 4 through 1578, line 6)

157. In November 1991, Sterling raised approximately $23 million through a public offering of common stock and the conversion of $2.1 million in preferred stock to common stock. (JSF #16)

158. Sterling's public offering raised enough capital to put it into capital compliance under FIRREA. (Gilkey, Tr. 274, lines 16-21)

159. As a result, on April 8, 1992, the Government lifted the operating restrictions imposed by Sterling prior to and during the term of the injunction. (P-299A; P-299B)

160. This capital raising, however, did not make Sterling whole from the breach. (Gilkey, Tr. 291, lines 12-15; Gilkey, Tr. 390, line 19 through 391, line 10)

161. Sterling had lost people, assets, deposits and income and, on a going-forward basis, had lost the capital that could be invested in profitable assets over time. (Gilkey, Tr. 291, line 25 through 292 line 5)

## D. STERLING SUFFERED HARM AS A RESULT OF THE GOVERNMENT'S ACTIONS.

### *1. Sterling Lost Valuable Assets And Was Precluded From Seeking Others.*

#### a. Sterling Lost Valuable Business Customers.

162. The harm to Sterling was not limited to the business Sterling had to direct to competitors because of these restrictions:

> By declaring us a capital deficient company, we lost the capital that we contracted for and had sought out forbearances to match the time frames we needed to solve the problems. So we lost capital. We lost people in significant numbers, high quality portfolio group of good bankers, good mortgage bankers. We lost loans. And we lost deposits. I might parenthetically add here, that's what a bank is, is capital, loans, deposits, and -- and its people make it up. But

> for me personally, the thing that added to that was the reputation was substantially tainted. And a banker banks on his reputation.

(Gilkey, Tr. 220, line 14 through 221, line 9)

163. Business clients look to both the stability and reputation of an institution and the relationship with the individual banker. (Beil, Tr. 1298, lines 2-13; Beil, Tr. 1298, line 19 through 1299, line 4)

164. FIRREA and the restrictions caused uncertainty among employees and customers, causing several customers to leave. (Neely, Tr. 1036, lines 7-10; Neely, Tr. 1047, line 16 through 1048, line 20)

165. Such uncertainty was devastating, particularly to relationships with business customers. (Beil, Tr. 1301, lines 6 -14)

166. In mid-1990, Sterling customers and the business community exhibited concern because of the growing media attention as to the impact of FIRREA on Sterling. (Neely, Tr. 1017, line 24 through 1019, line 22)

167. Sterling's reputation in the community was affected. (Beil, Tr. 1305, lines 1-7)

168. Customers, in some instances, followed loan officers who left Sterling to new institutions. (Neely, Tr. 1029, line 22 through 1030, line 3)

169. Sterling literally walked one customer across the street so he could open a $1.7 million account with a competitor because Sterling could not take the uninsured deposit. (Gilkey, Tr. 235, lines 6-12)

170. Almost twenty years later, people still ask Sterling about FIRREA and this lawsuit. (Stanley, Tr. 1281, lines 6-13)

**b. Experienced Employees Left Sterling Following The Breach.**

171. The shrinkage did not just affect Sterling's assets, but affected the entire organization of the bank:

> We lost people, good friends, people that were capable of becoming superior bankers. We lost customers that I had had for years that went to other companies. And I never saw them again from a customer standpoint. We lost deposits which we were never able to recover. And reputation-wise, it was a very difficult time both – even after the – the offering, our competitors, others questioned our capability and our reputation.

(Gilkey, Tr. 280, line 24 through 281, line 12)

172. Sterling had significantly higher turnover in its staff after the passage of FIRREA and attendant imposition of restrictions. (Stanley, Tr. 1256, line 21 through 1259, line 6)

173. Staff left because of concerns that they would lose their jobs and the constraints limiting the amount of business that could be done at Sterling. (Stanley, Tr. 1264, line 19 through 1265, line 5)

174. The OTS restrictions affected staff morale. (Neely, Tr. 1020, line 22 through 1021, line 8)

175. Key employees, including Cajer Neely, left Sterling because customers were leaving and Sterling did not have the capability of creating new business to replace what had been lost. (Neely, Tr. 1024, line 20 through 1025, line 3)

**c. The Government's Regulations Precluded Sterling From Pursuing Business Banking.**

176. On March 9, 1990, the Government allowed Sterling to engage in limited business banking lending, but imposed restrictions that made profitable lending impossible. (Gilkey, Tr. 240, line 5 through 241, line 9; Gilkey, Tr. 242, line 25 through 244, line 10; P-266)

177. Specifically, the Government required Sterling to reduce its business banking loans,

which can only be accomplished by not renewing loans that come due and by asking customers to take their loans elsewhere. (Gilkey, Tr. 240, lines 5-14; P-266)

178. The Government also barred Sterling from issuing letters of credit. (Gilkey, Tr. 240, line 15 through 241, line 9; P-266)

179. The effect of barring letters of credit was twofold: (1) Sterling lost the fee income from issuing such letters; and (2) to accommodate its customers, Sterling was forced to take the customers to competitors to obtain letters, "effectively…saying to the customers [that] we can no longer manage your business." (Gilkey, Tr. 240, line 15 through 241, line 9)

180. The commercial banking department could not increase customers and could not make additional extensions to existing customers, affecting its ability to make loans. (Neely, Tr. 1045, lines 6-14)

***2. Two Profitable Subsidiaries Faced Severely Restricted Business Activities.***

**a. Intervest**

181. The effect of the Government's "loans to one borrower" restriction virtually closed down Intervest which, at that time, averaged $5 million per loan. (Gilkey, Tr. 216, line 10 through 217, line 10)

182. During 1989 through 1992, Intervest's profits went from $600,000 per year to zero. (Gilkey, Tr. 218, line 21 through 219, line 7)

183. After FIRREA, Intervest was forced to stop lending and ceased to grow. (Harlow, Tr. 805, lines 16-24)

184. Intervest was able to honor its existing contracts, but could not originate new loans and was forced to reduce the staff of loan officers from eleven to one and total staff was reduced

to three people. (Harlow, Tr. 807, line 18 through 808, line 19)

185. Intervest's core business is financing commercial real estate construction and purchase. (Crithfield, Tr. 1062, line 23 through 1063, line 3)

186. Loan producers are critical for the success of Intervest because of their expertise and their personal relationships with customers. (Harlow, Tr. 783, lines 1-22)

187. Intervest grows its business through hiring good loan producers. (Harlow, Tr. 783, line 23 through 784, line 22)

188. Loan officers were let go because there was no more work after FIRREA. (Crithfield, Tr. 1064, lines 16-20)

189. Loan officers were forced to tell valued customers that Intervest could not lend. (Crithfield, Tr. 1066, line 4 through 1067, line 7)

190. At that point, no person at Intervest was producing loans. (Harlow, Tr. 808, lines 20-25)

191. In 1990, Intervest did $21 million in lending. (Harlow, Tr. 812, lines 8-15)

192. In 1991, the volume was $0. (Harlow, Tr. 812, lines 15-17)

193. Since Sterling came into capital compliance in 1991, Intervest's trend has been dramatically positive. (Harlow, Tr. 822, lines 16-18)

194. By 1994, Intervest's loan production was $104 million. (Harlow, Tr. 817, lines 6-13)

195. In 2006, Intervest's loan production was $1.5 billion. (Harlow, Tr. 822, lines 22-25)

196. Sterling did not plan for or have a business reason to take Intervest's lending to 0 in 1991. (Harlow, Tr. 823, line 4 through 824, line 1)

197. But for the constraints imposed upon Intervest in late 1989 and early 1990, Intervest's

growth would have continued in 1990, 1991, and to the present day. (Harlow, Tr. 824, lines 4-11; Harlow, Tr. 825, line 3 through 826, line 5; Harlow, Tr. 858, lines 5-11)

198. FIRREA cost lost profits for Intervest because of forgone loans. (Harlow, Tr. 850, lines 13-16)

**b. Action Mortgage**

199. The restriction also severely limited the business of Action Mortgage Company ("Action"). (Gilkey, Tr. 217, line 22 through 218, line 20)

200. Sterling lost its residential construction lenders, the backbone of Action, because its customers could not be serviced under the OTS restrictions. (Gilkey, Tr. 218, lines 2-20)

201. Action lost 35 to 40 loan officers. (Stanley, Tr.1269, line 25 through 1270, line 5)

***3. Following The Lifting Of The Restrictions And Sterling's Return To Capital Compliance, Sterling Began To Grow Again But Was Never Able To Attain The Growth It Would Have Had If It Not Been Restricted After FIRREA.***

**a. Sterling Is A Smaller Bank Than It Would Have Been But-For The Breach.**

202. But for the Government's breach and Sterling's resultant shrinkage, Sterling would have been approaching $1 billion in size on September 30, 1990. (Gilkey, Tr. 281, line 13 through 282 line 7)

203. The shrinkage affected Sterling's growth even after 1991, and Sterling has never caught up to where it would be but-for the breach:

> A: …[I]t decreased our base of capital from which to grow from. So it's like taking a piece out of a puzzle that we had to replace before we could continue our growth pattern.
>
> Q: Do you have any belief as to – as chief credit officer for Sterling Savings as to whether but for the occurrences in early 1990, you would have been a bigger bank in 1990 in terms of loans receivable on the books?

* * *

A: Absolutely.

Q: Is there any doubt in your mind about that?

A: None whatsoever.

Q: How about 1990?

A: There's no doubt.

Q: No doubt about what?

A: That we would have grown.

Q: Larger than you actually were?

A: Absolutely.

Q: And then once you started to grow again, do you believe that Sterling has grown into the position it would have occupied if none of this had ever happened? Did you get it all back in the marketplace yet?

* * *

A: I don't' think you ever replace that. That's a piece of the puzzle that is – is – would have been additive to the whole growth pattern of our company. I don't' know how you – it's gone.

Q: Do you believe you would be a bigger bank today but for the breach?

A: Absolutely.

Q: Is there any doubt in your mind about that?

A: None whatsoever.

(Page, Tr. 1144, line 18 through 1147, line 1 (objections overruled and omitted))

**b. Sterling Could Have Used The Additional Capital It Lost As A Result Of The Breach To Support Additional Assets.**

204. Sterling could have and would have utilized the supervisory goodwill taken by the

breach. (Page, Tr. 1103, lines 2-9; Welch, Tr. 1598, lines 11-19)

205. Sterling could have used the additional assets that would have been supported by the capital lost from the breach. (Gilkey, Tr. 282, lines 11-19; James, Tr. 2830, lines 20-25)

206. Sterling had not experienced any problem growing prior to the breach, and did not expect any difficulty doing so after the breach. (Gilkey, Tr. 283, line 7 through 284, line 1)

207. Since 1991, Sterling has raised capital in every year but two. (Gilkey, Tr. 290, lines 1-7 and 13-19; Gilkey, Tr. 418, line 24 through 419, line 2; Welch, Tr. 1628, lines 21-25; P-501; P-505)

208. On an ongoing basis, Sterling seeks additional capital in order to pursue value enhancing growth. (Gilkey, Tr. 290, lines 8-12; Gilkey, Tr. 416, lines 4-7)

209. In the early 1990s and mid-1990s, Sterling's core capital slightly exceeded the minimum; later, the cushion expanded. (Byrne, Tr. 1347, lines 8-23; Bajaj, Tr. 4141, lines 1-18; P-513)

210. However, Sterling's risk-based capital has remained just above the well-capitalized threshold. (Byrne, Tr. 1347. lines 8-23; P-513)

211. Sterling has never voluntarily turned down an opportunity to raise capital. (Gilkey, Tr. 291, lines 8-11; Gilkey, Tr. 416, lines 4-7)

**c. Sterling's Profits Continued To Grow Even As It Acquired More Assets.**

212. Sterling's return on average assets, or the earnings generated from those assets, was not compromised or lowered as a result of Sterling's rapid expansion. (Gilkey, Tr. 157, lines 7-13)

213. In fact, Sterling's return on average assets has improved from 1991 through the

present. (Byrne, Tr. 1654, line 20 through 1655, line 19; P-506; P-512)

214. Despite Sterling's growth, it has been able to achieve a stable net interest margin which resulted in stable rate of return on assets. (Byrne, Tr. 1662, line 23 through 1663, line 13; P-507)

215. Sterling's profit margin improves as it grows because of efficiencies in costs of administrations, geographic diversity and risk diversity. (Page, Tr. 1108, line 9 through 1109, line 21)

216. Sterling has been profitable in every quarter of its existence save one. (Byrne, Tr. 1659, lines 6-16)

217. The economy in the Pacific Northwest during the early 1990s was positive, with growth in the population, personal income, employment, and agricultural economy. (Gilkey, Tr. 284 lines 3-12; Faulstich, Tr. 343, line 20 through 344 line 6; Conerly, Tr. 885, lines 5-10)

218. Sterling grows every year even without knowledge of who its new customers will be:

> Q: Do you know who the borrowers are who are going to make up that…700 million something in new business that you have to do [to meet growth goals]?
>
> A: No.
>
> Q: How can you be confident that you'll get there?
>
> A: Because we've done it in the past.
>
> Q: Do you think you can do it again?
>
> A: Absolutely.

(Page, Tr. 1142, line 22 through 1143, line 25)

219. Sterling had a small market share, and therefore could always acquire new business. (Page, Tr. 1104, line 1 through 1105, line 19)

220. At the time of the breach, Sterling was expanding into markets where previously it had not done business. (Gilkey, Tr. 284, lines 13-16) This geographic expansion enabled Sterling to grow without sacrificing asset quality or profitability. (Page, Tr. 1109, lines 10-21)

221. Sterling's divisions do not always meet their budgets, but Sterling still grows and remains profitable. (Page, Tr. 1113, line 13 through 1115, line 13)

222. Right now, if it had more capital, Sterling could utilize it; Sterling would put a corporate banking team in Bellevue, Washington, another in Seattle, and put multiple teams in Northern California. (Page, Tr. 1104, line 10 through 1105, line 1)

223. In 1995, years after the 1991 offering, the Government acknowledged that the capital position of Sterling "severely limit[ed]" its growth opportunities. (D-263, Bates 0053028)

## E. STERLING SUFFERED DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF CONTRACT.

### *1. Lost Profits*

224. Paul M. Horvitz is an economist who has specialized in the economics of the banking and financial markets over the course of his 50-year career. (Horvitz, Tr. 1978, line 20 through 1979, line 24; P-490) He is the Professor Emeritus of Finance at the University of Houston. He joined the faculty at the University of Houston as a Professor of Finance in 1977 and served as the Judge James A. Elkins Professor of Banking and Finance at the University of Houston from 1981 to 2000 when he retired from full-time lecturing. (Horvitz, Tr. 1986, lines 7011; P-490)

225. After graduating with a Ph.D. in economics from Massachusetts Institute of Technology in 1958, Professor Horvitz spent approximately 16 years with the federal banking regulatory agencies, first as a Financial Economist with the Federal Reserve Bank, later as a Senior Economist with the Federal Reserve Bank, later as a Senior Economist and Associate

Director of the Department of Bank in the Office of the Comptroller of the Currency, and then as a Director of Research and Deputy to the Chairman of the Federal Deposit Insurance Corporation (Horvitz, Tr. 1980, line 2 through 1984, line 23; P-490)

226. Professor Horvitz conducted research and has published extensively in the field of banking and finance including publications dealing with the thrift crisis in the 1980's, the threat to the FSLIC insurance fund, and the resulting legislation enacted in 1989. (Horvitz, Tr. 1985, lines 18-25; P-490) His publications total over 10 books and monographs, more than 50 articles in professional journals, and approximately 20 papers published in books. (Horvitz, Tr. 1989, line 7 through 1990, line 15; P-490)

227. Professor Horvitz taught almost exclusively in the areas of financial institutions, commercial banking and bank management, both at the undergraduate and graduate levels. (Horvitz, Tr. 1985, lines 14-17; P-490)

228. Professor Horvitz has consulted in his field over the years with agencies of the United States Government, including the Department of the U.S. Treasury, the Federal Deposit Insurance Corporation, the Federal Home Loan Bank Board, and other Governmental entities. (Horvitz, Tr. 1990, line 16 through 1993, line 17; P-490) He has testified before Congress on 10 to 12 occasions at hearings held by the U.S. Senate Banking and House Banking Committees and the House Small Business Committee. Much of his Congressional testimony during the 1980's and 1990's directly related to the thrift crisis and consideration of public policy to deal with it. (Horvitz, Tr. 1993, line 15 through 1994, line 2; P-490) Professor Horvitz has also testified several times before the Office of Thrift Supervision at public hearings over pending regulations (Horvitz, Tr. 1995, lines 11-20; P-490)

229. Professor Horvitz has served as a member of the Board of Directors of the Federal Home Loan Bank Board of Dallas, at the request of the Government as a Director of three savings and loan associations placed in the FSLIC Management Consignment Program, and was a member of the Board of Directors of Bank United of Texas, the largest thrift financial institution in Texas. (Horvitz, Tr. 1996, line 2 through 1997, line 25; P-490)

230. In addition to having been retained as an expert witness in fifteen to twenty non-*Winstar* cases, including cases over the year where he has been retained by the Government, Professor Horvitz has been retained and testified in four to five of the *Winstar* cases. (Horvitz, Tr. 1998, line 13 through 1999, line 21; Horvitz, Tr. 2004, lines 17-21; P-490)

231. Having spent his entire career devoted to research, publishing, teaching, and testifying before Governmental agencies about financial institutions and the thrift crisis and having served on the board of directors of financial institutions, Professor Horvitz is particularly well-qualified both from an academic as well as a practical standpoint to offer opinions as to the nature and extent of the injury sustained by Sterling as a result of the breach and as to the appropriate measure and amount of damage for the injury.

232. Understanding the magnitude and severity of the damages incurred by Sterling, as a result of the Government's breach of its agreements involved in Sterling's acquisition of insolvent thrifts, requires an understanding of the thrift crisis in the mid to late 1980's, the resulting threat to the FSLIC insurance fund, and the Government's method of dealing with the threat.

233. The thrift industry was created to facilitate home ownership through cheaper mortgages. Thrifts used deposit from the public to make mortgage loans to the public. (Horvitz, Tr. 2013, lines 1-25) Starting in the early 1980's, many thrifts experienced serious financial

difficulties when there was a prolonged period of very high interest rates. Many thrifts were forced to pay interest on deposits at substantially higher rates than they were earning on their long-term mortgage assets. For example, many thrifts had long-term mortgages on their books made in the 1960's or early 1970's at fixed rates of 6 or 7 percent; yet market conditions required them to pay 10 to 12 percent interest on deposits. (Horvitz, Tr. 2013 line 1 through 2015, line 7)

234. Many thrifts suffered operating losses. Many were unable to meet their capital requirements. Some failed and many more were in danger of failing. (Horvitz, Tr. 2015, lines 5-7, 20-21)

235. In turn, these events put pressure on the FSLIC insurance fund and the magnitude of the problem exceeded FSLIC's available resources. FSLIC did not have the funds available to resolve the number of failing thrifts. (Horvitz, Tr. 2015, lines 8-25)

236. Responding to this very real crisis to the insurance fund, FSLIC sought out healthy, capital-compliant, well-managed thrifts to absorb the failing thrifts and their negative net worth. (Horvitz, Tr. 2016, line 1 through 2017, line 1) FSLIC offered inducements to healthy institutions to take over failing ones, including special accounting treatment of supervisory goodwill allowing the acquiring institutions to include as an asset on its balance sheet the difference between the value of the assets it acquired and the liabilities it assumed. (Horvitz, Tr. 2017, line 11 through 2019, line 12; P-536) Inducements also consisted of capital credits and cash assistance and forbearances. (Horvitz, Tr. 2024, line 16 through 2005, line 25; P-536) Handling thrift failures in this manner represented a substantial savings to FSLIC as the regulatory credits were of no real cost to the FSLIC thereby enabling FSLIC to save its resources from otherwise having to cover the failed institutions' negative net worth. (Horvitz, Tr. 2018, line

19 through 2019, line 17)

237. The acquiring thrift, in turn, usually received regulatory capital on which it could leverage and grow and enabled the acquiring thrift to absorb over time the negative net worth of the failed thrift through amortization of the goodwill. (Horvitz, Tr. 202, line 1 through 2022, line 3) Forbearances were also very important to the acquiring thrift because they reduced the risk associated with assumption of the negative net worth and problem assets of the failed thrift. Typically the regulatory agency promised that, if the acquiring thrift encountered some financial difficulty following the acquisition, it would forbear for the specified period from bringing supervisory action so long as the problem (*e.g.*, capital non-compliance) was solely the result of the acquisition. (Horvitz, Tr. 2024, line 16 through 2025, line 25; P-536)

238. The plight of the thrift industry did not apply to Sterling. Sterling opened in 1983, well after the peak in interest rates. It did not have in its portfolio low interest rate loans made in the 1960's and 1970's. Sterling's loans made at market rates after 1983 generated returns in excess of costs of deposits. (Horvitz, Tr. 2032, line 12 through 2033, line 21; P-538) In addition, Sterling operated in the Pacific Northwest where the economy was strong. Sterling's deposits, assets, and profits grew each year without interruption through the 1989 fiscal year (June 30). (Horvitz, Tr. 2036, lines 13-21; P-539) Sterling has been profitable, and still remains profitable, in every year of its existence through the date of trial. Sterling has the same growth-oriented strategic plan and top executive management that it had from its very beginning. Not only did Sterling's plans call for rapid and substantial growth, Sterling, in fact, grew substantially and rapidly. (Gilkey, Tr.82, line 3 through 83, line 13) Although Sterling suffered a significant set back and shrinkage due to the Government's breach, Sterling grew from $730 million in assets at

fiscal year 1989 to over $10 billion as of 2007. (Gilkey, Tr.153, line 20 through 154, line 4) Its founders, Harold Gilkey and William Zuppe, had commercial banking backgrounds. (Faulstich, Tr.344, line 7 through 345, line 25; Horvitz, Tr. 2042, line 10 through 2043, line 8; P-539) Because of the foregoing, Sterling was virtually unique in the thrift industry. (Horvitz, Tr. 2032, line 10 through 2033, line 25; P-539)

239. The success of Sterling's growth strategy, the continuity of senior management, their prior commercial banking background, all add certainty and credibility to Professor Horvitz's calculation of expectancy damages. (Horvitz, Tr. 2042, line 6 through 2045, line 20; Horvitz, Tr. 2055, lines 15-23)

240. At the request of its regulators, during the mid to late 1980's, Sterling submitted bids for and acquired three troubled thrifts. The first insolvent thrift acquired by Sterling was Lewis Federal on November 15, 1985. Lewis Federal was in receivership and FSLIC and FHLBB estimated the liquidation of Lewis Federal would cost them $6 million. (Horvitz, Tr. 2057, lines 1-12; P-8, p. 3) In exchange for assuming the assets, liabilities, and negative net worth of Lewis Federal, Sterling received cash assistance from FSLIC of $1.75 million and contributed as a direct credit to net worth so that it counted as capital for regulatory capital compliance purposes. (Horvitz, Tr. 2062, lines 1-21; P-19) The resulting supervisory goodwill was to be amortized on a straight-line basis over 40 years. (Horvitz, Tr. 2063, line 17 through 2064, line 12; P-356A) In addition, Sterling received a 5-year forbearance on regulatory action if this failure to meet capital requirements during that period resulted from the acquisition of Lewis Federal. (Horvitz, Tr. 2082, line 15 through 2084, line 17; P-20; P-551)

241. Tri-Cities was in receivership and FSLIC estimated the cost of liquidation to be $20.7

million. (Horvitz, Tr. 2058, lines 17-25; P-38) Sterling acquired Tri-Cities on April 8, 1988, and assumed the negative net worth of Tri-Cities. In exchange, Sterling received $11.7 million in cash assistance, which was a direct credit to its net worth, and the resulting supervisory goodwill was to amortize over 15 years on a straight-line basis. (Horvitz, Tr. 2064, line 1 through 2065, line 8; P-356A) In addition, Sterling obtained the same 5-year forbearance agreement that it received in the Lewis Federal acquisition. (Horvitz, Tr. 2086, lines 13-25; P-28; P-552)

242. In December 1989, Sterling acquired Central Evergreen. Central Evergreen had an estimated liquidation cost of $10 million. (Horvitz, Tr. 2059 through 2060, line 8; P-399) In exchange, Sterling was permitted to record $8.4 million in identified intangibles and $13.6 million in unidentified intangibles as an asset of regulatory accounting purposes. (Horvitz, Tr. 2065, line 9 through 2067, line 20; P-356A) Together they constitute supervisory goodwill that survived FIRREA and was includible in capital. Unidentified intangibles were subject to a cap that phased out over 5 years. Identified intangibles were subject to a different formula. (Horvitz, Tr. 2068, line 1 through 2069, line 21; P-356A)

243. Overall, by acquiring Lewis Federal and Tri-Cities, Sterling saved the Government $26.7 million in liquidation costs – Lewis Federal ($6 million) and Tri-Cities ($20.7 million). (Horvitz, Tr. 2057, lines 1-12; Horvitz, Tr. 2058, lines 17022; P-8; P-27, P-38)

244. As a regulated thrift, Sterling underwent periodic examinations by the FHLBB and was rated in 5 categories and given a composite rating. The ratings were management, asset, quality, capital, and risk or "MACRO". Prior to the enactment of FIRREA, Sterling received very favorable ratings from the FHLBB. From 1983 through 1988, Sterling received a composite rating of 2, following each of the examinations; a management rating of 2, a risk rating of 2, and

capital rating of 2 except on the October 29, 1986, examination. (Horvitz, Tr. 2050, lines 1-14; Horvitz, Tr. 2051, line 17; P-45; P-540; P-541)

245. In the opinion of Professor Horvitz, a rating of 2 for any category, including a composite rating of 2, is as high as a thrift could get. A composite rating of 2 shows that Sterling achieved a superior performance before the advent of FIRREA without taking undue risk. (Horvitz, Tr. 2049, lines 3-23)

246. That Sterling received very favorable MACRO ratings prior to FIRREA without being criticized by its regulators for excessive risk and that it continued to receive high marks even after acquiring three insolvent thrifts lends credibility to and support to Professor Horvitz's damage model; namely, that the but-for bank would be equally as successful as the actual Sterling. Sterling achieved success by operating a highly-rated institution without taking on undue risk. (Horvitz, Tr. 2049, lines 3-23; P-541)

247. The only time Sterling's composite rating dropped (from a 2 to a 3) before the enactment of FIRREA was a result of the examination that began on June 19, 1989, but was not finalized and sent to Sterling until August 11, 1989, or just after FIRREA was enacted. Moreover, the examiner's comments that led to the dropping from 2 to 3 were based on the assumption that FIRREA would shortly become law. (Horvitz, Tr. 2050, lines 1-22; P-178; P-541) The examiner mentioned that "the proposed legislative action changing capital requirements for thrift institutions will have an adverse impact on the association." (Horvitz, Tr. 2053, lines 3-14; P-178; P-542) The dropping of the rating from a 2 to a 3 on July 25, 1989, reflects, in Professor Horvitz's opinion, "a post-FIRREA condition." (Horvitz, Tr. 2053, lines 15-18)

248. As of fiscal year end, June 30, 1989, Sterling was in full compliance with then

applicable capital standards. It earned net income of $1.3 million for fiscal 1989, an increase over 1988 despite the absorption of Central Evergreen during the year. In 1989, Sterling was profitable, growing rapidly, and fulfilling its business strategy of becoming a major financial institution in the Pacific Northwest. (P-78) Though Sterling's capital was modestly in excess of its regulatory requirements in 1989, it needed additional capital, beyond that which it acquired from troubled thrift transactions, to continue its growth strategy. (Gilkey, Tr. 177, line 16 through 178, line 17; Gilkey, Tr. 182, line 23 through 183, line 8; Gilkey, Tr. 186, line 18 through 187, line 6) So the Government required and Sterling planned an equity offering in 1989 after the Central Evergreen transaction was concluded to raise $10.5 million in capital. (P-44) The proposed equity offering was included in Sterling's Business Plan that became part of the Central Evergreen transaction. (Byrne, Tr. 1451, lines 6-11; Friend, Tr. 2309, line 24 through 2310, line 8; Friend, Tr. 2311, lines 8-14).

249. The Government recognized the importance of the capital that Sterling acquired from the acquisition of the troubled thrifts. For Sterling could not take on the negative net worth of the failing institutions without being able to count the regulatory capital acquired in the acquisitions. (Gilkey, Tr. 127, line 9 through 128, line 1)

250. After FIRREA's enactment, OTS issued regulations that wiped out Sterling's capital. (Horvitz, Tr. 2105, lines 7-25) This had an enormous damaging impact on Sterling. Instead of Sterling's regulatory capital exceeding required capital, Sterling's became negative. (Horvitz, Tr. 2105, lines 7-25).

251. Prior to FIRREA, Sterling had a capital ratio in excess of four percent. Immediately after FIRREA regulation went into effect, all three capital ratios established by FIRREA were

negative. (Horvitz, Tr. 2105, lines 17-25)

252. FIRREA regulations wiped out all of Sterling's capital from the first $2 million the original investors put into the bank and all the capital that had been accumulated since then. This is because Sterling's capital was below zero. It was insolvent. (Horvitz, Tr. 2106, lines 1-17)

253. In the first examination after FIRREA jointly conducted by OTS and FDIC on November 13, 1989, the FDIC suddenly dropped Sterling's composite rating to a 5 and its management rating to a 4. (P-179; P-541) This conduct shows how badly and arbitrarily the Government treated Sterling during this period. (Horvitz, Tr. 2049, lines 7-9) Although Sterling's management had been rated a 2 for the five years before FIRREA, suddenly in November 1989, two months after FIRREA's enactment, management is rated a 4. In Professor Horvitz's opinion nothing changed between August and November 1989 except for the change in capital requirement and the Government's breach of contract. (Horvitz, Tr. 2051, line 12 through 2052, line 9)

254. Because of the increase in capital standards mandated by FIRREA and the resulting downgrade of Sterling's MACRO ratings, the Government immediately began to treat Sterling as a troubled thrift. First, the OTS refused to permit payment of dividends on the preferred stock portion of the $10.5 million equity offering planned for late fall of 1989, even though the offering was oversubscribed. The stock offering was cancelled because investors are naturally reluctant to purchase preferred stock on which no dividends can be paid. (Byrne, Tr. 1445, lines 15-23; Horvitz, Tr. 2092, line 23 through 2043, line 7; P-7; P-395) Second, the Government imposed operating restrictions on Sterling which included, among others, limiting loans to any one borrower to $500,000; restricting business lending to existing customers only; prohibiting the

issuance of letters of credit; prohibiting the acceptance of deposits over $100,000; limiting asset growth. (Horvitz, Tr. 2017, lines 2-20)

255. Sterling was thus forced to curtail operation dramatically; refer good customers to competitor banks; and to abandon its growth strategy. (Gilkey, Tr. 212, lines 15-24; Gilkey, Tr. 216, line 10 through 217, line 10; Byrne, Tr. 1965, line 14 through 1966, line 6) Because of the breach, Sterling's commercial lending ability was virtually destroyed; its commercial construction lending shut down; and its residential construction and real estate lending capacity severely curtailed. (Gilkey, Tr. 237, line 3 through 239, line 6; P-258) Key personnel abandoned Sterling and its reputation in the banking and business communities injured. (Byrne, Tr. 1965, line 14 through 1966, line 6; Harlow, Tr. 807, line 18 through 808, line 19)

256. In an attempt to come into capital compliance, Sterling contracted its asset base, reducing in size for the first time since it opened its doors. Because of the breach, Sterling shrunk total assets from approximately $731 million in June 1989 to approximately $590 million on September 30, 1991, a decrease of about 20%. (Horvitz, Tr. 2018, line 24 through 2112, line 10) Sterling's shrinkage was substantial and costly. Sterling was forced to sell some of its best performing assets ... the ones with the greatest profit built in. (Horvitz, Tr. 2110, lines 17-20) It lost some of its best loan producers. (Horvitz, Tr. 2113, lines 15-25)

257. In sum, the loss of capital due to the breaching provisions of FIRREA and the regulations issued thereunder, caused Sterling to forego growth and to shrink for the first time in its history. The resulting loss of profits was directly caused by the breach. (Horvitz, Tr. 2543, line 7 through 2544, line 24)

258. After the Government threatened to close Sterling and place it in receivership, in May

1990. Sterling sought and obtained a temporary restraining order and thereafter a preliminary injunction issued on July 3, 1990, preventing the Government from shutting down Sterling. (Horvitz, Tr. 2114, lines 1-8)

259. The injunctive relief mitigated some, but not all, of Sterling's damages. Since 1990, Sterling has earned over $300 million in net profits. If Sterling had been closed in 1990, its lost profits would have been in excess of $300 million, not the $58 million Professor Horvitz has calculated. Professor Horvitz's lost profits calculation is in no way negated or lessened by virtue of the injunctive relief. Likewise, Sterling's market value is about $1.5 billion at the time of trial. If Sterling had been closed, its market value at the time of trial would be zero. The regulators avoided a $1.5 billion loss. In that sense, mitigation was about 96 percent successful. In short, damages incurred by a closed institution would be far greater than those where the institution was forced to shrink but remained in business. (Horvitz, Tr. 2114, line 14 through 2116, line 4)

260. From the standpoint of an economist, a reasonable and well-established measure of damages is the difference between the actual earnings of the businesses enterprise and the earnings it would have had absent the breach. In economic theory, the objective of a business enterprise is to maximize profits. The difference in profits, therefore, between what the enterprise actually earned and what it could have earned but for the breach is the measure of the extent of damages. (P-454, Ex. 6)

261. Although economic forecasting is a legitimate function for which economists are trained, Professor Horvitz's measurement of Sterling's lost profits resulting from the breach does not use any forecasting. The key determination of a thrift's earnings is interest rates on loan and deposits. Sterling's lost earnings are only for the period of 1990 through 2006. No forecasting is

required for this historical period. It is merely a matter of looking them up. (Horvitz, Tr. 2040, lines 2-21; P-454, Ex. 6) This makes the lost profits calculation an easier task and renders the results more certain. (Horvitz, Tr. 2039, line 17 through 2040, line 1; P-454, Ex. 6)

262. Another fact that makes the Sterling's lost profit model and calculation easier is that, unlike many of the *Winstar* plaintiffs who had a history of operating losses, Sterling was always profitable throughout its history. So when Professor Horvitz assumed in his lost profits model that the "but-for" Sterling would earn profits at the same rate as the actual Sterling for the past years 1990 through 2006, he was able to do so without having to forecast the future at all. Again, this lends a high degree of reasonable certainty to Professor Horvitz's lost profits calculations. (Horvitz, Tr.2039, line 2 through 2040, line 21; P-454, Ex. 6)

263. The starting point in Professor Horvitz's lost profits analysis was to calculate the amount of regulatory capital Sterling would have had if its Lewis Federal and Tri-Cities contracts had been honored. (Horvitz, Tr. 2090, line 11 through 2092, line 7; Horvitz, Tr. 2516, line 15 through 2517, line 5) In analyzing the amount of disallowed capital, Professor Horvitz first calculated the disallowed capital ("intangibles") from the Lewis Federal and Tri-Cities acquisitions to be $15.5 million as of December 31, 1989. (Horvitz, Tr. 2091, lines 9-11) To that number, he added $10.4 million of Central Evergreen's supervisory goodwill that counted toward core capital and the $5.6 million of other qualifying Central Evergreen intangibles. To that number, Professor Horvitz added the $10.5 million from the 1989 capital offering and that places the core capital of the but-for bank at $28.786 million as December 31, 1989, and thus Sterling was in capital compliance with FIRREA's new capital standards but for the breach. Whereas it actually reported at negative $2.2 million for effect, the breach resulted in a disallowance of $3.1

million in capital. (Horvitz, Tr. 2091, line 4 through 2094, line 19; P-454, Ex. 6, Tables 2a, 3a, 3c, 4a, 4b, 4c, and 5) The amounts of regulatory capital Sterling would have had if its Lewis Federal and Tri-Cities contracts had been honored by the Government may be summarized as follows:

| | | |
|---|---|---|
| | Actual Core Capital | ($2.273 million) |
| + | Actual Qualifying Supervisory Goodwill ("QSGW") | ($10.308 million) |
| | *Sub-Total* | *($12.581 million)* |
| + | Lewis Federal and Tri-Cities Intangibles | $15.557 million |
| + | 1989 Unit Offering | $10.500 million |
| + | Central Evergreen QSGW | $10.421 million |
| + | Central Evergreen Other Intangibles | $5.670 million |
| - | Other Adjustments | $0.781 million |
| | **But-For Bank Core Capital** | **$28.786 million** |

(P-454, Ex. 6, Tables 2a, 3a, 3c, 4a, 4b, 4c and 5)

264. Since the additional capital would have supported or leveraged additional assets, the next step in Professor Horvitz's analysis was to measure the asset size of Sterling on a year-by-year basis, but-for the breach. (Horvitz, Tr. 2517, lines 1-5; P-454, Table 5; P-559; P-564) In measuring the asset size of the but-for Sterling, Professor Horvitz used two limitations or constraints to render his model more conservative. The first was a capital constraint and the second was a growth constraint. (Horvitz, Tr. 2517, line 6 through 2520, line 4; P-454, Table 5; P-564)

265. As for the capital constraint, from 1989 to 1991, Professor Horvitz used a 4.0% capital ratio based on Sterling's 1989 business plan, which after 1991 started increasing from 5.5% capital ratio consistent with changes in Sterling's actual core capital ratio. (Horvitz, Tr. 2517,

lines 6-22; P-564) To be conservative, in all years the but-for Sterling's capital ratio is higher than the actual bank. (Horvitz, Tr. 2518, lines 5-11, lines 23-25; P-454, Tables 2a and 5; P-566) The assumed 4.0% capital ratio is reasonable in light of what Sterling planned to do, and in light of what it actually did.

266. As for the growth constraint, in no year does the but-for Sterling grow faster than the internal growth rate of the actual bank. (Horvitz, Tr. 2519, line 18 through 2520, line 25; P-454, Ex. 6, Table 1; P-564; P-566) The internal growth rate of existing assets ignores any merger or acquisitions. (Horvitz, Tr. 2520, lines 2-5; P-454, Ex. 6, Table 1)

267. Then Professor Horvitz's model adopts as the but-for bank asset size whichever constraint produces the smaller bank on a year-by-year basis. (Horvitz, Tr. 2521, line 4 through 2522, line 16; P-454, Ex. 6, Table 5, columns A, B, and C) The resulting incremental assets (the but-for assets minus the actual assets) that Sterling would have had but-for the breach are tabulated in Column C of Table 5 and in Column B of Table 1 of Exhibit 6 of P-454 and are best illustrated in P-573 (Horvitz, Tr. 2522, lines 5-16; P-454, Ex. 6, Table 1; P-573) The incremental assets are the assets Sterling did not have because of the breach. (Horvitz, Tr. 2522, lines 15-16)

268. There is ample evidence that Sterling would have achieved at least the size indicated for the but-for bank because of the conservative nature of the capital and growth constraints employed by Professor Horvitz's model, because the but-for bank grows at a slower rate than the actual bank, because a substantial part of increased assets of the but-for bank are not new assets that the but-for bank would have to acquire, but are replacements for the assets that Sterling divested when it shrunk, and because the actual bank found as much or more assets in each year following the year in which the incremental assets are added to the but-for bank. (Horvitz, Tr.

2523, line 1 through 2525, line 6; P-454, Ex. 6, Table 1; P-573) For example, the year in which the largest incremental assets is 1997. In that year, Professor Horvitz's model adds $427,211,000 in assets to the but-for bank. Yet, one year later, by December 31, 1998, the actual Sterling has added more than $427 million in assets to its portfolio. (Horvitz, Tr. 2525, line 7 through 2626, line 4; P-454, Ex. 6, Table 1, Column C (12/31/97) compared to Column A (12/31/98); P-573, Column C (12/31/97) compared to Column A, 12/31/98) Plus, the but-for Sterling missed out on real opportunities to gather additional assets during the period between 1989 and 1994 when the RTC had the greatest amount of assets for sale at bargain prices. (Horvitz, Tr. 2526, line 13 through 2527, line 19; P-572) So the Court finds there were sufficient assets in the market place to more than support the incremental or foregone assets Professor Horvitz adds to the but-for bank.

269. Next, Sterling would have earned a return on the incremental or foregone assets. Professor Horvitz used the same rate of return on the incremental assets as Sterling earned on its actual assets to calculate lost profits. In this way, he did not have to project or forecast what the but-for bank might have earned. (Horvitz, Tr. 2527, line 20 through 2528, line 16; P-454, Ex. 6, Table 1, Column D; Table 3b, Column 7; P-576, Column B) For this reason, Professor Horvitz's return on average assets figures on a year-by-year basis are reasonable and conservative. There are valid economic reasons for believing that Sterling could have earned a greater rate of return or higher yield on the incremental assets. First, there are economies of scale and scope associated with increased size. Second, there were increased profits associated with RTC acquisitions that Sterling had to forego because of its disallowed capital. (Horvitz, Tr. 2529, line 5 through 2530; line 15)

270. The final step is Professor Horvitz's lost profits calculation is to multiply the return on average assets of the actual bank times the incremental or foregone assets of the actual bank on a year-by-year basis. From the date of breach, assumed to be December 31, 1989, through September 30, 2006, and the total lost profits came to $58,164,000. That is, the larger but-for bank would have earned $58,164,000 more than the actual bank absent the breach. (Horvitz, Tr. 2530, line 25 through 2531, line 7; P-454, ex. 6, Table 1; P-516)

271. Wounded bank damages are defined by Professor Horvitz to include costs and expenses that a thrift incurred as a result of being in a weakened condition because of the breach that it would not otherwise have incurred. (Horvitz, Tr. 2536, line 22 through 2537, line 7) These costs and expenses are in addition to and different from lost profits and to make Sterling whole requires compensation for these costs. (Horvitz, Tr. 2537, lines 8-11)

272. Professor Horvitz assumed $4.6 million in wounded bank damages that were restored to hypothetical capital. This figure included $304,006 in legal and accounting fees. (Byrne, Tr. 1906 through 1942) It was appropriate to restore the legal and accounting fees to capital for purposes of lost profits calculations, as Sterling's capital was diminished by these amounts, but Sterling has adjusted its request to damages to resolve these issues.

273. Based on his definition of wounded bank damages, Professor Horvitz requested that Sterling's management compile a list of expenses that met his definition or criteria of wounded bank damages. (Horvitz, Tr. 2538, lines 11-18) He furnished the categories to Sterling and the criteria for computing the wounded bank damages. In turn, Professor Horvitz reviewed the computations and supporting invoices but did not verify them so must rely on Sterling for their accuracy. (Horvitz, Tr. 2538, lines 14-21) Based thereon, wounded bank damages total $4.25

million.

274. This is a relatively conservative number because Professor Horvitz did not include in his wounded bank damages calculations anything that could not be measured precisely. For example, Sterling employee turnover in the wake of the breach was about 60 percent. This is a huge number of employees. Obvious costs include hiring, training, a period of inferior performance. This is clearly a wounded bank damage but was not included because of the difficulty in measuring the costs with fair precision. (Horvitz, Tr. 2537, line 20 through 2538, line 10) For this reason, Professor Horvitz's opinion that Sterling incurred at least $63.4 million in damages as a result of the breach, even if some of the wounded bank damages are not compensable, is fair and reasonable. (Horvitz, Tr. 2543, line 9 through 2544, line 4)

275. Professor Horvitz's lost profits calculation goes through September 30, 2006. However, the but-for bank still would have some capital, absent the breach, from the Lewis Federal acquisition that was amortizing through 2025 and thus beyond when the lost profits calculations ended. (Horvitz, Tr. 2541, line 20 through 2542, line 14) Professor James calculated the cost of replacing that capital at $600,000 and Professor Horvitz adopted the figure. (Horvitz, Tr. 2542, line 17 through 2543, line 4; P-534)

276. Professor Horvitz's opinion as to the total expectation damages suffered by Sterling may be summarized as follows:

| | |
|---|---|
| Lost Profits on Incremental assets | $ 58.20 million |
| Wounded Bank Damages | $ 4.25 million |
| Future Damages (2006-2025) | $ 0.60 million |
| **Total** | **$ 63.05 million** |

(Horvitz, Tr. 2543, lines 7-9; P-454, Ex. 6, Table 1; P-534) The total expectation damages have

been proven to a high degree of certainty and they were proximately caused by the enactment of FIRREA, and the regulations issued thereunder, disallowing breached regulatory contractual capital that Sterling acquired through the Lewis Federal and Tri-Cities transactions. (Horvitz, Tr. 2543, line 7 through 2544, line 24)

277. The damages incurred by Sterling as a result of the Government's breach were clearly foreseeable in the sense that the parties to the acquisition agreement discussed and recognized the importance of contractual capital and hence it was foreseeable that the loss or disallowance of contractual capital would harm Sterling. But the damages were not only foreseeable, they were clearly foreseen by the parties. The negotiation between Harold Gilkey and Ed Hedlund over the acquisition of Tri-Cities, and the linkage between Tri-Cities and Central Evergreen demonstrate that the acquisition of Central Evergreen could not be undertaken without the contractual capital obtained in the Tri-Cities acquisition. (Horvitz, Tr. 2545, line 1 through 2546, line 6)

278. The forbearance provisions of the Lewis Federal and Tri-Cities acquisition agreements provided that if Sterling failed its net worth or capital requirements solely due to those supervisory acquisitions, for example, through Sterling assumption of the net worth deficiencies of those thrifts, it will not be subject to any regulatory action (Horvitz, Tr. 2083, lines 4-14; Horvitz, Tr. 2084, lines 8-17; P-20; P-28; P-551; P-552)

279. Even assuming Mr. Bankhead and Mr. Hargett are correct that the capital Sterling acquired through the Central Evergreen would not count in determining the but-for Sterling's capital compliance as of December 31, 1989, Sterling was still in compliance with regulatory capital measures when the forbearances are taken into account. (Horvitz, Tr. 2098, line 15 through 2099, line 1; P-549)

280. Professor Horvitz testified to a detailed analysis of how and why Sterling was in capital compliance as of December 31, 1989. (Horvitz, Tr. 2099, line 2 through 2101, line 18; P-549) He assumes and starts with the but-for bank core capital as of December 31, 1989, of $15.868 million. He then subtracts out the net worth deficiency relating to the minimum requirement for both Lewis Federal (negative $1,627 million) and Tri-Cities (negative $9.254 million), which brings the but-for bank core capital net of the Lewis Federal and Tri-Cities deficiencies to $26,749 million. He then determines the minimum core capital requirement for Sterling to be $21,549 million, thus generating a core capital surplus of $5,159 million. (Horvitz, Tr. 2099, line 7 through 2101, line 16; P-549)

281. Therefore, regardless of the treatment of Central Evergreen's capital, Sterling was in compliance given the forbearances. (Horvitz, Tr. 2101, lines 17-18; P-549) Since Sterling was in capital compliance, the regulators could not walk in and close Sterling for being out of compliance and should not have attempted to do so. (Horvitz, Tr. 2102, lines 2-25)

282. Professor Horvitz was justified in adding back to but-for capital the $10.5 million proceeds from the 1989 unit offering because the only reason regulators rejected the dividend payment was a conclusion that Sterling would not have been in compliance even if with the offering. In turn, that was because the regulators did not give Sterling credit for the contractual goodwill. (Horvitz, Tr. 2092, line 20 through 2093, line 25; P-254) It is clear from the evidence that if the regulators had made calculations based on the contracts Sterling would have been in capital compliance after receiving the proceeds, the dividend payment would have been approved, and the fully subscribed offering would have been completed. (Horvitz, Tr. 2044, lines 1-19; Horvitz, Tr. 2098, line 23 through 2099, line 1; P-268) Hence, it is proper to include the $10.5

million as capital in the but-for Sterling. (Horvitz, Tr. 2094, lines 17-19) (Friend, Tr. 2401, line 21 through 2402, line 11)

283. Because Sterling was in capital compliance as of December 31, 1989, by applying the Lewis Federal and Tri-Cities forbearances, the Court does not have to decide the issue raised by Mr. Bankhead of whether the qualifying supervisory goodwill from Central Evergreen is to be included in the calculation of regulatory capital. (Horvitz, Tr. 2098, line 23 through 2099, line 1)

***2. QSGW And Contractual Goodwill Are Different Things.***

284. On or about December 30, 1989, Sterling's contractual goodwill resulting from its acquisition of Lewis Federal was approximately $3,241,000. (P-454, DX-1046, Ex. 6., Table 6a; DX-2003) Sterling contracted for the right to treat the goodwill as regulatory capital as then defined and not as later defined by FIRREA. *Sterling Savings*, 53 Fed. Cl. at 610-11.

285. By December 30, 1989, Sterling's contractual goodwill resulting from its acquisition of Tri-Cities was approximately $12,317,000. (P-454, DX-1046, Ex. 6., Table 6a, DX2003) Sterling contracted for the right to treat the goodwill as regulatory capital as then defined and not as later defined by future statutes or regulations such as FIRREA. *Id.* at 612.

286. As of December 1989, Sterling's combined total contractual goodwill arising from the Lewis Federal and Tri-Cities transactions was approximately $15,557,000. (Bankhead, Tr. 3327, lines 17-19; Bankhead, Tr. 3335, line 12 through 3337, line 9; DX-2010; DX-2014)

287. As part of the Central Evergreen agreement, Sterling contracted for approximately $23,800,000 in goodwill to be treated as regulatory capital and amortized over 12 years. *Sterling Savings*, 53 Fed. Cl. at 613. Though Sterling contracted for the right to treat the goodwill as regulatory capital per the amortization schedule, Sterling assumed the risk that this promise may

be subject to redefinition or modification by future regulations. *Sterling Savings Assoc., v. United States*, 72 Fed. Cl. 404, 411 (2006).

288. Sterling's right to count the Qualifying Supervisory Goodwill ("QSGW") from Central Evergreen is a contractual right separate and apart from its rights under the Lewis Federal and Tri-Cities contracts; they are distinct and independent contracts. (Schott, Tr. 2481, line 9 through 2483, line 13)

289. Messrs. Bankhead and Hargett agree that, if Sterling had the contractual right to include the goodwill from Central Evergreen in regulatory capital, their opinions would have to change. (Bankhead, Tr. 3371, lines 6-18; Hargett, Tr. 3458, lines 3-17)

290. In the but-for-world, contractual goodwill and QSGW are different and should be treated as such. (Schott, Tr. 2454, line 3 through 2457, line 21) There is no definition of contractual goodwill in FIRREA. (Bankhead, Tr. 3360, lines 3-4; Hargett, Tr. 3453, lines 4-7)

291. Contractual goodwill is not subject to any quantitative limitations (unlike QSGW) (Schott, Tr. 2454, line 3 through 2457, line 21; Bankhead, Tr. 3362, lines 1-10; Bankhead, Tr. 3363, lines 4-22; Hargett, Tr. 3457, lines 1-10; Hargett, Tr. 3463, lines 1-9) For example:

a. Under FIRREA, QSGW may be treated as regulatory capital subject to a five-year phase-out; contractual goodwill may be treated as regulatory capital for the length of the amortization period set forth in a contract. (Schott, Tr. 2456, lines 6-18; Bankhead, Tr. 3363, lines 14-22; Hargett, Tr. 3457, lines -10; Hargett, Tr. 3463, lines 1-9)

b. Though QSGW may be counted as regulatory capital under FIRREA, the amount that may be considered as regulatory capital is capped by regulation. Contractual goodwill may be treated as regulatory capital in full. (Schott, Tr. 2456, lines 6-18; Hargett, Tr. 3362, lines 1-8)

c. QSGW is only to be considered as a capital under the core and risk-based capital standards. Contractual goodwill qualifies under any of FIRREA's capital standards, including as tangible capital. (Schott, Tr. 2457, lines 12-21; Hargett, Tr. 3364, lines 2-8; Hargett, Tr. 3463, lines 10-16)

292. If Congress in the but-for world would had recognized the contracts, it could have carved out an exception to tangible capital to include the contractual goodwill. (Hargett, Tr. 3464, lines 2-21) That is what Congress did in FIRREA with regard to purchase mortgage services rights ("PMSRs"), an asset, but a tangible asset under FIRREA. (Hargett, Tr. 3417, lines 1-20; Hargett, Tr. 3464, lines 2-15)

293. FIRREA did not eliminate a thrift's right to treat supervisory goodwill as capital for regulatory purposes. (Hargett, Tr. 3419, lines 4-24) FIRREA's regulations specifically permitted such a treatment up to a 1.5% limit of total assets. (*Id.*)

294. Mr. Bankhead's calculation, whereby Sterling is not allowed to count the entire value of the Central Evergreen goodwill as regulatory capital, effectively penalizes Sterling for entering into the Lewis Federal and Tri-Cities contracts. (James, Tr. 2870, lines 18-25)

295. Capital in excess of required level is not an indication that Sterling did not have profitable opportunities to pursue.(Welch, Tr. 1646, line 17 through 1647, line 4; Byrne, Tr. 4318, line 22 through 4319, line 6; Byrne Tr. 4324, line 24 through 4325, line 19)

296. Sterling would not have incurred the wounded bank damages and legal bills absent the breach. (Byrne, Tr. 1970, line 13 through 1974, line 20)

## F. WOUNDED BANK DAMAGES

### *1. STERLING INCURRED ADDITIONAL LITIGATION AND ACCOUNTING COSTS.*

297. From 1989 through 1992, Sterling incurred increased legal, accounting and insurance costs because of the Government's treatment of Sterling as a troubled thrift. increased correspondence with regulators and more frequent examinations. (Byrne, Tr. 1696, line 2 through 1701, line 13; P-339; P-339A)

298. Sterling's improper treatment as a troubled thrift led to higher costs as a result of increased correspondence with regulators and more frequent examinations. (Byrne, Tr. 1425, line 19 through 1426, line 14)

399. Sterling would not have incurred these legal bills which reduced earnings and capital but-for the breach. (Byrne, Tr. 1970, line 13 through 1974, line 20)

300. These amounts are properly restored to capital for purpose of lost profits calculations, but Sterling has withdrawn its request to have these amounts reimbursed as damages.

***2. Sterling Incurred Losses On The CJ-4 Loan Losses.***

301. The "CJ-4 Loan" is a loan Sterling was in the process of funding when FIRREA became effective. (Byrne, Tr. 1673, line 14 through 1674, line 9)

302. Because of the restriction on loans to new borrowers, Sterling was unable to get approval to fund the loan, leading to a counterclaim in a lawsuit by the borrower against Sterling and the eventual foreclosure on the loan. (Byrne, Tr. 1673, line 14 through 1674, line 9; Byrne, Tr. 1675, lines 10-19; Byrne, Tr. 1880, line 21 through 1881, line 10; Byrne, Tr. 1891, line 11 through 1893, line 18; DX-943)

303. In the fall of 1989, Sterling was faced with the borrower requiring an additional $500,000 to finish the project. (Zuppe, Tr. 3078, line 21 through 3080, line 1)

304. Sterling requested permission from the OTS to lend the additional funds to increase

Sterling's value in the asset, but OTS refused and had "little interest" in hearing the business plan to maximize the value of the project. (Zuppe, Tr. 3080, line 21 through 3083, line 7)

305. Sterling incurred losses totaling $1,240,000 from the CJ-4 loan, which it would not have incurred but for the breach. (Byrne, Tr. 1673, line 14 through 1674, line 9; P-336; P-336A; Zuppe, Tr. 3093, line 24 through 3094, line 9)

***3. Sterling Incurred Additional Regulatory And Supervisory Costs Incurred.***

306. Sterling incurred regulatory supervision costs from being treated as a troubled thrift. (Byrne, Tr. 1680, line 11 through 1682, line 3; Byrne, Tr. 1918, lines 7-23; Byrne, Tr. 1928, line 20 through 1929, line 25; P-337; DX-514)

307. Sterling was charged the "premium" rate assessed to troubled thrifts. (Byrne, Tr. 1973, line 19 through 1974, line 20; P-337 at SG 0803460)

308. In December 1990, Sterling was required by the OTS to make a payment into the Savings Association Insurance Fund ("SAIF") at a rate usually assessed to an undercapitalized thrift. (P-294)

309. The Government refused to recognize that Sterling had a preliminary injunction and that it should be allowed to make a payment into the SAIF at a lower rate. (Byrne, Tr. 1526, line 12 through 1527, line 17.

***4. Sterling Incurred Costs From The Withdrawn 1989 Offering.***

310. Sterling incurred costs from the 1989 failed offering. (Byrne, Tr. 1684, line 7 through 1688, line 1; P-338A; P-338)

311. Sterling lost costs paid to Dain Bosworth and for printing costs and road shows as a result of the Government's refusal to allow dividends and resulting cancellation of the offering.

(Gilkey, Tr. 208, line 10 through 209, line 5)

***5. Sterling Incurred Damages As A Result of The Increased Purchase Price Of Great American Bank Branches.***

312. Prior to the enactment of FIRREA, the applications manager for the OTS called Mr. Gilkey and told him the Great American purchase was approved. (Gilkey, Tr. 213, lines 2-13)

313. Subsequently to the approval, OTS issued an approval that required Sterling to meet conditions which it could not meet. (Gilkey, Tr. 213, line 25 through 214, line 7; Friend, Tr. 2301, line 16 through 2302, line 21; Friend, Tr. 2306, lines 10-25)

314. Sterling sought reconsideration of the conditions, in part because of the fact that Sterling's lack of compliance arose from the acquisition of Central Evergreen. (P-379)

315. The OTS again refused to allow the transaction to go forward until Sterling was in compliance with FIRREA's new regulatory capital requirements. (Friend, Tr. 2307, line 19 through 2308, line 15; P-413; DX-388)

316. Had the OTS allowed the Great American purchase in late 1989, it would have cost Sterling approximately $63,000. (Gilkey, Tr. 215, line 10 through 216, line 1)

317. When Sterling was able to purchase one of the branches, five years later, it cost 1.8 million. (Gilkey, Tr. 215, line 18 through 216, line 1; Horvitz, Tr. 2143, lines 10-16)

***6. Sterling Incurred Damages As A Result Of Not Being Able To Bid On Resolution Trust Corporation Assets.***

318. During 1990 and 1991, the Resolution Trust Company ("RTC") was liquidating banks and selling branches at attractive values. (Gilkey, Tr. 401, line 11 through 404, line 9; Horvitz, Tr. 2143, lines 10-25; P-559)

319. Sterling could not take advantage of those opportunities because of its capital position from the breach. (Gilkey, Tr. 401, line 1 through 403, line 15)

320. No acquisitions were made between 1988 and 1993 because of the breach; without the capital, Sterling could not expand or open new branches. (Gilkey, Tr. 427, line 25, through 428, line 13; Horvitz, Tr. 2527, lines 2-6)

321. Sterling was precluded from participating in bidding on RTC acquisitions because of the breach. (Gilkey, Tr. 545, line 6 through 546, line 2)

## G. COST OF CAPITAL.

### *1. Dr. Christopher James Is A Qualified Expert In Thrift Economics And Finance.*

322. Dr. Christopher James is the William H. Dial/SunBank Eminent Scholar in Finance and Economics at the University of Florida. Dr. James has held this position since 1989. (James, Tr. 2811, lines 12-14; P-491)

323. Dr. James obtained his Ph.D. in Economics from the University of Michigan in 1978, specializing in Industrial Organizations and Finance. (James Tr. 2813, ll. 7-8; P-491, 1). Prior to receiving his Ph.D., Dr. James graduated from the University of Michigan's M.B.A. program in 1977, specializing in Finance. (James, Tr. 2813, lines 8–9; P-491, p. 1)

324. Dr. James has taught finance at the University of Oregon and University of Michigan, as well as several other visiting professorships. (James, Tr. 2813, line 14 through 2814, line 3; P-491, p. 1)

325. Dr. James served on the Board of Directors at SunTrust Bank of Florida for approximately 15 years. (James, Tr. 2812, lines 17-22) Dr. James also sits on the Board of Directors for Big Brothers/Big Sisters in Florida. *Id.*

326. Prior to assuming his current position at the University of Florida, Dr. James worked in the United States Treasury Department as a Senior Economic Advisor to the Comptroller of the Currency. (James, Tr. 2814, lines 8-17; P-491, p. 1). In this capacity, Dr. James consulted and advised the comptroller on issues regarding bank regulatory policy and how the economy impacts different financial institutions. *Id.*

327. Dr. James also worked as a consultant for the FDIC in the late 1980s and early 1990s. (James, Tr. 2814, line 18 through 2815, line 6; P-491) Dr. James worked with the FDIC in developing a model (still in use today) that evaluates the cost to the FDIC of a failed institution and how best to dispose of that institution. *Id.*

328. Dr. James has served as a consultant to several Federal Reserve Banks, including the Federal Reserve Banks of New York, San Francisco and Chicago. In addition, Dr. James served as a visiting scholar to the Board of Governors of the Federal Reserve System, focusing primarily on issues of bank regulatory policy. (James, Tr. 2815, lines 9-23; P-491, p. 1)

329. Dr. James has published a number of articles in scholarly journals, focusing on banking and thrift institutions, how they raise capital, and the impact of regulatory policy on their operations. (James, Tr. 2819, lines 3-10; P-491, pp. 2-6) Dr. James is an Associate Editor with the Journal of Financial Economics, served for 12 years as an Associated Editor or the Journal of Finance, and is an Associate Editor on three other scholarly financial journals, including the Journal of Financial Services Research. (James, Tr. 2819, lines 13-23; P-491, pp. 6-7)

330. Dr. James has been qualified as an expert on more than 15 occasions in various United States courts, including five *Winstar* cases. (James, Tr. 2818, lines 3-23)

***2. Supervisory Capital Was Valuable Prior To FIRREA*.**

331. In short, regulatory capital has value to Sterling in particular because it allows the bank to hold additional earning assets. (James, Tr. 2830, lines 20-22)

332. In the late 1980s and early 1990s there were essentially three basic sources of regulatory capital. First was capital obtained from issuing securities to investors; common and preferred stock, and subordinated debt. A second source of capital was retained operating earnings. (James, Tr. 2834, line 17 through 2836, line 2)

333. The third source of supervisory capital in this time frame was supervisory goodwill, capital credits, and/or other regulatory forbearances. (James, Tr. 2836, lines 3-8)

334. Prior to the enactment of FIRREA, supervisory capital counted as regulatory capital. (James, Tr. 2837, lines 13-16; Faulstich, Tr. 364, lines 6-7, 16-20)

335. Because a bank had to maintain a minimum capital ratio, supervisory capital had value in that it allowed a bank to obtain a greater number of income earning assets. (James, Tr. 2836, line 21 through 2837, line 12; James, Tr. 2830, lines 11-12)

### *3. Similarities And Differences Between Supervisory Capital And Tangible Equity Capital.*

336. Both supervisory capital and tangible equity capital allow a thrift to acquire earning assets through leverage. (James, Tr. 2902, lines 21-25; Bajaj, P-655)

337. Supervisory capital has no required cash flows. (James, Tr. 2903, lines 8-9; P-655) Consequently, Sterling did not owe an expected rate of return on the supervisory capital it acquired through its contracts with the United States Government. (James, Tr. 2903, lines 11-14)

338. Tangible equity capital, on the other hand, carries with it an expected rate of return to the shareholders or providers of the capital. (James, Tr. 2903, lines 22-25; P-655)

339. These differences between supervisory capital and tangible equity capital make up part

of the actual cost of capital that Sterling experienced in its efforts to mitigate the effects of the Government's breach. (James, Tr. 2904, lines 2-9; P-655)

***4. Capital Raised By Sterling In The Assumed Mitigation Was Costly.***

340. Every capital raised bears some economic cost. (Bajaj, Tr. 4265, line 24 through 4266, line 2)

341. The actual cost of capital raised consists of transaction costs and costs of capital measured by the coupon rates. (James, Tr. 2875, line 21 through 2876, line 22)

342. Transaction costs associated with common stock offerings include, but are not limited to, broker commissions, filing expenses, preparation of the registration statement, attorney's fees, accountant fees, and the price of underwriter's warrants. (James, Tr. 2932, line 16 through 2933, line 6; P-672)

343. The value of granting warrants is determined according to the Black-Scholes Option Pricing Formula. (James, Tr. 2937, lines 2-12; P-673)

344. Because common stock is a riskier investment than preferred stock, an investor in common stock expects a higher rate of return than an investor investing in preferred stock. (James, Tr. 2914, lines 20-25; P-661)

345. Consequently, a riskier security carries higher costs to the issuing entity, Sterling in this case, than a safer investment would. Id. As noted in previous *Winstar* cases, most notably the *Home Savings* case, there is a cost associated with capital. (James, Tr. 2923, lines 4-18; P-662)

346. The Courts have rejected the zero cost of replacing capital theory proposed by the Government. (James, Tr. 2931, line 16 through 2932, line 5)

***5. Components Of Damages Arising From Assumed Replacement.***

347. If Government's position was correct that Sterling's 1991 and 1993 capital raisings fully raised the regulatory capital lost via the breach, a conservative estimate of Sterling's total damage as a direct result of the breach is $18.7 million. (James, Tr. 2831, line 21 through 2832, line 13; P-650) 348. Assuming the regulatory capital was replaced in 1990 to 1992,, Sterling suffered harm related to capital raised that would not have occurred absent the breach. (James, Tr. 2831, lines 17-20)

349. Assuming Sterling replaced the Government's promises, it issued a costly capital to replace breached contractual supervisory capital which already supported existing assets. The capital raised was more costly than the breached contractual supervisory capital. (James, Tr. 2920, line 3 through 2922, line 6; P-656)

350. Sterling's total cost of "replacement" consists of four components. $4.1 million represents the figure for lost profits incurred before full mitigation. $9.1 million represents the actual costs of capital raised, the costs associated with the capital in terms of the required return to investors. Third, the transaction costs allocated to the assumed replacement cost Sterling approximately $900,000. Fourth, Sterling incurred wounded bank damages by $4.3 million. (James, Tr. 2893, line 11 through 2894, line 5; P-650)

***6. Sterling Incurred Costs Related To Mitigation.***

351. Prior to the assumed full replacement, Sterling incurred lost profits damages. (James, Tr. 2895, lines 1-24; P-652; P-653)

352. Sterling's 1991 offering could only have replaced some of Sterling's lost profits damages but would not replace all of the supervisory capital that Sterling lost as a result of the

breach of contracts. (James, Tr. 2895, lines 10-24; P-651)

353. Sterling incurred lost profits damages from the date of breach up until the date of the assumed full replacement with a 1993 offering. (James, Tr. 2895, lines 1-6; P-651; P-653)

354. Applying Professor Horvitz's lost profits model of the actual bank's return on average assets to the foregone assets from the time of breach until full mitigation in February of 1993 with slight adjustments, Sterling's lost profits prior to the assumed full mitigation are $4.137 million. (James, Tr. 2899, line 10 through 2900, line 10; P-653)

355. After accounting for the assumed mitigation of supervisory goodwill lost over the result of the Central Evergreen transaction, Sterling replaced $7.57 million worth of supervisory capital related to the acquisitions of Lewis Federal and Tri-Cities through its 1991 common stock offering. (James, Tr. 2910, lines 2-6; P-658)

356. Dr. James only calculates ongoing costs of the replacement capital equal to the level of breached contractual supervisory capital which amortizes over time. (James, Tr. 2927, line 21 through 2928, line 15; P-667)

357. In 1993, again, allocating a proportion of the 1993 offering to mitigate the damages caused by the breach of the Lewis Federal and Tri-Cities agreements, Sterling raised $4.04 million to mitigate those damages. (James, Tr. 2911, line 17 through 2912, line 6; P-659)

358. Taken together, the $7.57 million raised and allocated to Lewis Federal and Tri-Cities breach in 1991, and the $4.04 million raised and allocated to the Lewis Federal and Tri-Cities mitigation in 1993, results in the sum of $11.61 million raised by Sterling in mitigation of the Government's breach of the Lewis Federal and Tri-Cities agreements. (James, Tr. 2912, lines 9-20; P-659)

359. Part of the total costs associated with the assumed mitigation capital was $9.115 million. Of the $9.115 million, $7.729 million represents the costs to Sterling from the time of breach until September of 2006. The remaining $1.386 million represents the cost to Sterling going forward; that is, from September 30, 2006, until 2025, the year in which the contract expires. (James, Tr. 2929, lines 10-21; P-667; P-668)

360. The total transaction costs associated with the 1991 offering were $3.326 million. After allocating on a pro-rata basis, the mitigation of the withdrawn 1989 offering and the elimination of the Central Evergreen supervisory capital, the transaction costs directly attributable to mitigating the damages caused by the breach of the Lewis Federal and Tri-Cities agreements is approximately $900,000. (James, Tr. 2933, line 13 through 2934, line 2; P-672)

361. The Government agrees that the $900,000 figure is a reasonable approximation of the actual costs incurred by Sterling in mitigating the damages caused by the Lewis Federal and Tri-Cities breaches. (James, Tr. 2934, line 25 through 2935, line 4)

362. Dr. James' estimate of mitigation damages assuming replacement net of wounded bank costs is $14.1 million. (James, Tr. 2893, line 11 through 2894, line 5; P-650)

363. The dividend yield of BBB-rated preferred stock as of September 29, 2006 was 6.30%. (P-675; James Tr. 2941 lines 4-11.)

## H. COST OF CAPITAL

364. The Courts have rejected the zero cost of replacing capital theory proposed by the Government. (James, Tr. 2931, line 16 through 2932, line 5)

365. Assuming Sterling mitigated, it issued a costly capital to replace breached contractual supervisory capital which already supported existing assets. The capital raised was more costly

than the breached contractual supervisory capital. (James, Tr. 2920, line 3 through 2922, line 6; P-656)

# IV. ARGUMENT

## A. STERLING IS A "LOST VOLUME SELLER."

### *1. Summary*

The Government argues that Sterling is not entitled to lost profits damages in part because Sterling was able to earn profits after 1991 off real capital that it raised, and according to the Government, those profits must be credited to the Government against Sterling's lost profits damages on the theory that the profits earned were the same as Sterling would have earned absent the Government's breach. This argument should be rejected for a number of reasons.

First, Sterling was, and is a fast-growing company, which constantly adds capital to support its growth. It is a smaller bank than it could have been absent the breach. To this day, it could use the revoked contractual capital.

Second, regulatory contractual capital is fully additive to actual capital. Accordingly, any real capital raised after the breach could only be said to have "replaced" the revoked contractual capital as of the point Sterling ceased to have a need for capital to pursue prospective opportunities. Sterling has never yet reached that point. Thus, the Government is not entitled to claim credit for Sterling's actual profits in mitigation of the losses it caused. This analysis is fully supported by the law of contract damages as explained in the lost volume seller rule.

### *2. Legal Standards For A Lost Volume Seller.*

"A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 490 (2006). The court explained:

> **Lost volume damages are premised on the notion that had the defendant fully performed, the plaintiff would have had the benefit of the original sale, and as**

> **a trader of the particular good, the profits from the subsequent sale as well.** If a lost volume seller sells goods to a second buyer after the first buyer's breach, it nevertheless loses the profits from the first potential sale to the breaching buyer. The lost volume seller could have made the second sale and earned profits on it regardless of the breach. Accordingly, **no remedy other than an award of lost profits on the breached sale is adequate to make the lost volume seller whole.**

*Id.* (internal citations omitted) (emphasis added). This method of calculating damages "can apply to a multitude of plaintiffs who are not traditional lost volume sellers." *Id.* at 493 and n.2, citing White & Summers, UNIFORM COMMERCIAL CODE § 7-11 at 389.

Though lost volume damages are most often applied in the context of a sale of goods, the Restatement of Contracts provides that any injured party able to prove it "could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both" is entitled to lost volume damages. RESTATEMENT (SECOND) OF CONTRACTS § 347, comment f. Professors Calamari and Perillo explain the standard a party must meet to be considered a lost volume seller:

> [I]f the relation between the parties is such that the wronged party was legally free to enter into similar contracts with others, that subsequent to the breach, the wronged party could have or actually has made similar contracts, in no way reduces the entitlement to damages.

John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS, § 14.16 (4th ed. 1998). Thus, a party seeking recovery as a lost volume seller must demonstrate both that the party could have done all the business contemplated by the breached contract as well as the business it actually did after the breaching and would have done so. Thus, the test to determine whether a party can recover as a lost volume seller has both a subjective and objective component. *Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734, 740 (Ct. App. Texas 1992). The subjective component "requires the injured party to demonstrate that he possessed the intent to take on additional contracts." *Id.* The objective

component "requires the injured party to establish that he had the capacity to enter into new contracts without incurring additional expenditures. *Id.* The determination of whether a party is a lost volume seller is a question of fact. *Gianetti v. Norwalk Hospital*, 833 A.2d 891, 901 (Conn. 2003), citing 3 RESTATEMENT (SECOND), § 347, comment (f), p. 117. "The whole concept of lost volume status is that the sale of the goods to the resale purchaser could have been made with other goods had there been no breach. In essence, the original sale and the second sale are independent events, becoming related only after breach, as the original sale goods are applied to the second sale." *Van Ness Motors v. Vikram*, 535 A.2d 510, 511 (N.J. Super. 1987).

The lost volume rule has been recognized throughout the country. *E.g., C.I.C. Corp. v. Ragtime, Inc.*, 726 A.2d 316, 320 (N.J. Super. 1999) (listing cases). For example, in *Trienco, Inc. v. Applied Theory, Inc.*, 102 Or. App. 362 (1990), the court awarded lost profits damages to a lost volume plaintiff who designed and manufactured an optical scanning device. The court described a lost volume seller is a party "whose ability to supply its goods exceeds the demand and who, if one buyer breaches, will have permanently lost a sale in its total market." *Id.* at 365. Likewise, *in C.I.C. Corp. v. Ragtime, Inc.*, 726 A.2d 316 (N.J. Super. 1999), the court awarded lost profits to a lost volume seller who leased vending machines. The court explained:

> Where, as here, a plaintiff lessor agrees to lease an article of which the supply in the market is for all practical purposes not limited, then the law would be depriving him the benefit of his bargain if on the breach of the agreement, it required his claim against the lessee to be reduced by the amount he actually did or reasonably could realize on a reletting of the article. For if there had been no breach and another customer had appeared, the lessor could as well have secured another such article and entered into a second lease. In case of the breach of the first lease, he should have the benefit of both bargains or not – in an situation where the profit on both would be the same – be limited to that profit on the second of them.

*Id.* at 320.

***3. Sterling Has Demonstrated That It Would Have Done The Business It Did And More.***

Like a lost volume seller, Sterling: (1) possessed the capacity to utilize more capital to make additional sales and profits; (2) it would have been profitable for Sterling to obtain more capital; and (3) Sterling would have raised and utilized more capital absent the breach. *See R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) (company established status as lost volume seller). Sterling was unable to take other opportunities for profits because of its loss of necessary capital from the breached contract and the Government's consequent attack on it. Sterling will always be behind on its profits compared to where it would have been absent the breach. *See Ragen Corp. v. Kearney & Trecker Corp.*, 912 F.2d 619, 627 (3d Cir. 1990) (even where the seller resells the item, the seller is still not made whole because of the lost profit from the initial breach); *Advanced Medical, Inc. v. Arden Medical Systems, Inc.*, 955 F.2d 188, 200-01 (3d Cir. 1992) (a lost volume seller "will always, in the end, have only one sale instead of two, and therefore will suffer damages"); *Robert Burton Associates, Inc. v. Preston Trucking Co.*, 149 F.3d 218, 221 (3d Cir. 1998) (vacating order of summary judgment as to damages where disputed facts remained as to whether seller lost other sales as a result of having to resend shipment to buyer after buyer lost first shipment in transit).

The Government argues that Sterling is not a lost volume seller because what it lost because of the breach – the Government's promise to count the FSLIC cash assistance as regulatory capital – is not a piece of equipment which Sterling could "mass produce." The Government misses the point. The volume that Sterling lost is not the FSLIC promise, which has no intrinsic value, but rather the resultant ability of Sterling to earn profits by leveraging on the promised capital. "The value of leverage is the potential for profits." *Bank United of Texas, FSB v. United States*, 50 Fed.

Cl. 645, 655 n. 11 (2001), *aff'd in part, rev'd in part,* 80 Fed. Appx. 663 (2003). Sterling has demonstrated its ability to leverage capital and the record is undisputed that Sterling could profitably utilize all of the capital it has at its disposal and more. Because of the breach, Sterling will always be behind where it could have been. Therefore, the lost profits method of damages provides the most accurate and appropriate measure of the harm done to Sterling by the Government's breach.

## B. A LOST PROFITS MEASURE IS THE APPROPRIATE MEASURE TO CALCULATE THE DAMAGES OWED STERLING.

"The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1371 (Fed. Cir. 2003). These expectancy damages "are normally equated with lost profits, although other measures of damages may be applied. *American Federal Bank, F.S.B. v. United States,* 68 Fed. Cl. 346, 355 (2005); *California Federal Bank, F.S.B. v. United States,* 245 F.3d 1342, 1349 (Fed. Cir. 2001). Williston notes:

> Because the goal of protecting the plaintiff's expectation interest is to place the promise in the same position as performance would have done, it follows that an award of damage will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because **only by awarding lost profits will the plaintiff be made fully whole.**

24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002), p. 24 (emphasis added).

The Federal Circuit has established that, in order to be entitled to lost profits damages, the plaintiff must establish that: (1) the breach caused its failure to earn the alleged lost profits; (2) the loss was foreseeable; and (3) the measure of damages is "reasonably certain." *California Federal Bank v. United States,* 395 F.3d 1263, 1267 (Fed. Cir. 2005); *Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 344 (2004) (awarding $5,602,000 of damages under lost profits

analysis after trial); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007); *see also First Federal Savings and Loan Association of Rochester v. United States*, No. 95-517C, __ Fed. Cl. __, 2007 WL 1160294, slip op. at 9 (April 13, 2007)).

***1. Sterling Has Established Causation Of Lost Profits Damages.***

**a. Standard To Establish Causation Of Lost Profits**

To establish causation of lost profits, a plaintiff need not establish that the breach is "the sole factor or sole cause" of the lost profits. *First Federal*, slip op. at 10, quoting *Cal. Fed. Bank*, 395 F.3d at 1267. "The existence of other factors operating in confluence with the breach" will not preclude recovery. *Id.* "The causal connection between the breach and the loss of profits must be 'definitely established' so that 'the nonbreaching party will not be awarded more than it would have received if the contract had been performed.'" *Id.*, quoting *Cal. Fed. Bank*, 395 F.3d at 1267.

**b. Sterling's Lost Profits Were Caused By The Breach.**

Prior to the breach, Sterling implemented a successful business strategy of growth through deposit gathering and acquisitions. Sterling was profitable by the end of its first year of business, and its deposits, assets and profits increased each year without interruption through fiscal year 1989. Indeed, in 1989, Sterling was one of the fastest growing thrifts in the Pacific Northwest. (P-414)

Sterling's management team, unchanged since Sterling's inception and repeatedly complimented by its regulators, implemented a successful business strategy to grow Sterling. The Government knew that Sterling's goal in acquiring troubled thrifts was to obtain more capital which it could leverage to profits.

The breach, however, derailed Sterling, forcing it to shrink, and to reduce its operations and forgo profitable business opportunities. Sterling suffered a reduction in income because OTS restrictions did not permit it to originate certain types of construction loans that would have been converted to permanent loans, and was forced to withdraw business banking, consumer lending, commercial real estate and residential construction activity. OTS forced Sterling to withdraw from fixed rate lending and public funding activities for a period of time. Sterling also was forced to stop gathering uninsured deposits. Moreover, Sterling lost specific deposits and/or customers because of the OTS restrictions on Sterling in the wake of FIRREA. Sterling could not make certain loans to its customers and was forced to refer those customers to other financial institutions, the effect of which cannot be underestimated. Indeed, the public was aware of the Government's adverse actions toward Sterling, and many of Sterling's customers, concerned about the Bank's viability, chose to leave for other financial institutions. Likewise, specific customers sought construction loans from Sterling during that time or inquired about the possibility of loans and Sterling was unable to accommodate them. Sterling not only was unable to grow through new customers because of the public concern over its problems with the Government, but it had to turn away the customers it already had. Sterling also lost investment opportunities because of the Government's breach-driven attack.

**c. The Damages Incurred By Sterling Caused By The Government's Breach Were Foreseeable.**

Sterling is not required to establish actual foresight of the harm, but merely "reason to foresee…It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in contemplation of the parties at the time they made the contract." *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126, 146 (2003); *see also First Federal*, slip op. at 21.

Sterling's lost profits were foreseeable. As the Supreme Court noted in *Winstar*, the whole point of the contracts with Sterling was to enable Sterling to credit the cash assistance to its net worth to leverage its assets higher and (hopefully) produce greater profits. It was reasonably foreseeable that breaching the contracts, and disallowing Sterling that capital, would cause Sterling to curtail growth of profitable assets and thereby necessarily lose profits it would have realized.

Indeed, the Government clearly knew that Sterling would use the capital granted by the agreements to support an asset structure for growth. Noting that Sterling's business plan after the acquisition of Tri-Cities was "ambitious" but "consistent with growth trends of the recent past", the Government noted that the growth "is supported largely by the infusion of FSLIC assistance, which is to be counted as regulatory capital." (P-24, § VII (A); *see also* P-27, § VI (Sterling's "business plan consists of asset growth of approximately 15% annually. This growth is supported largely by the infusion of the FSLIC assistance as regulatory net worth."). When the Government was attempting to convince Sterling to acquire the failing Central Evergreen, the key factor for Sterling (as known to the Government at that time) was its abilities to leverage as capital the cash assistance received in the Tri-Cities acquisition. (*See* P-389)

Thus, at the time the Lewis and Tri-Cities agreements were executed, it was reasonably foreseeable that Sterling would continue to follow its strategic business plan to achieve growth through deposit gathering, lending and acquisitions, and that the Government's breach of the agreements would cause Sterling to lose those profits. *See First Federal*, slip op. at 22.

### ***2. The Measure Of Sterling's Damages Is Reasonably Certain.***

#### **a. Standard To Establish Reasonable Certainty**

A plaintiff seeking recovery for lost profits is not required to prove an exact amount; if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Cal. Fed. Bank*, 395 F.3d at 1267, *quoting Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004). "The ‘reasonable certainty' test allows some flexibility." *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 88 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003). Moreover,

> The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: “ ‘It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.’ ” *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237, 416 F.2d 1345, 1358 (Ct. Cl.1969) (quoting *Specialty Assembling & Packing Co. v. United States*, 174 Ct. Cl. 153, 355 F.2d 554, 572 (1966)).

*Bluebonnet Sav. Bank, F.S.B. v. U.S.*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

To prove lost profits with reasonable certainty, a plaintiff must establish: "(1) the estimated reduction in the amount of profitable assets caused by the breach; and (2) the appropriate average return, based on comparable historical results, that would have been earned on such lost assets." *First Federal*, slip op. at 23. Even though Sterling's expert is "required to opine on what would have happened in a world that never was", such testimony constitutes a sufficient and sound basis for the Court to award lost profits. *See First Federal, Id.*

#### **b. Sterling's Lost Profits Calculation Is Reasonably Certain.**

Sterling, in contrast to other *Winstar* plaintiffs, does not require that economic forecasting or

speculation be used to determine the amount of its lost profits. The vast majority of *Winstar* plaintiffs had been weak financial institutions in the 1980s, before the breach, and were weak in the 1990s. While Sterling has been profitable throughout its history, many of the plaintiffs had a history of operating losses. Some of the plaintiffs were forced to close after the breach.

Here, the model is a straightforward method of calculating the lost profits of Sterling. The amount of regulatory capital Sterling would have had if its contracts had been honored by the Government is a known quantity. It would have been used to support additional assets. Sterling would have earned a return on those assets, at a known rate. These earnings would be added to capital and allowed the acquisition of additional foregone assets that would yield additional profits. Such cumulative lost profits from the time of the breach to the present total $58.164 million.

Professor Horvitz's model is conservatively constructed using constraints that limit profit. Dr. Horvitz's calculations of foregone assets used in the model are limited in each year by capital and growth constraints. Foregone assets are never assumed to be any larger than allowed by the more limiting or smaller of these constraints. Lost profits are thus limited by the conservative small size of assumed foregone assets.

The lost profit calculation assumes that the but for Sterling would earn profits at the same rate as the actual Sterling for the years 1990 through 2006. This assumption, based on undisputed facts, is conservative because: (1) the model does not include Sterling's actual losses from breaching conduct that raised its costs and lowered its income; (2) the model uses Sterling's actual rate of return during the period that the Government was in fact suppressing Sterling's return by its breaches of contract; (3) as Sterling grew, its fixed overhead costs would have been spread under economies of scale; (4) absent the breach, Sterling would have had the opportunity to acquire failing thrift

institutions from the Government, which would have been more profitable than Sterling's actual return on assets; and (5) the assumption that but-for Sterling would have earned returns at at least the same rate as actual Sterling is further verified by the return on average assets obtained by Sterling when the actual bank reached the size of the but-for bank.

Moreover, Sterling's proffered calculations are based on the conservative assumption that the foregone assets would be similar to those held by the actual bank. The actual bank held usual and ordinary type assets. There is no reason to doubt that additional assets of the type held by Sterling were readily available and Sterling has, in every year of its existence, forecasted and achieved growth. That means, in the real world, that each year Sterling has to forecast a certain level of assets necessary to replace loans that go off the books as part of normal business operations, and additional assets to achieve growth, and then go to the market to find those assets. It does so, and has done so successfully every year of its existence, without knowing in advance who the borrowers (and depositors) will be. Using this method, Sterling has grown to over $10 billion in assets.

Indeed, Sterling finds billions in new assets every year. Sterling originated $5 billion in new assets in 2006. The proof is well established dispute that, if its contract capital were restored, Sterling could easily find the additional assets to be supported by that capital.

The conservatism of Sterling's calculations is further confirmed by the growth of the actual bank. Professor Horvitz assumed, in 2000, a conservative rate of growth in his but for model. The actual Sterling grew to a larger size than the but for bank within a short period of time (usually within one year). The basic reason why the model's bank grows as rapidly as it does is because the actual bank (with the same management and business strategy operating in the identical economic environment) grew rapidly. There is no reason to believe that Sterling would not have used the

capital lost to Sterling due to the Government's breach in the same way it has used the capital it was permitted to utilize. The Court should therefore find that Sterling's lost profits caused by the breach total $58.164 million.

In sum, the calculation of Sterling's lost profits depends upon the actual bank's performance in the ideal economic environment and under the direction of the same management in place at the time of the breach. The measure is reasonably certain and should be credited. The Court should award Sterling lost profits damages in the amount of $58.164 million.

## C. THE ACTUAL PERFORMANCE OF STERLING IS THE BEST EVIDENCE OF ITS DAMAGES.

Sterling has proven that its actual performance, prior to and after the breach, was that of a profitable, well-run and growing institution. Calculation based upon this actual performance is the most reliable method of determining damages. The Government has argued that lost profits cannot be proven in a *Winstar* case, ignoring that cases in which the lost profits measure have been rejected have featured methods that do not rely upon actual performance of the institution.

For example, in *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 100, 115 (2004), the court rejected a lost profits model that relied upon obtaining assets that were "unmoored in the factual evidence presented at trial." The model assumed that the but for bank would grow with the addition of some mixture of mortgage-backed securities and residential mortgages and excluded the possibility that assets would be acquired through acquisitions. However, the facts indicated that the thrift's plans to grow relied upon the acquisition of other financial institutions and to increase commercial, consumer and construction loans. *Id.* at 100, 112, 114-15. The court "[found] it more probable that [the thrift's] investment philosophy in the but-for world would have been much as it was in the real world." *Id.* at 120. The flaw was "not that [the lost profits model] uses but-for projections,

but that these but-for projections are not rooted in and frequently conflict with the factual evidence presented to the court." *Id.* at 123-24; *see also Advent Systems, Limited v. Unisys Corporation*, 925 F.2d 670, 682 (3d Cir. 1991) (noting "serious reservations about the validity of expert testimony [as to lost profits] based on prior predictions of sales for a given period when actual performance data for that same time span are available").

Likewise, in *Bank United*, the trial court rejected a lost profits claim because contrary to the rapid wholesale growth reflected in the thrift's lost profits models, the thrift's pre-FIRREA business plans projected a focus on retail growth supplemented by wholesale purchases. 50 Fed. Cl. at 659-60. Moreover, the thrift's actual growth was inconsistent with that forecasted in its models. *Id.* at 662. Professor Horvitz's model in this case suffers from no such infirmity. It assumes that Sterling would behave exactly as it did, only with greater leverage. As. Professor Horvitz explained, leverage acts asa magnifier of profit or losses. Sterling was profitable in the actual world.

### D. STERLING MITIGATED, BUT DID NOT CURE, THE HARM CAUSED BY THE BREACH.

The Government argues that Sterling fully mitigated the breach and, therefore, was not harmed. This argument was rejected by the *Long Island* court:

> [T]he Government starts down a proper analytical path to evaluate Long Island's efforts to mitigate the Government's breach, but **the Government stops short of the critical inquiry whether *Long Island* nonetheless suffered damage despite reasonable mitigation efforts. This posture by the Government contravenes the teachings of *LaSalle Talman*.** In that decision, the Federal Circuit ruled that post-breach efforts at mitigation had to be taken into account in addressing damages….*Long Island* bears the burden of proving these damages, but the Government bears the burden of proving that Long Island's efforts at substitute performance were **unreasonable…it is evident that Long Island's mitigation through substitute performance reduced the amount of damages for which the Government is liable – but not to zero.**

*Long Island Savings Bank, FSB v. United States*, 60 Fed. Cl. 80, 89-90 (2004) (internal citations omitted).

Sterling's success in obtaining an injunction and in launching the 1991 offering certainly mitigated the damages (but for these efforts, Sterling's claim would have exceeded $1.5 billion (Horvitz, Tr. 2115, line 18 through 2116, line 4) but did not erase the damage done to Sterling caused by the Government's breach. Sterling raised capital in almost every year since 1991; Sterling raised or the holding company downstreamed capital in 1991, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, 2006 and 2007. Given its aggressive growth strategy, Sterling has always needed more capital, and could have utilized the capital taken away for profit.

## E. PROFESSOR HORVITZ'S OPINION THAT STERLING WOULD BE PERMITTED TO COUNT BOTH THE QSGW FROM CENTRAL EVERGREEN AND THE CONTRACTUAL GOODWILL FROM LEWIS FEDERAL AND TRI-CITIES IS CORRECT AS A MATTER OF LAW AND UNDISPUTED FACT.

### *1. Sterling's Right To Count The Supervisory Goodwill From Central Evergreen Is Also Contractual.*

Messrs. Bankhead and Hargett testified that, in the but-for-world, Sterling would not have been permitted under FIRREA to count both the QSGW from Central Evergreen and the so-called contractual goodwill from Lewis Federal and Tri-Cities. (Schott, Tr. 2460, line 21 through 2463, line 2, Bankhead, Tr. 3330, lines 2-14; Hargett, Tr. 3424, lines 1-12; Hargett, Tr. 3431, lines14-20; DX-2005; DX-2505; DX-2506) These opinions, however, which are used to criticize Professor Horvitz's calculation of the but-for bank's core capital are contrary to the law of this case and premised upon the false assumption that the right to count the goodwill from the Central Evergreen transaction is not contractual in nature (*i.e.*,, that Sterling does not have the contractual right to count the QSGW from Central Evergreen). Though Sterling may have accepted the risk of regulatory change, that

change (*i.e.*, FIRREA) did not eliminate altogether Sterling's contractual right to treat goodwill from the acquisition of Central Evergreen as regulatory capital. Instead, the effect of FIRREA was to reduce (not eliminate) the amount of goodwill that Sterling could otherwise treat as regulatory capital under its contract. (Hargett, Tr. 3419, lines 4-24)

To be clear, in 2002, this Court, through Chief Judge Damich, held that Sterling contracted for the right to count $23,800,000 in goodwill from the Central Evergreen transaction towards Sterling's regulatory capital requirement subject to amortization over 12 years. *Sterling Savings.*, 53 Fed. Cl. at 613; *Sterling Savings*, 72 Fed. Cl. at 405. Contrary to what the Government's experts all assumed, this Court's 2006 opinion on the Government's motion for reconsideration did not reconsider whether the right to treat the Central Evergreen goodwill as regulatory capital was a contractual right, but instead, whether the contractual right to do so was subject to future regulatory changes, such as FIRREA. *Sterling Savings*, 72 Fed. Cl. at 407, 409. The Court held that it was, but did not go so far as to hold that Sterling had no contractual rights concerning the regulatory treatment of the goodwill from Central Evergreen. *Id*. at 411.

Simply put, the Court construed Sterling's Central Evergreen agreement to mean that Sterling had the contractual right to treat the goodwill from Central Evergreen as regulatory capital and to amortize over 12 years, *but only for so long as the statutes and regulations permitted as much. See Id.* at 409, 411 (emphasis added). If the statutes and regulations were to later change, reducing or eliminating Sterling's right to treat the goodwill as regulatory capital, that is something Sterling knowingly agreed to in its contract. *Id*. at 411.

The question therefore not considered by Messrs. Bankhead and Hargett was whether or to what degree did FIRREA modify Sterling's otherwise contractual right to treat all $23,800,000 in goodwill

as regulatory capital and to amortize it over 12 years. The answer to this question is that FIRREA reduced both rights, but did not eliminate them altogether. In short, before FIRREA, Sterling had the contractual right to count all $23.8 million of goodwill as regulatory capital and to amortize it over a 12 year period. Per the Court's 2006 ruling, Sterling still had the contractual right to treat the goodwill from Central Evergreen as regulatory capital (in addition to its distinct rights to do the same with regard to Lewis Federal and Tri-Cities), but only to the extent and in a manner permitted by new regulations (*i.e.,* as QSGW subject to the cap and the 5 year phase-out requirement)[1]. To deny Sterling that right in the but-for world, as Messrs. Hargett and Bankhead do, is to breach its contract in a new and different way.

In sum, Sterling submits that, in addition to its right to treat all the goodwill from Lewis Federal and Tri-Cities as regulatory capital per those distinct contracts, it also has the distinct contractual right under the Central Evergreen contract to count the goodwill from that acquisition as regulatory capital, so long as it does so in a manner consistent with FIRREA's regulations. If, as Messrs. Hargett and Bankhead assume, a regulator in the but-for world were to deny Sterling that right, such a denial would effectuate a breach of contract. Therefore, Messrs. Hargett's and Bankhead's opinions should be rejected on these grounds.

In any event, Sterling was entitled to the benefits and protection of the Lewis Federal and Tri-Cities forbearance provisions. By applying these forbearances, Sterling was in capital compliance as of December 31, 1989. Because Sterling was in compliance, the Court does not have to decide the issue raised by Messrs. Bankhead and Hargett as to whether the qualifying supervisory goodwill from Central Evergreen is to be included in the calculation of regulatory capital.

---

1 Put differently, under the Central Evergreen agreement, as construed by the Court, Sterling had the right to treat such goodwill as regulatory capital to the extent permitted by law.

### *2. Messrs. Bankhead's And Hargett's Opinions Improperly Categorize QSGW And Contractual Goodwill As Being Identical.*

Assuming for the sake of the argument that the right to treat Central Evergreen goodwill as regulatory capital is not contractual, Messrs. Hargett and Bankhead's opinions still should be rejected because they improperly consider the contractual goodwill from Lewis Federal and Tri-Cities as or equivalent to QSGW. At trial, Messrs. Bankhead and Hargett acknowledged many differences between contractual goodwill and QSGW, differences that distinguish the two. As discussed below, these differences establish that, contrary to their opinions, QSGW and contractual goodwill are not one and the same.

#### a. Contractual Goodwill May Be Treated As Tangible Capital Under FIRREA; Non-contractual Goodwill May Not.

The most significant difference between QSGW and the contractual goodwill from the Lewis Federal and Tri-Cities acquisitions is that the latter may be counted towards all three of FIRREA's capital standards (tangible, core, and risk-based). (Schott, Tr. 2457, lines 12-21; Hargett, Tr. 3364, lines 2-8; Hargett, Tr. 3463, lines 10-16) Messrs. Hargett and Bankhead conceded this distinction, which is significant because, under FIRREA, tangible capital is not limited by any sort of cap or phase out requirement under FIRREA. This difference alone invalidates Messrs. Hargett's and Bankhead's opinions.

Moreover, because contractual goodwill is equivalent to tangible capital for regulatory purposes, it could be applied as such under FIRREA's core capital calculation without being considered QSGW or as some other intangible asset. For example, when Mr. Bankhead re-calculated Sterling's core capital as $15,869,000, he did so by first assuming that Sterling's total tangible capital was negative $12,581,000 and that its total QSGW was $15,557,000, the amount of contractual

goodwill generated by the Lewis Federal and Tri-Cities agreements. He excluded the $10,421,000 of QSGW from Central Evergreen because, in his opinion, FIRREA does not distinguish between contractual and non-contractual goodwill and thus, for purposes of FIRREA's cap and phase out requirements, no more goodwill may be treated as regulatory capital. (Bankhead, Tr. 3327, lines17-22) However, if one were to treat Sterling's contractual goodwill as tangible capital, per Messrs. Bankhead's and Hargett's own testimony, the outcome of Mr. Bankhead's model becomes quite different. By including the contractual goodwill as tangible capital, Sterling, under Mr. Bankhead's own theory, is now free to include the qualifying unidentified intangibles from Central Evergreen as QSGW. The calculation would be as follows:

**CALCULATION OF STERLING'S CORE CAPITAL**
**WITH CONTRACTUAL GOODWILL TREATED AS TANGIBLE CAPITAL**

| | | (thousands) |
|---|---|---|
| **Negative Tangible Capital at 12/31/89 of ($12,581), plus contractual goodwill of $15,557:** | | $ 2,976 |
| ***Adjustments Related to Non-Contractual Goodwill*** | | |
| Total Non-contractual Supervisory Goodwill (Central Evergreen) | 11,357 | |
| 1.5% Of But-For Sterling's Assets (QSGW) | | 10,421 |
| ***Other Adjustments*** | | |
| Identified Intangibles | | 5,670 |
| Capital Raising | | 10,500 |
| Incremental But-For Bank Adjustments | | (781) |
| **But-For Sterling's Core Capital** | | **$ 28,786**[2] |

2 It makes no difference that Professor Horvitz considered the contractual goodwill as an intangible. The point is that because contractual goodwill and QSGW are different, Sterling is entitled to use both in calculating core capital.

Moreover, the concession that contractual goodwill may be treated as tangible capital under FIRREA undercuts the Government's argument that, even after consideration of all the contracts, the FDIC would still have focused on Sterling's lack of tangible capital. (Potthast, Tr. 3204, lines 13-19; Hargett, Tr. 3415, line 8 through 3417, line 5) Because the contractual goodwill is to be treated as capital, tangible or otherwise, any regulatory action in contravention of Sterling's right to treat its contractual goodwill as such would constitute a different sort of breach. *See Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 70 (2006).

**b. Other Important Distinctions Invalidate Messrs. Bankhead's And Hargett's Opinions.**

Messrs. Bankhead and Hargett acknowledged other significant differences between contractual and non-contractual goodwill, establishing that Professor Horvitz assumptions are valid. First, they both acknowledged that contractual goodwill is not limited by the five-year phase-out requirement of FIRREA, while QSGW is so limited. (Schott, Tr. 2456, lines 6-18; Hargett, Tr. 3362, lines 1-8) They also acknowledged that contractual goodwill is not subject to any cap under FIRREA, while QSGW is subject to the cap. (Schott, Tr. 2456, lines 6-18; Bankhead, Tr. 3363, lines 14-22; Hargett, Tr. 3457, lines -10; Hargett, Tr. 3463, lines 1-9) Most importantly, neither expert can deny that the contractual goodwill from the Lewis Federal and Tri-Cities acquisitions is to be defined as regulatory capital as then defined under the contracts, not as later defined by FIRREA. That is what Judge Damich held when he ruled that Sterling did not assume the risk of regulatory change as under the Lewis Federal and Tri-Cities agreements. *Sterling Savings*, 53 Fed. Cl. at 612. To consider

contractual goodwill from Lewis Federal and Tri-Cities as controlled by a definition set forth in FIRREA would be to undercut that ruling.[3]

Overall, it is clear that Mr. Bankhead's model only works, if at all, if one assumes that contractual goodwill and QSGW are virtually indistinguishable. The undisputed facts and testimony demonstrate, however, that they are quite different. As *Winstar* precedent has established, Sterling contracted for regulatory capital equal to that of cash, common stock of equal dollar value, or any other recognized tangible capital:

> Because the FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, <u>the Bank Board had to offer a 'cash substitute'</u> to induce a healthy thrift to assume a failed thrift's obligations.

*Winstar*, 518 U.S. 839, 849-50, 116 S. Ct. 2432, 2443 (1996) (emphasis added). QSGW, as defined by FIRREA, is not such a cash or tangible capital substitute. Thus, QSGW is not one and the same as Sterling's contractual goodwill, which undisputedly is such a substitute. (Schott, Tr. 2457, lines 12-21; Hargett, Tr. 3364, lines 2-8; Hargett, Tr. 3463, lines 10-16)

In sum, in the but for world, Sterling is entitled to count as regulatory capital <u>both</u> the full amount of goodwill from its contracts (one form of regulatory capital) and the so-called QSGW from the Central Evergreen acquisition (another form of regulatory capital) subject to FIRREA's cap and phase-out requirements.

### F. STERLING SUFFERED WOUNDED BANK DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF CONTRACT.

Sterling's prayer for relief regarding wounded bank damages is firmly grounded in *Winstar* precedent. *Southern California Federal Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319, 1337 (Fed. Cir.

[3] Notwithstanding this ruling, as a matter of fact, Sterling could not have contracted for a defined type of regulatory capital that did not exist at the time of contracting.

2005) (affirming trial court's award of approximately $36 million in wounded bank damages to damaged thrift); *Glendale*, 378 F.3d at 1311-1312 (upholding trial court's award of $381 million to damaged thrift); *California Federal Bank*, 245 F.3d 1342. Wounded bank damages "compensate for the costs incurred by the thrift because of its status as a 'troubled' or under-capitalized institution. Such costs include higher costs of funds, higher insurance and regulatory premiums and assessments, and extra attorney and consultant fees to interface with the regulators." *Southern California*, 422 F.3d at 1327. In Sterling's case, wounded bank damages were limited to injuries it suffered "as a result of the breach" and its "weakened condition." (Horvitz, Tr. 2537, lines 2-4)

Professor Horvitz carefully proscribed the scope of the included wounded bank damages to those that could be measured with "a fair degree of precision." (Horvitz, Tr. 2538, line 11 through 21; Horvitz, Tr. 2538, lines 7-10) Sterling provided ample evidence of the wounded bank damages within the scope of Professor Horvitz's precise limits:

- Sterling incurred damages as a result of not being able to fund the CJ-4 Loan. (Byrne, Tr. 1673, line 14 through 1674, line 9; Zuppe, Tr. 3093, line 24 through 3094, line 9; P-336; P-336A)
- Sterling incurred additional regulatory and supervisory costs from being treated as a troubled thrift, including being charged at the "premium" rate for troubled thrifts and paying the "undercapitalized thrift" rate to the SAIF. (Byrne, Tr. 1680, line 11 through 1682, line 3; Byrne, Tr. 1918, lines 7-23; Byrne, Tr. 1928, line 20 through 1929, line 25; Byrne, Tr. 1973, line 19 through 1974, line 20; P-337 p. SG 0803460; P-294; P-337; DX-514)

- Sterling incurred additional costs associated with the withdrawn 1989 offering. (Gilkey, Tr. 208, line 10 through 209, line 5; Byrne, Tr. 1684, line 7 through 1688, line 1; P-338A; P-338)
- Sterling incurred damages as a result of the increased purchased price of Great American Bank branches. (Gilkey, Tr. 215, line 10 through 216, line 1)
- Sterling incurred damages as a result of not being able to bid on RTC assets. (Gilkey, Tr. 401, line 1 through 403, line 15; Gilkey, Tr. 427, line 25, through 428, line 13; Gilkey, Tr. 545, line 6 through 546, line 2; Horvitz, Tr. 2527, lines 2-6)

In addition, Sterling chose not to include in its wounded bank calculations those figures that were undoubtedly a result of its troubled status but that could not be precisely measured. (Horvitz, Tr. 2537, line 20 through 2538, line 10) In addition, although the additional legal, accounting and insurance fees were a direct result of the Government's breach, Sterling does not now pursue those costs. As a result, Sterling's wounded bank claim is a conservative calculation of the actual damages suffered by the institution.

## G. IF THE COURT AGREES THAT STERLING REPLACED THE LOST CAPITAL, DAMAGES SHOULD BE AWARDED.

Sterling doesn't contend that it replaced the Government's promise in 1991-1993. But the Government does. If the Court agrees with the Government (it should not, for reasons previously stated), Sterling offered the opinion of Professor Chris James, whose credentials as a scholar and experienced bank director far outweigh those of any expert called by the Government.

Under contract law, it is well established that a party which obtains "cover" (*i.e.*, replacement) in response to its counterparty's breach is entitled to the cost of the cover less any amount saved by virtue of the breach. In this case, there was no amount saved by virtue of the breach. Unlike the

typical commercial case, in which a buyer does not pay the seller for goods that are not delivered, and thus has that money available to apply to the cost of replacement goods, Sterling fully performed all of its promises to the government -- it assumed and paid all the excess liabilities of the acquired thrifts -- and was not relieved of any duty to the government.

The courts, and all economist experts, agree that all capital has a cost. See, *e.g.*, *Home Savings Bank of America v. United States*, 399 F.3d 1341 (Fed. Cir 2005) (holding that "[t]he [trial] court correctly discounted the argument made by the government's expert that capital has no cost other than transaction costs . . ."); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) (noting that "capital is not 'costless' to either the investor or the recipient."); *Globe Savings Bank, F.S.B. v. U.S.*, 65 Fed. Cl. 330, 349 (Ct. Fed. Cl. 2005) (*quoting LaSalle Talman* for the position that "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings."). All experts agree that the cost of capital is in part a function of the risk associated with the instrument exchanged for money: common stock is the most risky, thus the highest cost, followed by preferred stock, secured debt, and so on. (James, Tr. 2876, lines 7 through 15; Bajaj). Common stock presents a unique valuation challenge because while it does not involve a fixed promise to return a specific cash flow, it does involve a (high, given the risk) expectation of returns on investment. Its cost cannot necessarily be established by reference to cash flows, where dividends have not been paid. However, this Court has recognized that capital raised is costly even if dividends are not paid immediately. *Home Savings Bank*, 399 F.3d at 1354.

The capital instrument issued by Sterling in 1991 was common stock, on which it did not pay a dividend.[4]

---

[4] Sterling Savings Bank's parent, Sterling Financial did not pay dividends on its common either until very recently. The capital instrument issued by Sterling in 1993 was preferred stock

Professor James followed a conservative method of assigning a cost to the common stock. He used the coupon rate on the preferred stock that Sterling issued in 1992. This is a close substitute, as it involves the identical issuer in identical circumstances (Sterling Savings Bank), and is conservative in that the cost of a less-risky preferred issue is necessarily lower than that of common issue.

Professor James noted that Sterling's capital requirements necessarily involved not only the assumed replacement, but also replacement of goodwill lost from the Central Evergreen transaction and replacement of the expected proceeds of the frustrated 1989 offering. Accordingly, he allocated the offerings of 1991 and 1993 logically among those needs, finding that "replacement" would have been complete as of the 1993 offering.

Because Sterling did not raise a sufficient amount of "replacement" capital until 1993, it suffered lost profit damages up to that point. Dr. James calculated lost profits from the date of breach to the date of the first offering, and lost profits (reduced by the effect of the 1991 offering) through the 1993 offering. These amounts, plus wounded bank damages (net of the withdrawn figure for legal and accounting) constitute damages suffered by Sterling because of the breach prior to the alleged "replacement."

The Government's principal argument is that the only cost of capital was the transaction costs -- legal, accounting and underwriting fees and expenses -- necessary to bring it about. This is so, says the government, because common stock has effectively no cost. The government's argument in this regard is flummery, and has been repeatedly rejected by this Court:

---

with a coupon rate of 10.75%.

"…Professor James testified that Professor Miller's focus on net present value is unacceptable because it reduces plaintiff's damages by the amount of capital to be raised in the floatation. The court agrees. …Professor Miller's theory …pre-ordains the outcome of the analysis because his approach can only yield a zero outcome. In effect, his theory is that the cost of capital is zero because any costs expended (as measured by present value) generate capital of an equal amount. This theory makes no sense in the context of a damages calculus. In simplest terms, before the breach, plaintiff had an asset – supervisory goodwill. After the breach, the asset is gone."

*LaSalle Talman*, 45 Fed. Cl. at 106-07 (1999).

"The government argues that the $300 million had 'no cost' because 'the firm receives cash worth $300 million,' which is 'the full value of the promise it is selling.' The Court of Federal Claims correctly rejected that argument, for capital is not 'costless' to either the investor or the recipient."

*Id*. at 1373.

"Describing Mr. Ross's premise, the government asserts that 'the net cost of raising capital is limited to transaction costs.' Def.'s Br. at 24. That theory was squarely rejected by the Federal Circuit in *LaSalle Talman, 317 F.3d at 1374-75*. Here, as in *LaSalle*, 'the government argues that the [replacement capital] had 'no cost' because 'the firm receives cash worth [the same amount as the securities the firm issues],' which is 'the full value of the promise it is selling.'' *Id. at 1374*; *see also* Tr. 4395:21 to 4396:7 (Test. of Ross). The Federal Circuit concluded that the trial court 'correctly rejected that argument, for capital is not 'costless' to either the investor or the recipient'; rather, ''the cost of capital is the required rate of return on various types of financing.'' *LaSalle Talman, 317 F.3d at 1374-75* (quoting James Van Horne & John M. Wachowicz, Jr., *Fundamentals of Financial Management* 387 (10th ed. 1998)). In this respect, 'the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings.' *Id. at 1375*. *See also Home Sav., 399 F.3d at 1352-1355* (affirming a trial court's award of expectancy damages measured by cost of replacing capital, based on a thrift's required rate of return for its capital financing less the 'safe rate' of return the thrift could earn by investing the capital thus obtained)."

*The Globe Savings Bank*, 65 Fed. Cl. at 349.

"The government also makes its perennial argument in *Winstar*-related litigation that transaction costs represent the only costs associated with raising capital. Recognizing that the Federal Circuit has consistently rejected that argument, *see, e.g., LaSalle, 317 F.3d at 1374-75*; *Home Savings IV, 399 F.3d at 1354*, the

> government asserts that the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo, U.S.*, 161 L. Ed. 2d 577, 125 S.Ct. 1627 (2005), 'establishes' that the court of appeals in *Home Savings* and *LaSalle* 'erred in affirming the rejection of the transaction-costs measure.' Def.'s Br. at 60. *Dura Pharmaceuticals* is inapposite to a measurement of the costs of replacing supervisory goodwill with tangible capital. In *Dura Pharmaceuticals*, the Supreme Court held that in a securities fraud action, an inflated stock price does not by itself prove a causal connection between a material misrepresentation of the stock and a shareholder's loss. *Dura Pharm., 125 S. Ct. at 1632-33*. The government reasons that '*Dura Pharmaceuticals* contradicts . . . the approach adopted in *Home Savings* and *LaSalle*[, which] bases damages upon the happenstance of any post-issuance divergence between the expected values of the dividends and the return on the new capital.' Def.'s Br. at 61. To the contrary, as plaintiffs observe, the divergence manifested in measurements of costs of replacement capital results not from happenstance but from the reality that supervisory goodwill has no capital costs, whereas tangible capital does have such costs. *See* Pls.' Reply at 19."

*The Long Island Savings Bank, FSB, and The Long Island Savings Bank of Centereach FSB v. The United States*, 67 Fed. Cl. 616, 646 (2005)

The Government's expert was impeached on this point, however. He agreed that it is not true in finance theory that capital raised through issuance of common stock has no cost. He agreed that common stock does have a cost. He explained that the more precise theoretical idea is that capital raised through issuance of common stock has no net cost. He agreed that this concept works in economic theory on the assumption that a company will not raise capital by issuing common except to pursue profitable opportunities whose returns exceed the expected cost of common stock. The hypothetical firm raises capital and invests in the new opportunity, at that time creating in consequence a new set of positive cash flows. Because no rational firm would ever issue common stock to pursue an opportunity whose returns were less than the cost of the common, it can be said that the net cost to the firm of the common issuance is limited to transaction costs. *Id.*

The entire predicate to the government's idea of "replacement", however, is that Sterling was not raising capital (and incurring the associated cost) to pursue new opportunities. Rather, the entire

idea underpinning the government's theory of "replacement" is that Sterling lost an existing capital item (contractual capital) that was part of an existing balance sheet structure but "replaced" it with a different (and much more costly) but interchangeable capital item in the form of common stock, to support a preexisting set of assets. As Professor James explained (James, Tr. 2920, line 3 through 2922 line 6), one cannot replace the government's promise -- as to which the government had no expectation of future returns -- with an instrument that is highly costly (because of the expected returns) and pretend that Sterling is not worse off as a result of the exchange in the amount of the additional returns promised on the new issue of common stock.

In other words, the government may not in fairness avoid paying damages for the lost profits it caused by alleging that common stock was issued as "replacement" for its broken promise, then further avoid its responsibility for the true cost of such alleged "replacement" by arguing that the cost of "replacement" should be calculated on the assumption that it wasn't "replacement" at all, but rather an issue of common stock in contemplation of a new series of returns that would cancel out the cost of the issuance of common.

## V. CONCLUSION

For these reasons, Sterling respectfully requests an order finding Sterling has been damaged in the amount of $63.327 million.

Respectfully submitted this 21st day of September, 2007.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member Of the Bar of the United States Court of Federal Claims

1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on September 21, 2007, a copy of the foregoing **STERLING'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff

'