**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

---

# DEFENDANT'S POST-TRIAL REPLY BRIEF

---

**Respectfully submitted,**

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**Of counsel:**

**TAREK SAWI**
**Senior Trial Counsel**
**MELINDA HART**
**DELISA SANCHEZ**
**WILLIAM KANELLIS**
**ELIZABETH HOLT**

**ELIZABETH M. HOSFORD**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0332**

**November 19, 2007**

**Attorneys for Defendant**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . iv

DEFENDANT'S POST-TRIAL REPLY BRIEF.. . . . . . 1

ARGUMENT.. . . . . . 3

I. STERLING'S LOST-PROFITS CLAIM IS BASELESS. . . . . . 3

A. Sterling's Mitigation Precludes An Award Of Lost Profits. . . . . . 4

B. Sterling Is Not A "Lost Volume Seller". . . . . . 10

C. Sterling Failed To Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model. . . . . . 17

1. Dr. Horvitz's Lost-Profits Model Does Not Measure Harm Attributable To Sterling's Alleged Loss Of Employees, Loans, Customers, And Reputation. . . . . . 18

2. Sterling Would Have Failed FIRREA's Core Capital Requirement Even Absent The Breach. . . . . . 22

a. Mr. Bankhead's Calculation Of "But-for" Core Capital Correctly Accounts For The Central Evergreen Goodwill. . . . . . 23

b. Mr. Bankhead Correctly Recognized The Lewis Federal and Tri-Cities Goodwill As "Qualifying Supervisory Goodwill" In Calculating Sterling's "But-For" Core Capital Ratio. . . . . . 26

c. Sterling's Lewis Federal And Tri-Cities Forbearances Do Not Support Dr. Horvitz's Assumption That Sterling Would Have Met FIRREA's Core Capital Requirement Absent The Breach . . . . . 30

3. The Government Did Not Violate The Injunction Prohibiting Application Of FIRREA In A Manner Inconsistent With Sterling's Contracts . . . . . . . . . . . . . . . . . . . . . . . . . 33

4. Sterling's Lost-Profits Claim Ignores Its Conversion To A Commercial Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal And Tri-Cities . . . . . . . . . . . . . . . . . . . . 38

E. The Damages Arising From Dr. Horvitz's Lost-Profits Model Are Not Reasonably Certain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1. Dr. Horvitz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages, Including A Claim That Has Been Abandoned, To Create Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2. Sterling's Model Requires Economic Forecasting . . . . . . . . . . . . . . . . . . 44

3. Sterling's Actual Profitability Does Not Render Dr. Horvitz's Model Reasonably Certain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4. Sterling's Model Is Not Conservative . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

a. Dr. Horvitz's Assumption That The Incremental Bank Would Grow At The Same Rate As The Actual Bank Is Not Conservative . . . . . . . . . . . . . . . . . . . . . . . . 48

b. Dr. Horvitz's Assumption That Sterling's "But For" Assets Would Have Been As Profitable As Its Actual Assets Is Not Conservative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

c. Dr. Horvitz's Assumption That "Usual and Ordinary" Assets Of The Type Held By Sterling Were Readily Available Is Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

II. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES BECAUSE DR. JAMES'S MODEL IS FATALLY FLAWED AS A MATTER OF LAW AND DEMONSTRABLY WRONG AS A MATTER OF FINANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A. Sterling's Mitigation Claim Fails As A Matter Of Law . . . . . . . . . . . . . . . . . . . 56

B. Sterling's Model Is Invalid As A Matter Of Finance . . . . . . . . . . . . . . . . . . . . . . . 59

C. Sterling's Assertions Are Demonstrably Wrong And Unavailing . . . . . . . . . . . . 60

III. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . 63

A. Sterling's Claim For Damages Associated With The CJ-4 Loan Fails As A Matter Of Law .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

B. Sterling's Claim For Excess Supervision Costs Fails As A Matter Of Law .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

C. Sterling's Claim For The Costs Of the 1989 Offering Fails As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

D. Sterling's Claim For The Costs Of Acquiring The Great American Branch Fails As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

E. Sterling's Belated Claim For Damages For Failing To Bid On RTC Sales Fails As a Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

# TABLE OF AUTHORITIES

**Page(s)**

## CASES


Am. Fed. Bank, FSB v. United States,
68 Fed. Cl. 346 (2005). .......... 13, 41

Bank of America, FSB, v. United States,
67 Fed. Cl. 577 (2005), aff'd, 495 F.3d 1366 (Fed. Cir. 2007). .......... 4, 10, 62

Bank United of Texas v. United States,
50 Fed. Cl. 645 (2001), aff'd in part & rev'd in part, 80 Fed. Appx.
663, 2003 WL 22177282 (Fed. Cir. 2003),
cert. denied, 543 U.S. 916 (2004). .......... *passim*

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001).......... 4, 41

California Fed. Bank, FSB v. United States,,
43 Fed. Cl. 445 (1999), aff'd in part, 245 F.3d 1342 (Fed. Cir. 2001),
cert. denied, 534 U.S. 1113 (2002). .......... 3, 5, 10, 61

California Fed. Bank v. United States,
54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 344 (2005). .......... *passim*

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd, 301 F.3d 1328 (Fed. Cir. 2002). .......... 25, 39, 40

Chapman Law Firm v. United States,
490 F.3d 934 (Fed. Cir. 2007).......... 33

Citizens Fin. v. United States,
64 Fed. Cl. 498, aff'd, 170 Fed. Appx. 129 (Fed. Cir.
2006). .......... *passim*

Citizens Fin. v. United States,
57 Fed. Cl. 64 (2003). .......... 57

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). .......... 13, 41, 45

Comcation, Inc. v. United States,
78 Fed. Cl. 61 (2007). ........ 27

District of Columbia v. United States,
67 Fed. Cl. 292 (2003). ........ 42

Dura Pharmaceuticals, Inc. v. Broudo,
544 U.S. 336 (2005). ........ 61

Estate of Berg v. United States,
687 F.2d 377 (1982). ........ 5

Fifth Third Bank of Western Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005). ........ 4, 56, 57, 63

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003). ........ *passim*

First Federal Sav. and Loan of Rochester v. United States,
76 Fed. Cl. 106 (2007), appeal docketed, No. 07-5161
(Fed. Cir. August 17, 2007). ........ 39, 40

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001). ........ 3

Glendale Fed. Bank, F.S.B., v. United States,
378 F.3d 1308 (Fed. Cir. 2004). ........ 4

Granite Management Corp. v. United States,
58 Fed. Cl. 766, aff'd in part and remanded in part on other grounds,
416 F.3d 1373 (Fed. Cir. 2005). ........ *passim*

Herman Schwabe, Inc. v. United Shoe Machinery Corp.,
297 F.2d 906 (2d Cir. 1962). ........ 64

Kalvar Corp. v. United States,
543 F.2d 1298 (1976). ........ 33

LaSalle Talman Bank, FSB v. United States,
64 Fed. Cl. 90 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006). ........ *passim*

LaSalle Talman Bank v. United States,
45 Fed. Cl. 64 (1999), aff'd in part and vacated in part,
317 F.3d 1363 (Fed. Cir. 2003). ........ 56, 57, 61, 62

Library of Congress v. Shaw,
478 U.S. 310 (1986)........................................................................................................ 42

Long Island Savings Bank, FSB v. United States,
60 Fed. Cl. 80 (2004). ...................................................................................................... 7

Long Island Savings Bank, FSB v. United States,
67 Fed. Cl. 616 (2005), rev'd, __ F.3d___,
WL 2685640 (Fed. Cir. Sept. 13, 2007).......................................................................... 7

Midwest Indus. Painting v. United States,
4 Cl. Ct. 124 (1983). ........................................................................................................ 10

Northern Helex Co. v. United States,
634 F.2d 557 (1980)........................................................................................................... 6

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006)................................................................................ 4, 68

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006). ............................................................................................ 11, 15

Quiman v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). ..................................... 5

R.E. Chemical Corp. v. Diasonics, Inc.,
826 F.2d 678 (7th Cir. 1987). ................................................................................ 10, 11

Reynolds v. Roberts,
207 F.3d 1288 (11th Cir. 2000). .................................................................................... 36

Ross-Simons of Warwick, Inc. v. Baccarat,
182 F.R.D. 386 (D.R.I. 1998). ....................................................................................... 36

S. Cal. Fed. Sav. & Loan v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in
part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir. 2005)....................... 4, 13, 41, 49

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003). ............................................................................................. *passim*

Southern Pacific Communications v. AT&T,
556 F. Supp. 825 (D.D.C. 1982)..................................................................................... 64

Standard Fed. Bank v. United States,
62 Fed. Cl. 265 (2004). .......... *passim*

Sterling Sav. Ass’n v. Ryan,
751 F. Supp. 871 (E.D. Wash., 1990). .......... 34

Sterling Sav. Ass'n v. United States,
72 Fed. Cl. 404 (2006). .......... 20, 23, 24

Sterling Sav. Assn. v. United States,
53 Fed. Cl. 599 (2002). .......... 37, 38, 64

Suess v. United States,
52 Fed. Cl. 221 (2002). .......... 6

Sun Cal, Inc. v. United States,
25 Cl. Ct. 426 (1992). .......... 10

T&M Distribs., Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999). .......... 33

United States v. Burton Coal Co.,
273 U.S. 337 (1927). .......... 5

## STATUTES, RULES, AND REGULATIONS

12 C.F.R. § 567.1 (1990). .......... 26

12 C.F.R. § 567.5 (1990). .......... 26

12 C.F.R. §567.8 (1989). .......... 22

12 C.F.R. Part 3, Appx. A, § 2(c)(1)(I). .......... 18, 37

28 U.S.C. § 2516(a) (2000). .......... 42

Financial Institutions Reform, Recovery, and Enforcement Act
of 1989, Pub. L. No. 101-73, 103 Stat. 183. .......... 7

## MISCELLANEOUS

Restatement (Second) of Contracts § 347 (1981). .......... 4

Restatement (Second) of Contracts § 351 (1981). .......... 4

Restatement (Second) of Contracts § 351 cmt. e. ........................................................................ 65

Restatement (Second) of Contracts § 352 (1981). ........................................................................... 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STERLING SAVINGS ASSOCIATION, a state chartered savings association, STERLING FINANCIAL CORPORATION, a Washington corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-829C** |
| | ) | **(Judge Wheeler)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POST-TRIAL REPLY BRIEF**

Pursuant to Paragraph 19[1] of Appendix A of the Rules of the United States Court of Federal Claims, and this Court's Order dated July 24, 2007, defendant, the United States, respectfully submits the following Post-trial Reply Brief in response to Plaintiff's Post-trial Memorandum Of Contentions Of Fact And Law, dated September 21, 2007.[2]

Sterling, in its opening brief, fails to establish that the thrift is entitled to lost profits or that it incurred out-of-pocket costs, over and above transaction costs, in mitigating its damages by replacing its contractual goodwill in 1991. With respect to Sterling's lost profits claim, the initial brief only highlights the insurmountably speculative and counterfactual nature of Dr. Paul Horvitz's model. First, Sterling acknowledges, again, that it mitigated when it raised capital in 1991. Pl. Br., p. 86; see also Tr. 18:22-25, 20:25-21:5 (Weatherhead). Nonetheless, Sterling

---

[1] In our opening brief, we inadvertently cited to Paragraph 11 of Appendix A, rather than Paragraph 19.

[2] Pl. Br. refers to plaintiff's Post-trial Memorandum Of Contentions Of Fact And Law, while PFF refers to plaintiff's individually numbered proposed findings of fact. Gov. Br. refers to our post-trial proposed findings of fact and law, while DFF refers to our individually numbered proposed findings of fact.

maintains, incredibly, that it is entitled to lost profits, contrary to black-letter law precluding an award of lost profits in the event of mitigation. Second, in relying almost exclusively upon its track record of growth to support its lost profits claim, Sterling tacitly acknowledges that its model is merely a "money machine" that assumes that additional capital equates with profits. Pl. Br., p. 82-83. This Court, however, has rejected that assumption on eight separate occasions, and Sterling has provided no facts that merit a different outcome here. Finally, Sterling acknowledges that its lost profits model relies upon the inclusion of wounded bank costs in the "but-for" capital calculation, yet Sterling fails to provide a single citation supporting this virtually unprecedented approach to damages. Each of these flaws, combined with other flaws addressed below or in our opening brief, mandate dismissal of Sterling's lost-profits claim.

With respect to its claim for the actual cost of replacing the contractual goodwill, Sterling acknowledges that Dr. Christopher James's model does not measure out-of-pocket costs incurred by the thrift in raising replacement capital. Pl. Br., pp. 96-97; see Granite Management Corp. v. United States, 58 Fed. Cl. 766, 777-79, aff'd in part and remanded in part on other grounds, 416 F.3d 1373 (Fed. Cir. 2005) (plaintiff's failure to measure the out-of-pocket costs attributable to the replacement capital resulted in rejection of the claim). This failure requires rejection of the claim as a matter of law.

Finally, Sterling has not met its burden of proof with respect to each of its wounded bank damages claims.[3]

---

[3] Sterling, at a status conference held on December 15, 2006, abandoned claims for restitution as a remedy and reliance. Nonetheless, in its contentions of fact, PFF ¶¶ 240-242, Sterling alleges that, "by acquiring Lewis Federal and Tri-Cities, [it] saved the Government $26.7 in liquidation costs. . ." PFF ¶ 243. This allegation, which is completely unsupported, would be relevant, if at all, only to claims for restitution or reliance, which Sterling has

## ARGUMENT

Sterling's lost-profits claim is counterfactual and speculative as a matter of law. The hypothetical premise of Sterling's claim for alleged mitigation costs, other than $900,204 in transaction costs, is contrary to well-established precedent, and Sterling's "wounded bank" damages fail to satisfy the prerequisites of an expectancy damages claim.

## I. STERLING'S LOST-PROFITS CLAIM IS BASELESS

Sterling's admission that it mitigates undermines the thrift's lost-profits claim. Pl. Br., pp. 86-87. When a claimant mitigates in a breach of contract case, it cannot simultaneously argue that it is a "lost volume seller," as alleged by Sterling. Pl. Br., pp. 74-78.

In addition, Sterling failed to demonstrate that its claimed lost profits were foreseeable, caused by the breach, or reasonably certain. To the contrary, Dr. Horvitz admitted that the lost profits he modeled were not foreseeable. Tr. 2964:7-13 (Horvitz). Further, elimination of the noncontractual Central Evergreen goodwill from regulatory capital was sufficient to render Sterling noncompliant with minimum regulatory capital requirements, thus precluding a finding of causation. Finally, Dr. Horvitz's model, which assumes, like eight similar models already rejected by this Court, that capital always generates profits, cannot meet the reasonable certainty test.

---

abandoned. Further, the Federal Circuit has determined that such liquidation cost estimates are not reliable in measuring restitution and reliance claims. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001); California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1351-52 (Fed. Cir. 2000) ("CalFed"); Granite, 416 F.3d at 1380-81. Therefore, the allegation is of no relevance to the theories advanced by Sterling at trial.

A. Sterling's Mitigation Precludes An Award Of Lost Profits

Sterling seeks expectation damages in this case. To recover expectation damages, Sterling must demonstrate that the damages it seeks "are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); see also Southern Calif. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005); Bank of America, FSB v. United States, 67 Fed. Cl. 577, 584-85, (2005), aff'd, 495 F.3d 1366 (Fed. Cir. 2007); Restatement (Second) of Contracts §§ 347, 351, 352 (1981).

Sterling's statement of the legal standard applicable to expectation damages suggests that lost profits are the sole source of expectation damages, and must be awarded in each case. Pl. Br., pp. 78-79. That assumption is contrary to precedent. The Court of Appeals for the Federal Circuit has reviewed many Winstar-related cases and has assessed the ability of plaintiffs to prove claims such as those presented by Sterling. In four opinions, the appellate court has (1) explained the legal requirements applicable to lost-profits claims and the factual circumstances in which these claims arise in Winstar -related cases, and (2) observed that, "given the speculative nature of such a damages claim, . . . experience suggests that it is largely waste of time and effort to attempt to prove such damages" in a Winstar-related case. Glendale Fed. Bank, F.S.B., v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); California Federal Bank, F.S.B. v. United States, 395 F.3d 1263, 1270-71, cert. denied, 126 S. Ct. 344 (2005)("CalFed II"); Fifth Third of Western Ohio v.United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005).

This Court, like all courts, applies the least speculative, cost-minimizing methodology for calculating damages in a given case. See, e.g., Quiman v. United States, 39 Fed. Cl. 171, 185 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). Courts do not seek to "penalize" parties that breach contracts. CalFed, 43 Fed. Cl. 445, 461 (1999), aff'd in part, 245 F.3d 1342 (Fed. Cir. 2001)(punitive damages are "not the purpose of contract remedies"). Instead, the purpose of expectation damages is to put the non-breaching party in the financial position it would have been in had the breach not occurred, subject to the limitations upon these damages. Accordingly, the usual remedy for a breach of contract is "cover," or the difference between the cost of the item under the breached contract and the market price of the item at the time of the breach. See, e.g., United States v. Burton Coal Co., 273 U.S. 337 (1927); Estate of Berg v. United States, 231 Ct. Cl. 466, 469-74, 687 F.2d 377 (1982) (damages for the Government's breach of its obligation to redeem bonds at par value is the difference between the par value of the bonds and their market value at the time of breach).

In 1991, Sterling acquired more than $23 million in new regulatory capital, which far exceeded the $15.557 million in contractual goodwill that it would have possessed absent a breach. In its opening brief, Sterling admits that this capital raising resulted in mitigation. Pl. Br., pp. 86-87. Sterling also admits that it "attempted" to mitigate by shrinking and obtaining a district court injunction prohibiting the Government from taking action inconsistent with its contracts. Pl. Br., pp. 23-31, PFF ¶¶ 114-155.[4] Nonetheless, Dr. Horvitz's lost-profits claim assumes that none of the $15.557 million in goodwill has been, or ever will be, replaced,

[4] In section I.C.3 below, as well as pages 67-71 of our opening brief, we demonstrate that the injunction precludes a finding of causation in this case, and that the shrink, even if deemed mitigation, is not accounted for in Dr. Horvitz's model.

notwithstanding Sterling's mitigating acts, over $500 million in capital raising since 1991, and capacity to raise additional capital. Id. at 51, 87; P-454, tables 1, 8; P-534.

In support of this remarkable assumption, Sterling offers the wildly speculative claim that, had it not raised capital in 1991, the thrift would be entitled to over $1.5 billion in damages. Pl. Br., p. 87. The $1.5 billion number is not the subject of any analysis. Instead, at trial, Dr. Horvitz merely offered the bald assertion that Sterling's current market value is $1.5 billion, and its damages would be equal to that value if it had been closed by the Government after the breach. Tr. 2115:18-2116:4 (Horvitz).

Even assuming Sterling could support the $1.5 billion claim, there is no legal basis for such an assertion. In the sole Winstar-related case in which a closed thrift's market value was awarded, the Court awarded the market value at the time of the breach, not almost 20 years later. Suess v. United States, 52 Fed. Cl. 221, 231-32 (2002).[5] In this case, however, Sterling was not closed, and it remains under the ownership of its shareholders. Therefore, its market value at any time is irrelevant to Dr. Horvitz's lost-profits model. Indeed, that model is premised upon the loss of contractual goodwill, yet ignores the replacement of that goodwill with tangible capital.

Moreover, Sterling's claim that damages are warranted even in the event of mitigation is only partly right. Pl. Br., p. 87. Sterling is entitled to the recover the costs associated with taking reasonable steps, in mitigation, to avoid greater loss. Northern Helex Co. v. United States, 225 Ct. Cl. 194, 634 F.2d 557 (1980). The costs Sterling incurred in mitigating do not exceed in $900,204. Tr. 4097:20-4098:10; 4264:6-4265:1 (Bajaj); P-672. Sterling, however, is not also

[5] Further, it is pure speculation to assume that, absent Sterling's lawsuit, it would have been closed. Pl. Br., p. 51. Had Sterling not filed suit, it is possible that it would have been sold or merged, resulting in the same or higher market value than it currently enjoys.

entitled to lost profits. Actual mitigation or a "failure to take steps to avoid damages" precludes recovery of damages "even if shown to be foreseeable and (if avoided) reasonably certain." Bank United of Texas v. United States, 50 Fed. Cl. 645, 654 (2001), aff'd in part & rev'd in part, 80 Fed. Appx. 663, 2003 WL 22177282 (Fed. Cir. 2003), cert. denied, 543 U.S. 916 (2004).

Further, the sole authority Sterling cites for its contention that lost profits are the only appropriate damages in this case, Long Island Savings Bank, FSB v. United States, 60 Fed. Cl. 80, 89-90 (2004), is inapposite. Pl. Br., pp. 86-87. In Long Island, the Government argued, in a motion for summary judgment, that a capital plan providing temporary forbearance from FIRREA's[6] provisions precluded the plaintiff thrift from seeking damages attributable to certain acts taken to replace the goodwill, including a shrink and a capital infusion from the thrift's parent company. Long Island, 60 Fed. Cl. at 89-90. In rejecting the argument, the Court held only that the thrift was entitled to prove damages attributable to the mitigating acts themselves. Id. at 90. The Court did not hold that Long Island was entitled to ignore its mitigation and instead seek expectancy damages, as Sterling has done in this case.

Moreover, the Court held that, in light of the plaintiff's mitigation through replacement of goodwill with tangible capital, an award of lost profits, including profits allegedly lost as a result of a pre-replacement shrink, would result in a "windfall" to the plaintiff. Id. at 650.[7] In light of Sterling's mitigation, a lost profits award in this case would also result in a windfall.

---

[6] "FIRREA" is the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183.

[7] Long Island was ultimately awarded only its cost of replacing the goodwill eliminated by FIRREA, although the award was ultimately reversed because fraud rendered the contract void ab initio. Long Island Savings Bank, FSB v. United States, 67 Fed. Cl. 616, 648 (2005), rev'd, __ F.3d ___, WL 2685640 (Fed. Cir. Sept. 13, 2007).

Sterling also boasts that it has raised capital or received infusions from its holding company, Sterling Financial Corporation ("SFC") in "1991, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2003, 2004, 2006 and 2007." Pl. Br., p. 87. Nonetheless, it claims, without citation and in an apparent effort to demonstrate that it has not replaced the $15.557 million in contractual goodwill eliminated by FIRREA,[8] that it "has always needed more capital, and could have utilized the capital taken away for profit." Id. This bald assertion is contrary to the evidence of record. Sterling's investment banker, Mr. Welch, testified that capital is always available for pursuit of profitable opportunities, Tr. 1593:17-1594:1, 1631:1-8 (Welch), and Mr. Gilkey acknowledged that Sterling could obtain capital for profitable activities. Tr. 615:22-24 (Gilkey). Similarly, Sterling's contemporaneous financial documents reveal that SFC had the ability to downstream additional funds to Sterling, if needed. DX 197, p. 2183 (SFC's operating plan for 1998 stated that the holding company had "capacity to make additional capital contributions in 1998 if the capital can be profitably invested."); see also P-96, p. 3221, note 11, ¶ 14 (capacity to borrow an additional $34 million in 1999). Indeed, between 1992 and September 30, 2006, SFC added, in total, $633.3 million in new debt and capital, but downstreamed only $492.4 million to Sterling. DFF ¶¶ 71-87.[9]

---

[8] Even a cursory review of Sterling's contentions of law (Pl. Br., pp. 74-100) reveals that it is largely devoid of citation to the record and, consequently, not obviously based upon application of law to fact. This glaring omission, standing alone, demonstrates the weakness of Sterling's claimed entitlement to damages in excess of transactions costs.

[9] In a single proposed finding of fact, Sterling offers the following conclusory statement about its excess capital: "Capital in excess of required level is not an indication that Sterling did not have profitable opportunities to pursue." PFF ¶ 295. In support, Sterling cites to testimony by Mr. Welch and Mr. Byrne that is irrelevant or fails to support the conclusion. Mr. Welch stated that, if Sterling had supervisory goodwill and available capital at the holding company level, there would be no relationship between the supervisory goodwill and the capital available

Further, Mr. Byrne, upon cross-examination, when confronted with his 2000 deposition testimony, conceded that, between 1993 and 2000, Sterling had access to additional capital. Tr. 1783:24-1792:25 (Byrne). In fact, Sterling has been unwilling to raise capital in the form of common stock out of fear that "[a]ny capital issuance in advance of settling the goodwill claim would unfairly penalize the existing shareholders." DX 233, p. 0718; see also Tr. 1627:21-1628:15 (Welch).

Each of these facts reveal the falsity of Sterling's unsupported statement that it could not replace the $15.557 in contractual goodwill eliminated by FIRREA because it has "always needed more capital." Given Sterling's capacity to raise capital when needed, its failure to mitigate precludes an award of lost profits.

---

at the holding company. Id. (citing Tr. 1646:17-1647:4 (Welch)). This testimony has no bearing on our point, which is that, in a world in which FIRREA eliminated goodwill, but Sterling had profitable loans available to it, it could have and would have availed itself of the capital available at the holding company level. Its decision not to access that capital shows that no such opportunities were available, and the goodwill would not have resulted in increased profits. Similarly, Mr. Byrne's testimony that Sterling and SFC accumulated capital in 1997 and 1998 in anticipation of an acquisition ignores the fact that Sterling failed to meet its own asset target in 1997, notwithstanding the availability of capital to support such loans. PFF ¶ 295; Tr. 4318:22-4319:6 (Byrne); DX 196, p. 3242 (shortfall of $131,069,000). Finally, Mr. Byrne's general statement that lenders placed limitations upon the amount of debt that would be issued to Sterling at given points in time is misleading. PFF ¶ 295; Tr. 4324:24-4325:19 (Byrne). The document relied upon by Mr. Byrne to support that testimony expressly states that SFC possessed the capital to borrow $34.3 million over and above the $30 million it actually borrowed in 1999. P-96, p. 3221, note 11, ¶4 ("At December 31, 1999, Sterling could incur an additional $34.3 million in debt. . .").

### B. Sterling Is Not A "Lost Volume Seller"

Sterling's demonstrated ability to raise capital, combined with its failure to employ all of the capital available to it in the actual world, also undermines its claim that mitigation was impossible because it is a "lost volume seller." Pl. Br., pp. 74-78.[10]

While courts have held that the mitigation defense may be defeated in certain circumstances because the contractor is deemed a "lost volume seller," see, e.g., R.E. Chemical Corp. v. Diasonics, Inc., 826 F.2d 678, 685 (7th Cir. 1987), that doctrine has never been invoked by this Court in the Winstar-related cases, and certainly never validated by the Federal Circuit. Instead, this Court and the Federal Circuit have determined that the loss of goodwill can be mitigated by replacing the goodwill with tangible capital. See, e.g., CalFed., 245 F.3d at 1350; Bank United, 50 Fed. Cl. at 654-55. As noted in our opening brief, to date, "[n]umerous courts have indeed allowed recovery based on the cost to an injured thrift of mitigating its damages, specifically, the cost incurred by the thrift in replacing its lost goodwill." Bank of America, 67 Fed. Cl. at 580 (2005).

Even if the concept of lost volume sales can be applied to capital in a Winstar setting, a position for which there is no support, Sterling cannot meet its burden of proving that it satisfies the test applied in determining whether a plaintiff is a "lost volume seller." Sterling claims that it satisfied the following prerequisites to recognition as a "lost volume seller:" (1) it possessed the

---

[10] In attempting to invoke the "lost volume seller" rule, Sterling first offers the unclear contention that "the Government is not entitled to claim credit for Sterling's actual profits in mitigation of the losses it caused." Pl. Br., p. 74. We do not "claim credit" for Sterling's profits; we have instead demonstrated, consistent with black-letter law, that Sterling's replacement of the goodwill eliminated by FIRREA forecloses a claim for lost profits. Bank United, 50 Fed. Cl. at 654 (2001); Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); Midwest Indus. Painting v. United States, 4 Cl. Ct. 124, 133 (1983); Gov. Br., pp. 43-44, 49.

capacity to make additional sales; (2) it would have been profitable to make an additional sale; and (3) it probably would have an additional sale absent the breach. Diasonics, 826 F.2d at 685. This Court has held that a plaintiff seeking "lost volume seller" status must also show that the profits on the additional sales would have been at least equivalent to the profits it earned on actual sales. Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 497 (2006)

While Sterling's brief includes a lengthy discussion of the "lost volume seller" doctrine, concluding with its contention that it satisfies the first three prongs of the test articulated above, Pl. Br., pp. 74-77, Sterling neglects to cite a single fact or piece of evidence supporting the statement. Pl. Br., p. 74-77.[11] This is not surprising, because the evidence of record solidly establishes the contrary.

Although Sterling possessed the capacity to take on additional assets, it did not prove that the breach had any impact on its ability to acquire assets. In at least five years since late 1991, when it achieved capital compliance, Sterling has failed to meet its budgeted growth targets, notwithstanding the fact that it held sufficient capital to support the target. Tr. 759:11-22 (Gilkey); Tr. 1155:23-1156:9 (Page); DFF ¶ 92; see also Bank United, 50 Fed. Cl. at 662-63 (lost-profits claim unsupported when thrift could not find profitable use for capital in actual

---

[11] At paragraphs 202 through 206 of its proposed findings of fact, Sterling attempts to support the assumptions in Dr. Horvitz's lost-profits model with testimony by its officers that Sterling would have been bigger absent the breach. PFF ¶¶ 202-206. The testimony, however, establishes only that the officers' personal assumptions, with absolutely no documents or facts to provide the "missing elements" of Dr. Horvitz's model, including the type of assets and liabilities that would have been acquired absent the breach, the source of the assets and liabilities, how the assets and liabilities would have been acquired, the assets' risk rating, the duration of the assets and liabilities, the yield of the assets, and the cost of the liabilities. Tr. 3560:2-3561:16 (Hamm); DX 3007; see Fifth Third Bank v. United States, 55 Fed. Cl. 223, 242 (2003).

world).[12] Further, at all times between 1991 and the present, Sterling has had access to capital from its holding company to fund profitable opportunities, but it has not taken full advantage of that capital, as demonstrated above. See Bank United, 50 Fed. Cl. at 662 (no lost profits when thrift had access to capital for pursuit of profitable opportunities). Indeed, SFC was formed in order to achieve more flexibility in capital raising due to its ability to raise debt and downstream it to Sterling in the form of regulatory capital. Tr. 1743:1-10 (Byrne).

Moreover, notwithstanding its "aggressive" growth strategy, Pl. Br., p. 87, Sterling has consistently maintained excess regulatory capital, and has utilized less profitable wholesale assets and higher cost wholesale liabilities to fill out its balance sheet because there were inadequate amounts of profitable retail assets and lower costing retail liabilities available in the marketplace. Tr. 3772:18-3775:14, 3775:24-3778:3 (Hamm); DX 3012; DX 3013. Finally, Sterling acknowledged, in 1992, after its capital raising, that it expected to maintain its capital in excess of fully-phased in capital requirements, and did "not foresee limitations on its ability to increase total assets." DX 228, p. WON884 1563. This contemporaneous statement demonstrates Sterling's recognition that, after it replaced its goodwill in 1991, capital adequacy would not be a future impediment to growth. See also Tr. 1635:10-12 (Welch).

Second, Sterling did not prove that it had unlimited access to profitable assets, as required by the second prong of the Diasonics test. Dr. Horvitz's model is, in essence, a "money machine" that assumes each additional dollar of capital yields four dollars in profit. Tr. 4114:21-4116:10 (Bajaj); DX3546; DX 3577. Dr. Horvitz failed to identify the assets and liabilities that

[12] In a proposed finding of fact in our opening brief, we inadvertently stated that Sterling failed to meet its growth targets in six years, rather than five years. PFF ¶ 91; compare Gov. Br., p. 83 (accurately reflecting that Sterling failed to meet its growth targets in five years).

would yield the assumed profits, a flaw that has resulted in rejection of "forgone assets" models in eight cases. Tr. 2616:2-2619:25 (Horvitz); Tr. 3620:19-3622:4, 3622:23-3623:7 (Hamm); DX 3007; Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358 (2005) ("AmFed"); Citizens Fin. Servs. v. United States, 64 Fed. Cl. 498, 514, aff'd, 170 Fed. Appx. 129 (Fed. Cir. 2006) (model presented by Dr. Horvitz); LaSalle Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 101-06 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006)(model presented by Dr. James); Standard Fed. Bank v. United States, 62 Fed. Cl. 265, 279-81 (2004); Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 115 (2004); S. Cal. Fed. Sav. & Loan v. United States, 57 Fed. Cl. 598, 625-27 (2003), aff'd in part, rev'd in part, and remanded on other grounds, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal") (model presented by Dr. Horvitz); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 304-06 (2003); Fifth Third, 55 Fed. Cl. at 241-42. Similarly, Sterling's investment banker, Mr. Welch, who specialized in thrift financing for many years, stated unequivocally that asset size is not an indicator of profitability. Tr. 1648:16-1649:6 (Welch).

Further, Sterling's failure to access all of the capital available to it, coupled with its acknowledgment that capital adequacy would not be an impediment to growth, demonstrate that the retention of the contractual goodwill on its balance sheet would not have resulted in additional profits. If, in fact, the "money machine" model created by Dr. Horvitz reliably estimated the profits that could be made simply by adding additional capital, then Sterling could have, and should have, raised additional capital to replace it. Mr. Welch, the investment banker called by Sterling at trial, testified that capital is always available for the pursuit of profitable opportunities. Tr. 1593:17-1594:1, 1631:1-8 (Welch).

In addition, as our expert, Dr. Bajaj, pointed out, three major banks, Wells Fargo, Bank of America, and Washington Mutual, are located within a block of Sterling's headquarters. Tr. 4146:20-4147:2 (Bajaj). If there was any truth to Dr. Horvitz's model, Sterling "could get the capital from just around the block. Actually people would be knocking on Sterling's doors to want to give it all the capital in the world." Tr. 4147:8-13 (Bajaj). Sterling's alleged failure to take advantage of these opportunities to replace the contractual goodwill demonstrates not that it is a "lost volume seller," but that the profits generated by Dr. Horvitz's model are speculative and unreliable, and cannot be awarded.

Similarly, Sterling cannot meet the third prong of the "lost volume seller" test, which required it to demonstrate that it would have taken on more assets absent the breach. Sterling's failure to utilize its capacity in the actual world renders it impossible for it to show that it would have profitably employed even more capacity in its "but-for" world. If Sterling was a lost volume seller and could have generated profits as easily as Dr. Horvitz's assumes in his model by the mere addition of goodwill to regulatory capital, it had ample opportunity to demonstrate that, while the district court injunction was pending, by actually generating profits at the rate projected by Dr. Horvitz. Instead, Sterling claims lost profits for the period that the injunction was in place.[13]

Sterling also did not demonstrate that the profits it would have made on the incremental assets assumed in Dr. Horvitz's model would have been as profitable as its actual assets. Consequently, it cannot meet the fourth prerequisite to "lost volume seller" status applied by this

[13] Our response to Sterling's claim that the Government violated the injunction is set forth below in Section I.C.3.

Court in Precision Pine, 72 Fed. Cl. at 497-98. As we previously explained, the law of diminishing marginal returns renders it virtually impossible for a financial institution to assume that incremental assets will be as profitable as actual assets. Gov. Br., pp. 78-79. This was acknowledged by Sterling's former chief executive officer, Mr. Gilkey, who conceded that Sterling obtained the best assets first, and that there was no guarantee that additional assets would perform as well as assets previously acquired. Tr. 489:23-490:14 (Gilkey); see also Tr. 505:14-506:7 (Gilkey); DX 738 at WON935 1503; DX 709 at WON920 1291; DX 711 at WON935 2211; DX 710 at WON935 2182; P-81, pp. 6, 7, 37; P-83, pp. 7, 34; P-85, pp. 2, 3, 24; see also DFF ¶¶ 93-99. Even Dr. Horvitz acknowledged that Sterling's filings with the Securities and Exchange Commission ("SEC") demonstrated that, as Sterling sought out additional assets and liabilities, it was forced to take on more costly liabilities and lower yielding loans. Tr. 2653:7-14; 2653:25-2654:10 (Horvitz); P-95, p. 34 (Sterling 10-k providing financial information for 1995-1998); Tr. 2647:6-2648:6, 2654:11-2658:17 (Horvitz).

Further, our expert, Dr. Hamm, showed that Dr. Horvitz's model failed to account for the effects of competition upon a thrift's ability to obtain incremental profitable assets. Sterling provided no evidence that, absent the breach, it would have been able to acquire assets that were actually acquired by other thrifts without taking steps that substantially reduce, or eliminate, its profit margin. Tr. 3631:14-3632:17, 3635:6-3643:5, 3643:6-3644:2 (Hamm); Gov. Br., pp. 79-80. Indeed, Sterling's internal documents, as well as testimony by its executives at trial, demonstrate Sterling has consistently faced strong competition that has limited its ability to acquire profitable assets. DFF ¶¶94-99; DX 706. Moreover, Dr. Hamm established that Sterling's status as a relatively small player in some of its markets would not make it easier to

obtain additional profitable assets, because large thrifts do not give small thrifts a "free pass," but instead will take steps to protect their market share by monitoring the activities of competitors and pricing accordingly. Tr. 3791:2-3794:6 (Hamm); DX 3014.[14]

Finally, Sterling contends that it is entitled to lost profits because "the value of leverage is the potential for profit," quoting Bank United, 50 Fed. Cl. at 655 n. 11. The key word in that quote is "potential." In Bank United, the Court denied the plaintiff's claim for lost profits notwithstanding the elimination of substantial amounts of contractual regulatory capital by FIRREA and its observation that leverage holds the potential for profits. Id. at 664. Indeed, the Federal Circuit has deemed the assertion that leverage creates wealth a "fallacy," CalFed II, 395 F.3d at 1271, and none of the plaintiffs seeking lost profits in the Winstar-related cases has been deemed a "lost volume seller." As previously shown, Dr. Horvitz's model, like many lost-profits models rejected in prior cases, is a "money machine" that assumes each additional dollar of capital yields four dollars in profit, and he has acknowledged the falsity of that assumption by conceding that the profits estimated by his model could not be foreseen by potential investors with capital to pursue those profits. Tr. 4114:21-4116:10 (Bajaj); DX3546; DX 3577; Tr. 2694:7-13 (Horvitz).

Moreover, the "lost volume seller" concept is inconsistent with Dr. Horvitz's view of the thrift industry. He testified that, at the time FIRREA was enacted, he wrote an article espousing his view that increased capital requirements are not harmful to thrifts. DX 919, pp. 1-3; Tr. 2571:18-2573:5, 2572:22-2573:16 (Horvitz). If, in fact, thrifts can always yield additional profits

[14] Also, contrary to Sterling's characterization of itself as a small player in its market, Dr. Hamm showed that the thrift is actually a dominant deposit gatherer in many areas in which it operates. Tr. 3787:17-3790:18 (Hamm).

through growth, as assumed by Dr. Horvitz's model in this case, then all thrifts are "lost volume sellers" who would be harmed by increased capital requirements that prevent the thrift from leveraging all of its capital. Consequently, the "lost volume seller" approach embraced by Sterling is directly contrary to the economic principles espoused by its lost profits expert, Dr. Horvitz. Tr. 2602:2-8 (Horvitz). For this reason, as well as the reasons set forth above, Sterling failed to satisfy its burden of proving that additional leverage would have been profitable in this case. Therefore, it cannot circumvent its mitigation by claiming that it is a "lost volume seller."

### C. Sterling Failed To Prove That The Breach Caused The Lost Profits Alleged In Dr. Horvitz's Model

In our opening brief, we demonstrated that Sterling failed to prove that the breach caused its alleged lost profits, citing the "but for" standard applied by the Federal Circuit in CalFed II, 395 F.3d at 1267-68 (Fed. Cir.); Gov. Br., pp. 41, 52-71. Sterling relies upon the CalFed II decision in reciting the causation standard applicable to this case. Pl. Br., p. 79. Therefore, there is no question that the "but for" standard of causation applies here.

At trial, we showed that Sterling failed to establish causation for three reasons. First, the breach did not cause Sterling to fail the tangible and core capital requirements, and Sterling failed to satisfy its burden of proving that the breach caused it to fail the risk-based capital requirements. Gov. Br., pp. 52-67. Second, Dr. Horvitz incorrectly assumes that the breach caused Sterling to suffer lost profits during the period that the temporary restraining order (TRO) and preliminary injunction precluded the Government from taking action inconsistent with Sterling's contracts. Id. at 67-71. Third, the breach did not cause Sterling to forgo profitable opportunities, thus defeating any claim for lost profits. Id. at 71-74.

In the section of its brief addressing causation, Sterling does not speak to any of these issues. Instead, Sterling offers, again without a single citation to the record, less than two pages of general statements about losses of customers allegedly caused by the breach. Pl. Br., pp. 79-80. Sterling does not even attempt to establish a relationship between these alleged losses and the damages assumed in Dr. Horvitz's model, which is to be expected, because no such relationship exists. Later in the brief, Pl. Br., pp. 87-93, Sterling attempts to rebut our demonstration that it would not have satisfied the minimum core capital requirement even absent the breach. Sterling's rebuttal, however, is ultimately based upon a new method of calculating core capital that is inconsistent with Dr. Horvitz's methodology and contrary to the post-FIRREA regulations governing the calculation of regulatory capital.

Further, Sterling incorrectly implies, in its proposed findings of fact, that the district court's 1990 issuance of an injunction prohibiting the Government from acting inconsistent with its contracts did not prevent it from incurring lost profits because the Government violated the terms of the injunction. PFF ¶¶ 133-155.

Finally, Sterling ignores the fact that, once the thrift converted to a commercial bank, regulations prohibited it from counting supervisory goodwill as regulatory capital. 12 C.F.R. Part 3, Appx. A, § 2(c)(1)(I).

**1. Dr. Horvitz's Lost-Profits Model Does Not Measure Harm Attributable To Sterling's Alleged Loss Of Employees, Loans, Customers, And Reputation**

Some of Sterling's current and former employees, directors, and officers testified about post-FIRREA harm Sterling allegedly suffered from the loss of employees, loans, customers, and

reputation. See PFF ¶ 162-175. The evidence does not support such allegations and, even if true, the claims are irrelevant to Sterling's lost-profits model.

First, Sterling's witnesses have not provided evidence that the breach caused the thrift to lose employees, loans, customers, and reputation. See, e.g., Tr. 762:15-21 (Gilkey)(witness was not shown any documents demonstrating that Sterling lost a specific customer because of a lack of capital); Tr. 807:18-23 (Harlow)(Intervest was allowed to honor existing loan contracts); Tr. 853:9-15 (Harlow)(witness claims customers were unable to come to Intervest, but could point to no paperwork showing that these customers would qualify for a loan); Tr. 1037:16-1039:18 (Neely)(after leaving Sterling, loan officer became a competitor of Sterling and was motivated to move customers to his new employer); Tr. 1041:5-16 (Neely)(witness did not remember actually turning away any specific customer who wanted loan or deposit products); Tr. 1041:17-20 (Neely)(witness does not recall turning away any new customer that wanted loans for business purposes); Tr. 1042:3-1043:19 (Neely)(discussing various reasons why customers may choose to leave a financial institution); Tr. 1068:24-1069:4 (Crithfield)(witness does not recall any existing customers leaving Sterling or taking their business loans elsewhere); Tr. 1286:25-1287:13 (Stanley)(despite testifying that documents indicated why employees left Sterling, witness was shown no documents).

Second, "the breach" that these witnesses discussed was a breach of the Lewis Federal Savings and Loan Association ("Lewis Federal"), Tri-Cities Savings and Loan Association ("Tri-Cities"), and Central Evergreen Savings & Loan Association ("Central Evergreen") contracts. See, e.g., Tr. 874:20-24 (Conerly)(witness claims Intervest lost loan originations because of "FIRREA," but does not know how many); Tr. 1017:19-1019:16 (Neely)(former loan officer

discussing impact of "FIRREA"); Tr. 1202:6-22 (Barnett)(witness's testimony of alleged harm based upon the loss of goodwill from all three transactions); Tr. 1208:4-1209:20 (Barnett)(same); Tr. 1256:13-1257:25 (Stanley)(addressing consequences of "FIRREA" upon human resources, including employee turnover). This Court, however, has ruled that the Government is only liable to Sterling for the breach of the Lewis Federal and Tri-Cities contracts. Sterling Sav. Ass'n v. United States, 72 Fed. Cl. 404, 411 (2006). Sterling's witnesses offered no evidence as to whether the alleged loss of employees, loans, customers, and reputation would have occurred based upon the breach of only the Lewis Federal and Tri-Cities contracts.

Third, Sterling failed to quantify the harm resulting from the alleged loss of these employees, loans, customers, and reputation, regardless of its definition of "the breach." See, e.g., Tr. 874:20-24 (Conerly)(witness claims Intervest lost loan originations because of "FIRREA," but does not know how many); Tr. 848:25-850:7 (Harlow)(witness does not know how Intervest would have specifically grown absent the Government's breach); Tr. 850:17-21 (Harlow)(witness does not know how big Intervest would have been absent the Government's breach); Tr. 1067:16-1068:14 (Crithfield)(former loan officer testified he could not make commercial real estate loans to certain customers, but customers never filed loan applications); Tr. 1287:23-1288:5 (Stanley)(witness never attempted to quantify the damage to Sterling's reputation allegedly caused by the breach).

Further, while Sterling now alleges that it "attempted to mitigate" by shrinking in response to the breach, Pl. Br., pp. 23, 80, that claim is refuted by contemporaneous documents demonstrating that Sterling was considering a shrink prior to the breach. Prior to FIRREA's enactment, Sterling considered shrinking its asset base to $650 million in an attempt to improve

the negative tangible capital position that resulted from its acquisition of Central Evergreen. Tr. 3671:16-22 (Hedlund); P-404, WON889 0474. Further, on August 3, 1989, when Mr. Byrne believed that Sterling's goodwill would be grandfathered by FIRREA, he submitted a business plan for 1990 that was a "no-growth plan in terms of total assets." DX 358, p. WON879 0180; Tr. 1794:10-25, 1797:14-20 (Byrne).

Moreover, our experts, Drs. Hamm and Bajaj, demonstrated that the shrink actually helped Sterling in this case - during the period between 1989 and 1991, Sterling improved its profitability while shrinking its balance sheet. Tr. 4125:6-4126:20 (Bajaj); P-157, p. SG1007276; Tr. 486:1-8 (Gilkey); DX 3502; California Fed. Bank v. United States, 54 Fed. Cl. 704, 713-14 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005) (plaintiff must prove shrink is harmful in order to demonstrate lost profits). This was possible because Sterling capitalized upon its ability to originate loans and quickly sell them into the marketplace, a strategy that reaped profits but did not require it to hold substantial amounts of capital. Tr. 4128:10-4132:8 (Bajaj); P-81, p. 6; P-83, p. 7; P-85, p. 2. Thus, prior to its recapitalization in 1991, Sterling actually benefitted from shrinking its balance sheet and shifting its focus to buying and quickly reselling residential mortgage loans. For these reasons, Sterling failed to demonstrate that the shrink was caused by the breach or resulted in harm.

Finally, even accepting the facts alleged by Sterling as true, such testimony is irrelevant because Dr. Horvitz does not rely upon it in his damages model. Tr. 4309:20-4310:4 (Bajaj); see generally P-454. Dr. Horvitz's model measures profits that allegedly would have been earned upon incremental assets, rather than measuring the income that would have been earned

on specific loans that Sterling divested or was unable to make.[15] This flaw in his model renders it impossible for Sterling to demonstrate that its alleged lost profits would have occurred but for the breach, thus precluding a finding of causation in this case. See Fifth Third, 55 Fed. Cl. at 242 (the fact of the shrink did not provide the "missing elements" of the model, i.e., the business opportunities that would have been pursued absent the breach).

### 2. Sterling Would Have Failed FIRREA's Core Capital Requirement Even Absent The Breach

At trial, Dr. Horvitz readily acknowledged that his lost-profits damages would be zero if he had not assumed that, absent the breach, Sterling would have raised $10.5 million in new capital in December 1989. Tr. 2757:8-18 (Horvitz). At trial, we demonstrated the fallacy of that assumption. See Gov. Br., pp. 19-21, 114-117, and pp. 43-44, 67 below. We also showed, however, that, even if we assume that Sterling would have raised $10.5 million in 1989 absent the breach, causation was not established, because Sterling would nonetheless have failed to satisfy FIRREA's minimum core capital requirement. Tr. 2745:22-2748:22 (Horvitz); 12 C.F.R. § 567.8 (1989). In addition, if core capital were calculated properly, Dr. Horvitz's model would result in zero damages. See Tr. 2745:22-2753:12 (Horvitz).

Sterling does not dispute that Dr. Horvitz's model yields zero damages if the core capital calculation performed by our expert, Mr. Barefoot Bankhead, is incorporated into the model. See generally Pl. Br., pp. 87-93; see also Tr. 2495:17-2497:7 (Horvitz); Tr. 3328:15-3329:17 (Bankhead). Instead, Sterling attempts to discredit our capital calculation by incorrectly

---

[15] Nor do any of Sterling's other damages claims rely upon such testimony. Therefore, the Court should not award any damages based upon the alleged loss of employees, loans, customers, and reputation.

contending that it is contrary to "law of the case" and by offering a methodology for calculating the core capital ratio that permits Sterling to exceed the maximum amount of goodwill allowed by the regulations in arriving at that ratio.

**a. Mr. Bankhead's Calculation Of "But-for" Core Capital Correctly Accounts For The Central Evergreen Goodwill**

Sterling's attempt to discredit the opinions of Messrs. Bankhead and Hargett on the grounds that they ignore the "contractual" nature of the Central Evergreen goodwill is baseless. Pl. Br., pp. 87-89. First, Sterling erroneously claims that Mr. Bankhead's and Mr. Hargett's shorthand reference to the Central Evergreen goodwill as "noncontractual" goodwill is at odds with this Court's finding that the agreement governing the Central Evergreen acquisition merely shifted the risk of regulatory change to Sterling with respect to the goodwill generated by the acquisition. During the course of his testimony, Mr. Bankhead clearly articulated what he meant by his reference to the Central Evergreen goodwill as "noncontractual." Tr. 3303:23-3304:21 (Bankhead). In using the term "noncontractual," Mr. Bankhead fully recognized that the Central Evergreen goodwill was created when Sterling contracted with the Government to acquire Central Evergreen. Id.; see also Sterling, 72 Fed. Cl. at 411. Moreover, Mr. Hargett testified that he agreed with the views of Mr. Bankhead. Tr. 3413:20-3414:24 (Hargett).

In addition, Mr. Bankhead's methodology for calculating core capital does not run afoul of the Central Evergreen contract. Sterling erroneously contends that the Court held that Sterling had a contractual right to count the Central Evergreen goodwill as capital until the regulations changed. To the contrary, the Court expressly recognized that, at the time of the Central Evergreen acquisition, Sterling possessed the right to count goodwill as regulatory capital

without Government approval. Sterling, 72 Fed. Cl. 406, n.6. Further, the Court noted that neither the Central Evergreen agreement nor the attached business plan mentions goodwill or provided any forbearance with respect to goodwill. Id. at 410. Ultimately, however, whether the goodwill was contractual or noncontractual is irrelevant because the parties agree that the Central Evergreen goodwill was subject to the post-FIRREA regulations limiting the use of goodwill in calculating regulatory capital ratios. Pl. Br., p. 88. Thus, even if Sterling was deemed to have a contractual right to count goodwill as regulatory capital until the regulations changed, Mr. Bankhead's and Mr. Hargett's opinions would not change.

Sterling also claims that Mr. Bankhead's interpretation of the regulations effectively "eliminate[d]" Central Evergreen goodwill that could otherwise be counted as capital post-FIRREA. Id. That is wrong. As Mr. Bankhead and Mr. Hargett demonstrated at trial, the error in Dr. Horvitz's core capital calculation lies in his assumption that the Central Evergreen goodwill could be utilized to exceed the maximum amount of goodwill includable in calculating core capital. Tr. 3325:15-3326:23 (Bankhead); Tr. 3423:14-3424:20 (Hargett); Gov. Br., pp. 57-58. Neither Mr. Bankhead nor Mr. Hargett opined that the Central Evergreen goodwill could not be included in core capital under any circumstances.

At trial, Mr. Bankhead demonstrated that, (1) the regulation implementing FIRREA allowed Sterling to include a maximum of $10,421,000 of its supervisory goodwill in core capital (i.e., 1.5 percent of its total assets), and (2) absent the breach, Sterling would have been permitted to include all $15.557 million of its Tri-Cities and Lewis Federal goodwill in core capital. Tr. 3325:15-3326:9 (Bankhead). As a result, absent the breach, Sterling would have been allowed to include goodwill equal to $15.557 million, or 2.239 percent of its asset size, in core capital,

rather than 1.5 percent, or $10.421 million, as specified in the regulation. Tr. 3323:9-3324:6 (Bankhead); DX 2011. Thus, the Central Evergreen goodwill would not be eligible to count as core capital because the Tri-Cities and Lewis Federal goodwill would bring the total amount of goodwill included in core capital above the 1.5 percent ceiling. Id.; Tr. 3325:15-3326:23 (Bankhead).

This is the correct method because the Government, through its regulations, stated that no thrift in the country could, in calculating tangible and core capital, count goodwill in excess of 1.5 percent of its assets. This was true regardless of how much goodwill a thrift possessed, or how, or why, or when the goodwill was obtained. Indeed, as the Federal Circuit observed, Congress phased out the use of goodwill as capital because experience has shown that its use "exacerbated the [thrift] crisis rather than alleviat[e] it." Castle v. United States, 301 F.3d 1328, 1333 (Fed. Cir. 2002). Sterling's own experts agreed. Mr. Schott admitted that Congress and the regulators viewed goodwill to be a major part of the problem, and its elimination and the requirement of tangible capital to be a major part of the solution. Tr. 2477:12-16 (Schott). Indeed, Mr. Schott agreed with this view of goodwill. Tr. 2474:9-2746:9 (Schott). Similarly, Dr. Horvitz concluded that excessive risk taking due to low capital levels was "the major cause of the thrift debacle." Tr. 2564:19-2565:7. He explained that thrifts with little capital are likely to take imprudent risk. "Since the new owners have little capital of their own at stake, there is a strong tendency towards excessive risk taking." Tr. 2740:6-8 (Horvitz). Indeed, he stated that this was precisely the cause of the thrift crisis. Tr. 2740:3-2741:5 (Horvitz).

As demonstrated above, Mr. Bankhead's calculation of "but for" core capital permits Sterling, consistent with its Tri-Cities and Lewis Federal contracts, to include more goodwill in capital than permitted by the regulation implementing FIRREA. Thus, Sterling's claim that it would nonetheless be permitted to include Central Evergreen goodwill in core capital is groundless in light of the Court's holding that the thrift assumed the risk of regulatory change.

**b. Mr. Bankhead Correctly Recognized The Lewis Federal and Tri-Cities Goodwill As "Qualifying Supervisory Goodwill" In Calculating Sterling's "But-For" Core Capital Ratio**

Sterling also attacks Mr. Bankhead's recognition of the Lewis Federal and Tri-Cities goodwill as "qualifying supervisory goodwill" for purposes of the regulation governing the calculation of core capital. 12 C.F.R. §§ 567.1, 567.5 (1990). Sterling contends that the Lewis Federal and Tri-Cities goodwill is not qualifying supervisory goodwill because the post-FIRREA regulation, which requires qualifying supervisory goodwill to be added to tangible capital, would have required inclusion of the Lewis Federal and Tri-Cities goodwill in tangible capital, thus leaving only the Central Evergreen to be added back as qualifying supervisory goodwill. Pl. Br., p. 91. Consequently, Sterling argues, in calculating its "but-for" core capital, Mr. Bankhead should have included the Lewis Federal and Tri-Cities goodwill as tangible capital and added back only the Central Evergreen goodwill as qualifying supervisory goodwill. Pl. Br., pp. 90-92. This argument suffers from several fatal flaws.

First, Mr. Schott, Sterling's proffered expert on the core capital issue, agreed that the Lewis Federal and Tri-Cities contractual goodwill is supervisory goodwill for purposes of the post-FIRREA regulations governing the calculation of regulatory capital, and that qualifying supervisory goodwill is a subset of supervisory goodwill. Tr. 2493:12-2494:14 (Schott). Thus,

the Lewis Federal and Tri-Cities goodwill would be recognized as "qualifying supervisory goodwill" in calculating the required core capital ratio. Second, Sterling criticizes Mr. Bankhead for assuming, in calculating "but-for" core capital, that Sterling possessed negative $12.581 million of tangible capital as of December 31, 1989. Pl. Br., p. 90.

That criticism is baseless because, in calculating core capital, Mr. Bankhead intentionally adopted the negative $12.581 million actual tangible capital number that Dr. Horvitz used in order to tailor his calculation most closely to Dr. Horvitz's. Tr. 3321:18-25; 3327:4-22, 3335:14-20 (Bankhead); DX2010; DX 2012; DX 2014. Thus, Mr. Bankhead began his core capital calculation by assuming that Sterling possessed negative $12.581 million in tangible capital at the end of 1989, and arrived at the "but for" core capital amount by adding the Lewis Federal and Tri-Cities supervisory goodwill to that number, in addition to other intangible items that would have been allowed in the "but-for" world. See DX 2010, DX 2012, DX 2014. As acknowledged in Sterling's opening brief, Pl. Br., p. 53, Dr. Horvitz also assumed, in calculating "but-for" core capital, that Sterling would start the calculation with tangible capital in the amount of negative $12.581 million and add back the Lewis Federal and Tri-Cities goodwill as a qualifying intangible. See also P-454, Tables 2a, 3a, 3c, 4a, 4b, 4c, and 5.

Second, the alternative "but-for" core capital calculation presented for the first time in Sterling's brief, Pl. Br., p. 91, is not in the record. Indeed, Sterling admits that, pursuant to its theory, the calculation "would be as follows." Id. (emphasis added)(providing no citation to the record for support of the calculation). Further, as noted above, the calculation is at odds with the method by which Dr. Horvitz calculated core capital. Therefore, the Court should strike this calculation. Comcation, Inc. v. United States, 78 Fed. Cl. 61 n.25 (2007).

Even if the Court does not strike the calculation from the record, the outcome should not change. As noted by Sterling, Mr. Hargett acknowledged that the contractual capital would count as tangible capital for purposes of the post-FIRREA capital regulations. Tr. 3364:2-7 (Hargett). For purposes of the core capital calculation, however, the post-FIRREA regulations expressly permitted thrifts to include goodwill in core capital only up to 1.5 percent of asset size. Tr. 3421:16-3423:16 (Hargett). Absent the breach, Sterling would have been allowed to include goodwill equal to $15.557 million, or 2.239 percent of its asset size, in core capital, rather than 1.5 percent, or $10.421 million, as specified in the regulation. Tr. 3323:9-3324:6 (Bankhead); DX 2011.

Further, Mr. Schott conceded that (1) Mr. Bankhead included all of the contractual goodwill in computing Sterling's "but-for" core capital ratio, and (2) that the amount of goodwill attributable to those acquisitions exceeded the maximum amount of supervisory goodwill that could be included in core capital pursuant to the regulation implementing FIRREA. Tr. 2491:7-19 (Schott). Therefore, Sterling's contention that "but for" Sterling would have been "free to include" the Central Evergreen goodwill in qualifying supervisory goodwill is baseless because it contravenes the express limitation of the regulation.[16] Pl. Br., p. 91.

---

[16] Sterling contends that, "even after the consideration of all the contracts, the FDIC would have focused on Sterling's lack of tangible capital," implying that the Government would have ignored its contractual goodwill for purposes of the minimum tangible capital requirement Pl. Br., p. 92. That contention is incorrect. As demonstrated above, Mr. Bankhead's calculation, which was derived from Dr. Horvitz's, does not assume that Sterling's contractual goodwill would not count as tangible capital for purposes of calculating regulatory capital ratios. It merely assumes that Sterling would not be entitled to include its noncontractual Central Evergreen goodwill in core capital once the 1.5 percent limit was met and exceeded by the Lewis Federal and Tri-Cities goodwill. Further, Sterling's citation to the testimony of Mr. Potthast on this point is misplaced for two reasons. First, Mr. Potthast did not testify about FDIC treatment of goodwill, he testified about OTS treatment of goodwill. Second, Mr. Potthast correctly testified

Further, Sterling acknowledges that Messrs. Bankhead and Hargett recognized "other significant differences between contractual and non-contractual goodwill. This, however, does not support Dr. Horvitz's assumptions, as Sterling suggests. Pl. Br., p. 92. Indeed, Mr. Bankhead's acknowledgment that the contractual goodwill would not be subject to the phaseout of qualifying supervisory goodwill and the 1.5 percent cap demonstrates that he did not disregard Sterling's contractual rights. This acknowledgment also defeats Sterling's claim that Mr. Bankhead viewed contractual capital and qualifying supervisory goodwill as "virtually indistinguishable." Pl. Br., p. 92.

Finally, Sterling misses the point in asserting that our experts cannot deny that "contractual goodwill from the Lewis Federal and Tri-Cities acquisitions is to be defined as regulatory capital as then defined under the contracts, not as later defined by FIRREA." Pl. Br., p. 92. First, the contractual goodwill must be considered in calculating goodwill under the post-FIRREA regulations, with the proviso that it is to be included in calculating Sterling's capital ratios. The Central Evergreen goodwill, however, is subject to all of the limitations of the post-FIRREA regulations, as Sterling acknowledges, Pl. Br., p. 88, and, absent the breach, would not have been included in core capital because the contractual goodwill would already have met and exceeded regulatory limit.

---

that goodwill would not be of assistance to Sterling in dealing with its interest rate risk issues. Tr. 3204:13-19 (Potthast). Sterling's Lewis Federal and Tri-Cities contracts provided protection in calculating regulatory capital. Sterling has never contended, and the Court has never held, that Sterling had a contractual right to use its goodwill in demonstrating that its interest rate risk was at appropriate levels. Similarly, Mr. Hargett's testimony that goodwill is an intangible, while correct, is irrelevant, because we do not dispute that, but for the breach, Sterling's contractual goodwill would have been included in its tangible capital calculation.

As a result, Sterling cannot demonstrate that the breach caused its damages. Even absent a breach, and assuming that Sterling would have raised $10.5 million in new regulatory capital in December 1989 (an assumption with which we disagree), Sterling would have failed to meet the core capital requirement, and would have been subject to the restrictions placed upon it in the actual world. Tr. 3328:15-24, 3329:13-17 (Bankhead). Further, Dr. Horvitz conceded that Mr. Bankhead's adjustment to his core capital calculation reduces Sterling's lost-profits estimate to zero. Tr. 2495:17-2497:7 (Horvitz).

**c. Sterling's Lewis Federal And Tri-Cities Forbearances Do Not Support Dr. Horvitz's Assumption That Sterling Would Have Met FIRREA's Core Capital Requirement Absent The Breach**

In our opening brief, we demonstrated that Dr. Horvitz's new opinion regarding the Lewis Federal and Tri-Cities forbearance letters is incorrect and does not render "but-for" Sterling compliant with FIRREA's core capital requirement. Gov. Br., pp. 61-65. In support of this opinion, Sterling's contentions of law merely state, in two sentences, without citation to the record, that "Sterling was entitled to the benefits and protection of the Lewis Federal and Tri-Cities forbearance provisions. By applying these forbearances, Sterling was in capital compliance as of December 31, 1989." Pl. Br., p. 89.

Sterling's proposed findings of fact also provide virtually no support for the opinion. With respect to Lewis Federal, Sterling merely states that the Government provided a forbearance from adverse action arising from Sterling's failure to meet net worth requirements as a result of the acquisition. PFF ¶ 53-55; see also generally PFF ¶¶ 278-81, 283. With respect to Tri-Cities, Sterling contends only that the FHLBB agreed to "forbear from regulatory action for

any failure by Sterling to meet capital requirements, for a five year period following the acquisition." PFF ¶ 72; see also generally PFF ¶¶ 278-81, 283.

As we demonstrated in our opening brief, Sterling has misstated and misapplied the forbearances to claim that it would have met the core capital requirement even if Mr. Bankhead is right about the methodology for calculating core capital. Gov. Br., pp. 61-65. Sterling committed two major errors. First, Sterling incorrectly relied upon a section of the forbearances that applied solely to acquisitions achieved through the pooling method of accounting, which creates a net worth deficiency, when it is undisputed that the Lewis Federal and Tri-Cities acquisitions were accomplished pursuant to the purchase method of accounting. The purchase method does not result in a net worth deficiency because the gap between assets and liabilities is filled by goodwill. Gov. Br., pp. 61-64; P-20, p. WOF014 0600; P-28, p. WOF014 1397 ; Tr. 1873:17-1874:20 (Byrne); Tr. 2780:6-21 (Horvitz); Tr. 3391:2-3392:12 (Hargett); Tr. 3285:3-16; 3291:6-8 , 3345:18-3346:10, 3347:15-3348:2 (Bankhead).

Second, Dr. Horvitz readily admitted that Sterling's application of the forbearances at issue results in double-counting of the Lewis Federal and Tri-Cities goodwill. In that regard, Dr. Horvitz conceded that he might have misinterpreted the forbearance. Tr. 2782:1-2784:18 (Horvitz). Indeed, Dr. Horvitz acknowledged that he is not an expert in accounting, Tr. 2002:1-16 (Horvitz), and is not qualified to give a legal interpretation of the acquisition contracts in this case, Tr. 2003:4-7, 2721:13-23 (Horvitz), of which the forbearance letters are necessarily a part.

Further, Sterling's characterization of the forbearances in its brief is incorrect. With respect to Lewis Federal, Sterling claims that a forbearance protecting it from failure to meet net worth requirements as a result of the Lewis Federal acquisition permitted it to count the Lewis

Federal goodwill twice. PPF ¶ 53-55. That contention is wrong for the reasons set forth above, and suffers from a further flaw mandating rejection of Sterling's "forbearance" argument. Even assuming that the forbearance protected Sterling from failure to meet the net worth requirements as a result of the Lewis Federal acquisition, it would not be of assistance because, in calculating core capital, Mr. Bankhead gives Sterling full credit for the Lewis Federal goodwill. Tr. 3323:9-3324:6 (Bankhead). Instead, the Central Evergreen acquisition causes Sterling's noncompliance with the core capital requirement in the "but-for" world. Therefore, Sterling cannot claim that the forbearance permitted it to double-count the Lewis Federal goodwill to correct a deficiency that resulted from the Central Evergreen acquisition.

Similarly, with respect to Tri-Cities, Sterling claims that the forbearance letter reflected the Government's agreement to "forbear from regulatory action for any failure by Sterling to meet capital requirements, for a five year period following the acquisition." PFF ¶ 72. That proposed finding of fact misstates the forbearance language, which applies only to failure to meet the capital requirements arising "solely" from Sterling's acquisition of Tri-Cities. P-28, p. WOF014 1397 (FSLIC "will forbear . . . for any failure of Sterling to meet the capital requirements of Section 563.13 arising solely from . . . (2) Sterling's assumption of the capital deficiency of the disappearing institution as of the Effective Date."). Thus, as was the case with Lewis Federal, even if we assume that the forbearance applies to purchase method acquisitions, which it does not, it is inapplicable nonetheless because Mr. Bankhead gives Sterling full credit for the Tri-Cities goodwill, and the Central Evergreen acquisition causes the thrift's failure to meet the core capital requirement. Consequently, Dr. Horvitz's core capital calculation that

allegedly accounts for "forbearances" granted in connection with Lewis Federal and Tri-Cities is baseless, and should be rejected.

### 3. The Government Did Not Violate The Injunction Prohibiting Application Of FIRREA In A Manner Inconsistent With Sterling's Contracts

In our opening brief, we established that lost profits could not have been incurred by Sterling during the period that the district court's injunction prohibited the Government from taking action inconsistent with Sterling's contracts, including the Central Evergreen agreement, which this Court subsequently ruled was not breached. Gov. Br., pp. 68-70; DFF ¶¶ 45-62. Sterling, in its proposed findings of fact, concedes that the injunction was a form of mitigation, yet claims its lost profits during the pendency of the injunction because the Government "unlawful[ly]" enforced the restrictions that were subject to the injunction's prohibitions. PFF ¶¶ 133-150.

In alleging noncompliance with the injunction, Sterling effectively contends that the Government operated in bad faith. Government officials, however, are presumed to act in good faith, and "it requires 'well-nigh irrefragable proof' to induce a court to abandon the presumption of good faith dealing." T&M Distribs., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999)(quoting Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1301-02 (1976); see also Chapman Law Firm v. United States, 490 F.3d 934, 940 (Fed. Cir. 2007). Sterling's evidence does not show that the OTS was operating in bad faith. To the contrary, the Government merely regulated Sterling as permitted by the district court. See, e.g., P-277; P-279; P-285; P-288; DX 496.

Indeed, Sterling's recitation of the facts surrounding this issue is misleading and incomplete. For example, Mr. Byrne admitted that the OTS was allowed to regulate Sterling for the purposes of safety and soundness, Tr. 1827:13-16 (Byrne), yet Sterling implies that any effort to take action with respect to safety and soundness concerns would have been improper and contrary to the injunction. See, e.g., PFF ¶¶135-137, 144. That implication is contrary to the district court opinion granting the injunction. Upon reconsideration, the district court held that the injunction's original prohibition against placing Sterling into conservatorship or receivership was overly broad, and narrowed that portion of the injunction to clarify that the "Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect." Sterling Sav. Assn. v. Ryan, 751 F. Supp. at 871, 882-84 (E.D. Wash., 1990). Sterling cannot point to a single instance in which the Government attempted to restrict Sterling in a manner inconsistent with the injunction, much less in bad faith, as required by law.

For example, Sterling cites to testimony of Mr. Byrne to establish that Sterling was told "numerous times that the restrictions were still operative, despite the TRO." PFF ¶ 138 (citing Tr. 1822:2-12, 1501:17-24 (Byrne); P-281; DX-441). While, at trial, Mr. Byrne initially claimed that Ms. Friend verbally instructed Sterling to abide by the restrictions, Tr. 1822:2-12 (Byrne), Sterling fails to acknowledge that he was immediately impeached with his 2000 deposition, and reiterated his deposition testimony that he could not recall such verbal instructions. Tr. 1822:13-1823:13 (Byrne).

Sterling's other citation to Mr. Byrne's testimony, Tr. 1501:17-24 (Byrne), establishes only Mr. Byrne's alleged "belief" that the pre-injunction restrictions had not been lifted. That

"belief," however, is belied by a contemporaneous letter from Mr. Byrne to Ms. Friend, dated June 28, 1990, in which Mr. Byrne advised Mr. Friend that Sterling recognized that it was not required to comply with the restrictions. DX 1078, p. WON939 0204. Similarly, the documents cited by Sterling, PFF ¶ 138, are of no assistance on this issue. A June 18, 1990 letter from Ms. Friend to Mr. Byrne expressly states that OTS intended to "strictly obey" the district court's order, DX 441, and a June 20, 1990 letter from Ms. Friend to Mr. Byrne merely reiterates that Sterling had been subject to pre-TRO restrictions, and was required to report post-TRO activity inconsistent with the restrictions. P-281, p. SG1005455; see also DFF ¶¶ 50-52.

Similarly, Sterling's claim that the Government's inquiries about a $35 million investment constituted a violation of the injunction is incorrect. PFF ¶ 145-150. Although, initially, OTS advised Sterling that information requested was required by Regulatory Bulletin RB 3a-1, which applied to troubled thrifts, soon thereafter Ms. Friend instructed Mr. Byrne to ignore the reference to RB 3a-1 because it had been mentioned in error. DX 481, p. WON934 0605; see also P-258 (January 26, 1990 letter subjecting Sterling to growth guidelines, pursuant to RB 3a-1, that OTS was enjoined from enforcing).

Although OTS did not disallow the purchase, the agency expressed concern about it from a safety and soundness standpoint, and directed Sterling to make no further purchases of securities over $1 million without approval. P-290. Further, in an October 22, 1990 letter, OTS's counsel advised Sterling that requests for information about the $35 million MBS purchase did not conflict with the district court's preliminary injunction. DX 481, p. WON934 0605; see also P-293, p. SG1007930-32. Thus, Sterling's claim that the inquiries about the $35 million investment violate the injunction is unfounded.

In short, the overwhelming evidence presented at trial established that the Government honored the injunction prohibiting it from taking action inconsistent with Sterling's contracts. Indeed, Mr. Gilkey told OTS that, as of 1992, after Sterling recapitalized, he had not experienced retribution by OTS staff. DX 1055.

Further, as previously shown, if Sterling believed that a violation of the injunction had occurred, its remedy was to seek relief from the district court. See Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir. 2000) ("If the plaintiff . . . believes that the defendant . . . is failing to comply with the [injunction's] mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned."); Ross-Simons of Warwick, Inc. v. Baccarat, 182 F.R.D. 386, 399 (D.R.I. 1998) (noting that a plaintiff seeking to enforce an injunction must bring an action for civil contempt rather than a separate action for damages). Instead, Sterling concedes that it made a business decision not to seek further relief from the district court. PFF ¶ 147 ("Sterling considered seeking a contempt order on the grounds that the OTS was not complying with the Court's injunctions, but decided that, in view of its desire to run a business, initiating further litigation would only harm the thrift."). This concession, coupled with Sterling's failure to provide "well-nigh irrefragable proof" that the Government acted in bad faith, demonstrate that Sterling's claim for damages arising from the injunction period were not caused by the breach.[17]

[17] Further, as noted in our opening brief, the error extends beyond 1991, because Dr. Horvitz assumes that Sterling would have used the earnings allegedly forgone in 1990 and 1991 to acquire more assets in later years, resulting in additional lost profits. P-454, table 1; see Gov. Br., pp. 69-70.

**4. Sterling's Lost-Profits Claim Ignores Its Conversion To A Commercial Bank**

Sterling voluntarily converted to a commercial bank in July 2005. Tr. 582:17-583:4 (Gilkey). Sterling does not contend that the breach caused it to convert. Once Sterling voluntarily converted to a commercial bank, regulations prohibited it from counting supervisory goodwill as regulatory capital. 12 C.F.R. Part 3, Appx. A, § 2(c)(1)(I). As a result, even absent the breach, upon Sterling's conversion in July 2005, it would no longer have been able to count supervisory goodwill towards regulatory capital.

Moreover, the application of commercial bank regulations prohibiting goodwill from counting as regulatory capital would not have amounted to a breach of Sterling's Tri-Cities and Lewis Federal contracts. The documents deemed contractual in this case evidence agreements between Sterling and savings and loan regulators, the FHLBB and FSLIC, and the forbearance letters expressly state that FHLBB and FSLIC were forbearing from enforcing regulations governing those agencies. See, e.g., P-20, p. WOF014 0800; P-28, p. WOF014 1397; see also Sterling Sav. Assn. v. United States, 53 Fed. Cl. 599, 602-05 (2002). Indeed, the assistance agreements expressly stated that the goodwill associated with the cash contributions from FSLIC could be counted as capital for purposes of reporting to the Bank Board. Id. at 603, 605. Sterling has never contended, nor is there a basis to contend, that the thrift entered into separate agreements with commercial bank regulators providing for forbearance from regulations governing commercial banks. Therefore, Sterling should not be awarded lost profits – or any other damages – after July of 2005.

### D. The Allegedly Forgone Profits In Dr. Horvitz's Model Were Not Foreseeable When Sterling Acquired Lewis Federal And Tri-Cities

Sterling claims that the Government should have foreseen that a breach of the Lewis Federal and Tri-Cities contracts would result in lost profits because, at the time of the Tri-Cities acquisition, the FHLBB was aware that Sterling intended to pursue an "ambitious" growth plan in reliance upon FSLIC assistance. Pl. Br., p. 81. As a preliminary matter, the Government did not breach its agreement to provide FSLIC assistance to Sterling in connection with the Lewis Federal and Tri-Cities acquisitions, and Sterling has never even alleged a breach of that agreement. Instead, the Court has found that the Government breached an agreement to permit Sterling to count goodwill associated with the FSLIC assistance provided in those acquisitions as capital. Sterling, 53 Fed. Cl. at 615.

Although it may have been foreseeable that Sterling would reap earnings from the investment of the FSLIC cash assistance, which totaled approximately $13 million for the Lewis Federal and Tri-Cities acquisitions, it was not foreseeable that the goodwill associated with the FSLIC assistance would generate profits. DFF ¶¶ 4, 8. Indeed, as established in our opening brief, Dr. Horvitz opined that, if potential investors had foreseen the profits assumed in his model, they would have provided the capital needed to achieve those profits. Tr. 2694:7-13 (Horvitz); Gov. Br., pp. 50-51. Dr. Horvitz also acknowledged that the lost profits in his model were, in fact, not foreseeable to any potential investor. Id. at 50. If such profits were not foreseen to investors at any point between 1989 and 2006, then the profits could not have been foreseen by the Government in 1985 and 1988, when the Lewis Federal and Tri-Cities acquisitions occurred.

Similarly, Sterling is not aided by its claim that foreseeability of its lost profits is established because the "linkage between Tri-Cities and Central Evergreen demonstrate that the acquisition of Central Evergreen could not have been undertaken without the contractual capital obtained in the Tri-Cities acquisition." PFF ¶ 277; see also PFF ¶¶ 75-78. Even if such a linkage existed,[18] that has no bearing on whether the elimination of the Tri-Cities goodwill would result in lost profits.

Finally, it could not have been foreseen that (1) Sterling would obtain an injunction prohibiting the Government from enforcing FIRREA in contravention of Sterling's contracts and lose profits nonetheless; or that (2) Sterling would lose profits notwithstanding its replacement of the contractual goodwill and its affirmative statement that it did "not foresee limitations on its ability to increase total assets." DX 228, p. WON884 1563; see Gov. Br., pp. 51-52.

### E. The Damages Arising From Dr. Horvitz's Lost-Profits Model Are Not Reasonably Certain

In our opening brief, we demonstrated that Sterling's lost-profits model suffers from eight flaws that render it unreliable, speculative, and unable to satisfy the reasonable certainty test, which requires proof of lost profits to be "rooted in fact." Castle v. United States, 48 Fed.Cl. 187, 206 (2000), aff'd, 301 F.3d at 1328 (Fed. Cir. 2002).[19] The flaws we identified are: (1) Dr.

---

[18] Certain documents imply that the Government was aware, at the time of the Central Evergreen acquisition, that Sterling inquired as to whether the goodwill associated with the Tri-Cities FSLIC assistance counted as regulatory capital. See, e.g., P-393. At most, however, the Government was aware that the Tri-Cities goodwill counted as regulatory capital at the time of the Central Evergreen acquisition. Id. There is no evidence that the Government expected Sterling to leverage that goodwill through the addition of assets.

[19] Sterling claims, quoting First Federal Sav. and Loan of Rochester v. United States, 76 Fed. Cl. 106, 123 (2007), appeal docketed, No. 07-5161 (Fed. Cir. August 17, 2007), that the reasonable certainty test requires a plaintiff to establish: "(1) the estimated reduction in the

Horvitz failed to identify profitable opportunities that would have been obtained absent the breach, Gov. Br., pp. 76-78; (2) Dr. Horvitz's model invalidly assumes that Sterling would have earned the same return on incremental assets as it earned on actual assets, Gov. Br., pp. 78-83; (3) Sterling's profitability in the actual world does not render Dr. Horvitz's model reasonably certain, Gov. Br., p. 82; (4) Sterling's failure to meet its budgeted growth targets renders Dr. Horvitz's assumption that profitable opportunities would have been available inherently speculative, Gov. Br., p. 83; (5) Dr. Horvitz's model ignores the fact that Sterling has maintained excess regulatory capital since 1992, Gov. Br., p. 83-85; (6) Dr. Horvitz's incorrectly assumes that growth equates with profits, Gov. Br., pp. 85-86; (7) the assumed capital ratios in Dr. Horvitz's models are speculative, Gov. Br., pp. 86-89; and (8) Dr. Horvitz's model is invalid as a

---

amount of profitable assets caused by the breach; and (2) the appropriate average return, based on comparable historical results, that would have been earned on those lost assets." Pl. Br., p. 82. The test recited in Rochester, however, assumes that the fact of damage has already been proved, and all that remains is a calculation of the losses. In this case, however, Sterling's lost-profits model suffers from numerous structural flaws that render it inherently counterfactual and speculative as a matter of law to conclude that it lost profitable assets as a result of the breach. Castle, 48 Fed. Cl. at 206. Consequently, Sterling's statement of the reasonable certainty standard, which assumes that the breach caused a loss of profitable assets, is inapplicable.

Moreover, although the Rochester Court awarded lost-profits damages, the case is inapposite for other reasons. First, Rochester is the subject of an appeal. Second, in Rochester, the plaintiff's expert, unlike Dr. Horvitz, actually identified the assets and liabilities that would have been acquired absent a breach. 76 Fed. Cl. at 116-17. Third, in Rochester, the Court found that the thrift, which possessed over $6 billion in assets prior to the breach, would have grown by in excess of $400 million in 1989 alone. Id. at 119-20. Based upon this finding, the Court awarded approximately $26 million of lost-profits damages. Here, Sterling implausibly claims that, absent the breach, it would have acquired incremental assets every year between 1989 and at least 2006. P-454, table 1. Further, Sterling, unlike First Federal of Rochester, obtained an injunction prohibiting the Government from taking action inconsistent with its alleged contracts. Thus, this case has nothing in common with Rochester.

matter of law because it relies upon unproven wounded bank damages to create lost profits, Gov. Br., pp. 89-90.

In attempting to establish the "reasonable certainty" of Dr. Horvitz's model, Sterling begins by claiming that uncertainty should not preclude an award of its alleged lost profits, relying upon Cal. Fed., 395 F.3d at 1267. Pl. Br., p. 82. Similarly, Sterling's tacitly suggests, citing Bluebonnet, 266 F.3d at 1355, that a "jury verdict" approach may be utilized by the Court to reach a fair and reasonable approximation of damages. In Granite, 416 F.3d at 1382-83, the Federal Circuit rejected such suggestions, holding instead that such concepts are inapplicable if a plaintiff fails to prove its damages.[20]

As previously shown, in eight separate cases, where the plaintiff's expert, like Dr. Horvitz, merely assumed that the "but-for" bank would obtain profitable incremental assets, but failed to identify with specificity the profitable opportunities that plaintiff would have acquired in the "but-for" world, this Court has rejected plaintiffs' lost-profits claims. See, e.g., Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358 (2005) ("AmFed"); Citizens Fin., 64 Fed. Cl. at 514; LaSalle, 64 Fed. Cl. at 101-06; Standard Fed., 62 Fed. Cl. at 279-81 (2004); Columbia First, 60 Fed. Cl. at 115; S. Cal., 57 Fed. Cl. at 625-27; S. Nat'l Corp., 57 Fed. Cl. at 304-06 (2003); Fifth Third, 55 Fed. Cl. at 241-42.

[20] Further, the "jury verdict" method is available only when a plaintiff can demonstrate a "justifiable inability" to prove its damages, and that there is no more reliable method for arriving at an award. Bluebonnet, 266 F.3d at 1357-58. Here, Sterling has never even alleged that it was justifiably unable to prove its damages, instead insisting that its lost-profits model is an accurate calculation of its alleged losses. Moreover, there is a more reliable method for arriving at an award, in the form of the transactions costs that Sterling incurred in replacing its goodwill.

Sterling, in attempting to articulate its basis for contending that its lost-profits model meets the reasonable certainty test, fails again to provide even a single citation to the record in support of the contention. See generally Pl. Br., pp. 82-86. Instead, Sterling claims, in general terms, that its model "does not require economic forecasting," is conservatively constructed, and is distinguishable from other cases in which lost profits have been rejected because the plaintiffs in those cases did not premise their lost-profits models upon "actual performance" of the thrift. Pl. Br., pp. 82, 83, 85. Sterling also contends, without providing a legal basis, that inclusion of its alleged wounded bank damages in its lost-profits model is appropriate. Each of these contentions is baseless.

**1. Dr. Horvitz's Model Is Not Reasonably Certain And Is Invalid As A Matter Of Law Because It Relies Upon Unproven Wounded Bank Damages, Including A Claim That Has Been Abandoned, To Create Lost Profits**

In our opening brief, we demonstrated that Dr. Horvitz's model is invalid as a matter of law because he generates lost profits from Sterling's alleged wounded bank damages. Gov. Br., pp. 89-90. Sterling, in its opening brief, abandons its $304,005.79 claim for wounded bank damages in the form of legal, accounting, and insurance costs incurred in defending against OTS's enforcement of FIRREA. Pl. Br., pp. 62-63, 94-95. Nonetheless, Sterling maintains, without explanation, that "[t]hese amounts are properly restored to capital for purpose of lost-profits calculations." PFF ¶ 300. This reasoning suffers from two fatal flaws. First, as we demonstrated previously, Sterling's claim for lost profits on all of its wounded bank claims is unprecedented, and must be viewed, at best, as an extreme claim for prejudgment interest, which Sterling is barred from recovering. 28 U.S.C. § 2516(a) (2000); Library of Congress v. Shaw, 478 U.S. 310, 317 (1986); District of Columbia v. United States, 67 Fed. Cl. 292, 341 (2003)

("[N]o matter what term plaintiff uses, compensation for the belated receipt of money violates the no-interest rule absent an express statutory waiver of sovereign immunity from liability for interest.").

Second, Sterling's "restoration" of the $304,005.79 to capital for purposes of lost-profits results in additional lost profits of $2,747,000, which far exceeds the amount of the abandoned wounded bank claim. Tr. 4114:21-4116:10 (Bajaj); DX 3546. To the extent that Sterling has admitted that it is not legally entitled to the costs themselves, its claim for lost profits on the claim is absurd on its face, and would be even if the lost profits did not exceed the alleged actual costs.

Sterling's other wounded bank claims produce a similarly lopsided result, in that the lost profits on these alleged claims far exceed the costs themselves, with no legal justification. In total, the wounded bank damages of $4.6 million (including the abandoned claim) generate $30.011 million of Sterling's $58.164 million claim for lost profits. Tr. 4114:21-4116:10 (Bajaj); DX 3546.

Finally, as demonstrated previously, removal of Dr. Horvitz's assumption that Sterling would have raised an additional $10.5 million in capital in 1989 absent the breach reduces damages to zero. Tr. 2757:8-18 (Horvitz). Sterling claims that the $10.5 million was properly included in "but for" capital because, absent the breach, the $10.5 would have brought it into capital compliance, and its request for preapproval of dividends would have been granted. PFF ¶ 282.[21] There is no basis in the record for such an assertion. OTS policy prohibited the blanket

[21] As previously shown, this issue is ultimately irrelevant. Applying Mr. Bankhead's method for calculating "but for" core capital, Sterling would have failed the capital requirement even if it were credited with the $10.5 million. Gov. Br., pp. 55-61; pp. 22-33 above.

preapproval of a thrift's payment of future (as opposed to already accrued) dividends because it would deprive OTS of its ability to regulate the safety and soundness of the thrift's operations, and to monitor its earnings performance. Tr. 3675:23-3676:8 (Hedlund); Tr. 2221:23-2222:5 (Friend). Further, Mr. Byrne admitted that uncertainty surrounding the payment of dividends on the 1989 offering would have existed even if the Tri-Cities and Lewis Federal goodwill had been grandfathered under FIRREA. Tr. 1815:11-1816:24 (Byrne). Thus, Sterling cannot establish with reasonable certainty that it would have raised the $10.5 million absent the breach or that it is entitled to lost profits upon this speculative assumption.

**2. Sterling's Model Requires Economic Forecasting**

Sterling incorrectly claims that Dr. Horvitz's model does not require economic forecasting. Pl. Br., pp. 82-83. Dr. Hamm demonstrated that Sterling's model is based in its entirety upon economic forecasting because none of the conditions that applied to Sterling's actual assets can be assumed to have applied to its incremental assets. Tr. 3563:12-3564:10 (Hamm). Dr. Horvitz had to forecast the profitability, volume, type, source and duration of assets and liabilities. He also forecasted the risk rating of assets, yield on assets, cost of liabilities, and the volume, type, term and cost of hedging instruments. Id. at 3560:2-3561:16, 3564:11-21 (Hamm); DX 3007. Without the basic identification of assets and liabilities, any forecast of profits is impossible. Tr. 3562:21-3563:11 (Hamm). In fact, Dr. Horvitz conceded that his model lacked critical elements when he testified as follows: "I'll agree that there are a million things you say that the model doesn't include." Tr. 2618:10-11 (Horvitz).

**3. Sterling's Actual Profitability Does Not Render Dr. Horvitz's Model Reasonably Certain**

Sterling incorrectly claims that its model is reasonably certain because it is based upon actual performance, while models rejected by the Court have been presented by thrifts that were "weak" or "forced to close after the breach." Pl. Br., pp. 82-83; 85-86. Sterling's profitability in the actual world does not provide a basis to distinguish Sterling's model from the models previously rejected by the Court. See Pl. Br., pp. 82, 85-86. In at least five of the eight cases in which the forgone assets methodology has been rejected, the model projected profitability at the same rate, or a lesser rate, than that actually attained by the plaintiff thrift. See Fifth Third, 55 Fed. Cl. at 240-42; Southern National, 57 Fed. Cl. at 303-04; and Standard Federal, 62 Fed. Cl. at 276-77; LaSalle, 64 Fed. Cl. at 101-06; Columbia First, 60 Fed. Cl. at 110-11.

Sterling mistakenly asserts that Dr. Horvitz's model, which assumes that Sterling could have acquired the "usual and ordinary" types of assets held by the thrift, Pl. Br., p. 84, should be distinguished from the rejected Columbia First model, when it is obvious that Sterling's model is more seriously flawed than the Columbia First model. In Columbia First, the Court criticized the plaintiff for proffering a model based upon retail loans and mortgage-backed securities when, during summary judgment proceedings, the plaintiff had claimed that it would have made more acquisitions absent the breach. Pl. Br., p. 85, citing Columbia First, 60 Fed. Cl. at 100, 112, 114-15. Here, Dr. Horvitz assumes profits on so-called forgone assets at the same rate actually earned by Sterling with absolutely no identification of the assets and liabilities that would have been acquired absent the breach. This is exactly what Dr. Horvitz did in Citizens Financial - he assumed that additional assets and liabilities would be acquired and did not identify them,

because such identification "didn't matter." Tr. 2627:19-25 (Horvitz). The Court, in Citizens Financial, disagreed, and rejected Dr. Horvitz's model for failure to meet the reasonable certainty requirement. Citizens Fin., 64 Fed. Cl. at 514; Tr. 2636:17-2637:2; see also Fifth Third, 55 Fed. Cl. at 241 (rejecting, upon summary judgment, a model nearly identical to Dr. Horvitz's because the expert failed to identify the investments or opportunities foregone by the thrift). Thus, Sterling's bald, unsupported assertion that "[t]here is no reason to doubt that additional assets of the type held by Sterling were readily available" cannot be the basis for an award of $58.1 million in lost profits. Pl. Br., p. 84.[22]

Sterling's attempt to distinguish this case from Bank United suffers from the same problem. Pl. Br., p. 86. In Bank United, the plaintiff thrift erred in modeling a wholesale "but for" world that was inconsistent with pre-breach business plans projecting growth in retail deposits. For the reasons set forth in Citizens Financial, Dr. Horvitz cannot sidestep that error by failing to identify the assets and liabilities in his model. Further, Sterling does not accurately reflect the reasoning in Bank United when it claims that the Court determined that the "thrift's actual growth was inconsistent with that forecast in its models." Pl. Br., p. 86, citing Bank United, 50 Fed. Cl. at 662. In fact, the Court rejected Bank United's lost-profits model because, among other things, it failed to account for the fact that, during portions of the alleged damages

[22] Further, Sterling's boasts that it "finds billions in new assets every year" and "originated $5 billion in new assets in 2006" are misleading and irrelevant. Pl. Br., p. 84. We do not dispute that Sterling finds new assets every year. Our point is that Sterling has not demonstrated that the availability of $15.557 million in goodwill (which would have diminished to $1.856 million by 2006 (P-454, table 4a)) would have enabled it to acquire even more profitable assets than it already had under its very aggressive approach, and in light of its failure to obtain all of the assets budgeted in many years in which Dr. Horvitz projects lost profits.

period, Bank United was underleveraged and unable to find sufficient profitable assets. Bank United, 50 Fed. Cl. at 662-664. That is a flaw shared by Dr. Horvitz's model.

As previously shown, Sterling experienced difficulty meeting its budgeted asset targets notwithstanding sufficient capital to support the targets, and its internal board and committee minutes document the thrift's attempts to acquire assets in the face of stiff competition and aggressive pricing. DFF ¶¶ 92-99; see also DX 263, p. SG0053044; DX 267, p.WON923 1856; DX 269, p. PSG039 0672 (OTS examination reports documenting difficulty in obtaining low cost liabilities). Thus, Bank United does not support Sterling's lost-profits claim. Moreover, Sterling has not attempted to distinguish at least four of the cases in which the Court has rejected forgone assets models like Dr. Horvitz's. See Fifth Third, 55 Fed. Cl. at 240-42; Southern National, 57 Fed. Cl. at 303-04; Standard Federal, 62 Fed. Cl. at 279-80; and LaSalle, 64 Fed. Cl. at 101-06.

**4. Sterling's Model Is Not Conservative**

Sterling contends that the following assumptions of Dr. Horvitz's model are "conservative:" (1) the "but for" bank would grow at the same rate as the actual bank, subject to capital restraints; (2) the incremental assets in the "but for" bank would be as profitable as the actual assets in each year; and (3) the assets of the "but for" bank would be the "usual and ordinary" type held by the actual bank. Pl. Br., pp. 83-85. The thrift also contends that the "conservative" nature of Dr. Horvitz's model is demonstrated by the fact that the actual bank has grown beyond his 2000 projections. Id. at 84.

**a. Dr. Horvitz's Assumption That The Incremental Bank Would Grow At The Same Rate As The Actual Bank Is Not Conservative**

Sterling's first basis for claiming that Dr. Horvitz's model is conservative has already been rejected by the Court in other Winstar-related cases. In Standard Fed., Southern National, and Fifth Third, the experts assumed that the "but for" bank would be grow at the same rate as the actual bank, and their lost-profits models were rejected nonetheless because they were too speculative. Standard Fed., 62 Fed. Cl. at 279-80; Southern National, 57 Fed. Cl. at 303-04; Fifth Third, 55 Fed. Cl. at 240.[23] Indeed, in Citizens Financial, Dr. Horvitz's model assumed that the "but for" bank would operate at higher, presumably more "conservative" capital ratios than the actual bank, and the model was rejected as speculative nonetheless. Citizens Fin., 64 Fed. Cl. at 512-13.

Moreover, this argument is not strengthened by the fact that the actual bank has grown beyond Dr. Horvitz's projections in his 2000 report. Pl. Br., p. 84. If anything, Sterling's actual growth, coupled with its ability to raise hundreds of millions of dollars of capital, is further evidence that, if the goodwill would have yielded the spectacular profits projected by Dr. Horvitz, Sterling could have, and would have, accessed the capital markets to obtain the capital

---

[23] In its proposed findings of fact, Sterling claims that Dr. Horvitz's model is conservative because, "in all years the but-for Sterling's capital ratio is higher than the actual bank." PFF ¶ 265. This claim is misleading. Dr. Horvitz's model assumes that "but for" Sterling operates as slightly higher capital ratios than actual Sterling in four years. See P-454, tables 2a, 3a, 3e, 5. In the vast majority of years encompassed by Dr. Horvitz's model, however, he assumes that the incremental assets grow at the same rate as actual assets. Further, as demonstrated in our opening brief, Gov. Br., pp. 86-89, for the years 1989-91, Dr. Horvitz assumes a core capital ratio that is less than the ratio the bank projected in its pre-breach business plan, thus inflating lost profits by 70 percent. Finally, as demonstrated above, in Citizens Financial, the Court rejected Dr. Horvitz's model notwithstanding its assumption that the "but for" bank operated at higher capital ratios than the actual bank. Citizens Financial, 64 Fed. Cl. at 512-13; see also LaSalle, 64 Fed. Cl. at 101, n.14.

needed to achieve additional growth and profits. Further, much of Sterling's growth since 2000 has been through acquisitions. As demonstrated by Dr. Bajaj at trial, it is misleading to look at aggregate financials and make conclusions about incremental growth absent the breach without "disentangling" the effects of acquisitions, which do not create economic value on average, from internal growth, which Sterling failed to do. Tr. 4258:16-4262:17 (Bajaj).

#### b. Dr. Horvitz's Assumption That Sterling's "But For" Assets Would Have Been As Profitable As Its Actual Assets Is Not Conservative

Likewise, Dr. Horvitz's assumption that the "but for" assets would be as profitable as the actual assets was not deemed "conservative" in Citizens Financial Dr. Horvitz made this exact assumption in that case, and it was rejected as too speculative because, among other things, small adjustments to the assumed capital ratio led to exponential increases in the damages amount. As noted by the Court, Dr. Horvitz's model in Citizens Financial, which projected $.55 of profit for each dollar of goodwill eliminated, would result in infinite damages over an eight-year period if no capital requirements were imposed. Citizens Financial, 64 Fed. Cl. at 513. In this case, the same "money machine" approach yields $4.00 of lost profits for every dollar of goodwill eliminated. Tr. 2627:12-18, 2630:20-2632:18 (Horvitz); see Citizens Fin., 64 Fed. Cl. at 513-14; see also SoCal, 57 Fed. Cl. at 625-27; Southern National, 57 Fed. Cl. at 305; Fifth Third, 55 Fed. Cl. at 228, 241 (model that projected profits at a lesser rate than actual bank experienced rejected upon summary judgment).

In addition, as demonstrated in our opening brief, Gov. Br., pp. 78-79, Dr. Horvitz's assumption ignores the law of diminishing marginal returns, which the Citizens Financial Court held undermined the assumption, as acknowledged by Dr. Horvitz at trial. Tr. 2637:3-2638:21

(Horvitz); Citizens Fin., 64 Fed. Cl. at 512-13; see also LaSalle, 64 Fed. Cl. at 105-6. Dr. Horvitz also ignores other evidence undermining his assumption, including the fact that Sterling had a history of resorting to less profitable assets in the form of MBSs once it has exhausted the supply of more profitable loans. Gov. Br., p. 79; Tr. 3772:18-3775:14 (Hamm); 3775:24-3778:3 (Hamm); DX3012; DX3013. Indeed, Mr. Gilkey acknowledged that Sterling would not have expanded its balance sheet with wholesale assets and liabilities due to the negative spread associated with such a strategy. Tr. 560:11-21 (Gilkey); see DX 186, pp. PSG047 1355-56.

Moreover, Dr. Horvitz's assumption ignores the effects of competition on profits, as demonstrated by Dr. Hamm at trial. Dr. Horvitz's model makes no allowance for market forces that erode profitability when a thrift attempts to increase market share. Gov. Br., pp. 79-80; Tr. 3628:9-3629:2, 3635:6-3644:2 (Hamm); Southern National, 57 Fed. Cl. at 305.

Further, this argument ignores Dr. Hamm's point that "real money" capital, which Sterling has raised in the hundreds of millions of dollars, is more valuable than goodwill. Dr. Horvitz's model does not account for the distinction between real money capital and paper capital. Tr. 3834:6-3835:1 (Hamm). Real money capital can be invested at a return, substituted for interest bearing liabilities, and used to reduce a thrift's other borrowing costs (because creditors are more comfortable lending to thrifts with tangible capital). Real money also affords a thrift more operating flexibility and provides access to liabilities, like medium term notes, not available to thrifts without real money. Tr. 3835:10-3837:3 (Hamm). Paper capital cannot do any of these things. Tr. 3837:4-15 (Hamm). Therefore, Dr. Horvitz's assumption that "but for" Sterling's return on average assets ("ROAA") would have equaled its actual ROAA is undermined by his assumption that, absent the breach, Sterling could have achieved everything

that actual Sterling achieved without real money capital to support its assets. Tr. 3837:16-3838:5 (Hamm).

Other factors alleged to support Dr. Horvitz's assumption that profits on incremental assets would equal profits on actual assets are equally meritless. Pl. Br., p. 83. First, Sterling claims the assumption is conservative because "the model does not include Sterling's actual losses from breaching conduct that raised its costs and lowered its income." Id. This assertion is remarkable in that it serves only to prove that Sterling has not made a claim for "actual" losses, seeking instead to obtain lost profits that are purely speculative in nature for all of the reasons we have articulated above and in our opening brief.

Second, Sterling claims that the model "uses Sterling's actual rate of return during the period that the Government was in fact suppressing Sterling's return by its breaches of contract." Id. This assertion is equally remarkable in that Sterling provides no facts or evidence to support the claim. To our knowledge, no evidence or testimony was proffered to support an alternative rate of return that would have been earned absent the breaches. In fact, one of Sterling's demonstratives illustrates how Sterling's return on average assets (ROAA) bears little or no relationship to its asset size. P-506 (demonstrating that Sterling's ROAA has often decreased as its asset size has grown in the actual world).

Sterling's third claim, that "as Sterling grew, its fixed overhead costs would have been spread under economies of scale," Pl. Br., p. 83, is speculative, unsupported, and was invalidated by Dr. Hamm at trial. Dr. Hamm testified that research shows that economies of scale in the thrift industry are not significant. Thus, Dr. Horvitz wrongly assumed that economies of scale would render his model conservative. Tr. 3824:21-3825:5 (Hamm). In addition, Sterling has not

achieved economies of scale. Quite the contrary, as Sterling's assets have risen, its ratio of general and administrative, or operating expenses (known as "G&A" expenses), has remained nearly the same. Tr. 3825:6-3826:15 (Hamm): DX 3022. Indeed, Sterling's G&A expense ratio was lower in 1989, when assets were $730 million, than at the time of trial, when Sterling estimated its current asset size to be $11.5 billion. Tr. 3826:16-3827:6 (Hamm).[24]

Sterling also argues that unidentified "economies of scope" render Dr. Horvitz's model conservative. Pl. Br., p. 55 (PFF ¶ 269). As explained by Dr. Hamm, however, economies of scope cannot apply to "but for" Sterling, because Dr. Horvitz has not identified the characteristics of the "but for" assets. Therefore, Dr. Horvitz cannot show that Sterling has added more product lines in order to diversify and achieve growth. Tr. 3829:2-3830:10 (Hamm).

Sterling's fourth claim, that "absent the breach, Sterling would have had an opportunity to acquire failing thrift institutions from the Government, which would have been more profitable than Sterling's actual return on assets," Pl. Br., p. 83, is also groundless for all of the reasons set forth previously. Gov. Br., pp. 71-74. In short, Mr. Gilkey admitted he did not know which acquisitions would or would not have been completed absent the breach, in part because Sterling did not control the entire negotiations. Tr. 551:3-19; see also Tr. 541:7-552:25 (Gilkey). He testified that Sterling had to compete with other institutions upon a bid basis to make acquisitions from the Resolution Trust Corporation (RTC), and that he could not say which RTC deals would have happened absent the breach because RTC could sell to whomever they wanted. Tr. 543:17-

---

[24] At trial, Sterling incorrectly suggested that a slowdown in the growth of employees is evidence of economies of scale. Like most thrifts, Sterling has substituted capital for labor by using computers instead of people. Tr. 3827:18-3829:1 (Hamm).

546:2; see also Citizens Fin., 64 Fed. Cl. at 508 (rejecting lost-profits model proffered by Dr. Horvitz notwithstanding evidence of potential acquisitions due to absence of evidence establishing that acquisitions could have been accomplished profitably).

Further, Dr. Hamm testified that it was speculative for Dr. Horvitz to assume that Sterling could have achieved the growth projected in his models through acquisition of branches or whole thrifts. Thrift acquisitions are difficult to accomplish, uncertain, and not under management control. Tr. 3802:3-3803:2 (Hamm). Further, Dr. Horvitz's model makes no allowance for the payment of a cash premium for the acquisitions he assumes would have occurred. Tr. 3806:21-3807:17 (Hamm); see also Citizens Fin., 64 Fed. Cl. at 508 (failure to take into account cash premiums precluded finding that plaintiff would have made profitable RTC acquisitions absent the breach). Moreover, Sterling would not have been a viable candidate for RTC acquisitions, even absent the breach, because it was insolvent on a tangible net worth basis prior to the enactment of FIRREA. Tr. 3813:11-3815:8 (Hamm). Finally, Dr. Horvitz admitted that RTC sales were made in a competitive manner and sold for full market value. Tr. 2729:25-2730:9 (Horvitz). Therefore, his assumption that RTC acquisitions would have been more profitable than Sterling's actual operations is speculative.

**c. Dr. Horvitz's Assumption That "Usual and Ordinary" Assets Of The Type Held By Sterling Were Readily Available Is Incorrect**

Dr. Horvitz avers that his model is conservative because he assumed that Sterling would have held the "usual and ordinary" assets held in the actual world because they were "readily available." Pl. Br., p. 84. This assumption fails for many of the reasons applicable to his assumption that Sterling's "but for" assets would have been as profitable as its actual assets. As

a preliminary matter, this argument has already been rejected in Fifth Third, 55 Fed. Cl. at 241, in which the Court held that the lost-profits model was "speculative as a matter of fact and law" because it assumed "that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results. . . as the actual business activities in which plaintiff engaged. . . ."

Further, even assuming that the market for loans and investments is vast, Sterling has not established that it could have originated profitable assets, because Sterling competed with many institutions that shared its desire to obtain and retain profitable customers, thus limiting what can be achieved in the marketplace. Tr. 3629:3-25 (Hamm). In order for Sterling's "slice of the pie" to be bigger, its competitors' slices had to be smaller. Sterling's competitors included thrifts like Washington Federal and Washington Mutual, commercial banks, money market funds, credit unions, mutual funds, Merrill Lynch cash management accounts, mortgage brokers, retirement systems, and insurance companies. Tr. 3632:18-3633:22 (Hamm); DX3008. These entities compete for same customers as Sterling, and Dr. Horvitz made no allowance for that. Tr. 3633:23-3634:20 (Hamm).

For these reasons, Sterling's claim that its growth in the actual world guarantees that it would have grown even more absent the breach is invalid. As Sterling's expert on the economics of the Northwest, Dr. Conerly, acknowledged, the economy in the Pacific Northwest has been strong, thus enabling all thrifts to grow. Tr. 885:5-10 (Conerly). Dr. Conerly also admitted, however, that Sterling has many competitors, and if the economy has been good for Sterling, it was also good for Sterling's competitors. Tr. 974:18-975:8 (Conerly). Indeed, all other things

being equal, if the economic environment of the Pacific Northwest was consistently stronger than the national average, Dr. Conerly would expect additional competition to move into the area. Tr. 976:9-22 (Conerly). Thus, Dr. Conerly admitted that, in performing a damages analysis, competition would be an important factor to analyze. Tr. 977:2-8 (Conerly). While Dr. Conerly evaluated the size of the "economic pie," he did not analyze how that pie would be split between Sterling and its competitors. Tr. 977:9-978:4 (Conerly).

As demonstrated above, neither did Dr. Horvitz. Therefore, his model, like the model presented in Southern National, should be rejected for its failure to consider competition. In Southern National, the Court rejected a lost-profits model that failed to account for competition, stating that plaintiff's expert "did not believe that competition from other banks 'would have [made] a substantial difference' in the way First Federal obtained additional assets, so his lost-profits calculation does not take competition into account." 57 Fed. Cl. at 305. In rejecting the plaintiff's lost-profits theory, the Court noted:

> Plaintiffs' counsel at oral argument presented the novel theory that First Federal's presence as a "small player in a very, very large and liquid market" obviated the need for [its expert] to account for competition in his lost profits calculation. Plaintiffs have offered no evidence to support this theory, and the court does not credit it, either as a matter of fact or of common sense.

Id. at 305, n.11 (citations omitted).

For all of these reasons, Dr. Horvitz's lost-profits model fails the reasonable certainty test, and should be rejected.

## II. THE COURT SHOULD REJECT PLAINTIFFS' "MITIGATION" DAMAGES BECAUSE DR. JAMES'S MODEL IS FATALLY FLAWED AS A MATTER OF LAW AND DEMONSTRABLY WRONG AS A MATTER OF FINANCE

Sterling does not, as indeed it cannot, distinguish its "mitigation" damages model from those repeatedly rejected by this Court and the Federal Circuit. Nor does Sterling offer a serious defense of the reasoning and assumptions underlying Dr. James's model. Rather, Sterling touts Dr. James's credentials and implies that the credentials should suffice to support his indefensible and uniformly rejected hypothetical model.

### A. Sterling's Mitigation Claim Fails As A Matter Of Law

Sterling's explicit admissions dooms its mitigation claim as a matter of law. Sterling explicitly states that "[t]he capital instrument issued by Sterling in 1991 was common stock on which it did not pay a dividend." Pl. Br., p. 96.[25] Sterling further admits that Dr. James assigned a cost to that common stock by assuming a preferred issuance on which dividends were paid. Id. This hypothetical preferred issuance with its hypothetical dividend payments serves as a "proxy" or "estimate" of actual costs. Tr. 2875:21-2876:7, 3051:17-20 (James); P-500, p. 11. Yet, three times the Federal Circuit has rejected indistinguishable models by Dr. James. Granite Management Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1236-37 (Fed. Cir. 2005); LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003).

[25] In 2005, Sterling commenced the payment of dividends on its common stock. Tr. 1775:3-9. (Byrne); P-103, p. SG100 3530. Dr. James, however, does not offer those dividends as a basis for an award of damages. In fact, the payments are de minimus, and, even if considered as actual costs, would result in no damages because the cash benefits of the capital raised would far exceed the amount of dividends paid on the common stock. Tr. 4021:1-15, 4022:16-4023:18. 4047:8-22; 4049:10-22 (Bajaj). Indeed, the payment of the dividends commenced before Dr. James issued his most recent expert report, in December 2006.

In LaSalle, Dr. James used hypothetical dividend payments from a hypothetical preferred stock issuance as a proxy for the costs the company "actually" incurred. LaSalle Talman Bank v. United States, 45 Fed. Cl. 64, 77, 102 (1999), aff'd in part, vacated in part, 317 F.3d 1363 (Fed. Cir. 2003)). The Federal Circuit rejected that model in its entirety precisely because it did "not reflect the actual experience." LaSalle, 317 F.3d at 1375. In Fifth Third, this Court noted that "[t]he Court of Federal Claims has rejected the theory that models for preferred stock can be used to calculate the cost of replacement capital for goodwill lost through the enactment of FIRREA." The Court also held that "the law does not recognize Professor James's theory." Fifth Third, 55 Fed. Cl. at 243-44. The Federal Circuit agreed. Fifth Third, 402 F.3d at 1236-37. In Granite, the plaintiff replaced the goodwill by a capital infusion on which no dividends were paid. Again, Dr. James purported to measure the cost of this actual infusion on which no dividends were paid by a "proxy" hypothetical issuance of preferred stock and ample hypothetical dividend payments. Yet again, this Court and the Federal Circuit rejected the model, noting once more that the "fatal flaw" in Dr. James's formula is that he ignored the "actual experience." Granite, 58 Fed. Cl. at 778-779, aff'd, 416 F.3d at 1381-82; see also Citizens Fin. v. United States, 57 Fed. Cl. 64, 71 (2003)(in which the Court rejected a "hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy").

Sterling does not even attempt to distinguish its current Dr. James model from those repeatedly rejected by this Court and the Federal Circuit. Indeed, Sterling explicitly admits the "fatal flaw." Sterling's actual experience was to issue common stock on which it paid no dividends, and the model computes damages based upon a hypothetical preferred issuance followed by fictitious dividend payments. Pl. Br., p. 96-97. Thus, Sterling's mitigation damages

are limited to its $900,204 transaction costs. Tr. 4097:20-4098:10; 4264:6-4265:1 (Bajaj); P-672.

This would be the maximum mitigation damages even if we accept for the sake of argument, Dr. James's erroneous assumption, Gov. Br. pp. 90-91, 97-99, that Sterling replaced only $7.57 million in contractual goodwill in its 1991 common stock offering, and the remaining, $4.04 million in contractual goodwill in 1993, when it issued preferred stock to SFC at a dividend coupon rate of 10.75 percent. Tr. 4017:4-17; 4058:20-4059:23 (Bajaj); P-658; P-659. Assuming, incorrectly, that a portion of the dividends paid on the 1993 offering are actual mitigation costs, Sterling is nonetheless not entitled to mitigation damages because it would enjoy a net benefit when earnings on the mitigation capital are considered.

In 1991, Sterling began to accrue earnings on the proceeds of the $7.57 million in common stock that Dr. James identifies as replacement capital. P-658. According to Dr. James's own analysis, Sterling enjoyed a cash benefit of about 7 percent.[26] Tr. 4059:24-4061:24 (Bajaj); P-459. This offsetting benefit of Sterling's capital raising exceeds the alleged cost associated with the $4.04 million of capital allegedly replaced in 1993. Tr. 4059:24-4061:24 (Bajaj). The net cost of the capital replacement, even if the Court assumes that a portion of the mitigation occurred in 1993, is negative. Tr. 4059:24-4061:24 (Bajaj). Consequently, Dr. James cannot create "actual" damages by assuming that a portion of the 1993 offering replaced contractual goodwill eliminated by FIRREA.

[26] The cash benefit rates used by Dr. James for the period between 1991 and 2006 ranged from 4.96 percent to 9.29 percent, for an average of approximately 7 percent. P-459, column [5].

## B. Sterling’s Model Is Invalid As A Matter Of Finance

Setting aside that the dividend costs posited by Dr. James’s model are fictitious and consequently not recoverable, the model is otherwise flawed. Dr. James basis his claimed damages on the spread between the 10.75 percent yield on preferred stock and the 7 percent average benefit received by the bank from investing the cash proceeds in its average assets such as mortgage loans. This spread, however, has nothing to do with FIRREA, or the loss of goodwill. Indeed, it is not a damage or harm of any sort for any reason. Tr. 4032:6-18 (Bajaj). Sterling's noncumulative preferred stock gave the thrift the option and flexibility to not pay dividends any time it deemed it prudent to forgo such payments. The 10.75 percent rate was the price of that flexibility, and a compensation to the holders of the preferred stock for the fact that they are taking the risk that Sterling may reduce or entirely eliminate dividend payments at any time. Tr. 4042:14-4044:9 (Bajaj).

By contrast, Sterling's mortgage borrowers "have to make their interest payments or the collateral will be repossessed." Tr. 4032:19-4033:15 (Bajaj). The 7 percent yield on these assets reflect the fact that the payment is required and Sterling is taking far less risk than the holders of preferred stock. Thus, the difference in yield upon which Dr. James basis his damages calculation has nothing to do with replacement costs, or loss of the goodwill.

The spread is also unrelated to the breach. Moreover, it is not a harm. Rather it reflects the fact that the company is obtaining a reduction of risk as a result of that spread. Tr. 4041:18-4042:13 (Bajaj). If the bank did not want this risk reduction, it could eliminate the spread by investing in riskier assets with higher yields. Tr. 4093:12-4095:15 (Bajaj). For example, if Sterling raised $15 million at a yield of 10.75 percent, it could invest that money in

riskier assets offering the same 10.75 percent return and eliminate any spread. Even if there were no such assets available, then Sterling could simply take a larger group of assets from its balance sheet (which always exceeded $590 million) and slightly increase the risk, and thus the expected return, on those assets. That would also eliminate the spread upon which Dr. James relies to compute his alleged damages. Tr. 4093:12-4095:15 (Bajaj).

Neither of Sterling's experts offered any response to Dr. Bajaj's critique. Sterling did not ask one question on cross examination relevant to this argument. Sterling's brief does not explain how the spread between a risky preferred stock and a collateralized mortgage loan can possibly reflect damage, let alone damage caused by the breach. In short, Dr. James's model is indefensible, even if the Court was to ignore the "fatal flaw" that the dividends are fictitious.

### C. <u>Sterling's Assertions Are Demonstrably Wrong And Unavailing</u>

Sterling's admission that its "actual experience" was to raise common stock upon which it paid no dividends, and that its model is based upon a hypothetical preferred issuance with fictitious dividend payments, is sufficient to reject its mitigation claim regardless of any other assertions that Sterling may offer. Nonetheless, we address some of Sterling's assertions herein.

Sterling falsely accuses us of arguing that capital is free or that it has no costs. Pl. Br., p. 97. We do neither. When a company issues stock it sells a claim on its future earnings. The market values that claim and the price the company receives for that stock equals precisely all the expected benefits that the holders of the stock expect to receive. As Dr. Horvitz himself admitted, when a company issues stock, at the time of capital raising, all the expected cash flows from the stock issued are exactly equal to the cash the company receives in return for that stock. Tr. 2605:24-2606:25 (Horvitz). This does not mean that the stock is free or that capital has no

cost. Rather, precisely because nothing is free, the amount of cash the company receives equals the value of the stock the company gives up in return for the cash. Likewise, because nothing is free the company will not give away any free stock, nor will the investors give away free cash. Each will insist on equal value, thus the net costs are transaction costs. Tr. 4044:14-4046:1 (Bajaj). The Supreme Court has recognized this same principle. "[A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase payment is offset by ownership of a share that possesses equivalent value at that instant." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005)(emphasis in original).

Indeed, both this Court and the Federal Circuit have previously concluded that an award of transaction costs would fully account for the expected cost of capital because the cash the thrift received would be of equal value to the future distributions for the stock issued. CalFed, 245 F.3d at 1350 ("[F]loatation costs provide[ ] an appropriate measure of . . . damages incurred in replacing the supervisory goodwill with tangible capital."); see Bank United, 50 Fed. Cl. at 665..

Sterling is correct that there is a line of cases that holds that regardless of the valuation at the time of issuance, the Court should focus on the "actual experience" after the issuance and measure the costs and benefits that actually occurred and award damages if any on that basis. LaSalle, 317 F.3d at 1375. This approach however would not aid Sterling. As demonstrated in our opening brief and above, Sterling's "actual experience" shows that it received benefits from the capital that far outweigh any actual cognizable costs. Sterling reported that the capital it raised in 1991 resulted in an immediate and significant improvement in its profits and return on equity. P-84, p. 0063100-01; Tr. 2581:4-2583:20 (Horvitz). Moreover, Sterling admits that it

paid no dividends on this capital. Pl. Br., p. 96. Thus, "[t]he benefits would overwhelm the cost by several orders of magnitude." Tr. 4049:10-22 (Bajaj).

Unable to claim actual costs either on an ex ante or an ex post basis, Sterling seeks to straddle the various approaches to computing costs in a vain attempt to manufacture damages. Sterling states that common stock has a higher risk than preferred stock and thus carries a higher "expectation of returns on investment." Pl. Br, p. 93. The higher risk, however, is borne by the shareholder, not the company. The fact that the investor hopes that the value of his stock will increase and that he will be able to sell it to other investors at a higher price is not a damage to the company. As this Court held, a transfer from one shareholder to another does not create a damage to the institution. Bank of America FSB, v. United States, 67 Fed. Cl. 577 at 591 (2005) aff'd 495 F.3d 1366 (Fed. Cir. 2007). Indeed, the Court held that regardless of the return the shareholders "expected" to receive on their retained earnings, the only cost that is cognizable is the dividends the company actually paid on those retained earnings. Id., 67 Fed. Cl. at 588-89. In short Sterling cannot obtain a cash award to compensate for payments that it never made.

Finally, unable to defend Dr. James's model as a matter of economics or finance and unable to reconcile it with the models the Federal Circuit has repeatedly rejected, Sterling touts Dr. James's resume and credentials as if they should suffice to cure the model's analytical and legal problems. Sterling claims that Dr. James's credentials "far outweigh those of any expert called by the Government," Pl. Br., p. 95, and boasts that Dr. James has been qualified as an expert in "five Winstar cases." Pl. Br., p. 67 (PFF ¶ 330). Yet, in three of those cases he offered a model identical to the model he presents here, and the Federal Circuit rejected the model in toto, Dr. James's credentials not withstanding. LaSalle, 45 Fed. Cl. at 77, 317 F.3d at 1375;

Fifth Third, 55 Fed. Cl. at 243-44, 402 F.3d 1221, 1236-37 (Fed. Cir. 2005); Granite, 416 F.3d at 1381-82. In a fourth case, in which Dr. James offered a lost-profits model, this Court rejected the model in its entirety finding that "Professor James was a persistent advocate for plaintiff on the merits. His opinions generally were not persuasive compared with those of defendant's experts."[27] CalFed, 54 Fed. Cl. at 707. Further, this Court found that Dr. James selected a "proxy" for his model in order to "inflate" damages. "Professor James inflated profits . . . . Professor James used a funding proxy in his model that repriced frequently because he knows that interest rates declined during the early 1990's. In reality, the bank thought interest rates were going to rise during that period, and would not have taken such a gamble." Id. at 708 (emphasis added). The Court should reject Dr. James's use of a "proxy" to create fictitious dividend costs, notwithstanding his resume.

## III. THE COURT SHOULD REJECT STERLING'S ALLEGED WOUNDED BANK CLAIMS AS A MATTER OF LAW

We have addressed Sterling's contentions regarding its wounded bank damages in our prior brief. Gov Br., pp. 16-22, 105-117. Here, we simply show that given the undisputed facts, Sterling's wounded bank claims fail as a matter of law.

One of the essential assumptions for the wounded bank claim is that absent the breach, the regulators would have preapproved dividend payments and Sterling's 1989 offering would have succeeded. Without that assumption, Sterling would have been out of capital compliance and would have suffered the very same wounded bank damages as well as the same alleged lost-profits damages. See Tr. 2748:23-2749:18 (Horvitz).

[27] Dr. Hamm was one of those Government's experts in CalFed.

Sterling claims that it possessed a contractual right to the payment of dividends. Tr. 1819:13-17 (Byrne). In August 2006, the Court ruled that Sterling did not possess such a right. Sterling, 53 Fed. Cl. at 614-615. It is undisputed that regulatory preapproval of dividend payments is unprecedented. Tr. 3676:9-3677:6 (Hedlund); Tr. 2221:11-2222:5 (Friend) (OTS's policy of not preapproving dividend payments was "long-standing"). None of Sterling's fact or expert witnesses could cite to any case where OTS preapproved dividend payments. Moreover Mr. Byrne admitted that the uncertainty surrounding the payment of dividends on its 1989 offering would have existed even if the Tri-Cities and Lewis Federal goodwill had been grandfathered under FIRREA. Tr. 1815:11-1816:24 (Byrne).

Thus, Sterling's wounded bank claims, like its lost-profits model, are premised upon the assumption that the regulators would have taken the unprecedented step of preapproving dividend payments. Sterling bears the burden of proving not only the reasonable certainty of its overall claim but also of each of the underlying assumptions. Southern Pacific Communications v. AT&T, 556 F. Supp. 825, 1076 (D.D.C. 1982); see Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 911-13 (2d Cir. 1962). A model that is premised upon a speculative assumption cannot be reasonably certain.

Moreover, Sterling claims that its wounded bank damages claims are "conservative" because it abandoned its claim for legal, accounting, and insurance costs, and because it "chose not to include in its wounded bank calculations those figures that were undoubtedly a result of its troubled status but that could not be precisely measured." Pl. Br., p. 95. In effect, Sterling suggests that the Court should award the claimed wounded bank damages, even if deficient, because there were other damages that it did not assert. Such reasoning is, at best, meritless. See

CalFed, 54 Fed. Cl. at 710 (inaccuracies in damages model that offset each other result in "haphazard method for an expert to use.").

In addition to being premised upon demonstrably false assumptions, the wounded bank damage claims fail as a matter of law for additional reasons.

### A. Sterling's Claim For Damages Associated With The CJ-4 Loan Fails As A Matter Of Law

Sterling asserts that but for the breach, it would have been able to make further loans to the borrower, and that additional loans would have led to avoidance of a loss on the CJ-4 Loan. Pl. Br., p. 94. We have shown that all of Sterling's factual contentions regarding this claim are false. Gov. Br., pp. 108-110. Even if, for the sake of argument and contrary to fact, we accept Sterling's factual assertions, the claim fails as a matter of law. If any prospective lender at the time could have foreseen Sterling's allegation that additional loans would have cured the problem and resulted in no default, then they would have extended credit to the borrower and the default and subsequent loss would have been averted. After all, the borrower was free to obtain financing from anyone who believed that the borrower would eventually make good on the debt. Foreclosure occurred precisely because no lender at the time foresaw or believed Sterling's current assertions. This renders Sterling's CJ-4 claim the classic Restatement example of an unforeseeable claim. The Restatement makes clear that since "credit is so widely available," it is simply not foreseeable that "the borrower will be unable to make substitute arrangements." Restatement (Second) of Contracts § 351 cmt. e.

### B. <u>Sterling's Claim For Excess Supervision Costs Fails As A Matter Of Law</u>

Sterling claims to have incurred excess supervision costs as a result of the breach. Pl. Br., p. 94. Mr. Byrne, however, conceded that he did not know whether OTS would have conducted the complained of examination if the exclusion of the non-contractual Central Evergreen goodwill alone would have resulted in Sterling's noncompliance with the minimum capital requirements. Tr. 1932:3-1933:17 (Byrne).

Moreover, the regulators determined that, "given Sterling's high amount of growth in the past three years, asset quality concerns, poor financial condition and low rated management, the association is highly susceptible to fraud[,]" and was "tied for first" on a fraud matrix compiled of Seattle district institutions. Tr. 2267:4-2268:3 (Friend); DX 470 at 2108. Given these findings it is perfectly appropriate and consistent with the contracts for the regulators to pay particular attention to Sterling's activities and to ensure that it is operated in a safe and sound manner.

Dr. Horvitz explained that thrifts with little capital are likely to take imprudent risk. "Since the new owners have little capital of their own at stake, there is a strong tendency towards excessive risk taking." Tr. 2740:6-8; DX 1076 at 149. Indeed, he stated that this was precisely the cause of the thrift crisis. Tr. 2740:3-2741:5. Given that, even with the goodwill forbearance fully in place, the regulators would have and indeed should have paid close attention to ensure the thrift's safety and soundness.

Mr. Byrne also acknowledged that a March 1990 assessment was calculated using a formula that applied to all thrifts, regardless of their exam rating. The methodology required OTS to multiply the level of assets maintained by each thrift by a standard rate. P-337, pp.

SG0803453-54, SG0803460; Tr. 1918:24-1920:10, 1975:8-1976:5 (Byrne). Further, Sterling's claim for seven additional assessments imposed between 1990 and 1991 fails, as demonstrated in our opening brief, because Sterling would have been assessed as a troubled thrift even absent the breach. Gov. Br., p. 111-12.

### C. Sterling's Claim For The Costs Of the 1989 Offering Fails As A Matter Of Law

Sterling claims that absent the breach the regulators would have preapproved dividend payments and its 1989 public offering would have succeeded. Pl. Br., p. 95. We have demonstrated that Sterling's assertions are simply false. Gov. Br. pp. 114-116. The claim, however, fails as a matter of law. Dr. Horvitz admitted that if the regulators had informed Sterling that they would not grant the pre-approval that Sterling was seeking, and Sterling nonetheless continued to incur expenses, then such expenses should not be part of wounded bank damages. Tr. 2799:4-2800:3 (Horvitz). There is no dispute that Sterling continued to incur these expenses even after they were notified that no pre-approval would be granted. Gov. Br., pp. 114-116. Thus, the claim fails.

Moreover, Dr. Horvitz admitted that, in the "but for" world, Sterling would have had to incur transaction costs to raise capital in 1989. Tr. 2800:12-23 (Horvitz). Indeed, absent such a capital raising in 1989, his lost-profits model would become zero. Tr. 2800:17-19 (Horvitz). According to Sterling's own theory, these alleged costs would have been incurred in the no breach world, and, as such, they are simply not compensable.

### D. Sterling's Claim For The Costs Of Acquiring The Great American Branch Fails As A Matter Of Law

Sterling admits that Dr. Horvitz based his wounded bank calculations upon information and data that he received from Mr. Byrne. Pl. Br., p. 56. Sterling further admits that Dr. Horvitz "did not verify" this information and thus "must rely on Sterling for [its] accuracy." Id. Further, Sterling's counsel acknowledged that Mr. Byrne failed to testify about his calculation of the damage attributable to the Great American Saving Bank wounded bank claim. Therefore, the claim is unsupported by the record. Tr. 2737:5-2738:2 (Weatherhead). This alone suffices to dispose of the claim. Gov Br., pp. 106-108; see CalFed, 54 Fed. Cl. at 715 (2002)(model that was entirely dependent upon what expert was told by management was "naive" and not helpful to the Court).

Sterling claims that, but for the breach, it would have bought a Great American branch for $63,000. It claims that the branch increased in value to over $1.8 million five years later and it seeks damages for that incredible appreciation. Not only does the record contain no factual evidence to support the allegations, but the allegations themselves are the classic example of an unforeseeable claim.

The Federal Circuit has held that while the Government can foresee that a plaintiff in a Winstar-related case would have to raise capital to replace the goodwill, a claim for the losses from selling the thrift's "crown jewels" is unforeseeable, because the Government would have had no reason to foresee at the time of the contract that a sale of the "crown jewels" would be the only source of replacement capital. Old Stone, 450 F.3d at 1376. Similarly, it could not have been foreseeable at the time of the contract that the breach would cause Sterling to lose the

opportunity to buy a $1.8 million asset for a mere $63,000. If Great American or any one else foresaw that the branch's value would increase 62-fold in five years, then they certainly would not have sold it for $63,000. If anyone foresaw this alleged increase, the asset's price would immediately have risen to reflect that anticipated increase. Tr. 4110:23-4112:19 (Bajaj). Thus, the damage Sterling alleges, even if we accept as true all of its implausible and unsupported assertions, was not foreseeable.

### E. Sterling's Belated Claim For Damages For Failing To Bid On RTC Sales Fails As a Matter Of Law

Neither Sterling nor Dr. Horvitz have quantified any alleged damages from failing to bid on RTC sales. Indeed, Sterling's claim that such damages should be included under the wounded bank theory was advanced for the first time in its post-trial brief. The claim is untimely and utterly without merit.

Dr. Horvitz admitted at trial that the RTC sold its products at fair market value, in a competitive bidding process. Tr. 2729:9-2730:3 (Horvitz). Indeed, he published a peer reviewed article proving that point. Id.; DX 1065. Thus, the ability to bid on RTC sales would have provided no inherent value. Moreover, Dr. Horvitz prepared no analysis to determine whether Sterling would have been the winning bidder absent the breach. Tr. 2734:24-2735:3 (Horvitz). Indeed, Dr. Horvitz opined, also without analysis, that all of his Winstar clients would have been successful purchasers of RTC products in the no breach world. This included Citizens, Ben Franklin, Glendale and So Cal. Tr. 2726:7-2628:12 (Horvitz). Thus, Sterling's belated, unquantified claim for damages is as baseless as it is untimely.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in our initial brief, Sterling is entitled, at most, to an award of transactions cost damages in the amount of $900,204.00, to compensate for its replacement of contractual goodwill.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/ Elizabeth M. Hosford

Of counsel:

TAREK SAWI
Senior Trial Counsel
MELINDA HART
DELISA SANCHEZ
WILLIAM KANELLIS
ELIZABETH HOLT

ELIZABETH M. HOSFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0332

November 19, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on November 19, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Elizabeth M. Hosford