DRAFT 11/19/07 @ 5:00 pm

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S RESPONSE TO**
**DEFENDANT'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND LAW**

WITHERSPOON, KELLEY, DAVENPORT
& TOOLE, P.S.
1100 US BANK BUILDING
422 W. RIVERSIDE
SPOKANE, WA 99201
Tele: (509) 624-5265

WILLIAM D. SYMMES
LESLIE R. WEATHERHEAD
WILLIAM M. SYMMES

November 19, 2007

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STERLING'S RESPONSES TO THE GOVERNMENT'S REPEATED OBJECTIONS . . 2

A. STERLING WOULD HAVE BEEN COMPLIANT WITH FIRREA'S CAPITAL RATIO REQUIREMENTS HAD THE GOVERNMENT HONORED ITS OBLIGATIONS . . . . . . . . . . . 2

1. *The Court Has Already Ruled That Sterling Has A Contractual Right To Include All The Supervisory Goodwill From The Lewis Federal And Tri-Cities Transactions As Capital Without Limitation* . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. *Pursuant To The Court's Prior Ruling, The Central Evergreen Contract, And FIRREA's Mandate, Sterling Is Entitled To Include The Qualifying Supervisory Goodwill From The Central Evergreen Transaction Toward Its Regulatory Capital Ratio Requirement – To The Extent Permitted By Law* . . . . . . . . . . . . . . . . . . . 4

3. *In Evaluating The But-For Sterling's Post FIRREA Capital Compliance, The Court Should Include The $10.5 Million, Which But For The Breach Would Have Been Realized By The Failed 1989 Stock Offering* . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. THE GOVERNMENT'S ARGUMENTS REGARDING EXCESS CAPITAL AT STERLING'S HOLDING COMPANY LEVEL ARE WRONG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. *Sterling's Actual History And Performance Belie The Government's Position* 16

2. *To The Extent That Sterling Financial Corporation Held Any Capital That It Did Not Downstream, It Was Obliged To Do So* . . . . . . . . . . . . . . . . . . . . . . . . . 22

3. *The Government's Argument That Sterling Should Have Operated Below The "Well-Capitalized" Standard Should Be Rejected* . . . . . . . . . . . . . . . . . . . . . . 10

III. STERLING'S DAMAGES MODELS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A. STERLING IS ENTITLED TO LOST PROFITS AS A LOST VOLUME SELLER . . . . . . . . . . 29

B. DR. HORVITZ'S MODEL ESTABLISHES DAMAGES WHICH ARE FORESEEABLE, CAUSED BY

THE BREACH, AND PROVEN WITH A DEGREE OF REASONABLE CERTAINTY WELL OVER THE MODEST THRESHOLD REQUIRED . . . . . 31

1. *That Sterling Would Be Forced To Forego Assets And Profits In The Event Of A Breach Was Foreseeable* . . . . . 32

2. *Sterling's Foregone Assets And Lost Profits Were Caused By The Breaches* . 35

a. The Government's Breach Caused Sterling To Forgo Profitable Assets . 39

3. *Sterling Has Proven With Reasonable Certainty That The Government's Breach Resulted In Approximately $63 Million In Lost Profits* . . . . . 44

a. Sterling Established Forgone Assets With Reasonable Certainty . . . . . . 45

b. Dr. Horvitz's Use Of 4% As The Government's "Alternate But-For World" Sterling's Capital Ratio Is Proper And Does Not Impair The Certainty Of His Calculations . . . . . 50

2. *Sterling Established The Profitability Of The Forgone Assets With Reasonable Certainty* . . . . . 51

3. *Sterling's Lost Profits Model Is Based In Facts Not present In Other Winstar Cases* . . . . . 54

4. *Sterling's Occasional Failure To Meet Budgeted Growth Does Not Render Dr. Horvitz's Model Speculative* . . . . .

C. IF THE COURT DOES NOT ACCEPT STERLING'S LOST PROFITS MODEL, IT SHOULD AWARD COSTS OF REPLACEMENT DAMAGES. . . . . .

1. *Dr. James' Model Is Not A Hypothetical Model And His Use Of The Preferred Stock's Coupon Rate As A Proxy For The Costs Of Raising Common Stock Is Reasonable And Results In A Reliable And Proper Award Of Replacement Cost Damages* . . . . .

2. *Assuming Sterling Replaced All The Capital Lost To FIRREA, It Could Not Have Done So Until After The 1993 Offering Was Completed* . . . . .

3. *The Government's Notion That Raising Capital Has No Costs Beyond Transaction Costs Has Been Rejected By The Courts* . . . . .

4. *The Court Should Award A Tax Gross Up Unless The United States Is Willing To State On The Record That Any Award Will Not Be Taxable* . . . . .

D. **THE COURT SHOULD AWARD WOUNDED BANK DAMAGES** . . . . . . . . . . . . . . . . . . . .

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S. Ct. 1011 (1974) . . . . . . . . . . . . . . . . . . . . .

*American Federal Bank, F.S.B. v. United States*, 68 Fed. Cl. 346 (2005) . . . . . . . . . . . . . . . . . . .

*Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126 (2003) . . . . . . . . . . . . . . . . . . . . . . . .

*Bluebonnet Sav. Bank, F.S.B. v. U.S.*, 266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . .

*Bull v. U.S.*, 65 Fed. Cl. 407 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*California Federal Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . .

*California Federal Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed. Cir. 2001) . . . . . . . . . . . .

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd*, 301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . .

*Citizens Financial Service, F.S.B. v. United States*, 64 Fed. Cl. 498 (2005) . . . . . . . . . . . . . . . . . .

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . .

*Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . .

*Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) . . . . . . . . . . . . . . . . .

*Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345 (Ct. Cl.1969) . . . . . . . . . . . . . . .

*Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003) . . . . . . . . . . . . . . . . . .

*Fifth Third Bank v. United States*, 71 Fed. Cl. 56 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*First Federal Savings and Loan Association of Rochester v. United States*, 76 Fed. Cl. 99 (2007)

*Foley Co. v. United States*, 11 F.3d 1032 (Fed. Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*George A. Fuller Co. v. United States*, 108 Ct. Cl. 70, 69 F. Supp. 409 (1947) . . . . . . . . . . . . . . .

*Gianetti v. Norwalk Hospital*, 833 A.2d 891 (Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Glendale Fed. Bank. F.S.B. v. United States*, 378 F.3d 1308 (Fed. Cir. 2004) . . . . . . . . . . . . . . . .

*Globe Savings Bank, FSB v. United States*, 59 Fed. Cl. 86 (2003) . . . . . . . . . . . . . . . . . . . . . . . . .

*Granite Management Corp. v. United States*, 58 Fed. Cl. 766 (2003) . . . . . . . . . . . . . . . . . . . . . .

*Guaranty National Insurance Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990) . . . . . . . . . . . . . . . . . .

*Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972 (1965) . . . . . . . . . . . . . . . . .

*Home Sav. of. America v. United States*, 57 Fed. Cl. 694 (2003) . . . . . . . . . . . . . . . . . . . . . . . . .

*Landmark Land Company, Inc. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . .

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . .

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*LaSalle Talman Bank v. United States*, 64 Fed. Cl. 90 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Locke v. United States*, 151 Ct. Cl. 262 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734 (Ct. App. Texas 1992) . . . . . . . . . . . . . . . .

*McAbee Constr., Inc. v. United States*, 97 F.3d 1431 (Fed. Cir.1996) . . . . . . . . . . . . . . . . . . . . . .

*Northrop Grumman Information Technology, Inc. v. United States*, 78 Fed. Cl. 45 (2007) . . . . . .

*Praecomm, Inc. v. U.S.*, 78 Fed. Cl. 5 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460 (2006) . . . . . . . . . . . . . . . . . . . .

*S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007) . . . . . . . . . . . . . . . . . . . . . . . .

*Southern California Federal Savings & Loan Association v. United Sates*, 57 Fed. Cl. 598 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Southern California Federal Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319 (Fed. Cir. 2005) . . . . . .

*Southern National Corporation v. United States*, 57 Fed. Cl. 294 (2003) . . . . . . . . . . . . . . . . . . .

*SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662 (Fed. Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . .

*Standard Federal Bank v. United States*, 62 Fed. Cl. 265 (2004) . . . . . . . . . . . . . . . . . . . . . . . .

*Sterling Savings Assoc. v. USA*, 53 Fed. Cl. 599 (2002), *amended on other grounds*, 72 Fed. Cl. 404 (2003), *vacated in part on rehearing* by 72 Fed. Cl. 404 (2006) . . . . . . . . . . . . . . . . . . . . . . . . .

*Sterling Savings Assoc., v. United States*, 72 Fed. Cl. 404 (2006) . . . . . . . . . . . . . . . . . . . . . . . .

*Stockton East Water Dist. v. United States*, 75 Fed. Cl. 321 (2007) . . . . . . . . . . . . . . . . . . . . . . .

*Story Parchment Co. V. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S. Ct. 248 (1931) . . .

*United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir.1983) . . . . . . . . . . . . . . . . . . . .

*Winstar Corp. v. United States*, 518 U.S. 839, 116 S. Ct. 839 (1996) . . . . . . . . . . . . . . . . . . . . . .

*Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 119 S. Ct. 391 (1998) . . . . . . . . . . . . .

**FEDERAL STATUTES**

U.S. Const. Art. I., Sec. 10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

12 U.S.C. § 1464(t)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

12 U.S.C. § 1831e(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Financial Institutions Reform, Recovery and Enforcement Act of 1989 . . . . . . . . . . . *ad passim*

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS § 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

RESTATEMENT (SECOND), § 347, comment (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STERLING SAVINGS ASSOCIATION, a state-chartered savings association, STERLING FINANCIAL CORPORATION, a Washington Corporation,<br><br>Plaintiffs,<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Court No. 95-829-C<br><br>(Judge Wheeler) |

**STERLING'S RESPONSE TO**
**DEFENDANT'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND LAW**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The Government's arguments are premised on a purely theoretical world. A world with perfect information. A world with no transaction costs. A world with no market or human friction to deploying capital. A world where infrastructure materializes instantly to facilitate immediate expansion. A world where "capital flows like water."

Sterling Savings Association ("Sterling") does business in the real world. A world where growth is accretive. A world where infrastructure must gradually be developed to serve the requirements of deliberate business growth. A world where acquisitions take time to digest. A world where people must be trained. A world with actual imperfect capital markets rather than instantaneous omniscient markets of laissez faire perfection. Sterling's growth and profitability from

a $2.1 million dollar institution in 1983 to a more than $10 billion dollar institution today provides more than sufficient evidence and support for the application of the volume seller rule to enable the Court to arrive at "reasonable approximation of the damages" owed to Sterling in the form of lost profits. *See Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

## II. STERLING'S RESPONSES TO THE GOVERNMENT'S REPEATED OBJECTIONS

The Government raises two objections in most every section of its brief. These two arguments are: (1) that Sterling would have been non-compliant with the FIRREA's capital ratio requirements in the "but-for" world and (2) that Sterling, and SFC, maintained excess capital. Rather than responding to these arguments each time the Government raises them, Sterling opts to respond to each of them at the outset and once.

### A. STERLING WOULD HAVE BEEN COMPLIANT WITH FIRREA'S CAPITAL RATIO REQUIREMENTS HAD THE GOVERNMENT HONORED ITS OBLIGATIONS.

Much of the United States' argument involves various assertions that even if the Lewis Federal and Tri-Cities contracts had been honored, Sterling still would have been capital non-compliant after the enactment of FIRREA. The numbers and the accounting are not disputed; this is not a question of accounting or for expert opinion. It is merely a question of law.

Sterling had a right under its contracts to count the following items toward its regulatory capital requirements: (1) its actual capital calculated under GAAP; (2) the contractual goodwill from the Lewis Federal transaction (subject to amortization); (3) the contractual goodwill from the Tri-Cities transaction (subject to amortization); and (4) the contractual goodwill from the Central Evergreen transaction, in an amount equal to that permitted under FIRREA and subject to FIRREA's phase out provisions. Additionally, as a direct and foreseeable consequence of the Government's breach, Sterling was unable to complete its intended 1989 unit stock offering, the proceeds of which

together with the supervisory goodwill, would have been sufficient to render Sterling compliant with FIRREA's capital ratios. Though it has been determined that Sterling had no contractual right to the unit offering, the refusal to approve the dividend payment was a direct and foreseeable consequence of the Government's breach – based upon the conclusion that Sterling would not thereafter be capital compliant under FIRREA, a conclusion that was the direct contravention of Sterling's contractual right to treat goodwill as regulatory capital.

The Government, missing the point, erroneously asserts: (1) that the Central Evergreen contract was not breached and therefore Sterling cannot include any contractual goodwill from that transaction in its calculations; and (2) that Sterling had no contractual right to declare dividends during the 1989 offering. From these false premises, the Government concludes that Sterling would have been post-FIRREA capital deficient in the but-for world. From this conclusion the Government argues that Sterling's damages models are speculative, not foreseeable and not reasonably certain.

***1. The Court Has Already Ruled That Sterling Has A Contractual Right To Include All The Supervisory Goodwill From The Lewis Federal and Tri-Cities Transactions As Capital Without Limitation.***

Before FIRREA, thrifts had a single capital ratio requirement; there was no distinction between core, tangible and risk-based capital. These distinctions were first introduced with the enactment of FIRREA. The Government and Sterling entered into the Lewis Federal and Tri-Cities agreements under the pre-FIRREA regime.

In 2002, the Court decided cross motions for summary judgment as to liability. *Sterling Savings v. United States*, 53 Fed. Cl. 599 (2002) (*Sterling I*). The Court held:

> . . . with respect to the Lewis and Tri-Cities transactions, the Court finds that Defendant breached the contractual rights of Plaintiff to the use of supervisory goodwill and FSLIC cash contributions for regulatory capital

> purposes and to amortize the goodwill over 40 and 15 years, respectively. Defendant also breached its contractual obligation with respect to the Lewis and Tri-Cities transactions to forbear from exercising its regulatory authority against Plaintiff for failing to meet its regulatory ratio requirements when it imposed restrictions on Plaintiff's operations.
>
> *Sterling I*, 53 Fed. Cl. at 615.

Thus, it has already been established that Sterling had a right to count the entirety of the Lewis Federal and Tri-Cities supervisory goodwill toward its capital requirement ratios. There has been no dispute regarding the fact that Sterling was entitled to count "every penny of the goodwill and capital credits" from the Lewis Federal and Tri-Cities transactions toward its capital ratio requirements subject to the amortization schedules set forth in the contracts. (*See* Schott, Tr. 2490, line 22 through 2491, line 6).

When Sterling contracted with the Government it contracted for regulatory capital without restriction that could be leveraged in the same manner as cash. The Government cannot reclassify that capital as "qualifying supervisory goodwill" – a concept which did not exist at the time of contracting.

***2. Pursuant To The Court's Prior Ruling, The Central Evergreen Contract, And FIRREA's Mandate, Sterling Is Entitled To Include The Qualifying Supervisory Goodwill From The Central Evergreen Transaction Toward Its Regulatory Capital Ratio Requirement – To The Extent Permitted By Law.***

Though the parties are in complete agreement regarding the Lewis Federal and Tri-Cities transactions there is significant disagreement regarding how the Court should regard the supervisory goodwill stemming from the Central Evergreen transaction. The Government's position is that the Court's 2006 order on reconsideration (*Sterling Savings Association v. United States*, 72 Fed. Cl. 404 (2006) (*Sterling V*) stripped Sterling of any contractual right to the Central Evergreen supervisory goodwill. Sterling submits that the Court's ruling did no such thing. In fact, during the

Government's cross examination of Allan Schott, the Court indicated that the Government's expressed view goes too far:

> If I understand your question, it does seem to be an improper hypothetical. It does not reflect the court's holding about the Central Evergreen transaction . . . Just to elaborate on that, the court held, regarding the Central Evergreen transaction, that the Plaintiff Sterling assumed the risk of any change in regulations that might occur after the date of the transaction. But I don't think it goes so far as to say that the supervisory goodwill should be ignored thereby. It still is an item that ought to be treated to the extent it might be allowed thereafter on a phase-out basis by FIRREA.
>
> (Schott, Tr. 2485, line 21 through 2486, line 10).

As demonstrated in Sterling's opening brief, and as indicated above, the Court's ruling in no way strips Sterling of any rights under the Central Evergreen contract. Instead the Court's ruling was that the contract requires Sterling to accept the risk of regulatory change, that is, accept that its rights and obligations under the contract could be modified by a subsequent regulatory change. Such a regulatory change occurred with the enactment of FIRREA. Before FIRREA, the Central Evergreen contract permitted Sterling to count the supervisory goodwill credited in the Central Evergreen transaction as capital without limitation. After FIRREA, the Central Evergreen contract permitted Sterling to count the supervisory goodwill therefrom toward its core and risk-based capital requirements in an initial amount equal to or less than 1.5% of the bank's total assets. Counsel for the Government conceded that " . . . the Tri-Cities and Lewis Federal contracts do not tell us anything about what we can or cannot do with Central Evergreen's goodwill . . ." (Schott, Tr. 2489, lines 9-12). That concession is correct, in so far as it goes, but the facts demonstrate that a major objective of the Tri-Cities contract was to facilitate the Central Evergreen merger. The Court should reject a constricted reading of the Tri-Cities contract that would render the Central Evergreen merger unsupportable.

In addition to having a contractual right to so count the supervisory goodwill from Central Evergreen, Sterling had a statutory right to include that goodwill in its regulatory capital calculations. This Court has recognized that rights and obligations arising *ex contractu* are separate and distinct from those arising from statute or common law. *See Bull v. U.S.*, 65 Fed. Cl. 407, 413 -14 (2005) (*citing Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 78-9, 119 S. Ct. 391 (1998); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49-50, 94 S. Ct. 1011 (1974)). At the time of the breach, pursuant to FIRREA [specifically 12 U.S.C. § 1464(t)(3)(A)] an eligible savings association had a right to "include qualifying supervisory goodwill in calculating core capital." The amount of supervisory goodwill that FIRREA permitted to be included in a thrift's capital calculations began at 1.5% of total assets and phased out to 0% at the year's end of 1994. 12 U.S.C. § 1464(t)(3)(A). This right inured to Sterling without regard to its contracts with the Government; the contract rights are additive to the rights Sterling otherwise has under statute. The Court heard expert testimony that "contractual capital" and "qualifying supervisory goodwill" are separate and distinct; pointedly the Court heard expert testimony that "[c]ontractual assistance exists and is based upon the contract that created it and it exists in accordance with the terms and conditions of that contract[, while] [q]ualifying supervisory goodwill is a grant of authority by FIRREA . . ." (Schott, 2454, lines 2-5; 2455, lines 8-14). The Government's experts were fully in agreement. (Plaintiff's Findings Nos. 284-293).

The Government and Sterling understood and recognized that the acquisitions of Tri-Cities and Central Evergreen were inextricably connected. Sterling evaluated the possibility of acquiring Tri-Cities without government assistance. (Plaintiff's Findings Nos. 58 & 59). However, after mere hours of investigation, Sterling chose not to acquire Tri-Cities. (Plaintiff's Findings No. 60). Subsequent to Sterling's refusal to acquire Tri-Cities, it was contacted by the Government and asked

if it would be interested in acquiring Central Evergreen; Sterling declined due to Central Evergreen's size, problems, and Sterling's lack of capital. (Plaintiff's Findings Nos. 61 & 62). After Sterling had declined to acquire these two failing thrifts it was again contacted by the Government, this time with a proposal under which the regulatory capital from acquiring Tri-Cities would enable Sterling to acquire Central Evergreen. (Plaintiff's Findings Nos. 63 & 64). The governmental regulators wanted Sterling to acquire Central Evergreen, and noted that it was necessarily "subject to Sterling getting Tri-Cities." (Plaintiff's Findings No. 76).

Despite: (1) *Sterling V*,; (2) FIRREA's clear mandate; and (3) the undisputed factual evidence that the parties mutually understood that the Tri-Cities and Central Evergreen acquisitions were dependent upon one another, the Government persists in arguing that Sterling was not permitted to count the qualifying supervisory goodwill from the Central Evergreen transaction (up to 1.5% of total assets) toward its core capital calculations if it also counts the regulatory capital vouched safe by the Lewis Federal and Tri-Cities contracts. That is simply a breach in new creative guise.

The Government has presented argument from Messrs. Bankhead and Hargett suggesting that a hypothetical regulator would not permit Sterling to include the qualifying supervisory goodwill from the Central Evergreen transaction in its core capital calculations. (*See* Defendant's Findings at pp. 55 through 58). The Court should reject this argument for two reasons.

First, whether the Central Evergreen contract and/or FIRREA permit Sterling to include the true Central Evergreen supervisory goodwill in its core capital calculations are matters of contract and statutory interpretation. These are matters of law exclusively within the Court's domain, as to which the post-hoc speculation of the Government's experts are not really opinion so much as legal argument. *See* Fed. R. Evid. 701, cmt. ("If . . . attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is

called for . . ."). In the real world, the OTS **never** recognized **any** supervisory goodwill, (*see* Hargett, Tr. 3453, line 4 through 3454, line 18; Bankhead, Tr. 3356, line 17 through 3359, line 13), so there is no **factual** basis on which to know how OTS might have calculated capital had it decided not to breach its contracts (or to breach them in a different way). The FDIC, another federal agency with regulatory authority, did decide to honor Sterling's contracts. Its conclusion, contrary to the speculations of the Government's witnesses, was that Sterling was fully compliant with capital requirements. (P-88 (". . . including these off-balance sheet items. The institution meets its applicable minimum capital levels . . .")). Further, the calculation suggested by Mr. Bankhead is not only argumentative and speculative, it actually constitutes another breach by the Government. *E.g., Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 70 (2006).

The second reason to reject the Government's argument is more subtle. Throughout this case, the Court has been presented evidence and argument regarding what happened in the "but-for" world and what happened in the actual world. The "but-for" world is a world where the Government honored its contracts with Sterling; it is a world where FIRREA does not breach contracts. The actual world is self-explanatory. However, the Government's argument occurs in an alternate but-for world – a world where FIRREA exists, and where the Lewis Federal and Tri-Cities agreements can still be breached by applying the mechanics of FIRREA to render the regulatory capital unusable and valueless.. The Government argues that in this alternate but-for world the Government would not permit Sterling to include the supervisory goodwill from Central Evergreen toward its core capital calculations – even to the limited extent that Sterling was in fact permitted by FIRREA in the real world to use it as Qualifying Supervisory Goodwill. The Government's argument must fail because this alternate but-for world scenario would result in the frustration of the Tri-Cities contract (which was intended to facilitate the Central Evergreen merger) and a breach of the Lewis Federal,

Tri-Cities **and** Central Evergreen contracts[1]. In addition, the Government's alternate but-for world scenario would revoke the goodwill which the real-world Sterling is entitled to use as capital, under law and by agreement.

Furthermore, even using the accounting criteria forwarded by Messrs. Bankhead and Hargett, the but-for Sterling would be entitled to include the Central Evergreen supervisory goodwill toward its core and risk-based capital requirements under FIRREA. Both Mr. Bankhead and Mr. Hargett recognize that the regulatory capital from the Lewis Federal and Tri-Cities acquisitions may be counted towards all of FIRREA's capital standards, whereas qualifying supervisory goodwill from Central Evergreen cannot be used to satisfy the tangible capital requirement. (Hargett, Tr. 3364, lines 2-8; Bankhead, Tr. 3463, lines 10-16). Since FIRREA contains quantitative and temporal limitations on the use of supervisory goodwill as capital and it is stipulated that the regulatory capital created in the Lewis Federal and Tri-Cities contracts is subject to no such limitations, it is obvious that the two are different, and while FIRREA limits the use of Central Evergreen goodwill, it cannot (without breaching) put limits on the use of the regulatory capital from the previous two contracts. As was demonstrated in Sterling's opening post-trial brief, in the but-for world [and conceded by the Government and its experts (Plaintiff's Findings Nos. 284-293)], Sterling could have used the entirety of the Lewis Federal and Tri-Cities supervisory goodwill toward its tangible capital requirement, thereby leaving its core and risk-based capital requirement (or bucket) open to allow for the inclusion of the Central Evergreen supervisory goodwill. (Plaintiff's Findings at pp. 90-91).

---

[1] It is important to reiterate that *Sterling V* did not hold that there was no contract, or that the contract was abrogated in full by FIRREA. The holding was that the risk of regulatory change was assumed by Sterling. The regulatory change that occurred was a mere limitation on the amount of supervisory goodwill that could be included, not a wholesale prohibition on including supervisory goodwill.

Because the Lewis Federal and Tri-Cities contracts entitle Sterling to count capital without limitation (tangible or otherwise) toward its regulatory requirement, and because FIRREA permits Sterling to include the Central Evergreen qualifying supervisory goodwill as core and/or risk based capital[2], any regulatory action in contravention of Sterling's right to treat its contractual goodwill as such would constitute a different sort of breach. *See Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 70 (2006).

***3. In Evaluating The But-For Sterling's Post FIRREA Capital Compliance, The Court Should Include The $10.5 Million, Which But For The Breach Would Have Been Realized By The Failed 1989 Stock Offering.***

As part of the Central Evergreen transaction Sterling was contractually required to raise capital. (Plaintiff's Findings No. 87). That having been a specific and express part of the Central Evergreen contract, the Government cannot credibly maintain either that it was not foreseen, or that the breach caused no harm to Sterling. In order to raise the required capital, Sterling had planned a stock offering in 1989. (Plaintiff's Findings Nos. 98 & 99). After FIRREA, Sterling's regulators took the position that despite the Government's breach, Sterling was still contractually obliged to raise the required capital. (Plaintiff's Findings Nos. 87, 98 & 99).

Certain facts regarding this stock offering were accepted into evidence without contradiction or dispute. One, the offering would have been successful – indeed, it was oversubscribed. (Plaintiff's Findings No. 103). Two, because of FIRREA and the Government's breach, at the time of the offering the Government did not consider Sterling to meet regulatory capital requirements. (Plaintiff's Findings No. 102). Three, the Government recognized that it was in both the Government's and Sterling's best interest for the offering to succeed and a key regulatory official

2 Subject, of course to FIRREA's temporal phase out requirements.

recommended that the OTS use its discretion to approve it. (Plaintiff's Findings No. 105). Four, the Government knew that the offering would fail without the Government's non-objection to Sterling paying future dividends on certain conditions. (Plaintiff's Findings No. 104). Five, the Government refused to issue a non-objection statement, for the sole reason that Sterling would not, **after** the offering, be capital compliant – a conclusion the Government could not have reached but-for the breach. (Plaintiff's Findings Nos. 109 & 110). Six, as a result, the offering failed and Sterling suffered monetary losses. (Plaintiff's Findings No. 110). Sterling would have been fully compliant with FIRREA's capital requirements had the Government honored its contracts with Sterling and if the 1989 offering was completed.

The Government overstates Sterling's request for a non-objection. Sterling sought a very modest statement from the Government; all Sterling asked was that the Government –

> . . . indicate that the Office of Thrift Supervision – Twelfth District would not object to Sterling's payment of dividend on the Preferred Stock in the future assuming that Sterling continued its operations in a safe and sound manner and that funds for the payment of such dividends were legally available, notwithstanding noncompliance with the capital requirements under FIRREA.
>
> (Plaintiff's Findings No. 102)

In practical effect (though not in so many words), Sterling asked the Government to honor the forbearances which were part of its contracts with Sterling. The Government refused, despite its knowledge that its refusal "would be death to [the] new offering." (Plaintiff's Findings Nos. 104, 109, 110 & 112). It is immaterial whether the Government' refusal was policy-driven or not. Either way, it was a breach of contract: the Government insisted Sterling's contract bound it to raise capital. To interfere with that effort was absurd and a breach of the Government's contract duty of good faith.

The Government argues: "[t]his Court . . . has previously ruled that Sterling did not obtain a contractual right to pay dividends . . . when it entered into an agreement in connection with its acquisition of Central Evergreen." (Defendant's Findings at pg. 114). However, that is not what the Court held; the Court actually ruled that the Central Evergreen contract did not impose a duty on the Government to permit Sterling to pay dividends. *Sterling I*, 53 Fed. Cl. at 614-5. And, as Sterling observed at the time, that ruling did not alter the fact that cancellation of the offering was, if itself not a direct breach, a foreseeable consequence of the Government's prior breach. Sterling's Reply Regarding Motion to Clarify, filed 10/31/2002, at pg. 3 (". . . [T]he Court should clarify that its ruling does not foreclose Sterling from proving, in the damages phase of the case, that but for the Government's breach, the November 1989 capital issue would have proceeded."). The Government also argues that Sterling sought some form of pre-approval and that "long-standing" OTS policy prohibited pre-approval. (Defendant's Findings at pp. 115-116). First, of course, the stock offering at issue was in 1989 – the very year OTS was formed – and OTS could not have had a "long-standing" policy on anything at the time. Second, and far more importantly, Sterling did not seek pre-approval of anything; all Sterling sought was a statement by the Government indicating that it would, in effect, comply with the contracts it sought and entered.

It is a long-standing and firmly established principle of contract law that "[t]here is 'an implied provision of every contract, whether it be one between individuals or between an individual and the [g]overnment, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.' " *Praecomm, Inc. v. U.S.*, 78 Fed. Cl. 5, 13 (2007) (*quoting George A. Fuller Co. v. United States*, 108 Ct. Cl. 70, 69 F. Supp. 409, 411 (1947)), *see also Restatement (Second) of Contracts* § 205, at 99 (1981). The Government breached its contract with Sterling, despite the fact that it had no affirmative obligation to permit Sterling to

declare dividends, by improperly preventing Sterling from raising the very capital it was saying Sterling was contractually bound to raise. The Government has taken the position that Sterling was obliged to raise capital; the Government knew that the 1989 offering was intended to satisfy that contractual obligation; and the Government knew that its refusal to issue a non-objection was the death knell to that offering[3]. As such, the Government breached the implied provision prohibiting it from interfering with Sterling's performance.

Additionally, and independent of whether the Government breached any contractual implied provision, the failure of the 1989 stock offering was a foreseeable consequence of the breaches, which were established as a matter of law by *Sterling I* and *Sterling V*. Breach of contract damages are foreseeable where "they follow from the breach of contract in the ordinary course of events." *LaSalle Talman Bank v. United States*, 64 Fed. Cl. 90, 98 (2005) (internal quotations omitted) (*quoting Home Sav. of. America v. United States*, 57 Fed. Cl. 694, 726 (2003). As demonstrated above, the Government's refusal to honor its contracts with Sterling resulted in the failure of the 1989 offering. The Government cannot be heard to argue that this was unforeseeable where the only evidence before the Court shows that: (1) the offering was an express part of the Central Evergreen contract, performance of which the Government demanded, (2) the offering would have been

---

[3] The Defendant argues that one reason for cancelling the offering was a recommendation by the FDIC that certain assets be classified. Defendant's Proposed Finding 34. That is not true. Mr. Gilkey testified that he objected forcefully to the FDIC's recommendation, and that the FDIC withdrew the recommendation, acceding to Mr. Gilkey's assertion that it lacked jurisdiction to require that the disputed assets be downgraded. (Gilkey, Tr. 641, line 11 through 642, line 12). The 1989 offering was withdrawn due to the OTS's unwillingness to provide its non-objection to the payment of dividends. (Byrne, Tr. 1445, lines 15-23). In fact, an OTS Memorandum drafted by William Durbin, OTS's District Director, dated March 30, 1990, states, in relevant part: "Due to the inability to pay dividends, Sterling decided not to go ahead with the offering." (P-268, Bates WON942 1320). Mr. Durbin had earlier told Sterling that its request was denied because Sterling would not be in capital compliance upon completion of the offering. (P-254).

successful, indeed, oversubscribed; (3) the Government recognized that the stock offering was in all parties' best interest; (4) the Government knew that its refusal to issue a non-objection would kill the offering; and (5) had the Government had honored its contracts and not prevented the 1989 offering, Sterling would have been fully compliant with FIRREA's capital ratio requirements.

The Government candidly accepted, at the time, that its own action (or inaction) caused the offering to fail. In a March 1990 memorandum, the OTS described the events as follows:

> In keeping with the agreement executed in conjunction with the Central Evergreen acquisition, management planned to issue additional preferred stock in late 1989. The projected offering, however, would not have brought the institution into capital compliance. **Because of this**, prior approval would not be issued for the payment of dividends on the "to be issued" preferred stock. Investment advisors for the institution indicated that non-dividend bearing stock would not be received well in the market place, and advised management accordingly. **Due to** the inability to pay dividends, Sterling decided not to go ahead with the offering.
>
> (P-268, Bates WOT942 1320) (Emphasis added).

Had the Government honored Sterling's contractual and statutory rights to include supervisory goodwill as capital, the 1989 stock offering would have rendered Sterling fully capital compliant.

Additionally, as Carol Friend's demonstration (DX-1080) graphically illustrated on cross examination, had Sterling been allowed to go forward with the planned 1989 capital raising, it would have had positive tangible capital by December 31, 1989. (DX-1080; Friend, Tr. 2399, line 7 through 2402, line 1). DX-1080 is meant to demonstrate Sterling's capital deficiency even after adding in the FSLIC assistance and qualifying supervisory goodwill from the Lewis Federal and Tri-Cities acquisitions. Ms. Friend's demonstrative shows a deficit of $8.3 million. However, if the 1989 offering had taken place, and Sterling was allowed to raise the contemplated $10.5 million, it is beyond dispute that the institution would have been in compliance with its tangible capital requirement. (Adding $10.5 million to DX-1080's "bottom line" of negative $8.3 million creates a

positive $2.3 million.)

The Government asks the Court to evaluate this case on the false presumption that Sterling would have fallen short of FIRREA's capital ratio requirements even if the Government honored its contracts. However, based upon the proper legal standards and the facts presented, the Court should evaluate this case from the only premises supported by the evidence: (1) the Government breached its contracts with Sterling; and (2) but for those breaches, Sterling would have been fully capital compliant based upon: (a) the supervisory goodwill stemming from Lewis Federal and Tri-Cities; (b) the qualifying supervisory goodwill from the Central Evergreen transaction, pursuant to and in accord with FIRREA; and (c) the capital that would have been obtained via the 1989 stock offering, which failed as a direct and foreseeable result of the Government's breaches.

### B. THE GOVERNMENT'S ARGUMENTS REGARDING EXCESS CAPITAL AT STERLING'S HOLDING COMPANY LEVEL ARE WRONG.

The Government has located, among over fifteen years of Sterling's records, a handful of records that show that at a few moments in Sterling's history it had not met the aggressive targets it set for itself. Relying on this handful of snap shots, and completely ignoring the larger picture of Sterling's explosive growth, the Government argues that Sterling could not, at any point over the past 17 years, have found and profited from more assets than it actually had. It also notes that Sterling maintained a capital cushion, and concludes that this proves that Sterling did not have profitable opportunities available to it. However, neither fact nor law supports the Government's position. This Court has previously rejected that exact same argument asserted by the exact same litigant, and held that "a thrift is 'entitled to manage its capital conservatively, maintaining a cushion . . . adequate to protect against the vagaries of the market." *Commercial Federal Bank v. United States*, 59 Fed. Cl. 338, 347 (2004) (*quoting Home Sav.*, 57 Fed. Cl. at 721). The Government's

argument is also contrary to the evidence in this case. The Government argues that the profits Sterling actually earned after 1992 must be credited to the damages it caused as "mitigation." This is correct only if Sterling fails to prove that it could have earned both its actual profits and the profits lost because of the breach. Sterling did prove exactly that: all of Sterling's senior executives testified, all without doubt, that Sterling would have carried more profitable assets, and made greater profits but for the breach. (Harlow, Tr. 824, lines 4-11; 825, lines 12-23; Page, Tr. 1145, line 12 through 1147, line 1; Barnett, Tr. 1191, lines 17-23; Stanley, Tr. 1282, lines 4-13; Zuppe, Tr. 3094, lines 3-9; Gilkey, Tr. 395, lines 8-15; 405, lines 2-14). But the Government argues that Sterling had "excess" or unused capital, which the Government insists constitutes proof that Sterling would not, or could not, have carried more profitable assets than it actually did. The Government is wrong.

***1. Sterling's Actual History And Performance Belie The Government's Position.***

The Government has cherry-picked a few select points in Sterling's history in a vain attempt to argue that Sterling Financial held capital in reserve which went unused, and that this proves there were no business opportunities from which Sterling might generate profits. However, the record before the Court establishes (a) that Sterling was **constantly** growing and **continuously** in need of capital, and (2) that anytime Sterling (or SFC) had accumulated capital on hand it was holding it for a specific project or promptly used it for other growth initiatives – always accumulating and then profitably deploying capital. The Government has specifically pointed to 1994, 1997, and SFC's Key Bank line of credit in order to defeat Sterling's lost profit model; each of those arguments is addressed in turn below.

The undisputed evidence was that Sterling was constantly seeking additional capital. Mr. Welch, Sterling's investment banker, testified that Sterling's primary strategy has been to grow and that it needed capital to do so. (Welch, Tr. 1642, line 12 through 1643, line 6). Mr. Gilkey testified

that from the beginning, Sterling sought to add capital via acquisitions and to pursue an aggressive growth strategy. (Plaintiff's Findings Nos. 3-6). The Government asserts that SFC held excess capital which it failed to downstream in the 1994. (Defendant's Findings 74). That is simply untrue. In the year ending on June 30, 1994 SFC had a preferred stock offering which increased shareholder's equity from $48.272 million to $76.539 million. (P-88, Bates 0802786; Byrne, Tr. 4327, lines 2-19). All of the capital which was raised by this preferred stock offering was invested in Sterling Savings Bank. (P-88, Bates 0802786; Byrne, Tr. 4328, lines 2-18). Sterling used that capital to acquire (1) three branches from Far West Bank; (2) five branches from Great American Bank; and (3) American Liberty Savings Bank. (P-505; P-503). Sterling also adjusted its balance sheet by decreasing loans and increasing its mortgage-backed securities during the fiscal year ending on June 30, 1994. (P-88, Bates 0802753) As Mr. Byrne explained, these were the same assets, but converting them to mortgage-backed securities was a low-cost way of raising Sterling's risk-based capital ratio. Finally, SFC only maintained $1.8 million in cash in fiscal year 1994; this was a significant decrease from the $4.1 held at the end of fiscal year 1993. Sterling also grew from $1.039 billion in 1993, to $1.541 billion in 1995. (P-86, Bates 0063151; P-89, Bates 0048640). Despite the Government's position, the facts show that neither Sterling nor SFC maintained excess capital; Sterling used the capital it had to support its actual growth. Sterling could have used the contract capital to be bigger to begin with, or for greater asset value.

The Government also points to SFC's having capital on hand at the close of 1997. However, once that snapshot is placed in context, it becomes clear that this capital reserve provides no support for the Government's position. At year end 1997, SFC had approximately $21.3 million in reserve. (P-95, Bates 702953; Byrne, Tr. 4315, line 18 through 4316, line 6). However, as Mr. Byrne explained, during 1997 this money was being held in reserve in anticipation of Sterling's purchase

of a number of Key Bank branches, which was completed in June 1998. (Byrne, Tr. 4316, lines 7-20; 4320, lines 18-21). Once Sterling's acquisition of these branches was complete, SFC's capital was drawn down to "bare minimum levels." (Byrne, Tr. 4320, line 22 through 4321, line 6). Not only did Sterling use the entirety of the $21.3 million in reserve to purchase the Key Bank branches, Sterling also had to borrow an additional $25 million to complete the acquisition. (P-95, Bates 702953). Again, the facts do not support the Government's position that Sterling held excess capital and lacked profitable opportunities.

These facts betray the basic flaw in the Government's position: in the real world, it takes time to accumulate capital and negotiate the acquisition of profitable opportunities. Only in the theoretical world of the Government's imagination is there an instantaneous matching of capital and opportunity. In that world, one might argue that a short-term capital reserve proves the absence of profitable opportunity; but that is not the real world, the world established by the evidence in this case.

In addition to regulatory and contractual requirements that SFC maintain some capital reserve, a brief historical analysis of Sterling's plans, capital assets, and borrowings, establishes that Sterling always maintained a capital cushion, and would have done so absent any breach. In 1998, Sterling intended to pursue an aggressive growth strategy; had approximately $2.3 billion in total assets; and had approximately $97.24 million in "other borrowings," which are the type of borrowings the Government asserts should have been used more liberally. (P-95, Bates 702862, 702916 &702938). The next year, Sterling again intended to pursue an aggressive growth strategy; had increased assets to $2.55 billion; and had increased those borrowings to $110 million. (P-96, Bates 703144, 703198 & 703220). In 2000, Sterling again pursued an aggressive growth strategy; again increased assets to $2.66 billion; and had borrowings of $110 million. (P-97, Bates 706358, 706411 & 706434).

The Government claims that SFC did not use a $15 million combined line of credit with Key Bank in 2000. (Byrne, Tr. 4330-4336). It claims, therefore, that this proves Sterling could not have been larger. However, taking the Government's snapshot and placing it in context, it is clear that Sterling grew aggressively in 2000 and 2001. In 2000 assets went from $2.55 billion to $2.66 billion, then in 2001, Sterling increased its total assets to $3.039 billion. (P-98, Bates 900005-6; 900061). In 2001, SFC increased borrowings by $17.5 million, to $127.5 million. (*Id*. at 900088). The Government relies on a sleight of hand made possible by deliberately ignoring the realities about the timing of investment and growth in the in the real world. The undisputed evidence is that Sterling grew in size every year.

The Government's argument should be rejected because Sterling has demonstrated a pattern of pursuing and using as much capital as it could to fund its operation and has increased its borrowings when necessary to do so; Sterling continues this pattern up to today. Additionally, as demonstrated below, Sterling has used capital and borrowings to grow its business both organically and via acquisition. In light of Sterling's long and uninterrupted history of growth and profitability the Court should reject the Government's argument as flatly incredible in view of the growth Sterling actually achieved. Indeed, the Government has not answered the question that it must answer before its position can be credited: if Sterling had no opportunities, how did it grow the way it did?

A brief examination of Sterling's acquisitions, new branch openings and capital events establishes that Sterling had a practice and pattern of raising capital, putting it to profitable use, raising more capital and again putting it to profitable use. Based upon this pattern, Sterling may superficially appear to have excess capital at a handful of moments in time. However, the facts when viewed as a whole show that Sterling consistently used this capital to fund internal growth or acquisitions. For example, in 1993 Sterling raised approximately $12.9 million via an issuance of

subordinated notes. (P-86, Bates 0063142). That same year Sterling used that capital to purchase six branch sites from Key Bank. (P-503; P-505; Gilkey, Tr. 434, line 16 through 435, line 1). In 1994 Sterling raised approximately $21.2 million in convertible preferred stock and $4 million by acquiring American Liberty. (Gilkey, Tr. 414, lines 5-12; 481, lines 9-13).

That same year Sterling used that capital to acquire the following: (1) three branches from Far West Bank; (2) five branches from Great American Bank; and (3) American Liberty Savings Bank. (P-503; P-505; Gilkey, Tr. 414, lines 5-9; 435, lines 16-18; P-88, Bates 0802753). These acquisitions brought significant accounts and cash to the bank. Also in 1994 Sterling opened a new branch in Spokane Valley. (P-504; P-88, Bates 0802753). In 1995 Sterling raised $5 million from SFC's previous financing, and used the funds for internal growth. (P-505; Gilkey, Tr. 414, lines 13-20). In 1996 Sterling borrowed $8 million from Key Bank, again to fund internal growth. (P-505; Byrne, Tr. 1763, line 16 through 1764, line 6). In 1997 Sterling began the process of purchasing the Key Bank branches discussed above, however in the same year Sterling raised $3 million for internal growth and issued $12 million in trust preferred securities. (P-505; P-488; Gilkey, Tr. 416, line 13 through 417, line 3; Welch, Tr. 1621, line 17 through 1622, line 5). In 1998 Sterling acquired Big Sky Bancorp, this brought $7.7 million in capital; however, that same year Sterling opened a new branch in Coeur d'Alene, Idaho. (P504; P-505; Gilkey, Tr. 417, line 16 through 418, line 17; 428, line 14 through 429, line 2). In 1999, Sterling received $6.5 million in capital from floating rate notes, and in 2001 raised approximately $38 million, through combined capital events. (P-505; Gilkey, Tr. 418, line 18 through 420, line 2). In 2001 Sterling also acquired Source Capital Corp. for $9.1 million (P-98, Bates 0900064 & 0900107) and opened a new Corporate Banking Center in Portland, Oregon, which also required an outlay of capital. (P-503; P-504; P-98, Bates 0900037). Furthermore, in 2002 Sterling opened a new Corporate Banking Center in Seattle, Washington, and

a Business Banking Center in Portland, Oregon. (P-504; Gilkey, Tr. 428, line 14 through 429, line 11). Sterling's practice of raising capital and shortly thereafter putting it to use for organic and acquisition growth illustrates four important points: (1) Sterling has always been in a growth mode; (2) Sterling was capable of putting capital to profitable use; (3) Sterling in fact put capital to profitable uses; and (4) the Government's arguments from selected moments in time provides no support for its position that Sterling could not have profitably employed the capital lost due to the breach.

The evidence before the Court is that Sterling consistently intended to grow and that it consistently grew in deposits, assets and capital. Without consistently pursuing capital, Sterling could not have grown to become a more than $10-billion-dollar institution. Sterling's constant increases to its capital to support its steady growth defeat the Government's argument that Sterling held excess capital and lacked profitable opportunities. The undisputed evidence before the Court also establishes that Sterling was consistently in need of additional capital. Though it is true that Sterling had access to the markets, as it told its investors, and raised lots of capital, it was **never** able, at any moment in time, to get as much as its management believed it could use. (Welch, Tr. 1509, lines 8-15, 25; 1590, line 3; 1592, lines 7-11). Accretion to capital and assets are gradual, in the real world. Sterling has proven that it would have added all the capital and assets it actually did add **even if** the Government hadn't forced it to shrink as part of its breach. There is no evidence to suggest that Sterling could have added capital any faster than it actually did, but chose not to because it didn't think it would be profitable to do so. (Welch, Tr. 1589, lines 8-15; 1589, line 25 through 1590, line 30). Absent such evidence, the Government is not entitled to claim Sterling's actual profits as a credit to the lost profits caused by its breach.

***2. To The Extent That Sterling Financial Corporation Held Any Capital That It Did Not***

***Downstream, It Was Obliged To Do So.***

Through its history, SFC was obliged to maintain increasing levels of capital and liquidity. SFC was regulatorily required to maintain capital. SFC had contractual commitments with its commercial lenders, which required it to maintain capital. Finally, SFC was in practical terms required by its rating company to maintain capital.

SFC was required to maintain increasing capital to satisfy OTS examinations. (Byrne, Tr. 4322, lines 8-24). Specifically, SFC was required to show its regulators that it had sufficient capital to meet is operating expenses and to pay interest on its debt, in order to maintain its status as a source of strength for Sterling. (*Id.*). This obligation and SFC's need to remain a source of strength for the bank required it to maintain a certain level of liquidity at the holding company level and belies the Government's argument that SFC's capital position should prevent an award of lost profits.

Sterling showed that SFC issued subordinated notes the proceeds of which were downstreamed to Sterling Savings Bank. But these notes, and the regulatory environment in which they exist, forbade SFC to downstream **all** the proceeds. Sterling showed that the notes were attended by (1) restrictions on incurring additional indebtedness; (2) covenants which restricted SFC's operations; and (3) requirements that SFC maintain certain liquidity. (James, Tr. 2887, line 20 through 2888, line 6). Mr. Byrne testified that SFC's lenders required Sterling to agree to covenants as a condition of borrowing funds, and that these covenants limited Sterling's ability to incur additional debt. (*See* Byrne, Tr. 4325, line 11 through 4326, line 6).

Mr. Byrne also explained that the holding company, SFC, was required to maintain increasing levels of capital to satisfy its rating company's requirements. (Byrne, Tr. 4323, line 11 through 4324, line 19). SFC was rated by a service which provides information to the general market regarding the company's strength. (*Id.*). In order to maintain an investment grade rating, SFC was

required to maintain a certain level of liquidity; without an investment grade rating SFC would have been less able to raise capital at all, and it would have ceased to be able to provide an inexpensive source of capital to Sterling Savings Bank. Finally, the Court heard testimony that Sterling was always in need of additional capital to continue its growth. (Byrne, Tr. 1786, lines 23-25). In fact, David Welch testified that there never came a time when Sterling indicated it did not have growth plans and need for additional capital. (Welch, Tr. 1595, lines 7-11). It is simply untrue that SFC's business operations, specifically its maintenance of liquidity and observance of limits on its borrowing capacity illustrate that Sterling could not profitably have employed the capital taken from it by the breach.

Finally, it is not Sterling's burden to prove that there were not isolated moments when its loan volume was not as targeted, or where its capital was momentarily higher than optimal. In the theoretical world of "efficient markets" assumed by the Government and its experts, capital "flows like water" immediately to opportunities. (*See* Bajaj, Tr. 4003, lines 16-19). But the evidence before the Court is that this is not how the real world works. Capital formation and asset growth, external and internal, are gradual accretive processes. Mr. Gilkey explained that profitably deploying capital via commercial mortgages or construction loans can take 2 to 3 years from the time of agreement to completion. (Gilkey, Tr. 931, line 22 through 392, line 15). Mr. Page illustrated for the Court that building a loan portfolio requires more than simply hiring a gross of loan officers[4]. (Page, Tr. 1100, line 9 through 1101, line 6). Mr. Page explained that new employees must be educated in the bank's lending culture and capital must be allocated to support their loan portfolios. (Page, Tr. 1101, lines 7-25). Mr. Byrne testified that it takes time to grow

4 As discussed below, the Government's breach impaired Sterling's ability to hire and retain loan officers.

internally because it takes time to hire loan officers, to train the loan officers to where they can generate portfolios of loans; Mr. Byrne testified that it may take a year and a half for a loan officer to develop a quality loan portfolio. Mr. Byrne also testified that approximately half of Sterling's growth occurred internally. (Byrne, Tr. 1317, line 20 through 1315, line 13). Mr. Page also addressed the ultimate issue well; he was asked if there has ever been a time where Sterling was not in pursuit of additional capital to leverage, and he responded: "[o]nly maybe brief, brief periods. But we are always, always after capital." (Page, Tr. 1103, lines 2-6).

Mr. Welch worked as Sterling's investment banker from 1991 to 2002. (Welch, Tr. 1568, lines 11-14; 1598, lines 8-10). Mr. Welch testified that there is not "an unlimited willingness among investors to provide capital to anyone who wants it . . ." (Welch, Tr. 1570, line 23 through 1571, line 1). Before capital can be raised via issuance of public securities, an investment banker must conduct due diligence, which involves hours of meeting with the issuer's top executives and full day meetings with the issuer's Chief Financial Officer and Chief Executive Officer in order for the banker to understand the issuer's business model. The due diligence process also involves the banker conducting research or investigation into the issuer's accounting and regulatory relationships. this process of due diligence can take four to six months. (Welch, Tr. 1570, lines 13-17; 1571, line 2 through 1573, line 3). Based upon his analysis and study of Sterling, Mr. Welch testified that had the Government permitted Sterling to use the regulatory capital lost due the breach in November of 1991, Sterling would have employed that capital. Specifically, Mr. Welch testified that "Sterling was a growing institution. And it was going to employ capital." (Welch, Tr. 1589, lines 8-15; 1589, line 25 through 1590, line 3). At no time did Sterling tell Mr. Welch that it was done growing and did not need additional capital for the foreseeable future. (Welch, Tr. 1592, lines 7-11).

Not only does growth take time, the capital markets will not respond to rapid growth. Mr.

Welch explained that he was not always in a position to get the capital Sterling wanted. Mr. Welch testified that there is not "an unlimited willingness among investors to provide capital to anyone who wants it . . . " (Welch, Tr. 1570, line 23 through 1571, line 1). Before capital can be raised via securities an investment banker must conduct due diligence; this process can take four to six months. (Welch, Tr. 1570, lines 13-17; 1571, line 2 through 1573, line 3). On occasion Sterling would want to pursue acquisitions or opportunities which were too large for it to absorb. On these occasions Mr. Welch served as a "governor" on Sterling's desire to continually raise capital. (Welch, Tr. 1595, line 12 through 1597, line 22). Mr. Welch's role as a governor involved matching the risks and returns of a particular venture or line of business. On some occasions, Mr. Welch would approve of Sterling's plans, however on others, he would recommend Sterling adopt a more moderate approach. He would recommend more digestible ventures. Sterling "always kind of want[ed] to do more, bigger, faster. And [Mr. Welch] would be a little bit of, let's do what makes sense. Let's do the right size. Let's do this a little more cautiously." (Welch, Tr. 1642, line 12 through 1643, line 6). Mr. Welch testified that increasing loans and investments or expanding branch networks cannot be done on an immediate timetable. (Welch, Tr. 1645, lines 1-5).

Additionally, Mr. Welch testified that a holding company will retain some funds because it is easier to transfer funds from a holding company to a subsidiary than it is to do the reverse. Mr. Welch testified that it is common for a holding company to downstream enough capital to permit the subsidiary to remain well capitalized or to meet some agreement with its regulators, but to withhold any additional capital and keep available for holding company uses. (Welch, Tr. 1645, line 6 through 1646, line 15). Mr. James testified that whether SFC had capital at the holding company level is wholly unrelated to whether Sterling could have profitably employed the lost supervisory goodwill. (Welch, Tr. 1646, line 17 through 1647, line 4). From the time that Mr. Welch began

working with Sterling until he left the RBC Capital, there was never an occasion where Sterling could not have had and would not have employed the lost supervisory goodwill. (Welch, Tr. 1598, lines 8-19). Importantly, Sterling has remained profitable as it grew larger. (Welch, Tr. 1648, lines 13-15).

Dr. Horvitz testified that Sterling raised all the capital it was able to in 1991. Dr. Horvitz points out that Sterling was the first capital deficient thrift to successfully go to the capital market, when it did so in 1991. Each time Sterling went to the market it raised as much capital as it could get, "But [Sterling] was always short of capital or needing capital. [Sterling] never caught up to what they would have had absent the breach." Further, "despite all of the capital that – that Sterling did raise during this period, [it was] still subject virtually every year, virtually every examination, to criticism of [its] capital position by the regulators." (Horvitz, Tr. 2550, line 6 through 2553, line 19). Likewise, the Government's expert, Dr. Bajaj recognized and agreed that acquisitions may require an institution to "take a breather from [its] organic growth to digest" the acquisition. (Bajaj, Tr. 4278, lines11-16). Dr. Bajaj also recognized that responsible management requires growth by acquisition to be done incrementally. (Bajaj, Tr. 4278, lines 20-24). Furthermore, Dr. Bajaj agreed with Mr. Page's testimony that responsible organic growth should be done incrementally. (Bajaj, Tr. 4278, line 25 through 4279, line 5). Finally, Dr. Bajaj recognized, despite his prior position that capital flows like water, that "[c]apital market doesn't throw capital at [banks] . . . Of course people do their due diligence." (Bajaj, Tr. 4281, lines 13-15). In sum, Dr. Bajaj recognized that contrary to the Government's position both organic and acquisition growth require time and must be done incrementally. This testimony by Dr. Bajaj condemns the Government's arguments that Sterling could have added $15 million to its capital at its whim, and that Sterling's momentary capital mismatch proves that no opportunities were available. The opportunities were

there, and Sterling seized them as rapidly as it could, but Sterling never caught up to where it would have been had the Government not breached its contracts, placed regulatory restrictions on Sterling, and damaged its reputation in the market place.

### *3. The Government's Argument That Sterling Should Have Operated Below The "Well-Capitalized" Standard Should Be Rejected.*

The Government asserts that Sterling's operation as a "well-capitalized" institution, rather than flirting with regulatory insolvency, should bar recovery. (*See* Defendant's Findings at pp. 88-90). The Court should reject that argument.

Sterling has always pursued an aggressive growth strategy. (Plaintiff's Findings Nos. 3-8). As a result of strategy, Sterling has traditionally been highly-leveraged; this in turn has caused its regulators to assert that Sterling needed more capital. (Plaintiff's Findings Nos. 9-10). From 1989 to 2001, Sterling's regulators steadfastly took the position that Sterling needed additional capital – even at times when it exceeded the FDIC's "well capitalized" standard. (*See* DX-244; P-262; DX-255; DX-258; DX-263; DX-267; DX-269; DX-278; DX-280; DX-282). Additionally, in order for Sterling to continue in its aggressive growth it required regulatory approval on its mergers and acquisitions; if Sterling operated below the FDIC's "well-capitalized" standard, such approval would not have been forthcoming. (Byrne, Tr. 1348, line 3 through 1349, line 4; Horvitz, Tr. 2549, line 23 through 2550, line 5). The Court should reject the Government's litigation position, which contradicts the position actually taken by the Government's regulators in the real world: the latter insisted that Sterling needed to operate with more, not less, capital.

It should also be pointed out that in the years immediately following FIRREA, Sterling was being regulated as a troubled thrift (Plaintiff's Findings Nos. 306-09). However, the Government recognized that Sterling's "lack of capital compliance is due to the implementation of FIRREA

versus unsafe and unsound operating practices." (P-268, Bates WOT942 1322). In other words, the Government cannot have it both ways. The same Government that regulated Sterling under the guise of safety and soundness concerns, while internally recognizing that Sterling's capital compliance difficulties did not result from unsafe or unsound operations, should not be permitted to now argue that Sterling could have operated with less capital still.

## III. STERLING'S DAMAGES MODELS

The major difference between *Sterling v. United States* and the bulk of the *Winstar* cases is that Sterling has been profitable its entire existence and has grown during its entire existence except when under constraint by its regulators. Sterling is unique among thrifts in that its primary market area is the Pacific Northwest, whose economy did not endure the hardships felt in other areas of the country. Sterling is also unique in that it has been run from the start by experienced, excellent commercial bankers. Sterling's growth and profitability both before and after FIRREA show that it is entitled to an award of lost profits under the "volume seller" doctrine. Sterling presented two distinct damages models. Sterling maintains it is entitled to lost profits. In the event the Court were to reject Sterling's lost profits model as a matter of law, Sterling also provided the Court an alternative analysis seeking damages based upon the costs of replacement capital.

### A. STERLING IS ENTITLED TO LOST PROFITS AS A LOST VOLUME SELLER.

The Government attempts to use Sterling's profitability as the basis to avoid compensating Sterling for the damage caused by the Government's breach. The Government's position is that it should be awarded a credit for Sterling's profits in any damage calculation. However, as pointed out in Sterling's opening brief, regulatory supervisory goodwill is fully additive to actual capital. It cannot thus have been "replaced" by real capital unless and until Sterling is no longer able profit from it, in addition to actual capital. As long as Sterling continues to grow and remain profitable,

it can use and profit from the capital revoked in breach of contract, and is entitled to lost profits. Sterling has never reached a point where it has no need for the capital which the Government took from it. Until Sterling reaches a point where it has no need for additional capital, it will always be one capital raising or stock offering behind where it would have been had the Government honored its obligations. In turn, Sterling's profits will always be incrementally lower than they would have been had the Government performed.

Sterling's opening brief discusses the standards and doctrines applicable to Sterling as a lost volume seller. The Government's opening brief does not address this issue in any meaningful depth. However, certain aspects of the lost volume seller doctrine should be emphasized. This Court has described a lost volume seller as "one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 490 (2006). This Court has also recognized that "**no remedy other than an award of lost profits on the breached sale is adequate to make the lost volume seller whole.**" *Precision Pine*, 72 Fed. Cl. at 490 (Emphasis added). The test to determine whether a party can recover as a lost volume seller has both a subjective and objective component. *Lone Star Ford, Inc. v. McCormick,* 838 S.W.2d 734, 740 (Ct. App. Texas 1992). The subjective component "requires the injured party to demonstrate that he possessed the intent to take on additional contracts." *Id.* The objective component "requires the injured party to establish that he had the capacity to enter into new contracts. *Id.* The determination of whether a party is a lost volume seller is a question of fact. *Gianetti v. Norwalk Hospital*, 833 A.2d 891, 901 (Conn. 2003) (*citing* RESTATEMENT (SECOND), § 347, comment (f), p. 117). In the *Winstar* context, this Court has impliedly recognized the lost volume seller doctrine, holding that lost profits are a proper measure of damages where the plaintiff forwent a growth strategy, but remained profitable

due to pursuing other lines of business, which could have been pursued in conjunction with a growth strategy. *Commercial Federal*, 59 Fed. Cl. at 350.

Being an issue of fact, the Court must examine the lost volume seller doctrine's applicability to Sterling based upon the evidence presented at trial. The Court heard testimony that on the date of the trial, Sterling possessed the capacity to utilize the lost capital. Specifically, the Court heard that if Sterling had additional capital today, it would grow internally by (1) putting a corporate banking team in Bellevue, Washington; (2) putting another corporate banking team in Seattle, Washington; (3) putting another corporate banking team in northern California; and (4) putting multiple business banking teams in northern California. (Page, Tr. 1103, line 17 through 1105, line 1). And, of course, Sterling proved that it steadily grows by acquisition. The Court heard evidence that Sterling was consistently capable of profitably leveraging the capital it had available to it. (Gilkey, Tr. 156, lines 5-12; 283, line 7 through 284, line 1; Page, Tr. 1103, lines 2-6). A prime example of this fact is that, by the time this case went to trial, the actual bank (over $10 billion in assets) surpassed the but-for bank in asset size ($8.9 billion in assets) by approximately $2.6 billion. (*Compare* Plaintiff's Findings No. 13 with DX-1046, Ex. 6, Table 1). Since the evidence admitted at trial showed that Sterling would have generated additional profits with the lost capital, the proper remedy for the Government's breach is an award of lost profits**.**

### B. DR. HORVITZ'S MODEL ESTABLISHES DAMAGES WHICH ARE FORESEEABLE, CAUSED BY THE BREACH, AND PROVEN WITH A DEGREE OF REASONABLE CERTAINTY WELL OVER THE MODEST THRESHOLD REQUIRED.

The remedy in a breach of contract case is " . . . designed to make the non-breaching party whole. One way to achieve that end is to give the nonbreaching party . . . the benefits the nonbreaching party expected to receive in the absence of a breach." *First Federal Savings and Loan Association of Rochester v. United States*, 76 Fed. Cl. 99, 112 (2007) (*quoting Cal. Fed. Bank v.*

*United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005)), *see also Bluebonnet Sav.*, 266 F.3d at 1355. This measure of damages is known as "expectancy." *Id.*, at 1355. Expectancy damages are "normally equated with lost profits." *California Federal Bank v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001); *American Federal Bank, F.S.B. v. United States*, 68 Fed. Cl. 346, 355 (2005).

Expectancy damages, including lost profits, are recoverable where they were: (1) caused by the breach of contract; (2) reasonably foreseeable or actually foreseen; and (3) proven with reasonable certainty. *Bluebonnet Sav.*, 266 F.3d at 1355; *First Federal*, 76 Fed. Cl. at 113. The Government demands proof of lost profits to a high degree of scientific exactitude. But that is not the standard. "The ascertainment of damages is not an exact science, and where responsibility is clear, it is not essential that the amount [of damages] be ascertainable with exactness or mathematical precision." *Id.*., at 1355. Evidence is sufficient to warrant an award of lost profits where ". . . **the evidence adduced is sufficient to enable a court or a jury to make a fair and reasonable approximation**." *Id.* (emphasis added) (*citing Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969)), *see also First Federal*, 76 Fed. Cl. at 123 ("if a reasonable probability of damages can be clearly established, uncertainty as to the amount will not preclude recovery.") (*quoting Cal. Fed.*, 395 F.3d at 1267; *Glendale Fed. Bank. F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004)). Even where, unlike here, there are gaps in the proof because of the destructiveness of the breach, this Court held that "[a] defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 432-33 (2007) (*quoting Locke v. United States*, 151 Ct. Cl. 262, 267 (1960)).

***1. That Sterling Would Be Forced To Forego Assets And Profits In The Event Of A Breach Was Foreseeable.***

Justice Souter wrote for the plurality in *Winstar* that "[f]rom the acquiring thrift's perspective . . . the treatment of supervisory goodwill as regulatory capital was attractive because it . . . allowed the thrift to leverage more loans (and, it hoped, make more profits)." *Winstar Corp. v. United States*, 518 U.S. 839, 850-51, 116 S. Ct. 839 (1996). The breach of these contracts had the unavoidable effect of making such profits impossible to attain. The breach was deliberate. The *Winstar* Court also noted that FIRREA "not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate. *Winstar Corp.*, 518 U.S. at 850-51. Finally, this Court held:

> [I]t is part of the definition of a savings and loan institution to make a business of leveraging capital to create a portfolio of profitable assets. [The Government] could easily foresee that one consequence of its breach could be a decline in plaintiff's asset base, which is used for no other purpose than the generation of profits.
>
> *Commercial Federal*, 59 Fed. Cl. at 354-55.

The reason for these contracts' existence was for the acquiring thrifts to generate profit, and Congress was cognizant of that fact. The Government cannot be heard to argue nearly twenty years later that a thrift's loss of profits was an unforeseeable consequence of its deliberate breach.

The Government overstates the standard of foreseeability to be applied by the Court. The Government cites *Landmark Land Company, Inc. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001), in support of its position that Sterling is obliged to clear a relatively high hurdle in proving that damages were foreseeable. (*See* Defendant's Findings at pg. 42). However, *Landmark* arises under and applies a reliance theory of recovery. *See generally*, *Landmark*, 256 F.3d 1365. This matter is before the Court under an expectancy theory and should be adjudged as such. This Court articulated the relevant inquiry for questions of foreseeability in lost profit claims:

> So long as the government had reason to know that [the bank] intended to leverage its supervisory goodwill and capital credit, it had reason to know that if [the bank's] supervisory goodwill and capital credit were taken away that [the bank] would lose potential profits from leveraging that capital.
>
> *Citizens Financial Service, F.S.B. v. United States*, 64 Fed. Cl. 498, 504 (2005).

Put plainly, "[f]oreseeability requires only reason to foresee, not actual foresight." *First Federal*, 76 Fed. Cl. at 122 (emphasis and quotations omitted).

The Court should find that Sterling's lost profits were foreseeable. First, the generation of profits is the entire reason that Sterling entered into the contracts at issue. Second, as the Government is apt to point out, on a tangible net worth basis Sterling was insolvent at the time FIRREA was enacted. (*See* Defendant's Findings at pg. 73). In fact, as of August 1989 Sterling's tangible capital was a negative 2.6%. (P-246A, Bates WON889 0007). Despite this fact, Sterling's 1988 business plan, projected Sterling would have approximately $840.0 million in assets and approximately $6.7 million in net profits as of the fourth quarter of fiscal year 1991. (P-196, Bates 0142210, 1042211). In light of the fact that Sterling had no tangible assets, which could be profitably leveraged, every dime of that projected asset growth and profit was derived, of necessity, from the contractual goodwill obtained via its contracts with the Government. On this record, the Court should find that Sterling's loss of profits was a foreseeable result of the Government's breach.

The Government argues that it was not foreseeable that Sterling would obtain a Temporary Restraining Order against the Government's wrongful conduct, but nonetheless comply with the Government's dictates. (*See* Defendant's Findings at pp. 51-52). However, this argument ignores the history of the Government's pre and post injunction regulation of Sterling. The fact of the matter is that the injunction did nothing more than prevent the Government from closing Sterling down. (*See* Plaintiff's Findings No. 142). Immediately after the temporary injunction was entered the

Government required Sterling to submit reports of its conduct. (Plaintiff's Findings No. 133). The Government paid lip service to the injunction, then changed the justification of its regulatory stance to "safety and soundness" and threatened Sterling with "safety and soundness" regulation. (Plaintiff's Findings No. 134). This change of stance may have absolved the Government from any assertion that it was in contempt, but it was still in breach of contract. The Government internally recognized that its "safety and soundness concerns" were wholly driven by Sterling's lack of capital compliance. (Plaintiff's Findings Nos. 136 & 137). While the injunction was in place the Government refused to permit Sterling to grow. (Plaintiff's Findings No. 141). Finally, despite internal recognition that Sterling suffered from no safety or soundness concerns except as related to low capital, the Government assigned Sterling the lowest possible examination rating, despite the injunction. (Plaintiff's Findings No. 143). On this record, the Court should not find that Sterling's compliance with the Government's restrictions rendered lost profits unforeseeable, especially where the Government clearly continued to limit Sterling's growth and business activities, and did not formally lift those restrictions until April, 1992. (P-299B).

***2. Sterling's Foregone Assets And Lost Profits Were Caused By The Breaches.***

The Federal Circuit has applied both the "but for" and "substantial factor" test in evaluating questions of causation in breach of contract cases. *First Federal*, 76 Fed. Cl. at 113. The Federal Circuit has placed the selection of the proper standard within the trial court's discretion, taking account of the facts of the particular case. *Id.*, at 113 (*citing Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007)). Furthermore, under either standard "[the plaintiff] need not establish that the breach . . . was 'the sole factor or sole cause' of its lost profits." *First Federal* at 113 (*quoting Cal. Fed.*, 395 F.3d at 1268).

The Government's arguments regarding causation closely mirror their arguments regarding

foreseeability; specifically the Government asserts that its breach caused no loss because (1) of the injunction; (2) Sterling would have failed FIRREA's capital requirements in the but-for world; and (3) Sterling assuredly lacked profitable opportunities. Sterling has shown that while the injunction mitigated against the massive losses that closure of Sterling would have entailed, it did not prevent the Government from curtailing Sterling's growth and profitability and that Sterling would have met FIRREA had its contracts not been breached.[5] It has also shown that Sterling has never lacked for opportunity; it has consistently lacked capital to seize opportunities.

Regardless of whether Sterling would comply with FIRREA's capital standards, the forbearance provisions would have prohibited the Government to impose operating restrictions on Sterling, as it did. The cancellation of the 1989 offering, and the crippling restrictions on business operations and growth that were imposed on Sterling from 1990 to April 1992 independently breached the forbearance provisions in the contracts. The Government's defense as to the forbearance provisions is invalid: the Government argues simply that the contracts don't mean what they say.

The Government argues that the Lewis Federal and Tri-Cities forbearance letters are "provided in the alternative" and that the provisions regarding Sterling's acquisition of the two entities prior net worth deficiencies should be rendered inoperative. However, such a reading is contrary to established contract law and contrary to the facts presented to the Court.

Governmental forbearance agreements were important to Sterling's acquisition of the failing thrifts at issue in this matter. (Plaintiff's Findings No. 237). Those forbearance agreements are contracts, and it has already been held that the Government "breached its contractual obligation with

---

5 See pp. ____ above.

respect to the Lewis and Tri-Cities transactions to forbear for exercising its regulatory authority against Plaintiff for failing to meet its regulatory ratio requirements . . ." *Sterling I*, 53 Fed. Cl. 599, 615 (2002). The Government now asks the Court to hold that the forbearance provisions are mere surplusage.[6]

The Court should apply the forbearance provisions as written, rather than rendering portions thereof irrelevant. "Contract interpretation begins-and sometimes ends-with the plain meaning of the written agreement." *SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662, 665-66 (Fed. Cl. 2007) (*quoting Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir 1993)). The contract must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all its parts. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir.1996). It is a well-established principle in the Federal Circuit that:

> An interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.
>
> *Northrop Grumman Information Technology, Inc. v. United States*, 78 Fed. Cl. 45, 49 (2007) (*quoting Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972, 979 (1965)), *see also United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir.1983) (a court interpreting a contract must give reasonable meaning to all parts of the contract and should not render portions of it meaningless).

Dr. Horvitz explained how under the forbearance agreements Sterling would remain capital compliant after FIRREA, even if the Government's position regarding Central Evergreen's

---

[6] It ill becomes the United States to make such an argument in any case, but least of all here, where the government succeeded in the Central Evergreen contract matter in convincing the Court that boilerplate language at the end of the contract must be applied to trump the bargained-for provision that Sterling not only comply with the "lesser of" any new regulations or the Business Plan.

supervisory goodwill was correct. Dr. Horvitz's explanation begins with Mr. Bankhead's opinion as to what the but-for bank's core capital would have been on December 31, 1989, which was $15.869 million. (DX-1049, pg. 8). Relative to the regulatory requirements that would have applied to Lewis Federal as of December 31, 1989, Lewis Federal would have had a net worth deficiency of $1.627 million. (Plaintiff's Findings No. 280; P-549; P-8, Bates 000080). Pursuant to Sterling's agreement with the Government, Sterling took on Lewis Federal's negative net worth, which *a fortiori* included the $1.627 million regulatory net worth deficiency. Similarly, as of December 31, 1989 Tri-Cities would have had a regulatory net worth deficiency of $9.254 million. (Plaintiff's Findings No. 280; P-549; P-27, Bates WOR488 0072). Sterling also assumed Tri-Cities' negative net worth and regulatory net worth deficiency. In recognition of these undisputed facts, Dr. Horvitz applied the forbearance contracts as written and subtracted the combined $10.881 million in regulatory net worth from Sterling's December 31, 1989 core capital (as adjusted pursuant to Mr. Bankhead's opinions). (Plaintiff's Findings No. 280; P-549). This exercise by Dr. Horvitz was nothing more than applying the forbearance agreements as written to the numbers at issue. This analysis illustrated that had the Government complied with the forbearance agreements, which it wrote, Sterling would have remained capital compliant after FIRREA. (Plaintiff's Findings No. 280; P-549).

In its 2007 briefing, the Government argues that the forbearance agreements cannot be read as they are written; instead, the Government argues, the agreements must be read such that the forbearances are provided only in the alternative. (Defendant's Findings at pp. 61-65). As shown above that is factually incorrect. Additionally, the Government's argument that the forbearance agreements are "provided in the alternative, and their applicability is dependant upon the method of accounting utilized in structuring the acquisitions" can only be sustained by ignoring a portion

of the parties' contract. (Hargett, Tr. 3444, line 14 through 3446, line 15). The contract says **nothing** about an intention that any of its terms be deemed superfluous or alternative or anything of the sort. The Government has provided no parole evidence suggesting that any party to the negotiations believed the contract was only enforceable in part.

In a 1997 pleading, after unsuccessfully arguing that "Sterling was not granted a contractual right to count the goodwill as regulatory capital" the Government addressed the forbearance agreements and wrote[7]:

> The only specific agreement made by the Government with respect to waiver of regulatory capital requirements . . . was set forth in another provision of the . . . Forbearance Letter. The Bank Board granted certain regulatory forbearances with respect to net worth requirements affected by the acquisition of . . . liabilities and assets for a period of five years . . . This interpretation of the . . . Forbearance letter is confirmed by Sterling's President, William Zuppe, in an affidavit attached to Sterling's motion. He states:
>
>> . . . [I]f the regulators were required to adhere to their written contractual commitments, Sterling would be entitled to . . . forbearance from capital regulatory standards until <u>April 8, 1993</u> [five years] if Sterling's failure to comply therewith was caused by an increase in liability from the acquisition . . .
>
> In light of this provision, it made sense for Sterling to enter into this transaction even in the absence of any guarantee that it could count supervisory goodwill toward regulatory capital requirements.
>
> (Defendant's Motion to Dismiss Plaintiff Sterling Financial Corporation; Cross Motion for Summary Judgment; and Opposition to Plaintiffs' Motion for Partial Summary Judgment, at pp. 48-9 (internal citation omitted)).

The Government's shifting, self-contradicting positions do little credit to a nation whose respect for the sanctity of contracts is enshrined in its very Constitution. U.S. Const. Art. I., Sec. 10.

---

7 In this section of its argument the Government was addressing the Tri-Cities Forbearance Letter, however the language of the Lewis Federal Forbearance Letter is functionally the same.

**a. The Government's Breach Caused Sterling To Forgo Existing And Future Profitable Assets.**

The Government argues that its breach did not cause Sterling to forgo profitable opportunities because: (1) Sterling did not show specifically which acquisitions would have been completed but for the breach; (2) Dr. Horvitz's model does not account for the payment of cash premiums; (3) Sterling would not be permitted to participate in RTC acquisitions due to its capital non-compliance; and (4) SFC's failure to downstream capital proves Sterling lacked profitable opportunities.[8]

The Court should reject the Government's argument regarding the RTC acquisitions because Sterling would be wholly capital compliant but for the breach (see above pp. ____) and would therefore be a viable candidate for such acquisitions. The Court should reject the Government's argument regarding SFC's asserted failure to downstream capital, neither Sterling nor SFC held "excess" capital; all capital that was held in reserve was either done for specific growth goals or due to some obligation to hold it. (See above pp. ___).

The Government is critical of Sterling's lost profits model because it does not specifically identifying the "forgone assets." This is urged as both a basis for finding that Sterling's damages were not caused by the breach and as a basis for finding that Sterling's damages have been proven with sufficient certainty. While the argument is unpersuasive, it is more applicable to the issue of reasonable certainty and we therefore address it in our response to that argument (see below, pp. ____).

---

[8] The Government also argues that Sterling's lost profits were unforeseeable as a result of Dr. Horvitz not attempting to determine the but-for bank's risk-based capital ratio. This argument ignores Dr. Horvitz's testimony. Dr. Horvitz's model specifically focuses on core capital. Dr. Horvitz explained that with adequate core capital, an institution can arrange its balance sheet to satisfy either the FDIC adequately-capitalized standard or the well-capitalized standard. (Horvitz, Tr. 2768, line 22 through 2770, line 1). Additionally, DX-522, Bates WON934 1998, establishes that the actual bank did occasionally operate at less than the well-capitalized standard.

The evidence presented at trial establishes that Sterling both lost existing assets and had to forego future assets. Evidence was presented without contradiction that Sterling consistently pursued a growth strategy before the breach. (Plaintiff's Findings No. 3). Sterling's strategy has been to grow both via acquisitions and via organic growth. (Plaintiff's Findings No. 4). When Sterling opened for business in 1983 it was worth approximately $2.1 million. (Plaintiff's Findings No. 1). By 2007, Sterling had grown to well over $10 billion dollars and has branches in nine western states. (Plaintiff's Findings No. 14). However, from January 1990 to November 1991 Sterling was wholly unable to grow as a result of the Government's regulation of it as a troubled thrift. (Plaintiff's Findings No. 114). Sterling had no choice but to **reverse** its business strategy: to shrink its asset base in order to increase its capital ratios. (Plaintiff's Findings No. 116). Between 1989 and 1991 Sterling reduced its assets from approximately $730 million to approximately $590 million. (Plaintiff's Findings No. 117; Gilkey, Tr. 2781, line 8 through 279, line 2). Sterling had no plans to shrink its assets during this period (Plaintiff's Findings No. 118; Page, Tr. 1144, lines 7-9). In the process of shrinking its assets, Sterling was forced to sell some of its best performing assets. (Plaintiff's Finding No. 256).

The Court should find, on the undisputed evidence, that Sterling would not have shrunk and shed some of its best assets (and customers) except for the breach. *See Commercial Federal*, 59 Fed. Cl. at 349.

Additionally, the evidence before the Court establishes that Sterling was unable to acquire additional assets as a result of the Government's breach. Even after Sterling obtained an injunction prohibiting the Government from regulating it in a manner inconsistent with the contracts, the Government refused to permit Sterling to grow. (Plaintiff's Findings No. 141). This limitation was a direct result of the Government's view of Sterling as a troubled thrift, which was in turn a direct

result of the Government's breach-induced refusal to credit Sterling with its supervisory goodwill. (*See* P-268). The Government said that its imposition of restraints was justified on safety and soundness grounds independent of any problems Sterling had arising from the Government's breach, (Plaintiff's Findings No 142), but the Government candidly recorded in its internal documents that Sterling's "lack of capital compliance is due to the implementation of FIRREA versus unsafe and unsound operating practices." (Plaintiff's Findings No. 137; P-268).

Finally, Sterling proved that as a result of the breach, Sterling lost staff, customers and accounts. (Plaintiff's Findings No. 164). The Court heard that business clients look to both the stability and reputation of an institution in placing their accounts, and that the Government's hostile treatment of Sterling sowed uncertainty which was devastating to Sterling. (Plaintiff's Findings Nos. 163, 164 & 165). Sterling lost loan officers as a result of the breach; in some instances these loan officers took their accounts with them. (Plaintiff's Findings No. 168). In one instance Sterling literally had to walk a client across the street to a competitor's bank because Sterling could not accept uninsured deposits, pursuant to the Government's regulation of Sterling as a troubled thrift. (Plaintiff's Findings No. 169). Sterling lost customers due to Government regulations prohibiting it from issuing letters of credit. (Plaintiff's Findings Nos. 178, 179). Intervest, the Sterling subsidiary whose commercial lending activity was essential to Sterling's business strategy, was forced to completely stop lending as a result of the Government's abuse of Sterling as a troubled thrift. During the period 1990 to 1992, Intervest's profits fell from $600,000 per annum to $0, and it ceased to be a pipeline of profitable commercial loans to Sterling. (Plaintiff's Findings Nos. 182 & 183; Harlow, Tr. 777, line 19 through 780, line 22; 822, line 5 through 826, line 5). Action Mortgage, another Sterling subsidiary, lost between thirty five (35) to forty (40) loan officers as a result of the breach. (Plaintiff's Findings No. 201). In sum, but for the breach and the resulting

forced shrinkage, Sterling would have been approaching $1 billion in size as of September 1990. On this record the Court should find that the Government's breach caused Sterling to forgo assets and profits. All these facts also add to the reasonable certainty of Dr. Horvitz's opinion. The key question before the Court is thus: how much damage did Sterling suffer as a result of the breach.

The Government cites figures which show that Sterling was more profitable in 1991 than before, and has the temerity to claim (in a simple *post-hoc-ergo-propter-hoc* fallacy unattended by **any** analysis whatever) that its breach benefitted Sterling. Sterling's profitability did increase in 1991, but not because it was forced to become smaller. Sterling proved that its profitability gains in 1991 flowed from (1) its success in converting non-productive assets (non-performing loans and foreclosed real estate) inherited from Tri-Cities and Central Evergreen into income-producing assets (DX-522, Bates WON934 1998)[9] and (2) its success in taking advantage in its residential mortgage business of an extraordinary boom in home sales in its principal market area. (Byrne, Tr. 1665, line 22 through 1667, line 1). Sterling couldn't grow (and lost income from residential mortgages it couldn't add to its asset portfolio) and Action Mortgage, its residential mortgage subsidiary, had fewer loan officers, but Action was nevertheless able to profit as a mortgage broker. That kept Sterling alive in 1990-1991. (Gilkey, Tr. 277, line 3 through 278, line 7; Byrne, Tr. 1665, line 22 through 1666, line 7).

---

[9] An OTS memo dated July 17, 1991, states:

> Significant improvements in Sterling's financial conditional occurred during the period December 1988 through June 1991 including: . . . (2) REO decreased to $4.7 million from $15.8 million, . . .(4) delinquencies greater than 60 days decreased to 2.26% of TA from 4.53% of TA. Operating performance also improved.

***3. Sterling Has Proven With Reasonable Certainty That The Government's Breach Resulted In Approximately $63 Million In Lost Profits.***

The final element of the expectancy damages analysis "call[s] for reasonable certainty with regard to the *fact* of damages rather than the *amount*. . . ." *Castle v. United States*, 48 Fed. Cl. 187, 206 (2000), *aff'd*, 301 F.3d 1328 (Fed. Cir. 2002). "The standard for reasonable certainty of damages in the *Winstar* context requires that the damages model and its estimates be 'grounded in the actual performance of the bank.' " *Standard Federal Bank v. United States*, 62 Fed. Cl. 265, 287 (2004) (*quoting Columbia First Bank v. United States*, 60 Fed. Cl. 97, 125 (2004)). Applying this standard, courts have "imposed a lesser standard of proof in the calculation of damages whose existence has been sufficiently established." *Castle*, 48 Fed. Cl. at 206 (*citing Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S. Ct. 248 (1931)); *First Federal*, 76 Fed. Cl. 99. This Court summarized the lost profits analysis as follows:

> . . . the claim for lost profits is, at bottom, a prediction about the success the bank could have expected to achieve had it been permitted to proceed with performance under its contract. In order for such a claim to satisfy the reasonable certainty standard, the proof relied upon must be rooted in fact. The court, in other words, must be able to look either to the actual performance of the bank or to the experiences of the industry of which it is a part, to ensure that the profits being claimed are consistent with the projected extension of the bank's economic activity. A claims whose back structural components lack such factual foundation is simply speculation.
>
> *Castle*, 48 Fed. Cl. at 206.

The Federal Circuit has held that in evaluating damages in this matter:

> If a reasonable probability of damages can be clearly established uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of the damages.
>
> * * *
>
> We have . . . allowed the so called "jury verdicts," if there was clear proof of injury and there was no more reliable method for computing damages . . . In

> estimating damages, the Court of Claims occupies that position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment on the evidence provided by the parties.

*Bluebonnet Sav.*, 266 F.3d at 1356-7 (internal quotations omitted).

The factual evidence and expert testimony presented by Sterling clearly establishes "a reasonable probability of damages" that the Court should make a fair and reasonable approximation of damages based upon the testimony of Dr. Horvitz, which makes such an approximation.

**a. Sterling Established Forgone Assets With Reasonable Certainty.**

The Government criticizes Dr. Horvitz's model because it "does not identify the assets that Sterling would have acquired absent the breach or the liabilities that would have funded those claimed incremental costs." (Defendant's Findings at pg. 76). The Government also argues that the model "does not take into account the 'hedging' that would be necessary in order to bring interest rate risk exposure within bounds in the 'but-for' world." (Defendant's Findings at pg. 77).

Taking the second argument first, interest rate risk involves matching maturities of loans and deposits or other borrowings. Dr. Horvitz assumed only that Sterling would continued to match these as it grew, as it has in fact done, to meet regulatory requirements.

The Government's primary argument is that Dr. Horvitz's model should be rejected because he does not specifically enumerate the precise forgone assets on an individual basis. But the law does not require such specificity. Further the evidence presented to this Court establishes with more than sufficient certainty, the nature and categories of the forgone assets which is based upon the same asset mix of the actual bank. The Government cites various cases where plaintiffs were unable to prove lost profits, however these cases do not provide rules amenable to general application. Instead these cases are simply examples of plaintiffs failing their burden. *Fifth Third Bank of*

*Western Ohio v. United States*, 55 Fed. Cl. 223 (2003), holds that lost profits have not been proven with reasonable certainty where the bank: (1) predicts damages based upon past performance; (2) did not identify any business opportunities that the bank would have pursued; (3) did not identify any markets that it would have exploited; (4) and did not identify any particular type of investment to which it would have allocated assets but for the breach. *Fifth Third*, 55 Fed. Cl. at 240-2. However, the plaintiff in the *Fifth Third* case was not criticized for failing to name names. *See Fifth Third* , 55 Fed. Cl. at 240-2; *Southern National Corporation v. United States*, 57 Fed. Cl. 294, 304 (2003).

Dr. Horvitz's model does not contain any speculation or forecasting. (Plaintiff's Findings No. 261). The relevant market conditions and interest rates are known facts. This matter was tried in the summer of 2007; Sterling's lost profits model seeks damages from 1990 to 2006. (Plaintiff's Findings No. 261). As the model applies only to past events, in contains no forecasting and no speculation.

The Government offered no factual testimony establishing that Sterling could not have achieved the asset level and profits testified to. In *Lasalle Talman*, 64 Fed. Cl. at 102, the Court noted that the Government offered counter evidence showing that the plaintiff lacked profitable opportunities in the breach period. In this case, the Government offered no factual evidence to establish that Sterling would not have been able to find and exploit profitable business opportunities — as it actually did in the real world.

In contrast to the dearth of evidence presented by the Government, Sterling offered days of factual testimony. This testimony established that Sterling's business plan was growth oriented, that Sterling was forced to shrink, Sterling lost opportunities as a result of the breach, that Sterling lost employees, that Sterling lost customers, and most importantly, that Sterling's reputation in the

marketplace was damaged and that as a consequence Sterling is a smaller bank than it would have been but for the breach. As this Court has written, ". . . the factual predicate of any expert's opinion must find support in the record and that mere theoretical speculations lacking a basis in the record . . ." are insufficient. *Standard Federal*, 62 Fed. Cl. at 288.

First, the historical record cannot be denied: Sterling grew virtually every quarter from its founding until 1990, when the Government ordered it to cease growing. Sterling has grown every quarter since April 1992, when the Government lifted its restrictions.

It has grown organically, leveraging on retained earnings to expand its assets, and it has grown externally by acquisition. On that undeniable record, and given the undisputed evidence concerning the expanding economy in Sterling's market area, Sterling has proven **by its actual conduct** that it would have had greater profits. In other words, as the Court observed in its remarks in denying the Government's mid-trial motion, it is possible to view Sterling's predicament as purely one of timing: there is no doubt that Sterling could grow – because it did – but Sterling suffers lost profits because its growth was retarded beginning with the two years that the Government forced it to shrink and restricted its operations. On this view, Dr. Horvitz's use of Sterling's actual performance ratios is perfectly sound.

Second, it is possible to view Sterling's claim to lost profits as arising from its inability, for lack of capital, to take on assets and acquisitions that it didn't get. Dr. Horvitz's approach is equally sound on this view, given the undisputed evidence that (1) the economy in Sterling's market area is strong (Plaintiff's Findings No. 23); (2) the executives in change of Sterling's loan production were certain they could have generated significant additional business (Harlow, Tr. 824, line 4 through 826, line 5; Page, Tr. 1144, line 22 through 1147, line 1); (3) Sterling has **never** cut price to obtain growth, but instead has emphasized service and a specific market approach as its competitive

advantage (Gilkey, Tr. 802, line 2 through 803, line 16); (4) Sterling has maintained a stable rate of average return on assets as it has grown (P-506) and (5) as discussed below, there were plentiful acquisition targets (and RTC bargains) available to Sterling, if it only had the capital.

Sterling was founded and is operated by managers with commercial banking backgrounds. (Plaintiff's Findings Nos. 19 & 238). Since opening and with the sole exception of the period immediately following FIRREA, Sterling has consistently and successfully applied a growth oriented business plan. (Plaintiff's Findings No. 238). Sterling's business plan involved taking deposits from rural communities and investing them in urban communities. (Plaintiff's Findings No. 5).

Sterling never knows who its individual borrowers will be as it expands, but it knows how to find them. The Court heard, for example, that if Sterling had the capital to grow as of the trial it would (1) put a corporate banking team in Bellevue, Washington; (2) put another corporate banking team in Seattle, Washington; (3) put another corporate banking team in northern California; and (4) put multiple business banking teams in northen California. (Page, Tr. 1103, line 17 through 1105, line 1).

The Court heard evidence that but for the breach, Sterling would have participated in RTC acquisitions. Mr. Gilkey testified that in the early 1990s there were RTC acquisitions that Sterling would have pursued but for the breach. (Gilkey, Tr. 401, lines 1-14). Specifically, Mr. Gilkey indicated that Sterling would have been interested in acquiring Frontier, which was a $100 million institution in Walla Walla, Washington. (Gilkey, Tr. 401, lines 20-25). Mr. Gilkey also testified that Sterling would have sought to acquire two savings and loans (one in Seattle and one in central Oregon) each worth approximately $50 million. (Gilkey, Tr. 402, lines1-6). Mr. Gilkey also testified that but for the breach Sterling would have pursued Ben Franklin and Equitable Savings

& Loan in Portland, Oregon. (Gilkey, Tr. 402, lines 7-13). The RTC was liquidating Ben Franklin at ten cents on the dollar. (Gilkey, Tr. 402, lines 7-13). Finally, the Court heard evidence that but for the breach Sterling would have been in a "much more aggressive position" with respect to its attempt at acquiring Far West Federal, which was a Portland institution worth more than $1 billion. (Gilkey, Tr. 402, line 21 through 403, line 8). The Government's argument that Sterling would not have been a viable candidate for RTC acquisitions stems from a theory that the Government would continue to breach its contracts. Properly applying the contractual goodwill to Sterling's tangible capital requirements, Sterling would have more than sufficient tangible capital to be a viable candidate for RTC acquisitions. The fact is that Sterling was sought out by the Government for acquisitions before FIRREA; in a world where the Government honored its contracts, Sterling would be equally valued for the skill of its managers before and after FIRREA.

Sterling has offered sufficient evidence to show with reasonable certainty that it lost assets as a result of the breach. The evidence presented provides ample support for Dr. Horvitz opinion that the but-for bank's $ 28.786 million in core capital would have supported forgone profitable assets. (Plaintiff's Finding No. 263). Additionally, Dr. Horvitz has two important and conservative constraints built into his model; these constraints operate to limit the amount of forgone assets in any given year, and in turn to reduce Sterling's damages. (Plaintiff's Findings No. 264). The first of these constraints is a capital constraint which sets a capital ratio of 4% for years 1989 through 1991, and a capital ratio of 5.5% after 1991. (Plaintiff's Findings No. 265). The second constraint is a growth constraint and prohibits the but-for bank from growing faster, in any given year, than the actual bank did in the same year. (Plaintiff's Findings No. 266). Unlike the vast majority of *Winstar* plaintiffs, Sterling's model does not forecast profits that would have been attained by a failed bank – instead, Sterling's model is retrospective and establishes the assets the historical Sterling would

have attained if it had the benefit of the capital denied it by the Government's breach. Moreover, Dr. Horvitz's model is cautious and conservative (and therefore more than reasonably certain) in that the actual Sterling is by now larger than the "but-for" Sterling predicted by Dr. Horvitz at the time he issued his report. (*Compare* Plaintiff's Findings No. 13 with DX-1046, Ex. 6, Table 1).

**b. Dr. Horvitz's Use Of 4% As Sterling's Capital Ratio Is Proper And Does Not Impair The Certainty Of His Calculations.**

The Government criticizes Dr. Horvitz's use of a 4% capital ratio because it is lower by 16 points than the ratio projected in Sterling's 1989 business plan which was used in Dr. Horvitz's earlier opinion. Dr. Horvitz explained that in his earlier reports, issued prior to the Court's 2006 ruling on reconsideration, he had assumed the capital ratios and the growth rates imbedded in the Central Evergreen business plan. (Horvitz, Tr. 2774, line 19 through 2776, line 24). Dr. Horvitz explained that it was no longer possible for the but-for Sterling to continue to employ both **these rates** following the 2006 ruling. Without all of the supervisory goodwill assumed in the original business plan, the but-for bank would have to make a choice: it could either grow at the rate projected in the original business plan, or it could carry the 4.16% capital ratio, but it could no longer do both. *Id.* Dr. Horvitz had to decide how the but-for Sterling would choose between aggressive growth and maintenance of a higher capital ratio. *Id.* He concluded Sterling would prefer growth over a conservative capital ratio, and therefore revised his assumed capital ratio from 4.16% to 4.0%. Dr. Horvitz was absolutely correct to do so, as shown by the undisputed facts of Sterling's actual history. In a planning document in 1984, Sterling recorded its intention to aim for a 5% capital ratio, with an important caveat: "that for the company to continue its pattern of rapid growth **it may be required to take Sterling to a leverage ratio of 4.0%.**" (P-208, Bates 0179743) (Emphasis added).

Indeed, as events played out in the real world, following the breach, Sterling shrank but **still** operated at a leverage ratio of less than 4.0%. As the Government noted in a memo discussing Sterling's status and prospects in July 1991, Sterling intended to raise capital sufficient to attain a 4.0% core capital ratio. (DX522, Bates WON934 1998). There is no suggestion that Sterling would have been uncomfortable at the 4.0% level; on the contrary, that was Sterling's target.[10] Thus, Dr. Horvitz , assumptions are founded solely in fact.

Dr. James also testified that he had observed that Sterling preferred growth over a capital cushion. (James, Tr. 3025, line 15 through 3026, line 13; 3069, line 9 through 3070, line 15). Finally, in each year referenced in Dr. Horvitz's model, the "but-for" bank maintains a core capital ratio that is **higher** than that of the actual bank. (Plaintiff's Findings No. 265).

***2. Sterling Established The Profitability Of The Forgone Assets With Reasonable Certainty.***

The Government argues that Dr. Horvitz's model should be rejected because it does not specifically account for the "law" of diminishing returns and market competition. However, Dr. Horvitz model contains constraints which more than compensate for these issues. It is important to stress exactly what Dr. Horvitz model does; it simply adds the forgone assets to Sterling's historical actual assets and applies that historical rate of return to the forgone assets to arrive at the figure for forgone assets during each year. (Plaintiff's Findings No. 269; P-454). In this manner, the but-for bank and the actual bank are constrained each year by the same market forces. The Government

---

[10] The memo does record doubts about whether the underwriters would be able to resolve investor doubts about future regulatory risk. *Id.*, Bates 0179744. Mr. Welch testified that it was necessary to raise more capital (than the amount contemplated in DX-522) to be able to assure the market that the capital influx would completely and certainly resolve doubts about "regulatory risk." But absent the breach, and the doubts it engendered about Sterling in the marketplace, the Government's own records prove that Sterling would have been content to be leveraged at 4.0%

wants to paint Dr. Horvitz's model as an unreliable extrapolation into an unknown future, but that was not the evidence.

The Government asserts that the "law" of diminishing returns would force Sterling's forgone assets to be less profitable and the liabilities funding those assets to be more expensive. (Defendant's Findings at pp. 78-9). However, the evidence presented shows that Sterling's assets and liabilities were not so constrained due to Sterling's business model. Sterling was consistently expanding the scope of its business, both in geography and in operations. (Plaintiff's Findings Nos. 3-7). The "law" of diminishing returns works in economic theory where each opportunity is assumed to be costlier and less profitable than the previous one. But this theoretical "law" cannot be uncritically applied to the real world. A concern can expand without diminishing returns if it can find equally profitable opportunities (for a simple example, the millionth dollar invested in Treasury Bills is just as profitable as the first) and if it can achieve cost savings (economies of scale) as it grows. (Horvitz, Tr. 2637, line 3 through 2638, line 21; 2650, line 3 through 2651, line 8; Bajaj, Tr. 4226, line 19 through 4227, line 2). The evidence of Sterling's actual performance shows it has done both – Sterling has grown from a $2 million dollar institution to a more than $10 billion dollar institution. (Plaintiff's Findings Nos. 1 & 13). Sterling's net interest margin (the primary source of its profits) and its return of average assets have remained stable as it has grown almost exponentially. (P-506; P-507). Sterling achieved its growth not by cutting price or accepting lower asset quality but by growing horizontally into larger geographic market areas. Sterling has grown to have a presence in nine western States. (Plaintiff's Findings Nos. 13 & 14).

Sterling has achieved economies of scale as it has grown. Dr. Horvitz testified that the fact that Sterling had 300 employees in 1989 and has only 3,000 employees today illustrates the impact of economies of scale. (Horvitz, Tr. 2139, line 24 through 2142, line 10). Sterling is fifteen (15)

times larger today, than it was in 1989 but employs only ten (10) times more employees; as Dr. Horvitz testified if Sterling had to employ 1,500 more employees its profits would be reduced due to additional salaries, benefits and other staffing costs. (Horvitz, Tr. 2139, line 24 through 2142, line 10). However, due to economies of scale, Sterling is able to do the same amount of business with much fewer employees, thus increasing profitability. (Horvitz, Tr. 2139, line 24 through 2142, line 10).

As for competition, Dr. Horvitz's model uses Sterling's historical growth, asset level and rate of return on average assets. These were all achieved in a competitive environment. (Page, Tr. 1093, line 25 through 1094, line 16; Neely, Tr. 1013, line 21 through 1014, line 10; Gilkey, Tr. 706, lines 9-21). Dr. Horvitz's opinion thus fully accounts for competition and other market forces that the but-for bank might face, because the actual bank faced those same challenges. Dr. Horvitz testified also that as a small player in a large market with a specific niche Sterling has an easier time acquiring market share than a larger concern might have.

The Government made a similar argument regarding competition in *Commercial Federal*. This Court should conclude, as *Commercial Federal* did, that "[i]t is true that competition and economic conditions can affect the profitability of a business, but that is true not only during the period of breach but also before and after." *Commercial Federal*, 59 Fed. Cl. at 348. Regarding the plaintiff therein, the Court wrote:

> Throughout the entire history of plaintiff's operations it faced changing economic conditions, including deep recession during the early 1980s, and yet it experienced profitable growth placing it as one of the top performing Kansas thrifts. As described by defendant's primary expert, Dr. Mukesh Bajaj, increased competition from commercial banks and loan origination by non-banking institutions surely would have challenged plaintiff's operations with or without FIRREA. Nonetheless, the allegation that these factors, and not FIRREA's elimination of a massive portion of plaintiff's capital, were a substantial cause of plaintiff's shrink strategy was not credible. Defendant

> ignored the actual performance of plaintiff, demonstrating its capacity to weather, even thrive, in the face of pre-breach and post-breach economic and competitive challenges. To the extent that these factors did contribute to plaintiff's business plans, the court concludes that the conservative growth and profitability percentages applied by [plaintiff's expert] compensate for them.
>
> *Id.*, at 348.

Similarly, evidence has been presented that Sterling thrived in a competitive market both before and after FIRREA. Remarkedly, Sterling was profitable even while under attack by the Government; there is no basis in fact for a conclusion that it would have been less profitable without such attack. It would certainly have been, and remained, a larger, more profitable bank. (Gilkey, Tr. 395, lines 8-15; 405, lines 2-14; Page, Tr. 1145, line 12 through 1147, line 1; Harlow, Tr. 824, lines 4-11; 825 lines 12-23). Additionally, the Court has heard evidence and expert opinion that the Northwestern United States' strong and growing regional market, as well as Sterling's modest market share enhanced Sterling's ability to compete and grow. (Plaintiff's Findings Nos. 24-26, 238).

***3. Sterling's Lost Profits Model Is Based In Facts Not present In Other Winstar Cases.***

The Government argues that Dr. Horvitz' testimony in this case is indistinguishable from that he offered in *Citizens Financial*, 64 Fed. Cl. 498 and *Southern California Federal Savings & Loan Association v. United Sates*, 57 Fed. Cl. 598 (2003). However, even though the methodologies employed are very similar, the facts of this case distinguish it from prior *Winstar* cases and render an award of lost profits fully in accord with Federal Circuit precedent and prior cases in the Court of Federal Claims.

The plaintiff's claim in *Citizens Financial*, was predicated upon a claim that it had a goal of maintaining a regulatory capital ratio of 10%, both before and after FIRREA. *Citizens Financial*, 64 Fed. Cl. at 506-7. Based upon the evidence presented, the Court concluded that the plaintiff had

no such goal and therefore suffered no harm as a result of the breach. *Id.*, at 506-7. This was no failure of a damages model, it was a failure by plaintiff to prove an essential premise of the model.

Despite resolving the matter on causation grounds, the Court commented on Dr. Horvitz's model under the reasonable certainty standard. *Id.*, at 511-4. The Court made four comments on Dr. Horvitz's model. First, the Court was critical that Dr. Horvitz's model used the 10% capital ratio discussed above. *Citizens Financial,* 64 Fed. Cl. at 513. Second, the Court took issue with the 20% growth rate assumed in the model; here, again, the plaintiff failed to prove that the assumed growth rate was inconsistent with the actual bank's business models and performance. *Id.* at 513. Third, the Court noted that Dr. Horvitz did not identify any investments the bank would undertake that would yield a 1.1% return on assets. *Id.* Finally, the Court indicated that Dr. Horvitz's model "erroneously assumed that [the plaintiff] could grow to any size and still maintain a guaranteed 1.1% profit." *Id.*

These comments do not have anything to do with Sterling's case or the model presented by Dr. Horvitz. We have proven that the capital ratio used by Dr. Horvitz was consistent with Sterling's history, and actually higher than that used by the actual bank in the period 1990 to 1992. Second, Dr. Horvitz did not apply a static growth rate to Sterling. Instead, he used Sterling's actual post-breach historical growth rates and capital ratios as limiting constraints and calculated forgone assets and profits using Sterling's actual returns on average assets. Three important facts illustrate the significance of this. First, for the period from June 30, 1996 to December 31, 1996 Dr. Horvitz's model actually shows a negative figure for lost profits. (P-454, Table 1). This is because Dr. Horvitz used the actual bank's return on average assets for that period, which was negative .03%. (P-454, Table 1). Second, Dr. Horvitz's model always uses a capital ratio which is greater than that used by the actual bank; this constraint operates to limit the amount of lost profits in any given

period. (Horvitz, Tr. 2518, line 23 through 2519, line 17). Finally, the actual bank in the real world ended up growing faster, larger and more profitably than the but-for hypothetical bank predicted by Dr. Horvitz when he issued his report. (P-568)

*Southern California* also involved a very different factual context. Southern California Savings and Loan Association was facing severe problems due to large operating losses, poor management, poor quality control, underwriting standards, and large contingent liabilities. *Southern California*, 57 Fed. Cl. at 601. The FHLBB placed the institution into receivership, and it was ultimately purchased by a group of private investors. *Id.* The Court disapproved the plaintiff's reliance upon its pre-breach business plan; its inability to account for a significant California recession; and its failure to account for two significant capitalizations undertaken by the plaintiff. *Id.*, at 625-6. Additionally, the Court criticized plaintiff's use of 70 basis points as the rate of return on forgone assets. *Id.*, at 626. While the Court agreed with Dr. Horvitz that it was proper to compare the plaintiff to other California thrifts in arriving at a rate of return, the Court was "unconvinced that Dr. Horvitz's model accurately or credibly represents SoCal's expectation damages." *Id.*

*Sterling v. United States* stands on such different facts that any comparison to *Southern California* is inappropriate. First, Sterling has an unbroken history of profitability and growth in a robust Northwest economy. Second, Sterling has experienced none of the changes in management that were present in *Southern California*. The witnesses the Court observed firsthand are the same managers who founded the bank, were sought out by the Government for their skill as managers, and have succeeded in growing the bank from $2 million to $10 billion in assets. Third, Dr. Horvitz's model in this case does not rely upon static rates of return nor growth rates derived from industry averages. Instead, Dr. Horvitz model is carefully tailored each year to determine the

forgone (or incremental) assets each year, based upon Sterling's own, actual real world performance – which takes account of market and competition conditions. Dr. Horvitz then applies a specific and tailored rate of return to those forgone assets, again based upon Sterling's real world performance. Fourth, the Pacific Northwest market did not experience any recession.

The evidence before the Court establishes that Sterling was consistently profitable for its entire existence, that Sterling was always able to profitably employ capital, and that Sterling has always been ably managed by experienced helmsmen. The fact that Sterling has consistently grown and produced profit permitted Dr. Horvitz's to conduct his calculations without any guess work. The key determination of a thrift's earnings is the interest rates on deposits and loans; by the time Dr. Horvitz conducted his analysis, these figures were historical facts. (*See* Plaintiff's Findings No. 261). Unlike the vast majority of *Winstar* plaintiffs (which were, if not closed, not historically profitable), Sterling has always been profitable; its history is fact not speculation. (Plaintiff's Findings No. 262). As such, Sterling's post-breach (but now historical) profitability permitted Dr. Horvitz to evaluate lost profits retrospectively, and therefore avoid the types of forecasting which prior *Winstar* courts have deemed improper. In *First Federal*, the Court accepted an approach similar to that used by Dr. Horvitz here:

> . . . the yield percentages and costs on which [Plaintiff's expert] based his spread of 87 basis points were historical averages based upon the actual results of [the Plaintiff bank] from 1989 until the end of 1996 . . . the assets that would have been obtained but for the breach were the same types of assets that [the bank] had historically acquired. Therefore, it was reasonable [for Plaintiff's expert] to use [the bank's] actual, historical rates of return and costs to determine the lost spread income.
>
> 76 Fed. Cl. at 120 (citations omitted).

Likewise, in *Commercial Federal*, the Court accepted an approach similar to Dr. Horvitz's; and rejected the Government's arguments about profitability during a shrinkage period in an attempt to

obviate itself of responsibility for the damages wrought by its refusal to honor its word.

> [The Government] argued that asset growth does not necessarily lead to additional profits. In fact, during the period in question that [Plaintiff's] assets were shrinking, its net income was growing substantially . . . Although these facts are compelling, the court is convinced that during the period in question, with additional capital, [Plaintiff] would have profitably leveraged it. The increase in net income during the period of breach was a result of a very successful strategy to increase fee income through such activities as mortgage servicing. This activity could have taken place at the same time the institution increased its asset base and loan origination activities, had capital been available. The court is persuaded that the converse relationship between assets and profit cited by [the Government] is an important consideration, but does not overcome [plaintiff's] record of profitable growth and average asset return . . .
>
> *Commercial Federal*, 59 Fed. Cl. at 350.

Sterling's profitability during its shrinkage was directly attributable to its conversion of non-earning assets from Tri-Cities and Central Evergreen into profitable loans (*see* DX-522), and originating home loans and selling them on the secondary market. (Gilkey, Tr. 219, line 17 through 220, line 10; Byrne, Tr. 1656, line 4 through 1657, line 12; 1666, line 8 through 1667, line 10; Bajaj, Tr. 4226, line 19 through 4227, line 2). There is no basis in fact for the Government's supposition that Sterling could not have done a good measure of additional such profitable business, but for the breach.

***4. Sterling's Occasional Failure To Meet Budgeted Growth Does Not Render Dr. Horvitz's Model Speculative.***

The fact that Sterling has on occasion failed to meet the budget goals it set for itself, has no bearing on the validity of Dr. Horvitz's model. The Court heard evidence that Sterling intentionally set "stretch budgets." (Page, Tr. 1110, line 16 through 1111, line 9). Sterling used these budgets to motivate its producers to work diligently, rather than to meet budgets and then slow down their production. (Page, Tr. 1110, line 16 through 1111, line 9). The Court also heard evidence that

Sterling typically plans on twenty percent (20%) growth from year end to year end, and that Sterling has consistently met those objectives, even though it is true that it might not meet a given budget objective at a given "snapshot" in time. (Page, Tr. 1142, line 25 through 1143, line 9). The fact that Sterling sets aspirational budgets and at one point or another was not at its target has no bearing on the validity of Dr. Horvitz's model. As Mr. Page explained, budgets are established to take the bank from where it is to where it (most optimistically) aims to go by the end of the budget period. (Page, Tr. 1110, line 16 through 1111, line 9).

The Court has recognized the validity of lost profits models which are based upon actual bank performance. In a prior *Winstar* case the Court noted that the flaw with the plaintiff's model "was not that [it] uses but-for projections, but that these but-for projections are not rooted in and frequently conflict with the actual evidence presented to the court." *Columbia First*, 60 Fed. Cl. at 123-4. The same court wrote: "it [is] more probable that [the thrift's] investment philosophy in the but-for world would have been much as it was in the real world." *Id.*, at 120. In this instance the Court has been presented a lost profits model which is tied each year to Sterling's actual investment and spending decisions and uses Sterling's actually yearly asset and liability mix as the basis for calculating the relevant rate of return – this model is firmly rooted in Sterling's actual performance and provides a reliable and concrete factual basis upon which to award lost profits.

Further, as the but-for bank's performance is based in all ways on the actual bank's performance in the same period, any failure of the actual bank to meet a budget would be shared by the but-for bank. The Court should not lose sight of what Dr. Horvitz's model does – it merely adds the incremental forgone assets to the actual bank's performance each year.

## C. IF THE COURT DOES NOT ACCEPT STERLING'S LOST PROFITS MODEL, IT SHOULD AWARD COSTS OF REPLACEMENT DAMAGES.

In the event the Court rejects Sterling's lost profits model as a matter of law, Sterling presented a model for the replacement costs of capital. The Federal Circuit has recognized that "the costs of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context . . ." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003). No *Winstar* plaintiff can truly replace what the Government took from it, as such this Court has permitted damages "based on the difference of what [the plaintiff] paid for supervisory goodwill, namely, zero, and what it cost plaintiffs to generate that new capital." *Home Savings*, 57 Fed. Cl. at 710.

The Government raises three central objections to Sterling's mitigation model. First, the Government incorrectly characterizes Dr. James' model as a hypothetical replacement model. Second, the Government insists that Sterling fully mitigated its damages via the 1991 offering. Finally, the Government maintains that the only cost to capital is the transaction costs incurred in raising such capital.

Dr. James' model is not a hypothetical model; instead it uses a conservative preferred coupon rate as a comparable for more costly (but harder-to-value) common stock. Sterling indeed mitigated potentially billions of dollars in damages. Sterling did not fully mitigate its losses (even assuming it "replaced" capital) until it raised capital in 1993. Finally, both the facts of this case and prior *Winstar* case law establish that capital has costs beyond its transaction costs.

***1. Dr. James' Model Is Not A Hypothetical Model And His Use Of The Preferred Stock's Coupon Rate As A Proxy For The Costs Of Raising Common Stock Is Reasonable And Results In A Reliable And Proper Award Of Replacement Cost Damages.***

Sterling's "replacement" model consists of four (4) elements. (Plaintiff's Findings No. 350). The first element is the lost profits suffered between the breach and when full mitigation occurred; this figure is $4.1 million. (Plaintiff's Findings No. 350). Second, the actual cost of the capital

raised totals $9.1 million. (Plaintiff's Findings No. 350). Third, the transaction costs involved in raising the capital was $3.3 million (of which the part attributable to "replacement" was approximately $900,000). (Plaintiff's Findings Nos. 350, 360, P-672). Finally, Sterling suffered wounded bank damages of $4.3 million (adjusted to take out litigation fees and costs). (Plaintiff's Findings No. 350; DX-1046). Dr. James' figure for lost profits was derived from Dr. Horvitz's model. Likewise, Dr, James' figure for wounded bank damages was derived, as were Dr. Horvitz's, from Mr. Byrne's (further discussed below). The Government does not disagree that the transaction costs attributable to "replacement" are at least $900,000 (the Government's number is low, because the Government fails to allocate *all* of the 1991 transaction costs to damages though it allocates ***all*** of the offering proceeds to "replacement"). Therefore, the issue is over the $9.1 million dollars in the cost of common stock. Likewise, the parties do not dispute that Dr. James' methodology was to use the preferred stock coupon rate on a later Sterling offering as a comparable security value the 1991 common stock.

The Government improperly characterizes Dr. James' model as a hypothetical replacement model, however there is nothing hypothetical about it. The Government cites to cases disapproving the valuation of hypothetical stock offerings as a measure of contract damages. There is nothing hypothetical about the capital raised by Sterling in 1991 and 1993. Sterling actually raised capital in 1991 and again in 1993. Dr. James' model simply uses a preferred stock coupon rate (from the 1993 offering) as a comparable for the cost of the common stock issued in 1991, something well accepted among financial economists. Common stock involves no fixed cash flow, so it is trickier to assign a cost to it. It is admissible and reasonable to use a very similar security (preferred stock) from exactly the same institution to derive the cost of the common stock the bank issued. (James, Tr. 2875, line 24 through 2876, line 22).

Both Sterling's and the Government's experts agreed that common stock definitely has a cost, even though no cash flow is specific to it and that the cost of capital is partially a function of the risk to the investor associated with the instrument. (James, Tr. 2876, lines 7-15; Bajaj, Tr. 4045, lines 12-21). Likewise, there is agreement among the experts that common stock is more risky, therefore more costly than preferred stock. (James, Tr. 2876, lines 7 through 15; Bajaj, Tr. 4045, lines 12-21). Using a preferred stock coupon rate to determine the costs of common stock would result in a conservative damage figure.

It is true that both this Court and the Federal Circuit have looked unfavorably on hypothetical capital replacement models. *See Globe Savings Bank, FSB v. United States*, 59 Fed. Cl. 86, 96 (2003) (collecting cases). However, "[t]he Federal Circuit has endorsed the use of a replacement capital calculation . . ." *Southern National*, 57 Fed. Cl. at 309 (*citing LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003)).

In *LaSalle Talman,* the plaintiff sought replacement capital damages after a capital infusion from a "merger partner." 45 Fed. Cl. at 103. The plaintiff's expert premised his calculations upon the costs that the plaintiff would have incurred in a theoretical stock offering. *Id*. The trial court labeled this approach "purely hypothetical" because there had been no actual stock offering, and refused recovery; the Federal Circuit affirmed, and noted that the model did not "reflect the actual bank's experience." *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed. Cl. 64, 103 (1999); *LaSalle Talman*, 317 F.3d at 1375.

In *Southern National*, the plaintiff sought damages based upon a "forecasted . . . but-for world where [the plaintiff ] issued preferred stock annually . . ." 57 Fed. Cl. at 309. In that case, the plaintiff's expert determined the cost of replacing the goodwill by totaling the costs of these equity issuances, which never actually occurred. *Id.* The Court rejected the plaintiff's model based upon

its being a "hypothetical calculation of damages." *Id.*, *see also Granite Management Corp. v. United States*, 58 Fed. Cl. 766, 777 (2003) (rejecting cost of replacement model based upon a hypothetical stock offering where capital was actually raised via a capital infusion from the plaintiff's parent). In *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl.126, 159 (2003), the Court said: "damages can and should be based on the actual undertakings, rather than on a speculative model based on an event that never took place."

Sterling has not supposed any hypothetical issue of stock. It really did issue stock (and does not believe the capital it raised "replaced" what was lost to the breach). Sterling's expert simply used the characteristics of the securities it actually issued – preferred stock (which does have a fixed cash flow) to help him put a value on the other security Sterling actually issued (common stock, with no fixed cash flow). In *Home Savings*, 57 Fed. Cl. at 715 this Court accepted a plaintiff's use of a comparable to provide a value for an actual capital raising. As Sterling has done, the plaintiff used a different security issued by the same institution as a comparable for the security sought to b valued. *Id.* Dr. James' model does not offer an analysis of the costs of any hypothetical capital raising. Instead, Dr. James' model values two actual stock offerings, using one to derive a value for the other. Dr. James' approach is conservative: all experts recognize that preferred stock is less risky and therefore less costly than common stock.

The Government also asserts that Dr. James' model does not properly account for the difference in value between tangible capital and supervisory goodwill. However. Dr. James' model specifically took account of the fact that supervisory goodwill requires no cash flow but also does not earn income itself. (James, Tr. 2902, line 7 through 2905, line 25; P-657). Furthermore, Dr. James' used the 30-year United States Treasury Bond as the rate of return for the value of tangible capital. (P-465; P-676; P-677). This approach was specifically endorsed by the court in *Home*

*Savings*, 57 Fed. Cl. at 728 (noting "plaintiffs' use of the safe rate is precipitated by a fact over which they have no control – supervisory goodwill cannot be directly replaced.") As such, Dr. James' use of a preferred coupon rate to value an actual common stock offering, while accounting for the difference in value between supervisory goodwill and tangible capital, is a conservative actual costs of replacement model.

***2. Assuming Sterling Replaced All The Capital Lost To FIRREA, It Could Not Have Done So Until After The 1993 Offering Was Completed.***

The Government asserts that Sterling fully replaced its capital after the 1991 stock offering because Sterling became compliant with FIRREA at that time. Like the Government's other arguments, this argument fails both legally and factually. This Court recognized in *Home Savings* that replacement of lost supervisory goodwill can occur over multiple capital events.

FIRREA had three consequences to Sterling's capital: First, Sterling lost the capital promised to it in the Lewis Federal and Tri-Cities contracts. Second, Sterling lost a chunk of the capital promised in the Central Evergreen contract (and the part not taken away had to be sooner replaced, since FIRREA required it to be phased out in less than half the time the contract had provided for amortization). Third, Sterling had to cancel a stock offering that had been planned all along to support its continued growth. Accordingly, any assumption that Sterling "replaced" the lost capital should assume that Sterling "replaced" all three issues. Dr. James allocated Sterling's accrued "replacement" logically to all three losses (it is entirely logical to suppose that the first $10 million would replace the $10 million Sterling had all but raised upon the breach). The Government insists that any capital raising should be accrued to have been dedicated first and exclusively to its breach, with no basis other than its relentless desire to avoid paying for the harm that it caused.

***3. The Government's Notion That Raising Capital Has No Costs Beyond Transaction Costs Has Been Rejected By The Courts.***

The Government argues that Sterling's offering of common stock has no costs other than transaction costs. (Defendant's Findings at pp. 93-94). This argument was addressed in Sterling's opening brief, and the authorities cited therein clearly establish that the Government's position has been rejected by this Court. The Federal Circuit has also addressed and rejected that argument; "capital is not 'costless' to either the investor or the recipient." *LaSalle Talman*, 317 F.3d at 1374. The Federal Circuit has defined the cost of capital as the rate of return on various types of financing, and noted that "a capital investment does not become a 'gift' . . . simply because the return on that investment is expected to be paid out of earnings." *Id.*, at 1375. "All capital raised by a corporation has a cost." *Id.*, at 1374 (*quoting Guaranty National Insurance Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990).

The Government argues "investment in securities has zero net present value." (Plaintiff's Findings No. 93). Dr. Bajaj (and the Government's case) was thoroughly impeached on that point. Dr. Bajaj admitted that all common stock has a cost, whether or not a dividend is to be paid. (Bajaj, Tr. 404, lines 12-21). Dr. Bajaj argued that if a business raises capital it must already have in mind a prospective opportunity whose return is greater than the expected cost of the common stock it will issue, or it wouldn't raise capital in the first place. In these circumstances, since the cost of the capital will be covered by the expected profit, the net cost of capital to the firm can be said to be zero. (Bajaj, Tr. 4266, line 24 through 4268, line 24) Dr. Bajaj agreed that Sterling, if it is assumed to have raised "replacement" capital, was not raising capital to fund prospective investments, but was rather selling costly common stock to support an existing set of assets that had been supported by capital (the Government contracts) whose cost had already been absorbed and which had zero future cost. (Bajaj, Tr. 4265, line 24 through 4280, line 5; *see also Home Savings*, 57 Fed. Cl. at 710 (permitting damages "based on the difference of what [the plaintiff] paid for supervisory goodwill,

namely, zero, and what it cost plaintiffs to generate that new capital" because no *Winstar* plaintiff can truly replace what the Government took from it)).

But never mind, opined Dr. Bajaj, Sterling could fix that problem by selling its existing portfolio of assets and getting new, much higher-return (i.e., riskier) assets to replace them and cover the cost of the capital. (Bajaj, Tr. 4271, line 3 through 4276, line 1). The factual and legal problems with that approach are obvious: legally the Government has shown no authority for the argument that a plaintiff has a duty to radically alter its business model in order to "mitigate" a defendant's damages. Factually, Dr Bajaj had not attempted to define what assets, in what volumes, would need to be replaced with riskier higher-return investments to cover the cost of capital. Why not, one wonders? It is safe to assume the Government would have asked him to do so were it not painfully obvious that a bank cannot buy the risky, high-return assets that Dr. Bajaj was talking about and still call itself a bank. Recall that the thrift collapse was caused largely by bad risks taken by thrifts hungry to offset low-return 30-year mortgages with high-return, risk investments, and that FIRREA remedied this by, among other things, forbidding thrifts to hold junk bonds. 12 U.S.C. § 1831e(d).

The Government made the exact same claim to the exact same Court in *LaSalle Talman Bank, FSB v. United States*, 64 Fed. Cl. 90 (2005). The Court rightfully rejected it, noting:

> Prof. James does not have to account for the earnings on that portion of plaintiff's actual portfolio that was supported by the capital infusion because they equal those that would have flowed from the government's original promise. Those earnings would have accrued to the but-for thrift because supervisory goodwill was capable of sustaining an identical portfolio. Requiring plaintiff to account for those earnings in its model would defeat the purpose of mitigation.
>
> * * *
>
> If defendant's argument is taken to its logical conclusion, plaintiff could never recover in a cost-of-replacement-capital model because all but-for earnings are assumed to be paid out as dividends and all but-for dividends are

treated as a cost.

*LaSalle Talman*, 64 Fed. Cl. at 109-10.

The Court should reject the Government's argument, and permit Sterling damages based upon the costs of raising the 1991 capital and the 1993 capital.

### *4. The Court Should Award A Tax Gross Up Unless The Government Is Willing To State On The Record That Any Award Will Not Be Taxable.*

The Government spends more time arguing regarding a tax gross up than the issue is due. Sterling proposes two solutions either of which are reasonable and would resolve the issue in accord with Federal law. First, if the Government, through its Department of Justice lawyers state on the record their authority to bind their client to the position, and that any award received in this matter is not taxable, Sterling will rely upon that representation and will not seek a tax gross up. Alternatively, Sterling will state on the record, that if the requested gross-up is made Sterling will report any award received as taxable and will pay taxes upon it. Either solution will resolve the Government's concerns.

## D. THE COURT SHOULD AWARD WOUNDED BANK DAMAGES.

Wounded bank damages "compensate for the costs incurred by the thrift because of its status as a 'troubled' or under-capitalized institution. Such costs include higher costs of funds, higher insurance and regulatory premiums and assessments, and extra attorney and consultant fees to interface with the regulators." *Southern California Federal Sav. & Loan Ass'n v. U.S.*, 422 F.3d 1319, 1327 (Fed. Cir. 2005).

Sterling presented evidence of five distinct areas of wounded bank damages. (P-464). However, based upon the evidence presented at trial, Sterling has withdrawn any prayer for litigation-related fees and costs (though these amounts are properly restored to adjusted capital for

purposes of the lost profits model). First, Sterling presented evidence that it incurred approximately $1 million in costs in the failed 1989 stock offering. (P-464; Plaintiff's Findings Nos. 310-311). Second, Sterling proved its additional regulatory costs resulting from the Government's treatment of Sterling as a troubled thrift. (P-464; Plaintiff's Findings Nos. 306-09). Third, Sterling proved its damages stemming from losses on the "CJ-4" loan. (P-464; Plaintiff's Findings Nos. 301-05). Finally, Sterling proved it incurred losses resulting from the increased costs of acquiring branches of Great American Savings and its being unable to participate in RTC acquisitions. (P-464; Plaintiff's Findings Nos. 312-321).

The Government is critical of Sterling's experts for relying upon figures calculated by Sterling's CFO. This criticism is unfounded. Mr. Byrne is Sterling CFO and testified in this matter. As CFO Mr. Byrne bears responsibility for furnishing reports regularly relied on by Sterling in the conduct of its business, and by the investing public. Mr. Byrne holds a business degree from Gonzaga University and has been a licensed CPA for approximately 27 years. (Byrne, Tr. 1312, lines 2-21). As CFO for the bank, Mr. Byrne prepared the figures on which the Plaintiff's experts relied in calculating their damage models. It provides no basis for criticism that Sterling's experts relied upon these figures; all the figures referenced in Sterling's annual statements and 10k reports were prepared by Sterling under Mr. Byrne's direction. The figures prepared by Mr. Byrne are no less reliable.

The facts underlying these wounded bank damages are enumerated in Sterling's opening brief. Those facts provide sufficient factual support for Sterling's experts to provide reasonably certain calculations of Sterling's losses.

## IV. CONCLUSION

The Court should award Sterling lost profits and wounded bank damages in the amount of

$63,057.

Respectfully submitted this 19th day of November, 2007.

**WITHERSPOON, KELLEY, DAVENPORT & TOOLE, P.S.**

By: /s/ William D. Symmes
William D. Symmes, Counsel of Record
And Member Of the Bar of the United States Court of Federal Claims

1100 U.S. Bank Building
422 West Riverside Avenue
Spokane, WA 99201-0300
Telephone No. (509) 624-5265
Facsimile No. (509) 458-2717

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on November 19, 2007, a copy of the foregoing **STERLING'S RESPONSE TO DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT AND LAW** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ William D. Symmes
William D. Symmes
Attorney for Plaintiff